APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZX), CV-04-8776 (RZX)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 2 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Plaintiff-Appellant,Laura  Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 2)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants  Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, 70-1 | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion | 2 | 285 |

| | | for Entry of Judgment Pursuant to Rule 54(b) | | |
|---|---|---|---|---|
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|---|---|---|---|---|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1:  Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2:  Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3:  Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4:  Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A:  Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B:  Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C:  Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E:  Transcript Cover Sheet for  Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F:  Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8:  Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9:  Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10:  September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11:  Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14:  September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | 2006. | | |
|---|---|---|---|---|
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A:  Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B:  October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C:  Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D:  Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | | | |
|---|---|---|---|---|
| | | *Siegel* | | |
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|-------|---------|------------------------------------------------------------------------------------------------------------|---|------|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B:  April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A:  Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G:  January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H:  January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I:  February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J:  Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M:  Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | | | |
|---|---|---|---|---|
| | | Motion for Partial Summary Judgment | | |
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A:  Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B:  June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D:  March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L:  Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P:  April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A:  November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B:  April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB:  October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC:  October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD:  February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE:  Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF:  March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A:  December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| | | | | |
|---|---|---|---|---|
| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
| | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br><br>             Plaintiff, <br> v. <br><br> WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1–10, <br><br>             Defendants. | **Case No. 2:04-cv-08400-ODW(RZx)** <br> Case No. 2:04-cv-08776-ODW(RZx) <br><br> **ORDER GRANTING PLAINTIFFS LEAVE TO FILE A SUR-REPLY** |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br><br>             Plaintiffs, <br> v. <br><br> TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1–10, <br><br>             Defendants. | |

/ / /

/ / /

/ / /

The Court has received Defendants' Reply in support of their February 7 Motion for Summary Judgment.  While the Reply technically and formalistically complies with the Local Rules' formatting and length guidelines, the Court notes that DC has buried the equivalent of at least three full pages of argument into footnotes.  This is an improper proper use of footnotes,[1] and the Court does not condone such a blatant attempt to subvert the Local Rules' page-length dictates.  Plaintiff is therefore granted leave to file a sur-reply no longer than 5 pages in length to respond to any arguments addressed in Defendants' Reply.  Should she choose to file a sur-reply, Plaintiff must do so no later than Monday, March 18, 2013.

**IT IS SO ORDERED.**

March 12, 2013

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

---

[1] *E.g.*, *First Advantage Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal. 2008) ("A footnote is the wrong place for substantive arguments on the merits of a motion . . . .  The Court can only assume that the parties placed the arguments in question in footnotes because they lacked space in the main text of their briefs. . . . The use of footnotes to circumvent [the Local Rules' page-length and formatting] rules is improper.").

**ER 40**

1 DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2 MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3 CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4 O'MELVENY & MYERS LLP
  1999 Avenue of the Stars, 7th Floor
5 Los Angeles, CA  90067-6035
  Telephone:  (310) 553-6700
6 Facsimile:   (310) 246-6779

7 Attorneys for the DC Comics Parties

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 LAURA SIEGEL LARSON,                    Case No.  CV 04-8400 ODW (RZx)
   individually and as personal
12 representative of the ESTATE OF         **DC COMICS' NOTICE OF CROSS-**
   JOANNE SIEGEL,                          **APPEAL TO THE UNITED STATES**
                                           **COURT OF APPEALS FOR THE**
13                Plaintiff,               **NINTH CIRCUIT**

14       v.                                The Hon. Otis D. Wright II

15 WARNER BROS. ENTERTAINMENT
   INC., DC COMICS, and DOES 1-10,
16
              Defendants and
17            Counterclaimants.

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that defendants and counterclaimants in the above-entitled actions (collectively, "DC") hereby cross-appeal to the United States Court of Appeals for the Ninth Circuit from the "Amended Judgment" dated June 18, 2013, entered in the above-entitled "*Larson* Superman" case, Docket No. 735. DC cross-appeals from the Court's judgment to the extent it grants plaintiff Laura Siegel Larson any relief, including with respect to her First Claim, as well as the underlying rulings on which the judgment is based, *e.g.*, the district court's orders of March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), October 30, 2009 (Docket No. 595), and June 18, 2013 (Docket No. 734). DC also appeals the Court's judgment to the extent it denies DC's Second Counterclaim ("Declaration that Any Claim by the Siegels for Co-Ownership of Superman (Including its Derivative Superboy) is Barred by the Statute of Limitations").

Larson filed a notice of appeal in this matter on July 16, 2013. Docket No. 738. DC's notice of cross-appeal is timely pursuant to Rule 4 of Federal Rules of Appellate Procedure.

This *Larson* Superman case and appeal are related to the "*Larson* Superboy" case and appeal, which are presently docketed as Case No. CV 04-8776 ODW (RZx) before this Court, and as Appeal No. 13-56244 before the United States Court of Appeals for the Ninth Circuit.

Dated:    July 17, 2013

Respectfully submitted,

O'MELVENY & MYERS LLP

By:   /s/  Daniel M. Petrocelli
                    Daniel M. Petrocelli

OMM_US:71610592

DC'S NOTICE OF CROSS-APPEAL

**ER 42**

Marc Toberoff (State Bar No. 188547)
  mtoberoff@toberoffandassociates.com
Keith G. Adams (State Bar No. 240497)
  kadams@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
Malibu, California, 90265
Telephone:   (310) 246-3333
Fax:              (310) 246-3101

Attorneys for Plaintiff-Counterclaim
Defendant, Laura Siegel Larson,
individually and as personal representative
of the Estate of Joanne Siegel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>       Plaintiff,<br><br>   v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br>       Defendants and<br>       Counterclaimants. | Case No: 04-CV-08400 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT** |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>       Plaintiff,<br><br>   v.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br>       Defendants and<br>       Counterclaimants. | |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, the plaintiff-counterclaim defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final amended judgment, filed and entered in this case on June 18, 2013 (Docket No. 735) by the Honorable Otis D. Wright, II in the United States District Court for the Central District of California, after the district court, on June 18, 2013, issued an order (Docket No. 734), granting in part the motion, timely filed by plaintiff-counterclaim defendant on May 16, 2013, to amend the prior judgment entered by the district court on April 18, 2013 pursuant to Federal Rule of Civil Procedure 59(e).


July 16, 2013                    RESPECTFULLY SUBMITTED,

                                 /s/ Marc Toberoff
                                 TOBEROFF & ASSOCIATES, P.C.
                                 Attorneys for Plaintiff-Counterclaim Defendant,
                                 Laura Siegel Larson

1
2
3
4
5
6
7
8        UNITED STATES DISTRICT COURT
9        CENTRAL DISTRICT OF CALIFORNIA
10   JOANNE SIEGEL and LAURA SIEGEL     )
     LARSON,                            )   CASE NO.  CV-04-8400-SGL (RZx)
11                                      )
                  Plaintiffs,           )
12                                      )
     v.                                 )
13                                      )   **ORDER DENYING PLAINTIFFS'**
                                        )   **MOTION FOR RECONSIDERATION;**
14   WARNER BROS. ENTERTAINMENT         )   **ORDER DENYING DEFENDANTS'**
     INC.; TIME WARNER INC.; and DC     )   **MOTION FOR RECONSIDERATION;**
15   COMICS                             )   **ORDER AMENDING COURT'S**
                                        )   **AUGUST 12, 2009, ORDER**
16                Defendants,           )
                                        )
17   _____)

18             **DEFENDANTS' MOTION FOR RECONSIDERATION**

19          Despite having been passed more than thirty-three years ago, the

20   termination provisions in the 1976 Copyright Act have been little utilized by authors

21   or their heirs and, consequently, little explored by the courts.  *See* William F. Patry,

22   *The Failure of the American Copyright System: Protecting the Idle Rich*, 72 NOTRE

23   DAME L. REV. 907, 922 (1997) ("by not making termination automatic and requiring

24   authors to jump through hoops even more formidable than those renewal

25   presented" under the 1909 Act, the consequence is that, "in practice, the

26   termination right has" been "barely used," with "approximately 0.72% of [termination]

27   transfers hav[ing] been recorded, as required, with the Copyright Office"); *see also*

28   Decl. Jeremy N. Williams ¶ 6 (noting that even for a company with as diverse and

large a catalog of copyrighted properties as Warner Bros., it has only received 65

termination notices since the late 1980s, or roughly only three termination notices a

year).

This is also true of the limited case law construing the regulations

promulgated by the Copyright Office to govern the exercise of the statutory

termination right.

It is in this context that the Court has explored the harmless error rule

contained in 37 C.F.R. § 201.10(e)(1).  This provision was promulgated by the

Copyright Office to address missteps made in complying with regulatory

requirements specifying the "form, content, and manner of service" for termination

notices under the 1976 Copyright Act.  In this case, the regulatory requirement in

question is the one requiring identification of the "title, . . . the name of at least one

author . . . , and the date copyright was originally secured in, each work to which the

notice of termination applies; and, if possible and practicable, the original copyright

registration number."  37 C.F.R. § 201.10(b)(1)(iii).  The termination notices served

by the plaintiffs, the widow and daughter to Jerome Siegel the co-creator of the

iconic comic book superhero Superman, failed to provide the "title," the "name of

one author," "date copyright was originally secured," or the "original copyright

registration number" for the first two weeks of Superman newspaper comic strips

that were published in the Milwaukee Journal beginning on January 18, 1939, and

concluding on January 28, 1939.[1]

Instead, the termination notices stated that, in addition to all the other works

that were so identified by title, registration number, *etc.*, (spanning some 546 pages

_____

[1]  These newspaper strips first relayed the story concerning the circumstances leading to the destruction of Superman's home planet Krypton, the identity of his Kryptonian parents (Jor-L and Lora), and Superman's Kryptonian name (Kal-L).  Certain aspects of the story were altered when another version of Superman was created decades later in a universe known as Earth-1 (as distinguished from the earlier version consigned to Earth-2), notably the names were changed to Jor-El, Lara, and Kal-El.

2

1   and concerning literally tens of thousands of Superman works published from 1938

2   to 1997, including Superman newspaper strips published in the Milwaukee Journal

3   from February 20, 1939, and onward, *see* April 30, 2007, Decl. Michael Bergman,

4   Ex. X at 325), it also applied to:

> [E]ach and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK . . ., Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

12  *Id.* at 3 n.1.

13        No one disputes that such information is insufficient to meet the regulatory

14  command to provide a "complete and unambiguous statement . . . without

15  incorporation by reference of information in other documents or records" that clearly

16  identifies the title, date on which copyright was originally secured, and registration

17  number for the work in question.  Although works concerning the Superman

18  character and the planet Krypton is mentioned, no title or other concrete identifying

19  information (such as registration numbers or date the copyright was originally

20  secured) is provided.  Thus presented for the Court was the question of whether,

21  under these circumstances, this non-compliance with the regulatory requirements

22  was nonetheless harmless so as not to affect the validity of plaintiffs' termination

23  notice from applying to those first two weeks' worth of Superman newspaper strips.

24        In its August 12 decision, the Court answered in the affirmative.  Noting that

25  consideration of whether an error in meeting the formalities called for in the

26  regulations is harmless is a "fact-intensive inquiry," the Court reasoned that, given

27  the nature of the property at issue (an iconic comic book superhero character

28  exploited continuously in every form of media imaginable for the past seventy

years), the amount of effort Siegel's heirs took in carefully cataloging and identifying the vast universe of works potentially at issue, the minuscule number of works that were not so specifically identified in the notice, and the presence of the catch-all clause itself, the error committed in this particular case, under these particular circumstances, was indeed harmless. *See Siegel v. Warner Bros. Entertainment Inc.*, - F. Supp.2d -, 2009 WL 2512842, at *49-53 (C.D. Cal. Aug. 12, 2009).

After having subjected the issue through the crucible of defendants' arguments in their motion for reconsideration and further elucidation of the relevant facts both in this case and in those other cases referenced in the earlier Order, the Court reaffirms its earlier disposition of the question and finds that the error in question was in fact harmless.

Accordingly, defendants' motion for reconsideration is **DENIED**.

**A.** ***Construction of Relevant Statutory and Regulatory Language***

The Court begins by looking to the language in the statute and the regulation itself. Section 304(c) of the 1976 Copyright Act governs the termination of grants to works created under the auspices of the 1909 Copyright Act. Among the litany of provisos erected in effectuating such a termination of transfer is that a notice be prepared and served upon certain entities, during a five-year fixed window measured from the date the copyright in the work(s) in question was originally secured, and, most importantly for purposes of the present motion, that said notice must "comply, in form, content, and manner of service, with requirements" prescribed by "the Register of Copyrights." 17 U.S.C. § 304(c)(4)(B). The statute thus requires that a termination notice be filed that meets certain requirements as to its form, content, and service, but is silent as to what those precise requirements are, instead leaving that to be completed by the relevant agency. Toward that end, shortly after the 1976 Act's passage, the Register (Barbara Ringer) promulgated regulations seeking to fill in these gaps in how parties were to go about preparing such termination notices. Among the litany of formalities eventually required to be

observed with respect to the "content" in the termination notice was that it "must

include a clear identification" of the following:

> (I) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

> (ii) The title and the name of at least one author of, and the date copyright was originally secured in, *each work to which the notice of termination applies*; and, if possible and practicable, the original copyright registration number;

> (iii) A brief statement  reasonably identifying the grant to which the notice of termination applies;

> (iv) The effective date of termination; and

> (v) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant.  In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author [and then

37 C.F.R. § 201.10(b)(1)(I)-(v) (1977) (emphasis added).[2]

Recognizing the intricacies of the formalities being established and the

potential for gaps in the terminating parties' (especially in the case of an author's

heirs) knowledge of the information sought by those formalities due to the long

passage of time that may have occurred since the grant and works in question were

executed and published,[3] the Register also placed a safety valve that could operate

to relieve terminating parties from mistakes or other traps for the unwary that would

be created by requiring strict conformance to the regulation's requirements.  Section

---

[2]  The regulation was subsequently amended to take account of changes to the duration of copyrights and their effects on the termination right enacted by the Sonny Bono Copyright Term Extension Act of 1998.

[3]  *See* 42 F.R. 45916, 45917 ("Under section 304(c) of the Act, the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication").

201.10(e)(1) to the regulations, titled "Harmless errors," declares that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of section 304(c) of title 17, U.S.C., shall not render the notice invalid." Thus, by the regulation's own formulation, an error's "materiality," and hence its "harmlessness," was to be viewed through the prism of the information needed to adequately advance the purpose sought by the statutory termination provisions themselves.

This "safety valve" also contained subsection (e)(2), which provided a litany of examples of errors that the Register sought to make clear were never to be viewed as harmful so long as certain conditions were met. *See* 74 F.R. 12554, 12555 (section (e) gives "examples of forgivable, harmless error"). Specifically, "errors made in *giving* the date or registration number referred to in paragraph (b)(1)(ii), or in *complying* with the provisions of paragraph (b)(1)(v) of this section, or in *describing* the precise relationships under clause (2) of paragraph (c) of this section[, the signature provisions thereto]," were all excused so long as the commission of the error was done "in good faith and without any intention to deceive, mislead, or conceal relevant information." 37 C.F.R. § 201.10(e)(2) (emphasis added). This subsection to the harmless error rule is the source of the first point of disagreement between the parties in terms of how to construct the more general harmless error rule set forth in (e)(1).

From the nature of the admitted "examples" set forth in (e)(2) and the fact that (e)(1) states that the errors in question must be "in a notice," defendants extrapolate that the Register sought to limit application of the general rule set forth in (e)(1) to the same universe of types or "kinds" of errors specified in (e)(2), and even then, the errors must be ones concerning information that was actually conveyed rather than omitted. In other words, defendants' construction of the regulation posits that only scrivener or other such "typographical" errors (presumably meaning misspellings of the title to a work, mistakes as to a numeral(s)

used for a registration number or a date) could ever qualify for consideration as being harmless; or, in the context of the present case, the rule would never apply unless the "work is otherwise properly identified." (Defs' Mot Recon. at 3; Defs' Reply at 2). As explained by defense counsel:

> The harmless error exception [in (e)(2)] does not provide *any* example involving an outright *omission* of the required information. Rather, it allows for *errors* within required information that has actually been provided (*e.g.*, an incorrect date, or an incorrect description of the relationship between the terminating and filing party), all of which must be accompanied by a *justifiable and legitimate explanation.* . . . [I]t cannot be disputed that on its face section 210.10(e)(1) makes exceptions for 'harmless errors,' not 'harmless omissions,' a distinction fully borne out by the examples in 201.10(e)(2).

(Defs' Sur-sur-reply at 1 (emphasis in original)).

As set forth below, defendants reading of the harmless error rule is both incomplete as a general matter, but also misdirected in terms of the specifics of this case. The harmless error rule applies to much more than simple clerical or typographical errors, but at the same time, this is *not* a case where the termination notice was completely absent of *any* information regarding the works in question.

To begin, defendants read subsection (e)(2) backwards. The Register made clear that the examples contained in (e)(2) were *not* meant to define or otherwise delimit the general class of errors to which the harmless error rule in general would apply. Instead, the Register expressly stated that the *only* reason for the inclusion of the specific examples in (e)(2) in the first instance was so that, by their recitation, "disputes" would be avoided that those particular errors could ever be considered harmful. *See* 42 F.R. 45916, 45919 ("the final regulation requires specific items of information that, in some cases, were not in our [initial] proposal. We do not intend that the validity of notices of termination *should be subject to disputes* over whether errors concerning these specific items are 'harmless.' Accordingly, we have added a new paragraph (e)(2) to make clear that errors made in connection with this information will not affect the validity of the notice" (emphasis added)).

7

Thus, subsection (e)(2) was meant to create a safe harbor for which no "dispute" would arise as to the harmless error rule's application, thereby staving off the need for judicial decision-making. Far from seeking to constrain application of the harmless error rule, those examples in (e)(2) were only meant to foreclose disputes as to a certain narrow class of errors; the inference being that the Register was cognizant that there would be occasion for further disputes concerning errors outside the kinds contained in (e)(2) that would be left for courts to decide in applying the general rule found in (e)(1).

Lest there be any doubt on the point, the Register placed a proviso at the beginning of subsection (e)(2) that specifically reminds the reader that the litany of examples that followed were to be read "*without prejudice* to the general rule provided by paragraph (e)(1) of this section." (emphasis added). Far from suggesting the principle of *expresio unius est exclusion alterius* ("the expression of one thing is the exclusion of another"), or that subsection (e)(2) somehow contained a clear and "specific rule" to be applied against the general harmless error provision found in (e)(1), this proviso recognizes that the reach of the harmless error safety valve is *broader* than the specified class of examples listed in subsection (e)(2). Nowhere in defendants' papers have they acknowledged, much less attempted to square, this opening proviso to (e)(2) with their proposed construction of the regulation.

The Court's reading is consistent with another regulation promulgated by the Register respecting content formalities for filing a notice of intent to obtain a compulsory license (sometimes referred to as a mechanical license) to reproduce non-dramatic musical works (meaning, a song's words and music) in phonorecords. 37 C.F.R. § 201.18(d)(v)(A), like its regulatory cousin, section 201.10(b), requires that the notice for a compulsory license provide a "clear statement of . . . the title of the non-dramatic musical work" affected thereby. Section 201.18(g) also provides a harmless error provision that, like in 201.10(e)(1), is keyed to whether the error in

question "materially affects the adequacy of the information required to serve the purposes of" the relevant statutory section giving rise to the right to file said notice. In the accompanying commentary to the proposed regulation, the Register noted that the required information in the notice was meant to "help the copyright owner identify which of his or her works are being used under the license." 66 F.R. 45241, 45243. Nonetheless, the Register recognized that "errors may occur," and that "potential licensees should not be denied use of the license" on account of these errors when it does "not affect the legal sufficiency of notice." *Id.* However, unlike with the termination notice regulation, the Register decided against providing a safe harbor provision, observing that "the Office does not anticipate that it will have any role in resolving disputes about whether an error in a notice as harmless." *Id.* Instead, "such disputes will have to be adjudicated in the courts." *Id.*

Thus, a general harmless error rule, unadorned, anticipates and invites disputes as to its application to arise and be resolved by the courts. This is the same principle underlying a section like section 201.10(e)(1), and the proviso placed in front of the safe harbor language in 201.10(e)(2) affirms that this general principle governs: Outside that safe harbor, the harmless error rule continues to apply, leaving it for courts to resolve any and all the other disputes, covering many different potential situations and categories of errors, that may arise.

Having addressed the limited safe harbor provision of (e)(2), the Court returns to consideration of the language set forth in the harmless error rule in (e)(1) to determine when an admitted error other than as listed in (e)(2), is harmless. The language the Register used in (e)(1) expressly ties the determination of the "harmlessness" of any error in question with the adequacy of the information needed to "serve the purposes of . . . section 304(c)." Thus, the regulatory language directs the court to examine the purpose of the termination right contained in section 304(c), and what information is needed to adequately fulfill that purpose. In short, that purpose, as set forth below, is to provide authors or their heirs a

9

meaningful opportunity to recapture the right to the extension in the copyright term afforded to such earlier works by the 1976 Act, while at the same time ensuring that reasonable notice is given to grantees (or their successors) and to the public so as to identify what work(s) are affected.

The termination provisions initially proposed by the Copyright Office during the 1960s revision process to the 1909 Act were much different than that which was ultimately enacted by Congress in 1976. The Office's initial proposal was that the termination of transfer right would take effect automatically, without authors being required to fulfill certain procedural steps to effectuate their right. This proposal was "strongly objected to by distributors and strongly defended by authors, and became, in the words of the Copyright Office, 'the most explosive and difficult issue in the revision process'" of the 1909 Act. Patry, 72 NOTRE DAME L. REV. at 921. In the end, a "practical compromise" was reached by Congress that was designed to "further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved," notably the possible disruption such exercise of the termination right might bring to long-established business dealings and the chains of title involving affected properties. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 n.39 (1985). Amongst the compromise reached was the deletion of the termination right's automatic nature, in favor of "the burden [being] placed on [authors or their heirs] to file a notice of intent to terminate the transfer." Patry, 72 NOTRE DAME L. REV. at 921; *see* 17 U.S.C. § 304(c) (noting that the copyright in a pre-1978 work (other than one "made for hire"), "the exclusive or nonexclusive grant" to which (other than one made "by will") was "subject to termination" so long as certain "conditions" were met).

Thus, among the competing objectives and interests sought to be achieved through section 304(c) was not only affording authors or their heirs a meaningful

opportunity to benefit from the newly extended copyright term,[4] but also for the existing assignee to receive reasonable notice of what rights of theirs are being affected through the exercise of the author's (or heirs') termination right. This compromise "purpose" behind section 304(c) was given concrete expression by the Register in the commentary accompanying the final adoption of 201.10, wherein it was observed that "the proposed regulation" was meant to "attempt[] to avoid the imposition of costly or burdensome requirements [on authors or their heirs], while, at the same time, giving the grantee and the public a reasonable opportunity to identify the affected grant and work from the information given in the notice." 42 F.R. 45916, 45918; *see also* 41 F.R. 50300, 50300 (making the same observation as the purpose of "[t]he proposed new § 201.10"). The Register thus recognized that the grantee's and the public's need for a "reasonable" chance to identify the "grant and work" at stake (which speaks to notions of actual and constructive notice) must be balanced against ensuring that the opportunity for authors or their heirs to actually share in the new right be meaningful by avoiding needlessly burdensome requirements. In this respect, therefore, careful consideration of the nature of the property at issue is necessary to assess this balance between providing reasonable notice to the grantee (or its successors) and the public, and avoiding undue burdens on authors or their heirs.

---

[4] *See Classic Media*, 532 F.3d at 984 ("The 1976 Act, and in particular its . . . termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs. . . . As stated in the 1976 Act House Report: 'The extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it" (quoting H.R. Rep. No. 94-1476, at 140 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659, 5756)); *see also Music Sales Corp. v. Morris*, 73 F. Supp.2d 364, 372 (S.D.N.Y. 1999) ("The 1976 Act created an additional opportunity for the author or the author's heirs to extract the fair value of the work"); 73 F.R. 3898, 3898 (labeling "termination provisions . . . set forth in section[] 304(c)" as "hav[ing] an equitable function; they exist to allow authors or their heirs a second opportunity to share in the economic successes of their works" for that extension in the duration of the copyright to the same put into place by the 1976 Act).

**B.** *Was Adequate Notice Given to the Recipient of the Notice?*

To begin, the Court agrees with defendants that, for any error in question to be considered harmless, its existence must be disclosed "in the notice" itself; complete omissions without *any* other information touching on the subject matter of the error in the notice will not suffice to trigger the rule's possible application. This construction is not only found in the regulation's command for the vast swath of information required to actually be set forth in the notice ("must include"), but also in (e)(1)'s description of the errors affected by it as those found "in a notice." The Register, when commenting upon harmless error, speaks of the "errors'" being "in a notice of termination." 42 F.R. 45916, 45919.

Such a construction is also consistent with one of the purposes underlying section 304(c), which was to provide "the recipient of the termination notice [with] sufficient information to understand what rights of theirs may or may not be at stake." *Siegel*, - F. Supp.2d. -, 2009 WL 2512842, at *52. The absence of *any* information in the notice about the work in question, for instance, would thwart a recipient's ability to be so apprised. As previously noted, the Register in her commentary accompanying the regulation, observed that § 201.10 attempts to require identification of the "the affected grant and work *from the information given in the notice.*" 41 F.R. 50300, 50300 (emphasis added). The complete lack of any information "in the notice" is not the "giving" of information.

Plaintiffs' argument that the regulation also states without equivocation that other items, other than those relating to the identification of the work, "must" also be "included" but are nonetheless found in (e)(2)'s safe harbor as errors that are subject to harmless error, misses the point. Those other examples in (e)(2) concern errors regarding the information actually *contained* in the notice. Thus, (e)(2) speaks of "errors made in *giving* the date or registration number" or in "*describing* the precise relationships" of the terminating parties to the author. Those are words connoting errors in information actually found within the notice. Moreover, the

1  multiplicity of information that must be included in the notice only underscores that

2  much information is required, not that *complete* omissions in conveying that

3  required information may be excused.

4          The Court emphasizes the word "complete," because it is also clear that, for

5  some of the regulatory commands, more than one piece of information is called for

6  in meeting that particular requirement.  For example, with respect to the particular

7  regulatory requirement at issue here, the regulation not only requires the title of the

8  work at issue, but also the date that the copyright in the same was originally

9  secured, the name of at least one of the authors of the work, and, if practical, the

10  original registration number.  Thus, there are multiple pieces of information that are

11  sought by this single requirement.  Omissions of some or parts of that information

12  might still be considered harmless so long as there are other pieces of information

13  sufficient to satisfy the particular requirement present in the notice.  The pertinent

14  question at that point would be whether that partial set of information is enough to

15  meet the purpose sought to be filled overall by the particular requirement.

16          Assume, for example, that in a termination notice, for whatever reason, no

17  title for a particular work is given, the author's name for that work is missing, and no

18  date is provided as to when copyright in that particular work was secured, *but* a

19  valid initial registration number for the work standing by itself is provided.[5]  In such a

20  circumstance there are clearly omissions of information required by 201.10(b)(1)(iii),

21  thus creating an error in the notice; however, it can hardly be disputed that the

22  information that is contained in the notice is nonetheless adequate for the recipient

23  to have a "reasonable opportunity to identify the . . . work."  As the Register noted,

24  much of the litany of information called for in (b)(1)(iii) (notably, the registration

25  number and the complete set of the authors to a work) was "intended to serve only

26  as a means of possible assistance to persons receiving a notice of termination in

27  ──────────────────────

28          [5]  The same example would equally apply if instead the title and author of
the work are given, but the registration number and date the copyright in the work
was originially secured was omitted.

13

identifying the work to which the notice applies. It is not itself a substantive condition of termination . . . ." 42 F.R. 45916, 45917. In this example, possessing the correct registration number by itself affords the recipient a "reasonable opportunity" to identify the work placed at issue by the termination notice. In contrast, where no mention of the title, the date copyright was secured, the registration number, the author's name *or anything else* about the work in question is made, no such opportunity can be said to exist. This is the circumstance that confronted the district court in *Burroughs v. Metro-Goldwyn-Mayer, Inc.* (a case discussed in more detail below) where the notice omitted altogether five Tarzan works without *any* other information respecting those works in the notice itself. In such a circumstance, it can hardly be said that the notice recipient would be given a "reasonable opportunity" to discover the work affected by the notice; the notice is completely devoid of any information disclosing that the work was ever at issue, much less providing a means upon which a recipient could begin an inquiry into identifying it.

Here, however, the circumstance in the present case lies between these two examples. As in *Burroughs*, there is no mention in plaintiffs' termination notices of the initial registration number, the title, the author, or the date on which the copyright was originally secured in the first two weeks' worth of Superman newspaper strips. On the other hand, there is, as in the first example, *some* information that points to the works in question, contained within the catch-all clause. Defendants offer scant argument about the catch-all in their briefs, instead labeling its informative value as "absurd," one that only "invites an examination of a 70-year span" of works. A more careful reading suggests otherwise.

At the outset, the Court acknowledges that the catch-all, as written, does not speak in terms of the regulation's specific litany of information for identifying works;[6]

---

[6] Such would be the case, if, for instance, the catch-all was drafted to state that the termination notice applied to "each and every Superman work by Jerome

a different lexicography is used for that purpose.  Instead, the catch-all was written in terms that define certain attributes in the copyright of the Superman character, including his planet of origin:  "[E]ach and every work . . . that includes or embodies the character, story element or indica reasonably associated with SUPERMAN . . . such as . . . the planet Krypton . . . ."[7]  No doubt utilization of a formulation based on the specific categories of information set forth in 210.10(b)(iii) would have been more useful, providing the recipient information that could be directly and readily checked against the records in the Copyright Office; the approach used instead required more familiarity by the recipient with the character itself to assist in searching the records in the Copyright Office.  That said, what plaintiffs' formulation lacks in terms of the specific form of information called for in (b)(iii), it makes up for in more precisely identifying the particular work that is put into question by the notice.

Defendants take issue that the catch-all notifies the recipient of the heirs intent to recapture "all the works" with the "planet Krypton" unadorned with any

_____

Siegel and Jospeh Shuster during the five-year termination window beginning with April 18, 1938, with the title Action Comics, Superman, World Finest (Best) Comics, All-Star Comics," all the latter having been listed in the notice as actual titles to the other Superman works, including the newspaper strips (again all published under the title "Superman")).

[7]  To the extent it could be argued that the catch-all also applied to character attributes aside from those explicitly mentioned (notably, through its reference to "without limitation"), such an argument may well run full square into the category of complete omissions discussed earlier.  Given that the catch-all is written in the language of copyright in a particular character, the mention that the notice applies to "all works" where the character appears adds nothing.  The character exists and is composed of specific attributes that are delineated on a work-by-work basis.  Accordingly, without mention of the specific attribute sought to be recaptured, it could be argued that the catch-all does not direct the recipient to know what in particular to look for in identifying the work(s) in question, a circumstance not all that different from when a termination notice is completely devoid of *any* information of the specific work affected.  In such a circumstance, the recipient would have to hazard a guess as to what are the attributes of the character and then act accordingly.  Given that this circumstance is not present in this case, the Court need not further address it.

information about the particular works put in issue, which will necessarily require them to plough through seventy years worth of Superman works, "some of which are ancient and difficult to even locate," to compile a list of all those with Krypton in it. (Defs' Mot. Recon. at 5). Defendants overstate their plight, ignoring a "basic principle" of copyright law in reviewing the catch-all clause. (Defs' Reply at 3). As ably demonstrated in defendants' own papers, and, more importantly, as explained in Judge Newman's concurring opinion in *Burroughs*, the copyrightable aspects of a character — the thing for which a notice is designed to declare its intent to recapture — are protected only to the extent the work in which that particular aspect of the character was first delineated remains protected, but not in the subsequent sequels in which that attribute is later repeated or used. (*See* Defs' Reply at 3 ("copyright protection and termination only exist work-by-work and characters are protected only as delineated in specific works"); Defs' Partial Mot. Summ. J. at 7-8 ("the presentations of Superman since 1938 . . . were not a static depiction but an ever-evolving portrayal, featuring new super powers, new villains, and new components to the Superman universe and back story. Indeed, the Superman story and characters evolved on an episode-by-episode basis," including "reference to some of the more famous story elements now associated with Superman" like "the name of Superman's home planet 'Krypton'"); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 631 (2nd Cir. 1982) (Newman, J., concurring) ("On the assumption that the character Tarzan is sufficiently delineated to support a copyright, there is no dispute that the delineation was complete upon the 1912 appearance of the first Tarzan title *Tarzan of the Apes.* Subsequent titles, including the omitted five, contained original exploits of Tarzan, but were not original with respect to the character itself. As to the character Tarzan, the subsequent titles were sequels, 'subsequent stories employing the same character'"); *see also* 1 MELVILLE NIMMER, NIMMER ON COPYRIGHT § 2.12 at 2-178.31 to 2-178.32 (rev. ed. 2009) ("Subsequent works in a series (or sequels) are in a sense derivative works,

while the characters which appear throughout the series are a part of the underlying [initial] work upon which the later works are based. . . .  So copyright in a particular work in a series will not protect the character as contained in such series if the work in the series in which the character first appeared has entered the public domain[; instead,] protection for the character extends only to those . . . elements added in" the sequel).

Thus understood, there can be only one work upon which plaintiffs could ever seek to recapture the copyright to "the planet Krypton" aspect of the "Superman character" — the work or series in which that aspect of the character was first explored.  Far from telling defendants "nothing," (Defs' Reply at 3), the catch-all, thus understood, in a very real sense, pointed them to a precise and notable work.  Admittedly, this information did not also point defendants to a specific place in the Copyright Office's records to investigate that particular work, such as would be the case if they had received the title of the work where Krypton was first explored, or the date the copyright in the same was first secured, but that raises questions as to the adequacy of the information — it cannot be said that there is a complete lack of any information being provided on the matter, as argued by defendants.

This then brings to the fore whether the information that was provided in the notice — that the termination notice applied to the work in which the "planet Krypton" aspect of the "Superman character's" copyright was first secured — was adequate for defendants to have had a "reasonable opportunity to identify" the "work."  In answering this question, the case of *Music Sales Corp. v. Morris*, 73 F. Supp.2d 364 (S.D.N.Y. 1999), provides useful insight.  In that case, which concerned the termination of the grant to various musical compositions by noted jazz composer and performer Billy Strayhorn, the question presented was whether the termination notice, whose description of the grant consisted merely of a boilerplate statement, "Grant or transfer of copyright and the rights of copyright

proprietor, including publication and recording right," was sufficient to meet section 201.10(b)(iv)'s regulatory requirement that the notice "must include . . . a brief statement reasonably identifying the grant to which the notice applies." The description of the grant was important because there were multiple potential grants to the compositions at issue. *Id.* at 367-68 (noting execution of three different agreements by Strayhorn, his heirs, and/or his estate relating to assignments in the musical works in question). The district court admitted at the outset that said description in the notice did not "reasonably identify the grant," *id.* at 378, and hence an error was committed in that regard in the notice. Nonetheless, the court found the information "adequate," meaning that the admitted error was harmless, noting that "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights." *Id.* This approach — reference to industry and agency custom — in judging the "adequacy" of the information provided for purposes of harmless error is the source of a dispute between the two leading commentators on copyright (Nimmer and Patry), and continues to be, viewed by this Court as overly "lax" and untethered to any consideration of the dual purposes underlying section 304(c). *See Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *51. That said, *Music Sales* remains as a beacon on the legal landscape demonstrating how little concrete information need be conveyed and yet still be considered adequate for purposes of section 304(c).

Defendants understandably seek to diminish the significance of *Music Sales*, correctly noting that it concerned the adequacy of information related to the grant, not identification of the work, at issue. From there defendants note that the more forgiving result in *Music Sales* can be explained as the product of the lesser "standard of adherence" called for in the regulation for identifying the grant (the terminating party need only "reasonably identify" it), as opposed to here, where the standard of adherence for identifying works is much higher ("must identify" the title, date copyright was originally secured, *etc.*). No doubt such a difference is manifest

18

in the regulation itself, but the problem with this argument is that it ignores that, in *Music Sales*, the district court found that the information in the termination notice did not even meet this lesser standard of adherence. That the regulation required a less specific, itemized menu of information was not a factor in the court's appraisal of adequacy of the information in the notice. Such differences in levels of adherence are taken into consideration in determining whether an error first occurred; once it is determined an error occurred, whether the information that was provided is nonetheless adequate is an altogether separate inquiry.

*Music Sales* demonstrates in broad strokes the extent to which less than precise information may nonetheless be excused through the harmless error rule.[8] Such allowance is explained in the commentary to those portions of the regulation requiring identification of both the grant and the work, in which the Register expressed her concern regarding the terminating parties' ability to access information regarding both the grant and the work. 42 F.R. at 45917 (observing in the context of the identification of the work that "the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication) & at 45918 (noting in context of identification of the relevant grant that "it will commonly be the case that the terminating author, or terminating renewal claimant, widow, widower, children or grandchildren of a deceased author, will not have a copy of the grant or ready access to a copy").

---

[8]  It should be noted that identification of the grant, however amphorously allowed under the pertinent regulatory requirement, was nonetheless something that "must be" clearly "included" and "identified" in the notice. It decidedly was not viewed as some "lesser" form of information. When speaking of what was sought to be achieved behind the regulations the Register specifically pointed to two pieces of information as lying at the center of the purpose of section 304(c) — "giving the grantee and the public a reasonable opportunity to identify the affected *grant and work*." 41 F.R. at 50300 (emphasis added); 42 F.R. at 45918.

1    Thus, some consideration must be given to this circumstance in judging the

2    adequacy of the information provided as to a work (or a grant), as it goes to another

3    core purpose of section 304(c) — providing authors or their heirs a meaningful

4    opportunity to recapture the right to the newly provided extended copyright term in

5    works which were long ago assigned away by them.  This is especially true in a

6    case such as this involving an author's heirs seeking to recapture the rights to a

7    long-ago created character exploited in literally thousands of works (even as

8    measured by the five-year window) in various different formats.  In such

9    circumstances more leeway should be afforded in terms of the adequacy of the

10   information contained in the notice.

11       The Court is mindful that the information that was actually conveyed in the

12   notice did not touch upon the specific types of information called for in the

13   regulation.  This fact has given the Court some pause, but in the end it is clear that

14   recital of the precise incantation of information in (b)(iii) is not as important as

15   whether the information (whatever it may be) that is contained in the notice in that

16   regard serves to apprise the recipient of the work affected.  Indeed, a court would

17   not be looking to the harmless error rule if the information recited correctly and in

18   full the entire menu of information called for in 201.10(b)(iii).  Again, as the Register

19   noted, much of the litany of information in (b)(iii) was not itself considered a

20   substantive condition of termination, but simply "as a means of possible assistance .

21   . . in identifying the work."  42 F.R. at 45917.  It is this factor  — whether the

22   information provided is of such assistance — that lies at the core of (b)(iii) and

23   forms the basis for the inquiry into the adequacy of the information provided.

24   Indeed, the Register repeatedly recognized that there may exist good reasons for

25   the absence of much of this litany of information in 201.10(b)(iii) concerning the

26   identification of the work and yet said errors could still be considered harmless.  *See*

27   42 F.R. at 45917, 45918.  As the Register observed: "[W]e remain convinced that

28   the required contents of the notice must not become unduly burdensome to

grantors, authors, or their successors, and must recognize that entirely legitimate reasons may exist for gaps in their knowledge and certainty." 42 F.R. at 45918.

Thus, in setting forth the notice's intent to recapture that portion of the Superman character's copyright concerning "the planet Krypton," the only work(s) in which such a copyright would subsist was the first one(s) in which that aspect of the character was explored. Such information is of much more assistance, as it focused defendants' inquiry to narrow and targeted work, than if the notice had instead relayed some of the menu of information in 201.10(b)(iii) by simply identifying the title and author of the strips. Literally thousands of Superman works (be it as comic books or newspaper strips) were published under the title "Superman," all of whom were created by Siegel and Shuster. With that understanding, the Court concludes that defendants were given information that the notice sought to terminate the first Superman work in which "the planet Krypton" appears; information which was of assistance in locating the actual work itself.

The Court begins with a practical observation: Despite efforts to vouch for their inability to know what to do when in receipt of this information (defendants claim that, in the absence of the particular litany of information in 201.10(b)(iii), they are powerless to divine on how to go forward), it is clear to the Court that a "reasonable opportunity" existed to identify a work utilizing this information. When viewed in a real world setting, a declaration that the notice applied to the first work in which the planet Krypton was featured is not as unilluminating as defendants suggest. This notice is directed to a world-famous character for which vast literature has been written concerning its publication history (as demonstrated by defendants' recital to various court cases, publications, and noted experts who understood the information as to Krypton first appearance). Add to this milieu the fact that the recipients of the notice are the ones in possession of all the information related to the character's appearance in various mediums since his first appearance in *Action Comics* No.1, and it becomes quite clear that the recipient in this case

1    would know, fairly quickly, which work the planet Krypton first appeared in the

2    Superman character's literary universe.  Whether such identification would be

3    sufficient in other circumstances, this Court cannot and does not say.  What makes

4    this case unique is the nature of the particular property being terminated.

5        Defendants argue that the contents of the termination notice must be such as

6    "to provide advance notice of each affected work without need for investigation [by

7    the grantee]."  (Defs' Mot. Recon. at 5).  Such a standard asks too much from the

8    termination notice; the Register clearly contemplated that recipients of the

9    termination notice would conduct their own investigation based on the information

10   contained therein.  *See* 42 F.R. at 45918 ("There is no real reason to believe that

11   recipients of termination notices will rely on such statements [concerning whether a

12   particular work was one made for hire or that the grant in question was not made by

13   will] rather than on their own review of the nature of the work and grant").  What is

14   required is sufficient information to assist a grantee in having a "reasonable

15   opportunity" to identify the work.  That it is an opportunity that is called for certainly

16   evinces an expectation that some action will be taken on the recipient's part to

17   actually identify the work using the information relayed even after receipt of the

18   notice.

19       Tellingly in this regard is the fact that, after receipt of the termination notice,

20   defendants did in fact conduct such an investigation into the early Superman

21   newspaper strips.   (Defs' Obj. and Response to New Arguments at 6 & n.10) ("In

22   early 2006, defendants obtained the copyright registrations for such Early Strips and

23   compared those registrations to the works identified in the 1997 termination notices

24   and concluded that the strips had not been identified").  Thereafter, defendants

25   served requests for admission related to those first two weeks of newspaper strips.

26   (Sept. 18, 2008, Decl. Michael Bergman, Ex. B).  At no point did defendants seek

27   admissions from plaintiffs for the second two weeks' worth of Superman newspaper

28   strips (published in the Milwaukee Journal from January 30, 1939, to February 18,

1939) that likewise were not identified in the termination notice by reference to title, author, registration number or date in which the copyright was originally secured. Those strips tell an alternative version of the story from *Action Comics* No. 1 and *Superman* No. 1 about how Clark Kent came to be hired as a newspaper reporter for the Daily Star, a story that contains *none* of the character attributes identified in the catch-all clause save for those (Lois Lane, Clark Kent, and Superman) that were developed (and the copyright for which were first secured) through earlier works.

Defendants also argue that allowing such a "catch-all" to satisfy the actual notice function, runs afoul of the regulations' admonishment that "the information specified in paragraphs (b)(1) . . . requires a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records." 37 C.F.R. § 201.10(b)(3). But here the clause at issue does not make reference to information in other documents or records; rather, it clearly identifies, *within the notice itself*, that the terminating party seeks for the notice to apply to that work in which the "planet Krypton" aspect of the "Superman character's" copyright was first secured. Far from a reference to something else, the clause serves as a declaration within the notice of what it sought to accomplish. Again, the defect with this clause (what renders it as an error for which the "harmless error" analysis is applied) is not its attempt to include something by reference outside the notice, but in the fact that the language in the catch-all fails to specify the title, author, date copyright was secured, and registration number for the particular work it is seeking to give notice of its recapture. There is no "speculation" to be engaged in by the notice's recipient, no guessing as to what was the terminating party's "subjective intent."

**C.    *Inadvertence***

Finally, defendants contend that the reason for the failure to provide the title, registration number, or date the copyright was originally secured to these first two weeks' worth of newspaper strips was *not* an inadvertent oversight on plaintiffs'

part, but instead was done for some unknown "strategic reason." (Defs' Mot.
Recon. at 7). They note that plaintiffs and their first attorney, Mr. George
Zadorozny, were made aware of these two weeks' worth of newspapers strips when
they (with their then counsel) commissioned a Thomson & Thomson copyright
records search report in 1997, wherein the fact was noted that the first newspaper
strip where Superman appeared was published on January 16, 1939. (Sept. 22,
2008, Decl. Marc Toberoff, Ex. A at 2 ("The character SUPERMAN made its debut
as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5,
1939. It was distributed by and registered for copyright in the name of the McClure
Newspaper Syndicate, through September 30, 1949")). The argument does not
withstand scrutiny.

At the outset the Court wishes to clear up a mistake in the prior order that
was made in assigning to plaintiffs' former counsel, Mr. Arthur Levine, the credit for
actually cataloguing the list of works contained in the termination notice — such
credit should instead go to Jerome Siegel's daughter, Laura Siegel Larson. As
relayed in great detail in a declaration she submitted in 2007 (and which is
reproduced in pertinent part hereafter) Ms. Larson tirelessly labored searching the
Copyright Office's registration records located in the Los Angeles Central Library to
compile said list, and then her work was later merged with information uncovered by
the Thomson & Thomson copyright records search:

> In connection with the preparation of plaintiffs'
> notices of termination . . . regarding 'Superman,' our
> attorney, George Zadorozny commissioned a full
> Thomson & Thomson report pertaining to 'Superman'
> based on the records at the U.S. Copyright Office. In
> addition, I personally conducted extensive research and
> investigation regarding all 'Superman' works going [as
> far] back as 1933, particularly the original 'Superman'
> works by Jerry Siegel and Joe Shuster.
>
> I conducted a very thorough search of the
> copyright registration records of the U.S. Copyright
> Office at the Los Angeles Central Library downtown.
> These records consist of numerous volumes titled
> 'Library of Congress Copyright Office --- Catalog of
> Copyright Entries.'

The bound volumes were published by the Library of Congress through 1978. For registrations after 1978, the U.S. Copyright Office and Library of Congress has made this information available online.

The copyright registration volumes are segregated by categories, such as 'Periodicals,' etc.,. Each volume bears a volume number and the year covered (either by full year or, in years with many copyright registrations, the volumes covered 6 months each).

Different categories of items in the 'List of Works' section of the notices of termination had to be researched in separate category volumes for each and every year. For instance, the copyright date and registration number of comic books were listed in the 'Periodicals' volumes. In the 1938 volumes, comic books were listed by the TITLE of the comic book. Therefore, the research required *prior knowledge of the title of the periodical in which the 'Superman' property appeared.*

In other words, to find the first copyrighted appearance of 'Superman' in comics I had to know the name of the comic book it appeared in. . . .
. . . .

There are also U.S. Copyright Office volumes for the category 'Books.' The listings (for such things as novels, coloring books, etc.,.) are arranged alphabetically by the author's last name or, if anonymous, by title. I searched such volumes under the names Jerome (or Jerry) Siegel and Joseph (and Joe) Shuster, together and separately and found a number of registrations through the years in the 'Books' catalogs.

I also thoroughly searched additional volumes for categories such as Motion Pictures, Music, Art, etc.,. which had their own peculiarities in the ways the properties were listed.

As one might imagine from the above description, my research literally entailed hundreds of hours and took weeks to complete. The results of my extensive investigation, complimented by the Thomson and Thomson report, are reflected in the detailed 'List of Works' contained in each of the notices of termination.

(May 29, 2007, Decl. Laura Siegel Larson ¶¶ 2-5, 7-8, 10-12 (emphasis in original)).

The termination notice lists hundreds of Superman newspaper strips,

including ones from as early as February 20, 1939, published in the Milwaukee

25

Journal. (*See* Decl. Michael Bergman, Ex. X at 325). That such great lengths were taken to include all the other newspaper strips created only reinforces that the failure to include those strips from January, 1939, was an inadvertent oversight on their part.[9] None of these "failures" in any way suggests that the failure to include the two weeks of newspaper strips was done other than in good faith with no intent to mislead or conceal.

Indeed, a plausible explanation exists for why the strips noted in the Thomson & Thomson report were not merged with Ms. Larson's voluminous compilation of works. The first two weeks of newspaper strips in question were all registered in 1944 (five years after having been published in the Milwaukee Journal beginning on January 16, 1939, through January 28, 1939) as prints or pictorial illustrations (administrative class K under the 1909 Act, *see Compendium of Copyright Office Practices* Index at 10 (July 1973 revisions)) under the title of "Superman"; the registration numbers thereto being K5-55490, K5-55491, K5-55492, K5-55493, K5-55494, K5-55495, K5-55496, K5-55497, K5-55498, K5-55499, K5-55500, and K5-55501. (Sept. 18, 2008, Decl. Michael Bergman, Ex. C). Interestingly, the remainder of the Superman newspaper strips appearing in the Milwaukee Journal and in other newspapers from February 20, 1939, going forward were all registered as either a periodical work (administrative class B under the 1909 Act, *see id.* at 10) or as a book (administrative class A under the 1909 Act, *see id.* at 5, 9). (April 30, 2007, Decl. Michael Bergman, Ex. X). This difference in

_____

[9] That the comic book expert (Mr. James Steranko) plaintiffs later retained *long after* the termination notices were served (and this litigation commenced) noted the existence of the January, 1939, newspaper strips in his expert report, or that there existed a Second Circuit decision from the 1950s to which Siegel and Shuster were not even a party that also mentioned the fact of these January, 1939, strips, *see National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594 (2nd Cir. 1951), cannot be used to impute a finding that the strips were purposefully omitted by plaintiffs. All that these facts show is that the January, 1939, strips could have been discovered had plaintiffs interviewed Mr. Steranko during the preparation of the notices or had better researched case law beforehand.

the administrative class of works under which the first two weeks of the Superman newspaper strips were registered *may* explain why it was missed when Ms. Larson compiled her exhaustive list of works.

Moreover, although defendants make much of the fact that the commissioned Thomson & Thomson copyright records search report made mention of Superman's first appearance in a newspaper strip in the Milwaukee Journal on January 16, 1939, glaringly absent from that report is any mention of the registration number under which that strip (and those that immediately followed) was registered under in the Copyright Office. Removing any doubt on this point is the fact that the catch-all in the termination notice itself expressly represents that "[e]very reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary."

The Court thus finds that plaintiffs' failure to specifically list the title, original registration number, or date copyright was originally secured in the first two weeks' worth of newspaper strips was indeed inadvertent and not some intentional act by plaintiffs done as part of some secret, but heretofore not understood, strategy. Although defendants have shown that discovery of this information was possible, there is simply nothing to suggest that the failure to include those strips was purposeful when the termination notices were put together. Inadvertent mistakes happen, and that is what this Court finds occurred here.

D.   *Constructive Notice*

Finding as the Court does that the termination notice provided the recipient sufficient information upon which to have a "reasonable opportunity" to identify the work affected does not address the complementary question of whether the notice, notwithstanding the error, fulfills the other purpose of providing notice to the public. In this regard, it is important to bear in mind that, for a termination notice to be recorded against a particular work, it is the Copyright Office's practice and

procedure to rely solely on the information found in the notice. "The document, or material attached to it, must identify the work to which it pertains so that, after the document is indexed by the Copyright Office, it would be revealed by a reasonable search under the title or registration number of the work." Compendium II: Copyright Office Practice 1608.01. Because the termination notice, even with the catch-all clause, does not identify the first two weeks' worth of newspaper strips in this particular manner, the Copyright Office did not index plaintiffs' termination notice against those strips in its records. Thus, were one to search only for the records to those two weeks' worth of strips, no mention of the termination notice would appear in the Copyright Office's records for the copyright to those works. This, of course, raises concerns over the adequacy of the information in the termination notice to apprise the public that those strips were affected by the notice.

But once again, the Court must consider the *nature* of the property that is the subject of the termination notice – the copyright to a character continuously exploited in numerous works for over seven decades. Although, as previously noted, each incremental expansion, refinement in, or further elucidation of the copyright in a character such as Superman is protected only through the copyright contained in the individual work or series in which that expansion was first relayed, the effective licensing of the character itself in the commercial setting generally requires rights to its complete library, not a discrete, narrow subpart to the same.

As plaintiffs have proffered, and which defendants have not sought to rebut, it is unlikely that these two weeks' worth of newspaper strips would be "licensed — or even used — separately from the remaining Superman mythos," the overwhelming majority of which works were in fact specifically listed in the termination notice in complete compliance with 201.10(b)(iii)'s requirements. (Pls' Opp. at 7 n.15). In short, plaintiffs' termination notices more or less papered over the copyright in the Superman character and the world built around him. Moreover, as plaintiffs have represented, and again as defendants have not challenged, if one

were to search the records of the Copyright Office for works, such as the two weeks' worth of strips (and indeed for *all* the newspapers strips published through McClure), with the title of "Superman," one would not only come across the two weeks' worth of strips in question but also references to other Superman newspaper strips with the same title whose plaintiffs' termination notices were in fact indexed against by the Copyright Office.[10]

This underscores and provides support for Patry's comment (and the Court's adoption thereof) that, "In the case of works consisting of a series or containing characters requiring the terminating party to list separately each work in the series or all works in which the character appears would render the termination right meaningless. Instead, notice that reasonably puts the terminated party on notice of the character being terminated is sufficient." PATRY ON COPYRIGHT § 7:45.[11] Patry's

_____

[10] Although admitting that the notices themselves are meant to assist the "grantee" whose rights are affected by the termination, recordation of the notice itself (as is called for in section 304(c)(4)(A) ("A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect")) is also designed to "notify the public." (Mot. Reconsideration at 1 n.1 (citing 17 U.S.C. § 205(c)). Interestingly, however, among the examples of errors that the Register already recognizes as being "harmless" are those relating to the date or registration number of the works affected by the notice itself. One would presume that if affording notice to the broader public was such an insurmountable obstacle to application of the harmless error rule, mistakes in the registration numbers given or the dates upon which the copyright was secured in said works would not be allowed as those are quite material impediments in the Copyright Office's ability to index the notice to affected works and thus undermines the public's ability to correctly identify whether a particular work was subject to separate ownership chain. Indeed, the Register recognized that the notice portion of the compromise's calculus was not to be one of absolute notice, but only sufficient information in the notice to give the public a "reasonable opportunity" to identify the work.

[11] Although defense counsel brushes aside Patry's comments as signifying nothing but some "commentator's observations," (Defs' Reply at 3), such was not counsel's assessment of Patry's work when reviewing his treatise now cited to by the Court. *See* Roger L. Zissu, Lawyer's Bookshelf, New York Law Journal (April 11, 2007) (reviewing WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007) (observing that Patry "is already a legend as a prolific author and active lawyer and teacher" whose earlier copyright works are "highly regarded" and whose treatise "surpasses not only the length of the multivolume works of Nimmer and Goldstein but also

formulation is consistent with the Register's call that all the grantee and the public are entitled to is a "reasonable opportunity to identify" that which is being terminated.

To require complete or perfect constructive notice (as advocated by defendants by reference to 17 U.S.C. § 205(c)) would provide authors or their heirs an illusory "opportunity" to recapture the extended copyright to property such as Superman, whose very success has led to its consistent appearance in print and other media for seventy years, leading to the creation of a large library of works in which constructive notice would have to be given.  It is in the context of such iconic characters that defendants' insistence on "certainty" and strict compliance would saddle authors and their heirs with having to conform to an overly "burdensome," "ritualistic formality" that does little, if anything, to advance the purpose of ensuring that the public (or the grantee) will receive a "reasonable opportunity" to identify the works affected "from the information given in the notice."  Indeed, if perfect constructive notice was an impediment to the harmless error analysis, it is curious that among the examples found in the safe harbor at (e)(2), the Register would have made allowance for mistakes as to the registration number or date on which the copyright was originally secured.  Such mistakes would undermine the very notice requirements of § 205(c) that defendants have held up as a reason not to find the error in this case harmless.  *Cf.* 17 U.S.C. § 205(c)(1) (labeling as necessary for a "reasonable search" of the Copyright Office's records one done "under the title or registration number of the work").

---

their scope and is destined to join these . . . as another staple in the field")).  That said, Patry's present position on this point has evolved.  In a 1996 law review article, Patry advocated the position now being advanced by defendants. *See* William F. Patry, *The Copyright Term Extension Act of 1995: Or How Publishers Managed to Steal Bread from Authors*, 14 CARDOZO ARTS & ENT. L.J. 661, 684 (1996) ("In the case of works consisting of a series or containing characters, special care has to be taken to list separately each and every work in the series, or all works in which the character appears").

To that end, this "constructive notice" effect so touted by defendants is not a concept to be bandied about in the abstract, as if it were an end unto itself. Such notice is informed largely by its purposes — it is a means to an end. To posit that any member of the public who was interested in exploiting Superman would somehow confine their review of the lengthy registration of the works in that character in the records of the Copyright Office to but a couple weeks' worth of newspaper strips in January, 1939, is, from a practical business perspective, nonsense. Instead it would transform the harmless error inquiry into an entirely wooden enterprise, shaped entirely by and made subservient to the formalities of the rule itself. Should any third party be interested in exploiting those original copyrightable elements found in those strips, they would have also searched other works to successfully utilize them (works that were in fact listed in the termination notices), and upon doing so discover the termination notice (and the catch-all clause contained therein), putting them on inquiry notice that the termination notice also applied to those strips. The valuable copyrightable story elements to the Superman character contained in those strips (Krypton, Jor-L, *etc.*) do not exist in a vacuum. As defendants have repeatedly noted to the Court throughout this litigation, Superman is comprised of many different elements which, but for the results of this litigation itself, are considered and marketed part of an aggregate whole, not as tiny individual copyrightable bits (a red cape here, a particular villain there, x-ray vision and the ability to fly over here, an alter ego personality to peruse around the corner, or a far away doomed planet over the horizon). The copyright in the Superman character exists as a conglomerate representing the story that has been told of him through seventy years of exploitation.

Nowhere do defendants come to grip with this fundamental quality of the copyrighted property at issue.[12] Instead, now that it does not suit them, they seek to

_____

[12] The only concession defendants in this regard is that perhaps Patry's formulation "might be justified where an author wrote *all* works featuring a character." (Defs' Reply at 3 n.4 (emphasis in original)). Why such a variance

press upon the Court that the entire argument that there is a "Superman 'mythos' or character" is but an "effort to circumvent the rules and overreach" by reference to "amorphously recapture[d] rights." (Defs' Reply at 2). To begin, the copyrightable nature of the Superman character was long ago recognized by the Second Circuit (a panel composed of Judge Learned Hand and his cousin Augustus Hand), *see Detective Comics, Inc. v. Burns Publications, Inc.*, 111 F.2d 432, 433 (2nd Cir. 1940), and is not some recent product of either plaintiffs or this Court. Even more glaring is the fact that, throughout this litigation, defendants themselves have spoken of the "Superman "character" and the surrounding "mythology" built around the character as being at stake in the notices filed by plaintiffs. To that end, they have sought to profit from that fact as a means to limit the scope and value of any copyrights plaintiffs eventually recaptured through the same. (Defs' Mot. Partial Summ. J. at 1, 2, 5-8).

Richly, defendants argue that the Court must follow the regulation's formalities "strictly," and that the Court's failure to do so in the August 12 Order "allow[ed] the 'harmless error' exception to swallow them whole." (Mot. Rec. at 2). Of course, the same could be said of defendants' proposition that the Court should so narrowly interpret the harmless error rule as to render it largely meaningless. The Court, however, is mindful that the Register put the harmless error rule into the regulations when they were first promulgated --- a safety valve which has not been changed despite numerous other changes to the 1976 Act and the regulations there under. The very presence of a harmless error rule demonstrates that the formalities that defendants so desire to be strictly enforced need not be followed to the letter;

---

would be justified in that particular factual circumstance, but not one where, as here, thousands of works of a character are in fact written by a single creative pair, is nowhere explained, nor does it appear to the Court to be a distinction of any substance (save for the fact that it would preclude a finding of harmless error in this case).

that is the very purpose for such a rule, allowing variances from otherwise mandated requirements.

However, perhaps the most puzzling aspect of defendants' position on this entire question is that not only do they fault plaintiffs for doing too little (namely, omitting the title, registration number, *etc.*, to the first two weeks' worth of newspaper strips), but, at the same time, fault them for doing too much (identifying within the notice reference to title, registration number, *etc.*, all the Superman works, even those outside the five-year termination window). Although defendants now assert that such over-inclusion amounted to "flooding notices with irrelevant works," it is quite clear that the reason such additional works were listed in the notices was to satisfy the very constructive notice arguments defendants have now so relentlessly required be served. By having the termination notice spread over such a large number of works, plaintiffs ensured that the impact of any missing gaps that may arise would be alleviated. The fact that the defendants seek to fault plaintiffs for being overly conscientious of the constructive notice quality provided by their termination notices is simply misguided.[13]

_____

[13] However, picking up on defendants' suggestion to simply look to the works from the relevant five-year window that were created by Siegel and Shuster and then compare them to those Tarzan works created by Burroughs does nothing to advance their cause. As admitted in Mr. Zissu's declaration (who represented Burroughs' heirs in the 1980s Second Circuit litigation), Burroughs himself only wrote 40 books (although it is undoubtedly true that thousands of other derivative Tarzan works were created by others). On the other hand, from the Court's review of the termination notice, of the 546 pages in the notice, 94 pages were directed to over 2,959 works created by Siegel and Shuster for the five-year period from 1938 to 1943, of which, again, but 14 works (the first two weeks of Superman newspaper strips) are in question here (comprising but .47%). (April 30, 2007, Decl. Michael Bergman, Ex. X at 4-6, 24-25, 40, 71, 195-215, 222, 224-236, 325-377, 450, and 478). As a final point the Court takes exception to defendants' implicit efforts to relegate Siegel's role in the development of the Superman character to nothing more than an insignificant player who did little more after Superman's initial success in *Action Comics* No. 1 : "Jerry Siegel's termination right allows recapture of only a handful out of *thousands of Superman works that he did not create to which his family has no legal right whatsoever.* " (Defs' Reply at 3 (emphasis added)). Defendants are advised that, for the period of 1938 to 1943, Siegel and Shuster *created* nearly all of the 2,959 Superman works noted by

The Court thus concludes that the information in the catch-all was adequate to give the public a "reasonable opportunity" to identify the affected works.

## E.   *Prior Case Law*

Defendants' last point is that the Court's "new rule" contradicts, misreads, and "overlooks" the case law directly on point, "judicial precedent" which defendants contend support their position.  (Defs' Reply at 2).  In this Court's view, defendants continue to misread that "precedent."  Only *one* other court has even touched upon application of the harmless error safety valve to errors committed in meeting 201.10(b)(iii)'s requirements.

*Burroughs v. Metro-Goldwyn-Mayer, Inc*., dealt with the status of Edgar Rice Burroughs' well-known character Tarzan, whose first appearance in print was in *Tarzan of the* Apes, published and copyrighted in 1912.  Eleven years later, in 1923, Burroughs transferred all his rights in that novel and all his subsequent works to Edgar Rice Burroughs, Inc., a family corporation.  In April, 1931, an agreement was

---

the Court (of which over 1,100 are Superman newspaper strips, *see* SUPERMAN: THE DAILIES 1939 - 1942 at  (1988) (noting that during this three-year period, "Jerry Siegel and Joe Shuster" created 966 Superman newspaper strips) and SUPERMAN: SUNDAY CLASSICS 1939 -1943 at vii - viii (1999) (noting that during this four-year period "Jerry Siegel and Joe Shuster" created 183 Sunday newspaper strips), and 85 of which were Superman comic books, *see* April 30, 2007, Decl. Michael Bergmann, Ex. X at 5-6, 24-25).  Indeed, were the Court to look to the entire period in which the pair created Superman material for Detective Comics (that is, until 1947), the number of Superman works would only increase to many thousands more.  Although it is true that Siegel's termination right does not extend to the overwhelming majority of these works he and Shuster in fact created, this is only so because those works were made by the pair for hire (a conclusion which the Court itself noted was a close call with respect to the newspaper strips), not because the pair did not in fact actually create them.  Moreover, if anyone overstates the case it is defendants, who seek to equate the size of the universe of Tarzan works created by Burroughs as "similar" to that for Superman.  (Decl. Zissu ¶ 9).  Burroughs actually only created the forty books (some of which were first printed in magazine serial form before being collected into book format); the remainder of the Tarzan works that defense counsel references, be it Tarzan movies, comic books, or newspaper strips, were not done by the hand of Mr. Burroughs but were derivative works created by others.  As noted earlier, the universe of Siegel and Shuster created Superman material is "certainly larger" than that at issue in *Burroughs.*

1   executed between the corporation and MGM whereby the film studio was granted
2   the right to make a movie, based not on any of Burroughs' literary works, but rather
3   on its own original screenplay, employing as characters Tarzan and other creatures
4   from Burroughs' works.  The agreement also permitted MGM to remake its Tarzan
5   film as often as it chose, provided that each remake was based substantially on the
6   first film.   In 1932, MGM released its hugely popular *Tarzan, The Ape Man* film.

7       During the 1970s, the Burroughs corporation licensed Warner Bros. to make
8   a new Tarzan film to be based on the 1912 book *Tarzan of the Apes*.  In order to
9   avoid possible competition between Warner Bros.' film project and any further MGM
10  remakes, Burroughs' heirs (Mr. Burroughs having died in 1950) served a
11  termination notice pursuant to section 304(c).  The heirs, however, did not serve the
12  notice on MGM, but only on the family corporation; they also served the notice in
13  December, 1977, three weeks before the 1976 Act became effective.  In 1980, while
14  the Warner Bros. film was in production, MGM announced plans for yet another
15  *Tarzan, The Ape Man* film remake.  Burroughs' heirs quickly filed suit for copyright
16  infringement against MGM, contending that the film studio's remake rights had been
17  terminated, prompting MGM to argue that the heirs' termination notice was
18  ineffective for a number of reasons, including one related to defects in the contents
19  of the notice.

20      The district court was presented with a preliminary injunction motion by
21  Burroughs' heirs to block the soon to be released *Tarzan* movie by MGM, arguing
22  that such a movie would infringe the copyrights to the 35 Tarzan works which they
23  alleged to have successfully recaptured upon the filing of a termination notice.  In
24  the course of an order denying plaintiffs' preliminary injunction, the district court
25  proffered *five* alternative rationales, each sufficient on its own to justify the court's
26  conclusion, for why the heirs were unlikely to prevail on the merits.  Among those
27  rationales was that the termination notice did not conform to the regulations
28  promulgated by the Register because it failed to list five other Tarzan works (the

termination notice was literally blank with regards to these works, there was no catch-all clause, no generalized reference to other works, nothing).  The question was then raised whether such a complete omission was somehow salvageable by reference to the harmless error rule.

In the course of two sentences the district court in *Burroughs* inquired into, analyzed, and concluded that it was not:  "Since the Notice did not include these five titles, . . . the Notice is deficient as to these five titles.  Such a deficiency is not 'harmless error'; it undoubtedly 'materially affects' the adequacy of the Notice."  491 F. Supp. 1320, 1326 (S.D.N.Y. 1980).  Other than this singular item, nothing else exists in the case law analyzing this question concerning application of the harmless error rule with respect to 201.10(b)(iii)'s regulatory requirements.  This case, however, is readily distinguishable.  Here, unlike in *Burroughs*, the termination notice, as set forth above, does have some information relating to the works that ultimately are at issue.  This is simply not a case of complete and total absence of information, a circumstance that the Court itself has recognized as one to which consideration of harmless error is not applicable.

Defendants note that the district court's decision in *Burroughs* was affirmed by the Second Circuit.  Admittedly, on appeal from the denial of the Burroughs' heirs preliminary injunction motion, the Second Circuit did affirm the district court, but it did so by way of a summary table disposition without giving any reason thereto.  *See Burroughs v. Metro Goldwyn Mayer, Inc.*, 636 F.2d 1200(2nd Cir. 1980) (noting only "AFFIRMED").  Given that the district court offered five different, and independently adequate reasons for the result it reached, the Second Circuit's later summary disposition cannot, with any degree of intellectual honesty, be argued as having held, adopted or otherwise incorporated the district court's "reasoning" with respect to one of those rationales.

Later, when the *Burroughs* case was before the Second Circuit for a second time in 1982 on appeal from the district court's disposition of the case on summary

judgment in favor of MGM, the court (as noted in the Court's earlier order) was not presented with, and did not engage in, an analysis regarding the harmless error rule; in fact, it did not even mention the harmless error rule, let alone incorporate it into its decision.  Defendants do not dispute this.[14]  Instead, the Second Circuit's 1982 decision in *Burroughs* only concerned whether the omission of the works rendered the entire notice invalid insofar as recapture of the copyright in the Tarzan character, or just invalid insofar as the omitted works were concerned.   The Second Circuit considered nothing else insofar as the omission was concerned.  Despite this fact (namely, the failure of the litigants to raise the issue with the Second Circuit in *Burroughs*, and that court's failure to hold one way or the other on it), it is argued by defendants as somehow proof that the court necessarily decided it, but thought the result so obvious that it decided not to state its holding:  "It is so clear from the face of the regulations that the harmless error exception cannot apply to entirely omitted works, it goes – and went --- without saying.  There was no need for either court to belabor the point."  (Defs' Reply at 2).  In our common law system of jurisprudence, such articulation of a court's holding is absolutely necessary for it to be cited as precedent on a contested point, and its absence cannot be vouched as a substitute for it.

Nor can it be said, as argued by defendants, that the district court in *Music Sales* somehow purported to consider the issue of harmless error in the context of 201.10(b)(iii)'s requirements. The district court in *Music Sales* did note as an aside that "only the works specified in a termination notice are terminated, even where the notice purports to terminate the grant including more works than actually listed in the notice." 73 F. Supp.2d at 380.  The district court's sole citation for authority for

---

[14]  Defendants bizarrely make the supposition that the reason the Second Circuit did not refer to the harmless error rule was "because it no longer had application or relevance to the case," which only reinforces this Court earlier conclusion that the decision has "limited persuasive value to the Court's current analysis." *Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *51.

its statement was the Second Circuit's 1982 *Burroughs* decision, which, as noted above, did not even consider application of the harmless error rule. Moreover, to the extent that *Music Sales* spoke of the question, it is a factually distinguishable circumstance given that there is absolutely no information in the notice with which to work with in identifying the work at issue. To state that the Second Circuit's decisions in *Burroughs* or that the district court's decision in *Music Sales* are "squarely on point," as defendants contend, is simply unfounded.

Far from creating a "new rule," the Court's August 12 Order constitutes the first time the harmless error rule has been actually interpreted by any court in a context even approaching that found in the current case.

**F.    *Conclusion***

Although defendants understandably believe its scrivener error construction of the harmless error rule is much more "certain," easily applied and beneficial, which it most assuredly is (especially from a grantee's perspective), the Register thought otherwise when it introduced the concept of harmless error as a means to provide relief from meeting these very formalities. Although defendants may disparage such "after-the-fact" arguments, the Register clearly contemplated that, through issuance of its harmless error rule, such "disputes" would indeed occur as a result of the rule's application by the courts. It was to that end that the Register created a safe harbor in subsection (e)(2) for which no dispute need arise. If the Register had wished to so confine its harmless error rule to the items found in (e)(2), it could have easily done so by removing the opening proviso clause to (e)(2) and instead closing that subsection with the provision "and other similar types of errors." It did not. The Register could have refrained from placing cautionary statements in the accompanying commentary insofar as to how rigid the formalities contained in said regulations should be applied and mistakes as to any number of the requirements (including those to identification of the works) could arise due to long passage of time that has elapsed since the underlying work in question was

created and published.  Again, it did not.  And finally, the Register could have refrained from tying the "materiality" of an error with the "purposes" undergirding the termination provisions themselves, purposes which are most assuredly not the one-way street in favor of grantees as defendants would have the Court to so read the regulations.  Defendants' suggestion that actually applying the harmless error rule in this case would lead to it nullifying another regulation (identifying each work) is grossly overstated.  The entire purpose of a harmless error rule is to excuse non-compliance with another regulation.  The broader rule is not nullified, but, given the circumstances of the particular case, is found not to be sufficient to warrant invalidating the termination notice to those works in question.

The Court ends its analysis of this question much as it did previously: "In the end, the Court finds that some consideration must be given to the nature of the copyrights sought to be recaptured" the "rights to works involving a particular character that has been continuously exploited for decades. . . . [W]hen the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is large" as is in the case of such a character as Superman, "and where the number of omitted works is minute relative to the included works, the presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice should be found to be effective even as to the omitted works." *Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *52, 53.  The absence of any one of these facts and the Court would not have found the error in the notice harmless.  In combination, under these particular circumstances, the Court finds that the purposes of section 304(c) are adequately served and the error is harmless.

## PLAINTIFFS' MOTION FOR RECONSIDERATION

This leaves plaintiffs' motion for reconsideration.  Plaintiffs' argue that Judge Learned Hand in *Fawcett Publications* made a finding regarding the non-work for hire nature of the strips Siegel and Shuster created for the newspaper syndicate

because he described McClure as the "proprietor" of the strips. Admittedly, the 1909 Act in some places distinguishes the proprietor to a copyright from the author to the same, an author being a term that would include an employer of a work made for hire. However, as noted by the Court in its August 12 Order, the term "proprietor" was also used by courts under the 1909 Act in the more colloquial sense as simply indicating ownership or title to the copyright without regard to whether such ownership was by way of work for hire or assignment. Given that the work for hire nature of the creation of the strips was not presented by the parties (the artists themselves were not parties to the case), to imply Judge Hand sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court some fifty years later is simply misdirected.

Plaintiffs also make much of the Court's finding that the "expense" test was met. What plaintiffs fault was (ironically given the above discussion) a typographical error in the Court's order. The Court never sought to expressly make a finding one way or the other on just the expense element; instead, at the end of its analysis, the Court held that, given the totality of the circumstances, the "instance and expense" test was met. The error was subsequently located in the process of submitting the order for publication (a circumstance not altogether surprising given the length of the Order), and the corrected version of the Order appears there. To remove any discrepancies between the published order of the Court and that submitted to the parties, the Court hereby **AMENDS** its August 12 Order so as to make it consistent with that published at - F. Supp.2d -, 2009 WL 2512842.

Finally, plaintiffs reargue about the payment of royalties, joint venture, and their assertion that *Picture Music* was simply wrongly-decided. As far as the royalties are concerned, nowhere in the case law has it ever been held that payment of royalties automatically means a given work was not made for hire. Instead, the case law speaks of that "generally" being true, or that such a fact

40

"weighs heavily against" it being a work for hire. The form of payment an artist receives is but a proxy for trying to determine the larger question concerning the precise business relationship the parties had entered into. It is generally true that employers, especially during the time of the 1909 Act, did not pay their employees or even independent contractors a share in the royalties generated from the commercial exploitation of their work. But just because that generally was the case, and served to cause courts to pause before finding to the contrary, does not mean that the parties' business relationship in every other measure was inconsistent with that found in an employer-employee or commissioning party-independent contractor setting.

The various types and forms in which employment compensation is contractually provided for can oftentimes be only exceeded by the imagination of the individuals and their employers involved in the contracting process. In this sense, notions of instance and expense are but proxies for the larger overarching inquiry of what was the nature of the parties' relationship. Just as in *Picture Music*, payment solely in the form of royalties could nonetheless still be found to be done in the context of an employment setting, so too here. Indeed, between the two, this case is much *stronger* for a finding of work for hire than in *Picture Music*. The artist in *Picture Music* was commissioned to create a single discrete project (writing a song), upon the completion of which she would receive thereafter royalties from the profits generated. The business relationship, insofar as the instance prong was concerned, was fairly week. Here, on the other hand, Siegel and Shuster entered into a five year contractual relationship calling for them to produce certain works, subjecting them to close editorial supervision, and giving their boss(es) the right to fire them and have them replaced by others. But for the payment in royalties, these are fairly strong hallmarks of an employment relationship.

In the end, despite the closeness of the question, the Court sees no reason to alter its decision. Plaintiffs' motion is therefore **DENIED**.

DATE:  October 30, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

**ER 86**

1

2

3

4

5

6

7

8

9

10                    **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

12

13  JOANNE SIEGEL and LAURA          )    Case No. CV-04-8400-SGL (RZx)
    SIEGEL LARSON,                   )
14                                   )
                Plaintiffs,          )    ORDER RESOLVING ADDITIONAL
15                                   )    ISSUES
          v.                         )
16                                   )
    WARNER BROS.                     )
17  ENTERTAINMENT INC.; TIME         )
    WARNER INC.; and DC COMICS,      )
18                                   )
                Defendants.          )
19  _____  )

20        The 1976 Copyright Act contains many intricate formalities that an author

21  (or his or her heirs) must navigate to successfully terminate the grant to the

22  copyright in an original work of authorship, but perhaps none is more fundamental

23  an impediment than the one excluding from the reach of termination the copyright

24  "in a work made for hire." 17 U.S.C. § 304(c); see 1 MELVILLE B. NIMMER, NIMMER

25  ON COPYRIGHT § 5.03[A] at 5-12 (2008) (commenting that the exclusion "relating to

26  termination of transfers is probably the most important feature of the work for hire

27  doctrine with respect to works created at present"); 3 WILLIAM F. PATRY, PATRY ON

28  COPYRIGHT § 7:42 (2008) (labeling as a "significant exclusion" to the right to

1    terminate the grant in "work-for-hire creations").  The complexity of the 1976 Act's

2    termination procedures stems as much from the fact that those provisions

3    intersect with and must be construed in light of the body of copyright law that

4    existed at the time the works were created (here, the 1909 Copyright Act) as from

5    the intricacies set forth in the 1976 Act itself.

6         This is particularly true when applying the "work made for hire" bar to works

7    created under the auspices of the 1909 Act, as the law developed by the courts

8    under the Act was oftentimes confused and not well-delineated, with its dimension

9    continuing to evolve long after the effective date of the 1976 Act.  See Easter Seal

10   Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,

11   815 F.2d 323, 325 (5th Cir. 1987) (commenting that the term "work for hire" was

12   undefined in statute, and that a "substantial body of cases developed as courts

13   worked out the definition").

14        Having previously addressed the iconic superhero Superman's first

15   appearance in Action Comics No. 1 in its earlier decision, the Court now considers

16   the myriad relationships and contractual arrangements surrounding the published

17   works of Superman by his creators Jerome Siegel and Joseph Shuster for the

18   years 1938 to 1943.  The task of disentangling these relationships and

19   agreements, and giving legal meaning to them, lies at the heart of this case.

20                          **I. FACTUAL BACKGROUND**

21        When the Court last left Superman, the copyright in the earliest published

22   version of the character, as depicted in the comic book Action Comics No. 1, had

23   been reunited with the heirs of one of his creators, Jerome Siegel.  See Siegel v.

24   Warner Bros. Entertainment Inc., 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008).

25   One might have thought that with the extensive discussion of Superman's creation

26   and development therein, little more would be left to be said about Superman's

27   first years in print; as the Court has since learned, there is more to the story.

28

1    Like the arc of a comic book serial, there has been an unfolding of

2 evidence regarding the creation and subsequent publication of Superman.  The

3 parties have presented to the Court previously undisclosed evidence surrounding

4 the back story to Superman's creation before 1938, the character's publication for

5 the years 1938 to 1943 in comic books published by Detective Comics after Action

6 Comics No. 1, and in the syndication of daily newspaper comic strips through the

7 McClure Newspaper Syndicate.

8    **A.    Pre-1938 Years:  Superman's Initial Creation and Development**

9    As recounted in the Court's earlier Orders, the development of Superman

10 evolved, with the character being re-worked by Siegel and Shuster over a period

11 of years.  However, missing from that account and now disclosed is the existence

12 of another collaborator.

13    The story picks up with Siegel dramatically rescuing from the flames the

14 cover art work from the pair's initial version of the Superman character in heroic

15 form (as a hulking strong man, sans super-human powers or alien origin, in the

16 fashion of Flash Gordon) after Shuster grew despondent when the publisher to the

17 comic book Detective Dan rescinded its offer to publish the material.  See Siegel,

18 542 F. Supp. 2d at 1103.  This led to a split of sorts with Siegel, with Shuster

19 apparently deciding he was no longer interested in continuing to illustrate

20 Superman, and Siegel apparently concerned that the character was going

21 nowhere under Shuster's artistic direction.  As Siegel later recounted, after the

22 debacle with Detective Dan, Shuster became "very discouraged" and decided that

23 he "did not want to work on Superman anymore."  (Decl. Marc Toberoff, Ex. F at

24 45).  Undeterred, Siegel sought out other artists to illustrate his scripts as he

25 continued to flesh out the Superman character.  See Siegel, 542 F. Supp. 2d at

26 1103 ("Undaunted, Siegel continued to tinker with his character, but decided to try

27 a different publication format, a newspaper comic strip").

28

1   Notably, Siegel approached illustrator Russell Keaton, who at that time was

2   providing the art work for the Buck Rogers Sunday newspaper strips.  For a few

3   months spanning the summer and fall of 1934, the pair exchanged

4   correspondence and scripts for Superman.  This activity culminated with Siegel

5   and Keaton producing a week's worth of newspaper comic strips (or nine

6   horizontal strips, each containing four panels, with dialogue and illustrations), and

7   Siegel drafting for Keaton's consideration three scripts (for which no illustrations

8   were ever created) for Superman that, taken together, demonstrated the evolving

9   nature of the character.

10   The story portrayed in the scripts and the week's worth of illustrated

11   material was devoted exclusively to Superman's upbringing as a child by a couple

12   known only as Sam and Molly Kent, and included the first inklings of a science

13   fiction aspect to the character, albeit with a much different take on Superman's

14   now well-familiar origins.

15   In this earlier version, Siegel conceived of Superman as having been sent

16   as an infant back in time, to then-present day America (circa 1935), in a time

17   machine created by "the last man on Earth" before the planet's destruction.  The

18   story is also notable as it contained the first expression of Superman's now

19   familiar super-human powers:  That he had a "physical structure millions of years

20   advanced from" those living in 1935, leading him to possess "colossal strength,"

21   the ability to "leap over a ten story building," "run[] as fast as an express train,"

22   and stated that "nothing less than a bursting shell could penetrate his tough skin."

23   Upon his arrival, Superman spoke a language that his adoptive parents did not

24   understand, and the secret of his origins was tied to a cryptic mystery note

25   accompanying him in the time machine.  When, as an adult, Clark Kent was

26   presented with the mystery note, he could not understand the words written on it.

27   Both the illustrated strips and the scripts contain the by-line crediting its authorship

28   to "Jerome Siegel and Russell Keaton."  (Decl. Marc Toberoff, Exs. C, D & E).

1      Keaton eventually chose not to take a chance on someone with such little

2  experience writing comics; by sometime in the first half of 1935, Siegel and

3  Shuster resumed their creative partnership and were again working together on

4  Superman, with the pair poised at the tipping point that would lead them to create

5  the version of the character that would transform the comic book industry.  In fact,

6  it was shortly thereafter that Siegel would have his breakthrough moment,

7  conceiving of the now-familiar Superman story on a "hot summer night."  It was

8  then that Siegel combined his now developed Superman character as a mythic

9  superbeing capable of fantastic feats with a new pseudo-scientific explanation for

10  those feats to make them more plausible — the character's extra terrestrial origin.

11  Shuster then went about creating a graphical representation of Siegel's character,

12  replete with costume and distinctive physical features:

> The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication.  Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers.  The art work for the first week's worth of "daily comic strips was completely inked" and thus ready for publication. The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings.

21  Siegel, 542 F. Supp. 2d at 1105.[1]  Much of this four weeks' worth of material was

22  later re-cut and re-pasted into a comic book format and published in the first

23  installment of Detective Comics' comic book magazine Action Comics.  Not widely

24  known is the amount of material, beyond that published, the pair had created

25  during these formative years, outside the watchful eye of any publisher.

26  _____

27      [1]  In its March 26, 2008, Order, the Court describes this "hot summer night"
moment as occurring in 1934; however, the undisputed evidence now points to an
28  undefined date in the summer of 1935.

ER 91

1    To begin, not <u>all</u> of the four weeks of pre-existing Superman material

2    created by Siegel and Shuster found its way into print in <u>Action Comics</u> No. 1.

3    During the editing process, Detective Comics decided to exclude the first weeks'

4    worth of material in order to accommodate space for other features in the comic

5    book.  As later explained by noted comic artist/writer/historian James Steranko in

6    his 1989 forward to DC Comics publication of <u>Superman Archives, Volume 1</u>:

7          McClure Syndicate agent M.C. Gaines, an early comics
           pioneer, just happened to have the Siegel and Shuster
8          submission on his desk when president Harry
           Donenfeld [of Detective Comics] phoned, inquiring
9          about original material to fill a new magazine he was
           assembling. . . .  Donenfeld recognized the material's
10         appeal and ordered the newspaper strip repasted into
           comic-book format, <u>with the first week eliminated to</u>
11         <u>accommodate available space in the magazine</u>, which
           was christened **Action Comics**. . . .  The opening tale
12         was reprinted <u>in its entirety</u> in **Superman** 1 . . . .

13   (emphasis added).

14         Indeed, if one compares the material published in <u>Superman</u> No. 1 with that

15   in <u>Action Comics</u> No. 1, the two mirror one another in every respect except that

16   <u>Superman</u> No. 1 contains an additional six pages (the first six pages in the comic)

17   filling in more details about Superman's formative years as well as providing the

18   prologue to the story told in <u>Action Comics</u> No. 1 (<u>see</u> Addendum A for the first six

19   pages of <u>Superman</u> No. 1).  Included in the famous first edition re-publication of

20   <u>Superman</u> No. 1 is a forward by Siegel himself, which gives the following

21   description of the origins and time of creation for these first six pages of material:

22         M.C. Gaines became involved in this enterprise[, the
           publication of <u>Superman</u> No. 1].  Readers may be
23         especially interested in the letter he wrote to me on
           March 27, 1939 on Detective Comics, Inc. stationary:
24         "With further reference to the SUPERMAN book . . . we
           have decided . . . that for the first six pages of the
25         SUPERMAN book that we would like you to take the
           first page of SUPERMAN, which appeared in ACTION
26         COMICS #1, and by elaborating on this one page,
           using different ideas than those contained on this
27         page, work up <u>two</u> introductory pages, the last panel of
           this second page to consist of the panel marked 'X' on
28         the enclosed sheet.  On these two pages, you will of

6

1   course leave out the scientific explanation of Clark
2   Kent's amazing strength, as we want a separate page
    on that item to use further back in the book with the
3   heading as follows:  'Scientific Explanation of
    Superman's Amazing Strength', in which you will
4   incorporate five or six various explanations, which we
    discussed while you were here in New York several
5   days ago.

6   (Decl. Marc Toberoff, Ex. GG).

7       Thus, the first two pages in <u>Superman</u> No. 1 was composed of material

8   created by Siegel and Shuster in 1939 when the comic book was published, but

9   the following four pages in the comic (pages three through six) represent the first

10  week of Superman material the pair had crafted in 1935.

11      Beyond this first four weeks of material (containing Siegel's dialogue and

12  Shuster's illustrations) that was later re-cut and re-pasted in comic book format,

13  Siegel also had written Superman material to which Shuster provided no

14  illustrations.

15      For example, Siegel wrote a paragraph previewing future Superman

16  exploits which was contained at the end of a "nine-page synopsis of the storyline

17  appearing in the three weeks of penciled daily Superman newspaper comic

18  strips." 542 F. Supp. 2d at 1105.  The paragraph Siegel wrote previewing future

19  Superman exploits has now been produced in this case:

20
21          This ends the first month's release and yet the
    potentialities of the character, SUPERMAN, has barely
22  been scratched.  He's headed for the most exciting and
    yet humorous adventures this world has even seen.
23  He will win a war single-handed, battle an airplane with
    his bare hands, swim several hundred miles and think
24  nothing of it, etc.,.  He's <u>different</u> and sure to become
    the idol of young and old.  He'll participate in sports
25  and astound the nation; he'll single-handed rescue a
    town from a flood through his super-strength.  Unlike
26  most adventure strips the scene of the story will not be
    laid in some fantastic, unknown jungle or planet or
27  country, but will be all the more astounding for having
    its locale on familiar streets.  SUPERMAN will operate
28  against a background of America's most well-known
    cities, buildings, and pleasure-spots.

7

1    (Decl. Marc Toberoff, Ex. A at 12 (emphasis in original)).

2          These broad outlines later found expression in the plot in Action Comics

3    No. 2, which involved Superman single-handedly averting a war brewing in the

4    fictional country of San Monte that had been instigated by a corporate war

5    profiteer.  In that comic book, there is a series of panels revealing Superman

6    battling a fighter plane in mid-air with his bare hands, and there is also a series of

7    panels depicting Superman swimming a great distance in the ocean.  Action

8    Comics No. 4 similarly gives concrete expression to the idea pitched in Siegel's

9    paragraph, telling the story of Superman interceding in a college football game

10   and using his superpowers on the field to astound the crowd.  Finally, in Action

11   Comics No. 5, Superman is shown saving a town from a flood after a huge dam

12   breaks.

13         Moreover, even with the renewed partnership with Shuster, Siegel still

14   looked to and would lift material he had created while corresponding with Keaton,

15   and use it for publications of his newly conceived Superman character.   Thus, in

16   November, 1934, Siegel sent to Keaton, a nine-page "synopsis of what will occur

17   during the next two months" to convince a potential publisher to bring the extant

18   version of Superman to print.  The synopsis submitted by Siegel is of the college

19   football story alluded to a year later in Siegel's "future exploits" paragraph and

20   tracks almost precisely the storyline, both the dialogue and the action direction,

21   that was later published by Detective Comics in Action Comics No. 4.[2]  The

22   _____

23        [2]  Plaintiffs also assert that there are additional pre-1938 Superman
     material, in the form of scripts, or synopses for daily newspaper strips, that were
24   created.  (Pls.' Opp. at 6 ("scripts (continuity) for 15 Superman daily comic strips
     (created by Siegel c. 1934) and a 9 page synopsis covering 2 months of daily (at 6
25   days per week) comic strips of Superman (created by Siegel c. 1934)")).  This
     reference to additional newspaper comic strip material is misleading.  The material
26   in question is nothing more than a reference to the newspaper strips that were
     later repackaged and published in Action Comics No. 1.  (See Decl. Marc
27   Toberoff, Ex. B ("The drawn daily strips of Superman, herein described, were later
     cut up, pasted onto pages, and reproduced together with the art of daily strip week
28   one and two in ACTION COMICS No. 1, June, 1938 issue"); Ex. X at 176 ("In
                                                                    (continued...)

ER 94

following example, comparing Siegel's 1934 script with a portion of the published

material found in <u>Action Comics</u> No. 4, is typical of this near seamless

interweaving between these two items.  The narrative from Siegel's script is

followed by the embodiment thereof in <u>Action Comics</u> No. 4:

<u>Script</u> (page 6)

> The coach says:  "This is going to be good!  The sap is running for a goal, with everyone on the field trying to stop him.  There goes Martin for him.  Watch Burke come down faster than a window-shade!"

> Martin is the first to reach SUPERMAN.  As he dives for a tackle he says:  "This is for poking into my locker!"  SUPERMAN's outhrust arm connects with Martin's face, thrusting off the tackler. "And this," says SUPERMAN,"is for busting me on the jaw!"

> Three more players close in on SUPERMAN, from all sides.  The coach says to his assistant:  "He'll have to be a superman to get by them."  SUPERMAN leaps to the shoulder of one of the three oncoming players, and springs on over the other two.  The coach's assistant replies:  "There's your superman!"

> SUPERMAN is already half-way down the field.  The coach's assistant says:  "I believe he's going to make it!"  To which Coach Oliver replies: "Just fool's luck so far.  Wait until he meets our 'unbeatables' — Stevens, Burns, and Dennis." The entire remaining team piles onto SUPERMAN.  The coach yells:  "They've got him!"

<u>Action Comics</u> No. 4 (page 8):

---

[2](...continued)
addition, I prepared a synopsis of the story continuity appearing in the three weeks of penciled daily strips.  Because we did not want to risk the loss of all the art work we had done, either through the mails or a failure to return it, the synopsis was sent to prospective out-of-town newspaper syndicates and publishers, in lieu of the three weeks of penciled strips, together with the first week of inked strips")).  Plaintiffs have not come forward with evidence to refute the fair inference of the evidence that is of record, that the "synopsis" mentioned is nothing more than what was later re-cut and re-pasted in <u>Action Comics</u> No. 1.

**B.      Superman's Publication in Comic Books and Newspaper Strips**

Siegel and Shuster's well-traveled Superman concept was eventually published by Detective Comics in the premiere issue of its comic book magazine Action Comics in April, 1938, becoming an almost instant success whose popularity endures to this day and whose depiction has been transferred to various media formats.  It is in this transfer to different formats that yet another portion of the untold history of Superman's first years in print takes shape.

Shortly before the publication of Action Comics No. 1, Siegel and Shuster signed a grant of their rights in the copyright to the Superman material contained therein to Detective Comics.  This assignment was executed on March 1, 1938, giving to Detective Comics "such work and strip, all good will attached thereto and

ER 96

1   exclusive right[s] to the use of the characters and story, continuity and title of strip

2   contained therein . . . to have and hold forever," in exchange for $130.  In the

3   grant, Siegel and Shuster further agreed that they would "not employ said

4   characters or said story in any other strips or sell any like strip or story containing

5   the same characters by their names . . . without obtaining [Detective Comics']

6   written consent therefore."

7       Superman's appearance in Action Comics No. 1 was followed by

8   subsequent installments, "published at regular intervals, each succeeding issue

9   having a SUPERMAN comic strip prepared by [Siegel and Shuster], who

10  continue[d] to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10

11  per page."  (April 20, 2007, Decl. Bergman, Ex. S at 282 (Westchester referee's

12  Finding of Fact No. 36)).[3]  Thus, Action Comics No. 2 was published on May 25,

13  1938; Action Comics No. 3 was published on June 25, 1938; Action Comics No. 4

14  was published on July 25, 1938; Action Comics No. 5 was published on August

15  25, 1938; and Action Comics No. 6 was published on September 26, 1938.

16      It is apparent from the undisputed evidence that publication of Superman

17  as a continuing feature in Action Comics was part of a pre-arranged, implicit

18  understanding between the artists and Detective Comics.  For instance, before

19  Superman was accepted for publication in the first issue of Action Comics,

20  Detective Comics' editor, in a letter dated January 10, 1938, voiced concerns to

21  Siegel about Shuster's ability to handle such a continuing "feature" given his pre-

22  existing commitments to doing the art work for other regularly appearing comics

23  for the publisher.  (Decl. Michael Bergman, Ex. A ("With all the work Joe is doing

24  now . . . could it be possible for him to still turn out 13 pages of this new feature?

25  . . . if it were humanly possible I'd like to have him turn out this 'Superman' for the

26  new magazine. . . .   It strikes me that adding another 13 pages to his already filled

27  _____

28      [3] The Court previously held that the referee's factual findings are binding in
    this litigation.  Siegel, 496 F. Supp. 2d at 1136.

1   schedule is loading him up to the neck.  Please let me know <u>immediately</u> whether

2   or not he can do this extra feature" (emphasis in original))).

3          Similarly, correspondence from another Detective Comics' editor to the pair,

4   <u>shortly before</u> Superman's initial appearance in <u>Action Comics</u> No. 1, also

5   suggested that the Superman comic was envisioned by the publisher to be a

6   regular feature in its <u>Action Comics</u> comic book for which the pair would provide

7   continuing material.  On April 8, 1938, Detective Comics sent a check in payment

8   for their "July material," and enclosed was a letter to Siegel remarking that the

9   publisher had "loaded [them] up with 43 pages a month" in material to produce,

10  and expressing concern with the pair's ability to handle such a monumental task,

11  but also reminding the pair that their "chances of . . . making more money is

12  bound up with the success of the magazine."  (Decl. Michael Bergman, Ex. B).

13         Superman's acceptance for publication in comic book format apparently

14  rekindled Siegel's interest in seeing his character syndicated in daily newspaper

15  strips.  As later explained by Shuster during the bench trial in the 1947

16  Westchester litigation, even with Superman's publication in <u>Action Comics</u> No. 1,

17  he and Siegel still "wanted to see Superman in the newspapers, not in the

18  magazines."  (Decl. Marc Toberoff, Ex. N at 118).  Their motive was an economic

19  one:  At this time, "black-and-white newspaper comic strips . . . were" not only "the

20  most popular medium for comics," but were also potentially the most lucrative.

21  <u>Siegel</u>, 542 F. Supp. 2d at 1103.  Toward that end, Siegel, initially without either

22  the approval of or notice to Detective Comics, began shopping around the now

23  accepted, but as yet unpublished, Superman character to various newspaper

24  publishers seeking syndication in or around March or early April, 1938.  That

25  Siegel did not first approach Detective Comics about syndicating Superman in

26  newspapers was understandable given that, in Shuster's words, Detective Comics

27  "wasn't running a newspaper."  (Decl. Marc Toberoff, Ex. N at 118).  As Siegel

28  later explained in an unpublished memoir titled "Creation of a Superhero":

1   I continued attempting to break into newspaper
    syndication.  On April 8, 1938, an employee in the
2   Business Department of the McClure Newspaper
    Syndicate wrote to me asking if I would be agreeable to
3   working out two weeks of "Superman" newspaper
    strips at no obligation to them: "You should get a letter
4   from the publisher of these magazines before we can
    get down to brass tacks on Superman."  He was
5   referring to "Action Comics."  He added, "The early
    panels describing the birth of SUPERMAN and how he
6   came to this planet could well be expanded into several
    weeks releases, we think."
7
    On April 13, 1938, he suggested that I submit the two-
8   weeks' sample releases of SUPERMAN around July
    1st.
9
    I wrote a detailed two weeks "Superman" daily strip
10  continuity account of Superman's origin on the planet
    Krypton; how his father and mother placed their infant
11  child in a rocket ship and sent him to Earth, moments
    before Krypton exploded.  And how, upon reaching
12  Earth, the infant was rescued from the flaming space
    craft and grew up to become crusading SUPERMAN.
13
    I sent the script to McClure Syndicate.
14

15  (Decl. Marc Toberoff, Ex. R).

16      Just before he submitted the script to McClure, Siegel wrote the following

17  letter to Detective Comics' president, J.S. Liebowitz, on April 18, 1938:[4]

18      Regarding SUPERMAN.  In their latest letter, McClure
        has instructed us to draw up the two weeks release of
19      SUPERMAN and get them submitted on July 1st.  This,
        Joe and I will do.  When we submit the drawn up strip
20      to them, I'll inform you at once.  I've no doubt but that if
        you drop in on the McClure Newspaper Syndicate at
21      that time to discuss matters, that your presence will aid
        materially in the selling of the strip.
22

23  (Decl. Marc Toberoff, Ex. S).

24      Siegel's unpublished memoir recounts what transpired thereafter:

25      On April 21, 1938, McClure responded that they
        preferred waiting until July 1: "Enclosed we return your
26      continuity for your safe-keeping.  Thank you for your
        energetic cooperation."
27

28
    _____

        [4]  Incidentally, the same day that Action Comics No. 1 was first published.

ER 99

> I knew that periodical publishers often returned to contributors, upon request, the rights other than first serial rights.  Wheeler-Nicholson had written to me that this was our arrangement.  I wrote to Liebowitz [at Detective Comics] that I had a newspaper syndicate interested in syndicating "Superman," and I requested that newspaper syndication rights to "Superman" be returned to Joe [Shuster] and me.
>
> In his letter to me dated June 9, 1938, Liebowitz replied, "While it is not our intention to hold you back in any way from a possible newspaper syndication of 'Superman', we are not in a position to give you what you ask for, that is a complete release.  If and when a syndicate makes a definite offer for the use of 'Superman', we can get together so that all of us will benefit."
>
> On June 13, 1938, M.C. Gaines of McClure wrote to me that since I had already completed the first two weeks of the SUPERMAN strip, I should now send the material to him.  "I will take this matter up at the first opportunity and let you know what we decide to do."
>
> Joe did a terrific art job of illustrating my script for these two weeks of the daily "Superman" strip.  I mailed the strips to McClure Syndicate.

(Decl. Marc Toberoff, Ex. R).

While waiting to hear back from McClure, Siegel pursued other newspaper syndicators to see if they might be interested in distributing a Superman newspaper comic strip, submitting with his pitch a copy of the two weeks' worth of material concerning Superman's origins.  One other newspaper syndicator that expressed some positive feedback was The Register and Tribune Syndicate.  Again, as explained by Siegel in his memoir:

> Chas. E. Lounsbury of the Register and Tribune Syndicate wrote to me on August 10, 1938, in response to my letter of August [sic] 26, "We are impressed with your outline and especially your enthusiastic approach.  We read with interest the optional two weeks' releases.  They do strike us as exciting and original."  He noted I had a proposal elsewhere, and said they could not give me a quick decision.  But if I was still in the clear after Labor Day, they would be glad to hear from me.
>
> On September 7, 1938, he again wrote that "such matters necessarily move rather slowly here. . . .

Personally I like SUPERMAN very much and believe
that with a few changes it has very good possibilities."
He stated that if McClure Syndicate was in a position to
take on the strip, he presumed I would go ahead. I
informed Liebowitz [at Detective Comics] of these
developments.

(Decl. Marc Toberoff, Ex. R; see also Decl. Marc Toberoff, Ex. T (September 7,

1938, letter from Managing Editor Chas Lounsbury to Jerome Siegel)).

Shortly thereafter, progress was made on the McClure front. In early

September, 1938, Liebowitz summoned Siegel to New York City to discuss the

McClure newspaper syndication proposal. (Decl. Marc Toberoff, Ex. R ("In early

September, Liebowitz asked me to come to New York to discuss the matter of

McClure's interest in syndicating 'Superman'")). What happened during this early

September meeting is later related in the June, 1941, Saturday Evening Post

story, "Up, Up and Awa-a-y!":

From the fall of '38 on, it was all sail and no anchor.
Amid the piteous sounds of syndicate editors kicking
themselves, McClure negotiated with Donenfield [at
Detective Comics] to handle the newspaper rights,
Donenfield to receive 40 per cent. Superman was
eventually placed in 230 daily and Sunday newspapers
scattered throughout the Western Hemisphere.
Donenfield's 1940 cut was $100,000.

The McClure negotiations were perceived by
considerable unhappiness for the partners. They
sensed — correctly — that syndicate editors, who had
once turned Superman down, would soon come to
them, hat in hand. They begged Donenfield to give
back the syndicate rights.

"We can't do that," he replied, "but if one of you will
come to New York, I'm sure we can work something
out."

Sitting up all night in the coach for lack of sleeper fare,
Siegel arrived, rumpled and yawning, to receive the
proposition: If the partners would confine all their
services to Donenfield for ten years, he would permit
them to do strips for McClure, himself retaining an
agent's 10 per cent — of McClure's gross, however,
not his own 40 per cent. In the heat of discussion
Siegel was frequently reminded that Donenfield owned
all rights and could freeze the partners out. The boys

15

1   signed a contract, which for the first year brought them
    an increase of less than $100 a month.

2

3   (Decl. Marc Toberoff, Ex. M).

4       The transaction was structured into two separate contracts, executed by

5   the parties on approximately September 22, 1938:[5]  An employment agreement

6   between Detective Comics, on one hand, and Siegel and Shuster, on the other

7   hand; and a newspaper syndication agreement among all three:  Detective

8   Comics, Siegel and Shuster, and McClure.

9       The newspaper syndication agreement gave McClure an eight-month

10  option for a "six days a week" Superman "daily strip."  If exercised, Detective

11  Comics agreed "to permit [Siegel and Shuster] to supply 'Superman' strip

12  exclusively to [McClure] for syndication in newspapers [throughout the world], for a

13  minimum period of five years from June 1, 1939," with an option for McClure to

14  "renew the agreement for a further period of five years."  "[I]n consideration,"

15  McClure agreed to pay "Detective . . . forty (40%) per cent of the net proceeds

16  from such syndication during the first year, forty-five (45%) per cent during the

17  second year and fifty (50%) per cent thereafter."  (Decl. Marc Toberoff, Ex. Q).

18  Payment to Siegel and Shuster for their "work" created under the contract was to

19  be done "solely" through Detective Comics.

20      The syndication agreement provided that Siegel and Shuster were to

21  supply said material to McClure "on an advanced schedule of at least six weeks"

22  so as to "insure ample time for distribution prior to release dates."  If Siegel and

23  Shuster failed to furnish said material in time, the agreement allowed Detective

24  Comics to substitute "other artists to do the feature and strip."  As to the

25  Superman newspaper strip material supplied to it by Siegel and Shuster, the

26  _____

27      [5]  The agreements are dated September 22, 1938 (before the publication of
    Action Comics No. 6); however, correspondence between the parties establishes

28  that Siegel and Shuster did not return the signed agreements to Detective Comics
    until September 30, 1938.  (See Decl. Bergman, Ex. C).

16

ER 102

1  syndication agreement provided that McClure, not Detective Comics, would have

2  "reasonable editorial supervision of the feature," which Siegel and Shuster

3  promised to maintain "at the standard shown in the sample submitted."  (Decl.

4  Marc Toberoff, Ex. Q).

5      The syndication agreement also provided that monthly statements of

6  McClure's net proceeds would be sent to "Detective and a copy to" Siegel and

7  Shuster.  Furthermore, both Detective Comics and Siegel and Shuster were given

8  the right to inspect McClure's books and records "in reference to the feature, at

9  any reasonable time."  (Decl. Marc Toberoff, Ex. Q).

10     As to the copyright in the material published in the newspaper comic strips,

11 the syndication agreement provided that it would be in McClure's name, with a

12 "reversionary" interest in favor of Detective Comics at the conclusion of the

13 contract's term.  (Decl. Marc Toberoff, Ex. Q ("The material contained in the

14 feature which we syndicate will be copyrighted in our name, but copyright reverts

15 to Detective at the termination of this contract")).  Toward that end, the syndication

16 agreement made clear that "the title 'Superman' shall always remain the property

17 of Detective," and that Detective Comics retained the copyright in Superman in all

18 other media "except daily or weekly newspaper publication."  (Decl. Marc

19 Toberoff, Ex. Q ("Our agreement covers newspaper rights only.  Radio, motion

20 picture, silent and talkie, book and all other rights are retained and owned by

21 Detective")).  Finally, McClure agreed to provide to Detective Comics free of

22 charge "all the original drawings of the 'Superman' strip, so that said drawings may

23 be used by Detective in the publication" of its comic book magazines, but only "six

24 months after [the] newspaper [strip's] release."

25     The employment agreement notably differentiates provisions relating to

26 newspaper strips and those concerning comic books.  The agreement contained

27 an opening declaration broadly asserting Detective Comics' rights to, among

28 others, the Superman copyright.  (Decl. Marc Toberoff, Ex. P ("We, Detective

1 Comics . . ., are the exclusive owners of comic strips known by the titles

2 'Superman'")).  The employment agreement further noted up front that Siegel and

3 Shuster had, up to that time, been doing the "art work and continuity for [the

4 Superman] comic[] for [Detective, and that Detective] wish[ed] [for them] to

5 continue to do said work and hereby employ and retain you for said purposes for

6 the period of this contract."  The following sentence then recited Siegel and

7 Shuster's agreement to "supply [Detective] each and every month hereafter, in

8 sufficient time for publication in our monthly magazines, sufficient copy and art for

9 each of said features each month hereafter."  The agreement distinguished this

10 duty from Siegel and Shuster's further duty under the syndication agreement: "You

11 shall also furnish in sufficient time to properly perform the terms of an agreement

12 we are executing together with you with the McClure Newspaper Syndicate, all of

13 the art and continuity for the newspaper strip entitled 'Superman' called for by said

14 agreement."  (Decl. Marc Toberoff, Ex. P).

15     The employment agreement then spelled out the per page compensation

16 rate Detective Comics would pay Siegel and Shuster for the respective comic

17 book characters they had been supplying to the publisher at that time (Superman

18 receiving the highest rate of $10 per page).  Again, the agreement then

19 distinguished this payment scheme with that for the artists' creation of the

20 Superman newspaper strips:

21     We further agree to pay you for the McClure
     Newspaper Syndicate strips which you may hereafter
22     furnish pursuant to the above-mentioned contract with
     McClure, on the following basis:

23
     When we receive payment from McClure on the
24     40% basis mentioned in the contract, we shall
     retain 7½% and pay you 32½% of the "net
25     proceeds" as defined in the McClure contract.

26     When we receive payment from McClure on the
     45% basis mentioned in the contract, we shall
27     retain 9% and pay you 36% of the "net proceeds"
     as defined in the McClure contract.

28

ER 104

> When we receive payment from McClure on the
> 50% basis mentioned in the contract, we shall
> retain 10% and pay you 40% of the "net
> proceeds" as defined in the McClure contract.

(Decl. Marc Toberoff, Ex. P).

As for ownership in the copyright to the newspaper strips, the employment

agreement provided that Detective Comics would own "all" such "material" and, at

Detective Comics' option, it could be "copyrighted or registered in [Detective's]

name or in the names of the parties designated by us."

The employment agreement further provided that Detective Comics had the

right to "reasonably supervise the editorial matter of all features" and the right to

terminate Siegel and Shuster's employment if "the art and continuity of any feature

shall not be up to the standard required for the magazines."

Moreover, the employment agreement provides that, should Detective

Comics decide to re-print some of the Superman newspaper strips in its

"magazines," Detective Comics would compensate the pair "at the above-

mentioned page rate less the percentage which McClure receives for said

syndication."

The employment agreement also contained a global (literally and

figuratively) prohibition against Siegel and Shuster "hereafter" furnishing to

anyone Superman material, whatever its form be it as a "comic" book, a

"newspaper" strip, or something else; instead, the artists agreed that they "shall

furnish such matter exclusively to [Detective Comics] for the duration of this

agreement as such matter may be required by us or as designated by us in

writing."

Around the time the syndication and employment agreements were signed

by all the parties concerned, Liebowitz wrote a letter on September 28, 1938, to

Siegel, commenting upon said agreements.  In the course of his lengthy

correspondence, Liebowitz reminded Siegel that, "[a]s I have pointed out to you

ER 105

1    many times, our company has very little to gain in a monetary sense from the

2    syndication of this material.  Also bear in mind, that we own the feature

3    'Superman' and that we can at any time replace you in the drawing of that feature

4    and that without our consent this feature would not be syndicated and therefore

5    you would be the loser in the entire transaction. . . .  It is entirely up to you and

6    Joe, whether you wish our pleasant relationship to continue and whether you wish

7    the strip 'Superman' to be syndicated." (Decl. Michael Bergman, Ex. B).  Siegel

8    quickly responded that both he and Shuster "are anxious and ready to do our best

9    on SUPERMAN so that all parties concerned will profit."  (Decl. Michael Bergman,

10   Ex. C).

11         With that, Siegel and Shuster produced daily newspaper strips for McClure

12   under the terms of the September 22, 1938, syndication agreement from

13   1939 through 1943; the first daily newspaper strip (depicting the first day's worth

14   of the two weeks of material created by Siege and Shuster in the spring of 1938)

15   appearing in the <u>Milwaukee News Journal</u> on January 16, 1939:

16

17   

26   The applications submitted by McClure (and, when approved, the certificates) for

27   the original copyright term registration for the Superman newspaper strips

28   (identified as a "PERIODICAL CONTRIBUTION") created and published from

ER 106

1939 to 1943 listed "McClure Newspaper Syndicate" as the claimant and "Jerry
Siegel and Joe Shuster" as the authors of the newspaper strips. (Decl. Michael
Bergman, Ex. C). No effort was made by any party throughout the initial term of
the Superman newspaper strips published through 1943 to file a supplemental
registration to make changes to the information contained in the original
registrations.

Two applications for renewal term registrations were, however, submitted
for the Superman newspaper strips in question during the 1960s: First, National
Periodical Publications Inc., as successor in interest to Detective Comics,
submitted applications for a renewal registration claiming as proprietors in the
copyright of the renewable matter in "a work made for hire," noting that said work
was a "contribution to periodical or other composite work," namely, the specific
newspaper issue in question. (Decl. Michael Bergman, Ex. C). Second,
applications for a renewal registration were also made by Siegel and Shuster,
listing themselves as authors of the renewable matter. (Decl. Marc Toberoff, Ex.
A (Thomson & Thomson copyright report noting that "the copyrights in the
[newspapers strips] originally published through 1943 were renewed . . . in the
names of Jerome Siegel and Joe Shuster, claiming as authors")).

Not long after Superman entered into newspaper syndication, it became
apparent that McClure could not provide the editorial supervision over the material
submitted by Siegel and Shuster as called for in the syndication agreement.
Correspondence between the artists and their magazine editor at Detective
Comics, J.S. Liebowitz, recount this increasingly rocky relationship. (Decl.
Michael Bergman, Ex. D (April 21, 1939, letter from Liebowitz in which he notes
"[e]very morning it seems to me I receive copies of criticisms and complaints sent
to you by Miss Baker of McClure" and that "Mr. Nimis of McClure was here today
and he stated that they definitely do not intend to go on as they are . . . they feel

1   that the time and effort and aggravation encountered in getting this thing going

2   properly is not worthwhile because of your lack of cooperation")).

3       Eventually, by January, 1940, it was clear that McClure had outsourced its

4   editorial supervision over the newspaper strips to editors at Detective Comics.

5   (Decl. Michael Bergman, Ex. I (January 22, 1940 letter commenting that "[w]e've

6   been having considerable talk about the daily releases on SUPERMAN, and I

7   believe Jack [Liebowitz] is writing to you to have you send all the material here

8   before it goes to the syndicate for release"); Ex. E (January 25, 1940 letter from

9   Liebowitz reminding Siegel that "all copy must clear through our office"); Ex.  F

10  (February 8, 1940 letter remarking on the "present arrangement" of Detective

11  Comics "editing of the strip")).  The substance of the editorial comments contained

12  in the correspondence from Detective Comics (both as to the Superman comic

13  book and later also the newspaper strips), pertained for the most part to

14  complaints about the pair's failure to follow its editorial directions and to submit

15  material on time, leaving the publisher to have to quickly scramble to get the

16  material to the printer to meet its deadlines.

17      There were, however, more substantive criticisms of both the script and

18  artwork supplied by the pair, with specific changes either made to yet-to-be

19  released material or suggested for later releases. (Decl. Michael Bergman, Ex. E

20  (noting that it was "unwise" to depict Clark Kent flying in the air without wearing

21  Superman's costume, as had been done with "the last daily release"); Ex. H

22  (returning 26-page script and suggesting that it be re-written for a 13-page story as

23  "there is nothing important enough about the story to justify its going to such

24  length"); Ex. I (cataloging critiques of specific artwork of "sketches" submitted by

25  Shuster); Ex. M (complaining "that a great deal hasn't been done to make Lois

26  look better," giving specific examples in which the artwork is deficient, and then

27  drawing an image of Lois on the correspondence that the editor suggests "Shuster

28  and his lads" use as an exemplar).

1      During the term of the syndication agreement, problems also arose with

2   Siegel and Shuster's ability to supply newspaper strips in a timely fashion to

3   McClure.  As a consequence, McClure turned to Detective Comics for "filler"

4   material for "newspapers which carried the comic strip SUPERMAN in order to

5   prevent said newspapers from terminating their syndication agreements with"

6   McClure.  Notably, Detective Comics did not supply in-house Superman

7   newspaper strips, as was its right under the terms of the syndication agreement.

8   Instead, Detective Comics "supplied" to McClure a Superman spin-off, the "comic

9   strip LOIS LANE, GIRL REPORTER, . . . without charge for use."  In fact,

10  Detective Comics and McClure entered into a side agreement in September,

11  1943, with reference to the Lois Lane newspaper strip's impact on the

12  computation of the net proceeds to be divided among the parties.  In the

13  agreement, the two "agreed that . . . 'net proceeds' for the purposes of computing

14  [Siegel and Shuster's] return from the newspaper publication of Superman should

15  be the entire gross receipts" from the same, "deducting therefrom only the cost of

16  cuts and proofs."  Detective Comics and McClure further agreed that "the

17  compensation of the [in-house] artists engaged by Detective Comics to draw the

18  releases of Lois Lane, Girl Reporter . . . furnished by Detective Comics to McClure

19  for newspaper syndication was to be deducted from the gross receipts of the

20  Superman syndication as 'mechanical costs' in computing 'net proceeds.'" Siegel

21  and Shuster were not parties to (nor were they apparently aware of) this

22  arrangement between McClure and Detective Comics.

23      Later, McClure notified Detective Comics of its election to extend for five

24  years (beginning from June 1, 1944) the term of the 1938 syndication agreement.

25  Contemporaneously, McClure "assigned to Detective Comics . . . all its rights, title

26  and interest in all copyrights in [the] Superman" newspaper strips created during

27  the preceding five years, "including all renewals and extensions thereof."  (Decl.

28  Toberoff, Ex. A at 5 (Thomson &Thomson copyright report, dated Feb. 29, 1996)).

1    During the same time period, the pair produced, under the terms of the

2    employment agreement, Superman material for various comic book magazines

3    published by Detective Comics, first in its serialized magazine <u>Action Comics</u>, then

4    as a stand-alone feature in the self-titled comic book magazine <u>Superman</u>.  The

5    terms contained in the 1938 employment agreement were later altered in a

6    modification agreement entered into between Detective Comics and the artists on

7    December 19, 1939.  In this modification agreement it was noted that, "while both

8    [the artists] have continued to furnish art work and continuity for 'SUPERMAN,' . . .

9    Mr. Shuster no longer furnishes the art work" for the other strips to which the pair

10   were under contract to produce, such as "Slam Bradley" or "Spy."  The parties

11   therefore agreed that, in exchange for Detective Comics being "free to make other

12   arrangements" for "furnishing [the] art work" for these other comics, Siegel and

13   Shuster's compensation for Superman comic book material (which the pair

14   reaffirmed that they would "continue to furnish all [the] art and continuity" thereof)

15   would be increased to $20 per page, and Detective Comics would pay the pair 5%

16   of the net proceeds derived from the commercial exploitation of Superman outside

17   that from comic books and newspaper syndication, and into such other mediums

18   as "radio, motion pictures, [and] the toy and novelty field."  (Decl. Michael

19   Bergman, Ex. A).

20   Detective Comics re-asserted that it had "the unrestricted right to adapt,

21   arrange, change, transpose, add to and otherwise deal with [the Superman] comic

22   strip . . . as [it] in [its] sole discretion . . . deem[ed] necessary."  The agreement

23   further contained Siegel's and Shuster's re-affirmation that Detective Comics was

24   the "sole and exclusive owners of the comic strip entitled 'Superman' . . . and to all

25   rights of reproduction . . . , including but not limited to the fields of magazine or

26   other book publications, newspaper syndication, radio broadcasts, television, [and]

27   motion pictures . . . ."  It was also acknowledged by the pair that Detective Comics

28   held "all right of copyright and all rights to secure copyright registration in respect

1  of all such forms of reproduction either in [its] name or others at [its] exclusive

2  option."

3       Not all the Superman comic book material supplied by Siegel and Shuster

4  after the September, 1938, employment agreement was published by Detective

5  Comics, although it remains unclear whether the pair was nonetheless paid for

6  such material.  For instance, plaintiffs have brought to the Court's attention the

7  curious tale of "K-Metal from Krypton."  In August, 1940, Siegel submitted a 26-

8  page script, accompanied by multiple pages of illustrations (mainly pencil

9  drawings, but some that had been inked) created by artists working in Shuster's

10 studio that, in the words of comic writer and historian Mark Waid, "would have . . .

11 radically" altered the then established Superman story line:  Lois Lane learns that

12 Clark Kent is Superman and the two agree to become partners and confidants;

13 the first appearance of the kryptonite concept (referred to in the material as K-

14 Metal derived from meteorite debris from the planet Krypton) and its debilitating

15 effects on Superman's powers; and Superman first learning of his Kryptonian

16 origins.  Although the material was not published when initially submitted by

17 Siegel, upon later being unearthed in DC Comics' library vault in 1988, copies of

18 the material were circulated among the top brass at the company in the hopes of

19 "obtaining Siegel's blessing to have the story re-illustrated and released . . . , but

20 for whatever reason, nothing ever came of it."  (Decl. Marc Toberoff, Ex. BB).

21      Eventually, disputes between Detective Comics and Siegel and Shuster led

22 to the pair leaving the employ of Detective Comics in 1947, ending involvement by

23 this talented pair in the further development of the Superman character.

24      **II. WORK MADE FOR HIRE UNDER THE 1909 ACT**

25      Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

26 prior grant in the copyright to his or her creation does not apply to a "work made

27 for hire" because the copyright in such a creation never belonged to the artist in

28 the first instance to grant; instead, it belonged at the outset to the party that

1   commissioned the work.  See 17 U.S.C. § 304(c).  This absolute bar to

2   termination brings into sharp focus a question that has figured prominently

3   throughout the parties' papers:  Whether any of the vast body of Superman

4   material created up to 1943 by Siegel, with either the assistance of Shuster, with

5   the assistance of others, or alone, was a "work made for hire."  If so, then plaintiffs

6   (as Siegel's heirs) cannot terminate his grant of the copyright in that material, such

7   a grant being merely a superfluous act that did not alter the pre-existing ownership

8   rights to that copyright.  See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554

9   (2d Cir. 1995) ("Once it is established that a work is made for hire, the hiring party

10   is presumed to be the author of the work").

11       Resolution of the work made for hire nature of this material is controlled by

12   the governing body of law in existence at the time Siegel crafted this Superman

13   material, that is, the 1909 Act and the precedent developed thereunder.  See Self-

14   Realization Fellowship v. Ananda Church, 206 F.3d 1322, 1325 (9th Cir. 2000)

15   ("Because all of the copied works were created before 1978, the Copyright Act of

16   1909 governs the validity of the initial copyrights"); Twentieth Century Fox Film

17   Corp. v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005) ("We first

18   consider Twentieth Century Fox Parties' infringement claims under the now

19   repealed Copyright Act of 1909 because [the work] was published before the . . .

20   effective date of the 1976 Copyright Act").

21       The 1909 Act provided that, "[i]n the interpretation and construction of this

22   title[,] . . . the word 'author' shall include an employer in the case of works made

23   for hire."  17 U.S.C. § 26 (repealed).  "Thus, with respect to works for hire, the

24   employer is legally regarded as the 'author,' as distinguished from the creator of

25   the work, whom Learned Hand referred to as 'the "author" in the colloquial

26   sense.'"  Martha Graham Sch. and Dance Foundation, Inc.v Martha Graham

27   Center of Contemporary Dance, Inc., 380 F.3d 624, 634 (2d Cir. 2004).  Nowhere,

28   however, did the 1909 Act define what was meant by "work made for hire" or

ER 112

1  "employer"; only the consequences flowing from such a designation were spelled

2  out.  The task of giving meaning to these terms was left to the courts.  "Although

3  for most of its life Section 26 was construed to extend work-for-hire status only to

4  traditional employer-employee relationships," by way of demonstration that the

5  work was done within the scope of one's job duties with their employer, "in the late

6  1960s, in limited circumstances, some courts began expanding the definition of

7  'employee' to cover authors outside the traditional employment relationship," to

8  those involving "an independent contractor," but only if it could be shown that "the

9  work was made at the hiring party's 'instance and expense.'"  2 PATRY ON

10  COPYRIGHT § 5:84. [6]

11       However, in 1965, the Ninth Circuit was the first court to utilize the

12  "instance and expense" test to determine whether works created either by

13  independent contractors or employees were ones made for hire.  See Lin-Brook

14  Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965).[7]  Said inclusion was

15  done by the court formulating an across-the-board presumption in favor of finding

16  work-for-hire ownership whenever a work is produced at the "instance and

17  expense" of the hiring party, said presumption only subject to being overcome by

18  evidence that the parties did not intend for such a result:

19            [W]hen one person engages another, whether as
              employee or as an independent contractor, to produce
20

21  ———————————————

22       [6]  Prior to this expansion, invocation of the instance and expense test to
     independent contractors only resulted in a determination that the commissioned
     party had assigned to the commissioning party the copyright for the initial term,
23   leaving the renewal term in the work with its creator.  See Estate of Burne Hogarth
     v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 160 (2d Cir. 2003).

24
          [7]  Plaintiffs object to the across-the-board application of the "instance and
25   expense" test set forth in Lin-Brook for determination of the for-hire status of all
     the works at issue in this case, arguing that at the time the works were created in
26   the late 1930s and early 1940s, the law governing work for hire extended only to
     the traditional employer-employee relationship.  Whatever appeal plaintiffs'
27   argument may otherwise have, it has been rejected by the Ninth Circuit.  See
     Twentieth Century, 429 F.3d at 877 (holding that rejection of the retroactive
28   application of Lin-Brook to evaluating works created by independent contractors
     would "overturn forty years of established case law within this circuit").

a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

Lin-Brook, 352 F.2d at 300 (noting that the presumption was not overcome because there was no evidence "as to the circumstances or intendment" of the parties); see also Twentieth Century, 429 F.3d at 881 ("[t]he presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"). The test sought to match the concept of a work made for hire with the purpose of the Copyright Act, that is, to "promote" the creation of "useful Arts."  U.S. Const. Art. 1, § 8.  As one court explained:  "[T]he law directs its incentives towards the person who initiates, funds and guides the creative activity, namely, the employer, but for whose patronage the creative work would never have been made. Copyright law 'is intended to motivate the creative activity of authors . . . by the provision of a special reward,'" namely, the legal protection afforded to such creative property through copyright. Estate of Hogarth v. Edgar Rice Burroughs, Inc., 62 U.S.P.Q.2d 1301, 1316 (S.D.N.Y. 2002) (quoting Sony Corp v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984)).  Toward that end, the instance and expense test requires the evaluation of three factors: (1) At whose instance the work was prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the creation of the work; and (3) at whose expense the work was created.  See Twentieth Century, 429 F.3d at 879, 881.

The "expense" requirement is met where a "hiring party simply pays an [employee or] independent contractor a sum certain for his or her work." Playboy Enterprises, 53 F.3d at 555.  Such regular, periodic payments of a sum certain bear the hallmark of the wages of an employee required to produce the work in question for his or her employer, and not that of a party who is free to engage with those other than the commissioning party in marketing his or her work.  See

1  Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642-43

2  (2d Cir. 1967).  "In contrast, where the creator of a work receives royalties as

3  payment, that method of payment generally weighs against finding a work-for-hire

4  relationship."  Playboy Enterprises, 53 F.3d at 555; see also Twentieth Century,

5  429 F.3d at 881 (finding that "expense" requirement met when publisher agreed to

6  pay the creator "a lump sum for writing the book, instead of negotiating a royalty

7  deal").

8       Finally, in speaking of the expense in the creation of the work, the focus is

9  not on who bore the costs or expense in physically creating the work itself (the

10 money spent to purchase the paper on which the dialogue and story elements was

11 printed, the typewriter used to put into concrete form the author's concepts of the

12 same, and the pencils and ink needed to draw the illustrations, etc.).  That

13 particular consideration relates to the question of whether "an artist worked as an

14 independent contractor and not as a formal employee," a distinction, as made

15 clear after the Ninth Circuit's decision in Lin-Brook, that has "no bearing on

16 whether the work was made at the hiring party's expense."  Playboy Enterprises,

17 53 F.3d at 555.  Instead, the focus is on who bore the risk of the work's

18 profitability.  See Twentieth Century, 429 F.3d at 881 ("there is little doubt that the

19 book was authored at [the publisher's] expense.  [The publisher] took on all the

20 financial risk of the book's success, agreeing to pay [the writer] a lump sum for

21 writing the book, instead of negotiating a royalty deal"); Picture Music, Inc. v.

22 Bourne, Inc., 314 F. Supp. 640, 651 (S.D.N.Y. 1970) (noting that "the fact that the

23 author was obliged to repay advances on royalties which were never accrued is an

24 indication that the relationship was not an employment for hire").

25       The "instance" component of the test inquires into "whether 'the motivating

26 factor in producing the work was the employer who induced the creation.'"

27 Twentieth Century, 429 F.3d at 879; see also Picture Music, Inc. v. Bourne, Inc.,

28 457 F.2d 1213, 1217 (2d Cir. 1972) (concluding that the fact the employer took the

1  "initiative in engaging" the author to create the work rendered it as one made for

2  hire).  That the commissioning party be the motivating factor is not a "but for" test

3  — that is, but for the artist's employment the work would not have been created —

4  but instead is a more narrow inquiry focused on the nature and scope of the

5  parties' business relationship.  As one court explained:

6          No doubt Graham was a self-motivator, and perhaps
          she would have choreographed her dances without the
7          salary of Artistic Director, without the Center's support
          and encouragement, and without the existence of the
8          Center at all, but all that is beside the point.  The fact is
          that the Center did employ her to do the work, and she
9          did the work in the course of her regular employment
          with the Center.  Where an artist has entered into an
10         explicit employment agreement to create works, works
          that she creates under that agreement cannot be
11         exempted from the work-for-hire doctrine on
          speculation about what she would have accomplished
12         if she had not been so employed.

13                          . . . .

14         There is no need for the employer to be the
          precipitating force behind each work created by a
15         salaried employee, acting within the scope of her
          regular employment.  Many talented people . . . are
16         expected by their employers to produce the sort of
          work for which they were hired, without any need for
17         the employer to suggest any particular project.
          "Instance" is not a term of exclusion as applied to
18         specific works created within the scope of regular
          employment.  It may have more significance in
19         determining whether an employee's work somewhat
          beyond such scope has been created at the employer's
20         behest or to serve the employer's interests . . . .

21  Martha Graham Sch., 380 F.3d at 640-41.

22         Thus, "under the 1909 Act[,] a person could be an employee yet create a

23  work 'as a special job assignment, outside the line of the employee's regular

24  duties.' In that event, the work is not a work for hire."  Id. at 635 (citing Shapiro

25  Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2d Cir. 1955)).  The

26  critical factor is what was the nature of the creator and publisher's business

27  relationship (be it as an employer-employee or an commissioner-independent

28  contractor) at the time of the work's creation, and whether the work in question

1  falls within the scope of those job duties.  It is for this reason that courts concern

2  themselves with "the degree to which the hiring party had the right to control or

3  supervise the artist's work," as its presence would reflect a circumstance found

4  when the work being created was done so within the confines of the pre-existing

5  employment relationship.  Twentieth Century, 429 F.3d at 879; see also

6  Donaldson, 375 F.2d at 643 (labeling as an "essential element" the "power to

7  direct and supervise the manner in which the writer performs his work"); Picture

8  Music, 314 F. Supp. at 650 ("The existence of an arrangement going beyond an

9  assignor-assignee relationship prior to the undertaking of the particular work.  The

10 antithesis of such an arrangement is a case where an author creates a work of his

11 own volition and then sells it to a proprietor").  Although it is not critical that the

12 commissioning party actually exercise its right of control and supervision in the

13 creation of the work in question, it is necessary that the party have the right to

14 direct, control, or otherwise shape the artist's work.  See Martha Graham Sch.,

15 380 F.3d at 635 ("The right to direct and supervise the manner in which the work

16 is created need never be exercised" (emphasis in original)); Picture Music, 314 F.

17 Supp. at 651 (labeling as "crucial" whether the hiring party had "[t]he right . . . to

18 direct and supervise the manner in which work is performed").

19      Moreover, there are certainly gradations of control a publisher could and

20 may have exerted in the creation of the work, and the greater the extent of such

21 supervision the "more likely it is that the work was created at the commissioning

22 party's instance."  Twentieth Century, 429 F.3d at 880.  Thus, a publisher

23 providing suggestions and comments on galleys to a novel, for instance, may

24 move into the realm of that associated with a work made for hire depending on the

25 degree and pervasiveness of said interaction.  Id. (labeling "the degree of in-

26 person supervision was much greater than" what the publisher "usual[ly]" did,

27 including utilizing the services of fact-checker and "regular face-to-face meetings"

28

1   by the author "with [the publisher's] editorial board" at which the author was

2   "provided . . . with extensive notes and comments").

3   ### III. APPLICATION OF THE WORK FOR HIRE DOCTRINE

4   ### TO THE RELEVANT WORKS

5           There are four major categories of Superman works over which the parties

6   are contesting the work for hire nature:  (A) Superman material created by Siegel

7   before the March 1, 1938, grant (including Action Comics No. 4 and portions of

8   Superman No. 1);[8] (B) Superman comic book material published in the interim

9   period after the March 1, 1938, grant but before the execution of the September

10  22, 1938, employment and syndication agreements (namely, the material

11  appearing in Action Comics Nos. 2-3 and 5-6);[9] (C) the remaining Superman

12  comic book material created by Siegel and Shuster beginning immediately after

13  the execution of the September, 1938, employment and syndication agreements

14  and continuing until the close of the five-year termination window on April 16, 1943

15  (namely, Action Comics Nos. 7-61 and Superman Nos. 1-23); and (D) Superman

16  daily newspaper comic strips published beginning in January, 1939 (under the

17  auspices of the September 22, 1938, syndication agreement) and continuing

18  through April 16, 1943 (the close of the five-year termination window).

19  **A.    Pre-March, 1938, Superman Material (Action Comics No. 4 and**

20         **portions of Superman No. 1)**

21          Beginning with the earliest Superman comic book material, there seems

22  little doubt that any Superman material that Siegel created by himself or with the

23  assistance of others prior to the March 1, 1938, grant, and that was later

24

25          _____

26          [8]  The Court previously considered the issue of whether Action Comics No. 1 was a work made for hire.  See Siegel, 542 F. Supp. 2d at 1126-28.  Nothing contained in this Order is meant to supersede that Order.

27          [9]  Although Action Comics No. 4 was published during this period, given that the dialogue thereto was arguably created during the pre-March, 1938, period, the Court will treat its work for hire nature there.

28

ER 118

1    published, is not a work made for hire.  That was a core holding in this Court's

2    March 26, 2008, Order, which itself was built upon the finding the Second Circuit

3    made during the parties 1970s' litigation over the renewal term rights to the

4    Superman copyright.  See Siegel, 542 F. Supp. 2d at 1126-28 ("Accordingly, . . .

5    all the Superman material contained in Action Comics, Vol. 1, is not a work-made-

6    for-hire and therefore is subject to termination."); Siegel, 508 F.2d at 914.

7    Adapting the language from the Second Circuit decision, the Superman material in

8    question had been crafted by the artists years before the relationship between its

9    authors and its ultimate publisher existed.  The creation of this material was not

10   done at the instance and expense of anyone other than the artists themselves.

11        The dispute is thus not with the work for hire nature of this material, but

12   rather over whether any of the following material either contains copyrightable

13   elements or suffers from some other defect preventing termination from occurring:

14   (1) The "future Superman exploits" paragraph written before the publication of

15   Action Comics No. 1; (2) the Superman material found in Action Comics No. 4,

16   which was based on Siegel's 1934 script and the other 1934 material created by

17   Siegel and Keaton; and (3) the first six pages of Superman No. 1.

18        **1.     Paragraph on Superman's Future Exploits**

19        As for the one paragraph concerning future exploits, there is no doubt that

20   the concepts embodied in that paragraph later found concrete expression in some

21   of the earliest Superman material published in Action Comics.  Plaintiffs' counsel,

22   however, would have the Court conclude that, based on this one scant paragraph

23   and its later fuller expression of the concepts contained therein, the Superman

24   materials found in Action Comics Nos. 2, 4, and 5 were created prior to the March

25   1, 1938 grant.  The problem with this argument is that the paragraph itself

26   constitutes mere ideas for future works rather than expressions of those ideas,

27   and thus contains no copyrightable material, which, of course, bars any effort at

28

ER 119

1   termination.  See 17 U.S.C. § 304(c) (limiting termination to the grant in the

2   "copyright" to a work).

3        "A copyright never extends to the 'idea' of the 'work,' but only to its

4   'expression,' and that no one infringes, unless he descends so far into what is

5   concrete as to invade that 'expression.'"  National Comics Publications, Inc. v.

6   Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (L. Hand, J.).  Aside

7   from the addition of a few adjectives, Siegel's one paragraph of future Superman

8   exploits has much more in common with Judge Learned Hand's conception of the

9   general idea of a play about "a riotous knight who kept wassail to the discomfort of

10  the household, or a vain and foppish steward who became amorous of his

11  mistress" than with its concrete expression in the form of Shakespeare's play

12  "Twelfth Night."  See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.

13  1930).  To turn Judge Hand's phrase, Siegel's one paragraph of future exploits

14  was little more than a generalized description of Superman performing an

15  unelaborated task or heroic feat, the precise details of which were left to be

16  sketched out at a later time, as later occurred, around the time the comic books

17  were published during 1938.[10]  Here, Siegel did little more than sketch the idea of

18  his superhero doing some broad-brushed act, the details being left to be filled in

19  later, as they were when he put the idea into concrete form by writing a script

20  setting down precisely how and why Superman "battles an airplane with his bare

21  hands."  In this sense the one paragraph sets out little more "than the most

22  general statement of what the [comic] is about."  Id.  The generalized description

23  Siegel put down to paper concerning Superman's "exploits" did not cross the line

24

25        _____

26        [10]  For instance, in the story in Action Comics No. 2,  Superman thwarts the
       efforts of an industrialist war profiteer who is secretly funding both sides in a war in
       a far-off land ("Superman will win a war single-handed"), that leads to Superman
27     battling aircraft ("battle an airplane with his bare hands"), swimming great
       distances in the ocean (he'll swim several hundred miles and think nothing of it"),
28     rescuing Lois Lane from being executed by a firing squad, and ending with the
       industrialist repenting his actions.

1  into something to which copyright protection applies and, accordingly, to which no

2  right to termination attaches.

3          **2.     Superman Material Created while Siegel Was Collaborating with**

4          **Keaton**

5          As far as the Superman material created by Siegel during his collaboration

6  with Keaton is concerned, save for one important exception, that material never

7  acquired statutory copyright protection under the 1909 Act, as it was either never

8  published with the requisite notice or registered as an unpublished work.  The

9  termination provisions apply only to a work for which the "copyright [therein was]

10 subsisting in either its first or renewal term on January 1, 1978."  17 U.S.C.

11 § 304(c).  Unless the material had been registered as unpublished works under

12 section 12 to the 1909 Act, copyright protection could be achieved only by

13 publication of the material, before January 1, 1978, bearing the requisite copyright

14 notice.  See Siegel, 496 F. Supp. 2d at 1150; 3 PATRY ON COPYRIGHT § 7:42

15 ("Section 304(c) . . . by its own terms covers only works in either their first or

16 renewal term on January 1, 1978.  The section thus does not cover works that

17 were unpublished" on that date); 3 NIMMER ON COPYRIGHT § 11.02[A][1] at 11-12

18 ("the termination provisions of Section 304(c) apply only if the work in question

19 was the subject of statutory copyright prior to the effective date of the current

20 Act").  There has been no evidence presented that any of the Siegel/Keaton

21 material was registered as an unpublished work under the 1909 Act, nor is there

22 any indication that any portions of the Siegel/Keaton material (other than that

23 appearing in Action Comics No. 4) was ever published with the requisite notice

24 before 1978.  Thus, although not works made for hire, most of the Siegel/Keaton

25 material is not subject to termination.

26         The same, however, cannot be said of the 1934 Superman football story

27 script written by Siegel and sent to Keaton.  Defendants do not dispute that the

28 storyline contained in Action Comics No. 4 published nearly verbatim the entirety

ER 121

1    of the script, as it surely did.  <u>See</u> generally <u>Siegel</u>, 496 F.Supp.2d at 1150-51

2    (discussing what was sufficient to demonstrate "publication" of material for

3    purposes of the 1909 Act).

4          Instead, defendants object to the Court's consideration of the script on

5    evidentiary grounds, complaining that the script had never been produced in

6    discovery, that it has not been authenticated, and that plaintiffs have failed to

7    provide the source of the material and how they came into possession of it.

8    (Defs.' Obj. to Pls.' Sept. 22, 2008 ¶ 7).  None of these evidentiary objections are

9    well-taken.  Plaintiffs have submitted declarations evidencing that the script in

10   question was in the possession of Russell Keaton's widow who turned it over,

11   along with other materials, to the family's literary and marketing agent, Denis

12   Kitchen, in 1993.  Mr. Kitchen thereafter on August 21, 2008, posted a comment

13   in response to a blog story titled "Russell Keaton, Superman's Fifth Beatle,"

14   wherein he disclosed that, in addition to the subject of the story (which concerned

15   the illustrated strips, but not the scripts, Siegel and Keaton had created

16   concerning the version of Superman as someone from Earth's future), "there's

17   LOTS more correspondence and scripts."  Plaintiffs' counsel thereafter ran across

18   Kitchen's post while searching the Internet, and after contacting him obtained a

19   copy of the script, which he then promptly produced. (Sept. 23, 2008 Decl.

20   Toberoff; Sept. 23, 2008 Decl. Joanne Siegel; Sept. 29, 2008 Decl. Denis

21   Kitchen).

22         Defendants also apparently argue that plaintiffs should be precluded from

23   acquiring any ownership stake in the artwork found in <u>Action Comics</u> No. 4, as no

24   artwork was contained in Siegel's 1934 script.  As stated in their papers:  "Even if

25   accepted in evidence . . . , the allegedly pre-existing continuity pertaining to <u>Action</u>

26   <u>Comics</u> #4 would not signify that the artwork and any new text in this comic book

27   were pre-existing as opposed to being prepared after March 1, 1938 as work for

28   hire."  (Defs.' Obj. to Pls.' Sept. 23, 2008, filing ¶ 4).  The record is devoid of any

1   evidence indicating when the artwork later found in Action Comics No. 4 was

2   created.  However, also missing is what specific legal argument defendants seek

3   raise based on that silence in the record.  For instance, the Court is left to wonder,

4   whether their challenge is based on an assertion that Shuster's artwork appearing

5   in Action Comics No. 4 is a work made for hire on the basis that it was created

6   following the March 1, 1938 grant; or are they asserting that Siegel's script lacks

7   sufficiently originality as to preclude any effort by plaintiffs to recapture the

8   copyright  in the artwork contained in Action Comics No. 4 as part of a joint work;

9   or is it for some other unarticulated reason?  Defendants have had ample time

10  and opportunity to precisely articulate their legal argument flowing from this factual

11  assertion, and they have failed to do so.  The Court has permitted defendants to

12  file four post-hearing briefs related to any of the issues raised at oral argument or

13  in opposing counsel's papers that were filed following the hearing.  Accordingly,

14  being unable to discern the legal basis for defendants' argument, the Court

15  declines to address the significance of defendants' unelaborated observation.

16  See Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994).

17      This is not to say, however, as plaintiffs would have the Court find, that

18  Siegel writing in 1934 the script ultimately published in Action Comics No. 4 (that

19  was but an expression of one of the ideas found in his "future Superman exploits"

20  paragraph) likewise means that Siegel also wrote the other Superman material

21  that are expressions of these ideas found in that one paragraph (such as that

22  found in Action Comics Nos. 2 and 5) during the same time frame.  There is no

23  evidentiary basis to support such an inference.  The evidence surrounding the

24  1934 football story script gives no indication that, other than the script in question,

25  Siegel had written or planned on writing more Superman scripts.  The one future

26  Superman exploits paragraph itself makes no mention that scripts for the ideas

27  therein had been or were in the process of being crafted by Siegel.  The cover

28  letter Siegel submitted to Keaton with the enclosed football story script likewise

ER 123

1   contains no indication that Siegel had or was planning on writing more scripts.

2   Rather, the evidence supports the inference that the script was created as a

3   discrete project to woo a prospective publisher.

4       Accordingly, because, as illustrated herein, the material appearing in Action

5   Comics No. 4 is based almost verbatim on Siegel's pre-1938 script, the Court

6   finds that the Superman material appearing therein was not a work made for hire

7   and is subject to termination.

8       **3.    Superman No. 1, pages 1-6**

9       This leaves the question of whether the first six pages in Superman No. 1,

10  which in all other respects consist of nothing more than a reprint of the Superman

11  comic from Action Comics Nos. 1-4, contains within it any additional pre-March 1,

12  1938, material.

13      Defendants label as "grossly exaggerated" the notion that the continuity to

14  these first six pages were written by Siegel in 1934.  (Defs.' Obj. to Pls.' July 28,

15  2008 Opp. Br. at 13).  To this end, defendants point to the fact that Siegel wrote in

16  his memoir, "The Story Behind Superman No. 1," that a Detective Comics' editor,

17  M.C. Gaines, wrote a letter to the pair on March 27, 1939, "specifying in detail

18  [what] the contents of [those] 'first six pages' [should entail], including specific

19  headings and panels."  (Id.)  It is defendants' factual characterization, not

20  plaintiffs', that exaggerates.  The  letter referenced by defendants makes clear

21  that it was the first two pages of the six at issue that was created at and the

22  subject of Mr. Gaines editorial direction.  Mr. Gaines remarked that insofar as the

23  "first six pages" of Superman No. 1 was concerned, the publisher would like the

24  pair to take the first page from Action Comics No. 1, "and by elaborating on this

25  one page," "work up two introductory pages" for Superman No. 1.  (Decl. Marc

26  Toberoff, Ex. GG (emphasis in original)).[11]  However, as to pages three through

27  _____

28      [11]  Plaintiffs' argument that the first two pages in Superman No. 1 were
                                              (continued...)

38

1  six in Superman No. 1, there is nothing in Mr. Gaines' letter indicating that the

2  material was created contemporaneously with Superman No. 1's publication in

3  1939. Quite the opposite is true.

4      Specifically, Mr. Steranko's forward to DC Comics' 1989 re-printing of

5  Superman No. 1 recounts the origins of pages three through six as consisting of

6  the first week of material Siegel and Shuster had created in 1935. It had been

7  intended by the artists to be part of Action Comics No. 1, but it was "eliminated" by

8  Detective Comics from inclusion in Action Comics No. 1 in order to make more

9  space available for other comics. Given that no evidence has been submitted to

10  rebut Mr. Steranko's statement (contained in one of defendants' publications, no

11  less), the Court finds that pages three through six of Superman No. 1 is material

12  created by Siegel and Shuster in 1935 and thus was not a work made for hire.[12]

13      Thus, in addition to that set forth in the Court's earlier orders, the

14  uncontroverted evidence establishes that the following works were not works

15  made for hire and are thus subject to termination: Action Comics No. 4 and

16  Superman No. 1, pages three through six.

17

18

19

20  ――――――――――――

21      [11](...continued)
22  created before the March 1, 1938, grant is equally unconvincing. Plaintiffs point to
    various scripts Siegel wrote to Keaton in 1934 to support this claim; however, too
    many discrepancies exist between those scripts and the two published pages in
23  Superman No. 1 to support the conclusion sought by plaintiffs. Moreover, this
    argument is in direct contradiction to Siegel's own account, set forth in his memoir,
24  of the date the first two pages of Superman No. 1 was created, which he places
    squarely in 1939.

25
26      [12]  Defendants conclusorily argue that the contents of the story line (but not
    the illustrations) contained in pages three through six of Superman No. 1 are
    nothing more than "de minimis" elements, to which no copyright would attach.
27  Other than offering this legal conclusion, nowhere have defendant provided any
    specific factual argument directed to what or how this continuity is defective.
28  Defendants have had ample opportunity to elaborate on this argument, but have
    not. Accordingly, the Court declines to consider it.

**B.** **Post-March 1, 1938, Superman Comic Book Materials Published Prior**
**to September, 1938, Employment Agreement (Material Appearing in**
**Action Comics Nos. 2-3 and 5-6)**

With respect to the comic books containing Superman material that were
published by Detective Comics in the interim period after the March 1, 1938, grant
and the September, 30, 1938, employment agreement, namely Action Comics
Nos 2-3 and 5-6, defendants' principal argument for why the instance test was met
is because Detective Comics was the rights holder in the underlying Superman
material contained in Action Comics No. 1 by virtue of the March 1, 1938, grant,
and thus its consent was required before any derivative Superman material could
be published.  In essence, defendants once again lean heavily on the derivative
nature of the work itself to demonstrate they had the right to control its creation.
As the Court remarked in resolving the work for hire status of the Superboy script
created by Siegel in 1940, the fact that a work is a derivative of another does not
automatically translate into it being considered a work for hire or as being
produced at the instance of the owner of the pre-existing work; something more is
required.  Siegel, 496 F. Supp. 2d at 1142-43.

Here, however, there is more than just a naked argument regarding the
derivative status of the works in question.  There is correspondence from
Detective Comics to Siegel and Shuster noting the publisher's expectation that the
pair would continue to generate derivative works of Superman for further
publication in its comic book magazines even after the character's initial release in
Action Comics No. 1.  In an April 8, 1938, letter, Detective Comics executive J.S.
Liebowitz remarked that the company had "loaded [the pair] up with 43 pages a
month [said sum including the pair's work on other comic book features for the
publisher such as "The Spy" and "Slam Bradley" as well as Superman]," noting
that "the success of the magazine is dependent on the type of work done by
yourself," and then concluding that he was "looking for your complete cooperation

40

1    for our mutual benefit."  (Decl. Michael Bergman, Ex. B).  Likewise, the January

2    10, 1938, letter from Detective Comics' editor refers to Superman as a "new

3    feature" that could overburden Shuster's time.

4         This correspondence certainly suggests that the Superman material after

5    Action Comics No. 1 was provided pursuant to an implicit agreement between the

6    artists and the publisher to furnish said material on a regular basis for the

7    publisher.  In essence, Detective Comics had already set aside space in its comic

8    book publications to accommodate the artist's Superman material even before the

9    character's first appearance in Action Comics No. 1.  This point is reenforced by

10   the fact that in every succeeding monthly issue of Action Comics for the period in

11   question there appeared a feature of Superman.  Indeed, at trial in the 1947

12   Westchester suit Shuster testified that in accepting Detective Comics' offer, the

13   pair anticipated that they would see Superman's publication in Action Comics.

14   (Decl. Marc Toberoff, Ex. N).  Furthermore, the referee in the 1947 Westchester

15   suit made a factual finding that the artists were regularly paid for the material

16   created during this interim period at the rate of $10 per page.

17        Given this correspondence, the regular appearance of the Superman

18   feature in subsequent publications, and the general understanding of the artists

19   themselves, the evidence leads the Court quite naturally to the conclusion that the

20   creation of the Superman material appearing in Action Comics Nos. 2-3 and 5-6

21   was solicited by and done at the instance of defendants.  See Playboy

22   Enterprises, Inc. v. Dumas,  960 F.Supp. 710, 715 (S.D.N.Y. 1997) (holding that

23   fact that paintings were furnished and published on a regular basis, and that they

24   were described as a "regular feature," "suggest[ed] that the magazine had an

25   implicit agreement with [the painter]" to produce those works, which was, in turn,

26   "persuasive proof of [the publisher's] role" in the works' creation), aff'd without

27   published opinion, 159 F.3d 1347 (2d Cir. 1998).

28

ER 127

1    Plaintiffs seek to undermine such an impression by making much of the fact

2    that there was no written agreement between the parties following the March 1,

3    1938, grant wherein Detective Comics specifically commissioned the pair to create

4    subsequent Superman comic book stories.  (Pls.' Opp. at 8 (noting that the March

5    1, 1938 grant "could have but did not provide for the employment of Siegel and

6    Shuster to create subsequent Superman stories")).  In plaintiffs' view, the entire

7    relationship between the parties for this six-month period following the grant is

8    akin to that of a screenwriter submitting a "spec screenplay" to a studio with the

9    hopes that it would be purchased.  (Pls.' Opp. at 5.)  Such a characterization of

10   the parties' relationship fails to weave in all aspects of that relationship.

11   Undoubtedly plaintiffs are correct that, in creating this material, there was

12   no guarantee by Detective Comics that it would accept it and thereby pay Siegel

13   and Shuster for their work. The first issue of Superman could have been a

14   commercial flop, leading the publisher to reconsider whether to continue to publish

15   such material or to place the character in the hands of different comic book artists.

16   Because there was no guarantee of success, continuation of the parties' business

17   relationship could have ended abruptly and early, thus placing Siegel and

18   Shuster's role with Detective Comics further afield than under the traditional

19   employee-employer scenario.  That said, the pair's business connection to their

20   "employer" (in the colloquial sense) was much stronger and closer to that of other

21   admitted work for hire scenarios (e.g., an independent contractor) given the nature

22   of the project and the material they were supplying to Detective Comics.  Cf. Self-

23   Realization Fellowship Church, 206 F.3d at 1326-27 (noting that a monk's writings

24   and religious lectures created while the monk was supported by the church was

25   not a work made for hire as the monk had less of a connection to the church than

26   another would have had in a traditional employment setting).

27   To begin, Siegel and Shuster were not simply creating some random work

28   and submitting it to a number of publishers for consideration; the comic book

ER 128

1  material was for a character to which the publisher to whom it was submitted

2  owned the pre-existing rights, rendering Siegel and Shuster's material as but a

3  derivative thereof.  Moreover, the material was submitted at the request of

4  Detective Comics.  Again, the letters from Detective Comics' executives in

5  January and April, 1938, indicate that the Superman material first published in

6  Action Comics No. 1 was not intended to be a one-shot deal, but rather was

7  conceived of as an ongoing "new feature" to which sequels would need to be

8  fashioned; hence, the Detective Comics executives' reference in the April 8, 1938,

9  letter to the "43 pages a month" the pair had been "loaded up" with by the

10  publisher, a page computation that included within it the 13-page Superman comic

11  book, and the January, 1938, letter voicing concerns regarding the possibility of

12  placing undesirable constraints on Shuster's time.  Perhaps the best way of

13  envisioning the parties' business relationship at this time was one in which the

14  artists were given a trial period of sorts to see whether their creation would be

15  commercially successful enough to warrant further formal action by the publisher.

16  Thus, the material over this six-month period was not sent on spec to see whether

17  the publisher would like it, but rather was sent as requested for publication in a

18  monthly feature in the hopes that the publisher would eventually decide to formally

19  pick up the feature on a long-term basis.

20      This characterization of the parties' relationship during this period is

21  confirmed by the September, 1938, employment agreement's recital that Siegel

22  and Shuster "have been doing the art work and continuity for us" and that

23  Detective wanted the pair "to continue to do said work and hereby employ and

24  retain you for said purpose."  In essence, the September, 1938 employment

25  agreement formalized what had informally been ongoing beforehand.  That

26  Detective Comics' requests were made on an informal basis before the written

27  agreements were executed does not detract from the fundamental fact that Siegel

28  and Shuster's creation of the derivative Superman material was done at the

1  request and instance of Detective Comics.  That Detective Comics waited six

2  months before more formally "employing" the pair to "continue" to do just that

3  does not detract from the core point that such production by Siegel and Shuster

4  was again done at the instance of Detective Comics; it simply shows that by that

5  point Superman had so proven itself a commercial success that the publisher

6  desired a more formalized arrangement to be placed down in writing to ensure

7  that the pair would continue to produce such material for it (rather than going on to

8  create other comic book characters for other publishers).

9      When these facts are considered in toto, it is easy to conclude that creation

10  of the works in question lie further along the spectrum from that found in a more

11  traditional employment relationship, as is the case for the comic books created by

12  in-house employees of the publisher.  The lack of any long-term guarantee or

13  commitment by the publisher to the business enterprise itself, however, is not

14  something which is atypical in an independent contractor situation.  That the pair

15  functioned in such a looser employment relationship with the hiring party is not

16  critical.  What is important is the existence of an engagement to create the works,

17  and the level of control and direction the commissioning party thereafter had over

18  creation of the works in question.  And in that regard, the fact that Siegel and

19  Shuster were commissioned by the publisher to create specific material to which

20  the publisher had the statutory right to exert control over its creation, and for which

21  they were paid upon the material's publication, is dispositive as to the instance

22  prong.

23      In short, Detective Comics, as the copyright holder of the pre-existing work,

24  approached the artists and asked that they create works derived from that pre-

25  existing material on a regular basis, and then paid the artists for that derivative

26  work.  As such, the material would fall within the category as a work made for hire.

27  Burroughs, 342 F.3d at 163; Picture Music, 457 F.2d at 1216.  Accordingly, the

28  Court finds that the Superman material in Action Comics Nos. 2-3 and 5-6, which

1   were published in the interim period after the March 1, 1938, grant but before the

2   execution of the September 22, 1938, employment agreement were works made

3   for hire.  The Superman material appearing in <u>Action Comics</u> No. 4, although

4   <u>published</u> during this same interim period, was not a work made for hire because it

5   consisted of material <u>created</u> in 1935.  <u>See supra</u> III.A.2.

6   **C.   Post-September, 1938, Superman Comic Book Material (Action**

7   **Comics Nos. 7-61 and Superman Nos. 1-23)**

8   It is clear to the Court that all of the <u>comic book</u> material produced by

9   Siegel and Shuster <u>after</u> they signed the employment agreement with Detective

10  Comics were works made for hire.  The employment agreement makes plain that

11  the pair were specifically "employ[ed] and retain[ed]" by Detective Comics for a

12  period of five years (with an option to extend for an additional five years) to

13  produce, on an ongoing basis, the comic book magazines for certain characters,

14  including Superman, in return for payment of a sum certain upon that materials'

15  publication.  Such an arrangement has all the elements of a relationship leading to

16  the creations of works made for hire.

17  Plaintiffs' argument regarding the "instance" prong of the test centers upon

18  the contention that, although Detective Comics <u>retained</u> a great deal of editorial

19  control over Siegel and Shuster's comic books, it actually <u>exercised</u> very little.

20  That the two were permitted to exercise their creative talents largely, or even

21  exclusively, in the manner they chose is not dispositive of whether the comics

22  were prepared at Detective Comics' instance.  <u>See Martha Graham Sch.</u>, 380

23  F.3d at 640-41 ("There is no need for the employer to be the precipitating force

24  behind each work created by a salaried employee, acting within the scope of her

25  regular employment.  Many talented people, whether creative artists or leaders of

26  major corporations, are expected by their employers to produce the sort of work

27  for which they were hired, without any need for the employer to suggest any

28  particular project").  "Complete control over the author's work is not necessary" to

1  meet the instance test, <u>Twentieth Century</u>, 429 F.3d at 880, all that is required is

2  the right to direct and supervise the manner in which the work is created, and

3  even then, "the <u>right</u> to direct and supervise . . . need never be exercised." <u>Martha</u>

4  <u>Graham Sch.</u>, 380 F.3d at 635 (emphasis in original).

5      Here, Detective Comics contractually reserved for itself the right to

6  "reasonably supervise the editorial matter of all features," a right which in some

7  instances it did exercise to provide editorial supervision over that material before it

8  was published, suggesting changes to the art work and the continuity submitted by

9  the pair.  While this supervision perhaps did not rise to the level the publisher in

10 <u>Twentieth Century</u> exercised over the author's manuscript, <u>see</u> 429 F.3d at 880

11 (explaining that "the degree of in-person supervision was much greater than usual,

12 including regular face-to-face meetings between General Eisenhower and

13 Doubleday . . . where the editorial board provided him with extensive notes and

14 comments" as opposed to the normal process of "waiting for the manuscript to be

15 completed, and then discussing possible improvements with the author"), nowhere

16 did the Ninth Circuit suggest that such heightened supervision was necessary to

17 demonstrate that the work was produced at the instance of the publisher.

18      Magnifying the extent of Detective Comics' right to control the Superman

19 comic books' creation is the fact that it was also the holder of the underlying

20 material from which the later Superman comic books were derived.  The fact that

21 Detective Comics approached Siegel and Shuster and, in a written agreement,

22 specifically engaged (and paid) for them to create comic book material derived

23 from the underlying Superman material it already owned, lends strong support to

24 the conclusion that said comic books were made at its instance.  <u>See</u> <u>Burroughs</u>,

25 342 F.3d at 163; <u>Picture Music</u>, 457 F.2d at 1217; <u>Siegel</u>, 496 F. Supp. 2d at 1143

26 ("It was these additional elements of requesting and paying for specific derivative

27 works that served to demonstrate that the creation of the derivative work was at

28 the instance of the commissioning party").

1    In this respect, the circumstances of this case are not all that different from

2    those in <u>Martha Graham School</u>.  Before being hired by a dance center, the artist

3    had created/choreographed various dances.  Later she was hired as the artistic

4    director (receiving a regular salary) for the dance center and charged with

5    choreographing new dances, which she did to great success.  In her position as

6    director of the dance center, the artist had nearly free reign in the type and

7    manner of the dances she created.  Nonetheless, the Second Circuit held that,

8    because the works in question fell specifically within the class of duties for which

9    the artist was hired to perform (the creation of dances), those works were made

10   for hire.  This case is no different.  Siegel and Shuster were undisputedly charged

11   after September 22, 1938, with supplying Detective Comics "each and every

12   month" the comic book material for Superman.  The works in question fall

13   precisely into the duties the employment contract called on Siegel and Shuster to

14   perform, thus meeting the "instance" prong of the work made for hire test.

15   As for the "expense" prong, the plaintiffs argue that the contingent nature of

16   Detective Comic's obligation to make payment for the material created (upon its

17   acceptance for publication), coupled with the fact that Siegel and Shuster had to

18   bear up-front costs (in more of an independent contractor role than a traditional

19   employee), negates this element.  This method of payment, plaintiffs argue,

20   renders the present case distinguishable from other "sum certain" cases where

21   the artist were paid regardless of whether their work was accepted for publication.

22   However, plaintiffs have failed to present evidence that Siegel and Shuster were

23   not, in any given instance, paid for their work.  Although there is evidence that at

24   least one of the works produced by Siegel and Shuster, "K-Metal from Krypton,"

25   was not accepted for publication by Detective Comics, nowhere have plaintiffs

26   pointed to any direct evidence indicating that the pair were not paid for this

27   rejected submission.  Plaintiffs speculate, rather than substantiate, this point.

28

ER 133

1    Plaintiffs attempt to fill this vacuum by pointing to declarations from comic

2    book historians who state that the industry practice at the time was for artists only

3    to be "paid for pages actually delivered by them and eventually published by" the

4    comic book publisher.  (Pls' Opp. at 20).  As the Court noted previously, appeals

5    to expert opinion of industry custom and practice are of "dubious evidentiary

6    value" owing to the fact that the expert in question is not venturing any opinion as

7    to what actually occurred with respect to the specific business relationship

8    between Detective Comics and Siegel and Shuster.  Siegel, 542 F.Supp.2d at

9    1130.

10    Moreover, the language in the parties' December, 1939, modification

11    agreement creates the strong inference that Shuster had been paid by Detective

12    Comics for all or a portion of that prior year's artwork for comic strips (other than

13    Superman) that he did not supply.  Furthermore, as disclosed in the 1947

14    Westchester action, Detective Comics decided near the end of the five-year

15    period in question to pay Siegel and Shuster for Superman material that neither

16    had contributed in creating.  See Siegel, 496 F.Supp.2d at 1138.  These instances

17    of payment for material not created by the artists establishes that the parties'

18    business relationship was anything but that fitting within the industry norm of

19    which the experts opine.  It also demonstrates that, despite plaintiffs' appeal to the

20    "possibilities" of payment given the contractual terms, the parties' actual business

21    relationship belied those terms.  In the end, the parties' actual pattern and practice

22    under the terms of the agreement speaks louder on the expense prong of the

23    work for hire question than such textual contingencies; all the Court has been

24    presented with in this regard are appeals to such possibilities and contingencies

25    that could, but for which there is no evidence ever did, take place.

26    Plaintiffs also emphasize all the costs, expenses, and overhead Siegel and

27    Shuster incurred in running their own artists' studio (payments to assistants,

28    payment of rent, purchasing art tools and supplies, etc.,) in producing the material

ER 134

1  they then supplied to Detective Comics, as demonstrating that the expense prong

2  has not been met.  In the end, this evidence suggests that the artists' relationship

3  with Detective Comics, even when under contract to produce the material in

4  question, was more distant from that of traditional employees and closer to that of

5  independent contractors; however, as noted above, the instance and expense test

6  under the 1909 Act also applied to independent contractors.  See Siegel, 496 F.

7  Supp. 2d at 1138 ("[C]ourts employing the instance and expense test have

8  discounted reliance on the circumstances and the cost borne for the production of

9  the work.  Such consideration relates to the question of whether 'an artist worked

10  as an independent contractor and not as a formal employee,' a distinction that has

11  'no bearing on whether the work was made at the hiring party's expense.'")

12  (quoting Playboy Enterprises, 53 F.3d at 555)).  The "expense" prong of the test is

13  therefore met.

14       Accordingly, applying the "instance and expense test," the undisputed

15  evidence establishes that the Superman materials created by Siegel and Shuster

16  during the term of their employment agreement (namely, Action Comics Nos. 7-

17  61, and to Superman Nos. 1-23) were works made for hire.[13]

18  **D.  Superman Newspaper Strips Published from 1939 to 1943**

19       This leaves the last and most difficult category — the newspaper strips for

20  the period 1939 to 1943 — which the Court further subdivides into two categories:

21  (1) the two weeks' worth of newspaper strip material Siegel and Shuster created

22  before the syndication agreement was executed and (2) the remaining newspaper

23  strips the pair created thereafter under the aegis of that agreement.  Because the

24  Court's ruling regarding the first two weeks' worth of newspaper strips implicates

25  more far-reaching issues, which are discussed in subsequent sections, the two

26

27  _____

28      [13]  The material appearing on pages three through six of Superman No. 1 is
the single exception to this conclusion.  See supra section III.A.3 (holding that
these pages were not works for hire).

49

1 sub-categories are addressed in reverse chronological order.  However, before

2 the Court may address the work for hire aspect of the newspaper strip materials, it

3 is necessary to discuss the significance of McClure's role in the September 22,

4 1938, agreements.

5      The complexity of the work for hire question on this last category of material

6 is due in large measure to the added dimension of McClure's presence in the

7 newspaper syndication endeavor, which altered and rearranged Detective Comics'

8 and the artists' then-existing business relationship.  To be sure, McClure has

9 served as the proverbial elephant in the room in this case, an elephant whose

10 significant impact on the business relationship created through the September 22,

11 1938, employment agreement and newspaper syndication agreement both sides

12 have sought to either ignore or diminish.   Defendants seek to relegate McClure to

13 the role of a mere licensee of the newspaper strips for which it owned nothing, lest

14 the material be injected into the public domain because McClure's listing itself as

15 the proprietor in the copyright notice and registration would arguably violate the

16 prohibition on divisibility of copyright in the 1909 Act.[14]  For their part, plaintiffs

17 _____

18     [14] As noted by Professor Nimmer, under the 1909 Act, "it was inferred" by
the courts that because the 1909 Act "referred in the singular to the 'copyright
19 proprietor' . . . the bundle of rights which accrued to a copyright owner," such as
the right to reproduce the material on the stage or in books, "were 'indivisible, 'that
20 is, incapable of assignment in parts."  3 NIMMER ON COPYRIGHTS § 10.01[A] at 10-
5.  Absent the complete assignment of rights commanded by the copyright, the
21 transfer was considered to be a license, with the transferor maintaining ownership
in all the rights to the copyright in the material.  Id. Given this, any publication of
22 the material by the transferee was required to contain a copyright notice in the
name of the copyright owner (that is, the transferor); other actions, such as the
23 transferee's publication of the material carrying a notice only in its name, would
result in publication without proper notice, thereby injecting the material into the
24 public domain.  3 NIMMER ON COPYRIGHTS § 10.01[C][2] at 10-12 to 10-13.  In light
of the rapid development of different forms of media in which material could be
25 reproduced, pressure began to build against continued adherence to the doctrine
of indivisibility, resulting in the creation of various judge-made exceptions to its
26 application.  Id. at 10-6 to 10-7.  One such exception crafted by some courts was
conceptualizing "such rights" conveyed as being "held in trust for the benefit of
27 the" transferor but with "legal title" resting in the name of the transferee thereby
allowing for the publication with notice thereto in the name of the transferee.  Id. at
28 10-13 to 10-14; see also Runge v. Lee, 441 F.2d 579 (9th Cir. 1971).  As

                                                        (continued...)

**ER 136**

1   contend that, in light of defendants' concession, McClure's role as a prospective

2   hiring party for a work made for hire may be ignored, but thereafter structure their

3   analysis of the relevant agreements to reach their desired conclusion that the

4   creation of the newspaper strips enured solely (and was so intended to enure

5   solely) to McClure's benefit.  Such an analysis is favored by plaintiffs because it

6   seemingly forecloses a conclusion that the newspaper strips were made at

7   Detective Comics' instance and expense.

8       Although each side frames the issue differently, both do so in a manner

9   that limits the analysis of the work for hire issue to the artists and Detective

10  Comics.  (Pls.' Opp. to Defs.' Sur-Reply at 6; Defs.' Reply at 9 n.8).  However

11  tempting it is to follow suit, the Court cannot so easily unburden itself from

12  confronting the relevant evidence in the record and is instead tasked with

13  attempting to give legal meaning to that evidence.

14      In determining the significance of McClure's role, the Court does not write

15  on an empty slate.  The significance from a copyright perspective of the terms in

16  these very agreements was previously litigated and adjudicated by the courts, a

17  fact which neither party brought to the Court's attention in their briefs, at oral

18  argument, or in the numerous unsolicited post-hearing briefs submitted.

19      In 1941, Detective Comics filed suit against Fawcett Publications, alleging

20  that Fawcett's comic book character Captain Marvel, a character who possessed

21  super strength and super speed, who wore a skin-tight costume with a cape, and

22  who hid his superhero identity by way of a radio-reporter alter ego, infringed the

23  copyright to Superman.  Thus began a twelve-year legal battle.  As a defense to

24  the action, Fawcett argued that the copyright to Superman had entered the public

25  domain due to asserted defects in the manner and form in which McClure had

26  _____

27      [14](...continued)
    Professor Nimmer observed, such judge-made exceptions effectively

28  "administered a death blow" to the doctrine "even under the 1909 Act." 3 NIMMER
    ON COPYRIGHT § 10.01[B] at 10-9.

1   affixed copyright notices on the publications of the Superman newspaper strips.

2   See National Comics Publications, Inc. v. Fawcett Publications, Inc., 93 F. Supp.

3   349, 356 (S.D.N.Y. 1950) (cataloguing the various forms to which McClure affixed,

4   or in some cases did not even attempt to affix, a copyright notice for the

5   newspaper strips).  Detective Comics' response was that it could not be charged

6   with any defects in the copyright notice as those "were errors and omissions of

7   McClure, by which it is not bound, for McClure was merely a licensee, and a

8   licensee cannot relinquish or abandon the rights of his licensor."  Id. at 357.  Thus,

9   the relationship of the parties to one another in the 1938 newspaper syndication

10  agreement vis-à-vis ownership of the copyrights to the Superman newspaper

11  strips assumed critical importance in resolving the case.  See Detective Comics,

12  Inc. v. Fawcett Publications, Inc., 4 F.R.D. 237, 239 (S.D.N.Y. 1944) (noting that

13  Fawcett's defense would render "the status of McClure, insofar as 'Superman' is

14  concerned, and the validity of its copyrights relating thereto, . . . a material

15  inquiry").[15]

16          At trial, the district court rejected Detective Comics' argument that McClure

17  was merely a licensee.  Instead, the district court determined that the arrangement

18  put in place by the newspaper syndication agreement was in the nature of a joint

19  venture.  See Fawcett Publications, 93 F. Supp. at 357 ("I think that this

20  contention is unsound, as the agreement with McClure was not a mere license to

21  use the strips but an agreement of joint adventure").  As explained by the district

22  court:

23                  The agreement with McClure contains all the
                elements of a joint adventure.  The subject matter of
24              the joint enterprise was the use of the "Superman"
                strips for the sole purpose of newspaper syndication.
25              The artists agreed to create and draw the strips,
                Detective agreed to pay them for their work and to
26              furnish the strips to McClure, and McClure agreed to

27  _____

28          [15] When Detective Comics later merged into and became National Comics
    Publications, Inc., the latter was substituted as plaintiff.

1
2
3
> sell the strips to newspapers. Both the artists and Detective agreed to cooperate with McClure. The proceeds of the sales (there could be no losses) were to be divided between Detective and McClure.

4

5

6

7

8

Id. The district court held that McClure took a valid copyright to the newspaper strips, but not because it was an "author, . . . proprietor, . . . [or] an assign"; rather, the district court held that the agreement's provision permitting McClure to copyright the strips in its name (which later reverted to Detective Comics) was a permissible manner by which a valid copyright could be taken. Id. at 358.

9

10

11

12

13

14

In light of this finding, the district court determined that "the errors and omissions of McClure" were indeed "chargeable to Detective," observing that "the rights and obligations of joint adventurers are substantially those of partners, and each participant in a joint adventure is an agent for the other." Id. The district court thereafter found that "with few exceptions," the newspaper strips were published without proper copyright notices and therefore the copyrights in the material for the same were abandoned into the public domain. Id.

15

16

17

18

19

20

21

22

23

24

On appeal, the Second Circuit, in a decision by none other than Judge Learned Hand, reversed and remanded. At the outset, the court noted that although characterizing the parties' agreement as one of joint venture would have "the same effect upon the copyrights in suit as though McClure were the proprietor," it found it unnecessary to decide whether that characterization was correct (although not without Judge Hand making the astute observation that the entire concept of joint venture is "one of the most obscure and unsatisfactory of legal concepts") as it concluded that "McClure was indeed the 'proprietor' of the copyrights" in the Superman newspaper strips and not a licensee of the same.[16]

25

26

27

28

---

[16] It was noted, however, that insofar as McClure simply borrowed existing Superman comic book material published previously by Detective Comics and then reprinted it for newspaper syndication then "at best 'McClure' could have become no more than a licensee." Id. at 600. McClure's copyright proprietor position with respect to the newspaper strips was for that material "which were produced and published under the contract of September, 1938." Id. at 601.

(continued...)

National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 599

(2d Cir. 1951) ("We agree with the result, but because we think that 'McClure' was

indeed the 'proprietor' of the copyrights, and for that reason we do not find it

necessary to decide whether the contract constituted a 'joint venture'").  Thus, as

a matter of copyright law, the acts and omissions of McClure vis-à-vis the

copyright notices affixed to the material when it was published were chargeable to

Detective Comics.

      Judge Hand noted that his conclusion was compelled by both the statute

and from construing the parties' intent as revealed in the agreements.  Only if

McClure was determined to be a "proprietor" could its publication of the

newspaper strips be done in such a manner that would secure copyright

protection under the 1909 Act.  Id. ("it is only on the assumption that 'McClure'

was the 'proprietor' of the 'work' — i.e., of the 'strips' prepared by the 'Artists'

under the contract — that any valid copyrights could be secured by publication in

the 'syndicated' newspapers").  Under Section 9, only "author[s] or proprietor[s]"

were entitled copyright a work; section 10 provided that an author or proprietor

could obtain copyright "by publication" with the "required" notice affixed; and

section 19 detailed the required contents of that notice.  Thus, unless "McClure

was a 'proprietor' of the 'strips' the purpose of the parties to copyright them was

defeated," a result to be avoided if it is possible to construe the words of the

agreement to effectuate that purpose.  Id.

      Judge Hand found that the text of the syndication agreement compelled

such a construction.  Id.  ("we say that the text [of the agreement] itself comports

---

[16](...continued)
Nowhere have the parties in the instant case sought to delineate which of the
strips (outside the first two weeks of strips, which no one suggests was borrowed
material) fall into these respective categories.  Given the Court's ultimate
disposition of the work for hire nature of the newspaper material produced after
the September, 1938, agreement is concerned, the Court declines to address this
issue.

54

1  only with the conclusion that 'McClure' was to be the 'proprietor'").  Toward that

2  end, the agreement was read as in effect placing ownership of the copyright with

3  McClure to be held in trust for its intended beneficiary — Detective Comics.  As

4  Judge Hand ably explained:

5         [T]he "material" — the "strips" — is to be
6  copyrighted in 'McClure's' name, but the copyright
    "reverts to Detective at the termination of this contract."
    That necessarily meant that, until the contract came to
7  an end, "McClure" was to have the "title" to the
    copyrights, for property cannot "revert" from one
8  person to another unless the person from whom it
    "reverts" holds title to it.  Even though he holds it in
9  trust, its fate depends upon his acts, not upon his
    beneficiary's.  The sentence which immediately follows
10 reinforces this conclusion; it reads: "The title
    'Superman' shall always remain the property of
11 Detective."  That disclosed a plainly deliberate
    distinction between the word, "Superman," used as a
12 "title," and the "works" which were to be produced in
    the future and published by "McClure" in the
13 "syndicated newspapers":  the title was to remain
    "Detective's" "property"; the copyrights were only in the
14 future to become its "property."  In final confirmation of
    this interpretation is the clause in which "McClure"
15 assumed "to provide Detective with all the original
    drawings . . . so that said drawings may be used by
16 Detective in the publication 'Action Comics' six months
    after newspaper release."  That is the language of a
17 "proprietor," who assumes power to license another to
    copy the "works."  Since for these reasons "McClure"
18 became the "proprietor" of any copyrights upon "strips"
    published under the contract, in so far as it failed to
19 affix the "required" notices upon the first publication of
    a "strip," and upon each copy published thereafter, the
20 "work" fell into the public domain.

21 Id.

22      As a result of this conclusion, Judge Hand determined that insofar as

23 McClure sent out "mats" to newspapers without any notice at all for the strips, the

24 copyrights in those strips were indeed lost to the public domain.  Id. at 601.  The

25 matter was remanded to the district court to conduct a new trial, in light of the

26 court's narrowing of the class of strips that could be considered abandoned, on

27 whether any newspaper strips placed at issue were validly copyrighted, and, if so,

28 whether Fawcett's Captain Marvel character infringed the copyright contained

1   therein.  See National Comics Publication, Inc. v. Fawcett Publications, Inc., 198

2   F.2d 927 (2d Cir. 1952).  Thereafter, the parties settled their dispute.

3         Accordingly, defendants' characterization of McClure as nothing more than

4   a mere "licensee" of the newspaper strips with no legal title to the copyright in

5   question was raised and rejected by the Fawcett decision.  Defendants are bound

6   by that judgment.

7         Applying Fawcett to the terms in the syndication agreement, the Court finds

8   that, in essence, McClure and/or Siegel and Shuster (depending on whether the

9   work was made for hire) obtained a grant (the "permission" noted in the

10  agreement) from Detective Comics to the newspaper rights in the underlying, pre-

11  existing Superman material; that permission was provided so that the both could

12  engage in the creation of a separably copyrightable derivative work (the

13  newspaper "strips" referenced by Judge Hand of which McClure was the

14  "proprietor") based on said pre-existing material owned by Detective Comics.

15        In this sense, discussion of divisibility is misplaced.  As Professor Nimmer

16  has noted by way of illustration strikingly similar to the circumstances presented in

17  this case, even under the 1909 Act a party could hold the separate copyright

18  contained in a derivative work, the pre-existing material of which was owned by a

19  third party, without transgressing notions of indivisibility:

20              [T]he producer of a motion picture . . . is
            undoubtedly the proprietor of the copyright in the
21          resulting film.  The film itself may be a derivative work
            based for example upon a novel.  In order that the
22          [film] not constitute an infringement of the novel the
            producer must obtain a grant of "motion picture rights"
23          in the novel.  However, because he was the proprietor
            of the final film did not under the 1909 Act render him
24          the "proprietor" of the motion picture rights [in the
            novel].  He was the licensee of the motion picture rights
25          in the novel but the proprietor of the derivative work
            motion picture.
26

27  3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9 n.30.  The same holds here.  McClure

28  was the licensee of the "newspaper right" in the underlying Superman copyright

1  held by Detective Comics, but was an owner of the copyright in any of the new

2  material found in the derivative newspaper strips.

3      Therefore, McClure's position as a "proprietor" and holder of legal title to

4  the separate copyright in these derivative newspaper "strips" renders it

5  conceivable that the creation of those strips were made at its "instance and

6  expense" (and thus a work for hire).[17]  Thus, as alluded to earlier, although

7  plaintiffs would prefer otherwise, the Court cannot escape consideration of the

8  issue of whether the newspaper strips were works made for hire for McClure

9  (rather than Detective Comics).

10      **1.    Post-September,1938, Newspaper Strips**

11      In order to evaluate whether the post-September, 1938, newspaper strips

12  were made for hire, the Court first considers how the terms in the agreements

13  themselves should be construed as a matter of contract law.  Plaintiffs urge the

14  Court to look at the terms in each agreement separate and apart from those

15  contained in the companion agreement, treating the two agreements as standing

16  alone as separate business deals.  Defendants characterize the agreements as

17  but sub-parts in a "total transaction" such that the terms contained therein "run

18  together because this whole thing is one business."  In defendants view, McClure

19  was "just the . . . agent or the syndication arm of [an] arrangement" that "centered

20  around Detective" Comics, and thus the terms in the agreements should be

21  construed in conjunction with and as applying to those in the other agreement.

22      The Court finds both characterizations partly accurate.  The terms in each

23  agreement do overlap with, make reference to, and fill gaps in the other.

24

25      _____

26      [17]  "[T]he term 'proprietor' [was] used by the 1909 Act and case-law under it
    to refer" not only to those who are owners by assignment, but also "to employers
    who induce the creation of a work made for hire and thus own the copyright in it."

27  Burroughs, 62 U.S.P.Q.2d at 1320 (citing Shapiro, Bernstein & Co. v. Bryan, 123
    F.2d 697, 700 (2d Cir. 1941) ("[W]hen the employer has become the proprietor of

28  the original copyright because it was made by an employee 'for hire,' the right of
    renewal goes with it, unlike an assignment")).

1   However, there are areas in each agreement which are self-contained and

2   unaffected by terms contained in the other agreement.

3        The employment agreement, for instance, bolsters the provision in the

4   newspaper syndication agreement wherein the artists agreed "to maintain [the

5   newspaper strips they submitted] at the standard shown in the sample submitted"

6   by containing a provision within it that requires the artists to "properly perform the

7   terms" in the newspaper syndication agreement.  Likewise, the employment

8   agreement fills in the blanks from the newspaper syndication agreement as to how

9   and in what manner the artists would be compensated.  The employment

10  agreement also added a further dimension to a term in the syndication agreement

11  by describing how the artists will be paid if, under the syndication agreement,

12  Detective Comics later used the newspaper strips in its comic books (paying the

13  artists at their normal "page rate less the percentage which McClure receives for

14  said syndication").  Similarly, the newspaper syndication agreement expressly

15  notes that payment for the artists' work would be addressed in the employment

16  agreement.

17       In contrast, the self-contained aspects of the agreements are best

18  illustrated by those relating to the hiring parties' <u>contractual</u> right to control and

19  supervise the creation of the material crafted by the artists.  Thus, for instance, the

20  employment agreement provided Detective Comics a <u>contractual</u> right (as

21  opposed to right to control inherent in fact that material was derivative of that to

22  which Detective Comics held the rights to the underlying work) to control or

23  supervise creation of "features."  It is clear in reading the employment agreement

24  that when it used the term "features" it did so solely in reference to the artists'

25  production of a comic book, describing the same as a "monthly feature," "monthly

26  magazine," or "magazine." In contrast, when the employment agreement made

27  reference to the artists' production of newspaper strips it employed terms such as

28  "newspaper strips," "McClure Newspaper Syndication strip," "material furnished for

1   syndicate purposes," and "syndicate matter."  Just as importantly, in the one

2   paragraph in the employment agreement that prohibited the artists from exploiting

3   Superman with anyone else save Detective Comics and McClure, the agreement

4   separately identifies each class of works rather than through use of defendants'

5   purported global term "feature."  (See Decl. Marc Toberoff, Ex. P ("You agree that

6   you will not hereinafter at any place . . . furnish to any other person, firm,

7   corporation, newspaper or magazine any art or copy for any comics to be used in

8   any strip or comic or newspaper or magazine containing [Superman]")).

9         In applying the "instance and expense" test, the crucial question for the

10  Court is how Siegel and Shuster fit into the scheme devised by the publisher and

11  the newspaper syndicator.[18]

12        The Court begins with evaluating the expense element, which is made

13  more complicated due to the method by which the pair were paid for the strips in

14  question.  Rather than being paid a salary or a sum certain for the newspaper

15  strips, the artists were paid only a percentage of any "net proceeds" that their

16  strips generated, that is, a royalty payment.  Generally, this manner of payment

17  tends to rebut the notion that the newspaper strips were made for hire.  See

18  Martha Graham Sch., 380 F.3d at 641 (noting that "evidence that Graham

19  personally received royalties for her dances . . . may rebut[]" the notion that the

20  dances were made for hire); Playboy Enterprises, 53 F.3d at 555 ("in contrast,

21  where the creator of a work receives royalties as payment, that method of

22  payment generally weighs against finding a work-for-hire relationship"); Twentieth

23  Century, 429 F.3d at 881 (finding that expense requirement met when publisher

24  agreed to pay the author "a lump sum for writing the book, instead of negotiating a

25  _____

26        [18]  Fawcett left unanswered the question of how McClure acquired
      ownership of the copyright in these derivative newspaper strips.  Was it acquired
27  by assignment from the artists or by their creation of the material as a work for
      hire?  Or was it acquired through an assignment from Detective Comics, who
28  initially owned the copyright in the works at their inception as works made for hire?
      For the Court's purposes, this distinction is not of particular importance.

royalty deal"); 2 PATRY ON COPYRIGHT § 5:61 ("Where payment is solely by
royalties, this fact weighs against an employment relationship").

The fact that payment of a sum certain might be forthcoming to the pair for
their work six months later if Detective Comics decided to reprint those newspaper
strips in its comic books does not detract from the fundamental nature of the
transaction as being geared toward a profit-sharing arrangement as the principal
method of compensation for all involved.  Moreover, defendants have not offered
any evidence to show whether or to what extent Detective Comics actually
exercised this option to reprint the newspaper strips, thus obligating Detective
Comics to pay Siegel and Shuster a sum certain for those works.

Indeed, the ongoing and extent of the financial risk assumed by Siegel and
Shuster with regards to the newspaper strips was significantly higher than they
had borne in any of their other business dealings involving Superman.  With
respect to the comic book strips, any financial risk assumed by the pair for the
expenses incurred in creating the material would be quickly ameliorated by the
publisher's decision to publish or not (a process taking only a matter of days or
perhaps weeks).  With respect to the newspaper strips, in contrast, such
expenses could be borne for months or even longer depending entirely on the
material's commercial success.

Admittedly, questions concerning the particular method of payment for the
work have lessened in importance over the years in determining whether it was
one made for hire.  As Patry has written in his treatise, "[b]oth the Second and
Ninth Circuits have taken a nuanced look at compensation," allowing courts to turn
aside or otherwise diminish the importance that receipt of payment was in
royalties has insofar as whether something was a work for hire.  2 PATRY ON
COPYRIGHT § 5:61 (citing Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136,
1142 (9th Cir. 2003) ("That some royalties were agreed upon in addition to this
sum is not sufficient to overcome the great weight of the contractual evidence

1  indicating a work-for-hire relationship") and <u>Playboy Enterprises</u>, 53 F.3d at 555

2  (wherein the court observed that royalty payments are not conclusive)).

3       Diminishing the importance of this evolution, however, is the fact that, in

4  nearly all of these cases, the authors of the works in question were paid a salary

5  or some other sum certain in addition to the receipt of royalties.  <u>See</u> <u>Estate of

6  Hogarth</u>, 62 U.S.P.Q.2d at 1317 ("Where, as here, the creator receives both a

7  fixed sum <u>and</u> royalties, the fact that the creator received a fixed sum is sufficient

8  to meet the requirement that the works be made at the employer's expense");

9  <u>Warren</u>, 328 F.3d at 1142 (creator received a fixed sum in addition to royalties).

10  Here, Siegel and Shuster were paid only royalties.  Such a financial arrangement,

11  especially when viewed through the realities of the parties' relationship, places this

12  case on the outer edges of the work for hire doctrine.

13       There are, however, other features present related to the works creation

14  (factors centered on the instance prong) that go to the core of what is envisioned

15  by a work made for hire relationship.  Clearly, Siegel and Shuster were engaged

16  (however viewed, by McClure or by Detective Comics, or by both) to create the

17  material.  They were clearly done at the instance of <u>either</u> McClure or Detective

18  Comics.  The syndication agreement (reinforced by the employment agreement)

19  tasked the pair as part of their job duties with the creation of the works in question.

20  Siegel and Shuster could be replaced if they did not submit their work on time.

21  Just as critically, the right to control the process in creating the work was doubly

22  reinforced between the pair's employers:  McClure possessed the contractual right

23  to supervise the artists' work (which it in fact exercised for a period of time) and

24  Detective Comics possessed the additional right to supervise and control the work

25  as the rights holder of the pre-existing Superman material utilized in the creation

26  of the derivative newspaper strips.  This engagement to create and this right of

27

28

1  control over the artist's creation of the work is not indicative of a joint venture with

2  the artists; rather, it is reflective of a more traditional employment engagement.[19]

3       In essence, read together, the syndication agreement and employment

4  agreement is suggestive of a loaned employee arrangement (although the

5  "employees" were more accurately viewed as independent contractors).  See 2

6  PATRY ON COPYRIGHT § 5:79 n.1.  Detective Comics retained a measure of control

7  over the artists; McClure retained control over the works those artists created and

8  that it intended to exploit for the benefit of Detective Comics, McClure, and the

9  artists themselves.  However those duties were conceived and to whomever they

10  were owed, the fundamental point remains that the instance in creating those

11  newspaper strips rested with someone other than Siegel and Shuster.

12       In this respect, the Second Circuit's decision in Picture Music, which

13  applied the instance and expense test,[20] is eerily similar to the facts presented

14  here.[21]  There, the issue presented was whether the adaptation of the musical

15  score, "Who's Afraid of the Big Bad Wolf," from the Walt Disney cartoon, "The

16  Three Little Pigs," into a song was a work made for hire.

17       Walt Disney and Irving Berlin, Inc. (apparently the author of the musical

18  score), believed that the score from the movie could be made into a popular song.

19  _____

20     [19]  Moreover, the arrangement lacks some of the key elements for a joint
venture to be found under New York law:  A sharing of some degree of control

21  over the venture and a sharing of the losses (as well as the profits) from the
venture. See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd., 909

22  F.2d 698, 701 (2d Cir. 1990) (setting forth test under New York law for joint
venture); Dinaco Inc., v. Time Warner, Inc., 346 F.3d 64, 68 (2d Cir. 2003)

23  (holding for a joint venture the parties "must submit to the burden of making good
the losses" of others to the venture); In re PCH Associates, 949 F.2d 585, 602 (2d

24  Cir.1991)  (right to inspect books and records not sufficient control for purposes of
establishing a joint venture).

25     [20]  Although not expressly discussing the two separate prongs of the

26  instance and expense test, Picture Music clearly applied both, as the Court does
here.  See Burroughs, 342 F.3d at 160 (2d Cir. 2003).

27     [21]  The Ninth Circuit has on more than one occasion cited approvingly to the

28  Second Circuit's decision in Picture Music.  See Twentieth Century, 429 F.3d at
880; Warren, 328 F.3d at 1142.

1  With Disney's approval, Berlin engaged Ann Ronell, an apparent freelancer, to

2  assist in the adaptation; "she did so, rearranging the musical themes in

3  collaboration with an employee of Berlin, and arranging the existing lyrics and

4  adding new ones of her own."  457 F.2d at 1214.

5       Disney thereafter agreed that, "[i]n exchange for an agreement to pay

6  certain royalties[, it would] assign all its rights in the new song to Berlin," and

7  further agreed that "either one-third or one-fourth of its royalties should be paid to

8  Miss Ronell for her services."  Id.  The copyright in the song was subsequently

9  registered in Berlin's name, with a credit of authorship to Ronell and Frank

10  Churchill, the Disney employee who had composed the original score for the film.

11  Id. at n.1.

12       Thereafter, when the right to seek the renewal term accrued, Ronell

13  claimed that she owned a one-half interest in the song.  Berlin's successor in

14  interest defended by asserting that Ronell's contribution to the song was a work

15  made for hire.  Notwithstanding that Ronell was paid only royalty payments (and

16  not a "fixed salary"), the Second Circuit agreed.

17       Much like the present case, the Picture Music case involved three parties,

18  not the usual two parties to an employer-employee relationship.  In Picture Music,

19  an artist freelanced with another party (Berlin) to adapt a score owned by a third

20  party (Disney) into a song.  The Second Circuit was unconcerned with this

21  variation on the more ordinary dyad business relationship and method of payment:

22  "The purpose of the statute is not to be frustrated by conceptualistic formulations

23  of the employment relationship."  Id. at 1216.

24       Also much like the present case, the Second Circuit found a right to control

25  the artist's work on the part of both of the other parties, although one party had

26  more direct control than the other:  "[T]he trial court found that employees of Berlin

27  did in fact make some revisions in Miss Ronell's work.  Moreover, since Disney

28  had control of the original song on which Miss Ronell's work was based, Disney

1 (and Berlin, with Disney's permission), at all times had the right to 'direct and

2 supervise' Miss Ronell's work." Id.

3 Although certain initial copyright registrations designated Siegel and

4 Shuster as the "authors" of the newspaper strips, the registration certificates in

5 Picture Music listing the artist as the song's "author" was disregarded in favor of

6 the realities of the parties' relationship; so too, here, the fact that McClure took it

7 upon itself to list Siegel and Shuster as the "author" of the newspaper strips is

8 effectively rebutted when one looks to the realities of the parties' actual business

9 relationship. See Burroughs, 342 F.3d at 166-67 ("A certificate of registration

10 creates no irrebuttable presumption of copyright validity . . . [w]here other

11 evidence in the record casts doubt on the question, validity will not be assumed").

12 Finally, and for the Court's current purpose, most importantly, the court

13 clearly considered the method of payment for Ronell's work — solely by way of

14 royalties — not dispositive of whether the song was made for hire: "The absence

15 of a fixed salary, however, is never conclusive, nor is the freedom to do other

16 work, especially in an independent contractor situation." Picture Music, 457 F.2d

17 at 1216.

18 As the Picture Music court summed up its holding: "In short, the 'motivating

19 factors' in the composition of the new song, 'Who's Afraid of the Big Bad Wolf,'

20 were Disney and Berlin. They controlled the original song, they took the initiative

21 in engaging Miss Ronell to adapt it, and they had the power to accept, reject, or

22 modify her work. She in turn accepted payment for it without protest . . . . That

23 she acted in the capacity of an independent contractor does not preclude a finding

24 that the song was done for hire." Id. at 1217.

25 The Court can here sum up its ruling in an almost identical manner. After

26 the execution of the syndication and employment agreements, the artists did not

27 independently decide to create the newspaper strips; rather, they did so because

28 they were contractually obligated to do so and because they expected to receive

64

1   compensation for their creations.  McClure retained editorial supervision rights

2   over the material; it could "accept, reject, or modify [the pair's] work."  Detective

3   Comics owned the original work from which the derivative newspaper strips were

4   created; it agreed to allow Siegel and Shuster to continue to create derivative

5   works based upon it.  Siegel and Shuster assented to this arrangement.  That they

6   did so in the capacity of independent contractors, like the artist in Picture Music,

7   "does not preclude a finding that [the newspaper strips] were done for hire."

8          Thus, the Court concludes that the expense prong is met, and that the

9   newspaper strips were works made for hire.  However the duties of the artists

10   were conceived, and to whomever they were owed, the fundamental point remains

11   that the instance in creating those newspaper strips Siegel and Shuster rested

12   with someone other than themselves.  Such indicia of a work for hire relationship

13   insofar as the creation of the newspaper strips is concerned is reflected in the

14   facts that the employment agreement obligated them to timely supply — "shall

15   furnish" — the necessary material to McClure; the syndication agreement

16   specified that the copyright in that material belonged to McClure, not Siegel and

17   Shuster; and the syndication agreement noted that, if the pair did not meet their

18   obligation of timely supplying such material to McClure, Detective Comics could

19   appoint someone else to create the Superman newspaper strip.  Far from

20   suggesting that the creation of the material fell outside the scope of the pair's

21   rights and duties under the auspice of their employment with Detective Comics,

22   the agreements demonstrate how deeply enmeshed and integral the creation of

23   such newspaper strips were to Siegel and Shuster's job.

24          Of course, the splitting of the employer role between McClure and

25   Detective Comics makes the characterization of that role (i.e., whether the true

26   employer was McClure or Detective Comics, or both) a much more difficult

27   question, but that difficulty is easily surmounted for purposes of the present

28

1   inquiry:  Whether the artists' created the newspaper strips within the scope of their
2   job duties.  This they clearly did.

3        Moreover, although in some circumstances the royalty payments could lead
4   to a conclusion (as suggested by plaintiffs) that the parties entered into a joint
5   venture, here, the peculiar structure of the arrangement does not (as it did not in
6   Picture Music) alter the core nature of the relationship.  Specifically, the
7   arrangement "employ[ed]" the artists to provide art work and continuity to
8   Detective Comics and to "furnish," as part of their duties, the newspaper material
9   to McClure.  The arrangement allowed the artists to be replaced by other artists if
10  they failed to do so in a timely manner.  Thus, as in Picture Music, the fact that the
11  pair were paid in royalties rather than a sum certain does not alter the relationship
12  in such a fashion as to lead to the conclusion that the works were not made for
13  hire.  Indeed, the parties' arrangement left no doubt that Siegel and Shuster's role
14  in creating the material could be (and was in fact) substituted by other artists
15  should they fail to timely supply such material.  In this respect, Siegel and
16  Shuster's role was much like that of an employee or independent contractor
17  retained to perform a job, not that of a partner to a joint venture.

18       In sum, this case, much like Picture Music, lies on the outer boundaries of
19  what would constitute a work made for hire, but given that the core elements
20  sought to be captured and addressed by the doctrine are present, the Court finds
21  that the newspaper strips created by Siegel and Shuster after September, 1938,
22  were works made for hire and accordingly the termination notices submitted by
23  plaintiffs do not reach the grant to those works.

24       Thus, because the Court finds that the newspaper strips created by Siegel
25  and Shuster after September 22, 1938, were works made for hire, the right to
26  terminate does not reach the grant to those works.

27

28

ER 152

1               **2.**     **Pre-Syndication Agreement Newspaper Strips**

2         In stark contrast to the post-syndication agreement newspaper strips, it is

3 clear from the record that the initial two weeks' worth of newspaper strips were not

4 created at the instance of either Detective Comics or McClure; instead, a wholly

5 different "motivating factor" instanced their creation by Siegel and Shuster during

6 the spring of 1938.

7         The sequence of events surrounding these two weeks' worth of newspaper

8 strips is telling:  It began with Siegel soliciting interest in Superman for newspaper

9 syndication in March or early April, 1938.  McClure expressed some interest,

10 telling Siegel to draft two weeks' worth of material for syndication and suggesting

11 that the material fill in the background of Superman's origins and arrival on Earth.

12 Siegel and Shuster created the material, focused on Superman's origin and

13 arrival, and submitted it to McClure.  McClure then _returned_ the material to Siegel

14 pending its decision whether it wished to proceed with syndication efforts.  In the

15 meantime, Siegel submitted the material to _other_ newspaper syndicators for their

16 consideration.  Eventually, McClure, not any other newspaper syndicator, entered

17 into a syndication agreement with Detective Comics and the artists.[22]

18         It is clear to the Court that the initial two weeks' worth of newspaper

19 material Siegel and Shuster created in the spring of 1938, well _before_ the

20 syndication agreement, was not made at the instance or expense of anyone but

21 the artists.  Admittedly, McClure did ask for the material to be created and did

22

23       [22]  Both sides make attempts at historical revisionism of this record.

24 However, viewed in light of this record, plaintiffs' contention that Siegel had written the script for the two weeks of material "on his own volition," before soliciting

25 McClure's interest is unsupported.  (Pls.' Obj. Defs.' Reply at 13).  Siegel's own recounting of how and when the material was created contradicts this contention.

26 Defendants' characterization of the facts fares no better.  They assert that Siegel's solicitations for Superman's appearance in newspaper strips was at Detective

27 Comics' direction or, at least, with Detective Comics' approval.  (Defs.' Obj. to Pls.' July 28, 2008 Opp. at 8).  The evidence clearly shows that Siegel first approached

28 McClure, then _later_ sought to bring Detective Comics into the fold _after_ receiving a positive response from McClure.

1  make suggestions as to its subject matter, but such requests were done outside

2  the confines of any business relationship between the parties and, more

3  importantly, other circumstances rebut the importance of this fact.   Moreover, the

4  work was created without any discussion of, much less any guarantee of,

5  compensation and without any commitment from McClure that it would ever

6  publish the material.

7        Defendants place great weight on the fact that the two weeks' worth of

8  newspaper strips were derivative in nature, arguing that such status forecloses the

9  work's creation from being done in the instance of anyone but the owner of the

10  underlying material — Detective Comics.  However, the cases defendants cite to

11  for this proposition, as noted by the Court in its prior order in the Superboy matter,

12  require that the rights holder to the underlying material actually be the one that

13  sought out and engaged the artists to create the derivative work beforehand.  See

14  Siegel, 496 F. Supp. 2d at 1142-44.  Here, creation of the first two weeks' worth of

15  newspaper strips were not commissioned by Detective Comics, but, at most, were

16  commissioned by McClure, who at the time held no rights to the underlying

17  Superman copyright.

18        Following up on that point, defendants next seek to label Siegel's

19  interaction with McClure as little more than "an inchoate solicitation requesting an

20  opportunity to perform a work," which it is argued is insufficient to rebut a finding

21  that the matter was done at the instance of the artists.   For this proposition,

22  defendants rely on the district court's opinion in Burroughs.  In that case, the noted

23  illustrator Burner Hogarth approached the owner of the copyright in the character

24  Tarzan, Edgar Rice Burroughs, Inc. ("ERB"), suggesting that the company "take

25  up the illustration of the Tarzan Sunday Color Page," which could be reproduced

26  in "hard cover book."  ERB later replied that the company's comic book properties

27  were in flux and that the two would have to "suspend our discussions temporarily."

28  Undeterred, Hogarth wrote back six months later, noting his availability to create

68

1    the Tarzan artwork.  At that point, ERB wrote a series of letters (dated in July,

2    1970) inquiring whether Hogarth could produce "a quality, high priced edition of an

3    adult version Tarzan of the Apes in graphic form," "described in detail" what it

4    envisioned the book to be, and "proposed terms for the project" (including

5    compensation) that ultimately found there way into the parties' written agreement.

6    Id. at 1303-04.  Thereafter, Hogarth set about creating the work requested.

7        With this factual backdrop, the district court concluded that Hogarth's early

8    contacts with ERB were not sufficient to demonstrate the book was made at his

9    instance, commenting "not every solicitation requesting an opportunity to perform

10   work constitutes an instancing."  Id. at 1316.  Instead, the district court found the

11   book project was "first 'instanced' by [ERB] in [its July, 1970] . . . letters, which

12   predicted all of the principal terms for production of the . . . Books."  Id.  The

13   district court further found significant the fact that because Hogarth was dealing

14   directly with the owner of the underlying Tarzan material of which the book

15   solicited would be derivative:  "[I]t would be 'beyond cavil that [he] would  . . . have

16   undertaken production of artwork for the Books [or] brought [it] to publication,

17   without receiving the assignment from ERB to do so."  Id. at 1317.

18       In contrast, here, the uncontroverted evidence shows that Siegel and

19   Shuster did just that:  Siegel created the script and Shuster created the artwork for

20   the first two weeks of newspaper strips without any indication that they received

21   permission to do so beforehand from Detective Comics.  Admittedly, both Siegel

22   and McClure understood such permission from Detective Comics would ultimately

23   have to be forthcoming before the material could be published,[23] but that is a far

24   cry from the notion that Detective Comics engaged Siegel and Shuster to create

25   the material at its instance.  To the contrary, the clearly defined (and expressed)

26

27       [23]  This is evidenced by McClure's admonition in its correspondence with

28   Siegel that he "should get a letter from [Detective Comics] before [the parties
     could] get down to brass tacks on SUPERMAN."

1  understanding that an artist must <u>eventually</u> obtain from a copyright holder

2  approval of his or her actions in creating a derivative work before that work may

3  be <u>published</u> is fundamentally incompatible with the notion that the copyright

4  holder tasked that artist with <u>creating</u> the derivative work in the first instance.

5  Unlike the artist in <u>Burroughs</u>, Siegel did not solicit from the underlying rights

6  holder an opportunity to create a derivative work; he instead solicited a third party

7  who at the time held no rights.

8         Nor does the fact that Siegel and Shuster were engaged by Detective

9  Comics for creating Superman material necessarily lead to the conclusion that the

10  newspaper strips were done at Detective Comics' instance.  Such material did not

11  fall within the scope of what Detective Comics had (at the time) commissioned

12  them to produce — comic <u>books</u>.  This fact was reinforced by Detective Comics

13  letter <u>after</u> the execution of the syndication agreement that it did not view creation

14  of the newspaper material as giving it "little to gain in a monetary sense" and by

15  Siegel and Shuster's later testimony during the 1947 Westchester litigation that

16  the impetus to seeking such newspaper syndication material after the March 1,

17  1938, grant was precisely because Detective Comics was <u>not</u> in the business of

18  syndicating newspaper comic strips.

19         Nor ultimately does the Court conclude that the material was prepared at

20  McClure's instance.  The fact that the material was created only after Siegel

21  approached McClure and Mcclure suggested a specific subject for the material

22  (Superman's origin and arrival on Earth) would normally lead to the conclusion

23  that the work was done at McClure's instance.  <u>See</u> 2 PATRY ON COPYRIGHT § 5:74

24  ("whether the hiring party is the motivating factor for the creation of the work, a

25  very important, and usually determinative factor is whether the work was

26  substantially completed at the time it was allegedly specially ordered . . . .  If the

27  work has not been begun before the parties meet, this fact weighs in the hiring

28  party's favor").  That McClure did not involve itself in supervising the creation of

70

1    the artists' work is likewise unimportant.  Id. ("the 'status of a work created by an

2    independent contractor as a specially ordered . . . work made for hire has nothing

3    to do with whether the commissioning party exercise any . . . supervision and

4    control over the independent contractor's work.'  Instead, it is sufficient that the

5    hiring party request a specific type of work without having to be involved in the

6    details of its creation").  There is, however, one complicating wrinkle that

7    distinguishes this case from all the other cases where a work is made by request

8    as a condition for obtaining employment — when presented with the works

9    reflecting the suggested storyline, McClure promptly returned it, commenting that

10   it would defer making a decision on the matter.

11       On this point, the Court finds the events that occurred after the materials'

12   return of great significance:  Siegel and Shuster attempted to sell this same two

13   weeks' worth of newspaper strips to another syndicator (The Register and Tribune

14   Syndicate), a fact which they publicized to Detective Comics and McClure without

15   objection from either.  If the material was intended by the parties to be a work

16   made for hire owned by McClure, such an act would be completely contrary to

17   such ownership.  That the artists nonetheless openly engaged in such efforts to

18   sell the work to others weighs heavily against creation of that material being

19   treated as a work for hire.  See Martha Graham Sch., 380 F.3d at 638 (finding

20   significant in conclusion that works (choreographed dances) were not made for

21   hire the fact that even after employing the artist to teach she "continued to receive

22   income from other organizations for her dance teaching and choreography").

23       Furthermore, the comment in the correspondence from the other syndicator

24   — that "[a]ny action on our part should not conflict with your progress in dealing

25   with the McClure Syndicate[; i]f they are in a position to take on your strip,

26   naturally I presume you will want to go ahead" — gives the impression that

27   ownership in the material was still, at that time, up for bid, with McClure, at most,

28   operating under the auspices of an informal right of first refusal and not under the

1   assumption that the rights belonged to any particular syndicator from its inception.

2   Such a "right of first refusal . . . is fundamentally incompatible with a finding that a

3   work . . . is . . . made for hire."  Siegel, 496 F. Supp. 2d at 1141.  Cf. 1 NIMMER ON

4   COPYRIGHT § 5.03[B] [2][D] at 5-56.8 ("[A] commission relationship may not exist,

5   even if the work is prepared at the request of an other, and even if such other

6   person bears the costs of its creation, where the person requesting the work is

7   expressly granted only a one-time use").

8       This leads to the next significant factor:  That the creation of the material

9   occurred without any mention or provision for compensation (either a fixed sum or

10  a percentage royalty) for the artists.  Even after creating the material, Siegel and

11  Shuster's efforts went unpaid for at least five months.  This distinguishes the

12  present case from Burroughs where the commissioning party's suggestion for the

13  creation of the work contained within it a recital of the basic financial terms of the

14  engagement.  Simply stated, there is no evidence that the material in question

15  was made at the expense of anyone save for the artists that created the material,

16  and who in turn shopped it to multiple syndicators looking for any takers to its

17  publication.

18      Accordingly, the Court finds that the two weeks' worth of newspaper comic

19  strip material created by Siegel and Shuster during the spring of 1938, before the

20  execution of the syndication agreement were not works made for hire.

21      **IV. ASSIGNMENT OF THE FIRST TWO WEEKS' WORTH**

22      **OF NEWSPAPER STRIPS AND TERMINATION NOTICE DEFICIENCIES**

23      As with all the Court's findings regarding work-for-hire status, this

24  conclusion has certain legal ramifications that necessarily flow from it which raise

25  secondary legal arguments concerning the plaintiffs' ability to terminate the grant

26  of these two weeks' worth of newspaper strips.  Thus the Court must address

27  whether all of the rights to the first two weeks' worth of newspapers strips were

28  assigned, the failure to serve McClure with the termination notice, and the failure

72

1 to identify the first two weeks' worth of newspaper strips among the works subject

2 to termination in the notice.

3 **A.** **Assignment of the First Two Weeks' Worth of Newspaper Strips**

4 Because the initial two weeks' worth of newspaper strips were not works

5 made for hire, when those strips were created, the copyright in them belonged at

6 its inception to Siegel and Shuster. That copyright was protected under state

7 common law until the works were published in January, 1939, at which time

8 federal statutory copyright protection may have attached, depending upon

9 compliance with certain statutory formalities. See Siegel v. Time Warner Inc., 496

10 F. Supp. 2d 1111, 1130 n.7 (C.D. Cal. 2007). As Professor Nimmer explains in

11 his treatise: "As to a work created and the subject of statutory copyright prior to

12 [the 1976 Act], such copyright did not subsist from the moment of creation.

13 Rather, it became effective either upon publication with notice . . . . Prior to such

14 publication . . . , a work created before [the 1976 Act] was protected from its

15 creation under the state law of common law copyright. Common law copyright in

16 a work initially vested in the author or authors thereof." 1 NIMMER ON COPYRIGHT

17 § 5.01[B] at 5-6. Because the Court has found that the two weeks' worth of

18 newspaper strips are not works made for hire, the "author" of those strips would

19 be Siegel and Shuster, not Detective Comics or McClure. This designation is

20 important because it impacts who may claim ownership of the works when

21 published, the required contents of the copyright notice affixed to the works when

22 published, and the contents of the registration certificate that was issued.

23 The 1976 termination provisions are limited only to grants in federally

24 copyrighted works, meaning works subsisting in a statutory initial or extended

25 renewal term as of the 1976's effective date. The right to terminate does not

26 apply to unregistered copyrights protected at common law or copyrights to works

27 that have fallen into the public domain as of the time of the 1976 Act. See PATRY

28 ON COPYRIGHT § 7:42. Thus, for termination notice to be effective to reclaim the

rights to the newspaper strips, the newspaper strips must have obtained proper

federal statutory copyright protection and maintained that protection up through

the time of the 1976 Act. This then raises the question of whether and how Siegel

and Shuster did obtain such statutory copyright protection of the material in their

newspaper strips under the 1909 Act; any defect in the process would call into

question plaintiffs' ability to terminate the grant to the copyright in those works.

Again as Professor Nimmer explains:

> However, the subsequently obtained statutory
> copyright [upon publication with notice] vested in such
> author or authors only if prior thereto, there had not
> been a transfer of the common law copyright . . . . In
> the event of such disposition, it was the transferee and
> not the original author or authors in whom statutory
> copyright initially vested. The determination of the
> proper person initially to claim statutory copyright under
> the 1909 Act remains of more than antiquarian interest,
> as an improper claim under the 1909 Act could have
> injected a published work into the public domain.

1 NIMMER ON COPYRIGHT § 5.01[B] at 5-6.

The question of assignment is highly significant because, under the 1909

Act, agents and licensees could not claim such statutory copyright ownership, but

an assignee could. "The assignee of an author's common law copyright might, by

virtue of such assignment, claim statutory copyright." Id. at 5-7.

The pertinent facts are reiterated for purposes of this discussion: The first

two weeks of newspaper strips were first published on January 16, 1939, in the

Milwaukee News Journal, which contain the following notice affixed thereto

"Copyright, 1939". The initial copyright registration is treated as having been

registered in the name of McClure Newspaper Syndicate, listing as the works

authors "Jerry Siegel and Joe Shuster, of United States."[24] Later on July 3, 1944,

---

[24] Defendants state that the copyright notice under which the material was first published was "in the name of McClure," (Defs.' Obj to New Arguments at Hearing at 1), but as noted by the Court, the notice affixed thereto actually did not list McClure, or anyone, as the copyright proprietor. Such a designation in the notice was required by § 19 under the 1909 Act, but this defect is of no

(continued...)

74

1  McClure "assigned to Detective Comics, Inc. all its rights, title and interest in all

2  copyrights in SUPERMAN, including the copyrights and all renewals and

3  extensions thereof."[25]

4       As the facts are presented in this case, an assignment by Siegel and

5  Shuster to McClure must have occurred before publication of the initial two weeks'

6  worth of newspaper strips; otherwise, the copyright notice on the works when first

7  published was inadequate to comply with the statutory formalities, and the works

8  have fallen into the public domain.  (Defs.' Obj and Response New Arguments at 2

9  (assuming "Siegel and Shuster owned the copyright of these works from

10  inception, there would need to have been an assignment from them of their entire

11  copyright rights to McClure before the strips appeared, in order to avoid loss of

12  copyright")).

13       Plaintiffs argue that the parties' course of conduct in conjunction with

14  various terms in the syndication agreement itself clearly imply that such an

15  assignment of the artists' rights in the newspaper strips to McClure occurred.  As

16  explained by plaintiffs:

17           While there is no express mention of a sale or
             transfer, under the [syndication] agreement Siegel and
18           Shuster delivered the newspaper strips, protected by

19  _____

20       [24](...continued)
    consequence as the Second Circuit's decision in Fawcett held that such a defect
21  in the notice was saved by virtue of § 21 except in those instances in which
    McClure "sent out 'mats' [of the strips to newspapers] without any notice at all"; in
22  such a situation "the copyrights on those 'strips' were lost, regardless of
    § 21."  191 F.3d at 601.

23       [25]  Two years after this assignment from McClure, Detective Comics was
24  consolidated into other companies into a company called National Comics
    Publications, Inc., which in turn was later consolidated in 1961 into the
25  aforementioned National Periodical Publications, Inc.  In the 1961 consolidation
    agreement it was represented that the new company had become "vested with all
26  the properties of Detective Comics, Inc., and National Comics Publications, Inc.,"
    including that it was "the owner of and is vested with title to all of the copyrights
27  (and renewals and extensions thereof) in the artistic and literary works consisting
    of newspaper cartoon strips or continuities entitled SUPERMAN which the
28  McClure Newspaper Syndicate had from the first day of publication to July 3,
    1944."

1  common law copyright, to McClure.  McClure then
2  copyrighted the material in its own name [(which the
   syndication agreement clearly provided was
3  permissible for them to do)], listing Siegel and Shuster
   as the 'authors.'  McClure then granted an exclusive
4  license to Detective with respect to the non-syndication
   rights [(namely, allowing Detective Comics to use the
5  strips in its comic book magazines free of charge six
   months after the strips first publication in the
6  newspapers)], and later on July 3, 1944 assigned the
   entire copyright [in the newspaper strips] to Detective
7  per the term of the [syndication] agreement.

8  (Pls.' Opp and Response to Defs.' Sur-reply at 11)

9       Defendants respond by arguing that an assignment must be supported by a

10  clear, unambiguous, written instrument, and that such instrument is lacking here.

11  (Defs.' Obj. and Response to New Arguments at 2-3 & n.5 ("there is no question

12  that neither of the September 22, 1938 agreements include such an assignment

13  . . . There is no language of copyright assignment" and further commenting that

14  "any assignment of common law copyright would have to have been in writing

15  under the statute of frauds").  This argument does not withstand scrutiny.

16       At the outset, the Court notes that an assignment of a common law

17  copyright was not subject to a requirement of writing.  To the contrary, during the

18  time the 1909 Act was in effect, at common law, a copyright was capable of

19  assignment so as to completely divest the author of his rights, "without the

20  necessity of observing any formalities."  Urantia Foundation v. Maaherra, 114 F.3d

21  955, 960 (9th Cir. 1997); accord Epoch Producing Corp. v. Killiam Shows, Inc.,

22  522 F.2d 737, 747 (2d Cir. 1975) (noting that assignment need not be in writing);

23  3 NIMMER ON COPYRIGHT § 10.03[B][2] at 10-56.3 ("it appears that an assignment

24  of common law copyright was not within the Statute of Frauds").  Other case law

25  further demonstrates that such an assignment could be oral or could be implied

26  from the parties' conduct.  See Jerry Vogel Music Co. v. Warner Bros., Inc., 535 F.

27  Supp. 172 (S.D.N.Y. 1982); Van Cleef & Arpels, Inc. v. Schechter, 308 F. Supp.

28  674 (S.D.N.Y. 1969).

1    Having rejected the notion that any writing is required, the Court

2    nevertheless concludes that the parties' syndication and employment agreements,

3    as well as their actions, make clear that the requisite complete assignment of both

4    the initial and the renewal term occurred.

5    Although the words "assign" or "transfer" do not appear in the syndication

6    agreement, such an intent was demonstrated by other language contained in the

7    agreement, as well as by Siegel and Shuster's delivery of newspaper strip material

8    to McClure. The syndication agreement provided that McClure would hold "all the

9    original drawings of the 'Superman' strip," which it would later provide to Detective

10   Comics on license for publication in its comic books.  Such expressed receipt of

11   the "original" material in question and the ability to license that material is not the

12   language used to describe the recipient of a mere license to the material in

13   question, but as one of an assignee.  As Judge Hand remarked, "[t]hat is the

14   language of a 'proprietor,' who assumes power to license another copy the

15   'works.'"  Fawcett, 191 F.2d at 599; see also Urantia, 114 F.3d at 960 (noting that

16   language in trust instrument declaring that transferee "retain[ed] absolute and

17   unconditional control of all plates . . . for the printing and reproduction . . . thereof"

18   was indicative of an "intent to transfer the common law copyright").

19   Defendants also argue that there could have been no assignment to the

20   two weeks' worth of newspaper strips through the syndication agreement because

21   that agreement indicated that at the time of the document's execution Siegel and

22   Shuster "had already created 'the sample submitted' and that the subject 'daily

23   strip . . . entitled 'Superman' . . . was owned by Detective."  (Defs.' Obj. and

24   Response to New Arguments at 3).  This argument selectively pieces together

25   different portions of the agreement as if they were written as a single whole, when

26   in fact those sections, read in the context, clearly indicate that the parties were not

27   speaking specifically to the initial two weeks of newspaper strips.  Rather, they

28   were speaking more generally to all newspaper strips published pursuant to the

ER 163

1     agreement.  Similarly, the reference defendants make to the agreement noting

2     Detective Comics' ownership to the title "Superman" does not necessarily apply to

3     the strips themselves, a distinction which Judge Hand also drew when construing

4     these same agreements.

5         Moreover, Siegel and Shuster not only allowed McClure to syndicate the

6     Superman newspaper strips, they gave McClure the original manuscript and

7     artwork to the same to McClure to hold in its possession.  "It has been held that

8     delivery of a manuscript suffices" for the purpose of establishing an assignment —

9     "so long as the intent to pass title in the common law copyright is likewise

10     present."  NIMMER ON COPYRIGHT § 10.03[B][2] at 10.56.3.  Such an inference is

11     particularly apt when "over a long period of time, the author and other interested

12     parties had acquiesced in the putative assignee's ownership."  Urantia, 114 F.3d

13     at 960.  Here, not only did the parties acquiesce in the agreement to McClure

14     receiving the originals to the strips but the parties' agreement stated that the

15     copyright notice in said material was to be made in McClure's name, something

16     which under the 1909 Act could not be undertaken by a mere licensee but only

17     "the author or proprietor" of the work.  Sanctioning such conduct clearly

18     constitutes an acquiescence on Siegel and Shuster's part to McClure's ownership

19     in the copyright to these newspaper strips, and is perhaps the clearest evidence in

20     the syndication agreement itself to an assignment being made in favor of McClure

21     by the artists.

22         Such language in the syndication agreement, and such action by the

23     parties clearly demonstrate at minimum an intent to transfer the initial copyright

24     term in the newspaper strips to McClure, see Urantia, 114 F.3d at 960, but there is

25     other language in the parties' September 1938 agreements that demonstrate an

26     intent by the authors to transfer the renewal term to those strips as well.

27         Not surprisingly, defendants contend that there was no such language of

28     complete assignment from Siegel and Shuster in the newspaper syndication or

1  employment agreements.  However, when one surveys the agreements as a
2  whole, it becomes readily apparent that there is language of assignment not just
3  of the authors' rights to the initial term, but also (as held by and argued to the
4  Second Circuit's during the litigation surrounding the rights to the Superman
5  renewal term in the 1970s) the renewal term as well.  Notably, the one paragraph
6  in the employment agreement that makes reference to and separately identifies
7  the artists' creation of both newspaper strips and comic books also contained
8  language whereby the artists agreed that they were "furnishing" this global
9  category of material "exclusively" to Detective Comics or to whomever else
10 Detective Comics might designate, an obvious reference to McClure.  (See Decl.
11 Toberoff, Ex. P ("[Y]ou shall furnish such matter exclusively to us . . . as such may
12 be required by us or as designated by us in writing.")).

13        Likewise, the concluding sentence to the paragraph in the employment
14 agreement which spells out the royalty payment terms for the newspaper strip
15 material created by the artists, contains an acknowledgment by the artists that "all
16 [such] material, art and copy shall be owned by" Detective Comics or whomever
17 Detective Comics permits (undoubtedly a reference to the derivative nature of the
18 work) the title in the same to be "copyrighted or registered in our name or in the
19 names of the parties designated by us" (another clear reference to McClure).

20        Despite this language, defendants argue that it is not sufficient, as "there is
21 no question that neither of the September 22, 1938 agreements include such an
22 assignment.  The agreements speak for themselves — they are not assignments
23 from Siegel and Shuster to anyone."  (Defs.' Obj. and Response to New
24 Arguments Made at Hearing at 3).  However, defendants' position is completely
25 contrary to that which its predecessors in interest have taken in the seven
26 decades since those agreements were executed.  It has been the position of
27 defendants and its predecessors in interest (made manifest during the 1970s
28 litigation surrounding the rights to the Superman renewal term) that the March 1,

1  1938, grant as well as the other agreements the parties entered into (up to and

2  including the 1948 stipulated judgment concluding the Westchester action), that

3  the artists in each instance effectuated a complete assignment of both the initial

4  and renewal terms to the Superman character.

5      Under the 1909 Act, general words of assignment can include renewal

6  rights if the parties had so intended.  See Venus Music Corp. v. Mills Music, Inc.,

7  261 F.2d 577 (2d Cir. 1958); cf. Fred Fisher Music Co. v. M. Witmark & Sons, 318

8  U.S. 643, 653 (1943) (observing that a specific intent to transfer the renewal term

9  must be present).  Following this line of authority, the Second Circuit in the 1970s

10 Superman litigation held that evidence of the parties' conduct and iterations of

11 their various contractual arrangements, which included language acknowledging

12 that the publisher would hold title to the copyright in the character "forever" and

13 prohibiting the artists' from exploiting Superman "at any time hereafter" except

14 with the character's publisher, indicated not simply an assignment of the artists'

15 initial term in the Superman character, but the renewal term as well.  Siegel, 508

16 F.2d at 913-914 (stating that "[t]he ready answer to this argument is that the state

17 court action determined that the agreements conveyed all of the plaintiffs' rights in

18 Superman to the defendants and not just the original copyright term" and noting

19 that the presence of such general terms of conveyance in the parties' agreements

20 such as "hold[ing] forever" a given right and agreeing not to use Superman in any

21 other strip "hereafter" connoted an assignment to the entirety of the copyright in

22 that material (emphasis added)).

23     This is the same language contained in the employment agreement

24 ("owned by us" or McClure, "will not hereafter" exploit Superman character except

25 with either Detective Comics or McClure, and shall provide such material

26 "exclusively to us" or McClure), whose terms apply, in this context at least, to the

27 syndication agreement.  Defendants, having relied on that judgment for over thirty

28 years to exploit Superman to the exclusion of any rights held by the artists, cannot

1    at this late date be heard to complain that a court will likewise rely on that

2    judgment as a basis to permit those artists to reclaim, under the statutorily

3    provided termination scheme, the rights transferred in those much-hailed grants.

4    Defendants are thus precluded both as a matter of judicial estoppel and as a

5    matter of res judicata from contesting whether there was "language of [complete]

6    copyright assignment" to both the initial and renewal term to the Superman

7    material at issue in the employment and newspaper syndication agreements.

8         Thus, the Court rejects the notion that the initial two weeks' worth of

9    newspaper strips is not subject to termination on account of the lack of any

10   assignment by Siegel and Shuster to the entire copyright in that material to

11   McClure prior to the material's publication.

12   **B.    Failure to Serve McClure with Termination Notice**

13        Defendants contend that, if there was such an assignment from Siegel and

14   Shuster to McClure, plaintiffs' failure to serve a copy of the termination notice on

15   McClure's successors renders the termination notice invalid.  (Defs.' Obj and

16   Response to New Arguments at 3 n.6).  Because all of McClure's rights in the

17   material were assigned to Detective Comics in 1944, and Detective Comics'

18   successors were served with the termination notice, the Court rejects this

19   argument.

20        The 1976 Copyright Act provides that the termination notice must be served

21   upon the "grantee or the grantee's successor in title."  17 U.S.C. § 304(c)(4).

22   Moreover, the regulations provide that an investigation will satisfy this notice

23   requirement in the context of termination of rights to works created before the

24   effective date of the 1976 Act.  37 C.F.R. § 201.10(d)(2) states that section

25   304(c)(4)'s service requirement is met if there has been a "reasonable

26   investigation" as to the current ownership of the rights to be terminated and

27   service has occurred on the person or entity "whom there is reason to believe" is

28   the current owner by transfer from the grantee.

1      Soon after the 1976 Act became effective, courts were faced with the

2 question of whether this provision, stated in the disjunctive, meant that a notice

3 served upon the immediate grantee would suffice, so that such grantee's current

4 successor in title need not be notified of the termination of its rights; the reverse

5 situation from that found in the present case.

6      In Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 633 (2d Cir.

7 1982), the district court held that failure to serve the current successor in title

8 rendered ineffective a purported termination, notwithstanding service on the

9 original grantee.   On appeal, although the Second Circuit found it unnecessary to

10 decide that particular issue, Judge Newman addressed it in a thoughtful

11 concurring opinion.  Acknowledging that it was "not clear from the statute or the

12 regulations who [as between the 'grantee' and 'the grantee's successor in title']

13 must receive notice of termination, and the legislative history offer[ed] no

14 guidance," id., Judge Newman construed the statutory provision as "sensibly read

15 to mean that notice is to be served (a) on the grantee, if the grantee has retained

16 all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all

17 rights to the transferee, or (c) if some rights have been conveyed, on the grantee

18 or the transferee (or both) depending upon which rights are sought to be

19 terminated." Id. at 634 n.5.  In Judge Newman's view, the statute was written to

20 require service on only those entities that currently hold a right to be terminated; it

21 was not meant to require a mad dash to serve everyone and anyone who may

22 have been involved in the chain of title to the copyright (but who possess no

23 present right to the same), as suggested here by defendants.  "Whatever the

24 meaning of 'grantee' and 'successor in title' in the notice termination provision, it

25 seems evident that their expression in the disjunctive was intended to cover

26 various contingencies, not to afford those exercising termination rights a choice as

27 to whom to serve." Id.

28

As explained by Professor Nimmer, "It follows that if the grantee has transferred some but not all of the rights that he acquired under the grant, whether the original grantee, his successor with respect to some of the rights, or both, must be served will turn on which rights are purportedly terminated under the termination notice. If all rights are being terminated, all of the persons who own any portion of such rights must be served in order to effectuate the termination, as the district court concluded." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.20.

The Court finds Judge Newman's concurring opinion in Burroughs to be persuasive, and adopts the reasoning contained therein. As summarized by Professor Nimmer, "[i]t follows, then, that service of the termination notice need only be made upon the last grantee in the chain of title of which those serving the notice are reasonably aware." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.18 - 11-40.21.

This is exactly what occurred here. Plaintiffs served the notice on the newspaper strips' most current owner — Detective Comics' successors in interest, DC Comics. Defendants try to diminish the significance of the 1944 assignment from McClure to Detective Comics of all its (McClure's) rights in the newspaper strips as nothing but a meaningless gesture.[26] But if Siegel and Shuster had, in

---

[26] The argument is built largely on the assumption that Detective Comics never received the ownership to the renewal term copyright by way of a "grant of a transfer or license" from McClure. 17 U.S.C. § 304(c). Such an argument seeks to make much of the fact that the first proviso to section 24 of the 1909 Act, provided the right of renewal for a "periodical" work is given to "the proprietor of such copyright." Barbara A. Ringer, Study No. 31 Renewal of Copyright (1960), reprinted in 1 Studies on Copyright at 524. As explained by Ringer, "the 'proprietor' in this context means the owner of the copyright at the time renewal registration is made, and not the first or original proprietor. In other words, a 'proprietor' claim [to the renewal right] follows the ownership of the copyright, and is not a personal right like the claim of an author under the second proviso." Id. Thus, when McClure secured the original copyright for the newspaper strips, it was the first proprietor and therefore entitled thereto to the renewal copyright in the same. Defendants argue that when ownership was transferred in this copyright from McClure to Detective Comics, that the renewal term, rather than being transferred by agreement, was transferred by way of an automatic function of the statute. (Defs.' Obj. to New Arguments at Hearing at 2 n.4.) This

(continued...)

1   fact, assigned their copyright in the newspaper strips to McClure, then the transfer

2   would be deeply meaningful as it is a clear and unambiguous grant of both the

3   initial and the not-yet-vested renewal term to the copyright in those strips, thereby

4   rendering Detective Comics (as its immediate successor National Periodical

5   Publications, Inc., would proclaim a few years afterwards) sole owner of the

6   entirety in the copyright to those newspaper strips owing entirely to McClure's later

7   assignment.  Indeed, defense counsel conceded during oral argument that if

8   McClure held the copyright to the newspaper strips in trust for Detective Comics,

9   then it would have required a "reassignment" for the copyright to be transferred to

10  Detective Comics.  Given that Judge Hand held that the right in the material was

11  indeed held "in trust" for Detective Comics, such an assignment was anything but

12  a meaningless gesture.

13       No party disputes that the termination notice was served on DC Comics,

14  the successor to Detective Comics and current holder of all the copyright in the

15  newspaper strips.  Accordingly, the termination notice complied with section

16  304(c)(4), and is not defective based on plaintiffs' failure to serve McClure.

17

18

19

20       [26](...continued)
    distinction, however, is mistaken.

21       The second proviso to section 24 noted that "in the case of any other
    copyrighted work, including a contribution by an individual author to a periodical or

22  to a cyclopedic work or other composite work, the author of such work" was
    entitled to the renewal term.  Judge Learned Hand later defined the term,

23  "composite work," for purposes of the first proviso in section 24, as limited to
    works "to which a number of authors have contributed distinguishable parts, which

24  they have not, however, 'separately registered.'"  Shapiro, 123 F.2d at 699.  Here,
    however, the newspaper strips were separately registered in the name of their

25  individual authors after the publication of the composite work in question, the
    newspaper.  Indeed, the two weeks' worth of newspaper strips themselves bear a

26  separate copyright notice on them.  In such an instance, the author of the work
    was entitled to the renewal in the separately registered copyright, and hence,

27  Detective Comics' receipt by way of assignment from McClure to said renewal
    term was not effectuated automatically by way of statute.  See Self-Realization

28  Fellowship v. Ananda Church, 206 F.3d 1322, 1329 (9th Cir. 2000) (holding that
    proprietor entitled to renewal term in composite work unless the individual
    contribution was separately registered).

**C.**     **Failure to Include Strips in Notice as Works Affected by Termination**

Having found that the initial two weeks' worth of newspaper strips created

in the summer of 1938 were not works made for hire, having concluded that

Siegel and Shuster assigned all their rights in the copyright to those two weeks'

worth of strips to McClure (which later assigned all its corresponding statutorily

protected copyright to Detective Comics), and having determined that plaintiffs'

failure to serve McClure or its successor does not invalidate the termination notice

as to these newspaper strips, the Court is confronted with one final question:

Whether the failure to list in the termination notice the initial two weeks' worth of

newspaper strips, first published in the Milwaukee News Journal in January, 1939,

invalidates the termination notice as to these newspaper strips.  (Decl. Michael

Bergman Summ. J. Mot., Ex. X at 325 (complete termination notice reprinted)).  In

the end, the Court determines it does not.

A fact not lost on either party or the Court is that potentially valuable

copyright elements subsist in this material, as it is the first material in which

Superman's home planet of Krypton is named, Superman's Krypton name is

revealed, and the circumstances surrounding Krypton's destruction are revealed.

Plaintiffs, to their credit, candidly admit that the first two weeks' worth of

newspaper strips are not listed in the termination notice; but they point to the fact

that the notice did contain the following catch-all clause:

> This Notice of Termination applies to each and every
> work (in any medium whatsoever, whenever created)
> that includes or embodies any character, story
> element, or indicia reasonably associated with
> SUPERMAN or the SUPERMAN stories, such as,
> without limitation, Superman, . . . the planet Krypton
> . . . .  Every reasonable effort has been made to find
> and list herein every such SUPERMAN-related work
> ever created.  Nevertheless, if any such work has been
> omitted, such omission is unintentional and involuntary,
> and this Notice also applies to each and every such
> omitted work.

(Decl. Bergman, Ex. X at 3 n.1).

**ER 171**

1    Defendants, for their part, advocate a harsh rule:  A mistake, even one of

2   omission, is a mistake of consequence; where such a mistake is made, the

3   authors and their heirs must suffer whatever consequences that flow from the

4   resulting invalidity of the copyright notice.  The Court cannot countenance such a

5   harsh, per se rule that is divorced from the underlying facts.

6    Although there is no approved form for termination notices, the Copyright

7   Office has promulgated regulations specifying the required contents of a

8   termination notice:  It must contain a "complete and unambiguous statement of

9   facts . . . without incorporation by reference of information in other documents or

10   records," 37 C.F.R. § 201.10(b)(2), and it must  include the following:

11         1.    the name of each grantee whose rights are
                 being terminated or the grantee's successor in
12               title, and each address at which service is made;

13         2.    the title and the name of at least one author of,
                 and the date copyright was originally secured in,
14               each work to which the notice applies (including,
                 if available, the copyright registration number);
15
16         3.    a brief statement reasonably identifying the
                 grant being terminated;

17         4.    the effective date of the termination; and

18         5.    the name, actual signature, and address of the
                 person executing the termination.
19

20   37 C.F.R. §§ 201.10(b)(1)-(1), (c)(1), and (c)(4).  The regulations promulgated by

21   the Register of Copyrights also contain a safety valve that "[h]armless errors in a

22   notice that do not materially affect the adequacy of the information required to

23   serve the purposes of [the statute] shall not render the notice invalid." 37 C.F.R.

24   § 201.10(e)(1).

25    In support of their position, defendants rely on Burroughs v. Metro-

26   Goldwyn-Mayer, Inc., 683 F.2d 610 (2d Cir. 1982).  In that case, the author's heirs

27   attempted to terminate the grant to the copyright in all the books written by Edgar

28   Rice Burroughs featuring the character Tarzan.  In the termination notice,

86

1   however, the author's heirs mistakenly listed only 30 of the 35 Tarzan books

2   written by Burroughs. In considering whether the termination notice was effective

3   in recapturing the copyright in those five omitted books, the Second Circuit held

4   that the omission, although inadvertent, rendered the termination notice invalid as

5   to those omitted works. Id. at 622 (noting that "the omission of the five titles" left

6   the grant "in those five books . . . intact" and unaffected by the termination notice).

7   In reaching this conclusion, the Second Circuit did not discuss section

8   210.10(a)(1)'s harmless error provision; rather, the court simply noted that the

9   regulations required identification of the title and date of original copyright for each

10   work sought to be recaptured, observed the omission in the termination notice,

11   and held that therefore the termination notice was invalid as to the omitted works.

12       Defendants thus vastly overstate the holding of Burroughs as supporting

13   the proposition that plaintiffs' "failure to identify [the newspaper strips] is fatal to

14   their purported termination and their omission cannot be mere 'harmless error.'"

15   (Defs.' Obj. to New Argument at Hearing at 7 (emphasis added)). Its failure to

16   discuss the harmless error rule makes Burroughs of limited persuasive value to

17   the Court's current analysis.

18       On this point, the Court has discovered only one court decision that

19   considered whether omissions or defects in the termination notice were "harmless

20   errors" such that the termination notice was effective. See Music Sales Corp. v.

21   Morris, 73 F. Supp. 2d 364 (S.D.N.Y. 1999). There, the termination notice

22   consisted merely of a bland boilerplate statement: "Grant or transfer of copyright

23   and the rights of copyright proprietor, including publication and recording right."

24   Although finding that the generic statement would not "reasonably identify[] the

25   grant," the district court nonetheless upheld its adequacy on the basis that "it

26   appears to be boilerplate on termination notices customarily accepted by the

27   Register of Copyrights." Id. at 378.

28

1    Leading commentators have differing views on Music Sales Corp, and by

2  extension, differing views on how stringent courts should be in applying the

3  harmless error safety valve.  Professor Nimmer, on one hand, is much more

4  formalistic on this point, cautious of the proverbial slippery slope.  As Professor

5  Nimmer explained in response to the Music Sales decision:

6        [T]he Register of Copyrights does not pass judgment
         by accepting notices of termination, so that the
7        ministerial act of filing them connotes no approval of
         their verbiage.  On that basis, the court's citation to
8        authority allowing agencies to interpret statutory
         requirements is inapposite.  But the court also cites
9        unspecified custom of the industry as validating the
         boilerplate approach.  It remains to test what that
10       custom might be.

11 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.22 - 11.40.22(1).

12    Patry, on the other hand, praised the Music Sales decision as bringing the

13 formalities contained in the regulations into conformity with the realities of how

14 those regulations are actually administered by the agency that was charged with

15 crafting them.  See 3 PATRY ON COPYRIGHT § 7:45 ("In Music Sales Corp. v. Morris,

16 the requirement of a 'brief statement reasonably identifying the grant to which the

17 terminated grant applies' was reviewed, with the court wisely accepting industry

18 custom and Copyright Office practices as indicating compliance").

19    The dearth of case law, along with the divergence of opinion between

20 these two leading commentators, presents the Court with an apparent choice:  On

21 the one hand, the Nimmer approach, i.e., an insistence on rigid adherence to the

22 formalities specified in the regulations or, on the other hand, the less formalistic

23 (but more practical), lax approach set forth in Music Sales and endorsed by Patry,

24 i.e., acceptance of industry and agency custom.  The Court declines to choose

25 one extreme or the other, applying instead a middle path that requires a more

26 fact-intensive inquiry in applying the harmless error safety valve.

27    Here, it is clear to the Court that plaintiffs undertook enormous effort to

28 comply with the overly formalist requirements of the termination provisions,

1    literally providing 546 pages' worth of works subject to the termination notice.  The

2    purpose of the regulations is to give the recipient of the termination notice

3    sufficient information to understand what rights of theirs may or may not be at

4    stake.  Here, any recipient of the termination notice would quickly understand that

5    the plaintiffs have sought to reclaim the copyright in any and all Superman works

6    ever created.  Indeed, any publisher receiving the notice would be foolish to

7    believe otherwise. That the termination notice included a broad and

8    comprehensive catch-all clause only reinforces that which the 546-page listing of

9    titles of works subject to the notice makes painfully obvious.

10   This reasoning is all the more sound because what was sought to be

11   recaptured involved the rights to works involving a particular character that has

12   been continuously exploited for decades.  It is this peculiar nature of the subject

13   matter of the termination notice that makes rigid adherence to the regulatory

14   formalities particularly inapt:

15               In the case of works consisting of a series or
             containing characters requiring the terminating party to
16           list separately each work in the series or all works in
             which the character appears would render the
17           termination right meaningless. Instead, notice that
             reasonably puts the terminated party on notice of the
18           character being terminated is sufficient.

19   3 PATRY ON COPYRIGHT § 7:45.  There is little doubt that plaintiffs' termination

20   notice satisfies this concept of reasonable notice that the copyright in the entire

21   body of works to the Superman character was sought to be recaptured.

22   The commentary accompanying adoption of the regulation buttresses this

23   view that such a reasonable notice test is particularly apt with respect to

24   copyrights in characters appearing in thousands of works in countless media over

25   many decades.  In that commentary, the Register of Copyrights (Barbara Ringer),

26   observed that the Copyright Office "remained convinced that the required contents

27   of the notice must not become unduly burdensome to grantors, authors, or their

28   successors, and must recognize that entirely legitimate reasons may exist for

ER 175

1  gaps in their knowledge and certainty." Termination of Transfers and Licenses

2  Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

3      Such a conclusion does not necessarily conflict with the Second Circuit's

4  decision in Burroughs.  There was a plausible evidentiary basis upon which the

5  court in Burroughs could have reached the outcome it did, even with consideration

6  of the harmless error safety valve as articulated here.  There were only thirty-five

7  Tarzan books that were possibly subject to termination.  In such a case, with a

8  more finite universe of works possibly at issue, the omission of a few of those

9  works in the termination notice would comprise a significant level of exclusion

10  (roughly 15%).  Thus, the works' exclusion could quite legitimately be viewed as a

11  more meaningful act by the recipient of the notice.  Stated differently, in such a

12  situation, there is simply less of a chance for a mistake or oversight occurring in

13  identifying works in the notice, and thus more probable that the recipient would

14  reasonably believe the omission to be intentional, thereafter acting accordingly

15  when contracting with other parties regarding the copyrights to the omitted works.

16  If the terminating party later declares its intention to recapture the omitted works, it

17  is more likely that the notice's recipient will suffer some prejudice beyond the

18  simple reclamation of the rights to the omitted works.  Such a circumstance is not

19  present in a case where, as here, there is a universe of literally thousands of

20  possible works.

21      In the end, the Court finds that some consideration must be given to the

22  nature of the copyrights sought to be recaptured.  In a case involving thousands of

23  works, to insist on literal compliance with the termination notice regulations sets

24  up a meaningless trap for the unwary without any meaningful vindication of the

25  purpose underlying the regulation at issue, a result that the Register expressly

26  disavowed as the intent of the regulations.  Even the most cautious cataloguer

27  could easily overlook a stray work or two among the many thousands at issue

28  here.  The existence of the catch-all provision, while not always necessarily

1  dispositive, clearly and expressly evinces an attempt by the authors to recapture

2  the rights to all the Superman works they authored, and the failure to expressly list

3  the initial two weeks' worth of newspaper strips among those works is harmless

4  error.

5       Having said that, the Court does not hold that all termination notices with

6  similar catch-all provisions will necessarily be sufficient as to inadvertently omitted

7  works.  However, when the notice evidences a demonstrable effort at cataloguing

8  all the relevant and related works, where the universe of those works is large (and

9  certainly larger than the universe of thirty-five works at issue in Burroughs), and

10 where the number of omitted works is minute relative to the included works, the

11 presence of a comprehensive catch-all provision such as that found here leads to

12 the conclusion that the relevant omission was harmless error and the termination

13 notice should be found to be effective even as to the omitted works.

14      Here, the near-Herculean effort and diligence then-plaintiffs' counsel,

15 Arthur J. Levine, placed on cataloging the works and drafting the termination

16 notice, and the inclusion of the express catch-all provision in the termination

17 notice, put to rest any reasonable doubt defendants may have had that plaintiffs

18 sought to recapture all, not just some, of the copyright in the Superman character.

19 In short, if receipt of the nearly six-pound, 546-page termination notice was not

20 enough to convey this message, it was made plain by the explicit statement

21 expressing plaintiffs' intent to terminate the copyrights in all the Superman works.

22      Accordingly, the Court finds that failure to list the two weeks' worth of

23 newspaper strips was harmless error that does not effect the validity of the

24 termination notice to the first two weeks' worth of Superman newspaper strips.

25                              **V. CONCLUSION**

26      At the conclusion of this final installment regarding the publication history of

27 and the rights to the iconic comic book superhero Superman, the Court finds that

28 plaintiffs have successfully recaptured (and are co-owners of) the rights to the

following works: (1) <u>Action Comics</u> No. 1 (subject to the limitations set forth in the Court's previous Order); (2) <u>Action Comics</u> No. 4; (3) <u>Superman</u> No. 1, pages three through six, and (4) the initial two weeks' worth of Superman daily newspaper strips. Ownership in the remainder of the Superman material at issue that was published from 1938 to 1943 remains solely with defendants.[27]

Dated: August 12, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

---

[27] Although raised by the parties, the Court declines to address, and preserves for consideration <u>in limine</u> of trial, the remaining issues raised in the parties' briefs, including the mechanics of how such an accounting would be performed (should the concept of apportionment used in the infringement context be applied and, if so, who bears the burden of proof, and whether such apportionment should be done on a work-by-work or template basis), questions on how and to what extent to divide up profits generated from so-called "mixed use" trademark/copyright, and whether and to what extent pre-termination derivative works were published <u>after</u> the termination date into post-termination derivative works subject to an accounting of profits.

92

ADDENDUM A





Case 2:04-cv-08400-SGL-RZ Document 560-2 Filed 08/12/2009 Page 48 of 49







































UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | CASE NO. CV-04-8400-SGL (RZx) |
| Plaintiffs, | [Consolidated for pre-trial and discovery purposes with CV-04-8776-SGL (RZx)] |
| v. | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS, | |
| Defendants. | |

The termination provisions contained in the Copyright Act of 1976 have aptly been characterized as formalistic and complex, such that authors, or their heirs, successfully terminating the grant to the copyright in their original work of authorship is a feat accomplished "against all odds."  2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:52 (2007).

In the present case, Joanne Siegel and Laura Siegel Larson, the widow and the daughter of Jerome Siegel, seek a declaration from the Court that they have overcome these odds and have successfully terminated the 1938 grant by Jerome Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's half of the copyright in the same.  No small feat indeed.  It requires traversing the

1   many impediments — many requiring a detailed historical understanding both

2   factually and legally of the events that occurred between the parties over the past

3   seventy years — to achieving that goal and, just as importantly, reckoning with the

4   limits of what can be gained through the termination of that grant.

5           Any discussion about the termination of the initial grant to the copyright in a

6   work begins, as the Court does here, with the story of the creation of the work itself.

7           In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High

8   School in Cleveland, Ohio.  Siegel was an aspiring writer and Shuster an aspiring

9   artist; what Siegel later did with his typewriter and Shuster with his pen would

10  transform the comic book industry.  The two met while working on their high

11  school's newspaper where they discovered their shared passion for science fiction

12  and comics, the beginning of a remarkable and fruitful relationship.

13          One of their first collaborations was publishing a mail-order fanzine titled

14  "Science Fiction: The Advance Guard of Future Civilization."[1]  In the January, 1933,

15  issue, Siegel and Shuster's first superman character appeared in the short story

16  "The Reign of the Superman," but in the form of a villain not a hero.  The story told

17  of a "mad scientist's experiment with a deprived man from the breadlines" that

18  transformed "the man into a mental giant who then uses his new powers — the

19  ability to read and control minds — to steal a fortune and attempt to dominate the

20  world."  (Decl. Michael Bergman, Ex. HH at 1126).  This initial superman character

21  in villain trappings was drawn by Shuster as a bald-headed mad man.

22          A couple of months later it occurred to Siegel that re-writing the character as

23  a hero, bearing little resemblance to his villainous namesake, "might make a great

24  comic strip character."  (Decl. Michael Bergman, Ex. HH at 1126).  Much of Siegel's

25  desire to shift the role of his protagonist from villain to hero arose from Siegel's

26  exposure to despair and hope:  Despair created by the dark days of the Depression

27  _____

28          [1]  A fanzine is a publication, usually distributed at no or nominal cost,
    produced by fans of a particular topic (such as comic books, opera, murder
    mystery stories, etc.) for others who share their interest.

2

and hope through exposure to the "gallant, crusading heros" in popular literature and the movies.  (Decl. Michael Bergman, Ex. HH at 1126).  The theme of hope amidst despair struck the young Siegel as an apt subject for his comic strip: "Superman was the answer — Superman aiding the downtrodden and oppressed." (Decl. Michael Bergman, Ex. HH at 1126).

Thereafter, Siegel sat down to create a comic book version of his new character.  While he labored over the script, Shuster began the task of drawing the panels visualizing that script.  Titling it "The Superman," "[t]heir first rendition of the man of steel was a hulking strongman who wore a T-shirt and pants rather than a cape and tights."  (Decl. Michael Bergman, Ex. HH at 1129).  And he was not yet able to hurdle skyscrapers, nor was he from a far away planet; instead, he was simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or Tarzan, who combated crime.  Siegel and Shuster sent their material to a publisher of comic books — Detective Dan — and were informed that it had been accepted for publication.  Their success, however, was short-lived; the publisher later rescinded its offer to publish their submission.  Crestfallen, Shuster threw into the fireplace all the art for the story except the cover (reproduced below), which Siegel rescued from the flames.

ER 188



EXHIBIT HH

Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by <u>Detective Dan</u> in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics. As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

ER 189

1    (Decl. Mark Evanier, Ex. A at 5-6).

2         On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming

3    over plot ideas for this new feature when an idea struck him:  "I was up late counting

4    sheep and more and more ideas kept coming to me, and I wrote out several weeks

5    of syndicate script for the proposed newspaper strip.  When morning came, I

6    dashed over to Joe [Shuster]'s place and showed it to him."  (Decl. Michael

7    Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic

8    hero tradition of Hercules, righting wrongs in present-day society.  His inspiration

9    was to couple an exaggeration of the daring on-screen acrobatics performed by

10   such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make

11   such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John

12   Carter of Mars stories, and placing all of this within a storyline that was the reverse

13   of the formula used in the Flash Gordon serials.  The end product was of a

14   character who is sent as an infant to Earth aboard a space ship from an unnamed

15   distant planet (that had been destroyed by old age) who, upon becoming an adult,

16   uses his superhuman powers (gained from the fact that his alien heritage made him

17   millions of years more evolved than ordinary humans) to perform daring feats for the

18   public good.

19        Siegel named his character "Superman."  Unlike his previous incarnation,

20   Siegel's new Superman character's powers and abilities were much more

21   extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile,

22   hurdle a twenty-story building, and run faster than an express train; and nothing less

23   than a bursting shell could penetrate his skin.  Siegel placed his character in a very

24   cosmopolitan environment that had the look and feel of mid-thirties America.  He

25   also humanized his character by giving his superhero an "ordinary person" alter

26   ego:  Mild-mannered, big-city newspaper reporter Clark Kent.  Siegel developed

27   this concept of Superman's secret identity both as a means for his superhero to

28   maintain an inconspicuous position in everyday society and as a literary device to

5

introduce a conflict — and the potential for story lines centered around that conflict — between the character's dual identities, a conflict played out no more dramatically than in the love "triangle" between the character's dual identities and another newspaper reporter, Lois Lane.

Shuster immediately turned his attention to giving life and color to Siegel's idea by drawing illustrations for the story. Shuster conceived of the costume for Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S" emblazoned on an inverted triangular crest on his chest, and boots as footwear. In contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed glasses, combed black hair, and sporting a fedora. He drew Superman and his alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive curl over his forehead, and endowed him with a lean, muscular physique. Clark Kent hid most of these physical attributes behind his wardrobe, which he could quickly doff revealing his Superman costume underneath when he was called to action by someone in need of his superpowers. One of the earliest of Shuster's sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted below:



CLARK KENT          SUPERMAN

ONE AND SAME !

The two then set about combining Siegel's literary material with Shuster's graphical representations.  Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication.  Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers.  (Decl. Michael Bergman, Ex. H at 1).  The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication.  (Decl. Michael Bergman, Ex. H at 1).  The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings.  (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations:  A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips.  (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

ER 192

2).

The two shopped the character for a number of years to numerous publishers but were unsuccessful.  As Siegel later recalled:  One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a black-and-white daily strip," a suggestion to which he and Shuster balked given their earlier experience with the comic book publisher of <u>Detective Dan</u>.  (Decl. Michael Bergman, Ex. H at 2).

In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company.  When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ."  (Decl. Michael Bergman, Ex. A).  The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

Soon thereafter Detective Comics decided to issue a new comic book magazine titled <u>Action Comics</u> and began seeking new material.  Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate.  Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip.  Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of <u>Action Comics</u>.

ER 193

On February 1, 1938, Detective Comics returned the existing Superman newspaper comic strip material to Siegel and Shuster for revision and expansion into a full-length, thirteen-page comic book production. Detective Comics' desire to place Superman in a comic book required that Siegel and Shuster reformat their existing Superman newspaper material by re-cutting the strip into separate panels and then re-pasting it into a comic book format.

An issue emerged due to Detective Comics' additional requirement that there be eight panels per page in the comic book. Siegel and Shuster's existing Superman newspaper material did not have enough drawings to meet this format. In response, portions of the thirteen-page comic went forward with fewer than eight panels per page, and in the remaining pages Shuster either trimmed or split existing panels to stay within the page size, or drew additional panels from the existing dialogue to meet the eight-panel requirement. As Shuster later recounted:

> The only thing I had to do to prepare Superman for comic book publication was to ink the last three weeks of daily strips which I had previously completely penciled in detail. In addition, I inked the lettering and the dialogue and story continuity and inked in the balloons containing the dialogue. Certain panels I trimmed to conform to Detective's page size. I drew several additional pictures to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release. Finally, I drew the last panel appearing on the thirteenth page. Detective's only concern was that there would be panels sufficient for thirteen complete pages. Jerry told me that Detective preferred having eight panels per page but in our judgment this would hurt the property. I specifically refer to the very large panel appearing on what would be page 9 of the thirteen page release. We did not want to alter this because of its dramatic effect. Accordingly, on this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2). Siegel similarly recollected:

> Upon receiving word from Detective that we could proceed, Joe Shuster, under my supervision, inked the illustrations, lettering and dialogue balloons in the three weeks of daily strips that had been previously penciled. In addition, he trimmed certain pictures to meet Detective's panel specifications and extended others. To assure ourselves of having the proper number of

ER 194

1    panels we added several pictures to illustrate the story
2    continuity, I had already written.  Added as well for this
     reason was the scientific explanation on page 1 of the
3    release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted

Superman material to Detective Comics.  Soon thereafter Detective Comics

informed Siegel that, as he had earlier suggested to them, one of the panels from

their Superman comic would be used as the template (albeit slightly altered from the

original) for the cover of the inaugural issue of <u>Action Comics</u>.  (Decl. Michael

Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of <u>Action Comics</u>,

Detective Comics wrote to Siegel, enclosing a check in the sum of $130,

representing the per-page rate for the thirteen-page Superman comic book release

and enclosing with it a written agreement for Siegel and Shuster's signatures.  The

agreement assigned to Detective Comics "all [the] good will attached . . . and

exclusive right[s]" to Superman "to have and hold forever."  (Decl. Michael

Bergman, Ex. F).  Siegel and Shuster executed and returned the written assignment

to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September

22, 1938, employment agreement in which Siegel and Shuster acknowledged that

Detective Comics was "the exclusive owner[]" of not only the other comic strips they

had penned for Nicholson (and continued to pen for Detective Comics), but

Superman as well; that they would continue to supply the artwork and storyline (or

in the parlance of the trade, the "continuity") for these comics at varying per-page

rates depending upon the comic in question for the next five years; that Detective

Comics had the "right to reasonably supervise the editorial matter" of those existing

comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing

the . . . characters or continuity thereof or in any wise similar" to these comics to a

third party; and that Detective Comics would have the right of first refusal (to be

exercised within a six-week period after the comic's submission) with respect to any future comic creations by Siegel or Shuster.

Detective Comics announced the debut of its <u>Action Comics</u> series with full page announcements in the issues of some of its existing publications. Specifically, in <u>More Fun Comics</u>, Vol. 31, with a cover date of May, 1938, Detective Comics placed the following black-and-white promotional advertisement on the comic's inside cover, which reproduced the cover of the soon-to-be published first issue of <u>Action Comics</u>, albeit in a greatly reduced size:



Similarly, <u>Detective Comics</u>, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement on the comic's inside cover which contained within it a reproduction of the cover (again in a reduced scale) of the soon-to-be published first issue of <u>Action Comics</u>:

ER 196



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.

ER 197



Superman itself was published by Detective Comics on April 18, 1938, in Action Comics, Vol. 1, which had a cover date of June, 1938. A full reproduction of the original Superman comic contained in Action Comics, Vol. 1, is attached as an addendum to this Order. See Attachment A to this Order. The Superman comic became an instant success, and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial depiction in Action Comics, Vol. 1. These additional works have added decades of new material to further define, update, and develop the character (such as his origins, his relationships, and his powers and weaknesses) in an ongoing flow of new exploits and supporting characters, resulting in the creation of an entire fictional Superman "universe." For instance, absent from Action Comics, Vol. 1, was any

ER 198

reference to some of the more famous story elements now associated with
Superman, such as the name of Superman's home planet "Krypton."  Many of
Superman's powers that are among his most famous today did not appear in Action
Comics, Vol. 1, including his ability to fly (even through the vacuum of space); his
super-vision, which enables him to see through walls ("x-ray" vision) and across
great distances ("telescopic" vision); his super-hearing, which enables him to hear
conversations at great distances; and his "heat vision," the ability to aim rays of
extreme heat with his eyes.  The "scientific" explanation for these powers was also
altered in ensuing comics, initially as owing to differences in gravity between Earth
and Superman's home planet (the latter being much larger in size than the former),
and later because Krypton orbited a red sun, and his exposure to the yellow rays of
Earth's sun somehow made his powers possible.  In a similar Earth-Krypton
connection, it was later revealed that Superman's powers could be nullified by his
exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

Aside from the further delineation of Superman's powers and weaknesses,
many other elements from the Superman story were developed in subsequent
publications.  Some of the most famous supporting characters associated with
Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and
Brainiac, were created long after Action Comics, Vol. 1, was published.  Moreover,
certain elements contained in Action Comics, Vol. 1, were altered, even if slightly, in
later publications, most notably Superman's crest.  In Action Comics, Vol. 1, the
crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the
middle, shown throughout the comic as solid yellow in most instances and as a red
"S" in two instances.  Thereafter, the emblem changed, and today is a large yellow
five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,
also in the color red.

The acclaim to which the release of Action Comics, Vo. 1, was greeted by
the viewing public quickly made Superman not only the iconic face for the comic

book industry but also a powerful super-salesman for his publisher.  Detective

Comics oversaw the creation, development, and licensing of the Superman

character in a variety of media, including but not limited to radio, novels, live action

and animated motion pictures, television, live theatrical productions, merchandise

and theme parks.  From such promotional activity, Detective Comics came to "own[]

dozens of federal trademark registrations for Superman related indicia, such as

certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz

¶ 10).  The most notable of these marks that are placed on various items of

merchandise are "Superman's characteristic outfit, comprised of a full length blue

leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

plane! . . . It's Superman!"  (Decl. Paul Levitz ¶ 10).

       Meanwhile, Siegel continued to submit other comic book characters to

Detective Comics that were also published.  Sometimes these submissions were

without Shuster serving as an illustrator and sometimes, such as in the case of

Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

Among these subsequent creations was "The Spectre," a comic written by Siegel

and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

More Fun Comics, Vol. 52.  The comic told the story about a superhero with a

supernatural bent — the character being the spirit of a police officer killed in the line

of duty while investigating a gangland overlord and who, after meeting a higher

force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

eternal rest only when he has wiped out all crime.

       With Superman's growing popularity, a growing rift developed between the

parties.  Siegel and Shuster believed that Detective Comics' poached the artists

apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

house to its New York offices, and further believed that Detective Comics had not

ER 200

paid them their fair share of profits generated from the exploitation of their Superman creation and from the profits generated from copycat characters that they believed had their roots in the original Superman character. As a result, in 1947, Siegel and Shuster brought an action against Detective Comics' successor in interest in New York Supreme Court, Westchester County, seeking, among other things, to annul and rescind their previous agreements with Detective Comics assigning their ownership rights in Superman as void for lack of mutuality and consideration.

After a trial, official referee J. Addison Young issued detailed findings of fact and conclusions of law wherein he found that the March 1, 1938, assignment of the Superman copyright to Detective Comics was valid and supported by valuable consideration and that, therefore, Detective Comics was the exclusive owner of "all" the rights to Superman. The parties eventually settled the Westchester action and signed a stipulation on May 19, 1948, whereby in exchange for the payment of over $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding that Detective Comics owned all rights to Superman. Two days later, the official referee entered a final consent judgment vacating his earlier findings of fact and conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

The feud between the parties did not end after the Westchester action. In the mid-1960s, the simmering dispute boiled anew when the expiration of the initial copyright term for Superman led to another round of litigation over ownership to the copyright's renewal term.[2] In 1969, Siegel and Shuster filed suit in federal district court in New York seeking a declaration that they, not Detective Comics' successor

---

[2] Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at the time of Siegel and Shuster's creation of Superman and later assignment of rights in the same to Detective Comics, an author was entitled to a copyright in his work for twenty-eight years from the date of its publication. See 17 U.S.C. § 24, repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq. Upon the expiration of this initial twenty-eight year term, the author could renew the copyright for a second twenty-eight year period (the "renewal term").

(National Periodical Publications, Inc.), were the owners of the renewal rights to the

Superman copyright.  See Siegel v. National Periodical Publications, Inc., 364

F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974).  The end

result of the litigation was that, in conformity with United States Supreme Court

precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

Siegel and Shuster had assigned not only Superman's initial copyright term but the

renewal term as well, even though those renewal rights had yet to vest when the

grant (and later the stipulation) was made.

After the conclusion of the 1970s Superman litigation, the New York Times

"ran a story about how the two creators of Superman were living in near destitute

conditions":

> Two 61-year-old men, nearly destitute and worried about
> how they will support themselves in their old age, are
> invoking the spirit of Superman for help. Joseph Shuster,
> who sits amidst his threadbare furniture in Queens, and
> Jerry Siegel, who waits in his cramped apartment in Los
> Angeles, share the hope that they each will get pensions
> from the Man of Steel.

Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

TIMES, Nov. 22, 1975, at 62.

Apparently in response to the bad publicity associated with this and similar

articles, the parties thereafter entered into a further agreement, dated December

23, 1975.  See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

moral obligation on our part'").  In the agreement, Siegel and Shuster re-

acknowledged the Second Circuit's decision that "all right, title and interest in"

Superman ("including any and all renewals and extensions of . . . such rights")

resided exclusively with DC Comics and its corporate affiliates and, in return, DC

Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

Siegel and Shuster with modest annual payments for the remainder of their lives; provided them medical insurance under the plan for its employees; and credited them as the "creators of Superman."  In tendering this payment, Warner Communications, Inc. specifically stated that it had no legal obligation to do so, but that it did so solely "in consideration" of the pair's "past services . . . and in view of [their] present circumstances," emphasizing that the payments were "voluntary." The 1975 agreement also made certain provisions for Siegel's spouse Joanne, providing her with certain monthly payments "for the balance of her life if Siegel" died before December 31, 1985.  Finally, Warner Communications, Inc. noted that its obligation to make such voluntary payments would cease if either Siegel or Shuster (or their representatives) sued "asserting any right, title or interest in the 'Superman' . . . copyright."  As the years went by Warner Communications, Inc. increased the amount of the annual payments, and on at least two occasions paid the pair special bonuses.

        As the time grew nearer to the December 31, 1985, cutoff date for surviving spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her "terrible worry" over the company's refusal to provide Jerome Siegel life insurance in the 1975 agreement.  (Decl. Michael Bergman, Ex. NN).  She voiced her concern that, should anything happen to her husband after the cutoff date, she and their daughter "would be left without any measure of [financial] security."  (Decl. Michael Bergman, Ex. NN).  The parties thereafter agreed by letter dated March 15, 1982, that Warner would pay Joanne Siegel the same benefits it had been paying her husband if he predeceased her, regardless of the time of his death.  (Decl. Michael Bergman, Ex. OO).  Jerome Siegel died on January 28, 1996, and Joanne Siegel has been receiving these voluntary survival spouse benefits since that time.

        In the meantime, changes in the law resurrected legal questions as to the ownership rights the parties had to the Superman copyright.  With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

concerning artists' transfers of the copyrights in their creations.  First, the 1976 Act

expanded by nineteen years the duration of the renewal period for works, like the

initial release of Superman in Action Comics, Vol. 1, that were already in their

renewal term at the time of the Act's passage.  See 17 U.S.C. § 304(b).

Second, and importantly for this case, the 1976 Act gave artists and their

heirs the ability to terminate any prior grants of the rights to their creations that were

executed before January 1, 1978, regardless of the terms contained in such

assignments, e.g., a contractual provision that all the rights (the initial and renewal)

belonged exclusively to the publisher.  Specifically, section 304(c) to the 1976 Act

provides that, "[i]n the case of any copyright subsisting in either its first or renewal

term on January 1, 1978, other than a copyright in a work made for hire, the

exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

any right under it, executed before January 1, 1978, . . . is subject to termination . . .

notwithstanding any agreement to the contrary . . . ."

It is this right of termination that Joanne Siegel and Laura Siegel Larson now

seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially

sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

---

[3]  Although the present case only concerns the Siegel heirs' efforts to
terminate the 1938 grant, it has come to the Court's attention that the estate of
Superman co-creator Joseph Shuster has recently filed termination notices to
reclaim the rights to the Superman copyright.  According to documents filed with
the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
and the court-appointed representative of the Shuster estate, has given notice of
the estate's intent to terminate the 1938 grant of the Superman copyright to
Detective Comics and its successors effective 2013.  As executor of the Shuster
estate, Peary is entitled, under changes made to the 1976 termination provisions
by the 1998 Sonny Bono Copyright Term Extension Act, to make the same
termination claims for the Superman copyright that Shuster or his heirs would have
been entitled to bring beforehand.  See 17 U.S.C. § 304(c)(2); 3 NIMMER ON
COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
originally passed if an author died without leaving heirs before exercising the right
to termination "the result was that no one could exercise [that] right," but this
"harsh result" was "ameliorated" through the passage of the 1998 Act by providing
that, "instead of lapsing," the termination right could be exercised by "the author's
executor, administrator, personal representative, or trustee").

ER 204

Levine, in compiling the information necessary to draft the termination notice itself.[4]

On April 3, 1997, the two heirs served seven separate notices of termination under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's potential grant(s) in the Superman copyright to defendants, including the March 1, 1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975, agreement. The termination notices also specified that they covered hundreds of works, with the added proviso that the intent was for the termination notice to apply "to each and every work . . . that includes or embodies" Superman, and the failure to list any such work in the notice was "unintentional and involuntary." Each of the termination notices had an effective date of April 16, 1999. A flurry of settlement discussions between the parties quickly ensued, but just as quickly fizzled out. Nearly two years then passed without much discussion between the parties.

The day before the purported termination was to take effect, defendants sent a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the termination notices. (Decl. Marc Toberoff, Ex. Q at 171). The same day DC Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel that his company would "continue to provide the income and insurance benefits you . . . have been receiving under the 1975 agreement, without prejudice to [the company's] rights under that agreement, as long as we all continue to pursue the goal of working together." (Decl. Michael Bergman, Ex. P).

Not long after the termination notices' effective date passed, the Siegel heirs retained new counsel and the parties re-entered into settlement discussions to resolve their respective claims to the Superman copyright. Towards that end, DC Comics (and its "successors, past and present subsidiaries or affiliates") and the Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed that neither would "assert any statute of limitations . . . defense[] relating to . . . the

_____

[4] Before going into private practice, Mr. Levine served as General Counsel for the United States Copyright Office and also as Executive Director for the National Commission on New Technological Uses of Copyrighted Works.

[Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof (the 'Tolling Period')" while the parties attempted "to find an amicable resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex. A at 1).  The agreement further provided that the tolling period would remain in effect "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the [Termination] Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices."  (Reply Decl. Marc Toberoff, Ex. A at 2).

At some point the broad outline of a global settlement concerning the copyright to the Superman material, as well as to other works Siegel either authored or contributed material to Detective Comics (notably, Superboy and The Spectre properties), was reached.  Specifically, on October 19, 2001, counsel for Joanne Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General Counsel confirming and summarizing the substance of the settlement.  The letter concluded that "if there is any aspect of the above that is somehow misstated, please let me know by [October 22, 2001] at 2:00, as I will be out of the office — and likely difficult to reach — for the following four weeks."  (Decl. Marc Toberoff, Ex. BB).

A week later, on October 26, 2001, Warner Bros' General Counsel John Shulman responded with a letter, stating that he had "reviewed" the summary set forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of what we believe the deal we've agreed to is"; the outline was five pages long. (Decl. Marc Toberoff, Ex. CC).  The letter concluded that Warner Bros. was "working on the draft agreement" so as to "have this super-matter transaction in document form."  (Decl. Marc Toberoff, Ex. CC).

A few months later, on February 1, 2002, outside counsel for Warner Bros. provided a copy of the promised draft agreement (spanning fifty-six pages), with the

proviso that, "[a]s our clients have not seen this latest version of the agreement, I must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was also made in the draft agreement for the need of certain "Stand Alone Assignments" that had as yet not been finalized, something which Warner's outside counsel promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time Warner's Chief Operating Officer Richard Parsons, recounting that she and her daughter had "made painful concessions and reluctantly accepted John Shulman's last [settlement] proposal [in October, 2001]," but upon reading the proposed draft agreement learned that they had been "stabbed in the back," as it "contained new, outrageous demands that were not in the [October, 2001] proposal," such as "condition[ing] recei[pt of] financial compensation for our rights on demands which were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter concluded that "[a]fter four years we have no deal and this contract makes an agreement impossible." (Decl. Michael Bergman, Ex. Z).

Time Warner's CEO quickly responded with a letter of his own on May 21, 2002, expressing shock and dismay as "each of the major points covered in the draft agreement . . . accurately represented the agreement previously reached" by the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by acknowledging that, as with all lengthy negotiations, Time Warner "expected" that the submission of the draft agreement would result in further "comments and questions on the draft" by Siegel family's representatives that "would need to [be] resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming Time Warner's continued interest "that this agreement can be closed based upon the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman, Ex. AA).

Not long thereafter, the Siegel heirs' lawyers submitted for the family's review and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

(Decl. Marc Toberoff, Ex. AA).  The Siegel heirs, on September 21, 2002, rejected the redraft and fired their attorneys.  (Decl. Marc Toberoff, Ex. AA).  That same day Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing] negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates concerning" their rights to, among other things, Superman.  (Decl. Michael Bergman, Ex. DD).

Joanne Siegel and Laura Siegel Larson thereafter filed the present action, with the assistance of new counsel, Marc Toberoff, on October 8, 2004.  Both sides have since filed cross-motions for partial summary judgment.

Reduced to their essentials, the legal questions at stake in the parties' cross-motions are two-fold:

(1) The validity and enforceability of the termination notices in light of (a) whether any copyrightable Superman material contained in the promotional advertisements for <u>Action Comics</u>, Vol. 1, lies outside the reach of the termination notice (and hence, the termination notice is not enforceable against it);  (b) whether certain portions of the Superman comic in <u>Action Comics</u>, Vol. 1, are in the nature of a work for hire (and hence, not subject to termination); (c) whether the failure to list the 1948 consent judgment in the notices as one of the grants sought to be terminated materially affects the notices of termination; (d) whether the post-termination receipt of benefits under the 1975 agreement acts as a novation to re-grant the Superman copyright; (e) whether the statute of limitations ran out before the instant action was instituted thereby forestalling this lawsuit; and (f) whether the settlement negotiations that took place between the parties resulted in an enforceable agreement disposing of the claims asserted in the present action; and,

(2) The parameters of what was recaptured (and the rights flowing therefrom) through the termination notices, namely, (a) whether plaintiffs have a right to defendants' post-termination foreign profits from the exploitation of the Superman

copyright; (b) whether plaintiffs are entitled to profits from any of the various

trademarks that defendants have procured since the grant in marketing Superman;

(c) whether plaintiffs are entitled to profits from the derivative works of the

Superman material published by Detective Comics and its successors in interest

prior to the termination notice's effective date; and (d) whether any recovery of

profits extends beyond those made through DC Comics' exploitation of the

Superman copyright to that of its corporate siblings and parent who are licensees to

that copyright's movie and television rights, be it based on an alter-ego theory or

other notion of equity.

     I.    <u>Validity and Enforceability of Termination Notices</u>

     The 1976 Act created a new right allowing authors and their heirs the ability

to terminate a prior grant to the copyright in their creations. <u>See</u> 17 U.S.C.

§ 304(c). The 1976 Act also set forth specific steps concerning the timing and

contents of the notices that had to be served to effectuate the termination of a prior

grant. One of the most important steps was placing a limit on the temporal reach

such a notice could have on what was subject to being recaptured. Specifically, the

"[t]ermination of the grant may be effected at any time during a period of five years

beginning at the end of fifty-six years <u>from the date copyright was originally</u>

<u>secured</u>." 17 U.S.C. § 304(c)(3) (emphasis added). Moreover, the notice is

required to be "served not less than two or more than ten years before" its effective

date.

     Taken together, someone seeking to exercise the termination right must

specify the effective date of the termination, and that effective date must fall within a

set five-year window which is at least fifty-six years, but no more than sixty-one

years, from the date the copyright sought to be recaptured was originally secured,

and such termination notice must be served two to ten years before its effective

date. The purpose of this time window for terminating pre-1978 grants was so that

the only rights to the copyright affected thereby were those to the 19-year extension

ER 209

Case 2:04-cv-08400-SGL-RZ Document 293 Filed 03/26/2008 Page 25 of 72

in the renewal term created by the 1976 Act, leaving undisturbed the grantee's vested interest to the original 28-year renewal term as set forth in the 1909 Act, the governing statute at the time the grant itself was made.

Additional procedures required to be followed to make the termination notice effective were specified as well: The author or his or her heirs had to serve "an advance notice in writing upon the grantee or the grantee's successor in title"; the notice had to be signed by the author or his or her heirs; the notice was required to "state the effective date of the termination"; and the notice must be "recorded in the Copyright Office before the effective date of termination." 17 U.S.C. § 304(c)(4).

Beyond these statutory requirements, the notice was also required to "comply, in form, content, and manner of service, with [the] requirements that the Register of Copyrights . . . prescribe[s] by regulation." 17 U.S.C. § 304(c)(4)(B). Toward that end, the Register promulgated regulations implementing this statutory proviso. See 37 C.F.R. § 201.10. Among those regulations was one requiring the terminating party to identify in the notice "each work as to which the notice of termination applies." 37 C.F.R. § 201.10(b)(1)(ii).

As one noted author has commented, "[i]t is difficult to overstate the intricacies of these [termination] provisions, the result of which is that they are barely used, no doubt the result desired by lobbyists for assignees." William Patry, Choice of Law and International Copyright, 48 AM. J. COMP. L. 383, 447 (2000); see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir. 1982) (commenting that the steps necessary to make a termination effective oftentimes create "difficult, technical questions"). Those intricate provisions oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating party to reclaim the full measure of the copyright in a work of authorship. This case is no different.

ER 210

### 1. Promotional Announcements

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938. Defendants contend that the promotional announcements for <u>Action Comics</u>, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of <u>Action Comics</u>, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively. As defendants frame it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it <u>cannot</u> be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability." (Defs' Mot. Partial Summ. J. at 29). Thus, any work that was published with notice prior to April 16, 1938, <u>i.e.</u>, sixty-one years before the stated effective date, remains untouched by the termination notice.[5]

Plaintiffs do not dispute the legal consequence section 304(c)'s five-year window has in this case on the effective reach of their termination notices. As drafters of the notice, Siegel's heirs were given <u>carte</u> <u>blanche</u> in identifying the termination notices' effective date. Once they chose a date, certain consequences flowed therefrom, the most important of which is to cabin the five-year window

---

[5] Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices. As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

within which the notice can recapture any copyright secured in the material to which

the grant was directed.  A copyright in a work statutorily secured even just days

outside this five year window is beyond the effective reach of the termination notice,

in much the same way a tardily-filed renewal registration has been held to be

ineffective.  Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

several days is fatal and that the purported renewal is void to rescue the subject

work from the public domain, whether filed after expiration of the one year or prior to

its initiation").  A leading treatise supports such a calculation and the consequences

flowing from it:

> The appropriate dates for termination notices are
> measured from "the date copyright was originally
> secured, or beginning on January 1, 1978, whichever is
> later."  In the case of pre-January 1, 1978 works,
> "secured" means the actual date the work was first
> published with notice (or in the case of unpublished
> works, the date of registration), e.g., April 15, 1970, not
> December 31, 1970.  Failure to pay attention to the
> differences between the date the copyright was originally
> secured for purposes of section 304(c) termination of
> transfer and section 305 expiration of term may lead to
> an untimely notice of termination.

2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

11-40.11 ("Suppose that statutory copyright for a song were first secured on May

21, 1925.  Based on the statutory provision that termination may be effected

'beginning at the end of fifty-six years from the date copyright was originally

secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

work was so published predates the current year by more than sixty-one years, then

the termination right [to that work] under section 304(c) has expired.  The statute

apparently requires calculation of all these termination periods from the exact date

of publication, rather than from the end of the publication year, as is appropriate for

determining copyright terms under the 1976 Act").

ER 212

It is in this sense that one can say whether a termination notice is timely or not, a question that does not go to the notice's validity (the notice remains valid with respect to a copyright in works that was secured during the five year window) but as to its enforceability against a copyright in a particular work pre- or post-dating that window. Thus, the key in deciding this timeliness question begins with a determination of when the copyright in the work in question was secured, and not when the work itself was created.

The determination of when the copyright in a work is secured is when the material was protected by statute, meaning when the copyright in such a work secured protection under this country's copyright laws. Under the 1909 Act, "works could have obtained statutory copyright . . . , without the necessity of registration, simply by the act of publishing copies of the work bearing a proper copyright notice. As to such works, registration did not create the copyright, but merely recorded it." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17 U.S.C. § 10 (repealed). Thus, the initial question is whether the comic books containing the promotional announcements bore such a copyright notice upon them.

Section 19 of the 1909 Act delineated what constituted proper notice: "The notice of copyright required by section 10 of this title shall consist either of the word 'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication." If the comic books in question contained such a notice, then the date of publication is also the date the copyright in the material contained therein was secured. If not, then any of the copyrightable material in the works (including the promotional announcements) was never secured (absent evidence that the material had been registered beforehand with the Copyright Office when it was in an unpublished state) but instead was injected into the public domain.

ER 213

1    Here, the material submitted by defendants (the cover page for the magazine

2    and the page on which the promotional announcements is displayed) does contain

3    such a notice. At the bottom of the promotional announcement itself is the

4    following: "Entire contents copyright 1938 by Detective Comics, Inc." (Decl.

5    Michael Bergman, Ex. C at 10 & Ex. D at 14). Thus, the copyright for any of the

6    works contained in the comic books in question was secured on the date they were

7    published.

8    This leads to the next question: What are the publication dates for the two

9    comic books that contained the promotional announcements for Action Comics,

10   Vol. 1, featuring an illustration of Superman? Defendants have submitted the initial

11   copyright registrations for these comics, which indicate that More Fun Comics,

12   Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13   plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14   April 10, 1938, six days outside the temporal reach of the termination notices.

15   Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16   constituted prima facie evidence of the publication date for a work.[6] See 17 U.S.C.

_____

18       [6] Defendants' suggestion that the addition of section 304(a)(4)(B) by the
19   Copyright Amendments Act of 1992 somehow altered this rule by extending the
     prima facie imprimatur to renewals like those in this case is simply mistaken.
20   (Defs' Reply at 40 & n.16). That section provides that, so long as the renewal
     occurred "within 1 year before [the] expiration" of the initial term, then "the
21   certificate of such registration shall constitute prima facie evidence as to the . . .
     the facts stated in the certificate." However, the 1992 Act's provisions placed one
22   very important proviso on its applicability — its provisions applied only where a
     party was filing a renewal registration to the "extended term of copyright in a work."
23   Thus, the amendments' provisions were limited to renewal claims to works that
     were still in their initial term when the 1976 Act became effective, January 1, 1978,
24   meaning for copyrights whose first term of copyright was secured on or after
     January 1, 1950. That is to say, section 304(a)(4)(B)'s provisions only applies to
25   works that had yet reached the time for renewal before the 1976 Act extended the
     term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the
26   comics containing the promotional announcements). For those works, the 1992
     amendments allowed such renewal to be made at anytime, but provided incentives
27   for prompt renewal, the most notable being the extension of the prima facie rule to
28   such promptly filed renewal claims. See 2 PATRY ON COPYRIGHT § 7:50 ("Effective

29

§ 209 (repealed) (providing that a "certificate of registration" issued by the Register of Copyrights "shall be admitted in any court as prima facie evidence of the facts stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d 737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the reason that renewal certificates issued during the 1909 Act were not accorded prima facie status was because of the "minimal attention" the Register of Copyrights paid to the information contained therein; "[a]s long as original registration for a work has been made, the Copyright Office accept[ed] it at face value").

Plaintiffs attempt to refute this prima facie evidence through expert testimony and by legal argument.

As to the latter, plaintiffs seek to discredit the value of the initial copyright registration for More Fun Comics, Vol. 31, because Detective Comics' successor did not obtain that registration until nearly 28 years after its publication, on the eve of the expiration of the initial copyright term. The 1909 Act required that, once copyright had been secured by publication with notice, "there shall be promptly deposited" the required copies of the published work and the registration claim itself. 17 U.S.C. § 13 (repealed). Plaintiffs suggest that such a "late" initial registration raises questions as to the trustworthiness of any of the information contained in that registration. (Pls' Opp. at 48-49). Plaintiffs correctly point out that Professor Nimmer in his treatise has commented that, "where there was a failure to

---

June 26, 1992, Congress abolished the requirements that works in their first term of copyright published or registered between 1964 and 1977 must be timely renewed in order to enjoy the (now) 67-year renewal term. Instead, these works are now automatically renewed for the full term of 75 years. Copyrights whose first term of copyright was secured between January 1, 1950, and December 31, 1963, still had to have been renewed according to the requirements of the 1909 Act. Failure to do so resulted in the work falling into the public domain. . . . Renewal claims may still be filed at any time during the renewal period, and a number of incentives have been added to encourage filing. [One such] incentive[] for renewing provided in the Copyright Act of 1992 are the prima facie status that is accorded to the validity of the work"). Given that none of the comics in question fall within the class affected by section 304(a)(4)(B), that section's expansion of the prima facie status to renewal claims does not apply here.

ER 215

1  promptly register and deposit, under the 1909 Act, some questions as to the viability

2  of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150.

3  But Professor Nimmer's comments as to the collateral consequences flowing from

4  such a delay were not geared toward the validity of the copyright itself, but to the

5  existence of an impediment to bringing an action for infringement.  See id. at 7-149

6  (noting that Supreme Court's Washingtonian decision effectively read the "words

7  'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not

8  satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . .

9  requirement was (as it still is) clearly a condition precedent to the right to bring an

10  infringement action").

11        Although the general line of reasoning plaintiffs seek to draw from such a

12  "late-in-time" registration makes sense from a policy perspective, plaintiffs have

13  cited no authority that such long delays in registration vitiates or otherwise

14  diminishes the statutorily conferred prima facie presumption to which such

15  registration claims (and the information contained therein) are entitled, especially

16  once a registration has (as here) been tendered.  Moreover, even were the Court to

17  entertain plaintiffs' invitation, there remains the initial registration for the other comic

18  book in question — Detective Comics, Vol. 15 — which was obtained shortly after

19  that comic book's publication and, hence, the problem pressed by defendants with

20  the promotional announcement contained therein falling outside the effective reach

21  of the termination notice remains.

22        Plaintiffs next contend that the copies of the registration certificates

23  submitted by defendants have not been authenticated by the declarant to whose

24  declaration they are affixed, and hence, are not admissible as proof of the comic

25  books' publication date.  (Pls' Opp. at 48-49 ("the certificate is not properly

26  authenticated, but is merely attached to the declaration of defendants' attorney, who

27  appears to have no personal knowledge of it").  Such extrinsic evidence of

28  authenticity by the declarant is unnecessary for these copyright registration

ER 216

certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal purporting to be that of the United States . . . or of a . . . department, officer, or agency thereof," with "a signature purporting to be an attestation or execution," is considered self-authenticated.  Close inspection of the copyright registration certificates submitted by defendants clearly reveals the seal issued by the United States Copyright Office, signed by the Register of Copyrights, and bearing the following legend: "[A]ttached are additional certificates for the [comics in question] which were registered in accordance with provisions of the United States Copyright Law." (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1) have been met, rendering the copies of the copyright registration certificates as self-authenticated and, thus, admissible.

The obscure nature of these promotional announcements does not alter this analysis.  It is undoubtedly true that the existence of these announcements was not widely recognized even by comic book aficionados.  That, however, does not change the effect their existence has vis-à-vis the termination notices' effective reach.  Once a termination effective date is chosen and listed in the notice, the five-year time window is an unbendable rule with an inescapable effect, not subject to harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to "[h]armless errors in a notice" that does not "materially affect the adequacy of the information") (emphasis added).  That good cause may have existed for failing to structure the termination notices so as to sweep the announcements within its reach does not obviate application of the rule itself.

The importance such promotional announcements may have on the reach of a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr. Levine, who drafted the termination notices in this case.  He also drafted plaintiffs' termination notice with respect to The Spectre copyright, and structured it in such a way so as to include among the works affected by the notice's five-year window a promotional announcement for The Spectre contained in a comic published a month

before the one containing the first comic book story of the character.  (Decl. Michael

Bergman, Exs. WW-YY (termination notice describing among the works affected by

the notice the promotional announcement as "Spectre character appearing in

costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28,

1939, as Copyright Registration No. B437786, publication date January 1940") &

Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

Having provided prima facie evidence of the comic books' publication dates,

the burden shifts to the plaintiffs to produce some evidence calling into question

those dates.  The burden of production is not a heavy one (in large measure owing

to the fact that so little is proffered by the applicant or scrutinized by the Copyright

Office in the application process to procure the registration in the first instance), but

it is one that must be met nonetheless.  See 3 PATRY ON COPYRIGHT § 9:14 ("the

Copyright Office has no ability to verify facts stated in the certificate, and not

surprisingly makes no effort to do so. . . .  At the most, the Office can take notice of

any inconsistent facts that appear on the deposit copy and request clarification from

the claimant . . . .  In any event, [the opposing party] should be required to present

only a small degree of evidence calling into question the fact at issue in order to

rebut the certificate's presumption").

On that point all that plaintiffs have submitted is the opinion of a comic book

historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among

other things, assist it "in attempting to determine approximate dates of past

publication" of its comics.  (Decl. Mark Evaier ¶ 12).  From this particular

experience, as well as his long history in the comic book industry, Mr. Evanier seeks

to cast doubt on the veracity of the asserted publication dates for the comics

containing the promotional announcements.  The general thrust of his expert

opinion is that, outside the first printing of certain famous comic superheros such as

Superman in Action Comics, Vol. 1,  a particular "run of the mill" comic book's exact

date of publication during the 1930s and 1940s is difficult to determine, rendering

ER 218

the dates listed on the certificates as nothing more than "mere guesstimates" by the publisher. (Decl. Mark Evanier ¶ 10). Furthermore, Mr. Evanier downplays the significance of the fact that the comic books in question contained promotional announcements for Action Comics, Vol. 1, as necessarily meaning that their publication must have preceded Action Comics publication. As Mr. Evanier explains, the dates provided by publishers were often the dates initially scheduled or intended for publication, but the actual dates often varied with printing, delivery, and other delays. (Decl. Mark Evanier ¶ 11).

Mr. Evanier's expert opinion is chalk full of information on the publication of comic books in general during this time period, but is void of any specific evidence or opinion as to the publication of the particular comic books in question in this case. He offers no evidence of any specific printing, delivery, or other problems that may have affected the publication of More Fun Comics, Vol. 31, or Detective Comics, Vol. 15. His general opinion thus does not sufficiently refute the prima facie evidence set forth in the initial copyright registration certificates for these particular comic books. At most, his opinion raises some doubts as to the precision of the dates contained in initial copyright registrations for comic books in general from this period. However, those copyright notices were completed at a time which, by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate as possible in listing those dates and long before any incentive to provide inaccurate dates by virtue of contemplating this present litigation or the termination provisions of the 1976 Act existed. Plaintiffs evidence does no more than inform the Court that, despite efforts to be precise about publication dates for comic books during this particular period, mistakes could be made; it is not at all probative on the issue of whether mistakes were in fact made with respect to the information contained in the particular registration certificates at issue in this case. The Court therefore finds that the promotional announcements containing an illustration of Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

ER 219

1    of the termination notices.

2         Perhaps anticipating this finding, plaintiffs next seek to downplay the

3    significance of the promotional announcements themselves by arguing that, legally

4    and factually, little, if any, copyrightable Superman material is contained in those

5    announcements.  Specifically, plaintiffs submit that Siegel and Shuster's material

6    was an indivisible joint work, and that the advertisements were a derivative work of

7    the authors' material.  Thus, they claim that none of the Superman material

8    contained in the promotional announcements (namely, the cover artwork from

9    Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice.  As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration.  [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story."  (Pls' Opp. at 44, 46).

19        This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year.  Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising.  That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

somehow unraveled the copyrightability in that portion of the work. The manner of a

work's authorship is entirely separate from the way in which an assignee may

exploit that material once it has acquired exclusive ownership of the same and,

correspondingly, whether there were anything copyrightable in the work the

assignee subsequently published using only parts of that material.

In this respect it is important to remember that a joint work can consist of

either inseparable or interdependent parts, the latter example of which include "the

collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

of the interdependent contributions of the collaborators, i.e., one person wrote the

lyrics and the other the music, either of which could on its own [stand] as an

independent work, but which, when combined, form a single[, separate]

'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6. The original Superman

material was the product of the story and dialogue written by Siegel and the art work

drawn by Shuster; each on its own could have been a work in its own right subject

to copyright protection, but when merged together they formed a single new and

unified interdependent work. See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

to [the same] (if a joint work) would be considered comprised of interdependent

parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

color to those words").

At most, Detective Comics took a part of Shuster's independently

copyrightable art work out of the joint work and utilized it, in conjunction with other

material (namely, the advertising slogan), in a promotional announcement. There is

no rule preventing a publisher or others from publishing portions or excerpts of

works, joint or otherwise, that it solely owns, and then seeking a separate copyright

in the same. Indeed, the opposite is true — the holder of a copyright is expressly

entitled to prepare derivative works based upon a copyrighted work it owns or to

utilize portions of that work in other materials. See 17 U.S.C. § 106(2); see

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

generally 17 U.S.C. § 1 (repealed).  Detective Comics could just as well have decided to split up the Superman material for publication into two or three installments as it could (and did) decide to publish a portion of that material in an advertisement to promote the comic.

This leads to plaintiffs' contention that the "derivative nature" of the promotional advertisement itself works to exclude any of the copyright in the pre-existing Superman material (notably, the art work for the Action Comics, Vol. 1 cover) contained therein from enuring to the benefit of the defendants to continue to exploit.  Generally, if an author contributes additional original material to a pre-existing work so as to recast, transform, or adapt that work, then the copyright protection afforded to the author of that derivative work extends only to that additional material and in no way extends to the underlying, pre-existing material.  See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not extend to any part of that work using "preexisting material in which copyright subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10.  Thus, it is asserted that the author of the pre-existing material work (here Siegel and Shuster) would continue to retain ownership in the same despite its use in the derivative work (the promotional announcement).

Even assuming that the changes made to the cover page for Action Comics, Vol. 1, in the promotional announcements is not merely a reproduction, but sufficiently "recast, transform, or adapts" the pre-existing material so as to be considered a derivative work thereof (e.g, the cover is shown in black and white instead of color, the scale of the artwork itself is diminished, and text is placed alongside the artwork), there remains a complicating wrinkle.  At the time the promotional announcements were placed in Detective Comics' existing comic book publications, the underlying pre-existing Superman material from which a portion of the announcements were derived (again the artwork for the cover) had yet to be published, and, hence, copyright in the same was protected at the time under state

ER 222

common law.  See 17 U.S.C. § 2 (repealed).

Given that the portion of the pre-existing material at issue had yet to achieve statutory copyright protection when it was first published in More Fun Comics, Vol. 31, and Detective Comics, Vol. 15, it was injected into the public domain upon the publication of the promotional announcements themselves, absent investiture of statutory copyright protection through its publication.  See 17 U.S.C. § 10 (repealed).  That is to say, the copyright in the cover of Action Comics, Vol. 1, itself first achieved statutory protection, if at all, upon its publication in the announcements, not its later publication in Action Comics, Vol. 1.  See 2 PATRY ON COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work copyright covers the unpublished material").

This fact has repercussions on plaintiffs' derivative works argument, as it alters the general rule described above.  Once Detective Comics published a portion of the previously unpublished pre-existing material — as was its right as owner of the material at that time — its continued protection resided exclusively under statutory copyright in the derivative work itself lest that portion of the pre-existing material (the art work for the cover) be injected into the public domain.  See Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished material is included in an authorized published derivative work, the derivative work publishes the previously unpublished material").  As Professor Nimmer explains:

> Because a derivative work by definition to some extent incorporates a copy of the pre-existing work, publication of the former necessarily constitutes publication of the copied portion of the latter.  Of course, an article that merely describes a pre-existing work but does not incorporate any substantial portion of it is not a derivative work and hence, does not publish the pre-existing work.  Unless the basic work is reproduced in the published work, it is not published.  If only the broad outlines or other fragmentary portion of the pre-existing work are copied and published in the derivative work, then only to that extent is the pre-existing work published.

ER 223

1  NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

    The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

    Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself.  Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices.  The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

1    (including that found in the cover to <u>Action Comics</u>, Vol. 1, <u>as</u> <u>depicted</u> in those

2    announcements) remains for defendants to exploit.

3        This leads to the question of the <u>scope</u> of the copyrighted material remaining

4    in defendants' possession by way of the promotional announcements, a question

5    that defendants themselves acknowledge "is most obviously answered by [looking

6    at] the ads which speak for themselves" and that does not require some "special

7    'lens'" to resolve.  (Defs' Reply at 44).

8        The Court begins by observing what is <u>not</u> depicted in the announcements.

9    Obviously, nothing concerning the Superman storyline (that is, the literary elements

10   contained in <u>Action Comics</u>, Vol. 1) is on display in the ads; thus, Superman's

11   name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12   of the oppressed, or his heroic abilities in general, do not remain within defendants

13   sole possession to exploit.  Instead the only copyrightable elements left arise from

14   the pictorial illustration in the announcements, which is fairly limited.

15       The person in question has great strength (he is after all holding aloft a car).

16   The person is wearing some type of costume, but significantly the colors, if any, for

17   the same are not represented, as the advertisement appears only in black and

18   white.  The argument that the "S" crest is recognizable in the promotional

19   advertisement is not persuasive.  What is depicted on  the chest of the costume is

20   so small and blurred as to not be readily recognizable, at best all that can be seen is

21   some vague marking or symbol its precise contours hard to decipher.  The Court

22   thus concludes that defendants may continue to exploit the image of a person with

23   extraordinary strength who wears a black and white leotard and cape.  What

24   remains of the Siegel and Shuster's Superman copyright that is still subject to

25   termination (and, of course, what defendants truly seek) is the entire storyline from

26   <u>Action Comics</u>, Vol. 1, Superman's distinctive blue leotard (complete with its

27   inverted triangular crest across the chest with a red "S" on a yellow background), a

28   red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

1 and run faster than a locomotive, none of which is apparent from the

2 announcement.

3     2.     Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4          Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5 prior grant in the copyright to a creation does not apply to a "work made for hire,"

6 because the copyright in such a creation was never the artist's to grant, belonging

7 instead to the one who employed the artist to create the work.  See 17 U.S.C.

8 § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9 ("Once it is established that a work is made for hire, the hiring party is presumed to

10 be the author of the work").  The manner in which Siegel and Shuster's Superman

11 material was submitted, then re-submitted in a reformatted version, and finally

12 accepted for publication by Detective Comics raises questions about the work for

13 hire status of the re-formatted material (but not the initial material submitted to the

14 publisher) later published in Action Comics, Vol. 1.

15          Defendants argue that portions of the copyrightable material contained in

16 Action Comics, Vol. 1, are unaffected by the termination notice because those

17 portions belong exclusively to them as "works for hire," arguing that certain material

18 found in the comic book was created by Detective Comics' in-house employees, or

19 that the material was added to the underlying Superman material by Siegel and

20 Shuster at the publisher's direction.  (Defs' Opp. at 27).  Specifically, the alleged

21 "additional" material provided by Detective Comics' in-house employees is the color

22 choices made throughout the comic, notably, the red color of the letter "S" on

23 Superman's crest and the art work for the cover to the magazine itself (albeit

24 modeled after a interior panel in the Superman comic illustrated by Shuster).

25 Similarly, the additional material supplied in response to the publisher's February 1,

26 1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27 "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28 the first Superman release" and "the last panel appearing on the thirteenth page."

(Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-interest presented much of the same evidence now submitted in this case to argue that this additional material transformed the entirety of Siegel and Shuster's pre-existing Superman material published in Action Comics, Vol. 1, into a work made for hire.  The Second Circuit rejected this argument, elaborating:  "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted.  The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format.  We do not consider this sufficient to create the presumption that the [comic book] strip was a work for hire."  Siegel, 508 F.2d at 914.  This conclusion forecloses any further litigation on the point of whether Shuster's additional drawings when reformatting the underlying Superman material into a comic book format or other facts related to such a theory such as the colorization process for Action Comics, Vol. 1, or the party responsible for the illustration of the cover to the magazine, rendered all or portions of the resulting comic book a work made for hire.

Defendants seek to avoid the collateral estoppel effect of the Second Circuit's decision by arguing that the only issue concerning the work for hire status of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions," and not what was "added to the first Superman story by Detective's employees," amongst whom defendants count Siegel and Shuster after they executed the December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the record.  The evidence that was proffered during the 1970s litigation in the trial court on the work for hire question included declarations from Siegel and Shuster discussing what took place during the reformatting process.  This is the same

ER 227

1  evidence that defendants now seek to use in this case to argue that the reformatted

2  material was a work made for hire.

3          Moreover, the circumstances surrounding the reformatting of the underlying

4  Superman material was not only mentioned by the Second Circuit, but discounted

5  by that court in passing on the work for hire nature of <u>Action Comics</u>, Vol. 1, itself,

6  not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7  It would be incongruous for the Court, in respecting as it must the Second Circuit's

8  judgment, to now hold that, while that reformatted material did not transform the

9  entirety of the material in <u>Action Comics</u>, Vol. 1, into a work made for hire, some

10 subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11 was somehow excised out and should be accorded work made for hire status.  The

12 litigation of the larger question sweeps within it defendants' opportunity to litigate a

13 subpart thereof.

14         A contrary holding would transgress certain core principles of collateral

15 estoppel:  "A new contention is not necessarily a new issue.  If a new legal theory or

16 factual assertion raised in the second action is relevant to the issues that were

17 litigated and adjudicated previously, the prior determination of the issue is

18 conclusive on the issue despite the fact that new evidence or argument relevant to

19 the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20 urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21 (3rd ed. 2007).  Significantly, much of the evidence underlying defendants'

22 arguments was presented in the Second Circuit litigation (notably Siegel and

23 Shusters' declarations submitted in that litigation) or, if not, was certainly available

24 to be used in that case (the colorization process for the initial printing of

25 <u>Action</u> <u>Comics</u>, Vol. 1, or that in-house employees supposedly drew the cover to the

26 magazine).  "A party may be precluded from re-litigating an issue if evidence

27 supporting the party's position on the issue could have been submitted in previous

28 litigation but, for whatever reason, was not properly raised.  Evidence that is not the

ER 228

result of a different factual situation or changed circumstances, but is instead historical in nature and could have been admitted at the first trial if properly submitted, cannot be introduced in subsequent litigation of the same issue." Id. § 132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d 245, 257 (D.C. Cir. 1992)).

Nowhere have defendants explained why they did not bring up the question of the colorization process for Action Comics, Vol. 1, or the cover art work for the magazine, before the courts handling the 1970s Superman litigation. The question about the legal effect the reformatting of the underlying Superman material had on the work for hire question was litigated by the parties and resolved by the courts during the 1970s Superman matter. Similarly, the question about the colorization and cover art work (and who was responsible for the same) could have been raised in conjunction with the work for hire question, but defendants failed or decided not to do so. Having litigated the question and having the opportunity to present all the evidence that pressed on the issue, defendants are now barred from seeking to relitigate it anew even under the purported limited guise that it is now being offered.

Some noted treatise writers have commented that the Second Circuit's analysis focusing on the work for hire nature of the additional reformatted material should have been analyzed as a derivative work, that is, that the additional material was derivative of the underlying Superman material. See 1 NIMMER ON COPYRIGHT § 5.03[B] [1][b][I] at 5-33 n.92. ("The Siegel decision . . . may be understood as holding that the first expression of the Superman character was the underlying work, and the later development of the character was a derivative work. Because only the derivative work was produced in a for-hire relationship, the underlying work remains the property of the creators"). However, this analysis does not benefit defendants.

First, no additional literary material was supplied in re-formatting the underlying Superman material into a comic book format. All the dialogue and

storyline contained in Action Comics, Vol. 1, was present before Detective Comics

requested the pair to provide a reformatted version of the material, and that literary

material remained unchanged through the reformatting process.  All that is left was

supplying some additional illustrations by Shuster, the precise ones specified in his

declaration.  From the Court's review of these additional illustrations, it appears that

the material is completely derivative of other panels in the Action Comics, Vol. 1,

comic, with its origins in the underlying Superman material.  Thus, for instance,

while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

background, so, too, does another panel containing the underlying, pre-existing

material.  Similarly, while the panels on the first page to the comic show Superman

leaping skyscrapers, running at high rates of speed, and demonstrating feats of

great strength, so, too, do other panels containing the pre-existing material.  Indeed,

the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

depiction of Superman was well on its way to being completely developed before

the re-formatted material in question was created some three years later.  Thus,

even if the additional material in question was tendered as a derivative work that

was made for hire by Shuster, all the potentially copyrightable material contained

therein is completely derivative of the pre-existing material and, hence, is not

subject to independent copyright protection in the first instance.  This, then, lends

strong support to the Second Circuit's observation: "Superman and his miraculous

powers were completely developed long before the employment relationship was

instituted."  Siegel, 508 F.2d at 914.

    Defendants also argue that the coloring for Action Comics, Vol. 1, was not

created or chosen by Siegel or Shuster, but was instead the product of some of

Detective Comics' in-house employees working in the printing department.  Even if

this argument was not otherwise precluded by collateral estoppel, the evidence

produced in support is less than persuasive.  According to "eye-witness" Jack Adler,

the material contained in comic books "at the time" was provided by artists to the

Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3).

"Typically," members of the staff then decided upon the color that would be applied

throughout the magazine, something that defendants argue is an additional element

added to the underlying Superman material that is itself subject to copyright

protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon

Mr. Adler's declaration, which is not as clear as they suggest.

Mr. Adler does not state that he worked on the colorizing of <u>Action Comics</u>,

Vol. 1, itself. Instead he states that he "worked for the engraving company that

made the metal plates for printing of, among other things, comic books for Detective

Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book

artists . . . submitted drawn and inked comic book work in black and white." (<u>Id</u>.).

Mr. Adler further states that the black-and-white pages "were then photographed by

the engraver and a photo print was hand[-]colored by staff at Detective and by the

engravers." (<u>Id</u>.). Of course, nothing in this statement precludes the possibility that,

even if the Superman material was so submitted, Siegel and Shuster may have also

placed certain color directions with their material to be utilized in the engraving

process. In fact, that the earlier incarnation of Superman as hulking strongman in

the tradition of Tarzan was created by the pair as a comic book with color

illustrations lends to the possibility that they already had pre-conceived color

choices in mind for the later comic if it were later reformatted into a comic book,

rather than a newspaper comic strip.

Moreover, viewed in context, Mr. Adler's declaration appears to describe

procedures generally employed in the printing process, not as evidence of what

actually occurred with respect to the printing of <u>Action Comics</u>, Vol. 1, itself. His

statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

in light of his candid admission that he has "no knowledge of Siegel and Shuster

selecting any of the color in <u>Action Comics</u>, No.1." (<u>Id</u>. ¶ 4). Mr. Adler attempts to

temper his admission of lack of knowledge by stating, without any basis, that he is

1    "aware that Detective staff member, Ed Eisenberg, selected the color for

2    Superman's 'S' in Shield on his costume." (Id.)  Of course, Mr. Adler's statement on

3    this point is inadmissible as it is based on hearsay.  Without any direct link between

4    Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5    an insufficient evidentiary foundation for his conclusions concerning the manner in

6    which the Superman material was supplied to the printer and the colorization of the

7    same was handled.

8         Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9    by Detective Comics' in-house artists.  However, the scant evidentiary basis

10   provided in support of this argument is ambiguous.  In a letter sent to Jerome Siegel

11   dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12   silverprint of the cover of Action Comics," with the observation that Detective

13   Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14   your recent letter." (Decl. Michael Bergman, Ex. I).  The inference sought to be

15   drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16   interior illustration from the Superman comic for the cover artwork he was stating

17   that one of the publisher's in-house artists saw the interior panel in question and

18   then drew the cover using the interior panel as inspiration.  Of course, given the

19   limited nature of the information contained in the passage it could also be argued

20   that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21   for the comic book's cover and Detective Comics decided to "use" this suggestion.

22   This alternative reading is not implausible.  As demonstrated by the pair's attempt to

23   have their earlier incarnation of Superman published by Detective Dan, Shuster had

24   in the past drawn exemplars for the cover illustration for his comics well before they

25   were ever accepted for publication.

26        In conclusion, the Court finds that the question of the work-for-hire nature of

27   certain portions of the Superman material published in Action Comics, Vol. 1, is

28   precluded from further litigation by operation of the 1974 Second Circuit decision.

1  Accordingly, the binding nature of that court's decision leads to the conclusion that

2  all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-

3  for-hire and therefore is subject to termination.

4       3.    <u>Failure to Include 1948 Consent Judgment</u>

5       Among the regulatory requirements promulgated by the Register of

6  Copyrights concerning the termination notice's "form, content, and manner of

7  service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8  "reasonably" identify "the grant" to which it applies.  37 C.F.R. § 201.10(b)(1)(iv).

9  Thus, if the author entered into five separate grants of rights for the same work, and

10  a notice of termination identifies only four of those grants, the fifth grant remains

11  "intact," and the grantee's rights thereunder remain unaffected.  <u>See</u> 3 NIMMER ON

12  COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated,

13  then the rights licensed under such grant remain").

14       Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15  judgment from the Westchester action is fatal to their attempts to terminate their

16  grant to the copyright in Superman, as that consent judgment was among the

17  grants leading to the transfer of ownership from the artists to Detective Comics.

18  Such argumentation is predicated upon the notion that, notwithstanding the

19  plaintiffs' act of identifying the stipulation between the parties from the Westchester

20  litigation that resulted in the consent judgment, identification of the consent

21  judgment from the Westchester action itself as (or part of) a "grant" was necessary

22  because it constituted the final step in "effectuat[ing] the transfer to [Detective

23  Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24  "without it the rights identified in the Stipulation would not have been transferred."

25  (Defs' Opp. at 39).  The Court disagrees.

26       Although the 1976 Act nowhere defines the term "grant," the central question

27  raised is plainly one of transfer:  Did Siegel and Shuster transfer any rights to

28  Superman through or in conjunction with the 1948 consent judgment?  If so, then it

operated as a grant by the artists in the same.

On that point, the 1976 Act is helpful as it defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright."  17 U.S.C. § 101; see Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125 U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right comprised in a copyright. [Thus, a]  'transfer' includes not only assignments (as understood under the [1909] Act), but also exclusive licenses and any other conveyance of copyright or of any exclusive right comprised in a copyright").

The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished. The binding nature of the transfer contained in the stipulation was completed the moment that agreement was executed.  The consent judgment was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement.  It merely parroted what was already agreed to by the parties in the stipulation itself.

Finally, even if the 1948 consent judgment is a "grant" separate and apart from (or part and parcel with) the 1948 stipulation, the regulations recognize that not all errors in compliance with its terms impact the validity of the termination notice: "Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of . . . section 304(c) . . . shall not render the notice invalid."  37 C.F.R. § 201.10(e)(1).  Here, viewing the issue in the light most favorable to the defendants, the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved

through the stipulation the parties reached two days earlier.  That plaintiffs only

identified the latter rather than the former does not materially affect defendants'

understanding of the "grant" sought to be affected by the notice.  Indeed, courts

have required much less in meeting the regulation's requirement of providing "a

brief statement reasonably identifying the grant being terminated."  See Music Sales

Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

the grant in the termination notice as the "grant or transfer of copyright and the

rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

termination notices customarily accepted by the Register of Copyrights"); see also 2

PATRY ON COPYRIGHT § 7:45 (approving Music Sales).  Nowhere do defendants

argue why the harmless error rule should not apply in a situation such as this where

one document that is a part in the process leading to the "transfer" of rights is

identified, but its necessary corollary was not.

Accordingly, the Court concludes that, even if the consent judgment is

viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

subject to the termination notice was a harmless error that did not diminish the

notice defendants received regarding the nature of the grant (and resulting transfer

of rights) that plaintiffs intended to terminate.

4.    Continued Acceptance of Benefits Under 1975 Agreement

Defendants argue that Joanne Siegel's continued acceptance of benefits

under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

post-termination grant of rights in the Superman copyright to defendants under the

terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

accepted the terms of the grant").  (Defs' Opp. at 41).  The legal premise of their

argument is that the 1976 Act recognizes that, once a termination notice has been

served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

free to make "a further grant . . . of any right covered by a terminated grant" to the

original grantee or its successor in title.  17 U.S.C. § 304(c)(6)(D).  The Court

ultimately rejects this argument as unpersuasive because it mistakenly assumes the 1975 agreement was a "grant" to the Superman copyright.

A look at the context leading up the execution of the 1975 agreement illuminates in what way the parties believed (and just as importantly did not intend) for that agreement to bind them. The 1975 agreement appears to have been drafted in response to bad publicity (apparently due to the juxtaposition of the creators' misfortune and the Superman character's commercial success), and not as a means to transfer or convey the party's rights to the Superman copyright. The agreement observed that nothing therein should be construed as undermining the rights defendants had been conferred by virtue of the March 1, 1938, assignment, rights which were later vindicated in the Westchester action and the 1970s Second Circuit litigation. Indeed, the agreement reaffirmed defendants' <u>existing</u> rights to Superman and provided plaintiffs with annual payments, medical insurance, and screen credits. Such conferral of benefits was identified in the agreement as a "voluntary" act by defendants in recognition of Siegel and Shuster's "past services." The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's widow on the timing of her husband's death.

This context and the language in the agreement itself demonstrate that the 1975 agreement was not a "grant." The agreement's execution did not result in the transfer or assignment of the Superman copyright. Indeed, the agreement itself expressly disavows such an interpretation by including language that the conferring of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in recognition of the pair's "past services," and that nothing therein should be construed as undermining the rights defendants had been conferred in the March 1, 1938, assignment as vindicated in the Westchester action and the 1970s Second Circuit litigation. Thus, by its own terms, no rights were transferred through the execution of that agreement. A reaffirmation of existing rights without more is no more "an assignment" or "conveyance" of rights to a copyright than it would if

ER 236

Detective Comics had instead issued a press release declaring that previous court rulings had recognized its existing ownership rights to that copyright.

Similarly, the 1982 codicil under which Joanne Siegel continued to receive annual payments and benefits did not transfer any rights. The codicil consists of five paragraphs. The first merely notes that the letter is in response to a letter written by Joanne Siegel to the company's executive officer regarding her concern over how she would provide for herself after her husband's death. The second referenced the 1975 agreement, noted the increase in the amount of the annual payments from $20,000 to $50,000 thereunder, and the payment of an additional bonus. The third clarified a royalty policy that applied to creators other than Siegel and Shuster. The fourth set forth the agreement to continue to pay benefits to Joanne Siegel for the balance of her life in the event her husband predeceased her before 1985. The fifth and final paragraph merely wishes Joanne Siegel and her family well. Nowhere in these five humble paragraphs is a transfer of rights to be inferred, much less explicitly found.

Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain contained in the 1975 agreement post-termination somehow operated as a de facto re-acceptance of the agreement itself (and the obligations flowing thereunder), nowhere among those re-accepted "obligations" or "commitments" in that agreement was there a grant to the Superman copyright. Defendants protest the Court drawing this conclusion, arguing that plaintiffs have admitted in their pleadings (their complaint, and by filing a termination notice directed at the 1975 agreement) that the 1975 agreement contained a grant to the Superman copyright. It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are considered judicial admissions" that bind the party who made them. American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988). That being said, "courts still have discretion not to apply the doctrine in particular cases." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

(citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion'")).

As noted at the outset, the termination provisions contained in the 1976 Act are among the most complex and technical ones in the statute. Given this complexity, it is not surprising that a party seeking to harness its machinery may, out of an abundance of caution, be more "over-inclusive" in terms of listing the possible "grants" it seeks to terminate. To penalize a party for being over-inclusive rather than under-inclusive is all the more inequitable given the high hurdles the termination provisions put in place. Here, plaintiffs were represented by highly experienced counsel who decided to list the 1975 agreement as a "grant" so as to leave no stone unturned; an approach all the more justified given the extremely technical and arcane arguments that have been advanced in this litigation concerning the efficacy and enforceability of the termination notices themselves. The Court therefore concludes that in these circumstances discretion counsels against applying the judicial estoppel doctrine in the manner advocated by defendants.

Accordingly, the Court concludes that Joanne Siegel's continued receipt of payments and benefits under the 1975 agreement and 1982 codicil thereto does not constitute a "further grant" or "an agreement to make a further grant" pursuant to 17 U.S.C. § 304(c)(6)(D).

5.    Statute of Limitations

Defendants contend that the present action was filed untimely. The statute of limitations itself is clear enough. The Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The issue raised by defendants implicates the latter clause and requires the Court to determine when plaintiffs' claims accrued.

At the outset, a clarification of terms is in order.  The instant matter, although couched in terms of terminating the 1938 grant, is in effect one for co-ownership of the copyright in the Superman material contained in <u>Action Comics</u>, Vol. 1, because, if successful, plaintiffs would gain only a joint ownership interest in that material with DC Comics, owing to the fact that Shuster left no heirs who could simultaneously seek to terminate his half of the grant in the material.  Claims of co-ownership accrue when there is a "plain and express repudiation of co-ownership . . . communicated to the claimant."  <u>Zuill v. Shanahan</u>, 80 F.3d 1366, 1369 (9th Cir. 1996).

Here, defendants assert that such a repudiation was expressed by a letter submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of negotiations that took place between the parties shortly after the submission of the termination notices.  The Court finds to the contrary.  As explained more fully below, although the letter stated a position that the termination notices were "defective," the letter addressed only the scope of the rights that could be recaptured by the termination notices and left unchallenged the notices' validity and enforceability, thus falling short of the required repudiation.[7]

_____

[7] One could quibble with whether any date other than the termination effective date itself can serve as the accrual date in a case involving the right to termination of a grant.  Much like having to await a judicial determination whether one is a heir (as opposed to instances when an ownership claim is based on whether or not someone is a creator) has been held to be the earliest instant for an accrual date, see <u>Stone v. Williams</u>, 970 F.2d 1043 (2nd Cir. 1992) (Hank Williams' putative daughter's claim to be an owner had to await judicial determination that she was in fact his daughter and heir, thus accrual date was not triggered when Hank Williams' first contested her putative status but instead when state court made determination that she was his heir), so too a claim of ownership by way of termination of a grant cannot be realized unless and until after the termination's effective date.  Stated another way, a party's status as a creator is a factual question subject to being challenged by the other putative co-owner at any time, and hence, the accrual date for the same would begin at that instant.  The same, however, is not true of a putative co-owner by way of termination.  Their status as co-owner is not predicated upon a pre-existing factual scenario, like whether they were involved in jointly creating the material per se.  Instead, their status as a co-owner is predicated upon a legal mechanism — the exercise of a

ER 239

1    Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2 Mr. Levine, that they considered "the Superman Notices to be defective in several

3 respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated

4 upon in the letter did not relate to the validity or enforceability of the termination

5 notices themselves, but pointed to areas curtailing the scope of what could be

6 recaptured even assuming the notice to be properly presented. These defects thus

7 did not call into question plaintiffs asserted right to termination contained in the

8 notices. For example, the letter remarks that defendants would still retain its rights

9 in trademarks that it had secured over the years to certain Superman-related

10 material, and that the termination would not give plaintiffs access to an accounting

11 of the foreign profits defendants gained from exploiting the copyright. Far from

12 repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13 validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do

14 not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15 joint owners of the United States copyright in the 'Superman' comic published in

16 Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17    Even more telling was DC Comics' subsequent conduct. The parties'

18 negotiations quickly broke down and not much of substance was communicated

19 between the parties thereafter. Then, the day before the termination effective date,

20 DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22 new statutory right revoking an earlier transfer in the copyright in question, be it

23 one they solely or jointly created — that takes place at a certain defined point in
time. Unless and until that legal triggering point is passed, there is nothing for the

24 other co-owner to reject or challenge. This is particularly the case given that
termination notices can be served up to ten years before the effective termination

25 date. Defendants' position would, as a matter of logic, countenance scenarios
where due to an early "rejection" of the termination notice, the passage of the

26 limitations period would occur well before the termination effective date even
arrived (and with it the putative co-owner's rights even vested). Nonetheless, the

27 Court need not resolve this question as the letter in question does not constitute a
plain and express repudiation of plaintiffs' termination notice (and, hence, its right

28 to co-ownership to the copyright in the Siegel and Shuster Superman material).

notice, proclaiming:

> The absence of any steps towards negotiation for two years, particularly on the 'eve' of the April 16, 1999 purported 'effective' date of the termination, leaves us concerned. Thus our client has no alternative but to move to the stage of <u>putting your clients on clear notice</u>, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, <u>your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices</u> . . . .

(Decl. Marc Toberoff, Ex. Q (emphasis added)).

If, as defendants contend, such notice of intent had been so clearly and unmistakably communicated over a year and half earlier, it is odd for them to have to repeat it and then state that they were "putting" plaintiffs "on notice" about it. Accordingly, the Court finds that the present action seeking declaratory relief regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the effective date of that termination. DC Comics' submission of the letter the day before that date denying the validity of the termination notice gave a plain and express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity of their termination notice was now ripe. <u>See</u> 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.")

Applying both the date of the accrual of the claim, the parties' tolling agreement to the three-year statute of limitations, and the filing date of this action, the Court concludes that it is timely. The effective date of the termination notice, and therefore the date of accrual, is April 16, 1999. The parties entered into a tolling agreement on April 6, 2000, which amounts to nine days less than one year

that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until

ten business days after plaintiffs' September 21, 2002, letter providing written notice

that they were ending settlement negotiations, that is, October 4, 2002, at which

time the limitations clock started ticking once more.[9]  The present action was filed

two years and four days later, on October 8, 2004.  Adding the periods of time the

limitations period was running together, it is clear that they add up to a period of

time just short of the three-year period set forth in § 507(b).

Accordingly, the Court concludes that the present action is timely.

6.    The 2001-2002 Settlement Negotiations

Defendants contend that plaintiffs' termination notice is no longer effective as

the parties' settlement negotiations led to them entering into a binding post-

termination agreement that resolved the issues presently before the Court.  A brief

review of the time line regarding those negotiations is helpful to the Court's analysis

of the present issue:

October 19, 2001     Pursuant to the parties' negotiations, plaintiffs' counsel
                     sent to defendants' counsel a six-page letter outlining
                     the substance of a settlement offer from defendants that

_____

[8]  Defendants' argument that the tolling agreement does not apply to
plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc.,
because neither was a "party to" or bound by that agreement is disingenuous.
(Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound
not only DC Comics but also its "past and present subsidiaries or affiliates." (Decl.
Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate
sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly
qualifies as a corporate affiliate to the same; a point defendants later admit when
speaking to the alter ego question presented in the pleadings. (Defs' Mot. Summ.
J. at 79 ("the following is a chart of the current corporate structure and affiliations
between DC, WBEI and TWI")).  Moreover, representatives for both companies
were actively involved in the settlement negotiations themselves, further
undermining any suggestion that they were bystanders to the process.

[9]  Defendants argue that the tolling period concluded much earlier based on
the parties earlier having reached "an amicable resolution of the dispute." (Defs'
Opp. at 51 (emphasis in original)).  Given that the Court finds that no such
"resolution," as opposed to a naggingly close potential for the same, occurred
through the parties settlement discussion post-termination, see infra A.6, their
argument is without merit.

was "accepted" by the plaintiffs.

October 26, 2001    Defendants responded, noting they were working on a
                    draft agreement and enclosing "a more fulsome outline"
                    of "what" they "believe the deal" they have "agreed" to is.

February 1, 2002    Defendants' counsel provided a fifty-six page draft
                    agreement that reserved the right to have their clients
                    comment upon it and noted that certain, related "stand
                    alone" assignments were in the process of being
                    finalized.

May 5, 2002         Plaintiffs responded to defendants' draft by stating that
                    the proposed agreement contained new, unacceptable
                    terms to which they had not agreed.

May 21, 2002        Defendants sent a letter to plaintiffs stating that they
                    believed that each of the major points in the settlement
                    had already been agreed upon.

Sept 21, 2002       Plaintiffs rejected their counsel's proposed draft
                    agreement and advised defendants in writing that they
                    were ending negotiations.

The parties are in agreement that California law should be applied in

deciding this question, but disagree as to its application. "California law is clear that

there is no contract until there has been a meeting of the minds on all material

points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998).

The failure to reach a meeting of the minds on all material points prevents the

formation of a contract even if the parties have orally agreed upon some of the

terms, or have taken some action related to the contract. Grove v. Grove Valve &

Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an

offer must be met exactly, precisely, and unequivocally for its acceptance to result

in the formation of a binding contract. See Panagotacos v. Bank of America, 60

Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719,

726 (1959). A qualified acceptance constitutes a rejection terminating the original

offer and the making of a counteroffer to the original offeror, which must also be

unequivocally accepted by the former offeror for a binding contract to form. See

Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159

Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance

amounts to a new proposal or counteroffer putting an end to the original offer'"); In

re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE

§ 1585 ("A qualified acceptance is a new proposal.").

The parties disagree over whether the terms contained in plaintiffs' October

19, 2001, letter differ in substance from those set forth in defendants' later letter of

October 26, 2001 (and accompanying outline), such that there was no unequivocal

acceptance of an offer and, thus, no agreement.  As with much in both life and law,

materiality is in the eye of the beholder.  From the Court's reading of the parties'

correspondence, it is clear that the parties went well beyond reaching a settlement

in principle regarding their respective positions to the Superman property.  Rather,

as suggested by the time line above, the parties' correspondence, and the actions

taken in response thereto, illustrates that they found themselves in the all-too-

familiar situation in which verbal settlement negotiations result in what the parties

believe to be an agreement on all the major points of dispute, but which, upon

further discussion, falls short of the agreement needed to resolve their dispute.  The

devil, as it often is, was in the details.

That material details remained is evidenced by defendants' response to

plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the

deal" they had "agreed to."   Moreover, defendants' February, 2002, draft

agreement was not even considered final by its authors, who reserved the right for

their clients to "comment" on it, and would also require the further submission of a

number of "stand alone" agreements yet to be finalized.  Indeed, Time Warner's

CEO later commented that submission of the draft agreement was "expected" to

result in further "comments and questions" from the Siegel heirs that "would need to

be resolved."

This give and take reveals that the parties, while close to agreeing to a

complete and comprehensive settlement of their dispute, had not passed the

1    threshold where they had finalized and assented to all material terms of such a

2    settlement.  Rather, as they attempted to sketch in the finer details of a settlement

3    from the broad outlines contained in the October 19 letter, more and more issues

4    arose upon which they could not reach agreement, resulting in the negotiations

5    falling apart.  In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6    888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7    which the courts held that no enforceable agreement was reached when the parties

8    had agreed to a rough outline of an agreement, but were thereafter unable to reach

9    agreement on the finer details and the negotiations fell apart.

10        Defendants' argument to the contrary is premised on the notion that they can

11   limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12   contract, regardless of their materially different October 26, 2001, letter in reply ("I

13   enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14   vastly different February 1, 2002, draft, which were both part and parcel of the same

15   settlement negotiation.  Ignoring these contemporaneous communications is at

16   odds with the requirement in contract formation that courts must consider "all the

17   surrounding circumstances."  Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18   These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19   agreement provides context and meaning as to the understanding the parties had

20   about the effect of the October 19 letter itself.

21        Defendants further seek to create issues of fact through post hoc testimony

22   and rationalizations.  None of this subjective belief is sufficient to defeat the

23   objective manifestation of the parties' intent relayed in the documents referenced

24   above that aptly demonstrate that there was no "meeting of the minds" on all

25   material terms.  See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26   existence of mutual consent is determined by objective rather than subjective

27   criteria, the test being what the outward manifestations of consent would lead a

28   reasonable person to believe.  Accordingly, the primary focus in determining the

existence of mutual consent is upon the acts of the parties involved"); Stewart v.

Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a

contract is based upon objective and outward manifestations of the parties"); CAL.

CIV. CODE § 1639.

One need only review the language of the parties' correspondence, their

conduct in reaction thereto, and the numerous material differences between the

terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002,

draft to reach the conclusion that the parties failed to come to an agreement on all

material terms.  See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12

(1970) (failure to reach meeting of the minds on all material points prevents contract

formation even though parties orally agreed on many terms, or have taken action

relating to the contract).  Far from signifying that the parties' "negotiations . . .

result[ed] in a binding contract" leaving nothing more than the drafting of more

formal documentation memorializing that agreement, see Louis Lesser Enterprises,

Ltd. v. Roeder, 209 Cal.App.2d 401, 404 (1962), these submissions between the

parties went far beyond that by adding in or further refining areas from what was

contained in the October 19 letter.  That after the submission of the October 19

letter defendants began the process of creating a settlement trust account and the

parties negotiated about providing Siegel and Shuster screen credits in the then

upcoming movie Superman Returns could as much be seen as goodwill gestures

on defendants' part while the negotiations continued as it could reflect an indication

on their part that they thought they were contractually bound to do the same.

From all of this there is no document or set of documents reflecting

agreement by the parties to singular, agreed terms.  Defendants cannot explain to

the Court what from the parties' differing exchange constitutes this purported

contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance"

reflected in the October 19 letter and either festoon upon it all the terms contained

in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

1    clearly and unequivocally rejected that latter draft agreement), or have the Court

2    perform that task.  The Court's responsibility is not to create a patch-quilt agreement

3    by stringing together certain expressions of assent made at one point (October 19),

4    and attaching to it material terms spelled out later in time (and to which the

5    supposedly assenting party promptly rejected).  See Industrial Indemnity v. Superior

6    Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7        Accordingly, the Court concludes that the parties' settlement negotiations did

8    not result in an enforceable agreement resolving the issues presently before the

9    Court.

10   B.   Limitations on Scope of Recaptured Rights

11       The principal purpose behind the creation of the termination right was to give

12   authors (and their heirs) a chance to retain the extended renewal term in their work

13   and then re-bargain for it when its value in the marketplace was known.  See H.R.

14   REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15   termination right "safeguarding authors against unremunerative transfers . . .

16   because of the unequal bargaining position of authors, resulting in part from the

17   impossibility of determining a work's prior value until it has been exploited").

18       The need for such a second bite at the apple flowed from the fact that the

19   1909 Act created a dual term in the copyright to a work, one realized upon the

20   work's publication and the second occurring twenty-eight years later with the

21   copyright's renewal.  Justification for this splitting of terms was based, in part, on the

22   understanding that an author's ability to realize the true value of his or her's work

23   was often not apparent at its creation, but required the passage of time (and the

24   marketing efforts by a publisher) to materialize.  The renewal term in the copyright

25   to the work thus served as a mid-course re-valuation tool allowing the author, by

26   giving him or her the right of renewal in the work, leverage in re-negotiating a better

27   deal with the original grantee or any other suitor who desired to continue to market

28   the copyright.  See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

ER 247

theory behind a dual system of term was that it gave the author or the author's heirs a 'second bite at the apple;' when the renewal term came around, the value of the copyright would be better known than at the time of initial publication. With this information, a new bargain could be struck that would more accurately reflect the market rate"). This re-valuation mechanism provided by the renewal term under the 1909 Act was largely frustrated by the Supreme Court's decision in <u>Fred Fisher Music</u>, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their rights to both the initial and the renewal term.

Although the termination right contained in the 1976 Act sought to correct the damage done by <u>Fred Fisher</u> to an author's ability to renegotiate through the reversion of rights, it did not revert to the author the full panoply of rights he or she would have enjoyed upon renewal under the 1909 Act. Owing in large measure to objections by publishers seeking to minimize the disruption to "existing contracts and authorized derivative works already in distribution" that such a recapture right would engender, <u>see</u> 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain limitations on what authors (or their heirs) gained from exercising the termination right. It is to these limits on the termination right that the Court now turns.

1.    <u>Foreign Profits</u>

Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code, governing copyrights], and in no way affects rights arising under any other Federal, State, or foreign laws." Defendants read from this a statutory limitation on the scope of any accounting arising from the termination notices in this case to those profits realized by the domestic exploitation of the Superman copyright contained in <u>Action Comics</u>, Vol. 1, excluding those realized from foreign sources. The Court finds this argument persuasive.

Although the Court can locate no case that has specifically addressed the issue of accounting profits from the foreign exploitation of a copyright that is subject

to a valid termination notice, the statutory text could not be any clearer on this

subject. Through this section, Congress expressly limited the reach of what was

<u>gained</u> by the terminating party through exercise of the termination right;

specifically, the terminating party only recaptured the <u>domestic</u> rights (that is, the

rights arising under title 17 to the United States Code) of the grant to the copyright

in question. Left expressly intact and undisturbed were any of the rights the original

grantee or its successors in interest had gained over the years from the copyright

through other sources of law, notably the right to exploit the work abroad that would

be governed by the copyright laws of foreign nations. Thus, the statute explains

that termination "in no way affects rights" the grantee or its successors gained

"under foreign laws."

     Such a reading is supported by leading commentators, who are in agreement

as to the effect of § 304(c)(6)(E) has in a case such as this.

     Professor Nimmer states:

> A grant of copyright "throughout the world" is
> terminable only with respect to uses within the
> geographic limits of the United States. Because
> copyright has no extraterritorial operation, arguably
> American law is precluded from causing the termination
> of rights based upon foreign copyright laws. A response
> to this argument is that the nonextraterritoriality of
> copyright is irrelevant because the question here is one
> of contract law, not copyright law, in that it concerns the
> effect of a contract granting certain rights. The contract
> law of one nation may be applicable in another nation
> under the latter's conflict-of-laws rule. The conclusive
> answer to this problem lies in the text of the termination
> provisions of the Copyright Act, which expressly provide
> that statutory termination "in no way affects rights arising
> under . . . foreign laws" — that is, under foreign copyright
> (not contract) laws. Thus, even if the conflicts rule of a
> foreign nation were to call for application of the American
> termination rule as a rule of contract law, that rule by its
> own terms excepts from termination the grant of those
> rights arising under foreign copyright laws.

3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

     Professor Patry agrees: "Accordingly, where a U.S. author conveys

worldwide rights and terminates under either section, grants in all other countries

ER 249

1  remain valid according to their terms or provisions in other countries' laws."  7

2  PATRY ON COPYRIGHT § 25:74.

3  Plaintiffs argue, however, that the section also allows for the possibility that

4  the terminating party gains not only the domestic rights to the copyright in question

5  (the "rights covered by the grant that arise under this title"), but also retains

6  whatever other rights it may have under "Federal, State, or foreign laws."  From this

7  premise, plaintiffs argue that, because an accounting between co-owners in a

8  copyright is governed by state law, and California state law allows for the sharing of

9  foreign profits between tenants in common, so, too, should defendants be forced to

10 account for their foreign profits.  This argument misses the fact that all plaintiffs

11 have gained from the termination right is a recapturing of the domestic copyright in

12 the Superman material published in Action Comics, Vol. 1.  Defendants continue to

13 hold, unaffected, separate rights to that copyright arising under foreign copyright

14 laws.  This distinction is important for two reasons.

15 First, such an open effort to extend the reach of U.S. copyright law overseas,

16 as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17 the plain terms of the statute (stating that termination does not affect another

18 parties' rights arising under the copyright laws of "foreign" nations), but stands in

19 stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20 have no application beyond the U.S. border."  Los Angeles News Serv. v. Reuters

21 TV Intern., 340 F.3d 926, 931 (9th Cir. 2003).  If Congress contemplated the ability

22 to attach or otherwise force the accounting of foreign profits to which the original

23 grantee or its successors are legally entitled under the copyright laws of other

24 nations through the backdoor of applying state law tenant in common principles,

25 one would have expected such an intention to have been made expressly, and

26 certainly with some explanation given the incongruity that arises from the statutory

27 language's notation that termination did not affect another's rights under "foreign

28 laws."

ER 250

Second, the cases cited by plaintiffs requiring one co-owner to account to the other for both domestic and foreign profits involved parties who were co-owners to the "world-wide" copyright in the work and, not as with the termination right, to only the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996) (noting that declaratory action was filed after other co-owner obtained a "renewal of the copyright" listing himself as the sole author in the song "Let the Good Times Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the domestic copyright in a work was allowed an accounting of a co-owner's foreign profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as were originally the subject of a grant will revert upon the termination of that grant. [T]o the extent that a grant includes rights based upon federal law other than the Copyright Act, state law, or foreign law, such rights are not subject to termination").

Accordingly, the Court holds that the termination notice affects only the domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to Detective Comics of the copyright in the Superman material contained in Action Comics, Vol. 1.  The termination notice is not effective as to the remainder of the grant, that is, defendants exploitation of the work abroad under the aegis of foreign copyright laws.  Thus, although defendants retain the unfettered right to exploit the works (and retain the profits derived therefrom) in foreign nations, they may do so domestically only as a co-owner (through Shuster's share) of the works.  See Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an independent right to use or license the use of the copyright. . . . . A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright . . . .").  As such, defendants must account to plaintiffs only for the profits from such domestic exploitation of the Superman copyright.

2.    Trademark Rights and Ownership of Pre-Termination Derivative Works

As noted in the previous section, the right to termination leaves undisturbed

the original grantee or its successors in interests rights arising under "federal law."

17 U.S.C. § 304(c)(6)(E).  Among the rights based on federal law that defendants

secured over the years were several trademarks that utilized or incorporated

portions of the copyrighted material found in <u>Action Comics</u>, Vol. 1.  Defendants

seek a declaration from the Court that, even if successful in terminating the

Superman copyright contained in <u>Action Comics</u>, Vol. 1, plaintiffs cannot share in

defendants' profits "purely attributable to [Superman] trademark rights."  (Defs'

Reply at 11).  Plaintiffs admirably concede the point in their briefs, but argue that

they are "entitled to profits from mixed trademark uses to the extent such exploit

recaptured copyright elements (e.g., 'Superman costume')."  (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are

entitled to an accounting as a result of their successfully terminating the 1938 grant,

it should not include any profits attributable to the "post-termination exploitation of

derivative works [of <u>Action Comics</u>, Vol. 1,] prepared prior to termination."  (Defs'

Mot. Summ. J. at 28).  Again, plaintiffs concede, as they should, this point.  (Pls'

Reply at 49 n.28).  Section 304(c)(6)(A) provides that derivative works created

during the grant (meaning up until the termination effective date) may continue to be

exploited after termination.  Again, however, plaintiffs hold out as a separate

question the existence of pre-termination derivative works that are "altered so as to

become post-termination derivative works."  (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs — the recapture or accounting from

the mixed use of trademark and copyright and what to do with any alteration in pre-

termination derivative works — are not the subject of the present motion, the Court

will not address them in this Order.  Even though it is clear that these issues will

impact the accounting of profits in some manner, they cannot be fully adjudicated

based on the narrow record currently before the Court and absent a full briefing of

the particular mixed uses or altered pre-termination derivative works that are

specifically at issue.

ER 252

1      Accordingly, the Court holds that the profits defendants garner from the use

2  of Superman trademarks that "are purely attributable to [those] trademark rights,"

3  and from its use of unaltered pre-termination derivative works are not subject to

4  accounting.

5      3.      Accounting for Profits of Warner Bros. Entertainment, Inc., and Time

6              Warner, Inc.

7      The parties are in disagreement over whether plaintiffs may directly share in

8  the profits from the exploitation of the works by DC Comics corporate sibling,

9  Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10  Warner, Inc. ("TWI").  The genesis for this claim stems from certain inter-corporate

11  transactions amongst these actors concerning the Superman copyright.  In the

12  same year that plaintiffs' termination notices became effective, DC Comics

13  executed an exclusive license in favor of WBEI (and a year later a separate

14  exclusive license with WBEI's television division) to exploit the Superman copyright

15  for the remainder of its extended renewal term in certain media formats, notably

16  movies, television, and home video.  (Decl. Marc Toberoff, Exs. E & F).  Defendants

17  contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18  accounting of the profits made by DC Comics (in the form of the licensing fees it has

19  collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20  made pursuant to the license.[10]

21      Defendants' argument is not without support.  The Court  starts with the

22  general principle that "each co-owner has an independent right to use or license the

23  use of the copyright[, but that a] co-owner of a copyright must account to other

24  co-owners for any profits he earns from licensing or use of the copyright."  Oddo,

25  743 F.2d at 633.  Licensees, on the other hand, are accountable only to their

26  _____

27          [10]  It appears to the Court that because TWI is not a licensee of the works, it
   may not have any profits to account for; however, absent evidence of this fact from
28  either side (or the representation that such is not the case), the Court cannot rule
   on this issue at this time.

ER 253

licensors, and owe no duty of accounting to the non-licensor co-owner of a copyright the licensee exploits.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523 (9th Cir. 1990).

Plaintiffs, however, take a different view of the licenses, arguing that "Warner has stepped exclusively into DC's shoes with respect to such motion picture and television copyrights." (Pls' Opp. at 30).  In other words, the exclusive license had the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs (assuming the successful termination of the 1938 grant) insofar as the exploitation of the copyright in the mediums in which those licenses are concerned.

This theory, however, requires large legal leaps that are not countenanced by current law.  To begin, in order for an exclusive license in the entirety of the interest in a joint work itself (such as Superman) to be effective, the consent of both joint owners in the copyrighted work is required.  See 2 PATRY ON COPYRIGHT § 5:7 ("A joint author (or co-owner) may not, however, transfer all interest in the work without the other co-owner's express (and written) authorization, since that would result in an involuntary transfer of the other joint owner's undivided interest in the whole"). The same requirement for prior consent holds true even with respect to the wholesale transfer of exclusive licenses in subparts to a copyright, such as a license transferring all the stage rights (not just the joint owner's rights) to a novel but not the movie or literary rights.  Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-39.

Such consent simply did not occur here.  DC Comics unilaterally sought to give an exclusive license to the entirety in the Superman property's movie and television rights to WBEI post-termination.  As a result, the attempt to provide an exclusive license was ineffective.  At best, all that was conveyed was a non-exclusive license, and, at worst, a license agreement whose terms are null and void absent ratification by plaintiffs.  See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

Applying these principles in a vacuum, the Court would readily reach the

ER 254

1   conclusion championed by defendants:  WBEI, as a licensee, is answerable only to

2   DC Comics as its licensor; that DC Comics is the only entity that must account for

3   profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4   DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5   the Superman copyright to WBEI.

6        However, the Court's analysis does not occur in vacuum; rather, it must take

7   into account the relevant facts of this case, particularly given that the accounting

8   sought by plaintiffs in this action is an equitable remedy, and the Court must

9   conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15       Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities —  parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27       This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

ER 255

restructuring of Time Warner's business, "for operating management purposes, DC reports" not to immediate corporate parent WCI, but to its sibling corporation "WBEI," the licensee of the rights at issue in this action. (Decl. Paul Levitz ¶ 17). As Levitz explains, "I report to and obtain approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business." (Id.). Although this is not evidence of what occurred at the time of the license, it is still probative evidence of the relatedness of the licensee and licensor that could result in an extremely favorable licensing arrangement that works to the detriment of the non-licensor co-owner. These open issues also touch upon factors to be considered in analyzing alter ego claims. See Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290 (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an opposing party is using the corporate form unjustly, is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result").

Whether the license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a "sweetheart deal," are questions of fact that are not answered on summary judgment, certainly not without the benefit of expert testimony which has not been presented by either party on this topic. The Court therefore concludes that summary judgment on this issue is inappropriate at this time.[11]

---

[11] Because the Court concludes that defendants' motion for summary adjudication of this issue must be denied for the reasons stated above, the Court does not at this time resolve other arguments raised by plaintiffs regarding this issue.

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long ago — the copyright in the Superman material that was published in <u>Action Comics</u>, Vol. 1.  What remains is an apportionment of profits, guided in some measure by the rulings contained in this Order, and a trial on whether to include the profits generated by DC Comics' corporate sibling's exploitation of the Superman copyright.

DATE:  March 26, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

ER 257

**ADDENDUM A**

































ER 260



















**ER 263**



































ER 266













































FILED

**NOT FOR PUBLICATION**

JAN 10 2013

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel, | No. 11-55863 |
| Plaintiff - Counter-claim Defendant - Appellant, | D.C. No. 2:04-cv-08400-ODW-RZ |
| v. | MEMORANDUM[*] |
| WARNER BROS. ENTERTAINMENT, INC., a corporation; DC COMICS, a New York General Partnership, | |
| Defendants - Counter-claimants - Appellees. | |

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel,<br><br>       Plaintiff - Counter-claim-<br>       Defendant - Appellee,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT, INC., a corporation; DC COMICS,<br><br>       Defendants - Counter-<br>       claimants - Appellants. | No. 11-56034<br><br>D.C. No. 2:04-cv-08400-ODW-RZ |

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson and Otis D. Wright, District Judges, Presiding

Argued and Submitted November 5, 2012
Pasadena, California

Before: REINHARDT and THOMAS, Circuit Judges, and SEDWICK, District Judge.[**]

    Defendants Warner Brothers Entertainment, Inc. and DC Comics

(collectively, "DC") appeal the district judge's grant of summary judgment to

Plaintiff Laura Siegel Larson as to DC's third and fourth counterclaims (which,

---

     [**]    The Honorable John W. Sedwick, Senior U.S. District Judge for the District of Alaska, sitting by designation.

both parties concede, are governed by California law).[1]  The district judge entered

judgment pursuant to Federal Rule of Civil Procedure 54(b), and we have

jurisdiction pursuant to 28 U.S.C. § 1291.  We reverse and remand as to these

counterclaims.

The district judge erred in granting summary judgment to Larson as to DC's

third and fourth counterclaims.  The central issue in these counterclaims is whether

the parties reached a binding settlement agreement during their negotiations over

the rights to Superman in 2001 and 2002.  The district judge, however, failed to

address whether the October 19, 2001, letter from Larson's then-attorney

constituted an acceptance of terms negotiated between the parties, and thus was

sufficient to create a contract.  We hold, as a matter of law, that the October 19,

2001, letter did constitute such an acceptance.[2]  The October 19, 2001, letter itself

plainly states that the heirs have "accepted D.C. Comics offer of October 16, 2001

---

[1]DC also appeals the district judge's grant of summary judgment to Larson as to certain aspects of Larson's first claim and DC's first counterclaim, as well as the entirety of DC's second counterclaim.  Larson cross-appeals the district judge's grant of summary judgment to DC as to the other aspects of Larson's first claim and DC's first counterclaim.  As explained below, we do not reach the issues raised by these claims.

[2]Larson, in her brief, states that this question should be resolved as a matter of law.  *See Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 699 (Cal. Ct. App. 2006) (citing *Robinson & Wilson, Inc. v. Stone*, 110 Cal. Rptr. 675, 682 (Cal. Ct. App. 1973)).

in respect of the 'Superman' and 'Spectre' properties.  The terms are as

follows . . . ."  What follows is five pages of terms outlining substantial

compensation for the heirs in exchange for DC's continued right to produce

Superman works.  The letter ends with Larson's attorney thanking DC's attorney

for his "help and patience in reaching this monumental accord."  Further, although

it is the objective, and not subjective, understandings of the parties that determine

whether they reached an agreement, extrinsic evidence of the parties' actions may

be used to determine whether the oral offer referred to in the letter had, in fact,

been made.  *Cf. Wedeck v. Unocal Corp.*, 69 Cal. Rptr. 2d 501, 507-08 (Cal. Ct.

App. 1997).  Statements from the attorneys for both parties establish that the

parties had undertaken years of negotiations, that they had resolved the last

outstanding point in the deal during a conversation on October 16, 2001, and that

the letter accurately reflected the material terms they had orally agreed to on that

day.

    We reject Larson's arguments that either state or federal law precludes a

finding that such a contract could have been created by the October 19, 2001,

letter.  California law permits parties to bind themselves to a contract, even when

they anticipate that "some material aspects of the deal [will] be papered later."

*Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011);

4

*Harris v. Rudin, Richman & Appel*, 87 Cal. Rptr. 2d 822, 828 (Cal. Ct. App. 1999). This principle applies notwithstanding the lack of an express reference to an intended future agreement, as long as the terms of any contract that may have been formed are sufficiently definite that a court could enforce them (as is undoubtedly the case here). *Facebook*, 640 F.3d at 1038 (noting the minimal requirements to form an enforceable contract, and that California law does not require express delegation regarding potential missing terms of a contract); *Patel v. Liebermensch*, 197 P.3d 177, 182-83 (Cal. 2008). That *Facebook* involved a contract signed by both parties does not render it any less controlling here; under California's statute of frauds, the only signature that is required is that of the party against whom a contract is sought to be enforced. *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin, *Summary of California Law, Contracts* § 359 (10th ed. 2005). Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a "duly authorized agent" of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent.

We therefore reverse the district judge's grant of summary judgment to Larson and direct the district judge to reconsider DC's third and fourth

counterclaims in light of our holding that the October 19, 2001, letter created an

agreement.  Because a judgment on those claims in DC's favor would appear to

render moot all of the other questions in this lawsuit, we decline to address these

other issues at this time.

      **REVERSED IN PART and REMANDED.**[3]

---

[3]We reach our conclusions without the need to consider the documents that are the subject of DC's motions for judicial notice and to supplement the record. DC's motions, and Larson's motion to strike the related portions of DC's brief, are therefore denied as moot.  Larson's motion for sanctions is also denied.  The parties shall bear their own costs on appeal.

1  DANIEL M. PETROCELLI (S.B. #97802)
2    dpetrocelli@omm.com
   MATTHEW T. KLINE (S.B. #211640)
3    mkline@omm.com
   CASSANDRA L. SETO (S.B. #246608)
4    cseto@omm.com
   O'MELVENY & MYERS LLP
5  1999 Avenue of the Stars, 7th Floor
   Los Angeles, CA 90067-6035
6  Telephone:  (310) 553-6700
   Facsimile:   (310) 246-6779
7

8  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
9  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
10 Cold Spring, NY 10516
   Telephone:  (845) 265-2820
11 Facsimile:   (845) 265-2819

12
13 Attorneys for Defendants and Counterclaimant

14            **UNITED STATES DISTRICT COURT FOR THE**
                 **CENTRAL DISTRICT OF CALIFORNIA**
15

16 JOANNE SIEGEL and LAURA          Case No. CV-04-8400 ODW (RZx)
   SIEGEL LARSON,
17                                   **DEFENDANTS' NOTICE OF**
                    Plaintiffs and   **CROSS-APPEAL TO THE UNITED**
18                  Counterdefendants,  **STATES COURT OF APPEALS**
                                     **FOR THE NINTH CIRCUIT**
19       v.
                                     The Hon. Otis D. Wright II
20 WARNER BROS.
   ENTERTAINMENT INC., DC
21 COMICS, and DOES 1-10,
22
                    Defendants and
23                  Counterclaimant.
24

25

26

27

28

1      PLEASE TAKE NOTICE that defendants Warner Bros. Entertainment Inc.

2 and DC Comics hereby cross appeal to the United States Court of Appeals for the

3 Ninth Circuit from the Judgment Pursuant To Fed. R. Civ. P. 54(b) dated May 17,

4 2011 (Docket No. 669) ("Judgment"), which purported to certify as final the

5 Court's orders dated March 26, 2008 (Docket No. 293), August 12, 2009 (Docket

6 No. 560), and October 30, 2009 (Docket No. 595) (collectively, "Interlocutory

7 Orders"), and enter judgment on plaintiff's First Claim for Relief and defendants'

8 First, Second, Third, and Fourth Counterclaims.  Plaintiff's notice of appeal was

9 filed on May 27, 2011 (Docket No. 671), and this notice of cross appeal is timely

10 pursuant to Federal Rule of Appellate Procedure 4(a)(3).

11      To be clear, defendants dispute the finality of the Judgment on the ground

12 that, *inter alia*, the Interlocutory Orders do not fully and finally dispose of any

13 claim as required for partial final judgment under Federal Rule of Civil Procedure

14 54(b).  *See* Docket Nos. 624, 624-1-624-4; 655, 655-1-655-7; 661, 661-1-661-9;

15 663.  Defendants will therefore move to dismiss plaintiff's appeal for lack of

16 jurisdiction.

17      Defendants file this cross-appeal to preserve their rights to appeal all adverse

18 rulings in the Interlocutory Orders, in the event the Ninth Circuit does not dismiss

19 plaintiff's appeal for lack of jurisdiction.  Defendants will voluntarily dismiss this

20 cross-appeal if their motion to dismiss plaintiff's appeal is granted.

21

22 Dated:      June 15, 2011      Respectfully Submitted,

23                      O'MELVENY & MYERS LLP

24                      By:  /s/ Daniel M. Petrocelli

25                          Daniel M. Petrocelli

26                          Attorneys for Defendants

27

28

DEFS.' NOTICE OF CROSS APPEAL

**ER 279**

1   Marc Toberoff (State Bar No. 188547)
      *mtoberoff@ipwla.com*
2   Nicholas C. Williamson (State Bar No. 231124)
      *nwilliamson@ipwla.com*
3   TOBEROFF & ASSOCIATES, P.C.
4   2049 Century Park East, Suite 3630
    Los Angeles, California, 90067
5   Telephone:  (310) 246-3333
    Fax:          (310) 246-3101
6
7   Attorneys for Plaintiff,
    Laura Siegel Larson, individually and as
8   personal representative of the Estate of
    Joanne Siegel
9
              **UNITED STATES DISTRICT COURT**
10
       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
11

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br><br> Plaintiff, <br> vs. <br><br> WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, <br><br> Defendants. | **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT** |
| DC COMICS, <br><br> Counterclaimant, <br> vs. <br><br> LAURA SIEGEL LARSON, as Personal Representative of the ESTATE OF JOANNE SIEGEL, and as an individual, <br><br> Counterclaim Defendant. | |

Notice is hereby given that LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,[1] Plaintiff and Counterclaim-Defendant in the above named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final judgment of the district court, filed on May 17, 2011 and entered in this case on May 20, 2011 at Docket No. 669 by the Honorable Otis D. Wright II in the United States District Court for the Central District of California, pursuant to Federal Rule of Civil Procedure 54(b), based on the district court's March 26, 2008 order (Docket No. 293), August 12, 2009 order (Docket No. 560), and October 30, 2009 order (Docket No. 595).

Dated: May 27, 2011

RESPECTFULLY SUBMITTED,

Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.

Attorneys for Plaintiff
Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel

---

[1] Joanne Siegel passed away on February 12, 2011. On May 23, 2011, after the district court entered judgment, but prior to the filing of the instant notice of appeal, the district court ordered the substitution of Laura Siegel Larson, as personal representative of the Estate of Joanne Siegel, for Joanne Siegel. Docket No. 670.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | Case No: CV 04-8400 ODW (RZx) |
| | Hon. Otis D. Wright II, U.S.D.J. |
| Plaintiffs, | [PROPOSED] **JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)** |
| vs. | |
| WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, | Complaint filed: October 8, 2004<br>Trial Date: None Set |
| Defendants. | |
| DC COMICS, | |
| Counterclaimant, | |
| vs. | |
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | |
| Counterclaim Defendants. | |

[PROPOSED] JUDGMENT

1                                    [~~PROPOSED~~] JUDGMENT

2          Based upon this Court's orders dated March 26, 2008 (Docket No. 293),

3 August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595), which

4 resolved certain of the claims and counterclaims in this case; the Court's March 15,

5 2011 order which granted Plaintiff's Motion For Entry of a Partial Judgment Under

6 Fed. R. Civ. P. 54(b) (Docket No. 659); the Court's May 5, 2011 order which denied

7 Defendants' Motion to Amend Partial Final Judgment Under Fed. R. Civ. P. 59(e)

8 (Docket No. 664), struck certain "superfluous, redundant and improper allegations"

9 from DC's counterclaims, and directed Plaintiffs to renew their Rule 54(b) motion;

10 and the Court's _May 17_, 2011 order granting Plaintiff's Renewed Motion for

11 Entry of a Partial Judgment Under Fed. R. Civ. P. 54(b) and For Stay of Remaining

12 Claims Pending Appeal Pursuant to the Court's May 5, 2011 order (Docket No. 667):

13          IT IS ORDERED AND ADJUDGED that pursuant to the Copyright Act, 17

14 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants,

15 assignments or transfers to any of the Defendants and any of their predecessors-in-

16 interest, of the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action

17 Comics,* No. 4, *Superman,* No. 1 (pages 3-6), and the first two weeks of the

18 Superman newspaper strips, and that as of April 17, 1999, Plaintiffs owned and

19 continue to own fifty percent (50%) of the aforesaid recaptured copyrights.

20          IT IS FURTHER ORDERED AND ADJUDGED that counterclaimant DC

21 Comics' First Counterclaim, which sought to invalidate the termination, is DENIED

22 for the reasons set forth in the Court's March 26, 2008 order.

23          IT IS FURTHER ORDERED AND ADJUDGED that the Second

24 Counterclaim is DENIED, as Plaintiffs' claims for declaratory relief were brought

25 within the relevant statute of limitations period.

26          IT IS FURTHER ORDERED AND ADJUDGED that the Third and Fourth

27 Counterclaims are DENIED, as the parties did not enter into a settlement agreement.

28          IT IS ORDERED AND ADJUDGED that, finding no just reason for delay, the

1   Court's orders dated March 26, 2008 (Docket No. 293), August 12, 2009 (Docket

2   No. 560), and October 30, 2009 (Docket No. 595) are CERTIFIED AS FINAL, and

3   JUDGMENT IN THIS ACTION IS HEREBY ENTERED PURSUANT TO FED. R.

4   CIV. P. 54(b) on the First Claim of the Third Amended Complaint, and the First,

5   Second, Third and Fourth Counterclaims of the Second Amended Counterclaims.

6

7

8   Dated: 5/17/11

    OTIS D. WRIGHT

9   Hon. Otis D. Wright II

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 10  JOANNE SIEGEL, an individual; and | Case No: CV 04-8400 ODW (RZx) |
| 11  LAURA SIEGEL LARSON, an individual, | Hon. Otis D. Wright II, U.S.D.J. |
| 12                    Plaintiffs, | **ORDER GRANTING RENEWED MOTION FOR ENTRY OF A** |
| 13            vs. | **PARTIAL JUDGMENT UNDER FED. R. CIV. P. 54(B) AND FOR** |
| 14  WARNER BROS. ENTERTAINMENT | **STAY OF REMAINING CLAIMS PENDING APPEAL** |
| 15  INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, | **PURSUANT TO THE COURT'S MAY 5, 2011 ORDER** |
| 16                    Defendants. | Complaint filed:  October 8, 2004 |
| 17 | Trial Date:  None Set |
| 18  DC COMICS, | |
| 19                    Counterclaimant, | |
| 20            vs. | |
| 21  JOANNE SIEGEL, an individual; and | |
| 22  LAURA SIEGEL LARSON, an individual, | |
| 23 | |
| 24                    Counterclaim Defendants. | |

25

26

27

28

[PROPOSED] ORDER GRANTING MOTION FOR PARTIAL FINAL JUDGMENT

1

## ORDER

2   As established by the Court's decisions of March 26, 2008 (Docket No. 293),

3   August 12, 2009 (Docket No. 560), October 30, 2009 (Docket No. 595), March 15,

4   2011 (Docket No. 659) and May 5, 2011 (Docket No. 664), the First Claim of

5   Plaintiffs' Third Amended Complaint and the First, Second, Third and Fourth

6   Counterclaims of Defendant DC Comics' Second Amended Counterclaims have been

7   fully resolved.  As set forth in the Court's March 15, 2011 order, there is no just

8   reason for delay entering judgment in this case.  Accordingly, for the reasons set forth

9   in the above-referenced orders, as well as plaintiff's motion papers and all of the

10  pleadings and records on file in this action, plaintiff's Renewed Motion for Entry of a

11  Partial Judgment Under Fed. R. Civ. P. 54(b) is hereby GRANTED.

12  IT IS HEREBY ORDERED that:

13       1.    Plaintiff's Renewed Motion for Entry of a Partial Judgment Under Fed.

14             R. Civ. P. 54(b) and For Stay of Remaining Claims Pending Appeal

15             Pursuant to the Court's May 5, 2011 order is GRANTED.

16       2.    Judgment in this action shall be entered on the First Claim of the Third

17             Amended Complaint, and the First, Second, Third and Fourth

18             Counterclaims of the Second Amended Counterclaims (as stricken in

19             part by the Court's May 5, 2011 order), and the Court's March 26, 2008

20             order (Docket No. 293), August 12, 2009 order (Docket No. 560), and

21             October 30, 2009 order (Docket No. 595) are hereby CERTIFIED AS

22             FINAL PURSUANT TO FED. R. CIV. P. 54(b).

23       3.    Further proceedings in this case are hereby stayed pending appeal.

24       4.    Instead of the status reports referred to in the Court's March 15, 2011

25             order, plaintiffs are ordered to file a status report on or before

26             **Wednesday, June 8, 2011,** and every 60 days thereafter, until further

27             order of the Court.

28  IT IS SO ORDERED. May 17, 2011          U.S. District Judge

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-8400 ODW (RZx) | Date | May 5, 2011 |
|---|---|---|---|
| Title | *Joanne Siegel, et al. v. Warner Bros. Entertainment, Inc., et al.* | | |

| Present: | The Honorable Otis D. Wright II, United States District Judge |
|---|---|

| Steve Chung | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):**    **Order Vacating March 15, 2011 Judgment [660] and Striking Superfluous Allegations from DC Comics' First Amended Counterclaim**

After certifying for appeal certain issues, the determination of which shall bear greatly on the upcoming trial in this matter, Defendant DC Comics pointed out that the counterclaims certified for appeal are not final. [661]  But the allegations which allegedly preclude a finding of finality for purposes of appeal are improperly included in the counterclaims. Specifically, this case, which bears the number 04-8400, involves Superman, not Superboy. A separate action bearing the number 04-8776 concerns Superboy. The Court long ago declined to consolidate both cases into one action, but Defendants have nevertheless included some Superboy allegations in the Superman action. Such superfluous, redundant and improper allegations are hereby ordered **STRICKEN**, such that case number 04-8400 shall include no allegations whatsoever as to Superboy, and vice versa.

Plaintiffs shall renew their motion for certification and lodge a proposed judgment accordingly.  Defendants' motion to amend judgment [661]is deemed **MOOT and the hearing scheduled for May 16, 2011 at 1:30 p.m. is VACATED**.

### SO ORDERED

| | ---- | : | 00 |
|---|---|---|---|
| Initials of Preparer | | RGN | |

**ER 287**

1

2

3   Marc Toberoff (State Bar No. 188547)
4    *mtoberoff@ipwla.com*
    Nicholas C. Williamson (State Bar No. 231124)
5    *nwilliamson@ipwla.com*
    Keith G. Adams (State Bar No. 240497)
6    *kgadams@ipwla.com*
    TOBEROFF & ASSOCIATES, P.C.
7   2049 Century Park East, Suite 3630
    Los Angeles, California, 90067
8   Telephone:  (310) 246-3333
    Fax:          (310) 246-3101
9
    Attorneys for Plaintiff,
10  Laura Siegel Larson

11              **UNITED STATES DISTRICT COURT**

12       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 13  JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | Case No: CV 04-8400 ODW (RZx) |
| 14 | Hon. Otis D. Wright II, U.S.D.J. |
| 15              Plaintiffs, | **ORDER GRANTING MOTION FOR ENTRY OF A PARTIAL** |
| 16       vs. | **JUDGMENT UNDER FED. R. CIV. P. 54(B) AND FOR STAY** |
| 17  WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a | **OF REMAINING CLAIMS PENDING APPEAL** |
| 18  general partnership; and DOES 1-10, | Complaint filed:  October 8, 2004 |
| 19 | Trial Date:  None Set |
| 20              Defendants. | Date:  March 21, 2011 |
| 21  DC COMICS, | Time: 1:30 p.m. |
| 22 | Place: Courtroom 11 |
| 23              Counterclaimant, | |
| 24       vs. | |
| 25  JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an | |
| 26  individual, | |
| 27              Counterclaim Defendants. | |

28

**ORDER**

Federal Rule of Civil Procedure 54(b) allows a district court to certify as final and immediately appealable interlocutory orders that resolve certain outstanding claims in a case:

> "When more than one claim for relief is presented in an action … or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

Fed. R. Civ. P. 54(b). To be eligible for entry of judgment under Rule 54(b), the order must constitute "an ultimate disposition of an individual claim entered in the course of a multiple claims action," and there must be no just reason to delay appellate review of the order until the conclusion of the entire case. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980). The Ninth Circuit embraces a "pragmatic approach focusing on severability [of claims] and efficient judicial administration" in the construction of what constitutes a claim and whether there is no just reason to delay appellate review. *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

In accordance with the Court's decisions of March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595), the First Claim of Plaintiffs' Third Amended Complaint and the First, Second, Third and Fourth Counterclaims of Defendants' Second Amended Counterclaims have been fully resolved.

In determining whether there is any just reason for delay, the factors to be considered include "whether the nature of the claims already determined is such that no appellate court would have to decide the same issues more than once, even if subsequent appeals are heard," and "whether immediate appellate resolution will foster settlement of the remaining claims." *Whitney v. Wurtz*, 2007 U.S. Dist. LEXIS

ORDER GRANTING MOTION FOR PARTIAL FINAL JUDGMENT **ER 289**

60077, at *5 (N.D. Cal. Aug. 16, 2007).  Entry of judgment on adjudicated claims under Rule 54(b) is especially appropriate where the claims determine the scope and contours of trial as to the remaining issues, that trial is likely to be protracted, and the Court will avoid wasting resources in a re-trial.  *See Continental Airlines*, 819 F.2d at 1525 (approving Rule 54(b) entry of judgment where "the district court effectively narrowed the issues, shortened any subsequent trial by months, and efficiently separated the legal from the factual questions").  Here, any errors in the rulings and consequent determination of the severable First Claim and the First, Second, Third and Fourth Counterclaims would directly impact and necessarily reverse the trial court on the remaining accounting claims.  Entry of a 54(b) judgment would streamline the issues, conserve judicial resources and promote settlement.  As such, there is no just reason for delay entering judgment in this case.

Accordingly, for the reasons set forth herein and in Plaintiff's motion papers, IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion For Entry of a Partial Judgment Under Fed. R. Civ. P. 54(b) and For Stay of Remaining Claims Pending Appeal is GRANTED.

2. Judgment in this action shall be entered on the First Claim of the Third Amended Complaint, and the First, Second, Third and Fourth Counterclaims of the Second Amended Counterclaims, and such Orders are hereby CERTIFIED FINAL PURSUANT TO FED. R. CIV. P. 54(b).

3. Further proceedings in this case are hereby stayed pending appeal.

2

ORDER GRANTING MOTION FOR PARTIAL FINAL JUDGMENT **ER 290**

1

2

3    4. Accordingly, the motion hearing and status conference scheduled for

4  March 21, 2011 at 1:30 p.m. is VACATED.

5    5. Plaintiff is ordered to file a status report on or before **Wednesday, May 18,**

6  **2011,** and every 60 days thereafter, until further order of the Court.

7  IT IS SO ORDERED.

8

9  Dated: March 15, 2011    _____

10                                           Hon. Otis D. Wright II

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

ORDER GRANTING MOTION FOR PARTIAL FINAL JUDGMENT **ER 291**

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Nicholas C. Williamson (State Bar No. 231124)
     nwilliamson@ipwla.com
3  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
4  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
5  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
6  Fax:          (310) 246-3101

7  Attorneys for Plaintiff,
   Laura Siegel Larson

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| 10    JOANNE SIEGEL, an individual; and | Case No: CV 04-8400 ODW (RZx) |
| 11    LAURA SIEGEL LARSON, an | Hon. Otis D. Wright II, U.S.D.J. |
| 12    individual, | |
|             Plaintiffs, | **ANSWER TO SECOND AMENDED COUNTERCLAIMS** |
| 13        vs. | Complaint filed:  October 8, 2004 |
| 14 | Trial Date:  None Set |
| 15    WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a | |
| 16    general partnership; and DOES 1-10, | |
| 17             Defendants. | |
| 18 | |
| 19    DC COMICS, | |
| 20             Counterclaimant, | |
| 21       vs. | |
| 22    JOANNE SIEGEL, an individual; and | |
| 23    LAURA SIEGEL LARSON, an individual, | |
| 24 | |
| 25         Counterclaim Defendants. | |

26

27

28

Plaintiffs and counterclaim defendants JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the "Plaintiffs"),[1] by their attorneys of record, hereby answer the counterclaims ("Counterclaims") of defendant DC Comics ("DC" or "Counterclaimant"):

1.     Plaintiffs admit only that DC is engaged in the business of licensing comic books.  Plaintiffs, at present, lack knowledge or information sufficient to admit the truth of the remaining allegations contained in paragraph 1 of the Counterclaims and on that basis deny same.

2.     Plaintiffs admit only that Joanne Siegel was an individual and citizen of the State of California, in the County of Los Angeles, that Joanne Siegel was the widow of author Jerome Siegel ("Siegel"), the individual who, without limitation, originated, created and authored the "Superman" character, premises, themes, setting, back-story, key supporting characters, and the first and many subsequent "Superman" stories, but Plaintiffs otherwise deny the allegations in paragraph 2 of the Counterclaims.

3.     Admitted.

4.     Plaintiffs admit only that Defendants purport to assert that this Court has subject matter jurisdiction and supplemental jurisdiction over the Counterclaims as alleged in paragraph 4 but otherwise deny the allegations in paragraph 4 of the Counterclaims.

5.     Admitted.

6.     Plaintiffs admit only that "The Reign of the Superman" written by Siegel with art by Joseph Shuster ("Shuster") was published in 1933 in a magazine entitled "Science Fiction" and that this material shared little, if any, similarity to various subsequent Superman material which Siegel created with art by Shuster but

---

[1] Joanne Siegel died on February 12, 2011.  Joanne's Siegel's daughter, defendant Laura Siegel Larson, is named in her mother's will as the executor of her estate, and has directed that this Answer to Second Amended Counterclaims be filed on behalf of Joanne Siegel's estate, pending a motion to substitute party under F.R.C.P. 25(a).

Plaintiffs otherwise deny the allegations in paragraph 6 of the Counterclaims.

7.     Plaintiffs admit only that Siegel created and wrote and Shuster drew art for  several variations of "Superman" including a 1933 version known as "The Superman" and other versions between 1933 and 1938 known as "Superman" (all created and written by Siegel and some drawn by Shuster) and that these works included but were not limited to the works listed in subparagraphs (a)-(e) in the fourth sentence of paragraph 7 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 7 of the Counterclaims.

8.     Plaintiffs admit only that between 1933 and 1938, Jerome Siegel and Joseph Shuster ("Siegel and Shuster") submitted certain Superman works to certain prospective publishers and newspaper syndicates; but Plaintiffs otherwise deny the allegations contained in paragraph 8 of the Counterclaims.

9.     Admitted.

10.     Plaintiffs admit only that on or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with Detective Comics, Inc. ("DCI") (the "December 4, 1937 Agreement") to continue to produce the comic magazine features "Slam Bradley" and "The Spy" for a period of two years which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to DCI which reserved the right to accept or reject same within sixty days; but Plaintiffs otherwise deny the allegations in paragraph 10 of the Counterclaims and respectfully refer the Court to the 1937 Agreement as evidence of the contents thereof.

11.     Plaintiffs admit only the first sentence of paragraph 11; and that a third party provided DCI with the "Superman" comic strips created and written by Siegel and drawn by Shuster in a newspaper syndication format (the "1934 Superman Comic Strip") and that DCI expressed interest in publishing this work in a thirteen page comic magazine, but Plaintiffs otherwise deny the allegations in paragraph 11 of the Counterclaims, including but not limited to, in so far as that Siegel and Shuster

alone and of their own accord cut and pasted their 1934 newspaper strips into panels and added a few transitional panels so as to convert from a newspaper to a magazine format (the "Revised 1934 Superman Comic Strip"); but Plaintiffs otherwise deny the allegations in paragraph 11 of the Counterclaims and respectfully refer the Court to Siegel and Shuster's 1934 Superman Comic Strip and Revised 1934 Superman Comic Strip as evidence of the contents thereof.

12.     Plaintiffs admit only that in an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), concerning a strip entitled "Superman," Siegel and Shuster sold to DCI the "strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title to the strip … and … not to employ said characters or story in any other strips … by their names contained therein…."; but Plaintiffs otherwise deny the allegations in paragraph 12 of the Counterclaims and respectfully refer the Court to the March 1, 1939 Agreement as evidence of the contents thereof.

13.     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Counterclaims and on that basis deny the same.

14.     Plaintiffs admit only that DCI published the Revised 1934 Superman Comic Strip in "Action Comics No. 1" bearing the cover date, June, 1938, but otherwise deny the allegations in paragraph 14 of the Counterclaims.

15.     Plaintiffs admit only that in addition to the Siegel and Shuster material published by DCI in "Action Comics No. 1," Siegel and Shuster created further original "Superman" material and stories; that on or about September 22, 1938, in conjunction with Siegel and Shuster entering into an agreement with The McClure Newspaper Syndicate concerning new "Superman" material created by Siegel and Shuster specifically for McClure newspaper strips, Siegel and Shuster entered into an agreement with DCI ( the "September 22, 1938 DCI Agreement") which stated that "[DCI] are the exclusive owners of the comic strips known by the titles "Superman,"

"Slam Bradley," "Spy," "Radio Squad," and "Federal Men" and to the rights to publish comics carrying the titles and characters contained therein and continuity thereof" and further stated that Siegel and Shuster had "been doing the artwork and continuity" for comics including "Superman" and that "[w]e wish you to continue to do said work and hereby employ and retain you for said purposes"; but Plaintiffs otherwise deny the allegations in paragraph 15 of the Counterclaims and respectfully refer the Court to the September 22, 1938 DCI Agreement as evidence of the contents thereof.

16.    Admitted.

17.    Denied.

18.    Plaintiffs admit only that on or about November 30, 1938, Siegel wrote to DCI (the "Superboy Summary") expressing his conception of a new comic "strip named SUPERBOY, which would relate the adventures of Superman as a youth … [which] would be very much different from the SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of adventures very much different …" and that DCI did not publish a "Superboy" comic at that time; but Plaintiffs otherwise deny the allegations in paragraph 18 of the Counterclaims and respectfully refer the Court to the Superboy Summary as evidence of the contents thereof.

19.    Plaintiffs admit only that "Superman No. 1" was solely created by Siegel and Shuster, and that it had a cover date of Summer 1939, but Plaintiffs otherwise deny the allegations in paragraph 19 of the Counterclaims.

20.    Plaintiffs admit only that on or about December 19, 1939, Siegel and Shuster entered into an agreement with DCI (the "December 19, 1939 Agreement") which modified the September 22, 1938 DCI Agreement by increasing Siegel and Shuster's compensation for the Superman comic strip material independently created by Siegel and Shuster from $10 per page to $20 per page, and granted Siegel and Shuster "5% of all net proceeds which may be derived by" DCI from the commercial exploitation of "Superman" outside of comic books and newspaper syndication such

as radio, motion pictures and toys, and which stated that DCI "are the sole and exclusive owners of the comic strip entitled 'SUPERMAN'"; but Plaintiffs otherwise deny the allegations in paragraph 20 of the Counterclaims and respectfully refer the Court to the December 19, 1939 Agreement as evidence of the contents thereof.

21.     Plaintiffs admit only that on or about December, 1940, Siegel solely authored a complete, thirteen page, original "Superboy" story ("Superboy Story"); that in the event his story was published as a comic book, Siegel suggested in a promotional prologue to the story that there should be a box stating: "So many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth that the creation of this newest and most promising magazine comic strip character was inevitable! And so here he is at last … the answer to your requests … America's outstanding boy hero: SUPERBOY!!"; and that in the event his story was published as a comic book, Siegel further suggested a promotional epilogue in a box stating: "And so was launched the career of SUPERBOY, youthful Champion of Righteousness!  In later years he was to become the mighty figure known as SUPERMAN!  But the story of SUPERBOY'S amazing and often humorous adventures is a series of astonishing narratives in itself …!  Don't miss a single adventure of the comic page's newest sensation: SUPERBOY!!"; but Plaintiffs otherwise deny the allegations in paragraph 21 of the Counterclaims and respectfully refer the Court to Siegel's Superboy Story as evidence of the contents thereof.

22.     With respect to the allegations in the first sentence of paragraph 22, Plaintiffs admit only that on November 18, 1944 DCI issued for sale "More Fun Comics No. 101" with a cover date of January-February 1945 which contained the first Superboy comic story published by DCI, but Plaintiffs otherwise deny the allegations in this first sentence of paragraph 22 of the Counterclaims.  Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 22 and on that basis deny the same, and Plaintiffs

deny the allegations in the third sentence of paragraph 22 of the Counterclaims.

23.     Plaintiffs admit only that in 1947 Siegel and Shuster brought suit against National Comics Publications, Inc., DCI's purported successor, in the New York Supreme Court in Westchester County (the "Westchester Action"), that the Westchester Action was, in part, the culmination of a dispute between only Siegel (not Siegel and Shuster) and National over DCI's publication of Siegel's "Superboy," and that in addition to a number of other remedies such as an accounting, Siegel and Shuster also sought in the Westchester Action to rescind the March 1, 1938 Agreement and the September 22, 1938 DCI Agreement based on DCI's alleged fraud and repeated breaches of such agreements; but Plaintiffs otherwise deny the allegations in paragraph 23 of the Counterclaims and respectfully refer the Court to the complaint in the Westchester Action as evidence of the contents thereof.

24.     Plaintiffs admit only that after trial of the Westchester Action the court issued an opinion ("Westchester Opinion") in which it found that DCI acted illegally in publishing Superboy on the grounds that the court "[could] not accept [DCI's] view that Superboy was in reality Superman" and that "Superboy was a separate and distinct entity"; and found that the March 31, 1938 Agreement transferred to DCI Siegel and Shuster's rights in Superman and that the September 22, 1938 DCI Agreement should not be rescinded; but Plaintiffs otherwise deny the allegations in paragraph 24 of the Counterclaim and respectfully refer the Court to the Westchester Opinion as evidence of the contents thereof.

25.     Plaintiffs deny that an appeal was ever actually taken by the defendants in the Westchester Action and Plaintiffs have insufficient knowledge or belief to admit the truth of the allegation that the Westchester Action Interlocutory Judgment was temporarily stayed pending appeal, and on that basis deny this allegation as well, but Plaintiffs otherwise admit the allegations in paragraph 25.

26.     Plaintiffs admit only that the parties to the Westchester Action entered into a stipulation dated May 19, 1948 (the "1948 Stipulation") and that the court

ANSWER TO SECOND AMENDED COUNTERCLAIMS     ER 298

issued a consent judgment dated May 21, 1948 (the "1948 Consent Judgment"), but Plaintiffs otherwise deny the allegations in paragraph 26 of the Counterclaims and respectfully refer the Court to the 1948 Stipulation and 1948 Consent Judgment as evidence of the contents thereof.

27.     Plaintiffs admit only that Siegel and Shuster filed an action against National Periodical Publications ("National") in the United States District Court for the Southern District of New York for a declaration as to whether or not they had granted to National's alleged predecessor the renewal copyright to Superman; that the District Court's decision was published in *Siegel v. National Periodical Publications, Inc.,* 364 F. Supp. 1032 (S.D.N.Y. 1973) wherein the court broadly interpreted the grant of "all rights" in Superman in the agreements in question as intended to grant the copyright to Superman for the renewal term; and that the district court's decision was appealed by Siegel and Shuster to the United States Court of Appeals for the Second Circuit and its decision was published in *Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909 (2nd Cir. 1974), but Plaintiffs otherwise deny the allegations in paragraph 27 of the Counterclaims and respectfully refer the Court to said published opinions as evidence of the contents thereof.

28.     Plaintiffs admit only that in *Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909 (2nd Cir. 1974), the Court of Appeals affirmed that National owned the original "Superman" copyright for the renewal term based on the *res judicata* effect of the 1947 Westchester Action, and that Siegel and Shuster did not appeal the Second Circuit's decision, but Plaintiffs otherwise deny the allegations in paragraph 28 of the Counterclaims and respectfully refer this Court to the Second Circuit's published opinion as evidence of the contents thereof.

29.     Plaintiffs admit only that Siegel and Shuster signed an agreement with Warner Communications, Inc., dated December 23, 1975 (the "December 23, 1975 Agreement"), wherein it alleged it was the parent company of National, and that the December 23, 1975 Agreement, amongst many other terms and conditions, contains

the language quoted in paragraph 29 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 29 of the Counterclaims and respectfully refer this Court to the December 23, 1975 Agreement as evidence of the contents thereof.

30.     Plaintiffs admit only the first sentence of paragraph 30 of the Counterclaims and that under the December 23, 1975 Agreement annual payments were to be made to Joanne Siegel only if Mr. Siegel died before December 21, 1985 (Mr. Siegel died January 28, 1996), but Plaintiffs otherwise deny the allegations in paragraph 30 of the Counterclaims and respectfully refer the Court to the December 23, 1975 Agreement as evidence of the contents thereof.

31.     Plaintiffs admit only that in "Action Comics No. 1" Superman is depicted as, without limitation: having been born on a distant planet, sent to Earth aboard a rocket ship, and as having, among other traits, extraordinary physical abilities, including but not limited to, and by way of example, superhuman strength, the ability to leap 1/8 of a mile, the power of superhuman speed, to run faster than a locomotive train, the power of invulnerability, to withstand injury from bullets, knives, etc, and that, without limitation, Superman is a heroic figure in a distinctive costume who uses his extraordinary physical and mental abilities to fight crime, champion the oppressed and benefit mankind; that Superman is the "secret identity" of a mild-mannered bespectacled newspaper reporter, known as Clark Kent, who works for a newspaper originally called "The Daily Star," but later changed to "The Daily Planet"; but Plaintiffs otherwise deny the allegations in paragraph 31 of the Counterclaims and respectfully refer the Court to "Action Comics No. 1" as evidence of the contents thereof.

32.     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of the Counterclaims and on that basis Plaintiffs deny the same.

33.     Plaintiffs deny the allegations in the last sentence of paragraph 33 of the Counterclaims, and with respect to the remaining allegations in paragraph 33,

ANSWER TO SECOND AMENDED COUNTERCLAIMS          ER 300

1  Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of

2  such allegations and on that basis deny same.

3      34.    Denied.

4      35.    Plaintiffs admit only that Superman's original crest or shield appearing

5  in "Action Comics No. 1" was comprised of a large inverted triangle in the color

6  yellow bearing, in the middle, the letter "S" in the color red, and that over the years

7  this was slightly modified to a large inverted triangle in the color yellow (with its

8  upper corners cropped and outlined in the color red) bearing in the middle, the letter

9  "S" in the color red, and that this "S" crest or shield was conceived and presented by

10  Siegel and Shuster as a strong symbol of the Superman character they created; but

11  Plaintiffs otherwise deny the allegations in paragraph 35 of the Counterclaims.

12      36.    Plaintiffs admit that DC has registered numerous works featuring

13  Superman with the Register of Copyrights, but otherwise lack knowledge or

14  information sufficient to form a belief as to the truth of the allegations in paragraph

15  36 of the Counterclaims and on that basis deny same.

16      37.    Denied.

17      38.    Denied.

18      39.    Denied.

19      40.    Plaintiffs lack knowledge or information sufficient to form a belief as to

20  the truth of the allegations contained in paragraph 40 of the Counterclaims and on

21  that basis Plaintiffs deny same.

22      41.    Denied.

23      42.    Plaintiffs admit only the allegations in the first sentence of paragraph 42

24  of the Counterclaims, except Plaintiffs lack knowledge or information sufficient to

25  form a belief as to whether the April 8, 1997 date is accurate and on that basis deny

26  same; and Plaintiffs admit only the allegations in the second sentence of paragraph 42

27  of the Counterclaims, but Plaintiffs deny the characterization of the terminations as

28  "purported" and deny the allegations in the third sentence of paragraph 42 of the

Counterclaims.

43.     Plaintiffs admit only that Plaintiffs' seven Notices of Termination relating to "Superman" ("Superman Notices") terminated under 17 U.S.C. § 304(c) the seven grants set forth in paragraph 42 of the Counterclaims regarding Siegel and Shuster's original "Superman" material, "Action Comics No. 1" and underlying thousands of additional works all as listed in the Superman Notices; but Plaintiffs otherwise deny the allegations in paragraph 43 of the Counterclaims and respectfully refer the Court to the Superman Notices as evidence of the contents thereof.

44.     Denied.

45.     Plaintiffs admit only that Plaintiffs' four Notices of Termination of Transfer relating to "The Spectre" ("Spectre Notices") terminated under 17 U.S.C. § 304(c) the four grants set forth in paragraph 45 of the Counterclaims insofar as any such grant conveyed Siegel's copyright interest in "The Spectre"; but Plaintiffs otherwise deny the allegations in paragraph 45 of the Counterclaims and respectfully refer the Court to the Spectre Notices as evidence of the contents thereof.

46.     Plaintiffs admit only that the "Spectre Notices" terminated under 17 U.S.C. § 304(c) alleged grants of Siegel's copyright interest in "The Spectre," and that the Spectre Notices listed hundreds of works involving "The Spectre," including the works set forth in paragraph 46 of the Counterclaims ("Spectre Works"); but Plaintiffs otherwise deny the allegations in paragraph 46 of the Counterclaims and respectfully refer the Court to the Spectre Notices as evidence of the contents thereof.

47.     Plaintiffs admit only that DC's counsel sent a letter to Plaintiffs' counsel dated April 16, 1997; that sometime thereafter DC requested that the parties enter into a confidentiality agreement, and that DC's counsel also sent Plaintiffs' counsel a letter dated November 5, 1997 which, in part, contained the language quoted in paragraph 47, but Plaintiffs otherwise deny the allegations in paragraph 47 of the Counterclaims and respectfully refer the Court to the above letters as evidence of the contents thereof.

48.     Plaintiffs admit only that Plaintiffs and DC entered into a confidentiality agreement dated December 17, 1997 ("Confidentiality Agreement"), that DC, by its counsel, sent a letter dated December 18, 1997 to Plaintiffs' counsel which discussed issues it believed were relevant to a proposed purchase of all rights arising out of Siegel's authorship of "Superman," but did not set forth the terms of such proposed purchase; which letter stated, in part, among many other things that "there is a substantial legal issue as to the effectiveness of your clients' termination of DC's interests in the Superman Comic.  Nonetheless DC's offer assumes … that your client's termination and their rights therein are valid and that such termination was effective"; and that on June 19, 1998, Plaintiffs' counsel sent a letter to DC's counsel which requested detailed information regarding the profit definitions and historical revenues of DC and any Time-Warner company from the exploitation of "Superman"; but Plaintiffs otherwise deny the allegations in paragraph 48 of the Counterclaims and respectfully refer the Court to the above letters as evidence of the contents thereof.

49.     Denied.

50.     Plaintiffs admit only that on April 15, 1999, one day before the effective termination date set forth in Plaintiffs' Superman Notices, DC, by its counsel, for the first time purported to deny the validity of the Superman Notices, but Plaintiffs otherwise deny the allegations in paragraph 50 of the Counterclaims and respectfully refer the Court to the April 15, 1999 letter as evidence of the contents thereof.

51.     Plaintiffs admit only that on or about April 30, 1999, the law firm of Gang, Tyre, Ramer & Brown ("Gang, Tyre") wrote a letter to DC Comics indicating that it was then representing Plaintiffs; that DC Comics provided $228,172.65 to Plaintiffs as a non-refundable advance against monies owed by Defendants to Plaintiffs due to the "Superman Notices," and that the parties thereafter engaged in confidential negotiations pursuant to the Confidentiality Agreement, but Plaintiffs otherwise deny the allegations in paragraph 51 of the Counterclaims.

11
ANSWER TO SECOND AMENDED COUNTERCLAIMS          ER 303

52.     Plaintiffs admit only that Kevin Marks of Gang, Tyre wrote a letter to DC's counsel dated October 19, 2001 outlining initial terms of a proposed agreement for which many other material terms had not yet been offered or agreed upon; but Plaintiffs otherwise deny the allegations in paragraph 52 of the Counterclaims insofar as the allegations mischaracterize the truth by, without limitation, excluding the complete contents and the context of Kevin Marks' October 19, 2001 letter, and Plaintiffs respectfully refer the Court to this letter as evidence of the contents thereof.

53.     Plaintiffs admit only that DC Comics' counsel wrote a letter dated October 26, 2001 to Plaintiffs' counsel and that on or about February 1, 2002 DC's counsel sent to Plaintiffs' counsel a proposed written agreement containing many new material terms not contained in DC/Warner Bros. Entertainment's original proposal, and terms that differed from and/or substantially diluted the terms negotiated; but Plaintiffs otherwise deny the allegations in paragraph 53 of the Counterclaims and respectfully refer the Court to this letter and this proposed agreement as evidence of the contents thereof.

54.     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the Counterclaims and on that basis Plaintiffs deny the same.

55.     Plaintiffs admit only that Plaintiff Joanne Siegel wrote a letter dated May 9, 2002 to Richard Parsons, the Co-Chief Operating Officer of AOL Time Warner, Inc. ("Time Warner") objecting to DC/Warner Bros. Entertainment's proposed written agreement as containing "new, outrageous demands that were not in the[ir] proposal," but Plaintiffs otherwise deny the allegations in paragraph 55 of the Counterclaims.

56.     Plaintiffs admit only that Plaintiffs sent a letter dated September 21, 2002 to DC terminating all negotiations with DC and Time Warner, but Plaintiffs otherwise deny the allegations in paragraph 56 of the Counterclaims.

57.     Plaintiffs admit only that they served DC, Warner Bros. Entertainment

Inc. ("Warner Bros.") and Time Warner with a Notice of Termination of Transfer which related specifically to "Superboy" ("Superboy Notice"); that the Superboy Notice terminated, effective November 17, 2004, the two grants of copyright in "Superboy," the 1948 Stipulation and the 1975 Agreement, and identified many works containing the character "Superboy, " but Plaintiffs otherwise deny the allegations in paragraph 57 of the Counterclaims.

58.     Plaintiffs admit only that the Superboy Notice terminated the aforesaid grants regarding Siegel's Superboy Summary and Superboy Story as published in the comic book "More Fun Comics No. 101," and many additional titles, but Plaintiffs otherwise deny the allegations in paragraph 58 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

59.     Plaintiffs admit only that the Superboy Notice contains, in part, the language quoted in paragraph 59 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 59 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

60.     Plaintiffs admit only that the Superboy Notice states that Jerome Siegel is the sole author of the first and original "Superboy" works, all as set forth in the Superboy Notice, but Plaintiffs otherwise deny the allegations in paragraph 60 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

61.     Plaintiffs admit only that the Superboy Notice lists the WB "Smallville" television series as a work derived from Jerome Siegel's original "Superboy" copyright(s) and thus affected by Plaintiffs full recovery of such copyright(s) on the effective date of termination set forth in the Superboy Notice; that "Smallville," like Superboy, features the life and relationships of Clark Kent as a youth going to school in a small rural town in the American heartland (named "Smallville" in the comic book "Superboy No. 1") and that this derivative television series naturally contains certain minor supporting characters not created by Jerome Siegel.  Plaintiffs lack

knowledge or information sufficient to form a belief as to the truth of the allegation that "Smallville" contains "storylines wholly original to the series" and on that basis deny the same. Plaintiffs otherwise deny the allegations in paragraph 61 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

62.     Plaintiffs admit only that on or about June 17, 2004, Ari Emanuel, a talent agent and founder of the Endeavor Talent Agency, sent a letter to Warner Bros. confirming that since "Smallville" is derived from "Superboy," DC Comics and Warner Bros. would be prohibited after November 17, 2004, the effective date of the Superboy Notice, from producing and exploiting new derivative "Smallville" episodes; but Plaintiffs otherwise deny the allegations in paragraph 62 of the Counterclaims and respectfully refer the Court to Mr. Emanuel's letter as evidence of the contents thereof.

63.     Plaintiffs admit only that by letter dated August 4, 2004, Marc Toberoff, Plaintiffs' attorney of record, reiterated that since "Smallville" is derived from "Superboy," DC Comics and Warner Bros. would be prohibited after November 17, 2004, the effective date of the Superboy Notice, from producing and exploiting new derivative "Smallville" episodes, but Plaintiffs otherwise deny the allegations in paragraph 62 of the Counterclaims and respectfully refer the Court to Mr. Toberoff's letter as evidence of the contents thereof.

64.     Admitted.

65.     Plaintiffs admit only that Plaintiffs filed the within action on October 8, 2004, and that on October 22, 2004 Plaintiffs filed a different action (Civil Case No. 04-08776) regarding ownership of the "Superboy" copyright which was assigned to the Honorable Ronald S.W. Lew, but Plaintiffs otherwise deny the allegations in paragraph 65 of the Counterclaims.

## FIRST COUNTERCLAIM

66.     Plaintiffs re-allege and incorporate by reference paragraphs 1-65

inclusive, as though fully set forth herein.

67.     Plaintiffs admit only that DC purports to assert that the Superman Notices and/or the Superboy Notice are ineffective for the purported reasons set forth in DC's Counterclaims, but Plaintiffs deny such assertions and otherwise deny the allegations in paragraph 67 of the Counterclaims.

68.     Denied.

69.     Denied.

70.     Admitted.

71.     Plaintiffs admit only that DC's counsel sent a letter dated April 15, 1999, the day before the effective date of the Superman Notices, purporting to reject the scope and validity of the Superman Notices, including but not limited to the Superman Notice which terminated the 1975 Agreement, to the extent, if any, that it granted or purported to grant any of Siegel's "Superman" copyright interests, but Plaintiffs otherwise deny the allegations in paragraph 71 of the Counterclaims, and respectfully refer the Court to this letter as evidence of the contents thereof.

72.     Plaintiffs admit only that DC's counsel sent a letter dated August 29, 2004, shortly before the effective date of the Superboy Notice, purporting to reject the scope and validity of the Superboy Notice, which, without limitation, terminated the December 23, 1975 Agreement, to the extent, if any, that it granted or purported to grant any of Jerome Siegel's "Superboy" copyright interests, but Plaintiffs otherwise deny the allegations in paragraph 72 of the Counterclaims, and respectfully refer the Court to this letter as evidence of the contents thereof.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Plaintiffs admit only that Plaintiffs' Superboy Notice terminated the grant of Siegel's copyright in his Superboy Summary and Superboy Story as

published in "More Fun Comics No. 101" in 1944, and that the Notice lists many additional published titles which feature or relate to "Superboy," but Plaintiffs otherwise deny the allegations in paragraph 77 of the Counterclaims.

78.     Denied.

79.     Denied.

80.     Plaintiffs admit only that 17 U.S.C. § 304(c) permits the termination of grants of copyrights subsisting in either their first or renewal term as of January 1, 1978, but Plaintiffs otherwise deny the allegations in paragraph 80 of the Counterclaims.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Plaintiffs admit only that Plaintiffs deny the allegations in paragraphs 65-87 to the extent denied hereinabove, but Plaintiffs otherwise deny the allegations contained in paragraph 88 of the Counterclaims.

89.     Plaintiffs admit only that a declaration of the Court in this action is necessary, but otherwise deny the allegations contained in paragraph 89 of the Counterclaims.

## SECOND ALTERNATIVE COUNTERCLAIM

90.     Plaintiffs re-allege and incorporate by reference paragraphs 1-89 inclusive, as though fully set forth herein.

91.     Plaintiffs admit only that one day before the effective date of the Superman Notices, DC's counsel, by letter to Plaintiffs' counsel, dated April 15, 1999, purported to reject the Superman Notices, but Plaintiffs otherwise deny the

allegations in paragraph 91 of the Counterclaims.

92.     Plaintiffs admit only that after April 16, 1999, Warner Bros., Time Warner and DC have, without limitation, failed to account to Plaintiffs for their share of profits from the exploitation of the original "Superman" copyrights, but Plaintiffs otherwise deny the vague and ambiguous allegations in paragraph 92 of the Counterclaims.

93.     Denied.

94.     Denied.

95.     Plaintiffs admit only that Plaintiffs deny the allegations in paragraphs 89-94 to the extent denied hereinabove, but Plaintiffs otherwise deny the allegations contained in paragraph 94 of the Counterclaims.

96.     Plaintiffs admit that a declaration of the Court is necessary, but otherwise deny the allegations contained in paragraph 96 of the Counterclaims.

### THIRD ALTERNATIVE COUNTERCLAIM

97.     Plaintiffs re-allege and incorporate by reference paragraphs 1-96 inclusive, as though fully set forth herein.

98.     Denied.

99.     Denied.

100.   Denied.

101.   Denied

### FOURTH ALTERNATIVE COUNTERCLAIM

102.   Plaintiffs re-allege and incorporate by reference paragraphs 1-101 inclusive, as though fully set forth herein.

103.   Denied.

104.   Admitted.

105.   Plaintiffs admit that DC seeks a judicial declaration, but Plaintiffs otherwise deny the allegations in paragraph 105 of the Counterclaims.

## FIFTH ALTERNATIVE COUNTERCLAIM

106.   Plaintiffs re-allege and incorporate by reference paragraphs 1-65 inclusive, as though fully set forth herein.

107.   Plaintiffs admit that the Superman Notices and Superboy Notice are effective and that DC alleges a purported fifth alternative counterclaim, but Plaintiffs otherwise deny the allegations in paragraph 107 of the Counterclaims.

108.   Plaintiffs admit that DC makes purported contentions in its purported fifth alternative counterclaim but Plaintiffs otherwise deny the allegations in paragraph 108 of the Counterclaims.

109.   Plaintiffs admit that 37 C.F.R. § 201.10, promulgated by the U.S. Copyright Office under the 1976 Copyright Act, requires, in the context of and subject to the other provisions of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, that a notice of termination identify "each work to which the notice of termination applies," but Plaintiffs otherwise deny the allegations in or inferences of paragraph 109 of the Counterclaims.

110.   Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Counterclaims and on that basis Plaintiffs deny the same.

111.   Denied.

112.   Denied.

113.   Denied.

114.   Plaintiffs admit only that the Superman Shield appeared in certain prior works derived from Siegel's Superman works, but Plaintiffs otherwise deny the allegations in paragraph 114 of the Counterclaims.

115.   Denied.

116.   Denied.

117.   Denied.

118.   Denied.

119.   Plaintiffs admit only that certain works derived from "Action Comics No. 1" contain additional copyrightable elements not present in "Action Comics No. 1," such as new villains, but Plaintiffs otherwise deny the allegations in paragraph 119 of the Counterclaims.

120.   Denied.

121.   Plaintiffs admit only that Siegel's Superboy Summary and Superboy Story contain, in part, the language quoted in paragraph 121 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 121 of the Counterclaims, and respectfully refer the Court to the Superboy Summary and Superboy Story as evidence of the contents thereof.

122.   Denied.

123.   Denied.

124.   Denied.

125.   Denied.

126.   Plaintiffs admit that "More Fun Comics No. 101" contained both artwork and storyline, but Plaintiffs otherwise deny the allegations in paragraph 126 of the Counterclaims, and respectfully refer the Court to "More Fun Comics No. 101" as evidence of the contents thereof.

127.   Denied.

128.   Denied.

129.   Denied.

130.   Denied.

131.   Denied.

132.   Denied.

133.   Denied.

134.   Plaintiffs admit only that Plaintiffs deny the allegations in paragraphs 106-133 to the extent denied hereinabove, but Plaintiffs otherwise deny the allegations contained in paragraph 134 of the Counterclaims.

135. Plaintiffs admit that a declaration of the Court in this action is necessary, but otherwise deny the allegations contained in paragraph 135 of the Counterclaims.

## SIXTH ALTERNATIVE COUNTERCLAIM

136. Plaintiffs re-allege and incorporate by reference paragraphs 1-65 and 106-135 inclusive, as though fully set forth herein.

137. Denied.

138. Plaintiffs admit that a declaration of the Court in this action is necessary, but otherwise deny the allegations contained in paragraph 138 of the Counterclaims.

139. Plaintiffs admit that a declaration of the Court in this action is necessary, but otherwise deny the allegations contained in paragraph 139 of the Counterclaims.

## PRAYER FOR RELIEF

140. With respect to the relief requested in paragraph 1 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

141. With respect to the relief requested in paragraph 2 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

142. With respect to the relief requested in paragraph 3 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

143. With respect to the relief requested in paragraph 4 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

144. With respect to the relief requested in paragraph 5 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

145. With respect to the relief requested in paragraph 6 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to

any of the relief requested in said paragraph.

146.   With respect to the relief requested in paragraph 7 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

147.   The Counterclaims, and each purported counterclaim alleged therein, fail to allege facts sufficient to state a claim upon which relief sought or any relief could be granted.

## SECOND AFFIRMATIVE DEFENSE
### (Estoppel)

148.   The Counterclaims, and each purported counterclaim alleged therein, are barred, in whole or in part, by the doctrine of estoppel.

## THIRD AFFIRMATIVE DEFENSE
### (Laches)

149.   The Counterclaims, and each purported counterclaim alleged therein, are barred, in whole or in part, by the equitable doctrine of laches.

## FOURTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

150.   The Counterclaims, and each purported counterclaim alleged therein, are barred, in whole or in part, by the equitable doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE
### (Waiver)

151.   The Counterclaims, and each purported counterclaim alleged therein, are barred by the doctrine of waiver.

## SIXTH AFFIRMATIVE DEFENSE
### (Acquiescence)

152.   The Counterclaims, and each purported counterclaim alleged therein, are

barred by the doctrine of acquiescence.

## SEVENTH AFFIRMATIVE DEFENSE

### (Bad Faith)

153.    Counterclaimant is barred from obtaining any relief from its Counterclaims because Counterclaimant has acted in bad faith for improper purposes with respect to the subject matter of the Counterclaims.

## EIGHTH AFFIRMATIVE DEFENSE

### (Incorporation of Complaint)

154.    Plaintiffs hereby incorporate each of the allegations and claims for relief contained within Plaintiffs' complaint filed herein.

## NINTH AFFIRMATIVE DEFENSE

### (Reservation of Right to Amend)

155.    The Counterclaims, and each purported counterclaim therein, fail to state the claims for relief with sufficient particularity to permit Plaintiffs to discern and raise all appropriate defenses and Plaintiffs therefore reserve their rights to amend or supplement this answer with additional defenses.

## TENTH AFFIRMATIVE DEFENSE

### (Unknown Defenses)

156.    The answering Plaintiffs believe, and based upon such information and belief allege, that the Plaintiffs may have additional affirmative defenses available to them, which are not now fully known and which these answering Plaintiffs are not fully aware. The Plaintiffs accordingly reserve the right to assert any additional affirmative defenses after the same have been ascertained.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

157.    The Counterclaims, and each purported counterclaim therein, are barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## TWELFTH AFFIRMATIVE DEFENSE

### (Illegality)

158.    Counterclaimant is not entitled to any relief with respect to any of the Counterclaims to the extent of any illegality of any matters set forth in the Counterclaims.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Violations of Law)

159.    Counterclaimant has violated one or more laws which thereby eliminate or reduce any and all relief requested in the Counterclaims.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

160.    Any contract alleged in the Counterclaims which is contrary to public policy is unenforceable and/or any relief requested in the Counterclaims which is contrary to public policy should not be granted.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Comply With FRCP)

161.    Plaintiffs are not required to separately admit or deny each averment contained in each paragraph of the Counterclaims due to Counterclaimant's failure to comply with Rules 8(a) and 8(e) of the Federal Rules of Civil Procedure.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Plaintiffs' Compliance with 17 U.S.C. §304(c))

162.    The termination of the grants of copyright in "Superman" and "Superboy" pursuant to Plaintiffs' Notices of Termination were effective due to Plaintiffs' compliance with 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Plaintiffs' Termination Notices Not Invalidated By Technical Errors)

163.    Under 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, Plaintiffs' Termination Notices are not invalidated or curtailed due to technical errors or

omissions, if any, since Plaintiffs' intent to terminate all prior grants by Siegel of his copyright interests in "Superman," "Superboy" and other works is made clear to Counterclaimant in the Termination Notices timely served on Counterclaimant.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Termination Interests Under 17 U.S.C. § 304(c) Cannot Be Waived)

164.   Plaintiffs could not have waived or effectively waived, directly or indirectly, any of their termination rights or interests because such rights or interests under 17 U.S.C. § 304(c) persist "notwithstanding any agreement to the contrary" and cannot be waived.

## NINETEENTH AFFIRMATIVE DEFENSE

### (1948 Consent Judgment Not A Copyright Grant)

165.   The Consent Judgment dated May 21, 1948 need not have been terminated by Plaintiffs pursuant to 17 U.S.C. § 304(c) to regain Siegel's copyright interests because the Consent Judgment does not constitute a grant or assignment of a copyright interest in "Superman," "Superboy" or any other work authored by Siegel.

## TWENTIETH AFFIRMATIVE DEFENSE

### (1948 Consent Judgment Not an Operative Agreement)

166.   The Consent Judgment dated May 21, 1948 need not have been terminated by Plaintiffs pursuant to 17 U.S.C. § 304(c) to regain Siegel's copyright interests because it is not an operative agreement or grant of any copyright interest(s); the Consent Judgment merely recites which parties own which copyrights pursuant to a prior grant(s), namely the May 19, 1948 Stipulation, the operative grant which was duly terminated by Plaintiffs' termination notices pursuant to 17 U.S.C. § 304(c).

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (1975 Agreement Not a Copyright Grant)

167.   The December 23, 1975 Agreement between Counterclaimant's alleged predecessor Warner Communications, Inc. and Siegel and Shuster did not grant or assign any copyright interest of Jerome Siegel to Warner Communications, Inc.

ANSWER TO SECOND AMENDED COUNTERCLAIMS          ER 316

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (No Assignment of Copyright Under 17 U.S.C. §204(a))

168.   Plaintiffs did not assign their copyright interests in "Superman," "Superboy" or any other work, recovered as a result of Plaintiffs' exercise of their termination rights under 17 U.S.C.§ 304(c), because, without limitation, no written assignment of any such copyright interests was executed by Plaintiffs as required by 17 U.S.C. §204(a).

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Failure to List Ad Does Not Affect Superman Termination)

169.   Plaintiffs' "Superman" Termination Notices and "Superboy" Termination Notice are not invalidated or curtailed by failing to list an advertisement(s), allegedly depicting the cover of "Action Comics No. 1," if any, since Plaintiffs properly gave notice of their termination of the underlying *grant(s)* of the original "Superman" and "Superboy" copyrights pursuant to 17 U.S.C. § 304(c) and Plaintiffs' Termination Notices identified "Action Comics No. 1" and "More Fun Comics No. 101," respectively.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Not Works For Hire)

170.   The "Superman" works created by Jerome Siegel and/or by Siegel and Shuster, the "Superboy" works created by Jerome Siegel and any other works by Jerome Siegel and/or Joseph Shuster referred to in the Counterclaims do not constitute works-for-hire.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### ("Additional Action Comics No. 1" Material Is
### De Minimus and Terminable)

171.   The purported "Additional Action Comics No. 1 Material" referred to in the Counterclaims is *de minimus* and, in any event, was subject to Plaintiffs' termination under 17 U.S.C. §304(c) since any such material was not work-for-hire.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE
### (Counterclaimant Cannot Exploit New Derivative Works)

172.  Counterclaimant cannot exploit new derivative works based on copyrights that Plaintiffs have recovered pursuant to 17 U.S.C. §304(c) and/or based on works derived from such recovered copyrights.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Trademarks Cannot Restrain Plaintiffs' Use of Its Copyrights)

173.  Counterclaimant cannot use its purported trademark(s) to restrain Plaintiffs' use or exploitation of their copyright interests under the United States Copyright Act.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### (Use of "Superman" Shield Is a Use Of
### Plaintiffs' "Superman" Crest Copyright)

174.  Plaintiffs are entitled to an accounting by Counterclaimant for its licensing or other exploitation of the "Superman Shield" because such constitutes an exploitation of the copyright in Siegel and Shuster's "Superman Crest" which, at a minimum, is co-owned by Plaintiffs.

## TWENTY-NINTH AFFIRMATIVE DEFENSE
### ("Superman" Has Changed Very Little Since Its Creation)

175.  "Superman" has changed very little over the years since its original creation and development by Siegel and Shuster.

## THIRTIETH AFFIRMATIVE DEFENSE
### (Apportionment Is Not Applicable To Licensing)

176.  The doctrine of apportionment while at times applicable to the exploitation of derivative works should not be applied to Counterclaimant's receipt of passive licensing fees with respect to "Superman" and other works.

## THIRTY-FIRST AFFIRMATIVE DEFENSE
### (Any Apportionment Should Weigh In Plaintiffs' Favor)

177. "Superman" is one of those few copyrightable characters wherein the character, itself, *is* the story being told and, as such, any apportionment of profits from the exploitation of "Superman" should weigh heavily in Plaintiffs' favor. Likewise, "Superboy" is one of those few copyrightable characters wherein the character, itself, is the story being told and, as such, any apportionment of profits from the exploitation of "Superboy" should weigh heavily in Plaintiffs' favor.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

### (No Statute of Limitations Applicable To 17 U.S.C. §304(c) Termination)

178. Since Plaintiffs complied with the timing, notice and other prerequisites to the termination of prior copyright grants under 17 U.S.C. §304(c), no statute of limitations runs against Plaintiffs' Superman Terminations or Superboy Termination, nor is the statute of limitations nonetheless triggered by Counterclaimant's frivolous denial of the validity of such terminations.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Statute of Limitations Has Not Run Due To Tolling Agreement)

179. To the extent, if any, a statute of limitations or other time based defense is applicable to Plaintiffs' terminations, such statute has not run, and such time based defenses are ineffective, due to the "Tolling Agreement" executed by Counterclaimant and Plaintiffs dated April 20, 2000; and Counterclaimant has breached such Tolling Agreement by nonetheless asserting herein that Plaintiffs' Superman Terminations are barred by the statute of limitations.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (Confidentiality Agreement)

180. Plaintiffs are not required to separately admit or deny each averment contained in the Counterclaims relating to confidential negotiations between the parties due to the confidentiality agreement between Counterclaimant and Plaintiffs dated December 17, 1997, and Counterclaimant's breach of such confidentiality agreement.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Rule 408 of the FRE)

181.   Plaintiffs are not required to separately admit or deny each averment contained in the Counterclaims relating to conduct or statement made in settlement negotiations between the parties since such is inadmissible under Rule 408 of the Federal Rules of Evidence.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Payments Not Received By Joanne Siegel

### Under December 23, 1975 Agreement)

182.   The December 23, 1975 Agreement provided that Joanne Siegel was to receive payments only if Jerry Siegel died before December 21, 1985; and Mr. Siegel did not die until January 28, 1996.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (Beyond Scope of Authority)

183.   Plaintiffs' attorneys lacked authority and/or exceeded the scope of their authority with respect to the purported settlement agreement alleged by Counterclaimant.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

184.   The purported settlement agreement alleged by Counterclaimant is barred by the Statute of Frauds.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### (No Settlement Agreement Consummated)

185.   Plaintiffs did not execute a written settlement agreement with Counterclaimant, nor otherwise approve all material terms and conditions of a settlement agreement with Counterclaimant.  When Counterclaimant finally presented Plaintiffs with all material terms of Counterclaimant's settlement offer or counter-offer in the first draft of a written agreement, such was rejected by Plaintiffs,

1   in large part, because it contained many unacceptable material terms that had never

2   been proposed by Counterclaimant, nor agreed to by Plaintiffs.

3         WHEREFORE, Plaintiffs pray for judgment on the Counterclaims as follows:

4       1.     That all the Counterclaims be dismissed;

5       2.     That Counterclaimant takes nothing by its Counterclaims;

6       3.     That judgment be entered in favor of Plaintiffs on all counts;

7       3.     That Plaintiffs be awarded costs of suit;

8       4.     That Plaintiffs be awarded attorneys' fees incurred in defense of the

9              Counterclaims as permitted by Section 505 of the United States

10             Copyright Act;

11      5.     That Plaintiffs be awarded such other and further relief, both general and

12  special, as the Court may deem just and proper.

13  Dated:  March 3, 2011               RESPECTFULLY SUBMITTED,

14

15                                     Marc Toberoff

16                                     TOBEROFF & ASSOCIATES, P.C.

17                                     Attorneys for Plaintiff

18                                     Laura Siegel Larson

19

20

21

22

23

24

25

26

27

28

**JURY TRIAL DEMANDED**

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Counterclaims.

Dated:  March 3, 2011                    RESPECTFULLY SUBMITTED,

_____
Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.

Attorneys for Plaintiff
Laura Siegel Larson

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on February 21, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  February 21, 2014           /s/ Marc Toberoff
                                    Marc Toberoff