APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 3 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura  Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 3)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In Support of Defendants' Reply In Support Of Application to Tax Costs | 3 | 475 |
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |

| 730 | 5/16/13 | *Exhibit 4:  Invoice for Larson Deposition* | 3 | 485 |
|---|---|---|---|---|
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A:  Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B:  Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C:  Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E:  Transcript Cover Sheet for  Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F:  Transcript Cover Sheet for  Lewellen Deposition* | 3 | 518 |
| 729-1 | 5/14/13 | *Exhibit G:  Transcript Cover Sheet for  Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H:  Transcript Cover Sheet for  Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In | 3 | 549 |

ii

| | | | | |
|---|---|---|---|---|
| | | Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | | |
| 722-1 | 4/4/13 | *Exhibit 1:  Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3:  October 26, 2001 letter from Schulman to Marks* | 3 | 566 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|------|------|------|------|------|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| | | | | |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 8:  Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
| 722-1 | 4/4/13 | *Exhibit 9:  Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10:  September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11:  Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14:  September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A: Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B: Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C: Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D: Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E: Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B: April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A: Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G: January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H: January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I: February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J: Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M: Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|-----|----------|---------------------|----|----|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 30 of 281



1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:  (845) 265-2819

11 Attorneys for Defendants and Counterclaimant

12

13                **UNITED STATES DISTRICT COURT**

14               **CENTRAL DISTRICT OF CALIFORNIA**

15

16 JOANNE SIEGEL and LAURA          Case No. CV-04-8400 ODW (RZx)
   SIEGEL LARSON,
17                                   **SECOND AMENDED**
              Plaintiffs            **COUNTERCLAIMS**
18
        v.                          The Hon. Otis D. Wright II
19
   WARNER BROS.
20 ENTERTAINMENT INC., DC
   COMICS, and DOES 1-10,
21
              Defendants
22

23
   *WARNER BROS*
24 *ENTERTAINMENT INC, DC*
   *COMICS, and DOES 1-10*
25
              *COUNTERCLAIMANT*
26

27        *v.*

28 *JOANNE SIEGEL and LAURA*
   *SIEGEL LARSON*

           *COUNTERDEFENDANTS.*

                                    SECOND AMENDED
                                    COUNTERCLAIMS

                                    ER 323

On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for

Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16.

Docket Nos. 637, 643.  For purposes of completeness, defendants hereby reassert

the counterclaims contained in the First Amended Counterclaims, Docket No. 42,

with changes to reflect only the current date, the updated pleading title, and the

Court's dismissal of Time Warner Inc. as a party to this action.  Defendants reserve

all rights, including to amend these counterclaims as and when appropriate.

Defendant/Counterclaimant DC Comics, for its Second Amended

Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura

Siegel Larson, alleges:

## PARTIES

1.       Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a

New York General Partnership engaged in the business of, *inter alia*, creating,

exploiting, and licensing comic book stories and characters.  DC is the successor in

interest to all rights under copyright and other rights, including trademark rights

and the good will in and to the first Superman story and all other works and

products relating to the Superman character.

2.       Upon information and belief, Plaintiff/Counterclaim Defendant Joanne

Siegel is an individual and citizen of the State of California, in the County of Los

Angeles.  Upon further information and belief, Joanne Siegel is the widow of

Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

3.       Upon information and belief, Plaintiff/Counterclaim Defendant Laura

Siegel Larson is an individual and citizen of the State of California, in the County

of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a

daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and

Laura Siegel Larson are referred to herein as "the Siegels."

SECOND AMENDED
COUNTERCLAIMS

**ER 324**

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction of the subject matter hereof under the
provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright
ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also
known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections
1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332,
1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18
U.S.C. § 1367.

5.     Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information
and belief, a substantial part of the events giving rise to DC's claims occurred or a
substantial part of the properties that are the subject of these counterclaims are
situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found
in this District.

**FACTS COMMON TO ALL COUNTERCLAIMS**

**Background And History**

6.     Upon information and belief, in or about 1933, Jerome Siegel
("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on
creating a number of stories, including a story entitled "The Reign of the
Superman," which was published in a magazine put out by Siegel and Shuster
themselves entitled "Science Fiction." Upon further information and belief, other
than the same name, the "Superman" character in this story shared very little, if
any, similarity with the character that would later become known as Superman.

7.     Upon information and belief, in early 1933, Siegel and Shuster began
collaborating on "comic strips," initially for syndication and eventually for
publication in "comic books," a new and growing medium. Among their work
together were a number of comic strips featuring a character they named Superman.
This Superman character bore virtually no resemblance to the character of the same
name that had previously appeared in the "Science Fiction" magazine. Upon

- 2 -

further information and belief, those works, which were never published, included: (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page synopsis covering an additional two months of daily comic strips; and (e) fifteen daily comic strips (collectively the "Unpublished Superman Works").

8. Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9. Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10. On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years. Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11. Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics." In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review. At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12. In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip

entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein."

13.  DCI advertised the publication of the new comic story Superman and the new title "Action Comics No. 1" in others of its publications, including but not limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New Adventure Comics No. 26," all of which are cover dated May 1938 and, upon information and belief, were distributed in copies to the public on or before April 1, 1938.  These advertisements (the "Superman Ads"), which depict the Superman character in his costume, exhibiting super-strength, show almost the entirety of what would become the cover of "Action Comics No. 1."

14.  Upon information and belief, sometime prior to April 16, 1938, but after the Superman Ads, DCI published the thirteen page Superman comic book comprising the first Superman story in "Action Comics No. 1," bearing the "cover" date June 1938 (hereinafter "Action Comics No. 1").  However, Action Comics No. 1 was not comprised entirely of the pre-existing Unpublished Superman Works. Rather, upon information and belief, in response to DCI's instruction that the Unpublished Superman Works be presented as a thirteen page comic book and subject to DCI's right to control, Siegel and Shuster created additional materials to complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

15.  After the publication of Action Comics No. 1, upon information and belief, Siegel and Shuster supplied further original Superman stories at DCI's instance and expense and subject to its right to control.  On September 22, 1938, Siegel and Shuster entered into another employment agreement (the "DCI September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for

- 4 -

said purposes . . . ."  The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

16.    Also on September 22, 1938, Siegel and Shuster entered into an agreement with DCI and with the McClure Newspaper Syndicate (the "McClure September 22, 1938 Agreement") concerning the use of Superman in newspaper strips.

17.    All of Siegel and Shuster's contributions to Superman comic books and comic strips published subsequent to Action Comics No. 1 as well as the Additional Action Comics No. 1 Materials, were made either under the DCI March 1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by one or more of these Agreements, or certain subsequent agreements affirming those agreements, as employees of DCI or its successors or at DCI's instance and expense and subject to DCI's right of control, with the result that the copyrights to all Superman materials created by them after preparation of materials included in Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are owned exclusively by DC Comics as works made for hire under the then applicable 1909 Copyright Act.

18.    On November 30, 1938, Siegel wrote to DCI (the "November 1938 Letter") suggesting that it do a comic book named Superboy, "which would relate to the adventures of Superman as a youth."  The November 30, 1938 Letter does not contain any discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy.  DCI decided not to publish a "Superboy" comic at that time.

19.    In 1939, among the Superman comics prepared by Siegel and Shuster at the instance and expense of DCI and subject to its right of control, was Superman No. 1, with a cover date of Summer 1939.  In Superman No. 1, Clark Kent was depicted as a youth with super powers.

- 5 -

20.     On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips.  In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21.     Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth.  The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests... America's outstanding boy hero: SUPERBOY!"  The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided not to publish a "Superboy" comic at that time.

22.     Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

- 6 -

resemblance to anything contained in the Unpublished 1940 Superboy Script, and such similarities as may exist are common to earlier Superman related material owned by DCI.

23. In 1947, Siegel and Shuster brought suit against, *inter alia*, DCI's successor in interest, National Comics Publications, Inc. ("National") in the New York Supreme Court in Westchester County (the "Westchester Action"). The Westchester Action was, in part, the culmination of a dispute between Siegel and Shuster and National over what Siegel and Shuster claimed was DCI's unauthorized publication of Superboy. In the Westchester Action, in addition to seeking redress in connection with Superboy, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938 Agreement was obtained by duress, and sought to recapture all rights in Superman.

24. On November 21, 1947, the Court in the Westchester Action issued an opinion (the "Westchester Opinion") after trial in which it found that the March 1, 1938 Agreement transferred to DCI all rights in Superman and that the DCI September 22, 1938 Agreement was valid and not obtained under duress. The Court also held that in publishing Superboy, DCI had acted "illegally."

25. At the Court's request, the parties to the Westchester Action submitted proposed fact findings and conclusions of law. On April 12, 1948, the Court adopted fact findings and conclusions of law and issued an interlocutory judgment (collectively the "Westchester Action Interlocutory Judgment"). The defendants in the Westchester Action filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

26. Shortly thereafter, the parties to the Westchester Action entered into two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement"). Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledge

- 7 -

that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and exclusive owner of Superman, the conception, idea, continuity, pictorial representation and formula thereof in all media; (d) agreed that they were enjoined from creating, publishing or distributing any Superman work or any imitation thereof, and from using the title Superman or title that contained the word "Super"; (e) acknowledged that National was the sole owner of and owned exclusive rights in Superboy; (f) agreed that they were enjoined from creating, publishing or distributing Superboy or any imitation thereof; (g) agreed they were prohibited from representing their past connection with Superman and Superboy in such a way to confuse the public that such connection still existed; and (h) agreed they were prohibited from using any coloring, lettering or printing in referring to Superman or Superboy that was imitative of that used by National.

27.    In the 1960s, Siegel and Shuster again brought suit against National, this time in the United States District Court for the Southern District of New York for a declaration that they (and not National) owned the copyright in the renewal copyright term for Action Comics No. 1.  In a decision published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the district court held, *inter alia*, that the agreements between Siegel and Shuster on the one hand and DCI (and later National) on the other, intended to assign all rights in Superman to DCI and National, including renewal copyright rights.

28.    In a decision published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the lower court's ruling relating to National's ownership of all rights in Superman. Siegel and Shuster did not further appeal the ruling.

29.    On December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., then National's parent company (the

- 8 -

"December 23, 1975 Agreement"). Under this agreement, Siegel and Shuster again acknowledged that Warner Communications, Inc. was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised . . . ."

30.     Under the December 23, 1975 Agreement, Siegel and Shuster each were to and did receive throughout their lives annual payments as well as medical insurance coverage. Upon Siegel's death, annual payments were to be made to Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The amount of the annual payment pursuant to the December 23, 1975 Agreement was increased over the years. Since Siegel's passing in 1996, Joanne Siegel has continuously received and accepted annual payments and health insurance under that agreement.

### DC Comics' Development And Licensing
### Of Superman Works And Products

31.     The initial graphic representations of the Superman character in 1938, now stylistically dated, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap $1/8$th of a mile, hurdle a twenty-story building and run faster than an express train. In his ordinary life, the character is depicted as a mild-mannered newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego,

- 9 -

Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

32.     Since the publication of "Action Comics No. 1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33.     In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations.  These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34.     Over the years since Action Comics No. 1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Most notably, many of Superman's powers that are among his most famous today did not appear in Action Comics No. 1 but only appeared in later publications. These include: his ability to fly; his super-vision which enables him to see through walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his invulnerability to injury which is most often shown as bullets bouncing off his chest and/or arms.

35.     One notable part of the evolution of the appearance of the Superman character undertaken by DC Comics and its predecessors, has been the transformation of the emblem on the chest of Superman's costume. In Action Comics No. 1, the emblem was comprised of a small yellow inverted triangle bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics No. 1 Crest").  Thereafter, in changing the appearance of Superman and his costume, DC Comics and/or its predecessors significantly changed the Action Comics No. 1 Crest.  Bearing little if any resemblance to the original, it is now a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield Device").  The S in Shield Device, as transformed by DC Comics and its predecessors, has become a strong symbol, standing alone, of all goods and services relating to Superman and his sole source, DC Comics and its predecessors.

36.     At all relevant times, DC Comics, its predecessors in interest and licensees have duly complied with the provisions of the 1976 Copyright Act and its 1909 predecessor statute with respect to securing copyright protection for the numerous works in which the Superman character has appeared and establishing DC Comics' copyright ownership thereof, including the original and all works based upon and derived therefrom, and have received from the Register of Copyrights, valid and subsisting certificates of copyright registration and renewal with respect thereto.

37.     DC Comics and its predecessors have, since 1938, continuously held themselves out as the exclusive owners of all rights under copyright in Superman.

38.     DC Comics has over many decades adopted and made long, continuous and exclusive use of (a) the name and mark Superman and (b) certain key symbols and indicia of origin in connection with and to identify all authorized uses of the Superman character in print and all other media (sometimes hereinafter the "Superman symbols and indicia of origin").  The Superman name and mark and

Superman symbols and indicia of origin include, *inter alia*, Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases. Most notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a plane!...It's Superman!" first used in the introduction to the 1940 radio program The Adventures of Superman, and thereafter continuously repeated in Superman television programming and various Superman publications. All of these Superman symbols and indicia of origin have been used on and in connection with a wide variety of publications and licensed goods and services, as they have been added to the Superman character and mythology under DC Comics' and/or its predecessors' supervision and direction, but, in any event, for the earliest symbols, since as early as 1938.

39. As a result of the above-described continuous and exclusive use by DC Comics of the Superman name and mark, as well as the Superman symbols and indicia of origin for over sixty years, the names, marks and symbols and the appearance of the Superman character have become famous and the public has come to recognize that all publications, entertainment and products featuring Superman or bearing such marks all come from the same source, namely, DC Comics, and that DC Comics is the exclusive source of the Superman character and all uses of the character on and in connection with any goods and services.

40. DC Comics owns dozens of federal trademark registrations for Superman related indicia across a broad array of goods and services. Those registrations include, but are not limited to the following for the following marks: (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177, 1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803, 1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b) SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026, 1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

- 12 -

1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the "S in Shield" Device (either alone or as part of a rendering of Superman) 2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233, 1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630, 1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150, 1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No. 2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g) SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623, 1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i) SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881; (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306; (1) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304; (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No. 1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No. 1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and indicia of origin, the "Superman Marks").

41.     These registrations alone suffice to show the unusual breadth and scope of the use of such marks related to Superman by DC Comics or its licensees on or in connection with a broad range of goods and services, all of which have come to be seen over six decades by countless consumers as indicating an exclusive authorization or sponsorship thereof by plaintiff DC Comics, the publisher and source of all Superman comic books and other Superman productions and products.

### The Superman Notices Of Termination

42.     On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice

of Termination of Transfer Covering Extended Renewal.  Those documents purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the Siegels' share in the following grants of copyright: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19 1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975 Agreement (collectively the "Superman Notices").  However, the Siegels served no notice terminating their share of the copyright grant in the May 21, 1948 Consent Agreement.

43.     The Superman Notices purport to terminate the Siegels' share of the above grants listed therein in the Unpublished Superman Works, Action Comics No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1 Works").  However, in none of the seven Superman Notices, or anywhere else, do the Siegels purport to terminate their share of any copyright grant in the Superman Ads.

44.     In the Superman Notices, the Siegels expressly recognize and acknowledge that the character Superboy is a derivative work based on Superman. The Superman Notices expressly identify Superboy as part of the Superman "family" of characters in which the Siegels are purporting to terminate their grants. Indeed, the more than 15,000 works listed in the Superman Notices include hundreds of publications and other works that feature *only* Superboy (as opposed to Superman), and also Superman No. 1 with a cover date of Summer 1939, in which Superman is depicted as a youth.

45.     In late November, 1998, DC Comics received from Plaintiffs/Counterclaim Defendants. Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents entitled Notice of Termination of Transfer Covering Extended Renewal. Those documents purport to terminate, effective November 27, 2000, the Siegels'

- 14 -

share it the following grants of copyright relating to the character known as "The Spectre": (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c) and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement (collectively the "Spectre Notices").

46.     The Spectre Notices purport to terminate the Siegels' share of the above grants in: (a) the Spectre character appearing in costume in an ad in issue No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first Spectre comic book story published in issue No. 52 of "More Fun Comics" with a cover date of February 1940; (c) part 2 of the first Spectre comic book story published in issue No. 53 of "More Fun Comics" with a cover date of March 1940, and hundreds of additional works listed the Spectre Notices (collectively the "Spectre Works").

**The Parties' Negotiations**

**And The Agreement Reached**

47.     On April 17, 1997, less than ten days after DC Comics received the Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation. The Siegels requested that DC Comics make an initial settlement proposal. But prior to making such proposal, DC Comics requested that the parties enter into a confidentiality agreement. Frustrated by the Siegels' delay in responding to its proposed form confidentiality agreement, on November 5, 1997, DC Comics' counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you in the past, our client has elected, for settlement purposes only, not to respond to the [Superman Notices] served upon them by challenging their validity or scope *at this time*." (Emphasis added.)

48.     On December 17, 1997, DC Comics and the Siegels finally entered into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded its first substantive proposal with respect to the copyrights at issue, and in connection therewith also raised certain defects in the termination notice, stating "that there is a substantial legal issue as to the effectiveness of your clients' termination of DC's

- 15 -

interest in the Superman Comic." For more than six months despite repeated requests for feedback, DC Comics heard no response to its December 18, 1997 proposal. Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC Comics' counsel that did not respond to the proposal but only requested more information.

49.     On July 23, 1998, DC Comics provided the Siegels with the answers to the questions posed in their counsel's letter of June 19, 1998. Despite requests for feedback for another several months, DC Comics again received no response to its proposal.

50.     Having heard no response from the Siegels, on April 15, 1999, one day before the purported "Effective Date" set forth in the Superman-Notices, DC Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things, the reasons it considered the Superman Notices to be invalid.

51.     On April 30, 1999, DC Comics received a letter from the firm of Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented the Siegels in negotiations with DC Comics. Thereafter, the parties engaged in extensive negotiations with their respective lawyers attending meetings in California and New York, and exchanging proposals. During that time period, at the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance Payment") to the Siegels which payment was agreed to be an advance against any future sums provided under an agreement to be entered into between the parties.

52.     On October 16, 2001, a legal representative for DC Comics made an offer to the Siegels through Gang, Tyre by telephone. On October 19, 2001, Kevin Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001 offer. That day, Mr. Marks wrote a letter confirming that the Siegels had "accepted D.C. Comics offer of October 16, 2001" and outlined all of the material terms in detail. Those terms included, *inter alia*, that the Siegels transferred or would transfer all of

- 16 -

SECOND AMENDED
COUNTERCLAIMS

**ER 339**

their rights in the Superman property (which was defined in the letter as Superman, Superboy and related properties including but not limited to Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre." In exchange, the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d) significant guaranteed minimum payments as advances against royalties; and (e) percentage royalties from DC Comics' exploitations of Superman across all media, worldwide.

53.     By return letter of October 26, 2001, DC Comics' representative wrote back providing a "more fulsome outline" of the agreed upon points. Neither the Siegels nor any of their representatives in any way disputed the October 26, 2001 confirmatory outline from DC Comics.  On February 1, 2002, DC Comics forwarded a draft of a more formal written agreement memorializing the terms agreed to in the October 19 and 26, 2001 correspondence.

54.     After the October 2001 agreement, DC Comics entered into a written Option Purchase Agreement with Warner Bros., A Division of Time Warner Entertainment Company, L.P. (now known as defendant Warner Bros. Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics granted to Warner Bros. the option to license certain exclusive rights in Superman, and Warner Bros. has commenced photography of a feature-length motion picture based on the property.

55.     On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 2002, but purporting to object to unspecified provisions of the formal written draft and repudiating the agreement reached by the parties in October 2001.  To this day, the Siegels have not identified a single provision of the February 1, 2002 formal

SECOND AMENDED
COUNTERCLAIMS

1  draft that was inconsistent with the provisions in the Siegels' October 19, 2001

2  acceptance of DC Comics' proposal.

3      56.    On September 30, 2002, however, DC Comics received a letter from

4  the Siegels stating they were breaking off all discussions with DC Comics and

5  again repudiating the agreement reached by the parties in October 2001.

6                    **The Superboy Termination Notices**

7      57.    Notwithstanding the fact that the Siegels had already purported to

8  terminate grants with respect to the Superboy character effective April 16, 1999, on

9  November 8, 2002, the Siegels mailed to DC Comics another Notice of

10  Termination of Transfer purporting to relate solely to Superboy (the "Superboy

11  Notice"). The Superboy Notice purports to terminate, effective November 17, 2004,

12  only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the

13  December 23, 1975 Agreement, and identifies many of the same works identified in

14  the Superman Notices. As was the case with the Superman Notices, the Siegels

15  served no notice terminating the copyright grant in the May 21, 1948 Consent

16  Agreement.

17      58.    The Superboy Notice purports to terminate the above grants regarding

18  the following works: (a) the unpublished November 30, 1938 Letter; (b) the

19  unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d)

20  approximately 1,600 additional titles.  However, the Superboy Notice lists and

21  purports to terminate grants of rights under copyright relating to hundreds of the

22  same works already purportedly terminated by the earlier Superman Notices.  The

23  Superboy Notice does not purport to terminate the 1939 depiction of Superman as a

24  youth in Superman No. 1.

25      59.    In the Superboy Notice, the Siegels make the claim that Superboy is a

26  "separate and distinct copyrighted work and character from the copyrighted work

27  and character Superman."  This contention is erroneous.

28

60.     In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy.  This contention is also erroneous.

61.     Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville."  "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62.     On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia*, that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63.     On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64.     On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

**The Siegels' Filing Of Two Related Cases**

65.     On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

SECOND AMENDED
COUNTERCLAIMS
**ER 342**

## FIRST COUNTERCLAIM FOR DECLARATION
## THAT THE SUPERMAN NOTICES AND THE
## SUPERBOY NOTICE ARE INEFFECTIVE

66.    DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67.    DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

### #1 The May 21, 1948 Consent Agreement Has Not Been Terminated

68.    The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69.    As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect.  Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

### #2 The December 23, 1975 Agreement

70.    Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71.    By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

SECOND AMENDED
COUNTERCLAIMS

**ER 343**

72.     By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

73.     Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

74.     Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

75.     Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the December 23, 1975 Agreement, and the grant of copyright therein, remains in full force and effect.

SECOND AMENDED
COUNTERCLAIMS

ER 344

76.     Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

### #3 The Unpublished Superboy Works

77.     In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

78.     Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

79.     Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

80.     Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision.  As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any copyrightable material therefrom and DC Comics remains the sole owner thereof. Therefore, the Superboy Notice is ineffective.

### #4 Siegel Owned No Copyright In Superboy

81.     The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

82.    Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83.    Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84.    As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned ab initio by the copyright owner in Superman.

85.    Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus, the Superboy Notice is ineffective.

### #5 The Superman Notices Were Not Timely Served

86.    Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87.    All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304 (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999, was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3) and such notices

SECOND AMENDED
COUNTERCLAIMS

**ER 346**

of termination were served less than two years before the allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

88.     On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

89.     A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## SECOND ALTERNATIVE COUNTERCLAIM FOR DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS

90.     DC Comics repeats and realleges paragraphs 1 - 89 above as if fully set forth herein.

91.     Since as early as 1998, Plaintiffs/Counterclaim Defendants were on notice of DC Comics' position that the Superman Notices contained legal defects. Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim Defendants were on notice that DC Comics rejected the Superman Notices and asserted exclusive ownership of all copyright in Superman.

92.     Since April 16, 1999, the purported effective date of the Superman Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of their purported co-ownership of copyright in Action Comics No. 1.

93.     In response to DC Comics' above actions and assertion and such deprivation to the Siegels of the benefits of their alleged copyright co-ownership, Plaintiffs/Counterclaim Defendants took no action until filing the instant action on October 8, 2004, more than six years after DC Comics advised Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

- 24 -

and more than five years after being placed on notice by DC Comics of its claim of exclusive ownership of copyright in Superman and that it rejected and repudiated the Superman Notices and during which time period the Siegels were deprived of benefits to which they claim they are entitled.

94.     Because Plaintiffs/Counterclaim Defendants' claim of partial ownership of copyright accrued more than three years prior to Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into consideration any purported agreements to toll the statute of limitations, any claim of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is barred by the three-year statute of limitations of the Copyright Act.

95.     On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

96.     A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## THIRD ALTERNATIVE COUNTERCLAIM
## FOR BREACH OF CONTRACT

97.     DC Comics repeats and realleges paragraphs 1 - 96 above as if fully set forth herein.

98.     In or about October 2001, Plaintiffs/Counterclaim Defendants entered into a written agreement with DC Comics memorialized by the authorized agent of Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of DC Comics, John Schulman, which subsequently was confirmed and ratified in writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"), pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1) transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

- 25 -

transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in any and all past, present, and future Superman and Superboy-related properties, works, characters, names, and trademarks (collectively, the "Superman Works"), (2) agreed to accept certain compensation from DC Comics in consideration of any and all rights, title, and interest which they may have in the Superman Works (the "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim related to the Superman Works other than for breach of the Agreement (the "Covenant Not To Sue").

99.   DC Comics has performed all of its obligations under the Agreement, except to the extent such performance has been prevented or excused by the acts or omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without limiting the foregoing, DC Comics established a reserve account of the moneys due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the Agreement but for their repudiation and breach of the Agreement as herein alleged. DC Comics always has been and remains ready, willing, and able to perform all of its obligations under the Agreement, and will resume doing so upon either a withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the Agreement or a final adjudication that the Agreement is enforceable and binding on the parties.

100.   Plaintiffs/Counterclaim Defendants have repudiated and otherwise breached the Agreement by, among other things:

a.   Claiming, including in this action, that they have not transferred and are not contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all of their rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, and refusing to execute a formal written transfer thereof to DC Comics;

- 26 -

b. Repudiating the Financial Terms and claiming, including in this action, that they are entitled to additional compensation for the Superman Works; and

c. Initiating this action in violation of the Covenant Not To Sue.

101. As a direct and foreseeable result of the contractual breaches on the part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been damaged in an amount to be proven at trial.

## FOURTH ALTERNATIVE COUNTERCLAIM FOR DECLARATORY RELIEF REGARDING THE AGREEMENT

102. DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.

103. An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:

a. Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

b. If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c. If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to

- 27 -

DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner.

104. DC Comics is informed and believes, and on that basis alleges, that Plaintiffs/Counterclaim Defendants dispute these contentions.

105. DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct.

## FIFTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION OF LIMITATIONS ON THE SCOPE OF THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE

106. DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

107. In the event the Superman Notices and/or the Superboy Notice are deemed effective and the settlement agreement between the parties is not enforced, DC Comics asserts the following alternative counterclaim for a declaration limiting the scope and reach of the Superman Notices and the Superboy Notice in six separate and independent ways.

108. DC Comics contends that:

### #1 The Superman Ads

109. The regulations governing the contents of notices of termination promulgated by the U.S. Copyright Office under authority of the 1976 Copyright Act require, in relevant part, that a notice of termination served pursuant to section 304 (c) of the 1976 Copyright Act name "each work to which the notice of termination applies."

110.   Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

111.   The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

112.   The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

113.   Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

### #2 Use Of Superman And Superboy Derivative Works
### Prepared Prior To The Purported Effective Dates Of The
### Superman Notices And The Superboy Notice

114.   The Superman Notices purport to terminate the Siegels' share in the Copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works").  Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

115.   The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

SECOND AMENDED
COUNTERCLAIMS

**ER 352**

116.   The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117.   Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118.   All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119.   The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did not appear in Action Comics No 1 but only appeared later in the Post Action Comics No. 1 Works.

120.   Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.  Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

SECOND AMENDED
COUNTERCLAIMS

**ER 353**

### #4 Superboy Is A Derivative Work Based On Superman

121.   In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth."  In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests...America's outstanding boy hero: SUPERBOY!"

122.   As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

123.   Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

124.   The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture U.S. Copyrights therein, such recapture could not affect DC Comics' continuing right to create and exploit new derivative works that do not include such new copyrightable subject matter, including but not limited to, the television series "Smallville."

### #5 The Derivative Work Superboy Is A Joint Work Of Authorship

125.   Upon information and belief, the Siegel Superboy Proposals were joint works of authorship as they were prepared jointly with Shuster and because it was intended that their contents would be merged with artwork to create a comic book or comic strip.

126.   As eventually published, the works containing the Superboy character included both artwork and storyline.

127. The joint author's share in the Siegel Superboy Proposals is owned by DC Comics and cannot be terminated either by the Superman Notices or the Superboy Notice.

128. As a result of the foregoing, DC Comics right to continue to exploit the Siegel Superboy Proposals and any derivative works based thereon cannot be affected by either the Superman Notices or the Superboy Notice.

### #6 "Smallville" Is Not Derived From Superboy

129. Among the derivative works based upon Superman and authorized b DC Comics is the weekly television series, "Smallville."

130. Regardless of whether the Superboy Notice is effective and further regardless of whether Superboy is a derivative work based upon Superman, "Smallville" was derived from and based upon Superman and is not a derivative work based upon the Siegel Superboy Proposals or any succeeding Superboy comic or Superboy work exploited by DC Comics and/or its predecessors prior to May 21, 1948. Beyond sharing the idea of depicting Superman as a youth, Smallville is not substantially similar to the Siegel Superboy Works.

131. Thus, irrespective of any accounting issues relating to the Siegels' purported right to receive compensation with respect to new episodes of "Smallville," DC Comics' right to continue to authorize production, distribution, and airing of "Smallville" television episodes remains unaffected by the Superman Notices and the Superboy Notice.

### #7 The Additional Action Comics No. 1 Materials

132. The Additional Action Comics No. 1 Materials created in 1938 were prepared at the instance and expense of DCI and subject to its right to control. Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials were "works made for hire" and copyright therein was owned by DCI *ab initio*.

133. Because the Additional Action Comics No. 1 Materials were works made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

- 32 -

17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the Additional Action Comics No. 1 Materials.

134. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

135. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## SIXTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION REGARDING THE PRINCIPLES TO BE APPLIED IN AN ACCOUNTING

136. DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135 above as if fully set forth herein.

137. DC Comics contends that in the event the Superman Notices and/or the Superboy Notice were deemed valid and effective, any accounting to which the Siegels would be entitled relating to Superman (including its derivative work Superboy, collectively for this Counterclaim "Superman") would be subject to the following limitations and reductions:

    a.    The Siegels would not be entitled to any revenues derived from exploitation of Superman outside of the United States because termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of non-United States copyrights. 17 U.S.C. § 304 (c) (6) (E).

    b.    The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

c.     Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d.     Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present it the Superman works subject to accounting.

e.     Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f.     The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights.  As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

SECOND AMENDED
COUNTERCLAIMS

**ER 357**

g.     Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect expenses, taxes, and DC Comics' independent role as a publisher of Superman.

h.     Subject to all reductions aforesaid and otherwise determined by the Court to be applicable, the Siegels would be entitled to an accounting of only one-half of the copyright co-owner's profits.

138.   On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics as to the above issues.

139.   A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1.     Declaring that the Superman Notices and the Superboy Notice are ineffective for one or more of the reasons set forth in DC Comics' First Counterclaim;

2.     In the event that the Superman Notices and/or the Superboy Notice are deemed effective, for damages according to proof at trial on DC Comics' Third Alternative Counterclaim;

3.     In the event that the Superman Notices and/or the Superboy Notice are deemed effective, declaring on DC Comics' 'Fourth Alternative Counterclaim that, pursuant to the Agreement:

a.     Plaintiffs/Counterclaim Defendants have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

- 35 -

b.　　In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c.　　In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner;

4.　　In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that the scope and effect of the Superman Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth Alternative Counterclaim;

5.　　In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that any accounting to which Plaintiffs/Counterclaim Defendants may be entitled will be limited by all applicable principles, including but not limited to, those set forth in DC Comics' Sixth Alternative Counterclaim;

6.　　Awarding DC Comics its costs and reasonably attorneys' fees incurred in connection with DC Comics' defenses and claims herein seeking declarations with respect to copyright ownership; and

- 36 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 67 of 281

7.    Awarding DC Comics such other and further relief as may be just.

Dated:        February 17, 2011                Respectfully Submitted,

                                               O'MELVENY & MYERS LLP

                                               By: _____
                                                   Daniel M. Petrocelli
                                                   Attorneys for Defendants and
                                                   Counterclaimant

CC1:844136

- 37 -

                                                        SECOND AMENDED
                                                        COUNTERCLAIMS
                                                        **ER 360**

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Defendants and Counterclaimant

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>    Plaintiffs and Counterdefendants,<br><br>    v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br><br>    Defendants and Counterclaimant. | Case No. CV-04-8400 ODW (RZx)<br><br>**ANSWER TO THIRD AMENDED COMPLAINT**<br><br>The Hon. Otis D. Wright II |

On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16. Docket Nos. 637, 643. For purposes of completeness, defendants hereby reassert the responses and defenses contained in the Answer to Second Amended Complaint, Docket No. 385, with changes to reflect only the current date, the updated pleading title, plaintiffs' dismissal of their Fifth Claim for Relief, and the Court's dismissal of Time Warner Inc. as a party to this action. Defendants reserve all rights, including to amend this pleading as and when appropriate.

Defendants Warner Bros. Entertainment Inc. ("Warner Bros.") and DC Comics ("DC" or "DC Comics") (collectively, "defendants"), by their attorneys, answer the Third Amended Complaint filed by plaintiffs on January 31, 2011:

1. Defendants admit only that plaintiffs have brought this civil action for the alleged causes of action set forth in the Complaint, but otherwise deny the allegations in paragraph 1.

2. Defendants admit only that plaintiffs purport to assert that this Court has subject matter jurisdiction as alleged in paragraph 2 but otherwise deny the allegations contained in the Complaint.

3. Defendants admit only that plaintiffs purport to assert that this Court has supplemental jurisdiction as alleged in paragraph 3 but otherwise deny the allegations contained in the Complaint.

4. Defendants admit only that they regularly do business in the State of California and in this District but otherwise deny the allegations in paragraph 4.

5. Admitted.

6. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 and on that basis deny the same.

ANSWER TO THIRD
AMENDED COMPLAINT

ER 362

7.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and on that basis deny the same.

8.     Defendants admit that Warner Bros. Entertainment Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, and that it is an indirect wholly owned subsidiary of Time Warner Inc., but otherwise deny the allegations in paragraph 8 that DC Comics is a New York General partnership comprised of Warner Communications, Inc. and E.C. Publications, Inc.

9.     Defendants deny the allegations contained in paragraph 9 except admit that DC Comics is a New York General Partnership comprised of Warner Communications, Inc. and E.C. Publications, Inc.

10.     Defendants deny the allegations in paragraph 10 except admit that DC Comics is the successor-in-interest to, *inter alia*, Detective Comics, Inc. and National Periodical Publications, Inc. and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

11.     Defendants deny the allegations contained in paragraph 11 except admit that Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York and that certain of its wholly owned subsidiaries regularly conduct business in the State of California and in the County of Los Angeles. Defendants further admit that defendant Warner Bros. is affiliated with defendant Time Warner Inc. and that DC Comics is a New York general partnership whose general partners are entities affiliated with defendant Time Warner Inc.

12.     Denied.

13.     Denied.

ANSWER TO THIRD
AMENDED COMPLAINT

14. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and on that basis deny the same.

15. Denied.

16. Defendants admit only that in 1933 Siegel and Shuster co-created a character entitled Superman, which character was thereafter substantially changed prior to its first publication in 1938 but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16 and on that basis deny the same.

17. Defendants admit only that during the 1930s Siegel and Shuster created twenty-four days of comic strips featuring a character entitled Superman and a paragraph previewing future Superman exploits, but lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 and on that basis deny the same.

18. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 and on that basis deny the same.

19. Defendants admit only that Siegel and Shuster's work on features entitled "Henri Duval" and "Dr. Occult" was published by the Nicholson Publishing Company during the 1930s, that Malcolm Wheeler-Nicholson was involved with Detective Comics, Inc. and that work that Siegel and Shuster did on features entitled "Slam Bradley" and "Spy" was published in a comic magazine entitled "Detective Comics No. 1," but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 19 and on that basis deny the same.

20. Defendants admit only that on or about December 4, 1937, Jerry Siegel and Joe Shuster entered into an agreement with Detective Comics, Inc. but deny the remaining allegations in paragraph 20 except to the extent the allegations accurately

- 3 -

ANSWER TO THIRD AMENDED COMPLAINT

reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

21.   Defendants deny that Superman and his "miraculous powers" had all been completely developed by early 1938 and otherwise Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and on that basis deny the same.

22.   Defendants admit only that in early 1938 defendants' predecessor, Detective Comics, Inc., requested that Siegel and Shuster turn certain Superman comic strips they had co-created, along with additional material that Siegel and Shuster would newly create, into a 13-page comic book story suitable for publication in a comic magazine format, and that Siegel and Shuster thereafter delivered such a comic book story to Detective Comics, Inc. and that such story contained approximately 90 separate panels, but defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 22 and on that basis deny the same.

23.   Defendants deny the allegations contained in paragraph 23 except admit that certain elements and characters of the Superman mythology such as his origins from a distant planet, some of his physical traits, and his secret identity as Clark Kent were contained in Action Comics No. 1 and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

24.   Defendants admit only that Siegel and Shuster entered into an agreement with Detective Comics, Inc. dated March 1, 1938, whereby Siegel and Shuster transferred to Detective Comics, Inc. "the strip entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein," but otherwise deny the allegations contained in paragraph 24 except to the extent the allegations accurately

ANSWER TO THIRD
AMENDED COMPLAINT

1    reflect the contents of documents, and respectfully refer the Court to such

2    documents for evidence of the contents thereof.

3          25.    Defendants admit that Detective Comics, Inc. published a Superman

4    comic story in Action Comics No. 1 with a cover date of June 1938, lack

5    knowledge or information sufficient to form a belief as to the truth of the

6    allegations contained in paragraph 25 relating to the "Revised 1934 Superman

7    Comic Strip" and on that basis deny the same, and deny the remaining allegations

8    in paragraph 25, except to the extent the allegations accurately reflect the contents

9    of documents, and respectfully refer the Court to such documents for evidence of

10   the contents thereof.

11         26.    Defendants deny the allegations in paragraph 26 except admit that

12   Action Comics No. 1 contains Superman's origin from a distant, unnamed planet,

13   some of his physical traits, his secret identity as Clark Kent, a co-worker named

14   "Lois," and deny the remaining allegations in paragraph 26 except to the extent the

15   allegations accurately reflect the contents of documents, and respectfully refer the

16   Court to such documents for evidence of the contents thereof.

17         27.    Defendants admit only that following Action Comics No. 1, at the

18   instance and expense of Detective Comics, Inc., and subject to its right of control,

19   Siegel and Shuster jointly created some additional Superman episodes that appeared

20   in subsequent issues of Action Comics but deny the remaining allegations in

21   paragraph 27, except to the extent the allegations accurately reflect the contents of

22   documents, and respectfully refer the Court to such documents for evidence of the

23   contents thereof.

24         28.    Defendants admit only that between March 1938 and September 1938,

25   Siegel and Shuster jointly created Superman strips, stories and continuities at the

26   instance and expense of Detective Comics, Inc. and subject to its right of control,

27   but deny the remaining allegations in paragraph 28, except to the extent the

28

ANSWER TO THIRD
AMENDED COMPLAINT

allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29.    Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, Shuster, and The McClure Newspaper Syndicate entered into an agreement but deny the remaining allegations in paragraph 29, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

30.    Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, and Shuster entered into an agreement but otherwise deny the allegations in paragraph 30 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31.    Defendants admit only that between March 1938 and September 1938, Siegel and Shuster provided certain of the contents for Action Comics Nos. 1-6 and that Action Comics Nos. 2-6 were created at the instance and expense of Detective Comics, Inc. and subject to its right of control, and that Action Comics Nos. 1-5 were published prior to September 22, 1938; lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 relating to the publication date of Action Comics No. 6 and on that basis deny the same; and deny the remaining allegations in paragraph 31, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

32.    Denied.

33.    Defendants only admit that Siegel and Shuster entered into an agreement with Detective Comics, Inc. on December 19, 1939 but otherwise deny the allegations in paragraph 33, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

- 6 -

ANSWER TO THIRD
AMENDED COMPLAINT
**ER 367**

34.    Defendants deny the allegations contained in the first three sentences of paragraph 34, except that with respect to the allegations in the third sentence of paragraph 34, to the extent they accurately reflect the contents of documents, respectfully refer the Court to such documents for evidence of the contents thereof. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 and on that basis deny the same.

35.    Defendants admit the allegations of paragraph 35 except that defendants deny that the Official Referee's opinion in the 1947 Action was dated November 1, 1947, deny that the Official Referee only "up[held] the contracts in some respects," and lack knowledge or information sufficient to form a belief as to whether the Official Referee "signed" detailed findings of fact on April 12, 1948, and on that basis deny the same.

36.    Defendants admit the allegations contained in the first sentence of paragraph 36 except as to the date on which the dispute arose, but otherwise deny the allegations in paragraph 36 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

37.    Defendants deny the allegations in paragraph 37 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

38.    Defendants admit only that on December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., but deny the remaining allegations in paragraph 38 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39.    Defendants admit only that plaintiffs purport to have mailed notices of termination dated April 3, 1997, to defendants and various other entities, but deny

ANSWER TO THIRD
AMENDED COMPLAINT

ER 368

the remaining allegations in paragraph 39 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 and on that basis deny the same.

41.    Admitted.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    Defendants deny the allegations in paragraph 47 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

48.    Defendants deny the allegations in paragraph 48 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

49.    Defendants admit only that on April 15, 1999, plaintiffs received a letter from DC Comics' attorneys that, *inter alia*, rejected the termination notices and the validity thereof, and stated that DC Comics continued to claim sole copyright ownership in Superman as of that date.  Defendants deny the remaining allegations in paragraph 49 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and any documents related thereto for evidence of the contents thereof.

ANSWER TO THIRD
AMENDED COMPLAINT

ER 369

50.     Defendants deny the allegations in paragraph 50 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

51.     Defendants deny that plaintiffs own any copyright rights to Superman, that any such rights have been "recaptured" and that they have never accounted to the plaintiffs for any proceeds or profits from their exploitation of Superman, but otherwise admit the allegations in paragraph 51.

## FIRST CLAIM FOR RELIEF

52.     Defendants re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53.     Defendants deny the allegations contained in paragraph 53 except admit that an actual and justiciable controversy has arisen and now exists between the parties.

54.     Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 54, including but not limited to, subparagraphs (a) – (d).

55.     Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

## SECOND CLAIM FOR RELIEF

56.     Defendants re-allege and incorporate by reference paragraphs 1 through 55 inclusive, as though fully set forth herein.

57.     Defendants deny the allegations in paragraph 57 except admit only that an actual and justiciable controversy has arisen and now exists between plaintiffs and defendants.

58.     Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 58, including but not limited to, subparagraphs (a) – (f) and aver that the Court has already ruled in Defendants' favor with respect to subparagraph (a).

ANSWER TO THIRD
AMENDED COMPLAINT

59.     Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

### **THIRD CLAIM FOR RELIEF**

60.     Defendants re-allege and incorporate by reference paragraphs 1 through 59 inclusive, as though fully set forth herein.

61.     Defendants deny that plaintiffs are entitled to exploit the Superman crest and that plaintiffs are entitled to any accounting of any profits from any exploitation thereof and otherwise deny the allegations of paragraph 61.

62.     Defendants admit that they own and possess the exclusive right to use a trademark interest in the Superman "S in Shield" device, but otherwise deny the allegations in paragraph 62 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

63.     Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 63, including but not limited to, subparagraphs (a) – (e).

64.     Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

### **FOURTH CLAIM FOR RELIEF**

65.     Defendants re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66.     Defendants admit that defendant DC Comics has continuously licensed and commercially exploited and intends to continue to license and exploit its copyright rights in Superman.  Defendants further admit that defendant Warner Bros. Entertainment Inc. has made use of the Superman copyrights under license from defendant DC Comics. Defendants deny the remaining allegations in paragraph 66.

ANSWER TO THIRD
AMENDED COMPLAINT

ER 371

67.     Defendants admit that defendant DC Comics has earned profits from its exploitation of the Superman copyrights, and that defendant Warner Bros. Entertainment Inc. has earned profits from its licensed use of the Superman copyrights, but deny the remaining allegations in paragraph 67.

68.     Denied.

69.     Denied.

70.     Defendants admit that plaintiffs have demanded an accounting but otherwise deny the allegations in paragraph 70.

71.     Denied.

72.     Denied.

73.     Denied.

## FIRST AFFIRMATIVE DEFNSE

74.     Plaintiffs' complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

75.     Plaintiffs' claims are barred by the doctrines of laches, waiver, acquiescence, and/or estoppel.

## THIRD AFFIRMATIVE DEFENSE

76.     Plaintiffs' claims are barred because plaintiffs have not sent a Notice of Termination with respect to a separate and complete grant of rights in Superman by Siegel and Shuster.

## FOURTH AFFIRMATIVE DEFENSE

77.     Plaintiffs' claims are barred because plaintiffs have continued to accept the benefits of one of the grants of rights in Superman they allege to have terminated, even after the purported effective date of such termination.

## FIFTH AFFIRMATIVE DEFENSE

78.     The "Unpublished Superman" works are not eligible for termination under the Copyright Act or, if they are, any such termination is premature.

ANSWER TO THIRD
AMENDED COMPLAINT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 80 of 281

## SIXTH AFFIRMATIVE DEFENSE

79.    Plaintiffs' claims are barred by the statute of limitations, including but not limited to, 17 U.S.C. § 507(b).

## SEVENTH AFFIRMATIVE DEFENSE

80.    Plaintiffs' claims are barred because the notices of termination sent by plaintiffs were not timely served.

## EIGHTH AFFIRMATIVE DEFENSE

81.    Plaintiffs' claims are barred on the basis of settlement.

## NINTH AFFIRMATIVE DEFENSE

82.    Defendants incorporate herein by reference their Third and Fourth Alternative Counterclaims.  Plaintiffs' claims are barred on the basis of the Agreement.

## TENTH AFFIRMATIVE DEFENSE,

83.    Because the various paragraphs of plaintiffs' Complaint do not comply with Fed. R. Civ. P. 8(a) and (e), defendants are not required to separately admit or deny each averment contained therein.

## ELEVENTH AFFIRMATIVE DEFENSE

84.    Plaintiffs' claims are barred to the extent that the Court has already ruled adversely to plaintiffs with respect to any of them.

FOR THESE REASONS, defendants pray that the Court dismiss all of plaintiffs' claims and find for defendants on all counts, that defendants be awarded costs, including reasonable attorneys' fees, and pray for such other and further relief as this Court deems just and proper.

Dated:        February 17, 2011

Respectfully Submitted,

O'MELVENY & MYERS LLP

By: _____
        Daniel M. Petrocelli
        Attorneys for Defendants and
        Counterclaimant

ANSWER TO THIRD
AMENDED COMPLAINT

ER 373

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 81 of 281



1  Marc Toberoff (CA State Bar No. 188547)
     mtoberoff@ipwla.com
2  Nicholas C. Williamson (CA State Bar No. 231124)
     nwilliamson@ipwla.com
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 2720
4  Los Angeles, CA 90067
   Telephone: (310) 246-3333
5  Facsimile: (310) 246-3101

6  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON
7
                    UNITED STATES DISTRICT COURT
8
       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION
9

10  JOANNE SIEGEL, an individual;        Case No. CV 04-08400 ODW (RZx)
11  and LAURA SIEGEL LARSON, an
    individual,                          THIRD AMENDED COMPLAINT
12                                       FOR:
                                         [1] DECLARATORY RELIEF RE:
13           Plaintiffs,                      TERMINATION,
                                             17 U.S.C. §304(c);
14      vs.                              [2] DECLARATORY RELIEF RE:
15                                           PROFITS;
    WARNER BROS.                         [3] DECLARATORY RELIEF RE:
16  ENTERTAINMENT INC., a                    USE OF "S" CREST; and
17  corporation; DC COMICS, a           [4] ACCOUNTING FOR PROFITS.
    general partnership; and DOES 1-
18  10,
                                         DEMAND FOR JURY TRIAL
19
             Defendants.
20

21

22

23

24

25

26

27

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 82 of 281

DC COMICS,

       Counterclaimant,

   vs.

JOANNE SIEGEL, an individual;
and LAURA SIEGEL LARSON, an
individual,

       Counterclaim Defendants.

---

Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the "Plaintiffs"), by and through their attorneys of record, hereby allege as follows:

## JURISDICTION AND VENUE

1.    This is a civil action seeking declaratory relief, and an accounting for profits and related claims arising out of Plaintiffs' termination of prior grants of copyright in and to the original character and work known as "Superman" and subsequent "Superman" works pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c), and defendants' willful misconduct with respect thereto.

2.    This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 *et al.* and 28 U.S.C. §§ 1331, 1332, 1338(a) and (b).

3.    This Court has supplemental jurisdiction over the related state claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case and controversy as the federal claims herein.

4.    This Court has personal jurisdiction over the defendants in that defendants are regularly doing business in the State of California and in this

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 83 of 281

1  District, and because a substantial part of the relevant acts complained of herein

2  occurred in the State of California and this District.

3      5.     Venue is proper in the United States District Court for the Central

4  District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a)

5  because a substantial part of the wrongful acts that give rise to the claims herein

6  below occurred in this district and because WARNER BROS.

7  ENTERTAINMENT INC. has its principal place of business in this district.

8                              **PARTIES**

9      6.     Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an

10  individual and citizen of and resides in the State of California, in the County of

11  Los Angeles, and is and at all times has been a citizen of the United States.

12  Joanne Siegel is the widow of famed comic book creator Jerome (a.k.a. "Jerry")

13  Siegel.

14      7.     Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel")

15  is an individual and a citizen of and resides in the State of California, in the

16  County of Los Angeles, and is and at all times has been a citizen of the United

17  States.  Laura Siegel is the daughter of Jerome Siegel.

18      8.     Plaintiffs are informed and believe and based thereon allege that

19  defendant WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner

20  Bros.") is a corporation organized and existing under the laws of the State of

21  Delaware, which has its principal place of business in Los Angeles County,

22  California.  Warner Bros. is a wholly owned subsidary of Time Warner Inc.

23      9.     Plaintiffs are informed and believe and based thereon allege that

24  Defendant DC COMICS (hereinafter "DC") is a general partnership organized

25  and existing under the laws of the State of New York, which has its principal

26  place of business in the State of New York; and that DC regularly conducts

27  significant business in the State of California and in the County of Los Angeles.

28  DC is also a wholly owned subsidiary of defendant Warner Bros.  (Warner Bros.

3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 84 of 281

1   and DC are sometimes collectively referred to hereinafter as the "Defendants";

2   and each reference to Defendants shall also refer to each Defendant).

3        10.    Plaintiffs are informed and believe and based thereon allege that on

4   or about September 30, 1946, the New York corporations, Detective Comics,

5   Inc., Superman, Inc., All American Comics, Inc., Jolaine Publications, Inc.,

6   Wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc., Gainlee

7   Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc. and

8   Trafalgar Printing Co., Inc. were consolidated into the New York corporation

9   National Comics Publications, Inc., the name of which was later changed to

10   National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and

11   further that DC, and Warner Bros., and/or each of them, are the alleged

12   successor(s)-in-interest to National Periodical Publications, Inc.

13        11.    Plaintiffs are informed and believe and based thereon allege that

14   Time Warner Inc. (hereinafter "Time Warner") is a corporation organized and

15   existing under the laws of the State of Delaware, which has its corporate

16   headquarters in the State of New York, and that Time Warner regularly

17   conducts significant ongoing business in the State of California and in the

18   County of Los Angeles.  Time Warner is the parent company of both Warner

19   Bros. and DC.[1]

20        12.    Plaintiffs are informed and believe and based thereon allege that

21   Defendant DC never, or rarely, exploits "Superman," independently of its

22   controlling parent company, Warner Bros.; that even relatively linear functions

23   such as "Superman" licensing are not handled directly by DC, but are exploited

24   exclusively through Warner Bros.; that the agreements and other arrangements

25   between Defendants Warner Bros. and DC regarding "Superman" are not "arms

26   length" agreements, serve primarily Warner Bros.' interests, and thus, do not

27       
28

[1] Plaintiffs have omitted Time Warner Inc. as a party pursuant to the Court's May 19, 2009 and July 8, 2009 orders.  Plaintiffs respectfully reserve all rights to appeal such rulings and to reinstate Time Warner in the event the orders are reversed.

4

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 85 of 281

1    reflect the appropriate market values of the copyrights to "Superman," at issue

2    herein.

3       13.    Plaintiffs are informed and believe and based thereon allege that

4    Defendants Warner Bros. and DC are, and at all times material hereto were, the

5    alter-egos of each other and there exists and has existed at all times material

6    hereto a unity of interest and ownership among such Defendants such that any

7    separateness has ceased to exist in that Defendants, and/or each of them, used

8    assets of the other Defendants, and/or each of them, for its and/or their separate,

9    individual purposes, and caused valuable assets, property, rights and/or interests

10   to be transferred to each other without adequate consideration.

11      14.    Plaintiffs are informed and believe and based thereon allege that

12   the fictitiously named Defendants captioned hereinabove as Does 1 through 10,

13   inclusive, and each of them, were in some manner responsible or legally liable

14   for the actions, damages, events, transactions and circumstances alleged herein.

15   The true names and capacities of such fictitiously named defendants, whether

16   individual, corporate, associate, or otherwise are presently unknown to

17   Plaintiffs, and Plaintiffs will amend this Complaint to assert the true names and

18   capacities of such fictitiously named Defendants when the same have been

19   ascertained.  For convenience, each reference herein to a named Defendant shall

20   also refer to the Doe Defendants and each of them.

21      15.    Plaintiffs are informed and believe and based thereon allege that

22   each of the Defendants was the agent, partner, servant, employee, or employer

23   of each of the other Defendants herein, and that at all times herein mentioned,

24   each of the Defendants was acting within the course and scope of such

25   employment, partnership and/or agency and that each of the Defendants is

26   jointly and severally responsible for the damages hereinafter alleged.

27              **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

28      16.    In 1933 Jerome Siegel conceived the original idea of a cartoon strip

5

1 featuring a unique man of superhuman strength and powers who would perform

2 feats of great importance for the public good.  Siegel conceived, in essence, the

3 first "superhero" -- an original concept which embodied our nation's ideals at

4 the World's darkest hour, became a cultural icon and spawned, what is today, a

5 booming industry.  Jerry Siegel entitled his character -- "Superman."

6      17.    In or about 1934, Jerome Siegel authored twenty-four days (four

7 weeks) of "Superman" comic strips intended for newspaper publication, a

8 synopsis of comic strips for weeks two, three and four, a paragraph previewing

9 future "Superman" exploits and a nine page synopsis covering approximately

10 two months of daily "Superman" newspaper comic strips (at six days per week).

11 Plaintiffs are informed and believe and based thereon allege that these works,

12 though originally unpublished, were thereafter included or incorporated in the

13 early "Superman" comic strips thereafter published from on or about April 18,

14 1938 to April 13, 1943 (collectively, referred to hereinafter as the "Initially

15 Unpublished Works").

16      18.    In or about 1934, Jerome Siegel and the artist, Joe Shuster

17 (hereinafter collectively, "Siegel and Shuster") co-authored *fifteen* daily

18 "Superman" comic strips, consisting of one week (six days) of completely inked

19 daily "Superman" comic strips and three additional six day weeks of

20 "Superman" comic strips in penciled form (the "1934 Superman Comic Strip").

21 "Superman" was submitted by Siegel and Shuster to numerous publishers over

22 the next few years.

23      19.    Although "Superman" was not picked up for publication for some

24 time, Siegel and Shuster did get other features they created into print with the

25 Nicholson Publishing Company including "Henri Duval" and "Dr. Occult."  In a

26 letter dated October 4, 1935, the company's owner Malcolm Wheeler-

27 Nicholson, wrote to Mr. Siegel expressing an interest in publishing "Superman"

28 in comic book form but Siegel and Shuster rejected his offer.  Nicholson

6

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 86 of 281

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 87 of 281

1   became involved with a new comic magazine company, Detective Comics, Inc.
2   (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam
3   Bradley" and "Spy," which appeared in "Detective Comics No. 1."

4       20.    On or about December 4, 1937, Siegel and Shuster, as independent
5   contractors, entered into an agreement with Detective Comics (the "1937
6   Agreement") to continue to produce the comic magazine features, "Slam
7   Bradley" and "The Spy," which agreement provided, in part, that any new and
8   additional features which Siegel and Shuster produced for use in a comic
9   magazine were to be first submitted to Detective Comics which reserved the
10  right to accept or reject same within sixty days.

11      21.    One of the early entities to which Siegel had submitted "Superman"
12  was The McClure Newspaper Syndicate.  In or about early 1938, the head of the
13  syndicate sought Siegel's permission to forward Siegel and Shuster's 1934
14  Superman Comic Strip material to Detective Comics for potential publication in
15  its contemplated new magazine, "Action Comics."  By this time, "Superman"
16  and his miraculous powers had already been completely developed by Siegel
17  and Shuster.

18      22.    In or about January–February 1938, when Detective Comics
19  expressed interest to Siegel and Shuster in publishing their 1934 Superman
20  Comic Strip in a magazine, Siegel and Shuster cut and pasted their
21  aforementioned 1934 Superman Comic Strip into more than ninety separate
22  panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper
23  strip more suitable for a magazine layout.

24      23.    The "Superman" material described hereinabove, which was the
25  independent, original creation of Siegel and Shuster, contained virtually all of
26  the signature elements and characters of the "Superman" mythology and
27  constituted the formula for the continuing "Superman" series to come.  It
28  depicted and narrated the origin of the "Superman" character, and contained a

7

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 88 of 281

complete delineation of the literary and pictorial representation of "Superman," including without limitation, his habits, character, superhuman powers, appearance, costume, secret identity and attributes, and the sphere of public good "Superman" was to enhance.

24.    By an instrument dated March 1, 1938 (hereinafter, the "1938 Grant"), which had been prepared by Detective Comics, Siegel and Shuster agreed to the publication of their Revised 1934 Superman Comic Strip by Detective Comics in consideration for the sum of $10 per page for this thirteen page installment equal to a total of $130.

25.    Thereafter, Detective Comics published Siegel and Shuster's "Revised 1934 Superman Comic Strip" in the "June, 1938" issue of "Action Comics No. 1," which was issued for sale on April 18, 1938.

26.    Action Comics No. 1 and the predecessor materials created solely by Siegel and Shuster contained the essential elements of "Superman" which continue to this day, including without limitation, Superman's origin from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits, his mission as a champion of the oppressed to use his great powers to benefit humankind, his secret identity as newspaper reporter, "Clark Kent," his relationship with other key characters such as the newspaper editor from whom he takes his assignments and his romantic interest in Lois, who rebuffs Clark as a coward, while romantically inclined towards "Superman."

27.    Action Comics No. 1 was followed by further issues published at regular intervals, with each subsequent issue containing additional "Superman" material created by Siegel and Shuster.

28.    Between on or about March, 1938 and on or about September, 1938, Siegel and Shuster continued to create "Superman" strips, stories and continuities.

8

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 89 of 281

29.    On or about September 22, 1938, Detective Comics, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure Agreement") regarding the newspaper syndication of a "Superman" comic strip.

30.    On or about September 22, 1938, Detective Comics and Siegel and Shuster therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to do the "artwork and continuity" for five comic strips, including "Superman."

31.    Prior to September 22, 1938, Siegel and Shuster solely created six comic book issues of "Superman," published as Action Comics Nos. 1 through 6. Of these, Action Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics No. 6 was published four days later on September 26, 1938.

32.    Action Comics No. 1 is not a "work made for hire." Action Comics Nos. 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, are also not "works made for hire."

33.    On or about December 19, 1939, Detective Comics and Siegel and Shuster entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised Siegel and Shuster's per page compensation rate for the increasingly popular "Superman" comic strip.

34.    Plaintiffs are informed and believe and thereon allege that the "Superman" works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics were also not "works made for hire." The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on "Superman," yet Siegel and Shuster were never employees of Detective Comics. Siegel and Shuster operated their own independent comic book production business. Without

9

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 90 of 281

1  limitation, Siegel and Shuster were not paid a salary, but were consistently paid

2  on a "per page" basis, and only for materials actually delivered by them to

3  Detective Comics and published by Detective Comics.  Plaintiffs are further

4  informed and believe and thereon allege that in compensating Siegel and

5  Shuster, Detective Comics did not withhold or deduct payroll, social security

6  and other taxes normally deducted from employee salaries; Detective Comics

7  did not provide employee benefits to Siegel and Shuster; Siegel and Shuster

8  worked from their own premises (not Detective Comic's premises); determined

9  their own hours and days of work; supplied, used and paid for their own

10  instrumentalities, tools and materials; and hired and paid for their own

11  employees who worked at Siegel and Shuster's instance and expense, under

12  Siegel and Shuster's direction and full control.

13      35.    In or about 1947, Siegel and Shuster filed an action in the Supreme

14  Court of the State of New York, County of Westchester against National Comics

15  Publications, Inc. (hereinafter, the "1947 Action" ) to determine the validity of

16  the contracts between National Comics Publications, Inc.'s predecessors –in–

17  interest and Siegel and Shuster with respect to "Superman."  Pursuant to a

18  stipulation of the parties the action was referred for decision to an Official

19  Referee of the New York Supreme Court.  After trial of the action the Official

20  Referee rendered an opinion dated November 1, 1947.  On April 12, 1948, the

21  Official Referee signed detailed findings of fact and conclusions of law and

22  entered an interlocutory judgment upholding the contracts in some respects, to

23  which notices of appeal were filed by all said parties.  Settlement negotiations

24  ensued, resulting in a stipulation of settlement between said parties executed on

25  or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the

26  New York Supreme Court of a final consent judgment dated May 21, 1948.

27      36.    In or about the early 1970's, a dispute arose between Siegel and

28  Shuster and National Periodical Publications, Inc. regarding the renewal

10

1  copyright to "Superman," resulting in Siegel and Shuster's filing of an action

2  against National Periodical Publications, Inc. in the United States District Court

3  for the Southern District of New York for a declaration that Siegel and Shuster

4  were entitled to the renewal copyright to "Superman."  The District Court held

5  in <u>Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et</u>

6  <u>al.</u>, 364 F. Supp. 1032 (1973) that the initial "Superman" comic strip, published

7  in Action Comics No. 1, is a "work for hire" within the meaning of the

8  Copyright Act, 17 U.S.C. § 26, and that, in any event, the various agreements

9  between the parties, prior to the action, transferred the renewal copyright in this

10  material to Detective Comics.

11       37.     On appeal, the United States Court of Appeals for the Second

12  Circuit held in <u>Jerome Siegel and Joseph Shuster v. National Periodical</u>

13  <u>Publications, Inc. et al.</u>, 509 F.2d 909 (2nd Cir. 1974), that the District Court

14  erred in finding that Superman was a "work for hire" under the Copyright Act,

15  17 U.S.C. § 26, and that "Superman" and his miraculous powers were created

16  by Siegel and Shuster long before any employment relationship with Detective

17  Comics.  The Second Circuit nonetheless held that the Official Referee's

18  determination in the 1947 Action that Siegel and Shuster had transferred all

19  rights in "Superman" to Detective Comics implicitly included a determination

20  that Siegel and Shuster had transferred the renewal copyright in "Superman" to

21  Detective Comics; and that this determination was binding under the doctrine of

22  *res judicata.*

23       38.     On or about December 23, 1975, Siegel and Shuster entered into an

24  agreement with Warner Communications Inc. (hereinafter the "1975

25  Agreement") the alleged parent company of National Periodical Publications,

26  Inc., which provided for (i) annual payment of $20,000 to Siegel and Shuster

27  each for their respective lifetimes, plus medical benefits to Siegel and Shuster

28  each; and (ii) that Siegel and Shuster would be given credit on certain

11

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 92 of 281

1  "Superman" publications and derivative works as the "creators" of Superman, in

2  exchange for Siegel and Shuster's acknowledgement that Warner

3  Communications, Inc. was the exclusive owner of all right, title and interest in

4  and to "Superman."  (The 1937 Agreement, the 1938 Grant, the 1938 McClure

5  Agreement, the 1938 Agreement, the 1939 Agreement, the 1948 Stipulation and

6  the 1975 Agreement described hereinabove are hereinafter sometimes referred

7  to collectively as the "Alleged Grants.")

8       39.    On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel,

9  served by first class mail, postage prepaid, notices of  termination, as permitted

10  by the Copyright Act, 17 U.S.C. § 304(c) (hereinafter, the "Termination

11  Notices") on each of the Defendants and a number of their subsidiaries,

12  licensees and affiliates, terminating the Alleged Grants of the renewal copyright

13  to (i) the copyrightable "Superman" character, (ii) the 1934 Superman Comic

14  Strip and the Revised 1934 Superman Comic Strip, both published as/in Action

15  Comics No. 1, (iii) the material published as/in Action Comics Nos. 1-6

16  (statutory copyright to Action Comics No. 6 was secured on September 26,

17  1938), (iv) the material published as/in Action Comics Nos. 7- 61 (statutory

18  copyright to Action Comics No. 61 was secured on April 13, 1943), and/or (v)

19  subsequent works involving "Superman," all as set forth in the Notices of

20  Termination (hereinafter sometimes referred to collectively as the "Works").

21       40.    Plaintiffs are informed and believe and based thereon allege the

22  Initially Unpublished Works set forth in the Termination Notices were

23  incorporated or included in Works published thereafter, to which the

24  Termination applies.

25       41.    Plaintiffs are further informed and believe and based thereon allege

26  that the copyrights to all the Works were duly renewed.

27       42.    The Notices of Termination were drafted, served on Defendants

28  and filed with the United States Copyright Office, all in full compliance with

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 93 of 281

the Copyright Act, 17 U.S.C. § 304(c), and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. § 201.10 (2003). (Plaintiffs' aforesaid exercise of their termination rights under 17 U.S.C. § 304(c) regarding "Superman" is sometimes hereinafter referred to as the "Termination").

43.     As the original co-author of each Work Jerome Siegel owned an undivided fifty percent (50%) of the copyright of each Work prior to any alleged transfer or assignment of any such Work pursuant to any Alleged Grant.

44.     The Notices of Termination terminated on April 16, 1999 (hereinafter, the "Termination Date") all prior grants or purported grants of the renewal copyrights in and to each and/or all the Works for their extended renewal terms (hereinafter, sometimes referred to individually and collectively as the "Recaptured Copyrights"), including, but not limited to, the Alleged Grants.

45.     On April 16, 1999, the Termination Date, Plaintiffs re-gained ownership to Jerome Siegel's undivided fifty percent (50%) copyright interest in and to each and/or all the Works for their extended renewal terms.  In accordance with 17 U.S.C. § 304(c), and as set forth in the Notices of Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled to share in the proceeds from this recaptured interest.

46.     Defendants have acknowledged that the Notices of Termination are effective.  Defendants have further admitted that Plaintiffs thereby co-own the copyright(s) to at least the original "Superman" elements authored by Siegel and Shuster; and that Defendants have a duty to account to Plaintiffs for Defendants' exploitation of such copyright(s).

47.     On April 16, 1997, in response to the service of the Notices of Termination, John A. Schulman, Executive Vice President and General Counsel of Defendant Warner Bros., wrote a letter to Joanne Siegel, stating in relevant part:

13

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 94 of 281

1       "As to the Notices of Termination, I wasn't surprised

2       at their arrival…After the effective date of the

3       termination, there will still remain 14 years of

4       copyright protection left to the joint copyright holders

5       of the original Superman elements.  Those are what we

6       should share."

7      48. Similarly, on October 10, 1997, Paul Levitz, President and

8   Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in

9   relevant part:

10       "The [Superman] rights involved are non-exclusive;

11       they are shared with DC.  Since both you and DC

12       would have these rights, we would each have the

13       obligation to pay the other for using those rights if you

14       did not re-grant them to DC."

15      49. Yet, on April 15, 1999, one day before the Termination Date,

16   Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the

17   Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the

18   termination with respect to *any* "Superman" copyrights, stating in relevant part:

19       "[Y]ou are hereby put on notice that DC Comics

20       rejects both the validity and scope of the notices and

21       will vigorously oppose any attempt by your clients to

22       exploit or authorize the exploitation of any copyrights,

23       or indeed, any rights at all, in Superman."

24      50. Defendant DC's April 15, 1999 letter constituted a thinly veiled

25   threat that if Plaintiffs ever attempted to exploit *any* of their recaptured

26   copyright interests in "Superman," Defendants would engage in a campaign of

27   intimidation, including, but not limited to, instituting frivolous litigation against

28   Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs'

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 95 of 281

1  ability to exploit their Recaptured Copyright interests.  Given that Time Warner
2  is one of the largest media companies in the world with over $38 billion in
3  annual revenues, Defendants' threats had a devastating and chilling effect on
4  Plaintiffs' freedom to exploit the copyright interests they had properly regained
5  under the Copyright Act, 17 U.S.C. § 304(c), thereby damaging Plaintiffs and
6  causing them great emotional distress.

7     51.    In the nearly 9 ½ years since the Termination Date, none of the
8  Defendants has ever accounted to the Plaintiffs for any proceeds or profits
9  whatsoever from their ongoing exploitation of "Superman" and the jointly
10 owned Recaptured Copyrights.

11               **FIRST CLAIM FOR RELIEF**

12        (Declaratory Relief Re:  Termination, 17 U.S.C. § 304(c) - Against All
13                           Defendants)

14    52.    Plaintiffs re-allege and incorporate by reference paragraphs 1
15 through 51 inclusive, as though fully set forth herein.

16    53.    By reason of the foregoing facts, an actual and justiciable
17 controversy has arisen and now exists between Plaintiffs and Defendants under
18 Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective
19 rights and interests in and to the copyright to various "Superman" works, for
20 which Plaintiffs desire a declaration of rights.

21    54.    Plaintiffs contend and Defendants deny that:

22        a.    The Notices of Termination terminated on April 16, 1999 all
23 prior grants, assignments or transfers of copyrights for the extended renewal
24 term in and to each and/or all of the Works (as defined in paragraph 39
25 hereinabove) to any of the Defendants and other parties duly served with the
26 Notices of Termination, including their predecessors-in-interest; and

27        b.    As of the effective Termination Date, April 16, 1999,
28 Plaintiffs owned and continue to own an undivided fifty percent (50%) of the

15

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 96 of 281

1 | Recaptured Copyrights to each and/or all the Works for their renewal terms.

2 |      55.    A declaration of the Court is necessary pursuant to the Declaratory

3 | Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their

4 | respective rights and obligations with respect to the Termination and the

5 | copyright interests thereby recaptured by Plaintiffs.

6 | **SECOND CLAIM FOR RELIEF**

7 | (Declaratory Relief Re:  Profits from Recaptured Copyrights - Against All

8 | Defendants)

9 |      56.    Plaintiffs re-allege and incorporate by reference paragraphs 1

10 | through 55 inclusive, as though fully set forth herein.

11 |      57.    By reason of the foregoing facts, an actual and justiciable

12 | controversy has arisen and now exists between Plaintiffs and Defendants

13 | concerning how Profits from Recaptured Copyrights should be defined for

14 | purposes of Defendants and Plaintiffs accounting to one another as joint owners

15 | of the Recaptured Copyrights.

16 |      58.    Plaintiffs contend and Defendants deny that:

17 |         a.    Profits include Defendants' revenues from the post - April

18 | 16, 1999 exploitation of the Recaptured Copyrights in foreign territories, when

19 | such exploitation results from the predicate exercise *in the United States* of any

20 | right(s) under the Recaptured Copyrights by any Defendant, their licensees or

21 | assigns;

22 |         b.    There should be no *apportionment* of Profits since Plaintiffs

23 | are entitled to fifty percent (50%) of such Profits as *joint owners* of the

24 | Recaptured Copyrights;

25 |         c.    Alternatively, *apportionment*, if any, should apply only to

26 | profits from the exploitation of the Recaptured Copyrights in *derivative works*

27 | *created by a Defendant*, but not to profits from mere *licensing* of the Recaptured

28 | Copyrights.  Any such apportionment should weigh heavily in Plaintiffs' favor,

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 97 of 281

1  since the value of the "Superman" franchise exploited by the Defendants

2  ("Superman Franchise") is largely attributable to the unique "Superman"

3  mythology protected by the Recaptured Copyrights.  The Superman Franchise

4  capitalizes on the success of, and is hardly distinguishable from, the underlying

5  Recaptured Copyrights co-owned by Plaintiffs;

6         d.     Profits include profits from any merchandise or other

7  derivative works created, produced or manufactured on or after the Termination

8  Date, April 16, 1999, notwithstanding that the underlying licensing agreement

9  for such exploitations may have been executed prior thereto;

10         e.     Profits are not limited to the Profits of Defendant DC,

11  Warner Bros.' wholly owned subsidiary, but include the Profits of Defendant

12  Warner Bros., as well; and

13         f.     In determining Profits, deductible costs should include only

14  reasonable costs directly attributable to the exploitation of the Recaptured

15  Copyrights, of the type customarily deducted in arms' length agreements to

16  exploit copyrights of comparable value, all in compliance with Generally

17  Accepted Accounting Principles ("GAAP").

18      59.    A declaration of the Court is necessary pursuant to the Declaratory

19  Judgment Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their

20  respective rights and obligations with respect to Profits from the exploitation of

21  the Recaptured Copyrights after the Termination Date.

22                   **THIRD CLAIM FOR RELIEF**

23  (Declaratory Relief Re:  Use of the "Superman" Crest - Against All Defendants)

24      60.    Plaintiffs re-allege and incorporate by reference paragraphs 1

25  through 59 inclusive, as though fully set forth herein.

26      61.    By reason of the foregoing facts, an actual and justiciable

27  controversy has arisen and now exists between Plaintiffs and Defendants

28  concerning whether Plaintiffs are entitled, after the Termination Date, to

17

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 98 of 281

commercially exploit the "Superman" crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing (as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest) in the 1934 Superman Comic Strip and the 1934 Revised Superman Comic Strip created by Siegel and Shuster and published as Action Comics No. 1, and in only slightly revised form in subsequent Works (hereinafter the "Superman Crest"); and whether Defendants' duty to account, as non-exclusive joint owners of such Recaptured Copyrights, includes Profits from the licensing of this crest.

62. Defendants allege a trademark interest in a "Superman" shield (hereinafter the "Superman Shield" and/or "Superman Trademark") which is also comprised of a large red "S" on a broad triangular yellow field, first appearing in later Works, as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, with the upper corners of the triangular crest slightly cropped.

63. Plaintiffs contend and Defendants deny that:

a. The Recaptured Copyrights include the copyright to the "Superman" crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, in the 1934 Superman Comic Strip and the Revised 1934 Superman Comic Strip published as Action Comics No. 1, and appeared in subsequently published Works in only slightly revised form (hereinafter the "Superman Crest").

b. Defendants' alleged Superman Trademark design arose directly from, and is substantially identical to, Siegel and Shuster's copyrighted Superman Crest;

c. Defendants receive significant proceeds and value from the utilization and copying of the Superman Crest and/or substantially identical

18

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 99 of 281

1  Superman Shield for which Defendants must account to Plaintiffs;

2          d.      In turn, Plaintiffs should likewise be allowed to exercise

3  their rights under copyright with respect to the Superman Crest, including

4  without limitation the right to commercially exploit the Superman Shield in

5  merchandise;

6          e.      Defendants, in any event, cannot use the alleged Superman

7  Trademark or any other purported trademark interest regarding "Superman" to

8  prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of their rights

9  under the Copyright Act in any of the jointly owned Recaptured Copyrights.

10      64.     A declaration of the Court is necessary pursuant to the Declaratory

11  Judgment Act, 28 U.S.C. §§ 2201 *et seq*., so that the parties may know their

12  respective rights and obligations with respect to the Superman Crest and the

13  Superman Shield.

### FOURTH CLAIM FOR RELIEF

(Accounting for Profits - Against All Defendants)

16      65.     Plaintiffs re-allege and incorporate by reference paragraphs 1

17  through 64 inclusive, as though fully set forth herein.

18      66.     On or after the Termination Date, April 16, 1999, Defendants

19  and/or each of them have licensed and/or commercially exploited and will

20  continue to license or exploit the Recaptured Copyrights, including without

21  limitation, *via* merchandising, publishing, and derivative motion picture and

22  television programming.

23      67.     As result of such licensing and/or commercial exploitation of the

24  Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of

25  them have received and will continue to receive substantial Profits, fifty percent

26  (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured

27  Copyrights.

28      68.     Defendant Warner Bros. has acted and continues to act in most

19

1 instances as the effective joint-owner and licensor (as opposed to licensee) of

2 the Recaptured Copyrights; and, as such, Warner Bros., along with the other

3 Defendants, owes a duty to account to Plaintiffs.

4      69.    To date, the Profits received by Defendants and/or each of them

5 from such licensing and/or commercial exploitation on or after April 16, 1999 is

6 estimated to be in excess of $50 million, however the exact sums actually

7 received and to be received by Defendants and/or each of them, are unknown to

8 Plaintiffs at this time, for these amounts can be properly determined only by an

9 accounting.

10      70.    Plaintiffs have demanded an accounting by Defendants on a

11 continuing basis of all amounts received by them and/or payable to them from

12 such licensing and other commercial exploitation on or after April 16, 1999, and

13 that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

14      71.    In nearly 9 ½ years since the Termination Date, Defendants have,

15 nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

16      72.    Plaintiffs at no time waived their rights to receive their share of such

17 Profits, nor have Plaintiffs at any time consented to the use and exploitation of

18 the Recaptured Copyrights in the United States or any foreign territories.

19      73.    Plaintiffs are entitled to an ongoing accounting from Defendants

20 regarding all amounts received, realized by or payable to Defendants on or after

21 April 16, 1999 from the licensing and any other commercial exploitation of the

22 Recaptured Copyrights and "Superman Franchise," and to the payment by

23 Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

24

25      WHEREFORE, Plaintiffs pray for relief as follows:

26                **PRAYER FOR RELIEF**

27           <u>ON THE FIRST CLAIM FOR RELIEF</u>

28      74.    For a declaration as follows:

20

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 100 of 281

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 101 of 281

a.    That pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works; and

b.    That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

<u>ON THE SECOND CLAIM FOR RELIEF</u>

75.    For a declaration as follows:

a.    That as joint owners of the Recaptured Copyrights, Plaintiffs are entitled to an accounting for Profits received or payable to the Defendants;

b.    That Profits include Defendants' revenues from the post - April 16, 1999 exploitation of the Recaptured Copyrights in territories outside of the United States whenever such exploitation is based on the predicate exercise *in the United States* of any right(s) in and to the Recaptured Copyrights by any Defendant, their licensees or assigns;

c.    That there should be no *apportionment* of Profits since Plaintiffs are entitled to fifty percent (50%) of such Profits as joint owners of the Recaptured Copyrights;

d.    Alternatively, that apportionment should apply only to profits from the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but not to profits from *licensing* of the Recaptured Copyrights;

e.    That apportionment, if any, should weigh strongly in Plaintiffs' favor, since the value of the Superman Franchise is largely attributable to the unique "Superman" character and other elements created by Siegel and Shuster and protected by the Recaptured Copyrights, in a percentage that the court may deem just and proper;

f.    That Profits include profits from any merchandise or other derivative works created, produced or manufactured on or after the Termination

21

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 102 of 281

1   Date, April 16, 1999, notwithstanding that underlying licensing for such

2   exploitation may have occurred prior thereto;

3          g.     That Profits include the Profits of Defendants DC, Warner

4   Bros. and Time Warner, their subsidiaries and divisions; and

5          h.     That in determining Profits, only reasonable costs directly

6   attributable to the exploitation of the Recaptured Copyrights, of the type

7   customarily deducted in arms' length agreements to exploit copyrights of

8   comparable value to the Recaptured Copyrights, should be deducted from gross

9   revenues, all in compliance with GAAP.

10                      ON THE THIRD CLAIM FOR RELIEF

11     76.    For a declaration as follows:

12          a.     That by the Termination, Plaintiffs recaptured a fifty percent

13   (50%) interest in the copyright to the Superman Crest created by Siegel and

14   Shuster;

15          b.     That Defendants' Superman Shield design arose directly

16   from, and is substantially identical to, the copyrighted Superman Crest created

17   by Siegel and Shuster;

18          c.     That Defendants must account to Plaintiffs for fifty percent

19   (50%) of the proceeds they receive from the licensing or other exploitation of

20   the Superman Crest and/or Superman Shield;

21          d.     That Plaintiffs, as co-owners of the copyright in and to the

22   Superman Crest, likewise are permitted to license or otherwise exploit the

23   Superman Crest, subject to a duty to account to Defendants for any such

24   exploitation; and

25          e.     That Defendants cannot use their alleged trademark in the

26   Superman Shield or any other alleged trademark interest with respect to

27   "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or

28   exploitation of Plaintiffs' rights under the Copyright Act in the jointly owned

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 103 of 281

1  Recaptured Copyrights.

2  ON THE FOURTH CLAIM FOR RELIEF

3      77.    For an accounting by the Defendants, jointly and severally, of any

4  and all proceeds from the licensing and any other exploitation of the Recaptured

5  Copyrights or Superman Franchise on or after the Termination Date, April 16,

6  1999;

7      78.    For 50% of any and all proceeds from the licensing and any other

8  exploitation of the Recaptured Copyrights or "Superman Franchise" on or after

9  April 16, 1999 pursuant to such accounting; and

10      79.    For the imposition of a constructive trust for the benefit of

11  Plaintiffs on all sums received and to be received by the Defendants, jointly or

12  severally, derived from the licensing and any other exploitation of the

13  Recaptured Copyrights or "Superman Franchise" on or after April 16, 1999.

14  ON ALL CLAIMS FOR RELIEF

15      80.    For Plaintiffs' costs of suit;

16      81.    For interest at the highest lawful rate on all sums awarded Plaintiffs

17  other than punitive damages;

18      82.    For reasonable attorneys' fees; and

19      83.    For such other and further relief as the Court may deem just and

20  proper.

21

22  Dated: January 31, 2011            TOBEROFF & ASSOCIATES, P.C.

23

24                            Marc Toberoff

                            Attorneys for Plaintiffs,

25                            JOANNE SIEGEL and LAURA

                          SIEGEL LARSON

26

27

28

ER 396

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 104 of 281

**JURY TRIAL DEMANDED**

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Complaint for which trial by jury is allowable.

Dated:  January 31, 2011                 TOBEROFF & ASSOCIATES, P.C.

_____

Marc Toberoff
Attorneys for Plaintiffs,
JOANNE SIEGEL and LAURA
SIEGEL LARSON

Third Amended Complaint for Declaratory Relief and Accounting

**ER 397**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-3, Page 105 of 281

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On February 3, 2011, I served the attached documents described as

**THIRD AMENDED COMPLAINT**

as follows:

[ ]  :<u>BY MAIL</u>:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.  I placed ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

[X]  :<u>BY HAND</u>:

As follows: I delivered to the address listed below by hand the documents listed herein.

Daniel M. Petrocelli, Esq.
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

[X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 3, 2011, in Los Angeles, California.

Nicholas C. Williamson

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@toberoffandassociates.com
2  Keith G. Adams (State Bar No. 240497)
     kadams@toberoffandassociates.com
3  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway, #348
4  Malibu, California, 90265
   Telephone: (310) 246-3333
5  Fax:         (310) 246-3101

6  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
7  individually and as personal representative
   of the Estate of Joanne Siegel

8

                **UNITED STATES DISTRICT COURT**

9
             **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | **Case No: 04-CV-08400 ODW (RZx)\*** Case No: 04-CV-08776 ODW (RZx)\* Hon. Otis D. Wright II, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR AMENDMENT OF THE COURT'S APRIL 18, 2013 JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)** Date:  July 1, 2013 Time:  1:30 p.m. Place:  Courtroom 11 \*: Docket citations herein are to Case No. 04-CV-08400. |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND THE JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.   THE JUDGMENT SHOULD BE AMENDED TO LEAVE THE POST-FORMATION STATE CONTRACT ISSUES FOR STATE COURT .......................................................................................................... 2

   A.   DC's Procedural Arguments Are Baseless ........................................ 2

   B.   The Rescission and Acquiescence Decisions Were In Error ............... 4

   C.   The Court Did Not Need To Decide Rescission Or Acquiescence ..................................................................................... 7

   D.   DC's Waiver Arguments Are Unpersuasive ...................................... 7

II.  THE JUDGMENT SHOULD BE AMENDED TO PROPERLY REFLECT DC'S PLEADINGS AND THE COURT'S ORDERS ................ 9

   A.   DC's Fourth Counterclaim Can Only Be Granted If The First Claim Is Granted, At Least In Part ..................................................... 9

   B.   Prior First Claim Determinations Not Addressed By The Circuit Remain "Law Of The Case" And Should Be In The Judgment ......... 10

CONCLUSION .......................................................................................................... 12

**ER 400**

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Brown v. Grimes*,
192 Cal. App. 4th 265 (2011) ......................................................... 5-6

*Butler v. Eaton*,
141 U.S. 240 (1891) ........................................................................ 12

*Cal. Dep't of Soc. Servs. v. Thompson*,
321 F.3d 835 (9th Cir. 2003) .......................................................... 12

*Carr v. P.R. Ports Auth.*,
806 F. Supp. 2d 494 (D.P.R. 2011) ................................................. 11

*Cedars-Sinai Med. Ctr. v. Shalala*,
177 F.3d 1126 (9th Cir. 1999) .......................................................... 8

*Clipper Express v. Rocky Mt. Motor Tariff Bur.*,
674 F.2d 1252 (9th Cir. 1982) ........................................................... 2

*Cowgill v. Raymark Industries, Inc.*,
832 F.2d 798 (3d Cir. 1987) ............................................................ 11

*Daiichi Sankyo, Inc. v. Apotex, Inc.*,
2009 U.S. Dist. LEXIS 42154 (D.N.J. May 18, 2009) .................... 11

*Davis v. United States*,
2010 U.S. Dist. LEXIS 7036 (C.D. Cal. Jan. 28, 2010) ................. 10

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) .......................................................... 12

*Donovan v. RRL Corp.*,
26 Cal. 4th 261 (2001) ....................................................................... 4

*Earl v. Saks & Co.*,
36 Cal. 2d 602 (1951) ........................................................................ 4

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) ........................................................................... 3

ER 401

*Fisher v. Roe,*
263 F.3d 906 (9th Cir. 2001) ........................................................................ 2-3

*Gerace v. Cliffstar Corp.,*
2009 U.S. Dist. LEXIS 67021 (W.D.N.Y. July 30, 2009) ...................................... 9

*Greene v. Town of Blooming Grove,*
935 F.2d 507 (2d Cir. 1991) .............................................................................. 2

*Keller v. Hall,*
111 F.2d 129 (9th Cir. 1940) ............................................................................ 12

*Khadr v. United States,*
529 F.3d 1112 (D.C. Cir. 2008) ................................................................. 11-12

*Kurt Orban Co. v. S/S Shinsei Maru,*
1985 U.S. Dist. LEXIS 14815 (S.D.N.Y. Oct. 17, 1985).......................................... 9

*Lanier v. Fresno Unified Sch. Dist.,*
2013 U.S. Dist. LEXIS 64498 (E.D. Cal. May 2, 2013) .......................................... 9

*Larson v. Warner Bros. Entm't,*
2013 U.S. App. LEXIS 671 (9th Cir. Jan. 10, 2013)............................................10

*Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.,*
793 F. Supp. 2d 1189 (W.D. Wash. 2011) ........................................................... 8

*McClish v. Nugent,*
2008 U.S. Dist. LEXIS 7007 (M.D. Fla. Jan. 30, 2008)........................................11

*McCreary v. Mercury Lumber Distributors,*
124 Cal. App. 2d 477 (1957) ............................................................................. 6

*McDowell v. Calderon,*
197 F.3d 1253 (9th Cir. 1999) ....................................................................... 2-3

*McGinest v. GTE Serv. Corp.,*
247 Fed. Appx. 72 (9th Cir. 2007)...................................................................... 8

*Moro v. Shell Oil Co.,*
91 F.3d 872 (7th Cir. 1996) .............................................................................. 2

*National Asso. of Broadcasters v. FCC*,
554 F.2d 1118 (D.C. Cir. 1976)...................................................................11

*Parks v. "Mr. Ford"*,
68 F.R.D. 305 (E.D. Pa. 1975)......................................................................3

*Peer Int'l Corp. v. Pausa Records, Inc.*,
909 F.2d 1332 (9th Cir. 1990) .....................................................................5

*Pirelli Armstrong Tire Corp. Retiree Med Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) .................................................................. 9-10

*Portsmouth Square Inc. v. Shareholders Protective Committee*,
770 F.2d 866 (9th Cir. 1985) .....................................................................11

*Sparling v. Daou*,
411 F.3d 1006 (9th Cir. 2005) ....................................................................10

*Thomas v. Riddle*,
673 F. Supp. 262 (N.D. Ill. 1987)..............................................................11

*Thompson v. City of Shasta Lake*,
314 F. Supp. 2d 1017 (E.D. Cal. 2004) ......................................................10

*Tripati v Henman*,
845 F.2d 205 (9th Cir. 1988) ........................................................................3

*United States v. International Business Machines Corp.*,
79 F.R.D. 412 (S.D.N.Y. 1978) ...................................................................4

*Wang Zong Xiao v. Reno*,
837 F. Supp. 1506 (N.D. Cal. 1993) ..........................................................11

*White v. New Hampshire Dept. of Employ. Sec.*,
455 U.S. 445 (1982)......................................................................................2

## <u>Statutes</u>

Fed. R. Civ. P. 59 ............................................................................*passim*

**INTRODUCTION**

Rule 59(e)'s plain purpose is to bring error to the Court's attention, as Plaintiff properly has done. DC's opposition (Dkt. 732; "Opp.") to Plaintiff's 59(e) motion (Dkt. 731; "Mot.") invites the Court to leave uncorrected errors of law and fact.

Respectfully, it was error to dismiss Plaintiff's acquiescence and rescission defenses as a matter of law in the March 20, 2013 summary judgment order (Dkt. 717; "Order"). Per binding California Supreme Court authority, rescission does <u>not</u> require acknowledgement of a contract, as held. Furthermore, the Siegels' May 9, 2002 letter – viewed, as it must be, in the light most favorable to Plaintiff – acknowledged both an "agreement," as DC has argued, and gave breach as grounds for rescission. DC's *total inaction* from May 2002 to November 2004 also presents a triable issue as to "acquiescence." DC argues these defenses were waived, but there was no such holding, as this would also be error. Acquiescence was expressly pled, the factual predicates for rescission were pled, DC suffered no prejudice and had a full opportunity to be heard, and, since DC did not move on the Fourth Counterclaim until 2013, there was no reason for Plaintiff to litigate these defenses earlier.

Fortunately, there was no need for the Court to wade into post-October 19, 2001 events and these fact-intensive defenses that are completely ill-suited to summary judgment. The Order held that the October 19, 2001 letter operated as a present transfer of rights, granting the alternative relief sought in DC's Fourth Counterclaim and rendering these issues superfluous. If the parties choose to pursue post-October 19, 2001 state contract disputes further, they can do so in state court, just as the Court suggested for the inextricably related breach and repudiation issues.

Lastly, DC's Fourth Counterclaim was expressly pled in the alternative – *if* the termination was upheld. Judge Larson's orders and this Court's 2011 judgment found the termination valid as to select works, and the Circuit expressly did <u>not</u> reverse those determinations. Nor did this Court reconsider them on remand. Thus it is well-settled that these rulings remain "law of the case," notwithstanding the

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND THE JUDGMENT

ER 404

1  Circuit's reversal *on other grounds*, and it was error to deny Plaintiff's entire First

2  Claim.  Plaintiff's proposed amended judgment carefully comports with the pleadings

3  and the Courts' prior rulings in partially granting the First Claim.

### ARGUMENT

4

### I.    THE JUDGMENT SHOULD BE AMENDED TO LEAVE THE POST-FORMATION STATE CONTRACT ISSUES FOR STATE COURT

5

6

7       **A.    DC's Procedural Arguments Are Baseless**

8        "Rule 59(e) allows a party to direct the district court's attention to … [an]

9  error of law or fact, and enables the court to correct its own errors and thus avoid

10  unnecessary appellate procedures." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.

11  1996).  "The 'narrow aim' of Rule 59(e) is 'to make clear that the district court

12  possesses the power to rectify its own mistakes in the period immediately following

13  the entry of judgment.'" *Greene v. Town of Blooming Grove*, 935 F.2d 507, 512 (2d

14  Cir. 1991) (quot'g *White v. New Hampshire Dept. of Employ. Sec.*, 455 U.S. 445, 450

15  (1982)).  It "provides an efficient mechanism by which a trial court judge can correct

16  an otherwise erroneous judgment without implicating the appellate process." *Clipper

17  Express v. Rocky Mt. Motor Tariff Bur.*, 674 F.2d 1252, 1260 (9th Cir. 1982).

18        DC misrepresents the governing standard in arguing that Rule 59(e) motions

19  are granted only in "highly unusual" circumstances (Opp. 1, 3), citing *McDowell v.

20  Calderon*, 197 F.3d 1253 (9th Cir. 1999).  What *McDowell* really stated was:  "A

21  motion for reconsideration under Rule 59(e) 'should not be granted, absent highly

22  unusual circumstances, ***unless*** the district court is presented with newly discovered

23  evidence, committed clear error, or if there is an intervening change in the controlling

24  law.'" *Id.* at 1255 (citation omitted) (emphasis added).  Thus, it is only <u>outside</u> of

25  those three circumstances that a Rule 59(e) amendment is "highly unusual."  DC's

26  "dead fish" mantra (Opp. 2, 9, 10) is equally inapplicable, as that comment applied to

27  an appellate court disturbing findings of fact after a trial.[1]  Notably, in 2011, when

28

---

[1] *Fisher v. Roe*, 263 F.3d 906, 912 (9th Cir. 2001) ("Trial courts find facts. We do not. ….

1  DC itself moved for Rule 59(e) reconsideration, it simply contended that the Court

2  committed "error." Dkt. 662 at 1, 3, 5, 6; Dkt. 663 at 1, 4.

3      DC likewise misrepresents that Rule 59(e) bars re-argument (Opp. 5-8), citing

4  *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), which simply states that Rule

5  59(e) cannot be used to re-litigate *with new arguments/evidence*. *Id.* at 486 n.5.

6      DC criticizes Plaintiff's motion as seeking reconsideration of the March 20,

7  2013 order, rather than the judgment (Opp. 2-4), but "[a] Rule 59(e) motion is a

8  proper vehicle for seeking reconsideration of a summary judgment ruling." *Tripati v*

9  *Henman*, 845 F.2d 205, 206 n.1 (9th Cir. 1988) (citation omitted); *McDowell*, 197

10 F.3d at 1255 (referring to "[a] motion for reconsideration under Rule 59(e)").

11     According to DC, Plaintiff cannot include anything in its Rule 59(e) motion –

12 neither "new argument" nor "reargument." That is not the law. Rule 59(e)'s purpose

13 – to bring "error" to the Court's attention – permits re-argument of mistaken

14 decisions. *See Parks v. "Mr. Ford"*, 68 F.R.D. 305, 308 (E.D. Pa. 1975) (Rule 59(e)

15 motion proper where "plaintiffs are rearguing their prior contentions"). DC accuses

16 Plaintiff of raising a "new argument" by stating that a rescission is no more than a

17 repudiation justified by another's breach (Opp. 8-9); but Plaintiff expressly noted this

18 relation in her original opposition. Dkt. 709 at 16, 19-22. DC also falsely suggests

19 that Plaintiff's argument – that notice of rescission need not acknowledge a binding

20 contract – is "new." Opp. 8. First, Plaintiff's summary judgment opposition stressed

21 that rescission had no formalistic requirements. Dkt. 709 at 20-22. In reply, DC

22 argued that "the rescinding party [in Plaintiff's cited case] acknowledged … an

23 underlying contract" (Dkt. 711 at 10), which Plaintiff addressed in its Court-approved

24 sur-reply. Dkt. 715 at 3-4. The Order then went beyond the reply, holding, without

25 citation to legal authority, that a rescission must acknowledge a binding contract as a

26 matter of law. Dkt. 717 at 9. Plaintiff's 59(e) motion properly addresses this

27

28 Thus, we will not disturb a district court's findings of fact unless we are left with the
definite and firm conviction that a mistake has been made.") (cited by DC).

1  unexpected holding, which contradicts binding California Supreme Court precedent.
2  *See United States v. International Business Machines Corp.*, 79 F.R.D. 412, 414
3  (S.D.N.Y. 1978) (Rule 59(e) motion proper where court "overlooked 'matters or
4  controlling decisions' which … might reasonably have altered the result").

5  **B.   The Rescission and Acquiescence Decisions Were In Error**

6  Rescission:  DC's two central legal contentions about rescission are that a
7  rescission notice must (1) first acknowledge a binding contract and (2) state proper
8  grounds for rescission.  Opp. 10.  Both arguments are erroneous.

9  Neither DC nor the Court cited a single California case stating that a notice of
10  rescission must acknowledge a contract.  DC tries to, but cannot, distinguish the
11  California Supreme Court's decision in *Donovan v. RRL Corp.*, 26 Cal. 4th 261
12  (2001).  DC's red herring that the *Donovan* defendant "*also* argued" rescission,
13  which "assumed contract formation" (Opp.11) is false:  it never argued rescission to
14  the trial court or on appeal, instead arguing no contract had been formed.  *Id.* at 294-
15  95.  *Donovan* nonetheless found (1) that a contract had been formed, as "defendant's
16  advertisement constituted an offer that was accepted;" but (2) that the defendant
17  "gave sufficient notice of its intent to rescind" by refusing to perform, <u>even though it
18  never acknowledged a contract</u>.  *Id.* at 270, 278 n.5.  The Order's holding that a
19  rescission notice must "acknowledge" a contract (Dkt. 717 at 9) is error and conflicts
20  with *Donovan* – precisely the sort of thing Rule 59(e) was intended to correct.

21  DC's halfhearted argument that the Siegels' letters did not give notice of
22  rescission because the "stated grounds" were supposedly "invalid" (Opp. 10) likewise
23  contradicts clear California Supreme Court authority.  *See Earl v. Saks & Co.*, 36 Cal.
24  2d 602, 609 (1951) ("One may justify an asserted rescission by proving that at the
25  time there was an adequate cause although it did not become known to him until
26  later.").  The Order acknowledges that DC's rendition of the law is incorrect.  Dkt.
27  717 at 10 ("[A] statement in the notice of certain grounds for rescission does not
28  prevent the party from thereafter relying upon different and proper grounds.").  The

4

Order nonetheless held a rescission must acknowledge a contract and implied a
rescinding party must state proper grounds.  Dkt. 717 at 9-10.  Even if that were the
law (it is not), it was error to hold on summary judgment that the Siegels' letters
failed to give such notice, as shown by the May 9, 2002 letter:

> We made painful concessions assured if we did we would arrive at an
> agreement.  ***When we made those difficult concessions and reluctantly
> <u>accepted</u> John Schulman's last proposal*** six months ago, … ***But we are owed
> more than three years of profits accounting on Superman and related
> properties which has not been paid***.  In addition, my disabled daughter still
> has not received the medical coverage she and her children were
> promised.……  For your representatives to condition our receiving financial
> compensation for our rights on demands which were not in ***the proposal <u>we</u>
> <u>accepted</u>***, is deceitful.  ….  I had hoped that [our] good relationships with Jerry
> Levin and DC Comics would continue after ***<u>we reached an agreement</u>***.  …..

Dkt. 709-2, Ex. 4.  The Order found that rescission was "simply unsupported by the
factual record" (Dkt. 717 at 10), but, viewed in the light most favorable to Plaintiff –
 the non-movant – the letter is more than sufficient to raise a triable issue of fact as to
rescission, even under the Order's test.  A reasonable trier of fact could find the
repeated references to "agreement" and "accept[ance]" of DC's proposal as
acknowledging the October 19, 2001 agreement.  DC cannot contest this, because DC
itself repeatedly argued that "[e]veryone continued to refer to the deal the parties had
made—even Larson's mother in her letter to Time Warner."  Dkt. 722-1, Ex. 13 at
225.[2]  A trier of fact could also reasonably find the statements about "owed" amounts
that have "not been paid" and DC's "conditioning" payment on new demands as
identifying proper grounds for rescission – *e.g.*, DC's failure to pay the Siegels as
required by the October 19, 2001 letter.  *See* Dkt. 717 at 10 (Order referencing DC's
failure to timely pay as "different and proper grounds" for rescission); *Peer Int'l
Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir. 1990) (rescission proper
where party "never complied with the royalty and accounting requirements"); *Brown*

---

[2] *See* Dkt. 181 at 73 (DC:  "[I]n her May 9, 2002 letter to Richard Parsons, Mrs. Siegel
acknowledged that the parties had reached an accord …"); Dkt. 646 ¶55 (DC:  "On May 9,
2002, [] Joanne Siegel wrote a letter … acknowledging that the Siegels had accepted DC
Comics' proposal …."); Dkt. 709-2, Ex. 16 at 224 (DC: on "May 9, 2002, [] Larson's
mother sent DC a letter acknowledging that Larson had 'accepted' DC's [] offer").

*v. Grimes*, 192 Cal. App. 4th 265, 277 (2011) (where one party commits "a material breach of the contract, the other party may be discharged from its duty to perform").

Acquiescence: DC's acquiescence arguments, like its reply and the Order, focus solely on Time-Warner's ambiguous May 21, 2002 letter. However, Plaintiff's acquiescence defense focused on DC's ***inaction*** from May 9, 2002 (when DC alleged the Siegels "repudiated") to November 22, 2004, after the Siegels filed suit. Dkt. 709 at 22-23. As shown by uncontested evidence, during that lengthy period DC never claimed that the parties were bound by a contract, never asserted ownership of the Siegels' recaptured copyrights, never demanded contract performance, never paid the amounts promised, and never offered to perform. Dkt. 709-1 ¶¶32-33. Instead, DC engaged in new negotiations with the Siegels in 2003-2004 without reference to any contract. *Id.* ¶31; *see McCreary v. Mercury Lumber Distributors*, 124 Cal. App. 2d 477, 486 (1957) ("[A]cquiescence is shown … by the absence of a showing that [the party] claimed any further rights under the old contract prior to the commencement of the subject action"). All of this together is quite glaring and, viewed in the light most favorable to Plaintiff, is more than enough to raise triable issues of fact.

Respectfully, the Order contained clear errors of law as to rescission and acquiescence, and both presented triable factual issues that could not be decided on summary judgment. If, as DC argues, adjudication of this was necessary to the Fourth Counterclaim, then Plaintiff had an absolute due process right to trial on both issues. If, as Plaintiff argues, the Court's finding of a "present transfer" of copyrights on October 19, 2001 eliminated such necessity, then the rulings on such defenses should be struck from its Order as superfluous to its judgment. If the parties continue to dispute these state contract issues, they can litigate in state court, which, as the Court acknowledged, is the appropriate forum for "breach" and "repudiation." Dkt. 717 at 12, 16; Dkt. 723 at 11. This is especially apt because repudiation/rescission are inextricably linked to whether the counter party was first to breach.

///

## C.   The Court Did Not Need To Decide Rescission Or Acquiescence

DC does not rebut Plaintiff's key point that to grant DC's Fourth Counterclaim it was unnecessary to adjudicate "rescission" and "acquiescence," which both implicate triable issues of fact preventing summary judgment.  The Fourth Counterclaim sought a declaration that the Siegels "*either* transferred *or* are contractually obligated to transfer" their rights through the October 19, 2001 letter. Dkt. 646 ¶103(a) (emph. added).  The Order granted the *former* relief, holding that the letter "operated itself to transfer the Siegels' Superman rights."  Dkt. 717 at 14.

DC argues the *non sequitur* that because Plaintiff put rescission and acquiescence at issue, the Court could decide these fact-laden issues as a matter of law.  Plaintiff actually argued that (1) the October 19, 2001 letter did not "actively transfer" the Siegels' Superman rights to DC, because the letter did not support that construction (Dkt. 709 at 9-11), and (2) DC was not entitled to specific performance of any *promise to assign* on a variety of grounds, including rescission and acquiescence.  *Id.* at 11-23.  Once the Court held, under its reading of the Circuit's decision and at DC's urging, that the October 19 letter was not a mere promise to assign, but itself transferred the Siegels' copyrights, the alternative arguments as to the present enforceability of any alleged promise to assign became superfluous.

The Court's judgment itself indicated that the "transfer" settled DC's Fourth Counterclaim:  "In the parties' October 19, 2001 settlement agreement, [the Siegels] 'transfer[red] all of [their] rights' to DC….  ***This complete transfer*** … entitles DC to judgment on its Fourth Counterclaim…."  Dkt. 724 at 1 (emph. added).

## D.   DC's Waiver Arguments Are Unpersuasive

DC pretends that the Order held that Plaintiff's rescission and acquiescence defenses were waived.  The Order did not hold this, and clearly ruled on the ***merits*** of both defenses in detail, which would make no sense if they were waived.  Dkt. 717 at 9 ("The Court finds as a matter of law that the … letters do not constitute proper notices of rescission"), 10 (the "letters failed to effect a rescission"), 12 ("[T]he Court

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND THE JUDGMENT

ER 410

finds there was no rescission, acquiescence or abandonment as a matter of law.").

Moreover, while the Order states that Plaintiff "waited nearly eight years to raise the[] abandonment and acquiescence defenses" (Dkt. 717 at 12), she *expressly* raised her acquiescence/abandonment defense in her answer to DC's Counterclaims. Dkt. 656 ¶¶149-153; *see* Dkt. 709-1 ¶42; Dkt. 715 at 2. Plaintiff also pled the factual predicates for rescission, putting DC on notice of that issue as well. Dkt. 656 ¶¶53-56, 97-105; *Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010) (answer gave notice by denying factual allegations). Nor could the defenses have been waived through failure to argue them previously, because DC did not move for summary judgment on its Fourth Counterclaim until 2013, and there was no reason to raise them earlier. Mot. at 17. Any waiver of these pled defenses would be error.

Even had the defenses not been adequately pled, clear Circuit authority holds that "affirmative defenses that were not pleaded in an answer may be raised for the first time on summary judgment." *McGinest v. GTE Serv. Corp.*, 247 Fed. Appx. 72, 75 (9th Cir. 2007); Mot. at 16-18. DC argues that this somehow does not apply because it was "prejudiced," but there is no cognizable prejudice. DC had ample opportunity to respond in its briefs. *See Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1128-29 (9th Cir. 1999) (no prejudice where unpled affirmative defense argued in briefing and counterparty can respond); *Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1198 (W.D. Wash. 2011) ("The parties have had had ample opportunity to address the [unpled affirmative defense] in their summary judgment briefs and accompanying filings. Under these circumstances, [the party] has not been prejudiced ...."). DC argues only that "key witnesses" are "unavailable." Opp. 10. Yet, the only "unavailable" witness is Joanne Siegel; all other potential witnesses – *i.e.,* Plaintiff and Mssrs. Marks, Emanuel, Levitz and Schulman – remain available. More importantly, DC thoroughly deposed all of these witnesses, including Joanne Siegel, about all of the facts and evidence at issue in the defenses – *e.g.,* the October 19, 2001, October 26, 2001, February 1,

2002, May 9, 2002, May 21, 2002 and September 21, 2002 letters (*see* Dkt. 729-1 ¶2) – and does not identify any new discovery or questioning it would actually pursue. That Joanne died after DC already took full discovery of her does not justify denial of Plaintiff's due process right to trial of her defenses. *See Lanier v. Fresno Unified Sch. Dist.*, 2013 U.S. Dist. LEXIS 64498, at *9 (E.D. Cal. May 2, 2013) (no prejudice where issue would not "require additional discovery"); *Gerace v. Cliffstar Corp.*, 2009 U.S. Dist. LEXIS 67021, at *18 (W.D.N.Y. July 30, 2009) (no prejudice because new claim is "closely related to the current claims" and "no need for substantial additional discovery"); *Kurt Orban Co. v. S/S Shinsei Maru*, 1985 U.S. Dist. LEXIS 14815, at *2 (S.D.N.Y. Oct. 17, 1985) (no prejudice as "[d]iscovery regarding the conduct underlying these claims has already been taken.").

## II.  THE JUDGMENT SHOULD BE AMENDED TO PROPERLY REFLECT DC'S PLEADINGS AND THE COURT'S ORDERS

### A.  <u>DC's Fourth Counterclaim Can Only Be Granted If The First Claim Is Granted, At Least In Part</u>

As pled, DC's alternative Fourth Counterclaim regarding an alleged October 19 agreement ***only*** came into play if the Court held that the termination was valid:

> 3.    In the event that the Superman [Termination] Notices … are deemed effective, declaring on DC Comics' Fourth Alternative Counterclaim that ….

Dkt. 646 at 35.  DC's opposition studiously ignores its own counterclaims, which establish that its Fourth Counterclaim could only be granted if Plaintiff's First Claim (termination's validity) was *granted* and DC's First and Second Counterclaims (alleging invalidity) were *denied*.  DC consciously pled in the alternative so as *not to have to pay the Siegels* under the October 19, 2001 letter if the termination were invalidated.  Having made this tactical choice, DC cannot now argue that the Fourth Counterclaim be granted, confirming a transfer of the Siegels' recaptured copyrights to DC, while denying their First Claim and the validity of their statutory termination.

Parties cannot simply amend their pleadings via briefs. *See Pirelli Armstrong*

1  *Tire Corp. Retiree Med Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir.

2  2011) (noting "axiomatic rule that a plaintiff may not amend his complaint in his

3  response brief"); *Davis v. United States*, 2010 U.S. Dist. LEXIS 7036, at *49 n.23

4  (C.D. Cal. Jan. 28, 2010) ("'[A] plaintiff may not amend his complaint through

5  arguments in his brief.'") (citations omitted).  Furthermore, courts are "not free to

6  rewrite plaintiff's complaint."  *Thompson v. City of Shasta Lake*, 314 F. Supp. 2d

7  1017, 1021 (E.D. Cal. 2004); *see also Sparling v. Daou*, 411 F.3d 1006 (9th Cir.

8  2005) (courts are not to "rewrite a deficient complaint").

9         Consistent with DC's pleadings, the entire premise of DC's motion was that

10  the Siegels recovered copyrights but transferred them to DC in the alleged October

11  19, 2001 agreement.  Dkt. 702 at 1 (arguing that on October 19, 2001 "the Siegels

12  transferred all of their rights in Superman and Superboy to DC"), 7 ("[T]he Court

13  should enter judgment in DC's favor on its Fourth Counterclaims and declare that

14  Larson transferred her Superman and Superboy copyrights to DC by virtue of the

15  October 2001 settlement agreement.").  Unless the Siegels' terminations were

16  effective (First Claim), they would have had no rights to transfer in October 2001

17  (Fourth Counterclaim), as Siegel and Shuster assigned their rights to DC long before.

18      **B.**    **Prior First Claim Determinations Not Addressed By The Circuit**

19          **Remain "Law Of The Case" And Should Be In The Judgment**

20         Judge Larson's detailed published decisions, incorporated in this Court's 2011

21  judgment, resolved numerous issues presented by the First Claim (and the First and

22  Second Counterclaims) as to the validity of the Siegels' termination, irrespective of

23  DC's alternative Fourth Counterclaim and the October 19, 2001 letter.  Mot. 22-23.

24  The Ninth Circuit reversed on other grounds, and its ruling was limited solely to

25  whether the October 19, 2001 letter formed a contract.  *See Larson v. Warner Bros.*

26  *Entm't*, 2013 U.S. App. LEXIS 671, at *2-3 n.1 (9th Cir. Jan. 10, 2013) (noting that,

27  although the parties briefed the First Claim and First and Second Counterclaims, "we

28  do not reach the issues raised by these claims").  And on remand this Court did not

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND THE JUDGMENT

ER 413

1   reconsider or readjudicate any of Judge Larson's detailed determinations.

2       It is well-settled, as set forth in case after case, that those prior rulings remain

3   valid as law of the case. *See National Asso. of Broadcasters v. FCC*, 554 F.2d 1118,

4   1124 (D.C. Cir. 1976) ("'A judgment may … be reversed by an appellate court on a

5   single ground, and remanded with other determinations of the trial court left intact. In

6   such a case, the unreversed determinations of the trial court are generally adhered to

7   on remand; [] this is an application of the doctrine of law of the case….'") (citation

8   omitted); *Thomas v. Riddle*, 673 F. Supp. 262, 266 (N.D. Ill. 1987) (same); *Cowgill v.*

9   *Raymark Industries, Inc.*, 832 F.2d 798, 802 (3d Cir. 1987) (holding that findings

10  from reversed judgment had preclusive effect; "When a court of appeals reverses a

11  judgment and remands for further consideration of a particular issue, leaving other

12  determinations of the trial court intact, the unreversed determinations of the trial

13  court" remain valid) (citation omitted)).[3]  Because the Court on remand did not

14  reconsider and re-adjudicate Judge Larson's detailed decisions as to the First Claim,

15  it was clear error to simply deny the First Claim.  *See Carr v. P.R. Ports Auth.*, 806 F.

16  Supp. 2d 494, 502 (D.P.R. 2011) ("[W]hether under the banner of the law-of-the-case

17  doctrine or otherwise, trial courts are generally reluctant to reconsider previously

18  litigated issues, for the sake of judicial efficiency.").  As these issues were fully

19  ventilated and adjudicated in 2007-2009, this Court has the clear power to enter

20  judgment consistent with these rulings, notwithstanding that Plaintiff did not move a

21  second time for summary judgment on the First Claim.  *See Portsmouth Square Inc.*

22  *v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

23       DC's cited cases are irrelevant.  *Khadr v. United States*, 529 F.3d 1112, 1116

24

25  _____
    [3] *See, e.g., McClish v. Nugent*, 2008 U.S. Dist. LEXIS 7007, at *8 n.7 (M.D. Fla. Jan. 30,
    2008) (where issue not decided on appeal, "the Court assumes that this [prior] determination

26  remains undisturbed and the Court need not reconsider it on remand"); *Daiichi Sankyo, Inc.
    v. Apotex, Inc.*, 2009 U.S. Dist. LEXIS 42154 (D.N.J. May 18, 2009) ("[T]he law of the

27  case controls prior decisions of this Court that were not addressed by the Federal Circuit.");
    *Wang Zong Xiao v. Reno*, 837 F. Supp. 1506, 1545 (N.D. Cal. 1993) (as reversal "dealt only

28  with eleventh cause of action," the "ruling as to the eleven remaining claims was not
    disturbed by the Ninth Circuit's decision, and consequently, it remains the law of the case").

(D.C. Cir. 2008), held that a dismissal could not be appealed after reversal by a tribunal. *Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 847 (9th Cir. 2003), and *Keller v. Hall*, 111 F.2d 129, 131 (9th Cir. 1940), hold that a reversed judgment is not preclusive, which is uncontested. Mot. at 23. *Butler v. Eaton*, 141 U.S. 240, 244 (1891), holds that parties cannot rely on expressly reversed parts of a judgment.[4]

Lastly, DC's opposition erroneously argues that Plaintiff's proposed amended judgment contradicts the Court's prior rulings, and falsely hypes that Plaintiff seeks to claim "thousands" of Superman works. Opp. 1, 14. Plaintiff's proposed judgment is carefully limited to comport with the Court's prior rulings. Dkt. 732 at 2 (granting First Claim "only to the extent that it sought a declaration that on April 16, 1999 the Siegels validly terminated … *Action Comics*, No. 1, as well as *Action Comics*, No. 4, *Superman*, No. 1 (pages 3-6), and the first two weeks of the Superman newspaper strips," as previously held by the Court). The proposed judgment does not grant Plaintiff any continuing interest in these works, but merely preserves the detailed determination that Plaintiff's statutory termination was valid as to such works.

Amending the judgment as proposed would thus comport with both DC's pleadings, the Court's prior decisions, and promote judicial efficiency.

## CONCLUSION

For the reasons herein and in Plaintiff's opening brief, Plaintiff respectfully requests that the Court amend the judgment as Plaintiff proposed (Dkt. 731-2).

Dated: June 17, 2013      RESPECTFULLY SUBMITTED,
                                  /s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Plaintiff, Laura Siegel Larson

---

[4] Notwithstanding DC's contrary arguments, a judgment would bind DC in *DC Comics*, because Siegel and Shuster's relationship with DC as to *Action Comics* No. 1 was identical. Case No. 10-CV-03633 ODW, Dkt. 191 at 11-12. *See Disimone v. Browner*, 121 F.3d 1262, 1266-1267 (9th Cir. 1997) ("Where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND THE JUDGMENT

1  DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4  O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for the DC Comics Parties

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>        Plaintiff,<br><br>      v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br><br>        Defendants and Counterclaimants. | Case No.  CV 04-8400 ODW (RZx)<br>Case No.  CV 04-8776 ODW (RZx)<br><br>**DC COMICS' OPPOSITION TO PLAINTIFF'S FED. R. CIV. P. 59(E) MOTION TO AMEND**<br><br>The Hon. Otis D. Wright II<br><br>**Hearing Date**:    July 1, 2013 |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>        Plaintiff,<br><br>      v.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br><br>        Defendants and Counterclaimants. | |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................... 1

II.     LARSON'S MOTION VIOLATES THE GOVERNING RULES. ............... 2

III.    RULE 59 CANNOT BE USED TO RELITIGATE RULINGS ON
        DC'S FOURTH COUNTERCLAIM AND LARSON'S DEFENSES
        TO IT. ....................................................................................... 4

        A.      Rules 59 and 7-18 Bar Larson From Recycling Her Arguments. ........ 5

        B.      The Court's Rulings Rejecting Larson's Three Affirmative
                Defenses Were Correct—And Certainly Not Clear Error. ................. 9

IV.     LARSON IS NOT ENTITLED TO RELIEF ON HER FIRST CLAIM. ...... 13

V.      CONCLUSION ........................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Ahmad v. Furlong*,
435 F.3d 1196 (10th Cir. 2006) ................................................... 9, 10

*Butler v. Eaton*,
141 U.S. 240 (1891) ...................................................................... 15

*Clark v. Fiedler*,
44 Cal. App. 2d 838 (1941) ...................................................... 10, 13

*Cooper v. Ramos*,
704 F.3d 772 (9th Cir. 2012) ........................................................ 15

*Costello v. U.S.*,
765 F. Supp. 1003 (C.D. Cal. 1991) ............................................... 8

*Donovan v. RRL Corp.*,
26 Cal. 4th 261 (2001) ............................................................ 11-12

*Enodis Corp. v. Cont'l Cas. Co.*,
2012 WL 2159598 (C.D. Cal. June 11, 2012) ............................... 3, 5

*Enunwaonye v. Aurora Loan Servs. LLC*,
2012 WL 952377 (C.D. Cal. Mar. 21, 2012) ............................. 3, 5-6

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) .................................................................... 3, 5

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ............................................. 10-11, 13

*Fisher v. Roe*,
263 F.3d 906 (9th Cir. 2001) ...................................................... 2, 9

*Harris v. City of Santa Monica*,
56 Cal.4th 203 (2013) .................................................................. 11

*In re Worlds of Wonder Secs. Litig.*,
814 F. Supp. 850 (N.D. Cal. 1993) ............................................ 8, 13

*Keller v. Hall*,
111 F.2d 129 (9th Cir. 1940) ........................................................ 15

*Khadr v. U.S.*,
529 F.3d 1112 (D.C. Cir. 2008) ............................................... 15, 16

*Kona Enters., Inc. v. Estate of Bishop*,
229 F.3d 877 (9th Cir. 2000) ......................................................... 2

*Larson v. Warner Bros. Entm't, Inc.*,
2013 WL 1113259 (9th Cir. Jan. 10, 2013) ............................... 16, 17

*Lobdell v. Miller*,
114 Cal. App. 2d 328 (1952) ........................................................ 11

*Mattel v. MGA Entm't, Inc,*
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ................................................................. 5, 6

*McDowell v. Calderon,*
   197 F.3d 1253 (9th Cir. 1999) ......................................................................... 1, 3

*McGinest v. GTE Serv. Corp.,*
   247 Fed. Appx. 72 (9th Cir. 2007) ................................................................... 9, 10

*MGA Entm't, Inc. v. Hartford Ins. Grp.,*
   869 F. Supp. 2d 1117 (C.D. Cal. 2012) ................................................................. 3

*Payton v. Woodford,*
   346 F.3d 1204 (9th Cir. 2003) ........................................................................... 2

*People ex rel. Kennedy v. Beaumont Inv., Ltd.,*
   111 Cal. App. 4th 102 (2003) .......................................................................... 11

*Robinson v. Sanctuary Record Grps., Ltd.,*
   763 F. Supp. 2d 629 (S.D.N.Y. 2011) ............................................................... 17

*Runyan v. Pac. Air Indus.,*
   2 Cal. 3d 304 (1970) ...................................................................................... 11

*S. Cal. Painters & Allied Trade Dist. Council No. 36 v.*
  *Best Interiors, Inc.,*
   359 F.3d 1127 (9th Cir. 2004) .......................................................................... 12

*State of Cal. Dept. of Social Servs. v. Thompson,*
   321 F.3d 835 (9th Cir. 2003) ........................................................................... 16

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC,*
   551 F. Supp. 2d 1069 (E.D. Cal. 2008) ............................................................. 8, 9

*Xiao v. Reno,*
   837 F. Supp. 1506 (N.D. Cal. 1993) ................................................................. 17

*Ybarra v. McDaniel,*
   656 F.3d 984 (9th Cir. 2011) ............................................................................ 6

## RULES

FED. R. CIV. P. 8 ............................................................................................... 11

FED. R. CIV. P. 56 .......................................................................................... 1, 13

FED. R. CIV. P. 59 ..................................................................................... *passim*

Local Rule 7-18 ......................................................................................... *passim*

## OTHER AUTHORITIES

CHRISTOPHER C. GOELZ & MEREDITH J. WATTS, FEDERAL NINTH
   CIRCUIT APPELLATE PRACTICE § 10:231 (Rutter 2012) ...................................... 16

# I.   INTRODUCTION

Laura Siegel Larson's Rule 59(e) motion—which seeks to amend judgments that were submitted months ago, that the parties extensively briefed, and that the Court entered without alteration after granting summary judgment—comes nowhere close to meeting Rule 59's strict test.  Such motions may be granted only in "highly unusual circumstances," *i.e.*, where the Court "is presented with newly discovered evidence," an "intervening change in [] law," or "committed *clear error*."  *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc).

Larson presents *no new evidence* or *law* to support her motion.  Rather, she rehashes her summary judgment briefs, attacking this Court's considered holdings about the invalidity of three of her untimely affirmative defenses to DC's Fourth Counterclaim.  Such re-argument is forbidden by Rule 59(e), Local Rule 7-18, and the case law applying these rules.  Moreover, nowhere in Larson's Rule 59 motion does she or can she show how this Court *clearly erred* in rejecting her defenses.

Worse still, Larson asks the Court to enter judgment in *her* favor on her First Claim, even though she *never moved* on the claim after the Ninth Circuit remand or in opposing DC's summary judgment motion.  The relief she seeks thus defies the Court's rules concerning motion practice, DN 598 at 8; 707; Case No. CV-10-3633, DN 593 at 2-3, as well as Rules 59 *and* 56.  The relief she seeks would also lead to gross inconsistencies in the Court's rulings and judgments.  In her First Claim, Larson purports to have terminated and now *own 50% of thousands of Superman "Works"*—works that this Court just held that *DC owned* outright, when it granted DC judgment on its Fourth Counterclaim and denied Larson's First Claim.  DN 717, 723-24.  (This also includes many works that Judge Larson ruled long ago that DC owned as works for hire—rulings Larson challenged in a failed appeal.)

To prevail under Rule 59, Larson must demonstrate that the Court's rulings are "clearly erroneous," meaning the Court's rulings "must strike [the Court] as more than *just maybe or probably wrong*"; they must "strike [the Court] as wrong

DC'S OPP. TO PL.'S RULE 59(E) MOT.

**ER 420**

1  with the force of a *five-week old, unrefrigerated dead fish*." *Fisher v. Roe*, 263

2  F.3d 906, 912 (9th Cir. 2001) (emphases added), *ovrl'd on other grounds by Payton*

3  *v. Woodford*, 346 F.3d 1204 (9th Cir. 2003). Larson's motion comes nowhere close

4  to meeting this test or justifying the "extraordinary [Rule 59] remedy" she seeks,

5  which must "be used sparingly in the interests of finality" and judicial economy.

6  *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

7       After a decade of litigation, the Court rightfully brought these *Siegel* cases to

8  an end. Larson's attempts to circumvent the Court's rulings—by engendering delay

9  and sowing confusion into those rulings for use on appeal or state-court litigation

10 she might file—should not be countenanced. Larson's motion should be denied.

## II.  LARSON'S MOTION VIOLATES THE GOVERNING RULES.

12      On April 18, 2013, the Court entered the two final judgments in the *Siegel*

13 Superman and Superboy cases that Larson now challenges. DN 724 (Superman);

14 Case No. CV 04-8776 ODW (RZx), DN 243 (Superboy). DC filed these proposed

15 judgments in February 2013, DN 702-5, *two months* before the Court entered them.

16 Larson had three chances to oppose DC's motions and the entry of these judgments

17 granting DC's Fourth Counterclaim and denying her First Claim: (1) in her initial

18 opposition papers, DN 709; (2) in her Court-ordered sur-reply, DN 715; and (3) in

19 her Court-ordered supplemental brief, DN 722. Not once in this briefing did

20 Larson cross-move for judgment on her First Claim.

21      After receiving this briefing and hearing all of Larson's arguments why DC's

22 summary judgment motions should be denied based on her affirmative defenses and

23 otherwise, the Court issued its two summary judgment orders, and then it separately

24 entered final judgment in the two *Siegel* cases. DN 717, 723, 724; Case No. CV

25 04-8776 ODW (RZx), DN 243. The Court made no changes to DC's proposed

26 judgments, *compare* DN 724, *with* DN 702-5; *and* Case No. CV 04-8776 ODW

27 (RZx), DN 243, *with* DN 222-5, and thus Larson cannot complain she was

28 surprised by the judgments' contents, she was prevented from briefing them, or that

DC'S OPP. TO PL.'S RULE 59(E) MOT.

1    there was some new issue they raised that she could only now address.

2         This is not remotely a case where Rule 59 applies.  Such motions are granted

3    only "in highly unusual circumstances" involving "clear error," "newly discovered

4    evidence," or a "change in [] law.'"  *McDowell*, 197 F.3d at 1255.  Larson cites no

5    new evidence, and the black-letter law that the Court applied in existing orders has

6    not changed.  Indeed, all the evidence Larson now cites was before the Court on

7    summary judgment, *e.g.,* Mot. 2, 6, 15-16, and nowhere in her Rule 59 brief does

8    Larson cite a single legal authority that issued after the Court ruled, *cf. id.* at ii-v.

9         In parallel with Rule 59(e)'s stringent test, Larson's motion must satisfy

10   Local Rule 7-18.  *See Enodis Corp. v. Cont'l Cas. Co.*, 2012 WL 2159598, at *2

11   (C.D. Cal. June 11, 2012).  Rule 7-18 limits reconsideration motions to the same

12   narrow grounds (new evidence, new law, or clear error) and prohibits parties from

13   rehashing arguments they made (or could have made) before:  "No motion for

14   reconsideration *shall in any manner repeat any ... argument* made in … opposition

15   to the original motion."  C.D. CAL. L.R. 7-18 (italics added).

16        Larson's motion violates all of these rules, pressing two forbidden lines of

17   argument.  First, as shown in Part III, she "rehashes arguments the Court has

18   already considered [at summary judgment], which is flatly insufficient to meet the

19   rigorous demands for reconsideration under Rule 59."  *Enunwaonye v. Aurora Loan

20   Servs. LLC*, 2012 WL 952377, at *2 (C.D. Cal. Mar. 21, 2012).  Second, as shown

21   in Parts III and IV, she raises arguments "that could have been raised prior to the

22   entry of judgment," but she has tactically chosen to raise now, only after she lost.

23   *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008).

24        Larson's motion should be denied because she fails both to state and to meet

25   the dictates of Rules 59 and 7-18.  *Cf. MGA Entm't, Inc. v. Hartford Ins. Grp.*, 869

26   F. Supp. 2d 1117, 1120 (C.D. Cal. 2012) (admonishing party for failing to state

27   correct legal test, "blithely referencing 'Rule [59(e)]," "entirely ignoring Rule 7-

28   18," and "failing to mention *any* case law regarding these rules").

### III. RULE 59 CANNOT BE USED TO RELITIGATE RULINGS ON DC'S FOURTH COUNTERCLAIM AND LARSON'S DEFENSES TO IT.

There are many reasons to reject Larson's challenge to the Court's final judgment on DC's Fourth Counterclaim, but a threshold procedural one is that the principal relief she seeks is unfounded. While the proposed judgment she submits with her motion would formally amend the Court's existing judgments in part, *compare* DN 724, *with* 731-2, the thrust of her Rule 59 motion is substantively an attack on the Court's March 2013 summary judgment order. Indeed, *17 pages* of Larson's Rule 59 motion reargues the Court's summary judgment ruling on her rescission, acquiescence, and abandonment defenses. Mot. 2-19. Larson goes so far as to ask the Court to *delete six pages* of its summary judgment order rejecting these defenses. *Id.* at 18-19 ("Plaintiff respectfully requests, based on all of the above, that the Court withdraw Section 'B' of its order (Dkt. 717 at 6-12).").

Larson does so even though *she* was the one who placed these issues before the Court for decision. As a result, the Court held it was *necessary* to reach her defenses to declare whether the parties' October 2001 agreement was presently enforceable—*i.e.*, *the very relief* that DC sought in its Fourth Counterclaim:

> DC's fourth counterclaim asks the Court to declare, based on a finding that the October 19 agreement remains binding and enforceable, that the Siegels either already have or now remain contractually obligated to transfer their rights in the Superman works to DC….
>
> The Ninth Circuit held only that the 'October 19, 2001, letter *created an agreement*…. But subsequent events may have affected the present enforceability of that contract, as by a material breach followed by an effective rescission of the deal. In order to pass on the present enforceability of the October 19 contract, the Court <u>must therefore proceed to determine</u> whether events after October 19, 2001, rendered the October 19 agreement subsequently unenforceable….
>
> The Siegels' breach and repudiation defenses do not affect the enforceability of the agreement, … <u>[b]ut the Siegels' rescission and abandonment defenses do inform the continued enforceability</u> of the October 19 agreement…. <u>These defenses therefore merit consideration.</u>

DN 717 at 5:22-7:6 (underlining added).

DC'S OPP. TO PL.'S RULE 59(E) MOT.

1    The Court's summary judgment order—which fully addressed and rejected

2    these defenses as a matter of law, as untimely, and as "unsupported by the factual

3    record," *id*. at 12:3-11—issued on March 20, 2013.  Rather than promptly challenge

4    this March 20 ruling, Larson waited to see what further rulings would issue.  Only

5    after the Court ruled in DC's favor on the Superboy and Ad issues, DN 723, did

6    Larson file her Rule 59 motion.  That motion is not really a challenge to the Court's

7    final judgment issued April 18, 2013, but rather a motion seeking to relitigate the

8    Court's March 20 summary judgment order.  Such a motion—misleadingly styled

9    under Rule 59—is untimely, *cf. Mattel v. MGA Entm't, Inc*, 782 F. Supp. 2d 911,

10   960 (C.D. Cal. 2011), and fails on the merits, as shown below.  Larson's motion

11   impermissibly repeats the same (losing) arguments she made on summary judgment

12   about contract law and federal pleading rules.  And even if such arguments could be

13   heard now (and they cannot), each ground Larson asserts is without merit.

14        **A.    Rules 59 and 7-18 Bar Larson From Recycling Her Arguments.**

15   After considering four briefs on the subject, and engaging in six pages of

16   analysis of its own—complete with extensive citations to California contract law

17   and the federal pleading rules, DN 717 at 7:7-12:6—the Court rejected Larson's

18   defenses.  It held "there was no rescission, acquiescence, or abandonment [of the

19   October 19 contract] as a matter of law, [and] the contract remains in existence and

20   enforceable."  *Id*. at 12.  The Court (i) rejected these defenses as a matter of law;

21   (ii) held that the record facts did not support them; and (iii) concluded that Larson

22   failed to timely plead them, *id*. at 9:1-12:11.  These were *three separate grounds* to

23   reject the defenses, which the parties fully briefed.  *E.g*., DN 709 at 20:18-23:17

24   (Larson: "The Siegels' Rescission"; "DC's Acquiescence and Abandonment"); 711

25   at 5:1-6:13, 10:3-11:10 (DC's reply); 715 at 2:18-4:7 (Larson's sur-reply: "No

26   Waiver of Defenses"; "Rescission"; "Acquiescence" and "abandonment").

27        Rule 59 bars rehashing these "old matters," *Exxon*, 554 U.S. at 486 n.5, and

28   so, too, does Rule 7-18, *supra* at 3; *Enodis*, 2012 WL 2159598, at *2; *Enunwaonye*,

DC'S OPP. TO PL.'S RULE 59(E) MOT.

**ER 424**

1  2012 WL 952377, at *2; *Mattel*, 869 F. Supp. 2d at 1120; *see also Ybarra v.*

2  *McDaniel*, 656 F.3d 984, 998 (9th Cir. 2011).  A side-by-side comparison of

3  Larson's summary judgment briefs and her Rule 59 brief demonstrates how she

4  violates these rules, and how she repeats her losing arguments, often verbatim:

| Larson's MSJ Opposition | Larson's Rule 59 Motion |
|---|---|
| After attempting to grind and muscle the Siegels, DC cannot now have its cake and eat it too…. DN 709 at 2. | DC grinded the Siegels…<br>DC cannot have its cake and eat it too. Mot. 8, 9. |
| DC indisputably did ***not*** perform or offer to perform "all" conditions required of it by the October 19, 2001 Letter.  For instance, DC agreed to provide the Siegels: (1) "[a] non-returnable, non-recoupable signing bonus of [$]1,000,000"; (2) "[a] nonreturnable, but recoupable advance of $2,000,000"; (3) additional payments, starting with $500,000 on March 31, 2002; (4) royalty statements starting on March 31, 2002; (5) credit "By Special Arrangement with the Jerry Siegel Family" on all Superman publications starting October 19, 2001; and (6) medical and dental insurance.  DN 709 at 14. | [A]fter the Siegels transferred their rights to DC on October 19, 2001, DC performed ***none*** of its obligations.<br>…<br>DC was obligated under the October 19, 2001 agreement to provide to [sic] the Siegels with: (1) a "signing bonus" of $1 million; (2) $2 million, as an upfront advance against royalties; (3) guaranteed annual payments of $500,000, starting March 31, 2002; (4) "royalty statements," starting March 31, 2002; (5) medical and dental insurance and (6) a "Special Arrangement" credit.  Mot. 7 (citations omitted). |
| The October 19, 2001 Letter made it clear that DC would pay an annual guarantee of $500,000 on March 31, 2002 for the year 2002-03…. DC did not pay or even offer to pay that $500,000, nor did it provide a royalty accounting to the Siegels, on March 31, 2002, materially breaching DC's agreement.  DN 709 at 19. | DC then actually breached by failing to pay and account to the Siegels by March 31, 2002, as explicitly and unconditionally set forth in the October 19, 2001 agreement.  Mot. 8 (citations omitted). |
| DC represented to the Circuit that the only terms are those contained in October 19, 2001 Letter. (DC: "Our position is [the terms are] everything in this letter, nothing more."). | As DC convinced the Circuit: "Our position is [the terms are] everything in this [October 19] letter, nothing more."<br>… |

DC'S OPP. TO PL.'S RULE 59(E) MOT.

ER 425

| | |
|---|---|
| …<br><br>DC thus cannot argue that its performance … was conditioned on a "long-form" agreement because that condition appears nowhere in the October 19, 2001 Letter.  DN 709 at 15 (citations omitted). | And as this Court held, "the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more."<br><br>…<br><br>None of DC's explicit obligations were contingent on the signing of a long-form agreement.  Mot. 7 (citations omitted). |
| Joanne Siegel properly invoked her right of rescission and provided DC with notice in a letter she sent on May 9, 2002.<br><br>…<br><br>At a minimum, this raises genuine issues of material fact that cannot be decided on DC's perfunctory motion.  DN 709 at 20-22 (citations omitted). | The Siegel's May 9 and September 21, 2002 letters … certainly gave DC more than sufficient notice that the parties contractual relationship was "at an end." The Court's determination that the Siegels' letters did not constitute notice of rescission as a matter of California law ignored numerous statements that, viewed in the light most favorable to the Siegels and drawing all inferences in their favor, precluded summary judgment.  Mot.  12  (citations omitted). |
| After Joanne Siegel sent her May 9, 2002 letter rescinding the October 19, 2001 Letter due to DC's breach, DC acquiesced.<br><br>…<br><br>After the Siegels' September 21, 2002 letter providing "formal notification" that they were "totally stopping and ending all negotiations," DC again did absolutely nothing.<br><br>…<br><br>Then, in 2003-04, DC simply recommenced negotiations with the Siegels, further acquiescing in their rescission.<br><br>…<br><br>DC's behavior over this three-year period (2001-04) – when it acted as though there were no binding agreement, | The Order rejected [Larson's acquiescence] defense as a matter of law because after these cases were filed in November 2004, DC alleged for the first time, and among numerous alternative defenses, that the October 19, 2001 letter was a binding settlement agreement. This ignored DC's undisputed inaction between 2002 and 2004, under circumstances in which DC would naturally have asserted the October 19, 2001 agreement.<br><br>…<br><br>Furthermore, DC entered into new negotiations with the Siegels' new representatives in 2003-2004, again without once asserting that the October 19, 2001 agreement bound the Siegels.<br><br>… |

DC'S OPP. TO PL.'S RULE 59(E) MOT.

| recommenced negotiations, and never claimed rights – raises genuine issues of material fact as to acquiescence that cannot be properly decided now. Mot. 22-23. | A jury could well infer … that DC acquiesced… Mot. 15-16 (citations omitted). |
|---|---|

Not only does Larson's Rule 59 motion repeat arguments from her summary judgment opposition, she recycles her summary judgment sur-reply as well. There, she argued she never waived her defenses and that her rescission, acquiescence, and abandonment defenses presented fact issues that must be resolved in her favor. *See* DN 715 at 2:18-4:7. Her Rule 59 motion reasserts those points all but word-for-word. *Compare, e.g.*, Mot. 1:27-2:2 ("DC cannot be heard to object that the notice did not acknowledge a contract when it asserted to the Ninth Circuit and this Court that the Siegel's May 9, 2002 notice 'acknowledged' the parties' agreement."), *with* DN 715 at 4:2 (sur-reply: "DC represented the opposite to Judge Larson *and* the Circuit: '[o]n May 9, 2002 … Mrs. Siegel acknowledged' an agreement.").

Larson's repetition of arguments the Court considered and rejected is nothing "more than a disagreement with the court's decision," *In re Worlds of Wonder Secs. Litig.*, 814 F. Supp. 850, 874 (N.D. Cal. 1993), and violates Rules 59 and 7-18. While Larson tries to posit new ways that the rescission and repudiation arguments the parties made were one and the same—and thus the Court should not have reached the former, *e.g.*, Mot. 1, 6—this new position "*could have been raised*" earlier and is thus improper under Rule 59. *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 551 F. Supp. 2d 1069, 1080 (E.D. Cal. 2008); *Costello v. U.S.*, 765 F. Supp. 1003, 1009 (C.D. Cal. 1991). It is also disingenuous; in her prior briefs, before she lost, she treated these issues as distinct. *E.g.*, DN 709 at 16:20-19:6, 20:18-22:11.

Equally barred (and equally incorrect, *infra* at 10-12) is Larson's claim that a party seeking to rescind a contract need not "acknowledge" it. *Compare* Mot. 10-12, *with* DN 717 at 9. The parties spent many pages of their briefs arguing the law of rescission, DN 709 at 20-22; 711 at 10; 715 at 3-4, and Larson never argued this

DC'S OPP. TO PL.'S RULE 59(E) MOT.

point—even though DC made plain that her failure to acknowledge the parties' contract contravened her rescission claim. *Compare* DN 711 at 10:10-16, *with* DN 715 at 3:27-4:3 (sur-reply). Again, Rule 59 motions may not be used to make arguments that could have been made before. *U.S. Fid.*, 551 F. Supp. 2d at 1080.

As for Larson's lengthy discussion about why the Court's rulings on her affirmative defenses were "unnecessary," Mot. 3:19-5:4, this section of her brief ignores the several pages of the Court's opinion expressly explaining why such rulings were required. DN 717 at 5:22-7:6; *supra* at 4. This part of her Rule 59 motion also notably omits any discussion of any case law, much less the heightened legal standard that governs—*i.e.*, whether the Court's analysis and conclusion why it had to reach these defenses now strike it as so wrong that its orders all but reek like "dead fish." *Fisher*, 263 F.3d at 912.

### B.    The Court's Rulings Rejecting Larson's Three Affirmative Defenses Were Correct—And Certainly Not Clear Error.

Again, the Court cited three grounds for rejecting Larson's rescission, acquiescence, and abandonment defenses: she asserted the defenses years too late; the defenses were legally without basis; and there were no record facts to support the defenses. Each ground was correct, and none remotely qualifies as clear error.

*1. Failure to Timely Plead.* The Court ruled that Larson failed to timely plead—and thus waived—her rescission, abandonment, and acquiescence defenses by failing to assert them for *eight years*. DN 717 at 10, 12 (Larson's opposition to DC's summary judgment motion marked first time "since the inception of this litigation" that she "contended that … the Siegels rescinded" 2001 deal; Larson "waited nearly eight years to raise [her] abandonment and acquiescence defenses").

Larson disagrees, Mot. 16-19, repeating the same arguments and citing the same cases she cited in her sur-reply, DN 715 at 2-3. Such repeated arguments are barred, *supra* at 3, 6, 8, and her repeated cites to cases like *McGinest v. GTE Serv. Corp.*, 247 Fed. Appx. 72, 75 (9th Cir. 2007), and *Ahmad v. Furlong*, 435 F.3d

1196 (10th Cir. 2006), fail, because unlike here—where the Court found that her delay in asserting her affirmative defenses prejudiced DC, DN 717 at 10—neither of the plaintiffs in *McGinest* nor *Ahmad* showed such prejudice, *see McGinest*, 247 Fed. Appx. at 75; *Ahmad*, 435 F.3d at 1204.

While Larson now spends more pages arguing DC was *not* prejudiced, *compare* Mot. 16-17, *with* DN 715 at 3, such losing arguments cannot be repeated in a Rule 59 motion. *Supra* at 3, 6, 8. She does not show how the Court's *specific finding* that DC *was* prejudiced, DN 717 at 10, was "clear error" or reeks like "dead fish," as is required. *Supra* at 1, 3. And she cannot overcome the fact that key witnesses DC would have deposed on these defenses, including her now-deceased mother, became unavailable in the eight years she waited to assert them.

Larson's waiver of these three defenses is an additional, independent ground to deny her motion. But even assuming her motion complied with Rules 59 and 7-18, and these defenses were not waived, they fail on the merits, too.

*2. Rescission.* The Court correctly held that Larson failed to rescind the 2001 agreement "as a matter of law." DN 717 at 9. To begin, because the Siegels' May and September 2002 letters to DC denied the existence of the 2001 contract, the Court rightly held that the Siegels' "clear objective intent" was to deny that the parties ever made a binding deal—*the Siegels' litigation position for eight years*—and *not* that the Siegels intended to rescind the existing 2001 contract in 2002—their newly asserted position in the hopes of staving off judgment. *Id.* ("[B]asic logic suggests that one cannot 'clearly indicate to the defaulting party that the injured party considers the contract to be terminated,' while denying that a contract was formed.") (citing California case law). In addition, even had the Siegels' 2002 letters recognized the 2001 contract, they *still* failed to rescind it because "the stated grounds on which the Siegels sought to rescind"—a breakdown in negotiations over the long-form contract—were invalid. DN 717 at 9-10 (*citing Clark v. Fiedler*, 44 Cal. App. 2d 838 (1941); *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034

DC'S OPP. TO PL.'S RULE 59(E) MOT.

**ER 429**

1  (9th Cir. 2011)).  The Court's holding that the May and September 2002 letters

2  "failed to effect a rescission,"  DN 717 at 10, relied on a straightforward application

3  of these and other clearly established principles of California contract law to the

4  plain language of the Siegels' letters, including their unambiguous statement in

5  their May 2002 letter to DC that "we have no deal."  DN 711 at 10; 717 at 9.

6      Larson's assertion that requiring a rescinding party to acknowledge the

7  existence of a contract before rescinding it would force her to "waive any

8  arguments that a binding contract was not formed," Mot. 11, has been rejected by

9  the California Supreme Court.  *E.g.*, *Harris v. City of Santa Monica*,  56 Cal.4th

10 203, 240-41 (2013) ("[I]t is well settled in California that a defendant may plead as

11 many inconsistent defenses in an answer as she may desire and that such defenses

12 may not be considered as admissions against interest…."). She also ignores the

13 Federal Rules, which as this Court held, permitted her to "plead inconsistent

14 defenses in the alternative."  DN 717 at 10 (citing FED. R. CIV. P. 8(d)).

15      In the cases Larson cites, parties sought to rescind contracts—the *existence* of

16 which was *undisputed*—arguing the contract was *unenforceable*, on equitable or

17 policy grounds.  *See People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App.

18 4th 102, 133 (2003) (rescission on grounds of illegality); *Runyan v. Pac. Air Indus.*,

19 2 Cal. 3d 304, 307-08 (1970) (fraud); *Lobdell v. Miller*, 114 Cal. App. 2d 328, 343

20 (1952) (same).  Larson cited similarly inapt cases at summary judgment, DN 711 at

21 10:10-16—meaning none of her cited cases is new, and none can be raised now,

22 *supra* at 1, 3.  Larson's heavy reliance on *Donovan v. RRL Corp.*, 26 Cal. 4th 261,

23 267 (2001), is misplaced for the same reasons.  There, a car dealer advertised a car

24 for $12,000 below the intended price.  Plaintiff sued for breach, arguing he

25 accepted the dealer's offer by tendering payment.  While the dealer argued the ad

26 was an invalid offer, it *also* argued it was entitled to rescind any contract that *might*

27 have been formed on grounds of mistake.  *Id.* at 272-78.  Contrary to Larson's

28 claim, the rescission argument in *Donovan* assumed contract *formation*, then

- 11 -                           DC'S OPP. TO PL.'S RULE 59(E) MOT.

1   challenged *enforceability* on separate grounds as well. *Id.* at 280-94.

2        Larson's additional complaints that the Court "waded into the parties' …

3   conduct/intentions and the fact-laden state-contract-law issues of rescission and/or

4   acquiescence," Mot. 4, fare no better. She argued the same at summary judgment,

5   *e.g.*, DN 709 at 20-22, meaning she is barred from doing so now, *supra* at 1, 3, 6.

6   She also makes no showing how the Court clearly erred in applying black-letter law

7   to her family's unequivocal statements and admissions. *Supra* at 1, 3. Larson's

8   suggestion that DC's counsel—when arguing before the Ninth Circuit months

9   ago—agreed that these issues must be decided as a matter of fact, Mot. 5, is

10  contrary to the record, and is yet another rehash of a losing argument she pressed

11  before, DN 709 at 8-9; 709-1 at 25. DC's counsel, in the text Larson quotes, was

12  describing the holding in *S. Cal. Painters & Allied Trade Dist. Council No. 36 v.*

13  *Best Interiors, Inc.*, 359 F.3d 1127 (9th Cir. 2004). And DC made clear throughout

14  the *Larson* appeal it was entitled to a full and final judgment in its favor, *as a*

15  *matter of law*. Appeal No. 11-55863, DN 31-1 at 28-34, 87; 49 at 3-9, 28.

16       *3. Abandonment/Acquiescence.* Larson relitigates her abandonment and

17  acquiescence defenses, claiming the Court misconstrued a May 2002 letter from

18  DC in DC's favor. Mot. 14-16. She wrests words from the letter out of context (as

19  she did on summary judgment), claiming it "states DC's 'hope' that the parties can

20  reach a *new agreement* on mutually acceptable terms." Mot. 15 (quoting DN 709-

21  2, Ex. 5 at 78, which <u>actually says</u> DC "continue[s] to hope that *this agreement can*

22  *be closed* based upon the earlier discussions with your lawyers.") (italics added).

23       The Court already parsed this sentence, rejected Larson's argument, and held

24  that the May 2002 letter, "[o]n its face," *supports DC's position* "that an agreement

25  existed on October 19 and would be followed by additional negotiations regarding

26  the long-form contract." DN 717 at 11. The Court correctly concluded the word

27  "hope" unambiguously referred to "additional negotiations" of the long-form, *id.* at

28  11—disputes over which "cannot invalidate or breach the underlying short-form,"

*id.* at 9-10 (citing *Clark*, *supra*; *Facebook*, *supra*).  As to Larson's claim that DC did nothing to enforce the agreement—or abandoned it—the Court rightly held that her contention was "belied by the entire course of this litigation."  DN 717 at 11.

Other than recycle her losing arguments, Larson does nothing to show how the Court's holdings on these points was error—much less *clear error*.  Larson's continued "disagreement with the court's decision" is not grounds for a Rule 59 motion.  *Worlds of Wonder*, 814 F. Supp. at 874.  It violates that rule.

## IV.     LARSON IS NOT ENTITLED TO RELIEF ON HER FIRST CLAIM.

A.  The most egregious aspect of Larson's Rule 59 motion is her request that judgment be entered in *her favor* on her First Claim even though she *never moved* on this claim after the Ninth Circuit issued its mandate.  Mot. 19-24.  DC moved on this First Claim after the mandate issued, and its proposed judgment and motion made clear from February 2013 onward that it sought final judgment on Larson's First Claim.  DC explained how under the parties' October 2001 agreement it owned all rights in Superman and Superboy, which compelled denying Larson's First Claim *and* granting DC's Fourth Counterclaim.  DN 702 at 6-9; 702-5 at 1-2.

Larson abandoned any chance to seek judgment in *her* favor on her First Claim—by letting months pass, judgment enter *in DC's favor*, and this case end, and still never moving under Rule 56 for judgment on her First Claim.  The Court made clear in its standing order, DN 598 at 6-8, and in rulings post-dating the Ninth Circuit's remand, that it would follow the summary judgment rules to the letter, DN 707; Case No. CV-10-3633, DN 593 at 2-3.  Larson's attempt to use Rule 59 to obtain relief she was obligated to seek *months ago* is highly improper and grounds alone to deny this half of her Rule 59 motion.  *Id.*[1]

---

[1]  Larson also asks the Court to deny DC's First and Second Counterclaims "with prejudice," Mot. 19-24, rather than "as moot" as it did in its April judgment, DN 724 at 3.  This belated, improper request fails for the same reasons:  it violates Rules 59 and 56, Local Rule 7-18, and this Court's orders about such motions.

B.  Larson's arguments about her First Claim also fail on the merits.  To begin, she badly misrepresents the thrust of her First Claim when she argues that, by granting DC's Fourth Counterclaim, the Court implied that both her termination notices *and her First Claim* were valid because DC pled its Fourth Counterclaim in the alternative to Larson's First Claim.  Mot. 20.  Exactly the opposite is true.  Larson's First Claim includes the critical contention that:

> As of the effective Termination Date, April 16, 1999, Plaintiffs *owned and continue to own an undivided fifty percent (50%) of the Recaptured Copyrights to each and/or all the Works* for their renewal terms.

DN 644 ¶ 54(b) (italics added).  Larson's complaint defines "Works" to include thousands of Superman works, DN 378 ¶ 39—all works that this Court just held that *DC owns outright*, DN 717, 723, 724, including works that Judge Larson held years ago that DC owned as works-for-hire, such as *Action Comics Nos. 2*, *3* and *5-61*, as well "subsequent works involving 'Superman' all as set forth in the Notices of Termination," *compare* DN 378 ¶ 39 (Larson's complaint, claiming to own such works), *with* DN 560 at 40-48 (Judge Stephen Larson's then-operative work-for-hire rulings), *with* Appeal No. 11-55863, DN 12 at 20-58 (Larson's appeal challenging these work-for-hire rulings on her First Claim as erroneous).  That Judge Larson found against Larson on her First Claim is perhaps best illustrated by how she framed her principal argument on appeal:  "The District Court <u>Improperly Found</u> On Summary Judgment That <u>Numerous Superman Works Were 'Works Made For Hire</u>.'"  Appeal No. 11-55863, DN 12 at 30 (underlining added).

The gravamen of Larson's First Claim is thus not merely that her termination notices were valid, but that she *owns 50% of the rights* in various Superman and Superboy works.  But as this Court ruled—in granting DC's Fourth Counterclaim, *and* in denying Larson's First Claim—Larson assigned *all* of her rights in Superman and Superboy to DC in 2001.  DN 717 at 12-15; 723; 724.

Any sort of amended judgment in Larson's favor on her First Claim would *contradict* the Court's considered and correct summary judgment orders and its

1    final judgments in DC's favor on its Fourth Counterclaims. Indeed, this is why DC

2    expressly pleaded its "settlement" defense as an affirmative defense to Larson's

3    First Claim. DN 645 ¶ 81. Larson may now wish to create confusion in the

4    appellate record or with respect to her rights vis-à-vis DC by having the judgment

5    on her First Claim altered. But such a Rule 59 ruling is without basis and would be

6    logically at odds with Court's summary judgment orders and final judgments.

7          C.  Larson also seeks to keep in place Judge Larson's copyright work-for-

8    hire rulings, positing that the Shuster family can use them in the *Pacific Pictures*

9    case, which they lost and are now appealing. Mot. 23. These arguments (which

10   Larson lacks standing to make, in any event) fail. As explained below, Judge

11   Larson's work-for-hire rulings no longer exist, because the summary judgment

12   ruling on Larson's First Claim that contained the rulings was *reversed* on appeal.

13         In any event, rulings involving the Siegels have no preclusive effect as to the

14   Shusters, because for issue preclusion to apply, "the issue sought to be precluded

15   from relitigation *must be identical* to that decided in a former proceeding." *E.g.*,

16   *Cooper v. Ramos*, 704 F.3d 772, 784 (9th Cir. 2012) (italics added). Jerry Siegel

17   and Joe Shuster had different relationships with DC, meaning rulings in the Siegels'

18   favor do not carry over. Indeed, Judge Larson noted: "It is by no means a foregone

19   conclusion that the Shuster estate will be successful in terminating the grant to the

20   Superman material published in *Action Comics No. 1*." DN 554 at 23.

21         As for whether Judge Larson's work-for-hire rulings survive, "[i]t has long

22   been well established that the reversal of a lower court's decision sets aside that

23   decision, leaves it 'without any validity, force, or effect,' and requires that it be

24   treated thereafter as though it never existed." *Khadr v. U.S.*, 529 F.3d 1112, 1115-

25   16 (D.C. Cir. 2008) (citing, *e.g.*, *Butler v. Eaton*, 141 U.S. 240, 244 (1891); *Keller

26   v. Hall*, 111 F.2d 129, 131 (9th Cir. 1940)). The default rule is that the Ninth

27   Circuit's reversal of Judge Larson's summary judgment order "annull[ed]" *every

28   aspect* of that ruling "*for all purposes*"—be it his erroneous contract rulings that

DC'S OPP. TO PL.'S RULE 59(E) MOT.

1  were reversed or the copyright rulings he made in the same order on Larson's First

2  Claim.  CHRISTOPHER C. GOELZ & MEREDITH J. WATTS, FEDERAL NINTH CIRCUIT

3  APPELLATE PRACTICE § 10:231 (Rutter 2012) ("RUTTER") (emphasis added); *see*

4  *State of Cal. Dept. of Social Servs. v. Thompson*, 321 F.3d 835, 847 (9th Cir. 2003).

5      Larson suggests the Ninth Circuit meant to leave Judge Larson's copyright

6  rulings in place.  Its order says no such thing, and nor can it be read to so hold.

7  Both DC and Larson challenged Judge Larson's work-for-hire First Claim rulings

8  on appeal, and when DC's counsel raised the issue at oral argument, the presiding

9  judge asked, "is this [copyright] issue resolved if you win on the summary

10  judgment [contract-law] question?"  DN 709-2 at 355:15-16.  DC answered: "Yes.

11  *Everything goes away* on the summary judgment, *everything*, your Honor.  It's—

12  it's the end of this case once and for all."  *Id.* at 355:17-19 (emphasis added).

13      Consistent with that colloquy, the Ninth Circuit "reverse[d] the district

14  judge's grant of summary judgment to Larson" on her First Claim and on DC's

15  Fourth and Fifth Counterclaims, and it noted that "a judgment [in] DC's favor" on

16  its counterclaims on remand may "render moot *all of the other questions* in this

17  lawsuit."  *Larson v. Warner Bros. Entm't, Inc.*, 2013 WL 1113259, at *2 (9th Cir.

18  Jan. 10, 2013) (emphasis added).  The Court expressed *no* inclination to preserve

19  Judge Larson's copyright rulings or to upset the normal default rule—that his

20  summary judgment rulings were now a "nullity."  *Khadr*, 529 F.3d at 1116.

21      Larson's claim that Judge Larson's rulings are "law of the case" is equally

22  without basis.  The *Siegel* and *Pacific Pictures* cases are different cases; Joe

23  Shuster's relationship with DC was different than Jerry Siegel's; and, thus, there is

24  no basis to apply Judge Larson's copyright rulings in *Siegel* beyond *Siegel*, as

25  Judge Larson himself expressly noted.  *Supra* at 15.  Moreover, Judge Larson's

26  summary judgment rulings on Larson's First Claim and DC's Fourth Counterclaim

27  has been "annull[ed]," RUTTER, *supra*, § 10:231, and Larson herself disputed

28  whether the law-of-the-case ruling should apply, in any event, to his rulings, *see*

DC'S OPP. TO PL.'S RULE 59(E) MOT.

1   Case No. 10-3633, DN 550-1 at 14-17 (Larson arguing law-of-the-case doctrine did

2   not apply to Judge Larson's ruling in *Siegel* that DC acted appropriately in handling

3   Toberoff Timeline documents).  And while Magistrate Judge Zarefsky did apply the

4   law-of-the-case doctrine (erroneously) to one overlapping discovery issue in *Siegel*

5   and *Pacific Pictures*, Case No. CV-10-3633 DN 209 at 3-4; 225 at 5-6, that *Siegel*

6   consent-agreement ruling at issue was invoked by the Siegels to bar discovery

7   against *themselves* and their fellow *Pacific Pictures* defendants—*i.e.*, there was

8   standing to make the argument.  In any event, such discovery rulings are different

9   than substantive copyright rulings.  As Judge Larson himself made clear, his

10  copyright rulings concerning the Siegels' rights in *Siegel* were not dispositive of the

11  Shusters' rights in whatever later case might follow.  *Supra* at 15.

12        Larson's cited cases are also off point.  In *Xiao v. Reno*, 837 F. Supp. 1506,

13  1545 (N.D. Cal. 1993), the court held that its "ruling as to the eleven remaining

14  claims [in the case] was not disturbed by the Ninth Circuit's decision" because the

15  Ninth Circuit expressly dealt with only *one* of *twelve* causes of action.  *See also*

16  *Robinson v. Sanctuary Record Grps., Ltd.*, 763 F. Supp. 2d 629, 631 (S.D.N.Y.

17  2011).  Here, in contrast, the Ninth Circuit dealt *expressly with Judge Larson's*

18  *rulings on Larson's First Claim and DC's Fourth Counterclaim*, and reversed

19  Judge Larson's summary judgment ruling on those claims without reservation.

20  *Larson*, 2013 WL 1113259, at *2.  It did not say or suggest that Judge Larson's

21  disputed copyright rulings involving the *same claims* remained intact.  It said if DC

22  prevailed on its settlement defense, those copyright issues would be "moot."  *Id.*

23  **V.     CONCLUSION**

24        Larson's motion should be denied.

25  Dated:  June 5, 2013                          Respectfully submitted,

26                                                By: /s/ Daniel M. Petrocelli

27  OMM_US:71587486.1                        Daniel M. Petrocelli

28

1 | Marc Toberoff (State Bar No. 188547)
   *mtoberoff@toberoffandassociates.com*
2 | Keith G. Adams (State Bar No. 240497)
   *kadams@toberoffandassociates.com*
3 | TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
4 | Malibu, California, 90265
Telephone: (310) 246-3333
5 | Fax:       (310) 246-3101

6 | Attorneys for Plaintiff-Counterclaim
Defendant, Laura Siegel Larson,
7 | individually and as personal representative
of the Estate of Joanne Siegel

8

### UNITED STATES DISTRICT COURT

9

### CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br>         Plaintiff, <br>   v. <br> WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, <br>         Defendants and <br>         Counterclaimants. | **Case No: 04-CV-08400 ODW (RZx)\*** <br> Case No: 04-CV-08776 ODW (RZx)\* <br><br> Hon. Otis D. Wright II, U.S.D.J. <br> Hon. Ralph Zarefsky, U.S.M.J. <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AMENDMENT OF THE COURT'S APRIL 18, 2013 JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)** |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br>         Plaintiff, <br>   v. <br> TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, <br>         Defendants and <br>         Counterclaimants. | *[Proposed] Order and [Proposed] Judgment filed concurrently* <br><br> Date:     July 1, 2013 <br> Time:    1:30 p.m. <br> Place:   Courtroom 11 <br><br> \*: Docket citations herein are to Case No. 04-CV-08400. |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 1, 2013 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, plaintiff-counterclaim defendant Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel ("Plaintiff"), will and hereby does move for amendment of the Court's April 18, 2013 judgment in the above-captioned actions (Dkt. 724) pursuant to Fed. R. Civ. P. 59(e).

The motion will be made on two principal grounds. *First*, in light of the Court's holding that the October 19, 2001 letter operated as a present transfer of the Siegels' copyrights to DC Comics ("DC"), the resolution of the rescission and acquiescence issues, which present questions for the trier of fact and are ill-suited for summary judgment, was unnecessary to the judgment on DC's Fourth Counterclaim. *Second*, the judgment denied Plaintiff's First Claim, and denied without prejudice DC's First and Second Counterclaims. However, the Court's prior orders on those claims were not addressed or disturbed on appeal, or reconsidered on remand, and therefore remained "law of the case." Accordingly, Plaintiff's First Claim should have been granted to the extent it sought a declaration that Plaintiff's termination notices were valid as to the Superman works set forth in the Court's prior orders, and DC Comics' First and Second Counterclaims, contesting their validity, should have been denied *with prejudice*.

This motion is made following the L.R. 7-3 conference of counsel, which took place on May 15, 2013, and is based on this Notice of Motion, the attached Memorandum of Points and Authorities, all of the pleadings, files, and records in these proceedings, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court.

Dated: May 16, 2013　　　　　　RESPECTFULLY SUBMITTED,
　　　　　　　　　　　　　　　　　/s/ Marc Toberoff
　　　　　　　　　　　　　　　　　TOBEROFF & ASSOCIATES, P.C.
　　　　　　　　　　　　　　　　　Attorneys for Plaintiff, Laura Siegel Larson

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 2

I. THE POST-2001 CONTRACT ISSUES WERE UNNECESSARILY
DECIDED AND NOT SUSCEPTIBLE TO SUMMARY JUDGMENT ....... 2

    A. The Post-October 19, 2001 State Contract Law Issues Were
    Unnecessary To The Court's Judgment ................................................ 2

    B. Rescission And Acquiescence Entail Genuine Issues of Fact
    Precluding Summary Judgment ........................................................... 5

        1. Whether The Siegels Justifiaby Rescinded Or Unjustifiably
        Repudiated The October 19, 2001 Agreement Was For The
        Trier Of Fact And Not Suitable For Summary Judgment .......... 6

            a. A Rescission Is A Justified Repudiation ......................... 6

            b. Whether The Siegels Rescinded Their October 19,
            2001 Acceptance Was A Triable Issue ............................ 6

            c. California Law Does Not Require A Rescinding Party
            To First Acknowledge A Contract ................................ 10

            d. Whether The Siegels' 2002 Letters Gave DC Notice
            Of Rescission Was For The Trier Of Fact ..................... 12

        2. On DC's Summary Judgment Motion, The Order Viewed
        The Acquiescence Evidence In The Light Most Favorable
        To DC ..................................................................................... 14

    C. Plaintiff Timely Asserted Rescission And Acquiescence .................. 16

II. THE JUDGMENT SHOULD BE AMENDED TO GRANT
PLAINTIFF'S FIRST CLAIM AND DENY DC'S FIRST AND
SECOND COUNTERCLAIMS WITH PREJUDICE ................................. 19

CONCLUSION ......................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Ahmad v. Furlong,*
435 F.3d 1196 (9th Cir. 2006) ............................................................ 16-17

*Allied Health Ass'n v. Arthrocare Corp.,*
2009 U.S. Dist. LEXIS 42806 (N.D. Cal. May 20, 2009)........................13

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...................................................................................5

*Clark v. Dana Woody & Assocs.,*
2013 U.S. Dist. LEXIS 18996 (S.D. Cal. Feb. 12, 2013)........................23

*Donovan v. RRL Corp.,*
26 Cal. 4th 261 (2001) ....................................................................... 10-11

*Don Johnson Prods. v. Rysher Entm't, Inc.,*
2009 U.S. Dist. LEXIS 81594 (C.D. Cal. June 8, 2009).........................23

*Earl v. Saks & Co.,*
36 Cal. 2d 602 (1951) ........................................................................ 13-14

*Eddy v. Gallaway,*
11 Cal. App. 3d 185 (1970) ......................................................................14

*Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.,*
822 F.2d 833 (9th Cir. 1987) .....................................................................9

*Griffin v. Beresa, Inc.,*
143 Cal. App. 2d 299 (1956).....................................................................14

*Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers,*
192 Cal. App. 2d 268 (1961).....................................................................14

*Hil-Mac Corp. v. Mendo Wood Products, Inc.,*
235 Cal. App. 2d 526 (1965).....................................................................14

*Hoffman v. Babbitt Bros. Trading Co.,*
203 F.2d 636 (9th Cir. 1953) .....................................................................5

*Honda v. Reed,*
156 Cal. App. 2d 536 (1958).....................................................................15

*Hull v. Ray,*
211 Cal. 164 (1930) ........................................................................... 10-13

*Johns Hopkins Univ. v. CellPro, Inc.,*
152 F.3d 1342 (Fed. Cir. 1998) ...............................................................18

*Johnson v. Goldberg,*
130 Cal. App. 2d 571 (1955)......................................................................8

ER 440

*Jordan v. Sony BMG Music Entm't, Inc.*,
2010 U.S. Dist. LEXIS 52585 (S.D. Tex. May 28, 2010)....................................23

*Kam-Ko Bio-Pharm Trading Co., Ltd. v. Mayne Pharma Inc.*,
560 F.3d 935 (9th Cir. 2009) ........................................................................10

*Larson v. Warner Bros. Entm't, Inc.*,
2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013)..............................*passim*

*Lobdell v. Miller*,
114 Cal. App. 2d 328 (1952) ..........................................................................6

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*,
191 Cal. App. 4th 435 (2010) .........................................................................8

*Marvel Worldwide, Inc. v. Kirby*,
777 F. Supp. 2d 720 (S.D.N.Y. 2011) ..........................................................22

*May v. Watt*,
822 F.2d 896 (9th Cir. 1987) ........................................................................14

*McCreary v. Mercury Lumber Distributors*,
124 Cal. App. 2d 477 (1957) ........................................................................16

*McGinest v. GTE Serv. Corp.*,
247 Fed. Appx. 72 (9th Cir. 2007)................................................................16

*McKesson Corp. v. Health Robotics, S.R.L.*,
2011 U.S. Dist. LEXIS 81192 (N.D. Cal. July 26, 2011) .............................23

*McNeese v. McNeese*,
190 Cal. 402 (1923) ......................................................................................11

*Melanie Howard Music, Inc. v. Warner Bros. Records*,
2009 U.S. Dist. LEXIS 105049 (M.D. Tenn. Nov. 10, 2009).......................23

*Morrison v. Mahoney*,
399 F.3d 1042 (9th Cir. 2005) ......................................................................18

*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*,
411 F.2d 889 (9th Cir. 1969) .....................................................................9-10

*Painters Joint Comm. v. J.L. Wallco, Inc.*,
2013 U.S. Dist. LEXIS 22915 (D. Nev. Feb. 19, 2013).................................23

*Paularena v. Superior Court of San Diego County*,
231 Cal. App. 2d 906 (1965) ........................................................................14

*Pearson v. Brown*,
27 Cal. App. 125 (1915) ................................................................................11

*Peer Int'l Corp. v. Pausa Records, Inc.*,
909 F.2d 1332 (9th Cir. 1990) ................................................................8-9, 13

*People ex rel. Kennedy v. Beaumont Investment, Ltd.*,
111 Cal. App. 4th 102 (2003) ....................................................................6, 10

*Perrey v. Televisa S.A. de C.V.*,
2010 U.S. Dist. LEXIS 142449 (C.D. Cal. Mar. 25, 2010)...................................23

*Ray Charles Found. v. Robinson*,
2013 U.S. Dist. LEXIS 21273 (C.D. Cal. Jan. 25, 2013) ......................................23

*Rice v. May*,
231 F.2d 389 (9th Cir. 1956) ...........................................................................6, 13

*Robinson v. Sanctuary Record Groups, Ltd.*,
763 F. Supp. 2d 629 (S.D.N.Y. 2011) ...................................................................21

*Runyan v. Pac. Air Indus.*,
2 Cal. 3d 304 (1970) ...............................................................................................6

*Scorpio Music (Black Scorpio)S.A. v. Willis*,
2013 U.S. Dist. LEXIS 29141 (S.D. Cal. Mar. 4, 2013) .......................................23

*Siegel v. Warner Bros. Entertainment Inc.*,
542 F. Supp. 2d 1098, 1138 (C.D. Cal. 2008) ...............................................*passim*

*Siegel v. Warner Bros. Entertainment Inc.*,
581 F. Supp. 2d 1067 (C.D. Cal. 2008) .................................................................19

*Siegel v. Warner Bros. Entertainment Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ...........................................................19, 23

*Siegel v. Warner Bros. Entertainment Inc.*,
690 F. Supp. 2d 1048 (C.D. Cal. 2009) .................................................................19

*Simmons v. Navajo County*,
609 F.3d 1011 (9th Cir. 2010) ..............................................................................16

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ................................................................................5

*U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
498 F.2d 335 (9th Cir. 1974) ..............................................................................8, 13

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000) ...............................................................................18

*United States v. Moriel-Luna*,
585 F.3d 1191 (9th Cir. 2009) ...............................................................................18

*United States v. Vacante*,
2010 U.S. Dist. LEXIS 73962 (E.D. Cal. June 2, 2010) ......................................23

*Vance v. Latimer*,
648 F. Supp. 2d 914 (E.D. Mich. 2009) ...............................................................23

*Wang Zong Xiao v. Reno*,
837 F. Supp. 1506 (N.D. Cal. 1993) ..................................................................3, 21

*Warner Bros. Entm't, Inc. v. X One X Prods.*,
644 F.3d 584 (8th Cir. 2011) .................................................................................23

*Westendorf v. W. Coast Contrs. of Nev., Inc.,*
712 F.3d 417 (9th Cir. 2013) ........................................................5

*Whitney Inv. Co. v. Westview Dev. Co.,*
273 Cal. App. 2d 594 (1969) ...................................................9, 11

*Wong v. Regents of the Univ. of Cal.,*
410 F.3d 1052 (9th Cir. 2005) ....................................................5

**<u>Statutes</u>**

Cal. Civ. Code § 1689 ...........................................................1, 6, 10

Fed. R. Civ. P. 56 ..............................................................5, 17

Fed. R. Civ. P. 59 ..............................................................1, 24

ER 443

**<u>INTRODUCTION</u>**

On January 10, 2013, the Ninth Circuit held that the Siegels' October 19, 2001 letter was "an acceptance" "sufficient" to create an agreement, and remanded for reconsideration of DC's Third and Fourth Counterclaims regarding that agreement. *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013). DC then moved for summary judgment on its Fourth Counterclaim, which asked for a declaratory judgment that under the October 19, 2001 agreement the Siegels "*either* transferred *or* are contractually obligated to transfer" their Superman rights to DC Comics. Dkt. 646 ¶103(a) (emphasis added). On April 18, 2013, this Court entered a judgment (Dkt. 724) based on its March 20, 2013 summary judgment order that the Siegels' October 19, 2001 letter "operated itself to transfer the Siegels' Superman rights to DC" (Dkt. 717 ("Order") at 14) – granting DC the relief it requested.

Plaintiff does not challenge that determination here – the central aspect of the judgment and DC's Fourth Counterclaim. Nor does Plaintiff now challenge the Court's preclusion of her statutory terminations regarding Superboy and the Superman "Ads." Dkt. 723. Respectfully, however, two specific aspects of the judgment should be amended pursuant to Fed. R. Civ. P. 59(e).

*First*, the Court's ruling that the Siegels' transferred their recaptured copyrights on October 19, 2001 largely granted DC's Fourth Counterclaim and removed any necessity for the Court to wade into the parties' subsequent conduct/intentions and the fact-laden state-contract-law issues of rescission and/or acquiescence that are not susceptible to summary judgment.

The Order mistakenly adopted DC's erroneous legal argument that a notice of rescission requires that a party first acknowledge a contract. This is not the law in California. In fact, under Cal. Civil Code § 1689, a party can rescind for defects in contract formation. Moreover, DC cannot be heard to object that the notice did not acknowledge a contract when it asserted to the Ninth Circuit and this Court that the

Siegels' May 9, 2002 notice "acknowledged" the parties' agreement.  Dkt. 722-1, Ex. 13 at 225 ("Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner.").  And DC repeatedly alleged that the Siegels' May 9 and September 21, 2002 letters "repudiat[ed] the agreement reached by the parties."  Dkt. 646 ¶¶55-56.  Though repudiation and rescission have different legal consequences, the two are closely related.  A *justified* repudiation *is* a rescission.  The rescission issue is therefore inextricably tied to the issue of DC's antecedent breach.

Plaintiff presented ample evidence regarding DC's anticipatory and actual breaches of the terms of the October 19, 2001 agreement, the Siegels' justified repudiation/rescission based on DC's breach, and DC's acquiescence due to its utter failure to assert an October 19, 2001 agreement *for two years* and its resumption of different negotiations in 2003-2004.  When viewed in the light most favorable to the non-moving party, such evidence was more than sufficient to raise questions for the trier of fact, precluding summary judgment.

Plaintiff has a fundamental right to trial of these claims and defenses here or in state-court.  The Court rightly concluded that the state-law contract claims of breach and repudiation are best left to a separate state-court action.  Dkt. 717 at 12, 16; Dkt. 723 at 11.  The same applies to Plaintiff's closely-related rescission and acquiescence claims, which are unnecessary to the Court's core judgment.

*Second,* the Court's judgment denied Plaintiff's First Claim (implicitly with prejudice), and denied "without prejudice" DC's First and Second Counterclaims – which all focused on whether the Siegels' termination notices were valid.  In 2011, the Court *granted* the First Claim and denied *with prejudice* the First and Second Counterclaims based on Judge Larson's detailed published decisions.  The Ninth Circuit's decision solely addressed and confirmed DC's October 19, 2001 agreement and thus remanded for reconsideration of DC's Third and Fourth Counterclaims regarding it.  Accordingly, on remand, this Court's summary judgment rulings also

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

only addressed DC's Fourth Counterclaim (DC moved to dismiss its Third

Counterclaim) and did not reconsider any portions of the prior orders which rightly

upheld Plaintiff's Superman termination notices.  As such, the Court's prior orders

remained "law of the case," see *Wang Zong Xiao v. Reno*, 837 F. Supp. 1506 (N.D.

Cal. 1993), and the judgment should be amended to *grant* the First Claim, consistent

with the prior rulings, and deny DC's First and Second Counterclaims *with prejudice*.

     This would also comport with the parties' pleadings, as DC's Fourth

Counterclaim, granted by the Court, was pled *in the alternative* to its First and

Second Counterclaims, such that it only had effect if the Siegels' Superman

termination was held valid.  Furthermore, such amended judgment would preserve

important, hard-earned precedent regarding an emerging area of copyright law that

has been repeatedly cited by other courts.  Lastly, such amendment would greatly

simplify the closely-related *DC Comics* case if it is remanded, because it would

enable the Court to apply issue preclusion to already-decided issues common to both

cases, including complex "work-for-hire" issues.

## ARGUMENT

### I. THE POST-2001 CONTRACT ISSUES WERE UNNECESSARILY DECIDED AND NOT SUSCEPTIBLE TO SUMMARY JUDGMENT

### A. The Post-October 19, 2001 State Contract Law Issues Were Unnecessary To The Court's Judgment

     As the Court is aware, DC appealed this Court's judgment in the Siegels' favor

on DC's Third and Fourth Counterclaims, for breach of the October 19, 2001 Letter

and declaratory relief regarding that letter, respectively.  On appeal, the Circuit held

that the October 19, 2001 Letter was "an acceptance of terms negotiated between the

parties" that "was sufficient" to create a contract on October 19, 2001, and remanded

so that this Court could "reconsider DC's third and fourth counterclaims in light of

our holding that the October 19, 2001, letter created an agreement."  *Larson*, 2013

U.S. App. LEXIS 671 at *3, *6.  On remand, DC moved for summary judgment on

1   its Fourth Counterclaim only, and to dismiss its remaining counterclaims, including

2   its Third Counterclaim.  Dkt. 702 at 7-8; 702-5.

3        DC's Fourth Counterclaim, expressly pled in the alternative to its First and

4   Second Counterclaims, sought a declaration that the Siegels "*either* have transferred

5   *or* are contractually obligated to transfer to DC Comics" their rights in the Superman

6   works.  Dkt. 646 ¶103(a) (emphases added).  On DC's motion for summary

7   judgment, the Court found that the October 19, 2001 agreement "operated itself to

8   transfer the Siegels Superman rights to DC."  Dkt. 717 at 14.  The Court thereby

9   granted DC the relief sought in its Fourth Counterclaim – namely, that the Siegels

10  "transferred … to DC Comics" their rights on October 19, 2001.  This unequivocal

11  decision mooted DC's *alternative* relief that the Siegels are currently "contractually

12  obligated to transfer" their rights to DC.

13       The Court's decision rendered it largely unnecessary for it to wade into or

14  resolve the morass of state-law contract issues regarding what happened *after* the

15  Siegels transferred their rights.  Those issues included whether DC subsequently

16  *breached* the October 19, 2001 agreement, whether the Siegels thereafter repudiated

17  (*i.e.*, breached) or justifiably rescinded the agreement due to DC's antecedent breach,

18  and/or whether DC, by its actions or inaction, acquiesced in the Siegel's repudiation.

19  These interrelated, fact-intensive issues regarding the parties' conduct and intentions

20  after October 19, 2001, and whether such constituted anticipatory breach, breach,

21  rescission, repudiation or acquiescence, were ill-suited for summary judgment.  The

22  issues were also unnecessary to the Court's judgment on DC's Fourth Counterclaim.

23  A declaratory judgment need not resolve *all* requested relief.  Whether the agreement

24  is enforceable today in light of the parties' alleged breaches was superfluous given of

25  the Court's decision that the Siegels had "transferred … to DC Comics" their

26  recaptured copyrights on October 19, 2001.

27       The Court has thrice stated that the parties' breach and repudiation claims are

28  unnecessary to its decision, and that these state-law contract matters are better

4

**ER 447**

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

resolved in "a separate state-court action."  Dkt. 717 at 12, 16; Dkt. 723 at 11.  The same holds true for the Siegels' rescission and acquiescence claims, which are inextricably intertwined with the issue of whether DC breached the October 19, 2001 prior to the Siegels' alleged repudiation or rescission of that agreement.

**B.**     **Rescission And Acquiescence Entail Genuine Issues of Fact Precluding Summary Judgment**

A motion for summary judgment may only be granted if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  "'On a motion for summary judgment the court cannot try issues of fact. It can only determine whether there are issues to be tried.'"  *Hoffman v. Babbitt Bros. Trading Co.*, 203 F.2d 636, 638 (9th Cir. 1953) (citation omitted); *see also Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1068 (9th Cir. 2005) (on summary judgment, courts "do not weigh the preponderance of the evidence, but decide simply whether genuine issues of fact exist").  The moving party bears the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact for trial.  *Anderson*, 477 U.S at 256.  Courts must also "view the evidence in the light most favorable to [] the non-moving party" (*Westendorf v. W. Coast Contrs. of Nev., Inc.*, 712 F.3d 417 (9th Cir. 2013)), and "all justifiable inferences are to be drawn" in their favor.  *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are matters for trial, not summary judgment.  *Anderson*, 477 U.S at 256.

As DC itself argued to the Ninth Circuit:  "The question of whether the subsequent events undid the prior [October 19, 2001] agreement or didn't undo the prior agreement, that's a fact question."  Dkt. 709-2, Ex. 19 at 345.  Plaintiff's fact-intensive rescission and acquiescence defenses presented issues for the trier of fact that could not be decided on summary judgment.

1.      **Whether The Siegels Justifiably Rescinded Or Unjustifiably Repudiated The October 19, 2001 Agreement Was For The Trier Of Fact And Not Suitable For Summary Judgment**

a.      A Rescission Is A Justified Repudiation

A central plank of DC's arguments was the notion that the Siegels' May 9, 2002 letter was a "repudiation" of the October 19, 2001 agreement, not a rescission, and that DC's performance was thereby excused.  Dkt. 711 at 6-8, 10.  While repudiation and rescission have different legal consequences, they are factually closely related.  A "rescission necessarily involves a repudiation of the contract." *Runyan v. Pac. Air Indus.*, 2 Cal. 3d 304, 316 (1970) (citation omitted); *see People ex rel. Kennedy v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 133 (2003) (same); *Lobdell v. Miller*, 114 Cal. App. 2d 328, 343 (1952) (same).  The difference is substantive, not formalistic, as advocated by DC and adopted by the Order.  In short, "rescission" is the justifiable repudiation of a contract.  The issue is whether a party's repudiation was **justified** by, for example, the other party's antecedent breach.  If justified, it is a "rescission;" if not, it is a "repudiation."  *See Rice v. May*, 231 F.2d 389, 395 (9th Cir. 1956) ("One who rescinds without excuse repudiates.").

The ample evidence of DC's breach after October 19, 2001, when viewed in the light most favorable to Plaintiff, the non-moving party, raised a triable issue of fact as to whether the Siegel's 2002 letters constituted a justified "rescission," as claimed by Plaintiff, or an unjustified "repudiation," as claimed by DC.

b.      Whether The Siegels Rescinded Their October 19, 2001 Acceptance Was A Triable Issue

As this Court aptly stated, "[u]nder California law one party to a contract may rescind the contract if the other party refuses or fails to fully perform" – *i.e.,* if the other party breaches or substantially non-performs.  Dkt. 717 at 7 (citing Cal. Civ. Code § 1689(b)(2)).

The Siegels' central obligation under the alleged October 19, 2001 agreement

was to "transfer all of [their] rights in the 'Superman' properties" to DC. Dkt. 709-2, Ex. 1 at 6 ¶C(1). Per DC's allegations (Dkt. 646 ¶103(a)) and summary judgment motion (Dkt. 702 at 6-7), the Court ruled that the Siegels transferred their recaptured copyrights in the October 19, 2001 agreement itself (Dkt. 717 at 14), thereby performing their central contractual obligation.

In exchange, DC was obligated under the October 19, 2001 agreement to provide to the Siegels with: (1) a "signing bonus" of $1 million; (2) $2 million, as an upfront advance against royalties; (3) guaranteed annual payments of $500,000, starting March 31, 2002; (4) "royalty statements," starting March 31, 2002; (5) medical and dental insurance and (6) a "Special Arrangement" credit. Dkt. 709-2, Ex. 1 (October 19, 2001 agreement). None of DC's explicit obligations were contingent on the signing of a long-form agreement. As DC convinced the Circuit: "Our position is [the terms are] everything in this [October 19] letter, nothing more." Dkt. 709-2, Ex. 19 at 346:23-347:1; *see* Dkt. 722-1, Ex. 13 at 219 ("DC has long agreed: the October 19 letter controls."); *Larson*, 2013 U.S. App. LEXIS 671, at *4 ("[T]he letter accurately reflected the material terms … agreed to…."). And as this Court held, "the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more." Dkt. 717 at 15.

However, after the Siegels transferred their rights to DC on October 19, 2001, DC performed ***none*** of its obligations. Instead, DC anticipatorily breached the October 19, 2001 agreement by conditioning its performance, in *both* its October 26, 2001 letter and February 1, 2002 agreement, on material changes to the fundamental terms agreed upon on October 19, 2001. Among those changes were significant royalty reductions, requirements that the Siegels assign additional copyrights to DC, and the replacement of the Siegels' single warranty with six aggressive warranties linked to indemnification by the Siegels. Dkt. 709-1 ¶¶8-16; Dkt. 709-2, Ex. 3 at 59-64. As Judge Larson determined in detailed findings, incorporated in the 2011 judgment (Dkt. 669), DC's October 26, 2001 letter contained "materially" different

**PLAINTIFF'S MOTION TO AMEND THE JUDGMENT**                    **ER 450**

terms, and the February 1, 2002 agreement contained "*vastly* different" terms than the terms agreed to in the October 19, 2001 letter. *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1138 (C.D. Cal. 2008) (emphasis added). The Circuit did not address events after October 19, 2001, nor disturb such findings.

This was **not** a simple matter of incorporating the October 19, 2001 terms in a long-form and including customary additional boilerplate, as DC argued (Dkt. 711 at 7) and the Order appeared to accept. Dkt. 717 at 9-10. Rather, DC grinded the Siegels – materially ***changing*** the agreed October 19, 2001 terms, and conditioning DC's payment on the Siegels' capitulation. DC's February 1, 2002 agreement made the Siegels' $1 million "signing bonus" and $2 million "advance" payable only "[u]pon full execution of this [2002] Agreement." Dkt. 709-2, Ex. 3 at 39.

DC's conduct arguably justified the Siegels' rescission of their October 19, 2001 agreement. *See U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 339 (9th Cir. 1974) ("[R]escission is justified where there is either an extended and unreasonable delay [or] imposition of new and onerous conditions to payment….").[1] And Joanne Siegel explicitly cited DC's improper conduct front and center in her May 9, 2001 notice to DC. Dkt. 709-2, Ex. 4 at 76 (DC "condition[ed] our receiving financial compensation for our rights on demands which were not in the proposal we accepted….").

DC then actually breached by failing to pay and account to the Siegels by March 31, 2002, as explicitly and unconditionally set forth in the October 19, 2001 agreement (Dkt. 709-2, Ex. 1 at 4 ¶B(1), 5 ¶¶B(2), (4)), again giving rise to a right of rescission. *See Rubin v. Fuchs*, 1 Cal. 3d 50, 53 (1969) (defendants were "entitled to, and did, rescind the contract" because plaintiff did not make payment); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir. 1990) (right to rescind

---

[1] *See also Johnson v. Goldberg*, 130 Cal. App. 2d 571, 576 (1955) ("Annexing an unwarranted condition to an offer of performance is a refusal to perform..."); *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 467 (2010) (same).

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT                    **ER 451**

where counterparty "made sporadic payments, [but] never complied with the royalty and accounting requirements" of copyright agreement). This improper conduct was also highlighted in the Siegels' May 9, 2001 notice to DC. Dkt 709-2, Ex. 4 at 76 ("[W]e are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised.").

DC cannot have its cake and eat it too. Now that the Court has ruled, at DC's urging, that the October 19, 2001 letter "operated itself to transfer the Siegels Superman rights to DC" (Dkt. 717 at 14), DC's failure to perform is even more evident and inexcusable. As DC's anticipatory and actual breaches of its payment obligations went to the heart of the Siegels' consideration under the October 19, 2001 agreement, this was more than sufficient to justify rescission by the Siegels.

Even if not part of a formal breach of contract claim, the issue of whether DC breached the October 19, 2001 agreement is inextricably linked to the issue of Plaintiff's "rescission," and gives rise to numerous issues of fact precluding summary judgment. For instance, whether DC conditioned its performance on changes to the terms of the October 19, 2001 agreement (Dkt. 709-1 ¶¶10, 19, 24); whether these changes and condition breached the October 19, 2001 agreement and were sufficiently material to justify rescission (*id.* ¶¶24-28, 32-33); and whether DC's non-payment by March 31, 2002 and other failures to perform were excused by some contrary understanding (Dkt. 711 at 8-9) are all questions for the trier of fact, not summary judgment. *See Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 601 (1969) ("Whether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact."); *Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.*, 822 F.2d 833, 840 (9th Cir. 1987) ("Whether a breach … [is] sufficient to be deemed material and thus to warrant rescission … is a question of fact properly determined by the trial court."); *Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 894 (9th

Cir. 1969) ("In each case, it is a question of fact as to whether or not a party has committed an anticipatory breach....").

The Siegels have a fundamental right to trial on these rescission issues, whether in this Court or in a state-court action.  *See Kam-Ko Bio-Pharm Trading Co., Ltd. v. Mayne Pharma Inc.*, 560 F.3d 935, 942 (9th Cir. 2009) ("[I]n a declaratory relief action, as in other civil actions, a party has 'an absolute right to a jury trial unless a jury has been waived.'").

c.    <u>California Law Does Not Require A Rescinding Party To First Acknowledge A Contract</u>

As the Court held, a "notice of rescission need not be formal and explicit" and need only "'clearly show[] the intention of the person rescinding to consider the contract at an end.'"  Dkt. 717 at 7 (quoting *Hull v. Ray*, 211 Cal. 164, 167 (1930)).  The Order nonetheless adopted DC's erroneous legal argument that the Siegels' 2002 letters "do not constitute proper notices of rescission" because they purportedly did not acknowledge the existence of a contract.  Dkt. 717 at 9; Dkt. 711 at 6-8, 10.

This finds no support in California law, which does ***not*** require that a rescinding party to first acknowledge a contract.  In fact, a party can rescind for a defect in contract formation.  Cal. Civil Code § 1689(1), (5); *see People ex rel. Kennedy*, 111 Cal. App. 4th at 133 (2003) (parties can rescind "'a contract that was never enforceable'") (citation omitted).  It would not make sense to require that a notice of rescission "acknowledge" the formation of a contract when rescission itself can be based on a defect in formation.

The California Supreme Court's decision in *Donovan v. RRL Corp.*, 26 Cal. 4th 261 (2001), is also instructive.  There, a car dealer's newspaper ad listed an incorrect price for a car; the plaintiff attempted to purchase the car at the advertised price; and the dealer refused to perform or acknowledge the contract.  *Id.* at 267-69.  The dealer argued that no contract was formed; but the Court concluded that its "advertisement constituted an offer that was accepted by plaintiff's tender of the

10

**PLAINTIFF'S MOTION TO AMEND THE JUDGMENT**

advertised price," thereby forming a contract. *Id.* at 276. The Court then cited the same California law as this Court – "'[i]t is not necessary that the notice to rescind shall be formal and explicit; it is sufficient that notice shall be given to the other party which clearly shows the intention of the person rescinding to consider the contract at an end.'" *Id.* at 278 n.5 (citing *Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980)). The Court concluded that the dealer "gave sufficient notice of its intent to rescind" even though the dealer never acknowledged a contract (*id.* at 278 n.5) and, indeed, never argued rescission on appeal. *Id.* at 293-94 (Werdegar, J., dissenting).

Nor does a requirement that rescission acknowledge a contract make sense from a practical perspective. Contract formation is often disputed. When disputes arise justifying rescission, reasonable minds can differ on whether an enforceable contract was even reached – as shown by Judge Larson's detailed opinion, and this Court's 2011 judgment, that the October 19, 2001 letter was not an enforceable agreement. *Siegel*, 542 F. Supp. 2d at 1133-37. If a party must first "acknowledge" a contract to give notice of rescission, it would waive any arguments that a binding contact was not formed. That is not and has never been the law.

All that is required is that a party give notice that they consider their dealings to be "at an end" (*Hull*, 211 Cal. at 167), whether or not there is a binding or potentially binding contract, and informal notice can suffice. *See Wilson*, 106 Cal. App. 3d at 809 (telephone call where party "'repudiat[ed]' her acceptance of the agreement was sufficient" notice of rescission); *Whitney Inv. Co.,* 273 Cal. App. 2d at 603 (triable issue of fact as to rescission where party, during "informal conversation," stated "'in my opinion they have not lived up to their obligations'"); *McNeese v. McNeese*, 190 Cal. 402, 405 (1923) (demand for return of property "was sufficient notice to defendant of plaintiff's desire and determination to rescind"); *Pearson v. Brown*, 27 Cal. App. 125, 131-132 (1915) ("Any appropriate words, or any definite acts, by which the vendor indicated that he would not proceed further … will be taken to amount to a rescission….").

In short, DC's representation of the law that a rescission must acknowledge the existence of a contract, believed by the Court, is contrary to California law and cannot stand as the basis of a decision.

### d. Whether The Siegels' 2002 Letters Gave DC Notice Of Rescission Was For The Trier Of Fact

The Siegel's May 9 and September 21, 2002 letters, written without the advice of counsel, certainly gave DC more than sufficient notice that the parties contractual relationship was "at an end." *Hull*, 211 Cal. at 167. The Court's determination that the Siegels' letters did not constitute notice of rescission as a matter of California law ignored numerous statements that, viewed in the light most favorable to the Siegels and drawing all inferences in their favor, precluded summary judgment.

Notably, even if a notice of rescission had to acknowledge an agreement (it does not), the Siegels made several statements in their 2002 letters that did this:

> We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, …
> But we are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.
> …. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful. …. I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement. …..
> After four years we have no deal ….

Dkt. 709-2, Ex. 4. And the letter gave clear notice that the Siegels considered their "agreement" to be at an end.

DC can hardly argue that the Siegels' notice was insufficient when DC claimed on appeal that the Siegels acknowledged an agreement in the May 9, 2002 letter. Dkt. 722-1, Ex. 13 at 225 ("Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner."); Dkt. 709-2, Ex. 16 at 224 (DC: on "May 9, 2002, [] Larson's mother sent DC a letter acknowledging that Larson had 'accepted' DC's October 16, 2001, offer"). DC repeatedly pled and argued the same thing to the district court. *See* Dkt. 646 ¶55 (DC: "On May 9, 2002,

[] Joanne Siegel wrote a letter … acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 200[1]….");  Dkt. 181 at 73 (DC:  "[I]n her May 9, 2002 letter to Richard Parsons, Mrs. Siegel acknowledged that the parties had reached an accord six months earlier….").  Because a justified "repudiation" *is* a "rescission," *Rice,* 231 F.2d at 395, DC's allegations that the Siegels "repudiated" the October 19, 2001 agreement in their May 9 and September 21, 2002 letters (Dkt. 646 ¶¶55-56, 99-100) also effectively acknowledged notice of rescission.  As the Court held, the Siegels' letters gave adequate notice that they intended to "otherwise repudiate the continued existence" of an agreement.  Dkt. 717 at 9.

Furthermore, even if a notice of rescission had to state the grounds for rescission (it does not), the Siegels did so, identifying (1) DC's failure to pay the Siegels; (2) DC's changing the October 19, 2001 terms; and (3) DC's conditioning its payment on the Siegels' capitulation to those changed terms.  Dkt 709-2, Ex. 4 at 76 ("But we are owed more than three years of profits accounting on Superman …which has not been paid.  ….  For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.").  The Order ignored these proper grounds for rescission (*see U.S. for Use of Bldg. Rentals Corp.* 498 F.2d at 339; *Peer Int'l Corp.*, 909 F.2d at 1335), mistakenly held that the only "stated ground[]" was "the Siegels' disdain for DC's February 1, 2002 long-form," and, on that basis, concluded that notice was insufficient.  Dkt. 717 at 9.

Furthermore, a notice of rescission need not state all grounds, or even the proper grounds, as the Court acknowledged.  Dkt. 717 at 10 ("[A] statement in the notice of certain grounds for rescission does not prevent the party from thereafter relying upon different and proper grounds.") (citing *Hull*, 211 Cal. at 167); *see also Allied Health Ass'n v. Arthrocare Corp.*, 2009 U.S. Dist. LEXIS 42806, at *26 (N.D. Cal. May 20, 2009) (granting rescission claim despite "failure to cite proper justification" in the notice); *Earl v. Saks & Co.*, 36 Cal. 2d 602, 609 (1951) ("One

may justify an asserted rescission by proving that at the time there was an adequate cause although it did not become known to him until later.").

Given all of the above, the Siegels gave sufficient notice of rescission to survive summary judgment.  *See Wilson*, 106 Cal. App. 3d at 809 ("[I]f facts exist that justify a rescission by one party, and he declares a rescission in some effectual manner, he terminates the contract.").  The May 9 and September 2002 letters, in conjunction with DC's prior anticipatory and actual breaches, raised triable issues of fact as to whether the Siegels rescinded their October 19, 2001 acceptance and agreement.  *See Hil-Mac Corp. v. Mendo Wood Products, Inc.*, 235 Cal. App. 2d 526, 530 (1965) ("The determination of whether a party entitled to rescind a contract has [rescinded] … depends upon the particular facts of each case.  The question is one of fact, to be resolved in the first instance by the trier of fact…."); *Paularena v. Superior Court of San Diego County*, 231 Cal. App. 2d 906, 914 (1965) (rescission is triable to a jury); *May v. Watt*, 822 F.2d 896, 900 (9th Cir. 1987) (Reinhardt, J.) (holding that party was entitled to present rescission claim to jury).

### 2. On DC's Summary Judgment Motion, The Order Viewed The Acquiescence Evidence In The Light Most Favorable To DC

The Order's determination that DC did not acquiesce in the Siegels' rescission or abandon the October 19, 2001 agreement also decided critical factual issues on summary judgment, by drawing all inferences *against* the non-movants, the Siegels.

Under California law, where a party repudiates a contract, and the other party acquiesces, abandonment is implied.  *See Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers*, 192 Cal. App. 2d 268, 279-280 (1961) ("[A]bandonment of a contract may be implied from the acts of the parties")  (cit'ns omitted); *Griffin v. Beresa, Inc.*, 143 Cal. App. 2d 299, 301 (1956)  ("[A]bandonment of a contract … may be accomplished by the repudiation of the contract by one of the parties and the acquiescence of the other ...."); *Eddy v. Gallaway*, 11 Cal. App. 3d 185, 191 (1970) (abandonment "is a mixed question of law and fact").

1    The Order rejected this defense as a matter of law because after these cases

2    were filed in November 2004, DC alleged for the first time, and among numerous

3    alternative defenses, that the October 19, 2001 letter was a binding settlement

4    agreement.  Dkt. 709-2 ¶¶36-37; 717 at 11-12.  This ignored DC's undisputed

5    *inaction* between 2002 and 2004, under circumstances in which DC would naturally

6    have asserted the October 19, 2001 agreement.  After the Siegels rescinded their

7    October 19, 2001 acceptance on May 9, 2002 and after they formally terminated

8    negotiations on September 21, 2002, DC did ***not*** (1) assert that the Siegels were

9    bound by an agreement; (2) even mention the October 19, 2001 letter; (3) assert

10   ownership of the Siegels' recaptured copyrights; (4) perform or tender performance

11   of any of DC's obligations under the October 19 agreement; (5) demand that the

12   Siegels perform by transferring or confirming a transfer of rights under the October

13   19, 2001 agreement; or (6) attempt to use its alleged "power of attorney" under the

14   agreement to transfer the Siegels' copyrights.  Dkt. 709-1 ¶¶32-33.

15   DC's complete and utter inaction is especially telling given the enormous value

16   of the Superman copyrights at issue.  Furthermore, DC entered into new negotiations

17   with the Siegels' new representatives in 2003-2004, again without once asserting that

18   the October 19, 2001 agreement bound the Siegels.  Dkt. 709-1 ¶31; *Honda v. Reed*,

19   156 Cal. App. 2d 536, 538 (1958) ("abandonment" where parties did not perform,

20   "negotiated for a new and different agreement" but "could not agree on terms").

21   Instead of crediting this evidence, the Order focused on DC's May 21, 2002

22   letter, which was not the sole, or even dominant, ground for Plaintiff's defense.

23   Notwithstanding this, DC's May 21, 2002 letter, when viewed in the light most

24   favorable to Plaintiff, also supports her arguments.  The May 21, 2002 letter states

25   DC's "hope" that the parties can reach a new agreement on mutually acceptable

26   terms.  Dkt. 709-2, Ex. 5 at 78 ("John and Paul look forward to meeting with your

27   representatives, and we continue to hope that this agreement can be closed based

28   upon the earlier discussions with your lawyers.").  A jury could well infer from this,

1   in conjunction with the above evidence, that DC acquiesced in the Siegels'

2   repudiation, and hoped to reach a new agreement acceptable to both parties. The

3   Order nonetheless construed the May 21, 2001 letter in the light most favorable to

4   DC – the moving party – just as it had done with the May 9, 2002 letter.

5          Respectfully, Plaintiff's acquiescence defense was for the trier of fact, and

6   could not be disposed of as a matter of law. DC's inaction over a prolonged period

7   after the Siegels' unequivocal repudiation/rescission raises a triable issues of fact as

8   to the parties' intent, when properly viewed in the light most favorable to the non-

9   moving party. *See McCreary v. Mercury Lumber Distributors*, 124 Cal. App. 2d 477,

10  486 (1957) (holding that "acquiescence is shown … by the absence of a showing that

11  [the plaintiff] claimed any further rights under the old contract prior to the

12  commencement of the subject action").

13         **C.      Plaintiff Timely Asserted Rescission And Acquiescence**

14         The Order criticized the Siegels' arguments as "too little too late," and stated

15  that the Siegels "waited nearly eight years to raise their abandonment and

16  acquiescence defense." Dkt. 717 at 10, 12. The Siegels expressly raised the defenses

17  of "Acquiescence," "Waiver" and "Laches" at the first opportunity in their Answer to

18  DC's Counterclaims (Dkt. 656 ¶¶149-153), as referenced in both Plaintiff's

19  opposition to DC's motion and Court-ordered sur-reply. Dkt. 709-1 ¶42; Dkt. 715 at

20  2. Plaintiff's Answer also specifically denied DC's allegations that it performed

21  under the October 19, 2001 agreement (Dkt. 646 ¶¶53, 55-56, 97-105; Dkt. 656 ¶¶53,

22  55-56, 97-105), placing DC's "non-performance"– the asserted basis for rescission –

23  at issue. *See Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010)

24  (answer that "denied the allegation" gave adequate "notice" of defense).

25         Even if Plaintiff had not pled the issues, the Ninth Circuit has made it clear that

26  "affirmative defenses that were not pleaded in an answer may be raised for the first

27  time on summary judgment." *McGinest v. GTE Serv. Corp.*, 247 Fed. Appx. 72, 75

28  (9th Cir. 2007) (holding that a party properly raised a new affirmative defense on

1  summary judgment after remand); *see also Ahmad v. Furlong*, 435 F.3d 1196, 1201

2  (9th Cir. 2006) ("[S]trict adherence to the pleading requirement is inappropriate when

3  the purpose … has been otherwise fulfilled.  The purpose … is to give the opposing

4  party notice … [and] a chance to argue…").

5        The only "prejudice" argued by DC was that it purportedly "was deprived of

6  discovery on [the issues] or the chance to litigate them before" (Dkt. 711 at 6), but

7  that does not add up.  DC had every opportunity to take full discovery and depose all

8  relevant witnesses on the contract issues, including the October 19, 2001 letter, the

9  October 26, 2001 letter, DC's February 1, 2002 agreement, and the Siegels' May 9

10  and September 21, 2002 letters, and did so at the ***thirty*** depositions in this case.  Dkt.

11  729-1 ¶2.  Despite this, DC on its own chose not to move for summary judgment on

12  its Fourth Counterclaim until 2013.  Moreover, in the closely related *DC Comics*

13  action, DC was allowed to repeat this discovery with regard to 2001-2004 events,

14  including re-deposing all relevant witnesses.

15        DC's "eight year" criticism, adopted by the Order, is unfounded.  The

16  junctures to present evidence on a claim/defense are on summary judgment or trial.

17  Parties may move for summary judgment on certain grounds, while preserving others

18  for trial.  Fed. R. Civ. P. 56(a).  The Siegels did not move for summary judgment as

19  to rescission or acquiescence, and instead "argued … that no contract was formed

20  with DC at all" (Dkt. 717 at 10), for good reason.  When the parties cross-moved for

21  partial summary judgment before Judge Larson, the Siegels successfully moved on

22  DC's Third and Fourth Counterclaim, arguing that the parties' objective exchange

23  fell short of a binding agreement.  Dkt. 161 at 45-61.  In opposition to the *Siegels'*

24  motion, DC argued that disputed issues of fact prevented summary judgment as to

25  whether the October 19, 2001 letter constituted a contract.  Dkt. 181 at 67-85.

26  Accordingly, DC did ***not*** affirmatively move for summary judgment on its Third or

27  Fourth Counterclaims regarding an October 19, 2001 agreement.  *Id.* at 67-68.

28        Judge Larson's 2007 ruling, and this Court's 2011 judgment, that no contract

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

was consummated eliminated any need for the Siegels to make alternative contract arguments like rescission or acquiescence.  The matter then went up on appeal for a year and a half.  The Circuit then found "that the October 19, 2001, letter created an agreement."  *Larson*, 2013 U.S. App. LEXIS 671 at *6.  The Circuit remanded for adjudication of DC's Third and Fourth Counterclaims "in light of our holding that the October 19, 2001, letter created an agreement."  *Id.*  The Circuit did not address or even mention events after October 19, 2001, preserving such issues for remand.  *See United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000) (lower courts on remand "are free as to anything not foreclosed by the mandate").  Thereafter, on February 7, 2013, DC for the first time moved for summary judgment on its Fourth Counterclaim, whereupon Plaintiff properly made her alternative arguments regarding rescission and acquiescence.  Dkt. 702.  In other words, prior to the recent reversal of this Court's 2011 judgment, there was no reason for Plaintiff to have pressed alternative arguments regarding DC's Fourth Counterclaim, like rescission/acquiescence, that are not conducive to summary judgment.

It is also well-established that a party can assert and the district court can consider new arguments made "for the first time on remand" on remand.  *United States v. Moriel-Luna*, 585 F.3d 1191, 1200 (9th Cir. 2009).  This is especially proper where, as here, a party had prevailed on other grounds and the appellate court's decision "changed the rules of the game."  *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1357 (Fed. Cir. 1998); *see Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) (permitting review of a new argument made on remand because the mandate rule "does not imply that a party cannot raise on a remand a point not reached when that same party prevailed previously").  The Siegels properly raised rescission and acquiescence in light of the Circuit's finding an October 19, 2001, contract, as there was no reason to press these arguments before.

* * *

Plaintiff respectfully requests, based on all of the above, that the Court

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

**ER 461**

withdraw Section "B" of its order (Dkt. 717 at 6-12), and grant DC's Fourth Counterclaim to the extent it seeks a declaration that the Siegels "transferred" their rights to DC in the October 19, 2001 agreement. This would preserve the integrity of the Court's core decision, while leaving trial of the state-law contract issues to a separate state-court action where they belong, in the event the parties do not settle.

## II. THE JUDGMENT SHOULD BE AMENDED TO GRANT PLAINTIFF'S FIRST CLAIM AND DENY DC'S FIRST AND SECOND COUNTERCLAIMS WITH PREJUDICE

Plaintiff's First Claim and DC's First and Second Counterclaims all relate to one, fundamental issue: whether or not the Siegels' Superman termination notices were valid. The Court's May 17, 2011 judgment, the subject of the recent appeal, granted Plaintiff's First Claim (in the "Superman" case) and denied with prejudice DC's First, Second, Third and Fourth Counterclaims (in both cases). Dkt. 669. In turn, that judgment was based on several lengthy, published decisions by Judge Stephen G. Larson. *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098; 581 F. Supp. 2d 1067 (C.D. Cal. 2008); 658 F. Supp. 2d 1036 (C.D. Cal. 2009); 690 F. Supp. 2d 1048 (C.D. Cal. 2009).

The Siegels' First Claim requested only a declaration that "Plaintiffs validly terminated" and recaptured Jerome Siegel's copyright interest in certain of his "Superman" works. Dkt. 644 ¶¶52-55. The Court fully resolved this claim with orders that upheld the validity of the Siegels' statutory termination and determined all the copyrighted Superman works (*e.g.*, *Action Comics,* No. 1) thereby recaptured by the Siegels. 542 F. Supp. 2d at 1130; 658 F. Supp. 2d 1036.

DC's First Counterclaim sought a declaration that the Termination was ineffective on three alleged grounds, each expressly adjudicated and rejected by the Court. *Compare* Dkt. 646 ¶¶68-69 *with* 542 F. Supp. 2d at 1131-32; ¶¶70-76 *with* 542 F. Supp. 2d at 1132-34; ¶¶86-89 *with* 542 F. Supp. 2d at 1117-19.

DC's Second Counterclaim sought declaratory relief that Plaintiff's claims

were barred by the statute of limitations, an argument expressly analyzed and rejected by the Court. *Compare* Dkt. 646 ¶¶90-96 *with* 542 F. Supp. 2d at 1134-36.

DC's Fourth Counterclaim – the only claim granted by the judgment – was expressly pled in the alternative, *if* the Court found that the Siegels' termination notices were valid:

> 3.    In the event that the Superman Notices [of termination] and/or the Superboy Notice [of termination] are deemed effective, declaring on DC Comics'' 'Fourth Alternative Counterclaim that, pursuant to the Agreement:
>
> a.    Plaintiffs/Counterclaim Defendants have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;
>
> ….

Dkt. 646 at 35.

In short, Plaintiff's First Claim sought a declaration that her terminations were valid under the Copyright Act, while DC's First and Second Counterclaims sought a declaration that they were invalid. DC's Fourth Counterclaim, which asked for a declaration that the Siegels transferred their recaptured Superman rights in the October 19, 2001 agreement, *only* came into play if, as the Court properly found, the Siegels had recaptured such Superman rights in 1999 pursuant to their 1997 termination notices.

DC's reason for pleading its Fourth Counterclaim "in the alternative" in this fashion is clear: if DC had succeeded in obtaining a declaration that the Siegels' termination was invalid, DC would ***not*** have wanted the Siegels' October 19, 2001 letter to be deemed an enforceable agreement, because then it would have been forced to pay the Siegels under that agreement even though the reason for it– the terminations – had been invalidated.

On appeal, Plaintiff appealed limited aspects of the Court's decision on the First Claim – namely, the determination that certain Superman works were not recaptured because they were "works for hire." DC cross-appealed the adverse determinations against it on all claims – the First Claim as well as the First through

Fourth Counterclaims. Dkt. 709-2, Ex. 18 at 325. However, the Circuit did <u>not</u> address or reverse the Court's judgment on the First Claim or the First or Second Counterclaims. It <u>only</u> addressed DC's Third and Fourth Counterclaims, as to the alleged October 19, 2001 agreement:

> Defendants Warner Brothers Entertainment, Inc. and DC Comics (collectively, "DC") appeal the district judge's grant of summary judgment to Plaintiff Laura Siegel Larson as to DC's third and fourth counterclaims (which, both parties concede, are governed by California law).n1 The district judge entered judgment pursuant to Federal Rule of Civil Procedure 54(b), and we have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand as to these counterclaims.
>
> n.1: DC also appeals the district judge's grant of summary judgment to Larson as to certain aspects of Larson's first claim and DC's first counterclaim, as well as the entirety of DC's second counterclaim. Larson cross-appeals the district judge's grant of summary judgment to DC as to the other aspects of Larson's first claim and DC's first counterclaim. As explained below, we do not reach the issues raised by these claims.

*Larson*, 2013 U.S. App. LEXIS 671 at *2-3, *6. The Ninth Circuit <u>expressly</u> declined to reach, much less reverse, the Court's determination on the First Claim, or the First and Second Counterclaims.

Thus, when the Ninth Circuit remanded, it remanded only for reconsideration of DC's Third and Fourth Counterclaims, relating to the October 19, 2001 agreement. *Id.* at *6. That decision – like this Court's 2013 summary judgment opinions (Dkt. 717, 723) – left the Court's prior adjudication of Plaintiff's First Claim, and DC's First and Second Counterclaims, untouched and "law of case." *See Wang Zong Xiao v. Reno*, 837 F. Supp. 1506, 1545 (N.D. Cal. 1993) ("The Court's ruling as to the eleven remaining claims was not disturbed by the Ninth Circuit's decision, and consequently, it remains the law of the case."); *Robinson v. Sanctuary Record Groups, Ltd.*, 763 F. Supp. 2d 629, 631 (S.D.N.Y. 2011) ("[A] finding of a district court that was properly challenged on appeal though not expressly or implicitly addressed by an appellate court remains the law of the case.").

Accordingly, the Court's judgment should have (a) granted Plaintiff's First Claim insofar as it sought a determination that the Siegels' 1997 notices of

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

**ER 464**

termination were valid as to specific Superman works, pursuant to the Court's prior decisions and judgment; and (b) denied *with prejudice* DC's First and Second Claims (instead of "without prejudice").

However, the Court's April 18, 2013 judgment largely adopted DC's proposed judgment (Dkt. 702-5, 724), which tactically ignored DC's own pleadings and the Court's prior orders to DC's unfair advantage. The judgment expressly granted DC's Fourth Counterclaim (pled by DC in the alternative "if" and only if the Court *granted* Plaintiff's First Claim), while flatly denying Plaintiff's First Claim, impliedly with prejudice, and dismissing DC's First and Second Counterclaims "without prejudice."

The Court obviously spent considerable time and resources sorting through the complicated legal and factual issues underlying the First Claim and the First and Second Counterclaims in its detailed published decisions. Amending the judgment to comport with the undisturbed portions of those prior decisions is advisable for several additional reasons.

First, pleading the Fourth Counterclaim "in the alternative" was a tactical choice by DC. DC easily could have chosen to plead the Fourth Counterclaim independently and regardless of whether the Siegel terminations were declared valid – but that would have run the risk that the terminations were found invalid, and DC would still have to pay the Siegels. Although that result would be equitable, since any settlement agreement reflects the risks of litigation, DC sought to have its cake and eat it too. DC must be held to the consequences of its own decisions.

Second, the Court's prior detailed orders set forth persuasive precedent as to numerous issues surrounding statutory terminations, an important and emerging area of copyright law. Numerous other courts and commentators have cited its holdings on termination-related issues that were left intact by the Ninth Circuit's ruling – *e.g.,* work-for-hire and derivative work exceptions, copyrightability, statute of limitations, alter-ego liability and/or jury trial issues.[2] Entering judgment against DC on the First

---

[2] *See, e.g., Warner Bros. Entm't, Inc. v. X One X Prods.*, 644 F.3d 584, 598-599 (8th Cir. 2011); *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 738 (S.D.N.Y. 2011); *Vance*

Claim and First and Second Counterclaims, consistent with the Court's prior detailed undisturbed decisions, would leave these important precedents intact.

Third, entry of judgment against DC on the First Claim and First and Second Counterclaims may greatly simplify related litigation <u>before this Court</u>. The Court's prior orders addressed and resolved the complicated "work for hire" issues relating to Siegel and Shuster's Superman work in the 1930's and 1940's, as well as issues relating to a 1948 consent judgment. *Siegel,* 542 F. Supp. 2d at 1126-30, 1131-32; 658 F. Supp. 2d at 1061-68, 1083. In the closely-related *DC Comics* case, DC made virtually-identical "work for hire" and other arguments that have been fully adjudicated against DC in this case. Case No. 10-CV-03633, Dkt. 49 ¶¶126-28, 153-54, 158-59. If the Court properly enters judgment against DC on the First Claim and First and Second Counterclaims, DC will be bound by that judgment and those orders as a matter of issue preclusion. *See Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987). This would greatly simplify resolution of such issues to the extent the Court's Rule 54(b) judgment in *DC Comics* is reversed. Otherwise, the parties will have to re-litigate those substantial issues of fact and law, heavily burdening the Court with further, complicated filings on matters already fully and fairly adjudicated.

In light of the Court's prior well-reasoned determinations, and the Ninth Circuit's narrow decision, the Court's judgment should be amended to grant the First

---

*v. Latimer*, 648 F. Supp. 2d 914, 927 (E.D. Mich. 2009); *Scorpio Music (Black Scorpio) S.A. v. Willis*, 2013 U.S. Dist. LEXIS 29141, at *14 (S.D. Cal. Mar. 4, 2013); *Ray Charles Found. v. Robinson*, 2013 U.S. Dist. LEXIS 21273, at *14 (C.D. Cal. Jan. 25, 2013); *Painters Joint Comm. v. J.L. Wallco, Inc.*, 2013 U.S. Dist. LEXIS 22915, at *4 (D. Nev. Feb. 19, 2013); *Clark v. Dana Woody & Assocs.*, 2013 U.S. Dist. LEXIS 18996, at *11 (S.D. Cal. Feb. 12, 2013); *McKesson Corp. v. Health Robotics, S.R.L.*, 2011 U.S. Dist. LEXIS 81192, at *14-15 (N.D. Cal. July 26, 2011); *United States v. Vacante*, 2010 U.S. Dist. LEXIS 73962, at *11-12 (E.D. Cal. June 2, 2010); *Jordan v. Sony BMG Music Entm't, Inc.*, 2010 U.S. Dist. LEXIS 52585, at *7-8 (S.D. Tex. May 28, 2010); *Perrey v. Televisa S.A. de C.V.*, 2010 U.S. Dist. LEXIS 142449, at *14 (C.D. Cal. Mar. 25, 2010); *Melanie Howard Music, Inc. v. Warner Bros. Records*, 2009 U.S. Dist. LEXIS 105049, at *25 (M.D. Tenn. Nov. 10, 2009); *Don Johnson Prods. v. Rysher Entm't, Inc.*, 2009 U.S. Dist. LEXIS 81594, at *17 (C.D. Cal. June 8, 2009); M. Nimmer & D. Nimmer, *Nimmer on Copyright* §§ 4.12[A], 4.12[B][4], 4.13[a],11.07.

Claim and hold that the Siegels' 1997 notices of termination were valid, as set forth in the Court's prior orders.

**<u>CONCLUSION</u>**

Pursuant to Fed. R. Civ. P. 59(e), Plaintiff respectfully requests that the Court's April 18, 2013 judgment be amended to grant the Siegels' First Claim, deny DC's First and Second Counterclaims with prejudice, and grant DC's Fourth Counterclaim, as set forth in Plaintiff's concurrently-filed proposed judgment.

Dated: May 16, 2013      RESPECTFULLY SUBMITTED,
/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Plaintiff, Laura Siegel Larson

PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10   LAURA SIEGEL LARSON,                   **Case No: 04-CV-08400 ODW (RZx)**
     individually and as personal           Case No: 04-CV-08776 ODW (RZx)
11   representative of the ESTATE OF
     JOANNE SIEGEL,                          Hon. Otis D. Wright II, U.S.D.J.
12                Plaintiff,                 Hon. Ralph Zarefsky, U.S.M.J.

13        v.                                 **[PROPOSED] ORDER GRANTING
                                             PLAINTIFF'S MOTION TO AMEND**
14   WARNER BROS. ENTERTAINMENT             **THE COURT'S APRIL 18, 2013**
     INC., DC COMICS, and DOES 1-10,        **JUDGMENT PURSUANT TO FED.**
15                Defendants and            **R. CIV. P. 59(e)**
                  Counterclaimants.
16   ─────────────────────────────
     LAURA SIEGEL LARSON,
17   individually and as personal
     representative of the ESTATE OF
18   JOANNE SIEGEL,
                  Plaintiff,
19        v.

20   TIME WARNER INC., WARNER
     COMMUNICATIONS INC.,
21   WARNER BROS. ENTERTAINMENT
     INC., WARNER BROS. TELEVISION
22   PRODUCTION INC., DC COMICS,
     and DOES 1-10,
23                Defendants and
                  Counterclaimants.
24   ─────────────────────────────

25

26

27

28

Good cause appearing, IT IS HEREBY ORDERED that Plaintiff's Motion to Amend the Court's April 18, 2013 Judgment Pursuant To Fed. R. Civ. P. 59(e) is GRANTED. The Court hereby withdraws Section "B" of its March 20, 2013 summary judgment order as unnecessary to its judgment. Case No. 04-CV-08400, Dkt. 717 at 6:22-12:12; Case No. 04-CV-08400, Dkt. 235 at 6:22-12:12. The Court will enter Plaintiff's proposed amended judgment in Case Nos. 04-CV-8400 and 04-CV-8776.

IT IS SO ORDERED.

Dated: _____     _____
                                                Hon. Otis D. Wright II.

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO AMEND THE JUDGMENT

1

2

3

4

5

6

7

8                       **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10  LAURA SIEGEL LARSON,                    **Case No: 04-CV-08400 ODW (RZx)**
    individually and as personal            Case No: 04-CV-08776 ODW (RZx)
11  representative of the ESTATE OF
    JOANNE SIEGEL,                          Hon. Otis D. Wright II, U.S.D.J.
12              Plaintiff,                   Hon. Ralph Zarefsky, U.S.M.J.

13          v.                              **[PROPOSED] AMENDED**
                                            **JUDGMENT PURSUANT TO FED.**
14  WARNER BROS. ENTERTAINMENT              **R. CIV. P. 59(e)**
    INC., DC COMICS, and DOES 1-10,
15              Defendants and
                Counterclaimants.
16  ────────────────────────────
    LAURA SIEGEL LARSON,
17  individually and as personal
    representative of the ESTATE OF
18  JOANNE SIEGEL,
                Plaintiff,
19          v.
20  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
21  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
22  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
23              Defendants and
                Counterclaimants.
24  ────────────────────────────

25

26

27

28

                            [PROPOSED] AMENDED JUDGMENT              **ER 470**

## JUDGMENT

In a series of published decisions dated March 26, 2008, August 12, 2009, and October 30, 2009 in the "Superman" case (Case No. 04-CV-08400, Dkt. 293, 560, 595), the court resolved plaintiff Laura Siegel Larson's First Claim and defendant-counterclaimant DC Comics' First and Second Counterclaims, filed in both the "Superman" case and the "Superboy" case (Case No. 04-CV-08776). The Court thereby determined that, pursuant to the Copyright Act, 17 U.S.C. § 304(c), the Siegels validly terminated on April 16, 1999 all prior grants or transfers by Jerome Siegel to any of the Defendants, or their predecessors-in-interest, of his interest in the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action Comics*, No. 4, *Superman*, No. 1 (pages 3-6), and the first two weeks of the Superman newspaper strips and that, as of April 17, 1999, the effective terminate date, the Siegels owned the aforesaid recaptured copyright interests.

On January 10, 2013, the United States Court of Appeals for the Ninth Circuit reversed Judge Larson's March 26, 2008 partial summary-judgment order in part and held that, "as a matter of law," Plaintiff entered into an enforceable settlement agreement with DC Comics on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*, Nos. 11-55863, 11-56034, 2013 WL 1113259, at *1 (9th Cir. Jan. 10, 2013). "Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations …, and that the letter" sent by Larson's attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material terms they had orally agreed to." *Id.* The Ninth Circuit directed this Court to "reconsider DC's third and fourth counterclaims in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2. The Ninth Circuit did not reach or address Plaintiff's First Claim in the "Superman" case, or the First and Second Counterclaims in the "Superman" and "Superboy" cases.

This Court's March 20 and April 18, 2013 Orders collectively granted DC's February 7, 2013 Motion for Summary Judgment on its Fourth Counterclaim. The

Court's March 20, 2013 Order was amended in part by this Court's _____ __, 2013 order ("Superman" case, Dkt. ___; "Superboy" case, Dkt. ___) granting Plaintiff's Motion to Amend the Judgment ("Superman" case, Dkt. 731; "Superboy" case, Dkt. 250), which withdrew Section "B" of that March 20, 2013 Order ("Superman" case, ECF No. 717 at 6:22-12:12; "Superboy" case, Dkt. 235 at 6:22-12:12).

Based on the decisions set forth above, this Court now enters an amended final judgment based on DC's Fourth Counterclaim in two of three long-running Superman cases presently before this Court: (1) the "Superman" case; and (2) the "Superboy" case. In the parties' October 19, 2001 settlement agreement, Plaintiff (and her family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics," effective October 19, 2001. Declaration of Daniel M. Petrocelli ("Petrocelli Decl.") Ex. B, at 21; *Larson*, 2013 WL 1113259, at \*1. This complete transfer on October 19, 2001 bars certain of Plaintiff's remaining claims in this case and entitles DC to judgment on its Fourth Counterclaim, which seeks a declaration confirming the October 19, 2001 settlement agreement against Plaintiff. The remaining claims are granted, denied, or dismissed as set forth below. Therefore:

**A.**     **Plaintiff's Claims (Superman, Case** No. CV-04-8400**)**

IT IS ORDERED AND ADJUDGED that Plaintiff's First Claim for Relief in the "Superman" case, for "Declaratory Relief re: Termination," is GRANTED only to the extent that it sought a declaration that on April 16, 1999 the Siegels validly terminated under the Copyright Act all prior grants, assignments or transfers by Jerome Siegel to any of the Defendants, or their predecessors-in-interest, of the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action Comics*, No. 4, *Superman*, No. 1 (pages 3-6), and the first two weeks of the Superman newspaper strips, and judgment is hereby entered in Plaintiff's favor on this claim as set forth herein. *See* "Superman" case, Dkt. 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's Second, Third

1   and Fourth Claims for Relief in the "Superman" case are DISMISSED, WITHOUT
2   PREJUDICE, AS MOOT.

3   **B.    Plaintiff's Claims (Superboy Case)**

4          IT IS ORDERED AND ADJUDGED that Plaintiff's First, Second, Third,
5   Fourth and Fifth Claims for Relief in the "Superboy" case are DISMISSED,
6   WITHOUT PREJUDICE, AS MOOT.

7   **C.    DC's Counterclaims (Superman and Superboy Cases)**

8          IT IS ORDERED AND ADJUDGED that DC's First Counterclaim, "For
9   Declaration That The Superman Notices And The Superboy Notice Are Ineffective,"
10  is DENIED WITH PREJUDICE in its entirety in the "Superman" case and as to Parts
11  (1), (2), and (5) in the "Superboy" case. *See* "Superman" case, Dkt. 293, 664
12  (striking parts (3) and (4) from the First Counterclaim in the "Superman" case).

13         IT IS FURTHER ORDERED AND ADJUDGED that DC's Second
14  Counterclaim, "For Declaration That Any Claim By The Siegels For Co-Ownership
15  Of Superman (Including Its Derivative Superboy) Is Barred By The Statute Of
16  Limitations," is DENIED WITH PREJUDCE. *See* "Superman" case, Dkt. 293.

17         IT IS FURTHER ORDERED AND ADJUDGED that DC's Fourth
18  Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement,"
19  is GRANTED in part as follows. The Court declares that, under the parties' October
20  19, 2001 settlement agreement, Larson and her family transferred to DC, worldwide
21  and in perpetuity, any and all rights, title, and interest, including all copyright
22  interests, that they had in Superman and Superboy, effective October 19, 2001.
23  Petrocelli Decl. Ex. B, at 19, 21; *Larson*, 2013 WL 1113259, at *1–2. Judgment is
24  hereby entered in DC's favor and against Larson on this counterclaim.

25         IT IS FURTHER ORDERED that DC's Third, Fifth, and Sixth Counterclaims
26  are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

27

28

1    IT IS SO ORDERED.

2

3    Dated: _____        _____
                                              Hon. Otis D. Wright II.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] AMENDED JUDGMENT                                    **ER 474**

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for the DC Comics Parties

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10  LAURA SIEGEL LARSON,                   Case No.  CV 04-8400 ODW (RZx)
    individually and as personal           Case No.  CV 04-8776 ODW (RZx)
11  representative of the ESTATE OF
    JOANNE SIEGEL,                         **DECLARATION OF PATRICK T.**
12                                         **PERKINS IN SUPPORT OF**
               Plaintiff,                  **DEFENDANTS' REPLY IN**
13                                         **SUPPORT OF APPLICATION TO**
         v.                                **TAX COSTS (DOCKET NO. 729)**
14
    WARNER BROS. ENTERTAINMENT
15  INC., DC COMICS, and DOES 1-10,

16             Defendants and
               Counterclaimants.
17
    LAURA SIEGEL LARSON,
18  individually and as personal
    representative of the ESTATE OF
19  JOANNE SIEGEL,

20             Plaintiff,

21       v.

22  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
23  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
24  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
25
               Defendants and
26             Counterclaimants.

27

28

# DECLARATION OF PATRICK T. PERKINS

I, Patrick T. Perkins, hereby declare and state:

1.  I am an attorney at law employed by Warner Bros. Entertainment Inc. as Vice President, Senior Intellectual Property Counsel.  Between 2004 and 2012, I served as outside litigation counsel and counsel of record for defendants (collectively, "DC") in the two above-entitled actions (Case Nos. CV-04-8400 and CV-04-8776) (the "*Siegel* Cases").  I have reviewed Defendants' Reply In Support Of Application To Tax Costs, Case No. CV-04-8400, Docket No. 729 ("Reply"), and submit this declaration in support thereof.  I have personal knowledge of the matters set forth in this declaration.

2.  As DC states in its Reply, "only *eight* out of more than thirty depositions taken in these cases were videotaped."  Docket No. 729 at 6.  Of these eight videotaped depositions, "DC was unable to locate itemized invoices" for four witnesses:  Mark Evanier, Laura Siegel Larson, Allen Lewellen, and James Steranko.  *Id.* at 7.  Although DC filed its Reply on May 14, 2013, I have continued to look through my records in an effort to locate relevant documentation, and was able to find videographer invoices from the depositions of Mr. Evanier, Ms. Larson, Mr. Lewellen, and Mr. Steranko.  For the Court's reference, I attach those invoices hereto as Exhibits A-D.

   a.  Attached hereto as Exhibit A is a true and correct copy of the videographer's invoice for the March 6, 2007 deposition of James Steranko, dated April 11, 2007.

   b.  Attached hereto as Exhibit B is a true and correct copy of the videographer's invoice for the March 30, 2007 deposition of Marc Evanier, dated April 18, 2007.

   c.  Attached hereto as Exhibit C is a true and correct copy of the videographer's invoice for the April 9, 2007 deposition of Allen Lewellen, dated April 24, 2007.

d.    Attached hereto as Exhibit D is a true and correct copy of the videographer's invoice for the October 5, 2007 deposition of Laura Siegel Larson, dated October 19, 2007.

3.    These invoices confirm that—contrary to plaintiff's speculation in her Objections, Docket No. 728 at 4-7—the non-itemized invoices DC originally submitted in support of its Application to Tax Costs, Docket No. 725-1, do *not* include non-recoverable charges for videography.  There is thus no need for this Court to discount the recoverable costs attributable to those depositions, as DC suggested in its Reply.  Docket No. 729 at 7.

4.    I personally took the depositions of James Steranko, Marc Evanier, Mark Warren Peary, Jean Peavy, and the second deposition of Laura Siegel Larson in the *Siegel* Cases.  While plaintiff speculates that the invoices DC submitted for those depositions could include non-recoverable charges for expedited transcripts and/or "real time" transcript feeds, Docket No. 728 at 4-5, to the best of my recollection, no such charges were incurred in connection with those depositions.

5.    I have taken and/or attended numerous depositions in the *Siegel* Cases, and am generally familiar with the prosecution of this matter, both by in-house and outside counsel.  Based on my experience—both in the *Siegel* Cases and in legal practice generally—when special services such as expedited transcripts or "real time" transcript feeds are requested, those charges are reflected on vendor invoices as separate line items.  *E.g.*, Docket No. 725-4 at 130 (invoice from deposition of Jules Feiffer reflecting separate videography charge).  Plaintiff's speculation that a non-itemized invoice could include non-recoverable charges for such special services is not consistent with my experience or recollection.

1        I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct. Executed this 16th day of May,

3   2013, in Burbank, California.

4

5                                               Patrick T. Perkins

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PERKINS DECL. ISO REPLY
ISO DEFENDANTS' COSTS APP.

# EXHIBIT 1



**Corporate Headquarters**
747 Third Avenue - 28th Floor
New York, NY 10017
Phone: (877) 702-9580
Fax: (212) 207-3311
www.tsgreporting.com

# INVOICE

**DATE:** 4/11/2007
**INVOICE #** 030607-28691

**Bill To:**    Patrick Perkins Esq.
Perkins Law Office, PC
1711 Route 9D
Cold Spring, NY  10516

**CASE:**           Siegel vs. Time Warner
**DEPOSITION:**     Steranko, James
**DATE:**           3/6/2007
**CITY:**           Philadelphia
**STATE:**          Pennsylvania

**Comments or Special Instructions:**

| REPORTER | VIDEOGRAPHER | SHIP VIA | TERMS |
|---|---|---|---|
| Kim Overwise | Brian Sappio | UPS Overnight | net 30 |

| DESCRIPTION | # OF PAGES / QTY | UNIT PRICE | AMOUNT |
|---|---|---|---|
| Videographer - 1st 2 Hours | 1 | $325.00 | $325.00 |
| Videographer - Each Additional Hour | 3 | $100.00 | $300.00 |
| Videographer - Each Additional Hour - Evening Rate | 4.5 | $150.00 | $675.00 |
| Certified Copy - VHS | 6 | $50.00 | $300.00 |
| Certified Copy - VHS - Complimentary | 6 | $50.00 | $0.00 |
| | | SUBTOTAL | $1,600.00 |
| | | SHIPPING & HANDLING | $50.00 |
| | | TOTAL | $1,650.00 |

Please make all checks payable to: **TSG Reporting, Inc.**      **Federal ID # 41-2085745**

For prompt payment processing, please include the invoice # with your check.  All balances in arrears will be assessed a late fee of 1.5% per month, not to exceed the legal limit.  If you have any questions, please call TSG.

**THANK YOU FOR YOUR BUSINESS!**

**EXHIBIT 1**
4

ER 480

# EXHIBIT 2

# INVOICE

U.S. Legal Support
15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403
Phone:818-995-0600   Fax:818-995-4248

| Invoice No. | Invoice Date | Job No. |
|---|---|---|
| 211160 | 4/18/2007 | 134309 |

| Job Date | Case No. |
|---|---|
| 3/30/2007 | |

| Case Name |
|---|
| Siegel v. Warner |

| Payment Terms |
|---|
| Due upon receipt |

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

VIDEOTAPE SERVICES
Mark Evanier - (VIDEO)                                                          1,876.30

TOTAL DUE >>>            $1,876.30

Ordered By : Michael Bergman
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Blvd.
Suite 900
Beverly Hills, CA 90212-2345

OK TO PAY

WAYNE M. SMITH

CHARGE TO: DC - Siegel

Please contact us immediately with questions or corrections regarding billing or payment.
No adjustments or refunds will be made after 120 days from date of payment.

Tax ID: 76-0535987                                                          Phone:     Fax:

*Please detach bottom portion and return with payment.*

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

Job No.     : 134309          BU ID      :40-GG
Case No.    :
Case Name   : Siegel v. Warner

Invoice No. : 211160          Invoice Date :4/18/2007
**Total Due  : $ 1,876.30**

Remit To: **U.S. Legal Support**
          **P.O. Box 671051**
          **Dallas, TX 75267-1051**

**PAYMENT WITH CREDIT CARD**

Cardholder's Name:
Card Number:
Exp. Date:                    Phone#:
Billing Address:
Zip:               Amount to Charge:
Cardholder's Signature:

**EXHIBIT 2**
5

ER 482

# EXHIBIT 3

# INVOICE

U.S. Legal Support
15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403
Phone:818-995-0600   Fax:818-995-4248

| Invoice No. | Invoice Date | Job No. |
|---|---|---|
| 211375 | 4/24/2007 | 134977 |

| Job Date | Case No. |
|---|---|
| 4/9/2007 | |

| Case Name |
|---|
| Siegel v. Warner |

| Payment Terms |
|---|
| Due upon receipt |

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

VIDEOTAPE SERVICES

Allen Wayne Lewellen - (VIDEO)                                                        743.25

TOTAL DUE >>>          $743.25

Ordered by :   Michael Bergman
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Blvd.
Suite 900
Beverly Hills, CA 90212-2345

OK TO PAY



WAYNE M. SMITH

CHARGE TO: DC - Siegel

Please contact us immediately with questions or corrections regarding billing or payment.
No adjustments or refunds will be made after 120 days from date of payments.

Tax ID: 76-0535987                                                          Phone:       Fax:

*Please detach bottom portion and return with payment.*

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

Job No.    : 134977           BU ID      :40-GG
Case No.   :
Case Name  : Siegel v. Warner

Invoice No. : 211375          Invoice Date : 4/24/2007
**Total Due  : $ 743.25**

Remit To: **U.S. Legal Support**
**P.O. Box 671051**
**Dallas, TX 75267-1051**

| PAYMENT WITH CREDIT CARD | AMEX | MASTERCARD | VISA |
|---|---|---|---|
| Cardholder's Name: | | | |
| Card Number: | | | |
| Exp. Date: | | Phone#: | |
| Billing Address: | | | |
| Zip: | Amount to Charge: | | |
| Cardholder's Signature: | | | |

**EXHIBIT 3**
6

ER 484

# EXHIBIT 4

# INVOICE

U.S. Legal Support
15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403
Phone:818-995-0600   Fax:818-995-4248

| Invoice No. | Invoice Date | Job No. |
|---|---|---|
| 218734 | 10/19/2007 | 142997 |
| **Job Date** | **Case No.** | |
| 10/5/2007 | | |
| **Case Name** | | |
| Siegel v. Warner | | |
| **Payment Terms** | | |
| Due upon receipt | | |

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

---

VIDEOTAPE SERVICES
    Laura Siegel Larson, Vol.2--(VIDEO)                468.25

**TOTAL DUE >>>**     **$468.25**

Ordered By    : Michael Bergman
              Weissman, Wolff, Bergman, Coleman, Grodin & Evall
              9665 Wilshire Blvd.
              Suite 900
              Beverly Hills, CA 90212-2345

LEGAL -- Mark Leino

Category:
Co. Code _2750_
IO: _10002770_
Atty:

QQQQ

Please contact us immediately with questions or corrections regarding billing or payment.
No adjustments or refunds will be made after 120 days from date of payments.

Tax ID: 76-0535987                               Phone:    Fax:

*Please detach bottom portion and return with payment.*

C/O Michael Bergman
DC Comics
Weissman, Wolff, Bergman, Coleman, Grodin & Evall
9665 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212-2345

Job No.    : 142997       BU ID    :40-GG
Case No.    :
Case Name  : Siegel v. Warner

Invoice No.  : 218734       Invoice Date :10/19/2007
**Total Due  : $ 468.25**

Remit To: **U.S. Legal Support**
      **P.O. Box 671051**
      **Dallas, TX 75267-1051**

| PAYMENT WITH CREDIT CARD | AMEX | VISA |
|---|---|---|

Cardholder's Name:
Card Number:
Exp. Date: _____ Phone#:
Billing Address:
Zip: _____ Amount to Charge:
Cardholder's Signature:

**EXHIBIT 4**
7
ER 486

1 DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2 MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3 CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4 O'MELVENY & MYERS LLP
  1999 Avenue of the Stars, 7th Floor
5 Los Angeles, CA 90067-6035
  Telephone: (310) 553-6700
6 Facsimile: (310) 246-6779

7 Attorneys for the DC Comics Parties

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10 LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | Case No. CV 04-8400 ODW (RZx) Case No. CV 04-8776 ODW (RZx) |
| 11 | **DEFENDANTS' REPLY IN SUPPORT OF APPLICATION TO TAX COSTS** |
| 12 | |
| 13 Plaintiff, | |
| 14 v. | **DECLARATION OF BRIAN PEARL FILED CONCURRENTLY HEREWITH** |
| 15 WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, | |
| 16 Defendants and Counterclaimants. | **Hearing Date**: May 17, 2013 |
| 17 | **Hearing Time**: 1:00 p.m. **Hearing Place**: Telephonic |
| 18 LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | |
| 19 | |
| 20 Plaintiff, | |
| 21 v. | |
| 22 TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, | |
| 23 | |
| 24 | |
| 25 | |
| 26 Defendants and Counterclaimants. | |
| 27 | |

28

Defendants (collectively, "DC") respectfully submit that this Court should award DC the limited costs it seeks. After nine years of protracted, expensive litigation, DC has now prevailed on all claims in the two above-entitled cases, and is entitled to recover certain costs reasonably and necessarily incurred in the course of that litigation. Although DC's actual costs far exceed $1 million, DC seeks the relatively conservative amount of $408,965.31—comprised primarily of witness, master, reproduction, and deposition transcript costs. While plaintiff objects to DC's request as "excessive," Objection at 1, courts routinely award comparable costs to prevailing parties in similarly complex and long-running cases. *See, e.g., In re Online DVD Rental Antitrust Litig.*, 2012 WL 1414111, at *1 (N.D. Cal. Apr. 20, 2012) (awarding over $700,000 in costs); *Kalitta Air, LLC v. Central Texas Airborne Sys.*, 2012 WL 6045246, at *6 (N.D. Cal. Dec. 5, 2012) (awarding over $600,000); *In re Ricoh Co., Ltd. Patent Litig.*, 2012 WL 1499191, at *6 (N.D. Cal. Apr. 26, 2012) (awarding over $675,000); *Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, 2011 WL 3880416, at *1 (N.D. Cal. Sept. 2, 2011) (awarding over $400,000); *Hynix Semiconductor Inc. v. Rambus Inc.*, 697 F.Supp.2d 1139, 1155 (N.D. Cal. 2010) (awarding over $750,000).

DC is fully entitled to recover these costs under the Local Rules and applicable case law; indeed, Federal Rule of Civil Procedure 54(d) "create[s] a presumption for awarding costs to prevailing parties" such as DC, and places the burden on plaintiff to "show why costs should not be awarded." *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 888 (9th Cir. 2010). As set forth below, plaintiff falls far short of meeting her evidentiary and legal burden.[1]

1. Witness Fees. DC seeks $32,959.70 in witness fees, including $32,437.50 in expert witness fees incurred in successfully defending plaintiff's claims.

---

[1] Plaintiff does not dispute that DC is entitled to several of its requested costs, including certain filing fees, Docket No. 725-1, line items 6-9 ($478); service fees, *id.*, line items 22-33 ($1,317.20); deposition fees, Objection at 7 ($1,992.40); and non-expert witness fees, *id.*, line items 116-29 ($522.20).

Plaintiff objects that, under Local Rule 54-4.7, expert witness fees are not recoverable beyond the $40 per diem amount provided for under 28 U.S.C. § 1821. Objection at 7-8. However, Rule 54 and 28 U.S.C. § 1821 cannot limit the amount of taxable fees where, as here, there is "explicit statutory authority to the contrary." *Trepel v. Roadway Express, Inc.*, 266 F.3d 418, 426-27 (6th Cir. 2001) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 440 (1987)). Federal Rule of Civil Procedure 26(b)(4)(E)(ii) provides that "the court *must require* that the party seeking discovery . . . pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions." (Emphasis added). This Rule provides "explicit statutory authority" for DC to seek reimbursement for the full amount of expert witness costs it reasonably incurred. *Trepel*, 255 F.3d at 427.

2. <u>Master Fees.</u> Local Rule 54-4.10 expressly allows a prevailing party to recover "[t]he reasonable fees and expenses of masters." DC seeks to recover $11,468.08 in fees paid to the Hon. Daniel Weinstein for serving in the function of master pursuant to the Court's December 15, 2010, order. In that order, the Court directed the parties to "agree upon a formula for apportionment [for an anticipated accounting trial] with the assistance of a third party mediator." Case No. 04-8400, Docket No. 636. Judge Weinstein—who had previously been appointed as a mediator to facilitate settlement discussions, Docket No. 294, and was thus familiar with the underlying facts of the case—was enlisted for this purpose.

Plaintiff seizes on the Court's use of the term "mediator" in its December 2010 order to argue that "mediation fees" are not recoverable. Objection at 8-9. This objection is not well-taken—as plaintiff knows, Judge Weinstein's function was *not* to facilitate mediation, but to assist the Court by determining a "formula for appointment" to apply in the accounting trial.[2] Docket No. 636. Such fees are fully recoverable under Local Rule 54-4.10.[3]

---

[2] To be clear, DC is *not* seeking any fees for Judge Weinstein's prior services as

3. <u>Reproduction Costs.</u>  DC seeks $293,282.29 in reproduction costs.
Plaintiff objects on two grounds—neither of which is persuasive.

a.  Plaintiff claims that Local Rule 54-4.11 does not permit recovery of the
"general" and discovery-related reproduction costs DC seeks.  Objection at 10-13,
17-19.  However, as this Court has observed, "the specifically enumerated items in
Local Rule 54-4.11 are non-exhaustive and . . . the Court may, in its discretion,
allow other costs for copies, *i.e.*, those costs that are necessarily obtained for use in
the case."  *In re Turn-Key-Tech Matters*, 2002 U.S. Dist. LEXIS 25584, at *4-5
(C.D. Cal. Nov. 27, 2002); *see also In re Katz Interactive Call Processing Patent
Litig.*, 2009 U.S. Dist. LEXIS 132100, at *134 (C.D. Cal. Sept. 8, 2009) ("[T]his
Court clearly has the discretion to award costs associated with making copies for
document production."); *Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice
Creams, Inc.*, 920 F.2d 587, 588 (9th Cir. 1990) (allowing recovery of reproduction
costs "necessarily obtained for use in the case").  As set forth in the declarations
DC submitted with its Application to Tax Costs, DC seeks reproduction costs that
were necessarily and reasonably incurred in successfully defending this litigation.
Such costs are plainly recoverable.  *See id.*

Moreover, this Court has expressly rejected plaintiff's argument that
discovery-related copying costs are not recoverable.  In *In re Katz*, the plaintiff
moved to retax $154,539.67 in copying costs awarded to defendant American
Airlines on the ground that these costs were incurred in connection with discovery
and were thus not recoverable.  2009 U.S. Dist. LEXIS 132100, at *134.  The Court
held that it "clearly has the discretion to award costs associated with making copies

---

a mediator *qua* mediator.

[3] Plaintiff asserts that the "parties previously agreed to share the costs of this
mediation on a 50/50 basis," Objection at 9, but cite only the declaration of Wayne
Smith, which says no such thing— which is no surprise, as DC made *no* such
blanket agreement.  Plaintiff's argument is irrelevant, in any event—DC is entitled
to recover the fees it paid Judge Weinstein in his role as master *even if* it agreed to
split certain up-front costs with plaintiff.  *See* C.D. Cal. Local Rule 54-4.10.

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 490**

for document production," and plaintiff "cannot reasonably argue that American did not need to copy documents in order to comply with its discovery obligations." *Id.* (citing *In re Turn-Key-Tech Matters*, 2002 U.S. Dist. LEXIS 25584, and *Internet Specialties W., Inc. v. Ispwest*, 2007 WL 1655726, at *1 (C.D. Cal. Feb. 7, 2007)).

Similarly, courts in the Ninth Circuit favor a "broad construction of 28 U.S.C. § 1920 with respect to electronic discovery costs," *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 2012 WL 1610979, at *4 (N.D. Cal. May 8, 2012), and frequently award costs incurred in connection with e-discovery. *See, e.g.*, *Tibble v. Edison Int'l*, 2011 WL 3759927, at *6-7 (C.D. Cal. Aug. 22, 2011) (concluding that costs of e-discovery experts "were necessarily incurred in responding to Plaintiffs' discovery requests"); *eBay Inc. v. Kelora Sys., LLC*, 2013 WL 1402736, at *16-17 (N.D. Cal. Apr. 5, 2013) (awarding e-discovery costs, including OCR costs); *In re Online DVD Rental Antitrust Litig.*, 2012 WL 1414111, at *1 (recognizing that court should broadly construe § 1920 "with respect to electronic discovery production costs" and awarding over $700,000 in such costs).

b. Plaintiff says the overall amount of reproduction costs DC seeks is "excessive." Objection at 10. This Court rejected a similar argument in *In re Katz*, concluding that the six-figure amount awarded to American was reasonable. 2009 U.S. Dist. LEXIS 132100, at *134-35. *See also:*

- *In re Online DVD*, 2012 WL 1414111, at *1 (awarding over $700,000 in costs);
- *Kalitta Air, LLC*, 2012 WL 6045246, at *6 (awarding over $600,000);
- *In re Ricoh*, 2012 WL 1499191, at *6 (over $675,000);
- *Baxter Healthcare*, 2011 WL 3880416, at *1 (over $400,000);
- *Hynix*, 697 F.Supp.2d at 1155 (over $750,000).

*In re Katz* also found that citation to other, lower cost requests—like those plaintiff cites here— "are not relevant," as "*[d]ifferent lawsuits with different document*

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 491**

1  *productions will undoubtedly have different costs*." *Id.* at *135 (emphasis added).

2  Likewise, plaintiff's citation to costs awards in other cases are irrelevant to the

3  instant actions—which, unlike plaintiff's cited cases, involved *nine years* of

4  complex litigation and over *850* discrete docket entries, excluding discovery the

5  parties served.

6       Plaintiff also specifically objects to a small fraction of the per-page copying

7  charges DC incurred as "excessive." Objection at 19-21. First, plaintiff claims that

8  any charge in excess of ten cents per page for black and white copying constitutes a

9  non-taxable "overcharge." *Id.* at 19-20 (citing copying charges ranging from eleven

10  to eighteen cents as alleged "overcharges"). Plaintiff cites no authority within the

11  Ninth Circuit for the proposition that copying charges in excess of ten cents per

12  page constitutes an "overcharge," nor do the Local Rules so provide. Indeed,

13  Central District of California Local Rule 54-4.11 contains *no* default per-page

14  limitation on copying charges.

15       With regards to color copying charges, the sole case plaintiff cites within the

16  Ninth Circuit, *Seven Signatures Gen. P'ship v. Irongate Azrep BW LLC*, 871 F.

17  Supp. 2d 1040 (D. Haw. 2012), is inapposite. That court found a $1.00 per-page

18  copying charge unreasonable in light of a local rule limiting copying costs to fifteen

19  cents per page. *Id.* at 1048 (citing District of Hawaii Local Rule 54.2(f)(4)). As

20  noted above, Central District of California Local Rule 54-4.11 *contains no such*

21  *limitation*. Furthermore, the party in *Seven Signatures* that challenged the $1.00

22  per-page rate submitted a declaration showing that a local commercial copier

23  charged forty-nine cents per page for color copying, leading the court to tax costs

24  for color copying at that rate. *Seven Signatures Gen. P'ship*, 871 F. Supp. 2d 1040

25  at 1048. Here, by contrast, plaintiff has submitted no such evidence—*nothing*, nor

26  does plaintiff explain why the color copying charges DC incurred—which reflect

27  the fair market value of such services and which are routinely paid by clients in

28  litigation—are unreasonable or excessive.

1    In any event, plaintiff's objection does not justify outright denial of DC's

2 request, as plaintiff suggests. Objection at 20-21. As plaintiff's own authority

3 confirms, while the Court can assess lower per-page copying charges as it sees fit, it

4 should not deny DC's request in its entirety. *See Squires v. Breckenridge Outdoor*

5 *Educ. Ctr.*, 2013 U.S. Dist. LEXIS 43373, at *21-22 (D. Colo. Mar. 27, 2013)

6 (reducing requested copying costs from $0.50 per page to $0.25 per page rather

7 than denying request outright). Here, no such reduction is necessary or appropriate

8 given plaintiff's failure to prove that the market price DC paid was in any way

9 excessive in this jurisdiction.

10    4. Deposition Transcript Costs. DC seeks $40,469.91 in deposition transcript

11 costs.[4] Plaintiff objects to all but $1,992.40 of those costs on the speculative basis

12 that they *could* include non-recoverable charges for videotaping and expedited

13 transcripts. Objection at 5-7. Plaintiff is wrong.

14    a. Despite plaintiff's assertion that DC "routinely" videotaped depositions,

15 Toberoff Decl. ¶ 2, only *eight* out of more than thirty depositions taken in these

16 cases were videotaped. Decl. of Brian Pearl ¶ 2, Exs. A-H. DC does not seek

17 recovery of any videotaping charges from these eight depositions:

18 - The itemized invoices DC submitted for the depositions of Mark Peary and

19   Jean Peavy, Docket No. 725-4, Ex. D at 136-37, include only taxable costs.

20 - DC's Application expressly excluded the videotaping charge on the itemized

21   invoice for the deposition of Mark Halloran. *Id.* at 117.

22 - DC does not seek recovery of the videotaping charge inadvertently submitted

23   with the invoice for the deposition of Jules Feiffer. *Id.* at 130, *see supra* n. 4.

24

25

26 ───────────
    [4] As set forth *infra* at 9, DC inadvertently included a handful of extraneous, non-taxable charges with its Application, including three expedited transcript charges,

27 Docket No. 725-1, line items 79, 80, 94, Ex. D at 116 ($952.56), 117 ($1,615.28), 140 ($506); and one videotaping charge, *id.*, line item 87, Ex. D at 130 ($850). DC

28 is not seeking recovery of these costs, which total $3,923.84.

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 493**

- As for the four remaining depositions—Mark Evanier, Laura Siegel Larson, Allen Lewellen, and James Steranko—DC was unable to locate itemized invoices. While it is possible these invoices include videotaping charges, there is a simple, rational basis to estimate and eliminate such charges. The invoice for Mr. Halloran's deposition, which lasted 8.5 hours, includes a $1,624.45 videotaping charge—*i.e.*, $191 per hour. Ex. D at 117. The invoice for Mr. Feiffer's deposition, which lasted 5.75 hours, includes a $850 videotaping charge—*i.e.*, $147 per hour. *Id.* at 130. This Court can use the average between these rates—*i.e.*, $169 per hour—to estimate videotaping charges on the non-itemized invoices and tax costs accordingly—*i.e.*, $1,605.50 for Mr. Evanier (9.5 hours, total invoice amount $3,217.00), $295.75 for Ms. Larson (1.75 hours, total invoice amount $1,107.80), $845 for Mr. Lewellen (5 hours, total invoice amount $1,421.55), and $1,352 for Mr. Steranko (8 hours, total invoice amount $2,694.55). Using such a metric to tax costs is fully appropriate, *see Squires*, 2013 U.S. Dist. LEXIS 43373, at *21-22 (reducing amount of costs rather than denying entire request), and would recognize the "presumption" in favor of awarding costs to DC as the prevailing party, *see Quan*, 623 F.3d at 888.

b. Plaintiff objects that the invoices DC submitted for non-videotaped depositions *could* include non-taxable costs, such as expedited transcript costs. Objection at 5-7. This objection is purely speculative—there is no indication such charges were *actually* included. Denying DC's costs request based on mere speculation would improperly shift plaintiff's burden to "show why costs should not be awarded" to DC, the prevailing party. *Cf. Quan*, 623 F.3d at 888. DC has endeavored in good faith to provide the best documentation it could locate from these decade-long cases, and seeks only a fraction of the actual costs it incurred. There is no justification for denying all of the deposition costs DC seeks based on

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 494**

the unavailability of itemized records from third-party vendors dating back as far as seven years.

5. Reporter's Transcripts.  DC seeks $32,688.38 in reporter's transcripts.  28 U.S.C. § 1920 provides that  "[a] judge or clerk of any court of the United States may tax as costs … [f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. § 1920(2).  "While courts are limited to those sections enumerated, courts are also free to interpret the meaning of cost within section 1920." *El Dorado Irrigation Dist. v. Traylor Bros.*, 2007 U.S. Dist. LEXIS 14440, at *25 (E.D. Cal. Feb. 9, 2007).  Furthermore, this Court has broad discretion to interpret and apply its local rules. *Delange v. Dutra Constr. Co.*, 183 F.3d 916, 919 n. 2 (9th Cir.1999).

While the literal language of  Local Rule 54-4.5 would appear to limit recovery of such costs to Court reporter's transcripts "requested by the Court or prepared pursuant to stipulation," and requests for transcript costs have been denied based on that language, *e.g. POM Wonderful, LLC v. Purely Juice, Inc.*, 2008 WL 4351842, at *5 (C.D. Cal. Sept. 22, 2008), other California district courts with substantively identical local rules have relied on Ninth Circuit authority to exercise their discretion to tax such costs where the case necessitated the use of transcripts even though the transcripts at issue were not formally requested by the Court or prepared pursuant to the parties' stipulation.  *E.g.*, *United Nat'l Maint. v. San Diego Convention Ctr. Corp.,* 2013 U.S. Dist. LEXIS 391, *6-7 (S.D. Cal. Jan. 2, 2013) (awarding reporter's transcript costs in "unusually complicated" where parties "relied upon and cited [transcripts] at length" in motion practice); *see also A.B.C. Packard, Inc. v. General Motors Corp.*, 275 F.2d 63, 75 (9th Cir. 1960) (finding cost of daily copies of trial transcripts recoverable if indispensable due to the length and complexity of trial).[5]  This Court should likewise exercise its discretion and

---

[5] These costs are also taxable under Rule 39(e)(2) of the Federal Rules of Appellate Procedure. *See PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 743 F.Supp.2d 1136, 1158 (C.D. Cal. 2010).

1  award DC the reporter's transcript costs it seeks.[6]  As in *United Nat'l Maint.* and

2  *A.B.C. Packard, Inc.*, these transcripts were necessary in order to prosecute and

3  defend an exceedingly complex case, and were regularly relied upon both by the

4  parties and the Court.

5      6. Adequacy of DC's Documentation.  Finally, plaintiff objects that DC has

6  provided insufficient documentation to determine whether certain costs are taxable.

7  Objection at 4, 7, 12-13.  As explained in Mr. Smith's declaration, DC has been

8  represented by multiple law firms in the above-entitled actions over the course of

9  almost a decade.  DC has endeavored in good faith to obtain the best documentation

10  available under the circumstances, and filed supporting declarations clarifying the

11  costs it seeks.  *E.g.*, *Ready Transp., Inc. v. CRST Malone, Inc.*, 2009 WL 1916405,

12  at *3 n.3 (C.D. Cal. June 30, 2009) (relying on counsel's assertion that amount

13  submitted in bill of costs did not include non-taxable videographer fees)The Court

14  can and should award DC these costs as set forth above.

15      7. Costs DC Does Not Seek.  In the course of preparing its Application—

16  which involved collecting hundreds of invoices from multiple sources and redacting

17  confidential and irrelevant information in a short period of time—DC inadvertently

18  submitted a small number of extraneous, non-taxable charges.  DC does not seek to

19  recover the following costs:

20      •  Filing fees, Docket No. 725-1, line items 4, 5, 10-15, 16-17 ($1,904.88);

21      •  Expedited deposition transcript charges, *id.*, line items 79, 80, 94, Ex. D at

22        116 ($952.56), 117 ($1,615.28), 140 ($506); and

23      •  A videotaping charge, *id.*, line item 87, Ex. D at 130 ($850).

24  DC apologizes to the Court for any inconvenience this oversight may have caused.

25

26      [6] To the extent DC inadvertently included charges related to deposition charges,
Objection at 3, those costs are clearly taxable under Local Rule 54-4.6.

27  Furthermore, contrary to plaintiff's objection, the charges for obtaining transcripts
of testimony in a different case were for use in the instant actions.  *See* Smith Decl.

28  ¶ 12.

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 496**

8. **Revised Total.** DC submits a revised request of $408,965.31, reflecting the aforementioned proposed adjustments to DC's Bill of Costs.

| Original Costs Request | $418,892.28 |
|---|---|
| Less non-taxable filing fees | ($1,904.88) |
| Less non-taxable expedited deposition transcript charges | ($952.56) ($1,615.28) ($506) |
| Less non-taxable videotaping charge | ($850) |
| Less suggested adjustment for videotaping of deposition of Mr. Evanier | ($1,605.50) |
| Less suggested adjustment for videotaping of deposition of Ms. Larson | ($295.75) |
| Less suggested adjustment for videotaping of deposition of Mr. Lewellen | ($845) |
| Less suggested adjustment for videotaping of deposition of Mr. Steranko | ($1,352 ) |
| **Adjusted Total:** | **$408,965.31** |

Dated:  May 14, 2013                     Respectfully Submitted,

By: /s/  Daniel M. Petrocelli
                                                        Daniel M. Petrocelli

DEFENDANTS' REPLY ISO
APP. TO TAX COSTS
**ER 497**

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   Attorneys for the DC Comics Parties

8                  **UNITED STATES DISTRICT COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10  LAURA SIEGEL LARSON,              Case No. CV 04-8400 ODW (RZx)
    individually and as personal      Case No. CV 04-8776 ODW (RZx)
11  representative of the ESTATE OF
    JOANNE SIEGEL,                     **DECLARATION OF BRIAN PEARL**
12                                     **IN SUPPORT OF DEFENDANTS'**
                Plaintiff,             **REPLY IN SUPPORT OF**
13                                     **APPLICATION TO TAX COSTS**
           v.
14
    WARNER BROS. ENTERTAINMENT
15  INC., DC COMICS, and DOES 1-10,

16              Defendants and        **Date**:      May 17, 2013
                Counterclaimants.     **Time**:      1:00 p.m.
17  _____       **Place**:     Telephonic
    LAURA SIEGEL LARSON,
18  individually and as personal
    representative of the ESTATE OF
19  JOANNE SIEGEL,

20              Plaintiff,

21         v.

22  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
23  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
24  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
25
                Defendants and
26              Counterclaimants.

27  _____

28
                                              PEARL DECL. ISO REPLY
                                       ISO DEFENDANTS' COSTS APP.
                                              **ER 498**

# DECLARATION OF BRIAN PEARL

I, Brian Pearl, do hereby declare:

1. I am an associate at O'Melveny & Myers LLP, counsel of record in the *Siegel* Cases (Case Nos. CV-04-8400 ODW, CV-04-8776 ODW) ("*Siegel* Cases") for Defendants DC Comics, Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., and WB Studio Enterprises Inc. (formerly known as and sued herein as Warner Bros. Television Production Inc.).  I make this declaration in support of Defendants' Application to Tax Costs.  I have personal knowledge of the facts set forth in this declaration.

2. Based on my review of the deposition transcripts in the *Siegel* Cases, I have determined that, out of over thirty depositions taken in these cases, only the following eight depositions were videotaped:  (1) Mark Warren Peary, November 11, 2006; (2) Jean Adele Peavy, November 11, 2006; (3) Jules Feiffer, March 5, 2007; (4) James Steranko, March 6, 2007; (5) Marc Evanier, March 30, 2007; (6) Allen Lewellen, April, 9, 2007; (7) Laura Siegel Larson, October 5, 2007; and (8) Mark Halloran, March 5, 2009.  The invoices for those depositions can be found at Ex. D to DC's Bill of Costs, at 117-120, 130, 135-37, 140; *see also* DN 725-1, at line items 80-83, 87, 90, 91, 94.

3. For the Court's reference, attached hereto are copies of the cover sheets of the transcripts of the above-referenced depositions.

 a. Attached hereto as Exhibit A is a true and correct copy of  the cover sheet of the transcript of the videotaped deposition of Mark Warren Peary, dated November 11, 2006.

 b. Attached hereto as Exhibit B is a true and correct copy of  the cover sheet of the transcript of the videotaped deposition of Jean Adele Peavy, dated November 11, 2006.

c.      Attached hereto as Exhibit C is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of Jules Feiffer, dated March 5, 2007.

d.      Attached hereto as Exhibit D is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of James Steranko, dated March 6, 2007.

e.      Attached hereto as Exhibit E is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of Marc Evanier, dated March 30, 2007.

f.      Attached hereto as Exhibit F is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of Allen Lewellen, dated April, 9, 2007.

g.      Attached hereto as Exhibit G is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of Laura Siegel Larson, dated October 5, 2007.

h.      Attached hereto as Exhibit H is a true and correct copy of the cover sheet of the transcript of the videotaped deposition of Mark Halloran, dated March 5, 2009.

I declare under penalty of perjury in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct, and that this declaration was executed this 14th day of May, 2013 at Los Angeles, California.


/s/ Brian Pearl
Brian Pearl

PEARL DECL. ISO REPLY
ISO DEFENDANTS' COSTS APP.
**ER 500**

# EXHIBIT A

1

|  |
|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE CENTRAL DISTRICT OF CALIFORNIA |

COPY

```
 4   JOANNE SIEGEL,                )
     LAURA SIEGEL LARSON          )
 5                                )
                   Plaintiffs,   )
 6                                )
        v.                        )  CASE NO.  CV 04-8400
 7                                )           CV 04-8776
     WARNER BROS, et al.          )
 8                                )
                   Defendants.   )
 9
```

```
13          DEPOSITION OF MARK WARREN PEARY
                  November 11, 2006
14                   8:30 a.m.
               317 Paseo de Peralta
15             Santa Fe, New Mexico
```

```
17       PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

18   TAKEN BY:  MR. PATRICK PERKINS
                Attorney for the Defendants
```

```
22   REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                   Bean & Associates, Inc.
23                 Professional Court Reporting Service
                   500 Marquette, Northwest, Suite 280
24                 Albuquerque, New Mexico 87102

25   (3519B) MC
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4           MR. MARC TOBEROFF
             2049 Century Park East, #2720
 5           Los Angeles, California 90067

 6   For the Defendants:

 7           PERKINS LAW OFFICE, P.C.
             1711 Route 9D
 8           Cold Spring, New York 10516
             BY:  MR. PATRICK PERKINS
 9

10   ALSO PRESENT:  MS. MARGO MOIR, Videographer

11

12              I N D E X
```

```
13   EXAMINATION OF MARK WARREN PEARY

14   By Mr. Perkins                                    3

15   CERTIFICATE OF COMPLETION OF DEPOSITION          86

16   WITNESS SIGNATURE/CORRECTION PAGE                88

17

18       EXHIBITS MARKED OR FORMALLY IDENTIFIED

19   1.   Subpoena in a Civil Case                     6

20   2.   Subpoena in a Civil Case                    13

21   3.   Joint Venture Agreement                     24

22   4.   Privilege Log                               37

23   5.   October 27, 2003 agreement                  40

24   6.   Order Admitting Will to Probate             48

25   7.   Notice of Termination of Transfer ...       50
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT A**
**4**

ER 503

# EXHIBIT B

L

1          UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL,              )
    LAURA SIEGEL LARSON         )
5                               )
                Plaintiffs,     )
6                               )
       v.                       )   CASE NO. CV 04-8400
7                               )            CV 04-8776
    WARNER BROS, et al.         )
8                               )
                Defendants.     )
9

10

11

12

13          DEPOSITION OF JEAN ADELE PEAVY
              November 11, 2006
                 1:26 p.m.
14            317 Paseo de Peralta
              Santa Fe, New Mexico
15

16

17      PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:

18  TAKEN BY:  MR. PATRICK PERKINS
               Attorney for the Defendants
19

20

21

22  REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                  Bean & Associates, Inc.
23                Professional Court Reporting Service
                  500 Marquette, Northwest, Suite 280
24                Albuquerque, New Mexico 87102

25  (3520B) MC



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT B**
5

ER 505

2

```
 1              A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4            MR. MARC TOBEROFF
              2049 Century Park East, #2720
 5            Los Angeles, California 90067

 6    For the Defendants:

 7            PERKINS LAW OFFICE, P.C.
              1711 Route 9D
 8            Cold Spring, New York 10516
              BY:  MR. PATRICK PERKINS
 9

10    ALSO PRESENT:   MS. MARGO MOIR, Videographer

11

12               I N D E X

13    EXAMINATION OF JEAN ADELE PEAVY

14    By Mr. Perkins                                3

15    CERTIFICATE OF COMPLETION OF DEPOSITION      38

16    WITNESS SIGNATURE/CORRECTION PAGE            40

17

18         EXHIBITS MARKED OR FORMALLY IDENTIFIED

19    12.   Subpoena in a Civil Case                5

20    13.   April 27, 1999 letter, Peavy to Levitz  12

21    14.   August 21, 1992 note, Peavy to Paul     18

22    15. September 10, 1992 letter, Frank to Paul  24

23    16.   August 1, 1992 letter, Levitz to Frank  25

24    17.   March 31, 2001 letter, Jean to Joanne   28

25
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**DEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

**EXHIBIT B**
6

ER 506

# EXHIBIT C

COPY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
JOANNE SIEGEL and LAURA SIEGEL
LARSON,

                    Plaintiffs,

          -against-                    Case No.
                                    04-8400 SGL (RZx)
WARNER BROS. ENTERTAINMENT
INC.; TIME WARNER INC.; DC
COMICS; and DOES 1-10,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
JOANNE SIEGEL and LAURA SIEGEL
LARSON,

                    Plaintiffs,

          -against-                    Case No.
                                    04-8776 SGL (RZx)
TIME WARNER INC.; WARNER
COMMUNICATIONS INC.; WARNER
BROS. ENTERTAINMENT INC.;
WARNER BROS. TELEVISION
PRODUCTION INC.; DC COMICS; and
DOES 1-10,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
AND RELATED COUNTERCLAIMS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                    March 5, 2007
                    10:16 A.M.


                    Videotaped Deposition
                    JULES FEIFFER

TA PASCULLO, President

## CLASSIC REPORTING, INC.
### TOTAL LITIGATION SUPPORT

13 West 36th Street • New York, New York 10018
Tel: (212) 268-2590 • Fax: (212) 268-2596

**EXHIBIT C**
7

ER 508

1

2                    Videotaped Deposition of Nonparty

3      Witness JULES FEIFFER, taken by Defendants,

4      pursuant to Subpoena, at the offices of Fross

5      Zelnick Lehrman & Zissu, P.C., 866 United

6      Nations Plaza, New York, New York 10017 before

7      Arta Pascullo, a Registered Professional

8      Reporter and Notary Public within and for the

9      State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S :

3         MARC TOBEROFF, ESQ.
               Attorney for Plaintiffs and the Witness
4              2049 Century Park East, Suite 2720
               Los Angeles, California 90067

5

6

          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
7              Attorneys for Defendants
               866 United Nations Plaza
8              New York, New York 10017
                    -and-
9         PERKINS LAW OFFICE, P.C.
               1711 Route 9D
10             Cold Spring, New York 10516

11        BY:   PATRICK T. PERKINS, ESQ., of Counsel

12
     ALSO PRESENT:
13
          ROBERT McDONALD - Videographer
14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

Case 13-56243 02/25/2014 ID: 8992563 DktEntry: 22-3 Page: 219 of 281
Case 2:04-cv-08400-ODW-RZ Document 725-1 Filed 05/14/13 Page 15 of 32 Page ID
#:19186

Page 1

1

2          UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA
3              EASTERN DIVISION

4                  -  -  -

5  JOANNE SIEGEL and              :
   LAURA SIEGEL LARSON,           :
6          Plaintiffs,            :
                                  :
7          vs.                    :
                                  :  Case No. 04-8400
8  TIME WARNER INC.; WARNER       :
   COMMUNICATIONS INC.;           :  Case No. 04-8776
9  WARNER BROS. ENTERTAINMENT     :
   INC.; WARNER BROS.             :
10 TELEVISION PRODUCTION          :
   INC.; DC COMICS; and           :
11 DOES 1-10,                     :
          Defendants.            :
12                 -  -  -
13        Philadelphia, Pennsylvania
           Tuesday, March 6, 2007
14
                   -  -  -
15
16        Videotaped Deposition of JAMES
17 STERANKO held at Morgan, Lewis & Bockius, LLP,
18 1701 Market Street, on the above date,
19 beginning at 2:17 p.m., before Kimberly A.
20 Overwise, a Certified Realtime Reporter and
21 Notary Public.
22                 -  -  -
23
24
25

**EXHIBIT D**
**10**
ER 512

APPEARANCES:

    MARC TOBEROFF, ESQ.

    Law Offices of Marc Toberoff PLC

        2049 Century Park East, Suite 2720

        Los Angeles, CA 90067

        Counsel for Plaintiffs and

        Counterclaim Defendants

    PATRICK T. PERKINS, ESQ.

    Perkins Law Office, PC

        1711 Route 9D

        Cold Spring, NY 10516

        Counsel for Defendants and

        Counterclaimants

ALSO PRESENT:

Brian Sappio

Jacqueline Vassalotti

Videographers

      (INDEX at end of transcript.)

EXHIBIT D

11

ER 513

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
          Plaintiffs,        )
                             )
     vs.                     )   No. 04-8400 SGL (RZx)
                             )
WARNER BROS. ENTERTAINMENT   )        -and-
INC., et al.,                )
                             )   No. 04-8776 SGL (RZx)
          Defendants.        )
_____)
                             )
AND RELATED CROSS-ACTION.    )
_____)

VIDEOTAPED DEPOSITION OF MARC S. EVANIER

Beverly Hills, California

Friday, March 30, 2007

Reported by:

DAVID S. COLEMAN

CSR No. 4613

```
 1            Videotaped deposition of MARC S. EVANIER,

 2       taken on behalf of Defendants and Counter-

 3       claimants, at 9665 Wilshire Boulevard, 9th

 4       Floor, Beverly Hills, California, beginning

 5       at 10:18 AM and ending at 7:48 PM on Friday,

 6       March 30, 2007, before DAVID S. COLEMAN,

 7       Certified Shorthand Reporter No. 4613.

 8

 9

10 APPEARANCES:

11

12 For Plaintiffs:

13      LAW OFFICES OF MARC TOBEROFF
        BY:  MARC TOBEROFF
14      Attorney at Law
        2049 Century Park East, Suite 2720
15      Los Angeles, California 90067
        310-246-3333
16

17
   For Defendants and Counterclaimant:
18
        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
19      9665 Wilshire Boulevard, 9th Floor
        Beverly Hills, California 90212
20      310-858-7888
        (Of Record But Not Present.)
21
            -and-
22
        PERKINS LAW OFFICE, PC
23      BY:  PATRICK T. PERKINS
        Attorney at Law
24      1711 Route 9D
        Cold Spring, New York 10516
25      845-265-2820
```

**EXHIBIT E**

**13**

ER 516

1 APPEARANCES (Continued):

2

3 THE VIDEOGRAPHER:

4      SEAN COUTU
       U.S. LEGAL SUPPORT
5      15250 Ventura Boulevard, Suite 410
       Sherman Oaks, California 91403
6      800-993-4464

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

JOANNE SIEGEL and LAURA        )
SIEGEL LARSON,                 )
                               )
        Plaintiffs,            )
                               )
    vs.                        )   No. 04-8400 SGL (RZx)
                               )
WARNER BROS. ENTERTAINMENT     )       -and-
INC., et al.,                  )
                               )   No. 04-8776 SGL (RZx)
        Defendants.            )
_____)
AND RELATED CROSS-ACTION.      )
_____)

VIDEOTAPED DEPOSITION OF ALLEN WAYNE LEWELLEN

Beverly Hills, California

Monday, April 9, 2007

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**US LEGAL SUPPORT**

*Certified Shorthand Reporters*

15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

```
 1          Videotaped deposition of ALLEN WAYNE LEWELLEN,

 2     taken on behalf of Defendants and Counter-

 3     claimants, at 9665 Wilshire Boulevard, 9th

 4     Floor, Beverly Hills, California, beginning

 5     at 10:09 AM and ending at 3:16 PM on Monday,

 6     April 9, 2007, before DAVID S. COLEMAN,

 7     Certified Shorthand Reporter No. 4613.

 8

 9

10   APPEARANCES:

11

12   For Plaintiffs:

13        LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
14        Attorney at Law
          2049 Century Park East, Suite 2720
15        Los Angeles, California 90067
          310-246-3333
16

17

18   For Defendants and Counterclaimant:

19        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
20        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
21        310-858-7888

22

23

24

25

                                              2
```

**U.S. LEGAL SUPPORT**

**EXHIBIT F**
**16**

ER 520

1    APPEARANCES (Continued):

2

3    THE VIDEOGRAPHER:

4         JERRY JOHANNING
          U.S. LEGAL SUPPORT
5         15250 Ventura Boulevard, Suite 410
          Sherman Oaks, California 91403
6         800-993-4464

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

**U.S. LEGAL SUPPORT**

**EXHIBIT F**
**17**

ER 521

# EXHIBIT G

ORIGINAL SHIPPED OCT 1 5 2007

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON, )
 )
 )
 Plaintiffs, )
 ) CASE NO.
 ) 04-8400 (RSWL)(RZx)
 VS. ) -and-
 ) 04-8776 (RSWL)(RZx)
 )
WARNER BROS. ENTERTAINMENT )
INC., et al., )
 )
 )
 Defendants. )
_____ )
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

**DISK ENCLOSED**

VOLUME II

VIDEOTAPED DEPOSITION OF LAURA SIEGEL LARSON

BEVERLY HILLS, CALIFORNIA

FRIDAY, OCTOBER 5, 2007

REPORTED BY:

JEAN F. HOLLIDAY

CSR No. 4535, RPR, CRR

**US LEGAL SUPPORT**

Certified Shorthand Reporters

15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

**EXHIBIT G**
**18**

ER 523

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL and LAURA          )
    SIEGEL LARSON,                    )
5                                     )
                                      )
6              Plaintiffs,            )
                                      )   CASE NO.
7          VS.                        )   04-8400 (RSWL)(RZx)
                                      )       -and-
8                                     )   04-8776 (RSWL)(RZx)
                                      )
9   WARNER BROS. ENTERTAINMENT        )
    INC., et al.,                     )
10                                    )
                                      )
11             Defendants.            )
    _____)
12  AND RELATED COUNTERCLAIMS.

13

14

15          Videotaped deposition of LAURA SIEGEL

16      LARSON, VOLUME II, taken on behalf of

17      Defendants and Counterclaimants, at

18      9665 Wilshire Boulevard, Ninth Floor,

19      Beverly Hills, California, beginning

20      at 10:27 a.m., and ending at 12:12

21      p.m., on Friday, October 5, 2007,

22      before JEAN F. HOLLIDAY, Certified

23      Shorthand Reporter No. 4535.

24

25

                                                    281

**U.S. LEGAL SUPPORT**

**EXHIBIT G**
**19**

ER 524

```
 1    APPEARANCES:

 2        FOR THE PLAINTIFFS:

 3            LAW OFFICES OF MARC TOBEROFF
              BY:  MARC TOBEROFF, ESQ.
 4            2049 Century Park East
              Suite 2720
 5            Los Angeles, California  90067
              (310)246-3333
 6

 7        FOR THE DEFENDANTS AND COUNTERCLAIMANTS:

 8            PERKINS LAW OFFICE, PC
              BY:  PATRICK T. PERKINS, ESQ.
 9            1711 Route 9D
              Cold Spring, New York  10516
10            (845)265-2820
              pperkins@ptplaw.com
11
              AND
12
              WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
13            BY:  MICHAEL BERGMAN, ESQ.
              9665 Wilshire Boulevard
14            Ninth Floor
              Beverly Hills, California  90212
15            (310)858-7888
              mbergman@wwllp.com
16

17        ALSO PRESENT:

18            David Chorley, Videographer

19

20

21

22

23

24

25
                                                          282
```

**U.S. LEGAL SUPPORT**

**EXHIBIT G**
**20**

ER 525

# EXHIBIT H

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | ) ) ) | |
|       Plaintiffs, | ) ) | |
|       vs. | ) | No. CV 04-8400 SGL (RZx) |
| WARNER BROS. ENTERTAINMENT INC., TIME WARNER INC., DC COMICS, and DOES 1-10, | ) ) ) ) | |
|       Defendants. | ) ) | |
| _____ | ) | |
| AND RELATED COUNTERCLAIMS. | ) | |
| _____ | ) | |

DEPOSITION OF MARK HALLORAN

MARCH 5, 2009

DAVID S. COLEMAN, CSR 4613

  278009

BARKLEY
Court Reporters

| | | | |
|---|---|---|---|
| (212) 808-8500 New York | (310) 207-8000 Los Angeles | (949) 955-0400 Irvine | (415) 433-5777 San Francisco |
| (702) 366-0500 Las Vegas | (916) 922-5777 Sacramento | (408) 885-0550 San Jose | (760) 322-2240 Palm Springs |
| | (858) 455-5444 San Diego | (951) 686-0606 Riverside | (818) 702-0202 Woodland Hills |

**EXHIBIT H**
21

ER 527

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JOANNE SIEGEL and LAURA     )
     SIEGEL LARSON,              )
 5                               )
              Plaintiffs,        )
 6                               )
         vs.                     )   No. CV 04-8400 SGL (RZx)
 7                               )
     WARNER BROS. ENTERTAINMENT  )
 8   INC., TIME WARNER INC.,     )
     DC COMICS, and DOES 1-10,   )
 9                               )
              Defendants.        )
10   _____)
                                 )
11   AND RELATED COUNTERCLAIMS.  )
     _____)
12

13

14

15

16              Videotaped deposition of MARK HALLORAN,

17   taken on behalf of Defendants and Counterclaimants, at

18   9665 Wilshire Boulevard, 9th Floor, Beverly Hills,

19   California, beginning at 10:19 AM and ending at 7:49 PM

20   on Thursday, March 5, 2009, before DAVID S. COLEMAN,

21   Certified Shorthand Reporter No. 4613.

22

23

24

25

                               2
```

```
 1   APPEARANCES:

 2

 3   For Plaintiffs and Counterdefendants:

 4        TOBEROFF & ASSOCIATES
          BY:  MARC TOBEROFF
 5        Attorney at Law
          2049 Century Park East, Suite 2720
 6        Los Angeles, California 90067
          310-246-3333
 7        mtoberoff@ipwla.com

 8

 9   For Defendants and Counterclaimants:

10        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
11             ANJANI MANDAVIA
               ADAM HAGEN
12             REBECCA HENNING
          Attorneys at Law
13        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
14        310-858-7888
          mbergman@wwllp.com

15

16   Videographer:

17        JESSE GLEN
          BARKLEY COURT REPORTERS
18        1875 Century Park East, Suite 1300
          Los Angeles, California 90067
19        310-207-8000

20

21

22

23

24

25
```

3

Mark Halloran

**BARKLEY**
Court Reporters

**EXHIBIT H**
**23**

ER 529

1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
    *kadams@toberoffandassociates.com*
3  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway, #348
4  Malibu, California, 90265
   Telephone:  (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
7  individually and as personal representative
   of the Estate of Joanne Siegel

8

                **UNITED STATES DISTRICT COURT**
9
           **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
10

11  LAURA SIEGEL LARSON,                    Case No: 04-CV-08400 ODW (RZx)*
    individually and as personal            Case No: 04-CV-08776 ODW (RZx)*
12  representative of the ESTATE OF
    JOANNE SIEGEL,                          Hon. Otis D. Wright II, U.S.D.J.
13                  Plaintiff,              Hon. Ralph Zarefsky, U.S.M.J.
           v.                              **PLAINTIFF'S COURT-ORDERED**
14                                         **SUPPLEMENTAL BRIEF RE:**
    WARNER BROS. ENTERTAINMENT             **EFFECT OF THE COURT'S**
15  INC., DC COMICS, and DOES 1-10,        **MARCH 20, 2013 ORDER ON THE**
                  Defendants and           **"ADS" AND "SUPERBOY"**
16                Counterclaimants.        **TERMINATIONS**

17  LAURA SIEGEL LARSON,                   *Declarations of Keith Adams and Laura*
    individually and as personal           *Siegel Larson filed concurrently*
18  representative of the ESTATE OF
    JOANNE SIEGEL,                         *: Docket citations herein are to Case No.
19                  Plaintiff,            04-CV-08400.
           v.
20
    TIME WARNER INC., WARNER
21  COMMUNICATIONS INC.,
    WARNER BROS. ENTERTAINMENT
22  INC., WARNER BROS. TELEVISION
    PRODUCTION INC., DC COMICS,
23  and DOES 1-10,
24                Defendants and
                  Counterclaimants.
25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BACKGROUND ...............................................................................................2

    A.    Superboy And The Superman Ads........................................................2

    B.    The 1997 Superman Termination And 2002 Superboy Termination ...3

    C.    The Superman/Superboy Litigations And The Ads Termination.........4

ARGUMENT .......................................................................................................6

I.    THE OCTOBER 19, 2001 AGREEMENT COULD NOT TRANSFER

    RIGHTS IN "SUPERBOY" OR THE "ADS" AS A MATTER OF LAW ....6

    A.    Congress' Clear Intent To Protect The Termination Right..................6

    B.    The "Revocation And Regrant" Decisions ..........................................7

    C.    The October 19, 2001 Letter Cannot Bar The Superboy Or Ads

        Terminations As A Matter Of Law ......................................................9

    D.    The October 19, 2001 Letter Does Not Satisfy California Law As To

        Revocation And Regrant ...................................................................10

        1.    The October 19, 2001 Letter Could Only Transfer The Rights

            The Siegels Recaptured By Their 1997 Terminations..............10

        2.    The Record Evidence Demonstrates That The Letter Was Not

            A Revocation And Regrant......................................................11

            a.    The Letter Was Not A Novation ...................................13

PROPOSAL FOR RESOLUTION .......................................................................14

CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Angel*,
37 Cal. 2d 856 (1951) ............................................................................... 13

*Alexander v. Codemasters Group Ltd.*,
104 Cal. App. 4th 129 (2002) ................................................................... 14

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ............................................................*passim*

*Fanucchi & Limi Farms v. United Agri Prods.*,
414 F.3d 1075 (9th Cir. 2005) ................................................................. 13

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943) ............................................................................... 6-7

*Greenberg v. National Geographic Society*,
533 F.3d 1244 (11th Cir. 2008) ................................................................. 6

*Marvel Characters Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ...................................................................... 8

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ...................................................... 7-9, 11

*Morey v. Vannucci*,
64 Cal. App. 4th 904 (1998) ..................................................................... 11

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) .................................................................................... 7

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ...................................................................... 8

*Siegel v. National Periodical Publications, Inc.*,
508 F.2d 909 (2d Cir. 1974) .................................................................... 14

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) .............................................. 3, 15

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...........................................*passim*

*Stewart v. Abend*,
495 U.S. 207 (1990) .................................................................................... 6

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ................................................................. 12

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995) ................................................................................. 13

*Wolf v. Walt Disney Pictures & Television,*
162 Cal. App. 4th 1107 (2008) .................................................................11, 14

**Statutes**

17 U.S.C. § 304 .......................................................................................*passim*

Cal. Civ. Code § 1636 .............................................................................13

Cal. Civ. Code § 1639 .............................................................................13

# **INTRODUCTION**

The October 19, 2001 letter could not transfer the Siegels' copyright expectancy from their 2002 termination notice regarding Superboy or their 2012 termination notice regarding the Superman Ads. Per 17 U.S.C. § 304(c)(6)(D), termination interests cannot be anticipatorily assigned prior to the service of a termination notice. Furthermore, under 17 U.S.C. § 304(c)(5), statutory heirs can exercise termination rights "notwithstanding any agreement to the contrary, including … an agreement to make a further grant." To the extent the 2001 letter is construed to waive, relinquish or encumber the Siegels' termination rights regarding Superboy or the Ads, it is void under the Copyright Act as an "agreement to the contrary."

The Siegels' 1997 termination notices did not apply to Superboy works, because those notices were strictly limited by the time "windows" set forth in 17 U.S.C. §§ 304(c)(3)-(4), and could only recapture works published by 1943. The Siegels' 2002 termination focused on Superboy, which was first published in 1944, and which DC owned pursuant to a 1948 grant by Jerome Siegel.

DC owned the Superman Ads pursuant to Siegel and Shuster's 1938 grant, and the Court ruled that the Ads were outside the termination "window" and "outside the effective reach of the [1997] termination notices." *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1119-23 (C.D. Cal. 2008). In 2012, Ms. Larson therefore served and filed a 17 U.S.C. § 304(d) termination notice regarding the Ads.

To circumvent the Copyright Act, DC argues that the October 19, 2001 letter silently revoked Siegel's pre-1978 grants (on which DC continued to rely *after* 2001) and re-granted to DC rights it already owned. The Ninth Circuit has made clear, however, that as a matter of federal copyright law, any "revocation and re-grant" must be "express," given § 304(c)(5) and Congress' concerted objective to protect the termination right. Thus, as a matter of Copyright law, this Court can rule that the Siegels' recaptured copyrights in Superboy and the Ads were not transferred in 2001.

Moreover, the reasonable inferences from the evidence support the Siegels,

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

and on DC's summary judgment motion, the Court must draw all reasonable inferences in favor of the Siegels, and against DC. The 2001 letter contains no language of revocation and, as DC conceded and this Court ruled, the 2001 letter controls, "nothing more." DC has never asserted that the 2001 letter cancelled Jerome Siegel's original grants. In fact, DC pled in this very case that such grants "are still in effect," relied on them to secure favorable rulings, and is judicially estopped from changing its position. Dkt. 646 ¶¶68-69. DC also relied on Siegel's pre-1978 grants outside this case, long after the 2001 letter. The first appearance of "revocation and regrant" is in *DC's* rejected 2002 draft proposal, which DC is also estopped from relying on, after repeatedly disavowing it before the Ninth Circuit.

The October 19, 2001 letter had no effect on the Siegels' 2002 Superboy and 2012 Ads terminations as a matter of federal Copyright law; and even under state contract law, DC's revisionist theory, at the very most, contrives a triable issue of fact as to the parties' mutual intent, precluding summary judgment for DC.

**BACKGROUND**

### A. Superboy And The Superman Ads

In 1933-34, writer Jerome Siegel and artist Joe Shuster co-created Superman. *Siegel*, 542 F. Supp. 2d at 1102-06. On March 1, 1938, they signed an agreement selling Superman to DC for $130. *Id.* at 1107. DC intended to publish "Superman" in a new magazine, *Action Comics,* which it promoted in prior promotional announcements in two of its other magazines (the "Ads"):

> Detective Comics announced the debut of its Action Comics series with full page announcements in the issues of some of its existing publications. Specifically, in *More Fun Comics*, Vol. 31, with a cover date of May, 1938, Detective Comics placed the following black-and-white promotional advertisement on the comic's inside cover, which reproduced the cover of the soon-to-be published first issue of *Action Comics*…
> Similarly, *Detective Comics*, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement ….
> Superman itself was published by Detective Comics on April 18, 1938, in *Action Comics*, Vol. 1, which had a cover date of June, 1938.

*Id.* at 1107-1110. *Action Comics* was an immediate success. *Id.* at 1110-11.

Later in 1938, Siegel created Superboy:

> Not long thereafter, on November 30, 1938, Siegel pitched the idea to Detective Comics of serializing a comic concerning the exploits of Superman as a young man. Siegel called his character "Superboy." ….
> Detective Comics, by a letter dated December 2, 1938, effectively declined to publish Siegel's proposed Superboy comic. Siegel later re-pitched the idea in December, 1940, through the submission of a lengthy script containing the storyline and dialogue for the proposed comic strip's first release or releases that fleshed out in greater detail the outlines of the Superboy story arc. Detective Comics again effectively declined to publish Superboy.
> Siegel entered the United States Army in July, 1943, to serve his country during World War II. In December, 1944, while Siegel was stationed abroad, Detective Comics published, without notice to Siegel and without his consent, an illustrated five- page comic strip entitled "Superboy" appearing as one among many other comics strips in the body of volume 101 of its magazine *More Fun Comics*.

*Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1114-1115 (C.D. Cal. 2007). In 1947, Siegel and Shuster sued DC in Westchester, N.Y. *Id.* The court held that DC owned Superman under the 1938 grant, but that DC had stolen Superboy from Siegel while he was fighting for his country in WWII. *Id.* at 1116. The parties then settled, and Siegel transferred Superboy to DC in a May 19, 1948 stipulation. *Id.* at 1118.

## B. The 1997 Superman Termination And 2002 Superboy Termination

In 1997, Siegel's widow, Joanne Siegel, and daughter, Laura Siegel Larson, served 17 U.S.C. § 304(c) notices of termination as to his Superman copyright grants to DC (the "1997 Terminations"). Dkt. 644 ¶39. Under the termination "windows" set forth in §§ 304(c)(3)-(4), the 1997 Terminations applied to Siegel's Superman works published between 1938 and 1943 (*id.*), although they listed derivative works outside this "window" out of an abundance of caution. Dkt. 646 ¶43.

On April 15, 1999, DC contested the 1997 Terminations. Dkt. 646 ¶49. DC and the Siegels thereafter had settlement negotiations, culminating in an October 19, 2001 letter from the Siegels' counsel, Kevin Marks (the "October 19, 2001 Letter"). Dkt. 646 ¶56. DC did not demand that the Siegels revoke Jerome Siegel's pre-1978 grants, or mention the Superman Ads, and, as Laura Siegel Larson testified, the Siegels had no intention to contractually revoke Jerome Siegel's pre-1978 grants. Declaration of Laura Siegel Larson ("LD"), ¶¶3-4. The October 19, 2001 Letter

stated that the Siegels "would transfer all of [their] rights in the 'Superman' and 'Spectre' properties (including 'Superboy')." Declaration of Keith Adams ("AD"), Ex. 2 at 12. DC responded with an October 26, 2001 letter and a February 1, 2002 draft "long-form" contract (the "February 1, 2002 Draft"), including many "materially" and "vastly different" terms. *Siegel,* 542 F. Supp. 2d at 1139. In contrast to the simple "transfer" language in the October 19, 2001 Letter, the February draft stated:

> WHEREAS, for the purposes of this Agreement … the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated … and to make a new grant to DC Comics of all rights.…
> … The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (…) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment ….

AD, Ex. 4 at 36-38; *id.* at 39-40 (similar grant for "POST ACTION COMICS NO. 1 SUPERMAN WORKS"). The Siegels flatly rejected DC's changes in letters dated May 9 and September 21, 2002. *Siegel*, 542 F. Supp. 2d at 1115-16; Dkt. 717 at 8.

On November 8, 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective termination date of November 17, 2004. AD, Ex. 5. That notice terminated *More Fun Comics, No. 101* (Nov. 1944) which "published" Siegel's "Superboy" script and contained the first appearance of Superboy and other post-1944 "Superboy" works. *Id.*; AD, Ex. 1 ¶¶155-76 .

## C. The Superman/Superboy Litigations And The Ads Termination

On October 8 and October 22, 2004, the Siegels filed two suits to enforce their statutory terminations as to Superman and Superboy. DC counterclaimed that the terminations were ineffective and that, if effective, the Siegels had "transferred or would transfer all of their rights in the Superman property" under the October 19, 2001 Letter. Dkt. 646 ¶¶52, 97-105. DC did not allege that the Letter revoked and regranted Jerome Siegel's original copyright grants. In fact, DC's counterclaims,

filed in both the Superman and Superboy suits, contradict its new claim that the October 19, 2001 Letter was a revocation of Siegel's prior grants. DC alleged that "[a]ll grants made by Siegel and Shuster of rights in Action Comics No. 1 *are still in effect*, and all rights under copyright granted therein are still owned exclusively by DC Comics." *Id.* ¶87 (emphasis added). DC also argued that "the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement" (*id.* ¶57) and that "the grant contained therein to all copyrights related to Superman *remains in full force and effect*." *Id.* ¶69 (emphasis added). DC also specifically pled that it retained the Ads pursuant to Siegel's original Superman grants, as "[t]he grants made by Siegel and Shuster … *are still in effect*, and all rights under copyright granted therein are still owned exclusively by DC Comics because the Superman [Termination] Notices do not list the works in which the Ads were first published." *Id.* ¶112 (emphasis added). On summary judgment, Judge Larson accepted DC's argument "that the [Ads] containing an illustration of Superman from the cover of *Action Comics*, Vol. 1, are outside the effective reach of the termination notices" because they were published outside the statutory 1938-43 termination "window" of the notices. *Siegel,* 542 F. Supp. 2d at 1118-23.

In 2011, this Court entered a judgment in the Superman case, and both sides appealed. Dkt. 669, 671, 674. DC repeatedly disclaimed the October 26, 2001 and February 1, 2002 drafts on appeal, representing that "[i]f any material difference does exist, DC has long agreed: the October 19 letter controls." AD Ex. 13 at 219.

On March 6, 2012, Ms. Larson served a 17 U.S.C. § 304(d) termination notice on DC regarding the early Superman Ads. Dkt. 709-1 ¶63; AD, Ex. 12. As such, the parties' pleadings herein do not address her Ads termination notice.

On January 10, 2013, the Circuit held that the October 19, 2001 Letter was a valid acceptance of an offer by DC. On remand, DC moved for summary judgment and this Court held "that the October 19, 2001 agreement … operated itself to transfer the Siegels Superman rights to DC" and that "the parties are bound by the

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

terms memorialized in Marks's October 19 letter; nothing more."  Dkt. 717 at 14-15.
The Court ordered further briefing "on the effect of the October 19, 2001 agreement
on the Superboy and early Superman ad works."  *Id.* at 15.

## **ARGUMENT**

## I.  **THE OCTOBER 19, 2001 AGREEMENT COULD NOT TRANSFER RIGHTS IN "SUPERBOY" OR THE "ADS" AS A MATTER OF LAW**

### A.  <u>Congress' Clear Intent To Protect The Termination Right</u>

Since 1831, Congress has provided authors rights to recover their copyrights,
and has strengthened those rights over time.  *Stewart v. Abend*, 495 U.S. 207, 217-20
(1990).  The 1909 Copyright Act divided copyright into "initial" and "renewal"
terms; the renewal term was intended to be owned by authors to protect those who
had struck imprudent deals.  *Id.* at 217-220; *Classic Media, Inc. v. Mewborn*, 532
F.3d 978, 983 (9th Cir. 2008) ("[T]he renewal process was intended to give an author
and his heirs a second chance …").  Congress' objective was gutted by *Fred Fisher
Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), which held that the renewal
interest could be anticipatorily assigned.  *Stewart*, 495 U.S. at 219.

The 1976 Copyright Act "was supposed to reverse two hundred years of
publishers' exploitation of authors."  *Greenberg v. National Geographic Society*, 533
F.3d 1244, 1259 n.1 (11th Cir. 2008).  "Congress's clear intent [was] to benefit
authors and their heirs with additional years of copyright protection" rather than
publishers (*Mewborn,* 532 F.3d at 982), so it coupled the extended renewal term with
a *new* right of authors and heirs to terminate pre-1978 copyright grants.  17 U.S.C. §
304(c).  17 U.S.C. § 203(a) allowed termination of an author's post-1978 grants.

Congress' further extension of the copyright term in 1998 was coupled with an
additional termination right for pre-1978 grants in 17 U.S.C. § 304(d).  *See Mewborn,*
532 F.3d at 985 ("In 1998 Congress reaffirmed its objectives….").

The termination right contrasts starkly with ordinary contract principles,
empowering authors and heirs to terminate prior copyright grants *without cause*, and

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

regardless of the parties' intent when the grant was made. Congress carefully safeguarded the termination right to prevent a repeat of *Fred Fisher* and "assure that its new benefits would be for the authors and their heirs." *Mewborn,* 532 F.3d at 984. Thus, the right cannot be contractually waived or circumvented: "Termination … may be effected notwithstanding any agreement to the contrary," and grants of the reversionary termination interest are only effective if made ***after*** a termination notice has been served (if to the original grantee) or after the effective termination date (if to third parties). 17 U.S.C. §§ 304(c)(5), (c)(6)(D). The Supreme Court has recognized that these provisions reflect a concerted effort to create an "inalienable authorial right to revoke a copyright transfer." *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.3 (2001).

## B. The "Revocation And Regrant" Decisions

The Ninth Circuit has twice considered whether a post-1978 agreement that is alleged to have revoked a pre-1978 grant and regranted copyrights can legally prevent a later statutory termination. *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Mewborn*, 532 F.3d 978. Neither case questioned that the termination right cannot be waived or circumvented, and upheld Congress' mandate that the right can be exercised "notwithstanding any agreement to the contrary." *Id.* at 988 (*Milne* never found "waiver or relinquishment of [the termination] right").

*Milne* dealt with the classic children's book *Winnie-The-Pooh*. In 1983, the author's son negotiated a new deal with the publisher that expressly called for the "revocation of [1930 and 1962] agreement[s] in favor of the new [1983] agreement, followed by the re-granting (on the same page) of the rights [back to the publisher]." *Id.* at 1040-41. The Ninth Circuit emphasized the "undisputed fact[] that the 1930 grant was expressly revoked." 430 F.3d at 1040 (agreement specifically "provided for the revocation of the 1930 and 1962 agreements"). Years later, the author's granddaughter sought to terminate, but the pre-1978 agreements had been expressly revoked and the 1983 agreement was not subject to termination. *Id.* at 1047-48.

*Mewborn* revisited these issues with another classic, *Lassie Come Home*, and

rejected the publisher's attempt to extend *Milne* beyond its "distinct factual scenario." 532 F.3d at 987. In 1976, the author's daughter, Mrs. Mewborn, assigned her film, TV and radio rights to a publisher. *Id.* at 980. In 1978, she signed a second contract, which "contained the identical transfer of … rights as the 1976 Assignment, but added language assigning ancillary rights." *Id.* at 980-81. Years later, Mewborn served a notice of termination of the 1976 assignment, and the publisher sued, claiming that because the 1978 grant dealt with *the same subject matter* as the 1976 grant, it operated as a "revocation and re-grant" under *Milne*. *Id.* at 981-82.

The Ninth Circuit rejected that argument and upheld Mewborn's termination. The Circuit stressed that the 1978 assignment, like the October 19, 2001 Letter and unlike the agreement in *Milne*, did not "expressly revoke[] the earlier … assignments and simultaneously re-grant[] the same rights." *Id.* at 989. *See also id.* at 988 n.7 (contrasting 1978 assignment with the *Milne* agreement that "expressly revoked" the author's pre-1978 grants). "Because [the publisher already] owned the motion picture, television and radio rights to the Lassie Works in 1978, Mewborn had nothing to transfer by virtue of the 1978 Assignment…. [T]he language in the 1978 Assignment purporting to assign the [same] rights is a nullity." *Id.* at 986.

The Second Circuit is the only other circuit to have considered these issues. In *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 283-84 (2d Cir. 2002), the publisher sought to preclude Captain America's co-creator from terminating a 1969 settlement agreement. The Second Circuit held that, to the extent the agreement was used to preclude termination, it "constitutes an 'agreement to the contrary' under § 304(c)(5)." *Id.* at 292. *Simon* thus "affirmed that 'the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.'" *Mewborn*, 532 F.3d at 985. *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), dealt with a situation like *Milne*. In 1994, John Steinbeck's widow renegotiated a contract with the publisher that *expressly* revoked his pre-1978 grants and re-granted his copyrights: "when signed by Author and Publisher, [this

agreement] will cancel and supersede the previous agreements." *Id.* at 196. The Second Circuit held Steinbeck's sons could not later terminate his revoked pre-1978 grant, emphasizing that the 1994 contract included a "clear expression of intent to terminate all prior grants" and replace them with the 1994 re-grant. *Id.* at 201.

### C.  The October 19, 2001 Letter Cannot Bar The Superboy Or Ads Terminations As A Matter Of Law

The October 26, 2001 Letter did not transfer the Siegels' rights recaptured by their 2002 Superboy termination or 2012 Ads termination.

1.  This Court held that the October 19, 2001 Letter "operated itself to transfer the Siegels' Superman rights to DC" (Dkt. 717 at 14) – *i.e.,* whatever rights the Siegels owned on that date. The Superboy notice was not served until November 8, 2002, and was not effective until November 17, 2004. The Ads notice was not served until 2012, and does not take effect until 2014. The October 19, 2001 letter could not have anticipatorily transferred the Siegels' Superboy or Ads expectancy before the notices were served, as a matter of law. 17 U.S.C. § 304(c)(6)(D).

2.  The October 19, 2001 Letter was not a "revocation and regrant." The Ninth Circuit has made plain that, given Congress' clear objectives to protect the termination right in § 304(c)(5), any such "revocation and re-grant" must be "express." *Milne*, 430 F.3d at 1040-41, 1047-48; *Mewborn*, 532 F.3d at 980-81, 986, 988-89. Like the purported 1978 re-grant in *Mewborn*, the October 19, 2001 Letter contains *no language of revocation*, let alone the requisite express revocation. In stark contrast, the post-1978 agreements in *Milne*, 430 F.3d at 1040, and *Steinbeck,* 537 F.3d at 200, both *expressly* revoked and replaced the author's pre-1978 grants. As Siegel's 1938 grant relating to the Ads and 1948 grant of Superboy were not revoked in the October 19, 2001 Letter, DC still owned these copyrights.

3.  DC may argue that the Siegels' 1997 Terminations "revoked" Jerome Siegel's grants. That makes no sense because under §§ 304(c)(3)-(4), a notice of termination ends a prior grant only as to works within a defined 5-year window –

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

here, April 16, 1938 to April 16, 1943.  As the Superboy and Ads works were outside that "window," Siegel's pre-1978 grants to DC remained in effect as to these works.

4.  Nor can the October 19, 2001 Letter be read to transfer any of Siegel's unterminated Superman or Superboy copyrights to DC because DC already owned such copyrights.  *Mewborn* addressed this very issue in holding that a purported 1978 "assignment" of rights by an author's daughter was a "nullity" because the publisher already owned the rights from a pre-1978 assignment.  532 F.3d at 986.  The situation here is identical, as DC had long owned the Superman Ads pursuant to Jerome Siegel's 1938 grant, and Superboy pursuant to his 1948 grant.  Dkt. 646 ¶¶12, 15-16, 23-30, 68-69.  As those works were not within the "window" of the 1997 Terminations, DC still owned them on October 19, 2001.  Just like the redundant 1978 grant in *Mewborn*, the October 19, 2001 grant is a "nullity" regarding the Superman Ads and Superboy.  532 F.3d at 986.

5.  DC is judicially estopped from arguing that Siegel's pre-1978 grants were revoked by the October 19, 2001 Letter.  DC alleged in its pleadings and argued on summary judgment that the Ads were not recaptured by the 1997 Terminations, and that Siegel's 1938 grant underlying the Ads was still in effect.  Dkt. 646 ¶112; AD, Ex. 8, Ex. 9.  After using those arguments to secure a ruling on summary judgment that DC owned the "Ads" under its pre-1978 grants (*Siegel*, 542 F. Supp. 2d at 1118-23), DC cannot turn around and argue the opposite – that the pre-1978 grants were supposedly revoked on October 19, 2001 and no longer in effect.  *See Williams v. Boeing Co.*, 517 F.3d 1120, 1134 (9th Cir. 2008) (judicial estoppel applies where "party was successful in persuading a court to accept its … position").

### D. The October 19, 2001 Letter Does Not Satisfy California Law As To Revocation And Regrant

#### 1. The October 19, 2001 Letter Could Only Transfer The Rights The Siegels Recaptured By Their 1997 Terminations

The Court need not reach DC's argument that the October 19, 2001 Letter

**ER 543**

supposedly constitutes a "revocation and regrant" under California law (Dkt. 711 at 12) and should hold, as a matter of federal Copyright law, that the letter did not transfer any copyrights recaptured by the Superboy and Ads terminations. The Ninth Circuit required in both *Milne*, 430 F.3d at 1040-44, and *Mewborn*, 532 F.3d at 986-87, 989 that a "revocation and re-grant" be expressly stated, not as a matter of state contract law, but of federal Copyright law – to protect the termination right as Congress intended – and to ensure that statutory terminations do not devolve into a free-for-all of state contract interpretation. Neither case even mentioned state law in its discussion. *Milne*, 430 F.3d at 1045 n.8 (passing reference to California contract); *Mewborn*, 542 F.3d at 979-991 (New York contract; no reference to state law).

Even if the Court applies California law, the evidence must be viewed in the light most favorable to the Siegels, as the non-movants, and courts must interpret a contract to give effect to the "objective manifestations of the parties' intent." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998). The obvious inference from the 2001 letter's simple provision that the Siegels "transfer all of [their] rights," and this Court's holding that this was a present transfer, is that it pertained to those rights owned by the Siegels in 2001. Jerome Siegel had long ago assigned Superman and Superboy to DC. Thus, the rights held by his wife and daughter on October 19, 2001 were those recaptured by their 1997 Terminations, and that did not include the Superboy or Ads works. The analysis can and should end there. It cannot be held on summary judgment that the 2001 letter was a "revocation and regrant" or that it anticipatorily transferred the Siegels' later recaptured rights in the Ads or Superboy.

## 2. The Record Evidence Demonstrates That The Letter Was Not A "Revocation And Regrant"

Under California law, a court must provisionally examine extrinsic evidence and admit it if the evidence "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008). The October 19, 2001 Letter

**ER 544**
PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

1  unambiguously supports Plaintiff's position, and is not "reasonably susceptible" to

2  DC's interpretation.  In any event, drawing "'all justifiable inferences … in [Ms.

3  Larson's] favor" (*Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010)), the

4  record evidence easily supports that the parties did not intend the October 19, 2001

5  Letter to be a revocation and regrant, preventing summary judgment for DC.

6        "Revocation and regrant" was not mentioned during the parties' negotiations

7  leading up to the October 19, 2001 Letter and is nowhere stated in the letter.  Ms.

8  Larson has clearly testified that it was never her intent to revoke her father's pre-

9  1978 grants.  LD, ¶¶3-4.

10       In addition to DC's allegations that the October 19, 2001 Letter was binding,

11  DC simultaneously pled that "[a]ll grants made by Siegel and Shuster or rights in

12  Action Comics No. 1 [1938] are still in effect, and all rights under copyright granted

13  therein are still owned exclusively by DC."  Dkt. 646 ¶87.  Had the October 19,

14  2001 Letter actually revoked DC's pre-1978 grants, the grants would not be "still in

15  effect."  As noted above, DC likewise pled and argued that its pre-1978 grants

16  remained effective as to all works (*e.g.,* the Ads) not covered by the Siegels' 1997

17  Terminations.  Dkt. 646 ¶112; AD, Ex. 8 at 123-38; Ex. 9 at 140-62.

18       DC's filings with foreign governments in 2006 and 2007 similarly listed and

19  relied upon Siegel and Shuster's operative pre-1978 grants, along with the October

20  19, 2001 Letter.  AD, Ex. 7 at 111-13; Ex. 10 at 164-66.

21       DC will cite to its own February 1, 2002 Draft, the only document that even

22  mentions "revocation and regrant," or to its October 26, 2001 letter, for some

23  nebulous "intent."  AD, Ex. 3 at 17; Ex. 4 at 36-39.  DC cannot do so.  DC told the

24  Ninth Circuit that "[t]o the extent that [the October 26, 2001] letter is perceived to

25  have added terms or suggested new terms, they're not part of the deal."  AD, Ex. 14

26  at 269:1-4; *see* AD, Ex. 13 at 219 ("DC has long agreed: the October 19 letter

27  controls.").  Having used such representations to convince the Circuit to find an

28  October 19, 2001 "agreement," DC is judicially estopped from using its later drafts

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

1  to add terms.  In any event, this Court held that "the parties are bound by the terms

2  memorialized in Marks's October 19 letter; nothing more."  Dkt. 717 at 15.

3        Furthermore, the Siegels firmly ***rejected*** the new and revised terms in DC's

4  October 26, 2001 and February 1, 2002 proposals.  "[T]he interpretation of a contact

5  must give effect to … 'the mutual intention of the parties at the time the contract is

6  formed.'"  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal.

7  Civ. Code §§ 1636, 1639).  DC cannot use its after-the-fact terms that the Siegels

8  rejected as evidence of the parties' "mutual intention" on October 19, 2001.

9                    a.    The Letter Was Not A Novation

10       DC will argue that the October 19, 2001 Letter novates or supersedes Jerome

11 Siegel's prior grants by simply dealing with the same subject matter.  The publisher

12 made the same "superseding" argument in *Mewborn*, which the Ninth Circuit firmly

13 rejected – holding that Mewborn's 1978 assignment of rights already owned by the

14 publisher was a complete "nullity."  532 F.3d at 981-82, 989-90.  "In deciding

15 whether an agreement was [a novation], California courts seek to determine the

16 parties' intent.  Determining the parties' intent is a highly fact-specific inquiry.  Such

17 inquiries are not generally suitable for disposition on summary judgment."  *Fanucchi*

18 *& Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005) (citations

19 omitted).  Furthermore, "evidence… of a novation must be 'clear and convincing.'"

20 *Alexander v. Angel*, 37 Cal. 2d 856, 860 (1951). Given the Siegels' firm rejection of

21 DC's new terms, and DC's own pleadings and conduct that contradict its new theory,

22 there is no "clear and convincing" evidence that both the Siegels and DC intended to

23 revoke and replace Jerome Siegel's pre-1978 grants in the October 19, 2001 Letter.

24                                    * * *

25       The Court should find that the October 19, 2001 Letter did not transfer the

26 Siegels' recaptured Superboy and Ads copyrights as a matter of federal copyright

27 law.  DC's interpretation can also be rejected as a matter of California contract law.

28 The record evidence does not permit any "justifiable inference" that the Siegels

---

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

intended the October 19, 2001 letter as a "revocation and regrant." At a minimum, viewing the evidence in the light most favorable to the non-movant, Ms. Larson, the letter is "reasonably susceptible" to the interpretation that it was *not* a "revocation and regrant," precluding summary judgment in DC's favor. *See Wolf,* 162 Cal. App. 4th at 1127 ("[T]he factual conflict is to be resolved by the jury."); *Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129 (2002) (reversing summary judgment where conflicting inferences could be drawn regarding contract).

## **PROPOSAL FOR RESOLUTION**

The *DC Comics* Appeal: The appeal in the related case, *DC Comics v. Pacific Pictures Corp.*, Appeal No. 12-57245, deals with similar issues of whether a post-1978 agreement forecloses statutory termination. The Circuit expedited the appeal and set oral argument for May 23, 2013. The Court may wish to await the outcome of that appeal, so as to make its decision with the benefit of that ruling.

The Ads: Beyond deciding that the Ad works recovered by the 2012 Termination could not have been assigned by the October 19, 2001 Letter as a matter of law, the Court need not otherwise resolve the 2012 Termination, which is not mentioned or addressed in any claims or counterclaims in this case.

Superboy: As the October 19, 2001 Letter also did not transfer Superboy rights recaptured by Ms. Larson's 2002 Termination, as matter of law, the Superboy case (No. 04-CV-08776) remains to be resolved. The case was originally assigned to the Honorable Ronald S.W. Lew. Based on the findings in Siegel and Shuster's 1947 action, confirmed as binding in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), Judge Lew fully resolved the parties' summary judgment motions, because the 1947 action "specifically determined that [DC] published the Superboy comic strip based upon the idea, plan, and conception of Siegel, in … *More Fun Comics* [No. 101]." AD, Ex. 6 at 101. Judge Lew found the 2002 Superboy termination valid, and rejected DC's "derivative work," "work for hire" and "joint work" arguments, leaving only one issue to be decided: whether DC's Superboy

1    works infringed the Siegels recaptured copyrights. *Id.* at 101-08.

2         Seven months later, Judge Lew took senior status, the case was reassigned, and

3    DC moved for reconsideration, re-arguing that Superboy was a "work for hire," that

4    Siegel's script was a "joint work," and that the script was not "published" by *More*

5    *Fun Comics*. Judge Larson reconsidered Judge Lew, but asked for further briefing:

6         [T]he Court has determined that Siegel's Superboy submissions were not a
         work made for hire, but the Court is unable to conclude whether the requisite
7        'publication' of the Superboy submissions occurred due to the unresolved
         matter regarding the submissions' derivative nature. Similarly, the Court was
8        unable to conclude whether the Superboy submissions were part of a joint
         work, but only because the issue of whether the submissions are a derivative
9        work remains unresolved (and a subject of further court-ordered briefing).

10   *Siegel,* 496 F. Supp. 2d at 1155. At oral argument, however, Judge Larson appeared

11   to recognize that the Superboy story – solely authored by Siegel – was not a "joint

12   work" (AD, Ex. 11 at 194:2-202:5) and DC conceded that it was a copyrightable

13   derivative work. *Id.* at 172:16. <u>Judge Larson never completed his ruling</u>.

14        Therefore, this Court has two paths. It could endeavor to complete Judge

15   Larson's reconsideration ruling, based on the parties' old supplemental briefing

16   and/or additional briefing, and thereafter adjudicate the copyright infringement and

17   accounting issues relating to the recaptured Superboy copyrights. Alternatively, the

18   Court could reinstate Judge Lew's clear order, based on the 1947 and 1974 rulings.

19   This would leave the issue of whether DC's Superboy works infringed Plaintiff's

20   recaptured Superboy copyrights, which can be expeditiously resolved.

21                                    **<u>CONCLUSION</u>**

22        DC's motion regarding the Superman Ads and Superboy must be denied.

23    Dated:  April 4, 2013              RESPECTFULLY SUBMITTED,
                                         /s/ Marc Toberoff
24                                       _____
                                         TOBEROFF & ASSOCIATES, P.C.
25                                       Attorneys for Plaintiff, Laura Siegel Larson

26

27

28

PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

1 | Marc Toberoff (State Bar No. 188547)
  *mtoberoff@toberoffandassociates.com*
2 | Keith G. Adams (State Bar No. 240497)
  *kadams@toberoffandassociates.com*
3 | TOBEROFF & ASSOCIATES, P.C.
  22337 Pacific Coast Highway, #348
4 | Malibu, California, 90265
  Telephone: (310) 246-3333
5 | Fax: (310) 246-3101

6 | Attorneys for Plaintiff-Counterclaim
  Defendant, Laura Siegel Larson,
7 | individually and as personal representative
  of the Estate of Joanne Siegel

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

10

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | Case No: 04-CV-08400 ODW (RZx)* Case No: 04-CV-08776 ODW (RZx)* Hon. Otis D. Wright II, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. **DECLARATION OF KEITH ADAMS IN SUPPORT OF PLAINTIFF'S COURT-ORDERED SUPPLEMENTAL BRIEF RE: EFFECT OF THE COURT'S MARCH 20, 2013 ORDER ON THE "ADS" AND "SUPERBOY" TERMINATIONS** |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | *Supplemental Brief and Declaration of Laura Siegel Larson filed concurrently* |

# **INDEX**

| Ex. | Title | Page |
|---|---|---|
| 1 | Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law | 3 |
| 2 | October 19, 2001 letter from Kevin Marks to John Schulman | 10 |
| 3 | October 26, 2001 letter from Schulman to Marks | 16 |
| 4 | February 1, 2002 letter from Patrick Perkins to Marks | 24 |
| 5 | November 8, 2002 Notice of Termination re: Superboy | 81 |
| 6 | March 23, 2006 Summary Judgment Order in *Superboy* Case | 94 |
| 7 | June 12, 2006 Affidavit of Damon Bonesteel | 111 |
| 8 | Excerpts from DC's April 30, 2007 Motion for Summary Judgment | 122 |
| 9 | Excerpts from DC's June 25, 2007 Reply re: Summary Judgment | 139 |
| 10 | September 10, 2007 Affidavit of Donna Josephson | 164 |
| 11 | Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases | 167 |
| 12 | March 5, 2012 Notice of Termination re: Superman Advertisements | 206 |
| 13 | DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012 | 212 |
| 14 | September 5, 2012 Oral Argument in the *Siegel* Appeal | 248 |

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.      I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for plaintiff-counterclaim defendant Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel ("Plaintiff"), in the above-captioned actions, and submit this declaration in support of Plaintiff's Supplemental Brief re: Effect of the Court's March 20, 2013 Order on the "Ads" and "Superboy" Terminations

2.      Attached hereto as Exhibit "1" is a true and correct copy of excerpts from the April 12, 1947 Findings of Fact and Conclusions of Law in the 1947 Westchester Action.

3.      Attached hereto as Exhibit "2" is a true and correct copy of an October 19, 2001 letter from Kevin Marks to John Schulman.

4.      Attached hereto as Exhibit "3" is a true and correct copy of an October 26, 2001 letter from John Schulman to Kevin Marks.

5.      Attached hereto as Exhibit "4" is a true and correct copy of a February 1, 2002 letter from Patrick Perkins to Kevin Marks.

6.      Attached hereto as Exhibit "5" is a true and correct copy of a November 8, 2002 Notice of Termination for Superboy.

7.      Attached hereto as Exhibit "6" is a true and correct copy of Judge Lew's March 23, 2006 Summary Judgment Order in the Superboy case, *Siegel v. Time Warner Inc.*, C.D. Cal. Case No. 04-CV-08776 ODW (RZx).

8.      Attached hereto as Exhibit "7" is a true and correct copy of a June 12, 2006 affidavit of Damon Bonesteel.

9.      Attached hereto as Exhibit "8" is a true and correct copy of excerpts from DC's Motion for Summary Judgment, filed on April 30, 2007.

10.     Attached hereto as Exhibit "9" is a true and correct copy of excerpts from DC's Reply re: Motion for Summary Judgment, filed on June 25, 2007.

11.    Attached hereto as Exhibit "10" is a true and correct copy of a September 10, 2007 affidavit of Donna Josephson.

12.    Attached hereto as Exhibit "11" is a true and correct copy of excerpts from the September 17, 2007 oral argument in the Superman and Superboy cases.

13.    Attached hereto as Exhibit "12" is a true and correct copy of a March 5, 2012 Notice of Termination for Superman Advertisements.

14.    Attached hereto as Exhibit "13" is a true and correct copy of excerpts from DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012.

15.    Attached hereto as Exhibit "14" is a true and correct copy of the transcript of the September 5, 2012 oral argument in the *Siegel* Appeal.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on April 4, 2013, at Malibu, California.

_____
Keith G. Adams

2

DECLARATION OF KEITH ADAMS RE: SUPPLEMENTAL BRIEF

**ER 552**

SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER

*1099-1947*

- - - - - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

                         Plaintiffs,    :

         -against-

NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT  :
NEWS CO., INC., THE MC CLURE NEWSPAPER SYNDICATE,
HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H.    :
SAMPLINER and WAYNE BORING,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

*203*

*305*

        The above-entitled action having been duly referred to the undersigned, pursuant to stipulation of the parties herein, as Referee to hear, try and determine with findings of fact and conclusions of law, and the said matter having duly come on to be heard before the undersigned, and the plaintiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN,ESQS., their attorneys (MORTON WEKSTEIN, ESQ.,of counsel, and the defendants NATIONAL COMICS PUBLICATIONS,INC., INDEPENDENT NEWS CO.,INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.SAMPLINER, having appeared by WEIL, GOTSHAL & MANGES, ESQS.,their attorneys (HORACE S. MANGES,ESQ., EDWARD C.WALLACE,ESQ., and ABRAHAM I. MENIN,ESQ., of counsel), and the defendant THE MC CLURE NEWSPAPER SYNDICATE, having appeared by JOHN L. MC CORMICK,ESQ., its attorney (JAMES L.BROWN,ESQ., of counsel), and the defendant WAYNE BORING having appeared by his attorney SIDNEY H. REICH,ESQ., and the Referee's oath having first been taken, and the proofs and allegations of the parties having been heard, and due deliberation having been had, I do find and decide as follows, stating my findings of fact and conclusions of law:

EXHIBIT 1-3
ER 555

conception, idea, plot, incidents and characters of the comic strip SUPERMAN, as therefore created by the plaintiffs.

153.  Since the expiration of the employment of WAYNE BORING by the plaintiff SHUSTER, the defendant BORING, in the employ of DETECTIVE COMICS, INC., SUPERMAN, INC. and NATIONAL COMICS PUBLICATIONS, INC., created cartoon material entitled SUPERMAN which presented the character SUPERMAN and was based upon the conception, idea, plot, incidents and character of fhe comic strip SUPERMAN as theretofore created by the plaintiffs.

154.  Defendants DETECTIVE COMICS, INC. and SUPERMAN, INC. knew of the plaintiff SHUSTER'S contract with the defendant BORING, Plaintiffs' Exhibit 101, as subsequently modified.

155.  On November 30, 1938, plaintiff SIEGEL wrote to DETECTIVE COMICS, INC. and suggested that the latter publish a comic strip under the title of SUPERBOY, which would narrate the adventures of SUPERMAN as a youth.

156.  On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14, a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY, the said letter having been received in evidence and marked Plaintiffs' Exhibit 16.

157.  On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time. (See Plffs. Ex. 17).

**45**

**EXHIBIT 1-4**
**ER 554**

158. DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159. DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip SUPERBOY under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14.

160. During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, Plaintiffs' Exhibit 36, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

161. The officer and Director of DETECTIVE COMICS, INC. who received on behalf of DETECTIVE COMICS, INC. at the hands of the plaintiff SIEGEL the submission of the letter concerning SUPERBOY, Plaintiffs' Exhibit 16, and the scenario or script, Plaintiffs' Exhibit 36, was JACOB LIEBOWITZ.

162. DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

**46**

**EXHIBIT 1-5**
**ER 555**

163.  Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics".

164.  The said comic strip release entitled SUPERBOY embodied and was based upon the idea, plan and conception contained in the plaintiffs, SIEGEL'S letter to DETECTIVE COMICS, INC. dated November 30, 1938, Plaintiffs' Exhibit 16.

165.  The said release of the said comic strip SUPERBOY published in December of 1944 embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in December of 1940, the said script being Plaintiffs' Exhibit 36.

166.  Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in Plaintiffs' Exhibit 16 and Plaintiffs' Exhibit 36.

167.  Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as published by DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. from December, 1944, until the date of the trial herein.

**47**

33

EXHIBIT 1-6
ER 556

168. The said publication was without the permission of the plaintiff SIEGEL.

169. Thereafter DETECTIVE COMICS, INC. did publish releases of the said comic strip entitled SUPERBOY in magazines bi-monthly until February of 1946, and monthly thereafter until on or about October 1, 1946.

170. From the 1st day of October, 1946, until the date of the trial herein, the defendant NATIONAL COMICS PUBLICATIONS, INC. has published monthly in magazines a comic strip entitled SUPERBOY.

171. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the letter, Plaintiffs' Exhibit 16.

172. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the scenario or script, Plaintiff's Exhibit 36, submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC.

173. The publication of all comic strip material entitled SUPERBOY was at all times without the permission of the plaintiff SIEGEL.

174. Plaintiff SIEGEL has received no payment on account of the publication of any of the material entitled SUPERBOY.

175. All publications of SUPERBOY by DETECTIVE COMICS, INC. from April, 1945 until the 1st day of October,

1946, and by the defendant NATIONAL COMICS PUBLICATIONS, INC. from October 1, 1946, until the date of the trial herein, contained affixed thereto the name of the plaintiffs SIEGEL and SHUSTER.

176. The use of the name of the plaintiff SIEGEL, as alleged in paragraph 175 was without the consent of the plaintiff SIEGEL.

177. The officer and director of DETECTIVE COMICS, INC., who on behalf of DETECTIVE COMICS, INC. caused the material entitled SUPERBOY to be published as hereinbefore set forth in these findings was JACOB LIEBOWITZ.

178. The officer and director of NATIONAL COMICS PUBLICATIONS, INC., who on behalf of NATIONAL COMICS PUBLICATIONS, INC. caused the material entitled SUPERBOY to be published as hereinbefore set forth in these findings, was JACOB LIEBOWITZ.

179. Defendant INDEPENDENT NEWS CO., INC. knowing of the rights of the plaintiff SIEGEL, under the contracts, Plaintiffs' Exhibits 14 and 15, sold and distributed to newsdealers for resale to the public throughout the United States, magazines containing the material entitled SUPERBOY as hereinabove described and set forth.

180. All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC.

**49**

**EXHIBIT 1-8**
**ER 558**

now and heretofore sold under the title SUPERBOY, or any
other comic strip material made in imitation of the con-
ception, characters, nature, incidents, action or plot of
the plaintiffs' comic strip SUPERBOY or from using any title
so imitative of SUPERBOY as will be calculated to deceive
the public so that it would believe the so entitled material
to have been created by the plaintiffs.

26. Plaintiff Siegel, as the originator and
owner of the comic strip feature SUPERBOY has the sole and
exclusive right to create, sell and distribute comic strip
material under the title SUPERBOY of the type and nature
heretofore published under that title and of the nature
described in plaintiffs' exhibits 16 and 36.

27. Defendants NATIONAL COMICS PUBLICATIONS, INC.,
and INDEPENDENT NEWS CO., INC. shall account to plaintiff
Siegel for all profits derived from the publication, sale
and distribution of all comic strip material entitled SUPER-
BOY by either of them or by SUPERMAN, INC. or by DETECTIVE
COMICS, INC., and the said profits derived from the said sale,
publication and distribution be divided according to law and
that the plaintiff Siegel have his just share thereof.

Dated: April 12, 1948.

OFFICIAL REFEREE,
Supreme Court, Westchester County

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.,
I, TIMOTHY C. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF FILED IN MY OFFICE ON 4/12/48 AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL,

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
FEE PAID 3-13-00

**56**

**EXHIBIT 1-9**
**ER 559**

# GANG, TYRE, RAMER & BROWN, INC.
### ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD R. PARSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1986)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

**VIA TELECOPIER and U.S. MAIL**

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

      Re:    <u>Siegel Family – "Superman"</u>

Dear John:

    This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

    A.    <u>Definitions</u>.

        1.    "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

        2.    "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

    B.    <u>Financial Terms</u>.

        1.    A non-returnable, but recoupable advance of $2,000,000.

236172.1

312

EXHIBIT 2-10
ER 560

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2. A non-returnable, non-recoupable signing bonus of 1,000,000.

3. D.C. Comics will forgive the $250,000 advance from last year -- stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4. There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5. A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6. A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

313

EXHIBIT 2-11
ER 561

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.  Recoupment begins as of January 1, 2000.

8.  During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.  Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C.  <u>Other Terms.</u>

1.  The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.  If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would <u>not</u> result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

314

EXHIBIT 2-12
ER 562

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.    Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4.    D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.    The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.    In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.    Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.    D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

315

EXHIBIT 2-13
ER 563

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 5

9.  DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10. Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11. At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12. The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14. Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

316

EXHIBIT 2-14
ER 564

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:    Joanne Siegel
       Laura Siegel Larson
       Bruce Ramer
       Don Bulson

236172.1

317

EXHIBIT 2-15
ER 565

OCT-26-2001  17:24      JOHN SCHULMAN                              818 954 4768      P.01



**WARNER BROS.**

John A. Schulman
Executive Vice President
and General Counsel

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

October 26, 2001

Via Facsimile (310) 777-4801
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA  90212

Re:    Siegels

Dear Kevin:

I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road.

I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

Thank you.

Sincerely,

John A. Schulman

JAS:hjl
cc:    Bruce Ramer, Esq. (w/encl)

**GTRB 0145**

A Time Warner Entertainment Company

**EXHIBIT 3-16**
**ER 566**

**EXHIBIT C**

<u>October 2001 Outline</u>

<u>Transfer</u>
- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual), . Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

<u>Initial Payment</u>
- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

319

EXHIBIT C

EXHIBIT 3-17
ER 567

OCT-25-2001  17:25        JOHN SCHULMAN                    818 954 4768    P.03

320

EXHIBIT C

EXHIBIT 3-18
ER 568

OCT-25-2001 17:25     JOHN SCHULMAN                    818 954 4768     P.04

**EXHIBIT C**

EXHIBIT 3-19
ER 569

OCT-25-2001 17:25     JOHN SCHULMAN                    818 954 4768     P.05

Annual Payment (Advance)
* $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
* Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
* Terminate when Action #1 US copyright terminates

Widows Benefits (not assignable or transferrable)
* $135,000/year
* Payable for Joanne's life, personal,
* Paid as now
* Medical, comparable to past, for life

Royalty
* Commencing for revenue received on or after 1/1/00
* All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
* 6% of DC's receipts from all Media licenses for use of the Properties, except:
   1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.
   2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%
* 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:
   1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.
   2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%
   3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%
   4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

322

**EXHIBIT C**

EXHIBIT 3-20
ER 570

OCT-25-2001  17:26      JOHN SCHULMAN                          818 954 4768      P.06

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.
- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

    1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

    2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

    3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

Payment

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

     47.5% Joanne Siegel
     23.75% Laura Siegel Larson
     23.75% Michael Siegel
     5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

Advise (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

323

EXHIBIT C

EXHIBIT 3-21
ER 571

OCT-25-2001 17:26    JOHN SCHULMAN                    818 954 4768    P.07

changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals which fall outside the safe harbors.

Safe Harbors for Intercompany Deals
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

324

**EXHIBIT C**

EXHIBIT 3-22
ER 572

OCT-25-2001  17:27     JOHN SCHULMAN                                  818 954 4768     P.08

Expedited Dispute Resolution (Any claims between the parties)
- Arbitration
- Compensation damages only to Siegels
- No injunction against DC/WB breaches, no termination of rights, no reversion
- DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

Medical Coverage/Son & Daughter (Grandsons only through minority) (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

Release and covenant not to sue by Siegels
- Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
- Approve all deals made before 12/31/00

Miscellaneous
- Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
- Siegels defend and indemnify re third party claims
- Siegels defend and indemnify re Dennis claim
- Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
- DC Comics to defend and indemnify Siegels' (who sign) against claims brought by third parties for DC/WB acts
- Siegels to refer all inquiries relating in any way to Properties to DC/WB.
- At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

**GTRB 0152**

TOTAL P.02

**EXHIBIT C**

EXHIBIT 3-23
ER 573

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014, and that all participants in the case are registered CM/ECF users.


Dated:  February 21, 2014 /s/ Marc Toberoff
Marc Toberoff