APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 4 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant,Laura Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 4)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |
| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice* | 4 | 756 |

i

| | | | | |
|---|---|---|---|---|
| | | *of Termination re: Superman Advertisements* | | |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|------|------|-----|---|-----|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A: Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B: Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C: Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D: Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E: Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F:  Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1:  October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2:  October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4:  May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5:  May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| | | | | |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 16:  DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
| 709-2 | 3/4/13 | *Exhibit 17:  Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19:  September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20:  January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21:  February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22:  February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23:  Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24:  February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25:  February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A: Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A: November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A: February 1996 Thompson & Thompson Copyright Report re: Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re: Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C: Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

xiii

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A: December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B:  April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A:  Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G:  January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H:  January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I:  February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J:  Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M:  Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| | | | | |
|---|---|---|---|---|
| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|-----|---------|------|----|------|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB:  October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC:  October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD:  February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE:  Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF:  March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A:  December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| **Docket No.** | **Filing Date** | **Document Title** | **Vol.** | **Page** |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

# FROSS ZELNICK LEHRMAN & ZISSU, P.C.

ALVIN FROSS
~ ALD J. LEHRMAN
STEPHEN BIGGER
MICHAEL I. DAVIS
ROGER L. ZISSU
MARIE V. DRISCOLL
RICHARD Z. LEHV
CAROL F. SIMKIN
MARGARET F. GOLDSTEIN
DAVID W. EHRLICH
SUSAN UPTON DOUGLASS
JANET L. HOFFMAN
PETER J. SILVERMAN
LAWRENCE ELI APOLZON
BARBARA A. SOLOMON
LISA PEARSON
MARK D. ENGELMANN
NADINE H. PARKER JACOBSON
ANDREW N. FREDBECK
GEORGES NAHITCHEVANSKY
CRAIG S. MENDE
PATRICK T. PERKINS
J. ALLISON STRICKLAND

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fzlz@frosszelnick.com

RECEIVED
FEB 0 4 2002

JAMES D. SILBERSTEIN
RUTH LAZAR
COUNSEL

MICHELLE P. FOXMAN
ROBERT A. BECKER
TAMAR NIV BESSINGER
ANGELA KIM
JOHN P. MARGIOTTA
LYDIA T. GOBENA
DIANE B. MELNICK
MICHAEL CHIAPPETTA
DANA WRUBEL
JESSICA HANN
JOSEPH R. MOLKO
EVAN GOURVITZ
CARLOS CUCURELLA
NANCY C. DICONZA
TANYA FICKENSCHER
ZOE HILDEN
LAUREN J. MANDELL

February 1, 2002

**VIA FEDEX**

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

    Re: Superman

Dear Kevin:

    I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. As our clients have not seen this latest version of the agreement, I must reserve their right to comment. In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

    Very truly yours,

    Patrick T. Perkins

Encls.

cc:    John Schulman, Esq.
       Paul Levitz
       Lillian J. Laserson, Esq.
       Carol F. Simkin, Esq.

I:\PPERKINS\DCC\SUPER\020201 Ltr-K. Marks.doc

326

**EXHIBIT E**

EXHIBIT 4-24
ER 574

02/01/02
4:51 PM

## AGREEMENT

AGREEMENT made this ___ day of ___ 2002, by and between DC COMICS, a New York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700 Broadway, New York, New York 10019, and Joanne Siegel, residing at 13900 Panay Way, R-115, Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106, Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel, Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The SIEGELS").

## DEFINITIONS

1.      The term "Works" is hereinafter defined collectively and individually as follows: any and all works, creations, material, matter, contributions, adaptations, modifications, derivative works and all other works of any kind whatsoever, including but not limited to all stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses, images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component, draft of, or part or portion of any of the foregoing, regardless of whether or not subject to copyright protection, regardless of whether or not published, regardless of whether or not any person knows of the existence of the foregoing, wherever in the world created, and whenever created , and regardless of the medium or form of expression or exploitation (whether or not now existing).

**327**

EXHIBIT 4-25
ER 575

**EXHIBIT E**

2. The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3. The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SUPERMAN and the first story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced *infra* in definition paragraph number __.

4. The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

2

EXHIBIT 4-26
ER 576

**EXHIBIT E**

5. The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6. The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7. The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8. The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

3

329
EXHIBIT 4-27
ER 577

**EXHIBIT E**

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9.  The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.  (1) First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B.  Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

4

**EXHIBIT E**

10. The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11. The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced _infra_ in definition paragraph number __.

12. The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

331

EXHIBIT 4-29

ER 579

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13. The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14. The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15. The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

6

332
EXHIBIT 4-30
ER 580

**EXHIBIT E**

16.     The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17.     The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A. (1)  First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2)  First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and

B. Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

333

EXHIBIT 4-31
ER 581

18.     The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19.     The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20.     The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works. (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21.     The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22.     The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

8

23. The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24. The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses. Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property. Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable. Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25. The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26. The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

9

335

EXHIBIT 4-33
ER 583

EXHIBIT E

27.    "Reversionary" rights shall mean:

a.    any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

b.    any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

c.    any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

d.    any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

e.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

f.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

10

336

EXHIBIT 4-34
ER 584

g. in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

## WHEREAS CLAUSES

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

11

337

EXHIBIT 4-35

ER 585

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

**EXHIBIT E**

EXHIBIT 4-36
ER 586

predecessor(s) and make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

## TERMS

1. <u>GRANT OF RIGHTS</u>. The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement. The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

   a) <u>Grant Of All Rights In The SUPERMAN Works.</u>

   i) <u>Grant Of All Rights In The ACTION COMICS NO. 1</u>
<u>SUPERMAN Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

13

339

EXHIBIT 4-37
ER 587

**EXHIBIT E**

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

ii) <u>Grant Of All Rights In The POST ACTION COMICS NO. 1 SUPERMAN Works.</u> The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

14

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and

to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel,

or any other person or entity claiming rights directly or indirectly through him in the

SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices,

the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS'

compliance with the other provisions in this subparagraph, and their execution of the Stand

Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this

Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant

made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS

and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1

SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in

perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective

April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every

kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to

the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including

all renewals and extensions thereof, and all claims or causes of action of any kind relating or

appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them,

own, or have ever owned or claimed, or could possibly ever claim, including as members of the

public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN

Derivative Works.

　　　b) Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative

Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

15

341

EXHIBIT 4-39
ER 589

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

      c)   <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.</u>  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

**EXHIBIT E**

d) Grant Of All Rights In The SPECTRE Works.

i) Grant Of All Rights In The MORE FUN COMICS SPECTRE Works. If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

ii) Grant Of All Rights In The POST MORE FUN COMICS SPECTRE Works. The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

343

EXHIBIT 4-41
ER 591

**EXHIBIT E**

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

18

344

**EXHIBIT E**

EXHIBIT 4-42
**ER 592**

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) Acknowledgement/Grant Of All Rights In The SPECTRE Marks. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

19

345

EXHIBIT 4-43
ER 593

**EXHIBIT E**

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest in the SPECTRE Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

g) <u>Grant Of All Rights In The OTHER SIEGEL Works.</u> To the extent that any OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every kind whatsoever, including but not limited to copyright rights, throughout the world for all terms of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public with respect to the OTHER SIEGEL Works when the copyright(s) or any of them therein expire and all claims or causes of action of any kind relating or appurtenant thereto.

h) <u>Acknowledgement/Grant Of All Rights In The OTHER Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the OTHER Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

20

346

whatsoever, (including as members of the public anywhere in the world should the OTHER Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the OTHER Marks including any goodwill associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

2.  Payments To The Siegels And Other Financial And Related Terms.  In complete consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions and authorship, and the other understandings and agreements herein made by The SIEGELS, DC COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

    a)  Initial Payments

        i)  Upon full execution of this Agreement, a non-recoupable payment of $1,000,000;

        ii)  Upon full execution of this Agreement, an advance of $2,000,000 against The SIEGELS' royalty payments under ¶2(d) hereof;

        iii) Upon full execution of this Agreement , the payment of $250,000 heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall become non-recoupable.

    b)  Annual Payments (Advances)

        i)  For ten years commencing in 2002, payable on March 31st of each year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS hereunder.

EXHIBIT 4-45
ER 595

ii) Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii) All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

22

348

EXHIBIT 4-46

ER 596

**EXHIBIT E**

iv)    The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)    <u>Widow's Benefits</u>

i)    For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)    Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)    <u>Royalties</u>

i)    Commencing for Revenues received on or after January 1, 2000;

ii)    6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

23

**EXHIBIT E**

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

iii) 6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

(A) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

(C) with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

(D) with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

24

350

EXHIBIT 4-48
ER 598

**EXHIBIT E**

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

   iv)  1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

   v)  1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property. A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories). A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories). However:

   (A)  with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

25

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ½ %;

(B)     with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

(C)     with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

(D)     with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

(E)     with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

352

EXHIBIT E

EXHIBIT 4-50
ER 600

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)     there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)     there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)     All royalties hereunder shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

27

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

    e)    <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

       47.5% to Joanne Siegel

       23.75 to Laura Siegel Larson

       23.75 to Michael Siegel

       5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder.  Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

    f)    <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit __ hereto is a copy of the medical coverage guidelines that currently apply).  DC Comics shall reimburse Laura Siegel Larson for premiums

**354**

**EXHIBIT E**

EXHIBIT 4-52
ER 602

she has paid for medical and dental insurance for her and James and Michael Larson  from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g)     Acknowledgement Of No Entitlement To Any Further Or Additional Payment.  The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3.    DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS.  The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto.  DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

29

355

EXHIBIT 4-53
ER 603

**EXHIBIT E**

4. <u>The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS.</u>
The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC COMICS ____ exclusively, all rights of any kind in The WORKS and The MARKS, and all future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive use, enjoyment, control, and benefit. The SIEGELS acknowledge and agree that effective with the grant made herein, and regardless of anything that occurs or does not occur in the future, including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been learned relating in any manner whatsoever to this Agreement or its terms, whether any person or entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of the works that are the subject of this Agreement fall into the public domain for any reason whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in The WORKS or The MARKS. By way of example only and without limitation, as of the effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to, and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own no and shall own no rights, title or interest, including but not limited to any Reversionary Rights, of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any right to use or authorize the use of any of the foregoing on any basis.

5. <u>The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or Under The Stand Alone Assignments.</u> The SIEGELS covenant not to and shall not challenge, make any claim against or concerning, or take any action, directly or indirectly, to interfere with

30

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of, or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other person or entity in doing so.

6. No Right To Terminate New Grant. Further to paragraph 4, The SIEGELS hereby acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright Act and they know of no such grants which were not identified in said Notices. The SIEGELS further acknowledge and represent and warrant that, within the meaning of the Copyright Act, this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision of the Copyright Act, or under any other statute, regulation, common law principle, body of law or otherwise throughout the world. The SIEGELS hereby designate DC COMICS as the administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7. Third Party And Intercompany Licenses.

a) DC COMICS shall enter into any and all Licenses with unaffiliated third parties with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

31

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)     The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property. The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below. If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances. In no event shall The SIEGELS have the

32

**EXHIBIT E**

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW Company, or on the basis of whether or not there is an advance or guarantee, or because DC COMICS did not hold an auction in respect thereof.

    c)    The applicable safe harbor agreements are as follows:

        i)    For live action and animated feature length theatrical motion pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues received by an affiliated motion picture distributor in the United States in U.S. Dollars from exploitation of the motion pictures, less taxes (including duties and other governmental fees), collection costs and trade association dues. Notwithstanding the foregoing, in respect of Licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i) gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross wholesale sales income received therefrom by an affiliated distributor, less a reasonable amount for returns.

        ii)    For animated direct to home video productions: $80,000 for each hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the home video production. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

        iii)    For live action television programs: 3% of the first 1.5 million dollars of Gross Receipts received by an affiliated television production company in the United States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

**EXHIBIT E**

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

iv)    For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

v)    For video games:

(A)    For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

(B)    For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

vi)    For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

**360**

**EXHIBIT E**

EXHIBIT 4-58
**ER 608**

from gross revenues received in the United States in U.S. Dollars on account of licensed merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

      vii)    For licensed publishing: 10% of net wholesale sales received by an affiliated publishing company in the United States in U.S. Dollars for each licensed publication. As used herein, "net wholesale sales" shall mean the affiliated publishing company's then standard definition of net wholesale sales.

      viii)    For website uses of Flash Animations and collateral material intended to supplement or support the Flash Animations: 5% of an affiliated online production company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation of the animations and collateral material after it has recouped its Production Costs. As used herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest thereto).

    8.  <u>Accounting.</u>  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable annually on March 31 of the year following the close of the annual accounting period. All payments shall be accompanied by a statement of account. The year 2000 statement and payment, if any, shall be made on March 31, 2002

    9.  <u>Audit.</u>  The SIEGELS may audit the books and records of DC COMICS solely in order to verify statements issued to The SIEGELS hereunder. Any such audit shall be at The SIEGELS' expense. Any audit shall be conducted only upon reasonable notice by a certified public accountant during regular business hours at DC COMICS' offices and in such manner as not to interfere with DC COMICS' normal business activities. In no event shall an audit with

35

**EXHIBIT E**

EXHIBIT 4-59
ER 609

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

10.    Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.

a) The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents. Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within ____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

**EXHIBIT E**

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

b) <u>The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact.</u> The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

11. <u>Conduct Of The Business.</u>

a) <u>No Disparagement By Parties.</u> The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

b) <u>Press Releases And Promotion.</u> The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

(i) upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

37

**363**

**EXHIBIT E**

EXHIBIT 4-61
ER 611

(ii)     shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)     shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c)  The SIEGELS Shall Refer Inquiries.  The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d)  Advise.  DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right.  The SIEGELS will be informed of such developments periodically.  To facilitate this, The SIEGELS will appoint one of them to receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments.  The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

**EXHIBIT E**

herein. Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

    e)   <u>Credit.</u>

     (i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

    (ii)    On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family". The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

365

EXHIBIT 4-63
ER 613

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f)    DC COMICS Right To Use Materials. DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g)    DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS. DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40

366

EXHIBIT 4-64
ER 614

**EXHIBIT E**

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

     h)    First Opportunity To Negotiate. The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. Representations And Warranties, Covenant Not To Sue And Indemnification.

     a)  The SIEGELS Have The Right and Power To Enter Agreement. The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

EXHIBIT 4-65
ER 615

**EXHIBIT E**

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS, including but not limited to all trademark rights (if any) and copyright rights, and all termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive and flow directly and only from Jerome Siegel; (vi) no person or entity other than The SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal representative of Mr. Siegel and his estate.

   b) <u>Release And Covenant Not To Sue By The SIEGELS.</u>

   i)    As of the date of execution of this Agreement, The SIEGELS and their descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and past, present and future, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby release and discharge now and forever DC COMICS and its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and past, present and future parents, subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively

42

**368**

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

ii)    In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

43

**EXHIBIT E**

EXHIBIT 4-67
ER 617

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

c) <u>Release And Covenant Not To Sue By DC COMICS.</u>

i)      As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

ii)      In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

370

EXHIBIT 4-68
ER 618

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

    d)     <u>The SIEGELS Indemnify DC Comics.</u> RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s) at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

    (i)     RELEASEE against RELEASOR arising out of a breach or claimed breach by RELEASOR (or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel) of any of the terms of this Agreement;

    (ii)     RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

    (a)     asserting any right in The WORKS and/or The MARKS;

    (b)     seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

    (c)     claiming any Reversionary Rights in The WORKS or The MARKS;

    (d)     that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

45

371

EXHIBIT 4-69
ER 619

EXHIBIT E

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

        (e)    relating to The SIEGELS representations and warranties herein, including but not limited to: i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

        (iii)    Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

    e)    <u>DC COMICS Indemnifies The SIEGELS.</u>  DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS. DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. <u>Confidentiality.</u> Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

46

372

EXHIBIT 4-70<br>ER 620

**EXHIBIT E**

14. <u>Dispute Resolution.</u>

a) <u>Choice of Law.</u> This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

b) <u>DC COMICS' Equitable Remedies Unlimited.</u> The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief. It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan. The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

c) <u>Arbitration As Sole Remedy To Address Disputes By The SIEGELS.</u> Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for an accounting of moneys due. The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

47

373

EXHIBIT 4-71
ER 621

**EXHIBIT E**

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever. Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so. Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

   d)     Limit On Remedy Available To The SIEGELS. If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto. The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

374
EXHIBIT 4-72
ER 622

**EXHIBIT E**

any sums due to The SIEGELS herein. The parties acknowledge that the financial benefit flowing to The SIEGELS under this Agreement represents a greater amount than what The SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce the Notices and any purported rights thereunder. As consideration for this, The SIEGELS expressly agree that in any event, including but not limited to any change in law or otherwise, the compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel regardless of the basis of any such claim.

    e)    <u>No Payment Due Unless Provided For Herein</u>  Except as provided in paragraph 2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and Michael Siegel. None of The SIEGELS or their heirs, executors, trustees, administrators, successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the extent it is not expressly provided for herein.

    f)    <u>Suspension Of Payments To The SIEGELS.</u>  If for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS' sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

49

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be suspended until the claim is finally resolved.

15. **Non Assignability Of Rights Granted To The Siegels.** The SIEGELS shall not assign, transfer, sell, license, or give away any of the rights provided to them under this Agreement, and any such assignment shall be null and void. The SIEGELS expressly agree that their heirs and/or all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement are expressly bound by this Agreement to the same extent to which The SIEGELS are bound by it. The SIEGELS shall expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement that such person(s) or entity or entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. <u>MISCELLANEOUS</u>

    a) <u>Severability.</u> In the event any provision hereof affecting The SIEGELS' grant of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by any competent court to be unenforceable, such determination shall not affect the effectiveness of any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in accordance with the parties' intent hereunder.

    b) <u>Successors.</u> This Agreement is enforceable against and binding upon the parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers, employees, directors, consultants, successors and assigns.

50

**376**

**EXHIBIT E**

EXHIBIT 4-74<br>**ER 624**

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED:</u>

DC COMICS, a division of Warner Bros., a    By: _____
Time-Warner Entertainment Company      Joanne Siegel


By: _____      Date: _____

377

EXHIBIT 4-75
**ER 625**

Title: _____

Date: _____

By: _____

     Laura Siegel Larson

Date: _____

The Estate of Jerome Siegel

By:_____
Joanne Siegel as sole executor, trustee, administrator and personal representative of Jerome Siegel and his estate

Date: _____

By: _____

     Michael Siegel

Date: _____

378

EXHIBIT 4-76
ER 626

**EXHIBIT E**

## **ACKNOWLEDGMENT**

STATE OF          )

                    SS.:

COUNTY OF          )


On _____ __, 2001 before me _____ personally came _____ to me known, by me duly sworn, did depose and say that deponent resides at _____ that deponent is the _____of DC COMICS, a division of Warner Bros., a Time-Warner Entertainment Company, the entity described in, and which executed the foregoing Agreement that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate seal, that it was affixed by order of the board of the corporation; and that deponent signed deponent's name thereto by like order.]

379

EXHIBIT 4-77
ER 627

## **ACKNOWLEDGMENT**

State of       )

           :ss:

County of     )

      On         2001 before me personally came Joanne Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.

_____

Notary Public

54

**380**

**EXHIBIT E**

EXHIBIT 4-78
ER 628

## ACKNOWLEDGMENT

State of          )

                  :ss:

County of         )


On          2001 before me personally came Laura Siegel Larson to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.


_____

Notary Public

EXHIBIT 4-79
ER 629

**EXHIBIT E**

## ACKNOWLEDGMENT

State of   )

     :ss:

County of   )

   On   2001 before me personally came Michael Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he executed the same.

        _____

          Notary Public

\\UNP1\VOL2\FIRMDOCS\PPERKINS\DCC\SUPER\Siegel Draft Agreement 020201.doc

56

EXHIBIT 4-80

ER 630

**EXHIBIT E**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 86 of 328

Notice of Termination of Transfer
Covering Extended Renewal Term

*Superboy*

000000612

EXHIBIT 5-81
ER 631

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 87 of 328

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To: AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

000000613

EXHIBIT 5-82
ER 632

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 88 of 328

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

2

000000614

EXHIBIT 5-83
ER 633

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 89 of 328

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: AOL Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020; AOL Time Warner Book Group, Inc., 1271 Avenue of the Americas, New York, NY 10020; Warner Books, Inc., 1271 Avenue of the Americas, New York, NY 10020; Little, Brown, and Company, 1271

EXHIBIT 5-84
ER 634

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 90 of 328

Avenue of the Americas, New York, NY 10020; DC Comics Inc., 1700 Broadway, 7th Floor, New York, NY 10019; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; Milton Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Wildstorm Productions, 888 Prospect Street, Suite 240, La Jolla, CA 92037; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Cantharus Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819; Hallmark Entertainment, Inc., 1325 Avenue of the Americas, 21st Floor, New York, NY 10019; Marvel Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016; Golden Books Publishing, 1540 Broadway, New York, NY 10036; Random House Golden Books for Young Readers, 1540 Broadway, New York, NY 10036; Inkworks, 4320 Delta Lake Drive, Raleigh, NC 27612; DK Publishing, Inc., 375 Hudson Street, New York, NY 10014; Scholastic, Inc., 557 Broadway, New York, NY 10012.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, and additionally, by certified mail, return receipt requested, to the above grantees or successors at the addresses shown.

2.      Each work to which this Notice of Termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERBOY, which was published and embodied in the illustrated comic book story in More Fun Comics, No. 101, January-February, 1945 issue, for which copyright was originally secured on November 23, 1944 under Copyright Registration No. B653651 and which was published in or about November 18, 1944. SUPERBOY and this work were previously adjudicated to have been based upon and embodied in the character,

000000616

EXHIBIT 5-85
ER 635

concept, script and scenario solely written and created by Jerome Siegel and to be a separate and distinct copyrighted work and character from the copyrighted work and character, SUPERMAN.[1] Renewal for the work was made July 17, 1972, in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under Copyright Renewal Registration No. R532582. SUPERBOY and the aforesaid work were based upon and embodied the following works to which this Notice of Termination also applies: (I) a three page summary or synopsis of the concept and plan for a new comic strip to be known as SUPERBOY solely originated, created, conceived and written by Jerome Siegel (c. 1938) and submitted by Jerome Siegel to Detective Comics, Inc. on or about November 30, 1938; and (II) a complete thirteen page script containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip, SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, solely originated, created,

---

[1] In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., Supreme Court of the State of New York, Case No. 1099-1947(1948), the Court signed findings of fact and conclusions of law on April 12, 1948 (from which neither side perfected an appeal) including, without limitation, that on or about November 30, 1938, Jerome Siegel submitted to Detective Comics, Inc. for its consideration a synopsis or summary of the conception and plan for a new comic strip entitled SUPERBOY (attached as Exhibit 16 thereto); that during December, 1940 Jerome Siegel submitted to Detective Comics, Inc. for its further consideration a complete script (attached as Exhibit 36 thereto) containing the continuity, plan and dialogue for the first "release" or "releases" of SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, all set forth by Jerome Siegel with detail and particularity; that the comic strip, SUPERBOY, published by Detective Comics, Inc. embodied and was based upon the idea, plan, conception and direction contained in said original material solely created by Jerome Siegel; that SUPERMAN did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY and that SUPERBOY was a work different and distinct from SUPERMAN; that the publication of all such comic strip material entitled SUPERBOY by Detective Comics, Inc. was at all times without the permission of Jerome Siegel; and accordingly, that Jerome Siegel, was the originator and owner of the comic strip feature, SUPERBOY, and had the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY, of the type and nature theretofore published by Detective Comics, Inc. Subsequent to these court findings, the parties entered into the above referenced agreement dated May 19, 1948 wherein Jerome Siegel assigned rights in SUPERBOY to National Periodical Publications, Inc., to which assignment this Notice of Termination applies, without limitation. In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973), aff'd in part, 508 F.2d 909 (2nd Circuit 1974), the Court held that the aforementioned findings by the Supreme Court of the State of New York in 1948 are binding and that any dispute with respect thereto is barred by the doctrines of res judicata and collateral estoppal.

5

EXHIBIT 5-86
ER 636

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 92 of 328

conceived, and written by Jerome Siegel in detail and with particularity, and submitted by Jerome Siegel to Detective Comics, Inc. on or about December, 1940. The remaining works to which this Notice of Termination applies[2] are:

| Title | Name of Author[3] | Date Copyright Secured[4] | Copyright Reg. No. |
|---|---|---|---|
| **SUPERBOY IN[5]:** | | | |
| More Fun Comics#101 | Detective Comics, Inc. | Nov. 18, 1944 | B653651 |
| More Fun Comics#102 | " | Jan. 16, 1945 | B661073 |
| More Fun Comics#103 | " | Mar. 20, 1945 | B669959 |
| More Fun Comics#104 | " | May 28 1945 | B679484 |
| More Fun Comics#105 | " | July 23 1945 | B687306 |
| More Fun Comics#106 | " | Sept. 23, 1945 | B696308 |
| More Fun Comics#107 | " | Nov. 20, 1945 | B701661 |

---

[2] This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERBOY or the SUPERBOY stories, such as, without limitation, *Superboy, Smallville, Lana Lang* and *Pete Ross*. Every reasonable effort has been made to find and list herein every such SUPERBOY-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

[3] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records. The listing of any corporation as author of any work that any given work is or was a "work made for hire;" nor is anything else herein to be construed as an admission such admission. Nothing contained in this Notice of Termination shall be construed to in any way limit or waive any right or remedy that the undersigned might have, at law or in equity, with respect to the subject matter hereof, all of which is hereby expressly reserved.

[4] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 published work whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 published work whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 unpublished work whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) will be given, and the year therein will constitute the year of creation. "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 unpublished work whose year of creation differs from its year of registration, the year of creation will be given (e.g. "DCRE: 1979"), followed by the specific registration date.

[5] "SUPERBOY IN:" means any and all works as described in footnote no. 2.

6

000000618

EXHIBIT 5-87
ER 637

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 93 of 328

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Dichotic (aka Smallville # 209) | Warner Bros. Television | 2002 | No record |
| Skinwalker (aka Smallville # 210) | " | 2002 | No record |
| Visage (aka Smallville # 211) | " | 2002 | No record |
| Smallville DVD (Episode #101: "Pilot" and Episode #102: "Metamorphosis") | | 2002 | No record |

**SMALLVILLE NOVELIZATIONS**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Smallville #1: Arrival | D C Comics, Inc. and AOL Time Warner, Inc. | 2002 | In progress |
| Smallville #2: See No Evil | " | Oct. 17, 2002 | In progress |
| Smallville #2: Dragon | " | Oct., 2002 | In progress |
| Smallville: Strange Visitors | " | Oct. 7, 2002 | In progress |
| Smallville #3: Flight | " | Dec., 2002 | In progress |
| Smallville #3: Hauntings | " | Dec., 2002 | In progress |
| Smallville #3: Pet Peeves | " | Dec., 2002 | In progress |
| Smallville #4: Whodunnit | " | Mar., 2003 | In progress |

3.     The grant(s) to which this Notice of Termination applies is(are) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand.[7]

4.     The effective date of termination shall be November 17, 2004.

---

[7] To the extent the following agreements are found or claimed to contain a grant(s) of, pertaining to or affecting SUPERBOY, in whole or in part, this Notice of Termination shall apply to such agreements as well: Agreement dated December 4, 1937 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other had; Agreement dated March 1, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc. and The McClure Newspaper Syndicate, on the other hand; and Agreement dated December 19, 1939 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand.

000000664

EXHIBIT 5-88
ER 638

5.      Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: November 8, 2002

*Joanne Siegel*
Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292

*Laura Siegel Larson*
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

000000665

EXHIBIT 5-89
ER 639

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 94 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 95 of 328

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable investigation to be made on our behalf as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ 8th ___ day of November, 2002, at Los Angeles, California.


Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292


Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

54

000000666

EXHIBIT 5-90
ER 640

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM to be served this 8th day of November, 2002, by First Class Mail, postage prepaid, upon the following:

To:  AOL Time Warner Inc.
     c/o Richard D. Parsons
     Chief Executive Officer
     75 Rockefeller Plaza
     New York, NY 10019

     Time Warner
     Entertainment Company, L.P.
     c/o Barry M. Meyer
     Chairman & C.E.O.
     75 Rockefeller Plaza
     New York, NY 10019

     Warner Bros. Inc.
     c/o Barry M. Meyer
     Chairman & C.E.O
     4000 Warner Boulevard
     Burbank, CA 91522

     Warner Communications Inc.
     75 Rockefeller Plaza
     New York, NY 10019

     Warner Bros. Television
     c/o Peter Roth
     President
     4000 Warner Boulevard
     Burbank, CA 91522

     Warner Music Group
     c/o Roger Ames
     Chairman & C.E.O.
     75 Rockefeller Plaza
     New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 96 of 328

55

000000667

EXHIBIT 5-91
ER 641

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 97 of 328

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

000000668

EXHIBIT 5-92
ER 642

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of November, 2002, at Los Angeles, California.

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

57

000000669

EXHIBIT 5-93
ER 643

FILED
CLERK U.S. DISTRICT COURT

MAR 23 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 24 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | |
|---|---|
| JOANNE SIEGEL & LAURA SIEGEL LARSON, | ) CV 04-8776 RSWL (RZX) |
| Plaintiffs | ) |
| v. | ) ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT & DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| TIME WARNER, INC., et al., | ) |
| Defendants. | ) |

DOCKETED ON CM

MAR 24 2006

BY                              003

Plaintiffs Joanne Siegel and Laura Siegel Larson's Motion for Partial Summary Judgment and Defendant Time

1

EXHIBIT 6-94
ER 644

Warner, Inc.'s Motion for Summary Judgment came on regularly
for hearing on March 20, 2006. This Court has considered
all of the papers and argument submitted on the matter and
**NOW FINDS AND RULES AS FOLLOWS:**

      As a preliminary matter, this Court **GRANTS** Plaintiffs'
and Defendants' requests for Judicial Notice pursuant to
Fed. R. Evid. 201.

      This copyright dispute arises out of facts stemming
back to 1938 and earlier, and including two previous cases
in 1947 and 1973. Plaintiffs in this case are Joanne
Siegel, widow of Jerome Siegel,[1] and their daughter, Laura
Siegel Larson. Jerome Siegel and Joseph Shuster are the
creators of Superman. Jerome Siegel is the originator,
creator of Superboy with Joseph Shuster providing much of
the illustration. Defendants in this case are Time Warner
Inc., the parent company of DC Comics ("Defendants"). DC
Comics predecessor in interest was National Comics
Publications, Inc. ("National") and its predecessor in
interest was Detective Comics ("Detective").

      In 1947, Jerome Siegel and Joseph Shuster sued National
in the New York Supreme Court for the County of Westchester

--------

      [1] Jerome Siegel passed away on January 28, 1996.

2

EXHIBIT 6-95
ER 645

1   ("the state court action") seeking a determination that
2   their March 1, 1938 contract was void.  Additionally, the
3   state court action sought to determine who owned the rights
4   to Superman and to Superboy.
5
6       On November 1, 1947 Judge Addison Young, the official
7   referee in the state court action, rendered a detailed
8   interlocutory judgment.  Then on April 12, 1948, Judge Young
9   signed a detailed findings of fact and conclusions of law.
10  He found that Jerome Siegel was the originator and sole
11  owner of the comic strip feature Superboy with the sole and
12  exclusive right to create, sell, and distribute the comic
13  strip under the title Superboy.
14
15      On May 19, 1948 the parties entered into a stipulation
16  to settle and on May 21, 1948, the Court entered a consent
17  judgment, vacating in all respects the interlocutory
18  judgment. The stipulation provided for a payment of
19  approximately $94,000.00 by National in exchange for
20  ownership in both Superman and Superboy.
21
22      In 1973, Siegel and Shuster again sued National in the
23  Southern District of New York seeking declaratory relief
24  that they were entitled to the copyright renewal rights of
25  Superman.  National counterclaimed for a finding of
26  declaratory relief in its favor.  District Judge Lasker

EXHIBIT 6-96
ER 646

granted National's Motion for Summary Judgement dismissing the complaint and finding "National to be the owner of the copyright of all Superman strips during the renewal term." Siegel & Shuster v. National Periodical Publications, Inc., 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973).

Judge Lasker noted that the findings of the State Supreme Court of Westchester were binding on the district court. Id. (citing to Vernitron Corp. v Benjamin, 440 F.2d 105, 108 (2d Cir. 1971)). Judge Lasker made a clear distinction between (1) the findings of fact of the state court and (2) the stipulated settlement and resulting consent judgment. Siegel & Shuster, 508 F.2d at 913.

Siegel and Shuster appealed and the Second Circuit affirmed finding that the district court "properly decided that the state court judgment of May 21, 1948 effectively estopped the plaintiffs from relitigating the issue of ownership of the renewal copyright." Siegel & Shuster v. National Periodical Publications, Inc. et al., 509 F.2d 909, 912-13 (2d Cir. 1974).

In November 2002, Jerome Siegel's widow and daughter served notices of termination for the Superboy copyrights pursuant to Section 304(c). Today, Plaintiffs seek a determination that they effectively terminated Defendants'

4

EXHIBIT 6-97
ER 647

1 renewal rights in Superboy pursuant to 17 U.S.C. § 304(c) on

2 November 17, 2004.

3

4     17 U.S.C. § 304(c) provides for termination of

5 transfers and licenses covering the extended renewal term.

6 Under the 1901 Copyright Act, protection was divided into

7 two separate consecutive terms of twenty-eight years: the

8 "initial term" and the "renewal term."  But as most

9 authors/creators were required to contract away both the

10 initial and renewal periods at the same time, they were

11 effectively denied the protection Congress sought to

12 provide.

13

14     As a result, on January 1, 1978, the 1976 Copyright Act

15 took effect significantly enhancing the rights of authors

16 and their heirs.  19 U.S.C. § 101, et seq.  The 1976 Act

17 extended the renewal term from 28 to 47 years, for works in

18 their renewal term when the 1976 Act took effect. Along with

19 adding 19 years to the renewal term period, the 1976 Act

20 coupled the extension with a _new_ right of authors and their

21 heirs to recapture the renewal of the copyright in works by

22 terminating any prior grant of the work executed before

23 January 1, 1978.  17 U.S.C. § 304(c).  It is under this

24 provision that Plaintiffs have sought to recapture Jerome

25 Siegel's ownership in the Superboy copyrights.

26

EXHIBIT 6-98
ER 648

1      Fundamental to the arguments presented by both

2 Plaintiffs and Defendants is the effect of the interlocutory

3 judgment issued by Judge Young on November 21, 1947 and the

4 detailed findings of fact and conclusions of law he issued

5 on April 21, 1948.

6

7      Currently, Defendants attempt to relitigate issues

8 determined in the 1947 state court case.  Defendants argue

9 vigorously that only the consent judgment has any preclusive

10 effect and that Judge Young's findings of fact have no

11 effect whatsoever on this litigation.  Defendants take this

12 position because their desired outcome is consistently in

13 direct conflict with the findings issued by Judge Young.

14 Specifically, Judge Young's findings contradict Defendants'

15 assertions regarding(1) the ownership of Superboy; (2)

16 whether Superboy is simply a derivative work of Superman;

17 and (3) whether Superboy was a "work for hire" solely owned

18 by Defendants' predecessors in interest, National and

19 Detective.

20

21      Defendants' current argument that Judge Young's

22 findings are not binding contradicts the position taken by

23 their predecessors in interest in the 1973 litigation and

24 the 1974 Second Circuit appeal regarding Superman.  In

25 applying the doctrine of res judicata in favor of

26 Defendants, Judge Lasker precluded, and the Second Circuit

EXHIBIT 6-99
ER 649

1  affirmed, Plaintiffs from litigating the issue of ownership

2  of the renewal period of the Superman copyrights.

3

4      Having relied on Judge Young's findings for previous

5  favorable determinations regarding Superman, Defendants now

6  take the inconsistent position that this Court is not bound

7  by the state court findings, as they relate to Superboy.

8  Defendants attempt to raise genuine issues of material fact,

9  where the facts were clearly determined by Judge Young after

10  the opportunity to take evidence and hear testimony on that

11  evidence from the parties directly involved in creating this

12  relationship.

13

14      Contrary to Defendants' assertions now, both the

15  Southern District of New York and the Second Circuit looked

16  directly to, even citing to, Judge Young's findings of fact.

17  This Court holds that it is consistent to continue this

18  position and will look to Judge Young's findings as binding

19  where relevant.  Here, while the consent judgment vacated

20  the interlocutory judgment in its entirety, this Court in

21  keeping a consistent position with the previous litigation

22  holds that Judge Young's findings of fact have preclusive

23  res judicata and collateral estoppel effect on this Court.

24

25      This Court now finds that Plaintiffs have availed

26  themselves of their legal right to recapture the Superboy

EXHIBIT 6-100
ER 650

1  copyrights pursuant to 17 U.S.C. § 304(c) and 37 C.F.R.

2  210.10.  As such, this Court **GRANTS** Plaintiffs' Motion for

3  Partial Summary Judgment.

4

5      Defendants argued that Plaintiffs' Superboy notices of

6  termination are ineffective, because the 1976 Act specifies

7  that only grants relating to "any copyright subsisting in

8  either its first or renewal term on January 1, 1978" are

9  subject to Section 304(c).

10

11     However, Plaintiffs presented uncontroverted evidence

12  supporting that the Superboy copyright was in fact

13  subsisting in its renewal term as of the 1976 Act's

14  effective date.  Specifically, Plaintiffs pointed to the

15  fact that the copyright in the serialized magazine, *More Fun*

16  *Comics*, No. 101 was secured on November 23, 1944 with

17  registration number B653651 and then renewed on July 17,

18  1972, twenty-eight years later, by National under renewal

19  registration number R532582.  In the 1947 state court

20  action, Judge Young specifically determined that Detective

21  Comics published the Superboy comic strip based upon the

22  idea, plan, and conception of Siegel, in a magazine entitled

23  *More Fun Comics*.

24

25     Alternatively, Defendants argued that, even if the

26  copyrights were subsisting in their renewal period as of

8

EXHIBIT 6-101
ER 651

1 | January 1, 1978, Plaintiffs' notices of termination are
2 | ineffective as the submissions are not eligible for
3 | termination as "works made for hire."  The Ninth Circuit has
4 | summarized the work for hire doctrine as follows:

5 |          When one person engages another, whether as
6 |          employee or as an independent contractor, to
7 |          produce a work of an artistic nature, . . . in the
8 |          absence of an express contractual reservation of
9 |          the copyright in the artist, the presumption arises
10 |          that the mutual intent of the parties is that the
11 |          title to the copyright shall be in the person at
12 |          whose instance and expense the work is done.

13 | Self-Realization Fellowship Church v. Ananda Church of Self-
14 | Realization, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting
15 | Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300
16 | (9th Cir. 1965)).

17 |

18 |    Defendants' argument that Superboy was a work for hire
19 | fails, as this conclusion directly conflicts with Judge
20 | Young's findings in the state court action. Specifically,
21 | Judge Young found that

22 |

23 | (1) Under Siegel and Shuster's September 12, 1938 agreement
24 |     with Detective Comics, they were to provide Detective
25 |     with the right of first refusal and a six week

26 |

9

EXHIBIT 6-102
ER 652

1    consideration period.[2]

2

3    (2)  On November 30, 1938, Siegel submitted in a writing

4         mailed to Detective for its consideration a synopsis,

5         summary of idea, conception, plan for a new comic known

6         as Superboy pursuant to the September 12, 1938

7         agreement.[3]

8

9    (3)  Detective declined to indicate its election to publish

10        Superboy within the six weeks and on December 2, 1938

11        Detective by letter to Siegel elected not to publish

12        Superboy.[4]

13

14       While not mentioning the term "work for hire," Judge

15   Young's findings naturally implicate the question.  Here a

16   presumption of "work for hire" cannot be found in

17   Defendants' favor, since not only did Judge Taylor find that

18   Defendants elected not to publish Superboy, but he also

19

20 ────────────────

21       [2] Judge Young found that Siegel independently created his
     original Superboy Synopsis and Superboy Story under the terms of the
     September 12, 1938 agreement between Siegel and his publisher, which
22   permitted him to create new comic strip concepts and stories outside
     the five Siegel and Shuster were currently producing for Detective.
23   The agreement only allowed Detective a right of first refusal to
     accept/reject within six weeks of a new submission. [Decl. Toberoff
24   Exh. B, Pg. 32 FOF 156-159, 160-162].

25       [3] [Decl. Toberoff Exh. B, Pg. 32 FOF #155, 156].

26       [4] [Decl. Toberoff Exh. B, Pg. 32 FOF #158, 159].

                              10

EXHIBIT 6-103
ER 653

1  found that Plaintiff Siegel and, not National, was the sole
2  owner of the Superboy property.  This finding will not
3  support a contrary conclusion that the "mutual intent of the
4  parties" was to have ownership of Superboy always be in
5  Detective or National, and therefore, the Defendants in this
6  action.

7

8       Alternatively, Defendants argued that Siegel created
9  Superboy as a derivative work based upon a pre-existing
10  original work whose copyright was owned by the hiring party,
11  and is therefore "produced at the instance and subject to
12  the right and control of the employing party." See Playboy
13  Enters. Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995).

14

15      Here again, Defendants' argument that Superboy is
16  simply a "derivative work" of Superman is unpersuasive.  The
17  1947 state court action specifically addressed the ownership
18  rights to Superman and Superboy separately.  Defendants'
19  attempt to recast Superboy as a "derivative work" or "work
20  for hire," stands is stark contrast to Judge Young's
21  conclusion that Detective/National was "perpetually enjoined
22  and restrained from creating, publishing, selling, or
23  distributing" Superboy, based on the fact that Siegel was
24  the sole and exclusive owner.[5] Defendants' argument also

25  _____

26       [5] [Decl. Toberoff Exh. B, Pg. 5-6 COL # 25].

11

EXHIBIT 6-104
ER 654

1 contradicts the fact that Siegel subsequently transferred

2 his exclusive interest in Superboy to National in the May

3 19, 1948 stipulated settlement. Had Superboy been nothing

4 more than a derivative work, Siegel would have owned no

5 interest in the Superboy property to transfer.

6

7     Having determined that Section 304(c) applies to this

8 dispute, this Court also finds that Plaintiffs have

9 established that no genuine issue of material fact exists

10 regarding the effectiveness of their termination of the

11 Superboy copyrights.

12

13     Pursuant to 17 U.S.C. 304(c) and 37 C.F.R. §

14 201.10(b)(1)(iv), Plaintiffs' termination notices list the

15 following pre-1978 grants of Superboy: (1) the May 19, 1948

16 Agreement (stipulated settlement); and (2) the December 23,

17 1975 Agreement (where relevant, though this agreement does

18 not mention Superboy). No post-1978 grants of rights

19 regarding Superboy exist.

20

21     Defendants argued that Plaintiffs failed to comply with

22 the termination regulations, because the termination notices

23 only list the May 19, 1948 stipulated settlement, but did

24 not list the May 21, 1948 "Final Consent Agreement."

25

26     This Court finds that no genuine issue exists that the

EXHIBIT 6-105
ER 655

operative grant of "Superboy" by Jerome Siegel was the May 19, 1948 stipulated settlement and that the consent judgment merely followed the parties' stipulation and was entered by the Court two days later.  Additionally, Regulation 201.10(b)(1)(iv) merely requires a "brief statement reasonably identifying the grant to which the notice of termination applies."  In fact, Regulation 201.10(e) provides that

> harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of . . .section 304(c) . . . shall not render the notice invalid.

Here, by listing the May 19, 1948 stipulated settlement, the termination notices provide a brief statement reasonably identifying the grant in question. Even, if including the May 21, 1948 consent judgment would have provided additional notice, its absence in no way materially affected the adequacy of Plaintiffs' notice.

As Jerome Siegel's widow, Joanne Siegel owns 50% of her husband's termination interest. 17 U.S.C. § 304(c)(2)(A). As one of his two surviving children, Laura Siegel Larson owns 25% of Siegel's termination interest.  17 U.S.C. § 304(c)(2)(A).  Together Plaintiffs own more than one-half of

13

EXHIBIT 6-106
ER 656

1  Siegel's termination interest required to effectively
2  terminate Siegel's grant pursuant to 17 U.S.C. §304(c)(1).
3
4  　　Defendants argued that Plaintiffs' Superboy termination
5  notices were ineffective, because Joseph Shuster has a co-
6  ownership/joint works interest in Superboy not asserted in
7  the termination notices.  Defendants argued that since
8  Shuster has a one-half interest in Superboy, Plaintiffs only
9  have Siegel's one-half interest, not the "more than one-
10 half" needed to terminate pursuant to Section 304(c).  They
11 point to the fact that More Fun (Superboy's comic) was
12 published with the byline "Jerry Siegel and Joe Shuster."
13
14 　　But, while Shuster was the illustrator attached to
15 Superboy, the 1947 state court action determined that Siegel
16 was the sole originator and owner of Superboy and Siegel
17 alone possessed exclusive ownership rights.  Ownership
18 rights, which he and not Shuster, subsequently transferred
19 in the stipulated settlement.  No facts support a contrary
20 finding.
21
22 　　Finally, this Court finds that Plaintiffs timely and
23 properly recorded with the Copyright Office and served on
24 Defendants the notices of termination for the Superboy
25 copyrights as required by 17 U.S.C. § 304(c) and 37 C.F.R. §
26 201.10.

14

EXHIBIT 6-107
ER 657

1    Therefore, this Court finds that Plaintiffs effectively

2    terminated Jerome Siegel's grants of the Superboy

3    copyrights, recapturing them on November 17, 2004.

4    To the extent that Defendants' Motion for Summary Judgment

5    makes a contrary request, this Court **DENIES** Defendants'

6    motion.

7

8    Also, as to Defendants, this Court **DENIES** Defendants'

9    request for a finding that the WB television show,

10   *Smallville*, does not infringe on Plaintiffs' recaptured

11   copyrights.  Defendants' argument reaches a quick and broad

12   conclusion that Plaintiffs' copyrights in Superboy protect

13   virtually nothing more than the idea of a "youth with super

14   powers."

15

16   In order to establish copyright infringement,

17   Plaintiffs must first establish ownership and then must show

18   the two following factors: (1) the defendant had access to

19   the copyrighted material; and (2) the defendant's material

20   is substantially similar to the copyrighted material.  Three

21   Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir.

22   2000).

23

24   Here, no genuine issue of material fact exists as to

25   Plaintiffs' ownership in the Superboy copyrights, nor is

26   there an issue that Defendants' had access to the Superboy

15

EXHIBIT 6-108
ER 658

1 property. But, because substantial similarity is
2 customarily an extremely close question of fact, summary
3 judgment has traditionally been frowned upon in copyright
4 litigation. _Hoehling v. Univ. City Studios, Inc._, 618 F.2d
5 972, 977 (2d. Cir. 1980).

6

7     Here, the specific question as to whether the
8 television show _Smallville_ infringes on Plaintiffs' Superboy
9 copyrights requires a detailed factual comparison of each
10 property's content characteristics, much of which are
11 disputed in Plaintiffs' and Defendants' papers. Plaintiffs
12 immediately start drawing comparisons between the storylines
13 of _Smallville_ and the Superboy comic strip, including the
14 cast of characters' names, personas, roles in the storyline,
15 their independent storylines, the location, etc. Enough
16 facts are presented, where this Court, contrary to
17 Defendants' request, could find that the main character in
18 _Smallville_ is in fact Superboy.[6]

19

20     Therefore, this Court in construing the submitted
21 evidence in the light most favorable to the non-moving
22 party, Plaintiffs, genuine issues of material fact exist as
23 to whether Defendants' television show _Smallville_ is
24 infringing Plaintiffs' copyrights.

25 ────────────────

26    [6] In the Superboy comic strip a billboard on the side of a rural
country road announces, "Welcome to Smallville! Home of Superboy."

16

EXHIBIT 6-109
ER 659

1    Therefore, Defendants' Motion for Summary Judgment is

2  DENIED.

3

4    This Court adopts Plaintiff's Findings of Fact and

5  Conclusions of Law with modifications.

6

7

8  IT IS SO ORDERED.

                                    RONALD S.W. LEW
9
                              _____
10                                  RONALD S.W. LEW
                              United States District Judge
11

12  DATED: March 23, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                        17

EXHIBIT 6-110
ER 660

UNITED STATES OF AMERICA)
STATE OF CALIFORNIA     ) ss:
COUNTY OF LOS ANGELES   )

On this 12th day of June, 2006, before me, the undersigned Notary Public, personally appeared Damon B. Bonesteel who appears in this act in the name and on behalf of WARNER BROS. PICTURES INTERNATIONAL, a division of Warner Bros Distributing Inc., and in the capacity of Vice President thereof, he certified to me that he was duly entitled to act as such.

The appearer has made to me the following statements to the best of his knowledge and belief:

1. Jerome Siegel, deceased, formerly a citizen and resident of the United States of America, and Joseph Shuster, deceased, formerly a citizen of Canada and resident of the United States of America ("Siegel and Shuster") wrote and illustrated original characters and stories for a comic strip property entitled "Superman" in or around 1938. Pursuant to the terms and conditions of an Agreement dated as of March 1, 1938, as amended and/or restated from time to time thereafter (including on September 22, 1938, December 19, 1939, May 19, 1948 and May 21, 1948), between Siegel and Shuster, on the one hand, and Detective Comics, Inc., 480 Lexington Ave., New York, New York ("Detective"), on the other hand, Siegel and Shuster sold and transferred to Detective all of their respective right, title and interest in and to said comic strip property entitled "Superman". Pursuant to said Agreement as amended and/or restated, Detective acquired, in relevant part, all right, title and interest in and to the exclusive motion picture rights, the characters, the artwork, and the storyline contained in said comic strip property (the "Superman Concept").

2. Pursuant to a merger among several publishing companies, including, in relevant part, Detective, in or around September 1946, National Comics Publications, Inc. located in New York City (actual address unknown) became the parent company of Detective. Pursuant to the terms and conditions of an Assignment dated February 24, 1947, Detective assigned to National Comics Publications, Inc. the rights in and to the Superman Concept. Pursuant to said Assignment, National Comics Publications, Inc. acquired all of Detective's right, title and interest in and to the Superman Concept.

3. Pursuant to an Assignment and Consolidation Agreement dated January 20, 1966, National Periodical Publications, Inc. became successor-in-interest to National Comics Publications, Inc. Pursuant to said Agreement, National Periodical Publications, Inc., became the owner of all right, title and interest in and to Detective and, in relevant part, the Superman Concept.

4. Pursuant to a merger of Kinney Parking Company and National Cleaning Company in 1966, Steve Ross, deceased, became head of a company known as Kinney National. Pursuant to an incorporation in New York State in November 1967, Kinney National changed its name to KNS Publishing Company, Inc. ("KNS"). Pursuant to a corporate merger in 1968 National Periodical Publications, Inc. merged with KNS and the resulting company retained the name National Periodical Publications, Inc. National Periodical Publications, Inc. acquired Warner Bros.-Seven Arts, a Delaware corporation, 666 Fifth Avenue, New York, New York in 1969. National Periodical Publications, Inc. divested its non-entertainment holdings and became part of the group Warner Communications Inc., a Delaware corporation, 75 Rockefeller Plaza, New York, New York 10019 ("WCI") in 1972. Pursuant to said successive acquisitions and mergers, WCI became the parent company of National Periodical Publications, Inc. in 1972.

5. Pursuant to the terms and conditions of an Agreement dated as of December 23, 1975 between Siegel and Shuster, c/o Edmund Preiss, Esq., Kane, Kessler, Proujansky, Priess & Permutt, on the one hand, and WCI and its subsidiaries, inclusive of National Periodical Publications, Inc., on the other hand, Siegel and Shuster agreed and acknowledged that WCI is the sole and exclusive owner of all of the right, title and interest in and to the Superman Concept, including, without

EXHIBIT 7-111
ER 661
DC 00158

limitation, the characters, artwork, and motion picture rights, throughout the world in perpetuity. Pursuant to said Agreement, WCI owns the motion picture production, distribution and ancillary rights in the Superman Concept throughout the world in perpetuity, inclusive of copyrights and trademarks therein.

6. In or around August 1976, National Periodical Publications, Inc. changed its name to DC Comics, Inc. Pursuant to an Assignment dated as of June 30, 1992, among Detective, DC Comics, Inc., successor-in-interest to National Periodical Publications Inc., 1700 Broadway, 3rd Floor, New York, New York 10019, DC Comics, A New York Partnership, 1700 Broadway, 3rd Floor, New York, New York 10019 ("DC") and Warner Bros. Inc., a Delaware corporation, 4000 Warner Boulevard, Burbank, CA 91522, a subsidiary of WCI ("Warner"), Detective assigned to Warner all of its right, title and interest in, among other properties, the Superman comic books and Warner, in turn, simultaneously assigned to DC all of its right, title and interest in said property, including, without limitation, all copyrights, and renewals, all rights under copyright, including the right to prepare derivative works, all versions of said property and all rights in any underlying properties.

7. Pursuant to an Agreement dated as of August 1, 1992 between Frank Shuster and Jean Shuster Peavy (heirs of Joseph Shuster), on the one hand, and DC, on the other hand, Shuster and Peavy granted to DC in perpetuity all rights in any copyrights, trademarks or other property rights in any and all work created in whole or in part by Joseph Shuster, or any works based thereon, including without limitation, the Superman Concept.

8. Pursuant to the terms and conditions of an Agreement dated as of November 6, 1999 between DC and Warner Bros., a division of Time Warner Entertainment Company, L.P., a Delaware limited partnership, 4000 Warner Boulevard, Burbank, CA 91522 ("WB"), successor-in-interest to Warner, DC assigned an exclusive license to WB through December 31, 2033, throughout the universe, in the motion picture production, distribution and ancillary rights in the Superman Concept, including, without limitation, sequels and remakes. Pursuant to said Agreement, Warner has an exclusive license to produce, distribute and exploit motion pictures, remakes and sequels based on the Superman Concept.

9. Pursuant to an Agreement dated October 19, 2001 between Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel), on the one hand, and DC, on the other hand, Siegel and Larson transferred to DC all of their rights in the Superman properties and the Superman Concept, in relevant part.

10. Pursuant to the terms and conditions of an Agreement dated as of June 1, 2004 between Red Sun Productions Pty Limited, an Australian corporation, Level 6, 116 Military Road, Neutral Bay, Australia ("RSP") and Warner Bros. Pictures Inc., a Delaware corporation, 4000 Warner Blvd., Burbank, CA 91522 ("WBPI"), successor-in-interest to Warner, WBPI engaged RSP to produce, on behalf of WBPI, one theatrical motion picture based on the Superman properties and the Superman Concept. Pursuant to said Agreement, RSP shall retain no rights in the proposed motion picture, all such rights being owned at all times during the production by WBPI.

11. Pursuant to the terms and conditions of an Agreement dated as of July 20, 2004, as amended, between WBPI and Danimal, Inc. f/s/o Dan Harris, a citizen and resident of the United States of America, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, Attn: Todd Feldman and Michael Dougherty, a citizen and resident of the United States of America, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212 , Attn: Danny Greenberg, (collectively "Writer"), Writer wrote a first draft Screenplay ("Screenplay No. 1"), a second draft Screenplay ("Screenplay No. 2") and several Polishes (collectively "Screenplay No. 3") entitled "Red Sun" based on the Superman properties and the Superman Concept. Pursuant to said Agreement, the Writers assigned all of their respective right, title and interest in and to Screenplay No. 1, Screenplay No. 2 and Screenplay No. 3 to WBPI exclusively in perpetuity throughout the universe.

EXHIBIT 7-112
ER 662
DC 00159

12.     WBPI produced a feature length motion picture entitled "Superman Returns" based on Screenplay Nos. 1 through 3 (the "Picture").  The Picture was recorded on tape in Australia by means of a Genesis Camera for transfer to film and the film was developed by Technicolor in Los Angeles, California.

13.     Pursuant to a general inter company agreement dated as of April 1, 2003, between WBPI, predecessor-in-interest to Warner Bros. Distributing Inc., a Delaware corporation, 4000 Warner Boulevard, CA 91522 ("WBDI") and Warner Bros. Entertainment Inc., a Delaware corporation, 4000 Warner Boulevard, Burbank, CA 91522 ("WBEI"), WBDI assigned to WBEI all of its distribution and exploitation rights in and to the Picture in perpetuity.

14.     Pursuant to a general inter company agreement dated as of April 1, 2003, between WBEI and Warner Bros. Pictures International, a division of Warner Bros. Distributing Inc., formerly a division of Warner Bros. Pictures Inc. ("International"), WBEI assigned to International the distribution and exploitation rights in the Picture throughout the universe in perpetuity.

15.     Under a general distribution agreement dated December 1, 2003 between International and Warner Bros. France S.A., a corporation organized under the laws of France, having an office at 115-123 avenue Charles De Gaulle, 92525 Neuilly sur Seine Cedex, France ("WBF"), the license to distribute the Picture for the territory of Metropolitan France (including Corsica), Andorra, Monaco, Algeria, Tunisia, Morocco, Mauritius, Madagascar, Haiti, Comores Island, Martinique, Guadeloupe, French Guiana, Reunion, French Polynesia, New Caledonia, Vanuatu (formerly New Hebrides), Wallis and Futuna Islands, and French Austral and Antarctic Lands and Djibouti; and ships and aircraft flying the French flag but not traveling to or from the United States as the political borders of each exist; and all diplomatic posts and camps, bases, installations and reservations of the military forces of France, for a period of one year from delivery of the positive print, was granted by International to WBF.

   The foregoing statement has been read to the appearer; he ratified the contents thereof in my presence under oath.

WARNER BROS. PICTURES INTERNATIONAL, A DIVISION OF WARNER BROS. DISTRIBUTING INC.

Damon B. Bonesteel
Vice President

Subscribed and sworn to before me this 12th day of June 2006.

Notary Public

CAROL F. TILTON
Commission # 1448186
Notary Public - California
Los Angeles County
My Comm. Expires Oct 28, 2007

EXHIBIT 7-113
ER 663

DC 00160

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 119 of 328

REPUBLIQUE FRANCAISE

_____

**CENTRE NATIONAL DE LA CINEMATOGRAPHIE**

_____

CONSERVATION DU
REGISTRE PUBLIC

_____

**Délivré à**

**WARNER BROS FRANCE**

**115/ 123 AVE CHARLES DE GAULLE**

**92525 NEUILLY SUR SEINE CEDEX**

Sur requête de WARNER BROS FRANCE

a été porté au registre des dépôts

le seize Juin 2006

l'acte n° 2006.7333 comportant 5 page(s) et

contenant les inscriptions :

**Numéro 2006.10600 sur l'oeuvre n°115721 dépôt n°12000**

RECU: La somme de **VINGT CINQ EUROS** réglée par :

Chèque n° 5905632 du 13/06/2006 sur BNP PARIBAS

N° 7221 du journal des perceptions

A Paris, le 16/06/2006

Le Conservateur du Registre Public
de la Cinématographie et de
l'Audiovisuel

Référence de l'acte : Titre SUPERMAN RETURNS
DISTRIBUTION                                                        En date du 12/06/2006
Bénéficiaire : WARNER BROS FRANCE Cédant : WARNER BROS PICTURES INTERNA

ROLE N°

000001

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL

EXHIBIT 7-114
ER 664
DC 00161

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 120 of 328

ETATS-UNIS D'AMERIQUE          )
ETAT DE CALIFORNIE             ) ss :
COMTE DE LOS ANGELES           )

Le 12 juin 2006, a comparu en personne par devant moi, Notaire Public soussigné, le nommé Damon B. BONESTEEL qui apparaît dans le présent acte au nom et pour le compte de WARNER BROS. PICTURES INTERNATIONAL, une division de Warner Bros. Distributing Inc., et en qualité de Vice-président Exécutif de ladite société, lequel a certifié par devant moi être dûment habilité à agir en tant que tel.

Le comparant a formulé par devant moi les déclarations suivantes en son âme et conscience :

1.    Jerome Siegel, décédé, anciennement ressortissant et résident américain, et Joseph Shuster, décédé, anciennement ressortissant canadien et résident américain (« Siegel et Shuster »), ont, vers l'année 1938, écrit et illustré des personnages et histoires originaux pour une bande dessinée intitulée « Superman ». Aux termes d'un Acte signé en date du 1er mars 1938, tel qu'il a été par la suite modifié et/ou reformulé (notamment le 22 septembre 1938, le 19 décembre 1939, le 19 mai 1948 et le 21 mai 1948), entre Siegel et Shuster, d'une part, et Detective Comics, Inc., 480 Lexington Avenue, New York, New York (« Detective »), d'autre part, Siegel et Shuster ont vendu et cédé à Detective l'ensemble de leurs droits, titres de propriété et intérêts respectifs afférents à ladite bande dessinée intitulée « Superman ». Par cet Acte, sous sa forme modifiée et/ou reformulée, Detective a acquis, pour l'essentiel, tous les droits, titres de propriété et intérêts afférents aux droits cinématographiques exclusifs, aux personnages, aux visuels et à l'intrigue de ladite bande dessinée (le « Concept Superman »).

2.    Suite à la fusion vers septembre 1946 de plusieurs sociétés d'édition, dont, pour l'essentiel, Detective, National Comics Publications, Inc., sise à New York (adresse réelle inconnue), est devenue la société mère de Detective. En vertu d'un Acte de cession en date du 24 février 1947, Detective a cédé à National Comics Publications, Inc. les droits sur le Concept Superman. Par cet Acte, National Comics Publications, Inc. a acquis tous les droits, titres de propriété et intérêts de Detective afférents au Concept Superman.

3.    Aux termes d'un Acte de cession et de consolidation en date du 20 janvier 1966, National Periodical Publications, Inc. est venue aux droits de National Comics Publications, Inc.. Par cet Acte, National Periodical Publications, Inc. est devenue le propriétaire de tous les droits, titres de propriété et intérêts afférents à Detective et, pour une partie essentielle, du Concept Superman.

4.    Suite à la fusion en 1966 de Kinney Parking Company et de National Cleaning Company, Steve Ross, décédé, a pris la direction d'une société connue sous le nom de Kinney National. Du fait de son établissement dans l'Etat de New York en novembre 1967, Kinney National est devenue KNS Publishing Company, Inc. (« KNS »). Suite à la fusion en 1968 de National Periodical Publications, Inc. et KNS, la société ainsi formée a conservé le nom de National Periodical Publications, Inc. National Periodical Publications, Inc. a acquis en 1969 Warner Bros. – Seven Arts, société de droit de l'Etat du Delaware, 666 Fifth Avenue, New York, New York. En 1972, National Periodical Publications, Inc. a cédé ses actifs ne relevant pas du monde du spectacle et est devenue membre du groupe Warner Communications Inc., société de droit de l'Etat du Delaware, 75 Rockefeller Plaza, New York, New York 10019

N° 2006- 10.600

ROLE N°
000002
CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE

EXHIBIT 7-115
ER 665
DC 00162

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 121 of 328

(« WCI »). Par ces acquisitions et fusions successives, WCI est devenue en 1972 la société mère de National Periodical Publications, Inc.

5.      Aux termes d'un Accord passé en date du 23 décembre 1975 entre Siegel et Shuster, c/o Edmund Preiss, chez Kane, Kessler, Proujansky, Priess & Permutt, d'une part, et WCI et ses filiales, dont National Periodical Publications, Inc., d'autre part, Siegel et Shuster ont reconnu et accepté que WCI était le propriétaire exclusif de tous les droits, titres de propriété et intérêts afférents au Concept Superman, y compris, notamment, les personnages, visuels et droits cinématographiques, dans le monde entier et à perpétuité. Par cet Accord, WCI possède les droits de production cinématographique, de distribution et annexes sur le Concept Superman, dans le monde entier et à perpétuité, y compris les copyrights et marques s'y rapportant.

6.      Vers août 1976, National Periodical Publications, Inc. est devenue DC Comics, Inc.. Aux termes d'un Acte de cession signé en date du 30 juin 1992 entre Detective, DC Comics, Inc., société venant aux droits de National Periodical Publications, Inc., 1700 Broadway, 3rd floor, New York, New York 10019, DC Comics étant une partnership de droit new-yorkais sise au 1700 Broadway, 3rd floor, New York, New York 10019 (« DC »), et Warner Bros. Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522, filiale de WCI (« Warner »), Detective a cédé à Warner l'ensemble de ses droits, titres de propriété et intérêts afférents, notamment, aux albums de bandes dessinées Superman, et Warner a, à son tour, cédé simultanément à DC l'ensemble de ses droits, titres de propriété et intérêts afférents auxdits biens, y compris, notamment tous les copyrights et reconductions, tous les droits dans le cadre de copyright, y compris le droit de préparer des oeuvres dérivées, toutes les versions desdits biens et tous les droits sur les biens sous-jacents.

7.      En vertu d'un Acte signé en date du 1er août 1992 entre Frank Shuster et Jean Shuster Peavy (héritiers de Joseph Shuster), d'une part, et DC, d'autre part, Shuster et Peavy ont cédé à perpétuité à DC tous les droits dans le cadre de tous copyrights, marques ou autres droits patrimoniaux sur toute oeuvre créée en tout ou partie par Joseph Shuster ou toute oeuvre tirée de celle-ci, y compris, notamment, le Concept Superman.

8.      Aux termes d'un Accord passé en date du 6 novembre 1999 entre DC et Warner Bros., une division de Time Warner Entertainment Company, L.P., société en commandite simple de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522 (« WB »), société venant aux droits de Warner, DC a consenti à WB, jusqu'au 31 décembre 2033 et dans le monde entier, une licence exclusive sur les droits de production cinématographique, de distribution et annexes sur le Concept Superman, y compris, notamment, les suites et remakes. Par cet Accord, Warner détient une licence exclusive de production, de distribution et d'exploitation de films, remakes et suites tirés du Concept Superman.

9.      En vertu d'un Acte signé en date du 19 octobre 2001 entre Joanne Siegel et Laura Siegel Larson (héritiers de Jerome Siegel), d'une part, et DC, d'autre part, Siegel et Larson ont cédé à DC l'ensemble de leurs droits sur les biens Superman et le Concept Superman pour l'essentiel.

10.     Aux termes d'un Acte signé en date du 1er juin 2004 entre Red Sun Productions Pty Limited, société australienne, Level 6, 116 Military Road, Neutral Bay, Australie (« RSP »), et Warner Bros. Pictures Inc., société de l'Etat du Delaware, 4000 Warner Boulevard,

ROLE N°

000063

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE

Monique
ROUZET LELIÈVRE
Expert - Traducteur
Agréé par la Cour
de Cassation
ANGLAIS

EXHIBIT 7-116
ER 666
DC 00163

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 122 of 328

Burbank, CA 91522 (« WBPI »), société venant aux droits de Warner, WBPI a engagé RSP pour produire, pour le compte de WBPI, un film cinématographique commercial tiré des biens Superman et du Concept Superman. Par cet Acte, RSP n'a conservé aucun droit sur le projet de film, l'ensemble de ces droits étant possédé, pendant toutes les phases de la production, par WBPI.

11.     En vertu d'un Acte signé en date du 20 juillet 2004, tel que modifié, entre WBPI et Danimal, Inc., intervenant pour les services de Dan Harris, ressortissant et résident américain, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, à l'attention de Todd Feldman, et Michael Dougherty, ressortissant et résident américain, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, à l'attention de Danny Greenberg (collectivement « les Auteurs »), les Auteurs ont écrit une première ébauche de scénario (le « Scénario N° 1 »), une seconde ébauche de scénario (le « Scénario N° 2 »), et plusieurs peaufinages (collectivement le « Scénario N° 3 ») intitulés « Red Sun » et tirés des biens Superman et du Concept Superman. Par cet Acte, les Auteurs ont cédés à WBPI l'ensemble de leurs droits, titres de propriété et intérêts afférents au Scénario N° 1, au Scénario N° 2 et au Scénario N° 3, en exclusivité, à perpétuité et dans le monde entier.

12.     WBPI a produit un long-métrage cinématographique intitulé « Superman Returns » et tiré des Scénarios N° 1 à 3 inclus (le « Film »). Le film a été enregistré sur bande en Australie au moyen d'une caméra Genesis à fins de transfert sur pellicule et la pellicule a été développée par Technicolor à Los Angeles en Californie.

13.     En vertu d'un accord général inter-sociétés signé en date du 1ᵉʳ avril 2003 entre WBPI, prédécesseur de Warner Bros. Distributing, Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, CA 91522 (« WBDI »), et Warner Bros. Entertainment Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522 (« WBEI »), WBDI a cédé à WBEI tous ses droits de distribution et d'exploitation sur le Film et ce, à perpétuité.

14.     Aux termes d'un accord général inter-sociétés signé en date du 1ᵉʳ avril 2003 entre WBEI et Warner Bros. Pictures International, une division de Warner Bros. Distributing Inc., ancienne division de Warner Bros. Pictures Inc. (« International »), WBEI a cédé à International les droits de distribution et d'exploitation du Film dans le monde entier et à perpétuité.

15.     Aux termes d'un accord général de distribution signé en date du 1er décembre 2003 entre International et Warner Bros. France S.A., société de droit français ayant ses bureaux au 115-123 avenue Charles de Gaulle, 92525 Neuilly sur Seine Cedex, France (« WBF »), une licence de distribution du Film sur le territoire de la France Métropolitaine (y compris la Corse), d'Andorre, de Monaco, de l'Algérie, de la Tunisie, du Maroc, de l'Ile Maurice, de Madagascar, de Haïti, des Comores, de la Martinique, de la Guadeloupe, de la Guyane Française, de la Réunion, de la Polynésie Française, de la Nouvelle Calédonie, de Vanuatu (anciennes Nouvelles Hébrides), de Wallis et Futuna, des Terres Australes et Antarctiques Françaises et Djibouti, et sur les navires et dans les avions battant pavillon français mais ne provenant pas ni n'étant à destination des Etats-Unis, en l'état de leurs frontières politiques actuelles, et dans tous les postes diplomatiques, camps, bases, installations et réserves des forces militaires de la France, a été accordée par International à WBF pour une durée d'un an à compter de la livraison de la copie positive.

ROLE N°

000004

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE

Monique
ROUZET LELIÈVRE
Expert - Traducteur
Agréé par la Cour
de Cassation

EXHIBIT 7-117
ER 667
DC 00164

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 123 of 328

La déclaration ci-dessus a été lue au comparant qui en a ratifié le contenu en ma présence sous la foi du serment.

WARNER BROS. PICTURES INTERNATIONAL, UNE DIVISION DE WARNER BROS. DISTRIBUTING INC.

(signature manuscrite)
Damon B. Bonesteel
Vice-président

Signé et déclaré sous serment par devant moi ce 12 juin 2006.

(signé) Carol F. TILTON
Notaire Public

| | |
|---|---|
| Sceau rond : | CAROL F. TILTON |
| Grand Sceau de | Charge N° 1448186 |
| l'Etat de Californie | Notaire Public - Californie |
| Eurêka | Comté de Los Angeles |
| | Ma Charge Expire le 28 octobre 2007 |



Pour traduction Certifiée Conforme

à l'original en langue *anglaise*

visé ne variétur sub n° *2006/420*

SOISY, le *15 juin 2006*

ROLE N°

000005

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL

EXHIBIT 7-118
ER 668
DC 00165

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 124 of 328



**WARNER BROS.**

**WARNER BROS. PICTURES FRANCE**

# DECLARATION

La société WARNER BROS. FRANCE, déclare que le film :

**SUPERMAN RETURNS**

sera exploité sous le titre français :

**SUPERMAN RETURNS**

Paris, le: 16/06/06

Lori Rault
Directrice Service Technique

*Céline Laborie
Service Technique*



ROLE N°

009006

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL

Une division de WARNER BROS. FRANCE
Société Anonyme au capital de 20.825.827 € - Siège Social : 115/123, Avenue Charles de Gaulle - 92525 NEUILLY SUR SEINE Cedex
RCS Nanterre B 320 623 846 - Siret 320 623 846 00070 - Code APE 921 C - N° TVA intracommunautaire : FR 53 320 623 846

EXHIBIT 7-119
ER 669
DC 00166

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 125 of 328

**REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL**
11, rue Galilée
75116 PARIS

## REQUETE D'INSCRIPTION

| | |
|---|---|
| Raison sociale du requérant<br>Adresse de correspondance | WARNER BROS France<br>115/123, avenue Charles De Gaulle<br>92525 Neuilly sur Seine Cedex |
| Personne à contacter | Céline LABORIE | Tél. : 01 72 25 10 93<br>Courriel : celine.laborie@warnerbros.com |

### Contrat signé le   12 / 06 / 2006

Entre :  WARNER BROS PICTURES INC. (USA)

Et :   WARNER BROS FRANCE

Contrat  en Anglais ☒     déposé en Version originale ☐          accompagné   d'une traduction jurée ☒
(affidavit)          en Espagnol ☐                                                                  d'un résumé          ☐

Objet : DISTRIBUTION

Valeurs :

## Œuvres ou Projets

| Numéro au R.P.C.A. ou au<br>Registre des Options | Titre |
|---|---|
| | **SUPERMAN RETURNS** |

Emoluments à prélever sur le compte client n°.....☐

A...Neuilly sur Seine., le  14/06/06..................

Nom et qualité      Céline LABORIE
                                Service technique

**WARNER BROS PICTURES FRANCE**
Une division de WARNER BROS. France
115/123, Avenue Charles de Gaulle
92525 NEUILLY-SUR-SEINE CEDEX
Tél. : 01 72 25 00 00
RCS Nanterre commercial
Siren 320 623 846

Celine LABORIE

EXHIBIT 7-120
ER 670
DC 00167

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 126 of 328

**REGISTRE PUBLIC
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL**
11, rue Galilée
75116 PARIS

**REQUETE D'IMMATRICULATION**

**FILMS ETRANGERS**

| | |
|---|---|
| Raison sociale du requérant<br>Adresse de correspondance | WARNER BROS France<br>115/123, avenue Charles De Gaulle<br>92525 Neuilly sur Seine Cedex |
| Personne à contacter | Céline LABORIE           Tél. : 01 72 25 10 93<br>Courriel : celine.laborie@warnerbros.com |

| Titre<br>de l'œuvre<br>(Sous-titre éventuel) | **SUPERMAN RETURNS** |
|---|---|

Titre original           …SUPERMAN RETURNS……………………………………………

Titre international        …SUPERMAN RETURNS……………………………………………

Producteur de
l'œuvre étrangère        …WARNER BROS PICTURES INC (USA)……………………………

**Caractéristiques**

Durée :…2……h………34….m………s          Fiction ☒   Documentaire ☐   Animation ☐

**CESSIONS DE DROITS D'AUTEUR A JOINDRE**

Si l'œuvre cinématographique est tirée d'une œuvre préexistante (roman, bande dessinée, pièce de théâtre), préciser le titre et le nom de l'auteur de cette œuvre :
………………………………………………………………………………………………………………………

| Auteurs | Qualité<br>(scénariste, dialoguiste, …) | Date de la cession<br>des droits d'auteur |
|---|---|---|
| Dan Harris | Scénariste | 20/07/2004 |
| Michael Dougherty | Scénariste | 20/07/2004 |
| | | |

Emoluments à prélever sur le compte client n°……☐      A…Neuilly sur Seine……., le …14 juin 2006……………………

Nom et qualité        LABORIE Céline
du signataire         Service technique

**WARNER BROS. PICTURES FRANCE**
Une division DE WARNER BROS. France
115/123, Avenue Charles de Gaulle
92525 NEUILLY-SUR-SEINE CEDEX
Tél. : 01 72 25 00 00
RCS Nanterre B 320 623 846
Siren 320 623 846
Cachet commercial

Réservé au service : Doublon : Lettre remise ☐     Lettre demandée ☐

**EXHIBIT 7-121**
**ER 671**
**DC 00168**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 127 of 328

1   WEISSMANN WOLFF BERGMAN
    COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    9665 Wilshire Boulevard, Ninth Floor
3   Beverly Hills, California 90212
    Telephone:  310-858-7888
4   Fax:        310-550-7191

5   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
6   866 United Nations Plaza
    New York, New York 10017
7   Telephone:  212-813-5900
    Fax:        212-813-5901

8
    PERKINS LAW OFFICE, P.C.
9   Patrick T. Perkins (Admitted *pro hac vice*)
    1711 Route 9D
10  Cold Spring, NY 10516
    Telephone: 845-265-2820
11  Fax:        845-265-2819

12  Attorneys for Defendants and Counterclaimant

13              UNITED STATES DISTRICT COURT
14      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

15  JOANNE SIEGEL and LAURA          )  Case Nos. CV 04-8400 SGL (RZx)
    SIEGEL LARSON,                   )            CV 04-8776 SGL (RZx)
16                                   )  Hon. Stephen G. Larson, U.S.D.J.
            Plaintiffs,              )
17                                   )
        vs.                          )  **DEFENDANTS' NOTICE OF**
18                                   )  **MOTION AND MOTION FOR**
    TIME WARNER INC., WARNER         )  **PARTIAL SUMMARY**
    COMMUNICATIONS INC.,             )  **JUDGMENT; MEMORANDUM OF**
19  WARNER BROS.                     )  **POINTS AND AUTHORITIES AND**
    ENTERTAINMENT INC.,              )  **SCHEDULES A & B IN SUPPORT**
20  WARNER BROS. TELEVISION          )  **THEREOF**
    PRODUCTION INC., DC COMICS,      )
21  and DOES 1-10,                   )  [Defendants' Local Rule 56.1
                                     )  Statement; Declarations of Michael
22          Defendants.              )  Bergman (2), Janice Cannon, Melinda
                                     )  Hage, Paul Levitz, Mark Rose, Jeff
23                                   )  Rovin, Julie Spencer and Exhibits
                                     )  Thereto; Notice of Lodging of Non-
24                                   )  Paper Exhibits; and [Proposed] Orders
                                     )  Filed Con-currently Herewith]
25                                   )
                                     )  Time:      10:00 a.m.
26                                   )  Date:      July 16, 2007
                                     )  Courtroom  1
27  AND RELATED COUNTERCLAIMS        )
                                     )
28

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 8-122
ER 672

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 128 of 328

II.   **AS A RESULT OF PLAINTIFFS' FAILURE TO TERMINATE CERTAIN COPYRIGHTED SUPERMAN AND SUPERBOY WORKS WITHIN THE TIMEFRAME AND IN THE MANNER REQUIRED BY THE COPYRIGHT ACT, DEFENDANTS REMAIN FREE TO USE THE UNTERMINATED WORKS OR THE ELEMENTS CONTAINED THEREIN WITHOUT THE NEED TO ACCOUNT TO PLAINTIFFS AND WITHOUT INFRINGING ANY OF THEIR COPYRIGHTS**

A.   **Summary of Argument**

In crafting the termination right included in the 1976 Act, Congress set out express parameters limiting the works that can be recaptured. Specifically, persons claiming to exercise the termination right *must* specify the effective date of the termination, and that effective date *must* fall within a set five-year window which is at least fifty-six years, but not more than sixty-one years, from the date the copyright was originally secured. 17 U.S.C. § 304(c)(3) & (4)(A). This copyright termination window is tantamount to a statute of limitations. As such, if any work falls outside the five-year window established by the effective date, it *cannot* be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability. Additionally, the Regulations adopted by the Register of Copyrights require that the terminating party identify in the notice "each work as to which the notice of termination applies." 37 C.F.R. § 210.10(b)(1)(ii). Failure to list a work in the notice of termination results in the copyright grant in any such work remaining intact.

*The Superman Notices*. The Superman Notices list an effective date of April 16, 1999. (Bergman Decl. Exhs. Z-DD, ¶ 4.) Accordingly, even assuming the validity of the Notices, Plaintiffs cannot recapture any work that was published prior to April 16, 1938; *i.e.* sixty-one years before the stated effective date. While *Action Comics No. 1*, which contained the first Superman *story,* was originally published on April 18, 1938 (Levitz Decl. ¶ 5), and is thus within this five-year

EXHIBIT 8-123
ER 673

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 129 of 328

window, at least two in-house announcements (identified in Schedule "A" hereto; *see also* Bergman Decl. Exhs. C, D) for that comic book, consisting of the cover image of that comic (*i.e.,* the "Announcements") were originally published prior to that date, and fall beyond the reach of Plaintiffs' Notices.   Moreover, neither the Announcements, nor the works in which they are contained, are identified in the Superman Notices as terminated works. (*Id.* Exhs. Z-DD.)   Therefore, Plaintiffs are not entitled to recapture any copyright grant in the Announcements, and Defendants remain free to use any and all copyrightable elements in the Announcements without liability to or recourse by Plaintiffs.

*The Superboy Notice.*   The Superboy Notice lists an effective date of November 17, 2004.  (Bergman Decl. Exh. FF, ¶ 4.)   Accordingly, no "Superboy" work originally published prior to November 17, 1943 – *i.e.,* sixty-one years before the effective date – is subject to recapture, even assuming the validity of the Notice.  The Non-Terminated Superboy Works (identified in Schedule "B" hereto; *see also, e.g.,* Bergman Decl. Exhs. E, K, L, N, O) – all of which contain aspects of Superman's childhood and youth – were originally published prior to November 17, 1943, and fall beyond the reach of the Notice.  Moreover, none of the Non-Terminated Superboy Works is identified in the *Superboy* Notice as a terminated work.  Therefore, Defendants retain the right to exploit each of the story elements in these works without infringing on any copyright interests Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

**B.    Termination Notice Requirements**

Among the conditions that must be satisfied in connection with the exercise of the termination right are (i) specification of "the effective date of termination," and (ii) identification of "the title . . . and the date copyright was originally secured in, each work to which the notice of termination applies."  17 U.S.C. § 304(c)(4)(A); 37 C.F.R. §§ 201.10(b)(ii) and (iv).

EXHIBIT 8-124
ER 674

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   The requirement that the effective date of termination be specified is

2   grounded in 17 U.S.C. § 304(c)(3), which provides:

3   Termination of the grant may be effected at any time

4   during a period of five years beginning at the end of fifty-

5   six years from the date copyright was originally secured,

6   or beginning on January 1, 1978, whichever is later.

7   17 U.S.C. § 304(c)(3). Section 304(c)(4)(A) further specifies that in order to effect

8   termination, the "notice shall state the effective date of the termination which shall

9   fall within the five-year period specified by [§ 304(c)(3)]." Section 304(c)(3)

10   operates such that the effective date of termination must be no later than 61 years

11   "from the date copyright was originally secured." 17 U.S.C. § 304(c)(4)(A).[22]

12   Section 304(c)(4)(B) provides that "[t]he [termination] notice shall comply

13   in form, content and manner of service, with requirements that the Register of

14   Copyrights shall prescribe by regulation." Those Regulations are set forth at 37

15   C.F.R. § 210.10 and provide, in relevant part, that "[a] notice of termination must

16   include a clear identification of . . . (iv) the effective date of termination." 37

17   C.F.R. § 210.10(b)(iv).

18   The Regulations also provide that "A notice of termination *must* include a

19   clear identification of each of the following: ¶ (ii) The title and the name of at least

20   one author of, and the date copyright was originally secured in, each work to which

21   the notice of termination applies; and, if possible and practicable, the original

22   copyright registration number." 37 C.F.R. § 210.10(b)(1)(ii) (emphasis supplied).

23   These requirements serve a number of important functions: They give notice to the

24   grantee of the specific works terminated; they establish the required fee for

25   recording the notice of copyright termination, which is based upon the number of

26   titles identified in the notice (37 C.F.R. § 201.3(c)(15)); and they provide a check

27

28   [22] The statute also requires that "the notice shall be served not less than two or more than ten years" before the effective date of termination. 17 U.S.C. § 304(c)(4)(A).

EXHIBIT 8-125
ER 675

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 131 of 328

1  against the "effective date," in that the timeliness of the termination notice as to

2  any identified work can be measured by reference to the date its copyright was

3  originally secured.

4  ## C.   Additional Factual Background: The Effective Dates and

5  ## Contents of the Termination Notices

6  ### 1.   The Superman Notices

7  The Superman Notices specify an effective date of April 16, 1999.[23]

8  (Bergman Decl. Exhs. Z-DD, ¶ 4.)  Applying the formula prescribed by statute, the

9  Notices are as a matter of law ineffective as to any Superman works for which

10  copyright was originally secured more than 61 years before that date – *i.e.*, prior to

11  April 16, 1938.  As noted above, the Announcements for the upcoming release of

12  *Action Comics No. 1* were published prior to April 16, 1938; specifically, in *More

13  Fun Comics No. 31* (published April 5, 1938) (*id.* Exh. C) and *Detective Comics

14  No. 15* (published April 10, 1938) (*id.* Exh. D).[24]  Moreover, the Notices fail to

15  identify in any manner the Announcements or the publications in which they were

16  contained.  (Bergman Decl. Exhs. Z-DD.)[25]

17  ### 2.   The Superboy Notice

18  The Superboy Notice lists an effective date of November 17, 2004.

19  (Bergman Decl. Exh. FF, ¶ 4.)  Applying the formula prescribed by statute, the

20

---

21  [23] The April 16, 1999 "effective date" of termination is a repeated focus of Plaintiffs' Superman Action.  *See, e.g.,* FASMC ¶¶ 44 & 45.

22  [24] As shown in Bergman Decl. Exhs. C and D, the Announcements depict the cover of

23  *Action Comics No. 1*, which contains the image of a fully-costumed Superman lifting an automobile over his head.

24  [25] The published appearance of Superman in comic books *prior to Action Comics No.

25  1* has long been recognized.  For example, the book "The Adventures of Superman Collecting," published by DC Comics in 1988, states that "Superman made his first

26  public appearance in the ad above, which was printed in New Adventure Comics shortly before the first issue of Action Comics (June 1938) was released."  (Bergman Decl. Exh.

27  HH.)  Similarly, the comic book industry's industry standard "blue book," the Overstreet Price Guide, has for many years noted the appearance of Superman in *More Fun Comics

28  No. 31*.  For instance, the 1996 edition of the Overstreet Price Guide, published a year before Plaintiffs served their Notices, describes *More Fun Comics No. 31* as "Has ad for Action #1." (*Id.* Exh. II.)

EXHIBIT 8-126
ER 676

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 132 of 328

1  Superboy Notice is ineffective as to any "Superboy" work for which copyright was

2  originally secured more than 61 years before that date − *i.e.*, prior to November 17,

3  1943.  The Non-Terminated Superboy Works (Schedule "B" hereto; *see also*

4  Bergman Decl. Exhs. E, K, L, N, O) − all of which contain aspects of Superman's

5  childhood and youth − were published prior to November 17, 1943.  Furthermore,

6  and as a necessary result of the "effective date" chosen by Plaintiffs, none of the

7  Non-Terminated Superboy Works is identified in the Superboy Notice as a

8  terminated work.  (Bergman Decl. Exh. FF.)

9      D.    <u>**Failure to Comply With the Time Periods Imposed By Section**</u>

10          <u>**304(c) and With the Regulations Promulgated Thereunder Results**</u>

11          <u>**in the Original Copyright Grants Remaining Intact**</u>

12      In explaining the statutory requirements of copyright termination, the

13  *Nimmer* treatise states as follows:

14          If the persons entitled to terminate a grant fail to serve a

15          proper termination notice within the required time, or

16          otherwise to comply with the required formalities, no

17          termination will occur by operation of the termination

18          provisions of the Copyright Act.  The grant will continue

19          in effect unless terminated by its own terms or for other

20          reasons, subject to attack for failure of consideration or

21          otherwise.

22  3 *Nimmer* § 11.09.  This conclusion is supported by long-standing legal principles

23  applicable to the interpretation and enforcement of statutory deadlines and

24  substantive administrative requirements.

25

26

27

28

EXHIBIT 8-127
ER 677

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 133 of 328

1.   **The "Effective Date" Provision of Section 304(c) Operates as a Statute of Limitations, Imposing an Absolute Limitation on Termination**

When, as part of a statutory right, Congress prescribes a specific time period within which a party may take legal action to enforce that right, the time period is effectively a statute of limitations. *Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co.*, 326 F.2d 575, 579 (9th Cir. 1964). Such time periods are absolute, and cannot be circumvented by a claim of "substantial compliance"; as the Supreme Court has noted, there is no such thing as "substantial compliance" when statutory deadlines are at issue. *United States v. Locke*, 471 U.S. 84, 101 (1985).

In *Locke*, owners of certain mining claims filed their "annual notice of intention to hold the claim" *on* December 31, 1980. 471 U.S. at 89-90. However, the relevant statute, 43 U.S.C. § 1744(a), provided that the filing occur *"prior to* December 31 of each year." 471 U.S. at 89. The mining claim owner asserted that because the filing was only one day late, there had been "substantial compliance" with the statutory requirements, an argument flatly rejected by the Supreme Court:

> The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle. If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have

EXHIBIT 8-128
ER 678

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 134 of 328

1      <u>any content, the deadline must be enforced.</u>  "Any less
2      rigid standard would risk encouraging a lax attitude
3      toward filing dates," *United States v. Boyle*, 469 U.S., at
4      249.  A filing deadline cannot be complied with,
5      substantially or otherwise, by filing late – even by one
6      day.
7 471 U.S. at 100-101(emphasis added).

8      The rule and rationale of *Locke* has been applied in a wide variety of

9 contexts.  In *Prussner v. United States*, 896 F.2d 218, 222 (7th Cir. 1990) (*en*

10 *banc*), the Seventh Circuit, sitting *en banc*, was called upon to decide whether

11 there had been substantial compliance with a Treasury regulation (26 C.F.R. § 20-

12 2032A-8(a)(3)) which required that "an election under this section is made by

13 attaching to a timely filed estate tax return [a recapture agreement]," where the

14 recapture agreement was filed four months late.  896 F.2d at 222.  Relying on

15 *Locke*, the full court held:

16      All fixed deadlines seem harsh because all can be missed
17      by a whisker – by a day [citing *Locke*] or for that matter
18      by an hour or a minute.  They are arbitrary by nature. . . .
19      The legal system lives on fixed deadlines; their
20      occasional harshness is redeemed by the clarity which
21      they impart to legal obligation.  "Deadlines are inherently
22      arbitrary; fixed dates, however, are often essential to
23      accomplish necessary results . . ."  *United State v. Boyle*,
24      469 U.S. 241, 249, 83 L.Ed.2d 622, 105 S.Ct. 687 (1985)
25      . . . There is no general judicial power to relieve from
26      deadlines fixed by legislatures or, as here, by agencies
27      exercising legislative-type powers.
28

EXHIBIT 8-129
ER 679

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 135 of 328

1  896 F.2d at 222-23, *accord Anin v. Reno*, 188 F.3d 1273, 1278 (11th Cir. 1999)

2  ("Congressional filing deadlines are given a literal reading by federal courts").

3      The rule in *Locke* has also been applied to the copyright statutes.  As noted

4  by the *Nimmer* treatise with respect to the deadline for renewal term copyright

5  applications, "[i]t has been held that a variance of even several days is fatal and

6  that the purported renewal is void to rescue the subject work from the public

7  domain, whether filed after expiration of the one year [in which the renewal

8  application may be filed] or prior to its initiation."  See 3 *Nimmer* § 9.05[b][1], at

9  9-44; *accord, Faulkner v. National Geographic Soc.*, 211 F. Supp. 2d 450 at and

10  n.81 (S.D.N.Y. 2002).

11      More recently, in *Metro-Goldwyn-Mayer Studios, Inc. v. Peters*, 309 F.

12  Supp. 2d 48 (D.D.C. 2004), *aff'd* 2005 U.S. App. LEXIS 5664 (D.C. Cir. Apr. 8,

13  2005), the court was called on to decide whether a claim for statutory royalties that

14  arrived at the Copyright Office on August 1st – *one day late* – nonetheless

15  "substantially complied" with 17 U.S.C. § 111(d)(4)(A), which required that such

16  claims be filed "[d]uring the month of July in each year."  309 F. Supp. 2d at 60.

17  The court held there was no compliance, substantial or otherwise, stating that "[a]

18  claim received after July 31 is plainly and simply late." *Id.* at 61.  The court

19  explained its ruling by observing that "[t]hese longstanding deadlines operate with

20  a conditional grace period," and quoted *Locke* for the proposition that "if the

21  concept [of a deadline] is to have any meaning, the deadline must be enforced."

22  *Id.*

23      The holding of *Locke* and its progeny apply with equal force here.  The

24  specification of the "effective date" of termination, in conjunction with the time

25  limits imposed by 17 U.S.C. § 304(c)(3), establishes a 61-year deadline beyond

26  which works simply are not subject to termination.

27

28

EXHIBIT 8-130
ER 680

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 136 of 328

2.      **Failure to Identify Any Allegedly Terminated Works in the Notices Results in the Copyrights Grants to Those Works Remaining in Effect**

As discussed above, in 17 U.S.C. § 304(c)(4)(B) Congress directed the Register of Copyrights "to prescribe" regulations setting forth the "requirements" for the "form, content and manner of service" to be included in all copyright notices of termination.  Those Regulations require, *inter alia*, that the notice include "[t]he title and name of at least one author, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number . . . ." 37 C.F.R. § 201.10(b)(1)(ii).  The failure to specify "each work to which the notice of termination applies" results in the copyright grant in any such work remaining intact. *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982).

*Burroughs* involved the attempt of the heirs of the author of stories featuring the character "Tarzan" to exercise their right of termination pursuant to Section 304(c).  683 F.2d 610.  In that case, however, although plaintiffs' notice of termination listed and covered the first Tarzan story, "Tarzan of the Apes," it did not list five of the later Tarzan books.  Because of this failure to comply with the Regulations, the Second Circuit held that the plaintiffs' notice of termination was not effective as to those unlisted titles, and that defendant was free to continue unfettered use of the Tarzan character as originally delineated.  As explained by the Court:

> While we do not suggest that the omission of the five
> titles affected the efficacy of the notice to terminate the
> interest of ERB, Inc., in such titles as were listed, see 3
> Nimmer on Copyright § 11.06(B), at 11-40 n.33 (1981),
> it did leave ERB, Inc.'s interest in those five books, all of

EXHIBIT 8-131
ER 681

1    which feature "Tarzan," intact . . . *We conclude,*

2    *therefore, that the heirs' incomplete notice left ERB, Inc.,*

3    *with license to use and exploit the character Tarzan.*

4  *Id.* at 622 (emphasis added). That is, *even if* the copyrightable content in works not

5  included in a notice of copyright termination *is* contained in other works that *have*

6  *been* properly terminated, the original grantees retain the right to use the

7  unterminated works pursuant to the terms of the original grant. *Id.*

8    **E.      DC Retains the Unfettered Right to Use All Copyrightable**

9          **Elements in the Superman and Superboy Works That Have Not**

10         **Been Terminated**

11         Under the principles enunciated above, DC and its licensees continue to

12  have the right to use the copyrightable elements contained in the Announcements

13  without the need to account to Plaintiffs and, with respect to Superboy, continue to

14  have the right to use the copyrightable elements contained in the Non-Terminated

15  Superboy Works without infringing any Superboy copyrights purportedly

16  recaptured by Plaintiffs.

17         As noted above, the cover of *Action Comics No. 1* (Bergman Decl. Exh. E) –

18  depicting the familiar image of Superman lifting a car over his head – was

19  published *before* the initial publication of the comic book in at least two comic

20  magazines cover-dated May 1938.[26] Because those magazines, namely *More Fun*

21  *Comics No. 31* (*id.* Exh. C) and *Detective Comics No. 15* (*id.* Exh. D), were

22  published more than 61 years prior to the "effective date" specified in the

23  Superman Notices, and because they were not identified in the Notices, the

24  Announcements for *Action Comics No. 1* and Superman contained in those

25  publications have not been terminated or recaptured. As a result, the

26

27  [26] A third announcement showing the cover of *Action Comics No. 1* was contained in
    the May 1938 issue of *New Adventure Comics No. 26*, believed to have been published
28  on April 8, 1938. (Bergman Decl. Exh. JJ.) Defendants have thus far been unable to
    locate the copyright certificate for this magazine.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

EXHIBIT 8-132
ER 682

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 137 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 138 of 328

1   Announcements, and Defendants' right to use any of the copyrightable elements

2   contained therein, remain unaffected by the Plaintiffs' Notices. *Burroughs*, 683

3   F.2d at 622.  That is, DC and its licensees retain the unfettered right to use the

4   content of the Announcements without the need to account to Plaintiffs.

5       With respect to *Superboy*, Plaintiffs have not, and could not, terminate any

6   grants in the Non-Terminated Superboy Works, the original publication date of

7   each of which was well before the November 17, 1943 reach of the Superboy

8   Notice (*see* Schedule "B" and Bergman Decl. Exhs. E, K, L, N, O), and none of

9   which was listed in the Notice (Bergman Decl. Exh. FF).  Accordingly, DC and its

10  licensees retain the right to use all story elements contained in the Non-Terminated

11  Superboy Works regarding Superman's youth without infringing on any exclusive

12  copyright interests Plaintiffs claim to have recaptured by virtue of the Superboy

13  Notice.

14  **F.**   **Any Attempt By Plaintiffs to Invoke the "Harmless Error" Rule**

15       **With Respect to the Timing and Content of the Notices Must Fail**

16       Plaintiffs might attempt to argue that under the Register of Copyright's

17  Regulation that "[h]armless errors in a notice that do not materially affect the

18  adequacy of the information required to serve the purposes of . . . Section 304(c) . .

19  . shall not render the notice invalid" (37 C.F.R. § 201.10(e)), the Court may

20  overlook the statutory deficiencies in the Notices.[27]  However, to do so would

21  contradict the plain language of the Copyright Act as well as the express content of

22  the Regulations themselves.  Indeed, any attempt to avoid the very specific

23  deadlines and limitations imposed by the termination statute would destroy the

24

25

---

26  [27] While Plaintiffs might try to argue "harmless error" in connection with the
    Announcements, which fall just days outside the reach of the Superman Notices, any
27  attempt to establish a "grace period" would merely place one on a slippery slope. The
    various unterminated works fall anywhere from six days to over four years outside the
28  statutory termination window.  There is no basis for arbitrarily deciding that six days late
    is not late, but that six months late is.

EXHIBIT 8-13
ER 683

1 balance Congress created to protect the rights of *all* who are affected by

2 termination – publishers as well as authors.[28]

3     First, the "effective date" requirement – and therefore the maximum

4 allowable reach of a termination notice – is a condition embodied in the statute

5 itself, and accordingly cannot be modified or ignored through administrative

6 construction. *Chevron U.S.A. Inc. v. National Resources Defense Council*, 467

7 U.S. 837, 843, n.9 (1984) ("the judiciary" as "the final authority on issues of

8 statutory construction . . . must reject administrative constructions which are

9 contrary to clear congressional intent."). Accordingly, a regulation cannot control

10 if it is inconsistent with the statutory language. *See United States v. Haggar*

11 *Apparel Co.*, 526 U.S. 380, 392 (1999). Indeed, if "Congress has directly spoken

12 to the precise question at issue," then "that is the end of the matter; for the court, as

13 well as the agency, must give effect to the unambiguously expressed intent of

14 Congress." *Chevron*, 467 U.S. at 842-843.

15     Second, statutory filing deadlines affecting the existence and ownership of

16 copyright are sacrosanct and immutable in the absence of any statement by

17 Congress to the contrary. *See Faulkner*, 211 F. Supp. 2d at 464 (collecting cases)

18 ("rule" that  failure to file application for renewal copyright within statutory

19 deadline "resulted in work entering public domain" is "undeniably strict"). Here,

20 Congress has not made any suggestion to the contrary; indeed, it has expressly

21 stated the opposite:  Section 304(c) is plain and unambiguous – copyright

22 termination *cannot* apply to works for which copyright has been obtained more

23 than 61 years prior to the effective date. Indeed, the regulatory task given to the

24 Register of Copyrights was clearly limited to regulating the "form, content, and

---

[28] The 1976 Act's unique 20-year drafting process has given its legislative history special status in its interpretation. *See Sony Corp.*, 464 U.S. at 462 n.9; *see also Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989). That legislative history emphasizes that the statutory provisions were not written as a one-way street, but were carefully crafted as "a practical compromise," H. Rep. at 124; S. Rep. at 108, to protect not just authors' families but also "publishers, film producers and other users" of their work. Supp. Reg. Rep. at 72.

EXHIBIT 8-134
ER 684

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 139 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 140 of 328

1   manner of service" of notices of termination served pursuant to the Copyright Act;

2   it did not reach the time in which such notices could be served.  17 U.S.C.

3   § 304(c)(4)(B).[29]

4       Third, the "harmless error" regulation is directed only at attempts to "render

5   the notice invalid."  37 C.F.R. § 201.10(e).  Defendants here do not rely upon

6   Plaintiffs' failure to timely terminate and failure to list the Announcements and the

7   Non-Terminated Superboy Works to render any portion of the Notices "invalid."

8   The question here does not concern *the validity* but only the *effect* of the Notices as

9   written and served; namely that Plaintiffs cannot recapture the copyrights to those

10   untimely and unlisted works.  Indeed, as shown above in *Burroughs*, the Second

11   Circuit expressly held that the "omission" of works from the termination notice did

12   not affect the "efficacy" of *the notice* as it related to *the listed works*.  *Burroughs*,

13   683 F.2d at 622.[30]

14       Finally, the Court should recognize that Plaintiffs' selection of April 16,

15   1999 as the effective date of the Superman Notices was calculated.  Plaintiffs had

16   the benefit of knowledgeable and astute counsel,[31] who designated the April 16,

17   1999 date for the dual purpose of (i) capturing *Action Comics No.1*[32] and (ii)

18   maximizing the number of additional "Superman" works that would be within the

19   five-year termination window.[33]  Thus, there was no "harmless error" – Plaintiffs'

20

21   [29] Indeed, mistakes in designating the effective date are not included among the Copyright Office's specific examples of "harmless errors" in 37 C.F.R. § 201.10(e)(2).

22   [30] Accordingly, such an omission also does not qualify as a "harmless error" that does

23   "not materially affect the adequacy of the information required to serve the purposes of section 304(c)."  37 C.F.R. § 210.10(e)(1).

24   [31] Their counsel at the time, Arthur Levine of the Washington DC law firm Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., is a highly regarded copyright law

25   expert, a former General Counsel of the U.S. Copyright Office and was Executive Director of CONTU, the National Commission on New Technological Uses of

26   Copyrighted Works.  (Bergman Decl. Exh. KK.)

27   [32] The termination date was chosen with the April 18, 1938 publication date of *Action Comics No. 1* firmly in mind.  The last "effective date" of termination that would capture

28   that work was April 18, 1999.  Plaintiffs specified April 16, 1999 as the "effective date" of termination – giving themselves two days to spare.

EXHIBIT 8-135
ER 685

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 141 of 328

1   designation of the "effective date" of termination was deliberate and carefully

2   selected to take advantage of the choice Congress decided to give to authors and

3   their families.[34]

4          Thus, Plaintiffs cannot use the "harmless error" regulation to extend the

5   reach of the Superman Notices to the Announcements.

6          **G.     Relief Requested**

7          Defendants therefore request an Order determining that DC and its licensees

8   are entitled to continue using all of the copyrightable elements contained in the

9   Announcements without the need to account to or share with Plaintiffs any of the

10  profits generated from such use, and that DC and its licensees are entitled to use all

11  of the story elements contained in the Non-Terminated Superboy Works without

12  infringing on any of the copyright rights Plaintiffs claim to have recaptured by

13  virtue of the Superboy Notice.

14

15

16

17

18

---

19  [33] Plaintiffs contend (and Defendants dispute) that *every* published Superman work within the five-year window defined by Section 304(c) (*i.e.* from 56-61 years prior to the
20  "effective date") is "recaptured" through the termination notices. Accordingly, Plaintiffs chose a date as close as possible to April 18, 1999 in the belief that this would allow
21  them, without serving any later notices, to recapture copyright rights in the maximum number of Superman works. This is illustrated by the allegations of Plaintiffs' complaint,
22  which in addition to claiming to have terminated and recaptured *Action Comics No. 1*, also claims to have terminated and recaptured all other *Action Comics* issues through no.
23  61, which was published on April 13, 1943 – and falling just within the 5-year window established by the designated effective date. (FASMC ¶39.)

24  [34] The choice of the effective date for the Superboy Notice likewise was not random. Virtually all of the "terminated works" identified in the Superboy Notice had previously
25  been identified as "terminated works" in the Superman Notices. However, when Plaintiffs decided to try to segregate Superboy from Superman on the theory that they
26  could claim a 100% copyright interest in Superboy while they could claim at most a 50% copyright interest in Superman, they had to serve a new and separate notice.
27  Accordingly, the Superboy Notice was served in November, 2002. Since Section 304(c) requires that a termination notice be served a minimum of two years prior to the
28  designated effective date, the Superboy Notice could not have had an effective date prior to November, 2004.

EXHIBIT 8-136
ER 686

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 142 of 328

2.     That DC and its licensees are entitled to continue using all of the copyrightable elements contained in the Announcements without the need to account to or share with Plaintiffs any of the profits generated from such use, and that DC and its licensees are entitled to use all of the story elements contained in the Non-Terminated Superboy Works without infringing on any of the copyright rights Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

<u>In the Superboy Action</u>

3.     That the post-termination episodes of *Smallville* do not infringe upon Plaintiffs' recaptured copyrights in the Submissions, and dismissing Plaintiffs' First Claim for Relief for copyright infringement and Fifth Claim for Relief for injunction in the Superboy Action, insofar as those claims relate to *Smallville*.

<u>In the Superman Action</u>

4.     That Plaintiffs cannot establish that TWI and WBEI are the alter egos of DC, and dismissing the First through Fifth Claims for Relief in the First Amended Complaint as against defendants TWI and WBEI.

DATED:     April 30, 2007     Respectfully submitted,

WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL, LLP

-and-

FROSS ZELNICK LEHRMAN ZISSU, PC

-and-

PERKINS LAW OFFICE, PLC

By _Michael Bergman_
    Michael Bergman
Attorneys for Defendants

EXHIBIT 8-137
ER 687

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 143 of 328

478 9545092

## Schedule A

## Unterminated "Superman" Works

| Title | Copyright Reg. No. | Publication Date |
|---|---|---|
| More Fun Comics no. 31 | B258595 | 04-05-38 |
| Detective Comics no. 15 | B379783 | 04-10-38 |
| All other "Superman" Works published prior to 04-16-38 | | |

## Schedule B

## Exemplary Unterminated "Superboy" Works

| Title | Copyright Reg. No. | Publication Date |
|---|---|---|
| Action Comics no. 1 | B379787 | 04-18-38 |
| Superman Daily Strip no. 1 | KF55490 | 01-16-39 |
| Superman Daily Strip no. 2 | KF55491 | 01-17-39 |
| Superman Daily Strip no. 3 | KF55492 | 01-18-39 |
| Superman Daily Strip no. 4 | KF55493 | 01-19-39 |
| Superman Daily Strip no. 5 | KF55494 | 01-20-39 |
| Superman Daily Strip no. 6 | KF55495 | 01-21-39 |
| Superman Daily Strip no. 7 | KF55496 | 01-23-39 |
| Superman Daily Strip no. 8 | KF55497 | 01-24-39 |
| Superman Daily Strip no. 9 | KF55498 | 01-25-39 |
| Superman Daily Strip no. 10 | KF55499 | 01-26-39 |
| Superman Daily Strip no. 11 | KF55500 | 01-27-39 |
| Superman Daily Strip no. 12 | KF55501 | 01-28-39 |
| Superman no. 1 | AA299871 | 05-18-39 |
| Superman Sunday Strip #1 | A132561 | 11-05-39 |
| The Saturday Evening Post | B501000 | 06-04-41 |
| Superman Sunday Strip #135 | A131596 | 05-31-42 |
| Superman (by George Lowther) | A168596 | 11-02-42 |
| All other "Superboy" works published prior to November 17, 1943 | | |

EXHIBIT 8-138
ER 688

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 144 of 328

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California  90212
4   Telephone:  310-858-7888
    Fax:           310-550-7191
5   Email:        mbergman@wwllp.com

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   866 United Nations Plaza
    New York, New York  10017
8   Telephone:  212-813-5900
    Fax:           212-813-5901
9
    PERKINS LAW OFFICE, P.C.
10  Patrick T. Perkins (Admitted *pro hac vice*)
    1711 Route 9D
11  Cold Spring, NY  10516
    Telephone:  845-265-2820
12  Fax:           845-265-2819

13  Attorneys for Defendants and Counterclaimant

14              UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
15

16  JOANNE SIEGEL and LAURA          )   Case No. CV 04-8776 SGL (RZx)
    SIEGEL LARSON,                   )
17                                   )   Hon. Stephen G. Larson, U.S.D.J.
                  Plaintiffs,        )
18                                   )   **DEFENDANTS' REPLY IN**
            vs.                      )   **SUPPORT OF MOTION FOR**
19                                   )   **PARTIAL SUMMARY**
    TIME WARNER INC., WARNER         )   **JUDGMENT**
    COMMUNICATIONS INC., WARNER      )
20  BROS. ENTERTAINMENT INC.,        )   Time:      10:00 a.m.
    WARNER BROS. TELEVISION          )   Date:      July 23, 2007
21  PRODUCTION INC., DC COMICS,      )   Place:     Courtroom  1
    and DOES 1-10,                   )
22                                   )
                  Defendants.        )
23                                   )
                                     )
24                                   )
                                     )
25                                   )
                                     )
26                                   )
                                     )
27  ─────────────────────────────── )
    AND RELATED COUNTERCLAIMS        )
28                                   )

EXHIBIT 9-139
ER 689

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 145 of 328

1   announcements.  This tactic clearly violates both the rules of evidence, as well as

2   the minimum requirements for expert testimony set forth in *Daubert.*

3        Meanwhile, in his declaration, Steranko launches into a rebuttal of certain

4   assertions about the contents of the Announcements made by Defendants' expert

5   Jeff Rovin in his expert report.  (Steranko Decl. ¶¶ 30-41.)  However, neither the

6   Rovin Report, nor the allegations addressed by Steranko in paragraphs 30-41 of

7   his declaration, were put into evidence on this motion by Defendants.  As a

8   result, Steranko's entire discussion is irrelevant to Defendants' motion for

9   summary judgment.  Thus, the Steranko Declaration, paragraphs 30-41, should

10  also be stricken as a violation of Fed. R. Evid. 402.

11  **III.   PLAINTIFFS HAVE FAILED TO RAISE A GENUINE**

12  **MATERIAL ISSUE OF FACT AS TO DEFENDANTS'**

13  **CONTINUING RIGHTS TO USE THE WORKS NOT**

14  **COVERED BY THEIR NOTICES OF TERMINATION**

15       Plaintiffs' only response to Defendants' motion to dismiss all claims

16  pertaining to the Superman and Superboy works not covered by their termination

17  notices is to contest the accuracy of the publication dates listed in the U.S.

18  copyright registrations for two Superman works.  Plaintiffs do not dispute –

19  indeed, they concede – the correctness of Defendants' presentation of the law

20  governing the timeliness and contents of such notices of termination.

21       More specifically, Plaintiffs' broadly worded pleadings, alleging that they

22  are entitled to a 50% share in the profits from all post-termination exploitation of

23  pre-1978 Superman works, also seek to cover any Superman works (a) that were

24  copyrighted before April 16, 1938, the earliest recapture date the statute allows,

25  given the April 16, 1999 effective date of the Superman Notices, and (b) that

26  were not identified in such notices (the "Unterminated Superman Works").

27  (FASMC (Bergman Decl. Exh. <u>EE</u>), ¶¶ 58(c), 66-73.)  But in their opposition,

28  Plaintiffs acknowledge that the Superman Notices could not affect Defendants'

EXHIBIT 9-140
ER 690

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 146 of 328

1    rights to continue to exploit such works if Plaintiffs did not comply with the

2    statutory requirements as to their timeliness and contents.

3        Plaintiffs' broadly worded claims in the Superboy Action similarly seek to

4    envelop Superboy works that the Superboy Notice cannot reach.  (*See, e.g.,*

5    FASBC (Bergman Decl. Exh. GG), ¶¶ 46-51.)  Under its November 17, 2004

6    effective date Plaintiffs through the Superboy Notice are only entitled to

7    recapture copyright rights in (i) works that were copyrighted before November

8    17, 1943 and (ii) works identified in such Notice.  Plaintiffs' opposition not only

9    concedes that the failure to timely serve and list in the Superboy Notice certain

10   Superboy copyrighted works (the previously defined "Non-terminated Superboy

11   Works") leaves Defendants with the right to continue their use of such works, it

12   goes further, not disputing *any* facts, including the Non-Terminated Superboy

13   Works identified in Schedule B to Defendants moving memorandum.

## A.    Additional Legal Background

15       Detective's various comic books discussed below, such as *Detective*

16   *Comics*, *Action Comics* and *More Fun Comics*, were published monthly and

17   typically included a series of different features devoted to the exploits of different

18   characters written by different authors.  *See, e.g. Action Comics No. 1* and *More*

19   *Fun Comics No. 101* featuring Superman, Chuck Dawson, Tex Thomson, the

20   Green Arrow, and other stories.  (Bergman Decl. Exhs. E, M.)  As indicated by

21   the letter "B" in the copyright registration numbers for these comic book issues

22   (*see e.g., id.* Exh. M), under section 5 of the 1909 Act, comic magazines

23   appearing monthly or at other regular intervals fell within the registration

24   category of "periodicals, including newspapers." 17 U.S.C. § 5 (repealed)

25   Periodicals of this nature were considered to be then, as they are today, collective

26   works in which the copyright in the collective work as a whole was owned by the

27   magazine proprietor, *see* 17 U.S.C. § 3 (repealed), while the copyright for each

28   individual contribution was owned by its author.  *See New York Times Co. v.*

EXHIBIT 9-141
ER 691

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 147 of 328

1  *Tasini,* 533 U.S. 483, 493 (2001) (explaining nature of collective works).  A

2  contribution to a collective work such as monthly magazine was afforded

3  separate copyright protection if originally created and separately owned by the

4  author. *See id.,* definition of "collective work."  As explained in the 1976

5  Copyright Act legislative history, the 1976 statute did not change the rights of the

6  collective work owner under the 1909 Act. H.R. Rep. No. 94-1476, 94th Cong.

7  2d Sess. (1976) ("H. Rep.") at 122.  These rights included not only ownership of

8  the publication as a whole but also ownership of individual contributions when

9  these were "written for hire by employees," as well as of "those copyrighted

10  contributions that have been transferred in writing to the owner by their authors,"

11  such as the Superman strips transferred in the March 1938 Grant by Siegel and

12  Shuster to Detective. *Id.*

**B.    Plaintiffs' Opposition Concedes That The Superboy Notice Did**
**Not Cover The Non-Terminated Superboy Works**

15  Plaintiffs have not challenged any facts or contested the legal

16  consequences, and thereby admit, that none of Defendants' rights to use any pre-

17  November 17, 1943 Superboy works have been terminated.  These include but

18  are not limited to the examples enumerated in Schedule B to Defendants' moving

19  memorandum. This means that irrespective of the effectiveness, if any, of the

20  Superboy Notice as to the Superboy Works listed therein, Defendants' rights to

21  use such unterminated Superboy material can continue to be freely exercised by

22  Detective's successors in interest, including in any episodes of *Smallville* or other

23  projects produced after November 17, 2004.  Accordingly, summary judgment to

24  this effect is now in order.

25

26

27

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 148 of 328

**C.   Plaintiffs Also Cannot Avoid The Consequences of Failure to Timely Terminate DC's Rights In the Superman Works Not Covered by Their Termination Notices**

With regard to Superman, Plaintiffs have sought to avoid the consequences of their failure to terminate Detective's contributions to two other comic books that were published outside of the window.  (*See* Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Defs. Mem.") at 29-32).  These contributions were the promotional Announcements that appeared in *More Fun Comics No. 31* covered by Copyright Registration No. B 258595 (showing a publication date of April 5, 1938) and *Detective Comics No. 15*, covered by Copyright Registration No. B 379783 (showing a publication date of April 10, 1938).  Both publications are cover dated "May 1938" (Bergman Decl. Exhs. C, D), whereas *Action Comics No. 1* is cover-date "June 1938" – one month later (*id*. Exh. E).

Although Plaintiffs make arguments about whether the statute's timing and content requirements for termination notices should apply with respect to the unterminated Superman works, they nowhere contest the purpose behind these provisions or what they provide.  (Defs. Mem. at 43-56.)  It is thus undisputed that as part of the legislative compromise embodied in the termination provisions, Congress laid down precise rules for the timing and content of notices of termination.  Since Plaintiffs' termination notices speak for themselves, there is no dispute about (i) "the effective dates of termination" specified by Plaintiffs and (ii) the "title . . . and the date copyright was originally secured in each work" to which these notices apply.  17 U.S.C. § 304(c)(4)(A).  There is also no dispute that these notices could not apply to grants of rights in works for which copyright was originally secured more than 61 years before such specified effective dates.

Nor is there any dispute that the two specific Unterminated "Superman" Works listed in Schedule A to Defendants' moving memorandum are not listed in

EXHIBIT 9-148
ER 693

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 149 of 328

1   Plaintiffs' notices of termination and that because such works were copyrighted[12]

2   before the dates to which such termination notices could apply, they cannot be

3   subject to termination under such notices.  (*See* Pl. Mem. at 43-44.)

4          As Plaintiffs who are seeking to alter the status quo and establish the

5   effectiveness of their recapture of rights under copyright, Plaintiffs bear the

6   burden of proof on such issues at trial.  *See, e.g., Three Boys Music*, 212 F.3d at

7   481 (setting forth elements a copyright infringement plaintiff must prove).

8   Defendants as movants have proffered undisputed evidence "negating an

9   essential element of the non moving party's claim" and showing that Plaintiffs do

10  "not have enough evidence to carry [their] burden of persuasion at trial." *Nissam*

11  *Fire & Marine Ins. Co. v. Fritz Cos., Inc.* 210 F.3d 1099, 1106 (9th Cir. 2000).

12  The negated or missing elements are the timeliness and necessary contents of

13  Plaintiffs' Superman Notices.  As a result, the burden on a summary judgment

14  motion "shifts to the non moving party to establish, beyond the pleadings, that

15  there is a genuine issue for trial" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

16  (1986).  To do this here, Plaintiffs must set forth by affidavit or as otherwise

17  provided in Rule 56 (e) "specific facts showing that there is a genuine issue for

18  trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Furthermore,

19  "the burden on the non-movant . . . increases where the factual context makes the

20  non-moving party's claim implausible . . . [and] mere disagreement or the bald

21  that a genuine issue of material facts exists" is insufficient. *Harper v. Wallinford*,

22  877 F.2d 728, 731 (9th Cir. 1989).  "If the evidence is merely colorable . . . or is

23  not significantly probative summary judgment may be granted." *Anderson*, 477

24  U.S. at 249-50.

25          Under these circumstances, Plaintiffs had to do more than sit back and

26  theoretically question Defendants' publication-date evidence; they had to come

27

28  [12] Under the 1909 Copyright Act, copyright could be secured for a work by "publication thereof with the notice required," 17 U.S.C. § 10, or for an unpublished work by its registration. *Id.* § 12.

EXHIBIT 9-144
ER 694

DEFENDANTS' REPLY IN SUPPORT OF  MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 150 of 328

1    forward themselves with contrary evidence.  *See Berkla v. Corel Corp.*, 66 F.

2    Supp. 1129, 1139 (E.D. Cal. 1999) (no inferences may be drawn in favor of non

3    movant without a factual predicate to base them on).  As noted, the only factual

4    issue Plaintiffs seek to raise concerning the application of the conceded rules is

5    whether these two Superman advertisements were published on April 5 and 10,

6    respectively, the dates shown in their copyright registrations.  As shown below,

7    instead of coming forward with contrary evidence, Plaintiffs' efforts to escape the

8    limitations of their termination notices consist only of demonstrably irrelevant

9    and inaccurate legal arguments unsupported by any relevant, admissible evidence

10   to contradict Defendants' proofs.  Defendants' principal tactic in these efforts, as

11   elsewhere in opposing summary judgment, is to keep as far away from the

12   dispositive statutory provisions as possible, while firing up every irrelevant,

13   distracting assertion imaginable, having nothing to do with the grounds and

14   substantive point of Defendants' motion.

15       **1.    Detective Had the Right to Publish The Pre April 16, 1938**

16            **Superman Promotional Announcements and Did So**

17       Plaintiffs' first argument is, to say the least, not entirely clear, complaining

18   that Defendants illegally "plucked" or "ripped" from Siegel and Shuster's joint

19   work a portion for publication in two comic books other than *Action Comics No.*

20   *1*.  (Pl. Mem. 44-45.)  Plaintiffs seem to be saying that because the Superman

21   strips arguably created by Siegel and Shuster in 1933 were joint works,

22   Detective, to whom they both transferred their entire copyright rights on March 1,

23   1938, was legally prohibited from using only a portion of such works as it wished

24   to prepare and publish the two advertisements it contributed to *More Fun Comics*

25   *No. 31* and *Detective Comics No. 15* before *Action Comics No. 1* was published

26   on April 16, 1938.[13]

27

28   _____

[13] Plaintiffs' description of the image accompanying the text used in these earlier comic books to promote *Action Comics No. 1* is in any event inaccurate.  The image appearing on the cover of *Action Comics No. 1* and in the Announcements is not the

31

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 9-145
ER 695

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 151 of 328

EXHIBIT 9-146
ER 696

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 152 of 328

1   There is no legal basis cited for this non sequitur.  Since Detective was the

2   copyright owner of the entirety of the copyright in the Superman strips purchased

3   in the March 1938 Grant, it is self-evident that on and after March 1, 1938, it was

4   empowered to exercise all of the rights afforded to a copyright owner in

5   Copyright Act, including the right "to prepare derivative works based upon the

6   copyrighted work." 17 U.S.C. § 106 (2).  It could therefore publish all or any part

7   of this material as it wished, irrespective of how many individuals were involved

8   in its authorship.  Plaintiffs themselves acknowledge that Siegel and Shuster had

9   every right to sell the undivided whole of their joint copyright rights (Pl. Mem. at

10  37), and did so.  The manner of authorship of a work and resulting joint

11  ownership has nothing to do with the way in which an assignee may exploit the

12  work.  (Pl. Mem. at 36).

13  Plaintiffs confusingly sum up their joint work argument by challenging

14  Detective's right almost 70 years ago to "assert a separate competing copyright in

15  the *Action Comics No. 1* cover" (Pl. Mem. at 45.)  It is nowhere explained what

16  "competing copyright" means – competing with whom and in what way?  But the

17  issue raised by Defendants' motion is not whether there is any "competing

18  copyright" but whether two particular Superman works and other Superboy

19  works were not terminated.  As noted above, as undisputed copyright owner of

20  all rights in any Siegel and Shuster material from March 1, 1938 forward,

21  Detective was therefore free to adapt and publish all or any parts of the Superman

22  materials it bought in any way it chose.  Detective could have decided to split up

23  the material for publication in two or three installments, publish portions to

24  promote its new Superman feature or just sell posters of certain images.[14]

25

26  same as any inside story panel of *Action Comics No. 1*, though it resembles panel no. 67 at page 9 of the strip. (*Compare* Bergman Decl. Exhs. C, D with E.)

27  [14] We address below Plaintiffs' word game in trying to portray inaccurately these advertisements, which we refer to as the "Announcements" and which appeared in

28  nationally *published* comic books, as unpublished works because of the "in-house announcements" nomenclature used once in our moving memorandum. (Defs. Mem. at 30.)  As explained in the Reply Declaration of DC's President, Paul Levitz ("Levitz

32

EXHIBIT 9-147
ER 697

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Finally, section 304 (c)'s termination right is expressly directed at "any

2   copyright subsisting in either its first or renewal term on January 1, 1978." It is

3   this provision that determines whether there is a pre-1978 existing work subject

4   to termination.  In other words, for the purposes of termination it is when

5   copyrightable material is <u>copyrighted</u>, either published with notice under section

6   10 of the 1909 Act or registered as an unpublished work under section 12, that

7   determines when the work that can be terminated, and <u>not</u> when such works are

8   <u>created</u>.  In the case of the Superman Announcements, there is no dispute that

9   these were contributions to collective works, the comic magazines that included

10  them, and that their copyright registrations provide their publication dates on

11  April 5 and April 10, 1938.  Indeed, the copyright indicia in both publications

12  *appears on the same page as the Superman Announcements therein.*  As shown

13  below, beyond general expressions of disbelief, Plaintiffs have failed to place

14  before the court any evidence showing any different publication dates.

15  **2.   Whether or Not The Promotional Announcements Were**

16  **"Derivative Works" Based Upon the Superman Material**

17  **in *Action Comics No. 1* is Irrelevant.**

18  Plaintiffs' second argument (Pl. Mem. at 46), entirely misses the point of

19  Defendants' motion.  Plaintiffs appear to believe that they can "rescue" the

20  unterminated Announcements – graphical depictions of Superman in his iconic

21  costume demonstrating his supernatural strength – by claiming that they are

22  "derivative works" based upon the previously created but subsequently

23  copyrighted *Action Comics No. 1*.  Even accepting Plaintiffs' factual assertion as

24

25  Reply Decl."), the term "house ad" (or, as used by Defendants' counsel in its moving brief, "house Announcement") is one used at DC and other comic book publishers to

26  signify an ad appearing in an earlier comic book issue to promote the same publisher's upcoming feature in another comic book. (Levitz Reply Decl. ¶ 2.)  More importantly

27  here, without regard to such terminology, Plaintiffs (i) do not deny that these ads, artwork and text, appeared as pictured in Bergman Decl. Exhs. <u>C</u> and <u>D</u> in editions that

28  were placed on sale to the general public, (ii) cannot honestly dispute the dates of publication stated in the publications' copyright registration certificates, and (iii) have come forward with no evidence to the contrary on either point.

EXHIBIT 9-148
ER 698

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 154 of 328

1   true, it does not change the fact that the Announcements are separate copyrighted

2   works that Plaintiffs have failed to terminate.

3       Plaintiffs attempt to mislead the Court by relying upon the unremarkable

4   and undisputed proposition that the copyright protection afforded to the author of

5   a derivative work does not extend to the pre existing material but only to the

6   newly added material. 17 U.S.C. § 103(b).  However, this is a red herring because

7   at the time these advertisements were created and published, they as well as all of

8   the other pre-existing Superman materials created by Siegel or Shuster before

9   March 1, 1938 were indisputably owned by DC's predecessor.  (Bergman Decl.

10  Exh. <u>B</u> (March 1, 1938 Assignment).) Thus, even if the Announcements were

11  considered derivative works, there was no division of ownership between the pre-

12  existing and new material.

13      Regardless of whether the Announcements are derivative works,

14  Defendants' point on its motion is that when a grant of rights in a work, such as

15  the Superman cover illustrations used to accompany the promotional text in the

16  Unterminated Superman Works, is one not subject to termination (*inter alia*

17  because the termination notice was not timely served in the statutory window),

18  the consequence is that the original grantee or its successors *may continue to use*

19  *all the contents of that work* under the terms of the original grant.  That the

20  unterminated work may be a derivative work is entirely irrelevant.  There is no

21  serious dispute that the Announcements represent the *first* Superman depiction

22  protected by statutory copyright, which obtained copyright protection *before*

23  April 16, 1938, the earliest possible date covered by the Superman Notices.  17

24  U.S.C. § 304(c)(4)(A).

25      Moreover, Plaintiffs' derivative work argument has already been rejected.

26  In *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982),

27  the Court held that even if the copyright rights granted in 1923 by the author to

28  ERB, Inc. for the original Tarzan story was terminated, the omission from the

EXHIBIT 9-149
ER 699

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 155 of 328

1  notice of termination of five later Tarzan titles left intact the grantee's rights to

2  use such works, including to use Tarzan's original delineation protected by the

3  author's copyright in the pre-existing original story which was identified in the

4  termination notice:

5           If we assume with plaintiffs that Tarzan as a character would

6           have been copyrightable in his first appearance and not

7           thereafter, we must nevertheless disagree with them as to the

8           sufficiency of their notice of termination. *When an author*

9           *grants the rights to a work that contains material protected by*

10          *the author's copyright in an earlier work, the grant implicitly*

11          *authorized the use of all material contained in the licensed*

12          *work, including material that may be covered by the author's*

13          *other[prior] copyrights.*  Thus, had Burroughs in his 1923

14          contract with ERB, Inc., listed only the Surviving Five titles,

15          his conveyance of the rights to those titles would implicitly

16          have authorized ERB, Inc., to use and exploit all material in

17          those titles, including the character Tarzan which was central

18          to each of those books.  The heirs' notice of termination did

19          not mention the Surviving Five, and stated merely that the

20          grant of renewal copyrights in the other works listed was

21          thereby terminated.  Since the heirs' omission of the five

22          works, while undoubtedly inadvertent, must be characterized

23          as voluntary, we do not see the rights with which ERB, Inc.

24          was thereby left in these five books as differing from the

25          rights ERB, Inc., would have had if the 1923 grant from

26          Burroughs to ERB, Inc., had listed only the Surviving Five.

27 683 F.2d at 622 (emphasis added).

28         This holding is dispositive here.  Because Plaintiffs' efforts to distinguish

EXHIBIT 9-150

ER 700

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 156 of 328

1  and avoid it are based upon demonstrably inaccurate statements about the facts of

2  both *Burroughs* and the present case, they only confirm the significance to the

3  present case of the Second Circuit's holding.  First, despite Plaintiffs' use of

4  italics, it is not true that the five unterminated Tarzan books not listed in the

5  Burroughs' heirs termination notice *"had been assigned in the grant."* (emphasis

6  in original). (Pl. Mem. at 52.)  In *Burroughs*, Edgar Rice Burroughs' grant in

7  question was one he made on April 2, 1923.  683 F.2d at 618.  The five Tarzan

8  titles omitted from his heir's notice of termination, referred to therein as the

9  "Surviving Five" titles, were *The Son of Tarzan; Tarzan, Lord of the Jungle;*

10  *Tarzan, Guard of the Jungle, The Tarzan Twins; and Tarzan and the Ant Men. Id.*

11  Although the Second Circuit's opinion does not state whether such five titles

12  were included in the 1923 grant, the date of the creation of four of these works, as

13  evidenced by Burroughs' biography (Declaration of James D. Weinberger

14  ("Weinberger Decl."), Exh. A) and one title's cover (Bergman Reply Decl. Exh.

15  VV), shows that each was created after April 2, 1923 so that, in fact, they could

16  not have been the subject of the 1923 grant.  Second, Plaintiffs are equally

17  incorrect in asserting that the Announcements "were not works conveyed in the

18  March 1, 1938 Grant" to Detective (Pl. Mem. at 52).  It is undisputed that the

19  March 1, 1938 grant to Detective encompassed all then existing rights under

20  copyright in the Superman character. (Bergman Decl. Exh. B.)

21          In sum, insofar as its holding with respect to derivative works is

22  concerned, *Burroughs* and the instant case are on all fours:  in *Burroughs*, as

23  here, the operative facts are that an author's grant of rights to use a derivative

24  work[15] implicitly authorized the use of material from a pre existing work with the

25  legal consequence that a termination only reaching the original work in which the

26

27

---

[15] Plaintiffs also do not claim, as they cannot almost 70 years after the publication of the pre-*Action Comics No. 1* Announcements, that these were published without authorization by Siegel and Shuster.

28

EXHIBIT 9-151
ER 701

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 157 of 328

1    character appeared, without termination of the rights in the derivative work, left

2    the grantee's rights to use the contents of the terminated works fully intact.

3          **3.    Plaintiffs' Arguments That the Publications of the**

4                **Announcements "Did Not Divest" The Copyright**

5                **Protection for *Action Comics No. 1* are Confused and Also**

6                **Have Nothing To Do With This Case**

7          **a.    The 1909 Act limited publication**

8                **doctrine is irrelevant**

9          Contrary to Plaintiffs' assertions (Pl. Mem. at 46-48), Defendants have not

10   contended that the publication of the Announcements before the April 16, 1938

11   on-sale date of *Action Comics No. 1* and failure of Plaintiffs to terminate DC's

12   rights in these works "divested" any copyright protection for any work.  The two

13   comic books in which these ads were published as well as *Action Comics No. 1*

14   all contained the required copyright notice (Bergman Decl. Exhs. C, D), and the

15   registrations for these works were all timely and duly secured and renewed. (*Id.*

16   *See also* Weinberger Decl. Exhs. B, C.)  On the contrary, Defendants maintain

17   that the copyrights for these works will endure for their full 95 year term of

18   protection.  17 U.S.C. § 304(b).

19         Nor is any "partial divestiture" theory (Pl. Mem. 48) – whatever that

20   means – involved.  What Defendants actually contend is that because of the

21   failure to terminate the rights granted to DC's predecessor, they may continue to

22   exploit the material in the Superman Announcements notwithstanding Plaintiffs'

23   service of the Superman Notices.  Plaintiffs failed to terminate because they did

24   not identify these works in the Superman Notices which were also served too late

25   to terminate them, even if they had been identified therein.  Plaintiffs have

26   twisted this contention beyond recognition in order to try to raise a question

27   about the publication dates for these Announcements.

28         Where the opposing party to a summary judgment motion comes forward

**EXHIBIT 9-152**
**ER 702**

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  with proof of its claims "[t]he evidence of the opposing party is to be believed . . .

2  and all reasonable inferences that may be drawn from the facts placed before the

3  court must be drawn in favor of the opposing party." *Berkla*, 66 F. Supp. 2d at

4  1139 (citations omitted).  But "inferences are not to be drawn out of thin air and

5  it is the opposing party's obligation to produce a factual predicate from which the

6  inference may be drawn." *Id.*  Accordingly, Plaintiffs must do more than have

7  their counsel express doubts about Defendants' evidence of the publication dates.

8       Instead of meeting their obligation, to cite relevant facts, Plaintiffs have

9  tried to divert the Court's attention with citations to irrelevant cases involving the

10  so-called "limited publication" doctrine.  (Pl. Mem. at 47-48.)  As explained by

11  Nimmer, under the 1909 Act,

12       [i]n order to mitigate the occasionally harsh rule that

13       publication divests common law rights, the courts evolved a

14       distinction between a "general publication" and a "limited

15       publication."

16       *         *         *

17       A limited publication has been held to be a publication "which

18       communicates the contents of a manuscript to a definitely

19       selected group and for a limited purpose, without the right of

20       diffusion, reproduction, distribution or sale."  Thus, if an author

21       distributes copies of his work to a circle of immediate friends

22       with the express or implied understanding that such copies will

23       not be duplicated or circulated, this is a limited publication.  On

24       the other hand, distribution to retailers for ultimate distribution

25       to the general public in itself constitutes a general, not a limited,

26       publication.

27  1 *Nimmer* § 4.13[A] (citations omitted); *Academy of Motion Picture Arts &*

28  *Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451-52 (9th Cir.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 158 of 328

1   1991) ("The distinction between general and limited publication reflects an

2   attempt by the courts to mitigate the harsh forfeiture effects of a divesting general

3   publication."). The harsh rule was due to the 1909 Act copyright notice

4   requirement. While unpublished, a work was protected under the common law

5   unless it was registered for protection under federal law as an unpublished work.

6   17 U.S.C. § 12 (repealed). Common law protection was lost upon publication

7   when federal copyright protection became available if the work was published

8   with the required copyright notice affixed. 17 U.S.C. § 10 (repealed); *Academy*

9   *of Motion Pictures* 944 F.2d at 1451-52. Section 26 provided that publication

10  occurred "when copies of the first authorized edition were placed on sale, sold, or

11  publicly distributed by the proprietor of copyright or under his authority." 17

12  U.S.C. § 26 (repealed); *see Academy of Motion Pictures*, 944 F.2d at 1452 ("A

13  general publication occurs when a work is made available to members of the

14  public regardless of who they are or what they will do with it"). The danger for

15  authors was that if the work was published without the required notice, it went

16  into the public domain. *Id.*

17      The 1909 Act limited publication caselaw Plaintiffs rely upon does not

18  address the question of when the comic books at issue here were published but

19  deals with preventing an author's common law work from inadvertently falling

20  into the public domain due to *the omission of the required copyright notice* upon

21  publication. These cases and other similar decisions represent one of the kind of

22  situations in which the copyright notice was likely to be omitted inadvertently

23  before a work was placed on sale, namely, where before the on-sale date the work

24  or portions of it were depicted in promotional materials or when product samples

25  were given away to promote orders.

26      The limited publication cases are completely inapposite here. First, no

27  omission of copyright notice or loss of protection is involved. In addition, the

28  other comic books, *More Fun Comics No. 31* and *Detective Comics No. 15*, like

EXHIBIT 9-154
ER 704

39

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 159 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 160 of 328

1   *Action Comics No. 1*, were collective works.  Although the Superman

2   Announcements were contributions to these comic magazines, the comic books

3   themselves were not advertising materials; they were periodicals containing a

4   series of illustrated comic book stories that also included some ads.  (Bergman

5   Decl. Exhs. <u>C</u>, <u>D</u>.)

6       Insofar as their publication is concerned, based on the admissible and

7   probative evidence there can also be no genuinely disputed issue that the comic

8   books in which the Announcements appeared were placed on sale on the dates of

9   first publication set forth in their original and renewal term registrations.  Nor is

10   there any dispute that these books were nationally distributed, and thus not

11   directed to a definitely selected group and for a limited purpose.  Section 209 of

12   the 1909 Act provided that the original term registration "certificate shall be

13   admitted in any court as prima facie evidence of the facts stated therein,"

14   including of "the date of publication" 17 U.S.C. § 209 (repealed).[16]  Furthermore,

15   under the 1909 Act such *prima facie* effect did not, unlike the rule pertaining to

16   works created after January 1, 1978 under the 1976 Act,[17] depend on when the

17   registration was obtained in relation to the date of publication.  *See 3 Nimmer* §

18   12.11 [A] ("The significant difference between these two provisions [1909 Act

19   section 209 and 1976 Act section 410 (c)] is that the *prima facie* effect of a

20   registration was achieved under the 1909 Act whenever registration occurred

21   whereas, under the current Act, it is limited to those registrations that occurred

22   before, or within five years after, first publication of the work" [footnote and

23

24

---

25   [16] Although renewal certificates were not originally accorded such prima facie
    evidentiary status, *see Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737,
    745 (2d Cir. 1975), in 1992 Congress added to the current 1976 Copyright Act section

26   304(a)(4)(B) which provides that the registration of a renewal term copyright within
    one year before expiration of a 1909 Act work's original term of protection will today

27   also give the certificate of renewal registration *prima facie* evidentiary effect as to the
    facts stated therein.  17 U.S.C. § 304(a)(4)(B).

28   [17] For 1976 Act works the registration must be made within 5 years of first
    publication.  17 U.S.C. § 410(c).

EXHIBIT 9-155
ER 705

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 161 of 328

1    citations omitted]).[18]

2          Plaintiffs do not challenge, nor could they almost 70 years later, the fact

3    that Detective published these Announcements in the two comic books at issue.

4    Nor can they contest the purpose of the Announcements as evidenced by their

5    contents to promote the sales of a "brand new" future comic book feature.  (*See*

6    Berman Decl. Exhs. C, D.)  Given such text and its purpose, it would be counter-

7    intuitive to suggest they were published after *Action Comics No. 1* was published.

8    Plaintiffs' inaccurate claim that the Unterminated Superman Works were only

9    made available in a limited publication fails to deal with these facts and the

10   above-noted direct evidence of the dates of publication of these comic books. [19]

              **b.      Plaintiffs' bald assertions that Defendants' copies of**

11                      **copyright registrations do not constitute**

12                      **"authenticated" proof that the Unterminated**

13                      **Superman Works were published on the dates set**

14                      **forth therein fail to create a genuine issue for trial.**

15

16         Plaintiffs' further attempt to conjure up a genuine issue of material fact on

17   the ground that the copies of copyright registrations previously submitted are not

18   authenticated (Pl. Mem. at 48) is just silly.  Apparently, the point of Plaintiffs'

19   objection is to have a trial on whether copies can be obtained from the U.S.

20   Copyright Office – a waste of party and judicial resources.  In any event, to deal

21   with this surprise contention, Defendants have now obtained and submit certified

22   copies of these registrations by the U.S. Copyright Office.  (Weinberger Decl.

23   Exhs. B, C.)  Second, the photocopies comprising the Defendants' initial exhibits

24

25   [18] While Congress could alter the pre-1992 rule adding *prima facie* evidentiary
     effect to renewal registrations, it could not have changed the 1909 Act rule giving such
26   evidentiary effect to all original term registrations without engaging in an
     unconstitutional "taking."  *See Roth v. Pritikin*, 710 F.2d 934, 939-40 (2d. Cir. 1983).

27   [19] If, on the other hand, as Plaintiffs without offering any proof, contend, *More Fun
     Comics No. 31* and *Detective Comics No. 15* were not generally published when they
28   went on sale, then as unpublished works not registered under section 12 of the 1909 Act
     they would not be copyrighted works subject to termination at all under section 304(c).

Exhibit 04 (2)-156
ER 706

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 162 of 328

1   in question (Bergman Decl. Exhs. C and D), are business records of DC and its

2   predecessors, consisting of true copies of these copyright registrations kept in the

3   ordinary course of its business.  (Levitz Reply Decl. ¶ 3.)  The copies submitted

4   are reproductions of the Bates stamped documents in question produced in

5   discovery from DC's files.  If, as we assume, Plaintiffs are not objecting to the

6   reliability of Defendants' photocopy machines, *see* Fed. R. Evid. 1003, but

7   instead to the fact that these records are not copies of registrations from the U.S.

8   Copyright Office, then DC's file copies of these documents are admissible in

9   their own right for these reasons: (i) they are admissible business records, Fed R.

10  Evid. 803 (6); (ii) they are true copies of ancient documents, Fed. R. Evid.

11  901(8); and (iii) they are copies of material from comic books bearing the volume

12  numbers and publication dates that qualify as "printed material purporting to be

13  newspapers or periodicals," Fed. R. Evid. 902(b).[20]

14                  **4.     Plaintiffs' Additional Objections to The Use of a 1909 Act**

15                          **Renewal Copyright Registration and the Date of Issue of**

16                          **an Original Term Registration Are Without Merit**

17          Plaintiffs' objections to the admissibility of the 1909 Copyright Act

18  registrations on the grounds that (a) no copy of the original term registration for

19  *Detective Comics No. 15* has been attached as an exhibit,[21] and (b) that the

20  original term registration for *More Fun Comics No. 31* was applied for and

21

22          [20] If the absence of evidence of a renewal registration for *More Fun Comics No. 31*
    means as Plaintiffs suggest that this periodical "would be in the public domain," then
23  such fact would only be another dead end for Plaintiffs, providing a further basis for the
    Court to rule that DC can continue to freely use its contents, including the Superman ad
24  printed therein, notwithstanding the Superman Notices.  This, for two reasons: anyone
    is free to use public domain material, and the termination right provided in Section
25  304(c) only applies to any "copyright subsisting in either its first or renewal term on
    January 1, 1978."  Under the 1909 Act only works published with the required
26  copyright notice or works unpublished but registered would have been subsisting in
    their first or renewal terms of statutory copyright protection.  17 U.S.C. §§ 10 and 12
27  (repealed).  The same would be true of any similar Superman ad appearing in *New
    Adventure Comics No. 26* which Defendants believe to have been published on April 8,
28  1938.  *See* Defs. Mem. at 38, n.26.

        [21] It now has been.  (Weinberger Decl. Exh. B.)

EXHIBIT 9-157
ER 707

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   secured "not on or around the time of such publication" but "over 27 years later"

2   are either made in ignorance or are vexatious.  As noted above, since 1992 under

3   section 304(c)(4)(B) of the 1976 statute, such renewal certificates now constitute

4   *prima facie* evidence themselves of the facts stated therein, including the date of

5   publication of this periodical.  A copy of the original term registration would

6   therefore only be duplicative evidence of the publication date.  The date of

7   issuance of an original term registration under the 1909 Act is similarly

8   irrelevant.  In *Washingtonian Publishing Co. v. Pearson,* 306 U.S. 30 (1939), the

9   Supreme Court held that once a copyright was secured by publication with proper

10   notice, the right to bring suit was not impaired by tardy deposit.  As explained in

11   Professor Latman's 1979 treatise, the *Washingtonian* doctrine became extended

12   so that "registration could be made at any time during the first term of copyright,

13   since a 27-year delay was excused." Alan Latman, *The Copyright Law* (BNA 5th

14   Ed. 1979) at 153 (citing *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161

15   F.2d 406 (2d Cir. 1946)).[22]

16     As for Plaintiffs' attempt to fabricate a fact issue as to the actual

17   publication date of *More Fun Comics No. 31 and Detective Comics No. 15* by

18   relying upon the purported "expert" testimony of Mark Evanier, as set forth in

19   Section II.B, *supra*, that testimony is inadmissible. Mr. Evanier: (1) did not

20   identify this topic in either of his expert reports, (2) did not establish his expertise

21   in the area of comic book publication practices; and (3) is not old enough to be a

---

[22] The Reply Declaration of DC's President now makes expressly clear what was previously indicated by its attorney's annexations as exhibits of copies of its document production, namely, that this and all of the other DC copies of copyright registrations came from its regularly kept business records, copies of which were produced to Plaintiffs in discovery. (Levitz Reply Decl. ¶ 3.) Plaintiffs' suggestion that the "original registration number appears to have been altered at some point" in the renewal certificate for *Detective Comics No. 15* is just another pointless and unfounded attempt to avoid the facts and consequences of Plaintiffs' own termination notices. On its face the Copyright Office's handwritten clerical change in the classification letter in the original registration number from "C" to "B" to signify the category "periodicals including newspapers," 17 U.S.C. § 5(b) (Bergman Decl. Exh. D), has nothing to do with the registration number or other information stated therein. And a certified copy of the original term registration, now submitted as Weinberger Decl. Exh. B, confirms the accuracy of this copy of the renewal registration.

43

EXHIBIT 9-158
ER 708

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   fact witness.  In any event, other than claiming that comic book publication dates

2   are notably unreliable, Evanier offers no testimony that *More Fun Comics No. 31*

3   *and Detective Comics No. 15* were published on any day other than that listed in

4   the copyright registrations.

5       **D.**    **Plaintiffs Have also Failed to Create Any Other**

6                      **_Genuine_ Material Fact Issues Pertaining to the**

7                      **Publication Dates or Contents of the Announcements**

8       Plaintiffs' even more belabored efforts to create fact issues with respect to

9   the following additional points are also without merit:

10      •   The issue is not whether the notices of termination were properly served

11         in the correct form and sufficiently clear in their wording to give

12         Defendants' fair notice of their contents (Pl. Mem. at 53), but whether

13         the notices could cover works it was too late to terminate and that were

14         omitted therefrom.

15      •   The question of what literary elements are contained in the

16         Announcements (Pl. Mem. at 50) misses the point of Defendants'

17         motion which only seeks to establish that they are outside of the

18         termination window.  In addition, any question about their contents is

19         most obviously answered by the ads which speak for themselves.

20         Notwithstanding Plaintiffs urging, *id.*, no special "lens" is required. For

21         now, however, the Court is only being asked to rule that Defendants'

22         rights to use these works (and their contents) have not been terminated.

23      •   Plaintiffs also cannot escape the consequences of failing to terminate

24         DC's rights to use the content of the Announcements by their counsel's

25         labeling them "obscure."  The undeniable facts are that the

26         Announcements took place before *Action Comics No. 1* was published,

27         that they existed and that they had to be identified in a timely served

28         notice of termination.  Under the circumstances, they are not subject to

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 164 of 328

**EXHIBIT 9-159**

44

**ER 709**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 165 of 328

1    recapture.

2    • Plaintiffs' claim that the existence of the promotional Announcements

3      was so "obscure" they could not be known or discovered (Pl. Mem. at

4      53) is irrelevant under the statute and flatly belied by their own conduct

5      in serving termination notices concerning Siegel's grants of copyright

6      to Detective with respect to another of his comic book characters,

7      "Spectre."  On November 20, 1998, Plaintiffs also served on

8      Defendants three Notices of Termination with respect to pre-1978

9      grants of copyright to this character, identifying in that notice not only

10     the myriad Spectre comic books which feature Spectre's adventures *but*

11     *also the one panel ad promoting Spectre's coming appearance a month*

12     *later in his first comic book story.* (Bergman Reply Decl. Exhs. WW-

13     YY at 2 ("Spectre character appearing in costume in an ad in issue No.

14     51 of More Fun Comics, copyrighted November 28, 1939, as Copyright

15     Registration No. B437786, publication date January 1940"); Levitz

16     Decl. ¶ 3 & Exh. A (showing the Spectre ad).)  The Spectre Notices are

17     significant in several ways.  First, it is an admission (i) that these kind

18     of ads prepared in house, but published generally in Detective's

19     nationally distributed comic books, *i.e.*, not as a "limited publication,"

20     were indeed considered works that legally had to be identified if

21     Detective's copyrights in them were to be effectively terminated; (ii)

22     that these kinds of Announcements were not only discoverable but

23     actually known by Plaintiffs and their counsel; and (iii) that they were

24     not "literally impossible for Plaintiffs to have located" and not so

25     "obscure" as to be incapable of being discovered with a reasonable

26     effort.  (Pl. Mem. 53.)[23]  The Spectre evidence thus has legal and

27

28   _____

     [23] Indeed, this Spectre announcement is listed in the same Overstreet Price Guide that identifies the *More Fun Comics No. 31* Announcement.  (*See* Bergman Decl. Exh. II.)

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 9-160
ER 710

1    factual significance as an admission on each of these points.

2  • Plaintiffs do not deny and therefore admit that widely available basic

3    books in the comic book field, including the comic book industry

4    standard "blue book," cited in footnote 25 to Defendants moving

5    memorandum, noted the prior appearance of the Announcements.

6    Accordingly, their claims that the Announcements could not have been

7    discovered (Pl. Mem. at 53) lack credibility for that reason as well. [24]

8  • The legal consequences of the failure to identify the Announcements

9    cannot be circumvented by any arguments that they appeared only a

10   few days before the April 16, 1938 publication of *Action Comics No. 1*

11   or claims of harmless error.  Plaintiffs admit what the rules are and the

12   consequences of failures to adhere to them by arguing that they should

13   not be given "blind application" (Pl. Mem. at 47.)  Mistakes, or most

14   likely here, deliberate choices, in designating the effective date of a

15   termination notice, do no qualify as "harmless errors."  *(See* Def. Mem.

16   at 39-42.)  As previously noted, the law is clear that the kinds of precise

17   statutory deadlines set for the service and effective dates of termination

18   notices, are sacrosanct, do not allow exceptions and must be met. (*Id.* at

19   33-36),

20 • The harmless error provision of the Copyright Office regulations, 37

21   C.F.R. § 210.10(e) has no application to the timeliness of the notices.

22   By its express terms this regulation only pertains to "[h]armless errors

23   *in* a notice" and the "adequacy of *the information*" set forth therein, not

24   to the timeliness of meeting the statutory deadline.  (*See* Defs. Mem. at

25

26   [24] Plaintiffs cannot wash away the published evidence, the existence of which they
     do not deny, showing that such pre-introduction Announcements for Superman were
27   well known by repeating other persons' irrelevant and ambiguous published statements
     saying only that the first Superman story or debut was in *Action Comics No. 1* or that
28   *Action Comics No. 1* was "[t]he first appearance of Superman."  No one disputes that
     the first Superman comic book adventure story was in *Action Comics No. 1.* But this
     fact has nothing to do with when these ads appeared.

EXHIBIT 9-161
ER 711

46

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 166 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 167 of 328

40).  Plaintiffs do not dispute that the Superman Notices were served too late to terminate grants in any works whose copyrights were subsisting before April 16, 1938.  As also previously discussed (Defs. Mem. at 39-42), the "harmless error" regulation can not alter or detract from the plain language of the statute or be interpreted loosely to permit evasions of the express language it employs.  The "harmless error" regulation is only directed at attempts to render "*the notice* invalid," (emphasis added) which Plaintiffs themselves acknowledge is not the issue here.  *See Burroughs*, 658 F.2d at 683.

## IV.  PLAINTIFFS HAVE FAILED TO RAISE ANY GENUINE ISSUE OF MATERIAL FACT ON THEIR DEFECTIVE CLAIM OF COPYRIGHT INFRINGEMENT

By their copyright infringement claim, Plaintiffs seek, *inter alia*, to enjoin the Defendants from further exploiting each and every episode of *Smallville* created after November 17, 2004, the alleged effective date of the Superboy Notice.  In response to carefully tailored interrogatories, Plaintiffs identified only three specific works they claimed were infringed: (1) the Pitch Letter; (2) the Script; and (3) *More Fun Comics No. 101*[25] (collectively "Plaintiffs' Works"). (Bergman Decl. Exh. PP.)  Now, in an attempt to avoid summary judgment on their defective infringement claim, Plaintiffs are all over the place, misstating the identity of both the allegedly infringed Plaintiffs' Works and the allegedly infringing Defendants' works and doing everything else possible to avoid the substantial similarity test and comparison required to determine Defendants' motion.

---

[25] Solely for purposes of this motion, Defendants include *More Fun Comics No. 101* as among the works to which Plaintiffs may lay claim.  This is one of the clearly erroneous holdings of Judge Lew's Order that is the subject of Defendants' pending Motion for Reconsideration.  It is undisputed that *More Fun Comics No. 101* was not written by Jerry Siegel but rather was written by DC editor Whitney Ellsworth, according to newly produced testimony from the Westchester Action.  (Bergman Reply Exh. ZZ.)  Defendants maintain that the Findings from the Westchester Action are not

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 168 of 328

1    <u>In the Superman Action</u>

2        4.    That Plaintiffs cannot establish that TWI and WBEI are the alter

3    egos of DC, and dismissing the First through Fifth Claims for Relief in the

4    First Amended Complaint as against defendants TWI and WBEI.

5

6    DATED:   June 25, 2007         Respectfully submitted,

7                                WEISSMANN WOLFF BERGMAN
                                 COLEMAN GRODIN & EVALL, LLP

8                                FROSS ZELNICK LEHRMAN ZISSU, PC

9                                         -and-

10                               PERKINS LAW OFFICE, PLC

11

12                               By: _____

13                                   Michael Bergman
                                     Attorneys for Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 9-163
ER 713

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 169 of 328

Donna Josephson
Associate General Counsel

September 10, 2007

**WARNER BROS.
PICTURES INC.**

Canadian Audio-Visual Certification Office
100 Sparks Street, 4th Floor
Ottawa, Ontario K1A 0M5
 Canada

Re:   **"SUPERMAN RETURNS"**

Gentlepersons:

The undersigned, Donna L. Josephson, is a practicing member of the California State Bar and Associate General Counsel at Warner Bros. Pictures, a division of WB Studio Enterprises Inc. ("WB"), with its principal offices at 4000 Warner Boulevard, Burbank, California 91522, United States of America.

The following sets forth the chain-of-title with respect to the motion picture entitled "SUPERMAN RETURNS" (the "Picture"):

1.     Jerome Siegel and Joseph Shuster, both of whom are now deceased (collectively, "Authors"), wrote and illustrated original character and stories for a comic strip property ("Underlying Material") entitled "Superman" in or around 1938.  Pursuant to an Agreement dated as of March 1, 1938 (as amended and/or restated from time to time thereafter, including on September 22, 1938; December 19, 1939; May 19, 1948; and May 21, 1948), between Authors and Detective Comics, Inc. ("Detective"), Authors sold and transferred to Detective all of their respective right in and to the comic strip, including exclusive motion picture rights, the character, the artwork and the storyline contained therein (collectively, the "Superman Concept").

2.     Pursuant to a merger among several publishing companies, including Detective, in or around September 1946, National Comics Publications, Inc. ("National Comics") became the parent company of Detective, and National Comics acquired all of Detective's rights in and to the Superman Concept pursuant to an Assignment dated February 24, 1947 from Detective to National Comics.

3.     Pursuant to an Assignment and Consolidation Agreement dated January 20, 1966, National Periodical Publications, Inc. ("NPP") became successor-in-interest to National Comics, and thereby became owner of the Superman Concept.

4.     NPP acquired Warner Bros.-Seven Arts corporation, in 1969, and then NPP divested its non-entertainment holdings and became part of the group Warner Communications Inc.

PCDocs #105436

A Warner Bros. Entertainment Company

EXHIBIT 10-164
ER 714
DC 00169

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 170 of 328

Canadian Audio-Visual Certification Office
September 10, 2007
Page 2

("WCI"), a Delaware corporation, in 1972.  Pursuant to said successive acquisitions and mergers, WCI became the parent company of NPP in 1972.

5.      Pursuant to the terms and conditions of an Agreement dated as of December 23, 1975 between Authors and WCI and its subsidiaries, inclusive of NPP, Authors agreed and acknowledged that WCI is the sole and exclusive owner of all of the right, title and interest in and to the Superman Concept, including, without limitation, the characters, artwork, and motion picture rights, throughout the world in perpetuity.  Pursuant to said Agreement, WCI owns the motion picture production, distribution and ancillary rights in the Superman Concept throughout the world in perpetuity, inclusive of copyrights and trademarks therein.

6.      In or around August 1976, NPP changed its name to DC Comics, Inc.

7.      Pursuant to an Assignment dated as of June 30, 1992, among DC Comics, Inc. (successor-in-interest to NPP), DC Comics, a New York Partnership ("DC") and Warner Bros. Inc., a subsidiary of WCI ("Warner"), on the one hand, and Detective, on the other hand, Detective assigned to Warner all of its right, title and interest in, among other properties, the Superman Underlying Material and Warner, in turn, simultaneously assigned to DC all of its right, title and interest in said property.

7.      Pursuant to an Agreement dated as of August 1, 1992 between Frank Shuster and Jean Shuster Peavy (heirs of Joseph Shuster), on the one hand, and DC, on the other hand, Shuster and Peavy granted to DC in perpetuity all rights in any copyrights, trademarks or other property rights in any and all work created in whole or in part by Joseph Shuster, or any works based thereon, including without limitation, the Superman Concept.

8.      Pursuant to an Agreement dated as of November 6, 1999 between DC and Warner Bros., a division of Time Warner Entertainment Company, L.P. ("WB"), successor-in-interest to Warner,  DC assigned an exclusive license to WB through December 31, 2033, throughout the universe, in the motion picture production, distribution and ancillary rights in the Superman Concept, including, without limitation, sequels and remakes.  Pursuant to said Agreement, Warner has an exclusive license to produce, distribute and exploit motion pictures, remakes and sequels based on the Superman Concept.

9.      Pursuant to an Agreement dated October 19, 2001 between Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel), on the one hand, and DC, on the other hand, Siegel and Larson transferred to DC all of their rights in the Superman properties and the Superman Concept, in relevant part.

10.     Pursuant to the terms and conditions of an Agreement dated as of June 1, 2004 between Red Sun Productions Pty Limited, an Australian corporation ("Red Sun") and Warner Bros. Pictures Inc. ("WBPI"), successor-in-interest to WB, WBPI engaged Red Sun to produce, on behalf of WBPI, one theatrical motion picture based on the Superman properties

EXHIBIT 10-165
ER 715
DC 00170

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 171 of 328

Canadian Audio-Visual Certification Office
September 10, 2007
Page 3

and the Superman Concept.  Pursuant to said Agreement, Red Sun shall retain no rights in the proposed motion picture, all such rights being owned at all times during the production by WBPI.

12.     The Screenplay for the Picture was written as a work for hire for WBPI by Dan Harris ("Harris") and Michael Dougherty ("Dougherty"), pursuant to a Writer Loanout/Employment Agreement dated as of July 20, 2004, as amended.

13.     Red Sun (on behalf of WBPI as provided in Paragraph 10 above) produced a feature length motion picture entitled "Superman Returns" based on screenplay written by Harris & Dougherty (the "Picture").

14.     Pursuant to 3 separate visual effects agreements dated January 26, 2005, April 4, 2005 and April 27, 2005, respectively, Red Sun engaged the following Frantic Film Entitles to perform visual effects services for the Picture:  Frantic Films Australia Pty Ltd (for work to be performed in Australia) and Frantic Films Pacific, Inc. (for work to be performed in Canada).

Very truly yours,

Donna L. Josephson

DLJ/tg

cc:     Karen Fouts
        Ken Zorniak

EXHIBIT 10-166
**ER 716**
**DC 00171**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

```
JOANNE SIEGEL, ET AL.,              )
                                    )
                  PLAINTIFFS,       )
                                    )
          VS.                       )   NO. CV 04-08776-SGL
                                    )
TIME WARNER, INC., ET AL.,          )
                                    )   CROSS MOTIONS FOR
                  DEFENDANTS.       )   PARTIAL SUMMARY JUDGEMENT
_____)
                                    )
AND RELATED CASES,                  )
                                    )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, SEPTEMBER 17, 2007

1:38 P.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

EXHIBIT 11-167
ER 717

Page 2

1 APPEARANCES:

2 ON BEHALF OF THE PLAINTIFFS:

3
                        LAW OFFICES OF MARC TOBEROFF
4                       BY:  MARC TOBEROFF
                        BY:  NICHOLAS WILLIAMSON
5                       2049 CENTURY PARK EAST,
                        SUITE 2720
6                       LOS ANGELES, CALIFORNIA  90067
                        310-246-3333
7

8
  ON BEHALF OF DEFENDANTS:
9

10                      WEISSMANN WOLFF BERGMAN COLEMAN
                         GRODIN & EVALL LLP
11                      BY:  MICHAEL BERGMAN
                        9665 WILSHIRE BOULEVARD,
12                      NINTH FLOOR
                        BEVERLY HILLS, CALIFORNIA  90212
13                      310-858-7888

14

15 ON BEHALF OF DEFENDANTS:

16                      FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                        BY:  ROGER L. ZISSU
17                      866 UNITED NATIONS PLAZA
                        AT FIRST AVENUE & 48TH STREET
18                      NEW YORK, NEW YORK  10017
                        212-813-5900
19

20
  ON BEHALF OF DEFENDANTS:
21
                        PERKINS LAW OFFICE, P.C.
22                      BY:  PATRICK T. PERKINS
                        1711 ROUTE 9D
23                      COLD SPRINGS, NEW YORK  10516
                        845-265-2820
24

25

EXHIBIT 11-168

ER 718

1   RIVERSIDE, CALIFORNIA; MONDAY, SEPTEMBER 17, 2007; 1:38 P.M.

2                              -OOO-

3          THE CLERK:  CALLING CALENDAR ITEM 11, CASE NUMBER

4  CV 04-8400-SGL, AND -8776, JOANNE SIEGEL VERSUS TIME WARNER

5  INC., ET AL.

6          MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

7  YOUR APPEARANCES FOR THE RECORD.

8          MR. BERGMAN:  MICHAEL BERGMAN FOR DEFENDANTS.

9          MR. ZISSU:  ROGER ZISSU, YOUR HONOR, FOR THE

10 DEFENDANTS.

11         MR. PERKINS:  PATRICK PERKINS FOR DEFENDANTS, YOUR

12 HONOR.

13         MR. TOBEROFF:  GOOD AFTERNOON, YOUR HONOR.

14         MARK TOBEROFF FOR THE PLAINTIFFS.

15         MR. WILLIAMSON:  GOOD AFTERNOON, YOUR HONOR.

16         NICHOLAS WILLIAMSON FOR THE PLAINTIFFS.

17         THE COURT:  GOOD AFTERNOON, COUNSEL.

18         WE'RE ON CALENDAR THIS AFTERNOON TO CONSIDER

19 CROSS MOTIONS FOR SUMMARY JUDGMENT RELATED TO BOTH THE SUPERBOY

20 AND THE SUPERMAN CASES.

21         I ALSO HAVE BEFORE ME AN EX-PARTE APPLICATION BROUGHT

22 BY THE PLAINTIFFS I'VE RECEIVED IN OPPOSITION FROM THE DEFENSE

23 WHICH THE COURT IS PREPARED TO TAKE UP THIS AFTERNOON AS WELL.

24 I'LL DEAL WITH THAT TOWARDS THE END OF THE HEARING.

25         WHAT I'D LIKE TO DO IS BEGIN WITH THE CROSS MOTIONS

EXHIBIT 11-169
ER 719

1  FOR PARTIAL SUMMARY JUDGMENT BROUGHT ON THE SUPERBOY MATTERS,

2  AS WELL AS THE SUPPLEMENTAL BRIEFS THAT WERE FILED ON THE

3  DERIVATIVE WORKS ISSUE WHICH I ASKED YOU TO SUBMIT; AND I

4  APPRECIATE YOU DOING SO.

5           LET ME BEGIN WITH THE DEFENSE, IF I COULD.

6           I GUESS THE FIRST QUESTION I HAVE ABOUT BOTH CROSS

7  MOTIONS, GIVEN WHERE THE COURT IS GOING ON THIS IN LIGHT OF THE

8  COURT'S LAST ORDER, THAT THIS IS MORE, AT THIS POINT --

9  ASSUMING THAT I FIND THAT IT ULTIMATELY IS A JOINT WORKS ISSUE

10 AND IT'S AN ACCOUNTING CASE, AS OPPOSED TO AN INFRINGEMENT

11 CASE -- MY QUESTION IS, WHY ARE THESE MOTIONS NOT MOOT?

12          MR. BERGMAN:  I TOTALLY AGREE WITH YOU, YOUR HONOR.

13 I WAS GOING TO RAISE THAT.  I DIDN'T WANT TO BE PRESUMPTUOUS,

14 BUT AS I READ YOUR HONOR'S DECISION OF JULY 27TH, ONE OF TWO

15 THINGS ARE THE CASE; EITHER THE SIEGEL SUBMISSIONS HAVE

16 SUFFICIENT COPYRIGHTABLE PROTECTABLE MATTER TO CONSTITUTE A

17 JOINT WORK, IN WHICH EVENT D.C., AS THE GRANTEE OF MR. SHUSTER,

18 WOULD BE A CO-OWNER OF THAT WORK AND, THEREFORE, COULD NOT

19 POSSIBLY INFRINGE THE WORK; OR MR. SIEGEL'S SUBMISSIONS DO NOT

20 HAVE SUFFICIENT COPYRIGHTABLE MATERIAL, IN WHICH EVENT THERE'S

21 NOTHING TO INFRINGE.

22          THE COURT:  OKAY.  SO YOU AGREE, FROM YOUR

23 PERSPECTIVE, THAT THAT WOULD RESOLVE THE INFRINGEMENT ISSUE?

24          MR. BERGMAN:  WE DO INDEED, YOUR HONOR.

25          THE COURT:  OKAY.

EXHIBIT 11-170

ER 720

1        SO THEN THE QUESTION BECOMES WHETHER OR NOT THOSE

2 WORKS DO HAVE SUCH SUFFICIENT ORIGINAL CREATIVE ASPECTS TO WHAT

3 THE SCRIPT -- IN PARTICULAR, WHETHER IT HAS SUFFICIENT CREATIVE

4 ASPECTS TO IT AS TO CONSTITUTE A COPYRIGHTABLE WORK.

5        MR. BERGMAN:  IN THAT RESPECT, YOUR HONOR, IF I MAY,

6 I'D LIKE TO HAVE MR. ZISSU ADDRESS THAT POINT.

7        THE COURT:  VERY WELL.

8        AND I'LL CERTAINLY BE GIVING THE PLAINTIFF A CHANCE

9 TO FULLY ADDRESS THESE ISSUES.  I'M NOT ASSUMING THAT YOU AGREE

10 WITH ANY OF THIS AT THIS POINT.

11        MR. ZISSU:  GOOD AFTERNOON, YOUR HONOR.

12        THE COURT:  GOOD AFTERNOON, COUNSEL.

13        I GUESS I FRAMED THE OPENING QUESTION TO YOU.

14        I GUESS I'M HARD-PRESSED TO EVEN CONTEMPLATE THE

15 CONTENTION THAT THE SCRIPT, AS IT WERE, IS COMPLETELY LACKING

16 IN ANY KIND OF CREATIVE ORIGINAL WORK.  I WOULD ASSUME THAT YOU

17 WOULD BE WILLING TO CONCEDE, AND PERHAPS I'M MISTAKEN, THAT

18 THERE IS SOME ELEMENT OF CREATIVE ORIGINAL WORK.  PERHAPS THERE

19 MIGHT BE A DEBATE ON THE SCOPE OF THAT AND HOW BROAD THAT IS,

20 BUT IS IT REALLY YOUR CONTENTION THAT THERE IS NOTHING THERE?

21        MR. ZISSU:  NO.

22        YOUR HONOR, THE SCRIPT, IN A PURELY -- IF THE

23 QUESTION IS PURELY IF IT ISN'T COPYRIGHTABLE, YES, IT'S

24 COPYRIGHTABLE.

25        THERE ARE MANY ASPECTS OF OUR ARGUMENT THAT GO TO NOT

EXHIBIT 11-171
ER 721

Page 6

1 ONLY THE SCOPE OF WHAT'S PROTECTABLE, BUT THEN THE

2 ALL-IMPORTANT QUESTION OF WHO OWNS WHAT THE CONTRIBUTIONS ARE

3 THAT ARE PROTECTABLE, AND THE EXTENT OF THEM; SO WE AGREE WITH

4 YOUR HONOR ON THAT.

5          AND I MIGHT ADD THAT THE COPYRIGHTABILITY -- IF YOU

6 SENT THE SCRIPT TO THE COPYRIGHT OFFICE, THE QUESTION WOULD BE

7 PURELY, 'IS IT COPYRIGHTABLE?'  AND THEY WOULD RECEIVE IT, AND

8 THEY WOULD, IN MY VIEW, IN OUR VIEW, ISSUE A REGISTRATION.

9          THAT'S A DIFFERENT QUESTION FROM THE QUESTION YOUR

10 HONOR POSED, WHICH IS WHETHER, UNDER 103(B), THE EXTENT OF

11 OWNERSHIP IN THE NEW CONTRIBUTIONS VERSUS, REALLY, WHAT'S OWNED

12 IN THE ORIGINAL WORK, WHICH IS THE BASIS FOR THE DERIVATIVE

13 WORK.

14          SO WE THINK THE PLAINTIFFS REALLY HAVE ADDRESSED THE

15 WRONG QUESTION BY SAYING 'IS IT COPYRIGHTABLE?'

16          SURE, IT'S COPYRIGHTABLE.

17          THEN WE HAVE YOUR HONOR'S QUESTION, WHICH IS WHAT

18 103(B) REQUIRES.  AND WE'RE NOT STRICTLY SPEAKING IN THE

19 CONTEXT OF COPYRIGHTABILITY.  THE CONTEXT WE FIND OURSELVES IN

20 IS A LITIGATION, A DISPUTE, AND THERE ARE TWO ASPECTS OF THAT

21 DISPUTE.  THERE'S AN INFRINGEMENT CLAIM GOING ON, UNLESS IT'S

22 RENDERED MOOT.  BUT IN THAT CONTEXT, WE ARE IN THE CONTEXT OF

23 INFRINGEMENT; AND A CHALLENGE IS BEING MADE TO THE EXTENT OF

24 THE COPYRIGHT OWNERSHIP OF THE AUTHORS, OR THE CO-AUTHORS, OF

25 THE ORIGINAL WORK.  AND THAT, TOO, IS A DISPUTED CONTEXT,

EXHIBIT 11-172

ER 722

Page 7

1 BECAUSE THERE'S A CHALLENGE AND THE DISPUTE AS TO THAT

2 COPYRIGHT OWNERSHIP.  SO IN THAT CONTEXT, WE'RE FORCED TO MOVE

3 AWAY FROM THE PURE QUESTION, 'IS IT COPYRIGHTABLE?'

4          IN ANSWERING THE QUESTIONS IN THEIR SUBMISSIONS, THE

5 PLAINTIFFS HAVE ANSWERED THE WRONG QUESTION, BECAUSE THEY'RE

6 REALLY ONLY GOING TO THE FIRST QUESTION, WHICH YOUR HONOR

7 ASKED, WHICH IS, WHERE DO WE START?  AND THEY SEEM TO THINK

8 FROM THAT THAT IT'S A VERY SIMPLE THING.

9          IF IT'S COPYRIGHTABLE, THEN THEY WANT TO REACH BACK

10 ON THE EXTENT OF THEIR OWNERSHIP AND WHAT'S BEEN NEWLY ADDED

11 AND REACH BACK AND SOMEHOW OWN THE UNDERLYING MATERIAL, WHICH

12 IS NOT NEWLY ADDED AND WHICH RESTS WITH THE AUTHORS, OR

13 CO-AUTHORS, OF THE ORIGINAL WORK.

14          THE COURT:  I UNDERSTAND THAT, AND I GUESS WHEN I

15 LOOK BACK THROUGH -- I THINK YOU REFER TO IT AS THE ORIGINAL

16 MATERIAL, PRESCRIPT MATERIAL, I'M REFERRED TO FRAMES, MOST

17 NOTABLY THE FRAME -- I'VE HAD SOME WONDERFUL BOOKS PROVIDED TO

18 ME HERE -- I GUESS THIS IS EXHIBIT 3 TO THE BERGMAN

19 DECLARATION, PAGE 9, WHERE I HAVE PROBABLY THE MOST DEVELOPED,

20 IF THAT'S THE RIGHT WORD TO USE, DEPICTION OF SUPERBOY IN THIS

21 KIND OF PRESCRIPT MATERIAL.

22          MR. ZISSU:  YES.

23          THE COURT:  AND ASSUMING ARGUENDO THAT THAT IS

24 CLEARLY NOT CAPTURED BY THE SCRIPT, THE QUESTION IS, HOW MUCH

25 OF THAT IS CAPTURED BY THE SCRIPT, OR HOW MUCH OF THE SCRIPT

EXHIBIT 11-173
ER 723

Page 8

1 DOES IT CAPTURE AND HOW MUCH DOES IT NOT?  THAT'S WHAT I'M

2 HAVING TROUBLE DOING, IS TRYING TO FIGURE OUT HOW MUCH OF THE

3 THEME, HOW MUCH OF THE CONCEPT, HOW MUCH OF THE DIALOGUE, HOW

4 MUCH HAS ALREADY BEEN COPYRIGHTED BY THAT EARLIER WORK AND HOW

5 MUCH IS COPYRIGHTABLE NOW BY THIS SCRIPT?  BECAUSE I THINK IT

6 IS PRETTY CLEAR THAT IT IS COPYRIGHTABLE.

7          THE QUESTION IS, WHAT DOES IT ADD?  WHAT IS SEPARATE

8 AND APART FROM WHAT WAS PREVIOUSLY DONE?  AND THAT'S NOT CLEAR.

9          MR. ZISSU:  IT'S NEVER GOING TO BE 100 PERCENT CLEAR.

10 IT JUST IS NOT SUSCEPTIBLE TO THAT.

11         THE PROBLEM, IF YOU WILL, WITH THE SCRIPT IS, IT'S

12 PURELY LITERARY, SO IT HAS SOME ISSUES AS TO THE EXTENT TO

13 WHICH VERBALLY COPYRIGHT PROTECTION WOULD BE AFFORDED FOR

14 WHATEVER IS NEW.

15         THE COURT:  YOU GET A PRETTY GOOD SENSE OF WHAT IT'S

16 ABOUT FROM READING THE SCRIPT.

17         MR. ZISSU:  RIGHT.  BUT IT HAS TO BE -- AND I WAS

18 GOING TO GET TO THIS -- TO JUST SAY IT'S COPYRIGHTABLE IS THE

19 BEGINNING OF THE QUESTION.  JUST TO SAY IT'S COPYRIGHTABLE

20 DOESN'T REALLY TAKE US VERY FAR IN TERMS OF --

21         THE COURT:  I UNDERSTAND.  I'M TRYING TO GET TO THAT

22 NEXT POINT.

23         MR. ZISSU:  THE PATRY TREATISE SAYS -- AND THIS IS,

24 WE THINK, THE WRONG APPROACH -- THAT ONE APPROACH IS TO SAY A

25 LIGHT IS TURNED ON -- IT'S LIKE A LIGHT SWITCH; IF THE LIGHT

EXHIBIT 11-174

ER 724

Page 9

1 SWITCH IS ON, THEN SOMEHOW THE -- IF THERE'S SOMETHING

2 COPYRIGHTABLE, THE NEW MATTER INCLUDES EVERYTHING AND THE

3 DERIVATIVE WORK OWNER OWNS EVERYTHING.

4          BUT PATRY SAYS IT'S REALLY LIKE A DIMMER; THE DEGREES

5 OF WHAT'S ADDED THAT WOULD BE RECOGNIZED AS OWNED ARE GRADUALLY

6 INCREASED ACCORDING TO WHAT'S CREATIVE OR THE LIGHT THAT'S

7 BROUGHT TO THINGS.

8          THE COURT:  I AGREE WITH THAT.

9          MR. ZISSU:  OKAY.  SO WE'RE WORKING ON THE CONCEPTS.

10          THERE IS A CASE WE WOULD LIKE TO BRING TO YOUR

11 ATTENTION, YOUR HONOR, WHICH ADDS, I THINK, A LITTLE BIT

12 EXACTLY ON YOUR QUESTION, AND IT'S A CASE -- IT'S

13 JUDGE WILSON'S DECISION IN 2003, IN A CASE CALLED SOBHANI

14 AGAINST RADICAL, MEDIA INC., IN WHICH --

15          THE COURT:  WHAT'S THE CITE, COUNSEL?

16          MR. ZISSU:  I'M SORRY.

17          THE CITE IS 257 F. SUPP. 2D 1234, AT 1239-40.

18          THE COURT:  YOU MEAN F.3D, I PRESUME?

19          MR. ZISSU:  I'M SORRY.  FED SUPP.

20          THE COURT:  OH, FED SUPP.  I'M SORRY.  THANK YOU.

21          MR. ZISSU:  FED SUPP.

22          AND THIS REALLY SPEAKS TO THIS.  HE HAD A SIMILAR

23 QUESTION TO YOUR HONOR'S, AND HE SAID, "HOWEVER, THERE IS AN

24 IMPORTANT LIMITATION SUGGESTED BY BOTH AUTHORITIES AND IGNORED

25 ENTIRELY BY PLAINTIFF.  COPYRIGHT PROTECTION DOES NOT EXTEND TO

EXHIBIT 11-175

ER 725

1 DERIVATIVE WORKS IF THE PREEXISTING WORK TENDS TO PERVADE THE

2 ENTIRE DERIVATIVE WORK," AND HE CITES -- HE'S QUOTING FROM

3 NIMMER, AT SECTION 306.

4          THE COURT:  I THINK THAT'S VERY INSTRUCTIVE LANGUAGE,

5 LANGUAGE THAT I WOULD BE, PERHAPS, INCLINED TO ADOPT MYSELF.

6 BUT THAT GETS US THEN BACK TO THE QUESTION, HOW MUCH OF THIS

7 PERVADES THIS?

8          MR. ZISSU:  WE THINK, EXCEPT FOR AS WE ARGUED IN OUR

9 BRIEF, CERTAIN SEQUENCES, INCLUDING THE DIALOGUE AND THE

10 IN-HEIGHT VERBA TEXT, IS PRETTY LIMITED.  EVERYTHING ELSE IS

11 PERVADED BY THE PREEXISTING SUPERMAN WORKS, THE THEMES, BUT

12 MORE IMPORTANTLY, THE VISUAL DEPICTIONS SHOWING THE POWERS OF

13 SUPERMAN.

14          THE COURT:  YOU'RE TALKING ABOUT SUPERBOY HERE?

15          MR. ZISSU:  I AM.  BUT SUPERMAN THAT PERVADES -- THE

16 DESCRIPTIONS OF SUPERBOY IN THE SCRIPT ARE PERVADED BY;

17 DOMINATED BY; INFUSED, IF YOU WILL, BY THE SUPERMAN PREEXISTING

18 WORKS.  AND THAT'S THE ISSUE THAT THIS -- I'LL CALL IT A

19 PERVASION RULE APPLIES.

20          AND THE DIFFERENCE IN TYPES OF WORKS IS VERY

21 IMPORTANT HERE.  IN ONE OF THE CASES YOUR HONOR CITES ON THE

22 JOINT WORK ISSUE, JUDGE POSNER'S DECISION IN GAIMAN AGAINST

23 MCFARLANE, HE MAKES THE DISTINCTION IN THAT CASE THAT THE

24 REASON HE VIEWS THE WORK DONE BY GAIMAN AS A PROTECTABLE WORK

25 AND AS A COPYRIGHTABLE CONTRIBUTION, PUTTING ASIDE THE HANDS-ON

EXHIBIT 11-176
ER 726

1 ISSUE, IS THAT IT'S BECAUSE IT'S DEPICTED VISUALLY.  HE DOES

2 NOT SAY, AS PLAINTIFFS ARGUE, THAT A STOCK CHARACTER -- YOU CAN

3 GET COPYRIGHT PROTECTION FOR A STOCK CHARACTER IN A LITERARY

4 WORK.  HE SAYS THE REASON IT BECAME PROTECTABLE IS IT WAS

5 MOVING FROM LITERARY TO DEPICTION SO THAT IT COULD BE

6 CONCRETELY SHOWN.  SO THAT IS AT, I THINK, 661 AND 662 OF

7 JUDGE POSNER'S DECISION.  BUT IT'S A VERY GOOD DISCUSSION OF

8 THIS ISSUE.

9           THE PERVASION IS THE PROBLEM.  IT'S SUBSTANTIALLY

10 PERVADED.

11           THE IDEA THAT THE PLAINTIFFS COULD, IN THIS CASE, OWN

12 THE THEMATIC INTERACTION BETWEEN THE PARENTS OF SUPERMAN, THE

13 KENTS, AND THE YOUNG MAN, OR THE BOY, REALLY -- AND OWN THAT

14 AND OWN THE THEME OF THE PARENTS TELLING THE BOY HE'S GOT TO

15 HIDE HIS POWERS SO THAT HE CAN USE THEM FOR HUMANITY -- THAT

16 SOMEHOW THAT'S SWEPT INTO WHAT CAN BE OWNED BY THE DERIVATIVE

17 WORK AUTHOR, IT DOESN'T MAKE ANY SENSE BECAUSE --

18           THE COURT:  BUT LET'S PUT THAT ASIDE.

19           LET'S SAY WE WERE TO PUT ASIDE THOSE TWO ELEMENTS,

20 BECAUSE ON THAT ONE FRAME, THAT'S EXACTLY WHAT IS DISCUSSED,

21 IS, 'YOU'VE GET TO HIDE YOUR SUPERPOWERS, OTHERWISE PEOPLE ARE

22 GOING TO MAKE FUN OF YOU OR HARASS YOU; AND WHEN YOU USE YOUR

23 POWERS, YOU'VE GOT TO USE THEM FOR THE BENEFIT OF HUMANITY.'

24           PUTTING ASIDE THOSE TWO ELEMENTS, THAT STILL LEAVES A

25 LOT OF DEVELOPMENT, CREATIVE DEVELOPMENT, MANIFESTED IN THE

EXHIBIT 11-177
ER 727

1 13-PAGE SCRIPT THAT IS NOT CAPTURED BY THOSE TWO COMPONENTS, IF

2 YOU WOULD, OF THE FRAME.

3          MR. ZISSU:  THAT'S JUST ONE.

4          WE WENT THROUGH -- WE SUBMITTED A CHART WHERE WE

5 SHOWED A LOT OF THE PREEXISTING MATERIAL AND WHERE IT ENDED UP

6 IN THE SCRIPT.

7          AFTER YOU FINISH THE FIRST FIVE OR SIX PAGES OF THE

8 SCRIPT, YOU START TO GET OUTSIDE OF THE THINGS THAT ARE

9 LITERALLY TAKEN, BUT THEY'RE STILL PERVADED BY SUPERMAN, THE

10 PREEXISTING SUPERMAN CHARACTER.  ALL THAT'S BEEN ADDED --

11 EXCEPT FOR THESE PARTICULAR SEQUENCES, LIKE THE HAUNTED HOUSE

12 EPISODE -- WHAT'S BEEN ADDED IS, "IT'S A BOY."  AND IRONICALLY,

13 WHAT THE PLAINTIFFS SAY IS NEW ABOUT THE SUPERBOY IS THAT THEY

14 ARE PRESENTING THE CHARACTER FULLY DEVELOPED.

15          WELL, FULLY DEVELOPED MEANS SUPERMAN.

16          THE COURT:  WELL, FULLY DEVELOPED AS A BOY, AS

17 OPPOSED TO --

18          MR. ZISSU:  THEY SAY HIS POWERS ARE FULLY DEVELOPED.

19 THAT'S WHAT THEY SAY IS THE MOST IMPORTANT NOVELTY.  AND

20 NOVELTY, WE THINK, IS IRRELEVANT IN WHAT'S NEW, PUTTING THAT

21 ASIDE; SO YOU REALLY JUST HAVE -- IF YOU OR I SAT DOWN AND WE

22 SAID, 'I WANT TO PRESENT SUPERMAN AS A BOY,' WE WOULD COME UP

23 WITH DIFFERENT SCENARIOS.  WE MIGHT COME UP AS A BABY.  YOU'D

24 HAVE TO SHOW HIS INCREDIBLE STRENGTH AS A KINDERGARTNER; HIS

25 TOUGH SKIN; HIS IMPERVIOUSNESS TO A SPITBALL ATTACK.  YOU'D

EXHIBIT 11-178

ER 728

1 HAVE TO SHOW HIS STRENGTH.

2          THE COURT:  BUT YOU DON'T GET -- AS A COPYRIGHT

3 HOLDER, SUPERMAN AS A BOY, AND THEN THAT FREEZES THE FIELD.

4 THERE IS ROOM FOR CREATIVE DEVELOPMENT.

5          MR. ZISSU:  THERE IS.  BUT THE QUESTION IS, WHAT DO

6 WE FIND IN THE SCRIPT?  AND THERE ARE THREE OR FOUR OF THESE

7 KINDS OF SCENARIOS, WHICH, EXCEPT FOR THEIR LITERAL TEXT, ARE

8 SCENES A FAIRE.  AND SCENES A FAIRE ARE CONSIDERED IN THE

9 CONTEXT OF INFRINGEMENT.  THEY ARE CONSIDERED IN THE CONTEXT OF

10 THE 103(B) DISPUTE.  THERE IS A DISPUTE GOING ON.

11          COPYRIGHT OWNERSHIP OF THE OWNERS OF THE UNDERLYING

12 WORK, VERSUS THE DERIVATIVE WORK AUTHOR IS AT STAKE IN AN

13 ADVERSARY CONTEXT.  AND IT'S FOR THE PURPOSE OF MAKING AN

14 INFRINGEMENT CLAIM.  BECAUSE WHAT THE PLAINTIFFS ARE DOING

15 HERE, THEY'RE TRYING TO USE THE ALLEGED COPYRIGHT OWNERSHIP AND

16 WHAT THEY SAY THEY ADDED IN THE SCRIPT TO REACH BACK, SOMEHOW

17 OWN AND PREVENT THE OWNER OF THE UNDERLYING WORK FROM

18 CONTINUING TO EXPLOIT THAT WORK.

19          THAT'S EXACTLY THE DANGER THAT ENTERTAINMENT RESEARCH

20 TALKS ABOUT.  AND THAT DANGER EXISTS FOR TWO REASONS:  IT'S NOT

21 ONLY BECAUSE YOU DON'T WANT THE DERIVATIVE WORK AUTHOR TO END

22 UP DOING ANYTHING OR OWNING ANYTHING THAT WOULD UNDERMINE AND

23 ADVOCATE THE RIGHT OF THE COPYRIGHT OWNER OF THE ORIGINAL WORK.

24 THERE'S ANOTHER DIMENSION TO IT.

25          IF DERIVATIVE WORK OWNERSHIP COULD BE USED IN THAT

EXHIBIT 11-179
ER 729

1 WAY, IT WOULD VIOLATE THE CONSTITUTIONAL AND BASIC PRECEPT OF

2 COPYRIGHT LAW THAT COPYRIGHT PROTECTION IS LIMITED FOR LIMITED

3 TIMES, BECAUSE -- AND THIS IS WHAT JUDGE POSNER TALKS ABOUT,

4 ALSO, IN GAIMAN AND HE DOES IT IN ANOTHER CASE HE CITES IN

5 GAIMAN CALLED PRINCE AGAINST PICKETT.  A DERIVATIVE WORK AUTHOR

6 COULD COME ALONG AND SAY, WELL, I USED SOMETHING PREEXISTING,

7 BUT I'M AN OWNER AND IT'S A COPYRIGHT THAT I HAVE; AND THEN THE

8 COPYRIGHT PROTECTION COULD BE EXTENDED ON THAT BASIS.  SOMEBODY

9 COULD KEEP MAKING DERIVATIVES SO THAT THERE WOULD BE NEW

10 COPYRIGHT, AND THE NEW COPYRIGHT WOULD END UP EXTENDING INTO

11 WHAT IS UNDERLYING, FOR WHICH PROTECTION HAS TO EXPIRE AT SOME

12 POINT.

13          SO THIS IS NOT A THEORETICAL THING.  YOU'LL FIND

14 JUDGE POSNER DISCUSSING THAT.

15          THE COURT:  BUT THAT'S NOT WHAT WE HAVE HAPPENING

16 HERE.

17          MR. ZISSU:  WELL, WE DON'T HAVE THE DURATION PROBLEM,

18 BUT WE DO HAVE THE PROBLEM OF -- WHAT THE PLAINTIFFS ARE TRYING

19 TO DO IS TO TAKE WHATEVER LITTLE THEY ADDED, TO SWEEP INTO THAT

20 THE PREEXISTING MATERIAL THAT'S GIVING THEM SOME POSITION.  AND

21 THE REASON THEY'RE DOING THAT IS SO THAT WHEN THEY GET TO

22 MORE FUN COMICS NUMBER 101, THEN THEY CAN SAY IT'S SIMILAR.

23          THE COURT:  I UNDERSTAND.

24          LET ME HEAR FROM THE PLAINTIFFS HERE.

25          MR. ZISSU:  I'M SORRY?

EXHIBIT 11-180

ER 730

1          THE COURT:  I'M GOING TO GIVE THE PLAINTIFFS A CHANCE

2 TO RESPOND TO THIS.

3          EVERYONE IS GOING TO HAVE PLENTY OF OPPORTUNITIES TO

4 TALK, BUT I DON'T WANT TO GIVE ANYONE TOO MUCH TIME.

5          MR. ZISSU:  THANK YOU, YOUR HONOR.

6          THE COURT:  THANK YOU, COUNSEL.

7          COUNSEL, IF YOU COULD BEGIN WITH MY INITIAL QUESTION

8 ABOUT --- YOU MAY HAVE A DIFFERENT TAKE ON THE MOOTNESS OF THE

9 CROSS MOTIONS AT THIS POINT, IN TERMS OF THE INFRINGEMENT

10 VERSUS AN ACCOUNTING ACTION, AND ALSO THIS ISSUE IN TERMS OF

11 THE DERIVATIVE WORKS.

12          MR. TOBEROFF:  IT'S NOT MOOT IN TERMS OF AN

13 ACCOUNTING ACTION, BECAUSE ONE OF THE MAJOR FACTORS THAT WILL

14 LATER BE DECIDED IN AN ACCOUNTING ACTION IS TO WHAT DEGREE THE

15 RIGHT TO PROFITS IS GOING TO BE APPORTIONED.  AND IN THAT

16 REGARD, DEFENDANTS WILL TAKE CERTAIN WORKS, LIKE "SUPERMAN

17 RETURNS TO SMALLVILLE," AND THEY WILL TRACE BACK ELEMENTS OF

18 THOSE WORKS TO PRIOR WORKS AND SAY, 'WE OWN THAT WORK WHICH

19 SHOWS HIM WITH HEAT VISION, AND WE OWN THIS WORK WHICH SHOWS

20 HIM WITH SOME OTHER POWER THAT'S NOT IN THE COPYRIGHTS THAT

21 PLAINTIFFS HAVE RECAPTURED,' AND THEREBY REDUCE THE PROFITS TO

22 WHICH PLAINTIFFS ARE ENTITLED.

23          WITH RESPECT TO SOMETHING LIKE SMALLVILLE, WHICH IT'S

24 OBVIOUS IT'S DERIVED FROM BOTH SUPERMAN AND, WE BELIEVE,

25 SUPERBOY, EVEN IF YOU MIGHT FIND AN INFRINGEMENT ACTION MOOT,

EXHIBIT 11-181

ER 731

1 IT'S STILL RELEVANT TO ASSESS THE COPYRIGHTABLE CONTRIBUTIONS

2 OF SUPERBOY TO AN APPORTIONMENT ACTION FOR SOMETHING LIKE

3 SMALLVILLE, WHICH BEARS A LOT OF COMPARISONS TO THE OVERALL

4 EXPRESSIONS IN THE SUPERBOY MATERIAL THAT WAS WRITTEN BY

5 JERRY SIEGEL.

6           SO TO THAT EXTENT, I SUBMIT IT'S MOST RELEVANT.

7           THE COURT:  AS FAR AS THE SUPERBOY MATERIAL, WHAT DO

8 YOU MAKE OF THIS SCRIPT AND PRESCRIPT ISSUE?

9           MR. TOBEROFF:  THE SCRIPT -- I THINK THE

10 DEFENDANTS -- THROUGH THE DISCUSSION, I THINK THERE HAS BEEN AN

11 ADMISSION THAT IT IS COPYRIGHTABLE.  THEY SAY THE ONLY THING

12 COPYRIGHTABLE IS HIS DEPICTION AS A TODDLER, A PRESCHOOLER, AND

13 THEN GOING TO GRADE SCHOOL.  BUT THAT'S WHAT THE WHOLE STORY IS

14 ABOUT.

15           I DON'T AGREE THAT SUPERBOY IS MERELY SUPERMAN.  HE'S

16 NOT, IF YOU REALLY LOOK CLOSELY AT IT.  AND I THINK YOU DO HAVE

17 TO LOOK CLOSELY, PARTICULARLY WHEN YOU'RE DEALING WITH COMIC

18 BOOK MATERIAL.  THE DECISION OF THE WORDS IN THE LITTLE BUBBLES

19 AND THE DECISION OF WHAT PICTURES TO SHOW IS, BY DEFINITION,

20 EXTREMELY LIMITED, PRIMITIVE, REPRESENTATIONAL; SO A LOT OF

21 THINGS ARE DONE SYMBOLICALLY AND A LOT OF THINGS ARE DONE TO

22 FORESHADOW EVENTS THAT WILL HAPPEN AFTER.

23           THIS IS PARTICULARLY TRUE IN THE COMIC BOOK SERIES,

24 AND IT'S PARTICULAR TRUE IN JERRY SIEGEL'S FIRST STORY, BECAUSE

25 THAT STORY WAS INTENDED, IF YOU WILL, TO BE THE PILOT OF THE

EXHIBIT 11-182
ER 732

1 COMIC BOOK SERIES; SO IT SETS UP A -- I DON'T WANT TO USE WORDS

2 THAT SOUND LIKE 'IDEA' OR 'CONCEPT' -- IT EXPRESSES, IN A

3 COPYRIGHTABLE MANNER, A FRAMEWORK, AN ARRANGEMENT OF LITERARY

4 ELEMENTS, IN SUCH A WAY TO BE ABLE TO SET UP THE SUPERBOY LINE

5 OF COMICS, WHICH ARE DIFFERENT IN HIS STORY, AND, IN FACT, WERE

6 DIFFERENT IN REALITY.

7          HIS STORY, WHICH NOW, IN RETROSPECT, DEFENDANTS WANT

8 TO MINIMIZE, ACTUALLY LED TO MORE FUN 101, WHICH LED TO

9 MORE FUN 102 AND A WHOLE BODY OF COPYRIGHTED COMIC BOOKS,

10 ANIMATED TV SHOWS, AND LIVE ACTION TV SHOWS.

11          THE COURT:  WHAT'S CONTAINED IN THAT SCRIPT, FROM

12 YOUR PERSPECTIVE, THAT'S NOT -- HOW DO I --

13          MR. TOBEROFF:  I'M GOING TO GET RIGHT TO THAT.  I

14 PROMISE.

15          THE COURT:  OKAY.  THANK YOU.  THAT'S MY STRUGGLE.

16          MR. TOBEROFF:  THE LINEAGE AND THE DERIVATION IS

17 IMPORTANT, BECAUSE WHAT WE'RE DEALING WITH HERE IS NOT JUST A

18 COPYRIGHTABLE STORY, BUT A COPYRIGHTABLE CHARACTER.  AND TO

19 LOOK BACK OVER THIS LONG LINE OF MATERIAL ALL FEATURING

20 SUPERBOY AND TO SAY THAT THE FIRST IS NOT COPYRIGHTABLE, I

21 DON'T BELIEVE IS A CORRECT RESULT.

22          IT'S LIKE LOOKING BACK AT MICKEY MOUSE AND SAYING HE

23 WAS MERELY A TALKING ANIMAL AND THERE ARE OTHER INSTANCES OF

24 TALKING ANIMALS.

25          THERE ARE MANY DIFFERENCES BETWEEN SUPERBOY AND

EXHIBIT 11-183
ER 733

Case 2:13-56243, 08/25/2014, ID: 9222563, DktEntry: 22-4, Page 189 of 328

Page 18

1 SUPERMAN.  AND, OF COURSE, WHEN YOU START GOING INTO THIS KIND

2 OF CREATIVE ANALYSIS, A LOT OF THINGS SOUND SUBJECTIVE.  AND I

3 SUBMIT -- AND I'LL QUOTE MR. ZISSU WHEN HE SAYS THAT WE DON'T

4 KNOW.  YOU DON'T KNOW 100 PERCENT.  THAT'S WHY THESE MATTERS

5 ARE FOR A JURY; THESE KIND OF SUBJECTIVE COMPARISONS AND

6 EVALUATIONS, I SUBMIT, ARE NOT FOR A COURT TO DECIDE, BECAUSE

7 YOU DO NOT KNOW 100 PERCENT, AND IT IS A VERY SUBJECTIVE

8 CONSIDERATION.

9          IN SUPERMAN, THE CHARACTER IS SUPERMAN.  HE'S

10 SELF-ASSURED; HE'S POWERFUL; HE'S KNOWS EXACTLY WHAT HE WANTS

11 TO DO AND WHERE HE IS AND WHY HE'S DOING WHAT HE'S DOING.

12          CLARK KENT IS SUPERMAN'S COVER IN THE SUPERMAN

13 STORIES.  IN FACT, HE DUMBS HIMSELF DOWN AS THE AWKWARD, SHY,

14 RETICENT CLARK KENT SO THAT PEOPLE WILL LEAVE HIM ALONE, SO HE

15 CAN GO ABOUT HIS BUSINESS AS SUPERMAN AND SAVE THE WORLD.

16          IN THE SUPERBOY STORIES, IT'S A VERY DIFFERENT

17 DYNAMIC.  SUPERBOY IS CLARK KENT.  SUPERBOY IS DEPICTED AS

18 AWKWARD.  HE IS DEPICTED AS GOING THROUGH EMOTIONAL AND

19 PHYSICAL DEVELOPMENT.  HE IS DEPICTED AS BEING CAUGHT IN THE

20 MIDDLE OF THINKING HE'S HUMAN AND WANTING TO DO WHAT ALL HUMANS

21 DO AND EXPERIENCE ADOLESCENCE LIKE ALL HUMANS; AND AT THE SAME

22 TIME, HAVING TO COME TO GRIPS WITH THE REALITY THAT HE CAN

23 NEVER FIT IN, THAT HE CAN NEVER BE ACCEPTED.  AND THE STORY, IF

24 YOU LOOK AT IT, ON THE ONE SENSE, IT'S A SILLY LITTLE SIMPLE

25 STORY, BUT IF YOU LOOK AT IT IN TERMS OF THE SYMBOLISM -- WHEN

EXHIBIT 11-184

ER 734

1 HIS PARENTS SAY THAT "WE DREADED THIS DAY WHEN SUPERBOY HAS TO

2 GO TO SCHOOL; WE DREADED THIS DAY," AND THEY'VE INSTILLED IN

3 HIM THIS IDEA THAT 'YOU NEED TO KEEP YOUR POWERS SECRET,

4 OTHERWISE YOU'LL BE AN OUTCAST,' MEANING YOU WON'T BE ACCEPTED.

5 AND THEN YOU SEE HIM HAVING TO ENDURE SCHOOL PRANKS AND BULLIES

6 AND A LOT OF THINGS, BUT THROUGH THE PERSPECTIVE OF THIS

7 PECULIAR INDIVIDUAL WHO'S BOTH HUMAN AND A TOTAL ALIEN.  AND

8 YET, HE WANTS TO BE ACCEPTED.  AND WHEN THEY SAY, "DO YOU WANT

9 TO BE A MEMBER OF THE (UNINTELLIGIBLE) CLUB," HE SAYS, "OH,

10 YES," WITH AN EXPLANATION POINT, ONLY TO DISCOVER THIS IS A

11 CRUEL PRANK.

12          IT'S A TOTALLY DIFFERENT DYNAMIC THAN THE DYNAMIC IN

13 SUPERMAN.

14          THE COURT:  I THINK I UNDERSTAND THAT.

15          HOW IS NOT EVERYTHING YOU JUST DESCRIBED NOT

16 CONTAINED, IN ESSENCE, ON THIS ONE PAGE?

17          MR. TOBEROFF:  IN WHICH PAGE ARE YOU REFERRING?

18          THE COURT:  PAGE 96 OF EXHIBIT 3.  THIS IS THE PAGE

19 WHERE THEY FIND THE CHILD; THEY OBSERVE HIS STRENGTH IN THE

20 ORPHANAGE; THE PARENTS GO TO THE ORPHANAGE; THEY COUNSEL HIM

21 ABOUT 'KEEPING YOUR STRENGTH SECRET OR YOU'RE GOING TO HAVE

22 ADVERSE CONSEQUENCES,' AND 'YOU ULTIMATELY NEED TO DO GOOD FOR

23 HUMANITY.'

24          MR. TOBEROFF:  AND MY ANSWER TO IT:  IT STOPS THERE.

25 IT JUST STOPS WITH HIM AS A LITTLE BABY, PICKED UP AT THE

EXHIBIT 11-185
ER 735

1 ORPHANAGE AND BEING ADOPTED BY PARENTS AND SAYING, 'YOU NEED TO

2 DO GOOD; WE NEED TO KEEP YOUR POWERS SECRET.'

3           FROM THERE, YOU HAVE ENDLESS CHOICES, WHICH NOW,

4 KNOWING ABOUT SUPERBOY AND SUPERMAN -- AND, IN FACT, YOU HAVE

5 TO BE AWARE THAT THE SUPERBOY DEVELOPMENT, OF SUPERBOY GROWING

6 UP IN SMALLVILLE, HAS ALSO BEEN INCORPORATED IN LATER SUPERMAN

7 WORKS; SO ALL OF THE THINGS THAT WE'RE TALKING ABOUT, YOU NOW

8 TAKE FOR GRANTED AND SAY IT'S COMPLETELY NATURAL:  OF COURSE,

9 HE GREW UP THIS WAY; AND, OF COURSE, HE WENT TO SCHOOL; AND, OF

10 COURSE, THEY HAD TO DEAL WITH THIS AND THAT; IT'S ONLY NATURAL.

11 BUT, IN FACT, AT THAT TIME, IN THE MIND OF JERRY SIEGEL, THESE

12 THINGS DIDN'T FLOW NATURALLY.  THERE ARE ENDLESS CHOICES.

13           AND MR. ZISSU, I BELIEVE, ADMITTED THAT.

14           THERE ARE ENDLESS CHOICES THAT JERRY SIEGEL HAD AS TO

15 WHAT TO DO AFTER IT STOPPED IN THAT FIRST PANEL IN ACTION ONE,

16 AND IN THOSE TWO PANELS IN SUPERMAN ONE.

17           AN EXAMPLE IS, IN SUPERMAN ONE, YOU SEE HIM TALKING

18 TO HIS PARENTS IN ONE PANEL, AND THEN THE NEXT PANEL, HE'S

19 JUMPING FROM ROOF TO ROOF OVER SKYSCRAPERS.  IT'S CLEARLY SET

20 IN THE CITY.  THERE ARE BIG SKYSCRAPERS.  IT'S SET IN

21 METROPOLIS.  IT'S SET IN SUPERMAN'S HOMETOWN.

22           JERRY SIEGEL CHOSE TO SET HIS SUPERMAN STORY IN THE

23 COUNTRY, IN A SMALL TOWN IN THE COUNTRY.

24           THE DEFENDANTS MAY SAY, WELL, THAT'S NOT PROTECTABLE;

25 THE COUNTRY IS NOT PROTECTABLE.

EXHIBIT 11-186

ER 736

Page 21

1          THE COURT:  YOU MEAN SUPERBOY?

2          MR. TOBEROFF:  SUPERBOY.  EXCUSE ME.

3          THE CHOICE IS NOT AN INSIGNIFICANT CHOICE, BECAUSE IN

4  THE COUNTRY, IT'S MUCH HARDER TO KEEP YOUR IDENTITY A SECRET;

5  EVERYBODY KNOWS EACH OTHER'S BUSINESS, AS EXEMPLIFIED BY THE

6  SCENE IN JERRY SIEGEL'S MATERIAL WHERE A LADY COMES OVER AND

7  SAYS, 'OH, WE'VE HEARD SO MUCH ABOUT YOUR SON,' AND SHE BARGES

8  INTO THEIR HOUSE, AND WE KNOW SHE'S PRYING BECAUSE MRS. KENT

9  SAYS, 'I HAVEN'T SEEN YOU FOR AGES.'  AND THE SCENE DEVELOPED

10 WHERE SHE'S BARGING IN; SHE'S ASKING ABOUT SUPERBOY, THE

11 ADOPTED SON WHO THEY'VE HEARD SO MUCH ABOUT.  THAT SCENE IS NOT

12 IN THERE BY ACCIDENT.  IT'S IN THERE TO SHOW EXACTLY THIS

13 POINT:  THAT IN A SMALL TOWN, IT'S GOING TO BE VERY HARD FOR

14 HIM TO KEEP HIS IDENTITY A SECRET.

15         ALSO, A SMALL TOWN, A RURAL SETTING, IS A GREAT

16 CONTRAST FOR HIS SUPER POWERS; IT'S A GREAT CONTRAST FOR THE

17 MIRACLE OF HIS SUPER POWERS.

18         THE COURT:  LET'S SAY I ACCEPT THIS.  YOU RAISED AN

19 INTERESTING POINT.  YOU SAID TO LEAVE THIS FOR THE JURY, THESE

20 SUBJECTIVE COMPARISONS.

21         HOW DO I DO THAT?  HOW DO YOU ENVISION THAT VERDICT

22 FORM ON THIS PARTICULAR QUESTION?

23         MR. TOBEROFF:  IT WOULD BE TO RULE THAT THE SUPERBOY

24 MATERIAL MEETS THE VERY LOW THRESHOLD OF ORIGINALITY BE

25 COPYRIGHTABLE.

EXHIBIT 11-187

ER 737

Page 22

1          THE COURT:  THAT'S WHAT I WAS AFRAID OF.

2          MR. TOBEROFF:  AND IT MEETS THE THRESHOLD TO BE

3 COPYRIGHTABLE.  AND A JURY WILL LOOK AT THOSE ELEMENTS

4 CONTAINED IN THAT MATERIAL, WHEN THEY ARE IN THE FULL TOTALITY

5 OF ANY APPORTIONMENT ARGUMENT, TO ASSESS ANY APPORTIONMENT

6 ARGUMENT OF DEFENDANT.  IT'S JUST ONE OF ANY OTHER PIECES OF

7 MATERIAL THAT PLAINTIFFS HAVE RECAPTURED.

8          IF YOU SAY IT WAS A JOINT WORK, THEY WOULD HAVE

9 RECAPTURED A 50-PERCENT SHARE OF THAT, AND THEY'RE ENTITLED TO

10 THAT, TO BE COMPARED TO SMALLVILLE AND OTHER SUPERBOY WORKS

11 WHICH ARE DIRECTLY SUPERBOY, TO SEE HOW MUCH OF WHAT HE DID IS

12 IN WHAT THEY'RE CURRENTLY EXPLOITING, AND, THEREFORE, HOW THE

13 PROFIT FROM THAT SHOULD BE APPORTIONED.

14          AND DEFENDANTS WILL USE APPORTIONMENT VERY HEAVILY.

15 THEY'RE TRYING TO REDUCE WHAT IS PAYABLE TO PLAINTIFFS IN

16 PROFIT.  THE REVERSE IS TRUE.  PLAINTIFFS SHOULD BE ENTITLED TO

17 USE WHATEVER COPYRIGHTS THEY HAVE GOTTEN BACK TO SHOW THE

18 ELEMENTS IN TODAY'S EXPLOITATION AND WHY THEY'RE ENTITLED TO

19 PROFITS FROM THE EXPLOITATION OF THOSE ELEMENTS.

20          THE COURT:  OKAY.

21          MR. BERGMAN:  YOUR HONOR, MAY I BRIEFLY SUPPLEMENT

22 WHAT MY CO-COUNSEL --

23          THE COURT:  I'M GOING TO GIVE YOU AN OPPORTUNITY.

24          I THINK YOU HAVE A FEW MORE WORDS.

25          MR. TOBEROFF:  I HAVE A FEW MORE WORDS, BUT I'D JUST

EXHIBIT 11-188

ER 738

1 LIKE AN OPPORTUNITY AFTERWARDS TO SPEAK TO YOU AGAIN ABOUT

2 THIS.  I DON'T THINK NOW IS THE TIME TO BRING IT UP.

3          THE COURT:  OKAY.  VERY WELL.

4          I APPRECIATE YOUR DISCRETION.

5          YES, COUNSEL, YOU MAY RESPOND.

6          MR. ZISSU:  INSTEAD OF GOING AROUND AND AROUND ABOUT

7 ENDLESS CHOICES, THAT'S NOT THE QUESTION.

8          THE QUESTION IS, WHAT'S IN HERE?  WHAT CHOICES WERE

9 MADE?  AND WE'VE ADDRESSED THAT.

10          THERE ARE PARTICULAR EPISODES THAT ARE NEW, AND

11 THAT'S IT.  THAT'S BASICALLY IT.  BUT WHAT'S PERVADED BY THE

12 BASIC CHARACTERISTICS OF THE SUPERMAN CHARACTER THROWN INTO AN

13 INFANT OR A TODDLER OR A KINDERGARTEN, THAT'S NOT NEW, AND

14 THERE ARE RULES.  WE'RE TALKING ABOUT A DERIVATIVE WORK.  THERE

15 MAY BE A LOW THRESHOLD FOR COPYRIGHTABILITY IN A PURE SENSE.

16          THE COURT:  ANSWER COUNSEL'S ARGUMENT.

17          HE SAYS IT'S NOT JUST A TODDLER OR AN INFANT OR A

18 TEENAGER, BUT THAT THERE'S AN ENTIRELY DIFFERENT CONTEXT;

19 THERE'S AN ENTIRELY DIFFERENT PSYCHOANALYTICAL FRAMEWORK OF

20 THIS DEVELOPING CHARACTER AND PERSONALITY.

21          MR. ZISSU:  THE CONTEXT IS THEMATIC, AND THOSE ARE

22 IDEAS:  SUPERMAN AS A BABY; YOU HAVE TO SHOW SUPERMAN'S

23 STRENGTH.

24          ANYTHING THAT DERIVES FROM WHAT'S PREEXISTING CANNOT

25 BE OWNED BY WHAT THE DERIVATIVE WORK AUTHOR ADDED.  THE

EXHIBIT 11-189

ER 739

1 PARTICULAR STORY OF THE BABY ON A CHANDELIER, YES, THAT

2 PARTICULAR SEQUENCE.

3         THE DIALOGUE AND THE CAPTIONS, FOR EXAMPLE, IN THE

4 HAUNTED HOUSE EPISODE, WHICH TAKE UP THE LARGEST PART OF WHAT'S

5 ADDED, THEY CAN BE OWNED BY THE DERIVATIVE WORK AUTHOR.

6         SO THAT'S THE ANSWER.

7         BUT THAT'S ONE THING.

8         AND WHEN YOU'RE DEALING WITH ANY WORK, INCLUDING,

9 ESPECIALLY, A DERIVATIVE WORK, WITH PRINCIPLES, LIMITING

10 PRINCIPLES, SUCH AS THE ONE THAT JUDGE WILSON MENTIONED, THE

11 QUESTION REQUIRES JUDICIAL LINE-DRAWING.  IT IS NOT TRUE THAT

12 EVERY CASE IN WHICH THERE'S AN ISSUE OF THIS KIND, WHETHER

13 THERE'S BEEN A NEW WORK PREPARED, IT GOES TO A JURY.

14         WHERE THE FACTS ARE NOT IN DISPUTE, THE CONTENT OF

15 THE WORKS, AND THERE'S NO ISSUE AS TO INDEPENDENT CREATION --

16 INDEPENDENT CREATION IS ONE OF THE RUBRICS OF DERIVATIVE WORK

17 INQUIRY.  AND IN THAT CONTEXT, THERE ARE FACT ISSUES THAT COME

18 UP.

19         IS THERE A PRIOR WORK?  WHAT'S INCLUDED IN THE PRIOR

20 WORK?  DID A SUBSEQUENT CREATOR MERELY, IN FACT, ACTUALLY COPY?

21 ACTUAL COPYING IS A FACT ISSUE.

22         ALL THAT IS PUT ASIDE HERE.  IT'S NOT AN ISSUE OF

23 WHETHER JERRY SIEGEL USED THE PREEXISTING SUPERMAN WORKS.  HE

24 DID; ACCESS IS THERE; COPYING IS THERE; HE SAID THAT HE BASED

25 THE SCRIPT ON THAT.

EXHIBIT 11-190

ER 740

1          ALL THAT'S LEFT HERE IS THE QUESTION THAT PROFESSOR

2 NIMMER SAYS, IN SECTION 2.01(B), REQUIRES JUDICIAL

3 LINE-DRAWING.  AND THAT'S HOW YOU DEAL WITH THE ISSUE OF -- A

4 JURY CAN'T JUST RUN WILD HERE, BECAUSE PRINCIPLES ARE

5 ARTICULATED IN ENTERTAINMENT RESEARCH.

6          AND BY THE WAY, ALSO BY JUDGE EASTERBROOK IN THE REED

7 UNION CASE, COME INTO PLAY.

8          THERE'S BEEN REFERENCE TO ARRANGEMENT, MR. TOBEROFF

9 MENTIONED.  WHERE IS THE ARRANGEMENT THAT WAS NEWLY ADDED

10 THAT'S BEEN AT ISSUE IN THE CASE?

11          THERE ARE THESE SEQUENCES.  THERE ARE THREE OR FOUR

12 OF THEM.  THEY'RE NEW.  THAT'S WHAT WE SAID.  BUT THERE'S A

13 VERY THIN AND LIMITED COPYRIGHT THAT ATTACHES TO THAT, ALTHOUGH

14 IT DOES EXIST.

15          IDEAS HAVE TO BE FACTORED OUT.  THEY JUST HAVE TO BE

16 FACTORED OUT.  THAT'S THE LAW, 102(B).  SO THE QUESTION OF WHAT

17 IS EXACTLY ANSWERED -- OF COURSE, I CAN'T TALK TO THE ENDLESS

18 CHOICES, AND I CAN'T GIVE A GENERAL -- OTHER THAN THESE

19 PRINCIPLES, IT REQUIRES THE COURT TO DO THAT.  AND IT'S DONE

20 OVER AND OVER AGAIN.  THERE'S JUST TONS OF THESE KINDS OF

21 CASES.

22          WHAT WE'RE LEFT WITH -- YOU KNOW, THE MOST CREATIVE

23 THING THAT'S BEEN ADDED, EXCEPT FOR ITS REPETITION, IS REALLY

24 THE VIEWS OF WHAT'S IN THE SCRIPT BY PLAINTIFFS' COUNSEL.

25          THE COURT:  THANK YOU.  I THINK I UNDERSTAND YOUR

EXHIBIT 11-191
ER 741

Page 26

1 POSITION.

2          IS THERE ANYTHING FURTHER FROM THE PLAINTIFFS ON THIS

3 POINT, BECAUSE I'D LIKE TO MOVE ON TO THE SUPERMAN MOTIONS.

4          MR. TOBEROFF:  YES, YOUR HONOR.

5          FIRST OF ALL, DEFENDANTS THEMSELVES, IN LISTING THE

6 CRITERIA THAT A COURT MUST LOOK AT IN A COPYRIGHT INFRINGEMENT

7 ACTION, LISTS CHARACTERS, THEMES, SETTINGS, OUT OF NINTH

8 CIRCUIT CASES, SUCH AS FUNKY FILMS; SO THEN TO TURN AROUND AND

9 SAY THE COURT MUST LOOK AT THEMES IN ASSESSING INFRINGEMENTS,

10 WHICH IS A MUCH -- INFRINGEMENT IS A MUCH HIGHER THRESHOLD TO

11 REACH THAN COPYRIGHTABILITY; SO YOU MUST LOOK AT THEMES AND

12 SETTINGS IN ASSESSING INFRINGEMENT.

13          AND YET, THEMES ARE MERE IDEAS THAT ARE

14 UNPROTECTIBLE.  THEMES ARE ABSOLUTELY PROTECTABLE, AND SECTION

15 101 PROTECTS THE ARRANGEMENT OF EVEN UNCOPYRIGHTABLE ELEMENTS

16 AS SET FORTH BY THE SUPREME COURT IN FEIST.

17          THE REASON WHY THIS IS A JURY QUESTION IS NOT BECAUSE

18 WE KNOW THAT THE FACTS OF CREATION BY SIEGEL OR THAT WE HAVE

19 THE MATERIAL IN FRONT OF US IS SET.  THE REASON WHY THIS IS A

20 JURY QUESTION IS PRECISELY BECAUSE OF THESE SUBJECTIVE CREATIVE

21 INTERPRETATIONS.

22          THIS IS NOT A CASE WHERE SOMEBODY IS CRAWLING OUT OF

23 THE WOODWORK LIKE IN (UNINTELLIGIBLE), WHO SENT A DRAWING OF

24 BATMAN IN, UNSOLICITED DRAWINGS, AND ACCUSED D.C. OF INFRINGING

25 HIS DERIVATIVE BATMAN DRAWING.

EXHIBIT 11-192
ER 742

1          THIS IS A CASE OF THE CREATOR OF SUPERMAN, WITHIN

2 MONTHS OF CREATING SUPERMAN, HAVING A NOTION THAT YOU COULD

3 HAVE A SEPARATE LINE OF SUPERBOY COMICS, AND THEN CREATING THE

4 FIRST PILOT OR SUPERBOY STORY.  IT'S A FAR DIFFERENT MATTER.

5          THE OTHER THING IS THAT DEFENDANTS ARE -- WHILE WE'RE

6 SAYING THIS ISN'T INFRINGEMENT, DEFENDANTS ARE PICKING AND

7 CHOOSING FROM INFRINGEMENT CASES ON THE ISSUE OF

8 COPYRIGHTABILITY.  AND THE CASES HAVE HELD, AND THE

9 COMMENTATORS HAVE HELD, BOTH NIMMER AND PATRY, THAT WHEN IT

10 COMES TO ASSESSING WHETHER SOMETHING IS COPYRIGHTABLE, YOU DO

11 NOT LOOK AT SCENES A FAIRE; YOU DO NOT LOOK AT PRIOR ART; YOU

12 DO NOT LOOK AT NOVELTY.  IT'S A TOTALLY DIFFERENT ASSESSMENT.

13 AND THAT'S THE ASSESSMENT THAT YOU'RE ASKING FOR.  YOU'RE NOT

14 ASKING FOR AN INFRINGEMENT ASSESSMENT.  AND A NUMBER OF

15 COMMENTS THAT MR. ZISSU HAS MADE GO TO INFRINGEMENT.

16          WHEN HE TALKS ABOUT THE TESTS IN AN ENTERTAINMENT

17 RESEARCH FOR A DERIVATIVE WORK -- AND HE TALKS ABOUT USING A

18 DERIVATIVE WORK TO PREVENT THE ORIGINAL MATERIAL FROM BEING

19 EXPLOITED -- THAT'S AN INFRINGEMENT TEST, BUT THAT'S NOT WHAT

20 YOU'RE ASKING ABOUT HERE.

21          THE COURT:  YOU'VE WON THIS POINT.  I RECOGNIZE THAT

22 THERE IS COPYRIGHTABLE MATERIAL IN THESE 13 PAGES.

23          WHAT I'M STRUGGLING WITH IS DEFINING THE SCOPE AND

24 EXTENT OF THAT COPYRIGHTABLE MATERIAL.

25          MR. BERGMAN:  MAY I BE HEARD BRIEFLY?

EXHIBIT 11-193

ER 743

1          THE COURT:  I'LL GIVE YOU A CHANCE.

2          MR. TOBEROFF:  SO THE THING I WANTED TO WAIT TO

3  MENTION AT THE END OF THE SUPERBOY CONVERSATION WAS THAT YOUR

4  HONOR LEFT THE DOOR OPEN EVER SO SLIGHTLY IN THE WAY YOU WORDED

5  YOUR ORDER.  IT WAS VERY CLEAR THE DIRECTION YOU WERE LEANING.

6          I WOULDN'T BE DOING MY JOB IF I DIDN'T SPEAK BRIEFLY

7  ABOUT THE JOINT WORK ISSUE.

8          THE COURT:  YOU MAY, BRIEFLY.

9          MR. TOBEROFF:  I'D LIKE TO JUST POINT OUT A COUPLE OF

10 THINGS.

11         YOUR HONOR MENTIONED IN THE ORDER -- AND I BELIEVE

12 THIS IS ABSOLUTELY TRUE -- THAT THE DEFINITION OF JOINT WORK,

13 WHICH WAS NOT CODIFIED UNDER THE 1909 ACT, WAS CODIFIED -- THE

14 CASE LAW DEVELOPED IT UNDER THE 1909 ACT; IT WAS CODIFIED IN

15 THE '76 ACT.

16         THE '76 ACT, SECTION 101, SAYS, "A JOINT WORK IS A

17 WORK PREPARED BY TWO OR MORE AUTHORS WITH THE INTENTION THAT

18 THEIR CONTRIBUTION BE MERGED INTO INSEPARABLE OR INTERDEPENDENT

19 PARTS OF THE UNITARY WHOLE."  YOU MENTIONED THAT.

20         THE JOINT WORK IN QUESTION HERE, HOWEVER, I

21 RESPECTFULLY SUBMIT, IS NOT SIEGEL'S STORY BECAUSE THERE IS A

22 LEAP OF LOGIC HERE.  SIEGEL'S STORY WAS NOT ILLUSTRATED BY

23 JOE SHUSTER.  THE JOINT WORK IS A DERIVATIVE WORK OF SIEGEL'S

24 STORY, WHICH IS MORE FUN 101.  THAT WAS ILLUSTRATED BY

25 JOSEPH SHUSTER.  OR, WE DON'T KNOW WHO ILLUSTRATED IT.

EXHIBIT 11-194

ER 744

1 DEFENDANT FIRST SAID IT WASN'T ILLUSTRATED BY JOE SHUSTER, AND

2 THEN THEY SAID THAT IT WAS ILLUSTRATED BY SOMEBODY IN HIS

3 WORKSHOP.

4          BUT, YOU SEE, THAT JOINT WORK WAS WRITTEN BY A D.C.

5 WRITER, AND WHEN THAT WAS ASSIGNED TO JOE SHUSTER TO

6 ILLUSTRATE, JOE SHUSTER DIDN'T BELIEVE THAT HE WAS ILLUSTRATING

7 JERRY SIEGEL'S WORK.  HE WAS ILLUSTRATING THE WORK OF THE

8 AUTHOR OF MORE FUN 101.

9          NOW, IT'S TRUE THAT JERRY SIEGEL INITIALLY INTENDED

10 THAT HIS WORK BE A COMIC STRIP, WHICH, BY DEFINITION, IS A

11 JOINT WORK, WORDS AND PICTURES.

12          THE COURT:  NOT ONLY THAT, THE LETTER FROM

13 JERRY SIEGEL ON NOVEMBER 30, 1938 -- I'M REFERRING TO EXHIBIT 8

14 HERE -- CERTAINLY IMPLIES THAT IT'S FROM BOTH HE AND JOE.

15          MR. TOBEROFF:  BUT THE SCRIPT WAS NOT WRITTEN BY

16 JOE --

17          THE COURT:  WELL, THE SCRIPT FOLLOWS -- YES.

18          MR. TOBEROFF:  I DON'T BELIEVE EVEN DEFENDANTS HAVE

19 ALLEGED THAT THE SCRIPT WAS WRITTEN BY JOE SHUSTER.

20          THE COURT:  NO.  OBVIOUSLY, JERRY DID THE WRITING.

21          MR. TOBEROFF:  RIGHT.

22          SO IT'S CLEAR THAT JERRY SIEGEL ORIGINALLY INTENDED

23 AND CONTEMPLATED THAT HIS STORY BE A COMIC STRIP, WHICH, BY

24 DEFINITION, IS A JOINT WORK.  HE EVEN INTENDED THAT HIS

25 PARTNER, JOE SHUSTER, ILLUSTRATE THAT STORY.

EXHIBIT 11-195

ER 745

1          BUT THAT'S NOT WHAT HAPPENED.

2          AND TO JUMP FROM MORE FUN 101 BACK TO THE SCRIPT,

3 BACK TO MORE FUN 101, AND FOR DEFENDANT TO PLAY BOTH ENDS

4 AGAINST THE MIDDLE, LEADS TO A VERY ODD RESULT.  AND THAT ODD

5 RESULT -- AND I BELIEVE THIS IS IMPORTANT, AND IT'S NOT A

6 PARADE OF HORROR ARGUMENT; IT'S A VERY REAL ARGUMENT -- THAT

7 END RESULT IS THAT, ACCORDING TO THIS DECISION, IT WOULD

8 ABSOLUTELY MEAN THAT MERELY BECAUSE SOMEONE WRITES THE LYRICS

9 TO A SONG, WHICH BY DEFINITION IS GOING TO BE A JOINT WORK,

10 LYRICS OR MUSIC, OR WRITES A COMIC STRIP THAT HE DOESN'T

11 ILLUSTRATE, BY DEFINITION A JOINT WORK -- HE INTENDED WHEN HE

12 WROTE IT TO BE A JOINT WORK.  AND IT MEANS THAT A COMPANY COULD

13 TAKE THAT STORY, CREATE A NEW DERIVATIVE WORK, ASSIGN AN

14 ILLUSTRATOR TO IT, OR ASSIGN A SONGWRITER TO DO THE MUSIC.

15          THE COURT:  LET ME STOP YOU HERE.

16          THIS SCRIPT THAT YOU'RE REFERRING TO -- I'M LOOKING

17 AT THE FIRST PAGE 1 OF IT, IT SAYS, "PANEL OCCUPIES FULL PAGE,

18 CONTAINS THE TITLE 'SUPERBOY,' THE BY-LINE 'BY JERRY SIEGEL AND

19 JOE SHUSTER.'"

20          MR. TOBEROFF:  ABSOLUTELY.

21          THE COURT:  THERE'S A STRIP BOX AND AN ILLUSTRATION

22 SHOWING SUPERBOY LEAPING HIGH OVER THE CITY AT GREAT SPEED,

23 ALONGSIDE SUPERMAN.

24          HE CLEARLY INTENDED THIS TO BE A JOINT WORK WITH

25 JOE SHUSTER.

EXHIBIT 11-196

ER 746

1          MR. TOBEROFF:  ABSOLUTELY.  BUT IT NEVER BECAME ONE.

2          THAT'S THE PROBLEM.  IT NEVER BECAME ONE.

3          WHAT HAPPENED WAS, THEY TOOK HIS WORK.  THEY CREATED

4 A NEW DERIVATIVE WORK, WHICH DEFENDANTS SAY DOESN'T HAVE ENOUGH

5 OF THE STORY IN IT.  THEY ASSIGNED THAT DERIVATIVE WORK,

6 WRITTEN BY A TOTALLY DIFFERENT AUTHOR AT D.C., TO JOE SHUSTER,

7 AND JOE SHUSTER'S INTENTION WAS TO ILLUSTRATE THAT WORK.  THAT

8 WAS THE JOINT WORK, NOT JERRY SIEGEL'S STORY, DESPITE HIS

9 INTENTIONS.

10          THE COURT:  I'LL TAKE A LOOK AT THIS, COUNSEL.

11          MR. TOBEROFF:  OKAY.

12          THE COURT:  I WANT TO GIVE THE DEFENSE A CHANCE TO

13 RESPOND.

14          MR. BERGMAN:  YOUR HONOR, WE'VE COME FAR ASTRAY FROM

15 YOUR HONOR'S PRIOR DECISION AND THE QUESTION YOU POSED AT THE

16 OUTSET OF THIS ARGUMENT.

17          YOUR PRIOR DECISION HELD, CORRECTLY SO, BECAUSE THE

18 WORKS WERE INTENDED TO BE A JOINT WORK, THAT IT WOULD BE A

19 JOINT WORK IF THERE WAS SUFFICIENT COPYRIGHTABILITY IN

20 MR. SIEGEL'S SUBMISSIONS.

21          I SAY IT DOESN'T MATTER.  EITHER WAY, D.C. OWNS HALF

22 OF THAT COPYRIGHT AND CANNOT CONCEIVABLY INFRINGE; AND,

23 THEREFORE, THERE CAN BE NO INFRINGEMENT ACTION.

24          DOES THE 13-PAGE SCRIPT HAVE ANY COPYRIGHTABLE

25 MATERIAL?

EXHIBIT 11-197
ER 747

1        SURE, IT DOES.

2        IT HAS MATERIAL OF A CHILD SITTING ON A TACK AND

3  BEING IMPERVIOUS.  IT HAS MATERIAL OF A CHILD TRYING TO JOIN A

4  CLUB AND BEING PUT INTO A HAUNTED HOUSE AND SAVING HIS FRIENDS.

5  IT DOESN'T INCLUDE THE ELEMENTS THAT WERE CONTAINED IN THE

6  ORIGINAL SUPERMAN WORK, BUT IT IS, FOR OUR INSTANT PURPOSES,

7  COPYRIGHTABLE.  BECAUSE IT IS, TO THAT LIMITED EXTENT,

8  COPYRIGHTABLE.

9        IT IS, AS YOU HAVE PROPERLY INDICATED, A JOINT WORK.

10        YOUR PRIOR DECISION SAID THAT THE ONE FACTOR

11 PREVENTING THE COURT FROM FINDING IT'S A JOINT WORK IS WHETHER

12 IT'S COPYRIGHTABLE AT ALL.

13        WELL, IT IS COPYRIGHTABLE TO SOME EXTENT.  IT IS,

14 THEREFORE, SUFFICIENT AS A CONTRIBUTION TO A JOINT WORK.  THE

15 WORK THEN BECOMES A JOINT WORK.  AND D.C., BY VIRTUE OF THE

16 GRANT FROM MR. SHUSTER, OWNS HALF OF THAT JOINT WORK.

17 THEREFORE, IT CANNOT CONCEIVABLY INFRINGE BY LICENSING

18 SMALLVILLE.

19        MR. TOBEROFF IS GETTING WAY AHEAD BY ARGUING

20 APPORTIONMENT; THAT'S SOMETHING TO BE ARGUED MUCH LATER IN THE

21 CASE.  THE IMMEDIATE QUESTION, WHICH YOU RAISE IN YOUR OPINION,

22 IS WHETHER THIS WAS A JOINT WORK.

23        THE COURT:  HOW DO YOU RESPOND TO HIS FINAL ARGUMENT,

24 THEN?

25        MR. BERGMAN:  I TOTALLY DISAGREE WITH MR. TOBEROFF.

EXHIBIT 11-198
ER 748

1          THE COURT:  I EXPECT THAT.

2          MR. BERGMAN:  BUT, YES, OF COURSE.

3          THE RECORD MAKES IT CLEAR.  THE RECORD ON WHICH YOUR

4  HONOR MADE YOUR DECISION MAKES IT CLEAR THAT MR. SIEGEL

5  INTENDED THIS WORK, THE SCRIPT WHICH HE WANTED TO BE PRODUCED

6  INTO A COMIC BOOK, TO BE A JOINT WORK.  THAT'S CLEAR FROM THE

7  BY-LINE THAT HE PUT ON TO IT.  THAT'S CLEAR FROM HIS PRIOR

8  EXPERIENCE.  MR. SIEGEL ISN'T AN ARTIST.

9          THE COURT:  I ACCEPT THAT.  BUT HIS ARGUMENT IS, THAT

10  MAY HAVE BEEN HIS INTENT, BUT THAT DIDN'T HAPPEN.

11          MR. BERGMAN:  WELL, FIRST OF ALL, THAT'S CONTRARY TO

12  WHAT MR. TOBEROFF HAS PREVIOUSLY ARGUED, BECAUSE HE'S

13  PREVIOUSLY ARGUED THAT THE WORK WAS PUBLISHED IN MORE FUN 101.

14          AND I SAY TO YOUR HONOR THAT UNDER THE COPYRIGHT LAW,

15  IT DOESN'T MATTER WHETHER THAT HAPPENED OR NOT.  WHAT MATTERS

16  WAS THE INTENTION OF THE JOINT AUTHORS IN CREATING THAT WORK.

17          THE COURT:  AND PERHAPS THAT'S THE QUESTION I NEED TO

18  COME BACK TO PLAINTIFFS' COUNSEL WITH.

19          WAS IT OR WAS IT NOT?  WAS THE SCRIPT OR WAS THE

20  SCRIPT NOT PUBLISHED IN MORE FUN 101?

21          MR. TOBEROFF:  IT WAS PUBLISHED TO AN EXTENT.

22          THE COURT:  TO AN EXTENT?  TO WHAT EXTENT?

23          I'M SORRY FOR INTERRUPTING YOU, COUNSEL, BUT THIS IS

24  THE QUESTION THAT I THINK YOUR ANALYSIS LEADS BACK TO.

25          MR. TOBEROFF:  THE ANALYSIS IS THAT MORE FUN 101 WAS

EXHIBIT 11-199
ER 749

Page 34

1 A DERIVATIVE WORK.  AND WE'RE LOOKING -- IT'S NOT THE SAME

2 WORK.  AND, THEREFORE, LOOK AT THAT DERIVATIVE WORK --

3          THE COURT:  IT'S A DERIVATIVE FROM?

4          MR. TOBEROFF:  FROM JERRY SIEGEL'S SCRIPT.

5          THE COURT:  FROM THE SCRIPT.

6          MR. TOBEROFF:  THAT DOESN'T MEAN THAT WHEN YOU

7 ILLUSTRATE THAT DERIVATIVE WORK, YOU'RE ILLUSTRATING

8 JERRY SIEGEL'S SCRIPT.

9          THE COURT:  SO THE SCRIPT ITSELF IS UNPUBLISHED,

10 THEN?

11          MR. TOBEROFF:  THE SCRIPT ORIGINALLY WAS AN

12 UNPUBLISHED WORK.

13          THE COURT:  NO.  BUT YOU'RE TELLING ME THAT ALL THAT

14 101 WAS WAS A DERIVATIVE WORK; SO THE SCRIPT ITSELF IS

15 UNPUBLISHED.  CORRECT?

16          MR. TOBEROFF:  IT WAS NOT PUBLISHED VERBATIM IN 101,

17 WHICH MEANS, BY DEFINITION, IT HAS TO BE A DERIVATIVE WORK.

18          THE CONCLUSION THAT DEFENDANTS ARE ADVOCATING, WHICH

19 ACTUALLY COMES FROM, I BELIEVE, JUST ONE CASE, ONE SECOND

20 CIRCUIT CASE, OR IT MAY EVEN BE A DISTRICT COURT CASE, IS WHERE

21 THEY SAID THAT IF AN ARTIST INTENDS THAT HIS CONTRIBUTION IS

22 FOR A JOINT WORK, IT DID NOT MATTER WHO THE OTHER ARTIST IS OR

23 EVEN WHEN THE OTHER ARTIST MAKES HIS CONTRIBUTION.  BUT THAT

24 DECISION ASSUMED THAT THE OTHER ARTIST IS COLLABORATING ON THE

25 SAME WORK.

EXHIBIT 11-200

ER 750

Page 35

1        HERE, DEFENDANTS SAY MORE FUN 101 WAS WRITTEN BY A

2 DIFFERENT AUTHOR AND WAS ILLUSTRATED BY JERRY SIEGEL.  THAT

3 DOES NOT TRANSFORM MR. SIEGEL'S WORK INTO A JOINT WORK.

4        AND THE PROBLEM WITH THIS PUTTING ON THE BLINDERS AND

5 SAYING JOINT WORK IS A QUESTION OF INTENT; HE INTENDED IT TO BE

6 A JOINT WORK, THEREFORE IT'S A JOINT WORK -- THE PROBLEM WITH

7 THAT IS, IT WOULD LEAD TO THE ABSURD RESULT THAT ANYONE DOING A

8 SCRIPT FOR A COMIC STRIP, WHICH BY DEFINITION HAS TO BE A JOINT

9 WORK, OR LYRICS FOR A SONG, BY DEFINITION A JOINT WORK, CANNOT

10 BE PROTECTED.

11        THE COURT:  ISN'T IT A LITTLE DIFFERENT WHEN YOU HAVE

12 THE ACTUAL ARTIST IN MIND, WHETHER IT'S RODGERS AND

13 HAMMERSTEIN, OR IN THIS CASE, SIEGEL AND SHUSTER?

14        MR. TOBEROFF:  NO.  IT SHOULDN'T BE DIFFERENT,

15 BECAUSE THOSE CASES, IN FACT, SAY IT DOESN'T MATTER WHO THE

16 OTHER PERSON IS.

17        THE COURT:  ALL RIGHT.

18        MR. TOBEROFF:  BUT I WANT TO MAKE THIS POINT:  THE

19 ABSURD RESULT IS, IF YOU WRITE A SCRIPT FOR A COMIC, YOU WRITE

20 A LYRIC FOR A SONG, A COMPANY -- IF WHAT DEFENDANTS ARE SAYING

21 IS CORRECT -- COULD SIMPLY TAKE THAT SCRIPT FROM YOU, OR TAKE

22 THE LYRICS FROM YOU.  SAY YOU INTEND IT TO BE A JOINT WORK.

23 THEREFORE, WHAT WE TOOK FROM YOU IS PART OF A JOINT WORK.

24 THEREFORE, SINCE IT'S A JOINT WORK, WE HAVE A NONEXCLUSIVE

25 RIGHT TO EXPLOIT IT, AND YOU CAN'T SUE US FOR COPYRIGHT

EXHIBIT 11-201

ER 751

1 INFRINGEMENT, EVEN THOUGH THEY CLEARLY STOLE YOUR STORY OR

2 LYRIC.  THAT COULD NOT POSSIBLY BE THE RESULT THAT YOUR HONOR

3 IS LOOKING FOR.

4          THE COURT:  I UNDERSTAND YOUR ARGUMENT.

5          OKAY.  VERY GOOD.

6          I DO WANT TO MOVE ON TO THE SUPERMAN MOTION.  WE'VE

7 DEVOTED AN HOUR TO SUPERBOY.  LET'S MOVE ALONG HERE.

8          MR. BERGMAN:  YOUR HONOR, IF I MAY, JUST ONE SENTENCE

9 TO WRAP UP THE POINT, AND MR. TOBEROFF LED RIGHT INTO IT.

10          THE COURT:  YOU MAY.

11          MR. BERGMAN:  THE SCRIPT WAS EITHER PUBLISHED IN 101

12 OR IT WAS NOT.  IF IT WAS PUBLISHED IN 101, IT'S A JOINT WORK,

13 UNDER YOUR PRIOR RULING.  IF IT WASN'T PUBLISHED, IT CAN'T BE

14 TERMINATED.

15          IN EITHER EVENT, IT CAN'T BE THE SUBJECT OF AN

16 INFRINGEMENT.

17          THANK YOU.

18          THE COURT:  ON SUPERMAN, THERE'S A NUMBER OF ISSUES

19 RAISED, AND THE WAY I LAID THEM OUT IN MY NOTES WAS TO GO

20 THROUGH THEM IN CHRONOLOGICAL ORDER, STARTING WITH THE EARLIEST

21 ISSUES, NAMELY THE PROMOTIONAL ADVERTISEMENT, AND KIND OF

22 MOVING FORWARD.

23          I DON'T HAVE A LOT OF QUESTIONS ON A NUMBER OF THE

24 ISSUES.  I DO HAVE QUESTIONS ON SOME OF THEM.  WHAT I WOULD

25 LIKE TO DO IS GO THROUGH MY QUESTIONS FIRST, AND THEN I WILL

EXHIBIT 11-202
ER 752

1 GIVE BOTH SIDES AN OPPORTUNITY TO AMPLIFY ANY OF THE ISSUES

2 THAT THEY MAY THINK I'VE OVERLOOKED OR ISSUES THAT NEED

3 AMPLIFICATION.

4         ON THIS ISSUE OF THE PROMOTIONAL ADVERTISEMENT AND

5 WHETHER IT FELL OUTSIDE THE 56-YEAR PERIOD OF TIME, I'LL GIVE

6 YOU MY TENTATIVE THOUGHTS, AND THEN I'D LIKE TO HEAR, ACTUALLY,

7 FROM BOTH SIDES.

8         ON THE ONE HAND, AT LEAST BASED ON THE EVIDENCE THAT

9 IS BEFORE ME NOW -- AND THAT EVIDENCE MAY CHANGE, BUT BASED ON

10 WHAT'S BEFORE ME NOW, I THINK IT'S PRETTY CLEAR THAT THE

11 PROMOTIONAL ADVERTISEMENT DID FALL OUTSIDE THE 56-YEAR PERIOD.

12         I UNDERSTAND THERE'S EXPERT TESTIMONY.  I'VE READ THE

13 EXPERT TESTIMONY THAT THESE DATES ARE DIFFICULT.  BUT BASED ON

14 THE REGISTRATION DATE FOR THE PARTICULAR MAGAZINES WHICH

15 CONTAINED THOSE PROMOTIONAL ADVERTISEMENTS, BASED ON THE

16 EVIDENCE BEFORE ME, I THINK IT'S CLEAR THAT IT FELL OUTSIDE.

17         AT THE SAME TIME, THE SCOPE OF COPYRIGHTABLE MATERIAL

18 IS EXTREMELY LIMITED, AS I THINK PLAINTIFF POINTS OUT THROUGH

19 THEIR EXPERT.  LOOKING AT THOSE ADS, WHICH DON'T EVEN CARRY THE

20 NAME "SUPERMAN," WHICH YOU CAN HARDLY MAKE OUT WHETHER IT'S AN

21 "S" OR A "5" OR WHAT IT IS ON HIS CHEST.  I MEAN, CERTAINLY YOU

22 HAVE THE CAPE THERE, AND YOU HAVE THE SUPERHUMAN STRENGTH,

23 BECAUSE HE'S CARRYING THIS CAR.  OUTSIDE OF THAT, I DON'T KNOW

24 WHAT THERE IS TO THAT WHICH GARNERS IN WARNER BROTHERS' FAVOR.

25         I MEAN, THERE'S CERTAINLY SOMETHING THERE, AND IT

EXHIBIT 11-203

ER 753

Page 128

```
 1              AND THEN I WILL ISSUE AN ORDER ON THAT AND THEN WE'RE
 2 DONE.
 3              ANY QUESTIONS?  NOW IS THE TIME.
 4              MR. TOBEROFF:  WHAT IS THE DEADLINE FOR THE ESCROW
 5 DOCUMENTS?
 6              THE COURT:  THE ESCROW DOCUMENTS SHOULD BE PRODUCED
 7 THIS WEEK.  I PRESUME IT'S JUST A MATTER OF THE ATTORNEY
 8 TURNING THEM OVER TO THE COURT.  HE SHOULD DO THAT FORTHWITH;
 9 AND I'LL GET A DECLARATION FROM YOU BY FRIDAY, AND FAX IT OVER
10 TO THE DEFENSE AND GET A RESPONSE FROM YOU BY TUESDAY.
11              MR. BERGMAN:  THANK YOU, YOUR HONOR.
12              MR. PERKINS:  THE ONLY OTHER ISSUE, YOUR HONOR,
13 RELATES TO AFTER THE AUDIT IS COMPLETED, A SCHEDULE FOR
14 MR. SILLS TO PROVIDE US WITH HIS REPORT AND FOR US TO BE ABLE
15 TO RESPOND WITH OUR EXPERT REPORT AND THE DEPOSITIONS OF THOSE
16 FOLKS.
17              THE COURT:  YOU SHOULD SCHEDULE THOSE EXPEDITIOUSLY.
18              ANY FURTHER QUESTIONS?
19              MR. BERGMAN:  NO, SIR.
20              THE COURT:  GOOD AFTERNOON.
21              MR. TOBEROFF:  THANK YOU, YOUR HONOR.
22              MR. BERGMAN:  THANK YOU, YOUR HONOR.
23              MR. PERKINS:  THANK YOU, YOUR HONOR.
24 / / /
25 / / /
```

EXHIBIT 11-204
ER 754

1                           CERTIFICATE

2

3 I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
   STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4 THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
   ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5 CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
   THE UNITED STATES.

6

7 _____          _____
   THERESA A. LANZA, CSR, RPR                      DATE
8 FEDERAL OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 11-205

ER 755

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:  Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 12-206**

**ER 756**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Laura Siegel Larson, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" work(s) made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the notices of termination (Document Nos. V3410 D577, V3410 D607, V3410 D630, V3410 D653, V3410 D807, V3410 D830, V3410 D853) served April 3, 1997, by Joanne Siegel and Laura Siegel Larson, that were recorded at the U.S. Copyright Office on February 2, 1998, or the notice of termination (Document No. V3491 D823) served November 8, 2002 by Joanne Siegel and Laura Siegel Larson, that was recorded at the U.S. Copyright Office on November 20, 2002.

EXHIBIT 12-207

ER 757

Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019. Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2. The works (individually, "Work"; collectively, the "Works") to which this Notice of Termination applies are as follows: the illustrated front cover of the SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, as depicted in a reduced black and white form in the advertisements for Action Comics, Vol. 1, No. 1, appearing in the following magazines:[2]

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1, 1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notices of termination dated April 3, 1997 regarding "Superman" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson or the notice of termination dated November 8, 2002 regarding "Superboy" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson. Every reasonable effort has been made to find and list herein every such work. Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

EXHIBIT 12-208
ER 758

| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |
|---|---|---|---|

3.      This Notice of Termination applies to the following grants, assignments, and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)      A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 4, 1937;

(c)      A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)      A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)      A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)      A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

EXHIBIT 12-209

ER 759

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

(g)    A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

4.    The effective date of termination shall be March 12, 2014.

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the Author, Jerome Siegel, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

6.    Jerome Siegel died on January 28, 1996.  There is no living widow of Jerome Siegel, and Laura Siegel Larson is the only living child of Jerome Siegel. Michael Siegel, Jerome Siegel's other child, is deceased and had no children.  As such, the undersigned, Laura Siegel Larson, is the sole person entitled to exercise Jerome Siegel's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary

**EXHIBIT 12-210**
**ER 760**

to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March __6__, 2012

Laura Siegel Larson
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

6

EXHIBIT 12-211
**ER 761**

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

EXHIBIT 13-212
ER 762

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

    A. Larson And DC Formed An Agreement On October 19, 2001 ..........3

    B. Contemplating A Long-Form Document Does Not Defeat A
Deal...................................................................................................7

    C. Larson Has Not Raised Any Material Difference On Any
Essential Term Between The Marks And Schulman Writings .........10

        1. Scope Of Rights .....................................................................10

        2. Monetary Terms .....................................................................11

        3. "Other" Non-Essential Terms .................................................13

        4. The February 2002 Long-Form ...............................................14

    D. Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II. DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-
OF-LIMITATIONS COUNTERCLAIM .........................................16

III. LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

    A. Elements Of *AC#1* Were Made-For-Hire .........................................17

        1. *National* Is Not Preclusive .......................................................17

        2. The 1938 Additions Were Made-for-Hire ...............................19

            a. New Content ..................................................................20

            b. Colorization .................................................................21

            c. Cover Art .....................................................................22

    B. DC Owns The Pre-McClure Strips....................................................23

        1. The Strips Were Made-for-Hire................................................23

        2. Larson's Failure To Terminate The Strips Is Dispositive .......24

    C. Pages 3-6 Of *S#1* Are Works-For-Hire .............................................25

    D. Artwork In *AC#4* Is Work-For-Hire .................................................26

    E. Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION ...................................................................................28

EXHIBIT 13-213

ER 763

# TABLE OF AUTHORITIES

## Cases

*Aalmuhammed v. Lee*,
   202 F.3d 1227 (9th Cir. 1999) ...................................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.*,
   62 Cal.App.4th 348 (1998) .................................................................................7

*Blix St. Records, Inc. v. Cassidy*,
   191 Cal.App.4th 39 (2010) .................................................................................7

*Burroughs v. M-G-M, Inc.*,
   491 F.Supp. 1320 (S.D.N.Y. 1980) ..................................................................23

*Burroughs v. M-G-M, Inc.*,
   683 F.2d 610 (2d Cir. 1982) .............................................................................23

*Chicot County Drainage Dist. v. Baxter County Bank*,
   308 U.S. 371 (1940) ..........................................................................................18

*Clarke v. Fiedler*,
   44 Cal.App.2d 838 (1941) ..................................................................................5

*Comm'r v. Sunnen*,
   333 U.S. 591 (1948) ..........................................................................................18

*Davis & Cox v. Summa Corp.*,
   751 F.2d 1507 (9th Cir. 1985) ..........................................................................18

*Digerati Holdings, LLC v. Young Money Entm't, LLC*,
   194 Cal.App.4th 873 (2011) .............................................................................13

*Dolman v. Agee*,
   157 F.3d 708 (9th Cir. 1998) ............................................................................21

*Duran v. Duran*,
   150 Cal.App.3d 176 (1983) .............................................................................5, 8

*Effects Assocs., Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) ..............................................................................6

i

EXHIBIT 13-214
ER 764

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
119 Cal.App.4th 263 (2004) ................................................................. 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ...................................................................22

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal.App.4th 613 (1991) ...................................................................6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ...................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ...................................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
773 F.2d 1068 (9th Cir. 1985) ...................................................................19

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) ................................................................. 19, 26

*Granite Rock Co. v. Teamsters*,
649 F.3d 1067 (9th Cir. 2011) ...................................................................18

*Harris v. Rudin, Richman & Appel*,
74 Cal.App.4th 299 (1999) ...................................................................5, 7

*In re Pacific Pictures Corp.*,
2012 WL 1640627 (9th Cir. May 10, 2012) ......................................................16

*Inamed Corp. v. Kuzmak*,
275 F.Supp.2d 1100 (C.D. Cal. 2002) ...................................................................13

*Leather v. Eyck*,
180 F.3d 420 (2d Cir. 1999) ...................................................................18

*Levin v. Knight*,
780 F.2d 786 (9th Cir. 1986) ................................................................. 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
777 F.Supp.2d 720 (S.D.N.Y. 2011) ...................................................................24

ii

EXHIBIT 13-215
**ER 765**

*Mattel, Inc. v. MGA Entm't, Inc.*,
616 F.3d 904 (9th Cir. 2010) ..................................................................4

*Murray v. Gelderman*,
566 F.2d 1307 (5th Cir. 1978) ..............................................................24

*Norris v. Grosvenor Mktg. Ltd.*,
803 F.2d 1281 (2d Cir. 1986) ................................................................18

*O'Brien v. R.J. O'Brien & Assocs., Inc.*,
998 F.2d 1394 (7th Cir. 1993) ...............................................................16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
107 Cal.App.4th 516 (2003) ..................................................................11

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 1213 (2d Cir. 1972) ................................................................23

*Playboy Enters., Inc. v. Dumas*,
53 F.3d 549 (2d Cir. 1995) ....................................................................24

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
77 F.3d 309 (9th Cir. 1996) ....................................................................7

*Sanborn v. Fed. Crop Ins. Corp.*,
93 Cal.App.2d 59 (1949) ......................................................................16

*Siegel v. Nat'l Periodical Publ'ns*,
508 F.2d 909 (2d Cir. 1974) ..................................................... 17, 18, 19

*Stephan v. Maloof*,
274 Cal.App.2d 843 (1969) .....................................................................7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) .................................................... *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
429 F.3d 869 (9th Cir. 2005) ..................................................... 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney*,
881 F.2d 772 (9th Cir. 1989) ...................................................................9

iii

EXHIBIT 13-216
ER 766

**Statutes**

17 U.S.C § 204(a) ........................................................................6

37 C.F.R. § 201.10(e)(1)-(2) .........................................................24

CAL. CIV. CODE § 1624 ..................................................................6

**Rules**

FED. R. EVID. 1002 ......................................................................27

EXHIBIT 13-217
ER 767

# INTRODUCTION

This case should have ended long before it began. The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute. Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer. Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C." RER-13. DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter. Even now, Larson tells the Court: "the parties thought they had arrived at terms" in October 2001. LOR-14.

And indeed they had arrived at terms. The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties. Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form. As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay. DC would receive peace with Larson and certainty in its Superman rights. The deal went bad

1

EXHIBIT 13-218
ER 768

only when—and only because—Hollywood businessman Marc Toberoff entered the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing. Under Toberoff's guidance, Larson asserts that, although all parties said they reached agreement on October 19, they were mistaken about essential terms. Her only evidence is an October 26 letter sent by DC's negotiator, John Schulman—which Larson says differs materially from the October 19 letter. She is incorrect, and neither she nor Marks took this position at the time. Every essential term in Schulman's letter is identical in substance to those in Marks' letter. Any difference either involves a non-essential term or is one of semantics. If any material difference does exist, DC has long agreed: the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the 2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire rules. Those rules and deals Larson's father made with DC control here, assuming the Court reaches these issues. Each of the disputed Superman works was created by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point, litigation must come to an end. That point [is] now…." *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011). Judgment should be entered in DC's favor, and the 2001 settlement agreement should be enforced.

EXHIBIT 13-219

ER 769

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer. SER-105, 434. Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent. SER-107-08, 456-61. A contract was formed on October 19; its terms stated in Marks' letter. While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal. And none reflects a disagreement on a material term.

### A. Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute. SER-434. By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one. SER-105-08, 434-35. The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16. SER-105-07, 434-35. DC made an offer on that final point and all other material terms. *Id.* On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed." SER-107-08. Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet. SER-456-61.

3

EXHIBIT 13-220

ER 770

Marks' October 19 call and letter sealed the deal. The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61. The letter unequivocally accepted DC's offer. SER-456 ("The Siegel Family... has accepted D.C. Comics offer of October 16, 2001...."). The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787. A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter. Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer." LOR-14-17. But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer. SER-110, 435. That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor. Larson does not dispute this Court may enter judgment for DC. DCB-28. At a minimum, the issue must be remanded for trial. *Id*. at 34. For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

EXHIBIT 13-221
ER 771

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

5

EXHIBIT 13-222
ER 772

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL. CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and subscribed by the party to be charged *or by the party's agent*") (emphasis added); DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be "signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson concedes Marks was her agent, RER-9, and his letter clearly expresses her "acceptance" to "transfer all of [her] rights in ... 'Superman,'" SER-456, 458. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated for two years, and resolved their last deal point on October 16. SER-456, 463-64. Larson suggests the October 16 deal was so hastily made that within days Marks and Schulman could not remember its terms; exchanged conflicting term sheets; and then let those conflicts fester. LOR-16-17. This account is unsupported. The parties stopped negotiating in October because they had a deal, and Marks *never* objected to Schulman's letter or called it a counter-offer. DC undertook the separate task of preparing a long-form, SER-435, and began performing on the

6

EXHIBIT 13-223

ER 773

2001 deal, reserving amounts due. These are all acts of parties who had a deal.[2]

## B. Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it "was subject to documentation and would need to be reduced to a mutually-acceptable written contract." LOR-26. But (i) Marks' October 19 letter contains no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v. Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St. Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express reservation* to make a contract unenforceable for lack of later documentation, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of intent not binding because it expressly stated it was "of no binding effect on any party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998) (draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may need to say this to mislead Larson about the deal he induced her to abandon—but the *record fact* remains that a reserve was set; it totals more than $20 million, SER-397-99; and the funds will be paid to Larson if this Court enforces the 2001 agreement. Larson gets all of this money, though Marks may have a claim to 5%; only Toberoff loses his improperly obtained 40% (or more) cut. DCB-16-19.

7

EXHIBIT 13-224

ER 774

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By _____
>
> Kevin S. Marks

8

EXHIBIT 13-225

ER 775

Marks never reserves Larson's rights pending a final agreement. That is especially clear when read in conjunction with the first paragraph of Marks' letter, which contain an unambiguous "acceptance" by Larson on defined "terms":

> Dear John:
>
> This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an agreement had already been reached—nothing in it constitutes a "clear reservation" either. Just the opposite: it expressly confirms "the deal we've agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting together the contemplated long-form. And there is no reservation, clear or otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

EXHIBIT 13-226
ER 776

### C. Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings

Larson does not dispute the only essential terms to a copyright transfer are "the subject matter, the price, and the party against whom enforcement is sought." *Levin*, 780 F.2d at 787; LOR-29. But she spends pages of her brief citing places where, in her view, Marks' October 19 and Schulman's October 26 letters differ. Some of the purported differences result from Larson's misapplication of the rules of contract interpretation. Others result from her failure to read the entire letters. The remainder are at most minor differences on non-essential terms. Even if any one met the high test for materiality (and none does), it would not matter. Sworn testimony from Schulman and Marks establishes that Marks precisely understood DC's October 16 offer, and set forth and accepted its terms. SER-110, 112, 435. Inconsistent terms DC tried to add—if there are any—must be ignored. *Facebook*, 640 F.3d at 1037-38. And while Larson says Schulman tried to get a better deal for DC, DC's position has been throughout: *if* there are any material differences in Schulman's letter, Marks' letter controls. RER-6; DCB-31; SER-435-37.

1. *Scope Of Rights*. Larson asserts that a material difference exists as to the scope of the properties—that Marks' letter applies to Superman, Superboy, Spectre, and related properties, but Schulman's supposedly expands the coverage to unnamed other properties. LOR-17. But in eight years of litigation, Larson has never identified a single property or work that she believes is covered by

10

EXHIBIT 13-227
ER 777

Schulman's supposedly more expansive language, and DC has never asserted any rights over these mystery properties.  That is because no such rights exist.

    2. *Monetary Terms*.  Larson asserts that Marks' letter does not allow DC to recover interest on the advances it provides, while the Schulman draft provides that interest "at 100% of prime" can be recovered after December 31 "of year of payment."  LOR-18 (citing SER-458, 467).  Larson is incorrect.  Paragraph 8 of *Marks'* letter provides that "beginning January 1 of the following year," after DC pays an advance, "there shall be interest at the prime lending rate."  SER-458.  This provision, which Larson fails to mention, shows no difference exists at all.

    Larson also suggests that "6% of DC's receipts from all Media licenses" is materially different from "6% of DC's 'gross revenues' derived from 'use of the property in any and all media,'" because "media licenses" is not defined in the Schulman letter, and thus might exclude direct sales or assignments.  LOR-18-19.  But the Schulman letter plainly uses the term "media license" in the broader sense to include such revenues.  It lists revenue from sales of "merchandise actually produced by DC" as an example of revenue from "merchandising licenses."  SER-467.  Because his term "license" includes direct sales, it has the broader meaning that Larson says only Marks' letter included.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526 (2003).

11

EXHIBIT 13-228
**ER 778**

Larson also points to semantic differences between the letters without assigning any weight to their materiality other than her own conclusory statements. For instance, she focuses on the fact that Marks' letter specifies three instances where the 6% media license fee would be reduced to 1.5%, whereas the Schulman draft cited these three instances as "examples." SER-457-58, 467-68, 495. In years of litigation, Larson has never pointed to a fourth property that was swept in.

Larson also suggests Schulman's letter allows DC to pay royalties below 1% in certain cases. LOR-20. Larson never raised this interpretation in her briefing or testimony below. Marks did not read the language that way, SER-536-37, nor did DC's later long-form draft, which clearly set the floor at 1%, SER-497. Even if Larson's new interpretation were correct, she cannot show it materially altered the agreement—particularly since it would permit *more* than 1% royalty in cases where Marks' letter capped the royalty at 1%. LOR-20.

Larson also says Schulman's letter departed Marks' letter by defining the term "extraordinary cases." SER 457, 467. It is hardly surprising that a vague term would be given a more precise definition, and the definition Schulman gave tracks the purpose articulated in the Marks draft, which stated that Six Flags would serve as an example because it "involves numerous characters." SER 457.

Along the same vein, Larson says Schulman's letter amended Marks' by defining "cameo" to mean stories where the subject "characters do not appear in

EXHIBIT 13-229
ER 779

the title of the publication or feature." SER-468. This definition accords with custom, DCB-33-34, and applied reciprocally—DC would not reduce Larson's royalties if one of its other characters (*e.g.*, Batman) made a cameo in Superman. Noting an accepted definition for a vague term is hardly a material change.

3. *"Other" Non-Essential Terms.* Larson also complains of differences in language concerning warranties, indemnification, publicity, and credit, but none are essential terms to a copyright transfer. DCB-34; *Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002). Even if there were disagreement over such non-essential terms, a contract arose on October 19 when agreement on all *essential* terms was reached. *Facebook*, 640 F.3d at 1037-38.

In any event, Larson does not identify material differences as to these non-essential terms. As to the warranties, Larson would have been required to provide "100% ownership" to DC and be subject to a duty of good faith and fair dealing not to interfere with the contract, which is an implied provision of every contract in California. *See Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal.App.4th 873, 885 (2011). The trivial difference in language concerning warranties thus could hardly give rise to "significant potential liability." LOR-22.

Similarly, the so-called "indemnification" provision merely implements the requirement that the "Siegel Family would transfer all of its rights … resulting in 100% ownership to D.C.," SER-458, and that the "Siegel Family" acted "through

13

EXHIBIT 13-230
ER 780

Joanne Siegel and Laura Siegel Larson," SER-456, in providing these rights.  Far

from being "significant obligations of the Siegels to indemnify," LOR-23, the

Siegel Family was asked to indemnify DC against suits by the Siegel Family.[5]

    4.  *The February 2002 Long-Form*.  Larson also points to so-called "vast

differences" between Marks' letter and DC's February 2002 long-form, LOR-24,

but she identifies only a few provisions in that draft that even arguably conflict.

As explained above and in DC's principal brief, DCB-32-33, even if DC proposed

materially different terms in the February 2002 draft long-form, those differences

cannot erase the October 19 agreement.  *Facebook*, 640 F.3d at 1038.[6]

### D.    Marks' August 2002 Memo Confirms A Deal Was Made

A document this Court recently ordered Larson to produce confirms the

parties made a binding agreement in October 2001.  In an August 2002 memo,

---

[5] Larson's remaining items scarcely merit mention.  She says Schulman required travel for Joanne Siegel and this was a material difference given her poor health.  LOR-23.  But Schulman's letter made clear any travel was "subject to [her] health."  SER-464.  Larson also cites a divergence as to credits in paid ads.  LOR-23.  But Schulman's letter requires credit on all "works where credit to creators is customary," SER-469, and Larson presents no evidence such credit was otherwise.

[6] Any differences are not material and are typical of clarifications in a long-form.  Larson says the draft excluded services from the royalty sums.  LOR-19.  But because services were never addressed in the prior drafts, this is not a different term.  The same is true of units, *e.g.*, returned or lost, for which there would be no revenue to pay royalties.  LOR-21.  Larson also says the draft excludes cash advances, LOR-19, but it does no such thing—it states a time when sums paid to DC would vest, SER-481.  Unsurprisingly, Marks told Schulman the February long-form was "consistent" with the October deal.  SER-125-28, 436, 440.

14

EXHIBIT 13-231

ER 781

Marks reminds Larson *four times* that she made a "deal" or "agreement" with DC in October 2001, and said he might have to testify against her if she repudiated it. RER-13. Even though Marks drafted his memo long after receiving Schulman's October 26 letter and after DC sent its February long-form, Marks never suggested that either altered the binding effect of the October 19 deal. Marks never said the parties viewed these two later documents as "counter-offers." Nor did he suggest that these post-agreement documents revealed a "mistake" about the terms of the deal. Rather, Marks stressed again and again that "an agreement was reached" between DC and Larson, and breaching it would subject her to suit. RER-13-14.

As both sides understood at the time, Schulman's October 26 letter and DC's draft long-form were simply parts of hammering out the formal documentation for an agreement that had already been reached. SER-435; RER-13-14. Had Larson worked with DC to document the fine points of their agreement, this matter could have long ago been resolved. But instead, lured by Toberoff's false promises, Larson reneged.

\*      \*      \*

The 2001 deal should be enforced, judgment should be entered in DC's favor, and this case should end. At a minimum, the district court's summary judgment order should be reversed, and the case remanded for a trial on DC's settlement defense.

15

EXHIBIT 13-232

ER 782

## II. DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM

DC's limitations defense turns on one disputed fact—whether settlement talks were terminated by a May 9, 2002, letter from Larson's mother to DC (making this action untimely), or a September 2002 letter from the Siegels to DC. DCB-37-39. While Larson argued below that settlement talks ended in September, she recently argued in the related *Pacific Pictures* case that the May 9 letter "ended" any chance of settling the matter. SER-827, 878-79. A jury should have a chance to hear this evidence and decide which letter ended settlement talks.

Larson contends the May 9 letter did not meet the requirements of the parties' tolling agreement, but that is a jury question. *Sanborn v. Fed. Crop Ins. Corp.*, 93 Cal.App.2d 59, 65 (1949). She also says that in *Pacific Pictures*, she described the May 9 letter as making negotiations "moribund," which means "dying," not dead. But she argued in *Pacific Pictures* the May 9 letter "ended" any prospect of resolving the matter, SER-825—which is possible only if the letter did, in fact, terminate negotiations.

Larson may have taken her new factual position to shield Toberoff from tort liability in *Pacific Pictures*—casting even more doubt on his relationship with her. *Cf. In re Pacific Pictures Corp.*, 2012 WL 1640627, at *1 (9th Cir. May 10, 2012). But whatever her motive, if it is credible for Larson to argue in *Pacific Pictures*

16

EXHIBIT 13-233

ER 783

that the May 9 letter ended any prospect of completing negotiations, then a jury in this case could find the same thing, and thus find that her lawsuit was untimely.

## III.   LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS

DC's cross-appeal challenges the district court's summary-judgment ruling that four Superman works were not made-for-hire:  portions of *Action Comics #1* ("*AC#1*"); *Action Comics #4* ("*AC#4*"); *Superman #1* (pages 3-6) ("*S#1*"); and two weeks of "Pre-McClure Strips."  Larson's opposition is unavailing.

### A.     Elements Of *AC#1* Were Made-For-Hire

Key elements of *AC#1*, added in 1938, were made-for-hire.  *Compare* ER-706, *with* SER-78; *see also* ER-654, 917, 957-59; SER-379-88, 442, 803.  The court in *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974), did not hold otherwise, and Larson's preclusion and merits arguments are without basis.

#### 1.     National *Is Not Preclusive*

Larson argues *National* precludes DC from making its work-for-hire arguments about the 1938 additions to *AC#1*, but she is mistaken.  The sole issue in *National* was whether Siegel and Shuster owned the renewal copyright in *AC#1*. *National* never considered the issue now before this Court:  whether the 1938 additions in *AC#1* were made-for-hire and thus are not subject to termination. Larson's suggestion (LOR-43) that *National* ruled on the work-for-hire status of the 1938 additions is inaccurate.  It merely concluded that these "revisions" were

17

EXHIBIT 13-234
ER 784

not "sufficient to create the presumption that *the strip* [*i.e.*, the *AC#1* Superman strip *in toto*] was a work for hire." 508 F.2d at 914 (emphasis added).

Larson concedes this case involves "evidence [and] argument not presented in [*National*]," but says issue-preclusion applies to any issue DC "could have" raised in *National*. LOR-44. Larson conflates issue-preclusion with claim-preclusion—it is only the latter doctrine that precludes litigating a claim that could have been raised. *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948); *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999). Larson offers seemingly contrary quotations from *Chicot County Drainage Dist. v. Baxter Cnty. Bank*, 308 U.S. 371, 378 (1940), and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985), but the quotes refer specifically to *res judicata* (or claim-preclusion).

Under settled *issue*-preclusion rules, a ruling in a prior case is preclusive only if the issue previously resolved is *identical* to the issue now raised, the issue was *actually litigated* before, and resolving it was *necessary*. *Sunnen*, 333 U.S. at 599-600; *Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); DCB-70. Larson's cases confirm this, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986), and she fails all three elements of the test.

Here, new evidence and argument is presented concerning a new issue—the standalone work-for-hire status of the 1938 additions. And *National*'s comments about work-for-hire were "unnecessary" to its decision. *National* affirmed the

18

EXHIBIT 13-235

ER 785

district court's ruling that Siegel transferred his rights in *AC#1*, and, thus, it did not need to address the district court's alternative ruling that *AC#1* was made-for-hire. Additional "determination[s] adverse to the winning party [*i.e.*, DC] do[] not have preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985). Larson disagrees, saying *National* could only reach the transfer-of-rights issue because it found *AC#1* was not a work-for-hire. LOR-44. *National* belies that reading: its comments on work-for-hire are *four sentences* at the end of the opinion, *after* affirming the district court's transfer-of-rights ruling.

### 2. *The 1938 Additions Were Made-for-Hire*

Larson's merits arguments are equally unpersuasive. The disputed *AC#1* elements were all added in 1938, after DC employed Siegel and Shuster as artists to create new and derivative works for DC. Because these elements were added at DC's "instance and expense," they are either works-for-hire in their own right, or DC is a joint owner of the works that contain them. DCB-42-43, 61-68.[7]

---

[7] Larson concedes "authors of derivative works … own the copyright to their added material." LOR-55. DC thus at least owns the copyright in the 1938 elements. Larson denies DC can be a joint owner because there was no intent "that DC or its staff be considered 'coauthors.'" LOR-53. But her own case—*Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 1999)—confirms that a joint work is created where multiple authors make independent contributions intending that their contributions be integrated into a single work. Here, that was plainly the case. DC exercised control over the creation and merging of the new elements into *AC#1*. DCB-67-68. "[C]omic book[s] are typically the joint work of four artists— the writer, the penciler[,] the inker[,] … and the colorist," *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004), and DC staff artists did the latter work. Larson

19

EXHIBIT 13-236
ER 786

a. *New Content.* Pursuant to the 1937 Employment Agreement, DC instructed Siegel and Shuster to adapt their preexisting Superman story "into a full length … strip" to be included in *AC#1*. ER-957; SER-379, 381. Siegel and Shuster "compli[ed]," ER-957, and "revised and expanded" their story to include new panels, text, and illustrations. ER-654, 957; SER-385-86. DC paid Siegel and Shuster for their contributions, ER-917, 958; SER-383, 804, and had the right to control and supervise them, ER-957; SER-379, 381, 383. These facts are undisputed, and easily satisfy the instance-and-expense test. DCB-67-68.

Larson quotes Shuster's testimony that DC did not give them specific directions "as to what to do or what to include in Superman," LOR-47, but the instance-and-expense test does not require particular directions—only that the work itself be ordered and paid for by the employer, DCB-54-55. It is the *right* to dictate substance that matters, *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879-80 (9th Cir. 2005), and DC owned and did exercise the rights one would expect an employer to exercise, ER-957, SER-379, 381, 383.

---

touts that Siegel and Shuster's names appear on the byline, LOR-53, but this is a custom not remotely dispositive of authorship. Indeed, the pair's names appear on many works made-for-hire that Larson did not seek to terminate, and DC's name appears on *AC#1*, the Promotional Announcements (which make no reference to Siegel or Shuster), and *all* Superman publications. Finally, the Announcements feature the cover art DC created and tout *AC#1*'s "*Color!*," SER-370, making clear these DC-created elements were instrumental to *AC#1*'s "appeal," *Aalmuhammed*, 202 F.3d at 1234.

EXHIBIT 13-237

ER 787

Larson also argues the 1938 Assignment proves that the new material—created before the Assignment—was not work-for-hire. LOR-46. This is wrong for many reasons. Among them, the 1938 Assignment assigned to DC the parts of *AC#1* that Siegel and Shuster created *before* working for DC; it is the work the pair did on the new elements that was made-for-hire. *Fox*, 429 F.3d at 881, also rejects Larson's claim about the assignment. Because the instance-and-expense test is satisfied for the 1938 additions, *supra* at 19-20, the presumption that DC owned all copyright in those works may be overcome only by evidence proving the parties *expressly agreed* Siegel would own the copyright, DCB-43. Larson has no such evidence, and *Fox* holds the mere existence of a later assignment does not qualify.[8]

*b. Colorization.* DC colorist Jack Adler—the only percipient witness—testified that Siegel and Shuster submitted the *AC#1* panels in black-and-white, and other DC artists selected colors to add. DCB-61. Larson does not defend the trial court's erroneous ruling that colorization cannot be copyrighted. *Id.* at 61-62. But she does cite the court's equally erroneous criticism of Adler. LOR-48-49. The court said Adler only "describe[d] procedures generally employed in the printing process," rather than "what actually occurred with respect to" *AC#1*, SER-50, when, in fact, Adler addressed those specifics. He testified it was industry custom

---

[8] Larson rewrites *Dolman v. Agee*, 157 F.3d 708, 712-13 (9th Cir. 1998), as holding, contrary to *Fox*, that an assignment alone rebuts the work-for-hire presumption. LOR-46. *Dolman*, 157 F.3d at 713, cited an assignment as but one of *numerous* factors that *together* sufficed. None of the other factors is present here.

21

EXHIBIT 13-238
ER 788

for artists to submit "comic book work … in black and white," and that this "*was the case with Action Comics No. 1*." SER-442 (emphasis added). He elaborated: "Siegel and Shuster provided the artwork in black and white. Color was applied as part of the regular printing process," and he even identified, by name, the DC artist who "selected the color for Superman's 'S.'" *Id.* Larson speculates Siegel or Shuster submitted "color guides," LOR-49, but no evidence supports this claim.

c. *Cover Art.* DC's February 22, 1938, letter to Siegel makes clear—and Siegel's memoir confirms—that DC's artists "used one of those panel drawings of SUPERMAN" as a template to create "the cover" of *AC#1*. SER-388, 803. Larson says the cover was based on Shuster's "large promotional panel-drawings," LOR-50, but whatever drawing was used as a "template," what matters is that the cover was created *by DC artists* and thus is owned by DC, DCB-62-67.

Larson asserts DC's cover art is not independently copyrightable because it is "closely derived" from an interior panel and any differences are "de minimis." LOR-51. But Larson concedes that the cover features Superman with "a visible S-crest on his chest" as well as "facial features and musculature," LOR-51 n.8, while the interior panel does not.[9] Those differences satisfy the test in *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220, 1226 (9th Cir. 1997), that a derivative work is copyrightable if it contains "non-trivial" variations

---

[9] DC did not use a "low-resolution copy" of the panel. LOR-51n.8. In fact, it enlarged the panel to make it more visible. *Compare* DCB-65-66, *with* SER-86.

EXHIBIT 13-239
ER 789

from the original work.  Larson says the different S-crest, facial features, and musculature appear in *other* panels in *AC#1*, LOR-51 n.8, but those elements first appeared in the Promotional Announcements that DC owns, DCB-80-81, 84.  And, in any event, DC's cover contains *seven other* non-trivial variations, DCB-64-65— all of which meet the *Genesis* test, and none of which Larson disputes.

### B.    DC Owns The Pre-McClure Strips ("Strips")

#### 1.    *The Strips Were Made-for-Hire*

The Strips were created *after* Siegel and Shuster entered into the 1937 employment agreement with DC, and *after* the pair assigned all of their Superman rights to DC in 1938.  ER-602-03, 615, 917; SER-582-89.  DC does not "ignore" the "instance and expense" test because of these agreements.  LOR-55.  Just the opposite:  the agreements are what *satisfy* the "instance" prong, because they mean the Strips were *necessarily* created at DC's instance.  DCB-71-72.  Since DC was the sole owner of all rights in Superman properties, it had complete control over the creation of new Superman material.  *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); DCB-47, 56-57.  It is thus irrelevant that Siegel and Shuster exercised creative independence.  LOR-55.[10]

---

[10] While authors of authorized derivative works "own the copyright to their added material" (LOR-55), where—as here—the derivative work is made-for-hire, the statutory "author" is the hiring party.  *Fox*, 429 F.3d at 881; DCB-9-10, 42-43.

EXHIBIT 13-240
ER 790

Larson concedes "Siegel and Shuster were compensated" for their work, LOR-55, which is enough to satisfy the "expense" prong. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995). And she concedes they created the Strips *expecting* to be compensated for their work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978), and that DC and McClure bore "the financial risk," *Fox*, 429 F.3d at 881—again establishing "expense." But she says the "expense" factor is not satisfied, because Siegel and Shuster were paid a royalty on net profits, rather than guaranteed compensation. LOR-55. Courts "roundly reject[]" that asserted distinction, as Toberoff well knows. *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (collecting cases).

2. *Larson's Failure To Terminate The Strips Is Dispositive*

Larson does not deny that her termination notice omitted *all* information concerning the Strips required by federal law—title, author, copyright date, and registration number. Rather, she argues the omission was harmless, because her notice included a "catch-all" footnote indicating an intent to recapture "every … omitted work." LOR-57. That theory contradicts the plain terms of the rule, which treats as harmless *only* those mistakes that "do[] not materially affect the adequacy of the information" in the notice. 37 C.F.R. §201.10(e)(1)-(2). The *complete omission* of all required information obviously *does* materially affect the adequacy of the notice—even with a catch-all, the required information is nonexistent.

24

EXHIBIT 13-241
ER 791

*Burroughs v. M-G-M, Inc.*, 491 F.Supp. 1320, 1326 (S.D.N.Y. 1980) (omission of

five Tarzan works "'materially affect(s)' the adequacy of the Notice").[11]

   If a termination notice could simply refer to "all works, including omitted

works," there would be no point in requiring *any* information concerning particular

works.  The rules specifically define errors that are harmless, Larson's error is not

among them, and courts cannot engraft new exceptions, especially given the

careful "compromise" the Copyright Act strikes between the rights of heirs and

grantees like DC.  DCB-15-16 (citing legislative history).[12]

### C.    Pages 3-6 Of *S#1* Are Works-For-Hire

   Larson maintains that pages 3-6 of *S#1* were created as part of the original

Superman story in 1935—before Siegel and Shuster entered into a work-for-hire

relationship with DC—and says there is "no evidence" to the contrary.  LOR-53.

Incredibly, Larson has no response (other than to ask the Court not to read it) to

Siegel's refutation of this theory in his memoir:  "[Commentators] state Superman

magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story.

The truth is that the additional pages were specifically created for use in Superman

---

   [11] Larson's effort to distinguish *Burroughs* fails.  It held the omission was "not harmless," 491 F.Supp. at 1326, and the Second Circuit ruled the "incomplete notice left [the grantee] with license to use" the works.  683 F.2d 610, 622.

   [12] Larson complains about DC's "math," LOR-59, but the numbers do not lie: of the 15 Superman works deemed subject to termination, the 12 Strips—80%— were completely omitted from her notices.  DCB-76-77.  That Larson wildly "over-noticed" other Superman works cannot turn a *nonexistent* notice of the Strips into an *adequate* one.

EXHIBIT 13-242
ER 792

Magazine No. 1." SER-805. Siegel's admission and DC's other evidence confirms these pages were made-for-hire on behalf of DC. DCB-78; SER-761.

### D. Artwork In *AC#4* Is Work-For-Hire

It is undisputed Siegel created *no* artwork to accompany the 1934 script that DC later incorporated into *AC#4*—a story illustrated by DC's staff artists. DCB-79-80. Larson's contention that DC cannot simultaneously own these illustrations as the author of a work-for-hire and as a joint author (LOR-54) misunderstands DC's argument. DC's primary submission is that the artwork is owned outright by DC as a work-for-hire, as the 99 panels of illustrations possess far more than the "*de minimis* quantum of creativity" necessary to be copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). The artwork is also a joint work between Siegel and DC, as both intended the script and illustrations to be combined into a comic strip. *Gaiman*, 360 F.3d at 659; *supra* n.7. Larson has no response, except to assert—without explanation—that the ownership of the *AC#4* artwork is "not before the Court." LOR-54. It is. DC claimed ownership below, RER-3, and the district court considered but "decline[d] to address" it in its August 2009 order being appealed, ER-78-79. The issue is preserved. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1397 n.1 (7th Cir. 1993).

EXHIBIT 13-243
ER 793

### E. Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate. The court held the Announcements were not subject to termination—and Larson does not challenge this ruling. LOR-71 n.14. The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy. SER-44-45. Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it. DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing. LOR-72. Not so. DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day." LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002. *See* DCB-82-83 (collecting cases). And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial. In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements. DCB-84; Docket Nos. 30-1, 36-1.

27

EXHIBIT 13-244

ER 794

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or, at the least, reverse and remand on that defense and DC's limitations defense for trial. If the Court finds it has jurisdiction on the copyright issues presented, and it finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: June 19, 2012

EXHIBIT 13-245
ER 795

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(C) because it contains 6,796 words, excluding the portions exempted by FED. R. APP. P. 32(a)(7)(B)(iii).  This brief's type size and type face comply with FED. R. APP. P. 32(a)(5) and (6).

Dated:  June 19, 2012                    O'MELVENY & MYERS LLP

By:   /s/ Matthew T. Kline
          Matthew T. Kline
          Attorneys for Warner Bros.
          Entertainment Inc. and DC Comics

EXHIBIT 13-246
ER 796

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2012, I caused to be electronically filed the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on June 19, 2012, at Los Angeles, California.

/s/ Cassandra Seto

Cassandra Seto

EXHIBIT 13-247
ER 797

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 253 of 328

Page 1

Appeal Nos. 11-56863, 11-56034

CERTIFIED
COPY

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON,
Plaintiff, Counterclaim-Defendant, Appellant,
and Cross Appellee,

v.

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
Defendants, Counterclaimants, Appellees,
and Cross-Appellants.

———————————

ON APPEAL FROM THE UNITIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————————

ORAL ARGUMENT

HEARD BEFORE NINTH CIRCUIT PANEL:

REINHARDT, THOMAS, SEDWICK

NOVEMBER 5, 2012

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR NO. 6420

Merrill Corporation - Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com

EXHIBIT 14-248
ER 798

EXHIBIT 20
265

ORAL ARGUMENT - 11/5/2012

Page 2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 254 of 328

```
 1                    PASADENA, CALIFORNIA

 2                    NOVEMBER 5, 2012

 3

 4                         ---0---

 5

 6      MARC TOBEROFF, ESQ.:  May it please the Court.  Good

 7  morning, your Honors.  My name is Marc Toberoff and I

 8  represent the Plaintiff, Laura Siegel Larson.

 9          I'd like to reserve 10 minutes of my 20 minutes

10  for rebuttal, if I may.

11          The Copyright Act's termination provisions were

12  designed to remedy the tremendous imbalance of power

13  between author/creators and media companies and to give

14  an author and an author's family an opportunity after a

15  very long waiting period to participate in the increased

16  market value of their works by finally recovering their

17  copyrights for the extended renewal term.

18          This case has become emblematic of the kind of

19  war of attrition an author's family must endure before

20  vindicating those rights.

21          I'm going to first turn to Warner Bros.'s

22  alleged settlement agreement defense.

23          Warner Bros.'s defense is based on a false

24  contract -- construct that it can artificially limit the

25  legal analysis to a single October 19th letter from the
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com/law

EXHIBIT 14-249
ER 799

EXHIBIT 20
266

ORAL ARGUMENT - 11/5/2012

Page 3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 255 of 328

1    Siegels' attorney and call that a contract, regardless

2    of the differing the terms in Warner Bros.'s October

3    26th counteroffer and vastly different terms in Warner

4    Bros.'s February 1st counteroffer, which were part and

5    parcel of the exact same contract negotiation.

6            The cases Warner Bros. relies on are in the

7    opposite, particularly the Facebook case.

8            In the Facebook case, unlike here, you had a

9    binding contract signed by the parties.  That contract

10   also contained a stipulation saying that it would be

11   binding and enforceable in a court of law.  So the

12   question before the Ninth Circuit was whether the terms

13   of that contract were sufficiently definite to be

14   enforceable.  And of course this Court, since it

15   basically called for the payment of fixed amounts of

16   cash and stock, found that it was enforceable.

17           None of that exists here.  After the

18   termination --

19   JUDGE REINHARDT:  Are you saying there was no

20   contract or that the contract, if it existed, was not --

21   not a contract that could be enforced?

22   MARC TOBEROFF, ESQ.:  There was no contract signed

23   by the parties.

24   JUDGE REINHARDT:  No.  I said -- that's your first

25   contention, that there's no contract.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 256 of 328

1            Is it your second contention or is that the

2    issue, whether there was a contract?

3        MARC TOBEROFF, ESQ.:  In this case --

4        JUDGE REINHARDT:  Yes.

5        MARC TOBEROFF, ESQ.:  -- the issue is whether

6    there's a binding contract.

7        JUDGE REINHARDT:  Okay.

8        MARC TOBEROFF, ESQ.:  So here after the effective

9    date of the settlement -- of the Siegels' termination in

10   April of 1999, on again/off again settlement discussions

11   ensued.

12           And on October 9th, John Schulman on behalf of

13   Warner Bros., their general counsel, and Kevin Marks on

14   behalf of the Siegels held a telephone conference.

15           On October 16th, Marks sends over a letter

16   purporting to set forth the terms that were discussed on

17   October 16th.

18           On October 19th in his letter, he's -- he's

19   going over the terms, but it's an equivocal letter

20   because at the end he says, "John, if I got anything

21   wrong, please let me know."

22       JUDGE THOMAS:  Why do you say that's equivocal?

23       MARC TOBEROFF, ESQ.:  Because it shows at the very

24   beginning it's indefinite because he's unsure of --

25       JUDGE THOMAS:  No.  That's using typical language.

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com/law

EXHIBIT 14-251
ER 801

EXHIBIT 20
268

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 257 of 328

Page 5

```
 1    It makes -- "this is what I see."

 2            I mean, the response to it, if they -- if they

 3    had written back and said, "No.  You're right," you'd

 4    have to agree that there's a contract; right?

 5       MARC TOBEROFF, ESQ.:  That could be the case.

 6       JUDGE REINHARDT:  What could be the case?

 7       MARC TOBEROFF, ESQ.:  Well, you said --

 8       JUDGE REINHARDT:  "This is absolutely right.  This

 9    is the contract we agreed to," isn't -- wouldn't that be

10    enough?

11       MARC TOBEROFF, ESQ.:  It's further along than the

12    facts here, but what happened here isn't --

13       JUDGE REINHARDT:  That I know, but that wasn't the

14    question.

15       MARC TOBEROFF, ESQ.:  Okay.

16       JUDGE REINHARDT:  All right.  So this could be the

17    contract if the parties agreed to it?

18       MARC TOBEROFF, ESQ.:  That's correct, if the party

19    agreed to material terms, you could have a contract.

20       JUDGE REINHARDT:  Yeah.

21            So you don't think that it's proper for a

22    lawyer who says, "This is the contract we agreed to.  If

23    you have any question about it" --

24       MARC TOBEROFF, ESQ.:  I don't think it's --

25       JUDGE REINHARDT:  -- "tell me"?
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com

EXHIBIT 14-252
ER 802

EXHIBIT 20
269

ORAL ARGUMENT - 11/5/2012

Page 6

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 258 of 328

1      MARC TOBEROFF, ESQ.:  -- improper at all, but I

2    don't think that forms --

3      JUDGE REINHARDT:  But, I mean, that shows

4    uncertainty?

5      MARC TOBEROFF, ESQ.:  It's not an unequivocal

6    acceptance of terms, but -- but even that --

7      JUDGE REINHARDT:  No.  It's a statement of the

8    terms.

9      MARC TOBEROFF, ESQ.:  It's a statement of what he

10   perceived the terms as discussed on October 16th.

11        On October 26th, Schulman writes back while

12   he -- Marks then goes off to China.  On October 26th,

13   Schulman writes back and in effect says, "You got it

14   wrong.  Enclosed is a more fulsome outline of what we

15   believe the terms of the deal are."

16        That constitutes a counteroffer because the

17   terms outlined in the October 26th letter from Schulman

18   materially differ from the terms in the October 19th

19   letter from Marks.

20        A counteroffer in the State of California

21   extinguishes Marks' offer.  Marks' offer itself is a

22   counteroffer because he purports to accept an offer on

23   October 16th that Schulman then tells him was never

24   made.  You could stop right there --

25      JUDGE THOMAS:  He didn't say that.  He said that's

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 14-253
ER 803

EXHIBIT 20
270

ORAL ARGUMENT - 11/5/2012

Page 7

1      "a more fulsome outline."

2              I mean, we have a -- there are sort of two

3      issues.   One is, did the parties ever agree to the

4      terms?   And -- and, two, were the terms embodied in the

5      first letter and-- and should a court enforce that?

6              And we've had -- there are cases that go a

7      little bit all over the map on that, but, I mean, there

8      are a lot of cases in which you say, "All right.   We

9      know you added some terms, but this is the agreement the

10     Court is going to enforce," and it's the simple

11     agreement as to terms.

12             So what -- what tells you that they're making a

13     true counteroffer as opposed to adding a bunch of

14     conditions that a court could later say, "Well, we're

15     not going to put those in because obviously the parties

16     didn't agree to them"?

17     MARC TOBEROFF, ESQ.:   Well, there's no agreement by

18     Warner Bros. as to the terms set forth in his letter.

19     In fact, there's disagreement.   There's disagreement as

20     to the properties that are being assigned.   There's

21     disagreement as to the essential term of compensation,

22     which you're dealing with a -- you're not dealing here

23     with a payment of cash and stock.   You're dealing with a

24     complex royalty system applicable to multiple media

25     where you're dealing with Marks that says, "We will not

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com

EXHIBIT 14-254
ER 804

EXHIBIT 20
271

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 259 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 260 of 328

1    indemnify Warner Bros.  We'll only warrant -- we haven't

2    sold these rights to someone else," and Warner Bros.

3    adding six or seven warranties with indemnifications

4    attached.

5         JUDGE REINHARDT:  Well, both sides agreed that they

6    had agreed to a contract.

7         MARC TOBEROFF, ESQ.:  No.  Both sides perceived that

8    they had a deal in principle.  And the cases have said

9    that a deal in principle does not make a binding

10   contract.

11        What happens is in his October 26th

12   counteroffer Schulman doesn't stop there but he makes

13   reference and incorporates by reference a February 1st

14   draft that then comes in and widens the gap between the

15   parties even further.

16        On -- on May 9th, Joanne Siegel reacts to the

17   new and different terms that are being added by Warner

18   Bros. and -- and rejects those terms and says, "There

19   will -- there is no agreement."

20        And on May 26th -- she wrote a letter to the

21   CEO of Time Warner, Dick Parsons.  On May 26th, 2002

22   Dick Parsons writes back and acknowledges that they had

23   no agreement.  He says, "We hope the parties can arrive

24   at an agreement."

25        From that point on, from October 19th of 2001

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 261 of 328

1    until we filed suit in -- in October of 2004, Warner

2    Bros. not once said that, "We have an agreement and we

3    accept the terms in the October 19th letter."  They were

4    totally silent for three years about that.

5          They come up with this concocted defense when

6    we filed suit to enforce the termination rights.  Under

7    cop- --

8    JUDGE THOMAS:  You've described a lot of factual

9    considerations.

10         Why -- why isn't this a matter for trial as

11   opposed to summary judgment?

12   MARC TOBEROFF, ESQ.:  Because contract formation is

13   based on the objective manifestations of the parties'

14   intent.  And here you have that objective manifestation

15   in the form of three or four undisputed documents: the

16   October 19th offer or counteroffer, the October 26th

17   counteroffer, the February 26th counteroffer, the May

18   9th rejection, and the May 26th letter in response

19   acknowledging that there's no agreement.

20         Warner has not come up with anything that

21   creates a genuine issue of material fact.

22         It -- the Court not only was allowed to rule on

23   summary judgment, it was required to rule on summary

24   judgment.

25   JUDGE THOMAS:  Why do you say that, "required"?

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 262 of 328

Page 10

```
 1         MARC TOBEROFF, ESQ.:  Because -- because based on --

 2    based on this undisputed objective manifestation of the

 3    parties' intent there, was no meeting of the minds on

 4    the material terms.  The Court rightly said, "I can

 5    point to no document that contains the parties'

 6    agreement."

 7         Warner Bros. -- a negotiation is a give and

 8    take.  You can't take an offer -- you can't go back

 9    freeze in time and take an offer that a party made, a

10    proposal that you eviscerated by the counteroffer,

11    continued to grind the other side in negotiations, and

12    when that fails, reach back and try and resuscitate a

13    offer that has been extinguished by a counteroffer.

14         JUDGE REINHARDT:  Well, an agreement was reached,

15    according to your client's lawyer -- right? -- and he

16    advised the other side on August 9th that, "I must

17    caution.  I believe an agreement was reached last

18    October, albeit subject to documentation."

19         So the issue was whether the documentation

20    reflected the agreement.

21         MARC TOBEROFF, ESQ.:  The contract fell apart, as

22    many contract negotiations, in the attempt to focus on

23    the details of the agreement.

24         JUDGE REINHARDT:  There was an agreement and then

25    there was a dispute over the details, the documentation
```

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 263 of 328

1    of it.

2        MARC TOBEROFF, ESQ.:  No.  There was a deal in

3    principle.  But that deal in principle, for instance,

4    involved a 6 percent royalty.  That 6 percent royalty

5    had all sorts of sliding scale reductions.  There were

6    exclusions as to revenues to -- to which that royalty

7    would apply, would not apply.  You had very important

8    issues (unintelligible) studio agreements.  You have a

9    series of warranties that have indemnifications attached

10   to them, and if someone is found that you've breached

11   that warranty, they withhold the money on the royalty.

12       JUDGE THOMAS:  No.  I understand that.

13       MARC TOBEROFF, ESQ.:  The question is not whether

14   that's an unusual term.  The question is whether it

15   had -- it was contained in the October 19th letter.  And

16   here he's saying, "There will be no indemnification from

17   the Siegels."

18            So the question is, does that become a material

19   term of the agreement?

20            And it certainly is a material term.  The fact

21   you have such indemnities customarily in agreements I

22   would submit is not the issue.

23            The question is, did they agree to it on

24   October 19th?  And they didn't.

25            Did Warner Bros. make that the condition of an

Merrill  Corporation - Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com

EXHIBIT 14-258
ER 808

EXHIBIT 20
275

ORAL ARGUMENT - 11/5/2012

Page 12

1    agreement?  Yes, they did.

2            And if-- and if these -- you know, people say

3    "a deal is a deal" precisely when they don't have a

4    binding contract.

5            If these terms were not material to Warner

6    Bros., then why did they insist upon them?

7            If a deal is a deal, then why did they go --

8    why didn't they just accept the October 19th recitation

9    of the terms and why did they continue to grind the

10   Siegels in the October 26th outline and in their

11   horrendous contract?

12           If you -- the same attorney, Marks, who sent

13   that attorney-client communication, which ordinarily

14   would have been privileged but for the fact it was

15   stolen from my law offices, the same attorney that wrote

16   that testified at length at deposition why, although he

17   thought there was a deal, there was no binding contract,

18   and he goes term by term by term in sworn testimony

19   comparing the huge gaps between the parties that had

20   developed.

21           You can't form a contract for the parties.  The

22   contract -- the parties have to form a contract

23   themselves.  Nor can you go back and -- and arrest the

24   legal analysis.

25   JUDGE REINHARDT:  I don't understand what that

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 264 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 265 of 328

1    means.

2           You can't form a contract between the parties

3    if you're their representative?

4       MARC TOBEROFF, ESQ.:  No.  A court cannot write a

5    contract for the parties when the parties themselves

6    cannot agree upon the terms.

7       JUDGE THOMAS:  No.  The only question is whether

8    they had an agreement in the earlier deal -- that's the

9    question -- and whether then there was a counteroffer

10   made later?  I mean, those are -- those are the two

11   questions.

12          I mean, if they had -- we have all sorts of

13   cases where you -- it happens all the time in

14   mediation.  Parties agree on principle.  They draft up a

15   set of principal points, and then they go draft

16   documents, and then another fight erupts and they say,

17   "Well, we can't agree on this."  It might be

18   indemnity.  It might be something else.  And then the

19   Court says, "All right.  I'm going to enforce the

20   initial agreement that you made, period."

21          Isn't that the question here?

22      MARC TOBEROFF, ESQ.:  No.  Here you don't even have

23   the first point.

24      JUDGE REINHARDT:  Well, that's --

25      MARC TOBEROFF, ESQ.:  Unlike --

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 266 of 328

```
 1          JUDGE THOMAS:  That's why --

 2          MARC TOBEROFF, ESQ.:  Unlike in the Facebook case

 3     where you have a signed document signed by the parties

 4     agreeing to certain terms that are definite and

 5     enforceable, you don't even have that here.

 6              And the reason we know you don't have that here

 7     is because rather than accept -- in your hypothetical

 8     you say they would accept the October 19th terms.  They

 9     did the opposite.  They didn't accept them.

10          JUDGE THOMAS:  Well, they purported to by saying,

11     "Here's a more fulsome."

12              Now, you -- you would say -- you say that's

13     artifice and they were actually counter- --

14          MARC TOBEROFF, ESQ.:  Of course.

15          JUDGE THOMAS:  -- counterclaiming.

16          MARC TOBEROFF, ESQ.:  In the Valente -- in the

17     Valente-Kritzer case this Court held that congratulatory

18     words as to --

19          JUDGE THOMAS:  Yeah.

20          MARC TOBEROFF, ESQ.:  -- finally arriving at a deal

21     or in our case a monumental accord are meaningless.

22              What you look to is the objective manifestation

23     and you don't have an agreement where you don't have a

24     mutual meeting of the minds on the material terms of an

25     agreement.
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com/law

EXHIBIT 14-261
ER 811

EXHIBIT 20
278

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 267 of 328

1           And here the objective evidence proves that.

2     And that's why in summary judgment the Court was

3     required to find there was no agreement.  And there is

4     nothing that they put forward that raised a genuine

5     issue of fact as to contract formation.

6           I'd like to reserve the remainder for rebuttal.

7     JUDGE REINHARDT:  Thank you.

8     MARC TOBEROFF, ESQ.:  Thanks.

9     DANIEL M. PETROCELLI, ESQ.:  May it please the

10    Court.  Daniel Petrocelli with my colleagues Cassandra

11    Seto and Matt Kline for the DC Comics parties.

12          Turning initially to the issue of the

13    settlement agreement, it's our fundamental position that

14    this was not a matter appropriate for summary judgment

15    and that the Court should have allowed this to go to

16    trial on the lynchpin factual issues of whether or not

17    the parties reached an agreement, and if so, to what?

18          And our position in the Court below and in this

19    appeal was that the parties did reach an agreement with

20    the acceptance letter that the plaintiff's lawyer sent

21    to DC Comics on October 19, 2001 at SER 456.

22          This is a detailed recitation of terms written

23    in powerful legal language of acceptance which says, "We

24    hereby -- the Siegel family has accepted DC Comics'

25    offer," and then it goes on to say, "The terms are as

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 268 of 328

1   follows," and this was the culmination of two-and-a-half
2   years of back and forth negotiations, and the record
3   before the District Court was that this letter was
4   written following a phone call between the two principal
5   negotiators where they resolved the last deal point, and
6   the testimony of Mr. Marks, the plaintiff's
7   representative was, "We are closed.  We will send you
8   the document."  Mr. Schulman responded, "Great.  We'll
9   start working on a long form."
10        This document is then sent, and a week later
11   Mr. Schulman responds, and, very importantly, this
12   document is sent by one of the most experienced lawyers
13   in one of the most experienced law firms in the country
14   dealing with entertainment contracts.  This lawyer who
15   knows and probably has written thousands of times a
16   reservation of rights that this document is not binding
17   until and unless a long form or a more formal document
18   is executed says no such thing in this letter.
19   JUDGE REINHARDT:  Now, are you talking about
20   Mr. Schulman's letter?
21   DANIEL M. PETROCELLI, ESQ.:  No.  I'm talking about
22   the acceptance letter, the document that constitutes the
23   contract.  That's the letter of October 19, 2001.
24   JUDGE REINHARDT:  All right.  And then you said -- I
25   thought you said that the reply --

Merrill  Corporation - Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com

EXHIBIT 14-263
ER 813

EXHIBIT 20
280

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 269 of 328

1          DANIEL M. PETROCELLI, ESQ.:  Okay.

2          JUDGE REINHARDT:  -- was written by Schulman.

3          DANIEL M. PETROCELLI, ESQ.:  I may have misspoken.

4               But in this document following the conversation

5     with the DC representative, there's no indication in

6     here that the parties do not intend to be bound until

7     some future event.  There's no reservation, and the

8     testimony in the record is, "We are closed."

9               Then a week later, Mr. Schulman, the recipient

10    of Mr. Marks' letter and the other negotiator, responds

11    to it, and he states -- and I won't characterize it as a

12    counteroffer because I think that's begging the issue.

13    He states, "I've received it.  I've reviewed it.  I

14    enclose herewith for you and Bruce a more fulsome

15    outline of what we believe the deal we've agreed to is.

16    We're working on the draft agreement so that by the time

17    you have accomplished something of truly momentous

18    import, we will have this super matter transaction in

19    document form."  And then he goes on and flushes out in

20    more detail the same terms that appear in the October 19

21    letter and adds some things here and there to be sure,

22    like an indemnity or he flushes out a detail on some of

23    these royalty provisions.  These are essentially

24    immaterial variations and differences that are the

25    normal part of a process of commencing a long -- a long

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com/law

EXHIBIT 14-264
ER 814

EXHIBIT 20
281

ORAL ARGUMENT 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 270 of 328

1    form document.

2          Now, the error, the fundamental error of

3    analysis here both by the District Court and by

4    Mr. Toberoff is -- is the fact that this process is

5    going on, that there's now an effort to create a long

6    form is dispositive of the -- of conclusion that

7    there is no contract.

8          And that's what the District Court ruled.

9    Simply because the parties after the contract was formed

10   in the -- in the unambiguous acceptance letter, just

11   because of that, the fact that they now endeavor to do a

12   long form, the judge concluded as a matter of law there

13   can be no agreement.

14         And that's just wrong.

15         There are scores of cases.  This is an

16   extremely familiar situation where parties believe

17   they've reached a deal.  They have a confirmatory letter

18   or document.  They go off to prepare the long document.

19   Something happens, things breakdown, and one side then

20   says, "We don't have a deal."

21   JUDGE REINHARDT:  Was there any affidavit or

22   information introduced in the District Court as to the

23   custom and practice in the industry of reaching an

24   agreement, proceeding with it and then having the

25   documents prepared?

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com

EXHIBIT 14-265
ER 815

EXHIBIT 20
282

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 271 of 328

1    DANIEL M. PETROCELLI, ESQ.:  There was no custom and

2    practice evidence in the record, but to be sure, that

3    would be highly relevant on the issue.

4        Mr. Schulman had a direct declaration in the

5    record saying that Mr. Larson's (sic) letter accurately

6    reflected all the terms of the deal and that he wasn't

7    intending to change anything and he was just flushing

8    out the detail.

9        Now the proof is in the pudding.

10       In response to this letter of October 26, which

11   the plaintiffs want to suggest is some material

12   departure, they even go so far as to say this is a

13   counteroffer.  In response to Mr. Schulman's letter,

14   Mr. Marks never objects.  He never reaches out and says,

15   "Wait a second.  You got a problem.  That's not what

16   we've agreed to."

17   JUDGE REINHARDT:  Tell me why, if that's correct, is

18   this matter for trial rather than summary judgment for

19   you?

20   DANIEL M. PETROCELLI, ESQ.:  Well, we did not move

21   for summary judgment in the Court below.

22   JUDGE REINHARDT:  You're not asking for that here?

23   DANIEL M. PETROCELLI, ESQ.:  Well, we think the

24   record evidence that there is an agreement is so strong

25   that we do think it can support a judgment in our favor,

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277           www.merrillcorp.com

EXHIBIT 20
283

EXHIBIT 14-266
ER 816

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 272 of 328

1   but we -- at the very minimum we believe that we're

2   entitled to a trial.

3        The judge just departed wildly from the summary

4   judgment standard.  He drew all that adverse inference

5   against us.  He -- he did not understand that the

6   question of whether or not the long form process does or

7   does not negate a prior agreement is a factual

8   question.

9        Your Honor dealt with that issue, if I may, in

10  the -- you had a case with Judge Pregerson on -- it was

11  the Best Interior -- the Best Interiors case, the same

12  situation.  The plaintiff was a labor union and they --

13  and they sued this company, and they had an agreement,

14  they had a handshake agreement, and then they went on to

15  do a long form, and things broke down, and the judge

16  concluded there was no deal as a matter of law, and this

17  Court reversed that and this Court said that the

18  question of the intent to contract is a fact issue.  The

19  question of whether the subsequent events undid the

20  prior agreement or didn't undo the prior agreement,

21  that's a fact question.

22  JUDGE THOMAS:  So are there undisputed facts or

23  not?

24       I mean, I -- I'm not sure I -- I understand

25  your answer because Judge Reinhardt was asking you, "Is

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com

EXHIBIT 14-267
ER 817

EXHIBIT 20
284

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 273 of 328

1    there sufficient evidence to -- for summary judgment in

2    your favor?"  And -- and you said, "Well, yes, there are

3    fact issues," so I'm --

4         DANIEL M. PETROCELLI, ESQ.:  There are -- there

5    are --

6         JUDGE THOMAS:  Tell me aside from the documents

7    themselves what genuine issues of material fact you

8    would raise.

9         DANIEL M. PETROCELLI, ESQ.:  The ques- -- the

10   threshold question of whether the parties intended to be

11   bound and by this letter, by this -- by this acceptance

12   letter or whether they intended not to be bound at that

13   time but only upon such time as they agreed to a long

14   form.  We say that they intended to be bound at this

15   time.

16        But that question and all the events that

17   happened, that's evidence that's relevant to the

18   threshold issue of whether or not there was a deal in

19   the first place.  It is not dispositive that there was

20   no deal.

21        And so that's the -- that's the fundamental

22   factual issue.

23        There's a second factual issue, I suppose, and

24   that's what -- what terms the parties agreed to.

25        Well, we -- our position is it's everything in

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 274 of 328

1   this letter, nothing more.  To the extent that

2   Mr. Schulman's letter is perceived to have added terms

3   or suggested new terms, they're not part of the deal.

4   It's that simple.

5       JUDGE THOMAS:  Why isn't that a matter of law that

6   you can decide on the basis of the documents

7   themselves?

8       DANIEL M. PETROCELLI, ESQ.:  You can decide as a

9   matter of law that if the parties reached the contract

10  as of October 19, everything thereafter doesn't matter.

11       What can't be decided as a matter of law is

12  that the parties did not reach an agreement.  That

13  cannot possibly be resolved against us with this record

14  of direct admissions by the plaintiffs that there was an

15  agreement, not only in the acceptance letter, not only

16  in the no response to Mr. Schulman's letter, thereby

17  indicating there was nothing significant or new or

18  different about it, but --

19      JUDGE REINHARDT:  Well, the second one was even more

20  fulsome than the first, I guess.

21      DANIEL M. PETROCELLI, ESQ.:  Excuse me?

22      JUDGE REINHARDT:  The second one was more fulsome

23  than the first.

24      DANIEL M. PETROCELLI, ESQ.:  The second one to be

25  sure was 50 pages of boilerplate, yes, but --

EXHIBIT 14-269
ER 819

EXHIBIT 20
286

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 275 of 328

1        JUDGE THOMAS:   Well, except -- except perhaps as to

2    royalty rate.

3        DANIEL M. PETROCELLI, ESQ.:   Excuse me?

4        JUDGE THOMAS:   Except perhaps as to royalty rate.

5        DANIEL M. PETROCELLI, ESQ.:   Well, under royalty

6    rate, if you really read the letter between Mr. Schulman

7    and Mr. Marks, they're -- they're flushing out very

8    precise little details about when the royalty rate gets

9    reduced, if multiple characterizes are involved, if it's

10   a cameo appearance, if it's a special project.   I mean,

11   this is why sometimes documents take 50 pages or more.

12        But that's not a material term, the absence of

13   which would negate a contract, and if it were, that

14   itself is a question of fact.   And case after case say

15   the -- the importance to which the parties attach to

16   particular terms is a fact question.

17        There was a question to Mr. Toberoff earlier I

18   think by Judge Reinhardt about whether this document,

19   this -- this contract, this acceptance letter of October

20   19 has sufficient material terms to constitute a

21   contract.

22        It does.   It easily passes the test.   I mean,

23   the threshold, as the Facebook case illustrates, is very

24   low: price, term.   So there's no question that this

25   document contains sufficient terms that a court could

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com/law

EXHIBIT 14-270
ER 820

EXHIBIT 20
287

1   never look at this document and conclude as a matter of

2   law that it's not sufficient to be a contract.

3        Whether there are new and additional terms that

4   the parties wanted and whether that somehow gets added

5   on here or doesn't get on, that's a fact question that

6   takes testimony about the significance to which parties

7   attach to -- to the point, did they discuss it in their

8   negotiations, did they not discuss it, did they forget

9   to put in something, did they not forget, and that's the

10  subject of testimony.

11       Counsel has conflated this idea of the

12  objective hearing of contracts, which to be sure is how

13  the issue is decided, with the rules of evidence about

14  what kind of testimony is admitted in order to prove up

15  intent.

16       All kinds of testimony is admitted, including

17  custom and practice, including parties' state of mind as

18  to why they did certain things, why they said certain

19  things.

20       So at bottom we think that this case never

21  should have been thrown out, and importantly this has

22  the potential to dispose of this entire dispute.

23       Under this agreement, which took three years to

24  negotiate, the plaintiffs would receive an immediate

25  payment of $20 million, plus substantial future

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com 14-271

EXHIBIT 14-271
ER 821

EXHIBIT 20
288

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 276 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 277 of 328

```
 1    consideration for the duration of the copyright term,

 2    which is 2033, plus medical benefits for their family

 3    and all kinds of other benefits.

 4          On the other hand, DC gets the transfer of the

 5    copyright interests that were recaptured by the Siegel

 6    family.  So they -- they transfer the copyright

 7    interests, and they get a lot of money.

 8        JUDGE REINHARDT:  Well, that's not -- that's

 9    not -- no need to try to persuade us it's a good deal

10    for them.  If they think it's a good deal --

11        DANIEL M. PETROCELLI, ESQ.:  Well --

12        JUDGE REINHARDT:  -- for them, they wouldn't be

13    here.

14        DANIEL M. PETROCELLI, ESQ.:  Well, that's correct,

15    your Honor, because they believed they had a better deal

16    when someone came along and offered them more, and --

17    and they then repudiated this agreement.

18          And one final comment.

19          This question about what we did and did not do

20    afterwards, that's a very incomplete recitation that was

21    received, but all of that is simply more relevant

22    evidence on the question of whether the parties at the

23    inception when they made their deal intended to be bound

24    or not.  That's just evidence of subsequent conduct of

25    the parties.  Whether it bears on the contract formation
```

ORAL ARGUMENT  11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 278 of 328

```
 1    or not is a relevance issue that's up to the trial judge

 2    here.

 3        JUDGE SEDWICK:  Let me ask you this question.

 4            We had read your papers to suggest you were

 5    seeking summary judgment, but assuming that you're

 6    either now only seeking a remand for trial or that we

 7    should independently decide that that's the most you

 8    could get, do you think that this Court needs to decide

 9    any of the other issues if we remand this case for trial

10    and whether there was an agreement?

11        DANIEL M. PETROCELLI, ESQ.:  I believe that since

12    this is potentially dispositive, it does not have to

13    because if this contract is proven and this contract is

14    enforced, that ends once and for all this dispute.

15    Every issue that is before your Honors and these very

16    large amount of briefs would all -- would all resolve.

17    That's why it took three years to do.  This wasn't some

18    initial offer.

19        JUDGE REINHARDT:  You may not be the one to answer

20    this question, but just out of curiosity, would it

21    resolve the prior case also?

22        DANIEL M. PETROCELLI, ESQ.:  Well, it would have a

23    significant impact at least on the damages in the prior

24    case and my view is it would go a long way to resolving

25    that one as well, at least insofar as the Siegel side is
```

EXHIBIT 14-273

ER 823

**EXHIBIT 20**

**290**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 279 of 328

1    concerned.

2           I don't know if I have any time left.

3           JUDGE REINHARDT:  You have five minutes.

4           DANIEL M. PETROCELLI, ESQ.:  I would like to turn to

5    one other legal issue that's on a totally separate

6    subject, if your Honors don't have any additional

7    questions on this topic, and that has to do with a

8    decision, purely legal decision that the District Court

9    below made.

10          And what the Court decided was that this very

11   first Superman comic book, which is called "Action

12   Comics Number 1," SER 714, the District Court decided

13   that since this was largely created by Mr. Siegel and

14   Mr. Shuster long before DC came into the picture, "this"

15   being the character Superman in black and white

16   sketches, that he awarded the copyrights in the various

17   elements in this action comics book entirely to the

18   Siegels and the Shusters.

19          The error -- we -- we said to the judge, "We

20   don't challenge that in the main, except for this.  We,"

21   DC, "back in 1938 came up with the idea of making a

22   comic book.  Siegel and Shuster had drawn sketches of

23   Superman for newspaper strips in black and white.  We

24   want to create a comic book.  We want to put it in

25   color.  And we then retained them to do so."

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277            www.merrillcorp.com

EXHIBIT 14-274
ER 824

EXHIBIT 20
291

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 280 of 328

1          It is undisputed that certain elements of this

2     were done by DC in concert with Shuster and Siegel but

3     with other employees and artists.  So we asked the Court

4     to declare certain parts of this -- certain parts of

5     this owned by DC, either as a work for hire or as a

6     joint work or other theories of ownership.

7          The Court said he was -- the Court concluded it

8     was precluded from doing so because of a decision back

9     in the seventies in the Second Circuit by DC's

10    predecessor and Siegel and Shuster called the National

11    case, and the Court believed that the National case was

12    res judicata and/or collateral estoppel and prevented DC

13    from litigating the issue of whether it had ownership

14    interest and admittedly part of the contributions that

15    it made to Action Comics 1.

16         And I only wanted to address the Court's ruling

17    on collateral estoppel.  But it was clearly wrong for

18    the following reason, and this is a purely legal issue.

19         The National case back in the seventies was a

20    lawsuit about who owned the renewal copyright in Action

21    Comics 1, and this was before the new termination

22    legislation came about, the second 28-year renewal

23    term.

24         DC contended that it owned the renewal term for

25    two separate and independent reasons.

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com

EXHIBIT 14-275
ER 825

EXHIBIT 20
292

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 281 of 328

1           One, the Siegel and Shuster parties transferred

2    full ownership of their Superman elements way back when

3    when they first met with DC and documented March 1.  So

4    they said, "We own it by contract."

5           Second, secondly DC said -- actually it was

6    National, its predecessor, but I'll just call it "DC."

7    DC said, "We own it because it was work for hire and we

8    were the author of it, and so we own the renewal

9    rights."  So they said, "We own the renewal right for

10   those reasons."

11          The District Court agreed on both counts, and

12   it went up to the Second Circuit.

13          The Second Circuit affirmed on the ground that

14   the conveyance of rights back in 1938 from Siegel and

15   Shuster to Na- -- to DC included the conveyance of the

16   rights to the renewal term, and so the decision below

17   was correct and it was affirmed.

18          The Second Circuit then went on to say,

19   however, that the ruling about work for hire was

20   incorrect, and it made some references to the fact that

21   Superman had been developed before DC came along, so how

22   could the entirety of Action Comics 1 be a work for

23   hire?

24          It's that language that the judge in this case,

25   the District Court, felt was binding on him.

Merrill Corporation - Los Angeles

Los Angeles - 800-826-0277          www.merrillcorp.com

EXHIBIT 14-276

ER 826

EXHIBIT 20

293

ORAL ARGUMENT - 11/5/2012

Page 30

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 282 of 328

```
 1              We pointed out below and pointed out in our

 2      papers, as a matter of law that cannot be res judicata

 3      or collateral estoppel because that was an adverse

 4      determination made in favor of a prevailing party and it

 5      was not necessary to the decision and it was dictum.

 6      We, for example, never could have appealed that

 7      decision.  We won, National did.  It never could have

 8      appealed solely for the purpose of addressing the

 9      alternative statement by the Court of Appeal that was

10      adverse to -- to National.

11              And case after case make this clear, including

12      the Fireman's Fund case in the Ninth Circuit, the --

13          JUDGE REINHARDT:  All right.  We're running out of

14      time.  Let me just ask you.

15              Is this -- is this issue resolved if you win on

16      the summary judgment question?

17          DANIEL M. PETROCELLI, ESQ.:  Yes.  Everything goes

18      away on the summary judgment, everything, your Honor.

19      It's -- it's the end of this case once and for all.

20          JUDGE REINHARDT:  All right.  Thank you very much.

21          DANIEL M. PETROCELLI, ESQ.:  Thank you very much,

22      your Honors.

23          MARC TOBEROFF, ESQ.:  Your Honors, Warner Bros.

24      cannot point to any place in 2001 where they accepted

25      the terms set forth in the October 19th, 2001 letter
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277                www.merrillcorp.com

EXHIBIT 14-277
ER 827

EXHIBIT 20
294

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 283 of 328

1    from Marks.

2           I don't know how one can find that a contract

3    exists without mutual agreement of both sides.

4           Instead of agreement from Warner Bros. we have

5    disagreement as reflected in the October 26th letter and

6    as reflected in Warner Bros.'s agreements.

7           It's -- it's insane to say this is purely a

8    question of formal documentation of an agreement of the

9    parties when there is --

10   JUDGE REINHARDT:  The problem -- and maybe you can

11   comment on this, Mr. Toberoff.  The problem is that the

12   October 26th letter doesn't reject the October 19th

13   letter.  It says, "a more ful- -- I'm enclosing a

14   fulsome outline of what we believe the deal we've agreed

15   to is."

16          Now, the argument on the other side is that

17   that says, "We've agreed to a deal but we're giving you

18   a more expansive outline of what that deal is."

19          Now, what's the answer to that?

20   MARC TOBEROFF, ESQ.:  The answer to that is whether

21   or not there's a contract is not based on verbiage such

22   as "a more fulsome outline."  It's based on the

23   comparison of the terms.  And anything less than an

24   unequivocal acceptance of an offer is a counteroffer

25   extinguishing that offer.  It's been that way forever in

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 284 of 328

1   California and it's still that way in California.  So

2   regardless of how you --

3   JUDGE REINHARDT:  Well, take -- take the example of

4   a movie distribution deal or a movie production deal

5   where the parties make -- they agree to the deal.  They

6   then start with the movie.  Finally in the middle of the

7   movie they get down to reducing everything to writing

8   and there's a disagreement but both parties agree that

9   "we have a deal."

10      Now, is that not an agreement without the

11  written exposition of it?

12  MARC TOBEROFF, ESQ.:  It depends on the terms of the

13  agreement.  Here -- here -- and there have been cases

14  about that where one side has argued, "In California and

15  Hollywood we do lunch.  We don't do contracts," and

16  they've rejected those arguments when it came down to

17  specific contract formation issues like this.

18      They cannot point to an acceptance of the terms

19  of the October 19th letter.  And instead we have --

20  JUDGE THOMAS:  Well, it depends on who is the

21  offerer and who is the-- who is the accepting party.

22      What-- what the October 19th letter says, "This

23  is to confirm our telephone conversation," it goes on to

24  say, "which we accept the DC Comics' offer of October

25  16th."

EXHIBIT 20
296

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 285 of 328

1        So if there's a legitimate offer on the 16th

2   and accepted on the 19th, does it really matter what

3   happened after that?

4        MARC TOBEROFF, ESQ.:  Yes, it does because on --

5        JUDGE THOMAS:  I mean, if there's a contract

6   formation as of this and it's reflected in the letter of

7   the 19th, then -- then there's a deal.

8        MARC TOBEROFF, ESQ.:  But this is an ongoing

9   negotiation that continues into 2002.

10       JUDGE THOMAS:  No.  I understand that.

11       MARC TOBEROFF, ESQ.:  And that's acknowledged by all

12  the parties.  So you can't artificially limit the

13  analysis to an oral communication on October 16th and a

14  written communication on October 19th.

15       JUDGE THOMAS:  I'm just saying, to my mind at least,

16  I haven't come to rest on it, but it certainly suggests

17  that it's a more complicated situation, and therefore

18  there's a -- probably a genuine issue of material fact.

19       MARC TOBEROFF, ESQ.:  I -- I can see none.  And I

20  can tell you why.  Because when he refers to the October

21  16th conferen- -- teleconference and -- and asks, "Do

22  you agree that these are the terms?" because that's what

23  he says, he says, "If I got anything wrong, let me

24  know," he's essentially asking, "Do you agree, Warner

25  Bros., that these are the terms?" and all they would

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com

EXHIBIT 14-280
ER 830

EXHIBIT 20
297

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 286 of 328

1    have to have done is said, "Yes," then you would have a

2    different situation.

3            And that's not the situation that exists here,

4    and the objective evidence shows that -- the undisputed

5    evidence shows that it's not the situation that exists

6    here.

7            What it shows is that Warner Bros. said,

8    "That's not what I believe" --

9        JUDGE THOMAS:  They didn't say that.

10       MARC TOBEROFF, ESQ.:  Yes, they did.

11       JUDGE THOMAS:  They said, "Here's -- here's a --

12   here's a larger outline."

13           Now today they say, "Well, that's essentially

14   the same terms."  And you can say, "Well, it's not the

15   same terms."

16           And, you know, obviously they didn't agree --

17   the parties did not agree on indemnity, period.  There's

18   no agreement on indemnity.

19           But the question for the Court is not

20   necessarily whether there was -- whether -- the question

21   is whether there was a contract formed before that.

22       MARC TOBEROFF, ESQ.:  Exactly.  This isn't -- well,

23   there's not a contract formed before that if when he

24   says, "This is the terms that we believe were

25   discussed," he doesn't just say, "more fulsome outline,"

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 287 of 328

1   he says, "a more fulsome outline of what we believe the

2   terms are."  They then send over a contract and reserve

3   the right of Warner Bros. to -- to -- to revise the

4   terms, and they acknowledge that the Siegels can also

5   revise the terms.  It's not just a matter of these

6   indemnity provisions.

7            I would refer the Court --

8       JUDGE THOMAS:  No.  I understand that.  I just used

9   that as an example.

10           I mean, it often happens where you have a deal

11  reached, a deal letter like this, and then the parties

12  add terms, and they say, "Well, that's not part of our

13  deal," and then they may agree or disagree on subsequent

14  terms, but that doesn't alter the original agreement or

15  the fact that it's been made.

16      MARC TOBEROFF, ESQ.:  The problem is you have no

17  acceptance to those original terms.  The hypothetical

18  doesn't apply here.

19      JUDGE THOMAS:  Unless you say that this -- the --

20  the letter of the 19th accepts an offer of the 16th.

21      MARC TOBEROFF, ESQ.:  And -- and we have a letter

22  from October 26th saying that wasn't the offer, "This is

23  what we believe the deals are."

24           Now, I want to draw the Court's attention to a

25  chart in our reply brief below which impressed the

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 288 of 328

1    District Court who dealt with this in tremendous

2    detail.  It's in our reply excerpts at Pages 140 to 149

3    where we outline the material differences.

4         Warner acknowledges that the properties being

5    assigned is an essential term using -- using words from

6    the -- from the Facebook case.

7         Well, the properties in the Marks' memo are

8    limited to three properties: Superman, Superboy and

9    Spectre.

10        The properties in Schulman's memo and then in

11   the February 1st agreement concern Superman, Superboy,

12   related properties and anything created for DC, whether

13   published or unpublished, by Siegel.  So there's an

14   expansion of what is even being assigned.

15        Secondly, the royalties.  You have a very

16   complex royalty situation here.  It's not like in

17   Facebook with a fixed amount of money and a fixed amount

18   of stock.  You have a 6 percent royalty which was

19   reducible to 3 percent, which is then reducible to 1 1/2

20   percent to 1 percent as an absolute floor.

21        Warner Bros. drills all sorts of holes in that

22   floor rendering them illusory and -- and having

23   situations where they would receive no money whatsoever

24   for the exploitation of Superman.

25        These are material contract terms.  You can't

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 289 of 328

1    ignore them.  They change the -- the -- the dance

2    between offer and counteroffer.  And that's the way

3    contract formation is analyzed in the State of

4    California.

5           Warner Bros. has a situation where if Superman

6    appears in a -- in another character's contract

7    published by DC, like Green Arrow, for weeks Superman is

8    appearing but the name is not in the title of the comic

9    book, under -- under Schulman's scenario, you would

10   receive a -- excuse me -- under Marks' scenario, you

11   would receive a royalty.  Under Warner Bros.'s scenario,

12   you receive no royalty.

13          It comes as no surprise that all of the changes

14   made by Warner Bros., which they now say are boilerplate

15   and not material, were all decidedly in Warner Bros.'s

16   favor and affect the key terms of the agreement: the

17   scope of the properties, the royalties and

18   compensation.

19          The -- the warranties and indemnifications is

20   not a small matter because what happens with the studios

21   when you enter in a contract and you have substantial

22   contingent compensation and there's any claim by a third

23   party or anything happens which they can claim triggers

24   a warranty, they will withhold your -- they will

25   withhold your royalty payments.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 290 of 328

Page 38

1          There are credit provisions where Marks says,

2     "We want credit in paid ads," because that's very

3     important to his clients and he testifies that to

4     effect.

5          Warner Bros.'s October 26th outline and their

6     long form says, "No credit in paid ads."  Warner Bros.

7     requires an elderly Joanne Siegel who is in her late

8     eighties to go on publicity tours promoting Superman.

9     None of this exists.  There's --

10    JUDGE REINHARDT:  Well, that doesn't sound like

11    (unintelligible) form.  As David's (sic) saying, "These

12    are the sort of -- the kind of things we put in our

13    contracts."

14         And, you know, that clause isn't drawn for her

15    individual -- you know, because they're concerned about

16    her.  That's a boilerplate provision.

17    MARC TOBEROFF, ESQ.:  Well, it's not boilerplate to

18    say that the Siegels have to indemnify Warner Bros. for

19    a claim for her ex-husband.

20    JUDGE REINHARDT:  No, no.  I'm talking about that

21    Joanne -- that Joanne Siegel has to go on a tour.  You

22    know, those are the kinds of things that have to be

23    worked out after there's a contract.

24    MARC TOBEROFF, ESQ.:  Well, but the royalty

25    provisions and the scope of the properties assigned go

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277                www.merrillcorp.com   14-285

EXHIBIT 20
302

EXHIBIT 14-285
ER 835

ORAL ARGUMENT   11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 291 of 328

```
 1    to the heart of this.  And under Section 204(a) of the
 2    Copyright Act when you have an assignment of a
 3    copyright, it has to be in writing signed by the
 4    assignee.
 5           Marks' letter does not assign any trans- -- any
 6    copyrights.  It says, "We will.  We anticipate signing
 7    those contracts."
 8           Nobody in this exchange viewed the October 19th
 9    letter outlining deal terms or the October 26th letter
10    outlining different deal terms as a binding, enforceable
11    contract.  Everybody understood that considering the
12    magnitude of these rights and the complexity of the
13    agreement that was being discussed that you would have a
14    final written agreement signed by both parties.
15    JUDGE THOMAS:  So how do we -- how do we determine
16    that as a matter of summary judgment, that everybody
17    understood?
18    MARC TOBEROFF, ESQ.:  Because -- because --
19    JUDGE THOMAS:  No.  I mean, you can't -- you can't
20    do that without -- without extrinsic evidence of the
21    parties.
22           And you well may be right.  I'm just saying.
23    But if you can't do it on the basis of the documents
24    alone.  If you have to rely on what you say is that
25    everybody understood, then that's extrinsic evidence
```

EXHIBIT 14-286
ER 836

EXHIBIT 20
303

ORAL ARGUMENT - 11/5/2012

Page 40

```
 1     that requires a resolution by a fact-finder.
 2          MARC TOBEROFF, ESQ.:  I respectfully disagree, your
 3     Honor.  If you look at the October 26th Warner Bros.
 4     communication, it specifically refers, "We will have
 5     this matter drafted in contract form and we will send it
 6     to you."  So right there you know --
 7          JUDGE THOMAS:  Well, that's what happens in all
 8     cases.  You don't have a -- you always have --
 9          MARC TOBEROFF, ESQ.:  But that's not extrinsic
10     evidence.  That's objective evidence saying that --
11     showing that the parties anticipated that the form of
12     agreement would be a written agreement signed by both
13     parties.  And that's what's required by the Copyright
14     Act.  That never happened.  And then they send it over
15     and they reserve the right to --
16          JUDGE THOMAS:  I don't mean to quarrel with you.
17     I'm just -- you know, we're working through these --
18     these cases.
19          But what often happens when you have a
20     situation like this is the Court will say, "If you have
21     enough for specific enforcement of the terms to which
22     you agreed," and therefore you execute the unnecessary
23     assignments and so forth.
24          The fact that they weren't all executed I don't
25     think is dispositive.
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277                www.merrillcorp.com/law

EXHIBIT 14-287
ER 837

EXHIBIT 20
304

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 292 of 328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 293 of 328

1           Now, you may well be right on it.  I'm just

2    saying that it's a more complicated issue than --

3    MARC TOBEROFF, ESQ.:  Your Honor, I believe if you

4    peel back the veneer of comments like "a deal is a deal"

5    and look at the actual facts of this case carefully, you

6    will see that under every single principle in California

7    law about contract formation this fails as a matter of

8    law and you can make that determination on this

9    objective exchange of undisputed documents.  The parties

10   absolute -- in the State of Calif- --

11   JUDGE REINHARDT:  I think we've explored this

12   fully.  And you're seven minutes are over, so --

13           I mean, you know, these are not simple issues,

14   and I don't mean that the answer may not be simple, but

15   the case, as you say, you know, we're going to -- to the

16   extent that we haven't sufficiently read them, we'll

17   certainly explore them all, and, you know, we understand

18   the arguments of both side, and they're legitimate

19   arguments, so --

20   MARC TOBEROFF, ESQ.:  I'd just like to read to you

21   from a memo that you pointed out, Marks' memo, which by

22   the way is an extra-record document that should be made

23   part of this record, but I'd like to read to you what

24   Marks actually says in that memo.

25           He says, "I believe a deal will be finalized

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 14-288
ER 838

EXHIBIT 20
305

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 294 of 328

```
 1    with DC Comics, even if this process is not entirely

 2    smooth -- smooth.  If the parties cannot reach final

 3    agreement, then the negotiations would be terminated."

 4    That's what he says in an attorney-client communication

 5    that they're saying proves there was a binding

 6    contract.

 7         JUDGE REINHARDT:  Okay.  Thank you.

 8         MARC TOBEROFF, ESQ.:  Thank you, your Honor.

 9         JUDGE REINHARDT:  The case just argued will be

10    submitted.

11                         ---0---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Merrill  Corporation  -  Los Angeles

Los Angeles - 800-826-0277              www.merrillcorp.com

EXHIBIT 14-289

ER 839

EXHIBIT 20

306

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 295 of 328

1  Marc Toberoff (State Bar No. 188547)
      *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
      *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
4  Malibu, California 90265
   Telephone:  (310) 246-3333
5  Fax:        (310) 246-3101

6  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
7  individually and as personal representative
   of the Estate of Joanne Siegel

8

   **UNITED STATES DISTRICT COURT**
9
   **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
10

11  LAURA SIEGEL LARSON,                  | Case No: 04-CV-08400 ODW (RZx)*
    individually and as personal          | Case No: 04-CV-08776 ODW (RZx)*
12  representative of the ESTATE OF        |
    JOANNE SIEGEL,                         | Hon. Otis D. Wright II, U.S.D.J.
13                      Plaintiff,         | Hon. Ralph Zarefsky, U.S.M.J.
14          v.                             |
                                           | **DECLARATION OF LAURA**
15  WARNER BROS. ENTERTAINMENT             | **SIEGEL LARSON IN SUPPORT OF**
    INC., DC COMICS, and DOES 1-10,        | **PLAINTIFF'S COURT-ORDERED**
16          Defendants and                 | **SUPPLEMENTAL BRIEF RE:**
            Counterclaimants.              | **EFFECT OF COURT'S MARCH 20,**
17                                         | **2013 ORDER ON THE "ADS" AND**
    LAURA SIEGEL LARSON,                   | **"SUPERBOY" TERMINATIONS**
18  individually and as personal           |
    representative of the ESTATE OF        | *Declaration of Keith Adams filed*
19  JOANNE SIEGEL,                         | *concurrently*
20                      Plaintiff,         |
21          v.                             |
22  TIME WARNER INC., WARNER               |
    COMMUNICATIONS INC.,                   |
    WARNER BROS. ENTERTAINMENT             |
23  INC., WARNER BROS. TELEVISION          |
    PRODUCTION INC., DC COMICS,            |
24  and DOES 1-10,                         |
25          Defendants and                 |
            Counterclaimants.              |
26

27

28

DECLARATION OF LAURA SIEGEL LARSON

**ER 840**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-4, Page 296 of 328

## DECLARATION OF LAURA SIEGEL LARSON

I, Laura Siegel Larson, declare as follows:

1.     I, individually and as personal representative of the Estate of Joanne Siegel, am a party in the above-entitled case, and submit this declaration in support of Plaintiff's Court-Ordered Supplemental Brief Re: Effect Of Court's March 20, 2013 Order On The "Ads" And "Superboy" Terminations.  I have personal knowledge of the facts set forth in this declaration.

2.     On April 3, 1997, my mother, Joanne Siegel, and I served DC Comics, among others, with notices of termination under section 304(c) of the Copyright Act relating to certain "Superman" works co-created by my father, Jerome Siegel.

3.     Between approximately April 16, 1997 and October 19, 2001, we had settlement discussions with DC Comics and/or its parent company, Warner Bros. Entertainment Inc. (together with their predecessors, "DC"), relating to our termination notices.

4.     During all of that time, it was never stated to me or otherwise expressed or implied that a settlement with DC would involve the contractual revocation of any of my father's pre-1978 copyright grants to DC, nor was it ever my understanding nor my intention to contractually revoke my father's original grants to DC as part of any settlement with DC.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on April 4, 2013, at Los Angeles, California.


*Laura Siegel Larson*

Laura Siegel Larson

1
DECLARATION OF LAURA SIEGEL LARSON

1  DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for the DC Comics Parties

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10 | LAURA SIEGEL LARSON, | Case No.  CV 04-8400 ODW (RZx) |
   | individually and as personal | Case No.  CV 04-8776 ODW (RZx) |
11 | representative of the ESTATE OF | |
   | JOANNE SIEGEL, | **DC COMICS' SUPPLEMENTAL** |
12 | | **BRIEF RE: FINAL JUDGMENT IN** |
   | Plaintiff, | **THE *SIEGEL* SUPERMAN AND** |
13 | | **SUPERBOY CASES PER THE** |
   | v. | **COURT'S MARCH 20, 2013 ORDER** |
14 | WARNER BROS. ENTERTAINMENT | |
   | INC., DC COMICS, and DOES 1-10, | DECLARATION OF DANIEL M. |
15 | | PETROCELLI[1] FILED |
   | Defendants and | CONCURRENTLY HEREWITH |
16 | Counterclaimants. | |
   | | The Hon. Otis D. Wright II |
17 | LAURA SIEGEL LARSON, | |
   | individually and as personal | |
18 | representative of the ESTATE OF | |
   | JOANNE SIEGEL, | |
19 | | |
   | Plaintiff, | |
20 | | |
   | v. | |
21 | TIME WARNER INC., WARNER | |
   | COMMUNICATIONS INC., | |
22 | WARNER BROS. ENTERTAINMENT | |
   | INC., WARNER BROS. TELEVISION | |
23 | PRODUCTION INC., DC COMICS, | |
   | and DOES 1-10, | |
24 | Defendants and | |
   | Counterclaimants. | |

25

26

27     [1] All record cites herein, whether to evidence, pleadings, or the Court's rulings are to
28 the Petrocelli Declaration ("PD"), so that the Court has ready access to the materials DC
   cites, as requested in the Court's March 20, 2013, order. *See* PD Ex. 42 at 1736.

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    THE WORKS AT ISSUE ......................................................................... 2

III.   LARSON TRANSFERRED ALL RIGHTS IN SUPERBOY AND
       THE ADS TO DC IN 2001 ....................................................................... 3

IV.    WHAT NEXT IF THE COURT DISAGREES WITH DC ABOUT
       THE 2001 AGREEMENT ......................................................................... 7

       A.     Larson Has No Right To Terminate Superboy ..................................... 8

              1.     Background ................................................................................. 8

              2.     The Pitch Material Was Never Published ............................... 10

              3.     Larson Can Claim No Rights In Previously Published
                     Elements .................................................................................... 11

       B.     Larson's 2012 Ads Notice Is Invalid, But The Issue Is Not Yet
              Ripe ............................................................................................ 13

              1.     Authorship .............................................................................. 13

              2.     Scope ........................................................................................ 14

V.     CONCLUSION ...................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alexander v. Angel,*
  37 Cal. 2d 856 (1951) .................................................................. 5

*Berkic v. Crichton,*
  761 F.2d 1289 (9th Cir. 1985) .................................................... 12

*Durham Indus. v. Tomy Corp.,*
  630 F.2d 905 (2d Cir. 1980) ....................................................... 12

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,*
  122 F.3d 1211 (9th Cir. 1997) .............................................. 11, 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ................................................................... 12

*Gagne v. Zodiac Maritime Agencies, Ltd.,*
  274 F. Supp. 2d 1144 (S.D. Cal. 2003) ..................................... 15

*Hamilton v. State Farm Fire & Cas. Co.,*
  270 F.3d. 778 (9th Cir. 2001) .................................................... 15

*Milne v. Slesinger,*
  2009 WL 3140439 (C.D. Cal. Sept. 25, 2009) .......................... 15

*Olympic Fin. Co. v. Thyret,*
  337 F.2d 62 (9th Cir. 1964) ......................................................... 5

*Penguin Grp. (USA) Inc. v. Steinbeck,*
  537 F.3d 193 (2d Cir. 2008) ..................................................... 1, 5

*Richlin v. MGM Pictures, Inc.,*
  531 F.3d 962 (9th Cir. 2008) ..................................................... 10

*San Gabriel Val. Ready-Mixt v. Casillas,*
  142 Cal. App. 2d 137 (1956) ....................................................... 5

*Milne v. Stephen Slesinger, Inc.,*
  430 F.3d 1036 (9th Cir. 2005) ............................................. passim

*Simmons v. Sweeney,*
  13 Cal. App. 283 (1910) ........................................................... 4-5

**STATUTES**

17 U.S.C. § 101 .............................................................................. 11

17 U.S.C. § 102 .............................................................................. 12

17 U.S.C. § 103(b) .......................................................................... 11

17 U.S.C. § 203(a) .......................................................................... 13

17 U.S.C. § 304(c) ............................................................................................. 7, 13

17 U.S.C. § 304(d) ............................................................................................. 8, 13

Fed. R. Civ. P. 56 ................................................................................................ 2, 8

**OTHER AUTHORITIES**

Goelz & Watts, Federal Ninth Circuit Appellate Practice
§ 10:231 (Rutter 2012) ................................................................................. 14

## I. Introduction

In its recent summary judgment ruling, the Court asked the parties to address two questions:  (1) Does DC own both Superboy and the Promo Ads under its 2001 Agreement with the Siegels?  And (2) assuming DC does not own the works under its Agreement, who owns them and how can the Court best resolve that question?

The answer to the first question is yes.  The 2001 Agreement, which Larson's lawyer documented, encompasses "all Superman, Superboy and related properties" as well as "all pre- and post-termination works" (*e.g.*, the works Larson now claims were not recaptured by her 1997 termination notices).  As this Court held in *Shuster*, "all" means "all," and the broad grants to DC in the 2001 Agreement cover both Superboy by name, as well as the Ads, which are black-and-white images of Superman copied from the cover of *Action Comics #1* ("*AC#1*").  Larson's 1997 notices listed "Superboy," *More Fun Comics #101* ("*MF#101*") (a Superboy work), and *AC#1*.  DC owns Superboy, *MF#101*, and the Ads under the 2001 Agreement the parties made *after* the 1997 notices' effective date, and in response to them.

Larson argues the 2001 Agreement did not assign rights in Superboy or the Ads because she did not serve notices terminating those works until after the Agreement.  But as this Court held in *Shuster*—relying on *Milne* and *Steinbeck*—an heir need not have served a termination notice to make a post-1978 agreement that revokes and replaces all prior copyright grants and bars future termination claims.  The 2001 Agreement meets this test.  It is a post-1978 contract that concerns the same subject matter as Siegel's pre-1978 grants and also contains new, all-encompassing grants to DC.  Larson took advantage of her statutory termination right and made a deal with DC in 2001, and she cannot re-trade on it now.  PD Exs. 34 at 1429; 43-54.  And while Larson now claims she had not invoked her termination rights in Superboy before the 2001 Agreement, that is simply untrue— as her prior admissions and the law confirm.

DC'S SUPP. BRIEF RE: FINAL JUDGMENT
**ER 846**

This analysis should begin and end the Court's inquiry—and should end these cases. Should the Court reach the second question, however, further proceedings may be required. As to Superboy, DC proposes to establish that it owns Superboy separate and apart from the 2001 Agreement, and Larson is statutorily unable to terminate any rights in that character. While DC believes there is an ample record before the Court for it to so rule now, as summarized below, DC is prepared to submit additional Rule 56 briefing at the Court's request.

As for the Ads, DC will establish that it is their statutory author as well, but doing that in the present proceeding is problematic. As Larson admits, *id.* Ex. 40 at 1713, she never sued on her 2012 Ads termination notice (unlike her 2002 Superboy notices), and nor has DC. Thus, while the issue of whether the Ads are encompassed by the 2001 Agreement *is* before this Court, the issue of whether the Ads are terminable works *is not*, as neither party has sought to challenge or enforce the 2012 notice. And while Larson may argue that resolving the Ads question is easy, based on Judge Larson's prior rulings or positions previously taken by DC, Judge Larson's rulings were reversed, and Larson's own binding admissions that led to those rulings bar her newly minted arguments about the Ads. In any event, such issues would need to be addressed, if ever, in newly filed litigation.

But to be clear, the Court's second question need not be litigated. The Court should enter final judgment for DC in these cases and rule the 2001 Agreement covers Superman (as it already has held) as well as Superboy and the Ads.

## II. The Works At Issue

Superboy. As Judge Larson observed, "Superboy" is "the youthful persona of the iconic comic book super hero 'Superman,'" PD Ex. 22 at 1031—he is not a separate character, just Superman as a youngster. The very first Superman comic book, *AC#1*, featured Superman in this way, as an infant escaping Krypton before its destruction, arriving on Earth as a toddler, and astounding employees of an orphanage with his super-strength by lifting a chair over his head. *Id.* Ex. 59 at

DC'S SUPP. BRIEF RE: FINAL JUDGMENT
**ER 847**

1777. Other early Superman works, including *Superman #1* (1939) and 1939 and 1942 newspaper strips, depict Superman as a youth, with his adopted family the Kents, discovering his superpowers. *Id.* Exs. 60 at 1792-93; 61-62; *infra* at 6. Larson originally conceded Superboy appeared in these early Superman works. Her 1997 termination notice listed these 1938, 1939, and 1942 works (along with 1,221 others devoted to Superboy) and said it recaptured "every work … reasonably associated with SUPERMAN," including "Superboy." PD ¶ 1; *id.* Ex. 11 at 93 n.1.

The Ads. DC published the Ads in 1938 in *Detective Comics #15*, *More Fun #31*, and *New Adventure Comics #26*—some two weeks before it published *AC#1*. PD Exs. 55-58. The Ads all feature a black-and-white version of the *AC#1* cover (*i.e.*, Superman lifting a car) and text announcing *AC#1*. *Id.*; *infra* Appendices 1-3. None depicts a new or different character or story; just Superman hoisting a car. *Id.*

**III. Larson Transferred All Rights In Superboy And The Ads To DC In 2001.**

This Court held that the "2001 agreement operated to transfer the Siegels' Superman rights to DC as of the date of that agreement." PD Ex. 42 at 1735. By its plain terms, the Agreement's transfer language covers all conceivable rights the Siegels could assert in the Superman properties, including Superboy and the Ads:

- Paragraph (A)(1) defines the "Property" being transferred as "*all Superman, Superboy and related properties…*." *Id.* Ex. 12 ¶ (A)(1).

- The Siegels did not retain *any* rights—Paragraph (A)(1) specifically includes "*all pre-and post-termination works* (including the so-called *Superman library*), *characters*, names and trademarks relating to the Property." *Id.*

- Paragraph (C)(1) confirms: "The Siegel Family would transfer *all of its rights* in the '*Superman*' and 'Spectre' properties *(including 'Superboy')*, resulting in *100% ownership to DC*." *Id.* ¶ (C)(1) (all italics added).

"All" means "all"—even where a copyright grant does "not specifically list" all properties. *Id.* Ex. 34 at 1428. And here, the 2001 Agreement lists Superboy repeatedly, *id.* Ex. 12 ¶¶ (A)(1), (C)(1), (C)(4), and encompasses the Ads, too, as

DC'S SUPP. BRIEF RE: FINAL JUDGMENT
**ER 848**

"Superman … related properties" and "pre-…termination works," *id.* ¶ (A)(1). There are no carve-outs in the 2001 Agreement for Superboy, the Ads, or any other Superman-related works. Indeed, not once in the many years of litigation about the 2001 Agreement—that is, until the Ninth Circuit held that it existed and transferred rights to DC—did Larson ever argue that Superboy or the Ads were not covered by it. To the contrary, in trying to list scores of asserted "material" differences in the parties' drafts of the long-form agreement, Larson raised many issues, but never raised one about the Agreement's including *Superboy*, *all* Superman-related works, or *all* "pre-termination" works like the Ads. *Cf., e.g.*, PD Ex. 66 at 1897-1906.

Seeking to stave off judgment, Larson now argues the 2001 Agreement did not transfer any rights in Superboy or the Ads because she did not seek to terminate them until 2002 and 2012, respectively. *Id*. Ex. 40 at 1713-15. She is mistaken.

1. In *Shuster*, this Court held that a post-1978 agreement that supersedes all pre-1978 copyright grants eliminates any termination right that may otherwise exist. *Id.* Ex. 34 at 1423-31. Like the operative agreement in *Shuster*, the "broad and all-encompassing language" in the 2001 Agreement—transferring, *e.g.*, "all Superman, Superboy and related properties" to DC—"operates to supersede all prior grants" of those rights. *Id*. at 1428. This 2001 grant was not only sweeping, it created a comprehensive new payment scheme to compensate the Siegels. *Id.* Ex. 12 ¶ (B). Moreover, the Siegels agreed never to exploit Superman, Superboy, or related properties, even after they went into the public domain, *and* they also agreed they would do nothing to "interfere[]" with DC's rights. *Id.* ¶¶ (C)(11)-(13).

The 2001 Agreement, which was entered into pre-*Milne*, did not contain the word "revoke," but such "magic words" are not required under copyright law, *id.* Ex. 34 at 1424-28, or California contract law. A contract covering the *same subject matter* as a prior contract—*i.e.*, grants of all of rights in Superman, Superboy, or pre-termination works (*e.g.*, the Ads)—supersedes earlier contracts on the same subject. *Id.*; *Simmons v. Sweeney*, 13 Cal. App. 283, 109 P. 265 (1910) (novation

DC'S SUPP. BRIEF RE: FINAL JUDGMENT

**ER 849**

1  where "parties … entered into another and entirely different agreement concerning

2  the same subject-matter" containing "inconsistent" terms such that both contracts

3  "could not be operative at the same time"); *Olympic Fin. Co. v. Thyret*, 337 F.2d

4  62, 66 (9th Cir. 1964) ("[C]ontrasting the rights and obligations of the parties"

5  under two contracts showed "intent of the parties … [was] to extinguish the former

6  obligations, and to replace them with a new set."); *San Gabriel Val. Ready-Mixt v.*

7  *Casillas*, 142 Cal. App. 2d 137, 140-41 (1956) (no requirement parties expressly

8  revoke first contract to replace it); *Alexander v. Angel*, 37 Cal. 2d 856, 860 (1951).

9       Nor does the fact that the 2001 Agreement bars Larson's later-served

10  Superboy and Ads termination notices make it an "agreement to the contrary."

11  Indeed, in *Shuster*, *Milne*, and *Steinbeck*, the heirs all had yet to terminate, and yet

12  in each case, the court held the parties' post-1978 agreements, which operated to

13  bar future termination notices, were valid. *Milne v. Stephen Slesinger, Inc.*, 430

14  F.3d 1036, 1047-48 (9th Cir. 2005) (collecting legislative history); *Penguin Grp.*

15  *(USA) Inc. v. Steinbeck*, 537 F.3d 193, 202 (2d Cir. 2008) (same); *see* PD Ex. 33 at

16  1409 n.10 (Toberoff admitting same). This was true in *Steinbeck*, 537 F.3d at 199,

17  203 n.5, 204, even though the heir could not have served a termination notice

18  (because she lacked the required majority interest), even though one of the key

19  works assigned ("The Grapes of Wrath") was not in the termination window, and

20  even though the heir—*unlike the Siegels*—tried to preserve future termination

21  claims, *cf. id.* at 203.

22       Here, the Siegels *reserved no rights—not* in Superboy, *not* in the Ads, and

23  *not* in any other works. The 2001 Agreement—which was the culmination of years

24  of negotiation, and was intended to fully and finally resolve all issues relating to

25  Superman and Superboy in exchange for substantial compensation—stretches wall

26  to wall, covering "100%" of "all Superman, Superboy and related properties" and

27  "all pre- and post-termination works." *Supra* at 3. Larson's recent claim to the

28  contrary is simply incorrect. The 2001 Agreement expressly covers Superboy, the

DC'S SUPP. BRIEF RE: FINAL JUDGMENT

**ER 850**

Ads, and all other Superman-related works, and Larson's lawyer rightly called this full and final settlement agreement a "monumental accord," PD Ex. 12 at 647— never once suggesting it resolved only the first of many future claims.

    2. Larson is also wrong to argue that she had not terminated as to Superboy when she made the 2001 Agreement. *Id.* Ex. 40 at 1713-15. Her *1997* notice, which purported to take effect in *1999*, expressly claimed to recapture "Superman" and "Superboy." It stated: "This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN," including "Superboy." *Id.* Ex. 11 at 93 n.1. The notice lists many works featuring Superman as a super-"child," "lad," and "youth" with super-powers. For example:




*AC#1* (1938), *Id.* Ex. 59 at 1777    *Superman #1* (1939), *Id.* Ex. 60 at 1793



Superman Sunday Strip (1942), *Id.* Ex. 61

When one couples the 1997 notice, with the works it lists and the 2001 Agreement, it is clear the Siegels knowingly assigned all rights in Superboy to DC in 2001.

Larson now asserts—for the first time—that she was mistaken in preparing her 1997 notice, the notice was partially invalid, and the 2001 Agreement could not have disposed of Superboy rights. In her recent sur-reply, she argues (a) Superboy was not published until November 1944 in *MF#101*; (b) the first time she could terminate *MF#101* was as of November 2000—56 years later; and (c) since her 1997 notice was effective April 1999, it was too early and thus invalid as to Superboy. *Id.* Ex. 41 at 1720-21.

This syllogism defies the plain record, Larson's admissions, copyright law, and common sense. Larson neglects to mention that the core Superboy story in *MF#101* appeared in works that DC published more than 56 years before her 1997 notice, including *AC#1*, *Superman #1*, and the 1942 strip reproduced above. These works, like *MF#101*, include Superboy's origin story, the story of his adoption by the Kents, examples of his superpowers (including speed and strength), and his dual identity and mission. *Id.* Exs. 59 at 1777; 60 at 1792-93; 61-65; 67 at 1919; 68-69. Unsurprisingly, Larson's 1997 notice, which listed all these works, sought to recapture Superboy, *supra* at 6; and neither in negotiating the 2001 Agreement, nor in her complaint here did Larson contend that her 1997 notice was invalid. To the contrary, her complaint sought to enforce the 1997 notice. PD Ex. 32 ¶¶ 39, 54.

In any event, under 17 U.S.C. § 304(c), a copyright grant can be terminated 56 to 61 years after copyright is first secured, provided the notice is served 2 to 10 years before its effective date. This means Larson could have served a termination notice for *MF#101* in November *1990* with an effective date of November 2000 to November 2005. Thus, her timing arguments on sur-reply are misleading, at best, as she clearly could have filed termination notices on Superboy and the Ads prior to the 2001 Agreement. The law did not require her to have that present right prior to making her *Milne*-like agreement in 2001, *supra* at 5, but even if it did, *she had it*.

**IV.  What Next If The Court Disagrees With DC About The 2001 Agreement.**

While the 2001 Agreement transferred all rights in Superboy and the Ads to

DC'S SUPP. BRIEF RE: FINAL JUDGMENT
**ER 852**

DC—a conclusion this Court should reach and that would end these cases—DC addresses below how to resolve these cases "should the Court find the [2001 Agreement] does not extend to these works." PD Ex. 42 at 1736. As noted above, the issue is more straightforward with respect to Superboy than the Ads.

### A. Larson Has No Right To Terminate Superboy.

In order for Larson to assert termination rights in Superboy, she must show that Jerry Siegel authored a work subject to statutory termination. 17 U.S.C. § 304(d). She cannot. The parties previously briefed and litigated this issue, but Judge Larson never fully resolved it. The Court can do so now—either on the existing briefing record, or with the aid of new Rule 56 cross-motions.

1. Background. Siegel and Shuster created "Superman" in the 1930s, and in 1937, entered into an employment agreement with DC that required them to submit "any new and additional features" to DC. PD Ex. 1. In March 1938, Siegel and Shuster assigned to DC the "exclusive right to the use of the [Superman] characters and story." *Id.* Ex. 3. DC "featured an adapted version of Siegel and Shuster's Superman story" in *AC#1*, which it published in 1938. *Id.* Ex. 34 at 1420. Over the next few years, DC's staff writers and artists—including Siegel and Shuster, "pursuant to work-for-hire agreements," *id.* at 1420—expanded the Superman character and mythos in comics, radio programs, and other media, *id.* Ex. 20 ¶ 6.

In November 1938, Siegel sent DC a letter proposing "a strip named SUPERBOY, which would relate the adventures of Superman as a youth." *Id.* Ex. 4. Siegel emphasized that since Superman was already "very much" "developed," a strip devoted to the character as "a child" would be "well received." *Id.* DC declined to publish a Superboy-specific strip at that time, though it continued to publish works featuring Superman as a youth. *Supra* at 2-3, 6-7.

In December 1940, Siegel sent DC an un-illustrated, 13-page draft script for a story titled "Superboy." PD Ex. 5. The script, bylined for Siegel *and* Shuster, consisted of background material copied from DC's preexisting Superman stories,

DC'S SUPP. BRIEF RE: FINAL JUDGMENT

**ER 853**

and three short childhood vignettes. *Compare id.*, *with*, *e.g.*, *id.* Exs. 16 at 797-98, 814-16; 18 at 876-82; 23 at 1115-17; 59 at 1777; 60 at 1792-93; 61-65; 67 at 1919; 68; *see* Ex. 69. The only new material was the three childhood vignettes and those were never used or published. *Id.* DC also declined to use the script or start a Superboy series then. *Id.* Ex. 20 ¶¶ 8-9. In 1943, Siegel joined the military and worked at the Army's Library and Publications Branch in Hawaii. *Id.* Exs. 6-7. In 1944, DC published in *MF#101* a Superboy story written by DC staff writer Whit Ellsworth. *Id.* Exs. 9-10; 22 at 1034; 63. *MF#101* retold the origin story from earlier Superman works, featuring a young Superman discovering his superpowers. PD ¶ 71 & Exs. 63; 9 at 84-85. Ellsworth testified he had not seen Siegel's November 1938 or December 1940 pitch material ("Pitch Material") when he wrote *MF#101*, *id.* Ex. 9 at 84-85; this testimony was never rebutted.

In 1947, Siegel and Shuster sued DC in state court seeking to annul their 1938 copyright grant and arguing that DC's publication of Superboy was improper. *Id.* Ex. 8; 22 at 1035. The presiding referee refused to annul the 1938 grant, but found, "as a matter of contract interpretation," the grant did not include Superboy. *Id.* Ex. 22 at 1098. While on appeal, the parties entered into a consent judgment acknowledging that DC owned "all rights" in Superman and Superboy. *Id.* at 1040.

The Siegels' 1997 and 2002 termination notices sought to recapture rights in *MF#101* and hundreds of other Superboy works. *Id.* Exs. 11; 13. The Siegels filed the Superboy case in 2004, alleging Siegel solely created Superboy,[2] they owned 100% of Siegel's Superboy rights, and DC's *Smallville* series infringed those rights. *Id.* Ex. 14. DC's Fourth Counterclaim—on which the Court just ruled, *id.* Ex. 42—alleged the parties' 2001 Agreement was enforceable and barred these Superboy notices, *id.* Ex. 15 ¶¶ 102-05. DC challenged the termination on other grounds, including that DC, *not Siegel,* authored the Superboy works, and his Pitch

---

[2] DC challenged defendants' effort to falsely position Siegel as the sole creator of Superboy in the related *Shuster* case. PD Exs. 33 at 1412-18; 31 ¶¶ 86-91, 129-33.

Material was not eligible for termination because it was never published and, in any event, was wholly derivative of DC's preexisting Superman works. *Id.* ¶¶ 77-85. Even if the Pitch Material *was* found to have been incorporated in *MF#101* and thus "published," as Larson claimed, DC alleged that Siegel was a joint author with Shuster, which precluded an infringement claim. *Id.* ¶¶ 125-28.

In 2006, Judge Lew granted partial summary judgment for the Siegels, ruling that the state court's 1947 findings compelled the conclusion that Superboy was independently copyrightable. *Id.* Ex. 19. In July 2007, Judge Larson issued a 73-page opinion overturning this order. Judge Larson held the state court's findings, *which were based on state contract law*, were not determinative of the parties' *federal copyrights*. *Id.* Ex. 22 at 1066. He also held that, even to the extent the Pitch Material was terminable, it was a joint work between Siegel and Shuster. *Id.* at 1092; *id.* Exs. 22 at 1092; 24; 26. Judge Larson directed the parties to brief whether and to what extent the Pitch Material contained material eligible for statutory copyright protection under the 1909 Copyright Act and thus subject to termination. *Id.* Ex. 22. That briefing remains unresolved, was collected by the parties at this Court's instruction, *id.* Ex. 30, and is summarized briefly below.

2. The Pitch Material Was Never Published. In order to be terminable, the Pitch Material had to be published in accord with the 1909 Copyright Act. PD Ex. 22 at 1093-94. The Siegels claim some of the Pitch Material was incorporated into *MF#101* and thus published. *Id.*; PD Ex. 17 at 840-41; *see Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 973 (9th Cir. 2008) (copyrightable material in unpublished work deemed published if incorporated into published work).

A comparison of the Pitch Material to *MF#101* shows that the Pitch Material was not published in *MF#101*, except for preexisting Superman elements owned by DC. This is unsurprising, since Ellsworth wrote *MF#101* without seeing the Pitch Material and based on earlier Superman works. *Supra* at 9. As DC has shown in prior briefs, *e.g.*, PD Ex. 16 at 808-09; 18 at 874-75; *see also id.* Ex. 69, the Pitch

Material and *MF#101* have different plotlines, dialogue, and supporting characters:

- The Pitch Material focuses almost exclusively on young Superman's interactions with the Kents and his classmates, while *MF#101* focuses principally on his Kryptonian origin story: his birth parents, Jor-L and Lora, the destruction of Krypton, and his journey to Earth. *Id.*; *supra* at 6, 8-9.

- The *only* overlapping story elements in *MF#101* and the Pitch Material are derived from DC's preexisting works: Superman's origins, his lifting a chair above his head at an orphanage, and his adoption by the Kents. *Id.*

- The only "new" elements in the Pitch Material do *not* appear in *MF#101* or elsewhere and were never published. *None* of the dialogue in the script appears, nor do the script's stories of Superman beating up bullies and saving classmates. Similarly, none of the supporting characters in the Pitch Material—other than those from preexisting works (*i.e.*, the Kents, orphanage staff, Superman's Kryptonian parents)—appear in *MF#101*. *Id.*

Because no part of the Pitch Material was published in *MF#101* (or any other work), it is not eligible for termination. *E.g.*, PD Ex. 16 at 808-09.

3. Larson Can Claim No Rights In Previously Published Elements. Aside from the unpublished childhood vignettes, the Pitch Material is wholly derivative of works owned by DC. 17 U.S.C. § 101 ("'derivative work' is a work based upon one or more preexisting works"); PD Exs. 21 at 973-74; 22 at 1099 (Judge Larson: Larson has "never claimed that Siegel's Superboy is not derivative of Superman."). The author of a derivative work can own *only* original, non-trivial, independently copyrightable elements he adds to existing works. *See* 17 U.S.C. § 103(b); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997). As Judge Larson noted, the more developed a character, the less room for non-trivial variations. PD Ex. 22 at 1100.

The Pitch Material contains none. Superman was, by Siegel's own account, "very much" "developed" when he sent his 1938 letter, *id.* Ex. 4 at 15, and even

DC'S SUPP. BRIEF RE: FINAL JUDGMENT
**ER 856**

1    more so when he sent his 1940 script. Indeed, he said the Superboy script was

2    simply "Superman as a youth," targeting the "faithful followers of …

3    SUPERMAN." *Id.* Ex. 5. By 1940, the year of his script, DC's published

4    Superman works depicted:

- the story of Superman's origins on the planet Krypton, journey to Earth on a
  spaceship, and rescue and adoption by the Kents;

- the infant Superman's demonstration of super-strength at an orphanage;

- young Superman's discovery and development of his superpowers;

- Superman's dual identity as Clark Kent;

- Superman's relationship with Ma and Pa Kent, who are aware of his
  superpowers and teach him to keep them secret and use them for good;

- Superman's personality traits and social mission to battle injustice; and

- Superman's physical attributes, including facial features, physique, and
  costume. PD Exs. 59 at 1777; 60 at 1792-93; 61-65; 67 at 1919; 69.

15   Larson cannot claim copyright in aspects of the Pitch Material that merely

16   recast these existing elements. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499

17   U.S. 340, 349-50 (1991); *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 908-11 (2d

18   Cir. 1980); *Entm't Research*, 122 F.3d at 1220. Nor can she claim copyright in the

19   idea of Superman as a boy—not only had that idea been expressed in DC's prior

20   works, the idea standing alone is incapable of copyright protection. *See Berkic v.

21   Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("No one can own the basic idea for

22   a story. General plot ideas are not protected."); 17 U.S.C. § 102. The only "new"

23   elements in the Pitch Material are disconnected vignettes of Superman as a toddler,

24   kindergartner, and fifth-grader. *Supra* at 8-9, 11; PD Ex. 69. Though this

25   material—largely generic, non-copyrightable ideas and scenes-a-faire (*e.g.*, dealing

26   with schoolyard bullies)—may theoretically be entitled to thin copyright protection,

27   PD Ex. 23 at 1121-23, this is irrelevant here—as *none* of it was ever published.

28

**B. Larson's 2012 Ads Notice Is Invalid, But The Issue Is Not Yet Ripe.**

While in the course of these *Siegel* cases the parties litigated the scope and enforceability of the 2001 Agreement, and whether Larson's prior termination notices listed the Ads (they did not, held Judge Larson, PD Ex. 25 at 1181-82), they have never litigated Larson's 2012 notice targeting the Ads, as she did not sue to enforce it or move to amend her complaint to add it. The Court can and should now rule that the Ads fall within the compass of the 2001 Agreement and its references to "all Superman-related works" and "all pre-termination works"—ending this issue once and for all. But if the Court disagrees, and the parties must litigate the validity of Larson's 2012 notice and all that entails, this can only occur in a new lawsuit.

There would be many issues to litigate in this new lawsuit, including who authored the Ads, the fact that two of the Ads (and Larson's termination notice targeting them) lack a copyright registration, and other defects in Larson's position. As a preview to that litigation, were it to be brought, DC summarizes below some of the open issues that would have to be litigated.

1. Authorship. It is undisputed, in light of the copyright grant Siegel made to DC in 1938 and the Court's recent ruling regarding the enforceability of the 2001 Agreement, that DC owned *AC#1* in 1938 when the Ads were made, and DC owns *AC#1* now—cover, inside story, and all—under the terms of the 2001 Agreement. PD Exs. 12; 42. It is also undisputed that the Ads—which feature black-and-white copies of *AC#1*'s cover—were copied from *AC#1*. *Id.* Ex. 21 at 972-73; *id.* Ex. 28 at 1263 (Siegels: "There is no question that the Ad constitutes a derivative work").

One question that bears on Larson's 2012 termination notice is who was the statutory author of the Ads under the 1909 Act. That issue was not definitively resolved because Judge Larson held that the Siegels' prior termination notices failed to list the Ads. *Id.* Ex. 25 at 1181-82. DC contends its staff artists created the Ads as a work-for-hire, that DC is the statutory "author" of the Ads, and that, as such, they are not subject to termination. 17 U.S.C. §§ 203(a), 304(c)-(d) .

1       There is *no* evidence Siegel drafted the promotional text in the Ads—all

2   which by its very nature (quoting prices, etc.) was drafted by DC, under the

3   supervision of Editor Vincent Sullivan, whose name (unlike Siegel's) appears on

4   the by-line of the three comics using the Ads and promoting *AC#1*.  *See* Appendix

5   1.  The parties dispute whether DC's staff artists created the cover image of *AC#1*, a

6   copy of which appears in black-and-white in the Ads, but no one disputes that the

7   Ads use a mere copy of the *AC#1* cover as their only visual image.  As DC showed

8   in its recent Ninth Circuit briefs, the record evidence, including a letter from

9   Sullivan to Siegel, shows that DC's staff artists—*without Siegel's involvement*—

10  used a panel drawing from the Superman story in *AC#1* to create the *AC#1* cover.

11  PD Exs. 2; 37 at 1529-30; 39 at 1675.  Larson disputed this.  *Id.* Ex. 38 at 1619-21.

12      Judge Larson had commented on this authorship issue in dicta, but not on full

13  briefing, and in a ruling the Ninth Circuit reversed.  *Cf.* GOELZ & WATTS, FEDERAL

14  NINTH CIRCUIT APPELLATE PRACTICE § 10:231 (Rutter 2012) ("reversal effectively

15  annuls or sets aside the lower court's decision for all purposes").  Judge Larson's

16  order held (erroneously) that DC was estopped from litigating whether *AC#1*'s

17  cover was made-for-hire, even though the work-for-hire status of the cover had

18  *never* been litigated.  PD Exs. 37 at 1529-30; 39 at 1675.  He then suggested, in

19  dicta, that the evidence (*i.e.*, Sullivan's 1938 letter to Siegel) was "ambiguous" as to

20  who created *AC#1*'s cover and one could argue the "inference[s]" either way.  *Id.*

21  Ex. 25 at 1194.  If ever, these disputed issues will need to be tried in new litigation.

22      2. Scope.  Larson long argued the copyrightable content of the Ads was *zero*.

23  *E.g.*, *id.* Ex. 38 at 1643 (Ads "entirely derivative" of *AC#1*, contain "no new

24  copyrightable elements," and do not "limit [or] restrict" copyrights in *AC#1*); *id.*

25  Ex. 29 at 1283 ("[T]here is nothing in the ads.  They are a hard-to-read black and

26  white depiction divorced from the story of Superman….  [Y]ou don't know if he is

27  a good guy, a bad guy, you don't even know he is Superman."); Appendix 4.  Judge

28  Larson largely agreed in his now-reversed ruling, PD Ex. 25 at 1181-87:

1       The Court begins by observing what is not depicted in the [Ads].
2   Obviously, nothing concerning the Superman storyline (that is, the literary elements contained in [*AC#1*]) is on display in the ads; thus,
3   Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities
4   in general, do not remain within [DC's] sole possession to exploit. Instead the only copyrightable elements left arise from the pictorial
5   illustration in the announcements, which is fairly limited.

6       The person in question has great strength…. The person is wearing some type of costume, but significantly the colors, if any, for the same
7   are not represented…. The argument that the "S" crest is recognizable in the promotional advertisement is not persuasive…. The Court thus
8   concludes that [DC] may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and cape.
9

10  DC disputed these scope findings for purposes of the accounting trial the

11  Court did *not* hold, *e.g.*, *id.* Exs. 27 at 1237-38, and need not hold given its ruling

12  on the 2001 Agreement.  While Larson says she will feature DC's prior arguments

13  in her supplemental brief, they are irrelevant, and, if ever, must be raised in new

14  litigation.  In any event, Larson's new position about the scope of the Ads is belied

15  by her prior briefs on the issue, which she pressed to obtain favorable rulings.

16  Judicial estoppel bars her from changing positions this way given the rulings she

17  obtained, *e.g.*, *Gagne v. Zodiac Maritime Agencies, Ltd.*, 274 F. Supp. 2d 1144,

18  1149-50 (S.D. Cal. 2003) (prior arguments "clearly inconsistent and were relied

19  upon by the prior court"); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d. 778,

20  782 (9th Cir. 2001) (same), especially as a tactical afterthought, *see Milne v.*

21  *Slesinger*, 2009 WL 3140439, at *5 (C.D. Cal. Sept. 25, 2009) ("conduct

22  demonstrates a blatant effort to salvage its lawsuit … by an taking entirely …

23  inconsistent" position).

24  **V.  Conclusion**

25      The Court should enter final judgment for DC in these cases, based on the

26  first question it posed, and rule the 2001 Agreement covers Superboy and the Ads.

27  Dated:  April 4, 2013               Respectfully submitted,

28                                      By:  ___/s/ Daniel M. Petrocelli

**Appendix 1: Promotional Ad** (PD Exs. 55 at 1770; 56 at 1772; 57 at 1774)[3]



---

[3] Full scale versions of the images in Appendices 1-3 appear as PD Exhibits 58 and 59 at 1776, 1785.

i

1  **Appendix 2: Cover of *Action Comics #1*** (PD Ex. 59 at 1776)

1  **Appendix 3:  Interior Panel of *Action Comics #1*** (PD Ex. 59 at 1785)



**Appendix 4: Marc Toberoff's Arguments About Promo Ads At August 2010 Hearing Before This Court**

(PD Ex. 29 at 1282:2-1285:20):

MR. TOBEROFF: On the promotional ads, I need to correct Mr. -- certain misstatements that were made by Mr. Petrocelli. It is not so that Judge Larson did not rule regarding the contents of the promotional ads. He specifically did in one of his published rulings, and I can read you a small portion of it.

What happened is that the promotional ads are something that unless -- that the Siegels, when they did their termination notices and they were represented by counsel in Washington, looked up at the copyright office every single Superman work, and if you look at the termination notices, they are yay high, and they did exhaustive research. But advertisements appear in a page in a magazine that has some different title. It doesn't say Superman. It says Zorro or some other character.

So they had no way of finding searching under Siegel and Schuster or searching under Superman these ads at the copyright office so for that reason they didn't elicit a termination notice. *Judge Larson found that for technical reasons, the ads were not terminated but after so holding, he went out of his way to point out that the ads which merely contained a black and white picture of the Action Comics Number 1 cover which was recaptured, and so it is redundant of something that actually was recaptured, has very little significance.* **And he went out of his way to say, yes, you have got the ads back, but there is nothing in the ads.** *They are a hard-to-read black and white depiction divorced from the story of Superman. So a person in -- running around in black and white tights with a cape, you don't know if he is a good guy, a bad guy, you don't even know he is Superman.*

What you see is what you get, and what you see is something completely divorced from the Superman story. So after saying on a technicality that the ads weren't included, he made crystal clear in his published decision, and I can point you to the page number. The cite is 542 F.Supp.2d 1098, on page 1126, where he says:

"This leads to the question of the scope of the copyrighted material remaining in defendant's possession by way of the promotional announcements, a question that defendants themselves acknowledge," quote, "is most obviously answered by looking at the ads which speak for themselves."

"The Court begins by observing what is not depicted in the announcements, obviously, nothing concerning the Superman storyline, that is the literary elements contained in Action Comics Number 1, paren, which was recaptured is on display in the ads.

"Thus Superman's name, his alterego, his compatriots, his origins, his mission to serve as the champion of the oppressed or his heroic abilities in general do not remain within defendant's sole possession to exploit.

"Instead, the only copyrightable elements left arise from the pictorial illustration of the announcements which is fairly limited. The person in question has great strength. He is, after all, holding aloft a car. The person is wearing some type of costume, but, significantly, the colors if any for the same are not represented as the advertisement appears only in black and white.

"The argument that the S crest is recognizable in the promotional advertisements is not persuasive. What is depicted on the chest of the costume is so small and blurred as to not be readily recognizable. At best, all that can be seen is some vague marking or symbol, its precise contours hard to decipher.

"The Court, thus, concludes that defendants may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and a cape. What remains of the Siegel and Schuster Superman copyright that is still subject to termination, of course, what defendants truly seek is the entire storyline from Action Comics Number 1, Superman's distinctive blue leotard complete with its embroidered triangular crest across the chest with a red S on a yellow background, a red cape and boots and his superhuman ability to leap tall buildings, repel bullets and run faster than a locomotive, none of which is apparent from the announcement."

So not so that Judge Larson did not rule as to the effect of the ads

after saying on a technicality that it is not in the termination.  *He said, but it is not that relevant because the ads are a strong man in black and white running around in leotards and a cape. That is not Superman*.  (Emphases added.)

OMM_US:71461124

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
     *kadams@toberoffandassociates.com*
3  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway, #348
4  Malibu, California, 90265
   Telephone:  (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
7  individually and as personal representative
   of the Estate of Joanne Siegel

8

9            **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 10  LAURA SIEGEL LARSON, | Case No. 04-CV-08400 ODW (RZx)* |
| 11  individually and as personal | Case No. 04-CV-08776 ODW (RZx)* |
| 12  representative of the ESTATE OF | Hon. Otis D. Wright II, U.S.D.J. |
| JOANNE SIEGEL, | Hon. Ralph Zarefsky, U.S.M.J. |
| 13            Plaintiff, | |
| 14        v. | **PLAINTIFF'S COURT-AUTHORIZED SUR-REPLY TO DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE SIEGEL SUPERMAN AND SUPERBOY CASES*** |
| 15  WARNER BROS. ENTERTAINMENT | |
| INC., DC COMICS, and DOES 1-10, | |
| 16            Defendants and | |
| Counterclaimants. | |
| 17 | |

Date:     March 25, 2013*
Time:     1:30 p.m.*
Place:    Courtroom 11*

| | |
|---|---|
| 17  LAURA SIEGEL LARSON, | *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary.  Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |
| 18  individually and as personal | |
| 19  representative of the ESTATE OF | |
| JOANNE SIEGEL, | |
| 20            Plaintiff, | **:  The Court *sua sponte* granted Plaintiff leave to file a sur-reply.  Dkt. 714. |
| 21        v. | |
| 22  TIME WARNER INC., WARNER | |
| COMMUNICATIONS INC., | |
| 23  WARNER BROS. ENTERTAINMENT | |
| 24  INC., WARNER BROS. TELEVISION | |
| PRODUCTION INC., DC COMICS, | |
| 25  and DOES 1-10, | |
| 26            Defendants and | |
| Counterclaimants. | |
| 27 | |

28

1.  "Attorney-In-Fact" Argument:  DC's new argument is that it can unilaterally assign the Siegels' copyrights via a supposed "power of attorney" in ¶ C.12 of the October 19, 2001 Letter.  Dkt. 711 ("Reply") at 1, 4.  DC is wrong.  **Paragraph C.1** states that the Siegels "would transfer" their rights.  Dkt. 709-2, Ex. 1 at ¶C.1.  An assignment is a present transfer; a promise to assign in the future has no legal effect.  *See* Rest. (2d) of Contracts, § 330 (1979); *Bd. of Trs. v. Roche Molecular Sys.*, 131 S. Ct. 2188, 2194 (2011) ("mere promise to assign [IP] rights in the future" is ineffective).  **Paragraph C.12** is similarly infirm:  "The Siegel Family would agree to execute further documents, and [DC] would be appointed as attorney-in-fact to execute such documents...."  *Id.* at ¶ C.12.  The letter facially contemplated a regular agreement that never happened, due to DC conditioning its performance on new/revised terms.  Dkt. 709-1 ("SGI") ¶¶10-24.  What the Siegels "would agree" to do is not the same as doing it, especially as to something so vital as forever assigning copyrights or granting a power of attorney to adverse parties.  Compounding this, DC's "would be" appointment applies to undefined "further documents" the Siegels "would [later] agree to execute."  Moreover, the use in C.12 of "further documents" (not "any documents") suggests it was not intended to apply to the core assignment.

DC also circularly assumes the 2001 letter is enforceable after rescission.  Finally, "a power [of attorney] is revocable unless it is coupled with 'a … present and coexisting interest in the subject of the power.'"  *Jay v. Dollarhide*, 3 Cal. App. 3d 1001, 1023 (1970) (cit'n omitted); Cal. Civil Code § 2356(a)(1) (same).  Even if C.12 gave DC a power of attorney, it would be revocable as DC had no "present interest" in the Siegels' recaptured copyrights, and they revoked any power long ago.  Dkt. 646 ¶¶55-56, 100.  DC's sole citation, *Niss v. Columbia Pic. Ind.,Inc.*, 2000 U.S. Dist. LEXIS 18328 (S.D.N.Y. Dec. 20, 2000), is an inapposite "work-for-hire" case.

2.  DC's Non-Performance:  DC must prove the elements of breach to get specific performance, including DC's "performance or excuse for nonperformance," which it cannot prove on summary judgment.  *CDF Firefighters v. Maldonado*, 158

Cal. App. 4th 1226, 1239 (2008).  The October 19, 2001 Letter contained numerous obligations DC had to perform by **March 31, 2002.**  Dkt. 709 at 14-15; 709-2 ¶¶6, 24, 32.  DC argues that this was all excused because Plaintiff "repudiated" the deal on **May 9, 2002** (Reply at 7), which makes no sense as a matter of timing.  None of this is an "affirmative defense."  DC's Fourth Claim is <u>premised</u> on a currently "enforceable" contract.  Dkt. 646 ¶103.  A court cannot declare contractual rights in a vacuum, without determining the threshold issue of DC's failure to perform.

DC argues it "is *undisputed* that DC began performing on the 2001 deal right away, by reserving payments it owed Larson."  Reply at 9 n.6.  But this is highly disputed.  DC first mentioned its purported "reserve account" in 2004 counterclaims.  Dkt. 646 ¶¶98-99.  Plaintiff denied DC's performance allegation, as silent internal actions are no substitute for performance.  Dkt. 656 ¶¶98-99.  DC's President in 2006 testified that its "reserve account" was mere bookkeeping of Siegel royalties, totaling approximately $20 million in less than ***5 years***.  Dkt. 709-2, Ex. 12 at 153-58.  DC reconfirmed this amount in 2007.  Dkt. 709-2, Ex. 13 at 168 n.18.  Yet, when DC finally purported to "tender" performance on February 28, 2013, it implausibly stated that the royalties owed ***after 6 more years*** were $21.5 million.  *Id.*, Ex. 25 at 380.

3.   <u>No Waiver of Defenses:</u>  First, it is DC's burden to *prove* performance or an excuse for non-performance.  "A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  Second, Ms. Larson pleaded sufficient defenses, including "No Settlement Agreement," encompassing  DC's anticipatory repudiation and rescission,[1] DC's "**Unclean Hands**" and "**Bad Faith**," barring its equitable relief, and DC's "**Acquiescence**," "**Waiver**" and "**Laches**" in not asserting the 2001 letter for 3 years.  Dkt. 656 ¶¶149-153.  DC's motion to strike the defenses as vague (Reply at 6 n.5) should have been made in a Rule 12(f) motion "before

---

[1] *See also* Dkt. 656 ¶¶185 (alleging "many unacceptable material terms that had never been … agreed to by Plaintiffs"); 53(DC insisted on "terms that differed from and/or substantially diluted the terms negotiated"), 55 (May 9, 2002 rescission), 56 (September 21, 2002 rescission).

1  responding to the pleading," and DC's cases all concern timely Rule 12(f) motions.

2      Third, Ms. Larson has not waived these issues because DC "must [] have

3  suffered some prejudice in order to apply waiver." *McGinest v. GTE Serv. Corp.*,

4  257 Fed. Appx. 72, 75 (9th Cir. 2007) ("Affirmative defenses that were not pleaded

5  in an answer may be raised for the first time on summary judgment."). "[S]trict

6  adherence to the pleading requirement is inappropriate when the purpose … has been

7  otherwise fulfilled. The purpose … is to give the opposing party notice …[and] a

8  chance to argue…" *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (9th Cir. 2006). DC has

9  long been aware of these issues. It counterclaimed that it "has performed all of its

10  obligations under the agreement," pointing to the same "reserve account" it points to

11  now. Dkt. 646 ¶99. DC's allegations and Plaintiff's denials (Dkt. 656 ¶¶53, 55-56,

12  97-105) sufficiently put DC's "non-performance" at issue. *See Simmons v. Navajo

13  County*, 609 F.3d 1011, 1023 (9th Cir. 2010) (answer that "denied the allegation,"

14  and summary judgment opposition, gave plaintiff adequate "notice" of defense). The

15  Siegels consistently maintained that DC altered the material terms of the October 19,

16  2001 Letter in bad faith. The factual underpinnings of the defenses have been argued

17  and reargued, and DC has taken discovery, here and in *DC Comics*, for 9 years. *See,

18  e.g., Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098 at 1115-16,

19  1136-39 (C.D. Cal. 2008); *Cripe v. City of San Jose*, 261 F.3d 877, 886 (9th Cir.

20  2001) ("[Defendant] argued the relevant facts…that sufficiently put the plaintiffs and

21  the court on notice of the actual issue."). In 2010, the defendants in *DC Comics*,

22  pleaded "rescission" and "failure of consideration," among other defenses to the

23  October 19, 2001 Letter, giving DC even more notice. Case 10-CV-03633, Dkt. 348

24  at 33-35 ¶¶193, 201; 347 at 33- 35 ¶¶193, 202, 205. Despite DC's rhetoric, Ms.

25  Larson has pled/asserted the facts and her defenses, and is permitted to make

26  alternative legal arguments based on the Circuit's ruling. *See* Fed. R. Civ. P. 8(c)(2).

27      4.  <u>Rescission</u>:  DC argues the May 2002 letter did not "acknowledge[] the

28  existence of an underlying contract" (Reply at 10), but it expressly stated "[we]

PLAINTIFF'S COURT-AUTHORIZED SUR-REPLY RE: MOTION FOR SUMMARY JUDGMENT

1   reluctantly accepted [DC's] last proposal six months ago."  Dkt. 702-2, Ex. 4 at 75.

2   DC represented the opposite to Judge Larson *and* the Circuit:  "[o]n May 9, 2002 ….

3   Mrs. Siegel acknowledged" an agreement. Dkt. 181 at 23;  Dkt. 709-2, Ex. 16 at 224.

4       5.    Acquiescence:  DC's argument that it did not acquiesce in 2001-2004

5   because it counterclaimed in late 2004 does not add up.  SGI ¶31; *Honda v. Reed*,

6   156 Cal. App. 2d 536, 538 (1958) ("abandonment" where parties did not perform,

7   "negotiated for a new and different agreement" but "could not agree on terms").

8       6.    The Ninth Circuit Ruling:  DC again selectively quotes the Circuit's

9   opinion, which speaks for itself.  The Circuit held that the October 19, 2001 Letter

10  "*was* sufficient to create a contract," but did not construe it.  *Larson v. Warner Bros.*

11  *Entm't*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. Jan. 10, 2013) (emphasis added).

12  DC misrepresents that the Circuit held the letter "afforded DC the 'continued right to

13  produce Superman works'" (Reply at 3), omitting that it merely described it:  "What

14  follows is five pages of terms outlining substantial compensation … in exchange for

15  DC's continued right to produce Superman works."  *Id.* at *3.  DC misrepresents that

16  the Circuit "held … that Marks validly transferred the copyrights" (Reply at 3) when

17  it held, in response to Plaintiff's 17 U.S.C. § 204(a) writing requirement argument,

18  that a letter by a "'duly authorized agent'" satisfies the writing requirement.  *Id.* at *6.

19  The Circuit did not address the issues here nor anything after October 19, 2001 – *i.e.,*

20  DC's October 26, 2001 Letter, February 1, 2002 Draft, or the Siegels' May 9 and

21  September 21, 2002 letters – and remanded DC's contract claims for adjudication by

22  this Court in the first instance.  *Id.* at *6; *Pullman-Standard v. Swint*, 456 U.S. 273,

23  291-92 (1982) ("[f]actfinding is the [] responsibility of district courts"); *Vincent v.*

24  *Trend W. Tech. Corp.*, 828 F.2d 563, 570-571 (9th Cir. 1987) (cautioning against

25  transforming "the court of appeals into a court of first instance").  DC's Appendix of

26  arguments the Circuit did not address is irrelevant for that reason.

27      7.    Superboy and "Ads":  The Siegels' 1997 termination did not apply to the

28  "Superboy" works or the "Superman" Ads as a matter of law.  Ms. Larson's

"Superman" terminations were served in 1997 (Dkt. 644 ¶¶39-45), and could only recapture works published by 1943, under 17 U.S.C. §304(c)(3)-(4)'s time windows. *See Siegel*, 542 F. Supp. 2d at 1119-23 (Ads were published outside the termination "window" and "outside the effective reach of the termination notices").  Ms. Larson's 2002 termination applied to "Superboy" works, first published in *More Fun Comics*, No. 101 (November 1944), that DC owned under a 1948 Stipulation.  Dkt. 709-2, Ex. 7 at 84-87.  Her 2012 termination under § 304(d) applied to the Ads, missed by her 1997 termination.  The October 19, 2001 Letter could ***not*** transfer the Siegels' termination interest in "Superboy" or the Ads because, as this Court held, per 17 U.S.C. § 304(c)(6)(D), termination interests cannot be assigned prior to service of a termination notice.  *See DC Comics v. Pac. Pictures Corp.,* 2012 U.S. Dist. LEXIS 149532, at *28 (C.D. Cal. Oct. 17, 2012).

DC contends that the October 19, 2001 Letter revoked Jerry Siegel's venerable Superman/Superboy grants and re-granted his copyrights (already owned for decades by DC) to DC.  But the letter contains no indication of this, and DC conceded that it controls.  SGI ¶¶11, 22, 52.  The Ninth Circuit has also made plain that any "revocation and re-grant" must be "express," given Congress' objective to protect the termination right.  *See* 17 U.S.C. §§ 304(c)(5), (c)(6)(D); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1040 (9th Cir. 2005); *Classic Media v. Mewborn*, 532 F.3d 978, 987 (9th Cir. 2008); 9th Cir. Case No. 12-57245, Dkt. 11 at 23-28; *Alexander v. Angel*, 37 Cal. 2d 856, 860 (1951) ("evidence… of a novation must be 'clear and convincing'") (cited by DC) (citation omitted).  Moreover, DC has relied on Siegel's original Superman and Superboy grants in these very cases, well after the October 19, 2001 Letter.  Dkt 646 ¶¶ 68-69, 87 ("All grants made by Siegel and Shuster of rights in Action Comics No. 1 are still in effect..."); Case No. 04-CV-08776, Dkt. 37 ¶35.

Dated:  March 18, 2013

RESPECTFULLY SUBMITTED,
/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorney for Plaintiff, Laura Siegel Larson

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014, and that all participants in the case are registered CM/ECF users.

Dated:  February 21, 2014                    /s/ Marc Toberoff
                                             Marc Toberoff