APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZX), CV-04-8776 (RZX)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 5 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura  Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 5)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A: Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B: Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|---|---|---|---|---|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1:  Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2:  Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3:  Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4:  Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A:  Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B:  Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C:  Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E:  Transcript Cover Sheet for  Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F:  Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | | | |
|---|---|---|---|---|
| | | Response in Objection to Motion | | |
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A: December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B:  April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A:  Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G:  January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H:  January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I:  February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J:  Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M:  Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

xix

| | | | | |
|---|---|---|---|---|
| | | Motion for Partial Summary Judgment | | |
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C:  May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D:  May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F:  June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G:  Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H:  Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I:  Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J:  Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K:  Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L:  Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M:  Notice of Termination re:  December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N:  Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R:  Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| | | | | |
|---|---|---|---|---|
| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| **Docket No.** | **Filing Date** | **Document Title** | **Vol.** | **Page** |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment"  In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for the DC Comics Parties

8                **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11  LAURA SIEGEL LARSON,                 Case No.  CV 04-8400 ODW (RZx)
    individually and as personal         Case No.  CV 04-8776 ODW (RZx)
12  representative of the ESTATE OF
    JOANNE SIEGEL,                       **DEFENDANT DC COMICS'**
13                                       **RESPONSE TO PLAINTIFF'S**
                   Plaintiff,            **STATEMENT OF GENUINE**
14                                       **ISSUES AND ADDITIONAL FACTS**
             v.                          **RE: DC COMICS' MOTION FOR**
15                                       **SUMMARY JUDGMENT IN THE**
    WARNER BROS. ENTERTAINMENT           ***SIEGEL* SUPERMAN AND**
16  INC., DC COMICS, and DOES 1-10,      **SUPERBOY CASES**
17                 Defendants and        The Hon. Otis D. Wright II
                   Counterclaimants.
18  ─────────────────────────────────    **Hearing Date**:     March 25, 2013
    LAURA SIEGEL LARSON,                                      (*Hearing Vacated*)
19  individually and as personal
    representative of the ESTATE OF
20  JOANNE SIEGEL,

21                 Plaintiff,

22           v.

23  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
24  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
25  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
26
                   Defendants and
27                 Counterclaimants.

28

DC Comics ("DC") submits this Response To Plaintiff's Statement of Genuine Issues And Additional Facts Re: DC Comics' Motion For Summary Judgment In The *Siegel* Superman And Superboy Cases. Part I addresses plaintiff Laura Siegel Larson's response to DC's Statement of Uncontroverted Fact. Part II addresses Larson's Statement of Additional Facts—which identifies no material facts in dispute on DC's summary judgment motion, but instead tries to create the impression of such disputes through improper, irrelevant, and inaccurate legal arguments that are inappropriate for inclusion in this Statement. *See* Case No. CV-04-8400, DN 598 at 6 ("Each paragraph should contain a narrowly focused statement of fact."). Part III addresses Larson's Conclusion of Law.

## I. REPLY TO LARSON'S RESPONSE TO DC'S STATEMENT OF UNCONTROVERTED FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT ("SUF") |
|---|
| 1. The agreement set forth in Kevin Marks' October 19, 2001, letter to John Schulman states:<br><br>"The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property….The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.<br><br>[Declaration of Daniel M. Petrocelli, Ex. B at 19, 21; *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1-2 (9th Cir. Jan 10, 2013)] |

| LARSON'S RESPONSE | DC'S REPLY |
|---|---|
| **Undisputed** that Kevin Marks sent a letter to John Schulman on October 19, 2001 containing the quoted language.<br><br>**Disputed** to the extent Warner | Larson's improper legal argument is inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, it is not well taken for the reasons set forth in DC's concurrently filed Reply In Support |

| | |
|---|---|
| argues that the October 19, 2001 letter transferred Ms. Larson's copyright interests in Superman or that Ms. Larson is obligated today to transfer such copyright. | Of Defendant DC Comics' Motion For Summary Judgment In The *Siegel* Superman And Superboy Cases ("Reply"). Reply 2-4. The Ninth Circuit held that Marks' October 19, 2001, letter was a valid transfer of the Siegels' Superman, Superboy, and other rights to DC, giving DC the "continued right to produce Superman works." *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit expressly rejected Larson's argument that the October 19, 2001, letter did not transfer the Siegels' rights to DC, and held the letter was "binding," its terms were "sufficiently definite that a court could enforce them," and the Copyright Act "expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that [Marks] was such an agent.*" *Id.* (emphasis added). The law of mandate prohibits Larson from recycling the arguments she lost on appeal. Reply 3-4. |
| | Even if the October 19, 2001, letter was not a transfer, it appointed DC "attorney-in-fact" for the Siegels to execute any "further documents" they failed to sign—including a copyright assignment. AD Ex. 1 at 8; *see* Reply 4; *Niss v. Columbia Pictures Indus., Inc.*, 2000 WL 1862814, at *6 (S.D.N.Y. Dec. 20, 2000) (party properly executed copyright assignment in reliance on a contractual attorney-in-fact provision after other party refused). |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 875**

## II. DC'S RESPONSES TO LARSON'S STATEMENT OF ADDITIONAL FACTS

| LARSON'S STATEMENT OF ADDITIONAL FACTS | DC'S RESPONSE |
|---|---|
| 2. In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices of termination pursuant to the Copyright Act as to Jerome Siegel's Superman copyright grants to DC Comics ("DC").<br><br>Plaintiff's Evidence: Dkt. 646 (DC's Second Amended Counterclaims; Counterclaims") ¶¶42-43. | **Undisputed**, but Larson omits that the Siegels' 1997 termination notices sought to recapture "each and every work … reasonably associated with SUPERMAN," *including* "Superboy," and listed thousands of Superman *and* Superboy works. Case No. CV-04-8400, DN 163 at 89 n.1. The Ninth Circuit rightly held that, regardless of the validity of these termination notices, the Siegels transferred whatever rights they held to DC in the October 19, 2001, agreement. *Larson*, 2012 WL 6822241, at *1; *see* Reply 2-4. |
| 3. In 1999, the Siegels and DC entered into formal negotiations, in which the Siegels were represented by attorney Kevin Marks and DC by Warner's then-General Counsel, John Schulman.<br><br>Plaintiff's Evidence: Counterclaims ¶51; Dkt. 656 (Plaintiff's Answer to DC's Second Amended Counterclaims ("Answer") at ¶ 51 | **Undisputed**. |
| 4. On October 16, 2001, DC made a settlement offer to the Siegels.<br><br>Plaintiff's Evidence: Declaration of Keith Adams ("AD") Ex. 1 at 4-9 | **Undisputed**. |

Case 13-56243 02/25/2014 ID 8992563 DktEntry: 32-5 Page 32 of 294

| | |
|---|---|
| 5. On October 19, 2001, Mr. Marks sent a "term sheet," in letter form, to Mr. Schulman (the "October 19, 2001 Letter"). Plaintiff's Evidence: AD Ex. 1 at 4-9 | **Undisputed** that Marks sent Schulman a letter on October 19, 2001, that, as the Ninth Circuit held, constituted a "binding" settlement agreement "as a matter of law" and "accurately reflected the [deal's] material terms." *Larson*, 2012 WL 6822241, at *1; *see* Reply 2-4. |
| 6. The October 19, 2001 Letter sets forth the terms of the parties' agreement and states in relevant part as follows:<br><br>Dear John:<br><br>This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:<br><br>A. Definitions.<br><br>1. "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called | **Undisputed** that Marks' October 19, 2001, letter contains the quoted language, but DC does not agree that Larson's selective quotation contains all "relevant" language. |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

Superman library), characters, names and trademarks relating to the Property.

2. "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B. Financial Terms.

1. A non-returnable, but recoupable advance of $2,000,000.

2. A non-returnable, non-recoupable signing bonus of 1,000,000.

3. D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4. There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6

below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5. A royalty of 6% of Superman/Spectre Gross Revenues. This applies without limitation) to the use of the entire Property, including the so-called superman library, in any and all media now or hereafter known (Excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 879**

the "safe harbor" motion picture and television deals discussed in Paragrah C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "superheroes" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. comic's characters and Looney Toons characters).

6. A royalty of 1% of the cover price of DC Comics' publications. This royalty applies when the Property is used alone, and will be adjusted pro-rate when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in

no event less than 0.5%.

7. Recoupment begins as of January 1, 2000.

…

C. Other Terms.

1. The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2. If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow invalidated or limited by operation of law, and there is a future court judgment against D.C.

- 8 -

Comics, this deal would apply against the amount of such judgment, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel family under this deal.

3. Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4. D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 882**

on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5. The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

…

8. D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

9. DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will

DC'S RESP. TO LARSON'S STMT. OF GENUINE ISSUES & ADDITIONAL FACTS

**ER 883**

have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10. Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the Lois & Clark" television program deal, the WB television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g.,

"Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% of the original rights deal.

11. At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12. The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have no transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 885**

| | | |
|---|---|---|
| 1 | disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family. | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | 14. Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for D.C. or affiliate actions. | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal. | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | Plaintiff's Evidence: AD Ex. 1 at 4-9 | |
| 19 | 7.    The parties intended the terms of the October 19, 2001 Letter to be transposed into an agreement format for signature by the parties. | **Disputed** to the extent Larson suggests that Marks' October 19, 2001, letter was not a binding agreement.  The Ninth Circuit rightly held "as a matter of law," that Marks' October 19, 2001, letter was a "binding" agreement, even absent any further or future long-form agreement. *Larson*, 2012 WL 6822241, at *1; *see* Reply 8-10.  That the parties contemplated finalization of a long-form document does not invalidate or breach their underlying short-form agreement.  This is the very issue Larson briefed and lost on appeal, Reply, Appendix 2 at 19-22, |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | Plaintiff's Evidence: AD Ex. 2 at 10; Ex. 10 at 115:21-116:1 | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

| | | |
|---|---|---|
| 1 | | as did the losing parties in *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037-38 (9th Cir. 2011); *see Larson*, 2012 WL 6822241, at *1 (*Facebook* is "controlling here"); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 847 (1941) (if the law allowed draft long-forms to undermine earlier agreement—and it does not—a party could improperly escape a contract "by simply suggesting other and additional terms"). The law of mandate prohibits Larson from recycling the arguments she lost on appeal. Reply 3-4. |
| 10 | 8.    On October 26, 2001, Mr. Schulman sent a letter to Mr. Marks, in which he enclosed a supposedly "more fulsome outline" of deal terms (the "October 26, 2001 Letter"). The letter stated in relevant part: | **Undisputed** that Schulman sent this letter and that it contains the quoted language.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1. |
| | Dear Kevin: | |
| | I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road. | **Disputed** that this fact is material or relevant to DC's motion.  *See* Reply 8-10; Response to SAF 7. |
| | I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will | |

- 14 -

have this super-matter transaction in document form.

Thank you.

…

Transfer

• Regrant, grant, etc.

• 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public

• 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties – even if not created for DC Comics

• All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")

• In perpetuity and worldwide

• Siegels will execute further documents as may be

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

ER 888

necessary to evidence DC's ownership of rights; designate WB as attorney in fact

• Siegels warrant and represent no termination nor any rights remaining except for rights under this agreement and the written agreement to include various provision to ensure same (jointly and severally)

• Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)

• Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)

• Give copy of all documents relating to rights/history

• Siegels warrant and represent not to interfere with or diminish DC/WB

- 16 -

Case: 13-56243 02/25/2014 ID: 8992563 DktEntry: 23-5 Page: 45 of 294

enjoyment of exclusive ownership, control, and use (jointly and severally)

• Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). Right to use J. Siegel bio and photos in publicity, etc., re property.

• The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in

any media.

Initial Payment

• $2 million recoupable (advance)

• $1 million non-recoupable

• Waive right to recoup $250,000 per 2000 letter

Annual Payment (Advance)

• $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal

• Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings

• Terminate when Action #1 US copyright terminates

Widows Benefits (not assignable or transferrable)

• $135,000/year

• Payable for Joanne's life, personal,

• Paid as now

• Medical, comparable to past, for life

- 18 -

Royalty

• Commencing for revenue received on or after 1/1/00

• All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year or payment

• 6% of DC's receipts from all Media licenses for use of the Properties, except:

1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%

2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%.

• 6% of DC's receipts from

ER 892

all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketing in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

2) with respect to licensees which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends Super Heroes), the 6% shall be reduced to 1.5%

3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 893**

well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

• 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be

directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

• 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories)

1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

2) there will be no reduction of the royalties payable

- 22 -

hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

3) there will be no royalties payable hereunder when the Properties appear in publication or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question

• [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

Payment

All monies due the Siegels hereunder, except widow's

benefit, shall be paid in following manner:

    47.5% Joanne Siegel

    23.75% Laura Siegel Larson

    23.75% Michael Siegel

    5.00% Gang Tyre Ramer & Brown Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

Advise (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 897**

rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing TV series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Sigel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 898**

other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial

Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period.

Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights.

Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals with fall outside the safe harbors.

Safe Harbors for Intercompany Deals

• Salkind (Motion Pictures)

• Lois & Clark (TV)

• WB Television Animation Deal

• Merchandising representation practice

Expedited Dispute Resolution (Any claims between the parties)

• Arbitration

• Compensation damages only to Siegels

• No injunction against

DC'S RESP. TO LARSON'S STMT. OF GENUINE ISSUES & ADDITIONAL FACTS

**ER 900**

DC/WB breaches, no termination of rights, no reversion

• DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

Medical Coverage/Son & Daughter (Grandsons only through minority) (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

DC'S RESP. TO LARSON'S STMT. OF GENUINE ISSUES & ADDITIONAL FACTS

ER 901

Release and covenant not to sue by Siegels

• Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)

• Approve all deals made before 12/31/00

Miscellaneous

• Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels; if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]

• Siegels defend and indemnify re third party

ER 902

| | |
|---|---|
| claims | |
| • Siegels defend and indemnify re Dennis claim | |
| • Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign | |
| • DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts | |
| • Siegels to refer all inquiries relating in any way to Properties to DC/WB. | |
| • At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d. | |
| <u>Plaintiff's Evidence</u>: AD Ex. 2 at 10-17 | |
| 9.      The October 26, 2001 Letter was sent when Mr. Marks was in China for an extended period; he did not return until late November 2001, and it was not forwarded to the Siegels.<br><br><u>Plaintiff's Evidence</u>: AD Ex. 10 at 104:9-22; Ex. 9 at 97:22-98:13 | **Undisputed**.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at \*1.<br><br>**Disputed** that any of these facts are material or relevant to DC's motion. *See* Reply 8-10; Response to SAF 7.  Larson's new arguments that the parties did make a deal in 2001, but DC |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 903**

Case 2:13-56245 02/25/2014 ID:8992563 DktEntry:23-5 Page 59 of 294

| | | |
|---|---|---|
| 1 | | somehow breached it, she rescinded it, and DC |
| 2 | | abandoned it—made 11 years after the fact, and |
| 3 | | only after her defeat in the Ninth Circuit—were |
| 4 | | waived long ago, Reply 5-6—and, in any event, |
| | | fail as a matter of law, *id.* 6-11. |
| 5 | 10. There were material | **Disputed** and irrelevant. While Larson relies on |
| 6 | differences between the October | Judge Larson's now-reversed summary |
| 7 | 19, 2001 Letter and the October | judgment ruling to establish this asserted fact, |
| | 26, 2001 Letter, all to DC's | the Ninth Circuit rightly "reversed" his order in |
| 8 | benefit and the Siegels' | full, and not in part, and held that Marks' |
| 9 | detriment. | October 19, 2001, letter accurately set forth the |
| 10 | Plaintiff's Evidence: Compare | parties' agreement. *Larson*, 2012 WL 6822241 |
| | AD Ex. 1 to Ex. 2; *Siegel v.* | at *2. "A reversal effectively annuls or sets |
| 11 | *Warner Bros. Entertainment,* | aside the lower court's decision for *all* |
| 12 | *Inc.*, 542 F. Supp. 2d 1908, | *purposes*." C. GOELZ & M. WATTS, FEDERAL |
| 13 | 1137 39 (C.D. Cal. 2008) | NINTH CIRCUIT APPELLATE PRACTICE § 10:231 |
| 14 | | (Rutter 2012) ("Rutter"); *State of Calif. Dep't of* |
| | | *Social Servs. v. Thompson*, 321 F.3d 835, 847 |
| 15 | | (9th Cir. 2003). Moreover, the Ninth Circuit |
| 16 | | rightly held, "as a matter of law," that the parties |
| 17 | | entered into a "binding" settlement agreement |
| 18 | | on October 19, 2001—despite their subsequent |
| | | disputes over finalization of the long-form |
| 19 | | contract. *Larson*, 2012 WL 6822241, at *1. |
| 20 | | Larson's improper legal arguments about |
| 21 | | "material[ity]" are inappropriate for inclusion in |
| 22 | | this Statement and irrelevant to the resolution of |
| | | DC's motion. In any event, they are not well |
| 23 | | taken for the reasons set forth in DC's reply, |
| 24 | | Reply 8-10, and above, Responses to SAF 7, 9. |
| 25 | 11. The October 26, 2001 | **Undisputed, but <u>against</u> Larson**. The Ninth |
| 26 | Letter contemplates a "regrant" | Circuit rightly held that Marks' October 19, |
| | of the Siegels' rights. | 2001, letter was a valid transfer of the Siegels' |
| 27 | Plaintiff's Evidence: AD Ex. 2 | Superman, Superboy, and other rights to DC, |
| 28 | at 11 | thus giving DC the "continued right to produce |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 904**

Superman works." *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit expressly rejected Larson's argument that the October 19, 2001, letter did not transfer the Siegels' rights to DC, and held the letter was "binding," its terms were "sufficiently definite that a court could enforce them," and the Copyright Act "expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that the heirs' attorney [Marks] was such an agent*." *Id.* (emphasis added). The law of mandate prohibits Larson from recycling the arguments she lost on appeal. Reply 3-4.

The October 19, 2001, agreement revoked and replaced all prior grants of the Siegels' Superman and Superboy copyrights. As this Court rightly held in the related *Shuster* case, an agreement that "deals squarely with the same subject matter as the parties' earlier agreements"—*i.e.*, grants of all Superman and Superboy copyrights—revokes and replaces those earlier copyright grants. *DC Comics v. Pac. Pictures*, 2012 WL 4936588, at *7 (C.D. Cal. Oct. 17, 2012); *see* Reply 11-12.

Larson's improper legal argument is inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, it is not well taken for the reasons set forth in DC's reply. Reply 2-4, 11-12. The Ninth Circuit rejected Larson's legal arguments, repeated here, that the parties' 2001 deal "contemplated" some future act, and that Marks' letter could not constitute a valid copyright

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 905**

| | transfer without Larson executing a further assignment. *Id.* 2-4. |
|---|---|
| 12. Marks testified to the material differences between the October 19, 2001 Letter and the October 26, 2001 Letter.<br><br>Plaintiff's Evidence: AD Ex. 10 at 107:4- 116:1 | **Disputed** and irrelevant. The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at \*1. The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement— and Schulman's October 26, 2001, letter. *Id.* at \*2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper legal arguments about "material[ity]" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 13. The October 26, 2001 Letter required the Siegels to assign additional copyrights to DC. As Marks testified:<br><br>I know that one area of difference [between the terms of the October 19, 2001 Letter and the terms of Schulman's October 26, 2001 Letter] was the scope of the rights granted. In my | **Disputed**, but irrelevant, to the extent Larson suggests that Schulman's October 26, 2001, letter "required the Siegels to assign additional copyrights to DC" that were not identified in Marks' October 19, 2001, letter. Larson does not, and has not, identified such "additional copyrights"—and there are none. The Ninth Circuit rightly rejected Larson's argument, and held that Marks' October 19, 2001, letter was a valid transfer of the Siegels' Superman, Superboy, and other rights to DC, thus giving |

| | |
|---|---|
| letter it referred to – very specifically to the Superman property and the Spectre property. That's what we had been talking about the whole time of our negotiations going back to the first meeting in 2 – 1999. And, of course, as you see here, the consideration, at least as set forth in my letter, for that matter I guess in John's letter, is based on revenue from the Superman and Spectre properties, yet John's letter referred more generally to all properties authored by Siegel for DC Comics and was not limited to the Superman and Spectre properties that we had been talking about.<br><br>Plaintiff's Evidence: Compare AD Ex. 1 with Ex. 2; Ex. 10 at 107:16-108:4 | DC the "continued right to produce Superman works." *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit expressly rejected Larson's argument that the October 19, 2001, letter did not transfer the Siegels' rights to DC, and held the letter was "binding," its terms were "sufficiently definite that a court could enforce them," and the Copyright Act "expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that the heirs' attorney [Marks] was such an agent*." *Id.* (emphasis added). The law of mandate prohibits Larson from recycling the arguments she lost on appeal. Reply 3-4.<br><br>The Ninth Circuit also rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement— and Schulman's October 26, 2001, letter. *Id.* at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper legal arguments, which are recycled from her losing Ninth Circuit briefs, are inappropriate for inclusion in this Statement |

- 34 -

Case: 13-56243 02/25/2014 ID: 8992563 DktEntry: 23-5 Page 63 of 294

| | |
|---|---|
| | and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9, 11. The Ninth Circuit rejected Larson's legal arguments that the parties' 2001 deal "contemplated" some future act, and that Marks' letter could not constitute a valid copyright transfer without Larson executing a further assignment. Reply 2-4. |
| 14. The October 26, 2001 Letter reduced the Siegels' royalty in many instances. At Marks testified:<br><br>I recall in [Schulman's October 26, 2001 Letter] new terms concerning how the royalty could be reduced. My understanding of our agreement, what I set forth in the October 19th letter, was that on media and merchandising licenses the royalty was 6 percent. If the other DC Comics characters appeared in the media program or in licensing or merchandising, that royalty could be reduced to a floor of 3 percent.<br><br>…<br><br>[In the October 26th letter the] categories where the 3 percent can be further reduced are broadened. | **Disputed** but irrelevant. The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement—and Schulman's October 26, 2001, letter. *Id.* at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper arguments about alleged "reduc[tions]" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 908**

| Plaintiff's Evidence: Compare AD Ex. 1 to Ex. 2; Ex. 10 at 110:4-111:12 | |
|---|---|
| 15.    The October 26 Letter changed when and where credit would be given to the Siegel family.  As Marks testified:<br><br>In terms of the credit to be accorded Siegel and Shuster, which was a point that I had as my point C.4, a point that I thought had long been agreed, that there would be a credit in paid ads of motion pictures, which is certainly in my experience is something that's very important to clients. They want to see credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's [October 26, 2001] letter provided for credit on screen only and not in paid ads.<br><br>Plaintiff's Evidence: Compare AD Ex. 1 to Ex. 2; Ex. 10 at 113:12-20 | **Disputed** but irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement— and Schulman's October 26, 2001, letter. *Id.* at *2.  "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper arguments about alleged "change[s]" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 16.    The October 26 Letter added numerous warranty and indemnity provisions found nowhere in the October 19, 2001 Letter. As Marks testified:<br><br>Another area where [Schulman's October 26, | **Disputed** but irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1.  The Ninth |

| | |
|---|---|
| 2001 Letter] differed involved warranties and representations and, in turn, indemnities. If you recall, we spoke earlier about the view that the only warranty and representation the Siegel family would make would be that they have not transferred rights to any other party, and in John's letter there are broader warranties than that, warranties that go beyond that.<br><br>…<br><br>John's warranties go beyond that, and so too in his letter he would have the Siegels indemnifying for areas that were not agreed and, indeed, not event discussed. So there's broader warranties and representations and, as a result, broader indemnities. And in fact there are additional indemnities added; for example, indemnifying for any claims brought by Dennis Larson.<br><br><u>Plaintiff's Evidence</u>: Ex 10 at 108:4-19 | Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement—and Schulman's October 26, 2001, letter. *Id.* at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper arguments about alleged "add[itions]" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 17.    The October 26, 2001 Letter confirmed the "Annual Payment (Advance)" of | **Undisputed**.<br><br>**Disputed** that this fact is material or relevant to |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 910**

| | |
|---|---|
| "$500,000 per year for ten years, commencing 2002, payable 3/31 of year," i.e., beginning March 31, 2002.<br><br>Plaintiff's Evidence:  AD Ex. 2 at 14 | DC's motion.  In any event, Larson's improper legal arguments about breach, rescission, and abandonment are not well taken for the reasons set forth in DC's reply.  Reply 8-11.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th 712, 751 (2006); *Ferguson v. City of Cathedral City*, 197 Cal. App. 4th 1161, 1169 (2011) (holding as a matter of law that once plaintiff called agreement "null and void," defendant "excused from further performance"); *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*, 480 F.2d 1112, 1116 (9th Cir. 1973) ("Performance by the party not in fault is always excused by the wrongful refusal to perform by the other party."); *United Bhd. of Carpenters & Jointers v. Endicott Enters., Inc.*, 806 F.2d 918, 922-23 (9th Cir. 1986) (federal law; affirming summary judgment ruling on repudiation where party did not "treat[] the [] agreement as if it were still in effect"); *Vier Const. Co., Inc. v. Local Union No. 12 of Int'l Union of Operating Eng'rs*, 1992 WL 317221, at *1 (9th Cir. Oct. 29, 1992) (same); 23 WILLISTON ON CONTRACTS § 63:31, at 548 (4th ed. 2002) (when party repudiates agreement, "failure of the injured party to continue performance is excused, since to hold that the injured party must proceed with performance and yet be denied compensation for so doing is neither conceivable, nor do the courts so hold"); RESTATEMENT 2D CONTRACTS § 253, cmt b (2012) (same). |
| 18.     On February 1, 2002, | **Undisputed**. |

| | |
|---|---|
| DC's outside counsel sent Mr. Marks a draft long-form agreement (the "February 1, 2002 Draft").<br><br>Plaintiff's Evidence:  AD Ex. 3 | **Disputed** that this fact is material or relevant to DC's motion.  *See* Reply 8-10; Responses to SAF 7, 9.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement—and later correspondence.  *Id.* at *2.  "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*."  Rutter § 10:231; *Thompson*, 321 F.3d at 847. |
| 19.    There were vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft, all to DC's benefit and the Siegels' detriment.<br><br>Plaintiff's Evidence:  Compare AD Ex.1 to Ex. 3; *Siegel*, 542 F. Supp. 2d at 1137-39 | **Disputed** and irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit also "reversed" Judge Larson's ruling, improperly cited by Larson as "evidence," that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement—and later correspondence.  *Id.* at *2.  "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*."  Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper legal arguments about "vast differences" are inappropriate for inclusion in this Statement and irrelevant to the resolution of |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 912**

| | |
|---|---|
| | DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 20.    Marks testified to the vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft.<br>Plaintiff's Evidence:  AD Ex. 10 at 125:13- 133:8 | **Disputed** and irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement— and later correspondence.  *Id.* at *2.  "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*."  Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper legal arguments about "vast differences" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 21.    Among other changes, the February 1, 2002 Draft altered the Siegels' royalty, to DC's benefit. Marks testified to such "trap doors" in which the Siegels would receive no royalties at all:<br>     [The February 1 2002 Draft] is purporting to say or at least raise the problem that | **Disputed** and irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract, and despite Marks' supposed testimony to the contrary, which Larson again cites here. *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit also "reversed" Judge Larson's ruling that there were material differences between |

- 40 -

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 913**

licensing revenues would not include that body of 60 years of derivative works that the people that DC Comics, Paul Levitz and others, made such an impression upon us as being so different from the original work and was the basis of the Superman library, which was contrary to what was agreed. The whole idea was to pick up all works and not to exclude works created by other people.

I mentioned that at the DC Comics meeting there was a specific discussion about an American Express ad campaign where Jerry Seinfield, who was in that campaign, specifically requested that the Curt Shaw version of Superman be used in the campaign. Under this [February 1, 2002] draft the proceeds of that campaign would be excluded, or at least there was an argument that they would be excluded, and that wasn't the intent. To parse through that language and to get there is very difficult, and I found – I considered

Marks' October 19, 2001, letter—setting forth the parties' "binding" settlement agreement—and later correspondence. *Id.* at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.

Larson's improper arguments about "changes" and "trap doors" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9.

DC'S RESP. TO LARSON'S STMT. OF GENUINE ISSUES & ADDITIONAL FACTS

ER 914

| | |
|---|---|
| that deceptive drafting and a trap door and highly, highly problematic.<br><br><u>Plaintiff's Evidence</u>:  AD Ex. 10 at 128:3- 22 | |
| 22.    The February 1, 2001 Draft provides for a revocation and regrant of the Siegels' rights.<br><br><u>Plaintiff's Evidence</u>:  AD Ex. 3 at 31-32,¶(1)(a)(i)-(ii) | **Undisputed**.<br><br>**Disputed** that this fact is material or relevant to DC's motion.  The Ninth Circuit rightly held that Marks' October 19, 2001, letter was a valid transfer of the Siegels' Superman, Superboy, and other rights to DC, thus giving DC the "continued right to produce Superman works." *Larson*, 2012 WL 6822241, at *1.  The Ninth Circuit expressly rejected Larson's argument that the October 19, 2001, letter did not transfer the Siegels' rights to DC, and held the letter was "binding," its terms were "sufficiently definite that a court could enforce them," and the Copyright Act "expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that the heirs' attorney [Marks] was such an agent*." *Id.* (emphasis added).  The law of mandate prohibits Larson from recycling the arguments she lost on appeal.  Reply 3-4.<br><br>The October 19, 2001, agreement revoked and replaced all prior grants of the Siegels' Superman and Superboy copyrights.  As this Court rightly held in the related *Shuster* case, an agreement that "deals squarely with the same subject matter as the parties' earlier agreements"—*i.e.*, grants of all Superman and Superboy copyrights—revokes and replaces |

| | those earlier copyright grants.  *Pacific Pictures*, 2012 WL 4936588, at *7; *see* Reply 11-12.<br><br>Larson's improper legal argument is inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, it is not well taken for the reasons set forth in DC's reply.  Reply 2-4, 11-12.  The Ninth Circuit rejected Larson's legal arguments, repeated here, that the parties' 2001 deal "contemplated" some future act, and that Marks' letter could not constitute a valid copyright transfer without Larson executing a further assignment.  *Id.* 2-4. |
|---|---|
| 23.     The February 1, 2001 Draft also confirmed the $500,000 annual advance, to be paid on March 31, 2002.<br><br><u>Plaintiff's Evidence</u>:  AD Ex. 3 at 39-40 | **Undisputed**.<br><br>**Disputed** that this fact is material or relevant to DC's motion.  In any event, Larson's improper legal arguments about breach, rescission, and abandonment are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Response to SAF 17.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Brotherhood*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at *1; 23 WILLISTON ON CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b. |
| 24.     DC did not pay or even tender the $500,000 annual payment, the $1,000,000 signing bonus, or the $2,000,000 | **Disputed** and irrelevant.<br><br>Larson's improper legal arguments about breach, rescission, and abandonment are |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 916**

| | |
|---|---|
| advance, as DC had expressly promised and as set forth in the October 19, 2001 agreement, by March 31, 2002.<br><br>Plaintiff's Evidence:<br>Counterclaims ¶¶ 99- 100 | inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, above, Response to SAF 17.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Bhd.*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at *1; 23 WILLISTON ON CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b.<br><br>Moreover, Larson had 11 years to raise the defenses she asserts for the first time in her opposition.  She pled 39 defenses in these cases, *see* Reply, Appendix 1, but never pled or argued breach, rescission, or abandonment—not in her answer, not in discovery responses, not in her various complaints, not on summary judgment on DC's settlement defense, and not on appeal. Case No. 04-8400, DN 1; 43; 161 at 45-62; 194 at 55-80; 378; 644; 656; Case No. 04-8776, DN 1; 28; 34; 43; 47; Appeal Nos. 11-55863, 11-56034, DN 43-1 at 13-36; KD Ex. F. |
| 25.    On May 9, 2002, Joanne Siegel sent a letter to Richard D. Parsons, COO of  AOL Time Warner Inc., objecting to the February 1, 2002 Draft.  Ms. Siegel's May 9, 2002 letter read in relevant part:<br><br>    Dear Dick, | **Undisputed** that Joanne Siegel's May 9, 2002, letter contains the quoted language, but the Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001— despite their subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1. |

ER 917

I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner.

. . .

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would

Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and Responses to SAF 7, 9, 17, 24.

DC'S RESP. TO LARSON'S STMT. OF GENUINE ISSUES & ADDITIONAL FACTS

**ER 918**

arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

. . .

[W]e are owed more than three years of profits accounting on Superman and related properties which has not been paid.

. . .

As for the contract, your representatives surely know

ER 919

that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more.

. . .

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 920**

| | |
|---|---|
| inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future?<br><br>. . .<br><br>After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the wont possible light. Is that the reputation you want?<br><br>Plaintiff's Evidence:  AD Ex. 4 at 75-77 | |
| 26.    On May 21, 2002, Mr. Parsons sent a reply letter to Joanne. Mr. Parson's letter stated:<br><br>Dear Joanne:<br><br>Thank you for your letter of May 9th. Your husband and his creations and his family have been a cherished part of the Warner, Time Warner and now AOL Time Warner family for many years. I was, therefore, quite troubled by your feeling. Consequently, I have been in contact with John | **Undisputed** that Parson's May 21, 2002, letter contains the quoted language.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Schulman and Paul Levitz
and have been informed that
each of the major points
covered in the draft
agreement which was
provided to your
representatives, more than
three months ago, accurately
represented the agreement
previously reached between
your representatives and
AOLTW's. Those
negotiating the agreement
for AOLTW even improved
- to your benefit- the terms
of our $250,000 recoupable
advance; they proposed as a
part of the overall deal that
the advance be non-
applicable and non-
recoupable. So, I am a bit at
a loss to understand the
level and intensity of your
distress.

As in all negotiations,
including the lengthy ones
which have brought us this
far, we expected that you
and your representatives
would have comments and
questions on the draft,
which comments and
questions we would need to
resolve. John and Paul look
forward to meeting with
your representatives, and we

- 49 -

| | |
|---|---|
| continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers.<br><br>In the interim, I want you to know that AOLTW is determined to do the right thing for the heirs of Jerry Siegel, you and your family, and that we continue to count SUPERMAN among America's cultural treasures with which we are proud to be associated.<br><br>Plaintiff's Evidence: AD Ex. 5 at 78 | |
| 27.    Mr. Parson's May 21, 2002 letter did not retract the aggressive demands in the February 1, 2002 Draft, or go back to the terms in the October 19, 2001 Letter the Siegels had confirmed was the agreement.<br><br>Plaintiff's Evidence: AD Ex. 5 at 78 | **Disputed** and irrelevant. The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1.<br><br>Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 7, 9, 17, 24. |
| 28.    Mr. Parson's May 21, 2002 letter did not argue the Siegels were in breach, demand the Siegels' performance, or assert DC's rights under the | **Disputed** and irrelevant. The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 923**

| | |
|---|---|
| October 19, 2001 Letter.<br><br>Plaintiff's Evidence:  AD Ex. 5 at 78 | contract.  *Larson*, 2012 WL 6822241, at *1.  Moreover, Larson omits that Parson told the Siegels:  "[W]e continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers."  AD Ex. 5 at 78.<br><br>Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 7, 9, 17, 24. |
| 29.     On September 21, 2002, the Siegels sent a letter to their attorneys and copied DC, in which they terminated Mr. Marks and provided "formal notification that we are totally stopping and ending all negotiations with DC Comics … effective immediately."<br><br>Plaintiff's Evidence:  AD Ex. 6 at 79 | **Undisputed** that the Siegels' September 21, 2002, letter contains the quoted language.<br><br>**Disputed** that this fact is material or relevant to DC's motion.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1. |
| 30.     On November 8, 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective date of November 17, 2004.<br><br>Plaintiff's Evidence:  AD Ex. 7 | **Undisputed**, but Larson omits that the Siegels' 1997 termination notices sought to recapture "each and every work … reasonably associated with SUPERMAN," *including* "Superboy," and listed thousands of Superman *and* Superboy works.  Case No. CV-04-8400, DN 163 at 89 n.1, many of which they simply repeated in their 2002 notice, AD Ex. 7.  The Ninth Circuit rightly held that, regardless of the validity of these termination notices, the Siegels transferred whatever rights they held to DC in the October 19, 2001, agreement.  *Larson*, 2012 WL |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 924**

| | |
|---|---|
| | 6822241, at *1; *see* Reply 11-12. |
| 31.  In 2003-04, DC simply resumed settlement negotiations with the Siegels.<br><br>Plaintiff's Evidence:  AD Ex. 8; Ex. 11 at 139:12-146:2; Ex. 23 at 376 | **Disputed** and irrelevant.  All that Larson cites for this improper legal argument, masquerading as a "fact," is a confidential settlement conversation in which DC tried to persuade her not to file this wasteful, expensive lawsuit. Reply 10-11; AD Ex. 8.  As the Ninth Circuit rightly held, the parties reached a "binding" settlement agreement on October 19, 2001— despite their subsequent disputes over finalizing a long-form contract. *Larson*, 2012 WL 6822241, at *1. |
| 32.  At no time between October 19, 2001 and October 8, 2004, or thereafter, did DC: pay the $500,000 annual advances, the $1,000,000 signing bonus, or the $2,000,000 advance; provide an accounting of royalties; provide the "By Special Arrangement with the Jerry Siegel Family"; or provide the Siegels medical and dental insurance.<br><br>Plaintiff's Evidence: Counterclaims ¶¶ 99- 100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 | **Disputed** and irrelevant.<br><br>Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 17, 24.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.* 6-8; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Brotherhood*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at *1; 23 WILLISTON ON CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b.<br><br>Moreover, Larson had 11 years to raise the defenses she asserts for the first time in her opposition.  She pled 39 defenses in these cases, *see* Appendix 1 to Reply, but never pled or |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 925**

| | |
|---|---|
| | argued breach, rescission, or abandonment—not in her answer, not in discovery responses, not in her various complaints, not on summary judgment on DC's settlement defense, and not on appeal. Case No. 04-8400, DN 1; 43; 161 at 45-62; 194 at 55-80; 378; 644; 656; Case No. 04-8776, DN 1; 28; 34; 43; 47; Appeal Nos. 11-55863, 11-56034, DN 43-1 at 13-36; KD Ex. F. |
| | Larson also omits the *undisputed* evidence that DC *did* begin performing on the parties' October 19, 2001, settlement agreement, including by reserving payments it owed the Siegels as they became due and requiring third parties to give the Siegels credits. Reply 8-10; AD Ex. 12 at 153:9-159:21; Case No. CV 04-8400, DN 181 at 18-25, 67-85; Appeal Nos. 11-55863, 11-56034, DN 31-1 at 16-18, 28-30. Larson also omits that, as DC said in one of its first filings in this case years ago, DC "always has been and remains ready, willing, and able to perform all of its obligations under the [2001] Agreement." DN 42 ¶ 99. |
| | Moreover, Larson made the same arguments in her appellate briefing, *see* Reply, Appendix 1 at 24, which the Ninth Circuit rejected. The law of mandate prohibits Larson from recycling the arguments she lost on appeal. Reply at 3-4. |
| 33.    At no time between October 19, 2001 and October 8, 2004 did DC file suit against the Siegels, claim rights under the October 19, 2001 Letter, retract or disclaim the October 26, 2001 Letter or February 1, | **Disputed** and irrelevant. <br><br> Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 926**

| | |
|---|---|
| 2002 draft, or claim that the October 19, 2001 Letter was an enforceable agreement.<br><br>Plaintiff's Evidence:<br>Counterclaims ¶¶ 99- 100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 | reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 17, 24.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Bhd.*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at \*1; 23 WILLISTON ON CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b.<br><br>Moreover, Larson had 11 years to raise the defenses she asserts for the first time in her opposition.  She pled 39 defenses in these cases, *see* Appendix 1 to Reply, but never pled or argued breach, rescission, or abandonment—not in her answer, not in discovery responses, not in her various complaints, not on summary judgment on DC's settlement defense, and not on appeal.  Case No. 04-8400, DN 1; 43; 161 at 45-62; 194 at 55-80; 378; 644; 656; Case No. 04-8776, DN 1; 28; 34; 43; 47; Appeal Nos. 11-55863, 11-56034, DN 43-1 at 13-36; KD Ex. F. |
| 34.    On October 8, 2004, the Siegels filed suit against DC regarding their Superman termination ("*Siegel*").<br><br>Plaintiff's Evidence:  Case No. 04-CV- 08400, Dkt. 1 | **Undisputed**. |
| 35.    On October 22, 2004, the Siegels filed suit against DC regarding their Superboy termination.<br><br>Plaintiff's Evidence:  Case No. | **Undisputed**. |

**ER 927**

| | |
|---|---|
| 04-CV- 08776, Dkt. 1 | |
| 36.     On November 22, 2004, DC filed counterclaims in the *Siegel* Superman and Superboy Cases.<br><br>Plaintiff's Evidence:  Case No. 04-CV- 08400, Dkt. 14 | **Undisputed**. |
| 37.     DC's counterclaims alleged for the first time that the October 19, 2001 Letter was an enforceable agreement.<br><br>Plaintiff's Evidence: Counterclaims ¶¶ 97- 105 | **Disputed** and irrelevant.  Schulman and Marks agreed that they formed an agreement in October 2001, AD Ex. 4; Case No. CV 04-8400, DN 181 at 18-25, 67-85; Appeal Nos. 11-55863, 11-56034, DN 31-1 at 16-18, 28-30, and the Ninth Circuit upheld this agreement, *Larson*, 2012 WL 6822241, at *1; *see also* Reply, Appendix 1 at 21-22.<br><br>Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion.  In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 17, 24.  Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform.  *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Bhd.*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at *1; 23 WILLISTON ON CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b.<br><br>Moreover, Larson had 11 years to raise the defenses she asserts for the first time in her |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 928**

| | | |
|---|---|---|
| 1 | | opposition. She pled 39 defenses in these cases, *see* Appendix 1 to Reply, but never pled or argued breach, rescission, or abandonment—not in her answer, not in discovery responses, not in her various complaints, not on summary judgment on DC's settlement defense, and not on appeal. Case No. 04-8400, DN 1; 43; 161 at 45-62; 194 at 55-80; 378; 644; 656; Case No. 04-8776, DN 1; 28; 34; 43; 47; Appeal Nos. 11-55863, 11-56034, DN 43-1 at 13-36; KD Ex. F. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | Moreover, Larson does not cite DC's initial November 22, 2004, counterclaims (which alleged that Marks' October 19, 2001, letter was a binding settlement agreement), but its October 18, 2005, First Amended Counterclaims. Case No. 04-8400, DN 42; DN 14 ¶¶ 96-100. |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | 38. DC's counterclaims alleged for the first time that the Siegels had repudiated that agreement by their May 9, 2002 and September 21, 2002 letters.

Plaintiff's Evidence: Counterclaims ¶¶ 99- 100 | **Disputed** and irrelevant. Moreover, DC urged Larson not to pursue this lawsuit before she filed it. *See* Response to SAF 31.

Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 17, 24. Larson's repeated and unequivocal repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform. *See id.*; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th at 751; *Ferguson*, 197 Cal. App. 4th at 1169; *Ocean Air*, 480 F.2d at 1116; *United Bhd.*, 806 F.2d at 922-23; *Vier*, 1992 WL 317221, at *1; 23 WILLISTON ON |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 929**

| | |
|---|---|
| | CONTRACTS § 63:31, at 548; RESTATEMENT 2D CONTRACTS § 253, cmt b.<br><br>Larson had 11 years to raise the defenses she asserts for the first time in her opposition. She pled 39 defenses in these cases, *see* Appendix 1 to Reply, but never pled or argued breach, rescission, or abandonment—not in her answer, not in discovery responses, not in her various complaints, not on summary judgment on DC's settlement defense, and not on appeal. Case No. 04-8400, DN 1; 43; 161 at 45-62; 194 at 55-80; 378; 644; 656; Case No. 04-8776, DN 1; 28; 34; 43; 47; Appeal Nos. 11-55863, 11-56034, DN 43-1 at 13-36; KD Ex. F. |
| 39. DC's Third Counterclaim was for breach of contract re: the October 19, 2001 Letter.<br><br>Plaintiff's Evidence: Counterclaims ¶¶ 97- 101 | **Undisputed**. |
| 40. DC's Fourth Counterclaim was for declaratory relief re: the October 19, 2001 Letter.<br><br>Plaintiff's Evidence: Counterclaims ¶¶ 101- 105 | **Undisputed**, but DC's Fourth Counterclaim provides, in full:<br><br>102. DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.<br><br>103. An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:<br><br>a. Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United |

States copyrights, which they may have in
the Superman Works;

b.  If for any reason Plaintiffs/Counterclaim
Defendants are adjudged not to have
transferred or not to be contractually
obligated to transfer to DC Comics,
worldwide and in perpetuity, all rights, title,
and interest, including all United States
copyrights, which they may have in the
Superman Works, then the remaining terms
of the Agreement are valid and enforceable
and Plaintiffs/Counterclaim Defendants are
not entitled to any compensation for any
past, present, or future exploitation of the
Superman Works by or upon license from
DC Comics other than pursuant to the
Financial Terms; and

c.  If for any reason Plaintiffs/Counterclaim
Defendants are adjudged not to have
transferred or not to be contractually
obligated to transfer to DC Comics,
worldwide and in perpetuity, all rights, title,
and interest, including all United States
copyrights, which they may have in the
Superman Works, then
Plaintiffs/Counterclaim Defendants
nevertheless are not entitled to license or
otherwise exploit the Superman Works in
any manner.

104.  DC Comics is informed and believes,
and on that basis alleges, that
Plaintiffs/Counterclaim Defendants dispute
these contentions.

105.  DC Comics seeks a judicial
determination of the parties' respective

| | rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct. |
| | Case No. 04-8400, DN 42 ¶¶ 102-05. |
| 41.    DC's Fourth Counterclaim asked the court to declare that the October 19, 2001 Letter either (1) transferred Ms. Larson's copyrights to DC or (2) contractually obligated Ms. Larson to transfer her copyrights in the future.<br><br>Plaintiff's Evidence: Counterclaims ¶ 103 | **Undisputed**, but DC's Fourth Counterclaim provides, in full:<br><br>102.  DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.<br><br>103.  An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:<br><br>a.  Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;<br><br>b.  If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the |

| | |
|---|---|
| | Financial Terms; and |
| | c.  If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner. |
| | 104.  DC Comics is informed and believes, and on that basis alleges, that Plaintiffs/Counterclaim Defendants dispute these contentions. |
| | 105.  DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct. |
| | Case No. 04-8400, DN 42 ¶¶ 102-05. |
| 42.    The Siegels' answer to DC's Counterclaims specifically pled the affirmative defenses of "waiver" and "acquiescence" as well as "No Settlement Agreement Was Consummated. <u>Plaintiff's Evidence</u>:  Answer ¶¶ 152, 185 | **Undisputed**, but Larson's boilerplate "waiver" and "acquiescence" defenses were not adequately pled—and in eight years of litigation, Larson *never* pled or argued breach, rescission, non-performance, or abandonment. Reply 5-6.  Larson provided no grounds for her boilerplate "waiver" and "acquiescence" defenses—factual, legal, or otherwise—and cited no evidence to support them.  *See id.*; *see also* FED. R. CIV. P. 8(b)(1)(a), (c), (d); *Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp. 2d 1046, 1049-1050 (N.D. Cal. 2004) (striking |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 933**

Case 2:13-56243 02/25/2014 ID: 8992563 DktEntry: 23-5 Page 89 of 294

| | |
|---|---|
| | defenses because a "reference to a doctrine, like a reference to statutory provisions, is insufficient notice"); *Gonzalez v. Preferred Freezer Servs., LBF, LLC*, 2012 U.S. Dist. LEXIS 93015, at *8 (C.D. Cal. July 5, 2012) (striking "laundry list" of 37 defenses for "failure to link [them] to the particular claims for relief" or "any facts supporting [them]"); *Desert European Motorcars, Ltd. v. Desert European Motorcars, Inc.*, 2011 U.S. Dist. LEXIS 96154, at *4-22 (C.D. Cal. Aug. 25, 2011) (same; striking defenses of *acquiescence*, waiver, etc.). Indeed, Larson does not even argue the "waiver" defense in her brief. |
| 43.    In *Siegel*, DC argued that it negotiated for the Siegels to receive credit on "Superman Returns" and set up a "reserve account." <br><br> Plaintiff's Evidence: AD Ex. 13 at 167-68, 178 | **Undisputed** but irrelevant and incomplete. The evidence is *undisputed* that—although Larson's repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform, *see* Reply 6-8—DC *did* begin performing under the 2001 deal, including by reserving payments it owed the Siegels as they became due and requiring licensees to give the Siegels credits. *Id.* 8-10. AD Ex. 12 at 153:9-159:21; Case No. CV 04-8400, DN 181 at 18-25, 67-85; Appeal Nos. 11-55863, 11-56034, DN 31-1 at 16-18, 28-30. DC not only "argued" this point, it definitively proved it, and Toberoff's *ipse dixits* to the contrary are not competent evidence. Case No. CV 10-3633, DN 507 at 11. |
| 44.    In *Siegel*, DC testified and represented to the court how much money was in a supposed "reserve account." <br><br> Plaintiff's Evidence: AD Ex. 12 at 159:6- 11; Ex. 13 at 168 n.18 | **Disputed** and irrelevant. Former DC President Paul Levitz confirmed that DC began reserving payments it owed the Siegels under the October 19, 2001, settlement agreement, but testified that he did not know the "current balance" of the reserve account. AD Ex. 12 at 159:6-8. Levitz |

| | |
|---|---|
| | never testified as to the exact amount of money in DC's reserve account. *See id.* |
| 45. In *Siegel*, the district court took note of the dubious nature of DC's supposed "reserve account." <br><br> Plaintiff's Evidence: AD Ex. 14 | **Disputed** and irrelevant. The evidence is undisputed that—although Larson's repudiation of the parties' October 19, 2001, settlement agreement excused DC's obligation to perform, *see* Reply 6-8—DC *did* begin performing, including by reserving payments it owed the Siegels as they became due. *Id.* 8-10. Judge Larson *never* suggested DC's reserve account was "dubious"—to the contrary, in the cited order, he denied the Siegels' *ex parte* application for additional details about the account, finding that this went "far beyond what the parties had themselves agreed was required" for DC to produce. AD Ex. 14 at 184. |
| 46. In *Siegel*, DC admitted that the October 19, 2001 Letter provided that copyrights "would" be transferred in the future, not that they had already been transferred. <br><br> Plaintiff's Evidence: AD Ex. 13 at 167-68, 177-78 | **Disputed** and irrelevant. The Ninth Circuit rightly held that Marks' October 19, 2001, letter executed a valid transfer of the Siegels' Superman, Superboy, and other rights to DC, thus giving DC the "continued right to produce Superman works." *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit expressly rejected Larson's argument that the October 19, 2001, letter did not transfer the Siegels' rights to DC, and held the letter was "binding," its terms were "sufficiently definite that a court could enforce them," and the Copyright Act "expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that the heirs' attorney [Marks] was such an agent*." *Id.* (emphasis added). The law of mandate prohibits Larson from recycling the arguments she lost on appeal. |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS
**ER 935**

| | |
|---|---|
| | In any event, even if the October 19, 2001, letter was *not* a transfer, it appointed DC "attorney-in-fact" for the Siegels to execute any "further documents" they failed to sign—including a copyright assignment. AD Ex. 1 at 8; *see, e.g.*, *Niss*, 2000 WL 1862814, at *6 (party properly executed copyright assignment in reliance on a contractual attorney-in-fact provision after other party refused). |
| | Larson's improper legal argument is inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, it is not well taken for the reasons set forth in DC's reply. Reply 4. The Ninth Circuit rejected Larson's legal arguments, repeated here, that the parties' 2001 deal "contemplated" some future act, and that Marks' letter could not constitute a valid copyright transfer without Larson executing a further assignment. *Id.* 2-4. |
| 47. In *Siegel* in 2008, Judge Larson concluded on summary judgment that the parties had failed to reach an agreement, citing the "materially different" terms of the October 26, 2001 Letter and the "vastly different" terms of the February 1, 2002 Draft.<br><br>Plaintiff's Evidence: *Siegel*, 542 F. Supp. 2d at 1138 | **Undisputed**, but the Ninth Circuit rightly "reversed" in full, and not in part, Judge Larson's ruling, and held that the parties reached a "binding" agreement on October 19, 2001—despite their subsequent disputes over finalization of a long-form contract. *Larson*, 2012 WL 6822241, at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847.<br><br>Larson's improper legal arguments about "materiality" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 936**

| | Reply 8-10, and above, Responses to SAF 7, 9. |
|---|---|
| 48. In *Siegel*, on May 20, 2010, this Court entered a Rule 54(b) judgment based on Judge Larson's summary judgment order.<br><br>Plaintiff's Evidence: Dkt. 669 | **Undisputed**. |
| 49. Both sides appealed the Rule 54(b) judgment in *Siegel* (9th Cir. Appeal Nos. 11-55863, 11-56034; the "*Siegel Appeal*").<br><br>Plaintiff's Evidence: Dkt. 671, 674 | **Undisputed**. |
| 50. In the *Siegel Appeal*, DC expressly asked the Ninth Circuit to enter judgment in its favor at least five times in its briefs.<br><br>Plaintiff's Evidence: AD Ex. 16 at 230, 252; Ex. 18 at 316, 318, 325 | **Undisputed** that DC argued—and the Ninth Circuit agreed—that DC was entitled to judgment "as a matter of law" on its settlement defense. *Larson*, 2012 WL 6822241, at *1. DC's Fourth Counterclaim (on which it now moves) seeks a declaration that, in the 2001 deal, Larson "transferred or [was] contractually obligated to transfer to DC" her rights in the Superman and Superboy works. Mot. 3, 4. The Ninth Circuit's ruling decided this issue not once, but twice. It held that the 2001 deal afforded DC "continued right to produce Superman works"—the main consideration DC sought—and that Marks could validly transfer the copyrights necessary for DC to exploit Superman. *Larson*, 2012 WL 6822241, at *1; *see* Reply 2-4. |
| 51. In the *Siegel Appeal*, the Ninth Circuit was well aware of DC's request for judgment, and questioned DC about it during oral argument. | **Undisputed** that DC argued—and the Ninth Circuit agreed—that DC was entitled to judgment "as a matter of law" on its settlement defense. *Larson*, 2012 WL 6822241, at *1. DC's Fourth Counterclaim (on which it now moves) seeks a declaration that, in the 2001 |

| Plaintiff's Evidence:  AD Ex. 19 at 344:17- 344:2 | deal, Larson "transferred or [was] contractually obligated to transfer to DC" her rights in the Superman and Superboy works.  Mot. 3, 4.  The Ninth Circuit's ruling decided this issue not once, but twice.  It held that the 2001 deal afforded DC "continued right to produce Superman works"—the main consideration DC sought—and that Marks could validly transfer the copyrights necessary for DC to exploit Superman. *Larson*, 2012 WL 6822241, at *1; *see* Reply 2-4. |
|---|---|
| 52.    In the *Siegel Appeal*, DC argued and admitted that the terms in the October 19, 2001 Letter were the only ones that the parties ever agreed to.<br><br>Plaintiff's Evidence:  AD Ex. 16 at 239-40; AD, Ex. 18 at 316 | **Undisputed** to the extent that DC argued—and the Ninth Circuit agreed—that Marks' October 19, 2001, letter constitutes a "binding" settlement agreement and "accurately reflected the [deal's] material terms." *Larson*, 2012 WL 6822241, at *1. |
| 53.    In the *Siegel Appeal*, DC argued and admitted that new or changed terms in the October 26, 2001 Letter were "not part of the deal."<br><br>Plaintiff's Evidence:  AD Ex. 19 at 346:23- 347:4 | **Disputed**, to the extent Larson suggests that the October 26, 2001, letter contained any "new or changed terms."<br><br>**Undisputed** that DC argued—and the Ninth Circuit agreed—that Marks' October 19, 2001, letter constitutes a "binding" settlement agreement and "accurately reflected the [deal's] material terms." *Larson*, 2012 WL 6822241, at *1. |
| 54.    In the *Siegel Appeal*, DC disavowed the February 1, 2002 Draft.<br><br>Plaintiff's Evidence:  AD Ex. 16 at 239-40 | **Disputed** and irrelevant.  The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite their subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1. |
| 55.    In the *Siegel Appeal*, DC told the Ninth Circuit that | **Disputed** and irrelevant.  Larson grossly mischaracterizes this statement, which DC's |

| | |
|---|---|
| whether the "subsequent events undid" the October 19, 2001 was a "fact question."<br><br>Plaintiff's Evidence: AD Ex. 19 at 345:18-21 | counsel made during oral argument before the Ninth Circuit in the limited context of describing the holding of *S. Cali. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004). AD Ex. 19 at 9-21. As Larson herself points out, *see* SAF 50, DC's position on appeal was that judgment was warranted in DC's favor on its settlement claims as a matter of law. DC's counsel made this clear at oral argument, stating: "You can decide as a matter of law that if the parties reached the contract as of October 19, everything thereafter doesn't matter." AD Ex. 19 at 347:8-10. |
| 56.    In the *Siegel Appeal*, Ms. Larson argued that (a) the October 19, 2001 Letter was not a valid contract, because it was not a writing signed by both parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's writing requirement in 17 U.S.C. § 204(a).<br><br>Plaintiff's Evidence: AD Ex. 17 | **Undisputed** that Larson's Third Brief on Cross-Appeal includes these two arguments, among others. Larson omits that the Ninth Circuit rejected both arguments, and held that Marks' October 19, 2001, letter executed a valid transfer of the Siegels' Superman, Superboy, and other rights to DC, thus giving DC the "continued right to produce Superman works." *Larson*, 2012 WL 6822241, at *1; *see also* Reply 2-4. |
| 57.    In the *Siegel Appeal*, DC contended that the Superman Ads were important and that they, "in fact, clearly do depict Superman's S shield, super-strength, costume, and facial features" and grant a copyright interest in such elements.<br><br>Plaintiff's Evidence: AD Ex. 16 at 248 | **Undisputed** that DC's Principal and Response Brief contains the quoted language.<br><br>**Disputed** that this fact is material or relevant to DC's motion. *See* Reply 11-12. Larson also omits that, for the past eight years, she has repeatedly asserted that the Promotional Ads were not copyrightable—or, "at best," were entirely derivative of Superman works indisputably covered by the 2001 deal. *E.g.*, DN 186 at 45-46. |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 939**

| 58. In the *Siegel Appeal*, on January 10, 2013, the Ninth Circuit reversed Judge Larson's opinion, holding that that the October 19, 2001 Letter constituted a valid acceptance of an offer by DC that "was sufficient" to create a contract. <br><br> Plaintiff's Evidence: *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) | **Undisputed**, but Larson omits key elements of the Ninth Circuit's ruling—including, *inter alia*, that the October 19, 2001, letter was a "binding" settlement agreement; that this letter "accurately reflected the [deal's] material terms"; that the agreement gave DC the "continued right to produce Superman works"; and that the terms of the 2001 deal were "sufficiently definite" such that "a court could enforce them"—*i.e.*, that no further writing was required. *Larson*, 2012 WL 6822241, at *1; *see also* Reply 2-4. |
|---|---|
| 59. In the *Siegel Appeal*, the Ninth Circuit did not disturb Judge Larson's findings as to the "materially" and "vastly different" terms in the October 26, 2001 Letter and the February 1, 2002 Draft, and remanded the case for further adjudication of DC's contract claims – its Third and Fourth Counterclaims. <br><br> Plaintiff's Evidence: *Larson*, 2013 U.S. App. LEXIS 671; *Siegel*, 542 F. Supp. 2d at 1138 | **Disputed**. The Ninth Circuit "reversed" in full, and not in part, Judge Larson's ruling and held that the parties reached a "binding" agreement on October 19, 2001—despite their subsequent disputes over finalization of a long-form contract. *Larson*, 2012 WL 6822241, at *2. "A reversal effectively annuls or sets aside the lower court's decision for *all purposes*." Rutter § 10:231; *Thompson*, 321 F.3d at 847. <br><br> Larson's improper legal arguments about "materiality" are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-10, and above, Responses to SAF 7, 9. |
| 60. On January 29, 2013, DC, for the first time in twelve years, offered "to tender payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported "rights of offset," rendering its offer illusory. <br><br> Plaintiff's Evidence: AD Ex. 20 | **Disputed**, and improper legal argument. DC urged Larson not to file these lawsuits in 2004. *See* Response to SAF 31. <br><br> Larson's improper legal arguments about breach, rescission, abandonment, and "illusory" offers are inappropriate for inclusion in this Statement and irrelevant to the resolution of |

| | |
|---|---|
| | DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 7, 9, 17, 24. Moreover, DC's reservation of its right to seek its fees as an "offset" against the amount owed to Larson under the 2001 agreement does not render DC's offer illusory or excuse Larson's continued repudiation of that agreement. If and when DC obtains judgment in these cases, it is entitled to move for a fee award under the Copyright Act. 17 U.S.C. § 505. If such a fee award is granted, the law is clear: DC may offset that award against any sums it owes Larson. *E.g., Strickland v. Becks*, 95 Cal. App. 3d Supp. 18, 20 (1979). |
| 61.     Despite requests by Ms. Larson, DC would also not provide the basis for its calculation of payment, leaving it completely uncertain whether DC's tender complied with the complicated royalty scheme of the October 19, 2001 Letter.<br><br>Plaintiff's Evidence:  AD Ex. 24; Ex. 25 | **Disputed**.<br><br>In any event, DC clearly stated that pursuant to "paragraph C.10 of the [2001] Agreement, [the Siegels] have audit rights with respect to any payments made by DC."  AD Ex. 25 at 380. Larson's improper legal arguments about breach, rescission, and abandonment are inappropriate for inclusion in this Statement and irrelevant to the resolution of DC's motion. In any event, they are not well taken for the reasons set forth in DC's reply, Reply 8-11, and above, Responses to SAF 7, 9, 17, 24. |
| 62.     DC's 2013 "tender" of Superman royalties owed was not much higher than what DC had testified was owed seven years earlier, in 2006.<br><br>Plaintiff's Evidence:  AD Ex. 12 at 159:6- 11; Ex. 13 at 168 n.18; Ex. 25 | **Disputed** and irrelevant. *See* Reply 9-11; Responses to SAF 9, 17, 32. Levitz confirmed in 2006 that DC began reserving payments it owed the Siegels under the October 19, 2001, settlement agreement as they became due, but testified that he did not know the "current balance" of the reserve account. AD Ex. 12 at 159:6-8. |

DC'S RESP. TO LARSON'S STMT. OF
GENUINE ISSUES & ADDITIONAL FACTS

**ER 941**

| 63. On March 6, 2012, Ms. Larson signed a § 304(d) notice of termination regarding Superman "Ads," with an effective date of March 12, 2014. <br><br> Plaintiff's Evidence: AD Ex. 15 | **Undisputed**. <br><br> **Disputed** that this fact is material or relevant to DC's motion. This notice was void *ab initio*. *See* Reply 11-12. |
|---|---|

### III. DC'S RESPONSE TO LARSON'S CONCLUSION OF LAW

| LARSON'S CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| 1. DC's motion is denied. The Ninth Circuit did not hold that the October 19, 2001 letter from the Siegels' attorney to DC actively transferred the Siegels' copyrights to DC, as DC solely argues. The Circuit only held that the letter was "an acceptance of terms negotiated between the parties" that "was sufficient" to create a contract. *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. January 10, 2013). DC's Third and Fourth Counterclaims remain for adjudication. | This argument is not well taken for the reasons set forth in DC's reply. Reply 1-12. Summary judgment should be granted in DC's favor on its Fourth Counterclaim as set forth in DC's motion, reply, and proposed order. Case No. CV-04-8400, DN 702; 711; 702-5. |

Dated: March 8, 2013

Respectfully submitted,

By: /s/ Daniel M. Petrocelli
  Daniel M. Petrocelli

DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for the DC Comics Parties

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>Plaintiff,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br><br>Defendants and Counterclaimants. | Case No. CV 04-8400 ODW (RZx)<br>Case No. CV 04-8776 ODW (RZx)<br><br>**REPLY IN SUPPORT OF DEFENDANT DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL* SUPERMAN AND SUPERBOY CASES**<br><br>The Hon. Otis D. Wright II<br><br>**Hearing Date**: March 25, 2013<br>(*Hearing Vacated*) |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>Plaintiff,<br><br>v.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br><br>Defendants and Counterclaimants. | |

1

# <u>TABLE OF CONTENTS</u>

I.   LARSON DISTORTS THE NINTH CIRCUIT'S RULING AND
     DC'S FOURTH COUNTERCLAIM ................................................2

II.  LARSON'S BREACH AND OTHER NEW DEFENSES WERE
     WAIVED AND ARE BASELESS ................................................5

     A.   Larson Long Ago Waived Her New Affirmative Defenses ................5

     B.   Larson's Waived "Defenses" Fail Because She Repudiated the
          2001 Deal ................................................................6

     C.   The Supposed "Defenses" Larson Waived Also Fail on their
          Own Terms ................................................................8

III. LARSON TRANSFERRED ALL RIGHTS IN SUPERBOY AND
     THE ADS TO DC IN 2001 ................................................11

IV.  CONCLUSION ................................................................12

# TABLE OF AUTHORITIES

**CASES**          **PAGE(S)**

*Alexander v. Angel,*
   37 Cal. 2d 856 (1951) ............................................................ 12

*Arachnid, Inc. v. Merit Indus., Inc.,*
   939 F.2d 1574 (Fed. Cir. 1991) ......................................... 4, 24

*Ball v. Rodgers,*
   2009 WL 1395423 (D. Ariz. Apr. 24, 2009) ............................ 6

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.,*
   402 U.S. 313 (1971) .................................................................. 5

*Campanelli v. Bockrath,*
   1997 U.S. Dist. LEXIS 7981 (N.D. Cal. June 4, 1997) ........... 4

*Clarke v. Fiedler,*
   44 Cal. App. 2d 838 (1941) ...................................................... 9

*Conley v. Gibson,*
   355 U.S. 41 (1957) .................................................................... 5

*Constantino v. U.S. Bank, N.A.,*
   2011 U.S. Dist. LEXIS 107795 (D. Haw. Sept. 23, 2011) ...... 8

*DC Comics v. Pacific Pictures Corp.,*
   2012 WL 4936588 (C.D. Cal. 2012) .............................. 5, 9, 11

*Desert European Motorcars, Ltd. v. Desert European Motorcars, Inc.,*
   2011 U.S. Dist. LEXIS 96154 (C.D. Cal. Aug. 25, 2011) ....... 6

*Edgerly v. City & County of San Francisco,*
   2011 U.S. Dist. LEXIS 155192 (N.D. Cal. May 26, 2011) ...... 6

*Facebook, Inc. v. Pac. Nw. Software, Inc.,*
   640 F.3d 1034 (9th Cir. 2011) .................................................. 9

*Ferguson v. Cathedral City,*
   197 Cal. App. 4th 1161 (2011) ................................................ 7

*Freeman v. Mostafavi,*
   2005 Cal. App. Unpub. LEXIS 10154 (Cal. App. Nov. 8, 2005) ..... 11

*GN Hello Direct, Inc. v. Plantronics, Inc.,*
   2004 WL 1775674 (Cal. App. Aug. 10, 2004) ......................... 7

*Gonzalez v. Preferred Freezer Servs., LBF, LLC,*
   2012 U.S. Dist. LEXIS 93015 (C.D. Cal. July 5, 2012) .......... 6

*Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers of Am.,*

192 Cal. App. 2d 268 (1961) ............................................................. 11

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
531 F.3d 767 (9th Cir. 2008) ............................................................ 4

*Hall v. City of Los Angeles*,
697 F.3d 1059 (9th Cir. 2012) .......................................................... 4

*Honda v. Reed*,
156 Cal. App. 2d 536 (1958) ............................................................ 11

*Hull v. Ray*,
211 Cal. 164 (1930) ......................................................................... 10

*In re Marriage of Burkle*,
139 Cal. App. 4th 712 (2006) ........................................................ 7, 8

*Jaunich v. Nat'l Union Fire Ins. Co.*,
647 F. Supp. 209 (N.D. Cal. 1986) .................................................. 10

*Jorst v. D'Ambrosio Bros. Inv. Co.*,
2001 WL 969039 (N.D. Cal. Aug. 13, 2001) ..................................... 6

*Larkspur v. Marin Cnty. Flood Control Dist.*,
168 Cal.App.3d 947 (1985) ............................................................... 9

*Larson v. Warner Bros. Entm't Inc.*,
2012 WL 6822241 (9th Cir. Jan. 10. 2013) ............................... *passim*

*Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*,
322 F. Supp. 98 (N.D. Ind. 1970) ..................................................... 4

*McCreay v. Mercury Lumber Dists.*,
124 Cal. App. 2d 477 (1954) ........................................................... 11

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ......................................................... 12

*Morrison v. Mahoney*,
399 F.3d 1042 (9th Cir. 2005) ........................................................... 5

*N.W. Acceptance Corp. v. Lynwood Equip.*,
841 F.2d 918 (9th Cir. 1988) ............................................................. 5

*Newman v. Phan*,
2002 WL 31421568 (Cal. App. Oct. 29, 2002) .................................. 5

*Niss v. Columbia Pictures Indus., Inc.*,
2000 WL 1862814 (S.D.N.Y. Dec. 20, 2000) .................................... 4

*Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*,
480 F.2d 1112 (9th Cir. 1973) ........................................................... 8

*Odima v. Westin Tucson Hotel*,
53 F.3d 1484 (9th Cir. 1995) ............................................................. 4

*Paulsell v. Cohen*,
2002 WL 31496397 (D. Or. May 22, 2002).......................................................... 5

*Penguin Grp. (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ............................................................................... 12

*Qarbon.com Inc. v. eHelp Corp.*,
315 F. Supp. 2d 1046 (N.D. Cal. 2004)................................................................ 6

*Rubin v. Mellvine Fuchs et al.*,
1 Cal. 3d 50 (1969) ............................................................................................ 10

*SCO Group, Inc. v. Novell, Inc.*,
2004 WL 4737297 (D. Utah June 9, 2004) ......................................................... 4

*Sram Corp. v. Shimano, Inc.*,
25 Fed. Appx. 626 (9th Cir. 2002) ...................................................................... 6

*Strickland v. Becks*,
95 Cal. App. 3d Supp. 18 (1979) ....................................................................... 10

*U.S. use of Building Rentals Corp. v. The W. Cas. & Sur. Co.*,
498 F.2d 335 (9th Cir. 1974) ............................................................................. 10

*United Brotherhood of Carpenters & Jointers v. Endicott Enters., Inc.*,
806 F.2d 918 (9th Cir. 1986) ............................................................................... 8

*Vier Const. Co., Inc. v. Local Union No. 12 of Int'l Union of Operating
Eng'rs*,
1992 WL 317221 (9th Cir. Oct. 29, 1992) .......................................................... 8

*Vineland Homes v. Barish*,
138 Cal. App. 2d 747 (1956) ............................................................................... 8

*Wilson v. Lewis*,
106 Cal. App. 3d 802 (1980) ............................................................................. 10

**OTHER AUTHORITIES**

WILLISTON ON CONTRACTS § 63:31, at 548 (4th ed. 2002) ...................................... 8

1 WITKIN SUMMARY OF CAL. LAW, CONTRACTS §§ 849, 851 (10th Ed. 2010)......... 8

RESTATEMENT 2D CONTRACTS § 253, cmt b (1981) ................................................. 8

**STATUTES**

17 U.S.C. § 204(a) ..................................................................................................... 3

17 U.S.C. § 505.................................................................................................... 9-10

CAL. CIV. P. CODE § 337(3) ....................................................................................... 6

CAL. CIV. CODE § 1440............................................................................................ 7, 8

CAL. CIV. CODE § 1691 ............................................................................................ 10

FED. R. CIV. P. 8(b)(1)(A), (c) ................................................................................. 5

FED. R. CIV. P. 8(b)(1)(a), (c), (d) .......................................................................... 6

FED. R. CIV. P. 8(d)(2)-(3) ....................................................................................... 6

1    Laura Siegel Larson has lost this case, and DC is ready, willing, and able to

2    pay her millions of dollars under the deal DC made with her and her prior counsel

3    in October 2001.  AD Exs. 20, 22, 25.  Despite her new counsel's efforts to rewrite

4    the deal and the Ninth Circuit's ruling, to recast DC's Counterclaims, and to assert

5    new claims Larson *never* asserted for close to a decade (and thus waived), the Court

6    can and should enter final judgment now in DC's favor.  Larson offers a cavalcade

7    of arguments and 62 alleged "material facts" in response to DC's motion.  All are

8    without basis or irrelevant, and each reduces to three erroneous points:

9        1.  Larson spends half her brief arguing DC needs *specific performance*—not

10   declaratory relief—to compel her to assign her copyrights.  The Ninth Circuit's

11   recent ruling and Marks' October 19, 2001, letter, which the circuit court held is the

12   parties' *agreement*, forecloses this gambit.  Under paragraphs C.1 and C.12 of the

13   2001 deal, DC does not need Larson to execute a further copyright transfer.  As the

14   Ninth Circuit held, Marks executed a valid transfer in 2001 and it is "undoubtedly

15   the case" that the terms of the deal "are sufficiently definite that a court could

16   enforce them."  *Larson*, 2012 WL 6822241, at *1.  Even if Marks had not made the

17   transfer (and he did), the 2001 deal appoints DC "as attorney-in-fact" to execute

18   such documents.  AD Ex. 1 at 8.  Larson cannot escape these rulings or clear terms,

19   and the Court should grant DC's declaratory relief claim affirming its rights.

20       2.  Eleven years after the fact—and only after defeat in the Ninth Circuit—

21   Larson makes the new and contradictory argument that the parties *did* make a deal

22   in 2001, DC breached it, she rescinded it, and DC abandoned the contract.  In eight

23   years of litigation involving two separate cases, Larson *never* pled these defenses.

24   During these eight years, she consistently asserted that no 2001 deal ever existed—

25   an argument the Ninth Circuit has now rejected.  In fact, despite pleading 11 claims

26   in these two *Siegel* cases and 39 affirmative defenses in each case, she never once

27   pled breach, non-performance, abandonment, or recission as claims or defenses,

28   despite many chances to do so or to so argue to this Court or on appeal.  These

DC'S REPLY ISO MSJ IN *SIEGEL*
SUPERMAN CASES
**ER 949**

1   defenses and claims were, thus, waived. Her waived defenses also fail as a matter

2   of law, in any event. Among many other reasons: Larson ignores that her repeated

3   repudiation of the 2001 deal starting in 2002 excused DC's performance—which

4   directly refutes her breach, recission, abandonment, and other new theories.

5       3. Larson argues that at least her Superboy case must survive because she

6   filed a second Superboy termination notice in 2002, *after* the 2001 deal. This claim

7   is frivolous. To begin, her *1997* termination notice—effective in *1999*—sought to

8   terminate Superboy, and the later *2001* deal specifically disposed of Superboy.

9   **I. Larson Distorts the Ninth Circuit's Ruling and DC's Fourth Counterclaim.**

10      a. Seeking to avoid the preclusive force of the Ninth Circuit's rulings on

11  remand, Larson contends the Court did not "interpret" the parties' October 2001

12  deal, "set forth its terms," or "determine if its terms are enforceable." Opp. 7. All

13  untrue. The Ninth Circuit held that the contract's terms were set forth in the "five

14  pages of terms outlining substantial compensation for the heirs in exchange for

15  DC's continued right to produce Superman works." 2012 WL 6822241, at *1.

16  Those five pages appear in Marks' October 19, 2001, letter, and the Ninth Circuit

17  held this letter "accurately reflected the [deal's] material terms." *Id.*; AD Ex. 1.

18      The Ninth Circuit also ruled on the enforceability of the key term (paragraph

19  C.1) on which DC relies in this motion—and which allows DC, in the Court's own

20  words, the "continued right to produce Superman works." 2012 WL 6822241, at

21  *1. Quoting paragraph C.1, Larson argued on appeal that Marks' letter did *not*

22  "transfer" her copyrights to DC because the parties contemplated a "further"

23  writing in which Larson herself "*would* [make such] transfer" of her copyrights.[1]

24  _____

[1] Here is what Larson argued to the Ninth Circuit; *see also* Appendix 2 at 22-24:

25      **D. A Final Written Agreement Signed By The Parties Was Required.**

        It is equally clear from the parties' words and conduct that, given the importance

26  and complexity of the subject matter and deal points, any agreement was subject to

    documentation and would need to be reduced to a mutually-acceptable written contract

27  [citing and then discussing state law].

        …. Moreover, as any such agreement would involve an assignment of the Siegels'

28  recaptured copyright interests, a written contract was required as a matter of law. 17

- 2 -

This is the same losing argument about the word "would" Larson repeats now, trying to create fact issues. Opp. 9-11. But the court "reject[ed] [her] arguments that either state or federal law preclude[d] a finding" that Marks' letter was binding. 2012 WL 6822241, at *1. It held the letter's terms were "sufficiently definite that a court could enforce them"—*i.e.*, no further writing was required. *Id.* And it held the Copyright Act's transfer provision, section 204(a), did <u>not</u> "bar[] the validity of [the] contract; that statute expressly permits an agreement *transferring ownership of a copyright* to be signed by a 'duly authorized agent'…, *and Larson does not contest that the heirs' attorney [Marks] was such an agent*." *Id*. (emphasis added).

This is the beginning and the end of the inquiry on this motion. DC's Fourth Counterclaim (on which it moves) seeks a declaration that, in the 2001 deal, Larson "transferred or [was] contractually obligated to transfer to DC" her rights in the Superman and Superboy works. Mot. 3, 4. The Ninth Circuit's ruling decided this issue not once, but twice. It held that the 2001 deal afforded DC the "continued right to produce Superman works"—the main consideration DC sought—and that Marks validly transferred the copyrights necessary for DC to still exploit Superman.

The law of mandate prohibits Larson from recycling her contrary arguments on appeal, Mot. 6, but she reasserts them nonetheless. Yet her own cited cases hold that a "mandate is controlling as to all matters within its compass," including issues "expressly and impliedly disposed of on appeal." Opp. 8:13-15. Here, the Ninth Circuit rejected her copyright "transfer" arguments, *supra* n.1, and asked this Court to consider *one* issue on remand: how its rulings impacted DC's Third and Fourth

---

U.S.C. § 204(a) [the copyright Act's "transfer" provision]….

Marks' October 19 Letter cannot possibly qualify as the required "writing." *While "[n]o magic words must be included in a document to satisfy § 204(a) …. the parties' intent as evidenced by the writing must demonstrate <u>"transfer of the copyright."</u> The October 19 Letter is <u>not "a transfer"</u> of the Siegels' copyrights to Warner: rather, it contemplates that the Siegels <u>"would [make such] transfer"</u> in a final executed agreement*….. [quoting paragraph C.1 of the October 19, 2001 agreement].

Here, a signed written agreement assigning the Siegels' copyrights was both contemplated by the parties and required, *but never approved and executed.* Kline Decl. ("KD") Ex B at 123-24 (bolded brackets in original; emphases added).

1   Counterclaims.  2012 WL 6822241, at *2.  As DC has shown, if judgment is

2   entered in its favor on its Fourth Claim (and it must be under the Circuit's ruling),

3   then its Third Claim (for breach of the 2001 deal) is moot, and DC will only need to

4   assert such a claim in a new lawsuit if Larson breaches the 2001 deal.[2]

5        b. Larson spends 12 pages attacking a straw man, arguing DC had to prove a

6   claim for *specific performance* to prevail on this motion.  Opp. 11-23.  DC does not

7   need a court order requiring Larson to transfer anything: Marks made the transfer in

8   2001, as the Ninth Circuit held; and even if he had not, and even if Larson refuses

9   to do so now, Larson fully empowered _DC_ to make the transfer.  The 2001 deal

10  foreclosed the game she now plays and provided DC, in paragraph C.12, the right

11  to act as "attorney-in-fact" for the Siegels and execute "further documents" the

12  Siegels failed to sign, AD Ex. 1 at 8.  *Cf., e.g., Niss v. Columbia Pictures Indus.,*

13  *Inc.*, 2000 WL 1862814, at *6 (S.D.N.Y. Dec. 20, 2000) (party properly executed

14  copyright assignment in reliance on a contractual attorney-in-fact provision after

15  other party refused).  Larson, of course, never addresses this key provision.[3]

---

16  [2] Page limits prevent DC from addressing all of Larson's recycled fact arguments, but
17  as Appendix 2 shows, all of her claims—about how to read Marks' letter; how it was not a
    valid copyright transfer, etc.—were unsuccessfully made on appeal and are barred, too.

18      Nor do her cited remand cases help her.  Opp. 7-8.  She cites *Guidiville*'s dissent; in
19  *Doe*, the Eighth Circuit asked the trial court to consider a new case; in *Lancaster*, the
    Ninth Circuit forbade a party from taking a position contrary to years of conduct; in
20  *Edgerly*, the court had "more to do" in light of a new issue raised on appeal.  *Campinelli,*
    *Odima*, and *Hall* confirm that, on remand, a district court may address issues *not* decided.
21  Here, there is no indication the Ninth Circuit asked this Court to revisit copyright transfer
    arguments it rejected or the "central issue" the court said it decided: "whether the parties'
22  reached a binding settlement."  2012 WL 6822241.  All the Ninth Circuit asked this Court
    to do is to apply the logic of its opinion to DC's Third and Fourth Counterclaims, and the
23  parties' summary judgment arguments, to see if this case could be finally resolved—
    thereby mooting Larson's other arcane copyright arguments.  *Compare id., with* Opp. 11.

24  [3] The copyright assignment cases she cites instead, Opp. 9-10, have no bearing.  *None*
    involved contracts with attorney-in-fact provisions.  Moreover:
25  • *Arachnid* involved assignments of future inventions and implicated specific patent
      law that legal title to inventions passes only after the invention becomes patentable.
26  • *Li'l Red Barn* involved a clause conditioning transfer of trademarks on plaintiff's
      future, possible default under a purchase agreement.
27  • And in *SCO Group*, the court held at the motion to dismiss stage that it could not
      resolve the parties' competing interpretations about an "excluded assets" provision.
28  Here, the Ninth Circuit ruled on a *full summary judgment record* that Marks—as Larson's

---

DC'S REPLY ISO MSJ IN *SIEGEL*
SUPERMAN CASES
**ER 952**

## II. Larson's Breach and Other New Defenses Were Waived and Are Baseless.

A. <u>Larson Long Ago Waived Her New Affirmative Defenses.</u>  Larson had 11 *years* to raise the defenses she asserts for the first time in her opposition.  She pled 39 defenses in these cases, *see infra* Appendix 1, but never pled or argued breach, rescission, or abandonment—*not* in her answer, *not* in discovery responses, *not* in her various complaints, *not* on summary judgment on DC's settlement defense, and *not* on appeal, SAF 24.  Tellingly, she never cites where she pled these defenses, but rather suggests they can be intuited from letters she wrote DC in 2002, Opp. 20-22, or are relevant to DC's Third Claim on which DC does *not* move, *id.* 12-13.  No matter these sleights of hand, the law is clear:  Larson's failure to plead or argue these defenses—in over eight years of litigation—bars her from raising them now.[4]

Rule 8 requires parties to "affirmatively state any avoidance or affirmative defense," in "short and plain terms."  FED. R. CIV. P. 8(b)(1)(A), (c).  "The purpose" of the pleading standards for affirmative defenses "is to give the opposing party notice of the plea," *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971), and to prevent surprise, *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Where a party fails to plead an affirmative defense or raise it by motion early on, it is waived.  *See Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005); *N.W. Acceptance Corp. v. Lynwood Equip.*, 841 F.2d 918, 924 (9th Cir. 1988).  This is true in contract and copyright cases, just like all others.  *E.g.*, *Paulsell v. Cohen*, 2002 WL 31496397, at *14 (D. Or. May 22, 2002) (party "precluded from making" arguments on summary judgment that no agreement existed, and if it existed plaintiff repudiated it, when it "never alleged any such affirmative defenses"); *Newman v. Phan*, 2002 WL 31421568, at *5 (Cal. App. Oct. 29, 2002) (breach defense to contract waived when not alleged in cross-complaint or answer).

---

duly appointed agent—validly assigned her copyrights to DC, and it rejected her claim that a "further" writing was required.  *Supra* at 2-4; *see also* 2012 WL 6822241, at *1 n.2.

[4] As for the 39 defenses Larson *did* plead, she waived them by not arguing them here.  *See DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588, at *9 (C.D. Cal. 2012).

1    Larson argued for eight years she did not make a contract with DC in 2001—

2  she did *not* contend DC breached the deal, she rescinded it, or DC abandoned it.

3  Rule 8(d) allowed her to plead inconsistent defenses in the alternative; she never

4  did so.  FED. R. CIV. P. 8(d)(2)-(3).  Allowing her to raise such defenses now—

5  when DC was deprived discovery on them or the chance to litigate them before—

6  would violate Rule 8, prejudice DC, and be an affront to the multiple courts that

7  spent years adjudicating DC's settlement claim and Larson's defense that no deal

8  was ever made.  *Cf. Jorst v. D'Ambrosio Bros. Inv. Co.*, 2001 WL 969039, at *9

9  (N.D. Cal. Aug. 13, 2001) (holding party waived defense when he tried to assert it

10  after "parties have proceeded through *almost a year of litigation*, including the

11  depositions of multiple witnesses and preparing [] summary judgment motions")

12  (emphasis added); *accord Ball v. Rodgers*, 2009 WL 1395423, at *3 (D. Ariz. Apr.

13  24, 2009); *Sram Corp. v. Shimano, Inc.*, 25 Fed. Appx. 626, 629 (9th Cir. 2002).[5]

14    B. Larson's Waived "Defenses" Fail Because She Repudiated the 2001 Deal.

15  Larson's untimely defenses are all premised on the notion that DC had a duty to

16  perform under the 2001 agreement but failed to do so.  Even had she preserved the

17  ───────────────

18    [5] Larson's answer, when listing boilerplate defenses—*e.g.*, estoppel, laches, unclean
hands, *infra* Appendix 1—did assert that DC's counterclaims "are barred by the doctrine
of acquiescence," *id.*  Larson provided no grounds for this defense or any facts to support

19  it.  *Id.*  She only addressed facts related to the 2001 agreement in other, later defenses—all
defenses the Ninth Circuit rejected, like her 37th (lack of authority), 38th (statute of
frauds), and 39th (no deal consummated) defenses.  *Compare id.*, *with* 2012 WL 6822241.

20    By merely invoking the term "acquiescence" in her answer, Larson failed to plead or
preserve it.  *See* FED. R. CIV. P. 8(b)(1)(a), (c), (d); *Qarbon.com Inc. v. eHelp Corp.*, 315

21  F. Supp. 2d 1046, 1049-50 (N.D. Cal. 2004) (striking defenses because a "reference to a
doctrine, like a reference to statutory provisions, is insufficient notice"); *Gonzalez v.

22  Preferred Freezer Servs., LBF, LLC*, 2012 U.S. Dist. LEXIS 93015, at *8 (C.D. Cal. July
5, 2012) (striking "laundry list" of 37 defenses for "failure to link [them] to the particular

23  claims for relief" or "any facts supporting [them]"); *Desert European Motorcars, Ltd. v.
Desert European Motorcars, Inc.*, 2011 U.S. Dist. LEXIS 96154, at *4-22 (C.D. Cal. Aug.

24  25, 2011) (same; striking defenses of *acquiescence*, waiver, etc.).

25    Any attempt to amend her answers or complaints now to assert these defenses or style
them as claims is too late by many years.  Rule 8 forbids this as shown above, as does the

26  statute of limitations on breach, rescission, and related contract claims.  Larson says DC
breached in October 2001, when John Schulman sent his letter, or in March 2002, when

27  DC allegedly failed to pay her.  Opp. 16-20.  Larson had four years (or until 2010, at best)
to assert such claims.  *See* CAL. CIV. P. CODE § 337(3).  She is three years too late, at least.

28

defenses (and she did not), each is barred *as a matter of law* because she openly and repeatedly repudiated the 2001 deal—excusing any obligation DC had to perform. *See* Mot. 1; CAL. CIVIL CODE § 1440; *In re Marriage of Burkle*, 139 Cal. App. 4th 712, 751 (2006); *Ferguson v. Cathedral City*, 197 Cal. App. 4th 1161, 1169 (2011).

In the first May 2002 letter she cites, Opp. 21, Larson *never* demanded DC perform under the 2001 deal; rather, she complained about DC's draft long-form. AD Ex. 3. She then abandoned long-form negotiations, despite Marks' warnings not to, and she fired Marks. KD Ex. C at 194-95; AD Ex. 6. In November 2002, she filed a new termination notice purporting to capture Superboy works she assigned to DC *in the 2001 deal*. AD Ex. 7; Ex. 1 ¶¶ A.1, C.1. She filed these lawsuits in 2004, and DC immediately cross-claimed that the parties' October 2001 deal barred her copyright claims. Mot. 3. When DC deposed Larson, she testified: "We never reached a final agreement." KD Ex. E at 214:4-5. In other sworn discovery, she denied she "intended to settle all claims concerning [her termination notices] in accordance with the terms set forth in the October 19 Letter." DN 184 at 350 (RFA No. 73). And in briefing here and in *Shuster*, she repeatedly denied making the 2001 deal. *E.g.*, DN 77 at 26 ("no agreement was made or executed by the parties"); KD Ex. A at 23 ("By 2002, these discussions broke down, and no agreement was consummated…."); Case No. 10-3633, DN 75 at 23-24.

Here, Larson not only openly challenged the 2001 agreement in 2002, she fought its existence in eight years of subsequent litigation and filed a termination notice in 2002 that sought to capture the same Superboy works she assigned to DC in the 2001 deal. It is hard to imagine a more unequivocal repudiation. *See Ferguson*, 197 Cal. App. 4th at 1169 (holding, as matter of law, that once plaintiff called agreement "null and void," defendant "excused from further performance"); *GN Hello Direct, Inc. v. Plantronics, Inc.*, 2004 WL 1775674, at *16 (Cal. App. Aug. 10, 2004) (defendant's performance excused by plaintiff's repudiation where plaintiff "agree[d] to engage in an action that was expressly prohibited by the

contract"); *Constantino v. U.S. Bank, N.A.*, 2011 U.S. Dist. LEXIS 107795, at *19
(D. Haw. Sept. 23, 2011) (Hawaiian law; defendant "repudiated the settlement
agreement when it refused to settle the case as agreed"; "[o]nce that occurred,
Plaintiffs were under no obligation to uphold their end of the agreement … to make
monthly payments"); *Vineland Homes v. Barish*, 138 Cal. App. 2d 747, 759-60
(1956) (where party repudiated property sale agreement by refusing to execute
escrow documents and claimed agreement was "void" and "unenforceable," the
other party excused from obligation to make payment); 1 WITKIN SUMMARY OF
CAL. LAW, CONTRACTS §§ 849, 851 (10th Ed. 2010).

Larson's words and conduct constitute repudiation as a matter of law, and
excused DC of any obligation to perform, *see id.*; CAL. CIVIL CODE § 1440; *Burkle*,
139 Cal. App. 4th at 751; 23 WILLISTON ON CONTRACTS § 63:31, at 548 (4th ed.
2002) (when party repudiates agreement, "failure of the injured party to continue
performance is excused, since to hold that the injured party must proceed with
performance and yet be denied compensation for so doing is neither conceivable,
nor do the courts so hold"); *accord* RESTATEMENT 2D CONTRACTS § 253, cmt b
(1981); *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*, 480 F.2d 1112, 1116 (9th
Cir. 1973); *see also United Brotherhood of Carpenters & Jointers v. Endicott
Enters., Inc.*, 806 F.2d 918, 922-23 (9th Cir. 1986) (federal law; affirming summary
judgment ruling on repudiation where party did not "treat[] the [] agreement as if it
were still in effect"); *Vier Const. Co., Inc. v. Local Union No. 12 of Int'l Union of
Operating Eng'rs*, 1992 WL 317221, at *1 (9th Cir. Oct. 29, 1992) (same).

C. <u>The Supposed "Defenses" Larson Waived Also Fail on their Own Terms.</u>

*1. Breach.* Larson claims DC breached the 2001 agreement—thus excusing
her performance—by sending her the October 26, 2001, and February 2, 2002,
long-form drafts. Opp. 16-19. Not so. Haggling over the terms of a long-form
does not invalidate or breach an underlying short-form agreement. This is the very
issue Larson briefed and lost on appeal, Appendix 2 at 19-20, 24, as did the losing

1    parties in *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037-38 (9th

2    Cir. 2011); *see also Larson*, 2012 WL 6822241, at *1 (*Facebook* is "controlling

3    here"); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 847 (1941) (if the law allowed draft

4    long-forms to undermine earlier agreement—*and it does not*—a party could

5    improperly escape a contract "by simply suggesting other and additional terms").[6]

6         Larson also argues (for the first time in 11 years) that DC should have made

7    a payment to her in March 2002—before her caustic letters, Opp. 19—yet she

8    clearly never demanded or asked for payment in March or in any of those letters, as

9    the letters' plain words confirm, *e.g.*, AD Ex. 4; DN 184 at 243.  In fact, up through

10   today, Larson has *never* asked DC to pay her under the 2001 deal, and Toberoff

11   cagily refuses to confirm whether she wants or will accept payment.  AD Exs. 20-

12   22, 24-25.  Given this, Larson cannot possibly show a material breach to justify

13   denying DC's Fourth Counterclaim—much less one invalidating a contract that has

14   a 30-year term, took four years to negotiate, took eight years to litigate, and her first

15   lawyer rightly called a "'monumental accord.'"  2012 WL 6822241, at *1; *see also

16   Larkspur v. Marin Cnty. Flood Control Dist.*, 168 Cal. App. 3d 947, 954 (1985).

17        Larson last complains that, while DC says it is ready, willing, and able to pay

18   her under the 2001 deal, DC reserved its rights to seek its fees as an "offset."  Opp.

19   6, 15 n.5.  This is neither a breach nor an excuse for Larson's continued repudiation

20   of the 2001 agreement, as DC is fully entitled to reserve its rights.  If and when DC

21   obtains judgment in these cases, it can move the Court to award its fees.  17 U.S.C.

22   _____

23       [6] Indeed, Facebook did not pay the losing party their settlement money until *after* the Ninth Circuit held the settlement agreement was enforceable and the district court entered

24   final judgment on remand on that ground.  *See* N.D. Cal. Case No. 07-1389, DN 786, 800.
         As for Larson's invented factual arguments that DC failed to perform on the 2001

25   deal—arguments which are all irrelevant for the reasons above—DC addresses these asserted "facts" in its response to Larson's 62 alleged "material" facts.  To take just one

26   example of how Larson distorts these so-called facts, the testimony is *undisputed* that DC began performing on the 2001 deal right away, by reserving payments it owed Larson, as

27   they became due.  SAF 43, 45; *cf.* Opp. 19-20.  Other than Toberoff's *ipse dixit*, he points to no contrary evidence.  *Id.*  As this Court has held, Toberoff's conclusory denials are not

28   competent evidence to resist summary judgment.  *See DC*, 2012 WL 4936588, at *7.

§ 505.  If an award is granted, the law is clear:  DC may offset it against sums it owes Larson.  *E.g.*, *Strickland v. Becks*, 95 Cal. App. 3d Supp. 18, 20 (1979).

2. *Rescission.*  As with breach, Larson never asserted recission before, and her present attempts to re-read her 2002 letters as rescinding the 2001 deal, Opp. 20-22, are without basis.  To rescind, Larson had to give DC clear notice of rescission and return all she received of value to DC, *see* CAL. CIV. CODE § 1691; she did neither.  Moreover, when it came time to plead her claims and defenses in these cases, she never pled or argued recission.  *See* Appendix 1; *supra* at 5-6.  To the contrary, she argued that she and DC never made a deal.  *See id.*

Her cited recission cases afford her no help.  In each, the rescinding party acknowledged the existence of an underlying contract before rescinding.  In *Wilson*, 106 Cal. App. 3d at 809, defendant rescinded by calling plaintiff and his agent and "repudiating" her admitted acceptance of the agreement.  In *Hull*, 211 Cal. at 166, plaintiff sent defendant a written notice stating he "[did] hereby rescind that certain contract of sale."  Larson, in contrast, told DC in 2002: "we have no deal"—not that we had a contract, and that she now rescinded it.  AD Ex. 4; *supra* at 7.  Larson's other two cases *refused* to find rescission, despite her suggestions to the contrary.[7]

3. *Abandonment or Acquiescence.*  Larson's claim that DC "abandoned" the 2001 deal in 2002 or years subsequent, Opp. 22-23, is baseless.  Over the past eight years, DC spent *millions of dollars* litigating and enforcing the 2001 agreement.  As DC said in one of its first filings in this case years ago, DC "always has been and remains ready, willing, and able to perform all of its obligations under the [2001] Agreement."  DN 42 ¶ 99.  Larson can point to no competent evidence or case law to prove abandonment or acquiescence of the 2001 deal.  Her cited cases involved

---

[7] *Cf.* Opp. 21; *with Rubin*, 1 Cal. 3d at 55 ("defendants were not entitled to unilaterally rescind the contract because of plaintiff's alleged breach in failing to deposit the full down payment"), *and U.S.*, 498 F.2d at 339 ("Pacific's delay in paying, if in fact demanded by Fritz, would not appear to be so unreasonable and material as to justify rescission").

While Larson claims rescission is a fact issue, *her* cases show the issue can be decided on summary judgment:  *Jaunich*, 647 F. Supp. at 210; *Wilson*, 106 Cal. App. 3d at 809.

1   parties who mutually rescinded and abandoned contracts by negotiating *new and*

2   *different agreements* that superseded the original. *See McCreay*, 124 Cal. App. 2d

3   at 485; *Honda*, 156 Cal. App. 2d at 539; *Freeman*, 2005 Cal. App. Unpub. LEXIS

4   10154, at *24. Larson tellingly cites no new such contract the parties negotiated or

5   made here. All that she (improperly) cites is a confidential settlement conversation,

6   in which DC tried to persuade her not to file this wasteful, expensive lawsuit. Opp.

7   23; SAF 31. Larson's only other case involved a party who waived his contractual

8   right to arbitrate by refusing to arbitrate prior to a lawsuit being filed. *Grunwald-*

9   *Marx*, 192 Cal. App. 2d at 279-80. Here, *DC sued to enforce the 2001 deal*; it

10  never abandoned it or acquiesced in its rescission, in litigation or otherwise.

11  **III.    Larson Transferred All Rights in Superboy and The Ads to DC in 2001.**

12       Finally, Larson argues summary judgment is "a legal impossibility" because

13  she served termination notices seeking to recapture Superboy and the Ads *after* the

14  2001 agreement. Opp. 23-25. This newly minted claim is without merit as well.

15       A. Larson notably omits that her ***1997*** termination notices sought to recapture

16  "each and every work … reasonably associated with SUPERMAN…such as…

17  Superboy," and listed thousands of Superman and Superboy works, DN 163 at 89

18  n.1, many of which she simply repeated in her 2002 notice, AD Ex. 7. The parties'

19  October 2001 deal—which was executed *after* she says the 1997 termination notice

20  took effect in *1999*, Opp. 3—included "all" Superboy works. Paragraphs A.1 and

21  C.1 of the 2001 deal encompass: "*all of [the Siegels'] rights* in the 'Superman' and

22  'Spectre' properties (including '*Superboy*')" and "*all Superman, Superboy and*

23  *related properties …, all pre- and post-termination works* (including the so-called

24  Superman library), [and] characters…." AD Ex. 1 at 4, 6 (emphases added). This

25  Court, in *Shuster*, made clear that "all" means "all," *DC*, 2012 WL 4936588, at *4-

26  9, and Larson cannot now pretend that "all" excluded Superboy or the Ads.

27       B. As this Court's summary judgment ruling in *Shuster* also makes clear, the

28  2001 deal is *not* a prohibited "agreement to the contrary." *Cf.* Opp. 24. Toberoff

1    made the same erroneous claim in *Shuster* that termination rights are "inalienable,"

2    *cf.* Opp. 12, and this Court, 2012 WL 4936588, at *8-9, like *Milne* and others, held

3    that Congress "anticipated that parties may contract, as an alternative to statutory

4    termination, to revoke a prior grant by replacing it with a new one," *Milne v.*

5    *Stephen Slesinger, Inc.*, 430 F.3d 1036, 1046 (9th Cir. 2005); *accord Penguin Grp.*

6    *(USA) Inc. v. Steinbeck*, 537 F.3d 193, 203 (2d Cir. 2008).

7         In *Shuster*—like *Milne* and *Steinbeck*—an heir entered into a post-1978

8    agreement that superseded all prior copyright grants and thus eliminated any

9    termination right that might exist.  2012 WL 4936588, at *4-9.  That is precisely

10   what happened here.  The "all-encompassing language" in the Larson's 2001

11   agreement with DC—transferring "all Superman, Superboy and related properties"

12   to DC—"unmistakably operates to supersede all prior grants" of the same rights.

13   *Id.* at *7.  There is no requirement that the 2001 deal contain "express … revocation

14   and re-grant" language.  Opp. 24.  As this Court held:  "The pertinent inquiry is …

15   'whether the subsequent agreement [is, as] a matter of intention, *expressed or*

16   *implied*, a superseder of, or substitution for, the old agreement."  2012 WL

17   4936588, at *4; *Alexander v. Angel*, 37 Cal. 2d 856, 860 (1951) (same; California).

18        Where, as here, an agreement "deals squarely with the same subject matter as

19   the parties' earlier agreements"—*i.e.*, grants of all Superman and Superboy rights—

20   it supersedes the earlier agreement and is enforceable.  2012 WL 4936588, at *7.

21   Larson's 2001 deal with DC, which the Ninth Circuit upheld, plainly covers the

22   Ads and Superboy.  Larson's later-filed termination notices seeking to recapture

23   these works *are void*—just like Shusters' failed termination notices.  *Id.* at *9.

24   **IV.  Conclusion**

25        Judgment should enter in DC's favor in the Superman and Superboy cases.

26   Dated:  March 8, 2013                    Respectfully Submitted,

27                                            By:  /s/ Daniel M. Petrocelli

28

DC'S REPLY ISO MSJ IN *SIEGEL*
SUPERMAN CASES
**ER 960**

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8                 **UNITED STATES DISTRICT COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10

11  LAURA SIEGEL LARSON,              Case No.  CV 04-8400 ODW (RZx)
    individually and as personal      Case No.  CV 04-8776 ODW (RZx)
12  representative of the ESTATE OF
    JOANNE SIEGEL,                    **DECLARATION OF MATTHEW T.**
13                                    **KLINE IN SUPPORT OF REPLY IN**
                 Plaintiff,           **SUPPORT OF DEFENDANT DC**
14                                    **COMICS' MOTION FOR**
            v.                        **SUMMARY JUDGMENT IN THE**
15                                    **_SIEGEL_ SUPERMAN AND**
    WARNER BROS. ENTERTAINMENT        **SUPERBOY CASES**
16  INC., DC COMICS, and DOES 1-10,
                                      The Hon. Otis D. Wright II
17            Defendants and
              Counterclaimants.       **Hearing Date**:    March 25, 2013
18                                                        (_Hearing Vacated_)
    LAURA SIEGEL LARSON,
19  individually and as personal
    representative of the ESTATE OF
20  JOANNE SIEGEL,

21               Plaintiff,

22          v.

23  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
24  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
25  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
26
              Defendants and
27            Counterclaimants.

28

**INDEX OF EXHIBITS**

| Exhibit | Pages | Description |
|---------|-------|-------------|
| A | 2-84 | Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12 |
| B | 85-174 | Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 43-1 |
| C | 175-210 | Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49 |
| D | 211-212 | Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013. |
| E | 213-217 | Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1, 2006. |
| F | 218-223 | Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006. |

KLINE DECL. ISO
DC'S MSJ REPLY
**ER 962**

# DECLARATION OF MATTHEW T. KLINE

I, Matthew T. Kline, declare and state:

1.    I am a partner at O'Melveny & Myers LLP, counsel of record for defendants and counterclaimants (collectively "DC") in this case.  I make this declaration in support of DC's Reply In Support Of Motion For Summary Judgment In The *Siegel* Superman And Superboy Cases.  I have personal knowledge of the matters set forth in this declaration.

2.    Attached hereto as Exhibit A is a true and correct copy of Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12.

3.    Attached hereto as Exhibit B is a true and correct copy of Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 43-1.

4.    Attached hereto as Exhibit C is a true and correct copy of the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49.

5.    Attached hereto as Exhibit D is a true and correct copy of a letter from Marc Toberoff to my partner Daniel Petrocelli, dated March 7, 2013, which Mr. Toberoff asked we submit with this reply.

6.    Attached hereto as Exhibit E is a true and correct copy of an excerpt from the deposition of Laura Siegel Larson, dated August 1, 2006.

7.    Attached hereto as Exhibit F is a true and correct copy of an excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 8th day of March, 2013, at Los Angeles, California.

/s/ Matthew T. Kline
Matthew T. Kline

- 1 -

# EXHIBIT A

APPELLATE CASE NO. 11-55863;
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, and Appellant.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, and Appellees.*

———————————

**APPELLANT LAURA SIEGEL LARSON'S FIRST BRIEF ON CROSS-APPEAL**

———————————

Appeal From The United States District Court for the Central District
of California,
Case No. CV-04-8400 ODW (RZx), Hon. Otis D. Wright II

———————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kgadams@ipwla.com*
22631 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant,*
*Laura Siegel Larson, individually and*
*as personal representative of the Estate*
*of Joanne Siegel*

**EXHIBIT A**
**2**

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION.............................................................1

ISSUES PRESENTED ...............................................................................1

STATEMENT OF THE CASE ...................................................................2

STATEMENT OF FACTS ..........................................................................5

    Siegel and Shuster's Creation of Superman .....................................5

    Siegel and Shuster's Early Superman Publications.........................7

    The 1938 Agreements with Detective and McClure .......................8

    Siegel and Shuster's Litigation With Defendants' Predecessors ...................9

    Plaintiffs' Termination Pursuant to the Copyright Act .................10

    The District Court Proceedings .....................................................11

STANDARD OF REVIEW ......................................................................14

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT ...........................................................................................17

I.    THE TERMINATION RIGHT UNDER THE U.S. COPYRIGHT ACT ............................................................................................17

II.    THE DISTRICT COURT IMPROPERLY FOUND ON SUMMARY JUDGMENT THAT NUMEROUS SUPERMAN WORKS WERE "WORKS MADE FOR HIRE" .....................20

    A.    "Work For Hire" Under the 1909 Copyright Act ...............20

        1.    Derivation of the "Work For Hire" Doctrine...........20

        2.    The Instance and Expense Test...............................24

i

3. In the Context of Statutory Termination, the "Instance and Expense" Test Should Be Narrowly Construed ................25

4. Defendants Bear the Burden on "Work For Hire" ....................28

B. *Action Comics, Nos. 2-3, 5-6* Were Not "Works For Hire" ...............29

C. The Superman Newspaper Strips Were Not "Works For Hire" .........33

1. The "Expense" Prong Was Not Met .........................................34

2. The "Instance" Prong Was Not Met .........................................36

3. The District Court Erred In Failing to Determine the "Author" of the Newspaper Strips .............................................39

4. The District Court Misapplied *Picture Music*, While Ignoring Clear Ninth Circuit Authority ...................................39

5. The Second Circuit Previously Held That McClure Was the "Proprietor," as Opposed to the "Author," of the Strips ........................................................................................41

6. The Parties' Conduct Also Demonstrates That McClure and Later Detective Owned the Newspaper Strips By Assignment, Not As "Work for Hire" ......................................43

D. *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* Were Not "Works For Hire" ...............................................................................47

1. *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* Were Not Created at Detective's "Expense" .....................................48

2. *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* Were Not Created at Detective's "Instance" .....................................54

3. The Parties Could Not Have Intended That Siegel and Shuster's Superman Works Were "Works For Hire" ...............55

ii

**EXHIBIT A**
**4**

4.     At a Minimum, the Evidence Raised Triable Issues of Fact .................................................................................. 57

STATEMENT OF RELATED CASES ................................................. 58

CONCLUSION .................................................................................... 59

CERTIFICATE OF COMPLIANCE ................................................... 60

STATUTORY ADDENDUM ............................................................... 61

CERTIFICATE OF SERVICE ............................................................ 72

**EXHIBIT A**
**5**

ER 968

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)........................................................................14

*Avtec Systems, Inc. v. Peiffer*,
21 F.3d 568 (4th Cir. 1994) ...........................................................50

*Brattleboro Publishing Co., v. Winmill Publishing Corp.* ("*Brattleboro*"),
369 F.2d 565 (2d Cir. 1966)................................................22, 41, 49

*Brattleboro Publishing Co., v. Winmill Publishing Corp.*,
250 F. Supp. 215 (D. Vt. 1966)......................................................49

*Carson Harbor Village, Ltd. v. County of Los Angeles*,
433 F.3d 1260 (9th Cir. 2006) .........................................................2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................29

*Clackamas Gastroenterology Associates, P.C. v. Wells*,
538 U.S. 440 (2003).......................................................................26

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ..............................................18-20, 27-28

*Community for Creative Non-Violence v. Reid* ("*CCNV*"),
490 U.S. 730 (1989)................................................................24, 27, 56

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ...............................................28-29, 45, 55

*Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*,
375 F.2d 639 (2d Cir. 1967)...........................................................36

*Egner v. E. C. Schirmer Music Co.*,
139 F.2d 398 (1st Cir. 1943)....................................................22, 42

iv

**EXHIBIT A**

**6**

*Epoch Producing Corp. v. Killiam Shows, Inc.* ("*Epoch*"),
522 F.2d 737 (2nd Cir. 1975) ................................................................ 25, *passim*

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*"),
342 F.3d 149 (2d Cir. 2003) ................................................................. 15, *passim*

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
2002 U.S. Dist. LEXIS 4219 (S.D.N.Y. Mar. 15, 2002) ................................42, 49

*Fred Fisher Music Co., v. M. Witmark & Sons*,
318 U.S. 643 (1943) ..................................................................................18, 20, 28

*Greenberg v. National Geographic Society*,
533 F.3d 1244 (11th Cir. 2008) ................................................................19

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1984) ..................................................................................50

*Houghton Mifflin Co. v. Stackpole Sons, Inc.*,
104 F.2d 306 (2d Cir. 1939) .....................................................................22, 45

*Jacobs v. Robitaille*,
406 F. Supp. 1145 (D.N.H. 1976) ............................................................42

*Jim Henson Productions v. John T. Brady & Associates*,
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ......................................................44, 47

*Lin-Brook Builders Hardware v. Gertler* ("*Lin-Brook*"),
352 F.2d 298 (9th Cir. 1965) ...................................................................22

*Magnuson v. Video Yesteryear*,
85 F.3d 1424 (9th Cir. 1996) ...................................................................44

*Martha Graham School & Dance Foundation, Inc. v. Martha Graham
Center of Contemporary Dance, Inc.* ("*Martha Graham*"),
380 F.3d 624 (2d Cir. 2004) .................................................................. 24, *passim*

*Marvel Characters v. Simon* ("*Marvel*"),
310 F.3d 280 (2d Cir. 2002)....................................................................20, 28, 58

**EXHIBIT A**
7

*May v. Morganelli-Heumann & Associates*,
618 F.2d 1363 (9th Cir. 1980) ..................................................23, 55, 58

*Mazer v. Stein*,
347 U.S. 201 (1954)...................................................................17

*Mifflin v. R. H. White*,
190 U.S. 260 (1902)...................................................................42

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) .....................................................28

*Molzof v. United States*,
502 U.S. 301 (1992)...................................................................26

*Morse v. Fields*,
127 F. Supp. 63 (S.D.N.Y. 1954) ................................................42

*National Center for Jewish Film v. Goldman*,
943 F. Supp. 113 (D. Mass. 1996) ..............................................21

*National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National
Comics*"),
191 F.2d 594 (2d Cir. 1951)................................................. 41, *passim*

*National Comics Publications, Inc. v. Fawcett Publications, Inc.*,
93 F. Supp. 349 (S.D.N.Y. 1950)................................................34, 41, 43

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001)...............................................................19, 27

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 1213 (2d Cir. 1972) .................................................. 23, 39-41

*Picture Music, Inc. v. Bourne, Inc.*,
314 F. Supp. 640 (S.D.N.Y. 1970) .............................................21, 40

*Playboy Enterprises, Inc. v. Dumas* ("*Playboy*"),
53 F.3d 549 (2d Cir. 1995)......................................................36, 49

**EXHIBIT A
8**

*Playboy Enterprises, Inc. v. Dumas* ("*Playboy*"),
960 F. Supp. 710 (S.D.N.Y. 1997) ........................................................49

*Public Ledger v. N.Y. Times*,
275 F. 562 (S.D.N.Y. 1921) ..................................................................42

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization* ("*Self-Realization*"),
206 F.3d 1322 (9th Cir. 2000) ...................................................... 15, *passim*

*Shapiro, Bernstein & Co. v. Bryan*,
123 F.2d 697 (2d Cir. 1941)..................................................................42

*Siegel v. National Periodical Publications*,
508 F.2d 909 (2d Cir. 1974)...................................................... 6, *passim*

*Siegel v. National Periodical Publications*,
364 F. Supp. 1032 (S.D.N.Y. 1973) ..............................................6, 9-10

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ................................................51

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911) ..................................................................................26

*Stewart v. Abend*,
495 U.S. 207 (1990)...................................................... 18-19, 31

*Twentieth Century Fox Film Corp. v. Entertainment Distribution* ("*Twentieth Century*"),
429 F.3d 869 (9th Cir. 2005) ...................................................... 15, *passim*

*United States v. Alameda Gateway Ltd.*,
213 F.3d 1161 (9th Cir. 2000) ..............................................................14

*Urantia Foundation v. Maaherra*,
114 F.3d 955 (9th Cir. 1997) ...............................................................44

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ..............................................................50

**EXHIBIT A**
**9**

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir. 1995)................................................................29

*Yardley v. Houghton Mifflin Co.*,
108 F.2d 28 (2d Cir. 1939).................................................... 22, *passim*

## Federal Statutes and Rules

17 U.S.C. § 101 *et seq.* (1978) ..........................................................19

17 U.S.C. § 203(a) .................................................................... 18-20

17 U.S.C. § 304(c) ...................................................................*passim*

17 U.S.C. § 304(c)(3)..............................................................5, 12, 21

17 U.S.C. § 304(c)(5)..................................................................3, 20

17 U.S.C. § 304(d) .....................................................................3, 18

17 U.S.C. § 9 (1974)......................................................................45

17 U.S.C. § 10 (1974)....................................................................42

17 U.S.C. § 24 (1974)................................................................18, 42

17 U.S.C. § 26 (1974)............................................................21, 39, 42

17 U.S.C. § 209 (1974) ..............................................................44-45

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................1

28 U.S.C. § 1337 ..........................................................................1

28 U.S.C. § 1367 ..........................................................................1

37 C.F.R. § 201.10 ..................................................................3, 10-11

**EXHIBIT A**
**10**

ER 973

Fed. R. Civ. P. 54(b) ........................................................................ 1, 5, 13-14

Fed. R. Civ. P. 56(c) ................................................................................... 14

Fed. R. Civ. P. 56(d) ................................................................................... 14

Fed. R. Civ. P. 4(a)(1)(A) ............................................................................. 1

## **Legislative History**

H.R. Rep. No. 94-1476 (1976) ............................................................... 19, 27

S. Rep. No. 104-315 (1996) ..................................................................... 3, 19

B. Varmer, Copyright Law Revision Study No. 13,
"Works Made for Hire and on Commission," Studies Prepared for the
Copyright Office (Comm. Print 1960) ..................................................... 22, 56

## **Treaties and Other Authorities**

Black's Law Dictionary, 2d Ed. (1910) ......................................................... 57

Black's Law Dictionary, 4th Ed. (1951) ........................................................ 57

M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") (2011)
1 *Nimmer* § 5.01[B] ..................................................................................... 44

1 *Nimmer* § 5.03[B][1][a][i] ......................................................................... 24

1 *Nimmer* § 5.03[B][1][a][ii] ........................................................................ 27

1 *Nimmer* § 5.03[B][2][d] ....................................................................... 25, 53

1 *Nimmer* § 5.03[B][2][c] ............................................................................. 55

3 *Nimmer* § 9.03[D] ........................................................................ 15, 23, 41

3 *Nimmer* § 9.11[B][1] ................................................................................. 19

**EXHIBIT A**
**11**

3 *Nimmer* § 10.03[B][2] ................................................................44

3 *Nimmer* § 10.09[B] ....................................................................46

3 *Nimmer* § 11.02[A][2] ..............................................................36

M. Nimmer, *Nimmer on Copyright*
§ 63 at 245 n.80 (1963) ................................................................56

W. Patry, *Patry on Copyright* ("*Patry*")
2 *Patry* § 5:45 .......................................................................15, 23

2 *Patry* § 5:54 ...........................................................25, 37, 44-45

2 *Patry* § 5:61 .....................................................................25, 36

2 *Patry* § 5:106 ..........................................................................44

x

**EXHIBIT A**
**12**

## STATEMENT OF JURISDICTION

This action, seeking, *inter alia*, a declaration of rights under Section 304 of the United States Copyright Act, was filed by Joanne Siegel (deceased) and Laura Siegel Larson (the "Siegels" or "Plaintiff(s)") against DC Comics (together with its predecessors, "DC"), Warner Bros Entertainment Inc. ("Warner"; together with DC, "Defendants") and Time Warner Inc. in the United States District Court for the Central District of California. DC counterclaimed seeking a declaration under Section 304 as well as other relief. The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367. This appeal arises from the district court's May 20, 2011 judgment pursuant to Fed. R. Civ. P. 54(b). The notice of appeal was timely filed by Plaintiff Laura Siegel Larson ("Appellant") on May 27, 2011. Fed. R. Civ. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Did the District Court err by finding, on Defendants' *de facto* motion for summary judgment, that the following Superman works co-authored by Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster") were "works made for hire," exempt from Plaintiffs' notices of termination under 17 U.S.C. § 304(c):

(a) *Action Comics, Nos. 2-3, 5-6*; (b) the 1939-1943 "Superman" newspaper strips (except for the first two weeks thereof) (the "Newspaper Strips"); and (c) *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* (except for pages 3-6 of *Superman,*

**EXHIBIT A**
**13**

*No.1*)?  *See* Appellant Laura Siegel Larson's Excerpts of the Record ("ER") 133-34.  Standard of review: de novo.  *Carson Harbor Village, Ltd. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).

## STATEMENT OF THE CASE

Plaintiff-Appellant Laura Siegel Larson is the only surviving child of legendary comic book author Jerome Siegel, co-creator of the world-renowned Superman.  This case concerns Plaintiffs' notices of termination pursuant to the Copyright Act, 17 U.S.C. § 304(c) ("Section 304(c)"), of Siegel's grants to DC of his copyright interests in the illustrated Superman stories published in *Action Comics, No. 1, Action Comics, Nos. 2-56, Superman, Nos. 1-23,*[1] and the daily Superman newspaper strips from 1939-1943 (the "Termination Notices"), all co-authored by Siegel and Shuster.

Siegel and Shuster's first Superman comic book story, created circa 1934 (ER 143-149), was published in 1938 in the magazine *Action Comics, No. 1*, by Detective Comics, Inc. ("Detective"), predecessor of defendant DC.  ER 154.  By agreement dated March 1, 1938, Siegel and Shuster granted to Detective all rights in their Superman story and character.  ER 151.  From 1938 to 1943, Siegel and Shuster created hundreds of additional Superman comic book stories published by

---

[1] Throughout this brief, references to *Action Comics, Nos. 1-56* and *Superman, Nos. 1-23* refer to Siegel and Shuster's Superman material published therein.

2

**EXHIBIT A**
**14**

Detective, and hundreds of Superman newspaper strips syndicated by the McClure Newspaper Syndicate ("McClure").  ER 54-67.

The U.S. copyrights in Siegel and Shuster's Superman works were originally set to expire in the mid-to-late-1990s.  However, the copyright term was extended for nineteen years by the Copyright Act of 1976, and again for an additional twenty years by the 1998 Sonny Bono Copyright Term Extension Act.  Congress intended that authors and their families have the opportunity to benefit from these extensions, rather than provide a windfall to assignees.  S. Rep. No. 104-315 at 22-23 (1996).  To that end, Congress granted authors and certain heirs the inalienable right to recapture their original copyrights by terminating prior transfers of copyright "notwithstanding any agreement to the contrary."  17 U.S.C. §§ 304(c)(5), (d).

On April 3, 1997, Appellant, along with her late mother, Joanne Siegel, Siegel's widow, availed themselves of this right by serving the Termination Notices on Defendants, with an effective date of April 16, 1999.  ER 1023-1092. The Termination Notices were drafted, served and filed in full compliance with Section 304(c), and the regulations promulgated thereunder, 37 C.F.R. § 201.10. ER 165-203, 1093-1107.

Following protracted and unsuccessful settlement negotiations with Defendants, the Siegels filed the instant action in October 2004, including a claim

3

**EXHIBIT A**

15

for declaratory relief that the Termination was valid.  DC counterclaimed for declaratory relief that the Termination was invalid, including on the purported ground that all the Superman works created by Siegel and Shuster were allegedly "works for hire" owned at inception by DC, and exempt from Section 304(c).  ER 164, 273-310, 324-348.

In 2007, the parties filed cross-motions for summary judgment.  ER 164-165.  In relevant part, the Siegels sought summary judgment that their Termination was valid as a matter of law with respect to the original Superman story published in *Action Comics, No. 1*, which Siegel and Shuster created long before any relationship with Detective.  *Id.*  The District Court granted Plaintiffs' motion, concluding that "all the Superman material contained in *Action Comics*, Vol. 1, is not a work-made-for-hire and therefore is subject to termination."  ER 189.

Thereafter, at Defendants' insistence, the parties briefed the issue of whether Siegel and Shuster's post-*Action Comics, No. 1* Superman works were "made for hire."  On August 12, 2009, the District Court ruled that *Action Comics, No. 4,* part of *Superman, No. 1* and the first two weeks of the Superman newspaper strips were ***not*** works for hire, because these stories had clearly been created by Siegel and Shuster prior to or outside of any relationship with Detective.  ER 43-141.

However, the District Court held on summary judgment that ***all*** of Siegel and Shuster's numerous other Superman works within the Termination window

(see 17 U.S.C. § 304(c)(3)), namely *Action Comics, Nos. 2-3, 5-56, Superman, Nos. 1-23,* and the remaining 1939-1943 Superman newspaper strips, were "works for hire." *Id.* In so ruling, the District Court failed to adhere to the standards governing summary judgment, and the test for determining whether such works were "made for hire." The District Court also ignored or misconstrued much of the record evidence.

More specifically, the District Court ignored that Siegel and Shuster's creation of these Superman works was speculative in that Detective's payment for submitted works was contingent on it choosing to publish them. Siegel and Shuster, which shouldered all the expenses of producing these Superman works, bore the entire financial risk of creation, and Detective held no legal right to control Siegel and Shuster's creative process. That is not "work for hire."

On May 17, 2011, the District Court filed a Fed. R. Civ. P. 54(b) Judgment, as its rulings had fully adjudicated Plaintiffs' First Claim, namely the validity of the Termination and the Superman works which Plaintiffs had recaptured, and DC's relevant counterclaims. ER 232-234. This appeal followed.

## STATEMENT OF FACTS

### Siegel and Shuster's Creation of Superman

In 1933, Jerome Siegel conceived of the original idea of a cartoon strip featuring a unique hero with superhuman powers called "Superman." *See Siegel v.*

**EXHIBIT A**
**17**

*National Periodical Publications,* 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909 (2d Cir. 1974); ER 275-276, 954-955.  Circa 1933-34, Siegel wrote, and Joseph Shuster illustrated, Superman works intended for publication in a newspaper format, including without limitation:  (i) twenty-four days (four weeks) of Superman newspaper comic strips (the "1934 Superman Strip"); (ii) an additional fifteen days of Superman comic strips; and Siegel also wrote: (iii) a seven-page synopsis of the last eighteen days (weeks 2-4) of such strips, plus (iv) a paragraph previewing future Superman exploits ("Preview"); (v) a nine-page synopsis covering an additional *two months* of daily Superman comic strips; and (vi)  a complete "continuity" (script) of Superman winning a football game. *Siegel*, 508 F.2d at 911; ER 275-276, 502-531, 954-955.

By 1934, "Superman and his miraculous powers were completely developed [by Siegel and Shuster]."  *Siegel*, 508 F.2d at 911, 914; ER 954-955.  They submitted Superman to numerous newspaper syndicates, including McClure, and to publishers, but it was not purchased.  ER 276, 955.

In or about early 1938, McClure forwarded Siegel and Shuster's 1934 Superman Strip to Detective for potential publication in its new magazine, "Action Comics."  ER 276, 955-957.  When Detective expressed interest in publishing their 1934 Superman Strip in a magazine, Siegel and Shuster "re-cut and pasted" it into a thirteen-page magazine format and submitted it to Detective.  *Siegel*, 508 F.2d at

6

**EXHIBIT A**

**18**

911; ER 276, 955-960.

## Siegel and Shuster's Early Superman Publications

*Action Comics, No. 1:* In a March 1, 1938 agreement (the "March 1, 1938

Agreement"), Siegel and Shuster transferred to Detective "'the strip entitled

'Superman' … and all goodwill attached thereto and exclusive rights to use the

characters and story, continuity and title of the strip'" for $130 ($10 per page). ER

276, 916-917, 958-960. On April 18, 1938, Detective published the 1934

Superman Strip in *Action Comics, No. 1*. ER 154, 214-227, 960.

*Action Comics, Nos. 2-6:* Siegel and Shuster created additional Superman

comics, adapting their pre-existing material, which were published by Detective in

*Action Comics, Nos. 2-6*. ER 532-579, 960-961. They were not employed by

Detective to create these works; Detective purchased these stories at the same

going rate of $10.00 per page. ER 960-961.

*The Early Newspaper Strips:* After submitting the re-cut 1934 Superman

Strip to Detective, Siegel and Shuster again followed their dream of having

Superman published as a newspaper comic strip. ER 615-617, 954-955, 957.

Siegel thus wrote "a detailed two weeks 'Superman' daily strip continuity account

of Superman's origin." ER 615. Without Detective's involvement, Siegel sent this

continuity to McClure, which preferred to revisit the project later. *Id*. Undeterred,

Siegel had Shuster illustrate his continuity, and they submitted the complete first

7

**EXHIBIT A**

**19**

two weeks of the Superman newspaper strips to McClure and other newspaper
syndicators, again without Detective's involvement.  ER 615-616, 621-630.

### The 1938 Agreements with Detective and McClure

After sales of *Action Comics* escalated due to Superman, Detective entered
into an agreement with Siegel and Shuster on September 22, 1938 (the "September
22, 1938 Agreement") to produce the "artwork and continuity" for five comic
strips, including Superman.  ER 604-607, 961-963.  Thereafter, Siegel and Shuster
submitted, and Detective purchased, further Superman stories that it published in
*Action Comics, Nos. 7-61* and *Superman, Nos. 1-6.*  ER 52-63, 87-91.

Under the September 22, 1938 Agreement, Siegel and Shuster received little
to no creative guidance or story proposals from Detective before producing their
works.  ER 812-813.  Siegel did not send his continuities to Detective for
"approval" before Shuster illustrated them.  ER 618, 761, 812.  Their New York-
based editor, Vince Sullivan, never visited them and his input was "limited to
accepting or rejecting the[ir] finished stories."  ER 679-680, 788, 812-813.

Based of their sample first two weeks of Superman newspaper strips, Siegel
and Shuster entered into an agreement with McClure and Detective, dated
September 22, 1938, concerning Siegel and Shuster's production and McClure's
syndication of the strips (the "McClure Agreement").  ER 608-611.  Siegel and
Shuster's sole consideration for supplying Superman newspaper strips to McClure

8

**EXHIBIT A
20**

was a contingent percentage of McClure's profits from licensing the strips.  ER 606, 609.

Siegel and Shuster were self-employed, with their own expanding comic production business, the "American Artists League" (ER 605), which supplied and sold (a) finished comic book stories that Detective purchased for publication and (b) finished Superman comic strips that McClure distributed to newspapers.  ER 606, 812-813.  Siegel and Shuster set their own hours and working conditions and those of their sizeable staff that they hired, managed, and paid (from an American Artists League bank account).  ER 583, 597-600, 726-754, 788, 812-813.  Siegel and Shuster also paid all their other expenses without reimbursement, including their studio's equipment, furnishings, artistic materials, postage, utilities and travel, and kept their own financial records.  ER 699-700, 747-754, 788, 812.  Detective did not "withhold payroll or any other form of taxes, nor did Siegel and Shuster receive any health benefits or insurance, nor did they receive any other traditional employee benefits such as sick pay or vacation pay."  ER 788, 812.

**Siegel and Shuster's Litigation With Defendants' Predecessors**

In 1947, Siegel and Shuster filed suit against Detective's successor National Comics Publications, Inc. ("National") seeking a declaration of rights with respect to Superman.  *Siegel*, 364 F. Supp. at 1034-1035; 508 F.2d at 912-913; ER 939.  The action was tried before Judge Addison Young, who thereafter rendered a

detailed opinion on November 21, 1947. ER 938-950. On April 12, 1948, after the trial and review of considerable evidence, Judge Young made lengthy findings of fact and conclusions of law, and held that National owned Superman pursuant to the March 1, 1938 Agreement. ER 951-993. The parties then entered into settlement negotiations which resulted in a stipulation dated May 19, 1948 and, pursuant to its express terms, Judge Young entered a consent judgment. *See Siegel,* 364 F. Supp. at 1034-1035; 508 F.2d at 912-913; ER 994-1017.

In 1969, Siegel and Shuster sought declaratory relief regarding ownership of the renewal copyrights to Superman, resulting in the Second Circuit's decision in *Siegel*, *supra*, 508 F.2d 909. The district court held and the Second Circuit affirmed that Judge Young's findings of fact and conclusions of law and the consent judgment (after settlement) were binding under *res judicata*, and that National owned the renewal copyright to Superman. *Id.* at 912-13.

### Plaintiffs' Termination Pursuant to the Copyright Act

On April 3, 1997, Joanne Siegel and Laura Siegel Larson, Siegel's widow and daughter, exercised their right under Section 304(c) to recapture Siegel's share of the copyright to the Superman works he co-authored by serving Defendants with Termination Notices as to Siegel's March 1938 Agreement and subsequent purported grants of Superman rights. ER 1023-1107. The Termination Notices complied with 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the relevant regulations,

**EXHIBIT A**
**22**

and had an effective date of April 16, 1999.

Commencing in April 1999, the parties engaged in protracted negotiations of a complex transaction for Plaintiffs to re-license to DC their recaptured copyright interests in the Superman works. ER at 161-164. By 2002, these discussions broke down, and no agreement was consummated. ER 198-203.

### The District Court Proceedings

In October 2004, Plaintiffs filed this action, including a First Claim for declaratory relief to validate their Termination under 17 U.S.C. § 304(c) and to determine the Superman works thereby recaptured, among other causes of action. ER 164, 338-339, 343-344. DC counterclaimed on various grounds: its First Counterclaim requested a declaration that the Termination was invalid; its Second Counterclaim requested a declaration that the Siegels' claims were barred by the statute of limitations; and its Third and Fourth Counterclaims alleged that the parties had entered into a purported settlement agreement. ER 293-301, 308-309.

On April 30, 2007, the parties filed cross-motions for partial summary judgment. ER 1143-1150. By order dated March 26, 2008, the District Court granted Plaintiffs' motion in relevant part, ruling that the Termination was valid and complied with 17 U.S.C. § 304(c) and 37 CFR § 201.10; that Plaintiffs' suit was not barred by the statute of limitations, and that no settlement agreement had been consummated by the parties. ER 165-213. The District Court held that

**EXHIBIT A**
**23**

Plaintiffs had successfully recaptured, without limitation, Siegel's co-authorship share of the copyright in the first Superman story, concluding that "all the Superman material contained in *Action Comics*, Vol. 1, is not a work-made-for-hire and therefore is subject to termination," and that the Second Circuit's determination in *Siegel,* 508 F.2d at 912-913, that *Action Comics, No. 1* was not "work for hire" was binding under the *collateral estoppel* doctrine. ER 182-189.

Thereafter, at Defendants' insistence, the parties filed briefing on so-called "Additional Issues," wherein Defendants sought partial summary judgment that Siegel's contribution to all Superman works other than *Action Comics, No. 1* published within the 1938-1943 Termination "window" (17 U.S.C. § 304(c)(3)) were "works for hire," not subject to termination. ER 74-134, 881-882. Plaintiffs asserted that such works were not "made for hire," and that, as to certain works (*Action Comics, Nos. 7-61, Superman, Nos. 1-23*), Defendants' motion, at most, implicated genuine issues of material fact for trial. ER 39, 881-882.

At issue was whether the following works were exempt from the Termination as "works for hire": (i) *Action Comics, Nos. 2-6,* (ii) *Action Comics, Nos. 7-61*; (iii) *Superman, Nos. 1-23*; and (iv) the 1939-1943 Superman newspaper strips syndicated by McClure. The District Court treated Defendants' "work for hire" motion as another motion for partial summary judgment (although the summary judgment deadline had lapsed), see ER 43-141, and ruled that: (i) the

**EXHIBIT A
24**

Superman material in *Action Comics, No. 4* and parts of *Superman, No. 1* were *not* works for hire because they were created circa 1934 prior to any agreement with Detective (ER 74-81); (ii) "the two weeks' worth of newspaper comic strip material created by Siegel and Shuster during the spring of 1938, before the execution of the McClure Agreement were *not* works made for hire" (ER 109-114); (iii) "the Superman material in *Action Comics, No*s. 2-3 and Nos. 5-6 … were works made for hire" as purportedly created under an implied understanding with Detective (ER 82-87); (iv) the Superman materials published under the September 22, 1938 Agreement (*Action Comics, Nos. 7-61*, and *Superman, Nos. 1-23*) were "works for hire" (ER 87-91); and (v) "the newspaper strips created by Siegel and Shuster after September 22, 1938, were works made for hire." ER 99-108. Both sides filed motions for reconsideration, which were denied. ER 1-42.

Pursuant to the above decisions, Plaintiffs recaptured Siegel's co-authorship share of, and co-own with DC, the copyrights to *Action Comics, No. 1*, *Action Comics, No. 4*, *Superman, No. 1* (pages 3-6), and the first two weeks of the Superman newspaper strips containing Superman's origin story. In light of these rulings, which fully adjudicated the validity of the Termination Notices and the works thereby recaptured, the District Court, on May 20, 2011, entered a judgment under Fed. R. Civ. P. 54(b) on Plaintiffs' First Claim and on DC's First, Second, Third and Fourth Counterclaims. ER 232-241. Plaintiff Laura Siegel Larson

**EXHIBIT A**
**25**

timely filed a notice of appeal on May 27, 2011.  ER 230-231.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of identifying evidence demonstrating the absence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  A fact is "material" if it affects the outcome of the suit under the governing substantive law.  *Id.* at 248.  In reaching its decision, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Id.* at 249-250.  These standards are equally applicable to motions for partial summary judgment.  Fed. R. Civ. P. 56(c), (d). The entry of judgment on some, but not all, claims under Fed. R. Civ. P. 54(b) is an appealable judgment.  12 U.S.C. § 1291. This Court reviews summary judgment decisions *de novo*.  *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1164 (9th Cir. 2000).

## SUMMARY OF ARGUMENT

"Works for hire" are the sole exclusion from the inalienable termination rights granted by the 1976 Copyright Act.  *See* 17 U.S.C. § 304(c).  Accordingly, the District Court's determination of which Superman works were "made for hire" determined the copyright interests recaptured by the Siegels' Termination.  The

**EXHIBIT A**
**26**

"instance and expense" test for "works for hire" under the 1909 Copyright Act governs this determination, *Self-Realization Fellowship Church v. Ananda Church of Self-Realization* ("*Self-Realization*"), 206 F.3d 1322, 1326 (9th Cir. 2000), although that test has been widely criticized as based on a misreading of earlier assignment cases. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*")*,* 342 F.3d 149, 161 n.15 (2d Cir. 2003); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 9.03[D], at 9-30 to 9-32 (2011); 2 W. Patry, *Patry on Copyright* ("*Patry*") § 5:45. The instance prong entails "an inquiry into whether 'the motivating factor in producing the work was the employer who induced the creation,'" and "the degree to which the hiring party had 'the right to control or supervise the artist's work.'" *Twentieth Century Fox Film Corp. v. Entertainment Distribution* ("*Twentieth Century*"), 429 F.3d 869, 879 (9th Cir. 2005) (citation omitted). A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's creation. *Id.* at 881.

Although Defendants wholly failed to meet their burden as to their statutory "work for hire" defense, the District Court erroneously held on summary judgment that the following Superman stories were "works made for hire":

*Action Comics, Nos. 2-3, 5-6:* Siegel and Shuster created these works "on spec," at their own expense, without any proven agreement with, engagement by or commitment from Detective. Detective simply chose to purchase these works

**EXHIBIT A**
**27**

from Siegel and Shuster for $10/page, just as it had purchased *Action Comics, No. 1*, long held not to be "work for hire."  *Siegel,* 508 F.2d at 912-913.  Because Siegel and Shuster took on all of the financial risk of creating these works, Defendants could not meet the "expense" prong of the test.  The "instance" prong was also not met as Defendants presented no evidence that Detective had any right to control or supervise the creation of these works.  In fact, the District Court ignored substantial evidence that Siegel wrote these Superman stories well before any relationship with Detective.

   ***The Newspaper Strips:***  Siegel and Shuster's agreement to produce the Newspaper Strips with McClure (the syndicator) and Detective (the underlying rightsholder) had all the hallmarks of a joint venture, not employment.  The "expense" prong was not met because Siegel and Shuster were entitled ***solely*** to a contingent profit participation, while shouldering the entire cost and financial risk of the strips' creation.  The "instance" prong was not met because the Newspaper Strips were the product of Siegel and Shuster's entrepreneurship; they, not Detective or McClure, were, without doubt, the "motivating factor" behind the strips.  Moreover, neither the September 22, 1938 Agreement nor the McClure Agreement gave Detective or McClure the right to control or supervise the strips' creation.  After acknowledging that the Newspaper Strips lay on the "outer edges" of the "work for hire" doctrine, the District Court nonetheless held on summary

judgment, and contrary to abundant evidence, that the Newspaper Strips were "work for hire."

*Action Comics, Nos. 7-61, Superman, Nos. 1-23:* Under Detective's September 22, 1938 Agreement with Siegel and Shuster, Detective was only obligated to pay the authors for that submitted work it chose to publish, rendering their work speculative by definition. ER 606. The "expense" prong was therefore not met because, while Siegel and Shuster shouldered all the expenses of creation, Detective was under no legal obligation to buy their work. Siegel and Shuster thus bore the entire financial risk of creation. The "instance" test was not met because Detective's "right to reasonably supervise the editorial matter" of its publications reflected the standard editorial role of every publisher, and Detective had no legal right to control Siegel and Shuster's creative process. ER 605-607. In fact, the evidence shows Detective's frustration with its lack of control and limited input as to Siegel and Shuster's Superman stories. ER 422-460.

## ARGUMENT

## I. THE TERMINATION RIGHT UNDER THE U.S. COPYRIGHT ACT

"The economic philosophy behind the [Copyright] clause … is the conviction that encouragement of individual effort by personal gain is the best way to advance the public welfare through the talents of authors [] in '[] useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219 (1954). Since the Copyright Act of 1831,

**EXHIBIT A**
**29**

Congress has consistently provided authors and their heirs with the right to recover assigned copyrights, and has strengthened such "recapture" rights over time to enable authors and their heirs to better realize the value of an author's work. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990). These protections culminated in the current Copyright Act's termination provisions. 17 U.S.C. §§ 203(a), 304(c)-(d).

Under the Copyright Act of 1909 (the "1909 Act"), copyright protection was divided into two separate, consecutive 28-year terms: the "initial" and "renewal" terms. 17 U.S.C. § 24 (1974). The renewal term was intended to be owned by the author at the end of the initial term, to protect authors who struck imprudent deals and allow them to participate in the increased value of their work. *See Stewart*, 495 U.S. at 217-220; *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 982 (9th Cir. 2008) ("[T]he renewal process was intended to give an author and his heirs a second chance to benefit from the fruits of his labors.").

This clear legislative purpose to protect and benefit authors was undermined entirely by *Fred Fisher Music Co., v. M. Witmark & Sons*, 318 U.S. 643, 657-59 (1943), which held that the renewal interest could be assigned during the initial term. *Stewart*, 495 U.S. at 219. Thereafter, publishers routinely insisted that authors assign *both* terms, curtailing authors' benefits from the economic success of their works. *Id.*

On January 1, 1978, the Copyright Act of 1976 (the "1976 Act") went into

18

**EXHIBIT A**
**30**

ER 993

effect, and with it major changes to U.S. copyright law that significantly enhanced authors' rights. 17 U.S.C. § 101 *et seq.* (1978). *See Classic Media,* 532 F.3d at 982 (referring to "Congress's clear intent to benefit authors and their heirs with additional years of copyright protection in the 1976 Act"); *Greenberg v. National Geographic Society*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008) ("The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the [] Copyright Act."). When Congress extended the renewal term from 28 to 47 years, it intended to benefit authors rather than grantees, *see* H.R. Rep. No. 94-1476 at 140 (1976), and therefore coupled the extension with a *new* right of authors and their heirs to terminate transfers of rights in the renewal term. 17 U.S.C. § 304(c).[2]

In recognition of this concerted legislative intent, the Supreme Court has emphasized the "inalienable authorial right to revoke a copyright transfer." *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.1 (2001). *See Abend,* 495 U.S. at 230 ("[1976 Act] provides an inalienable termination right"). This "termination right" lies in

---

[2] In addition, 17 U.S.C. § 203(a) allows an author or his heirs to terminate any post-January 1, 1978 grant by an author after 35 years. The 1976 Act thus granted a termination right for both existing and future grants. When the Sonny Bono Copyright Term Extension Act of 1998 further extended the renewal term, Congress again coupled the extension with a third termination right. 17 U.S.C. § 304(b), (d); S. Rep. No. 104-315 at 22-23 (1996); *see also* 3 *Nimmer* § 9.11[B][1] at 9-152; *Classic Media,* 532 F.3d at 985 ("In 1998, Congress reaffirmed its objectives with respect to the 1976 Act's termination provisions.").

19

**EXHIBIT A**
**31**

ER 994

stark contrast to ordinary contract principles, as it empowers authors and their statutory heirs to terminate prior grants of copyright without cause, regardless of the parties' promises, intent or expectations when the grant was made. 17 U.S.C. § 304(c)(5). Congress created this vital right to directly address the inequities caused by *Fred Fisher*, and "in large measure [it was] designed to assure that [the 1976 Act's] new benefits would be for the authors and their heirs." *Classic Media,* 532 F.3d at 984; *see also Marvel Characters v. Simon* ("*Marvel*"), 310 F.3d 280, 291 (2d Cir. 2002). Thus, in further abrogation of "freedom of contract" principles, the termination right cannot be waived or circumvented: "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary," and "[a] further grant … is valid only if it is made after the effective date of termination … [or as to] the original grantee or such grantee's successor in title, after the notice of termination has been served…." 17 U.S.C. §§ 304(c)(5), (c)(6)(B).

## II. THE DISTRICT COURT IMPROPERLY FOUND ON SUMMARY JUDGMENT THAT NUMEROUS SUPERMAN WORKS WERE "WORKS MADE FOR HIRE"

### A. "Work For Hire" Under the 1909 Copyright Act

#### 1. Derivation of the "Work For Hire" Doctrine

"Works for hire" are the sole exemption from the termination rights granted by the 1976 Act. 17 U.S.C. §§ 203(a), 304(c). Therefore, the District Court's determination of which, if any, of Siegel and Shuster's Superman works within the

Termination window (see 17 U.S.C. § 304(c)(3)) were "works made for hire"

would effectively determine the copyright interests recaptured by the Siegels'

Termination.  As these Superman works were created prior to 1978, the 1909 Act

governs them.  *Self-Realization*, 206 F.3d at 1326.

 The 1909 Act did not define "work for hire," but simply stated that "in the

interpretation and construction of this title…the word 'author' shall include an

***employer*** in the case of works made for hire."  17 U.S.C. § 26 (1974) (repealed)

(emphasis added).  Section 26 was to be narrowly applied:

> [T]he provision was included in the draft bills at the behest of two groups:
> the publishers of encyclopedias, directories and other composite works and
> the publishers of prints and similar works of graphic arts.  These publishers
> wished to insure their right to secure copyrights in material composed by
> their staffs without having to obtain their employees' assignments.

*Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 649, 651-52 (S.D.N.Y.

1970).  Thus, "'[u]ntil the mid-1960's, federal courts applied the work-for-hire

doctrine only to cases in which a traditional employer/employee relationship

existed between the hiring party and the creator.'"  *Twentieth Century,* 429 F.3d at

877 (citations omitted); *see also Hogarth,* 342 F.3d at 161 n.15 (same).  In

contrast, "[c]ommissioned works … were treated as if the commissioned party

impliedly agreed to convey the copyright along with the work itself to the hiring

party." *National Center for Jewish Film v. Goldman*, 943 F. Supp. 113, 116 (D.

Mass. 1996).

**EXHIBIT A
33**

As stated by the Copyright Office:

> The statutory concept of employment for hire is based on the specific contractual relationship between employer and employee. The courts have not given a definition of that relationship which will cover all situations that may come up, but all the cases have involved salaried employees who received either a fixed salary or a minimum salary plus commission…. Hence, it may be concluded that section 26 [of the 1909 Act] refers only to works made by salaried employees in the regular course of their employment.[3]

However, "[i]n the last decade that the [1909] Act was effective, courts expanded the doctrine to include less traditional relationships…." *Twentieth Century*, 429 F.3d at 877. *Lin-Brook Builders Hardware v. Gertler* ("*Lin-Brook*"), 352 F.2d 298, 300 (9th Cir. 1965), citing early implied assignment cases like *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939), formulated an "instance and expense" test to determine whether the employer of an independent contractor was the copyright "proprietor" by implied assignment.[4] *Lin-Brook* did not mention "work for hire." Citing *Lin-Brook,* the Second Circuit in *Brattleboro Publishing Co., v. Winmill Publishing Corp*. ("*Brattleboro*"), 369 F.2d 565, 567-68 (2d Cir. 1966), also used an "instance and expense" test to find an implied

_____

[3] B. Varmer, Copyright Law Revision Study No. 13, "Works Made for Hire and on Commission," Studies Prepared for the Copyright Office, Reprinted by the Subcommittee on Patents, Trademarks and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess. ("Copyright Law Revision Study No. 13") 127, 130 (Comm. Print 1960).

[4] *See Egner v. E. C. Schirmer Music Co.,*139 F.2d 398, 399 (1st Cir. 1943) ("Proprietor means the same as 'assigns.'").

22

**EXHIBIT A**
**34**

*assignment* of an independent author's copyright to a publisher. *See Hogarth*, 342 F.3d at 160 n.14.

*Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir. 1972) extended the "instance and expense" doctrine to find works by independent contractors were "for hire," based on misinterpretations of these implied assignment cases as "work for hire" cases. *Hogarth*, 342 F.3d at 160.[5] It was not until *May v. Morganelli-Heumann & Associates*, 618 F.2d 1363, 1368 (9th Cir. 1980) that this Circuit used the "instance and expense" test to determine if an independent contractor's work was "for hire."

As the extension of the "work for hire" doctrine to freelancers under the "instance and expense" test was based on a clear misreading of assignment cases, it has been roundly criticized by leading copyright authorities. *See* 3 *Nimmer* § 9.03[D], at 9-30 to 9-32 (decisions applying "instance and expense" doctrine to freelancers are "wrong both on principle and under the rule of the early cases"); 2 *Patry* § 5:45 (criticizing the vague expansion of "work for hire" to freelancers and

---

[5] "[*Picture Music*] characterized *Brattleboro* as having 'expressly applied the statutory work for hire doctrine to the case of an independent contractor'" when "what *Brattleboro* had done was [to] apply the 'instance and expense' test to determine that a party commissioned to create a work should be deemed to have assigned its copyright … to the commissioning party." *Hogarth*, 342 F.3d at 160 n.14. Similarly, "[*Picture Music*] stated that *Yardley* [] 'held that one who commissions an artist to paint a mural owns all rights to its reproduction,'" when in fact "*Yardley* had recognized that the executor of the deceased artist, not the commissioning party, held the renewal right." *Id.*

23

**EXHIBIT A**
**35**

"the worst features of [the] presumptive 'instance and expense' approach.").

Because the main issue in these early "instance and expense" cases was ownership, the line between ownership by implied assignment and ownership as "work for hire" was less important and often blurred. However, under 17 U.S.C. § 304(c), this distinction is critical because, while ownership is presumed by termination, "works for hire" are exempt, but works owned by assignment are not.

## 2. The Instance and Expense Test

The "instance" prong entails whether "the motivating factor in producing the work was the employer who induced the creation." *Self-Realization,* 206 F.3d at 1326; *Siegel,* 508 F.2d at 914 (same). Courts also look to the degree to which the "hiring party had 'the right to control or supervise the artist's work.'" *Self-Realization*, 206 F.3d at 1327 (citing 1 *Nimmer* § 5.03[B][1][a][i] (1999)). *See Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.* ("*Martha Graham*"), 380 F.3d 624, 635 (2d Cir. 2004) ("'instance" requires the employer have "the <u>right</u> to direct and supervise the manner in which the work is carried out," *i.e.*, the creative process) (original emphasis).

A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's creation. *Twentieth Century,* 429 F.3d at 881. *See also Community for Creative Non-Violence v. Reid* ("*CCNV*"), 490 U.S. 730, 741

**EXHIBIT A**
**36**

(1989). "Plainly, it is the expense of creation, rather than publication, that is relevant" to the "expense" test. 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c. As a publisher always bears the financial risk of publication and distribution, regardless of whether a work is "for hire," the risks of distributing a work should not affect analysis of the "expense" prong. *See* 2 *Patry* § 5:54; *Epoch Producing Corp. v. Killiam Shows, Inc.* ("*Epoch*"), 522 F.2d 737, 745 (2nd Cir. 1975) ("The existence of evidence that is as consistent with such a [for hire] relationship as it is with numerous other hypotheses[] cannot be bootstrapped" to support a "work for hire" conclusion).

Where payment is *contingent* (*e.g.*, a royalty or profit participation), this weighs very heavily against "work for hire," because the author bears the financial risk of the work's creation. *See Twentieth Century*, 429 F.3d at 881; 2 *Patry* § 5:61 ("Where payment is solely by royalties, this fact weighs against [work for hire]."); 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 (same).

Lastly, whether or not the instance and expense test is met turns on the "mutual intent of the parties." *Twentieth Century,* 429 F.3d at 877 (citations omitted).

### 3. In the Context of Statutory Termination, the "Instance and Expense" Test Should Be Narrowly Construed

If the "instance and expense" test is too broadly or literally construed, as it would be if equated with every publisher's right to reject or edit works, or with

**EXHIBIT A**
**37**

ER 1000

every publisher's payment for published material, the "test" would cease to have any meaning nor serve to differentiate between "work for hire" and speculative work, as it would apply equally to both.[6]

It is well-accepted that "where words are employed in a statute which had at the time a well-known meaning at common law … they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. v. United States*, 221 U.S. 1, 59 (1911). This remains a "cardinal rule of statutory construction." *Molzof v. United States*, 502 U.S. 301, 307 (1992).

The "instance and expense" test, if too liberally extended to independent contractors, contradicts the common law meaning of "employer" in the 1909 Act which connotes a more "conventional master-servant relationship." *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 455, 445 n.5 (2003) (common-law of agency is used to "determin[e] whether a hired party is an employee," and "draw[s] a line between independent contractors and employees").

As to copyright law, the Supreme Court also drew a very clear distinction between an "employee" and an "independent contractor," and expressly stated that "when Congress has used the term 'employee' without defining it, we have

---

[6] Unrestrained application of the "instance and expense" test also leads to absurdities. The work of an independent contractor would more easily qualify as "work for hire" than that of a traditional employee. For example, a work created by an employee "as a special job assignment, outside the line of the employee's regular duties" is not "work for hire," even though the employer pays for and has the right to supervise the work. *Martha Graham*, 380 F.3d at 635.

ER 1001

concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  *CCNV*, 490 U.S. at 739-40.  Notably, the Supreme Court unanimously *rejected* the use of the "instance and expense" test to determine who qualified as an employee under the 1976 Act, relying instead on the common law of agency to define an "employee."  *CCNV*, 490 U.S. at 749-50; *see* 1 *Nimmer* § 5.03[B][1][a][ii].

*Twentieth Century*, 429 F.3d at 878-79, declined to read *CCNV* as overruling the "instance and expense" test under the 1909 Act, stating that *CCNV*'s definition of "employee" was "dictum."  However, it never reconciled the "instance and expense" test with the 1909 Act's limitation of "work for hire" to an "employer" or its common law definition.

The clear legislative intent behind the termination provisions was "to benefit authors and their heirs."  *Classic Media,* 532 F.3d at 982.  The Supreme Court recently confirmed that the objective of  this "inalienable authorial right to revoke a copyright transfer" was to readjust the "author/publisher balance" by "enhanc[ing] the author's position."  *N.Y. Times,* 533 U.S. at 496 n.1; *see also* H.R. Rep. 94-1476 at 124 (1976).

Moreover, this Circuit has never applied the "instance and expense" test to determine "work for hire" under the 1976 Act's termination provisions.  None of its post-*CCNV* "instance and expense" cases relate to termination.  *See Twentieth*

*Century,* 429 F.3d at 878-79; *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998); *Self-Realization*, 206 F.3d at 1326. Similarly, none of its cases regarding the termination right involved the "work for hire" exception. *See, e.g., Classic Media,* 532 F.3d 978; *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005). When the Second Circuit addressed the "work for hire" exception to the termination right, it construed "work for hire" under the 1909 Act quite narrowly. *Marvel,* 310 F.3d at 290 (holding "an agreement made after a work's creation stipulating that the work was created as a work for hire constitutes an 'agreement to the contrary'" barred by the termination statute).

In light of the concerted legislative objective behind the 1976 Act's termination right, the controversial "instance and expense" test should be applied narrowly, and with care. If this already vague test is too loosely applied, the "work for hire" exception will swallow the rule, and effectively gut this "inalienable authorial right," just as *Fred Fisher Music*, 318 U.S. at 657-59, eviscerated the authorial benefits of Congress' copyright renewal scheme.

### 4.    Defendants Bear the Burden on "Work For Hire"

To prove "work for hire," this Circuit requires a defendant to come forth with "credible evidence that [the] work was done at the 'instance and expense' of [the commissioning party]." *Self-Realization*, 206 F.3d at 1326. Defendants bear the burden because: (i) "work for hire" is a statutory exception to the termination

**EXHIBIT A**
**40**

right, *see* 17 U.S.C. § 304(c); *Woods v. Bourne Co.*, 60 F.3d 978, 994 (2d Cir. 1995); (ii) "work for hire" is an affirmative defense, *see Dolman*, 157 F.3d at 712; and (iii) Defendants moved for summary judgment on this issue, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

### B.    *Action Comics, Nos. 2-3, 5-6* Were Not "Works For Hire"

The District Court erroneously held that *Action Comics, Nos. 2-3, 5-6* were "works for hire," on the slim basis of correspondence implying that Detective contemplated Siegel and Shuster's submission of more Superman material, "the regular appearance of the Superman feature in subsequent publications," and a supposed "implied agreement" of which there was no real evidence.  ER 83.  The District Court acknowledged, however, that "there was no guarantee by Detective Comics that it would accept it and thereby pay Siegel and Shuster for their work." ER 84.  Despite this lack of a proven agreement and guaranteed compensation, rendering Siegel and Shuster's work speculative by definition, the District Court nonetheless held on summary judgment that *Action Comics, Nos. 2-3* and *5-6* were "works for hire."  ER 86-87.

This decision was in error, as Defendants failed to even meet the threshold burden of showing that Siegel and Shuster had been "engaged" (ER 88) or "commissioned" by Detective to create *Action Comics, Nos. 2-3* and *5-6*.  *Self-Realization*, 206 F.3d at 1326.

**EXHIBIT A**
**41**

ER 1004

After submitting *Action Comics, No. 1* to Detective on February 22, 1938, Siegel and Shuster continued to create Superman comic strips (ER 957, 960) "on spec," at their own expense, without a contract or any commitment from Detective to pay for such material, as the District Court acknowledged.  ER 84.  The District Court did not and could not cite any evidence that at the time Siegel and Shuster created *Action Comics, Nos. 2-3, 5-6*, Detective was "the hiring party [that] t[oo]k on 'all the financial risk'" of such creation.  *Twentieth Century*, 429 F.3d at 880-81 (citing publisher's payment of (i) a fixed guaranteed sum to the author, (ii) "the expense for the entire staff who assisted [the author] in drafting the manuscript" and (iii) "the costs necessary to produce [material] … included in the book" to satisfy the "expense" prong).

The subsequent September 22, 1938 Agreement strongly suggests that Siegel and Shuster had ***not*** previously been engaged by Detective to create Superman works:  after noting that "you [Siegel and Shuster] have been doing the art work and continuity [for Superman]," it states:  "We wish you to continue to do said work and *hereby* employ and retain you for said purpose…."  ER 605 (emphasis added).

Defendants did not proffer and the District Court did not cite any evidence that Detective met the "instance" test and "had the right to control or supervise" Siegel and Shuster's creation of *Action Comics, Nos. 2-3, 5-6*.  *Twentieth Century*,

**EXHIBIT A**
**42**

429 F.3d at 879; *see also Martha Graham*, 380 F.3d at 635 (referring to "[t]he
<u>right</u> to direct and supervise the manner in which the work is created").

   Nor did Detective's purchase of the underlying rights to Superman in the
March 1, 1938 Agreement render subsequent Superman works "for hire."  To hold
otherwise would contradict an author's clear ability to own the copyright in his
derivative work.  *See Stewart,* 495 U.S. at 223 ("The aspects of a derivative work
added by the derivative author are that author's property."); ER 82 ("[T]he fact that
a work is a derivative of another does not automatically translate into it being
considered a work for hire or as being produced at the instance of the owner of the
pre-existing work.").

   In order to find that *Action Comics, Nos. 2-3, 5-6* were "works for hire,"
Defendants would have had to prove that Detective had engaged Siegel and
Shuster to create this material, committing to pay them for their services, and that
Detective controlled their creative process, *none of which* was shown by
Defendants or present in the record.

   Instead, the District Court simply assumed that *Action Comics, Nos. 2-3, 5-6*
"w[ere] part of a pre-arranged, implicit understanding between the artists and
Detective," citing pre-*Action Comics, No. 1* correspondence from Detective
expressing concern over Shuster's workload.  ER 53-54, 83-84.  A publisher's
routine concern over deadlines, however, applies to "work for hire" and non-

**EXHIBIT A
43**

"work-for-hire" alike.

It was also undisputed that portions of *Action Comics, Nos. 2- 6,* and *Superman, No. 1,* drew heavily on Siegel and Shuster's pre-existing material, created prior to even meeting Detective. For example, Siegel's 1934 Preview of Superman exploits to follow his 1934 Superman story, later published in *Action Comics, No. 1*, bears an uncanny resemblance to the stories in *Action Comics, Nos. 2, 4 and 5*.[7]

Of these stories, Plaintiffs were able to track down Siegel's full 1934 Superman football story, which matched Siegel's 1934 Preview and was later published in *Action Comics, No. 4*. ER 502-514, 551-558. Plaintiffs also demonstrated that the first week of Siegel and Shuster's 1934 Superman daily newspapers strips was dropped from *Action Comics, No. 1*, and that such material was thereafter published in *Superman, No. 1* (1939). *See* ER 513-525, 575-579. This evidence carried a strong inference that, prior to 1938, Siegel had already written the stories later published in *Action Comics, Nos. 2-6*. The District Court

---

[7] *Compare* ER 509 (1934 Preview: "He will win a war single-handed, battle an airplane with his bare hands, swim several hundred miles and think nothing of it, etc. …. He'll participate in sports and astound the nation; he'll single handed[ly] rescue a town from a flood through his superstrength"), 533-540 (*Action Comics, No. 2*, Superman intervening to single-handedly stop a war, battling a fighter plane with his bare hands, and swimming great distances with ease), 551-558 (*Action Comics, No. 4* Superman interceding in a college football game and using his superpowers on the gridiron to astound the crowd), 559-565 (*Action Comics, No. 5*, Superman saving a town from a flood after a dam breaks).

**EXHIBIT A
44**

duly found that *Action Comics, No. 4* and *Superman, No. 1* were not "for hire" because they published Siegels' 1934 stories, but otherwise ignored the strong inference that Siegel had conceived the other early Superman stories prior to 1938 as well.

Nor does Detective's payment of a going rate of $10 a page for *speculative* submissions it published transform such works into "works for hire" owned at inception by Detective. Detective purchased *Action Comics, Nos. 1* and *4*, which the District Court held were clearly not "works for hire," for the same going rate as *Action Comics, Nos. 2-3, 5-6.* ER 960. These stories are no more "work for hire" based on this payment than were *Action Comics, Nos. 1 and 4.*

The District Court should have found that *Action Comics, Nos. 2-3, 5-6*, like *Action Comics, Nos. 1* and *4*, were not "works for hire" because Defendants wholly failed to meet their evidentiary burden. The District Court's conclusory assumption that all work published by Detective was "work for hire," unless Plaintiffs affirmatively proved that a work was fully created prior to 1938, improperly reversed the evidentiary burden. At a bare minimum, Plaintiffs' evidence, viewed in the light most favorable to them, raised genuine issues of material fact for trial.

### C.    The Superman Newspaper Strips Were Not "Works For Hire"

The District Court correctly found that the first two weeks of Superman

**EXHIBIT A**
**45**

newspaper strips, created by Siegel and Shuster "on spec" in early 1938 as a sample, were not "works for hire," but it erroneously held on summary judgment that all of their subsequent Superman newspaper strips (the "Newspaper Strips") were "works for hire," even though the District Court could not determine whether the strips were Detective's or McClure's "work for hire," and the evidence "place[d] this case on the outer edges of the work for hire doctrine." ER 103, 108.

### 1. The "Expense" Prong Was Not Met

The McClure Agreement between McClure, Siegel and Shuster and Detective was not an employment agreement; rather, it closely resembled a joint venture. In essence, Siegel and Shuster were the product suppliers. The Newspaper Strips were created at Siegel and Shuster's Cleveland production house at their sole expense; McClure was the distributor via syndication to newspapers; and Detective was the licensor as the owner of underlying Superman rights via the March 1, 1938 Agreement. ER 608-611. Compensation was solely from profit sharing between the three. ER 606, 609, 675.

As a district court found, closer to the time in question, "[t]he agreement with McClure contains all the elements of a joint []venture," not employment. *National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National Comics*"), 93 F. Supp. 349, 357 (S.D.N.Y. 1950), *rev'd on other grounds* 191 F.2d 594.

**EXHIBIT A**
**46**

ER 1009

McClure did not pay Siegel and Shuster under the Agreement, but remitted a percentage of the "net proceeds" to Detective (40% escalating to 50% by year three), of which Detective remitted the lion's share (over 80%) to Siegel and Shuster.  ER 606, 609.  Detective simply gave its permission as a rights holder in exchange for the smallest "piece of the action" (7.5% to 10%), with Siegel and Shuster to receive 36% to 40%, and McClure retaining the remainder of "net proceeds."  ER 606, 609.  Per the McClure Agreement, Siegel and Shuster received a monthly profit statement from McClure, not from Detective, and had the independent right to "inspect [McClure's] books of account … at any reasonable time."  ER 610.

The Newspaper Strips were by no stretch created by Siegel and Shuster at either Detective's or McClure's "expense."  While McClure invested some overhead and expenses in syndicating the completed strips, Siegel and Shuster invested and took on 100% of the financial risk of *creating* the Newspaper Strips in their Cleveland "shop" (employee salaries, rent, equipment, paper, ink, delivery costs, *etc.*).  Because Siegel and Shuster's compensation was *purely* from a contingent share of "net proceeds" they, by definition, bore the cost and financial risk of the works' creation.  There was no guarantee that, after deducting McClure's syndication expenses, there would be "net proceeds," or that Siegel and Shuster's share would exceed their costs of creating the Newspaper Strips.

**EXHIBIT A**
**47**

ER 1010

There is no evidence that Detective invested any money or shared any real financial risk. ER 609.

Thus, Siegel and Shuster were the only parties that invested in and took on the *financial risk* of creating the Newspaper Strips. Their purely contingent profit share, an effective royalty, weighs heavily against a finding that the Newspaper Strips were "work for hire." *See Twentieth Century*, 429 F.3d at 881; 2 *Patry* § 5:61; *Martha Graham,* 380 F.3d at 641 (evidence that author "received royalties" for her work weighs against work for hire); *Playboy Enterprises, Inc. v. Dumas* ("*Playboy*"), 53 F.3d 549, 555 (2d Cir. 1995) ("royalty" payments "generally weigh[] against finding a work-for-hire relationship").

Siegel and Shuster's large share of the profits (32.5%-40%), consonant with their financial risk, especially compared to Detective's (7.5%-10%), also weighs heavily against "work for hire." *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 642 (2d Cir. 1967) (that "the money arrangement was heavily weighted in [the creator's] favor" "corroborate[s] the conclusion" that the work was not "for hire"); 3 *Nimmer* § 11.02[A][2].

The District Court clearly erred in finding that Siegel and Shuster's purely contingent and speculative royalty arrangement satisfied the "expense" test.

### 2. The "Instance" Prong Was Not Met

The Superman Newspaper Strips were also <u>not</u> created at the "instance" of

**EXHIBIT A**
**48**

either Detective or McClure.  The strip was the brainchild of Siegel and a long-held ambition of Siegel and Shuster as far back as 1933-34, when they created weeks of Superman strips "on spec" for newspaper syndication.  ER 273-276, 954-955.  The McClure Agreement itself was initiated by Siegel, who sent McClure and other syndicators his continuity for the first two weeks of Superman strips.  ER 616-617, 621-630.  When that proved insufficient, Shuster illustrated this continuity, and the two created a finished sample product.  ER 593-595, 616, 650-651, 810.  Siegel also prodded Detective, as the underlying rights holder, to participate in the transaction.  ER 619-621.

This record evidence amply demonstrates that Siegel, not Detective or McClure, was the "motivating factor" behind the Newspaper Strips.  *Self-Realization*, 206 F.3d at 1326.

While Siegel and Shuster agreed to produce Newspaper Strips in conformity with a sample newspaper format supplied by McClure, which could "have *reasonable* editorial supervision of the strips," this was not in the context of an employment relationship.  ER 610 (emphasis added).  McClure, the mere syndicator of the strips, did not have any real input in the creative process.  *See* 2 *Patry* § 5:54 ("Control" should not be found "where, as a practical matter, the hiring party does not participate in the elements of the work's creation….").

The Newspaper Strips were also not created at the "instance" of Detective.

**EXHIBIT A**
**49**

As set forth above, Siegel independently corresponded with syndicators, provided two weeks of completed sample strips, and, after obtaining McClure's interest, prodded Detective to participate. The creation of the Newspaper Strips did not fall within the scope of Siegel and Shuster's duties under their September 22, 1938 Agreement with Detective. ER 604-607. That agreement clearly stated that the authors were furnishing the Newspaper Strips *pursuant to the McClure Agreement*. ER 605-606. At most, the Newspaper Strips would be a "special job assignment, outside the line of [Siegel and Shuster's] regular duties," and thus not "works for hire." *Martha Graham*, 380 F.3d at 635, 640-41.

Neither the September 22, 1938 Agreement nor the McClure Agreement gave Detective the required "<u>right</u> to direct and supervise the manner in which the work is created." *Martha Graham*, 380 F.3d at 635; *see also Twentieth Century*, 429 F.3d at 879. Tellingly, the Newspaper Strips were to be furnished by Siegel and Shuster directly to McClure, not Detective. ER 610. Detective was so far removed that it insisted that McClure "provide Detective with all the original drawings of the Superman strip," not *vice versa*. ER 610.

Like McClure, Detective was by no means "the motivating factor" behind the strips. *Twentieth Century*, 429 F.3d at 879. Detective even acknowledged as much. ER 426-427 ("As I pointed out to you many times, our company has very little to gain in a monetary sense from the syndication .... [W]ithout our consent

**EXHIBIT A**
**50**

this feature would not be syndicated …. It is entirely up to you and Joe … whether you wish the strip 'Superman' to be syndicated.").

### 3. The District Court Erred In Failing to Determine the "Author" of the Newspaper Strips

As Defendants could not demonstrate that the Newspaper Strips were created at the "instance and expense" of either Detective or McClure, the District Court avoided determination of the entity for whom the Newspaper Strips were purportedly "works made for hire." ER at 103. This was fundamental error. A work must be created at the "instance and expense" of an ascertained employer to be "works for hire," *Twentieth Century*, 429 F.3d at 877 ("works ... may qualify as works-for-hire so long as they were created at the instance and expense of the commissioning party"), which necessarily determines the "authorship" of the work. 17 U.S.C. § 26 (1974). *See Epoch*, 522 F.2d at 743-45 (where multiple companies were potentially the employer "for hire," the court analyzed and decided whether the work was "for hire" for each company separately).

### 4. The District Court Misapplied *Picture Music*, While Ignoring Clear Ninth Circuit Authority

The District Court's sole basis for not adhering to the abundant case law enforcing the "expense" prong, and for ignoring this Circuit's clear guidance in *Twentieth Century*, 429 F.3d at 881, that sole payment in royalties weighs heavily against a finding of "work for hire," was *Picture Music, Inc.,* 457 F.2d 1213, a

**EXHIBIT A**
**51**

cursory 1972 out-of-Circuit decision that is factually distinguishable and flawed. ER 104-106.

The *Picture Music* facts much more closely approximate traditional employment than those surrounding the creation of the Newspaper Strips. While both cases involve three parties, the cases significantly diverge as to the *creation* of the respective works – the touchstone of "work for hire" analysis. *Twentieth Century*, 429 F.3d at 879. In *Picture Music*, Disney, the owner of a musical film score, and Irving Berlin Inc., the score's composer, decided to adapt the score into a song, and *employed* Ann Ronell to assist in this narrow, controlled task in collaboration with a Berlin employee. 457 F.2d at 1214-17. Ronell had very little artistic input,[8] and for 27 years did not claim co-ownership. *Id.*

As set forth above, Siegel and Shuster were the driving force behind the creation of the Newspaper Strips. They did not make marginal contributions; they created and produced the strips in their entirety. Siegel and Shuster did not lie silent for 27 years; they consistently protested and took legal action regarding Superman in 1947 and 1974. *See Siegel*, 508 F.2d at 912-13.

*Picture Music* also failed to properly apply the "instance and expense" test. The perfunctory decision is based on a surface analysis of "instance" and whether

_____

[8] The district court found Ronell's "additions" so slight that their copyrightability was "shrouded in doubt." *Picture Music, Inc.,* 314 F. Supp. at 647.

**EXHIBIT A**
**52**

Disney/Berlin were "'motivating factors' in the composition of the new song." 457 F.2d at 1217. Its sole mention of the "expense" prong is a passing disregard for Ronnel's royalty, citing *Brattleboro,* 369 F.2d 565, which did *not* entail a royalty or other contingent participation. 457 F.2d at 1217.

Unsurprisingly, *Picture Music* has been roundly criticized by leading copyright authorities and within its own circuit. *See Hogarth,* 342 F.3d at 160, 160 n.14; 3 *Nimmer* § 9.03[D] at 9-30-9-31, 9-31 n.98 ("*Picture Music* relied upon two prior decisions, *i.e.*, *Brattleboro* [], and *Yardley* []. Neither *Brattleboro* nor *Yardley* support [its] conclusion; indeed, they point to a contrary result.").

### 5. The Second Circuit Previously Held That McClure Was the "Proprietor," as Opposed to the "Author," of the Strips

The District Court held that DC was bound by the judgment in *National Comics*, 191 F.2d 594 (2d Cir. 1951), but effectively did not adhere to it. ER 98. In that case, National and McClure brought suit for alleged infringement of Superman copyrights. Fawcett's main defense was that the Newspaper Strips had been injected into the public domain through publication with a copyright notice in McClure's name, arguing that "McClure was neither the author, nor the proprietor … but [] a mere licensee" of the strips, contrary to the copyright notice requirements of the 1909 Act. *National Comics,* 93 F. Supp. 349, 357-58.

Sections 9 and 10 of the 1909 Act, at issue in *National Comics*, 191 F.2d at 599, distinguish between an "author" and a "proprietor." Under the 1909 Act, the

ER 1016

"author" of a work was either the individual creator or the "employer in the case of works made for hire." *See* 17 U.S.C. § 26 (1974). In contrast, and as the District Court improperly ignored (ER 39-40), the "proprietor" of a work under the 1909 Act was an "assign." *Public Ledger v. N.Y. Times*, 275 F. 562, 563-64 (S.D.N.Y. 1921) (Hand, L.). *See Egner,* 139 F.2d at 399 ("Proprietor means the same as 'assigns.'") (citing *Mifflin v. R. H. White,* 190 U.S. 260 (1902)); *Jacobs v. Robitaille*, 406 F. Supp. 1145, 1150 (D.N.H. 1976) (refers to "proprietor or assign" as synonyms); *Morse v. Fields*, 127 F. Supp. 63, 64 (S.D.N.Y. 1954) ("[A] person to whom the right to copyright is assigned is a proprietor."); *see also* 17 U.S.C. § 24 (1974) (distinguishing between copyright notices that bear the "author's true name" and those where "copyright was originally secured by ***the proprietor thereof***, or of any work copyrighted by a corporate body … ***or by an employer for whom such work is made for hire***") (emphasis added).[9]

Fawcett's defense clearly placed at issue whether McClure was the "author" (as the employer of a "work for hire") or a "proprietor" of the Newspaper Strips. Also at issue was whether McClure or Detective was the original owner of the

---

[9] Those few cases that use the term "proprietor" to refer to "works for hire" do so in a colloquial sense, see *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 U.S. Dist. LEXIS 4219, at *67 (S.D.N.Y. Mar. 15, 2002) and *Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697, 700 (2d Cir. 1941), not in analyzing the difference between "author or proprietor" in Sections 9 and 10 of the 1909 Act at issue in *National Comics*, 191 F.2d at 599. *See* 17 U.S.C. §§ 9, 10 (1974).

**EXHIBIT A
54**

ER 1017

copyrights to the Newspaper Strips. *National Comics,* 93 F. Supp. at 357-58. The Second Circuit held that McClure was "the 'proprietor' of the copyrights" in the Newspaper Strips and that McClure, not Detective, held the initial copyrights to the strips. 191 F.2d at 599 ("[U]ntil the contract came to an end, 'McClure' was to have the 'title' to the copyrights."). *National Comics* precludes finding McClure to be the "author" of the Newspaper Strips as "works for hire," rather than the "proprietor" by assignment. The decision also runs contrary to any finding that the Newspaper Strips were owned at inception as Detective's "work for hire." *Id.* ("The copyrights [in the strips] were only in the future to become [Detective's] property.").

> **6.** **The Parties' Conduct Also Demonstrates That McClure and Later Detective Owned the Newspaper Strips By Assignment, Not As "Work for Hire"**

The evidence shows that McClure owned the copyrights in the Newspaper Strips through an implied assignment of Siegel and Shuster's common law copyrights in the strips. The McClure Agreement provided that the Superman newspaper feature "will be copyrighted in [McClure's] name," and the original copyright registrations for the Newspaper Strips expressly state "Author: Jerry Siegel and Jerome Shuster, of the United States," while listing McClure as the owner. ER 381-417, 610, 634-648; *see Hogarth*, 342 F.3d at 165–66 (failure to list putative employer as an "author" in copyright registration creates presumption that

**EXHIBIT A**
**55**

ER 1018

the work was not "for hire").  McClure's copyright registrations constitute "prima facie evidence of the facts stated therein."  17 U.S.C. § 209 (1974).

While there is no express mention of a transfer of Siegel and Shuster's copyrights to McClure, it is clearly implied by both the McClure Agreement and the parties' course of conduct.  "Under the 1909 Copyright Act, common law copyright ownership … vested initially in the authors." *Jim Henson Productions v. John T. Brady & Associates*, 16 F. Supp. 2d 259, 284 (S.D.N.Y. 1997); *see also* 1 *Nimmer* § 5.01[B] at 5-6.  "Under the 1909 Act, common law copyright terminated when a work was published, at which point the work became eligible for federal statutory copyright." *Magnuson v. Video Yesteryear,* 85 F.3d 1424, 1428 (9th Cir. 1996).  No writings or other formalities were required for Siegel and Shuster to transfer their common law copyrights to McClure, as such could be assigned by an express or implied, oral or written, grant. *See Urantia Foundation v. Maaherra*, 114 F.3d 955, 960 (9th Cir. 1997) ("Under the 1909 Act, a common law copyright could be assigned without the necessity of observing any formalities."*), citing* 3 *Nimmer* § 10.03[B][2]; *Epoch*, 522 F.2d at 747; 2 *Patry* § 5:106.

The McClure Agreement is consistent with a transfer by Siegel and Shuster of their common law copyrights in the Newspaper Strips to McClure, in expressly giving McClure the right to register the copyrights in McClure's name in consideration for its syndication of the strips.  ER 610.

Courts routinely find an implied assignment in analogous situations involving the submission for publication of literary material protected by a common law copyright. *See Martha Graham,* 380 F.3d at 643 (the "fact that [the] publishers had the manuscript … sufficed to imply assignment of common law copyright") (citing *Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 311 (2d Cir. 1939) ("Since [the author] did not himself take out the copyright there was no need of a formal assignment by him …. mere delivery of the manuscript to the publishers was sufficient [to establish such assignment].") (citations omitted)); *Self-Realization,* 206 F.3d at 1327-28 (citing assignee's possession of a manuscript as evidence that the common-law copyright had been impliedly assigned).

McClure's subsequent copyright registration of the Newspaper Strips in McClure's name as owner – while properly listing Siegel and Shuster as the "Author[s]" (ER 381-417) – is also consistent with such a copyright transfer by Siegel and Shuster to McClure. 17 U.S.C. § 209 (1974).

Years later, on July 3, 1944, McClure assigned to Detective in writing the copyrights to the Newspaper Strips per the terms of the McClure Agreement, further undermining any notion that the strips were Detective's "works for hire." ER 368-378; *Dolman,* 157 F.3d at 712 ("Had the works been intended to be works for hire … there would have been no reason for … an invalid assignment of rights.").

All of this is consistent with Siegel and Shuster assigning their original common-law copyrights in the Newspaper Strips to McClure. *See* 3 *Nimmer* § 10.09[B] at 10-80 n.14 ("[N]umerous chains of title of statutory copyright [] rely at one or more links upon an oral or implied transfer of common law copyright, which when granted were perfectly valid").

Moreover, if the Newspaper Strips had been Detective's "works for hire," Siegel and Shuster need not have been parties to the McClure Agreement. Detective could simply have contracted with McClure to syndicate the Newspaper Strips. By contrast, in the McClure Agreement, McClure and Siegel and Shuster gave Detective the right to use the original Newspaper Strips "in the publication of 'Action Comics,' six months after newspaper release, without charge, or for any substituted magazines." ER 610. This also strongly suggests that Detective did not own this material at inception as "work for hire." *See National Comics*, 191 F.2d at 599 ("'McClure' assumed 'to provide Detective with all the original drawings so that said drawings may be used by Detective in the publication 'Action Comics' six months after newspaper release.' That is the language of a 'proprietor,' who assumes power to license another to copy the 'works.'").

Any claim that Detective owned the Newspaper Strips as its "works for hire," but impliedly licensed exclusive newspaper rights to McClure would be

**ER 1021**

inconsistent with the "indivisibility doctrine," [10] and with McClure's registration of the copyrights in its own name. It would also flatly contradict *National Comics,* because, in that event, McClure would be a mere "licensee," not the "proprietor" of the strips' copyright, injecting the strips into the public domain. 191 F.2d at 599. Nor, in that case, would McClure's written assignments of the copyrights to Detective in 1944 make sense.

In short, *all* of the parties' conduct under the McClure Agreement is consistent with the explanation that Siegel and Shuster owned the common law copyright in the Newspaper Strips at inception and impliedly transferred the copyrights to McClure, who registered the copyrights in its name upon publication (citing Siegel and Shuster as the "Authors") and years later assigned the copyrights to Detective. It is thoroughly inconsistent with the District Court's holding, on the "outer edges" of the doctrine, that the Newspaper Strips were "works for hire" for an undetermined entity. ER 103.

### D. *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* Were Not "Works For Hire"

The District Court erred in holding that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were "works for hire." The District Court largely based its

---

[10] *See Jim Henson Prods.*, 16 F. Supp. 2d at 288 ("Under the 1909 Copyright Act … copyrights were "indivisible," meaning that the bundle of rights that accrued to a copyright owner could only be assigned as a whole, and the transfer of anything less than all rights was deemed a license rather than an assignment.").

**EXHIBIT A**
**59**

decision on the fact that the September 22, 1938 Agreement states: "We…hereby *employ and retain you* … [to] supply us … in sufficient time for publication in our monthly magazines, sufficient copy and art for each of said [five] features [including Superman]." ER 605 (emphasis added). However, the phrase "employ and retain" is not dispositive: work-for-hire analysis under the 1909 Act requires evaluation of the "actual relationship between the parties." *Marvel,* 310 F.3d at 291. The "business relationship" between Siegel and Shuster and Detective was more akin to an "output deal" than employment – Siegel and Shuster were independent suppliers, supplying completed artistic product on a steady basis from their shop in Cleveland to Detective in New York for publication/distribution. ER 605-611.

### 1. *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* Were Not Created at Detective's "Expense"

Siegel and Shuster shouldered all of the expenses of creation – they managed and paid a large staff; paid for studio space, furnishings, equipment and materials, postage, utilities and travel; kept their own financial records; and set their own hours and working conditions. ER 584, 597-600 (testimony from employee Wayne Boring), 694-697, 701-702 (testimony of Defendants' expert); 726-754, 812-813.

Yet under the express terms of the September 22, 1938 Agreement, Detective would pay Siegel and Shuster $10 per page *only for their Superman*

**EXHIBIT A**
**60**

**stories it decided to publish.** ER 606 ("We agree to pay you *on publication*, for any and all said comics *published by us* and supplied by you, the following rates: Superman $10.00 per page.") (emphasis added). This is, by law, a discretionary **purchase** of completed material, not "work made for hire."

The "expense" prong necessarily entails some legal obligation on the part of the putative employer to pay for services and work that it commissions. If legally the hiring party "had no commitment to purchase any of [the author's] work" this supports a finding that such was not "made-for-hire." *Playboy,* 53 F.3d at 563. In numerous cases finding "work for hire," based on the payment of a "sum certain," the putative employer was obliged to pay the author, regardless of whether his work was ultimately published. *See Twentieth Century,* 429 F.3d at 881 (finding "instance and expense" because publisher was contractually obligated to pay author a nonrefundable cash advance); *Brattleboro,* 369 F.2d at 568 (2d Cir. 1966) (finding "instance and expense" because hiring party obliged to bear expense of creating the ad regardless of whether it was accepted and used, *see also Brattleboro,* 250 F. Supp. 215, 218 (D. Vt. 1966)); *Hogarth,* 342 F.3d at 163, 2002 U.S. Dist. LEXIS 4219, at *57 (contractual obligation to pay a guaranteed fixed sum); *Playboy,* 960 F. Supp. 710, 715-16 (S.D.N.Y. 1997) (obligation to pay "'turn-down'" fee for "unused work" weighs in favor of "work for hire"; "[t]he logical conclusion …is that Playboy paid Nagel for works it did not use because he

**EXHIBIT A
61**

ER 1024

created them at its instance").

If, as here, payment is expressly contingent on whether a putative employer choses to publish a work, then the logic of the "work for hire" doctrine collapses. A "work for hire" is owned at inception "automatically upon the employee's creation of the work," and the employer is considered the "author" of the commissioned work. *Hogarth*, 342 F.3d at 162; *Avtec Systems, Inc. v. Peiffer,* 21 F.3d 568, 575 (4th Cir. 1994) (where work was "for hire," employer owned the copyright "from the moment of the [work's] inception"). Thus, whether a work is "made for hire" must be determined by the relationship of the parties *prior to the work's creation*, not by after-the-fact contingencies, such as ultimate publication. Copyright "vest[s] in the author of an original work from the time of its creation." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1984). If payment turned on whether the putative employer felt like publishing the work, it could have no "authorship" (or ownership) of the work at "the time of its creation," rendering the transaction a "purchase" as a matter of law.

It is far more consistent with the "work for hire" doctrine that the putative employer be *legally obligated*, prior to creation of the work, to pay the author a non-contingent, fixed sum. If it failed to pay that sum, the work would remain "for hire," but the author would have a breach of contract claim. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1143 (9th Cir. 2003).

**EXHIBIT A
62**

ER 1025

Where, as here, payment is based on contingencies or the discretion of the putative employer, it is, by definition, speculative – the antithesis of "work for hire." It is for this reason that purely contingent compensation, such as a royalty, weighs heavily against a finding of "work for hire." *See* Section II.C.1, *supra*. Whereas Siegel and Shuster bore all of the expenses of creation (ER 584, 597-600, 694-697, 701-702, 726-754, 812-813), Detective had no legal obligation to pay for that work it chose not to publish. ER 606. Siegel and Shuster, not Detective, thus bore the financial risk of creating these Superman works. Decades later, Detective's successors "want to have their cake and eat it too."

The District Court avoided this contradiction by ***assuming***, contrary to the September 22, 1938 Agreement, that Detective paid for all material submitted by Siegel and Shuster regardless of whether Detective published the work. ER 89-90. In so doing, the District Court improperly ignored and/or misconstrued the record evidence, and its own decision in *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1138 (C.D. Cal. 2007) ("Siegel was also paid nothing by Detective Comics when he submitted his Superboy material to it, and it rejected the material for publication.").

Plaintiffs' experts, noted comic book historians Mark Evanier and James Steranko, *as well as Defendants' own expert*, Mark Waid, *all* testified that Siegel and Shuster were not paid for work Detective chose not to publish, consistent with

**EXHIBIT A**
**63**

the September 22, 1938 Agreement. *See* ER 689 (Waid: "If they [Detective] rejected it, they didn't pay for it"), 788, 812. The District Court simply discounted the expert testimony of *both* parties and drew unsupported inferences about "what actually occurred with respect to the specific business relationship between Detective Comics and Siegel and Shuster." ER 90.

Specifically, the District Court focused on language in a December 1939 agreement between Siegel and Shuster and Detective, concluding that it "creates the strong inference that Shuster had been paid by Detective Comics for all or a portion of that prior year's artwork for comic strips (other than Superman) that he did not supply." ER 90. The agreement simply stated that "Mr. Shuster no longer furnishes the artwork" for such strips. ER 765. The logical inference is that Siegel and Shuster's staff, rather than Shuster himself, drew the artwork that Detective purchased, not that Detective paid for work it did not publish. Moreover, as noted by the District Court, this language did not refer to Superman works.

Notably, Defendants' own conduct supports the conclusion that Detective only owned those Superman stories it purchased for publication. In 1988, Mr. Waid, while a DC employee, discovered a fascinating, unpublished 26-page Superman continuity (story) by Siegel dated August 7, 1940. ER 686-687, 691-692, 705-711. According to Waid, this K-Metal from Krypton story contains the first use of "Kryptonite," and its weakening of Superman's powers. ER 707, 712-

**EXHIBIT A**
**64**

725.

Waid sought to have this very significant work illustrated and published by DC Comics: "[the K-Metal story was] circulated to then-Superman editor Mike Carlin and to our mutual bosses in hopes we could obtain Siegel's blessing to have the story re-illustrated and released at last, but … nothing ever came of it." ER 686-687, 691-693, 710. Yet Defendants *never* published the K-Metal story per se, despite its obvious historical importance. If DC had "owned" this material as "work for hire," there would have been no need to obtain Siegel's permission. DC appears to have known that it did not own this work because Detective had not published it and thus had not paid for it.

The District Court disregarded this evidence by averring to the lack of "any direct evidence indicating that the pair were not paid for this rejected submission" (ER 89), rather than draw appropriate inferences from the evidence that did exist.

The September 22, 1938 Agreement and other record evidence reflects what one would expect – payment was *contingent* on Detective's decision to publish completed work and thus to purchase it. Siegel and Shuster bore all expenses of creating such works, and thus the financial risks of their creation. That is not "work for hire." *See Twentieth Century*, 429 F. 3d at 881; 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c. The District Court not only failed to consider the evidence in the light most favorable to Plaintiffs, but virtually ignored the evidence

that Detective was not legally obligated to pay Siegel and Shuster for their work, to incorrectly conclude that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were created at Detective's "expense."

### 2. *Action Comics, Nos. 7-61*and *Superman, Nos. 1-23* Were Not Created at Detective's "Instance"

As stated above, the "instance" requirement is largely determined by the degree to which the hiring party had "the right to control or supervise the artist's work." *Twentieth Century,* 429 F.3d at 879. As a matter of law and logic, this "right" to control a work's creation must refer to a legal right. "Control" cannot be construed as the practical power or superior bargaining position exercised by a buyer, or the kind of editorial supervision exercised by a publisher, with respect to both "works for hire" and "non-works-for-hire." *Id.* at 880 (distinguishing right of control under "instance" prong from a publisher's "typical process" of "discussing possible improvements with the author"); *see Epoch,* 522 F.2d at 745. The right of control also does not refer to the ultimate control every publisher has over whether to accept and publish a work; it refers to the much more specific "right" to control the creative process and "participate in the elements of the work's creation." 2 *Patry* § 5:54 ("Any hiring party ultimately has the ability to 'control' the work in the sense of accepting or rejecting it."); *Martha Graham,* 380 F.3d at 635.

The September 22, 1938 Agreement ambiguously states: "The standard of the said comics shall be equal to the present standards." ER 605. This by no

**EXHIBIT A
66**

ER 1029

means connotes a legal right to control Siegel and Shuster's creative process in Cleveland. Detective's right "to reasonably supervise the editorial matter of all features" (ER 607) is also not persuasive as it reflects the standard supervisory role of every publisher. *See Twentieth Century*, 429 F.3d at 880; 2 *Patry* § 5:54. All Detective really had was the purchasing power of any buyer.

In fact, Detective's letters to Siegel and Shuster demonstrate its growing frustration as to its lack of control over their creative process, a point ignored by the District Court when it presumed a right to control based on the ambiguous language of the September 22, 1938 Agreement. *See* ER 430-443, 450-451.

Siegel himself testified that Detective exerted little editorial control over the *creation* of Superman works. ER 758. Siegel and Shuster received little to no creative guidance or story proposals from Detective before starting work. ER 812-813. Siegel did not send his scripts to Detective for "approval" before Shuster illustrated them. ER 618, 761, 812. Siegel and Shuster's New York-based editor, Vince Sullivan, never visited them and his input was "limited to accepting or rejecting the finished stories they submitted." ER 788, 812-813.

### 3. The Parties Could Not Have Intended That Siegel and Shuster's Superman Works Were "Works For Hire"

It is well accepted that whether material is "work for hire" under the 1909 Act "always turn[s] on the intention of the parties." 1 *Nimmer* § 5.03[B][2][c] at 5-56.1; *see May,* 618 F.2d at 1368; *Dolman,* 157 F.3d at 712. Yet, until 1965-66,

"the courts had applied the work for hire doctrine under the 1909 Act exclusively

to traditional employees." *CCNV*, 490 U.S. at 749. As the "work for hire"

doctrine only applied to traditional employees during the 1938-1943 period at

issue, and Siegel and Shuster were clearly independent contractors, the parties

could not have intended that Siegel and Shuster's work was "for hire."

As late as 1963, the first edition of the *Nimmer* treatise stated: "Sec[tion] 26

expressly renders an employer for hire an 'author' but makes no comparable

provision with respect to commissioned works." M. Nimmer, *Nimmer on

Copyright*, § 63 at 245 n.80 (1963). "If in the creation of such material the

employee is to work as an independent contractor … then the employer must claim

such ownership by virtue of an assignment and not merely by virtue of his status as

an employer." *Id*. § 62.4 at 242, 244-245. The legislative history from 1960 of the

1976 Copyright Act also made it clear that the definition of "work for hire" under

the 1909 Act "refers only to works made by salaried employees in the regular

course of their employment." B. Varmer, Copyright Law Revision Study No. 13

(1960).

This understanding of "employer" and "employee" to mean traditional

employment and hiring is consistent with the contemporary legal definition of

ER 1031

these terms when the 1909 Act was passed, and later as well.[11]  In short, even if

Detective and/or Siegel and Shuster had retained sophisticated legal counsel in

1938 (or anytime prior to 1965) as to the "work for hire" issue, they would have

been advised that the Superman works were unequivocally <u>not</u> "works made for

hire."  Accordingly, the parties could not have then intended, as a matter of law,

that Siegel and Shuster's freelance creations be owned by Detective at inception as

"work for hire," instead of by implied assignment.

### 4.     At a Minimum, the Evidence Raised Triable Issues of Fact

Given all of the above, it cannot be said that *Action Comics, Nos. 7-61* and

*Superman, Nos. 1-23* were "works made for hire" as a matter of law, and that no

reasonable trier of fact could find in Plaintiffs' favor on this issue.  The "work for

hire" defense, because it turns on the mutual intent of the parties, is often ill-suited

for summary adjudication due to its inherently fact-intensive nature.  *See Twentieth*

*Century*, 429 F.3d at 874-75 (noting prior reversal of summary judgment as to

work for hire because "there were genuine issues of material fact"); *Self-*

*Realization*, 206 F.3d at 1330 (summary judgment was inappropriate for a work-

---

[11] *See* Black's Law Dictionary, 2d Ed. (1910) at 421 (defining "employer" as "one who employs the services of others; …who pays their wages or salaries" and "employee" "mean[s] some permanent employment or position"), 4th Ed. (1951) at 617-18 (defining "employer" in the same manner, and as "the correlative of employee," and "employee" as "a person working for salary or wages;… 'employee' must be distinguished from 'independent contractor'…..").

for-hire determination because district court improperly "ma[de] a determination of credibility"); *May*, 618 F.2d at 1368; *Marvel*, 310 F.3d at 292 (finding issues of fact as to "work for hire" preventing summary judgment; "[i]t will be up to a jury to determine whether Simon was the author of the Works and, therefore, whether he can exercise § 304(c)'s termination right").

With respect to *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23*, the record evidence, viewed in the light most favorable to Plaintiffs, at a minimum raised genuine issues of material fact as to whether such works were "made for hire," precluding summary judgment.

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants' cross-appeal of the District Court's judgment, *Larson v. Warner Bros. Entertainment Inc., et al.*, 9th Circuit Case No. 11-56034, is related to this case. The related district court case, *DC Comics v. Pacific Pictures Corporation, et al.*, C.D. Cal. Case No. 10-CV-03633 ODW (RZx), arises out of Superman notices of termination filed by the Estate of Joseph Shuster. There are two proceedings before this Court arising out of *DC Comics: In re Pacific Pictures Corp.*, 9th Circuit Case No. 11-71844, a writ proceeding regarding the theft of privileged documents during the District Court proceedings in this action; and *DC Comics v. Pacific Pictures Corporation*, 9th Circuit Case No. 11-56934, an appeal of the district court's denial of an anti-

**EXHIBIT A
70**

SLAPP motion filed in *DC Comics*.

## CONCLUSION

Plaintiff-Appellant respectfully requests that this Court reverse the judgment of the District Court, with instructions to enter partial summary adjudication in her favor on her First Claim as to *Action Comics, Nos. 2-3, 5-6,* the Newspaper Strips, and *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23,* and to remand for further proceedings.

Dated:  December 22, 2011        TOBEROFF & ASSOCIATES, P.C.

                                 /s/ Marc Toberoff

                                 Marc Toberoff

                                 Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT A**

**71**

Case 13-56243, 03/25/2014, ID: 8983563, DktEntry: 22-5, Page 190 of 294

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that the appellant Laura Siegel Larson's attached opening brief is proportionately

spaced, has a typeface of 14 points or more, and does not exceed 14,000 words.

Dated:  December 22, 2011          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
Marc Toberoff

Attorneys for Appellant, Laura Siegel Larson

ER 1035

# STATUTORY ADDENDUM

## 17 U.S.C. § 9 (1974 Rev.; Repealed)

§ 9. AUTHORS OR PROPRIETORS, ENTITLED; ALIENS. – The author or proprietor of any work made the subject of copyright by this title, or his executors, administrators, or assigns, shall have copyright for such work under the conditions and for the terms specified in this title: Provided, however, That the copyright secured by this title shall extend to the work of an author or proprietor who is a citizen or subject of a foreign state or nation only: ….

## 17 U.S.C. § 10 (1974 Rev.; Repealed)

§ 10. PUBLICATION OF WORK WITH NOTICE. – Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 22 of this title.

## 17 U.S.C. § 24 (1974 Rev.; Repealed)

§ 24. DURATION; RENEWAL AND EXTENSION. – The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: Provided, That in the case of any

ER 1036

posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: And provided further, That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright, office and duly registered therein within one year prior to the expiration of the original term of copyright: And provided further, That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

**EXHIBIT A
74**

## 17 U.S.C. § 26 (1974 Rev.; Repealed)

§ 26. TERMS DEFINED. – In the interpretation and construction of this title "the date of publication" shall in the case of a work of which copies are reproduced for sale or distribution be held to be the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority, and the word "author" shall include an employer in the case of works made for hire.

….

## 17 U.S.C. § 209 (1974 Rev.; Repealed)

§ 209. CERTIFICATE OF REGISTRATION; EFFECT AS EVIDENCE; RECEIPT FOR COPIES DEPOSITED. – In the case of each entry the person recorded as the claimant of the copyright shall be entitled to a certificate of registration under seal of the copyright office, to contain the name and address of said claimant, the name of the country of which the author of the work is a citizen or subject, and when an alien author domiciled in the United States at the time of said registration, then a statement of that fact, including his place of domicile, the name of the author (when the records of the copyright office shall show the same), the title of the work which is registered for which copyright is claimed, the date of the deposit of the copies of such work, the date of publication if the work has been reproduced in copies for sale, or publicly distributed, and such marks as to class

ER 1038

designation and entry number as shall fully identify the entry. In the case of a book the certificate shall also state the receipt of the affidavit, as provided by section 17 of this title, and the date of the completion of the printing, or the date of the publication of the book, as stated in the said affidavit. The Register of Copyrights shall prepare a printed form for the said certificate, to be filled out in each case as above provided for in the case of all registrations made after July 1, 1909, and in the case of all previous registrations so far as the copyright office record books shall show such facts, which certificate, sealed with the seal of the copyright office, shall, upon payment of the prescribed fee, be given to any person making application for the same. Said certificate shall be admitted in any court as prima facie evidence of the facts stated therein. In addition to such certificate the register of copyrights shall furnish, upon request, without additional fee, a receipt for the copies of the work deposited to complete the registration.

## **17 U.S.C. § 101 (2010)**

A "work made for hire" is –

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a

**EXHIBIT A**
**76**

**ER 1039**

written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

### 17 U.S.C. § 203

(a) Conditions for Termination. – In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

### 17 U.S.C. § 304

(c) Termination of Transfers and Licenses Covering Extended Renewal Term. – In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection

**EXHIBIT A**
**77**

(a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided

**EXHIBIT A**
**78**

among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case

**EXHIBIT A**
**79**

of a termination under subsection (d), within the five-year period specified by
subsection (d)(2), and the notice shall be served not less than two or more than ten
years before that date. A copy of the notice shall be recorded in the Copyright
Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with
requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the
contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all
rights under this title that were covered by the terminated grant revert, upon the
effective date of termination, to all of those entitled to terminate the grant under
clause (1) of this subsection. In the case of a grant executed by one or more of the
authors of the work, all of a particular author's rights under this title that were
covered by the terminated grant revert, upon the effective date of termination, to
that author or, if that author is dead, to the persons owning his or her termination
interest under clause (2) of this subsection, including those owners who did not
join in signing the notice of termination under clause (4) of this subsection. In all
cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination
may continue to be utilized under the terms of the grant after its termination, but

this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the

**EXHIBIT A**
**81**

ER 1044

termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) Termination Rights Provided in Subsection (c) Which Have Expired on or before the Effective Date of the Sonny Bono Copyright Term Extension Act. — In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by

70
**EXHIBIT A**
**82**

ER 1045

will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.

**EXHIBIT A**
**83**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, four copies of the excerpts of the record have been mailed to the Court, and one copy of the excerpts of the record have been mailed to opposing counsel on the date this brief was electronically filed.

Dated: December 22, 2011          TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams

Attorneys for Appellant, Laura Siegel Larson

# EXHIBIT B

ER 1048

APPELLATE CASE NO. 11-55863;
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————————

**APPELLANT LAURA SIEGEL LARSON'S THIRD BRIEF ON CROSS-APPEAL**

————————————

Appeal From The United States District Court for the Central District
of California,
Case No. CV-04-8400 ODW (RZx), Hon. Otis D. Wright II

————————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kgadams@ipwla.com*
Pablo D. Arredondo
 *parredondo@ipwla.com*
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant,
Laura Siegel Larson, individually and
as personal representative of the Estate
of Joanne Siegel*

# TABLE OF CONTENTS

COUNTER-STATEMENT OF JURISDICTION ....................................................1

INTRODUCTION ...............................................................................................1

ISSUES PRESENTED ON CROSS-APPEAL ......................................................4

STATEMENT OF FACTS ON CROSS-APPEAL ................................................5

      A.      Settlement Negotiations Between The Siegels and DC .......................5

SUMMARY OF ARGUMENT ...........................................................................8

ARGUMENT ...................................................................................................13

I.      NO AGREEMENT WAS REACHED BY THE PARTIES .........................13

      A.      The October 19 Letter Was A Counter-Offer That Warner
            Never Accepted ...................................................................................14

            1.      Contract Formation Requires An Objectively Manifested
                    Agreement To The Same Material Terms ................................14

            2.      There Was No Accepted Offer, Merely An Exchange Of
                    Unaccepted Counteroffers ......................................................15

      B.      The Numerous Material Differences Between The Proposals
            Demonstrate That No Agreement Was Consummated ......................17

            1.      Material Differences As To Scope Of The Agreement ...........17

            2.      Material Differences As To Monetary Terms..........................18

            3.      Other Material Differences ......................................................22

      C.      Warner's Cases On This Issue Are Manifestly Inapposite As
            They Concern The Enforceability Of Signed Agreements .................24

**EXHIBIT B**

**86**

ER 1050

D. A Final Written Agreement Signed By The Parties Was Required ............................................................26

E. The Clear Reservations Demonstrate That No Contract Was Formed..................................................28

F. Established Contract Law Applies To The Film Industry .................30

G. Summary Judgment Is Appropriate Because No Enforceable Agreement Existed As A Matter of Law.............................................31

1. Summary Judgment As To Contract Formation Is Proper ......31

2. None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed.............................33

II. THE SIEGELS' ACTION WAS TIMELY FILED ......................................36

III. NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE................39

A. The District Court Properly Rejected Warner's "Work-for-Hire" Claim As To *Action Comics, No. 1* .............................................39

1. Claim And Issue Preclusion Apply To Issues And Claims Raised Or Which Could Have Been Raised .............................40

2. Warner's Arguments Are Unpersuasive ...................................42

a. The "Work-For-Hire" Issue Was Decided ....................42

b. The "Work-For-Hire" Issue Was Litigated And The Second Circuit's Ruling Is Not Dicta.....................43

B. The Alleged Additions Were Not "Work-For-Hire" .........................45

C. DC Is Not A Joint Author Of *Action Comics, No. 1* ..........................52

IV. *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT WORKS-FOR-HIRE ...................................................................................53

ii

**EXHIBIT B**

87

V.   THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO
     WEEKS OF SUPERMAN NEWSPAPER  STRIPS ................................... 54

     A.   The Strips Were Not "Work-For-Hire" .................................. 54

     B.   Not Listing the Strips Separately In The Termination Was
          Harmless Error ..................................................................... 56

          1.    "Harmless Error" Is Broadly Defined ...................................... 56

          2.    Warner Was On Notice Of The Siegels' Intent To
                Terminate The Newspaper Strips ............................................. 57

          3.    Warner's Reliance On *Burroughs* Is Misplaced ...................... 58

          4.    Warner's Remaining Arguments Lack Merit .......................... 58

VI.  SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE
     NOT "WORKS-FOR-HIRE" .......................................................... 59

     A.   *Action Comics, Nos. 2-3, 5-6* .............................................. 61

     B.   The Newspaper Strips ......................................................... 62

     C.   *Action Comics, Nos. 7-61, Superman, Nos. 1-23* ............... 66

VII. THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE
     FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS ................. 68

     A.   The District Court Fully Adjudicated The First Claim and First-
          Fourth Counterclaims, Which Did Not Include The "Ads" Issue ..... 68

     B.   The District Court Accurately Described The Promotional
          Announcements ..................................................................... 71

CONCLUSION ........................................................................................ 74

CERTIFICATE OF COMPLIANCE ........................................................... 75

STATUTORY ADDENDUM .................................................................... 76

iii

CERTIFICATE OF SERVICE ................................................................... 77

**EXHIBIT B**
**89**

## TABLE OF AUTHORITIES

**CASES**

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ...................................................52

*Amerisource Bergen Corp. v. Dialysist West, Inc.*,
465 F.3d 946 (9th Cir. 2006) ....................................................69

*Apablasa v. Merritt & Co.*,
176 Cal. App. 2d 719 (1959) .............................................. 15-16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
352 F. Supp. 2d 1119 (C.D. Cal. 2005) ................................44

*Banner Entertainment, Inc. v. Superior Court*,
62 Cal. App. 4th 348 (1998) ...................................... 27, 32, 35

*Batjac Productions Inc. v. GoodTimes Home Video Corp.*,
160 F.3d 1223 (9th Cir. 1998) ..................................................73

*Beyene v. Coleman Security Services, Inc.*,
854 F.2d 1179 (9th Cir. 1988) ..................................................67

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
683 F.2d 610 (2d Cir. 1982).......................................................58

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
491 F. Supp. 1320, 1322 (S.D.N.Y. 1980) .............................58

*Bustamante v. Intuit, Inc.*,
141 Cal. App. 4th 199 (2006) ................................... 15, 31-32

*Callie v. Near*,
829 F.2d 888 (9th Cir. 1987) .....................................................32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................31

*Chicot County Drainage Dist. v. Baxter State Bank,*
308 U.S. 371 (1940)........................................................................ 44-45

*Clarke v. Fiedler,*
44 Cal. App. 2d 838 (1941) ..................................................................32

*Core-Vent Corp. v. Nobel Indus. AB,*
11 F.3d 1482 (9th Cir.1993) ................................................................68

*Curtiss-Wright Corp. v. General Electric Co.,*
446 U.S. 1 (1980).................................................................................68

*Davis & Cox v. Summa Corp.,*
751 F.2d 1507 (9th Cir. 1985) ......................................................... 41-42

*Devereaux v. Harper,*
 210 Cal. App. 2d 519 (1962) .......................................................... 16-17

*Dolman v. Agee,*
157 F.3d 708, 712 (9th Cir. 1998) ......................................................46

*Duran v. Duran,*
150 Cal. App.3d 176 (1983) ................................................................27

*Durkin v. Shea & Gould,*
92 F.3d 1510 (9th Cir. 1996) ..............................................................41

*Effects Assocs. v. Cohen,*
908 F.2d 555 (9th Cir. 1990) ..............................................................30

*Elite Show Servs. Inc. v. Staffpro, Inc.,*
119 Cal. App. 4th 263 (2004) .............................................................26

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,*
122 F.3d 1211 (9th Cir. 1997) ............................................................51

*Epoch Producing Corp. v. Killiam Shows, Inc.,*
522 F.2d 737 (2nd Cir. 1975)..............................................................59

**EXHIBIT B**
**91**

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal. App. 4th 613 (1991) ...................................................................25

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003)..................................................... 48, *passim*

*Estate of Thottam,*
165 Cal. App. 4th 1331, (2008) .............................................................25

*Goodworth Holdings Inc. v. Suh*
99 Fed. Appx. 806...................................................................................28

*Hydranautics v. FilmTec Corp.*,
204 F.3d 880 (9th Cir. 2000) ................................................................41

*In Harris v. Rudin, Richman & Appel*,
74 Cal. App. 4th 299 (1999) .................................................................25

*In re Eliapo*,
468 F.3d 592 (9th Cir. 2006) ................................................................28

*In re Marshall*,
600 F.3d 1037 (9th Cir. 2010) ..............................................................41

*In re Pago Pago Air Crash,*
 637 F.2d 704 (9th Cir. 1981) ................................................................16

*Industrial Indemnity v. Superior Court,*
224 Cal. App. 3d 828 (1990) ................................................................26

*Janes v. Wal-Mart Stores, Inc.*,
279 F.3d 883 (9th Cir. 2002) ................................................................38

*Jim Henson Productions v. John T. Brady & Associates*,
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ....................................................65

*Kamilche Co. v. United States*,
53 F.3d 1059 (9th Cir. 1995) ................................................... 40-42, 45

**EXHIBIT B**

*Krasley v. Superior Court*,
101 Cal. App. 3d 425 (1980) ............................................................ 31-32

*Landberg v. Landberg*,
24 Cal. App. 3d 742 (1972) ............................................................ 15-16

*LIN Broadcasting Corp. v. Metromedia Inc.*,
74 N.Y.2d 54 (1989) ....................................................................... 48, 56

*Louis Lesser Enterprises, Ltd. v. Roeder*,
209 Cal. App. 2d 401 (1962) ............................................................... 17

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003) .............................................................. 33

*Martha Graham School and Dance Foundation Inc. v. Martha Graham
Center of Contemporary Dance, Inc.*
380 F.3d 624 (2d Cir. 2004)................................................... 61, 63, 67

*Meyer v. Benko*,
55 Cal. App. 3d 937 (1976) .................................................................. 33

*Montana v. U.S.*,
440 U.S. 147 (1979)............................................................................. 40

*Music Sales Corp. v. Morris*,
73 F. Supp.2d 364 (S.D.N.Y. 1999) ................................................... 57

*National Comics Publications, Inc. v. Fawcett Publications, Inc.*,
191 F.2d 594 (2d Cir. 1951)........................................................ 12, 64

*Norris v. Grosvenor Mktg. Ltd.*,
803 F.2d 1281 (2d. Cir. 1986)............................................................. 45

*Novak v. Warner Bros Pictures, LLC*,
387 Fed.Appx. 747 (9th Cir. 2010)...................................................... 31

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F. 3d 708 (9th Cir. 2001) ............................................................. 41

**EXHIBIT B**

*Panagotacos v. Bank of America*,
60 Cal App 4th 851 (1998) ............................................................. 15-16

*Patel v. Liebermensch*,
45 Cal. 4th 344 (2008) ...........................................................................25

*Paulo v. Holder*,
669 F.3d 911 (9th Cir. 2011) .................................................................44

*Picture Music v. Bourne, Inc.*,
457 F.2d 1213 (2d Cir. 1972)........................................................... 60-61

*Playboy Enters. v. Dumas*,
53 F.3d 549 (2d Cir. 1995).......................................................... 43, 63, 67

*Portsmouth Square Inc. v. Shareholders Protective Committee*,
770 F.2d 866 (9th Cir. 1985) ...............................................................71

*Public Ledger v. N.Y. Times*,
275 F. 562 (S.D.N.Y. 1921)..................................................................64

*Radio TV Espanola S.A. v. New World Entertainment, Ltd.*,
183 F.3d 922 (9th Cir. 1999) ...............................................................28

*Rael v. Davis*,
166 Cal. App. 4th 1608 (2008) ....................................................... 33-34

*Reiter v. Cooper*,
507 U.S. 258 (1993)..............................................................................69

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
77 F.3d 309 (9th Cir. 1996) .................................................................27

*Rice v. Fox Broad. Co.*,
330 F.3d 1170 (9th Cir. 2003) .............................................................51

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
531 F.3d 962 (9th Cir. 2008) ...............................................................52

**EXHIBIT B**

ER 1058

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) ....................................................................18

*Roth v. Malson*,
67 Cal. App. 4th 552, 559 (1998) ...........................................................15

*S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*
359 F.3d 1127 (9th Cir. 2004) ................................................................32

*Schrock v. Learning Curve Int'l, Inc.*,
586 F.3d 513 (7th Cir. 2009) ..................................................................55

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322 (9th Cir. 2000) .......................................................... 46, 59

*Siegel v. Nat'l Periodical Publications*,
364 F. Supp. 909 (S.D.N.Y. 1973) ............................................. 43, 46-47

*Siegel v. Nat'l Periodical Publications*,
508 F.2d 909 (2d Cir. 1974)...................................................... 2, *passim*

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ..................................................55

*Stewart v. Abend*,
495 U.S. 207 (1990).......................................................................... 55, 60

*Stewart v. U.S. Bancorp*,
297 F.3d 953 (9th Cir. 2002) ..................................................................40

*Texaco, Inc. v. Ponsoldt*,
939 F.2d 794 (9th Cir.1991) ...................................................................68

*The Facebook Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) .......................................................... 24-26

*Tibbs v. Smart & Final Iris Co.*,
152 Cal. App. 2d 618 (1957) ..................................................................16

**EXHIBIT B**
**95**

*Twentieth Century Fox Film Corp. v. Entertainment Distributing*,
429 F.3d 869 (9th Cir. 2005) ................................................................... 40, *passim*

*Valente-Kritzer Video v. Callan-Pickney*,
881 F.2d 772, 775 (9th Cir. 1989) .................................................................. 28-29

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ........................................................................ 61

*Weddington Productions, Inc. v. Flick*,
60 Cal. App. 4th 793 (1998) ........................................................................... 15

*Weinstein Co. v. Smokewood Entm't Group*, LLC,
664 F. Supp. 2d 332 (S.D.N.Y. 2009) ............................................................ 30

*Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*,
106 F.3d 894 (9th Cir. 1997) .......................................................................... 45

*Wolff v. Inst. of Elec. & Electronics Engineers, Inc.*,
768 F. Supp. 66 (S.D.N.Y. 1991) ................................................................... 50

## RULES

Fed. R. Civ. P. 54(b) .............................................................................. *passim*

F.R.A.P. 10(a) ........................................................................................... 33

Ninth Circuit Rule 10-2 ............................................................................ 33

## STATUTES

17 U.S.C. § 204(a) ................................................................................ *passim*

17 U.S.C. § 209 .......................................................................................... 65

17 U.S.C. § 304(c)(1) ................................................................................. 69

17 U.S.C. § 304(c)(4) ............................................................................... `69

17 U.S.C. § 507(b) ..................................................................................... 36

28 U.S.C. § 1291 ........................................................................................1

Cal. Civil Code § 998 ...............................................................................26

Cal. Civ. Code § 1585 ......................................................................... 15-16

**REGULATIONS**

37 C.F.R. § 201.10(b)(1)(iii).....................................................................69

37 C.F.R. § 201.10(b) ...................................................................... *passim*

**OTHER AUTHORITIES**

ARTHUR CORBIN, CORBIN ON CONTRACTS (2006)
§ 3.36.......................................................................................................16

M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT (2011)
§ 5.03[B][2][d] .................................................................................. 59-60

§ 6.03.......................................................................................................54

WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007)
§ 5:54 ................................................................................................ 59, 67

§ 5:61 ...............................................................................................60, 63

*Oral Contracts In the Ent Industry*,
1 Va. Sports & Ent. L.J. 101 (2001) ............................................... 28, 30

*Resolving Disputes over Oral and Unsigned Film Agreements*,
L.A. Law. 18 (Apr. 1999) ............................................................... 28, 30

**EXHIBIT B**

ER 1061

## COUNTER-STATEMENT OF JURISDICTION

This court has jurisdiction over the F.R.C.P. 54(b) judgment on Plaintiff

Laura Siegel Larson's First Claim, and Defendant DC Comics' First through

Fourth Counterclaims. 28 U.S.C. § 1291.

## INTRODUCTION

The opposition and cross-appeal brief (Docket No. 31-1; "Opp.") of DC

Comics (including its predecessors, "DC") and its parent, Warner Bros.

Entertainment Inc. (including DC, "Warner") does little to address the real legal

issues in this case. Instead, Warner uses catchphrases divorced from the law,

erroneous arguments never made below, *ad hominem* attacks on opposing counsel,

and extra-record materials to evade plaintiff Laura Siegel Larson's ("Plaintiff")

statutory notices of termination regarding Superman ("Termination").

Touting "a deal is a deal" and Hollywood "custom and practice," Warner

pretends it entered into a binding contract with Plaintiff in October 2001, when

nothing could be further from the truth. In the three years before Plaintiff filed this

action in 2004 to enforce her Termination, Warner never once claimed such a

contract existed, and for good reason. The parties' objective written exchange of

counteroffers with many different material terms, amply demonstrate that no

contract was formed. As the District Court correctly held, "there is no document

or set of documents reflecting agreement by the parties to singular, agreed terms."

ER 202.[1]

Warner's arguments as to the other issues fare no better.  As to its purported statute of limitations defense, Warner argues, for the first time, a "trigger" date in May 2002, contradicting both its position below and the explicit terms of the parties' "tolling agreement."

As to its erroneous argument that Siegel and Shuster's conversion of their Superman story to a magazine format in *Action Comics, No. 1* was "work-for-hire," Warner pretends that the Second Circuit's decision in *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) – from which it has greatly benefited for four decades – is no longer preclusive.

Nor does Warner do anything to meaningfully counter Plaintiff's focused arguments in her opening brief (Docket No. 12; "App.") that the Superman newspaper strips, *Action Comics, Nos. 2-56* and *Superman, Nos. 1-6*, were not "work-for-hire." For pre-January 1, 1978 works, this sole exception to statutory termination is governed by the "instance and expense" test.  "Expense" requires the publisher to assume upfront the expense and thus, the financial risk of a work's *creation*, which DC chose not to do.  "Instance" requires that the publisher has the legal right to supervise and control the process and elements of creation, which DC

---

[1] "ER" refers to Plaintiff's excerpts of record, served on December 22, 2011; "SER" refers to Warner's supplemental excerpts of record, served on March 23, 2012; "RER" refers to Plaintiff's reply excerpts of record, served concurrently.

**EXHIBIT B**
**99**

lacked. Accordingly, Warner failed to meet its burden on summary judgment of demonstrating "instance and expense" by credible, admissible evidence.

On appeal, Warner sidesteps this governing test and spuriously argues that DC's ownership of underlying Superman rights renders every derivative work "for-hire," contrary to the Copyright Act and clear precedent. Warner also revises history to assert that Superman material produced in 1938-43 by Siegel and Shuster's independent Cleveland operation was "work-for-hire," when DC's agreements said no such thing and independent contractors were not held to produce "work-for-hire" until the mid-1960s.

As Warner cannot meet its evidentiary burden, it freely distorts the record with misleading statements and fabrications in the hope this Court will not catch them – *e.g.*, falsely pretending that Jerry Siegel's extra-record memoir supports their position.

In further desperation, Warner resorts to baseless irrelevant attacks on Plaintiff's counsel to elicit prejudice and distract from the merits. Warner's concocted "tortious interference" allegations, repeated here, were not before the District Court; are the subject of a different lawsuit (*DC Comics v. Pacific Pictures Corp., et al.*, C.D. Cal. Case No. 10-CV-03633 ODW (RZx)) still to be adjudicated; and are addressed in Plaintiff's pending Anti-SLAPP appeal. 9th Cir. Case No. 11-71844. In willful violation of established appellate procedures,

**EXHIBIT B
100**

Warner lards its excerpts of record with scores of documents that were also not

before the District Court.

This Court should firmly reject Warner's meritless attempts to undermine

and evade Plaintiff's statutory rights, affirm the District Court's judgment on

Warner's cross-appeal, and reverse the District Court's judgment and remand for

further proceedings on Plaintiff's appeal.

## ISSUES PRESENTED ON CROSS-APPEAL

1.      Did the District Court correctly find, based on the undisputed

documentary evidence, that no contract was formed when the parties exchanged

counteroffers with numerous differences in material terms, and there was no signed

written agreement, as contemplated by the parties and required by 17 U.S.C. §

204(a)?

2.      Did the District Court correctly find that Plaintiff's claims were timely

due to an explicit written tolling agreement between the parties?

3.      Did the District Court correctly find that *Action Comics, No. 1* was not

a "work-for-hire," where Warner's arguments were variations on those made by it

and rejected by the Second Circuit in prior litigation, and Warner, in any event, has

not met its evidentiary burden?

4.      Did the District Court correctly find that portions of *Action Comics,*

*No. 4* and *Superman, No. 1*, based on Siegel's pre-existing material, before any

**EXHIBIT B**
**101**

relationship with DC, were not "work-for-hire"?

5.     Did the District Court correctly find as to the first two weeks of "Superman" newspaper strips that: (a) they were not "work-for-hire" because they were created on a purely speculative basis; and (b) their inadvertent omission from Plaintiff's notices of termination was "harmless error" under 37 C.F.R. §201.10(e)(1), because Plaintiff's intent to "terminate" the strips was clear?

6.     Did the District Court correctly enter a Rule 54(b) judgment on Plaintiff's First Claim and Warner's First Counterclaim, where such claims focused on the validity of Plaintiff's Termination and were fully adjudicated by the District Court?

## STATEMENT OF FACTS ON CROSS-APPEAL

The facts set forth below concern parts of Warner's cross-appeal.  The facts relevant to Plaintiff's appeal and "work-for-hire" issues are set forth in her opening brief.

### A.     <u>Settlement Negotiations Between The Siegels And DC</u>

On April 3, 1997, the widow (Joanne Siegel) and daughter (Laura Siegel Larson) of Jerry Siegel (the "Siegels"), exercised their rights under 17 U.S.C.§ 304(c) by serving on DC/Warner and filing with the Copyright Office seven notices of termination of Jerry Siegel's Superman copyright grants.  ER 1023-1092.

Laura/Joanne Siegel and DC/Warner thereafter engaged in settlement negotiations. ER 161. On April 15, 1999, the day before the Siegel Termination was to take effect, DC contested its "validity and scope." SER 390. Thereafter, the Siegels hired attorney Kevin Marks ("Marks"), and signed an explicit "Tolling Agreement" with DC as to any time-based defenses to contemplated litigation (the "Tolling Agreement"). SER 348-351.

The parties continued settlement negotiations in 2000-2001, conducted on DC's behalf by Warner's then-general counsel, John Schulman ("Schulman"). SER 456-528. The negotiations were complex, spanning a range of terms including copyright assignments, intricate studio definitions/calculations of multi-tiered royalties for different media, warranties and indemnifications. *Id.* Negotiations progressed in a telephone conference on October 16, 2001 between Schulman and Marks. SER 536:12. On October 19, 2001, Marks sent Schulman a six-page letter outlining the substance of what he believed was Warner's settlement offer in the October 16, 2001 conference. SER 456-461. On October 26, 2001, DC responded with a materially different outline and counter-offer that contemplated further explication in a formal written agreement. SER 463-470. Months later, on February 1, 2002, DC sent the Siegels a 56-page settlement proposal with many more new and changed material terms, not in Marks' October 19, 2001 offer or DC's October 26, 2001 counter-offer. SER 472-528.

**EXHIBIT B**
**103**

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, President of AOL Time Warner, Inc., stating "we were stabbed in the back …. [y]our company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the proposal…. After four years we have no deal and this contract makes an agreement impossible." SER 412-414.[2]  Parsons wrote back on May 21, 2002, stating that "we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve" and "we continue to hope this agreement can be closed."  SER 416.

Aware of the Siegels' extreme dissatisfaction with the "new" and "inconsistent" material terms, Marks began drafting a new proposal, which he never sent to DC.  SER 418; RER 39:21-40:15.  Nor did DC ever attempt to agree to Marks' October 19, 2001 proposal, or to modify or retract DC's October 26, 2001 or February 1, 2002 counter-proposals.

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC's Paul Levitz, terminating Marks and providing "notification that we are

---

[2] Warner's unsupported allegations that its settlement proposal generously "guaranteed" the Siegels "tens of millions" (Opp. 3, 4, 7) is both irrelevant to contract formation and false.  Warner's February 2002 Draft is rife with Hollywood accounting tricks for which studios in general, and Warner in particular, are notorious.  SER 472- 523; *Ladd v. Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1300 (2010).  Warner would not be trying to force on Plaintiff, and Plaintiff would never have rejected, such a lucrative settlement.  SER 412-414.

**EXHIBIT B
104**

totally stopping and ending all negotiations with DC." SER 418; *see Siegel I*, 542 F. Supp. 2d at 1136. As this letter arguably did not comply with the express terms of the Tolling Agreement, the Siegels sent a further letter on October 28, 2002 that complied with such terms. SER 349-50 ¶7; RER 96-97 (October 28 2002 Letter).[3]

## SUMMARY OF ARGUMENT

I.     No agreement was reached between the Siegels and DC as a matter of law. The parties' correspondence shows that Kevin Marks' October 19, 2001 letter, John Schulman's October 26 letter, and Warner's February 1, 2002 draft all had sharply varying material terms, and hence under clear California law were *counteroffers*, not acceptances, that terminated the preceding offer. Neither the basic scope of the agreement as to copyrights to be assigned, the complex royalties to be paid, the parties' warranties and indemnifications, nor numerous other material terms were ever agreed-upon, as shown by this objective documented exchange. Furthermore, the parties clearly contemplated, and the Copyright Act required, a formal written agreement, executed by both parties, which never happened due to their disagreements over material terms. Against this, Warner

---

[3] Warner's gratuitous recitation of an August 2002 offer by Ari Emanuel (Opp. 18-19) and citation to extraneous materials, **not** part of the District Court record, is irrelevant to the legal issue of whether the parties formed a contract in October 2001. Warner's improper inclusion in its Excerpts of Record of 166 pages of extra-record material, and raising of prejudicial, irrelevant new arguments on appeal, are addressed more fully in Plaintiff's motion to strike, and in the appellants' opening brief in *DC Comics v. Pacific Pictures Corp.*, 9th Cir. Case No. 11-71844.

cites inapposite cases where a written instrument *signed by both parties* was found to be enforceable, and pleads for the first time that established contract law should not apply to the entertainment industry. The District Court, applying well-settled California law to the parties' undisputed evidence, properly found that no agreement had been reached.

II.     The District Court also correctly held that the Siegels' claims were timely filed due to the parties' written Tolling Agreement. On appeal, DC abandons all of its prior arguments, and frivolously argues for the first time that the May 9, 2002 letter from Joanne Siegel to AOL Time Warner's President, complaining about Warner's February 2002 draft, somehow cancelled the Tolling Agreement. But the Tolling Agreement expressly required specific, formal notice of cancellation by certified mail to both DC's general counsel and outside counsel, and the May 9, 2002 letter did none of this. The District Court correctly found that notice of cancellation was not given to DC until September 21, 2002 at the earliest, and Warner concedes that in such event this action would be timely. In fact, notice of cancellation, as explicitly defined in the Tolling Agreement, was not given until October 28, 2002.

III.     The District Court correctly found that no part of Siegel and Shuster's Superman story, as published in <u>Action Comics</u>, No. 1 ("*Action Comics, No. 1*"), was "work-for-hire." The Second Circuit's decision in *Siegel v. Nat'l Periodical*

**EXHIBIT B**
**106**

ER 1070

*Publications,* 508 F.2d 909, 914 (2d Cir. 1974), which specifically rejected

Warner's "work-for-hire" arguments (based on Siegel and Shusters' conversion of

their strip to a magazine format) bars Warner under preclusion doctrines.

Notwithstanding this, Warner has presented no evidence that DC made the

contributions it alleges (*e.g.*, choice of colors) or that Siegel and Shuster's

reformatting revisions were "work-for-hire."  Moreover, the alleged items, when

compared to Siegel and Shuster's pre-existing illustrated story contain minimal, if

any, protectable new elements.  Finally, even if "work-for-hire" and marginally

protectable, these limited revisions would not transform DC into a "co-author" of

Siegel and Shuster's celebrated Superman story, per established precedent.

IV.    The District Court correctly found that parts of *Action Comics, No. 4,*

and *Superman, No. 1* were not "work-for-hire" and were successfully terminated,

because they had been fully developed by Siegel "on spec" prior to any

involvement by DC, and hence were not DC's "work-for-hire."

V.    The District Court correctly found that the first two weeks of

"Superman" newspaper strips were not "work-for-hire."  The strips were also

created "on spec" by Siegel and Shuster who, on their own initiative, pitched these

sample strips to several newspaper syndicators.  The inadvertent omission of these

strips from the hundreds of Superman newspaper strips from the same period listed

in the Siegels' Termination notices was correctly held to be "harmless error" under

37 C.F.R. § 201.10. DC had clear notice of the Siegels' intent to terminate all Superman works subject to termination, as this was both stated in and otherwise evident from their Termination notices.

VI. As set forth in Plaintiff's opening brief, the District Court erred in finding that *Action Comics, Nos. 2-3, 5-6, Superman, Nos. 1-23,* and *Action Comics, Nos. 7-56* were "works-for-hire." The works were done without any guaranteed financial compensation, negating "expense," and Warner's own evidence amply demonstrates that DC lacked any legal "right" to supervise and control Siegel and Shuster's creative process, negating "instance."

As to the remaining 1938-43 "Superman" newspaper strips, the District Court held on summary judgment that these strips were on "the outer edges of the work-for-hire doctrine" (ER 103), even though DC had failed to meet its burden of proving that the strips were created at DC's "instance and expense." The strips were not created at DC's "instance," as Siegel and Shuster, not DC, were the motivating factor in their creation and syndication; nor at DC's "expense," because Siegel and Shuster paid all expenses of creating the strips, were solely entitled to a contingent royalty, and thus assumed the costs and financial risks of creation.

The District Court also erred in ignoring other significant evidence that the strips were not "work-for-hire" including: (i) the McClure Syndicate's presumptively correct copyright registrations listing Siegel and Shuster as authors

of the strips; (ii) the September 22, 1938 joint venture agreement between McClure, Siegel and Shuster, and DC (the "McClure Agreement") in which Siegel and Shuster were to receive a very large share of the profits, and DC a minor share; (iii) *National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National Comics*"), 191 F.2d 594 (2d Cir. 1951), which held that McClure, the syndicator, was the assignee or "proprietor" of the strips, not the author; and (iv) McClure's subsequent written <u>assignment</u> of the strips to DC.

   VII.   The District Court's Rule 54(b) judgment was proper.  Plaintiff's First Claim, and Warner's First through Fourth Counterclaims, required ***only*** that the District Court decide whether the Termination was valid and which Superman *works* were subject to termination as non-"work-for-hire." The District Court fully adjudicated the First Claim and Warner's purported defenses in three voluminous published opinions.  Warner erroneously argues that the Rule 54(b) judgment is improper, because the District Court did not fully adjudicate the *literary elements* present in each "terminated" work.  But such issues only pertain, if at all, to Plaintiff's Second through Fourth Claims, concerning Warner's accounting obligations, and are excluded from the Rule 54(b) judgment.  For this reason, DC's "Ads" argument is also a red herring.  Even were this Court inclined to consider the Ads, the District Court correctly determined that the Ads contained no original Superman content.  Lastly, Warner did not contest the Rule 54(b) judgment as to

its Second through Fourth Counterclaims, conferring jurisdiction in any event.

## ARGUMENT

## I.   NO AGREEMENT WAS REACHED BY THE PARTIES

In 2004, after the Siegels filed suit for a declaration that they had successfully recaptured Siegel's original Superman and Superboy copyrights, Warner contended for the first time that they had reached a binding agreement with the Siegels in October 2001.  ER 298-301.

Three key documents conclusively demonstrate that no agreement was consummated:  (1) an October 19, 2001 letter (SER 456-61; the "October 19 Letter") from the Siegels' then-counsel, Kevin Marks to Warner's general counsel, John Schulman, containing one set of terms; (2) an October 26, 2001 reply from Schulman to Marks, containing a "more fulsome outline" of materially different deal terms (SER 463-70; the "October 26 Letter") to be fleshed out in a "draft agreement;" and (3) Warner's proposed February 1, 2002 draft agreement (SER 472-528; the "February 2002 Draft").

The fundamental differences between these counteroffers included the properties at issue (Superman, Superboy and Spectre in Marks' draft; nearly everything Siegel ever wrote in Warner's), the classification and calculation of royalties, warranties/indemnifications of/by the Siegels, and many other material differences.  RER 140-49.

As the District Court aptly held, "[o]ne need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 2002, 2002 draft to reach the conclusion that the parties failed to come to an agreement on all material terms." ER 202.

On appeal Warner advances erroneous arguments that: (i) the October 19 Letter, which Warner did not accept, still "settled the matter;" and (ii) despite the many material differences between the counteroffers, there are supposedly no differences in "essential terms." For all of this, Warner relies on inapposite cases which simply find that clear agreements, *signed by both parties*, are enforceable.

A.   **The October 19 Letter Was A Counter-Offer That Warner Never Accepted**

1.   **Contract Formation Requires An Objectively Manifested Agreement To The Same Material Terms**

The glaring differences, set forth below, between the parties' respective write-ups (Marks' October 19 Letter and Schulman's October 26 Letter), made within a week after the parties thought they had arrived at terms, demonstrate that the parties had not reached agreement. This divergence becomes even clearer with Warner's February 2002 Draft, elaborating upon its October 26 Letter.

Contract formation requires that the parties "agree upon the same thing in

the same sense." Cal. Civ. Code § 1580. "If there is no evidence establishing a

manifestation of assent to the 'same thing' by both parties, then there is no mutual

consent to contract and no contract formation." *Weddington Productions, Inc. v.*

*Flick*, 60 Cal. App. 4th 793, 811 (1998).

"[I]f the material facts are certain or undisputed, the existence of a contract

is a question for the court to decide." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th

199, 208 (2006). *See Roth v. Malson*, 67 Cal. App. 4th 552, 559 (1998) (affirming

summary judgment that no contract was formed because counteroffer was not

accepted).

## 2. There Was No Accepted Offer, Merely An Exchange Of Unaccepted Counteroffers

It is black-letter law that the "terms proposed in an offer must be met

exactly, precisely, and unequivocally for its acceptance to result in the formation of

a binding contract." *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-

856 (1998) (citing *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959)).

"'[A] qualified acceptance amounts to a new proposal or counteroffer

putting an end to the original offer'" (*id.*), and that "new proposal or counteroffer

[] must be accepted by the former offeror now turned offeree before a binding

contract results." *Landberg v. Landberg*, 24 Cal. App. 3d 742, 750 (1972); *see*

Cal. Civ. Code § 1585 ("An acceptance must be absolute…. A qualified

acceptance is a new proposal.").  "If the acceptance contains conditions not
embraced in the offer or adds new terms, there is no meeting of the minds and no
acceptance." *In re Pago Pago Air Crash,* 637 F.2d 704, 706 (9th Cir. 1981).
Thus, a counteroffer terminates the original offer and the power to accept the
original offer. *See Panagotacos,* 60 Cal App 4th at 855-856; 1-3 *Corbin on
Contracts* § 3.36 (2006).

   Here, it is crystal-clear from the objective exchange of counteroffers that
each contained material terms not accepted by the other party.

   Marks' October 19 Letter, though styled as an "acceptance" of Schulman's
oral "offer" of October 16, 2001, was actually a "counteroffer" because, according
to Schulman and his October 26 "more fulsome outline," something very different
was discussed on October 16.  SER 456-461; 463-470.  *See Tibbs v. Smart & Final
Iris Co.*, 152 Cal. App. 2d 618, 618, 623 (1957) (affirming summary judgment
where "there is no enforceable written contract" despite a letter purporting to
"accept[] said offer").

   Schulman's October 26 Letter, which purported to outline Warner's October
16 "offer," contained materially different terms (more favorable to Warner) than
those in Marks' purported October 19 "acceptance," "putting an end to" Marks'
counter-offer. *Apablasa*, 176 Cal. App. 2d at 726.  *See* ER 201; *Devereaux v.
Harper,* 210 Cal. App. 2d 519, 524-525 (1962) (no contract where "one person

16
**EXHIBIT B
113**

offers to do a definite thing and another introduces a new term into the acceptance"); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal. App. 2d 401, 407 (1962) (no binding agreement where letters contain "substantial changes in the proposed terms" that indicate the initial letter "was never intended to be the final memorial of the agreement of the parties").

The February 2002 Draft, contemplated by Schulman's October 26 outline, elaborated upon it with even more new or revised material terms, further showing that no agreement had been reached. SER 472-528.

### B. The Numerous Material Differences Between The Proposals Demonstrate That No Agreement Was Consummated

#### 1. Material Differences As To Scope Of The Agreement

Warner concedes that the scope of the rights assigned is an "essential" term. Opp. 29. But Warner fails to address the blatant differences: Marks' October 19 Letter was specifically limited to "Superman, Superboy and related properties … and the Spectre property." SER 456. Schulman's October 26 Letter was far broader, and included "all rights" in (1) anything related to "Superman, Superboy, Spectre and related properties – even if not created for DC Comics," and (2) anything "arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published)," and whether or not related to Superman, Superboy or the Spectre. SER 456, 464, 533-4, 541-42.

Warner's counteroffers thus significantly broadened the scope of properties to be assigned, which alone is sufficient to defeat Warner's claim that a binding contract was formed. *See Roth v. Garcia Marquez*, 942 F.2d 617, 626-627 (9th Cir. 1991) (no contract where long-form document unsigned due to dispute over scope of rights to be transferred).

### 2.   Material Differences As To Monetary Terms

Warner also concedes that the royalty terms are "essential" (Opp. 29), but fails to address the substantial differences.

Recoupment:  Under the October 19 and October 26 counteroffers, Warner would advance $500,000/year, "recoupable" against the Siegels' royalties.  Under Marks' October 19 proposal, those advances would never accumulate interest if unrecouped (*i.e.,* if advances exceeded royalties); under Warner's proposals, all advances were "non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment."  SER 458, 467.

Media Royalties:  Marks' October 19 Letter proposed a royalty of 6% of DC's "gross revenues" derived from the "use of the property in any and all media, in and on merchandise and in promotional campaigns."  SER 457.

Schulman's October 26 Letter proposed "6% of DC's receipts from all Media licenses for use of the Properties" (compare SER 457 and SER 467), without providing the definition of "Media licenses."  Revenues from sources other

than "Media licenses" (*e.g.,* from direct sales or assignment by DC to third-parties as opposed to licenses) are thus excluded.

So, while the October 19 and October 26 letters both use "6%," the "6%" applies to different things.

The February 2002 Draft deviated further, limiting the 6% royalty to "amounts actually received" by DC "in United States Dollars" from "licensing," and excluding "any sums received by DC Comics for providing any services or materials in connection with the licensing." SER 481, 545:17-546:13. The draft further reduced the applicable revenue stream by excluding cash advances paid to DC (against its royalties), unless such monies were or became non-returnable. SER 481.

Marks' October 19 Letter envisioned a 6% royalty from any and all media and merchandising uses of Superman, subject to reduction (a) to 3% on a "pro rata" basis "when the property is used in conjunction with other book characters," (b) to 1.5% in three instances: "Justice League of America," "Superfriends" and "Superheroes," and (c) to 1% in "extraordinary cases … such as [Warner's] license to Six Flags." SER 457 ¶5, 536:4-537:5.

In contrast, Schulman's October 26 counteroffer, and subsequent February 2002 Draft, reduced the 6% (a) to 3% for "licenses which commingle the Properties with another DC property similar in stature and used in a like manner,"

and (b) to 1.5% for "licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (*e.g.,* Justice League, Superfriends, Superheroes)." SER 467, 495. This transformed a limited reduction in three instances ("*i.e.*"), into a general principle ("*e.g.*").

<u>Merchandising Royalties:</u>  There were also material differences as to merchandising royalties – an extremely significant source of revenue.

As with "Media Royalties," Marks' and Schulman's proposals differed in their 6%/3%/1.5% categorizations.

Furthermore, Marks' October 19 letter limited the "1%" category to "extraordinary cases," with the "Six Flags" license as an example. SER 457 ¶5. Schulman's October 26 counteroffer added an entirely new category "with respect to licenses …. [for] a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensees, but to the extent such information is not available, the 6% shall be reducible to not less than 1%" – meaning that the category was not limited to "extraordinary cases," **and** the "floor" could be under 1% (based on purported licensee information). SER 467.

The February 2002 Draft added further new terms, including no payments

**EXHIBIT B**
**117**

for the use of Superman in advertising and that "only 10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC would be included. SER 496-97, 499-500. This contrasted sharply with Marks' October 19 Letter, which stated that the 6% *would* apply to "promotional campaigns" and did not restrict revenue from merchandising. SER 457.

Publishing Royalties: The parties also never reached agreement on the royalty applicable to Superman's exploitation in DC's "non-Superman" publications. The October 19 Letter provided a baseline royalty of "1% of the cover price," with a "pro rata" adjustment for non-"cameo" appearances, to a floor of .5%. SER 457-58 ¶6. Warner's October 26 Letter stated that "there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties do not appear in the title of the publication or feature in question." SER 468 ¶25.

The February 2002 Draft expanded upon Warner's new floor of *no royalties whatsoever* where Superman did not appear "in the title of the publication or feature." SER 499. The February 2002 Draft further added that no royalties would be paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts of excess of seventy percent off of cover price." SER 481.

Thus, under Marks' October 19 proposal, the Siegels would have been paid

for nearly all appearances of Superman.  Under Warner's October 26 and February 2002 counteroffers, there were numerous new exclusions and reductions of the royalty rate and the revenues to which it would apply (*e.g.,* no revenues even if Superman appears for months as a main character in a "Green Arrow" comic).

### 3.    Other Material Differences

Other material differences concerned, *inter alia*, warranties, indemnification, arbitration, audit rights, and credits.  RER 140-49 (chart detailing differences between the proposals).

As to "warranties and representations," the October 19 Letter stated that the "Siegel Family would ***not*** make any warranties as to the nature of rights, but would [only] ***represent that they have not transferred the rights to any party***."  SER 460 ¶13 (emphasis added).  Schulman's October 26 Letter stated the "Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement," and "no contract of any kind with any other party with respect to or related to the Properties," and "not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use."  SER 464.  Such broader warranties result in significant potential liability.  SER 534:6-10.

As to "indemnification," the October 19 Letter stated only:  "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions" – all to

their benefit.  SER 460 ¶14.  Schulman's October 26 Letter specifically added that the "Siegels defend and indemnify re third party claims," "Siegels defend and indemnify re Dennis [Laura's ex-husband] claims," and "Widow and daughter [Joanne and Laura] indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to Sign."  SER 470; *see also* SER 517-18.  In essence, Warner turned the October 19 Letter's indemnification from Warner to the Siegels into significant obligations of the Siegels to indemnify Warner.

Furthermore, Marks' October 19 Letter provided only for mutual non-disparagement.  SER 460 ¶13.  Schulman's October 26 counteroffer required the Siegels to "positively publicize the Properties," including "travel" for "public appearances," and to "consult with DC prior to any personal appearances, written statements, interviews or other activities."  SER 464,535:19-536:3  (Marks: "[T]hat was a problem because we were dealing with a woman of advanced years and a woman who was ill, and travel on them could be a burden.…  I wouldn't have wanted there to be any dispute that they were not fulfilling an obligation … and that … being the basis for claiming breach and withholding royalty payments and the like.").

The parties also diverged as to the credits to be accorded Jerome Siegel. *Compare* SER 459 ¶4 ER (October 19 Letter:  credit to be given in "paid ads"

concerning the Properties) *with* SER 469 ER (October 26 Letter: no credit in "paid ads"); *see* SER 539:12-17 (Marks: "[C]redit in paid ads … is something that's very important to clients. They want to see the credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's letter provided for credit on screen only and not in paid ads.").

Just as Schulman couched his October 26 counteroffer as a "more fulsome outline," Warner dismisses vast differences in the February 2002 Draft as simply the product of it being a "long-form" or more "detailed." Opp. 32. Warner's subjective characterizations do nothing to change the objective manifestations of the parties' intent in their competing written counteroffers, nor the numerous material differences between them. ER 201 ("Defendants … seek to create issues of fact through <u>post hoc</u> testimony and rationalizations. None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents ....").

### C. <u>Warner's Cases On This Issue Are Manifestly Inapposite As They Concern The Enforceability Of Signed Agreements</u>

To evade this clear lack of an agreement, Warner cites to cases that stand for the unremarkable proposition that a written agreement, signed by the parties, is an enforceable contract if sufficiently "definite."

Warner relies primarily on *The Facebook Inc. v. Pac. Nw. Software, Inc.*,

640 F.3d 1034 (9th Cir. 2011) ("*Facebook*") (Opp. 26-27), which is inapposite as it concerned an agreement <u>signed</u> by both parties. Furthermore, "[t]he parties stipulated that the Settlement Agreement was … 'binding', and 'may be submitted [to a court] to enforce [it].'" *Id*. at 1037. The question was whether the signed document had sufficiently definite material terms to be enforceable. *Id*. As the material terms were a lump-sum payment and a specified amount of stock, this Court unsurprisingly found the executed agreement binding and enforceable. *Id*.

*Facebook* is similar to *In Harris v. Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999), also relied upon by Warner (Opp. 26), which upheld an agreement to pay $250,000 in exchange for a general release, executed by all parties, under a signature block stating "[a]ccepted and agreed."

Warner's other cases similarly involve a signed instrument demonstrating the parties' intent to be bound. *See Estate of Thottam,* 165 Cal. App. 4th 1331, 1340-41 (2008) (parties agreed "by initial and by signature" and the terms are "sufficiently clear to determine obligations to which the parties agreed"); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 (1991) (enforcing signed agreement where agreed-upon material terms were "undisputed"); *Patel v. Liebermensch*, 45 Cal. 4th 344, 346 (2008) (signed contract enforceable, though it did not specify the "time and manner of payment" because "a reasonable time is allowed").

Warner also relies on *Elite Show Servs. Inc. v. Staffpro, Inc.*, 119 Cal. App. 4th 263, 268-69 (2004), which did not concern contract formation, but simply found that a Cal. Civil Code § 998 litigation settlement offer (entitling one to fees and costs) was sufficiently definite.

If Marks' October 19 proposal contained signature lines executed by the parties, then *Facebook* and the other cases Warner cites might be applicable to whether the terms were sufficiently definite to be enforceable. That obviously did not happen. Instead, the parties' counteroffers demonstrate disagreement as to material terms preventing the formation of a contract.

Nor is it this Court's responsibility to relieve Warner from its failure to respond to Marks' October 19 Letter with an unqualified acceptance. As the District Court correctly noted, "there is no document or set of documents reflecting agreement by the parties to singular, agreed terms." ER 202. And where the parties have not agreed upon terms, "courts will not write a new contract" for them. *Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990).

### D. <u>A Final Written Agreement Signed By The Parties Was Required</u>

It is equally clear from the parties' words and conduct that, given the importance and complexity of the subject matter and deal points, any agreement was subject to documentation and would need to be reduced to a mutually-acceptable written contract. ER 463 ("We're working on the draft agreement"),

SER 472.  *See Rennick v. O.P.T.I.O.N. Care, Inc.,* 77 F.3d 309, 316 (9th Cir. 1996)

(affirming summary judgment; no contract as a matter of law where "the parties

intended … not to be bound unless and until a subsequent agreement was made").

"[W]hen it is a part of the understanding between the parties that the terms

of their contract are to be reduced to writing and signed by the parties, the assent to

its terms must be evidenced in the manner agreed upon or it does not become a

binding or completed contract."  *Duran v. Duran*, 150 Cal. App.3d 176, 180 (1983)

(citations omitted).  *See Banner Entm't Inc. v. Superior Court (Alchemy Filmworks*

*Inc.)*, 62 Cal. App. 4th 348, 358 (1998) ("When it is clear … that both parties

contemplated that acceptance of the contract's terms would be signified by signing

it, the failure to sign the agreement means no binding contract was created.")

(citation omitted).

Moreover, as any such agreement would involve an assignment of the

Siegels' recaptured copyright interests, a written contract was required as a matter

of law.  17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by

operation of law, is not valid unless an instrument of conveyance, or a note or

memorandum of the transfer, is in writing and signed by the owner of the rights

conveyed or such owner's duly authorized agent.").[4]

---

[4] On appeal Warner argues for the first time that a purported "handshake" is
sufficient and relies on "principles essential to the entertainment industry, where
many business deals are never formalized" (Opp. 3, 28-29), and on secondary

**ER 1088**

Marks' October 19 Letter cannot possibly qualify as the required "writing." While "[n]o magic words must be included in a document to satisfy § 204(a) …. the parties' intent as evidenced by the writing must demonstrate *a transfer* of the copyright." *Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (emphasis added). The October 19 Letter is not "a transfer" of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels "would [make such] transfer" in a final executed agreement. SER 458.

Here, a signed written agreement assigning the Siegels' copyrights was both contemplated by the parties and required, but never approved and executed. *See Goodworth Holdings Inc. v. Suh* 239 F. Supp.2d 947, 958 (N.D. Cal. 2002) (granting summary judgment where parties "had a lot of conversations about putting a deal together, but when it finally came down to determining material terms … in order to put them into writing, both parties walked away").

### E. The Clear Reservations Demonstrate That No Contract Was Formed

In *Valente-Kritzer Video v. Callan-Pickney*, 881 F.2d 772, 775 (9th Cir.

---

sources that nonetheless flag § 204(a)'s writing requirement, both placing it at issue. Opp. 28; *Oral Contracts In the Ent Industry* ("*Oral Contracts*"), 1 Va. Sports & Ent. L.J. 101, at 108-109), *Resolving Disputes over Oral and Unsigned Film Agreements* ("*Resolving Disputes*"), L.A. Law. 18 (Apr. 1999) at 20. Furthermore, as this "issue is one of law and … the [factual] record has been fully developed," it can properly be raised on appeal. *In re Eliapo*, 468 F.3d 592, 603 (9th Cir. 2006). Plaintiff also addressed § 204(a)'s writing requirement on summary judgment (RER 100), albeit on another point.

28

**EXHIBIT B**

**125**

**ER 1089**

1989), an attorney for one party sent a draft agreement accompanied by a letter that stated in part "Thank you for your cooperation and congratulations on landing the deal" and "Please call if you have problems."  This Court found that that there was no binding contract, despite the attorney's repeated references to "the deal," because the correspondence contained reservations, including the right to comment and a request for the other party to communicate any disagreements.  *Id.*

The same type of reservations appears throughout the correspondence here, demonstrating that neither side viewed their proposals as final.  Marks' October 19 Letter concluded by stating "John, if there is any aspect of the above that is somehow misstated, please let me know…."  SER 461.  Schulman's responsive October 26 Letter similarly stated "I enclose herewith … ***a more fulsome outline of what we believe the deal we've agreed to is.  We're working on the draft agreement*** … we will have this super-matter transaction in document form."  SER 463 (emphasis added).  The correspondence accompanying Warner's February 2002 Draft stated:

> I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property.  ***As our clients have not seen this latest version*** of the agreement, ***I must reserve their right to comment.***  In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments."  We are finalizing those and, as soon as they are ready we will forward them to you.

SER 472 (emphasis added).  Such reservations, along with the numerous material

29

**EXHIBIT B**
**126**

differences in the parties' counteroffers, make plain that they had not arrived at a contract.

### F.  Established Contract Law Applies To The Film Industry

This Court should give no currency to Warner's frivolous suggestion – not made below – that the entertainment industry requires deviation from established contract and copyright law.  Opp. 28.  *See Effects Assocs. v. Cohen*, 908 F.2d 555, 556-557 (9th Cir. 1990) (rejecting argument that "[m]oviemakers do lunch, not contracts" and enforcing 17 U.S.C. § 204(a)); *Weinstein Co. v. Smokewood Entm't Group*, LLC, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) (same).

In support of the proposition that it is "standard" in the entertainment industry to forgo written contracts, Warner cites to articles, not before the District Court, that contradict their position and, in any event, are unsupported by any testimony, expert or otherwise.  Opp. 28-29.  *Oral Contracts*, 1 Va. Sports & Ent. L.J. at 108-09, 111-12, cautions against oral agreements for anything but "simple and short-term contracts;" and notes that 17 U.S.C. § 204(a) mandates an executed written instrument for copyright transfers.  *Resolving Disputes*, L.A. Law. at 20, 48, notes "evidence of industry custom and practice is not [admissible] if it is offered to prove or disprove whether or not a contract was formed," and similarly emphasizes § 204(a)'s writing requirement.

**EXHIBIT B**
**127**

### G. Summary Judgment Is Appropriate Because No Enforceable Agreement Existed As A Matter of Law

#### 1. Summary Judgment As To Contract Formation Is Proper

Warner contends that "at a minimum" a jury should consider its position. Opp. 34-37. However, Warner has not met the threshold to survive summary judgment. Once Plaintiff met her initial burden of demonstrating the absence of a genuine issue of fact, the burden shifted to Warner to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). Warner points to no real evidence contradicting the facially-obvious correspondence that objectively demonstrates that no contract was formed. As this documentary evidence is "undisputed," the question of whether or not a contract was formed "is a question [of law] for the Court to determine." *Bustamante*, 141 Cal. App. 4th at 208.

Courts thus routinely decide the issue of whether a contract was formed on summary judgment. *See Novak v. Warner Bros Pictures, LLC,* 387 Fed. Appx. 747, 749 (9th Cir. 2010) (affirming summary judgment where "[t]he evidence conclusively establishes that, when negotiations broke off, the parties had not reached agreement" and "[n]o rational jury could find that a contract was entered between the Producers and Warner"); *Krasley v. Superior Court*, 101 Cal. App. 3d 425, 432 (1980) ("A number of cases have found [summary judgment] proper and

31
**EXHIBIT B**
**128**

indeed required in situations involving … contracts which were in fact illusory and consisted only of … offers and counteroffers.") (collecting cases and upholding summary judgment).

While Warner claims "whether parties intended to be bound by terms expressed in an informal agreement is one of fact," and summary judgment somehow improper, the cases it cites are either inapposite or to the contrary. Opp. 35; *Bustamante*, 141 Cal. App. 4th at 208 (affirming summary judgment that "no enforceable contract was ever formed between the parties," despite purported oral agreement); *Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359-62 (unsigned draft agreements did not create enforceable contract despite testimony as to oral agreements); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 846 (1941) ("When, as here, the evidence indisputably shows that all the terms and conditions of the understanding between the parties were definitely agreed upon … the parties are bound."); *S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1132 (9th Cir. 2004) (applying federal labor law, not California law, to find "triable issues of fact" as to a collective-bargaining agreement); *Callie v. Near*, 829 F.2d 888 (9th Cir. 1987) (applying Arizona law regarding a "court['s] equitable power to enforce summarily a ['*complete*'] agreement to settle a case pending before it").

## 2. None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed

To distract from glaring material differences in the parties' written counteroffers, Warner grossly mischaracterizes Marks' testimony to claim that a binding contract had been reached. Opp. 28-29, 32. Warner asserts that "Marks told Schulman the draft was 'not contrary to what [had been] agreed to' and the parties could 'deal with it.'" Opp. 32. The quotes were not even Marks' words, but inadmissible hearsay in the form of Schulman's purported notes that Plaintiff objected to below. RER 88 ¶15. Marks testified to the opposite. SER 127. Marks also testified in detail how Warner's counteroffers contained "many additional terms not agreed to." SER 128, 533-547.

Warner leans heavily on Marks' alleged subjective beliefs as to "a deal." [5] This approach is fundamentally incorrect, because whether a binding contract was formed is not based on subjective belief, but on objective manifestation of intent – here, the competing counteroffers. *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942–943 (1976) (mutual consent "is determined by objective rather than subjective criteria"); *Rael v. Davis*, 166 Cal. App. 4th 1608, 1618 n.11 (2008) ("Contract

---

[5] To do so, Warner improperly goes well "beyond the record evidence" and mischaracterizes inadmissible hearsay in a letter from Plaintiff to her half-brother. Opp. 37. Plaintiff's concurrently-filed motion to strike details Warner's brazen attempt to inject 166 pages of new material into the record on appeal in willful violation of established appellate procedures. F.R.A.P. 10(a); Circuit Rule 10-2; *Lowry v. Barnhart*, 329 F.3d 1019, 1025-26 (9th Cir. 2003).

formation is governed by objective manifestations, not subjective intent of any individual involved.").

Notwithstanding this, Marks' testimony is consistent with the evidence and the District Court's ruling that a binding contract was never consummated. RER 55 (Marks: "Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no ….").

Warner falsely asserts that the differences between the outlines were not raised at the time. Opp. 33. Schulman sent his October 26 Letter when Marks was away for a month in China. SER 461; RER 21:16-24. Upon Marks' return he attempted to contact Schulman, but Schulman was on vacation. RER 29:4-7. On May 9, 2002, Joanne Siegel wrote a letter to Parsons, President of AOL Time Warner, specifically condemning the "unconscionable contract dated February, 2002 [which] contained new, outrageous demands that were not in the proposal." SER 412-414.

Warner also conspicuously omits Parsons' May 21, 2002 reply to Ms. Siegel, in which he states "we continue to hope that this agreement can be closed." SER 416. Parson did *not* claim a binding agreement had ever been reached, but instead indicated that the parties had yet to reach an agreement. *See* ER 163 (District Court: "Time Warner 'expected' that the submission of the draft agreement would result in further 'comments and questions on the draft' by Siegel

family's representatives that 'would need to [be] resolve[d].'").

Warner also relies on its purported post-agreement conduct. Yet, at no time in the three years before the Siegels filed suit did Warner/DC ever assert that a settlement agreement had been reached. Nor did Warner/DC ever retract their October 26, 2001 or February 1, 2002 counteroffers.

Warner weakly claims that DC "manifested its understanding of the agreement" by "setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie." Opp. 30. This supposed "reserve account" was anything but. RER 73-74 (DC: "None of the Defendants have ever represented … that an actual escrow fund had been created," and admitting that DC had only "summary statements … consisting of one-line quarterly total entries."). Warner also never states that it provided the Siegel family credit on its 2005 film. SER 459 ¶4.

Warner's *de minimis* purported performance does nothing to overcome the fact that there was no meeting of the minds. *See Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359 ("[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*") (emphasis in original).

* * *

As the District Court correctly held: "[Warner's] argument … is premised on the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter, and call it a contract, regardless of their materially different October 26, 2001 letter … and their vastly different February 1, 2002 draft, which were both part and parcel of the same settlement negotiation." ER 201. None of Warner's arguments can withstand the great weight of the objective evidence that no contract was formed.

## II. THE SIEGELS' ACTION WAS TIMELY FILED

The Copyright Act provides a three-year statute of limitations for copyright claims. 17 U.S.C. § 507(b). The District Court held, and Warner does not dispute here, that the Siegels' claims accrued at the earliest on April 16, 1999. ER 197.

To facilitate settlement negotiations, DC and the Siegels entered into a tolling agreement dated and effective April 6, 2000 (the "Tolling Agreement") (SER 348-51) that neither "would assert any statute of limitations or laches defenses relating to …the [Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof." SER 348 at ¶1. Paragraph 7 provides that the Tolling Agreement remain in force "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices [of

Termination], or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices,'" and that "[a]ny [such] notices required under this Agreement shall be sent by United States Mail, Return Receipt Requested to: To DC Comics['] Lillian J. Laserson[,] General Counsel ... With a copy to: Carol F. Simkin/Roger L. Zissu," DC's outside counsel. SER. 349-350.

On September 21, 2002, the Siegels mailed a letter to their counsel, terminating them, and stating that "effective immediately, we are totally stopping and ending all negotiations with DC." A copy of this letter was sent by regular mail to Paul Levitz, then President of DC. RER 96-97.

Realizing that such cancellation notice did not precisely comport with paragraph 7 of the Tolling Agreement, the Siegels sent formal notification of cancellation on October 28, 2002 "[p]er the Tolling Agreement." SER 420.

The District Court correctly found that notice of cancellation was given, at the earliest, by the September 21, 2002 letter. Warner admits that "[i]f [the September 21, 2002] letter terminated negotiations" the Siegels' claims would be timely. Opp. 38. As "cancellation of th[e] Tolling Agreement" (SER 348 at ¶1, 349-50 at ¶7) did not occur until September 21, 2002, at the earliest, or October 28, 2002, at the latest, this action is timely.

Tellingly, Warner argued to the District Court that the statute was triggered on October 30, 2001 (RER 134-37), but now argues for the first time that "[t]here

**EXHIBIT B**
**134**

**ER 1098**

are two possible … 'triggers'" – May 9, 2002 or September 21, 2002.  Opp. 38.

Warner's argument is premised on a false construct.  Opp. 37-39.  Warner improperly claims for the first time on appeal (see *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002)) that Joanne Siegel's May 9, 2002 letter to Parsons at Time Warner, complaining about the February 2002 Draft, triggered the statute because she said it "makes an agreement impossible."  Opp. 38.[6]  The May 9, 2002 letter did not constitute "cancellation of th[e] Tolling Agreement pursuant to paragraph 7 [t]hereof" as it was not "sent by United States Mail, Return Receipt Requested" to DC's general and outside counsel – it was not even sent to DC.

Warner argues that a statement in another lawsuit that negotiations were "moribund" as of the May 9, 2002 letter is at odds with the fact that the Tolling Agreement was not cancelled until months later.  Opp. 39.  First, "moribund" means dying, not cancelled or terminated.  Second, this has no bearing on the plain language and effect of the Tolling Agreement, which expressly requires a formal cancellation notice "pursuant to paragraph 7 [t]hereof."  SER 348 at ¶1, 349-50 at ¶7.

The District Court correctly concluded that "the present action is timely."  ER 198.

---

[6] Before the District Court, Warner took the opposite position that the May 9, 2002 letter "confirmed" an "amicable resolution."  RER 136.

## III.   NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE

### A.   The District Court Properly Rejected Warner's "Work-for-Hire" Claim As To *Action Comics, No. 1*

The District Court correctly rejected Warner's tenuous claim that random aspects of *Action Comics, No. 1* (*i.e.*, sparse added panels, colorization and cover art by Shuster) necessary to convert it from a newspaper format to a magazine format were "work-for-hire," because "the thrust of [Warner's] argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here."  ER 183.

In *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) ("*Siegel*"), the Second Circuit held that *Action Comics, No. 1* was <u>not</u> a work-for-hire, based on the record before it and 1948 findings of fact from a prior state-court lawsuit between the authors and DC:

> The court below held that Superman was also a 'work for hire' within the meaning of the Copyright Act, 17 U.S.C. § 26 …. We disagree….  On the contrary, th[e] [state] court's finding of fact no. 8 was that the plaintiffs were "the originators and authors of the cartoon character SUPERMAN and of the title SUPERMAN and first created cartoon material in which the said character and title first appeared in 1934 … ."  The court below instead relied upon finding of fact no. 22 in which the state court found that ***the plaintiffs did revise and expand the Superman material at the request of the defendants and that this revised material constituted the formula for the ensuing series of strips. We do not consider this tantamount to a conclusion that Superman was a work for hire***. ….
> ***In the case before us Superman and his miraculous powers were completely developed long before the employment relationship was***

39

**EXHIBIT B**
**136**

ER 1100

*instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the strip was a work for hire*.[7]

As the District Court correctly held, Warner's claim is precluded by this decision that the "revisions …were simply to accommodate a magazine format," and that this is "not … sufficient" to establish "work-for-hire." *Id*.

## 1. Claim And Issue Preclusion Apply To Issues And Claims Raised Or Which Could Have Been Raised

Findings in prior litigation are binding on the parties and their successors in subsequent litigation under claim and issue preclusion. *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995). *See Montana v. U.S.*, 440 U.S. 147, 153-154 (1979) (preclusion doctrines protect litigants against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing … inconsistent decisions").

"[C]laim preclusion[] prohibits lawsuits on 'any claims that were raised *or could have been raised*' in a prior action." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002) (emphasis added).

Claim preclusion applies where there is "'(1) an identity of claims, (2) a

---

[7] The Second Circuit spoke of a "presumption" because satisfaction of the "instance and expense test" creates a rebuttable presumption that a work is "for-hire" under the 1909 Act. *Twentieth Century Fox Film Corp. v. Entertainment Distributing* ("*Twentieth Century*"), 429 F.3d 869, 881 (9th Cir. 2005).

final judgment on the merits, and (3) identity or privity between parties.'" *Owens*

*v. Kaiser Found. Health Plan, Inc.*, 244 F. 3d 708, 713 (9th Cir. 2001). Identity of

claims exists when two suits arise from "the same transactional nucleus of facts."

*Id*. What matters are the facts constituting the cause of action, not the legal theory

upon which a party chooses to frame its complaint. *Id*.

Issue preclusion "bars relitigation of issues 'actually litigated and necessarily

determined by a court'" in "'subsequent suits based on a different cause of action

involving a party to the prior litigation.'" *Durkin v. Shea & Gould*, 92 F.3d 1510,

1515 (9th Cir. 1996) (citations omitted). Issue preclusion applies where:

> (1) [T]he issue necessarily decided at the previous proceeding is identical to
> the one which is sought to be relitigated; (2) the first proceeding ended with
> a final judgment on the merits; and (3) the party against whom [issue
> preclusion] is asserted was a party or in privity with a party at the first
> proceeding.

*Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citation

omitted).

As with claim preclusion, "'once an issue is raised and determined, it is the

entire issue that is precluded, not just the particular arguments raised in support of

it in the first case.'" *Kamilche Co. v. United States*, 53 F.3d 1059, 1063 (9th Cir.

1995) (citations omitted). *See In re Marshall*, 600 F.3d 1037, 1061 (9th Cir. 2010)

("[P]reclusion applies even when the subsequent litigation rests on a new theory of

recovery."); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985)

("The judgment prevents litigation of all grounds and defenses that were or could have been raised in the action.").

Accordingly, the Second Circuit's *Siegel* decision that *Action Comics, No. 1* was not a work-for-hire prevents Warner from again arguing that *Action Comics, No. 1*, in whole or in part, was a "work-for-hire." *Kamilche*, 53 F.3d at 1062.

### 2. Warner's Arguments Are Unpersuasive

Warner lamely claims that, notwithstanding the Second Circuit's clear decision in *Siegel*, 508 F.2d at 912-914, that "portions" of *Action Comics, No. 1* were "work-for-hire."

      a.   <u>The "Work-For-Hire" Issue Was Decided</u>

Warner argues that, while the Second Circuit clearly stated "the evidence was not otherwise 'sufficient to create the presumption that [*Actions Comics No. 1*] was a work-for-hire' …. neither the district court nor the Second Circuit reached the opposite conclusion." Opp. 70.

This is sophistry. *Siegel* acknowledges that "the court below held that Superman was [] a 'work-for-hire,'" explains the district court's reasoning, and plainly holds: "We disagree." 508 F.2d at 909. The Second Circuit found that *Action Comics, No. 1* was **not** a "work-for-hire," as later recognized by both this and the Second Circuit. *See Twentieth Century,* 429 F.3d at 880 (stating that *Siegel* held that "the Superman comic strip was not created at the employer's instance

42

**EXHIBIT B**

**139**

where the Superman character 'had been spawned by the [author] four years before the relationship between [the] authors and the [employer]'"); *Playboy Enters. v. Dumas* ("*Playboy*")*,* 53 F.3d 549, 554 (2d Cir. 1995) ("[I]n *Siegel,* we found that the comic strip character Superman was not a "work-for-hire" because although the creators revised and expanded the comic strip at the request of the publishers and were paid for that work, the Superman character was completely developed long before the employment relationship existed.").

      b.    The "Work-For-Hire" Issue Was Litigated And The Second Circuit's Ruling Is Not *Dicta*

Warner falsely argues that, because it purportedly did not present the same arguments about revisions and colorization to the Second Circuit in *Siegel*, the issue was not "'actually litigated.'" Opp. 70.

In *Siegel*, Warner sought summary judgment that it owned the Superman renewal copyright, arguing that *Action Comics, No. 1* was "work-for-hire," which the district court accepted. *Siegel v. Nat'l Periodical Publications,* 364 F. Supp. 909, 1033-37 (S.D.N.Y. 1973). In rejecting this, the Second Circuit expressly considered DC's so-called "revised and expanded material" (Opp. 68), and concluded that this was insufficient to establish "work-for-hire," as the "the revisions … were simply to accommodate Superman to a magazine format." *Siegel*, 508 F.2d at 914. As the District Court correctly noted, DC's supposed

"contributions" were expressly litigated and considered in *Siegel*:

> The evidence that was proffered during the 1970s litigation in the trial court on the work-for-hire question included declarations from Siegel and Shuster discussing what took place during the reformatting process. This is the same evidence that defendants now seek to use in this case to argue that the reformatted material was a work made for hire.

ER 183-184; *see* ER 653-54 (Siegel affidavit); SER 385-386 (Shuster affidavit). On appeal, DC again relies on the testimony of Siegel and Shuster's testimony in *Siegel*. Opp. 67.

Nor was the Second Circuit's finding "dicta." Opp. 69. If DC had owned this Superman story as a "work-for-hire," there would have been no need for the remainder of the Second Circuit's holding that Siegel and Shuster owned this copyright, but transferred it to DC in a March 1, 1938 assignment (ER 917; the "March 1938 Grant").

To the extent Warner relies on evidence or argument not presented in *Siegel*, such does not change the analysis. *See Paulo v. Holder,* 669 F.3d 911, 918 (9th Cir. 2011) ("If a new legal theory or factual assertion raised in the second action is relevant to the issues that were litigated and adjudicated previously, the prior determination of the issue is conclusive…."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 352 F. Supp. 2d 1119, 1125 (C.D. Cal. 2005) ("Preclusion cannot be avoided simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first."); *Chicot County Drainage Dist. v. Baxter*

*State Bank*, 308 U.S. 371, 378 (1940) (preclusion applies "not only as respects matters actually presented … 'but also as respects any other available matter which might have been presented to that end'") (citation omitted).

The Second Circuit specifically considered and addressed the additions to *Action Comics, No. 1*. *Siegel,* 508 F.2d at 914. However, even if it had not, Warner's claim that limited portions of *Action Comics, No. 1* are "work-for-hire" is naturally subsumed within the litigated issue of whether *all* of it was a "work-for-hire." As the entirety of *Action Comics, No. 1* was held <u>not</u> to be "work-for-hire," a portion of it cannot be "work-for-hire." *See Kamilche*, 53 F.3d at 1063; *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d. Cir. 1986) (issue preclusion extends to issues which "by necessary implication... [are] contained in that which [was] explicitly decided."); *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) (same).

### B.    <u>The Alleged Additions Were Not "Work-For-Hire"</u>

Even notwithstanding the preclusive effect of *Siegel*, no part of *Action Comics, No. 1* was "work-for-hire."

<u>Siegel and Shuster's 1938 Material</u>:  Warner's claim that it owns as "work-for-hire" Siegel and Shuster's limited "additions" to their pre-existing material when they re-cut it to accommodate a magazine format is unpersuasive. Opp. 67-68. When Siegel and Shuster re-cut their Superman strip they did so "on spec" of

their own volition, as they were still merely trying to get their pre-existing work published. ER 511-12, 960 ¶¶32, 34.

To prove "work-for-hire," DC must establish "instance" – which requires that the "hiring party had 'the right to control or supervise the artist's work'" (*Self-Realization Fellowship Church v. Ananda Church of Self-Realization* ("*Self-Realization*"), 206 F.3d 1322, 1327 (9th Cir. 2000)) and "expense" – which requires that the hiring party take on the "financial risk" of the work's creation. *Twentieth Century,* 429 F.3d at 881. DC had neither.

DC purchased Siegel and Shuster's pre-existing thirteen-page strip in the March 1, 1938 Grant **after** it was re-cut with extra interstitial panels, submitted to DC and accepted for publication. *See* ER 960 ¶32 ("The first thirteen pages of SUPERMAN material … were in existence … before the execution of the instrument of March 1, 1938."); *Siegel*, 364 F. Supp. at 1034; 508 F.2d at 911.

DC's purchase of this finished product in the March 1, 1938 Grant belies the notion that the reformatted strip was "for hire." *See* ER 917; *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (noting that, "even if [defendant] had established that [the author] created the songs at the instance and expense of [employer] or [movie company], [plaintiff] rebutted the work-for-hire presumption" by executing an assignment to his employer's company).

Warner grossly mischaracterizes Siegel and Shuster's 1970s affidavits

**EXHIBIT B
143**

regarding the minor revisions they made to convert their Superman strip to a magazine format. Opp. 67. Siegel and Shuster both clearly testified that this was done on their own volition and at their own expense to facilitate their story's acceptance for publication. SER 386; ER 653-54; *Siegel*, 364 F. Supp. at 1034; 508 F.2d at 911, 914. DC merely provided format specifications (13 pages with 8 panels per page) and left it to the authors to figure it out. *See* SER 386 (DC: "just lay the thing out.").

Shuster was adamant that none of these revisions were done at DC's direction: "I am aware that the defendants on this motion have taken the position that they directed Jerry and I to revise and expand the Superman material submitted to them. This contention is false…. We were given no instructions or directions by Detective as to what to do or what to include in Superman." SER 386. Shuster explains that these changes were done only to "conform to [DC]'s page size" and to be certain of "having a sufficient number of panels to make a thirteen page release." *Id.*

Siegel is equally clear in his affidavit: "At no time did [DC] direct or even request that this material be revised. In fact it was published as we submitted it…." ER 653-54. Siegel also points out that the minor panels added to satisfy the format "illustrated the story continuity [Siegel] had already written." ER 654.

Nor did the March 1937 agreement between Siegel and Shuster and DC (ER

**EXHIBIT B**
**144**

**ER 1108**

1115-16; the "March 1937 Agreement") make Siegel and Shuster's work "for-hire." *Siegel*, 508 F.2d at 914. That agreement concerned other properties (*Slam Bradley* and *The Spy*) and merely gave DC a right of "first refusal" to purchase additional material, incompatible with ownership of "work-for-hire" at the moment of creation. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*")*,* 342 F.3d 149, 162 (2d Cir. 2003) ("[W]ith a true work for hire, copyright ownership. . . [is] with the employer automatically upon the employee's creation of the work"); *LIN Broadcasting Corp. v. Metromedia Inc.*, 74 N.Y.2d 54, 56 (1989) ("[A] right of first refusal merely provides . . . a chance to buy.").

Colorization: Warner contends, without support, that DC, not Siegel and Shuster, chose the colors in *Action Comics, No. 1*, and misrepresents the declaration of Jack Adler (Opp. 61-62), which the District Court properly eviscerated:

> ***Mr. Adler does not state that he worked on the colorizing of Action Comics, Vol. 1, itself***. Instead he states that he "worked for the engraving company that made the metal plates for printing of, among other things, comic books for Detective Comics." ….. Siegel and Shuster may have also placed certain color directions with their material to be utilized in the engraving process. ***In fact, that the earlier incarnation of Superman as hulking strongman in the tradition of Tarzan was created by the pair as a comic book with color illustrations lends to the possibility that they already had pre-conceived color choices in mind*** ….
>
> ***Moreover, viewed in context, Mr. Adler's declaration appears to describe procedures generally employed in the printing process, not as evidence of what actually occurred with respect to the printing of Action Comics, Vol. 1, itself***. …. Without any direct link

**EXHIBIT B**
**145**

between Mr. Adler's work and the printing of Action Comics, Vol. 1,
in particular, there exists an insufficient evidentiary foundation for his
conclusions ….

ER 186-87 (citations omitted). This conclusion was supported by expert
testimony. *See* RER 84-85 ¶¶6-10. As noted by the District Court, even if the
physical colorization of *Action Comics, No. 1* was handled by others, this would
not prevent Siegel and Shuster from choosing the colors in the form of "color
guides" or sketches for their "pet project." This was both commonplace for
contemporary comic artists, and there was evidence that Siegel and Shuster
actually did so. RER 85 ¶9.

    <u>Cover Art</u>: Warner's claim that DC's artists "created" the *Action Comics,
No. 1* cover ("Cover") is equally unpersuasive. Opp. 62. Warner cites to an
ambiguous letter by Vince Sullivan (Opp. 63), which the District Court properly
viewed as just as easily referring to a pre-existing cover illustration by Shuster. ER
188 ("[G]iven the limited nature of the information contained in the passage it
could also be argued that, in his earlier letter, Siegel enclosed an illustration by
Shuster as a suggestion for the comic book's cover and Detective Comics decided
to 'use' this suggestion.").

    DC misleads when it claims "per Siegel's suggestion, DC used one of the
panel drawings from the Superman story as a template to create the cover art.
Siegel confirmed these events in his memoir." Opp. 63. First, the part of the

49
**EXHIBIT B
146**

ER 1110

memoir it cites was not before the District Court and is not part of the record. Second, the memoir confirms that the District Court's "alternative reading" was correct – Shuster's pre-existing promotional art was used for the Cover, and not as a mere "template" by DC:

> A couple **large promotional** panel-drawings had several years earlier been prepared by Joe and me to illustrate Superman in action; these were shown by Joe and me to syndicate editors to demonstrate the impact and appeal of the feature. ***At my suggestion, Sullivan selected one of them and used it for the now very famous cover for [Action Comics, No. 1]. …. This cover has been very frequently reprinted***.

SER 804. Shuster's "large promotional" drawing, used as the Cover, was obviously adapted from the similar interior panel. Opp. 65. DC pretends that Siegel's memoir refers to the interior panel (as opposed to Shuster's "promotional" drawing) to falsely claim that "DC's artists … created the cover." Opp. 62.

Moreover, DC's contention that the Cover is "independently copyrightable" (Opp. 62) leads nowhere. First, the Cover is so closely derived from an interior panel of Siegel and Shuster's Superman story that it is a part of that joint work. *See* W*olff v. Inst. of Elec. & Electronics Engineers, Inc.*, 768 F. Supp. 66, 68 (S.D.N.Y. 1991) ("[N]o substance to. . . argument that the cover of [a work] should be regarded as a 'derivative work constitut[ing] an entirely new copyrighted product that is separate and distinct from the pre-existing work[] on which it is based.'"). Second, a comparison of the Cover to that interior panel and the remainder of Siegel and Shuster's illustrated story reveals differences so *de*

**EXHIBIT B**
**147**

*minimis* or "trivial" as not to qualify it as a copyrightable derivative work.
*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d
1211, 1222 (9th Cir. 1997) (holding that, though not "exact replica" of underlying
copyrighted character, works contained "trivial" differences unworthy of
copyright).[8] Third, even if the Cover was an "independently copyrightable"
derivative work, its copyright would only adhere to these minor differences, to the
extent each are not unprotectable. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170,
1175 (9th Cir. 2003).

* * * *

Warner has utterly failed to provide admissible evidence demonstrating that
DC chose the colors of *Action Comics, No. 1*, that it tweaked Siegel and Shuster's
interior panel to produce to the Cover, or that the disparate additional panels added
by Siegel and Shuster in the reformatting process were DC's "work-for-hire."
Even if Warner were not precluded by *Siegel*, it provided no admissible evidence
to sustain its "work-for-hire" defense.

---

[8] Warner's assertion that Superman "bears a visible S-crest on his chest" or has
"facial features and musculature" is irrelevant as *all of this* also exists in the pre-
existing Superman story. ER 214-227. To highlight supposed differences Warner
also improperly compares a high-resolution copy of the Cover to a low-resolution
copy of only the interior panel, ignoring the rest of the Superman story. Opp. 65-
66.

## C.   DC Is Not A Joint Author Of *Action Comics, No. 1*

Finally, even if Warner could show that certain additions were DC's "work-for-hire" *and* copyrightable, none of this rises to the level of making DC a joint author/owner of Siegel and Shuster's celebrated work, as it erroneously contends. Opp. 61-62, 64.

Warner assertion that such things as "adding colors … may constitute an original copyrightable contribution," or its dubious contention that the trivial differences between the Cover and interior panel are copyrightable, are both irrelevant. *Id*. As this Court held in *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232-1233 (9th Cir. 2000), the "authorship [] required under the statutory definition of a joint work [17 U.S.C. §101] … is not the same thing as making a valuable and copyrightable contribution" and "contribution of independently copyrightable material to a work …. will not suffice to establish authorship of a joint work."[9]

*Aalmuhammed* declined to extend joint authorship to the writer of *original scenes* in a movie. 202 F.3d at 1231, 1236. In so doing, this Court emphasized that it is "'the inventive or master mind' who 'creates or gives effect to the idea'" who is a co/joint-author, and that "putative coauthors make objective manifestations of a shared intent to be coauthors, as by denoting the authorship of

---

[9] "Because the 1976 Act incorporated the well-established case law interpreting the definition of 'joint work' under the 1909 Act, we may assess [joint authorship claims] under the more fully developed rubric of the 1976 Act." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008).

**EXHIBIT B**
**149**

The Pirates of Penzance as 'Gilbert and Sullivan.'" *Id.* at 1234 (citations omitted).

Consistent with Siegel and Shuster's status as the only "authors" of Superman, the very first page of DC's *Action Comics, No. 1* states its authorship – "Superman: Jerome Siegel & Joseph Shuster." ER 215. DC does not, and cannot, point to *any* "objective manifestation of a shared intent" that DC or its staff be considered "coauthors" of the *Action Comics, No. 1*.

## IV. *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT WORKS-FOR-HIRE

The District Court correctly found that portions of *Action Comics, No. 4* and *Superman, No. 1*, like *Action Comics, No. 1*, were not "works-for-hire" because they were created independently "on spec," prior to any involvement by DC.

*Superman, No. 1*:  Plaintiff demonstrated to the District Court through <u>both</u> a detailed comparison and expert testimony that Siegel's 1934 scripts for 15 Superman daily comic strips, published in *Superman, No. 1*, predated any contractual relationship with DC. *See* ER 514, 516, 526, 785-88; RER 69:13-70:15.

DC falsely claims that Siegel created this work after a DC editor "specif[ied] in detail the contents of 'the first six pages'" (Opp. 78); in fact, as found by the District Court, "there is nothing in Mr. Gaines' letter indicating that the material was created contemporaneously with Superman No. 1's publication in 1939" (ER

80-81), nor is there any "admission" by Siegel to that effect.

Finally, Warner, who had the burden on "work-for-hire," presented "no evidence" (ER 81) that this material was "work-for-hire."

*Action Comics, No. 4*:  Warner does not contest the ruling that Siegel's 1934 script published in *Action Comics, No. 4* was not "work-for-hire," as it predated his relationship with DC.  Instead, DC frivolously argues it owns Joe Shuster's artwork as "work-for-hire."  This is erroneous, but not before the Court in this appeal.  Warner also completely contradicts the notion that the artwork is "independently copyrightable" (Opp. 79) by admitting that *Action Comics, No. 4* is a "joint work."  Opp. 80.  As joint authors, Siegel and Shuster each owned an undivided fifty percent interest in the entire copyrights.  1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 6.03 at 6-7 (2011) (joint owner possesses "undivided ownership in the entire work, including all of the contributions contained therein").  Thus, Plaintiff's Termination recaptured Siegel's joint copyright interest in *Action Comics, No. 4*.

## V.     THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO WEEKS OF SUPERMAN NEWSPAPER STRIPS

### A.     The Strips Were Not "Work-For-Hire"

The District Court correctly found that the first two weeks of the "Superman" newspaper strips (the "Spec Strips") were ***not*** works-for-hire because

**EXHIBIT B**
**151**

they "were not created at the instance of either [DC] or McClure."  ER 109-14.

The evidence is clear:  Siegel wrote the Spec Strips without DC's

involvement (ER 615; 954-57 ¶¶9-10, 20); Shuster illustrated the strips before

McClure committed to buy them (ER 615-16, 625-30); Siegel submitted the strips

to syndicators other than McClure (ER 622); Siegel and Shuster were not engaged

to produce this material; and Siegel and Shuster were compensated only later,

under the September 1938 McClure Agreement, in the form of a royalty percentage

of "net profits," in any.  ER 606, 609.

DC ignores the "instance and expense" test, and asserts its ownership of the

underlying Superman rights transforms the Spec Strips into "works-for-hire."

DC's argument is contrary to controlling Supreme Court precedent, which permits

authors of derivative works to own the copyright to their added material.  *See*

*Stewart v. Abend*, 495 U.S. 207, 223 (1990) (recognizing, under the 1909 Act, that

"[t]he aspects of a derivative work added by the derivative author are that author's

property"); *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1142 (C.D. Cal.

2007) ("Were the Court to adopt defendants' approach [of basing "work-for-hire"

determinations on ownership of underlying rights], every derivative work would

also be considered a work made for hire."); *Schrock v. Learning Curve Int'l, Inc.*,

586 F.3d 513, 523 (7th Cir. 2009) ("[T]here is nothing in the Copyright Act

requiring the author of a derivative work to obtain permission to copyright his

work from the owner of the copyright in the underlying work.").

Similarly false is DC's suggestion (Opp. 71) that the March 1937 Agreement rendered Siegel and Shuster's work "for-hire" (see *Siegel,* 508 F.2d at 914), when it only gave Detective a right of "first refusal" to purchase new material by the authors. *See LIN Broadcasting Corp.*, 74 N.Y.2d at 56 ("[A] right of first refusal merely provides . . . a chance to buy."). This is fundamentally incompatible with "work-for-hire," which a putative employer owns at inception as the "author." *Hogarth*, 342 F.3d at 162.

Lastly, Warner asserts that "these strips were only completed *after* DC gave its consent," but undermines itself by admitting that Siegel had Shuster illustrated his scripts without any "'definite offer.'" Opp. 72. In any event, DC cites no supporting authority that such is sufficient to transform the Spec Strips into "work-for-hire."

**B.** **Not Listing The Strips Separately In The Termination Was Harmless Error**

**1.** **"Harmless Error" Is Broadly Defined**

As the District Court correctly found, any failure to specifically list the Spec Strips in the Siegels' Termination was "harmless error," under the regulations governing such notices:

> (e)(1) ***Harmless errors in a notice that do not materially affect*** the adequacy of the information required to serve ***the purposes*** of … ***section 304(c)…*** shall not render the notice invalid.

(2) *Without prejudice to the general rule provided by paragraph (e)(1)* of this section, errors made in [examples given] … shall not affect the validity of the notice if the errors were made in good faith ... .

37 C.F.R. § 201.10(e) (emphasis added). *See also* 74 F.R. 12554, 12555.

Contrary to this clear language, Warner claims that harmless error "applies *only* to mistakes concerning those 'specific items' of information" listed in (e)(2). Opp. 74. The obvious objective of the "harmless error" rule is to avoid invalidating termination notices based on inadvertent mistakes where, as here, the terminated party has actual or effective notice of the intent to terminate. *See Music Sales Corp. v. Morris*, 73 F. Supp.2d 364, 378 (S.D.N.Y. 1999) (finding actual notice although "generic statement would not seem to reasonably identify the grant").[10]

## 2. Warner Was On Notice Of The Siegels' Intent To Terminate The Newspaper Strips

Warner cannot seriously claim that it did not have notice of the Siegels' intent to terminate the dozen Spec Strips inadvertently omitted from the Termination, which listed *hundreds* of such "Superman" strips. ER 161:6-9. The Siegel Termination unambiguously provided notice of intent to terminate *all* grants of copyright in Superman to Warner's predecessors; as to every work portraying Superman; and states "if any such work has been omitted, such omission is unintentional and involuntary." ER 1026, 1036, 1046, 1056. As the District Court

---

[10] Warner relies on *dicta* in *Music Sales*, 74 F. Supp.2d at 380, which did not concern a failure to list any works in a termination notice. Opp. 75.

**EXHIBIT B
154**

ER 1118

noted, "any recipient of the termination notice would quickly understand that the plaintiffs have sought to reclaim the copyright in any and all Superman works ever created."  ER 131.

### 3.    Warner's Reliance On *Burroughs* Is Misplaced

Warner relies on *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 618, 622 (2d Cir. 1982), which does not concern § 201.10(e)'s "harmless error" rule.  *Burroughs* is also distinguishable because (1) the termination notice intentionally omitted five Tarzan titles (see ER 132:11-18, RER 51-52); and (2) the termination notice did not, as here, contain a statement of intent to terminate *all works* relating to the character.  The single, terminated 1923 grant assigned specified titles, not Tarzan, and excluded four works published after 1923 which were thus omitted from the termination notice.  *See Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1322 (S.D.N.Y. 1980).  The fifth work omitted from the notice was not renewed, injecting it into the public domain.  *Id.*; *see* RER 51-52.

### 4.    Warner's Remaining Arguments Lack Merit

Warner's remaining arguments (Opp. 76-77) are likewise untenable.

Superman's characterization as a "conglomerate" or a "character" is irrelevant to the court's "harmless error" analysis, as is the court's mention of "Krypton," because the court did not base its decision on this.  Plaintiff's concerted

**EXHIBIT B**
**155**

ER 1119

efforts in assembling a comprehensive list of nearly all Superman copyrights supported the conclusion that the omission of the Spec Strips was inadvertent.

Warner's math is also misleading. The Termination attempted to list every Superman work out of an abundance of caution. The Spec Strips inadvertently not listed constitute a tiny fraction of the hundreds of Superman works that fell within the 1938-1943 statutory termination window. 17 U.S.C. § 304(c)(3).

## VI. SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE NOT "WORKS-FOR-HIRE"

Siegel and Shuster's other 1938-1943 Superman works were not created at DC's "instance and expense." "Instance" requires that "the motivating factor in producing the work was the employer who induced the creation." *Self-Realization,* 206 F.3d at 1326; *Siegel,* 508 F.2d at 914 (same). Courts also look at the degree to which the "hiring party had 'the [legal] right to control or supervise the artist's work.'" *Self-Realization*, 206 F.3d at 1327 (citing 1 *Nimmer* § 5.03[B][1][a][i] (1999)). A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's *creation. Twentieth Century,* 429 F.3d at 881. As a publisher invariably bears the costs of publication, that is immaterial. *See* 2 *Patry* § 5:54; *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 745 (2nd Cir. 1975). "Plainly, it is the expense of creation, rather than publication, that is relevant" to the "expense" test. 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c.

**EXHIBIT B**
**156**

Where payment is *contingent* (*e.g.*, a royalty), this weighs very heavily against "work-for-hire," as the author bears the financial risk of creation. *Twentieth Century*, 429 F.3d at 881; 2 *Patry* § 5:61 ("Where payment is solely by royalties, this fact weighs against [work-for-hire].")); 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 (same).

As set forth above, (1) the March 1937 Agreement, which related to *Slam Bradley* and *The Spy*, not *Superman*, is irrelevant to Superman works published after DC's purchase of Superman in the March 1938 Grant; and (2) DC's ownership of the underlying rights is not determinative, and works are not "for hire" simply because they are derivative. *See Stewart*, 495 U.S. at 223.[11]

Warner cannot refute that Siegel and Shuster assumed all of the financial risk of ***creation***: they paid their own overhead, materials, and other expenses, including the expenses of multiple employees at their Cleveland company, none of which DC reimbursed. ER 583, 597-600, 606, 699-700, 726-754, 788, 812-813. Warner instead conflates the risks of creation with those relating to *publication and distribution* (*e.g.,* "printing, distributing, and promoting"). Opp. 46. *See* 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c ("[I]f funding publication could convert a manuscript into a "work-for-hire," then the category would soon subsume all

---

[11] Nothing in either *Hogarth* or *Picture Music, Inc.* even remotely stands for the ridiculous proposition that "any derivative work [is] a work-for-hire" when "the commissioning party owns the copyright in the underlying work," as DC erroneously contends. Opp. 47.

published material ….”).

A.   *Action Comics, Nos. 2-3, 5-6*

DC fails to meet its burden of demonstrating that these early Superman stories were "for-hire." As the District Court noted, "there was no guarantee by [DC] that it would accept it and thereby pay Siegel and Shuster for their work," negating expense.  ER 84.  Warner's claim that "courts have found work-for-hire where there was no obligation to pay for unpublished works" is not supported by its citations.  Opp. 49.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003) (arising under the 1976 Act, not 1909 Act, and involving contract that specified "work-for-hire"); *Picture Music,* 457 F.2d at 1216 (guaranteed payment); *Playboy*, 960 F. Supp. 710, 715-16 (S.D.N.Y. 1997) (obligation to pay "'turn-down'" fee for "unused work" weighs in favor of "work-for-hire"; "Playboy paid Nagel for works it did not use.").

Furthermore, there was no evidence that DC "had the [legal] right to control or supervise" the creation of *Action Comics, Nos. 2-3, 5-6*, as required for "instance."  *Twentieth Century*, 429 F.3d at 879; *see also Martha Graham School and Dance Foundation Inc. v. Martha Graham Center of Contemporary Dance, Inc.* ("*Martha Graham*"), 380 F.3d 624, 635 (2d Cir. 2004).

The September 22, 1938 Agreement, entered into well after the creation of *Action Comics, Nos. 2-3, 5-6*, specifies "[DC] _hereby_ employ[s] and retain[s]"

61

**EXHIBIT B**

**158**

Siegel and Shuster (ER 605 (emphasis added)), as they had ***not*** previously been engaged to create Superman stories. DC plainly waited six months to see if Superman was successful.

Nor was there any evidence that the September 22, 1938 Agreement "simply 'formalized what had informally been ongoing beforehand.'" Opp. 50, quoting ER 85. Prior to that, DC had only purchased Siegel and Shuster's Superman story in the March 1938 Grant; there is no evidence that DC did otherwise with respect to *Action Comics, Nos. 2-6*. This is further supported by the "spec" stories written by Siegel corresponding to *Action Comics, No. 4* and *Superman, No. 1*, and Siegel's preview of stories corresponding to the plots of *Action Comics, Nos. 2, 5,* and *7*, which long predated their DC relationship. ER 502-531; RER 65-70.

DC failed to meet its burden as to *Action Comics, Nos. 2-6*, and the District Court, on summary judgment, improperly ignored the reasonable inferences that such works were not "for-hire."

### B. The Newspaper Strips

As set forth above, the "Superman" newspaper strips ("Strips") were Siegel and Shuster's brainchild, and the entire project was undertaken at their initiative.

DC presents no evidence that the Strips "were created at DC's expense." Opp. 57. Pursuant to the McClure Agreement, Siegel and Shuster were solely entitled to a contingent royalty equal to 36-40% of "net profits," with the

syndicator McClure entitled to 56.5% -50%, and DC as licensor of underlying rights only entitled to 7.5-10%."[12]  Siegel and Shuster paid for all the costs of producing the Strips in exchange for a purely contingent percentage of "net profits," if any, and thus bore the financial risk of the Strips' success.

Warner's argument that "it is irrelevant that [Siegel and Shuster] were not paid a guaranteed amount" (Opp. 57) is contradicted by every precedent.  *See Twentieth Century,* 429 F.3d at 881 ("expense" test met because employer "took on all the financial risk" and "agree[d] to pay … a lump sum for writing the book, instead of negotiating a royalty deal"); *Martha Graham,* 380 F.3d at 641 (evidence that author "received royalties" for her work weighs against "work-for-hire"); *Playboy,* 53 F.3d at 555 ("royalty" payments "generally weigh[] against finding a work-for-hire relationship"); 2 *Patry* § 5:61 ("Where payment is solely by royalties, this fact weighs against [work-for-hire].").

Nor does Warner fare any better on "instance."  It again improperly relies on DC's status as a rightsholder, and on letters showing its lack of control over the creative process.  Opp. 55-56.  Faced with uncontroverted evidence that Siegel was the motivating factor behind the syndication of their strips (ER 109-14), DC attempts to bootstrap "instance" with weak argument that "DC itself also actively

---

[12] Warner baldly misrepresents that Detective "grant[ed] McClure a six-month exclusive license in the Strips – in exchange for 40-50% of the net proceeds from the Strips."  Opp. 60.

sought newspaper syndication" (Opp. 57) – citing a single advertisement in *Action Comics, No. 2* imploring fans to send letters.  SER 290.

DC falsely claims that Siegel and Shuster had a "contractual obligation to create [the Strips] for DC" under a September 22, 1938 agreement (Opp. 57), which merely references the "agreement … with the McClure Syndicate, [and] all of the art and continuity for the newspaper strips entitled 'Superman' called for by said agreement."  ER 607

Warner also does nothing to rebut the detailed arguments in Plaintiff's opening brief that showed that the parties did not intend or understand the Strips to be "work-for-hire."  App. 41-47.

Warner limply argues that "work-for-hire" was not at issue in *National Comics*, 191 F.2d 594, 599 (2d Cir. 1951), which focused on whether and how McClure and/or DC owned the Strips.  Warner does not to distinguish *National Comics'* holding that McClure was the "'proprietor' of the copyrights" in the Strips under the 1909 Act, and that "the copyrights [in the strips] were only in the future to become [DC's] property."  *Id*.  Under the 1909 Act, the "proprietor" of the Strips is clearly an "assign," not the "author" of a "work-for-hire."  *See Public Ledger v. N.Y. Times*, 275 F. 562, 563-64 (S.D.N.Y. 1921) (Hand, L.); App. 41-43.  Thus, under *National Comics,* McClure owned the Strips not as "works-for-hire," nor as DC's assignee, but as the assignee of Siegel and Shuster – the authors.

Warner also does nothing to refute that McClure owned the Strips by implied assignment from the authors, and that DC later obtained the strips via a written assignment from McClure. App. 43-47. Rather, Warner misrepresents *Twentieth Century*, 429 F.3d at 881, as holding that "assignment" language is irrelevant, when it merely found, under its facts, that surplus assignment language "alone … is insufficient" to rebut "work-for-hire" because "instance and expense" had been firmly established. As DC cannot establish "instance and expense," McClure's express assignment to DC is telling.

Warner dismisses McClure's copyright registration of the Strips, listing Siegel and Shuster as "authors," and mischaracterizes *Hogarth*. Opp. 59. A copyright registration constitutes "prima facie evidence of the facts stated therein." 17 U.S.C. § 209 (1974). Accordingly, in *Hogarth*, 342 F.3d at 167, the registrations weighed against "work-for-hire;" but, unlike here, the putative employer "discharged its burden of rebutting the presumption to be accorded the facts reflected in the original registrations."

Finally, Warner vaguely argues that DC "could [have] grant[ed] McClure a six-month exclusive license in the Strips." Opp. 60. But under the 1909 Act, "the transfer of anything less than all rights was deemed a license rather than an assignment" as copyrights were "indivisible." *Jim Henson Productions v. John T. Brady & Associates*, 16 F. Supp. 2d 259, 288 (S.D.N.Y. 1997). If McClure was

**EXHIBIT B**
**162**

the "licensee" of the Strips, its improper registration in its own name would have

injected them into the public domain.  As that did not happen, the only explanation

is that McClure owned the Strips via implied assignment from Siegel and Shuster,

and later assigned the Strips to DC, consistent with the McClure Agreement,

McClure's registrations, and McClure's assignment to DC.

All of this evidence did not merely "place this case on the outer edges of the

work-for-hire doctrine" (ER 103, 108) – it demonstrated that the Strips were *not*

"works-for-hire."  As Warner did not come close to meeting its burden of

establishing its "work-for-hire" defense, the District Court should have granted

summary judgment to the Siegels on this issue.

**C.**     ***Action Comics, Nos. 7-61, Superman, Nos. 1-23***

The 1938 Agreement did not make *Action Comics, Nos. 7-61* and *Superman,

Nos. 1-23* "works-for-hire."  "Expense" was not met because Siegel and Shuster

shouldered all the financial risks of creating their material, while DC was only

obligated to pay them for submissions it chose to publish (ER 606; Opp. 52 ("DC

was obligated to pay only for works DC decided to publish")); and "instance" was

not met by DC's standard editorial role as a publisher.  ER 605-607.

Warner admits that Siegel and Shuster *"incurred [the] costs"* of creating

their material.  Opp. 53.  As DC was not obligated to purchase the material or

reimburse costs, Siegel and Shuster naturally bore "the financial risk" of creation.

*Twentieth Century,* 429 F.3d at 881. If legally the hiring party "had no commitment to purchase…[the author's] work" this supports a finding that such was not "made-for-hire." *Playboy*, 53 F.3d at 563.

Warner's "instance" claim boils down to another variation on its unpersuasive argument that ownership of underlying Superman rights transforms any derivative work into a "work-for-hire." Opp. 54. Warner fails to demonstrate the requisite legal "right" to "participate in the elements of the work's creation." 2 *Patry* § 5:54; *Martha Graham,* 380 F.3d at 635.

Warner cannot evade the evidence that DC lacked editorial control (ER 758, 812-813); that Siegel did not submit scripts to DC for approval before Shuster illustrated them (ER 618, 761, 812); and that DC, like every publisher, was "limited to accepting or rejecting the finished stories [Siegel and Shuster] submitted." ER 788, 812-813.

Nor do the letters Warner relies on change this analysis. First, none were properly authenticated, but were simply attached to an attorney's declaration, as objected to below. RER 62. *See Beyene v. Coleman Security Services, Inc*., 854 F.2d 1179, 1182 (9th Cir. 1988) ("A writing is not authenticated simply by attaching it to an [attorney's] affidavit…."). Second, the letters do not evidence "control," but frustrations as to DC's lack of control over Siegel and Shuster's creative process. *See* ER 431, 434, 442, 445, 451.

**EXHIBIT B**
**164**

Given the above, the District Court's granting of summary judgment on this issue was erroneous, as at a minimum a reasonable trier of fact could readily find that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were not "for-hire."

## VII. THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS

### A. The District Court Fully Adjudicated The First Claim And First – Fourth Counterclaims, Which Did Not Include The "Ads" Issue

Federal Rule of Civil Procedure 54(b) allows a district court to enter an appealable judgment on interlocutory orders that constitute "an ultimate disposition of an individual claim," provided there is no just reason to wait until the entire case concludes. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).

Rule 54(b) certification is left to the sound discretion of the district court, and is proper if it aids in expeditious resolution while avoiding piecemeal appeals. *See Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1484 (9th Cir.1993). "The trend is towards greater deference to a district court's decision to certify under Rule 54(b)." *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991).

Plaintiff's First Claim, as amended, requests only the following relief:

74.     For a declaration as follows:
a.      That pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works; and

b.     That, as of the Termination Date, Plaintiffs owned and continue
to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

ER 343-44 ¶74.  Plaintiff's First Claim thus required the District Court:  (a) to

determine that the Termination complied with section 304(c) of the Copyright Act;

and (b) to determine those "works" recaptured by the Termination.  *See* 17 U.S.C.

§§ 304(c)(1), (4) (referring to "the work"); 37 C.F.R. § 201.10(b)(1)(iii) (focusing

on "each work to which the notice of termination applies").  It did ***not*** call for the

adjudication of the literary elements contained in each work.  In contrast,

Plaintiff's Second through Fourth Claims, which seek an accounting of profits

from such works, could involve an evaluation of their literary "elements" due to

general exploitation of the Superman franchise.

In several lengthy decisions, the District Court found that the Termination is

valid as to *Action Comics, No. 1*, as well as *Action Comics, No. 4*, *Superman, No. 1*

(pages 3-6), and the Spec Strips, but that the remaining Superman works within the

1938-43 termination window were "for-hire."  ER 1-227.

The District Court also fully adjudicated Warner's First through Fourth

Counterclaims, which sought to invalidate the Termination on various grounds.[13]

Accordingly, on May 17, 2011, the District Court properly entered a Partial

---

[13] Warner admits that the Rule 54(b) judgment on its Second through Fourth
Counterclaims was proper (Opp. 1), which alone is a sufficient basis for
jurisdiction.  *See Reiter v. Cooper*, 507 U.S. 258, 265 (1993); *Amerisource Bergen
Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 954 (9th Cir. 2006).

Judgment under Rule 54(b) as to Plaintiff's First Claim and as to Warner's First through Fourth Counterclaims.  ER 232-3, 293-300 ¶¶66-105, 343-344 ¶74.

Warner argues that Rule 54(b) certification was supposedly improper because (a) there are purported open issues as to the impact, if any, of limited promotional materials ("Ads") held to be excluded from the Termination, and (b) there is disagreement as to whether statements regarding literary elements in *Action Comics, No. 1* made in the background section of the District Court's first order, constitute "dicta."  Opp. 40-41.

The "dicta" issue is irrelevant to the First Claim, which does <u>not</u> seek relief as to the "literary elements" contained in *any* work.  ER 343-44 ¶74.

The District Court decided two "Ads" issues.  ***First,*** it held that the Ads were not subject to the Termination because their publication date fell outside the termination "window."  ER 167-76.  This is all that is relevant to the First Claim. ***Second,*** it properly determined that the derivative Ads' content was extremely limited (ER 176-82), as the Ads' reduced, black-and-white, and wholly derivative copy of the *Actions Comics, No. 1* cover was divorced from the Superman storyline and character in *Actions Comics, No. 1.*  But this determination is not part of the First Claim, which solely concerned whether the Termination was effective as to a given work.[14]  At most, this issue affects Plaintiff's Second through Fourth

---

[14] Warner's contention that Plaintiff has "waived" her right to challenge the

"accounting" claims (ER 344-346 ¶¶75-79), none of which are part of the Rule 54(b) Judgment.

As the First Claim and the First through Fourth Counterclaims have been fully adjudged and are severable from the other claims, the District Court's Rule 54(b) judgment was proper.

## B. The District Court Accurately Described The Promotional Announcements

If the Court is nonetheless inclined to reach the issue of the "copyrightable content" of the Ads, the District Court's ruling as to the Ads' negligible content was correct.

Warner falsely claims the "the *scope* of the rights at issue" was not at issue in the summary judgment motion. Warner acknowledges (Opp. 81-82) that courts have the inherent power to order summary judgment *sua sponte* so long as the adverse party had "a full and fair opportunity to develop and present facts and legal arguments" and "reasonable notice that the sufficiency of his or her claim will be in issue." *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

---

District Court's limited "Ads" ruling (Opp. 80-81) is misleading. Plaintiff maintains that, while the trivial, wholly derivative Ads were not "terminated," they have no impact on the copyrights (*e.g.*, *Action Comics, No. 1*) recaptured by the Termination. As this issue is not part of the Rule 54(b) judgment, Plaintiff could hardly have raised it on appeal. *See* Docket No. 7 at 11.

"Reasonable notice" requires that the party be on notice that the court might "reach" the issue. *Id*. at 869-70.

Warner had more than adequate notice. In fact, Warner asserted on summary judgment that "DC and its licensees continue to have the right to use the copyrightable elements contained in the [Ads] without the need to account to Plaintiffs." SER 708. In response, Plaintiff emphasized the lack of "copyrightable elements" in the Ads and submitted the reports of both parties' experts on the subject. SER 356:19-357:6; RER 104-106, 108-133 ¶¶30-41. In reply, Warner argued that the Ads "represent the first publication of the appearance of the Superman character" (RER 91:16-20), that "any question about [the Ads'] contents is most obviously answered by the ads which speak for themselves," and that "no special 'lens' is required." RER 93:18-20.

Finally, the Court clearly indicated at the hearing on the parties' summary judgment motions that it believed the Ads contained minimal copyrightable material, at best, and gave Defendants a fair opportunity to respond. RER 78:17-24. Defendants' counsel even discussed this issue with the Court:

> The Court: How do you respond to ***counsel's argument that all you have is the actual picture itself***, and not necessarily any of the elements therein?
> Mr. Zissu: Okay. Well, the thing about visual works, multi-media works, is that pictures are worth -- can be worth many words. We do have, if you look at it -- ***if you look at it, you have the figure of Superman as he appears there in his costume; you have his strength lifting a car; and you don't have that much more***.

72

**EXHIBIT B
169**

The Court:  *That's about it; right*.

RER 80:12-22 (emphasis added).

Warner was not "denied" "an opportunity to be heard" but rather had a full and fair opportunity to litigate, ample warning that the Court was considering the issue, engaged with the District Court, and chose to dodge questioning and submit what it now dismisses as a "multiple-generation photocopy" only after losing on the issue.  Opp. 82.

Warner's arguments about the contents of the Ads – an issue which it concedes is not part of this appeal (Opp. 86) – are erroneously premised.  Siegel's copyright in *Action Comics, No. 1* was correctly held by the District Court to have been recaptured pursuant to the Termination.  ER 133-4.  The Ads' reduced black-and-white copy of the mere cover of *Action Comics, No. 1* are entirely derivative, add no new copyrightable elements, and under clear Ninth Circuit law, derivative works **cannot** limit, restrict, or divest the copyrights in underlying work.  *See Batjac Productions Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1227 (9th Cir. 1998) ("[P]ublication of a derivative work does not affect the validity of a subsisting copyright in the preexisting work.").

Furthermore, the critical point is that the image on the comic book cover has meaning *only* in the context of the Superman storyline, character and other aspects of *Action Comics, No*. 1, not found in the Ads:  "[N]othing concerning the

**EXHIBIT B
170**

Superman storyline, that is, the literary elements contained in <u>Action Comics</u>, Vol.

1, is on display in the ads." ER 181:9-10.

## CONCLUSION

Plaintiff respectfully requests that this Court: (1) affirm the judgment of the

District Court that no agreement was reached between the Siegels and DC Comics;

that Plaintiff's action was timely filed; that *Action Comics, Nos. 1* and *4,*

*Superman, No. 1* and the first two weeks of Superman newspaper strips were not

"work-for-hire;" and were successfully recaptured by the Siegel Termination; and

(2) reverse the judgment of the District Court with instructions to enter partial

summary adjudication in Plaintiff's favor as to the Superman works within the

1938-1943 Termination window (i.e., *Action Comics, Nos. 2-3, 5-56, Superman,*

*Nos. 1-6,* and the remaining "Superman" newspaper strips); and (3) to remand for

further proceedings.

Dated:  May 24, 2011          TOBEROFF & ASSOCIATES, P.C.

                              /s/ Marc Toberoff
                              _____
                              Marc Toberoff

                              Attorneys for Appellant, Laura Siegel Larson

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify that this brief is accompanied by an unopposed motion, pursuant to F.R.A.P. 27, 28 and 32, and Circuit Rules 27-1 and 32-2,  for leave to file an oversize brief of no more than 17,500 words, and that the attached opposition and reply brief is proportionately spaced, has a typeface of 14 points or more, and contains __,____ words, as measured by the Microsoft Word program used to generate the brief.

 Dated:  May 24, 2011        TOBEROFF & ASSOCIATES, P.C.

 /s/ Marc Toberoff

 Marc Toberoff

 Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT B**

**172**

## STATUTORY ADDENDUM

All applicable statutes, rules, regulations, etc., are contained in the Statutory Addendum of Appellant Laura Siegel Larson's First Brief on Cross-Appeal and of the Principal and Response Brief of Cross-Appellants and Appellees Warner Bros. Entertainment Inc. and DC Comics.

**EXHIBIT B
173**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court.  Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred.  Pursuant to Circuit Rule 30-1.3, four copies of the reply excerpts of the record have been mailed to the Court, and one copy of the excerpts of the record have been mailed to opposing counsel on the date this brief was electronically filed.

Dated:  May 24, 2011                TOBEROFF & ASSOCIATES, P.C.

                                    /s/ Pablo D. Arredondo
                                    Pablo D. Arredondo

                                    Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT B
174**

ER 1138

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014, and that all participants in the case are registered CM/ECF users.

Dated: February 21, 2014           /s/ Marc Toberoff
                                        Marc Toberoff