APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 7 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 7)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 14:  October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |
| 709-2 | 3/4/13 | *Exhibit 16:  DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
| 709-2 | 3/4/13 | *Exhibit 17:  Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19:  September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20:  January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21:  February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22:  February 12, 2013* | 7 | 1626 |

| | | | | |
|---|---|---|---|---|
| | | *Letter from Petrocelli to Toberoff* | | |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |
| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |

| 702-2 | 2/7/13 | *Exhibit D:  Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
|---|---|---|---|---|
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |
| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

iv

| 70-1 | | | | |
|------|------|------|------|------|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | *for Lewellen Deposition* | | |
|---|---|---|---|---|
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8:  Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9:  Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10:  September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11:  Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14:  September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | *Parsons to Joanne Siegel* | | |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A:  Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B:  October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C:  Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D:  Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A: Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A: November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A: February 1996 Thompson & Thompson Copyright Report re: Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re: Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C: Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B: April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A: Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G: January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H: January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I: February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J: Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M: Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A: Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B: October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C: Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D: Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E: Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F: Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H: Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | | | |
|---|---|---|---|---|
| | | Motion for Partial Summary Judgment | | |
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C:  May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D:  May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F:  June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G:  Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H:  Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I:  Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J:  Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K:  Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L:  Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M:  Notice of Termination re:  December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N:  Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R:  Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| **Docket No.** | **Filing Date** | **Document Title** | **Vol.** | **Page** |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

# PRIORITY SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-08400-SGL (RZx)                    Date:  October 23, 2007

Title:     JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
           WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
           corporation; DC COMICS INC., a corporation; and DOES 1-10
========================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Jim Holmes                          None Present
           Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None present                            None present

PROCEEDINGS:   ORDER DENYING PLAINTIFFS' OCTOBER 4, 2007, <u>EX PARTE</u>
               APPLICATION (IN CHAMBERS)

        The Court has received and reviewed plaintiffs' October 4, 2007, <u>ex parte</u> application for an
order compelling defendants' compliance with the Court's September 17, 2007, discovery order,
and defendants' opposition thereto.  The basic subject matter of the <u>ex parte</u> application concerns
defendants' production of its internal profit projections (commonly referred to in the entertainment
industry as "ultimates") for, among other things, its movie <u>Superman Returns</u> and the television
series <u>Smallville</u>, as well as the turnover of documentation regarding a reserve account defendants
purportedly created in anticipation of the parties' settlement of the present dispute, such
documentation being referred to by the parties as the "settlement reserve account documents."

        Before addressing each of the production issues, some prefatory remarks are in order.
From reviewing the parties' correspondence it is apparent to the Court that the source of the
parties' dispute stems from the parties' divergent understanding of both the scope and extent of
the document production required by the Court's September 17, 2007, Order, a proper
understanding of which turns on the impact the Court's earlier August 13, 2007, discovery order
had on plaintiffs' then existing motions to compel, which themselves encompassed the same
subject matter as the production issues in the present <u>ex parte</u> request.  It is to that earlier

MINUTES FORM 90            DOCKETED ON CM            Initials of Deputy Clerk __jh__
CIVIL -- GEN                                                                    1
                              OCT 2 4 2007

                           BY                EXHIBIT 14                    ER 1436
                                             04483

Plaintiffs' ex parte request goes far beyond what the parties had themselves agreed was required for defendants to produce. This is important because the only reason the Court made mention of the "settlement reserve account documents" in its September 17, 2007, Order was simply to memorialize what the parties themselves represented during the September 17 hearing that they had agreed was to be produced. Notably, during oral argument at the September 17 hearing, plaintiffs' counsel acknowledged that, "[i]n the course of meeting and conferring pursuant to your order regarding outstanding requests, we have come to an agreement with respect to certain documents, which we have not yet all received, and we've come to an understanding with the defendants that even though they did not give us those documents when they had hoped to give them to us, they will not use the joint stipulation schedule against us should they not give us the documents . And we believe they will give us the documents." The correspondence between the parties during their meet and confer reveals that the documents to which plaintiffs' counsel referred as subject of the "agreement" were the settlement reserve account documents. (Decl. Marc Toberoff, Exs. I, K). This was confirmed by defense counsel during the hearing:

| THE COURT: | What about these supplemental documents that Mr. Toberoff just referred to regarding [w]hat you're supposed to produce but that he has not received yet? |
|---|---|
| MR. PERKINS: | I can speak to that, Your Honor. |
| THE COURT: | Thank you. |
| MR. PERKINS: | These are, I believe, documents from DC Comics, and there's one category of documents that we had trouble pulling them together in time, but they are — |
| THE COURT: | And how do you refer to these documents? |
| MR. PERKINS: | They are the reserve account documents. |

. . . .

| THE COURT: | Are you producing them? |
|---|---|
| MR. PERKINS: | Yes, we are. |
| THE COURT: | When? |
| MR. PERKINS: | This week, Your Honor. |

The parameters of defendants obligations to produce the settlement reserve account

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk __jh_____

**EXHIBIT 14**
**184**

ER 1437

documents are set forth in the correspondence exchanged between the parties following the August 13, 2007, discovery order. The August 30, 2007, letter from James Weinberger to plaintiffs' counsel references the only documented evidence as to what specifically the parties' had agreed to following their August 17, 2007, meet and confer:

> With respect to the settlement reserve account referenced in DC's counterclaim, I confirm our conversation that the settlement reserve is an accounting of liability under the settlement agreement. None of the Defendants has ever represented to you, your clients, or to the Court that an actual escrow fund had been created. As I advised you, the only documents in DC's possession, custody and control which reflect this reserve are (I) the general ledger, which incorporates the reserve in its balances but does not have line-item entries showing the precise amounts owed to the Siegels, and (ii) statements prepared periodically (with some gaps) that show the relevant balances. As we discussed, subject to your agreement that production will not constitute any waiver of privilege, we will provide you with copies of all of these summary statements prepared by DC which reflect the balances in the account as of the date listed. We are collecting these documents now; I will let you know when they are available.

(Decl. Mark Toberoff, Ex. G at 3).

Nowhere in the August 30, 2007, letter did defense counsel represent that defendants would produce, as now suggested by plaintiffs, "the schedules and other documentation demonstrating the computations and assumptions underlying" these periodic statements. (Pls' Memo. in Supp. at 2). Even more importantly, plaintiffs' counsel never communicated to defense counsel following receipt of this letter that anything contained therein misstated the nature of the parties' agreement concerning production of the settlement reserve account documents.

Later plaintiffs' counsel affirmed the nature of the parties' agreement with respect to the nature and scope of production relating to the settlement reserve account documents during a telephone conversation with defense counsel on September 11, 2007. Counsel's affirmance is reflected in a follow up letter defense counsel sent to plaintiffs' counsel on the same day, in which defense counsel noted from "our discussion today . . . some concerns you raised regarding our meet and confer on outstanding DC Comics discovery issues" and "confirm[ed] that in the event DC does not produce the statements evidencing the settlement reserve account <u>as we agreed to do in my August 30, 2007, letter</u> . . ., we will not oppose a motion to compel on the grounds that it was served after the September 11, 2007, deadline for serving a joint stipulation under the Court's August 13, 2007 Order." (Decl. Marc Toberoff, Ex. K at 1 (emphasis added)). Again, plaintiffs' counsel remained silent, not raising any objection or qualification to the nature and scope of the parties' agreement concerning production of the settlement reserve account documents that was set forth in defense counsel's August 30, 2007, letter.

MINUTES FORM 90  
CIVIL -- GEN         7         Initials of Deputy Clerk __jh_____

**EXHIBIT 14**  
**185**

ER 1438

On September 21, 2007, defendants produced to plaintiffs 14 pages worth of summary statements concerning the settlement reserve account referred to in Mr. Weinberger's August 30, 3007, letter and his later September 11, 2007, letter. (Decl. Marc Toberoff, Ex. P). Specifically, those summary statements comprise periodic excerpts consisting of one-line quarterly total entries for "Siegel and Shuster – Superman" amidst other line entries, covering a period from September 30, 2002, through June 30, 2006 (with some gaps for that period). Such a production is entirely consistent with what defense counsel represented to plaintiffs would be produced in his August 30, 2007, letter.

Nonetheless, plaintiffs' counsel, for the first time, voiced objections to the nature of the documents produced. In a letter dated September 24, 2007, plaintiffs' counsel complained that the summaries were "highly inadequate" as they did not contain any "back-up documentation whatsoever that reflects the analysis and calculations made in arriving at" the totals indicated on the summaries themselves. Furthermore, plaintiffs' counsel complained that the summaries produced were "not current, as it only extends until 6/30/06." Then plaintiffs' counsel mentioned, again for the first time, his understanding of the parties agreement following the August 17, 2007, meet and confer and contrasted it to what was represented in defense counsel's earlier correspondence:

> [I]n our August 17, 2007 "meet and confer," pursuant to the Court's August 13, 2007 order, you agreed to produce all responsive documents, without waiver of DC's purported attorney-client privilege. Notwithstanding this, your letter dated August 30, 2007, hedged and carefully backtracked by circumscribing the "reserve account" documents and your prior claims that the "reserve account" was reflected in DC's (undecipherable) general ledger (now re-stated in your August [30], 2007 [letter] as "incorporating the reserve in its balances but does not have line-item entries showing the precise amounts owed to the Siegels.")
>
> . . . .
>
> Please be advised that in the event DC does not agree to produce and thereafter promptly produce all documents relating to the "reserve account" repeatedly claimed by DC and testified to by its President, Paul Levitz, that Plaintiffs will have no choice but to move ex parte regarding this troubling matter.

(Decl. Marc Toberoff, Ex. Q (emphasis in original)).

Defendants were understandingly annoyed by plaintiffs' counsel's letter, and responded by sending a letter of their own on September 25, 2007, reiterating that the documents produced relating to the settlement reserve account were in conformity with the representations they made in the August 30, 3007, letter memorializing the parties' understanding following their earlier meet

MINUTES FORM 90
CIVIL -- GEN                                                    8

Initials of Deputy Clerk __jh_____

**EXHIBIT 14**
**186**

ER 1439

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

10

Initials of Deputy Clerk __jh_____

EXHIBIT 14
187

ER 1440

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:  Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President


Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 15**

ER 1441

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Laura Siegel Larson, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" work(s) made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.       The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the notices of termination (Document Nos. V3410 D577, V3410 D607, V3410 D630, V3410 D653, V3410 D807, V3410 D830, V3410 D853) served April 3, 1997, by Joanne Siegel and Laura Siegel Larson, that were recorded at the U.S. Copyright Office on February 2, 1998, or the notice of termination (Document No. V3491 D823) served November 8, 2002 by Joanne Siegel and Laura Siegel Larson, that was recorded at the U.S. Copyright Office on November 20, 2002.

2

**EXHIBIT 15**
**189**

ER 1442

Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to

37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail,

postage pre-paid to the above grantees or successors at the addresses shown.

      2.    The works (individually, "Work"; collectively, the "Works") to which this

Notice of Termination applies are as follows:  the illustrated front cover of the

SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, <u>as</u>

<u>depicted</u> in a reduced black and white form in the advertisements for Action Comics,

Vol. 1, No. 1, appearing in the following magazines:[2]

| <u>Title</u> | <u>Name of Author</u> | <u>Date Copyright Secured</u> | <u>Copyright Reg. No.</u> |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1, 1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notices of termination dated April 3, 1997 regarding "Superman" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson or the notice of termination dated November 8, 2002 regarding "Superboy" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson.  Every reasonable effort has been made to find and list herein every such work. Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

**EXHIBIT 15**
**190**

ER 1443

| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |

3.      This Notice of Termination applies to the following grants, assignments, and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)      A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 4, 1937;

(c)      A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)      A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)      A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)      A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

(g)    A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

4.    The effective date of termination shall be March 12, 2014.

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the Author, Jerome Siegel, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

6.    Jerome Siegel died on January 28, 1996.  There is no living widow of Jerome Siegel, and Laura Siegel Larson is the only living child of Jerome Siegel. Michael Siegel, Jerome Siegel's other child, is deceased and had no children.  As such, the undersigned, Laura Siegel Larson, is the sole person entitled to exercise Jerome Siegel's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary

**EXHIBIT 15
192**

ER 1445

to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March 6, 2012

Laura Siegel Larson
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

6

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

───────────────

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants*.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

───────────────

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND
## APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

───────────────

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 16**
**194**

ER 1447

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1.  Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2.  DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation.  Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated:  March 23, 2012              O'MELVENY & MYERS LLP

                              By:  /s/ Daniel M. Petrocelli
                                   Daniel M. Petrocelli
                                   Attorneys for Warner Bros.
                                   Entertainment Inc. and DC Comics

**EXHIBIT 16**
**195**

**ER 1448**

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................................... 1

INTRODUCTION .................................................................................................... 1

STATEMENT OF ISSUES PRESENTED ............................................................... 5

STATEMENT OF THE CASE ................................................................................. 6

STATEMENT OF FACTS ....................................................................................... 9

        A.    Statutory Background ................................................................. 9

        B.    Factual Background ................................................................. 10

             1.    Siegel And Shuster's Work-For-Hire
                   Arrangements With DC During The 1930s And
                   1940s ............................................................................. 10

             2.    Litigation Over Superman During The 1940s,
                   1960s, And 1970s ......................................................... 14

             3.    Larson's Termination Notices Under The 1976 Act
                   And The Parties' 2001 Settlement Agreement ............. 15

             4.    Larson Allies With A New Business Partner Who
                   Induces Her To Repudiate The 2001 Settlement
                   Agreement ..................................................................... 18

        C.    Proceedings Below .................................................................. 19

STANDARD OF REVIEW ..................................................................................... 22

SUMMARY OF ARGUMENT ............................................................................... 23

ARGUMENT ........................................................................................................... 25

        <u>DC's Cross-Appeal On Its Second Through Fourth Counterclaims</u>

    I.    THE DISTRICT COURT ERRED IN GRANTING
          SUMMARY JUDGMENT TO LARSON ON THE
          THRESHOLD SETTLEMENT AGREEMENT ISSUE ................... 25

**EXHIBIT 16**
**196**

ER 1449

A.    Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation ..........................................25

B.    The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law ........................28

C.    At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter ......................................................................................34

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM .................................................37

Larson's Appeal Of Her First Claim And
DC's Cross-Appeal On Both Parties' First Claims

I.    LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED .................................................................................40

II.    THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION ....................................................................41

A.    A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party ..................................................42

B.    The District Court Correctly Held That *Action Comics #2-3, #5-61*, *Superman #1 (Pages 1-2)-23*, And The Post-McClure Strips Were Works-For-Hire ....................................45

1.    *Action Comics #2-3, #5-6* .............................................48

2.    *Action Comics #7-61* And *Superman #1-23* .................51

3.    Post-McClure Newspaper Strips ....................................55

ii

**EXHIBIT 16**

**197**

C.    The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4*, *Superman #1* (Pages 3-6), And Pre-McClure Strips .........................................................................61

    1.    *Action Comics #1* ...........................................................61

        a.    Key Elements Of *Action Comics #1* Were Made-For-Hire ............................................................. 61

        b.    *National* Is Not Preclusive As To The Work-For-Hire Status Of *Action Comics #1* ...................... 68

    2.    Pre-McClure Strips ...................................................... 71

        a.    The Pre-McClure Strips Were Made At DC's Instance And Expense ........................................ 71

        b.    Larson's Failure To List The Pre-McClure Strips In Her Termination Notice Also Precludes Termination ....................................................... 72

    3.    Pages 3-6 Of *Superman #1* ...........................................77

    4.    Artwork In *Action Comics #4* .......................................79

    5.    Promotional Announcements .......................................80

CONCLUSION ....................................................................87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

iii

**EXHIBIT 16**

**198**

# TABLE OF AUTHORITIES

## CASES

*Almond v. ABB Indus. Sys., Inc.*,
2001 WL 242548 (S.D. Ohio Mar. 6, 2001).......................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller*,
938 F.2d 1038 (9th Cir. 1991) ...............................................40

*Atla-Medine v. Crompton Corp.*,
2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001).......................................36

*Banner Entm't, Inc. v. Super. Ct.*,
62 Cal.App.4th 348 (1998) .......................................... 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.*,
211 Cal.App.3d 1555 (1989).......................................29

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001).......................................62

*Burroughs v. M-G-M, Inc.*,
683 F.2d 610 (2d Cir. 1982)................................... 74, 75, 76

*Bustamante v. Intuit, Inc.*,
141 Cal.App.4th 199 (2006) .......................................... 29, 35

*Callie v. Near*,
829 F.2d 888 (9th Cir. 1987).......................................35

*CCNV v. Reid*,
490 U.S. 730 (1989).......................................43

*Chaffin v. U.S.*,
176 F.3d 1208 (9th Cir. 1999) .......................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
538 U.S. 440 (2003).......................................43

*Clarke v. Fiedler*,
44 Cal.App.2d 838 (1941).......................................... 26, 27

iv

**EXHIBIT 16**
**199**

*Comm'r v. Sunnen*,
    333 U.S. 591 (1948) ...................................................................68

*Cool Fuel, Inc. v. Connett*,
    685 F.2d 309 (9th Cir. 1982) .....................................................82

*Cuellar de Osorio v. Mayorkas*,
    656 F.3d 954 (9th Cir. 2011) .....................................................22

*Dolman v. Agee*,
    157 F.3d 708 (9th Cir. 1998) ..................................... 42, 43, 44

*Easter Seal Soc'y v. Playboy Enters.*,
    815 F.2d 323 (5th Cir. 1987) .....................................................42

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
    697 F.2d 27 (2d Cir. 1982) ................................................ 63, 64

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
    119 Cal.App.4th 263 (2004) .....................................................26

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
    122 F.3d 1211 (9th Cir. 1997) .................................................63

*EPIC, Inc. v. Pac. Lumber Co.*,
    257 F.3d 1071 (9th Cir. 2001) .................................................71

*Ersa Grae Corp. v. Fluor Corp.*,
    1 Cal.App.4th 613 (1991) .........................................................26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
    2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) .........................53

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
    342 F.3d 149 (2d Cir. 2003) ....................................... 42, 47, 59

*Estate of Thottam*,
    165 Cal.App.4th 1331 (2008) ...................................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ........................................................ 63, 80

**EXHIBIT 16**
**200**

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
   773 F.2d 1068 (9th Cir. 1985) ............................................................................71

*Gaiman v. McFarlane*,
   360 F.3d 644 (7th Cir. 2004).............................................................................80

*Gausvik v. Perez*,
   392 F.3d 1006 (9th Cir. 2004) ........................................................... 22, 51, 81

*Granite Rock Co. v. Teamsters*,
   649 F.3d 1067 (9th Cir. 2011) ................................................................ 68, 70

*Harper & Row, Publishers v. Nation Enters.*,
   471 U.S. 539 (1985) ..........................................................................................51

*Harris v. Rudin, Richman & Appel*,
   74 Cal.App.4th 299 (1999) ................................................................ 26, 27, 29

*In re Smith*,
   964 F.2d 636 (7th Cir. 1992)............................................................................58

*Inamed Corp. v. Kuzmak*,
   275 F.Supp.2d 1100 (C.D. Cal. 2002) .............................................................34

*Jachetta v. U.S.*,
   653 F.3d 898 (9th Cir. 2011)............................................................................51

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008)............................................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.*,
   16 F.Supp.2d 259 (S.D.N.Y. 1997)..................................................................60

*Lamle v. Mattel, Inc.*,
   394 F.3d 1355 (Fed. Cir. 2005)........................................................................29

*Levin v. Knight*,
   780 F.2d 786 (9th Cir. 1986)............................................................................29

*Lin-Brook Builders Hardware v. Gertler*,
   352 F.2d 298 (9th Cir. 1965)................................................................ 42, 43, 59

**EXHIBIT 16**
**201**

ER 1454

Lozano v. Ashcroft,
    258 F.3d 1160 (10th Cir. 2001) ..........................................................83

Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.
    of Contemporary Dance, Inc.,
    380 F.3d 624 (2d Cir. 2004)..............................................................55

Marvel Characters, Inc. v. Simon,
    310 F.3d 280 (2d Cir. 2002)....................................................... 45, 70

Marvel Worldwide, Inc. v. Kirby,
    777 F.Supp.2d 720 (S.D.N.Y. 2011)................................ 44, 49, 53, 78

Mattel, Inc. v. MGA Entm't, Inc.,
    2011 WL 3420603 (C.D. Cal. Aug. 4, 2011).....................................35

Mattel, Inc. v. MGA Entm't, Inc.,
    616 F.3d 904 (9th Cir. 2010)..................................................24, 35, 39

May v. Morganelli-Heumann & Assocs.,
    618 F.2d 1363 (9th Cir. 1980) ..............................................42, 43, 45

Medina v. Ramsey Steel Co.,
    238 F.3d 674 (5th Cir. 2001)..............................................................36

Meyer v. Holley,
    537 U.S. 280 (2003) ..........................................................................44

Murray v. Gelderman,
    566 F.2d 1307 (5th Cir. 1978) .....................................................43, 49

Music Sales Corp. v. Morris,
    73 F.Supp.2d 364 (S.D.N.Y. 1999)....................................................75

Narayan v. EGL, Inc.,
    616 F.3d 895 (9th Cir. 2010)..............................................................23

Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.,
    191 F.2d 594 (2d Cir. 1951)........................................................58, 69

New Hampshire v. Maine,
    532 U.S. 742 (2001) ..........................................................................39

**EXHIBIT 16**
**202**

ER 1455

*Nike, Inc. v. Just Did It Enters.*,
  6 F.3d 1225 (7th Cir. 1993).................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
  558 F.2d 1090 (2d Cir. 1977)...........................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.*,
  294 F.Supp. 545 (S.D.N.Y. 1968).....................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
  347 U.S. 89 (1954)..........................................................................51

*Patel v. Liebermensch*,
  45 Cal.4th 344 (2008) .....................................................................27

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972)................................................ *passim*

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995)................................................ 43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg*,
  2011 WL 1696826 (E.D. Ky. May 4, 2011) ......................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
  77 F.3d 309 (9th Cir. 1996)..............................................................29

*S. Cal. Painters v. Best Interiors, Inc.*,
  359 F.3d 1127 (9th Cir. 2004) .........................................................35

*Samuels v. Holland Am. Line-USA Inc.*,
  656 F.3d 948 (9th Cir. 2011)............................................................22

*Sargent v. Am. Greetings Corp.*,
  588 F.Supp. 912 (N.D. Ohio 1984)...................................................62

*Scherr v. Universal Match Corp.*,
  297 F.Supp. 107 (S.D.N.Y. 1967)....................................................44

*Scherr v. Universal Match Corp.*,
  417 F.2d 497 (2d Cir. 1969) ............................................................79

viii

**EXHIBIT 16**

**203**

ER 1456

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ............................................................40

*Seiler v. Lucasfilm, Ltd.*,
   808 F.2d 1316 (9th Cir. 1986) ...........................................................82

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
   206 F.3d 1322 (9th Cir. 2000) ............................................ 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
   161 F.2d 406 (2d Cir. 1946)...............................................................80

*Shaw v. Hahn*,
   56 F.3d 1128 (9th Cir. 1995)..............................................................70

*Siegel v. Nat'l Periodical Publ'ns*,
   364 F.Supp. 1032 (S.D.N.Y. 1973)....................................... 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns*,
   508 F.2d 909 (2d Cir. 1974).................................................. 11, 15, 68

*St. Paul Water Co. v. Ware*,
   83 U.S. 566 (1872) .............................................................................44

*Tex Print Indus., Inc. v. Zayre Corp.*,
   1977 WL 22752 (D. Mass. Feb. 10, 1977) ........................................83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011) ................................................. *passim*

*Thomas v. Ponder*,
   611 F.3d 1144 (9th Cir. 2010) ...........................................................23

*Toledano v. O'Connor*,
   501 F.Supp.2d 127 (D.D.C. 2007) ....................................................29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869
   (9th Cir. 2005)......................................................................... *passim*

*U.S. v. Alexander*,
   326 F.2d 736 (4th Cir. 1964)..............................................................83

**EXHIBIT 16**
**204**

ER 1457

*U.S. v. Diaz-Lopez*,
625 F.3d 1198 (9th Cir. 2010) ...........................................................82

*U.S. v. Resnick*,
594 F.3d 562 (7th Cir. 2010).............................................................78

*Vass v. Compaq Computer Corp.*,
953 F.Supp. 114 (D. Md. 1997) .......................................................36

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007)............................................................23

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) .........................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.*,
320 F.Supp.2d 821 (N.D. Iowa 2004).............................................36

*Weddington Prods., Inc. v. Flick*,
60 Cal.App.4th 793 (1998) ..............................................................31

## **STATUTES**

17 U.S.C. §4 (1909) (repealed 1976).....................................................9

17 U.S.C. §7 (1909) (repealed 1976)...................................................47

17 U.S.C. §24 (1909) (repealed 1976)........................................... *passim*

17 U.S.C. §26 (1909) (repealed 1976)............................................ 9, 41

17 U.S.C. §203 .............................................................................. 10, 41

17 U.S.C. §203 .....................................................................................74

17 U.S.C. §304 ............................................................................. *passim*

17 U.S.C. §507 .....................................................................................37

17 U.S.C. §702 .....................................................................................73

28 U.S.C. §1291 ....................................................................................1

28 U.S.C. §1331 ....................................................................................1

28 U.S.C. §1338 ...............................................................................1

28 U.S.C. §1367 ...............................................................................1

CAL. CIV. CODE §1550 .....................................................................25

**RULES**

FED. R. CIV. P. 54(b) ................................................................ *passim*

FED. R. CIV. P. 56(a) .......................................................................22

FED. R. EVID. 1002 ..........................................................................82

FED. R. EVID. 801(d)(2)(A) ..............................................................78

**REGULATION**

37 C.F.R. §201.10 ...................................................................... *passim*

**OTHER AUTHORITIES**

42 F.R. 45916-21 .................................................................... 74, 77

52 F.R. 23443-46 (1987) .................................................................62

76 F.R. 32320 (June 6, 2011) ..........................................................75

1 WILLIAM F. PATRY, PATRY ON COPYRIGHT (1st ed. 2007) ...................76

41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005) ..........44

6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3] (2011) ........................82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301 (2003) ...............................................34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101 (2001) ....................................28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. LAW. 18 (Apr. 1999) .............................................28

**EXHIBIT 16**
**206**

ER 1459

Jay M. Spillane,
   *Lawsuits over "Handshake Deals" Are As Old As the
   Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. &
   SPORTS LAW. 15 (1993) ........................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
   (2011) ...................................................................................... 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965)................................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
   LAW, 94TH CONG. 304 (1975)...........................................................................16

EXHIBIT 16
207

ER 1460

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth Counterclaims. Larson's First Claim asserts that copyright termination notices she served make her joint owner of several early Superman works. DC's Counterclaims assert that the notices are invalid (First Counterclaim); Larson's lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims. 28 U.S.C. §§1331, 1338, 1367. This Court has jurisdiction over DC's Second, Third, and Fourth Counterclaims, because they were fully and finally adjudicated below. 28 U.S.C. §1291. This Court lacks jurisdiction over Larson's First Claim and DC's First Counterclaim, which were not fully and finally adjudicated. *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that introduced elements of the iconic Superman character and story, including aspects of his appearance, powers, and background. As it comes before this Court—an appeal and cross-appeal addressing multiple rulings below—the case presents an

**EXHIBIT 16**
**208**

unusually broad array of doctrinal, factual, and procedural issues.  But much of the case reduces to a familiar proposition:  a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act.  The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned— while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance.  On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments.  On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended.  The heirs to Superman's original story writer served notices of termination as to certain early Superman works.  While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

2

**EXHIBIT 16**
**209**

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman. The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money. In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers. The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized. The rule there is simple, however: a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here. Superman's creators conceived the Superman character, but no one would publish it. It was only DC, years later, that recognized Superman's commercial potential. DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story. DC developed

**EXHIBIT 16**
**210**

ER 1463

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer:  DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story.  Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts.  And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims.  It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end.  Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

**EXHIBIT 16**
**211**

ER 1464

## STATEMENT OF ISSUES PRESENTED

### *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1.  a.  Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b.  Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2.  Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

### *Larson's Appeal On Her First Claim And*<br>*DC's Cross-Appeal On Both Parties' First Claims*

1.  Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2.  Assuming the Court has jurisdiction to hear these claims:

a.  Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

**EXHIBIT 16**

**212**

b.  Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c.  Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938.  ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves.  Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works.  The dispute here centers on whether certain of the

**EXHIBIT 16
213**

**ER 1466**

earliest derivative works were "made for hire" on DC's behalf, making DC the "author" of the works under the 1909 Act and precluding termination by Siegel's heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of litigation against DC—sought to exercise any termination rights in Superman. Within a year of Siegel's death in 1996, however, his widow Joanne (now deceased) and daughter Larson served termination notices seeking to recapture a broad range of Superman works. ER-1024-92. DC disputed most aspects of the termination notices, but sought to resolve the controversy through negotiation with Larson and her lawyer Kevin Marks. ER-16; SER-393, 100-01. The parties reached a settlement agreement on October 19, 2001, in which DC agreed to pay Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of millions more in future profit sharing, in exchange for which DC would receive all of the putative Superman rights Larson claimed to own. SER-132, 147-48, 434-35, 456-61. A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37. No buyer emerged; and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking a declaration that her termination notices were valid and entitled her to an

**EXHIBIT 16**
**214**

accounting of Superman-related profits.  ER-325.  DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations.  ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement.  SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim.  The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated.  ER-43-140.  But it held that certain other works were *not* made-for-hire and thus could be terminated.  ER-81, 114, 189.  The court did not, however, resolve the scope of the rights at issue.  *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire:  *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1*, *Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938.  ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims.  DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

8

**EXHIBIT 16**
**215**

did not fully adjudicate it (or DC's First Counterclaim). But assuming this Court

has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting

that while the court's work-for-hire rulings were correct as to the works contested

by Larson, the court erred in rejecting work-for-hire as to the following works (or

certain key elements therein): *Action Comics #1* and *#4*; pages 3-6 of *Superman*

*#1*, and two weeks of newspaper strips created before the McClure agreement. DC

also cross-appeals the court's ruling that pre-*Action Comics #1* promotional

announcements, while owned by DC, do not fully depict certain key Superman

elements.

## STATEMENT OF FACTS

### A.  Statutory Background

The 1909 Copyright Act governs the copyright in all works—including

those at issue here—published before January 1, 1978, the effective date of the

1976 Copyright Act. Under the 1909 Act, copyright could be secured for "all the

writings of an author."  17 U.S.C. §4 (1909) (repealed 1976).  Under the 1909 Act,

an "author" was entitled to a copyright for an initial 28-year period and an

additional 28-year "renewal" period. *Id*. §24.

The 1909 Act defined the statutory term "author" to "include an employer in

the case of works made for hire."  17 U.S.C. §26 (1909).  It also provided that "in

the case of … any work copyrighted by … an employer for whom such work is

made for hire," the author/employer was entitled to renewal rights.  *Id*. §24.  These two sections thus made clear that an "employer" in the case of a "work for hire" was a statutory "author" with full rights in both the original copyright and the renewal term.  For this reason, the 1976 Act's provisions addressing "termination" of the extended renewal term—the provisions at issue here—have no application to works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d), as Larson concedes, LB-21.

A person or entity who commissions a work is the statutory "author" of that work under the work-for-hire provision of the 1909 Act whenever the work was created at the "instance and expense" of the commissioning party, unless the parties expressly agreed that "the employee or independent contractor retained the copyright in his work."  *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

### B.    Factual Background

1.    <u>*Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s*</u>

Siegel, a young writer in Cleveland, and his high-school friend Shuster, an illustrator, worked together to conceive many fictional characters—including a crime-fighting hero named "Superman."  SER-6-7.  Between 1933 and 1937, Siegel and Shuster submitted draft Superman comic strips to several publishers, without success.  ER-584; SER-12, 678.

**EXHIBIT 16**
**217**

Case 2:04-cv-08400-ODW-RZ Document 689-3 Filed 06/04/13 Page 226 of 383 Page ID #:15685
Case: 13-56243 02/25/2014 ID: 8993561 DktEntry: 22-7 Page: 65 of 323 (125 of 125)

In 1937, DC[1] hired Siegel and Shuster to do comic-book work. On December 4, 1937, Siegel and Shuster entered into an employment agreement providing that DC would "employ [Siegel and Shuster] as Artists for a period of two years," pay them $10 per page of material, and, in return, Siegel and Shuster would "give their exclusive services" in producing certain comic features and submit all material for any new features to DC. ER-602-03. This "1937 Employment Agreement" also provided that if Siegel or Shuster left DC's employ, they were prohibited from using or copying "any of the products or work or creations or characters or plots used, made or created by [them] while in the employ of [DC]." ER-602.

Siegel and Shuster submitted various comic strips to DC under this agreement, including their existing black-and-white Superman drafts. SER-12-13, 678. DC chose to include the Superman story in its new *Action Comics* comic book, to be published April 18, 1938, with a June 1938 cover date. DC editor Vin Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished Superman drafts into a "full-length 13-panel production suitable for magazine publication." ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911 (2d Cir. 1974). At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors (including Detective Comics and National Comics Publications).

**EXHIBIT 16**
**218**
ER 1471

added "several additional pictures to illustrate the story continuity"—including a new picture showing Superman with a distinct "S" on his chest, which DC's own artists colored red. ER-654; SER-385-86. DC's artists colorized the strips, choosing and adding the iconic blue-and-red color scheme to Siegel's and Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover for *Action Comics #1* based on a panel that featured Superman in his DC-colorized costume—red cape and boots, blue leotard, and heraldic red "S" crest—and exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730. These Promotional Announcements were published beginning on April 5, 1938, before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572, 579-580. DC has filed a motion to lodge an original version of one comic book containing a Promotional Announcement (*Detective Comics #15*, published on April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and Shuster assigned to DC in writing all of their rights in Superman and agreed "not to employ said characters or said story ... without obtaining [DC's] written consent" ("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics #1* was published, Siegel and Shuster continued to supply DC with draft Superman

**EXHIBIT 16**
**219**

**ER 1472**

material, for which they were paid $10 per page.  ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  ER-605.  DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page.  ER-606-07.  The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works.  ER-606.  The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties.  ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do."  SER-219-49, 264-66.  This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media.  ER-858-86.  Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

**EXHIBIT 16**
**220**

cartoons, and merchandising resulted in royalty payments, bonuses, and other compensation for Siegel and Shuster amounting to $5.4 million (in today's terms) from 1938 to 1946 alone.  ER-466, 585-86, 945.

### 2. *Litigation Over Superman During The 1940s, 1960s, And 1970s*

DC's relationship with Siegel and Shuster became contentious.  Other artists and editors brought Superman to new media, including radio and film, and created many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away," or "It's a bird, it's a plane, it's Superman."  SER-680-81.  Siegel also left to serve in World War II; and while gone, DC, working with Shuster, published "Superboy" stories that Siegel argued DC had no permission to publish.  SER-590-95, 603-07, 680.

In 1947, Siegel and Shuster filed an action against DC in New York state court seeking to invalidate the 1938 Assignment ("Westchester Action").  SER-20, 597.  The Westchester court issued an interlocutory ruling concluding, *inter alia*, that the 1938 Assignment granted "all" Superman rights to DC, but that publishing the Superboy stories was improper.  ER-939-93.  In May 1948, DC, Shuster, and Siegel entered into a stipulation and consent judgment under which Siegel and Shuster acknowledged that the 1938 Assignment transferred to DC all rights in Superman, including "the title, names, characters, concept and formula" as set forth in *Action Comics #1*.  ER-995-1017.

**EXHIBIT 16**
**221**

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences.

Siegel again wrote Superman stories for DC, and Shuster received a stipend. SER-294-96. But in 1965, Siegel and Shuster challenged DC's copyright renewal rights in Superman, and in 1969 they filed a lawsuit seeking a declaration that they owned the Superman renewal copyrights. The court held that Siegel and Shuster assigned to DC *all* rights in Superman, including renewal rights. *Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help. In 1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of $20,000 each, lifetime medical benefits, and benefits and payments to their heirs. SER-641-75. In return, Siegel and Shuster acknowledged DC was the exclusive owner of "all right, title and interest" in Superman. SER-641. DC increased its annual payments to more than $125,000 annually, paid special bonuses, and provided other benefits to Siegel, Shuster, and their families. *See* SER-390, 427-31, 448, 641-75, 680.

3.   *Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term and give authors and certain heirs limited rights to terminate prior copyright grants for works subject to the extension term. The Act struck a careful "compromise" between the interests of authors and grantees, the latter of whom often invested

decades of effort to develop copyrighted works into successful properties. SECOND SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices purporting to terminate, as of 1999, various of Siegel's Superman copyright grants to DC ("Notices"). ER-1018-83. DC disputed the Notices' validity; but rather than litigate, the parties spent the next four years trying to reach a business deal. Larson was represented by Kevin Marks of the leading entertainment law firm Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg. SER-98-99, 433-34. DC's lead negotiator was then-General Counsel of Warner Bros., John Schulman. SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be reached, DC paid Larson a non-refundable advance of $250,000. SER-416. On October 16, 2001, DC made a settlement offer to Larson. SER-105, 434. On October 19, Marks called Schulman to accept the offer and report "we are closed." SER-107-08. Later that day, he sent Schulman a letter (1) confirming that Larson had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in six, single-spaced pages; and (3) thanking Schulman for his "help and patience in reaching this monumental accord." SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy')," in

**EXHIBIT 16**
**223**

exchange for, *inter alia*, $3 million, an annual guarantee of $500,000 per year for 10 years, and 6% of gross revenues from all media and merchandising revenues (*e.g.*, television, movies, and toys). SER-456-61. Almost all the money would be Larson's alone—Gang Tyre's fee was 5%. SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties' agreement, set forth "a more fulsome outline of what we believe the deal we've agreed to is," and indicated DC would begin drafting a long-form document so "we will have this super-matter transaction in document form." SER-118-19, 397-98, 463-70. Neither Marks nor Larson objected to Schulman's letter. ER-435. DC began performing its obligations under the October 19 agreement, including establishing a significant reserve for monies owed, which quickly grew to $20 million. SER-397, 399.

DC's outside counsel worked on the separate long-form document for three months and sent Marks a draft on February 1, 2002. SER-125, 435, 472-528. Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's mother sent DC a letter acknowledging that Larson had "accepted" DC's October 16, 2001, offer, but objecting to unspecified portions of the long-form document and concluding that "we have no deal[,] and this [long-form] contract makes an agreement impossible." SER-412-14. Marks told DC the long-form was "aggressive," but "not contrary to what had been agreed to," and the parties would

**EXHIBIT 16**
**224**

"deal with it."  SER-126-27, 130, 436, 439.  For the next two months, Marks

reworked the draft, which he sent to Larson on July 15, 2002.  SER-131-32.

### 4.   *Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement*

Starting in 2001, Toberoff, the self-described "rights-hunter," "movie

producer," and "intellectual property entrepreneur," began pursuing Siegel's and

Shuster's heirs.  SER-115-16, 182-84, 404, 817-23, 835-36, 859-63.  In November

2001, he induced the Shusters to become his business partners and to repudiate

their existing contractual arrangements with DC.  SER-183, 858-61.[2]  Thereafter,

the Shusters served a termination notice purporting to recapture certain Superman

rights as of October 26, 2013.  SER-844-56.

Toberoff targeted the Siegels as well.  SER-115-16, 182-83.  He wrote

Larson's brother and called Marks seeking to secure the Siegels' Superman rights

for himself.  SER-814.  Marks rebuffed Toberoff, telling him in February, July,

and August 2002 that Larson had made a deal with DC.  SER-115-16, 119-24, 182-

83, 811.  Toberoff insisted in August 2002 that Marks communicate to Larson that

he and agent Emanuel had an unnamed "investor" willing to purchase her rights for

$15 million cash and generous "back-end" compensation.  SER-122-24, 811, 875-

76.  Marks conveyed this offer to Larson, but admonished her that she had a "deal"

---

[2] Toberoff's business misconduct is the subject of another lawsuit and two appellate matters before this Court.  Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

**EXHIBIT 16**

**225**

with DC, and if she repudiated it, Marks would have to "testify against [her] in court."  SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations."  SER-418-20.  A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights.  SER-184, 422-25.  But the promised $15 million investor never materialized, and Toberoff never produced any other buyers.  SER-122-23, 184-87, 811-13, 875-76.  Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery.  SER-187, 839-44, 860-63.[3]

### C.    Proceedings Below

Larson filed suit on October 8, 2004.  Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward.  ER-338.  DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement.  ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee.  SER-186, 860-63.

In March 2008, the district court issued a partial summary judgment order. SER-5-90.  It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman.  SER-43-44.  The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 … such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63.  The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days.  ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues.  In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140.  But the court also ruled that *Action Comics #4*, *Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured.  ER-80-81, 140.

**EXHIBIT 16**
**227**

ER 1480

The district court expressly reserved ruling on key issues concerning the
scope of rights Larson recaptured.  It did not determine the extent to which
Larson's recaptured rights were diminished by DC's rights in the Promotional
Announcements.  SER-298-305, 310-13, 321-24, 2-3.  It left open whether its
enumeration of the limited Superman elements in *Action Comics #1*—as compared
to the universe of elements DC owns outright—was intended to be "dicta," as
Larson had argued.  SER-305-08, 313-19, 325-26, 2-3.  And it deferred ruling on
these and other open issues "until shortly before the time of" a later accounting
trial.  SER-198.

That accounting trial never occurred, and the open questions flagged by the
court were never answered.  In 2009, the judge presiding over the Superman cases
resigned, and the cases were reassigned.  The parties submitted a joint status report
agreeing that the "promotional announcement" and "dicta" questions had to be
answered before Larson's First Claim could be fully resolved.  SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that
case, and seeking an interlocutory appeal here.  SER-143-45.  The district court
denied Larson's Rule 54 and stay motions, listing seven open issues—including
the "promotional announcement" and "dicta" issues—that "foreclosed a finding
that [Larson's First Claim] … is final."  SER-141.  Larson amended her complaint
to remove the request for an accounting of profits from the First Claim, but she did

**EXHIBIT 16**
**228**

not eliminate the request for a scope of rights declaration.  Dkt. No. 5-1 at 12-14.

She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court

entered partial final judgment on Larson's First Claim and DC's First through

Fourth Counterclaims.  ER-235-41.

    Larson appealed and DC cross-appealed.  ER-228, 230.[4]  DC moved to

dismiss Larson's appeal, and the Appellate Commissioner denied the motion

without prejudice to its reargument in merits briefing.  Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

    This Court "review[s] de novo a district court's grant of summary

judgment."  *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).

Summary judgment is appropriate if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "In considering a motion for summary judgment, [the court] must draw all

reasonable inferences in favor of the nonmoving party."  *Samuels v. Holland Am.*

*Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011).  The "non-moving party's

evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

    [4] Larson's brief does not challenge (and thus waives the right to challenge, *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings on her First Claim, including that she did not recapture the Promotional Announcements, that certain pre-1938 material created by Siegel was *not* copyrightable, and that she was not entitled to profits from foreign exploitation of Superman.  ER-76-77, 180-81, 207.

**EXHIBIT 16**
**229**

favor," such that its "version of any disputed issue of fact is … presumed correct." *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010). The court must make "[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

### *DC's Cross Appeal On Its Second Through Fourth Counterclaims*

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims below are barred by the parties' 2001 settlement agreement and the Copyright Act's three-year limitations period. These threshold claims were fully adjudicated by the district court's Rule 54(b) judgment and are ripe for appeal.

I. Marks' October 19, 2001, letter reflects a legally enforceable agreement to resolve all claims at issue here, because it details all the essential terms of an agreement: the scope of rights at issue, a significant cash payment, and generous royalty terms, amounting to tens of millions of dollars for Larson. The letter expressly stated that Larson "accepted" DC's offer and referred to the parties' "monumental accord." Both parties' representatives testified that they understood an agreement had been reached. Given the parties' agreement on the essential terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

**EXHIBIT 16**
**230**

subsequently failed to conclude a formalized deal document.  *E.g.*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011).  At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter.  *E.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

II.  DC was entitled to factfinding on its limitations counterclaim.  Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing.  Larson herself has taken conflicting positions as to when negotiations were terminated.  Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely.  But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred.  Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

*Larson's And DC's Appeals On Their Respective First Claims*

I.  The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

II.  Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part.  The court held that the

**EXHIBIT 16**
**231**

vast majority of works at issue were created as works-for-hire, including *Action Comics #2-3*, *#5-61*, pages 1-2 of new material in *Superman #1*, *Superman #2-23*, and all strips created after the Syndication Agreement with McClure. Those rulings all involve Superman works created entirely after Siegel and Shuster assigned all Superman rights to DC and entered into employment agreements with DC to produce new Superman work under DC's direction. Those works are obviously and unambiguously works-for-hire. But the court also held that *Action Comics #1* and *#4*, *Superman #1* (pages 3-6), and the two weeks of Strips created before the Syndication Agreement were not works-for-hire and thus could be recaptured. Those rulings were incorrect. The district court also erred in ruling on rights contained within certain Promotional Announcements without examining the best visual evidence of their contents.

**ARGUMENT**

**DC'S CROSS-APPEAL ON ITS**
**SECOND THROUGH FOURTH COUNTERCLAIMS**

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE

### A. Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation

Under California law, an enforceable agreement is formed where one party accepts another party's offer in exchange for consideration. CAL. CIV. CODE

25

**EXHIBIT 16**
**232**

§1550.  And once a party accepts an offer, an enforceable agreement may arise even if subsequent documentation is contemplated, or additional terms and conditions are subsequently raised.  *See Facebook*, 640 F.3d at 1037-38; *Estate of Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 624 & n.3 (1991).

The question is simply whether the agreed-upon terms are "sufficiently definite that a court can ascertain the parties' obligations thereunder and determine whether those obligations have been performed or breached."  *Elite*, 119 Cal.App.4th at 268.  So long as "the parties have agreed to its existing terms," and those terms are definite, the "fact that an agreement contemplates subsequent documentation does not invalidate the agreement."  *Ersa*, 1 Cal.App.4th at 624 n.3; *see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

"Any other rule" would allow a party to repudiate a contract "whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions."  *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).  "If this were the rule, the contract would never be completed in cases where, by changes in the market, or other events … it became the interest of either party to adopt that course in order to escape or evade

**EXHIBIT 16**
**233**

obligations incurred in the ordinary course of commercial business." *Id.*  Put simply, "few contracts would be enforceable if … subsequent disputes were taken as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008).  Accordingly, "[w]here the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one,'" the parties' "failure to follow it with a more formal writing does not negate the existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

*Facebook* illustrates this rule.  After one day of settlement negotiations, the parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms of a corporate acquisition, including cash and stock consideration and mutual releases.  640 F.3d at 1037.  The settlement subsequently foundered during negotiation over documents that Facebook said were "required to finalize" the agreement, including a stock agreement and release form.  *Id.*

This Court held that the parties had formed an enforceable agreement, because the existing writing showed that the parties "meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later." *Id.* at 1038.  An informal agreement is not enforceable, the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

27

**EXHIBIT 16**
**234**

ER 1487

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

### B.     The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1.  The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook*. SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 Va. Sports & Ent. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

**EXHIBIT 16**
**235**

*Agreements*, L.A. LAW. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over*

*"Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily*

*Avoided)*, 11 ENT. & SPORTS LAW. 15, 15 (1993). The question, as in *Facebook*, is

simply whether the essential terms of the agreement can be identified. Here the

October 19 letter specified every term "deemed essential as a matter of law" in a

copyright assignment, *i.e.*, "the subject matter, the price, and the party against

whom enforcement is sought." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986);

*see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v.*

*O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007). The letter identified:

> • the full scope of rights assigned: "all of [their] rights in the 'Superman' and 'Spectre' properties (including 'Superboy'), resulting in 100% ownership to D.C. Comics"
>
> • the precise cash terms: an "advance of $2,000,000" and a "signing bonus of $1,000,000"
>
> • the specific royalty terms: "6% of Superman/Spectre Gross Revenues" from "all media" other than publications and "1% of the cover price of DC Comics' publications." SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was

tentative or contingent on formal documentation.[5] The extrinsic record confirms

---

[5] Under California law, an initial writing is not enforceable if it *clearly* demonstrates that the parties did *not* intend to be bound until other documents were executed. *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006); *Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

**EXHIBIT 16**
**236**

the opposite.  Marks testified he worked through "the last open point" of the agreement with Schulman on October 16, which "closed the deal," and he "believed that an accord had been reached on the terms exactly set forth in this letter."  SER-105-06, 111-12.  Schulman testified the October 19 letter "accurately set forth all material terms of our agreement."  SER-435.  DC manifested its understanding that an agreement was reached by beginning performance, setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie—both terms required by the October 19 writing.  SER-397, 399, 435-36, 459.

2.  The district court nevertheless held that no agreement was formed on October 19, finding that the terms of Marks' October 19 acceptance letter were "materially different" from DC's five-page letter of October 26, 2001, and "vastly different" from the 56-page "long form" draft of February 1, 2002.  SER-64.  These differences, the court found, showed that the parties "had not passed the threshold where they had finalized and assented to all material terms," because "as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart."  SER-63-64.

**EXHIBIT 16**

**237**

That analysis misses the point. Marks' October 19 acceptance of DC's offer settled the matter, and none of the subsequent discussions undid that contract. The fact that the parties did not reach agreement on issues that "arose" as they attempted to formalize the deal has no bearing on whether the parties had previously agreed on the *essential* terms of the deal, while understanding "that some material aspects of the deal would be papered later." *Facebook*, 640 F.3d at 1038. And the court nowhere identified in the October 26 letter any disagreement over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26 letter expressly confirms its understanding that a binding agreement had been reached. The letter states that Schulman was merely providing a "more fulsome outline of what we believe the deal *we've agreed to* is," and that DC would begin "working on the draft agreement" to put "this super-matter transaction *in document form*." SER-463 (emphasis added). The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to a rough outline of an agreement, but were thereafter unable to reach agreement on the finer details and the negotiations fell apart." SER-62. In fact, *Weddington* held the settlement agreement at issue unenforceable only because the parties had failed to agree on *the most essential matter in dispute between them*—the terms of a license for a "sound library," which "was a material issue to both sides" and thus not "a minor, immaterial or separable issue." 60 Cal.App.4th at 815.

**EXHIBIT 16**
**238**

ER 1491

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a
confirmation of terms *already agreed to*, as set forth in the October 19 letter, with
further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form
agreement was even more misplaced. It was, of course, vastly different in the
sense that it was a 56-page, detailed, formal draft contract, rather than a listing of
terms—just the kind of formal documentation that was attempted without success
in *Facebook*. But, again, nowhere did the court identify any essential term in the
long-form agreement that differed from the essential terms in the October 19 letter.
Marks himself did not express any reservations about the February 2002 long-form
until three months later, after he learned that Larson had complained about it.
SER-436. Even then, Marks told Schulman the draft was "not contrary to what
[had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is
the *new* terms that would be unenforceable, not the October 19 terms. As this
Court explained in holding that Facebook's duty to draft deal documents did not
render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms
that are unfair or oppressive, or that deprive the Winklevosses of the benefit of
their bargain, the district court could reject them as a breach of the implied
covenant of good faith and fair dealing …. The district court got it exactly right

**EXHIBIT 16
239**

when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers. A binding contract already existed, in the essential terms the Siegels accepted on October 19.

3. Although the district court itself identified no disagreements over essential terms reflected in the correspondence and drafts following the October 19 letter, Larson offered up some 10 pages of differences. But none were raised at the time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over an essential term. For example, Larson contended the October 19 and October 26 letters described the rights transfer differently, but both merely used different lawyerly phrases to say that DC would receive 100% of the rights in all Superman properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters state different terms for royalty reductions in "extraordinary cases" involving the use of Superman rights with other properties, but the only difference is that while the October 19 letter gives one *example* of such a use, the October 26 letter provides additional examples; the basic contractual term is identical. *Compare* SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman "cameo" appearances in other characters' stories, SER-553-54, but both letters provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

33

**EXHIBIT 16**
**240**

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and warranties, an obligation to provide certain historical documents, a right of first refusal on biographical works, publicity obligations, advertising credits, dispute-resolution procedures, and indemnities—likewise do not represent material differences concerning essential terms. *See Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution not essential). The differences in language thus do not undermine the basic agreement that is reflected in the plain terms of the October 19 letter and confirmed by the parties' contemporaneous conduct and subsequent testimony.

### C. At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter

At minimum, if there were any genuine dispute as to whether the parties intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the precise definition of "cameo," SER-437, which would have been worked out in the long form. Marks did not object to Schulman's description of "cameos" at the time, and when asked at his deposition to identify all differences between his letter and Schulman's, he did not mention "cameos." SER-118-19, 435, 533-44.

dispute should have been resolved by a jury. The question whether parties intended to be bound by terms expressed in an informal agreement is one of fact, *see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus "summary judgment is inappropriate" where that question is materially contested, *S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement inappropriate" where there is "conflicting evidence" as to whether parties agreed on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC, plainly precludes summary judgment against DC on this question. In *Mattel*, this Court reversed the same district court for making improper determinations concerning contractual intent on summary judgment, where they "turn[ed] in part on the credibility of conflicting extrinsic evidence." 616 F.3d at 910; *see Mattel, Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, *2 (C.D. Cal. Aug. 4, 2011) (jury finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here. Rather than accepting all inferences and making all credibility determinations in DC's favor, it engaged in its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of disagreements over its "finer details," SER-64, but *Callie* actually found disputed factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

**EXHIBIT 16**
**242**

**ER 1495**

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

testimony about the relevant events over testimony from DC witnesses, including testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz disputed, and the materiality of differences between the October 19 and 26 letters, which Schulman addressed. SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to light further indicating that Larson knew she was bound by the October 19 terms. In *Shuster*, the district court compelled Larson to produce a July 2003 letter she wrote to her brother, in which she repeatedly states that Marks insisted, in August 2002, that Larson had a "deal with Time Warner/DC." SER-810-14, 824-25. The letter states that Marks would "testify against [her] in court" if she repudiated the deal and accepted Toberoff's offer. SER-811. The letter confirms that Marks told Toberoff that Larson had a "deal" with DC. SER-811. Given this letter, there is *at least* a jury question as to whether Larson understood she was bound to the October 19 terms.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued," or 1,095 days. 17 U.S.C. §507(b). Larson's claims accrued on April 16, 1999—

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946). Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

5.    *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works. DC argued—and the district court agreed—that Larson failed to recapture

**EXHIBIT 16**
**245**

the Announcements published before *Action Comics #1* because they fell outside

the Notice's statutory time limit.  SER-43-44; 699-712.  Larson has not appealed

that holding, waiving any right to challenge it.  *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments

concerning the copyrightable elements in the Announcements, based on the court's

review of a poor, multiple-generation photocopy.  SER-44-45.  DC filed a motion

for clarification asserting that these statements could not be binding because

neither party moved for summary judgment as to the scope of the Announcements.

SER-328-343.  The district court found otherwise, on the ground that Larson's

opposition to DC's motion raised "questions concerning the scope of the

copyrightable material contained in those announcements."  SER-1.  Larson's

opposition, however, contended only that DC's motion raised "classic issues of

fact" concerning the scope of rights in the Announcements, "precluding summary

judgment" on the very scope question the court then decided.  SER-356-57.

Indeed, an entire section of Larson's brief was titled "The Question Of What

Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of

Material Fact."  SER-356.  On reply, DC fully agreed that this issue should be

reserved for trial and was *not* an issue for summary judgment.  ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party

must have "reasonable notice" and "a full and fair opportunity to ventilate the

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). DC had neither. The only issue on summary judgment was whether the Announcements were covered by Larson's Notices. While the scope question came up in briefing, both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard. Because the only issue properly before the court was when the Announcements were first published—and not their copyrightable content—DC did not present original versions of them. Instead, DC appended a multiple-generation photocopy from *More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics #15*. *See* SER-329-43. After reviewing these poor copies, the district court stated at oral argument: "[Y]ou can hardly make out whether it's an 'S' or a '5' or what it is on his chest." SER-339-340 . Rather than reserving the issue for trial or reviewing an original version, the court's summary judgment order concluded that "the 'S' crest" is not "recognizable." SER-44.

That ruling was incorrect. Where, as here, the content of a work is at issue, "[a]n original writing … is required in order to prove its content." FED. R. EVID. 1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986). Given "the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*, 625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.



# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR - -

Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

**10c at all Newsstands**

## SPECIAL PRIZES AND AWARDS!

## MORE FUN COMICS

*The National Comics Magazine*

**VINCENT A. SULLIVAN**

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.

*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*

ER 1502



*Version Electronically Filed By DC Below*

ER 1503



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the copyrightable elements in the Announcements can be determined at trial.

# CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and statute-of-limitations counterclaims and dismiss the remainder of this appeal on that basis. Alternatively, this Court should remand so the district court can hold a trial on these counterclaims and fully adjudicate Larson's First Claim and DC's First Counterclaim as well. If this Court decides to reach the merits of the parties' First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: March 23, 2003

**EXHIBIT 16**
**252**

ER 1505

APPELLATE CASE NO. 11-55863;
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

**APPELLANT LAURA SIEGEL LARSON'S THIRD BRIEF ON CROSS-APPEAL**

_____

Appeal From The United States District Court for the Central District
of California,
Case No. CV-04-8400 ODW (RZx), Hon. Otis D. Wright II

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kgadams@ipwla.com*
Pablo D. Arredondo
 *parredondo@ipwla.com*
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Plaintiff-Appellant,*
*Laura Siegel Larson, individually and*
*as personal representative of the Estate*
*of Joanne Siegel*

**EXHIBIT 17**
**253**

## **TABLE OF CONTENTS**

COUNTER-STATEMENT OF JURISDICTION ....................................................1

INTRODUCTION ................................................................................................1

ISSUES PRESENTED ON CROSS-APPEAL ......................................................4

STATEMENT OF FACTS ON CROSS-APPEAL ................................................5

     A.     Settlement Negotiations Between The Siegels and DC .......................5

SUMMARY OF ARGUMENT ............................................................................8

ARGUMENT .....................................................................................................13

I.     NO AGREEMENT WAS REACHED BY THE PARTIES .........................13

     A.     The October 19 Letter Was A Counter-Offer That Warner
           Never Accepted ...............................................................................14

           1.     Contract Formation Requires An Objectively Manifested
                  Agreement To The Same Material Terms .................................14

           2.     There Was No Accepted Offer, Merely An Exchange Of
                  Unaccepted Counteroffers .......................................................15

     B.     The Numerous Material Differences Between The Proposals
           Demonstrate That No Agreement Was Consummated ......................17

           1.     Material Differences As To Scope Of The Agreement ............17

           2.     Material Differences As To Monetary Terms...........................18

           3.     Other Material Differences .......................................................22

     C.     Warner's Cases On This Issue Are Manifestly Inapposite As
           They Concern The Enforceability Of Signed Agreements .................24

i

**EXHIBIT 17**
**254**

D.      A Final Written Agreement Signed By The Parties Was
        Required ............................................................26

E.      The Clear Reservations Demonstrate That No Contract Was
        Formed................................................................28

F.      Established Contract Law Applies To The Film Industry ................30

G.      Summary Judgment Is Appropriate Because No Enforceable
        Agreement Existed As A Matter of Law...............................31

        1.      Summary Judgment As To Contract Formation Is Proper ......31

        2.      None Of Warner's Purported Evidence Does Anything
                To Establish That A Contract Was Formed...........................33

II.     THE SIEGELS' ACTION WAS TIMELY FILED .......................................36

III.    NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE................39

A.      The District Court Properly Rejected Warner's "Work-for-
        Hire" Claim As To *Action Comics, No. 1* ...........................39

        1.      Claim And Issue Preclusion Apply To Issues And Claims
                Raised Or Which Could Have Been Raised ...........................40

        2.      Warner's Arguments Are Unpersuasive ...................................42

                a.      The "Work-For-Hire" Issue Was Decided ....................42

                b.      The "Work-For-Hire" Issue Was Litigated And
                        The Second Circuit's Ruling Is Not Dicta.....................43

B.      The Alleged Additions Were Not "Work-For-Hire" .........................45

C.      DC Is Not A Joint Author Of *Action Comics, No. 1* ...........................52

IV.     *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT
        WORKS-FOR-HIRE ..................................................................53

**EXHIBIT 17**
**255**

V.      THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO
        WEEKS OF SUPERMAN NEWSPAPER  STRIPS ...................................54

        A.      The Strips Were Not "Work-For-Hire"................................................54

        B.      Not Listing the Strips Separately In The Termination Was
                Harmless Error ...................................................................................56

                1.       "Harmless Error" Is Broadly Defined ....................................56

                2.      Warner Was On Notice Of The Siegels' Intent To
                        Terminate The Newspaper Strips ............................................57

                3.      Warner's Reliance On *Burroughs* Is Misplaced......................58

                4.      Warner's Remaining Arguments Lack Merit ...........................58

VI.     SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE
        NOT "WORKS-FOR-HIRE" ........................................................................59

        A.      *Action Comics, Nos. 2-3, 5-6*.............................................................61

        B.      The Newspaper Strips ........................................................................62

        C.      *Action Comics, Nos. 7-61, Superman, Nos. 1-23* ..............................66

VII.    THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE
        FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS.................68

        A.      The District Court Fully Adjudicated The First Claim and First-
                Fourth Counterclaims, Which Did Not Include The "Ads" Issue ......68

        B.      The District Court Accurately Described The Promotional
                Announcements ...................................................................................71

CONCLUSION .....................................................................................................74

CERTIFICATE OF COMPLIANCE....................................................................75

STATUTORY ADDENDUM ...............................................................................76

**EXHIBIT 17**
**256**

CERTIFICATE OF SERVICE ...................................................................................77

**EXHIBIT 17**

**257**

ER 1510

# TABLE OF AUTHORITIES

## CASES

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ......................................................52

*Amerisource Bergen Corp. v. Dialysist West, Inc.*,
465 F.3d 946 (9th Cir. 2006) ......................................................69

*Apablasa v. Merritt & Co.*,
176 Cal. App. 2d 719 (1959) ................................................. 15-16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
352 F. Supp. 2d 1119 (C.D. Cal. 2005) ....................................44

*Banner Entertainment, Inc. v. Superior Court*,
62 Cal. App. 4th 348 (1998) ............................................ 27, 32, 35

*Batjac Productions Inc. v. GoodTimes Home Video Corp.*,
160 F.3d 1223 (9th Cir. 1998) ....................................................73

*Beyene v. Coleman Security Services, Inc.*,
854 F.2d 1179 (9th Cir. 1988) ....................................................67

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
683 F.2d 610 (2d Cir. 1982) ........................................................58

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
491 F. Supp. 1320, 1322 (S.D.N.Y. 1980) ................................58

*Bustamante v. Intuit, Inc.*,
141 Cal. App. 4th 199 (2006) ............................................ 15, 31-32

*Callie v. Near*,
829 F.2d 888 (9th Cir. 1987) ......................................................32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................31

**EXHIBIT 17**
**258**

*Chicot County Drainage Dist. v. Baxter State Bank*,
308 U.S. 371 (1940) ............................................................................... 44-45

*Clarke v. Fiedler*,
44 Cal. App. 2d 838 (1941) ......................................................................32

*Core-Vent Corp. v. Nobel Indus. AB*,
11 F.3d 1482 (9th Cir.1993) ......................................................................68

*Curtiss-Wright Corp. v. General Electric Co.*,
446 U.S. 1 (1980) ....................................................................................68

*Davis & Cox v. Summa Corp.*,
751 F.2d 1507 (9th Cir. 1985) .............................................................. 41-42

*Devereaux v. Harper*,
210 Cal. App. 2d 519 (1962) ................................................................ 16-17

*Dolman v. Agee*,
157 F.3d 708, 712 (9th Cir. 1998) ............................................................46

*Duran v. Duran*,
150 Cal. App.3d 176 (1983) ......................................................................27

*Durkin v. Shea & Gould*,
92 F.3d 1510 (9th Cir. 1996) ....................................................................41

*Effects Assocs. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) ....................................................................30

*Elite Show Servs. Inc. v. Staffpro, Inc.*,
119 Cal. App. 4th 263 (2004) ....................................................................26

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ..................................................................51

*Epoch Producing Corp. v. Killiam Shows, Inc.*,
522 F.2d 737 (2nd Cir. 1975)....................................................................59

ER 1512

*Ersa Grae Corp. v. Fluor Corp.,*
1 Cal. App. 4th 613 (1991) ..................................................................25

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
342 F.3d 149 (2d Cir. 2003).................................................... 48, *passim*

*Estate of Thottam,*
165 Cal. App. 4th 1331, (2008) ..........................................................25

*Goodworth Holdings Inc. v. Suh*
99 Fed. Appx. 806 ..............................................................................28

*Hydranautics v. FilmTec Corp.,*
204 F.3d 880 (9th Cir. 2000) ..............................................................41

*In Harris v. Rudin, Richman & Appel,*
74 Cal. App. 4th 299 (1999) ...............................................................25

*In re Eliapo,*
468 F.3d 592 (9th Cir. 2006) ..............................................................28

*In re Marshall,*
600 F.3d 1037 (9th Cir. 2010) ............................................................41

*In re Pago Pago Air Crash,*
 637 F.2d 704 (9th Cir. 1981) .............................................................16

*Industrial Indemnity v. Superior Court,*
224 Cal. App. 3d 828 (1990) ..............................................................26

*Janes v. Wal-Mart Stores, Inc.,*
279 F.3d 883 (9th Cir. 2002) ..............................................................38

*Jim Henson Productions v. John T. Brady & Associates*,
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ..................................................65

*Kamilche Co. v. United States*,
53 F.3d 1059 (9th Cir. 1995) ...................................................40-42, 45

**EXHIBIT 17**
**260**

*Krasley v. Superior Court*,
101 Cal. App. 3d 425 (1980) ........................................................................ 31-32

*Landberg v. Landberg*,
24 Cal. App. 3d 742 (1972) ......................................................................... 15-16

*LIN Broadcasting Corp. v. Metromedia Inc.*,
74 N.Y.2d 54 (1989) .................................................................................... 48, 56

*Louis Lesser Enterprises, Ltd. v. Roeder*,
209 Cal. App. 2d 401 (1962) ...........................................................................17

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003) ..........................................................................33

*Martha Graham School and Dance Foundation Inc. v. Martha Graham Center of Contemporary Dance, Inc.*
380 F.3d 624 (2d Cir. 2004) ...............................................................61, 63, 67

*Meyer v. Benko*,
55 Cal. App. 3d 937 (1976) ..............................................................................33

*Montana v. U.S.*,
440 U.S. 147 (1979) ..........................................................................................40

*Music Sales Corp. v. Morris*,
73 F. Supp.2d 364 (S.D.N.Y. 1999) .................................................................57

*National Comics Publications, Inc. v. Fawcett Publications, Inc.*,
191 F.2d 594 (2d Cir. 1951) ....................................................................... 12, 64

*Norris v. Grosvenor Mktg. Ltd.*,
803 F.2d 1281 (2d. Cir. 1986) .........................................................................45

*Novak v. Warner Bros Pictures, LLC*,
387 Fed.Appx. 747 (9th Cir. 2010) ..................................................................31

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F. 3d 708 (9th Cir. 2001) ..........................................................................41

**EXHIBIT 17**

ER 1514

*Panagotacos v. Bank of America,*
60 Cal App 4th 851 (1998) ................................................................ 15-16

*Patel v. Liebermensch,*
45 Cal. 4th 344 (2008) ........................................................................25

*Paulo v. Holder,*
669 F.3d 911 (9th Cir. 2011) .............................................................44

*Picture Music v. Bourne, Inc.,*
457 F.2d 1213 (2d Cir. 1972)........................................................ 60-61

*Playboy Enters. v. Dumas,*
53 F.3d 549 (2d Cir. 1995)....................................................... 43, 63, 67

*Portsmouth Square Inc. v. Shareholders Protective Committee,*
770 F.2d 866 (9th Cir. 1985) .............................................................71

*Public Ledger v. N.Y. Times,*
275 F. 562 (S.D.N.Y. 1921)...............................................................64

*Radio TV Espanola S.A. v. New World Entertainment, Ltd.,*
183 F.3d 922 (9th Cir. 1999) .............................................................28

*Rael v. Davis,*
166 Cal. App. 4th 1608 (2008) ..................................................... 33-34

*Reiter v. Cooper,*
507 U.S. 258 (1993)...........................................................................69

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
77 F.3d 309 (9th Cir. 1996) ...............................................................27

*Rice v. Fox Broad. Co.,*
330 F.3d 1170 (9th Cir. 2003) ...........................................................51

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,*
531 F.3d 962 (9th Cir. 2008) .............................................................52

ER 1515

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) ...................................................................18

*Roth v. Malson*,
67 Cal. App. 4th 552, 559 (1998) ............................................................15

*S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*
359 F.3d 1127 (9th Cir. 2004) .................................................................32

*Schrock v. Learning Curve Int'l, Inc.*,
586 F.3d 513 (7th Cir. 2009) ...................................................................55

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322 (9th Cir. 2000) ........................................................... 46, 59

*Siegel v. Nat'l Periodical Publications*,
364 F. Supp. 909 (S.D.N.Y. 1973) ............................................... 43, 46-47

*Siegel v. Nat'l Periodical Publications*,
508 F.2d 909 (2d Cir. 1974).......................................................... 2, *passim*

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ...................................................55

*Stewart v. Abend*,
495 U.S. 207 (1990)........................................................................... 55, 60

*Stewart v. U.S. Bancorp*,
297 F.3d 953 (9th Cir. 2002) ...................................................................40

*Texaco, Inc. v. Ponsoldt*,
939 F.2d 794 (9th Cir.1991) ....................................................................68

*The Facebook Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ........................................................... 24-26

*Tibbs v. Smart & Final Iris Co.*,
152 Cal. App. 2d 618 (1957) ...................................................................16

**EXHIBIT 17**
**263**

*Twentieth Century Fox Film Corp. v. Entertainment Distributing,*
429 F.3d 869 (9th Cir. 2005) ................................................................ 40, *passim*

*Valente-Kritzer Video v. Callan-Pickney,*
881 F.2d 772, 775 (9th Cir. 1989) ....................................................... 28-29

*Warren v. Fox Family Worldwide, Inc.,*
328 F.3d 1136 (9th Cir. 2003) ...................................................................61

*Weddington Productions, Inc. v. Flick,*
60 Cal. App. 4th 793 (1998) ....................................................................15

*Weinstein Co. v. Smokewood Entm't Group,* LLC,
664 F. Supp. 2d 332 (S.D.N.Y. 2009) ......................................................30

*Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.,*
106 F.3d 894 (9th Cir. 1997) ...................................................................45

Wo*lff v. Inst. of Elec. & Electronics Engineers, Inc.,*
768 F. Supp. 66 (S.D.N.Y. 1991).............................................................50

## RULES

Fed. R. Civ. P. 54(b) ........................................................................*passim*

F.R.A.P. 10(a) .........................................................................................33

Ninth Circuit Rule 10-2...........................................................................33

## STATUTES

17 U.S.C. § 204(a) ......................................................................... *passim*

17 U.S.C. § 209........................................................................................65

17 U.S.C. § 304(c)(1)...............................................................................69

17 U.S.C. § 304(c)(4).............................................................................`69

17 U.S.C. § 507(b) ...................................................................................36

28 U.S.C. § 1291 ....................................................................................1

Cal. Civil Code § 998................................................................................26

Cal. Civ. Code § 1585 ........................................................................ 15-16

**REGULATIONS**

37 C.F.R. § 201.10(b)(1)(iii)...................................................................69

37 C.F.R. § 201.10(b) .................................................................... *passim*

**OTHER AUTHORITIES**

ARTHUR CORBIN, CORBIN ON CONTRACTS (2006)
§ 3.36.......................................................................................................16

M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT (2011)
§ 5.03[B][2][d] ................................................................................. 59-60

§ 6.03.......................................................................................................54

WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007)
§ 5:54 ................................................................................................ 59, 67

§ 5:61 .................................................................................................60, 63

*Oral Contracts In the Ent Industry*,
1 Va. Sports & Ent. L.J. 101 (2001) ............................................... 28, 30

*Resolving Disputes over Oral and Unsigned Film Agreements*,
L.A. Law. 18 (Apr. 1999) ............................................................... 28, 30

**EXHIBIT 17**

**265**

ER 1518

## COUNTER-STATEMENT OF JURISDICTION

This court has jurisdiction over the F.R.C.P. 54(b) judgment on Plaintiff
Laura Siegel Larson's First Claim, and Defendant DC Comics' First through
Fourth Counterclaims.  28 U.S.C. § 1291.

## INTRODUCTION

The opposition and cross-appeal brief (Docket No. 31-1; "Opp.") of DC
Comics (including its predecessors, "DC") and its parent, Warner Bros.
Entertainment Inc. (including DC, "Warner") does little to address the real legal
issues in this case.  Instead, Warner uses catchphrases divorced from the law,
erroneous arguments never made below, *ad hominem* attacks on opposing counsel,
and extra-record materials to evade plaintiff Laura Siegel Larson's ("Plaintiff")
statutory notices of termination regarding Superman ("Termination").

Touting "a deal is a deal" and Hollywood "custom and practice," Warner
pretends it entered into a binding contract with Plaintiff in October 2001, when
nothing could be further from the truth.  In the three years before Plaintiff filed this
action in 2004 to enforce her Termination, Warner never once claimed such a
contract existed, and for good reason.  The parties' objective written exchange of
counteroffers with many different material terms, amply demonstrate that no
contract was formed.  As the District Court correctly held, "there is no document
or set of documents reflecting agreement by the parties to singular, agreed terms."

ER 202.[1]

Warner's arguments as to the other issues fare no better. As to its purported statute of limitations defense, Warner argues, for the first time, a "trigger" date in May 2002, contradicting both its position below and the explicit terms of the parties' "tolling agreement."

As to its erroneous argument that Siegel and Shuster's conversion of their Superman story to a magazine format in *Action Comics, No. 1* was "work-for-hire," Warner pretends that the Second Circuit's decision in *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) – from which it has greatly benefited for four decades – is no longer preclusive.

Nor does Warner do anything to meaningfully counter Plaintiff's focused arguments in her opening brief (Docket No. 12; "App.") that the Superman newspaper strips, *Action Comics, Nos. 2-56* and *Superman, Nos. 1-6*, were not "work-for-hire." For pre-January 1, 1978 works, this sole exception to statutory termination is governed by the "instance and expense" test. "Expense" requires the publisher to assume upfront the expense and thus, the financial risk of a work's *creation*, which DC chose not to do. "Instance" requires that the publisher has the legal right to supervise and control the process and elements of creation, which DC

---

[1] "ER" refers to Plaintiff's excerpts of record, served on December 22, 2011; "SER" refers to Warner's supplemental excerpts of record, served on March 23, 2012; "RER" refers to Plaintiff's reply excerpts of record, served concurrently.

2

**EXHIBIT 17**
**267**

ER 1520

lacked.  Accordingly, Warner failed to meet its burden on summary judgment of demonstrating "instance and expense" by credible, admissible evidence.

On appeal, Warner sidesteps this governing test and spuriously argues that DC's ownership of underlying Superman rights renders every derivative work "for-hire," contrary to the Copyright Act and clear precedent.  Warner also revises history to assert that Superman material produced in 1938-43 by Siegel and Shuster's independent Cleveland operation was "work-for-hire," when DC's agreements said no such thing and independent contractors were not held to produce "work-for-hire" until the mid-1960s.

As Warner cannot meet its evidentiary burden, it freely distorts the record with misleading statements and fabrications in the hope this Court will not catch them – *e.g.*, falsely pretending that Jerry Siegel's extra-record memoir supports their position.

In further desperation, Warner resorts to baseless irrelevant attacks on Plaintiff's counsel to elicit prejudice and distract from the merits.  Warner's concocted "tortious interference" allegations, repeated here, were not before the District Court; are the subject of a different lawsuit (*DC Comics v. Pacific Pictures Corp., et al.*, C.D. Cal. Case No. 10-CV-03633 ODW (RZx)) still to be adjudicated; and are addressed in Plaintiff's pending Anti-SLAPP appeal.  9th Cir. Case No. 11-71844.  In willful violation of established appellate procedures,

**EXHIBIT 17
268**

Warner lards its excerpts of record with scores of documents that were also not

before the District Court.

     This Court should firmly reject Warner's meritless attempts to undermine

and evade Plaintiff's statutory rights, affirm the District Court's judgment on

Warner's cross-appeal, and reverse the District Court's judgment and remand for

further proceedings on Plaintiff's appeal.

## ISSUES PRESENTED ON CROSS-APPEAL

    1.    Did the District Court correctly find, based on the undisputed

documentary evidence, that no contract was formed when the parties exchanged

counteroffers with numerous differences in material terms, and there was no signed

written agreement, as contemplated by the parties and required by 17 U.S.C. §

204(a)?

    2.    Did the District Court correctly find that Plaintiff's claims were timely

due to an explicit written tolling agreement between the parties?

    3.    Did the District Court correctly find that *Action Comics, No. 1* was not

a "work-for-hire," where Warner's arguments were variations on those made by it

and rejected by the Second Circuit in prior litigation, and Warner, in any event, has

not met its evidentiary burden?

    4.    Did the District Court correctly find that portions of *Action Comics,*

*No. 4* and *Superman, No. 1*, based on Siegel's pre-existing material, before any

**EXHIBIT 17
269**

**ER 1522**

relationship with DC, were not "work-for-hire"?

5.     Did the District Court correctly find as to the first two weeks of "Superman" newspaper strips that: (a) they were not "work-for-hire" because they were created on a purely speculative basis; and (b) their inadvertent omission from Plaintiff's notices of termination was "harmless error" under 37 C.F.R. §201.10(e)(1), because Plaintiff's intent to "terminate" the strips was clear?

6.     Did the District Court correctly enter a Rule 54(b) judgment on Plaintiff's First Claim and Warner's First Counterclaim, where such claims focused on the validity of Plaintiff's Termination and were fully adjudicated by the District Court?

**STATEMENT OF FACTS ON CROSS-APPEAL**

The facts set forth below concern parts of Warner's cross-appeal. The facts relevant to Plaintiff's appeal and "work-for-hire" issues are set forth in her opening brief.

A.     <u>**Settlement Negotiations Between The Siegels And DC**</u>

On April 3, 1997, the widow (Joanne Siegel) and daughter (Laura Siegel Larson) of Jerry Siegel (the "Siegels"), exercised their rights under 17 U.S.C.§ 304(c) by serving on DC/Warner and filing with the Copyright Office seven notices of termination of Jerry Siegel's Superman copyright grants. ER 1023-1092.

**EXHIBIT 17
270**

Laura/Joanne Siegel and DC/Warner thereafter engaged in settlement negotiations.  ER 161.  On April 15, 1999, the day before the Siegel Termination was to take effect, DC contested its "validity and scope."  SER 390.  Thereafter, the Siegels hired attorney Kevin Marks ("Marks"), and signed an explicit "Tolling Agreement" with DC as to any time-based defenses to contemplated litigation (the "Tolling Agreement").  SER 348-351.

The parties continued settlement negotiations in 2000-2001, conducted on DC's behalf by Warner's then-general counsel, John Schulman ("Schulman").  SER 456-528.  The negotiations were complex, spanning a range of terms including copyright assignments, intricate studio definitions/calculations of multi-tiered royalties for different media, warranties and indemnifications.  *Id.*  Negotiations progressed in a telephone conference on October 16, 2001 between Schulman and Marks.  SER 536:12.  On October 19, 2001, Marks sent Schulman a six-page letter outlining the substance of what he believed was Warner's settlement offer in the October 16, 2001 conference.  SER 456-461.  On October 26, 2001, DC responded with a materially different outline and counter-offer that contemplated further explication in a formal written agreement.  SER 463-470.  Months later, on February 1, 2002, DC sent the Siegels a 56-page settlement proposal with many more new and changed material terms, not in Marks' October 19, 2001 offer or DC's October 26, 2001 counter-offer.  SER 472-528.

**EXHIBIT 17**
**271**

ER 1524

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, President of AOL Time Warner, Inc., stating "we were stabbed in the back …. [y]our company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the proposal…. After four years we have no deal and this contract makes an agreement impossible." SER 412-414.[2]  Parsons wrote back on May 21, 2002, stating that "we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve" and "we continue to hope this agreement can be closed."  SER 416.

Aware of the Siegels' extreme dissatisfaction with the "new" and "inconsistent" material terms, Marks began drafting a new proposal, which he never sent to DC.  SER 418; RER 39:21-40:15.  Nor did DC ever attempt to agree to Marks' October 19, 2001 proposal, or to modify or retract DC's October 26, 2001 or February 1, 2002 counter-proposals.

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC's Paul Levitz, terminating Marks and providing "notification that we are

_____

[2] Warner's unsupported allegations that its settlement proposal generously "guaranteed" the Siegels "tens of millions" (Opp. 3, 4, 7) is both irrelevant to contract formation and false.  Warner's February 2002 Draft is rife with Hollywood accounting tricks for which studios in general, and Warner in particular, are notorious.  SER 472- 523; *Ladd v. Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1300 (2010).  Warner would not be trying to force on Plaintiff, and Plaintiff would never have rejected, such a lucrative settlement.  SER 412-414.

**EXHIBIT 17**
**272**

totally stopping and ending all negotiations with DC." SER 418; *see Siegel I*, 542
F. Supp. 2d at 1136. As this letter arguably did not comply with the express terms
of the Tolling Agreement, the Siegels sent a further letter on October 28, 2002 that
complied with such terms. SER 349-50 ¶7; RER 96-97 (October 28 2002 Letter).[3]

## SUMMARY OF ARGUMENT

I.      No agreement was reached between the Siegels and DC as a matter of
law. The parties' correspondence shows that Kevin Marks' October 19, 2001
letter, John Schulman's October 26 letter, and Warner's February 1, 2002 draft all
had sharply varying material terms, and hence under clear California law were
*counteroffers*, not acceptances, that terminated the preceding offer. Neither the
basic scope of the agreement as to copyrights to be assigned, the complex royalties
to be paid, the parties' warranties and indemnifications, nor numerous other
material terms were ever agreed-upon, as shown by this objective documented
exchange. Furthermore, the parties clearly contemplated, and the Copyright Act
required, a formal written agreement, executed by both parties, which never
happened due to their disagreements over material terms. Against this, Warner

---

[3] Warner's gratuitous recitation of an August 2002 offer by Ari Emanuel (Opp. 18-
19) and citation to extraneous materials, *not* part of the District Court record, is
irrelevant to the legal issue of whether the parties formed a contract in October
2001. Warner's improper inclusion in its Excerpts of Record of 166 pages of extra-
record material, and raising of prejudicial, irrelevant new arguments on appeal, are
addressed more fully in Plaintiff's motion to strike, and in the appellants' opening
brief in *DC Comics v. Pacific Pictures Corp.*, 9th Cir. Case No. 11-71844.

cites inapposite cases where a written instrument *signed by both parties* was found to be enforceable, and pleads for the first time that established contract law should not apply to the entertainment industry. The District Court, applying well-settled California law to the parties' undisputed evidence, properly found that no agreement had been reached.

II.     The District Court also correctly held that the Siegels' claims were timely filed due to the parties' written Tolling Agreement. On appeal, DC abandons all of its prior arguments, and frivolously argues for the first time that the May 9, 2002 letter from Joanne Siegel to AOL Time Warner's President, complaining about Warner's February 2002 draft, somehow cancelled the Tolling Agreement. But the Tolling Agreement expressly required specific, formal notice of cancellation by certified mail to both DC's general counsel and outside counsel, and the May 9, 2002 letter did none of this. The District Court correctly found that notice of cancellation was not given to DC until September 21, 2002 at the earliest, and Warner concedes that in such event this action would be timely. In fact, notice of cancellation, as explicitly defined in the Tolling Agreement, was not given until October 28, 2002.

III.    The District Court correctly found that no part of Siegel and Shuster's Superman story, as published in Action Comics, No. 1 ("*Action Comics, No. 1*"), was "work-for-hire." The Second Circuit's decision in *Siegel v. Nat'l Periodical*

**EXHIBIT 17
274**

ER 1527

*Publications,* 508 F.2d 909, 914 (2d Cir. 1974), which specifically rejected Warner's "work-for-hire" arguments (based on Siegel and Shusters' conversion of their strip to a magazine format) bars Warner under preclusion doctrines. Notwithstanding this, Warner has presented no evidence that DC made the contributions it alleges (*e.g.*, choice of colors) or that Siegel and Shuster's reformatting revisions were "work-for-hire." Moreover, the alleged items, when compared to Siegel and Shuster's pre-existing illustrated story contain minimal, if any, protectable new elements. Finally, even if "work-for-hire" and marginally protectable, these limited revisions would not transform DC into a "co-author" of Siegel and Shuster's celebrated Superman story, per established precedent.

IV.    The District Court correctly found that parts of *Action Comics, No. 4,* and *Superman, No. 1* were not "work-for-hire" and were successfully terminated, because they had been fully developed by Siegel "on spec" prior to any involvement by DC, and hence were not DC's "work-for-hire."

V.    The District Court correctly found that the first two weeks of "Superman" newspaper strips were not "work-for-hire." The strips were also created "on spec" by Siegel and Shuster who, on their own initiative, pitched these sample strips to several newspaper syndicators. The inadvertent omission of these strips from the hundreds of Superman newspaper strips from the same period listed in the Siegels' Termination notices was correctly held to be "harmless error" under

37 C.F.R. § 201.10.  DC had clear notice of the Siegels' intent to terminate all Superman works subject to termination, as this was both stated in and otherwise evident from their Termination notices.

VI.    As set forth in Plaintiff's opening brief, the District Court erred in finding that *Action Comics, Nos. 2-3, 5-6, Superman, Nos. 1-23,* and *Action Comics, Nos. 7-56* were "works-for-hire."  The works were done without any guaranteed financial compensation, negating "expense," and Warner's own evidence amply demonstrates that DC lacked any legal "right" to supervise and control Siegel and Shuster's creative process, negating "instance."

As to the remaining 1938-43 "Superman" newspaper strips, the District Court held on summary judgment that these strips were on "the outer edges of the work-for-hire doctrine" (ER 103), even though DC had failed to meet its burden of proving that the strips were created at DC's "instance and expense."  The strips were not created at DC's "instance," as Siegel and Shuster, not DC, were the motivating factor in their creation and syndication; nor at DC's "expense," because Siegel and Shuster paid all expenses of creating the strips, were solely entitled to a contingent royalty, and thus assumed the costs and financial risks of creation.

The District Court also erred in ignoring other significant evidence that the strips were not "work-for-hire" including:  (i) the McClure Syndicate's presumptively correct copyright registrations listing Siegel and Shuster as authors

**EXHIBIT 17**
**276**

of the strips; (ii) the September 22, 1938 joint venture agreement between

McClure, Siegel and Shuster, and DC (the "McClure Agreement") in which Siegel

and Shuster were to receive a very large share of the profits, and DC a minor share;

(iii) *National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National*

*Comics*"), 191 F.2d 594 (2d Cir. 1951), which held that McClure, the syndicator,

was the assignee or "proprietor" of the strips, not the author; and (iv) McClure's

subsequent written <u>assignment</u> of the strips to DC.

    VII.   The District Court's Rule 54(b) judgment was proper.  Plaintiff's First

Claim, and Warner's First through Fourth Counterclaims, required ***only*** that the

District Court decide whether the Termination was valid and which Superman

*works* were subject to termination as non-"work-for-hire." The District Court fully

adjudicated the First Claim and Warner's purported defenses in three voluminous

published opinions.  Warner erroneously argues that the Rule 54(b) judgment is

improper, because the District Court did not fully adjudicate the *literary elements*

present in each "terminated" work.  But such issues only pertain, if at all, to

Plaintiff's Second through Fourth Claims, concerning Warner's accounting

obligations, and are excluded from the Rule 54(b) judgment.  For this reason, DC's

"Ads" argument is also a red herring.  Even were this Court inclined to consider

the Ads, the District Court correctly determined that the Ads contained no original

Superman content.  Lastly, Warner did not contest the Rule 54(b) judgment as to

**EXHIBIT 17**
**277**

**ER 1530**

its Second through Fourth Counterclaims, conferring jurisdiction in any event.

## ARGUMENT

## I.    NO AGREEMENT WAS REACHED BY THE PARTIES

In 2004, after the Siegels filed suit for a declaration that they had successfully recaptured Siegel's original Superman and Superboy copyrights, Warner contended for the first time that they had reached a binding agreement with the Siegels in October 2001.  ER 298-301.

Three key documents conclusively demonstrate that no agreement was consummated:  (1) an October 19, 2001 letter (SER 456-61; the "October 19 Letter") from the Siegels' then-counsel, Kevin Marks to Warner's general counsel, John Schulman, containing one set of terms; (2) an October 26, 2001 reply from Schulman to Marks, containing a "more fulsome outline" of materially different deal terms (SER 463-70; the "October 26 Letter") to be fleshed out in a "draft agreement;" and (3) Warner's proposed February 1, 2002 draft agreement (SER 472-528; the "February 2002 Draft").

The fundamental differences between these counteroffers included the properties at issue (Superman, Superboy and Spectre in Marks' draft; nearly everything Siegel ever wrote in Warner's), the classification and calculation of royalties, warranties/indemnifications of/by the Siegels, and many other material differences.  RER 140-49.

**EXHIBIT 17**
**278**

As the District Court aptly held, "[o]ne need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 2002, 2002 draft to reach the conclusion that the parties failed to come to an agreement on all material terms."  ER 202.

On appeal Warner advances erroneous arguments that:  (i) the October 19 Letter, which Warner did not accept, still "settled the matter;" and (ii) despite the many material differences between the counteroffers, there are supposedly no differences in "essential terms."  For all of this, Warner relies on inapposite cases which simply find that clear agreements, *signed by both parties*, are enforceable.

A.    **The October 19 Letter Was A Counter-Offer That Warner Never Accepted**

1.    **Contract Formation Requires An Objectively Manifested Agreement To The Same Material Terms**

The glaring differences, set forth below, between the parties' respective write-ups (Marks' October 19 Letter and Schulman's October 26 Letter), made within a week after the parties thought they had arrived at terms, demonstrate that the parties had not reached agreement.  This divergence becomes even clearer with Warner's February 2002 Draft, elaborating upon its October 26 Letter.

Contract formation requires that the parties "agree upon the same thing in

**EXHIBIT 17**
**279**

the same sense." Cal. Civ. Code § 1580. "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Weddington Productions, Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998).

"[I]f the material facts are certain or undisputed, the existence of a contract is a question for the court to decide." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006). *See Roth v. Malson*, 67 Cal. App. 4th 552, 559 (1998) (affirming summary judgment that no contract was formed because counteroffer was not accepted).

## 2. There Was No Accepted Offer, Merely An Exchange Of Unaccepted Counteroffers

It is black-letter law that the "terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract." *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-856 (1998) (citing *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959)).

"'[A] qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer'" (*id.*), and that "new proposal or counteroffer [] must be accepted by the former offeror now turned offeree before a binding contract results." *Landberg v. Landberg*, 24 Cal. App. 3d 742, 750 (1972); *see* Cal. Civ. Code § 1585 ("An acceptance must be absolute.... A qualified

**EXHIBIT 17**
**280**

acceptance is a new proposal."). "If the acceptance contains conditions not embraced in the offer or adds new terms, there is no meeting of the minds and no acceptance." *In re Pago Pago Air Crash,* 637 F.2d 704, 706 (9th Cir. 1981). Thus, a counteroffer terminates the original offer and the power to accept the original offer. *See Panagotacos,* 60 Cal App 4th at 855-856; 1-3 *Corbin on Contracts* § 3.36 (2006).

Here, it is crystal-clear from the objective exchange of counteroffers that each contained material terms not accepted by the other party.

Marks' October 19 Letter, though styled as an "acceptance" of Schulman's oral "offer" of October 16, 2001, was actually a "counteroffer" because, according to Schulman and his October 26 "more fulsome outline," something very different was discussed on October 16. SER 456-461; 463-470. *See Tibbs v. Smart & Final Iris Co.*, 152 Cal. App. 2d 618, 618, 623 (1957) (affirming summary judgment where "there is no enforceable written contract" despite a letter purporting to "accept[] said offer").

Schulman's October 26 Letter, which purported to outline Warner's October 16 "offer," contained materially different terms (more favorable to Warner) than those in Marks' purported October 19 "acceptance," "putting an end to" Marks' counter-offer. *Apablasa*, 176 Cal. App. 2d at 726. *See* ER 201; *Devereaux v. Harper,* 210 Cal. App. 2d 519, 524-525 (1962) (no contract where "one person

16

**EXHIBIT 17**
**281**

ER 1534

offers to do a definite thing and another introduces a new term into the acceptance"); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal. App. 2d 401, 407 (1962) (no binding agreement where letters contain "substantial changes in the proposed terms" that indicate the initial letter "was never intended to be the final memorial of the agreement of the parties").

The February 2002 Draft, contemplated by Schulman's October 26 outline, elaborated upon it with even more new or revised material terms, further showing that no agreement had been reached. SER 472-528.

### B. <u>The Numerous Material Differences Between The Proposals Demonstrate That No Agreement Was Consummated</u>

#### 1. Material Differences As To Scope Of The Agreement

Warner concedes that the scope of the rights assigned is an "essential" term. Opp. 29. But Warner fails to address the blatant differences: Marks' October 19 Letter was specifically limited to "Superman, Superboy and related properties … and the Spectre property." SER 456. Schulman's October 26 Letter was far broader, and included "all rights" in (1) anything related to "Superman, Superboy, Spectre and related properties – even if not created for DC Comics," and (2) anything "arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published)," and whether or not related to Superman, Superboy or the Spectre. SER 456, 464, 533-4, 541-42.

**EXHIBIT 17**

**282**

Warner's counteroffers thus significantly broadened the scope of properties to be assigned, which alone is sufficient to defeat Warner's claim that a binding contract was formed. *See Roth v. Garcia Marquez*, 942 F.2d 617, 626-627 (9th Cir. 1991) (no contract where long-form document unsigned due to dispute over scope of rights to be transferred).

### 2. Material Differences As To Monetary Terms

Warner also concedes that the royalty terms are "essential" (Opp. 29), but fails to address the substantial differences.

Recoupment:  Under the October 19 and October 26 counteroffers, Warner would advance $500,000/year, "recoupable" against the Siegels' royalties.  Under Marks' October 19 proposal, those advances would never accumulate interest if unrecouped (*i.e.,* if advances exceeded royalties); under Warner's proposals, all advances were "non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment."  SER 458, 467.

Media Royalties:  Marks' October 19 Letter proposed a royalty of 6% of DC's "gross revenues" derived from the "use of the property in any and all media, in and on merchandise and in promotional campaigns."  SER 457.

Schulman's October 26 Letter proposed "6% of DC's receipts from all Media licenses for use of the Properties" (compare SER 457 and SER 467), without providing the definition of "Media licenses."  Revenues from sources other

than "Media licenses" (*e.g.,* from direct sales or assignment by DC to third-parties as opposed to licenses) are thus excluded.

So, while the October 19 and October 26 letters both use "6%," the "6%" applies to different things.

The February 2002 Draft deviated further, limiting the 6% royalty to "amounts actually received" by DC "in United States Dollars" from "licensing," and excluding "any sums received by DC Comics for providing any services or materials in connection with the licensing."  SER 481, 545:17-546:13.  The draft further reduced the applicable revenue stream by excluding cash advances paid to DC (against its royalties), unless such monies were or became non-returnable. SER 481.

Marks' October 19 Letter envisioned a 6% royalty from any and all media and merchandising uses of Superman, subject to reduction (a) to 3% on a "pro rata" basis "when the property is used in conjunction with other book characters," (b) to 1.5% in three instances:  "Justice League of America," "Superfriends" and "Superheroes," and (c) to 1% in "extraordinary cases … such as [Warner's] license to Six Flags."  SER 457 ¶5, 536:4-537:5.

In contrast, Schulman's October 26 counteroffer, and subsequent February 2002 Draft, reduced the 6% (a) to 3% for "licenses which commingle the Properties with another DC property similar in stature and used in a like manner,"

and (b) to 1.5% for "licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (*e.g.,* Justice League, Superfriends, Superheroes)." SER 467, 495. This transformed a limited reduction in three instances ("*i.e.*"), into a general principle ("*e.g.*").

Merchandising Royalties: There were also material differences as to merchandising royalties – an extremely significant source of revenue.

As with "Media Royalties," Marks' and Schulman's proposals differed in their 6%/3%/1.5% categorizations.

Furthermore, Marks' October 19 letter limited the "1%" category to "extraordinary cases," with the "Six Flags" license as an example. SER 457 ¶5. Schulman's October 26 counteroffer added an entirely new category "with respect to licenses …. [for] a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensees, but to the extent such information is not available, the 6% shall be reducible to not less than 1%" – meaning that the category was not limited to "extraordinary cases," **and** the "floor" could be under 1% (based on purported licensee information). SER 467.

The February 2002 Draft added further new terms, including no payments

for the use of Superman in advertising and that "only 10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC would be included. SER 496-97, 499-500. This contrasted sharply with Marks' October 19 Letter, which stated that the 6% *would* apply to "promotional campaigns" and did not restrict revenue from merchandising. SER 457.

<u>Publishing Royalties:</u> The parties also never reached agreement on the royalty applicable to Superman's exploitation in DC's "non-Superman" publications. The October 19 Letter provided a baseline royalty of "1% of the cover price," with a "pro rata" adjustment for non-"cameo" appearances, to a floor of .5%. SER 457-58 ¶6. Warner's October 26 Letter stated that "there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties do not appear in the title of the publication or feature in question." SER 468 ¶25.

The February 2002 Draft expanded upon Warner's new floor of *no royalties whatsoever* where Superman did not appear "in the title of the publication or feature." SER 499. The February 2002 Draft further added that no royalties would be paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts of excess of seventy percent off of cover price." SER 481.

Thus, under Marks' October 19 proposal, the Siegels would have been paid

21

**EXHIBIT 17**
**286**

ER 1539

for nearly all appearances of Superman.  Under Warner's October 26 and February 2002 counteroffers, there were numerous new exclusions and reductions of the royalty rate and the revenues to which it would apply (*e.g.,* no revenues even if Superman appears for months as a main character in a "Green Arrow" comic).

### 3.    Other Material Differences

Other material differences concerned, *inter alia*, warranties, indemnification, arbitration, audit rights, and credits.  RER 140-49 (chart detailing differences between the proposals).

As to "warranties and representations," the October 19 Letter stated that the "Siegel Family would ***not*** make any warranties as to the nature of rights, but would [only] ***represent that they have not transferred the rights to any party***."  SER 460 ¶13 (emphasis added).  Schulman's October 26 Letter stated the "Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement," and "no contract of any kind with any other party with respect to or related to the Properties," and "not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use."  SER 464.  Such broader warranties result in significant potential liability.  SER 534:6-10.

As to "indemnification," the October 19 Letter stated only:  "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions" – all to

their benefit.  SER 460 ¶14.  Schulman's October 26 Letter specifically added that the "Siegels defend and indemnify re third party claims," "Siegels defend and indemnify re Dennis [Laura's ex-husband] claims," and "Widow and daughter [Joanne and Laura] indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to Sign."  SER 470; *see also* SER 517-18.  In essence, Warner turned the October 19 Letter's indemnification from Warner to the Siegels into significant obligations of the Siegels to indemnify Warner.

Furthermore, Marks' October 19 Letter provided only for mutual non-disparagement.  SER 460 ¶13.  Schulman's October 26 counteroffer required the Siegels to "positively publicize the Properties," including "travel" for "public appearances," and to "consult with DC prior to any personal appearances, written statements, interviews or other activities."  SER 464,535:19-536:3  (Marks: "[T]hat was a problem because we were dealing with a woman of advanced years and a woman who was ill, and travel on them could be a burden…. I wouldn't have wanted there to be any dispute that they were not fulfilling an obligation … and that … being the basis for claiming breach and withholding royalty payments and the like.").

The parties also diverged as to the credits to be accorded Jerome Siegel. *Compare* SER 459 ¶4 ER (October 19 Letter:  credit to be given in "paid ads"

concerning the Properties) *with* SER 469 ER (October 26 Letter: no credit in "paid ads"); *see* SER 539:12-17 (Marks: "[C]redit in paid ads … is something that's very important to clients. They want to see the credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's letter provided for credit on screen only and not in paid ads.").

Just as Schulman couched his October 26 counteroffer as a "more fulsome outline," Warner dismisses vast differences in the February 2002 Draft as simply the product of it being a "long-form" or more "detailed." Opp. 32. Warner's subjective characterizations do nothing to change the objective manifestations of the parties' intent in their competing written counteroffers, nor the numerous material differences between them. ER 201 ("Defendants … seek to create issues of fact through <u>post hoc</u> testimony and rationalizations. None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents ….").

## C. <u>Warner's Cases On This Issue Are Manifestly Inapposite As They Concern The Enforceability Of Signed Agreements</u>

To evade this clear lack of an agreement, Warner cites to cases that stand for the unremarkable proposition that a written agreement, signed by the parties, is an enforceable contract if sufficiently "definite."

Warner relies primarily on *The Facebook Inc. v. Pac. Nw. Software, Inc.*,

640 F.3d 1034 (9th Cir. 2011) ("*Facebook*") (Opp. 26-27), which is inapposite as it concerned an agreement signed by both parties. Furthermore, "[t]he parties stipulated that the Settlement Agreement was … 'binding', and 'may be submitted [to a court] to enforce [it].'" *Id*. at 1037. The question was whether the signed document had sufficiently definite material terms to be enforceable. *Id*. As the material terms were a lump-sum payment and a specified amount of stock, this Court unsurprisingly found the executed agreement binding and enforceable. *Id*.

    *Facebook* is similar to *In Harris v. Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999), also relied upon by Warner (Opp. 26), which upheld an agreement to pay $250,000 in exchange for a general release, executed by all parties, under a signature block stating "[a]ccepted and agreed."

    Warner's other cases similarly involve a signed instrument demonstrating the parties' intent to be bound. *See Estate of Thottam,* 165 Cal. App. 4th 1331, 1340-41 (2008) (parties agreed "by initial and by signature" and the terms are "sufficiently clear to determine obligations to which the parties agreed"); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 (1991) (enforcing signed agreement where agreed-upon material terms were "undisputed"); *Patel v. Liebermensch*, 45 Cal. 4th 344, 346 (2008) (signed contract enforceable, though it did not specify the "time and manner of payment" because "a reasonable time is allowed").

**EXHIBIT 17**
**290**

**ER 1543**

Warner also relies on *Elite Show Servs. Inc. v. Staffpro, Inc.*, 119 Cal. App. 4th 263, 268-69 (2004), which did not concern contract formation, but simply found that a Cal. Civil Code § 998 litigation settlement offer (entitling one to fees and costs) was sufficiently definite.

If Marks' October 19 proposal contained signature lines executed by the parties, then *Facebook* and the other cases Warner cites might be applicable to whether the terms were sufficiently definite to be enforceable. That obviously did not happen. Instead, the parties' counteroffers demonstrate disagreement as to material terms preventing the formation of a contract.

Nor is it this Court's responsibility to relieve Warner from its failure to respond to Marks' October 19 Letter with an unqualified acceptance. As the District Court correctly noted, "there is no document or set of documents reflecting agreement by the parties to singular, agreed terms." ER 202. And where the parties have not agreed upon terms, "courts will not write a new contract" for them. *Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990).

### D. <u>A Final Written Agreement Signed By The Parties Was Required</u>

It is equally clear from the parties' words and conduct that, given the importance and complexity of the subject matter and deal points, any agreement was subject to documentation and would need to be reduced to a mutually-acceptable written contract. ER 463 ("We're working on the draft agreement"),

SER 472.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (affirming summary judgment; no contract as a matter of law where "the parties intended … not to be bound unless and until a subsequent agreement was made").

"[W]hen it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract."  *Duran v. Duran*, 150 Cal. App.3d 176, 180 (1983) (citations omitted).  *See Banner Entm't Inc. v. Superior Court (Alchemy Filmworks Inc.)*, 62 Cal. App. 4th 348, 358 (1998) ("When it is clear … that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.") (citation omitted).

Moreover, as any such agreement would involve an assignment of the Siegels' recaptured copyright interests, a written contract was required as a matter of law.  17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").[4]

---

[4] On appeal Warner argues for the first time that a purported "handshake" is sufficient and relies on "principles essential to the entertainment industry, where many business deals are never formalized" (Opp. 3, 28-29), and on secondary

Marks' October 19 Letter cannot possibly qualify as the required "writing." While "[n]o magic words must be included in a document to satisfy § 204(a) …. the parties' intent as evidenced by the writing must demonstrate ***a transfer*** of the copyright." *Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (emphasis added). The October 19 Letter is not "a transfer" of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels "would [make such] transfer" in a final executed agreement. SER 458.

Here, a signed written agreement assigning the Siegels' copyrights was both contemplated by the parties and required, but never approved and executed. *See Goodworth Holdings Inc. v. Suh* 239 F. Supp.2d 947, 958 (N.D. Cal. 2002) (granting summary judgment where parties "had a lot of conversations about putting a deal together, but when it finally came down to determining material terms … in order to put them into writing, both parties walked away").

## E.    The Clear Reservations Demonstrate That No Contract Was Formed

In *Valente-Kritzer Video v. Callan-Pickney*, 881 F.2d 772, 775 (9th Cir.

---

sources that nonetheless flag § 204(a)'s writing requirement, both placing it at issue. Opp. 28; *Oral Contracts In the Ent Industry* ("*Oral Contracts*"), 1 Va. Sports & Ent. L.J. 101, at 108-109), *Resolving Disputes over Oral and Unsigned Film Agreements* ("*Resolving Disputes*"), L.A. Law. 18 (Apr. 1999) at 20. Furthermore, as this "issue is one of law and … the [factual] record has been fully developed," it can properly be raised on appeal. *In re Eliapo*, 468 F.3d 592, 603 (9th Cir. 2006). Plaintiff also addressed § 204(a)'s writing requirement on summary judgment (RER 100), albeit on another point.

1989), an attorney for one party sent a draft agreement accompanied by a letter that stated in part "Thank you for your cooperation and congratulations on landing the deal" and "Please call if you have problems." This Court found that that there was no binding contract, despite the attorney's repeated references to "the deal," because the correspondence contained reservations, including the right to comment and a request for the other party to communicate any disagreements. *Id.*

The same type of reservations appears throughout the correspondence here, demonstrating that neither side viewed their proposals as final. Marks' October 19 Letter concluded by stating "John, if there is any aspect of the above that is somehow misstated, please let me know…." SER 461. Schulman's responsive October 26 Letter similarly stated "I enclose herewith … *a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement* … we will have this super-matter transaction in document form." SER 463 (emphasis added). The correspondence accompanying Warner's February 2002 Draft stated:

> I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. *As our clients have not seen this latest version* of the agreement, *I must reserve their right to comment.* In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

SER 472 (emphasis added). Such reservations, along with the numerous material

**EXHIBIT 17**
**294**

ER 1547

differences in the parties' counteroffers, make plain that they had not arrived at a contract.

## F.    Established Contract Law Applies To The Film Industry

This Court should give no currency to Warner's frivolous suggestion – not made below – that the entertainment industry requires deviation from established contract and copyright law.  Opp. 28.  *See Effects Assocs. v. Cohen*, 908 F.2d 555, 556-557 (9th Cir. 1990) (rejecting argument that "[m]oviemakers do lunch, not contracts" and enforcing 17 U.S.C. § 204(a)); *Weinstein Co. v. Smokewood Entm't Group*, LLC, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) (same).

In support of the proposition that it is "standard" in the entertainment industry to forgo written contracts, Warner cites to articles, not before the District Court, that contradict their position and, in any event, are unsupported by any testimony, expert or otherwise.  Opp. 28-29.  *Oral Contracts*, 1 Va. Sports & Ent. L.J. at 108-09, 111-12, cautions against oral agreements for anything but "simple and short-term contracts;" and notes that 17 U.S.C. § 204(a) mandates an executed written instrument for copyright transfers.  *Resolving Disputes*, L.A. Law. at 20, 48, notes "evidence of industry custom and practice is not [admissible] if it is offered to prove or disprove whether or not a contract was formed," and similarly emphasizes § 204(a)'s writing requirement.

**EXHIBIT 17**
**295**

### G. Summary Judgment Is Appropriate Because No Enforceable Agreement Existed As A Matter of Law

#### 1. Summary Judgment As To Contract Formation Is Proper

Warner contends that "at a minimum" a jury should consider its position. Opp. 34-37. However, Warner has not met the threshold to survive summary judgment. Once Plaintiff met her initial burden of demonstrating the absence of a genuine issue of fact, the burden shifted to Warner to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). Warner points to no real evidence contradicting the facially-obvious correspondence that objectively demonstrates that no contract was formed. As this documentary evidence is "undisputed," the question of whether or not a contract was formed "is a question [of law] for the Court to determine." *Bustamante*, 141 Cal. App. 4th at 208.

Courts thus routinely decide the issue of whether a contract was formed on summary judgment. *See Novak v. Warner Bros Pictures, LLC,* 387 Fed. Appx. 747, 749 (9th Cir. 2010) (affirming summary judgment where "[t]he evidence conclusively establishes that, when negotiations broke off, the parties had not reached agreement" and "[n]o rational jury could find that a contract was entered between the Producers and Warner"); *Krasley v. Superior Court*, 101 Cal. App. 3d 425, 432 (1980) ("A number of cases have found [summary judgment] proper and

indeed required in situations involving … contracts which were in fact illusory and consisted only of … offers and counteroffers.") (collecting cases and upholding summary judgment).

While Warner claims "whether parties intended to be bound by terms expressed in an informal agreement is one of fact," and summary judgment somehow improper, the cases it cites are either inapposite or to the contrary.  Opp. 35; *Bustamante*, 141 Cal. App. 4th at 208 (affirming summary judgment that "no enforceable contract was ever formed between the parties," despite purported oral agreement); *Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359-62 (unsigned draft agreements did not create enforceable contract despite testimony as to oral agreements); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 846 (1941) ("When, as here, the evidence indisputably shows that all the terms and conditions of the understanding between the parties were definitely agreed upon … the parties are bound."); *S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1132 (9th Cir. 2004) (applying federal labor law, not California law, to find "triable issues of fact" as to a collective-bargaining agreement); *Callie v. Near*, 829 F.2d 888 (9th Cir. 1987) (applying Arizona law regarding a "court['s] equitable power to enforce summarily a ['*complete*'] agreement to settle a case pending before it").

**EXHIBIT 17**
**297**

### 2. None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed

To distract from glaring material differences in the parties' written counteroffers, Warner grossly mischaracterizes Marks' testimony to claim that a binding contract had been reached. Opp. 28-29, 32. Warner asserts that "Marks told Schulman the draft was 'not contrary to what [had been] agreed to' and the parties could 'deal with it.'" Opp. 32. The quotes were not even Marks' words, but inadmissible hearsay in the form of Schulman's purported notes that Plaintiff objected to below. RER 88 ¶15. Marks testified to the opposite. SER 127. Marks also testified in detail how Warner's counteroffers contained "many additional terms not agreed to." SER 128, 533-547.

Warner leans heavily on Marks' alleged subjective beliefs as to "a deal."[5] This approach is fundamentally incorrect, because whether a binding contract was formed is not based on subjective belief, but on objective manifestation of intent – here, the competing counteroffers. *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942–943 (1976) (mutual consent "is determined by objective rather than subjective criteria"); *Rael v. Davis*, 166 Cal. App. 4th 1608, 1618 n.11 (2008) ("Contract

---

[5] To do so, Warner improperly goes well "beyond the record evidence" and mischaracterizes inadmissible hearsay in a letter from Plaintiff to her half-brother. Opp. 37. Plaintiff's concurrently-filed motion to strike details Warner's brazen attempt to inject 166 pages of new material into the record on appeal in willful violation of established appellate procedures. F.R.A.P. 10(a); Circuit Rule 10-2; *Lowry v. Barnhart*, 329 F.3d 1019, 1025-26 (9th Cir. 2003).

**EXHIBIT 17**
**298**

ER 1551

formation is governed by objective manifestations, not subjective intent of any individual involved.").

Notwithstanding this, Marks' testimony is consistent with the evidence and the District Court's ruling that a binding contract was never consummated. RER 55 (Marks: "Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no ….").

Warner falsely asserts that the differences between the outlines were not raised at the time. Opp. 33. Schulman sent his October 26 Letter when Marks was away for a month in China. SER 461; RER 21:16-24. Upon Marks' return he attempted to contact Schulman, but Schulman was on vacation. RER 29:4-7. On May 9, 2002, Joanne Siegel wrote a letter to Parsons, President of AOL Time Warner, specifically condemning the "unconscionable contract dated February, 2002 [which] contained new, outrageous demands that were not in the proposal." SER 412-414.

Warner also conspicuously omits Parsons' May 21, 2002 reply to Ms. Siegel, in which he states "we continue to hope that this agreement can be closed." SER 416. Parson did *not* claim a binding agreement had ever been reached, but instead indicated that the parties had yet to reach an agreement. *See* ER 163 (District Court: "Time Warner 'expected' that the submission of the draft agreement would result in further 'comments and questions on the draft' by Siegel

family's representatives that 'would need to [be] resolve[d].'").

Warner also relies on its purported post-agreement conduct. Yet, at no time in the three years before the Siegels filed suit did Warner/DC ever assert that a settlement agreement had been reached. Nor did Warner/DC ever retract their October 26, 2001 or February 1, 2002 counteroffers.

Warner weakly claims that DC "manifested its understanding of the agreement" by "setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie." Opp. 30. This supposed "reserve account" was anything but. RER 73-74 (DC: "None of the Defendants have ever represented … that an actual escrow fund had been created," and admitting that DC had only "summary statements … consisting of one-line quarterly total entries."). Warner also never states that it provided the Siegel family credit on its 2005 film. SER 459 ¶4.

Warner's *de minimis* purported performance does nothing to overcome the fact that there was no meeting of the minds. *See Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359 ("[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*") (emphasis in original).

**EXHIBIT 17**
**300**

* * *

As the District Court correctly held:  "[Warner's] argument … is premised on the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter, and call it a contract, regardless of their materially different October 26, 2001 letter … and their vastly different February 1, 2002 draft, which were both part and parcel of the same settlement negotiation."  ER 201.  None of Warner's arguments can withstand the great weight of the objective evidence that no contract was formed.

## II.   THE SIEGELS' ACTION WAS TIMELY FILED

The Copyright Act provides a three-year statute of limitations for copyright claims.  17 U.S.C. § 507(b).  The District Court held, and Warner does not dispute here, that the Siegels' claims accrued at the earliest on April 16, 1999.  ER 197.

To facilitate settlement negotiations, DC and the Siegels entered into a tolling agreement dated and effective April 6, 2000 (the "Tolling Agreement") (SER 348-51) that neither "would assert any statute of limitations or laches defenses relating to …the [Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof."  SER 348 at ¶1.  Paragraph 7 provides that the Tolling Agreement remain in force "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices [of

**EXHIBIT 17**
**301**

ER 1554

Given the above, the District Court's granting of summary judgment on this issue was erroneous, as at a minimum a reasonable trier of fact could readily find that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were not "for-hire."

## VII. THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS

### A. The District Court Fully Adjudicated The First Claim And First – Fourth Counterclaims, Which Did Not Include The "Ads" Issue

Federal Rule of Civil Procedure 54(b) allows a district court to enter an appealable judgment on interlocutory orders that constitute "an ultimate disposition of an individual claim," provided there is no just reason to wait until the entire case concludes. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).

Rule 54(b) certification is left to the sound discretion of the district court, and is proper if it aids in expeditious resolution while avoiding piecemeal appeals. *See Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1484 (9th Cir.1993). "The trend is towards greater deference to a district court's decision to certify under Rule 54(b)." *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991).

Plaintiff's First Claim, as amended, requests only the following relief:

74.    For a declaration as follows:
a.    That pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works; and

68

**EXHIBIT 17**
**302**

   b. That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

ER 343-44 ¶74.  Plaintiff's First Claim thus required the District Court:  (a) to determine that the Termination complied with section 304(c) of the Copyright Act; and (b) to determine those "works" recaptured by the Termination.  *See* 17 U.S.C. §§ 304(c)(1), (4) (referring to "the work"); 37 C.F.R. § 201.10(b)(1)(iii) (focusing on "each work to which the notice of termination applies").  It did ***not*** call for the adjudication of the literary elements contained in each work.  In contrast, Plaintiff's Second through Fourth Claims, which seek an accounting of profits from such works, could involve an evaluation of their literary "elements" due to general exploitation of the Superman franchise.

   In several lengthy decisions, the District Court found that the Termination is valid as to *Action Comics, No. 1*, as well as *Action Comics, No. 4*, *Superman, No. 1* (pages 3-6), and the Spec Strips, but that the remaining Superman works within the 1938-43 termination window were "for-hire."  ER 1-227.

   The District Court also fully adjudicated Warner's First through Fourth Counterclaims, which sought to invalidate the Termination on various grounds.[13]

   Accordingly, on May 17, 2011, the District Court properly entered a Partial

---

[13] Warner admits that the Rule 54(b) judgment on its Second through Fourth Counterclaims was proper (Opp. 1), which alone is a sufficient basis for jurisdiction.  *See Reiter v. Cooper*, 507 U.S. 258, 265 (1993); *Amerisource Bergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 954 (9th Cir. 2006).

**EXHIBIT 17**
**303**

ER 1556

Judgment under Rule 54(b) as to Plaintiff's First Claim and as to Warner's First through Fourth Counterclaims.  ER 232-3, 293-300 ¶¶66-105, 343-344 ¶74.

Warner argues that Rule 54(b) certification was supposedly improper because (a) there are purported open issues as to the impact, if any, of limited promotional materials ("Ads") held to be excluded from the Termination, and (b) there is disagreement as to whether statements regarding literary elements in *Action Comics, No. 1* made in the background section of the District Court's first order, constitute "dicta."  Opp. 40-41.

The "dicta" issue is irrelevant to the First Claim, which does <u>not</u> seek relief as to the "literary elements" contained in *any* work.  ER 343-44 ¶74.

The District Court decided two "Ads" issues.  ***First,*** it held that the Ads were not subject to the Termination because their publication date fell outside the termination "window."  ER 167-76.  This is all that is relevant to the First Claim.  ***Second,*** it properly determined that the derivative Ads' content was extremely limited (ER 176-82), as the Ads' reduced, black-and-white, and wholly derivative copy of the *Actions Comics, No. 1* cover was divorced from the Superman storyline and character in *Actions Comics, No. 1.*  But this determination is not part of the First Claim, which solely concerned whether the Termination was effective as to a given work.[14]  At most, this issue affects Plaintiff's Second through Fourth

---

[14] Warner's contention that Plaintiff has "waived" her right to challenge the

**ER 1557**

"accounting" claims (ER 344-346 ¶¶75-79), none of which are part of the Rule 54(b) Judgment.

As the First Claim and the First through Fourth Counterclaims have been fully adjudged and are severable from the other claims, the District Court's Rule 54(b) judgment was proper.

## B. <u>The District Court Accurately Described The Promotional Announcements</u>

If the Court is nonetheless inclined to reach the issue of the "copyrightable content" of the Ads, the District Court's ruling as to the Ads' negligible content was correct.

Warner falsely claims the "the *scope* of the rights at issue" was not at issue in the summary judgment motion.  Warner acknowledges (Opp. 81-82) that courts have the inherent power to order summary judgment *sua sponte* so long as the adverse party had "a full and fair opportunity to develop and present facts and legal arguments" and "reasonable notice that the sufficiency of his or her claim will be in issue."  *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

---

District Court's limited "Ads" ruling (Opp. 80-81) is misleading.  Plaintiff maintains that, while the trivial, wholly derivative Ads were not "terminated," they have no impact on the copyrights (*e.g.*, *Action Comics, No. 1*) recaptured by the Termination.  As this issue is not part of the Rule 54(b) judgment, Plaintiff could hardly have raised it on appeal.  *See* Docket No. 7 at 11.

71

**EXHIBIT 17**

**305**

"Reasonable notice" requires that the party be on notice that the court might "reach" the issue. *Id.* at 869-70.

Warner had more than adequate notice. In fact, Warner asserted on summary judgment that "DC and its licensees continue to have the right to use the copyrightable elements contained in the [Ads] without the need to account to Plaintiffs." SER 708. In response, Plaintiff emphasized the lack of "copyrightable elements" in the Ads and submitted the reports of both parties' experts on the subject. SER 356:19-357:6; RER 104-106, 108-133 ¶¶30-41. In reply, Warner argued that the Ads "represent the first publication of the appearance of the Superman character" (RER 91:16-20), that "any question about [the Ads'] contents is most obviously answered by the ads which speak for themselves," and that "no special 'lens' is required." RER 93:18-20.

Finally, the Court clearly indicated at the hearing on the parties' summary judgment motions that it believed the Ads contained minimal copyrightable material, at best, and gave Defendants a fair opportunity to respond. RER 78:17-24. Defendants' counsel even discussed this issue with the Court:

> The Court: How do you respond to *counsel's argument that all you have is the actual picture itself*, and not necessarily any of the elements therein?
> Mr. Zissu: Okay. Well, the thing about visual works, multi-media works, is that pictures are worth -- can be worth many words. We do have, if you look at it -- *if you look at it, you have the figure of Superman as he appears there in his costume; you have his strength lifting a car; and you don't have that much more*.

**EXHIBIT 17**
**306**

The Court:  **That's about it; right**.

RER 80:12-22 (emphasis added).

Warner was not "denied" "an opportunity to be heard" but rather had a full and fair opportunity to litigate, ample warning that the Court was considering the issue, engaged with the District Court, and chose to dodge questioning and submit what it now dismisses as a "multiple-generation photocopy" only after losing on the issue.  Opp. 82.

Warner's arguments about the contents of the Ads – an issue which it concedes is not part of this appeal (Opp. 86) – are erroneously premised.  Siegel's copyright in *Action Comics, No. 1* was correctly held by the District Court to have been recaptured pursuant to the Termination.  ER 133-4.  The Ads' reduced black-and-white copy of the mere cover of *Action Comics, No. 1* are entirely derivative, add no new copyrightable elements, and under clear Ninth Circuit law, derivative works **cannot** limit, restrict, or divest the copyrights in underlying work.  *See Batjac Productions Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1227 (9th Cir. 1998) ("[P]ublication of a derivative work does not affect the validity of a subsisting copyright in the preexisting work.").

Furthermore, the critical point is that the image on the comic book cover has meaning *only* in the context of the Superman storyline, character and other aspects of *Action Comics, No*. 1, not found in the Ads:  "[N]othing concerning the

73
**EXHIBIT 17**
**307**

**ER 1560**

Superman storyline, that is, the literary elements contained in <u>Action Comics</u>, Vol. 1, is on display in the ads." ER 181:9-10.

## CONCLUSION

Plaintiff respectfully requests that this Court: (1) affirm the judgment of the District Court that no agreement was reached between the Siegels and DC Comics; that Plaintiff's action was timely filed; that *Action Comics, Nos. 1* and *4, Superman, No. 1* and the first two weeks of Superman newspaper strips were not "work-for-hire;" and were successfully recaptured by the Siegel Termination; and (2) reverse the judgment of the District Court with instructions to enter partial summary adjudication in Plaintiff's favor as to the Superman works within the 1938-1943 Termination window (i.e., *Action Comics, Nos. 2-3, 5-56, Superman, Nos. 1-6,* and the remaining "Superman" newspaper strips); and (3) to remand for further proceedings.

Dated: May 24, 2011          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT 17**
**308**

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

## LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

# REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
# WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 18**
**309**

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................1

I.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY
     JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

     A.   Larson And DC Formed An Agreement On October 19, 2001 ..........3

     B.   Contemplating A Long-Form Document Does Not Defeat A
          Deal................................................................................7

     C.   Larson Has Not Raised Any Material Difference On Any
          Essential Term Between The Marks And Schulman Writings ..........10

          1.   Scope Of Rights .................................................10

          2.   Monetary Terms .................................................11

          3.   "Other" Non-Essential Terms .................................13

          4.   The February 2002 Long-Form ..............................14

     D.   Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II.  DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-
     OF-LIMITATIONS COUNTERCLAIM ........................................16

III. LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

     A.   Elements Of *AC#1* Were Made-For-Hire .........................17

          1.   *National* Is Not Preclusive .....................................17

          2.   The 1938 Additions Were Made-for-Hire ..............................19

               a.   New Content ...............................................20

               b.   Colorization ..............................................21

               c.   Cover Art ..................................................22

     B.   DC Owns The Pre-McClure Strips.....................................23

          1.   The Strips Were Made-for-Hire.......................................23

          2.   Larson's Failure To Terminate The Strips Is Dispositive .......24

     C.   Pages 3-6 Of *S#1* Are Works-For-Hire ..............................25

     D.   Artwork In *AC#4* Is Work-For-Hire .................................26

     E.   Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION ..................................................................................28

**EXHIBIT 18
310**

# TABLE OF AUTHORITIES

## Cases

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 1999) ..................................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.*,
62 Cal.App.4th 348 (1998) ....................................................................................7

*Blix St. Records, Inc. v. Cassidy*,
191 Cal.App.4th 39 (2010) ....................................................................................7

*Burroughs v. M-G-M, Inc.*,
491 F.Supp. 1320 (S.D.N.Y. 1980) .....................................................................23

*Burroughs v. M-G-M, Inc.*,
683 F.2d 610 (2d Cir. 1982) ................................................................................23

*Chicot County Drainage Dist. v. Baxter County Bank*,
308 U.S. 371 (1940) .............................................................................................18

*Clarke v. Fiedler*,
44 Cal.App.2d 838 (1941) .....................................................................................5

*Comm'r v. Sunnen*,
333 U.S. 591 (1948) .............................................................................................18

*Davis & Cox v. Summa Corp.*,
751 F.2d 1507 (9th Cir. 1985) .............................................................................18

*Digerati Holdings, LLC v. Young Money Entm't, LLC*,
194 Cal.App.4th 873 (2011) ................................................................................13

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ...............................................................................21

*Duran v. Duran*,
150 Cal.App.3d 176 (1983) ...............................................................................5, 8

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) .................................................................................6

i

**EXHIBIT 18**
**311**

ER 1564

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
119 Cal.App.4th 263 (2004) ................................................................... 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) .................................................................22

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal.App.4th 613 (1991) ....................................................................6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ..................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ...............................................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
773 F.2d 1068 (9th Cir. 1985) ...............................................................19

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) ........................................................... 19, 26

*Granite Rock Co. v. Teamsters*,
649 F.3d 1067 (9th Cir. 2011) ...............................................................18

*Harris v. Rudin, Richman & Appel*,
74 Cal.App.4th 299 (1999) ...................................................................5, 7

*In re Pacific Pictures Corp.*,
2012 WL 1640627 (9th Cir. May 10, 2012) ..........................................16

*Inamed Corp. v. Kuzmak*,
275 F.Supp.2d 1100 (C.D. Cal. 2002) ...................................................13

*Leather v. Eyck*,
180 F.3d 420 (2d Cir. 1999) ..................................................................18

*Levin v. Knight*,
780 F.2d 786 (9th Cir. 1986) ....................................................... 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
777 F.Supp.2d 720 (S.D.N.Y. 2011) .....................................................24

ii

**EXHIBIT 18**
**312**

*Mattel, Inc. v. MGA Entm't, Inc.*,
  616 F.3d 904 (9th Cir. 2010) ................................................................. 4

*Murray v. Gelderman*,
  566 F.2d 1307 (5th Cir. 1978) ............................................................. 24

*Norris v. Grosvenor Mktg. Ltd.*,
  803 F.2d 1281 (2d Cir. 1986) ............................................................. 18

*O'Brien v. R.J. O'Brien & Assocs., Inc.*,
  998 F.2d 1394 (7th Cir. 1993) ............................................................ 16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
  107 Cal.App.4th 516 (2003) ............................................................... 11

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972) ............................................................ 23

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995) ................................................................ 24

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
  77 F.3d 309 (9th Cir. 1996) ................................................................. 7

*Sanborn v. Fed. Crop Ins. Corp.*,
  93 Cal.App.2d 59 (1949) .................................................................... 16

*Siegel v. Nat'l Periodical Publ'ns*,
  508 F.2d 909 (2d Cir. 1974) .................................................. 17, 18, 19

*Stephan v. Maloof*,
  274 Cal.App.2d 843 (1969) ................................................................. 7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
  640 F.3d 1034 (9th Cir. 2011) ................................................... *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
  429 F.3d 869 (9th Cir. 2005) ................................................ 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney*,
  881 F.2d 772 (9th Cir. 1989) ............................................................... 9

**EXHIBIT 18**
**313**

ER 1566

**Statutes**

17 U.S.C § 204(a) ...........................................................................6

37 C.F.R. § 201.10(e)(1)-(2).........................................................24

CAL. CIV. CODE § 1624 ..................................................................6

**Rules**

FED. R. EVID. 1002 .......................................................................27

iv

**EXHIBIT 18**
**314**

**ER 1567**

# INTRODUCTION

This case should have ended long before it began. The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute. Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer. Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C." RER-13. DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter. Even now, Larson tells the Court: "the parties thought they had arrived at terms" in October 2001. LOR-14.

And indeed they had arrived at terms. The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties. Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form. As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay. DC would receive peace with Larson and certainty in its Superman rights. The deal went bad

1

**EXHIBIT 18**
**315**

**ER 1568**

only when—and only because—Hollywood businessman Marc Toberoff entered the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing. Under Toberoff's guidance, Larson asserts that, although all parties said they reached agreement on October 19, they were mistaken about essential terms. Her only evidence is an October 26 letter sent by DC's negotiator, John Schulman—which Larson says differs materially from the October 19 letter. She is incorrect, and neither she nor Marks took this position at the time. Every essential term in Schulman's letter is identical in substance to those in Marks' letter. Any difference either involves a non-essential term or is one of semantics. If any material difference does exist, DC has long agreed: the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the 2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire rules. Those rules and deals Larson's father made with DC control here, assuming the Court reaches these issues. Each of the disputed Superman works was created by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point, litigation must come to an end. That point [is] now…." *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011). Judgment should be entered in DC's favor, and the 2001 settlement agreement should be enforced.

**EXHIBIT 18**
**316**

**ER 1569**

# I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer. SER-105, 434. Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent. SER-107-08, 456-61. A contract was formed on October 19; its terms stated in Marks' letter. While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal. And none reflects a disagreement on a material term.

## A. Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute. SER-434. By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one. SER-105-08, 434-35. The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16. SER-105-07, 434-35. DC made an offer on that final point and all other material terms. *Id*. On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed." SER-107-08. Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet. SER-456-61.

3

**EXHIBIT 18**
**317**

Marks' October 19 call and letter sealed the deal. The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61. The letter unequivocally accepted DC's offer. SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001…."). The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787. A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter. Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer." LOR-14-17. But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer. SER-110, 435. That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor. Larson does not dispute this Court may enter judgment for DC. DCB-28. At a minimum, the issue must be remanded for trial. *Id*. at 34. For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

**EXHIBIT 18**
**318**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

5

**EXHIBIT 18**
**319**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL. CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and subscribed by the party to be charged *or by the party's agent*") (emphasis added); DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be "signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson concedes Marks was her agent, RER-9, and his letter clearly expresses her "acceptance" to "transfer all of [her] rights in … 'Superman,'" SER-456, 458. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated for two years, and resolved their last deal point on October 16. SER-456, 463-64. Larson suggests the October 16 deal was so hastily made that within days Marks and Schulman could not remember its terms; exchanged conflicting term sheets; and then let those conflicts fester. LOR-16-17. This account is unsupported. The parties stopped negotiating in October because they had a deal, and Marks *never* objected to Schulman's letter or called it a counter-offer. DC undertook the separate task of preparing a long-form, SER-435, and began performing on the

6

**EXHIBIT 18**
**320**

ER 1573

2001 deal, reserving amounts due.  These are all acts of parties who had a deal.[2]

## B. Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it "was subject to documentation and would need to be reduced to a mutually-acceptable written contract."  LOR-26.  But (i) Marks' October 19 letter contains no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v. Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St. Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express reservation* to make a contract unenforceable for lack of later documentation, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of intent not binding because it expressly stated it was "of no binding effect on any party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998) (draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may need to say this to mislead Larson about the deal he induced her to abandon—but the *record fact* remains that a reserve was set; it totals more than $20 million, SER-397-99; and the funds will be paid to Larson if this Court enforces the 2001 agreement.  Larson gets all of this money, though Marks may have a claim to 5%; only Toberoff loses his improperly obtained 40% (or more) cut.  DCB-16-19.

7

**EXHIBIT 18**
**321**

**ER 1574**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By _____
>
> Kevin S. Marks

8

**EXHIBIT 18**
**322**

Marks never reserves Larson's rights pending a final agreement. That is especially clear when read in conjunction with the first paragraph of Marks' letter, which contain an unambiguous "acceptance" by Larson on defined "terms":

> Dear John:
>
> This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an agreement had already been reached—nothing in it constitutes a "clear reservation" either. Just the opposite: it expressly confirms "the deal we've agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting together the contemplated long-form. And there is no reservation, clear or otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

**EXHIBIT 18**
**323**

**ER 1576**

### E.    Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate.  The court held the Announcements were not subject to termination—and Larson does not challenge this ruling.  LOR-71 n.14.  The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy.  SER-44-45.  Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it.  DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing.  LOR-72.  Not so.  DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day."  LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002.  *See* DCB-82-83 (collecting cases).  And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial.  In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements.  DCB-84; Docket Nos. 30-1, 36-1.

**EXHIBIT 18**
**324**

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or,

at the least, reverse and remand on that defense and DC's limitations defense for

trial.  If the Court finds it has jurisdiction on the copyright issues presented, and it

finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER                         DANIEL M. PETROCELLI
O'MELVENY & MYERS LLP                      MATTHEW T. KLINE
1625 Eye Street, N.W.                      CASSANDRA L. SETO
Washington, D.C. 20006                     O'MELVENY & MYERS LLP
                                           1999 Avenue of the Stars, 7th Floor
                                           Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated:  June 19, 2012

28

**EXHIBIT 18
325**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 173 of 323

Appeal Nos. 11-56863, 11-56034

CERTIFIED
COPY

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON,
Plaintiff, Counterclaim-Defendant, Appellant,
and Cross Appellee,

v.

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
Defendants, Counterclaimants, Appellees,
and Cross-Appellants.

———————————

ON APPEAL FROM THE UNITIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————————

ORAL ARGUMENT

HEARD BEFORE NINTH CIRCUIT PANEL:

REINHARDT, THOMAS, SEDWICK

NOVEMBER 5, 2012

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR NO. 6420

EXHIBIT 19
326

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 174 of 323

ORAL ARGUMENT - 11/5/2012

Page 2

```
 1                    PASADENA, CALIFORNIA

 2                    NOVEMBER 5, 2012

 3

 4                         ---0---

 5

 6      MARC TOBEROFF, ESQ.:  May it please the Court.  Good

 7  morning, your Honors.  My name is Marc Toberoff and I

 8  represent the Plaintiff, Laura Siegel Larson.

 9          I'd like to reserve 10 minutes of my 20 minutes

10  for rebuttal, if I may.

11          The Copyright Act's termination provisions were

12  designed to remedy the tremendous imbalance of power

13  between author/creators and media companies and to give

14  an author and an author's family an opportunity after a

15  very long waiting period to participate in the increased

16  market value of their works by finally recovering their

17  copyrights for the extended renewal term.

18          This case has become emblematic of the kind of

19  war of attrition an author's family must endure before

20  vindicating those rights.

21          I'm going to first turn to Warner Bros.'s

22  alleged settlement agreement defense.

23          Warner Bros.'s defense is based on a false

24  contract -- construct that it can artificially limit the

25  legal analysis to a single October 19th letter from the
```

EXHIBIT 19

327

Page 3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 175 of 323

1    Siegels' attorney and call that a contract, regardless

2    of the differing the terms in Warner Bros.'s October

3    26th counteroffer and vastly different terms in Warner

4    Bros.'s February 1st counteroffer, which were part and

5    parcel of the exact same contract negotiation.

6           The cases Warner Bros. relies on are in the

7    opposite, particularly the Facebook case.

8           In the Facebook case, unlike here, you had a

9    binding contract signed by the parties.  That contract

10   also contained a stipulation saying that it would be

11   binding and enforceable in a court of law.  So the

12   question before the Ninth Circuit was whether the terms

13   of that contract were sufficiently definite to be

14   enforceable.  And of course this Court, since it

15   basically called for the payment of fixed amounts of

16   cash and stock, found that it was enforceable.

17          None of that exists here.  After the

18   termination --

19   JUDGE REINHARDT:  Are you saying there was no

20   contract or that the contract, if it existed, was not --

21   not a contract that could be enforced?

22   MARC TOBEROFF, ESQ.:  There was no contract signed

23   by the parties.

24   JUDGE REINHARDT:  No.  I said -- that's your first

25   contention, that there's no contract.

EXHIBIT 19

328

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 176 of 323

```
 1              Is it your second contention or is that the

 2       issue, whether there was a contract?

 3          MARC TOBEROFF, ESQ.:  In this case --

 4          JUDGE REINHARDT:  Yes.

 5          MARC TOBEROFF, ESQ.:  -- the issue is whether

 6       there's a binding contract.

 7          JUDGE REINHARDT:  Okay.

 8          MARC TOBEROFF, ESQ.:  So here after the effective

 9       date of the settlement -- of the Siegels' termination in

10       April of 1999, on again/off again settlement discussions

11       ensued.

12              And on October 9th, John Schulman on behalf of

13       Warner Bros., their general counsel, and Kevin Marks on

14       behalf of the Siegels held a telephone conference.

15              On October 16th, Marks sends over a letter

16       purporting to set forth the terms that were discussed on

17       October 16th.

18              On October 19th in his letter, he's -- he's

19       going over the terms, but it's an equivocal letter

20       because at the end he says, "John, if I got anything

21       wrong, please let me know."

22          JUDGE THOMAS:  Why do you say that's equivocal?

23          MARC TOBEROFF, ESQ.:  Because it shows at the very

24       beginning it's indefinite because he's unsure of --

25          JUDGE THOMAS:  No.  That's using typical language.
```

EXHIBIT 19
329

ORAL ARGUMENT - 11/5/2012

Page 5

```
 1    It makes -- "this is what I see."

 2         I mean, the response to it, if they -- if they

 3    had written back and said, "No.  You're right," you'd

 4    have to agree that there's a contract; right?

 5    MARC TOBEROFF, ESQ.:  That could be the case.

 6    JUDGE REINHARDT:  What could be the case?

 7    MARC TOBEROFF, ESQ.:  Well, you said --

 8    JUDGE REINHARDT:  "This is absolutely right.  This

 9    is the contract we agreed to," isn't -- wouldn't that be

10    enough?

11    MARC TOBEROFF, ESQ.:  It's further along than the

12    facts here, but what happened here isn't --

13    JUDGE REINHARDT:  That I know, but that wasn't the

14    question.

15    MARC TOBEROFF, ESQ.:  Okay.

16    JUDGE REINHARDT:  All right.  So this could be the

17    contract if the parties agreed to it?

18    MARC TOBEROFF, ESQ.:  That's correct, if the party

19    agreed to material terms, you could have a contract.

20    JUDGE REINHARDT:  Yeah.

21         So you don't think that it's proper for a

22    lawyer who says, "This is the contract we agreed to.  If

23    you have any question about it" --

24    MARC TOBEROFF, ESQ.:  I don't think it's --

25    JUDGE REINHARDT:  -- "tell me"?
```

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 177 of 323

EXHIBIT 20
269

EXHIBIT 19
330

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 178 of 323

1       MARC TOBEROFF, ESQ.:  -- improper at all, but I

2    don't think that forms --

3       JUDGE REINHARDT:  But, I mean, that shows

4    uncertainty?

5       MARC TOBEROFF, ESQ.:  It's not an unequivocal

6    acceptance of terms, but -- but even that --

7       JUDGE REINHARDT:  No.  It's a statement of the

8    terms.

9       MARC TOBEROFF, ESQ.:  It's a statement of what he

10   perceived the terms as discussed on October 16th.

11       On October 26th, Schulman writes back while

12   he -- Marks then goes off to China.  On October 26th,

13   Schulman writes back and in effect says, "You got it

14   wrong.  Enclosed is a more fulsome outline of what we

15   believe the terms of the deal are."

16       That constitutes a counteroffer because the

17   terms outlined in the October 26th letter from Schulman

18   materially differ from the terms in the October 19th

19   letter from Marks.

20       A counteroffer in the State of California

21   extinguishes Marks' offer.  Marks' offer itself is a

22   counteroffer because he purports to accept an offer on

23   October 16th that Schulman then tells him was never

24   made.  You could stop right there --

25       JUDGE THOMAS:  He didn't say that.  He said that's

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 179 of 323

1    "a more fulsome outline."

2         I mean, we have a -- there are sort of two

3    issues.  One is, did the parties ever agree to the

4    terms?  And -- and, two, were the terms embodied in the

5    first letter and-- and should a court enforce that?

6         And we've had -- there are cases that go a

7    little bit all over the map on that, but, I mean, there

8    are a lot of cases in which you say, "All right.  We

9    know you added some terms, but this is the agreement the

10   Court is going to enforce," and it's the simple

11   agreement as to terms.

12        So what -- what tells you that they're making a

13   true counteroffer as opposed to adding a bunch of

14   conditions that a court could later say, "Well, we're

15   not going to put those in because obviously the parties

16   didn't agree to them"?

17   MARC TOBEROFF, ESQ.:  Well, there's no agreement by

18   Warner Bros. as to the terms set forth in his letter.

19   In fact, there's disagreement.  There's disagreement as

20   to the properties that are being assigned.  There's

21   disagreement as to the essential term of compensation,

22   which you're dealing with a -- you're not dealing here

23   with a payment of cash and stock.  You're dealing with a

24   complex royalty system applicable to multiple media

25   where you're dealing with Marks that says, "We will not

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 180 of 323

1    indemnify Warner Bros.  We'll only warrant -- we haven't

2    sold these rights to someone else," and Warner Bros.

3    adding six or seven warranties with indemnifications

4    attached.

5        JUDGE REINHARDT:  Well, both sides agreed that they

6    had agreed to a contract.

7        MARC TOBEROFF, ESQ.:  No.  Both sides perceived that

8    they had a deal in principle.  And the cases have said

9    that a deal in principle does not make a binding

10   contract.

11       What happens is in his October 26th

12   counteroffer Schulman doesn't stop there but he makes

13   reference and incorporates by reference a February 1st

14   draft that then comes in and widens the gap between the

15   parties even further.

16       On -- on May 9th, Joanne Siegel reacts to the

17   new and different terms that are being added by Warner

18   Bros. and -- and rejects those terms and says, "There

19   will -- there is no agreement."

20       And on May 26th -- she wrote a letter to the

21   CEO of Time Warner, Dick Parsons.  On May 26th, 2002

22   Dick Parsons writes back and acknowledges that they had

23   no agreement.  He says, "We hope the parties can arrive

24   at an agreement."

25       From that point on, from October 19th of 2001

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 181 of 323

1    until we filed suit in -- in October of 2004, Warner

2    Bros. not once said that, "We have an agreement and we

3    accept the terms in the October 19th letter."  They were

4    totally silent for three years about that.

5         They come up with this concocted defense when

6    we filed suit to enforce the termination rights.  Under

7    cop- --

8    JUDGE THOMAS:  You've described a lot of factual

9    considerations.

10        Why -- why isn't this a matter for trial as

11   opposed to summary judgment?

12   MARC TOBEROFF, ESQ.:  Because contract formation is

13   based on the objective manifestations of the parties'

14   intent.  And here you have that objective manifestation

15   in the form of three or four undisputed documents: the

16   October 19th offer or counteroffer, the October 26th

17   counteroffer, the February 26th counteroffer, the May

18   9th rejection, and the May 26th letter in response

19   acknowledging that there's no agreement.

20        Warner has not come up with anything that

21   creates a genuine issue of material fact.

22        It -- the Court not only was allowed to rule on

23   summary judgment, it was required to rule on summary

24   judgment.

25   JUDGE THOMAS:  Why do you say that, "required"?

EXHIBIT 19

334

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 182 of 323

1      MARC TOBEROFF, ESQ.:  Because -- because based on --

2     based on this undisputed objective manifestation of the

3     parties' intent there, was no meeting of the minds on

4     the material terms.  The Court rightly said, "I can

5     point to no document that contains the parties'

6     agreement."

7          Warner Bros. -- a negotiation is a give and

8     take.  You can't take an offer -- you can't go back

9     freeze in time and take an offer that a party made, a

10     proposal that you eviscerated by the counteroffer,

11     continued to grind the other side in negotiations, and

12     when that fails, reach back and try and resuscitate a

13     offer that has been extinguished by a counteroffer.

14      JUDGE REINHARDT:  Well, an agreement was reached,

15     according to your client's lawyer -- right? -- and he

16     advised the other side on August 9th that, "I must

17     caution.  I believe an agreement was reached last

18     October, albeit subject to documentation."

19          So the issue was whether the documentation

20     reflected the agreement.

21      MARC TOBEROFF, ESQ.:  The contract fell apart, as

22     many contract negotiations, in the attempt to focus on

23     the details of the agreement.

24      JUDGE REINHARDT:  There was an agreement and then

25     there was a dispute over the details, the documentation

EXHIBIT 19

335

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 183 of 323

1    of it.

2        MARC TOBEROFF, ESQ.:  No.  There was a deal in

3    principle.  But that deal in principle, for instance,

4    involved a 6 percent royalty.  That 6 percent royalty

5    had all sorts of sliding scale reductions.  There were

6    exclusions as to revenues to -- to which that royalty

7    would apply, would not apply.  You had very important

8    issues (unintelligible) studio agreements.  You have a

9    series of warranties that have indemnifications attached

10   to them, and if someone is found that you've breached

11   that warranty, they withhold the money on the royalty.

12       JUDGE THOMAS:  No.  I understand that.

13       MARC TOBEROFF, ESQ.:  The question is not whether

14   that's an unusual term.  The question is whether it

15   had -- it was contained in the October 19th letter.  And

16   here he's saying, "There will be no indemnification from

17   the Siegels."

18           So the question is, does that become a material

19   term of the agreement?

20           And it certainly is a material term.  The fact

21   you have such indemnities customarily in agreements I

22   would submit is not the issue.

23           The question is, did they agree to it on

24   October 19th?  And they didn't.

25           Did Warner Bros. make that the condition of an

EXHIBIT 19

336

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 184 of 323

1    agreement?  Yes, they did.

2           And if-- and if these -- you know, people say

3    "a deal is a deal" precisely when they don't have a

4    binding contract.

5           If these terms were not material to Warner

6    Bros., then why did they insist upon them?

7           If a deal is a deal, then why did they go --

8    why didn't they just accept the October 19th recitation

9    of the terms and why did they continue to grind the

10   Siegels in the October 26th outline and in their

11   horrendous contract?

12          If you -- the same attorney, Marks, who sent

13   that attorney-client communication, which ordinarily

14   would have been privileged but for the fact it was

15   stolen from my law offices, the same attorney that wrote

16   that testified at length at deposition why, although he

17   thought there was a deal, there was no binding contract,

18   and he goes term by term by term in sworn testimony

19   comparing the huge gaps between the parties that had

20   developed.

21          You can't form a contract for the parties.  The

22   contract -- the parties have to form a contract

23   themselves.  Nor can you go back and -- and arrest the

24   legal analysis.

25        JUDGE REINHARDT:  I don't understand what that

EXHIBIT 19
337

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 185 of 323

1    means.

2          You can't form a contract between the parties

3    if you're their representative?

4       MARC TOBEROFF, ESQ.:  No.  A court cannot write a

5    contract for the parties when the parties themselves

6    cannot agree upon the terms.

7       JUDGE THOMAS:  No.  The only question is whether

8    they had an agreement in the earlier deal -- that's the

9    question -- and whether then there was a counteroffer

10   made later?  I mean, those are -- those are the two

11   questions.

12          I mean, if they had -- we have all sorts of

13   cases where you -- it happens all the time in

14   mediation.  Parties agree on principle.  They draft up a

15   set of principal points, and then they go draft

16   documents, and then another fight erupts and they say,

17   "Well, we can't agree on this."  It might be

18   indemnity.  It might be something else.  And then the

19   Court says, "All right.  I'm going to enforce the

20   initial agreement that you made, period."

21          Isn't that the question here?

22      MARC TOBEROFF, ESQ.:  No.  Here you don't even have

23   the first point.

24      JUDGE REINHARDT:  Well, that's --

25      MARC TOBEROFF, ESQ.:  Unlike --

EXHIBIT 19

338

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 186 of 323

1       JUDGE THOMAS:  That's why --

2       MARC TOBEROFF, ESQ.:  Unlike in the Facebook case

3   where you have a signed document signed by the parties

4   agreeing to certain terms that are definite and

5   enforceable, you don't even have that here.

6           And the reason we know you don't have that here

7   is because rather than accept -- in your hypothetical

8   you say they would accept the October 19th terms.  They

9   did the opposite.  They didn't accept them.

10      JUDGE THOMAS:  Well, they purported to by saying,

11  "Here's a more fulsome."

12          Now, you -- you would say -- you say that's

13  artifice and they were actually counter- --

14      MARC TOBEROFF, ESQ.:  Of course.

15      JUDGE THOMAS:  -- counterclaiming.

16      MARC TOBEROFF, ESQ.:  In the Valente -- in the

17  Valente-Kritzer case this Court held that congratulatory

18  words as to --

19      JUDGE THOMAS:  Yeah.

20      MARC TOBEROFF, ESQ.:  -- finally arriving at a deal

21  or in our case a monumental accord are meaningless.

22          What you look to is the objective manifestation

23  and you don't have an agreement where you don't have a

24  mutual meeting of the minds on the material terms of an

25  agreement.

EXHIBIT 19
339

ORAL ARGUMENT - 11/5/2012

1          And here the objective evidence proves that.

2     And that's why in summary judgment the Court was

3     required to find there was no agreement.  And there is

4     nothing that they put forward that raised a genuine

5     issue of fact as to contract formation.

6          I'd like to reserve the remainder for rebuttal.

7     JUDGE REINHARDT:  Thank you.

8     MARC TOBEROFF, ESQ.:  Thanks.

9     DANIEL M. PETROCELLI, ESQ.:  May it please the

10    Court.  Daniel Petrocelli with my colleagues Cassandra

11    Seto and Matt Kline for the DC Comics parties.

12         Turning initially to the issue of the

13    settlement agreement, it's our fundamental position that

14    this was not a matter appropriate for summary judgment

15    and that the Court should have allowed this to go to

16    trial on the lynchpin factual issues of whether or not

17    the parties reached an agreement, and if so, to what?

18         And our position in the Court below and in this

19    appeal was that the parties did reach an agreement with

20    the acceptance letter that the plaintiff's lawyer sent

21    to DC Comics on October 19, 2001 at SER 456.

22         This is a detailed recitation of terms written

23    in powerful legal language of acceptance which says, "We

24    hereby -- the Siegel family has accepted DC Comics'

25    offer," and then it goes on to say, "The terms are as

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 187 of 323

**EXHIBIT 19**

**340**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 188 of 323

1    follows," and this was the culmination of two-and-a-half

2    years of back and forth negotiations, and the record

3    before the District Court was that this letter was

4    written following a phone call between the two principal

5    negotiators where they resolved the last deal point, and

6    the testimony of Mr. Marks, the plaintiff's

7    representative was, "We are closed.  We will send you

8    the document."  Mr. Schulman responded, "Great.  We'll

9    start working on a long form."

10          This document is then sent, and a week later

11   Mr. Schulman responds, and, very importantly, this

12   document is sent by one of the most experienced lawyers

13   in one of the most experienced law firms in the country

14   dealing with entertainment contracts.  This lawyer who

15   knows and probably has written thousands of times a

16   reservation of rights that this document is not binding

17   until and unless a long form or a more formal document

18   is executed says no such thing in this letter.

19       JUDGE REINHARDT:  Now, are you talking about

20   Mr. Schulman's letter?

21       DANIEL M. PETROCELLI, ESQ.:  No.  I'm talking about

22   the acceptance letter, the document that constitutes the

23   contract.  That's the letter of October 19, 2001.

24       JUDGE REINHARDT:  All right.  And then you said -- I

25   thought you said that the reply --

EXHIBIT 19

341

ORAL ARGUMENT - 11/5/2012

```
 1         DANIEL M. PETROCELLI, ESQ.:  Okay.

 2         JUDGE REINHARDT:  -- was written by Schulman.

 3         DANIEL M. PETROCELLI, ESQ.:  I may have misspoken.

 4              But in this document following the conversation

 5    with the DC representative, there's no indication in

 6    here that the parties do not intend to be bound until

 7    some future event.  There's no reservation, and the

 8    testimony in the record is, "We are closed."

 9              Then a week later, Mr. Schulman, the recipient

10    of Mr. Marks' letter and the other negotiator, responds

11    to it, and he states -- and I won't characterize it as a

12    counteroffer because I think that's begging the issue.

13    He states, "I've received it.  I've reviewed it.  I

14    enclose herewith for you and Bruce a more fulsome

15    outline of what we believe the deal we've agreed to is.

16    We're working on the draft agreement so that by the time

17    you have accomplished something of truly momentous

18    import, we will have this super matter transaction in

19    document form."  And then he goes on and flushes out in

20    more detail the same terms that appear in the October 19

21    letter and adds some things here and there to be sure,

22    like an indemnity or he flushes out a detail on some of

23    these royalty provisions.  These are essentially

24    immaterial variations and differences that are the

25    normal part of a process of commencing a long -- a long
```

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 189 of 323

EXHIBIT 19

342

ORAL ARGUMENT - 11/5/2012

Page 18

```
 1    form document.
 2          Now, the error, the fundamental error of
 3    analysis here both by the District Court and by
 4    Mr. Toberoff is -- is the fact that this process is
 5    going on, that there's now an effort to create a long
 6    form is dispositive of the -- of conclusion that
 7    there is no contract.
 8          And that's what the District Court ruled.
 9    Simply because the parties after the contract was formed
10    in the -- in the unambiguous acceptance letter, just
11    because of that, the fact that they now endeavor to do a
12    long form, the judge concluded as a matter of law there
13    can be no agreement.
14          And that's just wrong.
15          There are scores of cases.  This is an
16    extremely familiar situation where parties believe
17    they've reached a deal.  They have a confirmatory letter
18    or document.  They go off to prepare the long document.
19    Something happens, things breakdown, and one side then
20    says, "We don't have a deal."
21    JUDGE REINHARDT:  Was there any affidavit or
22    information introduced in the District Court as to the
23    custom and practice in the industry of reaching an
24    agreement, proceeding with it and then having the
25    documents prepared?
```

EXHIBIT 19

343

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 191 of 323

Page 19

```
 1        DANIEL M. PETROCELLI, ESQ.:  There was no custom and

 2   practice evidence in the record, but to be sure, that

 3   would be highly relevant on the issue.

 4        Mr. Schulman had a direct declaration in the

 5   record saying that Mr. Larson's (sic) letter accurately

 6   reflected all the terms of the deal and that he wasn't

 7   intending to change anything and he was just flushing

 8   out the detail.

 9        Now the proof is in the pudding.

10        In response to this letter of October 26, which

11   the plaintiffs want to suggest is some material

12   departure, they even go so far as to say this is a

13   counteroffer.  In response to Mr. Schulman's letter,

14   Mr. Marks never objects.  He never reaches out and says,

15   "Wait a second.  You got a problem.  That's not what

16   we've agreed to."

17        JUDGE REINHARDT:  Tell me why, if that's correct, is

18   this matter for trial rather than summary judgment for

19   you?

20        DANIEL M. PETROCELLI, ESQ.:  Well, we did not move

21   for summary judgment in the Court below.

22        JUDGE REINHARDT:  You're not asking for that here?

23        DANIEL M. PETROCELLI, ESQ.:  Well, we think the

24   record evidence that there is an agreement is so strong

25   that we do think it can support a judgment in our favor,
```

**EXHIBIT 19**

**344**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 192 of 323

```
 1    but we -- at the very minimum we believe that we're

 2    entitled to a trial.

 3           The judge just departed wildly from the summary

 4    judgment standard.  He drew all that adverse inference

 5    against us.  He -- he did not understand that the

 6    question of whether or not the long form process does or

 7    does not negate a prior agreement is a factual

 8    question.

 9           Your Honor dealt with that issue, if I may, in

10    the -- you had a case with Judge Pregerson on -- it was

11    the Best Interior -- the Best Interiors case, the same

12    situation.  The plaintiff was a labor union and they --

13    and they sued this company, and they had an agreement,

14    they had a handshake agreement, and then they went on to

15    do a long form, and things broke down, and the judge

16    concluded there was no deal as a matter of law, and this

17    Court reversed that and this Court said that the

18    question of the intent to contract is a fact issue.  The

19    question of whether the subsequent events undid the

20    prior agreement or didn't undo the prior agreement,

21    that's a fact question.

22    JUDGE THOMAS:  So are there undisputed facts or

23    not?

24           I mean, I -- I'm not sure I -- I understand

25    your answer because Judge Reinhardt was asking you, "Is
```

ORAL ARGUMENT - 11/5/2012

1    there sufficient evidence to -- for summary judgment in

2    your favor?"  And -- and you said, "Well, yes, there are

3    fact issues," so I'm --

4         DANIEL M. PETROCELLI, ESQ.:  There are -- there

5    are --

6         JUDGE THOMAS:  Tell me aside from the documents

7    themselves what genuine issues of material fact you

8    would raise.

9         DANIEL M. PETROCELLI, ESQ.:  The ques- -- the

10   threshold question of whether the parties intended to be

11   bound and by this letter, by this -- by this acceptance

12   letter or whether they intended not to be bound at that

13   time but only upon such time as they agreed to a long

14   form.  We say that they intended to be bound at this

15   time.

16        But that question and all the events that

17   happened, that's evidence that's relevant to the

18   threshold issue of whether or not there was a deal in

19   the first place.  It is not dispositive that there was

20   no deal.

21        And so that's the -- that's the fundamental

22   factual issue.

23        There's a second factual issue, I suppose, and

24   that's what -- what terms the parties agreed to.

25        Well, we -- our position is it's everything in

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 193 of 323

EXHIBIT 19

346

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 194 of 323

1    this letter, nothing more.  To the extent that

2    Mr. Schulman's letter is perceived to have added terms

3    or suggested new terms, they're not part of the deal.

4    It's that simple.

5        JUDGE THOMAS:  Why isn't that a matter of law that

6    you can decide on the basis of the documents

7    themselves?

8        DANIEL M. PETROCELLI, ESQ.:  You can decide as a

9    matter of law that if the parties reached the contract

10   as of October 19, everything thereafter doesn't matter.

11       What can't be decided as a matter of law is

12   that the parties did not reach an agreement.  That

13   cannot possibly be resolved against us with this record

14   of direct admissions by the plaintiffs that there was an

15   agreement, not only in the acceptance letter, not only

16   in the no response to Mr. Schulman's letter, thereby

17   indicating there was nothing significant or new or

18   different about it, but --

19       JUDGE REINHARDT:  Well, the second one was even more

20   fulsome than the first, I guess.

21       DANIEL M. PETROCELLI, ESQ.:  Excuse me?

22       JUDGE REINHARDT:  The second one was more fulsome

23   than the first.

24       DANIEL M. PETROCELLI, ESQ.:  The second one to be

25   sure was 50 pages of boilerplate, yes, but --

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 195 of 323

1      JUDGE THOMAS:  Well, except -- except perhaps as to

2    royalty rate.

3      DANIEL M. PETROCELLI, ESQ.:  Excuse me?

4      JUDGE THOMAS:  Except perhaps as to royalty rate.

5      DANIEL M. PETROCELLI, ESQ.:  Well, under royalty

6    rate, if you really read the letter between Mr. Schulman

7    and Mr. Marks, they're -- they're flushing out very

8    precise little details about when the royalty rate gets

9    reduced, if multiple characterizes are involved, if it's

10   a cameo appearance, if it's a special project.  I mean,

11   this is why sometimes documents take 50 pages or more.

12       But that's not a material term, the absence of

13   which would negate a contract, and if it were, that

14   itself is a question of fact.  And case after case say

15   the -- the importance to which the parties attach to

16   particular terms is a fact question.

17       There was a question to Mr. Toberoff earlier I

18   think by Judge Reinhardt about whether this document,

19   this -- this contract, this acceptance letter of October

20   19 has sufficient material terms to constitute a

21   contract.

22       It does.  It easily passes the test.  I mean,

23   the threshold, as the Facebook case illustrates, is very

24   low: price, term.  So there's no question that this

25   document contains sufficient terms that a court could

EXHIBIT 19
348

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 196 of 323

1    never look at this document and conclude as a matter of

2    law that it's not sufficient to be a contract.

3             Whether there are new and additional terms that

4    the parties wanted and whether that somehow gets added

5    on here or doesn't get on, that's a fact question that

6    takes testimony about the significance to which parties

7    attach to -- to the point, did they discuss it in their

8    negotiations, did they not discuss it, did they forget

9    to put in something, did they not forget, and that's the

10   subject of testimony.

11            Counsel has conflated this idea of the

12   objective hearing of contracts, which to be sure is how

13   the issue is decided, with the rules of evidence about

14   what kind of testimony is admitted in order to prove up

15   intent.

16            All kinds of testimony is admitted, including

17   custom and practice, including parties' state of mind as

18   to why they did certain things, why they said certain

19   things.

20            So at bottom we think that this case never

21   should have been thrown out, and importantly this has

22   the potential to dispose of this entire dispute.

23            Under this agreement, which took three years to

24   negotiate, the plaintiffs would receive an immediate

25   payment of $20 million, plus substantial future

EXHIBIT 19

349

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 197 of 323

1    consideration for the duration of the copyright term,

2    which is 2033, plus medical benefits for their family

3    and all kinds of other benefits.

4         On the other hand, DC gets the transfer of the

5    copyright interests that were recaptured by the Siegel

6    family.  So they -- they transfer the copyright

7    interests, and they get a lot of money.

8         JUDGE REINHARDT:  Well, that's not -- that's

9    not -- no need to try to persuade us it's a good deal

10   for them.  If they think it's a good deal --

11        DANIEL M. PETROCELLI, ESQ.:  Well --

12        JUDGE REINHARDT:  -- for them, they wouldn't be

13   here.

14        DANIEL M. PETROCELLI, ESQ.:  Well, that's correct,

15   your Honor, because they believed they had a better deal

16   when someone came along and offered them more, and --

17   and they then repudiated this agreement.

18        And one final comment.

19        This question about what we did and did not do

20   afterwards, that's a very incomplete recitation that was

21   received, but all of that is simply more relevant

22   evidence on the question of whether the parties at the

23   inception when they made their deal intended to be bound

24   or not.  That's just evidence of subsequent conduct of

25   the parties.  Whether it bears on the contract formation

EXHIBIT 19

350

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 198 of 323

1    or not is a relevance issue that's up to the trial judge

2    here.

3        JUDGE SEDWICK:  Let me ask you this question.

4            We had read your papers to suggest you were

5    seeking summary judgment, but assuming that you're

6    either now only seeking a remand for trial or that we

7    should independently decide that that's the most you

8    could get, do you think that this Court needs to decide

9    any of the other issues if we remand this case for trial

10   and whether there was an agreement?

11       DANIEL M. PETROCELLI, ESQ.:  I believe that since

12   this is potentially dispositive, it does not have to

13   because if this contract is proven and this contract is

14   enforced, that ends once and for all this dispute.

15   Every issue that is before your Honors and these very

16   large amount of briefs would all -- would all resolve.

17   That's why it took three years to do.  This wasn't some

18   initial offer.

19       JUDGE REINHARDT:  You may not be the one to answer

20   this question, but just out of curiosity, would it

21   resolve the prior case also?

22       DANIEL M. PETROCELLI, ESQ.:  Well, it would have a

23   significant impact at least on the damages in the prior

24   case and my view is it would go a long way to resolving

25   that one as well, at least insofar as the Siegel side is

**EXHIBIT 19**

**351**

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 199 of 323

1    concerned.

2          I don't know if I have any time left.

3          JUDGE REINHARDT:   You have five minutes.

4          DANIEL M. PETROCELLI, ESQ.:   I would like to turn to

5    one other legal issue that's on a totally separate

6    subject, if your Honors don't have any additional

7    questions on this topic, and that has to do with a

8    decision, purely legal decision that the District Court

9    below made.

10         And what the Court decided was that this very

11   first Superman comic book, which is called "Action

12   Comics Number 1," SER 714, the District Court decided

13   that since this was largely created by Mr. Siegel and

14   Mr. Shuster long before DC came into the picture, "this"

15   being the character Superman in black and white

16   sketches, that he awarded the copyrights in the various

17   elements in this action comics book entirely to the

18   Siegels and the Shusters.

19         The error -- we -- we said to the judge, "We

20   don't challenge that in the main, except for this.  We,"

21   DC, "back in 1938 came up with the idea of making a

22   comic book.  Siegel and Shuster had drawn sketches of

23   Superman for newspaper strips in black and white.  We

24   want to create a comic book.  We want to put it in

25   color.  And we then retained them to do so."

EXHIBIT 19
352

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 200 of 323

1          It is undisputed that certain elements of this

2     were done by DC in concert with Shuster and Siegel but

3     with other employees and artists.  So we asked the Court

4     to declare certain parts of this -- certain parts of

5     this owned by DC, either as a work for hire or as a

6     joint work or other theories of ownership.

7          The Court said he was -- the Court concluded it

8     was precluded from doing so because of a decision back

9     in the seventies in the Second Circuit by DC's

10    predecessor and Siegel and Shuster called the National

11    case, and the Court believed that the National case was

12    res judicata and/or collateral estoppel and prevented DC

13    from litigating the issue of whether it had ownership

14    interest and admittedly part of the contributions that

15    it made to Action Comics 1.

16         And I only wanted to address the Court's ruling

17    on collateral estoppel.  But it was clearly wrong for

18    the following reason, and this is a purely legal issue.

19         The National case back in the seventies was a

20    lawsuit about who owned the renewal copyright in Action

21    Comics 1, and this was before the new termination

22    legislation came about, the second 28-year renewal

23    term.

24         DC contended that it owned the renewal term for

25    two separate and independent reasons.

EXHIBIT 19

353

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 201 of 323

1           One, the Siegel and Shuster parties transferred

2    full ownership of their Superman elements way back when

3    when they first met with DC and documented March 1.  So

4    they said, "We own it by contract."

5           Second, secondly DC said -- actually it was

6    National, its predecessor, but I'll just call it "DC."

7    DC said, "We own it because it was work for hire and we

8    were the author of it, and so we own the renewal

9    rights."  So they said, "We own the renewal right for

10   those reasons."

11          The District Court agreed on both counts, and

12   it went up to the Second Circuit.

13          The Second Circuit affirmed on the ground that

14   the conveyance of rights back in 1938 from Siegel and

15   Shuster to Na- -- to DC included the conveyance of the

16   rights to the renewal term, and so the decision below

17   was correct and it was affirmed.

18          The Second Circuit then went on to say,

19   however, that the ruling about work for hire was

20   incorrect, and it made some references to the fact that

21   Superman had been developed before DC came along, so how

22   could the entirety of Action Comics 1 be a work for

23   hire?

24          It's that language that the judge in this case,

25   the District Court, felt was binding on him.

EXHIBIT 19
354

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 202 of 323

1        We pointed out below and pointed out in our

2    papers, as a matter of law that cannot be res judicata

3    or collateral estoppel because that was an adverse

4    determination made in favor of a prevailing party and it

5    was not necessary to the decision and it was dictum.

6    We, for example, never could have appealed that

7    decision.  We won, National did.  It never could have

8    appealed solely for the purpose of addressing the

9    alternative statement by the Court of Appeal that was

10   adverse to -- to National.

11       And case after case make this clear, including

12   the Fireman's Fund case in the Ninth Circuit, the --

13       JUDGE REINHARDT:  All right.  We're running out of

14   time.  Let me just ask you.

15       Is this -- is this issue resolved if you win on

16   the summary judgment question?

17       DANIEL M. PETROCELLI, ESQ.:  Yes.  Everything goes

18   away on the summary judgment, everything, your Honor.

19   It's -- it's the end of this case once and for all.

20       JUDGE REINHARDT:  All right.  Thank you very much.

21       DANIEL M. PETROCELLI, ESQ.:  Thank you very much,

22   your Honors.

23       MARC TOBEROFF, ESQ.:  Your Honors, Warner Bros.

24   cannot point to any place in 2001 where they accepted

25   the terms set forth in the October 19th, 2001 letter

EXHIBIT 19

355

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 203 of 323

1       from Marks.

2             I don't know how one can find that a contract

3       exists without mutual agreement of both sides.

4             Instead of agreement from Warner Bros. we have

5       disagreement as reflected in the October 26th letter and

6       as reflected in Warner Bros.'s agreements.

7             It's -- it's insane to say this is purely a

8       question of formal documentation of an agreement of the

9       parties when there is --

10      JUDGE REINHARDT:  The problem -- and maybe you can

11      comment on this, Mr. Toberoff.  The problem is that the

12      October 26th letter doesn't reject the October 19th

13      letter.  It says, "a more ful- -- I'm enclosing a

14      fulsome outline of what we believe the deal we've agreed

15      to is."

16            Now, the argument on the other side is that

17      that says, "We've agreed to a deal but we're giving you

18      a more expansive outline of what that deal is."

19            Now, what's the answer to that?

20      MARC TOBEROFF, ESQ.:  The answer to that is whether

21      or not there's a contract is not based on verbiage such

22      as "a more fulsome outline."  It's based on the

23      comparison of the terms.  And anything less than an

24      unequivocal acceptance of an offer is a counteroffer

25      extinguishing that offer.  It's been that way forever in

ORAL ARGUMENT - 11/5/2012

Page 32

```
 1    California and it's still that way in California.  So
 2    regardless of how you --
 3        JUDGE REINHARDT:  Well, take -- take the example of
 4    a movie distribution deal or a movie production deal
 5    where the parties make -- they agree to the deal.  They
 6    then start with the movie.  Finally in the middle of the
 7    movie they get down to reducing everything to writing
 8    and there's a disagreement but both parties agree that
 9    "we have a deal."
10        Now, is that not an agreement without the
11    written exposition of it?
12        MARC TOBEROFF, ESQ.:  It depends on the terms of the
13    agreement.  Here -- here -- and there have been cases
14    about that where one side has argued, "In California and
15    Hollywood we do lunch.  We don't do contracts," and
16    they've rejected those arguments when it came down to
17    specific contract formation issues like this.
18        They cannot point to an acceptance of the terms
19    of the October 19th letter.  And instead we have --
20        JUDGE THOMAS:  Well, it depends on who is the
21    offerer and who is the-- who is the accepting party.
22        What-- what the October 19th letter says, "This
23    is to confirm our telephone conversation," it goes on to
24    say, "which we accept the DC Comics' offer of October
25    16th."
```

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 204 of 323

**EXHIBIT 19**

**357**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 205 of 323

```
 1              So if there's a legitimate offer on the 16th
 2     and accepted on the 19th, does it really matter what
 3     happened after that?
 4          MARC TOBEROFF, ESQ.:  Yes, it does because on --
 5          JUDGE THOMAS:  I mean, if there's a contract
 6     formation as of this and it's reflected in the letter of
 7     the 19th, then -- then there's a deal.
 8          MARC TOBEROFF, ESQ.:  But this is an ongoing
 9     negotiation that continues into 2002.
10          JUDGE THOMAS:  No.  I understand that.
11          MARC TOBEROFF, ESQ.:  And that's acknowledged by all
12     the parties.  So you can't artificially limit the
13     analysis to an oral communication on October 16th and a
14     written communication on October 19th.
15          JUDGE THOMAS:  I'm just saying, to my mind at least,
16     I haven't come to rest on it, but it certainly suggests
17     that it's a more complicated situation, and therefore
18     there's a -- probably a genuine issue of material fact.
19          MARC TOBEROFF, ESQ.:  I -- I can see none.  And I
20     can tell you why.  Because when he refers to the October
21     16th conferen- -- teleconference and -- and asks, "Do
22     you agree that these are the terms?" because that's what
23     he says, he says, "If I got anything wrong, let me
24     know," he's essentially asking, "Do you agree, Warner
25     Bros., that these are the terms?" and all they would
```

EXHIBIT 19
358

ORAL ARGUMENT - 11/5/2012

1    have to have done is said, "Yes," then you would have a

2    different situation.

3         And that's not the situation that exists here,

4    and the objective evidence shows that -- the undisputed

5    evidence shows that it's not the situation that exists

6    here.

7         What it shows is that Warner Bros. said,

8    "That's not what I believe" --

9         JUDGE THOMAS:  They didn't say that.

10        MARC TOBEROFF, ESQ.:  Yes, they did.

11        JUDGE THOMAS:  They said, "Here's -- here's a --

12   here's a larger outline."

13        Now today they say, "Well, that's essentially

14   the same terms."  And you can say, "Well, it's not the

15   same terms."

16        And, you know, obviously they didn't agree --

17   the parties did not agree on indemnity, period.  There's

18   no agreement on indemnity.

19        But the question for the Court is not

20   necessarily whether there was -- whether -- the question

21   is whether there was a contract formed before that.

22        MARC TOBEROFF, ESQ.:  Exactly.  This isn't -- well,

23   there's not a contract formed before that if when he

24   says, "This is the terms that we believe were

25   discussed," he doesn't just say, "more fulsome outline,"

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 206 of 323

**EXHIBIT 19**

**359**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 207 of 323

1    he says, "a more fulsome outline of what we believe the

2    terms are."  They then send over a contract and reserve

3    the right of Warner Bros. to -- to -- to revise the

4    terms, and they acknowledge that the Siegels can also

5    revise the terms.  It's not just a matter of these

6    indemnity provisions.

7          I would refer the Court --

8     JUDGE THOMAS:  No.  I understand that.  I just used

9    that as an example.

10          I mean, it often happens where you have a deal

11   reached, a deal letter like this, and then the parties

12   add terms, and they say, "Well, that's not part of our

13   deal," and then they may agree or disagree on subsequent

14   terms, but that doesn't alter the original agreement or

15   the fact that it's been made.

16    MARC TOBEROFF, ESQ.:  The problem is you have no

17   acceptance to those original terms.  The hypothetical

18   doesn't apply here.

19    JUDGE THOMAS:  Unless you say that this -- the --

20   the letter of the 19th accepts an offer of the 16th.

21    MARC TOBEROFF, ESQ.:  And -- and we have a letter

22   from October 26th saying that wasn't the offer, "This is

23   what we believe the deals are."

24          Now, I want to draw the Court's attention to a

25   chart in our reply brief below which impressed the

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 208 of 323

1    District Court who dealt with this in tremendous

2    detail.  It's in our reply excerpts at Pages 140 to 149

3    where we outline the material differences.

4           Warner acknowledges that the properties being

5    assigned is an essential term using -- using words from

6    the -- from the Facebook case.

7           Well, the properties in the Marks' memo are

8    limited to three properties: Superman, Superboy and

9    Spectre.

10          The properties in Schulman's memo and then in

11   the February 1st agreement concern Superman, Superboy,

12   related properties and anything created for DC, whether

13   published or unpublished, by Siegel.  So there's an

14   expansion of what is even being assigned.

15          Secondly, the royalties.  You have a very

16   complex royalty situation here.  It's not like in

17   Facebook with a fixed amount of money and a fixed amount

18   of stock.  You have a 6 percent royalty which was

19   reducible to 3 percent, which is then reducible to 1 1/2

20   percent to 1 percent as an absolute floor.

21          Warner Bros. drills all sorts of holes in that

22   floor rendering them illusory and -- and having

23   situations where they would receive no money whatsoever

24   for the exploitation of Superman.

25          These are material contract terms.  You can't

EXHIBIT 19

361

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 209 of 323

```
 1    ignore them.  They change the -- the -- the dance
 2    between offer and counteroffer.  And that's the way
 3    contract formation is analyzed in the State of
 4    California.
 5            Warner Bros. has a situation where if Superman
 6    appears in a -- in another character's contract
 7    published by DC, like Green Arrow, for weeks Superman is
 8    appearing but the name is not in the title of the comic
 9    book, under -- under Schulman's scenario, you would
10    receive a -- excuse me -- under Marks' scenario, you
11    would receive a royalty.  Under Warner Bros.'s scenario,
12    you receive no royalty.
13            It comes as no surprise that all of the changes
14    made by Warner Bros., which they now say are boilerplate
15    and not material, were all decidedly in Warner Bros.'s
16    favor and affect the key terms of the agreement: the
17    scope of the properties, the royalties and
18    compensation.
19            The -- the warranties and indemnifications is
20    not a small matter because what happens with the studios
21    when you enter in a contract and you have substantial
22    contingent compensation and there's any claim by a third
23    party or anything happens which they can claim triggers
24    a warranty, they will withhold your -- they will
25    withhold your royalty payments.
```

EXHIBIT 15
362

ORAL ARGUMENT – 11/5/2012

Page 38

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 210 of 323

1        There are credit provisions where Marks says,

2    "We want credit in paid ads," because that's very

3    important to his clients and he testifies that to

4    effect.

5        Warner Bros.'s October 26th outline and their

6    long form says, "No credit in paid ads."  Warner Bros.

7    requires an elderly Joanne Siegel who is in her late

8    eighties to go on publicity tours promoting Superman.

9    None of this exists.  There's --

10   JUDGE REINHARDT:  Well, that doesn't sound like

11   (unintelligible) form.  As David's (sic) saying, "These

12   are the sort of -- the kind of things we put in our

13   contracts."

14       And, you know, that clause isn't drawn for her

15   individual -- you know, because they're concerned about

16   her.  That's a boilerplate provision.

17   MARC TOBEROFF, ESQ.:  Well, it's not boilerplate to

18   say that the Siegels have to indemnify Warner Bros. for

19   a claim for her ex-husband.

20   JUDGE REINHARDT:  No, no.  I'm talking about that

21   Joanne -- that Joanne Siegel has to go on a tour.  You

22   know, those are the kinds of things that have to be

23   worked out after there's a contract.

24   MARC TOBEROFF, ESQ.:  Well, but the royalty

25   provisions and the scope of the properties assigned go

EXHIBIT 19

363

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 211 of 323

```
 1    to the heart of this.  And under Section 204(a) of the

 2    Copyright Act when you have an assignment of a

 3    copyright, it has to be in writing signed by the

 4    assignee.

 5            Marks' letter does not assign any trans- -- any

 6    copyrights.  It says, "We will.  We anticipate signing

 7    those contracts."

 8            Nobody in this exchange viewed the October 19th

 9    letter outlining deal terms or the October 26th letter

10    outlining different deal terms as a binding, enforceable

11    contract.  Everybody understood that considering the

12    magnitude of these rights and the complexity of the

13    agreement that was being discussed that you would have a

14    final written agreement signed by both parties.

15    JUDGE THOMAS:  So how do we -- how do we determine

16    that as a matter of summary judgment, that everybody

17    understood?

18    MARC TOBEROFF, ESQ.:  Because -- because --

19    JUDGE THOMAS:  No.  I mean, you can't -- you can't

20    do that without -- without extrinsic evidence of the

21    parties.

22            And you well may be right.  I'm just saying.

23    But if you can't do it on the basis of the documents

24    alone.  If you have to rely on what you say is that

25    everybody understood, then that's extrinsic evidence
```

EXHIBIT 15
364

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 212 of 323

1    that requires a resolution by a fact-finder.

2        MARC TOBEROFF, ESQ.:  I respectfully disagree, your

3    Honor.  If you look at the October 26th Warner Bros.

4    communication, it specifically refers, "We will have

5    this matter drafted in contract form and we will send it

6    to you."  So right there you know --

7        JUDGE THOMAS:  Well, that's what happens in all

8    cases.  You don't have a -- you always have --

9        MARC TOBEROFF, ESQ.:  But that's not extrinsic

10   evidence.  That's objective evidence saying that --

11   showing that the parties anticipated that the form of

12   agreement would be a written agreement signed by both

13   parties.  And that's what's required by the Copyright

14   Act.  That never happened.  And then they send it over

15   and they reserve the right to --

16       JUDGE THOMAS:  I don't mean to quarrel with you.

17   I'm just -- you know, we're working through these --

18   these cases.

19           But what often happens when you have a

20   situation like this is the Court will say, "If you have

21   enough for specific enforcement of the terms to which

22   you agreed," and therefore you execute the unnecessary

23   assignments and so forth.

24           The fact that they weren't all executed I don't

25   think is dispositive.  /

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 213 of 323

```
1              Now, you may well be right on it.  I'm just

2      saying that it's a more complicated issue than --

3      MARC TOBEROFF, ESQ.:  Your Honor, I believe if you

4      peel back the veneer of comments like "a deal is a deal"

5      and look at the actual facts of this case carefully, you

6      will see that under every single principle in California

7      law about contract formation this fails as a matter of

8      law and you can make that determination on this

9      objective exchange of undisputed documents.  The parties

10     absolute -- in the State of Calif- --

11     JUDGE REINHARDT:  I think we've explored this

12     fully.  And you're seven minutes are over, so --

13             I mean, you know, these are not simple issues,

14     and I don't mean that the answer may not be simple, but

15     the case, as you say, you know, we're going to -- to the

16     extent that we haven't sufficiently read them, we'll

17     certainly explore them all, and, you know, we understand

18     the arguments of both side, and they're legitimate

19     arguments, so --

20     MARC TOBEROFF, ESQ.:  I'd just like to read to you

21     from a memo that you pointed out, Marks' memo, which by

22     the way is an extra-record document that should be made

23     part of this record, but I'd like to read to you what

24     Marks actually says in that memo.

25             He says, "I believe a deal will be finalized
```

EXHIBIT 19

366

ORAL ARGUMENT - 11/5/2012

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-7, Page 214 of 323

1    with DC Comics, even if this process is not entirely

2    smooth -- smooth.  If the parties cannot reach final

3    agreement, then the negotiations would be terminated."

4    That's what he says in an attorney-client communication

5    that they're saying proves there was a binding

6    contract.

7         JUDGE REINHARDT:  Okay.  Thank you.

8         MARC TOBEROFF, ESQ.:  Thank you, your Honor.

9         JUDGE REINHARDT:  The case just argued will be

10   submitted.

11                      ---0---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 19
367

O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1999 Avenue of the Stars, 7th Floor | SAN FRANCISCO |
| BRUSSELS | Los Angeles, California 90067-6035 | SHANGHAI |
| HONG KONG | | SILICON VALLEY |
| LONDON | TELEPHONE (310) 553-6700 | SINGAPORE |
| LOS ANGELES | FACSIMILE (310) 246-6779 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |
| NEW YORK | | |

January 29, 2013

**VIA E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:  **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

In view of the Ninth Circuit's January 10th decision "that the October 19, 2001, letter created an agreement," DC Comics is prepared to tender payment under that Agreement. In that regard, we ask you to confirm that your clients are now prepared to perform under the Agreement pursuant to its terms.

The Agreement provides that DC Comics shall make payment directly to four parties: Joanne Siegel (47.5%), Laura Siegel Larson (23.75%), Michael Siegel (23.75%) and Gang, Tyre, Ramer & Brown (5%). However, as Joanne Siegel and Michael Siegel are deceased, it appears that payments of their respective shares should be made directly to their respective estate's representatives. We understand that Laura Siegel Larson is the Personal Representative of the Estate of Joanne Siegel and that Melvin Banchek is the Fiduciary of the Estate of Michael Siegel.

The Agreement also provides that DC Comics is to reimburse Laura Siegel Larson for costs of medical and dental insurance for her and her sons (for so long as they were minors) incurred since November 2000. Please have Ms. Larson provide us with appropriate documentation so that these amounts can be reimbursed.

Finally, Paragraph C.9 of the Agreement provides the opportunity for the Siegel Family to be informed about, and provide input regarding, major Superman developments. If Ms. Larson is interested in exercising this opportunity with respect to the forthcoming motion picture *Man of Steel*, please so advise and I will have Diane Nelson of DC Entertainment make appropriate arrangements.

**EXHIBIT 20**
**368**

**ER 1621**

O'MELVENY & MYERS LLP
January 29, 2013, Page 2

     The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Melvin Banchek
        Gerald Berk
        Donald Bulson
        Richard Kendall
        Arthur Levine
        John Pettker
        Bruce Ramer
        Gary Ruttenberg
        George Zadorozny

**EXHIBIT 20**
**369**

ER 1622

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

February 9, 2013

Via E-Mail

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 10-CV-08400 ODW (RZx)

Dear Dan:

I write on behalf of plaintiff Laura Siegel Larson, in response to your January 29, 2013 letter. Therein, defendant DC Comics purports to offer to tender performance pursuant to an October 19, 2001 letter.

As a preliminary matter, while the Ninth Circuit held that the October 19, 2001 letter constituted an acceptance sufficient to create a contract on that date, it decidedly did not order the district court to enter judgment in DC's favor. Instead, the Ninth Circuit expressly remanded and directed the district court to adjudicate "DC's third and fourth counterclaims" regarding the October 19, 2001 letter. DC's contract counterclaims and Ms. Larson's defenses to those counterclaims will need to be litigated, pursuant to the same legal standards and procedures applicable to any such claims and defenses.

DC's prodding the district court to hastily "enter judgment" in DC's favor with no regard for well-worn legal standards, such as those governing summary judgment and trial of material issues of fact, is transparent and improper.

DC's purported and belated "tender" of performance under the October 19, 2001 letter is facially incomplete and illusory. Among other deficiencies, and reserving all of Ms. Larson's rights and defenses, are the following:

1.      While DC offers to tender "payment," it does not specify the amount. Under the terms of the October 19, 2001 letter, DC would have been obligated to pay fixed compensation of at least $8.5 million over the past decade, commencing with $3.5 million on March 31, 2002. DC would also have been obligated to render annual accountings commencing on March 31, 2002 of the

**EXHIBIT 21
370**

ER 1623

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:     *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:   2 of 2

amounts due in cash and the contingent back-end participation set forth in the October 19, 2001 term sheet.

In addition, because the October 19, 2001 letter deems all but $1 million of the above cash payment as *an advance* against Ms. Larson's alleged contingent royalty set forth in the October 19, 2001 letter, DC's supposed "tender" of payment is meaningless and not susceptible to calculation without inclusion of detailed accounting statements computing the amount of Ms. Larson's alleged royalties thereunder.  As DC has repeatedly represented to the Court that it has kept a "reserve account" for the benefit of Ms. Larson pursuant to the October 19, 2001 letter and an ongoing accounting of monies it says are payable to Ms. Larson under the October 19, 2001 letter, DC could have readily provided this information but once again failed to do so.

Rendering DC's "tender" even more illusory, DC states in its January 29 letter that its supposed tender of payment is "without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved."  In short, DC vaguely offers to "tender" payment of an unspecified amount, but reserves the right to reduce that amount to a nullity.

DC's recently filed motions for summary judgment in *Larson v. Warner Bros. Entertainment Inc.* confirm that DC will seek to reduce or eliminate the monies it now pretends to "tender." C.D. Cal. Case No. 04-CV-08400 ODW (RZx), Dkt. 702 at 8 ("DC will seek its attorney's fees under the Copyright Act and its Fourth Claim in these cases….").

2.      Paragraph C.9 of the October 19, 2001 letter expressly states that DC will "provide the opportunity to be informed about major developments (*e.g.*, motion pictures, television programs …), and the Siegel Family will have an opportunity to give its input," and that the "Siegel Family will be informed of such [major] developments early enough in the development process so that their opportunity to give input is *meaningful*." (Emphasis added).  DC's offer of compliance regarding the forthcoming *Man of Steel* movie is thus illusory as well, as that film is slated for release on June 14, 2013, and it is our understanding that principal photography of that film has already been completed.

3.      DC's offer with respect to medical and dental insurance is incomplete, as it does not offer to reimburse the estate of Michael Siegel for his mental and dental insurance, from 2001 until his death in 2006.

4.      DC's tender of performance under the October 19, 2001 letter is further deficient in that it ignores other purported DC obligations in that letter, including the provision of credits "on Superman comics and other publications, movies and television programs," as set forth in Paragraphs C.3 and C.4, and "Full E&O and general liability" insurance coverage against liability for DC or its affiliates' actions, as set forth in Paragraph 14.

**EXHIBIT 21
371**

**ER 1624**

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:      *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:  3 of 3

On a different note, DC's copying of its January 29 letter to virtually every attorney it is aware of who has ever been even tangentially connected with Ms. Larson or the Shuster estate is a blatantly improper attempt to indirectly communicate with our clients in violation of Cal. R. Prof. Conduct Rule 2-100, sow confusion, and interfere with our firm's attorney-client relationships.  It also gratuitously burdens Ms. Larson and the Shuster estate with unnecessary legal fees.

As DC well knows:  Mr. Kendall does not represent Ms. Larson, or any other party in the *Siegel* litigations; he represents me regarding DC's frivolous tort claims.  Mr. Levine handled the Siegel's notices of termination in 1997, but has had very limited involvement since then, and no involvement in this litigation which commenced in 2004.  Mr. Bulson ceased representing Michael Siegel upon his death in 2006, and is in the midst of a dispute with his estate, of which Ms. Larson is the sole beneficiary.  Mr. Zadorozny does not represent Ms. Larson in these litigations, and, as Ms. Larson testified at her 2012 deposition, he infrequently advises her on an *ad hoc* basis on tangential matters.  Finally, as DC also knows, Mr. Pettker has had no relationship with Ms. Larson at all – rather he is the attorney who probated Joseph Shuster's estate back in 2003.

Due to these improprieties, Ms. Larson has instructed me to remind DC and your firm of your obligation to direct all communications to my law firm, her chosen attorneys of record in these cases, and not to prior or present counsel who do not represent her in these litigations.

Nothing in this letter should be construed as a waiver or limitation of Ms. Larson's rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 21**
**372**

**ER 1625**

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

February 12, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:     **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

This responds to your letter of February 9, 2013.

In my letter of January 29, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 Agreement ("Agreement") of "all amounts accrued through December 31, 2012." I then asked you to confirm that your client Laura Siegel Larson is now prepared to perform under the Agreement pursuant to its terms. Despite three pages of argument and rhetoric, your letter deliberately refused to provide the requested assurance that Ms. Larson is duly prepared to perform the Agreement. Therefore, DC reserves all its rights under the Agreement and the law, including the right to suspend its performance in view of your clients' continuing repudiation.

As to the remainder of your letter, DC's tender of performance under the Agreement was not deficient. DC was not required to reiterate every obligation under the Agreement. In addition to offering to pay "all amounts due," DC called out specific obligations requiring the active participation or cooperation of your clients. The credit obligations you mentioned, for example, do not require your clients' participation and as such were not specifically addressed. Nor does DC's reservation of rights undermine its tender of performance. If and when DC were to obtain an order for the payment of attorney's fees against your clients, then DC would have a right of offset, in addition to other relief.

Likewise without merit is your assertion that DC's tender regarding Paragraph C.9 of the Agreement is "illusory" because it comes too late. To date, your clients elected not to participate with DC and provide input based on their decision to wrongfully repudiate the

**EXHIBIT 22**
373

**ER 1626**

O'MELVENY & MYERS LLP
February 12, 2013, Page 2

Agreement.   This is a circumstance entirely of their own making, and one you and your clients are prolonging by continuing to repudiate the Agreement.

Also unfounded is your criticism of DC's tender because it did not offer to reimburse the estate of Michael Siegel for "mental [sic] and dental insurance, from 2001 until his death."  My letter was addressed to you in your capacity as Ms. Larson's counsel.  I do not understand that you are counsel to the Estate of Michael Siegel.  DC, of course, stands ready to reimburse those expenses under the Agreement if the Estate supplies the appropriate documentation.

The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

CC:   Melvin Banchek
Gerald Berk
Donald Bulson
Richard Kendall
Arthur Levine
Bruce Ramer

**EXHIBIT 22
374**

**ER 1627**

1  DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

12              Plaintiff,              **DC COMICS' STATEMENT OF**
                                        **GENUINE ISSUES OF**
13         v.                           **MATERIAL FACT AND**
                                        **RESPONSE TO DEFENDANTS'**
14  PACIFIC PICTURES                    **CONCLUSIONS OF LAW IN**
    CORPORATION, IP WORLDWIDE,          **OPPOSITION TO DEFENDANTS'**
15  LLC, IPW, LLC, MARC TOBEROFF,       **MOTION FOR PARTIAL**
    an individual, MARK WARREN          **SUMMARY JUDGMENT ON DC'S**
16  PEARY, as personal representative of **FOURTH, FIFTH AND SIXTH**
    the ESTATE OF JOSEPH SHUSTER,       **CLAIMS**
17  JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an             Hon. Otis D. Wright II
18  individual and as personal
    representative of the ESTATE OF
19  JOANNE SIEGEL, and DOES 1-10,       **Hearing Date**:    March 11, 2013
    inclusive,                                              (*Hearing Vacated*)
20
              Defendants.
21

22

23

24

25

26

27

28

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | LLC, and Emanuel, both in his individual capacity and as a representative for Endeavor. *See* Petrocelli Decl. ¶¶ 13-15, 21; DN 585 at 1-2, 6-14. |
| 22  | In 2003, Mr. Toberoff and Mr. Emanuel, on the Siegels' behalf, recommended settlement negotiations with DC.<br><br>Defendants' Evidence: AD, Ex. L, Ex. T at 158:12-165:2, Ex. EE at 461-62 | **Disputed**, to the extent this disregards that, as the Ninth Circuit rightly held, the parties had already entered into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1.<br><br>Moreover, to the extent Toberoff is disclosing legal advice he gave the Siegels, he has effected a subject-matter waiver concerning that advice and must immediately produce all communications—whether he claimed privilege over them before or not—on this subject matter. DN 205 at 14; FED. R. CIV. P. 502; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 23-25 (9th Cir. 1981); *U.S. v. Nobles*, 422 U.S. 225, 239 (1975); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.'"); *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 472 (N.D. Cal. 2012) (holding that where party "attempted to use [privilege] as both a shield and a |

- 26 -

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | sword, that is, to reveal a limited aspect of privileged communications in order to gain a tactical advantage in litigation" that the party "has waived the attorney-client privilege and work product protection as to all … communications concerning" the same subject). Toberoff's knowing choice to inject this issue into this case, on an affirmative motion of his own, compels a finding of waiver. *Id.* |
| 23 | On October 8, 2004, Mr. Toberoff, as attorney for the Siegels, filed the *Siegel v. Warner Bros. Entertainment, Inc.* case (C.D. Cal. Case No. 04-CV-08400, ODW (RZx) ("*Siegel*")[,] which sought to validate the Siegel Termination, and to enforce the Siegels' copyright interests.<br><br>Defendants' Evidence:  FAC ¶ 91 | **Undisputed**, although it disregards that the Ninth Circuit held that the parties entered into a binding settlement agreement on October 19, 2001, and, as of that date, the Siegels transferred whatever copyrights they purported to hold to DC. *Larson*, 2012 WL 6822241, at *1; Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |
| 24 | On February 17, 2005, DC counterclaimed in *Siegel*, that the October 19, 2001 letter constituted an enforceable contract.<br><br>Defendants' Evidence:  AD, Ex. AA at 425-428 | **Undisputed**.  The Ninth Circuit has held, "as a matter of law," that the parties did, in fact, enter into a "binding" settlement agreement on October 19, 2001.  *Larson*, 2012 WL 6822241, at *1.  DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |

- 27 -

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

**EXHIBIT 23**

**377**

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| based solely on rights equivalent to those protected by the federal copyright laws," it is preempted. *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998). DC's state-law Sixth Claim merely reformulates DC's Third Claim (FAC ¶¶165-73) under the Copyright Act and is premised on the same alleged Copyright Act violation, which it incorporates by reference. The claim is therefore preempted. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987); *Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987). | (Opp. 21-22). |
| (c). DC's Sixth Claim is also largely barred by the applicable four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Unfair competition claims begin to run "on the date the cause of action accrued, not on the date of discovery." *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002). Insofar as it is based on the 2001 and 2003 PPC Agreements, which were cancelled in 2004, the claim is barred by the statute of limitations. | DC's Sixth Claim is not time-barred, for the reasons set forth in DC's opposition (Opp. 19-21). |

Respectfully submitted,

Dated: February 15, 2013

By: /s/ Daniel M. Petrocelli
      Daniel M. Petrocelli
      Attorneys for Plaintiff DC Comics

OMM_US:71349970

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

ER 1631

**EXHIBIT 23**

**378**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

\* Also admitted in New York

February 27, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *Siegel v. Warner Bros. Ent., Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx)

Dear Dan:

We disagree with the conclusions and characterizations in your letters of February 9, 2013.

What is the total dollar amount of the "payment," inclusive of royalties that DC Comics is purportedly "prepared to tender,"  under the October 19, 2001 letter, to all parties, including Laura Siegel Larson, and the estates of Joanne Siegel and Michael Siegel?

The forgoing is without prejudice to plaintiff's claims, defenses and remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 24**
**379**

ER 1632

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

February 28, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:      <u>**October 19, 2001 Settlement Agreement Payment**</u>

Dear Marc:

This responds to your letter of February 27, 2013.

In my letters of January 29, 2013 and February 12, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 agreement ("Agreement") of all amounts accrued through December 31, 2012, provided that Ms. Larson (for herself and on behalf of the estate of Joanne Siegel) was prepared to perform under the Agreement pursuant to its terms.  Although it has been a month since my first letter, you have not responded to my requests that you confirm Ms. Larson is prepared to do so.  As a result, DC may continue to suspend its performance in view of your clients' ongoing repudiation of the Agreement.

In the absence of your clients' repudiation, the total amount that DC Comics would be prepared to tender to all parties (Laura Siegel Larson, the estates of Joanne Siegel and Michael Siegel, and the Gang, Tyre law firm) under the Agreement, accrued through December 31, 2012, is $21,557,352.  As provided in paragraph C.10 of the Agreement, your clients have audit rights with respect to any payments made by DC.

To reiterate, DC remains prepared to tender all amounts owing under the Agreement.  Accordingly, please let us know by close of business tomorrow if Ms. Larson is prepared to perform under the Agreement.

Finally, while you reference "letters" I sent to you on February 9, 2013, I believe you are referring to your own letter to me of that date, which I responded to on February 12, 2013.

**EXHIBIT 25
380**

ER 1633

O'MELVENY & MYERS LLP
February 28, 2013, Page 2


The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, any rights of offset that may arise, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP


CC:     Melvin Banchek
        Gerald Berk
        Donald Bulson
        Richard Kendall
        Arthur Levine
        Bruce Ramer

**EXHIBIT 25**
**381**

ER 1634

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, Suite 700
5   Los Angeles, CA  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:    (310) 246-6779

7   Attorneys for the DC Comics Parties

8   (continued on next page)

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11  LAURA SIEGEL LARSON,                Case No.  CV 04-8400 ODW (RZx)
    individually and as personal        Case No.  CV 04-8776 ODW (RZx)
12  representative of the ESTATE OF      Case No.  CV 10-3633 ODW (RZx)
    JOANNE SIEGEL,
13                                       **JOINT STATUS REPORT RE: THE**
               Plaintiff and Counter-defendant,   **SUPERMAN AND SUPERBOY**
14                                       **CASES PURSUANT TO THE**
          v.                             **COURT'S FEBRUARY 1, 2013,**
15                                       **ORDERS**
    WARNER BROS. ENTERTAINMENT
16  INC., DC COMICS, and DOES 1-10,      The Hon. Otis D. Wright II

17             Defendants and
               Counterclaimant.
18  ──────────────────────────────
    LAURA SIEGEL LARSON,
19  individually and as personal
    representative of the ESTATE OF
20  JOANNE SIEGEL,

21             Plaintiff and Counter-defendant,

22        v.

23  TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
24  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
25  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
26
               Defendants and
27             Counterclaimant.

28  (continued on next page)

1    DC COMICS,

2         Plaintiff,

3         v.

4    PACIFIC PICTURES
     CORPORATION, IP WORLDWIDE,
5    LLC, IPW, LLC, MARC TOBEROFF,
     an individual, MARK WARREN
6    PEARY, as personal representative of
     the ESTATE OF JOSEPH SHUSTER,
7    JEAN ADELE PEAVY, an individual,
     LAURA SIEGEL LARSON, an
8    individual and as personal
     representative of the ESTATE OF
9    JOANNE SIEGEL, and DOES 1-10,

10        Defendants.

11

12   MARC TOBEROFF (S.B. #188547)
       mtoberoff@toberoffandassociates.com
13   KEITH G. ADAMS (S.B. #240497)
       kadams@toberoffandassociates.com
14   PABLO D. ARREDONDO (S.B. #241142)
       parredondo@toberoffandassociates.com
15   DAVID A. HARRIS (S.B. #255557)
       dharris@toberoffandassociates.com
16   TOBEROFF & ASSOCIATES, P.C.
17   22337 Pacific Coast Highway #348
     Malibu, CA 90265
18   Telephone:   (310) 246-3333
     Facsimile:    (310) 246-3101
19

20   Attorneys for the Larson, Shuster, and Toberoff Parties

21

22

23

24

25

26

27

28

The parties respectfully submit this Joint Status Report pursuant to the Court's February 1, 2013, orders in the three Superman cases:  Case No. CV-04-8400, DN 701 ("*Siegel* Superman Case"); Case No. CV-04-8776, DN 221 ("*Siegel* Superboy Case"); and Case No. CV-10-3633, DN 571 ("*DC Comics* Case").   As ordered, this Joint Status Report reflects the parties' efforts to: (1) provide a concise procedural history of these cases; (2) set forth the current state of affairs in each case; and (3) propose an approach for resolving them.  *Id.*[1]

**Summary Of DC's Position**.  It is DC's submission that the three Superman cases can be fully complete within the next 60 to 90 days.  Based on the Ninth Circuit's recent ruling in the *Siegel* Superman Case, DC moved for final judgment in the *Siegel* Superman and Superboy Cases.  *See* Case No. CV-04-8400, DN 702. Such final judgments should enter.

As for the *DC Comics* case, the Court granted partial judgment in DC's favor on its First and Third Claims—mooting its Second Claim.  (That judgment is on appeal.)  DC moved for terminating default sanctions on its three remaining claims (its Fourth through Sixth Claims).  DN 573.  DC moved, separately, for summary judgment on its Sixth Claim.  DN 588.  DC's motions should be granted and, if they are, the only issue remaining to be decided will be DC's damages on its Fourth and Fifth Claims.  That issue can be proven quickly by DC's damages expert. Toberoff and the heirs disagree as set forth below, but DC will not use this joint submission to argue its case or respond to their arguments.  *Supra* n.1.

**Summary Of the Heirs/Toberoff Defendants' Position**.  The Larson (Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel), Shuster (Mark Warren Peary, as personal representative of the Estate of

---

[1] The parties have worked in good faith to prepare a mutually acceptable joint statement and met and conferred on its substance.  The parties agree that no party will be prejudiced by the descriptions of claims, defenses, and arguments presented herein, and reserve all rights and arguments as to any statements herein.  The parties were unable to agree on certain issues; in such instances, they separately set forth their respective positions and proposals.  *Id.*

1   Joseph Shuster, and Jean Adele Peavy), and Toberoff Parties (Marc Toberoff,

2   Pacific Pictures Corporation ("PPC"), IP Worldwide, LLC and IPW, LLC)

3   (collectively, the "Heirs") submit that the *DC Comics* Case can be resolved within

4   weeks.  The First and Third Claims are on appeal, and the Second Claim is

5   currently moot.  The Heirs have moved for summary judgment on DC's remaining

6   state-law claims, which would fully resolve this case.  DC's Fourth and Fifth

7   Claims are time-barred as the statute of limitations ran in 2008, and DC's Sixth

8   Claim is moot and, in any event, pre-empted by the Copyright Act.

9   　　　DC motion for an evidentiary hearing to impose drastic terminating sanctions

10  on its Fifth Claim (not "Fourth through Sixth Claims" as DC now asserts) does not

11  salvage its clearly time-barred claims.  The Heirs opposed DC's motion as legally

12  unsupportable, unprecedented, and contrary to clear Ninth Circuit authority.  DC

13  has had the few documents in question for months (in some cases a year), and has

14  shown no prejudice to justify sanctions.  Nor can such sanctions be imposed

15  without due process and a full evidentiary hearing.

16  　　　Nor has DC submitted any expert testimony or proven any damages.

17  　　　The Siegel Superman and Siegel Superboy Cases will require a few months

18  of further litigation.  DC filed premature motions "for final judgment," despite the

19  fact that the Ninth Circuit specifically did not remand the case for entry of

20  judgment.  The Ninth Circuit remanded for further adjudication of DC's contractual

21  Third and Fourth Counterclaims, to which Larson has strong defenses under

22  California contract law.  Larson will show in her oppositions to DC's motions (due

23  March 4, 2011), that there remain critical factual and legal issues regarding the

24  October 19, 2001 letter that must be fully adjudicated, as with any contract claim.

25  **I.    THE *SIEGEL* SUPERMAN AND *SIEGEL* SUPERBOY CASES**

26  　　　**A.    Procedural History**

27  　　　1. Background.  In 1997, plaintiff Laura Siegel Larson (and her now-

28  deceased mother, Joanne Siegel) served DC with notices of termination under 17

- 2 -

U.S.C. § 304(c) seeking to recapture Jerome Siegel's copyright interests in certain works. DC disputed the notices, and the parties discussed settlement. The Ninth Circuit has held that an October 19, 2001, letter from the Siegels' lawyer, Kevin Marks, constituted an acceptance of a DC offer, thereby creating an agreement. *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1 (9th Cir. Jan. 10, 2013). In 2002, the Siegels served an additional copyright termination notice seeking to recapture Siegel's copyright interests in certain Superboy works, which DC disputed.

In 2004, the Siegels, represented by their attorney Mr. Toberoff, filed two lawsuits—the *Siegel* Superman Case, and the *Siegel* Superboy Case—against the DC parties (DC Comics, Warner Bros. Entertainment Inc., Warner Communications Inc., Warner Bros. Television Production Inc., and Time Warner Inc.).

a. In the now-operative pleading in the *Siegel* <u>Superman</u> Case, Larson asserted four claims:

- Her First Claim sought a declaration that she recaptured, as of 1999, her father's alleged 50% interest in certain Superman copyrights pursuant to her 1997 termination notices, and that she continues to own that interest. Case No. CV-04-8400, DN 644 ¶¶ 52-55.
- Her Second Claim sought a declaration concerning her entitlement to profits from the allegedly recaptured copyrights. *Id.* ¶¶ 56-59.
- Her Third Claim sought a declaration that she recaptured her father's alleged 50% copyright interest in Superman's crest. *Id.* ¶¶ 60-64.
- Her Fourth Claim sought an accounting of DC's post-termination Superman profits. *Id.* ¶¶ 65-73.[2]

DC asserted six counterclaims in the *Siegel* Superman Case:

---

[2] Larson originally asserted, but then dismissed, additional claims for unfair competition under the Lanham Act and California law. DN 376.

- Its First Counterclaim sought a declaration that Larson's Superman and Superboy termination notices are invalid, alleging, *inter alia*, that they were untimely and did not terminate all of Jerome Siegel's grants to DC. Case No. CV-04-8400, DN 646 ¶¶ 66-89.

- Its Second Counterclaim alleged Larson's claims were time-barred. *Id.* ¶¶ 90-96.

- Its Third Counterclaim alleged that Larson breached the October 19, 2001, agreement. *Id.* ¶¶ 97-101.

- Its Fourth Counterclaim sought a declaration that, by the October 19, 2001, agreement, Larson "transferred or [is] contractually obligated to transfer to DC Comics" "any and all" of her Superman rights. *Id.* ¶¶ 102-05.

- Its Fifth Counterclaim sought a declaration to limit the scope of Larson's recaptured copyrights (if any). *Id.* ¶¶ 106-35.

- Its Sixth Counterclaim sought a declaration concerning accounting principles to apply if Larson's termination was valid. *Id.* ¶¶ 136-39.

b. Larson asserted five claims in the *Siegel* <u>Superboy</u> Case:

- Her First Claim sought an injunction preventing DC from infringing the Superboy copyrights she claims to have recaptured in 2004 by her Superboy notice of termination, as well as damages and other injunctive relief. Case No. CV-04-8776, DN 43 ¶¶ 61-75.

- Her Second Claim sought a declaration that, pursuant to her Superboy notice of termination, she owns 100% of her father's alleged Superboy copyrights identified in her notice; that the *Smallville* television series is derivative of Superboy; and that DC may not exploit new Superboy derivative works after the 2004 termination date. *Id.* ¶¶ 76-79.

- Her Third Claim sought damages and an injunction under the Lanham Act to prevent DC from violating her alleged trademark rights in

- 4 -

Superboy. *Id.* ¶¶ 80-92.

- Her Fourth Claim sought restitution and an injunction under California's unfair competition law requiring DC to credit Jerome Siegel as Superboy's alleged creator. *Id.* ¶¶ 93-102.

- Her Fifth Claim sought an injunction preventing DC from exploiting new Superboy derivative works after the 2004 termination date, and requiring DC to credit Jerome Siegel as Superboy's alleged creator. *Id.* ¶¶ 103-07.

DC asserted the same six counterclaims in the *Siegel* Superboy Case as it asserted in the *Siegel* Superman Case. DN 44.

2. Judge Larson's Summary Judgment Rulings. In March 2008, Judge Larson issued a partial summary judgment order in the *Siegel* Superman and Superboy Cases, holding that pursuant to the Siegels' notices of termination, they recaptured Jerome Siegel's 50% share of the first Superman story, published in *Action Comics No. 1*, but did not recapture rights in pre-*Action Comics No. 1* promotional announcements ("Ads"). Case No. CV-04-8400, DN 293. The Court rejected DC's Second, Third, and Fourth Counterclaims, ruling that Larson's claims were timely, and that the parties had not consummated a binding settlement agreement in October 2001. *Id.* at 57-59. In 2009, Judge Larson issued follow-up orders, in which he ruled that the Siegels had also recovered Jerome Siegel's 50% copyright share in the first two weeks of Superman newspaper strips, and in other early works, but further holding that the remaining Superman works were works-for-hire, *not* subject to termination. DN 560.

In a separate 2007 ruling in the *Siegel* Superboy case, Judge Larson ruled on a variety of the parties' respective arguments, but did not enter judgment in the case. Case No. 04-8776, DN 151 at 53-72; 9/17/07 Hr'g Tr. The parties dispute the impact of Judge Larson's rulings in the *Siegel* Superboy Case; their respective positions are set forth below in their respective case-management proposals.

1   After Judge Larson resigned, these cases were reassigned to the Hon. Otis D.

2   Wright II.  Case No. CV-04-8400, DN 596; CV-04-08776, DN 180.  Laura Siegel

3   Larson filed a motion under Rule 54(b), seeking to appeal portions of Judge

4   Larson's summary judgment rulings described above.  Case No. CV-04-8400, DN

5   628.  This Court denied Larson's initial motion, but ultimately granted her renewed

6   Rule 54(b) motion in March 2011.  DN 659.

7   In May 2011, the Court entered partial final judgment on Larson's First

8   Claim ("Declaratory Relief re: Termination") and DC's First through Fourth

9   Counterclaims (First: "Declaration that the Superman Notices and the Superboy

10  Notice are Ineffective"; Second: "Declaration that Any Claim by the Siegels for

11  Co-Ownership of Superman (Including its Derivative Superboy) is Barred by the

12  Statute of Limitations"; Third: "Breach of Contract"; Fourth: "Declaratory Relief

13  Regarding the Agreement").  DN 669.  Both parties appealed this Rule 54(b)

14  judgment.  DN 671; DN 674.  Larson's appeal focused on copyright work-for-hire

15  issues.  DC principally challenged Judge Larson's ruling that the parties failed to

16  reached a binding settlement agreement in 2001.  This Court stayed the *Siegel*

17  Superman Case pending those appeals, DN 667, and there was little activity in the

18  *Siegel* Superman and Superboy Cases while that appeal was pending.

19  ### B.   The Ninth Circuit's January 10, 2013 Ruling

20  On January 10, 2013, the Ninth Circuit reversed Judge Larson's March 2008,

21  summary judgment order and "direct[ed] the district judge to reconsider DC's third

22  and fourth [settlement-related] counterclaims in light of [its] holding that the

23  October 19, 2001, letter created an agreement."  *Larson*, 2012 WL 6822241, at *2.

24  The parties dispute the impact of this ruling; their respective positions are set forth

25  below in their respective case-management proposals.

26  ### C.   The Current State of Affairs

27  After the Ninth Circuit's ruling, DC filed a motion for summary judgment in

28  the *Siegel* Superman and Superboy Cases on February 7, 2013.  Case No. CV-04-

JOINT STATUS REPORT RE:
SUPERMAN & SUPERBOY CASES
**ER 1642**

8400, DN 702; Case No. CV-04-8776, DN 222. Larson's opposition is due March 4, 2013, and DC's reply is due March 11, 2013. Case No. CV-04-8400, DN 707 at 2. The Court vacated the hearing on these motions, and stated that "no appearances will be necessary unless otherwise ordered by the Court on a later date." *Id.*

### D. <u>DC's</u> Case-Management Proposal

The Court asked the parties to address the impact of the Ninth Circuit's ruling on these cases. Here is DC's submission:

<u>1. The Ruling.</u> The Ninth Circuit ruled, "as a matter of law," that Marks' "October 19, 2001 letter created an agreement" between Larson and DC, in which the Siegels transferred any Superman and Superboy copyrights they may have recaptured to DC, in exchange for millions of dollars. *Larson*, 2012 WL 6822241, at *1. The Ninth Circuit noted that the "[t]he central issue" on DC's settlement-related appeal was "whether the parties reached a binding settlement agreement during their negotiations over the rights to Superman in 2001 and 2002." *Id.* at *1. The Ninth Circuit held that Judge Larson "failed to address whether the October 19, 2001, letter from [Marks to DC] constituted an acceptance of terms negotiated between the parties, and thus was sufficient to create a contract." *Id.* In answering that question, the court wrote, *id.*:

> We hold, as a matter of law, that the October 19, 2001 letter *did* constitute such an acceptance…. The October 19, 2001, letter itself plainly states that the heirs have "accepted D.C. Comics offer of October 16, 2001in respect of the 'Superman' and 'Spectre' properties. The terms are as follows…." What follows is five pages of terms outlining substantial compensation for the heirs in exchange for DC's continued right to produce Superman works. The letter ends with Larson's attorney thanking DC's attorney for his "help and patience in reaching this monumental accord." Further, although it is the objective, and not subjective, understandings of the parties that determine whether they reached an agreement, extrinsic evidence of the parties' actions may be used to determine whether the oral offer referred to in the letter had, in fact, been made. [Citation.] Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations, that they had resolved the last outstanding point in the deal during a conversation on October 16,

2001, and that the letter accurately reflected the material terms they had orally agreed to on that day.

We reject Larson's arguments that either state or federal law precludes a finding that such a contract could have been created by the October 19, 2001, letter. California law permits parties to bind themselves to a contract, even when they anticipate that "some material aspects of the deal [will] be papered later." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011); [citation].… Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a "duly authorized agent" of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent.

The Ninth Circuit "direct[ed] the district judge to reconsider DC's third and fourth [settlement-related] counterclaims in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2. It noted: "Because a judgment on those claims in DC's favor would appear to render moot all of the other questions in this lawsuit, we decline to address these other issues at this time." *Id.*

2. The Impact. After over eight years of litigation, the *Siegel* Superman and Superboy Cases can and should now come to an end. DC's Fourth Counterclaim, asserted in both cases, seeks a declaration that the parties' October 2001 settlement agreement is enforceable, and that DC owns all of the copyrights on which Larson sued. *See* Case No. CV-04-8400, DN 702. As DC demonstrated in its pending summary judgment motions, judgment can and should be entered in DC's favor on its Fourth Counterclaims based on the Ninth Circuit's recent ruling. *Id.*

Granting DC judgment on its Fourth Counterclaim in each of the *Siegel* Superman Case and *Siegel* Superboy Cases renders DC's remaining counterclaims in the cases moot (meaning they should be dismissed without prejudice), and requires denial of Larson's claims (meaning they should be dismissed with prejudice). *Id.* Among other defects—and as will be addressed in DC's reply brief in support of its summary judgment motion (due March 11, 2013)—defendants' asserted contractual arguments to avoid such a judgment are without merit, contravene the Ninth Circuit's ruling, and were waived.

JOINT STATUS REPORT RE:
SUPERMAN & SUPERBOY CASES

**ER 1644**

1      After receiving full briefing on DC's pending summary judgment motions on

2   March 11, the Court should enter the proposed final judgments DC submitted with

3   its motions.  DN 702-5; Case No. CV-04-8776, DN 222-5.  These orders will end

4   these Superman and Superboy Cases, save for DC's fees request, 17 U.S.C. § 505.[3]

5      **E.      Larson's Case-Management Proposal**

6      These cases are not over.  The Ninth Circuit's ruling is decidedly limited.  It

7   holds only that the "October 19, 2001 letter created an agreement" between the

8   Siegels and DC.  *Larson*, 2012 WL 6822241, at *2.  Nothing in the ruling purports

9   to interpret the meaning of that agreement's terms, or to determine whether and to

10  what extent it was and/or still is enforceable.  And it certainly does not hold that the

11  "Siegels transferred any Superman and Superboy copyrights they may have

12  recaptured to DC," as DC argues above.  Had the Ninth Circuit believed that its

13  ruling was dispositive on this issue, it certainly would have indicated as such.

14  Instead, it specifically remanded the case and "direct[ed] the district judge to

15  reconsider DC's third and fourth counterclaims in light of [its] holding…." *Id.*

16     Now that the Ninth Circuit has held that the October 19, 2001 letter created a

17  contract, it falls to this Court to adjudicate DC's claims based on that contract.  As

18  will be detailed more fully in Ms. Larson's opposition to DC's motion for summary

19  judgment, there are a host of outstanding issues that preclude DC from the relief it

20  seeks:  DC has not and cannot meet the requirements for specific performance; DC

21  failed to perform or to even tender performance by March 31, 2002, the date agreed

22  upon in the October 19, 2001 letter; DC anticipatorily breached by instead

23  demanding unacceptable new and revised terms as a condition to its performance;

24

25     [3] DC submits that because DC's pending motion will resolve the entirety of the
    Superman and Superboy Cases, the Court need not address the issues left open by
26  Judge Larson's 2007 Superboy rulings.  In any event, DC argues that Judge Larson
    rightly rejected Larson's copyright infringement claim in the Superboy Case, ruling
27  that the Superboy script at issue in her 2002 copyright termination notice was a
    joint work between Jerome Siegel and Joseph Shuster.  Case No. 04-8776, DN 151
28  at 53-72; 9/17/07 Hr'g Tr.

JOINT STATUS REPORT RE:
SUPERMAN & SUPERBOY CASES
**ER 1645**

1    accordingly, the Siegels rescinded the agreement, and DC abandoned the

2    agreement.  Moreover, insofar as Superboy and the Superman promotional

3    announcements are concerned, the October 19, 2001 letter could not have

4    transferred any copyrights because the Copyright Act prevents the anticipatory

5    transfer of terminated rights.  17 U.S.C. §§ 304(c)(5), 304(c)(6)(D).

6        DC's motion for summary judgment mischaracterizes the Ninth Circuit's

7    ruling and ignores all of these outstanding contract issues in an attempt to push

8    through a judgment.  Granting DC a premature judgment will only lead to problems

9    on appeal and further delay a complete and final resolution of this case.  The Court

10   should instead set a scheduling order for proper briefing and trial on any remaining

11   issues of material fact this summer.

12   **II.**      **THE *DC COMICS* CASE**

13        **A.**     **Procedural History**

14        1.  DC's Claims.  DC filed this third case in May 2010, asserting six claims:

15            •   Its First Claim sought a declaration that the Superman copyright

16               termination notice served by the Estate of Joseph Shuster was invalid.

17               DN 49 ¶¶ 105-34.

18            •   Its Second Claim sought a declaration limiting the scope of rights the

19               Shusters allegedly recaptured—assuming their termination notice was

20               valid.  *Id.* ¶¶ 135-64.

21            •   Its Third Claim sought a declaration that certain of defendants'

22               agreements violated the Copyright Act.  *Id.* ¶¶ 165-72, 192.

23            •   Its Fourth Claim alleged Toberoff and Pacific Pictures intentionally

24               interfered with DC's business relationship and agreements with the

25               Shusters.  *Id.* ¶¶ 175-79.

26            •   Its Fifth Claim alleged Toberoff intentionally interfered with DC's

27               relationships with the Siegels.  *Id.* ¶¶ 181-86.

28

JOINT STATUS REPORT RE:
SUPERMAN & SUPERBOY CASES
**ER 1646**

- Its Sixth Claim sought a declaration that certain of defendants' agreements violated California unfair competition law.  *Id.* ¶¶ 188-89.

2. Defendants' Rule 12 And Anti-SLAPP Motions.  Defendants moved under Rule 12 to challenge DC's claims.  DN 333; 334; 338; 342.  They also filed a special motion to strike DC's state-law claims—its Fourth, Fifth, and Sixth Claims—pursuant to California's anti-SLAPP statute.  DN 75; 145; 304; 312.  The Court denied defendants' SLAPP motion in October 2011.  DN 337.  Defendants appealed, DN 339, and thereafter withdrew their Rule 12 motion, citing jurisdictional grounds, and answered DC's complaint.  DN 343; 347-49.  On January 10, 2013, the Ninth Circuit affirmed this Court's denial of defendants' anti-SLAPP motion.  *See DC Comics v. Pacific Pictures Corp.*, 2013 WL 120807 (9th Cir. Jan. 10, 2013).

3. The Parties' Cross-Summary Judgment Motions On DC's Federal Claims.  In July 2012, DC moved for summary judgment on its First and Third Claims, and defendants opposed and cross-moved for judgment on DC's First through Third Claims.  In October 2012, the Court granted summary judgment in DC's favor on its First and Third Claims and deemed its Second Claim moot.  DN 507.  The Court granted defendants' Rule 54(b) motion, and in December 2012, the Court entered partial final judgment for DC on its First and Third Claims.  DN 540.  Defendants' appeal of this Rule 54(b) judgment is pending, and will be heard, on an expedited basis, by the same panel that heard the other two appeals in the *Siegel* Superman Case and *DC Comics* Case.

## B.     The Current State of Affairs

The parties have three sets of substantive motions currently pending before the Court in *DC Comics*.

1. DC's Sanctions Motion.  DC moved for an evidentiary hearing, terminating sanctions and various other relief based on defendants' alleged

discovery misconduct.  DN 500; 527; 573.  That motion is fully briefed, and the Court has taken the matter under submission.  DN 575.

2.  Defendants' Summary Judgment Motion And DC's Cross-Motion.
Defendants moved for summary judgment on DC's Fourth, Fifth, and Sixth Claims, arguing that DC's Fourth and Fifth Claims are barred by the statute of limitations, and that its Sixth Claim is moot, preempted by federal law and, in part, time-barred.  DN 577.  DC opposed this motion, filed a Rule 56(d) affidavit in support of the same, and cross-moved for summary judgment on its Sixth Claim.  DN 588; 588-1.  These motions will be fully briefed today, February 25, 2013, when defendants file their reply brief.  The Court has ruled that "the matter will be decided upon without oral argument."  DN 581.

3.  DC's Motion for Attorneys' Fees.  DC moved to recover attorneys' fees from Mr. Toberoff and Pacific Pictures on its Third Claim.  That motion is fully briefed, DN 559; 576; 582, and the "matter stands submitted."  DN 580.[4]

**C.  DC's Case-Management Proposal**

After nearly three years of litigation, this *DC Comics* case can and should be fully and finally resolved within the next 60 to 90 days.

1.  The Court can and should enter summary judgment for DC on its Sixth Claim.  *See* DN 588 at 18-22.  As shown in its pending motion, *id.*, DC seeks a declaration that Toberoff's web of rights-tying agreements with the Siegels and Shusters are void and unenforceable under California's unfair competition laws.  *Id.*

2.  DC's Fourth through Sixth Claims can and should be resolved by DC's pending terminating sanctions motion, which seeks default judgment on all three of

---

[4] Also pending before the Court and Magistrate Judge Zarefsky are two discovery matters.  The first is defendants' motion for review of Judge Zarefsky's denial of their motion to compel, which will be fully briefed today, February 25.  DN 569; 579.  The Court took the hearing on this motion off calendar.  DN 580._  The second is DC's motion before Judge Zarefsky to compel further depositions of Mr. Toberoff, Mark Warren Peary, and Ms. Larson.  DN 584, 594.  That motion, which is fully briefed, is currently set for hearing on March 11, 2013.

these claims, given defendants' egregious discovery misconduct. DN 500; 527;
573; 588 at 2-4. If the Court were to grant DC judgment on this basis, the *only*
issue left to prove on Fourth and Fifth Claims is damages, which can be proved
quickly and easily. *E.g.*, DN 588 at 2-4 & n.1. Defendants' characterization of
DC's motion is inaccurate.

### E. <u>Defendants'</u> Case-Management Proposal

DC's remaining state-law Fourth, Fifth and Sixth Claims are long time-
barred or moot. After nearly three years of litigation, the *DC Comics* case can and
should be brought to a close in the next few weeks on Defendants' pending
summary judgment motion. *See* DN 577.

1. As shown in Defendants' motion, DC's Fourth and Fifth Claims are long
barred by the applicable two-year statute of limitations based on an undisputed
record demonstrating that DC was on notice of its claims in 2006. DC's Sixth
Claim is moot because the Court already granted DC the requested relief on its
Third Claim, and this claim is also preempted by the Copyright Act.

2. DC's overblown discovery motion for an evidentiary hearing re: sanctions
regarding DC's Fifth Claim (not its Fourth, Fifth and Sixth Claims, as DC pretends)
does not save its state-law claims from Defendants' summary judgment motion.
Without legal precedent, and contrary to clear Ninth Circuit authority, DC
unjustifiably seeks severe terminating sanctions based on (1) a handful of logging
errors among thousands of entries, regarding four documents which were produced
to DC many months ago; and (2) DC's misrepresentations that Michael Siegel's
former counsel sent his files to Mr. Toberoff in 2006, when, as the evidence easily
demonstrates, they did not send Mr. Siegels' files to Mr. Toberoff until 2011, and
thereafter these documents were all promptly logged or produced. DN 517 at 4-17.
DC has suffered no prejudice because it received the documents when these
discovery issues were resolved, long before any substantive decision on DC's Fifth
Claim – the sole claim to which the documents are even remotely relevant.

JOINT STATUS REPORT RE:
SUPERMAN & SUPERBOY CASES

**ER 1649**

If Defendants' summary judgment motion is granted, there would be no further issues to be decided by this Court, and a final judgment could be entered in this case.

Dated:  February 25, 2013          Respectfully Submitted,
                                   O'MELVENY & MYERS LLP

                                   By: /s/ Daniel M. Petrocelli
                                       Daniel M. Petrocelli

Dated:  February 25, 2013          Respectfully Submitted,
                                   TOBEROFF & ASSOCIATES, P.C.

                                   By: /s/ Marc Toberoff
                                       Marc Toberoff

<u>Attestation</u>

I hereby attest that the other signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  February 25, 2013          O'MELVENY & MYERS LLP

                                   By: /s/ Daniel M. Petrocelli

1  DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for the DC Comics Parties

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | Case No.  CV 04-8400 ODW (RZx) Case No.  CV 04-8776 ODW (RZx) |
| 12 | **DEFENDANT DC COMICS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL* SUPERMAN AND SUPERBOY CASES** |
| 13            Plaintiff, | |
| 14       v. | |
| 15  WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, | |
| 16            Defendants and       Counterclaimants. | DECLARATION OF DANIEL M. PETROCELLI, [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW, [PROPOSED] ORDER, AND [PROPOSED] FINAL JUDGMENTS FILED CONCURRENTLY HEREWITH |
| 17 | |
| 18  LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | |
| 20            Plaintiff, | |
| 21       v. | The Hon. Otis D. Wright II |
| 22  TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, | **Hearing Date**:  March 11, 2013 **Hearing Time**:  1:30 p.m. **Courtroom:**       11 |
| 25 | |
| 26            Defendants and       Counterclaimants. | |

27

28

PLEASE TAKE NOTICE that on March 11, 2013, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled court, located in Courtroom 11 at 312 North Spring Street, Los Angeles, California 90012, the DC Comics parties (DC Comics, Warner Bros. Entertainment Inc., Warner Communications Inc., Warner Bros. Television Production Inc., and Time Warner Inc.) (collectively, "DC") will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in the two *Siegel* Superman and Superboy cases, Case Nos. CV-04-8400 (Superman), CV-04-8776 (Superboy). This motion is made following multiple conferences of counsel, including on February 6, 2013, pursuant to Central District Local Rule 7-3.

In both the Superman and Superboy cases, DC's Fourth Counterclaim seeks a declaration that Larson transferred her Superman and Superboy copyrights to DC pursuant to a 2001 settlement agreement, and that the parties are bound by the terms of that agreement. In 2008, the prior judge in this case, the Hon. Stephen Larson, held on summary judgment that no settlement agreement was reached. Case No. 04-8400, DN 293; Case No. 04-8776, DN 174. Last month, the Ninth Circuit reversed that ruling and held, as a matter of law, that DC and Larson entered into a settlement agreement on October 19, 2001, the terms of which are set forth in a signed, six-page letter from Larson's former attorney, Kevin Marks. *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241 (9th Cir. Jan. 10, 2013). The court further held that the agreement constituted a valid copyright transfer. *Id*. at *1.

The Ninth Circuit's binding ruling compels judgment in DC's favor on its Fourth Counterclaim in both *Siegel* cases; renders DC's remaining counterclaims in the cases moot (meaning they should be dismissed without prejudice); and requires denial of Larson's claims in the cases (meaning they should be dismissed with prejudice). The Ninth Circuit requested that this Court resolve these questions on remand, and the Court can and should do so now, and bring these two long-running cases to an end.

DC'S MOTION FOR
SUMMARY JUDGMENT

**ER 1652**

1         This motion is based on this Notice of Motion and Motion and accompanying

2    Memorandum of Points and Authorities; the concurrently filed Declaration of

3    Daniel M. Petrocelli (cited herein as "Petrocelli Decl."); the concurrently filed

4    Statement of Uncontroverted Facts and Conclusions of Law (cited herein as

5    "SUF"); the concurrently filed Proposed Order; the concurrently filed Proposed

6    Final Judgment in the *Siegel* Superman case; the concurrently filed Proposed Final

7    Judgment in the *Siegel* Superboy case; and all exhibits, files, and records on file in

8    this action, matters of which judicial notice may be taken, and such additional

9    submissions and argument as may be presented at or before the hearing on this

10   motion.

11        Dated:  February 7, 2013        Respectfully submitted,

12                                By: /s/ Daniel M. Petrocelli

13                                    Daniel M. Petrocelli
                                  Attorneys for DC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2          After nearly a decade of litigation, the *Siegel* Superman (CV 04-8400) and

3    *Siegel* Superboy cases (CV 04-8776) can now come to an end.  In 1997, the Siegel

4    heirs served copyright termination notices on DC, seeking to terminate Jerry

5    Siegel's copyright grants in Superman and Superboy.  After years of negotiations,

6    DC and the Siegels entered into a settlement agreement on October 19, 2001, under

7    which, *inter alia*, the Siegels transferred all of their rights in Superman and

8    Superboy to DC, in exchange for millions of dollars.  But the Siegels repudiated

9    that agreement in 2002 and entered into a business deal with Marc Toberoff.  Laura

10   Siegel Larson and her now-deceased mother, Joanne Siegel (collectively,

11   "Larson"), then filed two lawsuits against DC seeking to show she still owned

12   Superman and Superboy copyrights.  DC counterclaimed in both cases for

13   declarations that the 2001 settlement agreement was valid and Larson transferred

14   her copyrights to DC.  Judge Larson (since resigned) granted summary judgment

15   against DC on these claims, holding the parties never reached a binding agreement.

16         Last month, the Ninth Circuit reversed Judge Larson's ruling.  It held that

17   DC and Larson entered into a binding settlement agreement on October 19, 2001, in

18   which DC promised her valuable consideration and she, in turn, *inter alia*,

19   transferred any copyrights that may have been recaptured to DC.  The Ninth Circuit

20   remanded the case to this Court to reconsider DC's Third and Fourth

21   Counterclaims—which are based on the 2001 settlement agreement.

22         DC's Fourth Counterclaim, asserted in both cases, sought a declaration that

23   the settlement agreement was enforceable and that DC owns all of the Superman

24   and Superboy copyrights on which Larson sued.  The judicial declaration DC seeks

25   under these Fourth Counterclaims should now enter in both *Siegel* cases, and the

26   remaining claims in both lawsuits (both Larson's claims and DC's counterclaims)

27   can now be dismissed.  This includes DC's Third Counterclaims for breach of

28   contract, which DC agrees can be dismissed without prejudice, if DC prevails on its

DC'S MOTION FOR
SUMMARY JUDGMENT
**ER 1654**

Fourth Counterclaims, and the Proposed Judgments it has submitted are entered. In short, these cases are over. Any attempt by Larson to resuscitate them is futile.

**II.     Statement of Facts**

    **A.     Background**

In 1997, Laura Siegel Larson (and her mother, Joanne) served copyright termination notices on DC seeking to recapture copyrights in Superman and Superboy works. DC disputed the validity of the notices and spent the next four years negotiating a compromise with Larson's lawyer, Kevin Marks. DC made a settlement offer to Larson and her family on October 16, 2001, and three days later, Marks sent DC a letter confirming that Larson and her family had "'accepted D.C. Comics offer.'" *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1 (9th Cir. Jan. 10, 2013). Marks' October 19 letter documented the agreement's material terms in six, single-spaced pages, and he thanked DC for its "'help and patience in reaching this monumental accord.'" *Id.*; Case No. 04-8400, DN 644 ¶¶ 39, 49.

Larson thereafter went into business with Marc Toberoff, denied the existence of the October 2001 agreement, and served an additional copyright termination notice seeking to recapture rights in Superboy, even though Superboy works had been included in her 1997 notices and the October 2001 settlement agreement. SUF 1; Case No. 04-8400, DN 163 at 89 n.1 (1997 notice: "This Notice of Termination applies to each and every work … reasonably associated with SUPERMAN… such as, … Superboy"); Case No. 04-8776, DN 54 at 83-140.

Larson filed two lawsuits against DC seeking to enforce her termination notices. In the Superman case (No. 04-8400), she asserted four claims, seeking:

    1) a declaration that in 1999 she had recaptured a 50% interest in certain Superman copyrights by virtue of her 1997 termination notice and that she continues to own that interest (First Claim);

    2) a declaration as to the profits she was entitled to from the allegedly recaptured Superman copyrights (Second Claim);

- 2 -

DC'S MOTION FOR
SUMMARY JUDGMENT

**ER 1655**

3) a declaration that in 1999 she had recaptured a 50% copyright interest in the Superman shield which she continues to own (Third Claim); and

4) an accounting of DC's post-termination Superman profits (Fourth Claim). Case No. 04-8400, DN 644. (Larson originally asserted, but then dismissed, other claims for unfair competition under the Lanham Act and California law. DN 376.)

DC filed counterclaims in the Superman case seeking:

1) a declaration that Larson's "Superman notices and the Superboy notice are ineffective" because, *inter alia*, they were untimely and did not terminate all of Siegel's prior grants to DC (First Counterclaim);

2) a declaration that Larson's claims were time-barred (Second Counterclaim);

3) damages for Larson's breach of the October 19, 2001, settlement agreement (Third Counterclaim);

4) a declaration that, by virtue of the "binding and enforceable" 2001 settlement agreement, Larson "transferred or [is] contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which [she] may have in the Superman Works" (Fourth Counterclaim);

5) a declaration limiting the scope of the Superman termination notices in the event it was found to be valid (Fifth Counterclaim); and

6) a declaration concerning the principles to be applied in any accounting, again assuming the termination was held to be valid (Sixth Counterclaim). *Id.*, DN 646.

Larson asserted five claims in the Superboy case (No. 04-8776) for:

1) an injunction preventing DC from infringing the Superboy copyrights she said she recaptured by her November 2002 termination notice, and also damages and an order requiring destruction of any infringing works (First Claim);

- 3 -

2) a declaration that, by virtue of the 2002 termination notice, she owned and does own 100% of certain Superboy copyrights; that the *Smallville* television series is derivative of Superboy; and that DC may not exploit any new *Smallville* or Superboy derivative works on or after the termination date in her notice, or November 17, 2004 (Second Claim);

3) an injunction under the Lanham Act requiring DC to ascribe copyright ownership in Superboy merchandise to Larson (Third Claim);

4) damages and an injunction requiring DC to ascribe copyright ownership in Superboy merchandise to Larson (Fourth Claim); and

5) an injunction preventing DC from exploiting new Superboy derivative works after November 17, 2004, and requiring DC to credit Jerome Siegel as the creator of Superboy on all such works.

Case No. 04-8776, DN 43.  DC contested these claims and raised the same six counterclaims it asserted in the Superman case.  *Id.*, DN 44.

On March 26, 2008, Judge Larson issued a partial summary judgment order in both the Superman and Superboy cases.  He rejected DC's Third and Fourth Counterclaims that the parties had entered into a binding settlement agreement in 2001, but found that the majority of disputed works sought by Larson in her First Claim were non-terminable works-for-hire owned by DC.  Case No. 04-8400, DN 293; Case No. 04-8776, DN 174.  Larson sought an interlocutory appeal of these rulings, Case No. 04-8400, DN 671; 674, and DC cross appealed.

**B.    The Ninth Circuit's January 10, 2013, Ruling**

On appeal, DC asked the Ninth Circuit to "ent[er] [] judgment [in its favor] on all claims [in the *Siegel* Superman case] on the basis of an October 2001 settlement agreement."  9th Cir. Appeal Nos. 11-55863, 56034, DN 31-1 at 5.  On January 10, 2013, the Ninth Circuit unanimously reversed Judge Larson's March 2008, summary judgment order.  *See Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241 (9th Cir. Jan. 10, 2013).  The court began its opinion by noting that

"[t]he central issue" on DC's settlement-related counterclaims was "whether the parties reached a binding settlement agreement during their negotiations over the rights to Superman in 2001 and 2002." *Id*. at *1.

The Court answered that question in the affirmative, explaining that Judge Larson "failed to address whether the October 19, 2001, letter from [Kevin Marks to DC] constituted an acceptance of terms negotiated between the parties, and thus was sufficient to create a contract." *Id*. The court explained, *id*.:

> We hold, as a matter of law, that the October 19, 2001 letter *did constitute such an acceptance.* [fn. 2:] Larson, in her brief, states this question should be resolved as a matter of law. [Citations omitted.] The October 19, 2001, letter itself plainly states that the heirs have "accepted D.C. Comics offer of October 16, 2001in respect of the 'Superman' and 'Spectre' properties. The terms are as follows…." What follows is five pages of terms outlining substantial compensation for the heirs in exchange for DC's continued right to produce Superman works. The letter ends with Larson's attorney thanking DC's attorney for his "help and patience in reaching this monumental accord." Further, although it is the objective, and not subjective, understandings of the parties that determine whether they reached an agreement, extrinsic evidence of the parties' actions may be used to determine whether the oral offer referred to in the letter had, in fact, been made. *Cf. Wedeck v. Unocal Corp.*, 69 Cal. Rptr. 2d 501, 507-08 (Cal. Ct. App. 1997). Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations, that they had resolved the last outstanding point in the deal during a conversation on October 16, 2001, and that the letter accurately reflected the material terms they had orally agreed to on that day.
>
> We reject Larson's arguments that either state or federal law precludes a finding that such a contract could have been created by the October 19, 2001, letter. California law permits parties to bind themselves to a contract, even when they anticipate that "some material aspects of the deal [will] be papered later." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011); *Harris v. Rudin, Richman & Appel*, 87 Cal. Rptr. 2d 822, 828 (Cal. Ct. App. 1999). This principle applies notwithstanding the lack of an express reference to an intended future agreement, as long as the terms of any contract that may have been formed are sufficiently definite that a court could enforce them (as is undoubtedly the case here). *Facebook*, 640 F.3d at 1038 (noting the minimal requirements to form an enforceable contract, and that California law does not require express delegation regarding potential missing terms of a contract); *Patel v. Liebermensch*, 197 P.3d 177, 182-83 (Cal. 2008). That *Facebook* involved a contract signed by

DC'S MOTION FOR
SUMMARY JUDGMENT
ER 1658

both parties does not render it any less controlling here; under California's statute of frauds, the only signature that is required is that of the party against whom a contract is sought to be enforced. *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin, *Summary of California Law, Contracts* § 359 (10th ed. 2005). Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a "duly authorized agent" of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent. (Emphases added).

The Ninth Circuit reversed Judge Larson's grant of summary judgment against DC and "direct[ed] the district judge to reconsider DC's third and fourth counterclaims in light of our holding that the October 19, 2001, letter created an agreement." *Id*. at *2. It further noted: "Because a judgment on those claims in DC's favor would appear to render moot all of the other questions in this lawsuit, we decline to address these other issues at this time." *Id*. Larson did not petition for rehearing, and the Ninth Circuit issued its mandate on February 4, 2013.

## II.    Summary Judgment Is Warranted On DC's Fourth Counterclaim In The *Siegel* Superman And Superboy Cases, And DC's Remaining Counterclaims In Those Cases Are Moot And Can Be Dismissed.

On remand, this Court is bound by the Ninth Circuit's mandate. *See* FED. R. APP. P. 41(c), and Committee Note to 1998 Amendment thereto. "When matters are decided by an appellate court, its rulings, unless reversed by it or by a superior court, bind the lower court." *Ins. Grp. Comm. v. Denver & R.G.W.R.R.*, 329 U.S. 607, 612 (1947). Summary judgment is appropriate where there is "no genuine issue as to any material fact," and the only issue is one of law. FED. R. CIV. P. 56(a); SCHWARZER, TASHIMA & WAGSTAFFE, CAL. PRACTICE GUIDE: FED. CIV. PROCEDURE BEFORE TRIAL §§ 14:3, 14:207 (2012).

### A.    Summary Judgment Is Warranted On DC's Fourth Counterclaim.

The Ninth Circuit's ruling compels judgment in DC's favor on its Fourth Counterclaims in both *Siegel* cases. The claims ask the Court for a declaration stating that under the October 2001, settlement agreement, Larson "transferred or

1  [is] contractually obligated to transfer to DC Comics, worldwide and in perpetuity,

2  any and all rights, title, and interest, including all United States copyrights, which

3  [she] may have in the Superman Works."  Case No. 04-8400, DN 646 ¶ 103(a);

4  Case No. 04-8776, DN 44 ¶ 103(a).

5      The Ninth Circuit held that the October 2001 settlement agreement—the

6  terms of which require Larson to "transfer all of [her] rights in the 'Superman' and

7  'Spectre' properties (including 'Superboy'), resulting in 100% ownership to D.C.

8  Comics," SUF 1— "created an agreement" "as a matter of law," *Larson*, 2012 WL

9  6822241, at \*1.  The Ninth Circuit rejected Larson's arguments that the 2001 deal

10  did not contain all the necessary material terms, and the Ninth Circuit also held that

11  the contract satisfied all of the requirements for a valid copyright transfer under the

12  Copyright Act.  *Id.*  On remand, Larson is bound by these holdings.  *Supra* at 6.

13      In accordance with the Ninth Circuit's ruling, and as set forth in DC's two

14  proposed judgments filed herewith, the Court should enter judgment in DC's favor

15  on its Fourth Counterclaims and declare that Larson transferred her Superman and

16  Superboy copyrights to DC by virtue of the October 2001 settlement agreement.[1]

17  **B.  DC's Five Remaining Counterclaims Are Moot.**

18      DC's other counterclaims are all rendered moot by the Ninth Circuit's ruling

19  on DC's case-determinative settlement defense.  DC's First, Second, Fifth, and

20  Sixth Counterclaims all seek relief that was only applicable *if* the parties did not

21  reach a binding settlement agreement in 2001.  DC's First Counterclaims dispute

22  the validity of Larson's termination notices; its Fifth Counterclaims dispute the

23  termination notices' scope; its Second Counterclaims are a now moot statute-of-

24   

25      [1] In the parties' meet-and-confer discussions preceding this motion, Larson's counsel was deliberately opaque about what defenses she would assert, saying no

26  more than she was reserving "all contractual and declaratory relief arguments." Petrocelli Decl. ¶ 2; Ex. A.  DC will address any such arguments, as needed, on

27  reply.  Defendants played a similar game when opposing DC's summary judgment motion in the *Pacific Pictures* case, *id.* Ex. C at 27 (DC's reply brief addressing this

28  tactic), and the Court rightly rejected it, *id.* Ex. D at 40 (opinion; collecting cases).

DC'S MOTION FOR
SUMMARY JUDGMENT

**ER 1660**

1   limitations defense; and its Sixth Counterclaims concern accounting principles that

2   were only relevant if the termination was declared valid. *Supra* at 3-4.

3       DC's Third Counterclaims (requesting damages for Larson's breach of the

4   2001 settlement agreement) will also be mooted if the Court enters judgment on its

5   Fourth Counterclaims, as DC requests above. Instead of damages for breach, DC

6   will seek its attorney's fees under the Copyright Act and its Fourth Claim in these

7   cases, and will seek damages against Toberoff in the related *Pacific Pictures* case.

8   Toberoff challenged DC's ability to seek those attorney's fees consistent with the

9   SLAPP statute. 9th Cir. Appeal No. 11-56934, DN 8 at 27; 37-1 at 37-38. The

10  Ninth Circuit rejected his SLAPP appeal and, with it, such arguments. *Id.*; *DC*

11  *Comics v. Pacific Pictures Corp.*, 2013 WL 120807 (9th Cir. Jan. 10, 2013).

12  **III.   Summary Judgment Is Warranted On Larson's Claims In The *Siegel***

13          **Superman And Superboy Cases.**

14      As the Ninth Circuit noted "appear[ed]" to be the case, it is *indeed* the case

15  that "a judgment [in] DC's favor" on its settlement counterclaim "render[s] moot all

16  of the other questions in this lawsuit," including Larson's claims for relief. *Larson*,

17  2012 WL 6822241, at *2. Her four claims in the Superman case all hinge on the

18  validity of her termination notice and her continued ownership of the allegedly

19  recaptured Superman copyrights. *Supra* at 2-3. Larson traded any rights she had in

20  Superman to DC, as part of the October 19, 2001, agreement. By that agreement's

21  express terms, Larson assigned to DC all of her rights and interests in Superman:

22      "The Property" means all Superman, Superboy and related properties
23      (including, for example, Supergirl, Steel, Lois & Clark and
        Smallville), and the Spectre property, and includes all pre- and post-
24      termination works (including the so-called Superman library),
        characters, names and trademarks relating to the Property. . . .

25      The Siegel Family would transfer all of its rights in the "Superman"
26      and "Spectre" properties (including "Superboy"), resulting in 100%
        ownership to D.C. Comics, as between the Siegel Family and D.C.
27      Comics.

28  SUF 1.

DC'S MOTION FOR
SUMMARY JUDGMENT

**ER 1661**

Larson's five claims in the Superboy case are equally barred. Her First Claim—seeking an injunction to prevent copyright infringement, *supra* at 3—requires that she owned the Superboy rights. "Only the copyright owner, or the owner of exclusive rights under the copyright, as of the time the acts of infringement occur, has standing to bring an action for infringement of such rights." *Oskar Sys., LLC v. Club Speed, Inc.*, 745 F. Supp. 2d 1155, 1159 (C.D. Cal. 2010); *Maljack Prods. v. Goodtimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996). Larson's claim that an infringement resulted from DC's exploitation of "new derivative works or products based on the 'Superboy' mythology," "*on or after November 17, 2004*," Case No. 04-8776, DN 43 ¶ 68, is barred by the 2001 settlement agreement, which specifically provides: "The Siegel Family would transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy')." SUF 1.

Larson's Second through Fifth Claims similarly fail, because all four expressly assume she owns the Superboy copyrights, *supra* at 4—again, rights the Ninth Circuit held she transferred to DC in October 2001, *id.* at 5-6.

**IV. Conclusion**

DC's motion for summary judgment should be granted, and its proposed judgments in the *Siegel* Superman and Superboy cases should enter immediately.

Dated: February 7, 2013

Respectfully Submitted,
O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for DC

OMM_US:71281420

DANIEL M. PETROCELLI (S.B. #097802)
 dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
 mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
 cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>             Plaintiff,<br><br>      v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br><br>             Defendants and Counterclaimants. | Case No.  CV 04-8400 ODW (RZx)<br>Case No.  CV 04-8776 ODW (RZx)<br><br>**DECLARATION OF DANIEL M. PETROCELLI IN SUPPORT OF DEFENDANT DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL* SUPERMAN AND SUPERBOY CASES**<br><br>The Hon. Otis D. Wright II<br><br>**Hearing Date**:   March 11, 2013<br>**Hearing Time**:   1:30 p.m.<br>**Courtroom:**      11 |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>             Plaintiff,<br><br>      v.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br><br>             Defendants and Counterclaimants. | |

## DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state:

1.     I am a partner at O'Melveny & Myers LLP, counsel of record for defendants and counterclaimants (collectively "DC") in this case. I make this declaration in support of DC's Motion For Summary Judgment In The *Siegel* Superman And Superboy Cases. I have personal knowledge of the matters set forth in this declaration.

2.     Following the Ninth Circuit's ruling in DC's favor in the *Siegel* Superman case on January 10, 2013, I spoke on several occasions to Marc Toberoff and Richard Kendall (his counsel in the related *Pacific Pictures* case), about DC's intent to bring a motion asking this Court to enter final judgment in the *Siegel* Superman and Superboy cases. I sent Mr. Toberoff and Mr. Kendall follow-up emails regarding DC's motion for entry of judgment on January 28 and February 1, 2013. My partner, Matthew Kline, sent Mr. Toberoff and Mr. Kendall additional correspondence (as well as drafts of the proposed judgments DC would be submitting in connection with this motion) on February 4, and on February 6, Mr. Kline had a telephone conference with Laura Siegel Larson's counsel. As detailed in Mr. Kline's follow-up email of February 6, Larson's counsel would not identify any specific ground based on which Larson would oppose DC's summary judgment motion or any objections Larson had to the draft proposed judgments DC had provided. Instead, Larson's counsel said Larson reserved "all contractual and declaratory relief arguments" in opposing DC's motion. Mr. Kline asked Larson's counsel in a follow-up email to identify any such arguments with specificity, but Larson's counsel declined to provide such details, and argued, as they had before, that DC's motion was premature. Mr. Kline and I both noted in our emails that Larson's counsel had created the delay here, and DC had tried on several earlier occasions to meet and confer. A true and correct copy of the parties' email correspondence described above is attached hereto as Exhibit A.

PETROCELLI DECL.
ISO DC'S MOT. SUMM. J.
**ER 1664**

3.      Attached hereto as Exhibit B is a true and correct copy of Kevin Marks' October 19, 2001, letter to John Schulman, described and discussed in the Ninth Circuit's recent ruling.  *See Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1 (9th Cir. Jan. 10, 2013).

4.      Attached hereto as Exhibit C is a true and correct copy of an excerpt from DC's Reply In Support Of Motion For Partial Summary Judgment On Its First And Third Claims For Relief, filed in the related *Pacific Pictures* case, Case No. CV-10-3633, DN 468.

5.      Attached hereto as Exhibit D is a true and correct copy of the Court's Order Granting Plaintiff's Motion For Partial Summary Judgment [458] And Denying Defendants' Cross-Motion [478], issued in *Pacific Pictures*, Case No. CV-10-3633, DN 507.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 7th day of February, 2013, at Los Angeles, California.

  /s/ Daniel M. Petrocelli
Daniel M. Petrocelli

OMM_US:71288309

PETROCELLI DECL.
ISO DC'S MOT. SUMM. J.
**ER 1665**

# EXHIBIT A

**From:** Kline, Matthew
**Sent:** Wednesday, February 06, 2013 3:40 PM
**To:** 'Marc Toberoff'
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Keith Adams; David Harris; Pablo Arredondo; Richard Kendall
**Subject:** RE: Larson v. Warner Bros. Entm't Inc.

Marc:

Your email is incorrect in every respect, and as Dan noted in his written correspondence with you on this very subject, we will not countenance the delays you are seeking to create with games of the sort documented below. DC will file its motion, and will alert the Court to your actions.

All rights reserved,

Matt Kline

**From:** Marc Toberoff [mailto:mtoberoff@toberoffandassociates.com]
**Sent:** Wednesday, February 06, 2013 3:07 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Keith Adams; David Harris; Pablo Arredondo; Richard Kendall
**Subject:** Re: Larson v. Warner Bros. Entm't Inc.


Matt:

The representations in your email are untrue. Defendants Warner Bros. and DC Comics ("Warner") plan to file a motion for summary judgment this Friday, February 6, after just holding a scheduled "meet and confer" conference today, February 4, knowingly violates L.R. 7-3, which mandates a 10-day grace period before filing. Though your false diatribe attempts to obfuscate and distract, it does nothing to alter the Rules.

Dan commented to me, when we were speaking about scheduling settlement talks, that Warner would bring a "motion to enter judgment," acting as if the Ninth Circuit had remanded with directions to enter judgment, when it did not.

Dan's January 28 e-mail to me reiterated that he would "move the Court to enter judgment."

I am informed by Dick Kendall (who, as you know, does not represent the plaintiff Ms. Larson or any other party in *Siegel*) that Dan had a conversation with Dick about settlement talks, in which Dan similarly described Warner's motion to enter judgment. Dick asked him what kind of motion he intended to bring and whether it was a summary judgment motion. Dan responded that he was not sure yet, but that it "might" be a summary judgment motion.

The first time plaintiff was informed that Warner would in fact bring a motion for summary judgment was in Dan's February 1, 2013 email, which still failed to even specify which claims Warner intended to move on. Obviously, none of these passing and non-committal references are a substitute for Warner's obligations to properly meet and confer under the Local Rules.

We urge Warner to reconsider its improper rushed filing and to adhere to the Rules.
Plaintiff reserves all rights.

Marc

**EXHIBIT A**
**3**

ER 1667

On Wed, Feb 6, 2013 at 12:00 PM, Seto, Cassandra <cseto@omm.com> wrote:

Please see the email below, sent on behalf of Matt Kline.


\*          \*          \*


Keith,


This confirms that we spoke with you today concerning the motion for summary judgment DC will file this Friday in the *Siegel* cases.


You indicated that Ms. Larson is reserving "all contractual and declaratory relief arguments," but refused to explain what those arguments are or how they impact any specific Claim or Counterclaim addressed in the two draft proposed judgments that we sent you.


You also said that DC is required by Local Rule 7-3 to wait 10 days from today to file its motion for summary judgment. As I pointed out, this ignores that my partner, Dan Petrocelli, has had many substantive discussions with Marc Toberoff and Dick Kendall (who claimed to be speaking for Marc) about DC's motion since the Ninth Circuit's January 10, 2013, ruling. And as you know, we have repeatedly requested that you identify any specific objections you have to DC's motion -- including in Dan's January 28 e-mail below -- but you have steadfastly refused. Indeed, you would not even confirm the supposed defenses defendants would assert that your co-counsel shared with Dan. These types of games -- all of which are aimed at engendering delay and securing tactical advantage -- are improper, and we will show the Court. We will also apprise the courts of how you violated the District Court's Local Rules and misled the Ninth Circuit about your schedule, in filing the summary judgment motion you did this week in *Pacific Pictures*.


All rights are reserved,


Matt Kline


**EXHIBIT A**

**4**

**ER 1668**

**From:** Kline, Matthew
**Sent:** Tuesday, February 05, 2013 8:16 PM
**To:** Keith Adams
**Cc:** Marc Toberoff; David Harris; Pablo Arredondo; Petrocelli, Daniel; Seto, Cassandra; Richard Kendall

**Subject:** RE: Larson v. Warner Bros. Entm't Inc.

Keith: We'll speak to you at 11am tomorrow. We disagree with your comments below, and all of DC's rights are reserved. Matt

**From:** Keith Adams [mailto:kadams@toberoffandassociates.com]
**Sent:** Tuesday, February 05, 2013 6:41 PM
**To:** Kline, Matthew
**Cc:** Marc Toberoff; David Harris; Pablo Arredondo; Petrocelli, Daniel; Seto, Cassandra
**Subject:** Re: Larson v. Warner Bros. Entm't Inc.

Matt:

Dan's email, sent last Friday night, was the first time DC bothered to even inform Ms. Larson that it intended to bring a motion for summary judgment (previously Dan vaguely stated that DC intended to "move the Court to immediately enter judgment") and even then DC failed to even identify the claim or claims on which DC intended to move. Furthermore, while Dan stated that DC intends to move "immediately" after the mandate issues, that is improper under L.R. 7-3.

In fact, your e-mail yesterday was the first time that DC stated the claims that it intended to move on. This cavalier attitude as to DC's obligations under L.R. 7-3 are particularly disconcerting, given the repeated dilatory fuss and false objections that you have made in the *DC Comics* case regarding the exchange of meet and confer letters and subsequent conferences whenever Ms. Larson informed DC that it intended to bring a motion.

Here, even though you provided Ms. Larson yesterday with two conclusory proposed judgments for the Siegel Superman and Superboy cases, you continue to not inform her of the specific purported grounds for DC's summary judgment motion, as is required, so that Ms Larson's counsel can properly prepare for and conduct a constructive meet and confer, as contemplated by the Rules.

The Ninth Circuit clearly did not order the entry of judgment in DC's favor; it expressly remanded and "direct[ed]" the district judge to reconsider DC's third and fourth counterclaims in light of our holding." DC's claims, and defendants' defenses thereto, must therefore be litigated before any judgment could be entered in either side's favor.

We are available this Wednesday at 11:00 a.m., or this Thursday at 12:00 p.m., to meet and confer.

Keith

On Mon, Feb 4, 2013 at 1:45 PM, Kline, Matthew <<u>mkline@omm.com</u>> wrote:

Counsel,


We have not heard back from you on a time to meet and confer today or tomorrow.  When are you available?  As part of our meet and confer, although not required, we are providing you with drafts of the proposed judgments that DC will seek in the *Siegel* Superman and *Siegel* Superboy cases.


All rights reserved,


Matt Kline



**From:** Petrocelli, Daniel
**Sent:** Friday, February 01, 2013 5:27 PM
**To:** Marc Toberoff; Seto, Cassandra
**Cc:** Kline, Matthew; David Harris; Keith Adams; Pablo Arredondo; Richard Kendall
**Subject:** RE: Larson v. Warner Bros. Entm't Inc.


Marc,


We disagree on all counts and cannot countenance the delay you are seeking to engender.  We will be moving for summary judgment in the Siegel Superman and Superboy cases immediately after the mandate issues on the ground, as discussed with Dick and you in recent calls, that the Ninth Circuit decision in the Siegel case disposes of the entirety of both cases.  We would like to meet and confer with you on Monday or Tuesday, so please let me us know when you are available on those days.    Thanks.


All rights are reserved,


Dan

**EXHIBIT A**
**6**

ER 1670

**From:** Marc Toberoff [mailto:mtoberoff@toberoffandassociates.com]
**Sent:** Thursday, January 31, 2013 7:30 PM
**To:** Seto, Cassandra; Petrocelli, Daniel
**Cc:** Kline, Matthew; David Harris; Keith Adams; Pablo Arredondo
**Subject:** Re: Larson v. Warner Bros. Entm't Inc.


Dan:


Local Rule 7-3 requires that you discuss "the substance of the contemplated motion." Your e-mail is unclear as to both the nature of the motion (*e.g.*, is it a motion for summary judgment?), the claim or claims to which it applies and DC's grounds for the motion. Because it is unclear what motion defendants intend to file, defendants cannot meaningfully evaluate or discuss their position. Once DC clarifies its motion, we will of course be more than happy to provide our position.


Furthermore, I do not understand why you are e-mailing Mr. Kendall, Ms. Brill and Mr. Daum regarding the *Siegel* case, as neither they nor anyone at their firm represent any of the parties in the *Siegel* litigation.

Please note our new e-mail address.


I look forward to hearing from you.

Regards

Marc


On Mon, Jan 28, 2013 at 11:01 AM, Seto, Cassandra <cseto@omm.com> wrote:

Please see the email below sent on behalf of Dan Petrocelli.


\*        \*        \*        \*        \*


Marc and Dick:

**EXHIBIT A**
**7**

ER 1671

As I have mentioned to you, when the mandate issues in the *Siegel* case, we intend to immediately move the Court to enter judgment in favor of our clients in both the Superman and Superboy cases based on the Ninth Circuit's recent decision regarding the 2001 agreement between the parties. In our discussions, you have indicated you may have objections to entry of judgment. To avoid delay in addressing any such issues, please let us know if you intend to object to entry of judgment and, if so, please specifically identify your objections. We will then arrange a time to promptly meet and confer about them. We would appreciate your response no later than Thursday. Many thanks.

All of DC's rights are reserved.

Dan

**Cassandra L. Seto**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067
Telephone: 310.246.6703 | Facsimile: 310.246.6779

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

--
Marc Toberoff

Toberoff & Associates, P.C.

22337 Pacific Coast Highway, #348

Malibu, California 90256

(t) 310.246.3333

(f) 310.246.3101

toberoffandassociates.com

**EXHIBIT A**
**8**

ER 1672

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your records accordingly.

_____

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

--

Keith G. Adams

Toberoff & Associates, P.C.

22337 Pacific Coast Highway, #348

Malibu, California 90256

(t) 310.246.3333

(f) 310.246.3101

toberoffandassociates.com

_____

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your records accordingly.

_____

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**EXHIBIT A**
**9**

ER 1673

--
Marc Toberoff

Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101
toberoffandassociates.com

———————

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your records accordingly.

———————

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1    DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3    CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4    O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
5    Los Angeles, CA 90067-6035
     Telephone: (310) 553-6700
6    Facsimile: (310) 246-6779

7    Attorneys for DC Comics Parties

8                  UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   LAURA SIEGEL LARSON,                Case No. CV 04-8776 ODW (RZx)
     individually and as personal
12   representative of the ESTATE OF     **[PROPOSED] FINAL JUDGMENT
     JOANNE SIEGEL,                      IN *SIEGEL* SUPERBOY CASE**
13
                   Plaintiff,            The Hon. Otis D. Wright II
14
          v.
15
     TIME WARNER INC., WARNER
16   COMMUNICATIONS INC.,
     WARNER BROS. ENTERTAINMENT
17   INC., WARNER BROS. TELEVISION
     PRODUCTION INC., DC COMICS,
18   and DOES 1-10,

19                 Defendants and
                   Counterclaimants.
20

21

22

23

24

25

26

27

28

                                        [PROPOSED] FINAL JUDGMENT

ER 1675

**[PROPOSED] JUDGMENT**

1        On January 10, 2013, the United States Court of Appeals for the Ninth

2 Circuit reversed Judge Larson's March 26, 2008, partial summary judgment order

3 and held that, "as a matter of law," plaintiff Laura Siegel Larson (referred to herein

4 in her individual capacity and as personal representative of the Estate of Joanne

5 Siegel as "Larson") entered into a settlement agreement with defendants

6 (collectively, "DC") on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*,

7 Ninth Circuit Appeal No. 11-56034, Docket No. 70 at 3 (opinion attached as

8 Exhibit A). "Statements from the attorneys for both parties establish that the parties

9 had undertaken years of negotiations …, and that the letter" sent by Larson's

10 attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material

11 terms they had orally agreed to." *Id.* at 4. The Ninth Circuit directed this Court to

12 "reconsider DC's third and fourth counterclaims" in the related *Siegel* Superman

13 case—which mirror DC's Third and Fourth Counterclaims in this *Siegel* Superboy

14 case—"in light of our holding that the October 19, 2001, letter created an

15 agreement." *Id.* at 5-6.

16        Consistent with the Ninth Circuit's opinion and instructions on remand, *id.* at

17 5-6, this Court may now enter final judgment in DC's favor in two of three long-

18 running Superman cases presently before this Court: (1) the above-entitled "*Siegel*

19 Superboy" case, Case No. CV-04-8776; and (2) the related "*Siegel* Superman" case,

20 Case No. CV-04-8400 (addressed in a separate Final Judgment filed concurrently

21 herewith). In the parties' October 19, 2001, settlement agreement, Larson (and her

22 family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to

23 D.C. Comics." This complete transfer bars Larson's remaining claims in this case

24 and entitles DC to judgment on its Fourth Counterclaim in this case, which seeks a

25 declaration confirming the October 19, 2001, settlement agreement against Larson.

26 DC's remaining counterclaims are dismissed, without prejudice, as moot.

27 Therefore:

- 1 -           [PROPOSED] FINAL JUDGMENT

1     A.  Larson's Claims

2        IT IS ORDERED AND ADJUDGED that Larson's First Claim for Relief, for

3  "Copyright Infringement," is DENIED, and judgment is hereby entered in DC's

4  favor and against Larson on this claim. *See also* DN 151 at 62; 175 at 1; Sept. 17,

5  2007 Hr'g Tr. at 4:6-5:4, 27:21-22.

6        IT IS FURTHER ORDERED AND ADJUDGED that Larson's Second

7  Claim for Relief, for "Declaratory Relief re: Termination," is DENIED, and

8  judgment is hereby entered in DC's favor and against Larson on this claim. *See*

9  *also* DN 170, 560.

10        IT IS FURTHER ORDERED AND ADJUDGED that Larson's Third Claim

11  for Relief, for "Violation of the Lanham Act § 43(a)(1)(B)," is DENIED, and

12  judgment is hereby entered in DC's favor and against Larson on this claim. *See*

13  *also* DN 174, 560.

14        IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fourth Claim

15  for Relief, for "Violation of California Business and Professions Code, §§ 17200 *et*

16  *seq.*," is DENIED, and judgment is hereby entered in DC's favor and against

17  Larson on this claim. *See also* DN 174, 560.

18        IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fifth Claim

19  for Relief, for "Injunctive Relief," is DENIED, and judgment is hereby entered in

20  DC's favor and against Larson on this claim. *See also* DN 174, 560.

21     B.  DC's Counterclaims

22        IT IS ORDERED AND ADJUDGED that DC's Fourth Counterclaim, for

23  "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED,

24  and judgment is hereby entered in DC's favor and against Larson on this

25  counterclaim.  The Court declares that, under the parties' October 19, 2001,

26  settlement agreement, Larson and her family transferred to DC, worldwide and in

27  perpetuity, any and all rights, title, and interest, including all copyright interests,

28  which they may have in Superman, Superboy, and Spectre.

**EXHIBIT A**                    **ER 1677**
**13**

1    IT IS ACCORDINGLY FURTHER ORDERED, ADJUDGED, and

2    DECREED that DC's First, Second, Third, Fifth, and Sixth Counterclaims are

3    DISMISSED, WITHOUT PREJUDICE, AS MOOT.

4    IT IS SO ORDERED.

5    Dated: _____    _____

6                                Honorable Otis D. Wright, II
                                 Judge, United States District Court

OMM_US:71285795

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -                          [PROPOSED] FINAL JUDGMENT

**EXHIBIT A**
**14**

ER 1678

DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for DC Comics Parties

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | Case No. CV 04-8400 ODW (RZx) |
| Plaintiff, | **[PROPOSED] FINAL JUDGMENT IN *SIEGEL* SUPERMAN CASE** |
| v. | The Hon. Otis D. Wright II |
| WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, | |
| Defendants and Counterclaimants. | |

[PROPOSED] FINAL JUDGMENT

1     **[PROPOSED] JUDGMENT**

2          On January 10, 2013, the United States Court of Appeals for the Ninth

3     Circuit reversed Judge Larson's March 26, 2008, partial summary judgment order

4     and held that, "as a matter of law," plaintiff Laura Siegel Larson (referred to herein

5     in her individual capacity and as personal representative of the Estate of Joanne

6     Siegel as "Larson") entered into a settlement agreement with defendants

7     (collectively, "DC") on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*,

8     Ninth Circuit Appeal No. 11-56034, Docket No. 70 at 3 (opinion attached as

9     Exhibit A). "Statements from the attorneys for both parties establish that the parties

10    had undertaken years of negotiations …, and that the letter" sent by Larson's

11    attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material

12    terms they had orally agreed to." *Id.* at 4.  The Ninth Circuit directed this Court to

13    "reconsider DC's third and fourth counterclaims in light of our holding that the

14    October 19, 2001, letter created an agreement." *Id.* at 5-6.

15          Consistent with the Ninth Circuit's opinion and instructions on remand, *id.* at

16    5-6, this Court may now enter final judgment in DC's favor in two of three long-

17    running Superman cases presently before this Court:  (1) the above-entitled "*Siegel*

18    Superman" case, Case No. CV-04-8400; and (2) the related "*Siegel* Superboy" case,

19    Case No. CV-04-8776 (addressed in a separate Final Judgment filed concurrently

20    herewith).  In the parties' October 19, 2001, settlement agreement, Larson (and her

21    family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to

22    D.C. Comics."  This complete transfer bars Larson's remaining claims in this case

23    and entitles DC to judgment on its Fourth Counterclaim in this case, which seeks a

24    declaration confirming the October 19, 2001, settlement agreement against Larson.

25    DC's remaining counterclaims are dismissed, without prejudice, as moot.

26    Therefore:

27

28

[PROPOSED] FINAL JUDGMENT

A.  Larson's Claims

IT IS ORDERED AND ADJUDGED that Larson's First Claim for Relief, for "Declaratory Relief re: Termination," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Second Claim for Relief, for "Declaratory Relief re: Profits from Recaptured Copyrights," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Third Claim for Relief, for "Declaratory Relief re: Use of the 'Superman' Crest," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fourth Claim for Relief, for "Accounting for Profits," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

B.  DC's Counterclaims

IT IS ORDERED AND ADJUDGED that DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED, and judgment is hereby entered in DC's favor and against Larson on this counterclaim.  The Court declares that, under the parties' October 19, 2001, settlement agreement, Larson and her family transferred to DC, worldwide and in perpetuity, any and all rights, title, and interest, including all copyright interests, which they may have in Superman, Superboy, and Spectre.

IT IS ACCORDINGLY FURTHER ORDERED, ADJUDGED, and DECREED that DC's First, Second, Third, Fifth, and Sixth Counterclaims are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

[PROPOSED] FINAL JUDGMENT

**EXHIBIT A**

**17**

ER 1681

1      IT IS SO ORDERED.

2  Dated: _____

                               _____

3                                     Honorable Otis D. Wright, II
                                 Judge, United States District Court

4  OMM_US:71247304

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -          [PROPOSED] FINAL JUDGMENT

**EXHIBIT A**
**18**

ER 1682

# EXHIBIT B

# GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD S. PASSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1988)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

## VIA TELECOPIER and U.S. MAIL

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

     Re:   Siegel Family – "Superman"

Dear John:

This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

A.   Definitions.

    1.   "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

    2.   "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B.   Financial Terms.

    1.   A non-returnable, but recoupable advance of $2,000,000.

236172.1

EXHIBIT 20
FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE 10-7-06
WITNESS Marks

GTRB 0302

**EXHIBIT B**
19

ER 1684

## GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2:   A non-returnable, non-recoupable signing bonus of 1,000,000.

3.   D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.   There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5.   A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6.   A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

GTRB 0303

**EXHIBIT B**
**20**

ER 1685

**GANG, TYRE, RAMER & BROWN, INC.**

John A. Schulman, Esq.
October 19, 2001
Page 3

　　　　royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.　　Recoupment begins as of January 1, 2000.

8.　　During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.　　Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five-year period is after the U.S. copyright expires.

C.　Other Terms.

1.　　The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.　　If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

**GTRB 0304**

**EXHIBIT B**
**21**

**ER 1686**

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3. Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4. D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5. The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6. In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7. Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8. D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

GTRB 0305

**EXHIBIT B**
22

ER 1687

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 5

9. DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10. Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11. At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12. The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14. Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

GTRB 0306

**EXHIBIT B**
23

ER 1688

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:  Joanne Siegel
Laura Siegel Larson
Bruce Ramer
Don Bulson

236172.1

GTRB 0307

**EXHIBIT B**

**24**

ER 1689

GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW
132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212
PHONE (310) 777-4900
TELECOPIER (310) 777-4801

TELECOPIER TRANSMITTAL SHEET

Date: October 19, 2001

PLEASE DELIVER THE FOLLOWING MATERIAL AS SOON AS POSSIBLE TO:

Recipient               Telecopier No.
John Schulman          (818) 954-4768

From: Kevin S. Marks

Re: Siegel Family - "Superman"

Number of pages transmitted (including this page): 6

COMMENTS:

IF DOCUMENT IS NOT RECEIVED PROPERLY,
PLEASE CALL (310) 777-4900 IMMEDIATELY.
THANK YOU.

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

## TRANSMISSION REPORT

## THIS DOCUMENT WAS CONFIRMED
## (REDUCED SAMPLE ABOVE - SEE DETAILS BELOW)

**\*\* COUNT \*\***
TOTAL PAGES SCANNED    :   7
TOTAL PAGES CONFIRMED  :   7

**\*\*\* SEND \*\*\***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|-----|----------------|------------|----------|--------|------|---------|
| 1 | 818 954 4768 | 10-19- 1 6:43PM | 2'35" | 7/ 7 | EC | COMPLETED |
| | | | | | | 12000 |

TOTAL    0:02'35"   7

NOTE:
No. : OPERATION NUMBER   48 : 4800BPS SELECTED   EC : ERROR CORRECT    G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE   SF : STORE & FORWARD   RI : RELAY INITIATE   RS : RELAY STATION
MB : SEND TO MAILBOX    PG : POLLING A REMOTE  MP : MULTI-POLLING    RM : RECEIVE TO MEMORY

GTRB 0308

ER 1690

# EXHIBIT C

Case 2:13-56243 02/25/2014 ID: 8992563 DktEntry: 22-3 Page 286 of 423 Page ID
#:15222
Case 2:04-cv-08400-ODW-RZ Document 702-2 Filed 02/07/13 Page 27 of 47 Page ID
Case 2:10-cv-03633-ODW-RZ Document 468 Filed 08/06/12 Page 1 of 17 Page ID
#:28836

DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Attorneys for Plaintiff DC Comics

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>        Plaintiff,<br><br>      v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**PLAINTIFF DC COMICS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST AND THIRD CLAIMS FOR RELIEF**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:  Aug. 20, 2012<br>**Hearing Time**:  1:30 p.m.<br>**Courtroom**:    11 |

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT C**
26

1    5. Without disputing any of the case law on which DC relies, defendants say

2 DC's Third Claim is time-barred. But, in so doing, they concede that, if the claim

3 is properly based on the 2008 consent agreement (and it is), *or* if the continuing-

4 harm or delayed-discovery doctrines apply (and they do), the claim was timely

5 filed. Opp. 24. As for defendants' claims that the illegal Pacific Pictures contracts

6 were cancelled, those irrelevant, fact-bound contentions, (SUF 85, 88, 31 & DC's

7 Responses), ignore that defendants signed another Pacific Pictures contract in *2011*,

8 well within the statutory period. While Pacific Pictures purported to quitclaim its

9 Shuster copyrights in this 2011 contract, this ignores that Pacific Pictures assigned

10 all of its Shuster rights to defendant IP Worldwide in 2002, which in turn assigned

11 those rights to defendant IPW. Neither IP Worldwide nor IPW is a party to the

12 2011 Pacific Pictures contract. SUF 100-01. These illegal agreements remain, and

13 defendants engaged in continuing misconduct well within the limitations period.

14 **III.    DEFENDANTS WAIVED THEIR AFFIRMATIVE DEFENSES.**

15    Although defendants' answer asserts a series of affirmative defenses to DC's

16 First and Third Claims, their opposition does not move on or prove them. Circuit

17 authority, contrary to defendants' two district court cases, Opp. 25, holds that their

18 "failure to raise [their] affirmative defense[s] … in opposition to … [DC's] motion

19 constitute[s] an abandonment of the defense[s]." *Diversey Lever, Inc. v. Ecolab,*

20 *Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999); *UMWA 1974 Pension v. Pittston Co.*,

21 984 F.2d 469, 478 (D.C. Cir. 1993); Decl. of C. Seto ¶ 2 (meet-and-confer record).

22    Dated: August 6, 2012            Respectfully submitted,

23                                     By: /s/ Daniel M. Petrocelli

24                                         Daniel M. Petrocelli

25

---

26 him, "[o]ne cannot know with certainty what the consent agreement means without seeing" it, Docket No. 209 at 8:1-2, and, without looking at the contract, accepted

27 Toberoff's representations about it contents. Since that ruling, defendants were deposed, and their admissions about the 2008 contract show it unlawfully impedes

28 DC's negotiation rights. SUF 42-43. The Court should review the contract itself.

- 12 -

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT C**
**27**

**ER 1693**

Case: 13-56243  02/25/2014   ID: 8992563   DktEntry: 22-7   Page 288 of 323

# EXHIBIT D

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>vs.<br><br>PACIFIC PICTURES CORP., *et al.*<br><br>                    Defendants. | CASE NO. CV 10-3633 ODW (RZx)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [458] AND DENYING DEFENDANTS' CROSS-MOTION [478] |

## I.    INTRODUCTION

DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed interest in the Superman copyrights after certain heirs of Joseph Shuster, the first illustrator of Superman, served DC with a copyright termination notice purporting to recapture certain early Superman works as of October 26, 2013.

DC now moves for partial summary judgment as to the First and Third Claims. DC's First Claim contests the validity of the termination notice at issue here, and its Third Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and his entertainment companies and business partners engineered in alleged violation of DC's rights under the Copyright Act.  (Mot. at 1 ("There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.").)

/ / /

## II.   FACTS

Semantic quibbles aside, the following facts are undisputed.  On March 1, 1938, Jerome Siegel and Joseph Shuster assigned to DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)  "Action Comics #1 ('AC#1'), published on April 18, 1938, with a cover date of June 1938, featured an adapted version of Siegel and Shuster's Superman story." (UF 4.) Defendants purport to, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.) All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements. Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone.  (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.").)  In 1947, Siegel and Shuster sued DC in New York to invalidate the 1938 assignment.  The court found that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster acknowledged that the 1938 assignment granted DC all rights in Superman.  (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works. Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. (UF 8.) Defendants argue DC does not disclose its financial assumptions for its calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500." (Id.)

/ / /

2

**ER 1696**

Case: 13-56243 02/25/2014 ID: 8992563 DktEntry: 22-3 Page: 291 of 423
Case 2:04-cv-08400-ODW-RZ Document 702-2 Filed 02/07/13 Page 32 of 47 Page ID #:15227
Case 2:10-cv-03633-ODW-RZ Document 507 Filed 10/17/12 Page 3 of 18 Page ID #:35086

1    DC has voluntarily increased the annual payments; made periodic cost-of-living

2    adjustments; given special bonuses; and paid to have Siegel, Shuster, and their families

3    travel to Superman-related events. (UF 9.) All told, the Siegels and Shusters have been

4    paid over $4 million under the 1975 agreement, not including medical benefits or bonuses.

5    (UF 10.) Shuster passed away on July 30, 1992. (UF 12.)

6        Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole

7    beneficiary and executrix of his estate. (UF 13.) Defendants dispute this, arguing the

8    statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary

9    in the event Jean predeceased him and omits that the will states: 'In the event that my sister

10   is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint

11   Mark Warren Peary to act as executor.'" (Opp'n UF.) On August 17, 1992, Jean filed an

12   affidavit in California state court identifying herself as Shuster's "successor" and sole heir

13   and requesting that certain property "be paid, delivered or transferred to her." (UF 14.)

14       Four days after filing her affidavit in state court, Jean wrote to DC, identifying

15   herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay Shuster's "final debts

16   and expenses." (UF 15.) Defendants attempt, but again fail to dispute this fact by pointing

17   out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe

18   Shuster to pay his final debts and expenses would be warmly appreciated." (Opp'n UF.)

19   DC offered to cover Joe's debts and increase survivor payments to his brother Frank from

20   $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.)

21       On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President,

22   Paul Levitz, stating he was "extremely pleased" with the increased payments and asking,

23   after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean,

24   who would "send [Frank] whatever money [he] wanted as a gift which would not be

25   taxable to [him]." Frank asked if he and Jean could meet with Levitz in New York to

26   discuss the issue. (UF 17.) Defendants' sole objection to this fact is that it misleadingly

27   fails to include subsequent correspondence. (Opp'n UF.)

28   ///

**EXHIBIT D**
**30**

ER 1697

Paul Levitz dealt with many authors and heirs during his decades as president of DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.) The parties executed an agreement on October 2, 1992 under which DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19; Petrocelli Decl. Exh. 24.)

Over the next decade, DC maintained good relations with the Shusters, and Jean and Paul Levitz corresponded regularly. In the close-to-60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required. (UF 20.) Defendants contend that, over this decade, Jean expressed displeasure at the amount and form of her payments and requested changes. (Opp'n UF.) In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright," but asked for an increase in payments "plus a yearly increment to account for inflation." (UF 21.) Defendants contend "Jean stated that at the present time 'Frank and I are not planning to reclaim the Superman copyright.' [And]: 'We believe we have a right to expect that you will be fair with us as well and will grant our request for increased payment. We will stick to our bargain which we signed, dated as of October 1, 1992'" (Opp'n UF.)

In 1999, Congress amended the copyright statute to grant additional statutory heirs termination rights under 17 U.S.C. § 304(d). Upon learning that Jerry Siegel's heirs had served a copyright termination notice on DC, Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for Superman. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus for this year as you had done many times in the past.

(UF 22.)

4

Case: 13-56243 03/25/2014 ID: 8002563 DktEntry: 22-3 Page: 293 of 323
Case 2:04-cv-08400-ODW-RZ Document 702-2 Filed 02/07/13 Page 34 of 47 Page ID #:15229
Case 2:10-cv-03633-ODW-RZ Document 507 Filed 10/17/12 Page 5 of 18 Page ID #:35088

In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.) In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal right to make such requests, but would pay her a bonus anyway, for which she thanked DC. (UF 24.) Jean's 50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound mind when she sent these letters to DC. (UF 26.) Mark Peary, Jean's doctor, and Jean's daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying." (UF 27.) On November 7, 2003, Mark Warren Peary (as substitute executor of the Shuster estate) served on DC a notice of termination of the prior grants of Shuster's Superman copyrights. (*See* Petrocelli Decl. Exh. 37.) Other facts shall be discussed as necessary.

## III. DISCUSSION

As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice [is] invalid." (First Amended Complaint "FAC", Docket No. 49 ¶¶ 106–34. DC argues it is entitled to summary judgment on three grounds: (1) "The 1992 Agreement Bars the Shusters from Pursuing Termination[;]" (2) "The Shusters Lack the Majority Interest Necessary to Terminate" because they assigned 50% of their putative rights to Pacific Pictures; and (3) "There Is No Statutory Basis for the Shusters to Terminate, given that Joe Shuster had no statutory heir under the Copyright Act when he died." (Mot. at 9.) "DC's Third Claim, pled in the alternative, alleges that the Pacific Pictures Agreements and 2008 consent agreement improperly restrict the Shuster heirs' ability to enter into agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.)

### *1992 Agreement*

The Copyright Act provides a termination right for the prior grant of a copyright transfer or license *only if* the grant was made *prior* to January 1, 1978. 17 U.S.C. § 304(d). Our inquiry begins, then, with whether the 1992 Agreement superseded "Joseph Shuster's key 1938 Grant and subsequent Superman grants[,]" as Defendants put it. (Opp'n at 12.)

**EXHIBIT D**
**32**

**ER 1699**

DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank Shuster – Joseph's siblings – bars the Shusters from exercising their statutory termination rights. (Mot. at 10.) That agreement provides, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement *fully settles all claims* to any payments *or* other rights *or* remedies which you may have under *any other agreement or otherwise*, whether now *or* hereafter existing *regarding any copyrights*, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. *In any event*, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

(SUF 19; Petrocelli Decl. Exh. 24 (emphasis added).)

As Defendants argued earlier in this litigation, New York law governs the 1992 Agreement. (*See* Docket No. 191 at 4 n.6 (applying choice of law principles and concluding "New York law clearly applies"); Docket No. 333 at 21; *see also* Reply at 2 (Defendants agree, "'whether [an] Agreement terminated and superseded [another],' is determined by governing state law – in this case, as in *Steinbeck*, 'New York law'" (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008))).)

Under New York law, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (N.Y. App. Div. 1994); *see also Northville Indus. Corp. v. Fort Neck Oil Term. Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 1984) ("[W]here [ ] parties have clearly expressed . . . their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement."). The pertinent inquiry is thus "whether the subsequent agreement, . . . in whatever form it may be, is[, as] a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 171 N.Y.S.2d 194, 199 (N.Y. App. Div. 1958) (emphasis added).

Defendants argue "the language of the 1992 Agreement clearly demonstrates that it was not a revocation or re-grant of Joe Shuster's prior Superman copyright grants and ends

6

1  the analysis." (Opp'n at 15.)  The Court does not share Defendants' view of clarity.  With

2  a broad release and all-encompassing language, it would here appear that the 1992

3  Agreement does indeed aim to supersede all prior agreements between the parties.  (*See*

4  SUF 19 ("[T]his agreement *fully settles all claims* to *any payments or other rights or*

5  *remedies* which you *may have* under *any other agreement or otherwise,whet her now or*

6  *hereafter existing* regarding *any copyrights . . . in any and all work* created *in whole or in*

7  *part by your brother, Joseph Shuster.*" (emphasis added)).)  Just as it says, the 1992

8  Agreement "fully settles" all obligations under any and all agreements.

9       As Defendants themselves acknowledge, "[w]here, as here, a contract's terms are

10  unambiguous, the 'intent of the parties must be determined from their final writing and no

11  parol evidence or extrinsic evidence is admissible.'"  (Opp'n at 15 (quoting *Int'l Klafter*

12  *Co., Inc. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989))); *see also Duane Reade, Inc.*

13  *v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) ("Whether a contract

14  is ambiguous is a threshold question of law . . . [for] the court.").

15       Like Defendants, the Court finds no ambiguity in the parties' agreement.  Unlike

16  Defendants, however, the Court finds that the 1992 Agreement does in fact settle all prior

17  agreements.  As Black's Law Dictionary confirms, "full settlement" is "a settlement and

18  release of all pending claims between the parties."  Black's Law Dictionary 1497 (9th ed.

19  2009).  The 1992 Agreement extends such release to "all claims to any payments or other

20  rights or remedies which [the Shusters] may have under any other agreement or otherwise,

21  whether now or hereafter existing regarding any copyrights . . . ."  (SUF 19.)  Accordingly,

22  the 1992 Agreement not only settled and released all "claims . . . rights [and] remedies"

23  concerning the Shuster copyrights under all prior agreements, but it also extended the

24  release to such rights and remedies as might exist "otherwise."  (Id.)

25       Immediately after so settling all rights, the 1992 Agreement expressly and

26  unambiguously provides: "In any event, you [Shuster's heir] now grant to us any *such*

27  *rights* and release us, our licensees and all others acting with our permission, and covenant

28  not to assert any claim of right, by suit or otherwise, *with respect to the above*, now and

7

1  forever." (SUF 19; Petrocelli Decl., Exh. 24 (emphasis added).)

2      Plainly, this subsequent grant deals with the same subject matter settled immediately

3  above (DC's copyright interests). In other words, the 1992 Agreement first settled all

4  claims, and then granted DC "such rights" as were just settled, essentially revoking and re-

5  granting all copyright agreements and interest. As New York law recognizes, "parties to

6  an agreement can mutually agree to terminate it by expressly assenting to its rescission

7  while simultaneously entering into a new agreement dealing with the same subject matter."

8  *Steinbeck*, 537 F.3d at 200 (citation omitted); *see also Milne v. Stephen Slesinger, Inc.*, 430

9  F.3d 1036, 1046 (9th Cir. 2005) (1983 agreement superseding pre-1978 grant "is not

10 subject to termination under section 304(d) because it was not 'executed before January 1,

11 1978,' as the statute expressly requires").

12     *Milne* involved the rights to Winnie the Pooh. In 1930, Pooh's author, A.A. Milne,

13 granted his copyright interest in Winnie the Pooh to SSI in exchange for a share of future

14 royalties. 430 F.3d at 1040. In 1983, A.A.'s son, Christopher, re-granted those same rights

15 to SSI and agreed not to pursue termination in exchange for increased royalties.

16 Subsequently, Christopher's daughter Clare attempted to terminate A.A.'s 1930 grant to

17 SSI. The Ninth Circuit held that her father's 1983 contract revoked all pre-1978 grants

18 which might otherwise have been terminable. *Id.* As Defendants note, "[i]n lieu of

19 statutory termination, Christopher agreed to the contractual 'revocation of the [1930]

20 agreement[] in favor of the new agreement, followed by the re-granting (on the same page)

21 of the rights in the Pooh works to SSI.'" (Opp'n at 9 ("*Milne* held there was no longer a

22 1930 grant to terminate, because the 1983 contract had expressly *revoked* it and expressly

23 *re-granted* the copyrights to SSI." (citation omitted)).)

24     Relying in part on *Milne*, *Steinbeck* reached a similar conclusion. In 1938, John

25 Steinbeck granted the copyrights in his most popular works to his publisher. After John's

26 death, his termination interest passed by statute to his widow Elaine and his children.

27 *Steinbeck*, 537 F.3d at 196, 203. Though Elaine did not hold the majority share of John's

28 termination interest in 1994 necessary to terminate, as successor by will to John's

8

copyrights, she entered into an agreement with the publisher superseding the 1938 agreement in exchange for increased royalties and other benefits.   John's children subsequently served a notice to terminate the 1938 grant, arguing Elaine's 1994 agreement was an "agreement to the contrary" because it had the effect of depriving them of their termination rights.  Finding against the children, the Second Circuit found it improper to read the prohibition on "'agreement[s] to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right." *Id.* at 202 (noting heirs can "threaten (or . . . make good on a threat) to exercise termination rights and extract more favorable terms from early grants of an author's copyright," but they do not have "more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them.").

Pointing in opposition to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike [that] in *Milne*, did not '*expressly* revoke the earlier … assignments.'" (Opp'n at 11 (quoting *Mewborn*, 532 F3d at 989).)   In *Mewborn*, the Ninth Circuit upheld a termination notice regarding the novel "Lassie Come Home."   In 1976, the author's daughter, Mewborn, assigned her share of Lassie rights to the publisher. *Id.* at 980.  In 1978, she signed a second contract, which purported to assign additional copyrights. *Id.* at 981.  In 1996, Mewborn served a termination notice of her 1976 grant.  The publisher sued, claiming the 1978 grant "superseded" the 1976 grant and cannot be terminated. Finding *Milne* inapplicable, the Ninth Circuit upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at 989.

Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its decision on the lack of an express revocation of earlier agreements.  *See id.* at 989 ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer Mewborn's termination right as to the 1976 Assignment . . . , the district court improperly concluded that the 1978 Assignment included a grant of Mewborn's termination right."

**EXHIBIT D**
**36**

**ER 1703**

Case: 13-56243  02/25/2014  ID: 8992563  DktEntry: 22-3  Page: 298 of 323
Case 2:04-cv-08400-ODW-RZ  Document 702-2  Filed 02/07/13  Page 39 of 47  Page ID #:15234
Case 2:10-cv-03633-ODW-RZ  Document 507  Filed 10/17/12  Page 10 of 18  Page ID #:35093

1  (emphasis added)). Rather than revoke and supersede prior agreements, the Ninth Circuit

2  found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the

3  additional enumerated rights that Mewborn had not assigned in 1976." *Id.*

4    Such is not the case here. The broad and all-encompassing language of the 1992

5  Agreement unmistakably operates to supersede all prior grants. (*See* Petrocelli Decl. Exh.

6  24.) Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to"

7  those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same

8  subject matter as the parties' earlier agreements, settling and displacing "all claims . . . .

9  under any agreement" "or otherwise" related to "any and all" works "created in whole or

10  in part by . . . Joseph Shuster." (UF 19.) Unlike the heirs in *Mewborn*, moreover, Jean and

11  Frank were aware of the Copyright Act's termination rights when they bargained for and

12  entered into the 1992 Agreement. (*See* UF 17, 21, 22.) As DC points out, "the fact that

13  Jean and Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows

14  that *Mewborn*'s concerns about [the heirs'] ignorance are inapt here." (Mot. at 17.)

15    Defendants insist "the [1992] agreement does not even mention Superman or Joseph

16  Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.) Surely

17  Defendants recognize that "any and all work created in whole or in part by . . . Joseph

18  Shuster" necessarily includes his most famous creation, Superman. And, just as clear, once

19  a party seeks to supersede all prior agreements, that party need not specifically list every

20  superseded agreement, lest that party forget one such agreement and thus leave open the

21  door for subsequent disputes. Indeed, Defendants' own expansive language that the 1992

22  Agreement does not mention "Joseph Shuster's key 1938 Grant *and subsequent Superman*

23  *grants*" counsels in favor of all-encompassing language.

24    It bears noting here that, as one New York court put it, "while the question of

25  whether a substituted agreement effects a discharge of a prior agreement constitutes a

26  triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact

27  does not arise when the opponent offers no evidence as to the parties' intent in making the

28  agreement." *Callanan Indus., Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712

**EXHIBIT D**
**37**

**ER 1704**

Case 2:04-cv-08400-ODW-RZ   Document 702-2   Filed 02/07/13   Page 40 of 47   Page ID
#:15235
Case 2:10-cv-03633-ODW-RZ   Document 507   Filed 10/17/12   Page 11 of 18   Page ID
#:35094

(N.Y. App. Div. 1986) (citations omitted).

As in *Callanan*, although Defendants have alleged in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, they have offered no evidence in support of that conclusion. Nor, indeed, have Defendants even controverted the facts alleged in Plaintiff's moving papers with anything other than "patently insufficient" general denials. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (explicating the parties' relative burdens on summary judgment).

To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong. As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement (along with Frank) which renegotiated the terms of the parties' prior agreements to her and Frank's benefit. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Shuster's original grants of his copyrights. As in *Milne*, Defendants "present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights." *Milne*, 430 F.3d at 1046–47 ("Certainly with regard to [*Milne*], [the heir's] concerns are unfounded. The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades.").

Similarly here, the 1992 Agreement came about several years "after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act . . . ." *Id.* Joseph Shuster, who himself passed away in 1992, never terminated his prior grants of the Superman copyrights to DC. And, by entering into the 1992 Agreement – which increased Frank and Jean's payments – the heirs essentially struck a deal that binds

11

Case 2:13-cv-02415-DWM/2014 ID: 8992563  DktEntry: 22-3  Page 300 of 423 Page ID
#:15236
Case 2:10-cv-03633-ODW-RZ  Document 507  Filed 10/17/12  Page 12 of 18  Page ID
#:35095

1   all other heirs.  *See Steinbeck*, 537 F.3d at 202. ("Once the termination right is

2   extinguished, it is extinguished with respect to all parties holding a termination interest,

3   whether or not they agreed to its exercise.").[1]

4       Defendants next argue that an author or his estate may exercise termination rights

5   "notwithstanding any agreement to the contrary . . . . 17 U.S.C. § 304(c)(5)." (Opp'n at

6   8 ("Thus, any agreement that purports to waive, settle or limit the termination right is

7   unenforceable.").)  Such argument was previously considered and rejected in *Steinbeck*:

8           We do not read the phrase 'agreement to the contrary' so broadly that it would
            include any agreement that has the effect of eliminating a termination right.
9           To do so would negate the effect of other provisions of the Copyright Act that
            explicitly contemplate the loss of termination rights. . . . Moreover,
10          the 1994 Agreement did not divest the Steinbeck Descendants of any
            termination right under section 304(d) when the parties entered into that
11          agreement.  In 1994, only 17 U.S.C. § 304(c) provided a termination
            right-section 304(d) would not become effective for another four years. It is
12          undisputed that the Steinbeck Descendants could not have exercised their
            termination rights in 1994 because they lacked more than one-half of the
13          author's termination interest. As of 1994, then, the agreement . . . did not
            deprive the Steinbeck Descendants of any rights they could have realized at
14          that time. None of the parties could have contemplated that Congress would
            create a second termination right four years later. Had Elaine Steinbeck not
15          entered into the 1994 Agreement, the section 304(c) termination right would
            have expired, and Penguin would have been bound only by the 1938
16          Agreement for the duration of the copyright terms absent (as ultimately
            happened) Congressional action. *We cannot see how the 1994 Agreement*
17          *could be an 'agreement to the contrary' solely because it had the effect of*
            *eliminating termination rights that did not yet exist.*
18

19  *Steinbeck*, 537 F.3d at 202–03 (emphasis added).

20      The same holds true here.  In 1992, when Joseph Shuster passed away and his heirs

21  entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody

22  else, held a termination right . . . ." (Opp'n at 16.)  As of 1992, then, "the agreement

23  entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could

24  have realized at that time." *Steinbeck*, 537 F.3d at 203.  Nor, of course, could the parties

25

26  ──────────────

27  [1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension
    from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding
28  Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

12

have contemplated that Congress would create a second termination right six years later. In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist." *Id.*

Defendants contend "DC's motion is defective [because] it fails to address most of Defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories." (Opp'n at 2.) The Court disagrees. It is not Plaintiff's duty to disprove Defendants' affirmative defenses, but rather, it is Defendants who bear the burden of proving the applicability of their affirmative defenses. *See, e.g.*, *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of proof at summary judgment with respect to affirmative defenses); *c.f. Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F. Supp. 2d 1019, 1023–24 (W.D. Wash. 2003) ("Since the affirmative defense of obviousness is Defendant's burden, by failing to challenge the issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

In sum, the Court finds that the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights, superseded and replaced all prior grants of the Superman copyrights. The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 grant, it is not subject to termination under 17 U.S.C. § 304(d).

### *Majority Interest*

Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who . . . own and are entitled to exercise a total of more than one-half of [an] author's termination interest" and "shall be signed by the [requisite] number and proportion of the owners." (Mot. at 18 (quoting 17 U.S.C. §§ 304(d)(1), (c)(1)–(4))); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).

13

DC contends "[a]ccording to the Shuster heirs' written contracts and deposition admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate served the [Termination] Notice." (Mot. at 18.) In 2001, after all, the Shusters had "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc Toberoff. (UF 31.) In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in 'Superman' pursuant to Section 304(d) of the U.S. Copyright Law." (UF 32.) Mark Warren Peary even admitted under oath that he understood when he signed the agreement "that all of [ ] Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says." (UF 33.)

Defendants contend "copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to anyone prior to the service of a termination notice, and can be transferred only to the grantee [i.e., DC] or its successor before 'the effective date of the termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. § 304(c)(6)(D)).) Thus, argue Defendants, "as a pure matter of law, the 2001/2003 [Pacific Pictures Corporation] PPC Agreements – pre-dating both the effective date and the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster Termination." (Opp'n at 18.)

DC argues Defendants must be held accountable for entering into these agreements, notwithstanding their illegality. (Reply at 8 ("This illegality defense fails for two reasons.").) First, although defendants say the Pacific Pictures contracts "did not transfer the prospective copyrights to be recovered by the Shuster Termination," Peary testified under oath, and without any objection, that the 2001 contract "transferr[ed] and assign[ed] to the venture" "all of the Joe Shuster rights, termination rights, to the extent they existed . . . ." (Reply at 8 (citations omitted).) "The 2003 agreement reaffirmed the 2001 Agreement [and] [t]hese admissions and facts are fatal to defendants' defense." (Id.)

While the Court finds problematic Defendants' conduct – especially their failure to inform the copyright office of agreements which they themselves believed would affect

14

ER 1708

Case: 13-56243 02/25/2014 ID: 8992563 DktEntry: 22-3 Page: 303 of 323
Case 2:04-cv-08400-ODW-RZ Document 702-2 Filed 02/07/13 Page 44 of 47 Page ID #:15239
Case 2:10-cv-03633-ODW-RZ Document 507 Filed 10/17/12 Page 15 of 18 Page ID #:35098

ownership of the subject copyrights – these agreements do not alter the fact that the "right to serve the Shuster Termination could not have been transferred to PPC." (Opp'n at 18 ("No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4).").) Thus, although Defendants may have believed that their contracts transferred the Shuster heirs' termination rights, those agreements did not and, indeed, could not have done so.

Second, DC argues Defendants fail "to address the public-policy rule that they may not assert the illegality of their own contracts as a defense." (Reply at 8 ("Like a swindler who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal to avoid liabilities they create.").) While that may be so, the Court does not believe that estoppel is applicable here. In fact, were the Court to hold Defendants to their contracts (and find they lacked the majority interest necessary to terminate), it would essentially rewrite copyright law, allowing parties to traffic in future rights. *See Milne*, 430 F.3d at 1047 (law "prohibit[s] a new grant of rights terminated by statute until after the effective date of termination – to avoid trafficking in future interests" by third parties). The Court thus finds the agreements did not transfer ownership of the subject copyrights, and that Defendants retained the requisite majority share.

### *Statutory Right to Terminate*

The 1998 Copyright Term Extension Act allows an "author's executor" to terminate when the "[t]ermination rights provided for in subsection (c) have expired on or before the effective date of the [CTEA]" – October 27, 1998 – and the author "has not previously exercised such termination right." (Mot. at 21 (quoting 17 U.S.C. § 304(d)) ("The Shuster Estate – formed by Peary, as its executor, in 2003 – relies on this provision to terminate, but § 304(d) has no application here.").) DC argues "[b]y its plain language, § 304(d) applies only where the window for exercising a termination right under the 1976 Copyright Act opened and closed – i.e., 'expired' – and an author or statutory heir failed to terminate during that window. It does not apply where [as here] an author died while the window

15

1    was open without terminating, without leaving a statutory heir, and when his sole heir,

2    Jean, fully resolved his estate in 1992." (Id. at 22.)

3       Given the Court's finding that the 1992 Agreement bars termination, as well as the

4    perfunctory briefing of the issue, the Court will not explore the matter at this time.

5      ***Third Claim***

6       DC argues it is entitled to summary judgment on its Third Claim, contending

7    "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (i)

8    purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective

9    termination date in 2013, and (ii) barring the Shusters from making any deal with DC

10    without Toberoff's and the Siegels' consent." (Reply at 10.)

11      Section 304(c)(6)(D) provides:

12       A further grant, or agreement to make a further grant, of any right covered by
a terminated grant is valid only if it is made after the effective date of the

13       termination. As an exception, however, an agreement for such a further grant
may be made between the author or [his heirs] and the original grantee or [its

14       successor], after the notice of termination has been served . . . .

15    17 U.S.C. § 304(c)(6)(D).

16       As such, between November 10, 2003 (when the Notice was served) and October 26,

17    2013 (its effective date), DC was and is the only party that may enter into an agreement

18    with the Shuster heirs regarding the Superman rights sought to be recaptured. (Mot. at 23

19    ("Section 304(c)(6)(D) not only bars third parties like Toberoff from 'trafficking in future

20    [copyright] interests,' *Milne*, 430 F.3d at 1047, it protects original grantees who, like DC,

21    spent decades developing and promoting the copyrighted property.")). As DC points out,

22    "Congress described this right in the original grantee's favor as 'in the nature of a right of

23    'first refusal.'" (Mot. at 23 (quoting H.R. REP. NO. 94-1476 at 127).) In *Milne*, the Ninth

24    Circuit reviewed the statutory text and legislative history, and confirmed that Section

25    304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin

26    to a "right of 'first refusal.'" 430 F.3d at 1047.

27    / / /

28

1   Defendants concede that "copyrights recaptured pursuant to a termination notice
2   cannot be anticipatorily transferred to anyone prior to the service of the termination notice,
3   and can be transferred only to the grantee or its successor before 'the effective date of the
4   termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. §304(c)(6)(D)).)

5   The Court further agrees with Defendants that, "as a pure matter of law, the
6   2001/2003 PPC Agreements – pre-dating both the effective date and the service of the
7   Shuster Executor's termination notice – *could not* and did not transfer the prospective
8   copyrights to be recovered by the Shuster Termination." (Opp'n at 18 (emphasis added).)
9   Such is the declaration DC seeks by this, its Third Claim.[2]

10   Defendants do not dispute that they entered into multiple agreements purporting to
11   grant and otherwise encumber rights covered by a (to be) terminated grant; indeed, they
12   agree that those agreements are void insofar as they aim to transfer the subject copyrights.
13   (*See* Opp'n at 18.) Those agreements run afoul of 17 U.S.C. § 304(c)(6)(D) as well and,
14   accordingly, are hereby deemed invalid.

15   / / /
16   / / /
17   / / /
18   / / /
19   / / /
20   / / /
21   / / /
22   / / /

23

24   [2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third
25   party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22 (citation omitted).) For
     one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized
26   agreements. That section, moreover, *does* in fact state that a third party grant agreement "is valid only
     if it is *made after* the effective date of termination." § 304(c)(6)(D) (emphasis added). And, finally, it is
27   beyond dispute that the subject agreements at issue here were *made* well *before* the termination date.

28

17

**EXHIBIT D**
**44**

ER 1711

## IV. CONCLUSION

As discussed above, DC's motion for summary judgment is **GRANTED**. [458] Defendants' cross-motion for summary judgment is **DENIED**.[3] [478]

**SO ORDERED**

October 17, 2012

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

---

[3] Defendants' cross-motion also attacks DC's Second Claim concerning the scope of Defendants' termination notice. As Defendants point out, however, "DC's Second Claim (FAC ¶¶135–64) seeks to re-litigate, and overlaps with, issues in _Siegel v. Warner Bros. Entertainment Inc._, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal. Much of this claim is barred by the doctrine of issue preclusion/collateral estoppel." (Defs' MSJ, Dkt No. 478 at 3 (citations omitted).) As that claim is related to one currently on review before the Ninth Circuit, this Court declines to rule on that aspect of Defendants' motion.

18

**EXHIBIT D**
**45**

ER 1712

1   DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   Attorneys for the DC Comics Parties

8         **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA**

10  LAURA SIEGEL LARSON,
    individually and as personal
11  representative of the ESTATE OF
    JOANNE SIEGEL,
12
          Plaintiff,
13
      v.
14
   WARNER BROS. ENTERTAINMENT
15  INC., DC COMICS, and DOES 1-10,

16        Defendants and
        Counterclaimants.
17
   LAURA SIEGEL LARSON,
18  individually and as personal
    representative of the ESTATE OF
19  JOANNE SIEGEL,

20          Plaintiff,

21      v.

22   TIME WARNER INC., WARNER
    COMMUNICATIONS INC.,
23  WARNER BROS. ENTERTAINMENT
    INC., WARNER BROS. TELEVISION
24  PRODUCTION INC., DC COMICS,
    and DOES 1-10,
25
        Defendants and
26      Counterclaimants.

27

28

Case No. CV 04-8400 ODW (RZx)
Case No. CV 04-8776 ODW (RZx)

**[PROPOSED] STATEMENT OF
UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW IN
SUPPORT OF DEFENDANT DC
COMICS' MOTION FOR
SUMMARY JUDGMENT IN THE
*SIEGEL* SUPERMAN AND
SUPERBOY CASES**

The Hon. Otis D. Wright II

**Hearing Date**:   March 11, 2013
**Hearing Time**:   1:30 p.m.
**Courtroom:**    11

                  [PROPOSED] STATEMENT OF
                 UNCONTROVERTED FACTS &
                 CONCLUSIONS OF LAW

After consideration of the papers in support of and in opposition to defendants' (collectively, "DC") Motion For Summary Judgment In The *Siegel Superman And Superboy Cases*, the Court hereby makes its findings of uncontroverted facts and conclusions of law as follows:

## UNCONTROVERTED FACTS

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| 1 | The agreement set forth in Kevin Marks' October 19, 2001, letter to John Schulman states: <br><br> "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.... <br><br> The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics. | Declaration of Daniel M. Petrocelli ("Petrocelli Decl."), Ex. B at 19, 21; *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1-2 (9th Cir. Jan. 10, 2013). |

## CONCLUSIONS OF LAW

As set forth in DC's summary judgment papers, Proposed Order, and Proposed Final Judgments:

1. On January 10, 2013, the United States Court of Appeals for the Ninth Circuit reversed Judge Larson's March 26, 2008, partial summary judgment order and held that, "as a matter of law," plaintiff Laura Siegel Larson (referred to herein in her individual capacity and as personal representative of the Estate of Joanne Siegel as "Larson") entered into a settlement agreement with DC on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. "Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations …, and that

ER 1714

1  the letter" sent by Larson's attorney, Kevin Marks, on October 19, 2001,

2  "accurately reflected the material terms they had orally agreed to." *Id.* The Ninth

3  Circuit directed this Court to "reconsider DC's third and fourth counterclaims in

4  light of our holding that the October 19, 2001, letter created an agreement." *Id.* at

5  *2.

6       2.  Consistent with the Ninth Circuit's opinion and instructions on remand,

7  *id.* at *1-2, this Court may now enter final judgment in DC's favor in the above-

8  entitled cases:  (1) the "*Siegel* Superman" case, Case No. CV-04-8400; and (2) the

9  "*Siegel* Superboy" case, Case No. CV-04-8776.  In the parties' October 19, 2001,

10  settlement agreement, Larson (and her family) "transfer[red] all of [their] rights" to

11  DC, "resulting in 100% ownership to D.C. Comics."  Petrocelli Decl. Ex. B at 21;

12  *Larson*, 2012 WL 6822241, at *1.  This complete transfer bars Larson's remaining

13  claims in the *Siegel* Superman and Superboy cases and entitles DC to judgment on

14  its Fourth Counterclaims in the *Siegel* Superman and Superboy cases, which seek a

15  declaration confirming the October 19, 2001, settlement agreement against Larson.

16  DC's remaining counterclaims are dismissed, without prejudice, as moot.

17       Therefore:

18       a.  Larson's Claims in the *Siegel* Superman Case

19       i.  Larson's First Claim for Relief, for "Declaratory Relief re: Termination,"

20  is DENIED, and summary judgment is hereby entered in DC's favor and against

21  Larson on this claim.  *See also* DN 293, 560.

22       ii.  Larson's Second Claim for Relief, for "Declaratory Relief re: Profits from

23  Recaptured Copyrights," is DENIED, and summary judgment is hereby entered in

24  DC's favor and against Larson on this claim.  *See also* DN 293, 560.

25       iii.  Larson's Third Claim for Relief, for "Declaratory Relief re: Use of the

26  'Superman' Crest," is DENIED, and summary judgment is hereby entered in DC's

27  favor and against Larson on this claim.  *See also* DN 293, 560.

28

[PROPOSED] STATEMENT OF
UNCONTROVERTED FACTS &
CONCLUSIONS OF LAW

iv.  Larson's Fourth Claim for Relief, for "Accounting for Profits," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

b. DC's Counterclaims in the *Siegel* Superman Case

i.  DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED, and summary judgment is hereby entered in DC's favor and against Larson on this counterclaim.  The Court declares that, under the parties' October 19, 2001, settlement agreement, Larson and her family transferred to DC, worldwide and in perpetuity, any and all rights, title, and interest, including all copyright interests, which they may have in Superman, Superboy, and Spectre.  Petrocelli Decl. Ex. B at 19, 21; *Larson*, 2012 WL 6822241, at *1-2.

ii.  DC's First, Second, Third, Fifth, and Sixth Counterclaims are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

a.  Larson's Claims in the *Siegel* Superboy Case

i.  Larson's First Claim for Relief, for "Copyright Infringement," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 151 at 62; 175 at 1; Sept. 17, 2007 Hr'g Tr. at 4:6-5:4, 27:21-22.

ii.  Larson's Second Claim for Relief, for "Declaratory Relief re: Termination," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 170, 560.

iii.  Larson's Third Claim for Relief, for "Violation of the Lanham Act § 43(a)(1)(B)," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 174, 560.

iv.  Larson's Fourth Claim for Relief, for "Violation of California Business and Professions Code, §§ 17200 *et seq.*," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 174, 560.

v.  Larson's Fifth Claim for Relief, for "Injunctive Relief," is DENIED, and summary judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 174, 560.

b.  DC's Counterclaims in the *Siegel* Superboy Case

i.  DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED, and summary judgment is hereby entered in DC's favor and against Larson on this counterclaim.  The Court declares that, under the parties' October 19, 2001, settlement agreement, Larson and her family transferred to DC, worldwide and in perpetuity, any and all rights, title, and interest, including all copyright interests, which they may have in Superman, Superboy, and Spectre.  Petrocelli Decl. Ex. B at 19, 21; *Larson*, 2012 WL 6822241, at *1-2.

ii.  DC's First, Second, Third, Fifth, and Sixth Counterclaims are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

Dated:  _____    _____

Honorable Otis D. Wright, II
Judge, United States District Court

OMM_US:71281336

- 4 -

[PROPOSED] STATEMENT OF
UNCONTROVERTED FACTS &
CONCLUSIONS OF LAW

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for the DC Comics Parties

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | Case No.  CV 04-8400 ODW (RZx) Case No.  CV 04-8776 ODW (RZx) |
| 11 | **[PROPOSED] ORDER GRANTING DEFENDANT DC COMICS'** |
| 12  Plaintiff, | **MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL*** |
| 13  v. | **SUPERMAN AND SUPERBOY** |
| 14 | **CASES** |
| 15  WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, | The Hon. Otis D. Wright II |
| 16  Defendants and Counterclaimants. | |
| 17 | **Hearing Date**:    March 11, 2013 |
| 18  LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | **Hearing Time**:    1:30 p.m. **Courtroom:**      11 |

10  LAURA SIEGEL LARSON,
    individually and as personal
11  representative of the ESTATE OF
    JOANNE SIEGEL,
12
            Plaintiff,
13
        v.
14
15  WARNER BROS. ENTERTAINMENT
    INC., DC COMICS, and DOES 1-10,
16
            Defendants and
17          Counterclaimants.
    _____
18  LAURA SIEGEL LARSON,
    individually and as personal
19  representative of the ESTATE OF
    JOANNE SIEGEL,
20
            Plaintiff,
21
        v.
22
    TIME WARNER INC., WARNER
23  COMMUNICATIONS INC.,
    WARNER BROS. ENTERTAINMENT
24  INC., WARNER BROS. TELEVISION
    PRODUCTION INC., DC COMICS,
25  and DOES 1-10,
26          Defendants and
    Counterclaimants.
27
28

                            [PROPOSED] ORDER GRANTING
                            DC'S MOT. FOR SUMM. J.

1    IT IS HEREBY ORDERED that DC Comics' Motion For Summary

2  Judgment In The *Siegel* Superman And Superboy Cases is GRANTED.

3    The Court will enter DC Comics' proposed judgments in Case Nos. CV-04-

4  8400 and CV-04-8776.

5    IT IS SO ORDERED.

6

7  Dated: _____          _____

8                                            Honorable Otis D. Wright, II
                                             Judge, United States District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING
DC'S MOT. FOR SUMM. J.

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for DC Comics Parties

8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11 LAURA SIEGEL LARSON,                 Case No.  CV 04-8400 ODW (RZx)
   individually and as personal
12 representative of the ESTATE OF      **[PROPOSED] FINAL JUDGMENT**
   JOANNE SIEGEL,                       **IN THE *SIEGEL* SUPERMAN CASE**
13
              Plaintiff,                The Hon. Otis D. Wright II
14
        v.
15
   WARNER BROS. ENTERTAINMENT
16 INC., DC COMICS, and DOES 1-10,
17            Defendants and
              Counterclaimants.
18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] JUDGMENT**

On January 10, 2013, the United States Court of Appeals for the Ninth Circuit reversed Judge Larson's March 26, 2008, partial summary judgment order and held that, "as a matter of law," plaintiff Laura Siegel Larson (referred to herein in her individual capacity and as personal representative of the Estate of Joanne Siegel as "Larson") entered into a settlement agreement with defendants (collectively, "DC") on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*, 2012 WL 6822241, at *1 (9th Cir. Jan. 10, 2013). "Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations …, and that the letter" sent by Larson's attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material terms they had orally agreed to." *Id.* The Ninth Circuit directed this Court to "reconsider DC's third and fourth counterclaims in light of our holding that the October 19, 2001, letter created an agreement." *Id.* at *2.

Consistent with the Ninth Circuit's opinion and instructions on remand, *id.* at *1-2, this Court may now enter final judgment in DC's favor in two of three long-running Superman cases presently before this Court: (1) the above-entitled "*Siegel* Superman" case, Case No. CV-04-8400; and (2) the related "*Siegel* Superboy" case, Case No. CV-04-8776 (addressed in a separate Final Judgment filed concurrently herewith). In the parties' October 19, 2001, settlement agreement, Larson (and her family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics." Declaration of Daniel M. Petrocelli ("Petrocelli Decl.") Ex. B at 21; *Larson*, 2012 WL 6822241, at *1. This complete transfer bars Larson's remaining claims in this case and entitles DC to judgment on its Fourth Counterclaim in this case, which seeks a declaration confirming the October 19, 2001, settlement agreement against Larson. DC's remaining counterclaims are dismissed, without prejudice, as moot. Therefore:

[PROPOSED] FINAL JUDGMENT

**ER 1721**

A.  Larson's Claims

IT IS ORDERED AND ADJUDGED that Larson's First Claim for Relief, for "Declaratory Relief re: Termination," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim.  *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Second Claim for Relief, for "Declaratory Relief re: Profits from Recaptured Copyrights," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Third Claim for Relief, for "Declaratory Relief re: Use of the 'Superman' Crest," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fourth Claim for Relief, for "Accounting for Profits," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 293, 560.

B.  DC's Counterclaims

IT IS ORDERED AND ADJUDGED that DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED, and judgment is hereby entered in DC's favor and against Larson on this counterclaim.  The Court declares that, under the parties' October 19, 2001, settlement agreement, Larson and her family transferred to DC, worldwide and in perpetuity, any and all rights, title, and interest, including all copyright interests, which they may have in Superman, Superboy, and Spectre.  Petrocelli Decl. Ex. B at 19, 21; *Larson*, 2012 WL 6822241, at *1-2.

IT IS ACCORDINGLY FURTHER ORDERED, ADJUDGED, and DECREED that DC's First, Second, Third, Fifth, and Sixth Counterclaims are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

[PROPOSED] FINAL JUDGMENT

**ER 1722**

1        IT IS SO ORDERED.

2   Dated: _____     _____

3                                                 Honorable Otis D. Wright, II
                                       Judge, United States District Court

4   OMM_US:71247304

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] FINAL JUDGMENT

**ER 1723**

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:   (845) 265-2819

11

12 Attorneys for Defendants and Counterclaimant

13 (continued on next page)

14          **UNITED STATES DISTRICT COURT**

15          **CENTRAL DISTRICT OF CALIFORNIA**

16 JOANNE SIEGEL and LAURA          Case No. CV-04-8400 ODW (RZx)
   SIEGEL LARSON,
17                                  **[~~PROPOSED~~] ORDER CERTIFYING
                Plaintiffs and       AND FORWARDING
18              Counterdefendants,   SUPPLEMENTAL RECORD**

19      v.

20 WARNER BROS.
   ENTERTAINMENT INC., DC
21 COMICS, and DOES 1-10,          **Judge**:     Hon. Otis D. Wright II

22              Defendants and
                Counterclaimant.
23

24

25

26

27

28

                                    [~~PROPOSED~~] ORDER CERTIFYING AND
                                    FORWARDING SUPPLEMENTAL RECORD

                                    **ER 1724**

The parties' Joint Stipulation to Certify and Forward Supplemental Record is hereby GRANTED.  Pursuant to Federal Rule of Appellate Procedure 10(e), the excerpts of the deposition of Kevin S. Marks attached as Exhibit A to the Joint Stipulation were omitted by error or accident and shall be certified and forwarded to the Court of Appeals.

IT IS SO ORDERED.

Dated: 12/5 , 2011

_____
OTIS D. WRIGHT
Honorable Otis D. Wright II
Judge, United States District Court

[PROPOSED] ORDER CERTIFYING AND
FORWARDING SUPPLEMENTAL RECORD

ER 1725

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone: (845) 265-2820
10 Facsimile: (845) 265-2819

11
   Attorneys for Defendants and Counterclaimant
12
   (continued on next page)
13

14            **UNITED STATES DISTRICT COURT**

15           **CENTRAL DISTRICT OF CALIFORNIA**

16  JOANNE SIEGEL and LAURA        | Case No. CV-04-8400 ODW (RZx)
    SIEGEL LARSON,
17                                  | **JOINT STIPULATION TO**
                     Plaintiffs and | **CERTIFY AND FORWARD**
18               Counterdefendants, | **SUPPLEMENTAL RECORD**
19         v.                       | **[PROPOSED] ORDER FILED**
                                    | **CONCURRENTLY HEREWITH**
20  WARNER BROS.
    ENTERTAINMENT INC., DC         | Hon. Otis D. Wright II
21  COMICS, and DOES 1-10,
22                  Defendants and
                    Counterclaimant.
23

24

25

26

27

28

ER 1726

1 | (continued from previous page)

2 | MARC TOBEROFF (S.B. #188547)
     mtoberoff@ipwla.com
3 | NICHOLAS C. WILLIAMSON (S.B. #231124)
     nwilliamson@ipwla.com
4 | KEITH G. ADAMS (S.B. #240497)
     kgadams@ipwla.com
5 | TOBEROFF & ASSOCIATES, P.C.
6 | 2049 Century Park East, Suite 3630
7 | Los Angeles, California 90067
   Telephone: (310) 246-3333
8 | Facsimile: (310) 246-3101

9 | Attorneys for Plaintiffs and Counterdefendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION TO
CERTIFY AND FORWARD
SUPPLEMENTAL RECORD

ER 1727

1   Plaintiff Laura Siegel Larson and defendants Warner Bros. Entertainment

2   Inc. and DC Comics, by and through their respective counsel of record, hereby

3   stipulate and agree as follows:

4   WHEREAS, defendants' opposition to plaintiffs' motion for summary

5   judgment was filed on May 29, 2007, Docket No. 179;

6   WHEREAS, the declaration of Michael Bergman in support of defendants'

7   opposition to plaintiffs' motion for summary judgment was also filed on May 29,

8   2007, Docket No. 184;

9   WHEREAS, excerpts of the deposition of Kevin S. Marks, which ought to

10  have been attached as Exhibit S to the Bergman declaration filed with defendants'

11  opposition, were inadvertently omitted and the deposition excerpts of another

12  deponent were inadvertently included;

13  WHEREAS, pursuant to Federal Rule of Appellate Procedure 10(e), the

14  district court may certify and forward a corrected record before or after the record

15  has been forwarded to the court of appeals when anything material is omitted from

16  the record by error or accident;

17  WHEREAS, defendants requested that they be allowed to correct the record

18  to reflect the deposition referred to in their briefing, and plaintiff so agreed;

19  NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED that,

20  subject to the Court's approval, the attached excerpts of the deposition of Kevin S.

21  Marks shall be certified and forwarded to the court of appeals.

22

23  Dated:  December 2, 2011     By:   /s/ Daniel M. Petrocelli
24                                           Daniel M. Petrocelli
                                             *Attorneys for Defendants*
25

26  Dated:  December 2, 2011     By:   /s/ Marc Toberoff
                                             Marc Toberoff
27                                           *Attorneys for Plaintiffs*

28

- 1 -

JOINT STIPULATION TO
CERTIFY AND FORWARD
SUPPLEMENTAL RECORD

ER 1728

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014, and that all participants in the case are registered CM/ECF users.


Dated:  February 21, 2014                     /s/ Marc Toberoff
                                                              Marc Toberoff