APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

———————————

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 11 OF 16**

———————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 11)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 184 | 5/29/07 | *Exhibit B:  June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D:  March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L:  Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P:  April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A:  November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B:  April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |
| 163 | 4/30/07 | *Exhibit C:  May 19, 1948 Stipulation of Settlement* | 11 | 2801 |

| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

iii

| 70-1 | | | | |
|---|---|---|---|---|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | | | |
|---|---|---|---|---|
| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|-----|--------|---|---|-----|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A: Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B: Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C: Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D: Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E: Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F:  Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1:  October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2:  October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4:  May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5:  May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6:  September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8:  Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9:  Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10:  Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11:  Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12:  Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13:  Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14:  October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16:  DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17:  Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18:  DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19:  September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20:  January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21:  February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22:  February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23:  Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24:  February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25:  February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A: Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A: November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A: February 1996 Thompson & Thompson Copyright Report re: Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re: Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C: Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | | | |
|---|---|---|---|---|
| | | *Siegel* | | |
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B:  April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A:  Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G:  January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H:  January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I:  February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J:  Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M:  Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A:  Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B:  June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D:  March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L:  Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P:  April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A:  November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B:  April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|-----|---------|-----|-----|------|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S:  Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T:  Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U:  March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V:  May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W:  Appellate Brief of National Periodical Publications, Inc. et. al.  from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X:  Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y:  December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z:  April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA:  September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| **Docket No.** | **Filing Date** | **Document Title** | **Vol.** | **Page** |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment"  In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

# EXHIBIT B

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 30 of 321

10622 Kimberley Avenue,
Cleveland, Ohio.
June 12, 1934.

Dear Mr. Kenton:

You will find enclosed the first week's script for the cartoon strip,
SUPERMAN. While the idea is a trifle fantastic -- a man with "infinite
strength" -- I think it will follow the lines you like. We begin with
"Superman" as a child and follow his history all the way up to maturity
when the real story begins: of his adventures in helping those in need.
Since Clark Kent possesses incredible strength there are great possibil-
ities for humor and adventure in his experiences as a child and youth. The
story of his youth will run at great length before we detail his adven-
tures as an adult. Early, he will find that his great strength, instead of
making friends for him, cause people to fear him. Mothers will not permit
their children to associate with him, he will be hated in school sports
because he never loses, etc. We can weave a very human story about him.

Here is the script for a possible sunday strip. It will acquaint you with
the secret of Clark Kent's origin.

I.

1, In his laboratory, the last man on earth worked furiously. He had only
   a few moments left.
2, Giant cataclysms were shaking the reeling planet, destroying mankind. It
   was in its last days, dying....
3, The last man placed his infant babe within a small time-machine he had
   completed, launching it as ---
4, --- the laboratory walls caved-in upon him.
5, The time-vehicle flashed back thru the centuries, alighting in the prim-
   itive year, 1935 A. D.   A passing motorist sighted the metal cylinder...
6, ...and upon investigating discovered the sleeping babe within.
7, The infant was placed in an orphanage. The first day, it playfully bent
   its metal bed out of shape. The astounded attendents, of course, did not
   realize they were caring for a child whose physical structure was millions
   of years advanced from their own.
8, The babe, named Clark Kent, was a physical wonder. At the age of five,
   when an older boy sought to bully him, Clark sent him flying thru the air.
9, Clark's colossal strength was a source of wonder and pleasure to him. He
   found, at twelve, that he could easily shatter the world's high jump and
   dash records.
10, His powers increased unbelievably. When maturity had been attained, Kent
    discovered he could leap over a ten story building, raise unheard-of
    weights, run as fast as an express train, and that nothing less than a
    bursting shell could penetrate his tough skin.
11, At 12, Early, Kent decided he must turn his titanic strength into chan-
    nels that would benefit mankind. And so wascreated SUPERMAN, champion
    of the oppressed, the physical marvel who had sworn to devote his exist-
    ence to helping those in need!

........

Let me know if you would care to work with me upon this strip. I'll be glad
to receive suggestions. The idea, incidently, is liked by the General Manager
of Bell Syndicate. Awaiting your reply....

EXHIBIT B

Sincerely,

Jerome Siegel

000003543

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 31 of 321

Jerome Siegel,
10622 Kimberley Ave.,
Cleveland, Ohio.

### SUPERMAN (Synopsis)

### (Releases for 2nd Week)

7.   Returning to his apartment, SUPERMAN enters thru a window. Next morning, having donned the glasses which give him a meek appearance, as he leaves for the newspaper on which he holds the position of reporter, the janitor of his building, shows him the morning paper which headlines Curry's innocence. Clark Kent is pleased to note that there is no mention of his dual-self, SUPERMAN, for he wishes to avoid as much publicity as possible. At the same moment, the governor, in his private chamber is speaking to a group of the country's most powerful men. Relating his encounter with SUPERMAN to them, he states he still cannot believe his senses, and that he thanks heaven SUPERMAN is apparently on the side of law and order.

8.   Reporting at the office, Kent is informed that the City Editor wishes to see him. As Clark seats himself before the City Editor, he is asked if he ever heard of SUPERMAN. Clark is startled but before he can say very much the editor continues. The City Editor explains that reports have been steadily streaming in that a fellow with gigantic strength named SUPERMAN actually exists. The editor states he is making it Kent's steady assignment to make reports on this half-mythical character. He asks Kent if he thinks he can handle the assignment. Kent, with a deprecatory wave of his hand replies, "Listen, Chief. If I can't find out anything about this SUPERMAN, no one can!"

9.   A desk man informs Kent that a call has just come in revealing that there is a wife-beating at 211 Court Avenue. Kent hurries off at the information, to

000003544

ER 2610

8

cover the tip.  At 211 Court Avenue, the bully who is beating his unconscious
wife with a strap, looks up to see SUPERMAN charging into the room and snarls,
"What d' **you** want?"  SUPERMAN seizes him by the shirt and holds him high above
his head while the bully cries, "Don't get tough!" to which SUPERMAN replies,
"Tough, is putting **mildly** the treatment you're going to get."  A slight slap
from SUPERMAN's palm sends the bully flying across the room to a wall at its
far end where plaster flies as the bully smashes into it.  The bully draws a
knife and leaping upon SUPERMAN drives it at his heart crying, "Y' asked for it!"

10.      The knife's blade snaps upon SUPERMAN's tough skin, and the bully cowers
back, quivering like a leaf at the miracle performed before his eyes, while
SUPERMAN says grimly, "And now you're going to get a lesson you'll never forget."
But before SUPERMAN can administer the "lesson" the bully faints in his arms.
SUPERMAN hears the shrieking of police-sirens outside the house and hurriedly
dons his street-clothes over his uniform.  As the policemen crowd into the room,
they find Clark Kent kneeling over the bully's unconscious body.  Replying to the
police captain's questions, Kent explains he arrived to find the place torn and
battered as it is.  "Looks as though our friend SUPERMAN dropped in to pay a
visit," he says.

11.      Back at the office Clark asks Lois, the girl reporter he is in love with,
to go with him that night.  She replies, "I suppose I'll give you a break — for a
change."  At a roadhouse that night, while they are dancing, Clark asks her why
she always avoids him at the office, to which she replies, "Please, Clark! I've
been writing sob stories all day.  Please don't ask me to dish out another."  Sit-
ting at a nearby table, watching Clark and Lois dance, are three hoodlums.  The
leader rises  and proclaims to this friends he's going to cut in on their dance
and if Clark doesn't like it, he'll push his face in.  Accosting Lois, the hoodlum,

000003545

Butch, upon being refused, takes her arm and insists she is going to dance with him and like it. Lois turns to Clark who is standing uncomfortably by and asks if he is going to stand for it.

12.   Clark reluctantly adheres to his role of a coward. He pleads with Lois to be reasonable, dance with the fellow and then they'll leave immediately. Lois says to Clark, "You can stay and dance with him if you wish, but I'm leaving." As Butch seeks to detain her she gives him a terrific slap that SUPERMAN himself would be proud of, for it almost knocks Butch off his feet. Butch, enraged, leaps upon Clark and pushes his face, seeking to provoke a fight. Clark, however, states he has no desire at all to fight and hurries, arms outstretched, after Lois, who is walking swiftly away in disgust. Outside the roadhouse, as Lois enters a taxi, alone, she says to his pleas, "You asked me earlier in the evening why I always avoid you. I'll tell you why now. Because you are a spineless, unbearable coward!"

. . . . . . . . . .

End of Second week's releases. . . . . . .

000003546

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 34 of 321

From:
Jerome Siegel,
10622 Kimberley Ave.,
Cleveland, Ohio.

## SUPERMAN (Synopsis)

### Releases for Weeks 3 and 4

13.  Back in the roadhouse Butch tells his friends he is not going to let
Lois get away with her insult to him and asks them to come with him. As they
leave the roadhouse, they do not see the figure of SUPERMAN, up on the roof
of the roadhouse, observing them.  Overtaking the taxi in which Lois is rid-
ing, they force it into a ditch and dragging her out of it, force her into
their car.

14.  As they tear madly along the road, Butch says he is sorry he let Lois'
yellow boy-friend off so easily.  A friend beside him says, "Well, maybe it
won't be long before you see him again."  Suddenly the man beside Butch cries,
"Look! There's a man standing in the road ahead of us."  Butch chuckles and
says, "Watch me scare the wits out of him."  He steps on the gas and roars down
upon the calmly waiting figure of SUPERMAN until he is so close the man beside
him shrieks, "Watch out! You'll hit him!"

15.  SUPERMAN easily hurdles the speeding car.  Then he turns and chases after
the madly rocketing auto, easily overtaking it.  Upon reaching it he lifts it
high above his head with one hand, while its occupants shriek out their lungs
in stark fear.

16.  SUPERMAN shakes the occupants out of the car, catching Lois in his free hand as she falls.  He then proceeds to smash the car to bits against the side of the cliff at the edge of the road, while the car's former occupants run screaming in all directions.

17.  SUPERMAN, with a single leap, catches up with the fleeing Butch, saying, "Just a minute!"  With Butch under one arm he leaps up into the air to the top of a telephone pole and ties Butch to the top by his pants.  Butch, suspended precariously, shouts to SUPERMAN who is a trifle below him suspended straight out supported only by the grip of one hand on a spike in the pole, "Get me offa here!"  But when SUPERMAN says, "O.K.  I'll cut you loose.", he screams, "No,no! I'd fall!"

18.  Lois is cowering back against the wreckage of the destroyed car as SUPER-MAN leaps down from the top of the telephone pole to her side and cautions her he means to do her no harm.  Taking her under his arm he returns her to the outskirts of the city, from the country road, and warns her to forget all that has happened that night.  In the morning, Lois tells the editor of her paper that she saw SUPERMAN last night, but he says, "Are you sure it wasn't pink elephants you saw!"

(End of third week.......)

---

(Beginning of fourth week)

19.  At the office, Clark begs Lois' pardon for his cowardly behavior, but she refuses to even speak to him.  Called into the editor's office, he learns that things are so dull the editor had decided to send him down to report the doings of a small South American war.  He is to take a camera with him and send back

000003548

pictures with his articles. Kent takes a train, not toward South America, but to Washington D.C. There, he attends a session of Congress and has a certain Senator Barrows pointed out to him, as he sits in the gallery. -- Why is SUPERMAN interested in Senator Barrows?

20. As Senator Barrows is leaving the Congress chambers he is stopped by a fugitive figure who asks when they may see each other. The Senator tells the man to come to his private office at eight that evening. SUPERMAN, pressed behind a pillar, hears everything and snaps a picture, with his camera, of the two men. Going to the "morgue" of the local newspaper, he shows the developed picture to the man in charge and learns that the man with Barrows is a prominent Washington lobbyist; no one knows who the lobbyist works for. That evening, at eight o'clock, SUPERMAN hangs suspended by his fingertips outside the window of Senator Barrows and listens to an interesting conversation.

21. Barrows informs the lobbyist of the progress he has made in pushing a certain bill. It is certain to pass and before others realize what has happened, plung the United States into war with an unnamed foreign power. The lobbyist, satisfied, informs Barrows he'll be well taken care of financially for his good work. Smirking, Barrows says, "I suppose you're going to be well taken care of yourself." Outside the window, SUPERMAN grimly thinks to himself, "You bet he will!"

22. As the lobbyist leaves Barrows' office he is accosted on the street by SUPERMAN who seized his arm and demands to know who is behind him in corrupting Senators Barrows. The lobbyist says he doesn't know what SUPERMAN is talking about. SUPERMAN says, "One of these silent men, eh! We'll see whether you'll talk." The lobbyist says, "Let go of my arm!" SUPERMAN says, "Your foot will do just as well!" And seizing the man by one foot he leaps up into the air-- straight for the telephone wires overhead.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 36 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 37 of 321

23.   SUPERMAN runs along the telephone wires at top speed while the lobby-
ist shrieks, "Let me down! We'll be electrocuted!" SUPERMAN says, "Oh, no
we won't! Birds sit on telephone wires and they aren't electrocuted! -- Not
unless they touch a pole and are grounded!" As he says this he hurdles a
pole and says, "Oops! Just missed it!" The lobbyist shrieks his lungs out.

24.   They come in view of the Capitol, and against the lobbyists protests,
SUPERMAN leaps from the wires to it. There upon the huge dome of the cap-
itol, the lobbyist screams down to the far distant streets below for help.
SUPERMAN points out a far building and suggests they leap to it. The lob-
byist begs him not to jump, but SUPERMAN seizes him and makes the attempt.
They miss the building -- and commence to fall toward the street, eighty
stories below!

(End of fourth week's releases)

---

This ends the first month's releases and yet the potentialities of
the character, SUPERMAN, has barely been scratched. He's headed for the
most exciting and yet humorous adventures this world has ever seen. He
will win a war single-handed, battle an airplane with his bare hands,
swim several hundred miles and think nothing of it, etc. He's different
and sure to become the idol of young and old. He'll participate in sports
and astound the nation; he'll single-handed, rescue a town from a flood
through his super-strength. -- Unlike most adventure strips the scene of
the story will not be laid in some fantastic, unknown jungle or planet or
country, but will be all the more astounding for having its locale on fam-
iliar city streets. SUPERMAN will operate against a background of America's
most well-known cities, buildings, and pleasure-spots.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 38 of 321

From:
Jerome Siegel
Cleveland, Ohio

**SUPERMAN**

(Sam) "Molly! Say! Did you see that ..... the car, Sam!
                                   looking ..... looks like a metal cylinder. It's re-
                                   ...... it."
(NOTE: Illustration shows elderly couple have stopped their car on a highway to
       investigate the cylinder which looks in their path.)
Sam: "Have ..... arms, Molly! Look!" "There's a child sleeping inside!"
Molly: "They might have been run over ..... killed! Who could have left it here!"
(NOTE: ..... and wife are kneeling at the side of the cylinder and regarding
       the sleeping babe within.)
Molly: "What are we going to do with it, Sam?"
Sam: "We'll turn him over to the people at the Edgewood Orphan Home. They'll take
     good care of him."

      . . . . . . . . . . . . . . . .

Explanatory panel: While driving along the highway, Sam Kent and his wife Molly discov-
                   ered a sleeping child within a strange cylinder. Together they journ-
                   eyed toward the Edgewood Orphan home where they turned the youngster
                   over to Miss Andrews, the matron.)

2.a.  Miss Andrews: "I assure you the child will be well taken care of."
      Molly: "Sam! His eye-lids are fluttering! He's awakening!"
      (NOTE: They are standing at the side of the bed where the child lies asleep.)
2.b.  Sam: "Don't startle him. The little tyke seems scared."
      Miss Andrews: "There, there, little fellow -- now don't you be frightened."
      (NOTE: Miss Andrews is reaching out to stroke the child's cheek.)
2.c.  (NOTE: The child has sprung from the bed, is leaping high over their heads. Miss
            Andrews is shrieking and fainting.)
      Miss Andrews: "EEeee!! --"
      Molly: "Sam -- this can't be!"
      Sam: "Stop him!"

      . . . . . . . . . . . . . . . .

Explanatory panel: Sam and Molly Kent, upon finding a child in a weird metal cylinder
                   directly in the center of a roadway, apparently abandoned, had turned
                   it over to the attendants of an orphan asylum. Awakening, the baby
                   had been frightened, and to the amazement of the horrified onlookers,
                   proceeded to leap over their heads -- a feat impossible, of course,
                   for an infant obviously only two or three years old.)

3.a.  The child struck its head against a cabinet and fell.
      Sam: "He seems all right. The jar knocked him unconscious, though."
      Molly: "Oh, Sam, what can it mean! That infant -- it leapt over our heads.
             It's impossible!"
      (NOTE: Sam is lifting the child in his arms.)
3.b.  Miss Andrews: "I -- I'm all right. That child! It's abnormal -- a freak!"
      An attendant: "You'd better leave now, Mr. and Mrs. Kent. We'll be glad to have
                    you call again."
      (NOTE: Miss Andrews is being supported by an attendant.)
3.c.  Miss Andrews, as soon as the Kents had departed, took a precaution...
      Miss Andrews: "There! Let's see you jump through those iron bars you -- you little
                    monster!"
      (NOTE: Metal bars have been placed about the bed.)

      . . . . . . . . . . . . . . . .

                    (Continued on the next page)

                                                        000003551



                                                        ER 2617
                                                            25

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 39 of 321

Page Two.

Superman

Explanatory panel: After being (severely) shocked upon seeing a three-year-old youngster spring over her head ... and ... took care of the three-year-old ... recurrence of the incident. U... er ... directions, the incredible in another metal bars;
5.a. Miss Andrews: "... I tell you, Doctor Hines; he almost hit the ceiling. And then I fainted I ..."
Doctor Hines: "Nonsense, Miss Andrews. You are only joking..."
(They are speaking within an office of the orphan home.)
5.b. Attendant: "Miss Andrews! You'd better come! That child you had confined, well he --"
Miss Andrews: "Come along, Doctor Hines. We'll see whether I was joking."
(NOTE: The attendant has rushed into the office; is excited.)
4.c. (They have entered the room where the child is kept to see the baby tearing the metal bars apart, playing with them. They are all thunderstruck by the sight.)
4.d. Miss Andrews: "Water! Quick! The doctor has fainted!"
(NOTE: Doctor Hines had fainted in her arms.)

• • • • • • • • • • • • • • • •

Explanatory panel: Frightened by having a three-year-old child leap up to the ceiling, Miss Andrews had him confined within a metal cage. Then, to her consternation, she found him twisting and crumpling the metal bars as though they had been made of putty.)
5.a. Miss Andrews: "He belongs in a circus, not an orphan-asylum. I won't stand for the creature being here, and that's final!"
Doctor: "Do not be hasty, you can't -- --"
Attendant: "Mr. and Mrs. Kent are here to see you, Miss Andrews."
5.b. Sam: "Yes, we'd like to adopt the youngster."
Molly: "You see, we have no children of our own, and we -- -- we like the little fellow."
Miss Andrews: "I'm sure it can be arranged."
5.c. And so, a few days after they had brought the child to the asylum, the Kents adopted
Sam: "Well, he's our son now, Molly."
Molly: "We'll be the best parents in the world to him."

• • • • • • • • • • • • • • • •

Explanatory panel: The Kents soon discovered that their adopted son lisped words entirely foreign to them.
6.a. Sam: "It can't be baby-talk. He's too old for that. And yet, it sounds like no language I ever heard, and I've heard plenty of 'em."
Molly: "Perhaps his people came from a foreign country."
6.b. Sam examined the metal cylinder for a clue to their adopted son's origin...
Sam: "The inside is lined with a soft velvety material. It looks like expensive stuff."
Molly: "And there's machinery too! What do you make of it?"
6.c. ...and discovered a clue!
Sam: "A note! It was hidden in the folds of the cloth."
Molly: "What does it say?"

• • • • • • • • • • • • • • • •

NOTE: I have included the explanatory panel material so as to follow the lay-out used in the other John Dille strips.

000003552

ER 2618
26

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 40 of 321

## SUPERMAN
### By Jerome Siegel and Russell Keaton

While searching within the metal projectile for a hint as to their
adopted son's origin, Molly and Sam had discovered a note,
written in a strange language, an almost impossible to read.
Molly! "We'll carry it to someone whom Clark is grown, we'll show
it to him. The boy has a right to learn who his real parents
are."

News of the adoption spread swiftly.
Woman-Neighbor: "Have you heard? Mrs. Pryin! The Kents have adopted
a three-year-old child!"
Mrs. Pryin: "Really!"

7.a. (NOTE: Mrs. Pryin is calling to her boy from the door of her house.
Her son, Edgar, is straddling a smaller boy and twisting his
arm behind him.)
Edgar: "Say, 'Uncle'!"
Boy on Ground: "Ouch! Aw, cut it out, Ed!"
Mrs. Pryin: "Behave, Edgar! Now come into the house and get cleaned
up. We're going calling on the Kents!"

• • • • • • • • • • • • • •

8.a. (NOTE: Scene is in the home of the Kents. Mrs. Pryin has just entered.)
Mrs. Pryin: "You play with Clark, honey, while I talk to Mrs. Kent."
Edgar: "I ain't gonna play with no baby!"
8.b. (NOTE: Clark is playing with an electric-train. Edgar scornfully kicks
it off the track. -- The parents have gone into the next room.)
Edgar: "An' if you weren't so little, I'd do the same to you!"
8.c. Mrs. Pryin: "When my Edgar was as old as Clark, I used to feed him lots
of cereals and vegetables. Now if you want Clark to be as
strong and healthy as my Edgar, well spinach and carrots
are...."
Mrs. Kent: "Thank you for the advice, Mrs. Pryin, but ----"
Shout from the Next Room: "WA-A-A-a-a-a!"
8.d. Mrs. Kent: " --- you see, Clark is quite strong and healthy all ready!"
(Mrs. Pryin is astounded.)
Edgar: "Ma! Make him let go!"
(Clark, angered, is holding Edgar up in the air with one hand, and
shaking him vigorously.)

• • • • • • • • • • • • • •

9.a. Sam: "Molly, this is serious! These exhibitions of Clark's super strength
must stop! The entire neighborhood is talking. I'm squeamish only
for the boy's sake."
Molly: "I know! If he is to live a normal life, he can't keep this up.
People fear and resent his superior strength."
9.b. But when Molly and Sam entered Clark's nursery...
Sam: "He's gone! Look! ... the window is open!"
Molly: "We've got to find him at once! He may already be involved in some
terrible mess!"
9.c. Finally, they discovered him.
(NOTE: Molly and Sam are looking down into the cellar from the top of
the stairs. They see Clark sobbing, his arms flung around the
metal projectile.)
Sam: "Why ... he's crying Molly, I think he's homesick -- for his real
parents."
Molly: "If only we knew from where he came and who is par

• • • • • • • • • • • • • • • •

000003553

ER 2619
27

SUPERMAN
By Jerome Siegel and Russell Keaton

10.a. (NOTE: Molly and Clark are on the second floor of their home, in Clark's
____ looking out of the window at ____, who is across the
Molly: "Look Clark! ____ ____ coming home from work! See him waving to ____

10.b. (NOTE: Clark ____ ____ ____ ____ is ____ ____ ____ ____ automobile
____ ____ coming toward ____ ____ tree at Sam!
10.c. (NOTE: ____ ____ ____ ____ ing toward Sam, who is unaware of the
____ seeing his father ____ in danger ____
has sprung ____ ____ the window ____ ____ is preparing to leap out of
the window.

10.d. Molly: "Clark! ____ Don't! ____ ____ ____
(____ picture shows Clark spri____ing down from the second-story window. Molly
____ rushed to the window and is looking down after him, horrified.)

11. (Explanatory panel:) Seeing his father menaced by a swerving automobile,
three-year-old Clark Kent had leapt down from a
second-story window.

11.a. Landing with scarcely a jar, and pausing not for an instant, Clark sped
toward his father with the speed of an unleashed arrow....
11.b. ....vaulting over a passing truck that barred his way!
11.c. Too late!
(NOTE: Picture shows auto crashing into tree. The tree snaps at its nar-
row base and is toppling upon Sam, who, transfixed with fear,
cannot avoid its path. Clark, straining himself to the utmost to
arrive in time, is bearing down -- but it can be seen he will ar-
rive too late to avert the tragedy.)

12.a. The fallen tree, which has pinned Sam to the earth, is slowly crushing out
his life. Clark with a final spring reaches the tree's side, braces his
feet firmly against the ground, and pits his strength against its bulk ---
12.b. Slowly the great weight rises! With his free hand, Clark drags his
father to safety!
(NOTE: Clark is supporting the raised tree with one hand, and with the
other he is dragging his father from out under the tree.)
12.c. (NOTE: Sam, in a hospital, is sitting up in bed and speaking to Molly
who has come with Clark to visit him. Perhaps you might place a
nurse and interne in the background.)
Sam: "We've been blind, Molly. The lad's strength is a god-send! I see
now that he's destined for wonderful things. It is our duty to train
him, Molly -- raise him so that he will use his super strength to
help those in need of assistance."
Molly: "You're right, Sam! We have a duty now, a duty greater than that
of being simply loving parents to our -- our SUPERMAN!"
...............

End of Second Week's Release

000003554

ER 2620
28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 42 of 321

# SUPERMAN

## By Jerome Siegel and Russell Keaton

13. (Explanatory panel) ...the years that follows, Sam and Molly ...raised ...him as their adopted son, in the conviction that he would turn his ...titanic strength into channels that would benefit mankind. When Clark's beloved foster parents passed away, he swore at their death-beds a binding oath. And so was created SUPERMAN, the physical marvel who champions the oppressed!

13.a. Clark: It's no use! I've puzzled over this unintelligible note, which holds the secret of my origin, hundreds of times. But I'm no closer to its secret.

(NOTE: Clark, in his bedroom, is seated at a table, reading the note Sam and Molly had found in the projectile, long years ago. On the table, open, is the small metal box in which he keeps the note.)

13.b. Replacing the Mystery Note in a metal box, Clark prepares to retire —

Clark: I'll look at it again, in the morning.

13.c. —unaware that a prowler crouches outside his window.

Prowler: He acts like whatever's in th' box is worth plenty. I'll wait 'till he's asleep, then sneak in.

(NOTE: The prowler is on the roof of the house, peering into the room. You might show Clark, in his pajamas, about to turn off the room's light.)

· · ·

14.a. (Picture shows the burglar coming into the room through the window. Kent is asleep in his bed.)

14.b. (The burglar's flashlight is shining on the metal box, which one of his hands is grasping.)

Prowler: Here she is!

14.c. Suddenly the lights flash on!

(NOTE: Clark, awakened, has arisen. His hand is on the light-switch.)

Clark: I thought so — a petty thief! Put down that box, pronto!

14.d. Prowler: Button your lip! One more peep or move an' you get punctured. — Say, what're you grinnin' at?

(NOTE: On the wall of the room is placed two crossed swords. As the burglar speaks, he snatches one of the swords down from the wall, holding it in readiness.)

· · ·

000003555

ER 2621
29



15:a.  (Clark is stepping forward, grimacing, the burglar has
       the sword raised in the hands, ready to crash down with (he))
       Prowler: I'm warning' you -- stand back!
       Clark:  Drop that sword, you fool, before you hurt
yourself!
15:b.  Prowler! You asked for it!
       (Clark is springing forward, with all his strength, the
burglar swings ---
5:c.  Th blade harmlessly glances off Clark's super-tough
skin, leaving not even a scratch!
15:d.  (The burglar is cowering back, speechless with fear
and amazement. Clark is breaking and crumbling the sword o
pieces in his two bare hands.)
       Clark! You're next!
       Prowler! No -- no! Don't touch me!

000003556

# EXHIBIT D

DCC00005027

EXHIBIT 24

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 45 of 321

EXHIBIT
U. S. Dist. Court
S. D. of N. Y.
APR 6 1939

Detective Comics, Inc.
480 Lexington Avenue
New York, N. Y.

I, the undersigned, am an artist or author and
have performed work for strip entitled "SUPERMAN"

In consideration of $130.00 agreed to be paid me
by you, I hereby sell and transfer such work and strip, all
good will attached thereto and exclusive right to the use of
the characters and story, continuity and title of strip contained
therein, to you and your assigns to have and hold forever and to
be your exclusive property and I agree not to employ said
characters or said story in any other strips or sell any like
strip or story containing the same characters by their names
contained therein or under any other names at any time hereafter
to any other person, firm or corporation, or permit the use
thereof by said other parties without obtaining your written
consent therefor. The intent hereof is to give you exclusive
right to use and acknowledge that you own said characters or
story and the use thereof, exclusively. I have received the
above sum of money.

_Joe Shuster_
_Jerome Siegel_

Accepted:

DETECTIVE COMICS, INC.

By _____

DCC00005027

EXHIBIT _D_

ER 2624  40

# EXHIBIT L



ER 2626

A thousand years ago, the state of the art that combines words and pictures was the illuminated manuscript - a carefully crafted, fragile document telling a tale only a select few would ever be privileged to read. A thousand years from now, the art form may evolve so that each of us takes the raw electrons from the air and turns them into our own fantasies, moving and speaking on command for the world to access. In between these forms, we have comics.

DC Comics celebrates the millennium mark by offering you the best and most vital examples of our art form. This millennium collection represents our most creative, most cataclysmic and most collectible issues for your shelf.

Paul Levitz
EXECUTIVE VICE PRESIDENT & PUBLISHER

## REMEMBERING THE MILLENNIUM

**Things were happening faster than a speeding bullet back in 1938** for the Man of Steel. Barely a year after his debut in ACTION COMICS #1, Superman was about to make a leap even more impressive than the measly eighth of a mile he could muster at the time!

Until 1938 most comics were usually filled with reprint material spotlighting the more successful newspaper strips of the day. And while ACTION COMICS was one of the first titles filled with original material — created from scratch for less money than it would have cost to reprint existing comic strips — few could have been ready for the sensation its

> SUPERMAN #1
> **The Man of Steel's First Solo Flight**

cover-featured star would cause! ACTION #1 spotlighted the debut performance of the world's first — and still foremost — super-hero: SUPERMAN!

It's been well documented elsewhere, since his June 1938 debut in that ten-cent comic book, just how huge an impression the arrival of Superman on Earth had made on the unsuspecting populace. He really was more than just an alien — he was alien to the world of the anthology comic book. Nearly all other recurring characters in titles like DETECTIVE COMICS and MORE FUN COMICS were private investigators, policemen or other earthbound adventurers. Superman was more fantastic, more unusual than anything the world had ever seen. (In fact, many a publisher rejected Jerry Siegel and Joe Shuster's creation claiming that he was simply TOO different.)

It soon became clear that nothing short of 64 pages of his own title could contain this Man of Tomorrow!

continued on inside back cover →

MILLENNIUM EDITION: SUPERMAN 1. December, 2000 (Originally published as SUPERMAN No. 1, Summer 1938). Copyright 1938) Published by DC Comics, 1700 Broadway, New York, NY 10019. Cover and introduction copyright © 2000 DC Comics. All rights reserved. The DC bullet, all characters featured in this issue, the distinctive likenesses thereof, and all related indicia are trademarks of DC Comics. The stories, characters and incidents featured in this publication are entirely fictional. Printed in Canada.
DC Comics, A division of Warner Bros - A Time Warner Entertainment Company 

ER 2627





Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 49 of 321



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 50 of 321



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 51 of 321

















Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 52 of 321







Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 53 of 321













ER 2632

100



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 54 of 321

















Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 55 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 56 of 321



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 57 of 321

















104









Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 58 of 321



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 59 of 321

# EXHIBIT P

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 61 of 321

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



April 15, 1999

Joanne Siegel
13900 Panay Way, Apt. R-115
Marina Del Rey, CA 90292

Dear Joanne:

I'm writing to follow up on our brief conversation of last week, in which you expressed your hope that we would be contacted shortly by your new California attorneys. As you know, that has not yet happened, and we continue to be concerned and frustrated by our inability to meet with you and/or your representatives to work towards an amicable resolution of your family's claims.

Because the two-year mark since the initial notices is about to be reached, our lawyers are sending formal notice of our position to Arthur Levine (as the last representative whose identity has been divulged to us). In addition, I wanted to let you know that DC will continue to provide the income and insurance benefits you that you have been receiving under the 1975 agreement, without prejudice to our rights under that agreement, as long as we all continue to pursue the goal of working together.

It remains my sincere personal goal to reach a resolution of these matters which is satisfactory to you and Laura. Please let me know if there is anything I can do to help achieve that goal, or to be helpful in any other way.

Best,

Paul Levitz

EXHIBIT U

A Division of Warner Bros.—A Time Warner Entertainment Company

000001129

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 62 of 321

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
4  Telephone:  310-858-7888
   Fax:        310-550-7191
5
   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6  Roger L. Zissu (Admitted *pro hac vice*)
   866 United Nations Plaza
7  New York, New York 10017
   Telephone:  212-813-5900
8  Fax:        212-813-5901
9  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY 10516
11 Telephone: 845-265-2820
   Fax:       845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
                 UNITED STATES DISTRICT COURT
14
         CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
15

16 JOANNE SIEGEL and LAURA      ) Case No. 04-8400 SGL (RZx)
   SIEGEL LARSON,               )
17                              ) Hon. Stephen G. Larson, U.S.D.J.
                                )
18           Plaintiffs,        )
                                ) **DEFENDANTS' OPPOSITION**
19      vs.                     ) **TO PLAINTIFFS' MOTION FOR**
                                ) **PARTIAL SUMMARY**
20 WARNER BROS. ENTERTAINMENT   ) **JUDGMENT AND**
   INC.; TIME WARNER INC.; DC   ) **MEMORANDUM OF POINTS**
21 COMICS; and DOES 1-10,       ) **AND AUTHORITIES IN**
                                ) **SUPPORT THEREOF**
22           Defendants.        )
                                ) [Defendants' Opposition to Local
23                              ) Rule 56.1 Statement; Declaration of
                                ) Michael Bergman and exhibits
24                              ) thereto]
                                )
25                              ) Date:    July 23, 2007
                                ) Time:    10:00 a.m.
26                              ) Place:   Courtroom 1
                                )
27 _____     )
   AND RELATED COUNTERCLAIMS.   )
28                              )

                                                    **ER 2641**

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................ 1

SUMMARY JUDGMENT STANDARD ................................................ 4

DEFENDANTS' STATEMENT OF FACTS, INCLUDING
RELEVANT DISPUTED MATERIAL FACTS ...................................... 5

    A.    The Origins of Superman ....................................................... 5

        1.    Action Comics No. 1 and the March 1, 1938
            Assignment ................................................................. 5

        2.    Siegel and Shuster's Further Grants to DC ................. 8

        3.    The Development of Superman by DC
            in Derivative Works ..................................................... 9

    B.    The Prior Litigation Between the Parties'
        Predecessors ...................................................................... 11

        1.    The Westchester Action ............................................. 11

        2.    Corrections of Plaintiff's Statement of Facts
            With Respect to Westchester Action ......................... 12

        3.    The Prior Federal Action ........................................... 13

    C.    Termination Rights Under § 304(c) of the 1976 Act ........ 15

    D.    Plaintiffs' Superman Notices of Termination And
        Filing And Filing of These Actions ................................... 16

    E.    The Parties' 2001 Settlement ........................................... 18

    F.    Corrections With Respect to Plaintiffs' Settlement
        Concerning Judge Lew's Decision in The Superboy
        Action .............................................................................. 25

ARGUMENT .................................................................................. 26

I.    MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY
    JUDGMENT WITH RESPECT TO PLAINTIFFS' RECAPTURE
    OF AN UNDIVIDED ONE HALF SHARE OF THE COPYRIGHT
    IN ACTION COMICS NO. 1 ..................................................... 26

A.   Genuine Issues of Material Fact Preclude
     Summary Judgment on Defendants' Defense that
     Portions of Action Comics No. 1 Were Created As
     "Works Made for Hire".........................................................27

     1.   Certain Material Portions Of Action Comics No. 1
          Were Created As Works Made For Hire By Siegel
          And Shuster Or By Third Parties And Thus, Cannot
          Be Subject To Termination............................................28

          a.   The Publication Of Action Comics No, 1......................28

          b.   The Additional Action Comics No. 1 Materials
               Were Created As "Work For Hire" And Thus
               Cannot Be Subject To Termination ...............................29

               1)   The Addition Of Color To Action
                    Comics No. 1 Was Work Prepared By
                    Regular Employees Of Detective
                    Within The Scope Of Their
                    Employment .........................................................29

               2)   The Portion Of Action Comics No. 1
                    Created By Siegel And Shuster After
                    Detective Told Them They "Could
                    Proceed" Were Created At The
                    Instance And Expense Of Detective
                    And Are Thus Work For Hire ...........................30

     2.   Plaintiffs' Attempts To Demonstrate That The
          Additional Action Comics No. 1 Materials Are Not
          Work For Hire Are Without Merit And, At Best, Are
          Rife With Genuine Issues Of Material Fact. .........................34

          a.   The Existence Of A Written agreement Does
               Not Affect The Work For Hire Status Of The
               Additional Action Comics No. 1 Materials .................34

          b.   Plaintiffs' Res Judicata And Collateral
               Estoppel Argument to Avoid the Work for
               Hire Status of the Additional Actions
               Comics No. 1 Materials Are Equally
               Untenable .........................................................35

B.   Plaintiffs Failed to Terminate the 1948 Final
     Judgment, Leaving In Place an Operative Grant of
     Rights in Superman ...............................................................39

C.   Joanne Siegel's Continued Acceptance of Benefits
     Under the 1975 Agreement Leaves in Place That
     Operative Grant .....................................................................40

D.   Genuine Issues of Material Facts Prevent
     Dismissal of Defendants' Statute of Limitations
     Defenses ...............................................................................47

1.    The Copyright Act's Statutes Of Limitations Bar Any Civil Action Not Commenced Within Three Years Of The Accrual Of A Claim ........................................... 47

2.    Plaintiffs' Attempted Reliance Upon The "Tolling Agreement" Is Misplaced. ........................................... 50

    a.    Summary Judgment Is Inappropriate Because There Are Genuine Issues Of Material Fact As To When Plaintiffs' Claim Of Co-Ownership Accrued And When The Tolling Agreement Terminated. .................... 50

    b.    Regardless Of When The Claim Accrued And When The Tolling Agreement Expired, Any Claims Of Co-Ownership Of Copyright Against Entities Other Than DC Comics Are Time-Barred. ........................................... 52

II.    AS A MATTER OF LAW, AN EFFECTIVE TERMINATION PURSUANT TO THE SUPERMAN NOTICES OF TERMINATION CANNOT REQUIRE A PROFIT ACCOUNTING FROM EXPLOITATION OF FOREIGN COPYRIGHT ........................................... 53

A.    BACKGROUND: THE ESTABLISHED COPYRIGHT FRAMEWORK IN WHICH TERMINATION MUST BE CONSIDERED ........................................... 53

1.    Rights of Co-Owners Of Copyright ........................................... 53

2.    National Treatment and Territorial Nature of the United States Copyright Act ........................................... 54

3.    The Presumption Against The Extraterritorial Effect of U.S. Legislation ........................................... 54

B.    Plaintiffs Have Misstated a Joint Owner's Duty to Account Which Only Requires the Co-Owners to Share Its Own Profits ........................................... 57

C.    Because Plaintiffs Cannot and Have Not Recaptured Any Ownership Interest in Foreign Copyrights, The Rules Governing Accountings Between Joint Owners Do Not Apply to Profits from Such Foreign Copyrights ........................................... 58

D.    Only the Copyright Act, Not State or Any Other Law, Determines the Rights That Can be Recaptured By Means of a Copyright Termination Under Section 304 (c) ........................................... 59

331633v1    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 66 of 321

1.    In The Copyright Act's Termination Provisions Congress Clearly and Broadly Expressed its Intent that the Terminating Party's Rights Could Not Affect a Grantee's Foreign Copyright Rights or Reach Actions Occurring Outside of the U.S. ....................................59

     a.    The Copyright Act Does Not Include Any Indication Of Congressional and Intent to Cover Conduct Occurring Outside the U.S. .................60

     b.    Congress Has Clearly Manifested Its Contrary Intent, To Wit, That Any Termination and Recapture of Copyright Rights Under Sections 304(c) and 203 Cannot Apply to Any Conduct Occurring Outside the Country. ...........................61

2.    Plaintiffs Do Not Own Any Interest in Foreign Copyright Rights Because These Are Not Subject to Termination ..............................................................61

3.    Plaintiffs' Theory That They Have Recaptured a Share of Foreign Copyrights On the Basis of State Common Law General Principles of Accounting Generally Governing The Rights of Property Co-Owners Disregards The Rules of National Treatment and Copyright Preemption .................................65

III.    WHETHER THE PARTIES ENTERED INTO AN ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A QUESTION OF FACT WHICH CANNOT BE RESOLVED ON SUMMARY JUDGMENT ...................................................................67

   A.    It Has been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement ................................................69

   B.    The Fact That the Parties Contemplated the Later Negotiation and Execution of a Long-Form Contract Does Not Negate the October 19 Agreement as a Matter of Law .....................71

   C.    The October 19, 2001 Agreement Is An Acceptance Of DC Comics' Offer And Is Not A "Counteroffer" That Was Rejected By Defendants ................74

   D.    Plaintiffs' Parade Of Alleged "Material Differences" Between The October 19, 2001 Agreement, The Schulman Letter, And The February Long Form Is Irrelevant And Misleading ...........................78

CONCLUSION ........................................................................85

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Aalmuhammed v. Lee,*
    203 F.3d 1227 (9th Cir. 2000)................................................................49

*American Title Ins. Co. v. Lacelaw Corp.,*
    861 F.2D 224 (9TH Cir. 1988)..........................................................44

*Ashton-Tate v. Ross,*
    916 F.2d 516 (9th Cir. 1990).............................................................57

*Benz v. Compania Naviera Hildago, S.A.,*
    353 U.S. 138 (1957)............................................................................55

*Books-A-Million, Inc. v. H & N Enterprises, Inc.,*
    140 F.Supp.2d 846 (S.D. Ohio 2001)..................................................26

*Brattleboro Pub. Co. v. Winmill Pub. Corp.,*
    369 F.2d 565 (2d Cir. 1966)...............................................................31

*Brunswick Beacon, Inc. v. Schock-Hopchas Pub. Co.,*
    810 F.2d 410 (4th Cir. 1987).............................................................32

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1981)...............................................................39

*Callie v. Near,*
    829 F.2d 888 (9th Cir. 1987)..............................................................68

*City of Saint Paul, Alaska v. Evans,*
    344 F.3d 1029 (9th Cir. 2003).............................................................49

*Core-Vent Corp. v. Implant Innovations, Inc.,*
    53 F.3d 1252 (Fed. Cir. 1995).............................................................79

*Craft v. County of San Bernardino,*
    468 F. Supp. 2d 1172 (D.D. Cal. 2006)..................................................4

*Creative Tech, Ltd. v. Aztech Sys. Pte., Ltd.,*
    61 F.3d 696 (9th Cir. 1995)...............................................................54

*Cytec Indus., Inc. v. B.F. Goodrich Co.,*
    32 F. Supp. 2d 821, 828-29 (S.D. Ohio 2002)....................................26

*Dolman v. Agee,*
    157 F.3d 708 (9th Cir. 1998)........................................................30, 34

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 68 of 321

*E.E.O.C. v. Arabian American Oil Co.,*
    499 U.S. 244 (1991) .................................................................55

*Easter Seal Soc'y for Crippled Children v. Playboy Enters.,*
    815 F.2d 323 (5th Cir. 1987) ......................................................31

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
    63 U.S.P.Q.2d 1301 (S.D.N.Y. 2002),
    *aff'd,*342 F.3d 149 (2d Cir. 2003) .................................29, 31, 49

*Feist Publs., Inc. v. Rural Telephone Serv.,*
    499 U.S. 340 (1991) .................................................................13

*Foley Bros., Inc. v. Filardo,*
    336 U.S. at 281 (1949) .............................................................55

*Forward v. Thorogood,*
    985 F.2d 604 (1st Cir. 1993) ......................................................29

*Fred Ahlert Music Corp. v. Warner Chappell Music,*
    155 F.3d 17 (2nd Cir.1988) ................................................16, 62, 63

*Fred Ahlert Music Corp. v. Warner/Chappell Music,*
    958 F.Supp. 170 (S.D.N.Y. 1997) .............................................62

*Glow Indus v. Lopez,*
    273 F. Supp. 2d 1095, 1114 n. 98 (C.D. Cal. 2003)......................43

*Harrison v. PPG Indus., Inc.,*
    46 U.S. 578, 592 (1980) ............................................................65

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ...................................................................66

*In re Artha Management, Inc.,*
    91 F.3d 326, 329 (21nd Cir. 1996).........................................69, 71

*Inamed Corporation v. Kuzmak,*
    275 F. Supp. 2d 1100 (C.D. Cal. 2002).........................69, 71, 79, 80, 85

*Itar-Tass Russion News Agency, Inc. v. Russian Kurier, Inc.,*
    153 F.3d 32 (2d Cir. 1988) ........................................................54

*Jasper v. Sony Music Entertainment, Inc.,*
    378 F. Supp. 2d 334, (2005) ......................................................57

*Kewanee Oil Co. v. Bicron Corp.,*
    416 U.S. 470 (1974) .................................................................66

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 69 of 321

*Leisure Time Enm't. v. Cal. Vista,*
    35 Fed. Appx. 565 (9th Cir. 2002) .............................................................60

*Lin-Brook Builders Hardware v. Gertler,*
    352 F.2d 298 (9th Cir. 1965) ...............................................................29, 35

*Los Angeles News Service v. Reuters Television Intern. Ltd.,*
    144 F. 3d 987 (9th Cir. 1998), *cert. denied,* 525 U.S. 1141 (1999) ............60

*Marvel Character, Inc. v. Simon,*
    310 F.3d 280 (2d Cir. 2002) ...............................................................37, 46

*May v. Morganelli-Heumann & Assocs.,*
    618 F.2d 1363 (9th Cir. 1980) ...................................................................31

*McCulloch v. Sociedad Nacional de Marineros de Honduras,*
    372 U.S. 10 (1963) ....................................................................................55

*Merchant v. Levy,*
    92 F.3d 51 (2d Cir. 1996) ..........................................................................49

*Meridian Project Sys., Inc. v. Hardin Const. Co.,*
    *426 F.* Supp. 2d 1101 (E.D. Cal. 2006) ......................................................26

*Microsoft Corp. v. AT&T Corp.,*
    127 S.Ct. 1746, (2007) ..............................................................................56

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005) ...............................................15, 16, 46, 48

*National Union Fire Ins. Co. v. Argonaut Ins. Co.,*
    701 F.2d 95 (9th Cir. 1983) .................................................................43, 44

*Niss v. Columbia Pictures Indus., Inc.,*
    2000 U.S. Dist. LEXIS 18328 (S.D.N.Y) .................................................33

*Oddo v. Ries,*
    743 F.2d 630 (9th Cir. 1984) .........................................................53, 57, 58

*Playboy Enters. v. Dumas,*
    53 F.3d 549 (2d Cir. 1995) ...................................................................31, 33

*Pye v. Mitchell,*
    574 F.2d 476 (9th Cir. 1978) ....................................................................53

*Rano v. Sipa Press, Inc.,*
    987 F.2d 580 (9th Cir. 1993) ....................................................................66

*Roth v. Marquez,*
    942 F.2d 617 (9th Cir. 1991) ....................................................................72

*Runoli Leathers Ltd. v. Mikhaeil,*
    2001 U.S. Dist. LEXIS 17896 at *7 (N.D. Cal. Oct. 23, 2001) .................81

*Sears Roebuck & Co. v. Stiffel Co.,*
    376 U.S. 225 (1964) ......................................................................66

*Self-Realization Fellowship Church v. Amanda Church of Self-Realization,*
    206 F.3d 1322 (9th Cir. 2000)....................................................29, 31

*Shapiro Bernstein & Co. v. Jerry Vogel Music Co., Inc.,*
    223 F.2d 252 (2nd Cir. 1955) ........................................... 30, 31-32

*Siegel v. National Periodical Publications,*
    364 F. Supp. 1032 (S.D.N.Y. 1973) ...............................................13

*Siegel v. National Periodical Publications,*
    508 F.2d 909 (2d Cir. 1974) ................................. 5-6, 13, 37, 39

*Sola Elec. Co. v. Jefferson Elec. Co.,*
    317 U.S. 172, 63 S.Ct. 172, 87 L.Ed. 165 (1942) .......................66

*Sony Corp. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ......................................................................15

*Stillman v. Travelers Ins. Co.,*
    88 F.3d 911 (11th Cir. 1996) ........................................................26

*Stone v. Williams,*
    970 F.2d 1043 (2d Cir. 1992), ......................................................48

*Subafilms, Ltd. v. MGM-Pathe Communications Co.,*
    24 F.3d 1088 (9th Cir. 1994), *cert. denied,* 513 U.S. 1001,
    115 S. Ct. 512, 130 L. Ed. 2d 419 (1994) .......................54, 60, 61

*Symphony Fabrics Corp. v. Podell Indus., Inc.,*
    94 Civ. 4373 (BSJ)1996 U.S. Dist. LEXIS 12767,
    *14 (S.D.N.Y. Aug. 30, 1996).....................................................68

*T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987) ......................................................69

*Twentieth Century Fox Film Corp. v. Entertainment Distributing,*
    429 F.3d 869 (9th Cir. 2005).....................29, 30, 31, 32, 33, 35

*United Dictionary Co. v. G&C Meriam,*
    208 U.S. 260, 28 S. Ct. 290 (1908) .............................................60

*Wady v. Provident Life & Accident Ins. Co. of Am.,*
    216 F. Supp. 2d 1060 (C.D.Cal. 2002)...........................................4

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 71 of 321

*Warner Bros. v. American Broadcasting Companies,*
    654 F.2d 205-06 (2d Cir. 1981)...................................................................10

*Zuill v. Shanahan,*
    80 F.3d 1366 (9th Cir. 1996).........................................................49, 53, 58

## STATE CASES

*Alexander v. Codemasters Group Ltd.,*
    104 Cal.App.4[th] 129 (2002).................................................................69

*Apablasa v. Merritt & Co.,*
    176 Cal. App. 2d 719 (1959).............................................................68, 74

*Banner Entertainment,*
    62 Cal.App.4[th] 348 (1998).......................................................68, 74, 75

*Beard v. Goodrich,*
    110 Cal.App.4[th] 1031 (2003)...............................................................75

*Beck v. American Health Group Int'l,*
    211 Cal.App.3d 1555 (1989)................................................................71, 72

*Brown v. Republic Prods., Inc.,*
    26 Cal. 2d 867 (1945).............................................................................57

*Duran v. Duran,*
    150 Cal. App. 3d 176 (1983)...................................................................72

*Ersa Grae Corp. v. Fluor Corp.,*
    1 Cal.App.4[th] 613 (1991)...............................................72, 76, 78

*Forgeron Inc. v. Hansen,*
    149 Cal. App. 2d 352 (1957)....................................................................72

*Harris v. Rudin, Richman & Appel,*
    74 Cal.App.4[th] 299 (1999)....................................................................71

*House of Prayer, etc. v. Evangelical Assoc. for India,*
    113 Cal.App.4[th] 48 (2003)....................................................................74

*Kern Sunset Oil Co. v. Good Roads Oil Co.,*
    214 Cal. 435, 6 P.2d 71 (Cal. 1931), ...............................................41, 46

*Kitty-Anne Music Co. v. Swan,*
    112 Cal.App.4[th] 30 (2003)....................................................................76

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 72 of 321

*King v. Stanley,*
    32 Cal.2d 584 (1948)............................................................76

*Kohn v. Jaymar-Rudy,*
    23 Cal.App.4th 1530, (1994)..............................................80

*Los Angeles v. Superior Court,*
    51 Cal. 2d 423 (1959)........................................................80

*Louis Lesser Enterprises, Ltd. v. Roeder,*
    209 Cal.App.2d 401 (1962)..........................................71, 78

*Mancuso v. Krackov,*
    110 Cal.App.2d 113 (1952)................................................80

*Miller v. Reidy,*
    85 Cal.App. 757 (Cal. Ct. App. 1927)............................41, 46

*Patch v. Anderson,*
    66 Cal. App. 2d 63, 66 (1944)............................................72

# FEDERAL STATUTES

**1909 Copyright Act**

17 U.S.C. § 24 (repealed) ...................................................8, 37

**1976 Copyright Act**

17 U.S.C. § 28 (repealed) ......................................................31

17 U.S.C. § 104(b).................................................................54

17 U.S.C. § 201(a) & (b) ........................................................53

17 U.S.C. § 201(b).................................................................64

17 U.S.C. § 203(b)............................................................16, 64

17 U.S.C. § 203(b)(1), (5)..................................................16, 62

17 U.S. C. § 203 (b)(5)...........................................................64

17 U.S.C. § 304(c)...........................................................passim

17 U.S.C. § 304(c)(5).......................................................40, 48

17 U.S.C. § 304(c)(6)..............................................................16

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 73 of 321

17 U.S.C. § 304(c)(6)(A) ..............................................................63

17 U.S.C. § 304 (c)(6)(A) & (E) ...................................................16

17 U.S.C. § 304(c)(6)(B) ..............................................................41

17 U.S.C. § 304(c)(6)(D) ...........................................................41, 82

17 U.S.C. § 304(c)(6)(E) ...........................................................2, 62, 65

17 U.S.C. § 401(a) .......................................................................60

17 U.S.C. § 507(b) .......................................................................47

Pub. L. No. 94-553, 90 Stat. 2541, § 304(a)(1976) ........................15

**Copyright Act Legislative History**

H. Rep. No. 94-1476,
94th Cong. 2d Sess. at 140 (1976) ...........................15, 31, 48, 53, 62

S. Rep. No. 94-473,
94th Cong. 1st Sess. (1975) ..........................................................15, 48

Supplementary Register's Report on the General Revision
of U.S. Copyright Law at 72 (1965) .............................................15, 48

**Other Statutes**

Bern Convention Implementation Act of 1988,
Publ. L. No. 100-568, 102 Stat. 2853 (1988) ................................54

35 U.S.C. § 271 (f)(1) .................................................................56

37 C.F.R. § 201.10 (b)(1)(iv) ........................................................39

Fed. R. Civ. P.56(e) ....................................................................4

22 N.Y. Comp. Codes R. & Regs. Tit. 22 § 670.2[a][4] (2005) ..........13

N.Y. Civ. Prac. Act § § 57-74 (1924)(repealed) ..............................13

## Treatises

Howard B. Abrams, *The Law of Copyright* (2006), § 12:41 ...................................64

Paul Geller & Melville B. Nimmer, 1 *International Copyright Law and Practice* (2005) § 6[2][a][i], fn. 70........................................................64

Paul Goldstein, *Goldstein on Copyright* (3d ed. 2006), § 5.4.3 at 5:135 .............64

Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases & Materials* (6th ed. 2006), 376-77...........................................................................64

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005)

    § 2.14 .............................................................................................30

    § 5.03[D].........................................................................................31

    § 6.03 .............................................................................................53

    § 6.10 .............................................................................................53

    § 6.12[B].........................................................................................57

    § 9.03 .............................................................................................37

    § 11.02[B][2] ..................................................................................64

    § 11.06[B] .......................................................................................39

William F. Patry

    *Choice of Law and International Copyright* (2000)
    48 Am.J.Comp.L. 383, 447 (2000).................................................64

    *Copyright Law and Practice (2004),* 495-97 ...............................64

    *Latman's The Copyright Law* 109 (6th ed. 1986) ..................16, 54

    *Patry on Copyright* (2006), § 7:42 & n.5 .........................60, 61, 64

Weinstein Korn & Miller, New York Civil Practice:
    CPLR, ¶ 5011.21 (2d ed. 2007 .......................................................38

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 75 of 321

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Time Warner Inc., Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics ("DC") (collectively "Defendants") submit this memorandum in opposition to Plaintiffs Motion for Partial Summary Judgment in Case No. CV 04-8400 SGL (the "Superman Action").[1]

## PRELIMINARY STATEMENT

As the Court is aware, this action and the companion Superboy Action involve the comic book character "Superman," who first made his public appearance almost 70 years ago. Plaintiffs are the widow and daughter of Jerome Siegel ("Siegel"), one of the two original creators of Superman. By virtue of these actions, Plaintiffs seek to recapture, pursuant to Section 304(c) of the 1976 Copyright Act, certain copyright interests that Siegel originally conveyed to DC and its predecessors as early as 1938.

Plaintiffs have now moved for partial summary judgment in both actions, seeking to establish some of their claims and to eliminate some of Defendants' defenses. In this Superman Action, Plaintiffs ask the Court to summarily decide (1) that their seven separate notices of termination with respect to Superman (the "Superman Notices") are valid and effective, and served to restore to Plaintiffs as of April 16, 1999 any copyright interests previously granted by Siegel to DC and its predecessors, not withstanding Defendants' various asserted challenges to the Notices; (2) that Plaintiffs are entitled to share in all post-termination revenues from the exploitation of the recaptured Superman copyrights, even those revenues generated from exploitation outside of the United States;[2] and (3) that the

---

[1] Because Plaintiffs have made two submissions of their summary judgment motions, one series of motions in this Superman Action, Case No. CV 04-8400 SGL (RZx) and the other in Case No. CV 04-8776 SGL (RZx) (the "Superboy Action"), Defendants have similarly served and filed two sets of opposition papers, one in connection with each motion.

[2] Indeed, although not the specific subject of this motion, Plaintiffs even more broadly seek to share in the revenues from the exploitation of the pre-termination Superman

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 76 of 321

settlement agreement Plaintiffs entered into with Defendants in October, 2001, resolving all of the claims they are now prosecuting, is not binding and enforceable on them.

But Plaintiffs' motions are not well taken; rather, they are founded upon a grab bag of arguments that invoke cherry-picked language taken out of context, and disregard obvious fact issues, established law and common sense. Accordingly, the issues presented by Plaintiffs in this motion are simply not subject to determination in their favor *as a matter of law*.

First, as demonstrated below, the validity and effectiveness of Plaintiffs' Superman Notices cannot be established until certain factual issues which underlie Defendants' challenges are litigated and determined at trial; namely (i) whether portions of the Superman strip in *Action Comics No. 1* – the entirety of which Plaintiffs claim to have recaptured – were actually "works for hire" not subject to termination under the Copyright Act; (ii) whether Plaintiffs' failure to terminate the final judgment on consent in the 1948 state court action between the parties leaves in place an operative grant of rights in Superman; (iii) whether Plaintiffs' continuing acceptance of benefits under a 1975 agreement between the parties leaves intact the operative Superman grant under that agreement; and (iv) whether Plaintiffs are barred by the statute of limitations from pursuing their declaratory relief claims on the termination claims. (*See* Section I.A-D, *infra*).

Second, Plaintiffs' requested ruling that they are entitled, under state law principles, to an accounting for a co-owner's 50 percent share of "all profits earned from Plaintiffs' recaptured 'Superman' copyrights both in the United States and foreign territories," contradicts the long-established rule against the extraterritorial application of U.S. law and the express terms of the statute that provides for copyright recapture. 17 U.S.C. § 304 (c)(6)(E). Even if there were a state law

works; the exploitation of portions of the Superman mythology and characters owned exclusively by DC and not subject to termination; and from the exploitation of the Superman family of trademarks – *none* of which is permissible under the termination provisions of the Copyright Act and established precedent,

ER 2655

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 77 of 321

1   principle entitling one who is not an owner of a foreign copyright to share in the

2   profits from exploitation of a jointly owned work outside of the U.S. (which there

3   is not), it would be pre empted and foreclosed by Congress' clear and

4   unambiguous expression to the contrary with respect any recapture of copyright

5   under section 304(c). In addition, the Supreme Court has consistently held that

6   whether a federal statute can reach foreign conduct in the way Plaintiffs request is

7   a question of statutory interpretation, and that unless a statute "clearly" manifests

8   Congress' intent to have legislation apply extraterritorially, it cannot be judicially

9   interpreted to do so. The Supreme Court has characterized this rule as "a cannon

10  of construction" creating a presumption against the foreign application Plaintiffs

11  seek for the Copyright Act. As such, the Copyright Act's termination provisions

12  limit the effect of any recapture to U.S. Copyright rights only, and Plaintiffs are not

13  entitled to share in any revenues generated from the foreign exploitation of

14  Superman. (*See* Section II.A-D, *infra*.)

15          Finally, Plaintiffs cannot circumvent their settlement agreement and dispose

16  of DC's Counterclaims on that contract as a matter of law. There are significant

17  and fundamental questions of fact as to whether the parties entered into a binding

18  agreement on October 19, 2001, resolving all of the claims which Plaintiffs are

19  asserting here, when Plaintiffs' attorney and authorized representative sent a letter

20  to DC's counsel expressly stating that "*The Siegel Family . . . has accepted D.C.*

21  *Comics offer of October 16, 2001 in respect of the 'Superman' . . . properties*" and

22  proceeded to set out in detail each of the material terms of that agreement. That is,

23  DC's Counterclaims simply are not amenable to summary adjudication: The

24  question of whether the agreement reached by the parties on October 19, 2001, and

25  memorialized by Plaintiffs' counsel in an executed writing on the same date, is

26  binding turns on questions of fact which are within the ultimate province of the

27  jury, and are not appropriate for resolution by the Court at this juncture. (*See*

28  Section III.A-D, *infra*.)

**ER 2656**

1    Plaintiffs' motion for summary judgment is part and parcel of their

2  misguided effort to recover more than they ever would be entitled to even if they

3  succeed on the merits. Defendants' opposition, along with Defendants' own

4  Motion for Partial Summary Judgment, are designed to expose the absence of legal

5  basis for this endeavor and to cut both actions down to their proper size.

6                      **SUMMARY JUDGMENT STANDARD**

7    Under Rule 56, a party seeking summary judgment bears the initial burden

8  of informing the court of the basis of its motion and of identifying those portions of

9  the pleadings and discovery responses that demonstrate the absence of a genuine

10  issue of material fact. *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F.

11  Supp. 2d 1060, 1065 (C.D. Cal. 2002). The Court construes all evidence and

12  reasonable inferences drawn therefrom in favor of the non-moving party. *Craft v.*

13  *County of San Bernardino*, 468 F. Supp. 2d 1172, 1175 (C.D. Cal. 2006). To the

14  extent Plaintiffs' motions raise issues of law as to the validity and effect of the

15  Superman Notices, Defendants submit these must be decided in Defendants' favor.

16  With respect to facts bearing on Plaintiffs' attempt to prevent a trial on the parties'

17  settlement, Plaintiffs cannot carry their burden of establishing as a matter of law

18  that the parties did not agree to be bound by the comprehensive letter of Plaintiffs'

19  counsel who expressly and with full authority confirmed all of the material terms

20  of such an agreement. Defendants' showing on this point more than satisfies its

21  obligation to demonstrate, by admissible evidence, the specific facts showing that

22  there is a genuine issue for trial. *Id*. *See also* Fed. R. Civ. P.56(e).

23

24

25

26

27

28

**ER 2657**

## DEFENDANTS' STATEMENT OF FACTS, INCLUDING
## RELEVANT DISPUTED MATERIAL FACTS[3]

### A.    The Origins of Superman

####    1.    *Action Comics No.* 1 and the March 1, 1938 Assignment

In the 1930s, Plaintiffs' predecessor, Siegel, along with his creative partner, artist Joseph Shuster ("Shuster"), jointly conceived of and created a cartoon strip that ultimately became the first Superman story. (*See* Declaration of Paul Levitz ("Levitz Decl."), ¶ 4.)  Their proposed syndicated strip of Superman was rejected numerous times over several years by a number of different publishers.

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics, Inc. ("Detective") (DC's predecessor) under which they provided artwork and continuity (*i.e.*, new stories) relating to a number of pre-existing characters other than Superman.  (Exhibit A to the Declaration of Michael Bergman ("Bergman Decl."), submitted herewith.)  That agreement provided, *inter alia*, that "any new and additional features which [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to [Detective]." (*Id*. Exh. A.)  Accordingly, Siegel and Shuster's submission of the Superman materials they had theretofore created was pursuant to the terms of that agreement.

Detective decided that it would exercise its option under the December 4, 1937 agreement and publish Superman, and by letter dated February 1, 1938, Detective editor Vin Sullivan returned the materials submitted by Siegel and Shuster and instructed them to "[s]tart in immediately on the thirteen (13) page feature of SUPERMAN for the new Action Comics Magazine." (Bergman Decl. Exh. B.)  Siegel and Shuster were instructed to revise and expand such materials into a "full-length production suitable for magazine publication . . . ." (*Siegel v.*

---

[3] The uncontroverted facts summarized in this section are relevant as background as to each of the grounds for denying Plaintiffs' motion for partial summary judgment.  All of these uncontroverted facts, disputed facts and relevant evidence are submitted herewith in Defendants' Response to Plaintiffs' Local Civil Rule 56.1 Statement of Uncontroverted Facts and Conclusions of Law.

ER 2658

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 80 of 321

1    *National Periodical Publications, Inc.*, 508 F.2d 909. 911 (2d Cir. 1974); Bergman

2    Decl. Exh. <u>C</u>.)  Siegel and Shuster's editor further instructed them that the work

3    should be "the very best" and "without imperfections." (Bergman Decl. Exh. <u>C</u>.)

4         Subsequently, on March 1, 1938, Siegel and Shuster executed an assignment

5    to Detective of all of their rights in Superman and in any previously created work

6    employing that character (the "1938 Assignment") (Levitz Decl. ¶ 5; Declaration of

7    Marc Toberoff in Support of Plaintiffs' Motion for Partial Summary Judgment

8    ("Toberoff Decl.") Exh. <u>E</u>.)[4]  The 1938 Assignment represented Detective's

9    exercise of the option granted to it by Plaintiffs under the December 4, 1937

10   Agreement.  (Bergman Decl. Exh. <u>B</u>.)[5]  In a contemporaneous letter of March 1,

11   1938 to Siegel, Detective executive Jack Liebowitz reiterated the need to provide

12   eight panels per page and chastised Siegel for failing to do so in connection with

13   *Action Comics No. 1*, and stating that, were Detective not so pressed for time that

14   he "would have rejected them." (Bergman Decl. Exh. <u>F</u>.)

15        Thus, at Detective's instruction, Siegel and Shuster expanded and adapted

16   their existing Superman strips into a format suitable for a comic book.  In a sworn

17   affidavit dated March 7, 1973, submitted in connection with a lawsuit brought by

18   Siegel and Shuster against DC's predecessor National Periodical Publications

19   (discussed below), Shuster testified that he "drew *several additional pictures* to

20   illustrate the story continuity and these appear on page 1 of the first Superman

---

[4] Detective then announced the debut of its *Action Comics* series, and Superman, in full page announcements in its May, 1938 issues of some of its existing publications, including *More Fun Comics No. 31*, published on April 5, 1938 (Bergman Decl. Exh. <u>D</u>), and *Detective Comics No. 15*, published on April 8, 1938 (*id.* Exh. <u>E</u>).  Both magazines contained full-page ads which reproduced the cover of the soon to be published first issue of *Action Comics*.  Defendants have moved for summary judgment that Plaintiffs' failure to terminate these announcements excludes them from the scope of the Superman Notices.

[5] Although Plaintiffs claim that the December 4, 1937 Agreement did not "pertain to Superman" (Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment ("Pl. Mem.") at 5), the findings of fact in the Westchester Action, on which Plaintiffs otherwise so heavily rely, state precisely the opposite:  "The instrument of March 1, 1938 [the 1938 Assignment] . . . represented the exercise by Detective Comics, Inc. of the option granted to it by the said agreement of December 4, 1937." (Toberoff Decl. Exh. <u>B</u>, Finding of Fact No. 29.)

6

ER 2659

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 81 of 321

release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release." (Bergman Decl. Exh. G. at 2.) Shuster further testified that at this time he also drew the last panel in *Action Comics No. 1*. (*Id.* at 2.) Siegel confirms this in his own affidavit dated March 1, 1973, testifying, in part, that "[u]pon receiving word from Detective that we could proceed, Joe Shuster, under my supervision . . . added several pictures to illustrate the story continuity." (*Id.* Exh. H at 5.) Siegel further testified that "the scientific explanation on page 1 of the release and the last panel at the foot of page 13" were added. (*Id.* at 5.) In addition, the cover to *Action Comics No. 1*, which was based on a panel in the story, was also prepared by Detective. On February 22, 1938, Detective sent Siegel a "silverprint" it had prepared of the cover. (Bergman Decl. Exh. I.)

In addition to these "several" additional pictures, cover and new text added after Detective said Siegel and Shuster "could proceed," more subject matter was added to *Action Comics No. 1*. As was the custom in the industry in 1938, Siegel and Shuster provided their materials in black and white. (Declaration of Jack Adler ("Adler Decl."), ¶¶ 3-4.) Color was then added at the printing step, with colors often decided upon by the publisher. (*Id.*) Specifically, employees on staff at Detective were provided with Siegel and Shuster's black and white work and decided upon the colors to be added, including but not limited to, the colors of Superman's now iconic costume. (*Id.* ¶ 4.) (The new drawings and text added to *Action Comics No. 1* by Siegel and Shuster after they were told they "could proceed" and the addition of color by Detective employees are collectively referred to as the "Additional *Action Comics No. 1* Materials.")

The first Superman story was published by Detective on April 18, 1938 in *Action Comics No. 1*, which had a cover date of June 1938. (Levitz Decl. ¶ 5; Bergman Decl. Exh. J.) Since *Action Comics No. 1* contained more than one feature, it was a collective work and was considered a periodical magazine under

ER 2660

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 82 of 321

1    the 1909 Copyright Act ("1909 Act"), 17 U.S.C. § 24 (repealed). In describing the

2    Copyright renewal certificates for *Action Comics No. 1* and the Superman story

3    contained therein, Plaintiffs have repeatedly asserted that the renewal claims were

4    made simply by Detective's successor "as proprietor of copyright." (Pl. Mem. at 6

5    n. 2, 21). What the renewal certificates actually state, however, is that Detective's

6    successor, National Periodical Publications, made its renewal claims "as proprietor

7    of a work made for hire." (Toberoff Decl. Exh. F at DCC 00045628.)

8           **2.      Siegel and Shuster's Further Grants to DC**

9           Following publication of *Action Comics No. 1*, Detective decided to engage

10   Siegel and Shuster to provide additional Superman stories and artwork for

11   subsequent comic book issues, including *Action Comics*. To this end, Detective

12   drew up and initiated two further agreements that Siegel and Shuster entered into

13   with Detective on September 22, 1938 (collectively the "September 1938

14   Agreements"), which specifically related to Superman and other named characters.

15   (Bergman Decl. Exhs. K, L.)

16          The first of the September 1938 Agreements includes the standard

17   ingredients of a work for hire relationship under the 1909 Act's "instance and

18   expense" test applicable to independent contractors engaged to furnish creative

19   material to a hiring party. As the copyright owner of certain comic books and

20   strips, including "Superman," Detective expressly "employ[ed] and retain[ed]"

21   Siegel and Shuster to continue to furnish for the duration of the agreement three

22   separate categories of further material for use in future issues, and provided the

23   payments they would receive. (*Id.* Exh. K.) The first category covered continuing

24   material for already existing monthly comic books and strips featuring five named

25   characters, including "Superman." The second category covered material that

26   could be used in "any strip or comic or newspaper or magazine" including such

27   five named "titles or the characters or continuity thereof or in any wise similar

28   thereto." Siegel and Shuster agreed not to furnish the material in such first two

8

ER 2661

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 83 of 321

categories to any other person or entity "in the United States or in any foreign country" for the duration of the agreement. For the third category, "any *other* artwork or continuity suitable for use as comics or comic strips" (emphasis added), Siegel and Shuster gave Detective "the right of first refusal thereof . . . at a price no greater than that offered to you by any other party." The key distinction between the first two categories on one hand, and the third, on the other, was between material relating to any of the five named characters featured in already existing comic books or any titles or characters "in any wise similar thereto" and all "other" material not related to these characters. (*Id*. Exh. K̲.) This agreement further provided that with respect to Siegel's and Shuster's submissions "[a]ll material, art and copy shall be owned by us [Detective] and at our option, copyrighted or registered in our name or in the names of the parties designated by us." It also provided Detective with the right to terminate the agreement and substitute other artists if their submissions were not "up to the standard" required for its magazines. (*Id*. Exh. K̲.)

The second of the September 1938 Agreements included the McClure Newspaper Syndicate as an additional party and added the terms under which Siegel and Shuster would prepare Superman newspaper comic strips, as well as a provision in which they acknowledged Detective's right to sell such strips to foreign newspapers. (*Id*. Exh. L̲). Both Agreements make clear that Siegel and Shuster were to furnish Superman comics *only* to Detective. (*Id*. Exhs. K̲, L̲.)

### 3.     The Development of Superman by DC in Derivative Works

The initial graphic representations of the Superman character in 1938, in a simple cartoon style, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. (Bergman Decl. Exh. J̲; Levitz Decl. ¶ 6.) From *Action Comics No. 1* we know only that Superman is a "champion of the oppressed" who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. (Bergman Decl. Exh.

ER 2662

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 84 of 321

1   J). Superman is depicted as possessed of extraordinary physical abilities, including

2   superhuman strength and the ability to leap 1/8th of a mile, hurdle a twenty-story

3   building and run faster than an express train. (*Id.*) In his ordinary life, the

4   character is depicted as a cowardly newspaper reporter known as Clark Kent, and

5   in his alter ego, Superman is a costumed heroic figure using his extraordinary

6   physical abilities to fight against crime. (*Id.*)

7       In the almost 70 years since the publication of *Action Comics No. 1*, DC has

8   authored or supervised the creation of, and has published and distributed,

9   thousands of other comic books and syndicated newspaper comic strips containing

10   additional adventures of Superman throughout the United States and abroad in

11   many millions of copies. (Levitz Decl. ¶ 6.) These derivative works have changed

12   his appearance and added decades of new material to further define, update and

13   develop the character in an ongoing flow of new exploits and supporting characters

14   resulting in the creation of an entire fictional Superman "universe." (*Id.* ¶ 6.) In

15   the years following the publication of *Action Comics No. 1*, Detective and its

16   successors consistently secured, exclusively in their own names, the original and

17   renewal term copyright registrations for all comic books in which Superman

18   appeared. At all times the renewal certificates stated in each case that the renewals

19   were made as "proprietor of a work for hire." (*See, e.g.*, Toberoff Decl. Exh. F.)

20   In this time frame, DC has also overseen the creation, development and licensing

21   of the character in a variety of media, including but not limited to radio, novels,

22   live action and animated motion pictures, television, live theatrical productions,

23   merchandise and theme park exploitations. (Levitz Decl. ¶ 6.)

24       As judicially recognized, *see Warner Bros. v. American Broadcasting*

25   *Companies*, 654 F.2d 205-06 (2d Cir. 1981), the presentations of Superman since

26   1938, provided first by Detective and then DC, were not a static depiction but an

27   ever-evolving portrayal, featuring new super powers, new villains and new

28   components to the Superman universe and backstory. (Levitz Decl. ¶ 7.) Indeed,

**ER 2663**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 85 of 321

the Superman story and characters evolved on an episode-by-episode basis as directed by the editors of DC for decades. (*Id.* ¶ 7.) Significantly, many of Superman's powers that are among his most famous today did *not* appear in *Action Comics No. 1* but only appeared in later publications. (*Id.* ¶ 7.) These include his ability to fly; his super-vision which enables him to see through walls ("x-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his ability to survive in space without atmospheric protection; and his "heat vision," the ability to aim rays of extreme heat with his eyes. (*Id.* ¶ 7.) Also absent from *Action Comics No. 1* was any reference to some of the more famous story elements now associated with Superman but at the time not yet created, such as "Kryptonite" or the name of Superman's home planet "Krypton," the "Fortress of Solitude," and the "Daily Planet." (*Id.* ¶ 7.) In addition, some of the most recognizable supporting characters associated with Superman do not appear in *Action Comics No. 1*, including Jimmy Olsen and villains Lex Luthor and Brainiac. (*Id.* ¶ 7.)[6]

## B. The Prior Litigation Between the Parties' Predecessors

### 1. The Westchester Action

In 1947, Siegel and Shuster commenced an action in the Supreme Court of the State of New York (the "Westchester Action") against, *inter alia,* DC's predecessor National Comics Publications, Inc. ("National"), Detective's parent company. (Bergman Decl. Exh. M.) The Westchester Action did not involve federal copyright doctrines; instead, Siegel and Shuster sought to annul and rescind their prior agreements with Detective in an effort to reclaim rights in Superman, and also sued for National's alleged improper use of the "entire plan" and "conception" of the "Superboy" character, a juvenile version of Superman. (*Id.*)

---

[6] Unlike many creative properties developed for media in later decades, in its early days there was no Superman "bible" which explored aspects of the property not yet presented in the comics. (*Id.* ¶ 7.)

ER 2664

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 86 of 321

On November 21, 1947, the referee to whom the case was referred issued a report making "interlocutory findings" substantially rejecting Siegel and Shuster's claims regarding Superman. (*Id.* Exh. N, ¶¶ 10-11.) Based on his interlocutory rulings, the referee subsequently entered an "Interlocutory Judgment" which, *inter alia*, declared National to possess the sole and exclusive right to exploit Superman and other Superman characters. (Toberoff Decl. Exh. A at 3.)

The parties both appealed from the referee's decision. However, while the appeals were pending, they settled their dispute, and on or about May 19, 1948, entered into a stipulation (the "Stipulation") under which the Interlocutory Judgment was to be "in all respects vacated" and the action dismissed in its entirety. (*Id.* Exh. C.) Pursuant to the Stipulation, the court entered a "Final Judgment" which provided that the Interlocutory Judgment "be and the same hereby is in all respects vacated," declaring and adjudging that National "is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERMAN . . . and to create, publish, sell, and distribute . . . cartoon or other comic strip material containing the characters SUPERMAN . . . and all other characters which have heretofore appeared in said cartoon or other comic strip material . . . ." (*Id.* Exh. D.) The Final Judgment also permanently enjoined Siegel and Shuster from exploiting and using the title SUPERMAN and any Superman material. (*Id.* Exh. D). Relying on the Final Judgment, National − and then DC − has continued to publish comics, conduct merchandising and license television programs under the name "Superman" in the almost 60 years since. (Levitz Decl. ¶ 9.)

## 2. Corrections of Plaintiff's Statement of Facts With Respect to Westchester Action

Plaintiffs' statement of undisputed facts concerning the Westchester Action requires certain corrections. First, as the Court is aware, it is Defendants' position that the vacated interlocutory findings in that action can have no preclusive effect

12

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 87 of 321

here, and Defendants' Motion for Reconsideration on that issue is currently under submission with the Court. Nevertheless, with respect to Detective's ownership rights regarding the first published appearance of Superman in *Action Comics No. 1* pursuant to the 1938 Assignment (Toberoff Decl. Exh. E),[7] it must be noted that unlike the referee's interlocutory findings and conclusions concerning Superboy, the Superman findings were not changed by either the Stipulation (Toberoff Decl. Exh. C) or the Final Judgment (*id.* Exh. D) entered on in that action.[8]

### 3. The Prior Federal Action

In 1969, Siegel and Shuster again sued DC's predecessors, this time claiming to own the renewal copyrights in Superman (the "Federal Action"). Summary judgment was granted against Siegel and Shuster by the United States District Court for the Southern District of New York in a published opinion, *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973) ("*National I*") (Toberoff Decl. Exh. S), and was affirmed by the Second Circuit Court of Appeals in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974) ("*National II*") (Toberoff Decl. Exh. T), with the Second Circuit holding that *all* of Siegel's and Shuster's copyright interests in Superman,

---

[7] Plaintiffs' reference to Jerome Siegel as having conceived of the original idea for a Superman comic strip and to the character as "unique" because of his superpowers and performance of good acts for the public, Pl. Mem. at 4, incorrectly suggests that no similar hero type had ever existed before and that uniqueness is a criterion for copyrightability. However, as explained by Defendants' expert Rovin, there were similar heroes before, and originality in the sense that the particular strips, including their dialogue, storyline and images, had their origin with Siegel and Shuster, not uniqueness or novelty, is all that was required for copyright protection. *Feist Publs., Inc. v. Rural Telephone Serv.*, 499 U.S. 340 (1991).

[8] Plaintiffs' assertion that "no appeal was perfected," citing to the Referee's opinion dated November 21, 1947, is designed to mislead: as noted in the Final Judgment (Toberoff Decl. Exh. D at 2), both sides filed notices of appeal from the Interlocutory Judgment, following which the parties settled upon the terms and conditions contained in the Final Judgment. To "perfect" an appeal in New York means only that the appeal briefs and record on appeal have been filed in the appellate court. "Perfecting an appeal" in New York means that an appellant has taken all steps necessary to place the appeal on the court's calendar for argument (*i.e.*, by filing a brief and the record) (*see* 22 N.Y. Comp. Codes R. & Regs. Tit. 22 § 670.2[a][4] (2005); N.Y. Civ. Prac. Act §§ 557-74 (1924) (repealed) (steps required to perfect of appeal)), a stage of the case having no relevance here or to Defendants' *sub judice* Motion for Reconsideration.

13

ER 2666

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 88 of 321

1    including all renewal rights, had previously been conveyed to DC's predecessors in

2    the 1938 Assignment. *Id.* at 912-13. The Court reached this conclusion on the

3    basis of the *res judicata* effect of the Final Judgment entered in the Westchester

4    Action. *Id.* at 912-13. Superboy was not at issue in the Federal Action. *National*

5    *I*, 364 F. Supp. at 1035.

6          After the conclusion of the Federal Action, the parties entered into a further

7    agreement, dated December 23, 1975 (the "1975 Agreement"), in which Siegel and

8    Shuster confirmed, "immediately after the signing of this agreement," that all right,

9    title and interest in Superman resided in National and its parent and affiliated

10   corporations, effectively re-granting whatever rights they had in Superman under

11   copyright. (Bergman Decl. Exh. MM, at 1-2.) In return, Siegel and Shuster

12   received the following consideration: (a) $20,000 each per year; (b) if Siegel died

13   before Dec. 31, 1985, Joanne Siegel would receive $20,000 per year until

14   December 31, 1985 and then $10,000 per year for the rest of her life; (c) Shuster's

15   brother Frank would receive $10,000 per year upon Shuster's death until

16   December 31, 1985 and $5,000 per year for the rest of his life; (d) Siegel and

17   Shuster would be included on the company medical plan; and (e) they would

18   receive a credit line on some Superman publications while Siegel and/or Shuster

19   remained alive. (*Id.* at 2-4.)

20         Over the years the 1975 Agreement was modified and the payment amounts

21   increased. In 1982, the agreement was amended at Joanne Siegel's request to

22   extend her "widow's benefit" by maintaining it at the same level irrespective of the

23   date of Siegel's death. (Bergman Decl. Exhs. NN, OO.) Indeed, since Siegel's

24   death in 1996, Joanne Siegel has remained on Warner Bros.' medical insurance

25   and has continued to accept and receive annual payments, most recently in excess

26   of $100,000 annually, despite the fact that the initial agreement only provided for

27   payments to Joanne Siegel if Siegel died before December 31, 1985. (Leviz Decl.,

28   ¶ 9.) Currently, and since the outset of this action in 2004, Mrs. Siegel receives

14

**ER 2667**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 89 of 321

1   annual payments of $135,000, totaling over $1,000,000 since the purported

2   effective date of the Superman Notices. (*Id.*)

### C. Termination Rights Under § 304(c) of the 1976 Act

4       In 1976, Congress enacted a comprehensive new copyright statute (the

5   "1976 Act"), which resulted from an extraordinary 20 year legislative effort. *Sony*

6   *Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 462 n.9 (1984). Under the

7   prior 1909 Act, copyright protection was available for an original 28-year term that

8   could be renewed for another 28 years. The 1976 Act extended the renewal term

9   for copyrights subsisting on January 1, 1978 by 19 years, thereby increasing the

10   combined term of available protection from 56 to 75 years. *See* Pub. L. No. 94-

11   553, 90 Stat. 2541, § 304(a) (1976).

12       To give "the author or the dependents of the author . . . a chance to benefit

13   from the extended [renewal] term," the 1976 Act included a new "termination"

14   option. H. R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976) ("H. Rep.") at 140; S.

15   Rep. No. 94-473, 94th Cong. 1st Sess. (1975) ("S. Rep.") at 123; *see* 17 U.S.C. §

16   304(c). This option enabled the author and the author's heirs to terminate certain

17   subsisting grants of rights under copyright that had been made by the author or his

18   heirs before January 1, 1978. It did not apply to "a work made for hire." *Id.* The

19   goal was to give authors and their descendants "the right to renegotiate" their prior

20   transfers originally made when the true value of the copyrighted works was

21   unknown. Supplementary Register's Report on the General Revision of U.S.

22   Copyright Law at 72 (1965) (hereafter "Supp. Reg. Rep."); H. Rep. at 124; S. Rep.

23   at 108; *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d. 1036, 1046 (9th Cir.

24   2005).

25       However, the new termination provision was not meant to be one-sided;

26   rather, it reflected "a practical compromise that would further the objectives of the

27   copyright law while recognizing the problems and legitimate needs of all interests

28   involved," H. Rep. at 124; S. Rep. at 108, and created "a practical benefit for

**ER 2668**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 90 of 321

authors and their families without being unfair to publishers, film producers and other users." Supp. Reg. Rep. at 72; *Milne*, 430 F.3d at 1046. Thus, in crafting the copyright termination right, Congress intended to protect the rights of authors and their families as well as those of publishers and others to whom they had granted rights. To achieve this goal, Congress in both of the new statute's termination provisions, sections 304(c) and 203, drew a line providing that the new reversion of rights is subject to specified "limitations" on the "effect of termination," 17 U.S.C. § 304(c)(6). *See, e.g.*, 17 U.S.C. §§ 203 (b)(1) & (5) and 304 (c)(6)(A) & (E).

Accordingly, the statute makes very clear that termination under section 304(c) is not "automatic," H. Rep. at 124; *accord* Pl. Mem. at 15, but merely an "option" available under specified circumstances and only where certain notice and timing requirements are met, William F. Patry, *Latman's The Copyright Law* 109 (6th ed. 1986) ("*Patry's Latman*"),[9] *Milne* 340 F.3d at 1045, and also subject to discreet "limitations." 17 U.S.C. §§ 304(c)(6) and 203(b); *Fred Ahlert Music Corp. v. Warner Chappel Music*, 155 F.3d 17, 19 (2d Cir. 1998) ("an author's termination rights are not unlimited").

**D.   Plaintiffs' Superman Notices of Termination And Filing of These Actions**

On April 3, 1997, Plaintiffs mailed the Superman Notices – seven separate notices of termination under section 304(c) of the 1976 Act, purporting to terminate Siegel's copyright grants to DC's predecessors in the Superman character and comic book stories dating back to 1938, and effective as of April 16, 1999. (Toberoff Decl. Exhs. G-M.) Among the copyright grants the Siegels purport to terminate in the Superman Notices is the 1975 Agreement. (Toberoff Decl. Exh. M.) Under that agreement, however, since Siegel's death, plaintiff Joanne Siegel has continued to accept monthly payments and receive health

---

[9] Relevant excerpts from *Patry's Latman* are attached at Bergman Decl. Exh. O.

ER 2669

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 91 of 321

insurance coverage. (Bergman Decl. Exhs. MM-OO.) By letter dated December 18, 1997, Defendants placed Plaintiffs on notice that they considered the Superman Notices to be defective in several respects. (Bergman Decl. Exh. GG.)

By letter dated April 15, 1999, DC rejected the efficacy of the Superman Notices, including the Notice pertaining to the 1975 Agreement. (Toberoff Decl. Exh. Q.) The same day, DC's president Paul Levitz wrote to Joanne Siegel stating, *inter alia*, that "DC will continue to provide the income and insurance benefits you [sic] that you have been receiving under the [December 23,] 1975 agreement, without prejudice to our rights under that agreement, as long as we all continue to pursue the goal of working together." (Bergman Decl. Exh. P.) As promised, DC has continued to pay, and Joanne Siegel continued to accept the benefits of the 1975 Agreement after April 15, 1999 and to this day. (Levitz Decl. ¶¶ 8-10.)

Moreover, the Superman Notices purport to terminate Siegel's — but not Shuster's — participation in the copyright grants to Detective. (Toberoff Decl. Exhs. G-M, ¶ 2.) Therefore, even if the Superman Notices are effective, DC remains (through Shuster's unterminated interests) a co-owner of the copyrights which are the subject of the Notices, and retains all the rights of a co-owner to exploit those copyrights without being subject to a claim for infringement. Accordingly, in the Superman Action, filed on October 8, 2004,[10] Plaintiffs essentially seek an accounting and a one-half share in the profits from the exploitation of Superman after the effective date of their Notices. (FASMC, ¶¶ 54(c), 57-59, 66-73, 105(d), 106, 108-110.)

Plaintiffs' operative complaint and their present motion cast a wide — and Defendants believe excessive — net with respect to the profits they seek to share: Thus, Plaintiffs allege that they are entitled not only to a share of the profits arising from the domestic exploitation of Superman copyrights, but also to a share of the

---

[10] Plaintiffs' First Amended Complaint in the Superman Action (Bergman Decl. Exh. Q) is hereinafter referenced as the "FASMC."

ER 2670

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 92 of 321

1    profits arising from any foreign exploitation of the character. (FASMC, ¶ 58(a);

2    Pl. Mem. at 25-28.) Plaintiffs further allege that they are entitled to a share of the

3    profits arising from the exploitation the Superman trademarks, including the

4    related characters and symbols associated with the character. (FASMC, ¶¶ 61-63,

5    107.) Finally, Plaintiffs allege that they are entitled to share in the profits of

6    Defendants from the post-termination exploitation of derivative works that had

7    been prepared by Defendants before the effective date of the termination.

8    (FASMC, ¶¶ 58(c), 66-73.)[11]

9        E.    **The Parties' 2001 Settlement**

10        Shortly after receiving the Superman Notices in April, 1997, DC Comics

11   initiated discussions with Plaintiffs' representative (then Arthur Levine, a

12   prominent copyright attorney with the Washington, D.C. firm of Finnegan,

13   Henderson, Farabow, Garret & Dunner) in an attempt to determine if the parties

14   could come to an acceptable resolution of their respective claims concerning the

15   Superman property. (Bergman Decl. Exh. R (transcript of Paul Levitz deposition

16   ("Levitz Tr.")) at 175:5-175:15; id. Exh. S ("Marks Tr.") at 27:19- 28:6.) When

17   sporadic discussions over the following months yielded no results, on April 15,

18   1999 – the day before the purported effective date of the Superman Notices – DC

19   set forth in a comprehensive writing its formal rejection of the Notices,[12]

20   contesting both their validity and their scope, and asserting that DC remained the

21   sole copyright owner of all aspects of the Superman property, with full right to

22   exploit that property as it chose, without the need to account to or share with

23   Plaintiffs any of the proceeds of that exploitation. (Toberoff Decl. Exh. Q.)

24

25   _____

     [11] Plaintiffs' claims that they are entitled to profits arising from exploitation of
     Superman trademarks and post-termination exploitation of derivative works prepared
26   prior to the effective date of termination are not the subject of this motion. Defendants,
     have, however, moved for summary judgment on these claims, which motion is currently
27   pending before the Court.

     [12] DC had previously notified Plaintiffs of certain deficiencies in the Notices in letters
28   set to Plaintiffs' counsel on November 5, 1997 (Bergman Decl. Exh. T) and December
     18, 1997 (id. Exh. U).

ER 2671

Two weeks later, on April 30, 1999, DC was contacted by Bruce Ramer, an attorney with the Beverly Hills law firm of Gang, Tyre, Ramer & Brown, Inc. ("Gang Tyre"), and was advised that Gang Tyre had been retained to represent Plaintiffs' interests in connection with the Superman Notices. (Bergman Decl. Exh. V.) The parties then began negotiations in earnest, with Kevin Marks of Gang Tyre ultimately becoming the lead negotiator for Plaintiffs, and John Schulman, General Counsel and Executive Vice President of Warner Bros. Entertainment Inc. ("Warner Bros."), the lead negotiator for DC. (Declaration of John Schulman ("Schulman Decl."), ¶ 4; Bergman Decl. Exh. S (Marks Tr.) at 24:15-25:10.)[13]

The discussions between Mr. Marks and Mr. Schulman were extensive and far-reaching, spanning some two and a half years, and consisting of several face to face meetings as well as numerous communications both written and oral, with the parties addressing and resolving certain key issues before moving on to other issues. (Schulman Decl. ¶ 5.)[14] These negotiations culminated on October 16, 2001, when Mr. Marks and Mr. Schulman reached agreement on what they both understood to be the final outstanding deal point in a global resolution designed to settle all of Plaintiffs' claims and potential claims related to the Superman Notices. (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11; Schulman Decl. ¶¶ 6-7.)[15] Accordingly, on October 19, 2001, apparently after obtaining his clients' approval (Bergman Decl. Exh. S (Marks Tr.) at 145:16-146:4), Mr. Marks called Mr.

---

[13] Although Mr. Schulman remained exclusively employed by Warner Bros., his services were provided to DC for this purpose. (Bergman Decl. Exh. W (Schulman Tr.) at 95:14-96:16; Schulman Decl. ¶ 4.)

[14] On April 6, 2000, Plaintiffs and Defendant DC Comics entered into a tolling agreement to encourage continued negotiations (the "Tolling Agreement"). (Schulman Decl. ¶ 5; Toberoff Decl. Exh. Z.)

[15] Contrary to Plaintiffs' unsupported assertion in their moving papers (*see* Pl. Mem. at 46 lines 13-16), Mr. Marks and Mr. Schulman did not discuss "many different terms, including contingent compensation formulas" in that conversation. Instead, the conversation was limited to one item, agreement on which "closed the deal," because the parties had already previously come to an understanding on all of the other components of the agreement. (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11.)

Schulman to tell him that "we are closed" (*id.* at 134:19-135:5); he then sent Mr. Schulman a letter confirming their earlier telephone conversation and expressly stating that "the Siegel Family (through Joanne Siegel and Laura Siegel Larson the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties." (Toberoff Decl. Exh. BB, hereinafter the "Marks Letter".)[16] The Marks Letter went on to set forth, in six single-spaced pages, the terms of the parties' deal, concluding with a thanks to Mr. Schulman for his "help and patience in reaching this monumental accord." (*Id.*) As Mr. Marks testified to at deposition, as of October 19, 2001, he "believed that an accord had been reached on the terms exactly set forth in this letter." (Bergman Decl. Exh. S (Marks Tr.) at 148:3-148:14.)

The deal reached by the parties contemplated, among other things, that upon transfer to DC of all of Plaintiffs' Superman interests, DC would provide Plaintiffs with up-front payments in the amount of $3 million, as well as a substantial guaranteed advance against certain royalties based on DC's on-going exploitation of the Superman properties. (Toberoff Decl. Exh. BB (Marks Letter) at ¶ B; Schulman Decl. ¶ 6.) Although the parties anticipated that a more formal document would be drawn up, neither Mr. Marks nor Mr. Schulman – nor, indeed, any other representatives of the parties – expressed in any way that the parties' October 19 agreement was not complete or would not be binding unless and until that more formal document was executed. (Schulman Decl. ¶ 10.)

On October 26, 2001, Mr. Schulman started the process of the long-form documentation, by sending Mr. Marks a letter enclosing "a more fulsome outline" of the deal, and noting that they were working on a draft so that the transaction could be "in document form" shortly. (Schulman Decl. ¶ 8; Toberoff Decl. Exh.

---

[16] "Spectre," another property authored by Jerry Siegel, was the subject of a separate termination notice served by Plaintiffs, and is not at issue in these actions.

ER 2673

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 95 of 321

1   CC (hereinafter the "Schulman Letter").)  The five-page outline reiterated the
2   material points in the Marks Letter, fleshing out some details on certain terms that
3   Mr. Marks had generally addressed, and, in at least one instance, including an
4   agreed-upon point that Mr. Marks appeared to have forgotten to include.  (*Id.*)

5       Mr. Marks reviewed the Schulman Letter some weeks later.  (Bergman Decl.
6   Exh. S (Marks Tr.) at 149:17-149:22.)  Although he testified at deposition that he
7   noted some differences between the Schulman Letter and his letter of October 19,
8   Mr. Marks acknowledged that he did not discuss it with or send it on to his clients
9   (*id.* at 203:10-14), and he *never* advised Mr. Schulman that his "more fulsome
10  outline" of the parties' deal materially changed, misstated, or otherwise did not in
11  fact accurately reflect their prior discussions and ultimate agreement.  (*Id.* at
12  150:24-151:3; Schulman Decl. ¶ 9.)  Instead, Mr. Marks expected to address the
13  differences he noted in the Schulman Letter in the context of finalizing the
14  documentation of the long-form contract.  (Bergman Decl. Exh. S (Marks Tr.) at
15  163:21-164:1.)

16      Thereafter, DC prepared a long form contract reflecting the material terms of
17  the agreement, and providing for the formal assignment of any copyright interests
18  Plaintiffs might have in the Superman property to DC.  (Schulman Decl. ¶ 9.)  DC
19  immediately acted on the agreement, by including in the license agreement it was
20  then finalizing with Warner Bros. for the next Superman motion picture a specific
21  contractual requirement that Warner Bros. accord two separate screen credits –
22  namely, "Superman created by Jerry Siegel and Joe Shuster" and "By Special
23  Arrangement with the Jerry Siegel Family" – which credits had been negotiated by
24  Plaintiffs and were required under the terms of the parties' October agreement.
25  (Schulman Decl. ¶ 10.)[17]  DC also set up a reserve account for the monies that
26  would be due to Plaintiffs under the financial terms of the agreement upon the

27

28

---

[17] That agreement was negotiated in the latter part of 2001, and was executed in the
Spring of 2002.  (Schulman Decl. ¶ 10.)

21

ER 2674

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 96 of 321

1  formal transfer of their Superman interests to DC. (Bergman Decl. Exh. <u>R</u> (Levitz

2  Tr.) at 289:9-290:1.)[18]

3      In or about late November, 2001, shortly after the parties reached their

4  accord – and completely unbeknownst to DC – Mr. Marks was contacted by

5  Plaintiffs' present counsel, Marc Toberoff, who was then acting as a principal for

6  an entity called "IP Worldwide, LLC" ("IPW") which was, according to Mr.

7  Toberoff, in the business of acquiring intellectual property rights. (Bergman Decl.

8  Exh. <u>S</u> (Marks Tr.) at 151:4-152:19; *id*. Exh. <u>X</u> (Toberoff Tr.) at 87:5-87:10.) Mr.

9  Toberoff also was a principal of Pacific Pictures Corporation ("PPC"), a motion

10 picture production company which had, just a few days earlier, entered into a joint

11 venture agreement with the heirs of Joe Shuster "for the purpose of retrieving,

12 enforcing and exploring" all of Shuster's "rights, claims, copyrights, property, title

13 and interests" in his "creations," particularly Superman. (Bergman Decl. Exh.

14 <u>Y</u>.)[19] Mr. Toberoff informed Mr. Marks that he was interested in acquiring the

15 Siegels' interest in the Superman property, but was advised by Mr. Marks that

16 Plaintiffs were already in the "documentation phase" with DC for those interests.

17 (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 152:3-153:22.)

18     On February 1, 2002, DC's attorneys forwarded to Mr. Marks a long-form

19 contract for his review. (Schulman Decl. ¶ 9; Bergman Decl. Exh. <u>S</u> (Marks Tr.) at

20 177:18-177:21; Toberoff Decl. Exh. <u>DD</u>) (hereinafter the "February Draft".) Mr.

21 Marks received and reviewed the February Draft (Bergman Decl. Exh. <u>S</u> (Marks

22 Tr.) at 182:1-182:2), and apparently sent it on to his clients. Mr. Marks did not

23 inform Mr. Schulman, or DC's attorneys who had prepared the document, that the

24

25

---

26  [18] As of the latter part of 2006, that reserve account totaled approximately $20 million. (*Id*. at 295:6-295:15.)

27  [19] The joint venture agreement provides for the venture to retain the services of Marc
28  Toberoff to render legal services in connection with all disputes concerning Shuster's rights. (*Id*. Exh. <u>Y</u>) It also provides for the Shusters to share any proceeds "from the enforcement, settlement or exploitation" of their rights 50/50 with PPC. (*Id*.)

ER 2675

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 97 of 321

February Draft was contrary in any material respect to the deal that had been agreed to by the parties in October. (Schulman Decl. ¶ 11.)

On May 9, 2002, more than three months after being sent the February Draft, Joanne Siegel − without the participation or even the prior knowledge of Mr. Marks (Bergman Decl. Exh. S (Marks Tr.) at 181:14-181:24) − sent a letter to Richard Parsons, the Chief Executive Officer of Time Warner Inc. (then known as AOL Time Warner Inc.), complaining that the proposed long-form contract was "unconscionable." (Bergman Decl. Exh. Z.) Mrs. Siegel acknowledged that Plaintiffs had "accepted John Schulman's last proposal six months ago" but stated that the February Draft contained "demands which were not in the proposal we accepted . . . ." (Id.)

On May 16, 2002, after receiving a copy of Mrs. Siegel's letter, Mr. Schulman called Mr. Marks to ask what had prompted the letter, and whether there were any problems he should be aware of. (Schulman Decl. ¶ 11; Bergman Decl. Exh. S (Marks Tr.) at 181:14-182:10.) Mr. Marks advised Mr. Schulman that he had not seen and did not know about the letter. (Schulman Decl. ¶ 11; Bergman Decl. Exh. S (Marks Tr.) at 181:14-181:24.) Mr. Marks further stated, in substance, that while the February Draft was "very aggressive" he could "deal with it," and that although the draft contained certain things that had not been agreed to, it was "not contrary to what [had been] agreed to." (Schulman Decl. ¶ 11 & Exh. A.)[20]

On May 21, Mr. Parsons sent a letter in response to Mrs. Siegel's May 9 missive, in which he stated that "each of the major points covered in the draft agreement which was provided to your representatives, more than three months ago, accurately represented the agreement previously reached between your representatives and [AOL Time Warner]" and concluding that he hoped the

---

[20] Schulman Decl. Exhibit A is Mr. Schulman's contemporaneous notes of his May 16, 2002 telephone conversation with Mr. Marks. (Id. ¶ 11.)

23

ER 2676

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 98 of 321

1   agreement could be "closed" based upon the prior discussions. (Bergman Decl.
2   Exh. AA.) Neither Mrs. Siegel nor any of her representatives ever responded to
3   this letter.

4       Mr. Marks thereafter drafted a long-form contract that he apparently felt
5   would be more acceptable to his clients. (Bergman Decl. Exh. S (Marks Tr.) at
6   196:21-197:15; Bergman Decl. Exh. BB.) That draft long-form was transmitted to
7   Plaintiffs on July 15, 2002, but was not provided to DC. (Bergman Decl. Exh. S
8   (Marks Tr.) at 198:25-199:3; Schulman Decl. ¶ 12.)[21]

9       On July 30, Mr. Toberoff again contacted Mr. Marks to inquire as to the
10  status of Plaintiffs' dealings with DC on the Superman property. (Bergman Decl.
11  Exh. S (Marks Tr.) at 165:25-167:3.) When informed that there was a
12  confidentiality agreement in place and that Mr. Marks would not speak with him
13  about DC, Mr. Toberoff asked if Mr. Marks would be willing to enter into separate
14  negotiations with him regarding the sale of the Siegels' Superman interests. (Id.)
15  Mr. Marks declined to do so, but told Mr. Toberoff that if he had an offer to make,
16  Mr. Marks would present it to his clients. (Id.) Accordingly, in early August,
17  2002, Mr. Toberoff's company, IPW, offered to purchase Plaintiffs' Superman
18  copyright interests for $15 million and "a meaningful back-end." (Id. at 167:7-
19  169:25.) Mr. Marks communicated that offer to his clients. (Id. at 169:21-170:12.)

20      On September 21, 2002, Plaintiffs abruptly terminated Mr. Marks' and Gang
21  Tyre's representation of them, without any prior notice, via a letter copied to Paul
22  Levitz, DC's President and Publisher. (Bergman Decl. Exh. S (Marks Tr.) at
23  202:1-202:16; Id. Exh. DD.) On the same day, Plaintiffs sent a separate letter to
24  DC repudiating the parties' October 19 agreement and purporting to break off all
25  further negotiations, and claiming that February Draft contained "outrageous,

---

27  [21] Defendants have not seen a copy of that draft long-form, and Plaintiffs have refused
    to produce it on the basis of the attorney client privilege. Defendants' motion to compel
28  its production was denied by Magistrate Zarefsky. (Bergman Decl. Exh. CC) It is
    therefore not possible to know what was in that draft or if it differed materially from the
    February Draft.

24

ER 2677

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 99 of 321

never discussed, unacceptable demands." (Bergman Decl. Exh. <u>BB</u>.) Plaintiffs then promptly retained Mr. Toberoff to represent them (*id.* Exh. <u>X</u> (Toberoff Tr. at 106:1-107:4; 132:4-134:7), and after being advised by Mr. Toberoff's business partner that DC's offer for their Superman copyright interests was "ridiculously low" (*id.* Exh. <u>EE</u> (Laura Siegel Larson Tr.) at 28:15-28:18), entered into an agreement with IPW dated October 3, 2002 pursuant to which Plaintiffs retained IPW to be their exclusive representative in connection with their Superman interests. (Bergman Decl. Exh. <u>FF</u>.)[22]

Later attempts by the parties to resolve these issues did not reach fruition, and Plaintiffs subsequently filed these actions. DC has accordingly filed counterclaims against Plaintiffs for breach of contract and to enforce the terms of the October 19, 2001 agreement between the parties. (*Id.* Exh. <u>GG</u>.)[23]

**F.      Corrections With Respect to Plaintiffs' Statement
         Concerning Judge Lew's Decision in The Superboy Action**

As the Court now knows from Defendants' Motion for Reconsideration, Judge Lew's March 24, 2006 Order (the "Lew Order," Toberoff Decl. Exh. <u>U</u>) did not, as Plaintiffs assert, find that the copyright law defenses which formed the basis for Defendants' own cross motion for partial summary judgment in the Superboy Action substantively "lacked merit." (Pl. Mem. at 9.) In fact, the scope and effect of the Lew Order is limited – relying almost exclusively on the vacated Interlocutory Findings in the Westchester Action, and reaching only the extent of Plaintiffs' very narrow cross-motion for partial summary judgment in the Superboy Action. Significantly, Plaintiffs did not move in either case to dismiss DC's affirmative defenses or First Amended Counterclaims, the bulk of which do not

---

[22] Pursuant to the representation agreement, IPW was to provide the services of Marc Toberoff in connection with the negotiation, sale or license of Plaintiffs' Superman rights, but the parties agreed that such services would not include litigation, which services, if required, would be provided by Mr. Toberoff subject to good faith negotiation of a mutually acceptable agreement. (*Id.*)

[23] DC's First Amended Counterclaims (Bergman Decl. Exh. <u>GG</u>) are hereinafter referred to as the "FACC."

25

ER 2678

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 100 of 321

1  overlap with and were not litigated as part of Plaintiffs' motion for partial

2  summary judgment in the Superboy Action.[24]  Those unlitigated counterclaims

3  remain a part of the instant action.

4  **ARGUMENT**[25]

5  **I.  MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY**

6  **JUDGMENT WITH RESPECT TO PLAINTIFFS'**

7  **RECAPTURE OF AN UNDIVIDED ONE HALF SHARE OF**

8  **THE COPYRIGHT RIGHTS IN *ACTION COMICS NO. 1***

9  Plaintiffs' request that the Court declare its Superman Notices legally

10  effective to recapture an undivided fifty percent interest in the copyrights to the

11

12

13  [24] In the earlier motion, Defendants argued that, as a matter of law under established
copyright doctrines, Siegel's Superboy submissions (1) were derivative of pre-existing

14  Superman works, (2) constituted "works for hire" under the applicable 1909 Act test, and
as such were owned by DC's predecessor, and (3) had never been "published" or

15  registered as unpublished works; therefore, they were not eligible for termination and
recapture under section 304(c). Defendants also argued (4) that Plaintiffs' Superman

16  Notices did not list the May 21, 1948 Final Judgment. Relying almost exclusively on the
vacated Interlocutory Findings in the Westchester Action as precluding Defendants'

17  substantive copyright law contentions, Judge Lew (i) ruled that it was harmless error for
the Superman Notices to omit the Final Judgment as a terminated grant because Plaintiffs

18  had listed the Stipulated Settlement that preceded the Final Judgment on consent, (ii)
rejected on the basis of collateral estoppel and res judicata, without addressing the merits,

19  each of Defendants' other copyright defenses; (iii) found that Siegel's Superboy
submissions had been "published" in *More Fun Comics No. 101*, and (iv) held that

20  consequently Plaintiffs had recaptured the "Superboy copyrights" as of November 17,
2004. (*Id.*) The "Superboy copyrights" were not defined or described in the Order

21  (Toberoff Decl. Exh. U at 6-14).

22  [25] Plaintiffs' motion is, on its own terms, limited to only certain of Defendants'
defenses to termination, namely, that certain portions of *Action Comics No. 1* constituted

23  a work made for hire; that the Superman Notices were required to list the 1948 Final
Judgment; that Joanne Siegel's continued acceptance of benefits under the 1975

24  Agreement served to nullify Plaintiffs' termination of the grant contained therein; that the
FASMC is barred by the statute of limitations; that foreign profits are not recoverable;

25  and that the FASMC is barred by settlement. Defendants, of course have pled additional
affirmative defenses and counterclaims which they retain. *See, e.g., Meridian Project*

26  *Svs., Inc. v. Hardin Const. Co.*, 426 F. Supp. 2d 1101, 1110 (E.D. Cal. 2006) ("Because
defendant's affirmative defenses were not raised in plaintiff's initial summary judgment

27  motion, the court will not address the issues raised by the affirmative defenses; those
defenses remain viable in the litigation.") (citing *Stillman v. Travelers Ins. Co.*, 88 F.3d

28  911, 913-14 (11th Cir. 1996); *Books-A-Million, Inc. v. H & N Enterprises, Inc.*, 140
F.Supp.2d 846, 851 (S.D. Ohio 2001). *See also Cytec Indus., Inc. v. B.F. Goodrich Co.*,
232 F. Supp. 2d 821, 828-29 (S.D. Ohio 2002).

**ER 2679**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 101 of 321

1  original Superman strips published in *Action Comics No. 1* cannot be decided on

2  summary judgment.

   A.  **Genuine Issues of Material Fact Preclude Summary**
3
       **Judgment on Defendants' Defense that Portions of *Action***
4
       ***Comics No. 1* Were Created As "Works Made for Hire"**
5
6  Plaintiffs' action is characterized primarily by their dogged effort to seek

7  profits attributable to works never created by Jerry Siegel or to works that Plaintiffs

8  cannot, as a matter of law, recapture. Plaintiffs' attempt to dismiss Defendants'

9  focused work for hire defense arises out of the same overreaching. As Plaintiffs

10 concede, Defendants <u>are not</u> seeking to invalidate the Superman Notices by

11 claiming that the entirety of *Action Comics No. 1* is a work made for hire. Rather,

12 Defendants merely assert that there are material portions of *Action Comics No. 1*

13 that were created as works made for hire, either by Siegel and Shuster, or by third

14 parties. Through their Fifth Alternative Counterclaim For Declaration Of

15 Limitations On The Scope Of The Superman Notices And The Superboy Notice

16 (FACC (Bergman Decl. Exh. <u>GG</u>), ¶¶ 106-135), and their Sixth Alternative

17 Counterclaim For Declaration Regarding The Principles To Be Applied In An

18 Accounting (*id.* ¶¶ 136-139), Defendants seek properly to define the scope of

19 profits to which Plaintiffs would be entitled in the event the Superman Notices are

20 deemed valid. Specifically, as relates to the work for hire defense, Defendants

21 plead that "[a]ny accounting of recoverable profits for exploitation of Superman

22 would be reduced to that portion of such profits that are attributable to the

23 copyrightable elements from *Action Comics No. 1* less the Additional *Action*

24 *Comics No. 1* Materials (if any), actually present in the Superman works subject to

25 accounting. (*Id.* ¶ 137(d).) In other words, Plaintiffs should not be entitled to share

26 in profits attributable to those portions of *Action Comics No. 1* that were created as

27 "work for hire" by them or by third parties.

28

ER 2680

1.   **Certain Material Portions Of** *Action Comics No.*
     *1* **Were Created As Works Made For Hire By**
     **Siegel And Shuster Or By Third Parties, And**
     <u>**Thus Cannot Be Subject To Termination.**</u>

   a.   **The Publication Of** *Action Comics No. 1*

Plaintiffs seek to re-write history by claiming that the Additional *Action Comics No. 1* Materials requested by DC on February 1, 1938 and added to the first Superman story consisted exclusively of re-cutting and pasting Siegel and Shuster's pre-existing Superman materials into a different format. (Pl. Mem. at 5.) This, however, is untrue. In fact, as set forth above and shown in a sworn affidavit of Joe Shuster, DC requested detailed revisions and changes in order to make the story suitable for publication. Shuster testified in the Federal Action upon which Plaintiffs now rely that he "drew *several additional pictures* to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release." (Bergman Decl. Exh. <u>G</u> at 2.) Shuster further testified that at this time he also drew the last panel in *Action Comics No. 1*. (*Id.*) Siegel confirms this in his own affidavit, testifying, in part, that "[u]pon receiving word from Detective that we could proceed, Joe Shuster, under my supervision . . . added several pictures to illustrate the story continuity." (*Id.* Exh. <u>H</u> at 5.) Siegel further testified that "the scientific explanation on page 1 of the release and the last panel at the foot of page 13" were added. (*Id.*) Additional material, such as color, was added by Detective's employees. (Adler Decl. ¶¶ 3-4.) Detective also prepared the cover for *Action Comics No. 1*. (Bergman Decl. Exh. <u>I</u>.) It cannot be disputed that these Additional *Action Comics No. 1* Materials constituted more than a mere cut-and-paste job.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 103 of 321

**b.** **The Additional *Action Comics No. 1* Materials Were Created As "Work For Hire" And Thus Cannot Be Subject To Termination.**

Plaintiffs acknowledge, as they must, that a copyrighted work prepared as a "work for hire" is not subject to termination under section 304(c) of the Copyright Act. (Pl. Mem. at 28.) As Plaintiffs further and reluctantly concede, under the 1909 Act (the version that applies here to works created before January 1, 1978), the courts -- including those in the 9th Circuit -- universally hold that the "work for hire" designation extends to works created by independent contractors, as well as to works created within the scope of a traditional employment relationship by a regular employee. Specifically, an independent contractor is considered an "employee" and a hiring party an "employer" for purposes of the 1909 Act if the work is made at the hiring party's "instance and expense." *See, e.g.*, *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005); *Self-Realization Fellowship Church v. Amanda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Forward v. Thorogood*, 985 F.2d 604, 606 (1st Cir. 1993).

**1)** **The Addition Of Color To *Action Comics No. 1* Was Work Prepared By Regular Employees Of Detective Within The Scope Of Their Employment.**

According to eye-witness Jack Adler, the colorist for *Action Comics No. 1*, Siegel and Shuster's work that would comprise the Superman story in *Action Comics No. 1* was provided to the Detective production staff in black and white. (Adler Decl. ¶ 4.) Members of Detective's staff, who were regular or traditional employees of Detective, then decided upon the color that would be applied

29

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 104 of 321

throughout the magazine. (*Id.*) As a leading copyright treatise explains, "[a]n original combination or arrangement of colors should be regarded as an artistic creation capable of copyright protection. Thus, adding colors to a previously black and white picture may constitute an original copyrightable contribution." 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.14 (2006) ("*Nimmer*"). Thus, this important copyrightable addition made to *Action Comics No. 1* by persons *other than Siegel and Shuster*, employees of Detective working within the scope of their employment, constitutes work for hire and cannot be terminated. 17 U.S.C. § 304(c). As a result, assuming *arguendo* that the Superman Notices are valid, any recapture of rights excludes the color present in *Action Comics No. 1* and, consequently, any calculation of profits would be required to exclude any profits attributable to any such color.[26]

> **2)** **The Portions Of *Action Comics No. 1* Created By Siegel And Shuster After Detective Told Them They "Could Proceed" Were Created At The Instance And Expense Of Detective And Are Thus Work For Hire.**

In cases that do not involve traditional employers and employees, the "instance and expense" test determines the work was for "hire" either because a hiring party commissioned a work or because the prospect of employment was the "motivating factor" that induced the work's creation.[27] *Twentieth Century Fox*,

---

[26] Defendants have moved for partial summary judgment on their counterclaim that Plaintiffs have failed to timely terminate the first published visual depiction of Superman, a black and white announcement reproducing the cover of *Action Comics No. 1*. When combined with the fact that Plaintiffs also cannot claim rights in the colors of Superman's costume, any profit recovery by Plaintiffs, if their termination notices were valid, would have to exclude profits attributable to the appearance of Superman's iconic costume.

[27] Plaintiffs, relying upon three cases, claim that courts have "often refused to apply the work for hire doctrine *even in the context of an employer-employee relationship.*" (Pl. Mem. at 29, emphasis in original.) Plaintiffs' statement is both wrong and a *non-sequitur*. First, Defendants' work for hire defense, as it relates to Siegel and Shuster, is not alleged in the context of a regular or traditional employer-employee relationship. The first of the cases cited by Plaintiffs, *Dolman v. Agee*, 157 F.3d 708 (9th Cir. 1998), is in the employer-employee context and thus is irrelevant. The second of Plaintiffs' cases,

30

ER 2685

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 105 of 321

429 F.3d at 879. A finding that the employer is the motivating force gives rise to a "presumption" of work for hire ownership that could only be altered by an "express" agreement of the hiring party to the contrary. *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980).[28] By the time of the adoption of the 1976 Act, courts applying the "instance and expense test" under the 1909 Act had developed "an almost irrebut[t]able presumption that any person who paid another to create a copyrightable work is the 'author' of the work for purposes of the statute, absent an agreement to the contrary." *Easter Seal Soc'y for Crippled Children v. Playboy Enters.*, 815 F.2d 323, 327 (5th Cir. 1987). "[A] party who hires another to create a copyrightable work is the 'author' of the work for the purposes of the statute, absent an agreement to the contrary." *Playboy Enters. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995).

The "instance and expense" inquiry focuses on at whose instance the work was created, at whose expense, and "the degree to which the 'hiring party' has 'the right to control or supervise the artist's work.'" *Twentieth Century Fox*, 429 F.3d at 879. However, this relates solely to the abstract right to control or supervise, not to whether the hiring party actually exercised that right. Indeed, the hiring party is "thought to maintain the 'right' to control simply by paying for the work and having the power to refuse to accept it." *Self Realization Fellowship Church*, 206

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., Inc.*, 223 F.2d 252 (2nd Cir. 1955), does not include any ruling on work for hire. The third case cited by Plaintiffs, *Forward v. Thorogood*, *supra*, is also off the mark. That case involved an ownership dispute relating to the *common law copyright* in certain unpublished tape recordings of a musical group. The court rejected plaintiff's attempt to claim work for hire of the common law copyright due to a failure of proof with respect to both instance and expense – the band members were not plaintiff's employees and there was no evidence that plaintiff had "commissioned" or compensated them. 985 F.2d at 606.

[28] *See also Brattleboro Pub. Co. v. Winmill Pub. Corp.*, 369 F.2d 565, 567 (2d Cir. 1966); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 62 U.S.P.Q.2d 1301, 1318 (S.D.N.Y. 2002), *aff'd*, 342 F.3d 149 (2d. Cir. 2003); 1 *Nimmer* § 5.03[D] at 5-56.10; section 201 (b) of the 1976 Act ("[i]n the case of a work made for hire," the hiring party "is considered the author . . . *unless the parties have expressly agreed otherwise* in a written instrument signed by them.") (emphasis added), which the legislative history describes as adopting the basic principle of 1909 Act law, H. Rep. at 121, and 17 U.S.C. § 28 (repealed).

31

ER 2684

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 106 of 321

F.3d at 1326; *Easter Seal*, 815 F.2d at 327; *Lin-Brook*, 352 F.2d at 300. Thus, "[b]efore 1978, it mattered little, if at all, that the commissioner neither possessed nor exercised the right to direct the manner in which the work was done." *Brunswick Beacon, Inc. v. Schock-Hopchas Pub. Co.*, 810 F.2d 410, 412 (4th Cir. 1987). The recipient need only possess the power to "accept, reject or modify" the work. *Twentieth Century Fox*, 429 F.3d at 880.

Siegel's sworn affidavit leaves no doubt that Detective was the motivating factor behind the Additional *Action Comics No. 1* Materials prepared by Siegel and Shuster. Indeed, Siegel testified that such work did not go forward until they received word from Detective that such work could proceed. (Bergman Decl. Exh. H at 5.) Both Siegel and Shuster's affidavits are corroborated by the documentary evidence, including but not limited to, letters from their editor at Detective instructing them to revise and expand their existing work into a work suitable for publication in a comics magazine. (*Id*. Exhs. B, C.) While much of what ended up in *Action Comics No. 1* was prepared before any relationship was instituted with Detective, *National*, 508 F.2d at 914, the "several pictures" that make up the Additional *Action Comics No. 1* Materials were prepared only *after* Detective made the commitment that they would publish Superman and only *after* Detective told Siegel and Shuster they "could proceed." (*Id*. Exh. G at 2; Exh. H at 5.) The evidence demonstrates that Detective was the "motivating factor" behind the Additional *Action Comics No. 1* Materials created by Siegel and Shuster. At the very least, there is a genuine issue of material fact as to this question.

The facts further demonstrate that Detective had the right of supervision as exhibited by its right to accept or reject Siegel and Shuster's work. Indeed, in his letter of March 1, 1938 to Siegel, Detective executive Jack Liebowitz reiterated the need to provide eight panels per page and chastised Siegel for failing to do so in connection with *Action Comics No. 1*, stating that, were Detective not so pressed for time, he "would have rejected them." (*Id*. Exh. F.) That Detective did not

ER 2685

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 107 of 321

reject *Action Comics No. 1* is immaterial.  The evidence establishes that Detective maintained the right to supervise Siegel and Shuster as demonstrated by its ability to demand high quality work (*id.* Exhs. <u>B</u>, <u>C</u>.), and by its ability to accept or reject their work (*id.* Exh. <u>F</u>).  Plaintiffs themselves concede this important fact in their brief, acknowledging that "Detective was under no obligation to pay Siegel and Shuster . . . until . . . Detective *had accepted it for publication* . . . ." (Pl. Mem. at 32.)

In their moving papers, Plaintiffs suggest that Detective's supervision of Siegel and Shuster's work during February 1938 is of no legal effect because Detective assertedly held no rights in Superman until the 1938 Assignment was executed on March 1 of that year.  (Pl. Mem. at 32)  But this is incorrect.  As demonstrated above, Detective held an exclusive option to Superman under the December 4, 1937 Agreement with Siegel and Shuster.  (Toberoff Decl. Exh. <u>B</u>.) As such, Detective's supervision of Siegel and Shuster in February 1938 was in furtherance of rights Detective already held in Superman.

The "expense" prong of the "instance and expense" test is also met.  Where the work at issue is to be produced by the hiring party who takes on "all the financial risk" the work is created at the employer's expense. *Twentieth Century,* 429 F.3d 869 at 881.  The expense element is also satisfied when the employing party "simply" pays any sum certain to the creator – regardless of amount and regardless of whether these works were ever published. *Playboy,* 53 F.3d at 555. *See also Niss v. Columbia Pictures Indus., Inc.,* 2000 U.S. Dist. LEXIS 18328 at *28 (S.D.N.Y. Dec. 20, 2000).  Here, there is no dispute Siegel and Shuster were paid for *Action Comics No. 1,* including the Additional *Action Comics No. 1* Materials.  (Bergman Decl. Exh. <u>F</u>.)  Thus, just as is the case with the color added by Detective employees, the "several additional" panels drawn by Shuster after Siegel and Shuster were instructed to "proceed" with *Action Comics No. 1,* were prepared at the instance and expense of Detective and thus cannot be terminated.

**ER 2686**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 108 of 321

### 2. Plaintiffs' Attempts To Demonstrate That The Additional *Action Comics No. 1* Materials Are Not Work For Hire Are Without Merit And, At Best, <u>Are Rife With Genuine Issues Of Material Fact.</u>

Plaintiffs attempt to overcome Defendants' work for hire defense by claiming that the existence of a written agreement assigning rights to Detective "belies" that the Additional *Action Comics No. 1* Materials were created as a work for hire. (Pl. Mem. at 32-33.) In addition, Plaintiffs claim that Defendants are precluded under the doctrines of *res judicata* and collateral estoppel from asserting that the Additional *Action Comics No. 1* Materials were created as work for hire. Neither argument has any support.

### a. The Existence Of A Written Agreement Does Not Affect The Work For Hire Status Of The Additional *Action Comics No. 1* Materials

Plaintiffs cite to one case – *Dolman v. Agee, supra* – in an attempt to establish the general proposition that the existence of an agreement assigning copyright rights would rebut the presumption that a work is made for hire. (Pl. Mem. at 33.) However, Plaintiffs' argument is without merit.

First, the 1938 Assignment has no relevance to the work for hire status of the addition of color to *Action Comics No. 1* by employees of Detective. Such copyrightable contribution was added not by Siegel and Shuster but by employees of Detective working within the scope of their employment. (Adler Decl. ¶ 3-4.)

Second, Plaintiffs fail to disclose to the Court that, as recently as 2005, the Ninth Circuit *rejected* the very argument Plaintiffs seek to make here. In *Twentieth Century Fox*, the work at issue, an autobiography of Dwight Eisenhower, was deemed to be a work for hire. The defendants sought to overcome the presumption that Eisenhower's work was "for hire" by pointing to a book contract purporting to assign all rights in the work to the publisher. The

34

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 109 of 321

Ninth Circuit, citing to its well-established precedent in *Lin-Brook*, stated that the agreement, without more, was insufficient to rebut the presumption that the book was created at the instance and expense of the publisher. *Twentieth Century Fox*, 429 F.3d at 881 (citing *Lin-Brook*, 352 F.2d at 300).

In *Twentieth Century Fox*, the Ninth Circuit also distinguished *Dolman*, explaining that in that case it relied upon evidence in addition to the existence of the assignment agreement, "including evidence that the assignee filed copyright registrations and renewals naming Shields as the author." *Id.* at 882, n.4. In this case, other than the 1938 Assignment, Plaintiffs have adduced *no evidence* to rebut the presumption that the Additional *Action Comics No. 1* Materials created by Siegel and Shuster was intended to be "work for hire."[29]

In sum, there is no general rule that the existence of an assignment of rights serves to rebut the strong presumption that a work created at the instance and expense of a commissioner is, in fact, a work for hire.

        **b.**    **Plaintiffs' *Res Judicata* And Collateral Estoppel Arguments to Avoid the Work for Hire Status of the Additional *Action Comics No. 1* Materials Are Equally Untenable**

Without a single citation to any case law, Plaintiffs claim that the Second Circuit's reversal in *National II* of the district court's finding that *Action Comics No. 1* was a work made for hire precludes Defendants under the doctrines of *res judicata* and collateral estoppel "from again claiming that Action Comics,[sic] No. 1, *or any part thereof*, is a "work for hire." (Pl. Mem. at 31, emphasis added.) Plaintiffs mischaracterize the Second Circuit's statement and are wrong as a matter of law.

---

[29] Moreover, because there is material in *Action Comics No. 1* that was undisputedly created prior to Siegel and Shuster receiving their assignment to "proceed" with additional work on Superman, the 1938 Assignment was necessary to assign rights in such pre-existing work. This can have no bearing on the parties' intent as to the new work created.

35

ER 2688

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 110 of 321

A comic book such as *Action Comics No. 1* that contained more than one feature, such as the first Superman story, was a collective work and considered a periodical magazine under the 1909 Act. As noted above, the copyright for Siegel and Shuster's contributions to that story was renewed in 1965 in the name of National "as proprietor of a work for hire." (Toberoff Decl. Exh. F at DCC 00045630.)

Notwithstanding the 1938 Assignment (*id*. Exh. E), the 1948 Final Judgment (*id*. Exh. D) and such renewal copyright registration (*id*. Exh. F), Siegel and Shuster sued National in 1969 for a declaration that they owned the renewal copyright in their contributions to the *Action Comics No. 1* periodical, and for copyright infringement in continuing to publish Superman comic books and otherwise exploit the Superman character. Since the only issue raised by Siegel and Shuster in the Federal Action related to the copyright ownership *of their own contribution*, the case did not relate to the ownership of the renewal copyright for any of the Additional *Action Comics No. 1* Materials added to the first Superman story by Detective's employees.

On a motion for summary judgment, the district court in *National I* had found against Siegel and Shuster on two grounds: (1) that Siegel and Shuster had assigned all rights -- including all renewal rights -- in earlier grants and (2) that *Action Comics No. 1* was a work made for hire. The Second Circuit in *National II* affirmed the lower court's ruling as to the first ground. However, with respect to the work for hire ruling it did not join the lower court's opinion. Specifically, the Court of Appeals found that, because the district court's finding of "work for hire" was purportedly based upon the findings of the state court in the Westchester Action, such finding was not warranted because "that issue was not litigated" in the Westchester Action. The Second Circuit went on to find that on the record before it, the evidence was not otherwise "sufficient to create the presumption that the strip was a work for hire" as to the Superman material authored by Siegel and

ER 2689

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 111 of 321

Shuster that pre-existed their submission of it to Detective. *National II*, 508 F.2d at 914. (*National I* together with *National II*, are referred to herein as the "National Litigations").

"Under the doctrine of res judicata . . . a <u>final judgment</u> on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action." *Marvel Character, Inc. v. Simon*, 310 F.3d 280, 286-287 (2d Cir. 2002) ("*Simon*") (emphasis added). The Second Circuit's decision and statement in *National II* is a far cry from *res judicata* with regard to the entirety of the first Superman story published in *Action Comics No. 1*, including the Additional *Action Comics No. 1* Materials authored by Detective's employees.

First, nowhere in the record have Plaintiffs provided a final judgment from the National Litigations.

Second, the issue that Defendants raise in this action, namely that DC is the copyright proprietor of a *portion* of *Action Comics No. 1* which was created after Siegel and Shuster's preexisting material and as a work for hire, was never raised in the National Litigations, nor, more importantly, could it have been. In the National Litigations, only a finding that *all* of *Action Comics No. 1*, not just the pre-existing material forming most of the first Superman story, was created as work for hire could have achieved National's objective of establishing that Siegel and Shuster were not entitled to the renewal right for all of the material comprising this feature. Section 24 of the 1909 Copyright Act, 17 U.S.C. § 24 (repealed) (the operative act in the National Litigations) permitted the periodical owner, Detective, to obtain the renewal copyright for the whole collective work it published, but also permitted authors who contributed *portions* to a periodical to obtain the renewal copyright in their contributions, provided the same were not works for hire. *See* 3 *Nimmer* § 9.03. This is in stark contrast to the issue asserted by Defendants in this case, namely, that because portions of *Action Comics No. 1* were created as work for hire, such portions are not subject to termination under section 304(c) and, as a

37

**ER 2690**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 112 of 321

result, to the extent the Superman Notices are valid, any profits to which Plaintiffs may be entitled cannot include profits attributable to the Additional *Action Comics No. 1* Materials.

Finally, the doctrine of *res judicata* is never applicable to a party's defense. *See* 10 Weinstein Korn & Miller, New York Civil Practice: CPLR, ¶ 5011.21 (2d ed. 2007) ("Insofar as a defense is not, itself, a claim for relief, its 'prior adjudication' effect should be viewed as one of collateral estoppel and not as *res judicata*."). Thus, the question of whether or not a defense previously raised and rejected can again be asserted is determined by the rules of collateral estoppel, to which we now turn.

Plaintiffs' assertion of collateral estoppel to block Defendants from raising work for hire is, however, similarly unavailing. Under the doctrine of collateral estoppel, an issue (as opposed to a claim) is precluded from re-litigation when all of the following conditions are met: (1) the resolution of the issue was necessary to support a valid and final judgment on the merits; (2) the identical issue was raised in the prior proceeding; (3) the issue was actually litigated and decided in the prior case; and (4) there was a "full and fair" opportunity to litigate the issue. *Simon,* 310 F.3d at 288-89. None of these conditions are met here.

First, as is evidenced by the fact that the work for hire issue was decided *against* National but the case was decided *in its favor*, the issue of whether or not *Action Comics No. 1*, and in particular, any portion thereof, was a work for hire, cannot be deemed "necessary" to support a final judgment. Second, the identical issue being raised by Defendants here – *i.e.*, that *portions* of *Action Comics No. 1* were prepared as work for hire – was undisputedly *never* raised in the National Litigations, let alone actually litigated or decided in the prior case. Third, the issue was not actually "decided." The Second Circuit made no finding that *Action Comics No. 1* was *not* a work for hire, only that the district court's ruling to the contrary based on *res judicata* was incorrect, and that the other evidence of record

ER 2691

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 113 of 321

1  was not "sufficient to create the presumption that the strip was a work for hire."

2  *National II*, 508 F.2d at 914. Finally, there was no "full and fair" opportunity to

3  litigate the issue in the National Litigations. As explained above, because only a

4  finding that *all* of *Action Comics No. 1* was work for hire would have defeated

5  Siegel and Shuster's claim, the issue of whether portions of the work were work for

6  hire could not have been raised.

7                                    *     *     *

8       Based upon the foregoing, Plaintiffs' summary judgment motion as to

9  Defendants' work for hire defense as it relates to portions of *Action Comics No. 1*

10 must be denied.

11 **B.    Plaintiffs Failed to Terminate the 1948 Final Judgment,**

12         **Leaving In Place An Operative Grant of Rights in Superman**[30]

13      As set forth above, the termination provisions of the 1976 Act sought to

14 forge a balance between authors' rights to renegotiate and fair notice to publishers.

15 This is why a notice of termination "must" identify "the grant" to which it applies.

16 37 C.F.R. § 201.10 (b)(1)(iv). Thus, if an author entered into five separate grants

17 of rights for the same work, and a notice of termination identifies only four of the

18 grants, the fifth grant remains "intact" and the grantee's rights thereunder

19 unaffected. *Cf. Burroughs*, 683 F.2d at 621-22; *Milne*, 430 F.3d at 1048 (copyright

20 termination invalid where pre-1978 grant is still effective); 3 *Nimmer* § 11.06[B] at

21 11-40.22(1) n.63. The Superman Notices fail to terminate the grant in the Final

22 Judgment in which Siegel, *inter alia*, effectuated the transfer to National of the sole

23 and exclusive ownership of all rights relating to "Superman." (*Compare* Toberoff

24 Decl. Exhs. G-M *with* Exh. D at 3-4.) Because Plaintiffs failed to identify the

25 Final Judgment, the grant of rights in Superman found therein remains intact.

26

---

27   [30] Defendants acknowledge that the Lew Order in the Superboy Action resolved this issue in Plaintiffs' favor in that action. However, Defendants have challenged certain

28 portions of that order in a Motion for Reconsideration in that case, currently *sub judice*, and wish to preserve their rights in the event it is necessary for this issue to be dealt with on appeal.

ER 2692

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 114 of 321

1    Plaintiffs' excuses for failing to terminate the Final Judgment do not hold

2    water.  First, they contend that that the document contained no operative grant and

3    thus did not have to be terminated.  According to Plaintiffs, since Siegel transferred

4    "Superman" to Detective in the 1938 Assignment, the Final Judgment could not as

5    a matter of law have conveyed "Superman" since it was already owned by

6    National.  (Pl. Mem. at 34-35.)  This is illogical and belied by Plaintiffs' actions in

7    drafting the Superman Notices, in which they identified in addition to the 1938

8    Assignment *six other grants of rights under copyright relating to Superman,*

9    including both the Westchester Action Stipulation and the 1975 Agreement in

10   which rights "to the Superman . . . characters" (Bergman Decl. Exh. MM at 1),

11   were transferred.  If Plaintiffs' theory about the Final Judgment not containing a

12   grant of copyright in Superman is correct, then it was unnecessary to seek to

13   terminate all of the grants of copyright rights relating to Superman once the 1938

14   Assignment was terminated.  But of course, those other grants and the Final

15   Judgment *all* had to be terminated for the rights granted and re-granted therein to

16   be terminated.  Moreover, the fact that the Final Judgment came only two days

17   after the Stipulation (as opposed to ten years) is of no moment – without it the

18   rights identified in the Stipulation would not have been transferred.

19   As such, since the Superman Notices failed to terminate a still-operative

20   grant of rights in Superman, Plaintiffs' motion for summary judgment on the

21   effectiveness of their termination must be denied.

22   **C.    Joanne Siegel's Continued Acceptance of Benefits Under**

23   **the 1975 Agreement Leaves in Place That Operative Grant**

24   An author or his heirs entitled to termination cannot effectively convey away

25   beforehand their right of termination.  As provided in section 304(c)(5),

26   "[t]ermination of the grant may be effected notwithstanding any agreement to the

27   contrary, including an agreement to make a will or to make any future grant."  On

28   the other hand, once, as here, a termination notice has been served and thereby

40

**ER 2693**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 115 of 321

"vested," *see* 17 U.S.C. (c)(6)(B), the terminating party is free to make a further grant to the "original grantee or such grantee's successor in title." 17 U.S.C. § 304(c)(6)(D).

It is indisputable that following service and vesting of the Superman Notices in April 1997, one of which identified and was directed specifically to the 1975 Agreement (Toberoff Decl. Exh. M), plaintiff Joanne Siegel continued, and to this day continues, to accept the widow's benefits afforded to her under the 1975 Agreement and the subsequent modifications increasing those benefits. (Levitz Decl. ¶¶ 9-10.) Indeed, since the purported effective date of the Superman Notices, Mrs. Siegel has collected more than $1 million pursuant to the 1975 Agreement she now claims to have terminated. (*Id.*) By Mrs. Siegel's continued acceptance of the widow's benefit after the effective date of the Superman Notice directed at the 1975 Agreement, Plaintiffs have effectively re-accepted the terms of the grant set forth in that Agreement. Plaintiffs cannot simultaneously claim that the 1975 Agreement has been terminated while accepting the benefits thereunder. Thus, all rights in Superman are owned entirely by Defendant DC.

This equitable principle has long been established under California law, best illustrated by cases relating to real property. *See, e.g., Miller v. Reidy*, 85 Cal.App. 757, 762, (1927) ("This was a clear attempt to eat the cake and still keep it. For the lessors month after month to accept rents specified in the lease, and at the same time declare that there was a forfeiture, results in an irreconcilable inconsistency."); *Kern Sunset Oil Co. v. Good Roads Oil Co.*, 214 Cal. 435, 440 (1931) ("acceptance of rent by the landlord from the tenant, after the breach of a condition of the lease, with full knowledge of all the facts, is a waiver of the breach and precludes the landlord from declaring forfeiture of the lease by reason of said breach."). This black letter principle applies here, where Plaintiffs are seeking to retain the benefits of the 1975 Agreement while at the same time asserting that their purported termination has rendered legally ineffective the very same

**ER 2694**

41

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 116 of 321

1   agreement in this case. Like the plaintiff in *Miller*, the Siegels cannot have their
2   cake and eat it too.

3       Recognizing their untenable position, Plaintiffs now argue that the widow's
4   benefits being paid to Mrs. Siegel are not the product of the 1975 Agreement, but
5   of some later, free-standing and un-related agreement. (Pl. Mem. at 38).
6   Plaintiffs' contentions on this issue, however, are directly contradicted by Mrs.
7   Siegel's own written words.

8       As an initial matter, there is no dispute that Mrs. Siegel has continued to
9   receive and accept no less than $10,000 per year under the 1975 Agreement. As
10  detailed above, the 1975 Agreement provides that after Jerry Siegel's death, Mrs.
11  Siegel will be paid $10,000 per year for the remainder of her life.[31] (Bergman
12  Decl. Exh. MM at 2-4.) Mrs. Siegel has been paid, and she has accepted, those
13  monies since Jerry Siegel's death in 1996. (Levitz Decl. ¶¶ 9-10.) These payments
14  have been made and accepted irrespective of whether (i) there has been any
15  amendment to the 1975 Agreement increasing the payment amounts, or (ii) rather
16  than under an amendment of the 1975 Agreement, the amounts in excess of
17  $10,000 are being paid in connection with some sort of separate and free-standing
18  agreement as Plaintiffs allege. (*Id.* ¶¶ 8-10.)

19      Plaintiffs ignore the language in the 1975 Agreement that provides for
20  payments to Mrs. Siegel upon Jerry Siegel's death for the rest of her life, and Mrs.
21  Siegel's acceptance of those payments through the present, asserting instead that
22  Mrs. Siegel's widow's benefits are being paid "at Mrs. Siegel's request" in
23  connection with a March 15, 1982 letter from then-Time Warner General Counsel
24  Martin Payson, and that such letter constituted a separate and free-standing

25

26  [31] Plaintiffs' counsel applies his own self-serving reading to the 1975 Agreement,
    claiming now that Mrs. Siegel was not entitled to any payments under the 1975
27  Agreement because Mr. Siegel's death post-dated December 31, 1985. (Pl. Mem. at 38.)
    While admittedly the 1975 Agreement is not the model of clarity on this point, it is clear
28  that Plaintiff Joanne Siegel believed that the 1975 Agreement was to be read to pay her a
    widow's benefit for the remainder of her life, *regardless* of when Mr. Siegel died.
    (Bergman Decl. Exh. NN.)

42                                                          ER 2695

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 117 of 321

agreement (Pl. Mem. at 38 & Toberoff Decl. Exh. FF). First, Mrs. Siegel's request did not in any way affect the $10,000 per year she was entitled to receive for life under the 1975 Agreement in the event she survived her husband. (Toberoff Decl. Exh. FF.) Rather, she was requesting that, in the event she survived Jerry Siegel, her widow's benefits be maintained at the same level as Jerry Siegel's payments after December 31, 1985, rather than be reduced to $10,000 per year as provided under the 1975 Agreement. (*Id.*) This is established by the February 14, 1982 written request from Mrs. Siegel to Steven Ross, the former Chairman of the Board of Time Warner Inc. – the letter to which the March 15, 1982 letter relied on by Plaintiffs responds *and which Plaintiffs have omitted from their motion*. (Bergman Decl. Exh. NN). In that letter, Mrs. Siegel plainly and explicitly requested that her benefits *under the 1975 Agreement* not be reduced on December 31, 1985 in the event Jerry Siegel pre-deceased her: "*Without an amendment to the contract* stating that *the same income* continue to me, my financial security is in jeopardy." (Bergman Decl. Exh. NN at 3 (emphasis added).) The March 15, 1982 letter from Mr. Payson constitutes an acceptance of Mrs. Siegel's request to amend the 1975 Agreement.

The evidence thus establishes that (i) Mrs. Siegel has continued to receive and accept at least $10,000 per year in widow's benefits under the 1975 Agreement, and (ii) that the amounts she has received above and beyond the $10,000 are in connection with an amendment to the 1975 Agreement. This alone is sufficient to create a factual issue on the question of whether the continuing acceptance of widow's benefits was under the 1975 Agreement, thus leaving it operative and in effect despite Plaintiffs' service of a notice of termination directed to that agreement. *See, e.g., Glow Indus v. Lopez*, 273 F. Supp. 2d 1095, 1114 n. 98 (C.D. Cal. 2003) (questions of parties' intent under contract not appropriate for summary judgment) (citing *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983)).

ER 2696

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 118 of 321

1    Plaintiffs next claim that even if the payments to Mrs. Siegel are under the

2    1975 Agreement and the agreement remains in effect, Plaintiffs' termination rights

3    still are not affected because that agreement contains no grants, only a

4    confirmation of past grants. (Pl. Mem. at 38.) But Plaintiffs are barred from

5    contending that the 1975 Agreement contained no grant of rights by the doctrine of

6    judicial admissions. "Factual assertions in pleadings and pretrial orders, unless

7    amended, are considered judicial admissions conclusively binding on the party

8    who made them." *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226

9    (9th Cir. 1988) (citation omitted).

10    In their operative pleading, Plaintiffs concede that they filed and served

11    notices of copyright termination directed at seven separate grants of rights, which

12    included the 1975 Agreement. (FASMC (Bergman Decl. Exh. Q), ¶¶ 38-39.)

13    Indeed, Plaintiffs themselves refer to the 1975 Agreement as one of seven "prior

14    grant(s)." (Pl. Mem. at 1.) Plaintiffs cannot now run from their pleading and claim

15    that the 1975 Agreement is not, in fact, a grant, but instead was included in the

16    case out of "an abundance of caution." (Pl. Mem. at 37.)

17    Even if Plaintiffs were permitted to repudiate their judicial admission at this

18    late stage in the litigation, their story does not hold water. Plaintiffs prepared and

19    served a separate, 555-page notice of copyright termination containing in excess of

20    15,000 separate works, directed at the 1975 Agreement. (Toberoff Decl. Exh. M.)

21    Plaintiffs then filed that document with Copyright Office, at a cost of several

22    thousand dollars. From the outset of the case, Defendants have asserted as a

23    defense to Plaintiffs' claim the fact of Plaintiff Joanne Siegel's continued

24    acceptance of benefits under the 1975 Agreement. The issue has been the subject

25    of extensive discovery and exchange of documents. Nevertheless, throughout this

26    process, Plaintiffs have never either withdrawn the notice of termination directed at

27    the 1975 Agreement from the U.S. Copyright Office, or sought to amend their

28

ER 2697

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 119 of 321

pleading to withdraw their claim for a declaration that the notice of termination directed at the 1975 Agreement is valid.

Indeed, if Plaintiffs' new contention were true, then virtually all of their termination notices would have been legally meaningless and superfluous and Plaintiffs would have needlessly expanded the scope and cost of this litigation.[32] The more logical and realistic view is, of course, that Plaintiffs terminated the 1975 Agreement because it contained a grant of rights, and thus "resuscitation" of that grant by Mrs. Siegel's continued acceptance of benefits thereunder would leave DC with a complete set of rights in Superman. At the very least, the inconsistency between Plaintiffs' actions and their argument in this motion is sufficient to create a genuine issue of fact to preclude any summary judgment.

Plaintiffs next contend that, assuming the 1975 Agreement granted Defendants rights in Superman and remains intact, that this could have no impact on the present action and Plaintiffs' termination rights since they were not parties to the Agreement. (Pl. Mem. at 39). According to Plaintiffs, the 1975 Agreement could thus not "effectively assign Plaintiffs' termination interest" because they were not signatories thereto. (*Id.* at 39.) But Plaintiffs are missing the point: Defendants do not contend that the 1975 Agreement assigned *Plaintiffs' termination interest* to Defendants – indeed, the termination right did not even exist when the 1975 Agreement was executed and any grant *in futuro* of Plaintiffs' rights subject to termination would be an ineffective "agreement to the contrary" under section 304(c)(5). Instead, Defendants claim that as a matter of equity, Plaintiffs cannot claim on the one hand that the 1975 Agreement and its grant of rights in Superman is terminated by virtue of the Superman Notices while at the

---

[32] If Plaintiffs do, in fact, now take the position that all of the Superman Notices after the first one were superfluous, Plaintiffs ought now to withdraw those notices of termination and dismiss any claims directed at such notices with prejudice. Of course, because Plaintiffs have forced Defendants to defend these claims, Defendants would request that the Court exercise its discretion under section 505 of the Copyright Act and award Defendants their attorneys' fees as the prevailing parties with respect to these termination notices.

ER 2698

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 120 of 321

same time continuing to reap the benefits of the financial payments provided under that very same grant. (Bergman Decl. Exhs. NN, OO; Levitz Decl. ¶¶ 8-10.) Having chosen to accept those benefits, Plaintiffs have thus *de facto* made a further post-termination grant to DC, National's successor-in-title, and waived their right to make such a grant to anyone else. *See Miller*, 85 Cal.App. at 762; *Kern Sunset Oil*, 214 Cal. at 440.

For the same reason, Plaintiffs' final argument that the 1975 Agreement cannot affect their termination rights because it is an "agreement to the contrary" under section 304(c)(5) falls away as well. Section 304(c)(5), which sets forth that termination may be effected notwithstanding an "agreement to the contrary," was drafted to prevent "litigation-savvy publishers" from utilizing, before and at the outset of the life of a creative work, their "superior bargaining position to compel authors to agree that a work was [not eligible for termination] in order to get their works published." *Simon*, 310 F.3d at 290-91. But Defendants do not contend here that the 1975 Agreement contains a provision in which the Siegels give up their termination rights; nor do Defendants claim that at any time before Plaintiffs' termination rights vested they agreed to make a future grant.[33] Instead, they claim that Plaintiffs' continued acceptance of benefits under the 1975 Agreement nullifies the termination of the Agreement, leaving the grant contained therein in place.

In short, because Plaintiffs continue to reap the benefits they bargained for under the 1975 Agreement, they cannot at the same time seek to profit from the alleged termination thereof. *Milne*, 430 F.3d at 1048 (copyright termination invalid where pre-1978 grant is still effective). As such, Plaintiffs' motion for summary judgment should be denied.

---

[33] In any event, it would be nonsensical to assert that an underlying copyright grant subject to termination can itself be an "agreement to the contrary" under the statute; if so, the termination provisions would make no sense. **ER 2699**

46

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 121 of 321

## D.     Genuine Issues of Material Fact Prevent Dismissal of Defendants' Statute of Limitations Defenses

By this suit, Plaintiffs seek a declaration that the Superman Notices are valid and that they are co-owners of copyright in certain Superman works. In their First Amended Counterclaims, Defendants assert that Plaintiffs' suit is barred by the Copyright Act's three-year statute of limitations. (Answer ¶ 110; FACC ¶¶ 90-96.) On their motion, Plaintiffs seek to dismiss Defendants' statute of limitations defense. Plaintiffs' motion in this regard is legally defective and rife with fact issues.

### 1.     The Copyright Act's Statute Of Limitations Bars Any Civil Action Not Commenced Within Three Years Of The Accrual Of A Claim.

The Copyright Act provides: "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The statutory language is all-encompassing and no exceptions are provided or suggested. There can be no dispute but that the instant litigation – an action for a declaration that the Superman Notices are valid and, as a result, Plaintiffs have become co-owners of copyright in "Superman" – is a "civil action" brought under the Copyright Act. In the face of the plain language of the statute, Plaintiffs nonetheless argue – based upon misguided "policy" arguments and upon misunderstood out-of-circuit authority that has expressly been disregarded by the Ninth Circuit – that the Copyright Act's statute of limitations cannot apply here. Plaintiffs are wrong.

Without citation to a single case or statutory provision, Plaintiffs, after addressing the alleged policy reasons for the termination right they purport to assert, claim that "Congress surely did not intend that its concerted efforts to safeguard this important recapture right could so easily be foiled by a publisher's predictable denial of a termination notice's validity, allegedly triggering the statute

47

**ER 2700**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 122 of 321

of limitations." (Pl. Mem. at 42.)  Plaintiffs' one-sided description of the termination right and facts is, at best, misleading.  As noted above, the termination right was not intended as a one way street but was carefully crafted as "a practical compromise" to protect not just "authors and their families" but also "publishers, film producers and other users."  H. Rep. at 124; S. Rep. at 108; Supp. Reg. Rep. at 72; *Milne*, 430 F.3d at 1046.  These efforts included the development of specific safeguards designed to protect the interests of all concerned.  Thus, while section 304(c) excludes from grants subject to termination dispositions by will, it specifically proscribes any author or any member of his family from making any "agreement to the contrary" such as "an agreement to make a future grant."  17 U.S.C. § 304(c)(5).

Moreover, even if Plaintiffs could establish the one-sided policy arguments they put forward, such arguments cannot exempt Plaintiffs from the Copyright Act's express time bar on civil actions brought under the Act.  Plaintiffs themselves concede that Congress engaged in concerted efforts to draft the termination provisions and cite in their brief to numerous detailed rules and procedures governing the termination right. (Pl. Mem. at 13-16.)  Had Congress chosen to exempt rights recaptured by means of the termination procedure from the statute of limitations set forth in section 507(b), it would have so specified in the statute.

Plaintiffs also seek to overcome Defendants' statute of limitations defense by claiming that the Copyright Act's statute of limitations does not apply to civil actions asserting copyright ownership. (Pl. Mem. at 43.)  In support of this claim, Plaintiffs cite to the *Second Circuit's* decision in *Stone v. Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993).[34]  However, Plaintiffs fail to disclose to the Court that *the Ninth Circuit* has held that the Copyright Act's

---

[34] Plaintiffs fail to disclose that since its holding in *Stone*, the Second Circuit has unequivocally recognized that the Copyright Act's statute of limitations applies to the assertion of co-ownership disputes, which, if not commenced within three years of accrual, are lost forever. *Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996).  **ER 2701**

48

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 123 of 321

statute of limitations *does* apply to civil actions, such as this one, asserting copyright co-ownership. In *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996), the Ninth Circuit unequivocally held that "[a] claim for a declaratory judgment of co-ownership and the relief ancillary to such a claim is a civil action, and 'no civil action shall be maintained . . . unless it is commenced within three years after the claim accrued.'" The Ninth Circuit in *Zuill* considered the Second Circuit's decision in *Stone*, calling its facts "highly idiosyncratic," and expressly declined to follow or even distinguish the decision "because it is not controlling authority in this circuit."[35] *Id.* at 1370. The law in the Second Circuit is in any event the same – a copyright co-ownership claim is time barred unless it is commenced within three years after the claim accrued. *Merchant*, 92 F.3d at 56-67. *See also Hogarth*, 342 F.3d at 164. The Ninth Circuit in *Zuill* effectively rejected the substantive arguments advanced by Plaintiffs on their motion, including but not limited to, the citation to legislative history. *Zuill*, 80 F.3d at 1369, n.1.[36]

Because Plaintiffs have brought this civil action under the Copyright Act, under the controlling precedent in the Ninth Circuit, the three-year statute of limitations of the Copyright Act applies.

---

[35] Plaintiffs' failure to disclose the holding in *Zuill* is even more troubling in light of their reliance upon *Aalmuhammed v. Lee*, 203 F.3d 1227 (9th Cir. 2000) (Pl, Mem. at 41-42.) Citing to its prior decision in *Zuill*, the Ninth Circuit in *Aalmuhammed* reiterated that "[a] claim of authorship of a joint work must be brought within three years of when it accrues."

[36] For several reasons, there is no basis for Plaintiffs' suggestion (Pl. Mem. at 42, n.10) that section 507(b) should bar any of Defendants' arguments because they did not file an action within 3 years after service of the Superman Notices seeking a declaration of copyright ownership. First, Defendants' arguments are pleaded in affirmative defenses challenging Plaintiffs' termination, and are not the subject of a counterclaim for a declaration of copyright ownership. Second, even if DC had pleaded counterclaims that could have been untimely, the laundry list of thirty-nine (39) affirmative defenses Plaintiffs pleaded to DC's counterclaims do not include statute of limitations. As such, a statute of limitations to DC's counterclaims can no longer be asserted. Third, it is well established that even where defendant has filed a time-barred counterclaim, a statute of limitations would not prevent an affirmative defense to a plaintiff's claim. *Hogarth*, 342 F.3d at 163-64 (collecting cases). *See also City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1035-36 (9th Cir. 2003).

49

ER 2702

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 124 of 321

2. **Plaintiffs' Attempted Reliance Upon The "Tolling Agreement" Is Misplaced.**

   a. **Summary Judgment Is Inappropriate Because There Are Genuine Issues Of Material Fact As To When Plaintiffs' Claim Of Co-Ownership Accrued And When The Tolling Agreement Terminated.**

As Plaintiffs concede, under the Copyright Act "claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Id*. at 1369. Plaintiffs claim that an express repudiation was received on April 15, 1999 but that the statute of limitations was tolled beginning on April 6, 2000 when the parties entered into the Tolling Agreement (Schulman Decl. ¶ 5; Toberoff Decl. Exh. Z). (Pl. Mem at 40.) Plaintiffs further claim that the Tolling Agreement remained effective until October 4, 2002 and that, because the instant action was commenced on October 8, 2004, Plaintiffs beat the expiration of the statute of limitations by four days. (*Id*. at 41.)

Plaintiffs' defense to the statue of limitations fails for two reasons. First, Plaintiffs received a first express repudiation by letter dated December 18, 1997. In that letter, Defendants placed Plaintiffs on notice that they considered the Superman Notices to be defective in several respects, thus beginning the statute of limitations running. (Bergman Decl. Exh. GG.) As a result, even assuming *arguendo* that the Tolling Agreement remained in effect until October 4, 2002 (a fact Defendants dispute), on that date, only **256 days** remained before the statute of limitations expired. Plaintiffs did not file their complaint until **734 days** after Plaintiffs claim the Tolling Agreement terminated, well after the statute of limitations had run.

Even if Plaintiffs can demonstrate that they did not understand that the December 18, 1997 letter constituted an express repudiation of their claim of co-

50

ER 2703

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 125 of 321

ownership, there is a genuine material issue of fact as to when the Tolling Agreement ceased to be in effect. The Tolling Agreement provides that it would "remain in effect until 10 business day after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, **or (b) the parties reaching an amicable resolution of the dispute between them relating to the Notices**." (Toberoff Decl. Exh. Z, emphasis added.)

As Plaintiffs concede, on October 19, 2001, prior counsel for Plaintiffs sent the six-page Marks Letter to John Schulman, confirming that his clients had "accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties." (Toberoff Decl. Exh. BB.) The Marks Letter goes on to outline in detail all material terms to which the parties had agreed. (*Id*.) For purposes of the Tolling Agreement, the Marks Letter represents the "amicable resolution" provided for in the Tolling Agreement. Ten business days thereafter – on October 30, 2001 – the Tolling Agreement expired by its own terms. That Plaintiffs have, after the fact, sought to "put the Genie back in the bottle" and have reneged on an agreement they accepted on October 19, 2001, cannot serve also to "reactivate" the Tolling Agreement.

Defendants anticipate that Plaintiffs will argue that no "amicable resolution of the dispute" was reached, advancing the same arguments urged in the portion of their motion directed to enforceability of the October 19, 2001 Agreement. But even if the October 19, 2001 Agreement is not ultimately enforced, it is nonetheless clear that as of October 19, 2001 a resolution of the dispute had "been reached," and the Tolling Agreement ended. This is confirmed by Joanne Siegel's own letter of May 9, 2002 where she attempts to repudiate the October 19, 2001 Agreement, but concedes that "we . . . accepted John Schulman's last proposal six months ago." (Bergman Decl. Exh. Y)

Thus, even if Plaintiffs claim they did not understand their claim of co-ownership to be expressly repudiated until April 15, 1999, because the Tolling

51

**ER 2704**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 126 of 321

1  Agreement expired on October 30, 2001, Plaintiffs waited 1430 days to bring suit

2  (on October 8, 2004) well beyond the 1095 days permitted under the Copyright

3  Act.  As a result, Plaintiffs' claims are time-barred.

**b.      Regardless Of When The Claim Accrued And When The Tolling Agreement Expired, Any Claims Of Co-Ownership Of Copyright Against Entities Other Than DC Comics Are Time-Barred.**

8  In their Fourth Claim for Relief, Plaintiffs assert that they are co-owners of

9  copyright in Superman with Defendant Warner Bros. in addition to DC.[37]  While

10 the existence of the Tolling Agreement may have tolled the statute of limitations on

11 Plaintiffs' copyright co-ownership claims against DC for some amount of time (the

12 length of which is in dispute), no such argument is available with respect to

13 Plaintiffs' co-ownership claims against Defendant Warner Bros.  The Tolling

14 Agreement is solely between DC and Plaintiffs.  None of the other Defendants is

15 mentioned in, let alone a party to, the Tolling Agreement.  Thus, even taking the

16 later accrual date advanced by Defendants – April 15, 1999 – because no claims of

17 co-ownership with Warner Bros. are tolled for any period of time, the statute of

18 limitations on such claims has clearly run as to it or any other non-party to the

19 agreement.

---

[37] Defendants dispute this and have moved for summary judgment on the claim that DC and Warner Bros. are alter-egos.

52

ER 2705

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 127 of 321

## II. AS A MATTER OF LAW, AN EFFECTIVE TERMINATION PURSUANT TO THE SUPERMAN NOTICES OF TERMINATION CANNOT REQUIRE A PROFIT ACCOUNTING FROM EXPLOITATION OF FOREIGN COPYRIGHTS

### A. Background: The Established Copyright Framework In Which Termination Must Be Considered

Since section 304(c) was enacted and must be considered in the framework of the remaining provisions of the 1976 Act, the particularly relevant provisions of the Act are summarized below.

### 1. Rights of Co-Owners Of Copyright

Section 201 of the 1976 Act carried forward the basic 1909 Act principles that copyright "vests initially in the author or authors of the work," that "authors of a joint work are co-owners of [the] copyright" and that "[i]n the case of works made for hire the employer . . . is considered the author . . ." and initial owner of copyright. 17 U.S.C. § 201(a) & (b). *See also* H. Rep. at 120-21. Under the 1909 Act, as today, each joint author is a co-owner who possesses "an undivided ownership in the entire work, including all of the contributions contained therein" 1 *Nimmer* § 6.03, at 6-7; *see Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978)), and who can nonexclusively exercise all the rights of the copyright owner subject only to a duty to account to other co-owners for their share of "profits" earned from such use or licensing (1 *Nimmer* § 6.10; *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984)). A joint author *cannot* be liable for infringement of copyright from such use or licensing. *Id. See also Zuill*, 80 F.3d at 1369.[38]

---

[38] Since no representative of Shuster exercised any termination right under Section 304(c), even assuming that Plaintiffs validly exercised their termination right, DC retains Shuster's share of any purportedly terminated Superman work, fully entitled to exercise such co-ownership rights today subject only to its duty to account. **ER 2706**

53

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 128 of 321

## 2.  National Treatment and Territorial Nature
## of the United States Copyright Act

Both in the United States and abroad, under the rule of so-called "national treatment," works authored in the U.S., such as the first Superman comic strip in *Action Comics No. 1*, are afforded the same protection in other countries as that provided therein to their own citizens. *See Itar-Tass Russian News Agency, Inc. v. Russian Kurier, Inc.*, 153 F.3d 32, 89 & n.8 (2d Cir. 1988); *Patry's Latman*, at 302.[39] As a result, for any one work by an American or foreign author there can be as many separate copyrights as there are countries affording copyright protection. Under the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"), to which the United States has adhered since 1989 (*see* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988)), such national treatment of copyright protection means that the substantive law of the country in which copyright infringement is alleged will govern a claim, even if the law of that country differs from the law of the country in which the work was created. *See also Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1097 (9th Cir. 1994). As explained by the Court of Appeals in *Subafilms*, national treatment implicates a rule of territoriality in which "[t]he applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published." *Id.* at 1097. *See also Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 701 (9th Cir. 1995).

## 3.  The Presumption Against The
## Extraterritorial Effect of U.S. Legislation

Whether a federal statute can cover in whole or in part any conduct overseas is a question of statutory interpretation, where the party claiming extraterritorial

---

[39] In order for foreign works to have the benefit of "national treatment" in the U.S., at least one of the indicia of reciprocity specified in Section 104(b) must be satisfied. 17 U.S.C. § 104(b).

ER 2707

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 129 of 321

1  effect bears the burden of proof to overcome the well established presumption to

2  the contrary.  As noted by Chief Justice Rehnquist,

3          It is a longstanding principle of American law 'that

4          legislation of Congress, unless a contrary intent appears,

5          is meant to apply only within the territorial jurisdiction

6          of the United States." *Foley Bros., 336 U.S. at 285.*  This

7          "canon of construction . . . is a valid approach whereby

8          unexpressed congressional intent may be ascertained."

9          *Ibid.*  It serves to protect against unintended clashes

10         between our laws and those of other nations which could

11         result in international discord.  *See McCulloch v.*

12         *Sociedad Nacional de Marineros de Honduras, 372 U.S.*

13         *10, 20-22 (1963).*

14         In applying this rule of construction, we look to see

15         whether 'language in the [relevant Act] gives any

16         indication of a congressional purpose to extend its

17         coverage beyond places over which the United States has

18         sovereignty or has some measure of legislative control.'

19         *Foley Bros., supra at 285.*  We assume that Congress

20         legislates against the backdrop of the presumption against

21         extraterritoriality.  Therefore, unless there is 'the

22         affirmative intention of the Congress clearly expressed,'

23         *Benz, supra, at 147,* we must presume it 'is primarily

24         concerned with domestic conditions.'  *Foley Bros., supra,*

25         *at 285.*

26 *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*").  *See*

27 *also id.* at 250 (party asserting that a statute has extraterritorial application of U.S.

28 law "must make the affirmative showing" that it does so).

ER 2708

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 130 of 321

Furthermore, as the Supreme Court has very recently explained, even where it can be shown that Congress in one provision of a statute has clearly manifested in express statutory language an intention to cover events taking place in foreign territories that are specifically described therein, the presumption against doing so precludes "an expansive interpretation" of such a provision and "tugs strongly against" its liberal construction. *Microsoft Corp. v. AT&T Corp.*, 127 S.Ct. 1746, 1751, 1758 (April 30, 2007). *Microsoft* involved the Patent Act under which "[i]t is the general rule . . . that no infringement occurs when a patented product is made and sold in another country" but to which Congress in 1984 had added a specific exception in Section 271(f) providing that an infringement occurs when one "supplies from the United States," for "combination" abroad a patented invention's "components." 35 U.S.C. § 271(f)(1); *see id.* at 1746. The Court held that this provision did not apply to computer software first sent from the United States to a foreign manufacturer on a master disk, or by electronic transmission, then copied by the foreign recipient on computers made and sold abroad. As Justice Ginsburg concluded, where Congress did not address "any arguable gaps" in the reach of Section 271(f), "our precedent leads us to leave in Congress' court" whether there should be any expansion of a specific statutory provision, even one that admittedly targeted certain foreign conduct for coverage by the patent laws:

> If the patent law is to be adjusted better 'to account for the realities of software distribution' [citation omitted], the alteration should be made after focused legislative consideration, not by the Judiciary forecasting Congress' likely disposition.

*Id.* at 1760.

ER 2709

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 131 of 321

**B.** **Plaintiffs Have Misstated a Joint Owner's Duty to Account Which Only Requires the Co-Owner to Share Its Own Profits**

While Plaintiffs accurately note the general principle that each of two joint authors own an undivided fifty percent interest in the copyright of the work, they have misstated the rule concerning the accountings of profits from exploitation of such jointly owned works. First of all, the rule only governs how joint owners account *to each other with respect to their own profits,* not anyone else's.[40] As explained by the Court of Appeals, "[a] co-owner of a copyright must account to other co-owners *for any profits he earns* from licensing or use of the copyright." *Oddo,* 743 F. 2d at 633 (emphasis added). Furthermore, under established law, a co-owner of a copyright is limited to a claim for his share of the profits received by the other co-owner from the license of the copyright; he does not have the right to pursue a claim for a share in the profits of the licensee as well. *See Ashton-Tate v. Ross,* 916 F.2d 516, 522-23 (9th Cir. 1990) (a copyright holder is entitled to share in licensing proceeds from co-owner, not in a licensee's profits); and *Brown v. Republic Prods., Inc.,* 26 Cal. 2d 867, 868 (1945) (upholding judgment that a copyright holder could not obtain accounting from co-owner's licensees). *See also Jasper v. Sony Music Entm't, Inc.,* 378 F. Supp. 2d 334, 346 (S.D.N.Y. 2005); 1 *Nimmer* § 6.12[B] ("A right of accounting may be enforced only as against the joint owner-licensor and not as against his licensee.").

Accordingly, it is only Defendant DC that would have any duty to account to or share with Plaintiffs its profits from the Superman property, if Plaintiffs termination notices are valid.

---

[40] Defendants have moved for summary judgment dismissing all claims of Plaintiffs brought against defendant Warner Bros. Entertainment Inc. and Time Warner Inc. as alter egos of defendant DC in an unfounded attempt to reach any of their Superman-related profits in the accounting claims.

57

ER 2710

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 132 of 321

**C.** **Because Plaintiffs Cannot and Have Not Recaptured Any Ownership Interest in Foreign Copyrights, The Rules Governing Accountings Between Joint Owners Do Not Apply to Profits from Such Foreign Copyrights**

Plaintiffs argue that they are entitled to a one half share of all profits – both foreign and domestic – from any exploitation of Siegel's recaptured interest in the Superman copyrights because state law general accounting principles so provide. Plaintiffs' theory is based on the false premise that by virtue of a statutory copyright termination one could become a joint owner of not only U.S. copyright rights but also foreign copyrights. However, as noted above, for any particular work there are separate copyrights for each different country and, as also shown below, neither Section 304(c) nor any other legal rule has provided or could give Plaintiffs any copyright ownership interest outside the U.S.[41]

The cases Plaintiffs rely upon to support their claim for a share of the foreign profits from exploitation of Superman copyrights (Pl. Mem. at 25-28), are all actions where the plaintiff was the co-owner of *all* copyright rights in the works at issue. But where, as here, there is no such extensive co-ownership interest, these decisions can have no application. In short, if you are not a co-owner as to foreign rights, you do not have a co-owner's right to participate in foreign revenues.

---

[41] Notwithstanding their above-quoted pleading, Plaintiffs now concede, as they must, that their claim to one-half share of profits from foreign exploitation of Superman as a joint owner does not derive from any principles dealing with copyright infringement. (Pl. Mem. at 25-28); *Oddo v. Reis, supra,* 743 F. 2d at 633 (as between co-owners of a copyright, "the duty to account does not derive from the copyright law's proscription of infringement"); *accord Zuill,* 80 F.3d at 1369.

58

ER 2711

**D.** **Only the Copyright Act, Not State or Any Other Law, Determines the Rights That Can be Recaptured By Means of a Copyright Termination Under Section 304 (c)**

   1. **In The Copyright Act's Termination Provisions Congress Clearly and Broadly Expressed its Intent that the Terminating Party's Rights Could Not Affect a Grantee's Foreign Copyright Rights or Reach Actions Occurring Outside of the U.S.**

It is undisputed that from March 1, 1938 until the April 16, 1999 purported effective date of the Superman Notices, DC as Detective's successor-in-interest has owned and exercised all worldwide rights under copyright in and to all of the Superman works for the original and renewal terms of protection. The sole basis for Plaintiffs' right to claim any ownership of copyright in such works today is Congress' decision in the 1976 Act to provide authors and their heirs with a right to terminate pre-1978 grants of copyright rights in specified conditions and to the limited extent that the statute allows in 17 U.S.C. § 304(c). In other words, whatever co-ownership rights Plaintiffs can claim to own today are creatures of statute, emanating solely from Section 304(c), which defines the scope, effect and limitations of any termination thereunder. It is undisputed that Plaintiffs have never been granted any other rights in the works at issue and, as demonstrated below, it cannot be gainsaid that under such provision itself the co-owner of a termination interest cannot recapture any rights except an undivided one-half share of the U.S. copyright rights. Accordingly, it is *only* DC that would have any duty to account to or share with Plaintiffs *only* its profits from U.S. uses of the Superman property, if Plaintiffs' termination notices are valid.

ER 2712

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 134 of 321

### a. The Copyright Act Does Not Include Any Indication Of Congressional Intent to Cover Conduct Occurring Outside the U.S.

As noted by Patry, "*every* court to have examined the issue has held that Congress did not intend the Copyright Act to be applied extraterritorially beginning with the Supreme Court in 1908." [footnote omitted] (emphasis added). 7 William F. Patry, *Patry on Copyright*, § 25:86 at 25-236 (2007) (hereinafter *Patry on Copyright*")[42] (citing *United Dictionary Co. v. G&C Meriam*, 208 U.S. 260, 264, 28 S. Ct. 290 (1908) and collecting cases, including *Leisure Time Enm't v. Cal Vista*, 35 Fed. Appx. 565 (9th Cir. 2002); *Los Angeles News Service v. Reuters Television Intern. Ltd.*, 144 F. 3d 987 (9th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999); and *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1096 (9th Cir. 1994), *cert. denied*, 513 U.S. 1001, 115 S. Ct. 512, 130 L. Ed. 2d 419 (1994)).

In the rare situation when Congress has intended to make an exception to the presumption against extraterritoriality, it has clearly expressed that intent. Thus, from January 1, 1978 until the U.S. adherence to the Berne Convention in March of 1989, when the statute was amended with regard to its copyright notice requirements, the Copyright Act included explicit language requiring the affixation of notice to copies of works distributed in both the U.S. and overseas. 17 U.S.C. § 401(a) (notice required on works "published in the United States or elsewhere") (before amended). Apart from this exception, Congress has made it clear in Section 602(b) that the Copyright Act does not otherwise apply extraterritorially: "In a case where the making of the copies or phonorecords would have constituted an infringement of copyright if this title had been applicable, their importation is prohibited." As pointed out in the Patry treatise:

---

[42] Relevant excerpts from *Patry on Copyright* are attached at Bergman Decl. Exh. <u>HH</u>.

ER 2713

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 135 of 321

Obviously, if the unauthorized making of copies overseas
was unlawful under Title 17, this section would be
wholly unnecessary. In reviewing the possible
extraterritoriality of the Copyright Act under the *Aramco*
decision, the Ninth Circuit, sitting *en banc*, also noted the
presence of section 602, and described its presence as
'doubly fortifying' the presumption against the statute's
extraterritoriality.

7 *Patry on Copyright*, § 25:86 at 25-238 (citing *Subafilms*, 24 F.3d at 1096).[43]

> **b.** **Congress Has Clearly Manifested Its Contrary Intent, To Wit, That Any Termination and Recapture of Copyright Rights Under Sections 304(c) and 203 Cannot Apply to Any Conduct Occurring Outside the Country.**

Plaintiffs' arguments about entitlement to share in profits earned from the exploitation of U.S. copyright rights in foreign territories ignore (a) the fact that under the Copyright Act Plaintiffs do not own and can never own, without a grant from DC, any foreign copyrights in any Superman works, and (b) the express limiting effect of the provisions of Section 304(c) of the statute making it clear that Plaintiffs' termination can in no way affect DC's continuing exclusive rights to exploit its foreign copyrights in such works. This broad statutory limitation includes no exceptions.

> **2.** **Plaintiffs Do Not Own Any Interest in Foreign Copyright Rights Because These Are Not Subject to Termination**

Section 304(c)(6) specifically provides that: "[I]n **all cases** the reversion of rights under this section is subject to" specified "limitations," including that

---

[43] In *Subafilms*, the Court also held that authorizing in the U.S. acts that are allegedly infringing abroad cannot constitute an actionable act of infringement under the U.S. Copyright Act. 24 F.3d at 1090-91.

61

ER 2714

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 136 of 321

"[t]ermination of a grant under this subsection affects only those rights covered by the grants that arise under this title [*i.e.* the Copyright Act], and *in no way affects rights arising under any other Federal, State, or foreign laws*." 17 U.S.C. § 304(c)(6)(E) (emphasis added). This sweeping and unequivocal language does not merely restrict a terminating party's right to recapture so as to include U.S. copyrights but not foreign copyrights. It is broader: termination "**in no way affects rights**" arising under foreign laws. As Congress explained in the legislative history, "rights [of grantees] under other Federal, State or foreign laws are **unaffected**." H. Rep. at 126 (emphasis added) (describing Section 203's nearly identical termination right as to post-1978 grants).[44]

The statutory limitation restricting the effect of termination to domestic copyright grants has been recognized by the Second Circuit Court of Appeals:

> The Copyright Act of 1976 . . . expanded the rights of
> authors and their heirs by automatically extending the life
> of their copyrights by 19 years, for a total of 75 years . . .
> and by allowing authors (or, if the authors are deceased,
> their statutory heirs) to terminate, for the period of the
> extended copyrights, any *domestic* copyrights interests in
> their work that they may have granted to others . . . .

*Fred Ahlert Music Corp.*, 155 F.3d at 18 (emphasis added).[45] In *Ahlert*, after noting the fact of the termination, the court stated further that "Warner's *domestic* rights in the Song reverted to Dixon's heirs" and that Warner, which was the successor to rights of the original grantee, retained the foreign rights after

---

[44] Section 304(c) is a close but not exact counterpart of Section 203, which provides a right to terminate an author's post-1977 grants of copyright rights. H. Rep. at 140. The same limitation on termination with respect to rights under other federal, state or foreign laws appears in Section 203. 17 U.S.C. §§ 203(b)(1), (5).

[45] Similarly, the District Court concluded that "[w]hile the [heirs] terminated defendant's right to use the song in the United States, defendant retained a grant to license the song everywhere else in the world except the United States." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 958 F. Supp. 170, 172, n. 1 (S.D.N.Y. 1997).

ER 2715

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 137 of 321

termination. *Id.* at 20 (emphasis added). *Ahlert* concerned a copyright termination under Section 304(c) by the statutory heirs of one of the two joint authors of the song "Bye Bye Blackbird" registered for copyright in 1926 (the "Song"). Prior to the 1953 renewal of the copyright, the co-authors had assigned their respective copyright interests in the Song to defendant Warner's predecessor in interest, who proceeded to authorize a derivative recording of the Song. Following service of an effective termination notice, the statutory heirs assigned their recaptured copyright in the Song to plaintiff. The Court analyzed the parties' rights as though one of the joint authors, Dixon, was sole author. 155 F.2d at 20, n.4. While the precise issue before the court was whether a particular post-termination use by defendant Warner of the pre-termination derivative work in the United States was covered by the "existing derivative works" exception to Section 304(c)(6)(A), both the parties and the Court acted on the unquestioned presumption that the termination affected only the domestic copyright, and that the foreign rights to both the Song and the derivative work remained unaffected and could continue to be exploited by the defendant Warner *without accounting to plaintiff.* Accordingly, after noting the fact of the termination, the court stated: "Thus, Warner's *domestic rights* in the Song reverted to Dixon's heirs." *Id.* at 20 (emphasis added).

All commentators are also in agreement on this point. According to *Nimmer*, Congress not only made a clear choice but also, because of the territorial nature of copyright protection, had no power to do otherwise:

> A grant of copyright 'throughout the world' is terminable
> *only with respect* to **uses** *within the geographic limits of*
> *the United States*. Because copyright has no
> extraterritorial operation, arguably American law is
> precluded from causing the termination of rights based on
> foreign copyright laws. . . . [E]ven if the conflicts rule of
> a foreign nation were to call for application of the

**ER 2716**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 138 of 321

American termination rule of contract law, that rule by its
own terms excepts from termination the grant of those
rights arising under foreign copyright law.

3 *Nimmer* §11.02[B][2]. Other commentators are in accord. *See, e.g.*, 1 William
F. Patry, *Copyright Law & Practice*, 495-97 (2004) (exceptions to termination
include "rights that arise under any . . . foreign law"); William F. Patry, *Choice of
Law and International Copyright*, 48 Am.J.Comp.L. 383, 447 (2000) ("One
provision is quite clear, however:  termination only affects U.S. rights."); Paul
Geller & Melville B. Nimmer, 1 *International Copyright Law and Practice*, §
6[2][a][i], fn. 70 (2005) ("*Geller*") (noting that *Nimmer* "clarif[ies] that only the
transfer of U.S. copyright would be terminated by invoking the U.S. right to
terminate."); 1 Paul Goldstein, *Goldstein on Copyright*, § 5.4.3 at 5:135 (3d ed.
2006); 2 Howard B. Abrams, *The Law of Copyright*, § 12:41 (2006) ("The Act
limits its application to termination of grants of rights based upon the United States
Copyright laws . . . ."); 2 *Patry on Copyright*, § 7:42 & n.5.[46] As stated by Patry in
his law review article:

> Sections 203(b)(5) and 304(c)(6)(E) both state, in
> relevant part, that termination 'affects only those rights
> covered by the grants that arise under this title [17
> U.S.C.], and in no way affects rights … under foreign
> laws.'  Accordingly, where a U.S. author conveys
> worldwide rights and terminates under either section,
> grants in all other countries remain valid according to
> their terms or provisions in other countries' laws.

48 Am.J.Comp.L. at 447.

---

[46] That termination cannot affect rights arising under foreign copyright laws is such a
basic tenet of the termination provisions, it is taught to law students in introductory
copyright courses. *See, e.g.*, Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases &
Materials*, 376-77 (6th ed. 2006).

64

ER 2717

### 3. Plaintiffs' Theory That They Have Recaptured a Share of Foreign Copyrights On the Basis of State Common Law Principles of Accounting Generally Governing The Rights of Property Co-Owners Disregards The Rules of National <u>Treatment and Copyright Preemption</u>

In the face of Congress' clear and unambiguous language in both the statute and the legislative history, Plaintiffs nevertheless assert that a recapture of United States rights under copyright under section 304(c) entitles them, in the case of Superman, to participate equally with Defendants in revenues derived from foreign exploitation because under state common law rules of accounting co-owners share with each other the profits from their commonly owned property. (Pl. Mem. 25-28). Any such theory would make no sense here because it is inconsistent with and would render entirely meaningless the copyright statute's express language to the contrary. Congress was undoubtedly fully cognizant of such general accounting principles, as well as the principles of national treatment and the inability of United States copyright law to have extraterritorial application, and decided in the clearest of terms that termination "in no way affects rights arising under . . . foreign laws" (17 U.S.C. § 304(c)(6)(E)).[47] Although accounting actions between co-owners of copyright are generally ones that can be brought under state law, where the parties have no co-ownership relationship as to foreign copyright rights, one cannot bootstrap such general common law principles of accounting into a copyright

---

[47] Equally far fetched would be any contention that because Congress did not expressly prohibit the operation of such state law accounting principles in the termination provision, Congress meant to have them apply under section 304(c)(6)(E). Plaintiffs' burden is to establish Congress' manifest intent in section 304(c) to have U.S. law reach conduct occurring beyond our borders. Neither the statute nor the legislative history of the 1976 Act contains any statement of intention to provide such an exception. As observed by Justice Stewart," . . . it would be a strange canon of construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980).

ER 2718

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 140 of 321

1    ownership interest that one has not obtained, and that the Congress expressly

2    decided one could not obtain.

3        Further, to the extent that Plaintiffs contend such state law accounting

4    principles trump Congress' decision to exclude foreign copyright rights from

5    termination, they run afoul of the Constitution's Supremacy Clause, Article VI,

6    and the most basic tenets of "conflict pre-emption." As noted by Nimmer ". . .

7    even apart from Section 301[of the Copyright Act], the general proposition

8    pertains in copyright law, or elsewhere, that 'a state law is invalid that stands as an

9    obstacle to the accomplishment of the full purposes and objectives of Congress.'"

10   1 *Nimmer* § 1.01[B][3][a] (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

11   As explained by Chief Justice Berger in *Kewanee Oil Co. v. Bicron Corp.*, 416

12   U.S. 470, 479-80 (1974), where state law touches upon and is inconsistent with

13   federal statutes,

14              it is "familiar doctrine" that the federal policy "may not

15              be set at naught, or its benefit denied" by the state law.

16              *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 172, 173,

17              176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942). "This is

18              true, of course, even if the state law is enacted in the

19              exercise of otherwise undoubted state power." . . . If the

20              scheme of protection developed by Ohio respecting trade

21              secrets "clashes with the objective of the federal patent

22              laws," *Sears Roebuck & Co. v. Stiffel Co., supra*, 376

23              U.S., at 231, 84 S.Ct. at 789, then the state law must fall.

24   The objectives of the termination provisions of the Copyright Act have been

25   specifically held to be the basis for pre-empting inconsistent state principles of

26   contract law. *See Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993),

27   where the Ninth Circuit held that since a California contract rule would directly

28

**ER 2719**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 141 of 321

conflict with the termination provisions for post 1978 grants set forth in section 203 of the Copyright Act, it was pre-empted and "federal law must control." *Id.*

As noted above, in crafting the termination provisions of the statute as it did, Congress drew a very clear line dividing just what rights could and could not be recaptured via termination. Under these circumstances, any rule or principle of state law that conflicts with that decision must fall and is foreclosed by the Copyright Act. Here, insofar as Superman is concerned, because the termination of only *Siegel's domestic* Superman copyright grants is involved, the Superman Notices can have no effect on DC's legal right as the sole owner of the foreign copyrights to continue to exploit those works outside of the United States without any obligation to account to Plaintiffs.[48]

## III. WHETHER THE PARTIES ENTERED INTO AN ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A QUESTION OF FACT WHICH CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Plaintiffs move this Court for an order dismissing DC's Third and Fourth Alternative Counterclaims for breach of contract and declaratory relief, asserting that there was no enforceable agreement between the parties as alleged by DC. That is, Plaintiffs would have this Court summarily resolve the question of whether or not a binding contract was formed between the parties on October 19, 2001 regarding the transfer of Plaintiffs' Superman copyright interests to DC. But such a determination is not the province of the Court at this juncture: It would require the Court to address and resolve questions of fact, weigh the evidence, and assess the credibility of the witnesses, none of which can properly be done on summary

---

[48] As noted above, any act by DC or its licensees in the exercise of some or all of the rights of copyright as a co-owner in the United States and exclusive owner outside the country can *never* constitute an *infringing* act in the United States or overseas. DC, which remains the sole owner of the foreign copyrights in foreign jurisdictions, is entitled to exercise all rights of ownership in such other jurisdictions without infringing any rights which may be held by Plaintiffs.

67

ER 2720

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 142 of 321

1    judgment.  Indeed, it has routinely been held that the question of the formation of a

2    contract is <u>for the trier of fact</u> upon considering the appropriate evidence.  *See*

3    *Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) (whether

4    parties mutually intended to be bound by terms contained in a proposed written

5    agreement is to be determined from the facts and circumstances of a particular case

6    and is a question of fact); *Symphony Fabrics Corp. v. Podell Indus., Inc.,* 94 Civ.

7    4373 (BSJ) 1996 U.S. Dist. LEXIS 12767, *14 (S.D.N.Y. Aug. 30, 1996) (to

8    determine whether a contract has been formed, the trier of fact must evaluate the

9    objective manifestations of the intent of the parties).

10          In general, an enforceable contract requires a meeting of the minds on the

11   material terms, along with an intention by the parties to be bound.  *Apablasa v.*

12   *Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959); *Callie v. Near*, 829 F.2d 888,

13   891 (9th Cir. 1987) ("In addition to the intent of the parties to bind themselves, the

14   formation of a settlement contract requires agreement on its material terms.").

15   Plaintiffs have failed to provide any sworn testimony from either of them

16   containing any objective evidence that the October 19, 2001 Letter did not

17   represent a "meeting of the minds" on all material terms.  This evidentiary failing

18   alone dooms Plaintiffs' motion.

19          Moreover, as demonstrated below, Defendants have presented sufficient

20   admissible evidence for a trier of fact to conclude that in October, 2001, (i) the

21   parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their

22   respective clients, reached a meeting of the minds on all material terms pursuant to

23   which Plaintiffs would convey their Superman copyright interests to DC, (ii) that

24   this agreement was contemporaneously memorialized and affirmed in a writing

25   executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties

26   intended and expected to be bound by the terms of that agreement notwithstanding

27   the fact that they contemplated negotiating and executing a more formal contract

28   thereafter.  In fact, the parties were proceeding along on that basis, with the

**ER 2721**

68

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 143 of 321

drafting and re-drafting of their more formal documentation, until Plaintiffs suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel, and abruptly jettisoned both the deal and their attorneys who negotiated it.

This evidence cannot be rejected or negated *as a matter of law* as would be required in a motion for summary judgment. *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129, 141 (2002) ("where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist."). Indeed, in assessing the existence of a contract on summary judgment, the court *must* draw all inferences in the light most favorable to the non-moving party. *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1116 (C.D. Cal. 2002) (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987)). Accordingly, Plaintiffs' motion for partial summary judgment on these claims must be denied, and DC should be permitted to present its contract Counterclaims to a jury for determination at trial.

A. **It Has Been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement**

As a preliminary matter, the question of Mr. Marks' authority to act on behalf of and to bind Plaintiffs to an agreement with DC is no longer an issue in this case. Generally, an attorney is *presumed* to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *See In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2nd Cir. 1996). In their Reply to DC's Counterclaims on the contract issues, Plaintiffs expressly asserted as their Thirty-Seventh affirmative defense that "Plaintiffs' attorneys lacked

ER 2722

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 144 of 321

1  authority and/or exceeded the scope of their authority with respect to the purported

2  settlement agreement alleged by Counterclaimant." (Bergman Decl. Exh. II.)

3  Notwithstanding this stated defense, Plaintiffs vigorously resisted all attempts by

4  Defendants to inquire into the scope of Mr. Marks' authority, and specifically into

5  whether or not Plaintiffs had authorized in advance or had consented to his

6  communication to DC on October 19, 2001, that "the Siegel Family . . . has

7  accepted" DC's offer. (Bergman Decl. JJ; *see also id.* Exh. S (Marks Tr.) at

8  146:21-147:11.) However, in response to Defendants' motions to compel

9  Plaintiffs and Mr. Marks to produce documents and respond to deposition

10 questions regarding his authority – and in an apparent attempt to forestall any order

11 by the Court in that regard – Plaintiffs' current attorney, Mr. Toberoff, conceded in

12 open court, *without qualification*, that the Marks Letter represented the statements

13 of Plaintiffs themselves. (Bergman Decl. Exh. KK.) Accordingly, relying on Mr.

14 Toberoff's statement and finding it to be binding on Plaintiffs, the Court *dismissed*

15 Plaintiffs' affirmative defense denying Mr. Marks' authority, and ruled that the

16 statements contained in the Marks Letter are the statements of Plaintiffs:

17                  To make sure of Plaintiffs' position, the Court, at the

18          hearing on April 30, 2007, directly asked Plaintiffs'

19          counsel whether the statements in the October 19, 2001

20          letter represented the statements of Plaintiffs. Plaintiffs'

21          counsel replied with an unqualified "yes." That answer

22          binds Plaintiffs here. To further make absolutely sure

23          that there is no remaining issue as to Mr. Marks'

24          authority in connection with the October 19, 2001 letter,

25          the Court hereby strikes the thirty-seventh affirmative

26          defense from the reply to the counterclaims in both cases.

27

28

ER 2723

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 145 of 321

(Bergman Decl. Exh. <u>LL</u>.)[49]

**B.** **The Fact That the Parties Contemplated the Later Negotiation and Execution of a Long-Form Contract Does Not Negate the October 19 Agreement as a Matter of Law**

Plaintiffs assert that even if the parties had "provisionally" agreed on all material terms of their deal in October, 2001, "given the importance and complexity of the subject matter and proposed deal points, any agreement would need to be reduced to a written contract in mutually acceptable fashion." (Pl. Mem. at 59-60.) From this premise, Plaintiffs argue that since no long-form contract was in fact finalized and executed, no enforceable agreement can exist. (*Id.* at 60-61.) But the mere fact that the parties contemplated, and embarked on the process of drafting, a later, long-form contract, does not establish *as a matter of law* that the parties did not intend their agreement, as memorialized in the Marks Letter, to be binding. *See Inamed Corp.,* 275 F. Supp. 2d at 1116 ("whether the parties intended that the letter agreement be a binding contract or rather an agreement to negotiate a further contract is a question of fact."); *Beck v. American Health Group Int'l,* 211 Cal. App. 3d 1555, 1562 (1989) ("Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties.").

Thus, where the parties intend to be bound – even if they expect to further reduce their informal writing to a more formal one – "the failure to follow it with a more formal writing <u>does not negate the existence of the prior contract</u>." *Harris v. Rudin, Richman & Appel,* 74 Cal. App. 4th 299, 307 (1999) (emphasis added).[50] *See also Louis Lesser Enters., Ltd. v. Roeder,* 209 Cal. App. 2d 401, 404 (1962)

---

[49] The Court's order also found that "An attorney is presumed to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *In re Artha Mgm't, Inc.,* 91 F.3d 326, 329 (2d Cir. 1996) (Bergman Decl. Ex. <u>LL</u>.)

[50] Holding, in overruling a demurrer, that "[w]hether the parties intended their communications to be a binding settlement agreement or an agreement to further negotiate after a formal draft was prepared was a factual question. . . ." *Id.* at 308.

**ER 2724**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 146 of 321

("[P]reliminary negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend to execute a formal writing."); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 at n3 (1991) (an agreement which contemplates subsequent, more detailed documentation is <u>not</u> invalid if the parties have agreed to its existing terms).

Defendants do not dispute that the parties contemplated further documentation of their agreement, including the preparation of formal assignments reflecting the transfer of Plaintiffs' copyright interests to DC. However, they contend that the evidence – and the reasonable inferences to be drawn from that evidence – supports a finding that the parties intended to be bound to the terms of their agreement reached on October 19, 2001, even before any such formal document was prepared and signed: Unlike the circumstances of the cases on which Plaintiffs rely,[51] neither Mr. Marks nor Mr. Schulman conditioned their agreement on the execution of more formal documentation, either in their correspondence, or orally. (Schulman Decl. ¶ 10.) In fact, both the Marks Letter and the Schulman Letter speak to a *presently existing* agreement. (Toberoff Decl. Exhs. <u>BB</u>, <u>CC</u>.)[52] Thus, for example, the detailed Marks Letter states of the parties' agreement that "the terms are as follows," and contains many references to "this deal." It sets forth all the material terms of the parties' agreement, and makes no mention of the preparation of a long-form agreement – that is, it operates as a stand alone document. Indeed, the only mention of additional documentation in the Marks Letter is with respect to ministerial-type documents relating to the

---

[51] *See, e.g., Patch v. Anderson*, 66 Cal. App. 2d 63, 66 (1944); *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 155, 163 (1989); *Duran v. Duran*, 150 Cal. App. 3d 176, 180 (1983); *Roth v. Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957)

[52] The Marks Letter expressly states that "the Siegel Family ... <u>has accepted</u> D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties," and acknowledges that a deal has been reached: "Many thanks for help and patience in <u>reaching this monumental accord</u>." (Toberoff Decl. Exh. <u>BB</u>.) Mr. Schulman's follow up correspondence encloses "a more fulsome outline of what we believe <u>the deal we've agreed to</u> is," filling in a few details, but otherwise in accord with the material terms set forth in the Marks Letter. (*Id.* Exh. CC.)

ER 2725

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 147 of 321

copyright transfers: "The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time." (*Id*. Exh. BB.) The Schulman Letter similarly states only that the "Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact." (*Id*. Exh. CC.)

Nor is there any other type of indication in the Marks Letter that the agreement the parties had reached as reflected therein was not immediately binding. On the contrary, Mr. Marks' choice of language reflects a deliberate effort to fully document the parties' agreement in the letter without the necessity for further negotiation of outstanding terms, without the need for additional documentation, and inviting the very type of response Mr. Schulman provided in his letter of October 26, 2001. (*Id*. Exh. BB) Likewise, the Schulman Letter (*id*. Exh. CC), which started the process of the more formal documentation that was admittedly contemplated by the negotiators, also contains no indication that the parties are not bound unless a more formal agreement is executed. In fact, DC *affirmatively acted* on the understanding that there was an immediate agreement, by negotiating for Warner Bros. to include Plaintiffs' credits in the upcoming motion picture *Superman Returns* (Schulman Decl. ¶ 7), and by setting up a reserve for the payment of all monies due to Plaintiffs pursuant to the terms of the agreement. (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

Similarly, in her May 9, 2002 letter to Richard Parsons, Mrs. Siegel *acknowledged* that the parties had reached an accord six months earlier, but protested only − *albeit* strongly − that the February Draft (Toberoff Decl. Exh. DD) did not reflect that agreement. (Bergman Decl. Exh. Z.)[53] Tellingly,

---

[53] "We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract. . . . For your representatives to condition our receiving financial compensation for **ER 126** on

1  Plaintiffs have submitted no evidence of any contemporaneous objective

2  manifestation by them or their counsel of an intent not to be bound until the

3  execution of a long-form.  Indeed, Plaintiffs' have submitted *no evidence*

4  *whatsoever* of their purported intention not to be bound − whether objective or

5  subjective − in connection with this motion.

6      C.    <u>The October 19, 2001 Agreement Is An Acceptance Of DC</u>

7          <u>Comics' Offer And Is Not A "Counteroffer" That Was</u>

8          <u>Rejected By Defendants</u>

9      Plaintiffs concede that the October 19, 2001 Agreement is drafted as an

10  "acceptance" of an offer made on October 16, 2001.  (Pl. Mem. at 57.)  However,

11  because Plaintiffs now attempt to avoid the agreement reached via that acceptance,

12  they seek to characterize the October 19, 2001 Agreement as a "counteroffer" that

13  was later rejected by Defendants.  (*Id.*)  Defendants absolutely reject this

14  characterization − Defendants have consistently maintained and assert again now

15  that the October 19, 2001 Agreement represented an acceptance of all material

16  terms offered by Mr. Schulman on behalf of Defendant DC.  (Schulman Decl. ¶¶

17  10, 13-15.)

18      As noted above, a contract is established when there is a meeting of the

19  minds between the parties on all material terms of their agreement, *Apablasa*, 176

20  Cal. App. 2d at 726, and its formation is a question *of fact* to be determined from

21  the particular circumstances of each case, *Banner Entertainment*, 62 Cal. App. 4th

22  at 358.  *What* the material terms of the contract are "depends on the circumstances

23  of the agreement, including the agreement and its context, the subsequent conduct

24  of the parties, and the remedy sought." *House of Prayer, etc. v. Evangelical Assoc.*

25  *for India*, 113 Cal. App. 4th 48, 53 (2003).  To ascertain whether the requisite

26  meeting of the minds exists − that is, whether the parties have assented "to the

27

28  demands which were not in <u>the proposal we accepted</u>, is deceitful." (*Id.,* *emphasis* added.)

74

ER 2727

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 149 of 321

1   same thing in the same sense" – the trier of fact must evaluate the evidence of the

2   parties' objective intent; namely "the outward manifestations of [their] consent."

3   *Banner Entm't*, 62 Cal. App. 4th at 358; *Beard v. Goodrich*, 110 Cal. App. 4th

4   1031, 1039-40 (2003).

5       The evidence before the Court certainly supports the conclusion that as of

6   the October 19, 2001 Marks Letter (Toberoff Decl. Exh. <u>BB</u>) the parties had

7   agreed to all material terms of their agreement, and intended to be bound thereby.

8   First, Mr. Marks, an experienced transactional lawyer, carefully worded his letter

9   to use the powerful legal language of acceptance – "The Siegel Family . . . *has*

10  *accepted* D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and

11  'Spectre' properties." (*Id.*) This choice of binding contractual language was not

12  accidental. Rather, the only reasonable inference is that the use of this language

13  was a deliberate attempt on the part of Plaintiffs' former counsel to conclude what

14  had been lengthy and complex negotiations and bind DC to the agreement.

15      Second and further supporting the conclusion that the October 19, 2001

16  Agreement contains all material terms agreed to by the parties, is the fact that Mr.

17  Marks painstakingly outlined in six single-spaced pages all of the material terms

18  that Plaintiffs were accepting. The only reasonable inference is that Mr. Marks

19  documented the terms he (and thus his clients) considered to be the material terms

20  accepted by Plaintiffs.

21      Third, DC's main negotiator, Mr. Schulman, has confirmed under oath in

22  response to Plaintiffs' current motion that the October 19, 2001 Agreement

23  accurately documented the material terms that had been offered on behalf of DC.

24  (Schulman Decl. ¶ 7.)

25      Plaintiffs point to alleged discrepancies between the Marks Letter, the

26  Schulman Letter, and the February Draft in an attempt to get out from under the

27  October 19, 2001 Agreement. But even *if* the Schulman Letter or the February

28  Draft did not comport in some respects with the parties' agreement as

75

**ER 2728**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 150 of 321

memorialized in the Marks Letter, or added additional terms that had not been discussed, that would mean only that the Schulman Letter and the February Draft did not constitute the agreement of the parties, *not* that the previous October 19 agreement was somehow vitiated. *See e.g. Kitty-Anne Music Co. v. Swan*, 112 Cal. App. 4th 30, 37-38 (2003) (holding that the parties had an enforceable agreement which plaintiffs breached, notwithstanding the fact that they never executed a draft long-form agreement prepared by plaintiffs which contained terms "drastically" different from the parties' prior deal memo, because the additional documentation was simply "intended to carry out the terms of the deal memo" which of itself constituted the parties' contract). *See also King v. Stanley*, 32 Cal. 2d 584, 589 (1948) (letters constituted enforceable written agreement for purchase of real property; court rejected defendant's contention that the escrow instructions did not follow the alleged contract obligations but included different terms which had not been accepted on the basis that "such instructions do not take the place of the agreement of sale <u>but merely carry it into effect. They are subject to modification without affecting the finality of the agreement already reached</u>.") (emphasis added); and *Ersa Grae Corp.*, 1 Cal. App. 4th at 624 (in rejecting argument that executed counteroffer was merely an agreement to agree, court noted that "[s]pecific definitions and lease terms were to be the subject of subsequent documentation and the parties were obligated to complete the documentation in good faith. No more is required.").

DC does not assert in its Counterclaim that the Schulman Letter or the February Draft constitutes the agreement of the parties; instead, it is seeking to enforce, and suing for breach of, the agreement reached on October 19, 2001 by Mr. Marks and Mr. Schulman as expressly reflected in the Marks Letter. (Bergman Decl. Exh. <u>GG</u>, ¶¶ 98-105.) Accordingly, if the admissible evidence and the reasonable inferences drawn therefrom can support a finding that the parties reached an agreement on all material terms on October 19, 2001, and intended to

**ER 2729**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 151 of 321

be bound to those terms – as Defendants contend they do – then DC's Counterclaims are sufficient to go to a jury *whether or not* any subsequent correspondence or proposed draft long-form agreement might have changed or added terms, and despite the fact that no formal contract was never executed.[54]

Indeed, the evidence supports the conclusion that Plaintiffs' belated claim that the Schulman Letter changed the deal or that the February Draft was "unacceptable" is nothing other than an *ex post facto* excuse for Plaintiffs to reject the deal they had already made for the promise of a much more lucrative payday from their current counsel and the companies he controlled: Mr. Marks *never* disputed anything in the Schulman Letter, and similarly voiced *no* concern about the February Draft until after he learned about his client's complaining letter to Time Warner's Chief Executive Officer; and even then he acknowledged to Mr. Schulman that although the draft was "very aggressive" and contained some things which had not been discussed *it was not contrary to what the parties had agreed to.* (Schulman Decl. ¶ 11.) Mr. Marks even tried his hand at re-crafting the draft into a form that would be acceptable to his client. (Bergman Decl. Exh. S (Marks Tr.) at 196:21-197:15, 198:25-199:3; *id.* Exh. BB.), but the effort came to naught when Plaintiffs abruptly fired Mr. Marks and terminated discussions with DC shortly after receiving Mr. Toberoff's "$15 million plus" offer. (*Id.* Exh. S (Marks Tr.) at 168:1-169:20.)

In sum, Defendants assert that there is a triable issue of fact on the question of the parties' intent to be bound to the terms of their October 19, 2001 agreement as reflected in the Marks Letter prior to the execution of an anticipated long-form

---

[54] As noted above, DC acted on the agreement by negotiating for Plaintiffs to receive their credits on *Superman Returns* (Schulman Decl. ¶ 10) and by setting up a reserve account for Plaintiffs' payments under the agreement. (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

ER 2730

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 152 of 321

contract, and Defendants are entitled to have that question determined by the trier of fact at trial.[55]

### D. Plaintiffs' Parade Of Alleged "Material Differences" Between The October 19, 2001 Agreement, The Schulman Letter, And The February Long Form Is Irrelevant And Misleading

In support of their argument that, as a matter of law, there was no "meeting of the minds" so as to constitute an enforceable agreement between the parties, Plaintiffs have presented this Court with a 9-page chart purporting to identify the "material" differences in deal terms between the Marks Letter, the Schulman Letter, and the February Draft (the "Chart"). As an initial matter, and as set forth above, this argument is nothing more than a "straw man." Defendants do not contend that the Schulman Letter or the February Draft constitutes the agreement of the parties, but rather that the agreement is as set forth in the Marks Letter, and was concluded on October 19, 2001, when Mr. Marks, with full authority from his clients, stated that "The Siegel Family . . . *has accepted* D.C. Comics offer of October 16, 2001." (Toberoff Decl. Exh. BB, emphasis added). Accordingly, any purported differences between the Marks Letter and any subsequent correspondence or documentation between the parties cannot affect the Court's determination as to whether it can rule, as a matter of law, that no enforceable agreement was entered into on October 19, 2001.

But even if the later communications can be considered to be of consequence in this analysis, it must be remembered that Mr. Marks *at no time* expressed any concern, disagreement, or dissatisfaction with the terms of the Schulman Letter, nor did he say that the Schulman Letter did not in fact accurately

---

[55] *Louis Lesser*, 209 Cal. App. 2d at 404 "[P]reliminary negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend to execute a formal writing." The rationale behind this principle is clear: "Any other rule would always permit a party who has entered into a contract like this to violate it, whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions." *Ersa Grae Corp.*, 1 Cal. App. 4th at 624, n3.

78

ER 2731

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 153 of 321

reflect the essential provisions of the agreement that the parties had reached. (Schulman Decl. ¶ 9; Bergman Decl. Exh. S (Marks Tr.) at 150:24-151:7.) Mr. Marks received the Schulman Letter, reviewed it, and awaited receipt of a draft long-form contract, *saying nothing.* (*Id.* at 150:24-151:7.) He did not challenge the Schulman Letter or seek to correct it, and did not disavow any of its terms or dispute that an agreement had been reached as reflected in its contents. (*Id.*)

Similarly, upon receipt of the February Draft, Mr. Marks did not protest any of its provisions to Mr. Schulman. Indeed, it was not until three months later when he learned that his client had complained to Time Warner Inc.'s CEO about the document that he expressed any reservations at all about the draft long-form. (Schulman Decl. ¶ 11.) And even then, Mr. Marks acknowledged to Mr. Schulman that the February Draft was *not* contrary to the parties' agreement, and undertook a re-write which would be more acceptable to his client. (*Id.*) That is, Mr. Marks' "outward manifestations" of intent support the reasonable inference that, under the particular facts and circumstances of this negotiation, the parties believed there was an existing agreement on all material points, and that neither the Schulman Letter nor the February Draft negated that agreement.[56]

Additionally, Plaintiffs do not establish, or even explain, how any of the purported differences reflected in the Chart – even if they were relevant to the Court's analysis on this motion – are "material" in the context of the parties' negotiations and ultimate agreement. Instead, Plaintiffs simply point to the Chart and indiscriminately label all the supposed differences contained therein as being "material," with no discussion, evidence or analysis as to how any of these purported differences undermine the parties' previously reached agreement, thus

---

[56] "One measure of whether terms are 'material' is whether they have been the subject of debate and discussion during the parties' negotiations." *Inamed*, 275 F. Supp. 2d at 1123. "[I]f these items were material to [defendant and his attorney] . . . [he] should have insisted that [the informal letter agreement] include provisions covering these items. His 'mental reservations [on the subjects] are legally irrelevant.'" *Id.* at 1122 (citing *Core-Vent Corp. v. Implant Innovations, Inc.*, 53 F.3d 1252, 1256 (Fed. Cir. 1995)).

ER 2732

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 154 of 321

1  making any meaningful response by Defendants effectively impossible. (Pl. Mem.

2  at 47, 48.)[57] As a general matter, the essential terms of a contract are those which,

3  if uncertain, would render the enforcement of the remainder of the agreement

4  unfair; all other terms are deemed non-essential. *Los Angeles v. Superior Court*,

5  51 Cal. 2d 423, 433 (1959). Stated otherwise, the material terms of a contract are

6  those from which the court can determine if there has been a breach of the

7  agreement and award damages. *Inamed*, 275 F. Supp. 2d at 1120. The defense of

8  uncertainty is disfavored, and the court should enforce an agreement if it appears

9  that the parties intended to enter into a contract and the outlines of the agreement

10  are sufficiently definite that the court knows what is to be enforced. *Id.* at 1120-

11  21. *See also Mancuso v. Krackov*, 110 Cal. App. 2d 113, 115 (1952) "The law

12  does not favor the destruction of contracts on the ground of indefiniteness, and if it

13  be feasible the court will so construe the agreement as to carry into effect the

14  reasonable intention of the parties if that can be ascertained."

15      In the context of these negotiations, a trier of fact could reasonably conclude

16  that any differences between the Marks Letter and the Schulman Letter or the

17  February Draft were not "material" to the parties' agreement. Terms that typically

18  are considered to be material to a contract as a matter of law include the subject

19  matter of the agreement, and the financial and performance terms expected of the

20  parties. *See, e.g., Kohn v. Jaymar*-Ruby, 23 Cal. App. 4th 1530, 1534 (1994);

21

22  [57] This is complicated by the fact that the Chart itself is egregiously misleading in its
representation of the contents of the two October letters: At times it purports to quote the
23  letters; at times it paraphrases them; and at times it just presents argument. Further, since
the outline contained in the Schulman Letter does not track the format of the Marks
24  Letter, the Chart double-counts purported differences (*see e.g.* "Scope of Agreement" and
"Grant of Rights" at 48-49); splits up provisions thereby exaggerating so-called
25  differences (*see e.g.* "Gross Revenue Definition" and "Royalty re: Media and
Merchandising" pp. 49-50); and implies differences in terms where there exist only
26  differences in language (*see e.g.* "Royalty re: DC Publications" pp. 50-51 and "Audit
Rights" at 56). The chart is additionally confusing because it is impossible to tell
27  whether Plaintiffs are claiming that there are material differences between all three
documents; between the Marks Letter and the Schulman Letter; between the Mark Letter
28  and the February Draft; or even between the Schulman Letter and the February Draft (*see
e.g.* "Attorney in Fact", at 53).

80

ER 2733

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 155 of 321

*Runoli Leathers Ltd. v.* Mikhaeil, 2001 U.S. Dist. LEXIS 17896 at *7 (N.D. Cal. Oct. 23, 2001). Here, the Chart does not identify *any* differences between the October letters and the February Draft regarding the core financial terms of the deal, and Mr. Marks acknowledged that there were none. (Bergman Decl. Exh. S (Marks Tr.) at 192:9-192:19.) Further, although the Chart purports to identify differences in both the scope of the rights granted by Plaintiffs and in the circumstances in which the royalty payments to Plaintiffs can be adjusted, no such differences in fact exist.

### *Scope of Agreement/Grant of Rights (Chart at 48)*

As to the scope of the agreement and the rights granted (*see* Chart at 48), the parties agreed that Plaintiffs would transfer to DC the entirety of their interest in all Superman and Spectre-related properties, whenever created, and that Plaintiffs would not exploit any aspects of those properties, even if and when they fell into the public domain. (Schulman Decl. ¶ 14; Bergman Decl. Exh. S (Marks Tr.) at 125:21-127:12.) The Marks Letter (Toberoff Decl. Exh. BB) and the Schulman Letter (*id.* Exh. CC) both reflect that understanding, even though stated in somewhat different language.[58] With respect to the transfer of Plaintiffs' interests in Superman, Superboy, Spectre, and all related characters or properties, there is no

---

[58] The Marks Letter (Toberoff Decl. Exh. BB) provides that "The 'Property' means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property" (Marks Letter ¶ A.1); "The Siegel Family would transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy'), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics" (Marks Letter ¶ C.1); and that "At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain" (Marks Letter ¶ C.11). The Schulman Letter (*id.* Exh. CC) – which contains a bullet-point outline – states "Regrant, grant, etc.; 100% of rights wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public; 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre and related properties – even if not created for DC Comics; All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e. copyrights, trademarks, indicia) therein (the "Properties"). (Schulman Letter, Outline at 1.)

ER 2734

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 156 of 321

meaningful difference between the Marks Letter and the Schulman Letter. While the Schulman Letter uses broader language than the Marks Letter, and appears to sweep up characters and properties which are *not* related to Superman, Superboy and Spectre (*e.g.* by using the "including but not limited to" language), this is a distinction without a legal difference:

Prior to his death, Siegel could have authored only two types of work for copyright purposes; namely, those that were works for hire, and those that were not. Copyright in works for hire belong at inception to the hiring party − whether DC or anyone else − who is deemed to be the copyright "author," and accordingly are not subject to recapture or conveyance by Siegel or his heirs. *See* 17 U.S.C. §304(c). Therefore, to the extent the definitions of "Properties" in the Schulman Letter potentially encompassed Siegel's works for hire, those works never did or could belong to Siegel or his heirs, and therefore could not be the subject of any conveyance or grant. Similarly, because of the specific restrictions of Section 304(c), Plaintiffs could not convey to DC any properties for which Siegel was the original copyright author (*i.e.* works that were *not* for hire) unless those works were the subject of a previously served notice of termination under Section 304(c). *See* Section 304(c)(6)(D).[59] The only notices of termination which had been served by Plaintiffs on DC as of October, 2001, were for Spectre and Superman related properties (including Superboy). Accordingly, those were the only properties that could have been the subject of any valid grant or transfer by Plaintiffs to DC. That is, under these facts and circumstances, the differences between the Marks Letter and the Schulman Letter concerning the scope of the rights granted are not material.

---

[59] "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author [or his heirs] and the original grantee or such grantee's successor in title, <u>after the notice of termination has been served</u> ...." *Id.* (emphasis added).

82

ER 2735

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 157 of 321

*Royalty Provisions (Chart at 49-51)*

Although it is unclear from the Chart, Plaintiffs seem to be arguing that the definitions of the revenues in which Plaintiffs are entitled to share are different in the Marks and Schulman Letter, and that the royalties payable on those revenues are also different. But Plaintiffs' Chart is highly deceptive; it misleadingly presents only truncated quotations from the two October letters, splits up the discussions in the letters so as to disguise their true contents, and adds argumentative statements that find no support in the letters themselves.[60] In reality, both the Marks Letter and the Schulman Letter similarly define the base royalties payable on DC's publication revenues and on non-publication (*i.e.* "Media") revenues, and both expressly provide for reductions in those base royalty rates payable to Plaintiffs. The amount and circumstances under which those reductions can be made also comport in all respects between the two letters. (*Compare* Marks Letter (Toberoff Decl. Exh. <u>BB</u>), ¶¶ 5-6; Schulman Letter (*id.* Exh. <u>CC</u>), Outline at 2-3.)[61]

---

[60] For example, in order to create the appearance of differences in the stated deal terms, Plaintiffs' Chart quotes the Marks Letter (Toberoff Decl. Exh. <u>BB</u>) as providing for a royalty calculation based on DC's "worldwide gross revenues derived from the Property" but fails to include the immediately succeeding clause in the letter expressly excluding "revenues derived from D.C. Comics' publications." (*See* Chart at 49; Marks Letter, ¶ A.2.). And it quotes the Schulman Letter (*id.* Exh. <u>CC</u>) as providing for a royalty calculation based on "DC's receipts from all Media licenses for use of the Properties" but *adds* the clause "subject to substantial additional reductions of the royalty rate" − *language not found in the Schulman Letter* − implying that such reductions are inconsistent with the Marks Letter. (*See* Chart at 49; Schulman Letter, Outline at 2.)

[61] In fact, Plaintiffs' attempts to make the letters at odds in this regard is disingenuous in the extreme: For example, Plaintiffs assert that, in contrast to the broader language of the Schulman Letter, the Marks Letter allows for reduction of the royalty rate to 1% only in the limited instance when the Properties are used in connection with other DC/Warner Bros. properties at the Six Flags amusement park (*see* Chart at 49-50). But what the Marks Letter *actually* states is that the royalty can be reduced to 1% "in extraordinary cases *such as* D.C. Comics/Warner Bros. universal license to Six Flags." (Toberoff Decl. Exh. <u>BB</u> ¶ 5.) The Schulman Letter simply contained language attempting to describe those "extraordinary cases." (*Id.* Exh. <u>CC</u>, Outline at 3.) Similarly, Plaintiffs state in the Chart that the Schulman Letter anticipates instances where there would be no royalty payable to Plaintiffs on certain publications, whereas the Marks Letter provides for the publication royalties to be "in no event less than 0.5%." (*See* Chart at 50-51.) But what the Marks Letter *actually* provides for is a royalty floor of 0.5% *other than when there is a "cameo" appearance by the characters.* (Marks Letter ¶ 6.) That is, the parties agreed there would be instances where no royalty would be payable on publications where the

ER 2756

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 158 of 321

A review of the Marks Letter and the Schulman Letter – outside the distorting lens of Plaintiffs' Chart – shows that the parties were in agreement in all material respects on the calculation of Plaintiffs' royalties, and that the language differences in the two letters represented nothing more than an attempt by Mr. Schulman to clarify the agreement and flesh out the Marks Letter as the first step toward documenting the long-form contract. (Schulman Decl. ¶¶ 8-9, 13-15.) In the one instance that there arguably is a difference in language in connection with the royalty provisions – that is, where the Schulman Letter provides for payments to Plaintiffs beyond the expiration of the copyright term for the properties if a motion picture or television program is produced in the few years prior to expiration (Toberoff Decl. Exh. CC, Outline at 3), and the Marks letter includes the language "other substantial projects (*akin to motion picture and television projects*) (*id*. Exh. BB, ¶ 9, emphasis added), Plaintiffs utterly fail to establish that the difference meets the "materiality" test articulated in the case law, or that such difference could not be addressed and accommodated in the process of documenting the long-form as anticipated by Mr. Marks. (Bergman Decl. Exh. S (Marks Tr.) at 162:11-164:1.).

### Other Provisions

The remaining "differences" identified in the Chart are either *not differences at all*,[62] or cannot be determined to be "material" as a matter of law under the

---

characters made a cameo appearance, and the Schulman Letter was simply trying to define what constituted a "cameo" appearance. (Schulman Letter (Toberoff Decl. Exh.CC), Outline at 3; Schulman Decl. ¶ 13.)

[62] *See, e.g.,* "Audit Rights" (Chart at 56). Although the Chart deliberately omits it, both the Marks Letter and the Schulman Letter expressly state that Plaintiffs are to have "full audit rights"; the Schulman Letter adds only the clarification that it will be pursuant to standard [Warner Bros.] language. *See also* "Attorney in Fact" (Chart at 53); "Credit" (Chart at 52); and "Release" (Chart at 54). As to each of these items the language in the Schulman Letter was the functional equivalent of the language of the Marks Letter, or merely clarified an ambiguity or filled in a gap regarding an agreed upon point. (Schulman Decl. ¶¶ 14, 15.)

ER 2737

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 159 of 321

1    circumstances of the parties' negotiations,[63] particularly since the parties had

2    already previously reached agreement on all material points as documented in the

3    Marks Letter, and were merely going through the later process of refining the

4    provisions of that agreement into a long-form contract. Here, the actions of

5    Plaintiffs' representative, Mr. Marks, objectively support only the conclusion that

6    the parties had reached a deal, that the Schulman Letter was not materially

7    inconsistent with that deal, and that what distinctions did exist would be addressed

8    in the long-form documentation. Accordingly, whether the purportedly "different"

9    terms in the Schulman Letter and the February Draft were material to the parties

10   under the circumstances of this case, or impact in any way on the determination of

11   the earlier formation of their agreement, are questions of fact to be resolved after

12   the taking and weighing of evidence at trial.

13                          *       *       *

14       For the foregoing reasons, Defendants respectfully request that the Court

15   deny Plaintiffs motion for partial summary judgment as to DC Comics' Third and

16   Fourth Alternative Counterclaims in this action.

17                          **CONCLUSION**

18       For the reasons set forth herein, Plaintiffs' motion for partial summary

19   judgment should be denied.

20

21   DATED:      May 29, 2007        Respectfully submitted,

22

23

24                          By _____

25                              Michael Bergman
                               Attorneys for Defendants and Counterclaimant

26

27   ───────────────────
     [63] *See, e.g., Inamed, supra,* where the court held that items such as license
28   termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute
     resolution were *not material* terms in the context of the parties' negotiations, because
     they were not the subject of much debate and discussion. 275 F. Supp. 2d at 1122.

                              **ER 2738**

                                  85

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 160 of 321



1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   Email: MToberoff@ipwla.com

5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7            UNITED STATES DISTRICT COURT

8      CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

9

10  JOANNE SIEGEL, an individual; and      Case No. CV 04-8400 SGL (RZx)
    LAURA SIEGEL LARSON, an
11  individual,                            [Honorable Stephen G. Larson]

                    Plaintiffs,
12                                         **DECLARATION OF MARC**
            vs.                            **TOBEROFF IN SUPPORT OF**
13                                         **PLAINTIFFS' MOTION FOR**
                                           **PARTIAL SUMMARY**
14  WARNER BROS.                           **JUDGMENT**
    ENTERTAINMENT INC., a
15  corporation; TIME WARNER INC., a       **VOLUME I**
    corporation; DC COMICS, a general
16  partnership; and DOES 1-10,            [Complaint filed: October 8, 2004]

17
                    Defendants.
18                                         Date: ~~TBD~~ July 16, 2007
                                           Time: 10:00 a.m.
19                                         Place: Courtroom 1

20  DC COMICS,                             [Notice of Motion; Memorandum of
                                           Points and Authorities In Support of
21                  Counterclaimant,       Motion For Partial Summary
                                           Judgment; Statement of
22          vs.                            Uncontroverted Facts and
                                           Conclusions Of Law; Request
23                                         For Judicial Notice And [Proposed]
    JOANNE SIEGEL, an individual; and      Order Filed Concurrently Herewith]
24  LAURA SIEGEL LARSON, an
    individual,
25
                    Counterclaim Defendants.
26

27

28

**ER 2739**

# DECLARATION OF MARC TOBEROFF

I, Marc Toberoff, declare as follows:

1.     I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Laura Siegel Larson and Joanne Siegel ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this Declaration in support of Plaintiff's Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     Attached hereto as "Exhibit A" is a true and correct certified copy of the Opinion, dated November 21, 1947, of the Official Referee Judge Addison Young (hereinafter, "Judge Young") in the action entitled *Jerome Siegel and Joseph Shuster v. National Periodical Publications, et al.* in the Supreme Court of the State of New York, Westchester County (hereinafter, the "1947 Action").

3.     Attached hereto as "Exhibit B" is a true and correct certified copy of Judge Young's Findings of Fact and Conclusions of Law dated April 12, 1948, in the 1947 Action.

4.     Attached hereto as "Exhibit C" is a true and correct copy of the Stipulation of settlement dated May 19, 1948 ("1948 Stipulation") between the parties to the 1947 Action (Jerome Siegel, Joseph Shuster and National Periodical Publications, *et al.*) which I had copied from the Joint Appendix in *Siegel v. National Periodical Publications, Inc. et al.*, 508 F.2d 909 (2d Cir. 1974).

5.     Attached hereto as "Exhibit D" is a true and correct certified copy of Judge Young's corresponding Final [Consent] Judgment dated May 21, 1948 in the 1947 Action.

1

6. Attached hereto as "Exhibit E" is a true and correct copy of the agreement dated March 31, 1938 between Jerome Siegel and Joseph Shuster on the one hand and Detective Comics, Inc. on the other hand ("March 31, 1938 Grant").

7. Attached hereto as composite "Exhibit F" are true and correct copies of the June 1, 1965 Certificates of Registration of a Claim to Renewal Copyright regarding Action Comics No. 1 and "Superman."

8. Attached hereto as "Exhibit G" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding the March 31, 1938 Grant.

9. Attached hereto as "Exhibit H" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 4, 1937 agreement.

10. Attached hereto as "Exhibit I" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported September 22, 1938 agreement with DC Comics, Inc.

11. Attached hereto as "Exhibit J" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported September 22, 1938 agreement with the McClure Newspaper Syndicate.

12. Attached hereto as "Exhibit K" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding the 1948 Stipulation.

2

13. Attached hereto as "Exhibit L" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 19, 1939 agreement.

14. Attached hereto as "Exhibit M" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 23, 1975 agreement.

15. Attached hereto as composite "Exhibit N" are a true and correct copies of the Certificates of Recordation dated September 17, 1998 from the United States Copyright Office for Plaintiffs' April 3, 1997 "Superman" termination notices.

16. Attached hereto as "Exhibit O" is a true and correct copy of an April 16, 1997 letter from John A. Schulman to Joanne Siegel.

17. Attached hereto as "Exhibit P" is a true and correct copy of an October 10, 1997 letter from Paul Levitz Joanne Siegel and Laura Siegel Larson.

18. Attached hereto as "Exhibit Q" is a true and correct copy of a April 15, 1999 letter from DC Comic's counsel to Plaintiffs' former counsel Arthur Levine.

19. Attached hereto as "Exhibit R" is a true and correct copy of Defendants First Amended Counterclaim for case no. CV 04-8400 SGL (RZx).

20. For the Court's convenience, a true and correct copy of the decision in *Siegel v. National Periodical Publications, Inc. et al.*, 364 F. Supp. 1032 (S.D.N.Y. 1973) is attached hereto as Exhibit "S."

21. For the Court's convenience, a true and correct copy of the decision in *Siegel v. National Periodical Publications, Inc. et al.*, 508 F.2d 909 (2d Cir. 1974) is attached hereto as Exhibit "T."

3

Declaration Of Marc Toberoff In Support Of Plaintiffs' Motion For Partial Summary Judgment

22.    A true and correct copy of Judge Ronald S. W. Lew's March 24, 2006 order in civil case no. 04-08776 RSWL (RZx) is attached hereto as "Exhibit U."

23.    A true and correct copy of Judge Ronald S. W. Lew's May 23, 2006 order in civil case no. 04-08776 RSWL (RZx) is attached hereto as "Exhibit V."

24.    Attached hereto as "Exhibit W" is a true and correct copy of the appellate brief of Defendants' alleged predecessors, defendants-appelles National Periodical Publications, Inc. *et al.* in *Jerome Siegel and Joseph Shuster v. National Periodical Publications, et al.* 508 F.2d 909 (2d Cir. 1974), which was produced in this action by Defendants.

25.    A true and correct copy of Plaintiffs' October 8, 2004 complaint for case no. CV 04-8400 (SGL (RZx) is attached hereto as "Exhibit X."

26.    Attached hereto as "Exhibit Y" is a true and correct of a December 23, 1975 agreement between Warner Communications, Inc. and Jerome Siegel and Joseph Shuster.

27.    Attached hereto as "Exhibit Z" is a true and correct copy of a tolling agreement dated April 6, 2000 between Plaintiffs and DC Comics.

28.    Attached hereto as "Exhibit AA" is a true and correct copy of a letter dated September 21, 2002 from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer.

29.    Attached hereto as "Exhibit BB" is a true and correct copy of a letter dated October 19, 2001 from Plaintiffs' former counsel Kevin Marks ("Marks") to Defendants' general counsel John Schulman ("Schulman").

30.    Attached hereto as "Exhibit CC" is a true and correct copy of a letter dated October 26, 2001 from Schulman to Marks.

4

31.     Attached hereto as "Exhibit DD" is a true and correct copy of a letter dated February 1, 2002 from Defendants' counsel Patrick Perkins to Marks.

32.     Attached hereto as "Exhibit EE" is a true and correct copy of excerpts from the October 7, 2006 deposition of Marks.

33.     Attached hereto as "Exhibit FF" is a true and correct copy of a March 15, 1982 letter from Martin D. Payson, Senior Vice President and General Counsel for Warner Communications, Inc. to Joanne Siegel.

34.     Attached hereto as "Exhibit GG" is a true and correct copy of Plaintiffs' First Amended Complaint for case no. CV 04-8400 (SGL (RZx).

Executed on April 30, 2007 in Los Angeles, California.

_____

Marc Toberoff

Declaration Of Marc Toberoff In Support Of Plaintiffs' Motion For Partial Summary Judgment
ER 2744

# EXHIBIT A

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 167 of 321

SUPREME COURT

WESTCHESTER COUNTY

- - - - - - - - - - - - - - - - - - - - - - -

JEROME SIEGEL and JOSEPH SHUSTER,

                            Plaintiffs,

     - against -

NATIONAL COMICS PUBLICATIONS, INC. INDEPEN-
DENT NEWS CO., INC., THE McCLURE NEWSPAPER
SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ,
PAUL H. SAMPLINER and WAYNE BORING,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

       This action is brought to annul one agreement and to
rescind other agreements made between the plaintiffs and Detective
Comics, Inc. and defendant The McClure Newspaper Syndicate on the
ground that one contract entered into between the plaintiffs and
Detective Comics, Inc., the predecessor of National Comics Publica-
tions, Inc. dated on or about March 1st, 1938 is void for lack of
mutuality and consideration, and on the ground that other contracts
should be rescinded on account of fraud in the inducement thereof
and on the further ground that numerous material breaches of said
contracts occurring since they were entered into justify their
rescission at the instance of the plaintiffs. As an incident of such
relief, plaintiffs ask to enjoin all defendants from publishing or
distributing a comic production called "Superman" and certain other
cartoon features. Plaintiffs also ask for judgment declaring their
rights in the premises, also for an accounting and incidental relief.

       Some time in 1933 plaintiff Siegel conceived the idea of
a cartoon strip, the feature character of which would be a man of
superhuman strength and power who would perform feats of great magni-
tude for the public good. He discussed the idea with his friend
Shuster who was an artist, and together they prepared a comic strip
containing separate panels embodying Siegel's idea. This was the

- 1 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 168 of 321

origin of the Superman comic strip.

After this joint creation of the Superman strip panels in 1933, plaintiffs worked together in creating other cartoon strips, some of which between 1933 and 1938 they sold for publication. One of their customers was the Nicholson Publishing Company which during this period purchased comic strip material on behalf of Detective Comics, Inc. In the latter part of 1937 the Nicholson Publishing Company went out of business and as a result Detective Comics, Inc. acquired some of the Nicholson magazine properties. In this manner Detective Comics, Inc. came into direct communication with plaintiffs and on December 4th, 1937 the defendant Liebowitz, representing Detective Comics, Inc. met Siegel in New York. At this conference Liebowitz told Siegel that he proposed to increase the $9.00 pay rate which Nicholson had been paying for some of their comic strips to $10.00. They also discussed at this time the possibility of Detective Comics, Inc. publishing a new magazine and the plaintiffs furnishing new strips for such magazine. Liebowitz told Siegel at this time, that if they published such magazine and accepted and published features created by plaintiffs they would be paid at the rate of $10.00 per page, but Liebowitz testifed that at this time he told Siegel that Detective Comics, Inc. would have to own all rights to such features.

As a result of this conference of December 4th, 1937 Detective Comics, Inc. on that date entered into a written contract of employment with plaintiffs with reference to two features known as "Slam Bradley" and "The Spy", the material for which plaintiffs had been furnishing for Nicholson. This contract dated December 4th, 1937 transferred to Detective Comics, Inc. all rights to any materials produced by plaintiffs under it and prohibited plaintiffs upon termination of the agreement from in any way using any of the characters, plots or materials so produced.

Early in 1938 Detective Comics, Inc. decided to issue a new comic magazine to be called "Action Comics". In seeking new materials for this proposed new magazine, inquiry was made of the

- 2 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 169 of 321

defendant McClure Newspaper Syndicate as to whether it had any
available material for such magazine.  Among the material submitted
by McClure to Detective Comics was the Superman strip created by
plaintiffs which consisted of a few panels suitable for newspaper
syndication.  This material had been left with Nicholson by the
plaintiffs for publication but Nicholson had rejected it and it
had remained in the custody of Nicholson for a long time.  An examin-
ation of the Superman material convinced Detective Comics that it
was appropriate for inclusion in its new magazine and accordingly
this material was returned to the plaintiffs for revision and ex-
pansion into a full length thirteen page production suitable for
magazine production.  Plaintiffs thereupon complied with the request
and submitted the enlarged material on or about February 22nd, 1938.

The first issue of Action Comics in which Superman was to
appear was designated as the June, 1938 issue.  However, the magazine
was actually issued for sale in advance on April 18th, 1938.  On
March 1st, 1938, prior to the printing of the first issue of Action
Comics, Detective Comics wrote to the plaintiff Siegel at Cleveland,
Ohio where he and Shuster both resided, enclosing a check in the sum
of $130.00 in payment of the first thirteen page Superman strip at
the agreed rate of $10.00 per page, and at the same time a written
agreement was enclosed for plaintiffs' signatures.  This agreement
is the one which plaintiffs now claim is void for lack of mutuality
and consideration and is as follows:

"Detective Comics, Inc.
480 Lexington Avenue
New York, N.Y.

I, the undersigned, am an artist or author and
have performed work for strip entitled 'SUPERMAN'.

In consideration of $130.00 agreed to be paid
me by you, I hereby sell and transfer such work and
strip, all good will attached thereto and exclusive
right to the use of the characters and story, continu-
ity and title of strip contained therein, to you and
your assigns to have and hold forever and to be your
exclusive property and I agree not to employ said
characters or said story in any other strips or sell
any like strip or story containing the same characters
by their names contained therein or under any other
names at any time hereafter to any other person, firm
or corporation, or permit the use thereof by said other
parties, without obtaining your written consent therefor.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 170 of 321

The intent hereof is to give you exclusive right to use and acknowledge that you own said characters or story and the use thereof exclusively.  I have received the above sum of money.

                                Joe Shuster
                                Jerome Siegel

Accepted:

DETECTIVE COMICS, INC.

By J.S. Liebowitz    "

This agreement was duly received by the plaintiffs and executed and returned to Detective Comics, Inc.  The first issue of Action Comics was followed by further issues, each succeeding issue having a Superman comic strip prepared by the plaintiffs who continued to be paid by Detective Comics at the agreed rate of $10.00 per page.

After Superman had been published by Detective Comics, interest was shown by McClure in its newspaper syndication and as a result two agreements were simultaneously executed under date of September 22nd, 1938.  One of these agreements was between plaintiffs and Detective Comics, the other was between Detective Comics, the plaintiffs and McClure Newspaper Syndicate.  Both of these agreements were forwarded to the plaintiffs at Cleveland, Ohio for signature and they were duly executed and returned to Detective Comics, Inc. with a letter written by Siegel.

The agreement between plaintiffs and Detective Comics refer not only to Superman but also to other cartoons namely, "Slam Bradley", "The Spy", "Radio Squad" and "Federal Men". The agreement states that Detective Comics, Inc. "are the exclusive owners of comic strips known by the titles "SUPERMAN", etc., and to the rights to publish comics carrying said titles and characters contained therein, and continuity thereof".  It provides for plaintiffs' employment for a five year period with an option in favor of Detective Comics for an additional five year contract.  In connection with this

- 4 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 171 of 321

employment, the agreement provides as follows:

"You agree that you will not hereafter at any place in the United States or in any foreign country, furnish to any other person, firm, corporation, newspaper or magazines any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing the above titles or the characters or continuity thereof or in any wise similar thereto, but you shall furnish such material exclusively to us for the duration of this agreement as such matter may be required by us or as designated by us in writing."

By the terms of this agreement, Detective Comics, Inc. agreed to pay plaintiffs for magazine strips referred to by the parties as "releases" of Superman at the rate of $10.00 per page and to pay them from 65% to 80% of income to be received by Detective Comics from McClure under the newspaper syndication agreement of September 22nd, 1938. By this syndication agreement McClure's received from Detective Comics an eight months' option dating from October 1st, 1938 for newspaper syndication of Superman on a daily basis. Subsequently, McClure availed itself of the option. Under this agreement Detective Comics was to be paid by McClure from 40% to 50% of the net proceeds from such syndication, for which plaintiffs were to supply the material. As already stated, from 65% to 80% of the money received in this way by Detective Comics from such syndication was to be paid to the plaintiffs. This syndication agreement was also for a term of five years with the right in McClure to renew for a further period of five years.

As time went on Superman became increasingly popular. As a result certain changes occurred in the relationship between Detective Comics, Inc. and plaintiffs. While originally plaintiffs had performed both the art work and the continuity for Superman and other comic strip features, the time came when the plaintiff Shuster no longer furnished the art work for any strip other than Superman, although Siegel continued to furnish continuity for all of the other strips. With this change in the situation a modification agreement was entered into between plaintiffs and Detective Comics, Inc. dated December 19th, 1939. By this agreement the compensation for Superman to the plaintiffs was increased to $20.00 per page, and in addition Detective Comics, Inc. agreed to pay the plaintiffs 5% of the net

- 5 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 172 of 321

proceeds which it might derive from commercial exploitation of Superman other than from magazine and book publication and newspaper syndication. This 1939 agreement contained the following provisions:

"1.  That we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled "SUPERMAN" and the other comic strips entitled as above mentioned, and to all rights of reproduction of all said comic strips and the titles and characters contained therein, and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other form of reproduction. We have all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction either in our own names or others at our exclusive option.

"2.  That you have not done or permitted any act or thing which might impair any of our aforesaid rights with respect to any of the aforesaid comic strips and that so far as you are concerned our full and complete ownership thereof and of all reproduction rights in connection therewith are vested in us free and clear of the rights of any other persons or parties whatsoever.

"3.  That we have the unrestricted right to adapt, arrange, change, transpose, add to and otherwise deal with any or all said comic strips and the titles, characters and continuity thereof as we in our sole discretion may deem it necessary or advisable to do so.

"4.  That we have the unrestricted right to grant to others upon such bases as we in our sole discretion shall determine, any of the foregoing rights of reproduction with respect to any of the aforesaid comic strips and the titles, characters and continuity thereof."

Although no further written agreements were made between Detective Comics, Inc. and the plaintiffs subsequent to December 19th, 1939 the compensation paid to the plaintiffs had been increased by Detective Comics, Inc. through the years very substantially owing to the success of the publication of Superman. It was shown that commencing with July, 1940 the releases were at the rate of $35.00 per page payable to the plaintiffs. For the usual thirteen page strip this meant payment of $455.00 per release for both art work and continuity. In February, 1942 the rate was increased to $500.00 per release and in August, 1942 to $600.00. In March, 1943 it was found that the plaintiffs were not always able to fulfill their commitments for production of the art work and continuity for both magazine use and newspaper syndication, and an arrangement was made whereby Siegel was to receive $200.00 for each magazine release for which he did not furnish

- 6 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 173 of 321

the continuity and Shuster was to receive $150.00 for each release for which he did not furnish the art work. In June, 1943 the rate was again increased to $1,000. per magazine release for both art and continuity supplied by plaintiffs. Subsequently different arrangements were made from time to time in regard to the rate to be paid for the releases.

In addition to the money paid for the releases, Detective Comics gave the plaintiffs substantial annual bonuses, some of these bonuses amounting to as much as $10,000. in one year equally divided between the plaintiffs. Evidence shows that up to the commencement of this action on March 5th, 1947 the plaintiffs had received over $400,000.

I shall first consider the instrument of March 1st, 1938 (Pl. Ex. 11). Plaintiffs contend that this instrument is entirely without consideration and therefore void, and even if it should be held that it is supported by sufficient consideration it is ineffective to convey any rights to Detective Comics, Inc. in the comic strip feature Superman, the characters appearing therein or the title thereto.

It is quite apparent that the $130.00 which is the recited consideration in said instrument was already due and owing the plaintiffs before the instrument was executed. It was therefore past consideration and insufficient to support Plaintiffs' Ex. 11.

The defendants argue, however, that there was other sufficient consideration not expressed in the instrument. Of course, it was competent for defendants to prove the true consideration, if one existed. Keuka College v. Ray (167 N.Y. 96); Strobe v. Netherland Company, Inc. (245 A.D. 573, 575); Richardson on evidence,(5th Edition 324, 426).

The defendants assert that the evidence in this case shows other substantial consideration sufficient to support Plaintiffs' Exhibit 11. It was shown that on December 4th, 1937 the plaintiff Siegel signed an agreement with Detective Comics, transferring all

ER 2752

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 174 of 321

rights to the comic features known as "Slam Bradley" and "The Spy".
At the same time Siegel and the defendant Liebowitz discussed a new
magazine which Detective Comics, Inc. contemplated publishing and
Siegel was told that he would be paid for any features published
in this new magazine at the same rate which had been agreed upon for
Slam Bradley and The Spy, and furthermore that Detective Comics, Inc.
would have to own any such features, as had been agreed upon by the
instrument of December 4th, 1937 with reference to Slam Bradley and
The Spy.  The terms of the contract of December 4th, 1937, though
primarily relating to the features specified therein, also related to
future dealings between plaintiffs and Detective Comics as to other
features and as to these other features Detective Comics, Inc. were
given a first option to accept or reject them.  In effect, therefore,
the instrument of March 1st, 1938 represented the exercise by Detective
Comics of the option granted to it by the December 4th, 1937 agreement.
It is therefore argued that the specific mention of $130.00 as a
consideration in the March 1st, 1938 instrument was superfluous and
unnecessary to its validity so far as the element of consideration is
concerned; that the real consideration was plaintiffs' express desire
and Detective Comics, Inc. concurrence in that desire to see Superman
in print.  There can be no doubt of this desire on the part of the
plaintiffs, so it is urged that when Detective Comics, Inc. accepted
Superman for publication and published it, it furnished the true con-
sideration for the agreement of March 1st, 1938.  In other words, the
plaintiffs desire to see Superman in print and the realization of that
desire by Detective Comics' acceptance of the strip for publication and
actually publishing it were the most vital elements of consideration
supporting the instrument dated March 1st, 1938.  I am of the opinion
that defendants contention in this respect is sound and shall there-
fore hold that the instrument in question was sufficiently supported
by valid consideration.

     I shall next consider what, if any, rights were conveyed to
Detective Comics, Inc. by the instrument of March 1st, 1938.  Plain-
tiffs contend in this respect that Superman was a concept or an idea

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 175 of 321

and had no physical existence,and was not transferable. The comic
strip when produced became property and could be sold, but until
that existed there was no property right capable of assignment.
This has been frequently held and I believe is settled law. See
Harms v. Stern (229 Fed. 42) and many other cases cited on this
point set forth in plaintiffs' brief. Apparently, however, one or
more exceptions to this general rule have been recognized by the
Courts and it is argued by the defendants' counsel that under the
facts and circumstances shown in the present case, Superman had been
reduced to material form, and was at the time the agreement of March
1st, 1938 was executed taken out of the realm of the "concept" or
"idea" stage and had ripened into concrete expression. The argument
on this point is substantially as follows: The first Superman release
consisted of ninety-nine separate panels containing the story or con-
tinuity, so-called, as well as art work intended to be spread over
thirteen pages of the June, 1938 issue of Action Comic magazine.
This release disclosed that it contained a complete delineation of
the pictorial representation of Superman, of the habits and character
of Superman, of the superhuman powers and attributes with which Super-
man was endowed and of the sphere of public good which Superman
exploits were to enhance. So it is argued that this first Superman
release was not simply and alone a complete story and sequence in
pictures and script, it was truly the delineation of the course of
development of sequences to follow.Though the incidental and story
material called continuity might thereafter vary from time to time,
their distinctive pattern was fixed by that first release. This first
release constituted the formula for the continuing series to come.
This, it is claimed, was what Detective Comics, Inc. purchased from
these plaintiffs when it accepted the release and paid the plaintiffs
therefor. The ideas and concepts expressed and embodied in that
first release having been reduced to concrete form or formula were
assignable.

Defendants counsel argues that the case of Cole v. Phillips
H. Lord, Inc. (262 D.D. 116) is a decisive authority on this point.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 176 of 321

In the Cole case the plaintiff had presented to defendant in concrete form, a formula for a series of radio programs based upon the character of a vigorous, crusading, district attorney engaged in fighting rackets and racketeers. Such program contemplated an indefinite number of broadcasts in a series. When the defendant made use of this formula the plaintiff sued for payment. In the Trial Court the complaint was dismissed as a matter of law, apparently upon the theory plaintiff had no property right in the combination of ideas evolved into a formula for a radio program. The Appellate Division reversed and ordered a new trial stating, among other things,

> "If plaintiff's 'Racketeer & Company' and '137 Centre Street' had the same idea or series of ideas evolved into a program such as 'Mr. District Attorney' (as the jury might well have found), certainly they would have been justified in concluding that as between these parties it was plaintiff's original basic idea and formula.

> "That a property right exists with respect to a combination of ideas evolved into a program, as distinguished from rights to particular scripts, finds support in defendant's own course of conduct. When it transferred any rights to 'Mr. District Attorney', it sold not scripts but the basic idea."

I realize that the decision on this point is most important in this litigation and I am not entirely clear upon it, but the fact stands out that the first Superman release had been delivered for publication prior to March 1st, 1938 and this release certainly contained a full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did I believe constitute a formula for the continuing series to come and in my opinion this was assignable and was purchased by the defendant.

I shall therefore hold that the March 1st, 1938 instrument transferred to Detective Comics, Inc. all of plaintiffs' rights to Superman.

This holding, of course, disposes of plaintiffs' claim for rescission of the September 22nd, 1938 agreement on account of fraud consisting of false representation made by the defendants to the effect that they owned Superman. In this connection plaintiffs also

- 10 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 177 of 321

ask for rescission because of alleged false information as to the popularity of Superman. I have examined this claim and am of the opinion that the evidence is insufficient to support a finding of fraud on this ground.

Plaintiffs also claim that the agreement of September 22, 1938 was procured by duress on the part of the defendants Detective Comics, Inc. and its officers and should be annulled on this account. No such claim was made in the complaint and I am of the opinion that the evidence referred to by plaintiffs in support of this contention is insufficient in any event to support a finding of duress.

Plaintiffs contend further that the agreement of September 22nd, 1938 should be rescinded for material breaches thereof by the defendants. These alleged breaches are as follows:

1. The alleged publication of Superboy. (Third and Fourth causes of action).

2. The publication of many imitative and competing features, similar to Superman (First cause of action).

3. The failure to pay plaintiff Siegal $400.00 and plaintiff Shuster $350.00 per ghosted release (Sixth and Seventh causes of action).

4. The failure to pay to plaintiff Siegel $800.00 for four certain releases (Fourteenth cause of action).

5. The failure to pay plaintiffs in connection with the publication of the book "The Adventures of Superman" (Ninth cause of action).

6. The publication of certain advertising material concerning Superman without plaintiffs' consent (Twelfth cause of action).

I am satisfied that the contract of September 22nd, 1938 should not be rescinded for any of the reasons given by the plaintiffs.

It is quite clear to me, however, that in publishing Superboy the Detective Comics, Inc. acted illegally. I cannot accept defendants view that Superboy was in reality Superman. I think Superboy was a separate and distinct entity. In having published Superboy without right, plaintiffs are entitled to an injunction preventing such publication and under the circumstances I believe the defendants should account as to the income received from such publication and

- 11 -

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 178 of 321

that plaintiffs should be given an opportunity to prove any damages they have sustained on account thereof. The defendant, Detective Comics admit owing plaintiffs over $3,000. for publishing Superboy but this amount is calculated on a basis not binding upon the plaintiffs.

I think also that plaintiffs are entitled to an accounting as demanded in their Eighth cause of action.

As to the defendants The McClure Newspaper Syndicate and Wayne Boring, in view of the decision now made by me, the evidence fails to support the allegations of the complaint against them, and the complaint therefore as to them is dismissed.

A decision may be presented in accordance with this memorandum and I believe an interlocutory judgment should also be submitted, all of this to be upon five days notice to all parties.

Dated: November 21st, 1947.

J. ADDISON YOUNG,

OFFICIAL REFEREE.

STATE OF NEW YORK, COUNTY OF WESTCHESTER, SS.:
I, _____, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, COUNTIES HELD THEREIN DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
_____ FILED IN MY OFFICE ON 11/25/47 AND THAT THE SAME IS A CORRECT TRANSCRIPT THEREFROM AND OF THE WHOLE OF SAID ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.
COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY

# EXHIBIT B

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 180 of 321

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

1099 - 1947

- - - - - - - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

                     Plaintiffs,    :    203

       -against-              :   305

NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT
NEWS CO., INC., THE MC CLURE NEWSPAPER SYNDICATE,
HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,               :

                     Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - -x

         The above-entitled action having been duly referred
to the undersigned, pursuant to stipulation of the parties
herein, as Referee to hear, try and determine with findings
of fact and conclusions of law, and the said matter having
duly come on to be heard before the undersigned, and the
plaintiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN,ESQS.,
their attorneys (MORTON WEKSTEIN, ESQ.,of counsel, and the de-
fendants NATIONAL COMICS PUBLICATIONS,INC., INDEPENDENT NEWS
CO.,INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.SAMPLINER,
having appeared by WEIL, GOTSHAL & MANGES, ESQS.,their attor-
neys (HORACE S. MANGES,ESQ., EDWARD C.WALLACE,ESQ., and
ABRAHAM I. MENIN,ESQ., of counsel), and the defendant THE
MC CLURE NEWSPAPER SYNDICATE, having appeared by JOHN L.
MC CORMICK,ESQ., its attorney (JAMES L.BROWN,ESQ., of counsel),
and the defendant WAYNE BORING having appeared by his attorney
SIDNEY H. REICH,ESQ., and the Referee's oath having first been
taken, and the proofs and allegations of the parties having
been heard, and due deliberation having been had, I do find
and decide as follows, stating my findings of fact and con-
clusions of law:

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 181 of 321

## FINDINGS OF FACT

1. Defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT NEWS CO., INC. and THE MC CLURE NEWSPAPER SYNDICATE are corporations duly organized and existing under the laws of the State of New York; DETECTIVE COMICS, INC. was a corporation duly organized and existing under the laws of the State of New York, and was one of the constituent corporations consolidated on September 30, 1946 into defendant NATIONAL COMICS PUBLICATIONS, INC.

2. Defendant NATIONAL COMICS PUBLICATIONS, INC., at all times hereinafter mentioned, was and still is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

3. Defendant INDEPENDENT NEWS CO., INC., at all times hereinafter mentioned, was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York.

4. Defendant THE MC CLURE NEWSPAPER SYNDICATE, at all times hereinafter mentioned, was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York.

5. Previous to September 30, 1946, DETECTIVE COMICS, INC. was a corporation duly organized and existing under and by virtue of the laws of the State of New York.

6. Previous to October 1, 1946, SUPERMAN, INC. was a corporation duly organized and existing under and by virtue of the laws of the State of New York, and the said corporation was organized by DETECTIVE COMICS, INC. and the defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and at all times hereinafter mentioned the officers and directors of SUPERMAN, INC. were the same persons who were the officers and directors of DETECTIVE COMICS, INC.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 182 of 321

and all facts known to DETECTIVE COMICS, INC. were known to SUPERMAN, INC., and at all times hereinafter mentioned SUPERMAN, INC. was completely controlled by DETECTIVE COMICS, INC., and the defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER.

7. On or about the 30th day of September, 1946, Detective Comics, Inc., All American Comics, Inc., Superman, Inc., Jolaine Publications, Inc., Wonderwoman Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc., and Trafalgar Printing Co., Inc. consolidated into a single corporation pursuant to the provisions of Sections 85 to 90 of the Stock Corporation Law of the State of New York, the same being the defendant NATIONAL COMICS PUBLICATIONS, INC.

8. Plaintiffs are the originators and authors of the cartoon character SUPERMAN and of the title SUPERMAN and first created cartoon material in which the said character and title first appeared in 1934 and continued to create such cartoon material until the institution of the present action, and the plaintiffs are the authors and originators of other cartoon characters which have appeared in the cartoon strip entitled SUPERMAN, chief among which are SUPERMAN, also known as Clark Kent, Lois Lane and Perry White, and the plaintiffs are known to the public as the authors and creators of the cartoon material in which the character SUPERMAN appears and of the character SUPERMAN and of other cartoon characters which appear and have appeared in cartoons entitled SUPERMAN.

9. Some time in 1933 plaintiff SIEGEL conceived the idea of a cartoon strip, the feature character of which

3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 183 of 321

would be a man of superhuman strength and power, who would perform feats of great magnitude for the public good.

10. Plaintiff SIEGEL, together with plaintiff SHUSTER, an artist, prepared a comic strip containing separate panels embodying SIEGEL'S idea which was submitted to numerous publishers and newspaper syndicates, but was uniformly rejected.

11. After the joint creation of the SUPERMAN strip panels in 1933, plaintiffs collaborated in creating other cartoon strips, some of which were purchased by Nicholson Publishing Company for resale to DETECTIVE COMICS, INC.

12. In the latter part of 1937, Nicholson Publishing Company went out of business and DETECTIVE COMICS, INC. acquired some of its magazine properties.

13. On December 4, 1937, defendant LIEBOWITZ, representing DETECTIVE COMICS, INC., met plaintiff SIEGEL in New York City.

14. At the said conference defendant LIEBOWITZ proposed to plaintiff SIEGEL that the $9. page rate which Nicholson Publishing Company had been paying plaintiffs for certain comic strips, be increased to $10.

15. At the said conference DETECTIVE COMICS, INC. entered into a written contract of employment (Def. Ex. C), with plaintiffs with reference to two comic features known as "Slam Bradley" and "The Spy", the material for which

4

21
ER 2762

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 184 of 321

plaintiffs had been furnishing Nicholson Publishing Company; said contract provided in part as follows:

> "2. The Employees agree to give their exclusive services as artists in producing features known as "Slam Bradley" and "The Spy" during said period of employment, to the Employer, and agrees that all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creator thereof, the Employee acting entirely as the Employer's employee.

> "3. In the event that the Employee leaves the service of the Employer prior to the termination date set forth in this Agreement or subsequent thereto, and for any reason whatsoever, the Employees agree that they will not, directly or indirectly, and through any means whatsoever, use, duplicate, simulate or bring into being any of the products or work or creations of characters or plots used, made or created by him while in the employ of the Employer.

> "4. It is understood that any new and additional features which the Employees produce for use in a comic magazine are to be first submitted to the Employer, who reserves the right to accept or reject same within a period of Sixty days."

16. At the said conference defendant LIEBOWITZ and plaintiff SIEGEL discussed the possibility of DETECTIVE COMICS, INC. publishing a new magazine and plaintiffs furnishing new comic strips for such magazine; defendant LIEBOWITZ told plaintiff SIEGEL that if DETECTIVE COMICS, INC. published such a magazine and accepted and published any comic features created by plaintiffs, they would be paid at the increased rate of $10. per page, but that DETECTIVE COMICS, INC. would have to own all rights to such comic features.

17. Early in 1938, DETECTIVE COMICS, INC. decided to publish a new comic magazine to be called "Action Comics".

18. Thereupon, DETECTIVE COMICS, INC. inquired of defendant THE MC CLURE NEWSPAPER SYNDICATE as to whether the

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 185 of 321

latter had any available material suitable for the proposed
magazine "Action Comics".

19. Defendant THE MC CLURE NEWSPAPER SYNDICATE, then
submitted to DETECTIVE COMICS, INC. the SUPERMAN comic strip
created by plaintiffs, which strip consisted of a few panels
suitable for newspaper syndication (Pl. Ex. 2).

20. The said SUPERMAN comic strip material
had been rejected by defendant THE MC CLURE NEWSPAPER
SYNDICATE, but had remained in its custody for a long time.

21. DETECTIVE COMICS, INC. examined the said
SUPERMAN material and returned it to plaintiffs for revision
and expansion into a full length thirteen page comic strip
release suitable for magazine publication.

22. Plaintiffs revised and expanded the said
SUPERMAN material in compliance with the said request of
DETECTIVE COMICS, INC. and on or about February 22, 1938
resubmitted such revised and expanded material to DETECTIVE
COMICS, INC. Said material, consisting of ninety-nine
separate panels, constituted the formula for the continuing
SUPERMAN series to come. It depicted and narrated the
origin of the character SUPERMAN, and contained a complete
delineation of the pictorial representation of SUPERMAN,
of his habits and character, of the superhuman powers and
attributes with which SUPERMAN was endowed and of the
sphere of public good which SUPERMAN exploits were to
enhance.

6

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 186 of 321

23. Previous to March 1, 1938, there was due and owing by DETECTIVE COMICS, INC. to the plaintiffs the sum of $130.00, and the $130.00 recited as consideration in Plaintiffs' Exhibit 11 is the same $130.00 which was previously due and owing by DETECTIVE COMICS, INC. to the plaintiffs on or about February 22, 1938.

24. On March 1, 1938, prior to the printing of the first issue of "Action Comics", DETECTIVE COMICS, INC. wrote to plaintiff SIEGEL at Cleveland, Ohio, where he and plaintiff SHUSTER both resided, enclosing a check in the sum of $412. which included $130. in payment of the first thirteen page SUPERMAN release at the agreed rate of $10. per page, and a written instrument for plaintiffs' signatures (Pl. Ex. 11).

25. Said instrument, dated March 1, 1938, read as follows:

"Detective Comics, Inc.
480 Lexington Avenue
New York, N.Y.

"I, the undersigned, am an artist or author and have performed work for strip entitled "SUPERMAN".

"In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer such work and strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever and to be your exclusive property and I agree not to employ said characters or said story in any other strips or sell any like strip or story containing the same characters by their names contained therein or under any other names at any time hereafter to any other person, firm or corporation, or permit the use thereof by said other parties without obtaining your written consent therefor. The intent hereof is to give you exclusive right to use and acknowledge

7

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 187 of 321

that you own said characters or story and the use thereof, exclusively. I have received the above sum of money.

Sgd.  Joe Shuster

Sgd.  Jerome Siegel

Accepted:

DETECTIVE COMICS, INC.

By  Sgd.  J.S. Liebowitz"

26.  The instrument of March 1, 1938 (Pl. Ex. 11) was duly received by mail at Cleveland, Ohio, by plaintiffs, who thereupon executed it, and on March 3, 1938 returned it by mail to DETECTIVE COMICS, INC.

27.  On or about the 3rd day of March, 1938, the plaintiffs executed an instrument dated March 1, 1938, which granted to DETECTIVE COMICS, INC. certain rights with respect to the comic strip SUPERMAN, which instrument has been received in evidence and marked Plaintiffs' Exhibit 11.

28.  The instrument of March 1, 1938 (Pl. Ex. 11) was executed by plaintiffs by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE COMICS, INC.

29.  The instrument of March 1, 1938 (Pl. Ex. 11) represented the exercise by DETECTIVE COMICS, INC. of the option granted to it by the said agreement of December 4, 1937 (Def. Ex. C).

30.  Upon receipt by DETECTIVE COMICS, INC. of the instrument of March 1, 1938 (Pl. Ex. 11), it published the first SUPERMAN release in the June, 1938 issue of "Action Comics", which magazine was issued for sale on April 18, 1938.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 188 of 321

31. The first thirteen pages of SUPERMAN material were published on April 18, 1938, in the June, 1938 issue of "Action Comics" magazine.

32. The first thirteen pages of SUPERMAN material mentioned in paragraph 31 hereof were in existence and were in the possession of DETECTIVE COMICS, INC. before the execution of the instrument of March 1, 1938, Plaintiffs' Exhibit 11.

33. The said first thirteen pages of SUPERMAN material mentioned in paragraphs 31 and 32 hereof and the panels submitted in Plaintiffs' Exhibit 2 were the only SUPERMAN material which had been submitted by the plaintiffs to DETECTIVE COMICS, INC. and which had come into the possession of DETECTIVE COMICS, INC. previous to the execution and delivery of the instrument of March 1, 1938, Plaintiffs' Exhibit 11.

34. Plaintiffs' desire to see SUPERMAN in print and the realization of that desire by DETECTIVE COMICS, INC.'s acceptance of the SUPERMAN strip for publication and actually publishing it, were vital elements of consideration supporting the instrument of March 1, 1938 (Pl. Ex. 11).

35. Between March, 1938 and March, 1947 DETECTIVE COMICS, INC. expended large sums of money and devoted much time and effort in the promotion and popularization of the comic strip SUPERMAN and the names and characters appearing therein.

36. The said June, 1938 issue of "Action Comics" was followed by further issues published at regular intervals, each succeeding issue having a SUPERMAN comic strip prepared by plaintiffs, who continue to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10. per page.

26

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 189 of 321

37. During September of 1938, DETECTIVE COMICS, INC. and the defendants HARRY DONENFELD and JACOB LIEBOWITZ made oral representations to the plaintiffs that DETECTIVE COMICS, INC. owned SUPERMAN and had the power to discharge the plaintiffs at any time and to cease receiving at the hands of the plaintiffs any comic strip material depicting SUPERMAN, and to cease publishing any such material created by the plaintiffs and could thereafter legally continue to produce literary and artistic material depicting SUPERMAN, and the plaintiffs would be powerless to thereafter create and publish any material depicting SUPERMAN and powerless to receive any revenue from SUPERMAN.

38. In September, 1938 DETECTIVE COMICS, INC. represented to plaintiffs that it owned all rights to SUPERMAN. Said representation was believed by DETECTIVE COMICS, INC. to be true, and was, in fact, true.

39. On September 22, 1938, two agreements were simultaneously executed, one of which was between DETECTIVE COMICS, INC. and plaintiffs, and the other was between DETECTIVE COMICS, INC., plaintiffs and THE MC CLURE NEWSPAPER SYNDICATE.

40. Both of said agreements were forwarded by mail by DETECTIVE COMICS, INC. to plaintiff SIEGEL at Cleveland, Ohio, for signature by both plaintiffs; they were duly executed by both plaintiffs and returned by plaintiff SIEGEL by mail to DETECTIVE COMICS, INC. on September 30, 1938. In all negotiations leading to the execution of said agreements of September 22, 1938, plaintiff SIEGEL acted for himself and for plaintiff SHUSTER and was duly authorized so to do by plaintiff SHUSTER.

27

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 190 of 321

41. On or about September 28, 1938, DETECTIVE COMICS, INC. mailed to the plaintiffs for the purpose of execution by the plaintiffs the documents herein received in evidence and marked Plaintiffs' Exhibits 14 and 15, and enclosed in the same wrapper was the letter herein received in evidence and marked Plaintiffs' Exhibit 12.

42. In the said letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. made in writing to the plaintiffs the representation that DETECTIVE COMICS, INC. owned SUPERMAN and that the said DETECTIVE COMICS, INC. had the right to any time replace the plaintiffs in the creation of material depicting SUPERMAN and to continue to publish such material without receiving the same at the hands of the plaintiffs, and that the plaintiffs would be "the loser in the entire transaction".

43. In the same letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. and the defendant JACOB LIEBOWITZ represented that in a certain popularity poll held immediately before September 28, 1938, 30% of the returns from the readers designated SUPERMAN as the favorite comic strip feature.

44. The agreement dated September 22, 1938 (Pl. Ex. 14), between plaintiffs and DETECTIVE COMICS, INC. provided for plaintiffs' employment for five years from September 22, 1938 with an option in favor of DETECTIVE COMICS, INC. for an additional five years.

45. By said agreement, plaintiffs expressly confirmed that DETECTIVE COMICS, INC. was the exclusive owner

28

ER 2769

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 191 of 321

of the comic strip known as SUPERMAN and of the right to publish said comic strip and the characters contained therein and the continuity thereof, and further provided that plaintiffs would not,

"hereafter at any place in the United States or in any foreign country, furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or news-paper or magazine containing the above titles or the characters or continuity thereof or in any wise similar thereto, but you shall furnish such material exclusively to us for the dura-tion of this agreement as such matter may be required by us or as designated by us in writing."

46. By the terms of said agreement, DETECTIVE COMICS, INC. agreed to pay plaintiffs for SUPERMAN magazine strips (referred to by the parties as "releases") at the rate of $10. per page and to pay them from 65% to 80% of any income received by DETECTIVE COMICS, INC. from defendant THE MC CLURE NEWSPAPER SYNDICATE, under the newspaper syndica-tion agreement of the same date.

47. By the termsof said newspaper syndication agreement (Pl. Ex. 15), defendant THE MC CLURE NEWSPAPER SYNDICATE, was given an eight months option dating from October 1, 1938 for newspaper syndication of SUPERMAN.

48. Defendant THE MC CLURE NEWSPAPER SYNDICATE availed itself of said option.

49. By the terms of said newspaper syndication agreement, defendant THE MC CLURE NEWSPAPER SYNDICATE agreed to pay DETECTIVE COMICS, INC. 40% to 50% of the net proceeds from such syndication; this agreement was for a period of five years from June 1, 1939 with the right in defendant THE MC CLURE NEWSPAPER SYNDICATE to renew for a further period of five years.

29

ER 2770

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 192 of 321

50. Defendants HARRY DONENFELD, JACOB LEIBOWITZ and PAUL H. SAMPLINER were the officers and directors of DETECTIVE COMICS, INC. until October 1, 1946, and have been since October 1, 1946, and are as of the date of the trial herein, the officers and directors of NATIONAL COMICS PUBLICATIONS, INC. and at all times mentioned in these findings were and are the officers and directors of the defendant INDEPENDENT NEWS CO., INC.

51. Defendants HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. at all times mentioned in these findings knew the terms of the plaintiffs' contracts with DETECTIVE COMICS, INC., Plaintiffs' Exhibit 14 and 15.

52. On December 19, 1939, a modification agreement (Pl. Ex. 22), was entered into between plaintiffs and DETECTIVE COMICS, INC. by which plaintiffs' compensation for SUPERMAN magazine releases was increased to $20. per page, and in addition DETECTIVE COMICS, INC. agreed to pay to plaintiffs 5% of the net proceeds to be derived from commercial exploitation of SUPERMAN other than from magazine and book publication and newspaper syndication.

53. On or about the 19th day of December, 1939, the plaintiffs and the defendant DETECTIVE COMICS, INC. entered into an agreement to modify the contract dated September 22, 1938, and the said agreement to modify the said contract was received in evidence and marked Plaintiffs' Exhibit 22.

**30**

ER 2771

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 193 of 321

54. During December of 1939 and immediately previous to the execution of Plaintiffs' Exhibit 22, DETECTIVE COMICS, INC. and the defendant JACOB LIEBOWITZ represented to the plaintiffs that DETECTIVE COMICS, INC. owned the character SUPERMAN and was therefore under no obligation to pay the plaintiffs anything on account of commercial licensing.

55. Commencing with the July, 1940 magazine releases, DETECTIVE COMICS, INC. increased plaintiff's compensation for SUPERMAN magazine releases to $35. per page, which, for the usual thirteen page release, amounted to $455. per release.

56. In February, 1942, DETECTIVE COMICS, INC. increased plaintiffs' compensation for SUPERMAN magazine releases to $500. per release.

57. In August, 1942, DETECTIVE COMICS, INC. increased plaintiffs' compensation for SUPERMAN magazine releases to $600. per release.

58. In March, 1943, by reason of the fact that plaintiffs were not always able to fulfill their commitments for production of the art work and continuity for both magazine use and newspaper syndication, DETECTIVE COMICS, INC. agreed with plaintiff SIEGEL to pay him the sum of $200. per release for each SUPERMAN magazine release for which he did not furnish the continuity and agreed with plaintiff SHUSTER to pay him the sum of $150. per release for each SUPERMAN magazine release for which he did not furnish the art work.

31

ER 2772

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 194 of 321

59. In June, 1943, DETECTIVE COMICS, INC. increased plaintiffs' compensation for SUPERMAN magazine releases to $1,000. per release.

60. In or about June, 1943, plaintiff SHUSTER commenced to submit his art work for SUPERMAN magazine releases in pencil instead of in ink as he had theretofore done.

61. The cost of having said releases inked was $180.

62. Plaintiff SHUSTER was paid for a time $500. less the sum of $180., or the sum of $320., for each SUPERMAN magazine release submitted in pencil.

63. In July, 1943, plaintiff SIEGEL ceased to submit any continuity to DETECTIVE COMICS, INC. by reason of his induction into the Army of the United States.

64. In December, 1944, DETECTIVE COMICS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he did not furnish the art work to the sum of $200.

65. In March, 1946, DETECTIVE COMICS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he furnished the art work in pencil to $380.

66. On December 12, 1946, defendant NATIONAL COMICS PUBLICATIONS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he furnished the art work in pencil to $500.

32

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 195 of 321

67. Commencing in 1946, DETECTIVE COMICS, INC. turned over to plaintiffs all of the income received by it from THE MC CLURE NEWSPAPER SYNDICATE from newspaper syndication of SUPERMAN.

68. In connection with outside commercial exploitation of SUPERMAN during the year 1941, DETECTIVE COMICS, INC. paid plaintiffs a bonus of $500. in lieu of 5% of the net income from that source.

69. In connection with outside commercial exploitation of SUPERMAN during the year 1942, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $7,000.

70. SUPERMAN, INC. paid to each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1942, the sum of $2,000.00

71. In connection with outside commercial exploitation of SUPERMAN during the year 1943, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $6,000.

72. SUPERMAN, INC. paid each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1943 the sum of $1,500.

73. In connection with outside commercial exploitation of SUPERMAN during the year 1944, DETECTIVE COMICS, INC. and SUPERMAN, INC. on its behalf, paid plaintiffs a bonus of $6,000.

33

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 196 of 321

74. SUPERMAN, INC. paid to each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1944 the sum of $1,500.

75. In connection with outside commercial exploitation of SUPERMAN during the year 1945, DETECTIVE COMICS, INC. paid plaintiffs a bonus of $10,000.

76. SUPERMAN, INC. paid the plaintiffs nothing on account of royalties for commercial exploitation of SUPERMAN, for the year 1945.

77. In connection with outside commercial exploitation of SUPERMAN during the year 1946, defendant NATIONAL COMICS PUBLICATIONS, INC. paid plaintiffs the sum of $3,069.56.

78. During the period commencing in December, 1937 and ending March, 1947, plaintiffs received in excess of $400,000. as compensation from DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC.

79. During the period commencing December 1, 1937 and ending March 1947, the plaintiffs received from DETECTIVE COMICS, INC., SUPERMAN, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC., in compensation for magazine publication and all outside exploitation including money received as bonuses the sum of $195,196.64.

80. During the period commencing December 19,1939 and ending March 1947, the plaintiffs received from the defendants NATIONAL COMICS PUBLICATIONS, INC. and DETECTIVE COMICS, INC. the sum of $205,998.21 as compensation for the newspaper publication of SUPERMAN.

34

17

ER 2775

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 197 of 321

81. On or about August 30, 1943, DETECTIVE COMICS, INC. duly notified each of the plaintiffs in writing of its election to extend the term of the employment contract of September 22, 1938 for an additional five year period from September 22, 1943.

82. Defendant THE MC CLURE NEWSPAPER SYNDICATE duly notified DETECTIVE COMICS, INC. of its election to extend for five years from June 1, 1944, the term of the newspaper syndication agreement dated September 22, 1938.

83. Plaintiff SIEGEL upon his return to civilian life in January of 1946 was willing and able to supply the full complement of continuity for all of the needs of newspaper and magazine publication exactly as he had done before the war.

84. Plaintiff SHUSTER has not established that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. has rejected any SUPERMAN art work prepared by him, pursuant to any scheme to prevent him from producing SUPERMAN material.

85. Plaintiff SIEGEL has not established that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. has rejected any SUPERMAN continuity prepared by him, pursuant to any scheme to prevent him from producing SUPERMAN material.

86. Some of the continuity furnished by plaintiff SIEGEL after his return to civilian status was deemed by

35

ER 2776

DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-
TIONS, INC. to be unsuitable for publication in comic
magazines designed for juvenile readers and was rejected in
good faith.

87. During the period commencing in June, 1943
down to January, 1946, plaintiff SHUSTER failed to furnish
art work for the SUPERMAN comic strip in sufficient quanti-
ties to meet the requirements of DETECTIVE COMICS, INC.

88. Defendants HARRY DONENFELD, JACOB LIEBOWITZ,
PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. did not
agree with each other or with DETECTIVE COMICS, INC.,
SUPERMAN, INC. or THE MC CLURE NEWSPAPER SYNDICATE, to
injure plaintiffs by depriving them of their rights under
their employment contract, or to interfere with, hinder
or impair the performance of such contract by the said
DETECTIVE COMICS, INC., or THE MC CLURE NEWSPAPER SYNDICATE.

89. Plaintiffs elected in their complaint to
rescind the contract dated September 22, 1938, and herein
marked in evidence as Plaintiffs' Exhibits 14 and 15, and
the various modifications thereof, and offered in their com-
plaint to release and discharge DETECTIVE COMICS, INC., THE
MC CLURE NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS
PUBLICATIONS, INC. from any further obligation to perform
the same and did offer in their complaint to return to the
said DETECTIVE COMICS, INC., the defendant THE MC CLURE
NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS PUBLICA-
TIONS, INC. all things which rightfully become theirs upon
such a rescission.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 198 of 321

36

ER 2777

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 199 of 321

90. LOIS LANE is and at all times was a central character in the SUPERMAN comic strip and was and is depicted as a girl reporter.

91. The comic strip LOIS LANE, GIRL REPORTER, was supplied by DETECTIVE COMICS, INC. to defendant THE MC CLURE NEWSPAPER SYNDICATE, without charge for use as a filler by newspapers which carried the comic strip SUPERMAN in order to prevent said newspapers from terminating their syndication agreements with defendant THE MC CLURE NEWSPAPER SYNDICATE as to the comic strip SUPERMAN.

92. From June 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines, 120 releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not create the continuity.

93. DETECTIVE COMICS, INC. paid to plaintiff SIEGEL the sum of $200. per release for each of said 120 releases, which sum was accepted by plaintiff SIEGEL in full payment.

94. From July 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines 130 releases of the comic strip SUPERMAN for which plaintiff SHUSTER did not create the art work.

95. DETECTIVE COMICS, INC. paid to plaintiff SHUSTER the sum of $150. per release for 80 of said releases, and the sum of $200. per release for 50 of said releases, which sums were accepted by plaintiff SHUSTER in full payment.

ER 2778

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 200 of 321

96. On or about September 22, 1943, DETECTIVE COMICS, INC. entered into an agreement, Plaintiffs' Exhibit 56, with the defendant THE MC CLURE NEWSPAPER SYNDICATE, with reference to the comic strip entitled, LOIS LANE, GIRL REPORTER.

97. Thereafter DETECTIVE COMICS, INC. and the said defendant THE MC CLURE NEWSPAPER SYNDICATE did furnish to a newspaper "THE CLEVELAND PLAIN DEALER" various releases of the said comic strip LOIS LANE, GIRL REPORTER.

98. Affixed to the various individual releases of the said comic strip material LOIS LANE, GIRL REPORTER, which was furnished to a newspaper were the names of the plaintiffs as authors of the said individual releases of the said comic strip as published in the newspaper.

99. Plaintiffs were not the authors of the said individual releases of the comic strip LOIS LANE, GIRL REPORTER as published in the newspaper.

100. Plaintiffs did not give their permission for the use of their names as authors of the said releases of the said comic strip material LOIS LANE, GIRL REPORTER as published in the newspaper.

101. DETECTIVE COMICS, INC., the defendant THE MC CLURE NEWSPAPER SYNDICATE and the plaintiffs agreed in Plaintiffs' Exhibit 15 that "net proceeds" for the purposes of computing the plaintiffs' return from the newspaper publication of SUPERMAN should be the entire gross receipts, deducting therefrom only the cost of cuts, mats and proofs

38

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 201 of 321

and it was specifically provided that no other expenses what-
soever should be deductible from gross receipts in order to
arrive at "net proceeds".

102.  In the agreement, Plaintiffs' Exhibit 56,
DETECTIVE COMICS, INC. and the defendant THE MC CLURE NEWS-
PAPER SYNDICATE agreed to and with each other that the
compensation of the artists engaged by DETECTIVE COMICS, INC.
to draw the releases of LOIS LANE, GIRL REPORTER to be fur-
nished by DETECTIVE COMICS, INC. to the defendant THE MC CLURE
NEWSPAPER SYNDICATE for newspaper publication, was to be
deducted from the gross receipts of the SUPERMAN syndication
as "mechanical costs" in computing "net proceeds".

103.  Defendant THE MC CLURE NEWSPAPER SYNDICATE
and DETECTIVE COMICS, INC. did during the period of publica-
tion in said newspaper of LOIS LANE, GIRL REPORTER deduct
from the gross receipts from newspaper syndication of
SUPERMAN the compensation of the artists engaged by DETECTIVE
COMICS, INC. to draw LOIS LANE, GIRL REPORTER, in computing
"net proceeds".

104.  Plaintiffs were not parties to Plaintiffs'
Exhibit 56 and were given no notice by DETECTIVE COMICS, INC.
and the defendant THE MC CLURE NEWSPAPER SYNDICATE of the
existence thereof or the terms thereof.

105.  The existence of the provision in Plaintiffs'
Exhibit 56 for deducting the compensation of the artists en-
gaged by DETECTIVE COMICS, INC. to draw LOIS LANE, GIRL
REPORTER from gross receipts from publication of SUPERMAN

**39**

ER 2780

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 202 of 321

in newspapers in computing net proceeds was unknown to the plaintiffs until May, 1947, when the plaintiffs received the answer in this action of THE MC CLURE NEWSPAPER SYNDICATE, with a true copy of Plaintiffs' Exhibit 56 attached thereto.

106. Plaintiffs did not know until May of 1947, at the time they received the answer of the defendant THE MC CLURE NEWSPAPER SYNDICATE, that DETECTIVE COMICS, INC. and the defendant THE MC CLURE NEWSPAPER SYNDICATE had deducted from gross receipts in computing "net proceeds" from the newspaper publication of SUPERMAN, the compensation of the artists who drew the newspaper comic strips LOIS LANE, GIRL REPORTER.

107. DETECTIVE COMICS, INC. authorized Random House, Inc., an independent book publisher, to publish a book entitled "The Adventures of Superman", for which plaintiffs did not supply the material, except for four illustrations prepared by plaintiff SHUSTER.

108. Random House, Inc. is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

109. The book entitled "The Adventures of Superman" is not a collection of SUPERMAN comic strips, but a work of fiction in the form of a full length novel.

110. The modification agreement dated December 19, 1939, expressly excludes book publication as an item of income in which plaintiffs were entitled to participate.

23

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 203 of 321

111. DETECTIVE COMICS, INC. received payments from Random House, Inc. which it included (without obligation so to do) in the gross receipts applicable to commercial exploitation of SUPERMAN.

112. "Superman-Tim" was a booklet printed by Diamond Sales Corporation pursuant to a license from DETECTIVE COMICS, INC., which contained SUPERMAN material.

113. "Superman-Tim" was sold to various department stores whose names were printed on said booklet and was distributed gratis to their customers.

114. "Pyco-Pay" was a booklet distributed to dentists by Pyco-Pay Company, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

115. The booklet "Pyco-Pay" was designed to teach children the proper care of their teeth and was distributed by dentists gratis to their young patients.

116. "The Christmas Book" was a booklet printed by Diamond Sales Corporation, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

117. "The Christmas Book" was sold to department stores, which printed their names thereon and distributed it gratis to their customers.

118. The booklets "Superman-Tim", "Pyco-Pay" and "The Christmas Book" were not sold to the public and were not SUPERMAN comic magazine releases.

**41**

24

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 204 of 321

119. The Kellogg Company, sponsor of the SUPERMAN radio program, printed SUPERMAN material upon cartons of its breakfast food, with the consent of DETECTIVE COMICS, INC.

120. The Kellogg Company made no payment for said SUPERMAN material.

121. R.H. Macy & Co., Inc. caused an advertisement containing SUPERMAN material to be printed in the New York Journal-American on one occasion, in connection with a Thanksgiving Day parade held by R.H. Macy & Co., Inc., which material was printed with the consent of DETECTIVE COMICS, INC.

122. R. H. Macy & Co., Inc. made no payment for said SUPERMAN material.

123. The two agreements of September 22, 1938 between plaintiffs and DETECTIVE COMICS, INC. (Pl. Ex. 14), and plaintiffs, DETECTIVE COMICS, INC. and THE MC CLURE NEWSPAPER SYNDICATE (Pl. Ex. 15), respectively, referred specifically to magazine releases and newspaper syndication, and made no reference to the publication of promotional material.

124. The commercial exploitation of SUPERMAN was first referred to in the modification agreement of December 19, 1939, which agreement expressly provided that DETECTIVE COMICS, INC. had the unrestricted right to grant to others, upon such basis as DETECTIVE COMICS, INC., in its sole discretion, should determine, any rights to repro-

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 205 of 321

duction with respect to the comic strip SUPERMAN, and the titles and characters and continuity thereof.

125.  From November, 1945 to March, 1947, DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. published 20 releases of comic strips for which plaintiff SHUSTER created and executed the art work in pencil and for which he accepted the sum of $380. per release in full payment.

126.  In the year 1946 DETECTIVE COMICS, INC. published four releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not furnish the continuity and for which DETECTIVE COMICS, INC. sent to him its check in full payment, at the rate of $200. per release.

127.  Plaintiff SIEGEL has retained the said check.

128.  During 1946 DETECTIVE COMICS, INC. published four certain releases of the comic strip SUPERMAN entitled "Malten World", "Mad Weather in Metropolis", "Superself" and "Mxyz and the Wonderful Lamp", for which the plaintiff SIEGEL did not furnish the continuity.

129.  DETECTIVE COMICS, INC. delivered to the plaintiff SIEGEL a check in the amount of $1,000. Plaintiffs' Exhibit 59, which was given as payment for the four releases mentioned in paragraph 128 hereof and the additional release entitled "Old Gang of Superboy's".

**43**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 206 of 321

130. The said check, Plaintiff's Exhibit 59, was given on March 15, 1946.

131. Plaintiff SIEGEL advised DETECTIVE COMICS, INC. that he did not desire to cash the check, Plaintiffs' Exhibit 59, since it included a payment for a release of SUPERMAN bearing in its title the word "SUPERBOY" and that he could not do anything which would call into question in any way his rightful ownership of the comic strip SUPERBOY.

132. DETECTIVE COMICS, INC. on July 9, 1946, by letter, Plaintiffs' Exhibit 63, agreed to furnish a new check to plaintiff in place of Plaintiffs' Exhibit 59, which would cover the four releases other than "Old Gang of Superboy's".

133. Although the same has been duly demanded no other check has ever been given in payment for the four releases mentioned in paragraph 128 of these findings.

134. Since December 19, 1939 SUPERMAN, INC., DETECTIVE COMICS, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. received various sums of money from the production of radio programs and motion pictures entitled SUPERMAN, and by the sale of licenses to various persons engaged in commercial enterprises and incurred expenses in connection therewith.

135. SUPERMAN, INC.; DETECTIVE COMICS, INC. and NATIONAL COMICS PUBLICATIONS, INC. from December 19, 1939 to date have acquired and received large sums of money by

44

ER 2785

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 207 of 321

the production of radio features and moving pictures entitled SUPERMAN, based upon the characters, conception, plot and incidents created by the plaintiffs, and by the sale of licenses to various persons engaged in commercial enterprises permitting the said persons to affix to their products and to use in the furtherance of the said commercial enterprises the name and pictorial representation of SUPERMAN.

136. From December 19, 1939 until the present time, SUPERMAN, INC., DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. have had complete control of all books, records and papers relating to the matters set forth in paragraph 135 of these findings and have at all times refused to permit the plaintiffs to examine said books, records and papers.

137. During the years 1940, 1941, 1942, 1943, 1944 and 1945 SUPERMAN, INC. and DETECTIVE COMICS, INC. failed to render any account of the income and expenditures relating to matters set forth in paragraph 135 hereof and did refuse to furnish such account during the years 1940, 1941, 1942, 1943, 1944 and 1945.

138. Plaintiffs during the years 1940, 1941, 1942, 1943, 1944 and 1945 did duly demand the rendering of an account of the matters set forth in paragraph 135 of these findings.

139. On July 8, 1946, SUPERMAN, INC. and DETECTIVE COMICS, INC. furnished what purported to be an account of the matters set forth in paragraph 135 hereof for the years 1942

45

ER 2786

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 208 of 321

1943, 1944 and 1945 and that the said account was as claimed
by plaintiffs without substantial information and was insuf-
ficient to constitute an account of the matters dealt with
in paragraph 135 of these findings.

140.  DETECTIVE COMICS, INC. and SUPERMAN, INC.
and the defendants NATIONAL COMICS PUBLICATIONS, INC. have
failed and refused to furnish any account whatsoever of the
matters dealt with in paragraph 135 of these findings for
the years 1940 and 1941.

141.  Defendant NATIONAL COMICS PUBLICATIONS,INC.
during January, 1947 furnished a purported account of the
matters dealt with in paragraph 135 hereof for the year 1946.

142.  The said purported account described in
paragraph 141 was as claimed by plaintiffs incomplete and
furnished insufficient information to constitute an account
of the matters dealt with in paragraph 135 hereof.

143.  Plaintiffs have duly demanded that DETECTIVE
COMICS, INC., SUPERMAN, INC. and the defendant NATIONAL
COMICS PUBLICATIONS, INC. furnish a true and sufficient
account of the matters mentioned in paragraph 135 of these
findings for the years 1940, 1941, 1942, 1943, 1944, 1945
and 1946.

144.  Plaintiffs have duly performed all the
terms and conditions of the contract, Plaintiffs' Exhibits
14 and 15, as modified by Plaintiffs' Exhibit 22, on their
part to be performed up to the commencement of this action.

**46**

ER 2787

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 209 of 321

145. Plaintiffs have not established any fraud or duress on the part of any of the defendants.

146. Defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and SUPERMAN, INC., did not induce or agree to induce defendant WAYNE BORING to breach an employment agreement with plaintiff SHUSTER.

147. Defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and SUPERMAN, INC., did not interfere with or render impossible the performance of any agreement between defendant WAYNE BORING and plaintiff SHUSTER or agree so to do.

148. Defendant WAYNE BORING did not breach his contract of employment with plaintiff SHUSTER.

149. Defendant WAYNE BORING did not violate any rights of plaintiff SHUSTER.

150. Defendant WAYNE BORING did not wrongfully furnish art work to any of defendants.

151. Defendant WAYNE BORING has not, in any way, injured or damaged plaintiff SHUSTER.

152. During the term of the agreement set forth in paragraph 153 of plaintiffs' proposed findings, the defendant BORING created cartoon material for DETECTIVE COMICS, INC. and SUPERMAN, INC. portraying the character SUPERMAN and entitled SUPERMAN, and the comic strip LOIS LANE, GIRL REPORTER, which comic strips were both based upon the

47

ER 2788

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 210 of 321

conception, idea, plot, incidents and characters of the comic strip SUPERMAN, as therefore created by the plaintiffs.

153. Since the expiration of the employment of WAYNE BORING by the plaintiff SHUSTER, the defendant BORING, in the employ of DETECTIVE COMICS, INC., SUPERMAN, INC. and NATIONAL COMICS PUBLICATIONS, INC., created cartoon material entitled SUPERMAN which presented the character SUPERMAN and was based upon the conception, idea, plot, incidents and character of the comic strip SUPERMAN as theretofore created by the plaintiffs.

154. Defendants DETECTIVE COMICS, INC. and SUPERMAN, INC. knew of the plaintiff SHUSTER'S contract with the defendant BORING, Plaintiffs' Exhibit 101, as subsequently modified.

155. On November 30, 1938, plaintiff SIEGEL wrote to DETECTIVE COMICS, INC. and suggested that the latter publish a comic strip under the title of SUPERBOY, which would narrate the adventures of SUPERMAN as a youth.

156. On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14, a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY, the said letter having been received in evidence and marked Plaintiffs' Exhibit 16.

157. On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time. (See Plffs. Ex. 17).

48

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 211 of 321

158. DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159. DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip SUPERBOY under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14.

160. During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, Plaintiffs' Exhibit 36, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

161. The officer and Director of DETECTIVE COMICS, INC. who received on behalf of DETECTIVE COMICS, INC. at the hands of the plaintiff SIEGEL the submission of the letter concerning SUPERBOY, Plaintiffs' Exhibit 16, and the scenario or script, Plaintiffs' Exhibit 36, was JACOB LIEBOWITZ.

162. DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

49

ER 2790

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 212 of 321

163. Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics".

164. The said comic strip release entitled SUPERBOY embodied and was based upon the idea, plan and conception contained in the plaintiffs, SIEGEL'S letter to DETECTIVE COMICS, INC. dated November 30, 1938, Plaintiffs' Exhibit 16.

165. The said release of the said comic strip SUPERBOY published in December of 1944 embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in December of 1940, the said script being Plaintiffs' Exhibit 36.

166. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in Plaintiffs' Exhibit 16 and Plaintiffs' Exhibit 36.

167. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as published by DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. from December, 1944, until the date of the trial herein.

**50**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 213 of 321

168. The said publication was without the permission of the plaintiff SIEGEL.

169. Thereafter DETECTIVE COMICS, INC. did publish releases of the said comic strip entitled SUPERBOY in magazines bi-monthly until February of 1946, and monthly thereafter until on or about October 1, 1946.

170. From the 1st day of October, 1946, until the date of the trial herein, the defendant NATIONAL COMICS PUBLICATIONS, INC. has published monthly in magazines a comic strip entitled SUPERBOY.

171. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the letter, Plaintiffs' Exhibit 16.

172. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the scenario or script, Plaintiff's Exhibit 36, submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC.

173. The publication of all comic strip material entitled SUPERBOY was at all times without the permission of the plaintiff SIEGEL.

174. Plaintiff SIEGEL has received no payment on account of the publication of any of the material entitled SUPERBOY.

175. All publications of SUPERBOY by DETECTIVE COMICS, INC. from April, 1945 until the 1st day of October,

51

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 214 of 321

1946, and by the defendant NATIONAL COMICS PUBLICATIONS, INC. from October 1, 1946, until the date of the trial herein, contained affixed thereto the name of the plaintiffs SIEGEL and SHUSTER.

176. The use of the name of the plaintiff SIEGEL, as alleged in paragraph 175 was without the consent of the plaintiff SIEGEL.

177. The officer and director of DETECTIVE COMICS, INC., who on behalf of DETECTIVE COMICS, INC. caused the material entitled SUPERBOY to be published as hereinbefore set forth in these findings was JACOB LIEBOWITZ.

178. The officer and director of NATIONAL COMICS PUBLICATIONS, INC., who on behalf of NATIONAL COMICS PUBLICATIONS, INC. caused the material entitled SUPERBOY to be published as hereinbefore set forth in these findings, was JACOB LIEBOWITZ.

179. Defendant INDEPENDENT NEWS CO., INC. knowing of the rights of the plaintiff SIEGEL, under the contracts, Plaintiffs' Exhibits 14 and 15, sold and distributed to newsdealers for resale to the public throughout the United States, magazines containing the material entitled SUPERBOY as hereinabove described and set forth.

180. All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC.

52

ER 2793

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 215 of 321

181. Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182. At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183. Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184. No agreement was reached between DETECTIVE COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i. e., at the rate of $200. per release of standard length of thirteen pages.

185. That the defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC., have continued to publish, sell or distribute the said comic strip SUPERBOY and threaten to continue to so publish the same.

53

ER 2794

## CONCLUSIONS OF LAW

1. By virtue of the instrument of March 1, 1938, plaintiffs transferred to DETECTIVE COMICS, INC. all of their rights in and to the comic strip SUPERMAN including the title, names, characters and concept as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine "Action Comics" and by virtue of said instrument DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN, including the title, names, characters and concept as the same were set forth in the said first release.

2. The instrument of March 1, 1938 was supported by valid consideration.

3. Any representations by DETECTIVE COMICS, INC. to plaintiffs that it owned SUPERMAN were neither false nor fraudulent.

4. The two agreements of September 22, 1938, namely that between DETECTIVE COMICS, INC. and plaintiffs, and that between DETECTIVE COMICS, INC., plaintiffs and defendant THE MC CLURE NEWSPAPER SYNDICATE, as originally made and as thereafter modified, are valid.

5. The said agreements of September 22, 1938 were not entered into by plaintiffs under duress nor were plaintiffs induced to execute the said agreements by any false or fraudulent representations.

6. There have been no material breaches of the said agreements of September 22, 1938, or of any modifications

ER 2795

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 216 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 217 of 321

thereof, by DETECTIVE COMICS, INC., defendant NATIONAL COMICS
PUBLICATIONS, INC. or defendant THE MC CLURE NEWSPAPER
SYNDICATE.

7. The publication by DETECTIVE COMICS, INC. or
SUPERMAN, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC.
of comic strips entitled Batman, Lois Lane, Girl Reporter,
Johnny Quick, The Flash, Green Lantern, Aquaman, Air Wave,
Hour-Man, Wonder Woman, Star-Man, Dr. Fate, Hawkman, Crimson
Avenger, The Ultra-Man, TNT and Dan the Dyna-Mite, Manhunter,
The Gay Ghost, Newsboy Legion starring The Guardian,
Tarantula, Mr. Terrific, Sandman, The Atom, The Green Arrow,
Dr. Mid-Nite, Genius Jones, Scribbly and The Red Tornado,
Robin, The Boy Wonder and Liberty Belle did not violate
any rights of plaintiffs in Superman nor are plaintiffs
entitled to any moneys by reason of such publication.

8. Plaintiffs have failed to establish that def-
endants HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAMPLINER
and INDEPENDENT NEWS CO., INC. or any of them conspired
with DETECTIVE COMICS, INC., SUPERMAN, INC. or defendant THE
MC CLURE NEWSPAPER SYNDICATE to injure plaintiffs by depriv-
ing them of any rights under either of said agreements of
September 22, 1938, or any modification thereof.

9. Publication by DETECTIVE COMICS, INC. and
defendant NATIONAL COMICS PUBLICATIONS, INC. of the comic
strip entitled LOIS LANE, GIRL REPORTER, did not violate
any rights of plaintiffs.

10. No moneys are due and owing by DETECTIVE COMICS,
INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. to

55

-2-

ER 2796

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 218 of 321

plaintiff SIEGEL for the 120 magazine releases of SUPERMAN
for which he did not furnish the continuity and for which
he received the sum of $200. per release.

11. No moneys are due and owing by DETECTIVE
COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC.
to plaintiff SHUSTER for the 80 magazine releases of SUPER-
MAN for which he did not furnish the art work and for which
he received the sum of $150. per release.

12. No moneys are due and owing by DETECTIVE
COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC.
to plaintiff SHUSTER for the 50 SUPERMAN magazine releases
for which he did not furnish the art work and for which he
received the sum of $200. per release.

13. Plaintiffs are not entitled to an accounting
of any profits received by SUPERMAN, INC. or DETECTIVE
COMICS, INC. from publication of the book entitled "The
Adventures of Superman".

14. The SUPERMAN material which appeared in the
booklets "Pyco-Pay", "Superman-Tim" and "The Christmas Book",
on the cartons of breakfast food of The Kellogg Company,
and in the advertisement of R. H. Macy & Co., Inc. appearing
in the New York Journal-American constituted outside com-
mercial exploitation of SUPERMAN as defined in the agreement
of December 19, 1939.

15. No moneys are due and owing by DETECTIVE
COMICS, INC., SUPERMAN, INC. or defendant NATIONAL COMICS
PUBLICATIONS, INC. to plaintiff SHUSTER for magazine releases
of the comic strip SUPERMAN for which plaintiff SHUSTER

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 219 of 321

furnished the art work in pencil and for which he received the sum of $380. per release, nor for any other art work furnished by plaintiff SHUSTER.

16. The agreements of September 22, 1938, as originally made and as thereafter modified, are not illusory and do not lack mutuality.

17. Plaintiffs have failed to establish that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-TIONS, INC. schemed or conspired in any manner to prevent plaintiffs from furnishing the continuity or art work for the SUPERMAN comic strip.

18. Plaintiff SHUSTER has failed to establish that defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER and DETECTIVE COMICS, INC. and SUPERMAN, INC. or any combination including any of them, conspired to injure plaintiff SHUSTER by inducing defendant WAYNE BORING to breach his agreement with plaintiff SHUSTER or to interfere with the performance of said agreement.

19. Plaintiff SHUSTER has failed to establish that defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, or any of them, interfered in any manner with any contractual rights existing between plaintiffs and defendant WAYNE BORING.

20. The evidence fails to sustain the allegations of the complaint against defendants THE MC CLURE NEWSPAPER SYNDICATE and WAYNE BORING.

21. The complaint is dismissed on the merits as to each and every cause of action alleged therein, as to

57

-4-

ER 2798

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 220 of 321

defendants THE MC CLURE NEWSPAPER SYNDICATE and WAYNE BORING, and judgment is directed to be entered accordingly.

22. Plaintiffs are entitled to an accounting of all income and expenses of DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. in connection with the outside commercial exploitation of SUPERMAN as defined in the agreement of December 19, 1939.

23. Defendant NATIONAL COMICS PUBLICATIONS, INC., shall account to the plaintiffs for all income and profits acquired by the defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT NEWS CO., INC. and by DETECTIVE COMICS, INC. and SUPERMAN, INC. through the production of radio features and moving pictures entitled SUPERMAN and by the sale of commercial licenses of all kinds, and that the profits derived therefrom be divided according to law, and that the plaintiffs have their just share thereof.

24. Defendants shall be perpetually enjoined and restrained from affixing the names of the plaintiffs to any published material of any nature whatsoever and from affixing the names of the plaintiffs to any advertising or from using the names of the plaintiffs for any commercial purposes whatsoever.

25. Plaintiff Siegel is the originator and the sole owner of the comic strip feature SUPERBOY, and the defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC., their agents, servants and employees are perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material of the nature

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 221 of 321

now and heretofore sold under the title SUPERBOY, or any
other comic strip material made in imitation of the con-
ception, characters, nature, incidents, action or plot of
the plaintiffs' comic strip SUPERBOY or from using any title
so imitative of SUPERBOY as will be calculated to deceive
the public so that it would believe the so entitled material
to have been created by the plaintiffs.

26. Plaintiff Siegel, as the originator and
owner of the comic strip feature SUPERBOY has the sole and
exclusive right to create, sell and distribute comic strip
material under the title SUPERBOY of the type and nature
heretofore published under that title and of the nature
described in plaintiffs' exhibits 16 and 36.

27. Defendants NATIONAL COMICS PUBLICATIONS, INC.,
and INDEPENDENT NEWS CO., INC. shall account to plaintiff
Siegel for all profits derived from the publication, sale
and distribution of all comic strip material entitled SUPER-
BOY by either of them or by SUPERMAN, INC. or by DETECTIVE
COMICS, INC., and the said profits derived from the said sale,
publication and distribution be divided according to law and
that the plaintiff Siegel have his just share thereof.

Dated:  April 12, 1948.

　　　　　　　　　　　　　　　　　　　　　OFFICIAL REFEREE,
　　　　　　　　　　　　　　Supreme Court, Westchester County

STATE OF NEW YORK, COUNTY OF WESTCHESTER ss.
I, TIMOTHY E. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL,
THEREOF FILED IN MY OFFICE ON _____ AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
FEE PAID                                               2-13-00

59

-6-

ER 2800

# EXHIBIT C

ER 2801

*Case reported in 364 F. Supp. 1032 (S.D.N.Y. 1973)
aff'd 508 F.2d 909 (2d cir. 1974).*

# 73-2844

## United States Court of Appeals

### For the Second Circuit

JEROME SIEGEL and JOSEPH SHUSTER,

*Plaintiffs-Appellants,*

*against*

NATIONAL PERIODICAL PUBLICATIONS, INC.,
JACOB S. LIEBOWITZ, IRWIN DONENFELD and
PAUL H. SAMPLINER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## JOINT APPENDIX

COUDERT BROTHERS
*Attorneys for Plaintiffs-Appellants*
200 Park Avenue
New York, New York 10017
973-3300

WEIL, GOTSHAL & MANGES
*Attorneys for Defendants-Appellees*
767 Fifth Avenue
New York, New York 10022
758-7800

60

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 224 of 321

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Docket Entries | 1a |
| Complaint | 2a |
| Answer and Counterclaim | 10a |
|     Exhibit A—Agreement of March 1, 1938 | 28a |
|     Exhibit B—Agreement of December 4, 1937 | 29a |
|     Exhibit C—Opinion of Referee J. Addison Young | 31a |
|     Exhibit D—Findings of Fact | 43a |
|             Conclusions of Law | 70a |
|     Exhibit E—Interlocutory Judgment | 76a |
|     Exhibit F—Stipulation | 80a |
|     Exhibit G—Final Judgment | 87a |
| Affidavit of Edward C. Wallace Read in Support of Motion | 95a |
|     Exhibit 1—Letter | 112a |
|     Exhibit 2—Letter | 114a |
|     Exhibit 3—Letter | 115a |
|     Exhibit 4—Letter | 116a |
|     Exhibit 5—Letter | 117a |
|     Exhibit 6—Letter | 118a |
|     Exhibit 7—Letter | 119a |

ER 2803
000000002

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 225 of 321

PAGE

Affidavit of Jerome Siegel Read in Opposition to
    Motion ........................................................................ 121a

    Exhibit A—Superman (Synopsis) ........................ 132a

    Exhibit B—Letter ...................................................... 139a

    Exhibit C—Letter ...................................................... 141a

    Exhibit D—Letter ...................................................... 142a

Affidavit of Joseph Shuster Read in Opposition to
    Motion ........................................................................ 143a

Affidavit of Gordon T. King Read in Opposition
    to Motion .................................................................... 145a

    Exhibit A—First Week of Inked Strips ................ 147a

    Exhibit B—Three Weeks of Synopsized Strips 150a

    Exhibit C—Excerpts from Liebowitz Deposition 163a

    Exhibit D—Excerpts from Liebowitz Testimony
    in Westchester Action ........................................ 168a

Opinion of Judge Morris E. Lasker ................................ 171a

ER 2804
000000003

## DOCKET ENTRIES

COMPLAINT Filed April 8, 1969

ANSWER Filed April 30, 1969

MOTION FOR SUMMARY JUDGMENT Filed December 21, 1972

PAPERS IN OPPOSITION TO THE MOTION Filed March 8, 1973

OPINION OF JUDGE LASKER Filed October 18, 1973

ER 2805
000000004

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 226 of 321

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

- - - - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

                    Plaintiffs,

        -against-

NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC., THE MC
CLURE NEWSPAPER SYNDICATE, HARRY
DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - -x

STIPULATION

            IT IS HEREBY STIPULATED AND AGREED between
the above named parties and their respective attorneys, as
follows:

            1.  The interlocutory judgment entered
herein on the 13th day of April, 1948, shall be in
all respects vacated.

            2.  The complaint herein shall be dis-
missed as to each and every cause of action alleged
therein as to all defendants.

            3.  The plaintiffs shall be paid by
the defendant NATIONAL COMICS PUBLICATIONS, INC.,
the sum of NINETY FOUR THOUSAND THIRTEEN DOLLARS
AND SIXTEEN CENTS ($94,013.16) as and for all sums
due and owing to them under and pursuant to the
terms of the following agreements, as modified:

        (a)  Agreement dated December 4, 1947
    between DETECTIVE COMICS, INC. and JEROME
    SIEGEL and JOSEPH SHUSTER.

        (b)  Agreement dated September 22, 1938
    between DETECTIVE COMICS, INC. and JEROME
    SIEGEL and JOSEPH SHUSTER.

64

(c) Agreement dated September 22, 1938 between DETECTIVE COMICS, INC., JEROME SIEGEL, JOSEPH SHUSTER and THE MC CLURE NEWSPAPER SYNDICATE.

(d) Agreement dated December 19, 1939 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

4. All of the said agreements as originally made and as modified, are valid.

5. All of said agreements as originally made and as modified, are terminated insofar as plaintiffs may have any rights under and by virtue of said agreements, or any of them.

6. By virtue of the instrument of March 1, 1938, plaintiffs validly transferred to DETECTIVE COMICS, INC., one of the constituent corporations of defendant NATIONAL COMICS PUBLICATIONS, INC., all of their rights in and to the comic strip SUPERMAN, including the title, names, characters, concept and formula, as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine "Action Comics" and by virtue of said instrument, said DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN, including the title, names, characters, concept and formula as the same were set forth in the said first release.

7. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERMAN and to the conception, idea, continuity, pictorial representation and formula

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 228 of 321

of the cartoon feature SUPERMAN as heretofore
portrayed and published, and to create, publish,
sell and distribute and to cause to be created,
published, sold and distributed cartoon or other
comic strip material containing the characters
SUPERMAN (also known as "Clark Kent"), LOIS LANE,
PERRY WHITE and all other characters which have
heretofore appeared in said cartoon or other comic
strip material, and such sole and exclusive owner-
ship includes, but is not limited to, the fields of
book and magazine publications, newspaper syndica-
tion, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all
other forms of reproduction and presentation,
whether now in existence or that may hereafter be
created, together with the absolute right to
license, sell, transfer or otherwise dispose of
said rights.

8.  Plaintiffs shall and do hereby
consent to a judgment enjoining and restraining them,
their agents, servants and employees, from creating,
publishing, selling or distributing, or permitting
or causing to be created, published, sold or distri-
buted any material of the nature heretofore created,
produced or published under the title SUPERMAN, or
any material created, produced or published in
imitation thereof, or from using, permitting or caus-
ing to be used in connection with any comic strip or
other material created by them the title SUPERMAN or
any title imitative of the title SUPERMAN, or which
shall contain as part thereof the word "SUPER".

66

ER 2808
000000085

9. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights.

10. Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY.

67

9. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights.

10. Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY.

68

ER 2810
060000087

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 231 of 321

11. Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from

(a) Representing their past connection with the comic strips SUPERMAN and/or SUPERBOY in such manner as may be likely to induce the belief that such past connection still exists;

(b) Making any representation as to such past connection in conjunction with any material, comic or otherwise, hereafter issued by plaintiffs or either of them, or with their consent or on their behalf, more than half as conspicuous as to size, or more conspicuous as to color, type of lettering or style of print than the name or title of any such hereafter issued material, or in any other manner as may be likely to induce the belief that defendant NATIONAL COMICS PUBLICATIONS, INC. is or may be associated with such hereafter issued material; and

(c) Using any colors, lettering and/or printing in referring to the words SUPERMAN and/or SUPERBOY imitative of the colors, lettering and/or printing now or hereafter used by defendant NATIONAL COMICS PUBLICATIONS, INC. in portraying said words or either of them.

12. Defendant NATIONAL COMICS PUBLICA-TIONS, INC. is the sole and exclusive owner, with all rights of absolute ownership thereto appertaining,

69

000000088

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 232 of 321

in and to the comic strips entitled Batman; Lois
Lane, Girl Reporter; Slam Bradley; Johnny Quick;
The Flash; Green Lantern; Aquaman; Air Wave; Hour-
Man; Wonder Woman; Star-Man; Dr. Fate; Hawkman;
Crimson Avenger; The Ultra-Man; TNT and Dan the
Dyna-Mite; Manhunter; The Gay Ghost; Newsboy
Legion starring the Guardian; Tarantula; Mr.
Terrific; Sandman; The Atom; The Green Arrow;
Dr. Mid-Nite; Genius Jones; Scribbly and The Red
Tornado; Robin, the Boy Wonder; and Liberty Belle.

Dated: New York, N.Y.
        May //, 1948.

*Document Signed
By the Parties, and
their attorneys
and their signatures
were acknowledged
By a notary Public*

_Jerome Siegel_

_Joseph Shuster_

NATIONAL COMICS PUBLICATIONS, INC.

by _____
    Vice-President

INDEPENDENT NEWS CO., INC.

By _____
   President

THE MC CLURE NEWSPAPER SYNDICATE

By _William O'Connell_
   Treasurer

_Harry Donenfeld_
Harry Donenfeld

_Jacob Liebowitz_
Jacob Liebowitz

_Paul H. Sampliner_
Paul H. Sampliner

70

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 233 of 321

ER 2812
000000089

# EXHIBIT D

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 235 of 321

At a Term of the Supreme Court
of the State of New York, held
in and for the County of
Westchester, at the Official
Referee's Chambers, 542 Main
Street, in the City of New
Rochelle and State of New York,
on the 2 | day of May, 1948.

*1099 - 1947*

PRESENT:

      HON. J. ADDISON YOUNG,

          Official Referee.

- - - - - - - - - - - - - - - - - *203x/305*

JEROME SIEGEL and JOSEPH SHUSTER,

          Plaintiffs,  :

   -against-                 <u>FINAL JUDGMENT</u>

NATIONAL COMICS PUBLICATIONS, INC.,  :
INDEPENDENT NEWS CO., INC., THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD,  :
JACOB LIEBOWITZ, PAUL H. SAMPLINER and
WAYNE BORING,                :

          Defendants.  :

- - - - - - - - - - - - - - - - - - - -x

      This action having been referred to HON. J.

ADDISON YOUNG, an Official Referee in and for the Ninth

Judicial District, by an order duly made and entered herein

the 19th day of May, 1947, to hear, try and determine the

issues in this matter, with the same force and effect as if

they were tried at a regular term of this Court, and plain-

tiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN, ESQS.,

their attorneys (MORTON WEKSTEIN, ESQ., of counsel), and

defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT

NEWS CO., INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL

H. SAMPLINER, having appeared by WEIL, GOTSHAL & MANGES,

ESQS., their attorneys (HORACE S. MANGES, ESQ., EDWARD C.

WALLACE, ESQ., and ABRAHAM I. MENIN, ESQ., of counsel),

and defendant THE MC CLURE NEWSPAPER SYNDICATE having

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES

71

ER 2814

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 236 of 321

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES
L. BROWN, ESQ., of counsel), and defendant WAYNE BORING
having appeared by SIDNEY H. REICH, ESQ., his attorney,
and after trial had, and said Official Referee having on
the 12th day of April, 1948 duly made and filed his decision
stating his findings of fact herein and conclusions of law
thereon, and directing interlocutory judgment, which said
interlocutory judgment was duly entered in the office of the
Clerk of this Court on the 13th day of April, 1948, and
defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT
NEWS CO., INC. having duly served and filed a notice of
appeal dated April 27, 1948 from certain parts of said inter-
locutory judgment and plaintiffs having duly served and filed
a notice of appeal dated May 10, 1948, from certain parts of
said interlocutory judgment, and said notices of appeal having
been withdrawn, and the parties hereto and their respective
attorneys having duly consented to the vacating of said
interlocutory judgment and to the entry of final judgment as
hereinafter set forth, it is

ORDERED AND ADJUDGED that the said inter-
locutory judgment entered herein on the 13th day of April,
1948, be and the same hereby is in all respects vacated; and
it is further

ORDERED AND ADJUDGED that the complaint be
and it hereby is dismissed as to each and every cause of
action alleged therein as to all defendants; and it is further

DECLARED AND ADJUDGED that the following
agreements as originally made and as modified, are valid;

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 237 of 321

(a)  Agreement dated December 4, 1937 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

(b)  Agreement dated September 22, 1938 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

(c)  Agreement dated September 22, 1938 between DETECTIVE COMICS, INC., JEROME SIEGEL, JOSEPH SHUSTER and THE MC CLURE NEWSPAPER SYNDICATE.

(d)  Agreement dated December 19, 1939 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER;

and it is further

DECLARED AND ADJUDGED that all of said agreements as originally made and as modified, be and they hereby are terminated insofar as plaintiffs may have any rights under and by virtue of the said agreements, or any of them; and it is further

DECLARED AND ADJUDGED that by virtue of the instrument of March 1, 1938, plaintiffs validly transferred to DETECTIVE COMICS, INC., one of the constituent corporations of defendant NATIONAL COMICS PUBLICATIONS, INC., all of their rights in and to the comic strip SUPERMAN, including the title, names, characters, concept and formula, as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine "Action Comics" and that by virtue of said instrument, said DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN, including the title, names, characters, concept and formula as  the same were set forth in the said first release; and it is further

DECLARED AND ADJUDGED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive

3.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 238 of 321

owner of and has the sole and exclusive right to the use
of the title SUPERMAN and to the conception, idea, continuity,
pictorial representation and formula of the cartoon feature
SUPERMAN as heretofore portrayed and published, and to
create, publish, sell and distribute and to cause to be
created, published, sold and distributed cartoon or other
comic strip material containing the characters SUPERMAN
(also known as "Clark Kent"), LOIS LANE, PERRY WHITE and
all other characters which have heretofore appeared in said
cartoon or other comic strip material, and that such sole
and exclusive ownership includes, but is not limited to, the
fields of book and magazine publications, newspaper
syndication, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all other forms
of reproduction and presentation, whether now in existence
or that may hereafter be created, together with the
absolute right to license, sell, transfer, or otherwise
dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their
agents, servants and employees, be and they hereby are
enjoined and restrained from creating, publishing, selling
or distributing or permitting or causing to be created, pub-
lished, sold or distributed any material of the nature
heretofore created, produced or published under the title
SUPERMAN, or any material created, produced or published
in imitation thereof, or from using, permitting or causing
to be used in connection with any comic strip or other
material created by them the title SUPERMAN or any title
imitative of the title SUPERMAN or which shall contain as
part thereof the word "SUPER"; and it is further

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 239 of 321

DECLARED AND ADJUDGED that defendant
NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive
owner of and has the sole and exclusive right to the use
of the title SUPERBOY and to create, publish, sell and
distribute and to cause to be created, published, sold and
distributed cartoon or other comic strip material containing
the character SUPERBOY and all other characters which have
heretofore appeared in said cartoon or other comic strip
material and that such sole and exclusive ownership includes,
but is not limited to, the fields of book and magazine
publications, newspaper syndication, radio broadcasts,
dramatic presentation, television, motion picture repro-
duction and all other forms of reproduction and presentation
whether now in existence or that may hereafter be created,
together with the absolute right to license, sell, transfer
or otherwise dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their
agents, servants and employees be and they hereby are
enjoined and restrained from creating, publishing, selling
or distributing, or permitting or causing to be created,
published, sold or distributed any material of the nature
heretofore created, produced or published under the title
SUPERBOY or any material created, produced or published in
imitation thereof or from using, permitting or causing to be
used in connection with any comic strip or other material
created by them the title SUPERBOY or any title imitative of
the title SUPERBOY; and it is further

ORDERED AND ADJUDGED that the plaintiffs,
their agents, servants and employees, be and they hereby are
enjoined and restrained from

5.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 240 of 321

(a) Representing their past connection with the comic strips SUPERMAN and/or SUPERBOY in such manner as may be likely to induce the belief that such past connection still exists;

(b) Making any representation as to such past connection in conjunction with any material, comic or otherwise, hereafter issued by plaintiffs or either of them, or with their consent or on their behalf, more than half as conspicuous as to size, or more conspicuous as to color, type of lettering or style of print than the name or title of any such hereafter issued material, or in any other manner as may be likely to induce the belief that defendant NATIONAL COMICS PUBLICATIONS, INC. is or may be associated with such hereafter issued material; and

(c) Using any colors, lettering and/or printing in referring to the words SUPERMAN and/or SUPERBOY imitative of the colors, lettering and/or printing now or hereafter used by defendant NATIONAL COMICS PUBLICATIONS, INC. in portraying said words or either of them;

and it is further

ORDERED AND DECLARED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner, with all the rights of absolute ownership thereto appertaining, in and to the comic strips entitled Batman; Lois Lane, Girl Reporter; Slam Bradley; Johnny Quick; The Flash; Green Lantern; Aquaman; Air Wave; Hour-Man; Wonder

6.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 241 of 321

Woman; Star-Man; Dr. Fate; Hawkman; Crimson Avenger; The

Ultra-Man; TNT and Dan the Dyna-Mite; Manhunter; The Gay

Ghost; Newsboy Legion starring the Guardian; Tarantula;

Mr. Terrific; Sandman; The Atom; The Green Arrow; Dr. Mid-

Nite; Genius Jones; Scribbly and The Red Tornado; Robin,

the Boy Wonder; and Liberty Belle.

ENTER

_Addison Young_

Official Referee of the Supreme
Court of the State of New York.

_Robert Field_

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.,

I, TIMOTHY C. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF FILED IN MY OFFICE ON 5/21/48 AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
   IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
(FEE PAID)                                                    2.10 Ce

ER 2820

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 242 of 321

Entry of the foregoing judgment is hereby
consented to.

*Jerome Siegel*
Jerome Siegel

*Joseph Shuster*
Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By _____
Vice-President

INDEPENDENT NEWS CO., INC.

By *Paul H. Sampliner*
President

THE MC CLURE NEWSPAPER SYNDICATE

By *William O'Connell*
TREASURER

*Harry Donenfeld*
Harry Donenfeld

*Jacob Liebowitz*
Jacob Liebowitz

*Paul H. Sampliner*
Paul H. Sampliner

*Wayne Boring*
Wayne Boring

*Fleming, Weinstein & Friedman*
Attorneys for Plaintiffs

*Weil, Gotshal & Manges*
Attorneys for Defendants National
Comics Publications, Inc., Inde-
pendent News Co., Inc., Harry
Donenfeld, Jacob Liebowitz and
Paul H. Sampliner

*John L. McCormick*
Attorney for Defendant The McClure
Newspaper Syndicate

*Sidney H. Reich*
Attorney for Defendant Wayne Boring

78

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 243 of 321

STATE OF New York )
COUNTY OF New York } SS.:

      On the *19* day of May, 1948, before me personally came JEROME SIEGEL, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executedthe same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429, Reg. No. 1110-C-9
Commission Expires March 30, 1949

STATE OF NEW YORK )
COUNTY OF New York } SS.:

      On the *19* day of May, 1948, before me personally came JOSEPH SHUSTER, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429, Reg. No. 1110-C-9
Commission Expires March 30, 1949

79

ER 2822

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 244 of 321

STATE OF NEW YORK )SS.:
COUNTY OF NEW YORK )

On the *vo* day of May, 1948, before me
came JACOB S. LIEBOWITZ, to me known, who being by me duly
sworn, did depose and say that he resides at Great Neck,
New York; that he is the Vice-President of NATIONAL COMICS
PUBLICATIONS, INC., the corporation described in, and which
executed the foregoing instrument; that he knows the seal of
said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he signed
his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 15-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:

On the *vo* day of May, 1948, before me came
PAUL H. SAMPLINER, to me known, who being by me duly sworn,
did depose and say that he resides at 944 Fifth Avenue,
New York, N.Y.; that he is the President of INDEPENDENT
NEWS CO., INC., the corporation described in, and which
executed, the foregoing instrument; that he knows the seal
of said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he
signed his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 15-Y-0
Commission Expires March 30, 1950

STATE OF *New York* )
COUNTY OF *New York* ) SS.:

*William O'Connell* On the 21th day of May, 1948, before me came
*_____* , to me known, who being
by me duly sworn, did depose and say that he resides at
*St. Albans, New York* ; that he is the *Treasurer*
of THE MC CLURE NEWSPAPER SYNDICATE, the corporation
described in, and which executed the foregoing instrument;
that he knows the seal of said corporation; that the seal
affixed to said instrument is such corporate seal; that it
was so affixed by order of the Board of Directors of said
corporation; and that he signed his name thereto by like
order.

GEORGE J. McCARTIN, Jr.
Notary Public, State of New York
Residing in Queens County
Queens Co. Clks. No. 3801, Reg. No.121-Mc-0
N.Y. Co. Clks. No. 304, Reg. No. 237-Mc-0
Kings Co. Clks. No. 72, Reg. No. 146-Mc-0
Bronx Co. Clks. No. 13, Reg. No. 81-Mc-0
Certificate filed in Westchester Co.

**80**

ER 2823

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 245 of 321

STATE OF NEW YORK     }
COUNTY OF NEW YORK   } SS.:

On the 10 day of May, 1948, before me personally came HARRY DONENFELD, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. TAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 8, Reg. No. 15-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK   }
COUNTY OF NEW YORK  } SS.:

On the 10 day of May, 1948, before me personally came JACOB LIEBOWITZ, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. TAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 8, Reg. No. 15-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK   }
COUNTY OF NEW YORK  } SS.:

On the 10 day of May, 1948, before me personally came PAUL H. SAMPLINER, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 8, Reg. No. 15-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK   }
COUNTY OF NEW YORK  } SS.:
    Westchester

On the 21 day of May, 1948, before me personally came WAYNE BORING, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ADELE JAMPOL
Notary Public in the State of New York
Appointed for Westchester County
Commission expires March 30, 1949

**81**

ER 2824

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 246 of 321

# EXHIBIT F

# Certificate of Registration of a Claim to Renewal Copyright

FORM R

REGISTRATION NO.

R  362187

DO NOT WRITE HERE

This Is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office.    In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

(a) Name  NATIONAL PERIODICAL PUBLICATIONS, INC.

Address  575 Lexington Avenue, New York 22, New York

Claiming as  Proprietor of copyright in a composite work

(b) Name ....................................

Address ....................................

Claiming as ....................................

(c) Name ....................................

Address ....................................

Claiming as ....................................

**2. (a) Title:**

........ ACTION COMICS, Vol. 1, No. 1

........ June 1938 Issue

(b) Renewable Matter:

(c) Contribution to Periodical or Other Composite Work:

....................................

(Title of periodical or composite work)

If a periodical, give: Vol. ................; No. ................; Date ................

**3. Authors of Renewable Matter:**

....................................

**4. Facts of Original Registration:**

Original registration number: Class  C. I. B. ; No. B  379,787

If registered as published, give date of publication ........ April 18, 1938

If registered as unpublished, give date of registration ....................................

Original copyright claimant  DETECTIVE COMICS, INC.

*Complete all applicable spaces on next page*

EXAMINER

ER 2826

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 248 of 321

5. Deposit account:

6. Send correspondence to:

Name WILLIAM K. FRIEDMAN        Add 11 East 44th St., New York, N.Y. 10017

7. Send certificate to:

(Type or print name and address)

| | |
|---|---|
| Name | WILLIAM K. FRIEDMAN |
| Address | 11 East 44th Street |
| | (Number and street) |
| | New York        New York        10017 |
| | (City)              (State)              (ZIP code) |

## Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

### Time limits

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15, 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received in* the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

### How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

### Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

A. The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* ........................ and/or the child

   ........................ (Name of author)

   *(children) of the deceased author* ........................
   (Name of author)

3. The author's executor(s), if the author left a will and

   if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*

   ........................ (Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*

   ........................ *there being no will.*
   (Name of author)

B. In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

   *a corporate body otherwise than as assignee or licensee of the individual author.* (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received | |
| JUN - 1 1965 | |
| Fee received | |
| 97425 JUN-1 '65 | |

U. S. GOVERNMENT PRINTING OFFICE : 1954 O - 721 - 480        (May 1964—50,000)        *Page 4*

84

ER 2827        ER 045629

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 249 of 321

## Certificate of Registration of a Claim to Renewal Copyright

FORM R

REGISTRATION NO.

R 362188

DO NOT WRITE HERE

**This Is To Certify** that the statements set forth on this certificate have been made a part of the records of the Copyright Office.   In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

(a) Name ..... NATIONAL PERIODICAL PUBLICATIONS, INC.

Address ..... 575 Lexington Avenue, New York, N.Y. 10022

Claiming as ..... Proprietor of copyright in a work made for hire

(b) Name .....

Address .....

Claiming as .....

(c) Name .....

Address .....

Claiming as .....

**2. (a) Title:**

"Superman" a comic strip ......... constituting front cover and pages 1-

13 inclusive in body of ACTION COMICS - Vol.1, No.1, June 1938 issue.

(b) Renewable Matter:

(c) Contribution to Periodical or Other Composite Work:

(Title of periodical or composite work)

If a periodical, give: Vol. .............; No. ...............; Date .....

**3. Authors of Renewable Matter:**

**4. Facts of Original Registration:**

Original registration number: Class ..... C. I. B. .........; No. B 379,787

If registered as published, give date of publication ..... April 18, 1938

If registered as unpublished, give date of registration .....

Original copyright claimant ..... DETECTIVE COMICS, INC.

EXAMINER

*Complete all applicable spaces on next page*

EXHIBIT I

85

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 250 of 321

5. Deposit account:

6. Send correspondence to:

Name WILLIAM K. FRIEDMAN          Addre 11 East 44th St., New York, N.Y. 10017

7. Send certificate to:

(Type or print name and address)

Name    WILLIAM K. FRIEDMAN

Address  11 East 44th Street
         (Number and street)

         New York        New York        10017
         (City)          (State)          (ZIP code)

## Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

### Time limits

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15, 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received* in the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

### How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

### Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

A. The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* ........................ *and/or the child*
   (Name of author)

   *(children) of the deceased author* ........................
   (Name of author)

3. The author's executor(s), if the author left a will and

if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*
........................
   (Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*

........................ *there being no will.*
   (Name of author)

B. In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

a corporate body otherwise than as assignee or licensee of the individual author. (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

NATIONAL PERIODICAL PUBLICATIONS, INC.

| FOR COPYRIGHT OFFICE USE ONLY |
|---|
| Application received |
| JUN - 1 1965 |
| Fee received |
| 97425 JUN - 1 '65 |

ER 2829     DGC00045631

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 251 of 321

# EXHIBIT G

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 252 of 321

# NOTICE OF TERMINATION OF TRANSFER
# COVERING EXTENDED RENEWAL TERM

TO:  Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 253 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joe Shuster and Detective Comics, Inc. executed on or about March 1, 1938, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 254 of 321

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.    Each work to which this notice of termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work was based upon the following works to which this Notice of Termination also applies: Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

ER 2833

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 255 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|-------|-------------------|---------------------------|---------------------|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

90
ER 2834

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 256 of 321

3.    The grant to which this Notice of Termination applies is a one page

agreement between Detective Comics, Inc. and Jerome Siegel and Joe Shuster, co-

authors of the comic book/strip SUPERMAN, identified as follows: An Agreement

executed on or about March 1, 1938, which states in part that the co-authors are selling

and transferring to Detective Comics, Inc., the comic strip SUPERMAN,

"all good will attached thereto and exclusive right to the use of the characters and

story, continuity and title of strip contained therein, to you [Detective] and your

assigns to have and hold forever and to be your exclusive property. . . "

The Agreement included at the time all SUPERMAN works in existence up through said

date (March 1, 1938), which included the above described SUPERMAN story in a form

suitable for comic book publication, the thirteen page SUPERMAN comic book story and

its cover, the twenty-four (24) days (i.e., four weeks) of previously unpublished

SUPERMAN newspaper comic strips from which the thirteen pages were derived, a

seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips,

an untitled paragraph previewing future SUPERMAN exploits, fifteen SUPERMAN daily

comic strips (12 strips & 3 scripts), and a nine page synopsis covering an additional two

months of daily (at 6 days per week) comic strips of SUPERMAN.  As affirmed in Siegel

v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), said Agreement also

granted Detective Comics, Inc. rights in the future, including renewal rights.

4.    The effective date of termination shall be April 16, 1999.

2-March 1, 1938 Agreement

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 257 of 321

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow,

Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel

Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and

Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's

termination interest, are executing this notice and constitute a 75% majority interest of those

persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the

transfer described herein-above.  To the best knowledge and belief of the undersigned, this

notice has been signed by all persons whose signature is necessary to terminate said grant

under Section 304(c) of Title 17, United States Code.


Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292


Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 258 of 321

# CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 259 of 321

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this 24 day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

2-March 1, 1938 Agreement

554

ER 2838

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 260 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 261 of 321

# EXHIBIT H

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 262 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 263 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joe Shuster and Detective Comics, Inc. executed on or about December 4, 1937, and the undersigned set forth in connection therewith the following:

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

97
ER 2842

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.     Each work to which this notice of termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work was based upon the following works to which this Notice of Termination also applies: Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 265 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

BR 2844

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 266 of 321

3. The grant to which this Notice of Termination applies is a two page agreement between Detective Comics, Inc. and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: An Agreement of Employment executed on or about December 4, 1937, which states in part that "any new and additional features which the Employees [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to the Employer [Detective Comics, Inc.], who reserves the right to accept or reject same within a period of Sixty days." Prior to the execution of this agreement, Jerome Siegel had written the following SUPERMAN works: SUPERMAN story in a form suitable for comic book publication, twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips, a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, an untitled paragraph previewing future SUPERMAN exploits, fifteen SUPERMAN daily comic strips (12 strips and 3 scripts), and a nine page synopsis covering an additional two months of daily (at 6 days per week) comic strips of SUPERMAN. Assuming for purposes of this notice that said agreement contains a provision affecting rights to SUPERMAN, which, when first exercised by Detective Comics, Inc. on March 1, 1938, constituted a grant of non-work-for-hire SUPERMAN works and a grant of a transfer of renewal copyright(s) in SUPERMAN, the said grant included all SUPERMAN works in existence up through said date (March 1, 1938) as listed in paragraph 2 above and the renewal rights therein, and also included rights in the future including the renewal rights in the remaining works set forth in paragraph 2 above.

4. The effective date of termination shall be April 16, 1999.

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow,

Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel

Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and

Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's

termination interest, are executing this notice and constitute a 75% majority interest of those

persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the

transfer described herein-above.  To the best knowledge and belief of the undersigned, this

notice has been signed by all persons whose signature is necessary to terminate said grant

under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 268 of 321

# CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2c¹ day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 269 of 321

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this 3d day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

1-December 4, 1937 Agreement

103
ER 2848

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

# EXHIBIT I

ER 2850

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 272 of 321

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

3-September 22, 1938 Agreement (1)

1

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 273 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Detective Comics, Inc. executed on or about September 22, 1938, and the undersigned set forth in connection therewith the following:

1.    The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

*106*
ER 2852

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 274 of 321

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

      2.      Each work to which this notice of termination applies is as follows: The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 275 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

ER 2854
108

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 276 of 321

3. The grant to which this Notice of Termination applies is a three page agreement between Detective Comics, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about September 22, 1938, which states in part that, "We, Detective Comics, Inc., are the exclusive owners of comic strips known by the title... 'Superman'... and to the rights to publish comics carrying said title... and characters contained therein and continuity thereof." The foregoing agreement included at the time all SUPERMAN works in existence up through said date (September 22, 1938), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4. The effective date of termination shall be April 16, 1999.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 277 of 321

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 278 of 321

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to

37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of

Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of the

records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

____ day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this

___ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 280 of 321

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

# EXHIBIT J

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 282 of 321

114
ER 2861

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 283 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster, Detective Comics, Inc., and The McClure Newspaper Syndicate executed on or about September 22, 1938, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

115
ER 2862

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 284 of 321

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

2.      Each work to which this notice of termination applies is as follows: The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

4-September 22, 1938 Agreement (2)                    3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 285 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 286 of 321

3. The grant to which this Notice of Termination applies is a three page agreement between Detective Comics, Inc., The McClure Newspaper Syndicate and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about September 22, 1938, which states in part that "Superman" is "owned by Detective" and copyright "reverts to Detective at the termination of this contract. The title 'Superman' shall always remain the property of Detective... Radio, motion picture, silent and talkie, book and all other rights are retained and owned by Detective." The foregoing agreement included at the time all SUPERMAN works in existence up through said date (September 22, 1938), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4. The effective date of termination shall be April 16, 1999.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 287 of 321

5.    Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 288 of 321

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to

37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of

Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of the

records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

3 d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

4-September 22, 1938 Agreement (2)

553

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 289 of 321

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this

31 day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

4-September 22, 1938 Agreement (2)                    554

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 290 of 321

4-September 22, 1938 Agreement (2)

122
ER 2869

# EXHIBIT K

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 292 of 321

TO: Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

6-May 19, 1948 Agreement

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 293 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and National Comics Publications, Inc. executed on or about May 19, 1948, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

ER 2872 4

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 294 of 321

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

2.    Each work to which this notice of termination applies is as follows: The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this

Notice of Termination applies[1] are:

----

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 295 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

126
ER 2874

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 296 of 321

3. The grant to which this Notice of Termination applies is a seven page agreement between National Comics Publications, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A stipulation executed on or about May 19, 1948, providing in part that by virtue of a March 1, 1938 agreement, the co-authors transferred to Detective Comics, Inc. their ". . . rights in and to the comic strip SUPERMAN" and that National Comics Publications, Inc. "is the... owner of and has the... right to the use of the title[s] SUPERMAN [and SUPERBOY and] to the conception, idea, continuity, pictorial representation and formula of the cartoon feature SUPERMAN as heretofore portrayed and published" and the right to exploit "the characters SUPERMAN (also known as 'Clark Kent'), LOIS LANE, PERRY WHITE and all other characters" appearing in the SUPERMAN or SUPERBOY cartoons or comic strip material; and that said rights included licensing, "book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentations, television, motion picture reproduction and all other forms of reproduction and presentation..." (A copy of the stipulation is available on request.) The foregoing stipulation included at the time all SUPERMAN works in existence up through said date (May 19, 1948), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the stipulation also granted National Comics Publications, Inc. rights in the future, including renewal rights.

4. The effective date of termination shall be April 16, 1999.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 297 of 321

5.    Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 298 of 321

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF
TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant
to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of
Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being
terminated, by commissioning a search of U.S. copyright records, including a search of the
records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
2d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 299 of 321

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this 3rd day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 300 of 321

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

# EXHIBIT L

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO: Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 302 of 321

132
ER 2881

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 303 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Detective Comics, Inc. executed on or about December 19, 1939, and the undersigned set forth in connection therewith the following:

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

ER 2882

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 304 of 321

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

      2.     Each work to which this notice of termination applies is as follows: The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787. This work was written by Jerome Siegel and illustrated by Joe Shuster. Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188. The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel. The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

134
ER 2883

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 306 of 321

3. The grant to which this Notice of Termination applies is a two page agreement between Detective Comics, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about December 19, 1939, modifying the September 22, 1938 Letter Agreement between Detective Comics, Inc., and Jerome Siegel and Joseph Shuster, and providing in part that: "we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled 'SUPERMAN' . . . and to [sic] all rights of reproduction of all said comic strips and the titles and characters contained therein and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other form of reproduction..." and all rights of copyright in said forms of reproduction. The foregoing agreement included at the time all SUPERMAN works in existence up through said date (December 19, 1939), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4.    The effective date of termination shall be April 16, 1999.

136
ER 2885

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 307 of 321

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow,

Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel

Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and

Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's

termination interest, are executing this notice and constitute a 75% majority interest of those

persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the

transfer described herein-above.  To the best knowledge and belief of the undersigned, this

notice has been signed by all persons whose signature is necessary to terminate said grant

under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

_____
Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

_____
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 308 of 321

# CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this 24 day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041


I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 310 of 321

# EXHIBIT M

ER 2890

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:  Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 312 of 321

141
ER 2891

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 313 of 321

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Warner Communications Inc. executed on or about December 23, 1975, and the undersigned set forth in connection therewith the following:

1.    The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

142
ER 2892

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

     2.     Each work to which this notice of termination applies is as follows:  The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet.  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 315 of 321

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 316 of 321

3. The grant to which this Notice of Termination applies is a twelve page agreement (with additional pages for exhibits) between Warner Communications Inc. and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about December 23, 1975, acknowledging that Warner Communications Inc.

> "is the sole and exclusive owner of all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of any such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised, together with the absolute right to transfer, license, sell or otherwise dispose of said rights."

The foregoing agreement included at the time all SUPERMAN works in existence up through said date (December 23, 1975), as listed in paragraph 2, above, and the renewal rights therein, and also included rights in the future including the renewal rights in the remaining works set forth in paragraph 2 above.

4. The effective date of termination shall be April 16, 1999.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 317 of 321

5.     Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

7-December 23, 1975 Agreement

552

**146**

ER 2896

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 318 of 321

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant

to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of

Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of the

records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

3rd day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

7-December 23, 1975 Agreement

553

ER 2897

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 319 of 321

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this _3rd_ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

7-December 23, 1975 Agreement

554

**148**
**ER 2898**

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-11, Page 320 of 321

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on February 21, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  February 21, 2014                    /s/ Marc Toberoff
                                             Marc Toberoff