APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 12 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 12)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| **Docket No.** | **Filing Date** | **Document Title** | **Vol.** | **Page** |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit N:  Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R:  Defendants' First Amended Counterclaim* | 12 | 2915 |
| 164 | 4/30/07 | *Exhibit S:  Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
| 164 | 4/30/07 | *Exhibit T:  Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U:  March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V:  May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W:  Appellate Brief of National Periodical Publications, Inc. et. al.  from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |

| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |
| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |

## INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|------|--------|----------------------------------------------------------------------------------|---|-----|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

|  |  | *2006.* |  |  |
|---|---|---|---|---|
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A:  Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B:  October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C:  Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D:  Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|-------|---------|---------------------------------------------|---|------|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

|  |  | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* |  |  |
|---|---|---|---|---|
| 340-1 | 7/21/08 | *Exhibit B: April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A: Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G: January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H: January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I: February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J: Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M: Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S:  Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T:  Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U:  March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V:  May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W:  Appellate Brief of National Periodical Publications, Inc. et. al.  from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X:  Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y:  December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z:  April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA:  September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB:  October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC:  October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD:  February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE:  Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF:  March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A:  December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| | | | | |
|---|---|---|---|---|
| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
| | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

# EXHIBIT N



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 30 of 321

FL
10a

DATE: September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.    Suite 600
Washington, D.C.  20005-3315

ATTN:  Arthur J. Levine:

LIBRARY
OF
CONGRESS

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 577-599 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

REGISTER OF COPYRIGHTS

Enclosure(s):
Document(s)        1

```
*************************************************************
*************************************************************
** Beginning with Volume 3404, individual pages of your    **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document  **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.   **
*************************************************************
*************************************************************
```

150

# Copyright Office of the United States

## THE LIBRARY OF CONGRESS

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCUMENT WAS RECORDED IN THE COPYRIGHT OFFICE ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
| --- | --- |
| 3410 | 577 |

| VOLUME | PAGE |
| --- | --- |
| 3410 | 599 |



OFFICIAL SEAL

*Marybeth Peters*

Register of Copyrights and Associate Librarian for Copyright Services

**151**



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 32 of 321

FL
10a

**DATE:**     September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.  20005-3315

LIBRARY
OF
CONGRESS

ATTN:  Arthur J. Levine:

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 607-629 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

**REGISTER OF COPYRIGHTS**

Enclosure(s):
Document(s)       1

```
*****************************************************************
*****************************************************************
** Beginning with Volume 3404, individual pages of your       **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document     **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.      **
*****************************************************************
*****************************************************************
```

152

Recorded Documents
June 1998—15,000

**ER 2903**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 33 of 321

*Copyright*
*Office*
*of the*
*United*
*States*

THE
LIBRARY
OF
CONGRESS

# *Certificate of Recordation*

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-
MENT WAS RECORDED IN THE COPYRIGHT OFFICE
ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
| --- | --- |
| 3410 | 607 |

| VOLUME | PAGE |
| --- | --- |
| 3410 | 629 |

OFFICIAL SEAL

*Marybeth Peters*

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**153**



FL
10a

DATE:

September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.  20005-3315

LIBRARY
OF
CONGRESS

ATTN:  Arthur J. Levine:

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 630-652 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

REGISTER OF COPYRIGHTS

Enclosure(s):
Document(s)           1

```
*************************************************************
*************************************************************
** Beginning with Volume 3404, individual pages of your    **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document  **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.   **
*************************************************************
*************************************************************
```

154

# Copyright Office of the United States

## THE LIBRARY OF CONGRESS

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-
MENT WAS RECORDED IN THE COPYRIGHT OFFICE
ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
|--------|------|
| 3410 | 630 |

| VOLUME | PAGE |
|--------|------|
| 3410 | 652 |

OFFICIAL SEAL

*Marybeth Peters*

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**155**



FL
10a

LIBRARY
OF
CONGRESS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 36 of 321

DATE:        September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.  20005-3315

ATTN:  Arthur J. Levine:

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 653-675 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

REGISTER OF COPYRIGHTS

Enclosure(s):
Document(s)        1

```
**************************************************************
**************************************************************
** Beginning with Volume 3404, individual pages of your    **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document  **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.   **
**************************************************************
**************************************************************
```

**156**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 37 of 321

*Copyright*
*Office*
*of the*
*United*
*States*

THE
LIBRARY
OF
CONGRESS

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-
MENT WAS RECORDED IN THE COPYRIGHT OFFICE
ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
|--------|------|
| 3410 | 653 |

| VOLUME | PAGE |
|--------|------|
| 3410 | 675 |



OFFICIAL SEAL

*Marybeth Peters*

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**157**



DATE:
September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.   20005-3315

ATTN:  Arthur J. Levine:

LIBRARY
OF
CONGRESS

COPYRIGHT
OFFICE

101 Independence
Avenue, S.E.

Washington, D.C.
20559-6000

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| Volume | 3410 |
|---|---|
| Page(s) | 807-829 |

The recording fee has been handled as follows:

| Received | $ |
|---|---|
| Applied | $ |
| Refunded (under separate cover) | $ |
| Charged to your deposit account | $ |

Sincerely yours,

REGISTER OF COPYRIGHTS

Enclosure(s):
Document(s)        1

```
***********************************************************
***********************************************************
** Beginning with Volume 3404, individual pages of your  **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document    **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.     **
***********************************************************
***********************************************************
```

158

Recorded Documents
June 1998—15,000
ER 2909

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 38 of 321

*Copyright*
*Office*
*of the*
*United*
*States*

*THE*
*LIBRARY*
*OF*
*CONGRESS*

# Certificate of Recordation

**THIS IS TO CERTIFY THAT THE ATTACHED DOCU-MENT WAS RECORDED IN THE COPYRIGHT OFFICE ON THE DATE AND IN THE PLACE SHOWN BELOW.**

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
|--------|------|
| 3410 | 807 |

| VOLUME | PAGE |
|--------|------|
| 3410 | 829 |



OFFICIAL SEAL

*Marybeth Peters*

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**159**



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 40 of 321

DATE:     September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.  20005-3315

ATTN:  Arthur J. Levine:

LIBRARY
OF
CONGRESS

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 830-852 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

**REGISTER OF COPYRIGHTS**

Enclosure(s):
Document(s)       1

```
******************************************************
******************************************************
** Beginning with Volume 3404, individual pages of your   **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document   **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number.   **
******************************************************
******************************************************
```

160

Recorded Documents
June 1998—15,000
**ER 2911**

*Copyright
Office
of the
United
States*

*THE
LIBRARY
OF
CONGRESS*

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-
MENT WAS RECORDED IN THE COPYRIGHT OFFICE
ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
|--------|------|
| 3410 | 830 |

| VOLUME | PAGE |
|--------|------|
| 3410 | 852 |



OFFICIAL SEAL

Marybeth Peters

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**161**



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 42 of 321

FL
10a

DATE:     September 17, 1998

FINNEGAN, HENDERSON, FARABOW, GARRETT and DUNNER
1300 I Street, N.W.   Suite 600
Washington, D.C.  20005-3315

ATTN:  Arthur J. Levine:

LIBRARY
OF
CONGRESS

COPYRIGHT
OFFICE

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| **Volume** | 3410 |
| **Page(s)** | 853-875 |

101 Independence
Avenue, S.E.

The recording fee has been handled as follows:

| | |
|---|---|
| **Received** | $ |
| **Applied** | $ |
| **Refunded (under separate cover)** | $ |
| **Charged to your deposit account** | $ |

Washington, D.C.
20559-6000

Sincerely yours,

**REGISTER OF COPYRIGHTS**

Enclosure(s):       1
Document(s)

```
**********************************************************
**********************************************************
** Beginning with Volume 3404, individual pages of your  **
** document will again be numbered.  In addition, a barcode is **
** applied to the first page which bears a volume/document **
** number which refers to the whole document.  The term 'page' **
** used on the certificate refers to the document number. **
**********************************************************
**********************************************************
```

162

Recorded Documents
June 1998—15,000
**ER 2913**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 43 of 321

# Copyright Office of the United States

## THE LIBRARY OF CONGRESS

# Certificate of Recordation

THIS IS TO CERTIFY THAT THE ATTACHED DOCU-
MENT WAS RECORDED IN THE COPYRIGHT OFFICE
ON THE DATE AND IN THE PLACE SHOWN BELOW.

THIS CERTIFICATE IS ISSUED UNDER THE SEAL OF THE COPYRIGHT OFFICE.

DATE OF RECORDATION

2Feb98

| VOLUME | PAGE |
|--------|------|
| 3410   | 853  |

| VOLUME | PAGE |
|--------|------|
| 3410   | 875  |

OFFICIAL SEAL

*Marybeth Peters*

Register of
Copyrights and
Associate
Librarian for
Copyright
Services

**163**

Certificate of Recordation
C-762 March 1998—15,000

ER 2914

# EXHIBIT R

1   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
2   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
3   New York, New York 10017
    Telephone:  212-813-5900
4   Fax:        212-813-5901

5   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
6   Michael Bergman (SBN 37797)
    David L. Burg (SBN 130403)
7   Adam Hagen (SBN 218021)
    9665 Wilshire Boulevard, Ninth Floor
8   Beverly Hills, California 90212
    Telephone:  310-858-7888
9   Fax:        310-550-7191

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York 10516
12  Telephone: 845-265-2820
    Fax:        845-265-2819

13

14  Attorneys for Defendants and Counterclaimants

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17

18  JOANNE SIEGEL, an individual; and          )  Case No. 04-8400 RSWL (RZx)
    LAURA SIEGEL LARSON, an                    )  Honorable Ronald S.W. Lew
19  individual,                                )
                                               )  Related To 04-08776 RSWL (RZx)
20            Plaintiffs,                       )
                                               )  **FIRST AMENDED**
21      vs.                                    )  **COUNTERCLAIMS**
                                               )
22  WARNER BROS. ENTERTAINMENT                 )
    INC., a corporation; TIME WARNER           )
23  INC., a corporation; DC COMICS, a          )
    general partnership; and DOES 1-10,        )
24                                             )
              Defendants.                       )
25                                             )
                                               )
26  AND RELATED COUNTERCLAIMS.                 )
                                               )
27

28

                                    1
    314270v1 02231.0811      FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 46 of 321

1    Defendant/Counterclaimant DC Comics, for its First Amended

2    Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura

3    Siegel Larson, alleges:

4

5                              **PARTIES**

6        1.      Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a

7    New York General Partnership engaged in the business of, *inter alia*, creating,

8    exploiting, and licensing comic book stories and characters.  DC is the successor in

9    interest to all rights under copyright and other rights, including trademark rights

10   and the good will in and to the first Superman story and all other works and

11   products relating to the Superman character.

12       2.      Upon information and belief, Plaintiff/Counterclaim Defendant

13   Joanne Siegel is an individual and citizen of the State of California, in the County

14   of Los Angeles.  Upon further information and belief, Joanne Siegel is the widow

15   of Jerome Siegel, the individual credited as a co-creator of the first Superman

16   stories.

17       3.      Upon information and belief, Plaintiff/Counterclaim Defendant Laura

18   Siegel Larson is an individual and citizen of the State of California, in the County

19   of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a

20   daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and

21   Laura Siegel Larson are referred to herein as "the Siegels."

22                    **JURISDICTION AND VENUE**

23       4.      This Court has jurisdiction of the subject matter hereof under the

24   provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright

25   ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also

26   known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections

27   1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332,

28

                                    2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 47 of 321

1  1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18

2  U.S.C. § 1367.

3      5.      Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information

4  and belief, a substantial part of the events giving rise to DC's claims occurred or a

5  substantial part of the properties that are the subject of these counterclaims are

6  situated in this District and/or the Plaintiffs/Counterclaim Defendants may be

7  found in this District.

8              **FACTS COMMON TO ALL COUNTERCLAIMS**

9                      **Background And History**

10     6.      Upon information and belief, in or about 1933, Jerome Siegel

11  ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated

12  on creating a number of stories, including a story entitled "The Reign of the

13  Superman," which was published in a magazine put out by Siegel and Shuster

14  themselves entitled "Science Fiction." Upon further information and belief, other

15  than the same name, the "Superman" character in this story shared very little, if

16  any, similarity with the character that would later become known as Superman.

17     7.      Upon information and belief, in early 1933, Siegel and Shuster began

18  collaborating on "comic strips," initially for syndication and eventually for

19  publication in "comic books," a new and growing medium. Among their work

20  together were a number of comic strips featuring a character they named

21  Superman. This Superman character bore virtually no resemblance to the character

22  of the same name that had previously appeared in the "Science Fiction" magazine.

23  Upon further information and belief, those works, which were never published,

24  included: (a) twenty four (24) days of Superman comic strips intended for

25  newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of

26  such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page

27  synopsis covering an additional two months of daily comic strips; and (e) fifteen

28  daily comic strips (collectively the "Unpublished Superman Works").

<center>3</center>

ER 2918

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 48 of 321

8.    Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9.    Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10.    On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years. Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11.    Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics." In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review. At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12.    In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein."

4

314270v1 02231.0811

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 49 of 321

13. DCI advertised the publication of the new comic story Superman and the new title "Action Comics No. 1" in others of its publications, including but not limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New Adventure Comics No. 26," all of which are cover dated May 1938 and, upon information and belief, were distributed in copies to the public on or before April 1, 1938. These advertisements (the "Superman Ads"), which depict the Superman character in his costume, exhibiting super-strength, show almost the entirety of what would become the cover of "Action Comics No. 1."

14. Upon information and belief, sometime prior to April 16, 1938, but after the Superman Ads, DCI published the thirteen page Superman comic book comprising the first Superman story in "Action Comics No. 1," bearing the "cover" date June 1938 (hereinafter "Action Comics No. 1"). However, Action Comics No. 1 was not comprised entirely of the pre-existing Unpublished Superman Works. Rather, upon information and belief, in response to DCI's instruction that the Unpublished Superman Works be presented as a thirteen page comic book and subject to DCI's right to control, Siegel and Shuster created additional materials to complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

15. After the publication of Action Comics No. 1, upon information and belief, Siegel and Shuster supplied further original Superman stories at DCI's instance and expense and subject to its right to control. On September 22, 1938, Siegel and Shuster entered into another employment agreement (the "DCI September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for said purposes . . . ." The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

16. Also on September 22, 1938, Siegel and Shuster entered into an agreement with DCI and with the McClure Newspaper Syndicate (the "McClure

314270v1 02231 0811 FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 50 of 321

1  September 22, 1938 Agreement") concerning the use of Superman in newspaper
2  strips.

3       17.    All of Siegel and Shuster's contributions to Superman comic books
4  and comic strips published subsequent to Action Comics No. 1 as well as the
5  Additional Action Comics No. 1 Materials, were made either under the DCI March
6  1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure
7  September 22, 1938 Agreement, or contemporaneous oral agreements confirmed
8  by one or more of these Agreements, or certain subsequent agreements affirming
9  those agreements, as employees of DCI or its successors or at DCI's instance and
10 expense and subject to DCI's right of control, with the result that the copyrights to
11 all Superman materials created by them after preparation of materials included in
12 Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are
13 owned exclusively by DC Comics as works made for hire under the then applicable
14 1909 Copyright Act.

15      18.    On November 30, 1938, Siegel wrote to DCI (the "November 1938
16 Letter") suggesting that it do a comic book named Superboy, "which would relate
17 to the adventures of Superman as a youth." The November 30, 1938 Letter does
18 not contain any discussion of plot, dialogue, appearance, or any other
19 copyrightable material relating to Superboy. DCI decided not to publish a
20 "Superboy" comic at that time.

21      19.    In 1939, among the Superman comics prepared by Siegel and Shuster
22 at the instance and expense of DCI and subject to its right of control, was
23 Superman No. 1, with a cover date of Summer 1939. In Superman No. 1, Clark
24 Kent was depicted as a youth with super powers.

25      20.    On December 19, 1939, Siegel and Shuster entered into a new
26 agreement with DCI (the "December 19, 1939 Agreement"), which agreement
27 modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel
28 and Shuster's compensation for Superman comic books and newspaper strips. In

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 51 of 321

1    addition, the December 19, 1939 Agreement provided for payment for Siegel and

2    Shuster for uses of Superman beyond comic books and newspaper strips, such as

3    radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel

4    and Shuster again acknowledged DCI's sole ownership of Superman.

5         21.    Upon information and belief, in approximately December 1940,

6    Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page

7    script of continuity for Superboy (the "Unpublished 1940 Superboy Script"),

8    renewing his suggestion to DCI that it publish a comic book about Superman as a

9    youth.  The December 1940 Superboy Script, which sets forth a credit line of "By

10   Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of

11   today's leading adventure comic strip, SUPERMAN, wrote in demanding the

12   adventures of Clark Kent as a youth . . .And so here he is at last…the answer to

13   your requests…America's outstanding boy hero: SUPERBOY!"  The Unpublished

14   1940 Superboy Script goes on to say about Superboy that "[i]n later years he was

15   to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided

16   not to publish a "Superboy" comic at that time.

17        22.    Upon information and belief, on a date prior to November 18, 1944,

18   DCI published its first comic book containing the adventures of Superboy, who

19   was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of

20   January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon

21   information and belief, DCI employed Shuster or an artist from Shuster's art studio

22   (with Shuster's knowledge and under his supervision) to create the artwork and

23   writer Don Cameron to write the Superboy story contained in "More Fun Comics

24   No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

25   resemblance to anything contained in the Unpublished 1940 Superboy Script, and

26   such similarities as may exist are common to earlier Superman related material

27   owned by DCI.

28

311
ER 2922

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 52 of 321

23.     In 1947, Siegel and Shuster brought suit against, *inter alia,* DCI's successor in interest, National Comics Publications, Inc. ("National") in the New York Supreme Court in Westchester County (the "Westchester Action"). The Westchester Action was, in part, the culmination of a dispute between Siegel and Shuster and National over what Siegel and Shuster claimed was DCI's unauthorized publication of Superboy. In the Westchester Action, in addition to seeking redress in connection with Superboy, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938 Agreement was obtained by duress, and sought to recapture all rights in Superman.

24.     On November 21, 1947, the Court in the Westchester Action issued an opinion (the "Westchester Opinion") after trial in which it found that the March 1, 1938 Agreement transferred to DCI all rights in Superman and that the DCI September 22, 1938 Agreement was valid and not obtained under duress. The Court also held that in publishing Superboy, DCI had acted "illegally."

25.     At the Court's request, the parties to the Westchester Action submitted proposed fact findings and conclusions of law. On April 12, 1948, the Court adopted fact findings and conclusions of law and issued an interlocutory judgment (collectively the "Westchester Action Interlocutory Judgment"). The defendants in the Westchester Action filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

26.     Shortly thereafter, the parties to the Westchester Action entered into two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement"). Under both documents, *inter alia,* Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and

8

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 53 of 321

1  exclusive owner of Superman, the conception, idea, continuity, pictorial
2  representation and formula thereof in all media; (d) agreed that they were enjoined
3  from creating, publishing or distributing any Superman work or any imitation
4  thereof, and from using the title Superman or title that contained the word "Super";
5  (e) acknowledged that National was the sole owner of and owned exclusive rights
6  in Superboy; (f) agreed that they were enjoined from creating, publishing or
7  distributing Superboy or any imitation thereof; (g) agreed they were prohibited
8  from representing their past connection with Superman and Superboy in such a
9  way to confuse the public that such connection still existed; and (h) agreed they
10 were prohibited from using any coloring, lettering or printing in referring to
11 Superman or Superboy that was imitative of that used by National.

12      27.    In the 1960s, Siegel and Shuster again brought suit against National,
13 this time in the United States District Court for the Southern District of New York
14 for a declaration that they (and not National) owned the copyright in the renewal
15 copyright term for Action Comics No. 1. In a decision published in *Siegel v.*
16 *National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the
17 district court held, *inter alia*, that the agreements between Siegel and Shuster on
18 the one hand and DCI (and later National) on the other, intended to assign all rights
19 in Superman to DCI and National, including renewal copyright rights.

20      28.    In a decision published in *Siegel v. National Periodical Publications,*
21 *Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the
22 lower court's ruling relating to National's ownership of all rights in Superman.
23 Siegel and Shuster did not further appeal the ruling.

24      29.    On December 23, 1975, Siegel and Shuster entered into an agreement
25 with Warner Communications, Inc., then National's parent company (the
26 "December 23, 1975 Agreement"). Under this agreement, Siegel and Shuster
27 again acknowledged that Warner Communications, Inc. was the sole and exclusive
28 owner of "all right, title and interest in and to the 'Superman' concept, idea,

9

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 54 of 321

1 continuity, pictorial representation, formula, characters, cartoons and comic strips,

2 title, logo, copyrights and trademarks, including any and all renewals and

3 extensions of such rights, in the United States and throughout the world, in any and

4 all forms of publication, reproduction and presentation, whether now in existence

5 or hereafter devised . . . ."

6       30.    Under the December 23, 1975 Agreement, Siegel and Shuster each

7 were to and did receive throughout their lives annual payments as well as medical

8 insurance coverage. Upon Siegel's death, annual payments were to be made to

9 Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The

10 amount of the annual payment pursuant to the December 23, 1975 Agreement was

11 increased over the years. Since Siegel's passing in 1996, Joanne Siegel has

12 continuously received and accepted annual payments and health insurance under

13 that agreement.

## DC Comics' Development And Licensing
## Of Superman Works And Products

16       31.    The initial graphic representations of the Superman character in 1938,

17 now stylistically dated, presented his adventures with a limited number of

18 characters in settings that had the look and feel of that particular period. From the

19 portrayal of the Superman character in "Action Comics No. 1," we only know that

20 he is an upright hero who was sent as an infant to Earth aboard a space ship from

21 an unnamed distant planet destroyed by old age. Superman is also depicted as

22 secretly possessed of extraordinary physical abilities, including superhuman

23 strength and the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and

24 run faster than an express train. In his ordinary life, the character is depicted as a

25 mild-mannered newspaper reporter for <u>The Daily Star</u> known as Clark Kent, and in

26 his alter ego, Superman is a costumed heroic figure using his extraordinary

27 physical abilities to fight against crime.

28

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

ER 2925
314

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 55 of 321

1    32.    Since the publication of "Action Comics No. 1," DC Comics has

2    authored, published and distributed several thousand other comic books containing

3    the adventures of Superman throughout the United States and abroad in many

4    millions of copies, adding more than 60 years worth of material to further define,

5    update and improve upon the Superman character and presenting an ongoing new

6    flow of Superman exploits and characters resulting in the creation of an entire

7    fictional Superman "universe."

8    33.    In addition to the publication of new comic books containing the

9    Superman comic strip character, DC Comics has over the last 66 years participated

10   in the creation, development and licensing of numerous Superman live action and

11   animated feature length motion pictures, motion picture serials, radio and

12   television serials and live theatrical presentations.  These works have also

13   significantly contributed to the modernizing and evolution of the Superman

14   character from his 1938 appearance.

15   34.    Over the years since Action Comics No. 1, the presentations of

16   Superman provided first by DCI and then DC Comics did not present a static

17   depiction but an ever-evolving portrayal of Superman continuously, featuring new

18   super powers, new villains, new components to the Superman universe, new

19   elements in the Superman back story, and changes in the appearance of Superman.

20   Most notably, many of Superman's powers that are among his most famous today

21   did not appear in Action Comics No. 1 but only appeared in later publications.

22   These include: his ability to fly; his super-vision which enables him to see through

23   walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-

24   hearing which enables him to hear conversations at great distances; his

25   invulnerability to injury which is most often shown as bullets bouncing off his

26   chest and/or arms.

27   35.    One notable part of the evolution of the appearance of the Superman

28   character undertaken by DC Comics and its predecessors, has been the

11

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 56 of 321

1    transformation of the emblem on the chest of Superman's costume. In Action
2    Comics No. 1, the emblem was comprised of a small yellow inverted triangle
3    bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics
4    No. 1 Crest"). Thereafter, in changing the appearance of Superman and his
5    costume, DC Comics and/or its predecessors significantly changed the Action
6    Comics No. 1 Crest. Bearing little if any resemblance to the original, it is now a
7    large yellow five-sided shield, outlined in the color red, and bearing the letter "S"
8    in the middle, also in the color red (the "S in Shield Device"). The S in Shield
9    Device, as transformed by DC Comics and its predecessors, has become a strong
10   symbol, standing alone, of all goods and services relating to Superman and his sole
11   source, DC Comics and its predecessors.

12       36.    At all relevant times, DC Comics, its predecessors in interest and
13   licensees have duly complied with the provisions of the 1976 Copyright Act and its
14   1909 predecessor statute with respect to securing copyright protection for the
15   numerous works in which the Superman character has appeared and establishing
16   DC Comics' copyright ownership thereof, including the original and all works
17   based upon and derived therefrom, and have received from the Register of
18   Copyrights, valid and subsisting certificates of copyright registration and renewal
19   with respect thereto.

20       37.    DC Comics and its predecessors have, since 1938, continuously held
21   themselves out as the exclusive owners of all rights under copyright in Superman.

22       38.    DC Comics has over many decades adopted and made long,
23   continuous and exclusive use of (a) the name and mark Superman and (b) certain
24   key symbols and indicia of origin in connection with and to identify all authorized
25   uses of the Superman character in print and all other media (sometimes hereinafter
26   the "Superman symbols and indicia of origin"). The Superman name and mark
27   and Superman symbols and indicia of origin include, *inter alia*, Superman's
28   characteristic outfit, comprised of a full length blue leotard with red cape, a yellow

12

1  belt, the S in Shield Device, as well as certain key identifying phrases. Most

2  notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a

3  plane!...It's Superman!" first used in the introduction to the 1940 radio program

4  The Adventures of Superman, and thereafter continuously repeated in Superman

5  television programming and various Superman publications. All of these

6  Superman symbols and indicia of origin have been used on and in connection with

7  a wide variety of publications and licensed goods and services, as they have been

8  added to the Superman character and mythology under DC Comics' and/or its

9  predecessors' supervision and direction, but, in any event, for the earliest symbols,

10 since as early as 1938.

11      39.    As a result of the above-described continuous and exclusive use by

12 DC Comics of the Superman name and mark, as well as the Superman symbols and

13 indicia of origin for over sixty years, the names, marks and symbols and the

14 appearance of the Superman character have become famous and the public has

15 come to recognize that all publications, entertainment and products featuring

16 Superman or bearing such marks all come from the same source, namely, DC

17 Comics, and that DC Comics is the exclusive source of the Superman character

18 and all uses of the character on and in connection with any goods and services.

19      40.    DC Comics owns dozens of federal trademark registrations for

20 Superman related indicia across a broad array of goods and services. Those

21 registrations include, but are not limited to the following for the following marks:

22 (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177,

23 1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803,

24 1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b)

25 SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026,

26 1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

27 1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the

28 "S in Shield" Device (either alone or as part of a rendering of Superman)

13

1 | 2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233,

2 | 1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630,

3 | 1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150,

4 | 1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No.

5 | 2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY

6 | Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g)

7 | SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623,

8 | 1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i)

9 | SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881;

10 | (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306;

11 | (l) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304;

12 | (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No.

13 | 1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No.

14 | 1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION

15 | COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and

16 | indicia of origin, the "Superman Marks").

17 |     41.    These registrations alone suffice to show the unusual breadth and

18 | scope of the use of such marks related to Superman by DC Comics or its licensees

19 | on or in connection with a broad range of goods and services, all of which have

20 | come to be seen over six decades by countless consumers as indicating an

21 | exclusive authorization or sponsorship thereof by plaintiff DC Comics, the

22 | publisher and source of all Superman comic books and other Superman

23 | productions and products.

24 | **The Superman Notices Of Termination**

25 |     42.    On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim

26 | Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel,

27 | Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled

28 | Notice of Termination of Transfer Covering Extended Renewal. Those documents

1   purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the
2   Siegels' share in the following grants of copyright: (a) the December 4, 1937
3   Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938
4   Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19,
5   1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975
6   Agreement (collectively the "Superman Notices"). However, the Siegels served no
7   notice terminating their share of the copyright grant in the May 21, 1948 Consent
8   Agreement.

9        43.    The Superman Notices purport to terminate the Siegels' share of the
10  above grants listed therein in the Unpublished Superman Works, Action Comics
11  No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1
12  Works"). However, in none of the seven Superman Notices, or anywhere else, do
13  the Siegels purport to terminate their share of any copyright grant in the Superman
14  Ads.

15       44.    In the Superman Notices, the Siegels expressly recognize and
16  acknowledge that the character Superboy is a derivative work based on Superman.
17  The Superman Notices expressly identify Superboy as part of the Superman
18  "family" of characters in which the Siegels are purporting to terminate their grants.
19  Indeed, the more than 15,000 works listed in the Superman Notices include
20  hundreds of publications and other works that feature *only* Superboy (as opposed
21  to Superman), and also Superman No. 1 with a cover date of Summer 1939, in
22  which Superman is depicted as a youth.

23       45.    In late November, 1998, DC Comics received from Plaintiffs/
24  Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their
25  then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents
26  entitled Notice of Termination of Transfer Covering Extended Renewal. Those
27  documents purport to terminate, effective November 27, 2000, the Siegels' share in
28  the following grants of copyright relating to the character known as "The Spectre":

15

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 60 of 321

1  (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c)

2  and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement

3  (collectively the "Spectre Notices").

4       46.    The Spectre Notices purport to terminate the Siegels' share of the

5  above grants in: (a) the Spectre character appearing in costume in an ad in issue

6  No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first

7  Spectre comic book story published in issue No. 52 of "More Fun Comics" with a

8  cover date of February 1940; (c) part 2 of the first Spectre comic book story

9  published in issue No. 53 of "More Fun Comics" with a cover date of March 1940,

10  and hundreds of additional works listed the Spectre Notices (collectively the

11  "Spectre Works").

<div align="center">

**The Parties' Negotiations**

**And The Agreement Reached**

</div>

14       47.    On April 17, 1997, less than ten days after DC Comics received the

15  Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation.

16  The Siegels requested that DC Comics make an initial settlement proposal.  But

17  prior to making such proposal, DC Comics requested that the parties enter into a

18  confidentiality agreement.  Frustrated by the Siegels' delay in responding to its

19  proposed form confidentiality agreement, on November 5, 1997, DC Comics'

20  counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you

21  in the past, our client has elected, for settlement purposes only, not to respond to

22  the [Superman Notices] served upon them by challenging their validity or scope *at*

23  *this time*."  (Emphasis added.)

24       48.    On December 17, 1997, DC Comics and the Siegels finally entered

25  into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded

26  its first substantive proposal with respect to the copyrights at issue, and in

27  connection therewith also raised certain defects in the termination notice, stating

28  "that there is a substantial legal issue as to the effectiveness of your clients'

<div align="center">

16

</div>

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 61 of 321

1  termination of DC's interest in the Superman Comic." For more than six months,
2  despite repeated requests for feedback, DC Comics heard no response to its
3  December 18, 1997 proposal. Finally, on June 19, 1998, the Siegels' counsel sent
4  a letter to DC Comics' counsel that did not respond to the proposal but only
5  requested more information.

6      49.    On July 23, 1998, DC Comics provided the Siegels with the answers
7  to the questions posed in their counsel's letter of June 19, 1998. Despite requests
8  for feedback for another several months, DC Comics again received no response to
9  its proposal.

10     50.    Having heard no response from the Siegels, on April 15, 1999, one
11 day before the  purported "Effective Date" set forth in the Superman Notices, DC
12 Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim
13 Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things,
14 the reasons it considered the Superman Notices to be invalid.

15     51.    On April 30, 1999, DC Comics received a letter from the firm of
16 Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented
17 the Siegels in negotiations with DC Comics. Thereafter, the parties engaged in
18 extensive negotiations with their respective lawyers attending meetings in
19 California and New York, and exchanging proposals. During that time period, at
20 the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance
21 Payment") to the Siegels which payment was agreed to be an advance against any
22 future sums provided under an agreement to be entered into between the parties.

23     52.    On October 16, 2001, a legal representative for DC Comics made an
24 offer to the Siegels through Gang, Tyre by telephone. On October 19, 2001, Kevin
25 Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001
26 offer. That day, Mr. Marks wrote a letter confirming that the Siegels had
27 "accepted D.C. Comics offer of October 16, 2001" and outlined all of the material
28 terms in detail. Those terms included, *inter alia,* that the Siegels transferred or

17

ER 2902

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 62 of 321

1   would transfer all of their rights in the Superman property (which was defined in
2   the letter as Superman, Superboy and related properties including but not limited to
3   Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre." In exchange,
4   the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable
5   non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the
6   Advance Payment; (d) significant guaranteed minimum payments as advances
7   against royalties; and (e) percentage royalties from DC Comics' exploitations of
8   Superman across all media, worldwide.

9        53.    By return letter of October 26, 2001, DC Comics' representative
10  wrote back providing a "more fulsome outline" of the agreed upon points. Neither
11  the Siegels nor any of their representatives in any way disputed the October 26,
12  2001 confirmatory outline from DC Comics. On February 1, 2002, DC Comics
13  forwarded a draft of a more formal written agreement memorializing the terms
14  agreed to in the October 19 and 26, 2001 correspondence.

15       54.    After the October 2001 agreement, DC Comics entered into a written
16  Option Purchase Agreement with Warner Bros., A Division of Time Warner
17  Entertainment Company, L.P. (now known as defendant Warner Bros.
18  Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics
19  granted to Warner Bros. the option to license certain exclusive rights in Superman,
20  and Warner Bros. has commenced photography of a feature-length motion picture
21  based on the property.

22       55.    On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel
23  wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company
24  acknowledging that the Siegels had accepted DC Comics' proposal of October 16,
25  2002, but purporting to object to unspecified provisions of the formal written draft
26  and repudiating the agreement reached by the parties in October 2001. To this day,
27  the Siegels have not identified a single provision of the February 1, 2002 formal
28

18

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 63 of 321

1   draft that was inconsistent with the provisions in the Siegels' October 19, 2001

2   acceptance of DC Comics' proposal.

3       56.    On September 30, 2002, however, DC Comics received a letter from

4   the Siegels stating they were breaking off all discussions with DC Comics and

5   again repudiating the agreement reached by the parties in October 2001.

6                          **The Superboy Termination Notices**

7       57.    Notwithstanding the fact that the Siegels had already purported to

8   terminate grants with respect to the Superboy character effective April 16, 1999,

9   on November 8, 2002, the Siegels mailed to DC Comics another Notice of

10  Termination of Transfer purporting to relate solely to Superboy (the "Superboy

11  Notice"). The Superboy Notice purports to terminate, effective November 17,

12  2004, only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the

13  December 23, 1975 Agreement, and identifies many of the same works identified

14  in the Superman Notices. As was the case with the Superman Notices, the Siegels

15  served no notice terminating the copyright grant in the May 21, 1948 Consent

16  Agreement.

17      58.    The Superboy Notice purports to terminate the above grants

18  regarding the following works: (a) the unpublished November 30, 1938 Letter; (b)

19  the unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d)

20  approximately 1,600 additional titles. However, the Superboy Notice lists and

21  purports to terminate grants of rights under copyright relating to hundreds of the

22  same works already purportedly terminated by the earlier Superman Notices. The

23  Superboy Notice does not purport to terminate the 1939 depiction of Superman as

24  a youth in Superman No. 1.

25      59.    In the Superboy Notice, the Siegels make the claim that Superboy is a

26  "separate and distinct copyrighted work and character from the copyrighted work

27  and character Superman." This contention is erroneous.

28

314290v1 02231.0811        FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 64 of 321

60.     In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy. This contention is also erroneous.

61.     Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville." "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62.     On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia,* that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville"

63.     On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64.     On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

### The Siegels' Filing Of Two Related Cases

65.     On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

324

314290v1 02231.0811

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 65 of 321

# FIRST COUNTERCLAIM FOR DECLARATION
## THAT THE SUPERMAN NOTICES AND THE
## SUPERBOY NOTICE ARE INEFFECTIVE

66.     DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67.     DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

### #1 The May 21, 1948 Consent Agreement Has Not Been Terminated

68.     The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69.     As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect. Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

### #2 The December 23, 1975 Agreement

70.     Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71.     By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

ER 2936

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 66 of 321

72. By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

73. Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement. DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

74. Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement. DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

75. Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the

22

326

314270v1 02231.0811

ER 2937

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 67 of 321

1   December 23, 1975 Agreement, and the grant of copyright therein, remains in full

2   force and effect.

3       76.    Thus, DC Comics is and continues to be the sole owner of all rights

4   of any kind, including rights under copyright, in Superman (and its derivative work

5   Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

6                 **#3 The Unpublished Superboy Works**

7       77.    In the Superboy Notice, the Siegels purport to terminate copyright

8   grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy

9   Script and approximately 1,600 additional published titles purportedly relating to

10  Superboy (the "Published Superboy Works").

11      78.    Upon information and belief, as of January 1, 1978, both the

12  November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel

13  Superboy Proposals") remained unpublished and thus were neither in their first nor

14  their second term of copyright as of that date.

15      79.    Copyright in the Published Superboy Works is owned exclusively by

16  DC Comics by virtue of their having been prepared as works made for hire for DC

17  Comics' and/or its predecessors, or by virtue of other copyright grants that remain

18  in full force and effect.

19      80.    Pursuant to the requirements set forth by section 304 (c) of the 1976

20  Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in

21  their first or second term of copyright as of January 1, 1978, could be terminated

22  under that provision. As a result, the Superboy Notice is ineffective as to the

23  Siegel Superboy Proposals or any portion of any derivative works containing any

24  copyrightable material therefrom and DC Comics remains the sole owner thereof.

25  Therefore, the Superboy Notice is ineffective.

26

27

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 68 of 321

## #4  Siegel Owned No Copyright In Superboy

81.     The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

82.     Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83.     Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84.     As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned *ab initio* by the copyright owner in Superman.

85.     Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c). Thus, the Superboy Notice is ineffective.

## #5  The Superman Notices Were Not Timely Served

86.     Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87.     All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

1   prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304
2   (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999,
3   was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3)
4   and such notices of termination were served less than two years before the
5   allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

6       88.     On information and belief, plaintiffs deny DC Comics' contentions
7   and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above.
8   Accordingly, an actual controversy has arisen and now exists between
9   Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

10      89.     A justiciable controversy exists concerning the above issues and a
11  judicial declaration is necessary and appropriate to determine the parties'
12  respective rights with regard thereto.

13          **SECOND ALTERNATIVE COUNTERCLAIM FOR**
14      **DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR**
15  **CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE**
16      **SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS**

17      90.     DC Comics repeats and realleges paragraphs 1 - 89 above as if fully
18  set forth herein.

19      91.     Since as early as 1998, Plaintiffs/Counterclaim Defendants were on
20  notice of DC Comics' position that the Superman Notices contained legal defects.
21  Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim
22  Defendants were on notice that DC Comics rejected the Superman Notices and
23  asserted exclusive ownership of all copyright in Superman.

24      92.     Since April 16, 1999, the purported effective date of the Superman
25  Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of
26  their purported co-ownership of copyright in Action Comics No. 1.

27      93.     In response to DC Comics' above actions and assertion and such
28  deprivation to the Siegels of the benefits of their alleged copyright co-ownership,

25

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 70 of 321

1  Plaintiffs/Counterclaim Defendants took no action until filing the instant action on

2  October 8, 2004, more than six years after DC Comics advised

3  Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

4  and more than five years after being placed on notice by DC Comics of its claim of

5  exclusive ownership of copyright in Superman and that it rejected and repudiated

6  the Superman Notices and during which time period the Siegels were deprived of

7  benefits to which they claim they are entitled.

8      94.    Because Plaintiffs/Counterclaim Defendants' claim of partial

9  ownership of copyright accrued more than three years prior to

10 Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into

11 consideration any purported agreements to toll the statute of limitations, any claim

12 of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is

13 barred by the three-year statute of limitations of the Copyright Act.

14     95.    On information and belief, plaintiffs deny DC Comics' contentions

15 and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above.

16 Accordingly, an actual controversy has arisen and now exists between

17 Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

18     96.    A justiciable controversy exists concerning the above issues and a

19 judicial declaration is necessary and appropriate to determine the parties'

20 respective rights with regard thereto.

21            **THIRD ALTERNATIVE COUNTERCLAIM**

22               **FOR BREACH OF CONTRACT**

23     97.    DC Comics repeats and realleges paragraphs 1 - 96 above as if fully

24 set forth herein.

25     98.    In or about October 2001, Plaintiffs/Counterclaim Defendants entered

26 into a written agreement with DC Comics memorialized by the authorized agent of

27 Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of

28 DC Comics, John Schulman, which subsequently was confirmed and ratified in

314270v1 02231.0811        FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 71 of 321

1   writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"),

2   pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1)

3   transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

4   transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and

5   interest, including all United States copyrights, which they may have in any and all

6   past, present, and future Superman and Superboy-related properties, works,

7   characters, names, and trademarks (collectively, the "Superman Works"), (2)

8   agreed to accept certain compensation from DC Comics in consideration of any

9   and all rights, title, and interest which they may have in the Superman Works (the

10  "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim

11  related to the Superman Works other than for breach of the Agreement (the

12  "Covenant Not To Sue").

13      99.    DC Comics has performed all of its obligations under the Agreement,

14  except to the extent such performance has been prevented or excused by the acts or

15  omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without

16  limiting the foregoing, DC Comics established a reserve account of the moneys

17  due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which

18  DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the

19  Agreement but for their repudiation and breach of the Agreement as herein alleged.

20  DC Comics always has been and remains ready, willing, and able to perform all of

21  its obligations under the Agreement, and will resume doing so upon either a

22  withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the

23  Agreement or a final adjudication that the Agreement is enforceable and binding

24  on the parties.

25      100.   Plaintiffs/Counterclaim Defendants have repudiated and otherwise

26  breached the Agreement by, among other things:

27          a.    Claiming, including in this action, that they have not transferred

28  and are not contractually obligated to transfer to DC Comics, worldwide and in

314270v1 02231.0811            FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 72 of 321

1   perpetuity, all of their rights, title, and interest, including all United States

2   copyrights, which they may have in the Superman Works, and refusing to execute

3   a formal written transfer thereof to DC Comics;

4           b.   Repudiating the Financial Terms and claiming, including in this

5   action, that they are entitled to additional compensation for the Superman Works;

6   and

7           c.   Initiating this action in violation of the Covenant Not To Sue.

8       101.   As a direct and foreseeable result of the contractual breaches on the

9   part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been

10  damaged in an amount to be proven at trial.

11          **FOURTH ALTERNATIVE COUNTERCLAIM FOR**

12       **DECLARATORY RELIEF REGARDING THE AGREEMENT**

13      102.   DC Comics repeats and realleges paragraphs 1 - 101 above as if fully

14  set forth herein.

15      103.   An actual controversy now exists between DC Comics and

16  Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is

17  binding and enforceable and, therefore, that:

18          a.   Plaintiffs/Counterclaim Defendants either have transferred or

19  are contractually obligated to transfer to DC Comics, worldwide and in perpetuity,

20  any and all rights, title, and interest, including all United States copyrights, which

21  they may have in the Superman Works;

22          b.   If for any reason Plaintiffs/Counterclaim Defendants are

23  adjudged not to have transferred or not to be contractually obligated to transfer to

24  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

25  United States copyrights, which they may have in the Superman Works, then the

26  remaining terms of the Agreement are valid and enforceable and

27  Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 73 of 321

1  past, present, or future exploitation of the Superman Works by or upon license from

2  DC Comics other than pursuant to the Financial Terms; and

3              c.      If for any reason Plaintiffs/Counterclaim Defendants are

4  adjudged not to have transferred or not to be contractually obligated to transfer to

5  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

6  United States copyrights, which they may have in the Superman Works, then

7  Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

8  otherwise exploit the Superman Works in any manner.

9        104.   DC Comics is informed and believes, and on that basis alleges, that

10  Plaintiffs/Counterclaim Defendants dispute these contentions.

11        105.   DC Comics seeks a judicial determination of the parties' respective

12  rights and obligations, which is necessary and appropriate to allow them to

13  properly govern their future conduct.

14            **FIFTH ALTERNATIVE COUNTERCLAIM FOR**

15      **DECLARATION OF LIMITATIONS ON THE SCOPE OF THE**

16        **SUPERMAN NOTICES AND THE SUPERBOY NOTICE**

17        106.   DC Comics repeats and realleges paragraphs 1 - 65 above as if fully

18  set forth herein.

19        107.   In the event the Superman Notices and/or the Superboy Notice are

20  deemed effective and the settlement agreement between the parties is not enforced,

21  DC Comics asserts the following alternative counterclaim for a declaration limiting

22  the scope and reach of the Superman Notices and the Superboy Notice in six

23  separate and independent ways.

24        108.   DC Comics contends that:

25                  **#1  The Superman Ads**

26        109.   The regulations governing the contents of notices of termination

27  promulgated by the U.S. Copyright Office under authority of the 1976 Copyright

28  Act require, in relevant part, that a notice of termination served pursuant to section

ER 2944

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 74 of 321

1  304 (c) of the 1976 Copyright Act name "each work to which the notice of
2  termination applies."

3      110.    Upon information and belief, all of the Superman Ads first secured
4  copyright protection by publication with copyright notice prior to April 16, 1938
5  and prior to publication of Action Comics No. 1.

6      111.    The Superman Ads contain and show the appearance of Superman,
7  his costume, and his super-strength.

8      112.    The grants made by Siegel and Shuster as to the appearance of
9  Superman, his costume, and his super-strength, are still in effect, and all rights
10 under copyright granted therein are still owned exclusively by DC Comics,
11 because the Superman Notices served by the Siegels do not list the works in which
12 the Superman Ads were first published.

13      113.    Thus, DC Comics is the exclusive owner of all copyright in and to the
14 Superman Ads and thereby retains exclusive ownership of copyright in the
15 appearance of Superman therein, including but not limited to, the appearance of the
16 Superman costume.

17          **#2  Use Of Superman And Superboy Derivative Works**
18          **Prepared Prior To The Purported Effective Dates Of The**
19              **Superman Notices And The Superboy Notice**

20      114.    The Superman Notices purport to terminate the Siegels' share in the
21 copyright grant of Jerome Siegel in all Superman-related works thereafter derived
22 from Action Comics No. 1, including but not limited to the more than 15,000
23 Superman related works (in addition to Action Comics No. 1) listed in the
24 Superman Notices (the "Superman Derivative Works").  Included among the
25 Superman Derivative Works is the image of the "S in Shield Device" that has
26 become a strong trademark of Superman and his single source, DC Comics.
27
28

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 75 of 321

115. The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

116. The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117. Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118. All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics. DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119. The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements"). These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No. 1 but only appeared later in the Post Action Comics No. 1 Works.

120. Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 76 of 321

1   Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.

2   Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

3                   **#4  Superboy Is A Derivative Work Based On Superman**

4         121.    In the November 1938, Letter suggesting the idea for a Superboy

5   comic strip, Siegel stated such comic "would relate to the adventures of Superman

6   as a youth." In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many

7   faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in

8   demanding the adventures of Clark Kent as a youth . . .And so here he is at

9   last…the answer to your requests…America's outstanding boy hero:

10  SUPERBOY!"

11        122.    As demonstrated by the foregoing, the Siegel Superboy Proposals

12  were based upon the pre-existing Superman character and stories and are thus

13  derivative works based thereon, and were not made at the instigation of Siegel.

14        123.    Thus, even if the Superboy Notice were effective, any recapture of

15  copyright rights would be limited to any new copyrightable subject matter added

16  by Siegel and Shuster to the pre-existing Superman character and stories

17  exclusively owned by DC Comics and its predecessors.

18        124.    The new copyrightable subject matter contained in the Siegel

19  Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture

20  U.S. Copyrights therein, such recapture could not affect DC Comics' continuing

21  right to create and exploit new derivative works that do not include such new

22  copyrightable subject matter, including but not limited to, the television series

23  "Smallville."

24            **#5  The Derivative Work Superboy Is A Joint Work Of Authorship**

25        125.    Upon information and belief, the Siegel Superboy Proposals were

26  joint works of authorship as they were prepared jointly with Shuster and because it

27  was intended that their contents would be merged with artwork to create a comic

28  book or comic strip.

314270v1 02231.0811            FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 77 of 321

1      126.   As eventually published, the works containing the Superboy character

2  included both artwork and storyline.

3      127.   The joint author's share in the Siegel Superboy Proposals is owned

4  by DC Comics and cannot be terminated either by the Superman Notices or the

5  Superboy Notice.

6      128.   As a result of the foregoing, DC Comics right to continue to exploit

7  the Siegel Superboy Proposals and any derivative works based thereon cannot be

8  affected by either the Superman Notices or the Superboy Notice.

9              **#6 "Smallville" Is Not Derived From Superboy**

10      129.   Among the derivative works based upon Superman and authorized by

11  DC Comics is the weekly television series, "Smallville."

12      130.   Regardless of whether the Superboy Notice is effective and further

13  regardless of whether Superboy is a derivative work based upon Superman,

14  "Smallville" was derived from and based upon Superman and is not a derivative

15  work based upon the Siegel Superboy Proposals or any succeeding Superboy

16  comic or Superboy work exploited by DC Comics and/or its predecessors prior to

17  May 21, 1948. Beyond sharing the idea of depicting Superman as a youth,

18  Smallville is not substantially similar to the Siegel Superboy Works.

19      131.   Thus, irrespective of any accounting issues relating to the Siegels'

20  purported right to receive compensation with respect to new episodes of

21  "Smallville," DC Comics' right to continue to authorize production, distribution,

22  and airing of "Smallville" television episodes remains unaffected by the Superman

23  Notices and the Superboy Notice.

24              **#7 The Additional Action Comics No. 1 Materials**

25      132.   The Additional Action Comics No. 1 Materials created in 1938 were

26  prepared at the instance and expense of DCI and subject to its right to control.

27  Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 78 of 321

1   Materials were "works made for hire" and copyright therein was owned by DCI *ab*
2   *initio.*

3       133.    Because the Additional Action Comics No. 1 Materials were works
4   made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to
5   17 U.S.C. § 304 (c).  As a result, DC Comics remains the sole owner of the
6   Additional Action Comics No. 1 Materials.

7       134.    On information and belief, plaintiffs deny DC Comics' contentions
8   and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above.
9   Accordingly, an actual controversy has arisen and now exists between
10  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

11      135.    A justiciable controversy exists concerning the above issues and a
12  judicial declaration is necessary and appropriate to determine the parties'
13  respective rights with regard thereto.

14              **SIXTH ALTERNATIVE COUNTERCLAIM FOR**
15              **DECLARATION REGARDING THE PRINCIPLES**
16                 **TO BE APPLIED IN AN ACCOUNTING**

17      136.    DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135
18  above as if fully set forth herein.

19      137.    DC Comics contends that in the event the Superman Notices and/or
20  the Superboy Notice were deemed valid and effective, any accounting to which the
21  Siegels would be entitled relating to Superman (including its derivative work
22  Superboy, collectively for this Counterclaim "Superman") would be subject to the
23  following limitations and reductions:

24          a.  The Siegels would not be entitled to any revenues derived from
25              exploitation of Superman outside of the United States because
26              termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of
27              non-United States copyrights.  17 U.S.C. § 304 (c) (6) (E).

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 79 of 321

b. The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

c. Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d. Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present in the Superman works subject to accounting.

e. Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f. The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights. As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

g. Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect

35

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 80 of 321

1    expenses, taxes, and DC Comics' independent role as a publisher of
2    Superman.

3    h. Subject to all reductions aforesaid and otherwise determined by the
4       Court to be applicable, the Siegels would be entitled to an accounting
5       of only one-half of the copyright co-owner's profits.

6    138.  On information and belief, plaintiffs deny DC Comics' contentions
7  and/or the legal effect ascribed thereto as set forth above.  Accordingly, an actual
8  controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants
9  and DC Comics as to the above issues.

10   139.  A justiciable controversy exists concerning the above issues and a
11 judicial declaration is necessary and appropriate to determine the parties'
12 respective rights with regard thereto.

13   WHEREFORE, DC Comics demands judgment as follows:

14   1.    Declaring that the Superman Notices and the Superboy Notice are
15 ineffective for one or more of the reasons set forth in DC Comics' First
16 Counterclaim;

17   2.    In the event that the Superman Notices and/or the Superboy Notice
18 are deemed effective, for damages according to proof at trial on DC Comics' Third
19 Alternative Counterclaim;

20   3.    In the event that the Superman Notices and/or the Superboy Notice
21 are deemed effective, declaring on DC Comics' Fourth Alternative Counterclaim
22 that, pursuant to the Agreement:

23       a.    Plaintiffs/Counterclaim Defendants have transferred or are
24 contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any
25 and all rights, title, and interest, including all United States copyrights, which they
26 may have in the Superman Works;

27       b.    In the event that Plaintiffs/Counterclaim Defendants are
28 adjudged not to have transferred or not to be contractually obligated to transfer to

---

36

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 81 of 321

1  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all
2  United States copyrights, which they may have in the Superman Works, then the
3  remaining terms of the Agreement are valid and enforceable and
4  Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any
5  past, present, or future exploitation of the Superman Works by or upon license from
6  DC Comics other than pursuant to the Financial Terms; and

7          c.      In the event that Plaintiffs/Counterclaim Defendants are
8  adjudged not to have transferred or not to be contractually obligated to transfer to
9  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all
10 United States copyrights, which they may have in the Superman Works, then
11 Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or
12 otherwise exploit the Superman Works in any manner;

13     4.      In the event that the Superman Notices and/or the Superboy Notice
14 are deemed effective, and DC Comics is not granted the relief sought on its Fourth
15 Alternative Counterclaim, declaring that the scope and effect of the Superman
16 Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth
17 Alternative Counterclaim;

18     5.      In the event that the Superman Notices and/or the Superboy Notice
19 are deemed effective, and DC Comics is not granted the relief sought on its Fourth
20 Alternative Counterclaim, declaring that any accounting to which
21 Plaintiffs/Counterclaim Defendants may be entitled will be limited by all
22 applicable principles, including but not limited to, those set forth in DC Comics'
23 Sixth Alternative Counterclaim;

24     6.      Awarding DC Comics its costs and reasonably attorneys' fees
25 incurred in connection with DC Comics' defenses and claims herein seeking
26 declarations with respect to copyright ownership; and

27

28

314270v1 02231.0811     FIRST AMENDED COUNTERCLAIMS

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 82 of 321

1  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all
2  United States copyrights, which they may have in the Superman Works, then the
3  remaining terms of the Agreement are valid and enforceable and
4  Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any
5  past, present, or future exploitation of the Superman Works by or upon license from
6  DC Comics other than pursuant to the Financial Terms; and

7         c.    In the event that Plaintiffs/Counterclaim Defendants are
8  adjudged not to have transferred or not to be contractually obligated to transfer to
9  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all
10  United States copyrights, which they may have in the Superman Works, then
11  Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or
12  otherwise exploit the Superman Works in any manner;

13      4.    In the event that the Superman Notices and/or the Superboy Notice
14  are deemed effective, and DC Comics is not granted the relief sought on its Fourth
15  Alternative Counterclaim, declaring that the scope and effect of the Superman
16  Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth
17  Alternative Counterclaim;

18      5.    In the event that the Superman Notices and/or the Superboy Notice
19  are deemed effective, and DC Comics is not granted the relief sought on its Fourth
20  Alternative Counterclaim, declaring that any accounting to which
21  Plaintiffs/Counterclaim Defendants may be entitled will be limited by all
22  applicable principles, including but not limited to, those set forth in DC Comics'
23  Sixth Alternative Counterclaim;.

24      6.    Awarding DC Comics its costs and reasonably attorneys' fees
25  incurred in connection with DC Comics' defenses and claims herein seeking
26  declarations with respect to copyright ownership; and

27

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 83 of 321

1       7.     Awarding DC Comics such other and further relief as may be just.

2

3  DATED:    October 14, 2005

4                             FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                  Roger L. Zissu

5                             James D. Weinberger

6                                   -and-

7                             WEISSMANN WOLFF BERGMAN
                             COLEMAN GRODIN & EVALL LLC

8                             Michael Bergman
                             David L. Burg

9                             Adam Hagen

10                                 -and-

11                             PERKINS LAW OFFICE, P.C.
                             Patrick T. Perkins

12

13                             By:_____

14                               David L. Burg

15                         Attorneys for Defendants Warner Bros.

16                         Entertainment Inc. and Time Warner Inc., and
                         Defendant and Counterclaimant DC Comics

17

18

19

20

21

22

23

24

25

26

27

28

314270v1  02231.0811           FIRST AMENDED COUNTERCLAIMS          343

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 84 of 321

1

2           PROOF OF SERVICE
              1013A(3) C.C.P. Revised 5/1/88
3     STATE OF CALIFORNIA            )
                                     ) ss.
4     COUNTY OF LOS ANGELES          )

5           I am employed in the County of Los Angeles, State of California; I am over the age of 18
6     and not a party to the within action; my business address is 9665 Wilshire Blvd, Suite 900,
      Beverly Hills, CA 90212.  On the date shown below, I served the foregoing document described
7     as **FIRST AMENDED COUNTERCLAIMS** on the interested parties in said action9, by
      placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

8

9     Marc Toberoff
      Law Offices of Marc Toberoff, PLC
10    1999 Avenue of the Stars, Suite 1540
      Los Angeles, CA 90067
11

12    __XX__    **(BY MAIL)**  I am "readily familiar" with the firm's practice of collection and processing
                correspondence for mailing.  Under that practice it would be deposited with the U.S. postal
13              service on that same day with postage thereon fully prepaid at Beverly Hills, California.  I
                am aware that on motion of the party served, service is presumed invalid if postal
14              cancellation date or postage meter date is more than one day after date of deposit for
15              mailing in affidavit.

16    __        **(FACSIMILE SERVICE)**  I caused such document to be transmitted via facsimile to the
                offices of the addressees at the numbers listed above.
17

18    __        **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the
                offices of the addressee(s) via Federal Express, next business day delivery service.
19

20              Executed on **October 17, 2005**, at Beverly Hills, California.

21    __        **STATE**     I declare under penalty of perjury under the laws of the State of California
                that the foregoing is true and correct.
22

23    __XX__    **FEDERAL**     I declare that I am employed in the office of a member of the bar of this
                court at whose direction the service was made.

24

25                            _____
                              Adrienne Crayton-Sarpy
26

27

28

                                                                           344

                                                                    **ER 2955**

# EXHIBIT S

Service: Get by LEXSEE®
Citation: 364 F. Supp. 1032

*364 F. Supp. 1032, *; 1973 U.S. Dist. LEXIS 11458, **;*
*180 U.S.P.Q. (BNA) 575*

Jerome SIEGEL and Joseph Shuster, Plaintiffs, v. NATIONAL PERIODICAL PUBLICATIONS, INC., et al., Defendants

No. 69 Civ. 1429

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

364 F. Supp. 1032; 1973 U.S. Dist. LEXIS 11458; 180 U.S.P.Q. (BNA) 575

October 18, 1973

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs sought a declaration that plaintiffs, and not defendants, were entitled to the copyright renewal rights of a renowned comic strip. Defendants filed a motion to dismiss plaintiffs' complaint and sought a declaration that defendants were entitled to the copyright renewals.

**OVERVIEW:** Plaintiffs, creators of a comic strip, alleged that plaintiffs, and not defendants, were entitled to the copyright renewal rights in the comic strip. Defendants contended that the renewal rights belonged to defendants. Plaintiffs had previously brought an action against defendants' successor for a declaration of the rights in the comic strip. Defendants sought a motion for summary judgment to dismiss plaintiffs' complaint because the comic strip was a work for hire and the agreements between the parties divested plaintiffs of the renewal copyrights. Plaintiffs' action for declaration of rights was barred by res judicata. The court held that the agreements between the parties confirmed that defendants owned the renewal copyrights as a matter of law. The court dismissed plaintiffs' complaint.

**OUTCOME:** The court granted defendants' motion for summary judgment to dismiss plaintiffs' complaint and held that on the material facts, and because plaintiffs were precluded from relitigating matters, defendants owned the renewal copyrights in the comic strip as a matter of law.

**CORE TERMS:** strip, renewal, comic strip, annexed, hire, magazine, comic, statue, employment agreement, consent judgment, renewal term, newspaper, transferred, cartoon, conclusions of law, summary judgment, reproduction, syndication, suitable, creator, stipulation of settlement, employment relationship, extrinsic evidence, clay model, exclusive right, declaration, continuity, binding, artist, Copyright Act

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Copyright Law > Subject Matter > General Overview ⬑

Copyright Law > Ownership Interests > Works Made for Hire ⬑

*HN1* ⬇ The elements of an employment for hire include the existence of an arrangement going beyond an assignor, assignee relationship, the payment of wages or other

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 86 of 321



remuneration, the right of the employer to direct and supervise the manner in which the work is performed, and the existence of an express contract for hire, especially one calling for an author to devote his exclusive artistic services to his employer. <u>More Like This Headnote</u>

**JUDGES:** [**1]

Lasker, District Judge.

**OPINIONBY:** LASKER

**OPINION:** [*1033]  LASKER, District Judge.

Although Clark Kent, generally known as Superman, is happily capable of solving all problems without going to court, his creators and exploiters, mere mortals like the rest of us, are not so fortunate. Jerome Siegel and Joseph Shuster are Superman's creators. They seek a declaration that they, and not the defendant National (the other defendants are National's officers) are entitled to the copyright renewal rights of the renowned comic strip. National counterclaims for a declaration in its favor. It is stipulated that both plaintiffs and defendants have made timely renewal filings with the Register of Copyright. The matter comes before us on defendants' motion for summary judgment dismissing the complaint and declaring National to be the owner of the copyright of all Superman strips during the renewal term. We find, on the material facts as to which there is no genuine issue, that National is the owner of the copyright renewal term and grant the motion.

I.

This is not the first time the parties have locked horns in a contest as to rights to Superman. As indicated below, plaintiffs instituted an action [**2] on the subject against National in 1947 in the New York Supreme Court for the County of Westchester. The court made voluminous findings of fact and conclusions of law. Although the issue of renewal rights was not specified in that litigation, we hold that, on the facts found by the court, which are binding on the parties here, National is the owner of *all* rights in Superman. The facts, as we now describe them, are those found by the State Court, n1 as supplemented by correspondence between the parties marked at a deposition in this action, and, where appropriate, references are made to those findings.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The plaintiffs' 9(g) statement submitted on this motion "disputes" certain findings of fact made by the State court and the interpretation of some of those findings as set forth in defendants' 9(g) statement. The principles of collateral estoppel and *res judicata* bar plaintiffs' "dispute" of any finding by the State court. As to the question of interpretation of the findings, we disagree with plaintiffs' view and agree with defendants.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [**3]

II.

In 1933, Siegel conceived the idea of a cartoon strip, whose feature character was a man of superhuman strength who would perform great feats for the public good. Siegel discussed his idea with Shuster, an artist, and together they prepared a comic strip embodying the idea. They did not publish the strip but continued to collaborate on other cartoon strips, some of

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 87 of 321



which they sold for publication between 1933 and 1938.

[*1034] One of their customers during that period was the Nicholson Publishing Co., which purchased material from plaintiffs on behalf of Detective Comics, Inc. (National's predecessor in interest). When, in late 1937, Nicholson went out of business, Detective acquired some of its magazine properties.

On December 4, 1937 Detective entered into a written employment contract with plaintiffs (Exhibit B, annexed to Answer) relating to two features known as "Slam Bradley" and "The Spy" which plaintiffs had been furnishing to Nicholson. This contract provided that the plaintiffs would give their exclusive services as artists in producing "Slam Bradley" and "The Spy" for a period of two years and that "all of these products and work done by said Employee for said [**4] Employer during said period of employment, shall be and become the sole and exclusive property of the Employer". The agreement also provided that any new or additional features were to be submitted first to Detective who was given an option on them.

When, in 1938, Detective decided to issue a new comic magazine, to be named Action Comics, it reviewed the Superman material which plaintiffs had prepared in 1933, and requested them to revise and expand it to a full length production suitable for magazines. Plaintiffs submitted the expanded material in February, 1938. On March 1, 1938, prior to the first printing of the first issue of Action Comics, Detective sent Siegel a proposed release (Exhibit A, annexed to Answer). The release, which plaintiffs executed, transferred to Detective the first thirteen page Superman strip, "all good will attached thereto and *exclusive right* to the use of the characters and story, continuity and title of strip . . . to have and hold *forever* and to be your *exclusive* property . . ." (emphasis supplied).

On April 18, 1938, Detective published the Superman strip prepared by plaintiffs in the first issue of Action Comics. After the initial publication, [**5] plaintiffs continued to supply Detective with Superman strips for publication. On September 22, 1938, Detective, plaintiffs, and McClure Newspaper Syndicate executed agreements for the newspaper syndication of Superman and other strips. Plaintiffs and Detective simultaneously executed a new long-term employment agreement which stated that Detective was "exclusive owner" of Superman and of the "right to publish" Superman comics. (Findings of Fact 44-46, Exhibit D, annexed to Answer).

As Superman became increasingly popular, certain changes occurred in the relationship between plaintiffs and Detective. Plaintiffs ceased work on other cartoon features to concentrate on the Superman strip. With this change, plaintiffs and Detective executed a supplemental employment agreement on December 19, 1939, increasing plaintiffs' compensation and reiterating that Detective was the "sole and exclusive owner" of Superman, of "all rights of reproduction and of *all copyright and all rights to secure copyright registration* in respect of all such forms of reproduction . . ." (Opinion of Judge Young in the Westchester action, Exhibit C, annexed to Answer, emphasis added).

The 1939 agreement was [**6] the last written agreement between the parties until 1947. During the intervening years plaintiffs' compensation increased to $1,000. per release plus royalties from newspaper syndication and other forms of commercial exploitation. By 1947, plaintiffs' total compensation from all sources for the strip amounted to over $400,000.

III.

In 1947, plaintiffs brought the action we have described against National, Detective's successor, and several of its officers, seeking, among other things, a determination that the March 1, 1938 release was void, and a declaration of the rights of the parties.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 88 of 321



The Westchester action was tried before Official Referee J. Addison Young who rendered a detailed opinion on November **[*1035]** 1, 1947, finding the March 1, 1931 release valid and holding that National, not plaintiffs, owned all rights to Superman. On April 12, 1948, Judge Young signed Findings of Fact and Conclusions of Law. His Conclusions of Law included the following:

> "1. By virtue of the instrument of March 1, 1938, plaintiffs transferred to DETECTIVE COMICS, INC. *all* of their rights in and to the comic strip SUPERMAN including the title, names, characters and concept as same **[**7]** were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine 'Action Comics' and by virtue of said instrument DETECTIVE COMICS, INC. became the *absolute* owner of the comic strip SUPERMAN, including the title, names, characters and concept as the same were set forth in the said first release." (Exhibit D, annexed to Answer, emphasis added)

This conclusion was incorporated almost *verbatim* in an interlocutory judgment signed on April 12, 1948, from which neither side perfected an appeal. Instead, the parties began settlement negotiations, and, on May 19, 1948, signed a stipulation under which National was to pay (and subsequently did pay) some $94,000. in exchange for all rights to Superman and to "Superboy," another cartoon strip created by plaintiffs whose ownership was contested. The stipulation (Exhibit F, annexed to Answer) recited the first conclusion of law just quoted and further stated that:

> "7. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the *sole and exclusive* owner of and has the sole and exclusive right to the use of the title SUPERMAN and to the conception, idea, continuity, pictorial representation **[**8]** and formula of the cartoon feature SUPERMAN as heretofore portrayed and published . . . *and such sole and exclusive ownership includes, but is not limited to* the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentations, television, motion picture reproduction and all other forms of reproduction and presentation, whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights." (Emphasis added).

On May 21, 1948, Judge Young signed a final consent judgment incorporating this provision and stating:

> "ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from creating, publishing, selling or distributing or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERMAN, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERMAN **[**9]** or any title imitative of the title SUPERMAN or which shall contain as part thereof the word 'SUPER'." (Exhibit G, annexed to Answer).

IV.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 89 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 90 of 321

Defendants move for summary judgment on two grounds: first, that the initial Superman strip was a "work for hire" within the meaning of the Copyright Act and second, that the various agreements between the parties, as well as the consent judgment in the Westchester action divested plaintiffs of the renewal copyrights. Before we discuss these contentions, we note that the findings of the State Supreme Court in the Westchester action are binding upon us here. Vernitron Corp. v. Benjamin, 440 F.2d 105, 108 (2d Cir. 1971). The terms of the stipulation of settlement in that action, and the consent judgment are also binding. Stuyvesant Insurance Co. v. Dean Construction Co., 254 F. Supp. 102, 110 (S.D.N.Y.1966), aff'd on opinion below, 382 F.2d 991 (2d Cir. [*1036] 1967). Furthermore, the issues which plaintiffs want to litigate in this action could have been raised in the Westchester action, and consequently are barred by res judicata as well, so that summary judgment must be entered on this ground in addition to those we are about to discuss. [**10]

We find that Superman is a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26. In Picture Music, Inc. v. Bourne, 314 F. Supp. 640, 650-651 (S.D.N.Y.1970), Judge Pollack ably described HN1↑the elements of an employment for hire: "The existence of an arrangement going beyond an assignor -- assignee relationship," the payment of wages or other remuneration, the "right of the employer to direct and supervise the manner in which the work is performed," and the "existence of an express contract for hire, especially one calling for an author to devote his exclusive artistic services to his employer." These elements were indisputably present in the relationship between plaintiffs and Detective. The Westchester Court found that on December 4, 1937, plaintiffs entered into a written contract of employment with Detective with reference to two comic features known as "Slam Bradley" and "The Spy" (Finding of Fact 15) which provided that plaintiffs would "give their exclusive services as artists" in producing these features and that "any new and additional features which Employees produce for use in a comic magazine are to be first submitted to Employer, who reserves the right [**11] to accept or reject same within a period of Sixty days" (Finding of Fact 15).

The Westchester court also found as a fact that after examining the 1933 Superman material, Detective "returned it to plaintiffs for revision and expansion into a full-length thirteen page comic strip release suitable for magazine publication" and that plaintiffs complied with Detective's requests (Findings of Fact 21, 22). The court further found that the release executed by plaintiffs on March 1, 1938, represented the exercise by Detective of the option granted to it by the employment agreement of December 4, 1937 (Finding of Fact 29). These findings, particularly when viewed in conjunction with the correspondence between the parties during 1937-38, establish that Detective as employer supervised and directed the work of plaintiffs in connection with Superman.

Even if the relationship between Detective and plaintiffs was not a classic employment relationship, the Second Circuit's decision on appeal in Picture Music, Inc. v. Bourne, 457 F.2d 1213, 1216-1217 (2d Cir. 1972), requires a finding that Superman was a "work for hire." There the court, in holding that the work of an independent contractor was [**12] a work for hire if it was done "at the instance" of one who commissioned the work, observed that "The purpose of the statute is not to be frustrated by conceptualistic formulations of the employment relationship."

There can be no doubt that the plaintiffs' revisions of the 1933 Superman strip in 1938 were done at the instance of Detective.

Plaintiffs contend, however, that notwithstanding the employment relationship, Superman was a fully developed work by 1933 so that, as a matter of law it cannot be a "work for hire". The authority cited for this proposition, Scherr v. Universal Match Corp., 417 F.2d 497 (2d Cir. 1969) actually militates against plaintiffs' position. That case dealt with the copyright status of a statue in an Army post, which the plaintiffs, two enlisted men, had constructed pursuant to an Army work assignment. The assignment grew out of a clay model of the

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 91 of 321

statue created by the two men during their leisure time. In deciding that the larger statue was a work made for hire, the court said:

> "While the idea for the statue originated from the smaller clay model, the statue differs from the model. Moreover, plaintiffs never attempted to secure a copyright for their **[\*\*13]** original clay model. Their claim of infringement **[\*1037]** rests solely upon whether they possess an effective copyright in the finished statue." ( _Scherr, supra_, at 499).

The court's reasoning in _Scherr_ is controlling here. The court in the Westchester action explicitly found that the original (1933) embodiment of the Superman concept consisted of "a few panels suitable for newspaper syndication" (Finding of Fact 19), and that the strip was suitable for magazine publication only after plaintiffs "resubmitted such revised and expanded material" to Detective (Findings of Fact 21, 22). Moreover, the Westchester court found that the Action Comics strip of 1938, rather than the 1933 newspaper strip, "constituted the formula for the continuing SUPERMAN series to come" (Finding of Fact 22). Res judicata bars plaintiffs from relitigating this issue.

V.

Defendants also argue that the various agreements between the parties, as well as the stipulation of settlement and the consent judgment in the Westchester action transferred the renewal copyrights to Detective. Concededly, none of the agreements between the parties, or the findings in the Westchester action expressly refer **[\*\*14]** to the transfer of the renewal rights. Therefore, the intent of the parties must be established from the language of the agreements and the attendant circumstances.

We believe that the various agreements between the parties consistently reiterated an intention to give to Detective all of the rights in Superman, with no reservation of any kind in plaintiffs. The 1937 employment agreement stated that all work on these features "shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creater thereof . . .," and gave Detective an option on "any new or additional features" created by plaintiffs.

The Westchester court found that the March, 1938 release represented an exercise of that option for the Superman strip. The release transferred "such work and strip, all good will attached thereto and exclusive right to the use of the characters and the story, continuity and title of [the] strip . . . to [Detective] and [its] assigns to have and to hold forever and to be your exclusive property." It also stated that "The intent hereof is to give you exclusive right to use and acknowledge that you own said characters or story and the **[\*\*15]** use thereof exclusively."

The supplemental employment agreement of September 22, 1938 "expressly confirmed that DETECTIVE COMICS, INC. was the exclusive owner of the comic strip known as SUPERMAN . . ." and the consent judgment permanently enjoined plaintiffs from using or furnishing the product to any other person or publication (Finding of Fact 45).

The Westchester court's conclusions of law in the 1947 action stated that by the March 1, 1938 instrument plaintiffs transferred "all their rights in and to the comic strip 'SUPERMAN'" and that Detective became the "absolute owner" of the strip (Conclusions of Law #1, Exhibit D, annexed to Answer).



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 92 of 321

The language of the interlocutory judgment in that action, as well as the language of the final judgment and the stipulation of settlement is similarly unequivocal. By the stipulation, Paragraph 10, plaintiffs further acknowledged defendants' "absolute right to license, sell, transfer or otherwise dispose of said rights" (Exhibit F, annexed to Answer).

In the face of this repeatedly unequivocal language, plaintiffs cite several authorities for the proposition that general language of assignment does not convey the renewal copyright unless [**16] the intention to convey it appears by unambiguous extrinsic evidence. Venus Music Corp. v. Mills Music, Inc., 261 F.2d 577 (2d Cir. 1958); Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518 (2d Cir. 1958) cert. denied, 358 U.S. 831, 79 S. Ct. 51, 3 L. Ed. 2d 69 (1958). While we [*1038] agree with this argument as a general proposition, these cases are not controlling here. In both *Venus* and *Marks*, the creator of the property executed general assignments of the property to one party with no mention of renewal rights, and subsequently executed specific assignments of the renewal rights to another party. The trial courts in both cases had to decide which of these ostensibly inconsistent instruments conveyed the renewal, and consequently looked to extrinsic evidence to establish the intent of the earlier, general assignments. Neither case suggests, however, that extrinsic evidence is required where, as here, the disputed agreements are internally consistent.

We believe that Geisel v. Poynter Products, Inc., 295 F. Supp. 331, 341-342 (S.D.N.Y.1968) is more in point. In *Geisel*, the plaintiff argued that implicit in the language of general [**17] assignment was a trade custom to the effect that defendant would hold the copyright in trust for him. It was undisputed there that defendant owned the renewal term, plaintiff contending that certain other rights were reserved to him. In confirming the assignment, the court said:

> "In ordinary acceptance, the expressions 'all rights' or 'complete rights' have a non-technical and literal meaning. Plaintiff has failed to sustain the burden of proof which is upon him when he seeks to impart to these words a connotation that is diametrically opposite to their plain, colloquial sense . . . The terms . . . when understood according to their plain meaning, signify a totality of rights . . . ( *Geisel, supra,* at pp. 341-342.)

Plaintiffs also assert that the renewal term exists to give the creator a second chance to exploit a property whose marketability was uncertain at the time it was created. They point out that Detective was staffed by thoroughly experienced businessmen who surely would have explicitly referred to the renewal term in the various agreements between the parties had it actually been bargained for.

But these arguments prove too much. Plaintiffs certainly knew by 1947, [**18] if not before, that Superman was an extraordinarily marketable man, as well as one of unusual powers. Both parties were represented by distinguished counsel in the 1947 proceedings, which resulted in a stipulation worded in all-inclusive language. The fact that this language makes no specific reference to renewal rights militates as much as if not more strongly against plaintiffs than defendants, in whose favor all rights to Superman were confirmed on the face of the various agreements.

Since we find that plaintiffs are precluded from relitigating matters which could have been raised in the 1947 action, and since, on the material facts before us, Detective owns the



renewal copyrights as a matter of law, defendants' motion for summary judgment to dismiss the complaint is granted.

It is so ordered.

Service: **Get by LEXSEE®**
Citation: **364 F. Supp. 1032**
View: Full
Date/Time: Tuesday, February 14, 2006 - 9:45 PM EST

* Signal Legend:
● -  Warning: Negative treatment is indicated
Ⓠ -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 93 of 321

# EXHIBIT T


Service: **Get by LEXSEE®**
Citation: **508 F.2d 909**

*508 F.2d 909, \*; 1974 U.S. App. LEXIS 5777, \*\*;*
*184 U.S.P.Q. (BNA) 257*

JEROME SIEGEL and JOSEPH SHUSTER, Plaintiffs-Appellants, v. NATIONAL PERIODICAL
PUBLICATIONS, INC., JACOB S. LIEBOWITZ, IRWIN DONENFELD and PAUL H. SAMPLINER,
Defendants-Appellees

Docket No. 73-2844, No. 36 - September Term, 1974

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

508 F.2d 909; 1974 U.S. App. LEXIS 5777; 184 U.S.P.Q. (BNA) 257

November 7, 1974, Argued
December 5, 1974, Decided

**PRIOR HISTORY:** **[\*\*1]**

Appeal from an order of the United States District Court for the Southern District of New
York, Lasker, J., granting defendants' motion to dismiss the complaint which sought a
declaratory judgment regarding the ownership of copyright renewal rights.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs sought review of the United States District Court for
Southern District of New York summary judgment determining that defendants owned
copyright renewal rights of a comic strip that had been created by plaintiffs.

**OVERVIEW:** In a prior state action, plaintiffs entered into a stipulation of settlement, and
a final consent judgment was entered determining that defendants were exclusive owners
of a comic strip created by plaintiffs. Later, plaintiff sued defendants seeking a declaratory
judgment that they owned copyright renewal rights. The lower court granted summary
judgment to defendants. On appeal, the court affirmed. The state court determination that
defendants owned all rights to the strip without limitation was proper and binding in this
subsequent federal action. The judge's determination that the strip was work for hire
within the meaning of the Copyright Act, 17 U.S.C.S. § 26, was improper. The issue was
not litigated at all in state court. The strip was completely developed long before the
employment relationship between the parties commenced. The revisions directed by
defendants were not sufficient to create a presumption that the strip was work for hire.
Thus, the only ground of affirmance was a res judicata effect of the state court action.

**OUTCOME:** Summary judgment was affirmed because prior consent judgment in state
court had a res judicata effect.

**CORE TERMS:** strip, renewal, hire, comic strip, comic, magazine, cartoon, convey,
reproduction, transferred, continuity, judicata, conveyed, consent judgment, exclusive right,
res judicata, declaration, forever, Copyright Act, summary judgment, finding of fact,
relitigating, infantryman, binding, collateral estoppel, conclusions of law, conclusion of law,
absolute owner, referee, predecessor

 

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Preclusion & Effect of Judgments > Res Judicata 🔍

*HN1* ⬆ It is clear that a consent judgment does have res judicata effect. More Like This Headnote | *Shepardize:* Restrict By Headnote

Copyright Law > Duration & Renewal > General Overview 🔍

*HN2* ⬆ General words of assignment can include renewal rights if the parties had so intended. That intent is to be determined by the trier of the facts. More Like This Headnote | *Shepardize:* Restrict By Headnote

Copyright Law > Ownership Interests > Works Made for Hire 🔍

*HN3* ⬆ The work for hire doctrine is applicable only when the employee's work is produced at the instance and expense of the employer, or, in other words, when the motivating factor in producing the work was the employer who induced the creation. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** Gordon T. King, New York, New York (Coudert Brothers, New York, New York, Carleton G. Eldridge, Jr., of Counsel), for Plaintiffs-Appellants.

Michael D. Hess, New York, New York, (Weil, Gotshal & Manges, New York, New York, Edward C. Wallace, Heather G. Florence, of Counsel), for Defendants-Appellees.

Philip B. Wattenberg, New York, New York, for Amicus Curiae Music Publishers' Association of the United States, Inc.

Irwin Karp, New York, New York, for Amicus Curiae Authors League of America, Inc.

**JUDGES:** Kaufman, Chief Judge, Anderson and Mulligan, Circuit Judges.

**OPINIONBY:** MULLIGAN

**OPINION: [*910]** MULLIGAN, Circuit Judge:

This is an appeal from the granting of summary judgment dismissing the complaint upon the order of the Hon. Morris E. Lasker, filed on October 18, 1973. While the opinion below, 364 F. Supp. 1032 (S.D.N.Y. 1973), sets forth the facts **[*911]** in detail, it will be **[**2]** necessary to repeat some of the more salient factual background.

I

The issue presented is who has the copyright renewal rights in the famous "Superman" cartoon character. In 1933, plaintiff Jerome Siegel conceived the idea of Superman -- a person of unprecedented physical prowess dedicated to acts of derring-do in the public interest. In the same year, together with plaintiff Joseph Shuster, he created a Superman comic strip which consisted of several weeks' worth of material, some of which was completely "inked in" and ready for publication, and some of which consisted of mere black-and-white pencil drawings. The new strip was not published at this time, although plaintiffs continued to collaborate on other strips that were then in publication.

One of plaintiffs' customers for these other strips was Detective Comics, Inc. (Detective), the

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 96 of 321



predecessor in interest of the present defendant National Periodical Publications, Inc. (National). On December 4, 1937 Detective entered into a written employment contract with plaintiffs, whereby the latter would furnish two other strips exclusively to Detective for a period of two years. The plaintiffs further agreed "that all of these products **[\*\*3]** and work done by said Employee [plaintiffs] for said Employer [Detective] during said period of employment, shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creator thereof, the Employee acting entirely as the Employer's employee." The agreement also gave Detective the right of first refusal for any new strips the plaintiffs might produce.

In 1938, for the first time, plaintiffs submitted their 1933 Superman materials to Detective to be considered for use in a new magazine, Action Comics. Detective asked plaintiffs to revise and expand the materials into a full-length production suitable for magazine publication, and this was done.

Thereafter, and prior to the first appearance of Superman in Action Comics, Detective prepared a written release, dated 1 March 1938, which was executed by plaintiffs and accepted by Detective. This release sold and transferred to Detective "such work and strip [Superman], all good will attached thereto and exclusive rights to the use of the characters and story, continuity and title of strip contained therein, to you [Detective] and your assigns to have and hold forever and to be **[\*\*4]** your exclusive property. . . . The intent hereof is to give you exclusive right to use and acknowledge that you own said characters or story and the use thereof exclusively . . .."

On 19 December 1939, a supplemental employment agreement was entered into. It raised plaintiffs' compensation for the increasingly popular Superman strip, and in addition contained the following language:

> That we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled "SUPERMAN".. and to [sic] all rights of reproduction of all said comic strips and the titles and characters contained therein, and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication . . . and all other form of reproduction. We have all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction. . . .

No further written agreements between the parties were ever executed, although plaintiffs were paid compensation at ever-increasing rates. By 1947, plaintiffs' total compensation for the strip exceeded $400,000.

In that year plaintiffs instituted an action against **[\*\*5]** defendant National in the New York State Supreme Court, Westchester County, to annul the contracts between the parties for various reasons. The March 1938 agreement was specifically attacked as void for lack of mutuality and consideration. In addition, plaintiffs **[\*912]** asked for a declaration of the rights of the parties in the Superman character.

Referee J. Addison Young, in an opinion dated 21 November 1947, concluded that the March 1938 agreement was valid and that it transferred to Detective "*all* of plaintiffs' rights to Superman" (emphasis added). Shortly thereafter, on 12 April 1948, the referee signed findings of fact and conclusions of law. The first such conclusion stated:

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 97 of 321



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 98 of 321

1. By virtue of the instrument of March 1, 1938, plaintiffs transferred to DETECTIVE COMICS, INC. all of their rights in and to the comic strip SUPERMAN including the title, names, characters and concept . . . and by virtue of said instrument DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN . . ..

On 19 May 1948 the parties signed a stipulation which called for the payment of certain moneys by National to plaintiffs. In addition the stipulation repeated **[\*\*6]** the above quoted conclusion of law, and also stated that:

Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERMAN and to the conception, idea, continuity, pictorial representation and formula of the cartoon feature SUPERMAN as heretofore portrayed and published . . . and such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, [etc.] and all other forms of reproduction and presentation, whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights.

The final consent judgment filed by the referee on 21 May 1948 incorporated the above stipulation and further

DECLARED AND ADJUDGED that by virtue of the instrument of March 1, 1938, plaintiffs validly transferred to DETECTIVE COMICS, INC. . . . all of their rights in and to the comic strip SUPERMAN . . . and that by virtue of said instrument, said DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN . . . and it is further

DECLARED AND ADJUDGED **[\*\*7]** that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title . . . and . . cartoon feature SUPERMAN . . . and it is further

ORDERED AND ADJUDGED that plaintiffs . . . be and they hereby are enjoined and restrained from creating, publishing, selling or distributing . . . any material of the nature heretofore created, produced or published under the title SUPERMAN . ..

Plaintiffs now seek a declaration that they, and not defendant National, own the copyright renewal rights to the Superman strip. National counterclaims for a similar declaration in its



favor. It is stipulated that both parties made timely renewal filings with the Register of Copyright.

The court below granted defendants summary judgment dismissing the complaint, primarily for three reasons:

1) The 1947 Westchester action bars relitigation of questions concerning the rights of the parties in Superman, because of res judicata;

2) Superman was a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26 (Supp. 1974), and therefore the renewal rights are in the employer;

3) the various **[**8]** agreements between the parties consistently manifested an intention to give to Detective all of plaintiffs' rights in Superman, including the right of renewal of copyright, though it was never mentioned expressly in any of the agreements.

II

We are persuaded here that the court below properly decided that the state court judgment of May 21st, 1948 effectively estopped the plaintiffs from relitigating the issue of the ownership of **[*913]** the renewal copyright. n1 In the state action the present plaintiffs sought, *inter alia*, a declaratory judgment with respect to the rights of the parties in Superman. After a trial the official referee rendered an opinion as well as detailed findings of fact and conclusions of law. An interlocutory judgment was entered on April 12, 1948 and notices of appeal were filed by both parties. Settlement negotiations then ensued which resulted in a stipulation of settlement and the entry of a final consent judgment of May 21st, 1948. No appeals were taken, and no question has been raised as to the validity of the judgment. There is no doubt that the judgment of the state court is binding in this subsequent federal action. See Vernitron Corp. v. Benjamin, 440 F.2d 105, 108 **[**9]** (2d Cir.), cert. denied, 402 U.S. 987, 29 L. Ed. 2d 154, 91 S. Ct. 1664 (1971).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The parties on this appeal have used the terms "res judicata" and "collateral estoppel" interchangeably. The distinction depends upon whether or not the former judgment was rendered on the same cause of action (res judicata) or on a different cause of action (collateral estoppel). 1B J. Moore, Federal Practice para. 0.441[2] (2d ed. 1974); Restatement of Judgments § 68, comment a (1942). Since we hold that the state judgment action determined that the defendants owned all of the rights to the Superman strip without reservation, the doctrine of res judicata is properly applicable.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN1* It is equally clear that a consent judgment does have res judicata effect, Stuyvesant Insurance Co. v. Dean Construction Co., 254 F. Supp. 102, 110 (S.D.N.Y. 1966), aff'd sub nom. Stuyvesant Ins. Co. v. Kelly, 382 F.2d 991 (2d Cir. 1967); **[**10]** 1B J. Moore, *supra*, para. 0.409[5]; see United States v. Swift & Co., 286 U.S. 106, 115, 76 L. Ed. 999, 52 S. Ct. 460 (1932).

The only issue before us is whether the state judgment actually determined whether the copyright renewal rights to Superman were vested in the defendants here. While it is true that the term "renewal copyright rights" was not mentioned in the state court judgment, we are persuaded that the state court action finally determined that Detective, predecessor in interest to National, owned all rights to Superman without limitation.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 99 of 321


565, 567 (2d Cir. 1966), or, in other words, when the "'motivating factor in producing the work was the employer who induced the creation . . .,'" Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir.), cert. denied, 409 U.S. 997, 34 L. Ed. 2d 262, 93 S. Ct. 320 (1972). Superman had been spawned by the plaintiffs four years before the relationship between his authors and the defendants existed. We consider Scherr v. Universal Match Corp., 417 F.2d 497 (2d Cir. 1969), cert. denied, 397 U.S. 936, 25 L. Ed. 2d 116, 90 S. Ct. 945 (1970), cited below, to be distinguishable. In that case two servicemen had created a small clay model of an infantryman. Their Army superiors directed them thereafter to sculp a statute 25 feet high with a 12 foot figure of a charging infantryman; the court found this larger creation to differ from the model. The copyright was held to be the property of [**15] the United States under the work for hire doctrine. In the case before us Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the strip was a work for hire.

Accordingly, we affirm the dismissal of the complaint, but only on the ground that the 1947 state court action, in interpreting the agreements between the parties, precludes the plaintiffs from contesting ever again that all rights in Superman, including the renewal copyright, have passed forever to defendants.

Service: **Get by LEXSEE®**
Citation: **508 F.2d 909**
View: Full
Date/Time: Tuesday, February 14, 2006 - 9:44 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any Shepard's signal to Shepardize® that case.


About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 101 of 321

The injunction in the 1948 decree, which enjoined the plaintiffs from publishing Superman, is not limited to the copyright period or what remained thereof but is perpetual. The plaintiffs were represented by counsel in the state court and there is no limiting language in the judgment which would support the present contention that renewal rights were preserved. On the contrary, a reading of the judgment and the findings inescapably leads to the conclusion that the decree settled for once and for all that the defendants had all right and title to Superman for all time.

Appellants argue that the agreements did not **[\*\*11]** convey the renewal rights because, as a rule, a general transfer of an original copyright without mention of renewal rights does not convey the latter without proof of a contrary intention. Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518, 521 (2d Cir.), cert. denied, 358 U.S. 831, 3 L. Ed. 2d 69, 79 S. Ct. 51 (1958). The ready answer to this argument is that the state court action determined that the agreements conveyed *all* of the plaintiffs' rights in Superman to the defendants and not just the original copyright term. Under the doctrine of res judicata we are not free collaterally to re-examine the agreements to determine whether or not the construction placed upon them was warranted. Restatement of Judgments § 48, comment a; 1B Moore, *supra*, para. 0.405[1], at 629.

We also should point out that in Venus Music Corp. v. Mills Music, Inc., 261 F.2d 577 (2d Cir. 1958) this court held that *HN2*⊤general words of assignment can include renewal rights if the parties had so intended. Accord, cases cited in Annot. **[\*\*12]** , 2 A.L.R. 3d 1403, 1415-16 (1965). That intent is to be determined by the trier of the facts. Here the March 1938 agreement between the parties did not simply purport to convey a copyright; in fact, the term is not mentioned in that agreement. Rather, the sale of the Superman strip conveyed the "exclusive **[\*914]** right to the use of the characters and story, continuity and title of [the] strip . . . to you and your assigns *to have and hold forever*" (emphasis added). Moreover, the authors agreed not to "employ said characters or said story . . . or sell any like strip or story . . . *at any time hereafter* to any other person, firm or corporation . . . ." (emphasis added).

The state court was called upon to construe these instruments and the determination of that court that the plaintiffs intended to convey all their rights, including implicitly the renewal of the copyright, was, in our view, entirely proper. In any event, that decision is binding on us here.

III

The court below held that Superman was also a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26; since this conclusion was based upon the fact findings **[\*\*13]** of the state court, the court below further concluded that res judicata would bar the plaintiffs from relitigating the factual basis of the "work for hire" point. We disagree. While it is evident that the state court concluded as a matter of law that the plaintiffs conveyed all their rights in Superman to the defendants, there was no conclusion of law in the state court that the comic strip was a work for hire so as to create the presumption that the employer was the author. That issue was not litigated at all in the state court. On the contrary, that court's finding of fact no. 8 was that the plaintiffs were "the originators and authors of the cartoon character SUPERMAN and of the title SUPERMAN and first created cartoon material in which the said character and title first appeared in 1934. . . ." The court below instead relied upon finding of fact no. 22 in which the state court found that the plaintiffs did revise and expand the Superman material at the request of the defendants and that this revised material constituted the formula for the ensuing series of strips. We do not consider this tantamount to a conclusion that Superman was a work for hire. **[\*\*14]** *HN3*⊤That doctrine is applicable only when the employee's work is produced at the instance and expense of the employer, Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d

# EXHIBIT U

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 103 of 321



```
FILED
CLERK U S DISTRICT COURT

MAR 23 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY
```

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA



```
ENTERED
CLERK, U.S. DISTRICT COURT

MAR 24 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY
```

JOANNE SIEGEL & LAURA    )
SIEGEL LARSON,           )        CV 04-8776 R (RZx)
                         )
         Plaintiffs      )
                         )        ORDER
    v.                   )        GRANTING PLAINTIFFS'
                         )        MOTION FOR PARTIAL
                         )        SUMMARY JUDGMENT  &
TIME WARNER, INC.,       )        DENYING DEFENDANTS'
et al.,                  )        MOTION FOR SUMMARY
                         )        JUDGMENT
                         )
         Defendants.     )
                         )

```
DOCKETED ON CM

MAR 24 2006

BY                003
```



Plaintiffs Joanne Siegel and Laura Siegel Larson's

Motion for Partial Summary Judgment and Defendant Time

1

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 104 of 321

1  Warner, Inc.'s Motion for Summary Judgment came on regularly
2  for hearing on March 20, 2006.  This Court has considered
3  all of the papers and argument submitted on the matter and
4  **NOW FINDS AND RULES AS FOLLOWS:**

5

6      As a preliminary matter, this Court **GRANTS** Plaintiffs'
7  and Defendants' requests for Judicial Notice pursuant to
8  Fed. R. Evid. 201.

9

10     This copyright dispute arises out of facts stemming
11 back to 1938 and earlier, and including two previous cases
12 in 1947 and 1973.  Plaintiffs in this case are Joanne
13 Siegel, widow of Jerome Siegel,[1] and their daughter, Laura
14 Siegel Larson.  Jerome Siegel and Joseph Shuster are the
15 creators of Superman.  Jerome Siegel is the originator,
16 creator of Superboy with Joseph Shuster providing much of
17 the illustration.  Defendants in this case are Time Warner
18 Inc., the parent company of DC Comics ("Defendants").  DC
19 Comics predecessor in interest was National Comics
20 Publications, Inc. ("National") and its predecessor in
21 interest was Detective Comics ("Detective").

22

23     In 1947, Jerome Siegel and Joseph Shuster sued National
24 in the New York Supreme Court for the County of Westchester
25 _____
26     [1] Jerome Siegel passed away on January 28, 1996.

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 105 of 321

1  ("the state court action") seeking a determination that
2  their March 1, 1938 contract was void.  Additionally, the
3  state court action sought to determine who owned the rights
4  to Superman and to Superboy.

5

6      On November 1, 1947 Judge Addison Young, the official
7  referee in the state court action, rendered a detailed
8  interlocutory judgment.  Then on April 12, 1948, Judge Young
9  signed a detailed findings of fact and conclusions of law.
10 He found that Jerome Siegel was the originator and sole
11 owner of the comic strip feature Superboy with the sole and
12 exclusive right to create, sell, and distribute the comic
13 strip under the title Superboy.

14

15     On May 19, 1948 the parties entered into a stipulation
16 to settle and on May 21, 1948, the Court entered a consent
17 judgment, vacating in all respects the interlocutory
18 judgment. The stipulation provided for a payment of
19 approximately $94,000.00 by National in exchange for
20 ownership in both Superman and Superboy.

21

22     In 1973, Siegel and Shuster again sued National in the
23 Southern District of New York seeking declaratory relief
24 that they were entitled to the copyright renewal rights of
25 Superman.  National counterclaimed for a finding of
26 declaratory relief in its favor.  District Judge Lasker

3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 106 of 321

1  granted National's Motion for Summary Judgement dismissing
2  the complaint and finding "National to be the owner of the
3  copyright of all Superman strips during the renewal term."
4  Siegel & Shuster v. National Periodical Publications, Inc.,
5  364 F. Supp. 1032, 1033 (S.D.N.Y. 1973).

6

7      Judge Lasker noted that the findings of the State
8  Supreme Court of Westchester were binding on the district
9  court. Id. (citing to Vernitron Corp. v Benjamin, 440 F.2d
10  105, 108 (2d Cir. 1971)). Judge Lasker made a clear
11  distinction between (1) the findings of fact of the state
12  court and (2) the stipulated settlement and resulting
13  consent judgment.  Siegel & Shuster, 508 F.2d at 913.

14

15      Siegel and Shuster appealed and the Second Circuit
16  affirmed finding that the district court "properly decided
17  that the state court judgment of May 21, 1948 effectively
18  estopped the plaintiffs from relitigating the issue of
19  ownership of the renewal copyright."  Siegel & Shuster v.
20  National Periodical Publications, Inc. et al., 509 F.2d 909,
21  912-13 (2d Cir. 1974).

22

23      In November 2002, Jerome Siegel's widow and daughter
24  served notices of termination for the Superboy copyrights
25  pursuant to Section 304(c).  Today, Plaintiffs seek a
26  determination that they effectively terminated Defendants'

4

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 107 of 321

1  renewal rights in Superboy pursuant to 17 U.S.C. § 304(c) on
2  November 17, 2004.

3

4      17 U.S.C. § 304(c) provides for termination of
5  transfers and licenses covering the extended renewal term.
6  Under the 1901 Copyright Act, protection was divided into
7  two separate consecutive terms of twenty-eight years: the
8  "initial term" and the "renewal term."  But as most
9  authors/creators were required to contract away both the
10  initial and renewal periods at the same time, they were
11  effectively denied the protection Congress sought to
12  provide.

13

14      As a result, on January 1, 1978, the 1976 Copyright Act
15  took effect significantly enhancing the rights of authors
16  and their heirs.  19 U.S.C. § 101, et seq.  The 1976 Act
17  extended the renewal term from 28 to 47 years, for works in
18  their renewal term when the 1976 Act took effect. Along with
19  adding 19 years to the renewal term period, the 1976 Act
20  coupled the extension with a new right of authors and their
21  heirs to recapture the renewal of the copyright in works by
22  terminating any prior grant of the work executed before
23  January 1, 1978.  17 U.S.C. § 304(c).  It is under this
24  provision that Plaintiffs have sought to recapture Jerome
25  Siegel's ownership in the Superboy copyrights.

26

                                5

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 108 of 321

1    Fundamental to the arguments presented by both
2    Plaintiffs and Defendants is the effect of the interlocutory
3    judgment issued by Judge Young on November 21, 1947 and the
4    detailed findings of fact and conclusions of law he issued
5    on April 21, 1948.

6

7    Currently, Defendants attempt to relitigate issues
8    determined in the 1947 state court case. Defendants argue
9    vigorously that only the consent judgment has any preclusive
10   effect and that Judge Young's findings of fact have no
11   effect whatsoever on this litigation. Defendants take this
12   position because their desired outcome is consistently in
13   direct conflict with the findings issued by Judge Young.
14   Specifically, Judge Young's findings contradict Defendants'
15   assertions regarding(1) the ownership of Superboy; (2)
16   whether Superboy is simply a derivative work of Superman;
17   and (3) whether Superboy was a "work for hire" solely owned
18   by Defendants' predecessors in interest, National and
19   Detective.

20

21   Defendants' current argument that Judge Young's
22   findings are not binding contradicts the position taken by
23   their predecessors in interest in the 1973 litigation and
24   the 1974 Second Circuit appeal regarding Superman. In
25   applying the doctrine of res judicata in favor of
26   Defendants, Judge Lasker precluded, and the Second Circuit

                              6

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 109 of 321

1 | affirmed, Plaintiffs from litigating the issue of ownership
2 | of the renewal period of the Superman copyrights.
3 |
4 | Having relied on Judge Young's findings for previous
5 | favorable determinations regarding Superman, Defendants now
6 | take the inconsistent position that this Court is not bound
7 | by the state court findings, as they relate to Superboy.
8 | Defendants attempt to raise genuine issues of material fact,
9 | where the facts were clearly determined by Judge Young after
10 | the opportunity to take evidence and hear testimony on that
11 | evidence from the parties directly involved in creating this
12 | relationship.
13 |
14 | Contrary to Defendants' assertions now, both the
15 | Southern District of New York and the Second Circuit looked
16 | directly to, even citing to, Judge Young's findings of fact.
17 | This Court holds that it is consistent to continue this
18 | position and will look to Judge Young's findings as binding
19 | where relevant. Here, while the consent judgment vacated
20 | the interlocutory judgment in its entirety, this Court in
21 | keeping a consistent position with the previous litigation
22 | holds that Judge Young's findings of fact have preclusive
23 | res judicata and collateral estoppel effect on this Court.
24 |
25 | This Court now finds that Plaintiffs have availed
26 | themselves of their legal right to recapture the Superboy

7

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 110 of 321

1  copyrights pursuant to 17 U.S.C. § 304(c) and 37 C.F.R.
2  210.10.  As such, this Court **GRANTS** Plaintiffs' Motion for
3  Partial Summary Judgment.

4

5      Defendants argued that Plaintiffs' Superboy notices of
6  termination are ineffective, because the 1976 Act specifies
7  that only grants relating to "any copyright subsisting in
8  either its first or renewal term on January 1, 1978" are
9  subject to Section 304(c).

10

11     However, Plaintiffs presented uncontroverted evidence
12  supporting that the Superboy copyright was in fact
13  subsisting in its renewal term as of the 1976 Act's
14  effective date.  Specifically, Plaintiffs pointed to the
15  fact that the copyright in the serialized magazine, *More Fun*
16  *Comics*, No. 101 was secured on November 23, 1944 with
17  registration number B653651 and then renewed on July 17,
18  1972, twenty-eight years later, by National under renewal
19  registration number R532582.  In the 1947 state court
20  action, Judge Young specifically determined that Detective
21  Comics published the Superboy comic strip based upon the
22  idea, plan, and conception of Siegel, in a magazine entitled
23  *More Fun Comics*.

24

25     Alternatively, Defendants argued that, even if the
26  copyrights were subsisting in their renewal period as of

8

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 111 of 321

January 1, 1978, Plaintiffs' notices of termination are
ineffective as the submissions are not eligible for
termination as "works made for hire." The Ninth Circuit has
summarized the work for hire doctrine as follows:

> When one person engages another, whether as
> employee or as an independent contractor, to
> produce a work of an artistic nature, . . . in the
> absence of an express contractual reservation of
> the copyright in the artist, the presumption arises
> that the mutual intent of the parties is that the
> title to the copyright shall be in the person at
> whose instance and expense the work is done.

Self-Realization Fellowship Church v. Ananda Church of Self-
Realization, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting
Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300
(9th Cir. 1965)).

Defendants' argument that Superboy was a work for hire
fails, as this conclusion directly conflicts with Judge
Young's findings in the state court action. Specifically,
Judge Young found that

(1) Under Siegel and Shuster's September 12, 1938 agreement
    with Detective Comics, they were to provide Detective
    with the right of first refusal and a six week

9

1    consideration period.[2]

2

3   (2)  On November 30, 1938, Siegel submitted in a writing

4        mailed to Detective for its consideration a synopsis,

5        summary of idea, conception, plan for a new comic known

6        as Superboy pursuant to the September 12, 1938

7        agreement.[3]

8

9   (3)  Detective declined to indicate its election to publish

10       Superboy within the six weeks and on December 2, 1938

11       Detective by letter to Siegel elected _not_ to publish

12       Superboy.[4]

13

14    While not mentioning the term "work for hire," Judge

15 Young's findings naturally implicate the question.  Here a

16 presumption of "work for hire" cannot be found in

17 Defendants' favor, since not only did Judge Taylor find that

18 Defendants elected not to publish Superboy, but he also

19

---

20    [2] Judge Young found that Siegel independently created his
21 original Superboy Synopsis and Superboy Story under the terms of the
    September 12, 1938 agreement between Siegel and his publisher, which
22 permitted him to create new comic strip concepts and stories outside
    the five Siegel and Shuster were currently producing for Detective.
23 The agreement only allowed Detective a right of first refusal to
    accept/reject within six weeks of a new submission. [Decl. Toberoff
24 Exh. B, Pg. 32 FOF 156-159, 160-162].

25    [3] [Decl. Toberoff Exh. B, Pg. 32 FOF #155, 156].

26    [4] [Decl. Toberoff Exh. B, Pg. 32 FOF #158, 159].

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 113 of 321

found that Plaintiff Siegel and, not National, was the sole
owner of the Superboy property. This finding will not
support a contrary conclusion that the "mutual intent of the
parties" was to have ownership of Superboy always be in
Detective or National, and therefore, the Defendants in this
action.

Alternatively, Defendants argued that Siegel created
Superboy as a derivative work based upon a pre-existing
original work whose copyright was owned by the hiring party,
and is therefore "produced at the instance and subject to
the right and control of the employing party." See Playboy
Enters. Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995).

Here again, Defendants' argument that Superboy is
simply a "derivative work" of Superman is unpersuasive. The
1947 state court action specifically addressed the ownership
rights to Superman and Superboy separately. Defendants'
attempt to recast Superboy as a "derivative work" or "work
for hire," stands is stark contrast to Judge Young's
conclusion that Detective/National was "perpetually enjoined
and restrained from creating, publishing, selling, or
distributing" Superboy, based on the fact that Siegel was
the sole and exclusive owner.[5] Defendants' argument also

---

[5] [Decl. Toberoff Exh. B, Pg. 5-6 COL # 25].

11

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 114 of 321

1  contradicts the fact that Siegel subsequently transferred

2  his exclusive interest in Superboy to National in the May

3  19, 1948 stipulated settlement.  Had Superboy been nothing

4  more than a derivative work, Siegel would have owned no

5  interest in the Superboy property to transfer.

6

7      Having determined that Section 304(c) applies to this

8  dispute, this Court also finds that Plaintiffs have

9  established that no genuine issue of material fact exists

10 regarding the effectiveness of their termination of the

11 Superboy copyrights.

12

13     Pursuant to 17 U.S.C. 304(c) and 37 C.F.R. §

14 201.10(b)(1)(iv), Plaintiffs' termination notices list the

15 following pre-1978 grants of Superboy: (1) the May 19, 1948

16 Agreement (stipulated settlement); and (2) the December 23,

17 1975 Agreement (where relevant, though this agreement does

18 not mention Superboy).  No post-1978 grants of rights

19 regarding Superboy exist.

20

21     Defendants argued that Plaintiffs failed to comply with

22 the termination regulations, because the termination notices

23 only list the May 19, 1948 stipulated settlement, but did

24 not list the May 21, 1948 "Final Consent Agreement."

25

26     This Court finds that no genuine issue exists that the

12

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 115 of 321

1   operative grant of "Superboy" by Jerome Siegel was the May
2   19, 1948 stipulated settlement and that the consent judgment
3   merely followed the parties' stipulation and was entered by
4   the Court two days later.  Additionally, Regulation
5   201.10(b)(1)(iv) merely requires a "brief statement
6   reasonably identifying the grant to which the notice of
7   termination applies."  In fact, Regulation 201.10(e)
8   provides that

9

10          harmless errors in a notice that do not materially
11          affect the adequacy of the information required to
12          serve the purposes of . . .section 304(c) . . .
13          shall not render the notice invalid.

14

15      Here, by listing the May 19, 1948 stipulated
16   settlement, the termination notices provide a brief
17   statement reasonably identifying the grant in question.
18   Even, if including the May 21, 1948 consent judgment would
19   have provided additional notice, its absence in no way
20   materially affected the adequacy of Plaintiffs' notice.

21

22      As Jerome Siegel's widow, Joanne Siegel owns 50% of her
23   husband's termination interest.  17 U.S.C. § 304(c)(2)(A).
24   As one of his two surviving children, Laura Siegel Larson
25   owns 25% of Siegel's termination interest.  17 U.S.C. §
26   304(c)(2)(A).  Together Plaintiffs own more than one-half of

                        13

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 116 of 321

1  Siegel's termination interest required to effectively
2  terminate Siegel's grant pursuant to 17 U.S.C. §304(c)(1).
3

4      Defendants argued that Plaintiffs' Superboy termination
5  notices were ineffective, because Joseph Shuster has a co-
6  ownership/joint works interest in Superboy not asserted in
7  the termination notices.   Defendants argued that since
8  Shuster has a one-half interest in Superboy, Plaintiffs only
9  have Siegel's one-half interest, not the "more than one-
10 half" needed to terminate pursuant to Section 304(c).  They
11 point to the fact that More Fun (Superboy's comic) was
12 published with the byline "Jerry Siegel and Joe Shuster."
13

14     But, while Shuster was the illustrator attached to
15 Superboy, the 1947 state court action determined that Siegel
16 was the sole originator and owner of Superboy and Siegel
17 alone possessed exclusive ownership rights.  Ownership
18 rights, which he and not Shuster, subsequently transferred
19 in the stipulated settlement.  No facts support a contrary
20 finding.
21

22     Finally, this Court finds that Plaintiffs timely and
23 properly recorded with the Copyright Office and served on
24 Defendants the notices of termination for the Superboy
25 copyrights as required by 17 U.S.C. § 304(c) and 37 C.F.R. §
26 201.10.

                          14

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 117 of 321

1    Therefore, this Court finds that Plaintiffs effectively
2    terminated Jerome Siegel's grants of the Superboy
3    copyrights, recapturing them on November 17, 2004.
4    To the extent that Defendants' Motion for Summary Judgment
5    makes a contrary request, this Court **DENIES** Defendants'
6    motion.

7

8    Also, as to Defendants, this Court **DENIES** Defendants'
9    request for a finding that the WB television show,
10   *Smallville*, does not infringe on Plaintiffs' recaptured
11   copyrights.  Defendants' argument reaches a quick and broad
12   conclusion that Plaintiffs' copyrights in Superboy protect
13   virtually nothing more than the idea of a "youth with super
14   powers."

15

16   In order to establish copyright infringement,
17   Plaintiffs must first establish ownership and then must show
18   the two following factors: (1) the defendant had access to
19   the copyrighted material; and (2) the defendant's material
20   is substantially similar to the copyrighted material.  Three
21   Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir.
22   2000).

23

24   Here, no genuine issue of material fact exists as to
25   Plaintiffs' ownership in the Superboy copyrights, nor is
26   there an issue that Defendants' had access to the Superboy

15

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 118 of 321

1  property.  But, because substantial similarity is
2  customarily an extremely close question of fact, summary
3  judgment has traditionally been frowned upon in copyright
4  litigation.  <u>Hoehling v. Univ. City Studios, Inc.</u>, 618 F.2d
5  972, 977 (2d. Cir. 1980).

6

7      Here, the specific question as to whether the
8  television show *Smallville* infringes on Plaintiffs' Superboy
9  copyrights requires a detailed factual comparison of each
10  property's content characteristics, much of which are
11  disputed in Plaintiffs' and Defendants' papers. Plaintiffs
12  immediately start drawing comparisons between the storylines
13  of *Smallville* and the Superboy comic strip, including the
14  cast of characters' names, personas, roles in the storyline,
15  their independent storylines, the location, etc. Enough
16  facts are presented, where this Court, contrary to
17  Defendants' request, could find that the main character in
18  *Smallville* is in fact Superboy.[6]

19

20      Therefore, this Court in construing the submitted
21  evidence in the light most favorable to the non-moving
22  party, Plaintiffs, genuine issues of material fact exist as
23  to whether Defendants' television show *Smallville* is
24  infringing Plaintiffs' copyrights.

25

26      [6] In the Superboy comic strip a billboard on the side of a rural
country road announces, "Welcome to Smallville! Home of Superboy."

16

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 119 of 321

1    Therefore, Defendants' Motion for Summary Judgment is

2  **DENIED**.

3

4    This Court adopts Plaintiff's Findings of Fact and

5  Conclusions of Law with modifications.

6

7

8  **IT IS SO ORDERED.**

                                        **RONALD S.W. LEW**
9
                                   _____
10                                     **RONALD S.W. LEW**
                                   United States District Judge
11

12  DATED: March 23, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

26

17

# EXHIBIT V

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 121 of 321

1

2

3

4

5

6

7

FILED
CLERK, U.S DISTRICT COURT

MAY 2 2 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

8              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**

9

10

11  JOANNE SIEGEL & LAURA        )        CV 04-8776 RSWL (RZx)
    SIEGEL LARSON,               )
12                               )
            Plaintiffs           )        **ORDER** THIS CONSTITUTES NOTICE OF ENTRY
13                               )                AS REQUIRED BY FRCP, RULE 77(d).
       v.                        )
14                               )
                                 )
15  TIME WARNER, INC.,           )
    et al.,                      )
16                               )
                                 )
17                               )
                                 )
18          Defendants.          )
                                 )
19  _____  )



ENTERED
CLERK, U.S. DISTRICT COURT

MAY 2 3 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

20

21      Defendants Motion to Certify this Court's Order for

22  Immediate Appeal pursuant to 28 U.S.C. § 1292(b) on calendar

23  for May 22, 2006 was taken under submission.   No

24  appearances by counsel are necessary.

25

26      This Court has considered all of the papers and

                            1

93

ER 2992

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 122 of 321

1  argument submitted on the matter and **NOW FINDS AND RULES AS**
2  **FOLLOWS:**

3

4     The general rule is that an appellate court should not
5  review a ruling from a district court until after entry of
6  final judgment. <u>Coopers & Lybrand v. Livesay</u>, 437 U.S. 463,
7  474 (1978).

8

9     An exception to this general rule appears in 28 U.S.C.
10  § 1292, which provides that certification of an
11  interlocutory order for appeal is appropriate when the order
12  involves a controlling question of law, as to which there is
13  substantial ground for difference of opinion, and where a
14  resolution thereof will materially advance the termination
15  of the litigation. 28 U.S.C. § 1292(b).

16

17     However, Congressional legislative history "indicates
18  that [interlocutory appeal] was to be used only in
19  extraordinary cases where decision of an interlocutory
20  appeal might avoid protracted and expensive litigation.  It
21  was not intended merely to provide review of difficult
22  rulings in hard cases." <u>United States Rubber Co. v. Wright</u>,
23  359 F.2d 784, 785 (9th Cir. 1966).

24

25     This Court finds that this case is not one of the
26  extraordinary cases contemplated by 28 U.S.C. §1292, nor

2

1  does the application of the statute's requirements to the

2  facts of this case support certifying the Order for

3  immediate appeal.

4

5      Therefore, Defendants' Motion to Certify this Court's

6  Order for Immediate Appeal is **DENIED**.

7

8  **IT IS SO ORDERED.**                    *RONALD S. W LEW*

9

10                                    _____
                                            **RONALD S.W. LEW**
11                                      United States District Judge

12  DATE: May 22, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

**248**
**ER 2994**

# EXHIBIT W

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 125 of 321

# United States Court of Appeals

### For the Second Circuit

## Docket No. 73-2844

JEROME SIEGEL and JOSEPH SHUSTER,

*Plaintiffs-Appellants,*

*against*

NATIONAL PERIODICAL PUBLICATIONS, INC., JACOB S.
LIEBOWITZ, IRWIN DONENFELD and PAUL H. SAMPLINER,

*Defendants-Appellees.*

## BRIEF OF DEFENDANTS-APPELLEES

### Statement

This brief is submitted on behalf of the corporate de-
fendant National Periodical Publications, Inc. (hereinafter
referred to as "National") and the three individual de-
fendants. It is submitted in opposition to the appeal of
plaintiffs-appellants from a summary judgment in favor
of defendants based upon a decision of the Honorable
Morris E. Lasker.

The basic question presented by this appeal is: who
is the owner of the renewal term of the copyright of the

249

DCC00003365
ER 2996

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 126 of 321

## 2

first published Superman comic strip—plaintiffs, who wrote and drew the first strip or the defendant National, the successor in interest of the original copyright proprietor of the Superman strip? In his opinion granting summary judgment dismissing the complaint, Judge Lasker determined that, as a matter of law, the renewal copyright is owned by defendant National.

### Issues Presented

Judge Lasker's decision is based upon the following determinations:

1. Superman is a "work made for hire", within the meaning of Section 26 of the Copyright Act, 17 U.S.C. §§1-216; and

2. In addition, plaintiffs transferred the renewal copyright in Superman to defendant National in a series of consistent written instruments.

In making these determinations, Judge Lasker relied not only on the affidavits and exhibits submitted by both sides on the motion for summary judgment, but on documents included in the Appendix on this appeal and arising out of a prior action between the parties in the New York Supreme Court, County of Westchester, including (1) the Opinion of Justice J. Addison Young, (2) that Court's Findings of Fact and Conclusions of Law, (3) an Interlocutory Judgment from which neither side perfected an appeal, (4) a Stipulation of settlement of that action and (5) a Final Consent Judgment based thereon. These documents are annexed as Exhibits C, D, E, F, and G respec-

## 3

tively to the Answer herein and form part of the record in this action.

Defendants submit that Judge Lasker's determination with respect to both issues was proper and should be affirmed and that his determination that the parties are bound by the prior litigation between them—the Findings, Interlocutory Judgment, Stipulation of settlement and Final Consent Judgment resulting therefrom—was equally proper.

### The Facts

In December 1937, plaintiffs entered into a written employment agreement with National's predecessor in interest, Detective Comics, Inc. (hereinafter referred to as "Detective"), a copy of which Employment Agreement is annexed to the Answer as "Exhibit B". This Employment Agreement specifically related to two features, created by plaintiffs known as "Slam Bradley" and "The Spy," which materials plaintiffs had been supplying to Nicholson Publishing Co. After Nicholson, which had been purchasing the material on behalf of Detective, went out of business in late 1937, plaintiffs and Detective entered into their first direct business association. This first Employment Agreement between Detective and plaintiffs provided that plaintiffs agreed "to give their exclusive services as artists" to Detective in producing these two features and that "all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer." The agreement further provided that any new or additional features would be sub-

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 127 of 321

mitted first to Detective which was given an option on them.

After execution of the Employment Agreement, Detective planned to publish a new comic magazine called "Action Comics". It learned that plaintiff Siegel, as writer, and plaintiff Shuster, as artist, had prepared a few panels in black and white for a comic strip for newspaper publication called Superman and had submitted them, unsuccessfully, to numerous publishers and newspaper syndicates. Detective reviewed this material, which plaintiffs had prepared in 1933, to determine its suitability for "Action Comics". After reviewing these panels, Detective determined that the material would be appropriate for publication if revised and expanded into a full 13 page color comic strip suitable for a comic magazine. Pursuant to Detective's instructions, plaintiffs submitted the revised and expanded material in February 1938.

On March 1, 1938, prior to the first printing of the first issue of "Action Comics", the parties entered into yet another agreement (referred to by Judge Lasker as a release), annexed as "Exhibit A" to the Answer, which transferred to Detective the first 13 page Superman strip with "all good will attached thereto and *exclusive* right to the use of the characters and story, continuity and title of strip

• • to have and hold *forever* and to be *your exclusive property*." (emphasis supplied). Subsequent to execution of this further agreement, on April 18, 1938, Detective published the first Superman strip in the first issue of "Action Comics". The original copyright strip registered is of this first published material. With the increasing popularity of

4

Superman, plaintiffs continued to write and draw Superman strips and Detective continued to publish them.

On December 19, 1939, plaintiffs and Detective executed a supplemental employment agreement increasing plaintiffs' compensation and reiterating that Detective was the "sole and exclusive owner" of Superman and of "all rights of reproduction and of all copyright and all rights to secure copyright registration in respect to all forms of reproduction • • •." (See Exhibit C to Answer) As documented in the moving affidavit of Edward C. Wallace, during this period plaintiffs' compensation increased substantially and by March 1947 they had received over $400,000. from Detective.

It was in 1947 that plaintiffs instituted an action in the Supreme Court, Westchester County, against National, Detective's successor, and certain of its officers, seeking a declaration of the rights of the parties with respect to various comic strips, including Superman and a determination that the agreement of March 1, 1938 releasing all of plaintiffs' rights to Superman was void for lack of mutuality and not supported by consideration. By consent of the parties, all of whom were represented by counsel, the action was tried before Official Referee J. Addison Young (to hear and determine) and on November 21, 1947 Justice Young rendered a detailed opinion (Exhibit O to Answer). In that opinion he specifically held that the rights to Superman belonged to National's predecessor and not to the plaintiffs. Subsequent to the trial, Justice Young made lengthy Findings of Fact and Conclusions of Law (Exhibit D to Answer) and an Interlocutory Judgment (Exhibit E to

5

DGC99983367
ER 2998

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 128 of 321

Answer) was signed on April 12, 1948. Neither side perfected an appeal from the Interlocutory Judgment; instead they entered into settlement negotiations which resulted in a Stipulation of settlement (Exhibit F to Answer) which, in turn, was incorporated into a Final Consent Judgment (Exhibit G to Answer) signed on May 21, 1948.

Pursuant to the said Stipulation and the Final Consent Judgment, defendants agreed to pay to plaintiffs over $94,000 in exchange for any and all remaining rights to Superman and to "Superboy", which later comic is not a subject of this litigation.

As is clear from the Findings of Fact and Conclusions of Law and Stipulation of settlement in the Westchester action, all rights in and to Superman were transferred by the agreement of March 1, 1938 under which National became the "absolute owner of the comic strip Superman, including the title, names, characters and concept as the same were set forth in the said first release." (1st Conclusion of Law, Exhibit D to Answer).

In addition to determining that the March 1, 1938 agreement was valid and did serve to convey and transfer all rights in and to Superman to National, the Final Consent Judgment incorporated the following permanent injunctive provision:

"ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from creating, publishing, selling or distributing or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced, or published un-

der the title SUPERMAN, or any material created, produced or published in imitation thereof, or from using, any comic strip or other material created by them with the title SUPERMAN or any title imitative of the title SUPERMAN or which shall contain as part thereof the word SUPER." (Exhibit G to Answer)

As summarized above, the facts upon which defendants rely and upon which Judge Leaker based his determination are fully documented by the exhibits annexed to the Answer and the correspondence between the parties annexed to the moving affidavit. These facts fall into two categories. One category is facts found by Justice Young in the Westchester action. These facts relate to defendants' contention and Judge Leaker's holding that Superman was a work for hire. The second group of facts, documented by the Stipulation of settlement and the Final Consent Judgment in the Westchester action, as well as correspondence subsequent to that action, relate to defendants' contention and Judge Leaker's determination that various agreements between the parties, even apart from and subsequent to the agreement of March 1, 1938, would have divested plaintiffs of the renewal copyrights.

Plaintiffs' contentions that res judicata and collateral estoppel should not apply here relate only to one of the two holdings of the court below—that Superman was a work for hire. These contentions have no bearing on the second legal theory asserted by defendants and sustained below—that plaintiffs transferred the renewal rights through contractual grants. Accordingly, the question of res judicata and collateral estoppel will be covered in Point I below dealing with the lower court's determination that Superman was a work for hire.

DER0000368

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 129 of 321

# ARGUMENT

## POINT I

Defendant National owns the renewal term of the copyright of the first Superman strip as a work made for hire for its predecessor, Detective.

As stated in the summary of facts above, plaintiffs were working as employees of Detective at the time that the first Superman strip was published. While plaintiffs, as they must, admit this basic fact, they attempt to argue that Superman was not a work for hire because the character of Superman was sketched and created in 1933, prior to any employment relationship between plaintiffs and Detective. Accordingly, their entire argument is predicated on the contention that any changes or revisions made at the instance of Detective, prior to its acceptance of the Superman strip for publication in "Action Comics", were so insubstantial as to preclude a finding that the copyrighted Superman comic strip flowed from the conceded employment relationship. In determining that Superman was a work for hire because of both (1) the employment relationship that existed and (2) the expansion and revision of the initial concept done under the direction and instruction of Detective, the court below relied on the post-trial Findings signed by Justice Young in the Westchester action as well as certain correspondence annexed to the moving affidavit.

## A. The Westchester Action

Plaintiffs seek to circumvent Justice Young's Findings by arguing that neither the doctrine of res judicata nor the doctrine of collateral estoppel applies.

Defendants submit that Judge Lasker was correct in holding that the Westchester determinations are binding on the litigants in this action. The rule that the findings in one litigation are binding upon the same parties in another litigation involving the same facts is so well established that the court's talk in terms of "no question" or "no doubt". And this clearly applies to findings by a state court in the context of a subsequent federal court action. As stated by this Court in Vermitron Corp. v. Benjamin, 440 F.2d 105, 108 (2d Cir. 1971):

"There can be no question but that the doctrine of collateral estoppel would be applied in any instance where the state court had determined a factual issue arising in a subsequent federal litigation. Restatement of Judgments Chap. 3 §68(1) (1942); e.g. Connelly v. Balkwit, 174 F. Supp. 49 (N.D. Ohio 1959)."

Similarly, the conclusions embodied in the Final Consent Judgment are equally binding upon plaintiffs herein. In an opinion subsequently affirmed by this Court, the District Court in Siwyconset Insurance Co. v. Dean Construction Co., 254 F. Supp. 102, 110 (S.D.N.Y. 1966), aff'd 382 F.2d 991 (2d Cir. 1967), stated:

"There is no doubt that a judgment entered upon a settlement is res judicata as to all questions which were or could have been litigated in the action in which the judgment was entered. E.g., Stella v. Kaiser, 218 F. 2d 64 (2d Cir. 1954), cert. den., 350 U.S. 835, 76 S. Ct. 71, 100 L. Ed. 745 (1956); Lorma Estates, Inc. v. Omnichrome Corp., 260 App. Div. 538, 294 N.Y.S. 861 (1st Dept.), aff'd, 275 N.Y. 425, 10 N.E. 2d 793 (1937)."

In contesting the lower court's holding that the Westchester determinations are binding on the parties, plain-

DPC00003369

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 130 of 321

10

tiffs cite three cases in which *res judicata* was not applied. Yet in each of those three cases the reasons for refusing to apply *res judicata* have no bearing on the present litigation. For example, in *Lerner v. Richardson*, 443 F.2d 1386 (4th Cir. 1971) the court refused to apply the doctrine to a prior administrative determination, made without a hearing, where it had before it only an affidavit describing the prior determination. In *Gwen Investments Co. v. Central Building, Inc.*, 288 F.2d 19 (9th Cir. 1961) the court refused to apply the doctrine because the party who relied thereon failed to plead *res judicata* as required by the Federal Rules of Civil Procedure. There the court noted that:

"It appears to us that before an action may be summarily dismissed on the ground of *res judicata* the ends of justice require as a minimum that the defense of *res judicata* appear from the face of the complaint or that the record of the prior case be received in evidence. In the instant case, such defense does not appear on plaintiffs' complaint, nor was the record in the prior case received in evidence." (at p. 24)

Similarly, in *Hood v. Burnett*, 51 F.R.D. 477 (N.D. Ga. 1971) the court required the parties to submit all parts of the record in the prior proceeding which they deemed applicable to the pending litigation. Here, of course, defendants pleaded *res judicata* and collateral estoppel in their initial pleading and they annexed as exhibits to their Answer all of the relevant records from the prior litigation.

Similarly, the two cases cited by plaintiffs to bolster their argument that *res judicata* does not apply here actually confirm defendants' contention and Judge Lasker's

11

determination that the doctrine does apply. *Wolcott v. Hutchins*, 290 F. Supp. 569 (S.D.N.Y. 1968), aff'd on opinion below, 404 F. 2d 937 (2d Cir. 1969) did apply the doctrine after rejecting arguments that a different cause of action was involved in the subsequent suit. What the court stated in *Wolcott* applies equally here.

"We are dealing with estoppel by judgment that concludes the parties both as to those matters actually litigated and those which might have been raised with respect to the same cause of action. *Angel v. Bullington*, 330 U.S. 183, 67 S. Ct. 657, 91 L. Ed. 832 (1947); *Jackson v. Irving Trust Co.*, 311 U.S. 494, 61 S. Ct. 326, 85 L. Ed. 297 (1941).''

And while the doctrine was not applied in *Saylor v. Lindsley*, 391 F. 2d 965 (2d Cir. 1968), that holding was specifically based on the fact that the prior action was dismissed, prior to any adjudication on the merits, because the plaintiff in the first suit failed to post the necessary bond for costs.

The cases on which plaintiffs rely in contesting Judge Lasker's application of the doctrine of collateral estoppel are equally inapposite. In *Unger v. Mondell*, 471 F. 2d 1163 (2d Cir. 1972) this Court made it clear that two justices of the New York Supreme Court differed on whether or not the parties in the litigation before them had, in fact, entered into a stipulation in open court. Here, of course, the Stipulation of settlement as well as the Findings of Fact and other aspects of the action were reduced to writing and filed at the time. Collateral estoppel was not applied against the Commissioner of Internal Revenue in *Neuwelandt v. Commissioner*, 424 F. 2d 639 (2d Cir. 1970), cert. den., 400 U.S. 827 (1970)

ER 000870

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 131 of 321

where the Commissioner had failed to show criminal evasion of taxes beyond a reasonable doubt in the first action and subsequently brought a civil action with the lesser burden of proof by a fair preponderance of the evidence.

Finally, it should be noted that application of the doctrines of res judicata and collateral estoppel here is not only proper, but based on good reason. There is little about the underlying operative facts and transactions that can be supplied by testimony of witnesses decades after the events and almost twenty-six years after the prior litigation. As is common with most actions based upon ownership of the renewal term of a copyright, the basic transactions between the parties occurred several decades before the trial of the action. The comments of the court in Picture Music, Inc. v. Bourne, Inc., 314 F. Supp. 640, 652 (S.D.N.Y. 1970), aff'd 457 F.2d 1213 (2d Cir. 1972), cert. den., 409 U.S. 997 (1972), a case that will be discussed at length below, are applicable here:

"The resolution of this case and the renewal copyright claims goes down to an issue of the intention of the parties. This must be adjudicated after a lapse of 37 years from the time of the operative events. Most of the people who dealt with the matter contemporaneously are dead and the memories of interested witnesses in their recital of the past have undeniably dimmed, lapsed or been constructed. The objective manifestations, the acts, writings and contemporaneous claims of the parties and the reasonable inferences therefrom, measured against the probabilities, provide a more reliable index to the truth than mustered recollections on each side of the case, understandably schooled for the trial."

Because of the extensive indisputable documentary evidence arising from the Westchester action which is binding on the parties here and the inherent uselessness of any new testimony on events occurring far in the past, Judge Leeker's reliance on the record in granting summary judgment was proper.

B.  The Creation of the First Copyrighted Superman Strip

On this appeal, plaintiffs contend, as they did below, that Superman was not and cannot be considered a work for hire because it had been created by plaintiffs prior to any business connection between them and Detective. Yet defendants contend and the court below held that notwithstanding this initial delineation of the Superman character, the copyrighted material did flow directly from the employment relationship between the parties. Indeed, this conclusion is compelled by a review of the Findings of Fact in the Westchester action.

There is no question that the first business arrangement between plaintiffs and Detective was a written contract of employment dated as of December 4, 1937 with respect to plaintiffs' services in producing "Slam Bradley" and "The Spy". (Finding 16).* Subsequent to entry into that agreement, in early 1938 the parties met to discuss publication of a new comic magazine, "Action Comics", and the Superman material plaintiffs had created in 1938, which material had been uniformly rejected by other publishers. (Findings 10 and 20). This initial Superman creation "consisted of

* The Findings of Fact in the Westchester action, Exhibit D to the Answer, are abbreviated herein as "Finding".

ER 2002

DCC00003371

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 132 of 321

a few panels suitable for newspaper syndication." (Finding 19). Upon reviewing that unpublished material, Detective returned it to plaintiffs "for revision and expansion into a full length 13 page comic strip" (Finding 21). Accordingly, the original material created in 1933 was uniformly rejected, was never published and never achieved a federal copyright which could be renewed.

Moreover, what eventually appeared as Superman in "Action Comics" may have been contained from the 1938 material, but it also contained the ideas and published "was the revised and expanded" material which "constituted the formula for the continuing Superman series to come" (Finding 22). This was the first copyright and this and the succeeding work were all made subject to an agreement of employment between plaintiffs and Detective (Finding 44).

The lack of any copyright significance in the first unpublished panels created in 1933 is established clearly in *Scherr v. Universal Match Corp.*, 417 F. 2d 497 (2d Cir., 1969). The facts in that case, which concern the copyright status of a statue in an army post, are strikingly parallel to the facts in this action. There, the plaintiffs were two army enlisted men who had constructed a statue during their duty hours, pursuant to a work assignment from their military supervisors. The assignment to build the statue grew out of a small clay table model of a statue constructed by the two soldiers voluntarily during their leisure time. This table model, the analogue of plaintiffs' Superman strips prepared in 1933 for use in newspapers, came to the

attention of the post authorities after the initial creation. Similarly, the instruction of the post authorities to the soldiers to prepare the large full scale statue was made precisely in the same manner Detective instructed plaintiffs to prepare, revise and expand the Superman material to make it suitable for magazine publication. In determining whether or not the large statue was in fact a work made for hire, this Court rejected the soldiers' argument that the initial creation, the table model, was developed by them prior to any instructions from the post authorities. In rejecting that claim this Court noted at page 499:

"While the idea for the statue originated from the smaller clay model, the statue differs from the model. Moreover, plaintiffs never attempted to secure copyright for their original clay model. The claim of infringement rests solely upon whether they possess an effective copyright in the finished statue."

This language from this Court's opinion in *Scherr* clearly applies to the original newspaper strip created by plaintiffs herein in 1933. That newspaper strip, like the clay model, was the genesis of the work assignment that produced the copyrighted work in question. The mere fact that the earlier prototype was not a work made for hire cannot alter the status of the finished product as a work made for hire.

Defendants submit that the majority holding in *Scherr* that the subject statue was a work made for hire is equally applicable to the Superman material copyrighted by Detective. Although Judge Friendly dissented from the majority opinion in *Scherr*, that dissent contained a pertinent discussion of the policy of the work made for hire rule

DCR08003372

which clearly supports the conclusion that under the employment relationship between plaintiffs and Detective, it is equitable to hold that the copyright both in the original and renewal term of the work belongs to National as successor to the employer:

"It is often said, as in the majority opinion, that the essential factor in applying the 'work for hire' doctrine is 'whether the employer possessed the right to direct and to supervise the manner in which the work was being performed'. See Nimmer, Copyright §62.2. Where the employer in fact falls the employee pretty much what to do, vesting copyright in the former is wholly consistent with the policy of the Copyright Act since the creativity can be said to be primarily the employer's and the employee has simply carried out his instructions. In fact the decisions go beyond this and vest copyright in the employer where he has no intention of controlling the detailed activity of the employee but the latter has been employed for the very purpose of producing copyrightable material. The paradigm instance is the man hired by a music publisher to write songs. To hold that the writer has the copyright would make the contract of employment senseless. A renewal much closer case (on Copyright §83) concerns the independent contractor commissioned to create a work of art. Even here, while there may not have been an understanding by both parties at the time of contracting that the purchaser should be free to publish or authorize copying of the work, it is not unreasonable to assume in the absence of contrary proof that the parties expected the purchaser to wind up owning the work lock, stock, and copyright and that the artist set his price accordingly. To allow the artist to retain the copyright would thus deprive the purchaser of his bargain and give the

artist a windfall. Both these situations, therefore, can be squared with the policy of the Constitution and the Copyright Act on the basis of carrying out what the parties contemplated at the time of contracting, or at least what they probably would have contemplated if they had thought about it.'

The policy position set forth in Judge Friendly's dissenting opinion does, of course, assume the existence of an employment relationship between the parties. Beyond peradventure, such an employment relationship existed between plaintiffs and Detective at the time the copyrighted material was created. And this employment relationship led to the creation of the material which was in fact copyrighted by National's predecessor—the renewal term of which is here in dispute.

C. The Employment Relationship Between Plaintiffs and Detective

Plaintiffs were employees of Detective, National's predecessor, pursuant to the written Employment Agreement of December 1937. That agreement set forth their compensation and term of service. It specifically provided that plaintiffs agreed "to give their exclusive service as artists" to Detective. With respect to the comic strip produced by plaintiffs pursuant to that agreement, it stated that they "shall be and become the sole and exclusive property of the employer and the employer shall be deemed the sole creator thereof, the employee acting entirely as the employer's employee." Indeed, the contract even goes on to provide that upon termination of plaintiffs' employment plaintiffs agree that "they will not directly or indirectly and through any means whatsoever, use, duplicate, simi-

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 133 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 134 of 321

18

late or bring into being any of the products or work or creations or characters or plots, used, made or created by him while in the employ of the employer."

The written agreement between the parties unmistakably established two things: First, plaintiffs were Detective's employees in every sense of the word, and, second, the parties recognized and agreed that all work produced by plaintiffs for Detective would be the sole and exclusive property of Detective. Indeed, even absent a statutory rule that the copyright in works made for hire belong to the employer rather than the creator, the copyright would belong to Detective rather than to plaintiffs by the very wording of the contract.

The relationship of employer and employee was established not only by the written agreement between the parties but also by their behavior as set forth in the documentary evidence. Plaintiffs worked on the comic strips Detective told them to work on, pursuant to deadlines established by Detective. Their work was closely supervised by Detective even as to such detailed matters as the number of panels on a page and plaintiffs' work schedule.

Based upon these indisputable facts, it is clear that all Superman strips produced by plaintiffs and published by National and its predecessors were "works made for hire" as that term is used in Section 26 of the Copyright Act, 17 U.S.C. §26, which provides that the word "author" when used in the Act includes "an employer in the case of works made for hire" and in Section 24, 17 U.S.C. §24, which

19

provides that when a "copyright was originally secured . . . by an employer for whom such work is made for hire," the proprietor of the copyright rather than the author is entitled to the renewal term of the copyright.*

This is confirmed by the cases construing the term "works made for hire" in the context of ownership of copyright, both in its renewal term and in the original term. This Court has most recently interpreted and explained this term in *Picture Music, Inc. v. Bourne, Inc.*, 457 F. 2d 1213 (2d Cir.), cert. den. 409 U.S. 997 (1972). That case concerned the ownership of the renewal term to the song "Who's Afraid of the Big Bad Wolf". The plaintiffs' predecessor in interest was a freelance song writer who was asked by the defendant's predecessor to help adapt the music in the animated cartoon film "The Three Little Pigs" into a popular song. This Court concluded that the song writer was not an employee but rather an independent contractor. Nevertheless it held that the song was a work made for hire because it was commissioned by the defendant's predecessor. Obviously, in the case at bar where plaintiffs were clearly employees in the traditional sense rather than independent contractors, the product of that relationship is work made for hire.

This Court stressed two factors in *Picture Music* which are also present here. First, "the motivating factor in producing the work was the employer who induced the creation" (at p. 1216). Here, the decision to produce the Superman strip was Detective's and pursuant thereto it directed plaintiffs to change their work schedule so as to

* The pertinent provisions of §24 and 26 are set forth at the end hereof.

258

DER00003374

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 135 of 321

20

produce the Superman strip in preference to other prior work assignments. This Court also stressed the significance of "the right of the employer to direct and supervise the manner in which the writer performs his work" (at p. 1216). As our discussion above indicates, this factor is indisputably present here.

The *a fortiori* character of the *Picture Music* case can be seen by an examination of the opinion of the District Court below, 314 F. Supp. 640 (S.D.N.Y., 1970). That court believed that the question of whether the song was a work made for hire turned upon the issue of whether the plaintiffs' predecessor was an employee or an independent contractor. While not specifically determining that issue, rather resting upon another line of reasoning, which we shall discuss in *Point II* below, the court did marshal the various factors indicating whether a particular person was an employee or an independent contractor for copyright purposes. Virtually all of these criteria bespeak a finding that plaintiffs herein were Detective's employee.

The first four factors which the District Court stated in *Picture Music* militate in favor of a finding of employment for hire are directly applicable to the facts of this case:

"(1) The existence of an arrangement going beyond an assignor-assignee relationship prior to the undertaking of the particular work. Ringer, *supra*, at 537. The antithesis of such an arrangement is a case where an author creates a work of his own volition and then sells it to a proprietor. Id.; T. Kupferman, 'Renewal of Copyright', 44 Colum. L. Rev. 712,

21

716 (1944); Olympia Press v. Lancer Books, Inc., 267 F. Supp. 920, 924 (S.D.N.Y., 1967)." (at p. 560)

Obviously, here the arrangement between plaintiffs and Detective was of a long-term-employment relationship pursuant to a written contract entered into prior to their work on Superman.

"(2) The payment of wages or other remuneration. Copinger & Skone James, *supra*. A regular salary is an important indicant of employment, Ringer, *supra*; Von Tilzer v. Jerry Vogel Music Co., 53 F. Supp. 191 (S.D.N.Y., 1943), aff'd sub nom. (Gumm v.) Jerry Vogel Music Co., 158 F. 2d 516 (2d Cir., 1946), but the salary need not be fixed and has often been in the form of advances against future royalties, if any. M. Nimmer, Copyright, §62.2, at 269.2-269 (1969); Tobani v. Carl Fischer, Inc., *supra*; (Shapiro, Bernstein & Co. v. Bryan, 123 F. 2d 697 (2d Cir., 1941); Fred Fischer Music Co. v. Leo Feist, Inc., 55 F. Supp. 359 (S.D.N.Y., 1944)." (at p. 651)

Here, the written agreement between the parties provided for payment of regular compensation to plaintiffs, computed on a per strip basis:

"(3) The right of the employer to direct and supervise the manner in which work is performed. Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., *supra*; Olympia Press v. Lancer Books, Inc., *supra*; Bryoco, Inc. v. Robbins Music Corp., 289 F. Supp. 136 (S.D.N.Y., 1967); Copinger & Skone James, *supra*; M. Nimmer, Copyright §62.2, at 269.2-269 (1969). This indicant has been called 'crucial'. Nimmer, *supra*. Courts have noted whether 'the author's work was edited by his employer and whether control was exerted over the style and content of the work. Olympia Press v. Lancer Books, Inc., *supra*,'" (at p. 651)

259

DEC00003375

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 136 of 321

As set forth above, Detective not only had the right to direct and supervise, but it exercised that right. Accordingly, this "crucial" factor is present here.

> "(4) The existence of an express contract for hire, especially one calling for an author to devote his exclusive artistic services to his employer, *Tobani v. Carl Fischer, Inc., supra; Shapiro, Bernstein & Co. v. Bryan, supra; Fred Fischer Music Co. v. Leo Feist, Inc., supra,* or requiring him to execute special contracts in connection with all works created which assign his copyright interest. *Fred Fisher Music Co. v. Leo Feist, Inc., supra.*" (at p. 661)

The written contract here did so limit and restrain all of plaintiffs' activities with respect to works used or published by Detective.

While the next three factors used in *Picture Music* may not have existed here, they were, in the language of the court "a non-essential ingredient of the employment relationship." And, indeed, the seventh factor, the employer's right to dismiss the employee was found by Justice Young in Finding 37 in the Westchester action. That finding indicates that during September 1938, Detective represented to plaintiffs that it had the right to discharge them at any time, to cease publishing material created by them and to continue to produce Superman notwithstanding such discharge.

Thus, even aside from the subsequent holding of this Court that works made for hire apply to works of independent contractors as well as employees, the Superman strip was a work made for hire by virtue of all the factors in the relationship between the parties indicating an employer-employee relationship.

# POINT II

**Plaintiffs conveyed the renewal term of the copyright of the Superman strip to National through various agreements between the parties.**

Even apart from the employee status of plaintiffs, National is still entitled to the renewal term as a result of the various written agreements between the parties, both prior to the publication of the first Superman strip and in settlement of the Westchester action. Admittedly the agreements between the parties do not expressly refer to the renewal term of copyright nor for that matter to the original term of copyright. Yet the intention of the various agreements was that plaintiffs transferred, in their entirety, all rights that they had or could have had in Superman to Detective.

The 1937 Employment Agreement specifically stated with respect to all of the productions and work done by plaintiffs for Detective that they "shall be and become the sole and exclusive property of the Employer and the Employer shall be deemed the sole creator thereof." The Employment Agreement went on to provide that after plaintiffs leave Detective's employ for any reason whatsoever, plaintiffs would not "directly or indirectly and through any means whatsoever, use, duplicate, simulate or bring into being any of the productions or work or creations or characters or plots used, made or created by him while in the employ of the employer."

Furthermore, on March 1, 1938, after the acceptance of the Superman magazine strip by Detective and prior to its publication in the first issue of "Action Comics", plaintiffs

IHRC00073376

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 137 of 321

signed a release agreement in order to induce Detective to publish the strip. This 1938 agreement referred the strip, "the exclusive right to the use of the characters, and story, continuity and title" to Detective "forever" (emphasis supplied). If further provided that plaintiffs were: "not to employ said characters or said story in any other strip or sell any like strip or story containing the same characters by their names contained therein or under any other names at any time hereafter to any other person, firm or corporation, or permit the use thereof by said other parties, without obtaining your written consent therefor" (emphasis supplied).

These two instruments read together indicate a total divestiture by plaintiffs of all their rights to any interest in Superman. Moreover, these agreements specifically enjoin plaintiffs for all time thereafter from any further use of the Superman strip or characters without Detective's consent. Any interpretation that such agreements do not include a transfer of all of plaintiffs' rights including the renewal right is illogical as it would give plaintiffs an illusory right, since they would own the renewal term and yet be precluded by permanent injunction from using the Superman story or characters. Indeed, defendants submit that there is no way that terms such as "forever" and "at any time hereafter" can be construed to mean only 28 years.

Justice Young's first Conclusion of Law that Detective "became the absolute owner of the comic strip Superman including the title, names, character and concept", as a result of these agreements was embodied in the Interlocutory Judgment in the Westchester action. Subsequent to that

Interlocutory Judgment and after negotiations between National and plaintiffs—in which plaintiffs were represented by counsel—plaintiff and defendant National agreed to the entry of a judgment which not only includes language identical to that of Justice Young's Conclusions, but goes on to provide in even more inclusive language that National "is the sole and exclusive owner of and has the sole and exclusive right to the use of the title Superman and to the conception, idea, pictorial representation and formula of the cartoon feature Superman as heretofore portrayed and published." It goes on to order that plaintiffs are permanently enjoined "from creating, publishing, selling or distributing" or "using" "any material of the nature heretofore created, produced or published under the title Superman." This Consent Judgment, in effect a further written agreement between the parties, can only be interpreted as a transfer of everything plaintiffs had or could have had, including any right to the renewal term.

Against all of this undisputed evidence which clearly shows that all rights, including renewal rights, were conveyed to National in settlement of the Westchester action, plaintiffs rely on the sole argument that none of the agreements between the parties specifically refers to copyright renewal rights. Relying primarily on two cases, Venus Music Corp. v. Mills Music Inc., 261 F. 2d 577 (2nd Cir. 1968) and Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F. 2d 518 (2nd Cir. 1968), cert. den. 358 U.S. 831 (1968), plaintiffs argue that the evidence here is not sufficient to overcome what plaintiffs call a presumption that general words of assignment do not pass renewal rights. Yet, regardless of whether such a pre-

261

DCC00003377
ER 3008

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 138 of 321.

sumption does apply, here there clearly is—and the District Court has so found—unambiguous evidence that transfer of the renewal was intended.

Moreover, as noted by Judge Lasker in his opinion below, both the *Venus* case and the *Marks* case involved a series of conflicting agreements under which the respective creators conveyed general rights to one or more parties and specific renewal rights to another party. It was in comparing the general with the specific, that this Court in *Marks* found that the grantee under the general agreement did not have sufficient evidence to overcome the creators' clear intention to convey renewal rights to the other party under the specific agreement. And in *Venus*, it was found that a second general conveyance included the renewal rights as the assignor no longer had the original term to convey. Accordingly, the determinations in those cases flow from the basic rules of the construction of ambiguous contracts. Here, in contrast, the agreements are not ambiguous, they are thoroughly consistent and there is no contradictory or countervailing evidence of any kind. Contrary to plaintiffs' suggestion in its brief (at p. 29) the court below did not substitute the number of agreements for evidence of intent. It found that the intent was incontroverted and unambiguous as expressed in the agreements.

The lower court properly noted that the facts in *Geisel v. Poynter Products, Inc.*, 295 F. Supp. 331 (S.D.N.Y. 1968) are more directly in point to the situation here. *Geisel* concerned the rights in the renewal term of a contribution to a magazine where the contending parties were the author and the magazine's publisher's successor in interest. In

the *Geisel* case, unlike this case where the relationship between plaintiffs and Detective is spelled out in written instruments, the court had to construe the arrangement between the parties based upon the custom and usage in the industry and a mere index card record of the transaction. Based upon the testimony before it, the court held that "all rights or complete rights" were assigned to the magazine. It then went on to construe the meaning of such phrases which are paralleled in the written contracts before this Court:

"In ordinary acceptance, the expressions 'all rights,' or 'complete rights' have a non-technical and literal meaning. Plaintiff has failed to sustain the burden of proof which is upon him when he seeks to impart to these words a connotation that is diametrically opposite to their plain, colloquial sense *** The terms 'all rights' and 'complete rights', when understood according to their plain meaning, signify a totality of rights, including the right of reproduction or common law copyright and the right to secure statutory copyright without qualification." (at pp. 341-342)

The court restated this conclusion in the following language:

"Absent a reservation of the common law copyright or other rights, the copyright and all other rights pass with an absolute and unconditional sale. ***

The parties formulate differently the rule of law deducible from the foregoing decisions—the difference revolving around the point whether an implied reservation of rights may be as effective as an express reservation in precluding the transfer of all of the artist's rights. Regardless of the formulation, the evidence in the present case convincingly establishes only one conclusion: all rights (including the common

DKPC00093378

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 139 of 321

law copyright) in the cartoons were transferred to Liberty without any equitable or other rights reserved to plaintiff. Liberty's statutory copyright likewise is not subject to any equitable or other rights in plaintiff." (at p. 344)

Here, of course, there was no reservation by plaintiff of any copyright interest, either common law or statutory, original or renewal term. Accordingly, following *Geisel*, all copyright interest passed to Detective. The *Geisel* case is direct precedent here because at the time of the alleged infringement in *Geisel*, the copyright was in its renewal rather than initial term. Unless the renewal term belonged to the publisher it would have had no rights to the works in question.

The construction of the ownership of the renewal term in *Geisel* is in accordance with other decisions holding that an author who is party to a sweeping all embracing contract, transferring all his rights in his work, has no implied retained right. Thus, in *Vargas v. Esquire, Inc.*, 164 F. 2d 522 (7th Cir. 1974), where the plaintiff was the creator of the famous Varga pinup girl, the court held that he had no implied right to require Esquire magazine to use his name in connection with the drawings in the face of the broad contractual grant of all his rights to Esquire without reservations:

"'* * * plaintiff by plain and unambiguous language completely divested himself of every vestige of title and ownership of the pictures, as well as the right to their possession, control and use. The language by which the extent of the grant is to be measured, 'shall forever belong exclusively to Esquire, and Esquire shall have all rights with respect thereto, including

(without limiting the generality of the foregoing) the right to use, lease, sell or otherwise dispose of the same as it shall see fit,' would appear to leave no room for a contention that any right, claim or interest in the pictures remained in the plaintiff after he has sold and delivered them to the defendant.'" (at p. 525)

Quoting from *Domeyer v. O'Connell*, 364 Ill. 467, 470, 4 N.E. 2d 830, 832, the court in *Vargas* stated:

"'The rules concerning the construction of contracts are so well established as to require but brief attention. The object of construction is to ascertain the intention of the parties. * * * That intention is to be determined from the language used in the instrument and not from any surmises that the parties intended certain conditions which they failed to express. Where there is no ambiguity in the language used, from that, and that alone, may the intention of the parties be gathered. * * *

"'* * * An implied intention is one necessarily arising from language used or a situation created by such language. If such intention does not necessarily arise, it cannot be implied. On the other hand, absence of a provision from a contract is evidence of an intention to exclude such provision.'" (at p. 526)

Applying that rule to the facts in *Vargas*, the Seventh Circuit continued its opinion as follows:

"'As already shown, we think there is no ambiguity in the granting language of the contract, nor can there be an implied intention from the language thus employed of an intention of the parties of any reservation of rights in the grantor. The parties had been dealing with each other for a number of years, and the fact that no reservation was contained in the contract strongly indicates that it was intentionally omitted. Such a reservation will not be presumed; it must

DSPC00003379

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 140 of 321

be expressed and clearly imposed. Grant v. Kellogg Co., D.C., 89 F. Supp. 48, 51, affirmed 2 Cir., 154 F. 2d 59." (at p. 526)

See also: *Harris v. Twentieth Century Fox Film Corp.*, 43 F. Supp. 119 (S.D.N.Y. 1942).

Also supporting defendants' position is the opinion of this Court in *Picture Music, Inc. v. Bourne, Inc., supra,* discussed at length in Point I. While this Court's affirmance rested upon a different ground, the District Court opinion was grounded upon an interpretation of the relationship between the parties which negated ownership of the renewal term by the songwriter Miss Ronell:

"Miss Ronell sought and expected only money and credit—not copyrights or renewal privileges. She was not a weak negotiator for her own interests. She never indicated a claim to an ownership in the popular song or its copyright or in any renewal copyright until about 1960. She knew that Berlin was the music publisher and had immediately copyrighted the song. Berlin had not sought or obtained any authorization in respect of the copyright or the publication of the song from Miss Ronell. It would have been normal to seek and obtain or supply such authorization if it was... less, Miss Ronell never claimed that she had any interest in the work, its copyrights or the publication of the song, except to obtain the royalties agreed upon in 1933 and except to be given public recognition (plaudits) in the form set out in the original credits. She did not broaden her claims even when the popular song was a great success. Nearly three decades later, she hit upon the ideas which gave rise to this suit and the filing of claims to the last year of the original copyright and to the renewal copyright." (at pp. 652, 653)

The behavior of Miss Ronell in the *Picture Music* case parallels that of plaintiffs herein. Never once did they make any claim to ownership of a copyright interest, either in the original or renewal term, until they filed their 1965 claim to the renewal term with the Copyright Office without informing National. This failure to assert copyright claims is significant in view of the fact that plaintiffs like Miss Ronell were "not weak negotiators for their own interest." They were represented by counsel, and succeeded in obtaining from Detective a large sum of money in the settlement of the Westchester action.

Plaintiffs argue that insufficient or no consideration was paid for renewal rights, that plaintiffs were inexperienced and that Detective and National were staffed by experienced businessmen and should have known to make specific reference to renewal rights. Such arguments are without merit and, in Judge Lasker's words, "prove too much." First, as to consideration, the undisputed evidence is that up until the time of the Westchester action plaintiffs had been paid some $400,000. and, then, in the settlement of that action they were paid an additional $94,000. Second, both sides were represented by counsel throughout the Westchester action and the settlement thereof. Finally, in 1952, well after the 1946 conclusion of the Westchester action, plaintiff Siegel, through a letter from his then lawyer which Siegel had read, confirmed and approved as indicated by his signature thereon, admitted that he had no further claim against defendants herein. As stated by Siegel's counsel in that letter annexed as "Exhibit 7" to the moving affidavit:

"I have told Jerry (Siegel) that in my opinion he is entirely without any legal justification for any of the

DER00008380

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 141 of 321

statements he recently made since his entire dispute with (the defendants) was fully and completely disposed of by the judgment he consented to in the settlement of the litigation in Westchester County. I have told Jerry that he has no claim for money or for anything else against (the defendants) . . . I have made it clear to him that whatever (the defendants) may elect to do by way of help to Jerry in his present predicament cannot be construed as any admission by them or any of them of any obligation to him.''

Moreover, the circumstances of the settlement of the Westchester action contain yet another manifestation of the parties' intention. The settlement agreement was reached after a hard fought litigation. At that time Superman had been for many years a big commercial success, and National and its predecessors had spent large sums of money promoting and developing it. It appeared that Superman would continue to enjoy public favor for a number of years. In order to achieve a settlement of the litigation and to finally and permanently enjoin plaintiffs from using or exploiting Superman, National paid over $94,000. to plaintiff. Obviously, it would be unthinkable for National to have done so without at the same time requiring every conceivable right to the property which was the subject of the settlement. In particular, they could not have intended and the permanent injunction provision could not have contemplated that these rights were to terminate some eighteen years hence, when the original term would expire. Such a result would have left defendants at the mercy of plaintiff, from whom they had just bought peace, and would have emasculated the permanent injunction provision beyond reason.

The very unreasonableness of plaintiffs' contentions renders them meaningless as a matter of law. In Grant v. Kellogg Co., 58 F. Supp. 48 (S.D.N.Y. 1944), aff'd per curiam 154 F. 2d 59 (2nd Cir. 1946), which concerned the rights to the characters "Snap", "Crackel" and "Pop", used to advertise Kellogg's Rice Krispies, the court emphasized the unreasonableness of the plaintiff's contention that he had the right to prohibit further use of these characters:

"It is not to be implied that defendant intended to give up what constant advertising had built, when and if Grant, voluntarily or otherwise, ceased his employment by it. If the theme and advertising idea, or slogan, whatever it may be called, so well ingrained in public notice after six years of extensive and expensive advertising, were to be proscribed by Grant's defection, voluntary termination of service, or expulsion, or even death, all benefit from its large investment and extensive advertising campaign would cease. To imply any such result, to my mind, is contrary to the authorities, against the weight of the evidence, and entirely unreasonable." (at p.53)

In the case at bar, the interpretation of the settlement agreement for which plaintiffs contend is equally unreasonable in that it would implicitly deprive National of its rights to the valuable property Superman at the expiration of the original term at the same time plaintiffs were permanently enjoined from using it.

Moreover, as the second chronological transfer by plaintiffs of all rights to Superman, it follows (in accordance with a Venus Music Corp. v. Mills Music Inc., 261 F. 2d 577 (2d Cir. 1958) that that transfer included the renewal rights.

ER 3012
DCC00003381

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 142 of 321

## Conclusion

94

For all the reasons stated herein, we submit that the District Court's order granting defendants' motion for summary judgment and the judgment entered pursuant thereto were proper and should be affirmed.

Respectfully submitted,

WEIL, GOTSHAL & MANGES
*Attorneys for Defendants-Appellees*
767 Fifth Avenue
New York, New York 10022
(212) 768-7900

EDWARD C. WALLACE
HARVEY GRANT FLORENCE
*Of Counsel*

---

## Applicable Statute

85

### Copyright Act

§24. Duration; Renewal and Extension

The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name, or is published anonymously or under an assumed name: *Provided,* That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright; * * *.

§26. Terms Defined

In the interpretation and construction of this title * * * the word "author" shall include an employer in the case of works made for hire.

266

DER 003382

EXHIBIT X

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 144 of 321

1   Marc Toberoff (CA State Bar No. 188547)
    Rafael Gomez-Cabrera (CA State Bar No. 229744)
2   Jeffrey B. Linden (CA State Bar No. 224761)
    Nicholas C. Williamson (CA State Bar No. 231124)
3   LAW OFFICES OF MARC TOBEROFF, PLC
    1999 Avenue of the Stars, Suite 1540
4   Los Angeles, CA 90067
    Telephone: (310) 246-3333
5   Facsimile: (310) 246-3101

6   Attorneys for Plaintiffs
    Joanne Siegel and Laura Siegel Larson
7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10
    JOANNE SIEGEL, an individual; and      Civil Case No. _____
11  LAURA SIEGEL LARSON, an individual,

12              Plaintiffs,                COMPLAINT FOR:
                                           [1] DECLARATORY RELIEF RE:
13        vs.                                  TERMINATION, 17 U.S.C.§304(c);
                                           [2] DECLARATORY RELIEF RE:
14  WARNER BROS. ENTERTAINMENT                  PROFITS;
15  INC., a corporation; TIME WARNER INC., [3] DECLARATORY RELIEF RE:
    a corporation; DC COMICS INC., a           USE OF "S" CREST;
16  corporation; and DOES 1-10,            [4] ACCOUNTING FOR PROFITS;
                                           [5] WASTE OF JOINTLY OWNED
17              Defendants.                     COPYRIGHTS;
18                                         [6] VIOLATION OF LANHAM ACT
                                               15 U.S.C. § 1125;
19                                         [7] VIOLATION OF CALIFORNIA
20                                             BUSINESS AND PROFESSIONAL
                                               CODE §§ 17200 ET SEQ.
21
22                                         DEMAND FOR JURY TRIAL
23
24        Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the
25  "Plaintiffs"), by and through their attorney of record, hereby allege as follows:
26              JURISDICTION AND VENUE                                        **267**
27        1.    This is a civil action seeking declaratory relief, accounting for profits, remedies
28  for violations of the Lanham Act and violations of California unfair competition laws and

    Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition    ER 3015

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 145 of 321

related claims arising out of Plaintiffs' termination of prior grants of copyright in and to the original character and work known as "Superman" and subsequent "Superman" works pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c), and defendants' willful misconduct with respect thereto.

2.    This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 *et al.* and 28 U.S.C. §§ 1331, 1338(a) and 1332 .

3.    This Court has supplemental jurisdiction over the related state claims herein in that these claims form part of the same case and controversy as the federal claims herein.

4.    This Court has personal jurisdiction over the defendants in that defendants are regularly doing business in the State of California and in this District, and because a substantial part of the relevant acts complained of herein occurred in the State of California and this District.

5.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

### PARTIES

6.    Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an individual and citizen of and resides in the State of California, in the County of Los Angeles, and is and at all times has been a citizen of the United States.  Joanne Siegel is the widow of famed comic book creator Jerome (a.k.a. "Jerry") Siegel.

7.    Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel") is an individual and a citizen of and resides in the State of California, in the County of Los Angeles, and is and at all times has been a citizen of the United States.  Laura Siegel is the daughter of Jerome Siegel.

8.    Plaintiffs are informed and believe and based thereon allege that defendant WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner Bros.") is a corporation organized and existing under the laws of the State of Delaware, which has its principal place

**268**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 146 of 321

1   of business in Los Angeles County, California. Warner Bros. is a wholly owned subsidiary of

2   Defendant TIME WARNER INC.

3          9.      Plaintiffs are informed and believe and based thereon allege that Defendant DC

4   COMICS INC. (hereinafter "DC") is a corporation organized and existing under the laws of

5   the State of New York, which has its principal place of business in the State of New York; and

6   that DC regularly conducts significant business in the State of California and in the County of

7   Los Angeles. DC is also a wholly owned subsidiary of defendant Warner Bros.

8          10.     Plaintiffs are informed and believe and based thereon allege that on or about

9   September 30, 1946, the New York corporations, Detective Comics, Inc., Superman, Inc., All

10  American Comics, Inc., Jolaine Publications, Inc., Wonderwoman Publishing, Inc., Hop

11  Harrigan Enterprise, Inc., Gainlee Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best

12  Comics, Inc. and Trafalgar Printing Co., Inc. were consolidated into the New York

13  corporation National Comics Publications, Inc., the name of which was later changed to

14  National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and further that DC,

15  Warner Bros. and Time Warner, and/or each of them, are the alleged successor(s)-in-interest

16  to National Periodical Publications, Inc.

17         11.     Plaintiffs are informed and believe and based thereon allege that Defendant

18  TIME WARNER INC. (hereinafter "Time Warner") is a corporation organized and existing

19  under the laws of the State of Delaware, which has its corporate headquarters in the State of

20  New York, and that Time Warner regularly conducts significant ongoing business in the State

21  of California and in the County of Los Angeles. Time Warner is the parent company of both

22  Warner Bros. and DC. (Time Warner, Warner Bros. and DC are sometimes collectively

23  referred to hereinafter as the "Defendants;" and each reference to Defendants shall also refer

24  to each Defendant).                                                              **269**

25         12.     Plaintiffs are informed and believe and based thereon allege that Defendant DC

26  never, or rarely, exploits "Superman," independently of its controlling parent company,

27  Warner Bros.; that even relatively linear functions such as "Superman" licensing are not

28  handled directly by DC, but are exploited exclusively through Warner Bros.; that the

3

ER 3017

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 147 of 321

1   agreements and other arrangements between Defendants Warner Bros. and DC regarding

2   "Superman" are not "arms length" agreements, serve primarily Warner Bros.' interests, and

3   thus, do not reflect the appropriate market values of the copyrights to "Superman," at issue

4   herein.

5        13.    Plaintiffs are informed and believe and based thereon allege that Defendants

6   Time Warner, Warner Bros. and DC are, and at all times material hereto were, the alter-egos

7   of each other and there exists and has existed at all times material hereto a unity of interest and

8   ownership among such Defendants such that any separateness has ceased to exist in that

9   Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for

10  its and/or their separate, individual purposes, and caused valuable assets, property, rights

11  and/or interests to be transferred to each other without adequate consideration.

12       14.    Plaintiffs are informed and believe and based thereon allege that the fictitiously

13  named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them,

14  were in some manner responsible or legally liable for the actions, damages, events,

15  transactions and circumstances alleged herein.  The true names and capacities of such

16  fictitiously named defendants, whether individual, corporate, associate, or otherwise are

17  presently unknown to Plaintiffs, and Plaintiffs will amend this Complaint to assert the true

18  names and capacities of such fictitiously named Defendants when the same have been

19  ascertained.  For convenience, each reference herein to a named Defendant shall also refer to

20  the Doe Defendants and each of them.

21       15.    Plaintiffs are informed and believe and based thereon allege that each of the

22  Defendants was the agent, partner, servant, employee, or employer of each of the other

23  Defendants herein, and that at all times herein mentioned, each of the Defendants was acting

24  within the course and scope of such employment, partnership and/or agency and that each of

25  the Defendants is jointly and severally responsible for the damages hereinafter alleged.

26                 **FACTS COMMON TO ALL CLAIMS FOR RELIEF**     **270**

27       16.    In 1933 Jerome Siegel conceived the original idea of a cartoon strip featuring a

28  unique man of superhuman strength and powers who would perform feats of great importance

                  4

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 148 of 321

1  for the public good. Siegel conceived, in essence, the first "superhero" -- an original concept
2  which embodied our nation's ideals at the Worlds' darkest hour, became a cultural icon and
3  spawned, what is today, a booming industry. Jerry Siegel entitled his character --
4  "Superman."

5      17.   In or about 1934, Jerome Siegel authored twenty-four days (four weeks) of
6  "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for
7  weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine
8  page synopsis covering approximately two months of daily "Superman" newspaper comic
9  strips (at six days per week). Plaintiffs are informed and believe and based thereon allege that
10 these works, though originally unpublished were thereafter included or incorporated in the
11 early "Superman" comic strips thereafter published from on or about April 18, 1938 to April
12 13, 1943 (collectively, referred to hereinafter as the "Initially Unpublished Works").

13     18.   In or about 1934, Jerome Siegel and the artist, Joe Shuster (hereinafter
14 collectively, "Siegel and Shuster") co-authored *fifteen* daily "Superman" comic strips,
15 consisting of one week (six days) of completely inked daily "Superman" comic strips and
16 three additional six day weeks of "Superman" comic strips in penciled form. (the "1934
17 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous
18 publishers over the next few years.

19     19.   Although "Superman" was not picked up for publication for some time, Siegel
20 and Shuster did get other features they created into print with the Nicholson Publishing
21 Company including "Henri Duval" and "Dr. Occult." In a letter dated October 4, 1935, the
22 company's owner Malcolm Wheeler-Nicholson, wrote to Mr. Siegel expressing an interest in
23 publishing "Superman" in comic book form but Siegel and Shuster rejected his offer.
24 Nicholson became involved with a new comic magazine company, Detective Comics, Inc.
25 (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam Bradley" and
26 "Spy," appeared in "Detective Comics No. 1."                                    **271**

27     20.   On or about December 4, 1937, Siegel and Shuster, as independent contractors,
28 entered into an agreement with Detective Comics (the "1937 Agreement") to continue to

                                              5

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 149 of 321

1  produce the comic magazine features, "Slam Bradley" and "The Spy," which agreement

2  provided, in part, that any new and additional features which Siegel and Shuster produced for

3  use in a comic magazine were to be first submitted to Detective Comics which reserved the

4  right to accept or reject same within sixty days.

5      21.    One of the early entities to whom Siegel had submitted "Superman" was The

6  McClure Newspaper Syndicate.  In or about early 1938, the head of the syndicate sought

7  Siegel's permission to forward  Siegel and Shuster's 1934 Superman Comic Strip material to

8  Detective Comics for potential publication in its contemplated new magazine, "Action

9  Comics."  By this time, "Superman" and his miraculous powers had already been completely

10  developed by Siegel and Shuster.

11      22.    In or about January–February 1938, when Detective Comics expressed interest

12  to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel

13  and Shuster cut and pasted their aforementioned material into more than ninety separate

14  panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper strip more

15  suitable for a magazine layout.

16      23.    The "Superman" material described hereinabove, which was the independent,

17  original creation of Siegel and Shuster, contained virtually all of the signature elements and

18  characters of the "Superman" mythology and constituted the formula for the continuing

19  "Superman" series to come.  It depicted and narrated the origin of the "Superman" character,

20  and contained a complete delineation of the literary and pictorial representation of

21  "Superman," including without limitation, his habits, character, superhuman powers,

22  appearance, costume, secret identity and attributes, and the sphere of public good "Superman"

23  was to enhance.

24      24.    By an instrument dated March 1, 1938 (hereinafter, the "1938 Grant"), which

25  had been prepared by Detective Comics, Siegel and Shuster agreed to the publication of their

26  Revised 1934 Superman Comic Strip by Detective Comics in consideration for the sum of

27  $130.

28



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 150 of 321

25.   Thereafter, Detective Comics published Siegel and Shuster's "Revised 1934 Superman Comic Strip" in the "June, 1938" issue of "Action Comics No. 1," which was issued for sale on April 18, 1938.

26.   Action Comics No. 1 and the predecessor materials created solely by Siegel and Shuster contained the essential elements of "Superman" which continue to this day, including without limitation, Superman's origin from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits, his mission as a champion of the oppressed to use his great powers to benefit humankind, his secret identity as newspaper reporter, "Clark Kent," his relationship with other key characters such as the newspaper editor from whom he takes his assignments and his romantic interest in Lois, who rebuffs Clark as a coward, while romantically inclined towards "Superman."

27.   Action Comics No. 1 was followed by further issues published at regular intervals, with each subsequent issue containing additional "Superman" material created by Siegel and Shuster.

28.   Between March, 1938 and on or about September, 1938, Siegel and Shuster continued to create "Superman" strips, stories and continuities.

29.   On or about September 22, 1938, Detective Comics, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure Agreement) regarding the newspaper syndication of a "Superman" comic strip.

30.   On or about September 22, 1938, Detective Comics and Siegel and Shuster therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to do the "artwork and continuity" for five comic strips, including "Superman."

31.   Prior to September 22, 1938, Siegel and Shuster solely created six comic book issues of "Superman," published as Action Comics Nos. 1 through 6. Of these, Action Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics No. 6 was published four days later on September 26, 1938.

**273**

**ER 3021**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 151 of 321

32.     Action Comics No. 1 was not a "work made for hire." Action Comics Nos. 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, were also not "works made for hire."

33.     On or about December 19, 1939, Detective Comics and Siegel and Shuster entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised Siegel and Shuster's per page compensation rate for the increasingly popular "Superman" comic strip.

34.     Plaintiffs are informed and believe and thereon allege that the "Superman" works created by Siegel and Shuster after they entered into the September 22, 1938 agreement with Detective Comics were also not "works made for hire." The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on "Superman," yet Siegel and Shuster were never traditional employees of Detective Comics. Without limitation, Siegel and Shuster were not paid a salary, but were consistently paid on a "per page" basis, and only for materials actually delivered by them and published. Plaintiffs are further informed and believe and thereon allege that in compensating Siegel and Shuster, Detective Comics did not withhold or deduct payroll, social security and other taxes normally deducted from employee salaries; Detective Comics did not provide employee benefits to Siegel and Shuster; Siegel and Shuster worked from their own premises (not Detective Comic's premises); determined their own hours and days of work; supplied, used and paid for their own instrumentalities, tools and materials; and hired and paid for their own assistants.                                                                          **274**

35.     In or about 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester against National Comics Publications, Inc. (hereinafter, the "1947 Action" ) to determine the validity of the contracts between National Comics Publications, Inc.'s predecessors–in–interest and Siegel and Shuster with respect to "Superman." Pursuant to stipulation of the parties the action was referred for decision to an Official Referee of the New York Supreme Court. After trial of the action the Official Referee rendered an opinion dated November 1, 1947. On April 12, 1948, the Official Referee signed

8

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 152 of 321

1 | detailed findings of fact and conclusions of law and entered an interlocutory judgment
2 | upholding the contracts in some respects, to which notices of appeal were filed by all said
3 | parties. Settlement negotiations ensued, resulting in a stipulation of settlement between said
4 | parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry
5 | in the New York Supreme Court of a final consent judgment dated May 21, 1948.

6 |      36.    In or about the early 1970's, a dispute arose between Siegel and Shuster and
7 | National Periodical Publications, Inc. regarding the renewal copyright to "Superman,"
8 | resulting in Siegel and Shuster's filing of an action against National Periodical Publications,
9 | Inc. in the United States District Court for the Southern District of New York for a declaration
10 | that Siegel and Shuster were entitled to the renewal copyright to "Superman." The District
11 | Court held in Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al.,
12 | 364 F. Supp.1032 (1973) that the initial "Superman" comic strip, published in Action Comics
13 | No. 1, is a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. §26, and that,
14 | in any event, the various agreements between the parties, prior to the action, transferred the
15 | renewal copyright in this material to Detective Comics.

16 |      37.    On appeal, the United States Court of Appeals for the Second Circuit held
17 | in Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al., 509 F.2d
18 | 909 (2nd Cir., 1974), that the District Court erred in finding that Superman was a "work for
19 | hire" under the Copyright Act, 17 U.S.C. §26, and that "Superman" and his miraculous
20 | powers were created by Siegel and Shuster long before any employment relationship with
21 | Detective Comics. The Second Circuit nonetheless held that the Official Referee's
22 | determination in the 1947 Action that Siegel and Shuster had transferred all rights in
23 | "Superman" to Detective Comics implicitly included a determination that Siegel and Shuster
24 | had transferred the renewal copyright in "Superman" to Detective Comics; and that this
25 | determination was binding under the doctrine of *res judicata*.     **275**

26 |      38.    On or about December 23, 1975, Siegel and Shuster entered into an agreement
27 | with Warner Communications Inc. (hereinafter the "1975 Agreement") the alleged parent
28 | company of National Periodical Publications, Inc., which provided for (i) the payment of

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 153 of 321

$10,000 to Siegel and Shuster, modest annual payments plus medical benefits to Siegel and

Shuster and, upon their deaths, to certain of their respective heirs; and (ii) that Siegel and

Shuster would be given credit on certain "Superman" publications and derivative works as the

"creators" of Superman, in exchange for Siegel and Shuster's acknowledgement that Warner

Communications, Inc. is the exclusive owner of all right, title and interest in and to

"Superman." (The 1937 Agreement, the 1938 Grant, the 1938 McClure Agreement, the 1938

Agreement, the 1939 Agreement, the 1948 Stipulation and the 1975 Agreement described

hereinabove are hereinafter sometimes referred to collectively as the "Alleged Grants".)

39.    On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel, served by first

class mail, postage prepaid, notices of termination, as permitted by the Copyright Act, 17

U.S.C. § 304 (c) (hereinafter, the "Termination Notices") on each of the Defendants and a

number of their subsidiaries, licensees and affiliates, terminating the Alleged Grants of the

renewal copyright to (i) the copyrightable "Superman" character, (ii) the 1933 Superman

Comic Strip and the Revised 1933 Superman Comic Strip, both published as/in Action

Comics No. 1, (iii) the material published as/in Action Comics Nos. 1-6 (statutory copyright

to Action Comics No. 6 was secured on September 26, 1938), (iv) the material published as/in

Action Comics Nos. 7- 61 (statutory copyright to Action Comics No. 61 was secured on April

13, 1943), and/or (v) subsequent works involving "Superman," all as set forth in the Notices

of Termination (hereinafter sometimes referred to collectively as the "Works").

40.    Plaintiffs are informed and believe and based thereon allege the Initially

Unpublished Works set forth in the Termination Notices were incorporated or included in

Works published thereafter, to which the Termination applies.

41.    Plaintiffs are further informed and believe and based thereon allege that the

copyrights to all the Works were duly renewed.

42.    The Notices of Termination were drafted, served on Defendants and filed with

the United States Copyright Office, all in full compliance with the Copyright Act, 17 U.S.C.

304(c). and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. §

**276**




Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 154 of 321

1    201.10 (2003). (Plaintiffs' aforesaid exercise of their termination rights under 17 U.S.C. §

2    304(c) regarding "Superman" is sometimes hereinafter referred to as the "Termination").

3         43.     As the original co-author of each Work Jerome Siegel owned an undivided fifty

4    percent (50%) of the copyright of each Work prior to any alleged transfer or assignment of any

5    such Work pursuant to any Alleged Grant.

6         44.     The Notices of Termination terminated on April 16, 1999 (hereinafter, the

7    "Termination Date") all prior grants or purported grants of the renewal copyrights in and to

8    each and/or all the Works for their extended renewal terms (hereinafter, sometimes referred to

9    individually and collectively as the "Recaptured Copyrights"), including, but not limited to,

10    the Alleged Grants.

11        45.     On April 16, 1999, the Termination Date, Plaintiffs re-gained ownership to

12    Jerome Siegel's undivided fifty percent (50%) copyright interest in and to each and/or all the

13    Works for their extended renewal terms. In accordance with 17 U.S.C. 304(c), and as set forth

14    in the Notices of Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled

15    to share in the proceeds from this recaptured interest.

16        46.     Defendants have acknowledged that the Notices of Termination are effective.

17    Defendants have further admitted that Plaintiff's thereby co-own the copyright(s) to at least

18    the original "Superman" elements authored by Siegel and Shuster; and that Defendants have a

19    duty to account to Plaintiffs for Defendants' exploitation of such copyright(s).

20        47.     On April 16, 1997, in response to the service of the Notices of Termination,

21    John A. Schulman, Executive Vice President and General Counsel of Defendant Warner Bros.

22    wrote a letter to Joanne Siegel, stating in relevant part:

23              "As to the Notices of Termination, I wasn't surprised at their

24              arrival...After the effective date of the termination, there will

25              still remain 14 years of copyright protection left to the joint

26              copyright holders of the original Superman elements. Those are

27              what we should share."

28

**277**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 155 of 321

48.     Similarly, on October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in relevant part:

> "The [Superman] rights involved are non-exclusive; they are shared with DC. Since both you and DC would have these rights, we would each have the obligation to pay the other for using those rights if you did not re-grant them to DC."

49.     Yet, on April 15, 1999, one day before the Termination Date, Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the termination with respect to *any* "Superman" copyrights, stating in relevant part:

> "[Y]ou are hereby put on notice that DC Comics rejects both the validity and scope of the notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed, any rights at all, in Superman."

50.     Defendant DC's April 15, 1999 letter constituted a thinly veiled threat that if Plaintiffs ever attempted to exploit *any* of their recaptured copyright interests in "Superman," Defendants would engage in a campaign of intimidation, including, but not limited to, instituting frivolous litigation against Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs' ability to exploit their Recaptured Copyright interests. Given that Time Warner is one of the largest media companies in the world with over $38 billion in annual revenues, Defendants' threats had a devastating and chilling effect on Plaintiffs' freedom to exploit the copyright interests they had properly regained under the Copyright Act, 17 U.S.C. § 304 (c), damaging Plaintiffs and causing them great emotional distress.

51.     In the nearly 5 ½ years since the Termination Date, none of the Defendants has ever accounted to the Plaintiffs for any proceeds or profits whatsoever from their ongoing exploitation of "Superman" and the jointly owned Recaptured Copyrights.

////

12

**278**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 156 of 321

# FIRST CLAIM FOR RELIEF

(Declaratory Relief Re: Termination, 17 U.S.C. § 304(c) - Against All Defendants)

52.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53.     By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants under Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective rights and interests in and to the copyright to various "Superman" works, for which Plaintiffs desires a declaration of rights.

54.     Plaintiffs contend and Defendants deny that:

        a.      The Notices of Termination terminated on April 16, 1999 all prior grants, assignments or transfers of copyrights for the extended renewal term in and to each and/or all of the Works (as defined in paragraph 39 hereinabove) to any of the Defendants and other parties duly served with the Notices of Termination, including their predecessors-in-interest;

        b.      As of the effective Termination Date, April 16, 1999, Plaintiffs owned and continue to own an undivided fifty percent (50%) of the Recaptured Copyrights to each and/or all the Works for their renewal terms;

        c.      By reason of the foregoing, Plaintiffs are entitled to fifty percent (50%) of any and all proceeds, compensation, monies, profits, gains and advantages from the exploitation of, or attributable to, in whole or in part, any aspect of the Recaptured Copyrights (hereinafter, sometimes referred to as "Profits"); and

        d.      By reason of the foregoing, Defendants own or control only fifty percent (50%) of the Recaptured Copyrights, and thus, as of the Termination Date, had and have no authority to confer exclusive licenses or grants with respect to any element of the "Superman" mythology protected by the Recaptured Copyrights.

55.     A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their respective rights and

13

**279**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 157 of 321

1   obligations with respect to the Termination and the copyright interests thereby recaptured by

2   Plaintiffs.

3   ## SECOND CLAIM FOR RELIEF

4   (Declaratory Relief Re: Profits from Recaptured Copyrights - Against All Defendants)

5   56.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 55

6   inclusive, as though fully set forth herein.

7   57.   By reason of the foregoing facts, an actual and justiciable controversy has

8   arisen and now exists between Plaintiffs and Defendants concerning how Profits from

9   Recaptured Copyrights should be defined for purposes of Defendants and Plaintiffs accounting

10  to one another as joint owners of the Recaptured Copyrights.

11  58.   Plaintiffs contend and Defendants deny that:

12  a.   Profits include Defendants' revenues from the post - April 16, 1999

13  exploitation of the Recaptured Copyrights in foreign territories, when such exploitation results

14  from the predicate exercise *in the United States* of any right(s) under the Recaptured

15  Copyrights by any Defendant, their licensees or assigns,;

16  b.   There should be no *apportionment* of Profits since Plaintiffs are entitled

17  to fifty percent (50%) of such Profits as *joint owners* of the Recaptured Copyrights;

18  c.   Alternatively, *apportionment*, if any, should apply only to profits from

19  the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but

20  not to profits from mere *licensing* of the Recaptured Works.  Any such apportionment should

21  weigh heavily in Plaintiff's favor, since the value of the "Superman" franchise exploited by

22  the Defendants ("Superman Franchise") is largely attributable to the unique "Superman"

23  mythology protected by the Recaptured Copyrights.  The Superman Franchise capitalizes on

24  the success of, and is hardly distinguishable from, the underlying Recaptured Copyrights co-

25  owned by Plaintiffs;

26  d.   Profits include profits from any merchandise or other derivative works

27  created, produced or manufactured on or after the Termination Date, April 16, 1999,

28

14

**280**

ER 3028

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 158 of 321

1  notwithstanding that the underlying licensing agreement for such exploitations may have been

2  executed prior thereto;

3      e.    Profits are not limited to the Profits of Defendant DC, Warner Bros.'

4  wholly owned subsidiary, but include the Profits of Defendants Warner Bros. and Time

5  Warner, as well; and

6      f.    In determining Profits, deductible costs should include only reasonable

7  costs directly attributable to the exploitation of the Recaptured Copyrights, of the type

8  customarily deducted in arms' length agreements to exploit copyrights of comparable value,

9  all in compliance with Generally Accepted Accounting Principles (GAAP).

10     59.    A declaration of the Court is necessary pursuant to the Declaratory Judgment

11  Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their respective rights and

12  obligations with respect to Profits from the exploitation of the Recaptured Copyrights after the

13  Termination Date.

14                          **THIRD CLAIM FOR RELIEF**

15      (Declaratory Relief Re: Use of the "Superman" Crest - Against All Defendants)

16     60.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 59

17  inclusive, as though fully set forth herein.

18     61.    By reason of the foregoing facts, an actual and justiciable controversy has

19  arisen and now exists between Plaintiffs and Defendants concerning whether Plaintiffs are

20  entitled, after the Termination Date, to commercially exploit the "Superman" crest comprised

21  of a large red "S" centered on a broad triangular yellow field, first appearing (as part of

22  "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest)

23  in the 1934 Superman Comic Strip and the 1934 Revised Superman Comic Strip created by

24  Siegel and Shuster and the published as Action Comics No. 1, and in only slightly revised

25  form in subsequent Works (hereinafter the "Superman Crest"); and whether Defendants' duty

26  to account, as non-exclusive joint owners of such Recaptured Copyrights, include Profits from

27  licensing of this crest.

28

15

**281**



1    62.    Defendants allege a trademark interest in a "Superman" shield (hereinafter the

2  "Superman Shield" and/or "Superman Trademark") which is also comprised of a large red "S"

3  on a broad triangular yellow field, first appearing in later Works, as part of "Superman's"

4  costume, centered on and highlighting Superman's "V" shaped muscular chest, with the upper

5  corners of the triangular crest slightly cropped.

6    63.    Plaintiffs contend and Defendants deny that:

7        a.    The Recaptured Copyrights include the copyright to the "Superman"

8  crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing

9  as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped

10 muscular chest, in the 1934 Superman Comic Strip and the Revised 1934 Superman Comic

11 Strip published as Action Comics No. 1, and appeared in subsequently published Works in

12 only slightly revised form (hereinafter the "Superman Crest").

13        b.    Defendants' alleged Superman Trademark design arose directly from,

14 and is substantially identical to, Siegel and Shuster's copyrighted Superman Crest;

15        c.    Defendants receive significant proceeds and value from the utilization

16 and copying of the Superman Crest and/or substantially identical Superman Shield for which

17 Defendants must account to Plaintiffs;

18        d.    In turn, Plaintiffs should likewise be allowed to exercise their rights

19 under copyright with respect to the Superman Crest, including without limitation the right to

20 commercially exploit the Superman Shield in merchandise;

21        e.    Defendants, in any event, cannot use the alleged Superman Trademark

22 or any other purported trademark interest regarding "Superman" to prevent, hinder or restrain

23 Plaintiffs' use, exercise or exploitation of their rights under the Copyright Act in any of the

24 jointly owned Recaptured Copyrights.

25    64.    A declaration of the Court is necessary pursuant to the Declaratory Judgment

26 Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their respective rights and

27 obligations with respect to the Superman Crest and the Superman Shield.

28 ////

**282**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 159 of 321



# FOURTH CLAIM FOR RELIEF

(Accounting for Profits - Against All Defendants)

65. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66. On or after the Termination Date, April 16, 1999, Defendants and/or each of them have licensed and/or commercially exploited and will continue to license or exploit the Recaptured Copyrights, including without limitation, *via* merchandising, publishing, and derivative motion picture and television programming.

67. As result of such licensing and/or commercial exploitation of the Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of them have received and will continue to receive substantial Profits, fifty percent (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured Copyrights.

68. Defendant Warner Bros. has acted and continues to act in most instances as the effective joint-owner and licensor (as opposed to licensee) of the Recaptured Copyrights; and, as such, Warner Bros., along with the other Defendants, owes a duty to account to Plaintiffs.

69. To date, the Profits received by Defendants and/or each of them from such licensing and/or commercial exploitation on or after April 16, 1999 is estimated to be $40 million, however the exact sums actually received and to be received by Defendants and/or each of them, are unknown to Plaintiffs at this time, for these amounts can be properly determined only by an accounting.

70. Plaintiffs have demanded an accounting by Defendants on a continuing basis of all amounts received by them and/or payable to them from such licensing and other commercial exploitation on or after April 16, 1999, and that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

71. In nearly 5 ½ years since the Termination Date, Defendants have, nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

////

////

17

**283**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 160 of 321



72. Plaintiffs at no time waived their rights to receive their share of such Profits, nor have Plaintiffs at any time consented to the use and exploitation of the Recaptured Copyrights in the United States or any foreign territories.

73. Plaintiffs are entitled to an ongoing accounting from Defendants regarding all amounts received, realized by or payable to Defendants on or after April 16, 1999 from the licensing and any other commercial exploitation of the Recaptured Copyrights and "Superman Franchise," and to the payment by Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

### FIFTH CLAIM FOR RELIEF

(Waste of Co-Owned Copyright - Against All Defendants)

74. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 73 inclusive, as though fully set forth herein.

75. On or about April 16, 1999, Plaintiffs became and currently are the co-owners, as tenants in common, with Defendants of an undivided fifty percent (50%) of the Recaptured Copyrights.

76. The April 15, 1999 letter from Defendant DC's attorneys alleged hereinabove baselessly denied the validity of the Termination with respect to *any* and all "Superman" copyrights and threatened to take action against Plaintiffs if they attempted to exploit *any* of their Recaptured Copyrights.

77. In so threatening Plaintiffs, DC, and by extension DC's parent companies, Warner Bros. and Time Warner, asserted exclusive ownership and control of "Superman" and effectively controlled the Recaptured Copyrights, notwithstanding the Termination.

78. Plaintiffs are informed and believe and thereon allege that in light of Defendants' adverse claims, resources, power and ubiquitous presence in the marketplace, virtually no parties would dare to license the Recaptured Copyrights from Plaintiffs.

79. Plaintiffs are informed and believe and thereon allege that since the Termination Date, Defendants and/or each of them have caused injury to the Recaptured Copyrights by committing waste thereon. Plaintiffs are informed and believe and thereon

18

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 162 of 321



1  allege that such waste includes, without limitation, Defendants under-utilization of the
2  Recaptured Copyrights, non "arms length" contracts between wholly owned subsidiaries
3  and/or divisions, self-serving accounting practices and the improper allocation of revenues,
4  costs and profits with respect to the Recaptured Copyrights, and the overall weakening of the
5  Superman Franchise due to Defendants relatively marginal exploitation thereof in a period
6  when market opportunities for such a superhero franchise has been and continues to be at an
7  all time high.

8      80.    The ongoing waste by Defendants has caused and continues to cause great
9  irreparable injury to Plaintiffs as co-owners of the Recaptured Copyrights, and such damages
10  are particularly acute given that the Recaptured Copyrights are of limited duration.

11      81.    By reason of the foregoing, Defendants have committed waste on the
12  Recaptured Copyrights, and as a direct and proximate result thereof, have damaged Plaintiffs
13  in an amount not yet ascertained, but which will be assessed at the time of trial.

14      82.    Plaintiffs are informed and believe and thereon allege that Defendants'
15  frivolous denial of the validity of the Termination with respect to any "Superman" copyrights;
16  Defendants' threats to bring suit against Plaintiffs if they attempted to exploit any of their
17  recaptured copyright interest; and Defendants willful failure to account and improper
18  accounting practices, after the Termination Date, were conducted in an intentional, malicious,
19  calculated and oppressive manner in conscious disregard for Plaintiffs' rights, health and
20  feelings, and knowingly and intentionally injured and damaged Plaintiffs, which conduct
21  constituted oppression and malice as defined by California Civil Code § 3294.  In accordance
22  with California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount
23  sufficient to punish Defendants, to be assessed at trial.

24                    **FIFTH CLAIM FOR RELIEF**

25      (Violation of the Lanham Act § 43(a), 15 U.S.C. § 1125 - Against All Defendants)

26      83.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82
27  inclusive, as though fully set forth herein.

28  ////

**285**

**ER 3033**



Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 163 of 321

84. Plaintiffs are informed and believe and thereon allege that Defendants have failed and refused to include Plaintiffs names, as co-owners of the Recaptured Copyrights, on any and all copyright notices pertaining to such Recaptured Copyrights, with a willful intention to mislead and misrepresent the nature, qualities, and origins of Defendants' goods, services or commercial activities.

85. Plaintiffs are informed and believe and thereon allege that Defendants DC, Warner Bros. and Time Warner have falsely represented to third parties that Defendants are the *exclusive* owners of all copyrights to the Recaptured Copyrights and based upon such false claims, representations and omissions have induced others to enter into agreements with them, including but not limited to agreements to *exclusively* license, develop, and create new derivative works from the Recaptured Copyrights.

86. Plaintiffs are informed and believe and thereon allege that Defendants used such false designations, attributions and omissions regarding the Recaptured Copyrights in interstate commerce in order to induce others to enter into contracts or other forms of business arrangements with Defendants for the exploitation of Recaptured Copyrights. Such actions constitute the use of false description or representation in interstate commerce, likely to cause confusion, mistake or to deceive and is in opposition to the protection of the public interest.

87. Defendants have passed off and continue to pass off and misrepresent the Recaptured Copyrights which are co-owned by Plaintiffs as being exclusively owned by Defendants, thus appropriating Plaintiffs' rights in the Recaptured Copyrights and depriving Plaintiffs of their rights to ownership credit in, and use of, the Recaptured Copyrights and of attendant goodwill, resulting in likely confusion of and a fraud on the public.

88. Plaintiffs are informed and believe and thereon allege that in doing so Defendants were attempting to pass off the Recaptured Copyrights as Defendants sole property in a manner calculated to deceive Plaintiffs' potential licensors and/or customers and members of the public. **286**

89. Defendants' passing off and false and misleading designation have proximately caused and will continue to cause Plaintiffs substantial injury and damage including, without



1 limitation, loss of customers, dilution of goodwill, injury to their business reputation, and
2 diminution of the value of the Recaptured Copyrights. The ongoing harm this wrongful
3 conduct will cause to Plaintiffs is both imminent and irreparable, and the amount of damage
4 sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is allowed to
5 continue unabated.

6       90.     By reason of the foregoing, Defendants have violated and are continuing to
7 violate the Lanham Act, 15 U.S.C. § 1125.

8       91.     Plaintiffs are entitled to an injunction, during the pendency of this action, and
9 permanently, restraining Defendants, their officers, agents and employees, and all persons
10 acting in concert with them, from *exclusively* licensing or granting rights to any element of the
11 Superman Franchise protected by the Recaptured Copyrights

12      92.     Plaintiffs are entitled to injunctive relief during the pendency of this action and
13 permanently, restraining Defendants, their agents, employees, and all persons acting in concert
14 with them, from engaging in any further violations of the Lanham Act, and to require
15 Defendants to include Plaintiffs' names on all copyright notices relating to the Recaptured
16 Copyrights.

17      93.     Plaintiffs have no adequate remedy at law with respect to these ongoing
18 violations.

19      94.     Plaintiffs are further entitled to recover from Defendants the damages,
20 including attorneys' fees and costs, it sustained and will sustain, and any income, gains,
21 profits, and advantages obtained by Defendants as a result of their acts and omissions alleged
22 hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed
23 at the time of trial.                                                    **287**

24      95.     Plaintiffs are informed and believe and thereon allege that Defendants'
25 wrongful conduct, acts and omissions were conducted in an intentional, callous, and
26 calculated manner in conscious disregard for Plaintiffs' rights, health and feelings, and
27 knowingly and intentionally injured and damaged Plaintiffs, which conduct constituted
28 oppression and malice as defined by California Civil Code § 3294. In accordance with

21

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 164 of 321



1　California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount

2　sufficient to punish Defendants DC, Warner Bros. and Time Warner, to be assessed at trial.

<div align="center">

**SIXTH CLAIM FOR RELIEF**

(Violation of California Business and Professions Code, §§ 17200 *et seq.*

(Unfair Competition) - Against All Defendants)

</div>

6　　　96.　　Plaintiffs re-allege and incorporate herein by reference the allegations set forth

7　in paragraphs 1 through 95, inclusive, as though fully set forth herein.

8　　　97.　　In addition to the wrongful acts and omissions alleged hereinabove and

9　incorporated herein, Plaintiffs are informed and believe that since the Termination Date,

10　Warner Bros.' and its parent, Time Warner, have intentionally omitted from Time Warner's

11　Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-

12　K and other publicly reported documents any and all mention of the Termination, even though

13　it drastically reduces their ownership interest in "Superman" -- one of their most valuable

14　intellectual properties. Such systematic public misrepresentations by omission are likely to

15　deceive, cause confusion and mistake and are an affront to the public interest.

16　　　98.　　Defendants' wrongful conduct, acts, and omissions alleged hereinabove

17　constitute unlawful, unfair business practices and unfair competition under California

18　Business and Professions Code §§ 17500 *et seq.*, and under the common law.

19　　　99.　　As a direct and proximate result of Defendants' conduct, acts, and omissions as

20　alleged hereinabove, Plaintiffs are entitled to recover their share of any income, gains,

21　compensation, profits and advantages obtained, received or to be received by Defendants, or

22　any of them, arising from the licensing and any other exploitation of the Recaptured

23　Copyrights; and are entitled to an order requiring Defendants, jointly and severally, to render

24　an accounting to ascertain the amount of such proceeds.

25　　　100.　　As a direct and proximate result of Defendants' wrongful conduct, acts and

26　omissions pleaded hereinabove, Plaintiffs have been damaged, and Defendants have been

27　unjustly enriched, in an amount that shall be assessed at trial for which damages and/or

28　restitution and disgorgement is appropriate. Such damages and/or restitution and

<div align="center">22</div>

**288**

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**ER 3036**



1 disgorgement should include a declaration by this Court that Defendants are jointly and

2 severally the constructive trustee for the benefit of Plaintiffs and an order that Defendants

3 convey to Plaintiffs fifty percent (50%) of all proceeds and other compensation received or to

4 be received by Defendants that are attributable the licensing or exploitation on or after the

5 Termination Date of the Recaptured Copyrights.

6       101.    Defendants' wrongful conduct, acts, omissions have proximately caused and

7 will continue to cause Plaintiffs substantial injury and damage including, without limitation,

8 loss of customers, dilution of goodwill, injury to Plaintiffs' reputation, and diminution of the

9 value of Plaintiffs' joint ownership interest in the Recaptured Copyrights. The harm this

10 wrongful conduct will cause to Plaintiffs is both imminent and irreparable, and the amount of

11 damage sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is

12 allowed to continue without restraint.

13       102.    Plaintiffs are entitled to an injunction, during the pendency of this action, and

14 permanently, restraining Defendants, their officers, agents and employees, and all persons

15 acting in concert with them, from *exclusively* licensing or granting rights to any element of the

16 Superman Franchise protected by the Recaptured Copyrights

17       103.    Plaintiffs are entitled to an injunction, during the pendency of this action, and

18 permanently, restraining Defendants, their officers, agents and employees, and all persons

19 acting in concert with them, from engaging in any such further unlawful conduct, and

20 requiring Defendants to include Plaintiffs' names on all copyright notices relating to the

21 Recaptured Copyrights.

22       104.    Plaintiffs have no adequate remedy at law with respect to such ongoing

23 unlawful conduct.                                       **289**

24       105.    Plaintiffs are informed and believe and thereon allege that Defendants'

25 wrongful conduct, acts and omissions were conducted in an intentional, malicious, calculated

26 and oppressive manner in conscious disregard for Plaintiffs' rights, health and feelings, and

27 knowingly and intentionally injured and damaged Plaintiffs, which conduct constituted

28 oppression and malice as defined by California Civil Code § 3294. In accordance with

<div align="center">23</div>



California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount sufficient to punish Defendants, to be assessed at trial.

WHEREFORE, Plaintiffs pray for relief as follows:

## PRAYER FOR RELIEF

### ON THE FIRST CLAIM FOR RELIEF

106. For a declaration as follows:

    a.     That pursuant to the Copyright Act, 17 U.S.C.§304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works;

    b.     That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights;

    c.     That Defendants control only fifty percent (50%) of the Recaptured Copyrights, and thus, as of the Termination Date, had/have no authority to confer *exclusive* licenses or grants with respect to any element of the "Superman" mythology protected by the Recaptured Copyrights; and

    d.     That Plaintiffs are entitled to fifty percent (50%) of any and all Profits from the exploitation of, or attributable to, in whole or in part, any aspect of the Recaptured Copyrights.

### ON THE SECOND CLAIM FOR RELIEF

107. For a declaration as follows:

    a.     That as joint owners of the Recaptured Copyrights, Plaintiffs are entitled to an accounting for Profits received or payable to the Defendants;

    b.     That Profits include Defendants' revenues from the post - April 16, 1999 exploitation of the Recaptured Copyrights in territories outside of the United States whenever such exploitation is based on the predicate exercise *in the United States* of any right(s) in and to the Recaptured Copyrights by any Defendant, their licensees or assigns;

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 167 of 321

24

**290**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 168 of 321

c.    That there should be no *apportionment* of Profits since Plaintiffs are entitled to fifty percent (50%) of such Profits as joint owners of the Recaptured Copyrights;

d.    Alternatively, that apportionment should apply only to profits from the exploitation of the Recaptured Works in *derivative works created by a Defendant*, but not to profits from *licensing* of the Recaptured Works;

e.    That apportionment, if any, should weigh strongly in Plaintiff's favor, since the value of the Superman Franchise is largely attributable to the unique "Superman" character and other elements created by Siegel and Shuster and protected by the Recaptured Copyrights, in a percentage that the court may deem just and proper;

f.    That Profits include profits from any merchandise or other derivative works created, produced or manufactured on or after the Termination Date, April 16, 1999, notwithstanding that underlying licensing for such exploitation may have occurred prior thereto;

g.    That Profits include the Profits of Defendants DC, Warner Bros. and Time Warner, their subsidiaries and divisions; and

h.    That in determining Profits, only reasonable costs directly attributable to the exploitation of the Recaptured Copyrights, of the type customarily deducted in arms' length agreements to exploit copyrights of comparable value to the Recaptured Copyrights, should be deducted from gross revenues, all in compliance with Generally Accepted Accounting Principles (GAAP).

### ON THE THIRD CLAIM FOR RELIEF

108.    For a declaration as follows:

a.    That by the Termination, Plaintiffs recaptured a fifty percent (50%) interest in the copyright to the Superman Crest created by Siegel and Shuster;

b.    That Defendants' Superman Shield design arose directly from, and is substantially identical to, the copyrighted Superman Crest created by Siegel and Shuster;

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition **ER 3039**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 169 of 321

f.     That Defendants must account to Plaintiffs for fifty percent (50%) of the proceeds they receive from the licensing or other exploitation of the Superman Crest and/or Superman Shield;

g.     That Plaintiffs, as co-owners of the copyright in and to the Superman Crest, likewise are permitted to license or otherwise exploit the Superman Crest, subject to a duty to account to Defendants for any such exploitation; and

h.     That Defendants cannot use their alleged trademark in the Superman Shield or any other alleged trademark interest with respect to "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of Plaintiffs' rights under the Copyright Act in the jointly owned Recaptured Copyrights.

## ON THE FOURTH CLAIM FOR RELIEF

109.   For an accounting by the Defendants, jointly and severally, of any and all proceeds from the licensing and any other exploitation of the Recaptured Copyrights or Superman Franchise on or after the Termination Date, April 16, 1999;

110.   For 50% of any and all proceeds from the licensing and any other exploitation of the Recaptured Works or "Superman Franchise" on or after April 16, 1999 pursuant to such accounting; and

111.   For the imposition of a constructive trust for the benefit of Plaintiffs on all sums received and to be received by the Defendants, jointly or severally, derived from the licensing and any other exploitation of the Recaptured Works or "Superman Franchise" on or after April 16, 1999.

## ON THE FIFTH CLAIM FOR RELIEF

112.   For compensatory and consequential damages according to proof as shall be determined at trial; and

113.   For punitive and exemplary damages as may be awarded at trial.

/ / / /

/ / / /

/ / / /

**292**



ON THE SIXTH CLAIM FOR RELIEF

114. For an order preliminarily and thereafter permanently enjoining Defendants from *exclusively* licensing or granting rights to any element of the Superman Franchise protected by the Recaptured Copyrights;

115. For an order preliminarily and thereafter permanently requiring Defendants include Plaintiffs' names on any and all copyright notices relating to the Recaptured Copyrights;

116. For compensatory and consequential damages according to proof as shall be determined at trial;

117. For such other and further relief and remedies available under the Lanham Act, 15 U.S.C. § 1125, which the Court may deem just and proper; and

118. For punitive and exemplary damages as may be awarded at trial.

ON THE SEVENTH CLAIM FOR RELIEF

119. For an accounting of all Profits;

120. For the imposition of a constructive trust on all Profits received and to be received;

121. For restitution to Plaintiffs of Defendants' unlawful proceeds;

122. For an order preliminarily and thereafter permanently enjoining Defendants from *exclusively* licensing or granting rights to any element of the Superman Franchise protected by the Recaptured Copyrights;

123. For an order preliminarily and thereafter permanently requiring Defendants include Plaintiffs' names on any and all copyright notices relating to the Recaptured Copyrights;

124. For compensatory and consequential damages according to proof as shall be determined at trial;

125. For such other and further relief and remedies available under California Business and Professions Code, §§ 17200 *et seq.*, which the Court may deem just and proper; and

**293**

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**ER 3041**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 171 of 321

1    126.    For punitive and exemplary damages as may be awarded at trial.

2                        ON ALL CLAIMS FOR RELIEF

3    127.    For Plaintiffs' costs of suit;

4    128.    For interest at the highest lawful rate on all sums awarded Plaintiffs other than

5    punitive damages;

6    129.    For reasonable attorneys' fees; and

7    130.    For such other and further relief as the Court may deem just and proper.

8    Dated: October 8, 2004                    LAW OFFICE OF MARC TOBEROFF

9

10                                            By: _____
                                                   Marc Toberoff

11                                            Attorneys for Plaintiffs Joanne Siegel and
12                                            Laura Siegel Larson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                                        **294**

                                            28

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**ER 3042**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 172 of 321




1    **JURY TRIAL DEMANDED**

2          Plaintiffs hereby request a trial by jury on each claim for relief alleged in the

3    Complaint.

4    Dated: October _3_, 2004                LAW OFFICE OF MARC TOBEROFF

5

6                                            By: _____
                                                        Marc Toberoff
7
                                             Attorneys for Plaintiffs Joanne Siegel and
8                                            Laura Siegel Larson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                                              **295**

**ER 3043**

# EXHIBIT Y

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 174 of 321



# WARNER COMMUNICATIONS INC.

December 23, 1975

Mr. Jerome Siegel
Mr. Joseph Shuster
c/o Edmund Preiss, Esq.
Kane, Kessler, Proujansky, Preiss & Permutt
680 Fifth Avenue
New York, New York 10019

Dear Mr. Siegel and Mr. Shuster:

This letter, when countersigned by both of you, constitutes our agreement as follows:

1.   You conceived of and created "Superman".

2.   You acknowledge that Warner Communications Inc. ("Warner")*, both immediately before and immediately after the signing of this agreement, is the sole and exclusive owner of all right, title and interest in and to the "Superman" concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of any such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence

_____

* Such term, as used in this agreement, includes Warner Communications Inc., National Periodical Publications, Inc., Licensing Corporation of America, and all other Warner subsidiaries.

12/18/75

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 175 of 321

or hereafter devised, together with the absolute right to transfer, license, sell or otherwise dispose of said rights.

3. You brought a proceeding in the United States District Court and in the United States Court of Appeals, asserting certain rights in Superman, and this case was determined against your claims. The Court of Appeals unanimously decided that "all rights in Superman, including the renewal copyright, have passed forever to [National Periodical Publications, Inc., a Warner subsidiary.]" You did not appeal this case to the Supreme Court of the United States. Your determination not to appeal was your own determination. Whatever your subjective reasons may have been, you acknowledge that the determination not to appeal was not made by reason of any promise or inducement by Warner or its representatives.

4. Warner does not have any legal obligation to pay you any sum of money whatsoever and does not acknowledge that any wrong has been done to you.

5. Warner has nevertheless determined, in consideration of your past services to Warner and in view of your present circumstances, to make the following voluntary payments:

a. Warner will make monthly payments to each of you at the annual rate of $20,000 for your respective lifetimes, less any applicable withholding taxes, commencing January 1, 1976.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 176 of 321

b. In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner will pay his wife, Joanne Siegel, if she survives him, monthly payments at the rate of $20,000 a year, commencing on the date of Jerry's death, and ending December 31, 1985, and thereafter monthly payments at the rate of $10,000 a year for the balance of her life. If Joanne does not live to December 31, 1985, Warner will pay Laura Siegel, Jerry's daughter, if she survives Joanne and Jerry, at the rate of $20,000 a year from the date of Jerry's death or Joanne's death, whichever is later, to December 31, 1985; all payments to Laura will cease on that date. All payments to be less any applicable withholding taxes.

c. In addition, Warner will pay Frank Shuster (Joe's brother), if he survives Joe, monthly payments at the rate of $10,000 a year commencing on the date of Joe's death and ending December 31, 1985, and thereafter at the rate of $5,000 a year for the balance of his life. All payments to be less any applicable withholding taxes.

d. In addition, Warner will include both of you in the Warner insured medical plan, covering employees generally, or any successor plan thereto. A copy of such plan as now in effect, together with cover memo dated December 17, 19 is annexed hereto and incorporated by this reference as Schedule

e. In addition, as requested by you, Warner has paid you, simultaneous with the signing of this agreement, the sum of $7,500 each (not subject to withholding) which you have stated that you intend to apply to legal fees and disbursements incurred by you in connection with the lawsuit described

above.  Any such payment is to be made by you directly to your counsel in such action, in your discretion, and Warner does not recognize or have any obligation to such counsel. Warner does not recognize or have any obligation to your present counsel.

In addition, Warner has paid you, simultaneous with the signing of this agreement, the sum of $10,000 each (not subject to withholding), which you have requested, to be applied to your debts.

f.  The obligation of Warner to make the periodic payments provided for above to you, to Jerry's wife (or daughter and to Joe's brother, and the credit line obligation set forth in paragraph 6, will cease forthwith, if you, or either of you, or anyone acting on your behalf, or claiming through you, commences an action, suit or proceeding against Warner (including its subsidiaries), or against any licensee of Warner (1) asserting any right, title or interest in the "Superman" concept, ide continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks; or (2) asserting any financial claims against Warner or any licensee, or claiming any credit line rights, other than as provided for in this agreement.

6.  The following credit line provisions are agreed upon:

a. The following "obligatory credit line"
provisions apply only during the lifetime of the longer-lived
of Jerry Siegel and Joe Shuster. They apply only to "Superman
Books" whether new or reprints bearing a July 1976 cover date,
or which are on the July 1976 production schedule or are pub-
lished or licensed after such date. "Superman Books" means
only the following: (i) Superman and Action Comics comic books;
(ii) other comic books, comic strips and books in which both
of the following conditions are met: (A) "Superman" is the sole
title of the strip, alone or with other words, and the name of
another cartoon character is not also used in the title or is
not used instead in the title; and (B) Superman is the sole cen-
tral character of the strip, the foregoing being intended to
exclude comic books, comic strips and other books combining more
than one central character, or featuring a different central
character. The foregoing definition explicitly excludes "Justice
League of America", "World's Finest" and "The Superman Family",
but is not limited to such exclusions. In construing this pro-
vision, it is understood that the reason for such exclusions is
that, while Warner wishes to give you credit for creating Superman
it cannot do so and does not agree to do so in any situation where
confusion may result as to whether someone else's creation is
yours, or where it would be necessary to use multiple credit lines

As to "Superman Books" (July 1976 and after),
the following "obligatory credit line" provisions will apply:
The credit line "created by Jerry Siegel and Joe Shuster", or

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 178 of 321

"by Jerry Siegel and Joe Shuster", or "Superman created by Jerry Siegel and Joe Shuster", or "Superman by Jerry Siegel and Joe Shuster", any of such forms being satisfactory, will be used on the first inside page in conjunction with the title or logo "Superman". Such credit line will appear approximately as in Exhibit A, but typeface and size can be changed in Warner's sole discretion, as long as the credit line remains legible.

You waive your rights of privacy under the New York Civil Rights Law and comparable or similar statutory or case law of other jurisdictions to permit the "obligatory credit line" uses, and to permit any other uses in any other publications if Warner or its licensees elect in their sole discretion to include a credit line in any of them. The agreement to carry such credit line, and the carrying of such credit line, does not constitute an admission by Warner or any licensee of any proprietary ownership, right, title or interest of Siegel and Shuster in Superman or in such comic books, strips or books, there being none, and you agree that there is no such proprietary ownership, right, title or interest. The omission of such credit line shall not give rise to any right or remedy on the part of Siegel and Shuster, including but not limited to injunctive re-lief, unless such credit line shall have been omitted from an issue or edition covered by the "obligatory credit line" use pro-vision, and unless thereafter you shall give notice (in accord-ance with the notice provisions hereof) to Warner of such omissic

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 179 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 180 of 321

and unless such credit line shall be omitted from an additional issue or edition which goes to press after the receipt date shown on such registered mail notice, in which case the remedy shall be limited to an affirmative injunction requiring such credit line to be carried in issues or editions going to press after the date of the injunction; it is explicitly understood and agreed that such injunction will not be an injunction to restrain distribution of the issues or editions from which credit has been omitted, and you hereby waive any such remedy. The reasonable expenses of obtaining such injunction shall be reimbursed to you by Warner, but you agree that you shall not be entitled to any damages or other payments whatsoever, which you hereby waive.

b. Warner has previously licensed to Film Export A.G. the right to produce one or more Superman motion pictures, not yet released, for theatrical, TV, and other use. Warner agrees to write a letter request

to the licensee to include a credit line ("Superman created by Jerry Siegel and Joe Shuster") in the screen credits. This is not a best efforts undertaking; Warner's sole obligation will be discharged by sending the letter, which shall quote this paragraph. Warner does not represent or warrant that the licensee will honor the request; on the contrary, Warner has stated that there is no basis for reopening the license agreement. Any use by the movie licensee of the credit line will explicitly not constitute an acknowledgment of any proprietary ownership or right, title or interest of Siegel or Shuster in Superman or in such movies, there being none, as you acknowledge, nor will any royalties, remuneration or compensation be payable to you by reason of any such use. You waive your rights of privacy under the New York Civil Rights Law and similar or comparable statutory or case law of other jurisdictions if the movie licensee elects to carry the credit line. There is no requirement as to typeface or size if the licensee elects to carry the credit line. You acknowledge that the present agreement between you and Warner is binding whether or not the movie licensee agree to carry the credit line.

       c.  As to any motion picture or TV license agreements entered after the date hereof, Warner will require the licensee to carry the credit line ("Superman created by Jerry Siegel and Joe Shuster") in the screen credits. Any use by any such future movie or TV licensee of the credit line will explicitly not constitute an acknowledgment of any proprietary

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 181 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 182 of 321

ownership or right, title or interest of Siegel or Shuster
in Superman or in such movie or TV presentation, there being
none, as you acknowledge, nor will any royalties, remuneration
or compensation be payable to you by reason of any such use.
You waive your rights of privacy under the New York Civil Rights
Law and comparable or similar statutory or case law of other
jurisdictions to permit such credit line.  There is no require-
ment as to typeface or size in movie or TV use.

       d.  No credit line will be carried on any use
licensed by Licensing Corporation of America (a Warner subsidi-
ary) including but not limited to clothing, toys, games, premium
or other merchandising rights, and no credit line request will
be made by Licensing Corporation of America to licensees.

       7.  You agree to accept the payments and the credit
line provision set forth above in full accord, satisfaction,
recognition and release of any and all claims by you, whether
legal, moral, equitable or otherwise; you acknowledge that the
agreed payments and the credit line provision are fair, generous
equitable, satisfactory and sufficient, and that they meet the
objectives of your recent communications to us and to the press
radio, TV, etc.; you acknowledge that you do not now have, and
will not in the future have, any rights to Superman; and you
agree that any statements you make to the press, radio, TV, etc
will be consistent with the foregoing.  You authorize Warner to
include the reference to you in the statement annexed hereto
as Exhibit B which Warner intends to release, at the signing of
this agreement.  You intend to release the statement annexed

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 183 of 321

hereto as Exhibit C, and you authorize Warner to do so on your behalf, at the signing of this agreement. You further acknowledge that you have signed this agreement freely and without compulsion, and that this agreement has been reviewed by your present counsel, Edmund Preiss.

8. Any notice to Warner shall be given by registered mail, return receipt requested as follows:

Warner Communications Inc.
75 Rockefeller Plaza
New York, New York 10019
Attention:  Jay Emmett
            Executive Vice President

with copy to:

Martin D. Payson, Esq.
Vice President and General Counsel
Warner Communications Inc.
75 Rockefeller Plaza
New York, New York 10019

with copy to:

National Periodical Publications, Inc.
c/o Warner Communications Inc.
75 Rockefeller Plaza
New York, New York 10019
Attention:  William Sarnoff

Any notices to Mr. Siegel or Mr. Shuster shall be given by registered mail, return receipt requested as follows:

Jerome Siegel
11711 Mayfield Ave., Apt. 14
West Los Angeles, California 90049

Joseph Shuster
98-120 Queens Boulevard  Apt 4-K
Forest Hills, New York  11374

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 184 of 321

with copy to:

> Edmund Preiss, Esq.
> Kane, Kessler, Proujansky, Preiss & Per:
> 680 Fifth Avenue
> New York, New York 10019

Any party may furnish change of address by notic

9. This agreement may be signed in counterpart. The counterparts taken together will constitute the original.

10. The payment provisions hereof will be binding upon any purchaser of substantially all of the assets of or any successor by merger to Warner Communications Inc. (the pare corporation). The credit line provisions (limited as set forth in paragraph 6) will be binding upon (a) any purchaser of the National Periodical Publications Inc. business, (b) any purchaser or licensee of the rights to publish the Superman and Action Comics series, or of any other comic book, comic strip c book in the "obligatory credit line use" category, and (c) any licensees of the future motion picture and TV rights to Superma if any (excluding the existing movie licensee). Payment provisions and credit line provisions are personal to the named individuals and are not assignable, and do not benefit their heirs, executors or administrators.

11. This agreement shall be interpreted in accordanc with the laws of New York applicable to contracts made and to be performed solely within New York.

Please sign below to signify that this sets forth

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 185 of 321

the entire understanding between us.

    With our best wishes to you both.

<div align="right">

WARNER COMMUNICATIONS INC.

By                                 

             Jay Emmett
           Executive Vice President

</div>

Accepted and Agreed:

Jerry Siegel

Joseph Shuster

EXHIBIT Z

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 187 of 321

## TOLLING AGREEMENT

THIS AGREEMENT is made and entered into this ___ day of April, 2000, by and between DC COMICS ("DC") and JOANNE and LAURA SIEGEL ("SIEGEL").

WHEREAS, SIEGEL served upon DC and other entities the Notices of Termination of Transfer Covering Extended Renewal Term listed in Exhibit A hereof, which contain certificates stating that there were mailed on April 3, 1997 (the "Notices");

WHEREAS, DC by letter dated April 15, 1999 rejected the validity and scope of the Notices;

WHEREAS, at this time, DC and SIEGEL are in negotiations to find an amicable resolution in respect of the Notices;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained and to encourage continued negotiations between the parties, DC and SIEGEL for themselves, their predecessors, successors, past and present subsidiaries or affiliates, and legal representatives agree as follows:

1. The parties agree not to assert any statute of limitations or laches defense relating to or rights claimed based upon, the validity, invalidity, or legal effect of the Notices, or any one of them, where such defenses become available because of the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof (the "Tolling Period"). The parties agree that this Agreement shall not be construed as, nor considered to be, a waiver of any other claims or defenses in any lawsuits or actions, including such defenses available because of the passage of time prior to the date hereof.

2. The parties acknowledge that nothing in this Agreement (nor its execution) is, or shall be construed as an admission or acknowledgment of liability or an admission or

RECEIVED TIMEAPR. 7. . 2:38PM

FROM : LARSON
SENT BY :

DE...ATUS LEGAL
FAX NO. : 310-827-7227
4- 5- 0 : 5:21PM :

Apr. 06 2000 03:12PM P3
-310 827 7227              16 6/12

acknowledgement that any laches or statute of limitations claim is or would be valid. Nor shall this Agreement constitute a litigation standstill agreement by any of the parties hereto under which any of them agrees not to institute litigation to protect or enforce their rights except that, if a party terminates negotiations under Paragraph 7 hereof, no party shall initiate litigation for a period of 10 business days.

3. The parties irrevocably acknowledge and agree that they are now and forever estopped and precluded from contesting or denying the validity and enforceability of this Agreement, and have been advised of the legal effect of this Agreement by their respective legal counsel.

4. The parties acknowledge and agree that this Agreement is not admissible in any litigation proceedings for any purpose other than enforcement of the terms hereof, nor shall it otherwise be considered an admission by any party hereto.

5. This Agreement constitutes the entire agreement among the parties hereto and sets forth all promises, covenants, agreements, conditions, and understandings between the parties with respect to the tolling of any statute of limitations or laches defenses.

6. Any controversy regarding this Agreement shall be decided without regard to rules of construction regarding uncertainty.

7. The Tolling Period provided for in this Agreement shall remain in effect until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices. Cancellation of the Tolling Period by one of the above events shall not alter or extinguish the parties' other rights hereunder. Any notices required under this Agreement shall be sent by United States Certified Mail, Return Receipt Requested to:

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 189 of 321

To DC Comics

To The Siegels

Lillian J. Laserson
General Counsel
DC Comics
1700 Broadway
New York, New York 10019

Joanne Siegel
11000 Tranby Way, Roll6
Marina Del Rey, CA 90292

Laura Siegel Larson
6660 Pacific Avenue, No. 106
Playa del Rey, CA 90293

With a copy to:

With a copy to:

Carol P. Simkin/Roger L. Zissu
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017

Bruce Ramer/Kevin S. Marks
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

8. The terms of this Agreement apply to Michael Siegel as between Michael Siegel and

DC.

AGREED:

DC COMICS

JOANNE SIEGEL

By: _____

_____

Date: 4/7/2000

Date: _____

LAURA SIEGEL LARSON

_____

Date: April 6, 2000

# EXHIBIT AA

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 191 of 321

Joanne Siegel
13929 Marquesas Way #201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

September 21, 2002

Kevin S. Marks, Esq.
Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212

Dear Kevin and Bruce,

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman, Superboy, the Spectre and all related characters and entities. We instruct you to take no further actions on our behalf.

Please return all materials regarding the above including but not limited to files, correspondence, notes and documents to us forthwith. These should be sent to Joanne Siegel at the above address.

It is a shame that four years were wasted due to DC Comics and AOL Time Warner's greed. We have no intention of publically disparaging DC or any individual in the parent company. However, should DC or its parent company, officers, attorneys, representatives or spokespersons disparage us or our rights, we will vigorously respond in kind.

Sincerely,                                        Sincerely,

*Joanne Siegel*                                   *Laura Siegel Larson*

Joanne Siegel                                     Laura Siegel Larson

CC: Michael Siegel
     Don Bulson, Esq.
     Paul Levitz

# EXHIBIT BB

ER 3063

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 193 of 321

# GANG, TYRE, RAMER & BROWN, INC.
### ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD S. PASSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1986)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

<u>VIA TELECOPIER and U.S. MAIL</u>

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

      Re:    <u>Siegel Family – "Superman"</u>

Dear John:

      This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

    A.    <u>Definitions</u>.

        1.    "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

        2.    "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

    B.    <u>Financial Terms</u>.

        1.    A non-returnable, but recoupable advance of $2,000,000.

236172.1

312

ER 3064

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 194 of 321

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2. A non-returnable, non-recoupable signing bonus of 1,000,000.

3. D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4. There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5. A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6. A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

313

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 195 of 321

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7. Recoupment begins as of January 1, 2000.

8. During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9. Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C. Other Terms.

1. The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2. If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 196 of 321

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.  Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4.  D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.  The accounting statements will be rendered March 31ˢᵗ, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.  In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.  Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.  D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

315

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 197 of 321

9.  DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10. Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11. At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12. The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14. Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

316

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 198 of 321

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:  Joanne Siegel
     Laura Siegel Larson
     Bruce Ramer
     Don Bulson

236172.1

317

ER 3069

# EXHIBIT CC



**WARNER BROS.**

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

John A. Schulman
Executive Vice President
and General Counsel

October 26, 2001

**Via Facsimile (310) 777-4801**
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA 90212

    Re:   Siegels

Dear Kevin:

    I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road.

    I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

    Thank you.

Sincerely,

John A. Schulman

JAS:hjl
cc:   Bruce Ramer, Esq. (w/encl)

**GTRB 0145**

A Time Warner Entertainment Company

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 200 of 321



## October 2001 Outline

### Transfer
- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual), . Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

### Initial Payment
- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

319

ER 3072

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 201 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 203 of 321

321



 818 954 4768   P.05

## Annual Payment (Advance)

- $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
- Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
- Terminate when Action #1 US copyright terminates

## Widows Benefits (not assignable or transferrable)

- $135,000/year
- Payable for Joanne's life, personal,
- Paid as now
- Medical, comparable to past, for life

## Royalty

- Commencing for revenue received on or after 1/1/00
- All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
- 6% of DC's receipts from all Media licenses for use of the Properties, except:

    1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.

    2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

- 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

    1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

    2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

    3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

    4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

322

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 204 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 205 of 321



- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Loonoy Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

    1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

    2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

    3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

## Payment

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

> 47.5% Joanne Siegel
> 23.75% Laura Siegel Larson
> 23.75% Michael Siegel
> 5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

## Advise (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

ER 3076



changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals which fall outside the safe harbors.

Safe Harbors for Intercompany Deals
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

324

ER 3077

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 206 of 321

  810 954 4768    P.08

**Expedited Dispute Resolution** (Any claims between the parties)
- Arbitration
- Compensation damages only to Siegels
- No injunction against DC/WB breaches, no termination of rights, no reversion
- DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

**Medical Coverage/Son & Daughter (Grandsons only through minority)** (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

**Release and covenant not to sue by Siegels**
- Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
- Approve all deals made before 12/31/00

**Miscellaneous**
- Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
- Siegels defend and indemnify re third party claims
- Siegels defend and indemnify re Dennis claim
- Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
- DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts
- Siegels to refer all inquiries relating in any way to Properties to DC/WB.
- At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

# EXHIBIT DD

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 209 of 321

# FROSS ZELNICK LEHRMAN & ZISSU, P.C.

ALVIN FROSS
. .ALD J. LEHRMAN
STEPHEN BIGGER
MICHAEL I. DAVIS
ROGER L. ZISSU
MARIE V. DRISCOLL
RICHARD Z. LEHV
CAROL F. SIMKIN
MARGARET F. GOLDSTEIN
DAVID W. EHRLICH
SUSAN UPTON DOUGLASS
JANET L. HOFFMAN
PETER J. SILVERMAN
LAWRENCE ELI APOLZON
BARBARA A. SOLOMON
LISA PEARSON
MARK D. ENGELMANN
NADINE H. PARKER JACOBSON
ANDREW N. FREDBECK
GEORGES NAHITCHEVANSKY
CRAIG S. MENDE
PATRICK T. PERKINS
J. ALLISON STRICKLAND

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fziz@frosszelnick.com

RECEIVED
FEB 0 4 2002

JAMES D. SILBERSTEIN
RUTH LAZAR
COUNSEL

MICHELLE P. FOXMAN
ROBERT A. BECKER
TAMAR NIV BESSINGER
ANGELA KIM
JOHN P. MARGIOTTA
LYDIA T. GOBENA
DIANE B. MELNICK
MICHAEL CHIARPETTA
DANA WRUBEL
JESSICA MANN
JOSEPH R. MOLKO
EVAN GOURVITZ
CARLOS CUCURELLA
NANCY C. DICONZA
TANYA FICKENSCHER
ZOE HILDEN
LAUREN J. MANDELL

February 1, 2002

**VIA FEDEX**

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

Re:  Superman

Dear Kevin:

I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. As our clients have not seen this latest version of the agreement, I must reserve their right to comment. In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

Very truly yours,

Patrick T. Perkins

Encls.

cc:  John Schulman, Esq.
     Paul Levitz
     Lillian J. Laserson, Esq.
     Carol F. Simkin, Esq.

I:\PPERKINS\DCC\SUPER\020201 Ltr-K. Marks.doc

326

## AGREEMENT

AGREEMENT made this ___ day of ___ 2002, by and between DC COMICS, a New York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700 Broadway, New York, New York 10019, and Joanne Siegel, residing at 13900 Panay Way, R-115, Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106, Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel, Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The SIEGELS").

## DEFINITIONS

1.      The term "Works" is hereinafter defined collectively and individually as follows: any and all works, creations, material, matter, contributions, adaptations, modifications, derivative works and all other works of any kind whatsoever, including but not limited to all stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses, images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component, draft of, or part or portion of any of the foregoing, regardless of whether or not subject to copyright protection, regardless of whether or not published, regardless of whether or not any person knows of the existence of the foregoing, wherever in the world created, and whenever created , and regardless of the medium or form of expression or exploitation (whether or not now existing).

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 211 of 321

2.     The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3.     The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SUPERMAN and the first story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced infra in definition paragraph number ___.

4.     The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 212 of 321

5.     The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6.     The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7.     The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows:  all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8.     The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

3

329

ER 3083

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 213 of 321

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9. The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A. (1) First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B. Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

4

330

ER 3084

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 214 of 321

10.     The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11.     The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows:  all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant.  The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced _infra_ in definition paragraph number ___.

12.     The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

331

ER 3085

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13.     The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14.     The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15.     The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 215 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 216 of 321

16. The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17. The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

> A. (1) First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or
>
> (2) First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and
>
> B. Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

333

**ER 3087**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 217 of 321

18.    The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation  or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19.    The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20.    The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works.  (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21.    The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22.    The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

334

ER 3088

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 218 of 321

23.     The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24.     The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses. Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property. Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable. Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25.     The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26.     The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

335

ER 3089

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 219 of 321

27.    "Reversionary" rights shall mean:

a.    any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

b.    any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

c.    any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

d.    any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

e.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

f.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

10

336

ER 3090

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 220 of 321

g. in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

## WHEREAS CLAUSES

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

11

337

ER 3091

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 221 of 321

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

12

ER 3092

predecessor(s) and make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

<div align="center">TERMS</div>

1. <u>GRANT OF RIGHTS</u>. The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement. The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

a) <u>Grant Of All Rights In The SUPERMAN Works.</u>

i) <u>Grant Of All Rights In The ACTION COMICS NO. 1</u> <u>SUPERMAN Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

<div align="center">13</div>

<div align="right">**339**</div>

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 222 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 223 of 321

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

ii)     Grant Of All Rights In The POST ACTION COMICS NO. 1 SUPERMAN Works. The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

14

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 224 of 321

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

b) Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

15

**341**

ER 3095

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

c) <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

16

ER 3096

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 226 of 321

d) <u>Grant Of All Rights In The SPECTRE Works.</u>

i) <u>Grant Of All Rights In The MORE FUN COMICS SPECTRE Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit ___, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

ii) <u>Grant Of All Rights In The POST MORE FUN COMICS SPECTRE Works.</u> The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

343

ER 3097

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 227 of 321

18

344

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 228 of 321

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) Acknowledgement/Grant Of All Rights In The SPECTRE Marks. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

345

ER 3099

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 229 of 321

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest in the SPECTRE Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

g) <u>Grant Of All Rights In The OTHER SIEGEL Works.</u> To the extent that any OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every kind whatsoever, including but not limited to copyright rights, throughout the world for all terms of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public with respect to the OTHER SIEGEL Works when the copyright(s) or any of them therein expire and all claims or causes of action of any kind relating or appurtenant thereto.

h) <u>Acknowledgement/Grant Of All Rights In The OTHER Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the OTHER Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

20

346

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 230 of 321

whatsoever, (including as members of the public anywhere in the world should the OTHER

Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they

hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in

the OTHER Marks including any goodwill associated therewith and all claims or causes of

action of any kind relating or appurtenant thereto.

    2.  <u>Payments To The Siegels And Other Financial And Related Terms.</u>  In complete

consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions

and authorship, and the other understandings and agreements herein made by The SIEGELS, DC

COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

    a)  <u>Initial Payments</u>

      i)  Upon full execution of this Agreement, a non-recoupable payment of

$1,000,000;

      ii)  Upon full execution of this Agreement, an advance of $2,000,000

against The SIEGELS' royalty payments under ¶2(d) hereof;

      iii)  Upon full execution of this Agreement , the payment of $250,000

heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between

SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall

become non-recoupable.

    b)  <u>Annual Payments (Advances)</u>

      i)  For ten years commencing in 2002, payable on March 31st of each

year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS

hereunder.

ER 3101



ii) Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii) All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

348

ER 3102

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 232 of 321

iv)    The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)  Widow's Benefits

i)  For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)  Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)  Royalties

i)    Commencing for Revenues received on or after January 1, 2000;

ii)    6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

23

349

ER 3103

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 233 of 321

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

   iii) 6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

   (A) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

   (B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

   (C) with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

   (D) with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

24

350

ER 3104

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 234 of 321

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

        iv)    1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

        v)    1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property. A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories). A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories). However:

        (A)    with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

<p style="text-align:center">25</p>

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 235 of 321

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ½ %;

(B)    with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

(C)    with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

(D)    with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

(E)    with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

352

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 236 of 321

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)     there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)     there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)     All royalties hereunder shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

353

ER 3107

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 237 of 321

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

        e)     <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

        47.5% to Joanne Siegel

        23.75 to Laura Siegel Larson

        23.75 to Michael Siegel

        5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder.  Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

        f)     <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit __ hereto is a copy of the medical coverage guidelines that currently apply).  DC Comics shall reimburse Laura Siegel Larson for premiums

she has paid for medical and dental insurance for her and James and Michael Larson from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g) <u>Acknowledgement Of No Entitlement To Any Further Or Additional Payment</u>. The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3. <u>DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS.</u> The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto. DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

355

ER 3109

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 238 of 321

4. The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS. The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC COMICS ____ exclusively, all rights of any kind in The WORKS and The MARKS, and all future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive use, enjoyment, control, and benefit. The SIEGELS acknowledge and agree that effective with the grant made herein, and regardless of anything that occurs or does not occur in the future, including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been learned relating in any manner whatsoever to this Agreement or its terms, whether any person or entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of the works that are the subject of this Agreement fall into the public domain for any reason whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in The WORKS or The MARKS. By way of example only and without limitation, as of the effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to, and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own no and shall own no rights, title or interest, including but not limited to any Reversionary Rights, of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any right to use or authorize the use of any of the foregoing on any basis.

5. The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or Under The Stand Alone Assignments. The SIEGELS covenant not to and shall not challenge, make any claim against or concerning, or take any action, directly or indirectly, to interfere with

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 240 of 321

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of, or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other person or entity in doing so.

6. <u>No Right To Terminate New Grant.</u> Further to paragraph 4, The SIEGELS hereby acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright Act and they know of no such grants which were not identified in said Notices. The SIEGELS further acknowledge and represent and warrant that, within the meaning of the Copyright Act, this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision of the Copyright Act, or under any other statute, regulation, common law principle, body of law or otherwise throughout the world. The SIEGELS hereby designate DC COMICS as the administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7. <u>Third Party And Intercompany Licenses.</u>

a) DC COMICS shall enter into any and all Licenses with unaffiliated third parties with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

**357**

**ER 3111**

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)     The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property. The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below. If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances.  In no event shall The SIEGELS have the

32

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW Company, or on the basis of whether or not there is an advance or guarantee, or because DC COMICS did not hold an auction in respect thereof.

  c)  The applicable safe harbor agreements are as follows:

    i)  For live action and animated feature length theatrical motion pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues received by an affiliated motion picture distributor in the United States in U.S. Dollars from exploitation of the motion pictures, less taxes (including duties and other governmental fees), collection costs and trade association dues. Notwithstanding the foregoing, in respect of Licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i) gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross wholesale sales income received therefrom by an affiliated distributor, less a reasonable amount for returns.

    ii)  For animated direct to home video productions: $80,000 for each hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the home video production. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

    iii)  For live action television programs: 3% of the first 1.5 million dollars of Gross Receipts received by an affiliated television production company in the United States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

359

ER 3113

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 243 of 321

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

       iv)    For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

       v)    For video games:

       (A)    For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

       (B)    For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

       vi)    For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

360

ER 3114

from gross revenues received in the United States in U.S. Dollars on account of licensed merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

vii)     For licensed publishing:  10% of net wholesale sales received by an affiliated publishing company in the United States in U.S. Dollars for each licensed publication.  As used herein, "net wholesale sales" shall mean the affiliated publishing company's then standard definition of net wholesale sales.

viii)     For website uses of Flash Animations and collateral material intended to supplement or support the Flash Animations: 5% of an affiliated online production company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation of the animations and collateral material after it has recouped its Production Costs.  As used herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest thereto).

8.   Accounting.  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable annually on March 31 of the year following the close of the annual accounting period.  All payments shall be accompanied by a statement of account.  The year 2000 statement and payment, if any, shall be made on March 31, 2002

9.   Audit.  The SIEGELS may audit the books and records of DC COMICS solely in order to verify statements issued to The SIEGELS hereunder.  Any such audit shall be at The SIEGELS' expense.  Any audit shall be conducted only upon reasonable notice by a certified public accountant during regular business hours at DC COMICS' offices and in such manner as not to interfere with DC COMICS' normal business activities.  In no event shall an audit with

35

361

ER 3115

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 245 of 321

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

10. Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.

a) The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents. Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within ____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

ER 3116

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 246 of 321

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

   b) The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact. The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

   11.      Conduct Of The Business.

   a) No Disparagement By Parties. The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

   b) Press Releases And Promotion. The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

          (i)      upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

**363**

**ER 3117**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 247 of 321

(ii)    shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)    shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c) The SIEGELS Shall Refer Inquiries. The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d) Advise. DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right. The SIEGELS will be informed of such developments periodically. To facilitate this, The SIEGELS will appoint one of them to receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments. The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

38

364

herein. Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

    e)   <u>Credit.</u>

      (i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

    (ii)    On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family". The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

365

ER 3119

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f) DC COMICS Right To Use Materials. DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g) DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS. DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40

366

ER 3120

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

    h)    <u>First Opportunity To Negotiate.</u>  The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. <u>Representations And Warranties, Covenant Not To Sue And Indemnification.</u>

    a)  <u>The SIEGELS Have The Right and Power To Enter Agreement.</u>  The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

**367**

ER 3121

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 251 of 321

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS, including but not limited to all trademark rights (if any) and copyright rights, and all termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive and flow directly and only from Jerome Siegel; (vi) no person or entity other than The SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal representative of Mr. Siegel and his estate.

b) <u>Release And Covenant Not To Sue By The SIEGELS.</u>

i) As of the date of execution of this Agreement, The SIEGELS and their descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and past, present and future, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby release and discharge now and forever DC COMICS and its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and past, present and future parents, subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively

42

368

ER 3122

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 252 of 321

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

ii)     In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

*369*

ER 3123

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 253 of 321

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

c) <u>Release And Covenant Not To Sue By DC COMICS.</u>

i) As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

ii) In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

44

370

ER 3124

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 254 of 321

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

d)    The SIEGELS Indemnify DC Comics.  RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s)  at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

(i)    RELEASEE  against RELEASOR  arising out of a breach or claimed breach by RELEASOR  (or any of the successors, assigns, heirs, estates, trustees, administrators or executors  of Jerome Siegel) of any of the terms of this Agreement;

(ii)    RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

(a)    asserting any right in The WORKS and/or The MARKS;

(b)    seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

(c)    claiming any Reversionary Rights in The WORKS or The MARKS;

(d)    that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

**371**

**ER 3125**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 255 of 321

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

(e)     relating to The SIEGELS representations and warranties herein, including but not limited to: i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

(iii)     Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

e)     DC COMICS Indemnifies The SIEGELS.  DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS.  DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. Confidentiality.  Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

372

ER 3126

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 256 of 321

14.     Dispute Resolution.

　　　　a)  Choice of Law.  This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

　　　　b)      DC COMICS' Equitable Remedies Unlimited.  The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief.  It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan.  The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

　　　　c)     Arbitration As Sole Remedy To Address Disputes By The SIEGELS.  Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for  an accounting of moneys due. The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

ER 3127

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 257 of 321

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever. Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so. Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

    d)    <u>Limit On Remedy Available To The SIEGELS</u>. If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto. The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

**374**

**ER 3128**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 258 of 321

any sums due to The SIEGELS herein.  The parties acknowledge that the financial benefit flowing to The SIEGELS under this Agreement represents a greater amount than what The SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce the Notices and any purported rights thereunder.  As consideration for this, The SIEGELS expressly agree that in any event, including but not limited to any change in law or otherwise, the compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel regardless of the basis of any such claim.

    e)    <u>No Payment Due Unless Provided For Herein</u>  Except as provided in paragraph 2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and Michael Siegel.  None of The SIEGELS or their heirs, executors, trustees, administrators, successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the extent it is not expressly provided for herein.

    f)    <u>Suspension Of Payments To The SIEGELS.</u>  If for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS' sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

**375**

**ER 3129**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 259 of 321

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be suspended until the claim is finally resolved.

15.     Non Assignability Of Rights Granted To The Siegels. The SIEGELS shall not assign, transfer, sell, license, or give away any of the rights provided to them under this Agreement, and any such assignment shall be null and void. The SIEGELS expressly agree that their heirs and/or all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement are expressly bound by this Agreement to the same extent to which The SIEGELS are bound by it. The SIEGELS shall expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement that such person(s) or entity or entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. MISCELLANEOUS

a)    Severability. In the event any provision hereof affecting The SIEGELS' grant of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by any competent court to be unenforceable, such determination shall not affect the effectiveness of any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in accordance with the parties' intent hereunder.

b)    Successors. This Agreement is enforceable against and binding upon the parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers, employees, directors, consultants, successors and assigns.

**376**

**ER 3130**

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED</u>:

DC COMICS, a division of Warner Bros., a      By: _____
Time-Warner Entertainment Company
                                                          Joanne Siegel


By: _____                    Date: _____

51

377

**ER 3131**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 261 of 321

Title: _____

Date: _____

By: _____

    Laura Siegel Larson

Date: _____

The Estate of Jerome Siegel

By:_____

Joanne Siegel as sole executor, trustee,
administrator and personal representative of
Jerome Siegel and his estate

Date: _____

By: _____

    Michael Siegel

Date: _____

52

**378**

ER 3132

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 262 of 321

## ACKNOWLEDGMENT

STATE OF          )

                       SS.:

COUNTY OF      )


On _____ __, 2001 before me _____ personally came _____ to me

known, by me duly sworn, did depose and say that deponent resides at _____

that deponent is the _____ of DC COMICS, a division of Warner Bros., a Time-Warner

Entertainment Company, the entity described in, and which executed the foregoing Agreement

that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate

seal, that it was affixed by order of the board of the corporation; and that deponent signed

deponent's name thereto by like order.]

**379**

**ER 3133**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 263 of 321

## ACKNOWLEDGMENT

State of          )

                  :ss:

County of         )


On          2001 before me personally came Joanne Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.


_____

Notary Public

54

**380**

ER 3134

## ACKNOWLEDGMENT

State of          )

                  :ss:

County of         )


On          2001 before me personally came Laura Siegel Larson to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.


_____

Notary Public

55

**381**

**ER 3135**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 265 of 321

## ACKNOWLEDGMENT

State of        )

                      :ss:

County of      )

On        2001 before me personally came Michael Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he executed the same.

_____

Notary Public

\\UNP1\VOL2\FIRMDOCS\PPERKINS\DCC\SUPER\Siegel Draft Agreement 020201.doc

*382*

ER 3136

# EXHIBIT EE

ER 3137

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 267 of 321

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA        )
SIEGEL LARSON,                 )
                               )
        Plaintiffs,            )
                               )
    vs.                        )        No. 04-8400 (RSWL)(RZx)
                               )
WARNER BROS. ENTERTAINMENT )             -and-
INC., et al.,                  )
                               )        No. 04-8776 (RSWL)(RZx)
        Defendants.            )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**


DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1


Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

1        Deposition of KEVIN S. MARKS, taken on

2     behalf of Defendants and Counterclaimants,

3     at 9665 Wilshire Boulevard, 9th Floor, Beverly

4     Hills, California, beginning at 10:05 AM on

5     Saturday, October 7, 2006, before DAVID S.

6     COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
13      Attorney at Law
          2049 Century Park East, Suite 2720
14      Los Angeles, California 90067
          310-246-3333
15

16   For Defendants and Counterclaimant:

17      WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
18      Attorney at Law
          9665 Wilshire Boulevard, 9th Floor
19      Beverly Hills, California 90212
          310-858-7888
20      mbergman@wwllp.com

21        -and-

22      PERKINS LAW OFFICE
          BY:  PATRICK T. PERKINS
23      Attorney at Law
          1711 Route 9D
24      Cold Springs, New York 10516
          845-265-2820
25

                                                                   2

1    APPEARANCES (Continued):

2

3    For the Witness:

4        JEFFER MANGELS BUTLER & MARMARO
         BY:  MARC MARMARO
5        Attorney at Law
         1900 Avenue of the Stars, 7th Floor
6        Los Angeles, California 90067-4308
         310-203-8080

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 270 of 321

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4        Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7            MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:49 10           MR. TOBEROFF:  Not to the extent you are

04:49 11   comparing the documents.

04:49 12           MR. MARMARO:  Maybe we should have the documents

04:49 13   in front of us.  Do you have any objection to him looking

04:49 14   at Mr. Schulman's letter?

04:49 15           MR. BERGMAN:  Not at all.

04:49 16           THE WITNESS:  I know that one area of difference

04:49 17   was the scope of the rights granted.  In my letter it

04:49 18   referred to -- very specifically to the Superman property

04:49 19   and the Spectre property.  That's what we had been

04:50 20   talking about the whole time of our negotiations going

04:50 21   back to the first meeting in 2 -- 1999.  And, of course,

04:50 22   as you see here, the consideration, at least as set forth

04:50 23   in my letter, for that matter I guess in John's letter,

04:50 24   is based on revenue from the Superman and Spectre

04:50 25   properties, yet John's letter referred more generally to

                                                                    155

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 271 of 321

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4         Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:51 10   warranties than that, warranties that go beyond that.

04:51 11        Oh, and by the way, that is also reflected in

04:51 12   the October 19th letter.  John's warranties go beyond

04:51 13   that, and so too in his letter he would have the Siegels

04:51 14   indemnifying for areas that were not agreed and, indeed,

04:51 15   not even discussed.  So there's broader warranties and

04:51 16   representations and, as a result, broader indemnities,

04:51 17   and in fact there are additional indemnities added; for

04:52 18   example, indemnifying for any claims brought by Dennis

04:52 19   Larson.

04:52 20        There is, I recall, a provision that talks about

04:52 21   furnishing DC Comics with historical information about

04:52 22   the properties and rights information about the

04:52 23   properties, and I felt from my representation of the

04:52 24   client that that was going to be problematic, in fact I

04:52 25   knew it was problematic, and it was not a point that had

156

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 272 of 321

04:52 1    been discussed before, it was not a point that had been

04:52 2    agreed before, and it was not a point that was in my

04:52 3    letter.

04:52 4        I know that there was a right of first

04:52 5    negotiation for any biographical material outlined in

04:52 6    John's letter.  Again, I don't recall ever discussing

04:53 7    that point before, much less agreeing to that point, and

04:53 8    it was not reflected in my letter.

04:53 9        When you get to elsewhere in John's letter, I

04:53 10   know he refers to an affirmative obligation on the part

04:53 11   of the Siegels to positively publicize the property and

04:53 12   to make themselves available or reasonably available for

04:53 13   travel, and what John and I had discussed and I had

04:53 14   believed agreed was that there would be mutual

04:53 15   non-disparagement, neither party would say anything bad

04:53 16   about the other, but we had not discussed and we had not

04:53 17   agreed about an affirmative obligation on the part of the

04:54 18   Siegels to positively publicize.

04:54 19       And in terms of the travel, I thought that was a

04:54 20   problem because we were dealing with a woman of advanced

04:54 21   years and a woman who was ill, and travel on them could

04:54 22   be a burden, notwithstanding that I think there was a

04:54 23   carve-out for -- subject to their health and

04:54 24   availability.  I wouldn't have wanted there to be any

04:54 25   dispute that they were not fulfilling an obligation about

157

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 273 of 321

going to travel to an event and that the failing to
travel to an event being the basis for claiming breach
and withholding royalty payments and the like.

I recall in this document new terms concerning
how the royalty could be reduced. My understanding of
our agreement, what I set forth in the October 19th
letter, was that on media and merchandising licenses the
royalty was 6 percent. If the other DC Comics characters
appeared in the media program or in licensing or
merchandising, that royalty could be reduced to a floor
of 3 percent.

And in our October telephone conversations this
issue was the subject of conversation, and John brought
up two other instances that would give rise to further
reductions of the royalty, and I know those instances
were specifically the use of Superman in conjunction with
properties called The Justice League, Superfriends and
Superheroes. I recall that John initially said it should
go down to 1 percent, and we agreed that in fact the
floor in that specific instance would be 1.5 percent.

And also in this October period John brought up
a further area where he said sometimes there are very
extraordinary licenses where the Time Warner licenses DC
properties, and, for example, Looney Tunes properties,
and he spoke specifically about Six Flags Magic Mountain

158

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 274 of 321

04:56 1   amusement park, where there are strolling characters and

04:57 2   signage and the like that use numerous characters, and he

04:57 3   suggested that the royalty should be further reduced in

04:57 4   that case to 1 percent, which we came to an understanding

04:57 5   on that.

04:57 6         In the October 19th letter there are broader

04:57 7   categories where the royalty --

04:57 8         MR. MARMARO:  Do you mean the October 19th

04:57 9   letter?

04:5710         THE WITNESS:  I'm sorry.  The October 26th

04:5711   letter.  The categories where the 3 percent can be

04:5712   further reduced are broadened.

04:5713         I know we've talked today about intercompany

04:5714   deals and safe harbors as one of the points throughout

04:5715   the discussion, and as I think I testified to earlier, we

04:5816   had agreed, I thought, that -- and I think it's reflected

04:5817   in John's letter, that if the Siegels were to challenge

04:5818   an intercompany deal that was outside a safe harbor,

04:5819   there would be an expedited dispute resolution procedure.

04:5820   That was the only discussion we had about alternative

04:5821   dispute resolution.  We never discussed arbitration in

04:5822   general applying to all of this, and yet John's letter

04:5823   provided for arbitration of disputes.  My letter did not.

04:5824         We talked earlier about the issue about for how

04:5825   long would the 6 percent royalty run and there being

                                                                      159

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 275 of 321

04:58 1    disagreement on the parties as to the length of time.

04:59 2    The DC Comics position was the royalty would terminate

04:59 3    when Action Comics No. 1 went into the public domain, and

04:59 4    I believe it was at that July 12th meeting, 2001 meeting

04:59 5    that we sat at John's table and discussed what happens if

04:59 6    a Superman movie, SUPERMAN 18, comes out a year before

04:59 7    Action Comics No. 1 goes into the public domain; there

04:59 8    should be a tail on that, to which John agreed.

04:59 9         So we agreed upon a tail where there was a movie

04:59 10   that was released close to the end of the period that

04:59 11   Action Comics No. 1 was still in copyright.  We agreed

04:59 12   that there would be a tail for television, and we had

04:59 13   agreed that there would be a tail -- at least my

04:59 14   understanding was we'd agreed that there would be a tail

05:00 15   for other substantial projects.  After all, 10 years from

05:00 16   now, 20 years from now it's not clear what media -- in

05:00 17   what media contents will be exploited, so I wanted to be

05:00 18   able to cover that.  John did not include that other

05:00 19   area, other substantial projects in the tail, as I

05:00 20   recall.

05:00 21        We had talked about throughout a full indemnity,

05:00 22   and E&O insurance.  I think the E&O insurance wasn't in

05:00 23   John's letter, and I think the indemnity proposed here

05:00 24   was a partial, what I considered to be a partial

05:01 25   indemnity.

                                                          160

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 276 of 321

05:01 1          On the credit point --

05:01 2   BY MR. BERGMAN:

05:01 3      Q    Before you get to that one, Mr. Marks --

05:01 4          MR. MARMARO:  Can I just interject, because I

05:01 5   think I may have placed a possible ambiguity in the

05:01 6   record when I mentioned before Mr. Marks went into this

05:01 7   explanation of the differences that the letters be placed

05:01 8   before him, and until this very last point he has not

05:01 9   been testifying from the letter.  I just wanted to note

05:0110   that for the record in case -- well, I just wanted to

05:0111   note that for the record.

05:0112          THE WITNESS:  In terms of the credit to be

05:0113   accorded Siegel and Shuster, which was a point that I had

05:0114   as my point C.4, a point that I thought had long been

05:0215   agreed, that there would be a credit in paid ads of

05:0216   motion pictures, which is certainly in my experience is

05:0217   something that's very important to clients.  They want to

05:0218   see the credit in the full-page ads in newspapers and

05:0219   posters, movie theaters and the like, and John's letter

05:0220   provided for credit on screen only and not in paid ads.

05:0221   BY MR. BERGMAN:

05:0222      Q    If I could just ask you a question about that,

05:0223   and I am going, with your indulgence, to go back to some

05:0224   of these --

05:0225      A    Yes.

                                                          161

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 277 of 321

05:49 1      A    Well, with the qualification that I am not an

05:50 2   expert in reading John's handwriting, I believe this

05:50 3   says, "'contains a lot of trap doors,'" which I would

05:50 4   have said because it is how I felt.

05:50 5      Q    Can you explain what you meant by that?

05:50 6      A    Yes, if I could do so with reference to the

05:50 7   document.

05:50 8      Q    You certainly could, sir.

05:50 9      MR. MARMARO:  And again assuming there is no

05:5010   objection from Mr. Toberoff to this.

05:5011   BY MR. BERGMAN:

05:5012      Q    Incidentally, before you begin reviewing that, I

05:5013   should make note of the fact that this copy which I've

05:5014   introduced and was produced by you is missing a few

05:5015   pages, 13, 20 and 42.

05:5016      MR. MARMARO:  The first I've heard of it.  If

05:5117   you had called me before the deposition, I would have

05:5118   looked into it.

05:5119      MR. TOBEROFF:  This particular copy or --

05:5120      MR. BERGMAN:  That particular copy -- if you

05:5121   gentlemen would like, I can -- or if the witness would

05:5122   like, I have another copy which contains --

05:5123      MR. MARMARO:  Because they're consecutively

05:5124   Bates stamped, which would indicate to me that there is a

05:5125   copying issue at our end or maybe how we -- how the

                                                              183

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 278 of 321

05:51 1    document was maintained.

05:51 2         MR. BERGMAN:  Why don't we see if the witness

05:51 3    can proceed.  Meanwhile, I will have --

05:51 4         MR. TOBEROFF:  Can you just repeat those

05:51 5    numbers, by the way?

05:51 6         MR. BERGMAN:  13, 20, 42.

05:51 7         MR. TOBEROFF:  Thank you.

05:51 8         MR. BERGMAN:  You're welcome.

05:52 9    Q    You were looking at the agreement to --

05:52 10   A    I was -- can we wait a moment?

05:52 11        MR. MARMARO:  Off the record.

05:52 12        (Discussion held off the record.)

05:52 13        THE WITNESS:  In my October 19, 2001 letter,

05:53 14   "The Property" was defined quite specifically to mean

05:53 15   "all Superman, Superboy and related properties

05:53 16   (including, for example, Supergirl, Steel, Lois & Clark

05:53 17   and Smallville), and the Spectre property, and includes

05:53 18   all pre- and post-termination works (including the

05:53 19   so-called Superman library), characters, names and

05:53 20   trademarks relating to the Property," and that's what we

05:53 21   had discussed throughout the negotiation.

05:53 22        I recall there was one time where DC made a

05:53 23   proposal to have a royalty attach only on post-

05:53 24   termination works, which was rejected by the Siegels.  In

05:53 25   the conversations the negotiations was to a royalty that

                                                              184

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 279 of 321

05:54 1    covered all the works.

05:54 2        In this agreement at page 9 there is a

05:54 3    definition of "Revenues." It's paragraph 24. The

05:54 4    revenues -- "The term 'Revenues' is hereinafter defined

05:54 5    as all amounts actually received by DC COMICS in the

05:54 6    United States [sic] from the licensing of the rights in

05:54 7    the SUPERMAN property" --

05:54 8        MR. MARMARO: "In United States Dollars."

05:54 9        THE WITNESS: Excuse me. Thank you.

05:54 10       -- "in United States Dollars from the Licensing"

05:54 11   with a capital L "of rights in the SUPERMAN Property and

05:54 12   the SPECTRE Property," and the sentence and indeed the

05:54 13   paragraph continues.

05:54 14       In paragraph 23 it says, "The terms 'Licensing'"

05:54 15   with a capital L and "'Licenses'" with a capital L "refer

05:54 16   to DC COMICS authorizing any third party to commercially

05:54 17   exploit the SUPERMAN Property and the SPECTRE Property."

05:54 18       So now we have to look to find the definition of

05:55 19   "SUPERMAN Property" and "SPECTRE Property." Superman --

05:55 20   that definition is at page 4, paragraph 9. That says,

05:55 21   "The term super property -- [sic] 'SUPERMAN Property',"

05:55 22   in quotes, "is hereinafter defined to mean the following:

05:55 23   (i) each of the pre-existing characters and elements

05:55 24   which first appeared in the SUPERMAN Works; and (ii) such

05:55 25   other characters and/or elements, if any, that may be

185

05:55 1    hereafter -- [sic] that may be created hereafter and meet

05:55 2    the following criteria," and then there is an extensive

05:55 3    definition of criteria.

05:55 4        So subpart 2 is the definition of "SUPERMAN

05:56 5    Property" includes some, but not all, works created from

05:56 6    and after the date of the agreement, and what is defined

05:56 7    as the "SUPERMAN Works." So then we go to the definition

05:56 8    of "SUPERMAN Works."

05:56 9        That definition is at page 3 -- No, I'm sorry,

05:56 10   page 2, paragraph 3, and if you parse through the

05:56 11   language, it says, quote, "The phrase 'SUPERMAN Works' is

05:56 12   hereinafter defined collectively and individually as

05:56 13   follows," and rather than -- if you would like me to read

05:56 14   it into the record, I can, but notably it continues,

05:56 15   "...that in any manner depict, include, embody, refer to,

05:57 16   describe, relate to, concern, are associated with, or

05:57 17   preceded, lead to and/or contributed in any manner to the

05:57 18   development of, or derive from, are based upon and arise

05:57 19   out of SUPERMAN, that were ever created (in whole, in

05:57 20   part or jointly) by JEROME SIEGEL." So "SUPERMAN Works"

05:57 21   refer to work created by Jerome Siegel.

05:57 22        In this document at paragraph 7, page 3, there

05:57 23   is a definition of yet another category of works which is

05:57 24   called the "SUPERMAN Derivative Works," and to summarize,

05:57 25   those are works relating to the Superman character and

186

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 280 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 281 of 321

05:57 1    the like that are created by persons other than Jerome

05:57 2    Siegel.

05:57 3         So when you put this together, this document is

05:58 4    purporting to say or at least raise the problem that

05:58 5    licensing revenues would not include that body of 60

05:58 6    years of derivative works that the people that DC Comics,

05:58 7    Paul Levitz and others, made such an impression upon us

05:58 8    as being so different from the original work and was the

05:58 9    basis of the Superman library, which was contrary to what

05:5810    was agreed.  The whole idea was to pick up all works and

05:5811    not to exclude works created by other people.

05:5812         I mentioned that at the DC Comics meeting there

05:5813    was a specific discussion about an American Express ad

05:5814    campaign where Jerry Seinfeld, who was in that campaign,

05:5915    specifically requested that the Curt Shaw version of

05:5916    Superman be used in the campaign.  Under this draft the

05:5917    proceeds of that campaign would be excluded, or at least

05:5918    there was an argument that they would be excluded, and

05:5919    that wasn't the intent.  To parse through that language

05:5920    and to get there is very difficult, and I found -- I

05:5921    considered that deceptive drafting and a trap door and

05:5922    highly, highly problematic.

05:5923    BY MR. BERGMAN:

05:5924         Q    I understand the "problematic" part.

05:5925              Did you believe at the time that it was

                                                              187

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 282 of 321

05:59 1    purposely drafted that way or that it was, you know, a

05:59 2    trap door that existed due to inadvertence or drafting

05:59 3    rather than an intentional attempt to deprive the Siegels

06:00 4    of something?

06:00 5        A    Well, I know from the cover letter there were

06:00 6    multiple versions of this internally, because what

06:00 7    Mr. Perkins transmitted was what he described as the

06:00 8    latest version of the work, so that suggested to me that

06:00 9    this had been -- and this is the first version that I

06:0010    ever saw, so that suggested to me that there had been at

06:0011    least one and perhaps more versions of the work that had

06:0012    been vetted, and this looked to me to be an agreement

06:0013    that -- a document that had been very purposefully

06:0014    drafted.  That was my take away from it.

06:0015            I have another example too.

06:0016        Q    Please let me hear it.

06:0117        A    Returning to page 9, paragraph 24, the second

06:0118    sentence, "Revenues shall not include any sums received

06:0119    by DC Comics for providing any services or materials in

06:0120    connection with the licensing of rights in the SUPERMAN

06:0121    Property and SPECTRE Property."  Well, what this

06:0122    suggested to me was that there would be or could be or

06:0123    could arguably be a deduction from revenues for services

06:0124    attributable to DC Comics or materials supplied by DC

06:0125    Comics.

                                                              188

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 283 of 321

06:01 1          Going back to our meeting -- second meeting with

06:02 2     Paul Levitz at Warner Bros. and our meeting in DC Comics,

06:02 3     one of the points that Paul made in connection with what

06:02 4     he described as the licensor share was that DC

06:02 5     contributes a lot in the management, in the exploitation

06:02 6     of the property, and that's a reason why any royalty to

06:02 7     the Siegels should be further reduced, because there

06:02 8     should be some of that pot attributable to DC Comics'

06:02 9     efforts.

06:02 10          I read this and viewed this as a double dip,

06:02 11     because that had already been accounted for in arriving

06:02 12     at the 6 percent, and I was very concerned that this

06:02 13     could be used to further reduce the ultimate royalty.

06:03 14          Q    Again, did you attribute that to an intentional

06:03 15     attempt to, as you have put it, double dip or just to,

06:03 16     with all due respect to the drafters of the agreement,

06:03 17     sloppy drafting?

06:03 18          A    Well, as I read this, this had the earmarks of

06:03 19     very studied, careful, intentional drafting.  I could not

06:03 20     go so far as to know with certainty what the intention of

06:03 21     any or -- of all or any of the people on the DC team was,

06:03 22     but when I told John there are trap doors in it, these

06:03 23     are the trap doors.  I mean, bear in mind this is an

06:03 24     agreement that took a long time to produce, and that also

06:04 25     led me to believe that it had been at least carefully

189

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 284 of 321

06:04 1    drafted, and at a minimum this raised concerns for me and

06:04 2    red flags for me.

06:04 3        Q    When you stated to Mr. Schulman that there were

06:04 4    trap doors in the agreement, did he ask you what you

06:04 5    meant, or did he ask you for an example?

06:04 6        A    I don't believe he did.

06:04 7        Q    Applying that term as you have, it's true, isn't

06:04 8    it, that those kind of problems or, as you put it, trap

06:04 9    doors can exist without intentional acts, just through

06:0410    the -- not being able to clearly think through a problem

06:0411    and properly document it?

06:0412             Hasn't that been your experience?

06:0513             MR. MARMARO:  Calls for speculation.

06:0514             MR. TOBEROFF:  I was going to make that

06:0515    objection.  It's also vague and ambiguous, leading.

06:0516             THE WITNESS:  It can be true that drafters make

06:0517    mistakes in drafting that are consequential, adversely

06:0518    consequential.

06:0519    BY MR. BERGMAN:

06:0520        Q    When you spoke with John Schulman, did you

06:0521    indicate to him that you felt that those trap doors were

06:0522    purposely created or that it was inadvertent, or did you

06:0523    say nothing in that regard?

06:0524        A    I don't recall that I said they were purposeful,

06:0525    and I don't recall that I said they were inadvertent.  I

                                                                    190

# EXHIBIT FF



**WARNER COMMUNICATIONS INC.**

**Martin D. Payson**
Senior Vice President and
General Counsel

(212) 484-6520

March 15, 1982

Mrs. Jerry Siegel
11928 Darlington Avenue
#102
Los Angeles, CA. 90049

Dear Joanne:

This is in response to your letter of February 14, 1982
to Steve Ross.

From December 1975, when WCI entered into its agreement
with Jerry and Joe, the Company has been very responsive
to the needs of Jerry and Joe and has voluntarily increased
their annual salaries from $20,000 per year to $60,000 per
year. In addition, as you know, in July 1981 we paid a
special bonus to each of Jerry and Joe of $50,000 and in
January 1982 an additional bonus of $25,000.

The royalty policy at DC Comics applies to the creators of
new series first published after October 1981. It was not
intended to nor does it cover Jerry and Joe. The generous
arrangements which we have worked out with Jerry and Joe
are the exclusive financial arrangements intended for them.

I am pleased to advise you that Warner Communications agrees
that if Jerry should predecease you, Warner Communications
will continue to pay to you for the remainder of your life
the same benefits which it is then paying to Jerry. We do
not believe that it is appropriate for the Company to make
any payments beyond that, and our agreement to continue pay-
ments for your lifetime is conditioned upon the absence of
continuing requests for payment beyond your lifetime.

I hope that you, Jerry and Joe are all well. With all good
wishes,

Sincerely,

Martin D. Payson

mdp/k

EXHIBIT GG

1 | Marc Toberoff (CA State Bar No. 188547)
  | Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
  | 1999 Avenue of the Stars, Suite 1540
3 | Los Angeles, CA 90067
  | Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for Plaintiffs and Counterclaim Defendants
  | JOANNE SIEGEL and LAURA SIEGEL LARSON

6

**ORIGINAL**

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 8 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

7 | **UNITED STATES DISTRICT COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9

10 | JOANNE SIEGEL, an individual; | Civil Case No. CV 04-8400 RSWL (RZx)
11 | and LAURA SIEGEL LARSON, an
   | individual,
12 | | **FIRST AMENDED COMPLAINT FOR:**
13 | Plaintiffs, | [1] DECLARATORY RELIEF RE: TERMINATION, 17 U.S.C. §304(c);
14 | vs.
15 | | [2] DECLARATORY RELIEF RE: PROFITS;
16 | WARNER BROS. ENTERTAINMENT INC., a | [3] DECLARATORY RELIEF RE: USE OF "S" CREST;
17 | corporation; TIME WARNER INC., a corporation; DC COMICS, a | [4] ACCOUNTING FOR PROFITS;
18 | general partnership; and DOES 1-10, | [5] WASTE OF JOINTLY OWNED COPYRIGHTS;
19 | | [6] VIOLATION OF LANHAM ACT
20 | Defendants. | 15 U.S.C. § 1125;
21 | | [7] VIOLATION OF CALIFORNIA BUSINESS AND
22 | | PROFESSIONS CODE
23 | | §§ 17200 *ET SEQ.*
24 | | **DEMAND FOR JURY TRIAL**
25
26 | | DOCKETED ON CM
27 | | OCT 2 6 2005
28 | | BY            002

1

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 288 of 321

LODGED

ER 0259

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 289 of 321

```
 1 │ ┌─────────────────────────────────────┐
 2 │ │ DC COMICS,                           │
 3 │ │           Counterclaimant,           │
 4 │ │                                      │
 5 │ │    vs.                               │
 6 │ │ JOANNE SIEGEL, an individual;        │
 7 │ │ and LAURA SIEGEL LARSON, an          │
   │ │ individual,                          │
 8 │ │                                      │
 9 │ │           Counterclaim Defendants    │
   │ └─────────────────────────────────────┘
```

10   Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter

11 the "Plaintiffs"), by and through their attorneys of record, hereby allege as

12 follows:

13 **JURISDICTION AND VENUE**

14   1.   This is a civil action seeking declaratory relief, accounting for

15 profits, remedies for violations of the Lanham Act and violations of California

16 unfair competition laws and related claims arising out of Plaintiffs' termination

17 of prior grants of copyright in and to the original character and work known as

18 "Superman" and subsequent "Superman" works pursuant to the United States

19 Copyright Act of 1976, 17 U.S.C. § 304(c), and defendants' willful misconduct

20 with respect thereto.

21   2.   This Court has subject matter jurisdiction over the claims set forth

22 in this Complaint pursuant to the United States Copyright Act (hereinafter, the

23 "Copyright Act"), 17 U.S.C. § 101 *et al.*, pursuant to the Lanham Act, 15

24 U.S.C. §§ 1121 and 1125(a) and (c) and 28 U.S.C. §§ 1331, 1332, 1338(a) and

25 (b).

26   3.   This Court has supplemental jurisdiction over the related state

27 claims herein under 18 U.S.C. § 1367 in that these claims form part of the same

28 case and controversy as the federal claims herein.

2

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

ER 1060

1    4.    This Court has personal jurisdiction over the defendants in that

2   defendants are regularly doing business in the State of California and in this

3   District, and because a substantial part of the relevant acts complained of herein

4   occurred in the State of California and this District.

5    5.    Venue is proper in the United States District Court for the Central

6   District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a)

7   because a substantial part of the wrongful acts that give rise to the claims herein

8   below occurred in this district and because WARNER BROS.

9   ENTERTAINMENT INC. has its principal place of business in this district.

10                              **PARTIES**

11    6.    Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an

12   individual and citizen of and resides in the State of California, in the County of

13   Los Angeles, and is and at all times has been a citizen of the United States.

14   Joanne Siegel is the widow of famed comic book creator Jerome (a.k.a. "Jerry")

15   Siegel.

16    7.    Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel") is

17   an individual and a citizen of and resides in the State of California, in the County

18   of Los Angeles, and is and at all times has been a citizen of the United States.

19   Laura Siegel is the daughter of Jerome Siegel.

20    8.    Plaintiffs are informed and believe and based thereon allege that

21   defendant WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner

22   Bros.") is a corporation organized and existing under the laws of the State of

23   Delaware, which has its principal place of business in Los Angeles County,

24   California.  Warner Bros. is a wholly owned subsidiary of Defendant TIME

25   WARNER INC.

26    9.    Plaintiffs are informed and believe and based thereon allege that

27   Defendant DC COMICS (hereinafter "DC") is a general partnership organized

28   and existing under the laws of the State of New York, which has its principal

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

404
ER 3161

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 290 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 291 of 321

1   place of business in the State of New York; and that DC regularly conducts

2   significant business in the State of California and in the County of Los Angeles.

3   DC is also a wholly owned subsidiary of defendant Warner Bros.

4        10.   Plaintiffs are informed and believe and based thereon allege that on

5   or about September 30, 1946, the New York corporations, Detective Comics,

6   Inc., Superman, Inc., All American Comics, Inc., Jolaine Publications, Inc.,

7   Wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc., Gainlee

8   Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc. and

9   Trafalgar Printing Co., Inc. were consolidated into the New York corporation

10  National Comics Publications, Inc., the name of which was later changed to

11  National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and

12  further that DC, Warner Bros. and Time Warner, and/or each of them, are the

13  alleged successor(s)-in-interest to National Periodical Publications, Inc.

14       11.   Plaintiffs are informed and believe and based thereon allege that

15  Defendant TIME WARNER INC. (hereinafter "Time Warner") is a corporation

16  organized and existing under the laws of the State of Delaware, which has its

17  corporate headquarters in the State of New York, and that Time Warner

18  regularly conducts significant ongoing business in the State of California and in

19  the County of Los Angeles. Time Warner is the parent company of both Warner

20  Bros. and DC. (Time Warner, Warner Bros. and DC are sometimes collectively

21  referred to hereinafter as the "Defendants;" and each reference to Defendants

22  shall also refer to each Defendant).

23       12.   Plaintiffs are informed and believe and based thereon allege that

24  Defendant DC never, or rarely, exploits "Superman," independently of its

25  controlling parent company, Warner Bros.; that even relatively linear functions

26  such as "Superman" licensing are not handled directly by DC, but are exploited

27  exclusively through Warner Bros.; that the agreements and other arrangements

28  between Defendants Warner Bros. and DC regarding "Superman" are not "arms

<center>4</center>

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 292 of 321

1    length" agreements, serve primarily Warner Bros.' interests, and thus, do not

2    reflect the appropriate market values of the copyrights to "Superman," at issue

3    herein.

4        13.    Plaintiffs are informed and believe and based thereon allege that

5    Defendants Time Warner, Warner Bros. and DC are, and at all times material

6    hereto were, the alter-egos of each other and there exists and has existed at all

7    times material hereto a unity of interest and ownership among such Defendants

8    such that any separateness has ceased to exist in that Defendants, and/or each of

9    them, used assets of the other Defendants, and/or each of them, for its and/or

10   their separate, individual purposes, and caused valuable assets, property, rights

11   and/or interests to be transferred to each other without adequate consideration.

12       14.    Plaintiffs are informed and believe and based thereon allege that the

13   fictitiously named Defendants captioned hereinabove as Does 1 through 10,

14   inclusive, and each of them, were in some manner responsible or legally liable

15   for the actions, damages, events, transactions and circumstances alleged herein.

16   The true names and capacities of such fictitiously named defendants, whether

17   individual, corporate, associate, or otherwise are presently unknown to

18   Plaintiffs, and Plaintiffs will amend this Complaint to assert the true names and

19   capacities of such fictitiously named Defendants when the same have been

20   ascertained. For convenience, each reference herein to a named Defendant shall

21   also refer to the Doe Defendants and each of them.

22       15.    Plaintiffs are informed and believe and based thereon allege that

23   each of the Defendants was the agent, partner, servant, employee, or employer of

24   each of the other Defendants herein, and that at all times herein mentioned, each

25   of the Defendants was acting within the course and scope of such employment,

26   partnership and/or agency and that each of the Defendants is jointly and

27   severally responsible for the damages hereinafter alleged.

28

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 293 of 321

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

16.    In 1933 Jerome Siegel conceived the original idea of a cartoon strip featuring a unique man of superhuman strength and powers who would perform feats of great importance for the public good.  Siegel conceived, in essence, the first "superhero" -- an original concept which embodied our nation's ideals at the Worlds' darkest hour, became a cultural icon and spawned, what is today, a booming industry.  Jerry Siegel entitled his character -- "Superman."

17.    In or about 1934, Jerome Siegel authored twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week).  Plaintiffs are informed and believe and based thereon allege that these works, though originally unpublished were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 to April 13, 1943 (collectively, referred to hereinafter as the "Initially Unpublished Works").

18.    In or about 1934, Jerome Siegel and the artist, Joe Shuster (hereinafter collectively, "Siegel and Shuster") co-authored *fifteen* daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip").  "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years.

19.    Although "Superman" was not picked up for publication for some time, Siegel and Shuster did get other features they created into print with the Nicholson Publishing Company including "Henri Duval" and "Dr. Occult."  In a letter dated October 4, 1935, the company's owner Malcolm Wheeler-

6

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 294 of 321

1  Nicholson, wrote to Mr. Siegel expressing an interest in publishing "Superman"

2  in comic book form but Siegel and Shuster rejected his offer. Nicholson became

3  involved with a new comic magazine company, Detective Comics, Inc.

4  (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam

5  Bradley" and "Spy," which appeared in "Detective Comics No. 1."

6      20.   On or about December 4, 1937, Siegel and Shuster, as independent

7  contractors, entered into an agreement with Detective Comics (the "1937

8  Agreement") to continue to produce the comic magazine features, "Slam

9  Bradley" and "The Spy," which agreement provided, in part, that any new and

10  additional features which Siegel and Shuster produced for use in a comic

11  magazine were to be first submitted to Detective Comics which reserved the

12  right to accept or reject same within sixty days.

13      21.   One of the early entities to which Siegel had submitted "Superman"

14  was The McClure Newspaper Syndicate. In or about early 1938, the head of the

15  syndicate sought Siegel's permission to forward Siegel and Shuster's 1934

16  Superman Comic Strip material to Detective Comics for potential publication in

17  its contemplated new magazine, "Action Comics." By this time, "Superman"

18  and his miraculous powers had already been completely developed by Siegel and

19  Shuster.

20      22.   In or about January–February 1938, when Detective Comics

21  expressed interest to Siegel and Shuster in publishing their 1934 Superman

22  Comic Strip in a magazine, Siegel and Shuster cut and pasted their

23  aforementioned 1934 Superman Comic Strip into more than ninety separate

24  panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper

25  strip more suitable for a magazine layout.

26      23.   The "Superman" material described hereinabove, which was the

27  independent, original creation of Siegel and Shuster, contained virtually all of

28  the signature elements and characters of the "Superman" mythology and

<center>7</center>

---

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 295 of 321

1  constituted the formula for the continuing "Superman" series to come.  It

2  depicted and narrated the origin of the "Superman" character, and contained a

3  complete delineation of the literary and pictorial representation of "Superman,"

4  including without limitation, his habits, character, superhuman powers,

5  appearance, costume, secret identity and attributes, and the sphere of public

6  good "Superman" was to enhance.

7        24.    By an instrument dated March 1, 1938 (hereinafter, the "1938

8  Grant"), which had been prepared by Detective Comics, Siegel and Shuster

9  agreed to the publication of their Revised 1934 Superman Comic Strip by

10 Detective Comics in consideration for the sum of $10 per page for this thirteen

11 page installment equal to a total of $130.

12       25.    Thereafter, Detective Comics published Siegel and Shuster's

13 "Revised 1934 Superman Comic Strip" in the "June, 1938" issue of "Action

14 Comics No. 1," which was issued for sale on April 18, 1938.

15       26.    Action Comics No. 1 and the predecessor materials created solely

16 by Siegel and Shuster contained the essential elements of "Superman" which

17 continue to this day, including without limitation, Superman's origin from the

18 distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his

19 scientist father), his core physical and mental traits, his mission as a champion of

20 the oppressed to use his great powers to benefit humankind, his secret identity as

21 newspaper reporter, "Clark Kent," his relationship with other key characters

22 such as the newspaper editor from whom he takes his assignments and his

23 romantic interest in Lois, who rebuffs Clark as a coward, while romantically

24 inclined towards "Superman."

25       27.    Action Comics No. 1 was followed by further issues published at

26 regular intervals, with each subsequent issue containing additional "Superman"

27 material created by Siegel and Shuster.

28

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

409

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 296 of 321

28.   Between on or about March, 1938 and on or about September, 1938, Siegel and Shuster continued to create "Superman" strips, stories and continuities.

29.   On or about September 22, 1938, Detective Comics, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure Agreement") regarding the newspaper syndication of a "Superman" comic strip.

30.   On or about September 22, 1938, Detective Comics and Siegel and Shuster therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to do the "artwork and continuity" for five comic strips, including "Superman."

31.   Prior to September 22, 1938, Siegel and Shuster solely created six comic book issues of "Superman," published as Action Comics Nos. 1 through 6. Of these, Action Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics No. 6 was published four days later on September 26, 1938.

32.   Action Comics No. 1 is not a "work made for hire." Action Comics Nos. 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, are also not "works made for hire."

33.   On or about December 19, 1939, Detective Comics and Siegel and Shuster entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised Siegel and Shuster's per page compensation rate for the increasingly popular "Superman" comic strip.

34.   Plaintiffs are informed and believe and thereon allege that the "Superman" works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics were also not "works made for hire." The 1938 Agreement for the first time used the term "employ and retain" with

9

1    respect to Siegel and Shuster's subsequent work on "Superman," yet Siegel and

2    Shuster were never employees of Detective Comics.  Siegel and Shuster

3    operated their own independent comic book production business.  Without

4    limitation, Siegel and Shuster were not paid a salary, but were consistently paid

5    on a "per page" basis, and only for materials actually delivered by them to

6    Detective Comics and published by Detective Comics.  Plaintiffs are further

7    informed and believe and thereon allege that in compensating Siegel and

8    Shuster, Detective Comics did not withhold or deduct payroll, social security

9    and other taxes normally deducted from employee salaries; Detective Comics

10   did not provide employee benefits to Siegel and Shuster; Siegel and Shuster

11   worked from their own premises (not Detective Comic's premises); determined

12   their own hours and days of work; supplied, used and paid for their own

13   instrumentalities, tools and materials; and hired and paid for their own

14   employees who worked at Siegel and Shuster's instance and expense, under

15   Siegel and Shuster's direction and full control.

16       35.    In or about 1947, Siegel and Shuster filed an action in the Supreme

17   Court of the State of New York, County of Westchester against National Comics

18   Publications, Inc. (hereinafter, the "1947 Action" ) to determine the validity of

19   the contracts between National Comics Publications, Inc.'s predecessors–in–

20   interest and Siegel and Shuster with respect to "Superman."  Pursuant to a

21   stipulation of the parties the action was referred for decision to an Official

22   Referee of the New York Supreme Court.  After trial of the action the Official

23   Referee rendered an opinion dated November 1, 1947.  On April 12, 1948, the

24   Official Referee signed detailed findings of fact and conclusions of law and

25   entered an interlocutory judgment upholding the contracts in some respects, to

26   which notices of appeal were filed by all said parties.  Settlement negotiations

27   ensued, resulting in a stipulation of settlement between said parties executed on

28

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 298 of 321

1  or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the

2  New York Supreme Court of a final consent judgment dated May 21, 1948.

3      36.   In or about the early 1970's, a dispute arose between Siegel and

4  Shuster and National Periodical Publications, Inc. regarding the renewal

5  copyright to "Superman," resulting in Siegel and Shuster's filing of an action

6  against National Periodical Publications, Inc. in the United States District Court

7  for the Southern District of New York for a declaration that Siegel and Shuster

8  were entitled to the renewal copyright to "Superman." The District Court held

9  in <u>Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et</u>

10  <u>al.</u>, 364 F. Supp. 1032 (1973) that the initial "Superman" comic strip, published

11  in Action Comics No. 1, is a "work for hire" within the meaning of the

12  Copyright Act, 17 U.S.C. § 26, and that, in any event, the various agreements

13  between the parties, prior to the action, transferred the renewal copyright in this

14  material to Detective Comics.

15      37.   On appeal, the United States Court of Appeals for the Second

16  Circuit held in <u>Jerome Siegel and Joseph Shuster v. National Periodical</u>

17  <u>Publications, Inc. et al.</u>, 509 F.2d 909 (2nd Cir. 1974), that the District Court

18  erred in finding that Superman was a "work for hire" under the Copyright Act,

19  17 U.S.C. § 26, and that "Superman" and his miraculous powers were created by

20  Siegel and Shuster long before any employment relationship with Detective

21  Comics. The Second Circuit nonetheless held that the Official Referee's

22  determination in the 1947 Action that Siegel and Shuster had transferred all

23  rights in "Superman" to Detective Comics implicitly included a determination

24  that Siegel and Shuster had transferred the renewal copyright in "Superman" to

25  Detective Comics; and that this determination was binding under the doctrine of

26  <i>res judicata</i>.

27      38.   On or about December 23, 1975, Siegel and Shuster entered into an

28  agreement with Warner Communications Inc. (hereinafter the "1975

<p style="text-align:center">11</p>

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 299 of 321

1  Agreement") the alleged parent company of National Periodical Publications,

2  Inc., which provided for (i) annual payment of $20,000 to Siegel and Shuster

3  each for their respective lifetimes, plus medical benefits to Siegel and Shuster

4  each; and (ii) that Siegel and Shuster would be given credit on certain

5  "Superman" publications and derivative works as the "creators" of Superman, in

6  exchange for Siegel and Shuster's acknowledgement that Warner

7  Communications, Inc. was the exclusive owner of all right, title and interest in

8  and to "Superman." (The 1937 Agreement, the 1938 Grant, the 1938 McClure

9  Agreement, the 1938 Agreement, the 1939 Agreement, the 1948 Stipulation and

10 the 1975 Agreement described hereinabove are hereinafter sometimes referred to

11 collectively as the "Alleged Grants.")

12     39.    On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel, served

13 by first class mail, postage prepaid, notices of termination, as permitted by the

14 Copyright Act, 17 U.S.C. § 304(c) (hereinafter, the "Termination Notices") on

15 each of the Defendants and a number of their subsidiaries, licensees and

16 affiliates, terminating the Alleged Grants of the renewal copyright to (i) the

17 copyrightable "Superman" character, (ii) the 1934 Superman Comic Strip and

18 the Revised 1934 Superman Comic Strip, both published as/in Action Comics

19 No. 1, (iii) the material published as/in Action Comics Nos. 1-6 (statutory

20 copyright to Action Comics No. 6 was secured on September 26, 1938), (iv) the

21 material published as/in Action Comics Nos. 7- 61 (statutory copyright to Action

22 Comics No. 61 was secured on April 13, 1943), and/or (v) subsequent works

23 involving "Superman," all as set forth in the Notices of Termination (hereinafter

24 sometimes referred to collectively as the "Works").

25     40.    Plaintiffs are informed and believe and based thereon allege the

26 Initially Unpublished Works set forth in the Termination Notices were

27 incorporated or included in Works published thereafter, to which the

28 Termination applies.

<div align="center">12</div>

---

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 300 of 321

41.   Plaintiffs are further informed and believe and based thereon allege that the copyrights to all the Works were duly renewed.

42.   The Notices of Termination were drafted, served on Defendants and filed with the United States Copyright Office, all in full compliance with the Copyright Act, 17 U.S.C. 304(c), and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. § 201.10 (2003).  (Plaintiffs' aforesaid exercise of their termination rights under 17 U.S.C. § 304(c) regarding "Superman" is sometimes hereinafter referred to as the "Termination").

43.   As the original co-author of each Work Jerome Siegel owned an undivided fifty percent (50%) of the copyright of each Work prior to any alleged transfer or assignment of any such Work pursuant to any Alleged Grant.

44.   The Notices of Termination terminated on April 16, 1999 (hereinafter, the "Termination Date") all prior grants or purported grants of the renewal copyrights in and to each and/or all the Works for their extended renewal terms (hereinafter, sometimes referred to individually and collectively as the "Recaptured Copyrights"), including, but not limited to, the Alleged Grants.

45.   On April 16, 1999, the Termination Date, Plaintiffs re-gained ownership to Jerome Siegel's undivided fifty percent (50%) copyright interest in and to each and/or all the Works for their extended renewal terms.  In accordance with 17 U.S.C. 304(c), and as set forth in the Notices of Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled to share in the proceeds from this recaptured interest.

46.   Defendants have acknowledged that the Notices of Termination are effective.  Defendants have further admitted that Plaintiff's thereby co-own the copyright(s) to at least the original "Superman" elements authored by Siegel and Shuster; and that Defendants have a duty to account to Plaintiffs for Defendants' exploitation of such copyright(s).

13

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 301 of 321

47.     On April 16, 1997, in response to the service of the Notices of
Termination, John A. Schulman, Executive Vice President and General Counsel
of Defendant Warner Bros. wrote a letter to Joanne Siegel, stating in relevant
part:

>       "As to the Notices of Termination, I wasn't surprised
>       at their arrival…After the effective date of the
>       termination, there will still remain 14 years of
>       copyright protection left to the joint copyright holders
>       of the original Superman elements.  Those are what we
>       should share."

48.     Similarly, on October 10, 1997, Paul Levitz, President and
Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in
relevant part:

>       "The [Superman] rights involved are non-exclusive;
>       they are shared with DC.  Since both you and DC
>       would have these rights, we would each have the
>       obligation to pay the other for using those rights if you
>       did not re-grant them to DC."

49.     Yet, on April 15, 1999, one day before the Termination Date,
Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the
Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the
termination with respect to *any* "Superman" copyrights, stating in relevant part:

>       "[Y]ou are hereby put on notice that DC Comics
>       rejects both the validity and scope of the notices and
>       will vigorously oppose any attempt by your clients to
>       exploit or authorize the exploitation of any copyrights,
>       or indeed, any rights at all, in Superman."

14

ER 572

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 302 of 321

1      50.   Defendant DC's April 15, 1999 letter constituted a thinly veiled

2  threat that if Plaintiffs ever attempted to exploit *any* of their recaptured copyright

3  interests in "Superman," Defendants would engage in a campaign of

4  intimidation, including, but not limited to, instituting frivolous litigation against

5  Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs'

6  ability to exploit their Recaptured Copyright interests.  Given that Time Warner

7  is one of the largest media companies in the world with over $38 billion in

8  annual revenues, Defendants' threats had a devastating and chilling effect on

9  Plaintiffs' freedom to exploit the copyright interests they had properly regained

10  under the Copyright Act, 17 U.S.C. § 304(c), thereby damaging Plaintiffs and

11  causing them great emotional distress.

12      51.   In the nearly 6 ½ years since the Termination Date, none of the

13  Defendants has ever accounted to the Plaintiffs for any proceeds or profits

14  whatsoever from their ongoing exploitation of "Superman" and the jointly

15  owned Recaptured Copyrights.

16                  **FIRST CLAIM FOR RELIEF**

17    (Declaratory Relief Re:  Termination, 17 U.S.C. § 304(c) - Against All

18                             Defendants)

19      52.   Plaintiffs re-allege and incorporate by reference paragraphs 1

20  through 51 inclusive, as though fully set forth herein.

21      53.   By reason of the foregoing facts, an actual and justiciable

22  controversy has arisen and now exists between Plaintiffs and Defendants under

23  Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective

24  rights and interests in and to the copyright to various "Superman" works, for

25  which Plaintiffs desires a declaration of rights.

26      54.   Plaintiffs contend and Defendants deny that:

27          a.   The Notices of Termination terminated on April 16, 1999 all

28  prior grants, assignments or transfers of copyrights for the extended renewal

<center>15</center>

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 303 of 321

1    term in and to each and/or all of the Works (as defined in paragraph 39
2    hereinabove) to any of the Defendants and other parties duly served with the
3    Notices of Termination, including their predecessors-in-interest;

4            b.    As of the effective Termination Date, April 16, 1999,
5    Plaintiffs owned and continue to own an undivided fifty percent (50%) of the
6    Recaptured Copyrights to each and/or all the Works for their renewal terms;

7            c.    By reason of the foregoing, Plaintiffs are entitled to fifty
8    percent (50%) of any and all proceeds, compensation, monies, profits, gains and
9    advantages from the exploitation of, or attributable to, in whole or in part, any
10   aspect of the Recaptured Copyrights (hereinafter, sometimes referred to as
11   "Profits"); and

12           d.    By reason of the foregoing, Defendants own or control only
13   fifty percent (50%) of the Recaptured Copyrights, and thus, as of the
14   Termination Date, had and have no authority to confer exclusive licenses or
15   grants with respect to any element of the "Superman" mythology protected by
16   the Recaptured Copyrights.

17       55.   A declaration of the Court is necessary pursuant to the Declaratory
18   Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their
19   respective rights and obligations with respect to the Termination and the
20   copyright interests thereby recaptured by Plaintiffs.

21                    **SECOND CLAIM FOR RELIEF**

22       (Declaratory Relief Re:  Profits from Recaptured Copyrights - Against All
23                            Defendants)

24       56.   Plaintiffs re-allege and incorporate by reference paragraphs 1
25   through 55 inclusive, as though fully set forth herein.

26       57.   By reason of the foregoing facts, an actual and justiciable
27   controversy has arisen and now exists between Plaintiffs and Defendants
28   concerning how Profits from Recaptured Copyrights should be defined for

                              16

1 purposes of Defendants and Plaintiffs accounting to one another as joint owners
2 of the Recaptured Copyrights.

3      58.    Plaintiffs contend and Defendants deny that:

4           a.    Profits include Defendants' revenues from the post - April
5 16, 1999 exploitation of the Recaptured Copyrights in foreign territories, when
6 such exploitation results from the predicate exercise *in the United States* of any
7 right(s) under the Recaptured Copyrights by any Defendant, their licensees or
8 assigns;

9           b.    There should be no *apportionment* of Profits since Plaintiffs
10 are entitled to fifty percent (50%) of such Profits as *joint owners* of the
11 Recaptured Copyrights;

12           c.    Alternatively, *apportionment*, if any, should apply only to
13 profits from the exploitation of the Recaptured Copyrights in *derivative works*
14 *created by a Defendant*, but not to profits from mere *licensing* of the Recaptured
15 Copyrights. Any such apportionment should weigh heavily in Plaintiffs' favor,
16 since the value of the "Superman" franchise exploited by the Defendants
17 ("Superman Franchise") is largely attributable to the unique "Superman"
18 mythology protected by the Recaptured Copyrights. The Superman Franchise
19 capitalizes on the success of, and is hardly distinguishable from, the underlying
20 Recaptured Copyrights co-owned by Plaintiffs;

21           d.    Profits include profits from any merchandise or other
22 derivative works created, produced or manufactured on or after the Termination
23 Date, April 16, 1999, notwithstanding that the underlying licensing agreement
24 for such exploitations may have been executed prior thereto;

25           e.    Profits are not limited to the Profits of Defendant DC,
26 Warner Bros.' wholly owned subsidiary, but include the Profits of Defendants
27 Warner Bros. and Time Warner, as well; and

28

<div align="center">17</div>

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

ER 3173

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 305 of 321

1     f.     In determining Profits, deductible costs should include only
2  reasonable costs directly attributable to the exploitation of the Recaptured
3  Copyrights, of the type customarily deducted in arms' length agreements to
4  exploit copyrights of comparable value, all in compliance with Generally
5  Accepted Accounting Principles ("GAAP").

6     59.    A declaration of the Court is necessary pursuant to the Declaratory
7  Judgment Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their
8  respective rights and obligations with respect to Profits from the exploitation of
9  the Recaptured Copyrights after the Termination Date.

10                        **THIRD CLAIM FOR RELIEF**
11  (Declaratory Relief Re:  Use of the "Superman" Crest - Against All Defendants)

12     60.    Plaintiffs re-allege and incorporate by reference paragraphs 1
13  through 59 inclusive, as though fully set forth herein.

14     61.    By reason of the foregoing facts, an actual and justiciable
15  controversy has arisen and now exists between Plaintiffs and Defendants
16  concerning whether Plaintiffs are entitled, after the Termination Date, to
17  commercially exploit the "Superman" crest comprised of a large red "S"
18  centered on a broad triangular yellow field, first appearing (as part of
19  "Superman's" costume, centered on and highlighting Superman's "V" shaped
20  muscular chest) in the 1934 Superman Comic Strip and the 1934 Revised
21  Superman Comic Strip created by Siegel and Shuster and published as Action
22  Comics No. 1, and in only slightly revised form in subsequent Works
23  (hereinafter the "Superman Crest"); and whether Defendants' duty to account, as
24  non-exclusive joint owners of such Recaptured Copyrights, includes Profits from
25  the licensing of this crest.

26     62.    Defendants allege a trademark interest in a "Superman" shield
27  (hereinafter the "Superman Shield" and/or "Superman Trademark") which is
28  also comprised of a large red "S" on a broad triangular yellow field, first

<center>18</center>

ER 4176

1   appearing in later Works, as part of "Superman's" costume, centered on and
2   highlighting Superman's "V" shaped muscular chest, with the upper corners of
3   the triangular crest slightly cropped.

4       63.   Plaintiffs contend and Defendants deny that:

5          a.    The Recaptured Copyrights include the copyright to the
6   "Superman" crest comprised of a large red "S" centered on a broad triangular
7   yellow field, first appearing as part of "Superman's" costume, centered on and
8   highlighting Superman's "V" shaped muscular chest, in the 1934 Superman
9   Comic Strip and the Revised 1934 Superman Comic Strip published as Action
10  Comics No. 1, and appeared in subsequently published Works in only slightly
11  revised form (hereinafter the "Superman Crest").

12         b.    Defendants' alleged Superman Trademark design arose
13  directly from, and is substantially identical to, Siegel and Shuster's copyrighted
14  Superman Crest;

15         c.    Defendants receive significant proceeds and value from the
16  utilization and copying of the Superman Crest and/or substantially identical
17  Superman Shield for which Defendants must account to Plaintiffs;

18         d.    In turn, Plaintiffs should likewise be allowed to exercise their
19  rights under copyright with respect to the Superman Crest, including without
20  limitation the right to commercially exploit the Superman Shield in
21  merchandise;

22         e.    Defendants, in any event, cannot use the alleged Superman
23  Trademark or any other purported trademark interest regarding "Superman" to
24  prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of their rights
25  under the Copyright Act in any of the jointly owned Recaptured Copyrights.

26      64.   A declaration of the Court is necessary pursuant to the Declaratory
27  Judgment Act, 28 U.S.C. §§ 2201 *et seq*., so that the parties may know their
28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 306 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 307 of 321

respective rights and obligations with respect to the Superman Crest and the Superman Shield.

## FOURTH CLAIM FOR RELIEF

### (Accounting for Profits - Against All Defendants)

65.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66.    On or after the Termination Date, April 16, 1999, Defendants and/or each of them have licensed and/or commercially exploited and will continue to license or exploit the Recaptured Copyrights, including without limitation, *via* merchandising, publishing, and derivative motion picture and television programming.

67.    As result of such licensing and/or commercial exploitation of the Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of them have received and will continue to receive substantial Profits, fifty percent (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured Copyrights.

68.    Defendant Warner Bros. has acted and continues to act in most instances as the effective joint-owner and licensor (as opposed to licensee) of the Recaptured Copyrights; and, as such, Warner Bros., along with the other Defendants, owes a duty to account to Plaintiffs.

69.    To date, the Profits received by Defendants and/or each of them from such licensing and/or commercial exploitation on or after April 16, 1999 is estimated to be in excess of $50 million, however the exact sums actually received and to be received by Defendants and/or each of them, are unknown to Plaintiffs at this time, for these amounts can be properly determined only by an accounting.

70.    Plaintiffs have demanded an accounting by Defendants on a continuing basis of all amounts received by them and/or payable to them from

20

ER 378

1 │ such licensing and other commercial exploitation on or after April 16, 1999, and

2 │ that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

3 │      71.    In nearly 6 ½ years since the Termination Date, Defendants have,

4 │ nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

5 │      72.    Plaintiffs at no time waived their rights to receive their share of

6 │ such Profits, nor have Plaintiffs at any time consented to the use and exploitation

7 │ of the Recaptured Copyrights in the United States or any foreign territories.

8 │      73.    Plaintiffs are entitled to an ongoing accounting from Defendants

9 │ regarding all amounts received, realized by or payable to Defendants on or after

10 │ April 16, 1999 from the licensing and any other commercial exploitation of the

11 │ Recaptured Copyrights and "Superman Franchise," and to the payment by

12 │ Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

13 │ <u>**FIFTH CLAIM FOR RELIEF**</u>

14 │ (Waste of Co-Owned Copyright - Against All Defendants)

15 │      74.    Plaintiffs re-allege and incorporate by reference paragraphs 1

16 │ through 73 inclusive, as though fully set forth herein.

17 │      75.    On or about April 16, 1999, Plaintiffs became and currently are the

18 │ co-owners, as tenants in common, with Defendants of an undivided fifty percent

19 │ (50%) of the Recaptured Copyrights.

20 │      76.    The April 15, 1999 letter from Defendant DC's attorneys alleged

21 │ hereinabove baselessly denied the validity of the Termination with respect to *any*

22 │ and all "Superman" copyrights and threatened to take action against Plaintiffs if

23 │ they attempted to exploit *any* of their Recaptured Copyrights.

24 │      77.    In so threatening Plaintiffs, DC, and by extension DC's parent

25 │ companies, Warner Bros. and Time Warner, asserted exclusive ownership and

26 │ control of "Superman" and effectively controlled the Recaptured Copyrights,

27 │ notwithstanding the Termination.

28 │

EB3179

 

78.  Plaintiffs are informed and believe and thereon allege that in light of Defendants' adverse claims, resources, power and ubiquitous presence in the marketplace, virtually no parties would dare to license the Recaptured Copyrights from Plaintiffs.

79.  Plaintiffs are informed and believe and thereon allege that since the Termination Date, Defendants and/or each of them have caused injury to the Recaptured Copyrights by committing waste thereon.  Plaintiffs are informed and believe and thereon allege that such waste includes, without limitation, Defendants under-utilization of the Recaptured Copyrights, non "arms length" contracts between wholly owned subsidiaries and/or divisions, self-serving accounting practices and the improper allocation of revenues, costs and profits with respect to the Recaptured Copyrights, and the overall weakening of the Superman Franchise due to Defendants relatively marginal exploitation thereof in a period when market opportunities for such a superhero franchise has been and continues to be at an all time high.

80.  The ongoing waste by Defendants has caused and continues to cause great irreparable injury to Plaintiffs as co-owners of the Recaptured Copyrights, and such damages are particularly acute given that the Recaptured Copyrights are of limited duration.

81.  By reason of the foregoing, Defendants have committed waste on the Recaptured Copyrights, and as a direct and proximate result thereof, have damaged Plaintiffs in an amount not yet ascertained, but which will be assessed at the time of trial.

82.  Plaintiffs are informed and believe and thereon allege that Defendants' frivolous denial of the validity of the Termination with respect to any "Superman" copyrights; Defendants' threats to bring suit against Plaintiffs if they attempted to exploit any of their recaptured copyright interest; and Defendants willful failure to account and improper accounting practices, after

22

ER4280

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 310 of 321

1 | the Termination Date, were conducted in an intentional, malicious, calculated

2 | and oppressive manner in conscious disregard for Plaintiffs' rights, health and

3 | feelings, and knowingly and intentionally injured and damaged Plaintiffs, which

4 | conduct constituted oppression and malice as defined by California Civil Code §

5 | 3294. In accordance with California Civil Code § 3294, Plaintiffs are entitled to

6 | punitive damages in an amount sufficient to punish Defendants, to be assessed at

7 | trial.

### SIXTH CLAIM FOR RELIEF

(Violation of the Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125

- Against All Defendants)

11 | 83.   Plaintiffs re-allege and incorporate by reference paragraphs 1

12 | through 82 inclusive, as though fully set forth herein.

13 | 84.   Plaintiffs are informed and believe and thereon allege that

14 | Defendants have in connection with tangible goods and products embodying the

15 | original "Superman" elements co-owned by Plaintiffs ("Superman Goods")

16 | misrepresented in commercial advertising and promotion that they are the

17 | *exclusive* owner of such goods and/or all rights underlying such goods and that

18 | based upon such false claims, representations and wrongful omissions have

19 | induced others to enter into improper agreements with them, including but not

20 | limited to agreements to *exclusively* exploit such Superman Goods.

21 | 85.   Defendant DC and Warner Bros. Consumer Products (a wholly

22 | owned division of Defendant Warner Bros.) regularly render licensing services

23 | with respect to Superman Goods. Plaintiffs are informed and believe and

24 | thereon allege that Defendants have misrepresented in their commercial

25 | advertising and promotion of such services that they have the right to grant

26 | *exclusive* licenses to "Superman" and that based upon such false claims,

27 | representations and wrongful omissions have induced others to enter into

28 |

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

ER 3191

1  agreements with them, including but not limited to agreements to *exclusively*

2  exploit Superman Goods.

3      86.    Plaintiffs are informed and believe and thereon allege such false

4  claims, representations and wrongful omissions misrepresented in commercial

5  advertising and promotion the nature, characteristics and qualities of such

6  Superman Goods, Defendants' licensing services or commercial activities.

7      87.    Plaintiffs are informed and believe and thereon allege such false

8  claims, representations and wrongful omissions were conducted by Defendants

9  or each of them with a willful intention to mislead buyers or potential buyers.

10     88.    Plaintiffs are informed and believe and thereon allege that

11 Defendants used such false or misleading descriptions, representations and

12 omissions of fact regarding such Superman Goods, Defendants' licensing

13 services or commercial activities in interstate commerce to induce others to enter

14 into improper contracts or other forms of business arrangements with

15 Defendants to exploit Superman Goods.

16     89.    Such use of false or misleading descriptions or representations of

17 fact in interstate commerce is in opposition to the protection of the public

18 interest.

19     90.    Defendants wrongful conduct has proximately caused and will

20 continue to cause Plaintiffs substantial injury and damage including, without

21 limitation, loss of customers, dilution of goodwill, injury to their business

22 reputation, lost profits and diminution of the value of their interests in

23 "Superman," derivative products and commercial activities.

24     91.    The ongoing harm this wrongful conduct will cause to Plaintiffs is

25 both imminent and irreparable, and the amount of damage sustained by Plaintiffs

26 will be difficult to ascertain if such wrongful conduct is allowed to continue

27 unabated.

28

<center>24</center>

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 311 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 312 of 321

1   92.   By reason of the foregoing, Defendants have violated and continue
2   to violate the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

3   93.   Plaintiffs are entitled to an injunction, during the pendency of this
4   action, and permanently, restraining Defendants, their officers, agents and
5   employees, and all persons acting in concert with them, from misrepresenting in
6   connection with Superman Goods, Defendants' licensing services and
7   commercial activities that they own *exclusive* rights to "Superman" and from
8   engaging in any further violations of the Lanham Act.

9   94.   Plaintiffs have no adequate remedy at law with respect to these
10  ongoing violations.

11  95.   Plaintiffs are further entitled to recover from Defendants under 15
12  U.S.C. § 1117(a) up to three times the damages they sustained and will sustain
13  and any income, gains, profits, and advantages obtained by Defendants as a
14  result of their wrongful acts and omissions alleged hereinabove, plus reasonable
15  attorneys' fees and costs, in an amount which cannot yet be fully ascertained, but
16  which shall be assessed at the time of trial.

17  **SEVENTH CLAIM FOR RELIEF**

18  (Violation of California Business and Professions Code, §§ 17200 *et seq.*;
19  Unfair Competition - Against All Defendants)

20  96.   Plaintiffs re-allege and incorporate herein by reference the
21  allegations set forth in paragraphs 1 through 95, inclusive, as though fully set
22  forth herein.

23  97.   Plaintiffs are informed and believe and thereon allege that since the
24  Termination Date, in addition to the wrongful acts and omissions alleged
25  hereinabove and incorporated herein, Warner Bros.' and its parent, Time
26  Warner, have intentionally omitted from Time Warner's Annual Reports on
27  Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and
28  other publicly reported documents any and all mention of the Termination, even

25

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 313 of 321

1  though it drastically reduces their ownership interest in "Superman" -- one of
2  their most valuable intellectual properties. Such systematic public
3  misrepresentations by omission are likely to deceive, cause confusion and
4  mistake and are an affront to the public interest.

5      98.  Defendants' wrongful conduct, acts, and omissions alleged
6  hereinabove constitute unlawful, unfair business practices and unfair
7  competition under California Business and Professions Code §§ 17500 *et seq.*,
8  and under the common law.

9      99.  As a direct and proximate result of Defendants' conduct, acts, and
10  omissions as alleged hereinabove, Plaintiffs are entitled to recover their share of
11  any income, gains, compensation, profits and advantages obtained, received or
12  to be received by Defendants, or any of them, arising from the licensing and any
13  other exploitation of the Recaptured Copyrights; and are entitled to an order
14  requiring Defendants, jointly and severally, to render an accounting to ascertain
15  the amount of such proceeds.

16      100.  As a direct and proximate result of Defendants' wrongful conduct,
17  acts and omissions pleaded hereinabove, Plaintiffs have been damaged, and
18  Defendants have been unjustly enriched, in an amount that shall be assessed at
19  trial for which damages and/or restitution and disgorgement is appropriate.  Such
20  damages and/or restitution and disgorgement should include a declaration by this
21  Court that Defendants are jointly and severally the constructive trustee for the
22  benefit of Plaintiffs and an order that Defendants convey to Plaintiffs fifty
23  percent (50%) of all proceeds and other compensation received or to be received
24  by Defendants that are attributable the licensing or exploitation on or after the
25  Termination Date of the Recaptured Copyrights.

26      101.  Defendants' wrongful conduct, acts, omissions have proximately
27  caused and will continue to cause Plaintiffs substantial injury and damage
28  including, without limitation, loss of customers, dilution of goodwill, injury to

<div align="center">26</div>

SCANNED

1  Plaintiffs' reputation, and diminution of the value of Plaintiffs' joint ownership

2  interest in the Recaptured Copyrights. The harm this wrongful conduct will

3  cause to Plaintiffs is both imminent and irreparable, and the amount of damage

4  sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is

5  allowed to continue without restraint.

6      102. Plaintiffs are entitled to an injunction, during the pendency of this

7  action, and permanently, restraining Defendants, their officers, agents and

8  employees, and all persons acting in concert with them, from *exclusively*

9  licensing or granting rights to any element of the Superman Franchise protected

10 by the Recaptured Copyrights

11     103. Plaintiffs are entitled to an injunction, during the pendency of this

12 action, and permanently, restraining Defendants, their officers, agents and

13 employees, and all persons acting in concert with them, from engaging in any

14 such further unlawful conduct, and requiring Defendants to include Plaintiffs'

15 names on all copyright notices relating to the Recaptured Copyrights.

16     104. Plaintiffs have no adequate remedy at law with respect to such

17 ongoing unlawful conduct.

18     WHEREFORE, Plaintiffs pray for relief as follows:

19              **PRAYER FOR RELIEF**

20          <u>ON THE FIRST CLAIM FOR RELIEF</u>

21     105. For a declaration as follows:

22         a.    That pursuant to the Copyright Act, 17 U.S.C. § 304(c),

23 Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or

24 transfers to any of the Defendants and any of their predecessors-in-interest, of

25 the renewal copyrights in and to each and/or all of the Works;

26         b.    That, as of the Termination Date, Plaintiffs owned and

27 continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights;

28

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 314 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 315 of 321

    c.    That Defendants control only fifty percent (50%) of the Recaptured Copyrights, and thus, as of the Termination Date, had/have no authority to confer *exclusive* licenses or grants with respect to any element of the "Superman" mythology protected by the Recaptured Copyrights; and

    d.    That Plaintiffs are entitled to fifty percent (50%) of any and all Profits from the exploitation of, or attributable to, in whole or in part, any aspect of the Recaptured Copyrights.

<u>ON THE SECOND CLAIM FOR RELIEF</u>

106.   For a declaration as follows:

    a.    That as joint owners of the Recaptured Copyrights, Plaintiffs are entitled to an accounting for Profits received or payable to the Defendants;

    b.    That Profits include Defendants' revenues from the post - April 16, 1999 exploitation of the Recaptured Copyrights in territories outside of the United States whenever such exploitation is based on the predicate exercise *in the United States* of any right(s) in and to the Recaptured Copyrights by any Defendant, their licensees or assigns;

    c.    That there should be no *apportionment* of Profits since Plaintiffs are entitled to fifty percent (50%) of such Profits as joint owners of the Recaptured Copyrights;

    d.    Alternatively, that apportionment should apply only to profits from the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but not to profits from *licensing* of the Recaptured Copyrights;

    e.    That apportionment, if any, should weigh strongly in Plaintiff's favor, since the value of the Superman Franchise is largely attributable to the unique "Superman" character and other elements created by Siegel and Shuster and protected by the Recaptured Copyrights, in a percentage that the court may deem just and proper;

28

1         f.     That Profits include profits from any merchandise or other

2 derivative works created, produced or manufactured on or after the Termination

3 Date, April 16, 1999, notwithstanding that underlying licensing for such

4 exploitation may have occurred prior thereto;

5         g.     That Profits include the Profits of Defendants DC, Warner

6 Bros. and Time Warner, their subsidiaries and divisions; and

7         h.     That in determining Profits, only reasonable costs directly

8 attributable to the exploitation of the Recaptured Copyrights, of the type

9 customarily deducted in arms' length agreements to exploit copyrights of

10 comparable value to the Recaptured Copyrights, should be deducted from gross

11 revenues, all in compliance with GAAP.

12                     <u>ON THE THIRD CLAIM FOR RELIEF</u>

13     107.   For a declaration as follows:

14          a.     That by the Termination, Plaintiffs recaptured a fifty percent

15 (50%) interest in the copyright to the Superman Crest created by Siegel and

16 Shuster;

17          b.     That Defendants' Superman Shield design arose directly

18 from, and is substantially identical to, the copyrighted Superman Crest created

19 by Siegel and Shuster;

20          c.     That Defendants must account to Plaintiffs for fifty percent

21 (50%) of the proceeds they receive from the licensing or other exploitation of

22 the Superman Crest and/or Superman Shield;

23          d.     That Plaintiffs, as co-owners of the copyright in and to the

24 Superman Crest, likewise are permitted to license or otherwise exploit the

25 Superman Crest, subject to a duty to account to Defendants for any such

26 exploitation; and

27          e.     That Defendants cannot use their alleged trademark in the

28 Superman Shield or any other alleged trademark interest with respect to

<div align="center">29</div>

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 316 of 321

430

1   "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or exploitation

2   of Plaintiffs' rights under the Copyright Act in the jointly owned Recaptured

3   Copyrights.

4   <u>ON THE FOURTH CLAIM FOR RELIEF</u>

5       108.   For an accounting by the Defendants, jointly and severally, of any

6   and all proceeds from the licensing and any other exploitation of the Recaptured

7   Copyrights or Superman Franchise on or after the Termination Date, April 16,

8   1999;

9       109.   For 50% of any and all proceeds from the licensing and any other

10  exploitation of the Recaptured Copyrights or "Superman Franchise" on or after

11  April 16, 1999 pursuant to such accounting; and

12      110.   For the imposition of a constructive trust for the benefit of Plaintiffs

13  on all sums received and to be received by the Defendants, jointly or severally,

14  derived from the licensing and any other exploitation of the Recaptured

15  Copyrights or "Superman Franchise" on or after April 16, 1999.

16  <u>ON THE FIFTH CLAIM FOR RELIEF</u>

17      111.   For compensatory and consequential damages according to proof as

18  shall be determined at trial; and

19      112.   For punitive damages as may be awarded at trial.

20  <u>ON THE SIXTH CLAIM FOR RELIEF</u>

21      113.   For an order preliminarily and thereafter permanently enjoining

22  Defendants from making such false or misleading descriptions, representations

23  and omissions of fact in connection with Superman Goods, Defendants' services

24  and commercial activities and from engaging in any further violations of the

25  Lanham Act;

26      114.   For up to three times the damages Plaintiffs sustained and will

27  sustain and any income, gains, profits, and advantages obtained by Defendants

28

30

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 317 of 321

1 as a result of their violations of the Lanham Act in an amount which cannot yet

2 be fully ascertained, but which shall be assessed at the time of trial; and

3        115.   For such other and further relief and remedies available under the

4 Lanham Act, 15 U.S.C. §§ 1125 and 1117 which the Court may deem just and

5 proper.

6                    <u>ON THE SEVENTH CLAIM FOR RELIEF</u>

7        116.   For an accounting of all Profits;

8        117.   For the imposition of a constructive trust on all Profits received and

9 to be received;

10        118.   For restitution to Plaintiffs of Defendants' unlawful proceeds;

11        119.   For an order preliminarily during the pendency of this action and

12 thereafter, permanently, (i) enjoining Defendants, their officers, agents,

13 employees, licensees and assigns, and all persons acting in concert with them,

14 from engaging in such further unfair business practices and unfair competition

15 under California Business and Professions Code §§ 17500 *et seq.*, and/or under

16 the common law, as alleged hereinabove; and (ii) requiring Defendants to

17 properly designate Plaintiffs as the co-owner of the Recaptured Copyrights in

18 "Superman" publications, products, advertising and promotional materials;

19        120.   For compensatory and consequential damages according to proof as

20 shall be determined at trial;

21        121.   For such other and further relief and remedies available under

22 California Business and Professions Code, §§ 17200 *et seq.* and/or the common

23 law, which the Court may deem just and proper.

24                    <u>ON ALL CLAIMS FOR RELIEF</u>

25        122.   For Plaintiffs' costs of suit;

26        123.   For interest at the highest lawful rate on all sums awarded Plaintiffs

27 other than punitive damages;

28        124.   For reasonable attorneys' fees; and

31

1    125. For such other and further relief as the Court may deem just and

2  proper.

3

4  DATED: October 17, 2005    LAW OFFICES OF MARC TOBEROFF, PLC.

5

6                            By: _____
                                    Marc Toberoff

7                            Attorneys for Plaintiffs and Counterclaim
                             Defendants JOANNE SIEGEL and
8                            LAURA SIEGEL LARSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32

First Amended Complaint for Declaratory Relief, Accounting, Lanham Act Violations & Unfair Competition

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 319 of 321

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-12, Page 320 of 321

## JURY TRIAL DEMANDED

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Complaint for which trial by jury is allowable.

DATED:  October 17, 2005     LAW OFFICES OF MARC TOBEROFF, PLC

By: _____
              Marc Toberoff

Attorneys for Plaintiffs and Counterclaim
Defendants JOANNE SIEGEL and
LAURA SIEGEL LARSON

33

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on February 21, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  February 21, 2014                     /s/ Marc Toberoff
                                                        Marc Toberoff