APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 13 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura  Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 13)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04-8776, 125 | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc. | 13 | 3413 |

# INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|---|---|---|---|---|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1:  Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2:  Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3:  Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4:  Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A:  Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B:  Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C:  Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E:  Transcript Cover Sheet for  Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F:  Transcript Cover Sheet* | 3 | 518 |

iv

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F: Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1: October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2: October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4: May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5: May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6: September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8: Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9: Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14: October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15: March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
|-------|---------|---|---|------|
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
|---|---|---|---|---|
| 340-1 | 7/21/08 | *Exhibit B: April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A: Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G: January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H: January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I: February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J: Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M: Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|-----|---------|------|----|------|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB:  October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC:  October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD:  February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE:  Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF:  March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A:  December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201.  As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
|  | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   E-mail: MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              **UNITED STATES DISTRICT COURT**

8      **CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION**

9

| | |
|---|---|
| 10  JOANNE SIEGEL, an individual; and | Case No. CV 04-08400 SGL (RZx) |
| 11  LAURA SIEGEL LARSON, an individual, | [Honorable Stephen G. Larson] |
| 12                  Plaintiffs, | |
| 13      vs. | **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 14  WARNER BROS. | |
| 15  ENTERTAINMENT INC., a corporation; TIME WARNER INC., a | |
| 16  corporation; DC COMICS, a general partnership; and DOES 1-10, | [Complaint filed: October 8, 2004] |
| 17      Defendants. | Date: TBD |
| 18 | Time: 10:00 a.m. |
| 19 | Place: Courtroom 1 |
| 20  DC COMICS, | [Statement of Uncontroverted Facts and Conclusions Of Law; Declaration of Marc Toberoff; Request For Judicial Notice and [Proposed] Judgment Filed Concurrently Herewith] |
| 21                  Counterclaimant, | |
| 22      vs. | |
| 23  JOANNE SIEGEL, an individual; and | |
| 24  LAURA SIEGEL LARSON, an individual, | |
| 25 | |
| 26                  Counterclaim Defendants. | |
| 27 | |

28

0

# I.     INTRODUCTION

Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world renowned comic book hero, "Superman," and the author of "Superboy."  These cases arise out of Plaintiffs' proper exercise of their right under section 304(c) of the 1976 United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original copyrights in "Superman" and "Superboy" by serving statutory notices on the defendants herein ("Defendants") on April 3, 1997 and November 8, 2002, respectively terminating Siegel's prior grant(s) of "Superman" (the "Superman Termination") and "Superboy" (the "Superboy Termination") to Defendants' predecessor(s).   Plaintiffs' statutory terminations complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated thereunder by the Register of Copyrights.

On April 16, 1999, the noticed "Superman" termination date, the joint copyright interest that Siegel had conveyed in "Superman" to Defendants' predecessors, duly reverted to Plaintiffs, sixty-one years after Siegel's original conveyance.  On November 17, 2004, the noticed "Superboy" termination date, the copyrights that Siegel had conveyed in "Superboy" to Defendants' predecessors duly reverted to Plaintiffs, fifty-six years after Siegel's original conveyance.

In the "Superboy" action (Case No. 04-8776 SGL (RZx)) Plaintiffs and Defendants filed cross-motions for partial summary judgment and summary judgment, respectively.  The Honorable Ronald S.W. Lew denied Defendants' motion and granted Plaintiffs' motion in its entirety, holding that Plaintiffs' Superboy Termination is valid and that Plaintiffs thereby recaptured the original "Superboy" copyrights.  In so holding the Court found that each of Defendants' purported defenses lacked merit.  Defendants have asserted a number of the same defenses with respect to the Superman Termination, discussed below.

Plaintiffs hereby move for partial summary judgment that their statutory

1

Superman Termination is valid as a matter of law with respect to the original "Superman" comic strips comprising the "Superman" story published in "Action Comics, No. 1," and that Plaintiffs have thereby recaptured Siegel's co-author share of the copyrights therein.

Plaintiffs move to dismiss Defendants' First and Second Alternative Counterclaims and parts of their Fifth Alternative Counterclaim, as such relate to Plaintiffs' recapture of Siegel's original "Superman" copyrights, because the defenses alleged therein lack merit.[1]

Plaintiffs also seek a ruling that they are entitled to an accounting by Defendants of all profits earned from Plaintiffs' recaptured "Superman" copyrights both in the United States and foreign territories based on "black letter" state law principles entitling co-owners to an accounting of *all* profits as "tenants-in-common."

Plaintiffs also move for an order dismissing Defendants' Third and Fourth Alternative Counterclaims on the ground that no binding written agreement disposing of Plaintiffs' recaptured copyrights was ever consummated by the parties in October, 2001, or thereafter, as a matter of law.

These issues are ripe for summary judgment in Plaintiffs' favor. There are no material issues of fact because the relevant facts are undisputed or were adjudicated in prior litigations between the parties' predecessors; and Defendants are unable to demonstrate a genuine issue of material fact as to those matters as to which they bear the burden.

---

[1] Defendants allege: (i) that Action Comics, No. 1 is in part excluded from 17 U.S.C. §304(c) as a purported "work made for hire"; First Amended Counterclaims, Declaration of Marc Toberoff (Toberoff Decl.), Exhibit ("Ex."), R ("FACC"), ¶¶ 132-135; (ii) that a May 19, 1948 consent judgment, purportedly constitutes a copyright "grant," not specifically listed in Plaintiffs' notices; FACC, ¶¶ 68-69; (iii) that a December 23, 1975 agreement purportedly constitutes a copyright "grant," and although listed in Plaintiffs' respective notice, was somehow effectively reinstated by Plaintiff Joanne Siegel's acceptance of pension benefits from Defendants; FACC, ¶¶ 70-76; (iv) that the Superman Termination was purportedly not timely served; FACC, ¶¶ 86-89; and (v) that Plaintiffs' Superman Termination is purportedly barred by the statute of limitations. FACC, ¶¶ 90-96

2

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## II.     UNDISPUTED FACTS

### A.     Prior Legal Actions

In 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester (the "1947 Action") against Defendant DC Comics' predecessor, National Comics Publications, Inc. ("National"), to determine the validity of various contracts between Siegel and Shuster and National's predecessors, including Detective Comics, Inc. ("Detective"), pursuant to which National claimed to own "Superman," and to determine ownership of Siegel's "Superboy." *See Jerome Siegel and Joseph Shuster v. National Periodical Publications et al.*, 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508F.2d 909, 912-913 (2nd Cir. 1974)(both the district court and Second Circuit describe the background of the 1947 Action).

Pursuant to stipulation of the parties the action was tried before an Official Referee of the New York Supreme Court, Judge Addison Young ("Judge Young"). *Id.* After trial of the 1947 Action, Judge Young rendered a comprehensive opinion dated November 21, 1947. *Id.* On April 12, 1948, Judge Young signed detailed findings of fact and conclusions of law and rendered an interlocutory judgment from which no appeal was perfected. *Id.* After reviewing considerable documentary and testimonial evidence, Judge Young found that National owned "Superman" pursuant to a written grant dated March 1, 1938 (the "March 1, 1938 Grant") but that Siegel was the sole author and owner of "Superboy." *See* Judge Young's Findings of Fact ("1948 FOF") and Conclusions of Law ("1948 COL") dated April 12, 1948 (collectively, the "1948 Findings"), Toberoff Decl., Ex. B and Request for Judicial Notice ("RJN"), Ex. B.

Settlement negotiations ensued, resulting in a stipulation of settlement by the parties dated May 19, 1948 ( the "May 19, 1948 Stipulation"), and pursuant to the stipulation the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Judgment"). *Siegel,* 364 F. Supp. at

3

1034-1035; 508 F.2d at 912-913.  *See* Toberoff Decl., Exs. S, T.

In 1969, Siegel and Shuster sought declaratory relief in the U.S. District Court for the Southern District of New York regarding ownership of the *renewal copyright* to "Superman," resulting on appeal in the Second Circuit's decision in *Siegel*, *supra*.  The district court and Second Circuit relied upon Judge Young's opinion, findings of fact, conclusions of law and resultant consent judgment after settlement of the 1947 Action and held them binding on the parties under the doctrine of *res judicata*.  Based thereon it was held that National owned the renewal copyright to "Superman" under the March 1, 1948 Grant.  *Siegel*,  F.2d at 912-913.

## B.     The Creation of Superman

The facts and conclusions set forth below are from the 1948 Findings, the district court's and Second Circuit's decisions in *Siegel*, *supra*, and/or from Defendants' First Amended Counterclaims as noted below.

In 1933, Siegel conceived of the original idea of a cartoon strip featuring a unique man of superhuman powers who would perform feats for the public good. Siegel called him "Superman." *Siegel*, 508F.2d at 911; 1948 FOF, fact 9; FACC, ¶ 6. In or about 1933 Siegel wrote, and the artist, Shuster, illustrated and "inked" multiple "Superman" comic strips intended for publication in a newspaper format, *Siegel*, 508F.2d at 911, 1948 FOF, Facts 8, 10; FACC, ¶ 7, which consisted of "(a) twenty-four days (four weeks) of Superman comic strips intended for newspapers (the "1933 Superman Strip"); (b) a seven-page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis covering an additional two months of daily [Superman] comic strips; and (e) fifteen daily comic strips.  FACC, ¶ 7; *see* 1948 FOF, Facts 8, 10.

By 1934, "Superman and his miraculous powers were completely developed [by Siegel and Shuster]."  *Siegel*, 508F.2d at 911, 914; 1948 FOF, Facts 8-11. "Superman" was submitted by Siegel and Shuster "to a number of prospective publishers and newspaper syndicates," but was not accepted for publication.  FACC,

4

¶ 8; 1948 FOF, Fact 10.

Meanwhile, from 1935 to 1937, Siegel and Shuster created other comic strips that were published. On or about December 4, 1937, Siegel and Shuster entered into an agreement with Detective (the "December 4, 1937 Agreement") to produce for publication two comic features, "Slam Bradley" and "The Spy." FACC, ¶ 10.

One of the early entities to which Siegel had submitted "Superman" was The McClure Newspaper Syndicate ("McClure"). In or about early 1938, McClure forwarded Siegel and Shuster's 1934 Superman Comic Strip to Detective Comics for potential publication in its contemplated new magazine, "Action Comics." 1948 FOF, Facts 18-19; *see* FACC, ¶ 11.

In early 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster "cut and pasted" it into a thirteen page format (the "Re-cut 1933 Superman Strip"), so as to render their newspaper strip more suitable for a magazine publication. *Siegel*, 508 F.2d at 911; 1948 FOF, Facts 17-18, 31-33; FACC, ¶ 11. Siegel and Shuster submitted their Re-cut 1933 Superman Strip to Detective in February, 1938. 1948 FOF, Fact 22. (The 1933 Superman Strip and the Re-cut 1933 Superman Strip are hereinafter collectively referred to as the "Original Superman Strips.")

"In an agreement with [Detective] dated March 1, 1938 [the March 1, 1938 Grant], Siegel and Shuster…transferred to [Detective] 'the strip entitled "Superman"…and all goodwill attached thereto and exclusive rights to use the characters and story, continuity and title of the strip'" in consideration for $130 ($10 per page for the thirteen page Re-cut 1933 Superman Strip). FACC, ¶ 12; 1948 FOF, facts 24, 25, 32; *see* March 1, 1938 Grant, Toberoff Decl., Ex. E.

The Re-cut 1933 Superman Strip "w[as] in existence…before the execution of the instrument of March 1, 1938." 1948 FOF, Fact 32. The "March 1, 1938 [Grant]…was executed by [Siegel and Shuster] by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE

5

COMICS, INC." 1948 FOF, Fact 28.

Thereafter, Detective published Siegel and Shuster's thirteen-page "Re-cut 1933 Superman Strip" in the "June, 1938" issue of "Action Comics, No. 1," which was first published on April 18, 1938. 1948 FOF, Fact 31; Toberoff Decl., Ex. F.[2]

Siegel and Shuster thereafter continued to create "Superman" comic strips which were published by Detective in subsequent periodical issues. 1948 FOF, Fact 35. On September 22, 1938, Siegel and Shuster entered into an agreement with Detective (the "September 22, 1938 Agreement") to produce the "artwork and continuity" for five existing comic strips created by Siegel and Shuster, including "Superman." 1948 FOF, Facts 39, 46; FACC, ¶ 15.

Also on September 22, 1938, Siegel and Shuster entered into an agreement with Detective and McClure concerning the use of Superman in newspaper strips (the "McClure September 22, 1938 Agreement"). FACC, ¶ 16.

On December 19, 1939, Detective and Siegel and Shuster entered into a supplemental agreement raising Siegel and Shuster's compensation rate for their production of the increasingly popular "Superman" comic strip from $10 to $20 per page (the "December 19, 1939 Agreement"). 1948 FOF, Fact 52; FACC, ¶ 20.

On December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications Inc.("WCI") (the "December 23, 1975 Agreement"), then National's alleged parent company, which re-acknowledged that WCI was the exclusive owner of "Superman," and provided Siegel and Shuster with modest annual payments and, finally, credit as the "creators" of "Superman." FACC, ¶ 30.

## C. Plaintiffs' Notices of Termination Regarding "Superman"

On April 3, 1997, Plaintiffs availed themselves of their legal right under the

---

[2] Detective thereafter registered the Action Comics, No. 1 periodical with the Register of Copyrights under copyright registration number B: 379787 in the name of Detective Comics, Inc, which was later renewed on June 1, 1965 in the name of National Periodical Publications, Inc. under copyright renewal registration number R: 362187. The copyright in the "Superman" story contained in the Action Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal registration number R: 362188. *See* Toberoff Decl., Ex. F; 1948 FOF, Fact 31.

United States Copyright Act, 17 U.S.C. § 304 (c) ("Section 304(c)"), as Siegel's widow and daughter, respectively, to recapture Siegel's co-authorship share of the copyrights in the Original Superman Strips and other Superman works, by serving a statutory notice of termination on the Defendants that Plaintiffs were terminating the March 1938 Grant.  ("Termination Notice No. 1").  Toberoff Decl., Ex. G.

On April 3, 1997, Plaintiffs also served on Defendants separate notices of termination of the following additional agreements, to the extent that any might be construed to contain a grant to any of Siegel's "Superman" works, including the Original Superman Strips:  the December 4, 1937 Agreement (non-applicable) ("Termination Notice No. 2"), the September 22, 1938 Agreement("Termination Notice No. 3"), the McClure September 22, 1938 Agreement ("Termination Notice No. 4"), the 1948 Stipulation ("Termination Notice No. 5"), the December 19, 1939 Agreement ("Termination Notice No. 6") and the December 23, 1975 Agreement (non-applicable) ("Termination Notice No. 7"). Toberoff Decl., Exs. H- M. (Collectively, these seven notices of Termination are hereinafter referred to as the "Termination Notices").

In particular, Termination Notice No. 2 (re:  December 4, 1937 Agreement) and Termination Notice No. 7 (re:  December 23, 1975 Agreement) were served and filed by Plaintiffs out of an abundance of caution. *Id*., Exs. H, M.  The December 4, 1937 Agreement did not pertain to "Superman;" and the December 23, 1975 Agreement did not contain a grant of copyright in "Superman," and merely acknowledged that Warner already owned all rights in "Superman." *Id*.

In each of the Termination Notices, the termination of the grant or potential grant listed in the respective notice (the "Termination(s)") was noticed to take effect on April 16, 1999 (the "Termination Date").  The Termination Notices were each served by Regular Mail, as required, and additionally by Certified Mail, Return Receipt Requested.  *See* 37 C.F.R. § 201.10.  Plaintiffs' Termination duly complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the

7

ER 3199

regulations promulgated thereunder by the Register of Copyrights.

Defendants originally acknowledged that the Notices of Termination are effective, and that Plaintiffs thereby recaptured and jointly own the copyright(s) to at least the original "Superman" elements authored by Siegel and Shuster.  On April 16, 1997, in response to the April 3, 1997 service of the Notices of Termination, John A. Schulman, Executive Vice President and General Counsel of Defendant Warner Bros. wrote a letter to Joanne Siegel, stating in relevant part:

> "As to the Notices of Termination, I wasn't surprised at their arrival…After the effective date of the termination, there will still remain 14 years of copyright protection left to the joint copyright holders of the original Superman elements.  Those are what we should share."

Toberoff Decl., Ex. O.

Defendants similarly acknowledged that they have a duty to account to Plaintiffs for Defendants' exploitation of the original "Superman" copyright(s).  On October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in relevant part:

> "The [Superman] rights involved are non-exclusive; they are shared with DC.  Since both you and DC would have these rights, we would each have the obligation to pay the other for using those rights if you did not re-grant them to DC."

Toberoff Decl., Ex. P.

 However, two years later, when Defendants' initial overtures to buy out Plaintiffs had not succeeded, DC sent a letter to Plaintiffs, dated April 15, 1999, *one day* before the Termination Date, denying the validity of the Terminations with respect to any "Superman" copyrights.  Toberoff Decl., Ex. Q.

Soon thereafter, commencing on or about April 30, 1999, the parties started negotiations of a complex transaction regarding Plaintiffs' joint interest in the "Superman" copyrights.  FACC, ¶ 51.  These discussions eventually broke down, however, and no agreement was consummated.  (For a detailed discussion of this subject see section III. H., below.)

8

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

On November 8, 2002, Plaintiffs exercised their right under 17 U.S.C. § 304(c) to recapture Siegel's original copyright in "Superboy" by serving statutory notice on the Defendants herein terminating Siegel's prior grant(s) of "Superboy" to Defendants' predecessor(s) on the noticed termination date of November 17, 2004. *See* FACC ¶ 57. On August 27, 2004, Defendant DC sent a letter refusing to recognize the Superboy Termination and Plaintiffs' statutory recapture rights. FACC, ¶ 64.

### D. The Current Superman Action and Superboy Action

On October 8, 2004, Plaintiffs commenced the instant action for declaratory relief as to the validity of the "Superman" Notices of Termination, an accounting and other relief with respect to "Superman" (Case No. 04-8770 SGL (RZx)) (the "Superman Action"). *See* Plaintiffs' First Amended Complaint, Toberoff Decl., Ex. GG. On October 22, 2004, Plaintiffs commenced a related action for declaratory relief, copyright infringement and an accounting regarding the "Superboy" Notice of Termination. (Case No. 04-8776 SGL (RZx))(the "Superboy Action"). *See* First Amended Supplemental Complaint.

On March 24, 2006, this Court (the Honorable Ronald S. W. Lew presiding) entered an order in the Superboy Action (the "March 24, 2006 Order") granting Plaintiffs' motion for partial summary judgment and denying Defendants' motion for summary judgment. Toberoff Decl., Ex. U. Judge Lew found that Plaintiffs' notice of termination regarding "Superboy" was valid and that Plaintiffs thereby recaptured Siegel's original "Superboy" copyright on November 17, 2004, the noticed termination date. *Id*., at 14-15. In so holding, the Court found that Defendants' purported defenses lacked merit. *Id.*, at 8-14. The Court preserved for trial the issue of Defendants' infringement of Plaintiffs' "Superboy" copyrights. *Id*., at 14-16.

Defendants thereafter moved for certification/interlocutory appeal of the March 24, 2006 Order under 28 U.S.C. §1292(b), which motion was denied by the Court by

9

ER 3201

an order entered on May 23, 2006.[3]  Toberoff Decl., Ex. V.

## III.   LEGAL ANALYSIS

### A.   <u>Standard Of Review</u>

Plaintiffs are entitled to the entry of summary judgment in their favor if, based on the pleadings and evidence on file, there is no *genuine* issue of *material* fact and Plaintiffs are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Partial summary judgment," where the Court disposes of some but not all claims or issues within a claim, is also permitted.  Fed. R. Civ. P. 56(c), (d).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48; 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)(emphasis in original).  Once Plaintiffs has met its initial burden of demonstrating the absence of a genuine issue of fact, the burden shifts to Defendants, as the non-moving parties, to go beyond the pleadings and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986); *see Gasaway v. Nothwestern Mut. Life Ins. Co.* 26 F.3d 957, 960 (9th Cir. 1994) ("mere allegations or denials" do not meet the non-movants' burden).  To avoid summary judgment the opposing party must also demonstrate a "genuine" issue of "material" fact on all matters as to which it bears the burden of proof.  *Celotex*, 477 U.S. at 324; *see Lake Nacimento Ranch Co. v. San Luis Obispo*, 841 F.2d 872, 876 (9th Cir. 1987).  If Defendants do not meet these burdens summary judgment must be granted in Plaintiffs' favor.

The instant motion presents a classic example of an issue of law that is ripe for summary judgment; namely the validity of Plaintiffs' Termination under 17 U.S.C. §

---

[3] Judge Lew took senior status and recused himself, whereupon this case was reassigned to the Honorable Stephen G. Larson.  Defendants seized this as an opportunity to improperly *re-argue* the parties' motions for summary judgment and Defendants' motion for certification in a purported "motion for reconsideration" of both of Judge Lew's orders, which motion is pending.

10

304(c) and Plaintiffs' recapture, at a minimum, of the Original Superman Copyrights. There are no material issues of fact because the relevant facts are undisputed or were previously adjudicated in the 1974 Action and/or the 1947 Action, and Defendants can not meet their burden as to their purported defenses to the terminations.

## B. The Recapture Right Under The United States Copyright Act

The importance and legislative purpose of the current Copyright Act's termination provisions at issue herein (17 U.S.C. § 304(c)) are best understood by reviewing the policies underlying its enactment and the predecessor provisions which led up to it. For over two centuries, the United States Copyright Act has consistently provided authors and their families with the right to regain previously transferred copyright interests. Over time, Congress strengthened and enhanced such "recapture" rights to protect authors and their heirs so as to enable them to realize the enhanced value of an author's copyrighted work. *See Stewart v. Abend*, 495 U.S. 207, 219, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990), *quoting* M. Nimmer & D. Nimmer, *Nimmer On Copyright* (hereinafter, "*Nimmer On Copyright*"), § 9.02. These protections culminated in the current Copyright Act's termination provisions. 17 U.S.C. §§ 203(a), 304(c) and 304(d).

### 1. Recapture Rights Under The Copyright Acts Of 1790 And 1831

The initial copyright statute, the Copyright Act of 1790 (the "1790 Act"), provided two separate copyright terms, an initial and renewal term of 14 years each. *See* 1 Stat. 124; *Stewart*, 495 U.S. at 217. Under the 1790 Act, authors and families were permitted during a copyright's renewal term to recapture copyrights assigned away during their initial term. *Id.*

In the Copyright Act of 1831 (the "1831 Act"), Congress strengthened the renewal/recapture right under the 1790 Act. *See* 4 Stat. 436. In so doing, it recognized the right of authors and their families to recover copyrights during the renewal term that had been previously sold to enable "the author, originally in a poor

11

bargaining position, to renegotiate the terms of the grant once the value of the work had been tested." *Stewart*, 495 U.S. at 217. The 1831 Act also prohibited authors from assigning away their spouse's or children's renewal rights. *Id.*; *see* 4 Stat. 436. "The evident purpose of the [renewal provision] is to provide for the family of the author after his death." *Stewart*, 495 U.S. at 217, *quoting De Sylva v. Ballantine*, 351 U.S. 570, 582, 76 S. Ct. 974, 100 L. Ed. 1415 (1956).

The renewal term was intended as a new grant reverting to the author at the end of the initial term. In fashioning the renewal term Congress was aware that authors had relatively little bargaining power and often sold or assigned their copyrights to publishers for small sums just to get their works published. The renewal term was intended to protect authors who may have struck imprudent bargains and to allow them to realize a portion of the true economic value of their work. *Stewart* at 217-20; *see also Nimmer On Copyright*, § 9.02.

## 2. <u>Recapture Right Under The 1909 Copyright Act</u>

The Copyright Act of 1909 ("1909 Act") continued the renewal system and increased both the initial and renewal terms from 14 to 28 years. *See* 17 U.S.C. § 24; H.R. Rep. No. 2222, 60th Congress, 2d Sess., 14 (1909). However, unlike the 1831 Act, the 1909 Act did not expressly prohibit authors from signing away their spouse's or children's renewal rights. As a result, some publishers used their superior bargaining position to force authors, their spouses and children to assign to them their renewal rights long before such rights vested. This practice of "contracting around" the renewal rights was controversial until the Supreme Court in *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U.S. 643, 657-59, 63 S. Ct. 773, 87 L. Ed. 1055 (1943), held that the renewal copyright expectancy could be assigned during the initial term, before the renewal copyright vested.

The legislative purpose of the renewal term was thereby effectively gutted by *Fred Fisher, supra*. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185, 105 S. Ct. 638; 83 L. Ed. 2d 556 (1985) (White, J., dissenting) (*Fred Fisher* "substantially

thwarted" Congress' goal of protecting authors through copyright recapture).  After *Fred Fisher*, publishers routinely insisted that authors assign *both* the initial and renewal copyrights in their initial grants, effectively eliminating the intended benefits to authors and their families of the renewal copyright plan.  *Stewart*, 495 U.S. at 219.

### 3.    The Termination Rights Under The 1976 Copyright Act

On January 1, 1978, the Copyright Act of 1976 went into effect, and with it major changes to U.S. copyright law that significantly affected the rights of authors and their families.  17 U.S.C. § 101 *et seq.* (1978).  The 1976 Act extended the renewal term from 28 to 47 years for works, such as the early "Superman" works, that were in their renewal term on January 1, 1978 when the 1976 Act took effect.  17 U.S.C. § 304(a).  Congress intended to give the benefit of the 19 additional years of copyright protection to authors and their families rather than to grantees, for whom the automatic grant of the extended term would have constituted an unjustified windfall.  *See* H.R. Rep. No. 94-1476 ("H. R. Rep."), at 140 (1976).

To that end, Congress coupled the term extension with a *new* right, at issue in this case, of authors and their statutory heirs (principally spouse, children and grandchildren) to terminate transfers of rights in a copyright's renewal term, provided that the grant was "executed before January 1, 1978," *i.e.,* before the 1976 Act went into effect.  17 U.S.C. § 304(c).[4]  The termination clause provides in pertinent part:

> "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise

---

[4] A closely related termination provision governs works copyrighted after January 1, 1978.  *See* 17 U.S.C. § 203(a).  Sections 203 and 304 are structurally parallel but diverge in some particulars.  For works copyrighted after January 1, 1978, Congress established the copyright term as the life of the author plus 50 years (later extended for another 20 years).  *See* 17 U.S.C. §302(a) (1982).  Congress also allowed the author or the author's surviving family members to terminate any license 35 years after any grant.  *See* 17 U.S.C. § 203(a).  Thus, for both existing and future copyrights, Congress granted authors and their family members the right to terminate any grant after a period of time in order to recapture the author's copyright.

13

than by will, is subject to termination under the following conditions:…"
17 U.S.C. §§ 304(c) and 304(c)(5).

As the Supreme Court noted in *Mills Music*, 469 U.S. at 173: "The principal purpose of… § 304 was to provide added benefits to authors... More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants…" *Mills Music*, 469 U.S. at 172-73 *citing* H.R. Rep. No. 94-1476, at 124 (1976). In devising Section 304(c), Congress recognized that authors commonly agree to one-sided copyright grants that publishers with far greater bargaining power design to be as expansive as possible in exchange for as little payment as possible. H.R. Rep. at 124. The results are often supremely unfair, as when a work proves financially successful for many years, but enriches only the grantee and not the author or the author's family.

Indeed, the Supreme Court recently recognized the overall intent of the 1976 Act to "enhance the author's position" and to adjust "the author/publisher balance," emphasizing the "inalienable authorial right to revoke a copyright transfer." *N.Y. Times v. Tasini,* 533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001) ; *see also Stewart*, 495 U.S. at 230 ("[1976 Act] provides an inalienable termination right"); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (settlement agreement cannot bar termination right); *Steinbeck v. McIntosh & Otis, Inc*., 433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006).

The termination right lies in stark contrast to ordinary contract principles, as it empowers authors and their statutory heirs to terminate grants of copyright *without cause*, regardless of the contracting parties' promises, intent or the assignee's expectations at the time the grant was made. 17 U.S.C. §304(c)(5).

In creating the new termination right, Congress directly addressed the inequities caused by *Fred Fisher* and sought to prevent the future erosion of the right of an author and his family to regain the copyright to an author's original work. Thus, in further abrogation of "freedom of contract" principles, Congress clarified that the termination right cannot be waived, cancelled or contracted around, and that

14

"[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5) (works copyrighted before January 1, 1978); *see* 17 U.S.C. § 203(a)(1) (identical for authors' grants executed after January 1, 1978).

To further protect authors and heirs against a repetition of *Fred Fisher*, Congress specified that the termination right or interest may not be assigned away until exercised by service of a notice of termination. *See* 17 U.S.C. § 304(c)(6)(B) ("[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of termination…[or as to] the original grantee or such grantee's successor in title, after the notice of termination has been served…"). Once a prior copyright grant is terminated, an author's statutory heirs may grant their recaptured copyright to whomever they wish, fulfilling the purpose to provide such heirs with an opportunity to realize the enhanced value of such copyrights. *Nimmer On Copyright*, §11.01[A].

At the same time, the 1976 Act reflected "a practical compromise that [would] further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." H.R. Rep. at 124. Thus, termination under Section 304(c) is not "automatic." *Id*. Rather, authors and their statutory heirs are only permitted to terminate such grants during a five-year window beginning fifty-six years after copyright had originally been secured in order to "recapture" the copyright for the extended renewal term. 17 U.S.C. § 304(c)(3). Termination is carried out by serving "advance notice" of the termination "not less than two or more than ten years before" its effective date. 17 U.S.C. § 304(c)(4)(A).

### 4.  The Termination Right Under The Sonny Bono Copyright Term Extension Act

In 1998, Congress re-affirmed their objectives with respect to the 1976 Act's termination provisions. The Sonny Bono Copyright Term Extension Act of 1998 ("CTEA"), effective October 27, 1998, extended the term of protection for works created prior to January 1, 1978 from 75 to 95 years. 17 U.S.C. § 304(b). As with

15

the 1976 Act's original term extension, Congress intended this unforeseen term extension as a benefit to authors and their families, not as a windfall for grantees or their successors.  Congress therefore once again coupled the extended term with a termination right for authors and their families, provided they had not exercised their termination right under Section 304(c).  17 U.S.C. § 304(d).  *See* S. Rep. No. 104-315, at 22-23 (1996); *Nimmer on Copyright* § 9.11[B] [1].

The economic philosophy behind our copyright law is the conviction that the public welfare is advanced by providing economic incentives to authors to exercise their creative talents.  *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Sony Corp. v. Universal Studios*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).  Congress provided this incentive by giving authors and, thereafter, their immediate family exclusive copyrights to their work and the ability to market those rights.  17 U.S.C. §106.  When Congress' reversionary renewal scheme was thwarted, it carefully fashioned the 1976 Act's termination provisions and subsequently CTEA's termination provisions to cure the inequities caused by *Fred Fisher*, "level the playing field" and promote the economic interests of authors. 17 U.S.C. §§304(c),(d).

C.  **Defendants Are Bound By The 1947 State Action and 1974 Federal Action Under *Res Judicata* and Collateral Estoppel**

It is well established that the findings in a prior litigation are binding on the parties or their successors in a subsequent litigation involving the same facts under the doctrines of *res judicata* and/or collateral estoppel.  *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995).  Strong policies favor repose and the finality of prior litigation on the merits.  *Res judicata* and collateral estoppel protect litigants against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Montana v. U.S.*, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979).  In light of these policies, preclusion is not to be applied in an

16

ER 3208

1  overly technical manner. *Tillman v. Nat. City Bank of N.Y.*, 118 F.2d 631, 634 (2d

2  Cir. 1941).

3       For preclusion purposes, the true identity of the facts surrounding an

4  occurrence constitutes the cause of action, not the legal theory upon which a party

5  chooses to frame his complaint. *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d

6  Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993). *See Berlitz Sch. Of Lang. of Am., Inc.*

7  *v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980)("When the factual predicate upon

8  which claims are based are substantially identical, the claims are deemed to be

9  duplicative for purposes of *res judicata*"); *In re Teltronics Servs., Inc.*, 762 F.2d 185,

10  193 (2d Cir. 1985)("New legal theories do not…defeat *res judicata*").

11       "Collateral estoppel prevents a party from re-litigating an issue decided against

12  that party in a prior adjudication" in which that party had a "'full and fair

13  opportunity'" to litigate. *Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d

14  Cir. 2002), *quoting Johnson v. Watkins*, 101 F.3d 792, 794-95 (2d Cir. 1996) and

15  *Schwartz v. Pub. Adm'r*, 24 N.Y.2d 65, 71 (1969). Preclusion applies to issues raised

16  as well as to issues that could have been raised at the time of the earlier action.

17  *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed.

18  2d 56 (1984). The preclusive effect also extends to issues not specifically addressed

19  but which "by necessary implication . . . [are] contained in that which [was] explicitly

20  decided." *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986).

21       **1.   The Findings of Fact and Conclusions Of Law in the 1947**

22              **Action Have Preclusive Effect**

23       The Full Faith and Credit Act, 28 U.S.C. § 1738, commands that a federal

24  court must accord a state court's resolution of claims and issues the same preclusive

25  effect as would be accorded in the rendering court. *See Matsushita Elec. Indus. Co.*

26  *v. Epstein*, 516 U.S. 367, 369, 116 S. Ct. 873, 878, 134 L. Ed. 2d 6 (1996); *Allen v.*

27  *McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

28       Both parties agree that the preclusive effect of the 1947 [New York] Action is

17

**ER 3209**

determined under New York law. *See Pension Trust Fund for Oper. Engrs v. Triple A Mach. Shop, Inc*., 942 F.2d 1457, 1464-1465 (9th Cir. 1991). New York has adopted a transactional approach to the doctrine of *res judicata* or claim preclusion. *Garguili v. Thompkins*, 790 F.2d 265, 269 (2d Cir. 1986). If a subsequent claim arises from the same "factual grouping" as a previously resolved claim, the subsequent claim is barred regardless of whether the two suits are based on different legal theories or seek different remedies. *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192 (1981); *Reilly v. Reid*, 45 N.Y.2d 24, 29-30 (1978); *EFCO Corp. v. U.W. Marx, Inc*., 124 F.3d 394, 397 (2d Cir. 1997). In New York "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred…" *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981).

The 1948 Findings, **as later argued by National**, were held to be binding on the parties' predecessors with respect to "Superman" under *res judicata* and collateral estoppel principles by the Southern District of New York and the Second Circuit in the federal *copyright* action, *Siegel v. National Periodical Publ., et al.,* 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 912-13 (2d Cir. 1974). Toberoff Exs. S, T.

The *Siegel* district court explicitly relied on the 1948 findings of fact in holding that the 1948 Action was *res judicata* as to National owning the "Superman" renewal copyright. 364 F. Supp. at 1035-1036 ("The findings of the State Supreme Court in the Westchester action are binding on us here."), *citing Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971); and also quoted and gave preclusive effect to the 1948 conclusions of law. 364 F. Supp. at 1035-1036; Toberoff Decl., Ex. S.

The Second Circuit, in affirming the district court's decision, likewise *quoted* Judge Young's first conclusion of law ("[b]y virtue of the instrument of March 1, 1938…Detective Comics, Inc. became the absolute owner of the comic strip Superman"), *Siegel*, 508 F.2d at 912; and delved into the heart of the case: "the state court action determined that the agreements conveyed *all* of the plaintiffs'

18

**ER 3210**

rights…Under the doctrine of *res judicata* we are not free collaterally to re-examine the agreements to determine whether the construction placed on them was warranted." *Id.* at 913. "The state court…construe[d] these instruments…[and] that decision is binding on us here." *Id.*

Defendants' predecessor, National, emphatically claimed in *Siegel* that the 1948 Findings were strictly binding under *res judicata* or collateral estoppel regarding its *federal* claim that it owned the *renewal copyright* in "Superman," even though this copyright issue was *not* addressed in the 1948 state action:

> "It should be noted that application of the doctrines of *res judicata* and *collateral* estoppel here is not only proper but based on good reason. There is little about the underlying facts and transactions that can be supplied by testimony of witnesses decades after the events and almost twenty-six [now fifty-nine] years after the prior litigation."

*See* National's Appellate Brief, p. 12 *citing Picture Music, Inc. v. Bourne, Inc.* 314 F. Supp. 640, 652 (S.D.N.Y. 1970), *aff'd* 457 F.2d 1213 (2d Cir. 1972), *cert. den.* 409 U.S. 997 (1972); *see also* pp. 2-3, 6-14, Toberoff Decl, Ex. W; March 24, 2006 Order at 6-7, Toberoff Decl, Ex. U.

Defendants, after benefiting enormously from the *Siegel* holding for over thirty years, are judicially estopped from taking inconsistent positions in this action regarding the preclusive effect of the 1948 Findings. *Hamilton v. State Farm Fire & Cas.*, 270 F.3d 778, 782 (9th Cir. 2001); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). *See* March 24, 2006 Order at 6:21-24, Toberoff Decl, Ex. U.

The 1948 Findings of Judge Young, nine years after the events in question, provide "a much more reliable index of the truth" than anything that can be mustered by Defendants today. *See Picture Music,* 314 F. Supp. at 652. "The subsequent [preclusive] effect…is a result which should be welcomed to avoid the task of reconsidering issues that have already been settled by another competent tribunal." *Vernitron Corp. v. Benjamin*, 440 F.2d 105,108 (2d Cir. 1971), *cert. denied*, 402 U.S. 987, 29 L. Ed. 2d 154, 91 S. Ct. 1664 (1971), *citing Klein v. Walston Co.*, 432 F.2d 936 (2d Cir. 1970). There is little about these underlying facts that can be supplied

19

by new testimonial evidence. Siegel is no longer alive and the majority of those who dealt with "Superman" at the time of its creation by Siegel and Shuster are also dead.

On summary judgment in the Superboy Action, Judge Lew thus held that the 1948 Findings had preclusive effect:

> Having relied on Judge Young's findings for previous favorable determinations regarding Superman, Defendants now take the inconsistent position that this Court is not bound by the state court findings ... Defendants attempt to raise genuine issues of material fact, where the facts were clearly determined by Judge Young after the opportunity to take evidence and hear testimony on that evidence from the parties directly involved in creating this relationship.
>
> Contrary to Defendants' assertions now, both the Southern District of New York and the Second Circuit looked directly to, even citing to, Judge Young's findings of facts. This Court holds that it is consistent to continue this position and will look to Judge Young's findings as binding where relevant … [T]his Court in keeping a consistent position with the previous litigation holds that Judge Young's findings of fact have preclusive res judicata and collateral estoppel effect on this Court.

March 24, 2006 Order, at 7, Toberoff Decl., Ex. U.

### 2. The Findings And Conclusions In The 1974 Action Have Preclusive Effect In This Action

The federal copyright action between the parties' predecessors, *Siegel v. National Periodical Publ., et al.,* 364 F. Supp. 1032, (S.D.N.Y. 1973), *aff'd* 508 F.2d 909 (2d Cir. 1974) held that "Superman" as originally published in Action Comics, No. 1 was <u>not</u> a "work made for hire" under the 1909 Copyright Act, and that Siegel and Shuster transferred to National *all* rights to "Superman," including the renewal copyright, in the March 1, 1938 Grant. The Second Circuit decision clearly has preclusive effect under the doctrines of *res judicata* and collateral estoppel, where relevant to the parties' "Superman" claims and defenses herein. *Kamilche*, 53 F.3d at 1062.

### D. Plaintiffs Duly Exercised Their Termination Right And Recaptured Siegel's Joint Copyright Interest In The Original Superman Strips

### 1. Plaintiffs' Termination Complied with the Copyright Act

Plaintiffs fully satisfied the requirements for statutory termination set forth in

20

ER 3212

17 U.S.C. § 304(c) ("Section 304(c)"):

      • Section 304(c) applies to "any copyright ... subsisting in its renewal term on the effective date of the [1976 Act]."  17 U.S.C. § 304(c).  Copyright in "Superman" subsisted in its renewal term on the effective date of the 1976 Act, January 1, 1978.  It is undisputed that Siegel and Shuster's Original Superman Strips were published in the serialized magazine, Action Comics, No. 1, for which copyright was first secured on April 18, 1938, when Action Comics, No. 1 was first published with a copyright notice.  Toberoff Decl., Ex. F; *see* Copyright Act of 1909, § 10 ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title….").  The blanket copyright to the Action Comics, No. 1 periodical was thereafter registered with the Register of Copyrights under copyright registration number B: 379787 in the name of Detective Comics, Inc, and renewed on June 1, 1965 in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal registration number R: 362187. *Id.*[5]  The copyright in the story entitled "Superman" contained in the Action Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal registration number R: 362188.  *See* Toberoff Decl., Ex. F; 1948 FOF, Fact 31.

      • Section 304(c) applies only to transfers or licenses "executed before January 1, 1978," by the author, the author's surviving spouse, children (or certain other designated persons).  17 U.S.C. § 304(c).  The principal March 1, 1938 Grant and other agreements (to the extent applicable) which were terminated by Plaintiffs were

---

[5] The statutory copyright in this collective periodical (Action Comics, No. 1) secures the statutory copyright in its component part – the Original Superman Strips.  *See Self-Realization Fellowship Church v. Ananda Church*, 206 F.3d 1322, 1329 (9th Cir. 2000) (a blanket copyright on a periodical protects its constituent parts); *Morse v. Fields*, 127 F. Supp. 63, 64-65 (SDNY 1954) (publication in a collective work will secure a copyright in all component parts); *see also* 2-7 *Nimmer on Copyright* § 7.12 ("The rule with respect to collective works under the 1909 Act…provided that a single notice in the name of the copyright owner of the collective work was sufficient to protect each contribution contained therein.").

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER 3213**

1  all pre-1978 instruments.  No post-1978 grant of "Superman" by Siegel or his heirs

2  exists and none has been alleged by Defendants.

3      • Section 304(c) allows termination by the author's "widow" and "surviving

4  children" which together own and are entitled to exercise more than one-half of the

5  author's termination interest under the statute.  17 U.S.C. §304(c)(1) and (c)(2)(A)

6  and (B).  Plaintiff Joanne Siegel is the author Siegel's widow and she therefore owns

7  fifty percent (50%) of Siegel's termination interest.  17 U.S.C. §304(c)(2)(A); FACC,

8  ¶ 2.  Plaintiff Laura Siegel Larson is one of Siegel's two children, and she therefore

9  owns twenty-five (25%) of Siegel's termination interest.  17 U.S.C. §304(c)(2)(A);

10  FACC, ¶ 3.  Together Plaintiffs own and constitute the more than one-half of Siegel's

11  termination interest required to effect the Termination.  17 U.S.C. § 304(c)(1).

12      • Section 304(c) requires the termination notice to "state the effective date of

13  termination, which shall fall within the five-year period" "beginning at the end of 56

14  years from the date copyright was originally secured," 17 U.S.C. §§ 304(d)(1),

15  (c)(4)(A), and requires that the termination notice be "served not less than two or

16  more than ten years" before the effective date of termination.  17 U.S.C. §

17  304(c)(4)(A).  Accordingly, Plaintiffs would have had to serve notice of termination

18  on or before April 19, 1997 to comply.  Service of the Termination Notices took

19  place on April 3, 1997 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10

20  (d)) and, in addition, by Certified Mail, Return Receipt Requested, which April 3,

21  1997 service date is "not less than two or more than ten years" before the effective

22  April 16, 1999 Termination Date.  Toberoff Decl., Exs.G-N; 17 U.S.C. §

23  304(c)(4)(A).  Plaintiffs' Termination Notice stated the date of termination, April 16,

24  1999, which fell within the proper time-frame from the date the copyright was

25  originally secured on April 18, 1938.  *Id*.; 17 U.S.C. §§ 304(d)(1), (c)(4)(A).

26      • Section 304(c) requires that a copy of the termination notice be "recorded in

27  the Copyright Office before the effective date of termination," 17 U.S.C. §

28  304(c)(4)(A), and that it comply "in form, content, and manner of service, with

22

requirements that the Register of Copyrights shall prescribe by regulation," 17 U.S.C. § 304(c)(4)(B).  Plaintiffs' Termination Notices were recorded in the Copyright Office on February 2, 1998, well before the April 16, 1999 Termination Date (Toberoff Decl., Ex. F); and the notice fully complied with 37 C.F.R. § 201.10, the regulations issued by the Register of Copyrights under 17 U.S.C. §304(c).

Because Plaintiffs met all of the statutory requirements of Section 304(c), their Termination should be deemed effective.  On April 16, 1999, the noticed Termination Date, Plaintiffs recaptured Siegel's joint copyright interest in the Original Superman Strips comprising Action Comics, No. 1 (hereinafter, the "Recaptured Superman Copyrights").

## 2.  <u>Plaintiffs Own An Undivided Fifty Percent Interest In The Copyrights To The Original Superman Strips</u>

Plaintiffs' Recaptured Superman Copyrights constitutes Siegel's undivided fifty percent (50%) joint interest in the copyrights to the Original Superman Strips for the extended renewal term.

The Original Superman Strips published in Action Comics, No. 1 were joint works created by co-authors, Siegel and Shuster.  The 1909 Act did not contain a definition of "joint authorship" or "joint work," which was left to the Courts to define.  *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 409 (2d Cir. 1946) *cert. denied*, 67 S.Ct. 1310 (1947), a leading joint authorship case under the 1909 Act, defined a "joint work" as "a work by two or more authors who merge their contributions into a single composition which is perceived by the audience as a unit."[6]

"Superman" satisfies this definition as Siegel merged his story/continuity with Shuster's illustrations into a single composition in the Original Superman Strips comprising Action Comics, No. 1 which is perceived as a unified work.  As joint

---

[6] The 1976 Copyright Act did not alter this definition.  It defines "joint work" as "a work prepared by two or more authors with the intention that their contribution be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

23

ER 3215

authors of the Original Superman Strips, Siegel and Shuster owned an undivided fifty percent interest in the entire copyrights therein as *tenants-in-common*. *See Pye v. Mitchell*, 574 F.2d 476,480 (9th Cir. 1978); *Sweet Music, Inc. v. Melrose Music Corp.*, 187 F. Supp. 655, 659 (S.D. Cal. 1960). It is undisputed that Siegel and Shuster conveyed their entire copyrights to the Original Superman Strips to Detective in the March 1, 1938 Grant. *Siegel*, 508 F. 2d at 911, 913; FACC, ¶¶ 12, 26; 1948 FOF, Facts 24 - 25, 32; *see* Toberoff Decl., Ex. E.

Section 304(c)(1) of the Copyright Act specifically addresses the termination procedures with respect to jointly authored works, such as "Superman." A co-author, if living, or if deceased, his widow, children or grandchildren, can recapture the copyright for the extended renewal term to the extent of the "particular author's share of the renewal copyright" in such work. 17 U.S.C. § 304(c)(1). Therefore, on April 16, 1999, when the March 1, 1938 Grant was terminated pursuant to Plaintiffs' Termination Notice No. 1., Plaintiffs became the owners of an undivided fifty percent interest in the copyrights to the Original Superman Strips comprising Action Comics, No. 1, pursuant to 17 U.S.C. 304(c)(1).

### E. Defendants Have A Duty To Account To Plaintiffs For Fifty Percent Of The Profits Earned From The Recaptured Superman Copyrights

Whereas Plaintiffs recaptured Siegel's joint ownership interest in the Original Superman Strips on April 16, 1999 pursuant to Section 304(c), Defendants, as the successors to Detective, retain Shuster's joint ownership interest in the copyrights to the Original Superman Strips, with the consequent duty to account to Plaintiffs for fifty percent of the profits earned by such copyrights. *Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569 (2nd Cir. 1955), *modified*, 223 F.2d 252 (1955); *see also Piantadosi v. Loew's Inc.*, 137 F.2d 534, 536-537 (9th Cir. 1943) (publisher becomes a joint owner of a work via assignment by a joint author). *See also* 1-6 *Nimmer on Copyright* § 6.12[B] (Courts have "uniformly recognized that one joint owner is accountable to the others for their rateable share of the profits that he has realized

24

ER 3216

from licensing of the work.")

In *Bernstein*, the co-authors of a song, the "12th Street Rag," each assigned their respective joint fifty percent interest in the song's renewal copyright to a different company. The lyricist assigned his half interest to the defendant; the composer assigned his half interest to a company which, in turn, assigned it to the plaintiff. The Court held that each company as a successor joint owner of the song's copyright had a duty to account to the other for half the monies earned from its exploitation of the song. 221 F.2d at 571.

Defendants' duty to account to Plaintiffs for the profits earned from Defendants' exploitation of the Original Superman Strips applies to profits earned from all sources from the publication of Action Comics, No. 1 and from the exploitation of new derivative "Superman" works, in any and all media, created on or after the April 16, 1999 Termination Date. 17 U.S.C. § 304(c)(6)(A).

## 1. **Defendants' Duty To Account Includes Profits Earned In Foreign Territories**

Claims by a co-owner of a copyright for an accounting are not governed by copyright law, but are governed by state common law property principles such as tenancy in common. *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984) ("A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright, but the duty to account does not derive from the copyright law's proscription of infringement. Rather, such duty to account is derived from 'equitable doctrines relating to unjust enrichment and general principles of law governing the rights of co-owners'") (internal citations omitted). *See also Community for Creative Non-Violence,* 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits owned thereby.") (internal

ER 3217

1    quotations omitted), *aff'd on other grounds,* 490 U.S. 730 (1989).[7]

2        As there can "be no copyright infringement between co-authors of a work, it

3    follows that state courts have exclusive competence to determine the fact of co-

4    authorship and the rights of assignment *and accounting* that flow therefrom."

5    (emphasis added).   3-12 *Nimmer on Copyright* § 12.01[A][1][b] (*citing Oddo v. Ries,*

6    743 F.2d 630, n.2 (9th Cir. 1984)).  *See also Korman v. Iglesias*, 736 F. Supp. 261,

7    265 (S.D. Fla. 1990) ("The Copyright Act neglected to provide for remedies between

8    co-authors ... The District of Columbia, Second, and Ninth Circuits have held and

9    Congress must have intended that co-authors may claim for an accounting…under

10   common law principles since the Copyright Act makes no mention of how co-authors

11   should enforce their rights to royalties as against each other."  Applying state law to

12   plaintiff's claim for share of royalties derived from joint work).

13       *Goodman v. Lee*, 78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)

14   is instructive.  The court affirmed a judgment declaring plaintiff a joint owner of the

15   copyright to the song "Let the Good Times Roll" and awarded plaintiff royalties

16   because, as a joint owner under Louisiana law, he was entitled to an accounting and

17   royalties based on all proceeds that defendants received from the song. *Id*. at 1012.

18   The Fifth Circuit held that while the issue of joint ownership of the song arises under

19   copyright law, once this issue was resolved, the accounting dispute among joint

20   owners was properly governed by state law.  *Id*.  The court held**:**

21        **"**The applicability of federal law ends with that [joint ownership]
22        determination, as Goodman's claim for an accounting is governed in all
         respects by state law.  It is widely recognized that '[a] co-owner of a
23        copyright must account to other co-owners for any profits he earns from

24   ---

     [7]  H.R. Rep. No. 94-1476, at 120 (1976)("Under the bill, as under the present law, co-owners of a
25   copyright would be treated generally as tenants in common, with each co-owner having an
     independent right to use or license the use of a work, subject to a duty of accounting to the other co-
26   owners for any profits"); *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646-47 (S.D.N.Y.
     1970)("It is clearly established that where a truly 'joint work' is created, each co-owner is akin to a
27   tenant in common. Accordingly…compensation obtained from the unilateral exploitation of the
     joint work by one of the co-owners without the permission of the others is held in a 'constructive
28   trust' for the mutual benefit of all owners, and there is a duty to account therefor.")(internal
     citations omitted), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997
     (1972); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co*., 223 F.2d 252 (2d Cir. 1955).

26

> the licensing or use of the copyright.... Significantly, '*the duty to account does not derive from the copyright law's proscription of infringement. Rather, it comes from"... general principles of law governing the rights of co-owners.*' As those general principles are rooted in state law, we look to the law of Louisiana for answers to the remaining issues presented by this appeal."

*Id.* (emphasis in the original).

**Notably, the 5th Circuit affirmed the district court's finding that the co-owners of the song had to account to each other for royalties earned both domestically *and outside the United States*:**

> "It is true that United States Copyright laws do not have extraterritorial effect and therefore, 'infringing actions that take place entirely outside the United States are not actionable.' Plaintiff's claim for an accounting of royalties as co-owner of the copyright to 'Let the Good Times Roll' is not, however, an action based upon an infringement of her copyright. Indeed, a co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright. 'Consequently, a suit to bring the co-owner of a copyright to account does not fall within the district court's jurisdiction over actions arising under the copyright law.' The extra-territorial nature of copyright law is inapposite to whether plaintiff is entitled to an accounting of foreign royalties received by defendants."

(internal citations omitted). *Goodman v. Lee*, 1994 U.S. Dist. LEXIS 18468, *11, 13 (E.D. La. 1994). *See also Goodman v. Lee*, 78 F.3d 1007, 1015 (5th Cir. 1996); *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984)("A co-owner of a copyright must account to other co-owners for *any* profits he earns from licensing or use of the copyright")(emphasis added).

Both state and federal courts in California have consistently held that an action for an accounting between joint owners of a copyright is governed by state law under which they are *tenants in common* entitled to share in *all proceeds* from such jointly owned copyright. *See In re Marriage of Worth*, 195 Cal. App. 3d 768, 776 (Cal. App. 1st Dist. 1987)(husband and wife hold title to copyrights as tenants in common and thus wife entitled "to share in *all* of the proceeds therefrom, including any settlement or award of damages resulting from the copyright infringement"); *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)(action for accounting amongst joint authors brought in federal court remanded to California

27

state court because an "action for an accounting or determination of ownership as between alleged co-owners is founded in state law and does not arise under the copyright laws");  *Morrill v. Smashing Pumpkins,* 157 F. Supp. 2d 1120, (C.D. Cal. 2001)("Each author of a joint work is a tenant in common"); *Durgom v. Janowiak*, 74 Cal. App. 4th 178, (Cal. App. 4th Dist. 1999)(court held nonpayment of royalties was a contract issue not preempted by federal copyright law, and states are expressly permitted to regulate activities violating legal or equitable rights, including the right to an accounting).

Plaintiffs are entitled as a matter of law to an accounting from Defendants for half the profits earned by the jointly owned Original Superman Copyrights embodied in Action Comics, No. 1.  *Oddo v. Ries,* 743 F.2d at 633.  As noted in *Goodman*, 1994 U.S. Dist. LEXIS 18468, at 11, 13 *aff'd* 78 F. 3d at 1015, this includes profits from the exploitation of such copyrights and derivative works in foreign territories because an accounting between copyright co-owners is governed by state law principles governing tenants in common, and is not subject to the copyright law's "extraterritoriality" proscription.

## F.   Defendants' Alleged Defenses To The Termination Lack Merit

### 1.   Action Comics, No. 1 Was Not A Work-Made-For-Hire

Section 304(c)'s termination provisions do not apply to a "work made for hire." 17 U.S.C. § 304(c).  Defendants thus claim that part of the Re-Cut 1933 Superman Strip created by Siegel and Shuster and thereafter purchased and published in Action Comics, No. 1 was still somehow owned by Detective at inception as "works made for hire" under the now repealed 1909 Copyright Act.  17 U.S.C. § 26. As set forth below, Defendants' argument is precluded by the Second Circuit's 1974 decision in *Siegel*, 508F.2d 909, 914 under the doctrines of *res judicata* or *collateral estoppel*. Notwithstanding this, it is also refuted by the plain fact that Detective *purchased* the "Superman" material at issue in the March 1, 1938 Grant *after* it had been independently created and submitted to Detective.

28

a. **"Work for Hire" Under The 1909 Copyright Act**

The 1909 Act does not provide any definition of "work made for hire" or "employer." In the vast majority of cases under the 1909 Act, federal courts consistently applied the work for hire doctrine *only* to traditional hierarchical employment relationships. *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005). However, "[i]n the last decade of the [1909] Act the Courts expanded the doctrine *somewhat* to include less traditional relationships." *Id., quoting Self-Realization Fellowship Ch. v. Ananda Ch.*, 206 F.3d 1322, 1331 (9th Cir. 2000)(emphasis added). The Ninth Circuit has "evaluated claims that a work was 'made for hire' by requiring "credible evidence that the work was done at the 'instance and expense' of the commissioning party." *Self-Realization,* 206 F.3d at 877, *quoting Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998).

Under the 1909 Act, when one person employs another to create an artistic work it gives rise to a *presumption* that the parties' *mutual intent* is for title to the copyright to belong to the employer at whose instance and expense the work is created. *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir 1965) (work for hire status turns on "mutual intent of the parties"). However, the presumption of copyright in the employer is rebuttable, as it "is based on the presumed mutual intent of the parties." *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368 (9th Cir.1980); *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2nd Cir. 1939), *cert. denied*, 309 U.S. 686 (presumption rests upon presumed intention).

Thus courts have often refused to apply the work for hire doctrine *even in the context of an employer-employee* relationship. *See e.g.*, *Dolman*, 157 F.3d at 712 (no evidence that songs written within scope of author's employment and the written assignment of songs to employer's company rebutted any work for hire presumption); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir. 1955), *modified on other grounds*, 223 F.2d 252 (2d Cir. 1955) (where employer purchased song lyric from employee by paying him to write the lyric, court found that because

29

this was in addition to his salary and a special job assignment, it was not a work for hire); *see also Forward v. Thorogood*, 985 F.2d 604, 606-7 (1st Cir. 1993) (court refused to apply work for hire doctrine to music demo tapes created with plaintiff's financial assistance, because while he booked and paid studio to create tapes, "he neither employed nor commissioned the band members.").

### b. Defendants' "Work For Hire" Claim Is Precluded By *Res Judicata* And Collateral Estoppel

Defendants did not allege that Action Comics, No. 1 (*i.e.*, the Original Superman Strips) was a work for hire in their Counterclaim or Answer, in apparent recognition that it was not and that they are precluded from claiming otherwise. *See* FACC (Toberoff Decl., Ex. R) and Answer. However, Defendants allege that at Detective's request Siegel and Shuster cut and pasted their pre-existing "Superman" newspaper strip into a magazine format and that "upon information and belief" they added additional material ("Purported Additional Material") to create the Re-cut 1933 Superman Strip published as Action Comics, No 1. FACC , ¶¶ 11, 14. Defendants erroneously claim that the Purported Additional Material is "work for hire" as allegedly prepared "at the instance and expense of [Detective] and subject to its right of control," "and that the copyright therein was owned by Detective *ab initio*," that is, from inception. FACC, ¶ 132.

Defendants have the burden to prove what Purported Additional Material they refer to because by all accounts the conversion of the 1933 Superman Strip (newspaper format) to the Re-cut 1933 Superman Strip (magazine format) published in Action Comics, No. 1 was largely mechanical involving cut and pasting, slight re-lettering, and trimming panels to fit a magazine format. *Siegel,* 508 F.2d at 914.

In *Siegel*, 508 F.2d at 914, the Second Circuit held that "Superman" as first published by Detective (in Action Comics, No. 1) was <u>not</u> a "work for hire." ("The court below had held that **Superman** was also a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26…We disagree."). Defendants are therefore

30

ER 3222

precluded under *res judicata* and collateral estoppel principles from again claiming

that Action Comics, No. 1, or any part thereof, is a "work for hire."

In fact**,** Defendants' claim as to the Purported Additional Material is

specifically precluded by *Siegel.* The Second Circuit expressly considered the 1948

Findings on the conversion of Siegel and Shuster's 1933 "Superman" newspaper strip

to a magazine format *at Detective's request* and that this was insufficient to transform

it into a work for hire:

> "There was no conclusion of law in the state court that the comic strip
> was a work for hire so as to create the presumption that the employer
> was the author. That issue was not litigated at all in state court. On the
> contrary, the court's finding of fact no. 8 was that the plaintiffs were 'the
> originators and authors of the cartoon character **SUPERMAN** and of the
> title **SUPERMAN** and first created cartoon material in which the said
> character and title first appeared in 1934. . . .'" The court below instead
> relied upon finding of fact no. 22 in which the state court found that the
> plaintiffs did not revise and expand the **Superman** material at the
> request of the defendants and that this revised material constituted the
> formula for the ensuing series of strips. We do not consider this
> tantamount to a conclusion that **Superman** was a work for hire."

508 F.2d at 914. The Second Circuit concluded that "Superman" and his powers had

been fully developed by Siegel and Shuster on their own and that any mechanical

revisions that may have been directed by Detective shortly before "Superman's" first

publication in Action Comics, No.1 were simply to accommodate a magazine format.

> "Superman had been spawned by the plaintiffs four years before the
> relationship between the authors and the defendants existed…Superman
> and his miraculous powers were completely developed long before the
> employment relationship was instituted. ***The record indicates that the
> revisions directed by the defendants were simply to accommodate
> Superman to a magazine format.*** We do not consider this sufficient to
> create the presumption that the strip was a work for hire."

*Id.* (emphasis added).

Defendants are thus precluded from re-litigating the claim or issue of whether

the Purported Additional Materials comprising such "revisions" was a "work for

hire" under the doctrines of *res judicata* or collateral estoppel.

31

**ER 3223**

### c.     The Purported Additional Material, To The Extent It Exists, Was Not "Work For Hire"

Even if the Court re-opened the "work for hire" issue, contrary to the preclusive effect of *Siegel*, 508 F.2d at 914, Defendants' admissions and documentary evidence also mandate a finding that the Purported Additional Material, to the extent it exists, was not "work made for hire."

Defendants' claim that they owned the Purported Additional Material "at inception" merely because they requested that Siegel and Shuster cut and paste their newspaper strip into a magazine format makes no sense.  When Siegel and Shuster re-cut their Superman strip they did so "on spec" of their own volition as they were still merely trying to get their work published.  1948 FOF, Fact 32, 34; Toberoff Decl., Ex. B.

It is undisputed that they presented their Re-cut 1933 Superman Strip to Detective in February, 1938.  *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911. At that point Detective had not even accepted their work for publication.  Detective purchased Siegel and Shuster's thirteen-page *Re-cut 1933 Superman Strip* in the March 1, 1938 Grant *after* it was submitted to Detective and accepted for publication. *See* 1948 FOF, Fact 32 ("The first thirteen pages of SUPERMAN material …were in existence…before the execution of the instrument of March 1, 1938."); *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911.  Defendants acknowledge this. FACC, ¶ 11 ("Siegel and Shuster cut and pasted the [newspaper]comic strips…to create a thirteen-page comic book story which was accepted for publication by [Detective]").

Detective was under no obligation to pay Siegel and Shuster for their Re-cut 1933 Superman Strip until such had been completed by Siegel and Shuster on spec and Detective had accepted it for publication and *purchased* the finished product in the March 1, 1938 Grant.  *See* Toberoff Decl., Ex. E.

*Dolman*, 157 F.3d at 712, is instructive. The plaintiff copyright owner sued a music publisher regarding certain movie soundtrack compositions created in the

32

1930s.  The author had composed the songs as an employee of a company that had contracted with a movie company to create soundtracks, and he later assigned the songs to the music publishing arm of his employer.  The Ninth Circuit affirmed the district court's refusal to apply the "work for hire" doctrine on the grounds that there was no evidence that the songs were within the scope of the author's employment; nor written at his employer's "instance and expense."  Significantly, the Court stated:

> "Moreover, even if [defendant] had established that [the author] created the songs at the instance and expense of [his employer] or [the movie company], **[plaintiff] rebutted the work for hire presumption," by having executed an assignment to his employer's company**:  "Had the works been intended to be works for hire for [his employer], there would have been no reason for [the music publishing subsidiary] to accept an invalid assignment of rights from [the author], knowing that its parent company already owned those rights." *Id.* at 712-13.  Additionally, "[the music publishing subsidiary] licensed the synchronization rights in the songs to [the movie company].  Had the songs been written for [the movie company] as works for hire, there would have been no need for such a license." *Id.*

Here, as in *Dolman*, the very existence of the March 1,1938 Grant belies the notion that the Re-cut 1933 Comic Strip was "for hire."  If it were a work for hire, there would be no rights to grant because the work would have been owned at inception by Detective.  It is undisputed that the parties executed the March 1, 1938 Grant after receiving the Re-cut 1933 Superman Strip in February, 1938, Detective decided to publish it, and thus purchased the material in the March, 1938 Grant.  *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911; 1948 FOF, Fact 32.  It is clear that the copyright to both the Original Superman Strips resided with Siegel and Shuster, to be assigned if and only if their speculative work was thereafter accepted and purchased by Detective.  As such, no portion of the Original Superman Strips, published in Action Comics, No. 1, is "work for hire."

## 2.  <u>The Termination Notice Was Not Required To List The 1948 Consent Judgment</u>

As set forth above, all rights to Siegel's Original Superman Strips were granted to Defendants' alleged predecessor, Detective, in the March 1, 1938 Grant.  *Siegel*,

33

508 F.2d at 913-914; 1948 COL, Conclusion 1.  The regulations promulgated under 17 U.S.C. § 304(c) by the Register of Copyrights ask for "a brief statement reasonably identifying the grant to which the notice of termination applies." 37 C.F.R. § 201.10(b)(1)(iv).  In compliance, Plaintiffs' Termination Notice No. 1 identified the March 1, 1938 Grant as the grant being terminated. Toberoff Decl. Ex. G.  On the noticed April 16, 1999 Termination date, Siegel's joint copyright interest in the Original Superman Strips reverted to Plaintiffs as further set forth above.

As discussed above, Plaintiffs served on Defendants and filed with the Copyright Office six additional Termination Notices, Nos. 2-7, out of an abundance of caution, to the extent that the respective agreement set forth in each such notice, granted *or might be construed to have granted* "Superman" works by Siegel. Toberoff Decl. Ex. H-M.

Amongst Plaintiffs' additional notices, Termination Notice No. 6  listed the May 19, 1948 Stipulation which settled the 1947 Action, wherein Siegel and Shuster re-acknowledged National's ownership of "Superman" and received money for Siegel's grant of "Superboy" to National.  Termination Notice No. 5, ¶ 3, p. 551, Toberoff Decl., Ex. K; May 19, 1948 Stipulation, Toberoff Decl., Ex. C.  The May 19, 1948 Stipulation provided for the May 21, 1948 Consent Judgment that was entered into two days later incorporating the terms agreed upon in the stipulation.

Defendants nonetheless asserted that Plaintiffs' Terminations are purportedly defective for not *also* listing the May 21, 1948 Consent Judgment.  *See* FACC, ¶¶ 66-68.  Firstly, the May 21, 1948 Consent Judgment is a judgment, not a "grant" of copyright.  *See* 37 C.F.R. § 201.10 (b)(1)(iv).  Secondly, the May 21, 1948 Consent Judgment merely follows the parties' underlying May 19, 1948 Stipulation entered into two days earlier which *is* explicitly identified in Plaintiffs' Termination Notice No. 6.  Thirdly, because the March 1, 1938 Grant constituted the operative grant of "Superman" to National's predecessors-in-interest, the subsequent May 21, 1948 Consent Judgment did not as a matter of law convey that which was previously

34

granted in 1938, and already in National's possession on May 21, 1948.  *Siegel*, 508 F.2d at 913-914; 1948 COL, Conclusion 1.

The Consent Judgment also has no adverse impact on Plaintiffs' Termination as "[t]ermination…may be effected notwithstanding any agreement to the contrary" 17 U.S.C. § 304(c)(5); and Siegel's or Plaintiffs' reversionary termination interest under Section 304(c) could not have been assigned, as a matter of law, until "after the notice of termination ha[d] been served [in 1997]". 17 U.S.C. § 304(c)(6)(B),(D).

As stated, the 1948 Consent Judgment merely acknowledges what was previously granted to Detective and National in agreements explicitly identified in Plaintiffs' Termination Notices (*e.g.*, the March 1, 1938 Grant of the Original Superman Strips.)  However, even if the May 21, 1948 Consent Judgment is somehow deemed a grant of rights previously granted (it is not and can not be), Plaintiffs' identification of the underlying May 19, 1948 Stipulation "reasonably identifies" the parallel May 21, 1948 Consent Judgment which was issued pursuant to the stipulation and mirrors it.  *See* 37 C.F.R. §201.10 (b)(1)(iv).

There is little case law on notice of termination formalities.  In *Burroughs v. MGM*, the court found that a Section 304(c) termination notice identifying a single 1923 grant and 35 titles applied to only the titles listed, but was not rendered ineffective with respect to those 35 titles by the fact that many of the titles were assigned by the author in subsequent grants that had not been identified in the termination notice.  683 F.2d 610, 614, 618, 622 (2d. Cir. 1982) ("As further Tarzan books were written, the rights in these were also transferred to the corporation").

*Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 378 (SDNY 1999), came to a similar conclusion.  There, the termination notice simply identified the grant as "grant or transfer of copyright and the rights of copyright proprietor, including publication and recording right only."  *Id*.  The Court held that the notice was adequate even though this "generic statement would not seem to reasonably identify the grant."  *Id*.

Defendants received more than ample *notice* within the statutory time frame of

ER 3227

1  Plaintiffs' intention to terminate prior grants of Siegel's "Superman" work and were

2  in no way prejudiced by Plaintiffs' not listing the May 21, 1948 Consent Judgment in

3  addition to the parallel May 21, 1948 Stipulation, the operative March 1, 1938 Grant

4  and three other prior agreements. *See* Terminations Nos. 1-6, Toberoff Exs. G-L.

5  The regulations of the Register of Copyright, on which Defendants purport to rely,

6  specifically dissuade such hyper-technical attempts to invalidate termination notices:

7  "Harmless errors in a notice that do not materially affect the adequacy of the

8  information required to serve the purposes of …section 304(c) of title 17,

9  U.S.C….shall not render the notice invalid." 37 CFR § 201.10(e)(1). Nor is such a

10 result supported by case law as set forth above.

11        Defendants alleged the same unavailing Consent Judgment defense with

12 respect to Plaintiffs' Superboy Termination in the Superboy Action (Case No. 04-

13 8776). In granting Plaintiffs' motion for partial summary judgment, Judge Lew

14 dismissed this purported defense as without merit:

15  "Defendants argued that Plaintiffs failed to comply with the termination
16  regulations, because the termination notices only list the May 19, 1948
    stipulated agreement, but did not list the May 21, 1948 'Final Consent
17  Agreement.'

18  "This court finds that ***no genuine issue exists that the operative grant of
    'Superbo'" by Jerome Siegel was the May 19, 1948 stipulated
    settlement*** and that the consent judgment merely followed the parties'
19  stipulation and was entered by the Court two days later. Additionally,
    Regulation 201.10(b)(1)(iv) merely requires a 'brief statement
20  reasonably identifying the grant to which the notice of termination
    applies.' In fact, Regulation 201.10(e) provides that:
21
22       harmless errors in a notice that do not materially affect the
         adequacy of the information required to serve the purposes of
23       …section 304(c) … shall not render the notice invalid.

24  "Here, by listing the May 19, 1948 stipulated settlement, the termination
    notices provide a brief statement reasonably identifying the grant in
25  question. Even, if including the May 21, 1948 consent judgment would
    have provided additional notice, its absence in no way materially
26  affected the adequacy of Plaintiffs' notice."

27 Order Granting Plaintiffs' Motion For Partial Summary Judgment & Denying

28 Defendants' Motion for Summary Judgment, entered March 24, 2006, at pp. 12-13,

**ER 3228**

1  Toberoff Decl., Ex. U.  This holding and logic applies with equal force to the

2  Superman Action "where the operative grant" of the Original Superman Strips was

3  the March 1, 1938 Grant.

4      **3.**    **The December 23,1975 Agreement Was Unaffected By**

5      **Defendants' Later Payment Of A Pension To Joanne Siegel**

6      **And, In Any Event, Was Not An Operative "Superman" Grant**

7      The December 23, 1975 Agreement was listed by Plaintiffs in the separate

8  Termination Notice No. 7 out of an abundance of caution, though it did not constitute

9  or contain a copyright grant in Siegel and Shuster's "Superman" works.  Toberoff

10  Decl., Exs. M, Y.  Moreover, Plaintiffs need not have served and filed Termination

11  Notice No. 7 to have recaptured Siegel's copyright interest in the Original Superman

12  Strips because this was accomplished by Plaintiffs' Termination No. 1 of the

13  operative March 1, 1938 Grant which had assigned all rights therein to Detective.

14  *Siegel*, 508 F.2d at 913-914; 1948 COL, Conclusion No. 1.

15      Yet, Defendants erroneously claim herein that Plaintiff Joanne Siegel's

16  continued receipt of a widow's benefit after the Termination Date effectively

17  reinstated and somehow transformed the December 23, 1975 Agreement into a

18  subsisting "Superman" copyright grant by Siegel and Shuster.  FACC, ¶¶ 70-76.

19      The 1974 Action confirmed that Defendants' predecessor, Detective, was

20  assigned all rights in "Superman" by Siegel and Shuster in their March 1, 1938 Grant.

21  *Siegel*, 508 F.2d at 913-914.[8]  WCI, to engender good will prior to the release of its

22  first "Superman" movie, nonetheless agreed in the December 23, 1975 Agreement to

23  pay Siegel and Shuster a small monthly stipend.  December 23, 1975 Agreement, ¶ 5,

24  Toberoff Decl., Ex. Y.  Plaintiffs were not parties to the December 23, 1975

25  Agreement.  *Id*.

26

27  [8] Additional agreements followed the March 1, 1938 Grant as set forth above which re-affirmed

28  Detective's and then their successors' ongoing ownership of "Superman" as follows: the September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, and the December 19, 1939 Agreement.  *See Siegel*, 364 F. Supp. at 1034.

37

1    Tellingly, the December 23, 1975 Agreement specifically acknowledged that

2    the 1974 Action held that WCI already owned all rights to "Superman": "The Court

3    of Appeals unanimously decided that 'all rights in Superman, including the renewal

4    copyright, have passed forever to [National Periodical Publications, Inc., a Warner

5    subsidiary.]'" December 23, 1975 Agreement, ¶ 3, Toberoff Decl., Ex. Y; *see also*

6    *Siegel*, 508 F.2d at 913-914. The December 23, 1975 Agreement therefore

7    acknowledged that the payment to Siegel and Shuster was not a negotiated payment

8    in exchange for a grant of "Superman" rights and specifically stated that WCI had no

9    obligation to make such payment:

> "4.    Warner does not have any legal obligation to pay you any sum of money whatsoever and does not acknowledge that any wrong has been done to you.
>
> 5.    Warner has nevertheless determined, in consideration for your past services to Warner and in view of your present circumstances, to make the following voluntary payments."

14    *Id.*, ¶¶ 4-5. The December 23, 1975 Agreement further provided as follows:

> "In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner will pay his wife, Joanne Siegel, if she survives him, monthly payments at the rate of $20,000 a year, commencing on the date of Jerry's death, and ending December 31, 1985, and thereafter monthly payments at the rate of $10,000 a year for the balance of her life."

18    *Id.*, ¶ 5 b. It is undisputed that Jerry Siegel died on January 28, 1996. Thus, Joanne

19    Siegel was not eligible for any payments under the December 23, 1975 Agreement.

20    At Joanne Siegel's request, Warner agreed by letter dated March 15, 1982 that

21    they would pay her a widow's pension if her husband predeceased her. This payment

22    was also voluntary and in no respect tied to any grant of rights in "Superman" or the

23    Original Superman Strips. Toberoff Decl., Ex. FF.

24    Firstly, the December 23, 1975 Agreement, as set forth above, does not contain

25    a grant of any copyrights in "Superman." Toberoff Decl., Ex. U. Secondly, the

26    December 23, 1975 Agreement, as a matter of law, could not have granted copyrights

27    in "Superman" that were already in WCI's possession, as acknowledged by the

28    December 23, 1975 Agreement, itself. This entirely moots Defendants' purported

38

1    defense.  Even in the unlikely event that Joanne Siegel's receipt of her widow's

2    benefit after April 16, 1999 was found to have somehow reinstated the December 23,

3    1975 Agreement, this, at best, could affect only Plaintiffs' Termination of the

4    December 23, 1975 Agreement.  Because the December 23, 1975 Agreement did not

5    contain a grant of any rights in "Superman," and certainly did not grant rights in the

6    Original Superman Strips transferred in the March 1, 1938 Grant, this purported

7    reinstatement, no matter how unlikely, would have no affect.

8           The December 23, 1975 Agreement, even if it contained a grant and had been

9    reinstated (it did not and was not)[9], it could not, in any event, effectively assign

10    *Plaintiffs'* termination interest because Plaintiffs *were not parties* to the December

11    23, 1975 Agreement.  Additionally, Plaintiffs' reversionary termination interest under

12    Section 304(c) could not have been assigned by Jerome Siegel in 1975 because under

13    the Copyright Act such an interest can not be assigned until "after the notice of

14    termination ha[d] been served [in 1997]."  17 U.S.C. § 304(c)(6)(B),(D).

15           Lastly, if Warner's agreement to pay Joanne Siegel a widow's pension is

16    misconstrued to somehow re-instate the December 23, 1975 Agreement and

17    transform it into a copyright grant such would also contradict the Copyright Act's

18    prohibition that "[t]ermination…may be effected notwithstanding any agreement to

19    the contrary" 17 U.S.C. § 304(c)(5).  *See Marvel*, 310 F.3d at 291.

20           **4.**    **Plaintiffs' Ownership Of The Recaptured Superman**

21               **Copyrights Is Not Barred By The Statute of Limitations**

22           Plaintiffs' claims for declaratory relief as to the validity of their "Superman"

23    Terminations are not barred by the Copyright Act's three year statute of limitations,

24    17 U.S.C. § 507(b), or other statute of limitations, as alleged by Defendants.  FACC,

25    ¶¶ 90-96; Answer, ¶ 110.

---

26

27    [9] As shown above, Joanne Siegel was not eligible for any payments under the express terms of the

28    December 23, 1975 Agreement because the condition precedent that Siegel "die[], on or before December 31, 1985" did not occur.  December 23, 1975 Agreement, ¶ 5 b., Toberoff Decl., Ex. U. It is unlikely that her acceptance today of a pension voluntarily paid by Warner has the effect of reinstating the December 23, 1975 Agreement to which she was not a party. Toberoff Decl., Ex. FF.

### a. **Plaintiffs' Complaint Was Filed Within the Purported Statute of Limitations**

As shown below, 17 U.S.C. § 507(b)'s three-year statute of limitations does not act as a bar to copyright recapture pursuant to 17 U.S.C. §304(c). Notwithstanding this, even if the three-year statute of limitations were held to be triggered by a publisher's express repudiation of a §304(c) termination, Plaintiffs nonetheless filed their complaint *before* the statute ran.

As set forth above, Plaintiffs served their Terminations on April 3, 1997 by regular mail and by certified mail, return receipt requested. Toberoff Decl., Exs. G-M. On April 15, 1999, one day before the effective Termination Date, DC sent Plaintiffs a letter (the "April 15, 1999 Letter") "rejecting the scope and validity of the [Terminations]." FACC, ¶ 71. It states in relevant part:

> "[T]he absence of any steps towards negotiation for two years, particularly on the "eve" of the April 16, 1999 purported "effective" date of the termination, leaves us concerned. Thus our client has no alternative ***but to move to the stage of putting your clients on clear notice***, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any rights at all, in Superman."

Toberoff Decl. Ex. Q. (emphasis added).

To facilitate settlement negotiations, the parties entered into a tolling agreement dated April 6, 2000 (the "Tolling Agreement"), effective as of said date, just in case any time based defenses could later be claimed by either side. *Id*. Ex. Z, at ¶ 1. By its express terms the Tolling Agreement remained in force until:

> "10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices [of Termination]."

*Id*. at ¶ 7.

On September 21, 2002, Plaintiffs sent a letter to DC, indicating that they were

40

ER 3232

"stopping and ending negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately." *Id.*, Ex. AA. Consequently, the Tolling Agreement ended "10 business days" later on October 4, 2002. *Id.*

The statute of limitations cannot be used to effectively bar Plaintiffs' section 304(c) Terminations. However, in the unlikely event the statute is even held to apply, it would not start to run until Defendants had communicated to Plaintiffs a *clear* and *express repudiation* of their Terminations. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (a "plain and express repudiation" is required under § 507(b)).

By Defendants' own admission this did not happen until **April 15, 1999**. *See* FACC, ¶ 91 ("effective at least as early as April 15, 1999, Plaintiffs/ Counterclaim Defendants were on notice that DC Comics rejected the Superman Notices."); *see also* April 15, 1999 Letter ("our client has no alternative but to move to the next stage of putting your clients on clear notice … that DC Comics rejects both the validity and scope of the Notices"), Toberoff Decl., Ex. Q.

Therefore the statute of limitations calculation (to the extent the statute is even applicable) is as follows. Three years equals 1,095 days. April 15, 1999 to April 6, 2000 (the date the Tolling Agreement commenced) equals 357 days, with 738 days left to run. Tolling Agreement, ¶ 1, Toberoff Decl., Ex. Z. The Tolling Agreement was in place until October 4, 2002, "ten business days after [Plaintiffs] terminat[ed] negotiations" by letter dated September 21, 2002. *Id.*, ¶ 7; Toberoff Decl., Exs. Z; AA. October 4, 2002 plus the 738 days left to run means the statute, if applicable, would run on October 12, 2004. Thus, to the extent the statute of limitations is even held to run against Plaintiffs' Terminations, they would have had until **October 12, 2004** to file their complaint in the Superman Action. Plaintiffs timely filed their complaint regarding the "Superman" Terminations on **October 8, 2004**. Toberoff Decl., Ex. X.

> **b.** **Strong Policies Disfavor Using The Statute of**

41

ER 3233

1 **Limitations To Bar Termination Under § 304(c)**

2 The legislative purpose of the Section 304(c) termination right is to relieve

3 authors "of the consequences of ill-advised and unremunerative grants" to publishers

4 in recognition of the unequal bargaining power between authors and publishers.

5 *Mills Music*, 469 U.S. at 172-73.  One could find not better example of this than

6 Siegel and Shuster's March 1, 1938 Grant of "Superman" to Detective for $130 in

7 order to see their work published. Toberoff Decl., Ex. E.

8 So important are the policies behind this authorial recapture right that it trumps

9 ordinary principles of contract and can be effected simply by the ministerial act of

10 giving notice within a defined time window.  *See* 17 U.S.C. §§ 304(d)(1), (c)(4)(A).

11 The importance Congress placed on this statutory recapture right is further evidenced

12 by the concerted safeguards it built into the 1976 Act's termination provisions.  *See*

13 *e.g.*, §304(c)(5) ("Termination of the grant may be effected notwithstanding any

14 agreement to the contrary"); 17 U.S.C. § 304(c)(6)(B),(D) (reversionary termination

15 interest can not be conveyed to original assignee until "after the notice of termination

16 has been served.").  Thus, this recapture right has repeatedly been held to be

17 "inalienable."  *Mills Music,* 469 U.S. at 172-73, *quoting* H.R. Rep. at 124; *Stewart v.*

18 *Abend*, 495 U.S. at 230; *Tasini,* 533 U.S. at 497 (discussed author's comparable

19 termination right under 17 U.S.C. § 203(a)(5)).

20 Congress surely did not intend that its concerted efforts to safeguard this

21 important recapture right could so easily be foiled by a publisher's predictable denial

22 of a termination notice's validity, allegedly triggering the statute of limitations.[10]

23 This would effectively mean that an author or his family, after waiting 56 years for

24 the termination window to open, would purportedly forever lose their recaptured

25 ───────────────────
[10]  Interestingly, if the three-year statute of limitations were to apply to Plaintiffs' Termination, then
26 it would appear that any claims by Defendants would be barred as they failed to seek declaratory
relief until long after April 3, 2000, i.e., within three years of being served with Plaintiffs'
27 Terminations on April 3, 1997.  Plaintiffs' Termination surely constitutes a clear and express
repudiation of Defendants' exclusive copyright interests in "Superman." *Aalmuhammed,* 202 F.3d
28 at 1231. As mere successors in interest, Defendants do not sit on a higher plain than the statutorily
endowed widow and children of "Superman's" co-creator.  17 U.S.C. § 304(c)(1).

42

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER 3234**

1  copyright if they did not undertake or, as will often be the case, could not afford to

2  undertake, the enormous expense of full blown litigation, within three years of any

3  repudiation by the publisher, *regardless of its merit*. *See* 17 U.S.C. §§ 304(d)(1),

4  (c)(4)(A). Clearly such interpretation contradicts the strong policies underlying the

5  recapture right and its objective of "leveling" the playing field for authors and their

6  families. *Stewart*, 495 U.S. at 230.

7                    **c.**      **<u>Section 507(b) Is Not A Bar To Copyright Ownership</u>**

8        The Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b),

9  does not eliminate the substantive right of copyright ownership; it only limits a

10 copyright owner's remedies to three years before suit. In much the same way that a

11 copyright owner does not lose his copyright by failing to sue an infringer within three

12 years, an owner does not lose his copyright interest by failing to request declaratory

13 relief and an accounting within three years. *Stone v. Williams*, 970 F.2d 1043, 1051

14 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993).

15       A request for declaratory relief under the Copyright Act is "a procedural device

16 used to vindicate substantive rights, it is time-barred only if relief on a direct claim

17 would also be barred." *Stone*, 970 F.2d at 1048; *see Luckenbach S.S. Co. v. U.S.*, 312

18 F.2d 545, 548 (2d Cir. 1963); *Romer v. Leary*, 425 F.2d 186, 188 (2d Cir. 1970)(in

19 declaratory relief actions, one looks to the underlying coercive claim in applying the

20 statute of limitations). The coercive relief Plaintiffs' seek is payment of their share of

21 the income earned by the Recaptured Superman Copyrights. Plaintiffs' property right

22 is violated each time Defendants fail to account to them and the limitations period

23 begins to run regarding that wrong. *See Shapiro, Bernstein & Co. v. Jerry Music* Co.,

24 223 F.2d 252, 254 (2d Cir. 1955); *Stone*, 970 F.2d at 1051. Because Plaintiffs'

25 underlying coercive claim for profits from the Recaptured Superman Copyrights is

26 not time-barred, Plaintiffs' procedural claim for declaratory relief is not time-barred.

27       *Stone*, *supra*, is factually on point and based on controlling law. *Stone* held

28 that 17 U.S.C. § 507(b) does not bar a declaratory relief action to establish copyright

1   ownership or an accounting action but only limits the damages (past profits) to three

2   years within suit.  970 F.2d at 1051.  While potentially limiting damages, *Stone* held

3   that the statute cannot terminate the substantive right of copyright co-ownership.

4        The plaintiff in *Stone* was the daughter of country singer songwriter Hank

5   Williams, Sr.  In 1985, she filed suit seeking a declaration that she is a one-third co-

6   owner of the renewal copyright to her father's songs and to an accounting of her

7   share of profits from their exploitation.  *Id.* at 1046.  Ms. Stone was legally entitled to

8   share in the profits at least six years earlier in 1979.  The district court granted

9   summary judgment holding her barred by § 507(b) because she had notice of her

10  copyright claim more than four years prior to filing her lawsuit.  *Id.* at 1047.

11       The Second Circuit *reversed* and held, based on established precedent, that 17

12  U.S.C. § 507(b) cannot be applied to cause the forfeiture of copyright ownership as

13  the statute limits only *remedies* to three years from when suit is filed.  *Id.* at 1051.

14  The *Stone* Court expressly rejected the proposition that copyright ownership is

15  forfeited when a co-owner fails to assert her rights within the limitations period.  *Id.*

16  at 1050-51; *citing Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.

17  1960), *cert. denied*, 364 U.S. 882 (1960)(upheld owner's failure to assert copyright

18  for 25 years).

19       *Stone* should be applied to the case at bar given the symmetry of facts and legal

20  issues presented in the two cases.  In reversing the lower court, *Stone* addressed the

21  same issue that is before this Court: the application of 17 U.S.C. §507(b) to a

22  declaratory relief action regarding a fractional copyright ownership interest and a

23  request for an accounting, constructive trust and profits.  970 F.2d at 1048; *see* First

24  Amended Complaint, ¶¶ 52-73.  While Ms. Stone's copyright entitlement is based on

25  her status as Hank Williams' daughter under 17 U.S.C. § 304(a), Plaintiffs'

26  entitlement is based on their status as Siegel's widow and daughter, respectively,

27  under 17 U.S.C. §§304(a) and (c), and the exercise of their termination rights under

28  §304(c) by the ministerial act of giving notice.

44

1    *Stone* correctly relied on "the long established rule" directly applicable to the

2    case at bar that "statutes of limitations bar remedies, not the assertion of rights." *Id.*

3    *at* 1051.  This bedrock principle of law is expressly acknowledged by the Supreme

4    Court: "[A]s a matter of constitutional law...statutes of limitations go to matters of

5    remedy, not to destruction of fundamental rights." *Chase Securities Corp. v.*

6    *Donaldson*, 325 U.S. 304, 314, 89 L.Ed. 1628, 65 S.Ct. 1137 (1944).

7         The Ninth Circuit also holds that "[s]tatutes of limitations generally cut off the

8    remedy without extinguishing the right." *Osmundsen v. Todd Pac. Shipyard*, 755

9    F.2d 730, 733 (9th Cir. 1985).  This "constitutional" principle has been directly

10   applied to the Copyright Act.  In *Prather v. Neva Paperbacks, Inc*., 446 F.2d 338, 340

11   (5th Cir. 1971), the Court held that 17 U.S.C. § 507(b) "affect[s] the remedy only, not

12   the substantive right" based on the legislative history of its nearly identical

13   predecessor, § 115(b).[11]  Because Plaintiffs' substantive copyright ownership exists

14   *by operation of law*, it can *not* be extinguished by § 507(b).

15       **G.    No Agreement Was Consummated By The Parties Regarding**

16            **Plaintiffs' Recaptured Superman Copyrights Or Recaptured**

17            **Superboy Copyrights As A Matter Of Law**

18        After the within actions were filed by Plaintiffs on October 4, 2004 for a

19   declaration that they had successfully recaptured Siegel's original "Superman" and

20   "Superboy" copyright interests, Defendants claimed *for the very first time* that they

21   purportedly purchased such interests in October, 2001 in a supposed written

22   agreement even though it was clear from the record and the parties' conduct that no

23

---

24   [11] The *Prather* Court referred to Senate Report which stated, "The committee [on the Judiciary]

25   wishes to emphasize that it is the committee's intention that the statute of limitations, contained in
     this bill, is to extend to the remedy of the person affected thereby, and not to his substantive rights."

26   S. Rep. No. 1014, 85th Cong., 1st Sess. 3 (1957).  The House Report stated: "[A]ll state statutes of
     limitation, which now govern the Federal courts in copyright actions, are limitations upon the

27   remedy, and the present bill has been drawn to apply this concept to a uniform Federal period of
     limitations.... Moreover, it was considered that the long-standing fact that both the copyright bar and

28   the courts have become accustomed to a limitation based upon the remedy warranted a continuation
     of this concept in the present bill."  H.R. Rep. No. 150, 85th Cong., 1st Sess. 2 (1957).

1  agreement had been made.  *See* Counterclaim, ¶¶ 98-105, Answer, ¶¶ 112-113.

2  Three key documents demonstrate that as a matter of law no agreement was

3  ever consummated:  (1) a letter dated October 19, 2001 (the October 19, 2001

4  Letter") from Plaintiffs' then counsel, Kevin Marks ("Marks")' to Warner's general

5  counsel, John Schulman ("Schulman"), Toberoff Decl., Ex. BB; (2) a reply letter

6  dated October 26, 2001 from Schulman to Marks, attaching an outline of purported

7  deal terms (collectively, the "October 26, 2001 Letter"), Toberoff Decl., Ex. CC; and

8  (3) a proposed first draft of an agreement sent by Defendants' outside counsel to

9  Marks on February 1, 2002 (the "February 1, 2002 Draft"), Toberoff Decl., Ex. DD.

10  The relevant history is as follows.  In 2000 and 2001 the parties communicated

11  sporadically concerning the potential settlement (*i.e*, purchase or license) of

12  Plaintiffs' Recaptured Superman Copyrights (and regarding another character called

13  "Spectre," not at issue herein).  FACC, ¶¶ 51, 52.  These negotiations became

14  increasingly complex and led to an October 16, 2001 conference between the parties'

15  counsel, Schulman and Marks, in which many different terms, including complicated

16  contingent compensation formulas, were discussed.  Toberoff Decl., Exs. BB, CC.

17  Thereafter, Marks sent Schulman the October 19, 2001 Letter which stated as

18  follows:

19  > "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the
   > majority owners of the terminated copyright interests) has accepted D.C.
20  > Comics' offer of October 16, 2001 in respect of the 'Superman' and
   > 'Spectre' properties.  The terms are as follows: . . . ."
21

22  Toberoff Decl., Ex. BB, p. 1.  The October 19, 2001 Letter proceeded to set forth

23  financial and other terms and concluded by stating:

24  > "***John [Schulman], if there is any aspect of the above that is somehow
   > misstated, please let me know***…I will be out of the office…for the
25  > following four weeks."

26  *Id*., at p. 1-6 (emphasis added).

27  Schulman responded to Marks' October 19, 2001 Letter by his October 26,

28  2001 Letter, stating as follows:

46

1     "I have received, and have finally had a chance to review, your outline fax of October 19… *I enclose herewith* for you and Bruce
2     *a more fulsome outline of what we believe the deal we've agreed to is.* We're working on the draft agreement so that by the time you

3 [return]…we will have this super-matter transaction in document form."

4 Toberoff Decl., Ex. CC (emphasis added). As clearly demonstrated below,

5 Schulman's "*more fulsome outline*" entitled "October 2001 Outline" contained *new*

6 *or different material terms* than that contained in Marks' October 19, 2001 Letter,

7 and was never accepted by Marks or Plaintiffs. *Id*.

8     Defendants' outside counsel thereafter furnished to Marks the February 1, 2001

9 Draft – a first draft of a proposed agreement – along with a cover letter dated

10 February 1, 2002, which stated as follows:

11     "I am pleased to enclose a *draft* agreement between your clients and DC Comics concerning the Superman property. *As our clients have not*
12 *seen this latest version of the agreement, I must reserve their right to comment*. In addition, you will note that the draft agreement makes
13 reference to certain 'Stand Alone Assignments.' We are finalizing those and, as soon as they are ready we will forward them to you."
14

15 Toberoff Decl, Ex. DD (emphasis added).

16     As demonstrated below, Defendants' February 1, 2002 Draft contained even

17 more material *new or changed terms* than that contained in Schulman's October 26,

18 2001 Letter; plus "trap doors" that effectively minimized key financial terms set forth

19 in Marks' October 19, 2001 Letter. *Id*.; *see also* Excerpts of Deposition Transcript of

20 Kevin Marks, at 183:1 - 7, 184:13 - 190:6, Toberoff Decl., Ex. EE ("Marks Depo.

21 Tr."). The February 1, 2002 Draft was rejected by Plaintiffs. Toberoff Decl., Ex. AA.

22     Disappointed and disillusioned by Defendants' overreaching tactics, Plaintiffs

23 terminated further negotiations by letter dated September 21, 2002. *Id*. Yet, at no

24 time prior to the filing of their original Answer and Counterclaim on November 22,

25 2004 did Defendants ever claim that a binding settlement agreement had been

26 reached. Nor did Defendants ever proffer to Plaintiffs the fixed compensation for

27 Plaintiffs' recaptured copyrights expressed in either the October 19, 2001 Letter, the

28 October 26, 2001 Letter or the February 1, 2001 Draft. Toberoff Decl., Exs. BB-DD.

47

**ER 3239**

Set forth below is a graph illustrating that there was no "meeting of the minds" between the parties by showing some of the material differences between the terms set forth in Marks' October 16, 2001 Letter, Schulman's October 26, 2001 Letter and Defendants' February 1, 2002 Draft.

| TERMS | OCT. 19, 2001 LETTER | OCT. 26, 2001 LETTER | FEB. 1, 2002 DRAFT |
|---|---|---|---|
| **Scope of Agreement** | Terms applied to Superman, Superboy, & related properties (e.g., Smallville, Lois & Clark), and Spectre ("Property"), and related trademarks. *See* October 19, 2001 Letter, Toberoff Decl., Ex. BB ("10/19/01 Letter") at p.1, ¶ 1; Marks Depo. Tr. at 155:18-19; 184:22-185:1. Toberoff  Decl., Ex. EE. | Terms applied to *all* Siegel properties, including but not limited to Superman, Superboy, Spectre, and all rights of all kinds. This included everything Siegel authored for DC (whether published or not) and everything related to Superman/ Spectre (whether created for DC or not).  *See* October 26, 2001 Letter Toberoff Decl., Ex. CC ("10/26/01 Letter") at p. 2; Marks Depo. Tr. at 155:25-156:3. Toberoff Decl., Ex. EE. | Terms cover any Siegel work for which he received any compensation from DC or its predecessors, including Superman and Spectre, plus associated trademarks. *See* October 1, 2002 Draft, Toberoff Decl., Ex.DD ("2/1/02 Draft") at pp. 8, 12, 20; Marks Depo. Tr. at 155:25-156:3; 184:13-187:22. Toberoff  Decl., Ex. EE.<br><br>This resulted in a "trap door": Plaintiffs' royalty (see below) tied to DC licensing revenues from *Siegel's* works and **failed to include revenues from all derivative Superman properties**.  *See* **Marks Depo. Tr. at 184:13-187:22**. |
| **Grant of Rights** | Plaintiffs "transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy') resulting in 100% ownership to D.C Comics." *See* 10/19/01 Letter at p.3, ¶ 1. | "Grant, re-grant, etc. [of] 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published) including post term. rights as members of the public" and "100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re: Superman, Superboy, Spectre, and related properties - even if not | Grant of all rights in Action Comics No. 1 Superman works, Post Action Comics No. 1 Superman works, Superman Derivative Works, and all Superman Marks; all rights in the Spectre Works, the Post More Fun Comics Spectre Works, the Spectre Marks; and all rights in all other Siegel Works. *See* 2/1/02 Draft at pp. 13-20.<br><br>Termination of all past grants and re-grant of all rights in Superman, Superboy, |

48

| | | | |
|---|---|---|---|
| | | created for DC Comics." *See* 10/26/01 Letter at p.2 | Spectre, as well as granting all rights in any other work ever created by Jerome Siegel. *See* 2/1/02 Draft at p. 14.<br><br>Plaintiffs must acknowledge that they do not have rights and will never have rights in any post-Action Comics No.1 Superman works and that all such works are [purportedly] "works made for hire" *See* 2/1/02 Draft at pp. 14-15. |
| **Gross Revenue Definition for Royalty Payments** | 6% of DC's "worldwide gross revenues derived from Property." *See* 10/19/01 Letter at p.1, ¶ 2. | "6% of DC's receipts from all Media licenses for use of the Properties," subject to substantial additional reductions of the royalty rate (see below). *See* 10/26/01 Letter at pp. 5-6. | 6% of "amounts actually received" by DC "in United States Dollars" from "Licensing." Revenues "shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property or SPECTRE Property" even though the 6% royalty rate already accounted for DC's services. S*ee* 2/1/02 Draft at p. 9, ¶ 24; Marks Depo. Tr. at 188:17-189:13.<br><br>Advances against royalties paid to DC by a licensee only become Revenues when the advance becomes non-returnable. *See* 2/1/02 Draft at p. 9, ¶ 24.<br><br>Revenues only derived from "Licensing," which refers to DC "authorizing any third party to commercially exploit" Superman/Spectre. *See* 2/1/02 Draft at p. 9, ¶ 23. |
| **Royalty re: Media and Merchand-ising** | 6% royalty when property is used alone or is licensed for motion picture and | Added new categories where 6% royalty could be *further reduced.* *See* 10/26/01 Letter at pp. | Added new categories where the 6% royalty could be *further reduced.* *See* 2/1/02 Draft at pp. 23-24: |

49

| | | | |
|---|---|---|---|
| | television. 6% royalty will be adjusted pro-rata if property is used in conjunction with other book characters (other than "cameo" type appearance) but to no less than 3%. The royalty can be further reduced to 1.5% in the case of "Justice League of America," "Superfriends" and "Superheroes" merchandise and to 1% for DC Comics/Warner Bros.' overall license to Six Flags. *See* 10/19/01 Letter at p. 2, ¶ 5; Marks Depo. Tr. at 158:4-159:5. | 5-6: <br><br> "[W]ith respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the license, but to the extent such information is not available, the 6% shall be reducible to not less than 1%." *Id.* <br><br> "[W]ith respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation." *Id.* | Revenues to which reduced 1.5% royalty applicable are much broader, encompassing all products where Superman / Spectre is not "predominant creative element" nor the "sole predominant identity or title." *See* 2/1/02 Draft at pp. 24; Marks Depo. Tr. at 159: 10-12. <br><br> Revenues to which reduced 1% royalty applicable broadened to include not only Six Flags but "other Licenses where Revenues from such Licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN property and/or SPECTRE Property or to other properties in which THE PLAINTIFFS do not share…" *See* 2/1/02 Draft at p. 25. <br><br> Added term that only "10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC "shall be deemed DC Comics' Revenues for purposes of royalty computation." *See* 2/1/02 Draft at pp. 24-25. <br><br> Added term that there is no payment obligation for use of Properties in Time Warner advertising. *See* 2/1/02 Draft at pp. 27-28. |
| **Royalty re: DC Publications** | 1% of cover price of DC publications when Property is | Changed the works to which the 0.5% royalty rate is applicable. Instead | Changed the works to which the 0.5% royalty rate is applicable. Instead of paying |

50

ER 3242

| | | | |
|---|---|---|---|
| | used alone. Adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than "cameo" appearance), but in no event less than 0.5%." *See* 10/19/01 Letter at pp. 2-3, ¶ 6. | of paying a minimum 0.5% royalty anytime Superman or Spectre appear:<br><br>"[T]here will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question" *See* 10/26/01 Letter at p. 6. | a minimum 0.5% royalty anytime Superman or Spectre appear:<br><br>"[T]here will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE property appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question." *See* 2/1/02 Draft at p. 27.<br><br>Added that no royalties are paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent off of cover price." *See* 2/1/02 Draft at p. 9. |
| **Royalty Extension ("Tail")** | Royalty payments cease at the expiration of the Action Comics No. 1 copyright, except for 1) films released during last five years of the copyright (royalties paid for 5 years from release), 2) TV series where royalties would be paid until the end of consecutive original episodes plus 3 years (to cover first syndication sale), and 3) "other substantial projects" (akin to motion picture and TV projects) released during the last 5 years | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 10/26/01 Letter at p. 6. | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 2/1/02 Draft at p. 27.<br><br>Royalties limited to revenues from direct "Licensing of exhibition and/or broadcast rights to the above motion pictures and television series," not to the associated "sale of any goods or provision of any services ancillary or collateral thereto. *See* 2/1/02 Draft at p. 27. |

51

ER 3243

| | | | |
|---|---|---|---|
| | of copyright (royalties paid for 5 years from release). *See* 10/19/01 Letter at p.3, ¶ 9. | | |
| **Right to Challenge Intra-Company DC Licensing (e.g., licenses to WB)** | Expedited dispute resolution procedure for challenging intra-company deals which fall outside "safe harbors." *See* 10/19/01 Letter at p.5, ¶ 10. | "Expedited dispute resolution procedure" applies to "any claims or between the parties." Plaintiffs limited to monetary damages only, "no injunction against DC/WB breaches, no termination rights, no reversion. DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach." *See* 10/26/01 Letter at p. 7. | Plaintiffs are to acknowledge "their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in doing so, may License, inter alia, the SUPERMAN Property." The Plaintiffs "shall have no right whatsoever to challenge any such license or any of the terms thereof" subject to safe harbor provisions. For "intercompany" agreements not covered by safe harbor provisions, Plaintiffs may challenge agreement only on basis "that the agreement is not commercially reasonable and fair in light of all the circumstances." *See* 2/1/02 Draft at pp. 32-35. |
| **Credit** | "Until expiration of the U.S. Copyright for Action Comics No. 1, there will be credit on 'Superman' comics and other publications, movies and television programs that reads 'By Special Arrangement with Jerry Siegel Family.'" *See* 10/19/01 Letter at p.4, ¶ 3. | Such credit "on Superman movies and TV shows first created after the date hereof (excluding later episodes of ongoing tv series)." *See* 10/26/01 Letter at p. 7. | Such credit "on new [Superman] works…first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of copyright of Action Comics No. 1." *See* 2/1/02 Draft at p. 39. |
| **Credit To Plaintiffs in "Paid Ads"** | Terms provided for credit to Plaintiffs in "paid ads" concerning the Properties. *See* | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 10/26/01 Letter at p.7; Marks Depo. Tr. at 161:12-20. | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 2/1/01 letter at pp. 39-40; Marks Depo. Tr. at 161:12-20. |

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ER 3244

| | | | |
|---|---|---|---|
| | 10/19/01 Letter at p.4, ¶ 4.  Marks Depo. Tr. at 161:12-20. | | |
| **Continuing relationship/ Publicity** | Provided only for mutual non-disparagement. *See* 10/19/01 Letter at p.5, ¶ 13. | New terms that Plaintiffs must furnish DC with Jerry Siegel's biography and photos for publicity purposes, and that AOLTW companies would get "first opportunity to negotiate for any biographical works in any media" by the Plaintiffs. *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:4-8.<br><br>New terms imposing an affirmative obligation on the Plaintiffs to "positively publicize the Properties," including "public appearances" and related "travel," in the future. New terms included Plaintiffs issuing "a joint press release" and "consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties." *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:19-158:3. | New terms regarding continuing relationship and Plaintiffs' publicity obligations:<br><br>1) Plaintiffs have obligation to positively publicize Properties, including making themselves available for public appearances/ travel; 2) DC consent required for all appearances, statements, interviews by Plaintiffs regarding Superman, etc; 3) Plaintiffs must issue joint press release with DC; 4) No contact by Plaintiffs with DC licensees is permitted. *See* 2/1/02 Draft at p. 37; Marks Depo. Tr. at 157:19-158:3.<br><br>New terms providing DC or its designee with "the first opportunity to negotiate" to buy "any biographical works in any media pertaining to Jerome Siegel." *See* 2/1/02 Draft at p. 41; Marks Depo. Tr. at 157:19-158:3. |
| **Attorney in Fact** | Appoints DC as attorney in fact. *See* 10/19/01 Letter at p. 5, ¶ 12. | Plaintiffs "will designate WB as attorney in fact." *See* 10/26/01 Letter at p. 2 | Appoints DC as attorney in Fact. *See* 2/1/01 letter at p. 36. |
| **Provide Rights Documents** | Not mentioned. | New term that Plaintiffs "[g]ive copies of all documents relating to rights/history." *See* 10/26/01 Letter at p.2. | Not mentioned. |

53

| | | | |
|---|---|---|---|
| | | *See* Marks Depo at 156:20-157:3. | |
| **Release and Covenant Not To Sue** | Not mentioned. | Adds "[r]elease and covenant not to sue by [Plaintiffs] [t]hrough date of signing of all claims past, present, and/or future, actual or potential." Adds that Plaintiffs "[a]pprove all deals made before 12/31/00." *See* 10/26/01 Letter at p. 8. | Adds full detailed mutual release by the parties and mutual covenants not to sue. *See* 2/1/02 Draft at pp. 42-45. |
| **Plaintiffs' Warranties & Represent-ations** | "Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party." *See* 10/19/01 Letter at p.5, ¶ 13. *See also* Marks' Depo. at 156:6-10. | Changed terms requiring that the Plaintiffs "warrant and represent," "jointly and severally": <br><br> 1) that they have "no termination nor any other rights remaining except for under this agreement;" <br> 2) that they have entered into "no contract of any kind with any other party with respect to or related to the Properties;" <br> 3) that they will not "exploit or enter into any agreements" re: the Properties; and <br> 4) that they will not "diminish the DC/WB enjoyment of exclusive ownership, control, and use" of the Properties. *See* 10/26/01 Letter at p. 2; Marks' Depo. at 156:6-10. | Changed terms that Plaintiffs warrant and represent, jointly and severally, that: <br><br> 1) Plaintiffs or Siegel have not granted any rights in or encumbered the Properties; <br> 2) "they know of no other party with any rights of any kind or that claim to any rights of any kind" in the subject works or trademarks; <br> 3) they shall not negotiate or enter into any agreement concerning the subject works; <br> 4) any of their rights in the works derive from Siegel; <br> 5) "no person or entity other than [Plaintiffs/DC] own any rights or could possibly claim any rights of any nature arising out of any [Siegel] Works;" <br> 6) they know of no other Siegel works in which they claim any rights; <br> 7) they know of no Superman works not listed in the Termination Notices; <br> 8) that Joanne Siegel is the sole executor, trustee, administrator, and personal rep. of the Siegel Estate. *See* 2/1/02 Draft at pp. 41-42; Marks' Depo. at 156:6-10. |

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | | New terms affirming that Plaintiffs have no right to challenge the agreement; and that Plaintiffs have no right to terminate any new grant of the Siegel works. *See* 2/1/02 Draft at pp. 30-31. |
| **Indemnifica-tion and Insurance Coverage** | "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson against liability for DC or affiliate actions." *See* 10/19/01 Letter at p. 5, ¶ 14. *See also* Marks Depo. Tr. *at* 160:21-25. | Terms do <u>not</u> provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegels who sign the agreement.<br><br>Instead, added new terms that Plaintiffs must "defend and indemnify DC re: third party claims," "defend and indemnify DC re: Dennis [Larson] claims" and "indemnify re: Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign." *See* 10/26/01 Letter at p.8; Marks Depo. Tr. at 156:14-19; 160:21-25. | Terms do not obligate DC to provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegel family members that sign the agreement "due to wrongful acts by [DC or WB]." *See* 2/1/02 Draft at p. 46.<br><br>**Added broad new terms that Plaintiffs must jointly and severally defend and indemnify DC for any/all** : 1) claims by DC against Plaintiffs arising from a breach or claimed breach by Plaintiffs "(or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel);" 2) **claims by** Plaintiffs, the estate and heirs of Siegel, Dennis Larson, or **any other person or entity**; **including "any claims relating to [Plaintiffs'] representations and warranties"** [see above]; and Plaintiffs' **obligation to indemnify is "fully binding regardless of whether any of the…claims [etc.]…are founded, valid, established in law or fact, or based on evidence**." *See* 2/1/02 Draft at pp. 45-46; Marks Depo. Tr. at 156:14-19; 160:21-25. |
| **If Rights Not Transferred** | If transfer prevented for "legal reason" (e.g., change in law), | Changed term. In the event Plaintiffs "attempt to assert claims, all but | Changed term. In the event Plaintiffs' rights grant is ineffective or Plaintiffs make |

55

| | | | |
|---|---|---|---|
| | "everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer…For the sake of clarity, this provision will not in any circumstances reduce the monies due the Siegel Family under this deal." *See* 10/19/01 Letter at p. 3 ¶ 2. | $100,000/year creditable to any other obligation WB has or may have to Siegels.  If any claim by Plaintiffs or successor results in DC expense or liability, compensation (over $100,000 annually) will be reduced thereby, and "only total due hereunder is ever due." *See* 10/26/01 Letter at p. 8. | a claim or have reversionary rights, resulting in any liability or damage to DC, any amounts due Plaintiffs will thereby be reduced (except $100,000 annually). Plaintiffs must acknowledge that the amount payable is more than they would have received in a court if they attempted to enforce their termination notices, and agree that any compensation payable to them, including due to a change in the law, will be capped by the amount payable in the agreement. *See* 2/1/02 Draft at pp. 48-49. |
| **Arbitration Provisions** | Expedited dispute resolution in one instance: "if the Plaintiffs were to challenge an intercompany deal that was outside a safe harbor." *See* 10/19/01 Letter at p.5, ¶10;Marks Depo. Tr. at 159:17-19. | Terms broadly require expedited dispute resolution / arbitration of "any claims between the parties." *See* 10/26/01 Letter at p. 8; Marks Depo. Tr. *at* 159:21-23. | Terms broadly require arbitration of  any and all disputes and limits the remedies available to the Plaintiffs.  *See* 2/1/02 Draft at pp. 47-50; Marks Depo. Tr. *at* 159:21-23. |
| **Audit Rights** | Plaintiffs have "full audit rights." *See* 10/19/01 Letter at p.5, ¶ 10. | Plaintiffs have audit rights subject to "[s]tandard WB language and time frames" and limitation of "[o]ne audit per any period." *See* 10/26/01 Letter at p. 7. | Plaintiffs have audit rights subject to new limitations: 1) No audit will begin later than 12 months after royalty statement provided; 2) No audit for longer than 5 business days; 3) Records supporting any royalty statement may not be audited more than once; 4) All statements binding unless majority of Plaintiffs object in writing within 12 months of receipt of statement, or if audit started, within 30 days of completion; 5) Plaintiffs audit at their own expense;  and |

56

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| | | | 6) Confidentiality provisions. *See* 2/1/02 Draft at pp. 35-36. |
|---|---|---|---|

1. **The October 19. 2001 Letter Constitutes A Counteroffer That Was Not Accepted By Defendants**

In a nutshell, Marks' October 19, 2001 Letter though styled as an "acceptance" of Schulman's "offer" of October 16, 2001 is, in reality, a "counteroffer" because, according to Schulman and his "more fulsome outline" something different was discussed on October 16, 2001 ("I enclose herewith… a more fulsome outline of what we believe the deal we've agreed to is.")   Toberoff Decl., Ex. CC.  The October, 2001 Outline attached by Schulman, which purported to be Defendants' October 16, 2001 "offer," contained materially different terms (more favorable, of course, to Defendants) than that contained in the purported October 19, 2001 "acceptance." Therefore, Marks' October 19, 2001 Letter was, in reality, a counteroffer.  It was not accepted by Schulman, and did not result in a contract as a matter of law.

The terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-856 (1998); *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959).  A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror which must be accepted by the former offeror now turned offeree before a binding contract results. *Panagotacos*, 60 Cal App 4th at 855-856; *In re Pago Pago Air Crash,* 637 F.2d 704, 706 (9th Cir. 1981); *Landberg* v. *Landberg* 24 Cal.App.3d 742, 750 (1972); Cal. Civ. Code § 1585 ("An acceptance must be absolute and unqualified…A qualified acceptance is a new proposal.")  *See also 1-3 Corbin on Contracts § 3.36 (2006)*(a counteroffer ordinarily terminates the power to accept the previously made offer to which it is a "counter" or reply in a negotiation.)

In *Glendale Motor Co. v. Superior Court*, 159 Cal.App.3d 389 (1984), where a settlement agreement was claimed, the court held that plaintiff's qualified acceptance

57

constituted a counteroffer and thus terminated the defendant's settlement offer as a matter of law.  The court noted that "California law has generally held that a qualified acceptance or counteroffer affects the viability of the offer itself, so that 'a qualified acceptance amounts to a new proposal or counteroffer *putting an end to the original offer*.'"  *Id*. at 396, *quoting Apablasa* v. *Merritt & Co*. 176 Cal.App.2d at 726.

In *Smith v. BioWorks, Inc*., 2007 LEXIS U.S. Dist. 6157 at *27 (ED CA 2007) the court held that the plaintiff's reservation and assertion of rights evidenced that "he signed the Agreement with the proviso that he did not accept certain terms.  Because plaintiff's letter constituted only a qualified acceptance, no binding contract was formed, and the rejection terminated defendant's offer.  Defendant's response letter, dated January 10, 2005, does not indicate an acceptance of plaintiff's counter-offer."

## 2.  No Contract Was Formed Because There Was Never A "Meeting Of The Minds" On All Material Terms

"California law is clear that there is no contract until there has been a meeting of the minds on *all* material points." *Banner Entnm't v. Superior Court*, 62 Cal. App. 4th 348 (1998) (citations omitted).  The failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.  *Grove v. Grove Valve & Reg. Co*., 4 Cal. App. 3d. 299, 311-312 (1970).

Here, Schulman's March 26, 2001 Letter made clear ("I enclose… a more fulsome outline of what we believe the deal we've agreed to is") and Defendants' February 1, 2002 Draft further confirmed that there had been no "meeting of the minds" between the parties and widened the gap between them by changing material terms and adding new material terms than that set forth in Marks' October 19, 2001 Letter (counteroffer). *See* Comparison Graph, *supra*; Toberoff Decl., Exs. BB- EE.

An essential element of any contract is "consent."  Civ. Code, § 1550; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44.  Such "consent" must be "mutual."  Cal. Civ. Code, § 1565; 1 Witkin, Summary of Cal. Law,

58

Contracts, § 119, p. 144; *Meyer v. Benko*, 55 Cal. App. 3d 937 (1976). Consent is not mutual, unless the parties agree upon the same thing in the same sense. *Banner Entertainment, Inc. v. Superior Court,* 62 Cal.App.4th 348, 358-359 (1998). There is no contract formation without a manifestation of assent to the "same thing" by both parties. Cal. Civ. Code, §§ 1550, 1565 and 1580. Contract law precludes specific enforcement of a contract when it cannot be determined exactly what terms the parties agreed upon. *Weddington Prods. v. Flick*, 60 Cal. App. 4th 793, 801 (1998).

The Ninth Circuit has made clear that district courts "may enforce only complete settlement agreements." *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987). *See also Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983); *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1189 (8th Cir. 1984).

"In addition to the intent of the parties to bind themselves, the formation of a settlement contract requires agreement on its *material terms*." *Callie v. Near*, 829 F.2d at 891. In *Callie*, the appellants' counsel wrote a letter to the other side "'to confirm' the terms of the settlement" as the parties were in agreement as to most material terms, including the settlement payment. *Id*., at 889. However, because they failed to agree on other terms, there could be no "meeting of the minds." *Id.*, at 891.

*Levitz v. The Warlocks*, 148 Cal. App. 4th 531, 534 (2007) is also illustrative. In ruling that a settlement agreement had not been reached although key terms had been agreed upon the Court held:

> "In their first communication with the court about their tentative settlement, the parties notified it they had a settlement 'in principle,' meaning they had yet to fix its exact terms. A settlement with open material terms is not a conditional settlement.' To the contrary, it is not a settlement at all because, like all contracts, it is not binding until the settling parties agree on all its material terms."

In this case no contract was made because the parties attempted, but failed, to agree on all material terms (see above). Moreover, even had they provisionally so agreed (they did not) it is clear from their conduct that, given the importance and complexity of the subject matter and proposed deal points, any agreement would need

59

ER 3251

to be reduced to a written contract in a mutually acceptable fashion. See October 26, 2006 Letter ("We're working on the draft agreement…"). Toberoff Decl., Ex.CC.

### 3. A Complete Written Agreement In Final Form, Signed By Both Parties, Was Contemplated But Never Completed, Approved Or Executed

It is further evident that the parties contemplated a complete written agreement in final form, which would contain additional terms, subject to the parties' mutual consent; and that there would be no binding contract until such final written agreement was reviewed, approved and executed by both parties. *See* Cover letter attaching Defendants' February 1, 2002 Draft ("As our clients have not seen this latest version of the agreement, I must reserve their right to comment"), Toberoff Decl., Ex. DD. *See Patch v. Anderson,* 66 Cal. App. 2d 63 (1944)(court found no enforceable written contract, merely an agreement to execute a contract whose material terms had not all been settled and agreed upon); *see also* 1 Williston on Contracts (4th ed. 1990) § 4:18, at 414; § 4:26, at 585-7.

"When it is clear…that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created." *Weddington*, 60 Cal. App. 4th at 801, *citing Beck v. Amer. Health Group Intern., Inc*., 211 Cal. App. 3d 1555, 1562 (1989). Thus, "it is a general rule…that, when it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract." *Duran v. Duran*, 150 Cal. App.3d 176, 180 (1983) (citations omitted). *See also Roth v. Garcia Marquez*, 942 F.2d 617, 626-627 (9th Cir. 1991); *Forgeron, Inc. v. Hansen*, 149 Cal. App. 2d. 352, 360 (1957).

"Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. 'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed

60

knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.'" *Kruse v. Bank of America*, 202 Cal. App.3d 38, 59 (1988) (citations omitted).

*Weddington*, 60 Cal. App. at 799, like this case, concerned a disputed settlement agreement which purported to license certain *copyrights*. The parties *both signed* a settlement memorandum before a private settlement judge that, like the October 19, 2001 Letter here, included "significant deal points," and described payment dates and amounts material to both sides. *Id.* When, as here, subsequent disagreements arose during the parties efforts to draft the final settlement agreement, the settlement judge, upon application of the putative licensee, signed an expanded settlement order (under Cal. Civ. Proc. Code § 664.6), imposing a copyright license "consistent with" the signed settlement memorandum; which order was entered by the trial court. *Id.* at 804.

The Court of Appeals reversed, holding that no "meeting of the minds" occurred on the material terms of the contract, and that a final agreement had not been signed by the parties. "As a result, there was no settlement agreement to enforce, pursuant to Cal. Civ. Proc. Code § 664.6 or otherwise." *Id.* at 812. The court noted: "The fact that the context was one of settlement negotiation…has no analytical impact on the question of whether an enforceable contract was ever formed." *Id.* at 815. It further noted that a court does not have the authority to create material terms of a settlement. *Id.* at 810-811. *See Terry v. Conlan*, 131 Cal. App. 4th 1445, 1459-1461 (2005) (trial court improperly attempted to define material terms and fill in the gaps of a settlement agreement).

Here, the documentary evidence and conduct of the parties clearly demonstrates that there was no meeting of the minds as to all material terms of an agreement, and that as a matter of law a binding contract was never reached, completed, approved and executed by the parties.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant their motion for summary adjudication in the form lodged separately herewith as the Proposed Judgment.

DATED: April 30, 2007                 LAW OFFICES OF MARC TOBEROFF, PLC


By_____
                      Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 91 of 252

1   WEISSMANN WOLFF BERGMAN
       COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    9665 Wilshire Boulevard, Ninth Floor
3   Beverly Hills, California 90212
    Telephone: 310-858-7888
4   Fax:        310-550-7191

5   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
6   866 United Nations Plaza
    New York, New York 10017
7   Telephone: 212-813-5900
    Fax:        212-813-5901
8
    PERKINS LAW OFFICE, P.C.
9   Patrick T. Perkins (Admitted *pro hac vice*)
    1711 Route 9D
10  Cold Spring, NY 10516
    Telephone: 845-265-2820
11  Fax:        845-265-2819

12  Attorneys for Defendants and Counterclaimant

13              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
14
15  JOANNE SIEGEL and LAURA          )  Case Nos. CV 04-8400 SGL (RZx)
    SIEGEL LARSON,                   )            CV 04-8776 SGL (RZx)
16                                   )  Hon. Stephen G. Larson, U.S.D.J.
           Plaintiffs,              )
17                                   )  **DEFENDANTS' NOTICE OF**
       vs.                          )  **MOTION AND MOTION FOR**
18                                   )  **PARTIAL SUMMARY**
    TIME WARNER INC., WARNER         )  **JUDGMENT; MEMORANDUM OF**
    COMMUNICATIONS INC.,             )  **POINTS AND AUTHORITIES AND**
19  WARNER BROS.                     )  **SCHEDULES A & B IN SUPPORT**
    ENTERTAINMENT INC.,              )  **THEREOF**
20  WARNER BROS. TELEVISION          )
    PRODUCTION INC., DC COMICS,      )  [Defendants' Local Rule 56.1
21  and DOES 1-10,                   )  Statement; Declarations of Michael
                                     )  Bergman (2), Janice Cannon, Melinda
22         Defendants.              )  Hage, Paul Levitz, Mark Rose, Jeff
                                     )  Rovin, Julie Spencer and Exhibits
23                                   )  Thereto; Notice of Lodging of Non-
                                     )  Paper Exhibits; and [Proposed] Orders
24                                   )  Filed Con-currently Herewith]
                                     )
25                                   )  Time:     10:00 a.m.
                                     )  Date:     July 16, 2007
26                                   )  Courtroom 1
                                     )
27  AND RELATED COUNTERCLAIMS        )
                                     )
28

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ER 3255

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 92 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 93 of 252

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that on July 16, 2007, at 10:00 a.m., or as soon

3  thereafter as counsel may be heard, in Courtroom 1 of the above-entitled court

4  located at 3470 Twelfth Street, Riverside, California 92501, Defendants Time

5  Warner Inc., Warner Communications Inc., Warner Bros. Entertainment Inc.,

6  Warner Bros. Television Production Inc. and Defendant and Counterclaimant DC

7  Comics (collectively "Defendants") will and hereby do move for partial summary

8  judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking,

9  with respect to certain claims advanced by Plaintiffs Joanne Siegel and Laura

10  Siegel Larson ("Plaintiffs"), the Court's orders as follows:

11      *In Case Nos. CV 04-8400 & CV 04-8776:*

12      1.    That Plaintiffs have no right under the Copyright Act to

13      obtain or share in Defendants' profits derived (a) from the foreign

14      exploitation of any new or existing Superman work, including any

15      work depicting "Superboy" or any other juvenile version of

16      Superman, (b) from the exploitation of the Superman family of

17      trademarks, or (c) from the continued exploitation of any Superman

18      derivative work, including "Superboy" or any other juvenile version

19      of Superman, created prior to the respective effective dates of

20      Plaintiffs' notices of termination served on Defendants under Section

21      304(c) of the Copyright Act;

22      2.    That as a result of Plaintiffs' failure to terminate certain

23      copyrighted works within the timeframe and in the manner required

24      by the Copyright Act, Defendants remain free to use the

25      unterminated works and the elements contained therein without the

26      need to account to Plaintiffs and without infringing any of their

27      copyrights;

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 94 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 95 of 252

*In Case No. CV 04-8776:*

    3.    That the episodes of the television series *Smallville* prepared on or after November 17, 2004 are not "substantially similar" to, and therefore do not infringe upon, any of the "Superboy" copyrights purportedly recaptured by Plaintiffs pursuant to their notice of termination served on Defendants under Section 304(c) of the Copyright Act; and

*In Case No. CV 04-8400:*

    4.    That neither Warner Bros. Entertainment Inc. nor Time Warner Inc. is the "alter ego" of DC Comics, and Plaintiffs therefore are not entitled to reach any Superman-related profits of either of these two defendants.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 27, 2007, and in accordance with the briefing schedule set forth in the Court's Order dated April 20, 2007.

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities and Schedules "A" and "B" appended thereto; Defendants' Local Rule 56.1 Statement; the Declarations of Michael Bergman, Janice Cannon, Melinda Hage, Paul Levitz, Mark Rose, Jeff Rovin and Julie Spencer, and the Exhibits thereto; Defendants' Notices of Lodging of Non-Paper Exhibits; the Declaration of Michael Bergman pursuant to Local Rule 7-17; all prior pleadings

/ / /

/ / /

/ / /

/ / /

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 96 of 252

1  and proceedings in this matter; and all oral and written evidence to be presented
2  at the hearing, if any, on this Motion.

3

4  DATED:      April 30, 2007        Respectfully submitted,

5                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.

6                                            -and-

7                                    PERKINS LAW OFFICE, P.C.
8

9                                            -and-

10                                   WEISSMANN WOLFF BERGMAN
11                                     COLEMAN GRODIN & EVALL LLP

12

13                                   By: _____
14                                        Michael Bergman
                                     *Attorneys for Defendants and Counterclaimant*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                              **ER 3260**
NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 97 of 252

# **TABLE OF CONTENTS**

OVERVIEW ................................................................. 1

SUMMARY JUDGMENT STANDARD.................................. 4

FACTUAL BACKGROUND ............................................. 5

    A.    The Origins of Superman and Superboy ...................... 5

        1.    *Action Comics No. 1* and Siegel and Shuster's Grants to DC ............................................ 5

        2.    The Development of Superman by DC.................. 7

    B.    Superboy.................................................... 8

    C.    The Trademarks............................................. 10

    D.    The Prior Litigation Between the Parties' Predecessors ................. 11

        1.    The Westchester Action ............................... 11

        2.    The Prior Federal Action.............................. 13

TERMINATION RIGHTS UNDER §304(c) OF THE 1976 ACT ..................... 13

PLAINTIFFS' NOTICES OF TERMINATION AND FILING OF THESE ACTIONS ................. 15

    A.    Superman.................................................. 15

    B.    Superboy.................................................. 16

LEGAL ARGUMENTS ON DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT.................... 17

    I.    PLAINTIFFS HAVE NO RIGHT TO OBTAIN OR SHARE IN PROFITS FROM (a) THE FOREIGN EXPLOITATION OF ANY NEW OR EXISTING SUPERMAN OR SUPERBOY WORKS, (b) THE EXPLOITATION OF THE SUPERMAN FAMILY OF TRADEMARKS, OR (c) THE EXPLOITATION OF ANY SUPERMAN OR SUPERBOY DERIVATIVE WORK CREATED PRIOR TO THE EFFECTIVE TERMINATION DATES.................... 17

    A.    Summary of Argument.................................... 17

    B.    The Established Copyright Framework in Which Termination Must be Considered.................... 18

        1.    Copyright Protection and Exclusive Rights ........... 18

        2.    Rights of Co-Owners Of Copyright.................... 18

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 98 of 252

3.    Derivative Works ........................................................ 19

4.    National Treatment and Territorial Nature of the United States Copyright Act ................................................ 20

C.    As a Matter of Law, Plaintiffs Can Terminate Only Grants of *Domestic, Copyright* Rights ............................... 21

1.    Foreign Copyright Rights Are Not Subject to Termination 21

2.    Trademark Rights Also Cannot Be Affected by Termination Under Section 304(c) ........................... 26

D.    As a Matter of Law, Defendants Are Entitled to Continue to Exploit Superman and Superboy Derivative Works Created Before the Effective Dates of the Respective Terminations Without Sharing With Or Accounting to Plaintiffs For the Revenues Derived Therefrom ................................................................ 26

E.    Relief Requested................................................................ 28

II.    AS A RESULT OF PLAINTIFFS' FAILURE TO TERMINATE CERTAIN COPYRIGHTED SUPERMAN AND SUPERBOY WORKS WITHIN THE TIMEFRAME AND IN THE MANNER REQUIRED BY THE COPYRIGHT ACT, DEFENDANTS REMAIN FREE TO USE THE UNTERMINATED WORKS OR THE ELEMENTS CONTAINED THEREIN WITHOUT THE NEED TO ACCOUNT TO PLAINTIFFS AND WITHOUT INFRINGING ANY OF THEIR COPYRIGHTS ....................................... 29

A.    Summary of Argument....................................................... 29

B.    Termination Notice Requirements .................................... 30

C.    Additional Factual Background: The Effective Dates and Contents of the Termination Notices ................................. 32

1.    The Superman Notices ............................................. 32

2.    The Superboy Notice ............................................... 32

D.    Failure to Comply With the Time Periods Imposed By Section 304(c) and With the Regulations Promulgated Thereunder Results in the Original Copyright Grants Remaining Intact ........... 33

1.    The "Effective Date" Provision of Section 304(c) Operates as a Statute of Limitations, Imposing an Absolute Limitation on Termination ...................... 34

2.    Failure to Identify Any Allegedly Terminated Works in the Notices Results in the Copyrights Grants to Those Works Remaining in Effect ...................... 37

ii

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 99 of 252

E.   DC Retains the Unfettered Right to Use All
     Copyrightable Elements in the Superman and
     Superboy Works That Have Not Been Terminated ........................... 38

F.   Any Attempt By Plaintiffs to Invoke the "Harmless
     Error" Rule With Respect to the Timing and Content
     of the Notices Must Fail ................................................................. 39

G.   Relief Requested .............................................................................. 42

III.  THE POST-TERMINATION EPISODES OF *SMALLVILLE* ARE
      NOT "SUBSTANTIALLY SIMILAR" TO, AND THEREFORE
      DO NOT INFRINGE UPON, ANY OF PLAINTIFFS'
      PURPORTEDLY RECAPTURED SUPERBOY COPYRIGHTS ....... 43

A.   Summary of Argument ...................................................................... 43

B.   Additional Factual Background ........................................................ 44

     1.   The Pitch ................................................................................ 44

     2.   The Prior Superman Publications ........................................... 44

     3.   The Superboy Script ............................................................... 44

     4.   *More Fun Comics No. 101* .................................................... 45

     5.   The *Smallville* Television Series .......................................... 46

C.   Plaintiffs' Superboy Notice and Copyright Infringement Claim ..... 47

D.   Judge Lew's Prior Summary Judgment Order .................................. 48

E.   Plaintiffs' Discovery Responses Concerning Infringement ............. 49

F.   As a Matter of Law, the Post-Termination Episodes of
     *Smallville* Do Not Infringe Upon Any Copyright Interests
     Recaptured and Owned By Plaintiffs ................................................ 53

     1.   The Standards for Copyright Infringement ............................. 53

          a.   Background ................................................................... 53

          b.   "Substantial Similarity" – The Required
               Comparison and Dissection of the Works ................... 55

          c.   Methodology and Analytic Tools for Filtering
               Out Unprotected Material in the Required
               Comparison ................................................................. 57

     2.   There is No "Substantial Similarity" Between
          *Smallville* and Plaintiffs' Works ......................................... 60

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 100 of 252

a.   Setting ..................................................... 62

b.   Characters ............................................... 64

c.   Plot and Sequence of Events........................... 71

d.   Themes .................................................... 74

e.   Mood ...................................................... 74

f.   Pace  ..................................................... 74

g.   Dialogue ................................................. 75

G.   Relief Requested........................................... 75

IV.   NEITHER WARNER BROS. ENTERTAINMENT INC. NOR
TIME WARNER INC. IS THE "ALTER EGO" OF DC, AND
PLAINTIFFS THEREFORE ARE NOT ENTITLED TO
REACH THE SUPERMAN-RELATED PROFITS OF EITHER
OF THESE DEFENDANTS ..................................... 76

A.   Summary of Argument..................................... 76

B.   Additional Factual Background............................ 77

1.   Corporate History and Structure of DC ................ 77

2.   Relationship of TWI and WBEI to DC................... 77

3.   DC's Licensing of Superman .......................... 80

C.   The Operative Allegations Against TWI and WBEI ...... 81

D.   The Undisputed Facts Establish That Neither TWI Nor
WBEI is Obligated to Account to or Share With Plaintiffs
Its Profits From the Superman Property ..................... 82

1.   Plaintiffs Are Not Entitled to an Accounting
from WBEI, Which is Simply a Licensee of
DC with Respect to Superman .......................... 82

a.   Joint Owners of a Copyright are Not Entitled to
an Accounting from their Co-owner's Licensees........ 82

b.   Notwithstanding Plaintiffs' Allegation that
WBEI is an "Effective Joint Owner" of Superman,
if the Superman Notices are Effective, then − *as a
Matter of Law* − WBEI Can *Only* be a Licensee of
DC………. ........................................... 84

2.   Neither TWI nor WBEI is the *Alter Ego* of DC  ........ 88

a.  Plaintiffs Cannot Meet The First Prong Of The
Alter Ego Test Because They Cannot Demonstrate
Sufficient Unity Of Interest Between TWI, WBEI
and DC ................................................................... 90

b.  Plaintiffs Cannot Demonstrate That Upholding
DC's Separate Identity Will Result In An Inequity..... 93

E.   Relief Requested.......................................................... 96

CONCLUSIONS ...................................................................... 96

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 102 of 252

# **TABLE OF AUTHORITIES**

**Page(s)**

## **FEDERAL CASES**

*Akzona, Inc. v. E.I. DuPont DeNemours and Co.,*
 607 F. Supp. 227 (D. Del. 1984)................................................ 92

*Aliotti v. R. Dakin & Co.,*
 831 F.2d 898 (9th Cir. 1987) ........................................................ 57

*Ameritec Corp. v. Ameritech Corp.,*
 1986 U.S. Dist. LEXIS 26195 (C.D. Cal. 1986) ......................... 94

*Anin v. Reno,*
 188 F.3d 1273 (11th Cir. 1999) .................................................... 36

*Apple Computers, Inc. v. Microsoft Corp.,*
 35 F.3d 1435 (9th Cir. 1994) ......................................... 54, 57, 58, 59

*Ashton-Tate v. Ross,*
 916 F.2d 516 (9th Cir. 1990) ........................................................ 83

*Berkic v. Crichton,*
 761 F.2d 1289 (9th Cir. 1985) ...................................... 56, 57, 60, 71

*Board of Trustees of Mill Cabinet Pension Trust Fund for N. Cal.*
*v. Valley Cabinet & Manufacturing Co.,*
 877 F.2d 769 (9th Cir. 1988) ............................................. 93, 94, 95

*Bodenstab v. J.R. Blank & Associate, Inc.,*
 1989 U.S. Dist. LEXIS 8554 (N.D. Ill. 1989) ............................. 86

*Burkitt v. Flawless Records, Inc.,*
 2005 U.S. Dist. LEXIS 11986 (E.D. La. 2005).................... 86, 87

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
 683 F.2d 610 (2d Cir. 1981) ........................... 37, 38, 39, 41, 62, 71

*Calvert v. Huckins,*
 875 F. Supp. 674 (E.D. Cal. 1995) ............................................... 92

*Cambridge Electrics Corp. v. MGA Electrics, Inc.,*
 227 F.R.D. 313 (C.D. Cal. 2004)........................................... 90, 91

*Cavalier v. Random House,*
 297 F.3d 815 (9th Cir. 2002) ................................................ 57, 59

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 103 of 252

*Chevron U.S.A. Inc. v. National Resources Defense Council,*
    467 U.S. 837 (1984).................................................................. 40

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989).................................................................. 40

*Cosgrove v. Warner Brothers Inc.,*
    13 U.S.P.Q. 2d 1555 (E.D.N.Y. 1989) .................................... 59

*Creative Tech., Ltd. v. Aztech System Pte., Ltd.,*
    61 F.3d 696 (9th Cir. 1995) ..................................................... 21

*Davidson v. Time Warner, Inc.,*
    1997 U.S. Dist. LEXIS 21559 (S.D. Tex. 1997)...................... 93

*Doe v. Unocal Corp.,*
    248 F.3d 915 (9th Cir. 2001) ................................................... 91

*Faulkner v. National Geographic Social,*
    211 F. Supp. 2d 450 (S.D.N.Y. 2002) ............................... 36, 40

*Feist Publs., Inc. v. Rural Telegraph Serv. Co.,*
    499 U.S. 340 (1991).................................................................. 18

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ..................................................... 91

*Fred Ahlert Music Corp. v. Warner-Chappell Music, Inc.,*
    155 F.3d 17 (2d Cir. 1998) ......................................... 22, 26, 27

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,*
    958 F. Supp. 170 (S.D.N.Y. 1997) ........................................... 22

*Frybarger v. International Bus. Machine Corp.,*
    812 F.2d 525 (9th Cir. 1987) ................................................... 54

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.,*
    462 F.3d 1072 (9th Cir. 2006) ....................... 55, 56, 57, 59, 60, 61, 63, 65

*Haskell v. Time, Inc.,*
    857 F. Supp. 1392 (E.D. Cal. 1994) .................................. 93, 94

*Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,*
    509 F.2d 64 (2d Cir. 1974) ...................................................... 59

*Hogan v. DC Comics,*
    983 F. Supp. 82 (S.D.N.Y. 1997) ............................................ 58

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 104 of 252

*Idema v. Dreamworks, Inc.,*
    162 F. Supp. 2d 1129 (C.D. Cal. 2001) ........................................... 58, 59, 65

*Itar-Tass Russian News Agency, Inc. v. Russian Kurier, Inc.,*
    153 F.3d 82 (2d Cir. 1988) ............................................................ 20

*Jasper v. Sony Music Entertainment, Inc.,*
    378 F. Supp. 2d 334 (S.D.N.Y. 2005) ...................................... 83, 84

*Joiner v. Ryder System,*
    966 F. Supp. 1478 (C.D. Ill. 1996) .............................................. 91

*Katzir's Floor and Home Design, Inc. v. M-MLS.com,*
    394 F.3d 1143 (9th Cir. 2004) ...................................................... 90

*Kouf v. Walt Disney Pictures & Television,*
    16 F.3d 1042 (9th Cir. 1994) ................................................. 56, 65, 71

*Lindsay v. R.M.S. Titanic, Inc. et al,*
    1999 U.S. Dist. LEXIS 15837 (S.D.N.Y. 1999) .......................... 84

*Litchfield v. Spielberg,*
    736 F.2d 1352 (9th Cir. 1984) ...................................................... 60

*Los Angeles News Serv. v. Reuters Television International, Ltd.,*
    149 F.3d 987 (9th Cir. 1998) ........................................................ 24

*McLeod v. Hosmer-Dorrance, Inc.,*
    1976 U.S. Dist. LEXIS 12289 (N.D. Cal. 1976) .......................... 89

*Metclaf v. Bochco,*
    294 F.3d 1069 (9th Cir. 2002) ................................................. 57, 58

*Metro-Goldwyn-Mayer Studios, Inc. v. Peters,*
    309 F. Supp. 2d 48 (D.D.C. 2004),
    *aff'd* 2005 U.S. App. LEXIS 5664 (D.C. Cir. Apr. 8, 2005) ............... 36, 37

*Microsoft Corp. v. Grey Computer,*
    910 F. Supp. 1077 (D. Md. 1995) ............................................... 85

*Mills Music, Inc. v. Snyder et al.,*
    469 U.S. 153 (1985) ................................................................ 27, 28

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005) ...................................................... 14

*Nichols v. Universal Pictures Corp.,*
    45 F.2d 119 (2d Cir. 1930) ..................................................... 58, 64

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 105 of 252

*Nielson v. Union Bank of California, N.A.,*
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ........................... 89, 91, 94

*Oddo v. Ries,*
    743 F.2d 630 (9th Cir. 1984) ............................... 19, 25, 50, 83

*Prussner v. United States,*
    896 F.2d 218 (7th Cir. 1990) ........................................ 35

*Pye v. Mitchell,*
    574 F.2d 476 (9th Cir. 1978) ........................................ 19

*Rice v. Fox Broadcasting Co.,*
    330 F.3d 1170 (9th Cir. 2003) ......................... 54, 62, 64, 71

*Robert Stigwood Group Ltd. v. O'Reilly,*
    530 F.2d 1096 (2d Cir. 1976) ........................................ 24

*Satava v. Lowry,*
    323 F.3d 805 (9th Cir. 2003) ........................................ 59

*Seymour v. Hull & Moreland Engineering,*
    605 F.2d 1105 (9th Cir. 1979) ....................................... 93

*Shaw v. Lindheim,*
    809 919 F.2d 1353 (9th Cir. 1990) ........................... 55, 56, 57

*Shaw v. Lindheim,*
    809 F. Supp. 1393 (C.D. Cal. 1992) ........................... 58, 65

*Sid & Marty Krofft Television Products, Inc. v. McDonald's Corp.,*
    562 F.2d 1157 (9th Cir. 1977) ................................. 56, 57

*Siegel v. National Periodical Publications, Inc.,*
    364 F. Supp. 1032 (S.D.N.Y. 1973) ................................ 13

*Siegel v. National Periodical Publications, Inc.,*
    508 F.2d 909 (2d Cir. 1974) ........................................ 13

*Silvers v. Sony Pictures Entertainment, Inc.,*
    402 F.3d 881 (9th Cir. 2005) ........................................ 85

*Sinicola v. Warner Brothers, Inc.,*
    948 F. Supp. 1176 (E.D.N.Y. 1996) ................................ 59

*Sony Corp. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ............................................. 13, 40

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ER 3269

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 106 of 252

*Stewart v. Abend,*
    495 U.S. 207 (1990).................................................................. 20

*Subafilms, Ltd. v. MGM-Pathe Communications Co., ,*
    24 F.3d 1088 (9th Cir. 1994) ............................................. 20, 21

*Swirsky v. Carey,*
    376 F.3d 841 (9th Cir. 2004) .................................................. 56

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000) .................................................. 54

*United State v. Boyle,*
    469 U.S. 241, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985) ............ 35

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999).................................................................. 40

*United States v. Locke,*
    471 U.S. 84 (1985)............................................................ 34, 35

*Wady v. Provident Life & Accident Insurance Co. of America,*
    216 F. Supp. 2d 1060 (C.D. Cal. 2002) ...................... 5, 91, 92, 96

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir. 1986) ..................................................... 58

*Walt Disney Products v. Air Pirates,*
    581 F.2d 751 (9th Cir. 1978) .................................................. 64

*Wang Labs, Inc. v. Mitsubishi Elecs., Am., Inc.,*
    860 F. Supp. 1448 (C.D. Cal. 1993) ........................................ 4

*Warner Bros., Inc. v. American Broad. Co.,*
    720 F.2d 231 (2d Cir. 1983) ................................................... 59

*Warner Bros., Inc. v. American Broad. Co.,*
    654 F.2d 204 (2d Cir. 1981) ........................................ 8, 65, 71

*Wechsler v. Macke International Trade, Inc.,*
    327 F. Supp. 2d 1139 (C.D. Cal. 2004) .................................. 95

*Weissman v. Freeman,*
    868 F.2d 1313 (2d Cir.), *cert. denied*, 493 U.S. 883 (1989) ...... 20

*Westinghouse Electric Corp. v. Pacific Gas & Electric Co.,*
    326 F.2d 575 (9th Cir. 1964) .................................................. 34

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 107 of 252

*Williams v. Crichton,*
  84 F.3d 581 (2d Cir. 1996) ................................................ 59

*Woods v. Bourne,*
  60 F.3d 978 (2d Cir. 1995) ................................................ 28

*Zuill v. Shanahan,*
  80 F.3d 1366 (9th Cir. 1996) .............................. 19, 25, 83

## STATE CASES

*Brown v. Republic Products, Inc.,*
  26 Cal. 2d 867 (1945) ........................................................ 83

*Doney v. TRW, Inc.,*
  33 Cal. App. 4th 245 (1995) ............................................ 95

*Laird v. Capital Cities/ABC, Inc.,*
  68 Cal. App. 4th 727 (1998) ............................................ 89

*Las Palmas Assoc. v. Las Palmas Center Assoc.,*
  235 Cal. App. 3d 1220 (1991) ........................................ 89

*Mesler v. Bragg Management Co.,*
  39 Cal. 3d 290 (1985) ...................................................... 88

*Mid-Century Insurance Co. v. Gardner,*
  9 Cal. App. 4th 1205 (1992) ...................................... 89, 91

*Sonora Diamond Corp. v. Superior Court,*
  83 Cal. App. 4th 523 (2000) .............................. 89, 90, 95

*Tomaselli v. Transamerica Insurance Co.,*
  25 Cal. App. 4th 1269 (1994) ........................................ 90

## FEDERAL STATUTES

### 1909 Copyright Act

17 U.S.C. § 7 (repealed).............................................. 10, 19

### 1976 Copyright Act

17 U.S.C. § 101 .................................................................. 19

17 U.S.C. § 102(b) ...................................................... 18, 57

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 108 of 252

17 U.S.C. § 103(b) .................................................................. 19, 54

17 U.S.C. § 104(b) ......................................................................... 20

17 U.S.C. § 106 ........................................................................ 18, 19

17 U.S.C. § 111(d)(4)(A) ................................................................ 36

17 U.S.C. § 201 ............................................................................. 85

17 U.S.C. § 201(a) & (b) ................................................................ 19

17 U.S.C. § 201(e) ......................................................................... 85

17 U.S.C. § § 203(b)(1), (5) ........................................................... 21

17 U.S.C. § 304(c) .................................................................. passim

17 U.S.C. § § 304(c)(3) ............................................................ 31, 36

17 U.S.C. § § 304(c)(4)(A) ................................................. 29, 30, 31

17 U.S.C. § § 304(c)(4)(B) ................................................. 31, 37, 41

17 U.S.C. § 304(c)(6)(A) ......................................................... 26, 27

17 U.S.C. § § 304(c)(6)(A), (E) ..................................................... 17

17 U.S.C. § 304(c)(6)(E) ................................................... 21, 24, 26

17 U.S.C. § 501(a) ......................................................................... *53*

17 U.S.C. § 501 *et seq.* .................................................................. 18

**Copyright Act Legislative History**

H.R. Rep. No. 94-1476,
94th Cong. 2d Sess.(1976) ...................... 14, 17, 18, 19, 20, 21 ,27 ,40 ,58

S.Rep. No. 94-473,
94th Cong. 1st Sess. (1975).................................................. 14, 40

Supplementary Register's Report on the General Revision
of U.S. Copyright Law ..................................................................... 14

**Other Statutes**

43 U.S.C. § 1744(a)....................................................................... 34

Bern Convention Implementation Act of 1988, Publ. L. No. 100-568, 102 Stat.
2853 (1988) 20

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 109 of 252

## Rules

26 C.F.R. § 20-2032A-8(a)(3) ............................................................... 35

37 C.F.R. § 201.3(c)(15) ......................................................................... 31

37 C.F.R. § 201.10(b)(ii) and (iv) .......................................................... 30

37 C.F.R. § 201.10(b)(1)(ii) ................................................................... 37

37 C.F.R. § 201.10(e) ........................................................................ 39, 41

37 C.F.R. § 201.10(e)(1) .................................................................... 39, 41

37 C.F.R. § 201.10(e)(2) ......................................................................... 41

37 C.F.R. § 202.1(a) ............................................................................... 62

37 C.F.R. § 210.10 .................................................................................. 31

37 C.F.R. § 210(b)(iv) ............................................................................ 31

37 C.F.R. § 210.10(b)(1)(ii) .......................................................... 29, 31, 37

37 C.F.R. § 210.10(e)(1) ......................................................................... 41

## Treatises

Howard B. Abrams, *The Law of Copyright* (2006), § 12:41 ........................... 2, 26

Paul Geller & Melville B. Nimmer, *International Copyright Law and Practice* (2005) § 6[2][a][i], fn. 70 ........................................................ 23, 26

Paul Goldstein, *Goldstein on Copyright* (3d ed. 2006), § 5.4.3 at 5:135 ....... 23, 26

Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases & Materials* (6th ed. 2006), 376-77 ................................................................. 23

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005)
    § 6.03 ................................................................................ 19
    § 6.10 ................................................................................. 1
    § 6.12[B] ............................................................................ 83
    § 9.05[b][1] ........................................................................ 36
    § 11.02[B][2] ................................................................. 22, 26
    § 11.06(B) at 11-40 n.33 (1981) ............................................... 37
    § 11.09 .............................................................................. 33
    § 13.03[B][4] at 13-88.7 ........................................................ 58

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 110 of 252

William F. Patry,

    *Choice of Law and International Copyright (2000)*

        48 Am.J.Comp.L. (2000) at 383, 447 ...................................................... 22

*Copyright Law & Practice* (2004) at 495-97 ........................................... 22, 26

*Latman's The Copyright Law* (6th ed. 1986) at 109 .................................. 14, 20

*Patry on Copyright* (2006), § 7:45 & n.5 ...................................................... 23

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 111 of 252

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Time Warner Inc., Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics (collectively "Defendants") respectfully move for partial summary judgment in Case Nos. CV 04-8400 SGL (the "Superman Action") and CV 04-8776 SGL (the "Superboy Action"), with respect to certain claims advanced by Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs").

## OVERVIEW

As the Court is aware, these cases involve the iconic comic book hero "Superman," who first made his public appearance in 1938, and who has loomed large in the popular cultural consciousness ever since. In the past 70 years, through careful development and marketing by his publishers, Superman's exploits have been chronicled in newspapers, television, radio and film, and the Superman "mythology" has been expanded and deepened through each of the iterations of his story. Plaintiffs are the widow and daughter of Jerome Siegel ("Siegel"), one of the two original creators of Superman. Pursuant to Section 304(c) of the 1976 Copyright Act, Plaintiffs seek to recapture, as of specified dates, certain copyright interests in the earliest version of Superman, which Siegel originally conveyed to defendant DC Comics ("DC") and its predecessors in 1938. But Plaintiffs' sights are not set on Superman alone; instead, they have filed two separate actions, against overlapping Defendants,[1] asserting two different types of copyright interests: Thus, Plaintiffs claim a 50% copyright ownership interest in "Superman," including all of his world of new characters, exploits and settings added by DC since 1938, and a 100% copyright interest in "Superboy," a later juvenile version of the same Superman character as developed by DC with other writers and artists.

---

[1] Warner Communications Inc. and Warner Bros. Television Production Inc. are not named in the Superman Action and are defendants only in the Superboy Action.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ER 3275

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 112 of 252

In the Superman Action, Plaintiffs claim to have terminated Siegel's prior "Superman" copyright grants to DC and its predecessors effective as of April 16, 1999. Plaintiffs acknowledge, as they must, that DC remains a co-proprietor of the Superman copyrights, and has a continuing right to exploit those copyrights. Accordingly, in the Superman Action Plaintiffs seek an accounting and a one-half share of Defendants' profits generated from the exploitation of those copyrights after the effective date of their purported termination.

In the Superboy Action, Plaintiffs claim to have terminated Siegel's alleged prior "Superboy" copyright grants to DC and its predecessors effective as of November 17, 2004. In that case, Plaintiffs claim to be the *exclusive* owners of the purportedly recaptured rights, and allege that Defendants have no continuing right to exploit any of the "Superboy copyrights" without their permission. Accordingly, in the Superboy Action Plaintiffs seek damages and injunctive relief for Defendants' alleged infringement of their Superboy copyrights after the effective date of their purported termination.

While Plaintiffs certainly are entitled to pursue whatever rights and remedies might be afforded to them under the Copyright Act – and while Defendants have no quarrel with their attempt to exercise those rights to the full extent permitted by the relevant statutory scheme – what Plaintiffs *actually* are trying to recover in these two actions is much more than either the statutes or established copyright law allow. In a classic example of overreaching, Plaintiffs claim an entitlement to a share of the revenue from *the worldwide exploitation of all aspects of the Superman mythology* as of the purported termination dates – in blatant disregard of the fact that the vast bulk of the revenues they claim are *specifically excluded* from reach by the very statute on which they base their claims of termination.

Defendants have consistently acted in good faith towards Plaintiffs in connection with their termination rights. Indeed, the parties resolved and settled all of Plaintiffs' claims over five years ago, in a multi-million dollar settlement that

ER 3276

Plaintiffs repudiated at the last moment – a settlement which DC seeks to enforce in these actions. But *even if* the parties' settlement agreement is not enforced, Plaintiffs' recovery in both these actions must be limited as required by Section 304(c) and long-standing copyright precedent to an allocable share of the profits of defendant DC *only*, generated from DC's *domestic* exploitation of *new works* created after the effective date of the termination, and then only to the extent the new works are not based on non-terminated works in which DC retains an exclusive copyright ownership interest. That is, Defendants contend that *even if Plaintiffs are successful in their termination claims, as a matter of law they are entitled to recover far less than they have alleged in their complaints.* Accordingly, Defendants bring this Motion for Partial Summary Judgment to properly delineate, pursuant to established copyright law, the scope and nature of any recovery Plaintiffs may be entitled to at trial.

In particular, Defendants assert that the uncontroverted facts, as well as settled copyright doctrine and precedent, establish, as a matter of law, that:

1. Plaintiffs have no right under the Copyright Act to obtain or share in Defendants' profits derived from (a) the foreign exploitation of any new or existing Superman work, including any work depicting "Superboy" or any other juvenile version of Superman, (b) the exploitation of the Superman family of trademarks, or (c) from the continued exploitation of any Superman derivative work created prior to the respective effective termination dates, including any work depicting "Superboy" or any other juvenile version of Superman.

2. As a result of Plaintiffs' failure to terminate certain copyrighted works within the timeframe and in the manner required by the Copyright Act, Defendants remain free to use the unterminated works and the elements contained therein without the need to account to Plaintiffs and without infringing any of their copyrights.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 114 of 252

3.     The post-termination episodes of the television series *Smallville* are not "substantially similar" to, and therefore do not infringe upon, any of Plaintiffs' purportedly recaptured Superboy copyrights.

4.     Neither Warner Bros. Entertainment Inc. nor Time Warner Inc. is the "alter ego" of DC, and Plaintiffs therefore are not entitled to reach any Superman-related profits of either of these defendants.

The first two grounds apply to both the Superman and the Superboy Actions. The third ground – regarding non-infringement of the *Smallville* television series – concerns the Superboy Action only. And the fourth ground – regarding "alter ego" – applies to the Superman Action only.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[a] party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor *as to all or any part thereof.*" (Emphasis added.) The standards and procedures for a partial summary judgment are the same as those for summary judgment. *See Wang Labs., Inc. v. Mitsubishi Elecs., Am., Inc.*, 860 F. Supp. 1448, 1450 (C.D. Cal. 1993) (citing Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, at 14:33 (The Rutter Group 2005)).

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis of its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue

of material fact. *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1065 (C.D. Cal. 2002). However, on an issue where the nonmoving party will have the burden of proof, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id.* Accordingly, the nonmoving party is thereafter required to demonstrate, by admissible evidence, the specific facts showing that there is a genuine issue for trial. *Id. See also* F.R.Civ.P. 56(e). The evidence presented must be *admissible*; conclusory or speculative testimony in affidavits and moving papers is *insufficient* to raise genuine issues of fact and defeat summary judgment. *Id.*

## FACTUAL BACKGROUND[2]

### A.    The Origins of Superman and Superboy

#### 1.    *Action Comics No. 1 and Siegel and Shuster's Grants to DC*

In the 1930s, Plaintiffs' predecessor, Siegel, along with his creative partner, artist Joseph Shuster ("Shuster"), jointly conceived of and created a cartoon strip that ultimately became the first Superman story. (*See* Declaration of Paul Levitz ("Levitz Decl."), ¶ 4.) Their proposed syndicated strip of Superman was rejected numerous times over several years by a number of different publishers; but in 1938, Detective Comics, Inc. ("Detective"), the predecessor-in-interest to DC, agreed to publish Superman in its upcoming new comic book series, *Action Comics*. (*Id.*)[3] Accordingly, on March 1, 1938, Siegel and Shuster executed an assignment to

---

[2] The uncontroverted facts summarized in this section are relevant as background and as to each of the several independent grounds advanced for partial summary judgment. Those uncontroverted facts that are relevant to only one of the several grounds advanced in this motion are addressed separately in the section discussing that particular ground. All of these facts, and the evidentiary support for the facts, is set forth in Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law submitted with this motion.

[3] Siegel and Shuster had been providing Detective with comic book features since late 1935, and had entered into an agreement with Detective in December 1937, which provided that "any new and additional features which [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to [Detective]." Siegel and Shuster submitted their Superman strip to Detective under the December 1937 agreement. (Levitz Decl. ¶ 4; *see also* Exhibit A to the Declaration of Michael Bergman in Support of Defendants' Motion for Partial Summary Judgment ("Bergman Decl.").)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 115 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 116 of 252

Detective of all of their rights in Superman and in any previously created work employing that character (the "1938 Assignment") (Levitz Decl. ¶ 5; Bergman Decl. Exh. B.)

At Detective's instruction, Siegel and Shuster expanded and adapted their existing Superman strips into a format suitable for a comic book, and Detective announced the debut of its *Action Comics* series, and Superman, in full page announcements in its May, 1938 issues of some of its existing publications. (Levitz Decl. ¶ 5; Bergman Decl. Exhs. C, D.)[4] The first Superman story was published by Detective on April 18, 1938 in *Action Comics No. 1*, which had a cover date of June 1938. (Levitz Decl. ¶ 5; Bergman Decl. Exh. E.)

Thereafter, Siegel and Shuster agreed to provide additional Superman stories and artwork for subsequent issues of *Action Comics*, and on September 22, 1938, entered into two further agreements with Detective (collectively the "September 1938 Agreements"), which specifically related to Superman and other named characters. (Bergman Decl. Exhs. F, G.) The first agreement reaffirmed Detective's copyright ownership of Superman, and "employ[ed] and retain[ed]" Siegel and Shuster to continue creating the Superman comics, among others. (*Id.* Exh. F). Siegel and Shuster agreed that they would not exploit Superman on their own, including outside of the United States, and also that, if they created artwork or continuity for any comics or strips containing the Superman character or "in any wise similar thereto," they would furnish such material exclusively to Detective for the duration of such agreement. Siegel and Shuster also agreed that, if they created any *other* material suitable for comics, Detective had the right to publish it. (*Id.* Exh. F). The second agreement included the McClure Newspaper Syndicate as an additional party and added the terms under which Siegel and Shuster would

---

[4] *More Fun Comics No. 31*, published on April 5, 1938 (Bergman Decl. Exh. C), and *Detective Comics No. 15*, published on April 8, 1938 (*id.* Exh. D), both contained full-page ads which reproduced the cover of the soon to be published first issue of *Action Comics* (the "Announcements"). The Announcements are described and discussed in more detail in Argument Section II, *infra*.

ER 3280

prepare Superman newspaper comic strips, as well as a provision in which they acknowledged Detective's right to sell such strips to foreign newspapers. (*Id.* Exh. G). Both Agreements make clear that Siegel and Shuster were to furnish Superman comics *only* to Detective. (*Id.* F, G.)

## 2. The Development of Superman by DC

The initial graphic representations of the Superman character in 1938, in a simple cartoon style, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. (Bergman Decl. Exh. E; Levitz Decl. ¶ 6.) From *Action Comics No. 1* we know only that he is a "champion of the oppressed" who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. (Bergman Decl. Exh. E). Superman is depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap 1/8th of a mile, hurdle a twenty-story building and run faster than an express train. (*Id.*) In his ordinary life, the character is depicted as a cowardly newspaper reporter known as Clark Kent, and in his alter ego, Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime. (*Id.*)

In the almost 70 years since the publication of *Action Comics No. 1*, DC has authored or supervised the creation of, and has published and distributed, thousands of other comic books and syndicated newspaper comic strips containing the adventures of Superman throughout the United States and abroad in many millions of copies. (Levitz Decl. ¶ 6.) These have changed his appearance and added decades of new material to further define, update and develop the character in an ongoing flow of new exploits and supporting characters resulting in the creation of an entire fictional Superman "universe." (*Id.*) In this time frame, DC has also overseen the creation, development and licensing of the character in a variety of media, including but not limited to radio, novels, live action and

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 118 of 252

1  animated motion pictures, television, live theatrical productions, merchandise and
2  theme park exploitations. (*Id.*)

3      As judicially recognized, *see Warner Bros., Inc. v. American Broadcasting*
4  *Cos.*, 654 F.2d 204, 205-06 (2d Cir. 1981), the presentations of Superman since
5  1938, provided first by Detective and then DC, were not a static depiction but an
6  ever-evolving portrayal, featuring new super powers, new villains and new
7  components to the Superman universe and backstory. (Levitz Decl. ¶ 7.) Indeed,
8  the Superman story and characters evolved on an episode-by-episode basis as
9  directed by the editors of DC for decades. (*Id.*) Significantly, many of
10 Superman's powers that are among his most famous today did *not* appear in *Action*
11 *Comics No. 1* but only appeared in later publications. (*Id.*) These include his
12 ability to fly; his super-vision which enables him to see through walls ("x-ray"
13 vision) and across great distances ("telescopic" vision); his super-hearing which
14 enables him to hear conversations at great distances; his "heat vision," the ability
15 to aim rays of extreme heat with his eyes; and his ability to survive in space
16 without atmospheric protection. (*Id.*) Also absent from *Action Comics No. 1* was
17 any reference to some of the more famous story elements now associated with
18 Superman but at that time not yet created, such as "Kryptonite" or the name of
19 Superman's home planet "Krypton," the "Fortress of Solitude," and the "Daily
20 Planet." (*Id.*) In addition, some of the most famous supporting characters
21 associated with Superman do not appear in *Action Comics No. 1*, including Jimmy
22 Olsen and villains Lex Luthor and Brainiac. (*Id.*)[5]

23 **B.    Superboy**

24      On November 30, 1938, shortly after signing the September 1938
25 Agreements, Siegel sent a letter to Detective enclosing some of his work
26 assignments and "pitching" some ideas for new comics (the "Pitch"). (Levitz

27 ───────────────
28 [5] Unlike many creative properties developed for media in later decades, in its early days
   there was no Superman "bible" which explored aspects of the property not yet presented
   in the comics. (Levitz Decl. ¶ 7.)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 119 of 252

Decl. ¶ 8; Bergman Decl. Exh. H.)  Among the ideas submitted was one for a comic strip entitled *Superboy* "which would relate to the adventures of Superman as a youth." (Levitz Decl. ¶ 8; Bergman Decl. Exh. H.)  The Pitch discussed conceptually the physical format for such a comic, and noted that "[t]here'd be lots of humor, action, and the characters would be mainly children of about 12-years rather than adults," but did not describe any specific plot or other story elements which would be included. (Levitz Decl. ¶ 8; Bergman Decl. Exh. H.)  Detective did not pursue the idea. (Levitz Decl. ¶ 9.)

In December 1940, Siegel made another submission to Detective, this time of a thirteen-page typed script titled "Superboy" under the byline of Siegel and Shuster (the "Script"). (Levitz Decl. ¶ 8; Bergman Decl. Exh. I.)  As admitted by Plaintiff Laura Siegel Larson (Bergman Decl. Exh. J, at 99:11-25), the Script was based on earlier presentations of Superman. (Levitz Decl. ¶ 8.)  The Script again sought to capitalize on the then-existing popularity of Superman, proclaiming in the very first "script box" that: "It has to happen!  So many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . . ." (Bergman Decl. Exh. I.)  The Script went on to repeat Superman's provenance and early upbringing from Detective's prior Superman publications, including *Action Comics No. 1* (Bergman Decl. Exh. E), a series of newspaper comic strips published in 1939 (*id.* Exh. K), and the comic book *Superman No. 1*, published in May 1939 (*id.* Exh. L) – all works owned exclusively by Detective and which pre-dated the Script. (Levitz Decl. ¶ 8; Bergman Decl. Exh. I.)[6]  In addition to the lengthy recap of Superman's origins, the Script contains dialogue and action involving the young Clark Kent; first as a toddler, then as a kindergartner, and finally as a fifth grader, concluding with the young Superman deciding to create his own "masquerade costume" in order to hide

---

[6] These pre-Script works are collectively referred to as the "Prior Superman Publications" and are described and discussed more fully in Argument Section III, *infra*, regarding Plaintiffs' copyright infringement claim.

ER 3283

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 120 of 252

his true identity. Detective did not proceed with the Script. (Levitz Decl., ¶ 9; Bergman Decl. Exh. I.)

On or around November 18, 1944, without Siegel or Shuster's participation, Detective published a comic strip entitled "Superboy" in *More Fun Comics No. 101*. (Levitz Decl. ¶ 9; Bergman Decl. Exh. M.)[7] By that time, various aspects of Superman's youth had already been imagined and explored in a number of different works, including in the Prior Superman Publications, and in certain other works, most notably the novel *The Adventures of Superman* by George Lowther, first published under license from Detective on November 2, 1942 (the "Lowther Novel"). (Levitz Decl. ¶ 8; Bergman Decl. Exh. N.)[8] Detective continued to publish "Superboy" comic strips – again without Siegel's or Shuster's participation – bi-monthly until 1946 and monthly thereafter for many years. (Levitz Decl. ¶ 9.)

## C. The Trademarks

Throughout the almost 70 year history of Superman, DC has built up strong trademark rights in the name and mark "Superman" and in certain key symbols and indicia of origin in connection with, and to identify all authorized uses of, the Superman character in print and all other media. (Levitz Decl. ¶ 10.)[9] The development of one particularly strong trademark corresponded with the evolution of the appearance of the emblem on the chest of Superman's costume. (*Id.* ¶ 11.) In *Action Comics No. 1*, the emblem was a small yellow inverted triangle bearing

---

[7] Both the Script and *More Fun Comics No. 101* are also described and discussed more fully at Argument Section III, *infra*.

[8] Superman's childhood had also been depicted or described in *Superman No. 1*, a Superman *Sunday Strip* published in May, 1942 (Bergman Decl. Exh. O), and in a Superman animated cartoon from the Max Fleischer studios from September, 1941 (Levitz Decl. ¶ 8). These publications, along with the Lowther Novel, the Prior Superman Publications and various others, are referred to collectively as the "Non-Terminated Superboy Works" and are discussed more fully in Argument Sections II and III, *infra*.

[9] DC owns dozens of federal trademark registrations for Superman-related indicia across a broad array of goods and services. (Levitz Decl. ¶ 10; Bergman Decl. Exh. P.)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 121 of 252

the letter "S" shown in yellow and twice in red. (*Id.* ¶ 11.)[10] Thereafter, the emblem changed significantly, and today is a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield Device"). (*Id.* ¶ 11.)[11]

The Superman name and mark and the Superman symbols and indicia of origin include, *inter alia*, Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases. (*Id.* ¶ 10.) Most notable among the latter is "Look! . . . Up in the sky! . . . It's a bird! . . . It's a plane! . . . It's Superman!" first used in the introduction to the 1940 radio program *The Adventures of Superman*, and thereafter continuously repeated in Superman television programming and various Superman licensed product. (*Id.* ¶ 10.) All of these Superman symbols and indicia of origin have been used on and in connection with a wide variety of publications and licensed goods and services, as they have been added to the Superman character and mythology under DC's and/or its predecessors' supervision and direction, since as early as 1938. (*Id.* ¶ 11.)

**D.    The Prior Litigation Between the Parties' Predecessors**

**1.    The Westchester Action**

In 1947, Siegel and Shuster commenced an action in the Supreme Court of the State of New York (the "Westchester Action") against, *inter alia,* DC's predecessor National Comics Publications, Inc. ("National"), Detective's parent company. (Bergman Decl. Exh. Q.) The Westchester Action did not involve federal copyright doctrines; instead, Siegel and Shuster sought to annul and rescind

---

[10] There is no evidence in the case that Siegel and Shuster originated any of the colors in Superman as their original submissions to DC Comics were in black and white. Notably, the two places where Superman's "S" is shown in red (the cover and last panel) were not part of the original strips. They were created at DC's direction *after* it agreed to publish Superman in *Action Comics No. 1.*

[11] The S in Shield Device, as transformed by DC and its predecessors, has become a strong symbol, standing alone, of all goods and services relating to Superman and his sole source, DC and its predecessors. (*Id.* ¶ 11.)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 122 of 252

their prior agreements with Detective in an effort to reclaim rights in Superman, and also sued for National's alleged improper use of the "entire plan" and "conception" of the Superboy character as set forth in the 1938 Pitch and the 1940 Script. (*Id.*)

On November 21, 1947, the referee to whom the case was referred issued a report making "interlocutory findings" substantially rejecting Siegel and Shuster's claims regarding Superman. (*Id.* Exh. R, at 10-11.) However, the referee found that *Superboy* "was a separate and distinct entity" from *Superman* (*id.* at 11), and in interlocutory Findings of Fact and Conclusions of Law dated April 12, 1948 (the "Interlocutory Findings"), found that Detective's publication of Superboy in *More Fun Comics No. 101* without authorization "embodied and was based upon the idea, conception, and plan" contained in the Pitch and in the Script (*id.* Exh. S, ¶ 164). Based on his interlocutory rulings, the referee subsequently entered an "Interlocutory Judgment" which, *inter alia*, provided for enjoining National from publishing Superboy and declaring that Siegel (independently of Shuster) was the "sole owner of the comic strip feature SUPERBOY." (*Id.* Exh. T, at 4-5.)

The parties both appealed from the referee's decision. However, while the appeals were pending, they settled their dispute, and on or about May 19, 1948, entered into a stipulation (the "Stipulation") under which the Interlocutory Judgment was to be "in all respects vacated" and the action dismissed in its entirety. (*Id.* Exh. U.) Pursuant to the Stipulation, the court entered a "Final Judgment" which provided that the Interlocutory Judgment "be and the same hereby is in all respects vacated" and declaring and adjudging that National "is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell, and distribute . . . cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material . . . ." (*Id.* Exh. V.) Relying on the Final Judgment, National – and then DC – continued

ER 3286

1   to publish comics, conduct merchandising, and license television programs under
2   the name "Superboy" in the almost 60 years since. (Levitz Decl. ¶ 9.)

### 2. The Prior Federal Action

4       In 1969, Siegel and Shuster again sued DC's predecessors, this time
5   claiming to own the renewal copyrights in Superman (the "Federal Action").
6   Summary judgment was granted against Siegel and Shuster by the United States
7   District Court for the Southern District of New York in a published opinion, *Siegel*
8   *v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), and
9   was affirmed by the Second Circuit Court of Appeals in *Siegel v. National*
10  *Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), with the Second Circuit
11  holding that *all* of Siegel's and Shuster's copyright interests in Superman,
12  including all renewal rights, had previously been conveyed to DC's predecessors
13  via the 1938 Assignment. *Id.* at 912-13. Superboy was not at issue in the Federal
14  Action. *Siegel*, 364 F. Supp. at 1035. After the conclusion of the Federal Action,
15  the parties entered into a further agreement, dated December 23, 1975, in which
16  Siegel and Shuster confirmed that all right, title and interest in Superman resided in
17  DC's predecessor and its parent and affiliated corporations (the "1975
18  Agreement"). (Bergman Decl. Exh. W.)

### TERMINATION RIGHTS UNDER § 304(c) OF THE 1976 ACT

20      In 1976, Congress enacted a comprehensive new copyright statute (the
21  "1976 Act"), which resulted from an extraordinary 20-year legislative effort. *Sony*
22  *Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 462 n.9 (1984). Under the
23  predecessor statute (the "1909 Act"), copyright protection was available for an
24  original 28-year term that could be renewed for another 28 years. The 1976 Act
25  extended the renewal term for copyrights subsisting on January 1, 1978 by 19
26  years, thereby extending the combined term of available protection from 56 to 75
27  years. *See* Pub. L. No. 94-553, 90 Stat. 2541, § 304(a) (1976).

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 123 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 124 of 252

1    To give "the author or the dependents of the author . . . a chance to benefit

2    from the extended [renewal] term," the 1976 Act included a new "termination"

3    option. H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976) ("H. Rep.") at 140; S.

4    Rep. No. 94-473, 94th Cong. 1st Sess. (1975) ("S. Rep.") at 123; *see* 17 U.S.C. §

5    304(c). This option enabled the author and the author's heirs to terminate certain

6    subsisting grants of rights under copyright that had been made by the author or his

7    heirs before January 1, 1978. The goal was to give authors and their descendants

8    "the right to renegotiate" their prior transfers originally made when the true value

9    of the copyrighted works was unknown. Supplementary Register's Report on the

10   General Revision of U.S. Copyright Law at 72 (1965) (hereafter "Supp. Reg.

11   Rep."); H. Rep. at 124; S. Rep. at 108; *see also Milne v. Stephen Slesinger, Inc.*,

12   430 F.3d. 1036, 1046 (9th Cir. 2005).

13   The new termination provision was not meant to be one-sided; rather, it

14   reflected "a practical compromise that would further the objectives of the copyright

15   law while recognizing the problems and legitimate needs of all interests involved,"

16   H. Rep. at 124; S. Rep. at 108, and created "a practical benefit for authors and their

17   families without being unfair to publishers, film producers and other users." Supp.

18   Reg. Rep. at 72; *Milne*, 430 F.3d at 1046. Thus, in crafting the copyright

19   termination right, Congress intended to protect the rights of authors and their

20   families as well as those of publishers and others to whom they had granted rights.

21   Accordingly, the statute makes very clear that termination under Section 304(c) is

22   not automatic but merely an "option" available under specified circumstances and

23   only where certain notice and timing requirements are met. William F. Patry,

24   *Latman's The Copyright Law* 109 (6th ed. 1986) ("*Latman's*"); *see Milne* at 1045.

25

26

27

28

ER 3288

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 125 of 252

## PLAINTIFFS' NOTICES OF TERMINATION AND FILING OF THESE ACTIONS

### A.   Superman

On April 3, 1997, Plaintiffs served seven separate notices of termination under Section 304(c), purporting to terminate Siegel's copyright grants to DC's predecessors in the Superman character and comic book stories dating back to 1938 (the "Superman Notices"), all effective as of April 16, 1999. (Bergman Decl. Exhs. <u>Z</u>-<u>DD</u>, ¶ 4.) By letter dated April 15, 1999, DC rejected the Superman Notices as untimely and legally invalid. (Bergman Decl. Exh. <u>EE</u>, ¶ 49.)[12]

The Superman Notices purport to terminate Siegel's − but not Shuster's − participation in the copyright grants to Detective and its successors. (Bergman Decl. Exhs. <u>Z</u>-<u>DD</u>, ¶ 2.) Therefore, even if the Superman Notices are effective, DC remains (through Shuster's unterminated interests) a co-owner of the copyrights which are the subject of the Notices, and retains all the rights of a co-owner to exploit those copyrights without being subject to a claim for infringement. Accordingly, in the Superman Action, filed on October 8, 2004, Plaintiffs essentially seek an accounting and a one-half share in the profits from the exploitation of Superman after the effective date of their Notices. (FASMC, ¶¶ 54(c), 57-59, 66-73, 105(d), 106, 108-110.)

Plaintiffs' operative complaint casts a wide − and inappropriately excessive − net with respect to the profits they seek to share:  Thus, Plaintiffs allege that they are entitled not only to a share of the profits arising from the domestic exploitation of Superman copyrights, but also to a share of the profits arising from any *foreign* exploitation of the character. (FASMC, ¶ 58(a).)  Plaintiffs further allege that they are entitled to a share of the profits arising from the exploitation the Superman trademarks, including the related characters and symbols associated with the

---

[12] Plaintiffs' First Amended Complaint in the Superman Action (Bergman Decl. Exh. <u>EE</u>) is hereinafter referenced as the "FASMC."

ER 3289

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 126 of 252

1  character. (FASMC, ¶¶ 61-63, 107.) Finally, Plaintiffs allege that they are entitled

2  to share in the profits of Defendants from the post-termination exploitation of

3  derivative works that had been prepared by Defendants before the effective date of

4  the termination. (FASMC, ¶¶ 58(c), 66-73.)

5  **B.  Superboy**

6  On November 8, 2002, Plaintiffs served a separate notice under Section

7  304(c), purporting to terminate, effective as of November 17, 2004, grants by

8  Siegel contained in the 1948 Stipulation entered into in the Westchester Action and

9  in the 1975 Agreement entered into after the conclusion of the Federal Action,

10  insofar as they pertained to Superboy (the "Superboy Notice"). (Bergman Decl.

11  Exh. FF.) The Superboy Notice listed hundreds of allegedly affected Superboy

12  works identical to those listed earlier in the Superman Notices. (Compare *id.* Exh.

13  FF at 6-52 *with id.* Exh. X at 5-550.) By letter dated August 27, 2004, DC rejected

14  the Superboy Notice as untimely and legally invalid. (Bergman Decl. Exh. GG, ¶

15  54.)[13]

16  On October 22, 2004, Plaintiffs filed the Superboy Action, seeking a

17  declaration that Plaintiffs have recaptured all copyright rights in Superboy, and

18  alleging that "[d]efendants' ongoing exploitation of the 'Superboy' mythology,

19  including but not limited to the Superboy Comic Books, and other publications,

20  'Superboy' merchandising, animated and live action television programming (*e.g.*,

21  the *Smallville* Series)" infringes Plaintiffs' recaptured copyright rights. (FASBC,

22  ¶¶ 67-68.) That is, Plaintiffs seek in this action all profits generated from the

23  exploitation of the Superboy character after the November 17, 2004 effective date

24  of the purported termination, including all profits from the post-termination

25  episodes of *Smallville*, which Plaintiffs claim infringe their Superboy copyrights.

26  (FASBC, ¶¶ 68-74, 111-112.)

27

28  [13] Plaintiffs' First Amended Complaint in the Superboy Action (Bergman Decl. Exh. GG) is hereinafter referenced as the "FASBC."

ER 3290

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 127 of 252

## LEGAL ARGUMENTS ON DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

As stated above, whatever the ultimate merits of Plaintiffs' claims of termination and recapture might be, the uncontroverted facts establish as a matter of law that Plaintiffs are not entitled to reach all of the revenues of Superman and Superboy which they seek to claim in these actions. Accordingly, Defendants move for partial summary judgment as to each of the following issues.

**I. PLAINTIFFS HAVE NO RIGHT TO OBTAIN OR SHARE IN PROFITS FROM (a) THE FOREIGN EXPLOITATION OF ANY NEW OR EXISTING SUPERMAN OR SUPERBOY WORKS, (b) THE EXPLOITATION OF THE SUPERMAN FAMILY OF TRADEMARKS, OR (c) THE EXPLOITATION OF ANY SUPERMAN OR SUPERBOY DERIVATIVE WORK CREATED PRIOR TO THE EFFECTIVE TERMINATION DATES**

**A. Summary of Argument**

As mentioned above, the termination right was added to the 1976 Act to improve the "bargaining position of authors" by giving them another chance to sell rights in their works after they had been sufficiently "exploited" to determine their "value." H. Rep. at 124. However, in crafting the termination provision, Congress drew lines reflecting "a practical compromise that [would] further the objectives of the copyright law while recognizing the problems and needs of all interests involved." *Id.* This compromise is reflected in significant statutory limitations on the effect of any termination. Among other things, even where properly exercised, termination applies *only* to the *United States copyright* in the original work under the grant – it cannot affect foreign copyright rights, trademark rights, or the right to continue to exploit any "derivative work prepared . . . before" the effective date of the termination. 17 U.S.C. §§ 304(c)(6)(A), (E). Accordingly, Plaintiffs are not entitled to share – in whole or in part – in any revenues generated by Defendants from the exploitation of any new or existing Superman or Superboy work outside

ER 3291

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 128 of 252

the United States; from the exploitation of any of the Superman or Superboy trademarks; or from the continuing exploitation of derivative works prepared before the effective date of the respective terminations.

## B. The Established Copyright Framework in Which Termination Must be Considered

Since Section 304(c) was enacted and must be considered in the framework of the remaining provisions of the 1976 Act, the particularly relevant provisions of the Act are summarized below.

### 1. Copyright Protection and Exclusive Rights

Section 102(b) of the 1976 Act provides that copyright protection subsists for "original works of authorship." 17 U.S.C. §102(b). But "[i]n no case does copyright protection . . . extend to any idea . . . [or] concept . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. §102(b); *See Feist Publs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991); H. Rep. at 56 ("[c]opyright does not preclude others from using the ideas or information revealed by the author's works.")[14]

A copyright owner is afforded several exclusive rights including, among other things, the right to reproduce the copyrighted work in copies; the right to prepare derivative works based upon the copyrighted work; and the right to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending. 17 U.S.C. §106. A violation of any of these exclusive rights constitutes infringement under Section 501 *et seq.*

### 2. Rights of Co-Owners Of Copyright

Section 201 of the 1976 Act also carried forward the basic principles that copyright "vests initially in the author or authors of the work," that "authors of a joint work are co-owners of [the] copyright" and that "[i]n the case of works made

---

[14] Section 102 of the 1976 Act carries forward "the standard of originality established by the courts" under the predecessor 1909 Act. H. Rep. at 51.

 ER 3292

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 129 of 252

for hire the employer . . . is considered the author . . ." and initial owner of copyright. 17 U.S.C. § 201(a) & (b). *See also* H. Rep. at 120-21. Under the 1909 Act, as today, each joint author is a co-owner who possesses "an undivided ownership in the entire work, including all of the contributions contained therein" 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 6.03, at 6-7 (2005) ("*Nimmer*"); *see Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978)), and who can nonexclusively exercise all the rights of the copyright owner subject only to a duty to account to other co-owners for their share of "profits" earned from such use or licensing (1 *Nimmer* § 6.10; *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984)). A joint author *cannot* be liable for infringement of copyright from such use or licensing. *Id. See also Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996).[15]

### 3. Derivative Works

As was the case under the now repealed Section 7 of the 1909 Act, 17 U.S.C. § 7 (repealed), the 1976 Act provides for protection of "derivative works based upon the copyrighted work," 17 U.S.C. § 106 and 103(a), similarly defining a "derivative work" as "a work based upon one or more preexisting works, such as . . . any . . . form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Section 103(b) provides that the "copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right to the preexisting material." 17 U.S.C. § 103(b). As explained in the legislative history, "[t]he most important point here is one that is commonly misunderstood today [under the 1909 Act]: copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the

---

[15] Since no representative of Shuster exercised any termination right under Section 304(c), even assuming that Plaintiffs validly exercised their termination right, DC retains Shuster's share of any purportedly terminated Superman work, fully entitled to exercise such co-ownership rights today subject only to its duty to account.

ER 3293

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 130 of 252

1    other on the copyright or public domain status of the preexisting material." H.

2    Rep. at 57; *accord Stewart v. Abend*, 495 U.S. 207, 224 (1990). As a result, one

3    who co-owns an original work upon which a derivative has been based by his co-

4    owner cannot use the derivative without the permission of the co-owner who

5    prepared the derivative unless he actually participated in preparing the new

6    version. *Weissman v. Freeman*, 868 F.2d 1313, (2d Cir.), *cert. denied*, 493 U.S.

7    883 (1989).

8         ### 4. National Treatment and Territorial Nature of the United
9              States Copyright Act

10        Both in the United States and abroad, under the rule of so-called "national

11   treatment," works authored in the U.S., such as the first Superman comic strip in

12   *Action Comics No. 1*, are afforded the same protection in other countries as that

13   provided therein to their own citizens. *See Itar-Tass Russian News Agency, Inc. v.*

14   *Russian Kurier, Inc.*, 153 F.3d 82, 89 & n.8 (2d Cir. 1988); *Latman's*, at 302.[16] As

15   a result, for any one work by an American or foreign author there can be as many

16   copyrights as there are countries affording copyright protection. Under the Berne

17   Convention for the Protection of Literary and Artistic Works (the "Berne

18   Convention"), to which the United States has adhered since 1989 (*see* Berne

19   Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853

20   (1988)), such national treatment of copyright protection means that the substantive

21   law of the country in which copyright infringement is alleged will govern a claim,

22   even if the law of that country differs from the law of the country in which the

23   work was created. *See also Subafilms, Ltd. v. MGM-Pathe Communications Co.*,

24   24 F.3d 1088, 1097 (9th Cir. 1994). As explained by the Ninth Circuit in

25   *Subafilms*, national treatment implicates a rule of territoriality in which "[t]he

26   applicable law is the copyright law of the state in which the infringement occurred,

27

28   [16] In order for foreign works to have the benefit of "national treatment" in the U.S., at least one of the indicia of reciprocity specified in Section 104(b) must be satisfied. 17 U.S.C. § 104(b).

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 131 of 252

1   not that of the state of which the author is a national or in which the work was first

2   published." *Id.* at 1097. *See also Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61

3   F.3d 696 , 701 (9th Cir. 1995).

4       **C.    As a Matter of Law, Plaintiffs Can Terminate Only Grants of**

5              ***Domestic, Copyright* Rights**

6           **1.    Foreign Copyright Rights Are Not Subject to Termination**

7       Based upon their Superman and Superboy Notices, Plaintiffs claim they

8   have terminated and recaptured not only United States copyright rights, but also a

9   purported share of all rights to exploit the Superman and Superboy copyrights

10  outside the United States. However, Section 304(c) specifically provides that:

11  "Termination of a grant under this subsection affects only those rights covered by

12  the grant that arise under this title [*i.e.* the Copyright Act], and *in no way affects*

13  *rights arising under any other Federal, State, or foreign laws.*" 17 U.S.C. §

14  304(c)(6)(E) (emphasis added). This language is unequivocal and direct:

15  termination "**in no way affects rights**" arising under foreign laws. As Congress

16  also explained in the legislative history, "rights under other Federal, State or

17  foreign laws are unaffected." H. Rep. at 126 (describing Section 203's nearly

18  identical termination right as to post-1978 grants).[17]

19      The statutory limitation restricting the effect of termination to domestic

20  copyright grants has been judicially recognized:

21              The Copyright Act of 1976 . . . expanded the rights of

22              authors and their heirs by automatically extending the life

23              of their copyrights by 19 years, for a total of 75 years . . .

24              and by allowing authors (or, if the authors are deceased,

25              their statutory heirs) to terminate, for the period of the

26

27  ───────────────────────

28      [17] Section 304(c) is a close but not exact counterpart of Section 203, which provides a right to terminate an author's post-1977 grants of copyright rights. H. Rep. at 140. The same limitation on termination appears in Section 203. 17 U.S.C. §§ 203(b)(1), (5).

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 132 of 252

1    extended copyrights, any *domestic* copyrights interests in

2    their work that they may have granted to others . . . .

3  *Fred Ahlert Music Corp. v. Warner-Chappell Music, Inc.*, 155 F.3d 17, 18 (2d Cir.

4  1998) (emphasis added).[18] In *Ahlert*, after noting the fact of the termination, the

5  court stated further that "Warner's *domestic* rights in the Song reverted to Dixon's

6  heirs" and that Warner retained the foreign rights after termination. *Id.* at 20

7  (emphasis added).

8    All of the copyright treatises are in agreement on this point. According to

9  *Nimmer*, Congress not only made a clear choice but also, because of the territorial

10 nature of copyright protection, had no power to do otherwise:

11    A grant of copyright 'throughout the world' is terminable

12    only with respect to ***uses within the geographic limits of***

13    ***the United States***. Because copyright has no

14    extraterritorial operation, arguably American law is

15    precluded from causing the termination of rights based on

16    foreign copyright laws. . . . [E]ven if the conflicts rule of

17    a foreign nation were to call for application of the

18    American termination rule of contract law, that rule by its

19    own terms excepts from termination the grant of those

20    rights arising under foreign copyright law.

21 3 *Nimmer* §11.02[B][2]. Other commentators are in accord. *See, e.g.*, 1 William

22 F. Patry, *Copyright Law & Practice*, 495-97 (2004) (exceptions to termination

23 include "rights that arise under any . . . foreign law"); William F. Patry, *Choice of*

24 *Law and International Copyright*, 48 Am.J.Comp.L. 383, 447 (2000) ("One

25 provision is quite clear, however: termination only affects U.S. rights."); Paul

26 ───────────────

27 [18] Similarly, the District Court concluded that "[w]hile the [heirs] terminated defendant's right to use the song in the United States, defendant retained a grant to license the song everywhere else in the world except the United States." *Fred Ahlert*

28 *Music Corp. v. Warner/Chappell Music, Inc.*, 958 F. Supp. 170, 172, n.1 (S.D.N.Y. 1997). We have been able to find no other case that addresses this issue even in passing.

**ER 3296**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 133 of 252

1  Geller & Melville B. Nimmer, 1 *International Copyright Law and Practice*, §

2  6[2][a][i], fn. 70 (2005) (noting that *Nimmer* "clarif[ies] that only the transfer of

3  U.S. copyright would be terminated by invoking the U.S. right to terminate."); 1

4  Paul Goldstein, *Goldstein on Copyright*, § 5.4.3 at 5:135 (3d ed. 2006); 2 Howard

5  B. Abrams, *The Law of Copyright*, § 12:41 (2006) ("The Act limits its application

6  to termination of grants of rights based upon the United States Copyright laws . . .

7  ."); 2 William F. Patry, *Patry on Copyright*, § 7:42 & n.5 (2006).[19]

8      In the face of Congress' clear and unambiguous language, Plaintiffs'

9  pleadings nevertheless allege that a recapture of United States rights under

10  copyright entitle them, in the case of Superman, to participate equally with

11  Defendants in revenues derived from foreign exploitation.  (*See* FASMC ¶¶ 58(a)

12  & 106(b) (Defendants' accounting obligations "include Defendants' revenues from

13  the [post-termination] exploitation of the Recaptured Copyrights in foreign

14  territories, when such exploitation results from the predicate exercise in the United

15  States of any right(s) under the Recaptured Copyrights by any Defendant, their

16  licensees or assigns.").)

17      Plaintiffs' apparent theory for such a right is that if any act of Defendants

18  relating to foreign exploitation occurred in the United States, then termination

19  under the Act also applies in the relevant foreign jurisdiction, and that the statutory

20  exclusion for rights arising under foreign law applies only where there is no

21  connection between the grantee's foreign uses of the copyright and any action or

22  occurrence in the United States.  But this theory makes no sense and would render

23  the statute's express language entirely meaningless.  Congress was fully cognizant

24  of the principles of national treatment and the inability of United States copyright

25  law to have extraterritorial application, but nonetheless decided in the clearest of

26

27      [19] That termination cannot affect rights arising under foreign copyright laws is such a
    basic tenet of the termination provisions, it is taught to law students in introductory

28  copyright courses.  *See*, *e.g.*, Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases &
    Materials*, 376-77 (6th ed. 2006).

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 134 of 252

terms that termination "in no way affects rights arising under . . . foreign laws" (17 U.S.C. § 304(c)(6)(E)). Furthermore, in any case in which, as here, there is a U.S.-authored work in which all the original rights, including United States and foreign copyrights, were assigned and then were exploited outside of the country, there will always be some act relating to foreign use occurring in the United States, if only an approval of such foreign exploitation. But the Ninth Circuit has expressly held that such an act *cannot* be the basis for a claim for relief under the United States Copyright Act. *Subafilms,* 24 F.3d at 1089.[20]

The only conceivable basis in law for Plaintiffs' theory – *albeit* one directly contrary to the plain language of the Copyright Act – is by analogy to the doctrine of "predicate acts." Under this doctrine, where there is a predicate act of infringement in the United States, the defendant can be sued in this country for the ensuing violations of copyright occurring abroad under foreign law. *See, e.g., Subafilms,* 24 F.3d at 1094-95. For liability to attach, however, there must be (i) an *infringing* act in the United States, which (ii) contributes to or assists (iii) an *infringing* act overseas. *See Los Angeles News Serv. v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 991-92 (9th Cir. 1998) (citing, *inter alia, Subafilms,* 24 F.3d at 1099; *Robert Stigwood Group Ltd. v. O'Reilly,* 530 F.2d 1096, 1100-01 (2d Cir. 1976) (copyright holders cannot recover for unauthorized performances of copyrighted work in Canada merely because the performers may have assembled and arranged all necessary elements in the United States)).

Here, insofar as Superman is concerned, because the termination of only *Siegel's domestic* Superman copyright grants is involved, the Superman Notices can have no effect on DC's legal right to exploit those works in the United States as a co-owner (through *Shuster's* share) of the United States copyright, and

---

[20] In *Subafilms,* 24 F.3d at 1089, the Circuit Court accordingly held that. with respect to an infringement abroad of a work protected under United States law. a claim for copyright infringement cannot be brought under the United States Copyright Act "when the assertedly infringing conduct consists solely of the authorization within the territorial boundaries of the United States of acts that occur entirely abroad."

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 135 of 252

1    overseas as the sole owner of the foreign copyright. In other words, any act by DC

2    or its licensees in the exercise of some or all of the rights of copyright as a co-

3    owner in the United States and exclusive owner outside the country can *never*

4    constitute an *infringing* act in the United States *or* overseas. DC, as the sole owner

5    of the foreign copyrights in foreign jurisdictions, is entitled to exercise all rights of

6    ownership in such other jurisdictions without infringing any rights which may be

7    held by Plaintiffs. Since the concepts of contributory infringement, constructive

8    trust, and predicate acts – as they apply to the recovery of foreign revenues or

9    damages – *all* depend upon there being an ultimate act in the foreign jurisdiction

10   which is a copyright infringement or is otherwise wrongful, a determination that

11   DC remains the sole owner of the copyrights overseas renders those concepts

12   irrelevant here. That is, to accept Plaintiffs' "predicate acts" argument would

13   completely nullify the inherent and express limitations on the consequence of a

14   U.S. termination affecting only rights under copyright in the U.S. and, for this

15   reason, must be rejected. Finally, to the extent Plaintiffs rely on such a theory, the

16   Ninth Circuit has also expressly rejected that a co-owners' duty to account to her

17   co-owner has any relation to the predicate acts doctrine sometimes employed in

18   connection with infringement analyses. In *Oddo v. Reis*, *supra*, 743 F.2d at 633,

19   the Court held that, as between co-owners of a copyright, "the duty to account does

20   not derive from the copyright law's proscription of infringement. Rather, it comes

21   from 'equitable doctrines relating to unjust enrichment and general principles of

22   law governing the rights of co-owners.'" *Accord Zuill*, 80 F.3d at 1369.

23        In short, the termination provisions of the 1976 Act expressly exclude from

24   their reach any rights arising under foreign copyright laws. Plaintiffs' attempt to

25   reach beyond the statute to increase their monetary recovery must therefore be

26   rejected as a matter of law.

27

28

**ER 3299**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 136 of 252

1
2    **2.    Trademark Rights Also Cannot Be Affected by**
     **Termination Under Section 304(c)**
3    The same exclusion concerning the inapplicability of Section 304(c) to
4    foreign copyright rights applies to Defendants' extensive trademark rights in the
5    Superman trademarks, since a termination "in no way affects rights arising under
6    any other Federal [or] State . . . laws." 17 U.S.C. § 304(c)(6)(E).  *See also* 3
7    *Nimmer* §11.02[B][2]; 1 *Copyright Law & Practice*, 495-97; 1 *International*
8    *Copyright Law and Practice*, § 6[2][a][i], fn. 70; 1 *Goldstein on Copyright*, § 5.4.3
9    at 5:135; 2 *The Law of Copyright*, § 12:41.  Accordingly, to the extent that, on the
10   basis of a *copyright* termination, Plaintiffs seek to recover a share of Defendants'
11   profits attributable to DC's continuing use of the Superman trademarks (FASMC, ¶
12   63(c)) or to enjoin DC's ongoing exploitation of such marks (FASBC, ¶ 78(d)),
13   such claims are expressly barred by the applicable statute.
14   **D.    As a Matter of Law, Defendants Are Entitled to Continue to**
15        **Exploit Superman and Superboy Derivative Works Created**
16        **Before the Effective Dates of the Respective Terminations**
17        **Without Sharing With Or Accounting to Plaintiffs For the**
18        **Revenues Derived Therefrom**
19   The 1976 Act contains another direct and express limitation to the reach of a
20   copyright termination of transfer pursuant to Section 304(c):
21               A derivative work prepared under the authority of the
22               grant before its termination may continue to be utilized
23               under the terms of the grant after its termination . . . .
24   17 U.S.C. § 304(c)(6)(A).  This exception permits a grantee, such as DC, who
25   prepares a derivative work before termination to continue to utilize the derivative
26   work during the extended renewal copyright term "under the terms of the grant."
27   *Ahlert*, 155 F.3d at 19 (quoting 17 U.S.C. § 304(c)(6)(A)).  As noted in the
28   legislative history, this so-called "Derivative Works Exception," represented

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 137 of 252

1  another key compromise in the formation of the termination provisions.  H. Rep. at

2  127.

3  In discussing the policy objective of benefiting authors' heirs that underlies

4  the termination right, the Supreme Court has held:

5  The Exception in § 304(c)(6)(A) was designed, however,

6  to exclude a specific category of grants – even if they

7  were manifestly unfair to the author – from that broad

8  objective.  The purpose of the Exception was to 'preserve

9  the right of the owner of a derivative work to exploit it,

10  notwithstanding the reversion.'  Therefore, even if a

11  person acquired the right to exploit an already prepared

12  derivative work by means of an unfavorable bargain with

13  the author, that right was to be excluded from the bundle

14  of rights that would revert to the author when he

15  exercised his termination right.  The critical point in

16  determining whether the right to continue utilizing a

17  derivative work survives the termination of a transfer of a

18  copyright is whether it was 'prepared' before the

19  termination.  Pretermination derivative works – those

20  prepared under the authority of the terminated grant –

21  may continue to be utilized *under the terms of the*

22  *terminated grant.*

23  *Mills Music, Inc. v. Snyder et al.*, 469 U.S. 153, 173 (1985) (emphasis added).  As

24  the Second Circuit explained later, "[t]he exception seeks to protect public access

25  to the derivative work as well as the rights of persons who have invested in

26  creating the derivative work."  *Alhert*, 155 F.3d at 19 (citation omitted).[21]

27  _____

28  [21] The Second Circuit has further explained that, without the Derivative Works
Exception "authors might use their reversion rights to extract prohibitive fees from
owners of successful derivative works or to bring infringement actions against them."

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 138 of 252

1    In *Mills*, the Supreme Court also held that "the phrase 'under the terms of
2 the grant' as applied to any particular licensee would necessarily encompass both
3 the [composer's original] 1940 grant [to the music publisher] and the individual
4 license executed pursuant thereto." *Mills*, 469 U.S. at 166-67. Thus, the "terms of
5 the grant" include the "entire set of documents that created and defined each
6 licensee's right to prepare and distribute derivative works." *Id.* at 167. In other
7 words, the effect of the Derivative Works Exception was "to preserve during the
8 post-termination period the panoply of contractual obligations that governed pre-
9 termination uses of derivative works by derivative work owners and their
10 licensees." *Woods*, 60 F.3d at 987.

11    Here, the Derivative Works Exception and the Supreme Court's ruling in
12 *Mills Music* make clear that Defendants retain the right to exploit (i) all of the
13 Superman derivative works created prior to April 16, 1999 pursuant to the terms of
14 the original 1938 Assignment and (ii) all of the Superboy derivative works created
15 prior to November 17, 2004 pursuant to the terms of the Westchester Stipulation,
16 without further payment or obligation to Plaintiffs.

17    **E.    Relief Requested**

18    Accordingly, Defendants respectfully request that the Court issue an Order
19 in both the Superman Action and the Superboy Action that to the extent Plaintiffs
20 are entitled to an accounting of or a share in the revenues generated by the post-
21 termination exploitation of Superman and/or Superboy, those revenues cannot
22 include any amounts attributable to the foreign exploitation of the copyrights, the
23 exploitation of any of the Superman family of trademarks, or the post-termination
24 exploitation of derivative works prepared prior to termination.

25

26

27

28

---

*Woods v. Bourne*, 60 F.3d 978, 986 (2d Cir. 1995).

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 139 of 252

## II.    AS A RESULT OF PLAINTIFFS' FAILURE TO TERMINATE CERTAIN COPYRIGHTED SUPERMAN AND SUPERBOY WORKS WITHIN THE TIMEFRAME AND IN THE MANNER REQUIRED BY THE COPYRIGHT ACT, DEFENDANTS REMAIN FREE TO USE THE UNTERMINATED WORKS OR THE ELEMENTS CONTAINED THEREIN WITHOUT THE NEED TO ACCOUNT TO PLAINTIFFS AND WITHOUT INFRINGING ANY OF THEIR COPYRIGHTS

### A.    Summary of Argument

In crafting the termination right included in the 1976 Act, Congress set out express parameters limiting the works that can be recaptured. Specifically, persons claiming to exercise the termination right *must* specify the effective date of the termination, and that effective date *must* fall within a set five-year window which is at least fifty-six years, but not more than sixty-one years, from the date the copyright was originally secured. 17 U.S.C. § 304(c)(3) & (4)(A). This copyright termination window is tantamount to a statute of limitations. As such, if any work falls outside the five-year window established by the effective date, it *cannot* be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability. Additionally, the Regulations adopted by the Register of Copyrights require that the terminating party identify in the notice "each work as to which the notice of termination applies." 37 C.F.R. § 210.10(b)(1)(ii). Failure to list a work in the notice of termination results in the copyright grant in any such work remaining intact.

*The Superman Notices*. The Superman Notices list an effective date of April 16, 1999. (Bergman Decl. Exhs. Z-DD, ¶ 4.) Accordingly, even assuming the validity of the Notices, Plaintiffs cannot recapture any work that was published prior to April 16, 1938; *i.e.* sixty-one years before the stated effective date. While *Action Comics No. 1*, which contained the first Superman *story,* was originally published on April 18, 1938 (Levitz Decl. ¶ 5), and is thus within this five-year

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 140 of 252

window, at least two in-house announcements (identified in Schedule "A" hereto; *see also* Bergman Decl. Exhs. C, D) for that comic book, consisting of the cover image of that comic (*i.e.,* the "Announcements") were originally published prior to that date, and fall beyond the reach of Plaintiffs' Notices. Moreover, neither the Announcements, nor the works in which they are contained, are identified in the Superman Notices as terminated works. (*Id.* Exhs. Z-DD.) Therefore, Plaintiffs are not entitled to recapture any copyright grant in the Announcements, and Defendants remain free to use any and all copyrightable elements in the Announcements without liability to or recourse by Plaintiffs.

*The Superboy Notice.* The Superboy Notice lists an effective date of November 17, 2004. (Bergman Decl. Exh. FF, ¶ 4.) Accordingly, no "Superboy" work originally published prior to November 17, 1943 – *i.e.,* sixty-one years before the effective date – is subject to recapture, even assuming the validity of the Notice. The Non-Terminated Superboy Works (identified in Schedule "B" hereto; *see also, e.g.,* Bergman Decl. Exhs. E, K, L, N, O) – all of which contain aspects of Superman's childhood and youth – were originally published prior to November 17, 1943, and fall beyond the reach of the Notice. Moreover, none of the Non-Terminated Superboy Works is identified in the *Superboy* Notice as a terminated work. Therefore, Defendants retain the right to exploit each of the story elements in these works without infringing on any copyright interests Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

**B.** **Termination Notice Requirements**

Among the conditions that must be satisfied in connection with the exercise of the termination right are (i) specification of "the effective date of termination," and (ii) identification of "the title . . . and the date copyright was originally secured in, each work to which the notice of termination applies." 17 U.S.C. § 304(c)(4)(A); 37 C.F.R. §§ 201.10(b)(ii) and (iv).

ER 3304

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 141 of 252

1    The requirement that the effective date of termination be specified is

2  grounded in 17 U.S.C. § 304(c)(3), which provides:

3            Termination of the grant may be effected at any time

4            during a period of five years beginning at the end of fifty-

5            six years from the date copyright was originally secured,

6            or beginning on January 1, 1978, whichever is later.

7  17 U.S.C. § 304(c)(3). Section 304(c)(4)(A) further specifies that in order to effect

8  termination, the "notice shall state the effective date of the termination which shall

9  fall within the five-year period specified by [§ 304(c)(3)]." Section 304(c)(3)

10  operates such that the effective date of termination must be no later than 61 years

11  "from the date copyright was originally secured." 17 U.S.C. § 304(c)(4)(A).[22]

12    Section 304(c)(4)(B) provides that "[t]he [termination] notice shall comply

13  in form, content and manner of service, with requirements that the Register of

14  Copyrights shall prescribe by regulation." Those Regulations are set forth at 37

15  C.F.R. § 210.10 and provide, in relevant part, that "[a] notice of termination must

16  include a clear identification of . . . (iv) the effective date of termination." 37

17  C.F.R. § 210.10(b)(iv).

18    The Regulations also provide that "A notice of termination *must* include a

19  clear identification of each of the following: ¶ (ii) The title and the name of at least

20  one author of, and the date copyright was originally secured in, each work to which

21  the notice of termination applies; and, if possible and practicable, the original

22  copyright registration number." 37 C.F.R. § 210.10(b)(1)(ii) (emphasis supplied).

23  These requirements serve a number of important functions: They give notice to the

24  grantee of the specific works terminated; they establish the required fee for

25  recording the notice of copyright termination, which is based upon the number of

26  titles identified in the notice (37 C.F.R. § 201.3(c)(15)); and they provide a check

27

28  [22] The statute also requires that "the notice shall be served not less than two or more than ten years" before the effective date of termination. 17 U.S.C. § 304(c)(4)(A).

31                                                ER 3305

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 142 of 252

against the "effective date," in that the timeliness of the termination notice as to any identified work can be measured by reference to the date its copyright was originally secured.

## C. Additional Factual Background: The Effective Dates and Contents of the Termination Notices

### 1. The Superman Notices

The Superman Notices specify an effective date of April 16, 1999.[23] (Bergman Decl. Exhs. Z-DD, ¶ 4.) Applying the formula prescribed by statute, the Notices are as a matter of law ineffective as to any Superman works for which copyright was originally secured more than 61 years before that date – *i.e.*, prior to April 16, 1938. As noted above, the Announcements for the upcoming release of *Action Comics No. 1* were published prior to April 16, 1938; specifically, in *More Fun Comics No. 31* (published April 5, 1938) (*id.* Exh. C) and *Detective Comics No. 15* (published April 10, 1938) (*id.* Exh. D).[24] Moreover, the Notices fail to identify in any manner the Announcements or the publications in which they were contained. (Bergman Decl. Exhs. Z-DD.)[25]

### 2. The Superboy Notice

The Superboy Notice lists an effective date of November 17, 2004. (Bergman Decl. Exh. FF, ¶ 4.) Applying the formula prescribed by statute, the

---

[23] The April 16, 1999 "effective date" of termination is a repeated focus of Plaintiffs' Superman Action. *See, e.g.,* FASMC ¶¶ 44 & 45.

[24] As shown in Bergman Decl. Exhs. C and D, the Announcements depict the cover of *Action Comics No. 1*, which contains the image of a fully-costumed Superman lifting an automobile over his head.

[25] The published appearance of Superman in comic books *prior to Action Comics No. 1* has long been recognized. For example, the book "The Adventures of Superman Collecting," published by DC Comics in 1988, states that "Superman made his first public appearance in the ad above, which was printed in New Adventure Comics shortly before the first issue of Action Comics (June 1938) was released." (Bergman Decl. Exh. HH.) Similarly, the comic book industry's industry standard "blue book," the Overstreet Price Guide, has for many years noted the appearance of Superman in *More Fun Comics No. 31*. For instance, the 1996 edition of the Overstreet Price Guide, published a year before Plaintiffs served their Notices, describes *More Fun Comics No. 31* as "Has ad for Action #1." (*Id.* Exh. II.)

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 143 of 252

Superboy Notice is ineffective as to any "Superboy" work for which copyright was originally secured more than 61 years before that date – *i.e.*, prior to November 17, 1943. The Non-Terminated Superboy Works (Schedule "B" hereto; *see also* Bergman Decl. Exhs. E, K, L, N, O) – all of which contain aspects of Superman's childhood and youth – were published prior to November 17, 1943. Furthermore, and as a necessary result of the "effective date" chosen by Plaintiffs, none of the Non-Terminated Superboy Works is identified in the Superboy Notice as a terminated work. (Bergman Decl. Exh. FF.)

**D.     Failure to Comply With the Time Periods Imposed By Section 304(c) and With the Regulations Promulgated Thereunder Results in the Original Copyright Grants Remaining Intact**

In explaining the statutory requirements of copyright termination, the *Nimmer* treatise states as follows:

> If the persons entitled to terminate a grant fail to serve a proper termination notice within the required time, or otherwise to comply with the required formalities, no termination will occur by operation of the termination provisions of the Copyright Act. The grant will continue in effect unless terminated by its own terms or for other reasons, subject to attack for failure of consideration or otherwise.

3 *Nimmer* § 11.09. This conclusion is supported by long-standing legal principles applicable to the interpretation and enforcement of statutory deadlines and substantive administrative requirements.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 144 of 252

1.  **The "Effective Date" Provision of Section 304(c) Operates
    as a Statute of Limitations, Imposing an Absolute
    Limitation on Termination**

When, as part of a statutory right, Congress prescribes a specific time period within which a party may take legal action to enforce that right, the time period is effectively a statute of limitations. *Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co.*, 326 F.2d 575, 579 (9th Cir. 1964). Such time periods are absolute, and cannot be circumvented by a claim of "substantial compliance"; as the Supreme Court has noted, there is no such thing as "substantial compliance" when statutory deadlines are at issue. *United States v. Locke*, 471 U.S. 84, 101 (1985).

In *Locke*, owners of certain mining claims filed their "annual notice of intention to hold the claim" *on* December 31, 1980. 471 U.S. at 89-90. However, the relevant statute, 43 U.S.C. § 1744(a), provided that the filing occur *"prior to December 31 of each year."* 471 U.S. at 89. The mining claim owner asserted that because the filing was only one day late, there had been "substantial compliance" with the statutory requirements, an argument flatly rejected by the Supreme Court:

> The notion that a filing deadline can be complied with by
> filing sometime after the deadline falls due is, to say the
> least, a surprising notion, and it is a notion without
> limiting principle. If 1-day late filings are acceptable, 10-
> day late filings might be equally acceptable, and so on in
> a cascade of exceptions that would engulf the rule erected
> by the filing deadline; yet regardless of where the cutoff
> line is set, some individuals will always fall just on the
> other side of it. Filing deadlines, like statutes of
> limitations, necessarily operate harshly and arbitrarily
> with respect to individuals who fall just on the other side
> of them, but if the concept of a filing deadline is to have

ER 3308

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 145 of 252

1      <u>any content, the deadline must be enforced.</u>  "Any less

2      rigid standard would risk encouraging a lax attitude

3      toward filing dates," *United States v. Boyle*, 469 U.S., at

4      249.  A filing deadline cannot be complied with,

5      substantially or otherwise, by filing late – even by one

6      day.

7  471 U.S. at 100-101(emphasis added).

8      The rule and rationale of *Locke* has been applied in a wide variety of

9  contexts.  In *Prussner v. United States*, 896 F.2d 218, 222 (7th Cir. 1990) (*en*

10  *banc*), the Seventh Circuit, sitting *en banc*, was called upon to decide whether

11  there had been substantial compliance with a Treasury regulation (26 C.F.R. § 20-

12  2032A-8(a)(3)) which required that "an election under this section is made by

13  attaching to a timely filed estate tax return [a recapture agreement]," where the

14  recapture agreement was filed four months late.  896 F.2d at 222.  Relying on

15  *Locke*, the full court held:

16      All fixed deadlines seem harsh because all can be missed

17      by a whisker – by a day [citing *Locke*] or for that matter

18      by an hour or a minute.  They are arbitrary by nature. . . .

19      The legal system lives on fixed deadlines; their

20      occasional harshness is redeemed by the clarity which

21      they impart to legal obligation.  "Deadlines are inherently

22      arbitrary; fixed dates, however, are often essential to

23      accomplish necessary results . . ." *United State v. Boyle*,

24      469 U.S. 241, 249, 83 L.Ed.2d 622, 105 S.Ct. 687 (1985)

25      . . . There is no general judicial power to relieve from

26      deadlines fixed by legislatures or, as here, by agencies

27      exercising legislative-type powers.

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 146 of 252

896 F.2d at 222-23, *accord Anin v. Reno*, 188 F.3d 1273, 1278 (11th Cir. 1999) ("Congressional filing deadlines are given a literal reading by federal courts").

The rule in *Locke* has also been applied to the copyright statutes. As noted by the *Nimmer* treatise with respect to the deadline for renewal term copyright applications, "[i]t has been held that a variance of even several days is fatal and that the purported renewal is void to rescue the subject work from the public domain, whether filed after expiration of the one year [in which the renewal application may be filed] or prior to its initiation." See 3 *Nimmer* § 9.05[b][1], at 9-44; *accord, Faulkner v. National Geographic Soc.*, 211 F. Supp. 2d 450 at and n.81 (S.D.N.Y. 2002).

More recently, in *Metro-Goldwyn-Mayer Studios, Inc. v. Peters*, 309 F. Supp. 2d 48 (D.D.C. 2004), *aff'd* 2005 U.S. App. LEXIS 5664 (D.C. Cir. Apr. 8, 2005), the court was called on to decide whether a claim for statutory royalties that arrived at the Copyright Office on August 1st – *one day late* – nonetheless "substantially complied" with 17 U.S.C. § 111(d)(4)(A), which required that such claims be filed "[d]uring the month of July in each year." 309 F. Supp. 2d at 60. The court held there was no compliance, substantial or otherwise, stating that "[a] claim received after July 31 is plainly and simply late." *Id.* at 61. The court explained its ruling by observing that "[t]hese longstanding deadlines operate with a conditional grace period," and quoted *Locke* for the proposition that "if the concept [of a deadline] is to have any meaning, the deadline must be enforced." *Id.*

The holding of *Locke* and its progeny apply with equal force here. The specification of the "effective date" of termination, in conjunction with the time limits imposed by 17 U.S.C. § 304(c)(3), establishes a 61-year deadline beyond which works simply are not subject to termination.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 147 of 252

## 2.     Failure to Identify Any Allegedly Terminated Works in the Notices Results in the Copyrights Grants to Those Works Remaining in Effect

As discussed above, in 17 U.S.C. § 304(c)(4)(B) Congress directed the Register of Copyrights "to prescribe" regulations setting forth the "requirements" for the "form, content and manner of service" to be included in all copyright notices of termination. Those Regulations require, *inter alia*, that the notice include "[t]he title and name of at least one author, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number . . . ." 37 C.F.R. § 201.10(b)(1)(ii). The failure to specify "each work to which the notice of termination applies" results in the copyright grant in any such work remaining intact. *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982).

*Burroughs* involved the attempt of the heirs of the author of stories featuring the character "Tarzan" to exercise their right of termination pursuant to Section 304(c). 683 F.2d 610. In that case, however, although plaintiffs' notice of termination listed and covered the first Tarzan story, "Tarzan of the Apes," it did not list five of the later Tarzan books. Because of this failure to comply with the Regulations, the Second Circuit held that the plaintiffs' notice of termination was not effective as to those unlisted titles, and that defendant was free to continue unfettered use of the Tarzan character as originally delineated. As explained by the Court:

> While we do not suggest that the omission of the five
> titles affected the efficacy of the notice to terminate the
> interest of ERB, Inc., in such titles as were listed, see 3
> Nimmer on Copyright § 11.06(B), at 11-40 n.33 (1981),
> it did leave ERB, Inc.'s interest in those five books, all of

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 148 of 252

1      which feature "Tarzan," intact . . . *We conclude,*

2      *therefore, that the heirs' incomplete notice left ERB, Inc.,*

3      *with license to use and exploit the character Tarzan.*

4 *Id.* at 622 (emphasis added). That is, *even if* the copyrightable content in works not

5 included in a notice of copyright termination *is* contained in other works that *have*

6 *been* properly terminated, the original grantees retain the right to use the

7 unterminated works pursuant to the terms of the original grant. *Id.*

8     **E.**    **DC Retains the Unfettered Right to Use All Copyrightable**

9         **Elements in the Superman and Superboy Works That Have Not**

10         **Been Terminated**

11      Under the principles enunciated above, DC and its licensees continue to

12 have the right to use the copyrightable elements contained in the Announcements

13 without the need to account to Plaintiffs and, with respect to Superboy, continue to

14 have the right to use the copyrightable elements contained in the Non-Terminated

15 Superboy Works without infringing any Superboy copyrights purportedly

16 recaptured by Plaintiffs.

17      As noted above, the cover of *Action Comics No. 1* (Bergman Decl. Exh. E) –

18 depicting the familiar image of Superman lifting a car over his head – was

19 published *before* the initial publication of the comic book in at least two comic

20 magazines cover-dated May 1938.[26] Because those magazines, namely *More Fun*

21 *Comics No. 31* (*id.* Exh. C) and *Detective Comics No. 15* (*id.* Exh. D), were

22 published more than 61 years prior to the "effective date" specified in the

23 Superman Notices, and because they were not identified in the Notices, the

24 Announcements for *Action Comics No. 1* and Superman contained in those

25 publications have not been terminated or recaptured. As a result, the

---

[26] A third announcement showing the cover of *Action Comics No. 1* was contained in the May 1938 issue of *New Adventure Comics No. 26*, believed to have been published on April 8, 1938. (Bergman Decl. Exh. JJ.) Defendants have thus far been unable to locate the copyright certificate for this magazine.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 149 of 252

Announcements, and Defendants' right to use any of the copyrightable elements contained therein, remain unaffected by the Plaintiffs' Notices. *Burroughs*, 683 F.2d at 622. That is, DC and its licensees retain the unfettered right to use the content of the Announcements without the need to account to Plaintiffs.

With respect to *Superboy*, Plaintiffs have not, and could not, terminate any grants in the Non-Terminated Superboy Works, the original publication date of each of which was well before the November 17, 1943 reach of the Superboy Notice (*see* Schedule "B" and Bergman Decl. Exhs. E, K, L, N, O), and none of which was listed in the Notice (Bergman Decl. Exh. FF). Accordingly, DC and its licensees retain the right to use all story elements contained in the Non-Terminated Superboy Works regarding Superman's youth without infringing on any exclusive copyright interests Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

**F.    Any Attempt By Plaintiffs to Invoke the "Harmless Error" Rule With Respect to the Timing and Content of the Notices Must Fail**

Plaintiffs might attempt to argue that under the Register of Copyright's Regulation that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of . . . Section 304(c) . . . shall not render the notice invalid" (37 C.F.R. § 201.10(e)), the Court may overlook the statutory deficiencies in the Notices.[27] However, to do so would contradict the plain language of the Copyright Act as well as the express content of the Regulations themselves. Indeed, any attempt to avoid the very specific deadlines and limitations imposed by the termination statute would destroy the

---

[27] While Plaintiffs might try to argue "harmless error" in connection with the Announcements, which fall just days outside the reach of the Superman Notices, any attempt to establish a "grace period" would merely place one on a slippery slope. The various unterminated works fall anywhere from six days to over four years outside the statutory termination window. There is no basis for arbitrarily deciding that six days late is not late, but that six months late is.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 150 of 252

1    balance Congress created to protect the rights of *all* who are affected by

2    termination – publishers as well as authors.[28]

3        First, the "effective date" requirement – and therefore the maximum

4    allowable reach of a termination notice – is a condition embodied in the statute

5    itself, and accordingly cannot be modified or ignored through administrative

6    construction. *Chevron U.S.A. Inc. v. National Resources Defense Council*, 467

7    U.S. 837, 843, n.9 (1984) ("the judiciary" as "the final authority on issues of

8    statutory construction . . . must reject administrative constructions which are

9    contrary to clear congressional intent."). Accordingly, a regulation cannot control

10   if it is inconsistent with the statutory language. *See United States v. Haggar*

11   *Apparel Co.*, 526 U.S. 380, 392 (1999). Indeed, if "Congress has directly spoken

12   to the precise question at issue," then "that is the end of the matter; for the court, as

13   well as the agency, must give effect to the unambiguously expressed intent of

14   Congress." *Chevron*, 467 U.S. at 842-843.

15       Second, statutory filing deadlines affecting the existence and ownership of

16   copyright are sacrosanct and immutable in the absence of any statement by

17   Congress to the contrary. *See Faulkner*, 211 F. Supp. 2d at 464 (collecting cases)

18   ("rule" that failure to file application for renewal copyright within statutory

19   deadline "resulted in work entering public domain" is "undeniably strict"). Here,

20   Congress has not made any suggestion to the contrary; indeed, it has expressly

21   stated the opposite: Section 304(c) is plain and unambiguous – copyright

22   termination *cannot* apply to works for which copyright has been obtained more

23   than 61 years prior to the effective date. Indeed, the regulatory task given to the

24   Register of Copyrights was clearly limited to regulating the "form, content, and

25

26   [28] The 1976 Act's unique 20-year drafting process has given its legislative history
     special status in its interpretation. *See Sony Corp.*, 464 U.S. at 462 n.9; *see also*
     *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989). That
27   legislative history emphasizes that the statutory provisions were not written as a one-way
     street, but were carefully crafted as "a practical compromise," H. Rep. at 124; S. Rep. at
28   108, to protect not just authors' families but also "publishers, film producers and other
     users" of their work. Supp. Reg. Rep. at 72.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 151 of 252

1  manner of service" of notices of termination served pursuant to the Copyright Act;

2  it did not reach the time in which such notices could be served. 17 U.S.C.

3  § 304(c)(4)(B).[29]

4      Third, the "harmless error" regulation is directed only at attempts to "render

5  the notice invalid." 37 C.F.R. § 201.10(e). Defendants here do not rely upon

6  Plaintiffs' failure to timely terminate and failure to list the Announcements and the

7  Non-Terminated Superboy Works to render any portion of the Notices "invalid."

8  The question here does not concern *the validity* but only the *effect* of the Notices as

9  written and served; namely that Plaintiffs cannot recapture the copyrights to those

10  untimely and unlisted works. Indeed, as shown above in *Burroughs*, the Second

11  Circuit expressly held that the "omission" of works from the termination notice did

12  not affect the "efficacy" of *the notice* as it related to *the listed works*. *Burroughs*,

13  683 F.2d at 622.[30]

14      Finally, the Court should recognize that Plaintiffs' selection of April 16,

15  1999 as the effective date of the Superman Notices was calculated. Plaintiffs had

16  the benefit of knowledgeable and astute counsel,[31] who designated the April 16,

17  1999 date for the dual purpose of (i) capturing *Action Comics No. 1*[32] and (ii)

18  maximizing the number of additional "Superman" works that would be within the

19  five-year termination window.[33] Thus, there was no "harmless error" – Plaintiffs'

---

20

21  [29] Indeed, mistakes in designating the effective date are not included among the Copyright Office's specific examples of "harmless errors" in 37 C.F.R. § 201.10(e)(2).

22  [30] Accordingly, such an omission also does not qualify as a "harmless error" that does

23  "not materially affect the adequacy of the information required to serve the purposes of section 304(c)." 37 C.F.R. § 210.10(e)(1).

24  [31] Their counsel at the time, Arthur Levine of the Washington DC law firm Finnegan,

25  Henderson, Farabow, Garrett & Dunner, L.L.P., is a highly regarded copyright law expert, a former General Counsel of the U.S. Copyright Office and was Executive Director of CONTU, the National Commission on New Technological Uses of

26  Copyrighted Works. (Bergman Decl. Exh. KK.)

27  [32] The termination date was chosen with the April 18, 1938 publication date of *Action Comics No. 1* firmly in mind. The last "effective date" of termination that would capture

28  that work was April 18, 1999. Plaintiffs specified April 16, 1999 as the "effective date" of termination – giving themselves two days to spare.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 152 of 252

1  designation of the "effective date" of termination was deliberate and carefully

2  selected to take advantage of the choice Congress decided to give to authors and

3  their families.[34]

4     Thus, Plaintiffs cannot use the "harmless error" regulation to extend the

5  reach of the Superman Notices to the Announcements.

6  **G.   Relief Requested**

7     Defendants therefore request an Order determining that DC and its licensees

8  are entitled to continue using all of the copyrightable elements contained in the

9  Announcements without the need to account to or share with Plaintiffs any of the

10  profits generated from such use, and that DC and its licensees are entitled to use all

11  of the story elements contained in the Non-Terminated Superboy Works without

12  infringing on any of the copyright rights Plaintiffs claim to have recaptured by

13  virtue of the Superboy Notice.

14

15

16

17

18

---

19  [33] Plaintiffs contend (and Defendants dispute) that *every* published Superman work
within the five-year window defined by Section 304(c) (*i.e.* from 56-61 years prior to the
20  "effective date") is "recaptured" through the termination notices. Accordingly, Plaintiffs
chose a date as close as possible to April 18, 1999 in the belief that this would allow
21  them, without serving any later notices, to recapture copyright rights in the maximum
number of Superman works. This is illustrated by the allegations of Plaintiffs' complaint,
22  which in addition to claiming to have terminated and recaptured *Action Comics No. 1*,
also claims to have terminated and recaptured all other *Action Comics* issues through no.
23  61, which was published on April 13, 1943 – and falling just within the 5-year window
established by the designated effective date. (FASMC ¶39.)

24  [34] The choice of the effective date for the Superboy Notice likewise was not random.
Virtually all of the "terminated works" identified in the Superboy Notice had previously
25  been identified as "terminated works" in the Superman Notices. However, when
Plaintiffs decided to try to segregate Superboy from Superman on the theory that they
26  could claim a 100% copyright interest in Superboy while they could claim at most a 50%
copyright interest in Superman, they had to serve a new and separate notice.
27  Accordingly, the Superboy Notice was served in November, 2002. Since Section 304(c)
requires that a termination notice be served a minimum of two years prior to the
28  designated effective date, the Superboy Notice could not have had an effective date prior
to November, 2004.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 153 of 252

### III. THE POST-TERMINATION EPISODES OF SMALLVILLE ARE NOT "SUBSTANTIALLY SIMILAR" TO, AND THEREFORE DO NOT INFRINGE UPON, ANY OF PLAINTIFFS' PURPORTEDLY RECAPTURED SUPERBOY COPYRIGHTS

#### A. Summary of Argument

In an attempt to maximize their potential monetary interest in the popular television series *Smallville*, Plaintiffs have alleged that the series is not derivative of Superman (as to which they have *at most* a one-half interest) but rather infringes on their alleged exclusive copyright interest in Superboy. Notwithstanding the obvious logical difficulty of viewing Superboy as a wholly independent original creation – not derivative of or otherwise related to his pre-existing adult self "Superman" – Plaintiffs have obtained a ruling that Siegel was the sole creator of Superboy, and that Plaintiffs have effectively recaptured the "Superboy copyrights" as of November 17, 2004.[35] While the Court is presently determining Defendants' motion to reconsider that earlier ruling, they do not challenge it for purposes of the instant Motion. Instead, Defendants contend, and the undisputed facts establish as a matter of law, that *Smallville* does not infringe on any possible copyright interest that Plaintiffs could have recaptured in Superboy.

The only "Superboy" works arguably authored by Siegel are the 1938 Pitch and the 1940 Script (collectively the "Submissions"), and accordingly the original copyrightable elements in those two works are the only "Superboy copyrights" Plaintiffs could have recaptured by virtue of the Superboy Notice. Under the infringement analysis long-mandated – and recently reiterated – by the Ninth Circuit, *Smallville* is not "substantially similar" to any of Plaintiffs' "Superboy" works as a matter of law; that is, the disputed works do not share similar

---

[35] As noted above, Plaintiff Laura Siegel Larson has admitted that the Superboy works allegedly prepared by Jerome Siegel were based on earlier presentations of Superman. (Bergman Decl. Exh. J at 99:11-25.)

ER 3317

characters, settings, plots, sequence of events, themes, mood or pace. Accordingly, there is no infringement here.

## B. Additional Factual Background

### 1. The Pitch

As set forth above, on November 30, 1938, Siegel "pitched" the idea of a comic entitled "Superboy" "which would relate to the adventures of Superman as a youth." (Bergman Decl. Exh. H) The Pitch did not describe any specific plot or other story elements which would be included in the proposed comic. (*Id.*) Detective did not pursue the idea. (Levitz Decl. ¶ 9.)

### 2. The Prior Superman Publications

Throughout 1939 and 1940 Detective continued to publish Superman stories in *Action Comics*, and eventually gave Superman his own home in a series of comics books titled *Superman*. (*See, e.g.*, Bergman Decl. Exh. L.) Superman was also published as a daily newspaper comic strip. (*Id.* Exh. K.) These early Superman comic books and comic strips recounted Superman's adventures, but also expanded on his "backstory": Detective introduced Superman's Kryptonian parents, "Lora" and "Jor-L," in a series of newspaper strips published in 1939, and added Superman's Earthly parents, the Kents, in *Superman No. 1*, published in May 1939. (*Id.* Exhs. K, L.) In *Superman No. 1* the Kents are shown to counsel young Clark to hide his great strength from people, but to use it to help humanity "when the proper time comes." (*Id.* Exh. L.) Indeed, the comic states that "the love and guidance of his kindly foster parents was to become an important factor in the shaping of the boy's future." (*Id.*)

### 3. The Superboy Script

In December, 1940, Siegel submitted the thirteen-page typed "Superboy" Script to Detective. (Bergman Decl. Exh. I.) The Script, which contains dialogue and describes panels – but contains no art work – tells the story of Superman at a few different stages in his childhood. (*Id.*) The Script recounts how the infant

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 155 of 252

1  Superman was sent to Earth in a spaceship, how he was adopted by the Kents, and

2  how even as a baby he showed his superpowers, which the Kents teach him to

3  conceal. (*Id.*) These elements were all repeated from the Prior Superman

4  Publications. (*See, e.g., id.* Exhs. E, K, L.)

5      The Script goes on to portray a few vignettes of Clark in his early childhood:

6  the infant Clark giving a young bully a black eye, and Clark in kindergarten,

7  impervious to the pranks of his classmates. (*Id.* Exh. I at 7-9.) The Script then

8  jumps to the fifth grade and describes an incident in which a group of classmates

9  plot to scare young Clark by luring him to a reputedly haunted house on the

10  promise of allowing him to join their club. (*Id.* Exh. I at 9-10.) As it turns out, the

11  old house is being used by a gang of criminals who capture and menace the

12  children. Young Clark arrives and, with his superpowers, rescues his classmates

13  and apprehends the criminals. (*Id.* Exh. I at 10-12.) As a result of this incident,

14  Clark determines to devote himself to helping people in need and decides to create

15  his own "masquerade costume" in order to hide his true identity. (*Id.* Exh. I at 13.)

16  While the costume is not described in the Script, it can be inferred it is the

17  Superman costume that was already famous from previously published comics.

18  The story concludes with the description of a panel in which Superboy is to be

19  portrayed "streaking over [a] city at night." (*Id.* Exh. I at 13.)

20      **4.**   ***More Fun Comics No. 101***

21      On or around November 18, 1944, Detective published, without Siegel's

22  involvement, a five page comic strip entitled "Superboy" in the comic book *More*

23  *Fun Comics No. 101* ("*MF 101*"). (Bergman Decl. Exh. M.)[36] The first three

24  pages of the strip depict Superman's origin story from Krypton, and the first part of

25  page 4 reiterates how he was found, as a babe, in the ruins of his spaceship by a

26  passing motorist, was left at an orphanage, and was thereafter adopted by the

27

---

28  [36] The story in *MF 101* is generally credited to author Don Cameron and Editor Jack Schiff. While the artwork is not credited, it is undisputed that it was not created by Jerry Siegel.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 156 of 252

Kents. (*Id.*)  The remainder of page 4 shows the boy demonstrating super-strength, super-speed, and the ability to leap over buildings, and concluding to himself that he should not let others learn how different he is.  (*Id.*)  The last page of the strip shows young Clark rescuing a man pinned under a car, and deciding to use his powers for good, but to conceal them.  (*Id.*)  The final panel of the strip shows a juvenile Superman, and states that "Clark Kent secretly fashions a colorful red-and-blue costume – and thus is born – SUPERBOY."  (*Id.*)

Detective continued to publish additional "Superboy" comic strips thereafter for a number of years – all without Siegel's participation.  (Levitz Decl. ¶ 9.)

### 5.   The *Smallville* Television Series

DC entered into an agreement dated as of December 5, 2000, with Warner Bros. Television Production ("WBTV"), a division of Time Warner Entertainment Company, L.P., pursuant to which DC granted WBTV an exclusive license to produce a live action episodic television series based on "the stories and adventures of the comic book character known as 'Clark Kent' or 'Superman'. . . ." (Levitz Decl. ¶ 16.)  DC approved the name "Smallville" for the series, which was contemplated to be an hour-long dramatic action series focusing on Clark Kent as a teenager, before he became Superman.  (*Id.*)[37]

*Smallville* premiered in the fall of 2001 on the WB Network, and chronicles the adventures of Clark Kent and various other characters from the Superman mythology during and after high school in the town of Smallville.  (Declaration of Melinda Hage ("Hage Decl."), ¶ 3.)[38]  A major premise of *Smallville* is that, on the day the infant who was to become Clark Kent arrived in his space capsule from the planet Krypton, a shower of meteors (Kryptonite) from Krypton also struck

---

[37]  The town in which Clark Kent grew up was first named "Smallville" in the comic book *Superboy No. 2*, cover dated May-June 1949, and published after the conclusion of the Westchester Action.  (Bergman Decl. Exh. LL.)

[38]  The DVDs and Synopses of each *Smallville* episode which first aired on or after November 17, 2004, are submitted herewith as Exhibits C through H to the Hage Declaration.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 157 of 252

1   Smallville, plaguing the town with a number of unexplained supernatural

2   phenomena ever since. (*Id.* ¶ 3.) The show centers around Clark Kent as a modern

3   young man coming to terms with his evolving powers and dealing with the unusual

4   Kryptonite-related occurrences in Smallville. (*Id.*) The action also highlights his

5   relationships with Lana Lang (his love interest) and a young Lex Luthor (who

6   grows up to be Superman's arch-enemy). (*Id.*)

7           As the series has progressed, it has increasingly devoted more of its story

8   lines to the supernatural and science fiction – with, among other things, a focus on

9   Superman's discovery of his origins on the planet Krypton and his father, Jor-El.

10  (*Id.*) Clark Kent in *Smallville* does not don the traditional Superman costume (*id.*),

11  nor does he exhibit many of the fully-formed powers possessed by the adult

12  Superman. *Smallville* is currently in its sixth network season (*id.* ¶ 10), and Clark

13  Kent has now graduated from high school and is working in Metropolis. (*Id.* Exh.

14  H.)

15      **C.**   **Plaintiffs' Superboy Notice and Copyright Infringement Claim**

16          As previously described, Plaintiffs' Superboy Notice relates only to

17  *Superboy*, and purports to terminate grants made only by Siegel in certain

18  Superboy works. (Bergman Decl. Exh. FF.) Specifically, Plaintiffs purported to

19  terminate any grant made by Siegel in the Stipulation entered into in the

20  Westchester Action, as well as in the 1975 Agreement between the parties (which

21  referenced "Superman" but not "Superboy"), to the extent they concern

22  "Superboy." (*Id.*) Since both the Pitch and the Script pre-date November 17, 1943

23  (*i.e.* 61 years before the effective date of the Superboy Notice), and their contents

24  were never themselves published, Plaintiffs have argued, based on the vacated

25  Westchester Interlocutory Findings, that *MF 101,* which was published on or about

26  November 18, 1944, effectively "published" the previously unpublished

27  Submissions, and that any rights to those early Submissions therefore were

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 158 of 252

1    recaptured pursuant to the Superboy Notice due to their much later "publication."

2    (FASBC (Bergman Decl. Exh. GG), ¶¶ 31-43.)[39]

3        Accordingly, in the Superboy Action Plaintiffs seek a declaration that they

4    have recaptured all rights in "Superboy" as of the November 17, 2004 effective

5    date of the Superboy Notice. (*Id.* ¶ 78(c).)  The First Claim for Relief in this action

6    is for copyright infringement, wherein Plaintiffs specifically allege that

7    "Defendants' ongoing exploitation of the 'Superboy' mythology, including but not

8    limited to the Superboy Comic Books, and other publications, 'Superboy'

9    merchandising, animated and live action television programming (*e.g.*, the

10   *Smallville* Series)" after the November 17, 2004 effective date infringes Plaintiffs'

11   copyright rights in the "Siegel Superboy Material." (*Id.* ¶ 67).  The "Siegel

12   Superboy Material" is defined in the complaint as the "Siegel Superboy Story" –

13   *i.e.* the December, 1940 Script – "together with all other material created by

14   Jerome Siegel relating to Superboy." (*Id.*)  Plaintiffs' Fifth Claim for Relief

15   requests an injunction against, among other things, Defendants' purported acts of

16   copyright infringement with respect to Superboy. (*Id.* ¶¶ 104-07.)

17   **D.    Judge Lew's Prior Summary Judgment Order**

18        In February, 2006, the parties filed cross-motions for summary judgment

19   and partial summary judgment in the Superboy Action.  Plaintiffs argued that, as a

20   matter of law, the Superboy Notice was proper, adequate and effective, and that

21   Plaintiffs had recaptured the "Superboy copyrights" as of November 17, 2004.

22   Defendants, on the other hand, argued that, as a matter of law under established

23   copyright doctrines, Siegel's Submissions (1) were derivative of pre-existing

24   Superman works, (2) constituted "works for hire" under the applicable 1909 Act,

25   and as such were owned by DC's predecessor, Detective, and (3) had never been

26   "published" or registered as unpublished works; therefore, they were not eligible

27   for termination and recapture under Section 304(c).  Additionally, Defendants

28

---

[39] Defendants dispute this contention.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

argued that even if Plaintiffs had successfully recaptured copyright rights in Superboy, those rights were not infringed by any of the post-termination episodes of *Smallville* because *Smallville* does not contain any copyrightable material emanating from any work which Plaintiffs claim to own exclusively by reason of termination; namely the Submissions.

On March 23, 2006, the Court granted Plaintiffs' motion for partial summary judgment, and denied Defendants' motion for summary judgment. (Bergman Decl. Exh. MM.) Relying almost exclusively on the vacated Interlocutory Findings in the Westchester Action, the Court (i) rejected each of Defendants' copyright defenses contesting the validity of the Superboy Notice, (ii) agreed that *MF 101* "published" the Submissions, and (iii) held that Plaintiffs had recaptured the "Superboy copyrights" as of November 17, 2004. (*Id.*) The "'Superboy' copyrights" were not defined or described in the Order. (*Id.*)[40]

With respect to Defendants' argument that, in any event, the *Smallville* series did not infringe on any copyrightable expression contained in the Submissions, the Court held that "the specific question as to whether the television show *Smallville* infringes on Plaintiffs' Superboy copyrights requires a detailed factual comparison of each property's content characteristics . . . ." (*Id.* at 16.) However, the Court did not engage in that detailed factual comparison; instead, after noting that Plaintiffs drew comparisons between "the storylines of *Smallville* and the Superboy comic strip," the Court simply concluded that fact issues precluded summary judgment in favor of Defendants on the infringement claim. (*Id.* at 16-17.)

E.    **Plaintiffs' Discovery Responses Concerning Infringement**

Following the Court's March 23 Order, DC served interrogatories on Plaintiffs seeking, *inter alia*, to probe all factual issues regarding Plaintiffs' claims

---

[40] As the Court is aware, the March 23, 2006 Order is the subject of Defendants' Motion for Reconsideration, which was argued on February 12, 2007, and is presently under submission and awaiting decision.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 160 of 252

1  of infringement in connection with Superboy.  (Bergman Decl. Exh. NN.)

2  Specifically, DC propounded an interrogatory (Interrogatory No. 3) asking

3  Plaintiffs to identify (1) Defendants' allegedly infringing works; (2) Plaintiffs'

4  allegedly infringed works; and (3) the specific passages, images or scenes which

5  Plaintiffs contend constitute the infringement.  (Id. at 4.)  Plaintiffs initially

6  objected to this discovery, but ultimately stipulated to the entry of a court order

7  requiring them to provide, without objection, "complete, substantive responses" to

8  the infringement interrogatory.  (Id. Exh. OO.)  The parties agreed, however, that

9  Plaintiffs could limit their infringement responses to the Smallville series.  (Id.)

10  On or about July 14, 2006, Plaintiffs served their Supplemental Responses to

11  DC's Interrogatory No. 3.  (Id. Exh. PP.)  In their responses, Plaintiffs identified

12  the allegedly infringing works as the post-termination episodes of Smallville, and

13  the allegedly infringed works as the Superboy Pitch and Script "and the original

14  characters and other elements contained in such works," and MF 101 "which

15  published the Siegel Superboy Material."  (Id. at 5.)[41]  However, Plaintiffs did not

16  identify the specific passages, images or scenes in the respective works which they

17  contended constituted the infringement, providing instead a lengthy narrative

18

19

20

21

---

[41] It is difficult to understand, under copyright principles, how Plaintiffs could have
22  any copyright interest in the content of MF 101, which was written by another author
under a work-for-hire relationship with Detective, without any input by Siegel. (See
23  Bergman Decl. Exh. M (last two pages).)  It is similarly difficult to understand how
Plaintiffs could be deemed the exclusive copyright owners in MF 101 since even if this
24  were not a work for hire owned solely by Detective, it is undisputed that it would then be
a joint work comprised of words and artwork, which artwork was undisputedly not
25  created by Siegel or his heirs.  MF 101 would then be a joint work of copyright – just like
Action Comics No. 1 – whose undivided one-half interest remains the property of DC. As
26  explained above, a joint owner of copyright cannot infringe its own copyright.  See, e.g.,
Oddo, 743 F.2d at 632-33.  Nevertheless, for purposes of this Motion, Defendants assume
27  such an exclusive ownership interest by Plaintiffs to the extent MF 101 used any material
in the Submissions that was not already contained in the Prior Superman Publications.
28  The Submissions and MF 101 are hereinafter collectively referred to as "Plaintiffs'
Works."

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 161 of 252

1  describing and comparing only the most vague and general aspects of Plaintiffs'

2  Works and of the *Smallville* series as a whole. (*Id.*)[42]

3    Accordingly, DC moved to compel Plaintiffs to provide the "complete,

4  substantive responses" they had previously been ordered to provide, and on

5  October 27, 2006, Magistrate Zarefsky granted DC's motion and ordered Plaintiffs

6  to provide further supplemental responses more fully responding to the

7  Interrogatory by identifying the allegedly infringed and infringing "passages,

8  images or scenes" in the disputed works. (*Id.* Exh. QQ.) Plaintiffs' further

9  supplemental responses were served on November 22, 2006, and purport to

10  identify 74 separate types of "similarities" in the post-November 17, 2004 episodes

11  of *Smallville* that allegedly infringe Plaintiffs' Works. (*Id.* Exh. RR.) These 74

12  separate itemizations of purportedly infringing "similarities" include such broad

13  comparisons and characterizations as "Clark as a child" (item 2); "Clark does not

14  wear glasses" (item 4); "Clark hangs out and interacts with classmates and peers

15  outside of school" (item 39); and "locals are nosy regarding outsiders" (item 66).

16  (*Id.*)

17    What these discovery responses clearly and unequivocally demonstrate is

18  that Plaintiffs can point to no actionable similarity between *Smallville* and any of

19  the materials in which Plaintiffs assert a copyright ownership interest: A review of

20  Plaintiffs' claimed instances of infringement reveals that all of the purported

---

[42] Thus, Plaintiffs' discovery responses purported to identify the following similarities between Plaintiffs' Works on the one hand, and the *Smallville* series on the other hand: (i) Both sets of works purportedly have a "lead character" who is a "modest, sensitive young man (somewhat of a loner) who, while attending school in a small rural town, must face growing up and all which that entails in the heightened context of coming to grips with the fact that he is very different from others and with the challenges and responsibilities of his supernatural powers." (ii) Both sets of works portray the lead's relationship with his adoptive parents, the Kents, who are "earnest, humble and moral people"; "simple country folk" who raise their adopted son as a human, and "gently guide and . . . counsel him on the need to restrain or conceal his tremendous power." (iii) Both sets of work are purportedly set in "a small rural town." (iv) And both sets of work purportedly explore the central theme of the "coming-of-age of a young man destined for greatness as a superhero," with the lead character "coming to grips with who he really is . . . while repressing and concealing his true self for fear that he will not be accepted by his peers." (*Id.*)

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 162 of 252

1  "similarities" are simply general ideas or generic scenes standard to a young super-

2  hero story, ***none of which is protectable by copyright***.  Furthermore, each of the

3  "Superboy" ideas, characters and relationships on which Plaintiffs now base their

4  claim of infringement were explored and expressed in (i) the Prior Superman

5  Publications in which DC remains co-owner of copyright, as well as in (ii) the

6  Non-Terminated Superboy Works published prior to November 17, 1943, which

7  are beyond the reach of the Superboy Notice.[43]  (Declaration of Jeff Rovin ("Rovin

8  Decl."), ¶ 22 & Exh. B.)  Defendants therefore are free to use the content of these

9  works – whether it is copyrightable expression or non-copyrightable ideas –

10  without infringing any of Plaintiffs' purportedly recaptured "Superboy copyrights."

11        After the close of fact discovery, the parties exchanged their respective

12  expert reports on the issue of infringement.  Defendants' experts have prepared

13  comprehensive reports comparing Plaintiffs' Works to the post-termination

14  *Smallville* episodes in accordance with the standards established by the Ninth

15  Circuit, and have concluded that there are no areas of substantial similarity

16  between the works which could arguably constitute copyright infringement.  (*See*

17  *generally* Rovin Decl.; Declaration of Mark Rose ("Rose Decl."), Exh. A.)  These

18  experts have also addressed each of the 74 claimed areas of similarity listed in

19  Plaintiffs' supplemental discovery responses (virtually all of which are non-

20  protectable ideas, themes or generic scenes) and most of which also have

21  specifically appeared in the Prior Superman Publications or the Non-Terminated

22  Superboy Works.  (Rovin Decl. ¶ 22 & Exh. B; Rose Decl. Exh. A at 18-26.)  As

23  Defendants' experts concluded, once these kinds of alleged similarities are filtered

24  out, there is simply nothing left of Plaintiffs' Works that is even arguably

25

26

---

27  [43] The Non-Terminated Superboy Works (Schedule "B") all contain story elements
that Plaintiffs claim to have recaptured through the Superboy Termination Notice – such
28  as a juvenile Superman, his rural upbringing, his outsider status, and his relationship with
his adoptive parents.

copying of protected elements of the copyrighted work. *Apple Computers, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).

Thus, the starting point in the infringement analysis is what work is alleged to have been copied. Here, Plaintiffs concede in their responses to interrogatories that the only specific works they allege have been infringed are the 1938 Pitch, the 1940 Script, and *MF 101* (*i.e.,* Plaintiffs' Works).[45] Accordingly, the only question addressed by this Motion is whether Plaintiffs can establish the second element, *i.e.,* that Defendants have copied protectable elements of those works. Where, as here, copying is not conceded, "the latter element may be established by showing that the works in question are substantially similar in their protected elements, and that the [allegedly] infringing party 'had access' to the copyrighted work." *Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1174 (9th Cir. 2003) (summary judgment granted); *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir. 2000) (summary judgment granted).[46] The absence of substantial similarity between two works may be decided as a matter of law, and the Court of Appeals has "frequently affirmed summary judgments in favor of defendants" on that issue. *Frybarger v. International Bus. Mach. Corp.*, 812 F.2d 525, 528 (9th Cir. 1987).

---

[45] To the extent Plaintiffs claim to have recaptured anything from *MF 101*, this could consist only of material from the Pitch or Script *actually used* in *MF 101*, not anything else newly added by that comic book's authors employed by Detective in 1944 -- who did not include Siegel or Shuster. If *MF 101*, in fact, made use of preexisting material from the Pitch and Script, then it was to that extent a derivative work based upon the Submissions. It is basic copyright law, however, that the copyright in a derivative work is "independent of . . . any copyright protection in the pre existing material" so that only the author of the material newly contributed can be the copyright owner of anything added to the pre-existing material. 17 U.S.C. § 103(b). Thus, Siegel could not be the copyright owner of any newly added material to any works featuring the character Superboy prepared after submitting the Script in December 1940.

[46] For purposes of this Motion, Defendants do not dispute that DC's predecessor, Detective, had access to both the Pitch and the Script.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 163 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 164 of 252

1  copyrightable which has been used in any way in the post-termination episodes of

2  *Smallville*. (*Id.*)

3      Plaintiffs have now had every opportunity to discover, gather, and articulate

4  the bases for their copyright infringement claim concerning "Superboy" and have

5  been unable to do so. Accordingly, on the basis of the updated and now completed

6  record, Defendants move again for summary judgment. Defendants submit that

7  Plaintiffs, as a matter of law, cannot establish and have no evidence to support

8  their claim that the post-termination episodes of the *Smallville* television series

9  infringe on any of the copyrightable elements contained in Plaintiffs' Works which

10 are or could be owned by Plaintiffs.[44]

11  **F.     As a Matter of Law, the Post-Termination Episodes of *Smallville***

12        **Do Not Infringe Upon Any Copyright Interests Recaptured and**

13        **Owned By Plaintiffs**

14        **1.     The Standards for Copyright Infringement**

15             **a.     Background**

16      The Copyright Act provides that "[a]nyone who violates any of the exclusive

17  rights of the copyright owner provided in section 106 . . . is an infringer . . . ," 17

18  U.S.C. § 501(a). Because the statute does not contain any further definition of

19  infringement, case law determines the elements that will establish such a cause of

20  action. It is well settled in these cases that to prove copyright infringement,

21  Plaintiffs must show (1) ownership of a valid copyright and (2) Defendants'

22
23       [44] The Declaration of Michael Bergman pursuant to Local Rule 7-17 ("L.R. 7-17") is
    submitted concurrently herewith. L.R. 7-17 requires a party to submit a declaration to the
    court when, as is the case here, the party submits an issue to a new judge that was
24   previously addressed and denied by a prior judge. That declaration must notify the new
    judge of (1) "the material facts and circumstances as to each prior motion"; (2) "the
25   ruling, decision, or order made"; and (3) "the new and different facts or circumstances
    claimed to warrant relief and why such facts or circumstances were not shown to the
26   judge who ruled on the motion." *Id.* Accordingly, the L.R. 7-17 declaration of Mr.
    Bergman describes in detail: (1) the issues presented earlier in Defendants' Motion for
27   summary judgment regarding copyright infringement; (2) the pertinent holding in Judge
    Lew's March 23, 2006 Order on Defendants' Motion for Summary Judgment; and (3)
28   how, through subsequent discovery efforts, Defendants have developed additional facts
    not previously available or addressed by Judge Lew that entitle them to relief.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 165 of 252

### b. "Substantial Similarity" – The Required Comparison and Dissection of the Works

The test for "substantial similarity," a term of art, has been developed and refined over the years in the summary judgment context. The Ninth Circuit has most recently addressed the "substantial similarity" test in some depth, granting summary judgment in a copyright infringement case quite analogous to this one. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006). In *Funky Films*, plaintiff alleged that defendant's HBO television series *Six Feet Under* infringed upon her prior screenplay *The Funk Parlor*: Both works take place in a family-run funeral home which has fallen on hard times; both begin with the untimely death of the family patriarch; in both, the death of the father precipitates the return of the eldest son who had earlier rejected the family business and left town; and in both works the older son joins his younger (gay) brother, who had remained at home, in trying to revive the family business in its struggle against a larger competitor. *Id.* at 1077-78. Both works also explore the themes of death, relationships, and sex. *Id.* at 1079.

The district court conducted an independent analysis of the two works and determined, as a matter of law, that no jury could reasonably find substantial similarities between the works, and accordingly granted summary judgment in favor of defendant. *Id.* at 1076. The Ninth Circuit *affirmed* after conducting its own *de novo* analysis of the works, reasoning that whatever similarities there were existed only at "a very high level of generality." *Id.* at 1081. In reaching this conclusion, the Court explained at length the "substantial similarity" test and its appropriate application.

As noted by the *Funky Films* court, the substantial similarity test contains an extrinsic and intrinsic component. *Id.* at 1077.[47] At summary judgment, courts

---

[47] The intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury. *See Shaw v. Lindheim*, 919 F.2d 1353, 1360-61 (9th Cir. 1990).

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 166 of 252

apply only the *extrinsic* test, since a "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).[48] The extrinsic test is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977).[49] It is appropriate for the Court to consider the testimony of experts in analyzing the factors in the extrinsic test. *Id.* The Court is required to make a comparison of the works, including an "analytical dissection" of their "constituent" and "protected elements," in which "it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (citations omitted). In applying the extrinsic test, the Court must also compare "***the actual concrete elements*** that make up the total sequence of events and relationships between the major characters" in the compared works. *Berkic*, 761 F.2d at 1293 (emphasis added). Accordingly, the test focuses on the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Funky Films*, 462 F.3d at 1077; *Kouf*, 16 F.3d at 1045 (citations omitted). In all of these cases summary judgment was granted.

---

[48] Thus, "[w]hen the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression." *Id.*

[49] Accordingly, substantial similarity "may often be decided as a matter of law." *Id.* *See also Shaw*, 919 F.2d at 1355 ("We have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity.") and *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985) (same).

ER 3330

c.  **Methodology and Analytic Tools for Filtering Out Unprotected Material in the Required Comparison**

The methodology and analytic tools for filtering out unprotected material in the substantial similarity comparison for deciding summary judgment motions include several bedrock precepts.  First, in assessing substantial similarity the court "may place *no* reliance upon any similarity in expression resulting from 'unprotectable elements.'"  *Apple Computers, Inc.* 35 F.3d at 1443 (quoting *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir. 1987)).  Included in "unprotectable elements" are "ideas" as opposed to their expression.[50]  As the Ninth Circuit has frequently emphasized, "[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic*, 761 F.2d at 1293; *Funky Films*, 462 F.3d at 1081.[51]  Instead, "protectable expression includes the **specific details** of an author's rendering of ideas." *Metclaf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (emphasis added).  As noted in this Circuit's seminal case, *Krofft*, 562 F.2d at 1163, n.6, "no better formulation has been devised" to distinguish an unprotected idea from protected expression than Judge Learned Hand's so-called abstractions test:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since

---

[50] *See* 17 U.S.C. § 102(b) ("[i]n no case does copyright protection for an original work of authorship extend to any idea . . . concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work").

[51] See also *Cavalier v. Random House*, 297 F. 3d 815, 824 (9th Cir. 2002) ("basic plot ideas . . . are not protected by copyright law."); and *Shaw*, 919 F.2d at 1356 ("Copyright law protects an author's expressions; facts and ideas within a works are not protected.").

1          otherwise the playwright could prevent the use of his

2          "ideas," to which, apart from their expression, his

3          property is never extended.

4 *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

5        Second, material considered to be "*scenes a faire*" is treated like ideas and

6 likewise is not protectable. *Id.*; *Funky Films*, 462 F.3d at 1077. *Scenes a faire*

7 include material or scenes that are "as a practical matter indispensable, or at least

8 standard, in the treatment of a given [idea]," *Apple Computer, Inc.*, 35 F.3d at

9 1444, as well as scenes and relationships which flow naturally from or are generic

10 from basic plot lines. *Metcalf*, 294 F.3d at 1074; *Funky Films*, 462 F.3d at 1077.[52]

11        Third, also to be excluded from the substantial similarity analysis are those

12 materials in a plaintiff's work which are repeated from pre-existing works, *Shaw v.*

13 *Lindheim*, 809 F. Supp. 1393, 1402 (C.D. Cal. 1992), as well as all "elements

14 borrowed from another author." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d

15 1129, 1177 (C.D. Cal. 2001).[53]

16        Obviously, any material of which a plaintiff is not copyright owner cannot

17 be the basis for an infringement claim. Accordingly, the required "filtration

18 process," must remove from the comparison of the works any portion of the

19 plaintiff's work not protected under copyright or not owned by the plaintiff. *Apple*

20

---

21    [52] Obvious and simple examples of *scenes a faire* would be the boy-meets-girl scene
22 in a romantic comedy, the climactic fight between hero and villain in an action adventure, and the death in combat of a buddy in a war film. More involved examples from
23 summary judgment case law include the following: "The appearance of drunks, prostitutes, vermin and derelict cars in any realistic work about the work of policemen in
24 the South Bronx," *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986); in a comedy involving a quarrel between prototypical Jewish and Irish fathers, "the marriage
25 of their children, the birth of grandchildren and reconciliation," *Nichols* 45 F.2d at 122; and in a writing about vampires, descriptions of "killings, macabre settings, and choices
26 about good and evil," 4 *Nimmer* at § 13.03 [B][4] at 13-88.7 (citing *Hogan v. DC Comics*, 983 F. Supp. 82 (S.D.N.Y. 1997)).

27    [53] This point is explained in the legislative history: "The most important point here is one that is commonly misunderstood today: copyright in a 'new version' covers only the
28 material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material." H. Rep. at 57.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 169 of 252

*Computer, Inc.*, 35 F.3d. at 1443; *Idema*, 162 F. Supp. 2d at 1176-77; *Satava v. Lowry,* 323 F.3d 805, 812 (9th Cir. 2003) ("*subtracting* unoriginal elements" required) (emphasis added)*; see also Cavalier*, 297 F.3d at 822 (courts "must take care to inquire only whether 'the *protectable elements, standing alone*, are substantially similar.'") (quoting *Williams v. Crichton*, 84 F.3d 581, 599 (2d Cir. 1996) (emphasis in original)). Once the non-copyrightable elements and matter not owned by the plaintiff are filtered out of the work, an objective comparison of the remaining copyrightable elements of the works must be conducted in order to determine if they are "substantially similar." *Id.*; *Funky Films*, 462 F.3d at 1077.

In addition, in examining the level and quality of the similarities found, the courts have also accorded weight to the *differences* between the works, finding that "'numerous differences tend to undercut substantial similarity.'" *Warner Bros., Inc. v. American Broad. Co.*, 720 F.2d 231, 241 (2d Cir. 1983) (citation omitted); *Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.*, 509 F.2d 64, 65-66 (2d Cir. 1974). *See also Sinicola v. Warner Bros., Inc.*, 948 F. Supp. 1176, 1190 (E.D.N.Y. 1996) ("numerous differences between the works cannot be ignored"); *Cosgrove v. Warner Bros. Inc.,* 13 U.S.P.Q.2d 1555, 1558 (E.D.N.Y. 1989) ("there are innumerable other differences between the two works").

Plaintiffs claim that their copyright in the Submissions and *MF 101* (Bergman Decl. Exhs. H, I, M) are infringed by *Smallville*. However, when these works are stripped of both pre-existing material (such as any material from the Prior Superman Publications) and other unprotectable material (such as *scenes a faire*, ideas, or the expression of those ideas contained in the Non-Terminated Superboy Works (Bergman Decl. Exhs. E, K, L, N, O)), Plaintiffs are left with very little, if any, copyrightable material they can claim to own exclusively on which to base any infringement claim. And, more importantly here, as shown below, none of that copyrightable material has been used in any *Smallville* episode created after November 17, 2004. (Hage Decl. Exhs. D, F, H.)

## 2. There is No "Substantial Similarity" Between *Smallville* and Plaintiffs' Works

As noted above, Plaintiffs' interrogatory responses describe Plaintiffs' Works in the most general terms as being about "a modest young man" attending school in "a small rural town," and "coming to grips with the fact that he is very different from others and with the challenges and responsibilities of his supernatural powers." (Bergman Decl. Exh. PP at 6.) Plaintiffs allege that these works center around the main character's relationship with his adoptive parents and explore the central themes of the "coming-of-age of a young man destined for greatness as a superhero," "themes which re-interpret, amplify and express the predicaments of adolescence in a wish fulfillment fantasy context." (*Id.* at 7.) These characters, relationships, and themes are also alleged to be present in the post-November 17, 2004 episodes of *Smallville*.[54] (*Id.* at 7-9.) As an initial matter – and as a simple review of the short works themselves clearly demonstrates – Plaintiffs grossly mischaracterize what the Script and *MF 101* actually contain. There is nothing in these works to indicate that the young Clark Kent is modest, lives in a small rural town, has any notable relationship with his parents, or is dealing with "adolescent" issues. *Compare* Plaintiffs' Works with *Smallville* episodes (Hage Decl. Exhs. D, F, H.) *See also* Rose Decl. Exh. A at 8; Rovin Decl. ¶¶ 9, 15. Furthermore, these broad types of similarities, even if they existed – and they do not – are insufficient to satisfy the extrinsic test of substantial similarity. *Funky Films*, 462 F.3d at 1081. *See also Berkic*, 761 F.2d at 1293, Rose Decl. Exh. A at 10.[55]

---

[54] While lists of similarities have sometimes been used by the courts, because they are drawn up by counsel and therefore self-serving, the Ninth Circuit has noted that "they are inherently subjective and unreliable." *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984). Plaintiffs' "list" of unprotectable themes and ideas similarly proves itself to be "inherently . . . unreliable."

[55] In *Berkic*, the Ninth Circuit noted that, "[b]oth [works] deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants. To some extent, both works take their

ER 3334

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 171 of 252

1   When pressed by Defendants – and ***ordered by the court*** – to provide the

2   details of what *specific passages, images or scenes* in their works were allegedly

3   infringed by Defendants, Plaintiffs submitted a list of 74 purported elements or

4   characteristics of their works which they contend are similar to the elements and

5   characteristics of *Smallville*. (Bergman Decl. Exh. RR.) This list also consists

6   mainly of general ideas or stock concepts that are standard or inevitable for the type

7   of work involved[56] and, to a large extent, inaccurately represents the contents of the

8   Script and *MF 101*. (Rovin Decl. ¶ 22 & Exh. B.) Further, many of these ideas,

9   concepts and relationships had previously been expressed in the Prior Superman

10  Publications, or were later explored in the Non-Terminated Superboy Works, and

11  accordingly must be "filtered out," as unoriginal material not exclusively owned by

12  Plaintiffs or not subject to Plaintiffs' Superboy Notice. (*Id.*) That is, using the

13  specific analysis mandated by the Ninth Circuit for the extrinsic test – and

14  comparing the two works for their *setting, plot, characters, theme, mood, pace,*

15  *dialogue and sequence of events* (*Funky Films*, 462 F.3d at 1078) – it is

16  incontestable that there is no "substantial similarity" between Plaintiffs' Works and

17  *Smallville*.[57]

18      The lack of any such substantial similarity is readily demonstrated by

19  viewing any of the post-termination episodes of *Smallville* and comparing them

20  under applicable Ninth Circuit standards to the Plaintiffs' Works (Bergman Decl.

21  Exhs. H, I, M). For the Court's convenience Defendants have submitted DVDs of

22  each post termination episode along with written summaries prepared by WBTV

23

24  general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization. *But this degree of similarity between the*

25  *basic plots of two works cannot sustain a plaintiff's claim that the works are* '*substantially similar.*'" *Id.* (emphasis added).

26  [56] *See, e.g.,* item 24 ("young Clark uses his powers to foil bad guys"); item 49 ("Mr.

27  and Mrs. Kent are small town folk"); and item 72 ("young Clark comes to realize that he is very different from everyone else").

28  [57] While these elements are addressed at some length below, they are discussed in much more detail in the Rovin and Rose Declarations submitted herewith.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 172 of 252

for purposes other than this litigation. (Hage Decl. Exhs. <u>C</u> through <u>H</u>.) As a supplement to the Court's own analysis, Defendants respectfully submit the following comparison using the Ninth Circuit's keystone considerations.

### a. Setting

Plaintiffs have claimed that both Plaintiffs' Works and *Smallville* are set in the rural town of "Smallville." (FASBC, ¶ 39.) However, this claim fails for a number of reasons. First, there is no mention of the name "Smallville" in either the Pitch, the Script, or *MF 101*. (Bergman Decl. Exhs. <u>H</u>, <u>I</u>, <u>M</u>.) Indeed, it is undisputed that Superman's home town of "Smallville" did not receive its name until *Superboy No. 2*, cover dated May-June 1949, a work which was never created or owned by Siegel. (*Id.* Exh. <u>LL</u>.) Thus, such work could not be the basis for Plaintiffs' copyright claim as Plaintiffs cannot claim to own it. Moreover, it is black letter copyright law that names, such as "Smallville," are not protected by copyright. *See, e.g.* 37 C.F.R. § 202.1(a) (words and short phrases such as names, titles, and slogans are not subject to copyright protection).[58]

Plaintiffs' claim of copyright infringement based on the notion that both works take place in a "rural" setting is similarly without merit. Attempting to claim copyright ownership in a "rural setting" is like trying to own stories that take place on a street, or in the jungle. This is the very sort of generality for which protection is denied under Judge Hand's "abstractions test." As a result, courts in this Circuit have consistently held that such claims do not give rise to copyright infringement. *See, e.g., Rice*, 330 F.3d at 1177 (in story about magician revealing his secrets, similarities such as being filmed in a street location without any audience is too generic to copy and is inconsequential); *Burroughs*, 683 F.2d at 624 (commonality in locale of sub-Sahara African jungle held too general and

---

[58] As a result of DC's use of the term SMALLVILLE in commerce, it has attained *trademark* significance, which trademark is owned by DC. (Bergman Decl. Exh. <u>P</u>.) As established in Argument Section I.C.2, *supra*, even if Plaintiffs' Superboy Notices are effective, they cannot affect DC's ownership of or its ability to use the SMALLVILLE trademark.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 173 of 252

1 abstract); and *Funky Film*, 462 F.3d at 1077-78 (that both works take place in a
2 family run, small funeral home held of no moment in view of differences at more
3 detailed levels of plot, character, themes, mood, pace, dialogue and sequence of
4 events).

5     Furthermore, Plaintiffs read much more into the Submissions than what
6 those works actually contain. The Submissions (Bergman Decl. Exhs. H, I) are
7 entirely vague as to setting, and, as established above, the name "Smallville" that
8 later became associated with the Superboy character nowhere appears in them.
9 Importantly, there is no indication in the Submissions that the key setting is a
10 farming community or that the Kents live on a farm. (*Id.*) Indeed, the Script
11 implies an *urban* setting, with the final panel of the work describing Superboy
12 "streaking over city at night." (*Id.* Exh. I at 13.) Similarly, *MF 101* has no defined
13 setting. (*Id.* Exh. M.) While some of the earlier panels in the 1944 comic could
14 possibly be interpreted as taking place in a rural or suburban setting, the final
15 scenes in *MF 101* – where young Clark rescues a trapped motorist and astounds his
16 friends with his strength – are clearly in an *urban* setting, among tall buildings and
17 skyscrapers. (*Id.* at 5.)

18     In contrast, *Smallville* decidedly takes place in a small town and on a farm,
19 among encroaching development and industrialization. (Hage Decl. Exhs. D, F,
20 H.)[59] Even if Plaintiffs could point to some clear indication that the Submissions
21 or *MF 101* are set in a rural setting, which they cannot, they can certainly point to
22 no similarity in the particular *expression* of rural settings in the respective works.
23 In other words, there are no specific similar landmarks, homes, schools,
24 topographies, or any other specific places in common in the respective works. (*See*
25
26     [59] In fact, Superman's upbringing on a farm was first conceived in the 1942 Lowther
27 Novel (Bergman Decl. Exh. N at 24), a Non-Terminated Superboy Work, and DC and its
licensees retain the right to use the contents of the Lowther Novel – and all of the Non-
28 Terminated Superboy Works – without infringing on any of Plaintiffs' "Superboy
copyrights."

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 174 of 252

1  Rose Decl. Exh. A at 10; Rovin Decl. ¶ 15.)  In short, there is simply no similarity
2  in setting between the two sets of works.

3               **b.     Characters**

4        Judge Learned Hand's classic 1930 observation in *Nichols* underlies the
5  basic rule that has informed the law of character protection ever since:

6               If Twelfth Night were copyrighted, it is quite possible
7               that a second comer might so closely imitate Sir Toby
8               Belch or Malvolio as to infringe, but it would not be
9               enough that for one of his characters he cast a riotous
10              knight who kept wassail to the discomfort of the
11              household, or a vain and foppish steward who became
12              amorous of his mistress.  These would be no more than
13              Shakespeare's "ideas" in the play, as little capable of
14              monopoly as Einstein's Doctrine of Relativity, or
15              Darwin's theory of the Origin of Species.  It follows that
16              the less developed the characters, the less they can be
17              copyrighted; that is the penalty an author must bear for
18              making them too indistinctly.

19  *Nichols*, 45 F.2d at 121.

20       Plaintiffs' claims of similarities in characters are legally unfounded and
21  factually without merit.  Initially, only "sufficiently delineated" characters warrant
22  copyright protection.  *Rice*, 330 F.3d at 1175-76.  While visual depictions, such as
23  cartoons, might readily meet the test, protection for literary characters is often
24  difficult to achieve.  *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir.
25  1978).  The schematic, exclusively verbal depictions of Superboy and the other
26  stock characters in the Script's exclusively textual continuity scenes are
27  consequently borderline in meriting copyright protection at all.  *Id.*  Even where
28  threshold protectable characterization exists, a plaintiff's claimed similarities as to

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 175 of 252

1    characters will be rejected, as a matter of law, where these pertain to material that

2    is too general and indistinctive. *See, e.g., Kouf,* 16 F.3d at 1042 (similarities with

3    respect to the "genius kid with thick-rimmed glasses" *held* not actionable).

4        To the extent there is any detailed character delineation in the Submissions,

5    this comes from the necessary incorporation of the attributes of the pre-existing

6    Superman character developed in the Prior Superman Publications in which

7    Plaintiffs admittedly do not claim exclusive ownership rights and which

8    characteristics therefore *may not be considered* when evaluating Plaintiffs'

9    infringement claim. *See Shaw,* 809 F. Supp. at 1402; *Idema,* 162 F. Supp. 2d at

10   1177. The kind of superhero traits repeated in the Superboy character, which

11   Plaintiffs incorrectly assert are new, have in any event been judicially held to be

12   too common in the superhero genre or are *scenes a faire* that are irrelevant to

13   establish substantial similarity where there are differences in incident and detail

14   between the works. *See Warner Bros. Inc.,* 654 F.2d at 210-11 (common use of:

15   tight fitting acrobatic costumes; heroes who fight megalomanial villains;

16   traits/powers of self-propelled flight; imperviousness to bullets; x-ray vision;

17   leading double life, with the character's heroic side kept in secrecy; and

18   stereotypical feats showing great strength, such as lifting a car with one hand, *held*

19   not actionable).

20       As shown below, the differences in detail between the characters in the

21   Submissions and those in *Smallville,* including new characters in *Smallville* with

22   no counterpart in the Submissions, also strongly militate against Plaintiffs'

23   infringement claim. *See Funky Films,* 462 F.3d at 1079.

24       *Young Clark Kent.* It is basic that Plaintiffs cannot appropriate for

25   themselves under a copyright theory the mere *idea* of portraying Superman as a

26   youth, as opposed to any particular expression of that idea. Indeed, the general

27   idea of a young Clark Kent derives from the Prior Superman Publications. As

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 176 of 252

described above, DC published young Clark Kent in *Superman No. 1*, more than a year prior to Siegel's initial submission of the Script:







(Bergman Decl. Exh. L). *See also* Rose Decl. Exh. A at 6 ("the general idea of a series portraying the adventures of Superman as a youth flows naturally from the premises established in *Action Comics* No. 1 and the daily strips from January

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 177 of 252

1   1939."). Moreover, since DC remains an undisputed co-copyright proprietor of the

2   Clark Kent/Superman character, it also has every right to depict that character, and

3   to license others to depict that character – at whatever stage in his life – without

4   being subject to a claim for copyright infringement.

5        The young Clark Kent as depicted in the Script is a fairly one-dimensional

6   character, shown briefly in a couple of vignettes from early childhood, and then in

7   a short action-adventure as a fifth-grader. (Bergman Decl. Exh. I). This Clark

8   shows no internal struggle, no moral turmoil, and no angst, adolescent or

9   otherwise; he is simply a young boy engaged in light adventure. (*Id.*) Similarly,

10  *MF 101* shows young Clark in a few panels demonstrating his superpowers, and

11  culminates in a brief episode where he uses his super-strength to free a trapped

12  motorist. (*Id.* Exh. M.) There is no exploration of Clark's thoughts, feelings, or

13  relationships. (*Id.*)

14       This is markedly different from the depiction of the young Clark Kent in

15  *Smallville. Smallville's* Clark is much older and more mature than the Clark of

16  Plaintiffs' Works. (*See generally*, Hage Decl. Exhs. C-H; Rose Decl. Exh. A at

17  11.) In the first episode allegedly affected by Plaintiffs' termination, he is a high

18  school senior, on the verge of adulthood with emerging sexual interests and a

19  varied set of relationships with his peers and his parents. (Hage Decl. Exh. C at 3

20  & Exh. D episode 9.) He is troubled, questioning, and unsettled, and deeply

21  interested in his Kryptonian past. Unlike the Superboy character in the Script and

22  in *MF 101*, the *Smallville* character is never shown in the traditional Superman

23  costume. (*Id.* ¶ 3.) Nor is there precedent in Plaintiffs' Works for such aspects of

24  the *Smallville* character as his vulnerability to various kinds of Kryptonite or the

25  split personality that he develops as the series unfolds. (Rose Decl. Exh. A at 11.)

26  In short, there is no substantial similarity between Plaintiffs' Works and *Smallville*

27  with respect to the Clark Kent character.

28

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 178 of 252

1       _The Kents_. In _Smallville_, the Kents are depicted as a *young* farming couple,

2 who are presented as kindly and loving towards their adopted son, whom they

3 discovered as a small child in the wreckage of a spaceship. (*Id*. Exh. A at 1 & Exh.

4 B at pilot episode.) The Kents have a complex and deeply explored relationship

5 with the teenage Clark Kent, and help him to come to terms with his Kryptonian

6 origins. (*Id. generally* Exhs. C-H.)

7       The age of the Kents is unstated in the Script (Bergman Decl. Exh. I), but in

8 *MF 101* they are clearly shown as being *elderly* (*id* Exh. M). Neither work shows

9 them as being farmers or living on a farm. (*Id*. Exhs. I, M.)[60] There is virtually no

10 depiction of the Kents in *MF 101*, and no material interaction between them and

11 Clark. Although there is a more significant description of the Kents in the Script,

12 these characters were first introduced in the Prior Superman Publications, which

13 pre-date the Script, notably in *Superman No. 1*:

14

15

16

17 

18

19

20

21

22

23

24

25

26

27

---

28   [60] The idea of the Kents as farmers was also first expressed in the 1942 Lowther Novel. (*Id*. Exh. N at Chapter III.)

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT



(Bergman Decl. Exh. L.)

Since these pre-existing depictions and characteristics of the Kents under any scenario will remain co-owned by DC, they must be "filtered out" of any substantial similarity analysis. Accordingly, there is no evidence of any substantial similarity between Plaintiffs' Works and *Smallville* with respect to the characters of the Kents.

*Jor-El and Lara*. Clark Kent's Kryptonian father "Jor-El" is a recurring character in *Smallville*. (Hage Decl. ¶ 3; Rose Decl. Exh. A at 10.) The characters of Superman's Kryptonian parents, "Jor-L" and "Lora" are briefly mentioned in the Script. (Bergman Decl. Exh. I.) "Jor-El" and "Lara," as they were later called, are more extensively depicted in the first three pages of *MF 101*, as concerned and

69

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 179 of 252

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 180 of 252

1  caring parents who send their only son away in a spaceship to escape the

2  impending destruction of Krypton. (*Id.* Exh. M.) But the characters of

3  Superman's Kryptonian parents were established in the Superman mythology well

4  before the Submissions, and appeared in the first daily Superman comic strips,

5  published in January of 1939:



19  (*Id.* Exh. K.) Accordingly, there is no basis to find substantial similarity based on

20  these characters.

21      *Other Characters*. Neither the Script nor *MF 101* shows young Clark

22  having a significant relationship with any other characters. (Bergman Decl. Exhs.

23  I, M.) *Smallville*, on the other hand, is populated with a number of distinct and

24  fully realized characters, who befriend, influence, or otherwise have a major

25  impact on Clark's life. These include his love interest, Lana Lang; his friend

26  Chloe Sullivan; and his good friend (and later to be Superman's arch-enemy) Lex

27  Luthor. (Hage Decl. ¶ 3 & *generally* Exhs. C-H; Rose Decl. Exh. A at 8-10.)

28  There is no counterpart for *any* of these characters in Plaintiffs' Works.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 181 of 252

### c.  Plot and Sequence of Events

It is well established that in granting summary judgment the courts "attach no significance" to similarities in general plot ideas because these are only at the abstract or general level and not protected by copyright. *See, e.g., Kouf*, 16 F.3d at 1045 (life struggle of kids fighting insurmountable dangers); *Berkic*, 761 F.2d at 1293 (exposing a criminal organization that murders healthy people and sells their organs for transplants); *Shaw*, 919 F.2d at 1362 (random similarities, such as danger scenes and concerned parents); *Burroughs*, 683 F.2d at 624 & 627 (common stories of (a) Tarzan, an ape-man living in the jungle, and Jane, a beautiful woman from civilized society who meet and fall in love and (b) "a woman choosing between two suitors"); and *Warner Bros. Inc.*, 654 F.2d at 210 (heroes in each work leading double lives, their heroic side being kept in deep secrecy). *See also Rice*, 330 F.3d at 1176 (commonality in featuring masked magician revealing secrets considered inevitable, *scene a faire* to theme of magician doing so while disguising his identity).

Here, there are no similarities in any detailed sequence of events in the works at issue, and *Smallville* only shares three general story elements with the Script and *MF 101*:  They all show Clark Kent's arrival on Earth, they all demonstrate his superpowers, and they all show him helping people in need.  As noted above, however, these story elements were established in the Prior Superman Publications, and are, in any event, *scenes a faire* in any Superman story.  The character's superpowers began in *Action Comics No. 1* (Bergman Decl. Exh. E), and his arrival on Earth is shown there and in *Superman No. 1* (*id.* Exh. L, excerpted above) in which his adoptive parents, who suggest he should help others, are also introduced.  And the general idea of Superman helping people – as distinct from any particular realization of that idea – is also a *scene a faire*, as helping people is what Superman commits himself to in the very first story in *Action Comics No. 1* (*id.* Exh. E).

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 182 of 252

1   Moreover, the concrete elements of expression in which the general ideas of

2   earthly arrival, discovery of superpowers, and good deeds are embodied in the two

3   works are manifestly different. In the Script and *MF 101* (*id.* Exhs. I, M), the

4   rocket merely lands and is discovered by a passing motorist. In *Smallville* the ship

5   lands in the context of a cataclysmic meteor shower that destroys buildings, kills

6   people, and scatters Kryptonite, setting off a chain of events that affects the

7   populace of the town well into the future. (Hage Decl. ¶ 3, Exh. A at 1 & Exh. B at

8   pilot episode.) In the Script and in *MF 101* (as in *Action Comics No. 1*) the baby

9   reveals his superpowers in the orphanage, whereas in *Smallville* Clark Kent does

10  not reveal his powers until he is a high school student when he is struck by a

11  speeding car and emerges unscathed. (Hage Decl. Exh. A at 1 & Exh. B at pilot

12  episode.) Furthermore, except for the general idea of doing good deeds, the

13  rescuing incidents in the two sets of works have nothing in common.

14  Also, the Script and *MF 101* imply continuing adventures in which

15  Superboy, disguised in the iconic costume, rescues people and battles criminals.

16  (Bergman Decl. Exhs. I, M.) The *Smallville* pilot, on the other hand, implies a

17  multi-faceted series that will involve romantic and competitive relationships

18  among various Smallville residents. (Hage Decl. Exh. A at 1 & Exh. B at pilot

19  episode.) Another integral part of the series, which was established in the

20  *Smallville* pilot, is the effect of the Kryptonite meteor shower in creating mutated

21  humans with various supernatural attributes, who provide a counterpoint to Clark

22  and his powers. (*Id.*) None of these story elements is even suggested, let alone

23  depicted, in Plaintiffs' Works.

24  Both Plaintiffs' Works and *Smallville* are in a general way concerned with

25  the development of the young superhero, but this general idea – apart from any

26  concrete expression of the idea in a particular story – is merely a *scene a faire* that

27  flows logically from the premise that Superman arrived on Earth as an infant. The

28  life story of any character *inevitably* progresses from infancy to maturity and,

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 183 of 252

1  moreover, this progression is depicted in *Superman No. 1* and the other Non-

2  Terminated Superboy Works. Both the Script and *MF 101* portray an elementary-

3  school Clark, whereas *Smallville* starts in high school and does not portray

4  Superman's pre-pubescent years. The plot component that a boy goes to school is

5  inevitable and clearly is not something that anyone can exclusively own. Also,

6  while Plaintiffs' Works are extroverted and proceed in a linear fashion, *Smallville*

7  is reflective and non-linear, with many interwoven plot threads. (Rose Decl. Exh.

8  A at 15.) And those plot threads are the antithesis of the "humorous" adventures

9  proposed by Siegel in the Pitch, and carried out by him in the Script. (*Compare*

10  Bergman Decl. Exhs. I, M *with* Hage Decl. Exhs. D, F, H.)

11      Indeed, virtually every post-termination episode of *Smallville* underscores

12  the sharp distinction in plot – and in mood, themes and characters – between that

13  series and Plaintiffs' Works. For example, in the episode titled "Bound," which

14  first aired on November 17, 2004 (the alleged effective termination date), the

15  young Lex Luthor wakes up in a hotel room next to a dead girl, and Clark sets out

16  to prove that Lex is not guilty of murder. (Hage Decl. Exh. C at 3 & Exh. D at

17  episode 9.) And in the episode titled "Thirst," which first aired on October 27,

18  2005, Lana Lang turns into a vampire, starts to suck the life out of her friends, and

19  must be stabbed in the heart by Clark with an antidote developed by LutherCorp.

20  (*Id.* Exh. E at 6 & Exh. F at episode 5.)

21      These plots – and the plots and sequence of events of the other post-

22  termination *Smallville* episodes[61] – have nothing in common with Plaintiffs'

23  Works.

24

25  ───────────────

26  [61] These plots are typical of the series: For example, in the episode titled "Recruit,"
    which first aired on February 9, 2005, Lois Lane gets into a drinking match with a
    Metropolis University football player, and is later charged with his murder after he

27  mysteriously dies. (*Id.* Exh. C at 4 & Exh. D at episode 13.) And in the episode tiled
    "Forever," which first aired on May 11, 2005, Clark must stop the school photographer

28  after he sets up a secret simulated high school and begins kidnapping students to keep his
    glory days of high school going forever. (*Id.* Exh. C at 6 & Exh. D at episode 21.)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 184 of 252

1

**d.     Themes**

2     The theme of the Superboy comic series as projected by the Submissions

3 and *MF 101* is simple and straightforward:  Superboy will be shown "venturing out

4 to help people in need," putting his "hidden strength to work" for good purposes.

5 (Bergman Decl. Exhs. I, M.)[62]  *Smallville*, on the other hand, addresses themes

6 such as emerging sexuality, the impact of the meteor shower on the larger

7 Smallville community, and Clark's investigation of his past.  (Rose Decl. Exh. A at

8 15-16.)  There is no substantial similarity in the themes of the works.

9

**e.     Mood**

10     The difference in mood between the works also weighs against any extrinsic

11 similarity.  *See Kouf,* 16 F.3d at 16 ("light hearted family adventure story" versus

12 "darker adventure").  The Pitch indicates that the Superboy comic series would be

13 about 12-year olds and be characterized by humor and action (Bergman Decl. Exh.

14 H), and these qualities are evident in both the Script and in *MF 101* (*id.* Exhs. I,

15 M).  *Smallville* is much more somber in style, with young Clark's arrival on Earth

16 amid a devastating meteor shower.  (Hage Decl. ¶ 3 & Exh. B at pilot episode.)

17 There is also a gothic element introduced by the frequent presence of different

18 grotesque Kryptonite-influenced characters.  (Rose Decl. Exh. A at 16-17.)

19 Accordingly, there is no similarity in the moods of the works.

20

**f.     Pace**

21     The various incidents in young Clark's life as dramatized in Plaintiffs'

22 Works are presented in simple chronological order, and there is no interweaving of

23 multiple narrative threads.  The few story elements contained the Script are the

24 stock fare of comic books involving a superhero as a child who leads a double life,

25 inevitably including showing him at home, in school and helping his friends in

26 danger.  (Bergman Decl. Exh. I.)  In contrast, the *Smallville* episodes are

27

28     [62] These themes were also addressed in the Prior Superman Publications (Bergman
Decl. Exhs. E, K, L), which are not the subject of the Superboy Notice.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 185 of 252

1   structurally complex stories in which various narrative threads alternate and

2   intertwine and are explored in significant detail, making for a completely different

3   narrative pace.  (Rose Decl. Exh. <u>A</u> at 17.)

4               **g.   Dialogue**

5        Plaintiffs have not pointed to – nor is there *any* – instance of substantial

6   similarity in dialogue between the Plaintiffs' Works and any *Smallville* episode.

7   (Bergman Decl. Exhs. <u>PP</u>, <u>RR</u>.)  Not only is there no shared dialogue between the

8   works, but the *nature* of the dialogue is profoundly different.  While the dialogue

9   in the Submissions and in *MF 101* is simple, superficial, and dated (*id*. Exhs. <u>H</u>, <u>I</u>,

10  <u>M</u>), the dialogue in *Smallville* is modern, and is relatively deep and expansive,

11  containing and revealing much personal information (Hage Decl. *generally* Exhs.

12  <u>D</u>, <u>F</u>, <u>H</u>.).

13              *       *       *

14       Employing the substantial similarity analysis mandated by the Ninth Circuit

15  demonstrates that the only similarity between *Smallville* and Plaintiffs' Works is

16  that they both embody the idea of Superman as a youth and refer to Superman's

17  origins at the most general and abstract level.  As a matter of law, Plaintiffs cannot

18  claim ownership of an idea or of the pre-existing Superman story elements reused

19  in Plaintiffs' Works.  Once these ideas and pre-existing foundation story elements

20  are "filtered out," what remains of the works that may be copyrightable and solely

21  owned by Plaintiffs does not resemble any of the expressive content in *Smallville*

22  episodes prepared after the effective date of the Superboy Notice.  That is, the

23  works are so entirely different that there is no possible actionable similarity.

24  **G.   <u>Relief Requested</u>**

25       Defendants respectfully request that the Court grant partial summary

26  judgment in their favor as to Plaintiffs' First Claim for Relief for copyright

27  infringement, and Fifth Claim for Relief for injunction in the Superboy Action,

28  insofar as those claims relate to the television series *Smallville*.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 186 of 252

## IV.    NEITHER WARNER BROS. ENTERTAINMENT INC. NOR TIME WARNER INC. IS THE "ALTER EGO" OF DC, AND PLAINTIFFS THEREFORE ARE NOT ENTITLED TO REACH THE SUPERMAN-RELATED PROFITS OF EITHER OF THESE DEFENDANTS

### A.    Summary of Argument

In an attempt to capture as much of the Superman revenue as possible, Plaintiffs have named in the Superman Action not only DC, their alleged copyright co-proprietor, but also Warner Bros. Entertainment Inc. ("WBEI") − a DC affiliate and a licensee of the Superman property − and Time Warner Inc. ("TWI"), the ultimate corporate parent of both DC and WBEI. Plaintiffs apparently recognize the black letter law that while co-owners of copyright must share their profits, *licensees* of one copyright co-owner have no obligation to account for their profits to the other co-owner (*see* Argument Section IV.D.1.a, *infra*); accordingly, the complaint in the Superman Action asserts a claim against these two defendants based on the contention that they are the *alter egos* of DC. Additionally, defendant WBEI is alleged to be an "effective joint owner and licensor" of the Superman copyrights, purportedly giving rise to an independent obligation to account for and to share with Plaintiffs its Superman-related profits.

However, there is no legal principle which creates or gives rise to liability for a purported "effective joint owner" of a copyright, and Plaintiffs can present no evidence that either WBEI or TWI is the *alter ego* of DC. Accordingly, and as a matter of law, neither TWI nor WBEI is independently obligated to account to Plaintiffs and to share with them any of their profits from Superman. TWI and WBEI are therefore entitled to have summary judgment entered in their favor as to the First through Fifth Claims for Relief in the Superman Action.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 187 of 252

B. **Additional Factual Background**

1. **Corporate History and Structure of DC**

The company now known as DC Comics began in the 1930s as "National Allied Publishing." (Levitz Decl. ¶ 12.) Through a series of name changes, mergers, and acquisitions in the 1930s and 1940s, National Allied Publishing became Detective Comics, then "National Comics Publications, Inc." and then "National Periodical Publications, Inc." ("NPP"). (*Id.*) In 1967, NPP was purchased by Warner Communications, Inc. ("WCI"). (*Id.*) In 1976, NPP's name was changed to DC Comics, Inc. (the "DC" standing for "Detective Comics"). (*Id.*)

In 1993, DC Comics, Inc. was dissolved and converted to a New York general partnership called "DC Comics" and has remained in that same form through the present. (*Id.* ¶ 13.) Since the formation of the DC Comics partnership in 1993, its partners have undergone one change. (*Id.*) From 1993 through March 2003, the partners of DC were WCI and Time Warner Entertainment Company, L.P. ("TWEC"), a Delaware limited partnership, and each held a one-half interest in the partnership. (*Id.*)[63] In March, 2003, TWI completed a restructuring of TWEC. (Levitz Decl. ¶ 13; Cannon Decl. ¶ 5.) As a result of the restructuring, WCI acquired complete ownership of TWEC's content businesses, including Warner Bros., Warner Bros. Television Production, and certain other former divisions of TWEC. (Cannon Decl. ¶ 5.) In connection with the restructuring of TWEC, WCI contributed its 50% interest in DC to E.C. Publications, Inc. ("EC")[64]

---

[63] TWEC was formed in 1992 among TWI, certain TWI affiliates, and third party investors. (Declaration of Janice Cannon ("Cannon Decl."), ¶¶ 2-4.) The TWI-related entities contributed various operating business assets to the TWEC partnership, while the non-TWI parties made substantial capital contributions in exchange for limited partnership interests. (*Id.* ¶ 4.) Between 1993 and 2003 TWI and TWI-related partners owned between approximately 70% and 75% of TWEC. During this period TWEC held various entertainment assets, including Warner Bros., HBO and Time Warner Cable. (*Id.*)

[64] EC is also a subsidiary of WCI and is the publisher of magazines and comic books such as *Mad Magazine*. (Levitz Decl. ¶ 13.)

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 188 of 252

and TWEC distributed its assets, including its partnership interest in DC, to WCI. (Levitz Decl. ¶ 13; Cannon Decl. ¶ 5.) As a result, today the partners of DC are EC and WCI, each holding a one-half interest. (Levitz Decl. ¶ 13; Cannon Decl. ¶ 5.)

The TWEC restructuring also resulted in the formation of a number of new corporations to hold and operate the content businesses formerly owned by TWEC. (Cannon Decl. ¶ 6.) These newly formed corporations included WBEI, which succeeded to, among other things, the Warner Bros. content business. (*Id.*) WBEI is the parent corporation of Warner Bros. Enterprises LLC, which in turn is the parent company of WB Studio Enterprises Inc., which produced, through its Warner Bros. Pictures division, the recent *Superman Returns* motion picture, and which produces, under its Warner Bros. Television division, the *Smallville* television series. (Declaration of Julie Spencer ("Spencer Decl."), ¶ 2.) WBEI is a subsidiary of WCI but holds no interest in DC. (*Id.* ¶ 3.) Thus, DC and WBEI are "sibling" entities under common ownership.

## 2. Relationship of TWI and WBEI to DC

TWI was originally incorporated in February, 2000 as AOL Time Warner Inc.; it underwent a name change to its present name in October, 2003. (Cannon Decl. ¶ 2.) TWI is the successor in interest to the company previously known as Time Warner, Inc., and now known as Historic TW Inc., which was formed in 1989 in contemplation of the merger of Time, Inc. and WCI. (*Id.*) TWI is a large publicly traded media company with over 1500 direct and indirect subsidiaries in the publishing, motion picture, and television industries. (*Id.* ¶ 3.) WCI is an indirect subsidiary − two levels removed − of TWI. (*Id.*) In addition to being a partner in DC, WCI is the corporate parent of defendant WBEI. (*Id.*) EC (DC's other constituent partner) and WBEI are, therefore, sister companies on the same rung of the TWI corporate ladder, and both are indirect subsidiaries of TWI. WBEI does not have any ownership or partnership interest in DC, and neither TWI

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 189 of 252

1  nor WBEI is the successor-in-interest to DC's predecessor NPP, as alleged by

2  Plaintiffs. (Spencer Decl. ¶ 3; Cannon Decl. ¶ 2.) The following is a chart of the

3  current corporate structure and affiliations between DC, WBEI and TWI:



18 (Levitz Decl. ¶ 13, Exh. A; Cannon Decl. ¶¶ 2-8; Spencer Decl. ¶¶ 2-3.)

19      Although TWI submits consolidated financial information regarding the

20 income and expenses derived from all its numerous subsidiaries, those subsidiaries

21 are operated and maintained as separate entities. (Cannon Decl. ¶ 7-8.) In

22 particular, DC and WBEI are in separate businesses and establish their own

23 business plans; have separate offices; maintain their own bank accounts and other

24 books and records; and have mostly different executive officers. (Id. ¶ 8; Levitz

25 Decl. ¶ 17; Spencer Decl. ¶ 2.) However, for financial reporting purposes, both

26 DC and WBEI fall within the "filmed entertainment" group of TWI companies –

27 which also includes New Line Cinema Corporation and Castle Rock Entertainment

28 – and for operating management purposes, DC reports to its ultimate corporate

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 190 of 252

1  parent through WBEI. (Levitz Decl. ¶ 17; Spencer Decl. ¶ 2; Cannon Decl. ¶ 7.)

2  Accordingly, DC's President and Publisher reports to and obtains approvals from

3  WBEI's President and Chief Operating Officer before making significant

4  acquisitions or certain financial decisions or investments that are outside the scope

5  of DC's customary acquisitions and investments; before implementing meaningful

6  strategic changes; and before embarking on something substantially outside DC's

7  normal course of business. (Levitz Decl. ¶ 17.) However, neither WBEI nor TWI

8  has day to day involvement in DC's core creative or business decisions and

9  operations other than in areas where they provide administrative support, such as

10  real estate services. (Id.; Spencer Decl. ¶ 3; Cannon Decl. ¶ 7.)

### 3.    DC's Licensing of Superman

12       DC is in the business of creating, publishing, and licensing comic book

13  stories and characters. (Levitz Decl. ¶ 14.) DC publishes scores of titles,

14  amounting to an output of hundreds of different comic books and graphic novels

15  annually. (Id.) DC is not in the business of producing movies, television shows, or

16  animated programs. (Id.) For that reason, DC enters into license agreements to

17  exploit its intellectual property through those and other media outlets. (Id.) DC

18  and its predecessors have entered into a number of license agreements over the

19  years – with both affiliates and non-affiliates – that involve the rights to market or

20  exploit Superman. (Id.) Some of the agreements grant exclusive licenses to

21  Superman in certain markets or media, and some grant non-exclusive rights. (Id.)[65]

22       Since April 16, 1999 (the purported effective date of Plaintiffs' Superman

23  Notices), and prior to the restructuring of TWEC in 2003, DC entered into several

24  license agreements with various divisions of TWEC concerning Superman,

---

25       [65] For example, in November, 1974, NPP entered into a production agreement for

26  movies based on the Superman property with Film Export A.G. ("Film Export"), an
   independent party not affiliated with any TWI entity. (Id.) The agreement granted Film

27  Export the exclusive right to produce, exhibit, and distribute movies based on Superman
   for a period of up to twenty-five years. (Id.) Over the years, WBEI has acquired – from

28  Film Export and its representatives – certain of the rights that Film Export had acquired
   from NPP. (Id.)

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 191 of 252

including agreements for the production and distribution of the motion picture *Superman Returns* and of the television series *Smallville*. (Levitz Decl. ¶¶ 15-16.)[66] After the 2003 restructuring of TWEC, those license agreements were ultimately assigned to WB Studio Enterprises Inc., an indirect wholly-owned subsidiary of WBEI. (*Id.* ¶ 16; Spencer Decl ¶ 2.)

## C.    The Operative Allegations Against TWI and WBEI

Plaintiffs' First Amended Complaint in the Superman Action (FASMC) (Bergman Decl. Exh. <u>EE</u>) asserts seven separate claims for relief, each of which is alleged against *all* defendants.  The first five claims are asserted against TWI and WBEI − along with DC − primarily on the theory that these defendants are alter egos of DC.  (*Id.*)[67]  Thus, Plaintiffs allege that DC is a wholly owned subsidiary of WBEI (FASMC, ¶ 9); that WBEI and TWI are the successors-in-interest to NPP, DC's predecessor-in-interest in the publication of the Superman comics (FASMC, ¶ 10); and that TWI, WBEI and DC are the alter-egos of one another (FASMC, ¶ 13).  Plaintiffs also allege that WBEI is a *de facto* joint owner of the Superman copyright by reason of the purported control it exercises over the exploitation of

---

[66] The agreement for *Superman Returns* is an "Option Purchase Agreement" dated as of November 6, 1999, pursuant to which DC granted to Warner Bros., a division of TWEC, the exclusive right to produce a feature motion picture utilizing the Superman property. (*Id.* ¶ 16.)  The agreement for *Smallville* is a "Rights Option and Assignment Agreement" dated as of December 5, 2000, as amended September 5, 2002, pursuant to which DC granted Warner Bros. Television Production, a division of TWEC, the exclusive license to produce a live action episodic television series based on the "stories and adventures of the comic book character known as 'Clark Kent' or 'Superman'." (*Id.*)

[67] The first claim for "Declaratory Relief re: Termination" seeks a declaration that Plaintiffs properly terminated the Superman copyright grants to DC under Section 304(c) of the 1976 Act; the second claim for "Declaratory Relief re: Profits" seeks a declaration as to how the Superman profits (and *whose* Superman profits) are to be accounted for and shared with Plaintiffs; the third claim for "Declaratory Relief re: Use of 'S' Crest" seeks a declaration that Plaintiffs are entitled to share in the profits from the exploitation of the Superman crest; *i.e.*, the S in Shield Device, and are entitled independently to license the crest to third parties; the fourth claim for "Accounting for Profits" seeks an accounting of all profits from the exploitation of the Superman property subsequent to the effective date of Plaintiffs' termination notices; and the fifth claim for "Waste of Jointly Owned Copyrights" seeks damages for the purported under-exploitation of the Superman copyrights post-termination.  This motion does not challenge Plaintiffs' sixth claim for "Violation of Lanham Act" or the seventh claim for "Violation of California Business and Professions Code §§ 17200 *et seq*."

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 192 of 252

the Superman property (FASMC, ¶¶ 12 & 68). Accordingly, Plaintiffs allege, they are entitled to an accounting and share of the Superman profits of not only DC, but also of TWI and WBEI (FASMC, ¶ 58(e)). However, as demonstrated below, each of Plaintiffs' factual predicates is without support and their legal conclusions are without basis.

**D.    The Undisputed Facts Establish That Neither TWI Nor WBEI is Obligated to Account to or Share With Plaintiffs Its Profits From the Superman Property**

Assuming, *arguendo*, that the Superman Notices are valid and effective, and that the parties' 2001 settlement agreement is, for some reason, unenforceable, Plaintiffs are co-owners of certain Superman copyrights *with DC*.[68] As co-owners, Plaintiffs would be entitled to an accounting *from DC* for profits DC has received from exploiting new works based on the co-owned copyrights which were created after the effective date of the termination. However, Plaintiffs have attempted to extend their statutory and common-law rights as co-owners by pleading causes of action against both WBEI and TWI, alleging that these additional defendants also must account to plaintiffs *as if* they too were co-owners of the copyrights. As explained below, Plaintiffs' claims have no support in law or fact.

**1.    Plaintiffs Are Not Entitled to an Accounting from WBEI, Which is Simply a Licensee of DC with Respect to Superman**

**a.    Joint Owners of a Copyright are Not Entitled to an Accounting from their Co-owner's Licensees**

As discussed briefly above, since Shuster's copyright interests, if any, in Superman have not been terminated, Plaintiffs are *at best* co-owners of certain of the Superman copyrights *with DC*. As a co-owner, DC retains the independent

---

[68] Defendants assert that the only Superman copyright subject to recapture by Plaintiffs is that subsisting in *Action Comics No. 1*.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 193 of 252

1  right to exploit the copyrights. *Oddo*, 743 F.2d at 633 ("each co-owner has an

2  independent right to use or license the use of the copyright."); *Zuill*, 80 F.3d at

3  1369. Indeed, that right can be exercised by DC even absent the consent of its

4  alleged co-owners. *See Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334,

5  346 (S.D.N.Y. 2005) ("It is basic copyright law that joint authors may legally grant

6  a license to a third party to exploit the work without co-author consent.").

7  Accordingly, even if the Superman Notices are valid and effective, then DC's only

8  obligation to Plaintiffs is the duty to account for and share the profits which <u>DC</u>

9  has realized from the domestic exploitation of the jointly owned copyrights since

10  the effective date of the Notices. *Oddo*, 743 F.2d at 633 ("A co-owner of a

11  copyright must account to other co-owners for any profits he earns from licensing

12  or use of the copyright.").

13      Under established law, a co-owner of a copyright is *limited* to a claim for his

14  share of the profits received by the other co-owner from the license of the

15  copyright; he does *not* have the right to pursue a claim for a share in the profits of

16  the *licensee* as well. *See Ashton-Tate v. Ross*, 916 F.2d 516, 522-23 (9th Cir.

17  1990) (a copyright holder is entitled to share in licensing proceeds from co-owner,

18  not in a licensee's profits); and *Brown v. Republic Prods., Inc.*, 26 Cal. 2d 867, 868

19  (1945) (upholding judgment that a copyright holder could not obtain accounting

20  from co-owner's licensees). *See also* 1 *Nimmer* § 6.12[B] ("A right of accounting

21  may be enforced only as against the joint owner-licensor and not as against his

22  licensee.").

23      The recent decision of the District Court for the Southern District of New

24  York in *Jasper v. Sony Music Entertainment, Inc.* is directly on point. There, the

25  plaintiff was one member of the well-known singing group the Isley Brothers. The

26  plaintiff's co-authors – the other Isley Brothers – undisputedly granted Sony Music

27  Entertainment a valid and binding exclusive license to exploit certain of the

28  group's works. The plaintiff contended that he was not a party to the license

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 194 of 252

1   agreement, that the license had expired, and that Sony was obligated to pay

2   royalties directly to him as co-author of the copyrighted works rather than to the

3   licensor pursuant to the terms of the license. The court disagreed, holding that

4   even if the plaintiff did not sign the license, his claim still failed as a matter of law

5   and was subject to dismissal because "licensees have no obligation to co-authors

6   with whom they do not contract." *Jasper*, 378 F. Supp. 2d at 346. *See also*

7   *Lindsay v. R.M.S. Titanic, Inc. et al*, 1999 U.S. Dist. LEXIS 15837, *22-23

8   (S.D.N.Y. 1999) ("The duty to provide an accounting from profits obtained runs

9   only between co-owners of a copyright; because DCI is only a licensee of a

10  putative joint owner of the copyright at issue here, [the plaintiff's] claim for an

11  accounting fails as a matter of law and must be dismissed.").[69]

12      Accordingly, as a licensee of DC with respect to Superman, WBEI has *no*

13  duty to account to or share with Plaintiffs its profits from the Superman property.

14      **b.     Notwithstanding Plaintiffs' Allegation that WBEI is**

15          **an "Effective Joint Owner" of Superman, if the**

16          **Superman Notices are Effective, then − *as a Matter of***

17          ***Law* − WBEI Can *Only* be a Licensee of DC**

18      Perhaps recognizing that they cannot reach the profits of DC's licensees,

19  including WBEI, Plaintiffs allege that WBEI has acted as the "effective joint

20  owner and licensor (as opposed to licensee)" of the purportedly recaptured

21  Superman copyrights and, on that basis, owes a duty to account to Plaintiffs. (*See*

22  FASMC, ¶ 68.)[70] But "copyright . . . is a creature of statute, and the only rights

23

---

24      [69] In *Lindsay,* the plaintiff sued R.M.S. Titanic, Inc. ("RMST") and Discovery
    Communications, Inc. ("DCI") for his share of the profits from the exploitation of certain
25  footage filmed during a Titanic salvage operation. RMST had granted DCI an exclusive
    license to exploit that footage. Although the court declined to find as a matter of law that
26  RMST and the plaintiff were joint copyright owners, a finding which would have
    required dismissal of the plaintiff's infringement claim, the court *dismissed* the plaintiff's
27  claim against DCI − the licensee − for an accounting of the moneys it received from its
    use of the copyrighted footage.

28      [70] In support of this conclusion, Plaintiffs allege that "DC never, or rarely exploits
    'Superman,' independently of . . . Warner Bros.; that even relatively linear functions such

                                    ER 3358

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 195 of 252

1    that exist under copyright law are those granted by statute." *Silvers v. Sony*

2    *Pictures Entm't, Inc.*, 402 F.3d 881, 883-884 (9th Cir. 2005) (citing *Microsoft*

3    *Corp. v. Grey Computer*, 910 F. Supp. 1077, 1084 (D. Md. 1995) ("Unlike

4    contracts, copyrights and the rights flowing therefrom are entirely creatures of

5    statute . . . .")).[71] The rules of copyright ownership, including certain definite

6    requisite formalities, are those prescribed by the Copyright Act, *see* 17 U.S.C. §

7    201, and neither the statute nor the case law thereunder recognizes an "effective"

8    or *de facto* owner of a copyright. Indeed, the rights and obligations relating to

9    copyright ownership are expressly delineated and governed by statute. Defendants

10   have found no authority for the proposition that this statutory framework can be

11   ignored or superseded in the event that a non-owner purports to exercise any rights

12   and benefits attendant to copyright ownership. *See* 17 U.S.C. § 201(e) (prohibiting

13   involuntary transfers of copyright ownership).

14       Further, the fact that DC purported to grant *exclusive* licenses to TWEC to

15   produce and distribute the *Superman Returns* motion picture and the *Smallville*

16   television series, which licenses were later assigned to an indirect wholly-owned

17   subsidiary of WBEI, does not impose any additional or different obligations on

18   WBEI, nor does it entitle Plaintiffs to reach WBEI's profits for this reason: *if* the

19   Superman Notices are determined to have been effective, then DC would only be a

20   co-owner of copyright and its exclusive licenses − or even an outright copyright

21   *grant* − would *as a matter of law* then be converted into *non-exclusive* licenses by

22   reason of Plaintiffs' lack of consent to any such transfer.[72] In other words, if

---

23

24   as 'Superman' licensing are not handled directly by DC, but are exploited exclusively
     through Warner Bros.; that the agreements and other arrangements between Defendants

25   Warner Bros. and DC regarding 'Superman' are not 'arms length' agreements, serve
     primarily Warner Bros. interests, and thus, do not reflect the appropriate market values of

26   the copyrights to 'Superman' . . . ." *See* FASMC, ¶ 12.

27   [71] Any issues which Plaintiffs might have regarding the appropriate market value of
     the license between DC and WBEI, or how DC allowed the Superman copyrights to be

28   exploited, can be addressed through Plaintiffs' claim of "waste" *against DC* asserted as
     their Fifth Claim for Relief.

     [72] If the Superman Notices are not valid, then DC remains the exclusive copyright

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 196 of 252

1 Plaintiffs have the copyright co-ownership rights they seek and claim to have in the

2 Superman Action, WBEI could *not* have become an owner – whether actual or *de*

3 *facto* – of the recaptured Superman copyrights, but could only have become a non-

4 exclusive licensee of DC. *See Bodenstab v. J.R. Blank & Assoc., Inc.*, 1989 U.S.

5 Dist. LEXIS 8554, (N.D. Ill. 1989). And, in such event, as a resultant non-

6 exclusive licensee, WBEI still would have no duty to account to Plaintiffs. *See*

7 *Burkitt v. Flawless Records, Inc.*, 2005 U.S. Dist. LEXIS 11986, *57-58 (E.D. La.

8 2005).

9       In *Bodenstab*, the intervenor Compuware alleged that it potentially was

10 subject to liability to plaintiff Bodenstab – the purported co-owner of certain

11 copyrighted programs Compuware was using – because Compuware's agreement

12 with the other co-owner of the copyrights (defendant Blank) granted Compuware

13 *ownership* of certain rights to those programs. The District Court disagreed, and

14 dismissed Compuware's complaint in intervention:

15           [Compuware's] argument is without merit. Transfer of

16           ownership of any of the exclusive rights comprised in a

17           copyright can only be accomplished with the consent of

18           all joint owners of the copyright. Thus, assuming

19           Bodenstab is a joint owner of these programs, Blank

20           could not have granted Compuware any ownership rights

21           without Bodenstab's consent.

22 *Id.* at *4. However, the failure to obtain a co-owner's consent to a purportedly

23 exclusive grant or license does not void the grant or license; it merely makes it

24 *non-exclusive. Id.* ("[A] grant of a right by less than all owners of the copyright

25 merely grants a license of the right but does not nullify the agreement itself.")

26 (citing 1 *Nimmer* § 6.12[C][3] ("Since . . . a grant executed by less than all of the

27

28 owner of the Superman property, with full right to license, exploit, or dispose of that
property.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 197 of 252

1  joint owners of a copyright is necessarily non-exclusive, it follows that any such

2  grant constitutes a non-exclusive license.")).

3       The issue of whether a co-owner can reach the profits of a licensee or

4  grantee who purports to exercise exclusive rights in a copyright was recently

5  addressed in *Burkitt v. Flawless Records, Inc., supra,* where the plaintiffs tried to

6  reach the profits of their alleged co-owner's exclusive licensees:

7         Plaintiffs acknowledge the general rule that licensees are

8         not subject to accounting claims by co-owners.  However,

9         plaintiffs maintain that the Universal Defendants were

10        granted an *exclusive* license which is a transfer of

11        ownership, thereby subjecting them to plaintiffs'

12        accounting claims.  Plaintiffs' argument is without merit.

13        An exclusive license can only be accomplished by

14        agreement of all co-owners.  Because plaintiffs maintain

15        that they did not consent to the license granted to the

16        Universal Defendants, any license granted by Scantlin

17        merely granted a license of the rights of the copyright

18        owner, i.e. a non-exclusive license, rather than a transfer

19        of ownership which is a transfer of all of the rights, i.e. an

20        exclusive license.  While a transfer of rights and/or

21        ownership could not be effected by Scantlin alone, the

22        absence of plaintiffs' permission does not nullify the

23        licensing agreement itself.

24 2005 U.S. Dist. LEXIS 11986, at *57-58 (citations and internal quotes omitted).

25      Thus, Plaintiffs' novel theory that WBEI is an "effective" joint-owner of the

26 Superman copyrights and is therefore subject to Plaintiffs' accounting claims finds

27 no support in the law.  As *Bodenstab* and *Burkitt* make clear – and as *Nimmer*

28 confirms – even an express grant of exclusive rights under a copyright will not

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 198 of 252

1    render a grantee an owner of those rights – with the corresponding rights and
2    obligations of a copyright owner – if there exists a non-consenting copyright co-
3    owner.[73]  Accordingly, if Plaintiffs have any recaptured interest in the Superman
4    copyrights, then they were non-consenting co-owners *vis-a-vis* DC's agreements
5    for *Superman Returns* and *Smallville*, and WBEI therefore is *at most* a non-
6    exclusive licensee of DC as to those rights.  That is, Plaintiffs' accounting claim
7    *cannot* reach the profits of WBEI, as a licensee of DC.[74]

8        Absent a finding of *alter ego* – for which, as demonstrated below, there is no
9    evidence – there is no basis on which liability can be established against WBEI for
10   an accounting or a share of its profits from Superman:  Under established
11   precedent, and even if their Notices of Termination are valid and effective,
12   Plaintiffs are limited to their share – if any – of the amounts paid by WBEI *to DC*
13   in connection with the exploitation of any copyrights jointly owned by Plaintiffs.

14        **2.    Neither TWI nor WBEI is the *Alter Ego* of DC**

15        Similarly, Plaintiffs' assertions of alter ego as a means of reaching the
16   profits of WBEI and TWI find no support in the facts or in the law.  The purpose of
17   the *alter ego* doctrine is to disregard the corporate structure for the sole intent of
18   avoiding injustice.  Its "essence . . . is that justice be done[,] . . . and thus the
19   corporate form will be disregarded only in narrowly defined circumstances and
20   only when the ends of justice so require."  *Mesler v. Bragg Management Co.*, 39
21   Cal. 3d 290, 301 (1985).  Courts, cognizant of the value of incorporation, have
22   cautioned that alter ego liability is not to be established lightly:  "Because society
23   recognizes the benefits of allowing persons and organizations to limit their

24

25   [73]  Plaintiffs acknowledge this legal principle in the FASMC: "Defendants own or
     control only fifty percent (50%) of the Recaptured Copyrights, and thus, as of the
26   Termination Date, had and have no authority to confer exclusive licenses or grants with
     respect to any element of the 'Superman' mythology protected by the Recaptured
27   Copyrights." (FASMC, ¶ 54(d).)

28   [74]  Plaintiffs cannot have it both ways – that is, they cannot claim a valid co-ownership
     in the Superman copyrights *and* claim that WBEI was granted some exclusive right under
     copyright, thus subjecting it to an accounting claim.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 199 of 252

business risks through incorporation, sound public policy dictates that imposition of *alter ego* liability be approached with caution." *Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220, 1249 (1991). *See also McLeod v. Hosmer-Dorrance, Inc.*, 1976 U.S. Dist. LEXIS 12289 at *4 (N.D. Cal. 1976) ("A long line of cases teaches that corporate entities are not to be lightly disregarded."). Accordingly, a plaintiff seeking to establish liability on the basis of alter ego must overcome the *presumption* of separateness. *See, e.g., Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1212 (1992) ("It is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity."); and *Nielson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003) ("[A] parent company is presumed to have an existence separate from its subsidiaries.").

Two distinct elements must be established before one entity may be adjudged an alter ego of another:

> First, there must be such unity of interest and ownership between the [two entities] that the separate personalities of the [two entities] do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the [one entity] alone.

*Neilson*, 290 F. Supp. 2d at 1115 (citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 526 (2000)). *See also Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 742 (1998) ("To justify piercing the corporate veil on an alter ego theory . . . a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist, and that an inequitable result would follow if the parent were not held liable.").

Therefore, in order to overcome the presumption of separateness and to demonstrate that DC is the alter ego of TWI and WBEI, Plaintiffs must establish

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 200 of 252

1   *both* that there is a unity of interest among TWI, WBEI, and DC such that their
2   separate personalities no longer exist *and* that an inequitable result would occur if
3   DC's liabilities (if any) were not treated as those of TWI and WBEI.

4          a.     **Plaintiffs Cannot Meet The First Prong Of The Alter**
5                 **Ego Test Because They Cannot Demonstrate**
6                 **Sufficient Unity Of Interest Between TWI, WBEI,**
7                 **and DC.**

8          Courts look at a number of factors in analyzing the first prong of the alter
9   ego test, which is often called the "unity" prong.  Although the specific analysis a
10  court chooses to employ often depends on the facts of the particular case, the
11  factors in this first prong include:  1) "commingling of funds and other assets;" 2)
12  "identical equitable ownership in the two entities;" 3) "use of the same offices and
13  employees;" 4) "use of one [entity] as a mere shell or conduit for the affairs of
14  another;" 5) "disregard of corporate formalities;" 6) "inadequate capitalization;"
15  and 7) "identical directors and officers."  *Sonora Diamond*, 83 Cal. App. 4th at
16  538-39.  *See also Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285,
17  n.13 (1994); and *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 326
18  (C.D. Cal. 2004).

19         To prevail on the first prong of the alter ego test, a plaintiff must offer
20  evidence sufficient to show a total disregard for the corporate structure.  Evidence
21  on one or two factors is <u>not</u> enough.  *Sonora Diamond*, 83 Cal. App. 4th at 539
22  ("No one characteristic governs, but the courts must look at all the circumstances
23  to determine whether the doctrine should be applied.").  *See also Katzir's Floor*
24  *and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) (the
25  fact of ownership and control "does not eviscerate the separate corporate identity
26  that is the foundation of corporate law").  As Judge Morrow of this Court
27  explained, "to defeat summary judgment, [the plaintiffs] must tender sufficient
28  evidence from which a rational jury could conclude that there exists such a unity of

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 201 of 252

1  interest and ownership [between the defendants] that the separate personalities of

2  the corporation[s] no longer exist." *Cambridge Elecs.*, 227 F.R.D. at 326 (citations

3  and internal quotations omitted).[75]

4        Plaintiffs unquestionably cannot satisfy this initial burden: DC, WBEI, and

5  TWI do <u>not</u> commingle their funds and other assets or disregard appropriate

6  corporate formalities; they do <u>not</u> use the same offices and employees or share

7  identical officers and directors; there is <u>not</u> identical equitable ownership in the

8  entities; and DC is <u>not</u> used "as a mere shell or conduit for the affairs" of either

9  TWI or WBEI.  (Levitz Decl. ¶¶ 12-17; Spencer Decl. ¶¶ 2-3; Cannon Decl. ¶¶ 2-

10  8.)  Plaintiffs can proffer no evidence to the contrary.  Furthermore, "[a] parent

11  corporation may be directly involved in financing and macro-management of its

12  subsidiaries . . . without exposing itself to a charge that each subsidiary is merely

13  its alter ego." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (citing

14  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) (no alter ego liability

15  notwithstanding that parental approval was required for leases, major capital

16  expenditures, and the sale of its subsidiary's assets)).  *See also Joiner v. Ryder*

17  *Sys.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) (no alter ego liability

18  notwithstanding that parent approved its subsidiaries' acquisitions and capital

19  budget).

20        Judge Morrow's decision in the *Wady* case, 216 F. Supp. 2d 1062, is directly

21  on point and is particularly instructive here.  There, plaintiff Wady sued her

22  disability insurance provider, Provident Life and Accident Insurance Company

23  ("Provident") as well as Provident's parent company, UnumProvident Corporation

24  ("UnumProvident"), for breach of contract and breach of the covenant of good

25  faith and fair dealing arising out of Provident's decision to terminate Wady's

26  

27    [75] As to TWI, Plaintiffs have alleged only that it is the ultimate parent of DC and WBEI, which in and of itself establishes nothing. *See, e.g., Neilson*, 290 F. Supp. 2d at 1116 ("[T]he mere fact that [the parent] owns the stock of the subsidiary will not suffice

28  to prove that the two entities are alter egos of one other . . . ."); and *Mid-Century Ins. Co.*, 9 Cal. App. 4th at 1215 (factor of ownership and control "is not significant in isolation").

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 202 of 252

1  disability benefits. UnumProvident moved for summary judgment on the ground
2  that it was not in privity of contract with Wady, and Wady opposed on the theory
3  that UnumProvident was the alter ego of its subsidiary, and thus was liable on her
4  contract claims to the same extent as Provident. (*Id.* at 1062.) Wady's evidence of
5  alter ego included numerous claim forms and correspondence written on
6  UnumProvident letterhead that referenced the business of its subsidiaries,
7  including Provident,[76] using pronouns such as "we," "us," and "our." (*Id.* at 1068.)
8  Wady also submitted evidence that the two entities shared a number of corporate
9  officers and directors, and that Provident freely borrowed money from its parent.
10  (*Id.*)

11      Judge Morrow held that even such evidence was insufficient to establish an
12  alter ego relationship between Provident and UnumProvident:

13          Plaintiff's evidence does not support the inference she
14          seeks to have the court draw. . . . None of the proffered
15          documents suggests that there is any question of
16          undercapitalization, commingled funds or disregard for
17          corporate formalities, all factors in evaluating whether
18          there is a unity of interest between two entities.

19  *Wady,* 216 F. Supp. 2d at 1068 (citing *Calvert v. Huckins,* 875 F. Supp. 674, 678
20  (E.D. Cal. 1995) (finding that the fact a parent company had an ownership interest
21  in a subsidiary, that the parent and the subsidiary had some interlocking
22  directorates and officers, that the parent had incorporated subsidiary's income
23  figures into its financial reports, that the parent had guaranteed a promissory note
24  for the subsidiary, and that the parent and the subsidiary shared counsel was not
25  sufficient to confer alter ego status.)). *See also Akzona, Inc. v. E.I. DuPont*

26  _____

27  [76] For example, the insurance claim forms bore the "Unum" logo, and were returnable
    to an "Unum" address; correspondence on Wady's claim was on UnumProvident
    letterhead; and Wady's medical information was requested via an "Unum" memorandum.
28  Additionally, Wady was interviewed by an adjuster who advised her that he represented
    UnumProvident. *See id.* at 1063-64.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 203 of 252

1  *DeNemours and Co.*, 607 F. Supp. 227, 238 (D. Del. 1984) (blurring corporate

2  separateness in the language of an annual report, an overlap of boards of directors,

3  parental approval of large capital expenditures, and parental guaranty of third-party

4  loans to a subsidiary was insufficient to establish an alter ego relationship).

5      Similarly here, Plaintiffs will not be able to demonstrate that there is

6  anything other than financial and operational relationships among TWI, WBEI,

7  and DC that are typical among affiliated entities and subsidiaries of a large

8  publicly held company such as TWI. Alter ego claims based on such standard

9  relationships between affiliates and subsidiaries – including TWI and its

10  subsidiaries – are routinely dismissed. *See, e.g., Haskell v. Time, Inc.*, 857 F.

11  Supp. 1392, 1403 (E.D. Cal. 1994) (rejecting allegation that TWI was the alter ego

12  of its subsidiary, Time, Inc.); and *Davidson v. Time Warner, Inc.*, 1997 U.S. Dist.

13  LEXIS 21559 (S.D. Tex. 1997) (dismissing TWI from the case, holding it was not

14  the alter ego of its subsidiaries, Interscope Records and Atlantic Records).[77]

15      In light of the established authority regarding the substantial standard which

16  must be met in order to prove an alter ego relationship, Plaintiffs' claims of alter

17  ego must fail on the unity prong alone.

  **b.**  **Plaintiffs Cannot Demonstrate That Upholding DC's**

19       **Separate Identity Will Result In An Inequity.**

20      Even if Plaintiffs were able to create doubt on the first prong of the test –

21  which they cannot – then their alter ego claim still must fail because they cannot

22  meet the second, "unfairness" prong. *See, e.g., Seymour v. Hull & Moreland*

23  *Engineering*, 605 F.2d 1105, 1113 (9th Cir. 1979) (even if the plaintiff could

24  establish disregard of corporate formalities, failure to establish the fraud prong

25  precluded alter ego finding); *Board of Trustees of Mill Cabinet Pension Trust Fund*

---

26   [77] "The entities have formal managerial barriers and . . . the corporations hold

27  themselves out to the world as separate entities; the subsidiaries identify themselves as
Time Warner companies." *Id.* at *18. Further, "there is no evidence that Interscope

28  Records or Atlantic Records are undercapitalized or would be unable to satisfy a
judgment if one is returned against them." *Id.* at *19.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 204 of 252

1   *for N. Cal. v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 773 (9th Cir. 1988); and

2   *Nielson*, 290 F. Supp. 2d at 1117-18 (dismissing alter ego claim even where the

3   defendant <u>did not dispute</u> the unity of interest prong because the plaintiff could not

4   establish that the parent "engaged in any bad faith conduct in its acquisition and/or

5   management of [its subsidiary.]").[78]

6          Courts have not adopted a uniform approach for analyzing this second part

7   of the alter ego test. Some courts have held that, to satisfy the inequity prong, a

8   plaintiff must present evidence that a corporation was established with a fraudulent

9   intent. *See, e.g., Ameritec Corp. v. Ameritech Corp.*, 1986 U.S. Dist. LEXIS 26195

10  (C.D. Cal. 1986) ("In addition to showing of control, one of the requirements of

11  finding an 'alter ego' status requires that the corporate entities be set up with

12  fraudulent intent or in bad faith."). These cases are meant to deal with sham

13  corporations created in an attempt to avoid liability. There is no doubt that DC

14  does not fall within this category; DC, including its predecessors in interest going

15  back to National Allied Publishing, has been in business for over 70 years and

16  obviously was not fraudulently created in order to protect either TWI or WBEI

17  from its debts or obligations. *See Haskell v. Time, Inc., supra,* 857 F. Supp. at

18  1403 (rejecting alter ego allegation against TWI because, among other reasons, the

19  plaintiff had not "alleged that [TWI's subsidiary] Time was fraudulently

20  incorporated in order to protect Time Warner.").[79] Indeed, DC was a viable entity

21  for many years *before* it became part of the TWI family of companies. As such, it

22  is the antithesis of the typical sham corporation created to avoid liability.

23

24

---

25  [78] Indeed, the FASMC does not even *allege* that any inequity will result from the

26  failure to find an alter ego relationship.

27  [79] In *Haskell*, the court granted TWI's motion to dismiss a claim that it was the alter

ego of its affiliates Time, Inc. and American Family Publishers on the basis that there

was "no reason to ignore its corporate structure." As in this case, TWI kept separate

28  records from its subsidiaries, and Time, Inc., "[w]ith annual sales of $2 billion," was

adequately capitalized. *Haskell*, 857 F. Supp. at 1403.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 205 of 252

1    Other courts have evaluated the inequity prong in terms of the degree of

2  injustice that would result from recognizing the corporate entity and refusing to

3  pierce the corporate veil. Injustice in this sense requires the plaintiff to establish

4  more than the "injustice" that would result from a subsidiary's inability to satisfy a

5  judgment. *See, e.g., Wechsler v. Macke Int'l Trade, Inc.*, 327 F. Supp. 2d 1139,

6  1145 (C.D. Cal. 2004) ("[I]t is not sufficient to merely show that a creditor will

7  remain unsatisfied if the corporate veil is not pierced, and thus set up such an

8  unhappy circumstance as proof [of] an inequitable result") (citations and internal

9  quotations omitted).[80] Rather, to raise a genuine issue of material fact as to the

10  second prong of the alter ego analysis, a plaintiff must identify conduct amounting

11  to fraud or bad faith. *See Sonora Diamond*, 83 Cal. App. 4th at 539 ("The alter ego

12  doctrine does not guard every unsatisfied creditor of a corporation but instead

13  affords protection where some conduct amounting to bad faith makes it inequitable

14  for the corporate owner to hide behind the corporate form."); and *Board of*

15  *Trustees*, 877 F.2d at 773 ("Garden variety fraud should be insufficient to pierce

16  the corporate veil in the absence of evidence of shareholder abuse of the corporate

17  form to defraud creditors.").

18    Furthermore, the fraud or bad faith must be in the use of the corporate form

19  to prevent the party harmed from receiving compensation for its damages. *Doney*

20  *v. TRW, Inc.*, 33 Cal. App. 4th 245, 249 (1995) ("Alter ego is essentially a theory

21  of vicarious liability under which the owners of a corporation may be held liable

22  for harm for which the corporation is responsible where, *because* of the

23  corporation's utilization of the corporate form, the party harmed will not be

24  adequately compensated for its damages.") (emphasis added). Thus, "[a] court will

25  pierce the corporate veil only where failure to do so would defeat the rights and

26

27

28

---

[80] Here, of course, there is no evidence that DC – a substantial and established company – would not be able to satisfy any judgment that Plaintiffs might obtain in this case.

ER 3369

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 206 of 252

1  equities of third persons." *Wady*, 216 F. Supp. 2d at 1070 (internal quotes and

2  citations omitted).

3       Plaintiffs have not alleged, and cannot point to, any injustice that would

4  result if they are required to pursue their first five claims for relief in the Superman

5  Action against only their purported copyright co-owner, DC.[81] Accordingly,

6  Plaintiffs cannot satisfy the second prong of the alter ego test, and their claims

7  against WBEI and TWI asserted on that basis should be dismissed.

8      **E.**   **Relief Requested**

9       Accordingly, Defendants request an Order in the Superman Action

10  dismissing the First through Fifth Claims for Relief in the First Amended

11  Complaint as against defendants TWI and WBEI.

12

13      **CONCLUSIONS**

14       Based on the arguments presented in this Memorandum of Points and

15  Authorities in Support of Defendants' Motions for Partial Summary Judgment, and

16  based on the undisputed facts as set forth in the Separate Statement of

17  Uncontroverted Fact and Conclusions of Law and the evidence submitted herewith,

18  Defendants respectfully request that the Court enter its Order(s) as follows:

19      In the Superman Action and the Superboy Action

20      1.    That to the extent Plaintiffs are entitled to an accounting of or a share

21      in the revenues generated by the post-termination exploitation of Superman

22      and/or Superboy, those revenues cannot include any amounts attributable to

23      the foreign exploitation of the copyrights, the exploitation of the Superman

24      family of trademarks, or the post-termination exploitation of derivative

25      works prepared prior to termination.

26

27

28  [81] As noted above, any claims that Plaintiffs might have that DC's agreements with WBEI did not result in sufficient consideration to DC can be addressed in Plaintiffs' existing claim against DC for waste.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 207 of 252

2.     That DC and its licensees are entitled to continue using all of the copyrightable elements contained in the Announcements without the need to account to or share with Plaintiffs any of the profits generated from such use, and that DC and its licensees are entitled to use all of the story elements contained in the Non-Terminated Superboy Works without infringing on any of the copyright rights Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

In the Superboy Action

3.     That the post-termination episodes of *Smallville* do not infringe upon Plaintiffs' recaptured copyrights in the Submissions, and dismissing Plaintiffs' First Claim for Relief for copyright infringement and Fifth Claim for Relief for injunction in the Superboy Action, insofar as those claims relate to *Smallville*.

In the Superman Action

4.     That Plaintiffs cannot establish that TWI and WBEI are the alter egos of DC, and dismissing the First through Fifth Claims for Relief in the First Amended Complaint as against defendants TWI and WBEI.

DATED:     April 30, 2007         Respectfully submitted,

WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL, LLP

-and-

FROSS ZELNICK LEHRMAN ZISSU, PC

-and-

PERKINS LAW OFFICE, PLC


By _____
     Michael Bergman
Attorneys for Defendants

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 208 of 252

4789545092

## Schedule A

### Unterminated "Superman" Works

| Title | Copyright Reg. No. | Publication Date |
|---|---|---|
| More Fun Comics no. 31 | B258595 | 04-05-38 |
| Detective Comics no. 15 | B379783 | 04-10-38 |
| All other "Superman" Works published prior to 04-16-38 | | |

## Schedule B

### Exemplary Unterminated "Superboy" Works

| Title | Copyright Reg. No. | Publication Date |
|---|---|---|
| Action Comics no. 1 | B379787 | 04-18-38 |
| Superman Daily Strip no. 1 | KF55490 | 01-16-39 |
| Superman Daily Strip no. 2 | KF55491 | 01-17-39 |
| Superman Daily Strip no. 3 | KF55492 | 01-18-39 |
| Superman Daily Strip no. 4 | KF55493 | 01-19-39 |
| Superman Daily Strip no. 5 | KF55494 | 01-20-39 |
| Superman Daily Strip no. 6 | KF55495 | 01-21-39 |
| Superman Daily Strip no. 7 | KF55496 | 01-23-39 |
| Superman Daily Strip no. 8 | KF55497 | 01-24-39 |
| Superman Daily Strip no. 9 | KF55498 | 01-25-39 |
| Superman Daily Strip no. 10 | KF55499 | 01-26-39 |
| Superman Daily Strip no. 11 | KF55500 | 01-27-39 |
| Superman Daily Strip no. 12 | KF55501 | 01-28-39 |
| Superman no. 1 | AA299871 | 05-18-39 |
| Superman Sunday Strip #1 | A132561 | 11-05-39 |
| The Saturday Evening Post | B501000 | 06-04-41 |
| Superman Sunday Strip #135 | A131596 | 05-31-42 |
| Superman (by George Lowther) | A168596 | 11-02-42 |
| All other "Superboy" works published prior to November 17, 1943 | | |

ER 3372

1 | Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
1999 Avenue of the Stars, Suite 1540
3 | Los Angeles, CA 90067
Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

6

7 | **UNITED STATES DISTRICT COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 JOANNE SIEGEL, an individual; and | Civil Case No. 04-8400 RSWL (RZx) |
| 11 LAURA SIEGEL LARSON, an individual, | **REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]** |
| 12 Plaintiffs, | |
| 13 | Honorable Ronald S.W. Lew |
| 14 vs. | |
| 15 WARNER BROS. | |
| 16 ENTERTAINMENT INC., a corporation; TIME WARNER INC., | |
| 17 a corporation; DC COMICS, a general | **DEMAND FOR JURY TRIAL** |
| 18 partnership; and DOES 1-10, | |
| 19 Defendants. | |
| 20 | |
| 21 DC COMICS, | |
| 22 Counterclaimant | |
| 23 vs. | |
| 24 JOANNE SIEGEL, an individual; and | |
| 25 LAURA SIEGEL LARSON, an | |
| 26 individual, | |
| 27 Counterclaim Defendants | |
| 28 | |

1

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 43
ER 3373

Plaintiffs and counterclaim defendants JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the "Plaintiffs"), by their attorneys of record, hereby answer the counterclaims ("Counterclaims") of defendant DC Comics ("DC" or "Counterclaimant"):

1.     Plaintiffs admit only that DC is engaged in the business of licensing comic books.  Plaintiffs, at present, lack knowledge or information sufficient to admit the truth of the remaining allegations contained in paragraph 1 of the Counterclaims and on that basis deny same.

2.     Plaintiffs admit only that Joanne Siegel is an individual and citizen of the State of California, in the County of Los Angeles, that Joanne Siegel is the widow of author Jerome Siegel ("Siegel"), the individual who, without limitation, originated, created and authored the "Superman" character, premises, themes, setting, back-story, key supporting characters, the first and many subsequent "Superman" stories, but Plaintiffs otherwise deny the allegations in paragraph 2 of the Counterclaims.

3.     Admitted.

4.     Plaintiffs admit only that Defendants purport to assert that this Court has subject matter jurisdiction and supplemental jurisdiction over the Counterclaims as alleged in paragraph 4 but otherwise deny the allegations in paragraph 4 of the Counterclaims.

5.     Admitted.

6.     Plaintiffs admit only that "The Reign of the Superman" written by Siegel with art by Joseph Shuster ("Shuster") was published in 1933 in a magazine entitled "Science Fiction" and that this material shared little, if any, similarity to various subsequent Superman material which Siegel created with art by Shuster but Plaintiffs otherwise deny the allegations in paragraph 6 of the Counterclaims.

2

Exh. B 44

ER 3374

7.    Plaintiffs admit only that Siegel created and wrote and Shuster drew art for several variations of "Superman" including a 1933 version known as "The Superman" and other versions between 1933 and 1938 known as "Superman" (all created and written by Siegel and some drawn by Shuster) and that these works included but were not limited to the works (a)-(e) in the fourth sentence of paragraph 7 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 7 of the Counterclaims.

8.    Plaintiffs admit only that between 1933 and 1938, Jerome Siegel and Joseph Shuster ("Siegel & Shuster") submitted certain Superman works to certain prospective publishers and newspaper syndicates; but Plaintiffs otherwise deny the allegations contained in paragraph 8 of the Counterclaims.

9.    Admitted.

10.    Plaintiffs admit only that on or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with Detective Comics, Inc. ("DCI") (the "December 4, 1937 Agreement") to continue to produce the comic magazine features, "Slam Bradley" and "The Spy" for a period of two years which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to DCI which reserved the right to accept or reject same within sixty days; but Plaintiffs otherwise deny the allegations in paragraph 10 of the Counterclaims and respectfully refer the Court to the 1937 Agreement as evidence of the contents thereof.

11.    Plaintiffs admit only the first sentence of paragraph 11; and that a third party provided DCI with the "Superman" comic strips created and written by Siegel and drawn by Shuster in a newspaper syndication format ( the "1934 Superman Comic Strip") and that DCI expressed interest in publishing this work in a thirteen page comic magazine, but Plaintiffs otherwise deny the allegations in paragraph 11 of the Counterclaims, including but not limited to, in so far as

3

1  that Siegel and Shuster alone and of their own accord cut and pasted their 1934

2  newspaper strips into panels and added a few transitional panels so as to convert

3  from a newspaper to a magazine format (the "Revised 1934 Superman Comic

4  Strip"); but Plaintiffs otherwise deny the allegations in paragraph 11 of the

5  Counterclaims and respectfully refer the Court to Siegel and Shuster's 1934

6  Superman Comic Strip and Revised 1934 Superman Comic Strip as evidence of

7  the contents thereof.

8      12.   Plaintiffs admit only that in an agreement with DCI dated March 1,

9  1938 (the "March 1, 1938 Agreement"), concerning a strip entitled "Superman,"

10  Siegel and Shuster sold to DCI the "strip, all good will attached thereto and

11  exclusive right to the use of the characters and story, continuity and title to the

12  strip… and…not to employ said characters or story in any other strips…by their

13  names contained therein…"; but Plaintiffs otherwise deny the allegations in

14  paragraph 12 of the Counterclaims and respectfully refer the Court to the March

15  1, 1939 Agreement as evidence of the contents thereof.

16      13.   Plaintiffs lack knowledge or information sufficient to form a belief

17  as to the truth of the allegations contained in paragraph 13 of the Counterclaims

18  and on that basis deny the same.

19      14.   Plaintiffs admit only that DCI published the Revised 1934

20  Superman Comic Strip in "Action Comics No. 1" bearing the cover date, June,

21  1938, but otherwise deny the allegations in paragraph 14 of the Counterclaims.

22      15.   Plaintiffs admit only that in addition to the Siegel and Shuster

23  material published by DCI in "Action Comics No. 1," Siegel and Shuster created

24  further original "Superman" material and stories; that on or about September

25  22, 1938, in conjunction with Siegel and Shuster entering into an agreement with

26  The McClure Newspaper concerning new "Superman" material created by

27  Siegel and Shuster specifically for McClure newspaper strips, Siegel and Shuster

28  entered into an agreement with DCI ( the "September 22, 1938 DCI

4

1    Agreement") which stated that "[DCI] are the exclusive owners of the comic

2    strips known by the titles "Superman," "Slam Bradley," "Spy," "Radio Squad,"

3    and "Federal Men" and to the rights to publish comics carrying the titles and

4    characters contained therein and continuity thereof" and further stated that

5    Siegel and Shuster had "been doing the artwork and continuity" for comics

6    including "Superman" and that "[w]e wish you to continue to do said work and

7    hereby employ and retain you for said purposes;" but Plaintiffs otherwise deny

8    the allegations in paragraph 15 of the Counterclaims and respectfully refer the

9    Court to the September 22, 1938 DCI Agreement as evidence of the contents

10   thereof.

11        16.    Admitted.

12        17.    Denied.

13        18.    Plaintiffs admit only that on or about November 30, 1938, Siegel

14   wrote to DCI (the "Superboy Summary") expressing his conception of a new

15   comic "strip named SUPERBOY, which would relate the adventures of

16   Superman as a youth...[which] would be very much different from the

17   SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of

18   adventures very much different..." and that DCI did not publish a "Superboy"

19   comic at that time; but Plaintiffs otherwise deny the allegations in paragraph 18

20   of the Counterclaims and respectfully refer the Court to the Superboy Summary

21   as evidence of the contents thereof.

22        19.    Plaintiffs admit only that Superman No. 1 was solely created by

23   Siegel and Shuster, that it had a cover date of Summer 1939, but Plaintiffs

24   otherwise deny the allegations in paragraph 19 of the Counterclaims.

25        20.    Plaintiffs admit only that on or about December 19, 1939, Siegel

26   and Shuster entered into an agreement with DCI (the " December 19, 1939

27   Agreement") which modified the September 22, 1938 DCI Agreement by

28   increasing Siegel and Shuster's compensation for the Superman comic strip

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]          Exh. B 47

1   material independently created by Siegel and Shuster from $10 per page to $20
2   per page, and granted Siegel and Shuster "5% of all net proceeds which may be
3   derived by" DCI from the commercial exploitation of "Superman" outside of
4   comic books and newspaper syndication such as radio, motion pictures and toys,
5   and which stated that DCI "are the sole and exclusive owners of the comic strip
6   entitled 'SUPERMAN';" but Plaintiffs otherwise deny the allegations in
7   paragraph 20 of the Counterclaims and respectfully refer the Court to the
8   December 19, 1939 Agreement as evidence of the contents thereof.
9       21.    Plaintiffs admit only that on or about December, 1940, Siegel solely
10  authored a complete, thirteen page, original "Superboy" story ("Superboy
11  Story"); that in the event his story was published as a comic book, Siegel
12  suggested in a promotional prologue to the story that there should be a box
13  stating : "So many faithful followers of today's leading adventure comic strip,
14  SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth that
15  the creation of this newest and most promising magazine comic strip character
16  was inevitable! And so here he is at last…the answer to your
17  requests…America's outstanding boy hero: SUPERBOY!!;" and that in the
18  event his story was published as a comic book, Siegel further suggested a
19  promotional epilogue in  a box stating: "And so was launched the career of
20  SUPERBOY, youthful Champion of Righteousness! In later years he was to
21  become the mighty figure known as SUPERMAN!  But the story of
22  SUPERBOY'S amazing and often humorous adventures is a series of
23  astonishing narratives in itself…!  Don't miss a single adventure of the comic
24  page's newest sensation: SUPERBOY!!;" but Plaintiffs otherwise deny the
25  allegations in paragraph 21 of the Counterclaims and respectfully refer the Court
26  to  Siegel's Superboy Story as evidence of the contents thereof.
27      22.    With respect to the allegations in the first sentence of paragraph 22,
28  Plaintiffs admit only that on November 18, 1944, DCI issued for sale More Fun

6

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 48

1    Comics No. 101 with a cover date of January-February 1945 which contained

2    the first Superboy comic story published by DCI, but Plaintiffs otherwise deny

3    the allegations in this first sentence of paragraph 22 of the Counterclaims.

4    Plaintiffs lack knowledge or information sufficient to form a belief as to the

5    truth of the allegations in the second sentence of paragraph 22 and on the basis

6    deny the same, and Plaintiffs deny the allegations in the third sentence of

7    paragraph 22 of the Counterclaims.

8        23.      Plaintiffs admit only that in 1947 Siegel and Shuster brought suit

9    against National Comics Publications, Inc., DCI's purported successor, in the

10    New York Supreme Court in Westchester County (the "Westchester Action"),

11    that the Westchester Action was, in part, the culmination of a dispute between

12    only Siegel (not Siegel and Shuster) and National over DCI's publication of

13    Siegel's "Superboy," and that in addition to a number of other remedies such as

14    an accounting, Siegel and Shuster also sought in the Westchester Action to

15    rescind the March 1, 1938 Agreement and the September 22, 1938 DCI

16    Agreement based on DCI's alleged fraud and repeated breaches of such

17    agreements; but Plaintiffs otherwise deny the allegations in paragraph 23 of the

18    Counterclaims and respectfully refer the Court to the complaint in the

19    Westchester Action as evidence of the contents thereof.

20        24.      Plaintiffs admit only that after trial of the Westchester Action the

21    court issued an opinion ("Westchester Opinion") in which it found that DCI

22    acted illegally in publishing Superboy on the grounds that the court "[could] not

23    accept [DCI's] view that Superboy was in reality Superman" and that "Superboy

24    was a separate and distinct entity;" and found that the March 31, 1938

25    Agreement transferred to DCI Siegel and Shuster's rights in Superman and that

26    the September 22, 1938 DCI Agreement should not be rescinded; but Plaintiffs

27    otherwise deny the allegations in paragraph 24 of the Counterclaim and

28

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]    Exh. B 49

1    respectfully refer the Court to the Westchester Opinion as evidence of the

2    contents thereof.

3         25.    Plaintiffs deny that an appeal was ever actually taken by the

4    defendants in the Westchester Action and Plaintiffs have insufficient knowledge

5    or belief to admit the truth of the allegation that the Westchester Action

6    Interlocutory Judgment was temporarily stayed pending appeal, and on that basis

7    deny this allegation as well, but Plaintiffs otherwise admit the allegations in

8    paragraph 25.

9         26.    Plaintiffs admit only that the parties to the Westchester Action

10   entered into a stipulation dated May 19, 1948 (the "1948 Stipulation") and that

11   the court issued a consent judgment dated May 21, 1948 (the "1948 Consent

12   Judgment"), but Plaintiffs otherwise deny the allegations in paragraph 26 of the

13   Counterclaims and respectfully refer the Court to the 1948 Stipulation and 1948

14   Consent Judgment as evidence of the contents thereof.

15        27.    Plaintiffs admit only that Siegel and Shuster filed an action against

16   National Periodical Publications ("National") in the United States District Court

17   for the Southern District of New York for a declaration as to whether or not they

18   had granted to National's alleged predecessor the renewal copyright to

19   Superman; that the District Court's decision was published in *Siegel v. National*

20   *Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973) wherein that

21   the court broadly interpreted the grant of "all rights" in Superman in the

22   agreements in question as intended to grant the copyright to Superman for the

23   renewal term; and that the district court's decision was appealed by Siegel and

24   Shuster to the United States Court of Appeals for the Second Circuit and its

25   decision was published in *Siegel v. National Periodical Publications, Inc.*, 508

26   F. 2d 909 (2nd Cir. 1974), but Plaintiffs otherwise deny the allegations in

27   paragraph 27 of the Counterclaims and respectfully refer the Court to said

28   published opinions as evidence of the contents thereof.

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 50

ER 3380

28.    Plaintiffs admit only that in *Siegel v. National Periodical Publications, Inc.,* 508 F. 2d 909 (2nd Cir. 1974), the Court of Appeals affirmed that National owned the original "Superman" copyright for the renewal term based on the *res judicata* effect of the 1947 Westchester Action, and that Siegel and Shuster did not appeal the Second Circuit's decision, but Plaintiffs otherwise deny the allegations in paragraph 28 of the Counterclaims and respectfully refer this Court to the Second Circuit's published opinion as evidence of the contents thereof.

29.    Plaintiffs admit only that Siegel and Shuster signed an agreement with Warner Communications, Inc., dated December 23, 1975 (the "December 23, 1975 Agreement"), wherein it alleged it was the parent company of National, and that the December 23, 1975 Agreement, amongst many other terms and conditions, contains the language quoted in paragraph 29 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 29 of the Counterclaims and respectfully refer this Court to the 1975 Agreement as evidence of the contents thereof.

30.    Plaintiffs admit only the first sentence of paragraph 30 of the Counterclaims and that under the December 23, 1975 Agreement annual payments were to be made to Joanne Siegel only if Mr. Siegel died before December 21, 1985 (Mr. Siegel died January 28, 1996), but Plaintiffs otherwise deny the allegations in paragraph 30 of the Counterclaims and respectfully refer the Court to the December 23, 1975 Agreement as evidence of the contents thereof.

31.    Plaintiffs admit only that in "Action Comics No. 1" Superman is depicted as, without limitation: having been born on a distant planet, sent to Earth aboard a rocket ship, and as having, among other traits, extraordinary physical abilities, including but not limited to, and by way of example, superhuman strength, the ability to leap 1/8 of a mile, the power of superhuman

9

1  speed, to run faster than a locomotive train, the power of invulnerability, to

2  withstand injury from bullets, knives, etc, and that, without limitation, Superman

3  is a heroic figure in a distinctive costume who uses his extraordinary physical

4  and mental abilities to fight crime, champion the oppressed and benefit mankind;

5  that Superman is the "secret identity" of a mild-mannered bespectacled

6  newspaper reporter, known as Clark Kent, who works for a newspaper originally

7  called "The Daily Star," but later changed to "The Daily Planet;" but Plaintiffs

8  otherwise deny the allegations in paragraph 31 of the Counterclaims and

9  respectfully refer the Court to Action Comics No. 1 as evidence of the contents

10  thereof.

11      32.    Plaintiffs lack knowledge or information sufficient to form a belief

12  as to the truth of the allegations contained in paragraph 32 of the Counterclaims

13  and on that basis Plaintiffs deny the same.

14      33.    Plaintiffs deny the allegations in the last sentence of paragraph 33

15  of the Counterclaims, and with respect to the remaining allegations in paragraph

16  33, Plaintiffs lack knowledge or information sufficient to form a belief as to the

17  truth of such allegations and on that basis deny same.

18      34.    Denied.

19      35.    Plaintiffs admit only that Superman's original crest or shield

20  appearing in Action Comics No. 1 was comprised of a large inverted triangle in

21  the color yellow bearing, in the middle, the letter "S" in the color red, and that

22  over the years this was slightly modified to a large inverted triangle in the color

23  yellow (with its upper corners cropped and outlined in the color red) bearing in

24  the middle, the letter "S" in the color red, and that this "S" crest or shield was

25  conceived and presented by Siegel and Shuster as a strong symbol of the

26  Superman character they created; but Plaintiffs otherwise deny the allegations in

27  paragraph 35 of the Counterclaims.

28

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]    Exh. B 52

ER 3382

36.    Plaintiffs admit that DC has registered numerous works featuring Superman with the Register of Copyrights, but otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Counterclaims and on that basis deny same.

37.    Denied.

38.    Denied.

39.    Denied.

40.    Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the Counterclaims and on that basis Plaintiffs deny same.

41.    Denied.

42.    Plaintiffs admit only the allegations in the first sentence of paragraph 42 of the Counterclaims, except Plaintiffs lack knowledge or information sufficient to form a belief as to whether the April 8, 1997 date is accurate and on that basis deny same; and Plaintiffs admit only the allegations in the second sentence of paragraph 42 of the Counterclaims, but Plaintiffs deny the characterization of the terminations as "purported" and deny the allegations in the third sentence of paragraph 42 of the Counterclaims.

43.    Plaintiffs admit only that Plaintiffs' seven Notices of Termination relating to "Superman" ("Superman Notices") terminated under 17 U.S.C. § 304(c) the seven grants set forth in paragraph 42 of the Counterclaims regarding Siegel and Shuster's original "Superman" material, Action Comics No. 101 and underlying thousands of additional works all as listed in the Superman Notices; but Plaintiffs otherwise deny the allegations in paragraph 43 of the Counterclaims and respectfully refer the Court to the Superman Notices as evidence of the contents thereof.

44.    Denied.

11

Exh. B 53

ER 3383

45.   Plaintiffs admit only that Plaintiffs' four Notices of Termination of Transfer relating to "The Spectre" ("Spectre Notices") terminated under 17 U.S.C. § 304(c) the four grants set forth in paragraph 45 of the Counterclaims insofar as any such grant conveyed Siegel's copyright interest in "The Spectre;" but Plaintiffs otherwise deny the allegations in paragraph 45 of the Counterclaims and respectfully refer the Court to the Spectre Notices as evidence of the contents thereof.

46.   Plaintiffs admit only that the "Spectre Notices" terminated under 17 U.S.C. § 304(c) alleged grants of Siegel's copyright interest in "The Spectre," and that the Spectre Notices listed hundreds of works involving "The Spectre," including the works set forth in paragraph 46 of the Counterclaims ("Spectre Works"); but Plaintiffs otherwise deny the allegations in paragraph 46 of the Counterclaims and respectfully refer the Court to the Spectre Notices as evidence of the contents thereof.

47.   Plaintiffs admit only that DC's counsel sent a letter to Plaintiffs' counsel dated April 16, 1997; that sometime thereafter DC requested that the parties enter into a confidentiality agreement, and that DC's counsel also sent Plaintiffs' counsel a letter dated November 5, 1997 which, in part, contained the language quoted in paragraph 47, but Plaintiffs otherwise deny the allegations in paragraph 47 of the Counterclaims and respectfully refer the Court to the above letters as evidence of the contents thereof.

48.   Plaintiffs admit only that Plaintiffs and DC entered into a confidentiality agreement dated December 17, 1997 ("Confidentiality Agreement"), that DC, by its counsel, sent a letter dated December 18, 1997 to Plaintiffs' counsel which discussed issues it believed were relevant to a proposed purchase of all rights arising out of Siegel's authorship of "Superman," but did not set forth the terms of such proposed purchase; which letter stated, in part, among many other things that "there is a substantial legal

12

1   issue as to the effectiveness of your clients' termination of DC's interests in the
2   Superman Comic. Nonetheless DC's offer assumes …that your client's
3   termination and their rights therein are valid and that such termination was
4   effective"; and that on June 19, 1998, Plaintiffs' counsel sent a letter to DC's
5   counsel which requested detailed information regarding the profit definitions
6   and historical revenues of DC and any Time-Warner company from the
7   exploitation of "Superman;" but Plaintiffs otherwise deny the allegations in
8   paragraph 48 of the Counterclaims and respectfully refer the Court to the above
9   letters as evidence of the contents thereof.

10      49.   Denied.

11      50.   Plaintiffs admit only that on April 15, 1999, one day before the
12  effective termination date set forth in Plaintiffs' Superman Notices, DC, by its
13  counsel, for the first time purported to deny the validity of the Superman
14  Notices, but Plaintiffs otherwise deny the allegations in paragraph 50 of the
15  Counterclaims and respectfully refer the Court to the April 15, 1999 letter as
16  evidence of the contents thereof.

17      51.   Plaintiffs admit only that on or about April 30, 1999, the law firm
18  of Gang, Tyre, Ramer & Brown ("Gang, Tyre") wrote a letter to DC Comics
19  indicating that it was then representing Plaintiffs; that DC Comics provided
20  $228,172.65 to Plaintiffs as a non-refundable advance against monies owed by
21  Defendants to Plaintiffs due to the "Superman Notices," and that the parties
22  thereafter engaged in confidential negotiations pursuant to the Confidentiality
23  Agreement, but Plaintiffs otherwise deny the allegations in paragraph 51 of the
24  Counterclaims.

25      52.   Plaintiffs admit only that Kevin Marks of Gang, Tyre wrote a letter
26  to DC's counsel dated October 19, 2001 outlining initial terms of a proposed
27  agreement for which many other material terms had not yet been offered or
28  agreed upon; but Plaintiffs otherwise deny the allegations in paragraph 52 of the

13

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 55
ER 3385

1   Counterclaims insofar as the allegations mischaracterize the truth by, without

2   limitation, excluding the complete contents and the context of Kevin Marks'

3   October 19, 2001 letter, and Plaintiffs respectfully refer the Court to this letter as

4   evidence of the contents thereof.

5        53.   Plaintiffs admit only that DC Comics' counsel wrote a letter dated

6   October 26, 2001 to Plaintiffs' counsel and that on or about February 1, 2002

7   DC's counsel sent to Plaintiffs' counsel a proposed written agreement containing

8   many new material terms not contained in DC/Warner Bros. Entertainment's

9   original proposal, and terms that differed from and/or substantially diluted the

10   terms negotiated; but Plaintiffs otherwise deny the allegations in paragraph 53 of

11   the Counterclaims and respectfully refer the Court to this letter and this proposed

12   agreement as evidence of the contents thereof.

13        54.   Plaintiffs lack knowledge or information sufficient to form a belief

14   as to the truth of the allegations contained in paragraph 54 of the Counterclaims

15   and on that basis Plaintiffs deny the same.

16        55.   Plaintiffs admit only that Plaintiff Joanne Siegel wrote a letter dated

17   May 9, 2002 to Richard Parsons, the Co-Chief Operating Officer of AOL Time

18   Warner, Inc. ("Time Warner") objecting to DC/Warner Bros. Entertainment's

19   proposed written agreement as containing "new, outrageous demands that were

20   not in the[ir] proposal," but Plaintiffs otherwise deny the allegations in

21   paragraph 55 of the Counterclaims.

22        56.   Plaintiffs admit only that Plaintiffs sent a letter dated September 21,

23   2002 to DC terminating all negotiations with DC and Time Warner, but

24   Plaintiffs otherwise deny the allegations in paragraph 56 of the Counterclaims.

25        57.   Plaintiffs admit only that they served DC, Warner Bros.

26   Entertainment Inc. ("Warner Bros.") and Time Warner with a Notice of

27   Termination of Transfer which related specifically to "Superboy" ("Superboy

28   Notice"); that the Superboy Notice terminated, effective November 17, 2004, the

14

two grants of copyright in "Superboy", the 1948 Stipulation and the 1975 Agreement, and identified many works containing the character, "Superboy," but Plaintiffs otherwise deny the allegations in paragraph 57 of the Counterclaims.

58.    Plaintiffs admit only that the Superboy Notice terminated the aforesaid grants regarding Siegel's Superboy Summary and Superboy Story as published in the comic book More Fun Comics No. 101, and many additional titles, but Plaintiffs otherwise deny the allegations in paragraph 58 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

59.    Plaintiffs admit only that the Superboy Notice contains, in part, the language quoted in paragraph 59 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 59 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

60.    Plaintiffs admit only that the Superboy Notice states that Jerome Siegel is the sole author of the first and original "Superboy" works, all as set forth in the Superboy Notice, but Plaintiffs otherwise deny the allegations in paragraph 60 of the Counterclaims and respectfully refer the Court to the Superboy Notice as evidence of the contents thereof.

61.    Plaintiffs admit only that the Superboy Notice lists the WB "Smallville" television series as a work derived from Jerome Siegel's original "Superboy" copyright(s) and thus affected by Plaintiffs full recovery of such copyright(s) on the effective date of termination set forth in the Superboy Notice; that "Smallville," like Superboy, features the life and relationships of Clark Kent as a youth going to school in a small rural town in the American heartland (named "Smallville" in the comic book "Superboy No. 1") and that this derivative television series naturally contains certain minor supporting characters not created by Jerome Siegel. Plaintiffs lack knowledge or

1 information sufficient to form a belief as to the truth of the allegation that

2 "Smallville" contains "storylines wholly original to the series" and on that basis

3 deny the same. Plaintiffs otherwise deny the allegations in paragraph 61 of the

4 Counterclaims and respectfully refer the Court to the Superboy Notice as

5 evidence of the contents thereof.

6      62.    Plaintiffs admit only that on or about June 17, 2004, Ari Emanuel, a

7 talent agent and founder of the Endeavor Talent Agency, sent a letter to Warner

8 Bros. confirming that since "Smallville" is derived from "Superboy," DC

9 Comics and Warner Bros. would be prohibited after November 17, 2004, the

10 effective date of the Superboy Notice from producing and exploiting new

11 derivative "Smallville" episodes; but Plaintiffs otherwise deny the allegations in

12 paragraph 62 of the Counterclaims and respectfully refer the Court to Mr.

13 Emanuel's letter as evidence of the contents thereof.

14      63.    Plaintiffs admit only that by letter dated August 4, 2004, Marc

15 Toberoff, Plaintiffs' attorney of record reiterated that since "Smallville" is

16 derived from "Superboy," DC Comics and Warner Bros. would be prohibited

17 after November 17, 2004, the effective date of the Superboy Notice, from

18 producing and exploiting new derivative "Smallville" episodes, but Plaintiffs

19 otherwise deny the allegations in paragraph 62 of the Counterclaims and

20 respectfully refer the Court to Mr. Toberoff's letter as evidence of the contents

21 thereof.

22      64.    Admitted.

23      65.    Plaintiffs admit only that Plaintiffs filed the within action on

24 October 8, 2004, and that on October 22, 2004 Plaintiffs filed a different action

25 (Civil Case No. 04-08776) regarding ownership of the "Superboy" copyright

26 which was assigned to the Honorable Ronald S.W. Lew, but Plaintiffs otherwise

27 deny the allegations in paragraph 65 of the Counterclaims.

28

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]    **Exh. B 58**

# FIRST COUNTERCLAIM

66.    Plaintiffs re-allege and incorporate by reference paragraphs 1-65 inclusive, as though fully set forth herein.

67.    Plaintiffs admit only that DC purports to assert that the Superman Notices and/or the Superboy Notice are ineffective for the purported reasons set forth in DC's Counterclaims, but Plaintiffs deny such assertions and otherwise deny the allegations in paragraph 67 of the Counterclaims.

68.    Denied.

69.    Denied.

70.    Admitted.

71.    Plaintiffs admit only that DC's counsel sent a letter dated April 15, 1999, the day before the effective date of the Superman Notices, purporting to reject the scope and validity of the Superman Notices, including but not limited to the Superman Notice which terminated the 1975 Agreement, to the extent, if any, that it granted or purported to grant, any of Siegel's "Superman" copyright interests, but Plaintiffs otherwise deny the allegations in paragraph 71 of the Counterclaims, and respectfully refer the Court to this letter as evidence of the contents thereof.

72.    Plaintiffs admit only that DC's counsel sent a letter dated August 29, 2004, shortly before the effective date of the Superboy Notice, purporting to reject the scope and validity of the Superboy Notice, which, without limitation, terminated the December 23, 1975 Agreement, to the extent, if any, that it granted or purported to grant, any of Jerome Siegel's "Superboy" copyright interests, but Plaintiffs otherwise deny the allegations in paragraph 72 of the Counterclaims, and respectfully refer the Court to this letter as evidence of the contents thereof.

73.    Denied.

74.    Denied.

17

75.   Denied.

76.   Denied.

77.   Plaintiffs admit only that Plaintiffs' Superboy Notice terminated the grant of Siegel's copyright in his Superboy Summary and Superboy Story as published in More Fun Comics No. 101 in 1944, and that the Notice lists many additional published titles which feature or relate to "Superboy," but Plaintiffs otherwise deny the allegations in paragraph 77 of the Counterclaims.

78.   Denied.

79.   Denied.

80.   Plaintiffs admit only that 17 U.S.C. § 304(c) permits the termination of grants of copyrights subsisting in either its first or renewal term as of January 1, 1978, but Plaintiffs otherwise deny the allegations in paragraph 80 of the Counterclaims.

81.   Denied.

82.   Denied.

83.   Denied.

84.   Denied.

85.   Denied.

86.   Denied.

87.   Denied.

88.   Plaintiffs admit only that Plaintiffs deny the allegations in paragraphs 65-87 to the extent denied hereinabove, but Plaintiffs otherwise deny the allegations contained in paragraph 88 of the Counterclaims.

89.   Plaintiffs admit only that a declaration of the Court in this action is necessary, but otherwise deny the allegations contained in paragraph 89 of the Counterclaims.

18

Exh. B 60
ER 3390

## SECOND ALTERNATIVE COUNTERCLAIM

90.   Plaintiffs re-allege and incorporate by reference paragraphs 1-89 inclusive, as though fully set forth herein.

91.   Plaintiffs admit only that one day before the effective date of the Superman Notice, DC's counsel, by letter to Plaintiffs' counsel, dated April 15, 1999, purported to reject the Superman Notices, but Plaintiffs otherwise deny the allegations in paragraph 91 of the Counterclaims.

92.   Plaintiffs admit only that after April 16, 1999, Warner Bros., Time Warner and DC have, without limitation, failed to account to Plaintiffs for their share of profits from the exploitation of the original "Superman" copyrights, but Plaintiffs otherwise deny the vague and ambiguous allegations in paragraph 92 of the Counterclaims.

93.   Denied.

94.   Denied.

95.   Plaintiffs admit only that Plaintiffs deny the allegations in paragraphs 89-94 to the extent denied hereinabove, but Plaintiffs otherwise deny the allegations contained in paragraph 94 of the Counterclaims.

96.   Plaintiffs admit that a declaration of the Court is necessary, but otherwise deny the allegations contained in paragraph 96 of the Counterclaims.

## THIRD ALTERNATIVE COUNTERCLAIM

97.   Plaintiffs re-allege and incorporate by reference paragraphs 1-96 inclusive, as though fully set forth herein.

98.   Denied.

99.   Denied.

100.  Denied.

101.  Denied

## FOURTH ALTERNATIVE COUNTERCLAIM

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]          Exh. B 61
ER 3391

102.   Plaintiffs re-allege and incorporate by reference paragraphs 1-101 inclusive, as though fully set forth herein.

103.   Denied.

104.   Admitted.

105.   Plaintiffs admit that DC seeks a judicial declaration, but Plaintiffs otherwise deny the allegations in paragraph 105 of the Counterclaims.

**FIFTH ALTERNATIVE COUNTERCLAIM**

106.   Plaintiffs re-allege and incorporate by reference paragraphs 1-65 inclusive, as though fully set forth herein.

107.   Plaintiffs admit that the Superman Notices and Superboy Notice are effective and that DC alleges a purported fifth alternative counterclaim, but Plaintiffs otherwise deny the allegations in paragraph 107 of the Counterclaims.

108.   Plaintiffs admit that DC makes purported contentions in its purported fifth alternative counterclaim but Plaintiffs otherwise deny the allegations in paragraph 108 of the Counterclaims.

109.   Plaintiffs admit that 37 CFR §201.10, promulgated by the US Copyright Office under the 1976 Copyright Act, requires, in the context of and subject to the other provisions of 17 U.S.C. §304(c) and 37 CFR §201.10, that a notice of termination identify "each work to which the notice of termination applies," but Plaintiffs otherwise deny the allegations in or inferences of paragraph 109 of the Counterclaims.

110.   Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Counterclaims and on that basis Plaintiffs deny the same.

111.   Denied.

112.   Denied.

113.   Denied.

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

**Exh. B 62**
**ER 3392**

114. Plaintiffs admit only that the Superman Shield appeared in certain prior works derived from Siegel's Superman works, but Plaintiffs otherwise deny the allegations in paragraph 114 of the Counterclaims.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. Plaintiffs admit only that certain works derived from Action Comics No. 1 contain additional copyrightable elements not present in Action Comics No. 1, such as new villains, but Plaintiffs otherwise deny the allegations in paragraph 119 of the Counterclaims.

120. Denied.

121. Plaintiffs admit only that Siegel's Superboy Summary and Superboy Story contain, in part, the language quoted in paragraph 121 of the Counterclaims, but Plaintiffs otherwise deny the allegations in paragraph 121 of the Counterclaims, and respectfully refer the Court to the Superboy Summary and Superboy Story as evidence of the contents thereof.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

126. Plaintiffs admit that More Fun Comics No. 101 contained both artwork and storyline, but Plaintiffs otherwise deny the allegations in paragraph 126 of the Counterclaims, and respectfully refer the Court to More Fun Comics No. 101 as evidence of the contents thereof.

127. Denied.

128. Denied.

129. Denied.

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 63
ER 3393

1  130.  Denied.

2  131.  Denied.

3  132.  Denied.

4  133.  Denied.

5  134.  Plaintiffs admit only that Plaintiffs deny the allegations in

6  paragraphs 106-133 to the extent denied hereinabove, but Plaintiffs otherwise

7  deny the allegations contained in paragraph 134 of the Counterclaims.

8  135.  Plaintiffs admit that a declaration of the Court in this action is

9  necessary, but otherwise deny the allegations contained in paragraph 135 of the

10  Counterclaims.

11  **SIXTH ALTERNATIVE COUNTERCLAIM**

12  136.  Plaintiffs re-allege and incorporate by reference paragraphs 1- 65

13  and 106-135 inclusive, as though fully set forth herein.

14  137.  Denied.

15  138.  Plaintiffs admit that a declaration of the Court in this action is

16  necessary, but otherwise deny the allegations contained in paragraph 138 of the

17  Counterclaims.

18  139.  Plaintiffs admit that a declaration of the Court in this action is

19  necessary, but otherwise deny the allegations contained in paragraph 139 of the

20  Counterclaims.

21  **PRAYER FOR RELIEF**

22  140.  With respect to the relief requested in paragraph 1 of the Prayer for

23  Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled

24  to any of the relief requested in said paragraph.

25  141.  With respect to the relief requested in paragraph 2 of the Prayer for

26  Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled

27  to any of the relief requested in said paragraph.

28

22

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

142.   With respect to the relief requested in paragraph 3 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

143.   With respect to the relief requested in paragraph 4 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

144.   With respect to the relief requested in paragraph 5 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

145.   With respect to the relief requested in paragraph 6 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

146.   With respect to the relief requested in paragraph 7 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

147.   The Counterclaims, and each purported counterclaim alleged therein, fail to allege facts sufficient to state a claim upon which relief sought or any relief could be granted.

### SECOND AFFIRMATIVE DEFENSE

### (Estoppel)

148.   The Counterclaims, and each purported counterclaim alleged therein, is barred, in whole or in part, by the doctrine of estoppel.

### THIRD AFFIRMATIVE DEFENSE

### (Laches)

149.   The Counterclaims, and each purported counterclaim alleged therein, is barred, in whole or in part, by the equitable doctrine of laches.

## FOURTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

150.   The Counterclaims, and each purported counterclaim alleged therein, is barred, in whole or in part, by the equitable doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver)

151.   The Counterclaims, and each purported counterclaim alleged therein, is barred by the doctrine of waiver.

## SIXTH AFFIRMATIVE DEFENSE

### (Acquiescence)

152.   The Counterclaims, and each purported counterclaim alleged therein, is barred by the doctrine of acquiescence.

## SEVENTH AFFIRMATIVE DEFENSE

### (Bad Faith)

153.   Counterclaimant is barred from obtaining any relief from its Counterclaims because Counterclaimant has acted in bad faith for improper purposes with respect to the subject matter of the Counterclaims.

## EIGHTH AFFIRMATIVE DEFENSE

### (Incorporation of Complaint)

154.   Plaintiffs hereby incorporate each of the allegations and claims for relief contained within Plaintiffs' complaint filed herein.

## NINTH AFFIRMATIVE DEFENSE

### (Reservation of Right to Amend)

155.   The Counterclaims and each purported counterclaim therein fails to state the claims for relief with sufficient particularity to permit Plaintiffs to discern and raise all appropriate defenses and Plaintiffs therefore reserve their rights to amend or supplement this answer with additional defenses.

24

## TENTH AFFIRMATIVE DEFENSE

### (Unknown Defenses)

156. The answering Plaintiffs believe, and based upon such information and belief allege, that the Plaintiffs may have additional affirmative defenses available to them, which are not now fully known and which these answering Plaintiffs are not fully aware. The Plaintiffs accordingly reserve the right to assert any additional affirmative defenses after the same have been ascertained.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

157. The Counterclaims and each purported counterclaim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## TWELFTH AFFIRMATIVE DEFENSE

### (Illegality)

158. Counterclaimant is not entitled to any relief with respect to any of the Counterclaims to the extent of any illegality of any matters set forth in the Counterclaims.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Violations of Law)

159. Counterclaimant has violated one or more laws which thereby eliminate or reduce any and all relief requested in the Counterclaims.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

160. Any contract alleged in the Counterclaims which is contrary to public policy is unenforceable and/or any relief requested in the Counterclaims which is contrary to public policy should not be granted.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Comply With FRCP)

25

161.   Plaintiffs are not required to separately admit or deny each averment contained in each paragraph of the Counterclaims due to Counterclaimant's failure to comply with Rules 8(a) and 8(e) of the Federal Rules of Civil Procedure.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Plaintiffs' Compliance with 17 U.S.C. §304(c))

162.   The termination of the grants of copyright in "Superman" and "Superboy," respectively pursuant to Plaintiffs' Notices of Termination were effective due to Plaintiffs' compliance with 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Plaintiffs' Termination Notices Not Invalidated By Technical Errors)

163.   Under 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, Plaintiffs' Termination Notices are not invalidated or curtailed due to technical errors or omissions, if any, since Plaintiffs' intent to terminate all prior grants by Siegel of his copyright interests in "Superman," "Superboy" and other works is made clear to Counterclaimant in the Termination Notices timely served on Counterclaimant.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Termination Interests Under 17 U.S.C. § 304(c) Cannot Be Waived)

164.   Plaintiffs could not have waived or effectively waived, directly or indirectly, any of its termination rights or interests because such rights or interests under 17 U.S.C. § 304(c) persist "notwithstanding any agreement to the contrary" and cannot be waived.

## NINETEENTH AFFIRMATIVE DEFENSE

### (1948 Consent Judgment Not A Copyright Grant)

165.   The Consent Judgment dated May 21, 1948 need not have been terminated by Plaintiffs pursuant to 17 U.S.C. § 304(c) to regain Siegel's

26

1  copyright interests because the Consent Judgment does not constitute a grant or

2  assignment of a copyright interest in "Superman," "Superboy" or any other work

3  authored by Siegel.

**TWENTIETH AFFIRMATIVE DEFENSE**

**(1948 Consent Judgment Not an Operative Agreement)**

6  166.  The Consent Judgment dated May 21, 1948 need not have been

7  terminated by Plaintiffs pursuant to 17 U.S.C. § 304(c) to regain Siegel's

8  copyright interests because it is not an operative agreement or grant of any

9  copyright interest(s); the Consent Judgment merely recites which parties own

10  which copyrights pursuant to a prior grant(s), namely the May 19, 1948

11  Stipulation, the operative grant which was duly terminated by Plaintiffs'

12  termination notices pursuant to 17 U.S.C. § 304(c).

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(1975 Agreement Not a Copyright Grant)**

15  167.  The December 23, 1975 Agreement between Counterclaimant's

16  alleged predecessor Warner Communications, Inc. and Siegel and Shuster did

17  not grant or assign any copyright interest of Jerome Siegel to Warner

18  Communications, Inc.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(No Assignment of Copyright Under 17 U.S.C. §204(a))**

21  168.  Plaintiffs did not assign their copyright interests in "Superman," or

22  any other work, recovered as result of Plaintiffs' exercise of their termination

23  rights under 17 U.S.C.§ 304 (c), because, without limitation, no written

24  assignment of any such copyright interests was executed by Plaintiffs as

25  required by 17 U.S.C. §204(a).

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(Failure to List Ad Does Not Affect Superman Termination)**

28

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

Exh. B 69
ER 3399

169.   Plaintiffs' "Superman" Termination Notices are not invalidated or curtailed by failing  to list an advertisement(s), allegedly depicting the cover of Action Comics No. 1, if any, since Plaintiffs properly gave notice of their termination of the underlying *grant(s)* of the original "Superman" copyright pursuant to 17 U.S.C. § 304(c) and Plaintiffs' Termination Notices identified Action Comics No. 1.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Not Works For Hire)

170.   The "Superman" works created by Jerome Siegel and/or by Siegel and Shuster, the "Superboy" works created by Jerome Siegel and any other works by Jerome Siegel and/or Joseph Shuster referred to in the Counterclaims do not constitute works-for-hire.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE
### ("Additional Action Comics No. 1" Material Is
### De Minimus and Terminable)

171.   The purported "Additional Action Comics No. 1 Material" referred to in the Counterclaims is *de minimus* and, in any event, was subject to Plaintiffs' termination under 17 U.S.C. §304 (c) since any such material was not work-for-hire.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Counterclaimant Cannot Exploit New Derivative Works)

172.   Counterclaimant cannot exploit new derivative works based on copyrights that Plaintiffs have recovered pursuant to 17 U.S.C. §304 (c) and/or based on works derived from such recovered copyrights.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Trademarks Cannot Restrain Plaintiffs' Use of Its Copyrights)

28

Exh. B 70
ER 3400

173. Counterclaimant cannot use its purported trademark(s) to restrain Plaintiffs' use or exploitation of its copyright interests under the United States Copyright Act.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

#### (Use of "Superman" Shield Is a Use Of
#### Plaintiffs' "Superman" Crest Copyright)

174. Plaintiffs are entitled to an accounting by Counterclaimants for their licensing or other exploitation of the "Superman Shield" because such constitutes an exploitation of the copyright in Siegel and Shuster's "Superman Crest" which, at a minimum, is co-owned by Plaintiffs.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

#### ("Superman" Has Changed Very Little Since Its Creation)

175. "Superman" has changed very little over the years since its original creation and development by Siegel and Shuster.

### THIRTIETH AFFIRMATIVE DEFENSE

#### (Apportionment Is Not Applicable To Licensing)

176. The doctrine of apportionment while at times applicable to the exploitation of derivative works should not be applied to Counterclaimant's receipt of passive licensing fees with respect to "Superman" and other works.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

#### (Any Apportionment Should Weigh In Plaintiffs' Favor)

177. "Superman" is one of those few copyrightable characters wherein the character, itself, *is* the story being told and, as such, any apportionment of profits from the exploitation of "Superman" should weigh heavily in Plaintiffs' favor.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

#### (No Statute of Limitations Applicable To 17 U.S.C. §304 (c) Termination)

29

1    178.   Since Plaintiffs complied with the timing, notice and other

2  prerequisites to the termination of prior copyright grants under 17 U.S.C.

3  §304(c), no statute of limitations runs against Plaintiffs' Superman

4  Terminations, nor is the statute of limitations nonetheless triggered by

5  Counterclaimant's frivolous denial of the validity of such terminations.

6               **THIRTY-THIRD AFFIRMATIVE DEFENSE**

7        **(Statute of Limitations Has Not Run Due To Tolling Agreement)**

8    179.   To the extent, if any, a statute of limitations or other time based

9  defense is applicable to Plaintiffs' terminations, such statute has not run, and

10  such time based defenses are ineffective, due to the "Tolling Agreement"

11  executed by Counterclaimant and Plaintiffs dated April 20, 2000; and

12  Counterclaimant has breached such Tolling Agreement by nonetheless asserting

13  herein that Plaintiffs' Superman Terminations are barred by the statute of

14  limitations.

15            **THIRTY-FOURTH AFFIRMATIVE DEFENSE**

16                  **(Confidentiality Agreement)**

17    180.   Plaintiffs are not required to separately admit or deny each

18  averment contained in the Counterclaims relating to confidential negotiations

19  between the parties due to the confidentiality agreement between

20  Counterclaimant and Plaintiffs dated December 17, 1997, and Counterclaimant's

21  breach of such confidentiality agreement.

22              **THIRTY-FIFTH AFFIRMATIVE DEFENSE**

23                   **(Rule 408 of the FRE)**

24    181.   Plaintiffs are not required to separately admit or deny each

25  averment contained in the Counterclaims relating to conduct or statement made

26  in settlement negotiations between the parties since such is inadmissible under

27  Rule 408 of the Federal Rules of Evidence.

28

                              30

REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]

## THIRTY-SIXTH AFFIRMATIVE DEFENSE
### (Payments Not Received By Joanne Siegel
### Under December 23, 1975 Agreement)

182. The December 23, 1975 Agreement provided that Joanne Siegel was to receive payments only if Jerry Siegel died before December 21, 1985; and Mr. Siegel did not die until January 28, 1996.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE
### (Beyond Scope of Authority)

183. Plaintiffs' attorneys lacked authority and/or exceeded the scope of their authority with respect to the purported settlement agreement alleged by Counterclaimant.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE
### (Statute of Frauds)

184. The purported settlement agreement alleged by Counterclaimant is barred by the Statute of Frauds.

## THIRTY-NINTH AFFIRMATIVE DEFENSE
### (No Settlement Agreement Consummated)

185. Plaintiffs did not execute a written settlement agreement with Counterclaimant, nor otherwise approve all material terms and conditions of a settlement agreement with Counterclaimant. When Counterclaimant finally presented Plaintiffs with all material terms of Counterclaimant's settlement offer or counter-offer in the first draft of a written agreement, such was rejected by Plaintiffs, in large part, because it contained many unacceptable material terms that had never been proposed by Counterclaimant, nor agreed to by Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment on the Counterclaims as follows:

1. That all the Counterclaims be dismissed;

2. That Counterclaimant takes nothing by its Counterclaims;

31

Exh. B 73
ER 3403

1     3.     That judgment be entered in favor of Plaintiffs on all counts;

2     4.     That Plaintiffs be awarded costs of suit;

3     5.     That Plaintiffs be awarded attorneys' fees incurred in defense of the

4              Counterclaims as permitted by Section 505 of the United States

5              Copyright Act; and

6     6.     That Plaintiffs be awarded such other and further relief, both

7              general and special, as the Court may deem just and proper.

8    DATED: November 1, 2005    LAW OFFICES OF MARC TOBEROFF, PLC

9

10                By: _____

                              Marc Toberoff

11

12        Attorneys for Plaintiffs and Counterclaim
            Defendants JOANNE SIEGEL and LAURA

13       SIEGEL LARSON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32

**JURY TRIAL DEMANDED**

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Counterclaims.

DATED: November 1, 2005      LAW OFFICES OF MARC TOBEROFF, PLC

By: _____
                              Marc Toberoff

Attorneys for Plaintiffs and Counterclaim
Defendants JOANNE SIEGEL and LAURA
SIEGEL LARSON

33

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 1999 Avenue of the Stars, Suite 1540, Los Angeles, California 90067.

On November 3, 2005, I served the attached documents described as **REPLY TO FIRST AMENDED COUNTERCLAIMS [SUPERMAN]** on all interested parties in this action by placing ___ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

David L. Burg
WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017

[X] :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on November 3, 2005, in Los Angeles, California.

Nicholas C. Williamson

Exh. B 76
ER 3406

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 243 of 252

1 WEISSMANN WOLFF BERGMAN
  COLEMAN GRODIN & EVALL LLP
2 Michael Bergman (SBN 37797)
  Anjani Mandavia (SBN 94092)
3 9665 Wilshire Boulevard, Ninth Floor
  Beverly Hills, California 90212
4 Telephone: 310-858-7888
  Fax:        310-550-7191
5
  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6 Roger L. Zissu (Admitted *pro hac vice*)
  866 United Nations Plaza
7 New York, New York 10017
  Telephone: 212-813-5900
8 Fax:        212-813-5901

9 PERKINS LAW OFFICE, P.C.
  Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY 10516
11 Telephone: 845-265-2820
   Fax:        845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
                UNITED STATES DISTRICT COURT
14    CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

15 JOANNE SIEGEL and LAURA          ) Case Nos. [Consolidated for
   SIEGEL LARSON,                   ) Discovery]
16                                  ) CV 04-8400 SGL (RZx)
                                    ) CV 04-8776 SGL (RZx)
17        Plaintiffs,               ) Hon. Stephen G. Larson, U.S.D.J.
                                    ) Hon. Ralph Zarefsky, U.S.M.J.
18        vs.                       )
                                    ) **DECLARATION OF MICHAEL**
19 TIME WARNER INC., WARNER         ) **BERGMAN IN SUPPORT OF**
   COMMUNICATIONS INC., WARNER      ) **DEFENDANTS' MOTION FOR**
20 BROS. ENTERTAINMENT INC.,        ) **PARTIAL SUMMARY**
   WARNER BROS. TELEVISION          ) **JUDGMENT**
21 PRODUCTION INC., DC COMICS,      )
   and DOES 1-10,                   )
22                                  ) Time:    10:00 a.m.
          Defendants.               ) Date:    July 16, 2007
23                                  ) Courtroom 1
                                    ) Judge Stephen G. Larson
24                                  )
                                    )
25                                  )
                                    )
26                                  )
   _____)
27                                  )
   AND RELATED COUNTERCLAIMS.       )
28                                  )

**ER 3407**

DECLARATION OF MICHAEL BERGMAN

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 244 of 252

I, Michael Bergman, declare and state as follows:

1.     I am member of Weissmann Wolff Bergman Coleman Grodin & Evall LLP, counsel for Defendants. This declaration, based upon my own personal knowledge and on our office's records, is submitted in support of Defendants Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros. Television Production Inc. and defendant and counterclaimant DC Comics' ("Defendants") Motion for Partial Summary Judgment.

2.     Attached hereto as Exhibit A is a true and correct copy of the December 1937 agreement between Jerry Siegel ("Siegel"), Joe Shuster ("Shuster") and Detective Comics ("Detective").

3.     Attached hereto as Exhibit B is a true and correct copy of the March 1, 1938 assignment from Siegel and Shuster to Detective.

4.     Attached hereto as Exhibit C is a true and correct copy of the cover and first page of *More Fun Comics No. 31*, along with a certificate of copyright registration for such work.

5.     Attached hereto as Exhibit D is a true and correct copy of the cover and first page of *Detective Comics No. 15*, along with a certificate of copyright registration for such work.

6.     Attached hereto as Exhibit E is the February 2000 DC Comics Millennium Edition reproduction of *Action Comics No. 1*, which was originally published in 1938. Although the comic from which the copy was made is a replica, and not the original, the panels are identical to those in the original comic.

7.     Attached hereto as Exhibit F is a true and correct copy of the September 22, 1938 agreement between Siegel and Shuster and Detective.

8.     Attached hereto as Exhibit G is a true and correct copy of the September 22, 1938 agreement between Siegel and Shuster, Detective and the McClure Newspaper Syndicate.

DECLARATION OF MICHAEL BERGMAN

9.     Attached hereto as Exhibit <u>H</u> is true and correct copy of the November 30, 1938 Superboy pitch letter from Siegel to Detective.

10.     Attached hereto as Exhibit <u>I</u> is a true and correct copy of the December 1940 Superboy script, produced by Plaintiffs in this action.

11.     Attached hereto as Exhibit <u>J</u> is a true and correct copy of an excerpt from the transcript of the deposition of plaintiff Laura Siegel Larson.

12.     Attached hereto as Exhibit <u>K</u> is true and correct copy of a collection of the first series of Superman newspaper strips published by the McClure Newspaper Syndicate in 1939. These strips were reproduced from Superman: The Dailies (1939-1942), published by Kitchen Sink Press and DC Comics in 1998.

13.     Attached hereto as Exhibit <u>L</u> is a true and correct copy of the December 2000 DC Comics Millennium Edition reproduction of *Superman No. 1*, which was originally published in 1939. Although the comic from which the copy was made is a replica, and not the original, the panels are identical to those in the original comic.

14.     Attached hereto as Exhibit <u>M</u> is a true and correct copy of an Excerpt from the November 2000 DC Comics Millennium Edition reproduction of *More Fun Comics No. 101*, originally published in 1945, showing the first published appearance of Superboy. Although the comic from which the copy was made is a replica, and not the original, the panels are identical to those in the original comic. A certificate of copyright registration for *More Fun Comics No. 101* is also attached.

15.     Attached hereto as Exhibit <u>N</u> is a true and correct copy of an excerpt from the novel *The Adventures of Superman* by George F. Lowther. The book is a 1996 reprint of the original 1942 publication.

16.     Attached hereto as Exhibit <u>O</u> is a true and correct copy of a 1942 Superman comic strip. This strip was reproduced from Superman: The Sunday Classics (1939-1943), published by Kitchen Sink Press and DC Comics in 1998.

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 245 of 252

DECLARATION OF MICHAEL BERGMAN

17.     Attached hereto as Exhibit P are true and correct copies of Superman-related United States federal trademark registrations owned by DC Comics.

18.     Attached hereto as Exhibit Q is a true and correct copy of the Complaint in the action captioned *Siegel v. National Comics Publs., Inc.*, No. 1099-1947 (N.Y. Sup. Ct.) (the "Westchester Action").

19.     Attached hereto as Exhibit R is a true and correct copy of the November 21, 1947 referee's report in the Westchester Action.

20.     Attached hereto as Exhibit S is a true and correct copy of the April 12, 1948 referee's Findings of Fact and Conclusions of Law in the Westchester Action.

21.     Attached hereto as Exhibit T is a true and correct copy of the referee's Interlocutory Judgment in the Westchester Action.

22.     Attached hereto as Exhibit U is a true and correct copy of the May 19, 1948 stipulation in the Westchester Action.

23.     Attached hereto as Exhibit V is a true and correct copy of the May 21, 1948 final consent judgment in the Westchester Action.

24.     Attached hereto as Exhibit W is a true and correct copy of a December 23, 1975 Agreement between Siegel, Shuster and Warner Communications, Inc.

25.     Attached hereto as Exhibit X is a true and correct copy of the following Superman Notice of Termination, entitled "Notice of Termination of Transfer Covering Extended Renewal Term: December 4, 1937 Agreement."

26.     Attached hereto as Exhibit Y is a true and correct copy of an excerpt from the following Superman Notice of Termination, entitled "Notice of Termination of Transfer Covering Extended Renewal Term: March 1, 1938 Agreement," excluding the list of works.

27.     Attached hereto as Exhibit Z is a true and correct copy of an excerpt from the following Superman Notice of Termination, entitled "Notice of Termination of Transfer Covering Extended Renewal Term: September 22, 1938

1 Agreement (1)," excluding the list of works.

2     28.    Attached hereto as Exhibit <u>AA</u> is a true and correct copy of an excerpt
3 from the following Superman Notice of Termination, entitled "Notice of
4 Termination of Transfer Covering Extended Renewal Term: September 22, 1938
5 Agreement (2)," excluding the list of works.

6     29.    Attached hereto as Exhibit <u>BB</u> is a true and correct copy of an excerpt
7 from the following Superman Notice of Termination, entitled "Notice of
8 Termination of Transfer Covering Extended Renewal Term: December 19, 1939
9 Agreement," excluding the list of works.

10    30.    Attached hereto as Exhibit <u>CC</u> is a true and correct copy of an excerpt
11 from the following Superman Notice of Termination, entitled "Notice of
12 Termination of Transfer Covering Extended Renewal Term: May 19, 1948
13 Agreement," excluding the list of works.

14    31.    Attached hereto as Exhibit <u>DD</u> is a true and correct copy of an excerpt
15 from the following Superman Notice of Termination, entitled "Notice of
16 Termination of Transfer Covering Extended Renewal Term: December 23, 1975
17 Agreement," excluding the list of works.

18    32.    Attached hereto as Exhibit <u>EE</u> is a true and correct copy of the First
19 Amended Complaint in Case No. 04-8400 (the "Superman Action").

20    33.    Attached hereto as Exhibit <u>FF</u> is a true and correct copy of the Notice
21 of Termination of Transfer Covering Extended Renewal Term: Superboy.

22    34.    Attached hereto as Exhibit <u>GG</u> is a true and correct copy of the First
23 Supplemental Amended Complaint in Case No. 04-8776 (the "Superboy Action").

24    35.    Attached hereto as Exhibit <u>HH</u> is a true and correct copy of an excerpt
25 from *The Adventures of Superman Collecting*, published by DC Comics in 1988.

26    36.    Attached hereto as Exhibit <u>II</u> is a true and correct copy of an excerpt
27 from the 1996 edition of the *Overstreet Price Guide*.

28    37.    Attached hereto as Exhibit <u>JJ</u> is a true and correct copy of the cover

4

and first page of *Adventure Comics No. 26*.

38.    Attached hereto as Exhibit <u>KK</u> is a true and correct copy of a printout of the web page located at http://www.finnegan.com/lawyers/index.cfm?id=47.

39.    Attached hereto as Exhibit <u>LL</u> is a true and correct copy of an excerpt from *Superboy No. 2*.

40.    Attached hereto as Exhibit <u>MM</u> is a true and correct copy of Judge Lew's March 23, 2006 order granting Plaintiff's motion for summary judgment and denying Defendants' motion for summary judgment the Superboy Action.

41.    Attached hereto as Exhibit <u>NN</u> is a true and correct copy of DC Comics' March 31, 2006 interrogatories to Plaintiffs.

42.    Attached hereto as Exhibit <u>OO</u> is a true and correct copy of this Court's June 28, 2006 Order.

43.    Attached hereto as Exhibit <u>PP</u> is a true and correct copy of Plaintiffs' July 14, 2006 Supplemental Interrogatory Responses.

44.    Attached hereto as Exhibit <u>QQ</u> is a true and correct copy of this Court's October 27, 2006 Order.

45.    Attached hereto as Exhibit <u>RR</u> is a true and correct copy of Plaintiffs' November 22, 2006 Further Supplemental Interrogatory Responses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this **30th** day of April, 2007 at Beverly Hills, California.

Michael Bergman

# EXHIBIT A

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 250 of 252

AGREEMENT OF EMPLOYMENT entered into the Fourth
day of December, 1937, by and between DETECTIVE COMICS, INC.,
a domestic corporation having its offices at 480 Lexington
Avenue, New York City, hereinafter referred to as the Employer,
and Jerome Siegel and Joe Shuster residing at Cleveland, Ohio,
hereinafter referred to as the Employees.

1. The Employer hereby agrees to employ, and does hereby
employ the Employees as Artists, for a period of two years,
commencing with December 4, 1937 and terminating December 3, 1939,
and to pay them for such services and for all of the matters
hereinafter set forth, the sum of Ten Dollars ($10) per page.

2. The Employees agree to give their exclusive services
as artists in producing features known as "Slam Bradley " and
"The Spy " during said period of employment , to the Employer,
and agrees that all of these products and work done by said
Employee for said Employer during said period of employment,
shall be and become the sole and exclusive property of the
Employer, and the Employer shall be deemed the sole creator
thereof, the Employee acting entirely as the Employer's employee.

3. In the event that the Employee leaves the service of
the Employer prior to the termination date set forth in this
Agreement or subsequent thereto, and for any reason whatsoever,
the Employees agree that they will not, directly or indirectly,
and through any means whatsoever, use, duplicate, simulate or
bring into being any of the products or work or creations or
characters or plots used, made or created by him while in the
employ of the Employer.

EXHIBIT A
PAGE 6

ER 3414    400045543

d. It is understood that any new and additional features which the Employees produce for use in a comic magazine are to be first submitted to the Employer, who reserves the right to accept or reject same within a period of Sixty days.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

In Presence of:

_Shelby M. Siegel_
Witness

_Shelby M. Siegel_
Witness

_____
Witness

DETECTIVE COMICS, INC.

BY _____ Employer L.S.

_Jerome Siegel_ L.S.
Employee

_____ L.S.
Employee

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-13, Page 251 of 252

EXHIBIT A
PAGE __7__

DCC00045544
ER 3415

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on February 21, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  February 21, 2014                  /s/ Marc Toberoff
                                                           Marc Toberoff