APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZX), CV-04-8776 (RZX)

_____

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 15 OF 16**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Plaintiff-Appellant, Laura  Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 15)

*Larson v. Time Warner Inc. et al.*, CD Cal Case No. 04-CV-08776

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |

# INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|------|------|------|------|------|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
|---|---|---|---|---|
| 730 | 5/16/13 | *Exhibit 1:  Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2:  Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3:  Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4:  Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A:  Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B:  Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C:  Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E:  Transcript Cover Sheet for  Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F:  Transcript Cover Sheet* | 3 | 518 |

iv

| | | | | |
|---|---|---|---|---|
| | | *for Lewellen Deposition* | | |
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A:  Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B:  Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F:  Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1:  October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2:  October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4:  May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5:  May 22, 2002 letter from* | 6 | 1331 |

| | | | | |
|---|---|---|---|---|
| | | *Parsons to Joanne Siegel* | | |
| 709-2 | 3/4/13 | *Exhibit 6:  September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8:  Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9:  Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10:  Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11:  Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12:  Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13:  Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14:  October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| | | | | |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A:  Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B:  October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C:  Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D:  Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A:  Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A:  November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A:  February 1996 Thompson & Thompson Copyright Report re:  Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re:  Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C:  Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

| | | Response in Objection to Motion | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| | | | | |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|--------|---------|--------------------------------------------------------|---|------|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

| | | | | |
|---|---|---|---|---|
| | | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* | | |
| 340-1 | 7/21/08 | *Exhibit B: April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A: Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G: January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H: January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I: February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J: Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M: Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
|---|---|---|---|---|
| 196 | 6/25/07 | *Exhibit A:  Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B:  October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C:  Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D:  Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E:  Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F:  Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H:  Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|---|---|---|---|---|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S:  Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T:  Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U:  March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V:  May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No.  04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W:  Appellate Brief of National Periodical Publications, Inc. et. al.  from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X:  Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y:  December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z:  April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA:  September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB: October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC: October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD: February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE: Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF: March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A: December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
|---|---|---|---|---|
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
| | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10   LAURA SIEGEL LARSON,                    Case No: 04-CV-08400 ODW (RZx)
     individually and as personal            Case No: 04-CV-08776 ODW (RZx)-**
11   representative of the ESTATE OF
     JOANNE SIEGEL,                           Hon. Otis D. Wright II, U.S.D.J.
12               Plaintiff,                   Hon. Ralph Zarefsky, U.S.M.J.

13           v.                               **AMENDED JUDGMENT**

14   WARNER BROS. ENTERTAINMENT
     INC., DC COMICS, and DOES 1-10,
15               Defendants and
                 Counterclaimants.
16   ────────────────────────────────
     LAURA SIEGEL LARSON,
17   individually and as personal
     representative of the ESTATE OF
18   JOANNE SIEGEL,
                 Plaintiff,
19           v.

20   TIME WARNER INC., WARNER
     COMMUNICATIONS INC.,
21   WARNER BROS. ENTERTAINMENT
     INC., WARNER BROS. TELEVISION
22   PRODUCTION INC., DC COMICS,
     and DOES 1-10,
23               Defendants and
                 Counterclaimants.
24

25

26

27

28

# JUDGMENT

In a series of published decisions dated March 26, 2008; August 12, 2009; and October 30, 2009, in the "Superman" case (Case No. 04-CV-08400, ECF Nos. 293, 560, 595), the Court resolved Plaintiff Laura Siegel Larson's First Claim and Defendant-Counterclaimant DC Comics' First and Second Counterclaims, filed in both the "Superman" case and the "Superboy" case (Case No. 04-CV-08776). The Court thereby determined that, pursuant to the Copyright Act, 17 U.S.C. § 304(c), the Siegels validly terminated on April 16, 1999, all prior grants or transfers by Jerome Siegel to any of the Defendants, or their predecessors-in-interest, of his interest in the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action Comics*, No. 4, *Superman*, No. 1 (pages 3–6), and the first two weeks of the Superman newspaper strips and that, as of April 17, 1999, the effective terminate date, the Siegels owned the aforesaid recaptured copyright interests.

On January 10, 2013, the United States Court of Appeals for the Ninth Circuit reversed Judge Larson's March 26, 2008 partial summary-judgment order in part and held that, "as a matter of law," Plaintiff Larson entered into an enforceable settlement agreement with DC Comics on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*, Nos. 11-55863, 11-56034, 2013 WL 1113259, at *1 (9th Cir. Jan. 10, 2013). "Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations . . . , and that the letter" sent by Larson's attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material terms they had orally agreed to." *Id.* The Ninth Circuit directed this Court to "reconsider DC's third and fourth counterclaims in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2. The Ninth Circuit did not reach or address Plaintiff's First Claim in the "Superman" case, or the First and Second Counterclaims in the "Superman" and "Superboy" cases.

This Court's March 20 and April 18, 2013 Orders collectively granted DC's February 7, 2013 Motion for Summary Judgment on its Fourth Counterclaim. The

ER 3599

Court then entered DC's proposed final judgment on April 18, 2013.  On June 18, 2013, the Court issued an Order ("Superman" case, ECF No. 734; "Superboy" case, ECF No. 253) granting in part Plaintiff's Motion to Amend the Judgment ("Superman" case, ECF No. 731; "Superboy" case, ECF No. 250).

Based on the decisions set forth above, this Court now enters an amended final judgment based on DC's Fourth Counterclaim in two of three long-running Superman cases presently before this Court:  (1) the "Superman" case; and (2) the "Superboy" case.  In the parties' October 19, 2001 settlement agreement, Larson (and her family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics," effective October 19, 2001.  Declaration of Daniel M. Petrocelli ("Petrocelli Decl.") Ex. B, at 21; *Larson*, 2013 WL 1113259, at *1.  This complete transfer on October 19, 2001, bars certain of Larson's remaining claims in this case and entitles DC to judgment on its Fourth Counterclaim, which seeks a declaration confirming the October 19, 2001 settlement agreement against Larson.    The remaining claims are granted, denied, or dismissed as set forth below.  Therefore:

A.    **Plaintiff's Claims (Superman, Case No. CV-04-8400)**

IT IS ORDERED AND ADJUDGED that Plaintiff's First Claim for Relief in the "Superman" case, for "Declaratory Relief re: Termination," is GRANTED, *but only* to the extent that it sought a declaration that on April 16, 1999, the Siegels validly terminated under the Copyright Act all prior grants, assignments, or transfers by Jerome Siegel to any of the Defendants, or their predecessors-in-interest, of the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action Comics*, No. 4, *Superman*, No. 1 (pages 3–6), and the first two weeks of the Superman newspaper strips, and judgment is hereby entered in Plaintiff's favor on this claim as set forth herein.  *See* "Superman" case, ECF Nos. 293, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's Second Claim for "Declaratory Relief re: Profits from Recaptured Copyrights," Third Claim for "Declaratory Relief re: Use of the 'Superman' Crest," and Fourth Claim for

"Accounting for Profits" in the "Superman" case are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

**B.**     <u>**Plaintiff's Claims (Superboy Case, Case No. CV-04-8776)**</u>

IT IS ORDERED AND ADJUDGED that Plaintiff's First Claim for "Copyright Infringement," Second Claim for "Declaratory Relief re: Termination," Third Claim for "Violation of the Lanham Act § 43(a)(1)(B)," Fourth Claim for "Violation of California Business and Professions Code, §§ 17200 *et seq.*," and Fifth Claim for "Injunctive Relief" in the "Superboy" case are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

**C.**     <u>**DC's Counterclaims (Superman and Superboy Cases)**</u>

IT IS ORDERED AND ADJUDGED that DC's First Counterclaim, "For Declaration That The Superman Notices And The Superboy Notice Are Ineffective," is DENIED WITH PREJUDICE in its entirety in the "Superman" case and as to Parts (1), (2), and (5) in the "Superboy" case. *See* "Superman" case, ECF Nos. 293, 664 (striking parts (3) and (4) from the First Counterclaim in the "Superman" case).

IT IS FURTHER ORDERED AND ADJUDGED that DC's Second Counterclaim, "For Declaration That Any Claim By The Siegels For Co-Ownership Of Superman (Including Its Derivative Superboy) Is Barred By The Statute Of Limitations," is DENIED WITH PREJUDCE. *See* "Superman" case, ECF No. 293.

IT IS FURTHER ORDERED AND ADJUDGED that DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED in part as follows. The Court declares that the parties' October 19, 2001 settlement agreement (embodied in Kevin Marks's letter of the same date) remains binding and enforceable solely under the terms contained in that agreement. Under that agreement, Larson and her family transferred to DC, worldwide and in perpetuity, any and all rights, title, and interest, including all copyright interests, that they had in Superman and Superboy, effective October 19, 2001. Petrocelli Decl. Ex. B, at 19, 21; *Larson*, 2013 WL 1113259, at *1–2. Judgment is hereby entered in

1  DC's favor and against Larson on this counterclaim.

2      IT IS FURTHER ORDERED that DC's Third, Fifth, and Sixth Counterclaims

3  are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

4

5

6  IT IS SO ORDERED.

7

8   Dated:  June 18, 2013      _____

9                                  Hon. Otis D. Wright II.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER 3602

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9           **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10 | LAURA SIEGEL LARSON,              | Case No: 04-CV-08400 ODW (RZx)
   | individually and as personal     | **Case No: 04-CV-08776 ODW (RZx)-\*\***
11 | representative of the ESTATE OF   |
   | JOANNE SIEGEL,                    | Hon. Otis D. Wright II, U.S.D.J.
12 |            Plaintiff,             | Hon. Ralph Zarefsky, U.S.M.J.
13 |       v.                         |
   |                                  | **ORDER GRANTING IN PART AND**
14 | WARNER BROS. ENTERTAINMENT        | **DENYING IN PART PLAINTIFF'S**
   | INC., DC COMICS, and DOES 1-10,   | **MOTION TO AMEND THE**
15 |            Defendants and         | **COURT'S APRIL 18, 2013**
   |            Counterclaimants.      | **JUDGMENT UNDER FEDERAL**
16 |——————————————————————————————————| **RULE OF CIVIL PROCEDURE 59(e)**
   | LAURA SIEGEL LARSON,              | **[250]**
17 | individually and as personal      |
   | representative of the ESTATE OF   |
18 | JOANNE SIEGEL,                    |
   |            Plaintiff,             |
19 |       v.                         |
20 | TIME WARNER INC., WARNER          |
   | COMMUNICATIONS INC.,              |
21 | WARNER BROS. ENTERTAINMENT        |
   | INC., WARNER BROS. TELEVISION     |
22 | PRODUCTION INC., DC COMICS,        |
   | and DOES 1-10,                    |
23 |            Defendants and         |
24 |            Counterclaimants.      |

25

26

27

28

1    IT IS HEREBY ORDERED that Plaintiff's Motion to Amend the Court's April

2  18, 2013 Judgment Pursuant To Fed. R. Civ. P. 59(e) is **GRANTED in part and**

3  **DENIED in part**.  The Court will not withdraw Section "B" of its March 20, 2013

4  summary-judgment order.  The Court determines that Section "B"—finding that the

5  2001 Agreement remains an enforceable contract because Larson had not rescinded it

6  and DC had not abandoned it—is a necessary prerequisite to the Court's subsequent

7  finding in Section "C" that the still-valid Agreement had operated to transfer the

8  Siegels' Superman rights to DC (the continued legal effect of which depends on the

9  continued enforceability of the Agreement).  But, for the well-articulated reasons set

10 forth on pages 19:9 to 22:9 of Plaintiff's moving papers, the Court will enter

11 Plaintiff's proposed amended judgment in Case Nos. 04-CV-8400 and 04-CV-8776.

12    IT IS SO ORDERED.

13

14 Dated:  June 18, 2013          _____

15                                                    Hon. Otis D. Wright II.

16

17

18

19

20

21

22

23

24

25

26

27

28

JS-6

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | Case No. CV 04-8776 ODW (RZx) |
| Plaintiff, | **FINAL JUDGMENT IN THE *SIEGEL* SUPERBOY CASE** |
| v. | The Hon. Otis D. Wright II |
| TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, | |
| Defendants and Counterclaimants. | |

## JUDGMENT

On January 10, 2013, the United States Court of Appeals for the Ninth Circuit reversed Judge Larson's March 26, 2008 partial summary-judgment order and held that, "as a matter of law," Plaintiff Laura Siegel Larson (referred to herein in her individual capacity and as personal representative of the Estate of Joanne Siegel as "Larson") entered into an enforceable settlement agreement with Defendants (collectively, "DC") on October 19, 2001. *Larson v. Warner Bros. Entm't Inc.*, Nos. 11-55863, 11-56034, 2013 WL 1113259, at *1 (9th Cir. Jan. 10, 2013). "Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations . . . , and that the letter" sent by Larson's attorney, Kevin Marks, on October 19, 2001, "accurately reflected the material terms they had orally agreed to." *Id.* The Ninth Circuit directed this Court to "reconsider DC's third and fourth counterclaims" in the related *Siegel* Superman case—which mirror DC's Third and Fourth Counterclaims in this *Siegel* Superboy case—"in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2.

Consistent with this Court's March 20 and April 18, 2013 Orders collectively granting DC's February 7, 2013 Motion for Summary Judgment (ECF Nos. 235, 242), this Court may now enter final judgment in DC's favor in two of three long-running Superman cases presently before this Court: (1) the above-entitled "*Siegel* Superboy" case, Case No. CV-04-8776; and (2) the related "*Siegel* Superman" case, Case No. CV-04-8400 (addressed in a separate Final Judgment filed concurrently herewith). In the parties' October 19, 2001 settlement agreement, Larson (and her family) "transfer[red] all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics." Declaration of Daniel M. Petrocelli ("Petrocelli Decl.") Ex. B, at 21; *Larson*, 2013 WL 1113259, at *1. This complete transfer bars Larson's remaining claims in this case and entitles DC to judgment on its Fourth Counterclaim in this case, which seeks a declaration confirming the October 19,

FINAL JUDGMENT
**ER 3606**

2001 settlement agreement against Larson. DC's remaining counterclaims are dismissed, without prejudice, as moot. Therefore:

### A. Larson's Claims

IT IS ORDERED AND ADJUDGED that Larson's First Claim for Relief, for "Copyright Infringement," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 151 at 62; 175 at 1; Sept. 17, 2007 Hr'g Tr. at 4:6-5:4, 27:21-22.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Second Claim for Relief, for "Declaratory Relief re: Termination," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 170, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Third Claim for Relief, for "Violation of the Lanham Act § 43(a)(1)(B)," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 174, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fourth Claim for Relief, for "Violation of California Business and Professions Code, §§ 17200 *et seq.*," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 174, 560.

IT IS FURTHER ORDERED AND ADJUDGED that Larson's Fifth Claim for Relief, for "Injunctive Relief," is DENIED, and judgment is hereby entered in DC's favor and against Larson on this claim. *See also* DN 174, 560.

### B. DC's Counterclaims

IT IS ORDERED AND ADJUDGED that DC's Fourth Counterclaim, for "Declaratory Relief Regarding the [2001 Settlement] Agreement," is GRANTED, and judgment is hereby entered in DC's favor and against Larson on this counterclaim. The Court declares that, under the parties' October 19, 2001 settlement agreement, Larson and her family transferred to DC, worldwide and in

perpetuity, any and all rights, title, and interest, including all copyright interests, that they may have in Superman, Superboy, and Spectre.  Petrocelli Decl. Ex. B, at 19, 21; *Larson*, 2013 WL 1113259, at *1–2.

IT IS ACCORDINGLY FURTHER ORDERED that DC's First, Second, Third, Fifth, and Sixth Counterclaims are DISMISSED, WITHOUT PREJUDICE, AS MOOT.

IT IS SO ORDERED.

Dated:  April 18, 2013

_____
Honorable Otis D. Wright, II
Judge, United States District Court

OMM_US:71285795

FINAL JUDGMENT

ER 3608

**O**

1

2

3

4

5

6

7

8             **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11   LAURA SIEGEL LARSON, individually        Case No. 2:04-cv-08776-ODW(RZx)
     and as personal representative of the
12   ESTATE OF JOANNE SIEGEL,                  **ORDER GRANTING
                                               DEFENDANTS' MOTION FOR
13                       Plaintiff,            SUMMARY JUDGMENT RE:
                                               SUPERBOY AND THE SUPERMAN
14         v.                                  ADS**
                                                **[04-cv-8776, ECF No. 222]**
15   WARNER BROS. ENTERTAINMENT
     INC., DC COMICS, and DOES 1–10,
16
                         Defendants.
17

18   LAURA SIEGEL LARSON, individually
     and as personal representative of the
19   ESTATE OF JOANNE SIEGEL,

20                       Plaintiff,

21         v.

22   TIME WARNER INC., WARNER
     COMMUNICATIONS INC., WARNER
23   BROS. ENTERTAINMENT INC.,
     WARNER BROS. TELEVISION
24   PRODUCTION INC., DC COMICS, and
     DOES 1–10,

25                       Defendants.

26   / / /

27   / / /

28   / / /

## I.  INTRODUCTION

On March 20, 2013, this Court granted Defendants' February 7, 2013 Motion for Summary Judgment in part, holding on remand from the Ninth Circuit that the parties' October 19, 2001 settlement agreement remained binding and enforceable. The Court also ordered the parties to file supplemental briefs addressing how that holding affected the parties' respective rights to Superboy and the Superman ad works.  The Court now holds that the 2001 settlement agreement encompassed those works.  The remainder of Defendants' Motion is therefore **GRANTED**, and this litigation of superhero proportions now draws to a close.

## II.  FACTUAL BACKGROUND

On March 1, 1938, writer Jerome Siegel and artist Joe Shuster signed an agreement selling Superman to DC Comics for $130.  *Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1107 (C.D. Cal. 2008).  DC intended to publish Superman in the inaugural issue of *Action Comics*, which it promoted in advance in black-and-white advertisements in two of its other magazines (the "Ads").  *Id.*  The Ads reproduced the cover of the forthcoming *Action Comics No. 1* with accompanying text:



ER 3610

In 1938, following Superman's successful debut, Siegel "pitched the idea to [DC] of serializing a comic concerning the exploits of Superman as a young man." *Siegel v. Warner Bros. Entm't Inc.*, 496 F. Supp. 2d 1111, 1114 (C.D. Cal. 2007.) DC twice declined to publish Siegel's proposed Superboy comic. *Id.* at 1115. But while Siegel was stationed abroad with the U.S. Army in 1943, DC published a five-page "Superboy" comic strip without Siegel's consent and without giving him notice. *Id.* Several rounds of litigation ensued, but suffice it to say for present purposes that the parties continue to dispute ownership, publication, and copyrightability of various aspects of Superboy.

In 1997, Laura Siegel Larson and Joanne Siegel (Siegel's daughter and now-deceased widow, respectively) served DC with a "nearly six-pound, 546-page termination notice" of Siegel's Superman copyright grants under 17 U.S.C. § 304(c). (Petrocelli Decl. in Support of Def.'s Supp. Br. ("Petrocelli Decl.") Ex. 11); *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1095 (C.D. Cal. 2009). This 1997 termination notice "applie[d] to each and every work (in any medium whatsoever, whenever created) that include[d] or embodie[d] any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stores, such as, without limitation, Superman . . . Superboy, . . . [or] Smallville." (Petrocelli Decl. Ex. 11, at 93 n.1; *see also* Pl.'s Supp. Br. 3 ("[T]he 1997 Terminations applied to Siegel's Superman works published between 1938 and 1943, although they listed derivative works outside this 'window' out of an abundance of caution.").) In other words, the Notice purported on its face to cover not only Superman, but also Superboy and the Superman Ads.

Shortly before the termination's 1999 effective date, DC contested the scope and validity of 1997 termination notice and subsequently entered settlement negotiations with the Siegels. After four years, these negotiations culminated in the October 19, 2001 letter that the Ninth Circuit and this Court have found constitutes the operative agreement between the parties. The 2001 agreement, like the 1997 notice of

3

**ER 3611**

termination, purported to cover Superboy and the Superman Ads. (*See* Petrocelli Decl. Ex. 12, at 647 (defining "The Property" subject to the settlement as "all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library, characters, names and trademarks relating to the property").)

But then efforts to reduce the 2001 agreement to a long-form contract broke down. As a result, the Siegels repudiated the agreement, served an additional notice of termination in 2002 purporting to recover the Superboy works, and sued DC in 2004 for declaratory relief with respect to the 1997 and 2002 notices of termination. The Siegels later served a subsequent 2012 notice of termination regarding the Ads, after Judge Larson held earlier in this litigation that the 2001 agreement was not binding and that the 1997 notice of termination failed to capture the Ads. The parties now dispute the effect of the 2001 settlement agreement on the Superboy and Ad works in light of the 2002 and 2012 notices of termination.

## III. DISCUSSION

DC maintains that the October 19, 2001 agreement constituted a revocation and re-grant of the Siegels' copyright interests (if any) in the Superboy and Superman Ad works that precluded the Siegels' 2002 and 2012 termination notices for those works. (DC's Supp. Br. 3–4.) The Siegels respond that the October 19, 2001 agreement cannot constitute a revocation and re-grant, because it "contains *no language of revocation*, let alone the requisite express revocation." (Pl.'s Supp. Br. 9 (citing *Milne*, 430 F.3d at 1040–41, 1047–48; *Mewborn*, 532 F.3d at 980–81, 986, 988–89).)

Two important appellate decisions undergird the parties' revocation-and-re-grant arguments: *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) and *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008). *Milne* concerned author A.A. Milne's classic *Winnie the Pooh* works. *Milne*, 430 F.3d at 1039. In 1930, Milne granted producer Stephen Slesinger certain copyright

ER 3612

interests in Pooh in exchange for royalties. *Id.* Slesinger then transferred his Pooh rights to Stephen Slesinger, Inc. (SSI), which in turn granted its rights exclusively to Disney. *Id.* at 1039–40. Milne later died in 1956, survived by his widow and son, Christopher Robin. *Id.*

Twenty years later, Congress passed the 1976 Copyright Act, which (among other things) extended the 1909 Act's renewal term and created a new termination right so that authors or certain of their heirs could take advantage of that extended term. *Id.* In 1983, faced with the possibility that Christopher Robin might seek to terminate his 1930 grant to SSI (but before any termination right had been exercised), Disney proposed that the parties renegotiate the rights to the Pooh works. *Id.* "Christopher accepted Disney's proposal and, using the bargaining power conferred by his termination right, negotiated and signed on April 1, 1983 a more lucrative deal with SSI and Disney that would benefit" Milne's heirs. *Milne*, 430 F.3d at 1040.

In 1998, Congress passed the Sonny Bono Copyright Term Extension Act ("CTEA"), Pub. L. No. 105-298, 112 Stat. 2827 (1998) (codified at 17 U.S.C. §§ 108, 203, 310–304). Of particular importance here, the CTEA further extended the term of copyright protection, granted an extended termination window *only for pre-1978 copyright grants*, and provided more favorable treatment to authors' heirs. *See* 17 U.S.C. § 304(c)–(d); *Milne*, 430 F.3d at 1038–39, 1041.

Years later, Christopher's daughter, Clare, attempted to terminate Milne's 1930 grant. The Ninth Circuit rejected this effort, holding that Christopher's 1983 grant revoked the pre-1978 grant and re-granted the same rights, thereby pulling the 1930 agreement from the grasp of the CTEA's extended termination provisions. *Id.* at 1048.

The Ninth Circuit further held that Christopher's 1983 grant did not constitute an ineffective "agreement to the contrary" under 17 U.S.C. § 304(c)(5). *Id.* at 1046. In so holding, the Ninth Circuit reasoned that Congress had "anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by

ER 3613

replacing it with a new one." *Id.*  But more importantly for this case, the Ninth Circuit found that Christopher's 1983 grant had effectively fulfilled Congress's objectives in disallowing authors or their heirs from entering into an agreement contrary to the future exercise of their newly granted statutory termination rights:

> The rationale behind [the CTEA] was to 'safeguard[] authors against unremunerative transfers' and improve the 'bargaining position of authors' by giving them a second chance to negotiate with more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.' *Congress sought to foster this purpose by permitting an author's heirs to use the increased bargaining power conferred by the imminent threat of statutory termination to enter into new, more advantageous grants.*  This is exactly what Christopher and the other beneficiaries of the Pooh Properties Trust did in 1983." *Milne*, 430 F.3d at 1046 (emphasis added) (quoting H.R. Rep. No. 94-1476 at 124, 1976 U.S.C.C.A.N. at 5740).

*Steinbeck* mirrored the *Milne* scenario.  In 1938, author John Steinbeck executed a publishing agreement covering several of his best-known works; the agreement was extended in 1939 to cover four additional works.  *Steinbeck*, 537 F.3d at 196.  The agreements were later assigned to Penguin Group, and Steinbeck thereafter properly renewed the copyrights subject to those agreements.  *Id.*  Steinbeck died in 1968, survived by his widow, Elaine, and two sons from a previous marriage, Thomas and John IV.  *Id.*

In 1994, Elaine and Penguin entered into a new agreement for continued publication of all works subject to the 1938 agreement, plus additional other Steinbeck works.  *Id.*  The 1994 agreement also altered the economic terms of the 1938 agreement to Elaine's benefit and expressly "cancel[ed] and supersede[d] the previous agreements, as amended, for the [works] covered [t]hereunder."  *Id.*

Elaine then died in 2003, and in 2004 Thomas and John IV's son jointly served a notice of termination purporting to terminate the grants made by the 1938 agreement.  *Id.*  Citing *Milne* with approval, the Second Circuit in *Steinbeck* held that

ER 3614

Elaine's 1994 agreement (1) "terminated and superseded" the 1938 agreement, *id.* at 200; and (2) was not an invalid "agreement to the contrary," "even if the agreement had the effect of eliminating a termination right that Congress did not provide until 1998." *Id.* at 202. Similar to the Ninth Circuit in *Milne*, the Second Circuit noted that Elaine had renegotiated and canceled the 1938 agreement "while wielding the threat of termination" and found that "this kind of renegotiation appears to be exactly what was intended by Congress." *Id.*

The Siegels' 1997 Termination notice and subsequent 2001 settlement agreement with DC presents this Court with an even clearer case than either *Milne* or *Steinbeck*. At the outset, the Court notes that this case does not—despite the parties' many pages of argument on the issue—implicate a revocation and re-grant scenario. In both *Milne* and *Steinbeck*, the courts began their analyses with the recognition that the CTEA's extended termination rights, which became effective in 1999, only applied to grants made *before* January 1, 1978. *Steinbeck*, 537 F.3d at 200; *Milne*, 430 F.3d at 1042. Thus, because the Milne and Steinbeck heirs had entered into post-1978 agreements that terminated and superseded the pre-1978 grants, those heirs were statutorily precluded from exercising the CTEA's new grant of termination rights.

Here, in contrast, DC and the Siegels entered into the 2001 agreement *after* the CTEA became effective in 1999. Because the extended termination rights the CTEA bestowed had already vested by the time the 2001 agreement was consummated, the Court need only concern itself with whether the 2001 agreement constituted an "agreement to the contrary" under § 304(c)(5).

Both *Milne* and *Steinbeck* preclude a finding that the 2001 settlement agreement constituted an "agreement to the contrary" under § 305(c)(5). In finding that the post-1978 revocation-and-re-grant agreements did not constitute agreements to the contrary, the courts in both *Milne* and *Steinbeck* ardently emphasized the fact that the heirs had vindicated Congress's intent by wielding their termination rights to extract more lucrative deals. The Ninth Circuit in *Classic Media, Inc. v. Mewborn* has since

ER 3615

expressly relied on this point in contrasting the facts of that case with those in *Milne*: "When the Milne heir chose to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, it was tantamount to following the statutory formalities, and *achieved the exact policy objectives for which § 304(c) was enacted.*"  532 F.3d 978, 987 (9th Cir. 2008) (emphasis added); *see also id.* at 988 (the subject agreement was consistent with and "fully honored Christopher's right of termination which could vest immediately if he served notice"; "[t]he avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the congressional purpose underlying them.").  Christopher, the Ninth Circuit noted, had chosen "to avoid the statutory formalities whereby the rights would actually vest in him and then he would have to renegotiate with the studio." *Id.* at 988.  Further, "the deal resulted in a net gain of hundreds of millions of dollars to [the Milne heirs], landing the studio and [the heirs] in the same place had [they] followed the formalities." *Id.*

By the 1997 termination notice and 2001 settlement agreement, the Siegels here went a step further than the heirs in *Milne* by actually engaging in the statutory formalities: While Christopher simply *could have* served a termination notice, the Siegels actually *did* serve a termination notice listing a vast spectrum of Superman and Superboy works.  Sure, DC disputed the validity and scope of the Siegels' 1997 notice.  And the Siegels served another termination notice in 2002 targeting Superboy in particular.  When Judge Larson later held that the Ads fell outside the scope of the 1997 termination notice,  the Siegels apparently felt compelled to file a 2012 termination notice with respect to the Ads.  But in construing the parties' October 2001 settlement agreement, the Court must focus on the subject of the settlement negotiations—the 1997 notice of termination that encompassed Superman, Superboy, and the Ads.  As of the date of the 1997 notice, it was an open question between the parties whether and to what extent any of these works were  within the ambit of the

ER 3616

1997 notice.  This uncertainty resulted in a lengthy four-year negotiation process that culminated in an October 19, 2001 settlement agreement whereby the Siegels *explicitly* granted DC their rights to "*all* Superman, *Superboy*, and related properties (including, for example, . . . *Smallville*," as well as "all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to" these rights.  (Petrocelli Decl. Ex. 12, at 647.)  In exchange for this grant, the Siegels received a $2 million advance, a $1 million non-recoupable signing bonus, forgiveness of a previous $250,000 advance, a guarantee of $500,000 per year for 10 years, a 6% royalty of gross revenues, and various other royalties.  Simply put, the Siegels entered into a *highly* remunerative new deal with DC as a *direct result* of their 1997 notice of termination that purported to encompass the Superboy and Superman Ad works now at issue.  "[T]his kind of renegotiation appears to be exactly what was intended by Congress."  *See Steinbeck*, 537 F.3d at 202.

Later decisions holding that Superboy and the Ads were not properly terminated by the 1997 notice do not change this result.  The course of litigation in this matter teaches that the Superboy and the Superman Ads were likely not properly terminated by the 1997 notice of termination, notwithstanding the fact that those works were listed in the notice.  The Court will therefore assume without deciding that absent the 2001 Agreement, the Siegels would have properly terminated Superboy through their 2002 notice of termination and the Ads through their 2012 notice of termination.  Under this presumption, the Siegels would have settled away their termination rights to Superboy and the Ads by way of the 2001 settlement agreement.  On the surface, this would appear to be an agreement to the contrary.  But the Siegels freely and intelligently entered into the 2001 agreement as a direct result of their 1997 attempt to terminate the Superboy and Ad works.  In 2001, they knew full well that the CTEA had been effective for more than two years.  And like Christopher, the Siegel heirs here had very much "in hand with which to bargain" in 2001 when they negotiated the settlement stemming from their 1997 termination notice.  *Mewborn*, 532 F.3d at 989.

**ER 3617**

The import of the 2001 agreement could not possibly have been lost on the Siegels at the time: they had already served a termination notice purporting to recapture the rights to the entire universe of Superman works. They had used that termination as leverage "to obtain considerably more money as a result of [their increased] bargaining power." *Id.* at 988. Clearly the 2001 agreement was not *contrary* to the Siegels' termination rights at all; "it was an agreement consistent with, and which fully honored [the Siegels'] right of termination" they undoubtedly *intended* to exercise as to Superboy and the Ads by the 1997 termination. *Id.*

Given that the Siegels settled their rights to Superboy and the Ads well before any court decided the 1997 termination notice did not in fact encompass those works, the Court cannot see how the 2001 settlement agreement could be an "agreement to the contrary" simply because it had the effect of eliminating certain termination rights the Siegels believed they had already exercised.

## IV. CONCLUSION

The Court holds that the 2001 settlement agreement between DC and the Siegels re-granted the Siegels' Superman, Superboy, and Superman Ad works to DC in return for substantial advances and royalties. Because the agreement leveraged the Siegels' all-encompassing 1997 termination notice to extract a highly remunerative new grant of the same rights, it was tantamount to following the statutory formalities and thus does not constitute an "agreement to the contrary" under 17 U.S.C. § 303(c)(5).

DC's February 7, 2013 Motion for Summary Judgment is therefore **GRANTED** in its entirety. To recap, the October 19, 2001 agreement (embodied in Kevin Marks' letter of the same date) remains binding and enforceable solely under the terms embodied in that agreement. That agreement encompasses all of the works subject to the related Superman and Superboy actions. *Siegel v. Warner Bros. Entm't Inc.*, No. 2:04-cv-08400-ODW-RZ (C.D. Cal. filed Oct. 8, 2004); *Siegel v. Time Warner Inc.*, No. 2:04-cv-08776-ODW-RZ (C.D. Cal. filed Oct. 22, 2004). Whether and how that

10

**ER 3618**

Case 12-56348, 02/25/2014, ID: 8992563, DktEntry: 2-15, Page 49 of 158

right has been affected by the parties' actions after October 19, 2001, is not now before the Court, as DC has voluntarily dismissed its third counterclaim for breach of contract, and the Siegels do not assert any contract claims related to the October 19 agreement. Thus, to the extent that any party contends any delay in performance or other breach gives rise to any damages, such a claim is properly subject to a separate state-court action for breach of contract.

A judgment will issue.

**IT IS SO ORDERED.**

April 18, 2013

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

**ER 3619**

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | **\*Case No. 2:04-cv-08776-ODW(RZx)\*** Case No. 2:04-cv-08400-ODW(RZx) |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDERING FURTHER BRIEFING** |
| v. | **[04-cv-8400, ECF No. 702]** |
| WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1–10, | **[04-cv-8776, ECF No. 222]** |
| Defendants. | |

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, | |
| Plaintiff, | |
| v. | |
| TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1–10, | |
| Defendants. | |

/ / /

/ / /

# I.   INTRODUCTION

Defendants   DC   Comics;   Warner   Bros.   Entertainment   Inc.;   Warner Communications, Inc.; Warner Bros. Television Production, Inc.; and Time Warner Inc. (collectively "DC") move for summary judgment in these consolidated Superman and Superboy cases following entry of the Ninth Circuit's February 4 Mandate.  The Ninth Circuit has directed this Court to reconsider DC's third and fourth counterclaims in view of its holding that an October 19, 2001 letter from the legal representative of the heirs to Superman co-creator Joe Siegel to Warner Bros. (and by extension DC Comics) created an agreement between the parties.  DC has effectively withdrawn its third counterclaim, and the Court **GRANTS** Defendants' Motion on its fourth counterclaim.

# II.   FACTUAL BACKGROUND

In 2004, Joanne Siegel and Laura Siegel Larson,[1] the heirs to Superman co-creator Jerry Siegel, sued DC seeking a judicial declaration that the copyright termination notices the Siegels served on DC in 1997 effectively recaptured their copyright interests in Superman.  DC counterclaimed that the parties had entered into a settlement agreement that the Siegels repudiated.   Specifically, DC's third counterclaim alleges that the Siegels breached a written October 19, 2001 agreement drafted by the Siegels' then-legal representative, Kevin Marks.  (Second Amended Counterclaims (SACC) ¶¶ 97–101.)  This agreement memorialized an earlier October 16, 2001 telephone conversation between Marks and Warner Bros.'s then-general counsel, John Schulman, during which the parties negotiated the final points of a deal giving DC the continued rights to Superman in exchange for substantial financial consideration.  (*See id.*)

---

[1] Joanne Siegel, Jerry Siegel's widow, has since passed away.  As a result, Plaintiff Laura Siegel Larson remains the only Plaintiff in this matter, both in her individual capacity and as the personal representative of the estate of the late Joanne Siegel.  For consistency with earlier rulings and the earlier facts of this case, Court will continue refer to Plaintiff as "the Siegels."

**ER 3621**

/ / /

DC's fourth counterclaim, in turn, sought a declaration that, by the October 19, 2001 agreement, the Siegels had "transferred or [is] contractually obligated to transfer to DC Comics" any and all of their Superman rights. (*Id.* ¶¶ 102–05.)

On March 26, 2008, now-resigned Judge Steven G. Larson held on partial summary judgment "that the parties' settlement negotiations did not result in an enforceable agreement [on October 19, 2001,] resolving the issues before the Court." (ECF No. 293, at 62.)  In so holding, Judge Larson considered the parties' 2001–2002 settlement negotiations and found that "[o]ne need only review the language of the parties' correspondence, their conduct in relation thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002[] draft to reach the conclusion that the parties failed to come to an agreement on all material terms."  (ECF No. 293, at 61.)  Judge Larson's holding effectively rejected DC's third and fourth counterclaims.

On November 5, 2012, the Ninth Circuit reversed Judge Larson's March 26, 2008 summary-judgment order, holding that the much-disputed October 19, 2001 letter from Marks to Schulman "constituted an acceptance of terms negotiated between the parties, and thus was sufficient to create a contract" as a matter of law. *Larson v. Warner Bros. Entmt., Inc.*, – F. App'x –, –, 2012 WL 6822241, at *1 (9th Cir. 2012).  The court further explained that it

> reject[ed the Siegels'] arguments that either state or federal law precludes a finding that such a contract could have been created by the October 19, 2001, letter.  California law permits parties to bind themselves to a contract, even when they anticipate that some material aspects of the deal will be papered later.  This principle applies notwithstanding the lack of an express reference to an intended future agreement, so long as the terms of any contract that may have been formed are sufficiently definite that a court could enforce them (as is undoubtedly the case here). *Larson*, 2012 WL 6822241, at *1 (internal quotation marks, alterations, and citations omitted).

**ER 3622**

/ / /

The Ninth Circuit then directed this Court "to reconsider DC's third and fourth counterclaims in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2.

DC brings the issue back before the Court on remand by way of its February 7, 2013 Motion for Summary Judgment. DC contends quite simply that the "Ninth Circuit's binding ruling compels judgment in DC's favor on its Fourth Counterclaim in both Siegel cases; renders DC's remaining counterclaims in the cases moot . . . ; and requires denial of [the Siegels'] claims in the cases." (Mot. i.) The Siegels, on the other hand, maintain that the Court's job isn't quite so simple, as the Court (or the factfinder, as the case may be) must now determine "[w]hat exactly the October 19, 2001 agreement meant, and whether and to what extent it is still enforceable given DC's subsequent conduct." (Opp'n 2.) While DC perhaps overstates the simplicity of the matter, it is nevertheless correct that the Ninth Circuit's ruling obliges the Court to grant its fourth counterclaim.

## III.   LEGAL STANDARD

On remand, this Court is bound by the Ninth Circuit's mandate. Fed. R. App. P. 41(c); *see also Ins. Grp. Comm. v. Denver & R.G.W.R.R.*, 329 U.S. 607, 612 (1947) ("When matters are decided by an appellate court, [the appellate court's] rulings, unless reversed by it or by a superior court, bind the lower court."). "[A] mandate is controlling as to all matters within its compass, while leaving any issue not expressly *or impliedly* disposed of on appeal available for consideration by the trial court on remand." *Odima v. Westin Tuscon Hotel*, 53 F.3d 1484, 1498 (9th Cir. 1995) (emphasis added) (quoting *Firth v. United States*, 554 F.2d 990, 993 (9th Cir. 1977)).

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

/ / /

4

/ / /

## IV.   DISCUSSION

While DC insists the Court need only enter judgment in its favor to resolve this matter once and for all, the Siegels urge on remand that the Court must instead conduct further proceedings in light of the Ninth Circuit's holding to determine what the October 19 agreement means today.  (Opp'n 7–8.)  DC concedes that its third counterclaim for breach of the October 19, 2001 agreement "can be dismissed without prejudice, if DC prevails on its Fourth Counterclaim."[2]  (Mot. 1.)  The Court therefore looks first to DC's fourth counterclaim to determine the extent to which the Ninth Circuit's mandate leaves open additional questions for resolution by this Court. Because the Court finds that resolution of additional issues impacting the continued enforceability of the agreement remains necessary to resolve DC's fourth counterclaim, the Court proceeds to address and resolve those issues.  The Court holds that the agreement remains enforceable and therefore does not reach DC's third counterclaim.[3]

**A.     The Ninth Circuit's Mandate does not fully resolve DC's fourth counterclaim**

The Court begins its analysis with the recognition that the Ninth Circuit's "holding that the October 19, 2001, letter created an agreement" does not dispense entirely with DC's fourth counterclaim—at least not immediately.  Indeed, had the Circuit thought its ruling on the October 19, 2001 Letter disposed of DC's counterclaims, it would have said so.

DC's fourth counterclaim asks the Court to declare, based on a finding that the October 19 agreement remains binding and enforceable, that the Siegels either already

---

[2]  DC apparently intends to seek attorney's fees under the Copyright act and for its fourth counterclaim rather than pursuing damages for breach of contract under its third counterclaim. (Mot. 8.)

[3]  As noted *supra* at 2, DC's third counterclaim alleges the Siegels' breach of the October 19, 2001 agreement.  (Second Amended Counterclaims ¶¶ 97–101.)

ER 3624

/ / /

have or now remain contractually obligated to transfer their rights in the Superman works to DC:

> An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement *is binding and enforceable* and, therefore, that: Plaintiffs/Counterclaim Defendants *either have transferred or are contractually obligated to transfer to DC Comics*, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works. . . . DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct. (Second Amended Counterclaims ¶¶ 103(a), 105 (emphasis added).)

The Ninth Circuit's holding didn't go quite so far as to fully settle this claim. The Ninth Circuit held only that "the October 19, 2001, letter *created an agreement*." Both this holding and the related finding that the October 19 letter created an agreement with terms sufficiently definite for a court to enforce necessarily imply only that the agreement was binding and enforceable *at the time of the agreement's creation*. But subsequent events may have affected the present enforceability of that contract, as by a material breach followed by an effective rescission of the deal. In order to pass on the present enforceability of the October 19 contract, the Court must therefore proceed to determine whether events after October 19, 2001, rendered the October 19 agreement subsequently unenforceable.

**B.    The October 19, 2001 agreement remains enforceable**

The Court is concerned here only with the present enforceability of the October 19 contract. The Siegels' breach and repudiation defenses do not affect the enforceability of the agreement, but rather constitute grounds for termination or a breach-of-contract action. *See, e.g.*, *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 602 (1969) ("A breach does not terminate a contract as a matter of

6

ER 3625

course but is a ground for termination at the option of the injured party.")  Because no party presently asserts a breach-of-contract claim, these defenses therefore are not properly before the Court.  But the Siegels' rescission and abandonment defenses do inform the continued enforceability of the October 19 agreement, as the Siegels' rescission or DC's abandonment of that agreement could have discharged the agreement, thereby rendering it presently unenforceable.  These defenses therefore merit consideration.

1.    *The Siegels failed to rescind the October 19, 2001 agreement*

The Siegels contend that the October 19, 2001 agreement is no longer enforceable because that agreement was properly rescinded on May 9, 2002, and their rescission was subsequently confirmed on September 21, 2002.

Under California law, one party to a contract may rescind the contract if the other party refuses or fails to fully perform.  Cal. Civ. Code § 1689(b)(2); *Loop Bldg. Co. v. De. Coo*, 97 Cal. App. 354, 364 (1929).  To properly effect a rescission, the rescinding party must "give notice of rescission to the party as to whom he rescinds" and either restore or offer to restore "to the other party everything of value which he has received from him under the contract."  Cal. Civ. Code § 1691.  A section 1691 notice of rescission need not be formal and explicit; rather, "it is sufficient that notice shall be given to the other party which clearly shows the intention of the person rescinding to consider the contract at an end."  *Hull v. Ray*, 211 Cal. 164, 167 (1930).  Further, the requirement of a restoration of consideration is unnecessary where, as here, nothing of value was received by the plaintiff.  *See* Cal. Civ. Code § 1691(b) (must restore "everything of value"); *Rosemead Co. v. Shipley Co.*, 207 Cal. 414, 421 (1929).  Failure to comply with section 1691's rescission procedures bars judicial enforcement of rescissory relief.  *Golem v. Fahey*, 191 Cal. App. 2d 474, 477 (1961) ("Since appellant failed to rescind upon learning of the mistake or within a reasonable time thereafter and failed to comply with any of the provisions of Civil Code, section 1691, he cannot now seek relief in this forum.").

ER 3626

///

In response to Kevin Marks's October 19 letter to John Shulman "accept[ing] D.C. Comics [*sic*] offer of October 16, 2001," Shulman sent Marks a letter on October 26, 2001, enclosing what he believed was a "more fulsome outline" of the deal terms. (SUF 8; Adams Decl. Ex. 2.) On February 1, 2002, DC's outside counsel followed up with a draft long-form agreement. (SUF 18; Adams Decl. Ex. 3.)[4]

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, Chief Operating Officer of DC's parent, AOL Time Warner Inc., objecting to the February draft. The Siegels now contend that the following language in the May 2002 letter "properly invoked [their] right of rescission":

> We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted John Shulman's last proposal [on October 19, 2001], we were stabbed in the back with a shocking contract.
> Your company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the [October 16] proposal. . . . (SUF 25; Adams Decl. Ex. 4.)
> After four years we have no deal and this [February 1] contract makes an agreement impossible. (SUF 25; Adams Decl. Ex. 4.)

Several months later, on September 21, 2002, the Siegels wrote to Marks to terminate him as their legal representative and reaffirm their intent, as the Siegels now contend, to "rescind" their contract with DC:

> As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February [1], 2002. We similarly reject your redraft of [that] document which you sent us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics . . . . (SUF 29; Adams Decl. Ex. 6.)

---

[4] These letters (and the new and materially different terms they allegedly contained) formed the basis of the Siegels and DC's dispute over whether Marks's October 19 letter had formed an agreement at all.

ER 3627

The Court finds as a matter of law that the May 9 and September 21, 2002, letters do not constitute proper notices of rescission under section 1691. First and foremost, neither letter even recognizes a contract at all, much less expresses the intent to rescind the contract. While a rescission notice does not have to be formal or explicit, basic logic suggests that one cannot "clearly indicate to the defaulting party that the injured party considers the contract to be terminated," *Whitney*, 273 Cal. App. 2d 594, 602, while simultaneously rejecting the very existence of the contract in the first place. Indeed, repudiation and rescission are distinct legal concepts that can yield very different legal rights and remedies.

Granted, the May 9 letter notes that the Siegels had "reluctantly accepted John Shulman's last proposal" on October 19, 2001. But any indication that this language recognized the existence of a contract on October 19 is undermined by the subsequent reference to DC's "unconscionable contract dated February [1]" and unambiguous statement that "[a]fter four years *we have no deal*." The clear objective intent of the May and September 2002 letters was thus to deny the existence of a contract altogether (or otherwise repudiate the continued existence of one due to a breakdown in negotiations), not to rescind it. And the Ninth Circuit's holding that a contract did in fact exist does not empower the Siegels now to retroactively convert that intent just because it turns out the facts were not what they believed at the time—especially when the unambiguous contents of those letters simply don't support the Siegels' newfound interpretation of the letters' meaning.

Even if the Court could concede that the May and September letters recognized the existence of a contract the Siegels clearly intended to rescind, the stated grounds on which the Siegels sought to rescind nevertheless do not warrant rescission as a matter of law. Both letters cite the Siegels' disdain for DC's February 1, 2002 long-form draft contract as the basis for the breakdown in negotiations (or for rescission of the contract, as they now contend on remand). But disputes over the terms of the long-form contract cannot invalidate or breach the underlying short-form agreement.

**ER 3628**

*Clark v. Fiedler*, 44 Cal. App. 2d 838, 847 (1941) (allowing draft long-form agreements to undermine the earlier agreement would improperly allow a party to escape a contract "by simply suggesting other and additional terms"); *see Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037–38 (9th Cir. 2011). And, "[o]f course, a mere notice purporting to rescind an agreement cannot have that effect unless the party giving such notice is entitled to rescind." *Brown v. Roberts*, 121 Cal. App. 654, 659 (1932).

The Court does acknowledge that a statement in the notice of certain grounds for rescission does not prevent the party from thereafter relying upon different and proper grounds. *Hull*, 211 Cal. at 167. The Siegels' Opposition to DC's Motion appears to do just that by arguing that DC had materially breached the October 19 agreement when it "failed to provide a royalty statement to the Siegels by March 31, 2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay the Siegels their royalties." (Opp'n 21; *see also id.* ("It is well-settled that a breach of the royalty provisions in a copyright contract can give rise to a right of rescission.").) But the Siegels' change of pace now is too little too late. As DC correctly notes, the Siegels have argued since the inception of this litigation only that no contract was formed with DC at all. Until now, they have not contended that DC breached the deal or that the Siegels rescinded it. Further, Federal Rule of Civil Procedure 8(d) permits parties to plead inconsistent defenses in the alternative, and the Siegels chose not to. "Allowing [the Siegels] to raise such defenses now—when DC was deprived discovery on them or the chance the litigate them before—would violate Rule 8, prejudice DC, and be an affront to the multiple courts that spent years adjudicating DC's settlement claim and Larson's defense that no deal was ever made." (Reply 6.)

In sum, the Court finds that the Siegels' May 9 and September 21, 2002 letters failed to effect a rescission under California Civil Code section 1691 because those letters do not clearly and objectively convey their intent to rescind an existing contract. The plain text of those letters manifestly conveyed the intent to *deny or*

ER 3629

repudiate the very existence of a contract; grafting the intent to *rescind* onto those letters now—more than ten years after the fact—would be to entertain a fiction.

   2.   *DC did not abandon the October 19, 2001 agreement or acquiesce to its rescission*

The Siegels also seek to destroy the current enforceability of the October 19 agreement on grounds that DC acquiesced in the Siegels' rescission or otherwise abandoned the October 19 agreement. They contend that Parsons's May 21, 2002, letter in response to their May 9 letter "did ***not*** argue that the Siegels were in breach or had otherwise acted improperly, nor did DC claim any rights under the October 19, 2001 Letter." (Opp'n 22 (citing SUF 28, 33).) But nor did the May 21 letter acquiesce to the Siegels' purported rescission (to the extent their May 9 letter could be construed as such). In fact, Parsons's May 21 letter actually *supports* the notion that an agreement existed on October 19 and would be followed by additional negotiations regarding the long-form contract. Parsons notes, "As in all negotiations, . . . we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve." (Adams Decl. Ex. 5.) And despite the Siegels' clear statement in their May 9 letter that "[a]fter four years we have no deal and this [February 1] contract makes an agreement impossible," Parsons persists in the May 21 response with the "hope that this agreement can be closed based upon the earlier discussions with your lawyers." *Id.* On its face, the May 21 letter simply does not support DC's acquiescence in any purported rescission by the Siegels.

As for the Siegels' contention that DC did nothing to enforce the October 19 agreement following receipt of their September 21 letter, this argument is belied by the entire course of this litigation. As DC notes, "Over the past eight years, DC spent *millions of dollars* litigating and enforcing the 2001 agreement." (Reply 10.) DC even specifically counterclaimed for breach of the October 19 agreement on October 18, 2005, noting that it "always has been and remains ready, willing, and able to

**ER 3630**

perform all of its obligations under the Agreement." (First Amended Counterclaims (ECF No. 42) ¶ 99.)

Aside from the fact that the Siegels have waited nearly eight years to raise their abandonment and acquiescence defenses, those defenses are simply unsupported by the factual record and are insufficient to preclude the enforceability of the October 19 agreement. Further, the parties' arguments regarding breach and repudiation are not properly before this Court on DC Comics's fourth counterclaim for declaratory relief, as those arguments go to performance of the October 19 agreement, not the agreement's underlying enforceability today. Because the Court finds there was no rescission, acquiescence, or abandonment as a matter of law, the contract remains in existence and enforceable, and any claims for breach of that agreement are now appropriate in a separate state-law action for breach of contract.

## C. The October 19, 2001 agreement transferred the Siegels Superman rights to DC

Having found that the October 19, 2001 agreement remains enforceable, the Court must now determine and declare "the parties' rights and obligations." The pivotal dispute in this fray is whether the October 19 letter itself effected a transfer of the Siegels' Superman rights, or whether the actual transfer remains to be made. According to DC, "the Ninth Circuit also held that the [October 19] contract satisfied all the requirements for a valid copyright transfer under the Copyright Act." (Mot. 7.) The Siegels respond that the October 19 letter could not have transferred the Siegels' copyrights because the very terms of that agreement state that "[t]he Siegel Family *would* transfer all of its rights in the 'Superman' and 'Spectre properties (including 'Superboy').' (*See* Opp'n 1.) They further maintain that should the Court accept "that the term 'would' is ambiguous – as opposed to flatly contradicting DC's interpretation – summary judgment in DC's favor remains improper." (Opp'n 10.)

Viewed in a vacuum, the language of the October 19 agreement plainly supports the Siegels' contention that the agreement itself did *not* operate to transfer

ER 3631

the Siegels' Superman rights to DC Comics.  The plain language of the agreement—"The Siegel Family *would* transfer all of its rights"—suggests that the transfer wasn't immediately operative.  Rather, insofar as the October 19 letter was a valid contract, it appears to have created a contractual duty on the Siegels' part to transfer their rights and a contractual right on DC's part to receive those rights.

Nevertheless, a somewhat perplexing aspect of the Ninth Circuit's mandate cause the Court to question its reading of the October 19 agreement in this way.  It appears instead that the Ninth Circuit implicitly found the October 19 agreement to constitute "an agreement transferring ownership of a copyright" under 17 U.S.C. § 204(a).

In their briefs before the Ninth Circuit, the Siegels argued that the October 19 letter could not have created an enforceable contract because "a written contract was required as a matter of law" under 17 U.S.C. § 204(a), and "Marks'[s] October 19 Letter could not possibly qualify as the required 'writing.'"  (Kline Decl. Ex B, at 123–25.)  Thus, the Siegels posited on appeal that "[t]he October 19 Letter is not 'a transfer' of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels 'would [make such] transfer in a final executed agreement."  (*Id.* at 125.)  The Siegels' counsel made an identical argument at oral argument: "Marks' letter does not assign any trans— any copyrights.  It says, 'We will.  We anticipate signing those contracts.'"  (Adams Decl. Ex. 19, at 364:5–7.)

Apparently in direct response to the Siegels' arguments, the Circuit explicitly found that § 204(a) was not "a bar to the validity of [the October 19] contract[, as] that statute expressly permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent' of the copyright owner, and [the Siegels do] not contest that the heirs' attorney was such an agent."  This Court reads this language to reflect the Ninth Circuit's view that the October 19 letter *was* a proper written transfer of copyright ownership under § 204(a) signed by the Siegels' duly authorized agent. Indeed, § 204(a) solely concerns the "transfer of copyright ownership, other than by

operation of law"; had the Ninth Circuit determined that the October 19 agreement did not itself operate as a presently operative transfer of the Siegels' Superman rights to DC, there would have been no need to raise § 204(a) at all. The Court therefore holds, in keeping with the Ninth Circuit's mandate, that the October 19, 2001 agreement operated to transfer the Siegels' Superman rights to DC as of the date of that agreement.

Finally, the Court notes that the determination whether the Siegels have already transferred their rights is of little consequence to the final resolution of this case considering the Court's holding that the agreement remains enforceable. The Court is bound by the Ninth Circuit's implied finding that the October 19 letter did in fact transfer copyright ownership under § 204(c). But to the extent one prefers this Court's reading of the agreement over the Ninth Circuit's presumed reading, the Siegels maintain that "[a] declaration that [the Siegels are] still obligated, under the October 19, 2001 Letter, to transfer her Superman rights to DC is procedurally flawed and does little to resolve this matter" because DC would have to seek specific performance to enforce that obligation. (Opp'n 12.) To this, the Court responds that its declaration that the October 19, 2001 agreement remains enforceable *does* conclude this matter, as DC seeks *only* declaratory relief. How DC would choose to proceed from here armed with a declaration that the contract remained enforceable but that the Siegels were still obligated to effect the transfer is beyond the purview of this Court.

In short, DC's fourth counterclaim seeks only declaratory—not affirmative—relief. The Court **GRANTS** DC's motion for summary judgment on DC's fourth counterclaim and holds that the October 19, 2001 agreement remains enforceable and operated itself to transfer the Siegels Superman rights to DC. This ends this Court's involvement in the parties' dispute (save for resolution of the Superboy and Superman Ad issue, as discussed below). That DC may have additional rights and duties

/ / /

14

flowing from the Court's declaration that the October 19 agreement does not prevent final termination of this case.

**D.     The Court requires additional briefing on the issues of Superboy and Superman ads**

What may preclude immediate closure of this chapter of the continuing Superman saga, however, is the lingering issue of what to do with Superboy and the early Superman ads.

Upon review of the parties' papers and the nearly insurmountable record in these cases, the Court has determined that it requires additional briefing on the effect of the October 19, 2001 agreement on the Superboy and early Superman ad works. The parties are therefore **ORDERED** to file supplemental briefs addressing how the Court's holding that the October 19 agreement remains binding and enforceable today affects the parties' respective rights to Superboy and the Superman ad works. The briefs should not exceed 15 pages in length and should devote particular attention to the relevant factual and procedural history with respect to these works, including the continued effect various earlier rulings by the Court have on these claims today. The briefs must also include a brief proposal for swift resolution of the Superboy and Superman ad issues should the Court find that the October 19 agreement does not extend to these works. The parties shall submit all documents on which they rely as exhibits. The parties' supplemental briefs are due no later than 5:00 p.m. on Thursday, March 28, 2013.

**V.     CONCLUSION**

Because there has, to date, been no unequivocal rescission or termination of the October 19, 2001 agreement (embodied in Kevin Marks' letter of the same date), that agreement remains binding and enforceable. As a result, the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more. *See Facebook*, 640 F.3d at 1038. Whether and how that right has been affected by the parties' actions after October 19, 2001, is not now before the Court, as DC has voluntarily

ER 3634

dismissed its third counterclaim for breach of contract, and the Siegels do not assert any contract claims related to the October 19 agreement. Thus, to the extent that any party contends any delay in performance or other breach gives rise to any damages, such a claim is properly subject to a separate state-court action for breach of contract.

Because the Court finds that DC must prevail on its fourth counterclaim as a matter of law, the Court dismisses DC's third counterclaim as moot. The Court will enter judgment and close this case following resolution of the lingering Superboy and Superman Ad issues.

**IT IS SO ORDERED.**

March 20, 2013

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**

ER 3635

"O"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-08776-SGL (RZx)                    Date: March 31, 2008

Title:   JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
         TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a
         corporation; WARNER BROS. ENTERTAINMENT INC, a corporation; WARNER
         BROTHERS TELEVISION PRODUCTION INC., a corporation; DC COMICS, a
         general partnership; DOES 1-10
=======================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

         Jim Holmes                              None Present
         Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None present                             None present

PROCEEDINGS:   ORDER DENYING AS MOOT PARTIES CROSS-MOTIONS FOR PARTIAL
               SUMMARY JUDGMENT IN CV-04-8776 CASE; ORDER REQUIRING
               PARTIES TO ENGAGE IN MEANINGFUL SETTLEMENT NEGOTIATIONS;
               ORDER SETTING PRE-TRIAL AND TRIAL DATES; ORDER STAYING
               RULING ON OUTSTANDING ISSUES CONTAINED IN JULY 27, 2007,
               ORDER PENDING SETTLEMENT DISCUSSIONS   (IN CHAMBERS)

        As the Court stated during the September 17, 2007, hearing on the parties' cross-motions
for partial summary judgment in these cases, the issues raised by the parties in the Superboy
action, Case No. CV-04-8776-SGL, were, in light of the Court's earlier ruling on July 27, 2007, and
with a forthcoming ruling in the companion Superman action, Case No. CV-04-8400-SGL, would
be rendered moot. With the Court's issuance of its Order on March 26, 2008, the Court finds that
the issues raised in the parties' cross-motions for partial summary judgment in the Superboy case
are, in fact, moot.

        In light of the Court's rulings to date in these companion cases, which have narrowed the
areas of dispute between the parties, the Court believes that it would be prudent at this juncture for
the parties to engage in meaningful settlement talks before their jointly chosen mediator, JAMS

MINUTES FORM 90                                    Initials of Deputy Clerk ___jh_____
CIVIL -- GEN                          1

**ER 3636**

Mediator Hon. Daniel Weinstein (Ret.), something which they apparently have not done since the inception of this litigation in 2004.

Accordingly, the Court hereby **ORDERS** the parties to devote the next sixty (60) days to engaging in a good faith effort to settle their dispute in the Superman and Superboy litigation before the JAMS Mediator. At the conclusion of this period, on June 1, 2008, the parties are to file a joint report, outlining the efforts that they have taken in furtherance of settlement and the results of those efforts.

Thereafter, the Court will, if the parties have not settled these cases, set out a briefing schedule and a hearing date on the five issues identified in the parties' February 21, 2008, Stipulation Requesting Status Conference and Briefing Schedule Regarding Certain Trial and Pre-Trial Matters, as well as the following issues left unresolved in this Court's March 26, 2008, Order in the Superman case: Whether and to what extent do the following fall within the scope of what plaintiffs regained through their termination notices: 1) Post-termination alterations to pre-termination derivative works; and 2) Mixed use of trademarks and copyright.

The Court also finds that there is a need for the placement of firm pre-trial and trial dates to both assist the Court in case management and to give predictability to counsel as to when the litigation in this case will come to an end. The Court therefore sets the following pre-trial and trial dates:

1. The Court will conduct a pre-trial conference in the Superman case on October 6, 2008, at 11:00 a.m. in Courtroom One.

2. Thereafter, the court will hold a hearing on any motions in limine in the Superman on October 20, 2008, at 11:00 a.m. in Courtroom One.

3. Trial in the Superman case is set for November 4, 2008, at 9:30 a.m. in Courtroom One.

As a final matter, the Court reserves issuing an order on the remaining issues brought up in the Court's July 27, 2007, Order in the Superboy case (and to which the parties have provided both supplemental briefing and oral argument), and setting the pre-trial and trial dates in the Superboy matter, if needed, until after the conclusion of the trial in the Superman case.

**IT IS SO ORDERED.**

Initials of Deputy Clerk ___jh_____

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



ENTERED
CLERK, U.S. DISTRICT COURT

JUL 3 0 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION / BY DEPUTY

Priority ✓
Send ✓
Enter ✓
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____



FILED
CLERK, U.S. DISTRICT COURT

JUL 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY

JIM HOLMES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA SIEGEL
LARSON,

              Plaintiffs,

v.

TIME WARNER INC., WARNER
COMMUNICATIONS INC., WARNER
BROS. ENTERTAINMENT INC.,
WARNER BROS. TELEVISION
PRODUCTION INC., and D.C. COMICS,

              Defendants.

CASE NO. CV-04-8776-SGL (RZx)

[Consolidated for pre-trial and discovery
purposes with CV-04-8000-SGL (RZx)]

ORDER GRANTING DEFENDANTS'
MOTION FOR RECONSIDERATION

    This case is the latest chapter in the continuing saga over who owns the copyright to "Superboy," the youthful persona of the iconic comic book super hero "Superman," spanning from the golden age of print media comics to the present-day revolution in digital media. Like the entire spectrum of graphics media technology, the law governing ownership rights to copyrights has changed dramatically, and it is precisely these changes in the law that bring this case to this Court.

    Although the story of how Superman and later Superboy came into being has become the stuff of legend among comic book fans, the Court will recite it once

DOCKETED ON CM

JUL 3 0 2007

ER 3638

ORIGINAL

more for those unfamiliar with the tale.

Jerome Siegel and Joseph Shuster are Superman's creators. In 1933, Siegel conceived of the idea of a comic strip featuring a character who is sent to Earth from a distant planet and, with superhuman powers, performs daring feats for the public good. Siegel named his character "Superman." Siegel discussed his idea with Shuster, an artist, and together they crafted a comic strip consisting of several weeks worth of material (both dialogue and artwork, some of the latter being completely "inked in" and ready for publication, and some consisting of no more than black-and-white pencil drawings) suitable for newspaper syndication embodying that idea. The two shopped the character around for a number of years to numerous publishers but were unsuccessful in having it published. In the meantime, Siegel and Shuster penned other comic book strips at their artist studio in Cleveland, Ohio, and sold them for publication, most notably "Slam Bradley" and "The Spy" to Nicholson Publishing Co., who purchased their material for resale to Detective Comics. When Nicholson folded shop in 1937, Detective Comics acquired some of its magazine properties, including the comic book strips penned by Siegel and Shuster.

The two entered into an agreement with Detective Comics on December 4, 1937, whereby they agreed to furnish some of the existing comic strips for the next two years and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics] and [Detective Comics] shall be deemed the sole creator thereof . . . ." The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given the initial option (to be exercised within sixty days after submission) to publish the material. Soon thereafter Detective Comics became interested in publishing Siegel and Shuster's now well-traveled Superman idea (but in an expanded 13-page comic book format), the interest eventually

1  culminating with Superman's release in April, 1938, in the first volume of Action

2  Comics, a new comic magazine issued by Detective Comics.  The Superman comic

3  strip became an instant success and Superman's popularity continues to endure to

4  this day as his depiction has been transferred to varying media formats.

5       On March 1, 1938, before Superman's publication, Siegel and Shuster

6  assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]"

7  to Superman in exchange for $130.  This assignment in ownership rights was later

8  confirmed in a September, 22, 1938, employment agreement in which Siegel and

9  Shuster acknowledged that Detective Comics was "the exclusive owners" of not

10  only the other comic strips they had penned earlier for Nicholson (and continued to

11  pen for Detective Comics) but Superman as well; that they would continue to supply

12  the art work and storyline (or in the parlance of the trade, the "continuity") for said

13  comics at varying per page rates depending upon the comic in question (Superman

14  being paid at the highest rate offered of $10 per page) for the next five years; that

15  Detective Comics had the "right to reasonably supervise the editorial matter" of

16  those existing comic strips; that Siegel and Shuster would not furnish "any art or

17  copy . . . containing the . . . characters or continuity thereof or in any wise similar" to

18  said comic strips to a third party; and Detective Comics would have the right of first

19  refusal (to be exercised within a six week period after the comic's submission) with

20  respect to any future comic strip creations conceived by Siegel or Shuster:

21              In the event you shall do or make any other art
            work or continuity suitable for use as comics or comic
22              strips, you shall first give us the right to first refusal
            thereof by submitting said copy and continuity ideas to
23              us.  We shall have the right to exercise that option for six
            weeks after submission to us at a price no greater than
24              offered to you by any other party.

25       Not long thereafter, on November 30, 1938, Siegel pitched the idea to

26  Detective Comics of serializing a comic concerning the exploits of Superman as a

27  young man.  Siegel called his character "Superboy."  As Siegel explained the

28  synopsis for the new comic strip:

3

> Superboy . . . would relate the adventures of Superman as a youth. . . . I'd like the strip to have a large number of pages, such as 13 so that I could develop it as well as Superman. . . . Tho the strip would feature super-strength, it would be very much different from the Superman strip inasmuch as Superboy would be a child and the type of adventures very much different. There'd be lots of humor, action, and the characters would be mainly children of about 12-years rather than adults. Also, inasmuch as this strip will probably be used as a newspaper feature, I should think that you would want to own all rights to it by having it first appear in your magazine.

Detective Comics, by a letter dated December 2, 1938, effectively declined to publish Siegel's proposed Superboy comic. Siegel later re-pitched the idea in December, 1940, through the submission of a lengthy script containing the storyline and dialogue for the proposed comic strip's first release or releases that fleshed out in greater detail the outlines of the Superboy story arch. Detective Comics again effectively declined to publish Superboy.

Siegel entered the United States Army in July, 1943, to serve his country during World War II. In December, 1944, while Siegel was stationed abroad, Detective Comics published, without notice to Siegel and without his consent, an illustrated five- page comic strip entitled "Superboy" appearing as one among many other comics strips in the body of volume 101 of its magazine More Fun Comics. The illustrations for the first Superboy comic strip were done by Shuster at the direction of Detective Comics. When Detective Comics published volume 101 to More Fun Comics it also secured a copyright in all the contents of the same under Copyright Registration No. B653651. Thereafter Detective Comics continued to publish (and Shuster for a period of time continued to illustrate) "Superboy" comic strips, first in its serialized magazine More Fun Comics, then in Adventure Comics, and eventually as a stand-alone feature in the self-titled comic book Superboy.

Detective Comics' publication of Superboy increased an already growing rift between the parties predicated largely upon Siegel and Shuster's conclusion that Detective Comics had not paid them their fair share of profits generated from the

1    exploitation of their Superman creation, as well as the profits generated from

2    characters like Superboy, which had his roots in the original Superman character.

3    As a result, in 1947, Siegel and Shuster brought an action against Detective

4    Comics' successor, National Periodical Publications, Inc., in New York Supreme

5    Court, Westchester County, seeking to annul and rescind their previous

6    agreements with Detective Comics as void for lack of mutuality and consideration.

7    As part of the suit Siegel argued that Detective Comics had no right to publish his

8    "Superboy" creation.        Towards that end, the third cause of action in the New

9    York state court complaint asserted that the release of the Superboy comic strip in

10   More Fun Comics, no. 101, "was based entirely upon the synopsis submitted" by

11   Siegel to Detective Comics, "and contained in detail the same characters, incidents

12   and plot" in the synopsis. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at

13   ¶ 30).  The complaint further alleged that Detective Comics' publication of Superboy

14   was done "without the consent of" and without payment to Siegel. (Defs' App. of

15   Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 31, 33).  These points were important as the

16   third cause of action averred that Siegel's Superboy submissions belonged to him

17   alone in light of Detective Comics' failure to exercise its right of first refusal under

18   the parties' September, 1938, contract.   (Defs' App. of Docs. in Supp. Mot.

19   Recons., Ex. 7 ¶¶ 28-29).  Essentially, the third cause of action pled that Detective

20   Comics had stolen Siegel's Superboy idea. (Defs' App. of Docs. in Supp. Mot.

21   Recons., Ex. 7 ¶ 31 (averring that Detective Comic's publication of Superboy

22   "use[d] and was based upon the conception and idea as submitted in writing and

23   detail by the plaintiff, SIEGEL")).

24        In the alternative, the fourth cause of action in the complaint alleged that the

25   "plot, conception and incidents" contained in Detective Comics' Superboy

26   publication "were based upon and copied from the plot, conception and incidents"

27   of Siegel and Shuster's Superman character, and that such misassociation

28   between Siegel's Superman creation and Detective Comic's Superboy was

1   exacerbated by Detective Comics affixing, without Siegel's consent, his name as

2   the author to each of the Superboy releases. (Defs' App. of Docs. in Supp. Mot.

3   Recons., Ex. 7 ¶¶ 36, 37). In so publishing Superboy, it was alleged Detective

4   Comics had "deceived the public" into believing that Siegel "was the author of the

5   continuity dialogue and action of each of the individual releases" when in fact he

6   "was not the author." (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 36).

7   Labeling such publication as "wrongful," the fourth cause of action alleged that such

8   unauthorized misassociation between the two was "injurious" to Siegel's reputation.

9   (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 38).

10          The complaint sought an accounting of the profits generated from

11  Superboy's publication and that further publication of Superboy be enjoined. (Defs'

12  App. of Docs. in Supp. Mot. Recons., Ex. 7 at page 29-30).

13          After a trial, official referee J. Addison Young, in an opinion dated November

14  21, 1947, concluded that the March 1, 1938, assignment of the rights to Superman

15  to Detective Comics was valid and supported by consideration, and that, therefore,

16  Detective Comics was the exclusive owner of "all" the rights to Superman. (Defs'

17  App. of Docs. in Supp. Mot. Recons., Ex. 8 at 371). With respect to Superboy, the

18  referee found that it was solely Siegel's creation; that Superboy was a work distinct

19  from Superman (thus falling within the right of first refusal provision contained in the

20  parties' September 22, 1938, agreement); and that, on account of Detective

21  Comics' failure to exercise its option to publish Superboy when first presented with

22  the idea, the rights to Superboy belonged to Siegel. As explained by the referee:

23              It is quite clear to me, however, that in publishing
                Superboy the Detective Comics, Inc. acted illegally. I
24              cannot accept defendants view that Superboy was in
                reality Superman. I think Superboy was a separate and
25              distinct entity. In having published Superboy without
                right, plaintiffs are entitled to an injunction preventing
26              such publication and under the circumstances I believe
                the defendants should account as to the income
27              received from such publication and that plaintiffs should
                be given an opportunity to prove any damages they
28              have sustained on account thereof.

                                        6                              ER 3643

1   (Decl. Marc Toberoff, Ex. N at 323-24).

2       Shortly thereafter, on April 12, 1948, the referee signed a thirty-six page

3   findings of fact and conclusions of law expanding upon the statements contained in

4   the opinion he had tendered earlier.  The factual findings pertinent to Superboy

5   were as follows:

6         156.   On or about November 30, 1938, the plaintiff
      SIEGEL, in writing and by mail, submitted to DETECTIVE

7         COMICS, INC. for its consideration and acceptance or
      rejection, for publication, under the terms of the contract

8         dated September 12, 1938, . . . a synopsis or summary of
      the idea and conception and plan of a new comic strip to

9         be known as SUPERBOY[, which would narrate the
      adventures of SUPERMAN as a youth] .

10
      157.   On December 2, 1938, DETECTIVE COMICS,

11        INC. deferred consideration of a SUPERBOY comic strip
      until some future time.

12
      158.   DETECTIVE COMICS, INC. did not within six

13        weeks indicate its election to publish the said new comic
      strip SUPERBOY.

14
      159.   DETECTIVE COMICS, INC. on or about

15        December 2, 1938, by its letter in writing to the plaintiff
      SIEGEL did elect not to publish the said comic strip

16        SUPERBOY under the terms of the contract dated
      September 22, 1938, . . . .

17
      160.   During the month of December, 1940, the plaintiff

18        SIEGEL submitted to DETECTIVE COMICS, INC. for its
      further consideration a complete script or scenario,

19        containing the continuity, plan and dialogue for the first
      "release" or "releases" of the proposed new comic strip

20        SUPERBOY, and that the said synopsis contained within
      itself the entire plan for the future publication of the said

21        comic strip SUPERBOY and the conception of the
      character SUPERBOY, all set forth with detail and

22        particularity.

23        162.   DETECTIVE COMICS, INC. did not within six
      weeks after the submission of the said script or scenario

24        indicate its election to publish the said comic strip
      SUPERBOY.

25
      163.    Thereafter and during December of 1944

26        DETECTIVE COMICS, INC. did publish a certain comic
      strip release entitled SUPERBOY in a magazine entitled

27        "More Fun Comics."

28        164.    The said comic strip release entitled
      SUPERBOY embodied and was based upon the idea,

plan and conception contained in the plaintiffs,
SIEGEL's letter to DETECTIVE COMICS, INC. dated
November 30, 1938   . . . .

165.   The said release of the said comic strip
SUPERBOY published in December of 1944 embodied
and was based upon the idea, conception and plan
contained in the script or scenario submitted by the
plaintiff SIEGEL to DETECTIVE COMICS, INC. in
December of 1940 . . . .

166.   Said first thirteen pages of SUPERMAN material
[in Action Comics no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as it was later submitted by the plaintiff
SIEGEL to DETECTIVE COMICS, INC. [in the 1938
pitch or the later 1940 script].

167.   Said first thirteen pages of SUPERMAN material
[in Action Comics no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as published by DETECTIVE COMICS,
INC. . . . from December, 1944, until the date of the trial
herein.

168.   The said publication was without the permission
of the plaintiff SIEGEL.

171.   All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan, conception
and direction outlined in the [1938 pitch].

172.   All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan,
conception and direction contained in the scenario or
script . . . submitted by the plaintiff SIEGEL to DETECTIVE
COMICS, INC. [in 1940].

173.   The publication of all comic strip material entitled
SUPERBOY was at all times without the permission of
the plaintiff SIEGEL.

174.   Plaintiff SIEGEL has received no payment on
account of the publication of any of the material entitled
SUPERBOY.

175.   All publications of SUPERBOY by DETECTIVE
COMICS, INC. from April, 1945 until . . . the date of the trial
herein, contained affixed thereto the name of the plaintiffs
SIEGEL and SHUSTER.

176.   The use of the name of the plaintiff SIEGEL . . .
was without the consent of the plaintiff SIEGEL.

179.   Defendant INDEPENDENT NEWS CO., INC.
knowing of the rights of the plaintiff SIEGEL, under the

8

1　　[September 22, 1938, contracts], sold and distributed to
2　　newsdealers for resale to the public throughout the
　　　United States, magazines containing the material
3　　entitled SUPERBOY as hereinafter described and set
　　　forth.

4　　180.　All the art work for the SUPERBOY releases was
　　　prepared by plaintiff SHUSTER under the direction of
5　　DETECTIVE COMICS, INC.

6　　181.　Plaintiff SHUSTER was paid in full by
　　　DETECTIVE COMICS, INC. or defendant NATIONAL
7
　　　COMICS PUBLICATIONS, INC. for all the art work
8　　furnished by him in connection with said SUPERBOY
　　　comic strip releases.
9
　　　182.　At the time that publication of the SUPERBOY
10　　comic strip was commenced, plaintiff SIEGEL was
　　　unavailable to furnish any of the continuity therefor being
11　　absent in military service.

12　　183.　Upon the return of plaintiff SIEGEL to civilian
　　　status in January, 1946, DETECTIVE COMICS, INC.
13　　entered into negotiations with him regarding SUPERBOY,
　　　proposing certain payments to him and affording him
14　　the opportunity of supplying the continuity for SUPERBOY
　　　releases.
15
　　　184.　No agreement was reached between Detective
16　　COMICS, INC. and plaintiff SIEGEL as a result of the
　　　aforesaid negotiations; however, defendant NATIONAL
17　　COMICS PUBLICATIONS, INC. has offered to pay plaintiff
　　　SIEGEL for SUPERBOY releases heretofore published,
18　　the same rate as he was paid for SUPERMAN magazine
　　　releases for which he did not furnish the continuity, i.e.,
19　　at the rate of $200 per release of standard length of
　　　thirteen pages.

20

21　(Decl. Marc Toberoff, Ex. O at 355-58).

22　　　　In conjunction therewith, the referee also made the following conclusions of

23　law: "Plaintiff Siegel is the originator and the sole owner of the comic strip feature

24　SUPERBOY, and . . . that the defendants . . . are perpetually enjoined and

25　restrained from creating, publishing, selling or distributing any comic strip material

26　of the nature now and heretofore sold under the title SUPERBOY. . . . Plaintiff

27　Siegel, as the originator and owner of the comic strip feature SUPERBOY has the

28　sole and exclusive right to create, sell and distribute comic strip material under the

title SUPERBOY." (Id. at 365-66). Thereafter both sides filed an appeal from the referee's findings of fact and conclusions of law. (Decl. Marc Toberoff, Ex. Q at 379).

While the matter was still on appeal, the parties reached a settlement on May 19, 1948, and signed a stipulation which called for the payment of over $94,000 to Siegel and Shuster. In addition, the stipulation provided that the referee's findings were to be vacated in all respects; reiterated the referee's earlier determination that Detective Comics owned the rights to Superman; and contained the following proviso concerning the ownership rights to Superboy: "Defendant NATIONAL COMICS PUBLICATION, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY . . . ." (Decl. Marc Toberoff, Ex. P at 374).

Two days later, on May 21, 1948, the referee entered a final consent judgment that, among other things, vacated the referee's findings of fact and conclusions of law entered on April 12, 1948, and expressly acknowledged that Detective Comics is the "sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY." (Decl. Marc Toberoff, Ex. Q at 379, 382).

The expiration of the initial copyright term for Superman in the mid-1960s led to another round of litigation between the parties.[1] In 1969 Siegel and Shuster filed suit in federal district court in New York seeking a declaration that they, and not

---

[1] Under the Copyright Act of 1909 (the "1909 Act"), in effect at the time of Siegel and Shuster's creation of Superman and later assignment of the same to Detective Comics, an author was entitled to a copyright in his work for twenty-eight years from the date of its publication. See 17 U.S.C. § 24, repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq. Upon expiration of this initial twenty-eight year term, the author could renew the copyright for a second twenty-eight year period (the "renewal term").

10

1   Detective Comics' successor, National Periodical Publications, Inc., were the

2   owners of the copyright renewal rights to Superman. See Siegel v. National

3   Periodical Publications, Inc., 364 F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d

4   909 (2nd Cir. 1974). In the process of analyzing their claim, both the federal district

5   court and later the Second Circuit made mention of both the referee's April, 1948,

6   vacated findings as well as the parties' May, 1948, final consent judgment. See

7   364 F.Supp. at 1035; 508 F.2d at 912-13. The courts, however, diverged as to

8   which of the various court documents coming out of the Westchester action should

9   have binding effect.

10      The district court found both the referee's vacated findings as well as the

11  final consent judgment to be binding upon it, see 364 F.Supp. at 1035 ("we note

12  that the findings of the State Supreme Court in the Westchester action are binding

13  upon us here. The terms of the stipulation of settlement in that action, and the

14  consent judgment are also binding"), whereas the Second Circuit only made

15  mention of the binding effect that the final consent judgment had on the case. See

16  508 F.2d at 913 ("There is no doubt that the [May 21, 1948,] judgment of the state

17  court is binding in this subsequent federal action"). Both courts, however,

18  concluded, in conformity with Supreme Court precedent at the time, see Fred

19  Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 656-59 (1943) (holding that

20  renewal rights were assignable by an author during the initial copyright term, before

21  the renewal right vested), that, in transferring "all their rights" to Superman to

22  Detective Comics pursuant to the final consent judgment, Siegel and Shuster had

23  assigned not only Superman's initial copyright term but the renewal term as well,

24  even though those renewal rights had yet to vest when the consent judgment was

25  entered. See 364 F. Supp. at 1037-38; 508 F.2d at 913-14.

26      Thus ended the tale of the battle over the ownership to the copyrights to

27  Superman and, by extension, Superboy. Or at least that was what everyone

28  believed at the conclusion of the Second Circuit litigation.

11                                                                      ER 3648

1   With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress

2   changed the legal landscape concerning author's transfers of their copyrights in

3   their creations.  The 1976 Act expanded the duration of the renewal period for

4   existing works already in their renewal term at the time of the Act for an additional

5   nineteen years, see 17 U.S.C. § 304(b), and, more importantly for this case, gave

6   authors the ability to terminate any prior grants of the rights to their creations that

7   were executed before January 1, 1978, irrespective of the terms contained in such

8   assignments, e.g., that all the rights (the initial and renewal) belonged exclusively to

9   the publisher.  Specifically, section 304(c) to the Act provides that, "[i]n the case of

10  any copyright subsisting in either its first or renewal term on January 1, 1978, other

11  than a copyright in a work made for hire, the exclusive or nonexclusive grant of a

12  transfer or license of the renewal copyright or any right under it, executed before

13  January 1, 1978, . . . is subject to termination. . . . notwithstanding any agreement

14  to the contrary . . . ."

15  It is this right to termination that Joanne Siegel, Jerome Siegel's widow, and

16  Laura Siegel Larson, his daughter, now seek to employ in this case.  In November,

17  2002, they served a notice of termination to defendants[2] directed solely at works

18  featuring Superboy, claiming to undo as of November 17, 2004, any grant provided

19  by Jerome Siegel to defendants' predecessors in interest contained in the May 19,

20  1948, stipulation.[3]  The present suit by Joanne Siegel and Laura Siegel Larson

21  seeks a declaration from this Court that the Superboy termination notice is valid

22  ───────────────

23  [2] The defendants consist of Detective Comics' successor in interest, DC
    Comics, and DC Comics' parent company, Time Warner, Inc., ("Time"), and

24  Time's subsidiaries, Warner Communications, Inc., Warner Brothers
    Entertainment, Inc., and Warner Brothers Television Production, Inc. (collectively

25  "defendants").

26  [3] Plaintiffs have also brought an action, Joanne Siegel, et al. v. Warner
    Brothers Entertainment, et al., CV-04-8400-SGL (RZx), seeking the Court to

27  declare that they have effectively terminated and recaptured the assignment of the
    Superman copyrights to defendants that took place by operation of the 1938

28  agreements executed by Siegel and Shuster with Detective Comics.

12

1  and that they have recaptured all of the copyright to Superboy since the effective

2  date of the termination.

3        This question – the validity of the termination notice – was addressed in a

4  March 24, 2006, Order, by the Honorable Ronald S.W. Lew of this Court, which

5  held: (1) The referee's findings from the 1948 Westchester action were binding,

6  notwithstanding their vacatur; (2) the referee's findings conclusively determined

7  certain unique and exclusive copyright issues, namely, that Siegel's Superboy

8  submissions were later "published" (as that term is used in copyright law) in

9  Detective Comics' More Fun Comics #101, and that the Superboy submissions

10 were neither a "work for hire," a "derivative work" of Superman, or a "joint work"

11 between Siegel and Shuster; and (3) the termination notice was otherwise valid

12 pursuant to the terms of the 1976 Act and the regulations promulgated thereunder.

13 The end result of the March 24, 2006, Order was that Joanne Siegel and Laura

14 Siegel Larson had recaptured the copyright to Superboy, leaving for trial whether

15 defendants (notably, by producing and broadcasting the successful WB television

16 series Smallville) had infringed Superboy's copyright since the effective termination

17 date and the scope of accounting for the profits defendants had reaped in exploiting

18 the copyright subsequent to the termination date. Thereafter, defendants' request

19 to certify the Order for an interlocutory appeal was denied.

20       On October 30, 2006, the matter was reassigned to the present judicial

21 officer, and defendants promptly sought reconsideration of the March 24, 2006,

22 Order, and the decision to deny certifying the matter for an interlocutory appeal.

23 For the reasons set forth below, the Court **GRANTS** defendants' motion for

24 reconsideration of the March 24, 2006, Order.

25       The legal questions at stake in the present motion are two-fold:

26       (1) Whether the referee's vacated findings from the Westchester action have

27

28

13                                    **ER 3650**

1    any binding effect in this case as a matter of judicial or collateral estoppel;[4] and,

2    (2) If they do have a preclusive effect, whether those findings foreclose

3    further consideration of or otherwise impact, certain questions at issue in this case

4    that are unique to copyright law. More to the point, the issue focuses on whether

5    the referee's findings preclude further litigation on whether, as a matter of copyright

6    law, (a) Siegel's submissions outlining the idea (and indeed the storyline and

7    dialogue) for Superboy were later "published" in volume 101 of More Fun Comics;

8    (b) the submissions were done under the auspices of a "work for hire"; (c) the

9

10         [4] Notably, the related doctrine of res judicata (or claim preclusion) has no
application in this case given the claim for terminating prior copyright grants

11    contained in the 1976 Act did not exist at the time of the Westchester action. See
Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287-88 (2nd Cir. 2002). In

12    Simon, the publisher argued that the co-creator of the late Captain America was
barred, as a matter of res judicata, from exercising his termination right under the

13    1976 Act because, in a settlement agreement reached between the parties during

14    a prior action in New York state court in the 1960s, the co-creator acknowledged
his contribution was done as work for hire. According to the publisher, there was

15    "no meaningful distinction between the authorship issue raised in the prior action
and the termination right at issue." Id. at 286. The Second Circuit disposed of the

16    publisher's argument, commenting that neither "the termination right" contained in

17    the 1976 Act nor the relief requested in the current case (termination of a prior
valid grant of a copyright in one's creation) existed at the time of the prior state

18    court action. Id. at 287. The court did acknowledge, however, that although res
judicata could not bar the co-creator from exercising the claim to terminate rights

19    under the 1976 Act, principles of collateral estoppel (or issue preclusion) may still

20    apply to bar litigation of certain issues that were actually decided in the prior
action, including whether the co-creator's contribution to the comic was done as a

21    work for hire:

22         Marvel also argues, correctly, that despite the
enactment of the 1976 Act, the 1909 Act governs the

23         authorship of the Works at issue here. However, it
does not follow, as Marvel suggests, that since the

24         Work's authorship was at issue in the previous actions,
Simon's termination claim is precluded here. While

25         Simon's assertion of authorship is the sine qua non of

26         both his prior claim to renewal rights and his present
claim to termination rights, it is merely an issue that

27         determines the validity of each claim.

28

Id. at 288 (emphasis in original).

submissions are nothing more than a derivative work based upon Superman with no original copyrightable elements contained therein; and (d) Siegel is the sole author of the work or whether the work is a "joint work" containing Siegel's storyline and Shuster's illustrations.

Ultimately, the Court concludes that, in conformity with the March 24, 2006, Order, the referee's findings must be given preclusive effect, but as a matter of collateral estoppel rather than judicial estoppel; however, contrary to the March 24, 2006, Order, those findings are not necessarily determinative of all the issues specified above, but require independent application of the governing body of copyright law to those findings to render a decision about the same.

## I.   ARE THE REFEREE'S VACATED FINDINGS BINDING AS A MATTER OF JUDICIAL ESTOPPEL?

In the process of passing on the plaintiffs' motion for partial summary judgment, the Court's March 24, 2006, Order held that the referee's vacated findings should be given preclusive effect on account of defendants' predecessors taking an inconsistent position as to those findings' binding nature during the 1970s Superman litigation in the Second Circuit:

> Defendants' current argument that Judge Young's findings are not binding contradicts the position taken by their predecessors in interest in the 1973 litigation and the 1974 Second Circuit appeal regarding Superman. In applying the doctrine of res judicata in favor of defendants, Judge Lasker precluded, and the Second Circuit affirmed, plaintiffs from litigating the issue of ownership of the renewal period of the Superman copyrights.

> Having relied on Judge Young's findings for previous favorable determinations regarding Superman, defendants now take the inconsistent position that this Court is not bound by the state court findings, as they relate to Superboy. Defendants attempt to raise genuine issues of material fact, where the facts were clearly determined by Judge Young after the opportunity to take evidence and hear testimony on that evidence from the parties directly involved in creating this relationship.

> Contrary to defendants' assertions now, both the

15

> Southern District of New York and the Second Circuit
> looked directly to, even citing to, Judge Young's findings
> of fact. This Court holds that it is consistent to continue
> this position and will look to Judge Young's findings as
> binding where relevant.

(Decl. Marc Toberoff, Ex. A at 9-10). Although not explicitly using the term, the Court's March 24, 2006, Order clearly invoked the doctrine of judicial estoppel. The Order specifically pointed to the fact that defendants' predecessor had sought to utilize the preclusive effect of the referee's vacated findings in connection with the 1970s Superman litigation and noted that such a position is fundamentally inconsistent with their present position that those same findings have no preclusive effect with respect to Superboy. Such a concern — preventing parties from seeking to take inconsistent legal positions in subsequent proceedings from those taken in earlier ones — is the hallmark feature of judicial estoppel. See New Hampshire v. Maine, 532 U.S. 742, 749-750 (2001); Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996). As one respected treatise noted, "Judicial estoppel is an equitable concept  intended to prevent the perversion of the judicial process. It is to be applied where intentional self-contradiction is being used as a means of obtaining unfair advantage." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.30 at 134-63 to 134-64 (3rd ed. 2006) (internal quotation marks and citations omitted).

That the doctrine is equitable in nature does not mean its application is unlimited. The Supreme Court has set out three questions to guide a court's decision whether to apply the doctrine in a given case: (1) Is the party's later position clearly inconsistent with its earlier position?; (2) Did the party succeed in persuading a court to accept its earlier position?; and (3) Would the party derive an unfair advantage or impose an unfair detriment on the opposing party were the court to allow it to pursue its now inconsistent position? New Hampshire, 532 U.S. at 750-51.

Applying this test here, the Court readily finds that defendants' present

16

1   position is clearly inconsistent with the one taken in the 1970s Superman litigation.

2   Defendants unquestionably sought to have the federal courts in that litigation bar

3   Siegel and Shuster's claim to the renewal rights to the Superman copyright by

4   reference, in part, to the referee's vacated findings. Now they argue that those very

5   findings have no preclusive effect. The first factor, therefore, weighs in favor of

6   application of judicial estoppel.

7          The second factor, whether defendants succeeded in having those courts

8   accept their position, is more problematic. Although at least one of those courts did

9   conclude that the referee's vacated findings were binding, see 364 F. Supp. at

10  1035; the difficulty lies in the fact that this particular legal point was not material to

11  the outcome in the case. Given that the referee's vacated findings and the parties'

12  final consent judgment were consistent with one another as to the ownership of

13  Superman, the federal courts during the 1970s Superman litigation were not called

14  upon to take a position, one way or the other, over the legally binding nature of the

15  referee's vacated findings separate and apart from the parties' final consent

16  judgment. Both the findings and the consent judgment supported those courts'

17  decisions that defendants were the owners of the renewal term to the Superman

18  copyright.

19         Here, in contrast, the separate legally binding nature of the referee's vacated

20  findings is very much in dispute because those findings are in direct conflict with the

21  parties' final consent judgment over the ownership rights to Superboy. In light of

22  the fact that the federal courts in the earlier Superman litigation did not have to

23  accept (and one in fact did not accept) defendants' earlier inconsistent position in

24  order to rule in defendants' favor in the manner in which they did, it is hard to

25  fathom how allowing defendants to now take a contrary position in this litigation

26  somehow operates to create the perception that either of the courts deciding the

27  1970s Superman litigation, or this Court for that matter, have been misled through

28  defendants inconsistent positions. See New Hampshire, 532 U.S. at 750 (noting

17

1   that result sought to be avoided by second factor is the creation of "the perception

2   that either the first or the second court was misled"). As one court explained:

3        [J]udicial estoppel is an "extraordinary remed[y] to be
invoked when a party's inconsistent behavior will

4        otherwise result in a miscarriage of justice." It is not
meant to be a technical defense for litigants seeking to

5        derail potentially meritorious claims, especially when the
alleged inconsistency is insignificant at best and there is

6        no evidence of intent to manipulate or mislead the
courts. Judicial estoppel is not a sword to be wielded by

7        adversaries unless such tactics are necessary to "secure
substantial equity."

8

9   Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3rd Cir.

10   1996).

11        The third factor weighs against application of judicial estoppel for much the

12   same reason. No miscarriage of justice or substantial inequity would take place

13   from allowing defendants to now take a position inconsistent with that taken during

14   the 1970s Superman litigation precisely because the prior contrary position was

15   itself immaterial to the outcome in those prior proceedings. See New Hampshire,

16   532 U.S. at 750-51 ("Absent success in a prior proceeding, a party's later

17   inconsistent position introduces no 'risk of inconsistent court determinations' and

18   thus poses little threat to judicial integrity"). No matter how the federal courts in the

19   Superman litigation parsed the matter, be it pursuant to the referee's vacated

20   findings, the parties' final consent judgment, or both, the conclusion reached would

21   be the same: Defendants were the owners to the renewal term to the Superman

22   copyright. It is not inequitable to allow defendants to now take a position

23   inconsistent with one taken in a prior litigation if the conclusion reached in that prior

24   litigation would have been the same regardless of the defendants' advocated

25   position.

26        Judicial estoppel is guided by pragmatic considerations geared towards "the

27   facts of the particular dispute in mind"; it is not meant as "a set of hard and fast

28   rules that might be circumvented by a clever litigant, on the one hand, or serve as a

18

trap for an unwary litigant, on the other." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.31 at 134-72 (3rd ed. 2006). Just because defendants took an inconsistent position in the past on a point that was not material to the outcome of that litigation does not mean they are bound to that position forevermore. Accordingly, the Court finds the March 24, 2006, Order's reliance on the doctrine of judicial estoppel is misplaced.

## II. ARE THE REFEREE'S VACATED FINDINGS BINDING AS A MATTER OF COLLATERAL ESTOPPEL?

This leaves whether the referee's vacated findings are binding through operation of collateral estoppel.

Federal courts must give a state court judgment the same preclusive effect as would be given to that judgment "under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Ed., 465 U.S. 75, 81 (1984); see also Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985) ("a federal court should determine the preclusive effect of a [earlier] state court judgment [through reference] to the law of the State in which judgment was rendered"); Pension Trust Fund v. Triple A Mach. Shop, 942 F.2d 1457, 1460 (9th Cir. 1991) (examining California law for purposes of determining res judicata effect of an earlier California state court judgment). Thus, in determining the preclusive effect of the vacated findings from the 1948 Westchester action, the Court must look to New York law.

Under New York law, collateral estoppel applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. See Mercantile & General Reinsurance Co. v. Colonial Assurance Co., 147 Misc.2d 804, 805-806 (N.Y. Sup. Ct. 1989) ("Collateral estoppel . . . requires that there have been a final, binding

19

1  determination in a prior action in which there was a full and fair opportunity to

2  litigate the issue involved"); see also Marvel, 310 F.3d at 288-89 (setting forth the

3  above elements for collateral estoppel under New York law).  The result achieved

4  through invocation of collateral estoppel is to prevent parties or their privies, such

5  as defendants in this case, from re-litigating in a subsequent action an issue of fact

6  or law that was fully and fairly litigated in a prior proceeding.

7        Defendants position on this point is fairly straightforward:  The referee's

8  findings were vacated by the parties' May, 19, 1948, stipulation and the subsequent

9  entry of the final consent judgment; with this vacatur, so too lapsed the binding

10  effect of the referee's findings because no final judgment was left in place to

11  enforce.  Defendants correctly note that, under New York law, a judgment that has

12  been vacated loses its preclusive effect.  See Ruben v. American and Foreign Ins.

13  Co., 592 N.Y.S.2d 167, 169 (N.Y. App. Div. 1992) ("Because the judgment was

14  vacated, the jury verdict lacks finality and cannot be given collateral estoppel

15  effect"); Church v. New York State Thruway Authority, 791 N.Y.S.2d 676, 679 (N.Y.

16  App. Div. 2005) ("when the judgment is subsequently vacated, collateral estoppel is

17  inapplicable"); see also Universal City Studios, Inc. v. Nintendo Co., 578 F.Supp.

18  911, 919 (S.D.N.Y. 1983) ("A judgment that has been vacated, reversed, or set

19  aside on appeal is thereby deprived of all conclusive effect, both as res judicata and

20  as collateral estoppel").

21        That said, courts outside of New York have recognized an exception to this

22  rule and have given preclusive effect to vacated judgments if those judgments were

23  the product of a trial and there is a significant lapse of time between the

24  proceedings.  See Aetna Casualty & Surety Co. v. Jeppeson & Co., 440 F. Supp.

25  394, 405 (D. Nev. 1977); Angstrohm Precision, Inc. v. Vishay Intertechnology, Inc.,

26  567 F. Supp. 537, 541 (E.D.N.Y. 1982) (construing Virginia law); see also Ringsby

27  Truck Lines v. Western Conference of Teamsters, 686 F.2d 720, 722 (9th Cir.

28  1982) (noting that the answer to whether to give preclusive effect to a trial court's

20

1  judgment after the parties settle the case while the matter is on appeal "may be

2  different in different cases as equities and hardships vary the balance between the

3  competing values of right to relitigate and finality of judgment" citing RESTATEMENT

4  (SECOND) OF JUDGMENTS § 28 (1982)).

5        There appears to be no authority conclusively determining whether such an

6  exception exists under New York law. In one New York state case, Mercantile &

7  General Reinsurance Co. v. Colonial Assurance Co., 147 Misc.2d 804 (N.Y. Sup.

8  Ct. 1989), the court did, however, make mention of the possibility of giving such

9  preclusive effect to vacated judgments in circumstances not all that different from

10  those in this case.

11        Then Justice (now federal district court judge) Harold Baer, Jr., issued a

12  comprehensive ruling examining the very question now in dispute in this case. In

13  Mercantile, a reinsurer sought a declaratory judgment that it was not bound to

14  provide reinsurance with respect to certain insurance policies. Id. at 805. The

15  reinsurer's obligations had been previously litigated in a prior New York state court

16  action involving the same insurance and reinsurance contracts, which resulted in

17  the grant of partial summary judgment against it. Id. While the matter was on

18  appeal the parties settled. Id. As an element of the settlement, the trial court

19  issued an order vacating the judgment and sealing the record. Id.

20        The question before Justice Baer was whether the vacated judgment from

21  the prior action collaterally estopped the reinsurer from seeking to relitigate those

22  issues in the case before him. He began his analysis by noting the general rule

23  that "a judgment that has been vacated will not provide a basis for collateral

24  estoppel." Id. at 806. The court then noted that some courts outside of New York,

25  while recognizing this general rule, had recognized that it may not "apply when the

26  vacatur has occurred after 'the expenditure of the court's resources in a jury trial.'"

27  Id. at 807. Although the expenditure of such judicial resources had not occurred in

28  the case before him, Justice Baer nonetheless chose to address the question,

21

explaining that it appeared to be one of "first impression" under New York law. Id.

In examining this question Justice Baer recognized that competing considerations affected the analysis. On the one hand, weighing in favor of continuing to afford preclusive effect to the vacated judgment, was the public's interest in the conservation of judicial resources. The more "resources of a hard-pressed judicial system [are] expended in resolving a matter," the more significant this factor becomes in preserving the results generated by that system. Id. at 808.

On the other hand, weighing against giving preclusive effect to a vacated judgment, is not only the private interest expressed by the parties themselves not to be bound by that judgment, but the court's similar conclusion in the prior action as well. As Justice Baer observed, "[h]ad the judge wished to allow preclusion, he could have dismissed [the case] rather than vacat[ing the findings as well]." Id. at 808. Additionally, there is the public interest in facilitating settlement by the parties, an interest which would be undermined if the effects of such settlement (notably, the agreement to vacate earlier court orders) was negated. Id. at 809 ("There M&G gave up its appeal on the basis of the settlement. It did so in reasonable reliance on the basic principle that a vacated judgment is of no effect"). The negative result of undermining the ability of parties to effectively settle their disputes would also spill over into parties litigating every possible issue in any "case in which there was any chance of a later suit."

> Every move possible and every countermove imaginable would become imperative. Every appealable ruling would have to be appealed. The system--and therefore the public interest--would suffer from this increase in the volume and ferocity of litigation.

Id. at 809.

In the end, Justice Baer returned to where he began his analysis, finding that none of the "exceptional circumstances" that may weigh in favor of giving preclusive effect to a vacated judgment existed in the case before him. The expenditure of judicial resources in the prior action was limited, as the prior

22

1  judgment was entered as a result of a partial summary judgment motion, not a trial.

2  Id. at 809-810. Moreover, given the relatively short gap in time between the two

3  proceedings, critical evidence (be it testimonial or documentary) still remained

4  available. Id. For these reasons Justice Baer left it for another occasion whether to

5  "carve out an exception to the rule that the vacatur of a judgment is not a

6  meaningless act for the purposes of issue preclusion." Id. at 809.

7        Despite defendants' protestations to the contrary, Justice Baer did not

8  find that under no set of circumstances could the general rule against affording

9  preclusive effect to vacated judgments give way. Justice Baer expressly left open

10  the possibility that an exception may exist where certain circumstances were

11  present. Id. at 810. The Mercantile court's decision not to categorically foreclose

12  application of collateral estoppel to vacated judgments is consistent with the

13  recognition in New York law that application of collateral estoppel is not a rigid and

14  inflexible concept, but one which produces varied results in different cases based

15  on how particular circumstances in those case tilt the equities and/or hardships.

16  See Juan C. v. Cortines, 89 N.Y.2d 659, 667 (1997) (describing collateral estoppel

17  as a "equitable doctrine" that is "grounded on concepts of fairness and should not

18  be rigidly or mechanically applied"). Such recognition is reflected by a long line of

19  New York cases citing approvingly to section 28 of the Restatement (Second) of

20  Judgments which allows courts to avoid applying the collateral estoppel doctrine

21  when otherwise warranted if special circumstances exist.[5] This is the very section

22  that the Ninth Circuit in Ringsby described as epitomizing the principal under

23  collateral estoppel that the "answer may be different in different cases as equities

24  and hardships vary the balance between the competing values of right to relitigate

25  and finality of judgment." 686 F.2d at 722. Thus, after Mercantile, there remains

---

27    [5] See Hodes v. Axelrod, 70 N.Y.2d 364 (1987); Juan C. v. Cortines, 89 N.Y.2d 659 (1997); Augustine v. Sugrue, 779 N.Y.S.2d 515 (2004); People v.

28  Roselle, 602 N.Y.S.2d 50 (1993); Goldstein v. Consolidated Edison Co. of New York, Inc., 462 N.Y.S.2d 646 (1983).

23

the possibility that a vacated judgment could be afforded preclusive effect if exceptional circumstances are present to warrant it. See Mercantile,147 Misc.2d at 810 (observing that whether such an exception should apply in a future case "may well require consideration of factors that the parties have not briefed or discussed and that might necessitate reflection not available to me as this trial approaches" (citing Ringsby)).

The exceptional circumstances noted in Mercantile are present here. Mercantile approvingly noted the district court decisions in Aetna and Angstrohm as worthy exemplars of when application of such an exception is warranted. In both cases, a judgment was entered after a trial, the judgment was later vacated by the court after the parties reached a settlement, and, at least in Aetna, a significant period of time (more than eight years) then passed before a separate proceeding was instituted where the preclusive effect of the earlier vacated judgment became an issue. Here, the vacated referee's findings were made following a trial that was conducted more than sixty years ago; all of the material witnesses to the transactions in question are now deceased; and some of the documents from that time are now lost. These facts fundamentally alter the balance of interests observed in Mercantile.

Failure to give preclusive effect to the referee's vacated findings here would seriously compromise the conservation and efficient use of judicial resources. The referee's findings were tendered after that court's expenditure of numerous resources in conducting a trial, listening to testimony, parsing over the record, and then rendering a judgment. All of those hard-pressed resources will simply be squandered were the Court not to afford those findings preclusive effect. This by itself, however, would probably not be enough to give preclusive effect to the referee's findings. See Ruben, 592 N.Y.S.2d at 171 (refusing to afford collateral estoppel effect to a vacated judgment that had been tendered following a trial and a verdict returned by a jury). But there is more: Absent reliance on the referee's

1   vacated findings, the lengthy passage of time since the trial and decision would

2   seriously threaten the reliability of any judgment handed down in the present case.

3   To believe that the factual issues actually litigated before the referee in the 1947

4   Westchester action could be relitigated in the present proceeding without a

5   significant degradation of the reliability of the conclusions reached in this

6   proceeding would give this Court and the parties' counsel too much credit.  Here, all

7   the Court has is some, but not all, the documents from the relevant period;

8   additionally, there are no witnesses who could testify to give life and context to

9   those documents still in existence.  Some of the copyright questions under

10  examination in this proceeding will require much more understanding than a partial

11  paper trial could provide.  Understanding the meaning of a document is oftentimes

12  the product of much more than simply looking at its words; live witness testimony

13  provides color, understanding, and context of the document's existence and

14  meaning.  The only court with the opportunity to assess the credibility of such live

15  testimony in connection with this legal dispute was presided over by the referee in

16  the Westchester action.  To refuse to afford the findings the referee made after

17  consulting all the documents, and hearing all the live testimony on the topic would

18  to be to deprive the record of the permutations, nuances, and subtleties those

19  witnesses' recollections placed on the meaning of those documents now brought

20  before this Court to examine.  If the eight-year gap in Aetna was sufficient to

21  warrant a finding that exceptional circumstances existed to give preclusive effect to

22  a vacated judgment due to the "dimmed" memories of those witnesses who could

23  still be found and the loss of documents that occurred in the interim, 440 F. Supp.

24  at 405, a sixty-year gap certainly suffices.

25       All that defendants can point to in rebuttal is that the parties bargained for

26  wiping the evidentiary slate clear, replacing it with their settlement agreement and

27  the final consent judgment.  Admittedly, this fact does weigh against giving

28  preclusive effect to the referee's findings, but the significance of the parties'

25

**ER 3662**

expectations is diminished by the particular concerns implicated in this case. To fail to give preclusive effect to the referee's findings in a case with such a lengthy gap between proceedings may very well make it extremely difficult, if not impossible, to create any reliable findings in the present litigation over plaintiffs' attempt to terminate the grants conferred to defendants shortly after those referee's findings were made. See Aetna, 440 F. Supp. at 405. Focusing solely on the parties' expressed intent as the lodestar for deciding whether collateral estoppel applies or not in this case would be to place the thumb too heavily on the side of the scale against preclusion without sufficiently taking account of the serious concerns that have arisen weighing in favor of preclusion due to the passage of time since the Westchester action took place.

This leads to another significant issue: The scope of the parties' private interest. Although it is undoubtedly true that the parties sought to avoid giving the referee's vacated findings preclusive effect, it must be remembered the context in which that private interest was expressed. The parties' sought to bar the further relitigation of claims relating to the scope of the grant itself to Superman's and Superboy's copyright (the ownership question); the stipulation and consent judgment served to end further debate on that point.[6] See Siegel, 508 F.2d at 913

---

[6] The parties' consent judgment would not have estopped further litigation of the issues related to the ownership question, such as work for hire status, etc., because neither the consent judgment nor the stipulation contain any findings with respect to those issues; instead, the consent judgment simply declares that Detective Comics was the sole and exclusive owner of Superman and Superboy, and leaves it at that. See Marvel, 310 F.3d at 289 ("where a stipulation of settlement is 'unaccompanied by findings,' it does 'not bind the parties on any issue . . . which might arise in connection with another cause of action. Here, although the Settlement Agreement contained detailed findings on the authorship issue, neither of the stipulations filed in the Prior Actions contain any specific findings as to whether Simon authored the Works independently or whether the Captain America character was created as a work for hire. Nor do the stipulations reference the Settlement Agreement in any way. Therefore, the stipulations do not collaterally estop Simon from litigating the issue of authorship underlying his termination claim in this action").

26

ER 3663

1  (noting that effect of parties' stipulation and final consent judgment was to "finally

2  determine[] that Detective . . . owned all rights to Superman without limitation").

3  Neither side, however, had any inkling of the existence of the current copyright

4  claim at issue in this case — namely, the 1976 Act's creation of the right to

5  terminate grants to copyrights. Reference to the private parties' interest as a

6  means to defeat giving preclusive effect to the referee's vacated findings in this

7  case, therefore, would be to stretch the parties' intentions to cover the litigation of

8  issues in a cause of action (the termination of ownership) they themselves had no

9  idea would exist or that they even sought to safeguard against. Cf. Marvel, 310

10 F.3d at 288 (refusing to afford res judicata to parties' earlier pre-1976 Act

11 settlement agreement concerning nature of grant of copyright in subsequent suit

12 seeking to litigate termination of that grant).

13         Undoubtedly some of the factual questions considered in the present effort

14 to terminate the grant of rights to the Superboy copyright will touch upon the same

15 facts as litigated in the state action over ownership to that same copyright.

16 Nonetheless, the point remains that those issues are brought in the context of a

17 legal right that was not conferred until decades later in the 1976 Act. Without giving

18 preclusive effect to the referee's vacated findings in this case, the right Congress

19 sought to give to artists and their heirs would be seriously (if not, fatally)

20 undermined simply through the passage of time, leaving in its wake nothing but a

21 partial documentary record, uncolored or given context by live testimony,

22 concerning factual questions critical in exercising that right to terminate prior grants.

23 Again, there are no detailed findings contained in the parties' stipulation or final

24 consent judgment to which the Court could otherwise defer, leaving the evidentiary

25 slate clean in this case save for the referee's vacated findings.

26         Indeed, the concern with the passage of time is invariably present with the

27 exercise of the termination rights conferred by the 1976 Act; through passage of

28 section 304 Congress effectively resurrected ownership to copyrights that had

27

**ER 3664**

1  otherwise long ago been thought to belong to the publisher since the Supreme

2  Court's 1943 decision in <u>Fred Fisher Music</u>.  Here, concerns with the effectiveness

3  of the 1976 Act termination remedy are alleviated to some extent with the presence

4  of the referee's vacated findings.  Those findings essentially encapsulate the

5  perception and recollection of the key participants to many of the factual questions

6  now at issue in this case.  This point is important to keep in mind as it further

7  diminishes the weight of the interest against giving preclusive effect to the referee's

8  findings.

9  When the private interest of the parties from the Westchester action is

10  compared to the substantial concerns weighing in favor of continuing to give

11  preclusive effect to the referee's vacated findings — preventing the loss of the

12  considerable judicial resources expended in the Westchester action that will

13  otherwise not be effectively replicated in the present proceeding with as much

14  assurance as the prior proceeding due to the loss of critical witnesses and

15  documents over the ensuing sixty year period — it is clear to this Court that

16  exceptional circumstances exist to give continuing preclusive effect to the referee's

17  findings despite their later vacatur.

## III. INTERSECTION OF COLLATERAL ESTOPPEL DOCTRINE
## WITH CONCEPTS UNIQUE TO COPYRIGHT LAW

20  Although the vacatur of the referee's findings does not, <u>ipso</u> <u>facto</u>, defeat

21  treating those findings as an estoppel, there remains a complicating wrinkle that

22  affects the scope and contours of the estoppel effect of those findings — the

23  longstanding Congressional grant of exclusive jurisdiction over copyright to the

24  federal courts.  <u>See</u> 28 U.S.C. § 1338(a) ("The district courts shall have original

25  jurisdiction of any civil action arising under any Act of Congress relating to . . .

26  copyrights . . . .  Such jurisdiction shall be exclusive of the courts of the states in . . .

27  copyright cases"); <u>see</u> <u>also</u> 28 U.S.C. §§ 41(7), 371(5) (repealed).  This legal reality

28  is important to this case as a number of the issues that must be addressed in

28

ER 3665

determining the validity of the Superboy termination notice are unique to federal copyright — specifically, whether the copyrightable material, if any, contained in Siegel's Superboy submissions was ever "published," done as a "work for hire," done as a "joint work" with Shuster, or as "derivative work" of Superman.

To begin, there is little question that state law matters are inextricably intertwined with many of the issues that arise in copyright disputes, whether it be matters involve the interpretation of contracts or concern the legal effects flowing from the formation of various business associations. It is well-established in the case law that state courts can determine matters of state law, the subject of which is a copyright, and federal courts must afford preclusive effect to those findings, even if giving such preclusive effect impacts, in whole or in part, consideration of matters peculiar to copyright law. See Vanderveer v. Erie Malleable Iron Co., 238 F.2d 510, 513 (3rd Cir. 1956) ("Although the bringing of actions arising under the patent laws is admittedly restricted to the federal courts, it has long been established that actions brought to enforce contracts of which a patent is the subject [may] . . . be brought in the state courts. The Supreme Court has held that a state court is empowered to determine questions, as distinguished from cases, arising under the patent laws, . . . and the court has given no indication that the conclusive effect between the parties of the determination of these questions is to be limited to the state courts"); T.B. Harms Co. v. Eliscu, 339 F.2d 823, 826 (2nd Cir. 1964) ("copyright has not been thought to infuse with any national interest a dispute as to ownership . . . turning on the facts or on ordinary principles of contract law"); Knickerboker Toy Co. v. Faultless Starch Co., 467 F.2d 501, 509 (C.C.P.A. 1972) ("Although 28 U.S.C. § 1338(a) provides that the federal district courts' original jurisdiction over copyright actions 'shall be exclusive of the courts of the states,' the state courts clearly may pass on the validity of a copyright . . . in the course of deciding a case over which they do have jurisdiction"); Murphy v. Gallagher, 761 F.2d 878, 886 (2nd Cir. 1985) (giving preclusive effect to state court

29

1  resolution of the dissolution of a corporation even though such resolution

2  conclusively determined later federal securities fraud claim); Jasper v. Bovina

3  Music, Inc., 314 F.3d 42, 46 (2nd Cir. 2002) ("if the case concerns a dispute as to

4  ownership of a copyright, and the issue of ownership turns on the interpretation of a

5  contract, the case presents only a state law issue"); see also Note, The Collateral

6  Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal

7  Jurisdiction, 91 HARV. L. REV. 1281, 1285 (1978) (noting that exclusiveness of

8  federal jurisdiction does not upset "the interests of the state courts in the integrity of

9  their findings on matters of state law within the normal sphere of their

10  competence").

11       That said, a state court's direct findings on matters peculiar to copyright law

12  itself would not be entitled to preclusive effect, either because such findings are not

13  necessary to the resolution of the case or, if necessary, then the state court's

14  finding exceeds its jurisdiction.[7] See Note, 91 HARV. L. REV. at 1287 ("[F]ederal

15  courts should give preclusive effect to state determinations of state questions

16  pleaded in the complaint, even if such issues arise in a subsequent action within

17  exclusive federal jurisdiction. No preclusive effect, however, should be given to

18  state court determinations of federal [questions] arising under laws whose

19  enforcement is within the exclusive jurisdiction of the federal courts"). Nor should a

20  state court's findings on matters of state law be neatly and uncritically translated

21  verbatim as a finding on a legal concept unique to copyright law simply because it

22  used the same phrase as the concept in question. See Music Sales Corp. v.

23  Morris, 73 F.Supp.2d 364, 377-78 (S.D.N.Y. 1999) ("Finally, the issues raised in this

24  dispute and in the 1989 [state court l]itigation are different and are governed by

25  different principles of law. This difference violates the estoppel requirement that the

26

27       [7] This principle would not, however, hold true of state court decisions
    concerning unpublished material made during the time the 1909 Act was effective.
28  Such "copyright" decisions were expressly left by the 1909 Act for state courts to
    determine under the common law.

1   issues be identical in <u>fact and law</u>. In the first action, Morris and the Strayhorn

2   Estate, then plaintiffs, sought, inter alia, the rescission of the 1962 Agreement and

3   1965 Amendment based upon Tempo's nonperformance. They did not raise the

4   terminability or invalidity of those contracts under copyright law, the issues raised in

5   this dispute. These different issues are governed by entirely different law. Issues

6   are not identical where the statutes, legal principles, or legal standards governing

7   them differ — even when the different issues rest on the same facts" (emphasis in

8   original)). However, even in such situations where a state court's proper and

9   legitimate findings necessarily impact a matter of peculiar copyright law, those

10  factual findings by the state court, save for the ultimate legal conclusion on a matter

11  exclusively of copyright law, are entitled to preclusive effect. <u>See</u> Note, 91 HARV. L.

12  REV. at 1289 ("the federal court can give preclusive effect only to those specific

13  findings which can be deduced from the state mixed finding of fact and law").

14       The present case and that decided in the Westchester action concern

15  discrete and separate legal claims: The latter involved state law claims for

16  misappropriation of property while the former involves federal copyright claims. To

17  be sure, these claims have significant factual overlap, but the resolution of the legal

18  claims in the Westchester action are not necessarily determinative of the purely

19  copyright legal claims in the present action.

20       The best illustration of this point is the Supreme Court's decision in <u>Becher v.</u>

21  <u>Contoure Laboratories, Inc.</u>, 279 U.S. 388 (1929). In that case, Becher, a

22  machinist, was employed to construct Oppenheimer's invention as well as the

23  improvements he made to his invention from time to time. As part of his

24  employment, Becher agreed to keep secret and confidential the information he

25  obtained from his employment and to not use it for his own benefit or for that of

26  anyone else. Contrary to his employment agreements, Becher obtained a patent

27  for himself based on information he learned from making instruments for

28  Oppenheimer. Oppenheimer obtained a judgment in a state court suit against

ER 3668

1    Becher for breaches of contract and fiduciary duty, that determined that Becher's

2    attainment of the patent was without Oppenheimer's knowledge and was done "in

3    violation of his agreement" with Oppenheimer, and required Becher to, among other

4    things, deliver "an assignment of the . . . patent and give up instruments similar to

5    the invention." Instead of abiding by the state court judgment, Becher brought a

6    federal suit for patent infringement, arguing that the earlier state court judgment

7    should be disregarded because, if it was sustained, it would serve to establish the

8    invalidity of his patent, and questions concerning the validity of patents are

9    questions for the federal courts alone.

10       Justice Holmes, writing for a unanimous court, affirmed the lower court's

11   ruling that the state court determinations precluded relitigation of those factual

12   issues in the patent case in federal court. The opinion began by noting that the

13   validation of Oppenheimer's claims in state court did not arise under or require the

14   consultation of the patent laws, but were purely state law determinations

15   independent of patent. Id. at 391 ("Oppenheimer's claim was an undisclosed

16   invention which did not need a patent to protect it from disclosure by breach of

17   trust"). Turning to the argument that, in establishing Oppenheimer's state law claim

18   that a breach of fiduciary duty and a breach of contract occurred, the state

19   judgment necessarily invalidated Becher's patent, Justice Holmes reasoned that

20   the grant of exclusive jurisdiction "does not give sacrosanctity" to questions of fact

21   which might also be conclusive of the federal claim. Id. Again, the state court

22   proceedings addressed only state law matters "independent of the patent law." Id.

23   Though giving preclusive effect to the state court's factual findings led to the legal

24   conclusion of an invalid patent, "that is not the effect of judgment. Establishing a

25   fact and giving a specific effect to it by judgment are quite distinct." Id. "A fact is

26   not prevented from being proved in any case in which it is material, by the

27   suggestion that if it is true an important patent is void . . . ." Id. at 391-92.

28       The principle to be culled from Becher is that federal courts are to give

32

1  preclusive effect to earlier state determinations of state questions pleaded in the

2  complaint, even if such state law issues arise in a subsequent action within the

3  federal court's exclusive jurisdiction, like copyright or patent. Such estoppel,

4  however, only operates as to the purely state law claims (and attendant facts)

5  decided by the state court. A federal court cannot simply transplant a state court's

6  finding as including the legal conclusions of the purely and exclusively federal

7  issues before it; although in some instances, those state findings may prove

8  "material" to the resolution of the exclusively federal law claim, such resolution of

9  that federal question must involve the application of those state findings to the

10 governing federal law on the topic in question before making the legal conclusion

11 concerning the exclusively federal issues.

12      The boundaries established by the Supreme Court in <u>Becher</u> were

13 highlighted in the Second Circuit's influential decision in <u>Lyons v. Westinghouse

14 Electric Corp.</u>, 222 F.2d 184 (2nd Cir. 1955). There Westinghouse brought suit in

15 state court arguing that Lyons had breached a contract "made with it as its agents

16 for the sale of electric lamps." <u>Id</u>. at 185. Lyons interposed as a defense that the

17 contract was unenforceable as it was the product of a conspiracy between

18 Westinghouse and General Electric "to restrain competition in the marketing of

19 such lamps" by requiring agents to "observe uniform price schedules" and

20 prohibiting them "from competing among each other," all in violation of the federal

21 anti-trust laws. <u>Id</u>. at 186. After a trial, the state court found the federal defense

22 without merit and awarded judgment to Westinghouse. While the matter was on

23 appeal, Lyons filed an action in federal district court alleging the same conspiracy to

24 violate the federal anti-trust laws. The district court stayed the federal proceedings

25 pending resolution of the state appeal. The Second Circuit granted Lyons a writ of

26 mandamus and ordered the district court to vacate the stay.

27      In granting mandamus relief, Judge Learned Hand, writing for the majority,

28 made clear that, absent such relief, the state proceedings would be allowed to

33

1    culminate in final settlement of the matter, leaving Westinghouse "in a position to

2    plead the [state court] judgment as an estoppel, and, if it is successful, that will

3    dispose of the action at bar without a trial." Id. at 186. Judge Hand explained that

4    such estoppel will "in substance" end the federal proceedings as it "will conclude

5    any future consideration of the existence of the conspiracy" upon which "all else

6    depends" for Lyons' federal suit. Id. Such a result would thus threaten the

7    Congressional grant to federal courts of exclusivity over jurisdiction of the federal

8    anti-trust laws. Acknowledging that the state court "had undoubted jurisdiction . . .

9    to decide the merits of" Lyons' defense, Judge Hand nonetheless reasoned that the

10    existence of exclusive federal jurisdiction over federal anti-trust claims required a

11    more limited preclusive effect be given to state court judgments when later litigating

12    such federal claims in federal court. Towards that end, Judge Hand analyzed

13    Becher, and relying on section 71 of the Restatement of Judgments,[8] distilled the

14    following principal from the Supreme Court's decision: "[There is a] distinction . . .

15    between the finding of one of the constituent facts that together make up a claim

16    and the entire congeries of such facts, taken as a unit; an estoppel is good as to

17    the first but not as to the second." Id. at 188; see also Red Fox v. Red Fox, 564

18    F.2d 361, 365 n.3 (9th Cir. 1977) (citing with approval quoted proposition from

19    Lyons). "The distinction between 'constituent' facts and 'congeries' of facts is

20    generally equated with the distinction between findings of fact and the application of

21    law to fact." Note, 91 HARV. L. REV. at 1284.

22      This principal has found expression in modern cases' reliance on state laws

23    that deny giving preclusive effect to an earlier state court judgment where such

24    estoppel would be a bar to litigating a claim within the exclusive jurisdiction of the

25    federal courts. See Marrese, 470 U.S. at 381-82 ("To be sure, a state court will not

26

---

27      [8] That section provided that "[w]here a court has incidentally determined a

matter which it would have had no jurisdiction to determine in an action brought

28    directly to determine it, the judgment is not conclusive in a subsequent action

brought to determine the matter directly."

ER 3671

1   have occasion to address the specific question whether a state judgment has issue

2   or claim preclusive effect in a later action that can be brought only in a federal

3   court.  Nevertheless, a federal court may rely in the first instance on state

4   preclusion principles to determine the extent to which an earlier state judgment bars

5   subsequent litigation. . . . a federal court can apply state rules of issue preclusion to

6   determine if a matter actually litigated in state court may be relitigated in a

7   subsequent federal proceeding").  Thus, courts have found that an earlier state

8   court judgment did not preclude litigation of issues within the exclusive jurisdiction

9   of federal courts because (citing to state law preclusion principles) of the lack of

10  identity between the state law claims and the federal ones at issue.  See RX Data

11  Corp. v. Department of Social Servs., 684 F.2d 192, 197-98 (2nd Cir. 1982)

12  (refusing to afford preclusive effect from prior state court action because there was

13  a lack of identity of issues between the state and federal suits).

14      Collateral estoppel has also been found not to apply because (under state

15  law preclusion principles) the particular federal issue could not be addressed by the

16  state court (or, if it was, the state court's judgment was a nullity) as it was beyond

17  its jurisdiction.  Id. at 198 (refusing to afford preclusive effect to earlier New York

18  Court of Claims decision because a claim for copyright infringement was beyond its

19  jurisdiction to decide).  Indeed, the Supreme Court itself has noted that fresh

20  consideration of most issues peculiar to a matter of exclusive federal jurisdiction

21  would not be barred by earlier state court rulings that purported to address those

22  same issues, because the matter would lie beyond the state court's jurisdiction to

23  decide and hence not be entitled to preclusive effect under state law.  See Marrese,

24  470 U.S. at 382 ("we note that claim preclusion generally does not apply where 'the

25  plaintiff was unable to rely on a certain theory of the case or to seek a certain

26  remedy because of the limitations on the subject matter jurisdiction of the courts.'  If

27  state preclusion law includes this requirement of prior jurisdictional competency,

28  which is generally true, a state judgment will not have claim preclusive effect on a

35                                    ER 3672

1    cause of action within the exclusive jurisdiction of the federal courts").[9]

2        These same limits to collateral estoppel and related doctrines are present in

3    New York law.  See Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 485

4    (1979) (noting that collateral estoppel analysis of whether state court judgment is

5    entitled to preclusive effect is determined, in part, by whether there exists "a

6    judgment on the merits by a court of competent jurisdiction"); Mural Arts v.

7    Sonsandi, 82 N.Y.S.2d 153, 154-55 (N.Y. Sup. 1948) ("no judgment may be held to

8    be res judicata as to an issue over which there was no jurisdiction in the Court

9    rendering the judgment"); see also Accolla v. Ladestri, 1989 WL 129484 *2

10   (S.D.N.Y. Oct. 26, 1989) ("Under New York law, it is clear that 'a claim is not barred

11   by res judicata if the court in which the first action was brought lacked subject

12   matter jurisdiction to adjudicate the claim'").

13       In the final analysis, then, when confronted with the effect of a prior state

14   court judgment on the present litigation of an issue that is uniquely within the

15   exclusive jurisdiction of the federal courts, federal courts must focus on what the

16   particular matters at issue in the state suit were and analyze the potential preclusive

17   effect of that state court's judgment through that lens.  When viewed in this context,

18   many of the matters resolved by the state court will not address directly the unique

19   federal issues, leaving it to the parties in the federal suit to present evidence and for

20   the federal court to resolve the federal issue.  Although many of the state court's

21   findings may properly bear on the analysis of the federal issue, in the end, the

22   federal court's conclusion must be the product of the application of federal law to

23   those state court findings and any additional evidence properly considered by the

24   federal court.

---

25       [9] Again, the matter would be much more difficult if the Westchester action

26   involved a state law that was a mirror image of federal copyright law or involved
     ownership to unpublished material as such matters were generally left for state

27   courts to resolve under the 1909 Act.  Here, however, the parties suit concerned

28   state common law tort claims involving the alleged "wrongful publication" of
     Siegel's idea clearly implicating the governing body of federal copyright law.

Here, many of the conclusions contained in the Court's March 23, 2006, Order were not the result of such a careful consideration and comparison of what was (and what was not) decided in the state court to resolve the state law claims there and of the federal questions at issue in the present case. Instead, the conclusions were the product of the Court simply treating (and then transcribing) the referee's findings en masse (especially those that contained the same phrases as those at issue in the present copyright matter), as if the Westchester action was a copyright case that conclusively settled issues unique to copyright. The Order's analysis failed to apply the governing body of copyright law to the referee's findings as is required under Lyons and the collateral estoppel doctrine under New York law. Although the referee's findings are relevant to some of the copyright issues in this case (most notably, whether Superboy was a work for hire), they are not wholly dispositive.

The March 26, 2006, Order missteps near its beginning when it characterizes defendants' arguments as an "attempt to relitigate issues determined in the 1947 state court case," (Order at 6) suggesting that the copyright issues at stake in the present litigation were litigated and resolved in the Westchester action. This perspective is reflected in the Order's treatment of the previously mentioned copyright issues. For instance, the Order observes that the referee "specifically determined that Detective Comics published the Superboy comic strip based upon the idea, plan, and conception of Siegel, in a magazine entitled *More Fun Comics*." (Order at 8). Notably absent from the Court's analysis was any indication whether such printing of the idea or concept of Superboy envisioned by Siegel necessarily meant that Siegel's submissions themselves (as opposed to the general idea embodied within) was published as a matter of federal copyright law, or whether such printing of general ideas contained in an otherwise detailed submission is sufficient to count as a publication. Instead, the finding was accepted as if the referee engaged in this detailed analysis in making that finding because the finding

37

ER 3674

contained the term "published." If that was what the referee did, he exceeded his jurisdiction to do so.

When speaking of the joint work issue, the Order simply notes that the referee found that Siegel was the sole originator and owner of Superboy, and concludes that this finding means Superboy could not be a joint work. (Order at 14). Again, the Order does not apply governing federal copyright law to the referee's findings so as to independently reach a conclusion whether Superboy was a joint work nor does it examine the nature of the Westchester action to determine what was being decided when the referee made that finding; instead, recitation of the referee's finding alone is used to directly perform that function.

On whether Superboy is a derivative work of Superman, the Order simply, without any analysis, states that litigation of such a question would be inconsistent with the referee's findings that Siegel owned Superboy and the payment for the subsequent transfer of the same per the parties' settlement agreement. (Order at 11-12).

Given all this, the Court finds defendants' motion for reconsideration of the Order well taken. Accordingly, the Court turns its attention to determining whether and to what extent the referee's vacated findings compel any conclusions as to the peculiar federal copyright issues before it; specifically, whether those findings impact the issues of whether Siegel's Superboy submissions were "works for hire," whether they were the product of a "joint authorship," whether they were subsequently "published," and whether they were a "derivative work."

## A.    Work Made For Hire

Under the 1976 Act, an author's (or his or her heirs') ability to terminate a prior grant in the copyright to his or her creation does not apply to a "work made for hire" because the copyright in such a creation never belonged to the artist in the first instance to grant. See 17 U.S.C. § 304(c). This proscription naturally raises the important question of whether Siegel's Superboy submissions were a "work

38

1  made for hire." If so, then Siegel's heirs cannot seek to terminate his earlier grant

2  of the Superboy copyright to defendants' predecessors in interest, such a grant

3  being merely a superfluous act that did not alter the pre-existing ownership rights to

4  that copyright. See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir.

5  1995) ("Once it is established that a work is made for hire, the hiring party is

6  presumed to be the author of the work").

7  Resolution of this question, as with all the copyright questions presented in

8  this case, is controlled by the governing body of law in existence at the time Siegel

9  submitted his Superboy material to Detective Comics, that is, the 1909 Act and the

10  precedent developed thereunder. See Self-Realization Fellowship v. Ananda

11  Church, 206 F.3d 1322, 1325 (9th Cir. 2000) ("Because all of the copied works

12  were created before 1978, the Copyright Act of 1909 governs the validity of the

13  initial copyrights"); Twentieth Century Fox Film Corp. v. Entertainment Distributing,

14  429 F.3d 869, 876 (9th Cir. 2005) ("We first consider Twentieth Century Fox

15  Parties' infringement claims under the now repealed Copyright Act of 1909 because

16  Crusade in Europe was published before the . . . effective date of the 1976

17  Copyright Act").

18  The 1909 Act provided that, "[i]n the interpretation and construction of this

19  title[,] . . . the word 'author' shall include an employer in the case of works made

20  for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the

21  employer is legally regarded as the 'author,' as distinguished from the creator of the

22  work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'"

23  Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of

24  Contemporary Dance, Inc., 380 F.3d 624, 634 (2nd Cir. 2004). Nowhere did the

25  1909 Act define what was meant by "work made for hire" or "employer"; only the

26  consequences flowing from such a designation were spelled out. The task of giving

27  meaning to these terms fell to the courts. The Ninth Circuit eventually formulated

28  the "instance and expense test" to determine whether a work is one made for hire

under the 1909 Act.  As explained by the Ninth Circuit:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965).  The test sought to match the concept of a work made for hire with the purpose of the Copyright Act.  As one court explained:  "[T]he law directs its incentives towards the person who initiates, funds and guides the creative activity, namely, the employer, but for whose patronage the creative work would never have been made. Copyright law 'is intended to motivate the creative activity of authors . . . by the provision of a special reward.'"  Estate of Hogarth v. Edgar Rice Burroughs, Inc., 2002 WL 398696, at *19 (S.D.N.Y. March 15, 2002) (quoting Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984)).  Toward that end, the instance and expense test requires the evaluation of three factors:  (1) At whose instance was the work prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the work; and (3) at whose expense was the work created.  See Twentieth Century, 429 F.3d at 879, 881.  Such an inquiry is a mixed question of law and fact.  See id. at 877.

Because such an inquiry requires the application of facts to the law, the parties spar over whether the referee's vacated findings did (or could) conclusively determine whether Siegel's Superboy submissions were a work made for hire.

Plaintiffs begin by arguing that the referee's finding that Siegel was the "originator and sole owner" of Superboy conclusively establishes that his submissions were not a work made for hire and that defendants are estopped from seeking to relitigate that finding.  The Court disagrees.  Nowhere in his findings did the referee once speak of work for hire (and plaintiffs, to their credit, acknowledge

that the referee "did not mention the phrase"). Certainly, the referee made findings dealing with the parties' business and contractual relationship concerning Siegel's Superboy submission, factual issues that touch upon the work made for hire question, but that was as far as the referee went. Whether those findings, when applied to the governing body of law under the 1909 Act, establish that those submissions were made as a work for hire is a question left for this Court to answer in the first instance.

Perhaps the best and most important example of this point is found in the Second Circuit's decision in Siegel. One of the issues pressed by the parties in that case was whether the referee's findings conclusively resolved the issue of whether Superman was a work made for hire. The district court found that it did because the parties' business dealings demonstrated the "existence of an arrangement going beyond an assignor-assignee relationship" to one more akin to a "classic employment relationship." 364 F.Supp. at 1036. In reaching this conclusion, the district court pointed to the referee's findings that Siegel and Shuster were under a contract of employment with Detective Comics at the time Superman was published; that Detective Comics's required Siegel and Shuster to return their original 1933 Superman material for revision and expansion before it could be published in Action Comics; and that the resubmitted material constituted the formula for the continuing Superman series. See Id. at 1036-37. The district court further concluded that Siegel and Shuster were barred by res judicata from seeking to relitigate the factual basis of the work made for hire question. Id. at 1037.

For its part, the Second Circuit disagreed with the district court's invocation of res judicata. The court of appeals noted that, "[w]hile it is evident that the state court concluded as a matter of law that the plaintiffs conveyed all their rights in Superman to the defendants," there was "no conclusion of law in the state court that the comic strip was a work for hire so as to create the presumption that the employer was the author. That issue was not litigated at all in the state court." 508

1  F.2d at 914. That said, the Second Circuit did note that several of the referee's

2  findings were relevant to the question of whether Superman was a work for hire,

3  but, unlike the district court, concluded that those findings pointed against a

4  determination that Superman was a work made for hire as a matter of federal

5  copyright law. Id. The Second Circuit seized on the referee's findings concerning

6  the nature of the 1933 Superman material as indicating that "Superman and his

7  miraculous powers were completely developed long before the employment

8  relationship was instituted," and further diminished the significance of the revisions

9  called for by Detective Comics as "simply to accommodate Superman to a

10 magazine format." Id. Given these facts, the Second Circuit concluded that

11 Superman did not meet the "instance and expense" test under the 1909 Act. Id. In

12 essence, by looking to and applying those specific factual findings by the referee to

13 the relevant body of copyright law on works made for hire, the Second Circuit

14 concluded that the original renderings of Superman constituted the original works,

15 later elaborations of which constituted, at most, derivative works. Id. at 914; see

16 also 1 Nimmer § 5.03[B][1][b] at 5-31 n.92.

17        Thus, to say that the referee's findings conclusively held one way or the

18 other on the question is mistaken. Rather, resolution of the issue requires this

19 Court to do exactly what the Second Circuit in its time did — apply the governing

20 body of copyright law under the 1909 Act to those findings made by the referee that

21 are relevant to the question, and render a legal judgment. Such an undertaking is

22 not, as plaintiffs argue, an attempt to "re-litigate" the nature of the parties'

23 relationship, but rather to litigate, for the first time, that which was not addressed in

24 the Westchester action — given the parties' business relationship as determined by

25 the referee, was the submission of Superboy to Detective Comics a work made for

26 hire. It is to that question that the Court now turns, with initial reference to the

27 instance and expense test set forth above.

28        The "expense" requirement is met where a "hiring party simply pays an

42

1  [employee or] independent contractor a sum certain for his or her work." Playboy

2  Enterprises, 53 F.3d at 555. Such regular, periodic payments of a sum certain bear

3  the hallmark of the wages of an employee required to produce the work in question

4  for his or her employer, and not that of a party who is free to engage those other

5  than the commissioning party in marketing his or her work. See Donaldson

6  Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642-43 (2nd Cir.

7  1967). "In contrast, where the creator of a work receives royalties as payment, that

8  method of payment generally weighs against finding a work-for-hire relationship."

9  Playboy Enterprises, 53 F.3d at 555; see also Twentieth Century, 429 F.3d at 881

10 (finding that "expense" requirement met when publisher agreed to pay the author "a

11 lump sum for writing the book, instead of negotiating a royalty deal").

12 　　　Here, it is true that none of the costs or expenses incurred in creating the

13 Superboy material (the paper on which the dialogue and story elements was

14 printed,  the typewriter used to put into concrete form the author's concepts of the

15 same, etc.,) was borne by Detective Comics.  The material was created at Siegel

16 and Shuster's artist studio in Cleveland, Ohio, using office supplies and other

17 materials bought and paid for by Siegel for the studio.  Nothing from Detective

18 Comics' offices in New York City was utilized in the creation of the Superboy

19 material.  All that said, nothing in the referee's findings or in the materials submitted

20 by the parties in this case would suggest that this was not also the case for the

21 other comic strips (Superman included) that Siegel and Shuster penned for

22 Detective Comics pursuant to the September, 1938, employment contract.  In

23 addition, courts employing the instance and expense test have discounted reliance

24 on the circumstances and the cost borne for the production of the work.  Such

25 consideration relates to the question of whether "an artist worked as an

26 independent contractor and not as a formal employee," a distinction that has "no

27 bearing on whether the work was made at the hiring party's expense." Playboy

28 Enterprises, 55 F.3d at 555.

1    Moreover, Siegel was also paid nothing by Detective Comics when he
2    submitted his Superboy material to it, and it rejected the material for publication.
3    Nor was Siegel paid when Detective Comics ultimately published the material
4    (assuming that Siegel's Superboy submissions were "published" in the magazine,
5    see infra III.C.) in More Fun Comics, no. 101 four years later.  The lack of payment
6    of any kind for the material itself would ordinarily negate a finding that the expense
7    requirement was met.  This lack of payment for the Superboy material itself is
8    particularly glaring considering that the referee found that Detective Comics would
9    periodically pay Siegel and/or Shuster at their regular per page rate for editions of
10   the Superman comic strip (a work for which they were employed to provide) even
11   when neither of them had contributed any of the continuity (Siegel) or illustrations
12   (Shuster) for the strip.  A reasonable inference to draw from this practice would be
13   that Detective Comics paid artists at least something for work they were employed
14   to produce even if the material submitted ultimately was not published; however,
15   with Superboy, no payments were ever made, regular or otherwise, leading to the
16   clear legal conclusion that Siegel was not employed by Detective Comics to create
17   the Superboy comic strip.
18       Defendants seek to downplay the absence of payment by noting that
19   Detective Comics ultimately did pay Siegel over $90,000 in settlement of the
20   Westchester action.  This fact, however, only bolsters the finding that the Superboy
21   submissions were not made at the expense of Detective Comics; instead, this
22   payment was made only after Detective Comics had been publishing Superboy for
23   a number of years.  If the material was part of a work made for hire arrangement,
24   such payment would have occurred at a time more contemporaneous with its
25   creation and submission, not years later and only then after the publisher had been
26   sued by the author for the unauthorized publication of the same (and not for breach
27   of an employment contract or agreement).  There is simply no evidence indicating
28   that the parties had a business understanding or contractual relationship allowing

44

1  for lengthy gaps in time between the creation of a work and payment for the same.

2  In the end, the complete lack of any periodic payment of a sum certain for

3  Siegel's Superboy material leads the Court to find that the expense requirement

4  has not been met in this case.

5  The "instance" component of the test inquires into "whether 'the motivating

6  factor in producing the work was the employer who induced the creation."

7  Twentieth Century, 429 F.3d at 879. That the commissioning party be the

8  motivating factor is not a "but for" test — that is, but for the artist's employment the

9  work would not have been created — but instead is a more narrow inquiry focused

10  on the nature and scope of the parties' business relationship. As one court

11  explained:

12  No doubt Graham was a self-motivator, and
   perhaps she would have choreographed her dances
13  without the salary of Artistic Director, without the
   Center's support and encouragement, and without the
14  existence of the Center at all, but all that is beside the
   point.

15

16  . . . .

17  . . . . There is no need for the employer to be the
   precipitating force behind each work created by a
18  salaried employee, acting within the scope of her regular
   employment. Many talented people . . . are expected by
19  their employers to produce the sort of work for which
   they were hired, without any need for the employer to
20  suggest any particular project. 'Instance' is not a term of
   exclusion as applied to specific works created within the
21  scope of regular employment. It may have more
   significance in determining whether an employee's work
22  somewhat beyond such scope has been created at the
   employer's behest or to serve the employer's interests

23  . . . .

24  Martha Graham, 380 F.3d at 640-41. Thus, "under the 1909 Act a person could be

25  an employee yet create a work 'as a special job assignment, outside the line of the

26  employee's regular duties.' In that event, the work is not a work for hire." Id. at 635

27  (citing Shapiro Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2nd

28  Cir. 1955)). The critical factor is what, if any, employment relationship (be it as an

45

ER 3682

1   employee-employer or an employer-independent contractor) existed between the
2   parties beforehand, and whether the work in question fell within the scope of those
3   job duties.  Toward that end, the "instance" requirement is also "shaped in part by
4   the degree to which the hiring party had the right to control or supervise the artist's
5   work," a circumstance reflective of the work being created within the confines of an
6   employment relationship.  Twentieth Century, 429 F.3d at 879 (internal quotation
7   marks and citations omitted).  Although it is not critical that the commissioning party
8   actually exercise its right of control and supervision in the creation of the work in
9   question, it is necessary that the party have the right to direct, control, or otherwise
10  edit the artist's work.  See Martha Graham, 380 F.3d at 635 ("The right to direct and
11  supervise the manner in which the work is created need never be exercised"
12  (emphasis in original)).

13          Plaintiffs rely heavily on the referee's finding that Siegel submitted Superboy
14  pursuant to the right of first refusal provision in the parties' September, 1938,
15  agreement, and therefore it was not material Siegel was otherwise obligated to
16  provide to Detective Comics (unlike the comic strips for Superman, Slam Bradley,
17  the Spy, etc.,) in the course of his regular employment with the publisher.  Given
18  that the publisher had yet to agree to publish the material when Siegel submitted
19  Superboy to Detective Comics, plaintiffs argue that Detective Comics could not
20  possibly be seen as owning the material at the inception, something which it claims
21  is a predicate for a work for hire.

22          Deciding not to publish material and owning the material beforehand are not
23  mutually exclusive propositions.  A publisher could own the material from its
24  inception, but decline to publish it.  Publication (or lack thereof) is not dispositive;
25  what is critical, however, is the referee's finding that the creation of Superboy fell
26  outside the scope of Siegel's regular job duties.  The parties' contract called for
27  Siegel (and Shuster) to provide Detective Comics the continuity and illustrations for
28  certain specified comic strips in exchange for remuneration at a specified sum

                                        46

1  certain; Superboy was not among the comics Siegel was required to perform work

2  for per the parties contract. The referee found that "Superboy was a separate and

3  distinct entity" apart from Superman for purposes of the scope of the parties'

4  September, 1938, agreement. It was for this reason that the referee thereafter

5  analyzed the claims relating to Superboy through the lens of the right of first refusal

6  provision. Siegel's presentation of Superboy to Detective Comics (rather than

7  some other comic publisher) therefore was the result of the provision in the parties'

8  contract requiring Siegel and Shuster to "first give [Detective Comics] the right to

9  first refusal" for "any other art work or continuity suitable for use as comics or comic

10 strips." Siegel's creation of the Superboy submissions was thus independent —

11 entirely separate and apart — of his regular job duties with Detective Comics.

12      This then leads to the question of whether Siegel necessarily made his

13 Superboy submissions specifically for the publisher, Detective Comics.

14      Here, there is no evidence that Siegel attempted to pitch his Superboy

15 submissions to any other comic book publisher after Detective Comics initially

16 turned him down. In fact the precise opposite is true. A little more than a year later

17 he re-pitched the idea to Detective Comics, but in a more fully developed format.

18 When this, too, was turned down by Detective Comics, there is no indication that

19 Siegel went elsewhere to pitch his idea. Instead, it appears (much like with his

20 original 1933 Superman material) Siegel tabled the material and continued to work

21 on other, existing projects. Shortly thereafter, Siegel joined the United States

22 armed forces and fought in World War II. When he returned home from his service

23 to the country, the opportunity to pitch the Superboy submissions to other comic

24 publishers was gone; Detective Comics had already been publishing a Superboy

25 comic for a period of time in Siegel's absence. Nothing in the parties' papers or in

26 the referee's findings shed any light as to whether Siegel only envisioned Detective

27 Comics as the publisher for his material, or if in fact other publishers were also

28 considered by him. Instead, the Court is left simply with the nature and structure of

the parties' contractual relationship in formulating a decision as to whether Siegel's Superboy submissions were works made for hire.

Viewed from this perspective, the situation is akin to a specially-commissioned work, rather than one produced in the regular course of an employee's job duties. Nimmer has drawn the same parallels for situations not that different than the present one:

> [A] situation may arise where the employer finds the employee's work unsuitable . . . . It seems probable that such unused material belongs to the employer, at least if the contract of employment contains language purportedly [conveying to the employer] 'all' material [created by the employee]. Even when there is an agreement between employer and employee that employer shall own certain material to be created by the employee, if in the creation of such material, the employee is to work as an independent contractor (even if for other duties he is an employee), then the employer must claim such ownership by virtue of an assignment, rather than by virtue of his status as an employer.

1 Nimmer § 5.03[B][1][b] at 5-37 (emphasis added). Here, nothing in the parties' contract purported to convey to Detective Comics ownership to all the material Siegel and Shuster ever created; rather, the contract conveyed only the material created with respect to certain specified comic strips of which Superboy was not one. With respect to works other than those enumerated comic strips, the most Detective Comics had was a one- time opportunity to lay claim to Siegel's Superboy material. See Broadcasting Corp. v. Metromedia Inc., 74 N.Y.2d 54, 56 (1989) ("a right of first refusal merely provides . . . a chance to buy"). The right of first refusal (and especially one that is not exercised) is fundamentally incompatible with a finding that a work falling within its provisions is a work made for hire. Cf. 1 Nimmer § 5.03[B][2][d] at 5-56.8 ("[A] commission relationship may not exist, even if the work is prepared at the request of another, and even if such other person bears the costs of its creation, where the person requesting the work is expressly granted only a one-time use"). Such a contractual provision is predicated upon the assumption that the material being submitted for the exercise of the option to publish belongs to

the artist at the outset. See LIN v. Metromedia, Inc., 74 N.Y.2d 54, 56 (1989) (noting that, under New York law, a "right of first refusal" requires the "owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price" (emphasis added)). If this were not so, there would be no need for the publisher to have the first opportunity at publishing the material; rather, it would already belong to the publisher, regardless of whether it publishes the material or not. Because material that is a work made for hire belongs at the inception to the publisher, having that same material submitted to the publisher in the first instance under a right of first refusal strongly suggests that it did not belong to the publisher when it was created.

A case illuminating this point is Playboy Enterprises, Inc. v. Dumas, 960 F. Supp. 710 (S.D.N.Y. 1997). Among the paintings at issue in that case were several that the artist had submitted to but were turned down by Playboy. Although it turned down publishing the paintings, Playboy nonetheless paid the artist a "turn-down" fee for the work. The parties squabbled over the impact these turned-down paintings had on whether the paintings that were accepted for publication were works made for hire. Playboy argued that its payment for paintings that it did not publish bolstered the impression that creation of the paintings (whether they were used or not) was due to it "request[ing] a submission from [the artist] each month," and undermined any argument that payments to the artist for those paintings were only for a one-time use. Id. at 715. The court agreed with Playboy, finding that the payments for unused works "show[ed] that it at least implicitly requested [the artist] to submit at least one painting a month and that it therefore was the motivating factor in the creation of those paintings." Id. As the district court elaborated: "The fact that Playboy made payments for unused work undercuts [the argument] that [those payments] must have been for the right to one-time use of the disputed works because [it] is all that Playboy required. But if Playboy never published a

49

1   work at all, there would have been no reason to pay anything for it absent a for-hire

2   relationship, as it would have had no need for any rights in such a case." Id. at 716.

3   The converse would also be true. The failure to pay for unused work,

4   notably those falling outside the artist's regular job duties, supports the conclusion

5   that the parties understood that such works fell outside the confines of any for-hire

6   relationship between them and were created at the artist's instance. While

7   payment demonstrates an acknowledgment on the publisher's part that the work

8   was being done for their benefit, the absence of such payment creates just the

9   opposite impression. Cf. id. ("The logical conclusion, and the one to which this

10  Court comes, is that Playboy paid Nagel for works it did not use because he

11  created them at its instance").

12  Thus, it appears that, at least viewed through the prism of the parties'

13  business and contractual relationship, Siegel's submission of Superboy to Detective

14  Comics was not a work made for hire. Defendants' attempt to cloud the issue by

15  focusing on the derivative or non-derivative status of the Superboy material itself, a

16  separate question on which the Court at this point reserves its ruling (see infra

17  III.D.). If any of Siegel's Superboy material is derivative of Superman, then,

18  defendants argue, use of that material would require the consent of Detective

19  Comics, as the owner to the Superman copyright, before it is published. It is this

20  required prior consent for publication that defendants contend impacts the work

21  made for hire question. Such control over the material, it is argued, translates into

22  Detective Comics holding the right to direct and supervise Siegel's Superboy

23  material, something which they contend is sufficient by itself to render the material

24  a work made for hire. In this regard defendants cite to Estate of Burne Hogarth v.

25  Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2nd Cir. 2003) and Picture Music,

26  Inc. v. Bourne, Inc., 457 F.2d 1213, 1216-17 (2nd Cir. 1972).

27  Defendants argument sweeps too broadly. Were the Court to adopt

28  defendants' approach, every derivative work would also be considered a work

1   made for hire. The ramifications of such a holding would be contrary to the 1909

2   Act's statutory scheme concerning derivative works, and is also unsupported by the

3   case law construing the Act.

4         As noted earlier, the copyright to a work made for hire is owned at its

5   inception by the commissioning party. If a derivative work is always a work made

6   for hire, then there would be nothing left for the creator of the additional

7   copyrightable material contained in the derivative work to own; the artist would have

8   no copyright to that material, it instead being owned by the copyright holder to the

9   pre-existing work. The 1909 Act, however, recognized that such additional material

10  contained within a derivative work was itself "subject to copyright" protection. 17

11  U.S.C. § 7 (repealed). Indeed, the 1909 Act specifically noted that "publication of

12  any such new works" would not undermine the validity of the copyright in the pre-

13  existing work. Id. For this reason, cases decided under the 1909 Act recognized

14  that "[t]he aspects of a derivative work added by the derivative author are that

15  author's property, but the element drawn from the pre-existing work remains on

16  grant from the owner of the pre-existing work." Stewart v. Abend, 495 U.S. 207,

17  223 (1990). If, as defendants contend, derivative works are always the property of

18  the copyright holder of the pre-existing work owing to their work for hire status,

19  there would be no need for the 1909 Act's concern with whether publication of that

20  derivative work implied that the derivative author had "an exclusive right to such use

21  of the original works," or, on the other hand, that "consent" of the owner to the pre-

22  existing work must be obtained before adaptations to that work are produced by the

23  derivative author. 17 U.S.C. § 7 (repealed). Those concerns would be internally

24  inconsistent as a matter of logic and common sense. The copyright holder to the

25  "original works" would necessarily be the owner of the additional material contained

26  in the derivative work; its prior consent would be unnecessary as it would own the

27  material for which consent is sought, and any such waiver would be logically

28  inconsistent as the material for which such waiver would be sought would also be

51

1  owned by the same entity.

2  Nor does the case law under the 1909 Act support defendants' position. In

3  all the cases cited by defendants, the copyright holder of the pre-existing work

4  approached the artist and specifically requested for the artist to create a work

5  derived from that pre-existing material and then paid the artist for the derivative

6  work in question, facts notably absent here. See Hogarth, 342 F.3d at 151-52;

7  Picture Music, 457 F.2d at 1217. It was these additional elements of requesting

8  and paying for specific derivative works that served to demonstrate that the creation

9  of the derivative work was at the instance of the commissioning party, not the

10  simple fact that the work itself was derivative. Nimmer in his treatise similarly

11  distinguishes the principal case cited by defendants on that very basis. See 3

12  Nimmer § 9.03[D] at 9-28.3 ("Picture Music is limited to the situation where the

13  commissioning party supplies to the independent contractor an underlying work

14  upon which the independent contractor [then] fashions a derivative work" (emphasis

15  in original)).

16  Here, in contrast, Detective Comics never requested that Siegel create

17  Superboy nor did it approach him to utilize the pre-existing material from Superman

18  for some unspecified derivative work. Instead, the idea for creating Superboy

19  occurred while Siegel was talking to a Mr. Nimis (whose relationship to the parties is

20  not disclosed in the pleadings or the referee's findings) about what "'top' [comic]

21  strip to use on the Sunday [newspaper] page of Superman," and Siegel suggested

22  using "a strip named Superboy" relaying "the adventures of Superman as a youth."

23  (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 4). Nowhere did Mr. Nimis (even

24  assuming he is affiliated with defendants' predecessors in interest) approach,

25  request, or suggest that Siegel use the pre-existing Superman copyright material as

26  a launching point for creating the comic strip to be placed at the top of Superman's

27  Sunday comic strip. That idea was Siegel's creation alone.

28  All that said, the Court agrees with defendants that, if Siegel's Superboy

52

submissions were a derivative work, such a designation would have vested

Detective Comics with the right to control that material (Detective Comics' consent

being necessary for the material's production). The Court finds that this right to

control, however, is not sufficient to conclude that Siegel's Superboy submissions

were a work made for hire. Those submissions were neither prepared at Detective

Comics' instance nor at its expense, points the Court finds more weighty in

resolving the work made for hire question in this case. Those points are predicated

upon the particular circumstances of the parties' relationship and the creation of the

works in question, something that is not as particularized with respect to a statutory

right inherent in all derivative works regardless of the relationship of the parties.

Accordingly, the Court finds that Siegel's Superboy submissions were not

works made for hire.

## B.    Joint Work

Defendants next argue that Siegel's Superboy submissions were

contributions to a joint work with Shuster. The effort to characterize the

submissions as part of a joint work is understandable. Under the 1909 Act, each

joint author of a copyrightable work is a co-owner of the same and possesses "an

undivided ownership in the entire work, including all of the contributions contained

therein." 1 Nimmer § 6.03, at 6-7; see also Davis v. Blige, 419 F.Supp.2d 493, 500

(S.D.N.Y. 2005) ("a co-owner has a legal right to grant a license in a work without

another co-owner's permission or to transfer his rights in the copyright freely.

Absent an agreement to the contrary, one joint owner may always transfer his

interest in the work to a third party"). Given that Shuster provided the illustrations to

Superboy at the direction of and was paid for the same by Detective Comics, those

illustrations are arguably provided as a work for hire for the publisher, thus giving

ownership over the same to Detective Comics.[10] If Superboy is determined to be a

---

[10] The question of whether the illustrations Shuster provided for More Fun
Comics no. 101 were in fact prepared as a work made for hire is not argued in the

1  joint work, Detective Comics would own half of the copyright either as the author of

2  Shuster's alleged work for hire artwork or as a consequence of the reversion of

3  Shuster's half to them given his or his heirs failure to timely exercise the right to

4  termination, thereby allowing it to continue to exploit the copyright to Superboy

5  subject only to having to provide an accounting to plaintiffs for any profits gained

6  therefrom. See 1 Nimmer § 6.10; see also Oddo v. Ries, 743 F.2d 630, 632-33

7  (9th Cir. 1984).

8       The 1976 Act, which codified the principles for joint authorship established in

9  the case law under the 1909 Act, see 1 Nimmer § 6.01 at 6-3 n.1, does not provide

10 a definition for an "author" or "joint authors" in a copyright, but instead defines a

11 "joint work" as one "prepared by two or more authors with the intention that their

12 contribution be merged into inseparable or interdependent parts of a unitary

13 whole."[11] 17 U.S.C. § 101. Components of a unitary work are "inseparable" when

14 they have little or no meaning standing alone, such as paragraphs in a novel, and

15 the components are considered "interdependent" when they could stand alone but

16 achieve a greater effect when combined, such as the lyrics and melody of a song.

17 See H.R. Rep. No. 94-1476, at 120 (1976), reprinted in 1976 U.S.C.C.A.N. 5659,

18 5736. Here, the copyright to Superboy (if a joint work) would be considered

19 comprised of interdependent parts — Siegel's dialogue and storyline (as contained

20 in his submissions) and Shuster's artwork giving life and color to those words. The

21 parties do not dispute that Shuster's illustrations for the Superboy comic released in

22

_____

23 parties' papers. This is understandable given Shuster or his heirs failure to join in
   or file separately a notice of termination related to either the Superman or
24 Superboy copyright. Given that the time to exercise the termination right has
   passed, ownership over Shuster's half of the copyrights reverts to defendants.

25

26 [11] Nimmer in his treatise has commented that the 1976 Act's definition for a
   "joint work" actually defines "joint authorship" and is simply designated incorrectly
27 in the Act. 1 Nimmer on Copyright § 6.01 at 6-3. Regardless, courts have utilized
   the statutory definition for "joint works" in delimiting the parameters of whether
28 someone was a joint author of a copyright. See Aalmuhammed v. Lee, 202 F.3d
   1227, 1231 (9th Cir. 2000).

More Fun Comics would otherwise qualify for joint authorship status. Anyone looking at the Superboy comic contained in that magazine would know that it owed its existence to both Shuster's illustrations and Siegel's words (assuming that the submissions were published in More Fun Comics, no. 101). See Aalmuhammed, 202 F.3d at 1232 ("It is . . . easy to apply the word ['author'] to two people who work together in a fairly traditional pen-and-ink way, like, perhaps, Gilbert and Sullivan. In the song, 'I Am the Very Model of a Modern Major General,' Gilbert's words and Sullivan's tune are inseparable, and anyone who has heard the song knows that it owes its existence to both men, Sir William Gilbert and Sir Arthur Sullivan, as its creative originator").

Rather, the central question with respect to the joint authorship issue in this case is whether Siegel prepared the Superboy submissions with the knowledge and intent that the comic strip would be a joint work, with Shuster providing illustrations to the comic strip if it were published. As far as the joint preparation and intention of the authors, the Senate Committee Report submitted with the passage of the 1976 Act states as follows:

> [A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parties be absorbed or combined into an integral unit . . . .

S. Rep. No. 94-473, at 103 (1975).

Here, the referee's findings make clear that Shuster had collaborated in the past on all the other comic strips conceived by Siegel; he did the illustrations for not only Superman, but for Siegel's other comic strip incantations, such as The Spy and Slam Bradley. With respect to Superboy, however, the two did not engage in the usual collaborative effort of the past. Siegel submitted the conception, including a script of the dialogue, for the Superboy comic to Detective Comics, but then a

55

four-year hiatus occurred before Shuster drew the illustrations for the same. When Shuster created those illustrations, Siegel was abroad serving in the military. There is absolutely no information submitted by the parties or contained in the referee's findings suggesting that Siegel brainstormed with Shuster in their studio when drafting his Superboy submissions.

However, contemporaneous and coordinated action between Siegel and Shuster is not required. As Judge Learned Hand explained, "it makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complimentary in the sense that they are to be embodied in a single work . . . ." Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2nd Cir. 1944). That said, there are indications that, when Siegel created the Superboy submissions, he envisioned those submissions as part of a unitary comic strip incorporating Shuster's artwork. The proposed script Siegel submitted for the Superboy comic itself, in the same way as all the other Siegel and Shuster comics were presented, contained the by-line crediting its authorship to "Jerry Siegel and Joe Shuster." Such shared billing in Siegel's submission is strong evidence of the intent to create a joint work. See Aalmuhammed, 202 F.3d at 1234 ("putative coauthors make objective manifestations of a shared intent to be coauthors, as by denoting the authorship of The Pirates of Penzance as 'Gilbert and Sullivan'"); Childress v. Taylor, 945 F.2d 500, 508 (2nd Cir. 1991).

Moreover, the audience appeal of Siegel's Superboy, as with all the other comic strips he helped conceive, was tied to Shuster's contribution of the illustrations. See Aalmuhammed, 202 F.3d at 1234 (citing as an objective manifestation of parties' mutual intent to create a joint work as whether "the audience appeal of the work turns on both contributions"). Superboy's appeal to the public was not only in reading the harrowing tales of the superhero's exploits but also in the colorful imagery Shuster provided to grip the reader's imagination.

56

ER 3693

See generally Maurel v. Smith, 220 F. 195, 200 (S.D.N.Y. 1915) (Learned Hand, J.) (characterizing the separately provided dialogue, plot, and music contributions to a comedic opera as being "like mosaics from which, though you may lift a stone, it loses the significance of its setting"). This evidence also supports a conclusion that Superboy is a joint work. See Aalmuhammed, 202 F.3d at 1234.

Plaintiffs make no effort to deny that any of this objective evidence would otherwise lead to the conclusion that Siegel's Superboy submissions were envisioned by Siegel as part of a unitary work comprised with Shuster's illustrations. Instead, their argument is more nuanced.

First, they seek to side-step the issue by arguing that the referee's finding that Siegel was "the originator and sole owner" of Superboy forecloses further discussion of whether the copyright to the creation of the same was a joint work. Plaintiffs' reliance on the referee's finding is misplaced. The referee was simply signifying that, as between Siegel and Detective Comics, Siegel was the sole owner and originator to the same. The question (and the ramifications flowing from the same) as to Shuster's authorship of the Superboy material was not presented to the referee to decide. Plaintiffs make mention that Detective Comics noted in its answer filed in the Westchester action that "substantial artwork for said comic strip entitled 'SUPERBOY' was performed by . . . SHUSTER and paid therefor by" Detective. (Reply Decl. Marc Toberoff in Supp. Mot. Partial Summ. J., Ex. A ¶ 14 at 6). Plaintiffs read into this averment that Detective Comics was seeking to utilize Shuster's illustrations as a basis to lay claim to partial ownership in Superboy itself, by labeling Shuster's contribution as a work for hire. The Court disagrees with this reading. To begin, the Second Circuit in Siegel held that the work for hire issue was not litigated in the Westchester action. 508 F.2d at 914 ("That issue was not litigated at all in the state court"). If the issue was not litigated directly before the referee, it certainly was not done indirectly through the guise of a joint authorship argument, which itself was predicated upon there being a work made for hire.

ER 3694

Moreover, the averment in question was interposed by Detective Comics in connection with Siegel and Shuster's fourth cause of action. (Id. ¶ 14 at 5 ("Deny each and every allegation contained in paragraphs 'THIRTY-SIXTH', 'THIRTY-SEVENTH', 'THIRTY-EIGHTH', and 'THIRTY-NINTH' of the complaint"). The fourth cause of action was plaintiffs' alternative claim for "the wrongful publication" of Superboy in which it argued that its "plot, conception and incidents were based upon and copied from the plot, conception and incidents of the plaintiff's comic strip Superman" (which the complaint argued in the first two causes of action belonged to Siegel and Shuster), and further argued that Detective Comics mislead the public into believing that Siegel was "the author of the continuity dialogue and action of each of the individual releases" for Superboy by affixing his name to the strip as its author. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36-37, at 10). It was in this context that Detective Comics sought to divine meaning from Shuster's illustrations and their payment for the same to him. Detective Comics stated in its answer that those facts indicated Shuster's tacit consent to the publication of Superboy (thereby negating that Detective Comics utilized Superman elements without the plaintiffs' consent, as one of the purported co-owners of Superman approved said publication) and also as constituting approval for the publisher to use Siegel and Shuster's by-line on the comic strip. (Reply Decl. Marc Toberoff, Ex. A ¶ 14, at 6 ("affixing of the name of plaintiff SIEGEL to some of said 'SUPERBOY' releases was with the knowledge and approval of plaintiff SHUSTER"). Thus, defendants' noting that Shuster had done the illustrations for the Superboy illustrations and paid for the same had nothing to do with the work made for hire nature of that contribution; rather, it merely countered the factual allegations in plaintiffs' fourth cause of action.

Nothing submitted by the parties conclusively shows the purpose for Detective Comic's representation that Shuster provided the illustrations for the comic was otherwise. Indeed, plaintiffs themselves note that Detective Comics'

1　recitation of Shuster's participation signified that it "claimed or could have claimed

2　in the 1947 Action that they co-own 'Superboy' by virtue of co-owning the artwork."

3　(Pls' Reply in Supp. Mot. Partial Summ. J. at 16 (emphasis added)).  This tacit

4　admission by plaintiffs undercuts their argument that, in making the finding that

5　Siegel was the originator and "sole owner" of Superboy, the referee did find that

6　Shuster was not a joint author of the work.  Undoubtedly, were this Court to hold

7　that Superboy was a "joint work" between Siegel and Shuster, this would effectively

8　undermine the referee's finding that Siegel was the "sole owner" of Superboy and

9　could, assuming that Shuster's artwork is considered a work for hire, negate the

10　injunction the referee placed against Detective Comics from exploiting Superboy.

11　That this would be the result from such a ruling does not mean that the referee

12　therefore must have considered and ruled on any potential question that could

13　unravel his decision.  Rather, it simply underscores the potential pitfalls in litigating

14　cases that touch on the subject matter of copyright in state court, a forum where not

15　all the issues that could impact rights to a copyright are, or can, be litigated.

16　　　　Switching gears, plaintiffs next argue that, regardless of whether or not

17　Siegel intended for his material to be part of a joint work with Shuster, this intention

18　was fundamentally altered when Detective Comics later published his material

19　without his consent.  (Pls' Reply in Supp. Mot. Partial Summ. J. at 17-18).  Plaintiffs

20　argue that consent to publication is necessary for the material to be treated as a

21　joint work.  The Court disagrees.  What the case law does suggest is that a

22　contributor's consent is required for the use or inclusion of his or her material as

23　part of a joint work, but not that, absent a contractual provision to the contrary, his

24　or her consent to publication of the joint work is required once that author has

25　already intended for the material to be part of a joint work.  In each of the cases

26　cited to by plaintiffs, the consent issue addressed was the author's consent for his

27　or her material to be used in a joint work, not consent to the joint  work's later

28　publication.

59

In <u>Szekely v. Eagle Lion Films, Inc.</u>, 242 F.2d 266 (2nd Cir. 1957), a license-holder approached Szekely to write the screen play based on a novel for which the license-holder had the motion picture rights. <u>Id</u>. at 267. The parties' contract contained a provision contemplating that there may be a need for collaboration on Szekely's screenplay, but conditioned such collaboration on Szekely's consent. <u>Id</u>. at 268. Furthermore, the parties' contract specifically provided that "all rights and title in the manuscript [were] to remain in Szekely until he received the agreed minimum compensation for his effort [of] $35,000." <u>Id</u>. at 267. The movie producer never paid Szekely the minimum compensation required under the contract, even after he "presented the final draft of his script," informing Szekely "that his screen play was not being used in the movie." <u>Id</u>. The movie producer's statement to Szekely was false. Instead, owing to financial constraints, the movie producer, without any notification to or obtaining of consent from Szekely, found another screenwriter to make revisions to Szekely's script, presumably for an amount less than that owed to Szekely under the contract. <u>Id</u>. After the movie was finished and released for distribution, Szekely sued, arguing that his rights to script were infringed. Defendants argued that Szekely "was merely a joint owner" with the other screenwriter, and that screenwriter's subsequent license of his rights to the script to the film producer entitled him to publish it without Szekely's consent. <u>Id</u>. at 268.

The Second Circuit disagreed. The court noted that the other screenwriter's "adaptation of [Szekely's] screen play . . . was not contemplated at the inception of the work, which was not planned as a joint work." In fact, Szekely specifically contracted with the movie producer that such collaboration (which could transform his screenplay into a joint work) could only happen "on [Szekely's] consent, which was not sought or obtained" before the other screenwriter was brought in to revise Szekely's screenplay. <u>Id</u>. The rule to be drawn from <u>Szekely</u> is simply that consent to inclusion of an author's separate material into a joint work is necessary; where

ER 3697

the author never intended for his material to be part of a joint work, he retains the rights to that material, particularly where, as in <u>Szekely</u>, there exists a contractual provision requiring the author's consent before adaption or other contribution to his material can occur. Those circumstances are not present here. When Siegel prepared his Superboy submissions, he clearly contemplated Shuster's contribution of artwork to his material. Moreover, there is absolutely no evidence presented by the parties or contained in the referee's findings demonstrating an understanding or arrangement between Siegel and Shuster that such prior consent was necessary before the other contributed his material to their comic strips.

Plaintiffs argue that to hold that Superboy was a joint work would be for the Court to sanction a publisher's theft of an author's work without fear of copyright infringement "so long as the author initially intended that his work be included in a joint or collective work." (Pls' Reply in Supp. Mot. Summ. J. at 17). Plaintiffs' argument collapses two different concepts, and ignores the consequences flowing from the fact that Siegel intended from the beginning for his Superboy submissions to be part of a joint work. Whether Detective Comics (or its successors in interest) should fear a suit for infringement of Siegel's material turns exclusively on the heretofore unlitigated question of whether Shuster's artwork was a work made for hire. Absent a finding that this was so, Detective Comics would remain liable for its publication of Superboy in <u>More Fun Comics</u>, no. 101 and subsequent thereto (assuming, of course, that the strip in <u>More Fun Comics</u> published the copyrightable material, if any, in Siegel's Superboy submissions). The absolution plaintiffs seek to give to Detective Comics from an infringement claim is thus premature. Similarly, the "theft" spoken of by plaintiffs is puzzling. Siegel intended all along to share the profits realized from his contribution to Superboy, the only difference being that he thought he would be sharing those profits with Shuster and now he (or rather his heirs) may have to share it with Detective Comics (or rather its successors). The only party who could possibly be seen as having something stolen would be

61

1  Shuster. Indeed, were the Court to hold that <u>Siegel</u> alone is entitled to the

2  copyright to and all the profits realized from Superboy because of Detective

3  Comic's "theft" from <u>Shuster</u>, the Court would be placing Siegel — the party whose

4  copyright rights were unaffected by the publisher's conduct — in a superior position

5  than that which even he envisioned to possess, all to the denigration of the

6  contribution (and the rights thereto) Shuster supplied to the joint work.

7      The one factor preventing the Court from finding that Siegel's Superboy

8  submissions were contributions to a joint work with Shuster's illustrations in the

9  Superboy comic is the unresolved issue (<u>see</u> <u>infra</u> III.D.) of whether there was in

10  fact any original copyrightable material in Siegel's Superboy submissions. The rule

11  in this circuit is that something is a joint work only if each contribution to that work,

12  standing alone, was independently copyrightable material. <u>See</u> <u>Ashton-Tate Corp.</u>

13  <u>v. Ross</u>, 916 F.2d 516, 521 (9th Cir. 1990) ("joint authorship requires each author to

14  make an independently copyrightable contribution"); <u>but see</u> <u>Gaiman v. McFarlane</u>,

15  360 F.3d 644, 658-59 (7th Cir. 2004) (refusing to apply above rule to situations

16  "where two or more people set out to create a character jointly in such mixed media

17  as comic books and motion pictures and [through their efforts] succeed in creating

18  a copyrightable character"); 1 Nimmer § 6.07[A][3][a], at 6-22 ("if authors A and B

19  work in collaboration, with A contributing sparkling plot ideas and B weaving them

20  into a completed screenplay, it cannot be doubted that both have made more than

21  a <u>de minimis</u> contribution to the resulting script. On that basis, both A and B should

22  be considered joint authors of the work even though, standing alone, plot ideas may

23  not be copyrightable"). At a minimum, there must be some copyrightable material

24  in Siegel's Superboy submissions, otherwise that material could not have formed a

25  predicate contribution to render Superboy a joint work. If, however, the Court were

26  to find that those submissions were completely derivative of Superman, then there

27  was no independently copyrightable material within those submissions and

28  Superboy is not a joint work.

62

## C.    Publication

"Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright [protection]." Stewart, 495 U.S. at 233; see also 17 U.S.C. § 10 ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title"). Publication was an important concept under the 1909 Act as the act of publication "constituted the dividing line between" common law copyright protected under state law and statutory copyright protected under federal law; publication of the work by itself divested an author of common law copyright protection, leaving the federal copyright statute as the only means to keep the work from becoming a part of the public domain. See Stewart, 495 U.S. at 233 ("Publication of a work without proper notice automatically sent a work into the public domain"). "The concept of publication was of immense importance under the 1909 Act. It became a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." 1 Nimmer § 4.01, at 4-3.

Although this line of demarcation was erased with the 1976 Act's pre-emption of common law copyright, see 17 U.S.C. § 301, the concept retains importance even under the 1976 Act. Specifically, section 304(c) only grants the right to terminate earlier grants to those "copyright[s] subsisting in either its first or renewal term on January 1, 1978." The only copyright subsisting in either its first or renewal term before the effective date of the 1976 Act were those protected under the 1909 Act, that is, those that had been published (as opposed to unpublished material protected by state common law) and registered. See 3 Nimmer § 11.02[A][1] at 11-12 ("the termination provisions of Section 304(c) apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act").

The 1909 Act, unlike the present governing statute, contained no definition for when a work was considered "published." Nonetheless, the definition for

63                                                                ER 3700

publication contained in section 101 to the 1976 Act is seen as generally codifying

the meaning of the concept as developed by the case law under the 1909 Act.  See

1 Nimmer § 4.04, at 4-20.1 (observing that the 1976 Act's definition for publication

"in general constitutes a codification of the definition evolved by case law prior to

adoption of the present Act").  The 1976 Act defined "publication" as "the

distribution of copies . . . of a work to the public by sale or other transfer of

ownership . . . ."  Thus, under the 1909 Act publication occurred "when by consent

of the copyright owner the original or tangible copies of a work are sold . . . or

otherwise made available to the general public."  1 Nimmer § 4.04 at 4-21.

Defendants contend that Siegel's Superboy submissions "were never

[separately] published or registered as unpublished works as of January 1, 1978."

(Defs' Opp. to Pls' Mot. Partial Summ. J. at 20).  Plaintiffs counter that the

copyrightable material contained in Siegel's Superboy submissions were later

"published" in the Superboy comic strip found in volume 101 of Detective Comic's

More Fun Comics, to which Detective Comics contemporaneously registered a

copyright.  The copyright to the magazine, it is contended, secured statutory

copyright protection to all its constituent parts, namely all the comic strips contained

in that volume of the magazine including Superboy.  See Self-Realization, 206 F.3d

at 1329 ("A blanket copyright on a periodical protects its constituent parts"); see

also Batjac Prods., Inc. v. Goodtimes Home Video Corp., 160 F.3d 1223, 1233-35

(9th Cir. 1998) (holding that, to the extent copyrightable material in an unpublished

work "is incorporated" in a published derivative work based thereon and actually

becomes a "component" thereof, it will be considered published by the later work).

Defendants do not dispute this legal point, but argue that none of the copyrightable

material contained in Siegel's Superboy submissions (assuming that there were any

contained therein) was printed in the Superboy comic strip published in volume 101

to More Fun Comics.  The point raised by defendants' argument stems from the

fact that the Superboy comic strip in More Fun Comics no. 101 does not track

64

1  verbatim the script, dialogue or storyline contained in Siegel's Superboy

2  submissions, in particular his 1940 proposed script. Given the discrepancy

3  between the two, the question becomes not so much whether Detective Comics'

4  issuance of More Fun Comics no. 101 constituted a publication, as it clearly did, but

5  whether any of the copyrightable material in Siegel's Superboy submissions was

6  published through the same.

7  　　　Plaintiffs argue that the question of publication was conclusively determined

8  by the referee's finding that Detective Comics' "comic strip release entitled

9  SUPERBOY published [in More Fun Comics no. 101] in December of 1944

10  embodied and was based upon the idea, plan and conception contained in" Siegel's

11  Superboy submissions. The problem for plaintiffs is that the referee's factual

12  finding does not go far enough. The referee's findings do not stand for the

13  proposition that everything (copyrightable or otherwise) contained in Siegel's

14  Superboy submissions was reprinted in More Fun Comics volume 101, but, instead,

15  only that the Superboy comic in More Fun Comics made concrete the "idea, plan

16  and conception" for a Superboy comic that was pitched and elaborated upon in

17  Siegel's submissions. This distinction is important as an "idea" as such is not

18  copyrightable, either under the 1909 Act or the 1976 Act. See National Comics

19  Publication, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) ("a

20  copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and

21  that no one infringes, unless he descends so far into what is concrete as to invade

22  that 'expression'"). Thus, the referee's finding leaves unanswered the critical point

23  for purposes of the question in this case: Whether any of the copyrightable

24  material in Siegel's Superboy submissions was in fact later published. Because the

25  question of whether and to what extent any copyrightable material was contained in

26  Siegel's Superboy submissions remains to be determined (see infra III.D.), the

27  Court is in no position at this time to make a final determination whether said

28  material, however characterized, was published in More Fun Comics no. 101.

## D.    Derivative Work

Section 7 to the 1909 Act discussed derivative works as being the "[c]ompilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter," and treated such additional material "as new works subject to copyright . . . ." 17 U.S.C. § 7 (repealed); see also Stewart, 495 U.S. at 231 (observing that section 7 to the 1909 Act signified "the types of works that may be derivative works"). Thus described, a derivative work is "any work based in whole, or in substantial part, upon a pre-existing work, if it satisfies the requirements of originality . . . and is not itself an infringing work, [and] will be separately copyrightable." 1 Nimmer § 3.01, at 3-3.  If an author contributes additional original material to a pre-existing work so as to recast, transform or adapt that work, then that additional material is subject to copyright protection, that is, it is a protectable derivative work.  See id. § 3.03, at 3-10; see also Asia Entertainment Inc. v. Nguyen, 40 U.S.P.Q.2d 1183, 1185 (C.D. Cal. 1996).  The resulting work need not be a qualitative improvement over the prior work; rather, what is necessary is that "the additional material injected in a prior work, or the manner of rearranging or otherwise transforming a prior work, must constitute more than a minimal contribution." Id. at 3-11; see also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991); Grove Press, Inc. v. Collectors Publication, Inc., 264 F.Supp. 603 (C.D. Cal. 1967).  "[T]he applicable standard in determining the necessary quantum of originality is that of a 'distinguishable variation' that is more than 'merely trivial.'  Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient." 1 Nimmer, at 3-12 to 3-13.

Defendants contend that Siegel's Superboy submissions are almost completely derivative of Superman, contain no original copyrightable element within

66

1   them, and, therefore, are not a protectable derivative work. (Defs' Opp. to Pls' Mot.

2   Partial Summ. J. at 24 ("derivative works based upon and incorporating pre-existing

3   Superman elements and ideas that were previously published")). To defendants,

4   "the submissions are based upon and, indeed dominated by, pre-existing,

5   published Superman elements . . . previously published by Detective at the time the

6   works were submitted by Siegel." (Defs' Mot. Summ. J. at 12). When these pre-

7   existing elements are removed from Siegel's submissions, all that is left, according

8   to defendants, is the unelaborated concept of Superman as a youth, or as plaintiffs

9   deride it, "'Superboy' is merely 'Superman' in smaller tights." (Pls' Reply in Supp.

10  Mot. Partial Summ. J. at 1). Viewing this singular additional material to be merely

11  trivial and insufficiently distinguishable, defendants argue that there is no

12  copyrightable material within Siegel's Superboy submissions.

13        Plaintiffs again respond by pointing to the referee's findings as conclusively

14  establishing that Superboy is not a completely derivative work. In particular,

15  plaintiffs note the referee's observation in his November, 1947, opinion: "I cannot

16  accept defendants view that Superboy was in reality Superman . . . . Superboy was

17  a separate and distinct entity"; this finding, plaintiffs argue, is fundamentally

18  inconsistent with a finding that Siegel's Superboy submissions is completely a

19  derivative work. (Pls' Reply in Supp. Mot. Partial Summ. J. at 18). Plaintiffs

20  characterize the referee's statement as a conclusion that Siegel's Superboy

21  submissions were "sufficiently new and original to constitute a distinct work from

22  Superman." (Id. at 19). Bolstering their view is the referee's separate finding that

23  Superman "did not contain the plan, scheme, idea or conception of the comic strip

24  Superboy."

25        The problem with this argument is two-fold. First, such a pure finding

26  relating to copyright law — that Superboy is not a "derivative work" under the 1909

27  Act — would, for the reasons set forth above, be well beyond the referee's

28  jurisdiction to make. There was no state law claim requiring consideration of

ER 3704

1    whether there was any original elements contained in Siegel's Superboy

2    submissions. More importantly, the Court finds nothing in the referee's findings and

3    conclusions relied upon by plaintiffs that would preclude litigation in this proceeding

4    concerning the derivative nature, if any, of Siegel's Superboy submissions pursuant

5    to federal copyright law.

6    Although at first glance the referee's findings may appear to speak directly

7    and conclusively to the issue of whether Superboy is a derivative work, upon further

8    assessment that is not necessarily the case. One must remember the context in

9    which the referee's statement was made: The question for the referee to resolve

10   was whether Superboy was part and parcel of Superman for purposes of whether

11   the first refusal rights contained in the parties' September, 1938, agreement were

12   implicated. The question resolved by the referee was a matter of contract

13   interpretation — what did the parties mean when they used the phrase "Superman"

14   in their contract — not whether Superboy contained any original elements worthy

15   of copyright protection. That Siegel's Superboy was distinct from Superman (even

16   assuming that the referee was speaking beyond the confines of the narrow contract

17   claim in dispute before him and making a larger observation of the two characters'

18   separateness) does not inform this Court's decision as to whether that which made

19   Siegel's Superboy distinct is also original (or more particularly, more than a merely

20   trivial variation from Superman) as that term is understood in federal copyright law

21   so as to render Siegel's creation subject to copyright protection. In addition, even

22   more problematic is the fact that the referee nowhere identifies in what way or

23   manner Siegel's Superboy is distinct from Superman, such differentiation forming

24   the subject of any copyrightable material in this case.

25   By way of further argument, plaintiffs seek to describe, in the most general of

26   ways, the additional material supplied by Siegel:

27           Siegel's "Superboy" focuses on the character, family and
             social life of a youth growing up in a small rural town
28           who faces the challenges of adolescence while
             repressing who he really is. Siegel's story is primarily

68

> devoted to the close relationship between "Superboy"
> and his earnest adoptive parents, and follows
> "Superboy's" small town adventures with his school
> classmates and townsfolk. . . . "Superboy" [is] a
> sufficiently original and distinct character and story from
> "Superman" to warrant independent copyright protection.

(Pls' Reply in Supp. Mot. Partial Summ. J. at 19, 20).

From this description it appears to the Court that, in addition to any argument that Superboy himself (or perhaps Ma and Pa Kent) was a separate copyrightable character, plaintiffs also argue that certain plot lines contained in Siegel's script were sufficiently distinct as to warrant separate copyright protection. (Pls' Opp. to Defs' Mot. Summ. J. at 12 ("The new elements in 'Superboy' authored by Siegel, including the themes, characters, relationships, mood, settings, locale and the interplay of such elements, are squarely protected by the Copyright Act")).

The Court is mindful that plaintiffs have never claimed that Siegel's Superboy is not derivative of Superman. Instead, they argue that his submissions contained original additional material that is itself entitled to copyright protection. (Pl's Opp. to Defs' Mot. Summ. J. at 11-12 ("Plaintiffs have never claimed that 'Superboy' is 'unrelated' to 'Superman' or that 'the Superboy character has nothing to do with the Superman character")). The problem the Court has with the parties' briefing on this issue is that, aside from seeking to delineate the "additional" material supplied by Siegel in his submissions, neither side has attempted to demonstrate how that material (whatever it may be, either by itself or when viewed as a whole) was more than a trivial variation from the pre-existing material in Superman, other comic book characters in general, or even more broadly with other fictional characters.

The Court, for example, has been presented with no evidence addressing whether other adolescent superhero comic book characters existed before Siegel conceived of Superboy in his submissions. Defendants make mention of a couple of panels in earlier Superman comic books where Superman was shown as an

ER 3706

infant, but nowhere have they pointed to comic strips where the storyline delineating this aspect of the Superman character had been so fleshed out as to comprise part of the pre-existing work.

Case law under the 1909 Act speaks to the issue of originality in the context of fictional characters in general and Superman in particular. The controlling principle was stated by Judge Learned Hand long ago when he added that fictional characters may be protected by copyright "quite independently of the 'plot' proper," but added such characters must be sufficiently developed beyond "stock characters" to obtain protection:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected . . . . If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for making them too indistinctly.

Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2nd Cir. 1930).

By the same token, the less developed a character in a prior work, the more room for the addition of material that will comprise more than a trivial variation from that character and, hence, be subject to copyright protection. Thus, the relevant question is how much, and to what extent, had the Superman character been fleshed out by the time Siegel submitted his Superboy material to Detective Comics. A decision by the Second Circuit concerning the Superman copyright contemporaneous with Siegel's submissions, Detective Comics, Inc. v. Bruns Publications, Inc., 111 F.2d 432 (2nd Cir. 1940), sheds some light on the matter.

70

ER 3707

There the court described the protectable elements of the Superman character as:

> "a man of miraculous strength and speed . . . [who] at times conceals his strength beneath ordinary clothing but after removing his cloak stands revealed in full panoply in a skin-tight acrobatic costume. . . . [He] is termed the champion of the oppressed. [He] is shown running toward a full moon 'off into the night,' and . . . is shown crushing a gun in his powerful hands. 'Superman' is pictured as stopping a bullet with his person. . . . 'Superman' is shown as leaping over a twenty story building . . . [and is] endowed with sufficient strength to rip open a steel door. [He] is described as being the strongest man in the world and . . . as battling against 'evil and injustice.'

111 F.2d at 433; see also National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (Learned Hand, J.) (describing earlier decision in Bruns Publishing as "limit[ing] the copyright to the specific exploits of 'Superman,' as each picture portrayed them"). It is thus the character's traits and attributes, as well as the character's interaction with other characters (notably compatriots and villains), that help define the boundaries of the copyright to a character. As Nimmer has observed in his treatise, "a visual similarity (although not completely identical in appearance) plus a similarity in character traits, may prove sufficient to constitute an infringement, even where the names of the plaintiff's and defendant's characters differ." 1 Nimmer § 2.12, at 2-178.29 to 2-178.30; see also Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 241 (2nd Cir. 1983); Sapon v. DC Comics, 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002) (examining whether author's additional material was sufficiently original as to be considered a protectable derivative work of Batman).

Given the factually intensive nature of the question, and the lack of elaboration in the parties' briefs on the topic, the Court finds that the better course at this point is to allow the parties an opportunity to more fully explore and provide their positions as to the derivative nature, if any, of Siegel's Superboy submissions, bearing in mind the legal principles set forth in Nichols as expounded in Bruns Publications, Warner Bros, and Sapon.

71

1       Accordingly, the Court finds that Siegel's Superboy submissions were not a

2   work made for hire.  However, for the reasons set forth above, the Court finds that it

3   cannot, at this stage, make a determination whether Siegel's Superboy

4   submissions were completely derivative of Superman or, if not, to what extent those

5   submissions contained additional, original copyrightable material.  Without resolving

6   this point, the Court cannot make a corresponding finding whether Siegel's

7   Superboy submissions were published in volume 101 of <u>More Fun Comics</u> or

8   whether those submissions were contributions to a joint work with Shuster.  Given

9   the critical nature of the derivative work issue to this case, the Court hereby

10  **ORDERS** that the parties submit simultaneous competing briefs within thirty (30)

11  days from the date of this Order concerning that issue, and that issue alone.

12  ### IV.  CONCLUSION

13      As set forth herein, the Court **GRANTS** defendants' motion for

14  reconsideration.  Consistent with this holding, the Court **VACATES** the following

15  portions of the March 23, 2006, Order:  Page 4, line 23 through page 12, line 5;

16  page 14, line 2 through page 14, line 20; and page 15, line 1 through page 15, line

17  6.  The portion of the March 23, 2006, Order denying defendants' motion for

18  summary judgment on the question of infringement remains in effect.  The Court

19  also **VACATES** the portions of the plaintiffs' statement of facts, entered on March

20  27, 2006, that are inconsistent with this Order.

21      The Court finds that the referee's findings from the 1947 Westchester

22  County action must be given preclusive effect pursuant to the doctrine of collateral

23  estoppel.  Based on the referee's findings, the Court has determined that Siegel's

24  Superboy submissions were not a work made for hire, but the Court is unable to

25  conclude whether the requisite "publication" of the Superboy submissions occurred

26  due to the unresolved matter regarding the submissions' derivative nature.

27  Similarly, the Court was unable to conclude whether the Superboy submissions

28  were part of a joint work, but only because the issue of whether the submissions

ER 3709

1  are a derivative work remains unresolved (and a subject of further court-ordered

2  briefing).

3        IT IS SO ORDERED.

4

5  DATE:  _7/27/07_____

6                                              _S.G.Larson_____

7                                              STEPHEN G. LARSON
                                               UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73

FILED
CLERK U.S. DISTRICT COURT

MAR 23 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 24 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | | |
|---|---|---|
| JOANNE SIEGEL & LAURA SIEGEL LARSON, | ) ) ) | CV 04-8776 RSWL (RZx) |
| Plaintiffs | ) ) ) | **ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT & DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| TIME WARNER, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

DOCKETED ON CM

MAR 24 2006

BY                              003

Plaintiffs Joanne Siegel and Laura Siegel Larson's
Motion for Partial Summary Judgment and Defendant Time

1

ER 3711

1  Warner, Inc.'s Motion for Summary Judgment came on regularly

2  for hearing on March 20, 2006. This Court has considered

3  all of the papers and argument submitted on the matter and

4  **NOW FINDS AND RULES AS FOLLOWS:**

5

6  As a preliminary matter, this Court **GRANTS** Plaintiffs'

7  and Defendants' requests for Judicial Notice pursuant to

8  Fed. R. Evid. 201.

9

10  This copyright dispute arises out of facts stemming

11  back to 1938 and earlier, and including two previous cases

12  in 1947 and 1973. Plaintiffs in this case are Joanne

13  Siegel, widow of Jerome Siegel,[1] and their daughter, Laura

14  Siegel Larson. Jerome Siegel and Joseph Shuster are the

15  creators of Superman. Jerome Siegel is the originator,

16  creator of Superboy with Joseph Shuster providing much of

17  the illustration. Defendants in this case are Time Warner

18  Inc., the parent company of DC Comics ("Defendants"). DC

19  Comics predecessor in interest was National Comics

20  Publications, Inc. ("National") and its predecessor in

21  interest was Detective Comics ("Detective").

22

23  In 1947, Jerome Siegel and Joseph Shuster sued National

24  in the New York Supreme Court for the County of Westchester

25  _____

26  [1] Jerome Siegel passed away on January 28, 1996.

2

1 ("the state court action") seeking a determination that
2 their March 1, 1938 contract was void. Additionally, the
3 state court action sought to determine who owned the rights
4 to Superman and to Superboy.

5

6     On November 1, 1947 Judge Addison Young, the official
7 referee in the state court action, rendered a detailed
8 interlocutory judgment. Then on April 12, 1948, Judge Young
9 signed a detailed findings of fact and conclusions of law.
10 He found that Jerome Siegel was the originator and sole
11 owner of the comic strip feature Superboy with the sole and
12 exclusive right to create, sell, and distribute the comic
13 strip under the title Superboy.

14

15     On May 19, 1948 the parties entered into a stipulation
16 to settle and on May 21, 1948, the Court entered a consent
17 judgment, vacating in all respects the interlocutory
18 judgment. The stipulation provided for a payment of
19 approximately $94,000.00 by National in exchange for
20 ownership in both Superman and Superboy.

21

22     In 1973, Siegel and Shuster again sued National in the
23 Southern District of New York seeking declaratory relief
24 that they were entitled to the copyright renewal rights of
25 Superman. National counterclaimed for a finding of
26 declaratory relief in its favor. District Judge Lasker

3

granted National's Motion for Summary Judgement dismissing the complaint and finding "National to be the owner of the copyright of all Superman strips during the renewal term." <u>Siegel & Shuster v. National Periodical Publications, Inc.</u>, 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973).

Judge Lasker noted that the findings of the State Supreme Court of Westchester were binding on the district court. <u>Id.</u> (citing to <u>Vernitron Corp. v Benjamin</u>, 440 F.2d 105, 108 (2d Cir. 1971)). Judge Lasker made a clear distinction between (1) the findings of fact of the state court and (2) the stipulated settlement and resulting consent judgment. <u>Siegel & Shuster</u>, 508 F.2d at 913.

Siegel and Shuster appealed and the Second Circuit affirmed finding that the district court "properly decided that the state court judgment of May 21, 1948 effectively estopped the plaintiffs from relitigating the issue of ownership of the renewal copyright." <u>Siegel & Shuster v. National Periodical Publications, Inc. et al.</u>, 509 F.2d 909, 912-13 (2d Cir. 1974).

In November 2002, Jerome Siegel's widow and daughter served notices of termination for the Superboy copyrights pursuant to Section 304(c). Today, Plaintiffs seek a determination that they effectively terminated Defendants'

4

1  renewal rights in Superboy pursuant to 17 U.S.C. § 304(c) on
2  November 17, 2004.

3

4      17 U.S.C. § 304(c) provides for termination of
5  transfers and licenses covering the extended renewal term.
6  Under the 1901 Copyright Act, protection was divided into
7  two separate consecutive terms of twenty-eight years: the
8  "initial term" and the "renewal term."  But as most
9  authors/creators were required to contract away both the
10  initial and renewal periods at the same time, they were
11  effectively denied the protection Congress sought to
12  provide.

13

14      As a result, on January 1, 1978, the 1976 Copyright Act
15  took effect significantly enhancing the rights of authors
16  and their heirs.  19 U.S.C. § 101, et seq.  The 1976 Act
17  extended the renewal term from 28 to 47 years, for works in
18  their renewal term when the 1976 Act took effect. Along with
19  adding 19 years to the renewal term period, the 1976 Act
20  coupled the extension with a _new_ right of authors and their
21  heirs to recapture the renewal of the copyright in works by
22  terminating any prior grant of the work executed before
23  January 1, 1978.  17 U.S.C. § 304(c).  It is under this
24  provision that Plaintiffs have sought to recapture Jerome
25  Siegel's ownership in the Superboy copyrights.

26

5

1    Fundamental to the arguments presented by both
2  Plaintiffs and Defendants is the effect of the interlocutory
3  judgment issued by Judge Young on November 21, 1947 and the
4  detailed findings of fact and conclusions of law he issued
5  on April 21, 1948.

6

7    Currently, Defendants attempt to relitigate issues
8  determined in the 1947 state court case.  Defendants argue
9  vigorously that only the consent judgment has any preclusive
10 effect and that Judge Young's findings of fact have no
11 effect whatsoever on this litigation.  Defendants take this
12 position because their desired outcome is consistently in
13 direct conflict with the findings issued by Judge Young.
14 Specifically, Judge Young's findings contradict Defendants'
15 assertions regarding(1) the ownership of Superboy; (2)
16 whether Superboy is simply a derivative work of Superman;
17 and (3) whether Superboy was a "work for hire" solely owned
18 by Defendants' predecessors in interest, National and
19 Detective.

20

21    Defendants' current argument that Judge Young's
22 findings are not binding contradicts the position taken by
23 their predecessors in interest in the 1973 litigation and
24 the 1974 Second Circuit appeal regarding Superman. In
25 applying the doctrine of res judicata in favor of
26 Defendants, Judge Lasker precluded, and the Second Circuit

6

1 │ affirmed, Plaintiffs from litigating the issue of ownership

2 │ of the renewal period of the Superman copyrights.

3 │

4 │     Having relied on Judge Young's findings for previous

5 │ favorable determinations regarding Superman, Defendants now

6 │ take the inconsistent position that this Court is not bound

7 │ by the state court findings, as they relate to Superboy.

8 │ Defendants attempt to raise genuine issues of material fact,

9 │ where the facts were clearly determined by Judge Young after

10 │ the opportunity to take evidence and hear testimony on that

11 │ evidence from the parties directly involved in creating this

12 │ relationship.

13 │

14 │     Contrary to Defendants' assertions now, both the

15 │ Southern District of New York and the Second Circuit looked

16 │ directly to, even citing to, Judge Young's findings of fact.

17 │ This Court holds that it is consistent to continue this

18 │ position and will look to Judge Young's findings as binding

19 │ where relevant.  Here, while the consent judgment vacated

20 │ the interlocutory judgment in its entirety, this Court in

21 │ keeping a consistent position with the previous litigation

22 │ holds that Judge Young's findings of fact have preclusive

23 │ res judicata and collateral estoppel effect on this Court.

24 │

25 │     This Court now finds that Plaintiffs have availed

26 │ themselves of their legal right to recapture the Superboy

7

copyrights pursuant to 17 U.S.C. § 304(c) and 37 C.F.R. 210.10. As such, this Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment.

Defendants argued that Plaintiffs' Superboy notices of termination are ineffective, because the 1976 Act specifies that only grants relating to "any copyright subsisting in either its first or renewal term on January 1, 1978" are subject to Section 304(c).

However, Plaintiffs presented uncontroverted evidence supporting that the Superboy copyright was in fact subsisting in its renewal term as of the 1976 Act's effective date. Specifically, Plaintiffs pointed to the fact that the copyright in the serialized magazine, *More Fun Comics*, No. 101 was secured on November 23, 1944 with registration number B653651 and then renewed on July 17, 1972, twenty-eight years later, by National under renewal registration number R532582. In the 1947 state court action, Judge Young specifically determined that Detective Comics published the Superboy comic strip based upon the idea, plan, and conception of Siegel, in a magazine entitled *More Fun Comics*.

Alternatively, Defendants argued that, even if the copyrights were subsisting in their renewal period as of

8

ER 3718

1  January 1, 1978, Plaintiffs' notices of termination are
2  ineffective as the submissions are not eligible for
3  termination as "works made for hire."  The Ninth Circuit has
4  summarized the work for hire doctrine as follows:

5         When one person engages another, whether as
6         employee or as an independent contractor, to
7         produce a work of an artistic nature, . . . in the
8         absence of an express contractual reservation of
9         the copyright in the artist, the presumption arises
10        that the mutual intent of the parties is that the
11        title to the copyright shall be in the person at
12        whose instance and expense the work is done.
13  Self-Realization Fellowship Church v. Ananda Church of Self-
14  Realization, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting
15  Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300
16  (9th Cir. 1965)).

17

18     Defendants' argument that Superboy was a work for hire
19  fails, as this conclusion directly conflicts with Judge
20  Young's findings in the state court action. Specifically,
21  Judge Young found that

22

23  (1) Under Siegel and Shuster's September 12, 1938 agreement
24      with Detective Comics, they were to provide Detective
25      with the right of first refusal and a six week

26

9

ER 3719

1    consideration period.[2]

2

3   (2)  On November 30, 1938, Siegel submitted in a writing

4        mailed to Detective for its consideration a synopsis,

5        summary of idea, conception, plan for a new comic known

6        as Superboy pursuant to the September 12, 1938

7        agreement.[3]

8

9   (3)  Detective declined to indicate its election to publish

10       Superboy within the six weeks and on December 2, 1938

11       Detective by letter to Siegel elected not to publish

12       Superboy.[4]

13

14       While not mentioning the term "work for hire," Judge

15  Young's findings naturally implicate the question.  Here a

16  presumption of "work for hire" cannot be found in

17  Defendants' favor, since not only did Judge Taylor find that

18  Defendants elected not to publish Superboy, but he also

19

20  _____

21       [2] Judge Young found that Siegel independently created his
    original Superboy Synopsis and Superboy Story under the terms of the
    September 12, 1938 agreement between Siegel and his publisher, which
22  permitted him to create new comic strip concepts and stories outside
    the five Siegel and Shuster were currently producing for Detective.
23  The agreement only allowed Detective a right of first refusal to
    accept/reject within six weeks of a new submission. [Decl. Toberoff
24  Exh. B, Pg. 32 FOF 156-159, 160-162].

25       [3] [Decl. Toberoff Exh. B, Pg. 32 FOF #155, 156].

26       [4] [Decl. Toberoff Exh. B, Pg. 32 FOF #158, 159].

10

ER 3720

1 found that Plaintiff Siegel and, not National, was the sole
2 owner of the Superboy property. This finding will not
3 support a contrary conclusion that the "mutual intent of the
4 parties" was to have ownership of Superboy always be in
5 Detective or National, and therefore, the Defendants in this
6 action.

7

8 Alternatively, Defendants argued that Siegel created
9 Superboy as a derivative work based upon a pre-existing
10 original work whose copyright was owned by the hiring party,
11 and is therefore "produced at the instance and subject to
12 the right and control of the employing party." See Playboy
13 Enters. Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995).

14

15 Here again, Defendants' argument that Superboy is
16 simply a "derivative work" of Superman is unpersuasive. The
17 1947 state court action specifically addressed the ownership
18 rights to Superman and Superboy separately. Defendants'
19 attempt to recast Superboy as a "derivative work" or "work
20 for hire," stands is stark contrast to Judge Young's
21 conclusion that Detective/National was "perpetually enjoined
22 and restrained from creating, publishing, selling, or
23 distributing" Superboy, based on the fact that Siegel was
24 the sole and exclusive owner.[5] Defendants' argument also

25 ────────────

26    [5] [Decl. Toberoff Exh. B, Pg. 5-6 COL # 25].

11

ER 3721

1    contradicts the fact that Siegel subsequently transferred

2    his exclusive interest in Superboy to National in the May

3    19, 1948 stipulated settlement.  Had Superboy been nothing

4    more than a derivative work, Siegel would have owned no

5    interest in the Superboy property to transfer.

6

7        Having determined that Section 304(c) applies to this

8    dispute, this Court also finds that Plaintiffs have

9    established that no genuine issue of material fact exists

10   regarding the effectiveness of their termination of the

11   Superboy copyrights.

12

13       Pursuant to 17 U.S.C. 304(c) and 37 C.F.R. §

14   201.10(b)(1)(iv), Plaintiffs' termination notices list the

15   following pre-1978 grants of Superboy: (1) the May 19, 1948

16   Agreement (stipulated settlement); and (2) the December 23,

17   1975 Agreement (where relevant, though this agreement does

18   not mention Superboy).  No post-1978 grants of rights

19   regarding Superboy exist.

20

21       Defendants argued that Plaintiffs failed to comply with

22   the termination regulations, because the termination notices

23   only list the May 19, 1948 stipulated settlement, but did

24   not list the May 21, 1948 "Final Consent Agreement."

25

26       This Court finds that no genuine issue exists that the

12

1  operative grant of "Superboy" by Jerome Siegel was the May
2  19, 1948 stipulated settlement and that the consent judgment
3  merely followed the parties' stipulation and was entered by
4  the Court two days later.  Additionally, Regulation
5  201.10(b)(1)(iv) merely requires a "brief statement
6  reasonably identifying the grant to which the notice of
7  termination applies."  In fact, Regulation 201.10(e)
8  provides that

10         harmless errors in a notice that do not materially
11         affect the adequacy of the information required to
12         serve the purposes of . . .section 304(c) . . .
13         shall not render the notice invalid.

15      Here, by listing the May 19, 1948 stipulated
16  settlement, the termination notices provide a brief
17  statement reasonably identifying the grant in question.
18  Even, if including the May 21, 1948 consent judgment would
19  have provided additional notice, its absence in no way
20  materially affected the adequacy of Plaintiffs' notice.

22      As Jerome Siegel's widow, Joanne Siegel owns 50% of her
23  husband's termination interest. 17 U.S.C. § 304(c)(2)(A).
24  As one of his two surviving children, Laura Siegel Larson
25  owns 25% of Siegel's termination interest.  17 U.S.C. §
26  304(c)(2)(A).  Together Plaintiffs own more than one-half of

ER 3723

1  Siegel's termination interest required to effectively
2  terminate Siegel's grant pursuant to 17 U.S.C. §304(c)(1).
3

4      Defendants argued that Plaintiffs' Superboy termination
5  notices were ineffective, because Joseph Shuster has a co-
6  ownership/joint works interest in Superboy not asserted in
7  the termination notices.   Defendants argued that since
8  Shuster has a one-half interest in Superboy, Plaintiffs only
9  have Siegel's one-half interest, not the "more than one-
10 half" needed to terminate pursuant to Section 304(c).  They
11 point to the fact that More Fun (Superboy's comic) was
12 published with the byline "Jerry Siegel and Joe Shuster."
13

14      But, while Shuster was the illustrator attached to
15 Superboy, the 1947 state court action determined that Siegel
16 was the sole originator and owner of Superboy and Siegel
17 alone possessed exclusive ownership rights.   Ownership
18 rights, which he and not Shuster, subsequently transferred
19 in the stipulated settlement.   No facts support a contrary
20 finding.
21

22      Finally, this Court finds that Plaintiffs timely and
23 properly recorded with the Copyright Office and served on
24 Defendants the notices of termination for the Superboy
25 copyrights as required by 17 U.S.C. § 304(c) and 37 C.F.R. §
26 201.10.

                              14

1    Therefore, this Court finds that Plaintiffs effectively

2  terminated Jerome Siegel's grants of the Superboy

3  copyrights, recapturing them on November 17, 2004.

4  To the extent that Defendants' Motion for Summary Judgment

5  makes a contrary request, this Court **DENIES** Defendants'

6  motion.

7

8    Also, as to Defendants, this Court **DENIES** Defendants'

9  request for a finding that the WB television show,

10  *Smallville*, does not infringe on Plaintiffs' recaptured

11  copyrights.  Defendants' argument reaches a quick and broad

12  conclusion that Plaintiffs' copyrights in Superboy protect

13  virtually nothing more than the idea of a "youth with super

14  powers."

15

16    In order to establish copyright infringement,

17  Plaintiffs must first establish ownership and then must show

18  the two following factors: (1) the defendant had access to

19  the copyrighted material; and (2) the defendant's material

20  is substantially similar to the copyrighted material.  Three

21  Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir.

22  2000).

23

24    Here, no genuine issue of material fact exists as to

25  Plaintiffs' ownership in the Superboy copyrights, nor is

26  there an issue that Defendants' had access to the Superboy

15

**ER 3725**

1  property.  But, because substantial similarity is

2  customarily an extremely close question of fact, summary

3  judgment has traditionally been frowned upon in copyright

4  litigation.  Hoehling v. Univ. City Studios, Inc., 618 F.2d

5  972, 977 (2d. Cir. 1980).

6

7      Here, the specific question as to whether the

8  television show Smallville infringes on Plaintiffs' Superboy

9  copyrights requires a detailed factual comparison of each

10  property's content characteristics, much of which are

11  disputed in Plaintiffs' and Defendants' papers. Plaintiffs

12  immediately start drawing comparisons between the storylines

13  of Smallville and the Superboy comic strip, including the

14  cast of characters' names, personas, roles in the storyline,

15  their independent storylines, the location, etc. Enough

16  facts are presented, where this Court, contrary to

17  Defendants' request, could find that the main character in

18  Smallville is in fact Superboy.[6]

19

20      Therefore, this Court in construing the submitted

21  evidence in the light most favorable to the non-moving

22  party, Plaintiffs, genuine issues of material fact exist as

23  to whether Defendants' television show Smallville is

24  infringing Plaintiffs' copyrights.

25  _____

26  [6] In the Superboy comic strip a billboard on the side of a rural country road announces, "Welcome to Smallville! Home of Superboy."

16

ER 3726

1     Therefore, Defendants' Motion for Summary Judgment is

2 **DENIED**.

3

4     This Court adopts Plaintiff's Findings of Fact and

5 Conclusions of Law with modifications.

6

7

8 **IT IS SO ORDERED.**

9                                   **RONALD S.W. LEW**

                                      ——————————————————

10                                    **RONALD S.W. LEW**

                           United States District Judge

11

12 DATED: March 23, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on February 21, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  February 21, 2014                    /s/ Marc Toberoff
                                                    Marc Toberoff