APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZX), CV-04-8776 (RZX)

———————————

**APPELLANT LAURA SIEGEL LARSON'S EXCERPTS OF RECORD
VOL. 6 OF 16**

———————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
Keith G. Adams
 *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant,Laura Siegel
Larson, individually and as personal
representative of the Estate of Joanne Siegel*

# INDEX TO EXCERPTS OF RECORD (Volume 6)

*Larson v. Warner Bros. Entertainment Inc. et al.,*
CD Cal Case No. 04-CV-08400

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 711-2 | 3/8/13 | *Exhibit C:  Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D:  Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E:  Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1, 2006.* | 6 | 1179 |
| 711-2 | 3/8/13 | *Exhibit F:  Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: | 6 | 1224 |

| | | | | |
|---|---|---|---|---|
| | | Defendants' Motion for Summary Judgment | | |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1:  October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2:  October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4:  May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5:  May 22, 2002 letter from Parsons to Joanne Siegel* | 6 | 1331 |
| 709-2 | 3/4/13 | *Exhibit 6:  September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8:  Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9:  Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |

| 709-2 | 3/4/13 | *Exhibit 10: Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
|-------|--------|---------------------------------------------------------------------|---|------|
| 709-2 | 3/4/13 | *Exhibit 11: Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12: Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13: Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |

# INDEX TO EXCERPTS OF RECORD (all volumes)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 735 | 6/18/13 | 59(e) Amended Judgment | 1 | 1 |
| 734 | 6/18/13 | 59(e) Order | 1 | 6 |
| 724 | 4/18/13 | "Final Judgment" In Superman | 1 | 8 |
| 723 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 1 | 12 |
| 717 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 1 | 23 |
| 714 | 3/12/13 | Order Granting Plaintiff Leave to File A Sur-Reply | 2 | 39 |
| 740 | 7/17/13 | Defendants Notice Of Cross-Appeal | 2 | 41 |
| 738 | 7/16/13 | Plaintiff's Notice of Appeal | 2 | 43 |
| 595 | 10/30/09 | Order on Motion for Reconsideration | 2 | 45 |
| 560 | 8/12/09 | Order on Additional Issues | 2 | 87 |
| 293 | 3/26/08 | Order on the Parties' Cross-Motions for Summary Judgment | 2 | 186 |
| 9th Cir. Case 11-55863, | 1/10/13 | Memorandum Disposition [Of Prior Appeal] | 2 | 272 |

| 70-1 | | | | |
|---|---|---|---|---|
| 674 | 6/15/11 | Defendant's Prior Notice of Cross-Appeal | 2 | 278 |
| 671 | 5/27/11 | Plaintiff's Prior Notice of Appeal | 2 | 280 |
| 669 | 5/17/11 | Judgment | 2 | 282 |
| 667 | 5/17/11 | Order Granting Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) | 2 | 285 |
| 664 | 5/5/11 | Order Vacating March 15, 2011 Judgment and Striking Superfluous Allegations from Counterclaim | 2 | 287 |
| 659 | 3/15/11 | Order Granting rule 54(b) Motion | 2 | 288 |
| 656 | 3/3/11 | Answer to Second Amended Counterclaims | 2 | 292 |
| 646 | 2/17/11 | Second Amended Counterclaims | 3 | 323 |
| 645 | 2/17/11 | Answer to Third Amended Complaint | 3 | 361 |
| 644 | 2/3/11 | Third Amended Complaint | 3 | 374 |
| 733 | 6/17/13 | Plaintiff's 59(e) Reply | 3 | 399 |
| 732 | 6/5/13 | Defendants' 59(e) Opposition | 3 | 416 |
| 731 | 5/16/13 | Plaintiff's 59(e) Motion | 3 | 437 |
| 731-1 | 5/16/13 | Plaintiff's Proposed 59(e) Order | 3 | 468 |
| 731-2 | 5/16/13 | Plaintiff's Proposed 59(e) Judgment | 3 | 470 |
| 730 | 5/16/13 | Declaration of Patrick T. Perkins In | 3 | 475 |

| | | | | |
|---|---|---|---|---|
| | | Support of Defendants' Reply In Support Of Application to Tax Costs | | |
| 730 | 5/16/13 | *Exhibit 1: Invoice For Steranko Deposition* | 3 | 479 |
| 730 | 5/16/13 | *Exhibit 2: Invoice For Evanier Deposition* | 3 | 481 |
| 730 | 5/16/13 | *Exhibit 3: Invoice for Lewellen Deposition* | 3 | 483 |
| 730 | 5/16/13 | *Exhibit 4: Invoice for Larson Deposition* | 3 | 485 |
| 729 | 5/14/13 | Defendants' Reply In Support of Application to Tax Costs | 3 | 487 |
| 729-1 | 5/14/13 | Declaration of Brian Pearl In Support of Defendants' Reply in support of Application to Tax Costs | 3 | 498 |
| 729-1 | 5/14/13 | *Exhibit A: Transcript Cover Sheet for Peary Deposition* | 3 | 501 |
| 729-1 | 5/14/13 | *Exhibit B: Transcript Cover Sheet for Peavy Deposition* | 3 | 504 |
| 729-1 | 5/14/13 | *Exhibit C: Transcript Cover Sheet for Feiffer Deposition* | 3 | 507 |
| 729-1 | 5/14/13 | *Exhibit D: Transcript Cover Sheet for Steranko Deposition* | 3 | 511 |
| 729-1 | 5/14/13 | *Exhibit E: Transcript Cover Sheet for Evanier Deposition* | 3 | 514 |
| 729-1 | 5/14/13 | *Exhibit F: Transcript Cover Sheet* | 3 | 518 |

| | | *for Lewellen Deposition* | | |
|---|---|---|---|---|
| 729-1 | 5/14/13 | *Exhibit G: Transcript Cover Sheet for Larson Deposition* | 3 | 522 |
| 729-1 | 5/14/13 | *Exhibit H: Transcript Cover Sheet for Halloran Deposition* | 3 | 526 |
| 722 | 4/4/13 | Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 530 |
| 722-1 | 4/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 3 | 549 |
| 722-1 | 4/4/13 | *Exhibit 1: Excerpts from April 12, 1947 Findings of Fact and Conclusions of Law* | 3 | 553 |
| 722-1 | 4/4/13 | *Exhibit 2: October 19, 2001 letter from Kevin Marks to John Schulman* | 3 | 560 |
| 722-1 | 4/4/13 | *Exhibit 3: October 26, 2001 letter from Schulman to Marks* | 3 | 566 |
| 722-1 | 4/4/13 | *Exhibit 4: February 1, 2002 letter from Patrick Perkins to Marks* | 4 | 574 |
| 722-1 | 4/4/13 | *Exhibit 5: November 8, 2002 Notice of Termination re: Superboy* | 4 | 631 |
| 722-1 | 4/4/13 | *Exhibit 6: March 23, 2006 Summary Judgment Order in Superboy Case* | 4 | 644 |
| 722-1 | 4/4/13 | *Exhibit 7: June 12, 2006 Affidavit of Damon Bonesteel* | 4 | 661 |

| 722-1 | 4/4/13 | *Exhibit 8: Excerpts from DC's April 30, 2007 Motion for Summary Judgment* | 4 | 672 |
|---|---|---|---|---|
| 722-1 | 4/4/13 | *Exhibit 9: Excerpts from DC's June 25, 2007 Reply re: Summary Judgment* | 4 | 689 |
| 722-1 | 4/4/13 | *Exhibit 10: September 10, 2007 Affidavit of Donna Josephson* | 4 | 714 |
| 722-1 | 4/4/13 | *Exhibit 11: Excerpts from September 17, 2007 Oral Argument in Superman and Superboy Cases* | 4 | 717 |
| 722-1 | 4/4/13 | *Exhibit 12: March 5, 2012 Notice of Termination re: Superman Advertisements* | 4 | 756 |
| 722-1 | 4/4/13 | *Exhibit 13: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 4 | 762 |
| 722-1 | 4/4/13 | *Exhibit 14: September 5, 2012 Oral Argument in the Siegel Appeal* | 4 | 798 |
| 722-2 | 4/4/13 | Declaration of Laura Siegel Larson In Support Of Plaintiff's Supplemental Brief re: "Ads" and "Superboy" | 4 | 840 |
| 721 | 4/4/13 | Defendants' Supplemental Brief re: "Ads" and "Superboy" | 4 | 842 |
| 715 | 3/18/13 | Plaintiff's Court Authorized Sur-Reply re: Defendants' Motion for Summary Judgment | 4 | 867 |

| 713 | 3/8/13 | Defendants' Response to Plaintiffs Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 5 | 873 |
|---|---|---|---|---|
| 711 | 3/8/13 | Defendants' Reply In Support Of Defendants' Motion for Summary Judgment | 5 | 943 |
| 711-1 | 3/8/13 | Declaration of Matthew T. Kline In Support Of Defendants' Motion for Summary Judgment | 5 | 961 |
| 711-2 | 3/8/13 | *Exhibit A: Appellant Laura Siegel Larson's First Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 12* | 5 | 964 |
| 711-2 | 3/8/13 | *Exhibit B: Appellant Laura Siegel Larson's Third Brief On Cross-Appeal, filed in Ninth Circuit Case Nos. 11- 55863, 11-56034, DN 43-1* | 5 | 1048 |
| 711-2 | 3/8/13 | *Exhibit C: Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics, filed in Ninth Circuit Case Nos. 11-55863, 11-56034, DN 49* | 6 | 1139 |
| 711-2 | 3/8/13 | *Exhibit D: Letter from Marc Toberoff to Daniel Petrocelli, dated March 7, 2013.* | 6 | 1176 |
| 711-2 | 3/8/13 | *Exhibit E: Excerpt from the transcript of the deposition of Laura Siegel Larson, dated August 1,* | 6 | 1179 |

| | | | | |
|---|---|---|---|---|
| | | *2006.* | | |
| 711-2 | 3/8/13 | *Exhibit F:  Excerpt from Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendant DC Comics' First Set Of Interrogatories No. 1-19, dated January 25, 2006.* | 6 | 1185 |
| 709 | 3/4/13 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1192 |
| 709-1 | 3/4/13 | Plaintiff's Statement of Genuine Issues and Additional Facts re: Defendants' Motion for Summary Judgment | 6 | 1224 |
| 709-2 | 3/4/13 | Declaration of Keith Adams In Support Of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 6 | 1252 |
| 709-2 | 3/4/13 | *Exhibit 1:  October 19, 2001 letter from Kevin Marks to John Schulman* | 6 | 1257 |
| 709-2 | 3/4/13 | *Exhibit 2:  October 26, 2001 letter from Schulman to Marks* | 6 | 1263 |
| 709-2 | 3/4/13 | *Exhibit 3: February 1, 2002 letter from Patrick Perkins to Marks* | 6 | 1271 |
| 709-2 | 3/4/13 | *Exhibit 4:  May 9, 2002 letter from Joanne Siegel to Richard D. Parsons* | 6 | 1328 |
| 709-2 | 3/4/13 | *Exhibit 5:  May 22, 2002 letter from* | 6 | 1331 |

| | | *Parsons to Joanne Siegel* | | |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 6:  September 21, 2002 letter from the Siegels to Marks* | 6 | 1332 |
| 709-2 | 3/4/13 | *Exhibit 7: November 8, 2002 Notice of Termination re: Superboy* | 6 | 1333 |
| 709-2 | 3/4/13 | *Exhibit 8:  Letter sent by Ari Emanuel to Bruce Rosenblum* | 6 | 1346 |
| 709-2 | 3/4/13 | *Exhibit 9:  Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | 6 | 1347 |
| 709-2 | 3/4/13 | *Exhibit 10:  Excerpts from October 7, 2006 deposition of Kevin Marks* | 6 | 1354 |
| 709-2 | 3/4/13 | *Exhibit 11:  Excerpts from November 2, 2006 deposition of Ari Emanuel* | 6 | 1388 |
| 709-2 | 3/4/13 | *Exhibit 12:  Excerpts from November 11, 2006 deposition of Paul Levitz* | 6 | 1402 |
| 709-2 | 3/4/13 | *Exhibit 13:  Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007* | 6 | 1416 |
| 709-2 | 3/4/13 | *Exhibit 14:  October 23, 2007 Order* | 7 | 1436 |
| 709-2 | 3/4/13 | *Exhibit 15:  March 5, 2012 Notice of Termination re: Superman Advertisements* | 7 | 1441 |

| 709-2 | 3/4/13 | *Exhibit 16: DC's Second Brief on Cross-Appeal in the Siegel Appeal, filed on March 23, 2012* | 7 | 1447 |
|---|---|---|---|---|
| 709-2 | 3/4/13 | *Exhibit 17: Larson's Third Brief on Cross-Appeal in the Siegel Appeal, filed on May 24, 2012.* | 7 | 1506 |
| 709-2 | 3/4/13 | *Exhibit 18: DC's Fourth Brief on Cross-Appeal in the Siegel Appeal, filed on June 19, 2012* | 7 | 1562 |
| 709-2 | 3/4/13 | *Exhibit 19: September 5, 2012 Oral Argument in the Siegel Appeal* | 7 | 1579 |
| 709-2 | 3/4/13 | *Exhibit 20: January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff* | 7 | 1621 |
| 709-2 | 3/4/13 | *Exhibit 21: February 9, 2013 Letter from Toberoff to Petrocelli* | 7 | 1623 |
| 709-2 | 3/4/13 | *Exhibit 22: February 12, 2013 Letter from Petrocelli to Toberoff* | 7 | 1626 |
| 709-2 | 3/4/13 | *Exhibit 23: Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in DC Comics, filed on February 16, 2013.* | 7 | 1628 |
| 709-2 | 3/4/13 | *Exhibit 24: February 27, 2013 Letter from Toberoff to Petrocelli* | 7 | 1632 |
| 709-2 | 3/4/13 | *Exhibit 25: February 28, 2013 Letter from Petrocelli to Toberoff* | 7 | 1633 |
| 708 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 7 | 1635 |

| 702 | 2/7/13 | Defendants' Motion for Summary Judgment | 7 | 1651 |
|---|---|---|---|---|
| 702-1 | 2/7/13 | Declaration of Daniel M. Petrocelli In Support Of Defendants' Motion for Summary Judgment | 7 | 1663 |
| 702-2 | 2/7/13 | *Exhibit A: Email Correspondence between Parties Counsel re: Motion for Summary Judgment* | 7 | 1666 |
| 702-2 | 2/7/13 | *Exhibit B: October 19, 2001 letter from Kevin Marks to John Schulman* | 7 | 1683 |
| 702-2 | 2/7/13 | *Exhibit C: Excerpts from DC's Reply In Support Of Motion for Partial Summary Judgment on Its First and Third Claims For Relief in Pacific Pictures case, Case No. CV-10-3633, DN 468* | 7 | 1691 |
| 702-2 | 2/7/13 | *Exhibit D: Order Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendants' Cross-Motion in Pacific Pictures case, Case No. CV-10-3633, DN 507* | 7 | 1694 |
| 702-3 | 2/7/13 | Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law | 7 | 1713 |
| 702-4 | 2/7/13 | Defendant's Proposed Summary Judgment Order | 7 | 1718 |
| 702-5 | 2/7/13 | Defendants' Proposed Judgment | 7 | 1720 |

| 681 | 12/5/11 | Order Certifying and Forwarding Supplemental Record | 7 | 1724 |
|---|---|---|---|---|
| 680 | 12/2/11 | Joint Stipulation To Certify And Forward Supplemental Record | 7 | 1726 |
| 680 | 12/2/11 | *Exhibit A: Excerpt from October 7, 2006 deposition of Kevin Marks* | 8 | 1729 |
| 602 | 12/21/09 | Joint Status Report | 8 | 1773 |
| 373-3 | 9/29/08 | Declaration of Dennis Kitchen re: Defendants' September 26, 2008 Objections | 8 | 1798 |
| 373-3 | 9/29/08 | *Exhibit A: November 12, 1934 Correspondence from Jerome Siegel to Russell Keaton* | 8 | 1801 |
| 364-2 | 9/22/08 | Declaration of Marc Toberoff re: Objections to September 18, 2008 Objections and Exhibit A (Thompson & Thompson Report) | 8 | 1714 |
| 364-1 | 9/22/08 | *Exhibit A: February 1996 Thompson & Thompson Copyright Report re: Superman* | 8 | 1817 |
| 361-1 | 9/18/08 | Exhibit B: Declaration of Michael Bergman re: Objections to Plaintiffs' July 28, 2008 Brief | 8 | 1827 |
| 361-3 | 9/18/08 | *Exhibit C: Copyright Registrations for the First Two Weeks of "Superman" Newspaper Strips* | 8 | 1830 |
| 353-1 | 8/5/08 | Declaration of Michael Bergman re: | 8 | 1867 |

|  |  | Response in Objection to Motion |  |  |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit A – January 10, 1938 letter from Vin Sullivan to Jerome Siegel* | 8 | 1871 |
| 353-2 | 8/5/08 | *Exhibit B – September 28, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1873 |
| 353-2 | 8/5/08 | *Exhibit C – September 30, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 8 | 1877 |
| 353-2 | 8/5/08 | *Exhibit D – April 21, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1879 |
| 353-2 | 8/5/08 | *Exhibit E – January 23, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1882 |
| 353-2 | 8/5/08 | *Exhibit F – February 8, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1885 |
| 353-2 | 8/5/08 | *Exhibit G – May 2, 1940 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1887 |
| 353-2 | 8/5/08 | *Exhibit H – November 5, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1890 |
| 353-2 | 8/5/08 | *Exhibit I – January 22, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1893 |
| 353-2 | 8/5/08 | *Exhibit J – January 29, 1940 letter from J.S. Liebowitz to Jerome* | 8 | 1896 |

| | | *Siegel* | | |
|---|---|---|---|---|
| 353-2 | 8/5/08 | *Exhibit K – March 18, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1899 |
| 353-2 | 8/5/08 | *Exhibit L – November 4, 1940 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1901 |
| 353-2 | 8/5/08 | *Exhibit M – February 19, 1941 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1903 |
| 353-3 | 8/5/08 | *Exhibit N – November 12, 1942 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1906 |
| 353-3 | 8/5/08 | *Exhibit O – February 21 letter from Whitney Ellsworth to Jerome Siegel* | 8 | 1908 |
| 353-3 | 8/5/08 | *Exhibit P – February 3, 1947 letter from J.S. Liebowitz to Jerome Siegel* | 8 | 1910 |
| 353-3 | 8/5/08 | *Exhibit Q – Exhibit showing 1937-1947 payments to Siegel and Shuster* | 8 | 1914 |
| 353-3 | 8/5/08 | *Exhibit R – Renewal Certificates for Post-March 1, 1938 Superman Works* | 8 | 1916 |
| 347 | 7/28/08 | Declaration of Marc Toberoff re: Plaintiffs' Memorandum of Points and Authorities in Opposition and Exhibits A-JJ | 8 | 1946 |

| 347-2 | 7/28/08 | *Exhibit A – Seven-Page Superman Synopsis* | 8 | 1951 |
|---|---|---|---|---|
| 347-2 | 7/28/08 | *Exhibit B – November 21, 1974 letter from Jerome Siegel to Laura Siegel* | 8 | 1959 |
| 347-2 | 7/28/08 | *Exhibit C – June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 8 | 1962 |
| 347-2 | 7/28/08 | *Exhibit D – Superman story illustrated by Russell Keaton* | 8 | 1964 |
| 347-3 | 7/28/08 | *Exhibit E – Continuity for 15 daily "Superman" Newspaper Strips, c. 1934* | 8 | 1974 |
| 347-4 | 7/28/08 | *Exhibit G – Action Comics, No. 2* | 8 | 1981 |
| 347-5 | 7/28/08 | *Exhibit H – Action Comics, No. 3* | 8 | 1990 |
| 347-6 | 7/28/08 | *Exhibit I – Action Comics, No. 4* | 8 | 1999 |
| 347-7 | 7/28/08 | *Exhibit J – Action Comics, No. 5* | 8 | 2008 |
| 347-8 | 7/28/08 | *Exhibit K – Action comics, No. 6* | 8 | 2015 |
| 347-9 | 7/28/08 | *Exhibit L – Excerpts from Superman, No. 1* | 8 | 2024 |
| 347-9 | 7/28/08 | *Exhibit M – June 21, 1941 Saturday Evening Post Article, "Up, Up and Awa-a-y"* | 9 | 2029 |
| 347-9 | 7/28/08 | *Exhibit N – Excerpts from Trial Transcript of 1947 Action* | 9 | 2036 |

| | | | | |
|---|---|---|---|---|
| 347-9 | 7/28/08 | *Exhibit O – December 4, 1937 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2050 |
| 347-9 | 7/28/08 | *Exhibit P – September 22, 1938 Agreement between Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2053 |
| 347-9 | 7/28/08 | *Exhibit Q – Seprember 22, 1938 Agreement between the McClure Newspaper Syndicate, Jerome Siegel, Joseph Shuster, and Detective Comics, Inc.* | 9 | 2057 |
| 347-9 | 7/28/08 | *Exhibit R – Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 9 | 2061 |
| 347-9 | 7/28/08 | *Exhibit S – April 18, 1938 letter from Jerome Siegel to J.S. Liebowitz* | 9 | 2068 |
| 347-9 | 7/28/08 | *Exhibit T – September 7, 1938 letter from Chas Lounsbury to Jerome Siegel* | 9 | 2070 |
| 347-9 | 7/28/08 | *Exhibit U – Excerpts from Superman: The Dailies* | 9 | 2073 |
| 347-9 | 7/28/08 | *Exhibit V – Copyright Registration Certificate for Superman No. 1* | 9 | 2080 |
| 347-10 | 7/28/08 | *Exhibit W – Excerpts from the United States Copyright Office Catalogue of Copyright Entries* | 9 | 2083 |

| 347-10 | 7/28/08 | *Exhibit X – March 1, 1973 Affidavit of Jerome Siegel* | 9 | 2098 |
|---|---|---|---|---|
| 347-10 | 7/28/08 | *Exhibit Y – Excerpts from Superman: Sunday Classics* | 9 | 2110 |
| 347-10 | 7/28/08 | *Exhibit Z - Excerpts from Superman: The Dailies* | 9 | 2119 |
| 347-11 | 7/28/08 | *Exhibit AA – Excerpts from the February 27, 2007 deposition of Mark Waid* | 9 | 2130 |
| 347-11 | 7/28/08 | *Exhibit BB – Article "K-Metal: The Lost Superman Tale" by Mark Waid* | 9 | 2153 |
| 347-11 | 7/28/08 | *Exhibit CC – Unpublished 26-page Superman story* | 9 | 2161 |
| 347-12 | 7/28/08 | *Exhibit DD – Checks and Bank Statements from the American Artists League* | 9 | 2175 |
| 347-12 | 7/28/08 | *Exhibit EE – Excerpts from the business ledger of Jerome Siegel* | 9 | 2196 |
| 347-12 | 7/28/08 | *Exhibit FF – Excerpts from the July 8, 1969 deposition of Jerome Siegel* | 9 | 2204 |
| 347-12 | 7/28/08 | *Exhibit GG – Excerpts from The Story Behind Superman No. 1 by Jerome Siegel* | 9 | 2208 |
| 340 | 7/21/08 | Declaration of Michael Bergman in Support of Defendants' Brief on Additional Issues | 9 | 2211 |
| 340-1 | 7/21/08 | *Exhibit A:  December 19, 1939* | 9 | 2213 |

|  |  | *Agreement between Jerome Siegel, Joseph Shuster and Detective Comics, Inc.* |  |  |
|---|---|---|---|---|
| 340-1 | 7/21/08 | *Exhibit B:  April 8, 1938 letter from J.S. Liebowitz to Jerome Siegel* | 9 | 2217 |
| 337 | 7/21/08 | Declaration of Keith Adams re: Plaintiff's Memorandum of Points and Authorities Pursuant to the Court's July 3, 2008 Order | 9 | 2219 |
| 337-2 | 7/21/08 | *Exhibit A:  Stipulation re: Scheduling Order and Order Thereon, entered by the Court on March 20, 2007* | 9 | 2227 |
| 337-2 | 7/21/08 | *Exhibit G:  January 12, 2007 Expert Report of James Steranko* | 9 | 2235 |
| 337-2 | 7/21/08 | *Exhibit H:  January 12, 2007 Expert Report of Mark Evanier* | 9 | 2259 |
| 337-3 | 7/21/08 | *Exhibit I:  February 9, 2007 Expert Rebuttal Report of Mark Evanier* | 9 | 2284 |
| 337-3 | 7/21/08 | *Exhibit J:  Excerpts from the March 30, 2007 Deposition of Mark Evanier* | 10 | 2316 |
| 337-3 | 7/21/08 | *Exhibit M:  Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2331 |
| 290 | 2/21/08 | Stipulation for Order Requesting Status Conference and Briefing Schedule | 10 | 2336 |

| | | | | |
|---|---|---|---|---|
| 196 | 6/25/07 | Reply Declaration of Marc Toberoff In Support Of Plaintiff's Motion for Partial Summary Judgment | 10 | 2340 |
| 196 | 6/25/07 | *Exhibit A: Tolling Agreement Between Plaintiffs and DC Comics, dated April 6, 2000* | 10 | 2343 |
| 196 | 6/25/07 | *Exhibit B: October 28, 2002 letter from Joanne Siegel and Laura Siegel Larson to Lillian J. Laserson* | 10 | 2349 |
| 196 | 6/25/07 | *Exhibit C: Excerpts from listings from the Library of Congress' Catalog of Copyright Entries for the years 1939, 1940 and 1976* | 10 | 2352 |
| 196 | 6/25/07 | *Exhibit D: Plaintiff's Memorandum of Points and Authorities In Support of Motion to Compel Production of Documents* | 10 | 2367 |
| 196 | 6/25/07 | *Exhibit E: Excerpts from November 7, 2006 Deposition of Paul Levitz* | 10 | 2474 |
| 196 | 6/25/07 | *Exhibit F: Excerpts from October 7, 2006 Deposition of Kevin Marks, Esq.* | 10 | 2479 |
| 196 | 6/25/07 | *Exhibit G: Excerpts from August 6, 2006 Deposition of Plaintiff Laura Siegel Larson* | 10 | 2485 |
| 196 | 6/25/07 | *Exhibit H: Defendants' Answer to First Amended Complaint* | 10 | 2491 |
| 194 | 6/25/07 | Plaintiff's Reply In Support Of | 10 | 2508 |

| | | Motion for Partial Summary Judgment | | |
|---|---|---|---|---|
| 184 | 5/29/07 | Declaration of Michael Bergman re: Plaintiffs' Motion for Summary Judgment | 10 | 2590 |
| 184 | 5/29/07 | *Exhibit A: Copyright Registration and Excerpts from "The Creation of a Superhero" by Jerome Siegel* | 10 | 2595 |
| 184 | 5/29/07 | *Exhibit B: June 12, 1934 letter from Jerome Siegel to Russell Keaton* | 11 | 2608 |
| 184 | 5/29/07 | *Exhibit D: March 1, 1938 Assignment from Jerome Siegel and Joseph Shuster to Detective Comics* | 11 | 2623 |
| 184 | 5/29/07 | *Exhibit L: Copy of Superman No. 1* | 11 | 2625 |
| 184 | 5/29/07 | *Exhibit P: April 15, 1999 letter from Paul Levitz to Joanne Siegel* | 11 | 2639 |
| 181 | 5/29/07 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment | 11 | 2641 |
| 163 | 4/30/07 | Declaration of Marc Toberoff re: Plaintiffs' Motion for Summary Judgment | 11 | 2739 |
| 163 | 4/30/07 | *Exhibit A: November 21, 1947 Opinion* | 11 | 2745 |
| 163 | 4/30/07 | *Exhibit B: April 12, 1948 Findings of Fact and Conclusions of Law* | 11 | 2758 |

| 163 | 4/30/07 | *Exhibit C: May 19, 1948 Stipulation of Settlement* | 11 | 2801 |
|-----|---------|-----|----|------|
| 163 | 4/30/07 | *Exhibit D: May 21, 1948 Consent Judgment* | 11 | 2813 |
| 163 | 4/30/07 | *Exhibit F: June 1, 1965 Renewal Copyright Registrations re: Superman* | 11 | 2825 |
| 163 | 4/30/07 | *Exhibit G: Notice of Termination re: March 31, 1938 Grant* | 11 | 2830 |
| 163 | 4/30/07 | *Exhibit H: Notice of Termination re: December 4, 1937 Agreement* | 11 | 2840 |
| 163 | 4/30/07 | *Exhibit I: Notice of Termination re: September 22, 1938 Agreement* | 11 | 2850 |
| 163 | 4/30/07 | *Exhibit J: Notice of Termination re: September 22, 1938 Agreement with McClure* | 11 | 2860 |
| 163 | 4/30/07 | *Exhibit K: Notice of Termination re: 1948 Stipulation* | 11 | 2870 |
| 163 | 4/30/07 | *Exhibit L: Notice of Termination re: December 19, 1939 Agreement* | 11 | 2880 |
| 163 | 4/30/07 | *Exhibit M: Notice of Termination re: December 23, 1975 Agreement* | 11 | 2890 |
| 163 | 4/30/07 | *Exhibit N: Certificates of Recordation re: Notices of Termination* | 12 | 2900 |
| 164 | 4/30/07 | *Exhibit R: Defendants' First Amended Counterclaim* | 12 | 2915 |

| 164 | 4/30/07 | *Exhibit S: Siegel v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (S.D.N.Y. 1973)* | 12 | 2956 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit T: Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2965 |
| 164 | 4/30/07 | *Exhibit U: March 24, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2973 |
| 164 | 4/30/07 | *Exhibit V: May 23, 2006 Order by Judge Ronald S. W. Lew in Civ. Case No. 04-08776 RSWL (RZx)* | 12 | 2991 |
| 164 | 4/30/07 | *Exhibit W: Appellate Brief of National Periodical Publications, Inc. et. al. from Siegel v. National Periodical Publications, Inc. et al., 508 F.2d 909 (2d Cir. 1974)* | 12 | 2995 |
| 164 | 4/30/07 | *Exhibit X: Plaintiff's Complaint* | 12 | 3014 |
| 164 | 4/30/07 | *Exhibit Y: December 23, 1975 Agreement between Warner Communications, Inc and Jerome Siegel and Joseph Shuster* | 12 | 3044 |
| 164 | 4/30/07 | *Exhibit Z: April 6, 2000 Tolling Agreement between Plaintiffs and DC Comics* | 12 | 3057 |
| 164 | 4/30/07 | *Exhibit AA: September 21, 2002 letter from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer* | 12 | 3061 |

| 164 | 4/30/07 | *Exhibit BB:  October 19, 2001 letter from Kevin Marks to John Schulman* | 12 | 3063 |
|---|---|---|---|---|
| 164 | 4/30/07 | *Exhibit CC:  October 26, 2001 letter from Schulman to Marks* | 12 | 3070 |
| 164 | 4/30/07 | *Exhibit DD:  February 1, 2002 letter from Patrick Perkins to Kevin Marks* | 12 | 3079 |
| 164 | 4/30/07 | *Exhibit EE:  Excerpts from October 7, 2006 Deposition of Kevin Marks* | 12 | 3137 |
| 164 | 4/30/07 | *Exhibit FF:  March 15, 1982 letter from Martin D. Payson to Joanne Siegel* | 12 | 3156 |
| 164 | 4/30/07 | *Exhibit GG: Plaintiff's First Amended Complaint* | 12 | 3158 |
| 161 | 4/30/07 | Plaintiffs' Motion for Partial Summary Judgment | 13 | 3192 |
| 159 | 4/30/07 | Defendants' Motion for Partial Summary Judgment | 13 | 3255 |
| 46 | 11/1/05 | Plaintiffs' Reply to Defendants' First Amended Counterclaims | 13 | 3373 |
| Case No 04-8776, 125 | 4/30/07 | Declaration of Michael Bergman re: Defendants' Motion for Summary Judgment | 13 | 3407 |
| Case No 04- | 4/30/07 | Exhibit A:  December 4, 1937 Agreement between Jerome Siegel, | 13 | 3413 |

| | | | | |
|---|---|---|---|---|
| 8776, 125 | | Joseph Shuster and Detective Comics, Inc. | | |
| Case No 10-3633, 74 | 9/20/10 | Minutes From September 20, 2010 Discovery Hearing [1] | 14 | 3416 |
| Case No 10-3633, 348 | 11/25/11 | Defendant Laura Siegel Larson's Answer to First Amended Complaint | 14 | 3418 |
| Case No 10-3633, 1 | 5/14/10 | Plaintiff DC Comics' Complaint | 14 | 3456 |
| | 2/19/14 | Docket Report (Case No. 04-8400) | 14 | 3521 |

---

[1] Larson requests that this court take judicial notice of certain documents files in the *Pacific Pictures* case – which was deemed "related" to the case below and transferred to the same district court judge – pursuant to Federal Rule of Evidence 201. As this Court has established, "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) (overruled on other grounds); *see also Reyn's Pasta Bella, LLC v Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of "pleadings, memoranda, expert reports, etc." from related case); *U.S. ex rel. Robinson Rancherita Citizen Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("we may take notice of proceedings in other courts") (internal quotations and citations omitted); *U.S. v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases")

## EXCERPTS OF RECORD (From Case No. 04-8776)

| Docket No. | Filing Date | Document Title | Vol. | Page |
|---|---|---|---|---|
| 254 | 6/18/13 | 59(e) Amended Judgment | 15 | 3598 |
| 253 | 6/18/13 | 59(e) Order | 15 | 3603 |
| 243 | 4/18/13 | "Final Judgment" In Superboy | 15 | 3605 |
| 242 | 4/18/13 | Order Granting Motion For Summary Judgment Re: Superboy And The Superman Ads | 15 | 3609 |
| 235 | 3/20/13 | Order Granting In Part Defendant's Motion For Summary Judgment | 15 | 3620 |
| 175 | 3/31/08 | Order Denying Cross-Motions for Partial Summary Judgment | 15 | 3636 |
| 151 | 7/27/07 | Order Granting Defendants' Motion for Reconsideration | 15 | 3638 |
| 82 | 3/23/06 | Order Granting Plaintiffs' Motion for Partial Summary Judgment & Denying Defendants' Motion for Summary Judgment | 15 | 3711 |
| 259 | 7/16/13 | Defendants' Notice of Cross-Appeal | 16 | 3728 |
| 257 | 7/16/13 | Plaintiff's Notice of Appeal | 16 | 3730 |
| 250 | 6/17/13 | Plaintiff's 59(e) Motion | 16 | 3732 |
| 227 | 2/25/13 | Joint Status Report Re: The Superman and Superboy Cases | 16 | 3763 |

| 184 | 12/21/09 | Joint Status Report | 16 | 3779 |
|---|---|---|---|---|
| 103 | 1/12/07 | Defendants' Motion for Reconsideration | 16 | 3804 |
| 56 | 2/15/06 | Defendants' Motion for Summary Judgment | 16 | 3806 |
| 51 | 2/15/06 | Plaintiff's Motion for Partial Summary Judgment | 16 | 3838 |
| 47 | 11/4/05 | Answer to First Amended Counterclaims | 16 | 3870 |
| 44 | 10/18/05 | First Amended Counterclaims | 16 | 3904 |
| 37 | 9/7/05 | Answer to First Supplemental Complaint | 16 | 3943 |
| 34 | 4/13/05 | First Supplemental Complaint | 16 | 3957 |
| | 2/19/14 | Docket Report (Case No. 04-8776) | 16 | 3986 |

# EXHIBIT C

ER 1139

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT C**
**175**

ER 1140

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

    A.  Larson And DC Formed An Agreement On October 19, 2001 ..........3

    B.  Contemplating A Long-Form Document Does Not Defeat A Deal........................................................................................7

    C.  Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings ..........10

        1.  Scope Of Rights ......................................................10

        2.  Monetary Terms.......................................................11

        3.  "Other" Non-Essential Terms ...................................13

        4.  The February 2002 Long-Form .................................14

    D.  Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II.  DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM ........................................16

III.  LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

    A.  Elements Of *AC#1* Were Made-For-Hire .........................................17

        1.  *National* Is Not Preclusive ........................................17

        2.  The 1938 Additions Were Made-for-Hire ..............................19

            a.  New Content ................................................20

            b.  Colorization .................................................21

            c.  Cover Art .....................................................22

    B.  DC Owns The Pre-McClure Strips.......................................................23

        1.  The Strips Were Made-for-Hire................................................23

        2.  Larson's Failure To Terminate The Strips Is Dispositive .......24

    C.  Pages 3-6 Of *S#1* Are Works-For-Hire .............................................25

    D.  Artwork In *AC#4* Is Work-For-Hire .................................................26

    E.  Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION .......................................................................................28

EXHIBIT C
176

ER 1141

# TABLE OF AUTHORITIES

## Cases

*Aalmuhammed v. Lee*,
   202 F.3d 1227 (9th Cir. 1999) ................................................................ 19, 20

*Banner Entm't, Inc. v. Super. Ct.*,
   62 Cal.App.4th 348 (1998) ...................................................................... 7

*Blix St. Records, Inc. v. Cassidy*,
   191 Cal.App.4th 39 (2010) ...................................................................... 7

*Burroughs v. M-G-M, Inc.*,
   491 F.Supp. 1320 (S.D.N.Y. 1980) ........................................................ 23

*Burroughs v. M-G-M, Inc.*,
   683 F.2d 610 (2d Cir. 1982) .................................................................... 23

*Chicot County Drainage Dist. v. Baxter County Bank*,
   308 U.S. 371 (1940) ................................................................................ 18

*Clarke v. Fiedler*,
   44 Cal.App.2d 838 (1941) ........................................................................ 5

*Comm'r v. Sunnen*,
   333 U.S. 591 (1948) ................................................................................ 18

*Davis & Cox v. Summa Corp.*,
   751 F.2d 1507 (9th Cir. 1985) ................................................................ 18

*Digerati Holdings, LLC v. Young Money Entm't, LLC*,
   194 Cal.App.4th 873 (2011) .................................................................... 13

*Dolman v. Agee*,
   157 F.3d 708 (9th Cir. 1998) .................................................................... 21

*Duran v. Duran*,
   150 Cal.App.3d 176 (1983) .................................................................... 5, 8

*Effects Assocs., Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) .................................................................... 6

i

EXHIBIT C
177

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
119 Cal.App.4th 263 (2004) ............................................................... 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ...............................................................22

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal.App.4th 613 (1991) ...................................................................6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) ..................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ..............................................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
773 F.2d 1068 (9th Cir. 1985) ...............................................................19

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) ........................................................... 19, 26

*Granite Rock Co. v. Teamsters*,
649 F.3d 1067 (9th Cir. 2011) ...............................................................18

*Harris v. Rudin, Richman & Appel*,
74 Cal.App.4th 299 (1999) .................................................................5, 7

*In re Pacific Pictures Corp.*,
2012 WL 1640627 (9th Cir. May 10, 2012) .......................................16

*Inamed Corp. v. Kuzmak*,
275 F.Supp.2d 1100 (C.D. Cal. 2002) ..................................................13

*Leather v. Eyck*,
180 F.3d 420 (2d Cir. 1999) ..................................................................18

*Levin v. Knight*,
780 F.2d 786 (9th Cir. 1986) ....................................................... 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
777 F.Supp.2d 720 (S.D.N.Y. 2011) ..................................................24

**EXHIBIT C**
**178**

**ER 1143**

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010) ...................................................................4

*Murray v. Gelderman*,
   566 F.2d 1307 (5th Cir. 1978) ...............................................................24

*Norris v. Grosvenor Mktg. Ltd.*,
   803 F.2d 1281 (2d Cir. 1986) .................................................................18

*O'Brien v. R.J. O'Brien & Assocs., Inc.*,
   998 F.2d 1394 (7th Cir. 1993) ...............................................................16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
   107 Cal.App.4th 516 (2003) ..................................................................11

*Picture Music, Inc. v. Bourne, Inc.*,
   457 F.2d 1213 (2d Cir. 1972) .................................................................23

*Playboy Enters., Inc. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995) .....................................................................24

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
   77 F.3d 309 (9th Cir. 1996) .....................................................................7

*Sanborn v. Fed. Crop Ins. Corp.*,
   93 Cal.App.2d 59 (1949) ........................................................................16

*Siegel v. Nat'l Periodical Publ'ns*,
   508 F.2d 909 (2d Cir. 1974) ..................................................... 17, 18, 19

*Stephan v. Maloof*,
   274 Cal.App.2d 843 (1969) ......................................................................7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011) ..................................................... *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
   429 F.3d 869 (9th Cir. 2005) ................................................... 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney*,
   881 F.2d 772 (9th Cir. 1989) ...................................................................9

**EXHIBIT C**
**179**

ER 1144

## Statutes

17 U.S.C § 204(a) ........................................................................6

37 C.F.R. § 201.10(e)(1)-(2) .........................................................24

Cal. Civ. Code § 1624 .................................................................6

## Rules

Fed. R. Evid. 1002 .....................................................................27

iv

**EXHIBIT C**
**180**

**ER 1145**

## INTRODUCTION

This case should have ended long before it began.  The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute.  Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer.  Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C."  RER-13.  DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter.  Even now, Larson tells the Court:  "the parties thought they had arrived at terms" in October 2001.  LOR-14.

And indeed they had arrived at terms.  The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties.  Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form.  As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay.  DC would receive peace with Larson and certainty in its Superman rights.  The deal went bad

1

**EXHIBIT C**
**181**

**ER 1146**

only when—and only because—Hollywood businessman Marc Toberoff entered the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing. Under Toberoff's guidance, Larson asserts that, although all parties said they reached agreement on October 19, they were mistaken about essential terms. Her only evidence is an October 26 letter sent by DC's negotiator, John Schulman—which Larson says differs materially from the October 19 letter. She is incorrect, and neither she nor Marks took this position at the time. Every essential term in Schulman's letter is identical in substance to those in Marks' letter. Any difference either involves a non-essential term or is one of semantics. If any material difference does exist, DC has long agreed: the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the 2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire rules. Those rules and deals Larson's father made with DC control here, assuming the Court reaches these issues. Each of the disputed Superman works was created by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point, litigation must come to an end. That point [is] now…." *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011). Judgment should be entered in DC's favor, and the 2001 settlement agreement should be enforced.

**EXHIBIT C**
**182**

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer. SER-105, 434. Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent. SER-107-08, 456-61. A contract was formed on October 19; its terms stated in Marks' letter. While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal. And none reflects a disagreement on a material term.

### A. Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute. SER-434. By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one. SER-105-08, 434-35. The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16. SER-105-07, 434-35. DC made an offer on that final point and all other material terms. *Id*. On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed." SER-107-08. Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet. SER-456-61.

**EXHIBIT C**
**183**

Marks' October 19 call and letter sealed the deal. The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61. The letter unequivocally accepted DC's offer. SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001…."). The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787. A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter. Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer." LOR-14-17. But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer. SER-110, 435. That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor. Larson does not dispute this Court may enter judgment for DC. DCB-28. At a minimum, the issue must be remanded for trial. *Id*. at 34. For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

**EXHIBIT C**
**184**

**ER 1149**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

---

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

5

**EXHIBIT C**
**185**

**ER 1150**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL.

CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and

subscribed by the party to be charged *or by the party's agent*") (emphasis added);

DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be

"signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson

concedes Marks was her agent, RER-9, and his letter clearly expresses her

"acceptance" to "transfer all of [her] rights in … 'Superman,'" SER-456, 458. "If

the copyright holder agrees to transfer ownership to another party, that party must

get the copyright holder to sign a piece of paper saying so. It doesn't have to be

the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v.

Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated

for two years, and resolved their last deal point on October 16. SER-456, 463-64.

Larson suggests the October 16 deal was so hastily made that within days Marks

and Schulman could not remember its terms; exchanged conflicting term sheets;

and then let those conflicts fester. LOR-16-17. This account is unsupported. The

parties stopped negotiating in October because they had a deal, and Marks *never*

objected to Schulman's letter or called it a counter-offer. DC undertook the

separate task of preparing a long-form, SER-435, and began performing on the

**EXHIBIT C
186**

2001 deal, reserving amounts due.  These are all acts of parties who had a deal.[2]

## B.    Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it

"was subject to documentation and would need to be reduced to a mutually-

acceptable written contract."  LOR-26.  But (i) Marks' October 19 letter contains

no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation
> does not invalidate the agreement if the parties have agreed to its
> existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v.

Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St.

Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express

reservation* to make a contract unenforceable for lack of later documentation,

*Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of

intent not binding because it expressly stated it was "of no binding effect on any

party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998)

(draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may
need to say this to mislead Larson about the deal he induced her to abandon—but
the *record fact* remains that a reserve was set; it totals more than $20 million, SER-
397-99; and the funds will be paid to Larson if this Court enforces the 2001
agreement.  Larson gets all of this money, though Marks may have a claim to 5%;
only Toberoff loses his improperly obtained 40% (or more) cut.  DCB-16-19.

**EXHIBIT C**
**187**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By
>
> Kevin S. Marks

8

**EXHIBIT C**
**188**

ER 1153

Marks never reserves Larson's rights pending a final agreement. That is especially

clear when read in conjunction with the first paragraph of Marks' letter, which

contain an unambiguous "acceptance" by Larson on defined "terms":

Dear John:

This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an

agreement had already been reached—nothing in it constitutes a "clear

reservation" either. Just the opposite: it expressly confirms "the deal we've

agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting

together the contemplated long-form. And there is no reservation, clear or

otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

**EXHIBIT C**
**189**

### C.    Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings

Larson does not dispute the only essential terms to a copyright transfer are "the subject matter, the price, and the party against whom enforcement is sought." *Levin*, 780 F.2d at 787; LOR-29.  But she spends pages of her brief citing places where, in her view, Marks' October 19 and Schulman's October 26 letters differ. Some of the purported differences result from Larson's misapplication of the rules of contract interpretation.  Others result from her failure to read the entire letters. The remainder are at most minor differences on non-essential terms.  Even if any one met the high test for materiality (and none does), it would not matter.  Sworn testimony from Schulman and Marks establishes that Marks precisely understood DC's October 16 offer, and set forth and accepted its terms.  SER-110, 112, 435. Inconsistent terms DC tried to add—if there are any—must be ignored.  *Facebook*, 640 F.3d at 1037-38.  And while Larson says Schulman tried to get a better deal for DC, DC's position has been throughout:  *if* there are any material differences in Schulman's letter, Marks' letter controls.  RER-6; DCB-31; SER-435-37.

1. *Scope Of Rights*.  Larson asserts that a material difference exists as to the scope of the properties—that Marks' letter applies to Superman, Superboy, Spectre, and related properties, but Schulman's supposedly expands the coverage to unnamed other properties.  LOR-17.  But in eight years of litigation, Larson has never identified a single property or work that she believes is covered by

10

**EXHIBIT C**
**190**

**ER 1155**

Schulman's supposedly more expansive language, and DC has never asserted any rights over these mystery properties. That is because no such rights exist.

2. *Monetary Terms*. Larson asserts that Marks' letter does not allow DC to recover interest on the advances it provides, while the Schulman draft provides that interest "at 100% of prime" can be recovered after December 31 "of year of payment." LOR-18 (citing SER-458, 467). Larson is incorrect. Paragraph 8 of *Marks'* letter provides that "beginning January 1 of the following year," after DC pays an advance, "there shall be interest at the prime lending rate." SER-458. This provision, which Larson fails to mention, shows no difference exists at all.

Larson also suggests that "6% of DC's receipts from all Media licenses" is materially different from "6% of DC's 'gross revenues' derived from 'use of the property in any and all media,'" because "media licenses" is not defined in the Schulman letter, and thus might exclude direct sales or assignments. LOR-18-19. But the Schulman letter plainly uses the term "media license" in the broader sense to include such revenues. It lists revenue from sales of "merchandise actually produced by DC" as an example of revenue from "merchandising licenses." SER-467. Because his term "license" includes direct sales, it has the broader meaning that Larson says only Marks' letter included. *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526 (2003).

**EXHIBIT C
191**

**ER 1156**

Larson also points to semantic differences between the letters without assigning any weight to their materiality other than her own conclusory statements. For instance, she focuses on the fact that Marks' letter specifies three instances where the 6% media license fee would be reduced to 1.5%, whereas the Schulman draft cited these three instances as "examples." SER-457-58, 467-68, 495. In years of litigation, Larson has never pointed to a fourth property that was swept in.

Larson also suggests Schulman's letter allows DC to pay royalties below 1% in certain cases. LOR-20. Larson never raised this interpretation in her briefing or testimony below. Marks did not read the language that way, SER-536-37, nor did DC's later long-form draft, which clearly set the floor at 1%, SER-497. Even if Larson's new interpretation were correct, she cannot show it materially altered the agreement—particularly since it would permit *more* than 1% royalty in cases where Marks' letter capped the royalty at 1%. LOR-20.

Larson also says Schulman's letter departed Marks' letter by defining the term "extraordinary cases." SER 457, 467. It is hardly surprising that a vague term would be given a more precise definition, and the definition Schulman gave tracks the purpose articulated in the Marks draft, which stated that Six Flags would serve as an example because it "involves numerous characters." SER 457.

Along the same vein, Larson says Schulman's letter amended Marks' by defining "cameo" to mean stories where the subject "characters do not appear in

12

**EXHIBIT C
192**

ER 1157

the title of the publication or feature." SER-468. This definition accords with

custom, DCB-33-34, and applied reciprocally—DC would not reduce Larson's

royalties if one of its other characters (*e.g.*, Batman) made a cameo in Superman.

Noting an accepted definition for a vague term is hardly a material change.

    3. *"Other" Non-Essential Terms.* Larson also complains of differences in

language concerning warranties, indemnification, publicity, and credit, but none

are essential terms to a copyright transfer. DCB-34; *Inamed Corp. v. Kuzmak*, 275

F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002). Even if there were disagreement over

such non-essential terms, a contract arose on October 19 when agreement on all

*essential* terms was reached. *Facebook*, 640 F.3d at 1037-38.

    In any event, Larson does not identify material differences as to these non-

essential terms. As to the warranties, Larson would have been required to provide

"100% ownership" to DC and be subject to a duty of good faith and fair dealing

not to interfere with the contract, which is an implied provision of every contract in

California. *See Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194

Cal.App.4th 873, 885 (2011). The trivial difference in language concerning

warranties thus could hardly give rise to "significant potential liability." LOR-22.

    Similarly, the so-called "indemnification" provision merely implements the

requirement that the "Siegel Family would transfer all of its rights … resulting in

100% ownership to D.C.," SER-458, and that the "Siegel Family" acted "through

**EXHIBIT C**
**193**

Joanne Siegel and Laura Siegel Larson," SER-456, in providing these rights. Far from being "significant obligations of the Siegels to indemnify," LOR-23, the Siegel Family was asked to indemnify DC against suits by the Siegel Family.[5]

   4. *The February 2002 Long-Form.* Larson also points to so-called "vast differences" between Marks' letter and DC's February 2002 long-form, LOR-24, but she identifies only a few provisions in that draft that even arguably conflict. As explained above and in DC's principal brief, DCB-32-33, even if DC proposed materially different terms in the February 2002 draft long-form, those differences cannot erase the October 19 agreement. *Facebook*, 640 F.3d at 1038.[6]

## D.    Marks' August 2002 Memo Confirms A Deal Was Made

A document this Court recently ordered Larson to produce confirms the parties made a binding agreement in October 2001. In an August 2002 memo,

---

[5] Larson's remaining items scarcely merit mention. She says Schulman required travel for Joanne Siegel and this was a material difference given her poor health. LOR-23. But Schulman's letter made clear any travel was "subject to [her] health." SER-464. Larson also cites a divergence as to credits in paid ads. LOR-23. But Schulman's letter requires credit on all "works where credit to creators is customary," SER-469, and Larson presents no evidence such credit was otherwise.

[6] Any differences are not material and are typical of clarifications in a long-form. Larson says the draft excluded services from the royalty sums. LOR-19. But because services were never addressed in the prior drafts, this is not a different term. The same is true of units, *e.g.*, returned or lost, for which there would be no revenue to pay royalties. LOR-21. Larson also says the draft excludes cash advances, LOR-19, but it does no such thing—it states a time when sums paid to DC would vest, SER-481. Unsurprisingly, Marks told Schulman the February long-form was "consistent" with the October deal. SER-125-28, 436, 440.

14

**EXHIBIT C**
**194**

**ER 1159**

Marks reminds Larson *four times* that she made a "deal" or "agreement" with DC in October 2001, and said he might have to testify against her if she repudiated it. RER-13. Even though Marks drafted his memo long after receiving Schulman's October 26 letter and after DC sent its February long-form, Marks never suggested that either altered the binding effect of the October 19 deal. Marks never said the parties viewed these two later documents as "counter-offers." Nor did he suggest that these post-agreement documents revealed a "mistake" about the terms of the deal. Rather, Marks stressed again and again that "an agreement was reached" between DC and Larson, and breaching it would subject her to suit. RER-13-14.

As both sides understood at the time, Schulman's October 26 letter and DC's draft long-form were simply parts of hammering out the formal documentation for an agreement that had already been reached. SER-435; RER-13-14. Had Larson worked with DC to document the fine points of their agreement, this matter could have long ago been resolved. But instead, lured by Toberoff's false promises, Larson reneged.

\* \* \*

The 2001 deal should be enforced, judgment should be entered in DC's favor, and this case should end. At a minimum, the district court's summary judgment order should be reversed, and the case remanded for a trial on DC's settlement defense.

15

**EXHIBIT C**
**195**

## II.    DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM

DC's limitations defense turns on one disputed fact—whether settlement talks were terminated by a May 9, 2002, letter from Larson's mother to DC (making this action untimely), or a September 2002 letter from the Siegels to DC. DCB-37-39.  While Larson argued below that settlement talks ended in September, she recently argued in the related *Pacific Pictures* case that the May 9 letter "ended" any chance of settling the matter.  SER-827, 878-79.  A jury should have a chance to hear this evidence and decide which letter ended settlement talks.

Larson contends the May 9 letter did not meet the requirements of the parties' tolling agreement, but that is a jury question.  *Sanborn v. Fed. Crop Ins. Corp.*, 93 Cal.App.2d 59, 65 (1949).  She also says that in *Pacific Pictures*, she described the May 9 letter as making negotiations "moribund," which means "dying," not dead.  But she argued in *Pacific Pictures* the May 9 letter "ended" any prospect of resolving the matter, SER-825—which is possible only if the letter did, in fact, terminate negotiations.

Larson may have taken her new factual position to shield Toberoff from tort liability in *Pacific Pictures*—casting even more doubt on his relationship with her. *Cf. In re Pacific Pictures Corp.*, 2012 WL 1640627, at *1 (9th Cir. May 10, 2012). But whatever her motive, if it is credible for Larson to argue in *Pacific Pictures*

**EXHIBIT C
196**

**ER 1161**

that the May 9 letter ended any prospect of completing negotiations, then a jury in

this case could find the same thing, and thus find that her lawsuit was untimely.

## III.  LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS

DC's cross-appeal challenges the district court's summary-judgment ruling

that four Superman works were not made-for-hire:  portions of *Action Comics #1*

("*AC#1*"); *Action Comics #4* ("*AC#4*"); *Superman #1* (pages 3-6) ("*S#1*"); and two

weeks of "Pre-McClure Strips."  Larson's opposition is unavailing.

### A.  Elements Of *AC#1* Were Made-For-Hire

Key elements of *AC#1*, added in 1938, were made-for-hire.  *Compare* ER-

706, *with* SER-78; *see also* ER-654, 917, 957-59; SER-379-88, 442, 803.  The

court in *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974), did not

hold otherwise, and Larson's preclusion and merits arguments are without basis.

#### 1.  National *Is Not Preclusive*

Larson argues *National* precludes DC from making its work-for-hire

arguments about the 1938 additions to *AC#1*, but she is mistaken.  The sole issue in

*National* was whether Siegel and Shuster owned the renewal copyright in *AC#1*.

*National* never considered the issue now before this Court:  whether the 1938

additions in *AC#1* were made-for-hire and thus are not subject to termination.

Larson's suggestion (LOR-43) that *National* ruled on the work-for-hire status of

the 1938 additions is inaccurate.  It merely concluded that these "revisions" were

17

**EXHIBIT C**
**197**

**ER 1162**

not "sufficient to create the presumption that *the strip* [*i.e.*, the *AC#1* Superman strip *in toto*] was a work for hire." 508 F.2d at 914 (emphasis added).

Larson concedes this case involves "evidence [and] argument not presented in [*National*]," but says issue-preclusion applies to any issue DC "could have" raised in *National*. LOR-44. Larson conflates issue-preclusion with claim-preclusion—it is only the latter doctrine that precludes litigating a claim that could have been raised. *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948); *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999). Larson offers seemingly contrary quotations from *Chicot County Drainage Dist. v. Baxter Cnty. Bank*, 308 U.S. 371, 378 (1940), and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985), but the quotes refer specifically to *res judicata* (or claim-preclusion).

Under settled *issue*-preclusion rules, a ruling in a prior case is preclusive only if the issue previously resolved is *identical* to the issue now raised, the issue was *actually litigated* before, and resolving it was *necessary*. *Sunnen*, 333 U.S. at 599-600; *Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); DCB-70. Larson's cases confirm this, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986), and she fails all three elements of the test.

Here, new evidence and argument is presented concerning a new issue—the standalone work-for-hire status of the 1938 additions. And *National*'s comments about work-for-hire were "unnecessary" to its decision. *National* affirmed the

**EXHIBIT C**
**198**

**ER 1163**

district court's ruling that Siegel transferred his rights in *AC#1*, and, thus, it did not need to address the district court's alternative ruling that *AC#1* was made-for-hire. Additional "determination[s] adverse to the winning party [*i.e.*, DC] do[] not have preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985). Larson disagrees, saying *National* could only reach the transfer-of-rights issue because it found *AC#1* was not a work-for-hire. LOR-44. *National* belies that reading: its comments on work-for-hire are *four sentences* at the end of the opinion, *after* affirming the district court's transfer-of-rights ruling.

### 2. *The 1938 Additions Were Made-for-Hire*

Larson's merits arguments are equally unpersuasive. The disputed *AC#1* elements were all added in 1938, after DC employed Siegel and Shuster as artists to create new and derivative works for DC. Because these elements were added at DC's "instance and expense," they are either works-for-hire in their own right, or DC is a joint owner of the works that contain them. DCB-42-43, 61-68.[7]

---

[7] Larson concedes "authors of derivative works … own the copyright to their added material." LOR-55. DC thus at least owns the copyright in the 1938 elements. Larson denies DC can be a joint owner because there was no intent "that DC or its staff be considered 'coauthors.'" LOR-53. But her own case— *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 1999)—confirms that a joint work is created where multiple authors make independent contributions intending that their contributions be integrated into a single work. Here, that was plainly the case. DC exercised control over the creation and merging of the new elements into *AC#1*. DCB-67-68. "[C]omic book[s] are typically the joint work of four artists— the writer, the penciler[,] the inker[,] … and the colorist," *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004), and DC staff artists did the latter work. Larson

19

**EXHIBIT C**
**199**

  a. *New Content.*  Pursuant to the 1937 Employment Agreement, DC

instructed Siegel and Shuster to adapt their preexisting Superman story "into a full

length … strip" to be included in *AC#1*.  ER-957; SER-379, 381.  Siegel and

Shuster "compli[ed]," ER-957, and "revised and expanded" their story to include

new panels, text, and illustrations.  ER-654, 957; SER-385-86.  DC paid Siegel and

Shuster for their contributions, ER-917, 958; SER-383, 804, and had the right to

control and supervise them, ER-957; SER-379, 381, 383.  These facts are

undisputed, and easily satisfy the instance-and-expense test.  DCB-67-68.

  Larson quotes Shuster's testimony that DC did not give them specific

directions "as to what to do or what to include in Superman," LOR-47, but the

instance-and-expense test does not require particular directions—only that the

work itself be ordered and paid for by the employer, DCB-54-55.  It is the *right* to

dictate substance that matters, *Twentieth Century Fox Film Corp. v. Entm't

Distrib.*, 429 F.3d 869, 879-80 (9th Cir. 2005), and DC owned and did exercise the

rights one would expect an employer to exercise, ER-957, SER-379, 381, 383.

---

touts that Siegel and Shuster's names appear on the byline, LOR-53, but this is a
custom not remotely dispositive of authorship.  Indeed, the pair's names appear on
many works made-for-hire that Larson did not seek to terminate, and DC's name
appears on *AC#1*, the Promotional Announcements (which make no reference to
Siegel or Shuster), and *all* Superman publications.  Finally, the Announcements
feature the cover art DC created and tout *AC#1*'s "***Color!***," SER-370, making clear
these DC-created elements were instrumental to *AC#1*'s "appeal," *Aalmuhammed*,
202 F.3d at 1234.

**EXHIBIT C
200**

Larson also argues the 1938 Assignment proves that the new material—
created before the Assignment—was not work-for-hire. LOR-46. This is wrong
for many reasons. Among them, the 1938 Assignment assigned to DC the parts of
*AC#1* that Siegel and Shuster created *before* working for DC; it is the work the pair
did on the new elements that was made-for-hire. *Fox*, 429 F.3d at 881, also rejects
Larson's claim about the assignment. Because the instance-and-expense test is
satisfied for the 1938 additions, *supra* at 19-20, the presumption that DC owned all
copyright in those works may be overcome only by evidence proving the parties
*expressly agreed* Siegel would own the copyright, DCB-43. Larson has no such
evidence, and *Fox* holds the mere existence of a later assignment does not qualify.[8]

*b. Colorization.* DC colorist Jack Adler—the only percipient witness—
testified that Siegel and Shuster submitted the *AC#1* panels in black-and-white, and
other DC artists selected colors to add. DCB-61. Larson does not defend the trial
court's erroneous ruling that colorization cannot be copyrighted. *Id.* at 61-62. But
she does cite the court's equally erroneous criticism of Adler. LOR-48-49. The
court said Adler only "describe[d] procedures generally employed in the printing
process," rather than "what actually occurred with respect to" *AC#1*, SER-50,
when, in fact, Adler addressed those specifics. He testified it was industry custom

_____

[8] Larson rewrites *Dolman v. Agee*, 157 F.3d 708, 712-13 (9th Cir. 1998), as
holding, contrary to *Fox*, that an assignment alone rebuts the work-for-hire
presumption. LOR-46. *Dolman*,157 F.3d at 713, cited an assignment as but one of
*numerous* factors that *together* sufficed. None of the other factors is present here.

**EXHIBIT C
201**

for artists to submit "comic book work … in black and white," and that this "*was
the case with Action Comics No. 1*." SER-442 (emphasis added). He elaborated:
"Siegel and Shuster provided the artwork in black and white. Color was applied as
part of the regular printing process," and he even identified, by name, the DC artist
who "selected the color for Superman's 'S.'" *Id.* Larson speculates Siegel or
Shuster submitted "color guides," LOR-49, but no evidence supports this claim.

c. *Cover Art.* DC's February 22, 1938, letter to Siegel makes clear—and
Siegel's memoir confirms—that DC's artists "used one of those panel drawings of
SUPERMAN" as a template to create "the cover" of *AC#1*. SER-388, 803. Larson
says the cover was based on Shuster's "large promotional panel-drawings," LOR-
50, but whatever drawing was used as a "template," what matters is that the cover
was created *by DC artists* and thus is owned by DC, DCB-62-67.

Larson asserts DC's cover art is not independently copyrightable because it
is "closely derived" from an interior panel and any differences are "de minimis."
LOR-51. But Larson concedes that the cover features Superman with "a visible S-
crest on his chest" as well as "facial features and musculature," LOR-51 n.8, while
the interior panel does not.[9] Those differences satisfy the test in *Entm't Research
Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220, 1226 (9th Cir.
1997), that a derivative work is copyrightable if it contains "non-trivial" variations

---

[9] DC did not use a "low-resolution copy" of the panel. LOR-51n.8. In fact, it
enlarged the panel to make it more visible. *Compare* DCB-65-66, *with* SER-86.

22

**EXHIBIT C
202**

from the original work.  Larson says the different S-crest, facial features, and musculature appear in *other* panels in *AC#1*, LOR-51 n.8, but those elements first appeared in the Promotional Announcements that DC owns, DCB-80-81, 84.  And, in any event, DC's cover contains *seven other* non-trivial variations, DCB-64-65— all of which meet the *Genesis* test, and none of which Larson disputes.

### B.  DC Owns The Pre-McClure Strips ("Strips")

#### 1.  *The Strips Were Made-for-Hire*

The Strips were created *after* Siegel and Shuster entered into the 1937 employment agreement with DC, and *after* the pair assigned all of their Superman rights to DC in 1938.  ER-602-03, 615, 917; SER-582-89.  DC does not "ignore" the "instance and expense" test because of these agreements.  LOR-55.  Just the opposite:  the agreements are what *satisfy* the "instance" prong, because they mean the Strips were *necessarily* created at DC's instance.  DCB-71-72.  Since DC was the sole owner of all rights in Superman properties, it had complete control over the creation of new Superman material.  *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); DCB-47, 56-57.  It is thus irrelevant that Siegel and Shuster exercised creative independence.  LOR-55.[10]

---

[10] While authors of authorized derivative works "own the copyright to their added material" (LOR-55), where—as here—the derivative work is made-for-hire, the statutory "author" is the hiring party.  *Fox*, 429 F.3d at 881; DCB-9-10, 42-43.

**EXHIBIT C**
**203**

Larson concedes "Siegel and Shuster were compensated" for their work, LOR-55, which is enough to satisfy the "expense" prong. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995). And she concedes they created the Strips *expecting* to be compensated for their work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978), and that DC and McClure bore "the financial risk," *Fox*, 429 F.3d at 881—again establishing "expense." But she says the "expense" factor is not satisfied, because Siegel and Shuster were paid a royalty on net profits, rather than guaranteed compensation. LOR-55. Courts "roundly reject[]" that asserted distinction, as Toberoff well knows. *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (collecting cases).

2. <u>*Larson's Failure To Terminate The Strips Is Dispositive*</u>

Larson does not deny that her termination notice omitted *all* information concerning the Strips required by federal law—title, author, copyright date, and registration number. Rather, she argues the omission was harmless, because her notice included a "catch-all" footnote indicating an intent to recapture "every … omitted work." LOR-57. That theory contradicts the plain terms of the rule, which treats as harmless *only* those mistakes that "do[] not materially affect the adequacy of the information" in the notice. 37 C.F.R. §201.10(e)(1)-(2). The *complete omission* of all required information obviously *does* materially affect the adequacy of the notice—even with a catch-all, the required information is nonexistent.

24

**EXHIBIT C**
**204**

**ER 1169**

*Burroughs v. M-G-M, Inc.*, 491 F.Supp. 1320, 1326 (S.D.N.Y. 1980) (omission of five Tarzan works "'materially affect(s)' the adequacy of the Notice").[11]

If a termination notice could simply refer to "all works, including omitted works," there would be no point in requiring *any* information concerning particular works.  The rules specifically define errors that are harmless, Larson's error is not among them, and courts cannot engraft new exceptions, especially given the careful "compromise" the Copyright Act strikes between the rights of heirs and grantees like DC.  DCB-15-16 (citing legislative history).[12]

### C.    Pages 3-6 Of *S#1* Are Works-For-Hire

Larson maintains that pages 3-6 of *S#1* were created as part of the original Superman story in 1935—before Siegel and Shuster entered into a work-for-hire relationship with DC—and says there is "no evidence" to the contrary.  LOR-53.  Incredibly, Larson has no response (other than to ask the Court not to read it) to Siegel's refutation of this theory in his memoir:  "[Commentators] state Superman magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story.  The truth is that the additional pages were specifically created for use in Superman

---

[11] Larson's effort to distinguish *Burroughs* fails.  It held the omission was "not harmless," 491 F.Supp. at 1326, and the Second Circuit ruled the "incomplete notice left [the grantee] with license to use" the works.  683 F.2d 610, 622.

[12] Larson complains about DC's "math," LOR-59, but the numbers do not lie: of the 15 Superman works deemed subject to termination, the 12 Strips—80%— were completely omitted from her notices.  DCB-76-77.  That Larson wildly "over-noticed" other Superman works cannot turn a *nonexistent* notice of the Strips into an *adequate* one.

**EXHIBIT C
205**

**ER 1170**

Magazine No. 1." SER-805. Siegel's admission and DC's other evidence confirms these pages were made-for-hire on behalf of DC. DCB-78; SER-761.

### D. Artwork In *AC#4* Is Work-For-Hire

It is undisputed Siegel created *no* artwork to accompany the 1934 script that DC later incorporated into *AC#4*—a story illustrated by DC's staff artists. DCB-79-80. Larson's contention that DC cannot simultaneously own these illustrations as the author of a work-for-hire and as a joint author (LOR-54) misunderstands DC's argument. DC's primary submission is that the artwork is owned outright by DC as a work-for-hire, as the 99 panels of illustrations possess far more than the "*de minimis* quantum of creativity" necessary to be copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). The artwork is also a joint work between Siegel and DC, as both intended the script and illustrations to be combined into a comic strip. *Gaiman*, 360 F.3d at 659; *supra* n.7. Larson has no response, except to assert—without explanation—that the ownership of the *AC#4* artwork is "not before the Court." LOR-54. It is. DC claimed ownership below, RER-3, and the district court considered but "decline[d] to address" it in its August 2009 order being appealed, ER-78-79. The issue is preserved. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1397 n.1 (7th Cir. 1993).

26

**EXHIBIT C**
**206**

### E.     Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate. The court held the Announcements were not subject to termination—and Larson does not challenge this ruling. LOR-71 n.14. The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy. SER-44-45. Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it. DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing. LOR-72. Not so. DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day." LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002. *See* DCB-82-83 (collecting cases). And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial. In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements. DCB-84; Docket Nos. 30-1, 36-1.

**EXHIBIT C**
**207**

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or, at the least, reverse and remand on that defense and DC's limitations defense for trial. If the Court finds it has jurisdiction on the copyright issues presented, and it finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: June 19, 2012

28

**EXHIBIT C**
**208**

ER 1173

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(C) because it contains 6,796 words, excluding the portions exempted by FED. R. APP. P. 32(a)(7)(B)(iii). This brief's type size and type face comply with FED. R. APP. P. 32(a)(5) and (6).

Dated: June 19, 2012        O'MELVENY & MYERS LLP

By:   /s/ Matthew T. Kline
         Matthew T. Kline
         Attorneys for Warner Bros.
         Entertainment Inc. and DC Comics

**EXHIBIT C**
**209**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2012, I caused to be electronically filed the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on June 19, 2012, at Los Angeles, California.

/s/  Cassandra Seto
_____
Cassandra Seto

**EXHIBIT C
210**

Case 12-56243 08/25/2014 ID: 9002563 DktEntry: 23-17 Page 67 of 327

# EXHIBIT D

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22631 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

March 7, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   *Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 10-CV-08400 ODW (RZx)

Dear Dan:

I write on behalf of plaintiff Laura Siegel Larson, in response to your February 28, 2013 letter, which claims that DC Comics is prepared to tender a fixed sum ("Sum") under the October 19, 2001 Letter.

Given the smaller cash payments and advances (against royalties) in the October 19, 2001 Letter, it is clear that most of this Sum represents the royalties DC claims are payable, for the 12-year period commencing January 1, 2000, pursuant to the complex royalty scheme in the October 19, 2001 Letter.

Ms. Larson, however, cannot possibly ascertain whether DC's Sum complies with the October 19, 2001 Letter unless DC first provides an accounting that details the revenues from various media to which the royalties were applied. In other words, to make any sense of this, she needs to know precisely how DC calculated the Sum. Even the October 19, 2001 Letter, with which DC purports to comply, requires royalty accounting statements in paragraph C.5, not simply audit rights as stated in your letter. Moreover, when a participant conducts an audit it is of the accounting statements rendered, and is not in a vacuum.

DC accounting statements were therefore requested in my letter to you of February 9, 2013, but to no avail. Without transparent accountings by DC, its February 28, 2013 offer of compliance is unverifiable, and, to that extent, illusory.

This is compounded by the troubling fact that the Sum that DC "tenders" in 2013 is only 5% higher than the amount DC represented was owed Ms. Larson as of 2006. *See* Warner's Opposition to Def.'s Motion for Summary Judgment at 22 n.18 (stating that "as of the latter part of 2006" the "[Siegels'] account totaled approximately $20 million dollars"). It defies common

**TOBEROFF & ASSOCIATES, P.C.**

March 7, 2013
Re:     *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:   2 of 2

sense that roughly 95% of the Sum accumulated in the first 6 years (since January 1, 2000), and that only 5% of Ms. Larson's royalties accumulated in the next 6 years.

If DC's purported financial tender is serious, please refrain from setting artificial deadlines and provide a full accounting sufficient to show exactly how DC computed its number.

The other contentions in your letter are disputed. Nothing in this letter should be construed as a waiver or limitation of Ms. Larson's rights or remedies, all of which are reserved.

Please attach a copy of this letter to any filing regarding DC's purported "tender" under the October 19, 2001 Letter.

Very truly yours,

Marc Toberoff

Case: 12-56243   08/25/2014   ID: 9202563   DktEntry: 23-17   Page: 70 of 327

# EXHIBIT E

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 71 of 327

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

     Plaintiffs,

    vs.

WARNER BROS. ENTERTAINMENT
INC., et al.,

     Defendants.

AND RELATED COUNTERCLAIMS.

No. 04-8400 (RSWL)(RZx)
     -and-
No. 04-8776 (RSWL)(RZx)

CERTIFIED
COPY

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

**EXHIBIT E**
213

ER 1180

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 72 of 327

1              The "after we reached...agreement," is that

2     referring to the period following Kevin Marks' October

3     19, 2001 letter?

4         A    No.  She was talking about if we reached a final

5     agreement.  We never reached a final agreement.

6              MR. TOBEROFF:  I guess I can't say it.  I think

7     I know what it means, but I'm not going to say it.

8     BY MR. ZISSU:

9         Q    At the top of the next page it says, "But this

10    contract seeks to discredit Jerry...and to undermine our

11    rights, a direct contradiction to what was said."

12             Did you consider this contract to be a

13    contradiction because all of the rights would end up with

14    DC?

15        A    No.  I think she's talking about a contradiction

16    to the -- to terms that we had approved.  She's not

17    talking about anything that we --

18        Q    And what --

19        A    -- didn't approve.

20             THE REPORTER:  "Didn't approve"?  Is that what

21    you said?

22             THE WITNESS:  I don't know what I said.

23             (Answer read.)

24             THE WITNESS:  I guess I said "didn't approve."

25    BY MR. ZISSU:

220

**EXHIBIT E**
**214**

ER 1181

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 73 of 327

Sep-16-06   02:31pm   From-                                    T-999   P.003/006   F-699

1
2
3
4
5
6
7
8          I, LAURA SIEGEL LARSON, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this _17th_ day of _September_,

15   20_06_, at _Playa Del Rey_, _California_.
                      (City)                    (State)

16
17
18
19          _Laura Siegel Larson_
             LAURA SIEGEL LARSON

20
21
22
23
24
25

                                                            278

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 74 of 327

1
2
3
4        I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby certify:
6            That the foregoing proceedings were taken
7    before me at the time and place herein set forth; that
8    any witnesses in the foregoing proceedings, prior to
9    testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under by
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14            I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17            IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated: _____ AUG 1 8 2006 _____
21
22                    _____
23                    DAVID S. COLEMAN, CSR NO. 4613
24
25

**EXHIBIT E**
**216**

ER 1183

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 75 of 327

Sep-18-06   02:31pm   From-                              T-998   P.004/006   F-698

# Errata Sheet

**Pg/Ln**                          **Correction**

5 | 20 *Lil* Change from: _Issue No. 31 of More Fun Comics dated May, 1938_
Change to: _cover and one page from Issue No. 31 of More Fun Comics dated May, 1938, cover and one page from Issue No. 26 of Adventure Comics dated May, 1938, and cover and one page from Issue No. 15 of Detective Comics_

16 | 7 *Lil* Change from: _" 1972 "_
Change to: _" 1973 "_

20 | 2 *Lil* Change from: _"I don't remember like that. "_
Change to: _"I don't remember anything like that."_

25 | 7 *Lil* Change from: _"I don't surf for any email address."_
Change to: _"I don't surf for an email address."_

30 | 24-25 *Lil* Change from: _"He was very energetic and passionate about the Siegel and the_
Change to: _He was very energetic and passionate about the Siegel — the Siegels_    Siegels

71 | 7-8 *Lil* Change from: _"It has nothing to do with copyright issue. "_
Change to: _"It has nothing to do with the copyright issue."_

135 | 1-2 *Lil* Change from: _"I mean that were not in the proposal would appear in a final_    write-up"
Change to: _"I mean that no conditions that were not in the original proposal would appear in a final write-up"_

180 | 11-12 *Lil* Change from: _"... is this contract referring to the list of Works,..."_
Change to: _"... is this referring to the list of Works..."_

251 | 24 *Lil* Change from: _"1991"_
Change to: _"1999"_

___ | ___    Change from: _____
Change to: _____

___ | ___    Change from: _____
Change to: _____

___ | ___    Change from: _____
Change to: _____

___ | ___    Change from: _____
Change to: _____

Signature: _Laura Siegel Larson_        Date: _September 17, 2006_

**EXHIBIT E**
**217**

ER 1184

Case 12-56243  08/25/2014  ID: 9202563  DktEntry: 22-17  Page 76 of 327

# EXHIBIT F

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   1999 Avenue of the Stars, Suite 1540
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   Joanne Siegel and Laura Siegel Larson

6

7              **UNITED STATES DISTRICT COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9  JOANNE SIEGEL, an individual; and         Civil Case No. **04-8400  RSWL (RZx)**
   LAURA SIEGEL LARSON, an
10 individual,                               **PLAINTIFFS JOANNE SIEGEL
                                             AND LAURA SIEGEL LARSON'S
11                                           RESPONSES TO DEFENDANT
            Plaintiffs,                      DC COMICS' FIRST SET OF
12                                           INTERROGATORIES NO. 1-19**
            vs.
13
   WARNER BROS.
14 ENTERTAINMENT INC., a
   corporation; TIME WARNER INC., a
15 corporation; DC COMICS, a general
   partnership; and DOES 1-10,
16
17         Defendants
18
19
20 DC COMICS,
21
            Plaintiffs
22
23         vs.
24
   JOANNE SIEGEL, an individual; and
25 LAURA SIEGEL LARSON, an
   individual,
26
27         Counterclaim Defendants
28

                            1

PLAINTIFFS' RESPONSES TO DEFENDANT DC COMICS' FIRST SET OF INTERROGATORIES

**EXHIBIT F
218**

**ER 1186**

Case 2:04-cv-08400-ODW-RZ Document 661-3 Filed 03/08/13 Page 224 of 237 Page ID
#:16108
Case 2:04-cv-08776-ODW-RZ Document 661-3 Filed 03/08/13 Page 248 of 237 Page ID
#:16108

**Response No. 2**

Plaintiffs further object to this interrogatory on the grounds that it is vague and ambiguous, including, without limitation, as to the phrase "agreed to by Plaintiffs." Plaintiffs further object to this interrogatory on the grounds that it is overbroad, burdensome and oppressive. Plaintiffs further object to this interrogatory on the ground that it is a premature contention interrogatory under Fed. Rule Civ. P. 33(c). Subject to and without waiving the foregoing general and specific objections, Plaintiffs respond, without limitation, as follows: The terms set forth in the October 19, 2001 letter did not constitute terms of an agreement; they were terms in a negotiation of a potential agreement that was later disrupted by Defendants' counteroffer(s), which were rejected by Plaintiffs, and never consummated. There was also never a meeting of the minds between Plaintiffs and Defendants as to all material terms of an agreement. Defendants acknowledged as much, including by submitting a draft counter-proposal to Plaintiffs on February 1, 2002 with new material terms not contained in the October 19, 2001 Letter, which, as stated in Defendants' counsel's cover letter which enclosed the counter-proposal, was subject to Defendants' "right to comment."

**Special Interrogatory No. 3**

If you contend that the letter of October 19, 2001 from Kevin Marks to John Schulman does not constitute an enforceable agreement, set forth all bases for such contention.

**Response No. 3**

Plaintiffs further object to this interrogatory on the grounds that it is vague and ambiguous, including, without limitation, as to the phrase "does not constitute an enforceable agreement." Plaintiffs further object to this interrogatory on the grounds that it is overbroad, burdensome and oppressive. Plaintiffs further object to this interrogatory on the ground that it is duplicative

11

PLAINTIFFS' RESPONSES TO DEFENDANT DC COMICS' FIRST SET OF INTERROGATORIES

**EXHIBIT F**
**219**

ER 1187

1 of Interrogatory No. 2.  Plaintiffs further object to this interrogatory on the

2 ground that it is a premature contention interrogatory under  Fed. Rule Civ. P.

3 33(c).  Subject to and without waiving the foregoing general and specific

4 objections, Plaintiffs respond, without limitation, as follows:

5 The October 19, 2001 letter from Kevin Marks to John Schulman in no

6 way constituted an enforceable agreement between Plaintiffs and D.C. Comics.

7 The terms set forth in the October 19, 2001 letter did not constitute terms of an

8 agreement; they were terms in a negotiation of a potential agreement that was

9 later disrupted by Defendants' counteroffer(s), which were rejected by

10 Plaintiffs, and never consummated.  There was also never a meeting of the

11 minds between Plaintiffs and Defendants as to all material terms of an

12 agreement.  Defendants acknowledged as much, including by submitting a draft

13 counter-proposal to Plaintiffs on February 1, 2002 with new material terms not

14 contained in the October 19, 2001 Letter, which, as stated in Defendants'

15 counsel's cover letter enclosing the counter-proposal, was subject to

16 Defendants' "right to comment."

17 **Special Interrogatory No. 4**

18 If you contend that any of the terms set forth in the letter of October 26,

19 2001 from John Schulman to Kevin Marks were not agreed to by Plaintiffs, set

20 forth all bases for such contention, including but not limited to, identifying the

21 terms Plaintiffs claim were not agreed to.

22 **Response No. 4**

23 Plaintiffs further object to this interrogatory on the grounds that it is

24 vague and ambiguous, including, without limitation, as to the phrase "agreed to

25 by Plaintiffs."  Plaintiffs further object to this interrogatory on the grounds that

26 it is overbroad, burdensome and oppressive.  Plaintiffs further object to this

27 interrogatory on the ground that it is a premature contention interrogatory under

28 Fed. Rule Civ. P. 33(c).  Subject to and without waiving the foregoing general

12

**EXHIBIT F**
**220**

ER 1188

1  (statutory copyright to Action Comics No. 6 was secured on September 26,
2  1938), and (iv) the material published as/in Action Comics Nos. 7- 61 (statutory
3  copyright to Action Comics No. 61 was secured on April 13, 1943), none of
4  which were works-for-hire.
5      The Notices of Termination were drafted, served on Defendants and filed
6  with the United States Copyright Office, all in full compliance with the
7  Copyright Act, 17 U.S.C. 304(c), and the regulations promulgated thereunder by
8  the Register of Copyrights, 37 C.F.R. § 201.10 (2003).  The Notices of
9  Termination terminated on April 16, 1999 all prior grants or purported grants of
10 the renewal copyrights in and to each and/or all the aforesaid for their extended
11 renewal terms.  On April 16, 1999, the noticed Termination Date, Plaintiffs re-
12 gained ownership to Jerry Siegel's undivided fifty percent (50%) copyright
13 interest in and to each and/or all of the subject works for their extended renewal
14 terms.
15
16 Dated:  June 7, 2006          LAW OFFICES OF MARC TOBEROFF, PLC
17
18                              _____
19                                   Marc Toberoff
                                Attorneys for Plaintiffs JOANNE
20                              SIEGEL and LAURA SIEGEL LARSON
21
22
23
24
25
26
27
28

26

PLAINTIFFS' RESPONSES TO DEFENDANT DC COMICS' FIRST SET OF INTERROGATORIES

**EXHIBIT F**
221

ER 1189

FROM :                         FAX NO. :                         Jun. 07 2006 08:50PM  P1

1

2     **VERIFICATION OF INTERROGATORY ANSWERS**

3        I, Joanne Siegel, Plaintiff, verify that the foregoing answers are

4     true and correct to the best of my knowledge, information and belief. I

5     declare under penalty of perjury that the foregoing is true and correct.

6

7        Executed on June 7, 2006 at Los Angeles, California.

8

9

10

11                                        Joanne Siegel

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

Received   Jun-07-06  08:10pm        From-                    To-                    Page  001

ER 1190

JUN-07-2006 09:55 PM                                310 927 7227          P.02

## VERIFICATION OF INTERROGATORY ANSWERS

I, Laura Siegel Larson, Plaintiff, verify that the foregoing answers are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2006 at Los Angeles, California.

_Laura Siegel Larson_
Laura Siegel Larson

28

Received   Jun-07-06  07:24pm     From-1 310 927 7227        To-             Page  002

ER 1191

1   Marc Toberoff (State Bar No. 188547)
      mtoberoff@toberoffandassociates.com
2   Keith G. Adams (State Bar No. 240497)
      kadams@toberoffandassociates.com
3   Pablo D. Arredondo (State Bar No. 241142)
      parredondo@toberoffandassociates.com
4   David Harris (State Bar No. 255557)
      dharris@toberoffandassociates.com
5   TOBEROFF & ASSOCIATES, P.C.
    22337 Pacific Coast Highway, #348
6   Malibu, California, 90265
    Telephone:   (310) 246-3333
7   Fax:         (310) 246-3101

8   Attorneys for Plaintiff-Counterclaim
    Defendant, Laura Siegel Larson,
9   individually and as personal representative
    of the Estate of Joanne Siegel

10              **UNITED STATES DISTRICT COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 12  LAURA SIEGEL LARSON, | Case No: 04-CV-08400 ODW (RZx)* |
| 13  individually and as personal | Case No: 04-CV-08776 ODW (RZx)* |
| representative of the ESTATE OF | |
| 14  JOANNE SIEGEL, | Hon. Otis D. Wright II, U.S.D.J. |
| 15              Plaintiff, | Hon. Ralph Zarefsky, U.S.M.J. |
| 16      v. | **PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE SIEGEL SUPERMAN AND SUPERBOY CASES** |
| 17  WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, | |
| 18              Defendants and | *Declaration of Keith Adams and Statement of Genuine Issues of Fact and Law filed concurrently* |
| 19              Counterclaimants. | |
| 20  LAURA SIEGEL LARSON, | Date:      March 25, 2013* |
| 21  individually and as personal | Time:      1:30 p.m.* |
| representative of the ESTATE OF | Place:     Courtroom 11* |
| 22  JOANNE SIEGEL, | *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary.  Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |
| 23              Plaintiff, | |
| 24      v. | |
| TIME WARNER INC., WARNER | |
| 25  COMMUNICATIONS INC., | |
| WARNER BROS. ENTERTAINMENT | |
| 26  INC., WARNER BROS. TELEVISION | |
| PRODUCTION INC., DC COMICS, | |
| 27  and DOES 1-10, | |
| 28              Defendants and | |
|                Counterclaimants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS ................................................................. 3

STANDARD OF REVIEW ................................................................ 6

ARGUMENT ...................................................................................... 6

I.  THE MANDATE DOES NOT SUPPORT PREMATURE
    JUDGMENT ............................................................................... 6

II. ISSUES OF MATERIAL FACT PREVENT SUMMARY
    JUDGMENT ............................................................................... 9

    A.  The October 19, 2001 Letter Did Not Transfer The Copyrights
        And DC Is Not Entitled To A Declaration Of Rights To That
        Effect ................................................................................... 9

        1.  The Letter's Language Does Not Support DC's
            Interpretation ............................................................... 9

        2.  Any Ambiguity Must Be Resolved By The Trier Of Fact ....... 10

        3.  The Circuit Did Not Hold That The Siegels Assigned
            Rights ........................................................................... 10

        4.  A Judgment That The Siegels "Are" Obliged To Transfer
            Rights To DC Would Not Settle The Issue .............................. 11

    B.  DC Is Not Entitled To Specific Performance ........................... 12

        1.  DC Did Not Perform Or Even Offer To Perform ..................... 14

        2.  The Failure To Complete A Long-Form Agreement Did
            Not Excuse DC's Non-Performance ....................................... 15

        3.  The Siegels Did Not Breach The Letter ................................. 16

            a.  DC's Anticipatory Breach/Repudiation ......................... 16

            b.  DC's Actual Breach ....................................................... 19

            c.  The Siegels' Rescission ................................................. 20

            d.  DC's Acquiescence and Abandonment ........................... 22

III. FEDERAL COPYRIGHT LAW PREVENTS SUMMARY
     JUDGMENT AS TO SUPERBOY AND THE SUPERMAN ADS ............ 23

CONCLUSION ................................................................................. 25

**ER 1193**

# TABLE OF AUTHORITIES

**Cases**

*Abdulkhalik v. City of San Diego,*
2009 U.S. Dist. LEXIS 110062 (S.D. Cal. Nov. 25, 2009) ...................................12

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) .................................................................................................6

*Arachnid, Inc. v. Merit Indus., Inc.,*
939 F.2d 1574 (Fed. Cir. 1991) .............................................................................10

*Barndt v. County of L.A.,*
211 Cal. App. 3d 397 (1989) ..................................................................................12

*Beverage v. Canton Pacer Mining Co.,*
43 Cal. 2d 769 (1955) ........................................................................................14-15

*Blackburn v. Charnley,*
117 Cal. App. 4th 758 (2004) .................................................................................13

*Brown v. Grimes,*
192 Cal. App. 4th 265 (2011) .................................................................................19

*Campanelli v. Bockrath,*
1997 U.S. Dist. LEXIS 7981 (N.D. Cal. June 4, 1997) ...........................................8

*Castaneda v. Dura-Vent Corp.,*
648 F.2d 612 (9th Cir. 1981) .................................................................................10

*CDF Firefighters v. Maldonado,*
158 Cal. App. 4th 1226 (2008) ..............................................................................13

*City of Hollister v. Monterey Ins. Co.,*
165 Cal. App. 4th 455 (2008) .................................................................................16

*Classic Media, Inc. v. Mewborn,*
532 F.3d 978 (9th Cir. 2008) .................................................................................24

*Darling Int'l, Inc. Baywood Partners, Inc.,*
2007 U.S. Dist. LEXIS 50985 (N.D. Cal. July 13, 2007) ......................................18

*Daugherty Co. v. Kimberly-Clark Corp.,*
14 Cal. App. 3d 151 (1971) ...................................................................................23

*Dobson v. Twin City Fire Ins. Co.,*
2012 U.S. Dist. LEXIS 93823 (C.D. Cal. July 5, 2012)........................................15

*Doe v. State of Nebraska,*
2002 WL 225907 (D. Neb. Dec. 14, 2002) .............................................................8

*Edgerly v. City & County of San Francisco*,
2011 U.S. Dist. LEXIS 155192 (N.D. Cal. May 26, 2011) ..................................... 8

*Edlin v. M/V Truthseeker*,
69 F.3d 392 (9th Cir. 1995) .................................................................................. 8

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ............................................................................ 15

*Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.*,
822 F.2d 833 (9th Cir. 1987) .............................................................................. 22

*Ferguson v. City of Cathedral City*,
197 Cal. App. 4th 1161 (2011) ........................................................................... 16

*Firth v. United States*,
554 F.2d 990 (9th Cir. 1977) ................................................................................ 8

*Freedman v. St. Matthias Parish*,
37 Cal. 2d 16 (1951) ........................................................................................... 18

*Freeman v. Mostafavi*,
2005 Cal. App. Unpub. LEXIS 10154 (Cal. App. 2d Dist. Nov. 8, 2005) ............. 23

*Golden West Baseball Co. v. City of Anaheim*,
25 Cal. App. 4th 11 (1994) ................................................................................. 13

*Griffin v. Beresa, Inc.*,
143 Cal. App. 2d 299 (1956) .............................................................................. 22

*Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers*
192 Cal. App. 2d 268 (1961) .............................................................................. 22

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
531 F.3d 767 (9th Cir. 2008) ................................................................................ 7

*Hall v. City of L.A.*,
697 F.3d 1059 (9th Cir. 2012) .............................................................................. 8

*Hil-Mac Corp. v. Mendo Wood Products, Inc.*,
235 Cal. App. 2d 526 (1965) .............................................................................. 22

*Hull v. Ray*,
211 Cal. 164 (1930) ............................................................................................ 20

*Honda v. Reed*,
156 Cal. App. 2d 536 (1958) .............................................................................. 23

*Industrial Indemnity v. Superior Court*,
224 Cal. App. 3d 828 (1990) .............................................................................. 10

*Irwin v. American Interactive Media*,
1994 U.S. Dist. LEXIS 16223 (C.D. Cal. Apr. 14, 1994) ..................................... 21

ER 1195

*Jaunich v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.,*
647 F. Supp. 209 (N.D.Cal.1986) ................................................................21

*Johnson v. Goldberg,*
130 Cal. App. 2d 571 (1955) ......................................................................18

*Katz v. Cal-Western Reconveyance Corp.,*
2010 U.S. Dist. LEXIS 98940 (N.D. Cal. Sept. 21, 2010) ......................13

*Lancaster v. Tilton,*
2007 U.S. Dist. LEXIS 48403 (N.D. Cal. June 21, 2007) .........................8

*Larson v. Warner Bros. Entm't, Inc.,*
2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) ...............1, 7, 11

*Li'l Red Barn, Inc. v. Red Barn Sys., Inc.,*
322 F. Supp. 98 (N.D. Ind. 1970) ................................................................9

*Local 659, I.A.T.S.E. v. Color Corp. of America,*
47 Cal. 2d 189 (1956) ................................................................................16

*Loop Building Co. v. De Coo,*
97 Cal. App. 354 (1929) .......................................................................17, 20

*Maffei v. N. Ins. Co. of N.Y.,*
12 F.3d 892 (9th Cir. 1993) ........................................................................10

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes,*
191 Cal. App. 4th 435 (2010) ................................................................16, 18

*Marvel Characters v. Simon,*
310 F.3d 280 (2d Cir. 2002) ......................................................................24

*McCreary v. Mercury Lumber Distributors,*
124 Cal. App. 2d 477 (1957) ......................................................................23

*Milne v. Stephen Slesinger, Inc.,*
430 F.3d 1036 (9th Cir. 2005) ....................................................................24

*Mycogen Corp. v. Monsanto Co.,*
28 Cal. 4th 888 (2002) ................................................................................12

*N.Y. Times v. Tasini,*
533 U.S. 483 (2001) ....................................................................................24

*Narayan v. EGL, Inc.,*
616 F.3d 895 (9th Cir. 2010) ........................................................................6

*Ninety Nine Invest. v. Overseas Courier Service (Sing.) Priv.,*
113 Cal. App. 4th 1118 (2003) ..................................................................14

*Odima v. Westin Tucson Hotel,*
53 F.3d 1484 (9th Cir. 1995) ........................................................................8

**ER 1196**

*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*,
411 F.2d 889 (9th Cir. 1969) ..................................................................... 17, 19

*Peer Int'l Corp. v. Pausa Records, Inc.*,
909 F.2d 1332 (9th Cir. Cal. 1990) ................................................................. 21

*Pichignau v. Paris*,
264 Cal. App. 2d 138 (1968) ......................................................................... 18

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
770 F.2d 866 (9th Cir. 1985) ......................................................................... 12

*Posner v. Grunwald-Marx, Inc.*,
56 Cal. 2d 169 (1961) .................................................................................... 19

*Rubin v. Fuchs*,
1 Cal. 3d 50 (1969) ........................................................................................ 21

*SCO Group, Inc. v. Novell, Inc.*,
2004 WL 4737297 (D. Utah June 9, 2004) ...................................................... 9

*Siegel v. Warner Bros. Entertainment, Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................................... 5

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ......................................................................... 6

*U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
498 F.2d 335 (9th Cir. 1974) ......................................................................... 21

*Union Oil Co. of California v. Greka Energy Corp.*,
165 Cal. App. 4th 129 (2008) ........................................................................ 13

*Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*,
593 F. Supp. 2d 1153 (S.D. Cal. 2008) .......................................................... 15

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007) ........................................................................... 6

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995) ........................................................................................ 9

*Walters v. Calderon*,
25 Cal. App. 3d 863 (1972) ........................................................................... 13

*Wilson v. Lewis*,
106 Cal. App. 3d 802 (1980) ......................................................................... 21

**Statutes**

17 U.S.C. § 304(c)(5) ...................................................................................... 24

17 U.S.C. § 304(c)(6)(D) ............................................................................ 2, 23

Cal. Civ. Code § 1439 ............................................................................................ 14

Cal. Civ. Code § 1639 .............................................................................................. 9

Cal. Civ. Code § 1689(b) ........................................................................................ 20

Cal. Civ. Code § 1691 ............................................................................................ 20

Cal. Civ. Code § 1657 ............................................................................................ 20

Cal. Civ. Code § 1693 ............................................................................................ 22

Cal. Civ. Code §1657 ............................................................................................. 20

Fed. R. Civ. P. 56(c) ................................................................................................ 6

Fed. R. Civ. P. 56(f) .............................................................................................. 12

Tables of Contents and Authorities

**ER 1198**

## **INTRODUCTION**

1
2       Defendant DC Comics' ("DC") summary judgment motion ("Mot.") is falsely
3   premised.  DC cannot rush this case to judgment based on its willful misreading of
4   the Ninth Circuit's recent decision.  The Circuit did ***not*** hold that the October 19,
5   2001 letter from the Siegels' attorney to DC actively transferred the Siegels'
6   copyrights to DC, as DC solely argues.  It held only that the letter was "an acceptance
7   of terms negotiated between the parties" that "was sufficient" to create a contract on
8   October 19, 2001, and remanded this case for adjudication of DC's counterclaims.
9   *Larson v. Warner Bros. Ent., Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir.
10  January 10, 2013).  What the resulting October 19, 2001 agreement meant, and
11  whether and to what extent it is still enforceable given DC's subsequent conduct, are
12  entirely separate questions raised by DC's counterclaims.  The answers to those
13  questions show that DC is not entitled to summary judgment – and why DC did not
14  bring a proper summary judgment motion as to its counterclaims.

15      As a matter of law, the October 19, 2001 letter could not have transferred the
16  Siegels' copyrights, as it unambiguously states that the Siegels "would" transfer their
17  rights in the future.  DC thus requires specific performance of the October 19, 2001
18  letter.  But specific performance requires that DC first prove that the Siegels <u>breached</u>
19  the agreement plus additional elements, which DC cannot establish and has not even
20  attempted to prove in its motion.  Tellingly, DC asked in its motion that its Third
21  Counterclaim for breach of contract be *dismissed*.  DC can neither prove the elements
22  of breach nor obtain specific performance under California law.

23      Today, DC insists that the terms are "everything in this [October 19] letter,
24  nothing more."  But in 2001-2002, DC acted as though it was not bound by it.  For
25  instance, the October 19, 2001 letter set forth a clear unequivocal obligation of DC to
26  pay the Siegels by March 31, 2002, and there is no condition in the October 19, 2001
27  letter that any "long-form" agreement first be negotiated.  That day came and went.
28  DC did not pay or even offer to pay, on March 31, 2002 in exchange for the Siegels'

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

performance, as it had promised, breaching its agreement. Instead, DC conditioned its performance on new and revised terms found nowhere in the October 19, 2001 letter, all of which favored DC and hurt the Siegels.

After attempting to grind and muscle the Siegels, DC cannot now have its cake and eat it too, and avoid the consequences of its actions in 2001-2002. Under clear California law, DC's anticipatory breach, followed by its actual breach of the October 19, 2001 letter, excused the Siegels' performance and allowed them to rescind the October 19, 2001 letter. In May 2002, the Siegels rejected DC's overreaching attempts to "claw back" on its promises to them, and exercised their right of rescission. In response, DC did not retract its demands and revert to the October 19, 2001 letter. DC did not offer to perform under the October 19, 2001 letter or claim that the Siegels were bound by the October 19, 2001 letter. Instead, DC acquiesced and engaged in new negotiations with the Siegels. DC asserted no rights under the October 19, 2001 letter until after the Siegels filed this action in October, 2004.

In short, when it mattered, DC did not honor the October 19, 2001 letter, anticipatorily breaching and then actually breaching its terms, causing justifiable rescission of the October 19, 2001 letter, and precluding its enforcement today.

At a minimum, this raises genuine issues of material fact barring summary judgment. DC entirely failed to address these issues in its motion, and they cannot be decided *ad hoc* as that would violate Ms. Larson's right to due process.

In addition, the October 19, 2001 letter could not have transferred the Siegels' recaptured Superboy copyrights or their rights in the early Superman promotional announcements ("Ads"). Under 17 U.S.C. § 304(c)(6)(D), a terminated copyright can only be re-granted to the original grantee *after* the notice of termination is served. The Siegels did not serve Superboy termination notices until 2002, and did not serve termination notices regarding the Ads until 2012. The October 19, 2001 letter could not have transferred to DC the Siegels' termination interests in Superboy or the Ads as a matter of law, and therefore the October 19, 2001 letter has no bearing on the

**ER 1200**
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

Siegels' *Superboy* case (C.D. Cal. Case No. 04-CV-08776).

DC's rush to judgment must be rejected, and its motion denied.

## STATEMENT OF FACTS

In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices of termination pursuant to the Copyright Act as to Jerome Siegel's Superman copyright grants to DC. Statement of Issues ("SGI") ¶2. In 1999, the parties entered into formal negotiations, in which the Siegels were represented by attorney Kevin Marks and DC by Warner's then-General Counsel, John Schulman. SGI ¶3.

On October 16, 2001, DC made a settlement offer to the Siegels. SGI ¶3. On October 19, 2001, Marks sent a "term sheet," in letter form, to Schulman, which the Ninth Circuit later held was a valid acceptance of DC's offer creating an agreement (the "October 19, 2001 Letter"). SGI ¶5. DC now argues and admits that these were the only terms the parties ever agreed to. SGI ¶52-53. The October 19, 2001 Letter contained a specific, time-sensitive obligation of DC: "an annual guarantee of $500,000 per year payable for ten years beginning March 31, 2002." SGI ¶6. There was also a $1,000,000 "signing bonus," presumably payable before March 31, 2002, and a $2,000,000 "advance" for the period beginning January 1, 2000. *Id.* At the time the parties agreed to this March 31, 2002 deadline, they intended the terms of the October 19, 2001 Letter to be transposed into an agreement format for signature by the parties, which should have been a relatively simple task. SGI ¶7.

DC did not accept the October 19, 2001 Letter as the parties' agreement. Instead, on October 26, 2001, Schulman sent a letter to Marks, enclosing a "more fulsome outline" of deal terms (the "October 26, 2001 Letter"). SGI ¶8. The October 26, 2001 Letter was sent when Marks was in China for a long period; he did not return until late November 2001, and it was <u>not</u> forwarded to the Siegels. SGI ¶9.

As is evident from the October 26, 2001 Letter, and as Marks testified, Schulman's "outline" contained new and changed terms that were materially different from those in the October 19, 2001 Letter, all in DC's favor. SGI ¶¶10-16. Among

**ER 1201**

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

other changes, the outline required the Siegels to assign additional copyrights to DC, reduced the Siegels' royalty in many instances, changed when and where credit would be given, and added numerous warranty and indemnity provisions found nowhere in the October 19, 2001 Letter. *Id*. The October 26, 2001 Letter also states that DC was preparing a "draft agreement." SGI ¶8. The October 26, 2001 Letter confirms the "Annual Payment (Advance)" of "$500,000 per year for ten years, commencing 2002, payable 3/31 of year," *i.e.*, beginning March 31, 2002. SGI ¶17.

After over three months, DC finally sent Marks a draft agreement on February 1, 2002 (the "February 1, 2002 Draft"), which was vastly different from the October 19, 2002 Letter, as Marks testified. SGI ¶¶6, 18-21. In addition to the new material terms in DC's October 26, 2013 Letter, DC insisted on numerous new and changed terms – all to DC's benefit and the Siegels' detriment. SGI ¶¶19-21.

The March 31, 2002 payment deadline came and went; DC did not pay or even tender the $500,000 annual payment, the $1,000,000 signing bonus, or the $2,000,000 advance, as DC had expressly promised and as set forth in the October 19, 2001 Letter. SGI ¶24.

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, COO of DC's parent, AOL Time Warner Inc., objecting to the February 1, 2002 Draft and stating: "When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago [the October 19, 2001 agreement], we were stabbed in the back with a shocking [February 1, 2002] contract" and that "[a]fter four years we have no deal and this contract makes an agreement impossible." SGI ¶25; Declaration of Keith Adams ("AD"), Ex. 4.

On May 21, 2002, Time Warner sent a reply letter to Joanne, stating it was "quite troubled by [her] feeling[s]." SGI ¶26. However, it did not retract its aggressive demands in the February 1, 2002 Draft, or go back to the terms in the October 19, 2001 Letter that the Siegels confirmed was their agreement. SGI ¶¶26-27. Instead, DC falsely maintained that the draft "accurately represented the

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

agreement previously reached," when a plain comparison of its Draft to the October 19, 2001 Letter revealed that this was not true.  SGI ¶¶6, 18-21, 26.

On September 21, 2002, the Siegels sent a letter in which they terminated Marks and provided "formal notification that we are totally stopping and ending all negotiations with DC Comics … effective immediately."  SGI ¶29.  Later, in November 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective date of November 17, 2004.  SGI ¶30.

In response to all of these events, DC did not claim rights under the October 19, 2001 Letter.  SGI ¶33.  Nor did DC comply, or offer to comply, with its obligations under the October 19, 2001 Letter.  SGI ¶32.  Instead, in 2003-04, DC simply resumed negotiations with the Siegels.  SGI ¶31.

The parties' new negotiations were unsuccessful and accordingly, on October 8 and October 22, 2004, the Siegels filed suits to enforce their statutory terminations as to Superman and Superboy, respectively.  SGI ¶¶34-35.  On November 22, 2004, DC counterclaimed, and contended for the first time in three years that the October 19, 2001 Letter constituted an agreement.  SGI ¶¶36-37.  DC also alleged for the first time that the Siegels had repudiated that agreement by their May 9, 2002 and September 21, 2002 letters.  SGI ¶38.  DC's Third Counterclaim against the Siegels was for breach of contract, and its Fourth Counterclaim (on which it now moves) sought only declaratory relief as to the October 19, 2001 Letter.  SGI ¶¶39-40.

Judge Larson concluded on summary judgment that the parties had failed to reach an agreement, citing the "materially different" terms of the October 26, 2001 Letter and the "vastly different" terms of the February 1, 2002 Draft.  SGI ¶47.  This Court then entered a Rule 54(b) judgment, and both sides appealed.  SGI ¶¶48-49.

On March 6, 2012, Ms. Larson served a termination notice on DC regarding early Superman Ads, with an effective date of March 12, 2014.  SGI ¶63.

On January 10, 2013, the Circuit reversed Judge Larson's ruling, holding that the October 19, 2001 Letter constituted a valid acceptance of DC's offer sufficient to

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

form an agreement on October 19, 2001.  SGI ¶58.  The Circuit did not disturb Judge Larson's findings as to the "materially" and "vastly different" terms in DC's October 26, 2001 Letter and February 1, 2002 Draft, and remanded the case for further adjudication of DC's contract claims – its Third and Fourth Counterclaims.  SGI ¶59.

On January 29, 2013, DC, for the first time in 12 years, offered "to tender payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported "rights of offset," rendering its offer illusory.  SGI ¶60.  DC also not provide the basis for its calculations, leaving it completely uncertain whether DC's tender complied with the complicated royalty scheme in the October 19, 2001 Letter.  SGI ¶61.  Troublingly, the amount of Superman royalties DC claimed it owed Ms. Larson in 2013, subject to DC's purported "rights of offset," was not much higher that what DC had testified was owed Ms. Larson seven years earlier in 2006.  SGI ¶62.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of identifying evidence demonstrating the absence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  The "non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must make all "credibility determinations" in favor of the nonmoving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## ARGUMENT

### I.   THE MANDATE DOES NOT SUPPORT PREMATURE JUDGMENT

DC's entire argument in support of judgment is premised on its outright misrepresentation that the Ninth Circuit "held" that "[Ms.] Larson … transferred any

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

1   copyrights that may have been recaptured to DC." Mot. at 1.

2       A plain reading of the opinion shows that the Circuit held no such thing. The

3   Circuit held only "that the October 19, 2001, letter did constitute … an acceptance"

4   and "was sufficient" to create a contract on that date. *Larson*, 2013 U.S. App. LEXIS

5   671, at *3. The Circuit did not interpret the contract, set forth its terms, determine if

6   the terms are enforceable, or even determine if the agreement is still in effect, as such

7   contract matters should be adjudicated in the first instance by a district court. *See*

8   *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 788 (9th Cir.

9   2008) (remanding case; "[b]ecause … factual issues exist with regard to the

10   contracts' interpretation, the district court is in a better position to 'make these

11   determination in the first instance'") (citation omitted). Accordingly, the Circuit

12   remanded to this Court for adjudication of DC's contract counterclaims.

13       DC admits that it specifically "ask[ed] the Ninth Circuit to enter judgment in

14   its favor on all claims in the *Siegel* Superman case" on the grounds it now asserts

15   here. Mot. at 4. In fact, DC expressly asked the Ninth Circuit "to enter judgment" in

16   its favor at least ***five*** times in its briefs. SGI ¶50.[1]

17       The Circuit was well aware of this request, and questioned DC about it. SGI

18   ¶51; AD, Ex. 19 at 344 (The Court: "[I]f that's correct, is this matter for trial rather

19   than summary judgment for you [DC]?"), 345-46 (The Court: "Judge Reinhardt was

20   asking you, 'Is there sufficient evidence [] for summary judgment in your favor?'").

21       Despite DC's clear requests and the Circuit's awareness of them, the Circuit

22   did ***not*** remand with instructions to enter judgment in DC's favor. Instead, it directed

23   this Court "to reconsider DC's third and fourth [contract] counterclaims in light of

24   our holding." *Larson*, 2013 U.S. App. LEXIS 671, at *6. In other words, the Circuit

25

26   [1] *See* AD, Ex. 16 at 230 (DC: "Marks' October 19, 2001, letter reflects a legally enforceable agreement to resolve all claims at issue here"), 252 (DC: "This Court should grant judgment as a

27   matter of law on DC's settlement … counterclaims and dismiss the remainder of this appeal on that basis."); Ex. 18 at 316 (DC: "Judgment should be entered in DC's favor, and the 2001 settlement

28   agreement should be enforced."), 318 (DC: "[The evidence] … justifies this Court entering judgment in DC's favor."), 324 (DC: "The Court should enter judgment in DC's favor on its settlement defense.").

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

remanded for further proceedings. *See Doe v. State of Nebraska*, 2002 WL 225907,
at *6 (D. Neb. Dec. 14, 2002) ("[T]he mandate issued in this case makes clear that
some additional inquiry is necessary…. I see no other reason why the [] Circuit
would remand this case 'for reconsideration in light of [opinion],'… if such analysis
were not required.").

If the Circuit thought its ruling on the October 19, 2001 Letter disposed of
DC's counterclaims, it would have said so. *See Lancaster v. Tilton*, 2007 U.S. Dist.
LEXIS 48403, at *9-10 (N.D. Cal. June 21, 2007) (rejecting argument about effect of
a Circuit ruling because "[h]ad the court intended [that effect], it could have done so
explicitly"). The fact that the Circuit instead "remand[ed] for further proceedings
indicate[s] that [it] believed that there was more to do." *Edgerly v. City & County of
San Francisco*, 2011 U.S. Dist. LEXIS 155192, at *7 (N.D. Cal. May 26, 2011)

And "there [is] indeed more to do." *Id.* at *8. "'[A] mandate is controlling as
to all matters within its compass, while leaving any issue not expressly or impliedly
disposed of on appeal available for consideration by the trial court on remand.'"
*Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (quoting *Firth v.
United States*, 554 F.2d 990, 993-94 (9th Cir. 1977)).

Thus, "when a court is confronted with issues that the remanding court never
considered, the 'mandate requires respect for what the higher court decided, not what
it did not decide.'" *Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012). "[A]ny
issue not decided by the court of appeals may be addressed by the district court on
remand, even if such issue varies or expands the scope of the original record."
*Campanelli v. Bockrath*, 1997 U.S. Dist. LEXIS 7981, at *8 (N.D. Cal. June 4, 1997)
(citing *Edlin v. M/V Truthseeker*, 69 F.3d 392, 393 (9th Cir. 1995)).

While the Circuit held that there was an agreement **on October 19, 2001**, the
issue now is what, if anything, that means **today**. As detailed below in Section II,
there are a host of reasons under well-established contract law why the October 19,
2001 Letter is no longer enforceable based on DC's refusal to abide by it. As DC's

**ER 1206**
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

own counsel told the Ninth Circuit, "[t]he question of whether the subsequent events undid the prior agreement or didn't undo the prior agreement, that's a fact question" that should not be decided on summary judgment. SGI ¶55; AD, Ex. 19 at 345.

DC has not even attempted to show that it is entitled to summary judgment on any of these critical issues, as they implicate numerous issues of material fact precluding summary judgment in DC's favor.

## II. ISSUES OF MATERIAL FACT PREVENT SUMMARY JUDGMENT

### A. The October 19, 2001 Letter Did Not Transfer The Copyrights And DC Is Not Entitled To A Declaration Of Rights To That Effect

#### 1. The Letter's Language Does Not Support DC's Interpretation

DC's motion requests a declaratory judgment that the October 19, 2001 Letter actively "transferred" the Siegel's copyrights at the time the letter was signed.[2] The Ninth Circuit made no such ruling, as it is contrary to the Letter's plain language.

Under California contract law, "the interpretation of a contact must give effect to … 'the mutual intention of the parties at the time the contract is formed.'" *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636, 1639). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible…." Cal. Civ. Code § 1639.

Here, the October 19, 2001 Letter is plain. The Siegel family agreed only that it "***would*** transfer all of its rights in the 'Superman' properties." SGI ¶6 (emph. added). At most, this shows an intent to transfer the copyrights at some future date. "A mere promise to assign rights in the future is not an actual assignment…." *SCO Group, Inc. v. Novell, Inc.*, 2004 WL 4737297 (D. Utah June 9, 2004); *see Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*, 322 F. Supp. 98, 106-07 (N.D. Ind. 1970) ("The wording of the contract here demonstrates clearly that neither of the parties intended

---

[2] *See* Dkt. 702 at 1 ("DC's Fourth Counterclaim … sought a declaration that the settlement agreement was enforceable and that DC owns all of the Superman and Superboy copyright"); 702-5 (DC's Proposed Judgment) at 1 ("In the parties' October 19, 2001, settlement agreement, Larson … "**transfer[red]** all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics. This complete transfer bars Larson's remaining claims….") (alterations in original) (emphasis added).

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

the reassignment to have any immediate legal effect."); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991) ("Although an agreement to assign in the future [patent rights] … may vest the promisee with equitable rights … such an agreement does not by itself vest legal title to [the rights] in the promise.").

DC admitted that the October 19, 2001 Letter provided that rights "would" be transferred in the future, not that they had already been transferred. SGI ¶46.

The plain language of the October 19, 2001 Letter bars DC's interpretation that it actively "transferred" copyrights to DC. It would be reversible error for this Court on summary judgment to contradict that plain language and declare that it did. *See Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990) ("We decline to rewrite the clear terms of the contract. When parties have … entered into an unambiguous contract courts will not write a new contract for them.").

## 2. Any Ambiguity Must Be Resolved By The Trier Of Fact

DC may argue that the term "would transfer" is somehow susceptible to its interpretation. If the Court accepts that the term "would" is ambiguous – as opposed to flatly contradicting DC's interpretation – summary judgment in DC's favor remains improper. Words are ambiguous if they are "susceptible of more than one construction or interpretation." *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981). "What the parties intended by an ambiguous contract" is "a triable issue of fact." *Id.* at 619-20. As a matter of contract law and civil procedure, "would transfer" cannot be read as "hereby transfers" on summary judgment against the non-movant. *See Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 898 (9th Cir. 1993) ("[S]ummary judgment is improper because different views of the intent of parties will raise genuine issues of material fact.").

## 3. The Circuit Did Not Hold That The Siegels Assigned Rights

In reply, DC will selectively quote the Circuit's opinion out of context as purported support for its argument that the October 19, 2001 Letter actively transferred rights. DC has already alluded to such arguments, which misinterpret the

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

Circuit's decision. Mot. at 7. Ms. Larson argued on appeal that (a) the October 19, 2001 Letter was not a valid contract because it was not a writing signed by both parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's writing requirement in § 204(a). SGI ¶56. In response, the Ninth Circuit held:

> [U]nder California's statute of frauds**, *the only signature that is required is that of the party against whom a contract is sought to be enforced*.** *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 149 Cal. App. 4th 333, 57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin, *Summary of California Law, Contracts* § 359 (10th ed. 2005). **Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract**; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent' of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent.

*Larson*, 2013 U.S. App. LEXIS 671, at *5-6 (emphasis added). Thus the Circuit merely held that the statute of frauds and § 204(a)'s writing requirement is not "a bar to the validity" of the October 19, 2001 Letter. The Circuit did not determine that the "would transfer" language of October 19, 2001 Letter actually transferred any rights, and remanded such contract issues to this Court for adjudication in the first instance.

Tellingly, the Circuit held that because "a judgment on [the Third and Fourth Counterclaims] in DC's favor *would* appear to render moot all of the other questions in this lawsuit, we decline to address these other issues *at this time*." *Id.* at *6 (emphasis added). If the Circuit had ruled, as DC claims, that Ms. Larson had transferred all of her recaptured Superman copyrights to DC in the October 19, 2001 Letter, such "other issues" (*e.g.*, the "work for hire" issues on appeal that determine which Superman works were subject to statutory termination) would already be moot. The Circuit's closing phrase "at this time" further indicates that these issues are still in play pending adjudication of the contract issues remanded to this Court.

### 4. A Judgment That The Siegels "Are" Obliged To Transfer Rights To DC Would Not Settle The Issue

In reply, DC may switch gears and argue for a declaration that Ms. Larson is contractually obliged to transfer her recaptured copyrights. SGI ¶41.

However, <u>a declaration that Ms. Larson is still obligated, under the October 19,</u>

**ER 1209**
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

2001 Letter, to transfer her Superman rights to DC is procedurally flawed and does little to resolve this matter. Courts recognize a clear distinction between a declaration of rights under a contract and specific performance, in which the court orders a party to perform. *See Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 898 (2002) ("Unlike coercive relief (such as [] specific performance, or an injunction) … a declaratory judgment merely declares the legal relationship between the parties."). Without an order of specific performance, DC would still not own the recaptured copyrights. *See Barndt v. County of L.A.*, 211 Cal. App. 3d 397, 406 n.12 (1989) ("Plaintiff argues that even though specific performance may not be available here, he is entitled to litigate his cause of action for declaratory relief. ….[T]hat remedy does not avail plaintiff anything…. [A] declaration of rights and liabilities under the settlement agreement would be inconsequential in the absence of any enforceable remedy."). Mere declaratory relief is not a solution. If affirmed, DC would still have to seek specific performance. If reversed, all of the issues below would also remain to be litigated. "Granting DC a premature judgment will only lead to problems on appeal and further delay a complete and final resolution of this case." Dkt. 708 at 10.

## B. DC Is Not Entitled To Specific Performance

DC may attempt on reply to seek specific performance – *i.e.*, an order that Ms. Larson must transfer her copyrights to DC – but that is procedurally defective. DC failed to move on this ground, and cannot do so on reply. *Abdulkhalik v. City of San Diego*, 2009 U.S. Dist. LEXIS 110062, at *33 (S.D. Cal. Nov. 25, 2009) ("The City failed to move for summary judgment on the [] claim in its initial motion. Raising [this] for the first time in a reply brief is inappropriate and will not be considered by the Court."), citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).[3]

DC is also not entitled to specific performance. Under California law,

---

[3] As a matter of due process, the Court would need to give "notice and a reasonable time to respond" to Ms. Larson before judgment could be entered on grounds "not raised" by DC. Fed. R. Civ. P. 56(f); *see Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) (noting that a *sua sponte* grant of summary judgment must meet "the requirements of the Federal Rules and the demands of due process").

"[s]pecific performance is not itself a cause of action, but rather *a remedy for breach of contract.*" *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 49 (1994) (emphasis added). *See also Katz v. Cal-Western Reconveyance Corp.*, 2010 U.S. Dist. LEXIS 98940, at *15 (N.D. Cal. Sept. 21, 2010) ("[S]pecific performance is a remedy for breach of contract, a cause of action which requires proof the contract was breached."). <u>A plaintiff seeking specific performance must therefore first prove a *breach* of contract.</u> *Id.* <u>Instead, DC's motion affirmatively asks the Court to "dismiss [] as moot" its Third Counterclaim for breach of contract.</u> Dkt. 702-5 at 2.

Moreover, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). In addition to demonstrating these elements of breach, to establish a right to specific performance DC must also show that "'(1) [the] terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate.'" *Union Oil Co. of California v. Greka Energy Corp.*, 165 Cal. App. 4th 129, 134 (2008) (quoting *Blackburn v. Charnley*, 117 Cal. App. 4th 758, 766 (2004)).

Here, the Circuit held only that a contract was formed on October 19, 2001. DC's motion is entirely silent on the other three requirements for a breach of contract, and the five requirements for specific performance[4] – for good reason. It cannot meet them as a matter of law and, in any event, they raise genuine issues of material fact barring summary judgment in DC's favor.

---

[4] As DC did not address the elements of specific performance in its motion, Ms. Larson does not fully address the "specific performance" elements here. Among other factual issues presented by such elements is whether DC's agreed payments were adequate consideration for the Siegels' rights underlying the multi-billion-dollar "Superman" franchise. *See Walters v. Calderon*, 25 Cal. App. 3d 863, 875 (1972) ("[T]here is the further question of whether the consideration is adequate to warrant the equitable relief requested" and that "the consideration must be equitably adequate.").

ER 1211
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

### 1.  DC Did Not Perform Or Even Offer To Perform

In order to show "performance" by DC sufficient to obtain "specific performance" from Ms. Larson, DC "must have (a) performed, (b) offered to have performed, or (c) proved a sufficient excuse for not performing, ***all*** the conditions required of [it] by the agreement."  *Beverage v. Canton Pacer Mining Co.*, 43 Cal. 2d 769, 777 (1955) (emph. added); *see Ninety Nine Invest. v. Overseas Courier Service (Sing.) Priv.*, 113 Cal. App. 4th 1118, 1126 (2003) ("To obtain specific performance, [a plaintiff] must establish its own performance or excuse for nonperformance."); Cal. Civ. Code § 1439 (for specific performance a party "must fulfill all conditions precedent … and must be able and offer to fulfill all conditions concurrent").

DC indisputably did ***not*** perform or offer to perform "all" conditions required of it by the October 19, 2001 Letter.  For instance, DC agreed to provide the Siegels: (1) "[a] non-returnable, non-recoupable signing bonus of [$]1,000,000"; (2) "[a] non-returnable, but recoupable advance of $2,000,000"; (3) additional payments, starting with $500,000 on March 31, 2002; (4) royalty statements starting on March 31, 2002; (5) credit "By Special Arrangement with the Jerry Siegel Family" on all Superman publications starting October 19, 2001; and (6) medical and dental insurance.  SGI ¶6.  DC did ***none*** of this nor even offered to do it.  SGI ¶¶24, 32.  Instead, DC conditioned its performance on the new and revised terms, *all* in DC's favor, in its October 26, 2001 Letter and February 1, 2002 Draft, and tried to muscle the Siegels into changing the terms in the October 19, 2001 Letter.  SGI ¶¶8-24.

DC has claimed that it performed when it allegedly "negotiate[ed] for [the Siegels] to receive their credits on *Superman Returns* … and … set up a reserve account for … payments."  SGI ¶43.  This is highly disputed; the Siegels received no such credit and it appears that DC's "account" never existed.  SGI ¶¶45, 62.  Even if DC took these small steps, it would still fall far short of the necessary performance of "all" the conditions required of DC in the October 19, 2001 Letter.

Although DC subsequently alleged that it was ready and willing to tender

14

**ER 1212**

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

1   performance in 2001 (Dkt. 646 ¶99), DC never once actually "offered to …

2   perform[]… all the conditions required." *Beverage*, 43 Cal. 2d at 777.  Indeed, it was

3   not until January 29, **2013** that DC sent a letter purporting to "tender" performance

4   under the October 19, 2001 Letter.  SGI ¶60.  This was eleven years too late.[5]  DC

5   should have performed, or at least offered to perform, in 2001, or by **March 31,**

6   **2002**, its agreed payment and accounting deadline.  Instead, DC continued to grind

7   the Siegels and act as though it were not bound by the October 19, 2001 Letter.

8        DC's rushed motion does not even address, let alone "prove [] a sufficient

9   excuse" for, its nonperformance.  *Beverage*, 43 Cal. 2d 769, 777.  DC's motion must

10  be denied.  *See Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*, 593 F. Supp. 2d

11  1153, 1161 (S.D. Cal. 2008) ("[T]o obtain a summary judgment, the moving party

12  must offer evidence sufficient to support a finding upon *every element* of his …

13  claim.") (quotations/citations omitted); *Dobson v. Twin City Fire Ins. Co.*, 2012 U.S.

14  Dist. LEXIS 93823, at *16 (C.D. Cal. July 5, 2012) (denying summary judgment

15  where plaintiff failed to show performance or excuse for nonperformance).

16           **2.      The Failure To Complete A Long-Form Agreement Did Not**

17                   **Excuse DC's Non-Performance**

18        DC represented to the Circuit that the only terms are those contained in

19  October 19, 2001 Letter.  SGI ¶¶52-53; AD, Ex. 19 at 346:23-347:1 (DC: "Our

20  position is [the terms are] everything in this letter, nothing more.").  DC thus cannot

21  argue that its performance (*e.g.*, payment by the March 31, 2002 deadline, credit on

22  publications after October 19, 2001) was conditioned on a "long-form" agreement

23  because that condition appears nowhere in the October 19, 2001 Letter.  The Circuit

24  held that the October 19, 2001 Letter was sufficient to constitute an agreement, citing

25  *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011),

26  which held a short-form agreement was binding even though "everyone understood

---

[5] Even DC's January 29, 2013 letter and subsequent letters continued to hedge and leverage DC's position, as it did not provide the royalty "accounting" required to determine if DC was complying with the royalty scheme in the October 19, 2001 Letter, and DC asserted an unlimited right to "offset" its claims against the amounts owed pursuant to the October 19, 2001 Letter.  SGI ¶¶60-61.

that some material aspects of the deal would be papered later." Thus, when a "long-form" agreement was not consummated within a reasonable time or by March 31, 2002, DC was obliged under the October 19, 2001 Letter to at least tender performance in exchange for the Siegels' performance, but never did.

Even if a "long-form" was somehow construed as a condition precedent to DC's obligations, contrary to *Facebook*, DC frustrated that condition precedent by its concerted delay (waiting 3 ½ months to provide its draft, SGI ¶18) and failure to negotiate the long-form in good faith. SGI ¶¶6-28. *See City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 508 (2008) ("A party to a contract may not avail itself of a condition precedent where by its own conduct it has rendered compliance therewith impossible.") (quotation omitted).

### 3. The Siegels Did Not Breach The Letter

DC has pled that it did not perform because the Siegels supposedly breached the October 19, 2001 Letter first. SGI ¶38. This raises a whole host of disputed factual issues as to who did what and when, and whose performance was thereafter excused. As detailed below, the Siegels did not breach the October 19, 2001 Letter because their performance was excused by (a) DC's anticipatory breach, (b) DC's actual breach, (c) the Siegels' warranted rescission based on DC's anticipatory and actual breach, and (d) DC's acquiescence or abandonment of any agreement.

#### a. DC's Anticipatory Breach/Repudiation

Under California law, once a party anticipatorily breaches or repudiates a contract, the other party "is no longer bound by the contract" and need not perform. *Ferguson v. City of Cathedral City*, 197 Cal. App. 4th 1161, 1169 (2011) (quotations omitted); *see Local 659, I.A.T.S.E. v. Color Corp. of America*, 47 Cal. 2d 189, 198 (1956) ("A repudiation of a contract … excuses performance."). A party repudiates an agreement if, like DC, it attempts to change or add new terms to the agreement. *See Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 467 (2010) ("Annexing an unwarranted condition to an offer of

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

performance is a refusal to perform."); *Loop Building Co. v. De Coo*, 97 Cal. App. 354, 364 (1929) ("If one who is bound to perform a contract annexes an unwarranted condition to his offer of performance, there is, in effect, a refusal to perform.").

Here, Marks' October 19, 2001 Letter listed the specific terms of the agreement. SGI ¶6. As DC admitted before the Ninth Circuit, these were the *only* terms that the parties had agreed to. SGI ¶52; AD, Ex. 19 at 346:23-347:1 (DC: "Our position is [the terms are] everything in this letter, nothing more."). The October 19, 2001 Letter should have ended the matter. Had DC acted in good faith, confirmed that the terms were those that the parties had agreed upon, obeyed its terms, and adapted the letter into a simple agreement for signature, there would be no dispute.

However, DC refused to do this or abide by the deal. As Marks testified, Judge Larson ruled, and the Ninth Circuit did not dispute, Schulman's "more fulsome outline" of the parties' agreement in his October 26, 2001 Letter contained numerous terms that were materially different from the October 19, 2001 Letter. SGI ¶¶8-16, 47. *See Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895 (9th Cir. 1969) ("If the offeror is not asserting a good faith interpretation of the contract terms, that fact may be evidence that he is repudiating the agreement."). Schulman's outline expanded the agreement to require the Siegels to assign additional copyrights to DC, added numerous reductions to the Siegels' royalty, changed when and where credit would be given to the Siegels, and tacked on a host of new warranty and indemnification provisions. SGI ¶¶8-16.

DC now backtracks, arguing that "[t]o the extent that Mr. Shulman's [October 26, 2001] letter is perceived to have added terms or suggested new terms, they're not part of the deal." SGI ¶53; AD, Ex. 19 at 347:1-4.

But at the time, DC doubled down and insisted on even more favorable terms. As Marks testified and Judge Larson ruled, DC's February 1, 2002 Draft was not just different from the October 19, 2001 Letter, it was "*vastly* different." SGI ¶¶19-21. DC attempted to reduce the Siegels' royalty even further, and expanded the instances

in which the Siegels would receive no royalty payments at all. SGI ¶21. Marks also testified in detail about the draft's deceptive accounting "trap doors." *Id.* When the Siegels duly objected, DC falsely insisted that its February 1, 2002 Draft "accurately represented the agreement previously reached." SGI ¶26.

As with the October 26, 2001 Letter, DC now disavows the February 1, 2002 Draft and says the opposite. SGI ¶54; AD, Ex. 16 at 239 ("[E]ven if the February 2002 draft included different terms, it is the new terms that would be unenforceable, not the October 19 terms."), 240 ("The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers.").

Notwithstanding DC's current self-serving spin, in 2001-02, when it mattered, DC did not accept the terms of the October 19, 2001 Letter. Instead, it repudiated them by demanding "terms different from the original contract" and/or insisting that the contract's "meaning or legal effect [were] different … from the true meaning or effect." *Darling Int'l, Inc. Baywood Partners, Inc.*, 2007 U.S. Dist. LEXIS 50985, at *85 (N.D. Cal. July 13, 2007) (quotations omitted). *See Johnson v. Goldberg*, 130 Cal. App. 2d 571, 576 (1955) ("Annexing an unwarranted condition to an offer of performance is a refusal to perform, making tender and demand by the other party unnecessary."); *Mammoth Lakes Land Acquisition, LLC,* 191 Cal. App. at 467 (same); *Loop Building Co.,* 97 Cal. App. at 364 (same).

The cold hard truth is that DC did not once indicate a willingness to be bound by or perform under the October 19, 2001 Letter until over *three years* later in an effort to thwart the Siegels' suit to enforce their statutory terminations. This is too little, too late, because Ms. Larson already acted on DC's repudiation of the October 19, 2001 Letter when she ended negotiations and filed suit. *See Freedman v. St. Matthias Parish*, 37 Cal. 2d 16, 19 (1951) (holding a "repudiation…if acted upon by defendant before it was retracted, would excuse performance on defendant's part and make plaintiff's repudiation a total breach of contract"); *Pichignau v. Paris*, 264 Cal. App. 2d 138, 141-42 (1968) (if a party "desires to retract his repudiation and restore

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

the agreement to its former vigor, the action must be taken *before* the other party has changed his position") (emphasis added). Viewed in the light most favorable to Ms. Larson, DC's October 26, 2001 Letter and February 1, 2002 Draft were clear repudiations of the October 19, 2001 Letter. *See Pacific Coast Engineering Co.*, 411 F.2d at 894 ("In each case, it is a question of fact whether or not a party has committed an anticipatory breach by repudiating the contract.").

### b. DC's Actual Breach

After DC anticipatorily breached, it did not retract its "outline" or "draft," nor honor the October 19, 2001 Letter. Instead, DC proceeded to actually breach its promises. The October 19, 2001 Letter made it clear that DC would pay an annual guarantee of $500,000 on March 31, 2002 for the year 2002-03. SGI ¶6. DC's October 26, 2001 Letter and the February 1, 2002 Draft said the same thing. SGI ¶¶17, 23. The October 19, 2001 Letter also required DC to provide the Siegels with a royalty accounting on March 31, 2002 (and additional payment to the extent the royalty exceeded DC's advance payments). SGI ¶6. DC did not pay or even offer to pay that $500,000, nor did it provide a royalty accounting to the Siegels, on March 31, 2002, materially breaching DC's agreement. SGI ¶¶24, 32. The October 19, 2001 Letter also required DC to give the Siegel family credit on all subsequent Superman publications, which DC did not do or offer to do. SGI ¶¶6, 32.

DC's breach of the October 19, 2001 Letter prevents DC from proving its own performance – an essential element of its claims. *See Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011) ("When a party's failure to perform a contract obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."); *Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 187 (1961) (noting "substantial performance" is required for breach of contract claim; "[w]hat constitutes substantial performance is a question of fact, but it is essential that there be no willful departure from the terms of the contract.").

In addition, DC promised to make two other payments under the October 19,

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

2001 agreement – a $1 million "signing bonus" and a $2 million recoupable advance for the period beginning January 1, 2000. SGI ¶6. Under Cal. Civ. Code § 1657, "[i]f the act is in its nature capable of being done instantly – as, for example, if it consists in the payment of money only – it must be performed immediately upon the thing to be done being exactly ascertained." The $1 million "signing bonus" should have thus been paid "immediately" after the October 19, 2001 agreement was signed, and DC's non-performance breached its promise to pay.

As to the $2 million advance, under California law, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." Cal. Civ. Code §1657. It would not make sense to pay a $500,000 "annual guarantee" on March 31, 2002 for 2002-03, before paying a $2 million "advance" designed to cover the period beginning January 1, 2000. The "reasonable time" to pay the $2 million was prior to March 31, 2002, and DC breached this term as well.

Actions speak louder than words: whatever DC says now, it did not consider the October 19, 2001 Letter enforceable when the time came for *DC* to perform in 2002. Instead, DC simply breached, and such breaches preclude DC's current after-the-fact efforts to enforce the October 19, 2001 Letter against Ms. Larson.

### c.   The Siegels' Rescission

Under California law, one party may rescind a contract if the other refuses or fails to fully perform. *See* Cal. Civ. Code § 1689(b) (rescission permitted if performance "fails in a material respect from any cause"); *Loop Bldg. Co.*, 97 Cal. App. at 364 ("A refusal or failure of a party fully to perform his part of the contract … gives the other party a right to rescind."). The rescinding party need only give "notice" to the other party. Cal. Civ. Code § 1691. The notice need not be "formal and explicit;" it must simply "show[] the intention of the person rescinding to consider the contract at an end." *Hull v. Ray*, 211 Cal. 164, 167 (1930).

DC failed to perform or offer to perform, and implicitly conditioned its performance on the Siegels' acceptance of DC's new terms, giving the Siegels a right

1   to rescind.  *See U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d

2   335, 339 (9th Cir. 1974) ("[R]escission is justified where there is either an extended

3   and unreasonable delay [or] imposition of new and onerous conditions to

4   payment…."); *Rubin v. Fuchs*, 1 Cal. 3d 50, 53 (1969) (defendants were "entitled to,

5   and did, rescind the contract" because plaintiff did not make payment under contract).

6        For instance, DC failed to provide a royalty statement to the Siegels by March

7   31, 2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay

8   the Siegels their royalties.  It is well-settled that a breach of the royalty provisions in

9   a copyright contract can give rise to a right of rescission.  *See Peer Int'l Corp. v.*

10  *Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir. 1990) (holding there was no

11  "triable issue of fact" that plaintiff had right to rescind where "although [defendant]

12  made sporadic payments, they never complied with the royalty and accounting

13  requirements" of copyright agreement); *Irwin v. American Interactive Media*, 1994

14  U.S. Dist. LEXIS 16223, at *17-19 (C.D. Cal. Apr. 14, 1994) (holding there was "a

15  triable issue of fact as to whether Defendants' failure to pay [$2,000] … constituted a

16  material breach of the [copyright] license entitling Plaintiff to revocation" of license).

17       Joanne Siegel properly invoked her right of rescission and provided DC with

18  notice in a letter she sent on May 9, 2002:

19       …. Negotiations dragged on for four difficult years.  We made
20       painful concessions assured if we did we would arrive at an
         agreement. When we made these difficult concessions and reluctantly
21       accepted [DC's] last proposal [on October 19, 2001]…we were
         stabbed in the back by a shocking contract.
22            Your company's unconscionable contract dated February [1], 2002
         contained new, outrageous demands that were not in the [October 16]
23       proposal.  ….
              After four years we have no deal and this [February 1] contract makes
24       an agreement impossible.

25  SGI ¶25.  *See Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980) ("[I]f facts exist

26  that justify a rescission by one party, and he declares a rescission in some effectual

27  manner, he terminates the contract."); *Jaunich v. Nat'l Union Fire Ins. Co. of*

28  *Pittsburgh, PA.*, 647 F. Supp. 209, 215–16 (N.D.Cal.1986) (affirming valid rescission

21

**ER 1219**

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

sent three months after learning basis for rescission); Cal. Civ. Code § 1693. The Siegels' September 21, 2002 letter confirmed their rescission by "formal notification that we are totally stopping and ending all negotiations with DC." SGI ¶29.

At a minimum, this raises genuine issues of material fact that cannot be decided on DC's perfunctory motion. *See Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.*, 822 F.2d 833, 840 (9th Cir. 1987) ("Whether a breach … [is] sufficient to be deemed material and thus to warrant rescission … is a question of fact properly determined by the trial court."); *Hil-Mac Corp. v. Mendo Wood Products, Inc.*, 235 Cal. App. 2d 526, 530 (1965) ("The determination of whether a party entitled to rescind a contract has [rescinded] … depends upon the particular facts of each case. The question is one of fact, to be resolved in the first instance by the trier of fact….").

### d. DC's Acquiescence and Abandonment

After Joanne Siegel sent her May 9, 2002 letter rescinding the October 19, 2001 Letter due to DC's breach (SGI ¶25), DC acquiesced. DC's May 21, 2002 letter in response did ***not*** argue that the Siegels were in breach or had otherwise acted improperly (SGI ¶28), nor did DC claim any rights under the October 19, 2001 Letter. SGI ¶33; *see Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers* 192 Cal. App. 2d 268, 279-280 (1961) ("It is well settled that an abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the other party….") (citations omitted); *Griffin v. Beresa, Inc.*, 143 Cal. App. 2d 299, 301 (1956) ("[A]bandonment of a contract … may be accomplished by the repudiation of the contract by one of the parties and the acquiescence of the other party in such repudiation....").

After the Siegels' September 21, 2002 letter providing "formal notification" that they were "totally stopping and ending all negotiations" (SGI ¶29), DC again did *absolutely nothing*. DC did not assert that it owned the Siegels' recaptured copyrights pursuant to the October 19, 2001 Letter or say anything about the October

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

19, 2001 Letter.  SGI ¶33; *see McCreary v. Mercury Lumber Distributors*, 124 Cal. App. 2d 477, 486 (1957) (holding that "acquiescence is shown … by the absence of a showing that [the plaintiff] claimed any further rights under the old contract prior to the commencement of the subject action").

Then, in 2003-04, DC simply recommenced negotiations with the Siegels, further acquiescing in their rescission.  SGI ¶31; *see McCreary*, 124 Cal. App. at 486 ("Acquiescence is shown by the negotiations for a new contract."); *Freeman v. Mostafavi*, 2005 Cal. App. Unpub. LEXIS 10154, at *24 (Cal. App. 2d Dist. Nov. 8, 2005) ("Rescission may be implied from … the negotiation of a new and different contract regarding the same subject matter."); *Honda v. Reed*, 156 Cal. App. 2d 536, 539 (1958) ("Abandonment … may be implied from … negotiating for a new and different contract concerning the same property or subject matter.").

DC's behavior over this three-year period (2001-04) – when it acted as though there were no binding agreement, recommenced negotiations, and never claimed rights – raises genuine issues of material fact as to acquiescence that cannot be properly decided now.  *See Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal. App. 3d 151, 155 (1971) ("conflict of facts" prevented summary judgment on acquiescence).

## III.   FEDERAL COPYRIGHT LAW PREVENTS SUMMARY JUDGMENT AS TO SUPERBOY AND THE SUPERMAN ADS

To the extent DC's motion seeks the transfer of Ms. Larson's copyrights to Superboy recaptured by her 2002 termination notice, or the early Superman Ads[6] to be recaptured by her 2012 termination (not pled), it is barred by the Copyright Act. When Congress created the termination right, it expressly provided that authors and heirs cannot anticipatorily re-grant their copyrights; rather, they can only re-grant their copyrights back to the terminated grantee "***after the notice of termination has been served***." 17 U.S.C. 304(c)(6)(D) (emphasis added).

DC's assertion that the October 19, 2001 Letter transferred the copyrights to

---

[6] DC concedes that these Ads, "in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features" and grant a copyright interest in such elements.  SGI ¶57.

Superboy is a legal impossibility. The Superboy termination notice was not served until November 8, **2002,** and not effective until November 17, **2004**; the Ads termination notice was not served until 2012, and does not take effect until 2014. SGI ¶¶30, 63. The October 19, 2001 Letter, as a matter of law, could not have re-granted these copyrights years before the notices were served.

Nor can the October 19, 2001 Letter be read to waive, settle or release the Siegels' termination right or termination interest regarding Superboy or the Ads. In a further effort to protect authors and their heirs from publishers' superior bargaining power, Congress made the termination right "inalienable." *N.Y. Times v. Tasini*, 533 U.S. 483, 496 (2001) (emphasizing the "inalienable" right "to revoke a copyright transfer"). Congress was explicit that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 304(c)(5). Thus to the extent DC argues that the October 19, 2001 Letter settled Ms. Larson's termination right as to Superboy or the Ads, it is unenforceable. *See Marvel Characters v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) (to the extent settlement agreement characterized works as non-terminable "works for hire" it is void as "agreement to the contrary").

DC will likely attempt to circumvent the Copyright Act's protections by arguing that the October 19, 2001 Letter somehow revoked Jerome Siegels' venerable pre-1978 copyrights grants and simultaneously re-granted his original copyrights to DC. *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1044-46 (9th Cir. 2005); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 982 (9th Cir. 2008).

However, in light of Congress' clear objectives, the Ninth Circuit has made plain that any such "revocation and re-grant" must be "express." *Milne*, 430 F.3d at 1040; *Mewborn*, 532 F.3d at 989. Here, nothing in the October 19, 2001 Letter even suggests, let alone expressly states, that the parties intended to revoke Jerome Siegel's copyright grants and to re-grant his copyrights. SGI ¶¶6, 52-53; AD, Ex. 19 at 346:23-347:1 (DC: "Our position is [the terms are] everything in this [October 19]

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

letter, nothing more."). The letter simply states: "The Siegel Family would transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy')." SGI ¶6. There is no mention of revocation and without a clear and unequivocal revocation the Siegels had no Superboy rights to transfer to DC in 2001 (prior to their 2002 termination), as DC has owned Superboy since 1948. *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1119 (C.D. Cal. 2007).

Tellingly, while the October 19, 2001 Letter contains no language of revocation or regrant (SGI ¶6), Schulman's October 26, 2001 outline and DC's February 1, 2002 draft both do. SGI ¶¶11, 22. This hurts DC, more than helps. The Siegels unequivocally rejected DC's new terms. SGI ¶25. And DC concedes that "[t]o the extent that [the October 26, 2001] letter is perceived to have added terms or suggested new terms, they're not part of the deal." AD, Ex. 19 at 347:1-4; *see also* AD, Ex. 18 at 316 ("If any material difference does exist, DC has long agreed: the October 19 letter controls."). In short, the relief DC seeks cannot end the *Siegel* Superboy case (C.D. Cal. Case No. 04-CV-08776) because the October 19, 2001 Letter could not anticipatorily settle or "transfer" the Siegels' Superboy termination interest until *after* the Superboy termination was served on November 8, 2002.

## CONCLUSION

DC's groundless motion for summary judgment must be denied.

Dated: March 4, 2013

RESPECTFULLY SUBMITTED,
/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Plaintiff, Laura Siegel Larson

**ER 1223**

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
    *kadams@toberoffandassociates.com*
3  Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@toberoffandassociates.com*
4  David Harris (State Bar No. 255557)
    *dharris@toberoffandassociates.com*
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:          (310) 246-3101

8  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
9  individually and as personal representative
   of the Estate of Joanne Siegel

10                **UNITED STATES DISTRICT COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 12  LAURA SIEGEL LARSON, | Case No: CV 04-8400 ODW (RZx)* |
| 13  individually and as personal | Case No: CV 04-8776 ODW (RZx)* |
| representative of the ESTATE OF | Hon. Otis D. Wright II, U.S.D.J. |
| 14  JOANNE SIEGEL, | Hon. Ralph Zarefsky, U.S.M.J. |
| 15           Plaintiff, | **PLAINTIFF'S STATEMENT OF** |
| 16       v. | **GENUINE ISSUES AND ADDITIONAL FACTS RE: DC** |
| 17  WARNER BROS. ENTERTAINMENT | **COMICS' MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL*** |
| INC., DC COMICS, and DOES 1-10, | **SUPERMAN AND SUPERBOY CASES** |
| 18       Defendants and | *Opposition Brief and Declaration of Keith* |
| 19       Counterclaimants. | *Adams filed concurrently* |
| 20  LAURA SIEGEL LARSON, | Date:      March 25, 2013* |
| individually and as personal | Time:      1:30 p.m.* |
| 21  representative of the ESTATE OF | Place:     Courtroom 11* |
| JOANNE SIEGEL, | *:  The Court has stated that it will take |
| 22           Plaintiff, | the motion(s) under submission and hold a |
| 23       v. | hearing if necessary. Dkt. 707. Docket citations herein are to Case No. 04-CV- |
| 24  TIME WARNER INC., WARNER | 08400. |
| COMMUNICATIONS INC., | |
| 25  WARNER BROS. ENTERTAINMENT | |
| 26  INC., WARNER BROS. TELEVISION | |
| PRODUCTION INC., DC COMICS, | |
| 27  and DOES 1-10, | |
| 28       Defendants and | |
| Counterclaimants. | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

| | **DC's Alleged Uncontroverted Fact** | **Plaintiff's Response** |
|---|---|---|
| 1 | **DC's Fact:** The agreement set forth in Kevin Marks' October 19, 2001, letter to John Schulman states:<br><br>"The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property….<br><br>The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics<br><br>**DC's Evidence:** Declaration of Daniel M. Petrocelli, Ex. B at 19, 21; *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241 at *1-2 (9th Cir. Jan 10, 2013). | **Undisputed** that Kevin Marks sent a letter to John Schulman on October 19, 2001 containing the quoted language.<br><br>**Disputed** to the extent Warner argues that the October 19, 2001 letter transferred Ms. Larson's copyright interests in Superman or that Ms. Larson is obligated today to transfer such copyright. |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | 2 | In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices of termination pursuant to the Copyright Act as to Jerome Siegel's Superman copyright grants to DC Comics ("DC"). | Dkt. 646 (DC's Second Amended Counterclaims; "Counterclaims") ¶¶42-43 |
| | 3 | In 1999, the Siegels and DC entered into formal negotiations, in which the Siegels were represented by attorney Kevin Marks and DC by Warner's then-General Counsel, John Schulman | Counterclaims ¶51; Dkt. 656 (Plaintiff's Answer to DC's Second Amended Counterclaims ("Answer") at ¶51 |
| | 4 | On October 16, 2001, DC made a settlement offer to the Siegels. | Declaration of Keith Adams ("AD") Ex. 1 at 4-9 |
| | 5 | On October 19, 2001, Mr. Marks sent a "term sheet," in letter form, to Mr. Schulman (the "October 19, 2001 Letter") | AD Ex. 1 at 4-9 |
| | 6 | The October 19, 2001 Letter sets forth the terms of the parties' agreement and states in relevant part as follows: <br><br> Dear John: <br><br> This is to confirm our telephone conversation of October 19,2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in | AD Ex. 1 at 4-9 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|

respect of the "Superman" and "Spectre" properties. The terms are as follows:

A.  Definitions.

1.  "The Property" means all Superman, Sueprboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

2.  "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B.  Financial Terms.

1.  A non-returnable, but recoupable advance of $2,000,000.

2.  A non-returnable, non-recoupable signing bonus of 1,000,000.

3.  D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.  There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | 5.  A royalty of 6% of Superman/Spectre Gross Revenues.  This applies Pwithout limitation) to the use of the entire Property, including the so-called superman library, in any and all media now or hereafter known (Exclusing DC Comics publications), in or on merchandise and in promotional campaigns.  This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragrah C(10).  This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% <u>except that</u> the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Sueprfriends" and "superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. comic's characters and Looney Toones characters).<br><br>6.  A royalty of 1% of the cover price of DC Comics' publications.  This royalty applies when the Property is used alone, and will be adjusted pro-rate when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.<br><br>7.  Recoupment begins as of January 1, 2000.<br><br>…<br><br>C.  <u>Other Terms.</u><br><br>1.  The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.<br><br>2.  If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|
| | be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgment, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel family under this deal.<br><br>3. Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.<br><br>4. D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.<br><br>5. The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).<br><br>…<br><br>8. D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000. | |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| 1 | | | |
| 2 | | 9.  DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful. | |

9.  DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.  Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the Lois & Clark" television program deal, the WB television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products.  There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors.  D.C. would also include in the "safe harbors" the Salking or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% of the original rights deal.

11.  At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.  The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have no transferred the rights to any party.  The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C.

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family. | |
| | | 14. Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for D.C. or affiliate actions. | |
| | | It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal. | |
| | 7 | The parties intended the terms of the October 19, 2001 Letter to be transposed into an agreement format for signature by the parties. | AD Ex. 2 at 10; Ex. 10 at 115:21-116:1 |
| | 8 | On October 26, 2001, Mr. Schulman sent a letter to Mr. Marks, in which he enclosed a supposedly "more fulsome outline" of deal terms (the "October 26, 2001 Letter"). The letter stated in relevant part: | AD Ex. 2 at 10-17 |
| | | Dear Kevin: | |
| | | I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road. | |
| | | I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form. | |
| | | Thank you. | |
| | | … | |
| | | Transfer<br>• Regrant, grant, etc.<br>• 100% of rights, wherever created, arising out | |

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public<br>• 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties – even if not created for DC Comics<br>• All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")<br>• In perpetuity and worldwide<br>• Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact<br>• Siegels warrant and represent no termination nor any rights remaining except for rights under this agreement and the written agreement to include various provision to ensure same (jointly and severally)<br>• Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)<br>• Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)<br>• Give copy of all documents relating to rights/history<br>• Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)<br>• Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). Right to use J. Siegel bio and photos in publicity, etc., re property.<br>• The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, | |

8

**ER 1232**

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media. | |

Initial Payment
- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

Annual Payment (Advance)
- $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
- Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
- Terminate when Action #1 US copyright terminates

Widows Benefits (not assignable or transferrable)
- $135,000/year
- Payable for Joanne's life, personal,
- Paid as now
- Medical, comparable to past, for life

Royalty
- Commencing for revenue received on or after 1/1/00
- All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year or payment
- 6% of DC's receipts from all Media licenses for use of the Properties, except:
1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%
2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super

| | | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|---|

Heroes), the 6% shall be reduced to 1.5%.

• 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketing in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

2) with respect to licensees which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends Super Heroes), the 6% shall be reduced to 1.5%

3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

• 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | • 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories)<br>1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%<br>2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question<br>3) there will be no royalties payable hereunder when the Properties appear in publication or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question<br>• [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.<br><br>Payment<br>All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:<br>    47.5% Joanne Siegel<br>    23.75% Laura Siegel Larson<br>    23.75% Michael Siegel<br>    5.00% Gang Tyre Ramer & Brown<br>Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.<br><br>Advise (Non-assignable or transferrable; subject | |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | to confidentiality) | |
| | | DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments. | |
| | | Credit (Non-assignable or transferrable) | |
| | | Credit on work first created after date hereof (excluding later episodes of ongoing TV series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.) Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.) | |
| | | Accounting | |
| | | Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.<br><br>Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)<br><br>Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals with fall outside the safe harbors.<br><br>Safe Harbors for Intercompany Deals<br>• Salkind (Motion Pictures)<br>• Lois & Clark (TV)<br>• WB Television Animation Deal<br>• Merchandising representation practice<br><br>Expedited Dispute Resolution (Any claims between the parties)<br>• Arbitration<br>• Compensation damages only to Siegels<br>• No injunction against DC/WB breaches, no termination of rights, no reversion<br>• DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach<br><br>Medical Coverage/Son & Daughter (Grandsons only through minority) (Non-assignable or transferrable)<br><br>Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.<br><br>Release and covenant not to sue by Siegels | |

**ER 1237**

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | • Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself) <br> • Approve all deals made before 12/31/00 <br><br> <u>Miscellaneous</u> <br> • Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels; if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due] <br> • Siegels defend and indemnify re third party claims <br> • Siegels defend and indemnify re Dennis claim <br> • Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign <br> • DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts <br> • Siegels to refer all inquiries relating in any way to Properties to DC/WB. <br> • At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d. | |
| 9 | The October 26, 2001 Letter was sent when Mr. Marks was in China for an extended period; he did not return until late November 2001, and it was not forwarded to the Siegels. | AD Ex. 10 at 104:9-22; Ex. 9 at 97:22-98:13 |
| 10 | There were material differences between the October 19, 2001 Letter and the October 26, 2001 Letter, all to DC's benefit and the Siegels' detriment. | *Compare* AD Ex. 1 to Ex. 2; *Siegel v. Warner Bros. Entertainment, Inc.,* |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | | 542 F. Supp. 2d 1908, 1137-39 (C.D. Cal. 2008) |
| | 11 | The October 26, 2001 Letter contemplates a "regrant" of the Siegels' rights. | AD Ex. 2 at 11 |
| | 12 | Marks testified to the material differences between the October 19, 2001 Letter and the October 26, 2001 Letter. | AD Ex. 10 at 107:4-116:1 |
| | 13 | The October 26, 2001 Letter required the Siegels to assign additional copyrights to DC.  As Marks testified:<br><br>I know that one area of difference [between the terms of the October 19, 2001 Letter and the terms of Schulman's October 26, 2001 Letter] was the scope of the rights granted.  In my letter it referred to – very specifically to the Superman property and the Spectre property.  That's what we had been talking about the whole time of our negotiations going back to the first meeting in 2 – 1999.  And, of course, as you see here, the consideration, at least as set forth in my letter, for that matter I guess in John's letter, is based on revenue from the Superman and Spectre properties, yet John's letter referred more generally to all properties authored by Siegel for DC Comics and was not limited to the Superman and Spectre properties that we had been talking about. | *Compare* AD Ex. 1 *with* Ex. 2; Ex. 10 at 107:16-108:4 |
| | 14 | The October 26, 2001 Letter reduced the Siegels' royalty in many instances.  At Marks testified:<br><br>I recall in [Schulman's October 26, 2001 Letter] new terms concerning how the royalty could be reduced.  My understanding of our agreement, what I set forth in the October 19th letter, was that on media and merchandising licenses the royalty was 6 percent.  If the other DC Comics | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 110:4-111:12 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | characters appeared in the media program or in licensing or merchandising, that royalty could be reduced to a floor of 3 percent.<br><br>…<br><br>[In the October 26th letter the] categories where the 3 percent can be further reduced are broadened. | |
| | 15 | The October 26 Letter changed when and where credit would be given to the Siegel family. As Marks testified:<br><br>In terms of the credit to be accorded Siegel and Shuster, which was a point that I had as my point C.4, a point that I thought had long been agreed, that there would be a credit in paid ads of motion pictures, which is certainly in my experience is something that's very important to clients. They want to see credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's [October 26, 2001] letter provided for credit on screen only and not in paid ads. | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 113:12-20 |
| | 16 | The October 26 Letter added numerous warranty and indemnity provisions found nowhere in the October 19, 2001 Letter. As Marks testified:<br><br>Another area where [Schulman's October 26, 2001 Letter] differed involved warranties and representations and, in turn, indemnities. If you recall, we spoke earlier about the view that the only warranty and representation the Siegel family would make would be that they have not transferred rights to any other party, and in John's letter there are broader warranties than that, warranties that go beyond that.<br><br>…<br><br>John's warranties go beyond that, and so too in his letter he would have the Siegels indemnifying for areas that were not agreed and, | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 108:4-19 |

| | | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|---|
| | | indeed, not event discussed. So there's broader warranties and representations and, as a result, broader indemnities. And in fact there are additional indemnities added; for example, indemnifying for any claims brought by Dennis Larson. | |
| | 17 | The October 26, 2001 Letter confirmed the "Annual Payment (Advance)" of "$500,000 per year for ten years, commencing 2002, payable 3/31 of year," *i.e.*, beginning March 31, 2002. | AD Ex. 2 at 14 |
| | 18 | On February 1, 2002, DC's outside counsel sent Mr. Marks a draft long-form agreement (the "February 1, 2002 Draft"). | AD Ex. 3 |
| | 19 | There were vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft, all to DC's benefit and the Siegels' detriment. | *Compare* AD Ex.1 to Ex. 3; *Siegel*, 542 F. Supp. 2d at 1137-39 |
| | 20 | Marks testified to the vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft. | AD Ex. 10 at 125:13-133:8 |
| | 21 | Among other changes, the February 1, 2002 Draft altered the Siegels' royalty, to DC's benefit. Marks testified to such "trap doors" in which the Siegels would receive no royalties at all: [The February 1 2002 Draft] is purporting to say or at least raise the problem that licensing revenues would not include that body of 60 years of derivative works that the people that DC Comics, Paul Levitz and others, made such an impression upon us as being so different from the original work and was the basis of the Superman library, which was contrary to what was agreed. The whole idea was to pick up all works and not to exclude works created by other people. | AD Ex. 10 at 128:3-22 |

**ER 1241**
PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | I mentioned that at the DC Comics meeting there was a specific discussion about an American Express ad campaign where Jerry Seinfield, who was in that campaign, specifically requested that the Curt Shaw version of Superman be used in the campaign. Under this [February 1, 2002] draft the proceeds of that campaign would be excluded, or at least there was an argument that they would be excluded, and that wasn't the intent. To parse through that language and to get there is very difficult, and I found – I considered that deceptive drafting and a trap door and highly, highly problematic. | |
| 22 | | The February 1, 2001 Draft provides for a revocation and regrant of the Siegels' rights. | AD Ex. 3 at 31-32, ¶(1)(a)(i)-(ii) |
| 23 | | The February 1, 2001 Draft also confirmed the $500,000 annual advance, to be paid on March 31, 2002. | AD Ex. 3 at 39-40 |
| 24 | | DC did not pay or even tender the $500,000 annual payment, the $1,000,000 signing bonus, or the $2,000,000 advance, as DC had expressly promised and as set forth in the October 19, 2001 agreement, by March 31, 2002. | Counterclaims ¶¶99-100 |
| 25 | | On May 9, 2002, Joanne Siegel sent a letter to Richard D. Parsons, COO of AOL Time Warner Inc., objecting to the February 1, 2002 Draft. Ms. Siegel's May 9, 2002 letter read in relevant part: <br><br>Dear Dick, <br><br>I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright. | AD Ex. 4 at 75-77 |

ER 1242
PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner.<br><br>…<br><br>Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.<br><br>Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.<br><br>…<br><br>[W]e are owed more than three years of profits accounting on Superman and related properties which has not been paid.<br><br>…<br><br>As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful. | |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more.<br><br>…<br><br>It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.<br><br>This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future?<br><br>…<br><br>After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the wont possible light. Is that the reputation you want? | |
| | 26 | On May 21, 2002, Mr. Parsons sent a reply letter to Joanne. Mr. Parson's letter stated:<br><br>Dear Joanne:<br><br>Thank you for your letter of May 9th. Your husband and his creations and his family have been a cherished part of the Warner, Time Warner and now AOL Time Warner family for many years. I was, therefore, quite troubled by your feeling. Consequently, I have been in contact with John Schulman and Paul Levitz and have been informed that each of the major points covered in the draft agreement which was provided to your representatives, more than | AD Ex. 5 at 78 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | three months ago, accurately represented the agreement previously reached between your representatives and AOLTW's. Those negotiating the agreement for AOLTW even improved - to your benefit- the terms of our $250,000 recoupable advance; they proposed as a part of the overall deal that the advance be non-applicable and non-recoupable. So, I am a bit at a loss to understand the level and intensity of your distress.<br><br>As in all negotiations, including the lengthy ones which have brought us this far, we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve. John and Paul look forward to meeting with your representatives, and we continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers.<br><br>In the interim, I want you to know that AOLTW is determined to do the right thing for the heirs of Jerry Siegel, you and your family, and that we continue to count SUPERMAN among America's cultural treasures with which we are proud to be associated. | |
| 27 | | Mr. Parson's May 21, 2002 letter did not retract the aggressive demands in the February 1, 2002 Draft, or go back to the terms in the October 19, 2001 Letter the Siegels had confirmed was the agreement. | AD Ex. 5 at 78 |
| 28 | | Mr. Parson's May 21, 2002 letter did not argue the Siegels were in breach, demand the Siegels' performance, or assert DC's rights under the October 19, 2001 Letter. | AD Ex. 5 at 78 |
| 29 | | On September 21, 2002, the Siegels sent a letter to their attorneys and copied DC, in which they terminated Mr. Marks and provided "formal | AD Ex. 6 at 79 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | notification that we are totally stopping and ending all negotiations with DC Comics … effective immediately." | |
| | 30 | On November 8, 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective date of November 17, 2004 | AD Ex. 7 |
| | 31 | In 2003-04, DC simply resumed settlement negotiations with the Siegels. | AD Ex. 8; Ex. 11 at 139:12-146:2; Ex. 23 at 376 |
| | 32 | At no time between October 19, 2001 and October 8, 2004, or thereafter, did DC: pay the $500,000 annual advances, the $1,000,000 signing bonus, or the $2,000,000 advance; provide an accounting of royalties; provide the "By Special Arrangement with the Jerry Siegel Family"; or provide the Siegels medical and dental insurance. | Counterclaims ¶¶99-100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 |
| | 33 | At no time between October 19, 2001 and October 8, 2004 did DC file suit against the Siegels, claim rights under the October 19, 2001 Letter, retract or disclaim the October 26, 2001 Letter or February 1, 2002 draft, or claim that the October 19, 2001 Letter was an enforceable agreement. | Counterclaims ¶¶99-100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 |
| | 34 | On October 8, 2004, the Siegels filed suit against DC regarding their Superman termination ("*Siegel*"). | Case No. 04-CV-08400, Dkt. 1 |
| | 35 | On October 22, 2004, the Siegels filed suit against DC regarding their Superboy termination. | Case No. 04-CV-08776, Dkt. 1 |
| | 36 | On November 22, 2004, DC filed counterclaims in | Case No. 04-CV- |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | the *Siegel* Superman and Superboy Cases. | 08400, Dkt. 14 |
| 37 | DC's counterclaims alleged for the first time that the October 19, 2001 Letter was an enforceable agreement. | Counterclaims ¶¶97-105 |
| 38 | DC's counterclaims alleged for the first time that the Siegels had repudiated that agreement by their May 9, 2002 and September 21, 2002 letters. | Counterclaims ¶¶99-100 |
| 39 | DC's Third Counterclaim was for breach of contract re: the October 19, 2001 Letter. | Counterclaims ¶¶97-101 |
| 40 | DC's Fourth Counterclaim was for declaratory relief re: the October 19, 2001 Letter. | Counterclaims ¶¶101-105 |
| 41 | DC's Fourth Counterclaim asked the court to declare that the October 19, 2001 Letter either (1) transferred Ms. Larson's copyrights to DC or (2) contractually obligated Ms. Larson to transfer her copyrights in the future. | Counterclaims ¶103 |
| 42 | The Siegels' answer to DC's Counterclaims specifically pled the affirmative defenses of "waiver and "acquiescence" as well as "No Settlement Agreement Was Consummated." | Answer ¶¶152, 185 |
| 43 | In *Siegel*, DC argued that it negotiated for the Siegels to receive credit on "Superman Returns" and set up a "reserve account." | AD Ex. 13 at 167-68, 178 |
| 44 | In *Siegel*, DC testified and represented to the court how much money was in a supposed "reserve account." | AD Ex. 12 at 159:6-11; Ex. 13 at 168 n.18 |
| 45 | In *Siegel*, the district court took note of the dubious | AD Ex. 14 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | nature of DC's supposed "reserve account." | |
| | 46 | In *Siegel*, DC admitted that the October 19, 2001 Letter provided that copyrights "would" be transferred in the future, not that they had already been transferred. | AD Ex. 13 at 167-68, 177-78 |
| | 47 | In *Siegel* in 2008, Judge Larson concluded on summary judgment that the parties had failed to reach an agreement, citing the "materially different" terms of the October 26, 2001 Letter and the "vastly different" terms of the February 1, 2002 Draft. | *Siegel*, 542 F. Supp. 2d at 1138 |
| | 48 | In *Siegel,* on May 20, 2010, this Court entered a Rule 54(b) judgment based on Judge Larson's summary judgment order. | Dkt. 669 |
| | 49 | Both sides appealed the Rule 54(b) judgment in *Siegel* (9th Cir. Appeal Nos. 11-55863, 11-56034; the "*Siegel* Appeal"). | Dkt. 671, 674 |
| | 50 | In the *Siegel* Appeal, DC expressly asked the Ninth Circuit to enter judgment in its favor at least five times in its briefs. | AD Ex. 16 at 230, 252; Ex. 18 at 316, 318, 325 |
| | 51 | In the *Siegel* Appeal, the Ninth Circuit was well aware of DC's request for judgment, and questioned DC about it during oral argument. | AD Ex. 19 at 344:17-344:2. |
| | 52 | In the *Siegel* Appeal, DC argued and admitted that the terms in the October 19, 2001 Letter were the only ones that the parties ever agreed to. | AD Ex. 16 at 239-40; AD, Ex. 18 at 316 |
| | 53 | In the *Siegel* Appeal, DC argued and admitted that new or changed terms in the October 26, 2001 Letter | AD Ex. 19 at 346:23-347:4 |

**ER 1248**
PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | were "not part of the deal." | |
| | 54 | In the *Siegel* Appeal, DC disavowed the February 1, 2002 Draft. | AD Ex. 16 at 239-40 |
| | 55 | In the *Siegel* Appeal, DC told the Ninth Circuit that whether the "subsequent events undid" the October 19, 2001 was a "fact question." | AD Ex. 19 at 345:18-21 |
| | 56 | In the *Siegel* Appeal, Ms. Larson argued that (a) the October 19, 2001 Letter was not a valid contract, because it was not a writing signed by both parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's writing requirement in 17 U.S.C. § 204(a). | AD Ex. 17 |
| | 57 | In the *Siegel* Appeal, DC contended that the Superman Ads were important and that they, "in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features" and grant a copyright interest in such elements. | AD Ex. 16 at 248 |
| | 58 | In the *Siegel* Appeal, on January 10, 2013, the Ninth Circuit reversed Judge Larson's opinion, holding that that the October 19, 2001 Letter constituted a valid acceptance of an offer by DC that "was sufficient" to create a contract. | *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) |
| | 59 | In the *Siegel* Appeal, the Ninth Circuit did not disturb Judge Larson's findings as to the "materially" and "vastly different" terms in the October 26, 2001 Letter and the February 1, 2002 Draft, and remanded the case for further adjudication of DC's contract | *Larson*, 2013 U.S. App. LEXIS 671; *Siegel*, 542 F. Supp. 2d at 1138 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | claims – its Third and Fourth Counterclaims. | |
| | 60 | On January 29, 2013, DC, for the first time in twelve years, offered "to tender payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported "rights of offset," rendering its offer illusory. | AD Ex. 20 |
| | 61 | Despite requests by Ms. Larson, DC would also not provide the basis for its calculation of payment, leaving it completely uncertain whether DC's tender complied with the complicated royalty scheme of the October 19, 2001 Letter. | AD Ex. 24; Ex. 25 |
| | 62 | DC's 2013 "tender" of Superman royalties owed was not much higher than what DC had testified was owed seven years earlier, in 2006. | AD Ex. 12 at 159:6-11; Ex. 13 at 168 n.18; Ex. 25 |
| | 63 | On March 6, 2012, Ms. Larson signed a § 304(d) notice of termination regarding Superman "Ads," with an effective date of March 12, 2014. | AD Ex. 15 |

## CONCLUSIONS OF LAW

As set forth in Plaintiff's Opposition to DC's motion:

1.      DC's motion is denied.  The Ninth Circuit did not hold that the October 19, 2001 letter from the Siegels' attorney to DC actively transferred the Siegels' copyrights to DC, as DC solely argues.  The Circuit only held that the letter was "an acceptance of terms negotiated between the parties" that "was sufficient" to create a contract.  *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. January 10, 2013).  DC's Third and Fourth Counterclaims remain for adjudication.

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

1  Dated: March 4, 2013          RESPECTFULLY SUBMITTED,
2                                /s/ Marc Toberoff
3                                TOBEROFF & ASSOCIATES, P.C.
                                 Attorneys for Plaintiff Laura Siegel Larson
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
     *kadams@toberoffandassociates.com*
3  Pablo D. Arredondo (State Bar No. 241142)
     *parredondo@toberoffandassociates.com*
4  David Harris (State Bar No. 255557)
     *dharris@toberoffandassociates.com*
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway, #348
6  Malibu, California, 90265
   Telephone:   (310) 246-3333
7  Fax:            (310) 246-3101

8  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
9  individually and as personal representative
   of the Estate of Joanne Siegel

10

## UNITED STATES DISTRICT COURT

11

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

12

13  LAURA SIEGEL LARSON,

14  individually and as personal

    representative of the ESTATE OF

15  JOANNE SIEGEL,

             Plaintiff,

16

             v.

17  WARNER BROS. ENTERTAINMENT

    INC., DC COMICS, and DOES 1-10,

18           Defendants and

             Counterclaimants.

19

20  LAURA SIEGEL LARSON,

    individually and as personal

21  representative of the ESTATE OF

    JOANNE SIEGEL,

22           Plaintiff,

23           v.

24  TIME WARNER INC., WARNER

    COMMUNICATIONS INC.,

25  WARNER BROS. ENTERTAINMENT

    INC., WARNER BROS. TELEVISION

26  PRODUCTION INC., DC COMICS,

    and DOES 1-10,

27           Defendants and

             Counterclaimants.

28

Case No: 04-CV-08400 ODW (RZx)*
Case No: 04-CV-08776 ODW (RZx)*

Hon. Otis D. Wright II, U.S.D.J.
Hon. Ralph Zarefsky, U.S.M.J.

**DECLARATION OF KEITH ADAMS
RE: DC COMICS' MOTION FOR
SUMMARY JUDGMENT IN THE
*SIEGEL* SUPERMAN AND
SUPERBOY CASES**

*Opposition and Statement of Genuine
Issues filed concurrently*

Date:        March 25, 2013*
Time:        1:30 p.m.*
Place:       Courtroom 11*

*:  The Court has stated that it will take
the motion(s) under submission and hold
a hearing if necessary.  Dkt. 707.  Docket
citations herein are to Case No. 04-CV-
08400.

## INDEX

| Ex. | Title | Page |
|---|---|---|
| 1 | October 19, 2001 letter from Kevin Marks to John Schulman | 4 |
| 2 | October 26, 2001 letter from Schulman to Marks | 10 |
| 3 | February 1, 2002 letter from Patrick Perkins to Marks | 18 |
| 4 | May 9, 2002 letter from Joanne Siegel to Richard D. Parsons | 75 |
| 5 | May 22, 2002 letter from Parsons to Joanne Siegel | 78 |
| 6 | September 21, 2002 letter from the Siegels to Marks | 79 |
| 7 | November 8, 2002 Notice of Termination re: Superboy | 80 |
| 8 | Letter sent by Ari Emanuel to Bruce Rosenblum | 93 |
| 9 | Excerpts from August 1, 2006 deposition of Laura Siegel Larson | 94 |
| 10 | Excerpts from October 7, 2006 deposition of Kevin Marks | 101 |
| 11 | Excerpts from November 2, 2006 deposition of Ari Emanuel | 135 |
| 12 | Excerpts from November 11, 2006 deposition of Paul Levitz | 149 |
| 13 | Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007 | 163 |
| 14 | October 23, 2007 Order | 183 |
| 15 | March 5, 2012 Notice of Termination re: Superman Advertisements | 188 |
| 16 | DC's Second Brief on Cross-Appeal in the *Siegel* Appeal, filed on March 23, 2012 | 194 |
| 17 | Larson's Third Brief on Cross-Appeal in the *Siegel* Appeal, filed on May 24, 2012. | 253 |
| 18 | DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012 | 309 |
| 19 | September 5, 2012 Oral Argument in the *Siegel* Appeal | 326 |
| 20 | January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff | 368 |
| 21 | February 9, 2013 Letter from Toberoff to Petrocelli | 370 |
| 22 | February 12, 2013 Letter from Petrocelli to Toberoff | 373 |
| 23 | Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in *DC Comics*, filed on February 16, 2013. | 375 |
| 24 | February 27, 2013 Letter from Toberoff to Petrocelli | 379 |
| 25 | February 28, 2013 Letter from Petrocelli to Toberoff | 380 |

## DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.    I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for plaintiff-counterclaim defendant Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel ("Plaintiff"), in the above-captioned actions, and submit this declaration in opposition to Defendant DC Comics' Motion for Summary Judgment.

2.    Attached hereto as Exhibit "1" is a true and correct copy of an October 19, 2001 letter from Kevin Marks to John Schulman.

3.    Attached hereto as Exhibit "2" is a true and correct copy of an October 26, 2001 letter from John Schulman to Kevin Marks.

4.    Attached hereto as Exhibit "3" is a true and correct copy of a February 1, 2002 letter from Patrick Perkins to Kevin Marks.

5.    Attached hereto as Exhibit "4" is a true and correct copy of a May 9, 2002 letter from Joanne Siegel to Richard Parsons.

6.    Attached hereto as Exhibit "5" is a true and correct copy of a May 22, 2002 letter from Richard Parsons to Joanne Siegel.

7.    Attached hereto as Exhibit "6" is a true and correct copy of a September 21, 2002 letter from Joanne and Laura Siegel to Kevin Marks.

8.    Attached hereto as Exhibit "7" is a true and correct copy of a November 8, 2002 Notice of Termination for Superboy.

9.    Attached hereto as Exhibit "8" is a true and correct copy of a letter from Ari Emanuel to Bruce Rosenblum.

10.    Attached hereto as Exhibit "9" is a true and correct copy of excerpts from the August 1, 2006 deposition of Laura Siegel Larson.

11.    Attached hereto as Exhibit "10" is a true and correct copy of excerpts from the October 7, 2006 deposition of Kevin Marks.

12.    Attached hereto as Exhibit "11" is a true and correct copy of excerpts

DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

from the November 2, 2006 deposition of Ari Emanuel.

13. Attached hereto as Exhibit "12" is a true and correct copy of excerpts from the electronic transcript of the November 11, 2006 deposition of Paul Levitz.

14. Attached hereto as Exhibit "13" is a true and correct copy of excerpts from Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, filed on May 29, 2007.

15. Attached hereto as Exhibit "14" is a true and correct copy of an order issued on October 23, 2007.

16. Attached hereto as Exhibit "15" is a true and correct copy of a March 5, 2012 Notice of Termination for Superman Advertisements.

17. Attached hereto as Exhibit "16" is a true and correct copy of excerpts from DC's Second Brief on Cross-Appeal in the *Siegel* Appeal (9th Cir. Case No. 11-55863), filed on March 23, 2012.

18. Attached hereto as Exhibit "17" is a true and correct copy of excerpts from Ms. Larson's Third Brief on Cross-Appeal in the *Siegel* Appeal, filed on May 24, 2012.

19. Attached hereto as Exhibit "18" is a true and correct copy of excerpts from DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012.

20. Attached hereto as Exhibit "19" is a true and correct copy of the transcript of the September 5, 2012 oral argument in the *Siegel* Appeal.

21. Attached hereto as Exhibit "20" is a true and correct copy of a January 29, 2013 letter from Daniel Petrocelli to Marc Toberoff.

22. Attached hereto as Exhibit "21" is a true and correct copy of a February 9, 2013 letter from Marc Toberoff to Daniel Petrocelli.

23. Attached hereto as Exhibit "22" is a true and correct copy of a February 12, 2013 letter from Daniel Petrocelli to Marc Toberoff.

24. Attached hereto as Exhibit "23" is a true and correct copy of Excerpts

**ER 1255**
DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

from DC's Statement of Genuine Issue re: Motion for Summary Judgment filed in *DC Comics* (C.D. Cal. Case No. 10-CV-03633) on February 16, 2013.

25.    Attached hereto as Exhibit "24" is a true and correct copy of a February 27, 2013 letter from Marc Toberoff to Daniel Petrocelli.

26.    Attached hereto as Exhibit "25" is a true and correct copy of a February 28, 2013 letter from Daniel Petrocelli to Marc Toberoff.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 4, 2013, at Malibu, California.

_____

Keith G. Adams

DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

# GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD R. PARSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA EILENBRUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1988)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

## VIA TELECOPIER and U.S. MAIL

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

Re:   Siegel Family – "Superman"

Dear John:

This is to confirm our telephone conversation of October 19, 2001. The Siegel Family
(through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright
interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and
"Spectre" properties. The terms are as follows:

A.   Definitions.

    1.   "The Property" means all Superman, Superboy and related properties
(including, for example, Supergirl, Steel, Lois & Clark and Smallville),
and the Spectre property, and includes all pre- and post-termination works
(including the so-called Superman library), characters, names and
trademarks relating to the Property.

    2.   "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross
revenues derived from the Property, excluding only revenues derived from
D.C. Comic's publications.

B.   Financial Terms.

    1.   A non-returnable, but recoupable advance of $2,000,000.

236172.1

312

EXHIBIT 1
4

ER 1257

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2.    A non-returnable, non-recoupable signing bonus of 1,000,000.

3.    D.C. Comics will forgive the $250,000 advance from last year -- stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.    There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5.    A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6.    A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

313

**EXHIBIT 1**

5

ER 1258

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7. Recoupment begins as of January 1, 2000.

8. During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9. Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C. **Other Terms.**

1. The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2. If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would <u>not</u> result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

314

**EXHIBIT 1**
6

ER 1259

**GANG, TYRE, RAMER & BROWN, INC.**

John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3. Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4. D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5. The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6. In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7. Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8. D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

315

EXHIBIT 1

7

ER 1260

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 5

9.    DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.   Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11.   At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.   The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13.   Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14.   Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

316

**EXHIBIT 1**
8

ER 1261

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By _____

Kevin S. Marks

KSM:ljl

cc:  Joanne Siegel
     Laura Siegel Larson
     Bruce Ramer
     Don Bulson

236172.1

317

**EXHIBIT 1**
**9**

ER 1262

OCT-26-2001  17:24        JOHN SCHULMAN                          818 954 4768      P.01



**WARNER BROS.**

John A. Schulman
Executive Vice President
and General Counsel

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

October 26, 2001

**Via Facsimile (310) 777-4801**
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA 90212

        Re:     Siegels

Dear Kevin:

        I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road.

        I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

        Thank you.

                                Sincerely,

                                John A. Schulman

JAS:hjl
cc:     Bruce Ramer, Esq. (w/encl)

**GTRB 0145**

A Time Warner Entertainment Company

**EXHIBIT 2**
**10**

ER 1263
318

## October 2001 Outline

Transfer

- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). . Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

Initial Payment

- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

319

**EXHIBIT 2**

**11**

ER 1264

OCT-26-2001  17:25          JOHN SCHULMAN                              818 954 4768    P.03

320

EXHIBIT 2
12

ER 1265

OCT-25-2001  17:25        JOHN SCHULMAN                        818 954 4768     P.04

321

EXHIBIT 2
13

ER 1266

OCT-29-2001  17:25        JOHN SCHULMAN                          818 954 4768      P.05

<u>Annual Payment (Advance)</u>
* $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
* Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
* Terminate when Action #1 US copyright terminates

<u>Widows Benefits</u> (not assignable or transferrable)
* $135,000/year
* Payable for Joanne's life, personal,
* Paid as now
* Medical, comparable to past, for life

<u>Royalty</u>
* Commencing for revenue received on or after 1/1/00
* All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
* 6% of DC's receipts from all Media licenses for use of the Properties, except:

> 1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.

> 2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

* 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

> 1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

> 2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

> 3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

> 4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

322

EXHIBIT 2
14

ER 1267

UCT-25-2001  17:26       JOHN SCHULMAN                          818 354 4768      P.06

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.
- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

    1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

    2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

    3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

Payment

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

    47.5% Joanne Siegel
    23.75% Laura Siegel Larson
    23.75% Michael Siegel
    5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

Advise (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

323

EXHIBIT 2
15

ER 1268

changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

<u>Credit</u> (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

<u>Accounting</u>

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

<u>Audit</u> (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals which fall outside the safe harbors.

<u>Safe Harbors for Intercompany Deals</u>
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

324

**EXHIBIT 2**

**16**

ER 1269

OCT-25-2001  17:27     JOHN SCHULMAN                                    818 954 4768    P.08

<u>Expedited Dispute Resolution</u> (Any claims between the parties)

* Arbitration
* Compensation damages only to Siegels
* No injunction against DC/WB breaches, no termination of rights, no reversion
* DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

<u>Medical Coverage/Son & Daughter (Grandsons only through minority)</u> (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

<u>Release and covenant not to sue by Siegels</u>
* Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
* Approve all deals made before 12/31/00

<u>Miscellaneous</u>
* Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
* Siegels defend and indemnify re third party claims
* Siegels defend and indemnify re Dennis claim
* Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
* DC Comics to defend and indemnify Siegels' (who sign) against claims brought by third parties for DC/WB acts
* Siegels to refer all inquiries relating in any way to Properties to DC/WB.
* At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

<b>GTRB 0152</b>

TOTAL P.02

<b>EXHIBIT 2</b>

17

ER 3250

# FROSS ZELNICK LEHRMAN & ZISSU, P.C.

ALVIN FROSS
~~ALD J. LEHRMAN
STEPHEN BIGGER
MICHAEL I. DAVIS
ROGER L. ZISSU
MARIE V. DRISCOLL
RICHARD Z. LEHV
CAROL F. SIMKIN
MARGARET F. GOLDSTEIN
DAVID W. EHRLICH
SUSAN UPTON DOUGLASS
JANET L. HOFFMAN
PETER J. SILVERMAN
LAWRENCE ELI APOLZON
BARBARA A. SOLOMON
LISA PEARSON
MARK D. ENGELMANN
NADINE H. PARKER JACOBSON
ANDREW N. FREDBECK
GEORGES NAHITCHEVANSKY
CRAIG S. MENDE
PATRICK T. PERKINS
J. ALLISON STRICKLAND

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fzlz@frosszelnick.com

RECEIVED
FEB 0 4 2002

JAMES D. SILBERSTEIN
RUTH LAZAR
COUNSEL

MICHELLE P. FOXMAN
ROBERT A. BECKER
TAMAR NIV BESSINGER
ANGELA KIM
JOHN P. MARGIOTTA
LYDIA T. GOBENA
DIANE B. MELNICK
MICHAEL CHIAPPETTA
DANA WRUBEL
JESSICA MANN
JOSEPH R. MOLKO
EVAN GOURVITZ
CARLOS CUCURELLA
NANCY C. DICONZA
TANYA FICKENSCHER
ZOE HILDEN
LAUREN J. MANDELL

February 1, 2002

**VIA FEDEX**

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

     Re:  Superman

Dear Kevin:

    I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. As our clients have not seen this latest version of the agreement, I must reserve their right to comment. In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

               Very truly yours,

               Patrick T. Perkins

Encls.

cc:    John Schulman, Esq.
       Paul Levitz
       Lillian J. Laserson, Esq.
       Carol F. Simkin, Esq.

I:\PPERKINS\DCC\SUPER\020201 Ltr-K. Marks.doc

326

**EXHIBIT 3**
**18**

ER 1271

02/01/02
4:51 PM

## AGREEMENT

AGREEMENT made this __ day of ___ 2002, by and between DC COMICS, a New York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700 Broadway, New York, New York 10019, and Joanne Siegel, residing at 13900 Panay Way, R-115, Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106, Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel, Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The SIEGELS").

## DEFINITIONS

1.    The term "Works" is hereinafter defined collectively and individually as follows: any and all works, creations, material, matter, contributions, adaptations, modifications, derivative works and all other works of any kind whatsoever, including but not limited to all stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses, images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component, draft of, or part or portion of any of the foregoing, regardless of whether or not subject to copyright protection, regardless of whether or not published, regardless of whether or not any person knows of the existence of the foregoing, wherever in the world created, and whenever created , and regardless of the medium or form of expression or exploitation (whether or not now existing).

327

**EXHIBIT 3**
19

ER 1272

2.    The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3.    The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SUPERMAN and the first story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced _infra_ in definition paragraph number __.

4.    The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

2

**328**

**EXHIBIT 3**
**20**

ER 1273

5. The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6. The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7. The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8. The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

3

329

**EXHIBIT 3**
**21**

ER 1274

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9.    The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.    (1) First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B.    Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

4

10. The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11. The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced _infra_ in definition paragraph number __.

12. The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

331

**EXHIBIT 3**
**23**

ER 1276

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13.   The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14.   The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15.   The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

332

**EXHIBIT 3**
**24**

ER 1277

16. The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17. The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A. (1) First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and

B. Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

333

**EXHIBIT 3**
**25**

ER 1278

18. The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19. The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20. The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works. (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21. The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22. The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

8

334

**EXHIBIT 3**
**26**

ER 1279

23. The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24. The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses. Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property. Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable. Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25. The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26. The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

9

335

**EXHIBIT 3**
27

ER 1280

27.     "Reversionary" rights shall mean:

      a.     any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

      b.     any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

      c.     any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

      d.     any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

      e.     any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

      f.     any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

336

**EXHIBIT 3**
**28**

ER 1281

    g.    in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

## WHEREAS CLAUSES

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

337

**EXHIBIT 3**
**29**

ER 1282

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

12

338

**EXHIBIT 3**
**30**

ER 1283

predecessor(s) and make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

<u>TERMS</u>

1. <u>GRANT OF RIGHTS</u>. The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement. The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

a) <u>Grant Of All Rights In The SUPERMAN Works.</u>

i) <u>Grant Of All Rights In The ACTION COMICS NO. 1</u>

<u>SUPERMAN Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

13

339

**EXHIBIT 3**
31

ER 1284

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

      ii)    <u>Grant Of All Rights In The POST ACTION COMICS NO. 1 SUPERMAN Works.</u> The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

14

340

**EXHIBIT 3**
**32**

ER 1285

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

b) <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative Works</u>. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

15

341

**EXHIBIT 3**
**33**

ER 1286

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

    c)  <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.</u>  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

16

342

**EXHIBIT 3**
**34**

ER 1287

d) Grant Of All Rights In The SPECTRE Works.

 i)  Grant Of All Rights In The MORE FUN COMICS SPECTRE Works. If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit ___, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

 ii)  Grant Of All Rights In The POST MORE FUN COMICS SPECTRE Works. The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

343

**EXHIBIT 3**
**35**

ER 1288

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

18

344

**EXHIBIT 3**
**36**

ER 1289

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) Acknowledgement/Grant Of All Rights In The SPECTRE Marks. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

19

**EXHIBIT 3**
**37**

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and

interest in the SPECTRE Marks, including any good will associated therewith and all claims or

causes of action of any kind relating or appurtenant thereto.

g) <u>Grant Of All Rights In The OTHER SIEGEL Works.</u> To the extent that any

OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that,

contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The

SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC

COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity

claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning

such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and

irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC

COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every

kind whatsoever, including but not limited to copyright rights, throughout the world for all terms

of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or

those claiming through any of them, own, or have ever owned or claimed, or could possibly ever

claim, including as members of the public with respect to the OTHER SIEGEL Works when the

copyright(s) or any of them therein expire and all claims or causes of action of any kind relating

or appurtenant thereto.

h) <u>Acknowledgement/Grant Of All Rights In The OTHER Marks.</u> The

SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and

can never claim any rights of any kind in the OTHER Marks and that all such rights are owned

solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever

owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

20

346

**EXHIBIT 3**
**38**

ER 1291

whatsoever, (including as members of the public anywhere in the world should the OTHER Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the OTHER Marks including any goodwill associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

    2.  <u>Payments To The Siegels And Other Financial And Related Terms.</u>  In complete consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions and authorship, and the other understandings and agreements herein made by The SIEGELS, DC COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

      a)  <u>Initial Payments</u>

        i)  Upon full execution of this Agreement, a non-recoupable payment of $1,000,000;

        ii)  Upon full execution of this Agreement, an advance of $2,000,000 against The SIEGELS' royalty payments under ¶2(d) hereof;

        iii) Upon full execution of this Agreement , the payment of $250,000 heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall become non-recoupable.

      b)  <u>Annual Payments (Advances)</u>

        i)  For ten years commencing in 2002, payable on March 31st of each year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS hereunder.

**EXHIBIT 3**
**39**

ii) Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii) All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

348

**EXHIBIT 3**
**40**

ER 1293

iv)    The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)   <u>Widow's Benefits</u>

i)   For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)   Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)   <u>Royalties</u>

i)    Commencing for Revenues received on or after January 1, 2000;

ii)    6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

23

349

**EXHIBIT 3**
**41**

ER 1294

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

        iii)    6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

        (A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

        (B)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

        (C)    with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

        (D)    with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

24

350

**EXHIBIT 3**
**42**

ER 1295

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

        iv)     1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

        v)     1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property. A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories). A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories). However:

        (A)     with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

25

351

**EXHIBIT 3**
**43**

**ER 1296**

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ⅓ %;

        (B)    with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

        (C)    with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

        (D)    with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

        (E)    with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

352

**EXHIBIT 3**
**44**

ER 1297

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)     there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)     there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)     All royalties hereunder shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

27

**EXHIBIT 3**
**45**

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

    e)   <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

       47.5% to Joanne Siegel

       23.75 to Laura Siegel Larson

       23.75 to Michael Siegel

       5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder. Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

    f)   <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit ___ hereto is a copy of the medical coverage guidelines that currently apply). DC Comics shall reimburse Laura Siegel Larson for premiums

354

**EXHIBIT 3**
**46**

ER 1299

she has paid for medical and dental insurance for her and James and Michael Larson from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g)    Acknowledgement Of No Entitlement To Any Further Or Additional Payment. The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3.    DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS. The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto. DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

29

355

**EXHIBIT 3**
47

ER 1300

4. <u>The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS.</u>
The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC COMICS ____ exclusively, all rights of any kind in The WORKS and The MARKS, and all future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive use, enjoyment, control, and benefit. The SIEGELS acknowledge and agree that effective with the grant made herein, and regardless of anything that occurs or does not occur in the future, including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been learned relating in any manner whatsoever to this Agreement or its terms, whether any person or entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of the works that are the subject of this Agreement fall into the public domain for any reason whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in The WORKS or The MARKS. By way of example only and without limitation, as of the effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to, and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own no and shall own no rights, title or interest, including but not limited to any Reversionary Rights, of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any right to use or authorize the use of any of the foregoing on any basis.

5. <u>The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or Under The Stand Alone Assignments.</u> The SIEGELS covenant not to and shall not challenge, make any claim against or concerning, or take any action, directly or indirectly, to interfere with

30

356

ER 1301

**EXHIBIT 3**
48

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of, or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other person or entity in doing so.

6. <u>No Right To Terminate New Grant.</u> Further to paragraph 4, The SIEGELS hereby acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright Act and they know of no such grants which were not identified in said Notices. The SIEGELS further acknowledge and represent and warrant that, within the meaning of the Copyright Act, this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision of the Copyright Act, or under any other statute, regulation, common law principle, body of law or otherwise throughout the world. The SIEGELS hereby designate DC COMICS as the administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7. <u>Third Party And Intercompany Licenses.</u>

a) DC COMICS shall enter into any and all Licenses with unaffiliated third parties with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

31

**EXHIBIT 3**
**49**

ER 1302

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)     The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property.  The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below.  If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances.  In no event shall The SIEGELS have the

*358*

**EXHIBIT 3**
**50**

ER 1303

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW Company, or on the basis of whether or not there is an advance or guarantee, or because DC COMICS did not hold an auction in respect thereof.

c)      The applicable safe harbor agreements are as follows:

i)      For live action and animated feature length theatrical motion pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues received by an affiliated motion picture distributor in the United States in U.S. Dollars from exploitation of the motion pictures, less taxes (including duties and other governmental fees), collection costs and trade association dues. Notwithstanding the foregoing, in respect of Licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i) gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross wholesale sales income received therefrom by an affiliated distributor, less a reasonable amount for returns.

ii)      For animated direct to home video productions: $80,000 for each hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the home video production. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

iii)      For live action television programs: 3% of the first 1.5 million dollars of Gross Receipts received by an affiliated television production company in the United States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

**EXHIBIT 3**
**51**

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

iv) For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

v) For video games:

(A) For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

(B) For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

vi) For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

34

360

**EXHIBIT 3**
**52**

ER 1305

from gross revenues received in the United States in U.S. Dollars on account of licensed merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

vii)    For licensed publishing: 10% of net wholesale sales received by an affiliated publishing company in the United States in U.S. Dollars for each licensed publication. As used herein, "net wholesale sales" shall mean the affiliated publishing company's then standard definition of net wholesale sales.

viii)    For website uses of Flash Animations and collateral material intended to supplement or support the Flash Animations: 5% of an affiliated online production company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation of the animations and collateral material after it has recouped its Production Costs. As used herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest thereto).

8.    <u>Accounting.</u>  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable annually on March 31 of the year following the close of the annual accounting period. All payments shall be accompanied by a statement of account. The year 2000 statement and payment, if any, shall be made on March 31, 2002

9.    <u>Audit.</u>  The SIEGELS may audit the books and records of DC COMICS solely in order to verify statements issued to The SIEGELS hereunder. Any such audit shall be at The SIEGELS' expense. Any audit shall be conducted only upon reasonable notice by a certified public accountant during regular business hours at DC COMICS' offices and in such manner as not to interfere with DC COMICS' normal business activities. In no event shall an audit with

35

361

**EXHIBIT 3**
**53**

ER 1306

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

10.    Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.

a) The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents. Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within ____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

**EXHIBIT 3**
**54**

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

b) <u>The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact.</u> The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

11. <u>Conduct Of The Business.</u>

a) <u>No Disparagement By Parties.</u> The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

b) <u>Press Releases And Promotion.</u> The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

(i) upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

37

**363**

**EXHIBIT 3**
**55**

ER 1308

(ii)     shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)    shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c)  The SIEGELS Shall Refer Inquiries.  The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d)  Advise.  DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right.  The SIEGELS will be informed of such developments periodically.  To facilitate this, The SIEGELS will appoint one of them to  receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments.  The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

38

364

**EXHIBIT 3**
**56**

ER 1309

herein. Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

    e)   <u>Credit.</u>

        (i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

    (ii)   On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family". The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

**EXHIBIT 3**
**57**

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f)    DC COMICS Right To Use Materials. DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g)    DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS. DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40                                                              366

**EXHIBIT 3**
**58**

ER 1311

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

      h)    First Opportunity To Negotiate. The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. Representations And Warranties, Covenant Not To Sue And Indemnification.

      a)   The SIEGELS Have The Right and Power To Enter Agreement. The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

41

**367**

**EXHIBIT 3**
**59**

ER 1312

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS, including but not limited to all trademark rights (if any) and copyright rights, and all termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive and flow directly and only from Jerome Siegel; (vi) no person or entity other than The SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal representative of Mr. Siegel and his estate.

    b)  <u>Release And Covenant Not To Sue By The SIEGELS.</u>

    i)    As of the date of execution of this Agreement, The SIEGELS and their descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and past, present and future, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby release and discharge now and forever DC COMICS and its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and past, present and future parents, subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively

42

**368**

**EXHIBIT 3**
**60**

ER 1313

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

      ii)     In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

         RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

**EXHIBIT 3**
**61**

ER 1314

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

c) <u>Release And Covenant Not To Sue By DC COMICS.</u>

i) As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

ii) In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

370

**EXHIBIT 3**
**62**

ER 1315

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

    d)     <u>The SIEGELS Indemnify DC Comics.</u> RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s) at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

    (i)     RELEASEE against RELEASOR arising out of a breach or claimed breach by RELEASOR (or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel) of any of the terms of this Agreement;

    (ii)     RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

    (a)     asserting any right in The WORKS and/or The MARKS;

    (b)     seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

    (c)     claiming any Reversionary Rights in The WORKS or The MARKS;

    (d)     that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

45

**371**

**EXHIBIT 3**

**63**

ER 1316

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

(e) relating to The SIEGELS representations and warranties herein, including but not limited to: i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

(iii) Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

e) <u>DC COMICS Indemnifies The SIEGELS.</u> DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS. DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. <u>Confidentiality.</u> Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

**EXHIBIT 3**
**64**

ER 1317

14.    Dispute Resolution.

    a)  Choice of Law. This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

    b)    DC COMICS' Equitable Remedies Unlimited. The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief. It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan. The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

    c)    Arbitration As Sole Remedy To Address Disputes By The SIEGELS. Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for an accounting of moneys due. The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

47

373

**EXHIBIT 3**
**65**

ER 1318

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever. Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so. Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

     d)    <u>Limit On Remedy Available To The SIEGELS</u>. If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto. The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

48

**374**

**EXHIBIT 3**
**66**

ER 1319

any sums due to The SIEGELS herein. The parties acknowledge that the financial benefit flowing to The SIEGELS under this Agreement represents a greater amount than what The SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce the Notices and any purported rights thereunder. As consideration for this, The SIEGELS expressly agree that in any event, including but not limited to any change in law or otherwise, the compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel regardless of the basis of any such claim.

e) __No Payment Due Unless Provided For Herein__  Except as provided in paragraph 2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and Michael Siegel. None of The SIEGELS or their heirs, executors, trustees, administrators, successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the extent it is not expressly provided for herein.

f) __Suspension Of Payments To The SIEGELS.__  If for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS' sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be suspended until the claim is finally resolved.

15.    Non Assignability Of Rights Granted To The Siegels.  The SIEGELS shall not assign, transfer, sell, license, or give away any of the rights provided to them under this Agreement, and any such assignment shall be null and void.  The SIEGELS expressly agree that their heirs and/or all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement are expressly bound by this Agreement to the same extent to which The SIEGELS are bound by it.  The SIEGELS shall expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement that such person(s) or entity or entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. MISCELLANEOUS

a)  Severability.  In the event any provision hereof affecting The SIEGELS' grant of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by any competent court to be unenforceable, such determination shall not affect the effectiveness of any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in accordance with the parties' intent hereunder.

b)  Successors.  This Agreement is enforceable against and binding upon the parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers, employees, directors, consultants, successors and assigns.

376

**EXHIBIT 3**
**68**

ER 1321

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED:</u>

DC COMICS, a division of Warner Bros., a      By: _____
Time-Warner Entertainment Company

                                                                   Joanne Siegel

By: _____      Date: _____

377

51

**EXHIBIT 3**
**69**

ER 1322

Title: _____

Date: _____

By: _____

       Laura Siegel Larson

Date: _____

The Estate of Jerome Siegel

By:_____
Joanne Siegel as sole executor, trustee,
administrator and personal representative of
Jerome Siegel and his estate

Date: _____

By: _____

       Michael Siegel

Date: _____

**EXHIBIT 3**
**70**

## **ACKNOWLEDGMENT**

STATE OF        )

                      SS.:

COUNTY OF     )

On _____ __, 2001 before me _____ personally came _____ to me known, by me duly sworn, did depose and say that deponent resides at _____ that deponent is the _____ of DC COMICS, a division of Warner Bros., a Time-Warner Entertainment Company, the entity described in, and which executed the foregoing Agreement that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate seal, that it was affixed by order of the board of the corporation; and that deponent signed deponent's name thereto by like order.]

53

379

**EXHIBIT 3**
**71**

## ACKNOWLEDGMENT

State of     )

       :ss:

County of    )

On       2001 before me personally came Joanne Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.

_____

Notary Public

54

**380**

**EXHIBIT 3**

**72**

ER 1325

## <u>ACKNOWLEDGMENT</u>

State of        )

              :ss:

County of      )

On        2001 before me personally came Laura Siegel Larson to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.

_____

Notary Public

**EXHIBIT 3**
**73**

## <u>ACKNOWLEDGMENT</u>

State of   )

     :ss:

County of  )


On   2001 before me personally came Michael Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he executed the same.


_____

Notary Public


\\UNP1\VOL2\FIRMDOCS\PPERKINS\DCC\SUPER\Siegel Draft Agreement 020201.doc


56

**EXHIBIT 3**
**74**

ER 1327

JOANNE SIEGEL
13929 Marquesas Way #201-A
Marina Del Rey, CA 90292
(310) 821-5894
May 9, 2002

Richard D. Parsons
Co-Chief Operating Officer
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

Dear Dick,

I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner. For years we had had a friendly relationship with the D C Comics people and were on very friendly terms with Jerry Levin. We remained friends after the terminations were filed. They knew that we acted not out of malice but were exercising our rights granted by the U. S. Congress. Because Joe Shuster, Superman's artist, had no surviving spouse or children, his rights were not terminated but are held by D C Comics.

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

Page 1

000000676

EXHIBIT  Z

**EXHIBIT 4**
75

ER 1328  232

That contract was sent to us three months ago. The company may think its representatives are very clever but with that contract they have sunk not only themselves and the company but you, Jerry Levin and Steve Case down to a very low level.

Granted, Jerry gave us an advance two years ago which while very much appreciated, was of short term help. But we are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.

As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more. Just like the Gestapo, your company wants to strip us naked of our legal rights. Is that moral? Does that contract demonstrate the company's true "core values" as stated in the Stockholders Annual Report? What about the "social responsibility" that's supposed to be the mission of the company's Values and Human Development Committee on which you serve? Is it all a lie to the stockholders and the public?

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future? Isn't it about time? Shouldn't everyone be treated fairly? Or is that not "good business" in this company?

I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement. When my husband died, Jerry Levin told me that my daughter and I were part of the Time Warner family, part of the company's history. They were beautiful words we appreciated. Another time, in a letter to me, he talked about honoring Jerry because of his huge

Page 2

000000677

**EXHIBIT 4**
76

ER 1329   233

contribution to the company. It sounded sincere. But this contract seeks to discredit Jerry Siegel and to undermine our rights, a direct contradiction to what was said.

After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the worst possible light. Is that the reputation you want?

Joanne Siegel

Page 3

000000678

**EXHIBIT 4**
77

ER 1330 234

## AOL Time Warner

$SiEGEL$

⑤

Richard D. Parsons
Chief Executive Officer

May 21, 2002

Ms. Joanne Siegel
13929 Marquesas Way, #201-A
Marina Del Rey, CA 90292

Dear Joanne:

Thank you for your letter of May 9th. Your husband and his creations and his family have been a cherished part of the Warner, Time Warner and now AOL Time Warner family for many years. I was, therefore, quite troubled by your feeling. Consequently, I have been in contact with John Schulman and Paul Levitz and have been informed that each of the major points covered in the draft agreement which was provided to your representatives, more than three months ago, accurately represented the agreement previously reached between your representatives and AOLTW's. Those negotiating the agreement for AOLTW even improved – to your benefit – the terms of our $250,000 recoupable advance; they proposed as a part of the overall deal that the advance be non-applicable and non-recoupable. So, I am a bit at a loss to understand the level and intensity of your distress.

As in all negotiations, including the lengthy ones which have brought us this far, we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve. John and Paul look forward to meeting with your representatives, and we continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers.

In the interim, I want you to know that AOLTW is determined to do the right thing for the heirs of Jerry Siegel, you and your family, and that we continue to count SUPERMAN among America's cultural treasures with which we are proud to be associated.

Sincerely,

Dick P.

RDP:pb

cc: Paul Levitz
John Schulman

AOL Time Warner Inc. • 75 Rockefeller Plaza • New York, NY 10019
tel 212 484 8100 • fax 212 275 3085

EXHIBIT
30

Confidential

WB004014

**EXHIBIT 5**
78

ER 1331

| Joanne Siegel | Laura Siegel Larson |
|---|---|
| **Joanne Siegel** | **Laura Siegel Larson** |
| **13929 Marquesas Way #201A** | **6400 Pacific Avenue #106** |
| **Marina Del Rey, CA 90292** | **Playa Del Rey, CA 90293** |

September 21, 2002

Kevin S. Marks, Esq.
Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212

Dear Kevin and Bruce,

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman, Superboy, the Spectre and all related characters and entities. We instruct you to take no further actions on our behalf.

Please return all materials regarding the above including but not limited to files, correspondence, notes and documents to us forthwith. These should be sent to Joanne Siegel at the above address.

It is a shame that four years were wasted due to DC Comics and AOL Time Warner's greed. We have no intention of publically disparaging DC or any individual in the parent company. However, should DC or its parent company, officers, attorneys, representatives or spokespersons disparage us or our rights, we will vigorously respond in kind.

Sincerely,                                        Sincerely,

*Joanne Siegel*                                  *Laura Siegel Larson*

Joanne Siegel                                    Laura Siegel Larson

CC: Michael Siegel
    Don Bulson, Esq.
    Paul Levitz

**EXHIBIT 6**
**79**

ER 1332

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 224 of 327

Notice of Termination of Transfer
Covering Extended Renewal Term

*Superboy*

000000612

EXHIBIT 7
80

ER 1333

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 225 of 327

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To: AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

000000613

**EXHIBIT 7**
**81**

ER 1334

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 226 of 327

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

2

000000614

**EXHIBIT 7**
82

ER 1335

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 227 of 327

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: AOL Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020; AOL Time Warner Book Group, Inc., 1271 Avenue of the Americas, New York, NY 10020; Warner Books, Inc., 1271 Avenue of the Americas, New York, NY 10020; Little, Brown, and Company, 1271

000000615

EXHIBIT 7
83

ER 1336

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 228 of 327

Avenue of the Americas, New York, NY 10020; DC Comics Inc., 1700 Broadway, 7th Floor, New York, NY 10019; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; Milton Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Wildstorm Productions, 888 Prospect Street, Suite 240, La Jolla, CA 92037; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Cantharus Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819; Hallmark Entertainment, Inc., 1325 Avenue of the Americas, 21st Floor, New York, NY 10019; Marvel Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016; Golden Books Publishing, 1540 Broadway, New York, NY 10036; Random House Golden Books for Young Readers, 1540 Broadway, New York, NY 10036; Inkworks, 4320 Delta Lake Drive, Raleigh, NC 27612; DK Publishing, Inc., 375 Hudson Street, New York, NY 10014; Scholastic, Inc., 557 Broadway, New York, NY 10012.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, and additionally, by certified mail, return receipt requested, to the above grantees or successors at the addresses shown.

2.      Each work to which this Notice of Termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERBOY, which was published and embodied in the illustrated comic book story in More Fun Comics, No. 101, January-February, 1945 issue, for which copyright was originally secured on November 23, 1944 under Copyright Registration No. B653651 and which was published in or about November 18, 1944. SUPERBOY and this work were previously adjudicated to have been based upon and embodied in the character,

000000616

**EXHIBIT 7**
**84**

ER 1337

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 229 of 327

concept, script and scenario solely written and created by Jerome Siegel and to be a separate and distinct copyrighted work and character from the copyrighted work and character, SUPERMAN.[1] Renewal for the work was made July 17, 1972, in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under Copyright Renewal Registration No. R532582. SUPERBOY and the aforesaid work were based upon and embodied the following works to which this Notice of Termination also applies: (I) a three page summary or synopsis of the concept and plan for a new comic strip to be known as SUPERBOY solely originated, created, conceived and written by Jerome Siegel (c. 1938) and submitted by Jerome Siegel to Detective Comics, Inc. on or about November 30, 1938; and (II) a complete thirteen page script containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip, SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, solely originated, created,

---

[1] In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., Supreme Court of the State of New York, Case No. 1099-1947(1948), the Court signed findings of fact and conclusions of law on April 12, 1948 (from which neither side perfected an appeal) including, without limitation, that on or about November 30, 1938, Jerome Siegel submitted to Detective Comics, Inc. for its consideration a synopsis or summary of the conception and plan for a new comic strip entitled SUPERBOY (attached as Exhibit 16 thereto); that during December, 1940 Jerome Siegel submitted to Detective Comics, Inc. for its further consideration a complete script (attached as Exhibit 36 thereto) containing the continuity, plan and dialogue for the first "release" or "releases" of SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, all set forth by Jerome Siegel with detail and particularity; that the comic strip, SUPERBOY, published by Detective Comics, Inc. embodied and was based upon the idea, plan, conception and direction contained in said original material solely created by Jerome Siegel; that SUPERMAN did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY and that SUPERBOY was a work different and distinct from SUPERMAN; that the publication of all such comic strip material entitled SUPERBOY by Detective Comics, Inc. was at all times without the permission of Jerome Siegel; and accordingly, that Jerome Siegel, was the originator and owner of the comic strip feature, SUPERBOY, and had the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY, of the type and nature theretofore published by Detective Comics, Inc. Subsequent to these court findings, the parties entered into the above referenced agreement dated May 19, 1948 wherein Jerome Siegel assigned rights in SUPERBOY to National Periodical Publications, Inc., to which assignment this Notice of Termination applies, without limitation. In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973), aff'd in part, 508 F.2d 909 (2nd Circuit 1974), the Court held that the aforementioned findings by the Supreme Court of the State of New York in 1948 are binding and that any dispute with respect thereto is barred by the doctrines of res judicata and collateral estoppal.

5

000000617

**EXHIBIT 7**
85

ER 1338

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 230 of 327

conceived, and written by Jerome Siegel in detail and with particularity, and submitted by Jerome Siegel to Detective Comics, Inc. on or about December, 1940. The remaining works to which this Notice of Termination applies[2] are:

| Title | Name of Author[3] | Date Copyright Secured[4] | Copyright Reg. No. |
|---|---|---|---|
| **SUPERBOY IN[5]:** | | | |
| More Fun Comics#101 | Detective Comics, Inc. | Nov. 18, 1944 | B653651 |
| More Fun Comics#102 | " | Jan. 16, 1945 | B661073 |
| More Fun Comics#103 | " | Mar. 20, 1945 | B669959 |
| More Fun Comics#104 | " | May 28 1945 | B679484 |
| More Fun Comics#105 | " | July 23 1945 | B687306 |
| More Fun Comics#106 | " | Sept. 23, 1945 | B696308 |
| More Fun Comics#107 | " | Nov. 20, 1945 | B701661 |

---

[2] This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERBOY or the SUPERBOY stories, such as, without limitation, *Superboy, Smallville, Lana Lang* and *Pete Ross*. Every reasonable effort has been made to find and list herein every such SUPERBOY-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

[3] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a "work made for hire;" nor is anything else herein to be construed as any such admission. Nothing contained in this Notice of Termination shall be construed to in any way limit or waive any right or remedy that the undersigned might have, at law or in equity, with respect to the subject matter hereof, all of which is hereby expressly reserved.

[4] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g. "DCRE: 1979"), followed by the specific registration date.

[5] "SUPERBOY IN:" means any and all works as described in footnote no. 2.

6

000000618

**EXHIBIT 7**
86

ER 1339

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 231 of 327

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Dichotic (aka Smallville # 209) | Warner Bros. Television | 2002 | No record |
| Skinwalker (aka Smallville # 210) | " | 2002 | No record |
| Visage (aka Smallville # 211) | " | 2002 | No record |
| Smallville DVD (Episode #101: "Pilot" and Episode #102: "Metamorphosis") | | 2002 | No record |

**SMALLVILLE NOVELIZATIONS**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Smallville #1: Arrival | D C Comics, Inc. and AOL Time Warner, Inc. | 2002 | In progress |
| Smallville #2: See No Evil | " | Oct. 17, 2002 | In progress |
| Smallville #2: Dragon | " | Oct., 2002 | In progress |
| Smallville: Strange Visitors | " | Oct. 7, 2002 | In progress |
| Smallville #3: Flight | " | Dec., 2002 | In progress |
| Smallville #3: Hauntings | " | Dec., 2002 | In progress |
| Smallville #3: Pet Peeves | " | Dec., 2002 | In progress |
| Smallville #4: Whodunnit | " | Mar., 2003 | In progress |

3.    The grant(s) to which this Notice of Termination applies is(are) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand.[7]

4.    The effective date of termination shall be November 17, 2004.

---

[7] To the extent the following agreements are found or claimed to contain a grant(s) of, pertaining to or affecting SUPERBOY, in whole or in part, this Notice of Termination shall apply to such agreements as well: Agreement dated December 4, 1937 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other had; Agreement dated March 1, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc. and The McClure Newspaper Syndicate, on the other hand; and Agreement dated December 19, 1939 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand.

000000664

**EXHIBIT 7**
**87**

ER 1340

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 232 of 327

5.      Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: November 8, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292


Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

000000665

**EXHIBIT 7**
88

ER 1341

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 233 of 327

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable investigation to be made on our behalf as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of November, 2002, at Los Angeles, California.


Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292


Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293


54

000000666

EXHIBIT 7
89

ER 1342

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 234 of 327

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM to be served this 8th day of November, 2002, by First Class Mail, postage prepaid, upon the following:

To:  AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

55

000000667

**EXHIBIT 7**

**90**

ER 1343

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 235 of 327

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

56

000000668

**EXHIBIT 7**
**91**

ER 1344

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 236 of 327

We declare under penalty of perjury that the foregoing is true and correct.

Executed this _8th_ day of November, 2002, at Los Angeles, California.

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

57

000000669

**EXHIBIT 7**
**92**

ER 1345

CONFIDENTIAL



*endeavor*

<u>Via Messenger</u>

Mr. Bruce Rosenblum
Warner Bros.
4000 Warner Blvd.
Bldg. 2, Room 215
Burbank, CA 91522

Dear Bruce,

As discussed, I represent Joanne Siegel and Laura Siegel Larson, the heirs of Jerry Siegel, the sole creator of SUPERBOY.

I've enclosed a courtesy copy of the Notice of Termination regarding SUPERBOY which applies as well to SMALLVILLE. The Termination document was served on November 8, 2002 by certified mail, return receipt requested and regular mail on a number of Warner Bros. people including Barry Meyer and Peter Roth.

The Termination was recorded with the Copyright Office on November 20, 2002. In fact, when my assistant went to the US Copyright internet site and punch in SMALLVILLE, the Termination comes up.

I'm informed that <u>effective November 17, 2004</u> this terminates prior assignments of SUPERBOY to WB's predecessors, at which time the entire U.S. copyright to SUPERBOY reverts to my clients and that afterwards WB can not make any new programs based on this copyright including new SMALLVILLE episodes.

Apparently in a prior 1947 New York case against WB's predecessor the Court decided that the story of Superman as a teenager with superpowers is a separate copyright from SUPERMAN (called SUPERBOY) solely owned by Mr. Siegel; that after the lawsuit Siegel assigned this to WB's predecessors, but that under US Copyright law my clients are now entitled to get back this copyright by the Termination. It seems the central issue here was already decided in 1947 and that this is binding today — that depicting SUPERMAN as a teenager is a separate copyright (called SUPERBOY) owned by Mr. Siegel and soon his heirs.

If both sides are willing to try I believe if with my help we can find a real business solution to this before it gets turned over to the lawyers and their self-fulfilling prophecies of a drawn out legal nightmare.

Best,

dbnr
Ariel Emanuel

Talent Agency · 370 · Wilshire Boulevard, 10th Floor · Beverly Hills, CA 90212 · 310 248-2000 · Fax 248-2020

TOTAL P.02

**EXHIBIT 8**
93

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 238 of 327

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

    vs.                No. 04-8400 (RSWL)(RZx)
                        -and-
WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

      Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL


DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006


Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934


www.sarnoffcourtreporters.com

Irvine  •  Los Angeles  •  San Francisco

phone 877.955.3855  •  fax 949.955.3854



**SARNOFF**
*Court Reporters and
Legal Technologies*

ER 1347

EXHIBIT 9

94

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
 5
             Plaintiffs,
 6
         vs.                        No. 04-8400 (RSWL) (RZx)
 7
     WARNER BROS. ENTERTAINMENT
 8   INC., et al.,
 9           Defendants.
                                         -and-
10   _____
     JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
11
             Plaintiffs,
12                                      No. 04-8776 (RSWL)(RZx)
         vs.
13
     TIME WARNER INC., WARNER
14   COMMUNICATIONS INC., WARNER
     BROS. ENTERTAINMENT INC., WARNER
15   BROS. TELEVISION PRODUCTION INC.,
     DC COMICS, and DOES 1-10,
16
             Defendants.
17   _____
     AND RELATED COUNTERCLAIMS.
18
     _____
19
20           Deposition of LAURA SIEGEL LARSON, taken on
21   behalf of Defendants and Counterclaimants, at 9665
22   Wilshire Boulevard, 9th Floor, Beverly Hills, California,
23   beginning at 10:05 AM and ending at 8:50 PM on Tuesday,
24   August 1, 2006, before DAVID S. COLEMAN, Certified
25   Shorthand Reporter No. 4613.
```

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 239 of 327

2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 240 of 327

```
 1              Beverly Hills, California, Tuesday, August 1, 2006

 2                       10:05 AM - 8:50 PM

 3

 4                     LAURA SIEGEL LARSON,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8                          EXAMINATION

 9    BY MR. ZISSU:

10         Q    Could you tell us your name?

11         A    Laura Siegel Larson.

12         Q    And where do you live?

13         A    6400 Pacific Avenue, No. 106, in Playa Del Rey,

14    California 90293.

15              MR. ZISSU:  Now, we will have certain

16    stipulations, which I think are normal.  Objections

17    except as to form are reserved.

18              Okay?

19              MR. TOBEROFF:  That's fine.

20    BY MR. ZISSU:

21         Q    Should I call you Miss Larson or Miss Siegel

22    or...

23         A    Miss Siegel.

24         Q    What do you prefer?

25         A    Miss Siegel would be fine, thank you.
```

9

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 241 of 327

```
1   reluctantly accepted John Schulman's last proposal six

2   months ago, we were stabbed in the back with a shotgun

3   contract," close quote.

4           Now, first, it's true that your mother uses the

5   word "accepted" here, not "approved," which you say you

6   prefer.

7           Isn't that true?

8      A    I prefer the word "approved."

9      Q    But she said "accepted."

10     A    She said that in this letter.

11     Q    Right.

12          And, by the way, what was John Schulman's last

13  proposal six months ago?

14     A    It was the -- our understanding of the

15  discussion that he had had with Kevin Marks --

16     Q    What was --

17     A    -- on October 16th.

18     Q    Was -- okay.  Is that a reference to a letter

19  that Mr. Schulman wrote?

20     A    No, there was no letter.  It was a verbal

21  discussion.

22          MR. ZISSU:  Let's have marked as Defendants'

23  Exhibit 24 a letter dated October 26 from John Schulman

24  to Kevin Marks.

25          (Defendants' Exhibit 24 marked.)
```

139

ER 1350

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 242 of 327

BY MR. ZISSU:

Q   Have you seen that before?

A   The first time I saw this was when Warner Bros. produced this during this litigation.

Q   You never saw that before?

A   No.

Q   Did your mother see it before?

A   No.

Q   So her -- your mother's reference wasn't to that letter --

A   No.

Q   -- in the --

A   She never saw --

Q   In this Defendants' Exhibit 23, your mother was not referring to Defendants' Exhibit 24.

    Correct?

A   Correct.

Q   Now going back to Defendants' Exhibit 23, and I will read again the last sentence of the portion I read before:  "When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract."

    Now, your mother didn't say that the acceptance was conditional, did she, in this letter?

140

1

2

3

4

5

6

7

8           I, LAURA SIEGEL LARSON, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14           EXECUTED this _17th_ day of _September_,

15   20 _06_, at _Playa Del Rey,_____, _California_.
                        (City)                    (State)

16

17

18

19   _Laura Siegel Larson_
     LAURA SIEGEL LARSON

20

21

22

23

24

25

278

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 243 of 327

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 244 of 327

1

2

3

4        I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under by

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14        I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19       AUG 1 8 2006

20   Dated: _____

21

22               DAVID S. COLEMAN, CSR NO. 4613

23

24

25

**EXHIBIT 9**

**100**

ER 1353

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
         Plaintiffs,             )
                                 )
    vs.                          )      No. 04-8400 (RSWL)(RZx)
                                 )
WARNER BROS. ENTERTAINMENT )            -and-
INC., et al.,                    )
                                 )      No. 04-8776 (RSWL)(RZx)
         Defendants.             )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL** *Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and as far as litigation

EXHIBIT 10
101

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 245 of 327

ER 1354

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 246 of 327

1          Deposition of KEVIN S. MARKS, taken on

2     behalf of Defendants and Counterclaimants,

3     at 9665 Wilshire Boulevard, 9th Floor, Beverly

4     Hills, California, beginning at 10:05 AM on

5     Saturday, October 7, 2006, before DAVID S.

6     COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9     APPEARANCES:

10

11    For Plaintiffs:

12         LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
13         Attorney at Law
           2049 Century Park East, Suite 2720
14         Los Angeles, California 90067
           310-246-3333
15

16    For Defendants and Counterclaimant:

17         WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
           BY:  MICHAEL BERGMAN
18         Attorney at Law
           9665 Wilshire Boulevard, 9th Floor
19         Beverly Hills, California 90212
           310-858-7888
20         mbergman@wwllp.com

21              -and-

22         PERKINS LAW OFFICE
           BY:  PATRICK T. PERKINS
23         Attorney at Law
           1711 Route 9D
24         Cold Springs, New York 10516
           845-265-2820

25

2

U.S. LEGAL SUPPORT

EXHIBIT 10
102

ER 1355

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 247 of 327

1          Beverly Hills, California, Saturday, October 7, 2006

2                    10:05 AM

3

4

5                    KEVIN S. MARKS,

6          having been first administered an oath,

7          was examined and testified as follows:

8

10:05 9                    EXAMINATION

10:05 10   BY MR. BERGMAN:

10:05 11      Q    Good morning, Mr. Marks.

10:05 12      A    Good morning.

10:05 13      Q    Would you state your full name for record,

10:05 14   please?

10:05 15      A    Kevin Stuart Marks, K E V I N, S T U A R T,

10:06 16   M A R K S.

10:06 17      Q    And am I correct, Mr. Marks, that you're a

10:06 18   partner in the firm of Gang, Tyre, Ramer & Brown?

10:06 19      A    Technically a member.  You can call me a

10:06 20   partner, yes.

10:06 21      Q    Okay.  Both you and Gang, Tyre have been served

10:06 22   with subpoenas for particular documents, and your counsel

10:06 23   has produced documents stamped GTRB 001 through 0635, and

10:06 24   we will be reviewing certain of those documents as we

10:06 25   proceed along with other documents.  You've also produced

8

EXHIBIT 10
103

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 248 of 327

04:35 1      Q    Still your assistant?

04:35 2      A    Yes.

04:35 3      Q    The log also refers at items 630 through -32 to

04:35 4   a paralegal at your firm by the name of Hillel Elkins.

04:35 5           Is Mr. Elkins still employed by the firm?

04:35 6      A    No.

04:35 7      Q    Do you know where he is presently employed?

04:35 8      A    I don't.

04:36 9           MR. BERGMAN:  Will you then mark as Exhibit 21

04:36 10  an October 26 letter from Mr. Schulman to Mr. Marks, GTRB

04:36 11  145 through 152.

04:36 12          (Deposition Exhibit 21 marked.)

04:36 13  BY MR. BERGMAN:

04:36 14     Q    Had you left the office, Mr. Marks, by the time

04:36 15  this October 26 letter was faxed?

04:37 16     A    Yes.

04:37 17     Q    And when you returned to the office around

04:37 18  Thanksgiving, as you stated, in 2001, how soon after your

04:37 19  return do you believe you reviewed the October 26th

04:37 20  letter?

04:37 21     A    I don't specifically recall, but it would have

04:37 22  either been that week or certainly the following week.

04:37 23     Q    After you reviewed the letter, did you discuss

04:37 24  it with Mr. Ramer?

04:37 25          MR. MARMARO:  I think -- I was going to say the

                                                              149

U.S. LEGAL SUPPORT

**EXHIBIT 10**
**104**

ER 1357

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 249 of 327

04:37 1    nature of the question, even though it's phrased as a yes

04:37 2    or no question, calls for the witness to divulge work

04:37 3    product information which is to discuss matters with, and

04:38 4    I would object and instruct on that basis.

04:38 5             (Instruction not to answer.)

04:38 6             MR. BERGMAN:  Okay.

04:38 7        Q    After you reviewed this October 26 letter, did

04:38 8    you compare the terms set forth in the letter with those

04:38 9    set forth in your October 19 letter?

04:3810            THE WITNESS:  Can I answer that?

04:3811            MR. MARMARO:  Yes, unless Mr. Toberoff has an

04:3812    issue with it.

04:3813            MR. TOBEROFF:  I'm not going to object.  It's

04:3914    work product, but I think it's yours.

04:3915            MR. MARMARO:  As long as you have no objection,

04:3916    he can answer the question.

04:3917            THE WITNESS:  I was even a month or five or six

04:3918    weeks after the fact of the October 19th letter pretty

04:3919    familiar with the terms that set -- that were set forth

04:3920    in that letter, so on first read I didn't -- I don't

04:3921    believe I did a line-by-line comparison, but I believe I

04:3922    later did.

04:3923    BY MR. BERGMAN:

04:3924        Q    Okay.  Did you at any time after that line-by-

04:3925    line comparison advise Mr. Schulman that there was any

                                                              150

EXHIBIT 10
105

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 250 of 327

04:47 1   objection to -- subject to those objections, having

04:47 2   Mr. Marks answer the question.

04:47 3        MR. TOBEROFF:  I object on work product

04:47 4   privilege, but I think I am not asserting that on behalf

04:47 5   of the clients.  I am not asserting that on behalf of the

04:47 6   Siegels.

04:47 7        MR. MARMARO:  Mr. Marks would be prepared to

04:47 8   answer the question if the Siegels have no objection to

04:47 9   it.

04:4710        MR. TOBEROFF:  As to your personal belief, no

04:4711   objection.

04:4712        THE WITNESS:  Well, if the question is did I

04:4713   think at this point there was a final, binding,

04:4714   enforceable agreement, the answer would be no, but I did

04:4715   believe that we had come to an agreement back on October

04:4716   19th, 2001, that was reflected exactly in the terms that

04:4817   I set out.

04:4818        At the end of that letter I wrote to John in

04:4819   substance and effect, "John, if I've gotten anything

04:4820   wrong, if I've misstated any of these terms, please let

04:4821   me know."  When John writes back on October 26, which I

04:4822   see later, in effect his letter is, "Yeah, you've got

04:4823   terms wrong.  My outline of the deal terms is different

04:4824   than your outline of the deal terms."  So while I thought

04:4825   we had an agreement on these terms, John evidently

                                                              154

EXHIBIT 10
106

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 251 of 327

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4       Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7            MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:49 10           MR. TOBEROFF:  Not to the extent you are

04:49 11   comparing the documents.

04:49 12           MR. MARMARO:  Maybe we should have the documents

04:49 13   in front of us.  Do you have any objection to him looking

04:49 14   at Mr. Schulman's letter?

04:49 15           MR. BERGMAN:  Not at all.

04:49 16           THE WITNESS:  I know that one area of difference

04:49 17   was the scope of the rights granted.  In my letter it

04:49 18   referred to -- very specifically to the Superman property

04:49 19   and the Spectre property.  That's what we had been

04:50 20   talking about the whole time of our negotiations going

04:50 21   back to the first meeting in 2 -- 1999.  And, of course,

04:50 22   as you see here, the consideration, at least as set forth

04:50 23   in my letter, for that matter I guess in John's letter,

04:50 24   is based on revenue from the Superman and Spectre

04:50 25   properties, yet John's letter referred more generally to

155

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 252 of 327

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4         Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:5110    warranties than that, warranties that go beyond that.

04:5111         Oh, and by the way, that is also reflected in

04:5112    the October 19th letter.  John's warranties go beyond

04:5113    that, and so too in his letter he would have the Siegels

04:5114    indemnifying for areas that were not agreed and, indeed,

04:5115    not even discussed.  So there's broader warranties and

04:5116    representations and, as a result, broader indemnities,

04:5117    and in fact there are additional indemnities added; for

04:5218    example, indemnifying for any claims brought by Dennis

04:5219    Larson.

04:5220         There is, I recall, a provision that talks about

04:5221    furnishing DC Comics with historical information about

04:5222    the properties and rights information about the

04:5223    properties, and I felt from my representation of the

04:5224    client that that was going to be problematic, in fact I

04:5225    knew it was problematic, and it was not a point that had

156

EXHIBIT 10
108

ER 1361

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 253 of 327

04:52 1    been discussed before, it was not a point that had been

04:52 2    agreed before, and it was not a point that was in my

04:52 3    letter.

04:52 4         I know that there was a right of first

04:52 5    negotiation for any biographical material outlined in

04:52 6    John's letter.  Again, I don't recall ever discussing

04:53 7    that point before, much less agreeing to that point, and

04:53 8    it was not reflected in my letter.

04:53 9         When you get to elsewhere in John's letter, I

04:53 10   know he refers to an affirmative obligation on the part

04:53 11   of the Siegels to positively publicize the property and

04:53 12   to make themselves available or reasonably available for

04:53 13   travel, and what John and I had discussed and I had

04:53 14   believed agreed was that there would be mutual

04:53 15   non-disparagement, neither party would say anything bad

04:53 16   about the other, but we had not discussed and we had not

04:53 17   agreed about an affirmative obligation on the part of the

04:54 18   Siegels to positively publicize.

04:54 19        And in terms of the travel, I thought that was a

04:54 20   problem because we were dealing with a woman of advanced

04:54 21   years and a woman who was ill, and travel on them could

04:54 22   be a burden, notwithstanding that I think there was a

04:54 23   carve-out for -- subject to their health and

04:54 24   availability.  I wouldn't have wanted there to be any

04:54 25   dispute that they were not fulfilling an obligation about

157

04:54 1   going to travel to an event and that the failing to

04:54 2   travel to an event being the basis for claiming breach

04:54 3   and withholding royalty payments and the like.

04:54 4         I recall in this document new terms concerning

04:54 5   how the royalty could be reduced.  My understanding of

04:54 6   our agreement, what I set forth in the October 19th

04:55 7   letter, was that on media and merchandising licenses the

04:55 8   royalty was 6 percent.  If the other DC Comics characters

04:55 9   appeared in the media program or in licensing or

04:55 10  merchandising, that royalty could be reduced to a floor

04:55 11  of 3 percent.

04:55 12        And in our October telephone conversations this

04:55 13  issue was the subject of conversation, and John brought

04:55 14  up two other instances that would give rise to further

04:56 15  reductions of the royalty, and I know those instances

04:56 16  were specifically the use of Superman in conjunction with

04:56 17  properties called The Justice League, Superfriends and

04:56 18  Superheroes.  I recall that John initially said it should

04:56 19  go down to 1 percent, and we agreed that in fact the

04:56 20  floor in that specific instance would be 1.5 percent.

04:56 21        And also in this October period John brought up

04:56 22  a further area where he said sometimes there are very

04:56 23  extraordinary licenses where the Time Warner licenses DC

04:56 24  properties, and, for example, Looney Tunes properties,

04:56 25  and he spoke specifically about Six Flags Magic Mountain

                                                              158

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 254 of 327

04:56 1    amusement park, where there are strolling characters and

04:57 2    signage and the like that use numerous characters, and he

04:57 3    suggested that the royalty should be further reduced in

04:57 4    that case to 1 percent, which we came to an understanding

04:57 5    on that.

04:57 6         In the October 19th letter there are broader

04:57 7    categories where the royalty --

04:57 8         MR. MARMARO:  Do you mean the October 19th

04:57 9    letter?

04:57 10        THE WITNESS:  I'm sorry.  The October 26th

04:57 11   letter.  The categories where the 3 percent can be

04:57 12   further reduced are broadened.

04:57 13        I know we've talked today about intercompany

04:57 14   deals and safe harbors as one of the points throughout

04:57 15   the discussion, and as I think I testified to earlier, we

04:58 16   had agreed, I thought, that -- and I think it's reflected

04:58 17   in John's letter, that if the Siegels were to challenge

04:58 18   an intercompany deal that was outside a safe harbor,

04:58 19   there would be an expedited dispute resolution procedure.

04:58 20   That was the only discussion we had about alternative

04:58 21   dispute resolution.  We never discussed arbitration in

04:58 22   general applying to all of this, and yet John's letter

04:58 23   provided for arbitration of disputes.  My letter did not.

04:58 24        We talked earlier about the issue about for how

04:58 25   long would the 6 percent royalty run and there being

159

EXHIBIT 10
111

ER 1364

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 255 of 327

| | |
|---|---|
| 04:58 1 | disagreement on the parties as to the length of time. |
| 04:59 2 | The DC Comics position was the royalty would terminate |
| 04:59 3 | when Action Comics No. 1 went into the public domain, and |
| 04:59 4 | I believe it was at that July 12th meeting, 2001 meeting |
| 04:59 5 | that we sat at John's table and discussed what happens if |
| 04:59 6 | a Superman movie, SUPERMAN 18, comes out a year before |
| 04:59 7 | Action Comics No. 1 goes into the public domain; there |
| 04:59 8 | should be a tail on that, to which John agreed. |
| 04:59 9 | So we agreed upon a tail where there was a movie |
| 04:59 10 | that was released close to the end of the period that |
| 04:59 11 | Action Comics No. 1 was still in copyright.  We agreed |
| 04:59 12 | that there would be a tail for television, and we had |
| 04:59 13 | agreed that there would be a tail -- at least my |
| 04:59 14 | understanding was we'd agreed that there would be a tail |
| 05:00 15 | for other substantial projects.  After all, 10 years from |
| 05:00 16 | now, 20 years from now it's not clear what media -- in |
| 05:00 17 | what media contents will be exploited, so I wanted to be |
| 05:00 18 | able to cover that.  John did not include that other |
| 05:00 19 | area, other substantial projects in the tail, as I |
| 05:00 20 | recall. |
| 05:00 21 | We had talked about throughout a full indemnity, |
| 05:00 22 | and E&O insurance.  I think the E&O insurance wasn't in |
| 05:00 23 | John's letter, and I think the indemnity proposed here |
| 05:00 24 | was a partial, what I considered to be a partial |
| 05:01 25 | indemnity. |

160

**U.S. LEGAL SUPPORT**

**EXHIBIT 10**

**112**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 256 of 327

ER 1365

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 257 of 327

05:01 1       On the credit point --

05:01 2  BY MR. BERGMAN:

05:01 3    Q  Before you get to that one, Mr. Marks --

05:01 4      MR. MARMARO:  Can I just interject, because I

05:01 5  think I may have placed a possible ambiguity in the

05:01 6  record when I mentioned before Mr. Marks went into this

05:01 7  explanation of the differences that the letters be placed

05:01 8  before him, and until this very last point he has not

05:01 9  been testifying from the letter.  I just wanted to note

05:01 10  that for the record in case -- well, I just wanted to

05:01 11  note that for the record.

05:01 12      THE WITNESS:  In terms of the credit to be

05:01 13  accorded Siegel and Shuster, which was a point that I had

05:01 14  as my point C.4, a point that I thought had long been

05:02 15  agreed, that there would be a credit in paid ads of

05:02 16  motion pictures, which is certainly in my experience is

05:02 17  something that's very important to clients.  They want to

05:02 18  see the credit in the full-page ads in newspapers and

05:02 19  posters, movie theaters and the like, and John's letter

05:02 20  provided for credit on screen only and not in paid ads.

05:02 21  BY MR. BERGMAN:

05:02 22    Q  If I could just ask you a question about that,

05:02 23  and I am going, with your indulgence, to go back to some

05:02 24  of these --

05:02 25    A  Yes.

161

05:02 1      Q   -- but I'm looking at C.4, the specific item you

05:02 2   indicated in the October 19, and it -- I see what you're

05:02 3   referring to.  You're referring to the paid ads.

05:02 4      A   Correct.  I mean it's two words, but it's two

05:03 5   meaningful words.

05:03 6      Q   Okay.

05:03 7      A   Again, Mr. Marmaro said I hadn't gone -- I

05:03 8   hadn't reviewed this for purposes of testifying now going

05:03 9   line by line, but those are to me the major areas, but

05:03 10  they may not be the exclusive points.

05:03 11     Q   Let me -- before turning to a closer examination

05:03 12  of those, let me ask you this:  Here you've been

05:03 13  negotiating an agreement for two and a half years, and

05:03 14  you leave on vacation and you believe that it's been

05:03 15  resolved, and you review the October 26 letter, and it

05:04 16  appears to have differences, as you've recounted them.

05:04 17          Given what had transpired in the past in your

05:04 18  relationship with Mr. Schulman, was there a reason why

05:04 19  you didn't call him and sit down with him and say,

05:04 20  "Look," in essence, "we have an inconsistency here, and

05:04 21  let's try to resolve it"?

05:04 22          MR. MARMARO:  As with the other questions, if

05:04 23  Mr. Toberoff has no issue with the response, then

05:04 24  Mr. Marks would be willing to respond.

05:04 25          MR. TOBEROFF:  I don't.

162

ER 1367

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 258 of 327

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 259 of 327

05:04 1        THE WITNESS:  John's letter -- cover letter that

05:04 2    attaches the outline says, "We're working on the draft

05:04 3    agreement so that by the time you have accomplished

05:04 4    something of truly momentous import, we will have the

05:04 5    super-matter transaction in document form," and I very

05:05 6    much took that to mean that by the time you get back,

05:05 7    you'll have a long-form agreement that we can work off

05:05 8    of, and I wanted to see that long-form agreement.

05:05 9    BY MR. BERGMAN:

05:05 10       Q    I see.  And anticipated that the disparities

05:05 11   between the two short forms to be resolved in the long

05:05 12   form?

05:05 13       MR. MARMARO:  I'm going to object to the form of

05:05 14   the question.  Vague and ambiguous and -- well, vague and

05:05 15   ambiguous.

05:05 16       MR. TOBEROFF:  Same objection and leading.

05:05 17       MR. MARMARO:  You're asking if that was the

05:05 18   reason?

05:05 19       Go ahead, you can answer subject to the

05:05 20   objections.

05:05 21       THE WITNESS:  I hope I'm answering the question.

05:05 22   I thought it would be a good thing for the process to get

05:05 23   the long form to move it forward rather than bring it to

05:05 24   a screeching halt at this point, so I wanted to allow

05:06 25   this process to move forward.  My thought was let's raise

                                                              163

EXHIBIT 10
115

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 260 of 327

05:06 1  these issues in the context of the long form.

05:06 2          MR. BERGMAN:  I see.

05:06 3          Why don't we take a five-minute break.

05:06 4          MR. MARMARO:  Sure.

05:06 5          (Recess.)

05:13 6          MR. BERGMAN:  Back on the record.

05:13 7     Q    Just to complete this question of the two

05:13 8  letters, Mr. Marks, when you prepared your October 19

05:13 9  letter, did you believe that you accurately recorded the

05:14 10 deal as Mr. Schulman had offered it to you?

05:14 11    A    I believe that I had accurately recorded the

05:14 12 deal that was negotiated between the parties.

05:14 13    Q    Okay.

05:14 14    A    Mr. Bergman, I do want to be clear, on October

05:14 15 16 I don't recall the conversation as being a recitation

05:14 16 of each term.  The October 16th conversation was focused

05:14 17 on the one open item.  That's my recollection.

05:14 18    Q    I understand that.  I appreciate it.

05:14 19    A    But I -- to answer your question, yes, I believe

05:15 20 I at this confirmation letter set forth the terms as

05:15 21 agreed.  Of course, I invited John to tell me if I had

05:15 22 misstated it in any way.

05:15 23    Q    Okay.  And at no time until you had reviewed the

05:15 24 long-form agreement did you have any discussion with

05:15 25 Mr. Schulman concerning any disparity that might exist

                                                          164

**EXHIBIT 10**
**116**

ER 1369

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 261 of 327

05:15 1    between the two letters?

05:15 2         MR. MARMARO:  Do you mean the draft long form?

05:15 3         MR. BERGMAN:  Yes.

05:15 4         THE WITNESS:  I did put a call in to

05:15 5    Mr. Schulman during this time period, but I don't recall

05:15 6    that we spoke.  I found out he was on vacation.  Or I

05:16 7    would later learn he was on vacation.

05:16 8    BY MR. BERGMAN:

05:16 9         Q    Returning to your phone register at page 614 --

05:1610         A    One moment, please.

05:1611         Q    There is a reference to a phone call from

05:1612    Mr. Toberoff at 6:09.  Was that call completed that day?

05:1613    Did you return it?

05:1614         A    I don't know if it was completed that day.

05:1615         Q    Did you return it at some point?

05:1616         A    Yes, I believe so.

05:1717         Q    Before I get into that, let me just make sure.

05:1718    If you look at page 615, you'll see another reference to

05:1719    a phone call from Mr. Toberoff.

05:1720         Was your reply to the phone call that you

05:1721    received on the 24th made prior to the 30th, or was it

05:1722    after the 30th?

05:1723         MR. MARMARO:  30th of July?

05:1724         MR. BERGMAN:  Yes.

05:1725         THE WITNESS:  I believe, looking at these

                                                              165

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 262 of 327

05:37 1    BY MR. BERGMAN:

05:37 2        Q    Okay.   In response to the second paragraph of

05:37 3    this letter, did you make any attempt to telephone

05:38 4    Mr. Schulman and tell him in substance that there were

05:38 5    disparities between the October 19 and 26 letters?

05:38 6            MR. MARMARO:   Let me have that question read

05:38 7    back, please.

05:38 8            (Record read.)

05:38 9            THE WITNESS:   I had made an attempt before this

05:3810    letter, but I don't recall making an attempt after this

05:3811    letter.

05:3912            MR. BERGMAN:   Would you mark as Exhibit 23 a

05:3913    letter dated February 1, 2002, with an attachment, a

05:3914    draft long-form agreement, Bates stamped GTRB 350 through

05:3915    399.

05:3916            (Deposition Exhibit 23 marked.)

05:4017    BY MR. BERGMAN:

05:4018        Q    Am I correct, Mr. Marks, that Exhibit 23 is a

05:4019    copy of the long-form agreement that you received in

05:4020    early February?

05:4021        A    Yes.

05:4022        Q    Did there come a time following your receipt of

05:4023    this agreement when you began a redraft of the agreement?

05:4024            MR. MARMARO:   The question is vague and

05:4025    ambiguous, and again I am going to...   I'm going to state

                                                                       177

05:40 1    that if Mr. Toberoff has an objection to Mr. Marks

05:40 2    answering this question, I'd like to know about it.  If

05:41 3    not, Mr. Marks will answer.

05:41 4         MR. TOBEROFF:  As to the fact of your attempting

05:41 5    a redraft and the date, I don't mind you testifying

05:41 6    because that's already been disclosed, I believe, in a

05:41 7    letter to a third party, but other than that, as to any

05:41 8    other substantive questions on that redraft, we object to

05:41 9    that as attorney-client privilege and attorney work

05:41 10   product from the clients' points of view.

05:41 11        MR. MARMARO:  We will follow that objection and

05:41 12   instruct on that basis.

05:41 13        MR. BERGMAN:  As to yes or no --

05:41 14        MR. MARMARO:  I think he said no.  I'm going to

05:41 15   let Mr. Toberoff talk.  I had understood he said

05:41 16   Mr. Marks can answer that question yes or no but not

05:42 17   beyond that.

05:42 18        MR. BERGMAN:  Oh.

05:42 19        MR. TOBEROFF:  Right.  And also the date if he

05:42 20   wants.

05:42 21        THE WITNESS:  There came a time where I began to

05:42 22   prepare a completely new draft, as opposed to a redraft,

05:42 23   of what I had understood the terms had been reached by

05:42 24   the parties back in October.

05:42 25   BY MR. BERGMAN:

178

EXHIBIT 10
119

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 263 of 327

ER 1372

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 264 of 327

05:42 1      Q   Can you tell us approximately when you commenced

05:42 2   that redraft?

05:42 3          MR. MARMARO:   Object to the use of the word

05:42 4   "redraft."

05:42 5          MR. TOBEROFF:   Object as well.

05:42 6          THE WITNESS:   I do not recall approximately when

05:42 7   I began the draft agreement.

05:43 8   BY MR. BERGMAN:

05:43 9      Q   Do you recall speaking with Mr. Schulman on May

05:43 10  16, '02, and I refer you to your privilege -- to your

05:43 11  telephone register, 608, which indicates a call from

05:43 12  Mr. Schulman?

05:43 13         MR. TOBEROFF:   I am sorry.   What was the Bates

05:43 14  number?

05:43 15         THE REPORTER:   608.

05:43 16  BY MR. BERGMAN:

05:43 17     Q   Do you recall that, sir?

05:43 18     A   Yes.

05:43 19     Q   And did you in fact speak with Mr. Schulman on

05:43 20  the 16th?

05:43 21     A   I believe I spoke with Mr. Schulman at least

05:43 22  once on or around the 16th.

05:44 23         MR. BERGMAN:   I'm going to ask the reporter to

05:44 24  mark as Exhibit 24 a one-page handwritten document Bates

05:44 25  stamped WB 005972.

179

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 265 of 327

05:44 1           (Deposition Exhibit 24 marked.)

05:44 2    BY MR. BERGMAN:

05:44 3        Q    Mr. Marks, let me tell you that Mr. Schulman has

05:44 4    not yet been deposed in connection with this matter, but

05:44 5    I will represent to you that, if and when deposed, will

05:45 6    identify this document as notes of a conversation that he

05:45 7    took with you and -- on May 16 of statements that you had

05:45 8    made to him with respect to the draft long-form

05:45 9    agreement.

05:45 10       The first purported quotation by Mr. Schulman

05:45 11   is, quote, "'not expect contract like that,'" close

05:45 12   quote.

05:45 13       Do you recall stating in substance to

05:45 14   Mr. Schulman with respect to the draft long form that you

05:45 15   did not expect a contract like that?

05:45 16       A    While I don't have a specific recollection of

05:46 17   this statement, it is in fact the case that I did not

05:46 18   expect a draft like the one that came in early February.

05:46 19       Q    Okay.  The next statement attributed to you is,

05:46 20   quote, "'very aggressive 1st draft,'" close quote.

05:46 21       Do you recall stating that in substance to

05:46 22   Mr. Schulman?

05:46 23       A    Yes.

05:46 24       Q    The next statement attributed to you is, quote,

05:46 25   "'can deal with it,'" close quote.

                                                              180

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 266 of 327

05:46 1          Do you recall stating that to Mr. Schulman with

05:46 2    respect to the draft long form?

05:46 3        A    Not with respect to the draft long form.

05:46 4        Q    Okay.  Do you recall during that conversation

05:46 5    stating to Mr. Schulman anything to the effect of "can

05:46 6    deal with it"?

05:47 7          MR. MARMARO:  The question is vague in the --

05:47 8    well, the question is vague and ambiguous, but go ahead

05:47 9    and answer.

05:47 10         THE WITNESS:  Yes, but some context is required

05:47 11   here.

05:47 12   BY MR. BERGMAN:

05:47 13       Q    Please give me the context.

05:47 14       A    In this time period I believe there are two

05:47 15   calls.  The first call, John calls me and says -- said,

05:47 16   "Did you know that your client had written to Dick

05:47 17   Parsons and accused the Time Warner people of acting like

05:47 18   Gestapo," and I said "No."

05:47 19         He said, "Well, I've just received a letter."

05:47 20         I said, "Could you send it to me?"  John asked

05:47 21   for my fax number, and he sent it to me.

05:48 22         And I read the letter, and I think I called him

05:48 23   back and said, "As you're presenting it to me, I knew

05:48 24   nothing about this."

05:48 25         And I think John would have in the letter, among

181

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 267 of 327

05:48 1    other things -- it was a letter from Joanne Siegel -- was

05:48 2    critical of the draft document that had been sent, and I

05:48 3    think John was asking me what I thought about it.

05:48 4         And now to get to your question, my -- I think

05:48 5    my comment goes to I can deal with the process of it.  I

05:48 6    think by this time I had formed an opinion that I could

05:48 7    not deal with that draft itself, but I could deal with

05:48 8    the process of moving forward on a long form.  I don't

05:49 9    think that long form.  At least that's how I felt at the

05:49 10   time.

05:49 11        Q    Okay.  The next statement attributed to you in

05:49 12   Exhibit 24 is, quote, "'contains a lot of sep,'" which I

05:49 13   take to mean separate, "'docs,'" which I am assuming

05:49 14   documents; that is, it would read, quote, "'contains a

05:49 15   lot of separate documents,'" close quote.

05:49 16        MR. MARMARO:  Is that what you're representing

05:49 17   Mr. Schulman -- because that's not my reading of it.

05:49 18        THE WITNESS:  I read it differently as well.

05:49 19        MR. BERGMAN:  Then I may be wrong.

05:49 20        MR. MARMARO:  But if you're representing

05:49 21   that's --

05:49 22        MR. BERGMAN:  No, I am not.  I am representing

05:49 23   that that is how I read what Mr. Schulman states are his

05:49 24   notes.

05:49 25        Q    How do you read that phrase?

                                                              182

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 268 of 327

05:49  1        A    Well, with the qualification that I am not an

05:50  2   expert in reading John's handwriting, I believe this

05:50  3   says, "'contains a lot of trap doors,'" which I would

05:50  4   have said because it is how I felt.

05:50  5        Q    Can you explain what you meant by that?

05:50  6        A    Yes, if I could do so with reference to the

05:50  7   document.

05:50  8        Q    You certainly could, sir.

05:50  9        MR. MARMARO:  And again assuming there is no

05:50 10   objection from Mr. Toberoff to this.

05:50 11   BY MR. BERGMAN:

05:50 12        Q    Incidentally, before you begin reviewing that, I

05:50 13   should make note of the fact that this copy which I've

05:50 14   introduced and was produced by you is missing a few

05:50 15   pages, 13, 20 and 42.

05:50 16        MR. MARMARO:  The first I've heard of it.  If

05:51 17   you had called me before the deposition, I would have

05:51 18   looked into it.

05:51 19        MR. TOBEROFF:  This particular copy or --

05:51 20        MR. BERGMAN:  That particular copy -- if you

05:51 21   gentlemen would like, I can -- or if the witness would

05:51 22   like, I have another copy which contains --

05:51 23        MR. MARMARO:  Because they're consecutively

05:51 24   Bates stamped, which would indicate to me that there is a

05:51 25   copying issue at our end or maybe how we -- how the

183

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 269 of 327

05:51 1   document was maintained.

05:51 2          MR. BERGMAN:  Why don't we see if the witness

05:51 3   can proceed.  Meanwhile, I will have --

05:51 4          MR. TOBEROFF:  Can you just repeat those

05:51 5   numbers, by the way?

05:51 6          MR. BERGMAN:  13, 20, 42.

05:51 7          MR. TOBEROFF:  Thank you.

05:51 8          MR. BERGMAN:  You're welcome.

05:52 9     Q   You were looking at the agreement to --

05:52 10    A   I was -- can we wait a moment?

05:52 11         MR. MARMARO:  Off the record.

05:52 12         (Discussion held off the record.)

05:52 13         THE WITNESS:  In my October 19, 2001 letter,

05:53 14  "The Property" was defined quite specifically to mean

05:53 15  "all Superman, Superboy and related properties

05:53 16  (including, for example, Supergirl, Steel, Lois & Clark

05:53 17  and Smallville), and the Spectre property, and includes

05:53 18  all pre- and post-termination works (including the

05:53 19  so-called Superman library), characters, names and

05:53 20  trademarks relating to the Property," and that's what we

05:53 21  had discussed throughout the negotiation.

05:53 22       I recall there was one time where DC made a

05:53 23  proposal to have a royalty attach only on post-

05:53 24  termination works, which was rejected by the Siegels.  In

05:53 25  the conversations the negotiations was to a royalty that

                                    184

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 270 of 327

05:54 1    covered all the works.

05:54 2         In this agreement at page 9 there is a

05:54 3    definition of "Revenues." It's paragraph 24. The

05:54 4    revenues -- "The term 'Revenues' is hereinafter defined

05:54 5    as all amounts actually received by DC COMICS in the

05:54 6    United States [sic] from the licensing of the rights in

05:54 7    the SUPERMAN property" --

05:54 8         MR. MARMARO: "In United States Dollars."

05:54 9         THE WITNESS: Excuse me. Thank you.

05:5410         -- "in United States Dollars from the Licensing"

05:5411    with a capital L "of rights in the SUPERMAN Property and

05:5412    the SPECTRE Property," and the sentence and indeed the

05:5413    paragraph continues.

05:5414         In paragraph 23 it says, "The terms 'Licensing'"

05:5415    with a capital L and "'Licenses'" with a capital L "refer

05:5416    to DC COMICS authorizing any third party to commercially

05:5417    exploit the SUPERMAN Property and the SPECTRE Property."

05:5418         So now we have to look to find the definition of

05:5519    "SUPERMAN Property" and "SPECTRE Property." Superman --

05:5520    that definition is at page 4, paragraph 9. That says,

05:5521    "The term super property -- [sic] 'SUPERMAN Property',"

05:5522    in quotes, "is hereinafter defined to mean the following:

05:5523    (i) each of the pre-existing characters and elements

05:5524    which first appeared in the SUPERMAN Works; and (ii) such

05:5525    other characters and/or elements, if any, that may be

185

EXHIBIT 10
126

ER 1379

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 271 of 327

05:55 1   hereafter -- [sic] that may be created hereafter and meet

05:55 2   the following criteria," and then there is an extensive

05:55 3   definition of criteria.

05:55 4   So subpart 2 is the definition of "SUPERMAN

05:56 5   Property" includes some, but not all, works created from

05:56 6   and after the date of the agreement, and what is defined

05:56 7   as the "SUPERMAN Works."  So then we go to the definition

05:56 8   of "SUPERMAN Works."

05:56 9   That definition is at page 3 -- No, I'm sorry,

05:5610   page 2, paragraph 3, and if you parse through the

05:5611   language, it says, quote, "The phrase 'SUPERMAN Works' is

05:5612   hereinafter defined collectively and individually as

05:5613   follows," and rather than -- if you would like me to read

05:5614   it into the record, I can, but notably it continues,

05:5615   "...that in any manner depict, include, embody, refer to,

05:5716   describe, relate to, concern, are associated with, or

05:5717   preceded, lead to and/or contributed in any manner to the

05:5718   development of, or derive from, are based upon and arise

05:5719   out of SUPERMAN, that were ever created (in whole, in

05:5720   part or jointly) by JEROME SIEGEL."  So "SUPERMAN Works"

05:5721   refer to work created by Jerome Siegel.

05:5722   In this document at paragraph 7, page 3, there

05:5723   is a definition of yet another category of works which is

05:5724   called the "SUPERMAN Derivative Works," and to summarize,

05:5725   those are works relating to the Superman character and

186

05:57 1  the like that are created by persons other than Jerome

05:57 2  Siegel.

05:58 3      So when you put this together, this document is

05:58 4  purporting to say or at least raise the problem that

05:58 5  licensing revenues would not include that body of 60

05:58 6  years of derivative works that the people that DC Comics,

05:58 7  Paul Levitz and others, made such an impression upon us

05:58 8  as being so different from the original work and was the

05:58 9  basis of the Superman library, which was contrary to what

05:58 10 was agreed.  The whole idea was to pick up all works and

05:58 11 not to exclude works created by other people.

05:58 12     I mentioned that at the DC Comics meeting there

05:58 13 was a specific discussion about an American Express ad

05:58 14 campaign where Jerry Seinfeld, who was in that campaign,

05:59 15 specifically requested that the Curt Shaw version of

05:59 16 Superman be used in the campaign.  Under this draft the

05:59 17 proceeds of that campaign would be excluded, or at least

05:59 18 there was an argument that they would be excluded, and

05:59 19 that wasn't the intent.  To parse through that language

05:59 20 and to get there is very difficult, and I found -- I

05:59 21 considered that deceptive drafting and a trap door and

05:59 22 highly, highly problematic.

05:59 23 BY MR. BERGMAN:

05:59 24    Q   I understand the "problematic" part.

05:59 25        Did you believe at the time that it was

                                                            187

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 272 of 327

ER 1381

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 273 of 327

05:59  1      purposely drafted that way or that it was, you know, a

05:59  2      trap door that existed due to inadvertence or drafting

05:59  3      rather than an intentional attempt to deprive the Siegels

06:00  4      of something?

06:00  5          A    Well, I know from the cover letter there were

06:00  6      multiple versions of this internally, because what

06:00  7      Mr. Perkins transmitted was what he described as the

06:00  8      latest version of the work, so that suggested to me that

06:00  9      this had been -- and this is the first version that I

06:00 10      ever saw, so that suggested to me that there had been at

06:00 11      least one and perhaps more versions of the work that had

06:00 12      been vetted, and this looked to me to be an agreement

06:00 13      that -- a document that had been very purposefully

06:00 14      drafted.  That was my take away from it.

06:00 15              I have another example too.

06:00 16          Q    Please let me hear it.

06:01 17          A    Returning to page 9, paragraph 24, the second

06:01 18      sentence, "Revenues shall not include any sums received

06:01 19      by DC Comics for providing any services or materials in

06:01 20      connection with the licensing of rights in the SUPERMAN

06:01 21      Property and SPECTRE Property."  Well, what this

06:01 22      suggested to me was that there would be or could be or

06:01 23      could arguably be a deduction from revenues for services

06:01 24      attributable to DC Comics or materials supplied by DC

06:01 25      Comics.

                                                              188

EXHIBIT 10                    ER 1382
129

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 274 of 327

06:01 1   Going back to our meeting -- second meeting with

06:02 2 Paul Levitz at Warner Bros. and our meeting in DC Comics,

06:02 3 one of the points that Paul made in connection with what

06:02 4 he described as the licensor share was that DC

06:02 5 contributes a lot in the management, in the exploitation

06:02 6 of the property, and that's a reason why any royalty to

06:02 7 the Siegels should be further reduced, because there

06:02 8 should be some of that pot attributable to DC Comics'

06:02 9 efforts.

06:02 10   I read this and viewed this as a double dip,

06:02 11 because that had already been accounted for in arriving

06:02 12 at the 6 percent, and I was very concerned that this

06:02 13 could be used to further reduce the ultimate royalty.

06:03 14  Q   Again, did you attribute that to an intentional

06:03 15 attempt to, as you have put it, double dip or just to,

06:03 16 with all due respect to the drafters of the agreement,

06:03 17 sloppy drafting?

06:03 18  A   Well, as I read this, this had the earmarks of

06:03 19 very studied, careful, intentional drafting.  I could not

06:03 20 go so far as to know with certainty what the intention of

06:03 21 any or -- of all or any of the people on the DC team was,

06:03 22 but when I told John there are trap doors in it, these

06:03 23 are the trap doors.  I mean, bear in mind this is an

06:03 24 agreement that took a long time to produce, and that also

06:04 25 led me to believe that it had been at least carefully

189

EXHIBIT 10
130

ER 1383

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 275 of 327

06:04 1   drafted, and at a minimum this raised concerns for me and

06:04 2   red flags for me.

06:04 3       Q   When you stated to Mr. Schulman that there were

06:04 4   trap doors in the agreement, did he ask you what you

06:04 5   meant, or did he ask you for an example?

06:04 6       A   I don't believe he did.

06:04 7       Q   Applying that term as you have, it's true, isn't

06:04 8   it, that those kind of problems or, as you put it, trap

06:04 9   doors can exist without intentional acts, just through

06:04 10  the -- not being able to clearly think through a problem

06:04 11  and properly document it?

06:04 12       Hasn't that been your experience?

06:05 13       MR. MARMARO:  Calls for speculation.

06:05 14       MR. TOBEROFF:  I was going to make that

06:05 15  objection.  It's also vague and ambiguous, leading.

06:05 16       THE WITNESS:  It can be true that drafters make

06:05 17  mistakes in drafting that are consequential, adversely

06:05 18  consequential.

06:05 19  BY MR. BERGMAN:

06:05 20       Q   When you spoke with John Schulman, did you

06:05 21  indicate to him that you felt that those trap doors were

06:05 22  purposely created or that it was inadvertent, or did you

06:05 23  say nothing in that regard?

06:05 24       A   I don't recall that I said they were purposeful,

06:05 25  and I don't recall that I said they were inadvertent.  I

                                                              190

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 276 of 327

06:05 1    just recall saying that they were there.

06:05 2        Q    Okay.  As I read the notes of Mr. Schulman, the

06:06 3    next item says, "'could have been 20, not 60 pages.'"

06:06 4             Do you recall saying that in substance to

06:06 5    Mr. Schulman?

06:06 6        A    Yes.

06:06 7        Q    The next purported statement is, "contains stuff

06:06 8    not agreed to," and I don't know if the last item is a

06:06 9    continuation of that or not, but let me stop there.

06:0610            Did you tell Mr. Schulman that the draft

06:0611    contains stuff not agreed to?

06:0612            MR. MARMARO:  I don't have an objection to the

06:0613    question, but I have an observation which I think is

06:0614    important --

06:0615            MR. BERGMAN:  Please.

06:0616            MR. MARMARO:  -- to place the question in

06:0617    context.  The five statements that you just read all

06:0618    purport to have quote marks around them.  The statement

06:0619    you just read does not, and you did not indicate that in

06:0720    your question, but I think the record should indicate

06:0721    that.

06:0722            MR. BERGMAN:  Okay.

06:0723            MR. TOBEROFF:  And my objection is it misstates

06:0724    the evidence.

06:0725    BY MR. BERGMAN:

                                                            191

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 277 of 327

06:07 1      Q   As you'll observe, Mr. Marks, as your client --

06:07 2   as your attorney has pointed out, the phrase "contains

06:07 3   stuff not agreed to" is not incorporated within quotation

06:07 4   marks.

06:07 5          Do you recall saying that in substance to

06:07 6   Mr. Schulman?

06:07 7      A   I recall saying in substance yes, there were

06:07 8   many things not agreed to.

06:07 9      Q   The last sentence, which also lacks quotation

06:0710   marks, says, "not contrary to what agreed to."

06:0811          Do you recall saying that in substance to

06:0812   Mr. Schulman?

06:0813      A   I recall saying, as I said before, it contained

06:0814   many additional terms that were not agreed to, not even

06:0815   discussed, and John saying something like, "Anything

06:0816   contrary?" with a question mark at the end of the

06:0817   sentence, and I have a recollection or a sense of saying,

06:0818   "Not as to the money terms, the 1 million, the 2 million,

06:0819   the 500,000, that's right."

06:0820      Q   Okay.  When you redrafted the long form, was it

06:0821   more than 20 pages?

06:0822          MR. TOBEROFF:  Objection --

06:0823          MR. MARMARO:  Let me just hear Mr. Toberoff's

06:0924   objections.

06:0925          MR. TOBEROFF:  I don't want you talking about

                                                              192

U.S. LEGAL SUPPORT

**EXHIBIT 10**

**133**

ER 1386

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 278 of 327

```
 1   STATE OF CALIFORNIA     )
                             ) ss
 2   COUNTY OF LOS ANGELES   )

 3

 4          I, DAVID S. COLEMAN, a Certified Shorthand

 5   Reporter, do hereby certify:

 6          That prior to being examined, the witness in

 7   the foregoing proceedings was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing

 9   but the truth;

10          That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14          I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   nor in anywise interested in the outcome thereof.

17          In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated:   OCT 1 7 2006

21

22

23   _____
     DAVID S. COLEMAN
24   CSR No. 4613

25
```

**EXHIBIT 10**
**134**

ER 1387

ORIGINAL SHIPPED    NOV 0 9 2006

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
        Plaintiffs,          )
                             )
    vs.                      )      No. 04-8400 (RSWL)(RZx)
                             )
WARNER BROS. ENTERTAINMENT   )            -and-
INC., et al.,                )
                             )      No. 04-8776 (RSWL)(RZx)
        Defendants.          )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

DEPOSITION OF ARIEL Z. EMANUEL

Beverly Hills, California

Thursday, November 2, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

**EXHIBIT 11**                    ER 1388

135

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 279 of 327

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 280 of 327

1            Deposition of ARIEL Z. EMANUEL, taken

2     on behalf of Defendants and Counterclaimants,

3     at 9665 Wilshire Boulevard, 9th Floor, Beverly

4     Hills, California, beginning at 3:08 PM on

5     Thursday, November 2, 2006, before DAVID S.

6     COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13      Attorney at Law
         2049 Century Park East, Suite 2720
14      Los Angeles, California 90067
         310-246-3333
15

16

For Defendants and Counterclaimant:

17

18      WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
         BY:  MICHAEL BERGMAN
19         ADAM HAGEN
         Attorneys at Law
20      9665 Wilshire Boulevard, 9th Floor
         Beverly Hills, California 90212
21      310-858-7888
         mbergman@wwllp.com

22

23

24

25

                                   2

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 281 of 327

1    APPEARANCES (Continued):

2

3    For the Witness:

4        ALSCHULER GROSSMAN STEIN & KAHAN
         BY:  MICHAEL J. PLONSKER
5        1620 26th Street, 4th Floor - North Tower
         Santa Monica, California 90404-4060
6        310-907-1000

7

8    ALSO PRESENT:  TOM McGUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 282 of 327

1    Beverly Hills, California, Thursday, November 2, 2006

2             3:08 PM

3

4          ARIEL Z. EMANUAL,

5   having been first administered an oath,

6   was examined and testified as follows:

7

8          EXAMINATION

9  BY MR. BERGMAN:

03:08 10   Q   Would you state your full name for the record,

03:08 11  please.

03:08 12   **A   Ariel Zev Emanuel.**

03:08 13   Q   Mr. Emanuel, have you had your deposition taken

03:08 14  before?

03:08 15   **A   Yes.**

03:08 16   Q   On how many occasions, approximately?

03:08 17   **A   I don't recall.**

03:08 18   Q   A number of them?

03:08 19   **A   I don't know how many.**

03:08 20   Q   Okay.  Let me just emphasize a few points.

03:09 21     I, of course, am here representing the DC

03:09 22  parties who are defendants and counterclaimants in this

03:09 23  action brought by Joanne and Laura Siegel.  I'll be

03:09 24  asking you questions, the reporter will take down

03:09 25  everything that is said verbatim and, at the conclusion

6

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 283 of 327

I'm -- you know, the -- and I appreciate it.  You brought

up -- it's the first time I remembered this thing from

Cleveland, but that's the -- I'll think about it some

more, but I don't think so.

BY MR. BERGMAN:

     Q    Okay.  Thank you.  If you recall --

     A    **I'll let you know.**

     Q    -- during the course of the deposition, please

say so.

          Okay?

     A    **Sure.**

     Q    Do you recall discussing the Laura and Joanne

Siegel interest in Superman with Bruce Rosenblum?

     A    **No.**

          MR. BERGMAN:  Would the reporter mark as Exhibit

6 a document that is undated.  It has previously been

introduced as an exhibit at a prior deposition and

purports to be from Mr. Emanuel.

          (Deposition Exhibit 6 marked.)

BY MR. BERGMAN:

     Q    Could you review that letter, Mr. Emanuel, and

tell me if it refreshes your recollection --

          MR. PLONSKER:  Of -- I'm sorry.  I thought you

were done.  About?

BY MR. BERGMAN:

                                                        70

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 284 of 327

Q    -- about having any discussion with

Mr. Rosenblum concerning the Siegel interest?

THE WITNESS:  Repeat the question.  I'm sorry.

MR. BERGMAN:  Yes.  Could you repeat it, please.

(Record read as follows:

"Could you review that letter, Mr.

Emanuel, and tell me if it refreshes

your recollection about having any

discussion with Mr. Rosenblum

concerning the Siegel interest?")

THE WITNESS:  No, it does not.

BY MR. BERGMAN:

Q    And I asked you that, sir, because you realize

you begin by saying, "As discussed"?

**A    I appreciate that.**

Q    I notice the initials above your name "dbnr."

Does that have any meaning to you?

**A    Since I was once a secretary, dictated not read.**

Q    Thank you.

**A    I was a good secretary.**

Q    I'll bet you were.

**A    I was.**

Q    Now, subsequent to this letter, although it

isn't dated, but you did in fact have a meeting with John

Schulman and certain other parties concerning the Siegel

71

interest, didn't you?

A   I have no idea of the time frame.

Q   Okay.  At any point in time.

A   I did have a meeting with a large gentleman from Warner Bros., a lawyer, and a person from DC Comics and Mr. Toberoff and myself.

Q   Okay.

A   I mean you're asking me about names.  I don't recall except his and mine.

Q   Mr. Schulman is a large gentleman.

MR. PLONSKER:  He will be happy to be described that way.

MR. BERGMAN:  Yes.

THE WITNESS:  He's a nice guy.

MR. PLONSKER:  Yes, he is.

BY MR. BERGMAN:

Q   What do you recall saying at that meeting?

A   I don't recall much.  The main discussions I think were between Mr. Toberoff and...

MR. PLONSKER:  Mr. Schulman?

THE WITNESS:  ...Mr. Schulman, and I think the gentleman from DC who had flown in, I think he said he had flown in for the meeting, as I recall, and all I remember him saying is something to the effect that all we have is -- Mr. Schulman said something to the effect

72

that -- something about DC being a sub something.  It was so convoluted.  And DC saying all we really have is 5 percent of gross of Superman, and that's all I -- I mean there was kind of back-and-forth between them, and I was kind of just taking it in.  I don't remember what I said, if I said anything at all.  And I'm sorry that's a little convoluted, so...

BY MR. BERGMAN:

    Q   During the course of the meeting, did either you or Mr. Toberoff make an offer as to the amount of money which the Siegels were prepared to accept in exchange for their rights?

    **A   I don't recall.**

    Q   Do you recall any discussion as to the financial basis upon which the matter could be resolved?

    **A   I'm assuming it might have happened.  All I remember -- the only major financial kind of conclusion of it I remember was the guy from DC saying that all they had was 5 percent of gross, and it was a sub-company of Warner Bros., and I really didn't remember why that had anything to do with this situation, but that's what I remember.**

    Q   Do you recall during the course of that meeting offering to convey the Siegel rights to DC --

    **A   Actually, excuse me, I want to --**

73

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 286 of 327

Q   Okay.

A   I do remember the large gentleman saying that he thought that -- he did go over -- he did say -- he said something about their pension and paying their pension, and this whole pension thing came up a lot, and that he thought they were being fair, and I think I made the statement, my normal statement, that fair is where you end up.  I think that's -- I think that was stated from my side.  I do remember that.  And that's all I really recall.

Q   Do you remember either you or Mr. Toberoff stating in substance that the Siegels wanted to end up with $50 million for their interest?

A   I don't recall that.

Q   Do you recall any figure being given to DC by either you or Mr. Toberoff during that meeting?

A   Not...  I don't -- all I remember is them talking about money.  I don't -- and I don't remember what the numbers were.  I don't, really.  I'm sorry.

Q   Okay.  As you went into that meeting, Mr. Emanuel, did you have in mind any particular amount of money or objective that you wanted to achieve in that meeting?

A   I was just there to kind of listen and take it all in and see if I could -- you know, kind of in my head

74

ER 1396

just kind of take it all in and see where people stood. I wasn't in there to negotiate, from my perspective going in.

Q   Okay.  And was there any discussion as to the amount of revenues that the Superman property was generating at that time?

A   There might have been.  I don't recall.  There might have been.

Q   Now, you say you weren't there to negotiate. What was -- what were you there for?

A   Really I was there, you know, to -- I was observing it, mainly.  I was kind of a presence.  I was there to observe the parties.  I wasn't negotiating.

Q   Okay.  Was it discussed between you and Mr. Toberoff that he would handle the negotiation at that meeting?

A   I don't recall if there was a pre-meeting -- I don't think there was a pre-meeting to that.

Q   Before you and Mr. Toberoff went into this meeting with Mr. Schulman -- and the gentleman from DC Comics is Paul Levitz, I believe.

A   Shorter gentleman.

Q   Yes.

Before going into that meeting, had you made any determination in your mind as to the amount of money you

75

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 288 of 327

ER 1397

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 289 of 327

wanted to obtain for the Siegels?

    A   Not to my knowledge.

    Q   Did you ever reach that point where you decided I want to get X dollars for their interest?

    A   You know, in my other life as an agent, I never determine value. As -- again, as I said to you, fair is where you end up so -- taught to me from a person from Warner Bros., Art Stolnitz.

    So when you say to me did I determine value, I never do that, because where we end up is where we end up. That's where fair is from your side and from my side. So I never -- when you ask me do you have this pre -- I don't. I never do that.

    Q   But isn't where you end up --

    A   Is fair.

    Q   -- molded and shaped by where you start?

    A   No, not from my knowledge. You should take some lessons. I've done -- my father says I've done pretty well.

    Q   How did the meeting at Warner Bros. end?

    A   Schulman, the tall guy, I think said that, you know -- I think he ended it that there was nothing more to discuss or that we would -- I think that's what he said, something like that.

    Q   Did Mr. Schulman say that after a specific

76

figure had been raised by either Mr. Toberoff or by you?

A   **Not to my knowledge.   I don't recall that.**

Q   Did you report to Joanne or Laura Siegel following that meeting as to what had transpired at that meeting?

A   **Did I?**

Q   Yes.

A   **I don't remember.**

Q   Do you recall having a meeting with the two Siegel women following the Warner's meeting?

A   **I only remember four meetings with the Siegels.**

Q   Okay.  We've covered two.

A   **I don't remember in what timeline.**

Q   Okay.  What do you recall transpiring at the third meeting?

A   **I can't actually put it in context of a first, second and third meeting.  I know there was a third meeting because I remember there was four meetings.  I don't remember.  I'm sorry.**

Q   Okay.  Do you have any recollection at all as to what happened in either of the last two meetings that you had with the Siegels?

A   **I don't want to assume anything because I'm told -- I don't want to assume anything that then leads to more hours here.  I'm assuming something was said, but**

77

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 291 of 327

I, ARIEL Z. EMANUAL, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____,
20____, at _____, _____.
          (City)                    (State)


_____
ARIEL Z. EMANUAL

86

ER 1400

STATE OF CALIFORNIA     )
                        ) ss
COUNTY OF LOS ANGELES   )


          I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

          That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

          In witness whereof, I have hereunto subscribed

my name.


Dated: ___**NOV 0 8 2006**___


                    _____
                    DAVID S. COLEMAN
                    CSR No. 4613

ER 1401

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                     -- - - -

 4   JOANNE SIEGEL, an individual;   )
     and LAURA SIEGEL LARSON, an     )
 5   individual,                     )
                      Plaintiffs,    )
 6        vs.                        )  Civil Case No.
                                     )  04-8840 (RXz)
 7   WARNER BROS. ENTERTAINMENT INC.,)      &
     a corporation; TIME WARNER INC.,)  04-8776 (RXz)
 8   a corporation; DC COMICS, a     )
     general partnership; and DOES   )
 9   1-10,                           )
                      Defendants.    )
10   DC COMICS,                      )
                 Counterclaimant,    )
11        vs.                        )
                                     )
12   JOANNE SIEGEL, an individual;   )
     andLAURA SIEGEL LARSON, an      )
13   individual,                     )
                 Counterclaim        )
14               Defendants.         )

15

16              DEPOSITION OF PAUL LEVITZ

17                Los Angeles, California

18              Tuesday, November 7, 2006

19         Volume II:  Pages 223 to 464

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com

23

24   REPORTED BY:  Sharon Campbell, CSR NO. 8643, RPR

25   FILE NO.:  A009B58
```

EXHIBIT 12
149

ER 1402

```
1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                         -- - - -

4    JOANNE SIEGEL, an individual;   )
     and LAURA SIEGEL LARSON, an     )
5    individual,                     )
                      Plaintiffs,    )
6          vs.                       )  Civil Case No.
                                     )  04-8840 (RXz)
7    WARNER BROS. ENTERTAINMENT INC.,)      &
     a corporation; TIME WARNER INC.,)  04-8776 (RXz)
8    a corporation; DC COMICS, a     )
     general partnership; and DOES   )
9    1-10,                           )
                      Defendants.    )
10   DC COMICS,                      )
              Counterclaimant,       )
11         vs.                       )
                                     )
12   JOANNE SIEGEL, an individual;   )
     andLAURA SIEGEL LARSON, an      )
13   individual,                     )
              Counterclaim           )
14            Defendants.            )

15         DEPOSITION OF PAUL LEVITZ, a Witness
     herein, taken on behalf of the Plaintiffs at
16   2049 Century Park East, Suite 2720,
     Los Angeles, California, commencing at
17   9:52 A.M., Tuesday, November 7, 2006, before
     Sharon Campbell, CSR No. 8643, RPR.
18

19

20

21

22

23

24

25
```

**EXHIBIT 12**
**150**

**ER 1403**

Case 2:13-56243 v.02/25/2014, ID: 8982563, DktEntry: 22-17, Page 295 of 327
Case 2:04-cv-08400-ODW-RZ Document 709-2 Filed 03/04/13 Page 153 of 383 Page ID
#:15618

```
 1                   A P P E A R A N C E S

 2

 3      For the Plaintiffs and Counterclaim Defendants
        Joanne Siegel and Laura Siegel Larson:
 4
        LAW OFFICES OF MARC TOBEROFF, PLC
 5      BY:  MARC TOBEROFF
        2049 Century Park East
 6      Suite 2720
        Los Angeles, California 90067
 7      (310) 246-3333

 8
        For the Defendants:
 9
        WEISSMANN, WOLFF, BERGMAN, COLE,
10      GRODIN & EVALL LLP
        BY:  MICHAEL BERGMAN
11      9665 Wilshire Boulevard
        Ninth Floor
12      Beverly Hills, California 90212
        (310) 858-7888
13

14   ALSO PRESENT:  Zazi Pope
                     Wayne Smith
15                   Warner Bros. Entertainment, Inc.

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 12
151

ER 1404

```
1              LOS ANGELES, CALIFORNIA; NOVEMBER 7, 2006

2                      TUESDAY, 9:52 A.M.

3

4       MR. TOBEROFF:  I'd like to mark, as Exhibit 18, the

5  document entitled "'Superman' Option Purchase

6  Agreement."  It's dated as of November 7, 1999, Bates

7  stamp WB 4199 to 4231.

8          (Plaintiffs' Exhibit No. 18 was

9          marked for identification by the

10         reporter and is included herewith.)

11

12                      PAUL LEVITZ,

13         having been first duly sworn, was

14         examined and testified as follows:

15

16                      EXAMINATION

17  BY MR. TOBEROFF:

18      Q    Have you ever seen this document before today?

19      A    I think so.  I think this is -- I don't know if

20  this is the final form or -- yes.  This is the executed

21  one, yes.

22      Q    "Yes"?

23      A    Yes.  I have seen this.

24      Q    Did you take part in the negotiation of this

25  agreement?
```

EXHIBIT 12

152

ER 1405

```
 1        MR. BERGMAN:  That's a wholly inappropriate

 2   question to ask the witness at a deposition.  It's a

 3   proper subject of an interrogatory.

 4             I do instruct the witness not to answer.

 5        MR. TOBEROFF:  I see.

 6             Can you mark that question, please.

 7        Q    If you can turn to page 27, paragraph 99.

 8        A    (Witness complies.)

 9        Q    If you go -- the second sentence starts:

10             "Specifically, and without limiting

11        the foregoing, DC Comics established a

12        reserve account of the monies due to

13   Plaintiff's/Counterclaim Defendants based upon

14        the Financial Terms."

15             And the financial terms are financial terms of

16   a purported agreement with the Siegels regarding their

17   termination interests.

18             Do you see that sentence?

19        A    I do.

20        Q    Okay.

21             To your knowledge, did DC establish such a

22   reserve account?

23        A    We did.

24        Q    Okay.  What bank is that -- does that

25   reserve -- when did you establish that reserve account?
```

**EXHIBIT 12**

**153**

**ER 1406**

```
 1      A     Approximately when we reached the agreement.

 2      Q     When?

 3      A     I don't remember the dates.

 4      Q     Is it in 2000?  2001?  2002?

 5      A     I don't remember the dates.  I'm sorry.

 6      Q     Who opened that account?

 7      MR. BERGMAN:  Objection.

 8            Assumes a fact not in evidence, lacks

 9   foundation.

10      THE WITNESS:  A reserve account is not necessarily

11   a physical bank account.

12      Q     BY MR. TOBEROFF:  Okay.

13      A     It's -- it's establishing the financial --

14   financial reserve, setting aside an identified amount

15   as due and owing for a particular purpose.

16      Q     So you're speaking of a bookkeeping function,

17   keeping track of?

18      MR. BERGMAN:  Object to the characterization as to

19   what the witness is referring to.

20      THE WITNESS:  It's -- it's a bookkeeping function.

21   It's a financial function.

22      Q     BY MR. TOBEROFF:  Okay.

23            But you -- are you saying you did not actually

24   establish a bank account in which monies were

25   deposited; is that correct?
```

**EXHIBIT 12**
**154**

**ER 1407**

```
 1       A     To the best of my knowledge, there's not a

 2    separate bank account.

 3       Q     Okay.

 4             Other than -- are you saying you kept track of

 5    what monies would be owed them; is that correct?

 6       MR. BERGMAN:  Objection.

 7             Mischaracterizes the witness's testimony.

 8       MR. TOBEROFF:  I'm not attempting to characterize.

 9    I'm asking if it's correct or not.

10       MR. BERGMAN:  But when you say, in other words,

11    Mr. Toberoff, you are characterizing.

12       MR. TOBEROFF:  No, I'm not.  I'm trying to

13    understand him.

14       THE WITNESS:  It was accrued as an amount on the

15    books of the company.

16       Q     BY MR. TOBEROFF:  But other than keeping track

17    of it on the books of the company, was there anything

18    else you did with respect to this reserve account?

19       MR. BERGMAN:  Objection.

20             Mischaracterizes the witness's testimony.

21       THE WITNESS:  It would, I believe, impact our --

22    our taxes, any other financially driven system.

23       Q     BY MR. TOBEROFF:  I'm not really asking what it

24    impacted.  I'm trying to -- let me break this down.

25    I'm trying to get a simple understanding of what you
```

**EXHIBIT 12**
**155**

**ER 1408**

 1   actually did, and so far you've told me something to

 2   the effect of -- and I'm not trying to mischaracterize

 3   your testimony.

 4          Just trying to get at the heart of what DC did.

 5   It says we established a reserve account.  And I asked

 6   what does that mean, and so far what I'm hearing is

 7   that something to the effect of keeping track of what

 8   monies would be owed the Siegels under that purported

 9   agreement in your bookkeeping.

10          Is that basically correct?

11      MR. BERGMAN:  Object to the preamble to that, and

12   object as misstating the testimony of the witness.

13      THE WITNESS:  We established it as a liability of

14   the company.

15      Q    BY MR. TOBEROFF:  What does that mean --

16   established?

17          What did you do -- physically do?

18      A    I physically did nothing.  I did not keep the

19   books of the company.

20      Q    Okay.

21          What did DC physically do?

22      A    If your question is the physical acts involved,

23   you would be better asking that of one of our financial

24   people.  I don't --

25      Q    Thank you.  But I'm asking you your knowledge

EXHIBIT 12
156

1   what did DC do.

2       A    I have told you what DC did.  We established an

3   accrual as a financial liability of the company for the

4   amounts as would be due under that agreement.

5       Q    Could you put that in plain Brooklyn English --

6   what you did.

7           Does that mean you kept track of the amounts

8   that would be due the Siegels under the agreement in

9   your bookkeeping?

10          Is that what that means?

11      MR. BERGMAN:  Asked and answered.  Misstates

12  testimony of the witness.

13      THE WITNESS:  We accrued those amounts as a

14  financial liability of the company.

15      Q    BY MR. TOBEROFF:  What does that mean --

16  accrued?

17      A    Accrual is a form of accounting where you take

18  acknowledgment of a liability as it is incurred rather

19  than cash accounting when you take note of a liability

20  when it is actually paid.

21      Q    So --

22      A    I'm not an accountant, either.  But that's what

23  I remember from cost accounting 101.

24      Q    Okay.

25          So am I correct that what you essentially did

EXHIBIT 12
157

ER 1410

1    by establishing reserve accounts is you kept track of

2    the monies that would be owed the Siegels under that

3    agreement if that agreement was effective?

4        MR. BERGMAN:  Objection.

5            Mischaracterized the testimony of the witness.

6        Q    BY MR. TOBEROFF:  Is that correct?

7            "Yes" or "no"?

8        MR. BERGMAN:  Again --

9        THE WITNESS:  I don't believe that is the full

10   import of establishing accrual.

11       Q    BY MR. TOBEROFF:  I'm not asking for the

12   import.

13           I'm asking is this a fair characterization of

14   what you did?

15       A    No.  I don't think that's a fair

16   characterization of what an accrual --

17       Q    Okay.

18           So you did not keep track of the monies that

19   would be owed the Siegels under this purported

20   agreement?

21       A    We kept track and we accrued those amounts as a

22   liability on the books of the company.

23       Q    Okay.

24           Anything else you did with regard to this

25   reserve account in addition to keeping track?

**EXHIBIT 12**
**158**

**ER 1411**

```
 1        MR. BERGMAN:  Objection.

 2            Mischaracterizes the testimony of the witness.

 3    Q    BY MR. TOBEROFF:  Anything else you did?

 4    A    I would not be aware if there was anything else

 5    physically done.

 6    Q    How much money is in this, quote, reserve

 7    account, end quote?

 8    A    I'm not sure what the current balance is.

 9    Q    Any idea?

10    A    I would estimate that it's to the order of

11    $20 million at this point.

12    Q    And when was the last time you checked that

13    balance?

14    A    I probably received some information on the

15    balance several months ago.

16    Q    Is this accrual done electronically?

17        MR. BERGMAN:  Objection.

18            Vague and ambiguous.

19        THE WITNESS:  I don't know how the physical

20    processes are done.  I mean, it would involve something

21    in computer technology somewhere along the way.

22        MR. TOBEROFF:  Okay.

23            Again, this is one of the areas where I find it

24    appalling that you have not produced these numbers to

25    us although they were requested under multiple
```

**EXHIBIT 12**
**159**

**ER 1412**

```
 1   publications that I've mentioned.

 2       Q    Other than that, are there any others?

 3       A    I've answered this three times.  I don't think

 4   so.

 5       MR. TOBEROFF:  Okay.  I have no further questions.

 6       THE WITNESS:  Yay.

 7       MR. BERGMAN:  I have none.

 8            Propose the normal stipulation that the court

 9   reporter will be relieved of her statutory obligations;

10   that she will send a copy of Mr. Levitz's transcript to

11   me; that within 30 days of my receipt, we will make any

12   necessary corrections and sign it under penalty of

13   perjury; and that I will notify Mr. Toberoff of any

14   changes that are made.

15            Is that agreeable?

16       MR. TOBEROFF:  Agreed.  Thank you.

17

18   (The Deposition concluded at 4:17 P.M.)

19

20                   *   *   *

21

22

23

24

25
```

**EXHIBIT 12**
**160**

```
1   STATE OF CALIFORNIA    )
                           ) ss
2   COUNTY OF LOS ANGELES )

3

4

5        I, the undersigned, declare under

6   penalty of perjury that I have read the

7   foregoing transcript, and I have made any

8   corrections, additions, or deletions that I

9   was desirous of making; that the foregoing

10  is a true and correct transcript of my

11  testimony contained therein.

12

13       EXECUTED this       day of          ,

14  at                        ,               .
         (City)                 (State)

15

16

17            PAUL LEVITZ

18

19

20

21

22

23

24

25
```

**EXHIBIT 12**

**161**

ER 1414

```
 1    STATE OF CALIFORNIA    )
                             ) ss
 2    COUNTY OF LOS ANGELES )

 3

 4

 5         I, SHARON CAMPBELL, C.S.R. No. 8643, RPR,

 6    Certified Shorthand Reporter, certify:

 7         That the foregoing proceedings were taken

 8    before me at the time and place therein set forth, at

 9    which time the witness was put under oath by me;

10         That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me and were thereafter

13    transcribed;

14         That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16         I further certify that I am not a relative

17    or employee of any attorney or of any of the parties,

18    nor financially interested in the action.

19         I declare under the penalty of perjury under

20    the laws of the State of California that the

21    foregoing is true and correct.

22         Dated this 15th day of November 2006.

23

24         _____
               Sharon Campbell, CSR No. 8643, RPR
25
```

EXHIBIT 12
162

ER 1415

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 307 of 327

1  WEISSMANN WOLFF BERGMAN
    COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
4  Telephone: 310-858-7888
   Fax:        310-550-7191
5
6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  866 United Nations Plaza
   New York, New York 10017
   Telephone: 212-813-5900
8  Fax:        212-813-5901
9  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY 10516
11 Telephone: 845-265-2820
   Fax:        845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
14          UNITED STATES DISTRICT COURT
15     CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
16 JOANNE SIEGEL and LAURA          ) Case No. 04-8400 SGL (RZx)
   SIEGEL LARSON,                   )
17                                  ) Hon. Stephen G. Larson, U.S.D.J.
                                    )
18          Plaintiffs,             )
                                    ) **DEFENDANTS' OPPOSITION**
19      vs.                         ) **TO PLAINTIFFS' MOTION FOR**
                                    ) **PARTIAL SUMMARY**
20 WARNER BROS. ENTERTAINMENT       ) **JUDGMENT AND**
   INC.; TIME WARNER INC.; DC       ) **MEMORANDUM OF POINTS**
21 COMICS; and DOES 1-10,           ) **AND AUTHORITIES IN**
                                    ) **SUPPORT THEREOF**
22          Defendants.            )
                                    ) [Defendants' Opposition to Local
23                                  ) Rule 56.1 Statement; Declaration of
                                    ) Michael Bergman and exhibits
24                                  ) thereto]
                                    )
25                                  ) Date:  July 23, 2007
                                    ) Time:  10:00 a.m.
26                                  ) Place: Courtroom 1
                                    )
27 ─────────────────────────────    )
   AND RELATED COUNTERCLAIMS.       )
28                                  )

**EXHIBIT 13**                                    **ER 1416**

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

165

profits arising from any foreign exploitation of the character. (FASMC, ¶ 58(a); Pl. Mem. at 25-28.)  Plaintiffs further allege that they are entitled to a share of the profits arising from the exploitation the Superman trademarks, including the related characters and symbols associated with the character. (FASMC, ¶¶ 61-63, 107.)  Finally, Plaintiffs allege that they are entitled to share in the profits of Defendants from the post-termination exploitation of derivative works that had been prepared by Defendants before the effective date of the termination. (FASMC, ¶¶ 58(c), 66-73.)[11]

### E.   The Parties' 2001 Settlement

Shortly after receiving the Superman Notices in April, 1997, DC Comics initiated discussions with Plaintiffs' representative (then Arthur Levine, a prominent copyright attorney with the Washington, D.C. firm of Finnegan, Henderson, Farabow, Garret & Dunner) in an attempt to determine if the parties could come to an acceptable resolution of their respective claims concerning the Superman property. (Bergman Decl. Exh. R (transcript of Paul Levitz deposition ("Levitz Tr.")) at 175:5-175:15; id. Exh. S ("Marks Tr.") at 27:19- 28:6.)  When sporadic discussions over the following months yielded no results, on April 15, 1999 – the day before the purported effective date of the Superman Notices – DC set forth in a comprehensive writing its formal rejection of the Notices,[12] contesting both their validity and their scope, and asserting that DC remained the sole copyright owner of all aspects of the Superman property, with full right to exploit that property as it chose, without the need to account to or share with Plaintiffs any of the proceeds of that exploitation. (Toberoff Decl. Exh. Q.)

---

[11] Plaintiffs' claims that they are entitled to profits arising from exploitation of Superman trademarks and post-termination exploitation of derivative works prepared prior to the effective date of termination are not the subject of this motion. Defendants, have, however, moved for summary judgment on these claims, which motion is currently pending before the Court.

[12] DC had previously notified Plaintiffs of certain deficiencies in the Notices in letters set to Plaintiffs' counsel on November 5, 1997 (Bergman Decl. Exh. T) and December 18, 1997 (id. Exh. U).

**EXHIBIT 13**
**164**

18

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 309 of 327

1    Two weeks later, on April 30, 1999, DC was contacted by Bruce Ramer, an

2  attorney with the Beverly Hills law firm of Gang, Tyre, Ramer & Brown, Inc.

3  ("Gang Tyre"), and was advised that Gang Tyre had been retained to represent

4  Plaintiffs' interests in connection with the Superman Notices.  (Bergman Decl.

5  Exh. <u>V</u>.)  The parties then began negotiations in earnest, with Kevin Marks of

6  Gang Tyre ultimately becoming the lead negotiator for Plaintiffs, and John

7  Schulman, General Counsel and Executive Vice President of Warner Bros.

8  Entertainment Inc. ("Warner Bros."), the lead negotiator for DC.  (Declaration of

9  John Schulman ("Schulman Decl."), ¶ 4; Bergman Decl. Exh. <u>S</u> (Marks Tr.) at

10  24:15-25:10.)[13]

11    The discussions between Mr. Marks and Mr. Schulman were extensive and

12  far-reaching, spanning some two and a half years, and consisting of several face to

13  face meetings as well as numerous communications both written and oral, with the

14  parties addressing and resolving certain key issues before moving on to other

15  issues. (Schulman Decl. ¶ 5.)[14]  These negotiations culminated on October 16,

16  2001, when Mr. Marks and Mr. Schulman reached agreement on what they both

17  understood to be the final outstanding deal point in a global resolution designed to

18  settle all of Plaintiffs' claims and potential claims related to the Superman Notices.

19  (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 132:11-134:11; Schulman Decl. ¶¶ 6-7.)[15]

20  Accordingly, on October 19, 2001, apparently after obtaining his clients' approval

21  (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 145:16-146:4), Mr. Marks called Mr.

---

[13] Although Mr. Schulman remained exclusively employed by Warner Bros., his services were provided to DC for this purpose.   (Bergman Decl. Exh. <u>W</u> (Schulman Tr.) at 95:14-96:16; Schulman Decl. ¶ 4.)

[14] On April 6, 2000, Plaintiffs and Defendant DC Comics entered into a tolling agreement to encourage continued negotiations (the "Tolling Agreement").  (Schulman Decl.¶ 5; Toberoff Decl. Exh. <u>Z</u>.)

[15] Contrary to Plaintiffs' unsupported assertion in their moving papers (*see* Pl. Mem. at 46 lines 13-16), Mr. Marks and Mr. Schulman did <u>not</u> discuss "many different terms, including contingent compensation formulas" in that conversation.  Instead, the conversation was limited to one item, agreement on which "closed the deal," because the parties had already previously come to an understanding on all of the other components of the agreement.  (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 132:11-134:11.)

**EXHIBIT 13**
**165**
19

ER 1418

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 310 of 327

1   Schulman to tell him that "we are closed" (*id*. at 134:19-135:5); he then sent Mr.

2   Schulman a letter confirming their earlier telephone conversation and expressly

3   stating that "the Siegel Family (through Joanne Siegel and Laura Siegel Larson the

4   majority owners of the terminated copyright interests) has accepted D.C. Comics

5   offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties."

6   (Toberoff Decl. Exh. <u>BB</u>, hereinafter the "Marks Letter".)[16]  The Marks Letter

7   went on to set forth, in six single-spaced pages, the terms of the parties' deal,

8   concluding with a thanks to Mr. Schulman for his "help and patience in reaching

9   this monumental accord."  (*Id*.)  As Mr. Marks testified to at deposition, as of

10  October 19, 2001, he "believed that an accord had been reached on the terms

11  exactly set forth in this letter." (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 148:3-

12  148:14.)

13        The deal reached by the parties contemplated, among other things, that upon

14  transfer to DC of all of Plaintiffs' Superman interests, DC would provide Plaintiffs

15  with up-front payments in the amount of $3 million, as well as a substantial

16  guaranteed advance against certain royalties based on DC's on-going exploitation

17  of the Superman properties.  (Toberoff Decl. Exh. <u>BB</u> (Marks Letter) at ¶ B;

18  Schulman Decl. ¶ 6.)  Although the parties anticipated that a more formal

19  document would be drawn up, neither Mr. Marks nor Mr. Schulman – nor, indeed,

20  any other representatives of the parties – expressed in any way that the parties'

21  October 19 agreement was not complete or would not be binding unless and until

22  that more formal document was executed.  (Schulman Decl. ¶ 10.)

23        On October 26, 2001, Mr. Schulman started the process of the long-form

24  documentation, by sending Mr. Marks a letter enclosing "a more fulsome outline"

25  of the deal, and noting that they were working on a draft so that the transaction

26  could be "in document form" shortly.  (Schulman Decl. ¶ 8; Toberoff Decl. Exh.

27

28  ---
    [16] "Spectre," another property authored by Jerry Siegel, was the subject of a separate termination notice served by Plaintiffs, and is not at issue in these actions.

EXHIBIT 13
166
20
ER 1419

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 311 of 327

1   CC (hereinafter the "Schulman Letter").)  The five-page outline reiterated the

2   material points in the Marks Letter, fleshing out some details on certain terms that

3   Mr. Marks had generally addressed, and, in at least one instance, including an

4   agreed-upon point that Mr. Marks appeared to have forgotten to include.  (*Id.*)

5       Mr. Marks reviewed the Schulman Letter some weeks later.  (Bergman Decl.

6   Exh. S (Marks Tr.) at 149:17-149:22.)  Although he testified at deposition that he

7   noted some differences between the Schulman Letter and his letter of October 19,

8   Mr. Marks acknowledged that he did not discuss it with or send it on to his clients

9   (*id.* at 203:10-14), and he *never* advised Mr. Schulman that his "more fulsome

10  outline" of the parties' deal materially changed, misstated, or otherwise did not in

11  fact accurately reflect their prior discussions and ultimate agreement.   (*Id.* at

12  150:24-151:3; Schulman Decl. ¶ 9.)  Instead, Mr. Marks expected to address the

13  differences he noted in the Schulman Letter in the context of finalizing the

14  documentation of the long-form contract.  (Bergman Decl. Exh. S (Marks Tr.) at

15  163:21-164:1.)

16      Thereafter, DC prepared a long form contract reflecting the material terms of

17  the agreement, and providing for the formal assignment of any copyright interests

18  Plaintiffs might have in the Superman property to DC.  (Schulman Decl. ¶ 9.)  DC

19  immediately acted on the agreement, by including in the license agreement it was

20  then finalizing with Warner Bros. for the next Superman motion picture a specific

21  contractual requirement that Warner Bros. accord two separate screen credits –

22  namely, "Superman created by Jerry Siegel and Joe Shuster" and "By Special

23  Arrangement with the Jerry Siegel Family" – which credits had been negotiated by

24  Plaintiffs and were required under the terms of the parties' October agreement.

25  (Schulman Decl. ¶ 10.)[17]  DC also set up a reserve account for the monies that

26  would be due to Plaintiffs under the financial terms of the agreement upon the

27

28
---
[17] That agreement was negotiated in the latter part of 2001, and was executed in the
Spring of 2002.  (Schulman Decl. ¶ 10.)

**EXHIBIT 13**
**167**                                                          **ER 1420**
21

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 312 of 327

1    formal transfer of their Superman interests to DC.  (Bergman Decl. Exh. R (Levitz

2    Tr.) at 289:9-290:1.)[18]

3         In or about late November, 2001, shortly after the parties reached their

4    accord – and completely unbeknownst to DC – Mr. Marks was contacted by

5    Plaintiffs' present counsel, Marc Toberoff, who was then acting as a principal for

6    an entity called "IP Worldwide, LLC" ("IPW") which was, according to Mr.

7    Toberoff, in the business of acquiring intellectual property rights.  (Bergman Decl.

8    Exh. S (Marks Tr.) at 151:4-152:19; *id*. Exh. X (Toberoff Tr.) at 87:5-87:10.)  Mr.

9    Toberoff also was a principal of Pacific Pictures Corporation ("PPC"), a motion

10   picture production company which had, just a few days earlier, entered into a joint

11   venture agreement with the heirs of Joe Shuster "for the purpose of retrieving,

12   enforcing and exploring" all of Shuster's "rights, claims, copyrights, property, title

13   and interests" in his "creations," particularly Superman.  (Bergman Decl. Exh.

14   Y.)[19]  Mr. Toberoff informed Mr. Marks that he was interested in acquiring the

15   Siegels' interest in the Superman property, but was advised by Mr. Marks that

16   Plaintiffs were already in the "documentation phase" with DC for those interests.

17   (Bergman Decl. Exh. S (Marks Tr.) at 152:3-153:22.)

18        On February 1, 2002, DC's attorneys forwarded to Mr. Marks a long-form

19   contract for his review.  (Schulman Decl. ¶ 9; Bergman Decl. Exh. S (Marks Tr.) at

20   177:18-177:21; Toberoff Decl. Exh. DD) (hereinafter the "February Draft".)  Mr.

21   Marks received and reviewed the February Draft (Bergman Decl. Exh. S (Marks

22   Tr.) at 182:1-182:2), and apparently sent it on to his clients.  Mr. Marks did not

23   inform Mr. Schulman, or DC's attorneys who had prepared the document, that the

24

25

26        [18] As of the latter part of 2006, that reserve account totaled approximately $20
     million.  (*Id*. at 295:6-295:15.)

27        [19] The joint venture agreement provides for the venture to retain the services of Marc
28   Toberoff to render legal services in connection with all disputes concerning Shuster's
     rights.  (*Id*. Exh. Y)  It also provides for the Shusters to share any proceeds "from the
     enforcement, settlement or exploitation" of their rights 50/50 with PPC.  (*Id*.)

**EXHIBIT 13**
**168**                                                                    22        ER 1421

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 313 of 327

1   February Draft was contrary in any material respect to the deal that had been

2   agreed to by the parties in October. (Schulman Decl. ¶ 11.)

3        On May 9, 2002, more than three months after being sent the February

4   Draft, Joanne Siegel – without the participation or even the prior knowledge of Mr.

5   Marks (Bergman Decl. Exh. S (Marks Tr.) at 181:14-181:24) – sent a letter to

6   Richard Parsons, the Chief Executive Officer of Time Warner Inc. (then known as

7   AOL Time Warner Inc.), complaining that the proposed long-form contract was

8   "unconscionable." (Bergman Decl. Exh. Z.) Mrs. Siegel acknowledged that

9   Plaintiffs had "accepted John Schulman's last proposal six months ago" but stated

10  that the February Draft contained "demands which were not in the proposal we

11  accepted . . . ." (Id.)

12       On May 16, 2002, after receiving a copy of Mrs. Siegel's letter, Mr.

13  Schulman called Mr. Marks to ask what had prompted the letter, and whether there

14  were any problems he should be aware of. (Schulman Decl. ¶ 11; Bergman Decl.

15  Exh. S (Marks Tr.) at 181:14-182:10.) Mr. Marks advised Mr. Schulman that he

16  had not seen and did not know about the letter. (Schulman Decl. ¶ 11; Bergman

17  Decl. Exh. S (Marks Tr.) at 181:14-181:24.) Mr. Marks further stated, in

18  substance, that while the February Draft was "very aggressive" he could "deal with

19  it," and that although the draft contained certain things that had not been agreed to,

20  it was "not contrary to what [had been] agreed to." (Schulman Decl. ¶ 11 & Exh.

21  A.)[20]

22       On May 21, Mr. Parsons sent a letter in response to Mrs. Siegel's May 9

23  missive, in which he stated that "each of the major points covered in the draft

24  agreement which was provided to your representatives, more than three months

25  ago, accurately represented the agreement previously reached between your

26  representatives and [AOL Time Warner]" and concluding that he hoped the

27

28
─────────────────────────
    [20] Schulman Decl. Exhibit A is Mr. Schulman's contemporaneous notes of his May
16, 2002 telephone conversation with Mr. Marks. (Id. ¶ 11.)

**EXHIBIT 13**

**169**

23

ER 1422

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 314 of 327

1   agreement could be "closed" based upon the prior discussions.  (Bergman Decl.

2   Exh. AA.)  Neither Mrs. Siegel nor any of her representatives ever responded to

3   this letter.

4        Mr. Marks thereafter drafted a long-form contract that he apparently felt

5   would be more acceptable to his clients.  (Bergman Decl. Exh. S (Marks Tr.) at

6   196:21-197:15; Bergman Decl. Exh. BB.)  That draft long-form was transmitted to

7   Plaintiffs on July 15, 2002, but was not provided to DC.  (Bergman Decl. Exh. S

8   (Marks Tr.) at 198:25-199:3; Schulman Decl. ¶ 12.)[21]

9        On July 30, Mr. Toberoff again contacted Mr. Marks to inquire as to the

10  status of Plaintiffs' dealings with DC on the Superman property.  (Bergman Decl.

11  Exh. S (Marks Tr.) at 165:25-167:3.)  When informed that there was a

12  confidentiality agreement in place and that Mr. Marks would not speak with him

13  about DC, Mr. Toberoff asked if Mr. Marks would be willing to enter into separate

14  negotiations with him regarding the sale of the Siegels' Superman interests.  (Id.)

15  Mr. Marks declined to do so, but told Mr. Toberoff that if he had an offer to make,

16  Mr. Marks would present it to his clients.  (Id.)  Accordingly, in early August,

17  2002, Mr. Toberoff's company, IPW, offered to purchase Plaintiffs' Superman

18  copyright interests for $15 million and "a meaningful back-end."  (Id. at 167:7-

19  169:25.)  Mr. Marks communicated that offer to his clients.  (Id. at 169:21-170:12.)

20       On September 21, 2002, Plaintiffs abruptly terminated Mr. Marks' and Gang

21  Tyre's representation of them, without any prior notice, via a letter copied to Paul

22  Levitz,  DC's President and Publisher.  (Bergman Decl. Exh. S (Marks Tr.) at

23  202:1-202:16; Id. Exh. DD.)  On the same day, Plaintiffs sent a separate letter to

24  DC repudiating the parties' October 19 agreement and purporting to break off all

25  further negotiations, and claiming that February Draft contained "outrageous,

26  _____

27  [21] Defendants have not seen a copy of that draft long-form, and Plaintiffs have refused
    to produce it on the basis of the attorney client privilege.  Defendants' motion to compel

28  its production was denied by Magistrate Zarefsky.  (Bergman Decl. Exh. CC)  It is
    therefore not possible to know what was in that draft or if it differed materially from the
    February Draft.

EXHIBIT 13
170                    24                    ER 1423

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 315 of 327

1   never discussed, unacceptable demands." (Bergman Decl. Exh. <u>BB</u>.)  Plaintiffs

2   then promptly retained Mr. Toberoff to represent them (*id*. Exh. <u>X</u> (Toberoff Tr. at

3   106:1-107:4; 132:4-134:7), and after being advised by Mr. Toberoff's business

4   partner that DC's offer for their Superman copyright interests was "ridiculously

5   low" (*id*. Exh. <u>EE</u> (Laura Siegel Larson Tr.) at 28:15-28:18), entered into an

6   agreement with IPW dated October 3, 2002 pursuant to which Plaintiffs retained

7   IPW to be their exclusive representative in connection with their Superman

8   interests.  (Bergman Decl. Exh. <u>FF</u>.)[22]

9        Later attempts by the parties to resolve these issues did not reach fruition,

10  and Plaintiffs subsequently filed these actions.  DC has accordingly filed

11  counterclaims against Plaintiffs for breach of contract and to enforce the terms of

12  the October 19, 2001 agreement between the parties.  (*Id*. Exh. <u>GG</u>.)[23]

13  **F.    Corrections With Respect to Plaintiffs' Statement**

14  **Concerning Judge Lew's Decision in The Superboy Action**

15       As the Court now knows from Defendants' Motion for Reconsideration,

16  Judge Lew's March 24, 2006 Order (the "Lew Order," Toberoff Decl. Exh. <u>U</u>) did

17  not, as Plaintiffs assert, find that the copyright law defenses which formed the basis

18  for Defendants' own cross motion for partial summary judgment in the Superboy

19  Action substantively "lacked merit."  (Pl. Mem. at 9.)  In fact, the scope and effect

20  of the Lew Order is limited – relying almost exclusively on the vacated

21  Interlocutory Findings in the Westchester Action, and reaching only the extent of

22  Plaintiffs' very narrow cross-motion for partial summary judgment in the Superboy

23  Action.  Significantly, Plaintiffs did not move in either case to dismiss DC's

24  affirmative defenses or First Amended Counterclaims, the bulk of which do not

25  _____

26  [22] Pursuant to the representation agreement, IPW was to provide the services of Marc
    Toberoff in connection with the negotiation, sale or license of Plaintiffs' Superman

27  rights, but the parties agreed that such services would not include litigation, which
    services, if required, would be provided by Mr. Toberoff subject to good faith negotiation

28  of a mutually acceptable agreement. (*Id*.)

    [23] DC's First Amended Counterclaims (Bergman Decl. Exh. <u>GG</u>) are hereinafter
    referred to as the "FACC."

**EXHIBIT 13**
**171**                                                                    25                            **ER 1424**

conflict with the termination provisions for post 1978 grants set forth in section
203 of the Copyright Act, it was pre-empted and "federal law must control." *Id.*

As noted above, in crafting the termination provisions of the statute as it did,
Congress drew a very clear line dividing just what rights could and could not be
recaptured via termination.  Under these circumstances, any rule or principle of
state law that conflicts with that decision must fall and is foreclosed by the
Copyright Act.  Here, insofar as Superman is concerned, because the termination
of only *Siegel's domestic* Superman copyright grants is involved, the Superman
Notices can have no effect on DC's legal right as the sole owner of the foreign
copyrights to continue to exploit those works outside of the United States without
any obligation to account to Plaintiffs.[48]

## III.   WHETHER THE PARTIES ENTERED INTO AN ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A QUESTION OF FACT WHICH CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Plaintiffs move this Court for an order dismissing DC's Third and Fourth
Alternative Counterclaims for breach of contract and declaratory relief, asserting
that there was no enforceable agreement between the parties as alleged by DC.
That is, Plaintiffs would have this Court summarily resolve the question of whether
or not a binding contract was formed between the parties on October 19, 2001
regarding the transfer of Plaintiffs' Superman copyright interests to DC.  But such
a determination is not the province of the Court at this juncture:  It would require
the Court to address and resolve questions of fact, weigh the evidence, and assess
the credibility of the witnesses, none of which can properly be done on summary

---

[48] As noted above, any act by DC or its licensees in the exercise of some or all of the
rights of copyright as a co-owner in the United States and exclusive owner outside the
country can *never* constitute an *infringing* act in the United States or overseas.  DC,
which remains the sole owner of the foreign copyrights in foreign jurisdictions, is entitled
to exercise all rights of ownership in such other jurisdictions without infringing any rights
which may be held by Plaintiffs.

**EXHIBIT 13**
**172**   67

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 316 of 327

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 317 of 327

1    judgment.  Indeed, it has routinely been held that the question of the formation of a

2    contract is <u>for the trier of fact</u> upon considering the appropriate evidence.  *See*

3    *Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) (whether

4    parties mutually intended to be bound by terms contained in a proposed written

5    agreement is to be determined from the facts and circumstances of a particular case

6    and is a question of fact); *Symphony Fabrics Corp. v. Podell Indus., Inc.,* 94 Civ.

7    4373 (BSJ) 1996 U.S. Dist. LEXIS 12767, *14 (S.D.N.Y. Aug. 30, 1996) (to

8    determine whether a contract has been formed, the trier of fact must evaluate the

9    objective manifestations of the intent of the parties).

10            In general, an enforceable contract requires a meeting of the minds on the

11   material terms, along with an intention by the parties to be bound.  *Apablasa v.*

12   *Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959); *Callie v. Near*, 829 F.2d 888,

13   891 (9th Cir. 1987) ("In addition to the intent of the parties to bind themselves, the

14   formation of a settlement contract requires agreement on its material terms.").

15   Plaintiffs have failed to provide any sworn testimony from either of them

16   containing any objective evidence that the October 19, 2001 Letter did not

17   represent a "meeting of the minds" on all material terms.  This evidentiary failing

18   alone dooms Plaintiffs' motion.

19            Moreover, as demonstrated below, Defendants have presented sufficient

20   admissible evidence for a trier of fact to conclude that in October, 2001, (i) the

21   parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their

22   respective clients, reached a meeting of the minds on all material terms pursuant to

23   which Plaintiffs would convey their Superman copyright interests to DC, (ii) that

24   this agreement was contemporaneously memorialized and affirmed in a writing

25   executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties

26   intended and expected to be bound by the terms of that agreement notwithstanding

27   the fact that they contemplated negotiating and executing a more formal contract

28   thereafter.  In fact, the parties were proceeding along on that basis, with the

**EXHIBIT 13**
**173**
68

ER 1426

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 318 of 327

drafting and re-drafting of their more formal documentation, until Plaintiffs suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel, and abruptly jettisoned both the deal and their attorneys who negotiated it.

This evidence cannot be rejected or negated *as a matter of law* as would be required in a motion for summary judgment. *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129, 141 (2002) ("where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist."). Indeed, in assessing the existence of a contract on summary judgment, the court *must* draw all inferences in the light most favorable to the non-moving party. *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1116 (C.D. Cal. 2002) (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987)). Accordingly, Plaintiffs' motion for partial summary judgment on these claims must be denied, and DC should be permitted to present its contract Counterclaims to a jury for determination at trial.

## A. It Has Been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement

As a preliminary matter, the question of Mr. Marks' authority to act on behalf of and to bind Plaintiffs to an agreement with DC is no longer an issue in this case. Generally, an attorney is *presumed* to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *See In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2nd Cir. 1996). In their Reply to DC's Counterclaims on the contract issues, Plaintiffs expressly asserted as their Thirty-Seventh affirmative defense that "Plaintiffs' attorneys lacked

EXHIBIT 13
174    69

ER 1427

1    authority and/or exceeded the scope of their authority with respect to the purported

2    settlement agreement alleged by Counterclaimant." (Bergman Decl. Exh. II.)

3    Notwithstanding this stated defense, Plaintiffs vigorously resisted all attempts by

4    Defendants to inquire into the scope of Mr. Marks' authority, and specifically into

5    whether or not Plaintiffs had authorized in advance or had consented to his

6    communication to DC on October 19, 2001, that "the Siegel Family . . . has

7    accepted" DC's offer. (Bergman Decl. JJ; *see also id*. Exh. S (Marks Tr.) at

8    146:21-147:11.) However, in response to Defendants' motions to compel

9    Plaintiffs and Mr. Marks to produce documents and respond to deposition

10   questions regarding his authority – and in an apparent attempt to forestall any order

11   by the Court in that regard – Plaintiffs' current attorney, Mr. Toberoff, conceded in

12   open court, *without qualification*, that the Marks Letter represented the statements

13   of Plaintiffs themselves. (Bergman Decl. Exh. KK.) Accordingly, relying on Mr.

14   Toberoff's statement and finding it to be binding on Plaintiffs, the Court *dismissed*

15   Plaintiffs' affirmative defense denying Mr. Marks' authority, and ruled that the

16   statements contained in the Marks Letter are the statements of Plaintiffs:

17              To make sure of Plaintiffs' position, the Court, at the

18              hearing on April 30, 2007, directly asked Plaintiffs'

19              counsel whether the statements in the October 19, 2001

20              letter represented the statements of Plaintiffs. Plaintiffs'

21              counsel replied with an unqualified "yes." That answer

22              binds Plaintiffs here. To further make absolutely sure

23              that there is no remaining issue as to Mr. Marks'

24              authority in connection with the October 19, 2001 letter,

25              the Court hereby strikes the thirty-seventh affirmative

26              defense from the reply to the counterclaims in both cases.

27

28

EXHIBIT 13
175

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 319 of 327

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 320 of 327

1    (Bergman Decl. Exh. <u>LL</u>.)[49]

2    **B.    The Fact That the Parties Contemplated the Later**

3    **Negotiation and Execution of a Long-Form Contract Does**

4    **Not Negate the October 19 Agreement as a Matter of Law**

5    Plaintiffs assert that even if the parties had "provisionally" agreed on all

6    material terms of their deal in October, 2001, "given the importance and

7    complexity of the subject matter and proposed deal points, any agreement would

8    need to be reduced to a written contract in mutually acceptable fashion." (Pl.

9    Mem. at 59-60.)  From this premise, Plaintiffs argue that since no long-form

10    contract was in fact finalized and executed, no enforceable agreement can exist.

11    (*Id.* at 60-61.)  But the mere fact that the parties contemplated, and embarked on

12    the process of drafting, a later, long-form contract, does not establish *as a matter of*

13    *law* that the parties did not intend their agreement, as memorialized in the Marks

14    Letter, to be binding.  *See Inamed Corp.,* 275 F. Supp. 2d at 1116 ("whether the

15    parties intended that the letter agreement be a binding contract or rather an

16    agreement to negotiate a further contract is a question of fact."); *Beck v. American*

17    *Health Group Int'l*, 211 Cal. App. 3d 1555, 1562 (1989) ("Whether a writing

18    constitutes a final agreement or merely an agreement to make an agreement

19    depends primarily upon the intention of the parties.").

20    Thus, where the parties intend to be bound – even if they expect to further

21    reduce their informal writing to a more formal one – "the failure to follow it with a

22    more formal writing <u>does not negate the existence of the prior contract</u>." *Harris v.*

23    *Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999) (emphasis added).[50]

24    *See also Louis Lesser Enters., Ltd. v. Roeder*, 209 Cal. App. 2d 401, 404 (1962)

25    _____

26    [49] The Court's order also found that "An attorney is presumed to have authority to act
      on his client's behalf, and a settlement entered into by the attorney can be set aside only
27    upon affirmative proof that the client did not give the attorney the appropriate authority.
      *In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2d Cir. 1996) (Bergman Decl. Ex. <u>LL</u>.)

28    [50] Holding, in overruling a demurrer, that "[w]hether the parties intended their
      communications to be a binding settlement agreement or an agreement to further
      negotiate after a formal draft was prepared is a factual question. . . ." *Id.* at 308.

**EXHIBIT 13**

176

71

ER 1429

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 321 of 327

("[P]reliminary negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend to execute a formal writing."); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 at n3 (1991) (an agreement which contemplates subsequent, more detailed documentation is <u>not</u> invalid if the parties have agreed to its existing terms).

Defendants do not dispute that the parties contemplated further documentation of their agreement, including the preparation of formal assignments reflecting the transfer of Plaintiffs' copyright interests to DC.  However, they contend that the evidence – and the reasonable inferences to be drawn from that evidence – supports a finding that the parties intended to be bound to the terms of their agreement reached on October 19, 2001, even before any such formal document was prepared and signed:  Unlike the circumstances of the cases on which Plaintiffs rely,[51] neither Mr. Marks nor Mr. Schulman conditioned their agreement on the execution of more formal documentation, either in their correspondence, or orally.  (Schulman Decl. ¶ 10.)  In fact, both the Marks Letter and the Schulman Letter speak to a *presently existing* agreement.  (Toberoff Decl. Exhs. <u>BB</u>, <u>CC</u>.)[52]  Thus, for example, the detailed Marks Letter states of the parties' agreement that "the terms are as follows," and contains many references to "this deal."  It sets forth all the material terms of the parties' agreement, and makes no mention of the preparation of a long-form agreement – that is, it operates as a stand alone document.  Indeed, the only mention of additional documentation in the Marks Letter is with respect to ministerial-type documents relating to the

---

[51] *See, e.g., Patch v. Anderson*, 66 Cal. App. 2d 63, 66 (1944); *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 155, 163 (1989); *Duran v. Duran*, 150 Cal. App. 3d 176, 180 (1983); *Roth v. Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957)

[52] The Marks Letter expressly states that "the Siegel Family ... <u>has accepted</u> D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties," and acknowledges that a deal has been reached:  "Many thanks for help and patience in <u>reaching this monumental accord</u>." (Toberoff Decl. Exh. <u>BB</u>.)  Mr. Schulman's follow up correspondence encloses "a more fulsome outline of what we believe <u>the deal we've agreed to</u> is," filling in a few details, but otherwise in accord with the material terms set forth in the Marks Letter. (*Id*. Exh. <u>CC</u>.)

**EXHIBIT 13**
**177**

72

**ER 1430**

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 322 of 327

1  copyright transfers: "The Siegel Family would agree to execute further
2  documents, and D.C. Comics would be appointed as attorney-in-fact to execute
3  such documents if the Siegel Family fails to do so within a reasonable period of
4  time." (*Id.* Exh. BB.) The Schulman Letter similarly states only that the "Siegels
5  will execute further documents as may be necessary to evidence DC's ownership
6  of rights; designate WB as attorney in fact." (*Id.* Exh. CC.)

7      Nor is there any other type of indication in the Marks Letter that the
8  agreement the parties had reached as reflected therein was not immediately
9  binding. On the contrary, Mr. Marks' choice of language reflects a deliberate
10 effort to fully document the parties' agreement in the letter without the necessity
11 for further negotiation of outstanding terms, without the need for additional
12 documentation, and inviting the very type of response Mr. Schulman provided in
13 his letter of October 26, 2001. (*Id.* Exh. BB) Likewise, the Schulman Letter (*id.*
14 Exh. CC), which started the process of the more formal documentation that was
15 admittedly contemplated by the negotiators, also contains no indication that the
16 parties are not bound unless a more formal agreement is executed. In fact, DC
17 *affirmatively acted* on the understanding that there was an immediate agreement,
18 by negotiating for Warner Bros. to include Plaintiffs' credits in the upcoming
19 motion picture *Superman Returns* (Schulman Decl. ¶ 7), and by setting up a
20 reserve for the payment of all monies due to Plaintiffs pursuant to the terms of the
21 agreement. (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

22     Similarly, in her May 9, 2002 letter to Richard Parsons, Mrs. Siegel
23 *acknowledged* that the parties had reached an accord six months earlier, but
24 protested only − *albeit* strongly − that the February Draft (Toberoff Decl. Exh.
25 DD) did not reflect that agreement. (Bergman Decl. Exh. Z.)[53] Tellingly,

26

27

---

28 [53] "We made painful concessions assured if we did we would arrive at an agreement.
When we made those difficult concessions and reluctantly accepted John Schulman's last
proposal six months ago, we were stabbed in the back with a shocking contract. . . . For
your representatives to condition our receiving financial compensation for our rights on

EXHIBIT 13
178

ER 934

73

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 323 of 327

1   Plaintiffs have submitted no evidence of any contemporaneous objective

2   manifestation by them or their counsel of an intent not to be bound until the

3   execution of a long-form.  Indeed, Plaintiffs' have submitted *no evidence*

4   *whatsoever* of their purported intention not to be bound – whether objective or

5   subjective – in connection with this motion.

C.   **The October 19, 2001 Agreement Is An Acceptance Of DC**
6
**Comics' Offer And Is Not A "Counteroffer" That Was**
7
**Rejected By Defendants**
8

9   Plaintiffs concede that the October 19, 2001 Agreement is drafted as an

10  "acceptance" of an offer made on October 16, 2001.  (Pl. Mem. at 57.)  However,

11  because Plaintiffs now attempt to avoid the agreement reached via that acceptance,

12  they seek to characterize the October 19, 2001 Agreement as a "counteroffer" that

13  was later rejected by Defendants.  (*Id.*)  Defendants absolutely reject this

14  characterization – Defendants have consistently maintained and assert again now

15  that the October 19, 2001 Agreement represented an acceptance of all material

16  terms offered by Mr. Schulman on behalf of Defendant DC.  (Schulman Decl. ¶¶

17  10, 13-15.)

18  As noted above, a contract is established when there is a meeting of the

19  minds between the parties on all material terms of their agreement, *Apablasa*, 176

20  Cal. App. 2d at 726, and its formation is a question *of fact* to be determined from

21  the particular circumstances of each case, *Banner Entertainment*, 62 Cal. App. 4th

22  at 358. *What* the material terms of the contract are "depends on the circumstances

23  of the agreement, including the agreement and its context, the subsequent conduct

24  of the parties, and the remedy sought." *House of Prayer, etc. v. Evangelical Assoc.*

25  *for India*, 113 Cal. App. 4th 48, 53 (2003).  To ascertain whether the requisite

26  meeting of the minds exists – that is, whether the parties have assented "to the

27

28  demands which were not in the proposal we accepted, is deceitful." (*Id.,* emphasis
    added.)

**EXHIBIT 13**
**179**
74
ER 1432

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 324 of 327

1  same thing in the same sense" – the trier of fact must evaluate the evidence of the

2  parties' objective intent; namely "the outward manifestations of [their] consent."

3  *Banner Entm't*, 62 Cal. App. 4th at 358; *Beard v. Goodrich*, 110 Cal. App. 4th

4  1031, 1039-40 (2003).

5      The evidence before the Court certainly supports the conclusion that as of

6  the October 19, 2001 Marks Letter (Toberoff Decl. Exh. <u>BB</u>) the parties had

7  agreed to all material terms of their agreement, and intended to be bound thereby.

8  First, Mr. Marks, an experienced transactional lawyer, carefully worded his letter

9  to use the powerful legal language of acceptance – "The Siegel Family . . . *has*

10  *accepted* D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and

11  'Spectre' properties." (*Id.*)  This choice of binding contractual language was not

12  accidental.  Rather, the only reasonable inference is that the use of this language

13  was a deliberate attempt on the part of Plaintiffs' former counsel to conclude what

14  had been lengthy and complex negotiations and bind DC to the agreement.

15      Second and further supporting the conclusion that the October 19, 2001

16  Agreement contains all material terms agreed to by the parties, is the fact that Mr.

17  Marks painstakingly outlined in six single-spaced pages all of the material terms

18  that Plaintiffs were accepting.  The only reasonable inference is that Mr. Marks

19  documented the terms he (and thus his clients) considered to be the material terms

20  accepted by Plaintiffs.

21      Third, DC's main negotiator, Mr. Schulman, has confirmed under oath in

22  response to Plaintiffs' current motion that the October 19, 2001 Agreement

23  accurately documented the material terms that had been offered on behalf of DC.

24  (Schulman Decl. ¶ 7.)

25      Plaintiffs point to alleged discrepancies between the Marks Letter, the

26  Schulman Letter, and the February Draft in an attempt to get out from under the

27  October 19, 2001 Agreement.  But even *if* the Schulman Letter or the February

28  Draft did not comport in some respects with the parties' agreement as

**EXHIBIT 13**
**180**
75

ER 1433

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 325 of 327

1   memorialized in the Marks Letter, or added additional terms that had not been

2   discussed, that would mean only that the Schulman Letter and the February Draft

3   did not constitute the agreement of the parties, *not* that the previous October 19

4   agreement was somehow vitiated.  *See e.g. Kitty-Anne Music Co. v. Swan*, 112 Cal.

5   App. 4th 30, 37-38 (2003) (holding that the parties had an enforceable agreement

6   which plaintiffs breached, notwithstanding the fact that they never executed a draft

7   long-form agreement prepared by plaintiffs which contained terms "drastically"

8   different from the parties' prior deal memo, because the additional documentation

9   was simply "intended to carry out the terms of the deal memo" which of itself

10  constituted the parties' contract).  *See also King v. Stanley*, 32 Cal. 2d 584, 589

11  (1948) (letters constituted enforceable written agreement for purchase of real

12  property; court rejected defendant's contention that the escrow instructions did not

13  follow the alleged contract obligations but included different terms which had not

14  been accepted on the basis that "such instructions do not take the place of the

15  agreement of sale <u>but merely carry it into effect.  They are subject to modification</u>

16  <u>without affecting the finality of the agreement already reached</u>.") (emphasis

17  added); and *Ersa Grae Corp.*, 1 Cal. App. 4th at 624 (in rejecting argument that

18  executed counteroffer was merely an agreement to agree, court noted that

19  "[s]pecific definitions and lease terms were to be the subject of subsequent

20  documentation and the parties were obligated to complete the documentation in

21  good faith.  No more is required.").

22       DC does not assert in its Counterclaim that the Schulman Letter or the

23  February Draft constitutes the agreement of the parties; instead, it is seeking to

24  enforce, and suing for breach of, the agreement reached on October 19, 2001 by

25  Mr. Marks and Mr. Schulman as expressly reflected in the Marks Letter.

26  (Bergman Decl. Exh. <u>GG</u>, ¶¶ 98-105.)  Accordingly, if the admissible evidence and

27  the reasonable inferences drawn therefrom can support a finding that the parties

28  reached an agreement on all material terms on October 19, 2001, and intended to

**EXHIBIT 13**
181   76

Case: 13-56243, 02/25/2014, ID: 8992563, DktEntry: 22-17, Page 326 of 327

1  be bound to those terms – as Defendants contend they do – then DC's

2  Counterclaims are sufficient to go to a jury *whether or not* any subsequent

3  correspondence or proposed draft long-form agreement might have changed or

4  added terms, and despite the fact that no formal contract was never executed.[54]

5       Indeed, the evidence supports the conclusion that Plaintiffs' belated claim

6  that the Schulman Letter changed the deal or that the February Draft was

7  "unacceptable" is nothing other than an *ex post facto* excuse for Plaintiffs to reject

8  the deal they had already made for the promise of a much more lucrative payday

9  from their current counsel and the companies he controlled:  Mr. Marks *never*

10  disputed anything in the Schulman Letter, and similarly voiced *no* concern about

11  the February Draft until after he learned about his client's complaining letter to

12  Time Warner's Chief Executive Officer; and even then he acknowledged to Mr.

13  Schulman that although the draft was "very aggressive" and contained some things

14  which had not been discussed *it was not contrary to what the parties had agreed*

15  *to.* (Schulman Decl. ¶ 11.)  Mr. Marks even tried his hand at re-crafting the draft

16  into a form that would be acceptable to his client.  (Bergman Decl. Exh. S (Marks

17  Tr.) at 196:21-197:15, 198:25-199:3; *id.* Exh. BB.), but the effort came to naught

18  when Plaintiffs abruptly fired Mr. Marks and terminated discussions with DC

19  shortly after receiving Mr. Toberoff's "$15 million plus" offer.  (*Id.* Exh. S (Marks

20  Tr.) at 168:1-169:20.)

21       In sum, Defendants assert that there is a triable issue of fact on the question

22  of the parties' intent to be bound to the terms of their October 19, 2001 agreement

23  as reflected in the Marks Letter prior to the execution of an anticipated long-form

24

25

26

27  _____

28  [54] As noted above, DC acted on the agreement by negotiating for Plaintiffs to receive their credits on *Superman Returns* (Schulman Decl. ¶ 10) and by setting up a reserve account for Plaintiffs' payments under the agreement.  (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

**EXHIBIT 13**
**182** 77

ER 1435

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014, and that all participants in the case are registered CM/ECF users.


Dated:  February 21, 2014                    /s/ Marc Toberoff_____
                                                                    Marc Toberoff